**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjøvik,**<br>*an individual*,<br><br>**Plaintiff,**<br><br>vs.<br><br>**Apple Inc.,**<br>*a corporation,*<br><br>**City of Santa Clara,**<br>*a local government,*<br><br>**Mr. Jenab et al**<br>*(individually, LP, LLC, &/or Trust)*<br><br>**Defendants.** | **Case No. 25-CV-07360-PCP**<br>**Env. "Citizen Suit"**<br>**& Cal. Public Nuisance**<br><br>**Judge: P. Casey Pitts**<br><br><br>**Plaintiff's Opposition to Defendant the City of Santa Clara's Motion to Dismiss (Dkt. 30).**<br><br><br>**Hearing:**<br>**Date:** Nov. 20, 2025<br>**Time:** 10:00 AM<br>**Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# TABLE OF CONTENTS

I.   BACKGROUND .................................................................................... 1

II.  LEGAL ARGUMENTS ........................................................................ 2

   A.  *The City was Provided Sufficient Notice of the Allegations in this Case.* ........... 2

   B.  *The Complaint is Sufficiently Pled, but if it is not, it can be Properly Amended and/or Supplemented.* ................................................................. 4

   C.  *Plaintiff is Not Requesting Judicial Review of Agency Decisions nor is the Plaintiff proposing to sue the City of Santa Clara as if was the U.S. EPA Administer* ............................................................................... 5

   D.  *Municipal Liability* ................................................................... 6

      1.  Ministerial Duties based on Law & Policy (Gov. Code, § 815.6) .............. 6

      2.  No Exception for Refusal to Perform Voluntarily Assumed Duty ............ 7

      3.  Liability for Known and Compelling Dangers on Public Property (Gov. Code, § 830 et seq.) ............................................................... 8

      4.  No Immunity for Fire Departments Personnel when They are not Fighting Fires ............................................................................. 12

      5.  No Design Immunity when Prior Conditions Change .......................... 13

      6.  The City Benefited from the Harm Caused .................................... 13

   E.  *Santa Clara Requested to be a Certified Unified Program Agency (CUPA)* ..... 15

   F.  *The City Violated Federal Environmental Laws and State Nuisance Laws.* .... 16

   G.  *The Plaintiff was Harmed by the City & Requests Concrete and Actionable Relief Against the City.* ............................................................. 21

III. CONCLUSION ................................................................................ 23

# Table of Authorities

## US Supreme Court Cases

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007). -------------------------------------------------------------------------------- 2

## US Court of Appeals Cases

*Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997) ---------------------------------------------------------------------------------- 4

*Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000) ---- 3

*Cmty. Ass'n v. Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) ------------------------ 4

*Cmty. Ass'n v. Bosma Dairy*, 305 F.3d 943, 951-952 (9th Cir. 2002)-------------------- 4

*Cordiano v. Metacon Gun Club Inc*, 575 F.3d 199, 212 (2nd Cir. 2009). ---------------- 7

*Covington v. Jefferson County,* 358 F.3d 626 (9th Cir. 2004). -------------------------- 3

*Daniel v. Cnty. of Santa Barbara,* 288 F.3d 375, 380------------------------------------ 3

*Ecological Rights Foundation v. PG&E,* No. 15-15424, 30-32 (9th Cir. 2017) ---------- 21

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp*, 123 F.4th 309 (5th Cir. 2024), cert. denied, 145 S.Ct. 2845 (2025) ------------------------------------------------ 22

*Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 248–49 (9th Cir. 1997) -------------------- 2

*Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir. 1988) ---------- 3

*Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). ---------------------------- 3

*Merrick v. Diageo,* 805 F.3d 685 (6th Cir. 2015)---------------------------------------- 19

*Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987). ---------------------------------- 3

*Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995) ----- 4

*San Francisco Baykeeper, Inc., v. Tosco Corporation, Diablo Services, Inc.,* 309 F.3d 1153 (9th Cir. 2002) ---------------------------------------------------------------- 4

*Shark River Cleanup Coalition v. Township of Wall,* 47 F. 4th 126 (3rd Cir. 2022). ----- 4

*Sierra Club v. Korleski,* No. 10-3269, (6th Cir. May 25 2012) -------------------------- 17

## US District Court Cases

*87 Street Owners Corp. v. Carnegie Hill-87th Street Corp.*, 251 F. Supp. 2d 1215 (S.D.N.Y. 2002)------------------------------------------------------------------22

*Gjovik v. Apple,* 3:23-cv-04597-EMC, (N.D. Jan. 30 2024).----------------------------- 2

## STATE CASES

*Baker v. City of Los Angeles,* 188 Cal. App. 3d 902, 908 (1986) ------------------------- 7

*Baldwin v. State of California*, 6 Cal.3d 424, 428 (1972)---------------------------------- 11

*Baldwin v. State of California,* 6 Cal.3d 424, 434 (1972) --------------------------------- 13

*Benavidez v. San Jose Police Dept.*, 71 Cal.App.4th 853, 863 (1999)------------------- 13

*Bonanno v. Central Contra Costa Transit Authority*, 30 Cal. 4th 139, 149 (2003).----10

*Bonanno v. Central Contra Costa Transit Authority*, 30 Cal.4th 139, 154 (2003) -----12

*Briggs v. State of California,* 14 Cal.App.3d 489, 497-498 (1971). ---------------------- 19

*Cameron v. State of California,* 7 Cal.3d 318, 329 (1972) -------------------------------- 19

*Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1476 (1993) -------------------------------------------------------------------------------------------10

*Cordova v. City of Los Angeles,* 61 Cal.4th 1099, 1106 (2015).------------------------- 11

*Ducey v. Argo Sales Co,* 25 Cal.3d 707, 718-719 (1979) --------------------------------- 11

*Ducey v. Argo Sales Co.*, 25 Cal. 3d 707, 715-716 (1979)--------------------------------- 9

*Fackrell v. City of San Diego*, 26 Cal.2d 196, 206 (1945) -------------------------------- 10

*Flournoy v. State,* 275 Cal.App.2d 806 (1969) ---------------------------------------------- 19

*Haggis v. City of Los Angeles,* 22 Cal. 4th 490, 498-499 (2000)------------------------- 7

*Lewis v. Mendocino Fire Protection District*, 142 Cal.App.3d 345 (1st Dist., 1983) --- 13

*Mathews v. City of Cerritos,* 2 Cal. App. 4th 1380 (1992) ------------------------------- 10

*McIvor v. Mercer-Fraser Co.* (1946) 76 Cal. App. 2d 247, 250, 253-254 (1946) ------22

*Mozzetti v. City of Brisbane,* 67 Cal.App.3d 565, 575 (1977)---------------------------- 13

*Muskopf v. Corning Hospital Dist.* (No. 7229) 55 A.C. 216. (1961) --------------------- 6

*Nestle v. City of Santa Monica,* 6 Cal. 3d 920, 931-936 (1972). --------------------------- 6

*Nestle v. City of Santa Monica,* 6 Cal. 3d 920, 939-940 (1972). ------------------------22

*Norg v. City of Seattle*, 522 P.3d 580 (Wash. 2023). ------------------------------------- 13

*Peterson v. San Francisco Community College Dist.,* 36 Cal. 3d 799, 812 (1984) ------12

*Peterson v. San Francisco Community College District,* 36 Cal.3d 800, 810 (1984) --- 12

*Peterson v. San Francisco Community College District*, 36 Cal.3d 799, 811 (1984) ---- 11

*Potter v. City of Oceanside,* 114 Cal.App.3d 564, 170 Cal.Rptr. 753 (1981) ----------- 13

*Ramos v. County of Madera* 4 Cal.3d 685, 692, 94 Cal.Rptr. 421, 484 P.2d 93. (1971) 6

*Salas v. California Dept. of Transp.*, 198 Cal.App.4th 1058, 1072 (2011) ------------- 12

*Sambrano v. City of San Diego,* 94 Cal. App. 4th 225,239 (2001) ----------------------- 10

Santa Clara County Ordinance B11 – 360, *et seq.* ------------------------------------------- 20

*Sapiro v. Frisbie,* 93 Cal. App. 299, 313 [270 P. 280] (1928) --------------------------- 22

*Slapin v. Los Angeles International Airport,* 65 Cal. App. 3d 484, 488 (1976) --------- 11

*Strongman v. Kern County*, 255 Cal.App.2d 308, 313 (1967) ---------------------------- 12

*Sutherland v. City of Fort Bragg,* 86 Cal. App. 4th 13, 19 (2000) ----------------------- 7

*Swaner v. City of Santa Monica*,150 Cal.App.3d 789, 808 (1984) ----------------------- 11

*Tansavatdi v. City of Rancho Palos Verdes* (Case No. S267453) 4 Cal.5th 639 (2023) 19

*Tansavatdi v. City of Rancho Palos Verdes,* 60 Cal. App. 5th 423 (2023) -------------- 12

*Vedder v. County of Imperial*,  36 Cal. App. 3d 654, 661 (1974) ------------------------- 20

*Vedder v. County of Imperial,* 36 Cal. App. 3d 654, 659 (1974) -------------------------- 9

*Wilson v. County of San Joaquin*, 38 Cal.App.5th 1, 250 Cal.Rptr.3d 563 (Cal. App.
    2019) -------------------------------------------------------------------------------------------- 13

*Zelig v. County of Los Angeles,* 27 Cal.4th 1112, 1133 (2002) -------------------------- 10

*Zelig v. County of Los Angeles,* 27 Cal.4th 1112, 1139 (2002). -------------------------- 11

## U.S. Statutes

15 USC § 2619(a)(1) --------------------------------------------------------------------------------- 17

33 USC § 1365(a)(1) --------------------------------------------------------------------------------- 21

42 U.S. Code § 11046 -------------------------------------------------------------------------------- 18

42 U.S. Code § 11046(a)(1)(C)-(D) --------------------------------------------------------------- 18

42 U.S.C. § 6972 ------------------------------------------------------------------------------------- 16

42 U.S.C. § 7002 ------------------------------------------------------------------------------------- 16

42 U.S.C. Sec. 7661 et seq ------------------------------------------------------------------------- 18

42 USC § 7604(a) ------------------------------------------------------------------------------------ 16

Fed. R. Civ. P. 8(a) ------------------------------------------------------------------ 2

## Treatises

2 Cal. Gov. Tort Liability Rptr. (Cont.Ed.Bar 4th ed. 1999) Dangerous Condition of

    Public Property, § 12.19, p. 732.) --------------------------------------------- 11

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed.

    2004) ---------------------------------------------------------------------------- 3

Borchard, Governmental Responsibility for Tort, 34 Yale L.J. 129, 229 -------------- 6

Casner and Fuller, Municipal Tort Liability in Operation, 54 Harv. L. Rev. 437 ----- 6

Julie Shambarger Mitchell, Environmental Law — A Citizen Suit Under EPCRA Is

    No Longer a Threat. Steel Company v. Citizens for a Better Environment, 118 S.

    Ct. 1003 (1998)., 21 U. ARK. LITTLE ROCK L. REV. 343 (1999). ---------------- 18

Repko, Commentary on Municipal Tort Liability, 9 Law & Cont. Prob. 214. --------- 6

Restatement (Third) Of Agency §2.04 (AM. L. Inst. 2006) --------------------------- 6

## Legislative History

Cal. Law Revision Commission Comment to Government Code  § 830 --------------- 10

Tort Liability of Public Entities and. Public Employees, 4 Cal.Law Revision

    Com.Rep. (Jan. 1963). ----------------------------------------------------------- 12

## State Statutes and Regulations

Cal. Civ. Code 3491 *et seq*. ---------------------------------------------------------- 19

Cal. Code Regs. Tit. 27, § 15100 ---------------------------------------------------- 15

Cal. Code Regs. Tit. 27, § 15330---------------------------------------------------- 7

Cal. Gov. Code § 818.20 ------------------------------------------------------------- 6

Cal. Gov. Code § 830 ----------------------------------------------------------------- 19

Cal. Gov. Code § 835 ------------------------------------------------------------------ 11

Cal. Gov. Code, § 810(b)------------------------------------------------------------- 6

Cal. Gov. Code, § 815.6 ------------------------------------------------------------- 6, 7

1

Cal. Gov. Code, § 830.2 --------------------------------------------------------- 10

Cal. Gov. Code, § 835 ------------------------------------------------- 9, 10, 11, 12

Cal. Gov. Code, § 835.2(a) ---------------------------------------------------- 12

Cal. Gov't Code § 811.2, 815, 945 -------------------------------------------- 6

Cal. Health & Safety Code § 25533. ----------------------------------------- 18

Cal. Health & Safety Code §§ 25503, 25507. ----------------------------- 18

Cal. Health & Safety Code 1799.107 ------------------------------------- 13

Cal. Health and Safety Code § 25531. ---------------------------------- 16

Santa Clara City Code 15.60.020 ------------------------------------------ 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Opposition to City of Santa Clara's Motion to Dismiss under Rule 12(b)(6)

1.      On Oct. 8 2025, the Defendant City of Santa Clara filed a Motion to Dismiss under Rule 12(b)(6) at Dkt. 29. On Oct. 10 2025, the Defendant re-filed the Motion to Dismiss at Dkt. 30, replacing the prior Motion to Dismiss filed at Dkt. 29. The Plaintiff's now files this Opposition. The City's Motion to Dismiss should be denied because the Sixty-Day letter and Complaint provided sufficient notice, the Complaint was sufficiently detailed, and the City is plausibly liable under multiple theories.

## I. Background

2.      The facility located at 3250 Scott Blvd in Santa Clara, California is used for semiconductor fabrication and manufacturing activities with operations starting around 2015 and ongoing. The facility is owned by Mr. Jenab (and his various legal entities), operated by Apple Inc, and the primary and often exclusive regulatory oversight regarding (federal, state, and local) environmental and public safety laws is managed by the city of Santa Clara. The facility has been found to be operating without required permits regarding a variety of hazardous waste and emission activities, has been cited for violations by the EPA, Air Board, Wastewater facility, and a variety of other entities. The facility has been found to be spilling, dumping, leaking, and otherwise emitting metric tons of hazardous, lethal, extremely dangerous, and other toxic substances into the nearby air, water, and land.

3.      Critically, the facility is <300ft from thousands of apartments at the Santa Clara Square Apartments, two public parks owned and managed by City of Santa Clara (including a children's playground), and a variety of restaurants, grocery stores, schools, and medical facilities all within 1000ft. The apartments were planned and built while the facility was in operation, but the facility was entirely omitted from the EIR and community review process managed by the City, continues to this day to provide no signage or indication of what operations are occurring at the facility, and most residents have no idea there are hazardous waste activities, air emissions, or water releases actively occurring. Multiple victims of chemical exposure at the apartments reported injuries to the multiple city officials including the Fire Dept., Mayor, Director of Public Works, and

other contacts starting in at least 2020 but nothing was done, and the city never informed these residents about the facility.

4.    The Plaintiff has been attempting to meet/confer with Defendants regarding the potential to stipulate to an interim agreement in lieu of her filing a Motion for Preliminary Injunction and also offered to stipulate to a 30-day extension for the city to file a responsive pleading. The Plaintiff also offered to meet/confer with the city regarding any needed clarification on which claims apply to the city. The city's counsel led the Plaintiff to believe it was considering these matters when it was actually preparing a Motion to Dismiss, provided her only hours notice, and expressly refused to meet/confer with her about any of these topics. Even Apple's current counsel, after years of scorched earth litigation between the Plaintiff and that company, has engaged professionally and met with the Plaintiff several times to meet/confer regarding the Motion for Preliminary Injunction and other litigation matters. It is out-of-state counsel for a municipality where Plaintiff resided for multiple years and almost died from acute chemical exposure, which is currently engaged in bad faith litigation tactics.

## II. Legal Arguments

### A. The City was Provided Sufficient Notice of the Allegations in this Case.

5.    Plaintiffs in federal court are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Furthermore, Rule 8(d)(1) requires "[e]ach allegation [to] be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). The purpose of Rule 8 is to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007). The "Plaintiff is not expected to try the entirety of her case in the complaint." *Gjovik v. Apple,* 3:23-cv-04597-EMC, (N.D. Jan. 30 2024).

6.    The Federal Rules also allow a court to dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6). See, e.g., *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 248–49 (9th Cir. 1997) ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim."). However, in Twombly, the Supreme Court

rejected the notion that "a wholly conclusory statement of a claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Twombly*, 550 U.S. at 561, 127 S. Ct. at 1968.

7.    Instead, the Court adopted a "plausibility standard," in which the complaint must "raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." Id. at 556, 127 S. Ct. at 1965. For a complaint to meet this standard, the "[ f ]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555, 127 S. Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of ] a legally cognizable right of action"); *Daniel v. Cnty. of Santa Barbara,* 288 F.3d 375, 380 (9th Cir. 2002) (" 'All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.' ") (quoting *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000)).

8.    When a Plaintiff appears pro se, the Court is encouraged to construe the allegations of the Complaint liberally and must afford the Plaintiff the benefit of any doubt. See *Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir. 1988). Moreover, in determining whether a complaint states a claim on which relief may be granted, allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). A *pro se* litigant must be given leave to amend his or her complaint unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

9.    The Sixty Day Notice was properly served. In fact, unlike some Citizen Suits filed by previously uninvolved NGOs, in this case, the Plaintiff has been deeply involved and actively advocating on this matter since 2020. The only recent introduction was between the Plaintiff and the Property Owner (Mr. Jenab and his various entities). The Plaintiff has been emailing, meeting with, requesting records from, and filing complaints to the city of Santa Clara about this matter for five years. Additionally, Notice requirements do not apply to matters regarding mishandling of hazardous waste. *Covington v. Jefferson County,* 358 F.3d 626, 637 (9th Cir. 2004).

10.    In the Ninth Circuit, the notice and pleading requirements for Environmental

Citizen Suits require "reasonable specificity" regarding the "nature and time of the alleged violations." *San Francisco Baykeeper, Inc., v. Tosco Corporation, Diablo Services, Inc.,* 309 F.3d 1153 (9th Cir. 2002) – ("The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.").

11. The Notice is not required to "list every specific aspect or detail of every alleged violation." *Cmty. Ass'n v. Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (quoting *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995). Ultimately, notice is sufficient if it is specific enough "to give the accused company the opportunity to correct the problem." *Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997).

12. A Citizen Suit plaintiff may also supplement their Complaint, following a prior Sixty Day Notice, with additional allegations of violations when those violations are "from the same source, were of the same nature, and were easily identifiable," *Cmty. Ass'n v. Bosma Dairy*, 305 F.3d 943, 951-952 (9th Cir. 2002). Examples of Notices and Complaints that were found to not provide sufficient notice include vaguely claiming the defendant violated "the entire CWA" and attaching a list of state environmental statutes without further elaboration. *Shark River Cleanup Coalition v. Township of Wall,* 47 F. 4th 126 (3rd Cir. 2022).

13. Here, there have been multiple complaints from multiple community members over at least five years to multiple city agencies (including the Mayor and City Council), intentional withholding of incriminating public records, and federal enforcement inspections and violations (which the City was aware of and participated in), which further verified the City has been on notice and chose to not correct the issues. For example, the city received the Sixty Day Notice and failed to respond in any way whatsoever to the plaintiff regarding the Notice until after the Complaint was filed in this lawsuit, and only after the Plaintiff politely and proactively contacted their counsel as noted above.

### B. The Complaint is Sufficiently Pled, but if it is not, it can be Properly Amended and/or Supplemented.

14. The City expressed many concerns in its Motion to Dismiss regarding the Plaintiff's decision to group allegations against the different defendants within her claims section. The Plaintiff is aware of no rule requiring she name each specific Defendant in each specific allegation

of each claim as long as the Defendants understand that at least some of the allegations on each count apply to them. Further, some of the allegations are labeled and assigned to specific Defendants and its at least implied that a designation of "Defendants" applies to all Defendants.

15.     The City also expressed concerns that the Complaint is too concise, that it should be longer, and needs to have more details. The Plaintiff thought her pleading provided sufficient clarity with the context of the Sixty Day Notice, concurrent government enforcement actions, detailed factual exposition within the Complaint. The Plaintiff was also concerned that her Complaint could be too detailed and overlength and accordingly errored on the side of "sufficient notice" rather than extensive detail. If the court finds the Complaint insufficient, then the Plaintiff respectfully requests permission to Amend the Complaint and to be provided a concurrent page limit as to not then provide so much detail as to violate Rule 8.

## C. Plaintiff is Not Requesting Judicial Review of Agency Decisions nor is the Plaintiff proposing to sue the City of Santa Clara as if was the U.S. EPA Administer

16.     The City's Motion to Dismiss appears to make several arguments that the Plaintiff never intended to put forward and disclaims those concepts here. First, the Plaintiff never intended to argue that she was suing the City under the "EPA Administrator" actions of the Citizen Suit statutes. If that's legally permissible the plaintiff might pursue it, but the plain meaning of the text of the statutes does not imply that it is allowed or intended. However, Plaintiff does argue mandatory duty theories under state law regarding the city's liability for the federal and state claims at issue in the case.

17.     Additionally, the Plaintiff is not attempting to obtain "Judicial Review" of any specific Santa Clara agency decisions like an appeal but instead she is pursuing a variety of liability and negligence theories in order to prove her case and obtain the statutorily defined relief provided under these statutes (injunctions, statutory penalties, etc.).

18.     The Plaintiff clearly seeks injunctive relief (including against the city) that is to be narrowly tailored to (among other important and necessary objectives) abate active health/safety hazards, to prevent further environmental harm, to redress harm already caused to the community and environment by these violations, and to ensure all defendants (including the city) start to comply with federal environmental laws going forward. The Plaintiff also requests penalties (to be

paid to the U.S. government and to be directed toward Supplemental Env. Projects) in order to punish the wrongdoers, provide relief to the EPA for the Defendants violations of EPA's statutes, and to deter future violations by these defendants and at this facility. This is requested against the city where allowed and reasonable, and due to the city's funding coming from public sources could also be provided as nominal damages if the EPA/ENRD does not object.

### D. Municipal Liability

19.    The California Gov. Code expressly authorizes that a city may be sued, including for injuries caused by acts or omissions by the entity itself and/or its employees. Cal. Gov't Code § 811.2, 815, 945; Restatement (Third) Of Agency §2.04 (AM. L. Inst. 2006). In California, it is "manifest that the legislature intended to allow" nuisance actions against governments when the claims are tailored to meet statutory provisions and with a "profound interest… in the eradication of the evils caused by the various forms of pollution." *Nestle v. City of Santa Monica,* 6 Cal. 3d 920, 931-936 (1972).

20.    The concept of municipal tort immunity did not originate with the concept of sovereign immunity and accordingly the burden is on the municipality to prove a rational basis as to why it should be exempt from liability for a claim that it injured someone, rather than immunity being assumed by default. *Muskopf v. Corning Hospital Dist.* (No. 7229) 55 A.C. 216. (1961); *Ramos v. County of Madera* 4 Cal.3d 685, 692, 94 Cal.Rptr. 421, 484 P.2d 93. (1971). Cal. Gov. Code, § 810(b). See also, Borchard, Governmental Responsibility for Tort, 34 Yale L.J. 129, 229; Casner and Fuller, Municipal Tort Liability in Operation, 54 Harv. L. Rev. 437; Repko, Commentary on Municipal Tort Liability, 9 Law & Cont. Prob. 214.

### 1. Ministerial Duties based on Law & Policy (Gov. Code, § 815.6)

21.    In California, public entities like the City of Santa Clara have accumulated a variety of general immunities from torts and other litigation, including when they fail to enforce certain laws. Cal. Gov. Code § 818.20. However, there are also statutory exceptions including "where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov. Code, § 815.6.

22.     Public entities are liable for damages when they breach mandatory duties created by express enactments which impose a nondiscretionary obligation designed to protect against risk of specific injuries. Cal. Gov. Code, § 815.6; *Haggis v. City of Los Angeles,* 22 Cal. 4th 490, 498-499 (2000). The facts of this case represent a situation satisfying the three-prong test for liability under § 815.6 where the applicable enactments imposed an obligatory requirement (shall vs may), the enactments were designed to protect against the type of injuries suffered, and the breach of those mandatory duties was the proximate cause of injuries suffered. Id; *Sutherland v. City of Fort Bragg,* 86 Cal. App. 4th 13, 19 (2000).

23.     The CUPA implementing statutes and regulations repeatedly using the term "shall," not "may," regarding the implementation and enforcement of federal environmental laws. ("The unified program agencies in each jurisdiction shall do all of the following… ). Further, there are CUPA performance reviews by CalEPA, including corrective action plans, and several CUPA has been removed from the CUPA program and the oversight responsibility returned to the County or State due to deficient and negligence administration. Cal. Code Regs. Tit. 27, § 15330. The delegation of federal environmental enforcement to a city is a privilege with mandatory obligations, not a default and discretionary "service" a city agency provides.

24.     Further, any state or local interpretation of federal environmental standards do not "define a party's federal liability under [federal environmental laws]" and the liability established under those federal laws is unaffected by non-federal interpretation. *Cordiano v. Metacon Gun Club Inc,* 575 F.3d 199, 212 (2nd Cir. 2009). Additionally, while generally immune from liability for injuries caused by licensing and permitting, public entities do have a duty not to issue licenses or permits to incompetent operators.  Cal. Gov. Code, § 818.4.

### 2. NO EXCEPTION FOR REFUSAL TO PERFORM VOLUNTARILY ASSUMED DUTY

25.     Liability may be imposed when safety officers assume a duty to provide a particular level of protection but then fail to do so. *Williams v. State of California*, 34 Cal.3d at pp. 23-24 & fn. 3; *Baker v. City of Los Angeles,* 188 Cal. App. 3d 902, 908 (1986). In requesting exclusive CUPA status and the resulting nearly exclusive jurisdiction for administration and enforcement of federal hazardous substance laws, the City made a promise to protect the residents of Santa Clara from the dangers of hazardous materials and waste, knowing those persons would reasonably rely upon the

City's public commitment, but many of those people were harmed by the city's negligent management of those laws, and at least some of those injuries occurred because of those people's reliance on the City's CUPA administration.

26.    The City reports in its 2025 Operating Budget that it only has 3.95 employees working on CUPA administration and enforcement for the entire city of Santa Clara. (pg472).[1] The Budget report further discloses that its only recent CUPA enforcement penalties issued were $9,087 in FY23-24, no HazMat fines have been issued recently, and its only other environmental penalties fines were $6,590 in FY23-24. Id at 209. Comparatively, the city reported $25,984 of annual fines for "Bingo Enforcement." Id at 210. The city's total annual fines for violations of federal environmental laws delegated under CUPA is ~35% of what the city has annually fined grandmothers for getting too carried away with their community Bingo games.

27.    The city clearly has no investment in actually administering and enforcing these federal environmental laws, and their reckless indifference to their own ministerial duties is also informative as to why they would be willing to conspire with violators, encourage violations, and conceal public safety issues – the city has displayed no investment in enforcing. or concern about violations regarding these federal environmental statutes. This is exactly the problematic attitude from this exact city that helped to create the toxic waste nightmare in the 1980s that was a direct trigger for the creation of these very federal statutes. Santa Clara county has always had the most Superfund sites (federal toxic waste dump clean-up sites managed under the CERCLA) in the nation because that contamination (primarily caused by reckless semiconductor manufacturing activities in this county) was quite literally one of the catalysts for the United States to enact CERCLA nationally. It appears Santa Clara has learned nothing.

### 3.    Liability for Known and Compelling Dangers on Public Property (Gov. Code, § 830 et seq.)

28.    Municipalities are also liable for known and compelling dangers on their property that give rise to ministerial duties on the part of public officers or employees. In this case we have a variety of city-owned property within the "premise" (the facility and surrounding area) including streets, sidewalks, trails, creeks, and parks. Of critical importance in this lawsuit are Meadow and

---

[1] City of Santa Clara FY 2025/26 and FY 2026/27 Adopted Biennial Operating Budget
https://www.santaclaraca.gov/home/showpublisheddocument/86913/638925781948230000 e

Creekside park, which are city owned parks that are located across the street from the factory. The city lists these parks on its website, charges fees related to these parks, and reports on these parks in official documents. Meadow and Creekside parks are city property.

29.    Meadow Park is located at 3355 Octavius Dr Santa Clara, CA 95054. [2] It has "BBQ Facilities, Fitness Equipment, Picnic Tables, Playground, and Restrooms." Creekside Park/ Redwood Trail Park is located at 3225 Scott Blvd. Santa Clara, CA 95054.[3] It has "BBQ Facilities, Fitness Equipment, and Picnic Tables." The plaintiff used both these parks herself, with her dog, and with her friends -- and was ill and injured at these parks with dizzy spells, difficulty breathing, rashes, GI discomfort, and other signs of chemical exposure.

30.    The City has published a Park Amenity and Design Standards policy document that for "Playgrounds" that notes that "safety is a high priority for design of children's playgrounds in the City of Santa Clara. The utmost attention should be devoted to providing safe equipment for children." The report stated the city must "conform to California Health and Safety Code… and "all new playgrounds open to the public are required to… comply with all Federal, State and local guidelines." [4]   In April 2017, the City of Santa Clara selected Kitchell CEM to perform Facility Condition Assessments (FCA's) for Parks and Recreation Department facilities and it included a detailed review of safety in the city's parks.

31.    Under Cal. Gov. Code, § 835, a public entity is liable for injury caused by a dangerous condition of its property when the property was in a dangerous condition, that condition created a reasonable foreseeable risk of the kind of injury which occurred, those dangerous conditions proximately caused the injuries, and the public entity failed to take measures to protect against the dangerous condition. *Vedder v. County of Imperial,* 36 Cal. App. 3d 654, 659 (1974); *Ducey v. Argo Sales Co.*, 25 Cal. 3d 707, 715-716 (1979). Here the city invited residents to these parks

---

[2] Santa Clara, Meadow Park,
https://www.santaclaraca.gov/Home/Components/FacilityDirectory/FacilityDirectory/171/15258?npage=4
[3] Santa Clara, Creekside Park/ Redwood Trail Park,
https://www.santaclaraca.gov/Home/Components/FacilityDirectory/FacilityDirectory/153/15258?npage=2
[4] City of Santa Clara Parks & Recreation Department - Park Amenity & Design Standards,
https://www.santaclaraca.gov/home/showpublisheddocument/75493/637705155656830000

and playgrounds, with an implied assurance of safety, when the city knew these playgrounds and parks contained hazardous air, water, and land.

32.    The city's liability arises from a public entity's unreasonable actions or omissions in creating, and/or failing to remedy, and/or failing to warn against the dangerous conditions. Cal. Law Revision Commission Comment to Government Code § 830; *Zelig v. County of Los Angeles,* 27 Cal.4th 1112, 1133 (2002). The dangerous conditions may arise out of design, location, structural conditions, natural conditions, or the presence of latent hazards even associated with normal use. *Bonanno v. Central Contra Costa Transit Authority,* 30 Cal. 4th 139, 149 (2003).

33.    There is no fixed rule as to what constitutes a dangerous or defective condition, and each case must depend upon its own facts. *Fackrell v. City of San Diego,* 26 Cal.2d 196, 206 (1945). A dangerous condition of public property can present itself in many forms and may be based on an "amalgam" of factors. *Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1476 (1993). Conditions are "not dangerous" if they are minor, trivial or create insignificant risk. Cal. Gov. Code, § 830.2.

34.    In this case, city employees took negligent or wrongful acts and omissions within the scope of their employment which helped to create the dangerous conditions. Cal. Gov. Code, § 835. In addition, in this case, the city had actual and constructive notice of the dangerous conditions and sufficient time prior to the injury to have taken measures to protect against the dangerous condition but did not take protective actions. Cal. Gov. Code, § 835. These conditions created "a hazard to those who foreseeably will use the property ... with due care."' *Sambrano v. City of San Diego,* 94 Cal. App. 4th 225,239 (2001) (citing *Mathews v. City of Cerritos,* 2 Cal. App. 4th 1380 (1992)).

35.    In *Vedder*, third parties leasing an airport property stored large amounts of gasoline and other combustible mate1ials on the property and the court found that "one who negligently stores gasoline and other highly combustible chemicals on his property, or knowingly permits such negligent storage, may be liable to others for a fire-incurred loss even though the fire was actually started by the negligent conduct of others." Id. at 660. In *Vedder,* the municipality allowed explosive chemicals to be stored on the property and the county's failure to provide fire protection was a factor in the court's determination that the property was maintained in a hazardous condition as

defined by Cal. Gov. Code, § 835 and accordingly allowing claims under §§ 850 and 850.2.

36.     The court elaborated that immunity "should not be applied to allow a public entity to escape responsibility for damages resulting from its failure to provide fire protection on property which it owns and manages itself, particularly where it has permitted a dangerous fire condition to exist on the property. In that situation, lack of fire protection is a proper factor to be considered as contributing to the existence of a dangerous condition on the property." Id. at 660-661. However, this liability can arise only when third party conduct is coupled with a defective condition of property." (2 Cal. Gov. Tort Liability Rptr. (Cont.Ed.Bar 4th ed. 1999) Dangerous Condition of Public Property, § 12.19, p. 732.)

37.     Where plaintiff's injury was caused by both a 'dangerous condition' and a third party's negligence, the plaintiff is not required to show that the 'dangerous condition' caused or contributed to the third party's negligent conduct. *Cordova v. City of Los Angeles,* 61 Cal.4th 1099, 1106 (2015).   Thus, the public entity cannot evade liability from its negligence or dangerous condition of public property by asserting that plaintiff's harm would not have resulted unless a third party had been negligent. *Baldwin v. State of California*, 6 Cal.3d 424, 428 (1972); *Ducey v. Argo Sales Co,* 25 Cal.3d 707, 718-719 (1979) – ("the state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury.") In fact, the state may be required to alter its property to provide a physical barrier against danger presented by third parties. *Zelig v. County of Los Angeles,* 27 Cal.4th 1112, 1139 (2002).

38.     There is extensive case law finding dangerous conditions of public property for which the public entity bears liability under Cal. Gov. Code § 835. These cases include factual patterns where the government's liability arose from its failure to implement measures to protect residents from harm caused by third parties. Examples include failure to create a protective barrier on a beach to prevent pedestrian injuries from vehicles (*Swaner v. City of Santa Monica*,150 Cal.App.3d 789, 808 (1984)); failure to provide adequate lighting in a parking lot and thereby increasing risk of assault (*Slapin v. Los Angeles International Airport,* 65 Cal. App. 3d 484, 488 (1976)); failure to maintain foliage in public parking lot which enabled a criminal assault and attempted rape (*Peterson v. San Francisco Community College District*, 36 Cal.3d 799, 811 (1984));

failure to warn of dangerous traffic condition (*Tansavatdi v. City of Rancho Palos Verdes,* 60 Cal. App. 5th 423 (2023)); and location of a bus stop requiring commuters to cross a busy street at an uncontrolled intersection (*Bonanno v. Central Contra Costa Transit Authority*, 30 Cal.4th 139, 154 (2003)). A public entity may even be liable if it "maintained the property in such a way as to increase the risk of criminal activity." *Peterson v. San Francisco Community College Dist.,* 36 Cal. 3d 799, 812 (1984).

39.     Unless the evidence conclusively establishes that "reasonable minds can come to but one conclusion," the existence of a dangerous condition is a question of fact. *Peterson v. San Francisco Community College District,* 36 Cal.3d 800, 810 (1984). "Actual notice" means that the public entity knew of the condition and knew or should have known that it was dangerous. Cal. Gov. Code, § 835.2(a). When the negligence of public entity employees has created the dangerous condition, then the public entity is presumed to have knowledge that the dangerous condition exists. *Brown v. Poway Unified School District,* 4 Cal.4th 820, 834 (1993).

40.     To establish constructive notice of a dangerous condition, plaintiff must prove that the condition existed for a long enough time and was so obvious that the public entity should have discovered the condition and its dangerous character. Cal. Gov. Code, § 835; *Strongman v. Kern County*, 255 Cal.App.2d 308, 313 (1967). Even without direct evidence, it is also possible to prove a government's notice of dangerous conditions and the existence of dangerous conditions by offering evidence of "substantially similar" prior incidents. (1990 silicon valley) *Salas v. California Dept. of Transp.*, 198 Cal.App.4th 1058, 1072 (2011).

### 4. No Immunity for Fire Departments Personnel when They are not Fighting Fires

41.     Municipal fire departments have a variety of immunities in place in order to ensure they're able to operate effectively in complex, high-risk situations that are also part of a generalized public duty. Tort Liability of Public Entities and. Public Employees, 4 Cal.Law Revision Com.Rep. (Jan. 1963). The public duty doctrine is a principle of tort law that a government entity cannot be held liable for the injuries of an individual resulting from a breach of a duty owed to the public as a whole. However, even fire departments may have liability arising from their typical activities, if their negligence creates injuries that arise out of a "particularized relationship," such as responding to a request for assistance but failing to follow protocols requiring verification of the address and

instead going to the wrong location. *Norg v. City of Seattle*, 522 P.3d 580 (Wash. 2023).

42.    Liability may also be imposed if a safety officer undertakes acts that increase the risk of harm. *Benavidez v. San Jose Police Dept.*, 71 Cal.App.4th 853, 863 (1999). Liability may be imposed if fire department personnel negligently cause injuries during work activities that are not specific to "fighting fires." Cal. Health & Safety Code 1799.107. See for example, *Potter v. City of Oceanside,* 114 Cal.App.3d 564, 170 Cal.Rptr. 753 (1981) finding liability when a fire captain provided negligent advice which "caused the escaping gas to ignite and explode"; *Wilson v. County of San Joaquin*, 38 Cal.App.5th 1, 250 Cal.Rptr.3d 563 (Cal. App. 2019) finding liability when a fire department provided negligent emergency medical services to an abused infant; *Lewis v. Mendocino Fire Protection District*, 142 Cal.App.3d 345 (1st Dist., 1983) finding liability for a fire department when responding to someone trapped by a fallen tree.

## 5. No Design Immunity when Prior Conditions Change

43.    Design Immunity may be lost with conditions changed in a manner that now causes the design to present a dangerous condition of public property. *Baldwin v. State of California,* 6 Cal.3d 424, 434 (1972) "[D]esign immunity persists only so long as conditions have not changed. Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard… [W]e conclude that [the Legislature] did not intend that the design immunity provided by section 830.6 would be perpetual."

44.    If negligence independent of the design is even partly responsible for the harm, then the design-immunity defense does not apply. *Mozzetti v. City of Brisbane,* 67 Cal.App.3d 565, 575 (1977)—(negligent maintenance of drainage system defeated design-immunity claim based on design of drainage system).

## 6. The City Benefited from the Harm Caused

45.    In June 2024, the City of Santa Clara adopted the biennial capital budget for the two-year period, July 1, 2024, through June 30, 2026, totaling $568.9 million in FY 2024/25 and

$358.9 million in FY 2025/26 [5]  In addition, adjustments were made to the FY 2024/25 operating budget, which totals $1.5 billion. This budget, which funds all City services and activities, is supported by a variety of revenues, such as user fees, property tax and sales tax, revenue from other agencies, licenses and permits, and other sources. The City of Santa Clara receives $10.17 of every $100 collected in property tax and reported $92.M in revenue from property taxes in 2025.

46.    In Santa Clara County, the company providing the largest gross assessed taxable value  is Apple Inc, followed by Google, Intel, and Microsoft, respectively. [6] "Over 90 percent of the business and personal property assessed value comes from less than five percent of the all companies in Santa Clara County." (Pg15). Apple is the #4 commercial taxpayer in Santa Clara County, with $2.9B assessed property and $38.2M *ad valorem* taxes with AV tax rate of 0.43%. 10% of taxes go the city. (pg18).[7] This creates a deep and unnatural dependency on the city to stay in the favor of a private corporation it is supposed to be regulating. These types of situations are often the justification for larger, non-local agencies to manage complex environmental or other regulatory matters as there is less of an inherent conflict of interest.

47.    For just the facility at 3250 Scott Blvd, the city obtains $10,686.01 in direct property tax (FY25-26) out of the $10.M property assessment valuation, and also receives around $3,018.58 through the Santa Clara City Bond 2024 tax (0.0287%).[8] All of this revenue arising out of the Facility is based on the property value where the Facility is located, and that property value could be diminished if it the environmental violations and public safety threats at the Facility and Premise were to become known, creating another inherent drive to conceal what is occurring.  That does not even consider jobs, reputation, sales tax, hybrid public-private service and utilities, and many other factors that are inherent when you start to think of these Silicon Valley cities as a sort of modified "company town." When a city's mere existence is entirely dependent on the active

[5] Santa Clara, 2025 City Calendar & 2024 Annual Report,
https://www.santaclaraca.gov/home/showpublisheddocument/85807/638715011099300000
[6] Santa Clara County, Office of the Assessor, Annual Report 2025 – 2026,
https://www.sccassessor.org/forms-and-publications/annual-report/item/580-annual-report-2025-2026
[7] Santa Clara County, Office of the Assessor, Annual Report 2025 – 2026,
https://www.sccassessor.org/forms-and-publications/annual-report/item/580-annual-report-2025-2026
[8] Santa Clara County Assessor Tax Bill for APN 216-29-117 (Tax Rate 007-014)

presence and operations of a handful of corporations, its clear that city cannot act independently regarding those corporations.

### E. Santa Clara Requested to be a Certified Unified Program Agency (CUPA)

48.    As detailed in the Complaint (Dkt. 1 at 10-11), the City of Santa Clara requested to exclusively control the implementation and enforcement of federal hazardous materials and waste laws through California's "Certified Unified Program Agency" ("CUPA") program. Santa Clara City Code 15.60.020. Otherwise, the U.S. EPA delegation to Cal. EPA, then delegates this responsibility to the Santa Clara County Dept. of Environmental Health or Cal. DTSC. Cal. Code Regs. Tit. 27, § 15100. Only Santa Clara, Sunnyvale, and Gilroy have opted to manage federal hazardous waste compliance at a city-level.[9]

49.    According to the City of Santa Clara's 2010-2035 General Plan: Environmental Impact Report Vol. 1, the goal of the CUPA program is "provide relief to businesses complying with the overlapping and sometimes conflicting requirements of formerly independently managed programs" and describes the City's CUPA responsibilities as providing a "service" that is "delivering significant benefits to the community" including "empower[ing] residents and businesses" and supporting "long-term" goals. Id at pg. 398-399, 463. Its unclear what the intention of these statements were but based on the city's actions it implies the city think's its doing a favor to businesses by ensuring no other agencies bother the business about compliance with annoying environmental laws, so those businesses continue operating in Santa Clara.

50.    Yet, the city General Plan also says Santa Clara Fire Department's "Community Risk Reduction" ("CRRD") duties include to "conduct state-mandated and operational permit inspections of local businesses and facilities to ensure compliance with fire, life safety, and environmental protection regulation" and "protect City residents from the risks inherent in the transport, distribution, use and storage of hazardous materials."  Id at 414, 465. The city knows how important these environmental laws are and chooses to disregard them to the determinant of public safety and the environment.

---

[9] Santa Clara County, Unidocs, Who Regulates What in Santa Clara County Page, http://www.unidocs.org/members/whoregulateswhat.html (last accessed 10/24/25).

## F. The City Violated Federal Environmental Laws and State Nuisance Laws.

51.     The Complaint sufficiently pleads plausible violations of the five environmental statues and public nuisance for which the city has plausible liability. Accordingly, the Plaintiff incorporates the Complaint (Dkt. 1), Sixty Day Notice (Dkt. 3-0), and Exhibits (Dkt 3-1, 3-2, 3-3) here. Due to lack of time and page limits, the Plaintiff's Opposition focused on the complex liability and immunity theories raised by the City and there was not enough time to properly respond to the specific statutory points.

52.     The Complaint alleges the City of Santa Clara violated the RCRA and seeks redress under both 42 U.S.C. § 6972 and 42 U.S.C. § 7002. (39-44). 42 U.S.C. § 6972(a)(1)(A)-(B) expressly applies to public entities ("any other governmental instrumentality or agency"). This is sufficiently plead and incorporated in the notice and exhibits.

53.      The city was aware of ongoing and serious violations of the RCRA and did not even report those violations as RCRA violations, did not notify CalEPA or U.S. EPA, and did nothing to stop those violations. Instead, the city concealed the violations by omitting detail and text from reports, omitted hazardous waste treatment activities from public records, refused to disclose RCRA activities and violations to injured members of the public, refused to respond to PRA requests regarding RCRA activities, and also apparently tipped off the subject of an EPA inspection about an unannounced RCRA inspection in violation of federal criminal law. Further, RCRA violations did have, and continue to create a substantial and imminent danger to the public and environment due to the City's actions and omissions, will knowledge of the violations, dangerous, and the legal requirements but instead chose the economic and other benefits of enabling noncompliance from favorite businesses.

54.     The Complaint alleges the City of Santa Clara violated the Clean Air Act and seeks redress under 42 USC § 7604(a)(1),(3) . (37, 44-48). This is sufficiently plead and incorporated in the notice and exhibits. "The federal program provides no options for implementing agencies to diminish the requirements or applicability of the federal program." Cal. Health and Safety Code § 25531. CAA includes terms related to criminal obstruction, mandatory reporting and actions, and also includes provisions related to endangerment. Like with the RCRA, and with some overlapping facts and issues as RCRA (the hazardous waste treatment exhaust, etc.) the city actively contributed

to, maintained, enabled, concealed, and encouraged an imminent and substantial danger to public safety and the environment.

55.     The city directly contributed to repeated violations of the CAA standards, limitations, and orders as described in the complaint including the city's failure to report issues or make referrals to the Air Board, failure to document violations and other noncompliance, knowledge of ongoing substantial and imminent harm caused by the violation, and active concealment of the violations. The city also directly contributed the construction of a major emitting facility without required air permits. The city knew the Facility was spilling, leaking, releasing, emitting, and exhausting at least 8 tons of hazardous substances into the ambient air each year including mercury, arsenic, phosphine, arsine, chlorine, fluorine, formaldehyde, and carbon monoxide. If the city could potentially have criminal liability due to deaths caused by those emissions, it makes sense the city should unquestionably have plausible civil liability under the environmental Citizen Suits.

56.     The city's violations include civil and potentially criminal violations of the CAA through their engagement with the Owner, Operator, and Facility as well as their liability related to the adjacent public property and the development of the apartments next to the Facility. While Citizen Suits are generally now allowed against local regulating entities when the allegations are about a failure to propose an adequate SIP (*Sierra Club v. Korleski,* No. 10-3269, (6th Cir. May 25 2012)), there is no prohibition on Citizen Suits where the alleged violations are particular, concrete, localized, and arise of a fact pattern giving rise to multiple theories of liability.

57.     The Complaint alleges the City of Santa Clara violated the TSCA and seeks redress under 15 USC § 2619. (56-57). 15 USC § 2619(a)(1) expressly applies to public entities ("any other governmental instrumentality or agency"). This is sufficiently plead and incorporated in the notice and exhibits. TSCA is not delegated to state or local goverments so any claim against the city under TSCA is as a violator or for failure to report violations to the EPA including related to the Facility's TSCSA violations related to lead, mercury, TCE, formaldehyde, and NMP. The city knew these substances were used at the facility, understood the processing equipment and release mechanisms, and knew about at least some of the spills, dumps, and other releases. TSCA expressly allows Citizen Suits to be filed against agencies for violating the statue.

58.    The Complaint alleges the City of Santa Clara violated the EPCRA and seeks redress under 42 U.S. Code § 11046. (52-55). 42 U.S. Code § 11046(a)(1)(C)-(D) expressly applies to public entities ("a State emergency response commission").

59.    The city played this role in claiming exclusive jurisdiction over hazardous waste and chemical releases at this facility. ("A unified program agency shall, in consultation with local emergency response agencies, establish an area plan for emergency response to a release or threatened release of a hazardous material within its jurisdiction...A unified program agency shall adopt procedures to provide for public input when approving applications" for exemptions.) Cal. Health & Safety Code §§ 25503, 25507. "The unified program agency shall, to the maximum extent feasible, coordinate implementation of the accidental release prevention program with the United States Chemical Safety and Hazard Investigation Board, the state emergency response commission and local emergency planning committees, the unified program elements specified in subdivision (c) of Section 25404, the permitting programs implemented by the air quality management districts and air pollution control districts pursuant to Subchapter V of the federal Clean Air Act (42 U.S.C. Sec. 7661 et seq.), and with other agencies." Cal. Health & Safety Code § 25533.

60.    The Complaint alleges the City of Santa Clara violated the EPCRA and seeks redress under  42 U.S. Code § 11046(a)(1)(A) due to the City contributing to the Owner and Operator's ongoing and long-running violations. This is pled and incorporated in the notice and exhibits. The EPCRA Citizen Suit provisions are woefully underdeveloped, and its implementing regulations were never enacted, apparently relying on the CERCLA Citizen Suit provisions. Case law for EPCRA Citizen Suits stalled in the 1990s after some highly restrictive court decisions that effectively chilled future litigation under the cause of action. [10]

61.    The Plaintiff plans to argue EPCRA Citizen Suit claims under both the statute but also under Congressional Intent, much of which actually arose out of local events and concerns in Santa Clara County through the 1970s-1990s. This moment, with the surge of re-shoring dangerous industrial facilities back into communities just like, and including Santa Clara county, seems like a

---

[10] Julie Shambarger Mitchell, Environmental Law—A Citizen Suit Under EPCRA Is No Longer a Threat. Steel Company v. Citizens for a Better Environment, 118 S. Ct. 1003 (1998)., 21 U. ARK. LITTLE ROCK L. REV. 343 (1999).

critical time and ideal location (the San Jose Courthouse) to try to breath life back into the EPCRA Citizen Suit cause of action. Accordingly, these claims are novel due to the underuse of the statute, and the Plaintiff requests the court consider allowing additional time and discovery prior to judging these matters on the factual merit.

62.     The Plaintiff argues the City violated the letter and spirit of the EPCRA, in its own failure to report known leaks and spills that resulted in released of extremely dangerous substances into the ambient air around these apartments, its concealment of the violations and threats (including refusing PRA requests), and its refusal to report these ongoing violations to CalOES or EPA, which are mandatory duties. ("A unified program agency shall implement the regulations adopted pursuant to this section.") Cal. Health & Safety Code § 25534.05. ("The purpose of EPCRA reporting requirements is to provide citizens with information about environmental hazards in their communities…"). *Don't Waste Arizona Inc v. McLane Foods Inc,* 950 F. Supp. 972 (D. Ariz. Jan. 8 1997).

63.     The Complaint further alleges the City of Santa Clara violated California Public Nuisance laws and seeks redress under Cal. Civ. Code 3491 *et seq.*. (57-60). The federal claims do not preempt the public nuisance claim and they can co-exist and support each other in the same litigation. *Merrick v. Diageo,* 805 F.3d 685 (6th Cir. 2015) – (finding no CAA preemption of state-source nuisance claims).

64.     A city can be liable for tort claims if it fails "to warn" or "to protect against" dangerous conditions of which the entity had notice. Cal. Gov. Code § 830; *Tansavatdi v. City of Rancho Palos Verdes* (Case No. S267453) 4 Cal.5th 639 (2023); *Flournoy v. State,* 275 Cal.App.2d 806 (1969); *Cameron v. State of California,* 7 Cal.3d 318, 329 (1972). This liability can extend as far as to find that even if warnings signs were placed, that placement was negligent if they cannot be easily seen, and thus then create tort liability against the government for a negligent attempt to warn. *Briggs v. State of California,* 14 Cal.App.3d 489, 497-498 (1971).

65.     The City's own general plan "restrict the use and storage of hazardous materials for industrial uses within 500 feet of existing residential uses." 5.3.5-P19 2010-2035 General Plan (pg413). It also requires the city to "locate hazardous waste management facilities in areas designated as Heavy Industrial on the Land Use Diagram if compatible with surrounding uses and

consistent with the County Hazardous Waste Management Plan." 5.10.5-P27 2010-2035 General Plan. (pg414). The state code also extensively implements Right to Know provisions (for example, "The Legislature finds and declares that as the state implements the federal accidental release prevention program pursuant to this article, the agency will play a vital and increased role in preventing accidental releases of extremely hazardous substances."). Cal. Health & Safety Code Section 25531.2.

66.     The Santa Clara Toxic Gas ordinance, as implemented in Santa Clara city code, also has mandatory duties and obligations which the Santa Clara city, per PRA responses, claims its never done with no documentation at all regarding the ordinance put in place to prevent catastrophic disasters. SC city Code 15.60.430; Santa Clara County Ordinance B11 – 360, *et seq*. The Santa Clara General Plan notes that "locally, toxic gases are used at sites, such as semi-conductor manufacturing... there are 25 facilities in Santa Clara regulated under the Toxic Gas Ordinance." (General Plan,  pg. 402). The Toxic Gas Ordinance is another example of a law that was implemented nationally (International Fire Code!), but which was originally created in response to severe public safety risks locally in Santa Clara County in the 1970s-1990s, which newspapers continuously discussing the potential catastrophic effect if even one facility exactly like the facility at 3250 Scott Blvd had a significant release of the toxic gas that area on site at 3250 Scott and which have been previously and repeatedly leaked/spilled at 3250 Scott, and which all Defendants repeatedly failed to report to CalOES, EPA, or the effected residents next door.

67.     Similarly, the ongoing mishandling of silane at this facility could also cause a catastrophic accident and mass casualty event (fire/explosion), and it is yet another specialty hazard that became apparent in Santa Clara County and triggered silane-specific safety laws to be created and implemented nationally. Cal. Gov. Code section 815 does not bar nuisance actions against public entities to the extent that such actions are founded on Civil Code sections 3479, 3480 and 3481. *Vedder v. County of Imperial*,  36 Cal. App. 3d 654, 661 (1974) – (finding a county can be liable for a fire hazard constituting a public nuisance from permitting  storage of gasoline and highly combustible chemicals by a third-party and while not requiring adequate fire protection facilities on public land).

68.     The Complaint alleges the City of Santa Clara violated the Clean Water Act and

seeks redress under 33 USC § 1365(a)(1). (pg 48-52). 33 USC § 1365(a)(1) expressly applies to public entities ("any other governmental instrumentality or agency"). The city has direct and mandatory compliance obligations under municipal NPDES Permit No. CAS612008 and implemented with California Regional Water Quality Control Board Order No. R2-2023-0019. This order establishes mandatory requirements of City of Santa Clara including that it " shall implement an industrial and commercial site control program at all sites that could reasonably be considered to cause or contribute to pollution of stormwater runoff" and it "shall conduct inspections, effective follow-up, and enforcement to abate potential and actual non-stormwater discharges." Id at C4.

69.     Santa Clara's Public Works departments manages water and sewer. The Plaintiff made complaints and requested assistance regarding the pollution occurring at the premise in 2020-2021 including speaking directly with the Water/Sewer Director Gary Welling and additional victims of the chemical exposure also contacting Welling in 2021.[11] The Order also requires that Santa Clara ("shall... effectively prohibit the discharge of non-stormwater ...  into storm drain systems and watercourses."). The city's NPDES permit, and Order also creates mandatory "shall" requirements regarding inspection, reporting, documenting, response, and follow-up regarding spills, dumping, and complaints including regarding private industrial operators. Id at C(5)(c)-(d).

70.     Because of this permit and associated language, there is an argument that the City of Santa Clara may have more direct liability under stormwater CWA claims than the other two defendants. See, *Ecological Rights Foundation v. PG&E,* No. 15-15424, 30-32 (9th Cir. 2017). The complaint also pleads sufficient facts and allegations to give rise a plausible Clean Water Act violation by the City of Santa Clara via at least stormwater-related violations and accordingly should not be dismissed.

### G. The Plaintiff was Harmed by the City & Requests Concrete and Actionable Relief Against the City.

71.     The plaintiff seeks relief that is well defined, aligns with traditional Citizen Suit

---

[11] Santa Clara, Water & Sewer Utilities, https://www.santaclaraca.gov/our-city/departments-g-z/water-sewer-utilities; Santa Clara, Public Works, Stormwater Pollution Prevention, https://www.santaclaraca.gov/our-city/departments-g-z/public-works/environmental-programs/stormwater-pollution-prevention

remedies, is reasonable and required, and these remedies would benefit the community, environment, EPA, and the Plaintiff. *Meghrig v. KFC Western, Inc,* 516 U.S. 479, 486 note 3 (1996). Some Citizen Suit cases are dismissed when remedies are requested that are redundant to new or ongoing remediation or corrective actions administered by local, state, or federal agencies. *87 Street Owners Corp. v. Carnegie Hill-87th Street Corp.*, 251 F. Supp. 2d 1215 (S.D.N.Y. 2002). However, here there is a vacuum of oversight or action as the enforcement of many laws at issue here either exclusively belong to City of Santa Clara or the City otherwise has a role related to referrals or joint-management, and the City is violating the very laws they are supposed to be enforcing.

72.    Further, if the City was removed from this lawsuit, there is injunctive relief that needs to be applied to the City but the city would no longer be party to this litigation and that order. That would certainly include orders about abating ongoing violations by the city, requiring the city comply with these laws, requiring the city take actions to abate hazards and the nuisance in its own public parks, creating notifications that warn residents of the dangers and hazards at least on the public property, requiring the city to take actions to mitigate the air and water exposure issues caused by the facility and impacting the apartments (ie, orders for the city to ensure the apartments to install charcoal filters in the fresh air intakes, requiring the city to mitigate the solvent vapor issues in the sewer system flowing from the facility's discharge directly to the apartments, etc.).

73.    The Plaintiff made complaints to the city about this facility, and the city did not act on those complaints, did not disclose to the Plaintiff what the facility was doing, did not stop the facility from continuing its violations and instead concealed and enabled ongoing violations. The Plaintiff's toxic torts were dismissed due to statute of limitations and an argument she should have discovered what was occurring at the facility prior despite her inquiries directly to the city about chemical exposure in that area and the city concealing the activities and violations at this facility for years.

74.    There are also independent policy justifications demanding relief. The concept is long-standing that a private person who suffers identifiable harm by reason of a violation of a municipal zoning law may sue the violator for  damages and may also seek injunctive relief when applicable. *Sapiro v. Frisbie,* 93 Cal. App. 299, 313 [270 P. 280] (1928); see also *McIvor v. Mercer-Fraser Co.* (1946) 76 Cal. App. 2d 247, 250, 253-254 (1946). *Nestle v. City of Santa Monica,* 6 Cal. 3d

920, 939-940 (1972). Santa Clara's reckless decision to allow heavy industrial activities next to dense residential, without ever notifying those residents of the industrial activities, keeping it out of the EIR, concealing the operations and violations, concealing the injuries caused to the residents, and its other unacceptable conduct is inexcusable. What occurred and is still occurring at this premise is without any rational or lawful basis.

75.    In addition, the court should consider the City's economic benefits received due to non-compliance and collaboration with the Operator regarding these violations. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp*, 123 F.4th 309 (5th Cir. 2024), cert. denied, 145 S.Ct. 2845 (2025). In stark contrast, the Plaintiff lost everything due to her advocacy about safety and environmental hazards at the Premise (job, income, savings, friends, reputation, health, career, etc.) while Santa Clara is still accumulating revenue from these same dangerous and unlawful activities.

## III. Conclusion

76.    In conclusion, the City's motion to dismiss should be denied. If the motion is not denied, the Plaintiff requests permission to Amend the complaint to address any deficiencies.

77.    The city has refused to engage meaningful in this matter for five years, while it has knowledge of and has actively contributed to an acute public safety hazard and ongoing environmental degradation. The city has received complaints and requests for help from multiple victims of chemical exposure, and has done nothing but protect Apple and Mr. Jenab's commercial business interests related to the hazard.

78.    The City now claims it should be completely removed from this lawsuit based on broad claims of sovereign immunity or suggestion that contribution and conspiracy liability could never apply in environmental and tort claims. What the city has not done is address the facts of this situation and the reasonable and foreseeable injuries that are known, for decades, to be caused by exactly these types of situations, and which federal laws were created to address when this sort of thing occurred previously in this exact city. Federal laws were created about these issues because these issues can and do kill people, and create environmental disaster areas which can require millions of dollars and hundreds of years to fully remediate.

79.    The Plaintiff apologizes this Opposition was filed a couple hours past the deadline. This opposition required extensive research into niche and novel areas of municipal liability, and

other uncommon legal theories, and was promptly completed and filed as soon as possible.

80.    Finally, the Plaintiff lives in Boston, MA but due to the seriousness of this lawsuit and her belief that the City is a required defendant in this matter, and their dismissal from this case could cause further irreparable harm to the community, the Plaintiff was able to fundraise the money needed to purchase a plane ticket to California and plans to attend oral arguments in person.

81.    Thank you for considering these arguments.


Respectfully filed,


/s/ **Ashley M. Gjovik**
*Pro Se Plaintiff*
Oct. 25 2025

legal@ashleygjovik.com
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272