# Exhibit F

1

**Ashley M. Gjovik, JD**
*Pro Se Plaintiff*

2

2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

3

4

5

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

6

7

**Case No. 3:23-cv-04597-CRB**

8

**Filed**: September 7 2023

9

**District Judge**: Honorable Charles R. Breyer

10

**ASHLEY GJOVIK**, *an individual*,

11

Plaintiff,

12

v.

13

14

**APPLE INC**, *a corporation*,

15

Defendant.

16

**FIRST AMENDED COMPLAINT
WITH EXHIBITS**

**PLAINTIFF'S CLAIMS**

1. **Sarbanes-Oxley Act Whistleblower,**
   18 U.S.C. §1514A

2. **Dodd-Frank Act Whistleblower,**
   15 U.S.C. §78u-6(h)(1)(A)(iii)

3. **Bane Civil Rights Act,**
   Cal. Civ Code § 52.1

4. **Ralph Civil Rights Act,**
   Cal. Civ Code § 51.7

5. **Racketeer Influenced & Corrupt
   Organizations Act,**
   18 U.S.C. §§ 1962(a), (c), (d)

6. **Ultrahazardous Activities**

7. **Whistleblower Protection Act**,
   Cal. Labor Code § 1102.5

8. **Retaliation for Filing Complaints,**
   Cal. Labor Code § 98.6

9. **Retaliation for Safety Activities,**
   Cal. Labor Code §§ 6310

10. **Termination in Violation of Public Policy**

11. **Private Nuisance; Per Se Nuisance**
    Cal. Civil Code § 3479

12. **Intentional & Negligent Infliction of
    Emotional Distress**

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

1

1
2
3

**COMPLAINT - TABLE OF CONTENTS**

I.      SUMMARY .................................................................................................................. 6

II.     AMENDMENT ............................................................................................................. 7

III.    JURISDICTION ........................................................................................................... 8

IV.     VENUE ...................................................................................................................... 10

V.      PARTIES ................................................................................................................... 11

VI.     NOTICE OF PENDENCY & CONFLICT OF LAWS .............................................. 11

VII.    FACTS & GENERAL ALLEGATIONS .................................................................... 13

    A.  CHRONOLOGICAL FACTS; BY TOPIC .............................................................. 14

        i.      Background on the Property and People Involved in This Case (2010-2015) ......................................... 14

        ii.     Gjovik Joins Apple; Team Bullies & Bribes Her (2015-2016) ................................................. 27

        iii.    The Batterygate Fiasco (2016) ................................................................................. 34

        iv.     Gjovik is Assigned to the "TRW Microwave Superfund site" Apple Office on the Triple Superfund Site (2017) ................................................................................................. 37

        v.      Apple Forces Research & Development Employees to Use Work Devices for Personal Activities; Apple Forces Them to Participate in Medical Studies and Invasive Data Collection (2015-2021+) .......................... 39

        vi.     Apple Fighting To Increase Their E-Waste & Threatening Families about Superfund Offices (2018) ... 43

        vii.    The Batterygate Fiasco, Part II (2018) ....................................................................... 44

        viii.   Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior (2019-2020) ............ 47

        ix.     Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020) 49

        x.      The HVAC/Sub-Slat Vent Fiasco (2020) ....................................................................... 58

        xi.     "Skipping the Line": The Vaccine Hoarding Incident (2020) ................................................. 60

        xii.    The TRW Microwave Superfund Site Debacle (2021) .......................................................... 62

        xiii.   Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021) .......................... 67

        xiv.    The Non-Consensual Sexism Investigation, Doxing, Gag Orders, & Other Retaliation (April-June 2021) 73

        xv.     Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive Intensify (April 2021-June 2021) .......... 76

        xvi.    Apple's Retaliation Against Gjovik Intensifies (May-June 2021) ............................................ 79

        xvii.   US EPA & Apple Engage in A Cover-Up; Work Together to Intimidate and Mislead GJOVIK (June-July 2021) 83

        xviii.  Gjovik Fights Back (July-August 2021) ....................................................................... 88

        xix.    Trouble with the US Government Sanctions Against Syria (2020-2021) ......................................... 96

*xx.    US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021)* ............................................................................................................98

*xxi.    Apple Removes Gjovik from her Office and Coworkers in Preparation for the US EPA Inspection; Apple Prepares to Fire Gjovik (August 2021)* .............................................................................111

*xxii.   Apple Unleashes a Digital & Physical Harassment Campaign Against Gjovik to Demoralize and Intimidate Her (August 2021)* ...........................................................................................................119

*xxiii.  Apple Pretends to Investigate Gjovik's Concerns; Gjovik Asks to Come Back & Apple Says No (August 2021)* 120

*xxiv.   Gjovik Accuses Apple of Violating the RICO Act; Apple Increases the Digital Harassment (August 2021)* 122

*xxv.    Gjovik Files Charges/Claims Against Apple with the State and Federal Government (August – September 2021)* ...............................................................................................................................127

*xxvi.   Apple Intimidates Gjovik and Tries to Force Her Onto a WebEx Meeting (September 3 2021)* ...........132

*xxvii.  Gjovik Files More Complaints Against Apple; Complaints of Apple Executives Criminal Conduct; Complaints about Batterygate Intimidation (September 3-9 2021)* ................................................134

*xxviii.  ……………………………………………… The Day Apple Fired Gjovik (September 9 2021)* 138

*xxix.   Apple Increases Intimidation and Retaliation (September 2021)* ..........................................................146

*xxx.    Gjovik Files More Charges; EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021)* .............................................................161

*xxxi.   Apple Works to Capture and Influence Government Agencies to Ignore Gjovik and Ignore Apple's Environmental/Safety Violations (October-December 2021)* ........................................................163

*xxxii.  Apple's Harassment of Gjovik Becomes Increasingly Deranged (September-December 2021)*............166

*xxxiii. ……The Government Responds to Gjovik; Some Agencies Complicit in the Cover-Up; Gjovik Escalates Further; Apple Bites Back (December 2021-January 2021)* ...........................................................168

*xxxiv. Gag Orders & Missing" Documents" (February-March 2022)* ..........................................................172

*xxxv.  Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be Sent to Jail if She Defends Herself (March 2022)*..........................................................................................................................174

*xxxvi. Gjovik Discovers the August 19 2021 Inspection (May 2022)* ...........................................................190

*xxxvii. .. Gjovik Discovers Apple's Been Hacking and Surveilling Her More Than She Thought; Appel Tries to Break into Gjovik's Home, Again (May 2022)*.............................................................................190

*xxxviii.        Gjovik Attempts to Investigate What Happened in 2021; Apple Increases the Cover-Up; Gjovik Still Gagged (May-August 2022)*..................................................................................................193

*xxxix. Gjovik Starts to Recover; Gjovik Discovers More of Apple's Misconduct; Gjovik Fights Back (August 2022 – February 2023)*....................................................................................................................196

*xl.     Apple and Orrick Try to Squash and Demoralize Gjovik Again (January-April 2023).* .......................201

*xli.    Gjovik Discovers the Secret Silicon Fabrication Plant; Apple commits more Felonies (February 2023)* 202

xlii.   *After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023).* ...........................................................206

xliii.   *Apple Respond with More Cover-Ups & Harassment (July-September 2023)* ...................................207

**VIII. LEGAL CLAIMS** .............................................................................................................................**208**

   **A.   SOX WHISTLEBLOWER RETALIATION (15 U.S.C. § 1514A)** ..................................................**210**

   **B.   DODD FRANK WHISTLEBLOWER RETALIATION (15 USC §78U-6(H)(1)(A)(III))**..........................**212**

   **C.   BANE CIVIL RIGHTS ACT: CAL. CIV. CODE § 52.1** ................................................................**213**

   **D.   RALPH CIVIL RIGHTS ACT: CAL. CIV. CODE §51.7** ...............................................................**217**

   **E.   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962** ........**219**

     i.   *Standing & Pleading*.................................................................................................................219

     ii.   *Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)* ......................................................222

     iii.   *Creation, Nature, and Operation of the Enterprise* ................................................................223

       1)   Apple as a Corporate Defendant ..........................................................................................224

       2)   The "Worldwide Loyalty Team" Enterprise .........................................................................224

     iv.   *Pattern; Vertical and Horizontal Relatedness of Predicate Acts* ..........................................225

     v.   *The Schemes* ...........................................................................................................................232

     vi.   *Predicate Acts/Threats Involving Certain State Offenses* .....................................................235

       1)   Criminal Bribery of Executive Officer (Cal. Penal Code § 67)............................................235

       1)   Criminal Commercial Bribery (Cal. Penal Code § 641.3) ...................................................237

       2)   Criminal Extortion (California Penal Code § 518) ..............................................................239

     vii.   *Predicate Acts Indictable Under Title 18 US Code* ..............................................................243

       1)   Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343) .....................................................243

       2)   Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512) ......................251

       3)   Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513) .................260

     viii.   *Predicate Acts Indictable Under Title 11 USC (Securities)* .................................................265

       1)   Securities Fraud (15 USC § 78) ...........................................................................................265

     i.   *Predicate Acts Indictable Under §2332(b)(g)(5)(B)*..............................................................269

       1)   Relating to Chemical Weapons (18 USC § 229) ..................................................................269

     ii.   *Injury in Fact to Plaintiff due to Racketeering Act*..............................................................278

     iii.   *Continuity & Threat to Continue* .........................................................................................283

   **F.   TORT: ULTRAHAZARDOUS ACTIVITIES** ...............................................................................**283**

   **G.   RETALIATION UNDER CALIFORNIA LABOR CODE** ................................................................**285**

     i.   *California Whistleblower Protection Act: Cal. Labor Code §1102.5* .....................................285

       1)   Video Recording in Bathrooms: Cal. Labor Code § 435 .....................................................287

     ii.   *Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6* .....................................288

       1)   Retaliation re: Work Conditions: Cal. Labor Code §232.5 (via § 98.6)..............................289

       2)   Lawful Off-Duty Conduct: Cal. Labor Code § 96(k) (via 98.6)...........................................290

     iii.   *Retaliation for Safety Complaints: Cal. Labor Code § 6310*...............................................291

4

1)    Right-to-Know Retaliation: Cal. Labor Code §6399.7 (via § 6310)..................................296

**H.**    **WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*) ......................298**

*i.*    *Tamney: Invasion of Privacy (Cal. Const. art. 1, § 1)* .......................................302

*ii.*    *Tamney: FTC Biometric Consent Rules* .............................................................306

*iii.*    *Breach Of Implied Contract: Good Cause Required (Foley/Banko)*....................308

**I.**    **NUISANCE (CAL. CIVIL CODE § 3479) ......................................................................310**

**J.**    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .............................................312**

**K.**    **PRETEXT GENERALLY ...........................................................................................320**

**IX.    DEMAND FOR RELIEF .................................................................................324**

**A.**    **SPECIAL REMEDIES ..............................................................................................328**

*i.*    *Exemplary and Punitive Damages*....................................................................328

*ii.*    *Medical Monitoring* ..........................................................................................330

*iii.*    *Special Damages*...............................................................................................330

*iv.*    *Injunctive Relief* ...............................................................................................331

*v.*    *Declaratory Relief & Nominal Damages* ...........................................................332

**X.    PRAYER FOR RELIEF ..................................................................................333**

**XI.    CERTIFICATION AND CLOSING ..................................................................335**

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

## I.    SUMMARY

1.    This complaint details a complex regulatory-compliance-avoidance scheme conducted by Apple Inc through a criminal enterprise, which prior-Apple-employee Ashley Gjovik became caught up in after she complained about toxic waste exposure at her Apple office, and then she reported Apple to federal agencies and law enforcement, and Apple decided to physically remove her from the scene of their apparent environmental crimes in order to prevent Gjovik from gathering of evidence, and then Gjovik was terminated the day before a federal affidavit about Apple's unlawful acts, shortly after complaining about "*witness intimidation"* from a "*Workplace Violence*"  interrogator. Gjovik realized it was all an effort to cover up intentional regulatory violations under at least three federal environmental statutes, which also implicated racketeering and securities fraud concerns, and to cover up over five years of Apple's poisoning of a large community by lawlessly releasing metric tons of solvent vapors and lethal gases into thousands of home windows and making some of the residents severely ill, including Gjovik. Gjovik's termination was then followed with over two years of deranged intimidation and threats to coerce Gjovik to drop her charges.

2.    Ashley Gjovik ("Plaintiff") files this complaint against Apple Inc ("Defendant"), Gjovik's prior employer. Gjovik first attempted to pursue claims through agencies, but two years after those claims were filed, there still has not been any final decisions on Gjovik's retaliation complaints other than a finding in Gjovik's favor in her unemployment insurance appeal. The US Department of Labor's statutory deadline to make a decision was February 10 2022. The NLRB's case metrics position Gjovik's NLRB charges against Apple in the top 1% of aged charges overdue for a decision on merit. Thus, due to uncertainty with the government charges, Gjovik files this civil complaint prior to her civil two-year statute of limitations on September 9 2023. Gjovik is "kicking-out" her California Department of Labor cases and US Department of

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Labor SOX whistleblower retaliation charge from the respective agencies, and consolidates those matters with her other civil claims here.

3.      A Racketeer Influenced and Corrupt Organizations ("RICO") Act case is appropriate and required here because Apple's threats and retaliation against Gjovik, and conspiracy to conceal its corrupt and unlawful acts, violated federal criminal statutes for which there is no other appropriate private civil action. Apple's retaliation against Gjovik was partially due to Gjovik reporting Apple to the FBI, US Department of Justice, and Santa Clara County District Attorney's office for multiple apparent criminal acts, and Gjovik's public accusations that Apple is actively violating the RICO Act – all of which Apple knew prior to Apple's abrupt termination of Gjovik by a Worldwide Loyalty Workplace Violence investigator and without explanation.[1] This is quite literally a "*RICO Act Whistleblower*" case.

4.      In lieu of the US District Attorney's office deciding to pursue a criminal case against Apple, (which hopefully still may occur at some point), Gjovik's only path to seek holistic justice for the extensive harm she suffered due to Apple's egregious conduct is a RICO lawsuit. RICO also enables Gjovik to admit evidence to show that Apple's actions towards Gjovik were part of a larger scheme, and to reflect the Russian-nesting-doll structure of Apple's tortious operations, as part of their systemic statutory civil violations, as part of their egregious ongoing criminal schemes. It is all related.

## II.    AMENDMENT

5.      Plaintiff filed the original complaint for this case on September 7 2023.

6.      Defendant received direct notice of the filing on September 15 2021 and personal service on September 21 2023. Defendant did not respond to Plaintiff until October 5 2023, and

---

[1] Gjovik complained to Apple about Apple violating RICO on August 21 2021, then posted that complaint on social media noting: "*One issue I'm raising to them is literally RICO,*" and then "@"ed the US Depart of Labor. https://twitter.com/ashleygjovik/status/1429174603713191936

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                          OCTOBER 25 2023

at which time Defendant asked that Defendant be allowed to submit their answer later, after Plaintiff files her first Amended Complaint.

7.    Plaintiff did not plan to file an Amended Complaint prior to the First Answer. After some negotiation, a stipulation was filed on October 9 2023 per Defendant's request, and approved by Judge Beeler on October 10 2023. Plaintiff then only had 16 days to draft and finalize her First Amended Complaint. This is the First Amended Complaint, filed October 25 2023, prior to the stipulated October 26 2023 deadline for the filing.

8.    Defendant has been on notice about the majority of issues included in this complaint for over two years. The counsel for Defendant here ("Orrick") has been assigned to this case for nearly two years and has already viewed a significant amount of the evidence through the US Department of Labor process. In addition to Orrick, Apple has hired at least three additional law firms to work on this case, including at least fourteen external counsel lawyers, half of which are Partners.[2] Plaintiff is and has been *pro se* for all government charges and civil litigation on this matter.

9.    Per stipulation, Defendant now has until November 16 2023 to file a response. Plaintiff will be reluctant to consent to further extensions, without compelling justification, considering the foregoing.

### III.    JURISDICTION

10.    This court has both Subject Matter and Diversity jurisdiction over these claims. The District Courts of the United States have original and exclusive jurisdiction over two of the claims in this case: whistleblower retaliation under SARBANES OXLEY ACT [18 U.S.C. §1514A]

---

[2] Known lawyer's defending Apple on Gjovik's claims: David R. Eberhart (Partner) at **O'Melveny & Myers**; Ron Holland (Partner), Chris Foster (Partner), Syed Mannan at **McDermott Will & Emery**; Harry Johnson (Partner), Brian Mahoney, Kelcey Philips, Mark Stolzenburg (Partner), and Crystal Carey at **Morgan, Lewis, & Bockius**; Jessica Perry (Managing Partner), Melinda S. Riechert (Partner), Kathryn G. Mantoan (Of Counsel), Kate E. Juvinall, and Ryan D. Booms at **Orrick, Herrington, & Sutcliffe.**

and DODD-FRANK ACT [15 USC §78u-6(h)(1)(A)(iii). This US District Court has federal question jurisdiction over "*all civil actions arising under the Constitution, laws, or treaties of the United States,*" [28 U.S.C. § 1331], which provides original jurisdiction over many issues in this case including claims of federal RICO with Predicate Acts under US Code Title 15 and Title 18;[3] and interpretation of agency complaints under CERCLA [42 U.S.C. § 9601], the RESOURCE CONSERVATION AND RECOVERY ACT ("RCRA") [42 U.S.C. §6901], the CLEAN AIR ACT [42 U.S.C. §7401],[4] complaints related to US CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC") and FOOD AND DRUG ADMINISTRATION ("FDA") programs;[5] legal questions related to US FEDERAL TRADE COMMISSION ("FTC") rules;[6] and issues related to US government sanctions on foreign countries.[7]

11.    The District Courts of the United States also have diversity jurisdiction over this case because the amount in controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332]. At the time the complaint was filed, Plaintiff was domiciled in New York, and is now domiciled in Massachusetts. Defendant is a corporation headquartered in California.

12.    Despite the inconvenience for the Plaintiff (who will request remote/video hearings, please), this case is proper in California instead of New York or Massachusetts because it requires analysis of California Labor and Penal Codes, California common law related to employee terminations in violation of public policy (*Tamney* claims), CALIFORNIA CONST. ART.

---

[3] 18 U.S.C. § 1965; *Tafflin v. Levitt*, 493 U.S. 455 (1990); *Butchers' Union Local 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir. 1986).
[4] Gjovik's U.S. EPA CERCLA Complaint: August 29, 2021; US EPA RCRA/CAA Complaint: June 12 2023, June 20 2023 Investigation, August ~17 2023 Inspection
[5] Gjovik's U.S. DOJ National Center for Disease Fraud (NCDF) Complaint: Sept 3, 2021
[6] Gjovik's FTC Report #154835129;
[7] Gjovik's U.S. DOJ FBI Complaint: Sept 3, 2021

1 and California employee's constitutional right to privacy, the Santa Clara County "Toxic Gas" ordinances, and other state laws.

13.       The federal courts have an independent basis for federal jurisdiction on this case; thus, they may also exercise supplemental jurisdiction because the claims arise from the same case and controversy, share a common nucleus of operative fact, and would ordinarily be expected to be tried in one judicial proceeding.[8] The state claims here require analysis of many of the same facts and legal questions as the federal claims, including: the retaliatory termination, other whistleblower retaliation, filing of complaints with the employer and with the government, environmental and health/safety concerns, threats and intimidation, hazardous materials and hazardous waste practices, chemical exposure, and obstruction of justice.[9] If the state causes of action in this complaint were tried separately, there would be duplicative trials concurrently holding hearings on many of the same facts and legal questions.

## IV.    VENUE

14.       Venue is proper in the District Court of Northern California because Apple is headquartered and operates in this district and a substantial amount of Gjovik's claims arose from acts, omissions, and injuries within the District of Northern California.

15.       **Divisional Assignment**: Plaintiff files this complaint to the San Francisco Division, however either the San Jose or San Francisco Division are proper as a substantial part of the events and omissions giving rise to the claim both occurred in Santa Clara County (Santa Clara city, Cupertino, and Sunnyvale) and in San Francisco County (San Francisco city). Apple conducts day-to-day commercial activities within both counties. Apple has engaged in substantial, continuous, and systemic activities within both counties, providing for a fair and

---

[8] 28 U.S.C. § 1367; *Osborn v. Haley*, 549 U.S. 225, 245 (2007).
[9] California Department of Labor: *Ashley Gjovik v. Apple Inc*., (RCI-CM-842830)

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                              OCTOBER 25 2023

reasonable basis for the exercise of personal jurisdiction over Apple by this Court in either division. [Civil L.R. 3-5(b)].

## V.    PARTIES

16.    Ashley Gjovik (pronounced "JOE-vik"), Plaintff, was an employee of Apple Inc and covered person under applicable statutes in this complaint. Gjovik is a natural person holding a Juris Doctor and appearing Pro Se. As of September 7 2022, Gjovik resides and was domiciled in Albany New York. Gjovik lived in Santa Clara from February 2020 through October 2020, and then again August 2021 through August 2022. Gjovik lived and worked in San Francisco County from October 2020 through August 2021. Gjovik established a consulting LLC in California in 2022 which she continues to manage with a virtual office in Sacramento,.

17.    Apple Inc, Defendant, is a business engaged in and affecting interstate commerce, and a covered entity under the statutes at issue here. Apple is a corporation headquartered in Cupertino California. Defendant has offices, retail stores, call centers, data centers, and other facilities in numerous US states and foreign countries.

## VI.    NOTICE OF PENDENCY & CONFLICT OF LAWS

18.    Gjovik's SOX whistleblower retaliation claim was filed August 29 2021, and the case was docketed with US Department of Labor on December 12 2021.[10] SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims.

---

[10] *Ashley Gjovik v Apple Inc,* Apple Inc./Gjovik/9-3290-22-051; OSHA 11(c) Procedures: 29 CFR Part 1977, EPA Procedures: 29 CFR Part 24, SOX Procedures: 29 CFR Part 1980

19.    Gjovik was forced to leave her CERCLA and OSHA whistleblower retaliation cases with US Department of Labor as the claim's exclusive jurisdiction is with US Department of Labor and there is no way to remove the two charges to US district courts for a de novo trial. The status of those charges is described in RICO Predicate Act "*Criminal Extortion*."

20.    Gjovik filed retaliation and labor code violation charges to the California Department of Labor on August 29 2021, and the initial interview was conducted in October 2021. California Department of Labor has not started the investigation of Gjovik's California case and the statutes allow an option for the complainant to take the matter to a court instead waiting on an agency decision. This lawsuit will replace the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830.

21.    NLRB charges cannot be removed to court as the NLRB has exclusive jurisdiction to adjudicate cases under the NLRA. Gjovik is a witness for the NLRB and some of the 18 US Code §§ 1512 and 1513 Predicate Acts in this complaint were part of a scheme to keep Gjovik from testifying or providing evidence, and to coerce her to withdraw and drop her NLRB charges. This civil case will hopefully relieve the witness intimidation and retaliation Gjovik has suffered from Apple.

22.    The NLRA cannot preclude a federal RICO claim where a RICO Predicate Act arises from conduct that also violates another federal statute, as then that conduct is also a federal and/or state crime.[11]

23.    Similarly, the state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.[12]   The 9th Circuit found, *"there is no clear and manifest intent on the part of Congress to pre-empt all state tort laws that traditionally have been available to those persons who … allege outrageous conduct at the*

---

[11] *Torres v. Vitale*, 954 F.3d 866, 874-75 (6th Cir. 2020).
[12] *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).

*hands of an employer. That would require us to conclude that Congress has displaced not only state tort law … but also state criminal law, to the extent that such criminal law is applied to retaliatory conduct.*"[13]

### VII.    FACTS & GENERAL ALLEGATIONS

24.    The claims and allegations against Apple in this case implicate several themes of issues for which there are relevant indirect facts required to provide proper framing related to retaliation pretext, RICO, and other contextual legal arguments. Most of these facts are already substantiated by public evidence, or evidence obtained through FOIA and Public Records Act Requests – however other indirect facts may require limited discovery. Certain facts not directly related to Gjovik are provided to show Apple's patterns of behavior on topics that are directly related to Gjovik's case, including:

a.    Apple's offices on toxic waste clean-up sites (Superfunds, Brownfields, etc.); including government oversight and property owners

b.    Apple's policies and practices related to hazardous material management; and hazardous waste management, storage, treatment, transport, and disposal

c.    Apple's (including Apple executives and Board members) involvement in conduct which could be considered fraudulent, misleading, threatening, and obstructive; including "astroturfing," false public statements, and manipulation of the press and public discourse

d.    Criminal investigations and charges against Apple and Apple executives

e.    Apple's history of environmental, health/safety, and labor violations; evidence of Apple's patterns/practice of responding to environmental, health/safety, and labor concerns; evidence of Apple's responses to US government inquiries and investigations

---

[13] *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1154-55 (9th Cir. 2000); *Torres v. Vitale,* 954 F.3d 866, 871 (6th Cir. 2020).

**A.    CHRONOLOGICAL FACTS; BY TOPIC**

**i.    Background on the Property and People Involved in This Case (2010-2015)**

25.    In April of 2010, Apple obtained a search warrant to raid the home of a tech reporter, seizing the reporter's computers and servers. There was no legal basis for the search and the warrant was withdrawn.[14] It was also revealed that Apple sat on a steering committee that oversaw and directed the "*police task force*" (the "Rapid Enforcement Allied Computer Team") that raided the reporter's home on behalf of Apple.[15]

26.    By May 2010, the search was now openly referred to as a home break-in, there was "*outrage*" from "*media watchdogs*", and press and public complained the task force was acting as "*Apple's secret police*" and as "*Apple's private police force*."[16] The search was believed by many to violate California's Constitutional Reporter Shield law.[17]

27.    In 2011, Apple's Worldwide Loyalty team arranged a raid of a man's home without a warrant and based on their own corporate tracking of iPhone GPS data.[18] Two Apple Global Security/Worldwide Loyalty employees obtained the presence of four plainclothes San

---

[14] Matt Zimmerman, *Gizmodo iPhone Warrant Affidavit Released, Impropriety of Search Confirmed,* EFF, May 14 2010, https://www.eff.org/deeplinks/2010/05/iphone-warrant-affidavit-confirms-impropriety

[15] John Letzing, *Police task force oversight committee has included Apple,* MarketWatch, April 27 2010, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27

[16] Pete Carey, *Raid in iPhone case shines spotlight on REACT team, Mercury News*, May 4 2010, https://www.mercurynews.com/2010/05/04/raid-in-iphone-case-shines-spotlight-on-react-team/ "*The Rapid Enforcement Allied Computer Team operated out of publicity's glare until last month, when armed with a search warrant, its investigators broke into the Fremont home of a blogger-editor for the website Gizmodo."*

[17] Matt Zimmerman, *OverREACTing: Dissecting the Gizmodo Warrant,* EFF, April 27 2010, https://www.eff.org/deeplinks/2010/04/gizmodo-search-warrant-illegal

[18] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader; SF Weekly, Lost iPhone 5: Bernal Heights Man Says Visitors Impersonating Police Searched His Home, https://web.archive.org/web/20211009190421/https://archives.sfweekly.com/thesnitch/2011/09/02/lost-iphone-5-bernal-heights-man-says-visitors-impersonating-police-searched-his-home-exclusive

Francisco police officers in order to search the man's home. The officers identified themselves as police while the Apple employees said nothing. The man assumed the Apple employees were also police officers and let them into his house. [19] The officers attempted to keep the search out of official records, leading the police spokesperson to initially assume it was a case of impersonation of officers by six individuals, not just two.[20]

28.    If the Apple employees who searched the man's home were not with the San Francisco police, that is a crime. And if they were with the SFPD, they had an obligation to report the information to the department, which did not happen.[21]

29.    One of the Apple employees threatened the Latino man and his family with deportation if he did not cooperate with their search of his home.

30.    Legally that is considered extortion, and any police officers involved would be violating the searched party's Constitutional rights. [22] Press coverage complained of "*taxpayer paid enforcers for Jobs' mob*."[23]

31.    Apple would later terminate Gjovik's employment only hours after Gjovik posted on Twitter linking to a 2011 article titled *"Lost iPhone 5: Bernal Heights Man Says Visitors Impersonating Police Searched His Home."*[24]^ The article discussed both 2010 and 2011 "break in" matters.

32.    In 2014, Oaktree Capital and Hines purchased 825 Stewart Drive in Sunnyvale California (Gjovik's future office and about which she would be terminated in 2021). Prior to the

---

[19] Id.
[20] Id.
[21] Mat Honan*, Apple Investigators Reportedly Impersonated SF Police*, Gizmodo, September 2011, https://gizmodo.com/apple-investigators-reportedly-impersonated-sf-police-i-5836990
[22] Fudzilla, Police investigate how they became Apple's secret police, https://www.fudzilla.com/news/24000-police-investigate-how-they-became-apples-secret-police
[23] Id.
[24] SFWeekly, Lost iPhone 5, *supra*; Twitter, https://twitter.com/ashleygjovik/status/1436071412624609287

purchase, the building sat vacant and gutted for over a decade. Indoor air testing during that time showed vapor intrusion was actively occurring inside the building.[25]

33.     In 2014, Ronald Sugar was an Apple Board member and chair of Apple's Finance and Audit committee, joining in 2010 after retiring from his role as CEO of Northrop Grumman Corporation. Sugar was also the lead independent director for the Chevron Board. In 2014, Robert Denham was a Chevron Board Member, an Oaktree Capital Board member, and a Board member of the James Irvine Foundation.[26]

34.     825 Stewart Drive is also known as the "TRW Microwave Superfund site" (EPA ID CAD009159088), which is one of the three sites making-up the "Triple Site" (EPA ID CAN000900265). The Responsible Party for the TRW Microwave site is Northrop Grumman Corporation, which acquired TRW decades ago.

35.     The "*Triple Site" is the collective name for three adjacent sites in Sunnyvale that have jointly contributed to a groundwater solvent plume*."[27] The US EPA webpage for Triple Site states that, "*a groundwater plume composed of volatile organic compounds (VOCs), including TCE, extends from these [three Superfund] sites more than a mile … This area of the neighborhood is referred to as the Offsite Operable Unit (OOU) and includes four schools and over 1,000 residences*."[28]

---

[25] US EPA, TRW Microwave, Site Documents – Vapor Intrusion, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC

[26] Chevron, https://chevroncorp.gcs-web.com/news-releases/news-release-details/former-salomon-inc-chairman-robert-e-denham-elected; https://chevroncorp.gcs-web.com/node/19621/html

[27] US EPA, *Triple Site Site Profile - Background*, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0900265#bkground

[28] Id.

36.     Under information and belief, Ronald Sugar brokered the sale of 825 Stewart Drive to Oaktree Capital and the lease of 825 Stewart Drive to Apple, exploiting his position on the Chevron Board and in the interests of Northrop Grumman Corporation.

37.     The US EPA determined in 2015 that the conditions at the Triple Site may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility. The data demonstrated a pathway for vapor intrusion is occurring at the Site.[29]

38.     In late 2015, Apple started stealth semiconductor manufacturing and silicon fabrication activities in a facility located at 3250 Scott Boulevard Santa Clara California.

39.     Apple was cited for building, environmental, health/safety, and fire code violations at 3250 Scott Blvd in at least 2015, 2016, 2017, and 2020.

40.     The 3250 Scott Blvd factory vented its exhaust of solvents and toxic gases less than 300 feet from a large apartment complex owned by The Irvine Company.

41.     In 2015, Irvine Company was finalizing the Environmental Impact Report ("EIR") for the 3255 Scott Blvd property across the street from Apple's plant and starting development of a large apartment complex (where Gjovik would live in 2020).

42.     Apple's factory at 3250 Scott Blvd was never mentioned in the 3255 Scott Blvd EIR despite being located less than 300 feet away (making the apartments a "*fenceline community*")

Under information and belief, Apple and Irvine Company conspired to keep Apple's activities out of the EIR because if it was included, Apple would have to comply with regulatory obligations and federal environmental statutes at the factory, and Irvine

---

[29] *In The Matter of: Offsite Operable Unit, Triple Site, Sunnyvale, California,* CERCLA Docket No 2019-05, Administrative Settlement Agreement & Order on Consent for removal Site Evaluation and Removal Action, Page 7

17

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Company would have to rent their future apartments at a lower value due to the degraded air quality from Apple's emissions.

43.    In 2015, Apple renovated the building at 825 Stewart Drive on the TRW Microwave Superfund site (that would become Gjovik's office). In May 2015, Northrop Grumman completed the installation of the sub-slat depressurization system and professional engineer certified sealing of the floor cracks and conduits, the primary mitigation measures to prevent vapor intrusion in the building.

44.    Apple's installation of the HVAC system for the building in late 2015 included Apple sawing the sub-slab vents on the main building roof down from three feet to one foot, and then installing the HVAC intake in close proximity to the Superfund vapor vents, and low to the ground where the vapors would pool on the roof.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Exhibit A-i-a**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



ED_0064756_0000152Q-00001

**Exhibit A-i-b**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

45.     Under information and belief, Apple also penetrated the slab in late 2015 to install equipment.

46.     Under information and belief, Apple never reported these activities to the US EPA or engaged an independent professional engineers for inspection and certification.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

47.    In May 2015, vapor intrusion testing at 825 Stewart Drive showed indoor air pollution of Trichloroethylene (TCE), 1,2-Dichloroethene (1,2-DCE), Toluene, Chloroform, Methylene Chloride, and Ethylbenzene. The testing also showed outdoor air contamination on the roof, possibly coming through the sub-slab vents. The rooftop air pollution included TCE, 1,2-DCE, Chloroform, and Xylenes.[30]

48.    Apple was sued by US FTC and US DOJ in 2013-2014 for violating the SHERMAN ACT. In court decisions in the US District Court and the 2nd Circuit of Appeals, the Judges complained that Apple was not taking the law seriously, showed no contrition, was only providing cryptic responses, showed '*strained and unreasonable'* readings of the law, took a '*confrontational and obstructionist approach'* to the lawsuit, dragged their feet and sat on their hands, and was not complying in good faith.[31] The District Court went so far as to say there was a "*blatant and aggressive disregard at Apple for the requirements of the law.*"[32]

49.    Following the decision against Apple, the court appointed a monitor to oversee Apple's response to the decision and ensure Apple began to comply with antitrust laws. Michael Bromwich was appointed as the monitor. Bromwich had previously worked as a federal prosecutor, as associate counsel in the Office of Independent Counsel for Iran-Contra, and was Inspector General for the US DOJ from 1994-1999.

---

[30] US EPA, TRW Microwave, Site Documents, Vapor Intrusion, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC
[31] *U.S. v Apple Inc,* F.Supp.2nd 263 (S. Dist. of NY 2014). *U.S. v Apple Inc,* 787 F.3d 131 (2nd Circuit 2015).
[32] *U.S. v Apple Inc,* F.Supp.2nd 263, supra.

50.    The monitor, Bromwich, issued his third report about his experience with on Apple on April 16 2015.[33] He described Apple's behavior as "*inappropriate*" and "*adversarial*," and complained Apple refused to provide evidence of regulatory compliance.[34]

51.    He complained that Apple had placed the new Compliance Officer in a position reporting to Tom Moyer instead of directly reporting to the Apple Board under Ronald Sugar. He called the reporting structure an "*intentional*" "*conflict of interest*", and warned it would compromise the Officer's ability, or even willingness, to challenge Apple's "*risky business decisions.*"[35]

52.    On October 15 2015, the federal monitor, Bromwich, complained that the chair of Apple's Finance and Audit Committee, Ronald Sugar, admitted to not reading Bromwich's reports beyond the executive summary. Upon hearing Bromwich's feedback, Apple protested it was "*bizarre*" to expect the Chair, Ronald Sugar, to read the entire report from a federal-court-appointed monitor as the result of a lawsuit against Apple by the federal government, of which Apple lost and was found to have violated the Sherman Act, despite Sugar being the Chair of the Audit & Finance Committee which claims to oversee regulatory compliance, including antitrust.

53.    Finally, Bromwich, also complained that Apple continued to refuse to provide information about their policies and procedures for investigating possible regulatory compliance issues. The monitor noted "*remarkable resistance*" from Apple on complying with the court order and his monitorship.[36]

---

[33] 3rd Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, and *State of Texas v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394 (April 14, 2015).
[34] Id.
[35] Id.
[36] Fourth Report of the External Compliance Monitor, *United States v. Apple, Inc., et al.,* No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394 (October 15 2015).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

54.      Apple engaged in deranged conduct towards Bromwich, quite similar to some of the actions Apple has taken against Gjovik. Apple had articles written about Bromwich to smear and try to intimidate him. Apple baselessly accused Bromwich of extortion. Bromwich quicikly found himself receiving obsense, harssing emails from anonymous accounts. Bromwich even attached some of these emails in his monitorship filings.

Case 1:12-cv-02826-DLC    Document 424-2    Filed 12/30/13

**Sunday, December 1, 2013 5:27:1**

**Subject:** Piece of Shit
**Date:**      Saturday, November 30, 2013 12:17:54 PM Eastern Standard Time
**From:**    My Site
**To:**        info@bromwichgroup.com

Name: Steve

Email: Blowme@gmail.com

Subject: Piece of Shit

Comments:
You are a thieving schiester piece of shit. There enough misery that beset
you for the rest of your life.

Steve Jobs

[37]

**Exhibit A-i-c** *Exhibit from Bromwich's Statement Filed in Response to Apple Attempting to Remove Him*

55.      Apple conducted another round of vapor intrusion testing at 825 Stewart Drive in December of 2015. Apple and Northrop Grumman submitted the results to US EPA in February 2016.

56.      On March 2 2016, the US EPA "approved" Apple's December 2015 test results, however, the US EPA actually re-approved the May 2015 results and did not respond to the December 2015 testing.

---

[37] US DOJ, Federal Monitor Report Filing, Declaration of Michael Bromwich,
https://www.justice.gov/d9/atr/case-documents/attachments/2013/12/30/302674.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

57.    In 2016, US EPA (Melanie Morash) wrote about the December 2015 results in her approval letter: "*of the five indoor air samples collected, the highest level of trichloroethene (TCE) detected was 0.58 micrograms per cubic meter (ug/m3).*"[38] [However, this was the May 2015 data]

58.    The December 2015 testing results actually showed an increase in sub-slab and indoor air pollution compared to the May 2015 results.[39] For instance, while the highest indoor air TCE reading in May 2015 was 0.58 µg/m3, the highest indoor air TCE reading in December 2015 was 1.2 µg/m3 (double). Or another example, during the May 2015 test results, no indoor air results exceeded US EPA or DTSC HERO limits; the December 2015 results, however, included results for Ethylbenzene which exceeded both US EPA and DTSC HERO limits.[40]

| | | Fraction: Parameter: | | VOAs Trichloroethene | VOAs Ethylbenzene |
|---|---|---|---|---|---|
| USEPA Region 9 Interim Accelerated RALs (Commercial/Industrial) | | | | 8[a]/7[b] | - |
| USEPA Region 9 Interim Urgent RALs (Commercial/Industrial) | | | | 24[b]/21[b] | - |
| | | USEPA Region 9 Industrial RSLs | | 3.0 | 4.9 |
| | | DTSC HERO Note 3 | | 3.0 | 4.9 |
| Location ID | Sample Name | Sample Date | Unit: | ug/m3 | ug/m3 |
| **Indoor Air Samples** | | | | | |
| IA-1 | J6038-IA1-050615-1 | 5/6/2015 | | 0.50 | 0.49 |
| IA-1 | J6038-IA1-050615-2 | 5/6/2015 | Dup | 0.51 | 0.51 |
| IA-2 | J6038-IA2-050615 | 5/6/2015 | | 0.50 | 0.45 |
| IA-3 | J6038-IA3-050615 | 5/6/2015 | | 0.20 | 0.40 |
| IA-4 | J6038-IA4-050615 | 5/6/2015 | | 0.54 | 0.56 |
| IA-5 | J6038-IA5-050615 | 5/6/2015 | | 0.58 | 0.59 |
| **Outdoor Air Samples** | | | | | |
| OA-1 | J6038-OA1-050615-1 | 5/6/2015 | | <0.11 | 0.11 |
| OA-1 | J6038-OA1-050615-2 | 5/6/2015 | Dup | 0.039 J | 0.069 J |

**Exhibit A-i-D:** *May 2015 Indoor Air Testing Results (US EPA)*

---

[38] US EPA, TRW Microwave, *EPA Approves Feb 2016 VI report,* https://semspub.epa.gov/work/09/1158558.pdf
[39] US EPA, *December 2015 VI Evaluation Report*, https://semspub.epa.gov/work/09/1158560.pdf
[40] Id at pages 26-25.

| | | Fraction: | VOAs | VOAs |
|---|---|---|---|---|
| | | Parameter: | Trichloroethene | Ethylbenzene |
| USEPA Region 9 Interim Accelerated RALs (Commercial/Industrial) | | | 8[a]/7[b] | - |
| USEPA Region 9 Interim Urgent RALs (Commercial/Industrial) | | | 24[a]/21[b] | - |
| USEPA Region 9 Industrial RSLs | | | 3.0 | 4.9 |
| DTSC HERO Note 3 | | | 3.0 | 4.9 |
| Location ID | Sample Name | Sample Date | Unit: | ug/m3 | ug/m3 |
| Indoor Air Samples | | | | | |
| IA-1 | J6038-IA1-122915-1 | 12/29/2015 | | 0.76 | 3.6 |
| IA-1 | J6038-IA1-122915-2 | 12/29/2015 | Dup | 0.78 | 4.2 |
| IA-2 | J6038-IA2-122915 | 12/29/2015 | | 1.1 | 12 |
| IA-3 | J6038-IA3-122915 | 12/29/2015 | | 1.1 | 6.0 |
| IA-4 | J6038-IA4-122915 | 12/29/2015 | | 1.0 | 4.4 |
| IA-5 | J6038-IA5-122915 | 12/29/2015 | | 1.0 | 4.2 |
| IA-6 | J6038-IA6-122915 | 12/29/2015 | | 0.94 | 2.9 |
| IA-7 | J6038-IA7-122915 | 12/29/2015 | | 1.0 | 5.8 |
| IA-8 | J6038-IA8-122915 | 12/29/2015 | | 0.39 | 0.58 |
| IA-9 | J6038-IA9-122915 | 12/29/2015 | | 1.2 | 1.9 |
| Outdoor Air Samples | | | | | |
| OA-1 | J6038-OA1-122915-1 | 12/29/2015 | | 0.25 | 0.80 |
| OA-1 | J6038-OA1-122915-2 | 12/29/2015 | Dup | 0.24 | 0.79 |

**Exhibit A-i-E:** *December 2015 Indoor Air Testing Results (US EPA)*

**Table A-1: Summary of 2013-2015 Indoor Air Test Results at 825 Stewart Drive**

| Location | Chemical | December 2013 Results | May 2015 Results | December 2015 Results | DTSC HERO/US EPA Safety Limits |
|---|---|---|---|---|---|
| Southwest Lobby/Front Sub-Slab Venting System | TCE | 82 µg/m3 (SS-1) 84 µg/m3 (SS-4) | 250 µg/m3 (SS-5) | 8,500 µg/m3 (SS-5) | 60-292 µg/m3 |
| | PCE | 15 µg/m3 (SS-1) 170 µg/m3 (SS-4) | 23 µg/m3 (SS-5) | 170 µg/m3 (SS-5) | 42-5,840 µg/m3 |
| | 1,2-DCE | 1.9 µg/m3 (SS-1) 1.6 µg/m3 (SS-4) | 4.3 µg/m3 (SS-5) | 790 µg/m3 (SS-5) | 700 µg/m3 |
| | Chloroform | 0.23 (SS-1 & 4) | 3 µg/m3 (SS-5) | 61 µg/m3 (SS-5) | 11-14,308 µg/m3 |
| Southwest Lobby/Front | TCE | 6.8 µg/m3 (AI-3) | 0.54 µg/m3 (IA-4) | 1.2 µg/m3 (IA-9) | 3 µg/m3 |

| Location | Contaminant | | | | |
|---|---|---|---|---|---|
| **Indoor Air (HVAC Zone 1)** | | | 0.51 µg/m3 (IA-1) | | |
| **Ashley's Lockdown Sub-Slab Venting System** | TCE | 1,900 µg/m3 (SS-2) | No Tests | 1,900 µg/m3 (SS-2) | 60-292 µg/m3 |
| | PCE | 170 µg/m3 (SS-2) | No Tests | 210 µg/m3 (SS-2) | 42-5,840 µg/m3 |
| **Ashley's Lockdown Indoor Air (HVAC Zone 2)** | TCE | 7.3 µg/m3 (AI-4) | No Tests | 1 µg/m3 (IA-7) | 3 µg/m3 |
| | Toluene | 3 µg/m3 (AI-4) | No Tests | 510 µg/m3 (IA-7) | 1,300-22,000 µg/m3 |
| | Ethylbenzene | 0.34 µg/m3 (AI-4) | No Tests | 5.8 µg/m3 (IA-7) | 4.9 µg/m3 |
| **Wi-Fi Lab Sub-Slab Venting System** | TCE | No Tests | 2,100 µg/m3 (SS-7) | No Tests | 60-292 µg/m3 |
| | PCE | No Tests | 290 µg/m3 (SS-7) | No Tests | 42-5,840 µg/m3 |
| | Toluene | No Tests | <27 (SS-7) | No Tests | 26,000 µg/m3 |
| | Ethylbenzene | No Tests | <31 (SS-7) | No Tests | 146,000 µg/m3 |
| **Wi-Fi Lab or Thermals Lab Indoor Air (HVAC Zone 1)** | TCE | 7.3 µg/m3 (AI-4) | 0.5 µg/m3 (IA-2) | 1.1 µg/m3 (IA-2) | 3 µg/m3 |
| | Toluene | 3 µg/m3 (AI-4) | 5.6 µg/m3 (IA-2) | 1,100 µg/m3 (IA-2) | 1,300-22,000 µg/m3 |
| | Ethylbenzene | 0.34 µg/m3 (AI-4) | 0.45 µg/m3 (IA-2) | 12 (IA-2) | 4.9 µg/m3 |
| **Back/North Offices Sub-Slab Venting System** | TCE | 110 µg/m3 (SS-3) | 47 µg/m3 (SS-11) | 210 µg/m3 (SS-10) | 60-292 µg/m3 |
| | PCE | <0.14 µg/m3 (SS-3) | 7.3 µg/m3 (SS-11) | 20 µg/m3 (SS-10) | 42-5,840 µg/m3 |
| | Ethylbenzene | 28 µg/m3 (SS-3) | <1.8 µg/m3 (SS-11) | <3.1 µg/m3 (SS-10) | 146,000 µg/m3 |
| **Back/North Offices Indoor Air (HVAC Zone 4)** | TCE | 7.7 µg/m3 (IA-1) | 0.2 µg/m3 (IA-3) | 1.1 µg/m3 (IA-3) | 3 µg/m3 |
| | Ethylbenzene | 0.52 µg/m3 (IA-1) | 0.4 µg/m3 (IA-3) | 6 µg/m3 (IA-3) | 4.9 µg/m3 |
| **Back/North Outdoor Air (Rooftop)** | TCE | 0.45 µg/m3 (OA1) | 0.039J µg/m3 (OA1) | 0.25 µg/m3 (OA1) | |
| | Ethylbenzene | 1.1 µg/m3 (OA1) | 0.11 µg/m3 (OA1) | 0.8 µg/m3 (OAI) | |
| | Toluene | 8 µg/m3 (OA1) | 0.93 µg/m3 (OA1) | 43 µg/m3 (OAI) | |

59.     Under information and belief, if the US EPA had reviewed the December 2015 test results, they may not have approved the results and/or may have said the building was not safe for occupation by workers. In the alternative, US EPA did review the December 2015 report but instead of denying it, or intentionally repeated the May 2015 results as a favor to Apple.

60.     In 2016, Oaktree Capital and Hines sold 825 Stewart Drive to CalSTRS via GI Partners while Apple was a tenant.

61.     Under information and belief, Apple's botched HVAC renovations in 2015 were never disclosed to CalSTRS, a state government agency, thus defrauding the California government.

62.     In December 2016, Apple was fined $450,000 by the California EPA for violating a number of Hazardous Waste laws, including operating off books waste processing plants, transporting waste without manifests, and failing to take proper employee safety precautions.[41] Apple also agreed to a five-year consent order.

63.     On November 8 2016, Apple submitted a Tier 1 Application to DTSC for the 3250 Scott Blvd plant that included inaccurate and incomplete information. The application denied that the site was on a chemical clean-up site despite being on a Superfund groundwater plume and other contamination. The application denied any chemical spills despite a citation that year for Apple spilling cooling water in a storm water drain.

ii.     **Gjovik Joins Apple; Team Bullies & Bribes Her (2015-2016)**

64.     Ashley Gjovik worked for Apple Inc from February 23 2015, until Apple terminated Gjovik's employment on September 9 2021 (effective September 10 2021). During

---

[41] CalEPA DTSC, "*Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*," Dec 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

her tenure with Apple, Gjovik led numerous high-profile projects. She participated in engineering project management of numerous high-profile products such as the iPhone, iPad, iPod, Apple Watch, MacBook Pro, MacBook Air, and Mac Pro and high-profile projects such as the launch of the Apple Music subscription service, Apple's transition of computers from Intel to Apple silicon, and work to establish the first company-wide Artificial Intelligence ethics policy.

65.     During Gjovik's nearly seven years with Apple, she was a significant contributor in developing and improving critical process and policies, mentoring employees, and managers, and providing strategic advice to executives. She has been praised for everything from "*saving Apple money*" to "*driving better testing and higher quality in Apple's software*." Her direct supervisor at the time of her termination previously illustrated what he called Gjovik's' "*amazing work*" as: "*the combination of broad networking, collaboration, understanding of many technical and non-technical areas*;" "*providing deep and meaningful insights*;" and "*connecting people for more collaboration*." He went on to say Gjovik had "*become a mentor to people around the organization*" around "*relationship skills*," "*crafting presentations,*" "*increasing visibility and network*," and "*coaching on tough conversations*."

66.     Gjovik's importance to Apple Inc was exemplified in her many outstanding performance reviews. These included Apple's award to Gjovik of large bonuses and raises due to her strong performance. Gjovik's performance never necessitated any performance improvement plan, nor did Apple ever issue any negative written reviews.

67.     In fact, Apple told Gjovik that she was an extremely valuable member of the company. At different times she was told by her supervisors that she was both "*key talent*" (unreplaceable) and a "*high performer*." Every annual performance review at Apple, Gjovik received at least one "*Exceeds Expectations*."

68.     Gjovik started at Apple on February 23 2015. Linda Keshishoglou was Gjovik's first direct manager at Apple. Venkat Memula was the Director of Gjovik's first team and Keshishoglou reported to Venkat.

69.     Gjovik experienced hostility from the start of her employment. In her first year, her colleagues created a whiteboard of insulting nicknames, another with tallies for points for "*should they quit*" and *"making [her] want to quit,"* and filed a ticket in the Radar work tracking tool entitled "*Make Ashley's Life a Living Hell."*

70.     Rob Marini and Brad Riegel told Gjovik that filing complaints to Human Resources at Apple is known as a "CLM." They explained that stands for "*Career Limiting Move.*"

71.     Despite knowing that she suffers from Post-Traumatic Stress Disorder (PTSD) Gjovik's colleagues would try to startle her, make her scream, and attacked her with Nerf guns and dodgeballs. Gjovik complained of these activities to Apple's Employee Relations team in July and August 2021, noting in an email on July 21 2021, that her coworkers had created a video/audio recording of her "*screaming bloody murder*" while they attacked her with dodge balls, then created a 'remix' version of her screams and shared it with the team, while they were "*laughing hysterically*."

72.      Gjovik was assigned to share an office with Rob Marini. Marini told her during the first week that prior coworkers who had shared an office with him previously had either quit, left the country, or committed suicide. Marini joked about which of those paths she would follow. Marini often made cruel and awful 'jokes' like that, despite Gjovik's complaints. One time, when she made a minor mistake drafting an XML document, Marini responded that everyone would be better off if Gjovik 's "*mother had had an abortion."*

29

73.     One of primary aggressors of the harassment at the time was a colleague named Brad Reigel. Reigel often made comments about Gjovik, calling her fat, an idiot, or stupid. Around December 2015, Reigel made her stay in an office conference room against her will, where he yelled at her while she cried. He would also often make somewhat violent jokes targeting her including but not limited to that he was going to "smack" Gjovik. These remarks were all the more concerning considering that he was known for bringing firearms into the office, and Gjovik had seen ammunition at his desk.

74.     Reigel had also destroyed objects when upset at work, including infamously striking a chocolate Easter bunny on a table to knock off its 'head' while screaming at Software QA Director, Josh Williams. Marini also claimed Reigel had previously physically '*flipped a table*' during a work meeting while he was upset.

75.     Reigel was also an active police officer with a local Police Department. Gjovik and her coworkers occasionally referred to him as "*Officer Reigel*."

76.     When Gjovik complained to Venkat about Reigel and Marini's behavior, Venkat acknowledged it was inappropriate but his suggestions for Gjovik in response to the misconduct included things like dumping the liquor bottles they had in their offices and replacing the liquor with water and food coloring.

77.     It was a regular occurrence for the team to drink at work during work hours, and regularly coerced Gjovik to do the same, despite Gjovik's protests.

78.     On August 16 2021, when Gjovik complained to Apple Employee Relations about her team from 2015-2016, Gjovik also noted Memula's own work-time intoxication, with Employee Relations noting: "*You mentioned that Memula would snuggle up on you while drunk, whisper to you, and say things that made no sense.*" Gjovik cited evidence including "*see photograph of during one instance with documentation of his phases of drunkenness on*

30

*whiteboard including these behaviors, then following photo of him "crucifying" himself upon said whiteboard writing*."

79.    One of Gjovik's coworkers on this team claimed to have familial connections to a major organized crime family. If this court finds direct ties to organized crime required for the RICO case, Gjovik will plead those details under seal.

80.    In 2016, Marini began bragging about creating and being a member of "*secret cabals*" that consisted of certain Apple employees on an invite-only basis at Marini and Venkat's discretion.

81.    Several months later Marini told Gjovik there was a vote in one of the cabals and they agreed she could be a member. Marini added Gjovik to an Apple AD group and around 20 other members. Marini repeatedly warned Gjovik that she must behave herself if she wanted Marini and the other members to allow her to remain in the cabal.

82.    Under information and belief, the decision to engage in off books silicon fabrication at 3250 Scott Boulevard may have been the outcome of one of these '*cabals*.'

83.    Marini invited Gjovik to several social events in San Francisco, often with other coworkers and Memula. Marini told Gjovik that if she wanted to succeed at Apple, she must never decline an invite to spend personal time with engineering leadership. All social events Gjovik attended included excessive alcohol intake which Gjovik did not feel was optional.

84.    Keshishoglou praised Gjovik's work performance but also refused to allow Gjovik to attend the same meetings or be included on the same emails or group text messages as Gjovik's all-male coworker peers (Brad Reigel, Aron Talburt, and Rob Marini) were part of. When Gjovik complained to Keshishoglou about the exclusion, Keshishoglou could not provide a coherent explanation for why Gjovik was not included.

31

85.     At or around six months into Gjovik's employment at Apple, Keshishoglou's manager, Venkat Memula, questioned Gjovik about Keshishoglou's performance and Gjovik disclosed her concerns about the double-standard. Memula asked to receive updates on the matter and expressed a desire to terminate or otherwise remove Keshishoglou from his team. Memula must have informed Keshishoglou about Gjovik's complaints.

86.     In September 2015, Linda Keshishoglou met with Gjovik privately to deliver Gjovik's review and compensation. Keshishoglou bragged she was able to provide Gjovik the unproportionally large compensation.  After detailing Gjovik's compensation and explaining Keshishoglou provided a favor for Gjovik, Keshishoglou then told Gjovik something akin to "*now go tell Venkat I'm a good manager*."

87.     It was Gjovik's understanding, based on conversations and company policies, that the 2015 annual performance review cycle would 'skip' her because her employment at Apple was six months or less by the July 2015 evaluation period. An employee like herself who had only been employed at Apple for five months was supposed to be categorized as "*too new to rate*." An employee that is "*too new to rate*" does not receive a bonus, additional RSU vesting, or salary increase.

88.     Instead, Gjovik did receive an annual performance review in 2015 which included a bonus, additional RSU vesting, and a salary increase. Further, the compensation Gjovik received was above the ranges allocated for her role as an ICT3 Engineering Project Manager.

89.     In September 2015, Keshishoglou provided Gjovik a $100,000 grant of RSUs vesting over four years. Under information and belief, the maximum grant for an employee at her level was $60,000 and as too new to rate there was to be no RSUs.

90.     Keshishoglou increased Gjovik's salary and also provided Gjovik a bonus, which may or may not have exceeded the range allocated, but did exceed the $0 scoped for too new to

32

rate. The document Keshishoglou showed Gjovik in the meeting showed future compensation that was not effective immediately and the RSUs additionally noted they would need Board approval.

91.     Gjovik interpreted Keshishoglou's statement as an offer of additional compensation only if Gjovik were to drop her complaints about Keshishoglou and instead begin praising Keshishoglou. Gjovik felt that if she were to refuse to drop her complaints, that Keshishoglou may retract the compensation she offered.

92.     Gjovik complained to Venkat Memula about it, who told Gjovik to complain to Human Resources.

93.     Shortly after Keshishoglou transferred to a different organization and her team was transferred under Officer Reigel.

94.     In July 2021, Gjovik reported this incident to Apple Employee Relations (Ekelemchi Okpo), including providing copies of emails exchanged between Gjovik, Memula and, Human Resources at the time, and a list of witnesses.

95.     Gjovik documented her interactions with Keshishoglou and the compensation incident in the 2021 "Issue Confirmation" for Apple's investigation as "*hostile work env based on sex; quid pro quo; bribe; failure to resolve hostile work environment.*"

96.     Officer Reigel promptly closed the *"Make Ashley's Life a Living Hell"* task as "*complete*" after Gjovik was transferred to report to him as her manager.

97.     While Reigel was Gjovik's manager he continued with his inappropriate conduct towards Gjovik, including several of the issues listed above. Gjovik complained to Memula repeatedly about Reigel but Memula refused to intervene.

98.     Gjovik started looking for a new job at Apple, interviewing with Haley Samale's team to manager new software features. Gjovik was told she got the job but then was later told she did not, due to Reigel providing negative feedback about her.

99.     Software Engineering VP Kim Vorrath then intervened and assigned Gjovik to run a program called Early Field Failure Analysis ("EFFA") reporting to a different manager.

100.    Gjovik wanted to leave Memula's organizing and tried to reject the position, but she was told it was her only option. Gjovik eventually accepted the role.

### iii.    The Batterygate Fiasco (2016)

101.    In 2016, Gjovik managed the Software Engineering failure analysis program for products in the field and launch planning for New Product Introduction, still under Memula's organization, now reporting to Shandra Rica. Gjovik drove field issue triage and root cause analysis to resolution for customer software quality issues, and partnered with hardware teams when software or firmware updates were needed to mitigate silicon or component issues.

102.    Rica reported to Memula and approached Gjovik to interact as personal friends. In 2016, Rica invited Gjovik out to drink at bars and to sleep over at Rica's home. Gjovik slept over several times with both women sleeping in the same bed. They had become close friends, Gjovik thought, so she was surprised when Rica severely retaliated against her months later.

103.    In late 2016, there were reports of possible battery failures and device stability issues in the field that were being escalated across numerous engineering teams at Apple.[42]

---

[42] California AG, "Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling" https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against, Investopedia, "Apple (AAPL) Reaches $500 Million Settlement Over iPhone 'Batterygate'," https://www.investopedia.com/apple-aapl-reaches-settlement-over-iphone-batterygate-5088300

104.    Gjovik felt like it was an emerging issue so began including it in her status report and repeatedly urged her management to inform Software executives about the matter, so they were not caught off guard.

105.    Gjovik's management, Evan Buyze and Rica, refused to notify Software Engineering Program Office leadership.

106.    Gjovik attempted to go around them and inform Rica's boss, Memula, who was concerned and agreed with Gjovik; however Rica and Buyze quickly retaliated against Gjovik for 'going around them' and demanded she not inform any software executives of the issue without their permission.

107.    Shortly after, Gjovik received text messages from Operations Vice President Priya Balasubramanian asking if she could come to an in-progress meeting about the battery issues. They said that Jeff Williams, the COO, was asking where a representative from Software Engineering was and wanted someone there.

108.    Gjovik quickly texted Buyze and Rica about the matter asking for their input, but it was late and both had stopped responding.

109.    Gjovik attended the meeting and spoke for several minutes sharing an update and the data she had previously vetted with functional teams. Jeff Williams seemed appeased and thanked her when she was done.

110.    Following these events Gjovik was informed that Craig Federighi (Senior Vice President of Software Engineering) was upset that Kim Vorrath (Memula's manager) never told him about the emerging issues, and Vorrath was upset that Memula had never told her about the emerging issue, and Memula told Gjovik he was going to try to '*take the fall*' because Gjovik had tried to escalate.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

111.    However, Rica and Buyze quickly blamed Gjovik and said the only reason they were in trouble was that Gjovik went to the meeting and shared status. They said while the status was accurate and vetted, that Gjovik should have simply declined to attend and refuse to provide information because that is easier.

112.    Rica and Buyze then insisted the program's response to the battery issue should be 'ignoring it' and 'hoping it goes away.' When Gjovik continued to raise concerns about staffing for the overall program, Rica and Buyze said Gjovik should 'ignore' those issues too.

113.    They told Gjovik that if field issues are bad enough that Software executives will hear about them directly from other Executives so Gjovik should act in bad faith and stonewall at a program level. Gjovik pushed back on this and attempted to remind both how important customer product quality is.

114.    Shortly after, Rica constructively terminated Gjovik.

115.    Rica explained that she and Buyze 'got in trouble' over Batterygate, issues with the new MacBookPro with Touchbar launch, and while Gjovik was out for a week because Gjovik had supposedly set an 'unreasonable expectation' that Software would do work and so people expected them to do work, but they did not want to do work. They told Gjovik they now had to "reset expectations" for other organizations that Software will only provide minimum engagement on customer field issues.

116.    Rica told Gjovik that Gjovik's job was now "*finding a new job*." Rica also told Gjovik to not tell anyone what she just said and added she "*doesn't like people who talk shit."*

117.    Out of concern for product quality, Gjovik brought the matter to the Human Resources business partner who agreed that Buyze and Rica "*cannot do that*" and said she would follow up. Gjovik had all of her job responsibilities removed for nearly three months until she

was able to obtain and start in a new role at Apple. Human Resources told Gjovik they cannot

take her job away and that Rica was in the wrong.

118.    Gjovik also complained about this matter to Apple Employee Relations in May,

July, and August 2021. In August 2021, Employee Relations investigator Ekelemchi Okpo

documented this situation in detail in his original version of the "Issue Confirmation":

> *"In 2016, Apple allegedly had products in the field (iPhones) with bad batteries. You*
> *shared that you gave Jeff Williams an update on field issues and the meeting went well.*
> *After your meeting with Williams, you felt that you were thrown under the bus by your skip*
> *level manager, Shandra Rica, and your manager, Evan Buyze, because they failed to*
> *update the leadership team on field issues. You told me that you did not have work*
> *assignments for 3 months after this incident, and your responsibilities were taken away.*
> *As a result, you believe that this was constructive discharge, and you raised your concerns*
> *to Michallik on December 7, 2016."*

Gjovik also provided her emails with Human Resources, Rica, and Buyze on the matter to Okpo

as evidence for the investigation.

### iv.    Gjovik is Assigned to the "TRW Microwave Superfund site" Apple Office on the Triple Superfund Site (2017)

119.    Gjovik joined Product Systems Quality in January 2017, reporting to David

Powers and Dan West.

120.    Apple assigned Gjovik to work in the Apple office called "Stewart 1" (aka

"SD01") at 825 Stewart Drive, Sunnyvale California from 2017-2021.

121.    Apple never informed Gjovik that the office was on a Superfund site or that it

was a chemical release clean-up site generally.

122.    Gjovik would later be informed by a friend that her office was known by the U.S. EPA as the "TRW Superfund site" and one of the three sites constituting the "Triple [Superfund] Site."[43]

123.    Under information and belief, in August 2019, Apple was flushing Trichloroethylene ("TCE") in their waste water at 3250 Scott Boulevard. Apple did not have TCE listed in their CERS inventory, or their inventories for the city HazMat, or reported in any of their other filings. Yet, their NPDES testing showed 24ug/L of TCE exiting the factory and entering the municipal sewer lines on August 23 2017.[44]

124.    On December 28, 2017, Gjovik's supervisor, Dan West, tried to organize a sexual relationship between Gjovik and a sous chef at his favorite Michelin star restaurant ("Chez TJ" in Mountain View).

125.    Gjovik arrived at the restaurant to eat dinner alone, but West texted her as he conspired with the head chef to have the sous chef act as Gjovik's waiter, and both West and Chef suggested to both parties they should become romantically involved.

126.    Gjovik objected but West persisted. West also paid Gjovik's bill for the dinner and refused to refund Gjovik or even disclose to Gjovik how much the bill was, despite Gjovik's protests.

127.    West used his position of authority over Gjovik, put Gjovik under duress with fear of retribution and retaliation in her employment, and paid money (estimated around $400) to persuade, encourage, and induce Gjovik to sleep with a business partner, although West's efforts need not and were not successful. West intended to influence Gjovik to engage in sexual intercourse or lewd act with another person, who was not West, in exchange for West to obtain

---

[43] US EPA, *Superfund site: TRW Microwave (Building 825) Sunnyvale CA,* https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0901181
[44] Note: Apple banned use of TCE in their supply chain, https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf

receipt of the indirect benefits of positive influence in his business and personal dealings with the management of his favorite "Michelin Star" restaurant.

128.     *Pimping and Pandering with Indirect Benefits* is a felony.[45]

129.     On the evening of Nov 30, 2020, West messaged Gjovik and they discussed the incident. West told Gjovik; "*of all the inappropriate things I've done. That might be top of the list, especially since I don't think you were comfortable telling me no.*" West said he did not remember paying the hundreds of dollars for her dinner, saying *"I must have been drunk. That's over the top."*

130.     Gjovik described the night as an "*arranged marriage.*" West told Gjovik he was "*awakening to all of [his] inappropriate behavior.*"

131.     From 2017-2020, Dan West asked to visit Gjovik at home several times. West also asked Gjovik out to dinner alone several times.

v.     **Apple Forces Research & Development Employees to Use Work Devices for Personal Activities; Apple Forces Them to Participate in Medical Studies and Invasive Data Collection (2015-2021+)**

132.     Apple's directly and indirectly requires that their corporate research & development employees exclusively use internal devices (ie, "dev-fused hardware" and internal software) and Apple software/services for both work and personal use.

133.     From 2015 through 2021, Gjovik mostly complied with Apple's requests and coercion to do this.

134.     Even if employees used "personal" devices, Apple's "*Workplace Searches and Privacy*" policy said Apple would still spy on them. The policy says employees should have "no expectation of privacy" when using "Apple systems" without qualifying "internal systems," and

---

[45] California Penal Code §§ 266h, 266i

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

even including "non-Apple property". Apple also says employees should "have no expectation of privacy when on Apple premises," which assumably includes anything devices they have with them even if they're "personal."

---

## Workplace searches

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

---

*Exhibit: A-v-A: Exceprt from Apple's "Workplace Searches and Privacy" policy*

135.    During this time, Apple was in a position to collect data (and store, analyze, and exploit that data) on Gjovik's real time and historic GPS location,[46] what devices were around here and who they belong to who Gjovik was talking to and about what (the corporate 'configuration profile' allowed full disk access and allegedly included a keystroke recorder),

---

[46] Likely a violation of Cal. Penal Code § 637.7, prohibiting the use of GPS to track another person.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                              OCTOBER 25 2023

what Gjovik's schedule was and who she met with, the contents and metadata of all of Gjovik's documents and photos, and other highly sensitive information.

136.    The full disk access meant Global Security/Worldwide Loyalty had direct access to any and all photos and biometrics captured by Gjovik's phone.

137.    On August 3 2017, an Apple engineering manager, Robert McKeon, emailed an unknown list of Apple employees, including Gjovik, about a "Gobbler" user study. The manager wrote the study used an iOS application called "Gobbler," and told employees "*As you continue to use your device, use the Gobbler application to periodically upload data that has been logged.*"  The manager then wrote, "*In terms of data collection, we want more. The algorithm uses deep learning and the more data the better.*" He wrote that the Gobbler algorithms are "*hungry for data*" and that "*for uploading data: all data that has your face in it is good data.*"

138.    Gjovik did not respond to or act on the email.

139.    On Aug 7 2021, Gjovik received a different email from a group account saying "*Come join us! We look forward to seeing you there*!"  The email appeared to be a mandatory social event. Gjovik accepted, assuming it was expected. (The message said nothing about Face ID.)

140.    Gjovik received another response later that day saying, "*Hello there! Thank you very much for responding to our invite! ..... You will receive an iCal invite to the event shortly... Please arrive at [Apple's Mathilda 3B office building] Patio at your scheduled time. Do not hesitate to reach out if you have any questions or concerns regarding the study. See you soon*!"

141.    Gjovik was tricked into attending a "social event" that was really a compound in a parking lot with an armed guard outside, where Gjovik was coerced to use the "Gobbler" application to provide her biometrics and videos of her before she left.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

142.    Gjovik received offers to participate in Gobbler prior and denied those offers, but Gjovik felt she had no choice but to comply once she arrived at the compound.

143.    From that day forward Gobbler was always installed on her iPhone and it was always capturing videos and biometrics from the front camera whenever "*it thought it saw a face.*" Even today Gjovik's iCloud is still connected to Gobbler with no way for Gjovik to disconnect it.



*Exhibit: Gjovik's iCloud Account, Current Day*

144.    Apple would later rename the application from Gobbler to "Glimmer" after criticism about the *facial "Gobbler"* name.

145.    On Apple's internal "Living On" help page, it explains that when you "live on" Apple devices, *"You are encouraged to make full use of your living on devices as you regularly would, and try to log as many bugs as possible. This will help us provide a better and bug free product to our customers.*

146.    Around this time Gjovik was contacted to participate in other user study programs including Apple wanting to study her ovulation cycles and menstruation, which she denied.

147.    Apple asked to study Gjovik's vitals while she ran and swam, which she denied.

148.    Apple asked to study Gjovik's vitals and sleep while she slept, which she accepted for a few months, but then left the program due to how invasive it felt.

149.    Apple also asked to 3D scan Gjovik's ears and ear canals, which Gjovik denied expressly in 2018 and stated her denial was 'indefinite.'

**vi.    Apple Fighting To Increase Their E-Waste & Threatening Families about Superfund Offices (2018)**

150.    Gjovik created a successful hardware re-use program in 2018, in order to fill test coverage gaps dependent on infrastructure, while also dramatically reducing e-waste.

151.    West and Powers suddenly canceled her project without consulting or notifying Gjovik and the explanation provided was that one of West's reports, Reed Johnson, requested the change in order to obtain personal benefit, and West approved.

152.    When Gjovik complained about the decision to cancel the project, resulting in a dramatic increase in e-waste and reduced test coverage for customer products which was known to increase risk and did result in customer field issues, Gjovik was repeatedly told by West and Powers that she was being "*emotional*," "*aggressive*," and "*irrational*."

153.    In 2021, Gjovik complained about this matter to Jenna Waibel and Ekelemchi Okpo, and included it in the August 2021 "Issue Confirmation."

154.    On April 13, 2018, Tom Moyer (*Worldwide Loyalty*) was quoted in a Bloomberg article saying that Apple "leakers" "*not only lose their jobs, they can face extreme difficulty finding employment elsewhere. The potential criminal consequences of leaking are real and that can become part of your personal and professional identity forever.*" [47]

---

[47] Mark Gurman, *Apple Warns Employees to Stop Leaking Information to Media*, Bloomberg, April 13 2018, https://www.bloomberg.com/news/articles/2018-04-13/apple-warns-employees-to-stop-leaking-information- to-media

155.    On April 18 2018, Gjovik's Apple team emailed her and her coworkers about a planned "Family Day" when they could bring their family members (spouses and children) to their office at the TRW Microwave Superfund site in Sunnyvale and Intersil/Siemens Superfund site in Cupertino. The email stressed the need for "confidentiality" and instructed employees to report any family members not complying with the secrecy rules at the Superfund sites to Apple Global Security.

156.    On or around December 2020, Charlene Wall-Warren, director of Environmental Technologies, reporting to Yannick Bertolus (Dan West's manager), suggested Gjovik join her team in a position working on implementing circular economy legislation across the company, including projects like "right to repair."

157.    Gjovik expressed to West and Wall-Warren that she would love to transfer to the role.

158.    Around January 2021, West informed Gjovik that Wall-Warren requested to have Gjovik transferred to her team and West declined to allow Gjovik to leave his team.

159.    As of January 2021, Gjovik had attempted to find a role where she could stay working at Apple indefinitely.

### vii.    The Batterygate Fiasco, Part II (2018)

160.    Gjovik was put on "document retention" for the Batterygate lawsuits on March 15 2018.[48]  The notice from Apple cited "*inquiries from the U.S. Department of Justice.*"

161.    In May 2018, Apple Legal reached out to perform Document Collection on Gjovik's devices, including her text messages.

162.    On May 8 2018, Gjovik replied saying she uses the same iMessage account for work and personal and said she strongly preferred to only share messages she had with the specific people involved in Batterygate. Or if they have to take all messages, she asked if she could delete personal messages first. On May 10, 2018, she added she is "*a private person.*"

---

[48] Silicon Valley Business Journal, *"Federal investigators open new probe into Apple's intentional iPhone slowdowns,"* Jan 31 2018, https://www.bizjournals.com/sanjose/news/2018/01/31/apple-iphone-battery-slowdown-probe-doj-sec-aapl.html  "*At the moment, investigators are reportedly looking at Apple's public statements, and whether the company violated securities laws by not disclosing material information to investors.*"

163.    On May 10 2018, an Apple lawyer replied telling her "*Do not delete any messages.*" She said, "*we can certainly identify the relevant text messages with the list of individuals that [she] provides.*"

164.    Gjovik asked if she could "*export the message conversations from all relevant people instead of sharing the entire database*?"

165.    An Apple lawyer replied on May 14, 2018, saying Gjovik should "*work with the team to do [her] best to avoid collection of entirely irrelevant information*" and that "*all documents are reviewed by attorneys, so if the document is not relevant to the issues, it will be categorized as such and not provided to requesting authoritie*s."

166.    However, during the meeting, Apple's lawyers insisted Gjovik let them copy her entire iMessage database. Gjovik protested and explained further she was primarily concerned about "nudes" and sexual messages with a sushi chef she was dating in Hawai'i who had no connection to Apple. Gjovik asked if she could show them the texts so they can confirm its irrelevant and then she can delete the thread before they copy it, but Apple said no, despite previously saying they would avoid collecting  unnecessary and irrelevant information.

167.    Apple told Gjovik they have ways to copy her data unilaterally without Gjovik's cooperation. Once Gjovik handed her messages over, the Apple lawyers told her they would keep her texts (and nude pictures) in their "*permanent evidence locker.*"

168.    Gjovik worried if she had an ethical duty to disclose to the man that Apple put his sexts in their 'permanent evidence locker' but because Apple says everything internal at Apple is confidential, she worried that saying anything to him would violate Apple policies. Further, she now realized Apple could be watching everything she does and if Apple did choose to take more personal data than they needed as a way to intimidate her to stay quiet about what happened in

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

2016, she worried Apple could be watching her to see what she does and possibly escalate their intimidation if it looks like she is not being a 'team player.'

169.    Gjovik complained about the incident to a few coworkers saying like it felt like they wanted "collateral" related to Gjovik's retaliatory discharge in 2016 because she refused to ignore Batterygate.

170.    Gjovik complained about the matter in 2018 to Dan West and Director John Basanese. Gjovik also posted on Twitter about the matter on August 19 2021 and it went viral.

171.    On September 7 2021, Gjovik also posted about it again, this time "quote-tweeting" a prior post where she complained about the Batterygate/nudes and also wrote "*the corruption at Apple may reach RICO levels*". Gjovik posted, "*I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the [battery] situation when I ran sw failure analysis.*" Gjovik was terminated two days later.

172.    On April 22 2018, Gjovik emailed Tom Moyer requesting "Business Conduct" approval to attend law school while she worked at Apple, a request suggested by a friend in Apple Legal.

173.    Gjovik also noted in her email that she hoped to get a job in Apple Legal after she graduated and if not, she planned to keep working at Apple, but do legal volunteer work on the side.

174.    On April 27 2018, Moyer replied and added a member from his team to review Gjovik's request. (Apple and Worldwide Loyalty knew Gjovik wanted to stay at Apple.) Moyer's team approved shortly after, providing requirements for when Gjovik needed to request additional permissions from them for certain school activities.

175.    In September 2019, Gjovik emailed Apple Business Conduct requesting permission to write for the law school's newspaper. Business Conduct approved as long as she

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

did not use Apple devices. Gjovik wrote, *"I work in an engineering group and we 'live on' devices and file bugs when we find issues. My teammates were actually excited about me being in school, because I would hit some interesting use cases that employees normally do not. I also do not have a backup phone or cell service that is personal only — because we really want live on from the teams."* Business Conduct replied with advice from Global Security, that actually, Gjovik is correct, and just ensure any work for "clients" is not done on Apple devices.

### viii.    Apple's Top Legal Executives Charged with Felonies; Admit to "Wild" Behavior (2019-2020)

176.    In January 2017, Ronald Sugar, Apple Board Member was interviewed about what his biggest challenges were as CEO of Northrop Grumman Corporation. Sugar said he worried about: whistleblowers. Sugar said he worried about *"someone talking to the Wall Street Journal… Someone filing whistleblower suits about something they imagine might've happening in the organization. You worry about that."*[49]

177.    The Santa Clara County District Attorney claims that on February 8 2019, Tom Moyer participated in a "*clandestine*" meeting with the Santa Clara County Sheriff's Office in order to arrange an exchange of iPads and political donations in exchange for concealed carry handgun permits for Apple Global Security. [50]

178.    On February 20 2019, Apple's Global Head of Corporate Law and Corporate Secretary, Gene Levoff, was charged by the US DOJ and US SEC for fraud.[51]

---

[49] YouTube, *The Ronald and Valerie Sugar Distinguished Speaker Series Featuring Ronald Sugar Live Stream*, quote at 47:18-49:08, UCLA School of Engineering, https://www.youtube.com/live/NqQlNSvK62Q?si=qwHBYKQ9pk6kQgvg&t=2838.
[50] The People v Thomas Moyer, California Sixth Appellate Circuit, H049408 (August 25 2023)
[51] US SEC, SEC Charges Former Senior Attorney at Apple with Insider Trading, https://www.sec.gov/litigation/litreleases/lr-24399

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

179.    On June 20 2019, Apple's ex-General Counsel and VP of Legal and Global Security, Bruce Sewell, was interviewed by Bloomberg Law about prior criminal investigations into Apple's business practices. Sewell discussed the successful 2013 US DOJ/FTC case against Apple for violating the Sherman Act. Sewell said that Apple knew there was a "*substantial chance [they would] lose but they were going to fight it*" and "*they would never settle that case, they would fight it as far as they could.*"[52]

180.    The same month, Sewell was interviewed by Columbia Law School and described Apple's corporate culture and legal team as "*kindergarten,*" "*very Laissez-faire,*" "*chaos,*" and "*a wild place.*"[53]

181.    Sewell said he tried to use risk to Apple's competitive advantage. He said Apple was able to get "*closer to risk*" then competitors, in-house lawyers understood which risk (and laws) they "*don't need to pay attention to,*" and that practice offered a competitive advantage to Apple. He said that in order to do that, the company must permit the conduct, because sometimes the in-house lawyers will "*get it wrong.*" He then described Apple's conduct with the 2013 antitrust case as "*very ugly*", but Tim Cook told him "*Not to be scared,*" and not "*to stop pushing the envelope.*"[54]

182.    In February 2020, the California Supreme Court described Apple's legal arguments defending their unlawful employment practices as "*farfetched,*" *inconsistent*, and

---

[52] Bloomberg Law, "*Bruce Sewell, Apple's Former General Counsel,*" quote at 16:51-20:10, https://youtu.be/KXlyqHZhJtU?si=KAAUaBiRQgdZ0rap&t=1010
[53] Columbia Law School, "*Former General Counsel of Apple Interviewed by Columbia Law Student,*" quote at 18:19-20:33, https://youtu.be/-wuf3KI76Ds?si=Lk7Frl4ZebGL5h0c&t=965
[54] Columbia Law School, "*Former General Counsel of Apple Interviewed by Columbia Law Student,*" quote at 36:55-39:55, https://youtu.be/-wuf3KI76Ds?si=wIPC3dIbsRX3588y&t=2126

48

"*untenable*." [55] The Court described Apple's work policies at issue as "*draconian*." The Court ruled against Apple and Apple Inc agreed to pay $29.9 million to a class of retail employees.

183.    In November 2020, Apple's Chief Compliance Officer and head of the *Worldwide Loyalty* team, Tom Moyer, was indicted for bribing the Santa Clara County Sheriff's office. (See "*Criminal Bribery of Public Official*" under RICO Predicate Acts). [56]

184.    Two Apple Global Security executives turned state's evidence on Moyer and Apple in exchange for immunity.[57]

185.    In December 2020, Apple submitted a request to revoke the DTSC consent decree in place since 2016. Under information and belief, the head of CalEPA at that time, Jared Blumenthal, orchestrated a revocation of the consent agreement despite Apple being in violation of the order, in exchange for a position as President of the Waverly Foundation working for Lisa Jackson and Laurene Powell Jobs, and/or other favors.

186.    In June 2022, Apple's head of corporate legal compliance, Gene Levoff, pled guilty to the US DOJ for six counts of securities fraud and six counts of wire fraud. Levoff faces potentially decades in federal prison (see "*Securities Fraud*" under RICO Predicate Acts).[58]

### ix.    Gjovik has Disabling Symptoms of Terminal Illness; The Secret Silicon Fabrication Plant Affair (2019-2020)

187.    Around 2019, US EPA and California EPA oversaw vapor intrusion testing of buildings on the Synertek Superfund (EPA ID CAD990832735) plume originating from 3050

---

[55] *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1055-56, 258 Cal. Rptr. 3d 392, 405-06, 457 P.3d 526, 537-38 (Feb. 2020)

[56] *Apple's head of global security indicted on bribery charges:* Washington Post, (Nov 2020), https://www.washingtonpost.com/technology/2020/11/23/apple-sheriff-bribery/

[57] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty,* 2020, https://www.mercurynews.com/2020/10/19/main-witness-in-santa-clara-county-concealed-gun-bribery-case-pleads-guilty/

[58] DOJ, *Apple's Former Director of Corporate Law Admits Insider Trading*, June 2022, https://www.justice.gov/usao-nj/pr/apple-s-former-director-corporate-law-admits-insider-trading

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Coronado Blvd in Santa Clara California. The Superfund property is owend by the same person, Kalil Jenab (a Cushman & Wakefield Vice Chairman) who also owns the 3250 Scott Blvd property and rented to Apple for silicon fabrication activities.

188.    Around this time, both EPA agencies were overseeing bioremediation of the plume which resulted in a "bounce-back" of increasing TCE, vinyl chloride, and other chemicals. US EPA CERLCA project manager Fatima Ty and manager Edwin "Chip" Poalinelli oversaw and were aware.

189.    At this time there was also increasing chemical contaminants in groundwater wells near Apple's 3250 Scott Blvd factory and Irvine Company's 3255 Scott Blvd apartments. For some reason, there was no state or federally overseen vapor intrusion testing at either of the properties despite them being on the plume.

190.    When Gjovik contacted US EPA in 2020 complaining about solvent exposure, Ty and Poalinelli (US EPA) claimed there were no issues or reason to think anything was wrong and did not disclose anything about the vapor intrusion testing or increasing contaminants at nearby wells.

191.    Under information and belief, Apple, Irvine Company, Cushman and Wakefield, Honeywell, and US EPA Region 9 were conspiring to secretly avoid testing and disclosures to reduce the cost of regulatory compliance for Apple and Irvine Company.

192.    In June 2019, there was a leak of the deadly gases phosphine and silane at Apple's 3250 Scott Boulevard factory.

193.    Apple did not report the spill/leak to the California Office of Emergency Services (CalOES).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

194.    Apple coerced the city Fire Department to use a codename for Apple in their incident report, and the agency complied and referred to Apple and their secret factory as "*Project Aria.*"

195.    In February 2020, Gjovik moved into an apartment complex at 3255 Scott Boulevard Santa Clara California. Gjovik quickly fell ill and became disabled. Gjovik suffered severe fainting spells, chest pains, palpitations, stomach aches, fatigue, and strange sensations in her muscles and skin.

196.    Gjovik visited the Emergency Room on February 13 2020, and Urgent Care (at AC Wellness, Apple's in-house clinic) on February 20 2020.

197.    AC Wellness Network LLC is a for-profit subsidiary of Apple Inc.

198.    In January 2021, Gjovik learned that the doctors and other medical professionals at the AC Wellness clinics "report to" a Director (Osman Aktar) in Apple's Operations team under Jeff Williams (who also oversees manufacturing supply chains, like what 3250 Scott Blvd is used for).

199.    Gjovik used AC Wellness for primary medical services from 2015-2020.

200.    Gjovik left for a different provider when her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (from Apple's solvent exposure) and instead suggested Gjovik could be suffering from anxiety.

201.    Gjovik went on short-term disability due to her severe, mysterious illness.

202.    Gjovik was screened for multiple severe and fatal diseases and disorders including: Multiple Sclerosis, brain tumors, fatal arrythmias, Neuromyelitis optica, and more.

203.    Gjovik suffered skin rashes, burns, hives, and her hair fell out to the extend she was had a shaved head for most of 2022 as the bald patches still grew back.

204.    On September 2 2020, Gjovik discovered there were elevated and unexpectedly 'spiking' levels of volatile organic chemicals inside her apartment at 3255 Scott Blvd. [Exhibit A-ix-A] The timing of the spikes aligned with her most severe health issues. [Exhibit A-ix-B]

205.    Gjovik gathered data on VOC air pollution patterns, documented medical symptoms at times the VOCs 'spiked,' and had an industrial hygienist test Gjovik's indoor air.

206.    Because there was no public information disclosing what activities were ocurring at 3250 Scott Blvd, Gjovik assumed the VOCs were solely from the Superfund site next door and/or the Brownfield contamination on site.

207.    Gjovik told Dan West and David Powers about what she discovered on September 2 2020, also asking their help to find someone to measure the chemicals in her apartment *"I need to find someone to measure tVOC (volatile organic compound) levels in my apartment & create an official record. This is generally a commercial/industrial thing apparently, I'm getting a bunch of very high tVOC (Total Volatile Organic Compounds) gas spikes. Always at night, around when weird stuff is happening, sometimes almost every night…. I woke up at 3am last night feeling terrible and having trouble breathing…and today I looked back & saw the air spike into the "can't even graph this poison" tVOC territory at 3am. I've had a lot of these middle of the night, wake up choking/sick incidents since I moved in. I wonder how many of them overlapped with these poison spikes…. Some of the spikes are so high, the monitor can't even report it (goes beyond "very polluted" which itself looks to be defined as toxic gas levels often found in laboratories with industrial chemicals). I don't know what you'd call it going beyond *that.*"*

208.    On September 2 2020, Dan West responded to Gjovik, "*Just got off the phone with a buddy…. the head of EHS at a medical devices company. His suggestions: If you suspect its the air in your apartment. Get out of there right away - even if it means going to a hotel. Your*

*health is more important and it's really hard to prove anything. He's spent hundreds of*

*thousands of dollars doing stuff at company sites and he still isn't convinced it did much…. You*

*can also hire someone called an industrial hygienist. I've never heard of this profession.*

*Apparently they can come to your location with all of the right equipment and do testing that is*

*supposed to be best in class…He closed with pushing to have you move again. His position is*

*that if you run the tests and it's bad, they probably won't be able to fix it. So you'd end up*

*moving anyway."*

209.    David Powers then replied to Gjovik and West on September 3 2020 writing,

*"I'm asking around. Your journey has just taken a pretty major twist! I'm glad you were able to*

*figure this out. Are you going to warn others in your apartment?"*

210.    In September 2020, Gjovik set up additional air monitors to watch the levels of

VOCs in her apartment next to the 3250 Scott Blvd factory (though she was not aware of the

factory exhaust at that time). The results of the data validated what Gjovik had noticed with her

symptoms and ad hoc testing, that the VOCs mostly spiked early in the morning and late at

night, like with an automated exhaust system. [Exhibit A-ix-B]

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023





Exhibit A-ix-A: 9/2/20 Text Messages          Exhibit A-ix-: Data Showing tVOC Trends

211.    Gjovik noticed there was an Apple facility at 3250 Scott Boulevard across the street and it was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on September 8, 9, and 10 2020 – inquiring if anyone was familiar with the area because Apple had an office there.

212.    At no time in 2020 or later did Apple ever disclose their manufacturing activities and chemical/gas emissions at 3250 Scott Boulevard to Gjovik.

213.    The Apple Real Estate manager did suggest Gjovik use a special type of paid leave to move out of the apartment called '*extreme condition leave*' which was designated for natural disasters.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

214.   A Hazardous Waste manager at 3250 Scott Blvd in 2020, Ryan Spartz, wrote in his LinkedIn profile for the time: "*Continued waste profile project …working with account manager and adding additional TSDFs to find cost savings for client. Research and implement other <u>cost-saving methods … come up with innovate methods for disposal of unique wastes</u>.*"

215.   Apple reported to the US EPA that in the year 2020 they released 7.8 tons (15,608 pounds) of volatile organic chemicals and 260 pounds of the now-banned combustible solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air from the 3250 Scott Blvd factory.[59]

216.   Gjovik's apartment at 3255 Scott Blvd was only a few hundred feet from the exhaust vents at 3250 Scott Blvd.

217.   The US EPA TRI regulatory filing for 3250 Scott Blvd claims an additional 14,743 pounds of NMP was taken offsite to three waste processing facilities. However, there are zero DTSC hazardous waste transport manifests from 2015-2022 for NMP.

218.   Under information and belief, either Apple lied that the NMP was taken offsite and instead disposed of it onsite, or Apple did take the NMP offsite but used illegal hazardous waste transporters and disposal facilities without manifests and lied about it. (See, "*Wire & Mail Fraud*" under RICO Predicate Acts).

219.   In February 2020, TCE was identified in Apple's waste water at 3250 Scott Blvd again. Apple still had not reported any possession of TCE on site.

220.   Under information and belief, Apple was using TCE at their silicon manufacturing plant but never disclosed it to regulators, and avoided disposing of it through

---

[59] US EPA, Federal Register, Document 2022-27438, Vol. 87, No. 242, December 19, 2022, ("EPA determined that NMP, as a whole chemical substance, presents an unreasonable risk of injury to health when evaluated under its conditions of use."); US EPA TRI report, 3250 Scott Blvd, 2020: https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219 310885&fac_search =fac_beginning ; US EPA Air Pollutant Report, 3250 Scott Blvd, 2020, https://echo.epa.gov/air-pollutant-report?fid=110001168254

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hazardous waste disposal facilities which would require manifests, and so instead flushed it into the sewers.

221.    On December 14 2020, Apple submitted their first hazardous waste manifests for activated charcoal at the 3250 Scott Boulevard facility. The manifests were for 630 pounds of activated charcoal.

222.    Under information and belief, Apple did not change the charcoal/carbon filters for their solvent exhaust from 2015 until December 2020, despite maintenance protocols usually calling for replacements at least every six months. Under information and belief, if Apple did replace solvent-soaked charcoal prior to 2020, it did so without manifests, and illegally disposed of hazardous waste without proper transporters or disposal.

**Table A-2: Apple's Manifests at 3250 Scott Blvd for Carbon and Filters**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Activated Charcoal (Carbon)** | 0 | 0 | 0 | 0 | 0 | 630lbs | 980lbs | 1255lbs |
| **Roof HVAC Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 400lbs | 0 |
| **Vacuum Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 60lbs (with glass) | 0 |

223.    In September 2020 Gjovik had an industrial hygienist test the indoor air at her apartment and it returned results showing a number of the chemicals in use by Apple at 3250 Scott Blvd including: Acetone, Acetonitrile, Acetaldehyde, Benzene, 1,2-Dichloroethane, Ethanol, Ethylbenzene, Hexane, Isopropanol, Isopropyl toluene, Methylene Chloride, Toluene, 1,2,4-TMB, Xylene.

224.    However, the TO-17 test only returned chemicals for ½ of the total VOCs it accounted for. The testing panel did not test for NMP, Arsine, Phosphine, Silane, or Chlorine – and these may have also been present.

225.    On October 25 2020, Gjovik's Occupational Exposure doctor, Dr. Robert Harrison with UCSF and the California DPH wrote to Gjovik's iCloud email address: *"These multiple measurement [show] your improvement once you moved – sure do point ot the effects of VOCs. So glad you feel better."*

226.    Gjovik met the Apple attorney responsible for EH&S and CERCLA due diligence back in early November 2020, Debra J. Rubenstein.

227.    During those meetings with Rubenstein, Gjovik was discussing what happened at her apartment and Rubenstein confided she recently joined Apple's legal team and was concerned to find that Apple had not been doing vapor intrusion testing on their Superfund offices."

228.    Gjovik talked to Mike Ertell and Ekelemchi Okpo about her concerns about what Rubenstein had said and that it was making her concerned about Apple pretending the 2021 testing was routine.

229.    Gjovik texted Okpo a follow up of Rubenstein's LinkedIn on July 28 2021, to which Ekelemchi Okpo responded, *"Thank you."*

230.    On November 6 2020, Gjovik met with another Chemical Exposure doctor, Dr. Kari Nadeau, at Stanford. Dr. Nadeau wrote in Gjovik's visit notes, *"It sounds Ashley's symptoms were a response to chemical exposure, and the timing of her symptoms aligns with her living in the [3255 Scott Blvd] apartment. The severity and timing of the symptoms points to some type of industrial chemicals in her apartment and/or the property beneath it."* Dr. Nadeau added in the visit summary, *"I recommend the government agency in charge of the remediation*

*site where she was living investigate the soil and groundwater as potential causes for her symptoms."*

x.    **The HVAC/Sub-Slat Vent Fiasco (2020)**

231.    On September 4 2019, Gjovik experienced a severe fainting spell at her Apple office at 825 Stewart Drive that last for several hours, requiring her to sit down in a chair, sit down on the floor, and even lay down on the floor of her cubicle.

232.    Gjovik's fainting spell started in Mike Ertell's office, she took an EKG with her Apple Watch, and she communicated her symptoms to Ertell.

233.    The spell continued at Gjovik's desk. A coworker in the Apple Government Affairs team had asked Gjovik to quickly send the Apple VP of Public Policy and Government Affairs, Cynthia Hogan,[60] a copy of Gjovik's white paper on Apple's AI ethics practices. Gjovik laid on the floor, dizzy, while drafting the email to the VP and sending the file.

234.    Later, Gjovik told David Powers about the fainting spell at some point the week after.

235.    Under information and belief, the fainting spell was due to vapor intrusion from the TRW Microwave Superfund site contamination.

236.    In September 2019, the US EPA emailed about high levels of TCE in the outdoor air at the TRW Microwave Superfund site (Gjovik's office) and across the Triple Site. The EPA said they were "concerned" and the TCE has been "inc*reasing over the past few years.*" EPA noted the TCE concentrations are "*often exceeding … indoor air residential… concentrations.*"

---

[60] Axios, *Apple policy exec leaving company*, May 13 2020, https://www.axios.com/2020/05/13/apple-policy-exec-leaving-company "*Cynthia Hogan, Apple's vice president for public policy and government affairs, has resigned from the company, Apple said. Hogan was recently tapped by the Biden campaign as one of four leaders of its vice presidential selection committee.*"

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1  EPA wrote that the levels of TCE in the outdoor air of Gjovik's office were "*close to exceeding*"

2  the threshold for fetal heart defects in the first trimester of pregnancy.



**Exhibit A-x-A**: *NOAA: TCE (Trichloroethylene) ["Poison"]*

237.    In 2020, John B. Frank was a Chevron Board member and James Irvine

Foundation Board member, and Frank was a Director at Oaktree Capital. In 2020, the 3250 Scott

Blvd factory was tied to Chevron through Ronald Sugar, and to Irvine Company through the

3255 Scott Blvd apartments next-door (where Gjovik lived). Gjovik's office at the 825 Stewart

Dr building on the TRW Microwave Superfund site was tied to Chevron through Ronald Sugar,

tied to Irvine Company through the new housing development next-door on the groundwater

plume, and tied to Oaktree Capital as Oaktree Capital owned the 825 Stewart Drive property

from 2014-2016.

238.    Under information and belief, these parties conspired about this real estate.

239.    On August 27 2020, there was smoke in the air due to wildfires and the smoke

entered the building at 825 Stewart Drive. Employees were complaining of burning eyes and

59

sore throats. Apple EH&S investigated the employee complaints and informed Gjovik's team that no action is required by Apple unless the indoor air particulate matter exceeds 500 ug/m3. Gjovik complained to David Powers that 500 ug/m3 was literally "hazardous" and there were many stages of unsafe air prior to exceeding 500 ug/m3. Powers ignored Gjovik's complaints.

240.    On November 12 2020, Northrop Grumman conducted the first "sub-slat depressurization vent" inspection on the roof of 825 Stewart Drive. Northrop Grumman would have seen that Apple sawed own the vents from 3 feet to 1 foot, and installed the HVAC intake on top of the vents in the section of the building where Gjovik sat. Northrop Grumman did not submit a report of their findings until demanded by the EPA in May 2021, and even then did not mention these issues.

### xi.    "Skipping the Line": The Vaccine Hoarding Incident (2020)

241.    In December 2020, Apple Senior Vice President Dan Riccio held an 'All Hands' for his staff, which included Gjovik. During the All Hands, Dan Riccio made a comment that he had just left a meeting with Apple CEO Tim Cook and that Apple entered a deal where they will obtain "early access" to the COVID-19 vaccines. Riccio said Apple will only need to 'wait' for doctors and the elderly, and then Apple will get 'a lot' for employees and their families, and even have 'extra left over.'

242.    Gjovik was disturbed and upset by Riccio's comments. At that point in the pandemic, there was a great need for vaccines for those with pre-existing conditions, front-line workers, and other high-risk populations. Riccio's comments inferred Apple arranged a backroom deal to 'skip the line' on the vaccine and intended to hoard the vaccines.

243.    Gjovik complained to West and Powers, but they never responded in a meaningful way. Gjovik then escalated her concerns to a Senior Director colleague in a different organization, Dr. Joshua Cohen, who is seen as an ethics leader at the company. Gjovik told him

what she witnessed and expressed her concerns and said if there was still time to stop Apple's plan, she wanted to try to intervene for the sake of public health and the community. The colleague jumped on the issue and escalated the matter to at least Deirdre O'Brien (Human Resources Vice President) and Lisa Jackson (VP of Apple Government Affairs & Lobbying). Gjovik was told they were both concerned if it was true. The colleague called Gjovik to confirm that Gjovik's recollection of events before the matter was escalated further. Gjovik confirmed her prior statements and suggested they seek the recorded video of Riccio's statements.

244.    Gjovik heard that the video was obtained, and Gjovik's statements were confirmed to be accurate, that Riccio did say those things. Gjovik was told it was escalated to the "e-team" (executive team reporting to CEO Tim Cook) and they were "put on notice" about "serious ethical issues" if what Riccio said was ever pursued.

245.    Gjovik was told the deal was either not actually in place or would not occur now. However, she was told "*there are individual stories about test machines and treatment that are troubling, but no such company wide access is on the table, much less a done deal,*" on December 9, 2020. Gjovik thanked Cohen for believing her and Cohen replied: "*It has never occurred to me not to believe [Gjovik].*"

246.    Gjovik had asked to remain confidential, noting everyone was '*terrified*' of Riccio. Gjovik was told her identity was kept confidential, though she worried that is not possible at Apple due to the Worldwide Loyalty Team.

247.    Dan Riccio was demoted around one month after Gjovik's concerns were raised, escalated, and confirmed.

248.    Gjovik made her identity known related to the matter during the July 2021 investigation (since Apple would find it going through her emails anyways) and labeled the evidence folder "*Corruption Whistleblowing*".

249.    Unsure whatever came of the situation, Gjovik also filed complaints with the FDA Office of Criminal Investigations and DOJ NCDF ("COVID-19 hoarding") about the matter on September 3, 2021, and posted on social media that she did on September 6 2021. Gjovik was also still using her iCloud email so Apple would have seen the email receipts.

250.    In January 2021, Dan West texted Gjovik that employees who complain about him may "*feast on a banquet of consequences*."

### xii.    The TRW Microwave Superfund Site Debacle (2021)

251.    On February 4 2021, a coworker who also worked in the TRW Microwave building texted Gjovik that Gjovik was the only Apple employee to inform her their office was a Superfund site. She said after learning that it was a Superfund site, she stopped drinking the water in the building. On March 16, 2021, she informed Gjovik that she had fought cancer in 2018 requiring chemotherapy.

252.    On March 11 2021, Santa Clara County investigated a spill of cooling water at Apple Park and told Apple to report the spill to CalOES. Apple refused to report the spill to CalOES.

253.    On March 15 2021, Apple received a Class II violation of hazardous waste laws for the spill. Apple never reported the spill to CalOES.

254.    On March 15 2021, Gjovik notified her managers, David Powers, and Dan West, that she wrote an article about her previous apartment on a Superfund site groundwater plume (next to 3250 Scott Blvd) and it was being published in a newspaper, SF Bay View.

255.    Gjovik notified them that Apple Business Conduct approved her article being published but noted she felt pressured not to write about "*the toxic nightmare that is Stewart 1*" (her Apple office)."

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

256.    On March 17 2021, Apple sent an email to Gjovik and Powers' management team saying it was going to test for "vapor intrusion" at Gjovik's office, 825 Stewart Drive, but did not mention it was a Superfund or explain what vapor intrusion was. Gjovik replied informing her coworkers it was a Superfund site with a link to the US EPA website for the office and two recent news articles about the site referring to the office as a *paved over environmental disaster zone*. [61] Gjovik explained what vapor intrusion was and told them to take it seriously.

257.    Gjovik asked in her email reply for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building.

258.    Gjovik expressed concerns that Apple employees *"should be better informed about these types of environmental risks at our offices."* Gjovik added, *"the chemicals under [the Stewart 1 office] if in high enough quantities, can cause cancer, disruption of nervous and endocrine systems, and birth defects & miscarriages."*

259.    Gjovik quickly faced retaliation and hostility from her manager, David Powers, quickly followed by retaliation and animus from Employee Relations, and her other manager Dan West, related to her safety concerns and complaints.

260.    Less than a week after her response to the email about vapor intrusion testing, on March 22 2021, Powers gave Gjovik a "*warning*" for sharing her safety concerns with his management team and he instructed her she was only to discuss safety concerns or talk about the CERCLA status of their office with him, EH&S, and Apple Employee Relations. Powers told Gjovik it was only a "*warning*" because he said, *"she was having mention health issues."*

---

[61] Alexis C. Madrigal, Not Even Silicon Valley Escapes History, The Atlantic (July 23 2013) ["The empty octagonal glass building is a TRW Microwave Superfund site. I'd been walking on a paved-over environmental disaster zone, colonized by whoever wanted to benefit from lower leasing prices and a lack of NIMBY opponents."] https://www.theatlantic.com/technology/archive/2013/07/not-even-silicon-valley-escapes-history/277824/

261.     Gjovik protested, explaining the Superfund status of their office was public information. Powers persisted & then proceeded to give Gjovik feedback on an Inclusion & Diversity presentation she gave to his management team and told her he received feedback from his all-male management team that Gjovik was *"being too hard on the white man."*

262.     On March 29 2021, Gjovik messaged a manager, Mike Ertell, who also reported to Powers, and she said, *"As of last Monday Dave has forbidden me from talking about health concerns about [Stewart 1 office] to anyone other than him, HR, and EH&S. I actually found some stuff and I can tell you, but you have to promise to tell him I'm not telling you."* Ertell confirmed he would not tell Powers Gjovik was discussing safety concerns, so Gjovik did not get in trouble with Powers.

263.     Ertell responded to Gjovik's map of their office with vapor intrusion results saying, *"Holy hell. Where did that [Stewart 1 office] map come from? If the entire 1st floor is over the U.S. EPA max, why is the building still open?"* Ertell worked only feet away from Gjovik in their office. Gjovik explained she *"made the map overlaying data from historical testing [Apple and Northrop Grumman] did with [Apple's] own maps so we can see that one place and bring it home [to Apple] that this is [Apple's] employees."* The Ertell responded, *"What's crazy is that on the Geotracker, they say no day care, no elder care, no residential, etc. So, it's fine & dandy for everyone else to get slowly poisoned? Before COVID, I was at work for longer than I was at home on a daily basis. So glad you are digging into this stuff for all of us."*

264.     On April 2 2021, Gjovik met with Jenna Waibel and Michael Steiger and asked them about the land use covenant for the building, the history of vapor intrusion, and other CERCLA-related topics. Gjovik expressed concerns that the 2014 Five-Year-Report for the site mentions the already very restrictive land use covenant, is apparently out of compliance with

California law and needs revised, [62] but Gjovik did not see any revisions. Gjovik asked, *"does California Civil Code § 1471 add any new requirements on the property not current reflected?"* Steiger told her simply "*that's a question for legal*" and never followed up. Gjovik pressed Steiger and Waibel why Apple does not inform its employees they are working on Superfund sites, repeatedly raising concerns about California Proposition 65 and state/federal Right to Know compliance. Steiger told Gjovik Apple "*decided*" employees did not have a right to know and did not plan to inform them. Gjovik protested saying she though there were legal, ethical, and even practical reasons employees should know – including so they knew to look for signs of vapor intrusion and how to report it. Steiger and Waibel continued to ignore Gjovik's concerns.

265.    On April 4-5 2021, Gjovik raised her concerns about her office with West saying, "*Did you know that [Stewart 1 office] has a history of TCE, vinyl chloride, & chloroform vapor intrusion as recent as 2013? Beyond industrial limits, inside. And they haven't done any testing or monitoring since 2015."* She added she was asking Apple EH&S to *"reconsider the current policy of not disclosing Superfund status to the employees that work in these sites*."

266.    West replied, "*Didn't know that. I'm pretty sure that before we moved in there was some testing. Not sure what though."*

267.    Gjovik responded, *"He said they did more remediation in 2014 and did some indoor air testing in 2015 and it was fine now, and they expect it to be fine. And I'm like what if the floor cracks, it's literally hades down there, and he's like yeah that would be bad, let us know if you smell anything weird. ER was there too. I expressed my understanding but general displeasure."*

---

[62] U.S. EPA, 4th Five Year Review: AMD & TRW Microwave Superfund Sites, 2014, https://semspub.epa.gov/work/09/1151964.pdf ["*The existing restrictive covenant was recorded prior to the passage of the California Civil Code section 1471, which establishes the framework for environmental covenants in California. The legal owners of the former TRW Microwave property should record a new restrictive covenant that is consistent with current California law.*"]

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                        OCTOBER 25 2023

268.    West replied, *"It's all supposed to be sealed. Under the foundation…But I'm no expert."*

269.    Gjovik messaged with her West, on or around April 5 2021, about the chemical exposure at her previous apartment, which sat on contamination from a Brownfield and a Superfund site and was also next to 3250 Scott Blvd. West asked Gjovik not to send him information about Gjovik's chemical exposure at 3255 Scott Blvd to his personal work email, saying: *"Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits."*

270.    On April 5 2021, Gjovik messaged with West about an article she wrote about the apartment on hazardous waste she lived at that made her ill in 2020. Gjovik informed West five other people contacted her who were also sick at the apartment and that she had been warned about retaliation, possibly including physical violence, from the property owner, Irvine Company.

271.    Gjovik told West she had sleeping with a knife under her pillow and West told her not to sleep with the knife anymore, or a gun, so it will not be used against her and to instead obtain pepper spray or a taser.

272.    West also warned Gjovik should worry about digital surveillance as well and suggested Gjovik purchase a necklace that includes a panic button and calls ADT agents. West told Gjovik *"if you don't have a therapist give EAP a call. You're in a stressful situation (to say the least)."*

273.    Gjovik informed West she had a therapist but was still struggling and had to increase her anxiety medication.

274.    On April 11 2021, Gjovik wrote to Powers, forwarding the email she sent with questions and concerns to Steiger and Waibel including about "*compromised*" and "*missing*"

sub-slat vents per the documentation, telling Powers, *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to have ever followed up on."*

### xiii.    Gjovik Was About to Expose What Apple Did at the Silicon Fab Plant (April 2021)

275.    On March 10 2021, Dr. Janice Prudhomme, the Asst. Deputy Director for Environmental and Occupational Health for the California Center for Public Health wrote to Gjovik's iCloud email address. The two had been corresponding about Gjovik's medical issues in 2020 and what she discovered about chemicals at her apartment. Gjovik shared a draft of the article she would publish in SF Bay View about her experience. Dr. Prudhomme wrote, *"Your story is so compelling and you hit on so many important aspects of the many facets of these hazardous waste sites and what appears to be failures from all sides and yes, money seemingly at the root of it all…. I love what you are trying to do and it takes tenacity to fight the big guys. Continuing to bring awareness to impacted communities is noble and will hopefully improve the lives of many. Thank you for sharing this story and all your hard work."*

276.    On April 5 2021, Gjovik also notified Osman Akhtar, Director of Apple "AC Wellness" employee medical Centers and Clinical Engineering, with whom she had been in previous contact with, sharing that after her article was published more people came forward from the 3255 Scott Blvd apartments reporting illness.

277.    Gjovik told Akhtar "*two are Apple employees. At least one went through AC Wellness but no one could figure out what's wrong with them*." Gjovik suggested the clinic should start "*screening local folks*" with unexplained medical symptoms that match solvent

exposure. Apple was on notice about the impact of its factory to the community and its own employees.

278.    On and around April 5 2021, additional victims came forward reporting solvent exposure medical systems while living next to Apple's 3250 Scott Boulevard factory. Some of them were current Apple employees.

279.    Around April 2021, Gjovik told Mayor Gillmor, via her iCloud email address, she was starting to investigate the industrial buildings uphill from 3255 Scott Blvd (which is where 3250 Scott Blvd was).

280.    In April 2021, one of Gjovik's law professors suggested she contact the Santa Clara County District Attorney's office and document her findings and concerns. The professor was a prior criminal law attorney and warned Gjovik that her complaints about the pollution and chemical exposure she discovered could lead to retaliation and violence.

281.    Gjovik contacted the County DA's office on April 9 2021 and talked to Bud Porter, Supervising Deputy District Attorney for Environmental Crimes. They scheduled a meeting and discussed Gjovik's concerns about 3255 Scott Blvd on April 16, 2021. Apple would have seen these emails on Gjovik's work devices.

282.    On April 15 2021, Gjovik sent an email to Joshua Cohen, Apple Senior Director, complaining of Apple's conduct related to her office at 825 Stewart Drive and the mis-handling of her complaints. Gjovik said she wanted to raise "*ethical concerns*" and complained that Apple's conduct was "*morally wrong*." Gjovik wrote to Cohen:

> "Apparently most Apple buildings are on chemical release sites. … When I asked why they aren't telling employees — what EHS told me was that Apple did an internal review and decided it has no legal obligation to disclose anything about these release sites to employees… I was sharing all this with [an employee in Lisa Jackson's organization] and she's apparently preparing a presentation for Lisa right now about a new Env Justice type project Apple

68

wants to lead and then when I told her what Apple's actually doing… she's like, uh oh. She's been doing more research and is preparing to raise the issue to Lisa in some way. But its even more complicated. I found an article from 2016 where apparently Apple was breaking hazardous waste laws and settled with the state gov for half a million. Alisha ([this persons'] manager) was quoted as saying that "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me."

283.    On April 21 2021, Gjovik raised concerns to Apple's Inclusion & Diversity team, via John Brown, complaining of disparate impact of chemical exposure at Apple's offices toxic waste sites, disproportionally harming non-white people and women.

284.    The I&D manager asked Gjovik to draft a business justification for Apple to not expose Black and Brown people, and women, to industrial chemical vapors. Gjovik wrote to Brown:

The majority of apple buildings are on really gross EPA Superfund and chemical release sites. For example, my building in Sunnyvale is on one of the worst superfunds in the country with decades of vapor intrusion at levels dangerous to human health. Apparently Apple's official policy is that they have no obligation to disclose the status of these sites (even with dangerous chemicals on site) unless they believe, based on data, that human healthy is actively being harmed. At the same time, they appear to be doing very little or no testing or monitoring. I'm interrogating EHS right now — despite decades of vapor intrusion testing, after they did a really short and limited number of tests that for the first time ever were in range, they never tested or monitored again until later this year (not done yet).

Apparently women get worse health issues from this type of chemical exposure. Because we have high body fat and sensitive hormones, etc. So if there are chemical vapor issues in buildings, women will get sicker. It also can mess with our reproductive health and pregnancies. But then EJ…. Which employees are going to spend the most time around vapor intrusion pathways (plumbing, vents, etc) — probably our Black and Brown employees working in maintenance & cooking type roles. Who's going to spend the most time physically exerting themselves running things around at these buildings? Probably our technicians and admins, who are also predominately people of color and women, respectively. Our technicians are predominately Black & Brown. So are the maintenance staff.

285.    Brown responded: *"Have you done a well-crafted succinct email on the issue, the impact of the issue, and possible solution to consider that you could send to EHS?"* Gjovik replied, *"They're fully aware And don't care Or at least legal said they don't care and EHS is following that."*

286.    Brown replied: *"So what is your actual ask of Apple in three bullet points?"* Gjovik responded:

"1) inform apple employees of the presence of industrial chemicals in the soil & groundwater beneath their buildings, along with any anticipated health risks 2) empower apple employees to understand these sites and their rights around them (like who at the EPA to call if they have questions about their specific building and want a neutral 3rd party) 3) do ongoing vapor intrusion testing and monitoring on buildings who have VI risk and train employees on site how to identify possible VI issues (medical symptoms, smells, etc) In a perfect world 4) require informed consent for employees to actually be assigned to work in the worst of these buildings."

Brown never replied.

287.    In April 2021 and through August 2021, Gjovik complained to Apple about an apparent failure to properly report and track workplace injuries. In April 2021, Gjovik was convinced a fainting spell at her office in September or December 2019 was due to vapor

intrusion. Apple Human Resources Business Partner Helen Polkes insisted Gjovik file a worker's compensation claim for the fainting spell. Gjovik questioned Apple's justification and incentives in requesting Gjovik file the claim nearly two years after the fact. Gjovik documented her confusion in emails with Polkes, Powers, and coworkers. Gjovik did follow Polkes instructions and filed a claim on April 26, 2021.[63]

288.    On April 21 2021, Gjovik contacted the US EPA about her Apple office on the TRW Microwave Superfund site. On April 23 2021, the US EPA told Apple that Gjovik contacted them about her Apple office. EPA's emails about Gjovik's questions and concerns advised, per Fatima Ty, that Apple should be included in any conversation that the US EPA had with Gjovik about the TRW Microwave Superfund site. Ty justified this requirement due to Ty's work "*in EHS at IBM.*" US EPA (Margot Perez-Sullivan, Fatima Ty, Edwin "Chip" Poalinelli, and Michael Schulman) drafted an email to Gjovik informing Gjovik they told Apple that Gjovik contacted them, but never sent it.

289.    On April 30 2021, Gjovik visited an occupational exposure doctor (Dr. Robert Harrison who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health[64]), about her exposure at 3255 Scott Blvd (the apartments next to Apple's 3250 Scott Blvd factory) and at 825 Stewart Drive.

290.    The UCSF visit notes summarized Gjovik's 2020 medical symptoms as "*Specifically, she was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal bleeding, and swollen glands*" The UCSF visit notes stated: "*there remains a concern about*

---

[63] Workers Compensation Claim for Chemical Exposure (# 302174831070001) § Filed: 4/26/2021; Dated: 12/4/2019
[64] UCSF, Dr. Robert Harrison MD MPH, https://profiles.ucsf.edu/robert.harrison

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

*potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies."*

291.    The April 30 2021 UCSF Occupational Exposure visit notes stated: "*She also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues in the building. She states her apartment was built in an industrial area next to a the Synertek Superfund and next to Apple Materials Superfund and Intel Magnetics Superfund. She also notes her current office is in TRW Microwave building on an EPA Superfund "Triple Site."*

292.    Under California law, by April 2021, and as early as February 2020, Gjovik was an environmental crime victim because she was a "*victim of a crime that caused physical injury*" and suffered "*physical, psychological, and financial harm due to the attempted commission of a crime or delinquent act*" from 3250 Scott Boulevard, and possibly 825 Stweart Drive, and thus was protected under Cal. Lab. Code § 230 against retaliation due to her crime victim status and any of her actions in ensuring her health, safety, and welfare.[65]

293.    Under federal law, by April 2021, and as early as February 2020, Gjovik was an environmental crime victim suffered direct physical, emotional or financial harm as a result of the commission of a federal crime.[66] Gjovik has the right to receive protection from a suspected offender or persons acting at their behest, the right to be reasonably protected from the accused, and the right to a full and timely restitution with proceedings free from unreasonable delay.[67]

---

[65] Cal. Lab. Code §§ 230, 230.5; Cal. Gov Code §§ 13951, 13955. "*regardless whether anyone is arrested*."
[66] US EPA, *Environmental Crime Victim Resources*, https://www.epa.gov/enforcement/environmental-crime-victim-resources; US DOJ, *Environmental Crime Victim Assistance*, https://www.justice.gov/enrd/environmental-crime-victim-assistance
[67] Victims' Rights and Restitution Act (34 U.S.C. § 20141); Crime Victims' Rights Act (18 U.S.C. § 3771).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

xiv.    **The Non-Consensual Sexism Investigation, Doxing, Gag Orders, & Other Retaliation (April-June 2021)**

294.    On April 9, 2021, Waibel replied to Gjovik's email, stating that she would launch an investigation into Powers, but only into his statements about Gjovik's '*mental health*' and complaints Gjovik was '*being too hard on the white man.*' Gjovik quickly replied to Waibel, indicating that she did not want an investigation because she feared retaliation, and instead simply wanted Waibel to explain "*labor laws*" to Powers. Waibel says she was going to open the sexism investigation whether Gjovik wanted it or not.

295.    Gjovik had a phone call with Waibel on April 27 2021. Gjovik had requested again that Waibel talk to Powers about "labor laws" and clarify if she can talk about her safety concerns. Waibel suggested a 10-minute phone call to discuss the "terms and conditions" of Gjovik's employment. During the call, Gjovik requested again that there not be a sexism investigation. Waibel said there will be a sexism investigation. Waibel also gave Gjovik a five-point balancing test if Gjovik wanted to talk about workplace safety including that information was complete, accurate, did not make an assessment about safety, does not cause a panic, and any follow up questions are redirected to EH&S to discuss privately with the other person.

On Apr 27, 2021, at 10:27 AM, Ashley Gjovik <ashleygjovik@apple.com> wrote:

Hi,

Hi Michael and Jenna,

I'm looking for some clarity on what I'm officially allowed and not allowed to say about Apple's offices/buildings on chemical release sites.

I chatted with Jenna this morning and she said I'm allowed to speak about any concerns about the terms and conditions of my employment — but I can only share information that is "complete and "accurate." Further, she said I should not cause "panic" if there's "no reason for panic." In addition, she said if there's any risk to employees safety, that communication would need to come directly from EHS. (Jenna, please confirm if this is a correct summary or not, and if not please clarify).

I mentioned to Jenna I'm still confused as to what that means. I had raised the issue weeks ago that my boss gave me "employee feedback" about my email with questions about the building and the VI testing, implied it was a "warning" because I was having "mental health issues," and forbid me from talking to anyone about the Superfund status of SD01 or any of my concerns about working in SD01 related to the building other than to him and EHS. Jenna said he denied he said this, but he hasn't followed up with me directly to clarify anything. (Jenna, please note if that is not correct per your convo with him).

Michael the script you read when we first met was great and that's why I called out what Dave told me to Jenna, because it seemed in direct contradiction to what you said. So I'd really appreciate clarity here. When I talked to Jenna, I asked if I could even talk openly about the Superfund status of SD01 and she said only if EHS confirms that is complete and accurate information. I told her I think it would be best if I have you confirm some key points so I don't get in trouble later. So Michael, I have some questions for you below about what is "complete and accurate" — as well as some general questions, perhaps for both of you.

**Questions for Michael (to confirm if complete and accurate)**
- Y or N: The Stewart 1 is an EPA Superfund site called "TRW Microwave," part of the EPA "Triple Site"
- Y or N: TRW Microwave is an active Superfund site.
- Y or N: The EPA calls the area "Triple Site" because three groundwater aquifers were contaminated with industrial chemicals, and all three became active EPA Superfund sites, and at some point all three groundwater plumes merged and/or overlapped into a triple-groundwater plume (including TRW's original plume, as well as the other two plumes now impacting TRW Microwave)
- Y or N: Until 2021, the latest indoor air vapor intrusion testing inside SD01 was in Dec of 2015.
- Y or N: Do you consider the EPA, DTSC, and/or Water Boards documentation on the TRW Microwave site (SD01) to be complete and accurate?
- Y or N: Does my building assignment (aka "my official desk is in SD01") constitute part of the "terms & conditions" of my employment?
- Y or N: Do the other Apple buildings I visit for meetings also constitute part of the "terms & conditions" of my employment? (Aka the Siemens and Intersil Superfund sites)
- Y or N: Tantau 8 is on an active EPA Superfund site called "Intersil"
- Y or N: Homestead 1 is on an active EPA superfund site called "Siemens"
- Y or N: The Siemens groundwater plume is known to have contaminated the groundwater of the property that is now "Apple Park"
- Y or N: Apple Park is on several state water boards clean up sites (aka "HP")

**General Questions**
- If Michael says a building on a Superfund is "safe," (which I think is already implied because it sounds like EHS hasn't acted on SD01 recently), am I still allowed to express concerns about working on a Superfund or that specific Superfund? Or if Michael says the building is "safe," am I not allowed to raise any of my own concerns about the safety or Apple's oversight?
- Do the criteria of — 1) complete & 2) accurate & 3) do not cause panic — apply only to sharing information internally with other Apple employees — or does that also apply to me speaking externally?
- Do your speech restrictions apply to me talking to the government about my concerns?
- How do we measure "do not cause panic"? A lot of people seem very concerned about working or living on/near Superfunds generally. Arguably, as they should be. If there is a fact that is complete and accurate (such as if Michael confirms SD01 is on an Active Superfund), am I still not allowed to share it if "it could cause panic."? I'm confused how to navigate this one. The facts alone could cause panic, but that doesn't seem like it should be my fault. At the same time, I don't want to get in trouble.

Thanks,
-Ashley

—
**Ashley M. Gjøvik**
 Engineering Program Manager
(408) 204-9976

*Exhibit A-xiv-A: Gjovik's Meeting Notes from the call with Waibel on April 27 2021*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

296.    Waibel replied to Gjovik and wrote that Gjovik must ensure "*the information she shares"… about "the terms and conditions of her employment"…" is accurate and complete as possible.*" Waibel added that she believed Powers comments to Gjovik "align" with her statement. Waibel added, "*if others have concerns, they can connect with EHS directly.*" She said, "*we would like to speak individually with each employee who is interested to allow them to address their concerns more privately.*"

---

**Jenna Waibel <jwaibel@apple.com>**                                          Apr 27, 2021 at 4:38:13 PM

Re: Questions about speech related to Apple's buildings on chemical release sites

To: Ashley Gjovik <ashleygjovik@apple.com>

Cc: Michael Steiger <msteiger@apple.com>

---

Hi Ashley,

Michael and I will discuss your questions below and get back to you. I wanted to clarify a few things now from your email below, and the rest we will revisit in the near future:

1) I didn't say you aren't allowed to share concerns at any time during our conversation. I didn't comment on the difference in sharing concerns internally or externally. I said you have a right to discuss the terms and conditions of employment. We ask that you ensure the information you share is as accurate and complete as possible when doing so.
2) I wasn't present in your conversation with Dave, so I can't say what he did or didn't say. However, Dave seemed confident that he did not use the terms "warning" or "mental health issues" related to your right to speak about your concerns. He said that it wasn't a warning and he did not forbid you from speaking to others. He said that the intention of his message was aligned with my message about. He said he encouraged you to work with EHS to understand the data available fully.
3) I shared today that if others have concerns, they can connect with me or EHS directly- we are not asking you to broker those conversations. Rather, we would like to speak individually with each employee who is interested to allow them to address their concerns privately.

Thanks again for our call today.  We will be in touch soon on the other clarifications.

**Jenna Waibel**

 Corporate Employee Relations
510-396-7823 mobile
jwaibel@apple.com

This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.

---

*Exhibit A-xiv-B: Waibel's Reply to Gjovik's Notes (A-xiv-A)*

297.    On April 29 2021, Gjovik met with West for their regular 1:1. Gjovik complained about the safety issues, retaliation, and harassment. She said she needed him to help and

---

75

intervene or else she would have no other choice but to quit Apple. West told her she can just quit Apple. Gjovik documented his statement in meeting notes and forwarded it to Waibel.



*Exhibit A-xiv-C: Gjovik's Meeting Notes About West sent to Waibel*

**xv.     Scrutiny and Issues at 3250 Scott Blvd and 825 Stewart Drive Intensify (April 2021-June 2021)**

298.     On April 27 2021, Gjovik emailed once of her law school professors, Professor Dorothy Glancy, about what was happening with Apple.  Gjovik wrote: "*I talked to a lawyer friend and they not only warned me to look out for retaliatory firing with this much whistle blowing — but that the HR BP may have pushed for workers comp because I guess it waives some litigation rights. I'm thinking I should probably talk to an employment attorney who specializes in OSHA type stuff.*"

299.     On April 30, 2021, there was another phosphine gas leak at the 3255 Scott Blvd facility. The HazMat agency report said the leak required an evacuation and that phosphine gas was vented into the exterior air.

300. Two weeks later, Apple submitted manifests to transport sixty pounds of '*vacuum filters with glass shards*' to a waste disposal facility.

301. The "*vacuum filters with glass shards*" and temporal proximity to the leak of a highly flammable and unstable gas,[68] suggests, there was an explosion during/related to the April 30 2021 leak. Under information and belief there was a phosphine explosion on April 30, 2021. Under information and belief, the residents in the apartments were never notified of the explosion or the venting of phosphine into their air.

302. Phosphine gas is a reportable substance under 42 U.S. Code §§ 1712, 9602, and 9603. Phosphine is an "Extremely Hazardous Substance" under CERCLA Section 103 and EPCRA Section 304.

303. Apple's concealed the HVAC issues (that they took a saw to the Superfund poison vents on the roof and then installed the HVAC intake on top of them where the poison air pools) at 825 Stewart Drive and avoided Gjovik's questions about the HVAC and air quality.

304. By May 2021, Apple must have known that Northrop Grumman finalized their first sub-slat depressurization system report and transmitted it to the US EPA, per the US EPA's request May 12 2021, triggered by Gjovik's complaints.

305. Under information and belief, at some point between May 12 and May 25, Northrop Grumman notified Apple that they were transmitting the report and data that would

---

[68] NOAA, *Cameo Chemicals – Phosphine*, https://cameochemicals.noaa.gov/chemical/1322 "Very toxic by inhalation at extremely low concentrations. Prolonged heating may cause containers to rupture violently and rocket… Highly flammable. Usually ignites spontaneously in air. Burns with a luminous flame… Phosphine can explode with powerful oxidizers. The gas is heavier than air and may travel along the ground to an ignition source. Container may explode in heat of fire… Reacts violently with: air… Liquefied phosphine can be detonated… Forms explosive mixtures with even small amounts of oxygen. Autoignites at low pressure."

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

reveal Apple's negligence, and that prior they had conspired to conceal the issue from regulators, while knowing Apple's employees were likely being exposed to carcinogens.[69]

306.    On May 2 2021, Gjovik emailed Professor Glancy again, *"The work stuff is very very urgent now. They want me to sign a bunch of workers comp stuff. And it appears I'm being pushed out of my current role, maybe even apple."*

307.    On May 5 2021, Gjovik emailed the Mayor of Santa Clara, Lisa Gillmor, sharing feedback on the Brownfield clean-up of her apartment at 3255 Scott Blvd from a community activist and the prior mayor of Mountain View, Lenny Siegel. Gjovik sent this email from her iCloud email account.

308.    Among other things, Siegel wrote, *"TCE is found at or above 16 μg/m^3 at three sampling points [at 3255 Scott Blvd], including one close to your former apartment, and it may be present at others but undetected because the detection limit for many of the samples was 100 μg/m^3. So instead of dismissing vapor intrusion, the city and regulators should either have required additional investigation or required that vapor mitigation, such as subslab depressurization, be built into the apartment buildings. … In my opinion, any building constructed where the TCE soil gas exceeds that level should be mitigated, but the worst case exposure does not explain the acute health issues that you experienced."*

309.    Gjovik had requested a letter of recommending form Dr. Cohen in January 2022 for law school applications, but Dr. Cohen had not had time write one yet. On May 5 2021, Gjovik replied to the email thread with Dr. Cohen and asked if he could please write one soon and noted, *"Things are getting increasingly complicated at work & I'm not expecting an outcome in my favor."* Gjovik said she had started to apply for new jobs as she was expecting to get fired imminently.

---

[69] Under Cal. Lab. Code § 6406, no person shall remove, displace, damage, or destroy any safety device or safe guard furnished for use in any place of employment. See also, Res Ipsa Loquitur.

310.    On May 16 2021, Gjovik complained that all of her iCloud@Apple documents disappeared from her personal iCloud account. Gjovik asked Apple's IT department to recover the files but they were unable. Under information and belief, the files were deleted as Apple Global Security was copying all of Gjovik's personal iCloud information in order to start investigating her as they planned a response to her concerns.

311.    On May 21 2021, Northrop Grumman prepared the report about their November 2020 inspection of Apple's 825 Stewart Blvd rooftop and the sub-slat depressurization system vents (that Apple sawed down to only one foot tall and installed the HVAC intake next to the vent exhaust).

312.    The same day Gjovik had a mammogram at UCSF ordered by her doctor due to "*recent industrial chemical exposure*."

313.    On May 25 2021, Northrop Grumman submited their sub-slat vent report to the US EPA omitting what Apple had done. Under information and belief, Apple and Northrop Grumman conspired to hide the issues from the US EPA and Gjovik and her coworkers.

### xvi.    Apple's Retaliation Against Gjovik Intensifies (May-June 2021)

314.    On May 17 2021, in a sudden change of course, in a meeting with Gjovik and Waibel, Steiger claimed the office was safe after all, and there would not be any testing in the building for vapor intrusion in the foreseeable future.

315.    The meeting was supposed to be to answer Gjovik's pending open questions from April 2021. Steiger and Waibel informed Gjovik they would not be answering any of her pending or new questions about the safety of Gjovik's office building.

316.    Steiger went on leave less than thirty minutes after the meeting.

317.    When the worker's compensation administrator contacted Gjovik, the representative expressed surprise and concerns that Apple would intentionally ask, or even allow

employees to work on Superfund sites. The Sedgwick investigator said she even called her contacts at Apple's HQ to confirm if Apple actually had offices on Superfunds. She said the contact's initial response was "of course not" but then upon searching Gjovik's office address online, the top result noted it was a Superfund site.

318.    The investigator was further distressed to learn that additional offices Gjovik had worked in and visited were also Superfund and Brownfield toxic waste clean-up sites. The investigator said she was going to set Gjovik's claim as "continuous injury" and Gjovik should expect the investigation to take at least two months.

319.    Waibel requested another phone call with Gjovik, and they talk on May 20, 2021. Gjovik summarizes the call in the August 2021 Issue Confirmation as: "*Jenna tells me she will talk to Rob Yepez [a Software Engineering Director] about my sexual harassment claim and tell him I was the one who reported it. I ask her not to and that I don't want him to know it was me and ask her not to look in to it and she says she will anyways and I can't stop her. She pressures me to give the witnesses name to her despite me raising concerns about her being on an H1B and worried about retaliation*."

320.    An agent of Apple implicitly threatening to deport and/or cancel the Permanent Resident Card sponsorship for one of Gjovik's best friends who was in the United States on a work visa, because Gjovik exercised her rights under Cal. Labor Code and was seeking information regarding whether Apple was in compliance with Cal. Labor Codes—is a violation of California Labor Code § 1019(b).[70]

321.    Gjovik told Waibel she was not including all of her complaints about issues at Apple, but only including the issues and related facts/issues to those that Waibel informed

---

[70] Cal. Lab. Code § 1019(b)(C), (D); [Note, Gjovik's friend, who had an in progress Permanent Resident application sponsored by Apple, no longer resides in the United States].

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

Gjovik she would be investigating. Waibel said her focus continued to be on "sexism" and disability discrimination related to mental health.

322.    Gjovik was out of paid time off and needed to take law school exams. Waibel suddently offered Gjovik that Gjovik can just take the time off to do her exams and did not need formal paid time off. Gjovik said that would be great. Waibel offered it and Gjovik accepted. There were no restrictions on who Gjovik could talk to or what Gjovik could do. Waibel called it "Administrative Leave."

323.    In May 2021, Gjovik asked Waibel to include the 2018 e-waste/hardware-re-use problem in her investigation. Gjovik said the unilateral decision to cancel her projects without her input, and not even informing her directly, was an example of her managers treating her poorly because of her sex/gender. Gjovik also said that the manager who got her project cancelled, Reed Johnson, intentionally undermined her and acted in a way he knew she did not support, because he thought less of her because she was a woman.

324.    Waibel claimed to have investigated the e-waste problem, and other issues Gjovik raised, but said there were "no policy violations." Waibel told Gjovik she informed Gjovik's managers and team that Gjovik complained about sexism, and now it was up to Gjovik to figure out how to go forward following the closure of her investigation.

325.    It was clear to Gjovik that most of the issues were not investigated. Gjovik complained about a "fake" investigation.

326.    On April 21 2021, Gjovik filed a worker's compensation claim for her 2019 fainting spell at the 825 Stewart Drive office, at the urging of Apple.

327.    Apple then entered an office-space real estate "mega-deal" with Irvine Company (on toxic waste clean-up sites) and the weekend of the deal, Gjovik received a voicemail late on

a Saturday night from the Sedgwick benefits administrator suddenly closing Gjovik's claim on May 22 2021.[71]

328.    Under information and belief, Apple, Irvine Company, and Sedgwick conspired to close Gjovik's claim as part of their deal.

329.    At some point between May 25 and June 1 2021 Apple conducted a "floor survey" looking for cracks in the slab of Gjovik's office at 825 Stewart Drive.

330.    Under information and belief, Waibel had offered the leave to Gjovik to get Gjovik out of the office while they inspected the floor.

331.    Waibel held a "wrap up call" with Gjovik on June 3 2021. Waibel said her investigation found no policy violations and the only next step for Gjovik is for her to "process this" and work with Polkes on Gjovik's "path forward." Gjovik sent email notes after complaining that Waibel never reviewed several things Gjovik complained about.

332.    Waibel replied to Gjovik on June 3 saying "*I could not confirm that violation of Apple policies occurred, Apple has taken appropriate action to address the findings of the investigation. If, in the future, you have any new concerns and/or experience behavior you feel is retaliatory, please contact your Helen or myself immediately.*"

333.    Gjovik responded on June 3, reiterating her concerns about workplace safety.

334.    On June 10 2021, Waibel told Gjovik she had to return to her Superfund office, even if she thought it was unsafe, unless Gjovik files a request for ADA accommodations. Gjovik told Waibel that does not make any sense. Waibel repeated it was the only option.

335.    On July 8 2021, Gjovik learned that Dan West had been reassigning her work to other people in his organization following the April meeting when he told Gjovik to quit.

---

[71] Silicon Valley, *Apple mega deal: Tech titan launches huge Sunnyvale expansion that could accommodate thousands*, https://www.siliconvalley.com/2021/05/24/apple-mega-deal-iphone-maker-huge-sunnyvale-expansion-real-estate-tech/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

336.    Gjovik complained to David Powers, Human Resources, and Employee Relations. One of the employees who received the new assignments apologized to Gjovik upon learning it was her work.

337.    On July 15, 2021, Powers suddenly and substantially increased Gjovik's workload with unfavorable projects.

338.    The move made it apparent that he was trying to force her to quit.

339.    Gjovik replied to Powers same day complaining that all the new assignments already belonged to other people, and that the increase was quadrupling her workload.

340.    Gjovik promptly informed Lagares and Polkes, that she was being "punished" by her supervisor.

xvii.    **US EPA & Apple Engage in A Cover-Up; Work Together to Intimidate and Mislead GJOVIK (June-July 2021)**

341.    On June 9 and June 10 2021, US EPA employees Edwin "Chip" Poalinelli and Michael Schulman conspired to arbitrarily update the public website information about the TRW Microwave site to say that "Human Exposure" was "Under Control" instead of "Not Under Control."

342.    The main site document for TRW Microwave, dated April 2021, said exposure was Not Under Control.

343.    On June 9 2021, one of Gjovik's coworkers emailed US EPA with concerns about their Superfund office. Schulman wrote a reply to the coworker saying Human Exposure is now Under Control. Schulman said he did not run his decision or email by Public Relations because "*he likes it*."

344.    On June 14 2021, Gjovik and another employee email Tim Cook (CEO) & Deirdre O'Brien (HR VP) expressing concerns about returning to work during the COVID-19

83

pandemic. Gjovik repeatedly expressed concerns about COVID safety.[72] The email included and referenced a petition with over 2,000 employee signatures, dozens of testimonials from employees, and an eight-minute video of about a dozen employees reading the petition aloud, including Gjovik.

345.     On June 30 2021, Apple entered the US EPA TRI information for the 3250 Scott Blvd factory noting the NMP emissions, treatments, and supposed disposal. This was apparently the first and only entry for TRI that Apple ever submitted for the facility.

346.     Under information and belief Apple was generating reportable emissions prior to the 2020 report, and after the 2020 report, but did not file reports with that information.

347.     On July 2 2021, Waibel emails Gjovik to notify her that there are cracks in the floor of Gjovik's office and Apple is going to repair the cracks, and following the repairs, then will test the air. Gjovik replied to Waibel asking if Apple would test the air before they fix the floor to understand if there was vapor intrusion occurring through the cracks for "*cancer monitoring.*" Apple said no.

---

**From: Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Follow up call next week
**Date:** July 2, 2021 at 2:55 PM
**To:** Jenna Waibel jwaibel@apple.com
**Cc:** Michael Steiger msteiger@apple.com, Antone Jain antone@apple.com

Hi Jenna,

Thank you for the update! Glad you hear y'all decided to proceed with the testing, even if TBD timing.

Any chance EH&S would be willing to do a "before" air testing in SD01, at least my lockdown (Sim City), to determine if the floor cracks were/are allowing vapor intrusion into the office space? It seems like it would also be helpful data to have to compare to the testing "after" the floor is sealed — especially since the last testing was six years ago — and considering my 2019 fainting incident at my desk & in Mike Ertell's office. If I was exposed, I'd really like to know to what chemical & at what levels, for future cancer monitoring, etc.

Thanks!

---
Ashley M. Gjovik

---

*Exhibit: The Cancer Email*

---

[72] i.e., Cal. Lab. Code §§ 6325, 6409.6

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

348. On July 4 2021, Gjovik expressed concerns to Lagares again about EH&S' suspicious conduct and statements, including that now Apple said they had no plan to test the air in the near future. Gjovik wrote to Lagares, "*The only reason I can think of that they're refusing to do this testing after they previously planned on doing it, was that all the questions I was asking were very good questions and revealed major gaps/issues — so they're going out of their way to not have evidence of their negligence.*" Gjovik implored Lagares to look into EH&S's conduct, saying "*I think everyone is forgetting I work in engineering & I'm in law school. I know how toxic torts work.... right now, it feels like I'm not only being harassed by my manager and my HR BP, but it appears there's a conspiracy to force me back into what appears to be a very physically unsafe office building."*

349. On July 4 2021, Gjovik complained to Lagares, that in 2017, West directly harmed Gjovik (by forcing her to eat peanut, which she is allergic to) and then failed to seek medical treatment despite potentially life-threatening injury (she was in anaphylaxis) due to West "*being too drunk*" and then days later Powers texted West complaining about why is he "*trying to kill*" Gjovik.

350. On July 7 2021, Gjovik met with EH&S (Steiger and Jain) and Waibel. Steiger said Apple refuses to test the indoor air before they fix the cracks in the floor.

351. Waibel claimed that because the 2015 test results came back acceptable that there is no reason to worry about vapor intrusion. Gjovik reminded Waibel the cracks in the floor are new and cracks in the floor is the primary vector for vapor intrusion at these sites.

352. Gjovik explained that a cracked slab is a "*change of circumstances*" and questions the need for air testing before and after the repairs, to confirm the repairs were successful. Waibel said no.

353.    Waibel said Apple will not provide Gjovik any details about what "*fixing the cracks*" entails and tells Gjovik they will not answer any more of her questions about it.

354.    Gjovik reiterated she does not feel safe at the office and that she is worried about vapor intrusion.

355.    Gjovik also complained to the three of them that she believed Apple was misrepresenting the conditions at the office and Apple's actions. Gjovik complained Apple claimed the floor crack survey and air testing is "*routine maintenance*," but that they also admitted it was the first time Apple had ever done it.

356.    In the meeting, Gjovik questioned how it is "*routine*" if it has never been done before. Steiger then claimed Apple had also performed floor-sealing activities at "*two or three buildings*."

357.    Gjovik asked which buildings, so she can understand if Apple was being honest with her or if they were indeed misrepresenting the situation. Waibel interjected and said, "*they won't discuss buildings [Gjovik's] not in,*" "*won't answer that question*," and "*that level of detail is not appropriate for this call.*"

358.    Steiger told Gjovik that Apple no longer has any plan to test the indoor air at the office, and that while it will occur at some point in the future, there is no estimated timeframe.

359.    Steiger also says when they test it will only be with passive samplers (not SUMMA & TO-15), with HVAC on (not standard), and when employees are working in the office (and could cause their own emissions).

360.    Gjovik expressed concerns that HVAC on brings in outdoor air and would dilute indoor vapor intrusion. Gjovik also complained that testing with employees working would give Apple an excuse to blame Gjovik's coworkers on causing their own emissions as an excuse for

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

any abnormal results (as Apple did when they blamed "construction" for the high Toluene and Ethylbenzene in the 2015 test results).

361.    Steiger and Jain told Gjovik their test plan is "*protocol*" and "*over and beyond*" what is expected.

362.    Gjovik asked them to share their protocols and documentation with her and they said no because they do not exist, and she can just "*Google it.*"

363.    Waibel then said Apple will not answer any of Gjovik's pending questions or any new questions and that Apple's position is that "*they feel it is safe.*"

364.    Gjovik emailed the three of them notes summarizing the meeting. Gjovik then forwarded those notes to the US EPA.

365.    Gjovik complained about this meeting to Okpo and Lagares and asked them to intervene.

366.    Gjovik included the meeting in her Issue Confirmation document from mid-August 2021. Gjovik noted that witnesses included: "*y'all know what you did.*"

367.    Steiger suddenly left from Apple in the midst of these discussions. Steiger returned to his prior employer, EKI, an environmental consulting group.

368.    Steiger had joined Apple in 2013 from EKI to work for Apple on hazardous waste issues, including the Apple Park clean-up for which EKI was a consultant.

369.    The last meeting Gjovik attended with Steiger, he seemed upset with Apple and was forced to simply read a piece of paper that appeared to have been written by Apple where he said essentially the office is safe because he is an expert, and he thinks it is safe.

370.    Steiger and Waibel told Gjovik that would be her final update about her office building.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

371.    Under information and belief, Apple and EKI conspired to conduct indoor air testing on or around August 4, 2021, but concealed the testing and the results. Apple also made no reference to the August 19, 2021, US EPA inspection in any subsequent legal filings on Gjovik's retaliation lawsuits and the US EPA employees (Poalinelli, Ty, Schulman, Perez-Sullivan) conspired with Apple to conceal the inspection from Gjovik. Under information and belief, Apple, US EPA employees, and Lisa Jackson conspired to hide this information from Gjovik in order to reduce Apple's liability to Gjovik in the lawsuits.

372.    On July 8-9 2021, Gjovik texted with her coworker Ertell complaining about Apple's handling of the office. She wrote, "*I'm seriously considering doing one of these 2hr sorbent tubes in the next few weeks before they seal the floor. Maybe ideally one early morning before people come in and later evening after people already left.*" Ertell replied, "*Glad that you are all over this*!"

373.    On July 12 2021, Apple told Gjovik again that she has to come back to her office on a Superfund site and with the COVID-19 Delta surge in September 2021 unless Gjovik files a request for ADA accommodations.

### xviii.    Gjovik Fights Back (July-August 2021)

374.    On July 16 2021, Gjovik emailed Lagares: "*As previously discussed at length, I have serious concerns about work place safety of my building, and Apple's other buildings on chemical release sites. At least for my building, from what I've seen, Apple appears to have been negligent with properly managing the vapor intrusion from the three toxic groundwater plumes under the building. Also, as mentioned, I believe I have already been injured by the vapor intrusion in 2019.*"

375.    Lagares told Gjovik that there were delays in his response to her because he had to consult with a larger group of people and remarked to her there was a substantial number of

stakeholders interested in her complaints. Under information and belief, Lagares was referring to members of the Enterprise in the scheme to hide Apple's unlawful acts, including: the Real Estate team, Steiger, EKI, AECOM, Northrop Grumman, Corporate Legal, Riccio, Worldwide Loyalty, Ronald Sugar, Lisa Jackson, Margot Perez Sullivan, Chip Poalinelli, Irvine Company, and others.

376.    On July 18, 2021, Gjovik posted on Apple's Slack discussion tool that Apple was negligent at her office and that Apple was misrepresenting their policies and protocols. Gjovik also complained of "*intimidation and retaliation for raising concerns.*" Gjovik shared she was hoping that her talking publicly about the issues might "*make Apple & their goons act more like humans.*" Gjovik posted on Apple Slack:

> "…the remote work ADA process was actually suggested to me by Employee Relations as some sort of accommodation in response to me yelling for months about their negligence with my office/the property it is on, failure to address my work place safety concerns, and misrepresentation of their policies/protocols. Also, yup I already reported her comments and my dissatisfaction with this whole mess of a process to Employee Relations. I have a big 90m meeting with two ER people this week to go over all this, in addition to my outstanding complaints about work place safety, sexism, sexual harassment, failure to address hostile work env, failure to report work place injuries, FMLA & ADA violations, intimidation and retaliation for raising concerns about all of the above, whistleblower retaliation, and a whole bunch more. To everyone suggesting I consider taking legal action, thank you and oh trust me, I am, but I think I will stress the judge out of I keep adding more & more cause of action after the initial complaint… so I'll let ER do their thing. Perhaps me talking publicly & semi-publicly about all this will make Apple & their goons act more like humans and less like a corporate machine, or at the very least act like a corporate machine with a PR crisis."

377.    Around July 2021, One of Gjovik's friends, an Apple Manager, warned her that if she kept posting about toxic waste and labor rights that *"Apple [was] going to take [her] Slack away."*

378.    Gjovik wrote to US EPA on July 19 2021 asking for an update and complaining about Ronald Sugar and conflicts of interest, and complaining Apple will not test the air before they fix the cracked floor. The next day she replied and added that she was concerned Apple did not notify US EPA about the cracks and claimed they do not have to. Gjovik asked EPA to find out "*what exactly this whole floor crack / floor sealing thing is about — in additional to the lack of air testing, and refusal to test the air before they seal the floor."*

379.    On July 20 2021, Gjovik wrote to US EPA from her iCloud email: "*Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."*

380.    On July 20 2021, US EPA emailed their Public Relations team informing them Gjovik had been complaining about her TRW Microwave Superfund office and about "*a connection between a member of Apple's BOD and his former post as CFO of TRW Microwave.*"

381.    Gjovik told Apple Employee Relations senior manager, Antonio Lagares, that because Waibel already ruined her career at Apple, Gjovik wanted Apple to have to actually investigate what happened to her during her time at Apple now.

382.    Gjovik told Lagares she was talking to reporters about Apple's work conditions and that she was considering suing Apple.

383.    On July 20 2021, Lagares agreed to open a new investigation into Gjovik's concerns.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

384.    Lagares assigned investigator Ekelemchi Okpo to Gjovik's case. Gjovik started meeting with Okpo on July 21 2021 to discuss her concerns.

385.    Gjovik emailed Apple Employee Relations a list of evidence folders she shared with them, labeled by year and cause of action including: *"Failure to Report Workplace Injuries, Workplace Safety Concerns, Assault and Battery, Negligence."*



*Exhibit A-xvii-A: Gjovik's Box Evidence Folders*

| Name ^ | Updated | Size |
|---|---|---|
| 2018 - Sexual Harassment | Yesterday by Ashley Gjovik | 2 Files |
| 2019 - Hostile Work Env | Today by Ashley Gjovik | 11 Files |
| 2019-21 - Asked Dan to Address Sexism from Dave | Today by Ashley Gjovik | 12 Files |
| 2020 - Corruption Whistleblowing | Today by Ashley Gjovik | 6 Files |
| 2020 - Disability Discrimination & FMLA Violation | Today by Ashley Gjovik | 6 Files |
| 2020 - Sexual Comments Dan Dave | Today by Ashley Gjovik | 6 Files |
| 2020 - Voting Advocacy | Yesterday by Ashley Gjovik | 4 Files |
| 2020-2021 - Hostile Work Env | Today by Ashley Gjovik | 9 Files |
| 2021 - Retaliation & Constructive Termination #3 | Today by Ashley Gjovik | 10 Files |
| 2021 - Whistleblowing & Advocacy | Yesterday by Ashley Gjovik | 8 Files |
| 2021 - Workers Comp | Yesterday by Ashley Gjovik | 2 Files |
| 2021 - Workplace Safety | Today by Ashley Gjovik | 55 Files |
| Ashley's Background | Yesterday by Ashley Gjovik | 3 Files |
| Ashley's Reviews | Today by Ashley Gjovik | 13 Files |
| MSQ Diversity | Yesterday by Ashley Gjovik | 3 Files |
| MSQ Job Definition | Today by Ashley Gjovik | 21 Files |

*Exhibit A-xvii-B: Gjovik's Box Evidence Folders*

386.     Apple said they would consider offering a severance package with Gjovik if Gjovik would sign a litigation waiver. Apple agreed Gjovik would not have to sign another NDA but did make the severance negotiation contingent on Gjovik executing a waiver of all claims while intentional concealing material facts about harm Apple caused to Gjovik through chemical exposure at her office at her apartment. Gjovik expressed concerns about the settlement amount and her potential medical costs if she was to get cancer from the exposure at her office.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Apple denied the severance on those conditions, in violation of California law. Apple had previously denied Gjovik's request for a different position not in a hostile work environment, knew she was in a hostile work environment, and then effective suspended Gjovik before it then swiftly fired her. If Gjovik accepted the claim waiver, Apple acted as if it would provide severance at some point and not terminate her.

387.    Because Gjovik denied the waiver, Apple discontinued Gjovik's employment and denied the raise and bonus due to her at that time in violation of Cal. Gov't Code § 12964.5(a).

388.    On July 23 2021, Gjovik was quoted by New York Times where Gjovik criticized Apple's COVID-19 response in an article about return to work with the Delta surge.

389.    On July 24 2021, New York Times make Gjovik's quote "Quotation of the Day" for the entire NYT.[73] Apple Employee Relations expressed they were upset Gjovik did this. Gjovik told Lagares that she was taking Labor Law and learned she is able to speak about her work conditions regardless of NDAs. Lagares told her it is annoying to Apple when employees "*figure that out*."

---

[73] New York Times, "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans,*" July 24 2021, https://www.nytimes.com/2021/07/24/todayspaper/quotation-of-the-day-virus-surge-complicates-return-to-office-plans.html

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

# The New York Times

## *Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*

  

July 24, 2021

"OK, you want me to put my life on the line to come back to the office, which will also decrease my productivity, and you're not giving me any logic on why I actually need to do that?"

ASHLEY GJOVIK, a senior engineering program manager at Apple, who was one of many employees to push back against an earlier plan to return to the office in September. Many companies are reconsidering their return dates after objections from employees and concerns about the surging Delta variant.

A version of this article appears in print on July 24, 2021, Section A, Page 3 of the New York edition with the headline: Quote of the Day. Order Reprints | Today's Paper | Subscribe

*Exhibit A-xvii-C: Gjovik's Quote in NYT, July 24 2021*

390.    On July 24 2021, Gjovik posted on Apple's Slack discussion tool complaining about secrecy at Apple after several of her coworkers suggested her quote in the NYT was "leaking" and Apple should/could fire her over it. Gjovik complained about Apple's "*over-generalized confidentiality scare tactics, culture of peer policing, and shaming.*"

391.    On July 26 2021, Gjovik posted on Apple's Slack discussion tool complaining that Apple's response to her concerns has just been to retaliate against her and intimidate her into silence – Gjovik asked if anyone else had been retaliated against for raising concerns. Many of Gjovik's coworkers responded that yes, they too had experienced retaliation from Apple for raising real and reasonable concerns. Okpo then swiftly interrogated Gjovik for over an hour

about her posts and the responses, repeatedly asking her to stop posting about her concerns, and

to stop encouraging other employees to post their concerns, and instead to send all employees to

speak with him directly. Gjovik said no, and complained she would not send other employees to

be retaliated against by Employee Relations.

392.    On July 28, 2021, Gjovik emailed Okpo and Lagares about discussions with

coworkers revealing frequent discrimination and harassment issues across Apple, and what

appeared to be systemic cover-ups of those issues instead of actually resolving the problems, and

that meanwhile Apple fraudulently holds itself out publicly as caring about human rights and

respect.

---

**From:** **Ashley Gjovik** ashleygjovik@apple.com 📎
**Subject:** Slack ER Chain
**Date:** July 28, 2021 at 2:46 PM
**To:** Ekelemchi Okpo eokpo@apple.com
**Cc:** Antonio Lagares (ER) alagares@apple.com

Hi,

The Slack chain we talked about yesterday & today: https://a1391194.slack.com/archives/CK1KDPQCF/p1627328464228400

Not even including DMs....

I don't seem to be the only employee subject to sexism, hostile work environment, harassment, and retaliation — who has received no real help from HR or ER in resolving the issue. (Yes I know you're looking into things now — but Jenna made things worse for me, and so far y'all have done nothing to mitigate the harm I'm experiencing ongoing).

There seems to be a growing group of us with very horrific stories to tell , who have tried to tell these stories, and have gotten no where at Apple.

As mentioned before, this is incredibly disappointing and unacceptable to me. Not just for my own situation — but also that women are being treated like this by their coworkers and ignored by HR/ER at a company that likes to pretend it cares about human rights, inclusion, diversity, and respect. Pretends seems to be the important word there.

-Ashley

**Thread** #women-in-swe😀

🚩 Added to your saved items

 **Ashley Gjøvik** Jul 26th at 12:41 PM
I just read this article and I have a lot of thoughts. I know this is a sensitive area, but I'm wondering if this is a topic that might be benefici discuss, at least for those of us that have tried to go through the employee relations process here, or know folks who have.

https://www.washingtonpost.com/technology/2021/07/23/amazon-gender-discrimination-investigation/

Do we think Apple does a sufficient job at handling employees complaints about discrimination? Do we feel comfortable even reporting issues?

---

*Exhibit: The Slakc/Retaliaton Email*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

393.    On July 29 2021, Gjovik complained to Okpo about her prior conversation with Apple EH&S Legal, Rubenstein, where the lawyer admitted Apple had not been testing the buildings for vapor intrusion and needs to be.

394.    On July 30 2021, Gjovik complained to Lagares, Okpo, Polkes, and Waibel about her concerns about her Superfund office and an apparent cover-up, and that she was "*talking to NYT about [the] whole debacle ongoing. NYT quoted [her] last week about [her] concerns about another workplace safety issue — what [she] feel[s] is inadequate safety protocols & policies around COVID exposure for employees being forced back into the office this fall in the midst of a global pandemic.*"

### xix.    Trouble with the US Government Sanctions Against Syria (2020-2021)

395.    In November 2019, the US Treasury found Apple liable for violations of Foreign Narcotics Kingpin Sanctions Regulations (31 C.F.R. Part 598) and Apple settled for $466,912.[74]

396.    The amount Apple was fined was based on aggravating factors including the number of Apple's apparent violations; the length of time those violations occurred; the multiple points of failure within Apple's sanctions compliance program, policies, and procedures; and that Apple's conduct "*demonstrated reckless disregard" of US sanctions requirements*. [75]

397.    On July 20 2021, Gjovik complained about a manager in West's organization making a written statement that sounded like he was bragging about smuggling and otherwise violating US sanctions on Syria.

---

[74] U.S. Treasury, OFAC, "*Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Apple, Inc.,*" Nov 25 2019, https://ofac.treasury.gov/recent-actions/20191125
[75] US Treasury, OFAC, "*ENFORCEMENT INFORMATION FOR NOVEMBER 25, 2019*" pg3, https://ofac.treasury.gov/media/25931/download?inline

398.    Gjovik had raised the issue a year prior, John Basense and Reed Johnson said they would look into, but there had been no response since.

399.    In the meantime, the male employee who was bragging about smuggling was promoted to manager of something called a "Comfort Team." Gjovik had inquired to the team as to what "Comfort Team" is but no one would respond.

400.    On July 20 2021, Gjovik contacted the Business Conduct team reporting to Tom Moyer about the sanctions issue. The team responded prompt and asked for a phone call.

401.    During the call Gjovik was asked to preserve evidence while they investigate.

402.    The investigator told her it did not sound like Apple violated sanctions because it was the employee's family handling the smuggling at his direction, and because it was illegally importing the goods into Syria, it would likely break Syrian laws but not US laws. Nothing was said about reporting the matter to the government regardless.

403.    The employee also bragged about running an IT consulting company, which is something Apple employees are generally forbidden from doing. Upon investigation the employee claimed the business was based in California but it was apparently entirely operated in Syria and Lebanon and used an iOS application to facilitate border-crossings between the countries.

404.    The investigator commented he was concerned that Gjovik's felt coworker thought it was normal to brag about illegal smuggling at work.

405.    Gjovik noted: "*I've been complaining about, amongst other things, the culture of impunity and general lawlessness in my org.*"

406.    Even before an investigation concluded into the border crossing company, West then emailed Gjovik saying that because Apple did not break the law there is no policy violations so everything is fine.

407. West added, however, they are going to remove the smuggling content from the article for undisclosed reasons that are not related to compliance.

408. Gjovik complained that West was minimizing the issue.

409. Dan West never responded to Gjovik ever again.

**xx.    US EPA Demands to Inspect Gjovik's Office; Apple Doubles-Down on the Cover-Up; Gjovik Demands Reform (July-August 2021)**

410. On July 26 2021, the US EPA's CERCLA QA team reviewed Northrop Grumman's report about the sub-slab vents on the roof of 825 Stewart Drive. The vapor intrusion expert reviewed the report seeing the Main building (where Gjovik sat) SSD vents were sawed down to one foot and were exhausting the Superfund pollutants near the HVAC intake. The QA lead, Mathew Plate, wrote that it was "*not appropriate.*"

411. On July 26 2021, the US EPA notified Northrop Grumman they wanted to inspect Gjovik's office at 825 Stewart Drive for vapor intrusion risk. US EPA told Northrop Grumman they wanted to inspect the sub-slat depressurization system, the building's concrete slab and cracks, any concrete slab penetrations, past indoor air sampling locations, and some additional topics.

412. Under information and belief, Northrop Grumman notified Apple that day. Northrop Grumman's emails to US EPA on July 28 2021 noted they were "*still waiting*" on confirmation from Apple.

413. Under information and belief, US EPA and Apple conspired to hide the fact that there was even an inspection from Gjovik indefinitely.

414. In early August, Apple would also attempt to coerce the US EPA to sign a four-page, single-spaced Non-Disclosure Agreement that would prohibit the US EPA from making

public statements about its compliance and enforcement activities against Apple, among other restrictions. The US EPA declined to sign Apple's NDA.[76]

415.    On July 27 2021, Gjovik forwarded her emails with the US EPA to Lagares and Okpo and encouraged them to do the right thing and adding the emails to a "*Work Place Safety*" folder with the other evidence folders.

416.    On July 27 2021, Gjovik complained to Apple about the hostile work environment created by Apple's intimidation and harassment of her. Gjovik demanded Apple address her concerns.

417.    Gjovik wrote to Lagares and Okpo that she was looking for short-term mitigations of keeping interactions with her managers in writing and for them to not make unfavorable changes to her workload or assignments.

418.    Gjovik told Lagares and Okpo, who kept repeatedly suggesting she take some sort of leave, that she did not want to go on leave. Gjovik complained that the leave Waibel put her on seemed to be an attempt to prevent her from monitoring the office and investigation while Waibel never actually investigated. Gjovik said she did not want medical leave or administrative leave.

419.    Gjovik repeatedly said that she only wanted the situation with West and Powers controlled, and that worst case Okpo and Lagares could "pause" her job with West and Powers if they refuse to put things in writing and refuse to stop making changes to her workload.

420.    Gjovik told Okpo that she learned in law school that administrative can be an adverse employment action. Gjovik told Okpo that if he wanted to pursue the "pausing" her job option, that it must be a discussion and she must agree to the terms which must still allow her to organize, gather evidence, and participate in her other work activities (like trainings, her AI

---

[76] Apple NDA, Apple Number: NDA202104810699, Environmental Protection Agency (released per US EPA FOIA Request)

ethics project with Apple Legal, and her civic engagement project with Apple University). Gjovik said Okpo must offer the terms of the leave and she would either accept or reject it, otherwise she said, case law says if they force her on leave its an unfavorable employment action.

421.    Around this time Okpo expressed disapproval that Gjovik was taking Employment Discrimination and Labor law school classes during the daytime. Gjovik told Okpo she was previously approved to take remote daytime classes in prior terms, as long as she was to multitask,

422.    Gjovik told Okpo that if he wanted to forbid her from taking Employment Discrimination and Labor law that he must put it in writing. Gjovik said something like "*we'll see what the Judge thinks of that.*"

423.    Gjovik wrote to Okpo and Lagares on July 27 2021 that she was also looking for a long-term solution to the issues that could either be a new role at Apple that is not a hostile work environment, or they should offer an exit package. She wrote *"I refuse to take medical leave as a response to the hostility. This is on Apple [Employee Relations] to resolve, not for me to hide from.*"

424.    Gjovik suggested several times that instead of working for West and Powers, that she could work in Employee Relations and try to fix their broken processes and culture of retaliation. At one-point Okpo offered that she could work in Employee Relations doing what she suggested, but that she would also have to continue to work for West and Powers. Gjovik expressed her frustration to Okpo that they still only seem to be trying to make her quit.

425.    On July 28 2021 Gjovik complained to a friend in Human Resources that she believed the Employee Relations investigations were "*a sham*", writing to him in Apple Slack:

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

"I've spent 20hrs in the last 2 weeks screaming at ER about Apple's ER being a sham & worthless & supporting the culture of discrimination and impunity – not to mention all of my work place safety concerns being actively ignored."

426.    On July 28 2021, Gjovik texted Okpo asking if he talked to Powers about keeping communications in writing, and Okpo said he did not.

427.    On July 30 2021, Gjovik posted on Twitter complaining about Apple. "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions*."

428.    After posting this Gjovik had ex-Apple employees contact her to say they had similar experiences. Other Big Tech employees and ex-employees supported Gjovik for speaking out. Gjovik then decided to start sharing more of what was happening between her and Apple on social media in order to help others understand the issues so they could advocate for employees, and in hope it may pressure Apple to act more reasonably.

429.    On July 30 2021, a Friday, Northrop Grumman wrote to US EPA that "*The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.*" [Monday of the next week was August 2 2021]. Under information and belief, Northrop Grumman were referring to Apple lawyer Debra Rubenstein.

430.    On July 30 2021, Gjovik posted on Apple Slack complaining about Apple's retaliation.

I have been raising concerns about an unsafe work environment. I have very good reason to believe I've been exposed to uncontrolled industrial chemicals. I've been complaining for months. ER has partnered with EH&S to dodge my questions and arguably misrepresent what's happening. I had to resort to getting the U.S. EPA & California OSHA involved. Guess what Employee Relations recommended? Submit a medical accommodation request through Sedgwick to

101

request remote work so I'm not exposed to the industrial chemicals. Guess what the request form asked for? Me to release a very large scope of medical records directly to Apple Inc and have my doctor fill out a detailed form explaining why exposure to uncontrolled industrial chemicals, possibly at toxic levels, is bad for my health and even referenced a worker's comp form I filled out for a fainting spell in my office in 2019, directly referencing vapor intrusion in my active Superfund office. Then what did Sedgwick do? Send me another detailed form for my doctor to fill out asking for more details about my health and also things like, what if we get you an air purifier by your desk? (Yes, an air filter, to mitigate the levels of TCE known to be in the air at my desk above max industrial levels even less than ten years ago). What happens when I complain to employee relations again that I have to fill out paper work to not get poisoned? Literally Nothing."

431.    On August 2 2021, Gjovik asked the US EPA what the status of her office was. She said Apple refused to answer anymore of her questions. She also noted she was talking to the New York Times. US EPA, Perez-Sullivan, responded August 3, 2021, thanking Gjovik for providing information )but failing to mention the inspection or HVAC issues). Perez-Sullivan also killed the New York Times story that day and reported her success in doing so to her manager.

432.    On August 2 2021, Gjovik and her coworker Mike Ertell, texted about their office. Ertell asked "*any updates on the testing in SD01?*" Gjovik replied: "*They told me they're not answering any more of my questions and they'll reach out to me when they feel like it.*"

433.    On August 2 2021, out of frustration with Okpo and Lagares refusing to re-investigate anything Waibel had supposedly investigated, and saying that if Waibel said it was fine then it was fine – Gjovik proceeding to start posting on Twitter about several of the smaller things she complained about. She told Okpo and Lagares that it was work conditions, and they claimed they investigated and found no issues, so then she is free to talk about it and she would do so.

434.    Gjovik posted on Twitter several examples of the evidence she provided related to West and Powers discriminating against her due to her sex/gender including a text message exchange with West where he was measuring the 'octaves' of her speaking voice, and another with Powers defending a political figure who was recently accused of sexually assaulting a woman. These posts quickly went viral.

435.    Sedgwick provided Gjovik a medical release form to Sedgwick on behalf of Apple which Gjovik signed. Gjovik met with her doctor, and he prepared the documentation for the request despite also being confused by Apple's approach on the matter.

436.    Gjovik complained repeatedly about the clear misuse of ADA and the offensive responses from Apple and Sedgwick related to her request. On August 2nd, Gjovik emailed Okpo, Lagares, Waibel, and Polkes

"My doctor faxed his response to Sedgwick's follow up questions to them today. Attaching for you below since I assume you'll ask them for it anyway. Note: the questions about whether an air purifier could mitigate Superfund vapor intrusion (so severe that a land use covenant with the government prohibits elder care and day care on site) was particularly offensive, but so is the fact itself that you're forcing me to release medical info & fill out forms to not be poisoned."

437.    Gjovik raised concerns to Apple in April through August of 2021, complaining of retaliation, discrimination, harassment, and intimidation. In response to Gjovik's detailed complaints with supporting evidence of misconduct by Apple managers and representatives, Apple (West, Powers, Polkes, Lagares, Okpo, Waibel) repeatedly suggested Gjovik's only path forward to resolve those issues was for Gjovik to request FMLA medical leave and/or utilize an Apple EAP ("Employee Assistance Program") mental health counselor.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

438.    Gjovik repeatedly complained that both of those suggestions implied Gjovik was imagining or overreacting to the issues, and that Gjovik's only option was to remove herself from Apple.

439.    Gjovik complained that she identified specific, tangible abuse and it was Apple's responsibility to investigate and remediate the misconduct. Gjovik also complained that Apple's inferences that the issue was Gjovik's mental health was undermined by Apple then suggesting an appropriate response to the abuse was to go on leave to remove herself from that abuse. Gjovik's logic and self-confidence did not deter Apple from continuing to pursue this line of intimidation for months and until Gjovik's inevitable termination.

440.    Gjovik told Apple she was moving apartments to Santa Clara on August 6 2021 and driving from San Francisco to Santa Clara to pick up her key on August 5 2021. Gjovik said since she will be driving through Sunnyvale anyways, she planned to visit the office on August 5th to gather evidence. Gjovik specifically mentioned a work laptop that she believed had copies of the text exchange with West when he tried to pimp/pander her in 2018.

441.    Then, on August 2 2021, shortly after Gjovik said this, Apple suddenly announced it was sending an EH&S team to Gjovik's office on August 4 2021.

442.    Gjovik quickly texted Ertell to see if he would be at the office before August 4 2021, so he could help gather evidence, but he said he did not think he would be there before August 4 2021.

443.    On August 3-4 2021, Gjovik asked other coworkers on her team who were onsite at the building, Simon Moen & Eddie Borjas, to take photographs of the cracks in the floor as evidence, fearing Apple was attempting to cover-up the safety issues and Gjovik and her colleagues would never understand if they were exposed to chemicals in way that harmed their health. Gjovik messaged them: "*Weird ask but if either of you are in [Stewart 1 office] today can*

*you please try to take detailed pics of any cracks you see in the floor – the cement – EH&S is supposed to fix it tomorrow-ish I want evidence of what they looked like before they do*."

444.    Gjovik's coworkers responded they were in the office and asked her to point to "*where the cracks are*" so he "*can take a pic*." They then sent a photo of a crack in the floor and asked, "*Do you consider this a crack?*" Gjovik responded, "*Thank you. Yes, can you get closer up to see the depth please and note where in the building it is. I love you both. The deeper the crack the more likely we're being slowly poisoned. I'll forward you an email after my meetings.* "



*Exhibit A-xx-A: Slack chat about the cracks in the floor at 825 Stewart Drive*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit A-xx-B: Slack chat about the cracks in the floor at 825 Stewart Drive*

Gjovik's coworker responded that he "*did a quick walk and its all over the place*." He

said he can "take pics" "but it is everywhere." Gjovik responded,

"If there's any way to show depth like sticking clay in a deep one and showing

how deep it is that would be amazing. It sounds like they're trying to cover all this

107

up as soon as tomorrow. This is me yelling about the cracks (email attachment). I think they're sealing them tomorrow but refusing to test or capture them otherwise until they fix them.

Gjovik's coworker responded with photos of cracks. Gjovik responded,

"Thank you. Would you mind looking in front of [Coworker 3]'s office and the concrete in front of the row where my desk is. I filed a workers comp complaint for fainting in Mike's office and at my desk in 2019 now due to suspected chemical exposure.

Gjovik's coworker responded "*Well definitely some cracks in the floor. Also, a ton of floor (in all cubicle / office space) is all under carpet, so how do they know what is cracked under there*?" Gjovik replied: "*They said they weren't going to look under the carpet because they're smart and talented people and I should stop asking questions.*" Gjovik informed Employee Relations of what they were doing and showed Okpo the photos. Gjovik complained she would not let them hide or destroy evidence.

445.    On August 3 2021, Alisha Johnson (prior US EPA Press Secretary under Lisa Jackson, now reporting to Lisa Jackson at Apple) emailed US EPA Public Relations to begin organizing an event where the current head of the US EPA, Michael Regan, would come to Apple Park and do a "fireside chat" with Lisa Jackson on August 17, two days before the US EPA's inspection of Gjovik's Superfund office. [77]

446.    The same day Apple announced a new "*joint commitment*" about "*protecting workers from chemical hazards*."[78] The program claimed Apple committed to

---

[77] Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*, https://www.axios.com/2021/08/18/epa-administrator-visits-apple-headquarters-climate
[78] Aug 3 2021, https://www.greenamerica.org/blog/groundbreaking-effort-protect-workers-chemicals-electronics; https://www.towardzeroexposure.org/about-the-program ; https://cleanelectronicsproduction.org/post/2021-08-03-electronics-industry-leaders-advance-toward-zero-exposure-to-workers-throughout-the-supply-chain

"*protect workers*" from chemical exposure, "*build safety systems and culture around process chemical management,*" and "*avoid harmful substances.*" The first round of highly prioritized chemicals to ensure workers have "*zero exposure*" to included NMP, Toluene, and TCE.[79]

447.    On August 3 2021, Margot Perez-Sullivan (US EPA) sent status to US EPA Public Relations saying the NYT reached out to her about Gjovik and Gjovik's office asking if there is anything newsworthy happening. Perez-Sullivan said she told the reporter, Jack Nichols, that the 2019 report on the office said the current remedy "*is protective*" and claimed the current US EPA Project Manager was "*on vacation.*" Perez-Sullivan wrote "*Reporter indicated he would not write a story.*"

448.    On the night of August 3 2021, Gjovik posted on Apple's Slack discussion tool encouraging her coworkers to speak out about work conditions and the terms and conditions of their employment.

449.    On August 4 2021 at 7:23 AM the city of Sunnyvale asked to Apple to inspect Gjovik's office for hazardous waste regulatory compliance.

450.    On the morning of August 4, Moen notified Gjovik he was at the office again. He provided more data on the cracks and also noted "*EH&S folks are here by the way. With so many devices. Nice job.*" Gjovik asked him to take a photo of them too and say, "*Ashley says hi.*" He responded, "*They are in the conf room next to Powers' office. Very difficult to take pic.*" Gjovik responded, "*they're legit hiding.*"

---

[79] Toward Zero Exposure, 2023 Report,
https://static1.squarespace.com/static/5fcaaeb867798450704de457/t/63ffcc83fe791111862f0a14/1677708419929/Toward+Zero+Exposure+Requirements+and+Verification+V1.1+February+2023.pdf

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit A-xx-C: Slack chat about the cracks in the floor at 825 Stewart Drive*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

xxi.     **Apple Removes Gjovik from her Office and Coworkers in**

**Preparation for the US EPA Inspection; Apple Prepares to Fire**

**Gjovik (August 2021)**

451.     A couple of hours later on August 4 2021, Apple suddenly put Gjovik on "indefinite administrative leave". Gjovik was supposed to meet with Okpo to continuing reviewing evidence files with him and discussing her concerns. Gjovik had been tracking the status of what they reviewed on the Box folders, and in addition to two pending folders, Gjovik had a new folder she wanted to review named "*New Evidence to Review 8-4*". Okpo said they were not going to review anymore evidence and Gjovik is now on leave. Gjovik protested and Okpo persisted.



**Exhibit A-xxi-A:** *Gjovik's Box folders on the morning of August 4 2021*

---

111

**Exhibit A-xxi-A:** *Gjovik's "8-4" Box folder on the morning of August 4 2021*

452.    Gjovik said she did not want to be on leave, but Apple said she did not have a choice. Gjovik said she wanted to still be able to talk to coworkers and gather evidence, and Apple said she was removed from the "*workplace*" and "*all workplace interactions.*" Gjovik was then left unable to coordinate with her coworkers to gather evidence, or to visit her office as planned to gather evidence in person the next day. Gjovik complained it was retaliation.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

453.    Under information and belief, after receiving notice from US EPA that they were going to inspect 825 Stewart Drive, and after having reviewed the extensive and meticulous evidence Gjovik gathered at 3255 Scott Blvd, and knowing Gjovik was about to be at 825 Stewart Drive to do the same -- Apple conspired to get to the office before Gjovik could, and also concurrently "*remove Gjovik from the workplace*" so she did not make a surprise visit, and "*remove Gjovik from all workplace interactions*" so no coworkers tipped Gjovik off as to what Apple was doing.

454.    After her meeting with Okpo, Gjovik still had two other meetings scheduled that day. Gjovik asked Okpo if the leave could start in a day or two so she has time to wrap up meetings and ensure her projects are covered. Okpo said no, the leave starts immediately. Gjovik complained to Okpo that the leave was retaliation. She complained he is setting her up for a bad review along with keeping her from organizing and gathering evidence.

455.    Gjovik went to both of her meetings that day. The first was with a coworker who wanted to talk about a bad experience they had with Employee Relations. She told the coworker what happened and said she was not sure if she would get in trouble for still attending their meeting.

456.    The last meeting of the day was with four senior managers in Dan West's organization. Gjovik knew Powers needed a specific outcome from that meeting and was expecting it that day, so Gjovik led the first half of the meeting like nothing was wrong. Once the project discussion completed, Gjovik then told them she was "*just put on leave*" and "*doesn't know if Apple will let her come back.*" Gjovik told them "*she did not understand what just happened*" and that Apple said it was voluntary but also said she had no choice.

457.    Gjovik told them solemnly that she expected it was probably the last meeting she'd ever lead as an engineering program manager at Apple. The senior managers advised her

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                           OCTOBER 25 2023

she should leave the call so she "*did not get in trouble with Employee Relations*." Gjovik acquiesced.

458.     Gjovik complained a lot on Apple Slack about being put on leave and told her coworkers to follow her on Twitter, or text or email, if they wanted to keep organizing now that she has to stop using Slack.

459.     A reporter contacted Gjovik after Gjovik's coworkers told the reporter what Gjovik posted. The reporter wanted to write an article about what Apple did.

460.     Gjovik agreed to let her write an article about Gjovik being put on leave, and it was picked up by other press.

461.     Gjovik realized Apple was preparing to fire her and quickly heard about conversations within her team that confirmed she was going to be fired. Starting around August 6 2021, the managers in West's organization start raising the "*Ashley Issue*" as a discussion topic in staff meetings. The managers say if anyone has concerns about the "*Ashley Issue*" they should talk to Helen Polkes. They and West mention West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands meeting.

462.     Gjovik realized they would not be discussing the "Ashley Issue" at a future all hands if she was there, and that West was already certain Gjovik was about to be fired. Gjovik also realized that Apple was sending her coworkers who were concerned that Gjovik had a point about Human Resources at Apple was severely corrupt, Apple was sending those coworkers to Human Resources. Gjovik realized Apple was not going to investigate or engage in good faith behavior.

463.     Gjovik complained about being on leave a lot. As she heard and saw Apple's conduct become more retaliatory, and Apple refused to let her go to trainings, Gjovik then began referring to the leave as a "suspension". Gjovik began to prepare for imminent termination.

464.    On the evening of August 4, Dan West also suddenly scheduled two large meetings with the women's group Gjovik founded and co-chaired.

465.    Starting on August 4-5, Gjovik began receiving harassing and threatening replies and comments from clearly fake social media accounts. One on a forum discussion about Gjovik, "Doval," wrote that Gjovik "*needs psychiatric help and confinement*" and that Gjovik "*is a psychopath and frankly is a danger to other apple Employees*!" The account went on to call Gjovik a "*ambulance chasing psychopath*" and said "*Apple needs to bring the hammer and make an example of people like this.*"[80]

466.    On August 12 2021 Gjovik filed complaints with US EEOC and California DFEH. Gjovik had her interview with EEOC on September 2 2021. Gjovik did not request an investigation but did request a Right to Sue letter which she received on 9 2021, prior to her termination. Apple was made aware of Gjovik's EEOC and DFEH complaints and that she was testifying to EEOC and DFEH about what Apple did to her by at least August 12 2021. Apple retaliated against Gjovik for filing a complaint and testifying with California FEHA. [Cal. Gov't Code § 12940(h); Cal. Code Regs. tit. 2, § 11021.].

467.    Gjovik saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices they would be on site for long periods of time: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5.

468.    This was unusual and highly suspicious. On August 12, Global Security (and/or *Worldwide Loyalty*) also hosted the first "*NPS Secrecy and Awareness Training*" for all of West's organization.

469.    Gjovik heard that around this time the managers in Dan West's organization were being instructed to avoid putting employee/labor things in writing due to how much evidence Gjovik was able to obtain.

---

[80] AppleInsider, 4 Aug 2021, https://forums.appleinsider.com/discussion/223222

***Table A-4: Apple's 825 Stewart Maintenance Work After 7/27 US EPA Inspection Notice***

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| August 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Sept 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

470.    On August 15 2021, Alisha Johnson (reporting to Lisa Jackson) sent US EPA Apple's talking points about Apple's environmental practices. Including: *"We've achieved Zero Waste to Landfill certifications at all supplier final assembly facilities for core product lines. In fiscal year 2020, we diverted more than 70% of waste across Apple facilities including retail stores. We have active Zero Waste to Landfill goals for retail, corporate facilities and our supply chain."*

471.    On August 16 2021, Apple emailed Gjovik and her coworkers about a "EH&S Walkthrough 8/18 8/19" at her Superfund office.

472.    The email included a map of the office created by EKI. EKI was the consulting company Michael Steiger was at prior, and rejoined after leaving Apple in July 2021. Under information and belief, Steiger began supporting Apple's environmental work at the office from his new position at EKI. Under information and belief, Apple and EKI assessed the office during these 'walkthroughs' and there is documentation of the issues they found.On August 17 and 18 2021, US EPA administrator Michael Regan was at Apple Park meeting with Lisa Jackson. They filmed a "*fireside chat*" and did interviews with press.

Aug 18, 2021 - Energy & Environment

# Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice

 Andrew Freedman, author of Axios Generate



EPA administrator Michael Regan (L) on a tour of Apple headquarters led by former EPA head and now Apple executive Lisa Jackson on Aug. 17, 2021. (Apple handout)

**Exhibit**: *Michael Regan, EPA Administrator, at Apple Park Aug 17-18 2021, before inspection*

473. CNBC published an article on August 18 2021 based on an interview with Apple's Lisa Jackson prior to the 'fireside chat' with Administrator Regan saying, "*Jackson told CNBC…Apple has made sustainability a big part of its corporate brand…. Jackson added she expects to discuss mandatory SEC disclosures of carbon emissions [with Regan on August 18 2023].*"[81]

474. On August 19th, the US EPA inspected Gjovik's Apple office for CERCLA compliance and found a number of issues, which were detailed in later reports.

475. The US EPA's justification for inspecting the office was:

---

[81] CNBC, *Apple backs Biden's proposal to eliminate greenhouse gases from power plants by 2035*, August 18 2021, https://www.cnbc.com/2021/08/18/apple-backs-biden-clean-energy-standard.html

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

"A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health."

**Destination**
TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
**Proposed Travel Start**
2021-08-19
**Description of why this work is urgent and essential**
A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.

The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
See less

476.    Notes from the August 19 2021 site visit and inspection included the following statements, as documented in records released via FOIA to Gjovik in 2022:

  a. "Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for VOCs bc venting into hvac. Would be better / need to extend 10' high."

  b. "Roof, East [Main] Bldg stack issues. Vents too close to chiller Cut too low.

  c. "SS-05 under carpet… Seems mislabeled… seal sub slat ports. Not abandoned properly."

  d. "4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller stack, not even sure how to extend."

  e. "Crack inspection documentation"

  f. "Locate the indoor SS missing ports."

477.    On August 20 2021, Michael Schulman of the US EPA emailed his teammates saying he would avoid creating a paper trail of the inspection and interactions with Apple. He wrote, "*I will not prepare a formal memo of the site visit. Anything I share with management will*

118

*be verbal or in an email, and at the "site management level" regarding human health*

*protectiveness and site management action items."*

478.    On August 23 2021, EPA CERCLA QA employee Mathew Platr submitted his

own notes to Schulman, also released to Gjovik via FOIA, which included the following

statements:

g.    *"Subslab sampling ports, left in place, have not been regularly smapled or*
        *maintained and several could not be located. It is recommended that these be*
        *located and maintained or decommissioned."*

h.    *"Significant, visible slab cracks, gaps and penetrations had been sealed…*
        *However large test equipment is bolted to the slab and it is unclear if any of*
        *these installations penetrate the slab."*

i.    *"SSD vents on the [West] roof are not significantly elevated above the roof (3*
        *feet) and are sheltered from the wind…"SSD vents on the [Main] roof are*
        *under the building chiller plant piping and are within 12-feet of a ventilationa*
        *system intake. There is not significant air flow near the SSD vent stacks and it*
        *is likely that the SSD vents are not functioning as intended and vapors could*
        *be building up on the roof near the HVAC intake."*

**xxii.    Apple Unleashes a Digital & Physical Harassment Campaign Against**
        **Gjovik to Demoralize and Intimidate Her (August 2021)**

479.    On August 12 2021, a fake Twitter account called "Beezie Wacks" was created to

harass Gjovik and began harassing Gjovik for several days. In a reply to a post Gjovik made

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

complaining about intimidation from Apple, Beezie told Gjovik that Gjovik was untrustworthy and unreliable.[82]

480.    When Gjovik complained the account was harassing her, Beezie replied with a link to the EEOC.gov website definition of harassment. Gjovik replied, "*I'm fairly sure EEOC only applies if you're my employer. Are you trying to tell me something, Beezie? Tim is that you?*" Gjovik added, "*You sure know a lot about employment law, Beezie.*"[83]

481.    On August 14 2021, Beezie was still harassing Gjovik and Gjovik had become certain the account was Apple. Gjovik responded to the account's posts: "*Beezie, would you plz let Tim know I'd like an update on the safety testing EH&S is doing in my office? They were supposed to send me an update by now. I haven't seen anything in my work email & ER wouldn't send to my personal email. Can you Tweet me when it's ready plz? Thx.*"

482.    On August 19 2021, another fake Twitter account, Mel Nayer, began harassing Gjovik. Nayer posted in a reply to a thread with Gjovik, "*I can't help to think though, that if #AshleyGjovik were Black Apple would have fired her weeks ago. White women, even when they are victims of workplace abuse, are treated with a level of privilege.*" [84]

483.    These fake accounts frequently harassed Gjovik about her gender, sex, race, disabilities, medical conditions, marital status, child status, and accused her of racism and classism.

### xxiii.   Apple Pretends to Investigate Gjovik's Concerns; Gjovik Asks to Come Back & Apple Says No (August 2021)

484.    On August 16 2021, Apple sent the "Issue Confirmation" of what they were supposedly investigating. (It is unknown what Apple was doing for the twelve days between

[82] Twitter: Beezie Wacks, https://twitter.com/beezie_wacks/status/1425921919447040003
[83] Twitter: Beezie Wacks, https://twitter.com/ashleygjovik/status/1426415093470744576
[84] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625

then and when Apple forced her on leave). Among other things, Okpo documented in the issue confirmation:

> "[Gjovik] mentioned that after [she] joined Apple, [she] heard that during [her] on-site interview, Bodhi Gerfen saw [her] and said something about [her] ass, and things he wanted to do to [her] ass."

> [Gjovik]  mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting. [Gjovik] told [Okpo] that when [she] addressed West about his comment, he said he didn't want to sleep with Powers so it wasn't a problem.

> "[Gjovik] stated that in 2017/2018, [John] Basanese told [her] that at [her] age, [she] needed to be married with children. {She] told [Okpo] that at holiday functions, Basenese made comments like "where is your partner?, don't you have a boyfriend?, settle down and have kids."

> "[Gjovik] shared that during a meeting in 2017, West made a "spanking" gesture with his hand to describe how [Gjovik] "keeps him in line"."

However, Okpo refused to document any of Gjovik's complaints about the safety of 825 Stewart Drive, including in the list of factors Gjovik believed caused retaliation.

485.    On August 16 2021, Gjovik emailed Okpo asking about her office. "*Can you please also provide more details on my workplace safety concerns — the last I heard from EH&S (via [Employee Relations]) was that they weren't going to answer any more of my questions and there was no ETA for any future updates. Do we know anything more? I've seen a lot of activity by EH&S at my building — and I also noticed they appear to have hired an enormous amount of vendors very recently. I'd love to learn more*."

486.    On August 17 2021, Apple emailed Gjovik asking to take three-dimensional scans of her ears and ear canals. Gjovik did not respond.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

487.    On August 19 2021, Gjovik posted on Twitter complaining about Apple demanding all of her messages, even those with nude photographs, back in 2018 for the Batterygate lawsuits and DOJ probe. Gjovik wrote: "*Sooo, #Apple has pics of my boobs. During a discovery thing 3yr ago, legal forced me to hand-over all my texts. They refused to let me delete anything, even "fully personal," even when I said "by fully personal I mean nudes." They said they're in their "permanent evidence locker".*[85]

488.    The post went 'viral' with over one million views, over one thousand 'retweets', and 52,363 visits to Gjovik's profile.

489.    On August 19 2021, Apple emailed Gjovik again to ask to capture three-dimensional imaging of Gjovik's ears and ear canals. Gjovik did not respond.

490.    On August 20 2021, Gjovik asked Okpo permission to attend a pre-registered training, even after the Professors approved, with Okpo justifying the denial "*because she was on leave.*"  Gjovik complained that the leave felt like punishment.

**xxiv.    Gjovik Accuses Apple of Violating the RICO Act; Apple Increases the Digital Harassment (August 2021)**

491.    On August 20 2021, Gjovik posted on Twitter complaining about Apple. She wrote in a thread of posts: "*I assume #Apple hoped I'd just quit the company by now. Nope. As I told Apple employee relations last month, I'm not quitting. They need to deal with the concerns I raised, & even more: stop intimidating, retaliating, & bullying me for even raising them. I'm here until they do… #Apple clearly couldn't find a solid reason to fire me with cause or I'm sure they would have tried. So, now it's a game of who blinks first. I'm not backing down.*"[86]

---

[85] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428495420917837826
[86] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1428846269619789824

492.    On August 21 2021, Gjovik 'quote Tweeted' her August 19 2021 post about the Batterygate discovery, and wrote: "*At the time, #Apple may have wanted leverage over me related to that lawsuit. I don't know what their intent was, but due to the focus of the suit, my whistleblowing, & the retaliation for it, it's in the realm of possibilities they took my nudes to intimidate me. Stay tuned...*"[87]

493.    On August 21 201, Gjovik submitted the first revised Issue Confirmation to Okpo and also posted on Twitter about it. On Twitter, she provided screenshots of the document where she suggested Apple needed to investigate itself for RICO Act violations.[88]



*Exhibit: A-xxiv-A: Gjovik's Issue Confirmation Concern List*

[87] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429177842399469569
[88] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429174603713191936

123

494.    Shortly after Gjovik's post about Apple and RICO, a fake Twitter account called "Mel Nayer," began replying to Gjovik's posts making threats and wild allegations. Nayer said, "*This is an ACTIVE @Apple investigation and the managers accused are now receiving death threats. Stop sharing confidential info/screenshots that could reveal identity of those involved. #AshleyGjovik #apple*."[89]  Nayer added, "*Managers accused are receiving death threats. Take down the work screenshots because identifies are being outed and lives are at risk now*."[90]

495.    Nayer added that "*people at Apple have been fired for sharing less*." Gjovik replied to Nayer, writing "*If during the lawsuits we track down your account & see you work/consult for Apple, then your note just now: "people at Apple have been fired for sharing less" won't age well. Then you're not "just trying to help," you are actually threatening & intimidating a whistleblower.*" [91]

496.    After the outburst from Nayer, Gjovik posted on Twitter: *"Y'all, I really think it's because I finally said "RICO.""*[92] Gjovik then replied to her own post with a link to a music video for the song "R.I.C.O." by Meek Mill featuring Drake.[93] Gjovik also posted, "*Now that we're all fully distracted by whatever the f THAT was, plz keep in mind it happened just hours after I mentioned: 1) The corruption at #Apple may reach R.I.C.O. levels 2) Legal may have taken my nudes to intimidate me as a whistleblower re: that lawsuit.*" [94]

497.    On August 22 2021, Gjovik sent the second revised Issue Confirmation to Okpo with her revisions and corrections, and she posted about it on Twitter.[95]

---

[89] Twitter, Mel Nayer, https://web.archive.org/web/20210822103330/https:/twitter.com/mel_nayer/status/142921555549 13533 957
[90] Id.
[91] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429216780178714625
[92] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429224817698304007
[93] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429233027683536897
[94] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429250234278825987
[95] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429621435878678536

124

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

498.    On August 23 2021, Gjovik sent the third revised Issue Confirmation to Okpo adding she filed including a Business Conduct complaint about Ronald Sugar and her office, and she attached the Issue Confirmation with all of her other concerns. She highlighted concerns about "Apple Real Estate Environment, Health, & Safety" which she detailed as "*RICO; Negligence, Misrepresentation; Fraud; Recklessness; Violations of Env Laws; OSHA, & Right to Know; Toxic Torts; Corporate Corruption; Organized Intimidation; Organized Witness Tampering*." Gjovik asked Apple to investigate themselves.

499.    Gjovik noted her concerns about Apple's response to Gjovik's initial concerns and the actions of the first Employee Relations investigator, Jenna Waibel, in the Issue Confirmation. Gjovik complained Waibel interjected herself in Gjovik's interactions with the EH&S without explanation, and when Gjovik asked Waibel on April 3 2021 to talk to her manager David Powers about comments he made about the EH&S concerns, Waibel refused but instead on April 9 insisted on opening an investigation into sexual discrimination. Gjovik told Waibel verbally and in writing, on at least April 9 and April 12, that she did not want a sexism investigation and that it would only cause retaliation. Waibel requests a phone call with Gjovik. They talk on the phone on April 27, 2021. Gjovik summarizes the call in her Issue Confirmation with Apple in August 2021:

> "I have a phone call with Jenna, after asking for another time if she's talked to Dave about telling me I can't talk openly about workplace safety concerns, and she is extremely hostile and essentially also tells me I can't talk openly about workplace safety concerns. I document our call and send clarifying questions to her and Michael. She then says she never said what she said upon seeing it documented. During that call I also started crying and pleaded with her to stop the investigation because the way it's going it seems like she's going to side with my manager and Dan and only get me in trouble. She says she can't cancel and investigation after it begins."

500.    Gjovik listed her short-term disability claim from 2020 as due to "chemical exposure." At that point, Apple knew it was responsible for disabling Gjovik in 2020 and that the chemicals Gjovik was exposed to came from Apple's secret silicon fabrication plant next to Gjovik's apartment. Apple continued to conceal this fact from Gjovik.

501.    On August 24 2021, Apple asked for a third time to conduct three-dimensional scanning of Gjovik's ears and ear canals. Gjovik did not respond.

502.    Starting in August 2021 and continuing to this day, hundreds of 'throwaway' and fake social media accounts posted about and to Gjovik making statements that were harassing, threatening, intimidating, defamatory, insulting, and harassing. These accounts were usually created the day of and only used to make these posts, or sometimes created prior but only used to make posts that were pro-Apple, including posting insults against other parties Apple was in litigation with including Corellium and Epic Games.

503.    Fake or suspicious accounts were also used to post similarly unsettling posts about Gjovik on forums. When articles were shared that mentioned Gjovik, many of these accounts posted inflammatory, offensive posts about Gjovik and those posts were very quickly 'liked' and 'upvoted' and any comments that were supportive of Gjovik were very quickly 'down voted' and even flagged and removed by moderators.

504.    Under information and belief, Apple created and managed these accounts to harass and defame those who challenged them, and also unnaturally influenced online discussion through flagging, reporting, and other artificial engagements, and also through their position at an 'administrator' in a number of forums including Reddit and HackerNews.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

xxv.     **Gjovik Files Charges/Claims Against Apple with the State and**

**Federal Government (August – September 2021)**

505.     On August 26 2021, Gjovik filed an NLRB charge against Apple and posted on Twitter that she did so.

506.     On August 26 2021, a news article discussed Apple's employment practices and wrote: *"One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems that have occurred within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave."*

507.     On August 28 2021, Gjovik complained on Twitter that she wanted Apple to stop asking to capture three-dimensional scans of her ears and ear canals. Gjovik said she could not tell if Apple was harassing her or being intrusive, or both.

508.     On August 28 2021, at 8:22pm, Gjovik posted on Twitter about Tom Moyer's criminal charges for bribery. "*Moyer served as #Apple's chief compliance officer from 2009-13 & one responsibility was to ensure Apple follows anti-bribery laws. The indictment comes 1yr after an Apple attorney in charge of enforcing the co's insider-trading policies was indicted on insider-trading charges.*"[96] [See RICO Predicate Act: Criminal Bribery]

509.     On August 28 2021, at 8:40pm, Gjovik posted on Twitter the link to the Meek Mill R.I.C.O. music video again. Gjovik wrote: "R.I.C.O. 💀"[97]

510.     On August 28 2021, Apple's Business Conduct team closed Gjovik's complaint about Ronald Sugar and Gjovik's Superfund office.

511.     On August 29 2021, Gjovik filed a formal complaint to the US EPA about Apple and her office complaining of Apple's "*lack of due diligence,*" about "*negligence*" and "*recklessness,*" and "*violations of Right to Know & OSHA.*" Gjovik complained, "Apple's

---

[96] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431774126272696328
[97] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431778838858518528

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                      OCTOBER 25 2023

response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site."

512.    On August 28 2021, Gjovik posted on Twitter about her manager, Dan West, attempting to pimp/pander her in 2017.[98] On August 29 2021, Gjovik added, "*If anyone's wondering, yes, indeed, I did call out this incident with my manager as a potential legal claim. For now, I referred it to    #AppleEmployeeRetaliations as "pimping & pandering with receipt of indirect benefits*."[99]

513.    Gjovik discovered a lawsuit from 2013, where ex-Apple Manager Joshua Banko sued Apple for retaliation and a termination in violation of public policy. Apple fired Banko for reporting embezzlement but Apple said they can fire employees for any reason they want, even committing crimes. The Judge disagreed with Apple.

514.    The lawsuit filings and decisions taught Gjovik about certain government charges she needed to file in order to sue Apple. Gjovik messaged Banko on August 30 2021 writing, "*it's only because of reading your suit that I realized I needed to file a whistleblower retaliation complaint with the Dept of Labor/OSHA -- and I did, just 2 days under the 30 day deadline. Thank you!!*" Banko never responded.

515.    On August 30 and 31 2021 Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy, Unless You Work at Apple*." [100]

516.    In Gjovik's posts she complained of Apple's surveillance of workers, its exploitation of workers at the sake of their privacy, Apple's culture of intimidation and

---

[98] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1431680707433140226
[99] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432092351485210627
[100] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

retaliation, and she compared working at Apple to being in a panopticon. (Apple would later

claim it was one of the reasons Gjovik was fired and called it "*leaking*.")[101]



> **ASHLEY M. GJØVIK**
> @ashleygjovik                                                         ...
>
> I still love #Apple products & brand. I devoted nearly 7
> years & much blood/sweat/tears ensuring Apple's
> products are exceptional. However, Apple the corporation
> needs a reckoning. Apple's policy of "secrecy" should not
> shield it from public scrutiny about human rights &
> dignity.
>
> Working at Apple in "normal" times, I walked in circles around their glass-walled
> panopticon, only able to badge into select lockdowns (a constant reminder that
> Apple has absolute control over my resources and access), and was immersed in a
> culture where it is implicitly forbidden to critique Apple policies or even speak
> openly to your coworkers with concerns about your employment & work
> conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other
> "powers that be." I realize now that during those times, I didn't question a lot of
> things that I should have. Not just the abuse I suffered, but also the constant
> invasion of privacy — and perhaps those two things are linked.
>
> There seems to be limitless ways Apple can access employee data and monitor us.
> I recently shared how violating it felt for Apple to demand to copy & permanently
> store my nudes for completely unrelated litigation. After the public outcry, I
> questioned other policies & actions Apple had taken. The internal "Glimmer" app
> had always troubled me, but I never voiced that concern, because inside we don't
> question the way things are or what we're asked to do. But now, in the light of day,
> considering everything Apple's already done to me, this app, the photos & data it
> gathers, and how little we know about what it does with all of that — is deeply
> troubling and I felt compelled to make it public. Apple's policy of "secrecy" should
> not shield it from public scrutiny about human rights & dignity.
>
> 11:56 AM · Aug 30, 2021 · Twitter Web App

*Exhibit: One of Gjovik's Aug 30 2021 Posts*

---

[101] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432381235926499332;
https://twitter.com/ashleygjovik/status/1432416891201490946

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                          OCTOBER 25 2023

517.    On August 31 2021, Gjovik posted on Twitter about the 2007 US SEC/DOJ charge against Apple's General Counsel and CFO for fraud.[102] Gjovik wrote, "2007: *"#Apple's General Counsel was charged with, among other things, committing fraud, lying to Apple's auditors, & violating prohibitions on circumventing internal controls."* She then posted about the 2010 US DOJ/FTC case against Apple for a salary-fixing conspiracy with other tech companies.[103] [See RICO Predicate Act: Securities Fraud]

518.    On September 1 2021, Gjovik created and published a website she called "iWhistleblower" with resources for Apple employees on the different government agencies they could file charges to about Apple's misconduct. Gjovik posted on Twitter about it and it was referenced in some news articles.[104]

519.    On September 1 2021, at 2:15am, Gjovik posted that she had filed a whistleblower tip to the US SEC about Apple.[105] Gjovik added in addition to a screenshot of the submitted tip, "*Y'all, the process is so broken. The only way I'm figuring out what paperwork I need to submit is by reading old lawsuits against #Apple & listing all the reasons Apple was able to act like Teflon (mostly missing paperwork)."*

520.    On September 1 2021, an Apple employee, Shantini Vyas wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator.* Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies*." Shantini's posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts. Gjovik does not know Vyas and under knowledge and belief Vyas made these posts under direction by Apple.

---

[102] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432803511431950339
[103] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432808176026472448
[104] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/143314076863857459
[105] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1432950336973533189

521.    On September 2-3, numerous papers wrote about Gjovik's charges against Apple. Bloomberg wrote about Gjovik's NLRB, US Dept of Labor, California Dept of Labor, and EEOC charges against Apple.[106] Bloomberg wrote,

> "Ashley Gjovik, a senior engineering program manager at Apple, said that she filed the Aug. 26 complaint, which cited harassment by a manager, a retaliatory investigation and forced paid administrative leave. Gjovik's situation began with fears about whether pollution had made her office a dangerous place to work. She says she was then retaliated against for voicing the concerns. "I should be able to raise concerns about safety and public policy," she said in an interview Thursday. Gjovik also has filed complaints with the Occupational Safety and Health Administration, California's labor commissioner's office and the Equal Employment Opportunity Commission, according to documents she provided. Gjovik said her goal is to bring light to systematic problems at Apple and try to improve policies. "I want to pierce the veil of intimidation and secrecy," she said in the interview. "The employees are terrified to speak up about their concerns."[107]

522.    On September 2 2021, Gjovik complained on Twitter that Apple had already assigned external counsel to her NLRB charge (McDermott Will & Emery), including two partners and one associate. She complained the Partners (per their website) specialized in "*defending leading companies against whistleblowers,*" and the associate had previously clerked with EEOC and the NLRB.[108]

523.    On September 2 2021, Gjovik was interviewed by US Equal Employment Opportunity Commission (EEOC). Gjovik said she did not want an investigation and just wanted a Right to Sue letter. Gjovik had been threatening to sue Apple for over two months now and she

---

[106] Bloomberg, *Apple Worker Complaints Reviewed by Labor Relations Board*, Sept 2 2021, https://www.bloombergquint.com/technology/national-labor-relations-board-fields-complaints-about-apple
[107] Id.
[108] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433593914963869696

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                           OCTOBER 25 2023

wanted to ensure she had all of the paperwork to do so. Gjovik Tweeted about her appointment with US EEOC.[109]

524.    On September 2 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor DIR Retaliation team alleging retaliation by Apple. Gjovik included a screenshot of the complaint. One question asked: How did your employer know about the protected right you exercised? Gjovik had written, *"I kept saying, 'Stop it you guys. There's Labor laws about this.'"*[110]

### xxvi.    Apple Intimidates Gjovik and Tries to Force Her Onto a WebEx Meeting (September 3 2021)

525.    On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB charge against Apple, suggesting she was lying. The article includes quotes from Vyas and Ricky Mondello. Mondello also shared Vyas thread about Gjovik and stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple.

526.    On September 3 2021, at 8:36am Okpo contacted Gjovik asking for her to join a WebEx meeting with him in less than two hours. Okpo said, "*Hi Ashley Good Morning, I would like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time work for you? Thank you.*"

527.    Under information and belief, Apple and MWE arranged the smear article to occur shortly before an attempted interrogation and forced settlement.

528.    On September 3 2021, Gjovik replied to Okpo complaining about being on leave and Apple's misconduct. Gjovik said she wanted to keep communication in writing. Gjovik

---

[109] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433292907490906113
[110] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433303578802749442

asked Okpo for a written update about the status of her office and complained that she has

received no updates but saw lots of notifications that EH&S was doing work at the building.

529.    Gjovik then posted on Twitter about Okpo reaching out, providing a screenshot of

her email response to Okpo. In the post Gjovik wrote, *"The    #Apple Employee Retaliations*

*team reached out today to "request a meeting." I replied that I am req we keep everything in*

*writing due to their freq misrep of verbal comms. I also req an explanation of how my perf*

*review will not be neg impacted by being forced on leave."[111]*

530.    At some point around September 2021, Gjovik heard two men in the attic above

her apartment. The men spent over an hour in the attic directly above the room she used as an

office. It made Gjovik feel uneasy at the time but she did not know what to do.

531.    In 2022, Gjovik raised the attic event to her landlord. The landlord said the only

entrance to the attic is through her bedroom closet. Gjovik said no one was in the apartment with

her. The landlord had no other explanation. Gjovik looked in the attic and found cables/cords

that did not look like they belonged – and the landlord told her they did not know where they

came from. Gjovik saw the attic units were divided by thin plywood and told her landlord she

suspected someone must have broken into an adjacent unit (there were a couple) and went into

the attic of that unit and then broke in to Gjovik's attic from there.

532.    Under information and belief. Apple broke into Gjovik's attic in the fall of 2021.

533.    Under information and belief, Apple installed electronic equipment in Gjovik's

attic to surveil her.

---

[111] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1433902544695095298

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                          OCTOBER 25 2023

1

2    **xxvii.  Gjovik Files More Complaints Against Apple; Complaints of Apple**

3          **Executives Criminal Conduct; Complaints about Batterygate**

4          **Intimidation (September 3-9 2021)**

5    534.    On September 3 2021, Gjovik filed a NCDF Disaster Complaint with the US

6    Department of Justice and posted on Twitter about filing it.

7    535.    On September 6 2021, Gjovik posted on Twitter as screenshot, captioned: "Aug 2

8    iMessage with Apple coworker: "*Seriously though, ER's face about the COVID vaccine &*

9    *Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please*

10   *talk to Deirdre O'Brien.*" @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo

11   of DOJ complaint & iMessage].[112]

12

13   536.    On September 3 2021, Gjovik filed a tip with the FBI about the possible

14   sanctions' violations. In the crime field she wrote: *"Possible violations of sanctions against*

15   *Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said*

16   *violation and coverup."*  Gjovik posted on Twitter that she had reported the matter to the FBI.

17   537.    On September 5 2021, Gjovik posted on Twitter about the US DOJ case against

18   Apple lawyer Gene Levoff. Gjovik said she found a denied motion in the case where Levoff's

19   defense was arguing "*insider trading laws don't exist*" and/or do exist "*but are*

20   *unconstitutional.*"[113]  [See RICO Predicate Act: Securities Fraud]

21

22   538.    On September 6 2021, Gjovik posted on social media about her cases with a

23   status update of the report numbers. In addition to the prior charges, she now also referenced her

24   SEC whistleblower tip and a DOJ complaint.[114]

25

26

27

28   _____

[112] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434830527140229124
[113] *US v. Gene Levoff,* USDC of NJ (Aug 12, 2020), Docket No. 19-cr-780, Motion to dismiss:
Denied; Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434406050275287043
[114] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434836915086188544

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

**Ashley M. Gjøvik**
@ashleygjovik

@NLRB Case: 32-CA-282142
@OSHA_DOL Whistleblower Claim: 1218-023
@USEEOC Case: 556-2021-00608
@SEC_Enforcement Whistleblower Claim: 16304-612-987-465
@CivilRights Complaint: 98145-RJH
@CA_DIR Whistleblower Claim: RCI-CM-842830
@CalDFEH Case: 202108-14540123

7:12 AM · Sep 6, 2021

*Exhibit A-xxvii-A: Gjovik's Post*

539.    On September 6 2021, Gjovik posted on Twitter about the Slack discussion from July 27 2021 where she and her coworkers discussed Apple retaliating against them for raising valid concerns.

540.    On September 7 2021, Gjovik posted on Twitter about the Batterygate/nude photographs matter. Gjovik finally disclosed the construction termination that occurred leading up to Apple's intimidating conduct. Gjovik posted, "*I spent much time pondering why my nudes were so critical to #Apple's doc collection for the Batterygate lawsuits...I worry Apple wanted to intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt the ⬆️ situation when I ran sw failure analysis.*" [115] Gjovik then added, "*#Apple Batterygate/Nudegate/Constructiveterminationgate.*"[116]

---

[115] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1435444339019182083
[116] Twitter, Ashely Gjovik, https://twitter.com/ashleygjovik/status/1435444945117073414

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit: A-xxvii-B: Gjovik's Post*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

*Exhibit: A-xxvii-C: Gjovik's Post*

541.    On September 7 2021, Gjovik discovered a Santa Clara County Superior Court lawsuit against Apple filed by one of her ex-coworkers. The ex-coworker, Crystal Brown, sued Apple due to harassment and retaliation from her manager, who was also Gjovik's manager, Dan West. The lawsuit was filed in 2018 and settled in 2019. Gjovik posted on Twitter about it tagging Tim Cook and Apple's Twitter accounts and complained that Apple had tried to claim they investigated West but found no 'policy violations' when he was sued by another employee only a couple of years prior and Apple had quickly settled the case.

542.    On September 7 2021, Okpo contacted Gjovik again asking to speak with Gjovik by September 10 2021. (Gjovik's NLRB affidavit was due September 13 2021). Now Okpo said there were some "inconsistencies" he wanted to discuss. Okpo is an attorney.

543.    Okpo never said, at any time, that Gjovik was under investigation, but instead maintained he was investigating Gjovik's concerns about others.

544.    Gjovik again asked to keep communications in writing. Gjovik asked for Business Conduct review (by Tom Moyer's team) of Okpo's repeated denial to keep communications in writing.

### xxviii.  The Day Apple Fired Gjovik (September 9 2021)

545.    On September 9 2021, around 1 AM the day Gjovik was fired, Gjovik was tipped off that Apple may be surveilling her through her work and personal devices. Gjovik posted publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my [personal] iCloud email and iMessages?"* To which members of the Info Sec community assured Gjovik Apple was doing that and more.

546.    Gjovik immediately began removing her data from Apple's servers. Realizing how terrified she had become of her employer; she began searching for legal resources. At 2:16am that morning Gjovik downloaded the US DOJ guide to litigating civil RICO cases, which Apple would have seen.



*Exhibit: 9/9 RICO Download*

547.    Minutes later at 2:27 AM Sept 9 2021, a self-declared "burner" Twitter account, with zero posts or "likes" ever, @Guybrus55626232, sent Gjovik a direct message accusing her of making a claim that was *"verifiably incorrect and complete misrepresentation of facts."* The

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

user claimed that when Gjovik posted she found the *Crystal Brown v Apple* lawsuit, and said Apple settled (which Apple did), she was "*unequivocally misrepresenting facts, most likely with malicious intent*." The account said, *"as someone attending law school, you should have known better."*

548.    This user would later contact Gjovik again on January 9 2022, accusing Gjovik of committing a federal crime. Gjovik asked the user to identify themself. The user refused and instead urged her to talk to her lawyer about 18 U.S. Code § 1512, a law Gjovik previously posted publicly she plans to pursue a charge against Apple for violating.

549.    It is under information and belief this user was an agent of Apple or acting on Apple's direction attempting to intimidate Gjovik to stop posting about her surveillance and privacy concerns and attempting to 'DARVO' Gjovik. Gjovik even responded on January 9, 2022, saying hi to "*Apple Legal*" and asking them to leave her alone. The user then deleted its account.

550.    On the day Gjovik was fired, her Box evidence folders still sat with several folders marked as pending as they had not been reviewed yet after Okpo stopped the process on August 4 2021 when he put Gjovik on leave.

*Exhibit; A-xxviii-A: Gjovik's Box Folders, Still Pending*

551.    On September 9 2021, at 11:49am, the city of Sunnyvale inspected Gjovik's Superfund Apple office for hazardous waste and fire code compliance and wrote up Apple for violating at least one law.

552.    On September 9 2021, at 1:58pm PST, Gjovik published comments about Apple's felonious impersonation of law enforcement in 2011.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



*Exhibit: A-xxviii-B: The Post About Apple Breaking Into People's Homes*

26
27
28

553.    Ten minutes later, at 2:08pm PST, Gjovik was contacted by Aleks Kagramanov, a "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour*."



*Exhibit: A-xxviii-C: Gjovik's Posts on 9/9/2021*

554.    Gjovik promptly responded at 2:10 PM PST, two minutes later, saying that she was willing to participate, but given the nature of her complaints, she wanted there to be a written record of their conversations. Kagramanov did not respond.

555.    Gjovik responded again at 2:27 PM PST complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator.

556.    Gjovik was posting screenshots of the conversation on Twitter in real time, along with her commentary and research discoveries about the team who contacted her. Gjovik posted on Twitter complaining of witness intimidation at 2:33 PM PST.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023



**Ashley M. Gjøvik**
@ashleygjovik

Replying to @ashleygjovik

Hey #Apple, "This feels a little like witness intimidation. I let @NLRB know." Love, Ashley

Clutches panic button & Mace while still laying on floor pondering the brutality of U.S. capitalism…

> **Ashley Marie Gjovik**                                    2:27 PM
> Re:                                                         **Details**
> To:                        Cc:  Ashley G (Work)
>
> FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.
>
> This feels a little like witness intimidation, etc...
>
> —
> Ashley M. Gjøvik
>  Senior Engineering Program Manager, Apple
> Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
> ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik

2:33 PM · Sep 9, 2021 · Twitter Web App

*Exhibit: A-xxviii-D: Gjovik's Posts on 9/9/2021*



**ashley m. gjovik**
@ashleygjovik

Replying to @Jaxploitation

Yeah… like so does he investigate the threats & violence, or is he the one that provides that as a service?

2:34 PM · Sep 9, 2021 · Twitter Web App

*Exhibit: A-xxviii-E: Gjovik's Posts on 9/9/2021*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

557.    Gjovik forwarded Kagramanov's emails to her NLRB investigator Alex Hadjuk at 2:26pm and 2:30pm PST, via her iCloud email address which Apple would have seen.

558.    A fake Twitter account called "EarlyRiser," then replied to one of Gjovik's posts saying "*It would be in your best interest to drop ideas of suing, or attempts at dragging them through any spiteful dirt, as it'll co\$t you.*"

559.    Under information and belief, "EarlyRiser" is Apple.

560.     Kagramanov then responded at 2:50 PM and said he was suspending all of Gjovik's account access. Aleks said "*we are investigating allegations that you improperly disclosed Apple confidential information*" and claimed she refused to 'participate' in his farcical investigation. (Apple, via Jessica Perry of Orrick) later admitted Apple already planned to fire Gjovik over a week earlier, with the decision made on or around August 29 2021).

561.    Gjovik responded to Kagramanov at 3:07 PM re-iterating she wanted to participate. *"As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all."* Gjovik added: "*I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government.*" "*I would really like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.*"

562.    Gjovik added in her 3:07 PM email reply to Kagramanov: "*In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.*"

563.    Gjovik search online for "*Apple*" and "*threat assessment and workplace violence*" to see if there were any articles about Kagramanov's team. LinkedIn returned three results,

including Kagramanov, and the Apple employee who broke into the Latino man's house in

2011. Gjovik posted about it at 4:20 PM.



*Exhibit: A-xxviii-F: Gjovik's Posts on 9/9/2021*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

564.     At 6:54 PM PST, Yannick Bertolus, Gjovik's Vice President, emailed Gjovik with subject line "*Your employment status*" and an attached letter saying she had been terminated for vague reasons. The termination letter repeated an ambiguous charge of leaking and said she "*failed to cooperate and to provide accurate and complete information during the Apple investigatory process.*" [117]

565.     Up until a few hours before she was fired, Gjovik had access to future product roadmaps; unreleased hardware/product design and configuration; future operation system source code; access to all Research & Development finance ordering accounts at the company, including the executive office, information on the manufacturing process and supply chain; competitive analysis; product pricing information; product launch dates; marketing plans; customer feedback and usage trends; access to future software features and projects; access to submit code to the OS releases and view what others submitted.

566.     On September 9 2021, an Apple Security manager Ricky Mondello, who was friends with a member of Gjovik's Software Engineering team (Faye Garfinkle, close friend of Rob Marini), posted on Twitter about Gjovik's termination, "*Sometimes you fuck around. Sometimes you find out.*"

### xxix.     Apple Increases Intimidation and Retaliation (September 2021)

567.     Gjovik testified to NLRB for her affidavit on September 10 2021.

568.     On September 10 2021, a fake Twitter account, "Beezie Wacks" began posting about Gjovik and in Gjovik's replies. Beezie shared, liked, and commented on other fake account and employee harassment of Gjovik. Beezie posted "*#ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit*

---

[117] Gizmodo, *Apple Fires Program Manager Who Accused Bosses of Harassment, Intimidation,* Sept 10 2021, https://gizmodo.com/apple-fires-program-manager-who-accused-bosses-of-haras-1847649269

*#coward,"* and then paid to 'promote' her Twitter post. Under information and belief Beezie was

Apple, and possibly Gjovik's first Employee Relations investigator, Jenna Waibel.

569.    On September 9-10 2021, a fake account on Reddit began posting about Gjovik.

The account "crissnovak" posted "*I so hope Apple, Northrop Grumman, Irvine Company sue her

*and teach her a lesson. I think she things she is going to get rich, but she's going straight to the

*poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this

*nonsense. Go Ashley go!*" [118] Crissnovak then began threatening other Apple employees they

may "*get Gjoviked*!" if Apple does not like them.

570.    Under information and belief crissnovak was Apple, possibly Waibel.

571.    On September 10 2021, one of Gjovik's coworkers began posting about Gjovik

under the screenname "Neoform."

572.    Neoform was Gjovik's coworker Ian O'Shaughnessy who sat a few desks from

Gjovik at 825 Stewart Drive.[119]

573.    For around a week when Gjovik was fired, Shaughnessy began posting

extensively about Gjovik on Twitter, Reddit, and other forums and social media sites.

574.    On threads about Gjovik getting fired, Shaughnessy posted:

    a.    *Vexatious litigant incoming!*

    b.    *Based on her writings and twitter feed, I would not be surprised in the least to*
        *learn she has some kind of psychosis.*

    c.    *She's entirely to blame for her firing.*

---

[118] Reddit, Apple fires Senior Engineering Program manager Ashley Gjovik,
https://www.reddit.com/r/apple/comments/plcc8i/apple_fires_senior_engineering_program_man
ager/hccxlth/?context=3
[119] Newsique, About, DJ Neoform/Ian O'Shaughnessy
https://web.archive.org/web/20070109074012/http://www.newsique.com/about/ ; Wikipedia Neoform
link to Newisque https://en.wikipedia.org/w/index.php?title=User:Neoform&oldid=92521016

147

d.  *She clearly doesn't have a lawyer, so I'd guess all of her claims are entirely baseless. The irony is: she's a law student graduating next year...How terrifying*

e.  *Why would the Finance & Audit committee oversee the renting/purchasing of property?*

f.  *You think there are law firms that will want to hire her? She's toxic.*

g.  *I was giving her the benefit of the doubt until I saw her claim that turning on her webcam during meetings was sexist.*

h.  *Right to Sue notices are the default position of the NLRB – ergo, they decided \*not\* to take action of their own, hence, you can go ahead and sue to resolve it yourself.*

i.  *Why are you certain the investigation had not been closed? She posted that ER had reached out to her, she effectively refused to talk to them, they replied saying "ok, we're going to proceed without you then." Sounds like they were wrapping things up…*

575.    Shaughnessy also "liked" Vyas' posts attacking Gjovik from September 2 2021.

576.    On September 22 2021, Gjovik finally blocked Shaughnessy ("Neoform") and upon which he replied:  "*Lol, you blocked me for giving you the most mild criticism? How thin-skinned are you?*"

577.    On September 12 2021, Gjovik received two calls from an Unknown number on with no voicemail.[120] Gjovik did not pick up and complained on Twitter that Apple needs to email her and keep it in writing if they want to talk. "if that was #Apple... As I've requested for months now, If @Apple would like to intimidate me, they need to do it in writing only please. Thanks. Appreciate your understanding."[121]

---

[120] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437228327555710977
[121] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437179879250960397

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

578.    Gjovik watched $591,612 in unvested AAPL RSUs disappear that weekend. [122] Gjovik was also due for her annual performance review, which Apple never gave, and would have had her annual bonus awarded with a week or so.

579.    The Press discussed Gjovik's retaliation and termination. A Public Radio representative with over 87,000 Twitter followers publicly commented about "The Ashley Gjovik Story," that "*the irony that Apple fired her during the week of Labor Day, allegedly as retribution for filing a NLRB complaint, should be lost on no one.*" A Bloomberg reporter who is covered Gjovik's labor struggle with Apple in depth posted after Gjovik's termination, "*Ashley Gjovik, who was fired by Apple Thursday after filing NLRB, OSHA, and EEOC complaints, has received right-to-sue notices allowing her to sue for discrimination in federal or state court.*" In September, The New York Times described Gjovik's situation with Apple: "*After taking her complaints about #Apple public this year, Ms. Gjovik was placed on leave and later fired. She filed complaints with the NLRB, OSHA, the EEOC, & the Justice Department.*" The close nexus between Gjovik's protected activities and Apple's negative actions towards her was lost on no one.

580.    On September 14 2021, a fake account on Reddit began posting that Apple employees will get "Gjovik'd" if they do not fall in line. Apple employees then began sharing the post and term "Get Gjovik'd."

581.    Under information and belief this account was Apple and the term Gjovik'd was a riff off the term "Steve'd" which referred to Steve Jobs laying people off.

582.    On September 15, 2021, Apple's lawyers at O'Melveny & Myers emailed Gjovik a letter implying she was terminated due to several Twitter posts and the video content in a news article.

---

[122] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1437248801006358532

**O'Melveny**

O'Melveny & Myers LLP          T: +1 415 984 8700                    File Number:
Two Embarcadero Center         F: +1 415 984 8701                    600,000-3 (Apple Inc.)
28th Floor                     omm.com
San Francisco, CA 94111-3823

September 15, 2021                                                   **David R. Eberhart**
                                                                    D: +1 415 984 8808
**VIA E-MAIL**                                                       deberhart@omm.com

Ms. Ashley Gjovik
1050 Benton Street, Apt 2310
Santa Clara, CA 95050
ashleygjovik@icloud.com

Dear Ms. Gjovik:

On behalf of Apple Inc., we write to request that you remove certain images and video that you
have displayed publicly in violation of your Confidentiality and Intellectual Property Agreement
with Apple dated January 31, 2015 (the "IPA").

The first are the images contained in the following tweet:

https://twitter.com/ashleygjovik/status/1431824501457633283

As you know, the images are comprised of internal Apple emails regarding a confidential Apple-
internal user study project. Please remove those images from any public location and refrain
from further public disclosures about that project.

The second is the image contained in the following tweet:

https://twitter.com/ashleygjovik/status/1432400136471072769

The related video is located here:

https://volume-
assets.voxmedia.com/production/7739cb4ec481082f874bd63244468b2d/547059/playlist.m3u8

As you know, that image and video were generated by a confidential internal Apple application
during confidential Apple-internal user studies. Please remove that image and video from any
public location and refrain from further public disclosures about that application or related user
studies.

A copy of the IPA is included with this letter. I am available to discuss this matter at any time. If
you are represented by counsel in this matter, please identify your counsel.

/ / /

Century City • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo

150

**O'Melveny**

Sincerely,

/s/ David Eberhart

David R. Eberhart
of O'MELVENY & MYERS LLP

*Exhibit: The O'Melveny & Myers Letter*

583.    The Partner, David Eberhard, pointed to the URLs and asked Gjovik to remove the content, which was black and white photos of Gjovik secretly taken from her iPhone to gather her biometrics without her consent; a video of these images including in her living room, bedroom, bathroom, and in public spaces; and Twitter posts where Gjovik complained about Apple's surveillance, intimidation tactics, overly restrictive confidentiality policies, and ex-Intelligence/ex-military corporate paramilitary team, the *"Worldwide Loyalty Team."*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



56

*^ The Twitter Posts Apple's Lawyer's Demanded that I Delete on Sept 15 2021 ^*

*Exhibit: The Posts in Question*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

*Exhibit: The Posts in Question*

584.    This letter created the implication of surveillance and confirmed actual surveillance of Gjovik by Apple. The message from Apple also expressly told Gjovik that Apple's surveillance of its employees is 'confidential' and speaking of it publicly can result in immediate termination.

585.    In addition to the bizarre and clearly pretextual timeline of events with Kagramanov, Apple's lawyers' communications also show Apple's retaliatory animus by timeline alone. Apple's lawyers contacted Gjovik on September 15 2021, pointing to content posted 16-18 days prior. This is supposedly the same content that Kagramanov reached out to Gjovik about on September 9 2021, saying he had to talk to her "*within the hour*" about it and when she simply asked to keep things in writing, Kagramanov suspended her account access.

586.    Gjovik obtained a lawyer to respond to Apple's lawyers about the Twitter posts.

153

587.    Gjovik's lawyer, David Hecht, sent Apple a letter on October 6 2021, saying, "*While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.*"

588.    Gjovik's lawyer told Apple, "*Your September 15, 2021, letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect.*"

589.    He then went on to knock down Apple's arguments one by one until nothing was left. Her lawyer closed, "*Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021, letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands*."

590.    Apple never responded.

---

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

**HECHT**PARTNERS
LLP

David L. Hecht
Partner
P: (212) 851-6821
E: dhecht@hechtpartners.com

October 6, 2021

**VIA E-MAIL**

David R. Eberhart
O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
deberhart@omm.com

**Re: Ashley Gjøvik**

Dear Mr. Eberhart,

     I represent Ms. Gjovik. I am in receipt of your letter dated September 15, 2021 and subsequent email communication with my client. Going forward, please direct all such correspondence to me.

     As you are aware, Ms. Gjovik has already complied with your September 15, 2021 demand to remove certain images from some of her Twitter posts. However, I write regarding the inappropriateness of your requests, which may comprise copyright misuse. While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.

     Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect. The IPA does not cover the images/video that Ms. Gjovik posted. For example, you take issue with Ms. Gjovik's post of screenshots of an automated email sent to Ms. Gjovik from "Ask," "an internal survey solution." The email itself was not marked as confidential. Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential. The content of the automated email also contained nothing that could be considered secret or otherwise proprietary: there was no disclosure of the content, methodology, identity of any participants in the survey (other than Ms. Gjovik), or any of the survey's findings. The posted image of the email merely noted what was already known

125 Park Avenue, 25th Floor, New York, NY 10017

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB          OCTOBER 25 2023

to the public: Apple was conducting 3D scans of human ears to "collect representative ear geometry data across age, gender, and ethnic groups" and to benefit "audio research efforts and better our understanding of ear geometry variance." It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPods products. In fact, Apple's Vice President of Product Marketing, Greg Joswiak, spoke publicly about the 3D ear scans over a year ago:

> "We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Joswiak says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."

*See* Jeremy White, *The secrets behind the runaway success of Apple's AirPods*, Wired (September 5, 2020), *available at* https://www.wired.co.uk/article/apple-airpods-success.

Accordingly, Ms. Gjovik cannot face restriction in disclosing a non-confidential email about the mere existence of a survey concerning 3D ear scanning (scanning that Apple had already publicly disclosed much earlier) sent to her during the period in which Apple put her on administrative leave. Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual.

Your September 15, 2021 letter and subsequent email communication also takes issue with image/video that you contend "were generated by a confidential internal Apple application during confidential Apple-internal user studies." Apple holds no copyright to these images, which were not authored by a human. As you are aware, United States copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *Trade-Mark Cases*, 100 U.S. 82, 94 (1879). Because copyright law is limited to "original intellectual conceptions of the author," Apple would be unable to register any of the images or video generated by the "Glimmer" app since a human being did not create the work. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884). Apple therefore cannot allege infringement of any copyright by Ms. Gjøvik.

To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such. You also have not alleged how mere images of Ms. Gjøvik, in her home, taken by the Glimmer app, on Ms. Gjøvik's own phone, could quality as confidential and/or

proprietary information under the IPA. For example, your letter fails to acknowledge that the images posted were (a) taken by an automated process running on Ms. Gjøvik's own iPhone and (b) captured her own likeness and portions of her living space. There can be no doubt that Ms. Ms. Gjøvik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the non-proprietary images Ms. Gjøvik posted, she intentionally rendered unreadable any conceivably non-public information when posting these otherwise non-proprietary images. Your claims of any violation of the IPA based on the posting of these images appear, therefore, to have no basis in fact or law.

Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021 letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.

Sincerely,

David L. Hecht
Hecht Partners LLP

cc: Erika Heath, Esq.
Ashley M. Gjøvik

*Exhibit: David Hecht's Letter to Apple's Lawyers re: Gobbler & Ear Canals*

591.    On September 15, 2021, Tim Cook announced an unexpected all hands meeting scheduled for September 17, 2021. This was unusual. He provided a way for staff to submit questions beforehand.

592.    Numerous people told Gjovik they submitted questions about why Apple was mistreating Gjovik, what Apple was going to do to fix its culture of retaliation, and why Apple had offices on Superfund sites.

593.    On September 21, 2021, Tim Cook sent an email to his staff complaining someone spoke publicly about the all hands (about pay equity, COVID response, benefits, and

other work conditions). Cook said Apple was "doing *everything in our power to identify those who leaked*." Cook said, "*people who leak confidential information do not belong here*."

594.    Apple notified Gjovik it was mailing her the possessions from her desk and sent a tracking number. Gjovik posted on Twitter the tracking number said the package was about to arrive. On September 29, 2021, another fake Twitter account, "BabyHummingbird," commented to Gjovik via Twitter about the box before she opened it, saying "*Don't open it*!" and included an image from the movie SE7EN that implies it contained a severed head of one of her loved ones.[123]

595.    Under information and belief, "BabyHummingbird" was Apple.



596.    On September 30 2021, Gjovik received a box of her personal items, full of broken glass.

---

[123] 18 U.S.C. § 876(c) prohibits mailing "any threat to kidnap any person or any threat to injure the person of the addressee or of another."




Ashley M. Gjøvik @ashleygjovik · Sep 30

#Apple prides itself in it's packaging… but this is what arrived at my doorstep today. My personal effects from my office, shoved haphazardly in a random box, no packing materials, infused with Superfund fumes, shards of glass, & spite.

597.    On October 1 2021, another fake Twitter account, "FemaleInTech," commented on one of Gjovik's Twitter posts complaining she just "*spent 5min pulling a chunk of glass out of the sole of my foot & I'd like to remind everyone that #Apple sent me this box of spite after taking away my health insurance the day I was fired.*" An Apple account replied, "*I think it would also be really impactful to post a picture of your bleeding wounds w/ a tweet calling out their HR people by name. At this point why not shame the individuals there for their unambiguous, documented spitefulness with horrifying photographic evidence*!"

598.    Assumably Apple wanted Gjovik to call out "people by name" as a preemptive defense of individual liability for their actions and wanted a photo to assess liability for the physical harm.

599.    Under information and belief, FemaleInTech, is Apple.

600.    On October 9 2021, Gjovik posted a Twitter thread about Apple's Worldwide Loyalty team firing her after she had posted on Twitter about Apple breaking into someone's home in 2011. Someone posted it on the "HackerNews" forum and quickly a number of very suspicious account began posting horrible things about Gjovik including a self-identified current

Apple employee (azinman2) calling her "*a nutcase*," and saying she has "*negative credibility*." Another suspicious account (0des) also defended Apple, condemned Gjovik, and bolstered the posts of azinman2. Both began accusing anyone who supported Gjovik as being Gjovik herself and a "*sockpuppet*." Another suspect account joined (n0000d3js) which not only harassed Gjovik but also defended Apple's break-in of the person's apartment in 2011 and said Apple's actions "*didn't break the law*." [124]

601.    Under information and belief all of these accounts were Apple.

602.    Posts in support of Gjovik were quickly flagged and removed, while posts Gjovik reported as harassment were ignored and left up, and when Gjovik tried to defend herself in the thread her posts were quickly flagged and removed by moderators.

603.    Under information and belief Apple has moderator/admin control over HackerNews threads.

604.    In that HackerNews thread, people then complained about the suspect accounts writing "*Are you Global Security or something? What makes you so invested in defending the wealthiest company on earth?*" Another posted, "*It's actually quite concerning and even a little suspicious that so many defamatory comments are linking criticism of the workplace with mental illness.*" Another added, '*If Apple is actually sending people to employee's homes, what's to stop them from manipulating discourse on forums such as this? They certainly have the money and the expertise to do it. If this is at all a concern, what is this forum doing to prevent that from happening?*" Another added, "*They definitely do this on macrumors just look at any comment section there.*" Another added, "*This thread looks very sus. The way few accounts are defending apple and accusing the employee raises more eyebrows on apple.*[125]

---

[124] HackerNews, https://news.ycombinator.com/item?id=28811746
[125] HackerNews, https://news.ycombinator.com/item?id=28811746

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

605.    Gjovik saw all of this playout in real time as she was tagged by HackerNews and read the comments as they came in. Gjovik posted on Twitter complaining it was clear Apple Global Security was behind many of the comments and they were further retaliating against her for the thread she posted about Apple's misconduct.

**xxx.    Gjovik Files More Charges; EPA Asks Apple for Status of Corrective Actions at Gjovik's Office; Apple Attacks Gjovik and Lies to the SEC (October 2021)**

606.    On October 7 2021, the US EPA sent a formal report of the August 29 2021 inspection and requested a number of correction items from Northrop Grumman and Apple including fixing the HVAC/vent situation, and locating and fixing several sub-slat vent ports inside the building.

607.    On October 12 2021, Gjovik filed two additional NLRB charges Apple, alleging Cook's email, and Apple's NDAs and employment policies (including surveillance) violate federal labor laws in numerous ways outlined with footnotes in her brief, Gjovik's charges were covered in the Press with quotes from prior NLRB leadership commenting on the strength of Gjovik's case. (The NLRB issued a decision of merit agreeing with Gjovik on January 29, 2023).

608.    Apple's proffered reasons for Gjovik's termination were so farfetched and pretextual, a detailed article was written about exactly that, titled "*Apple Wanted Her Fired. It Settled on an Absurd Excuse.*"[126] The October 14, 2021 article explained the background of Gjovik's whistleblowing about toxic waste as it was clearly the reason for Gjovik's termination.

---

[126] Dell Cameron, *Apple Wanted Her Fired. It Settled on an Absurd Excuse*, Gizmodo, Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

609.    On October 14, 2021 a discussion board account, "SlushierCupid", apparently created to celebrate Apple's legal win over Epic Games before transitioning to harassing Gjovik, posted in the comments for the "*Absurd Excuse*" article: "*This woman's tweets show she is both unhinged and a narcissist. I don't buy her story. What I do buy is that she is probably difficult to get along with and doing what many culturally brainwashed individuals do these days and play the victim card, hoping for attention and a payout.*" Commentors replied saying "*you're definitely not an Apple employee or contractor trying to smear her,*" and "*Apple's crisis team is on the move, I see*!" "SlushierCupid" added "*She attends law school, she knew she was going to be fired for whatever ridiculous reason Apple gave. I knew my brother would punch me when I irritated him non stop.*" Other accounts responded calling "SlushierCupid" an "*apple shill*" and noted all their pasts posts were "*in defense of [their] corporate master.*"

610.    On October 15 2021, "SlushierCupid" continued to post replies harassing and defaming Gjovik, now increasingly referencing Gjovik's apartment next to the 3250 Scott Blvd factory and Gjovik's Apple office on a Superfund site. They posed*, "I can not find a piece of evidence from any environmental agency or environmental non-profit who said her claims were valid either for the "poisoning" at work or the "poisoning" at home. If I am wrong, please point it out."*

611.    Under information and belief SlushierCupid was a member of Apple Global Security and Worldwide Loyalty team posting on behalf of Apple. Under information and belief SlushierCupid was involved in or aware of Apple's activities starting around August 2021 with joining chemical safety and environmental health NGOs in order to prevent them from supporting Gjovik. Under information and belief SlushierCupid was involved in or aware of Apple's conspiracy with the US EPA to cover-up what happened at Gjovik's office.

612.    On October 16 2021, Apple requested a "no-action" letter from the US SEC related to a shareholder proposal requesting a vote on a request for Apple to conduct a risk assessment on its use of NDAs to cover-up unlawful conduct. Apple's letter to SEC failed to mention they were actively under investigation by the NLRB over their NDAs, based on Gjovik's charges. Apple instead claimed its NDAs and use of NDAs was legal and ethical, so there was no need to have a vote.

613.    On October 26 2021, Gjovik filed an SEC whistleblower tip about Apple's fraudulent statements to the US SEC. On October 26 2021, Gjovik then emailed her NLRB investigator to complain that Apple was "*literally lying to the SEC*". Gjovik wrote that the situation at Apple was like *"Waco meets Enron."*

xxxi.    **Apple Works to Capture and Influence Government Agencies to Ignore Gjovik and Ignore Apple's Environmental/Safety Violations (October-December 2021)**

614.    On September 22 2021, Apple suddenly joined the advisory board of ChemFORWARD, a chemical safety NGO.[127] [Apple had suddenly joined this group in on May 7 2021.][128]

615.    On October 26 2021, Apple's lobbyists (reporting to Lisa Jackson) suddenly approached the US EPA Chemical Safety & Pollution Prevention program asking for a meeting.

616.    On October 27 2021, Apple's ChemFORWARD suddenly partnered with CEPN.[129]

---

[127] https://twitter.com/ChemForward/status/1308483392170844162; https://www.chemforward.org/news/apples-art-fong-to-lead-chemforward-technical-advisory-group
[128] https://twitter.com/ChemForward/status/1390773254680350722; https://www.chemforward.org/news/apple-and-chemforward-collaboration-offers-affordable-verified-data-on-safer-cleaners-to-protect-worker-health

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

617.    On November 2 2021, Apple suddenly gets "Electronics Watch" to join their CEPN 'worker safety' group.[130] Electronics Watch includes Gjovik's Occupational Exposure medical doctor, Dr. Robert Harrison, who is in their OHS Advisory Panel.[131]

618.    On November 3 2021, Apple co-hosts a chemical safety webinar with its new friends at ChemFORWARD.[132]

619.    On November 3 2021, Apple's lobbyists reporting to Lisa Jackson submit an agenda request to the US EPA Chemical Safety team, requesting a meeting.

620.    On November 16 2021 Gjovik asked US Department of Labor to confirm if they included CERCLA, SOX, and other relevant statutes in her case, in addition to OSHA Act. US Department of Labor (Andrea Diangco) then suddenly tried to dismiss her entire case and claimed it was never opened, despite FOIA documents revealing it was open and the investigator, Andrea Diangco, was making false and misleading statements.

621.    On November 23 2021, US EPA Chemical Safety replies to Apple's lobbyists and confirms the agenda which includes: the chemical Safer Choice Partner of the Year Award.

622.    On November 29 2021, Lisa Jackson, prior head of the US EPA and current Apple VP of Lobbying, emailed the current head of the US EPA a letter of recommendation for the person she wanted to run US EPA's Region 9 office, which oversees the majority of Apple's federally regulated offices and facilities. Jackson sent the letter from her Apple work email account.

---

[129] Oct 27 2021, https://www.chemforward.org/news/chemforward-invited-to-become-a-membernbspof-the-clean-electronics-production-network-cepn
[130] Nov 2 2021, https://electronicswatch.org/en/electronics-watch-joins-the-clean-electronics-production-network_2597317
[131] Electronics Watch, OHS Advisory Panel, https://electronicswatch.org/ohs-advisory-panel_2581888
[132] https://www.chemforward.org/news/november-3rd-webinar-recap; https://twitter.com/ChemForward/status/1466170142589657092

623.    On December 1 2021, Diangco finally contacted US EPA about Gjovik's case and asked "*did Gjovik report any CERCLA violations to you*?" US EPA (Chip) then met with US DOL (Diangco) to discuss Gjovik's complaints and the office.

624.    On December 12, 2021, the US Department of Labor docketed Gjovik's Whistleblower Protection Cases.

625.    A December 13 2021 Financial Times article was published on December 13, 2021, which said:

> "The labour department will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping. Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defence company responsible for the dump — and maintenance — of waste materials beneath the Sunnyvale office. Sugar could not be immediately reached for comment. "Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board. "Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."[133]

626.    On December 15 2021, Apple (represented by Art Fong) was part of a chemical safety webinar which discussed the dangers of certain 'restricted substances' including Benzene, Toluene, Methanol, TCE, and NMP (N-Methyl-Pyrrolidone).[134] The

---

[133] Financial Times, "*Apple faces probe over whether it retaliated against whistleblower*," Dec 13 2021, https://www.ft.com/content/973aae8d-21d9-4e84-8912-ead071c7935d
[134] https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

presentation discussed Apple's new program "Towards Zero Exposure" where it claimed to protect workers from chemical exposure. Apple noted "Participating Organizations" in the project which included "Electronics Watch" (Gjovik's chemical exposure doctor, Dr. Harrison); "ICRT" (the Silicon Valley chemical/labor activist Ted Smith), and Santa Cara University (Gjovik's law school).

627.    Under information and belief, Apple's decision to join these groups and participate in chemical safety/labor projects was part of a formal public relations/legal strategy devised by Apple to capture the NGOs and activists that would hold them accountable if it came out what they were doing, to continue making false statements about their practices but now for a larger audience, and to create 'talking points' for their defense -- and for applications to additional programs with the same goals noted above.

628.    When Apple applied for the 2023 US EPA chemical safety Safer Choice Partner of the Year award, Apple cited evidence of why it deserves the award as its partnerships with ChemFORWARD, CEPN, and other groups it joined in 2021.[135]

### xxxii.   Apple's Harassment of Gjovik Becomes Increasingly Deranged (September-December 2021)

629.    On October 2, 2021, an Apple account attempted to manipulate Gjovik to get access to Gjovik's computer. On November 5 2021, the same Apple account attempted to direct Gjovik to a specific 3rd party iPhone repair shop, which after realizing the account was Apple, now Gjovik believes was another attempt to modify her devices for surveillance.

---

[135] Note: In September 2022, Apple was caught fudning an "astroturf lobbying group" that acted as if it was independent but was influenced by Apple and made statements in support of Apple's intersts, even including amicus briefs. https://gizmodo.com/apple-lobby-app-developers-1849554671 https://twitter.com/ashleygjovik/status/1696344092265845100

630.    A coworker called "Joanna Appleseed" (alias because this person tried to sue Gjovik last year for naming her in charges and legal filings alleging witness intimidation, and Gjovik fears she might try to do it again) who worked in Apple's *Worldwide Loyalty* team, posted on social media about Gjovik's government complaints and investigations claiming they were meritless, and Gjovik was lying.

631.    Appleseed posted on September 9, 2021, that Gjovik's NLRB charge may not have merit and she does not believe in Gjovik's charges; on September 13 2021 she posted that Gjovik's EEOC and DFEH charges were meritless, on September 26 posted that Gjovik was lying about being put on leave and that Gjovik "*leaked IP*," and again on November 1 2021 referencing "*evidence*" and jury "*verdicts*". On September 16 she posted that no one should donate to Gjovik's GoFundMe and called Gjovik a "*predator*," On October 25, 2021, Appleseed posted that Gjovik's "complaints with federal and state agencies" do not have merit and that Gjovik was not being "*honest or genuine*" in filing the charges, and that Gjovik was "*harmful*" for doing so.

632.    On December 8 2021, Gjovik received an email from her website webform from a "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from "The Messenger," said, "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple.*" The email then quoted Matthew 5:38-42 from the Christian Bible.

633.    Under information and belief, the email came from Apple at or around Apple's first manufacturing facility in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data center.[136]

---

[136] NY Times, "Apple *Computers Used to Be Built in the U.S. It Was a Mess*.," Dec 2018, https://www.nytimes.com/2018/12/15/business/apple-california-manufacturing-history.html; CultureofMac, *A brief history of Apple's misadventures in manufacturing: Part 1*, https://www.cultofmac.com/616044/a-brief-history-of-apples-misadventures-in-manufacturing-part-1-cook-book-leftovers/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

634.    On December 13, 2021, Appleseed posted that Gjovik's claims were "*full-out fabricated nonsense that borders conspiracy*." On December 30, 2021, Appleseed posted that Gjovik has "*narcissistic personality disorder*" and urged people to ignore her. On October 25-29, 2021, Appleseed messaged one of Gjovik's friends and told them Gjovik was "*lying about a bunch of stuff*," "*lied to the public, to the government, about what happened to her.*" On December 29, 2021, Appleseed messaged one of Gjovik's friends claiming Gjovik was "*perjuring herself*." On December 30, 2021, Appleseed messaged once of Gjovik's friends saying Appleseed was "*one of Apple's witnesses against [Gjovik]*".

### xxxiii.  The Government Responds to Gjovik; Some Agencies Complicit in the Cover-Up; Gjovik Escalates Further; Apple Bites Back (December 2021-January 2021)

635.    On December 13 2021, US EPA (Chip) sent US DOL (Diangco) a copy of the October 7 2021 report about the August 19 2021 inspection of Gjovik's office. At this time Gjovik still did not know there was an inspection by US EPA due to her complaints. Diangco would never tell Gjovik about it or disclose that she knew about it. Chip would finally tell Gjovik in May of 2022.

636.     On December 14 2021, the US DOJ contacted Gjovik confirming receipt of a complaint she sent to their antitrust division in November of 2021.

637.    On December 20 2021, the US EPA (Margot Perez-Sullivan) responded to an IndependentUK reporter who had reached out asking about Gjovik and her office. US EPA said exposure was under control and failed to mention the inspection or ongoing corrective actions.

638.    On December 26 2021, Gjovik posted on Twitter about her intention to pursue a Dodd-Frank claim and witness retaliation claim against Apple, citing 18 USC § 1513.[137]

639.    On January 9 2022, Gjovik posted a Twitter thread summarizing what happened with Apple. Gjovik reflected: "*In July [2021], I was like, you know, it seems weird that you're doing RICO shit to me like witness intimidation about this office… Is this your normal MO or is it because apparently the CEO of the corp that dumped those chemicals is now on the Apple board of directors? Maybe also because the person who ran the US EPA reports to Tim cook now? They didn't like any of that. I filed some SEC charges about it. I filed a lot of charges. Then one eventful day, a Russian interrogator from Apple's workplace violence team said hello*"

640.    On or around January 10, 2022, Gjovik filed complaints about witness intimidation and witness retaliation to NLRB, US Department of Labor, and California Department of Labor. Gjovik posted on social media it was filed and suggested Apple send cease & desist, and document retention notices to a number of managers and employees including Vyas, Mondello, and Appleseed.[138]

641.    Around this time Appleseed filed a false report to the FBI accusing Gjovik of "*criminal extortion and blackmail*" and apparently reported Gjovik to a police department. On January 11 2022, Gjovik was notified by Twitter that someone reported Gjovik's Twitter posts (complaining of harassment) to German law enforcement.

642.    In January 2022, Gjovik contacted a VICE reporter Lorenzo Franceschi-Biccierai. And Gjovik told him that she just discovered an article he wrote about Apple in July 2021 about

---

[137] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434820337166786563
[138] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1481760216978837505; https://twitter.com/ashleygjovik/status/1481026531438706689

"Apple IP leakers" spying on Apple employees for Apple,[139] and that she thought Apple was doing something similar with the current labor organizing.

643.    Gjovik complained to Lorenzo that Appleseed worked for Global Security and one of the few other named persons involved in Appleseed's supposed employee union organizing was a known "IP leaker" named StellaFudge.

644.    Appleseed apparently asked StellaFudge to set up a Discord chat service where Apple employees could go to strategize organizing and unions at Apple. StellaFudge had previously "leaked" prototypes and other information that the VICE articles had said would be forgiven by Apple if the person then becomes a spy for Apple against Apple's employees. While hosting this labor organizing Discord server, StellaFudge continued to "leak" new IP, including prototype hardware. Under information and belief Apple has been spying on the labor and union organizing of its employees in the Discord server via access granted by StellaFudge.

645.    Under information Gjoviks' messages to Lorenzo about this were seen or known about by Apple and Gjovik's discovery about this was one of the reasons Apple obtained a gag order against Gjovik.

646.    On January 31 2022, Gjovik posted that she planned to submit her legal filings about the witness intimidation to the US Department of Justice, in addition to the whistleblower and labor agencies. Gjovik commented that Apple's actions were "criminal."[140]

647.    On January 31, 2022, Appleseed sued Gjovik in a Washington state court requesting an anti-harassment restraining order. Appleseed cited Gjovik's January 10, 2022, NLRB charge against Apple on her petition, writing under other pending litigation: "*NLRB*

---

[139] VICE, *Apple Tells Leaker to Snitch on Sources or It Will Report Them to the Police*, July 2021, https://www.vice.com/en/article/dyv5bm/apple-tells-leaker-to-snitch-on-sources-or-it-will-report-them-to-the-police
[140] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1488305820496322560

*Charge CA-288816 – charge against Apple Inc which contains false/misleading information about me made in bad faith by Ashley Gjovik.*"

648.    In January of 2022, Apple reported a number of Gjovik's social media posts and had the content removed. This included a Scribd document consisting of Apple's workplace surveillance policies, a legal memo Gjovik wrote documenting Apple's witness intimidation and retaliation, and photos of Brad Reigel and Rob Marini. The later two removals were confirmed by Appleseed to be a joint-effort between Apple and Appleseed.

649.    Gjovik informed the California EDD of the circumstances she was terminated under, and that Apple Inc never provided her the exact reasons for her termination. Gjovik informed the EDD of her government cases against Apple and of the general public opinion that her termination was retaliatory. However, on February 4th, 2022, Gjovik received a Notice of Determination from California EDD denying her Unemployment Insurance, citing disqualification under § 1256, explaining that she will not receive benefits because Apple alleges they terminated her due to misconduct as she *"broke a reasonable employer rule."* Gjovik appealed. Upon receipt of the case history, Gjovik her interview with EDD was never recorded and EDD instead claimed Gjovik never responded.

650.    Under information and belief, EDD deleted the record of the call, or never made a record in the first place, conspiring with Apple against Gjovik.

651.    Appleseed sent Gjovik a lengthy email on February 5, 2022 (over 3,000 words) making false accusations against Gjovik, unlawful demands of Gjovik, threats against Gjovik and demanded Gjovik withdraw allegations and evidence about Appleseed from Gjovik's' federal charges against Apple (charges about obstruction of justice & witness tampering). Appleseed in great hostility told Gjovik she believed one of Gjovik's SEC Whistleblower filings: *"contained absolutely no material information for shareholders."*

652.    Gjovik refused to withdraw any federal charge, allegations, or evidence -- and protested again that Appleseed was contacting her despite Gjovik's request Appleseed cease all communication with her.

### xxxiv. Gag Orders & Missing" Documents" (February-March 2022)

653.    On February 8 2022, Gjovik asked the US EPA FOIA team assigned to her Apple/825 Stewart Drive FOIA requests, if anyone was investigating her 2021 complaints about 825 Stewart Drive. The lawyers who report under Andrew Helmlinger claimed that California EPA was investigating the federal Superfund site. Gjovik complained that made no sense but the lawyers would not clarify further.

654.    It was the US EPA who was investigating. These lawyers who directly misled Gjovik reported to Helmlinger, who is married to an Orrick, Herrington, & Sutcliffe Partner, Robyn Helmlinger. (by now Orrick, via Jessica Perry, was already retained by Apple to defend Apple on Gjovik's US Department of Labor case).

655.    On February 11 2022, another fake Twitter account, FirstnameBunchofnumbers (@FirstNa47437596) began harassing Gjovik about about Gjovik's charges against Apple and Appleseed's lawsuit against Gjovik. The account posted a variety of attacks over a week or so, including:

> j.    *Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.. [Photo of young girl at computer drinking soda and smiling mischeiviously] link: https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines*
>
> k.    *If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law*

l.   *Cyberbullying is NOT Whistleblowing. In fact, neither is reporting the company to itself. That's called internal complaining, and you don't get accolades for it.*

m.  *honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*

n.   *You should probably get a clue that if Twitter doesn't even care about the alleged "wrongs" perpetrated against you that a court of law probably isn't going to either*

656.    Gjovik was served for Appleseed's lawsuit around noon on February 14 2022, for a February 15 2022 court date.

657.    On February 15 2022, Appleseed submitted a statement to the Washington state courts saying she complained about Gjovik to the FBI and also to the Chief Security Officer of the National Labor Relations Board, the previous Chief of Physical Security at The White House and a Security Manager at the Department of Defense.

658.    In the February 15, 2022, testimony Appleseed also claimed, without any evidence to support prima facie elements of the charges, that Gjovik committed "*criminal cyber-harassment, blackmail, and extortion.*"

659.    Gjovik contacted Bud Porter at the Santa Clara District Attorney's office about the developments with Apple, complaining about witness intimidation and witness retaliation on February 21 2022, and December 15 2022.

660.    Porter said it is generally up to the government agencies to refer cases to the District Attorney's office for prosecution, so Gjovik would need US NLRB, US EPA, or US Department of Labor to refer the case. Gjovik asked the agencies for DOJ referral repeatedly,

173

but they ignored her and some of them kept intimidating her themselves (i.e., US Department of Labor). Gjovik complained to Porter that the agencies were "*complicit in the cover-up*."

661.    On March 1 2022, a Washington state Judge in a court of Limited Jurisdiction ruled and granted the restraining order against Gjovik and demanded Gjovik not speak or write, publicly or privately, about the ex-Global Security employee, Gjovik's Apple cases (which complain of threats & harassment from the employee and many others), or anything else related to that employee for five years (until 2027) with the single exception of "*testifying*" to the government. Gjovik would eventually win the appeal, but it took until September 2022 and was not fully dismissed until January 2023.

662.    Gjovik's appellate win was even cited in a SCOTUS brief from the Electronic Frontier Foundation in December 2022.[141]

663.    During the March 1 2022 hearing Gjovik complained repeatedly about witness intimidation and witness retaliation in her legal filings and her testimony.

664.    On March 3 2022, some law firm requested a copy of the Appleseed lawsuit decision against Gjovik. Under information and belief, this was Apple's lawyers requesting a copy, and Apple's lawyers were aware of the lawsuit, if they did not orchestrate it themselves.

### xxxv.    Apple Lies about Everything; Apple Smears Gjovik; Gjovik Will Be Sent to Jail if She Defends Herself (March 2022)

665.    On March 3 2022, Jessica Perry for Orrick representing Apple, submitted Apple's position statement to US Department of Labor in response to Gjovik's claims of whistleblower retaliation under SOX, CERCLA, and the OSH Act. Apple's response was misleading,

---

[141] *Barton v State of Texas*, On Petition for Writ of Certiorari to the Supreme Court of the United States, Brief of Amicus Curiae Electronic Frontier Foundation, Eugene Volokh as Counsel of Record, pg10-12 "*Criticism of Political Activists*" (Dec 7 2022). https://www.supremecourt.gov/DocketPDF/22/22-430/249364/20221207141747388_22-430%20Amicus%20Electronic%20Frontier%20Foundation.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

fraudulent, harassing, and attempted to obstruct justice. Apple not only failed to mention anything about the August 2021 US EPA inspection of Gjovik's office, but Apple claimed that the last that was heard from EPA was in July 2021 and that Gjovik was being 'unreasonable' about her concerns. Orrick's letter also falsely claimed Gjovik 'wanted to be on leave' and referenced a non-existent email they claim documented Gjovik asking for leave, or referenced an email where Gjovik said she did not want to be on leave but Orrick claimed the opposite.

666.    On March 4 2022, Gjovik was provided a copy of Apple's position statement.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

orrick

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

**orrick.com**

March 4, 2022

<u>**VIA ELECTRONIC MAIL**</u>

**Jessica R. Perry**

| | |
|---|---|
| E | jperry@orrick.com |
| D | +1 650 614 7350 |
| F | +1 650 614 7401 |

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

Re:      <u>*Ashley Gjovik v. Apple Inc.*</u>, Case No. 9-3290-22-051

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

I.      **INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

4161-3255-5828

176

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

orrick

Andrea Diangco
March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by *intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press*, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

II.    **FACTUAL BACKGROUND**

   A.    **Apple Prohibits Discrimination, Harassment, and Retaliation.**

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

   B.    **Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.**

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                              OCTOBER 25 2023

orrick

Andrea Diangco
March 4, 2022
Page 3

promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the termination of her employment on September 10, 2021.[2]

Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties as an Apple employee." "Proprietary information" includes, inter alia, non-public "materials or information relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of Apple's rules and policies regarding proprietary information" and understood that breach of the agreement could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings." To safeguard information about Apple's products, employees are prohibited from disclosing confidential information without prior approval of management.

As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. On each occasion, Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple required all participants— as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed the Alpha Study Consent Form and expressly acknowledged that any information about the study, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.").

---

[2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

[3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from further unauthorized disclosure.

4161-3255-5828

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023



Andrea Diangco
March 4, 2022
Page 4

**C.**  **Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Andrea Diangco
March 4, 2022
Page 5

**D.**  **Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.**  **Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, ***Ms. Gjovik admitted to disclosing confidential information*** about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.**  **Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.**  **Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.

4161-3255-5828

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023



Andrea Diangco
March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- <u>March 22, 2021</u>: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- <u>April 2, 2021</u>: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- <u>April 9, 2021</u>: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."

4161-3255-5828

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023




Andrea Diangco
March 4, 2022
Page 7

- **April 11, 2021:** Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- **April 27, 2021:** Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- **May 17, 2021:** Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- **May 18, 2021:** Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- **June 10, 2021:** Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- **July 2, 2021:** ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- **July 7, 2021:** Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                           OCTOBER 25 2023

orrick

Andrea Diangco
March 4, 2022
Page 8

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

### 2. Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

### 3. Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

_____

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).

4161-3255-5828

orrick

Andrea Diangco
March 4, 2022
Page 9

I want to confirm our conversation a few minutes ago. **Per your request, you are now on paid administrative leave so as to not interact with your managers**.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

III.    **ARGUMENT**

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.

184

orrick

Andrea Diangco
March 4, 2022
Page 10

**A.    Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.**

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The **only** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.

4161-3255-5828

185

orrick

Andrea Diangco
March 4, 2022
Page 11

**B.    Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.**

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.

orrick

Andrea Diangco
March 4, 2022
Page 12

**C.      Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.**

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant*, 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.*, 402 F. App'x 936 (5th Cir. 2010); *Williams*, 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

**D.      Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.**

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that ***"[p]er your request, you are now on paid administrative leave"***—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced*, 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                         OCTOBER 25 2023

orrick

Andrea Diangco
March 4, 2022
Page 13

**IV.    CONCLUSION**

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By:    _____
       Jessica R. Perry


*Exhibit: Apple's US DOL Position Statement, March 2022*


667.    On March 18 and 24, Appleseed edited Gjovik's Wikipedia article to say there were no vapor intrusion issues at Gjovik's office and added a quote from Apple defending their employment practices.

668.    On April 7 2022, Gjovik asked US EPA for an update on the 825 Stewart Drive site.

188

669.    In April 2022, New York Post suddenly published a defamatory, harassing, traumatizing article about Appleseed suing Gjovik. NYP claimed both women were accusing each other of harassment, despite supposedly fighting harassment, and that Appleseed won a gag order over Gjovik. AppleInsider then wrote an equally inflammatory and traumatizing article about the New York Post article.

670.    Both New York Post and Apple Insider refused to correct or retract, or even update, the articles after Gjovik won the appeal of Appleseed's gag order.

671.    Under information and belief Apple was behind these articles & their stickiness on the top of Gjovik's search results on Google.

672.    On April 15 2022, Northrop Grumman submited a report about the sub-slat depressurization vents on the roof saying Apple installed their HVAC "*without consideration of the vents or their function*." Northrop Grumman wrote that the vents were in an "*assumed sphere of influence of the HVAC intakes*."

673.    On April 17, 2022, a Telegraph profile was published about Gjovik titled "Apple whistleblower Ashley Gjøvik: '*My life is a goddamn nightmare now*'", and the reporter posted the article on Twitter. Appleseed and her friends then quickly replied to the post and 'quote-tweeted' the post making allegations against Gjovik, and making derogatory statements about Gjovik, and about the reporter for writing about Gjovik.[142]

674.    After Appleseed's protest, The Telegraph changed the subtitle of the article about Gjovik from something positive to saying that what happened to Gjovik was the "*consequences of her actions.*" If Gjovik complained, Appleseed could try to have Gjovik incarcerated.

---

[142] Twitter, Lucy Burton, https://twitter.com/Lucymburton/status/1515641563350712323

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

### xxxvi.  Gjovik Discovers the August 19 2021 Inspection (May 2022)

675.    On May 12 2022, Gjovik notices a new document on the TRW Microwave EPA webpage. It was the annual groundwater monitoring report, but deep in the middle of the long report, there was an appendix related to the roof that mentioned an US EPA inspection of the site on August 19 2021. Gjovik them emailed the EPA site team asking about it.

676.    On May 12 2022, Gjovik complained to the EPA FOIA lawyers, who still had not released a single document, that they were hiding the inspection from her.

I assume in the five months you've been working on this, you already knew all this and you've kept this information away from me. For instance, the Aug 19 site visit emails with the EPA informing Apple & Northrop they were going to do a site inspection (assumably based on my whistleblower disclosures). I wonder if there's any coincidence that I'm a CERCLA whistleblower with a case against Apple, & reporting to the CEO of Apple is your old boss Lisa Jackson, meanwhile the US EPA appears to be hiding critical information from me in an apparent attempt to run out the clock the my cases against Apple. Please let me know if y'all are ready to do your jobs or if I should pursue and Inspector General complaint against y'all over this. Please send me the August 19 2021 site visit emails ASAP. I'm sure you're well aware those documents could make or break my CERCLA case."

677.    On May 27 2022, the US EPA, via Chip, sent Gjovik a copy of the October 7 2021 report of the August 19 2021 inspection.

### xxxvii. Gjovik Discovers Apple's Been Hacking and Surveilling Her More Than She Thought; Appel Tries to Break into Gjovik's Home, Again (May 2022)

678.    There were three highly suspicious "call-drops" during phone calls over a period of ten days in 2022. The first drop occurred May 16 at 6:29pm PST while Gjovik was on the

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

phone with an attorney in the state of Washington. The call dropped just as the lawyer was about to share information about the business associations of the local judge who had just ruled against Gjovik.

679.    The second drop occurred May 24 at 2:03pm during a call with a friend who lives and is located in Canada, and during this "drop" both experienced an outage of their entire internet connection and had to reboot routers in order restore the connection. The second drop occurred just as this friend was recommending an app that Gjovik could use to monitor her internet for hacking. [Gjovik got the name of the app from him after, and the app did show Gjovik's internet was being hacked]. The third drop occurred May 26 at 1:59pm while Gjovik was on the phone with the Santa Clara District Attorney's office reporting unlawful conduct by Apple.

680.    The third drop occurred just as an attorney at the Santa Clara District Attorney's office said something to Gjovik like "I will try to help you."

681.    On May 28 2022, Gjovik discovered hacking on her network.

682.    On May 29 2022, Gjovik discovered one of the items Apple mailed her from desk was emitting RF and EMF signals. Gjovik posted about it on Twitter.[143]

---

[143] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1530764537611288576 ; https://twitter.com/ashleygjovik/status/1530775382626025474

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023



*Exhibits: The Bugged Statue*

683.     On May 30 2022, Gjovik contacted the FBI to report hacking and the bugged object. The FBI agent she talked to advised Gjovik to give the object to the local police.[144]

684.     Several hours later Gjovik heard someone trying to break into her apartment through the front door. Gjovik posted on Twitter about it, blaming Apple.[145]

---

[144] Bugged items in violations of Cal. Penal Code [§§ 631, 632, 632.5, 632.6, 632.7] and US Code Title 18 [§§ 2511(1)(a), (c), (d); 2701-2712].

[145] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1531176997803679744 ; https://twitter.com/ashleygjovik/status/1531117000831959042

*Exhibit: May 30 2022 Break In Attempt*

685.    Gjovik called the Santa Clara city police on May 31, 2022 [re: report 2205310079] to report the listening device Apple planted in her chattel property and the call drops and internet interference that led to her to search her items for bugs. The police took possession of the statue. Gjovik later found her fake fig tree was also producing RF and EMF signals and threw it in the trash and complained on Twitter about it.

**xxxviii.        Gjovik Attempts to Investigate What Happened in 2021; Apple Increases the Cover-Up; Gjovik Still Gagged (May-August 2022)**

686.    On May 31 2022, Lisa Jackson has a private meeting with US EPA administrator Michael Regan.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

687. On June 1 2022, Gjovik asked questions about the HVAC, sub-slat vents, and cracked floor at her office. The same day, the US EPA lawyer for the site, Rebecca Reynolds, removed the site team from the email chain with Gjovik and told Gjovik she is only allowed to talk to the lawyer now and cannot talk to the site team.

688. On June 4 2022, MWE requested copies of the transcripts of Appleseed's lawsuit against Gjovik.

689. On June 7 2022, Gjovik had her first meeting with SEC's Enforcement team about her Apple charges.

690. On June 8 2022, Appleseed edited Gjovik's Wikipedia article deleting over 8,000 characters and accusing Gjovik of "libel" based on Gjovik's accusations against Lisa Jackson and Ronald Sugar.

691. On June 9 2022, Gjovik sued the state of Washington in facial and as-applied constitution challenge over the order against her due to Appleseed's lawsuit and the statute it was issued under. Gjovik said the statutes were unlawfully vague and broad to ever allow a decision like that, and that the entire matter was more witness intimidation.

692. On June 27 2022 Gjovik received her first FOIA documents from US EPA, over five months after she requested them.

693. On June 28 2022, the US District Court suddenly dismissed Gjovik's case against the state of Washington. Gjovik filed a motion for reconsideration, and the judge filed a second decision against Gjovik within hours.[146]

694. On July 12 2022, US EPA complained that Apple was not addressing most of their concerns about Gjovik's office. US EPA also emailed about the high levels of TCE in the outdoor air at Gjovik's office.

---

[146] *Gjovik v. State*, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022); *Gjovik v. State*, 2:22-cv-00807-RAJ-BAT (W.D. Wash. Jun. 28, 2022).

695.    On July 14, 2022, Gjovik argued her unemployment insurance appeal. Prior, the case was mysteriously closed with in accurate information, so the data about Gjovik's interview must have been destroyed or falsified. Gjovik won her appeal, and a decision was issued by an ALJ stating:

> Gjovik "received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability. In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work."[147]

696.    On July 20, 2022, Gjovik filed a complaint with the US EPA OIG Hotline about Jackson and others misconduct. Gjovik complained about "*false representation[s] about a material fact,*" "*fraud,*" "*knowingly falsifying or concealing a material fact,*" "*abuse of power,*" and "*improper use of government resources.*" Gjovik noted "*discrepancies between reported facts and supporting documentation,*" and "*site inspection different status than what was reported to EPA.*"

697.    On July 21 2022, Lisa Jackson visits the US EPA HQ to have a private meeting with US EPA administer Michael Regan.

698.    On July 27 2022, Gjovik cancelled her California Bar Exam appointment due to the smears and restraining order.

---

[147] Ashley M Gjovik (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022

195

699.    On July 28 2022, Northrop Grumman told the US EPA they are late in responding to US EPA's questions because Apple and CalSTRS stopped responding to them for weeks..

700.    Gjovik filed a complaint with the FBI on August 8, 2022, to report another break-in and electronics in her attic. The FBI again advised her to call the police. Gjovik called the Santa Clara city police on August 9, 2022 [re: report 2208090087] to report Apple breaking into her attic and installing some sort of electronic equipment. Gjovik also reported it to her landlord, Prometheus, on August 9, 2022.

701.    Under information and belief, Apple broke into Gjovik's attic at some point in the fall of 2021 and installed some sort of surveillance equipment and likely intercepted Gjovik's internet.

702.    On August 12 2022, Lisa Jackson made Jared Blumenthal (prior head of CalEPA, and head of US EPA Region 9 before that) President of the Waverly Foundation.

xxxix. **Gjovik Starts to Recover; Gjovik Discovers More of Apple's Misconduct; Gjovik Fights Back (August 2022 – February 2023)**

703.    In August 2022, Gjovik discovered Apple had broken into her attic in the fall of 2021 and installed some sort of surveillance equipment. Gjovik complained about this to her landlord, a large real estate company, and she reported it to the FBI and the local police.

704.    After Gjovik reported the attic situation to law enforcement the police said they would come by the next day to create the report. Gjovik left her home to run an errand. When Gjovik returned, the day before the police were to arrive and search her attic, she found two signs that someone had broken into her apartment and entered the attic. First, her dog's belly smelled strongly of cigarettes despite him not leaving the apartment while she was gone and Gjovik not smoking cigarettes. After noticing the odor, Gjovik quickly inspected her closet

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

where the entrance to the attic is and found attic insulation stuff on the floor despite having just vacuumed before she left.

705.    Under information and belief, Apple broke into Gjovik's apartment again, this time to retrieve whatever they installed in her attic, before law enforcement arrived.

706.    Gjovik moved to New York on Aug 31 2022. Gjovik chose the East Coast primarily to get far away from Apple.

707.    Gjovik won her appeal of the gag order against her in November 2022, which was then followed by even more harassment and defamation by Joanna Appleseed.

708.    On September 12 2022, Gjovik asked US DOL for status on her charges. On September 16 2022, US DOL had a call with Gjovik where a department executive, Captain Parra, shows up and intimidates Gjovik to withdraw her charges. Gjovik complains of intimidation and obstruction.

709.    On October 28 22022, the Santa Clara County Department of Environmental Health (SCC DEH), related to an Apple office on a toxic-waste clean-up site, instructed Apple to label its sub-slat vent risers with labels saying "CAUTION VENT RISER DO NOT TAMPER" every five feet throughout the building and on the roof.

710.    SCC DEH also insisted Apple notify the department if there are any cracks in the floor. SCC DEH also insisted that vent rises be at least 10 feet away from any window/opening/intake and at least 3 feet high on the roof.

711.    Gjovik had been giving DEH updates on Apple's sub-slat vent/HVAC and cracked floor situation at 825 Stewart Drive prior. Under information and belief, all of SCC DEH's explicit instructions on this matter were due to Gjovik telling them what happened at 825 Stewart Drive.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

712.    This SCC DEH building was part of the 'real estate mega deal' that occurred the weekend in May 2021 when Sedgwick suddenly closed Gjovik's' chemical exposure claim.



*From SCC DEH's documents for Apple's Office at Pathline Park*

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

713.    On November 2022 an expert consultant for the US EPA submitted a letter saying Apple should have been testing for indoor air vapor intrusion at Gjovik's office at a minimum of every five years. (The most recent testing was December 2015, so it was due again December 2020 – and the testing wasn't 'voluntary').

714.    On December 7 2022, Gjovik's appellate win against Appleseed was cited in a SCOTUS brief filed by EFF in *Barton v Texas*. On December 12 2022, the Washington state court ordered the prior decision and order against Gjovik to be vacated and the case against Gjovik dismissed. Appleseed harassment Gjovik even more.

715.    On December 30 2022, US FTC confirmed they received Gjovik's complaint about Apple's Face Gobbler and Ear Scans, and provided Gjovik a report tracking number.

716.    On January 11 2023, Gjovik reviewed the most recent Five-Year Report for the Synertek Superfund site next to 3250 Scott Blvd and emailed some questions and concerns to the US EPA contacts for the site (Edwin Poalinelli and Fatmina Ty). Gjovik asked why 3250 Scott Blvd was skipped when EPA ordered vapor intrusion testing in all other buildings on the plume. US EPA never responded. Gjovik started investigating 3250 Scott Blvd through public records requests.

717.    On January 20 2023, US EPA told Northrop Grumman to plan to do vapor intrusion testing at Gjovik's office in March 2023. Apple still had not done it for over 7 years now.

718.    In January 29 2023, NLRB found merit in two of Gjovik's charges against Apple's employment policies, including their NDAs and surveillance practices.[148]  NLRB that "*various work rules, handbook rules, and confidentiality rules at Apple*" are unlawful because

---

[148] *Apple Executives Violated Worker Rights, Labor Officials Say*, Bloomberg, Jan 30 2023, https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-say

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

they "*reasonably tend to interfere with, restrain, or coerce employees*" [149] In addition, the agency "*found merit to a charge alleging statements and conduct by Apple — including high-level executives — also violated the National Labor Relations Act*."[150]

719.    On February 7 2023, Macworld published an article about Gjovik's NLRB win. The article 'translated' Cook's email to Cook's actual meaning including Cook complaining about workers talking to reporters about work conditions, "*How can we put the screws to you if it's in the news? Duh. C'mon, people. Think*!" and "*Tattooed on Tim Cook's right bicep: "Loose lips…" And on his left: "...pink slips*." The article suggests after an "*old-fashioned intervention*" the public would learn that Apple acts the way it did to Gjovik and her coworkers in 2021 because "*Steve Jobs was... never hugged or whatever*."[151]

### xl.    Apple and Orrick Try to Squash and Demoralize Gjovik Again (January-April 2023).

720.    On January 23 2023, US DOL suddenly wanted to meet with Gjovik to discuss her case. Gjovik asked to record the call due to her concerns about their prior misconduct. US DOL agreed.

721.    On January 26 2023, Gjovik met with US DOL and Captain Parra, was a surprise participant again. The call lasted around three hours and Parra tried to intimidate Gjovik again and refused to allow her to 'object' to inaccurate statements. Parra claimed the call was completely off the record. Parra eventually acknowledged that US DOL did not actually investigate Gjovik's claims or evidence, and agreed to go back and do it now.

[149] CNN, *Apple has infringed on worker rights, NLRB investigators say,* Jan 31 2023, https://www.cnn.com/2023/01/31/tech/apple-worker-rights-nlrb/index.html
[150] Bloomberg, supra.
[151] Macworld, *Apple's war against leakers is really a battle against the people that matter most,* Feb 7 2023, https://www.macworld.com/article/1504665/macalope-apple-tim-cook-leakers-nlrb.html

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

722.    On February 11 2023, Appleseed was caught editing Gjovik's Wikipedia article again and was banned again.

723.    On February 21 2023, US DOL suddenly demanded Gjovik provide a copy of the audio recording from the prior meeting.

724.    Under information and belief, it was Orrick on behalf of Apple, and/or Morgan Lewis on behalf of Apple, requesting this audio transcript to use for their defense in Gjovik's cases.

725.    On February 27 2023, five Morgan Lewis attorneys filed a notice of appearance on Gjovik's NLRB charges, along with the three MWE lawyers. One of the Morgan Lewis attorneys was an ex-NLRB Board Member (Harry Johnson).

726.    On February 27 2023, US DOL suddenly demanded Gjovik index all of the documents and emails she previously sent US DOL Under information and belief, this was on request of Orrick and/or Morgan Lewis.

xli.    **Gjovik Discovers the Secret Silicon Fabrication Plant; Apple commits more Felonies (February 2023)**

727.    On February 21 2023, Gjovik discovered the silicon fabrication and manufacturing activities at 3250 Scott Blvd in Santa Clara, next to the apartment where she got sick. Gjovik posted on Twitter in real time as she learned about it. Gjovik added that day, "*I've been making muffled screaming noises for about twenty-five minutes now. WTAF IS WRONG WITH THEM. THEY MUST HAVE KNOWN THEY DID THAT SHIT TO ME!!!  No wonder they gave me that "extreme condition leave" to move out. Apple is the extreme condition*."

728.    Under information and belief, Apple saw these posts and discussed what their response should be to Gjovik now having this knowledge.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Ashley M. Gjøvik**
@ashleygjovik

...

APPLE IS DOING LITERAL ACTUAL GODDAMN SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT SHIT INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT



11:29 PM · Feb 21, 2023 · **7,123** Views

152

*Exhibit: The Discovery*

---

152 Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1628250591779516416

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                     OCTOBER 25 2023

729.    On March 1 2023, Gjovik asked if any chemists followed her Twitter account and could weigh in on if NMP could cause the reaction she saw on her jeans.

730.    On March 2 2023 and for several days following, a Twitter account created specifically to interact with Gjovik about her claims about N-Methyl-2-pyrrolidone (NMP), "Sybil", replied repeatedly to her posts. Sybil repeatedly claimed NMP is completely safe, not banned, and that Gjovik was lying about the yellow clothes and rusty jeans and it was occurring simply because Gjovik did not know how to do laundry properly.

731.    Even after blocking the NMP account, it continued to stalk Gjovik's posts and continue posting, next calling for Gjovik's account to be suspended due to supposedly spreading misinformation about NMP.

732.    Under information and belief, Sybil was Apple.

733.    On March 11 2023, a fake account ("Comrade Jones", sorry@butno.com) sent Gjovik an email claiming to be an ex-EPA compliance/enforcement employee. The account attempted to get Gjovik to stop talking about the vapor intrusion documentation for 825 Stewart Drive and ried to get Gjovik to stop talking about the NMP. The account made threats to intimidate Gjovik. The IP came from a location known for spam accounts.

> The reason I suggest you talk to an expert in the law here is because you have several misconceptions that are leaving you open to severe ridicule on a public stage. I don't know much about corporate law, but I can't imagine they won't attack your credibility and integrity.

*Threats from "Comrade Jones"*

734.    Under information and belief, "Comrade Jones" was Apple.[153]

---

[153] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1634647629421223936

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

735.    In February 19 2023, Joanna Applegate contacted Gjovik with an email saying she knows Gjovik does not "*wish to hear from [her]*" and then proceeded to make more accusations against Gjovik.

736.    On March 22 2023, US DOL said may dismiss Gjovik's entire case now if no audio file. Gjovik continued to protest US DOL's corrupt behavior to US DOL, on Twitter, to US DOL OIG, and in a petition she created on Change.org asking US DOL to stop doing corruption to whistleblowers.

737.    On March 28 2023, US EPA FOIA manager Andrew Helmlinger (married to a partner at Orrick) claimed there were no documents related to Apple's TRI filing about NMP waste and emissions in 2020. (EPA functional teams would later tell Gjovik that was incorrect).

738.    On April 3 2023, CalSTRS closed Gjovik's PRA request about her Apple Superfund office owned by CalSTRS. CalSTRS suddenly claimed there are no PRA documents other than a press release.

739.    Gjovik found note in an US EPA document that CalSTRS conducted a 2016 Environmental Site Assessment for 825 Stewart Drive. Gjovik asked CalSTRS for a copy. CalSTRS denied any knowledge of it.

740.    On April 10 2023, Gjovik was notified that Apple's Morgan Lewis attorneys had requested a 'reconsideration' of merit of Gjovik's NLRB charge that Tim Cook's email violated federal labor laws. The NLRB refused to answer Gjovik's questions as to how such a thing was arranged or to respond to her complaints that it was not allowed.

741.    On April 27 2023, Gjovik submitted two filings to NLRB. One objecting to the reconsideration process as a violation of the NLRA, APA, and US Constitution. The second arguing the charge should still be found to have merit.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                      OCTOBER 25 2023

742.    On May 5 2023, CalSTRS put 825 Stewart Drive up for sale. All public listings failed to disclose its a Superfund site.

743.    On May 26 2023, Applegate attempted to contact Gjovik through a third-party and attempted to get Gjovik on the phone with her without Gjovik knowing it would be Applegate on the other line. When Gjovik saw through the plan and complained to the third-party, that person explained Applegate wanted to talk to Gjovik about Gjovik's evidence against Apple in her federal charges that implicated Applegate and encourage Gjovik to withdraw that evidence.

744.    On May 30 2023, Gjovik complained to US EPA OIG and General Counsel's office about Helmlinger's conflict of interest with Orrick, and misconduct with her US EPA FOIA requests.

xlii.    **After Learning about the Factory and its Leaks/Spills, Gjovik is Certain Apple Made her Sick in 2020; Gjovik Goes After Apple (June-August 2023).**

745.    On June 23 2023, Gjovik filed complaints about Apple's facility at 3250 Scott Blvd to US EPA, CalEPA, city of Santa Clara, and Santa Clara County. Gjovik drafted a 28-page memo with three exhibits attachments: the factory operations, the apartment next door, and the history of the site. Gjovik also posted on Twitter that she did so and provided a link to a Google Drive folder with what she submitted – which is still accessible today.[154]

746.    On July 9 2023, NLRB affirmed the prior decision of merit on Gjovik's charge about Tim Cook's 2021 email.

---

[154] GoogleDrive, Ashley Gjovik – 3250 Scott Blvd Complaint,
https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

747.    On August 17 2023, US EPA inspected Apple's factory at 3250 Scott Blvd due to Gjovik's complaints.

748.    On August 25 2023, Tom Moyer was recharged with criminal bribery following the District Attorney's successful appeal on the prior dismissal.

### xliii.    Apple Respond with More Cover-Ups & Harassment (July-September 2023)

749.    In July 2023, Kate Adams Wikipedia article was suddenly removed. Weeks later her father, a famous environmentalism responsible helping get the Clean Water Act passed, had his Wikipedia page edited to remove details of his work with US environmental legislation and to remove Kate Adam's ties to Apple.

750.    In August 2023, CalSTRS suddenly sold 825 Stewart Drive to BentallGreenOak at $6.5M above the prior sale price, despite all of the new issues introduced by Apple's botched renovations, increased CERCLA obligations, and increasing contamination from the upgradient plume.[155] Under information and belief, the sale price was inflated to pay off CalSTRS for the harm Apple caused because CalSTRS is one of the largest Apple shareholders ($4B).

751.    On August 31, 2023, the US EPA published a brief letter responding to Apple's May 2023 vapor intrusion testing results at Gjovik's Apple office, the first testing since December of 2015, calling Apple's testing report and strategy "*fundamentally incorrect*," having "*no fundamental basis*," "*not accurate*," "*confusing*," and "*misleading*." Among other issues the

---

[155] Mercury News, *Apple-leased Silicon Valley office building is bought as value jumps*, Aug 29 2023, https://www.mercurynews.com/2023/08/29/apple-office-real-estate-sunnyvale-buy-build-tech-economy-covid-iphone/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

EPA complained that Apple still had not found the missing sub-slat vent port, something Gjovik also complained about in 2021.[156]

752.    On September 2023 a Reddit thread was started about this lawsuit and where harassing and defamatory comments were posted about Gjovik in an attempt to further intimidate and smear her. Gjovik reported many of the comments but the moderators refused to take down the comments other than one that was explicitly sexual. Gjovik discovered that at least one of the moderator's was an active Apple employee and someone who had harassed her while she was still an employee. Gjovik complained to the moderator's that Apple was protecting Apple harassing her but they never responded.

## VIII.  LEGAL CLAIMS

753.    Gjovik hereby incorporates by reference each and every allegation and fact .[157] Where any argument contradicts with another argument, one or both of the conflicting arguments will be pled in the alternative.

754.    Claims and allegations against "Apple" are made broadly to include corporate liability for relevant actors as appropriate for each statute/law and circumstance, including: Respondeat superior (managers, corporate officers, employees); labor law's "supervisor" theory; agency theory for agents (law firms, contracted service firms, those asked to do favors, those coerced to perform acts, employees, etc.).[158] Concurrently and in the alternative, Apple may be responsible via aiding, conspiring, inciting, orchestrating, negligence, condoning, and other methods of vicarious liability for unlawful conduct noted, which will be argued in detail where appropriate during the trial.

---

[156] US EPA, TRW Microwave Site, Re: Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023, https://semspub.epa.gov/work/09/100034523.pdf
[157] Federal Rules of Civil Procedure, Rule 10 Form of Pleadings, (c) Adoption by Reference
[158] Cal. Lab. Code § 1104

755.    It's under information and belief, that named parties were some of Apple Inc.'s agents and employees, and that those named were acting withing the scope of her/his/their agency and/or employment when he/she/they harmed Gjovik. [159]

756.    Even if named parties conduct was unauthorized by Apple Inc, it is still within the scope of employment and/or authorization because the conduct was committed in the course of a series of acts authorized by the employer and the conduct arose from a risk inherent in &/or created by Apple Inc [160] Further, actions outside work hours and facially appearing recreational are still within the scope of employment and/or agency because they were carried out with the employer's stated &/or implied permission, they provided a benefit to the employer, and/or because they had become customary.[161]

757.    Where any statute of limitations is in question of possibly being expired for an alleged claim, Gjovik, where reasonable, will argue the statute of limitations should be tolled due to Apple's fraudulent concealment of numerous material facts in this case. Most significantly, Gjovik not learning about the August 19 2021, inspection of her office until June 2022, and not learning about Apple's secret silicon fabrication plant outside her apartment in 2020 until February 21 2023; and only learning these facts after dogged, persistent research and public records requests despite much push back and obstruction in an attempt to keep these facts concealed. Gjovik may also argue, where applicable, the doctrine of continuing violations.[162]

---

[159] Judicial Council of California Civil Jury Instructions (2020 edition), *3701 Tort Liability Asserted Against Principal,* https://www.justia.com/trials-litigation/docs/caci/3700/3701/
[160] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3722. Scope of Employment - Unauthorized Acts*, https://www.justia.com/trials-litigation/docs/caci/3700/3722/
[161] Judicial Council of California Civil Jury Instructions (2020 edition), *CACI No. 3724. Social or Recreational Activities,* https://www.justia.com/trials-litigation/docs/caci/3700/3724/
[162] Gjovik's excited utterance upon discovery on February 21 2023, "APPLE IS DOING LITERAL ACTUAL ******* SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT **** INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS

**A.    SOX WHISTLEBLOWER RETALIATION (15 U.S.C. § 1514A)**

758.    The first claim against Apple is for retaliation under the SOX whistleblower statute. SOX whistleblower retaliation charges begin with US Department of Labor but then allow a "kick-out" of the charge if the US Department of Labor has not issued a decision within 180 days. Gjovik's SOX whistleblower retaliation claim was filed with US Department of Labor on August 29, 2021, and the case Docketed on December 10 2021. The case has been pending without resolution over 180 days. US District Courts have exclusive jurisdiction over "kicked-out" SOX whistleblower retaliation claims. If the Secretary fails to issue a timely final order, the complainant may seek de novo review in the appropriate district court of the United States having jurisdiction. [163] Jurisdiction vests with the district court when the case is filed. [164] There is a four-year statute of limitations to file a claim in court. [165]

759.    Gjovik engaged in activity protected and the employer knew Gjovik engaged in this activity, then Gjovik suffered an unfavorable employment action, and Gjovik's protected activity was a cause of the action. The Sarbanes-Oxley Act, 15 U.S.C. § 1514A, seeks to combat what Congress identified as a corporate culture that discourages employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally." [166]

760.    Gjovik filed complaints internally verbally and then formally, then complained to the government, and filed a complaint with the US SEC.

---

BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT"
https://twitter.com/ashleygjovik/status/1628250591779516416
[163] *Ashley Gjovik v Apple Inc* (Apple Inc/Gjovik/9-3290-22-051) U.S. Department of Labor; Gjovik's U.S. SEC Whistleblower Tip: Sept 1, 2021 (#16304-612-987-465); 28 U.S.C. § 1441(a); Sarbanes Oxley Act (SOX); Dodd Frank Act))
[164] *Stone v. Duke Energy Corp.*, 432 F.3d 320 (4th Cir.2005) (case below 2003-SOX-12).
[165] U.S. Department of Labor, *Whistleblower Investigations Manual,* https://www.osha.gov/sites/default/files/AnnotatedWIM.pdf
[166] S.Rep. No. 107-146, at 5 (2002).

761.     Gjovik had an objectively reasonable belief that Apple intentionally misrepresented and omitted certain facts to investors, which were material, and which risked loss, and thus may constitute securities fraud. Gjovik had an objectively reasonable belief that Apple violated SEC rules, and had insufficient internal controls, and engaged in fraud related to securities.

762.     Gjovik complained to Apple about conflicts of interest related to a board member and decision about her office, about apparent self-dealing by corporate insiders including an interested party transaction, Apple's false public statements about Apple's environmental and labor practices, including false statements by a prior government official and now Apple executive. Concerns that Apple's internal controls were inadequate; Apple appeared to be silencing and retaliating against whistleblowers and people raising concerns, in order to cover up the issues instead of investigate or resolve problems; Gjovik's complaints about the safety of her office and about the complaint process generally would be overseen by the Board Committee chaired by an officer Gjovik was complaining about, Ron Sugar.[167]

763.     Gjovik's concerns were material as Apple makes statements about the conditions of its properties, about its compliance with regulations, and its environmental practices in its SEC filings and communications to shareholders. Gjovik's complaints were reasonable as the allegations included all the basic elements of fraud.

764.     Gjovik also filed a complaint with the SEC on August 31 2021, and made it public on September 1 2021, that she did so. Apple knew about Gjovik's complaints and Gjovik's SEC charge when it fired her and Apple fired her because of her complaints and SEC charge, along with other protected activity.

---

[167] *Rocheleau v. Microsemi Corp Inc.*, 680 F. App'x 533, 535 (9th Cir.), cert. denied, U.S., 138 S. Ct. 166, 199 L.Ed.2d 40 (2017). *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 668 (4th Cir. 2015).

**B.    DODD FRANK WHISTLEBLOWER RETALIATION (15 USC §78U-6(H)(1)(A)(III))**

765.    Apple discriminated against, took adverse employment actions, and discharged Gjovik, in violation of the Dodd-Frank Act, due to Gjovik providing information related to a violation of the securities laws to the Securities and Exchange Commission; initiating, testifying in, or assisting in any investigation or administrative action of the SEC based upon or related to such information; and making disclosures that are required by SOX, the Securities Exchange Act of 1934, or other laws subject to the SEC's jurisdiction.

766.    Apple discharged, suspended, threatened, harassed, and discriminated against, directly and indirectly, Gjovik in the terms and conditions of employment because of lawful acts done by the Gjovik in providing information to the Commission and making protected disclosures, including but not limited to: about undisclosed conflicts of interests and self-dealing (Ronald Sugar, Lisa Jackson), misrepresentations in securities (see RICO section on *Securities Fraud*), false statements to government and shareholders, material fraudulent conduct, internal controls were inadequate, and also Gjovik filed a whistleblower tip with the US SEC on August 31 2021.[168]

767.    A number of Apple's employment policies also violate the Dodd-Frank Act and Apple cited these unlawful policies in its vague justification of Gjovik's sudden termination.

768.    US SEC began investigating Apple's NDAs in 2022 due to Gjovik's complaints.

769.    Gjovik has met with US SEC Enforcement three times now since 2022 to discuss her Apple whistleblower tips to the agency.

770.    Gjovik alleges violations of Dodd-Frank Act provisions and so brings an action in an appropriate district court of the United States. Gjovik brings an action under this subsection

---

[168] *Digital Realty Trust, Inc. v. Somers* (2018) US, 138 S.Ct. 767, 778. See *Banko v. Apple Inc*, 20 F.Supp.3d 749, 758 (ND CA 2013).

within ten years of the violation, six years of the retaliation, and within three years of knowledge of the violation. [15 U.S.C.A. § 78u-6] he Dodd-Frank Act does not preempt state law claims ore preclude federal laws. "*Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law*." [15 USC § 78u-6(h)(3)]

C.    BANE CIVIL RIGHTS ACT: CAL. CIV. CODE § 52.1

771.    Gjovik seeks relief under the Bane Civil Rights Act (§ 52.1) to deter discriminatory violence from Apple from occurring against Gjovik, stop Apple's threats of violence and intimidation, and to seek remedy for threats, coercion, intimidation, and property damage that has already occurred.[169]

772.    In an attempt to prevent Gjovik from exercising her civil rights, and to retaliate against her for trying to exercising her civil rights, Apple has maliciously terrorized Gjovik with threats, intimidation, and coercion that interferes with her constitutional and statutory rights.[170] Apple tried and did prevent Gjovik from doing things she had a right to do under law and to force Gjovik to do things she was not required to do under law.[171]

773.    Apple interfered and attempted to interfere by threat, intimidation, and/or coercion, or with reckless disregard for, Gjovik's exercise and/or enjoyment of a constitutional

---

[169] Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 63 (1987 Reg. Sess.) as am. Apr. 6, 1987, p. 2
[170] *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 787 (N.D. Cal. 2014); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1448 (Cal. Ct. App. 2006).
[171] *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 955-956 (2012).

or other right under California or federal law. [172] Apple intimidated Gjovik with an intent to prevent her from giving testimony.[173] Apple threatened Gjovik after Gjovik's testimony.

774.    Threats, intimidation, and coercion included, but was not limited to, aggressive surveillance, bugging objects, whatever Apple installed in her attic, breaking into her apartment, breaking into adjacent apartments, lurking outside her home, blocked calls, retaliatory litigation, retaliatory reports of Gjovik to law enforcement, lurking sedans and SUVs with dark windows, social media accounts making threatening, harassing, and intimidating statements to Gjovik, and someone handling her dog during one of the break-ins.

775.    Apple interfered and attempted to interfere with Gjovik's testimony to labor agencies by threatening her with violence and intimidation, including termination her employment, the day before she was to testify to the government about Apple, which is her right to exercise her labor rights and engage with the government as a citizen of California (at that time) and of the United States. Employment cases are included within the scope of §52.1 (Bane Act) & § 51.7 (Ralph Act).[174]

776.    Apple's supposed justification for terminating Gjovik, and Apple's conduct which Gjovik had complained about as Apple's justification, all violate the California Constitution Article 1 right to privacy. Gjovik had the right and continues to have the right to protest invasions into her privacy and Apple's pretextual termination for firing Gjovik and harassing letter from their law firm threatens, coerces, and intimidates Gjovik to refrain from exercising her Constitutional rights.

---

[172] Intimidating a Witness - California Penal Code 136.1; Threatening a Witness Prior to Testimony - California Penal Code § 137(b); Threatening a Witness After Testimony – Cal. Penal Code § 140(a)
[173] *People v. Serrano*, 77 Cal.App.5th 902, 912-913 [292 Cal.Rptr.3d 865] (2022); *People v. McDaniel*, 22 Cal.App.4th 278, 283 [27 Cal.Rptr.2d 306] (1994); *People v. McLaughlin*, 46 Cal.App.4th 836, 842 [54 Cal.Rptr.2d 4] (1996).
[174] *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc*., 212 Cal. App. 4th 258, 269, 150 Cal. Rptr. 3d 861, 870 (2012).

777.    Apple interfered and attempted to interfere with Gjovik's access to California's unemployment insurance program and right to a fair hearing under California UIC Code § 1251 through obstruction with the agency including apparently falsified records and deleted records, and/or false statements, and other irregularities marked with Apple's *modus operandi* in obstruction.[175] Apple interfered and attempted to interfere with Gjovik's right to a safe workplace [e.g., Cal. Labor Code §§ 6101, 6046, etc.] and warning workers about exposure to carcinogens [Proposition 65].

778.    Apple interfered and attempted to interfere with Gjovik's civil rights under state and federal law including her right to participate lawfully in speech and peaceful assembly opposing any denial of the opportunity to participate in federal civil rights.[176] For example, Apple's retaliatory litigation, retaliatory reports to law enforcement, and malicious gag order prohibited Gjovik from doing so, including prohibiting her from sharing public records and her legal filings, to complain (even privately) about the retaliatory lawsuit and gag order, and violating her right to free speech under the US Constitution, causing irreparable damage to Gjovik.[177]

779.    Apple's threats, intimidation, and coercion went beyond speech acts and restricting Gjovik's speech, also extending to the physical world by breaking and bugging her chattel property, breaking into her apartment, stalking her, and lurking outside her apartment, intercepting her internet and phone lines, etc.[178]

---

[175] Note: "bad faith tactics" can be sanctioned and fined: Cal. Unemp. Ins. Code § 2122
[176] 18 U.S. Code § 245 - Federally protected activities; § 245(b)(5)
[177] 12 Cal. Jur. 3d Civil Rights § 105. *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 958–59, 137 Cal. Rptr. 3d 839, 848 (2012).
[178] California Civil Code 52.1(j); Interference with Legal Rights., 8 Witkin, Summary 11th Const Law § 990 (2023); *Bates v. San Francisco Sheriff's D. Chief Arata*, No. C 05-3383 SI (N.D. Cal. Mar. 26, 2008); *Koerber v. Encyclopedia Britannica, Inc*., No. B312047, 18 (Cal. Ct. App. Jul. 13, 2022).

780.    Apple's actions threatened violence and created a reasonable fear of imminent harm. Apple attempted to interfere with Gjovik's exercise of her civil rights by way of threats, intimidation, and coercion. Apple made threats of violence against Gjovik and her property (i.e., the box with her chattel property covered in glass shards and a social media account threatening it could contain the severed head of one of her loved ones), that she reasonably believed would be carried out if she exercised her civil rights. Apple acted violently against Gjovik and her property to prevent her from exercising her rights and/or to retaliate against her for doing so.

781.    The retaliatory litigation against Gjovik was filed, per the Applegate's own testimony, because of Gjovik's NLRB charges against Apple, because Gjovik was complaining about witness intimidation by Apple, because Gjovik claimed Apple terminated her in retaliation for protected activity, and with the offer that the litigation and harassment would stop if Gjovik (summarized) *admitted she leaked IP, admitted she deserved to be fired, wanted to be on leave, removed her legal filings against Apple from public view, and admitted was a selfish liar who committed perjury by filing meritless charges against Apple.* The message was crystal clear to Gjovik: *the beatings will continue* until she dropped any and all legal claims against Apple.

782.    Apple did, conspired, aided, and incited the filing and threatening to file of false claims and reports about Gjovik to peace officers and law enforcement agencies that falsely alleged Gjovik engaged in unlawful activity and/or in activity that requires law enforcement intervention, knowing the claim and reports are false, and/or with reckless disregard for the truth or for falsity of the claim/report, and were filed after January 1 2021.[179] Apple filed false police reports, filed false FBI reports (alleging criminal extortion and blackmail), filed meritless litigation and obtained a gag-order in 2022 through fraud, filed false reports to social media services alleging serious crimes (including that one of Gjovik's legal filings was 'child

---

[179] Gov. Code § 51.7 (b)(2), Stats. 2020, c. 327 (AB 1775).

pornography'), and other depraved actions intending to instigate investigations into Gjovik, instigate searches of Gjovik's electronic devices and usage, instigate removal of Gjovik's published documents and statements, and to incite others to threaten and attack Gjovik due to these false allegations.

783.    Apple engaged in threats and actual acts of violence against Gjovik and her property, including: physical violence, psychological violence, and moral harassment.

784.    An action brought under section 52.1 is "independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law," including Civil Code section 51.7 (e.g., Ralph Act, below). [180]

## D.    RALPH CIVIL RIGHTS ACT: CAL. CIV. CODE §51.7

785.    Apple violated The Ralph Act when it threatened violence and committed violence against Gjovik and her property due to Gjovik's position in a labor dispute and Gjovik's other protected characteristics (sex/gender, disability, color/race, medical condition, etc), including her activism around environmental health and chemical exposure, activism around privacy rights, and her membership in a protected class of 'victims of environmental crime.'[181] [182]

---

[180] *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 843, 87 P.3d 1, 14 (2004); *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334, 949 P.2d 941, 944 (1998).

[181] Civ. Code, § 51.7, subd. (b)(1). See *Venegas v. Cnty. of Los Angeles*, 32 Cal.4th at pp. 841-842; *Jones v. Kmart Corp.*, 17 Cal.4th at p. 332; *Bay Area Rapid Transit Dist. v. Superior Court,* supra, 38 Cal.App.4th at pp. 144; *Boccato*, supra, 29 Cal.App.4th 1797; *Winarto v. Toshiba America Electronics Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1288-1290, fn. 13.) *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1457 (Cal. Ct. App. 2006)

[182] Civ. Code § 51.7(b)(1)), and codify identical language used in *In re Cox*, 3 Cal. 3d 205, 216, 90 Cal. Rptr. 24, 474 P.2d 992 (1970) to expand Unruh Act protected characteristics, not just the enumerated bases. (*McCalden v. California Library Ass'n*, 955 F.2d 1214, 1221, 22 Fed. R. Serv. 3d 975 (9th Cir. 1990). Social justice organization protesting for racial equality constitutes a "political affiliation," protected under the Ralph Act (*Black Lives Matter-Stockton Chapter v. San Joaquin Sheriff's Office,* 398 F. Supp. 3d 660, 679 (E.D. Cal. 2019).) Animal rights activism

217

786.    While not required, Apple did express discriminatory animus and intent for their threats of violence because of Gjovik's membership in a protected class of persons.[183] Apple also aided, conspired, and incited these acts (i.e., incited and aided with the meritless litigation and police reports against Gjovik and conspired to harass and threaten Gjovik about those reports and cases).[184]  As detailed in the Bane Act section above, Apple committed violence and made threats of violence against Gjovik and her property, including threatening messages and social media posts, threatening packages in the mail, tampering with Gjovik's chattels, destroying Gjovik's chattels, home break-ins, and other violence misconduct.[185]

787.    Apple engaged in threats and actual acts of violence against Gjovik and her property, including: physical violence, psychological violence, and moral harassment.

788.    A Ralph Act claim applies to employment and also does not displace another employment claim.[186] Ralph Act claims may be joined with an employment discrimination claim.[187] Apple intimidated Gjovik by threat of violence against Gjovik and/or her property and the substantial motiving reason for Apple's conduct was Apple's perception of Gjovik's position in protected groups of people. A reasonable person in Gjovik's position would have believed that Apple would carry out its threat and would have been intimidated by Apple's conduct. [188]

---

and membership in organization, constitutes a "political affiliation" under the Ralph Act. (*Campbell v. Feld Entertainment*, 75 F. Supp. 3d 1193 (N.D. Cal. 2014).)
[183] *Venegas v. County of Los Angeles,* 32 Cal.4th 820, 841 (2004). Oct 2020 – August 2021, Association with members of a protected class, S.F. Admin. Code § 12B.1(a) and 12B.2(a).)
[184] Civ. Code, § 52(b). Judicial Council of California Civil Jury Instruction 3064, Judicial Council of California Civil Jury Instruction 3064
[185] *Koerber v. Encyclopedia Britannica, Inc.,* No. B312047, 18 (Cal. Ct. App. Jul. 13, 2022)
[186] Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986 (1975-1976 Reg. Sess.) Apr. 6, 1976, p. 1.; Stamps v. Superior Court, 136 Cal.App.4th 1441, 1447 (Cal. Ct. App. 2006)
[187] *Stamps* at 1456-1457.
[188] Liability may also be found if a defendant "aids, incites, or conspires" in the denial of a right protected under Civil Code section 51.7. (Civ. Code, § 52(b).)

**E.     RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962**

789.     RICO is appropriate and justified in this case due to the uniquely extreme and corrupt conduct perpetrated by Apple against Gjovik in furtherance of concealing their systemic pattern of criminal schemes and enterprise. RICO enables a more efficient analysis of the facts in this case by including evidence of wrongdoing that does not ordinarily fit into a civil lawsuit.

790.     Use of RICO enables Gjovik to seek remedy for witness intimidation and retaliation violations outside a criminal case initiated by US Department of Justice.

791.     There is extensive evidence of fraud and regulatory violations occurring before and during Gjovik's disclosures, substantiating Gjovik's real-time complaints about a "cover-up" and "conspiracy."[189]

**i.     Standing & Pleading**

792.     Any allegations of fraud and any actions under THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, CODIFIED AS TITLE IX OF THE ORGANIZED CRIME CONTROL ACT OF 1970, must comply with pleading requirements set forth by FRCP 8(a) and *Iqbal/Twombly*.[190] The heightened pleading standard requires establishing the circumstances constituting fraud, including: date, time, place, communications, and name of the person who made a fraudulent representation.[191] Both fraud and RICO must be plead with particularity and so are plead in

---

[189] Craig A Benedict (retired Assistant US Attorney, Northern District of New York), The Interplay of Worker Protection and Federal Criminal Statutes in Environmental Prosecutions

[190] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

[191] Schrieber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1400 (9th Cir. 1986); Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977); Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009); Cohen v. Trump, Case No. 13-cv-2519-GPC-WVG, 12 (S.D. Cal. Feb. 21, 2014)

detail in the "General Allegations" above, here, and the sections below, unfortunately making this pleading quite long.[192]

793.    Gjovik was directly injured, with harm occurring to her business, her tenancy rights, and to her personal chattel property, due to Apple's racketeering Predicate Acts of § 1512 (Intimidating Witnesses) and § 1513 (Retaliating Against Witnesses) occurring within the last four years (2021-2023). Gjovik was directly injured with harm occurring to her personal chattel property due to Apple's racketeering Predicate Acts of 18 USC 229 (Relating to Chemical Weapons), occurring within the last four years (2020). Gjovik was directly injured with harm occurring to her business and to her chattel property due to Apple's racketeering Predicate Acts of 1341 (Mail Fraud) and 1343 (Wire Fraud), occurring within the last four years (2020-2023). Some of Apple's Mail and Wire Fraud Acts also included Predicate Acts of 15 USC 78 (Securities Fraud) within the last four years (2020-2023), which also directly harmed Gjovik's business and personal chattel property. Gjovik was directly injured, with harm occurring to her business, due to Apple's racketeering Predicate Acts. [193]

794.    Gjovik was directly injured by Apple's Predicate Acts of Commercial Bribery but is not claiming harm due to statute of limitations as the Acts occurred in 2015, over four years ago. Gjovik was only indirectly injured by Apple's Predicate Act of Criminal Bribery of Executive Officer and some of the 18 USC 78 (Securities Fraud) claims, and thus is not claiming redressable harm due to lack or direct injury and/or statute of limitations as some Securities Fraud claims occurred over four years ago. Gjovik also cites additional historic charges and claims against Apple, which are not Predicate Acts under RICO, but are evidence to support

---

[192] *Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N.D. Ill. 1996), aff'd, 185 F.3d 850, (7th Cir. 1999),

[193] *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc*., 388 F.3d 990, 1004 (7th Cir. 2004).

allegations of enterprise, scheme, and/or conspiracy. These claims include Sherman Act antitrust violations, impersonating law enforcement, and other felonious affairs.

795.     Standard whistleblower retaliation lawsuits usually do not support concurrent RICO claims, as employees who suffer retaliatory terminations often do so in (comparatively) dull and predictable ways. However, whistleblower retaliation cases do support RICO when a discharge of employment is also a RICO Predicate Act (i.e., 18 USC §§ 1512, 1513, etc.) that is part of a racketeering scheme and pattern. This is the situation with Gjovik's claims against Apple.

796.     Apple's termination of Gjovik consists of several RICO Predicate Acts. Gjovik complained of federal witness intimidation (§ 1512) the day before a federal affidavit and only hours before she was terminated in retaliation due to her cooperation with federal officers and federal investigations (§ 1513). Apple's termination of Gjovik was not simply because Gjovik refused to participate in Apple's pattern of racketeering activity, it was because Gjovik was a federal witness, a victim of federal crimes perpetrated by Apple, and Gjovik was informing to the Feds about Apple's misconduct and criminal activities.[194]

797.     In addition, and/or in the alternate, if Gjovik's termination is not found to be a Predicate Act or otherwise support RICO standing, then Gjovik argues her whistleblower retaliation claims are related to the RICO charges but are not "essential" to the alleged RICO scheme and conspiracy, and because the whistleblower case is related but peripheral to the RICO claims, then both claims can be pled concurrently.[195]   In addition, and/or in the alternate, if Gjovik's employment-related injury claims are not found to be Predicate Acts or otherwise support RICO standing, Gjovik still has standing based on harm/injury beyond the employment matters (i.e., harm to personal chattel property due to 18 USC 229 Predicate Acts; harm to

---

[194] *Reddy v. Litton Industries, Inc*., 912 F.2d 291, 294 (9th Cir. 1990).
[195] *Reddy* at 295/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

business and property due to witness intimidation and retaliation occurring well past Gjovik's termination, etc.).[196]

    ii.     **Conduct & Violations under 18 U.S.C. §1962(a), (c), (d)**

798.    Apple engaged in RICO Predicate Acts with knowledge the conduct was illegal. The conduct affects interstate and/or foreign commerce under 18 U.S. Code § 1962 through interstate mail, interstate wires, and other instrumentalities of interstate commerce. Under 1962(a), the "person" and the "enterprise" are the same ("Apple") and Apple's racketeering benefited itself financially. Under sections 1962(c) and (d), the "person" and the "enterprise" are distinct, the "person" is Apple, and the "enterprise" is Worldwide Loyalty.[197]

799.    Apple, as an enterprise-as-person concept (only under 1962-a), benefitted by playing an active role in the pattern of racketeering which directly injured Gjovik's property and business. Legitimate hazardous waste disposal costs thousands of dollars, so it is hard to imagine any situation in which the illegal dumping of toxic wastes by corporate officers, employees, or agents will not directly or indirectly benefit the corporation enterprise.

800.    In violation of Section 1962(c), Apple conducted and participated in the conduct of an associated enterprise ("Worldwide Loyalty") through a pattern of racketeering activity, and engaged in and/or the activities which affect interstate commerce Apple.

801.    In Violation of Section 1962(d), Apple conspired "to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity."[198]  Apple conspired to violate one or more of the substantive RICO provisions and

---

[196] *Reddy* at 296.
[197] RJR Nabisco, Inc. v. Eur. Cmty, 136 S. Ct. 2090, 2104 (2016); Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).
[198] *Salinas v. United States,* 522 U.S. 52, 63 (1997); *United States v. Wilkerson,* 966 F.3d 828, 841 (D. C. Cir. 2020); *United States v. Fernandez,* 388 F.3d 1119, 1228 (9th Cir. 2004).

member of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy. [199]

802.    Apple knowingly agreed to facilitate the commission of at least two racketeering acts constituting a pattern and scheme to be committed by any member of the conspiracy.[200]

### iii.    Creation, Nature, and Operation of the Enterprise

803.    Section 1962(c) requires the existence of two distinct entities: a "person" and an "enterprise" that is not simply the same person referred to by a different name. Even under subsection 1962(c), a corporate entity and its sole shareholder are sufficiently distinct to satisfy the "enterprise" and "person" elements of a subsection (c) violation.[201] The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." [202]

804.    The enterprise must either engage in interstate or foreign commerce or engage in activities that affect interstate or foreign commerce. An enterprise that orders supplies and transports its employees and products in interstate commerce, is "engaged in interstate commerce" for purposes of RICO, [203] as is an enterprise that uses telephones, the mail, or internet communications.[204] The interstate commerce requirement is satisfied if the activity of

---

[199] *Beck v. Prupis*, 529 U.S. 494, 503-07 (2000); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).

[200] See, e,g, *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Salinas v. United States*, 522 U.S. 52 (1997).

[201] Cedric Kushner Promotions, Ltd., 533 U.S. at 161; Living Designs, Inc., 431 F.3d at 361; First Capital Asset Management v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004).

[202] 18 U.S.C. § 1961(4); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).

[203] *United States v. Robertson*, 514 U.S. 669, 671-72 (1995); see also *United States v. Velasquez*, 881 F.3d 314, 329 (5th Cir. 2018); *United States v. Keltner*, 147 F.3d 662, 669 (8th Cir. 1998).

[204] *Velasquez*, 881 F.3d at 329 ("Use of instrumentalities of interstate commerce such as telephones, the U.S. Postal Service, and pagers to communicate in furtherance of the enterprise's criminal purposes can also constitute the enterprise affecting interstate commerce.")

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

either the enterprise or the predicate acts of racketeering affects interstate commerce.[205] Apple and the Worldwide Loyalty Team enterprises engage in interstate and foreign commerce.

### 1) Apple as a Corporate Defendant

805.    The defendant, Apple, is employed by the enterprise, associated with the enterprise, conducts in the enterprise's affairs, lead the enterprise, and participated in a pattern of racketeering with the enterprise.[206]  Apple can be held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself – including with law firms, expert witnesses, trade organizations, third-party administrators, doctors, and/or environmental consultants..[207]

### 2) The "Worldwide Loyalty Team" Enterprise

806.    The criminal enterprise in this complaint, where not Apple itself, will be named after a monster of Apple's creation, the "*Worldwide Loyalty Team*." This group has been repeatedly identified, over nearly two decades, as being involved the initiation, management, and/or cover-up of criminal acts in furtherance of common schemes. Worldwide Loyalty is an enterprise separate from the "person" (Apple) associated with the enterprise who engaged in unlawful RICO conduct.[208]

807.    Worldwide Loyalty's own chosen name ("Worldwide") confirms they are an entity which is engaged in and effects interstate and foreign commerce, further evidenced by

---

[205] See *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (quoting R.*A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1353 (5th Cir. 1985)); *Bunker Ramo Corp. v. United Bus. Forms, Inc.,* 713 F.2d 1272, 1289 (7th Cir. 1983).
[206] Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005); Churchill Village v. General Electric, 361 F.3d 566, 574-75 (9th Cir. 2004).
[207] Phillip Morris USA, Inc., 566 F.3d at 1111-12; Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005); See United States v. Blinder, 10 F.3d 1468, 1473–74 (9th Cir.1993). Jackson v. Sedgwick Claims Management Services, Inc., 699 F.3d 466 (6th Cir. 2012).
[208] Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1396 (9th Cir. 1986).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

interstate wire and mail, interstate travel and shipping, and 'ops' in numerous states and countries.

808.    Apple is heavily involved in the operation and maintenance of the enterprise, and most, if not all, of the schemes are for the ultimate benefit of Apple's short-term and long-term unlawful goals and objectives.[209]

809.    For 1962(c),(d) – Apple and the enterprise are distinct and separate entities. Most of the entities who are members of the enterprise are independent entities by definition – lawyers and professional engineers are licensed professionals with ethical obligations to maintain professional independence.[210] Similarly, law enforcement and regulatory agencies are supposed to operate independent of private interests.[211]

**iv.    Pattern; Vertical and Horizontal Relatedness of Predicate Acts**

810.    The predicate offenses relate to each other and the enterprise. Relatedness enabled Apple to commit the offense solely because of its position in the enterprise and/or his involvement in or control over the enterprise's affairs, and/or because the offense related to the

---

[209] *United States v Provenzano* (1980, CA3 NJ) 620 F2d 985; *United States v Thevis* (1979, ND Ga) 474 F Supp 134; *United States v Aleman* (1979, CA7 Ill) 609 F2d 298, cert den 445 US 946; *United States v Doherty* (1989, CA1 Mass) 867 F2d 47, cert den (US) 106 L Ed 2d 590; *United States v Hansen* (1976, ED Wis) 422 F Supp 430, later proceeding (CA7 Wis) 583 F2d 325, cert den 439 US 912, 58 L Ed 2d 259, 99 S Ct 283; 18 U.S.C.A. §§ 1961(4), 1962(c). *Williams v. Mohawk Industries, Inc.*, 314 F. Supp. 2d 1333 (N.D. Ga. 2004); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002); *United States v. DePeri*, 778 F.2d 963 (3d Cir. 1985) (Philadelphia Police Department), cert. denied, 475 U.S. 1109 (1986); *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984).; *United States v. Freeman*, 6 F.3d 586, 596-97 (9th Cir. 1993); *United States v. Balzano*, 916 F.2d 1273, 1290 (7th Cir. 1990); *U.S. v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *U.S. v. Frega*, 179 F.3d 793 (9th Cir. 1999); *United States v. Hocking*, 860 F.2d 769, 778 (8th Cir. 1988); *United States v. Dozier*, 672 F.2d 531, 543 & n.8 (5th Cir. 1982); *United States v. Nascimento*, 491 F.3d 25 (1st Cir. 2007).
[210] *Gadda v. Ashcroft*, 377 F.3d 934, 942–43 (9th Cir.2004); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir.1992). Model Rules of Prof'l Conduct R. 5.4.
[211] *United States v Griffin* (1981, CA4 Md) 660 F2d 996, cert den (1982) 454 US 1156, 71 L Ed 2d 313, 102 S Ct 1029.

activities of the enterprise.[212] Relatedness links each of Apple's predicates act to the enterprise.[213] Apple's predicate acts have similarities related to: purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (i.e., agency capture, intimidation and censorship, lying about environmental practices, whistleblower retaliation, etc).[214]

811.    Apple is currently engaging in predicate acts of racketeering activity and Apple has shown a long-running pattern and practice of regularly treating whistleblowers and those who are cooperating with investigations into Apple in a way that constitutes criminal harassment and intimidation. The goal of Apple's racketeering does not and cannot have an end date, as much of Apple's racketeering conduct is performed in order to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct, while frantically working to cover-up its prior criminal conduct, by engaging in even more criminal conduct. Cover-ups by their nature present a distinct threat of long-term continuation.[215]

812.    In 2009, Gizmodo wrote about Apple and this Enterprise and explained that the group calls themselves the "*Worldwide Loyalty Team*." The article added that some Apple employees chose to refer to the group as the "Apple Gestapo."

> "[Apple employees] [knew] how it feels to be watched, to always be considered guilty of crimes against another kind of state. He knew how it felt to have no privacy whatsoever when he was working right here, in a little Californian town

[212] *United States v. Vernace*, 811 F.3d at 615-16. *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citing United *States v. Cain,* 671 F.3d 271, 284 (2d Cir. 2012)); see also *Rajaratnam v. Motley Rice*, LLC, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020).
[213] *United States v. Henley*, 766 F.3d at 907 with *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008) ("It may be true that Fowler's predicate acts are not directly interrelated with each other, but that is not required. Instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise").
[214] *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989) (quoting former 18 U.S.C. § 3575(e)); *Reich*, 858 F.3d 55 at 61.
[215] *Mruz v. Caring*, Inc., 991 F. Supp. 701, 718 (D.N.J. 1998)

called Cupertino, in a legendary place located in One Infinite Loop. [He] knew about all that pretty well, back when he was working at Apple Inc"

The article details that Apple employees "*lack any privacy whatsoever*," that Apple has "*moles working everywhere*" that even "*management is not aware of,*" and if Apple thinks an employee shared sensitive information, the employee can except to "*get fired and sued into oblivion by Apple Legal.*" The article explains that when Worldwide Loyalty suspects a "*leak*" of information from employees to the outside world, the team brings in the "*special forces*" to "*coordinate the operation*" and "*supervise the supervisors*" as all cellphones are confiscated and data copied, then all data is reviewed including text messages and photos. "*No privacy, no limits.*"[216]

813.    If employees do not want to participate, they are asked to leave and never come back. Apple's demands are supposedly "voluntary" but any employees who resist will then be investigated as to why they are resisting. If a "leaker" is identified, they are held by Apple all day while they are "interrogated" and "intimidat[ed] by [Apple] threatening to sue." The article concludes complaining that the "happy hippie company" that Apple used to be has now been transformed into a "company that does KGB-style lockdowns and Gestapo interrogations that end in suicides."[217]

---

[216] Id.
[217] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

**GIZMODO**  

HOME   LATEST   REVIEWS   TECH   IO9   EARTHER   SCIENCE   FIELD GUIDE

APPLE

# Apple Gestapo: How Apple Hunts Down Leaks

By Jesus Diaz
12/15/09 5:38PM | Comments (440)



They call themselves the Worldwide Loyalty Team. Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to Jobs and Oppenheimer. Here's how they hunt people down.

*Exhibit: Apple Gestapo*

814.    Worldwide Loyalty engages in other activities that include individuals and groups outside of Apple Inc. The group was "*known for its network of informers and ruthless, systemic pursuit of leakers.*" [218] The team has an "undisclosed number of investigators around the world" to control information and prevent "*leaks*" from reaching competitors and "*the press*," and to "*hunt down*" the source when leaks do occur."[219] The team also has a sub-team called "Secrecy Program Management" which members are 'embedded' within product teams.[220]

---

[218] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader,* Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[219] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers
[220] Id.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

815.    In 2011, CNN described working at Apple as "*a brutal and unforgiving place*" and even after employees leave, "*the fear of retribution persists for years*" resulting in silence about what occurred during their employment.[221] In 2011, a Gawker reporter described the culture of working at Apple as "*bullying, manipulation and fear*" and described Apple's leadership as "*rude, dismissive, hostile, spiteful,*" and "*deeply disturbing.*"[222]

816.    Worldwide Loyalty was led by John Theriault (ex-Pfizer, ex-FBI) from 2007-2011.[223]

817.    Starting in September 2009, Tom Moyer became Apple's Chief Compliance Officer.[224]

818.    By 2014, Tom Moyer was Apple's "Head of Global Security."[225] Moyer reported to Apple's General Counsel and also to Apple's Audit and Finance Committee within the Board of Directors (led by Ronald Sugar).[226]

819.    In 2014, Moyer supposedly only had two employees reporting directly to him. One was the new court mandated Antitrust Compliance Officer and the other was Apple's Director of Business Conduct and Global Compliance.[227]

820.    It is unclear how Moyer is "Head of Global Security" if the team does not report to him. Under information and belief, Apple's Global Security team was created after the 2011

---

[221] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011, https://web.archive.org/web/20111019220441/http://tech.fortune.cnn.com/2011/08/25/how-apple-works-inside-the-worlds-biggest-startup/
[222] Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011, https://www.gawker.com/5847344/what-everyone-is-too-polite-to-say-about-steve-jobs
[223] Tate, Supra
[224] Apple Inc, Report of The Special Litigation Committee of The Board Regarding Director Defendants and Settlement (May 26 2017).
[225] *United States v. Apple, Inc., et al*., No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.,* No. 1:12-CV-3394; Second Report of the External Compliance Monitor, Michael R. Bromwich, October 14 2014.
[226] Id.
[227] Id.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

incident where Apple unlawfully broke into the Latino man's home.[228] Under information and belief, Tom Moyer replaced the prior head of Worldwide Loyalty, John Theriault.[229]

821.    These alleged schemes and patterns of conduct are not new or revolutionary allegations against Defendant. A tech reporter wrote about how sources with ties to Apple often "*suddenly register a look of disquiet when asked about Apple, then nervously close down the conversation.*" [230] The reporter noted that no one at Apple "*wants to risk disfavor,*" that Apple has an "*obsession with secrecy,*" says Apple has effectively established a "*culture of fea*r."[231]

822.    An op-ed in The Hill on August of 2023 accused Apple of being the "*world's most dishonest*" company and describes Apple's pattern of covering up unlawful conduct by bullying the victims of its unlawful acts with "*threats of legal and financial ruin.*"[232] A March 2022 op-ed in Courthouse News accused Apple "*litigious bullying*" that was "*shameful*" and "*disgusting.*"[233]

823.    The criticism wasn't just about labor or litigation, ti was also about environmental practices. In 2017, a Foundation for Economic Education article complained that Apple's messaging about its environmental practices is "*dishonest and misleads the public about broader

---

[228] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

[229] Bloomberg via Yahoo, *Apple Security Head Charged with Bribery for Gun Licenses*, https://www.yahoo.com/now/apple-security-head-charged-offering-202206641.html

[230] Mark Sullivan, *Apple's Obsession With Secrecy May Be A Self-Fulfilling Prophecy*, Fast Company (June 2017), https://www.fastcompany.com/40433541/apples-obsession-with-secrecy-may-be-a-self-fulfilling-prophecy

[231] Id.

[232] Mark Cooper, "*Apple's anti-competitive tactics must be stopped,*" The Hill, (Aug 19 2023), https://thehill.com/opinion/technology/4158989-apples-anti-competitive-tactics-must-be-stopped/

[233] Robert Kahn, "*Apple is Rotten,*" Courthouse News, March 18 2022, https://www.courthousenews.com/apple-is-rotten/

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

*policy issues.*" [234] In 2017, VICE described Apple's Environmental Responsibility Reports as "*annual grandstanding effort that the company uses to position itself as a progressive, environmentally friendly company,*" but behind the scenes the company "*undermines*" environmental goals. [235]

824. Frequent complaints include planned obsolescence, fighting right to repair, and insistence on disposal of e-waste instead of recycling. In 2020, Ethical Consumer gave Apple their "worst rating for environmental reporting".[236] In 2021, a Tribune Magazine article complained "*Apple's environmental initiatives are designed to greenwash fundamentally unsustainable production and consumption patterns.*" [237]

825. In addition to the well-established pattern of Apple's racketeering, Apple's depraved retaliation against a whistleblower (Gjovik) —a predicate act added by the Sarbanes-Oxley Act in 2002—is sufficiently related to allegations of witness intimidation and retaliation (§§ 1512, 1513). [238] Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower; therefore, in most cases retaliatory acts and the underlying scheme will satisfy the relatedness requirement.[239] Here, Gjovik was working to expose and report the Predicate Acts of wire fraud, mail fraud, securities violations, and violations of environmental laws with toxic chemical exposure. Gjovik was also reporting apparent violations of the RICO Act. Then Apple fired and terrorized her. It is all related.

---

[234] David L. Veksler, "Apple Is Not as Green as It Seems. Apple recently made some claims about its environmental impact that are, at best, questionable." FEE, Oct 15 2017, https://fee.org/articles/apples-environmental-claims-are-misleading/

[235] Jason Koebler, "*Apple Forces Recyclers to Shred All iPhones and MacBooks,*" VICE Motherboard, April 20 2017, https://www.vice.com/en/article/yp73jw/apple-recycling-iphones-macbooks

[236] Ethical Consumer, Apple Inc, https://www.ethicalconsumer.org/company-profile/apple-inc

[237] Paris Marx, *"Apple Won't Save the World,"* Tribune, May 17 2021, https://tribunemag.co.uk/2021/05/apple-wont-save-the-world

[238] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).

[239] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

### v.    The Schemes

826.    There is a lawful version of this enterprise. A corporation like Apple is able to lawfully report wrongdoing to law enforcement, able to request permits and to be regulated by agencies, able to rent buildings and operate facilities, able to hire professional engineers for construction and maintenance work, and able to employ law firms to represent them in litigation. None of these activities are activities RICO was designed to prohibit.[240] However, here, Apple chose violence. The "Worldwide Loyalty" enterprise with members from these supposedly independent entities is engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance, false statements about regulatory compliance in order to sell products and shares, and intimidation and obstruction to silence anyone who witnesses Apple's actual practices and who could report concerns to (non-captured) agencies and/or law enforcement. These activities occurred continuously over substantial period of time and poses a threat of continuing due to duration of activity and inherently unlawful acts in pursuit of unlawful goals.[241] As of now, the threat of continuing criminal activity extends indefinitely into the future.[242]

827.    Apple's conduct is not lawful or legitimate, nor is it simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws. This is similar to the scheme found in *US v Philip Morris*, where

---

[240] Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361–62 (9th Cir. 2005).

[241] *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991); *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *In re Managed Care Litigation*, 150 F. Supp. 2d 1330, 1351 (S.D. Fla. 2001); cf., *Churchill Village v. General Electric*, 361 F.3d 566, 574-75 (9th Cir. 2004).

[242] *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 237-39 (1989), *SKS Constructors, Inc. v. Drinkwine,* 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006).

232

the enterprise joined together to "maximize their profits" through "false and fraudulent statements, representations, and promises" about "the devastating health effects of smoking."[243]

828.    Apple's scheme is three parts. First, Apple intends to avoid expending the resources that would be required for basic regulatory compliance in most of its basic dealings. Apple has centralized administration oversight for functions including Human Relations, Employee Relations, Environmental Health & Safety, and Human Rights. Apple has hundreds of facilities across the country and sends instructions and feedback to those offices and facilities from the headquarters in Cupertino via interstate emails, phone calls, video calls, and physical mailings. Apple transmits knowingly false information (or omits and fails to transmit legally required information) via communications with government agencies and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to the complete lack of environmental sustainability, regulatory oversight and reporting despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities. The rampant retaliation and intimidation in response to employee labor complaints prevents charges from being filed with government which completely prevents government inspections and investigations that would have occurred because of those complaints. The scheme is in place in order avoid compliance with basic legal requirements and to intentionally hide known violations of the law.[244]

829.    Second, Apple intends to increase its stock price, sales, and other business dealings through a knowingly false reputation of strong regulatory compliance in all of its dealings (i.e., promoting itself as an industry leader in environmental responsibility, human rights, etc.). Apple made these false statements via a variety of medium , including: press

---

[243] *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 253 (D.C. Cir. 2015).
[244] Heller Fin., Inc. v. Grammco Computer Sales, Inc., 71 F.3d 518, 524 (5th Cir. 1996)

releases, quotes to the press, materials published and filed to SEC prior to annual shareholder meetings, including the main proxy report, statements on voting items, references, and links to supplementary materials to the main proxy report including company policies and annual updates on environmental compliance, supply chain-related human rights updates, conflict mineral reports, , and other documents.

830.     Apple transmits these false statements to shareholders and US SEC via interstate, emails, paper mailings, faxes, and phone calls. Apple also invites shareholders to travel (including interstate travel) to attend the shareholder meetings in person. Apple invites reporters to the campus for product announces where they also make false statements, and the invites and travel occur across state lines.

831.     Finally, Apple intents to bridge the gap between its actual practices and what it reports to its shareholders and to the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing government agencies to assist in these activities in order to cover-up the Apple's unlawful activities and fraudulent misrepresentations. Apple often sends its messages of retaliation, threats, intimidation, coercion, and harassment via interstate emails, text messages, phone calls, video calls, physical mailings, and other mediums.

832.     The victims directly injured, with property and business harms, caused by Apple's scheme, are those the operational regulations were put in place to protect. Apple's violations of labor laws & systemic retaliation for raising concerns harms its employees. Apple's violations of environmental and hazardous waste laws harms employees who are exposed, people in the community who are exposed, the general public where there is significant soil and groundwater contamination. Apple's violations of health/safety laws harm whoever is at the site

where the laws are not being followed, so employees and vendors at offices and industrial

facilities, customers, and workers at retail stores, and so on. These individuals are also harmed

due to the Apple's misleading and fraudulent statements about its actual practices, as it leads

those people to expect a certain level of safety and lawfulness, when in reality conditions are

likely to be unsafe and unlawful. This leads potential whistleblowers to fail to gather adequate

evidence, organize with employees, or promptly report issues to a regulator because they relied

on the false statements instead of acting with vigilance. This reliance makes the individuals 'fish

in a barrel' for Apple to swiftly retaliate, discredit, confuse, censor, and incapacitate.

### vi.     Predicate Acts/Threats Involving Certain State Offenses [245]

833.    For all acts Gjovik argues Apple, or agents of Apple committed the acts, or in the

alternative attempted to commit the acts, or in the alternative were accessories to the act,[246]or in

the alterative and/or in addition conspired to commit the act.[247]

### 1)  Criminal Bribery of Executive Officer (Cal. Penal Code § 67)

834.    Tom Moyer is Apple's "Chief Compliance Officer" and "head of Global

Security." Moyer's responsibilities include overseeing regulatory compliance, including anti-

bribery/FCPA, and Apple's Business Conduct program. Gjovik interacted with Moyer and his

team on several occasions in her time at Apple. Shortly before she was suspended Gjovik

reported smuggling/sanctions concerns to Moyer's team, and while suspended and before she

was fired, Gjovik reported the "Issue Confirmation" including accusations of bribery and RICO

---

[245] 18 U.S.C. § 1961(1)(a)
[246] 18 U.S.C. § 2(a) – Aider & Abettor
[247] 18 U.S.C.A. § 1964(d); 18 U.S. Code § 371 - Conspiracy to commit offense or to defraud
United States

to Moyer's team. Moyer was charged with criminal bribery in 2021 and then again in 2023. A chargeable instance of bribery under state penal code is a predicate act for RICO. [248]

835.    On November 19 2020, a grand jury issued an indictment and charged Apple's Tom Moyer with bribing an executive officer in violation of section 67[249] by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.[250]

836.    A defendant is found guilty of violating California Penal Code § 67 when they give or offer a bribe to an executive officer in California, or someone acting on the officer's behalf, and the defendant acted with the corrupt intent to unlawfully influence that officer's official act or decision.[251] A person acts with corrupt intent when he or she acts to wrongfully gain financial or other advantage for himself, herself, or someone else.[252] The crime is punishable by imprisonment for 2-4 years.[253]

837.    A trial judge unexpectedly dismissed the charge against Moyer sua sponte, and against the evidence and jury findings. The District Attorney appealed the dismissal and won on August 25, 2023.[254] The charge of bribery against Moyer was reinstated and affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings,

---

[248] Bribery: *United States v. Frega*, 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993).
[249] Penal Code Section 67 - "Bribery of an Executive Officer"
[250] *People v Thomas Moyer*, Case No. H049408, In the Court of Appeal of The State of California, Sixth Appellate District, Filed 8/25/23, https://www.courts.ca.gov/opinions/documents/H049408.PDF
[251] California Criminal Jury Instructions (CALCRIM 2023), Crimes Against Government, Bribery of Official, https://www.justia.com/criminal/docs/calcrim/2600/2600/
[252] Id.
[253] Robert Salonga, "*Appeals court revives bribery charge for Apple security exec in Santa Clara County concealed-gun permit scandal,*" Mercury News, Aug 25 2023, https://www.mercurynews.com/2023/08/25/appeals-court-revives-bribery-charge-for-apple-security-exec-in-santa-clara-county-concealed-gun-permit-scandal/
[254] *People v Thomas Moyer,* California Appellate Courts, Docket, https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=6&doc_id=2358260&doc_no=H049408&request_token=OCIwLSEmLkw3W1BZSCJNSEhIMFw7UCxbJyBOVzpRPDNOCg%3D%3D

236

removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[255]

838.    Tom Moyer was Apple's Director of Employment Law until September 2009 when he became Chief Compliance Officer. Moyer is responsible for Apple's compliance policies.[256] Today, Tom Moyer is the Chief Compliance Officer and Head of Global Security at Apple Inc. Apple told a federal monitor that Moyer "*has overall responsibility for Apple's ethics and compliance program including Apple's Business Conduct Policy, governing the ethical and legal obligations of Apple's Board, executives and over 120,000 employees around the world. Tom is also responsible for Apple's global security program including all physical security, executive protection, loss prevention, technology, security related investigations, and the security of new products and prototypes.*" [257] Moyer also leads *Worldwide Loyalty* and is now the second senior Apple officer/VP to be indicted for felonies in the last four years.

### 1) Criminal Commercial Bribery (Cal. Penal Code § 641.3)

839.    As discussed, Gjovik's first manager attempted to bribe Gjovik. Gjovik was disturbed by the exchange and reported it to her manager's manager, Venkat Memula. Memula expressed interest in exploiting the incident in order to initiate the removal of Keshishoglou and told Gjovik to report the incident to Human Resources to document it for him. Gjovik then reported it to the Human Resources business partner assigned to her organization, Kristen

---

[255] State v Moyer at 26, "While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See People v. Wong (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)"

[256] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc*., et al., No. 1:12-CV-2826, and *The State of Texas, et al. v. Penguin Group (USA) Inc., et al*., No. 1:12-CV-3394 (October 15 2014).

[257] Stanford, *Cybersecurity and the Legal Profession: Significant Challenges and Unique Opportunities*, 2015, https://law.stanford.edu/event/cybersecurity-and-the-legal-profession/

Michallik on September 25, 2015. Gjovik then informed Memula of her conversation with Michallik.

840.    Keshishoglou suddenly transferred to a different organization shortly after. Memula began inviting Gjovik to personal social events and connecting Gjovik to leaders at Apple, which Gjovik interpreted as Memula allowing Gjovik to join the 'inner circle' as a reward for helping him remove Keshishoglou. Gjovik understood this as an offer of additional favors and favoritism if she was to continue to assist Memula in his schemes. At the same time, Keshishoglou's team, including Gjovik, was then moved under Officer Brad Reigel, despite Gjovik's repeated complaints about Reigel's misconduct and it being generally known that Reigel disliked Gjovik '*because Gjovik reminded him of an ex-wife he hates*.' When Gjovik complained to Memula about being forced under Reigel, Memula acknowledged Reigel would not be a good manager but told Gjovik it was her job to help him become a good manager.

841.    It was chilling to Gjovik that misconduct at Apple seemed normalized with the exception of exploiting instances for additional unlawful or retaliatory objectives. Gjovik was disturbed she was coerced to participate in their scheme and was so openly rewarded with cronyism for 'playing along,' while concurrently actions were taken that showed Memula had no actual concern for her wellbeing or how her manager treated her.

842.    California Penal Code § 641.3(a) prohibits "Commercial Bribery" which includes any person offering or giving an employee money or anything of value, worth over $250, corruptly and without the consent of the employer, in return for using or agreeing to use the employee's position for the benefit of the other person. A chargeable instance of bribery under state penal code is a predicate act for RICO. [258]

---

[258] Bribery: *United States v. Frega,* 179 F.3d 793, 805-07 (9th Cir. 1999); *United States v. Jackson,* 72 F.3d 1370 (9th Cir. 1995); *United States v. Freeman,* 6 F.3d 586 (9th Cir. 1993).

### 2) Criminal Extortion (California Penal Code § 518)

843.    A chargeable instance of criminal extortion is a predicate act for RICO. In California, criminal extortion includes using threats to compel another person to hand over money or property or other consideration. It is a felony with up to four years of incarceration.[259] Threats may include wrongful use of force or fear, or threats under color of official right. Under federal law, it is a crime for United States officers or employees, under the color or pretense of office or employment commits or attempts an act of extortion.[260] Apple's and their enterprise members who are government agencies and/or employees of those agencies extorted Gjovik twice in only the last year in furtherance of the schemes at issue in this claim.

844.    Gjovik filed FOIA requests to the US EPA in January 2022 looking for records related to what occurred at her office in 2021. US EPA kept moving the request out and in May 2022, Gjovik noticed at the end of a very long report recently uploaded about her office mentioned vaguely an inspection at her office on August 19, 2021. Gjovik contacted Perez-Sullivan but got a bounce back saying Perez-Sullivan no longer worked at the EPA. Gjovik contacted the new contacts listed on the facility's webpage which would result in Poalinelli releasing the Oct 7 2022, report to Gjovik and for the first-time notifying Gjovik there was an inspection at her office, while she was suspended, and they found issues. The most concerning, was that the toxic gas from under the building, including TCE, was being sent into the HVAC intake since 2015.

845.    Gjovik asked to follow up questions at which point US EPA lawyer Rebekah Reynolds told Gjovik that Gjovik is only allowed to talk to her going forward and also said she will not talk to Gjovik or answer any of her questions. Gjovik was told her only option was FOIA and the FOIA team kept pushing out their ETAs for documents. Over the next year, the

---

[259] California Penal Code § 518
[260] 18 U.S. Code § 872 - Extortion by officers or employees of the United States

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

EPA slowly released hundreds of damning documents that were no only critical for Gjovik's lawsuits as they proved Gjovik was right and Apple was upset about it, but it also showed a concerted effort by US EPA employees (Poalinelli, Perez-Sullivan, Ty, Schulman) to keep Gjovik from finding out about what happened and what they found, and to suppress at least two potential news stories about Gjovik and the office (New York Times in July 2021 and Independent UK in December 2021).

846.    The US EPA FOIA team had a manager, Andrew Helmlinger, assigned to Gjovik and Gjovik was told he was her only contact for her FOIA requests. Helmlinger was often adversarial, even claiming Gjovik's requests were "commercial" because, he claimed, she was looking to make money by suing Apple. As such, Helmlinger began attempting to charge Gjovik as a "commercial requester" in order for Gjovik to receive documents about her office and what happened to her and her coworkers. Gjovik appealed to US EPA General Counsel's office and won, but Helmlinger persisted. Gjovik complained repeatedly , arguing that US EPA had an obligation to speak with her as a member of the community but instead they were forcing her to request documents through FOIA which EPA took over a year to release in some cases, and repeatedly demanded she pay them for. Gjovik also complained that it appeared US EPA was saving the most damning documents for the final releases, dragging it out as long as they could.

847.    On May 30 2022, Gjovik discovered and complained to US EPA that the FOIA manager, Andrew Helmlinger, is married to a Partner at the law firm ("Orrick, Herrington & Sutcliffe") that Apple hired to defend them from Gjovik's CERLCA (and SOX & OSH Act) retaliation case with the US Department of Labor. Gjovik complained that he had a personal interest in ensuring Gjovik did not receive the documents, and thus his repeated demands that Gjovik pay for her requests, knowing Gjovik did not have money was unlikely to be able to pay, in furtherance of his wife, and Apple's interests in concealing Apple's misconduct, obstructing

Gjovik's charges and lawsuits, and demoralizing Gjovik in hope she gives up – and Helmlinger

did all of this under the color of official title – which is extortion, among other things.

848.    Similarly, the US Department of Labor Whistleblower Protection Program's

obstruction of Gjovik's cases, including obstructing her NLRB charges and a number of federal

investigations including SEC and FTC, by demanding Gjovik provide them something they had

no right to demand and only planned to give it to Apple to help Apple defend itself from Gjovik,

under color of official title, and threatening to deprive Gjovik of her constitutional and statutory

rights if she did not comply.

849.    There was much misconduct from US Department of Labor from the start of

Gjovik's cases with them and Gjovik complained of obstruction to their OIG and Solicitor

starting in November 2021. This included a phone call in September 2022 where Gjovik was

told she would receive an update on her cases from her investigator (Diangco) and her

supervisor. Instead, on the phone call was the Regional Asst. Administrator Matthew Parra, on a

vacation day (per his out of office), who spent most of the call trying to intimidate Gjovik into

withdrawing her charges. Gjovik complained on the phone and after of their conduct, including

filing an OIG complaint about it.

850.    When US Dept of Labor suddenly wanted another phone call with Gjovik in

January 2023, Gjovik demanded she be allowed to record it or otherwise wanted to keep

communications in writing due to their prior misconduct. US Department of Labor acquiesced.

During the phone call, Captain Parra showed up again as a surprise guest and again made many

intimidating and obstructive comments, including repeatedly misstating facts and the law,

mostly repeating Apple's position statement and eventually admitting they apparently did not

investigate the evidence or briefs Gjovik submitted. Gjovik repeatedly tried to "object" to

Parra's statements, but Parra told her to stop and that the call was "informal" and "not on the

record," so Gjovik acquiesced and let him claim things that were not true and complied with bad legal analysis, with the hope they would simply agree to actually investigate by the end of it. On March 22, 2023, Diangco suddenly reached out to Gjovik demanding a copy of the audio file of the meeting. US DOL had not previously asked for a copy and did not attempt to make their own copy at the time. Gjovik asked why they wanted it, and they would not tell her.

851.    Gjovik told US Department of Labor she would share a copy with OIG to investigate the team's misconduct but otherwise would not share it unless they could provide a rational justification why they need it – and they did not. Gjovik complained to them it sure seemed like Apple wanted it to transcribe and use Gjovik's acquiescence to Parra against her in their defense.

852.    Then, in March 2023, Gjovik received a letter from Diangco demanding the audio file within ten days or else US Department of Labor may dismiss Gjovik's entire whistleblower retaliation case, regardless of merit. Gjovik complained to US Department of Labor that she would only share the file if they would draft an agreement "sealing" it so Apple could not get a copy. US Department of Labor never responded. Gjovik complained what they were doing seemed illegal and if they persisted, she would report their misconduct.

853.    Gjovik waited until the deadline at which point US Department of Labor still had not responded, so on April 2nd, 2023, Gjovik reported US DOL and Apple to the FBI for "procedural extortion" and notified the US Department of Labor of such. Gjovik has not heard back from US DOL since their extortion letter.

854.    Both of these incidents were examples of Apple's Worldwide Loyalty enterprise using regional departments of government agencies and/or their employees to help Apple cover-up Apple's systemic non-compliance with regulatory obligations and use of criminal tactics to

intimidate and silence whistleblowers and witnesses. These were not a new allegations about the US Department of Labor agency that Gjovik interacted with.[261]

### vii.    Predicate Acts Indictable Under Title 18 US Code [262]

855.    Apple conducted and participated in the affairs of the Worldwide Loyalty Team Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes: multiple violations of 18 U.S.C. § 1341 by engaging in mail fraud; multiple violations of 18 U.S.C. § 1343 by engaging in wire fraud; multiple violations of 18 U.S.C. § 1512 by tampering with witnesses and victims.[263]

### 1)  Mail Fraud & Wire Fraud (18 US Code §§ 1341, 1343)

856.    Every time Apple transmits a document or communication to the government, to shareholders, to the press, or to public interest groups – via the mail and/or over the wire – and Apple makes claims as to its regulatory compliance practices – each incident where Apple's statement is materially false can be a charge of mail and/or wire fraud. Wire fraud is intentionally devising or intending to devise a scheme to defraud by means of materially false or fraudulent pretenses, representations, or promises over interstate wire communications.[264] Apple's false statements made "*has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed.*"[265]

857.    Mail fraud and wire fraud are both RICO predicate offenses. The legal precepts relating to principals, accessories after the fact, misprision, and conspiracy apply to mail fraud and wire fraud as well. Gjovik's injury caused by Apple's mail and wire fraud is of her business

---

[261] See, Bloomberg, *He Investigated Dubious Firings for U.S. Then He Was Fired* (2017), https://www.bloomberg.com/politics/articles/2017-07-21/he-investigated-suspicious-firings-for-u-s-then-he-was-fired (same Regional Office as Gjovik's case)
[262] 18 U.S.C. § 1961(1)(b)
[263] *Steiner v eBay,* U.S. District Court of Massachusetts, 1:21-cv-11181, Complaint and Demand for Jury Trial, July 21 2021, https://www.scapicchiolaw.com/pdf/Steiner.pdf
[264] 18 U.S.C. § 1343. *United States v. Ransom*, 642 F.3d 1285, 1289-90 (10th Cir. 2011). *US v. Camick*, 796 F. 3d 1206 - Court of Appeals, 10th Circuit (2015).
[265] *United States v. Gordon*, 710 F.3d 1124, 1148 n. 26 (10th Cir.2013)

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                      OCTOBER 25 2023

and property, including "intangible property rights."[266] The RICO predicate act of mail fraud in furtherance of criminal acts does not displace other charges nor is it pre-empted by the federal statutes the mail fraud was used to engage in.[267]

858.     Apple's actions are especially egregious when there is a true and accurate report from another party (newspaper, nonprofit, etc.) about Apple's actual practices and Apple contacts the group demanding a "retraction" or "correction" of the true report, with changes requested to falsify the report, and Apple either citing prior falsified documents or requesting the falsification of the new report through threats, intimidation, and coercion. This happens often.[268]

859.     In 2016, Apple agreed to a consent decree and was fined $450,000 by the California government over hazardous waste violations with CalEPA.[269] This was covered by major publishers and Lisa Jackson's ex-US EPA team gave false comment.[270]

860.     In 2017, Apple was fined by the North Carolina government for violations of hazardous waste laws, which also revealed Apple was "lying" about the data center running on renewable energy. Again, Lisa Jackson's team provided comment.

861.     Gjovik complained to Apple, the press, and to the SEC that Lisa Jackson and Alisa Johnson 's conflict- of-interest and yet "*seem to be heavily involved in Apple's ... public relations about Apple's hazardous waste crimes/infractions*" and "*Lisa Jackson used to run the*

---

[266] *Carpenter v. US*, 484 U.S. 19, 26-27 (1987); *Pasquantino v. US,* 544 U.S. 349, 357 (2005).
[267] *United States v. Boffa*, 688 F.2d 919, 931-33 (3d Cir. 1982) (mail fraud statute not preempted by labor statutes, despite some overlap in statutes' coverage).
[268] FCPA Blog, *What does this Apple disclosure mean*? (2020), https://fcpablog.com/2020/02/10/what-does-this-apple-disclosure-mean/ ; See *U.S. v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 15 (S.D. Cal. Feb. 21, 2014).; *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* 431 F.3d 353, 365 (9th Cir. 2005); *Cohen v. Trump*, CASE NO. 13-cv-2519-GPC-WVG, 9 (S.D. Cal. Feb. 21, 2014)
[269] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/
[270] Reuters, *California EPA says settled with Apple on hazardous waste claims* (Dec 6 2016), https://www.reuters.com/article/us-apple-waste-violations/california-epa-says-settled-with-apple-on-hazardous-waste-claims-idUSKBN13V2HS

*U.S. EPA & Alisha was her press secretary, including commenting on the 2016 DTSC settlemen*t." Gjovik expressed concerns to Apple that Jackson must have known about Apple's offices on Superfund sites, but Jackson was making public statements about Apple's commitment to "*healthy communities*" and environmental justice. Gjovik also raised concerns that Jackson's team publicly stated in 2016 that Apple goes "*well beyond legal requirements*" but that EH&S told Gjovik Apple only does what is absolutely legally required related to Superfund sites. Apple never responded to Gjovik's concerns.

862.    In 2008, Gene Levoff (now awaiting prison sentencing) was Apple's Corporate Secretary and head of Corporate Law. He filed a no-action letter to the SEC on November 20 2008, fighting a shareholder proposal requesting a sustainability report that addressed, among other environmental topics, Apple's "*toxics*" and "*employee and product safety*."[271]

863.    In November 2016, Levoff fought another shareholder proposal about the environment, complaining that shareholders were trying to micromanage Apple's environmental practices and argued Apple's environmental statements are not false, citing NGOs and other groups praising Apple but failing to mention Apple's capture of these groups as part of its enterprise and schemes.[272]

864.    Levoff fought another shareholder proposal about Apple's environmental practices in November of 2017, complaining again of micromanaging and claiming Apple's actually doing a great job.[273] This was false.

865.    The US SEC began investigating Levoff for fraud in 2018, and then charged Levoff with twelve counts of criminal fraud in February 2019.

---

[271] US SEC, Apple, 2008, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2008/calvertasset112008-14a8.pdf
[272] US SEC, Apple, 2016, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2016/christinejantzapple120516-14a8.pdf
[273] US SEC, 2017, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2017/sustainvestasset121217-14a8.pdf

866.    Apple's statements were made in furtherance of a "scheme or artifice to defraud" and as such serve as the predicate offenses for a RICO violation.[274] Apple's scheme to defraud under environmental laws was undertaken with a reckless disregard for the truth or falsity of its hazardous waste representations. Apple employs a prior Presidential appointed administrator of the U.S. Environmental Protection Agency and much of her prior staff from the US EPA. Apple's Supply Chain Responsibility policies describe in detail the regulatory obligations for hazardous waste handling. Apple knew what was required of it and chose to break the law, knowing its actions would create significant risk of harm to the public and often did actually significantly harm the public.

867.    At 3250 Scott Blvd, from 2015-current, Apple manipulated hazardous waste manifest documents and regulatory filings in a concerted effort to suppress and conceal the Apple's actual hazardous waste practices. Apple used improper codes for hazardous waste disposal (i.e., coding solvent waste as non-RCRA, coding 'solvent mixtures' instead of notating each chemical, etc.). All of these efforts were in order to save money, downplay the environmental impact of the plant, and manipulate metrics on operations at the plant in order to mislead investors about Apple's environmental practices in annual SEC filings.

868.    On April 30 2021, Apple knowingly omitted information about another phosphine leak (and possible explosion) at its 3250 facilities by refusing to file a spill report with CalOES and demanding the city HazMat redact Apple's name from the incident report that was electronically filed for the incident. It is a crime under 42 US Code 11045(b)(4) and 42 USC 7413(c)(2)(B) to knowingly and willingly fail to provide required notice after releasing extremely hazardous substances.

---

[274] 18 U.S.C. §§ 1341, 1343. See *Philip Morris*, 449 F.Supp.2d at 852–54. *United States v. Philip Morris USA Inc*., 566 F.3d 1095, 1116 (D.C. Cir. 2009)

246

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

869.     On June 30 2021, Apple knowingly omitted information about its treatment and disposal of the now-banned chemical NMP at its 3250 Scott Blvd facility. Apple submitted an electronic filing to the US EPA claiming thousands pounds were treated on site, but the treatment mechanism noted was scrubbers which would not reduce the chemical to the extent noted. Further, Apple made false statements in this filing claiming 14,743 pounds of NMP were transported offsite to three waste processing facilities, however no manifests were ever created for those supposed transfers. Apple either lied that it transported the NMP at all and instead unlawfully deployed thousands of pounds of NMPs on site, or the Apple lied and transported the NMP without manifests to off book disposal facilities. It is a criminal violation of the Clean Air Act to make false statements and representations, and/or omit material information, and/or alter or conceal a document required under the Clean Air Act. (42 US Code 7413(c)(2)(A).

870.     Apple had repeatedly spoken publicly about the dangers of NMP (N-Methyl-2-pyrrolidone).[275] Apple placed NMP on its regulated chemicals list and required vendors prove they are not using NMP in their work on Apple's products.[276] Apple (Art Fong) spoke at a December 2021 webinar about Chemical Safety where it discussed the "priority chemicals" to eliminate from manufacturing supply chains, including NMP, Toluene, and TCE – among others.[277] Apple spoke of its new program "*Toward Zero Exposure*" where it committed to protect workers from exposure to chemical hazards.

871.     Apple's Clean Air Act and TRI reports for the 3250 Scott Blvd factory only included emissions for 2020. For all other years Apple was operating, Apple's failure to file

---

[275] GreenScreenChemicals,
  https://www.greenscreenchemicals.org/images/ee_images/uploads/resources/Safer-Cleaners-for-Electronics-Slides-20211215.pdf ; https://www.apple.com/environment/pdf/Apple_Prioritizing_Chemicals_2018.pdf;
[276] Apple, Regulated Substances,
https://www.apple.com/environment/pdf/Apple_Regulated_Substances_Specification.pdf
[277] GreenScreenChemicals, *supra*, at page 46.

247

reports inferred zero emissions, which is clearly false. Apple lied about its practices and Apple's lies show intentional harm.

872.    On May 28 2021, Apple submitted an application to the US EPA for "EPA Safer Choice Partner of the Year Award." Apple wrote, "*Volatile organic compounds (VOCs) are commonly found in consumer products and related manufacturing processes. VOCs are also major contributor to smog and overall poor air quality, which can adversely affect human health in local communities, making it not just an environmental issue, but an issue of environmental justice. While proper ventilation and engineering controls can protect the health and safety of those working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities.*" This is clearly false. Apple knows what the right thing should be, but intentionally chose not to do it (ie, 3250 Scott Blvd).

873.    Apple began leasing the 3250 Scott Blvd facility in 2014. They started renovations and operations (including hazardous waste generation and hazardous material storage) in 2015 but only contacted DTSC in November 2016 to begin the permitting process. On November 8, 2016, Apple submitted a Phase 1 tiered permit application. The 2016 DTSC application asked if there was knowledge of disposing of hazardous wastes in or under the property, and the applicant said "no." However, Apple admits in the application to a prior environmental assessment for the property, and Apple submitted a planning package to the city, which shows the applicant knew the property contained at least an "*acid neutralization plant,*" "*acid waste tank,*" and "*acid neutralization pit.*" All of these are for waste treatment and disposal.

874.    A quick public records search, and the review of the environmental report would both note that the site is directly next to an active US EPA Superfund site (Synertek,

248

CAD990832735) with a groundwater plume of solvents that extends under the property caused by spills and leaks. The same person, Jenab, owns both properties.

875.    Apple's August 2021 ESG report, which Apple references frequently in their SEC filings, states: *"Apple is committed to compliance with applicable export and sanctions laws. All employees are responsible for complying with these laws and reporting possible violations."[278]* Each time the report and any similar communications was emailed or shared digitally is wire fraud. Each time it was mailed, was mail fraud. Apple intentionally violates these laws as its standard practice. The statements are is false.

876.    An example of evidence supporting Apple's practices not matching their statements is Apple's "*Spill Response and Employee Hazardous Waste Training*" guide. Apple's guide prohibits employees from being trained on how to deal with chemical spills or hazardous waste. The guide requires that in case of a chemical spill the employee call Apple Global Security and they will decide if anyone tells the government (they do not) and they will send a third-party vendor to deal with the spill. This is a facially unlawful training policy.

877.    Gjovik complained of fraud with the cracks in floor at her Superfund office because Apple was supposed to report a "change of circumstance" to the US EPA and work with US EPA oversight to evaluate and fix a compromised mitigation system. Gjovik was concerned that Apple's standard operating procedure seemed to be lawlessness, which is the opposite of how they claim they operate.

878.    Apple's actions related to the HVAC and Sub-Slab Depressurization systems at 825 Stewart, and failure to install exhaust monitoring and abatement systems at 3250 Scott Blvd, likely violated 42 US Code 7413(c)(1) by constructing new sources and modifying existing sources, failing to comply with design and work practices, and emitting hazardous pollutants in

---

[278] Apple, 2021 ESG Report,
https://s2.q4cdn.com/470004039/files/doc_downloads/2021/08/2021_Apple_ESG_Report.pdf

violation of NESHAP. It is a criminal violation of 42 US Code 7413(c)(2)(C) to fail to install monitoring devices required by the Clean Air Act.

879.    In April 2023, Apple engaged in various schemes intending to frighten, frustrate, and intimidate Gjovik about the information she recently discovered about 3250 Scott and its air emissions. One of these schemes was an anonymous account (assumably Apple) sent her an email via the webform on her website claiming to be ex-US EPA enforcement and after commenting on a suspicious number of details about Gjovik's environmental complaints against Apple, then threatened her to stop talking about the NMP release. To support the threat, the person (Apple) claimed they had EPA insider information about an NMP air emission study that occurred on or after 2015. The email came from an IP flagged for spam and included certain details that seemed improbable for an actual US EPA employee to say. This email, among other felonies, was potentially "*False Impersonation of Federal Officer or Employee*" (18 U.S.C. § 912).[279] The email was sent as part of Apple's scheme to not comply with environmental laws, but claim it does, and use fraud, obstruction, and intimidation to silence anyone who could prove and report Apple's fraud – thus the email is another count of predicate act wire fraud.

880.    Apple knowingly omitted material information and/or made false statements and/or knowingly generated, stored, treated, transported, disposed of, exported, or otherwise handled hazardous waste without filing the appropriate documentation which is a felony offense under the Resource Conservation and Recovery Act and Clean Air Act.[280] Apple knowingly and intentionally manipulated and concealed scientific data in order to conceal its criminal conduct. Apple committed the above-mentioned violations while knowing it endangered others by engaging in this fraud.

---

[279] False Impersonation of Federal Officer or Employee (18 U.S.C. § 912). *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).
[280] 42 U.S.C. § 6928(d)

### 2) Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512) [281]

881.    Gjovik began meeting with the, U.S. NLRB and U.S. EEOC before she was fired, providing statements and evidence about her retaliation concerns. Gjovik has stated publicly in the press, in legal filings, and on social media, since August 2021 and ongoing, that she filed charges that would initiate communications with federal authorities and that she planned to vigorously participate in any investigation into Apple for their conduct against her which she reasonably believed was unlawful.[282] Many of the threats, intimidating and harassing messages, and corrupt acts were done acknowledging Gjovik's federal charges, cases, and proceedings. There is no question Apple understood the federal and criminal implications of their intimidation.

882.    Section 1512 applies to the obstruction of federal proceedings: judicial, congressional, or executive.[283] It consists of four somewhat overlapping crimes: use of force or the threat of the use of force to prevent the production of evidence; use of deception or corruption or intimidation to prevent the production of evidence; destruction or concealment of evidence or attempts to do so; and witness harassment to prevent the production of evidence.[284]

883.    Here, 18 U.S.C. 1512 (a) is implicated as assumed agents of Apple Inc referred to Gjovik's protected activities as "*worthy of death*" (Sept 7, 2021), and made references to Gjovik

---

[281] 18 U.S.C.A. § 1961 (B)

[282] *United States v. Guadalupe*, 402 F.3d 409, 412 (3d Cir. 2005).

[283] 18 U.S.C. § 1515(a)(1) ("official proceeding" means "a proceeding before a judge or court of the United States," "a proceeding before the Congress," "a proceeding before a Federal Government agency which is authorized by law," or "a proceeding involving the business of insurance whose activities affect interstate commerce . . .")

[284] Congressional Research Service, Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities, April 17 2014

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

dying from "*double tap*" gunshot wounds (Dec 20 2021[285]), that in Russia Apple whistleblowers

would die from a "*car accident*" (Oct 15 2021). The day she was fired an Apple account posted

on an article about Gjovik that he wanted Apple to "*hunt [leakers] down like wild animals*" and

they "*want to see them destroyed*" (September 9, 2021[286]). One Twitter account, Beezie Wacks,

posted on Sept 10, 2021, the day after Gjovik was fired, that the world was "*reaming*" her and

that Gjovik deserved it. The account also paid to promote (advertise) the post. Another account

posted a photo of a ban holding a baseball bat and wrote that Tim Cook was "*gonna f@*k some*

*peeps up*" (September 22, 2021[287]). Another Apple account was repeatedly, directly harassing

Gjovik on social media and at one point referenced what was happening to Gjovik as "*the nail*

*that sticks out, gets hammered*" (Jan 29, 2022[288]).

884.    Gjovik's NLRB affidavit was to be taken the day after she was fired. When

Workplace Violence interrogator unexpectedly reached out to her on September 9, 2021,

insisting he must talk to her within the hour, having never met the interrogator or heard of his

"Workplace Violence" team before, Gjovik wrote she was concerned he was intimidating her the

day before her affidavit as a federal witness against Apple Inc. Gjovik was fired a few hours

later without explanation.

885.    Upon reviewing Apple policies, the only mention of "Workplace Violence"

includes: "*Workplace violence includes, but is not limited to, physical aggression, verbal or*

---

[285] Reddit, now deleted user,
https://www.reddit.com/r/technews/comments/rkyslb/apple_employee_blows_whistle_on_illegal_spying/hpg6bzu/?utm_source=share&utm_medium=web2x&context=3
[286] Reddit: 22 Sept 2021, @pacmandaddy,
https://www.reddit.com/r/apple/comments/pt91m5/tim_cook_says_employees_who_leak_memos_do_not/hdv5qbj/
[287] MacRumors, 22 Sept 2021, https://forums.macrumors.com/threads/apple-ceo-tim-cook-in-leaked-memo-we-are-doing-everything-in-our-power-to-identify-leakers.2312633/page-2
[288] Twitter, I'mPinkThereforeI'mSpam (@I_mspam),
https://web.archive.org/web/20220130031154/https://twitter.com/i_mspam/status/1487549097070379008

*written threats, stalking, or destruction of property."* It is entirely unclear why this team was contacting Gjovik if not to intimidate and threaten her with at least an implied threat of violence.

886.    Later, Apple would claim Gjovik's termination was due to statements Gjovik made on August 28 and August 30, a full 10-12 days prior, yet on Sept 9th, 2021, Kagramanov insisted Gjovik get on the phone with him "*within the hour*." After her termination via email that day, Gjovik would not hear of the proffered reasons for her termination until September 15th, six days later. It is clear Kagramanov did not actually have a legitimate reason he planned to terminate Gjovik for on that day.

887.    An employer's termination, demotion, or harassment against an employee, caused by an employer's racketeering, under certain circumstances can constitute a RICO predicate act under § 1512.[289] There is no evidence any of Apple's agent's intimidating, harassing, and threatening conduct was actually good faith encouragements for Gjovik to testify truthfully.[290] Instead, Apple's agents even openly admitted they would continue terrorizing her until she dropped her charges and made specific false statements. They presented a false story to Gjovik of Gjovik's own experience and demanded Gjovik repeat that false story as if it were true.[291] (*She asked to be on leave. She leaked IP. She deserved to be fired*. etc.)

888.    Agents of Apple Inc wrote Gjovik was "*deserving of misery*," that they looked forward to seeing Apple "*swallow her & spit her out*," and that she is lucky Apple has not "*crushed her like a bug*." They posted "*She's a senior manager at Apple and going on a tirade against them over the ground beneath the building. What did she expect to have happen to her*?"

---

[289] *Dooley v. United Techs. Corp.*, No. CIV. A. 91-2499, at *5 (D.D.C. June 17, 1992)
[290] *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013); *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005) ("Cruzado did ask that they tell the truth; however, his version of 'the truth' that he urged upon them was anything but the truth")
[291] *United States v. LaShay,* 417 F.3d 715, 718 (7th Cir. 2005) ("corrupt persuasion occurs where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it")

and *"Apple fired you because they already know how this ends… They waited and looked for a policy violation, found it, and booted you."* Another wrote that as a *"seasoned employee, she more than others, was well aware of the consequences of airing dirty laundry,"* and Apple should *"have fired her weeks ago."*

889.    When Gjovik suffered harassment and intimidation that was openly said to be due to her federal cases, the focus was often Gjovik's NLRB charges. The interference extended to a lawsuit against Gjovik 'because of' Gjovik's NRLB charges, emails to Gjovik demanding she alter her testimony, emails demanding Gjovik omit certain evidence, and direct interference with the NLRB investigators overseeing Gjovik's charges and the resulting investigation. (NLRB investigators are considered Federal Officers under criminal statutes).[292]

890.    Apple committed Obstruction by Intimidation, an indictable offense under §1512(b) of tampering with a witness: a violation of federal law. Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik.[293]  Apple acted with intent to influence, delay, and prevent the testimony of Gjovik with NLRB, US SEC, US Department of Labor, California Department of Labor; or cause or induce Gjovik to withhold testimony and withhold document from the same, or cause or induce Gjovik to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in the same. Several of these cases

[292] 9-139.800 Interference with National Labor Relations Board Agent (29 U.S.C. § 162).
[293] *United States v. Khatami*, 280 F.3d 907, 911-12 (9th Cir. 2002)("Synthesizing these various definitions of "corrupt" and "persuade," we note the statute strongly suggests that one who attempts to "corruptly persuade" another is, given the pejorative plain meaning of the root adjective "corrupt," motivated by an inappropriate or improper purpose to convince another to engage in a course of behavior-such as impeding an ongoing criminal investigation"); *United States v. Gotti*, 459 F.3d 296, 343 (2d Cir. 2006)("This Circuit has defined 'corrupt persuasion' as persuasion that is 'motivated by an improper purpose.' *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

were federal proceedings and Apple intended to prevent Gjovik from cooperating with authorities.[294]

891.    Here, 18 U.S.C. 1512(b) is implicated as Apple employees & assumed agents of Apple Inc suggested Apple Inc should / will sue Gjovik for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees and agents suggested appropriate consequences for Gjovik's protected activity included jail, the death penalty, *"suing her into oblivion," "ending her," "destroying her," "ruining her,"* and bankrupting her. Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as *"invited upon herself"* like *"walking down a dark alley," "finding out"* for *"fucking around," a "self-fulfilling prophecy,"* and the *"consequence"* of *"airing Apple's dirty laundry."*

892.    Joanna Appleseed, on behalf of Apple Inc tried numerous times (including January 7th - 8th 2022 and February 5th, 2022) to coerce Gjovik to withdraw, retract, or otherwise stop a Wikipedia Arbitration Committee investigation into an account harassing Gjovik via Gjovik's Wikipedia article and which Gjovik alleged to be Appleseed or someone on Apple or Appleseed's behalf, but either way acting at the direction of Apple to smear and intimidate Gjovik. Wikipedia banned Gjovik and refused to tell her why, but later admitted 'because she filed an NLRB charge against Apple.' Gjovik complained to Wikipedia legal as that seems unlawful. In November 2022, the account harassing Gjovik was identified to be Appleseed and was banned herself.

893.    Apple Inc agents also threatened to denylist Gjovik from the technology, engineering, and legal employment fields: including *"never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the*

---

[294] 18 U.S. Code § 1512 (b) - Tampering with a witness, victim, or an informant

*California bar association's Moral Character investigation, and never getting a job anywhere again other than working in fast food."* (September 13 2021).

894.    Here, 18 U.S.C. 1512(c) & (d) are implicated as Apple managers, employees, and agents have referred to Gjovik's complaints to the federal and state government about Apple Inc as "*unsubstantiated*," "*meritless*," "*baseless*," "*dead in the water*," and that there's "*no case*." Apple's agents referred to Gjovik as an "*ambulance chaser*" and her cases as "*shakedown lawsuits*." Apple manager Ricky Mondello and ex-Apple employees Joanna Appleseed and Shantini Vyas have publicly called Gjovik a "*liar," "predator," "racist," "inconsequential," "not a real whistleblower."* These parties have described Gjovik's protected activities as a "*vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric*," and "*misinformation*." Among other things, Apple Inc & their agents have publicly called Gjovik a "*liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility, dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist, 'universally hated,' a psychopath, paranoid, Bipolar, psychotic, schizophrenic, a grifter, a Karen, a Super Karen, Karenx100, a 'typical feminist,'* and a *'classic cow'*.

895.    Apple knowingly used intimidation, threatened, and/or corruptly persuaded Gjovik, or attempted to do so, or engaged in misleading conduct toward Gjovik. Apple acted with intent to influence, delay, and/or prevent Gjovik from communicating to federal officers and law enforcement authorities' information relating to the commission or possible commission of an offense. There is a reasonable likelihood that at least one of Gjovik's communications targeted by Apple would have been made to a federal officer. The information that would have been communicated by Gjovik related to the possible commission of a federal offense. [295]

---

[295] 18 U.S. Code § 1512 (d) - Tampering with a witness, victim, or an informant

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

896.     The US Department of Justice describes examples of victim and witness intimidation including explicit or implicit threats of physical violence, property damage, courtroom intimidation, public humiliation of victims or witnesses (or their friends and families), parking outside the victim's or witness's house, nuisance phone calls, vague verbal warnings, threatening looks and gestures directed at the witness or victim in court, economic threats, and threats of deportation (all of which Apple has done to Gjovik).

897.     n situations where the Defendant aims for communitywide noncooperation there may also be assault, public humiliation of suspected informants, and random public acts of extreme brutality intended to terrify potential witnesses.[296] (i.e., "*don't get Gjovik'd*")

898.     Apple's presence in Silicon Valley is directly comparable to the community where a gang operates as both are worlds unto themselves—"*places where people live, attend school, and work, all within a radius of only a few blocks—from which they rarely venture out.*" Hearing about what Apple did to Gjovik is likely to silence anyone else.

899.     Even Gjovik's July 2021 Slack threat about retaliation showed how many people Apple had hurt and how silent they had been about it, and that Apple was silencing complaints at a mass scale.

900.     Apple's scheme with the enterprise to intimidate Gjovik to not participate in legal activities related to Apple, and to retaliate against her for what she had already done, included sending agents (employees, ex-employees, contractors, vendors, etc.) to her home to stand by and walk around the courtyard of her Santa Clara apartment, to follow her when she ran errands, to drive up to her New York apartment and capture videos/photos of her, and to send someone to

---

[296] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Research in Action: Victim and Witness Intimidation* (October https://www.ojp.gov/pdffiles/witintim.pdf 1995).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

stand on her New York sidewalk until she left the apartment and to send Gjovik notification she was being watched by the person.

901.    In California, Apple delayed, lingered, prowled, and/or wandered on the private property of Gjovik's apartments. Apple was on that property without a lawful purpose and intended to commit a crime if the opportunity arose. Apple's purpose was to commit a crime if the opportunity arose, which they did including by threatening Gjovik by taking unwanted photos and videos and looking into the home windows, of a federal witness, with an intent to intimidate;[297] by using social media accounts to harass Gjovik about the real-world events she was experiencing in real time, and at least once fleeing the scene when caught by a neighbor who said she would call police officers.[298]

902.    Apple maliciously and unlawfully damaged/obstructed/disconnected part of a telephone/cable/electrical line, or equipment connected to the line – and Apple maliciously and unlawfully made an unauthorized connection with part of a line used to conduct electricity or equipment connected to the line – when Apple broke into Gjovik's Santa Clara apartment and attic to install some sort of electronic equipment above her home office, assumably intercepting the electrical and internet lines.[299]

903.    Apple entered a residential apartment/room within a locked residential building and intended to commit felonious acts at least including installing surveillance equipment in Gjovik's attic, bugging Gjovik's chattels, replacing the batteries in their prior bugs in Gjovik's chattels, and obstructing/interfering with Gjovik's internet access.[300] Apple, and/or an agent of

---

[297] California Penal Code § 647i "Peeking"
[298] California Penal Code § 647(h) "Loitering"
[299] California Penal Code § 591 "Damaging Phone/Electrical Lines"
[300] California Penal Code 459 "Burglary"

258

Apple, willfully entered Gjovik's apartment without the consent of Gjovik and Apple had no lawful reason to do so.[301]

904.     Apple intentionally listened to or recorded a conversation/communication using an electronic amplifying/recording device without consent from all individuals who were party to the conversation/communication, and at least one of the other individuals who were party to the conversation/communication intended that the conversation/communication be confidential and had objectively reasonable grounds to believe it would be confidential. Apple violated 632(a) at least when it intercepted or otherwise overheard Gjovik's phone calls with the Santa Clara District Attorney's office, and a separate call with a lawyer in Seattle Washington, and a friend in Canada – which were the three phone calls where Gjovik's internet/cell connection dropped at very suspicious times in the call, and in the matter with the Canadian, both of their Wi-Fi connections were taken down at the same time and had to be rebooted – and these three events led to Gjovik's investigation which found the bugged objects in her home.[302]

905.     In addition, several government employees who participated in the enterprise's scheme engaged in conduct with at least Gjovik that is likely criminal. The first NLRB investigator, Alex Hajduk threatened Gjovik to obtain her signature on a document with her affidavit but which he also tampered with and threatened Gjovik not to correct or otherwise modify. In violation of California Penal Code § 141,[303] the NLRB investigator willfully, intentionally, and wrongfully changed Gjovik's affidavit to plant new information in the document which came from Apple's lawyers, not Gjovik, but the investigator made the affidavit appear as if Gjovik testified to it under oath. The investigator intended that his action would result in Apple's proffered reason for firing Gjovik to be wrongfully produced as Gjovik's

---

[301] California Penal Code § 602.5 "Trespass into Dwelling"
[302] California Penal Code § 632(a) "Eavesdropping and Recorded Communication
[303] Cal Penal Code 141 PC – crime to tamper with evidence or to plant evidence in any legal matter

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

genuine and true belief that could be a reason Apple fired her before Apple contacted her about the matter.

906.    He violated Cal. Penal Code § 522[304] when he threatened Gjovik that if she was to attempt to correct the document to only reflect what she actually said during her testimony, that her actions would expose by Apple and used by Apple to claim she is dishonest, lying about the retaliation, and felt it possible she was fired legitimately for cause. Hadjuk threatened Gjovik and a result of the threat, Gjovik signed the affidavit as prepared by the Investigator. The investigator also wrongly claimed Gjovik was not allowed to provided evidence in her charges and if she was to do so, the entire case may be thrown out. Hadjuk's actions also violate Penal Code 137(b) "Influencing a Witness by Fraud". Hadjuk used fraud against Gjovik with intent to cause Gjovik to withhold true testimony/information and give false testimony/information. The investigator made false statements, misrepresented information, and hid the truth with intent to deceive. Gjovik reported this to NLRB OIG in January 2022, who confirmed an investigation. Gjovik's case was transferred to a different region several weeks later.

### 3) Retaliating against a Witness, Victim, or an Informant (18 U.S. Code § 1513) [305]

907.    Gjovik put her career and physical safety at risk in order to obtain evidence of what she believed to be criminal acts and violations of federal law.[306] Gjovik worked with state and federal agencies, and law enforcement, to report issues starting in September 2020 with the chemical exposure issues next to 3250 Scott Blvd. Gjovik spent much time gathering information and evidence for the government to support her claims that something was wrong. When the government asked her for more information or a new type of data, Gjovik always

---

[304] Cal Penal Code § 522 PC -- crime to obtain another person's signature to a legal document by means of extortion
[305] 18 U.S.C.A. § 1961 (B)
[306] *United States v Joy Edwards,* United States Court of Appeals for the Sixth Circuit, No. 18-3541 (2019).

followed their instructions and was usually able to gather the data they wanted. These activities included Gjovik entering public, common, or general use areas but stealthily attempting to gather photos, videos, audio recordings, and scientific measurements like air quality readings.

908.    For example, one night at her apartment, Gjovik went up to the roof of her building through public, unlocked doors but around 11:30pm when she thought no one would be around. She brought with her tVOC monitors and other testing equipment. Once outside on the roof she set up the equipment and began taking photos of the utility lines and vents around her in attempt to figure out where the chemical fumes were coming from. Gjovik was confronted by a private security guard who questioned her about what she was doing. Gjovik became very nervous but showed him the tools and said she was testing the air, showing him the readings, and then Gjovik quickly left the roof. Gjovik's actions were not trivial.

909.    At Gjovik's office in July and August, Gjovik concerted with coworkers about gathering at least photographic evidence of the cracked Superfund floor and they did gather photos of the cracks before Apple could repair them. Gjovik talked with coworkers about doing their own indoor air testing. Gjovik shared information with the US EPA and her disclosures about the cracks led to an onsite inspection of the office which found issues. Gjovik was swiftly 'removed from the workplace and all workplace interactions' following the photography, talk of her own testing, and prior to the inspection.

910.    Apple even openly admitted to retaliating against Gjovik for her complaints about the Gobbler application, a clear violation of California state law and federal NLRB and FTC laws. While Gjovik initially brought her complaints about Apple's Gobbler practices to the press and public, and Apple said that is why they fired her, Gjovik continued to raise the issue filing additional charges to the federal government and law enforcement about Gobbler and also Apple's position on it. Apple continued to retaliate against Gjovik for doing so.

911.    Even the evidence noted in this complaint post-termination was diligently gathered by Gjovik in preparation of filing additional complaints to the US government about Apple's ongoing misconduct. Gjovik diligently documented and preserved Apple's deranged harassment. Most people would have given up – or at least would not have the strength to create a memo of this type of harassment. Gjovik did, and so Apple retaliated even more.

912.    Apple retaliated against a Federal Witness & Informant in violation of § 1513(b). Apple knowingly engaged in conduct with intent to retaliate for testimony given and records/documents produced by Gjovik in an official proceeding, and for Gjovik providing information relating to the commission or possible commission of a federal offense. Apple's conduct threatened to and did cause bodily injury to Gjovik and damaged Gjovik's property. Apple also conspired to commit one or more § 1513(b) offenses.

913.    Apple retaliated against a Federal Witness & Informant in violation of § 1513(e). Apple knowingly, with the intent to retaliate, took action harmful to Gjovik, including interference with the lawful employment or livelihood of Gjovik, for Gjovik providing to a law enforcement officer truthful information relating to the commission or possible commission of any Federal offense. Apple also conspired to commit one or more § 1513(e) offenses.

914.    Apple's harassment against Gjovik was serious acts and courses of conduct directed at Gjovik that caused substantial emotional distress to Gjovik and served no legitimate purpose. Apple's intimidation of Gjovik was serious acts and sources of conduct directed at Gjovik that caused fear or apprehension of Apple by Gjovik, and served no legitimate purpose. The serious acts are threatening, retaliatory, harassing, and violent conduct that reasonably influences the willingness of a victim or witness to testify or participate in a federal criminal

case or investigation. An individual who affirmatively conceals the commission of a §1513 by another is guilty of misprision.[307]

915.    Appleseed made numerous derogatory posts on social media about a federal informant and witness who testified against Appleseed's team at Apple, a team which leads the criminal enterprise at issue in the RICO claim. Appleseed's posts intended to retaliate and did cause Gjovik harm. There is no question that Appleseed's posts were in response to Gjovik's testimony.[308] Intent can be proven through circumstantial evidence, such as: (1) "the natural consequences likely to flow from the [retaliator's] actions," including fear on behalf of the witness.[309] This is also like the case with Apple's many fake social media accounts and Apple's harassing emails.

916.    In *U.S. v Camick*, the filing of a Civil Rights Lawsuit was found to violate 18 U.S.C. § 1513. As it was found to be filed with an intent to retaliate against a federal witness.. [310] Like *Camick*, Apple waited a suspicious amount of time to approach Gjovik at all about the concerns they later hired very powerful attorneys to email her about on October 15, 2021, implying they may sue Gjovik over those concerns. This was only after Apple terminated Gjovik and needed to search for a pretextual explanation – and were also looking for ways to threaten and intimidate her from pursuing legal charges against them.[311] Similarly, Applegate only sued Gjovik after Gjovik reported Applegate to agencies and law enforcement.

---

[307] CRS Reports for Congress, Obstruction of Justice: An Abridged Overview of Related Federal Criminal Laws, RS22783 (2007); 18 U.S. Code 4, *The elements of misprision of felony under 18 U.S.C. 4 are (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) defendant took steps to conceal the crime.*
[308] Intent may, and generally must, be proven with circumstantial evidence. *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007).
[309] *United States v. Stoker*, 706 F.3d 643, 646 (5th Cir. 2013)); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014).
[310] *U.S. v Camick,* 796 F.3d 1206 (2015).
[311] *EEOC v Outback Steakhouse,* 75 F. supp 2d 756 (ND Ohio 1999)

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                          OCTOBER 25 2023

917.    A defendant's liability can be based on its falsification, destruction, and misrepresentation of evidence during a judicial proceeding.[312] In fact, while common law often immunizes testimony from prior judicial proceedings, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity.[313] Apple's lawfare was not protected, including their letter about face Gobbler and Appleseed's lawsuit against Gjovik.

918.    The chilling effect of Apple's retaliation against Gjovik has been noted in articles, blog posts, social media, and even turned into memes. Gjovik's ex-coworkers began using the phrase "*get Gjoviked*" as slang for getting fired for speaking out about work conditions. Employees shared the term on message boards and Twitter (You are going to get "*Gjoviked*"). Further, a submission from an employee to the "AppleToo" employee group stated, "*even as we're writing this, we write it with fear, fear of getting single out and retaliate against, even though HR policy stats that Apple do not tolerate retaliation, after reading what Ashley Gjovik went through, we think the retaliation is real*."

919.    Here, it was clear the adverse actions Apple took and continues to take against Gjovik are in retaliation for her protected activities. Timing and ongoing antagonism have often been the basis for the causal link. Where there is a lack of temporal proximity, circumstantial evidence of a `pattern of antagonism' following the protected conduct can also give rise to the inference.[314] The causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two. In *Robinson v. SEPTA*, the intervening pattern of antagonism was so strong that it overcame the lack of temporal proximity and, alone, proved the causal link. There was no need to look beyond this

---

[312] See, Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co., 336 F.Supp.2d 1239, 1267 (S.D.Fla.2004)
[313] 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant).
[314] *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1  pattern for other circumstantial evidence.[315] Apple's retaliation against Gjovik has been swift,

2  continuous, and merciless.

3

4      viii.    **Predicate Acts Indictable Under Title 11 USC (Securities)** [316]

5          1)  **Securities Fraud (15 USC § 78)**

6      920.    Section 1961(1)(D) defines racketeering activity any offense, including attempts

7  and conspiracies, involving fraud in the sale of securities punishable under any law of the United

8  States.[317] The US government has repeatedly accused Apple of securities fraud in violation of

9  federal law.

10     921.    In 2007, the US SEC charged Apple executives with more than 13 counts of

11 securities violations, including at least five fraud charges including false statements to auditors,

12 false reports, falsifying records, circumventing internal accounting controls, and false proxy

13 statements.[318] Apple's corporate secretary and general counsel Nancy R. Heinen created falsified

14 'Board Meeting' notes for a meeting that never happened in order to back date stock grants for

15 Apple executives. Heinen also falsified Committee meeting notes as part of the scheme. The

16

17 fraud caused Apple to underreport it expenses by nearly $40 Million.

18     922.    In 2019, Gene Levoff (Apple's head of Corporate Law and corporate secretary

19

20 after Heinen) was indicted by the SEC for twelve felony counts of fraud based on insider

21 trading: six counts of wire fraud and six counts of securities fraud. In 2022, Levoff pled guilty to

22 six counts of securities fraud and agreed to a settlement agreement.[319] Levoff was the senior

23

24 ────────────────

[315] *Robinson v. SEPTA*, 982 F.2d 892 (3d Cir. 1993).

25 [316] 18 U.S.C. § 1961(1)(d)

26 [317] *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993); *United States v. Bledsoe*, 674 F.2d 647 (8th 1982); *United States v. Pray*, 452 F. Supp. 788 (M.D. Pa. 1978).

27 [318] US SEC Complaint against Apple Inc, 2007, https://www.sec.gov/files/litigation/complaints/2007/comp20086.pdf

28 [319] The Private Securities Litigation Reform Act of 1995 ("Reform Act") amended RICO to eliminate securities fraud as a predicate act except where the defendant has been criminally convicted of the securities fraud. 18 U.S.C. § 1964(c); see also Powers v. Wells Fargo Bank,

lawyer at Defendant who oversaw 'corporate law' and all SEC filings and compliance, including company-wide ensuring compliance with insider trading laws. Levoff's defense on the criminal charges was claiming that insider trading laws were a violation of the US Constitution.

923.    Gjovik accused Apple of fraud and violating securities law in July-August 2021 and filed her first SEC whistleblower tip about it on September 1, 2021. Gjovik complained Apple had been making materially false statements about their actual environmental, labor, and regulatory compliance practices to shareholders and the SEC. Gjovik also accused Apple of a conflict of interest with Ronald Sugar and her Superfund office. She was concerned, due to the poor condition of her office, and Apple's fervent cover-up about it, that Sugar had used his position on Apple's Board of Directors to influence Apple in ways to benefit his prior company, Northrop Grumman (i.e., interested party transactions, RESPA, etc.). Gjovik was also concerned he had a personal interest in covering up Gjovik's concerns in order to protect Northrop Grumman. The owner of Gjovik's office was CalSTRS, one of Apple's largest shareholders. Fraudulent regulatory filings about her office, including omission of required information to the US EPA, would defraud a key shareholder (with CalSTRS owning around $4 Billion of Apple stock in 2021.[320]

924.    Gjovik's concerns included public misstatements and fraudulent claims about Apple's actual environmental practices compared to what Gjovik saw internally (reckless disregard for the law and public safety), Apple's actual labor practices (Apple is actually one step away from installing the Foxconn "suicide nets" at Apple Park[321]), and Apple's general

---

NA, 439 F.3d 1043, 1045-46 (9th Cir. 2006) (vacating dismissal of claim against defendant who had been convicted of securities fraud, but affirming dismissal of claims against co-defendants who had not been convicted).

[320] 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5

[321] CNN, *Apple employee found dead at HQ shot himself*, 2016, https://money.cnn.com/2016/04/28/technology/apple-employee-death-gun-suicide/index.html ; The Verge, *APPLE'S FRONTLINE EMPLOYEES ARE STRUGGLING TO SURVIVE*, 2021,

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                          OCTOBER 25 2023

regulatory compliance and issue investigation practices (which is just mostly witness intimidation and retaliation). Apple promotes these topics and the false claim they are ethical leaders in these fields to attract customers to buy their products and to encourage investors to buy and hold Apple stock.

925.    As noted in the Wire & Mail Fraud sections, Gjovik also discovered concrete evidence of Apple's fraudulent statements to shareholders and the SEC about their environmental practices. Apple's SEC filings and proxy statements include 'Environment Progress Reports' which include detailed reporting on Apple's air emissions and hazardous waste generation. The items below are also included in mail/wire fraud.

926.    For instance, Apple reported that in 2021, they sent 1,599 tons of hazardous waste to disposal facilities from corporate facilities globally. Based on manifests, 512 tons of that global waste (32%) came from the facility at 3250 Scott Blvd.

927.    Apple also noted on the amount of waste they "diverted from landfills" and highlighted this number in the report under program they called "Zero Waste" saying they are moving towards "*waste-free operations*". Apple claimed in 2021 they "diverted" 491,000 tons of waste. Apple said, "*we maintain our commitment to the safe and responsible management of hazardous waste, both onsite and offsite.*"

928.    Meanwhile, at least at 3250 Scott Blvd, we have learned the way Apple was 'diverting' waste was blasting solvent fumes and toxic gases out their exhaust vents and into apartment windows.[322] Apple tells its shareholders it is engaging in environmentally friendly practices in order to reduce waste, however Apple is only reducing the paper trail and cost of its waste by illegally disposing of dangerous chemicals into residential neighborhoods.

---

https://www.theverge.com/c/22807871/apple-frontline-employees-retail-customer-service-pandemic
[322] Apple, 2022 Environmental Progress Report,
https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2022.pdf

267

929.    Apple knew exactly how dangerous those emissions were and still did it, and while they gassed a neighborhood, they also made public statements about the dangers of the same chemicals. For instance, Apple banned the use of NMP in their supply chain for years due to safety concerns and Apple even requires vendors to certify that they are not using it. Meanwhile, Apple blasted hundreds of pounds of NMP into Gjovik's windows in 2020.

930.    In 2021, Apple also instituted a "ESG modifier" for executive pay that can increase or decrease Executive Compensation 10% based on environmental (and other) practices. Apple's environmental violations were not just to save money on properly disposing of waste, it was also to inflate stock price with false and misleading claims about their actual practices, and to increase bonuses for the executives.[323] Apple is literally giving executives bigger bonuses for illegally disposing of hazardous waste.

931.    This was not the first time Apple's lied about its environmental practices. For years, Apple's "environmental" ESG branding to shareholders has centered around a claim of running on "Green Energy." In 2015 it was exposed that Apple's claims about its data center in Maiden North Carolina running on 100% green energy were false. Apple had claimed they did not use fossil fuels at the facility, and it was 100% "green" but records showed they did use fossil fuels and only <1% of the energy was "green".[324] Then in 2017, the North Carolina government discovered Apple was also violating environmental and health/safety laws with unauthorized generation, storage, and transport of hazardous waste. Apple was caught transporting waste without manifests, failing to keep records, and failing to report their activities

---

[323] Apple Inc, 2022 Proxy Statement, https://www.sec.gov/Archives/edgar/data/320193/000119312522003583/d222670ddef14a.htm
[324] *Analysts Call Apple Renewable Energy Claims 'Lies,'* The Carolina Journal, 2015, https://www.carolinajournal.com/analysts-call-apple-renewable-energy-claims-lies/

to regulators. Michael Steiger was also heavily involved in the North Carolina data center code violations.[325]

932.    Gjovik also filed a SEC complaint in October 2021 alleging shareholder fraud when Apple had filed a no-action letter trying to block a shareholder vote about Apple's use of overly restrictive NDAs. Apple's response had completely omitted the NLRB was actively investigating Apple's policies based on a NRLB charge Gjovik had filed a week prior. Apple was actively trying to suppress shareholder voting about an issue it knew it was in trouble over and tried to mislead the SEC in order to prevent that vote. As noted, the NLRB confirmed in January 2023 the policies did violate US labor laws. Gjovik has discussed the matter with US SEC Enforcement investigators who did deny Apple's request for a no-action letter.

### i.    Predicate Acts Indictable Under §2332(b)(g)(5)(B)

933.    Subsection G was added to Section 1961(1) and made "any act that is indictable under any provision listed in section 2332b(g)(5)(B)" of Title 18 a RICO predicate offense. 18 U.S.C. § 2332b(g)(5)(B) lists approximately fifty offenses that may constitute RICO predicate offenses under 18 U.S.C. § 1961(1)(G).

### 1)    Relating to Chemical Weapons (18 USC § 229) [326]

934.    The Weapons of Mass Destruction Prohibition Improvement Act of 2004 added 18 U.S.C. §§ 229-229F (relating to chemical weapons) as a RICO predicate offense in Section 1961(1)(B). 18 USC § 229 was created to implement the United States treaty obligations for the "Chemical Weapons Convention."[327]

935.    This case ultimately revolves around facts related to hazardous waste and chemical exposure. Apple did in fact chemical weapon attacked Gjovik's apartment, and then

---

[325] *Apple clean energy project fined for environmental violations*, The Carolina Journal, 2017, https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/
[326] 18 U.S.C.A. § 1961 (G); 18 U.S.C.A. § 2332 (B) (i)
[327] *Bond v US,* SCOTUS Amicus Brief from US DOJ, https://www.justice.gov/sites/default/files/osg/briefs/2013/01/01/2012-0158.mer.aa.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

terrorized Gjovik to cover up their chemical weapon attack, thus a RICO claim to seek remedy for the property damages seems appropriate.

936.    Apple possessed chemicals not intended for peaceful purposes, protective purposes, unrelated military purposes, or law enforcement purposes, as described in 18 U.S.C. § 229F(7).[328] The US government defines "peaceful purposes" in *US v Bond*: "*As a matter of simple English, use of a highly toxic chemical to injure or kill another individual is not use of the chemical for a peaceful purpose. To the contrary, that is use of a chemical as a weapon.*"[329] Further, activities are only peaceful if they are non-malicious and socially beneficial.[330] The statute's mens rea is "*knowing*" which is the same standard for the Clean Air Act. CAA instructs that it is enough the perpetrator know that a release of hazardous air pollutants into the ambient air places another person in imminent danger of death or serious bodily injury, and knowledge of the emissions occurring is enough.[331] The CAA also has a lesser violation for negligent emissions.

937.    The OPCW and Section 299 define "Toxic Chemical" for the purposes of "chemical weapon" quite generally as: "*Any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.*" Similarly, the exception of "peaceful propose" is also quite broad and cases often find general intent to release dangerous chemicals in a way that could cause mass suffering to be sufficient mens rea.

938.    Many cases have referenced chlorine gas as a chemical weapon, even though it is not listed in the Treaty Annex II, and courts have decided "*intending to release chlorine gas into*

---

[328] *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).
[329] *Bond v United States*, Brief for the United States, On Write of Certiorari to the US Court of Appeals for the 3rd Circuit, In the Supreme Court of the United States, No. 12-158
[330] Id.
[331] § 7413(c)(5)(A).

*an apartment building"* was enough to convict.[332] While some toxic gases are commercially available, under *Bond*, they may serve as chemical weapons when used to make gas bombs, thus invoking 18 USC § 229. [333]

939.    At 3250 Scott Blvd, Apple even stored and used chemicals that are listed on the Chemical Weapons Treaty Annex including Phosphorus Trichloride.

940.    Apple also used chemicals listed on Department of Homeland Securities list of "Chemicals of Mass Effect" including arsine, phosphine, and chlorine gases.[334]

941.    Apple repeatedly leaked phosphine gases from the factory at 3250 Scott Blvd, in at least 2019 and 2021. The incident report in 2021 notes Apple vented the phosphine gas into the exterior air (into the apartments).

942.    While sick in 2020, Gjovik would wake up occasionally at 3am feeling like she was dying and with symptoms of heart failure (which Gjovik complained to her doctors about at the time). Heart monitoring showed arrythmias and blood pressure monitoring showed very slow heart rate and very low blood pressure. All of those symptoms match Phosphine and Arsine gas exposure which can quickly become lethal. Gjovik felt like she was dying because Apple had some sort of auto-release of gases at 3 AM and chemical weapon attacked her in her bed, and she probably could have died.

943.    Apple has a great quantity of Arsine gas on site and Gjovik's medical tests from September 2020 showed arsenic in her blood with no other explanation than Arsine gas

---

[332] See *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [Bond] suggested, it may serve as a chemical weapon when used to make a chlorine bomb."); *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *6–7 (D. Haw. Jan. 21, 2021) (defendant who released chlorine gas in a residential neighborhood); *United States v. Fries*, No. 13-10116 (9th Cir. 2015) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood).
[333] See *Kimber*, 777 F.3d at 561.
[334] DHS, Chemicals of Interest, https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

271

exposure. Gjovik had one of those 3am spells before she had her blood and urine tested for chemicals and heavy metals early the next morning. Gjovik's blood showed arsenic at an elevated level but none in her urine. Arsenic in blood has a ~8hr half-life, and only shows in blood but not urine when exposed to Arsine gas (instead of ingesting arsenic). Apple chemical weapon attacked Gjovik with Arsine gas in her bedroom. Arsine gas becomes life threatening at only 0.91 parts per million over 10 minutes. There is no antidote for arsine gas poisoning.[335]

944.    Multiple occupational and environmental exposure doctors told Gjovik all of her symptoms were consistent with solvent exposure and other chemical exposures. The most noteworthy correlation was that exposure to solvent vapor and other gases can cause decreased heart rate (see below), volatile blood pressure (which Gjovik had confirmed via 24-hour blood pressure monitor), the rashes and burns on Gjovik's body, and Gjovik's symptoms of dizzy spells, fainting, numbness, and muscle spasms.



*Exhibit: Gjovik's Heart Rate (Dipping in 2020)*

945.    Apple was cited in 2020 for failing to report its stockpile of Chlorine gas at 3250 Scott Blvd to regulators. Apple also has a history of gassing its employees with Chlorine. At

---

[335] US CDC, *Arsine Emergency Response,*
https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750014.html

least two chlorine gas leaks have been reported at Apple facilities. In 2012 there was a chlorine

gas leak at an Apple factory which killed one worker and injured another four workers.[336] There

was a chlorine gas leak at an Apple data center in 2015 resulting in an evacuation, HazMat

response, and multiple employees taken to the hospital.[337]

946.    Gjovik's blood and urine medical tests also revealed the presence of several other

industrial chemicals including Toluene (Hippuric Acid) and Xylene (2-3-4 Methylhippuric Acid

(2,-3-,4-MHA) in her urine.



*NOAA: Phosphine*



*NOAA: Arsine*

---

[336] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 2012, https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-flna714480

[337] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015, https://www.theregister.com/2015/06/01/apple_data_center_chlorine_gas/ ; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015, https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                        OCTOBER 25 2023



**Chemical Datasheet**  [Add to MyChemicals] [Print Friendly Page]

## CHLORINE

Chemical Identifiers | Hazards | Response Recommendations | Physical Properties | Regulatory Information | Alternate Chemical Names

### Chemical Identifiers
What is this information? ▶

| CAS Number | UN/NA Number | DOT Hazard Label | USCG CHRIS Code |
|---|---|---|---|
| 7782-50-5 | 🔍 1017 | Poison Gas Oxidizer Corrosive | CLX |

| NIOSH Pocket Guide | International Chem Safety Card |
|---|---|
| Chlorine | CHLORINE |

**NFPA 704**

| Diamond | Hazard | Value | Description |
|---|---|---|---|
| | Health | 4 | Can be lethal. |
| | Flammability | 0 | Will not burn under typical fire conditions. |
| | Instability | 0 | Normally stable, even under fire conditions. |
| | Special | OX | Possesses oxidizing properties. |

(NFPA, 2010)

*NOAA: Chlorine*

---

**Chemical Datasheet**  [Add to MyChemicals] [Print Friendly Page]

## SILANE

Chemical Identifiers | Hazards | Response Recommendations | Physical Properties | Regulatory Information | Alternate Chemical Names

### Chemical Identifiers
What is this information? ▶

| CAS Number | UN/NA Number | DOT Hazard Label | USCG CHRIS Code |
|---|---|---|---|
| 7803-62-5 | 🔍 2203 | Flammable Gas | none |

| NIOSH Pocket Guide | International Chem Safety Card |
|---|---|
| Silicon tetrahydride | SILANE |

**NFPA 704**

| Diamond | Hazard | Value | Description |
|---|---|---|---|
| | Health | 1 | Can cause significant irritation. |
| | Flammability | 4 | Burns readily. Rapidly or completely vaporizes at atmospheric pressure and normal ambient temperature. |
| | Instability | 3 | Capable of detonation or explosive decomposition or explosive reaction but requires a strong initiating source or must be heated under confinement before initiation. |
| | Special | | |

(NFPA, 2010)

*NOAA: Silane*

---

**Chemical Datasheet**  [Add to MyChemicals] [Print Friendly Page]

## TOLUENE

Chemical Identifiers | Hazards | Response Recommendations | Physical Properties | Regulatory Information | Alternate Chemical Names

### Chemical Identifiers
What is this information? ▶



| CAS Number | UN/NA Number | DOT Hazard Label | USCG CHRIS Code |
|---|---|---|---|
| 108-88-3 | 🔍 1294 | Flammable Liquid | TOL |

| NIOSH Pocket Guide | International Chem Safety Card |
|---|---|
| Toluene | TOLUENE |

**NFPA 704**

| Diamond | Hazard | Value | Description |
|---|---|---|---|
| | Health | 2 | Can cause temporary incapacitation or residual injury. |
| | Flammability | 3 | Can be ignited under almost all ambient temperature conditions. |
| | Instability | 0 | Normally stable, even under fire conditions. |
| | Special | | |

(NFPA, 2010)

*NOAA: Toluene*

---

**Chemical Datasheet**  [Add to MyChemicals] [Print Friendly Page]

## N-METHYL-2-PYRROLIDONE

Chemical Identifiers | Hazards | Response Recommendations | Physical Properties | Regulatory Information | Alternate Chemical Names

### Chemical Identifiers
What is this information? ▶



| CAS Number | UN/NA Number | DOT Hazard Label | USCG CHRIS Code |
|---|---|---|---|
| 872-50-4 | 🔍 1993 | Combustible Liquid | |

| NIOSH Pocket Guide | International Chem Safety Card |
|---|---|
| none | N-METHYL-2-PYRROLIDONE |

**NFPA 704**

| Diamond | Hazard | Value | Description |
|---|---|---|---|
| | Health | 2 | Can cause temporary incapacitation or residual injury. |
| | Flammability | 2 | Must be moderately heated or exposed to relatively high ambient temperatures before ignition can occur. |
| | Instability | 0 | Normally stable, even under fire conditions. |
| | Special | | |

(NFPA, 2010)

*NOAA: NMP*

274

947.    At 3250 Scott Blvd, Apple's use, storage, and release (intentional and unintentional) of very toxic gases has the potential to produce a dense cloud of lethal gas that would be large enough to engulf the apartments. Such an emission, if it has not already occurred, could easily cause injuries and death. These use and release of these gases could injure first responders and should require the evacuation of an entire neighborhood and HAZMAT procedures if there were to be significant leak/spill. Apple is not only in "*possession of extremely dangerous substances with the potential to cause severe harm to many people,*" but Apple has taken intention acts to ensure no one knows they have these chemicals or that they are releasing these chemicals into the neighborhood air.

948.    Apple attempted to and did acquire, transfer, receive, stockpile, retain, own, possess, use, and/or threaten to use chemical weapons. Apple assisted or induced another person to do the same or attempted to conspire to do the same.[338] Apple is not an exempted agency or person.

949.    Apple has been on notice about the dangers of these toxic gases for decades. Apple was founded in the 1970s and would have witnessed the Bhopal incident in 1986.[339] Apple's local toxic Gas laws in Santa Clara County were designed to prevent a similar "*catastrophic gas leak.*" These laws apply to Apple's facility in Santa Clara County.

950.    "*The law's goal is to prevent a disaster such as the 1986 gas leak in Bhopal, India that killed 2,800 people.*" Palo Alto City Manager Bill Zaner said, "*This is the single most important piece of toxics legislation in the county in the last five years.*"  Ted Smith noted the

---

[338] 18 U.S.C. § 229(a)(2)
[339] NYT, *Gas Cylinders Removed from Blast Site in Jersey*; https://www.nytimes.com/1988/03/20/nyregion/gas-cylinders-removed-from-blast-site-in-jersey.html

275

most common gases used for semiconductor manufacturing are also "*the most deadly*" including arsine and phosphine.[340]

951.    Apple knowingly released many other chemicals from their facility including while Gjovik was there. Apple knowingly did so without proper abatement and apparently without even changing their charcoal filters for over six years. Apple admitted to releasing NMP into the outdoor air despite it being so hazardous it is now banned under TSCA.

952.    These chemicals and gases not only harmed Gjovik physically, but they harmed an incredible amount of Gjovik's property, of which Gjovik has photographs and other evidence documenting the stains and degradation. It is clear that Apple's retaliation and intimidation against Gjovik was not just about her office or her other complaints, it was also an attempt to coverup what Apple did to her at 3250 Scott Blvd. Apple's termination of Gjovik's employment was also an injury from this Predicate Act.

**Table 5: 3250 Scott Blvd: Rogue Chemicals; Risk Categories**

|  | Release / Leak / Spill / Violation | California "Proposition 65"[341] | US EPA "Extremely Hazardous Substances"[342] | TSCA Review: "Unreasonable Risks to Public Health"[343] | DHS Chemicals of Interest[344] |
|---|---|---|---|---|---|
| **Phosphine Gas** | Multiple Leaks |  | x |  | x (flammable; weapon of mass effect) |
| **Silane Gas** | Multiple Leaks |  | x |  | x (flammable) |

[340] Silicon Valley Toxics Coalition, *Silicon Valley Toxics News*, Volume 7, No. 1, Winter 1989; Santa Clara County Ordinance Code, Division B 11, Chapter XIV
[341] Proposition 65, https://oehha.ca.gov/media/downloads/proposition-65/p65chemicalslistsinglelisttable2021p.pdf
[342] Appendix A to Part 355—The List of Extremely Hazardous Substances and Their Threshold Planning Quantities, https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-355
[343] TSCA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca
[344] DHS CISA: https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

| | | | | | |
|---|---|---|---|---|---|
| **Arsine Gas** | Blood test | x (cancer) | x | | x (toxic; weapon of mass effect) |
| **Chlorine Gas** | Code violation for not reporting | | x | | x (toxic; weapon of mass effect) |
| **Benzene** | Indoor Air | x (cancer) | | | |
| **Ethylbenzene** | Indoor Air | x (cancer) | | | |
| **Toluene** | Indoor Air | x (cancer) | | | |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | x (cancer) | | x (January 2023) | |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | x (development) | | x (December 2022) | |

953.    Apple's possession and use of these chemicals knowingly and intentionally occurred without proper permits, in violation of reporting and risk management laws, with repeated code violations and leaks/spills, and without proper abatement technology. Apple has already harmed people, property, and the environment with its chemical weapons and the harm occurred but for Apple's refusal to comply with basic health/safety, environmental, and HazMat regulations in pursuit of the cheapest and quickest way to produce a result and to avoid reporting the waste and harm associated with the unlawful approach in regulatory filings. The full extent of Apple's misconduct will likely be revealed when US EPA releases the results of their August 17 2023 (per the EPA website) inspection of the factory, which was triggered by a complaint filed by Gjovik in June 2023.

954.    Apple was not using those chemicals for peaceful purposes. While a theory as to what Apple's non-peaceful purpose was is not required at this stage,[345] one possible theory is Apple's non-peaceful purpose was to violate environmental and health/safety laws in order to produce off-books prototypes at the lowest cost and with the least amount of government oversight, in knowing violation of federal, state, and local laws. Another non-peaceful purpose is

---

[345] *US v. Sandomire,* CR 20-00085 JMS, at *5 (D. Haw. Jan. 21, 2021). *US v Mancuso*, 718 F.3d 780 (9th Cir. 2013)., quoting *United States v. Cochrane*, 985 F.2d 1027, 1035 (9th Cir. 1993).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

that Apple intended to store toxic gases and release them out of their exhaust, [346] in violation of air quality and hazardous waste laws, knowing the chemicals would enter hundreds or thousands of residential homes, but doing it anyways because it cooked the books on their environmental filings to the US SEC and shareholders.

955.    The threshold is very low for establishing a violation of §229 in the pleading stage. [347] Here, like other 18 USC 229 cases, highly volatile and poisonous substances were repeatedly released into highly trafficked areas, placing many people at risk of serious harm and mass suffering.[348]

### ii.    Injury in Fact to Plaintiff due to Racketeering Act

956.    Gjovik's injuries from all Predicate Acts and racketeering were "by reason of" a RICO violation.[349]  Apple's racketeering led directly to the plaintiff's injuries.[350] Gjovik's injuries stem from Apple's retaliatory actions, RICO predicate acts, and several actions which were both retaliatory and RICO predicate acts, including Gjovik's termination as a violation of 18 USC §§ 1512 and1513. Apple's retaliation and termination of Gjovik are all part of the same RICO scheme to cover-up Apple's wrongdoing.[351]

---

[346] In *US v Sandomire*, a sufficient non-peaceful purpose to satisfy an indictment was an allegation of intent to create chlorine gas and release it into a large residential apartment building in downtown Honolulu. *United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *5 (D. Haw. Jan. 21, 2021).

[347] *Renfro v. J.G. Boswell Co. Inc.,* No. 117CV01069LJOSAB, 2017 WL 6611190, at *13 (E.D. Cal. Dec. 27, 2017), report and recommendation adopted, No. 117CV01069LJOSAB, 2018 WL 10322173 (E.D. Cal. Mar. 1, 2018)

[348] *U.S. v. Kimber*, C.A.2 (N.Y.) 2015, 777 F.3d 553, certiorari denied 136 S.Ct. 170, 577 U.S. 869, 193 L.Ed.2d 123. *Bond v. United States*, 572 U.S. 844, 865, 134 S. Ct. 2077, 2093 (2014)

[349] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

[350] *Anza*, supra, at 461, 126 S.Ct. 1991; *Holmes*, 503 U.S., at 268, 112 S.Ct. 1311; *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 654–55, 128 S. Ct. 2131, 2141–42, 170 L. Ed. 2d 1012 (2008)

[351] *DeGuelle v. Camilli*, No. 10-2172 (7th Cir. Dec. 15, 2011)

278

957.     A person's loss of a job, such as a termination, is an injury to one's business or property.[352] In situations where a termination itself is another RICO violation (i.e. §1512, §1513, etc.) in continuous racketeering and fitting the pattern of existing racketeering, or otherwise a result of a pattern of racketeering activity, then the termination is an injury-in-fact under RICO.[353] It would be contrary to public policy and the legislative intent of the RICO Act to immunize employers who are engaged in RICO acts, when one of their employee tries to blow the whistle to the feds on the employer's RICO activity (i.e. testifying to federal agencies, or informing to the FBI, etc.), and the employer responds to terminate the whistleblower with the intent and in a way which would violate additional RICO predicate act statutes. Racketeering is not "*transmogrif[ied]*" into something else simply because there is a termination of employment.[354]

958.     Apple injured Gjovik's business and property, and caused other injuries and loss, due to its Predicate Acts.[355] Apple injured Gjovik's business by terminating Gjovik' for a reason Apple knew would denylist Gjovik from working in law or for corporations, and knowing she would be forced to self-publish the reason and that it would be exposed in the already initiated legal proceedings. Apple's harassment of Gjovik ruined her reputation and ostracized her from the groups she hoped to work with and for with her legal degree. Gjovik had over $500,000 of unvested RSUs and a pending annual bonsu at the time of her termination which she would have

---

[352] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 711 (D.N.J. 1998); *Nodine v. Textron, Inc.*, 819 F.2d 347, 348 (1st Cir. 1987)
[353] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)
[354] *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 713 (D.N.J. 1998)
[355] *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975-76 (9th Cir. 2008) (citing *Sedima*, 473 U.S. at 496); see *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.,* 731 F.3d 556, 565-66 (6th Cir. 2013).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

been granted and vested if she was not fired. Apple's criminal termination of Gjovik resulted in business-related financial injury.[356]

959.    Apple injured Gjovik's property with their chemical emissions, including 7.8 tons of VOCs omitted 300ft from her windows the year she lived next to Apple's factory.[357] Gjovik has documented destruction of clothing and jewelry from the chemicals, of which Apple engaged in falsification of records, obstruction, and witness tampering. Gjovik has photos and other evidence of the specific chattel property, with receipts of purchase, that was discolored or otherwise degraded by chemical exposure, as well as real time complaints in 2020 and 2021 about the discoloration and the state Department of Public health agreeing it looked like solvent exposure.






*Exhibit: Gjovik's clothing, metals, and plastics turned yellow and/or reacted with oxidation*

---

[356] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985).
[357] See, US EPA EIS data for 2020

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

960.    Apple injured Gjovik's property through 'bugging' an item at her desk when they mailed her back her possessions, causing Gjovik to have to transfer her property to police custody for investigation. Apple injured Gjovik's property when it broke into her home and 'bugged' one of her fake trees and upon discovering the RF and EMF signals emanating from the fake fig tree, Gjovik disposed of the tree into a dumpster and complained about it on social media. (Gjovik also has the receipt for original purchase of the tree). Due to Apple's surveillance and hacking, Gjovik's property was injured in that it was compromised by Apple and Gjovik had to disconnect and dispose of it to protect herself from Apple. Property included Apple products of which Apple could monitor her via server use and logging, 'smart home' accessories which were hacked and controlled by hackers at least once, her router which was assumed to have been compromised when the equipment in the attic was installed by Apple, and other instances of damage.

961.    Apple injured Gjovik's property when they mailed her possessions back from her desk as a threat, posting online the box may contained a severed head of one of Gjovik's loved ones, and ensuring the box did contain a listening device in one of Gjovik's possessions, along with a very poorly packed box that ensured the salt lamps from Gjovik's desk (aka rocks) broke the glass on Gjovik's picture frames and glasses at her desk, resulting in a box full of rocks, broken glass, and a listening device – if Apple didn't intentionally destroy Gjovik's property before it was shipped.

962.    Apple injured Gjovik's business and property when it harassed her at and around her home to the extent she was forced to leave the west coast to escape Apple, and moved to New York next to a state executive building with state police stationed 24/7 outside her home. By being forced to move, Gjovik lost the opportunity to obtain work in Silicon Valley, Gjovik

had to get rid of many of her belongings because she could not afford to move them, and several items were destroyed in transit.

963.    Gjovik's injury occurred by reason of the Apple's violations.[358] If Apple had not engaged in unlawful conduct, including unauthorized air pollution and chemical releases, then Gjovik's property would not have been damaged. If Apple had not engaged in a cover-up, then Gjovik would have known to protect her property from Apple. If Apple had not engaged in a cover-up scheme, they would not have hacked into Gjovik's electronics, mailed her a bugged object, or broke her chattel property. These are concrete examples of financial loss.[359]

964.    Apple stained specific items of clothing, Apple caused reactions on the metal of specific items of clothing and jewelry, Apple bugged a specific fake tree, Gjovik lost concrete salary and RSUs when she was terminated, and so on. Civil RICO laws grant standing to any victim that sustained real injuries to his or her business or property.[360]

965.    The plaintiff must instead allege injury from an act that is analogous to an "*ac[t] of a tortious character*."[361]  The specific type of act that is analogous to an act of a tortious character may depend on the underlying substantive violation the defendant is alleged to have committed. Plaintiff must allege an act of racketeering and that is independently wrongful under any substantive provision of the statute.[362] Gjovik details the many torts and statutes violated by Apple inline and in the footnotes of this complaint.

---

[358] *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-11 (2010); see also *Vanderbilt Mortg. & Fin., Inc. v. Flores,* 735 F. Supp. 2d 679, 698-99 (S.D. Tex. 2010).

[359] *International Raelian Movement*, 2:08-cv-0687 FCD DAD, 11-12 (E.D. Cal. Sep. 1, 2010)

[360] *Canyon County v. Syngenta Seeds*, Inc., 519 F.3d 969, 972 (9th Cir. 2008); *Berg v. First State Ins. Co*., 915 F.2d 460, 464 (9th Cir. 1990).

[361] R

[362] *Beck v. Prupis*, 529 U.S. 494, 494–95, 120 S. Ct. 1608, 1610, 146 L. Ed. 2d 561 (2000)

### iii.    Continuity & Threat to Continue

966.    Apple has engaged in a series of related predicate acts, extending over a substantial period of time (decades). Further, Apple started a series of related predicate acts, and it is clear will continue these acts into the future unless there is intervention. Apple's misconduct is so persistent and egregious, and so dependent on continued intimidation of witnesses to keep witnesses quiet about what they know, that its impracticable that Apple would ever voluntarily stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the inertia of organized crime.

## F.    TORT: ULTRAHAZARDOUS ACTIVITIES

967.    Apple was engaged in an ultrahazardous activity that caused Gjovik to be harmed and that Apple is responsible for that harm. People who engage in ultrahazardous activities are responsible for the harm these activities cause others, regardless of how carefully they carry out these activities.

968.    Operating a semiconductor manufacturing factory and operating a facility on an active Superfund site are both ultrahazardous activities. Both activities have a high degree of risk of some harm to people, land, and chattels; a likelihood that the harm will be severe; there is an inability to eliminate the risk by the exercise of reasonable care; the activity is not a matter of common usage; the activities were inappropriate for the locations where they were carried on.[363]

969.    Semiconductor manufacturing is an ultrahazardous activity. For decades, its known to require use of pyrophoric gases which have a "serious fire hazard," combustible and flammable chemicals which must be "carefully monitored and handled by experienced

---

[363] Restatement of Torts Second, section 519-520

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

personnel," heating devices and ignition sources, and complex fire suppressant systems. Air handling systems at these plants must control "the spread of contaminants." [364]

970.    The storage of dangerous, highly poisonous gas is an activity which, even when conducted with the greatest of care and prudence, could cause damage to others in the neighborhood and thus is an ultrahazardous activity.[365] The possible consequences of the gas escaping and causing harm were known or should have been known. Even where the manufacture or sale of a hazardous material does not constitute an abnormally dangerous activity, the manner in which it is transported, stored, used, or disposed of may meet the standard.[366]

971.    Apple was engaged in use of poisons and flammable gas in a crowded area and Gjovik and her property were damaged as a result of those activities.[367] There is proof the chemicals and gases escaped with at least three document leaks. There is also proof of a history of negligence at the site with a number of citations for failure to comply with basic regulations and several root-caused formally as 'negligence.'

972.    There is also proof the Plaintiff's home was 300 feet from the plant. Like in the classic California ultrahazardous activity case, *Alonso v Hills*, an ultrahazardous activity like use of poisons or blasting, only 200 yards (or here, 300 feet) from hundreds of homes in a residential

---

[364] IMUA's Manufacturer's and Dealer's Committee, "*Underwriting Semiconductor Manufacturing Exposures*," 2000,
https://www.imua.org/Files/reports/Underwriting%20Semiconductor%20Manufacturing%20Exposures.html
[365] Langlois v. Allied Chem. Corp., 258 La. 1067, 1083, 249 So. 2d 133, 139 (1971)
[366] Abbatiello v. Monsanto Co., 522 F. Supp. 2d 524, 532–33 (S.D.N.Y. 2007); New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir.1985) (holding that "allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste constitutes abnormally dangerous activity").
[367] [§ 628] Ultrahazardous Activity., 4 Witkin, Cal. Proc. 6th Plead § 628 (2023)

district, will be found to be an ultrahazardous activity with strict liability even without proof of finding of negligence.[368]

973.     Apple's ultrahazardous activity was a substantial factory in causing Gjovik's harm to her property and herself.

## G.    RETALIATION UNDER CALIFORNIA LABOR CODE

974.     Generally, Apple discriminated and retaliated against Gjovik in violation of California Labor laws. For all claims, a complaint was filed with the California Department of Labor Department of Industrial Relations Retaliation department on August 29, 2021. The state labor complaints statute of limitations were tolled while under consideration of the Labor Commissioner but are now removed to this case, but are preserved by the Labor Commissioner for investigation if dismissed from this matter without a decision on the merits.[369] There is no requirement for an individual to exhaust administrative remedies before filing a lawsuit under most of these state Labor Codes, however administrative exhaustion was reached as a complaint was filed with the Retaliation Compliant Investigation Unit on time.[370]

### i.    California Whistleblower Protection Act: Cal. Labor Code §1102.5

975.     California Labor Code § 1102.5 "*reflects the broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation*."[371]

---

[368] Alonso v. Hills (1950) 95 C.A.2d 778, 214 P.2d 50; McKenna v. Pacific Elec. Ry. Co. (1930) 104 C.A. 538, 540, 286 P. 445.
[369] Cal. Lab. Code § 98.7
[370] Cal. Lab. Code § 98.7 (a)(1), (f), (g); *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012).
[371]  *Green v. Ralee Eng'g. Co*., 19 Cal. 4th 66, 77 (1998).

285

Apple violated § 1102.5 when it took adverse employment action against Gjovik due to Gjovik's protected activity.[372]

976.    Apple discharged and discriminated against Gjovik in retaliation for Gjovik's disclosure of information about Apple's unlawful acts and omissions. Gjovik disclosed Apple's violations of numerous laws as incorporated from allegations above and below this section, to government agencies. Gjovik had a reasonable cause to believe that the information she disclosed was a violation of statute and/or noncompliance with a rule or regulation.[373] Gjovik reported concerns to management, coworkers, the government, and the press.

977.    Prior to her termination, Gjovik provided information to public bodies (US NLRB, US and California Department of Labor, US SEC, US DOJ, US EEOC, California DFEH, US EEOC, US and California EPA, etc.) and several were already conducting an inquiry or which information initiated an inquiry. Gjovik testified before public bodies (US EEOC, US Department of Labor) and was scheduled to testify before public bodies (US NLRB) that were conducting investigations. Gjovik had reasonable cause to believe that the information provided to and testimony before the public body disclosed a violation of statute and/or noncompliance with a rule or regulation.

978.    Gjovik refused to engage in unlawful acts including participating in Apple's coverup, environmental crimes, and intimidation of witnesses. Gjovik had reasonable cause to believe that her participation in the cover-up would result in a violation of statute and/or non-compliance with rule or regulation. Apple discharged and discriminated against Gjovik, and Gjovik's disclosures and her refusal to participate in the cover-up was a contributing factor in

---

[372] *Dowell v. Contra Costa Cnty.,* 928 F.Supp.2d 1137, 1154 (N.D. Cal. 2013); *Derby v. City of Pittsburg*, Case No. 16-cv-05469-SI, 20 (N.D. Cal. Feb. 23, 2017), *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1355, 181 Cal. Rptr. 3d 68, 85 (2014)

[373] Cal. Lab.C. § 1102.5(b); *Diego v. Pilgrim United Church of Christ* (2014) 231 CA4th 913, 922-924, 180 CR3d 359, 366-367.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                OCTOBER 25 2023

Apple's decision to discharge and discriminate against Gjovik.[374] Further, Apple made, adopted, and enforced rules, regulations and/or policies that prevents employees from providing information or providing to a public body conducting an investigation, hearing, or inquiry.

979.     Violations of California Labor Code § 1102.5 can be pursued alone or also support a common law cause of action for wrongful termination in violation of public policy.[375] No agency exhaustion is required prior to filing a civil complaint.

### 1) Video Recording in Bathrooms: Cal. Labor Code § 435

980.     Video surveillance of private spaces in the workplace such as restrooms, locker rooms, changing rooms and similar locations is strictly prohibited without a court order."[376] Apple's supposed reason for termination Gjovik included Gjovik's protests of Apple's Face "Gobbler" iPhone app which took videos of Gjovik 'whenever it thought it saw a face' including in bathrooms, locker rooms, changing rooms, and similar locations. Among other legal protections Gjovik had for protesting the application and Apple's practices, Apple's use of the application violated Labor Code § 435. Gjovik has evidence of photos taken of her by the app in her bathroom.

---

[374] *Ferretti v. Pfizer Inc*., 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012)
[375] *Scheu v. Charter Commc'ns, LLC*, Case No. 08–CV–02835–MMM, 2011 WL 3204672, at *20 (C.D.Cal. July 27, 2011) ("Violations of California Labor Code § 1102.5 ... constitute public policy within the meaning of *Tameny* and its progeny.").
[376] Cal. Labor Code § 435.



*Figure 1: Photos captured by "Gobbler" in Gjovik's home bathroom, including Gjovik washing her face without clothing*

*Photos taken of Gjovik by Gobbler on the day of her first meeting with EH&S (April 2 2021)*

### ii.    Retaliation for Filing a Labor Complaint: Cal. Labor Code § 98.6

981.    Apple violated Section 98.6 by retaliating against Gjovik due to Gjovik filing a claim with the California Labor Commissioner instituting, and causing to be instituted proceedings related to the rights under the jurisdiction of the California Labor Commissioner, exercising rights provided under California Labor Code on behalf of herself and on behalf of other employees. Gjovik exercised labor rights provided under California Labor Code on behalf of herself and other employees when she complained about.

982.    Apple retaliated against Gjovik due to Gjovik's protected activity when she suffered materially adverse actions with causal connection to the protected activity and adverse actions which could dissuade a reasonable worker from making a charge of discrimination.[377] Gjovik's protected activities included filing complaints about work conditions which was protected under § 232.5.

---

[377] *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 57 (2006) (examining retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)); *see*

983.     Apple's supposed reason for termination Gjovik occurred while Gjovik was "*removed from the workplace and all workplace interactions*" and Gjovik was complaining on Twitter and to a reporter in an article exclusively about work conditions and the terms and conditions of employment at Apple, including unlawful and coercive surveillance.

### 1)   Retaliation re: Work Conditions: Cal. Labor Code §232.5 (via § 98.6)

984.     Apple discharged, disciplined, and discriminated against Gjovik due to her disclosure of information about Apple's work conditions. This applies to both the true reason Apple fired Gjovik but also Apple's proffered supposedly legitimate reason for terminating Gjovik. Apple's "legitimate" reason for discharging Gjovik's employment is unlawful under federal and state laws and is also retaliation for protected "work conditions."

985.     Under California Labor Code Section 232.5, employees have an enforceable right to disclose information about the employer's working conditions without restriction or fear of retaliation.[378] Under the statute and relevant case law, this right extends to disclosures to co-workers and to the general public, including media and press activity.[379] Apple cannot require Gjovik to refrain from disclosing or discussing information about the employer's working conditions.

---

*also Westendorf v. W. Coast Contractors of Nev.*, 712 F.3d 417, 422 (9th Cir. 2013) (examining Title VII retaliation claims).

[378] Working conditions" is properly understood to include "conditions of employment"—such as "workload, office sizes, perquisites of employment, and 'work-life balance.'" *Glassdoor, Inc. v. Super,* Ct.  9 Cal. App.5th 623, 638 (2017); it encompasses matters such as hours, benefits, work rules and regulations, workplace safety, and the physical environment. See *Chan v. Canadian Standards Ass'n ,* No. SACV 19-2162, 2020 WL 2496174, at *3 (C.D. Cal. Mar. 16, 2020); *Massey v. Thrifty Payless, Inc.*, No. G047734, 2014 WL 2901377, at *5 (Cal. App. June 27, 2014).

[379] See § 232.5; *Glassdoor*, 9 Cal. App.5th at 638 ("employees are entitled by statute to publicize their complaints about such matters."); *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1078-79 (9th Cir. 2007) (employer's arbitration secrecy rule could prevent discussion between employees and chill public disclosure of the employer's working conditions in violation of § 232.5).

986.    Remedies for harm from violations of § 232.5 are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. [380] No agency exhaustion is required prior to filing a civil complaint.

### 2) Lawful Off-Duty Conduct: Cal. Labor Code § 96(k) (via 98.6)

987.    Under Labor Code Section 96(k), Apple may not demote, suspend, discharge from employment, threaten discharge, or otherwise discriminate against any employee for lawful conduct occurring during nonworking hours away from the employer's premises when that conduct involves exercise of a "recognized constitutional right" and/or a right protected by the Labor Code.[381]

988.    Gjovik engaged in lawful conduct asserting "recognized constitutional rights" (free speech, speaking about work conditions, protesting unlawful conduct, protesting unlawful surveillance and unfair business practices), occurring during nonworking hours -- while she was on leave, away from Apple's premises. Apple retaliated against Gjovik and supposedly discharged Gjovik because of this protected conduct. While the reason was pretext, Apple's admission further implicates its animus and lawlessness.

989.    Apple put Gjovik on leave. Gjovik did not want to be on leave. Gjovik asked to come back and Apple said no. Apple cannot then turn around and claim the "leave" was worktime or the workplace. Apple told Gjovik she had been "*removed from the workplace.*" Until Apple let Gjovik return to work, Gjovik was off-duty.

990.    The fact Gjovik was posting about work conditions in her personal time does not transform Gjovik's personal time into work time. Further, protected disclosures are protected by their content, regardless of motive or if the content of information was related to job duties.[382]

---

[380] *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[381] Grinzi v. San Diego Hospice Corp., 120 Cal.App.4th 72 (2004); Barbee v. Household Automobile Fin. Corp., 113 Cal.App.4th 525 (2003)
[382] *Collier v. Superior Court*, 228 Cal. App. 3d 1117, 279 Cal. Rptr. 453 (1991)

991.    Remedies for harm from violations of § 96(k) are recoverable via private action under § 98.6 claims. There is a three-year statute of limitations for actions creating liability under statute. No agency exhaustion is required prior to filing a civil complaint.

### iii.    Retaliation for Safety Complaints: Cal. Labor Code § 6310

992.    Gjovik filed a Retaliation claim with California Department of Labor DIR and Apple was notified of such, prior to her termination. Apple retaliated against Gjovik preemptively out of fear Gjovik would file additional complaints related to health and safety at the workplace, and in hope the retaliation would cause Gjovik to drop her existing complaint out of fear and intimidation.[383]

993.    Apple's retaliation violated § 6310 which protects an employee who: (1) complains about safety or health conditions or practices, (2) institutes or causes to be instituted any proceeding relating to the employee's rights to safe and healthful working conditions, or testifies in any such proceeding, (3) exercises any rights under the California Occupational Safety and Health Act.[384]

994.    Apple discriminated against Gjovik because Gjovik exercised her rights under the federal and California law relating to occupational health and safety, and made written and verbal complaints on behalf of herself and/or others, to government agencies about health & safety issues at Apple facilities.[385]

995.    Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-

---

[383] *Lujan v. Minagar* (2004) 124 CA4th 1040, 1046, 21 CR3d 861, 866.
[384] Cal. Lab. Code § 6310(b)
[385] *Daly v. Exxon Corp.* (1997) 55 CA4th 39, 43-44, 63 CR2d 727, 729; *Freund v. Nycomed Amersham* (9th Cir. 2003) 347 F3d 752; *Touchstone Television Productions v. Sup.Ct. (Sheridan)* (2012) 208 CA4th 676, 681-682, 145 CR3d 766, 770.

related injuries and illnesses, and requested information about work related injury and illness reports or records. [386]

996.    Apple discriminated against and discharged Gjovik because Gjovik complained that Apple prohibited employees from observing and monitoring and measuring employee exposure to hazards pursuant to §142.3 (effectively determining "*whether the health of such employee is adversely affected by this exposure*") in violation of Cal. Labor Code §6408(c).

997.    Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide access to employees to accurate records of employee exposures to potentially toxic materials or harmful physical agents in violation of Cal. Labor Code §6408(d). Occupational Safety and Health Standards 1910 Subpart Z "*Toxic and Hazardous Substances*," the "*Access to employee exposure and medical records*" section describes Gjovik's statutory right to request information about her chemical and biological exposure at work.

998.    Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to notify employees who has been or who is being exposed to toxic materials or harmful physical agents and informing any employee so exposed of corrective action being taken in violation of Cal. Labor Code §6408(d).[387]

999.    Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure from the COVID-19 virus.

1000.   Apple discriminated against and discharged Gjovik because Gjovik made workplace health and safety complaints related to exposure to particulate matter in the indoor air of her office, caused by wildfire smoke.

---

[386] "*Every employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct.*" Cal. Lab. Code § 6407

[387] "*Every employer shall furnish ... safeguards, and shall adopt and use practices ... which are reasonably adequate to render such employment and place of employment safe and healthful...*" Cal. Lab. Code § 6401 "*No employer shall fail or neglect to ... do every other thing reasonably necessary to protect the life, safety, and health of employees.*" Cal. Lab. Code § 6403

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                         OCTOBER 25 2023

1001.   Apple discriminated against and discharged Gjovik because Gjovik complained that Apple failed to provide Material Safety Data Sheets to employees on a timely and reasonable basis on substances in the workplace.[388] Failure to furnish employees who may be exposed to a hazardous substance with information on the contents of the MSDS for the hazardous substances or equivalent information either in written form or through training programs.[389]

1002.   Apple discriminated against and discharged Gjovik because Gjovik complained that Apple is hiding its employee injury rates. Apple keeps internal registries of employee injuries that are not made public or shared with OSHA, however one was 'leaked' and described by reporters in 2017. Among other injuries, the report documented a female employee in Apple's Arques offices in Sunnyvale on an adjacent Superfund mega-plume as Gjovik's office, noting she complained of "*feeling lightheaded, had difficulty seeing clearly, could not stand*."[390] Apple told Gjovik they did not even record her fainting spell at the Triple Site. Apple likely has internal documents revealing vapor intrusion exposure to their employees yet denied any such knowledge or records.

1003.   Gjovik complained Apple never recorded or reported to OSHA her fainting spell in 2019, the peanut anaphylaxis in 2017, or a burn to her eyes from iPhone prototype lasers in 2018.

1004.   Gjovik complained about Apple's NDAs restricting discussion of workplace injuries. For example, Apple had provided an NDA for Gjovik to sign when a customer Apple

---

[388] California Labor Code §6398(a).
[389] California Labor Code §6398(b). "*All employers shall provide information to employees … to observe monitoring or measuring of employee exposure to hazards … accurate records of employee exposures to potentially toxic materials or harmful physical agents… Notification of any employee who has been or is being exposed to toxic materials or harmful physical agents … and informing any employee so exposed of corrective action being taken.*" Cal. Lab. Code § 6408
[390] William Turton, *Leaked Document Details Apple Employee Injuries, Hints at Secretive New Products.* Gizmodo, April 20 2017, https://gizmodo.com/leaked-document-details-apple-employee-injuries-hints-1794482497

Watch band gave her a severe rub-burn on her wrist. The NDA claimed to be a "Deed Poll" and said Apple considers it Confidential Information that they are *"conducting the study, the types and methods of data collection, and any other detail about the study, or how it is conducted – any information... learned about the study."* The NDA said not to tell anyone about the study, even other employees, friends, family members, and "*especially, the press*."

1005.   Prior to her termination, from March 2021 through September 2021, Gjovik complained to Apple and to the government about safety concerns about Gjovik's office, concerns about Apple's safety policies and practices, and concerns about the safety of Gjovik's coworkers. Apple's discrimination against Gjovik included but was not limited to firing, reassignment, lost opportunity for promotion, suspension, threats, and denial of benefits. Gjovik's safety complaints and inquiries were a substantial motivation reason for Apple's decision to discharge, discipline, and discriminate against Gjovik.

1006.   In addition, Apple did all of the above while knowing it created an unsafe workplace, while attempting to conceal the safety issues at the workplace, and while also concurrently refusing to fix some of the major safety issues at that workplace (i.e., it took them two years to address the vapor intrusion/HVAC issues). [391] In violation of OSH Act 1910.1020(g), Apple never provided Gjovik information about the records noted or her rights under this section, either upon first entering into employment or least annually thereafter.

1007.   In violation of 910.1020(e)(2)(i), Apple's response to Gjovik's request for exposure records for 825 Stewart Drive only resulted in Apple sharing the 2015 vapor intrusion testing result and no other data. When Gjovik requested information about her exposure to

---

[391] "*Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein.*" Cal. Lab. Code § 6400(a); "*No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful.*" Cal. Lab. Code § 6402. "*No employer, owner, or lessee of any real property shall construct or cause to be constructed any place of employment that is not safe and healthful.*" Cal. Lab. Code § 6404, 6405.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                          OCTOBER 25 2023

chemicals at her office, Apple should have provided a record measuring and monitoring the amount of toxic substances or harmful physical agents to which she had been exposed,[392] and in the absence of that data, then data about employees in work conditions similar to those of the employee to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected. [393] For instance, there are a number of EPA/OSHA studies about employee chemical exposure, and a number of EPA vapor intrusion studies in workplaces. Any of these could have been shared as a reference as to what Gjovik's exposure might be. When Gjovik started this type of inquiry, Waibel informed Gjovik that Apple would not discuss any of Gjovik's workplace safety concerns ever again.

1008.   Gjovik also raised concerns about Apple's history of negligence with due diligence, safety precautions, and lack of disclosure to employees around hazardous waste and its health impacts, citing the *People of the State of California v. Apple Inc* lawsuit over violations of Health and Safety Code,§§ 25100 and implementing regulations.[394] The settlement required injunctive relief to cease unlawful actions, require training at California Compliance School, conduct inspections and maintain documentation, and to pay the Department of Toxic Substances control $450,000.

1009.   Apple discriminated against and discharged Gjovik because Gjovik complained about a violation of Cal. Labor Code §6399.7 (Right to Know).[395] Because Apple violated Section 6399, as with the other codes above, Apple also violated the provisions of Section 6310.

---

[392] OSH Act 1910.1020(e)(2)(i)(A)(1)
[393] 1910.1020(e)(2)(i)(A)(2)
[394] *People of the State of California v Apple Inc*., Case No. 16CV303579, Final Judgement Pursuant to Stipulation (Dec 2016)
[395] Hazardous Substances Information and Training Act: "No person shall discharge or in any manner discriminate against, any employee because such employee …. because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such

**1)  Right-to-Know Retaliation: Cal. Labor Code §6399.7 (via § 6310)**

1010.   Apple retaliated against Gjovik because Gjovik complained or testified regarding non-compliance with the Hazardous Substances Information and Training Act. Labor Code section 6399.7 prohibits an employer from retaliating against an employee who complains or testifies about non-compliance with the Hazardous Substances Information and Training Act. While Gjovik argued with Apple about this matter related to 825 Stewart Drive (as she did not yet know about 3250 Scott Blvd), however, Apple knew and was considering her arguments in the context of 3250 Scott Blvd as well under both California Labor Code but also the federal RIGHT TO KNOW statute and the CLEAN AIR ACT.[396]

1011.   Apple failed to provide clear and reasonable warning to all individuals prior to exposure to chemicals listed on the Proposition 65 list of chemicals known to the State of California to cause cancer, birth defects, or reproductive harm. Apple, at 825 Stewart Drive, did not disclose the recent history and thus imminent risk of exposure to certain dangerous chemicals (TCE, ethylbenzene, toluene, vinyl chloride, etc.) above EPA risk levels. Apple had one or more listed chemicals emitted into the environment where employees were and could be exposed. Apple did not and could not prove the exposure caused no significant risk.[397] Apple did not provide the required warning to employees or others who were exposed, before, after, or during exposure in violation of Cal. Code of Reg. §5194(b)(6).[398] [399]

---

right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310." Cal. Labor Code § 6399.7

[396] The Emergency Planning and Community Right-to-Know Act (EPCRA), aka Title III of the Superfund Amendments and Reauthorization Act (SARA). EPCRA §§ 302, 304, 311-3. Clean Air Act, 42 U.S.C., § 7622(a).

[397] "A warning … shall not apply to … An exposure for which the employer responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for the chemicals known to the State to cause cancer… In any enforcement action the burden of showing that an exposure meets the criteria … shall be on the employer."

[398] "Before exposing any employee to any hazardous substance that otherwise falls within the scope of this section and which requires a warning under this Act (see 22 CCR Section 12000,

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1012.   Known exposed parties at 825 Stewart Drive include employees, vendors, federal employees, and city employees resulting in occupational and environmental exposures. Known exposed parties at 3250 Scott Blvd include employees, vendors, city employees, and thousands of nearby residents resulting in occupational and environmental exposures. In neither location were warnings or signs posted conspicuously in the workplace, in violation of §5194(b)(6). Gjovik raised these concerns and Apple said they refused to do this because they decided there was no "legal obligation" and then fired Gjovik.

1013.   At 825 Stewart Drive, Apple omitted disclosure of at least 10 §339 hazardous chemicals including the contaminants of concern recorded in the federal Record of Decision for the CERLCA site: 1,1,1-TCA; Freon-113); 75343, 1,1-Dichloroethane; Ethylidene chloride; 1,1-Dichloroethene; 1,2-Dichlorobenzene; Vinyl chloride; 1,2-Dichloroethylene, 1,2,3,5-Perchloroethylene, 1,2-trans-Dichloroethylene, TCE.

1014.   Prior indoor air testing at 825 Stewart Drive, also showed the presence of 2 additional §339 hazardous chemicals from §5194(b)(6), Toluene and Ethylbenzene, which were known to be in the CERCLA groundwater plume under the building, but Apple claimed without data the emissions were 'from construction,' yet did not provide conduct follow up air testing or provide warnings. Instead, Apple terminated and terrorized the whistleblower. Apple's conduct violated Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194, which is actionable under § 6310.

1015.   For 3250 Scott Boulevard chemical emissions and exposure, see under "RICO Act," the Predicate Act of violating 18 USC § 229 "*Relating to Chemical Weapons*," and also sections on "*Mail and Wire Fraud.*"

---

Chemicals Known to the State to Cause Cancer or Reproductive Toxicity) … any employer subject to the Act shall comply with the requirements set forth in… the Act."
[399] §5194(b)(6), in violation Labor Code §6360-6399.7 & Code of Regulations Title 8 §5194

297

**H.    WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY (*TAMNEY*)**

1016.    In California, an employer may be subject to tort liability if it terminates an employee in violation of a fundamental public policy.[400] Gjovik was retaliated against and discharged from employment for reasons that violate public policy. Among other unlawful reasons, Gjovik was terminated in violation of the "strong public interest" reflected in California Labor Code § 1102.5, "in encouraging employee reports of illegal activity in the workplace." [401][402] For example, it is a termination in violation of publicly policy (*Tamney Claim*) to terminate an employee for complaining about unsafe work conditions or for asking to work in a safe and healthful workplace.[403]

1017.    The true reasons for Gjovik's discharge are discussed as claims in this Complaint and in the government adjudications (all of Gjovik's pre-termination charges and complaints to the govenrment are filed are incorporated here), and Apple's other violations of the law are incorporated here accordingly, including but not limited to retaliation for disclosures about Batterygate, reporting sanctions violations and vaccine hoarding to the DOJ, all of Gjovik's other legal claims, and posting about Apple's 2011 home invasion), however Apple's, proffered though pretextual  reason for firing Gjovik also violates public policy. Apple claimed it fired Gjovik for exposing, protesting, and complaining about certain data collection practices by Apple and because Gjovik would not get on a phone call with a 'Workplace Violence'

---

[400] *Steffens v. Regus Grp., PLC*, 485 Fed.Appx. 187, 188 (9th Cir.2012) (citing *Gould v. Md. Sound Indus., Inc.,* 31 Cal.App. 4th 1137, 1147 (1995)).
[401] *Collier* at 1123; *Stoval* at *4; *Banko v. Apple, Inc.,* No. 13-02977 RS, 2013 WL 6623913, at *4 (N.D. Cal. Dec. 16, 2013)
[402] *Banko*; *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167; *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; CACI No. 2430.
[403] Cal. Lab.C. § 6400; *Hentzel v. Singer Co.* (1982) 138 CA3d 290, 298, 188 CR 159, 164; *Cabesuela v. Browning-Ferris Indus. of Calif., Inc.* (1998) 68 CA4th 101, 109, 80 CR2d 60, 64; *Boston v. Penny Lane Ctrs., Inc.* (2009) 170 CA4th 936, 947, 88 CR3d 707, 716-717

interrogator within 'the hour' to supposedly discuss Gjovik's complaints about these data collection practices, though Apple later admitted it already planned to fire Gjovik.

1018.   Apple's proffered reason for firing Gjovik which Apple claims is non-discriminatory, lawful, and was so important to Apple's business it justified immediate termination of an employee without warning – is literally illegal. Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of the California Constitution, California Labor Code 435, Cal. Penal Code 637.7, common law, and the US FTC Act. The unlawful data collection occurred with employees, but also with non-employees who were not given notice or asked for consent. Further, Apple claims if the employee were to warn the non-employee about the data collection, then the employee could be fired immediately as they did with Gjovik.

1019.   The policy violated by Apple is supported by constitutional and statutory provisions, the policy is public in that it insures to benefit the public, the policy is fundamental and substantial, and the policy was referenced at the time of discharge.[404]

1020.   Apple was put on notice that there were significant public policy concerns around the activities Gjovik complained of and was supposedly terminated over, when The Congress sent Apple a letter in 2017 inquiring as to exactly the information Gjovik disclosed, how Apple obtained the training data for Face ID. At which time the Apple executives refused to answer Congress and instead provided misleading and inaccurate statements.[405] Apple refused to say where the images came from but did falsely claim there was 'informed consent.' Apple knew

---

[404] *Ferrick v Santa Clara University*, 231 Cal.App.4th 1337 (2014); *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890;
[405]  Natasha Lomas, *Apple responds to Senator Franken's Face ID privacy concerns*, TechCrunch (October 17, 2017), https://techcrunch.com/2017/10/17/apple-responds-to-senator-frankens-face-id-privacy-concerns/

299

their use of employees for this data could not be consensual, so they did not provide that information to Congress.

1021.    As for Apple's complaints about Gjovik complaining about Apple asking repeatedly to scan Gjovik's ear canals, despite what Apple said to threaten Gjovik with a meritless IP lawsuit, the information Gjovik shared was not secret. In fact, Apple's extensive ear scanning was made public years prior,[406] and Apple would go on to talk about it more a couple months after Gjovik was fired, now claiming to have the largest library of ear (scans) in the world.[407]

1022.    In addition, contrary to what Apple claimed, Gjovik did not sign any NDA related to the ears. In fact, on August 10 2018 Gjovik emailed Apple, in response to similar requests, saying she didn't want her ears scanned "indefinitely."

1023.    The text of the post Apple complained about was Gjovik saying: "*I'm still over here in Apple's time-out chair & they keep telling me to respect my abuser's privacy & be silent. Meanwhile I got 3x of these in the last month since being on leave. NO, APPLE, STOP IT. I can't tell if they're harassing me or just being super intrusive or both.*"[408]Apple told Gjovik she was fired for posting this and called it "leaking."

1024.    Regardless of if Apple terminated Gjovik for the proffered reason, or the other reasons alleged, all reasons violate fundamental public policy, including interest in a workplace

---

[406] Wired, "*The secrets behind the runaway success of Apple's AirPods,*" Sept 5 2020, https://www.wired.co.uk/article/apple-airpods-success   "*We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes… we took that research further – studied more ears, more ear types.*"

[407] Wallpaper, *Inside Apple Park: first look at the design team shaping the future of tech*, Dec 9 2021, https://www.wallpaper.com/design/apple-park-behind-the-scenes-design-team-interview "*Thousands of ears were scanned.. I think we've assembled one of the largest ear libraries anywhere.*"

[408] Twitter, Aug 28 2021,: https://web.archive.org/web/20210829034222/https://twitter.com/ashleygjovik/status/1431824501457633283

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                OCTOBER 25 2023

free from illegal practices.[409] It is a violation of public policy for Apple to discharge an employee from employment due to the employee reporting crimes or due to the employee hiring an attorney,[410] due to the employee refusing to sign a liability waiver,[411] or for the employee refusing to engage in an unlawful act.[412] In *Collier*, the California Court of Appeal recognized that there is a compelling and "fundamental public interest in a workplace free from crime."[413] In *Banko v Apple*, the judge cited the *Collier* holding when striking down Apple's claim it could fire employees for whatever reason it wanted, even for reporting crimes.[414] The court explained that any laws captured in the penal code are always assumed to reflect public policy.

1025.   In all claims noted, Gjovik took action to report the issue/concern internally where feasible, attempting to work with the Apple to address the issues, but when Apple made its position clear that it would not change and that Gjovik would face retaliation if she continued to raise the issues/concerns, then she reported it publicly to a government, the media, and/or disclosing the information to the public herself in hope public pressure could influence more lawful and ethical conduct from Apple. Gjovik discussed these intentions publicly in interviews before she was fired.

1026.   Apple claims it retaliated against and terminated Gjovik for complaining about, protesting with her co-workers, and refusing to participate in activity that would have resulted in a violation of her rights and state and federal constitutions and statutes. Gjovik's termination was in violation of fundamental, basic, and substantial public policies of the State of California, including, but not limited to, section 1102.5 of the California Labor Code, section 17200 of the

---

[409] Banko; Collier; Ferrick.
[410] *Geliti v. Tishgart*, 77 Cal. App. 4th 219 (1999).
[411] *Baker Pac. Corp. v. Suttles*, 220 Cal. App. 3d 1148 (1990).
[412] Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167 (1980).
[413] *Banko* at 3.
[414] *Banko* at 5.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Business and Professions 2 Code, Article, I Section 1of the California Constitution, and Section 637.7 of the California Penal Code.

1027.   There is a two-year statute of limitations following termination to bring a claim in court. [415] The cause of action accrues at the time of dismissal.[416]

### i.    Tamney: Invasion of Privacy (Cal. Const. art. 1, § 1)

1028.   Article 1 of the California Constitution expressly recognizes that all people have an inalienable right to privacy. (CAL. CONST. ART. 1, § 1). The California Supreme Court has said that an invasion of privacy claim under the California Constitution requires the "*serious invasion*" of a "*legally recognized privacy interest*" in circumstances where the plaintiff enjoyed a "*reasonable expectation of privacy*".[417] The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians.[418]  Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.[419] This right to privacy impacts employment laws in many areas, from social media to surveillance to protection of medical information.

1029.   While "living on" (aka "dogfood") and "user studies" were often an actual responsibility of a role in Gjovik's Software Engineering team, she continued to feel pressure in Hardware Engineering as well. One example, in Gjovik's 2019 annual performance review, Powers wrote, "*She is an amazing bug finder. Everything she touches seems to break.*" Said one person, "*I'm impressed on ability to find bugs. It's odd that she just goes about her work yet finds so many panics/hangs on hardware that we say is solid. It helps that she's constantly living*

---

[415] Cal. Code Civ. Proc. § 335.1; *Turner v. Anheuser-Busch*, 7 Cal.4th 1238 (1994).
[416] See *Romano v. Rockwell Int'l, Inc*. (1996) 14 C4th 479, 501, 59 CR2d 20, 33; *Aviles-Rodriguez v. Los Angeles Comm. College Dist.* (2017) 14 CA5th 981, 991, 222 CR3d 444, 452.
[417] Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal. 4th 1, 35-37 (1994).
[418] *White v. Davis*,13 Cal.3d at p. 775.
[419] See *Annenberg v. Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637 [ 113 Cal.Rptr. 519]; 26 Hastings L.J. 481, 504, fn. 138 (1974).) *Porten v. University of San Francisco*, 64 Cal.App.3d 825, 829-30 (Cal. Ct. App. 1976)

*on as many unreleased products as she can and is diligent about filing bugs. Good stuff*! "There were many comments like this.

1030.   Gjovik was also coerced to 'file bugs' for any issues she found that could be software 'bugs' and to do so 'especially' if she 'hit the bug' in a 'customer scenario' (i.e., a situation that would be very unlikely to occur at work or during work hours) so Apple could obtain the invasive logging data from Gjovik, saying they cannot ask customers for that level of information.

1031.   Apple intended to invade it's employee's privacy. Whether it was to spy on them, to collect and hoard their data, or to exploit unpaid labor from them – Apple possessed intention and purpose in invading employee privacy, including Gjovik's privacy.

1032.   As Gjovik spoke with her coworkers about her opposition to Apple's surveillance practices, and many voiced the same concerns.[420] These conversations usually occurred outside of work hours, far from campus, and in hushed voices acknowledging Apple could be listening though their phones and other devices. Employers have no legal justification to monitor personal communications of their employees.[421] Gjovik was also unable to turn the logging and apps off, even if she felt brave enough to try worried Apple might notice and think she was disloyal. Gjovik repeatedly tried to sign out of the Gobbler app, but it always signed itself back in.

1033.   Apple violated Gjovik's right to privacy established by the California Constitution, by statutes, and by common law. Apple intruded into Gjovik's seclusion, Apple physically and constructively invaded Gjovik's privacy [Cal. Civ. Code § 1708.8(a), (b), (d)], and Apple surveilled Gjovik and forced Gjovik to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms in violation of California Labor

---

[420] See, *Myrna Arias v Intermex Wire Transfer*, Superior Court of the State of California, Bakersfield County, <u>Complaint</u> (May 5 2015). (settled out of court)
[421] see: *Watkins v. L.M. Berry & Co*., 704 F.2d 577, 583 (11th Cir. 1983); *In re Google Inc*., 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                              OCTOBER 25 2023

Code § 435.[422] This statute prohibits the employer from videotaping these areas and strictly

prohibits the use of that recording for "*any purpose*." Here, Apple used those videos, which

included biometric data, to develop its commercial products to sell to customers without actual

consent or notice to the people whose data was gathered, including <u>*bathroom videos*</u>.

1034.   The GDPR Article 29 Working Party emphasized the imbalance of power in the

employment context: "*Given the dependency that results from the employer/employee*

*relationship, it is unlikely that the data subject is able to deny his/her employer consent to data*

*processing without experiencing the fear or real risk of detrimental effects as a result of a*

*refusal. It is unlikely that an employee would be able to respond freely to a request for consent*

*from his/her employer to, for example, activate monitoring systems such as camera-observation*

*in a workplace, or to fill out assessment forms, without feeling any pressure to consent.*" The

Working Party also advises that the imbalance of power in the employment relationship makes

voluntary consent questionable and, for most work-related data processing, the GDPR lawful

basis relied upon "*cannot and should not*" be the employee's consent. [423]

1035.   Gjovik had a legally protected privacy interest and a reasonable expectation of

privacy under the circumstances (everyone should be able to demand privacy in the bathroom),

and Apple's conduct amounts to a serious invasion of Gjovik's protected interests.[424] Gjovik has

reasonable interests in precluding the dissemination or misuse of sensitive and confidential

information ('informational privacy') and interests in making intimate personal decisions or

---

[422] Cal. Lab. Code § 435 "(a) No employer may cause an audio or video recording to be made of an employee in a restroom, locker room, or room designated by an employer for changing clothes, unless authorized by court order. (b) No recording made in violation of this section may be used by an employer for any purpose. This section applies to a private or public employer."
[423] Joseph J. Lazzarotti and Maya Atrakchi, *Is Employee Consent under EU Data Protection Regulation Possible*?, National Law Review, February 27 2018, https://natlawreview.com/article/employee-consent-under-gdpr-possible
[424] *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1024 (N.D. Cal. 2012) (citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994)); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 829 (N.D. Cal. 2020)

conducting personal activities without observation, intrusion, or interference ('autonomy privacy')."[425]

1036.   Apple invaded Gjovik and other employee's privacy in many ways, but at issue here are Apple's requests to scan Gjovik's ears and Apple's use of the Face "Gobbler" application to gather videos and biometrics, and most importantly, Apple's declaration that those practices are 'secret' and any employee who 'leaks' those practices can be immediately terminated, even with open government investigations and charges against the employer.[426]

1037.   An   employee should be able to publicly protest an employer pestering them to 3D scan their ears and ear canals or to install an app on their iPhone called "Gobbler" that cannot be turned off and captures videos of faces with biometrics constantly, and which data is made immediately accessible to Worldwide Loyalty. Apple's declaration that it can terminate employees for protesting these invasions is a "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right*." [427]

1038.   The employer cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right. When an employee successfully refuses to submit to an employer's wrongful intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests.[428]

---

[425] *Hill* at 35; *In re Google* at 829.
[426] Apple's Position Statement, Apple FINAL DOL Response (Gjovik - CERCLA, OSHA, SOX), March 4 2022
[427] *Hill*. at 37. *In re Google* at 829.
[428] Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy

305

### ii.    Tamney: FTC Biometric Consent Rules

1039.   In addition to the privacy concerns, Apple is also unlawfully coercing employees to provide personal data Apple can use for research and development, including training machine learning models, without real consent or compensation, and in violation of federal competition laws and state and federal data protection laws. Apple's practices facially violate GDPR and Apple knows it, as it warned employees on August 3, 2017, to never use these apps "*in France and Germany*."

1040.   Section 5 of the FTC Act prohibits, among other things: unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable; and misleading statements to consumers.[429] Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

1041.   Here, Apple is not only coercing its employees to let Apple harvest their personal data, in highly personal situations and with omnipresent surveillance, but Apple is using that data to build their software for consumer products. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. One must assume Apple has hundreds of thousands of biometrics of non-employees – including children -- that are used to train Apple's machine learning models.

---

§ 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*
[429] FTC, *FTC Act Section 5: Unfair or Deceptive Acts or Practices*, Consumer Compliance Handbook, https://www.federalreserve.gov/boarddocs/supmanual/cch/200806/ftca.pdf

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

1042.   The FTC issued a statement recently on biometric privacy rights, explaining there are certain business practices that are always unlawful and there is never consumer 'consent' for those practices. They noted the FTC Act may be violated by "*surreptitious and unexpected collection of biometric information*."[430] FTC added, "*Injuries to consumers may also be compounded if there is no mechanism for accepting and addressing consumer complaints and disputes related to businesses' use of biometric information technologies*."[431] Like terminating an employee because they complained about the practices or tried to warn consumers?

1043.   The public policy on employee biometrics is clear with BIPA and GDPR; private entities are forbidden from selling or otherwise profiting from an employee's biometric identifier or biometric information under any circumstances.[432]

1044.   Further, as to Apple's "confidentiality" argument, the Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[433] Information regarding an employer's illegal activities is not protectable by means of restrictive covenant.[434] Facts relating to actual, alleged, or potential violations of the law are generally not protectable trade secrets. An employee's agreement not to disclose such information may, in some situations, be unenforceable as against public policy.[435] This is applicable here.

---

[430] FTC, *FTC Warns About Misuses of Biometric Information and Harm to Consumers,* May 18 2023, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers

[431] FTC, *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act,* https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf

[432] 740 ILCS 14/15(c).

[433] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret

[434] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret

[435] *EEOC v. U.S. Steel Corp.,* 671 F. Supp. 351, 358 (W.D. Pa. 1987); *Chambers v. Capital,* 159 F.R.D. 441, 444 1995);
*EEOC v. Astra, Inc.,* 94 F.3d 738, 745 (1st Cir. 1996)

307

1045.   Disgorgement is appropriate here and there is precedent of FTC using disgorgement as a remedy with at least five cases since 2019, including against Amazon and Cambridge Analytica.[436]

### iii.    Breach Of Implied Contract: Good Cause Required (*Foley*/*Banko*)

1046.   Gjovik worked for Apple for nearly seven years. Gjovik received numerous raises, commendations, positive evaluations, and promotions. Apple took actions to assure Gjovik of continued employment. Under the *Foley* factors, and like in *Banko v Apple*, Apple's words and/or conduct made it reasonable for Gjovik to believe that the employer promised to only discharge or demote her for good cause. For instance, Apple's personnel policies and practices include development plans that are to be issued prior to termination. In her 2017 annual review West told Gjovik, he" appreciates *her willingness to speak truth to authority" and told her to "keep doing this and good things will continue to follow."* This was a promise to Gjovik that if she reported unethical and unlawful conduct, and held leaders to account, that she would have continued employment at Apple.

1047.   Apple did not have good cause to discharge Gjovik for misconduct and did not conduct an appropriate investigation before terminating Gjovik. Apple claimed its investigation into Gjovik began on Aug 28-29, 2021, and that it knew then it would fire Gjovik. Apple hid the investigation into Gjovik and attempted to coerce Gjovik into phone calls under the premise Apple was investigating her concerns (not her). Apple contacted Gjovik twice after it supposedly started the investigation into Gjovik, both times pretending it was still investigating Gjovik's concerns, not that it was investigating Gjovik. Gjovik was already worried about bad faith conduct by Apple and requested communications to be in writing and if not, that Business

---

[436] IAPP, *Algorithm disgorgement 'significant part' of FTC's AI enforcement strategy,*
https://iapp.org/news/a/algorithm-disgorgement-significant-part-of-ftcs-ai-enforcement-strategy/

Conduct (Worldwide Loyalty) review her request and decide on the matter instead of the Employee Relations investigator.

1048.   Instead, Apple sent a "Workplace Violence and Threat Assessment" interrogator to terminate Gjovik knowing before he contacted her that he would fire her. Gjovik asked the interrogator to please explain what the accusations against her are, but the interrogator refused to respond and instead Gjovik received a vague notice of termination from her VP a few hours later.

1049.   Apple's termination of Gjovik was not honest, there was no appropriate investigation, and the termination was arbitrary and pretextual. Gjovik did not willfully breach a job duty, did not continually neglect her job duties, nor was she prevented from performing her job duties due to continued incapacity.[437] Apple did not act in good faith, the investigation was not reasonable, and Apple did not give Gjovik notice of the claimed misconduct or an opportunity for Gjovik to answer the charge of misconduct before making the decision to discharge Gjovik. Apple's practices were unlawful under California's Unfair Competition Law because it violated a rule contained in other statutes and combined with Gjovik's good-cause status, and the other issues noted above, Apple's termination of Gjovik was a violation of public policy.[438]

1050.   Apple also breached their Duty of Good Faith and Fair Dealing under the implied contract and written contract, by terminating Gjovik only days before annual bonus and salary increase, and only weeks before her next RSU vesting, in order to frustrated Gjovik's right to receive benefit from her agreement with Apple through opportunistic use of its corporate power.

---

[437] *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 57 [100 Cal.Rptr.2d 627]. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 100 Cal. Rptr. 3d 296 (Cal. Ct. App. 2009); *Cotran v. Rollins Hudig Hall Internat., Inc.,* 17 Cal.4th 93, 107 (Cal. 1998).
[438] Soil Retention Products, Inc. v. Brentwood Industries, Inc., S.D.Cal.2021, WL 689914 (2021).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

Further, Apple put Gjovik in a position where she was obligated by Apple policy to report issues but was punished for doing so, similar to *Banko v Apple*. Finally, Apple also fabricated the "evidence" it cited to justify terminating Gjovik, including inciting employees to file meritless complaints against Gjovik.[439]

1051.   There is at four-year statute of limitations for written contracts and a two-year statute of limitations for oral contracts to file a claim in court.[440]

**I.    NUISANCE (CAL. CIVIL CODE § 3479)**

1052.   Gjovik claims harm caused by Apple due to Apple's creation of a private nuisance, continuing nuisance, and absolute nuisance.

1053.   Gjovik controlled her apartment at 3390 Octavius Drive. Apple created a condition to exist that was harmful to health, offensive to the sense, and/or obstructed the free use of property as to interfere with the comfortable enjoyment of that property. Apple's conduct was intentional, reckless, and/or negligent. The condition Apple created substantially interfered with Gjovik's use and/or enjoyment of land, and an ordinary person would be reasonably annoyed by the condition. Gjovik did not consent to a defendant's conduct and Gjovik was harmed. Apple's conduct was a substantial factor in causing Gjovik's harm and the seriousness of the harm outweighs the social utility of the Apple's conduct. [441]

1054.   Gjovik suffered harm because Apple created a nuisance. Gjovik leased an apartment at 3390 Octavius Drive (aka 3255 Scott Blvd). Apple by acting and failing to act, created a condition or permitted a condition to exist that was harmful to health, offensive to the senses, was an obstruction to the free use of property, and was a fire, explosion, and poisoning

---

[439] *Town of Cheswold v. Vann,* 9 A.3d 467, 473 (Del. 2010).
[440] Cal. Code Civ. Proc. § 337, 339
[441] *Lussier v. San Lorenzo Valley Water Dist*. (1988) 206 Cal.App.3d 92, 100 [253 Cal.Rptr. 470].

hazard. Apple's conduct in acting or failing to act was intentional, unreasonable, and/or reckless. The condition Apple created and permitted to exist was the result of abnormally dangerous activity for which there should also be strict liability. [442]

1055.   Like in *King v Columbian Carbon*, Apple is continuously casting pollution upon the property of the owner and tenants of the Santa Clara Square Apartments, as it knew it would do when it constructed its plant. It knew then, as it knows now, that so long as it would continue its operation the pollution would continue to fall, not by accident or mishap, but in conformity with knowledge that it had before the erection of the plant. Apple should be presumed to have intended the natural known, and reasonable consequences of its act.[443]

1056.   The condition created by Apple interfered with Gjovik's use and/or enjoyment of her apartment. An ordinary person would reasonably be annoyed or disturbed by Apple's conduct and Gjovik did not consent to Apple's conduct. Gjovik was harmed and Apple's actions and omissions was a substantial factor in causing Gjovik's harm and the seriousness of the harm outweighs any public benefit of Apple's conduct.

1057.   Semiconductor manufacturing plants are long known to be dangerous for workers and those exposed to the chemicals used. Defendants knew or should have known that the chemicals released can cause reproductive hazards, including spontaneous abortions, stillbirths, malformations, birth defects, early childhood cancers, and other neurological, developmental, and degenerative conditions.[444]

---

[442] *Lussier*, supra, 206 Cal.App.3d at p. 100; see Rest.2d Torts, § 822).
[443] *King v. Columbian Carbon Co*., 152 F.2d 636, 640 (5th Cir. 1945)
[444] *Molina v. on Semiconductor Corp.,* C.A. No. N10C-12-267 JRJ (Del. Super. Ct. Mar. 27, 2013)

1058.   Damages may be recovered for "annoyance and distress, including mental anguish." Nominal damages are often awarded as well. [445] Once a cause of action for trespass or nuisance is established, an occupant of land may recover damages for annoyance and discomfort that would naturally ensue therefrom.[446]

1059.   Apple released chemicals categorized by Cal. Code Regs. Tit. 17, § 93000 as "Substances Identified as Toxic Air Contaminants" of which there is no safe level of exposure without "significant adverse health effects." These chemicals included: Benzene, Methylene Chloride, Chloroform, Vinyl Chloride, Formaldehyde, 1,3-Butadiene.[447] Apple released into the air chemicals categorized under 42 U.S.C. Section 7412(b) as "Hazardous Air Pollutants" and Cal. Code Regs. Tit. 17, § 93001 as "Hazardous Air Pollutants Identified as Toxic Air Contaminants" including: Benzene, Chlorine, Chloroform, Cresol, Ethylbenzene, Formaldehyde, Hexane, Phenol, Phosphine, Phosphorus, Toluene, Vinyl Chloride, Arsine. [448]

## J.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1060.   Apple inflicted IIED and/or NIED upon Gjovik in California from the start of the limitations period until Gjovik left California on August 31, 2021, at which point, Apple then inflicted IIED and/or NIED upon Gjovik starting once she arrived in New York on September 1 2022. Apple's extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, or negligently causing, emotional distress – actually and

---

[445] Kornoff v Kingsburg Cotton Oil Co (1955) 45 Cal.2d 265, 272. Kelly v CB&I Construction, Inc (2009) 179 Cal.App.4th 442, 456.
[446] *Kornoff v. Kingsburg Cotton Oil Co*. (1955) 45 Cal.2d 265, 272 [288 P.2d 507]
[447] Cal. Code Regs. Tit. 17, § 93000 - Substances Identified As Toxic Air Contaminants
[448] Cal. Code Regs. Tit. 17, § 93001 - Hazardous Air Pollutants Identified as Toxic Air Contaminants

proximately caused Gjovik to suffer severe or extreme emotional distress due to Apple's conduct.[449]

1061.    Gjovik began complaining to Apple in July 2021 that they were inflicting emotional distress (IIED) upon her. Generally, wrongfully motivated personnel decisions are not considered conduct "*beyond the bounds of human decency*" for the purposes of an IIED claim.[450] However, Punitive damages are still awarded for employment retaliation in cases of "*systematic courses of retaliation*" by creating an "*intimidating, hostile, and offensive working environment*."[451] An employer is liable for the willful and malicious torts of its employees committed in the scope of employment.[452]

1062.    Severe emotional distress means "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it."[453] Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society and is of a nature which is especially calculated to cause, and does cause, mental distress.[454]

1063.    Apple's conduct was not mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[455] Apple's misconduct towards Gjovik was/is extreme,

---

[449] *Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998). *Ferretti v. Pfizer Inc.,* 855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012)
[450] *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80; *Koerber v. Encyclopedia Britannica*, Inc., No. B312047, 9 (Cal. Ct. App. Jul. 13, 2022)
[451] *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 620 (Cal. Ct. App. 1989)
[452] *John R. v. Oakland Unified School Dist*. (1989) 48 Cal.3d 438, 447 [ 256 Cal.Rptr. 766, 769 P.2d 948]. *Fisher v. San Pedro Peninsula Hosp*., 214 Cal.App.3d 590, 618 (Cal. Ct. App. 1989)
[453] *Hughes v. Pair*, 46 Cal.4th 1035, 1051 (Cal. 2009); *Potter v. Firestone Tire Rubber Co*, 6 Cal.4th at p. 1004.
[454] *Fisher v. San Pedro Peninsula Hosp*., 214 Cal.App.3d 590, 617 (Cal. Ct. App. 1989); Prosser, Law of Torts (4th ed. 1971) p. 54; *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 229-30 (Cal. Ct. App. 1983).
[455] Rest.2d Torts, § 46; *Molko v.Holy Spirit Assn*. (1988) 46 Cal.3d 1092, 1122 [ 252 Cal.Rptr. 122, 762 P.2d 46], overruled on another ground in *Aguilar v. Atlantic Richfield Co*., supra, 25 Cal.4th 826, 853, fn. 19;

313

outrageous, persistent, and omnipresent. Apple's conduct left Gjovik in such fear for her safety, the safety of her dog, the integrity of her electronics and utilities, and the safety of her chattels – that Gjovik was confined to her home. Gjovik was and is under a justified belief that leaving her home, or even failing to properly secure entry to her home, would place her in danger and she could be killed. Gjovik was and is under a justified belief that leaving her dog at home unattended could result in harm to her dog and that he could be killed by Apple.[456] Apple has physically interacted with Gjovik's dog once, during at least one break-in to Gjovik's home, leaving a scent of cigarettes on the dog's body along with other signs of break-in, trespass to chattels, and additional modification of Apple's unlawful surveillance systems.

1064.    What distinguishes this claim from the Bane Act or Ralph Act claims, is Apple's deranged harassment, threats, and intimidation was intentional and malicious, following and with full knowledge that in 2020, Apple's emissions of toxic chemicals and gases into Gjovik's home left Gjovik unable to function and disabled, even formally on state short-term disability from May through September 2020.

1065.    Gjovik did not know what was making her ill at the time and was told it could be fatal illness or injury. Gjovik did not understand what the cause of her injury was and was warned by doctors that her fainting spells could lead to death if she was to fall and whack her head, and that if she had a fatal arrythmia that exercise could provoke a lethal heartbeat, and as such Gjovik was put on bed rest for months – concurrently while being poisoned by Apple's manufacturing emissions while she was at home and in bed. Apple's actions made Gjovik fear for her life, caused severe physical injuries, put Gjovik at high risk for cancer and disease in her lifetime, put Gjovik's dog at risk for cancer and disease, made Gjovik's hair fall out, caused

---

[456] ICAN Foundation, Stalking, "Though dogs provide a valuable service as a security agent for our homes, please be advised that a stalker may harm your animals. If you have a dog, make sure that you keep it indoors when you are not home and that you have a secure environment for it when you are home."

growths and rashes that may permanently disfigure Gjovik, and then proceeded to cover up what Apple did to Gjovik, while intentionally harassing, intimidating, threatening, and terrorizing Gjovik – knowing that the increased stress they were causing Gjovik was to make Gjovik even more likely to develop cancer and disease.

1066.    Apple could have acted with some decency and reserve, but instead Apple bugged Gjovik's objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, sued her, and reported her to law enforcement, repeatedly threatened to harm and "*ruin*" and "*destroy*" her, and even sent her emails pretending to be government employees threatening her to shut up about Apple's chemical leaks. Through all of this, Apple went out of their way to act like deranged maniacs whose conduct clearly exceeded all bounds of decency usually tolerated by society.

1067.    Apple did follow through on many of its threats (like suing Gjovik), and frequently combined online harassment with physical in-person harassment confirming to Gjovik online what they were doing in person, all of which makes Apple's conduct menacing, and not trivial.[457] Also, sufficient allegations for intention to cause or reckless disregard of the probability of causing emotional distress may be satisfied by threats concerning Gjovik's health and that of the Gjovik's family – like threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of "*suicide*" but "*never mind the double-tap.*"[458]

1068.    When Gjovik explains to people what Apple has done to her, when she shows them Apple's emails and posts, shows them the evidence she gathered of their physical intrusions and harassment, the default response is not to simply shake their head with

---

[457] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[458] *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 230 (Cal. Ct. App. 1983)

disappointment. No, it is to exclaim something such as "*Outrageous!!*"[459]  Further, these actions have caused fear in those around Gjovik, as well as in Gjovik herself. Gjovik has lost many friends through this – which she cannot blame them as Apple's menacing is likely smoke from the fire of actionable threats of violence and mayhem.[460]

1069.   Further, Apple's supposed (but pretextual) reason for firing Gjovik was two topics Gjovik had spoken about because Gjovik was so distressed by Apple's original conduct, but then Apple claimed Gjovik's outcry was an offense worthy of immediate termination, despite Apple's original conduct (the Face "Gobbler" app and the ear canal scans) being highly unlawful, unethical, and in some cases illegal.

1070.   In fact, A 2023 New York case awarded damages for Negligent Infliction of Emotional Distress due to the use of cameras in bathrooms. Gjovik protested "Gobbler," for among other reasons, it is taking photos of her while naked and while in the bathroom, and while naked in the bathroom. Gjovik complained of conduct found to be NIED and Apple then implicitly threatened to sue her if she was to protest it again and blamed their highly unlawful retaliation against Gjovik on Gjovik's outcry about unlawful conduct.[461]

1071.   Similarly, Appleseed's retaliatory litigation filed against Gjovik in 2022 was admittedly due to Gjovik's complaints about witness intimidation and harassment. The point of the lawsuit and request for the gag order was to prohibit Gjovik from speaking out about the trauma she was experiencing with threat of incarceration if she were to even complain privately. During that litigation, the petitioner from Apple's Worldwide Loyalty team, wrote in email to Gjovik saying that Gjovik complaining about Apple's death threats and Gjovik complaining about Apple trying to make her suicidal was "*harmful to Apple*" and Appleseed said she

---

[459] *Cochran v. Cochran*, 65 Cal.App.4th 488, 76 Cal. Rptr. 2d 540 (Cal. Ct. App. 1998).
[460] Rest.2d Torts, § 46, com. d. p. 73.
[461] *Brown v. New York Design Ctr., Inc*., N.Y. App. Div. 1st Dep't (Mar. 9, 2023).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                     OCTOBER 25 2023

"*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony (February 5 2022). After the gag order, Gjovik then could not complaint about what occurred without risking years of incarceration.

1072.   Appleseed then proceeding to continue to stalk, harass, defame, and intimidate Gjovik knowing she could get Gjovik incarcerated for multiple years if Gjovik responded in anyway.

1073.   Apple's conduct of course left Gjovik with "*discomfort, worry, anxiety, upset stomach, concern, and agitation*".[462] However, Gjovik also experienced overwhelming "*shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment [and] worry.*"[463]

1074.   Apple's actions were so extreme and caused such severe disruption to Gjovik's life, Gjovik suffered panic attacks worrying about losing her home and not having food or being able to care for her dog.[464] Gjovik cried every day. Gjovik kept a "go bag" by her front door in case some Apple-captured police offer showed up to haul her away to prison in Seattle. Gjovik had to arrange guardians for her dog and drafted a signed letter she posted on the door and gave to the guardians that instructed the police to allow the guardians to pick up Gjovik's eight-pound Chihuahua from the pound if Gjovik was arrested and incarcerated. Gjovik was and is constantly on edge.

1075.   Apple's surveillance of Gjovik during the retaliation period and prior when she was an employee using one device for personal and work, as requested by Apple, empowered

---

[462] *Koerber v. Encyclopaedia Britannica, Inc.,* No. B312047, 10-11 (Cal. Ct. App. Jul. 13, 2022)
[463] *Crisci v. Security Ins. Co.,*66 Cal.2d 425, 433 [ 58 Cal.Rptr. 13, 426 P.2d 173]; Rest.2d Torts, § 46, com. j. *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397 (Cal. Ct. App. 1970).
[464] *Alcorn v. Anbro Engineering*, Inc.,2 Cal.3d 493, 498; *Fletcher v. Western National Life Ins. Co.,* 10 Cal.App.3d 376, 398 (Cal. Ct. App. 1970).

Apple with massive amounts of data to know Gjovik's "work, home, personal lifestyle, patterns

of living, and daily comings and goings."[465]

1076.    Apple also has access to weapons, having weapons is part of Apple Global

Security's self-image and the self-image of their ex-law enforcement and ex-military staff,

Apple's threats have extended to Gjovik's friends and been made directly to Gjovik's friends,

Apple has a history of abuse and violence, Apple has destroyed Gjovik's property, Apple has

enlisted others to monitor and harass Gjovik, Apple has made unwanted attempts to

communicate with Gjovik directly and through third-parties,

1077.    Apple is notoriously obsessed with power and revenge, and Apple (one of the

most wealthy and powerful companies in the history of the modern world) surely has the means

to carry out any of their threats or any act of violence it desires against Gjovik.[466]

1078.    Apple smeared Gjovik's image and credibility beyond repair

1079.    As documented in legal filings, emails, doctor appointments, and in therapy

sessions throughout these two years – Gjovik has suffered severe insomnia, nausea from stress to

the point of vomiting, severe depression requiring anti-depressants due to suicidal ideation and

crying uncontrollable for hours every day. Gjovik suffers from paralyzing anxiety, and it has

been difficult to even get up and walk around, with Gjovik generally spending all day in some

form of the 'fetal position.' Gjovik has alternated between over eating and under eating, but

overall gained over forty pounds starting in late 2021. Gjovik's body has been stuck in PTSD

"hyperarousal" and she is constantly hyper-alert and vigilant, listening for sounds that there

could be another break in, or anther stalker outside her home waiting to harass her. Gjovik has

not been able to 'relax' for over three years.

---

[465] US DOJ, *Model Protocol for Community Oriented Police Response to Stalking,*
https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-w0045-pub.pdf
[466] Id.

1080.    Gjovik seriously considered suicide several times in 2021 - 2023.

1081.    Apple had full knowledge of Gjovik's precarious financial and medical situations, and the prior impact to her mental health before Apple started retaliating about the office. Apple knew the retaliation about the office would further traumatize Gjovik after Apple had previously traumatized her due to the 3250 Scott Blvd emissions. Then, Apple intentionally terrorized Gjovik more in addition to the office retaliation – with holistic, expansive, passionate terrorism of Gjovik assumably in hope that Gjovik killed herself or died of cancer quicker than she would have otherwise. Gjovik has spoken and written about this extensively over the last six months after discovering what Apple did at 3250 Scott Blvd and realizing the incredibly depravity of Apple's conduct.

1082.    Further, Apple's conduct caused Gjovik to suffer severe emotional distress when Apple exposed Gjovik to carcinogenic chemicals. Apple's conduct with the carcinogen chemicals was outrageous. Apple's intentional, reckless, and/or negligent conduct exposed Gjovik to carcinogens including TCE, Toluene, Arsine, and Vinyl Chloride. Apple intended to cause Gjovik distress, and acted with reckless disregard of the probability that Gjovik would suffer emotional distress knowing she was present where there were carcinogenic chemicals. Gjovik suffered severe emotional distress from a reasonable fear of developing cancer and Apple's conduct was a substantial factor in causing Gjovik's severe emotional distress. [467] Apple's conduct was despicable (base, vile, contemptible), and subjected Gjovik to cruel and unjust hardship, and was carried out with a willful and/or conscious disregard of Gjovik's rights and safety. In addition, or in the alternative, Apple intentionally misrepresented and/or concealed a material fact known to Apple (that Apple was responsible for Gjovik's 2020 illness) wanting to cause Gjovik harm by Gjovik not being able to litigate with all material facts and not able to take

---

[467] Potter v. Firestone Tire and Rubber Co. (1993) 6 Cal.4th 965, 1001.

319

necessary preventative measure for her health, with an apparent goal that Gjovik will soon die of cancer and disease, homeless and bankrupt -- as Apple's social media accounts threatened two years ago.[468]

1083.   Apple had a duty to follow environmental and health/safety laws, which it breached repeatedly and egregiously, resulting in emissions of carcinogenic chemicals. Reliable medical and scientific opinion will confirm that Gjovik's risk of developing cancer was significantly increased by the exposure caused by Apple and has resulted in actual risk that is significant. It appears Apple may have already caused Gjovik to develop cancer on her thyroid and she is waiting on a consultation with a specialist to learn more, but scheduling is severely delayed as Gjovik is now on Medicaid.[469] The latest ultrasound showed additional morphology of the growth.

1084.   In California, there is a two-year statute of limitations to file a complaint for IIED or NIED.[470] New York as a one-year (from act) statute of limitations for IIED and three years (from act) for NIED.[471] Gjovik argues Apple's conduct was IIED, but if not then, or concurrently also NIED. NIED does not require 'extreme and outrageous conduct.'[472]

## K.   PRETEXT GENERALLY

1085.   Between at least September 3 2021 and March 2022, Apple's explanation for terminating Gjovik changed multiple times; first presented as a neutral update on the investigation into Gjovik's concerns timed with publication of a defamatory article about

---

[468] CollegeHospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, 725.
[469] CACI No. 1601. Intentional Infliction of Emotional Distress - Fear of Cancer, HIV, or AIDS
[470] Cal. Code Civ. Proc. § 335.1; *Wassmann v. South Orange County Community College District*, No. G053411, California Court of Appeal (June 12, 2018)
[471] CPLR 215(3); 14 N.Y.Prac., New York Law of Torts 1:40
[472] Brown v. New York Design Ctr., Inc., 2023 WL 2417772 (N.Y. App. Div. 1st Dep't Mar. 9, 2023). Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc. (1989) 48 Cal.3d 583; Burgess v. Superior Court (1992) 2 Cal.4th 1064.

Gjovik's NLRB charge (September 3), then shifting to a request to discuss "*inconsistencies*" in Gjovik's complaints (September 7), then some urgent matter related to Workplace Violence, and confidential information requiring a response within 'the hour' (September 9), then accusations Gjovik vaguely violated Apple's employment policies and refused to get on the phone with the interrogator (later on September 9), then implying she was fired due to some of her Twitter posts on August 28 and August 30, including her open and public participation in an article about work conditions at Apple (September 15), then claiming Gjovik was fired for secretly, maliciously leaking confidential, product-related information and refusal to participate with an alleged investigation (March 2022).[473] All of these share some facts, yet differ on Apple's roaming pretextual, fragmented, and conflicting narratives.

1086.   Apple's animus against Gjovik continued to increase with the additional government charges and complaints she filed, and the continued requests from US EPA due to her disclosures, and any regulatory paperwork or communications required related to hazardous waste at 825 Stewart Dr and 3250 Scott Blvd. Actions related to the continued processing of a complaint may remind an employer of its pendency or stoke an employer's animus.[474]   Apple's corrupt conduct towards Gjovik became increasingly deranged the more Gjovik spoke out about Apple's Worldwide Loyalty team and Apple's history of trouble with the California and US governments.

1087.   Apple's later explanations for firing Gjovik contradict with the facts at the time of the termination. Apple claimed to not know about the article Gjovik participated in published August 30 2021, yet Apple was asked for comment on the article by the publisher several days

---

[473] *Timmons v. Franklin Electric Coop.*, 1997-SWD-2 (ARB Dec. 1, 1998) (shifting explanations for termination point to pretext)
[474] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008); *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).

prior to publication. Apple later claims Gjovik tried to conceal her involvement in the article, but the article includes quotes from Gjovik by name and an embedded video of images of Gjovik's face. Apple's later disclosed timeline of events around Gjovik's termination reveal Apple planned to terminate Gjovik by no later than August 29 2021, yet Apple contacted Gjovik on September 3 under the premise of discussing the details of Gjovik's complaints about harassment and retaliation.[475] Simple inconsistencies between reasons and facts have been enough to prove pretext in the "context of a concerted effort to conceal major safety hazards."[476]

1088.   Before Gjovik was fired, she had excellent performance ratings and an absence of prior complaints against her. Around the time of Gjovik's suspension and termination, Apple had indicated they were upset with Gjovik's protected activity and continued to advise Gjovik to not report safety concerns to her coworkers or the government.

1089.   Apple was also grossly dishonest about Gjovik's protected activity – including a conspiracy to conceal from Gjovik that her disclosures led to an US EPA inspection of her Apple office, that the US EPA identified a number of issues including active vectors for exposure to TCE and other chemicals, and that Apple was operating a secret semiconductor manufacturing plant venting metric tons of solvent fumes directly into the apartment windows where Gjovik lived when she got severely ill from solvent fumes.

1090.   Prior to her termination, and for some time, Apple had created and maintained an abuse and hostile work environment for Gjovik. The harassment Gjovik suffered would have detrimentally affected a reasonable person and did detrimentally affect Gjovik. The discriminatory conduct was frequent, pervasive, and severe; Gjovik suffered humiliation and harassment that unreasonably interfered with Gjovik's ability to do her job. The harassment included abuse and threats of abuse that seriously scared and harassed Gjovik for not legitimate

---

[475] Overall v. Tennessee Valley Authority, 97-ERA-53 (ALJ Apr. 1, 1998).
[476] St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

or lawful reasons.[477] After Gjovik's protected activity reporting her illness next to Apple's facility at 3250 Scott, reporting concerns about Apple's dealings about the COVID vaccine, and complaining about safety concerns at her office – Apple additionally established a hostile work environment through retaliatory harassment. Apple also refused to remedy the issues, even denying transfers.

1091.   Where the harassment was previously not severe enough to alter the terms and conditions of her employment, once the retaliation began, all actions noted were sufficient to be "retaliatory harassing conduct." [478]  In addition, or in the alternative, harassment & similar abuse occurred repeatedly over the course of Gjovik's employment and thus constitutes a hostile work environment even if not severe.[479] In addition or in the alternative, causation is seen from evidence that harassment by supervisors intensified shortly after Gjovik filed complaints.[480]

1092.   Apple terminated Gjovik within weeks, days, and under some statutes – only a matter of hours – after Gjovik engaged in protected activity. The temporal proximity here is enough for sole substantiation, but there is much additional evidence of pretext. Apple did not follow its own termination policies & process, and others were not terminated for the same actions; others were not terminated for far worse actions.

---

[477] California Courts, *Understanding Harassment Laws*, https://www.courts.ca.gov/1258.htm
[478] *See, e.g.*, *Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*, an employee claiming "retaliation by workplace harassment" is "no longer required to show that the harassment was severe or pervasive"); *EEOC v. Chrysler Grp., LLC*, No. 08-C-1067, 2011 WL 693642, at *8-11 (E.D. Wis. Feb. 17, 2011) (holding that reasonable jury could conclude employees were subjected to
unlawful retaliation under *Burlington Northern* standard when human resources supervisor verbally harassed them by screaming and pounding his fists on the table while threatening termination if they filed grievances). *See* Federal Sector Equal Employment Opportunity, 77 Fed. Reg. 43,498, 43,502 (July 25, 2012) (codified at 29 C.F.R. § 1614), https://federalregister.gov/a/2012-18134.
[479] *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)
[480] *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8-9 (1st Cir. 2006)

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                      OCTOBER 25 2023

1093.   Apple's online harassment cited Gjovik's protected activity as the reason for termination & retaliation. Before she was fired, Apple repeatedly told Gjovik not to speak with coworkers about her concerns about safety, labor, or retaliation. Apple's proffered reasons do not explain the other retaliation against Gjovik from March 2021-August 2021 (hostile work environment, constructive termination, reassigning of projects, increase in workload, assignment of unfavorable projects, etc.). Gjovik's September 9 2021 termination freed Apple from having to respond to Gjovik's discrimination and retaliation complaints, workplace safety complaints, vapor intrusion testing results, or provide her annual performance review the next week.

## IX.    DEMAND FOR RELIEF

1094.   **On the First Cause of Action: SOX Retaliation:** Apple violated SOX whistleblower retaliation prohibitions and thus owes Gjovik "make whole relief" with compensatory damages including lost wages (back pay, and front-pay or reinstatement), attorney's fees, and special damages for emotional distress and reputational harm.

1095.   **On the Second Cause of Action: Dodd-Frank Retaliation**: Due to of Apple's violation of the Dodd-Frank Act, Gjovik requests reinstatement (or front pay), two times the amount of back pay owed to the individual, with interest, and compensation for litigation costs, expert witness fees, and reasonable expenses.

1096.   **On the Third Cause of Action: Bane Civil Rights Act (§52):** Gjovik was harmed, and Apple's conduct was a substantial factor in causing Gjovik's harm. The Bane Act applies to private actors when they try to or do interfere with a victim's civil rights, as Apple did to Gjovik. Because Apple violated the Bane Act, Gjovik should be awarded compensatory damages, punitive/exemplary damages, attorney's fees with a fee multiplier, injunctive relief including a restraining order against Apple to protect Gjovik, treble damages, and a civil penalty

of $25,000.[481] Damages should be up to a maximum of three times the amount of actual damages but in no case less than $4,000 and attorney's fees.[482]

1097.    Damages should include, but not be limited to: Gjovik's loss of employment, Gjovik's legal costs in fighting retaliatory litigation, costs to hire a 'reputation management firm' to remove or downrank defamatory articles about Gjovik based on Apple's actions and allegations against her, moving costs to flee California and hide in New York, expenses for personal and home security measures, and compensation for her mental anguish and emotional suffering from living in fear.[483]

1098.    **On the Fourth Cause of Action: Ralph Civil Rights ACT (§51.7):** Gjovik was harmed and Apple's conduct was a substantial factor in causing Gjovik's harm.[484] Because Apple violated the Ralph Act, Gjovik should be awarded compensatory damages, punitive/exemplary damages, attorney's fees, a restraining order against Apple to protect Gjovik from Apple, and a civil penalty of $25,000.[485] Damages should include, but not limited to, losses described under The Bane Act above.[486]

1099.    **On the Fifth Cause of Action: RICO Act:** Between 2017 and 2021, Gjovik's salary increased from $120,000 to $169,000 (an increase of 40%) and she went from $144,717 in

---

[481] Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b).
[482] § 52. Denial of civil rights or discrimination; damages; civil action by persons aggrieved; intervention; unlawful practice complaint; waiver of rights by contract
[483] Cal. Civ. Code §§ 52(c) and 52.1(i); *Rodriguez v. County of LA*, 891 F.3d 776, 808–809 (9th Cir. 2018); Cal. Civ. Code § 52(b); *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1446-48 (2006).
[484] Cal. Civ. Proc. Code § 338. § 14:2. Ralph Act, Calif. Fair Housing and Public Accommodations § 14:2; *Stamps v. Superior Court*, 136 Cal.App.4th 1441, 1452 n.8 (Cal. Ct. App. 2006); *Ventura v. ABM Indus. Inc.,* 212 Cal. App. 4th 258, 269 (2012).
[485] 3068. Ralph Act - Damages and Penalty (Civ. Code, §§ 51.7, 52(b))
[486] Judicial Council of California Civil Jury Instruction 3068 Ralph Act - Damages

total compensation in 2015, to $386,382 in 2020 (an increase of 267%).[487]  At the time of her

termination, Gjovik held $590,000 in unvested Apple Inc RSUs. Gjovik's next annual

performance review was the week after she was terminated, and she had been expecting

compensation to be at least what she received the year before (another 3-4% salary increase, a

$22,000 bonus, and another $130,000 four-year RSU grant). Gjovik lost tangible pay due to

Apple's felonious discharge of her employment.

1100.   RICO injury claims require tangible harm and monetary loss. As described in the

RICO section, Gjovik suffered much damage to her chattel property due to Apple's

environmental mail and wire fraud, and nonpeaceful use of chemical weapons.

1101.   **On the Sixth Cause of Action: Ultrahazardous Activities**: Because Apple

engaged in ultrahazardous activities and caused injury to Gjovik through those activities, Gjovik

requests compensatory damages, including for distress and mental anguish.

1102.   **On the Seventh Cause of Action: Cal. Labor Code § 1102.5:** Because Apple

retaliated against Gjovik due to Gjovik's whistleblowing in violation of Cal. Labor Code §

1102.5, Apple owes Gjovik a civil penalty of $10,000 for each violation and reasonable

attorney's fees.[488] Apple shall also indemnify Gjovik of all her necessary expenditures or losses

incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with

interest.[489] Examples of violations are listed in the allegations.

1103.   **On the Eight Cause of Action: Cal. Labor Code § 98.6:** Because Apple

violated Cal. Labor Code § 98.6 by discriminating, retaliating, and taking adverse against Gjovik

because Gjovik engaged in protected conduct, Gjovik is owed reinstatement (or front pay),

---

[487] Note: these calculations are for purposes of proving tangible harm only and are not inclusive
of all factors to determine damage amounts, do not contain all damage and remedy types, and are
not meant to preclude or interfere with later remedy determinations.
[488] Cal. Lab. Code § 1102.5(f). *Sargent v. Board of Trustees of the California State University*,
Sonoma County Super. Ct. No. SCV-255399 (2021)
[489] Cal. Lab. Code § 2802

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

reimbursement for lost wages and work benefits, and civil penalties up to $10,000 for each employee for each violation.[490] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[491]

**1104.   On the Ninth Cause of Action: Cal. Labor Code § 6310:** Because Apple violated the California Occupational Safety and Health Act by discharging, threatening to discharge, demoting, suspending, and/or discriminating against Gjovik because Gjovik raised workplace safety concerns, Apple must reinstate Gjovik (or pay front pay) and reimburse Gjovik for lost wages and work benefits. [492] Apple shall also indemnify Gjovik of all her necessary expenditures or losses incurred by Gjovik in direct consequence of Apple's unlawful discharge of her duties, with interest.[493]

**1105.   On the Tenth Cause of Action: Wrongful Discharge in Violation of Public Policy**: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy; the discharged employee may maintain a tort action and recover damages traditionally available in such actions."[494] Gjovik requests compensatory damages, consequential damages, punitive damages, attorney's fees, and injunctive relief.

**1106.   **Gjovik requests all remedies available, including back-pay (for lost wages, bonuses, & benefits), compensatory damages (for pecuniary losses, emotional distress, mental anguish, reputational harm, personal humiliation), punitive and exemplary damages for Apple's reckless and callous disregard for Gjovik's rights and health, injunctive and declaratory relief including reinstatement (or front-pay), and purging of negative personnel records.

---

[490] Cal. Lab. Code § 98.6(b).
[491] Cal. Lab. Code § 2802
[492] Cal. Lab. Code § 6310(b).
[493] Cal. Lab. Code § 2802
[494] *Tameny v. Atlantic RichfieldCo*. (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330]

**1107.   On the Eleventh Cause of Action: Nuisance**: Cal. Civ. Code § 3501 provides remedies against a private nuisance in a civil action. Gjovik requests damages for annoyance, distress, mental anguish, and nominal damages.[495] Gjovik seeks compensatory damages for the injury caused by the nuisance, including personal injury.

**1108.   On the Twelfth Cause of Action: Intentional Inflict of Emotional Distress**: Because Apple inflicted severe emotional distress on Gjovik, Apple shall compensate Gjovik for emotional distress including but not limited to medical bills, lost wages, lost earning capacity, and other compensatory damages. Gjovik should be compensated for her anxiety, depression, insomnia, disordered eating, loss of consortium, PTSD, loss of reputation, and loss of enjoyment of life activities. Apple also should pay Gjovik the maximum amount of punitive/exemplary damages due to Apple's outrageous, repugnant, and deranged conduct.[496] Apple is liable for a variety of special remedies.

## A.   SPECIAL REMEDIES

**1109.   Gjovik** is informed and believes and, on that basis, alleges that Apple was at all relevant times aware of the conduct of all of their employees and agents, and approved and ratified that conduct.

### i.   Exemplary and Punitive Damages

**1110.   Apple** engaged in despicable conduct, exposing Gjovik to cruel and unjust hardship, with the intention to cause injury to Gjovik, and with conscious disregard of her rights. Defendants occupied a position of trust which gave them power to damage Gjovik's ability to earn a livelihood. Apple abused that position of trust by maliciously, fraudulently, and

---

[495] *Kornoff v Kingsburg Cotton Oil Co* (1955) 45 Cal.2d 265, 272.
[496] California Civil Jury Instructions (CACI) 1600. See, for example, *Christensen v. Superior Court* (1991) 54 Cal.3d 868; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995; *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590; *Hughes v. Pair* (2009) 46 Cal.4th 1035.

oppressively discharging Gjovik and intentionally interfering with her business. Apple's conduct was carried out by and ratified by one or more of Apple's agents, and it was willful and oppressive and done in conscious disregard of her rights. Gjovik is therefore entitled to punitive damages in an amount to be proven at trial.

1111.  Punitive (aka exemplary) damages are appropriate in this case. California law permits awards of punitive damages "for the sake of example and by way of punishing the defendant."[497] The most important factor in determining the amount of punitive damages to award is "reprehensibility."[498] The harm Apple caused was physical, not just  economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."[499]  These all apply here.

1112.  Under California law, a plaintiff may recover punitive damages in connection with a non-contractual claim if she establishes by clear and convincing evidence that the defendant is guilty of fraud, oppression, or malice. [Cal. Civil Code § 3294(a)].[500] The California Supreme Court has concluded that an appropriate maximum ratio between punitive and compensatory damages is "10 times the compensatory award."[501] Malice, for purposes of punitive damages, includes despicable conduct by the defendant with a willful and conscious disregard of the rights or safety of others.[502]

---

[497] Civ. Code, § 3294(a); *Zirpel v. Alki David Prods.*, B317334, 20 (Cal. Ct. App. Jun. 20, 2023)
[498] State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 419.
[499] *Zirpel v. Alki David Prods.,* No. B317334, 21-22 (Cal. Ct. App. Jun. 20, 2023).
[500] *Lupo et all v Quality Assurance Services*, Case No. 16cv737 JM (JMA), U.S. District Court, Southern District of California (July 26 2017); See *Turman v. Turning Point of Cent. California*, Inc., 191 Cal. App. 4th 53, 64 (2010).
[501] *Zirpel v. Alki David Prods.*, No. B317334, 23 (Cal. Ct. App. Jun. 20, 2023).
[502] Civ. Code, § 3294, subd. (c)(1).

1113.   Apple's conduct was despicable,  and so "base, vile or contemptible" that it would be despised and looked down upon by ordinary people.[503]

### ii.   Medical Monitoring

1114.   Gjovik requests remedy under statutes where available, that Apple provide and pay for medical monitoring for Gjovik, including any needed medical intervention on diseases resulting from Gjovik's exposure to Apple's chemicals and gases. Medical monitoring costs are a recoverable item of damages for plaintiffs who (1) prove exposure to toxic chemicals as a result of a defendant's tortious conduct and (2) establish that the need for medical monitoring is a reasonably certain consequence of the exposure. The cost of medical monitoring in the future is awarded in California courts where the plaintiff shows the need for such monitoring is a reasonably certain consequence of the toxic exposure, and the recommended monitoring is reasonable.[504] Gjovik will prove this related to both 825 Stewart Drive and 3250 Scott Blvd.

### iii.   Special Damages

1115.   Gjovik now suffers from permanent psychological trauma and damage because of Gjovik's actions. Because of the threats and intimidation, she feared for her life and the conspiracy hampered her ability to continue at the same level, causing her significant economic damage. Gjovik has suffered tremendously because of Apple's efforts.

1116.   Compensatory and consequential damages should include reimbursement for Gjovik's expenses in undertaking her own version of the *Federal Witness Security Program* and

---

[503] *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228; *Zirpel v. Alki David Prods*., No. B317334, 22 (Cal. Ct. App. Jun. 20, 2023).
[504] *Miranda v. Shell Oil Co*., 7 Cal. Rptr. 2d 623, 74 Ed. Law Rep. 144, Prod. Liab. Rep. (CCH) P 13297 (App. 5th Dist. 1992), review granted and opinion superseded, 10 Cal. Rptr. 2d 182, 832 P.2d 898, 76 Ed. Law Rep. 175 (Cal. 1992).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

*Crime Victims Assistance Program*,[505] in lieu of lack of assistance from the government. Expenses include "*medical costs, mental health counseling ... and lost wages.*"[506] Expenses may also include "*home security installation or improvement, relocation, crime scene clean-up.*"[507] Injunctive relief includes the right to refuse to be interviewed (interview, deposition, or discovery request) by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant – and to set reasonable conditions on the conduct of any such interview to which the victim consents."[508] Crime victim assistance costs also cover "*counseling... criminal justice advocacy, and emergency transportation.*"

1117.   Gjovik paid out of pocket for cross-country relocation, warned landlords and neighbors about the stalking and harassment, bought self-defense weapons, purchasing a digital address for her LLC in order to hide her home address wherever possible, installed home security equipment, attempted to remove damaging content from the internet through timely and costly SEO activities, and cleverly obtained 24/7 law enforcement outside her New York apartment at all times through proximity to a state executive building, and other tactics to stay safe.

### iv.     Injunctive Relief

1118.   Gjovik seeks injunctive relief against Apple, including, but not limited to an order that prohibits Apple from coercing their employees to allow Apple to gather and use their personal data in for-profit product development, including requests to participate in medical

---

[505] US DOJ, *Assistance and Resources for Victims,* https://www.justice.gov/enrd/environmental-crime-victim-assistance/assistance-and-resources-victims; CalVCB, *What is Covered*, https://victims.ca.gov/for-victims/what-is-covered/
[506] US DOJ, *supra*
[507] CalVCB, *supra*
[508] California Office of the Inspector General, *Marsy's Law,* https://oag.ca.gov/victimservices/marsys_law

experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct in violation of their rights of privacy. Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, but especially Gobbler data from 2017-2021, and the naked/undressed photos Apple obtained from Gjovik during the Batterygate fiasco in 2018.

1119.    Apple coerces employees to participate in these activities to extract their data and to exploit in research and development of commercial, for-profit products, in violation of the FTC Act and Cal. Bus. & Prof. Code § 17200. As a result of Defendants' unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik and her former co-workers. Apple should be required to restore these monies to Gjovik and her former co-workers however Apple's extensive use of these illegal practices will make calculating damages a challenge. In the absence of injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which cannot readily be remedied by damage remedies.

1120.    Apple should be ordered to disgorge unlawful data, and the fruit of the toxic data, models built off the unlawful data.

### v.    Declaratory Relief & Nominal Damages

1121.    Where there is no other remedy, provide declaratory relief and nominal damages of $1.00 (or $3.00 where treble damages apply).

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                                    OCTOBER 25 2023

# X.     PRAYER FOR RELIEF

WHEREFORE, Gjovik prays that this court enter judgement in her favor on each and every

claim for relief set forth above and award its relief, including but not limited to an Order:

a.     Entering judgement in her favor

b.     Awarding her monetary relief, including damages sustained in an amount to be
determined at trial.

c.     Awarding her compensatory damages

d.     Awarding her consequential damages

e.     Ordering her restatement at Apple, or else award her front pay and other
applicable relevant consequential damages

f.     Awarding her treble damages

g.     Awarding her punitive and exemplary damages

h.     Awarding her special damages

i.     Awarding her attorney's fees with a fee multiplier

j.     Awarding costs of suit incurred herein.

k.     Where applicable, all the above with interest

l.     Declaratory relief stating Gjovik is a Crime Victim under 18 U.S.C. § 3771 & 34
U.S.C. § 20141(e)(2)

m.     Declaratory relief stating Gjovik is a Crime Victim under California Labor Code
§§ 230, 230.5; Cal. Gov Code §§ 13951, 13955

n.     Order her personnel file cleared of negative references.

o.     Order injunctive relief prohibiting invasions of employee privacy.

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023

p.    Order injunctive relief forcing disgorgement of software and other products developed using Gjovik's unlawfully obtained personal data.

q.    Order injunctive relief forcing deletion of unlawfully obtained data of and related to Gjovik.

r.    Order prohibiting commercial profit by Apple from this 'story' and any revenue or profit to be held for benefit of Plaintiff and disgorged entirely to Plaintiff.

s.    Where there are no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00.

t.    For such other and further relief as the court deems just and proper.

**Plaintiff demands a Jury Trial.** [509]

Respectfully submitted,

By_____

Ashley M. Gjovik
*Pro Se* Complainant

---

[509] Fed. R. Civ. P. 38(b).

334

DATED: OCTOBER 25 2023

## XI.    CERTIFICATION AND CLOSING

448. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

449. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

450. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.[510]

Executed on:                    OCTOBER 25 2023

Signature of Plaintiff          _____

Printed Name of Plaintiff       Ashley M. Gjovik

Address: 2108 N St. Ste. 4553, Sacramento, CA 95816

Email: legal@ashleygjovik.com

Phone: (408) 883-4428

_____

[510] 28 U.S.C.A. § 1746

FIRST AMENDED COMPLAINT – 3:23-cv-04597-CRB                    OCTOBER 25 2023