Ashley M. Gjovik, JD
*In Propria Persona*
(415) 964-6272
legal@ashleygjovik.com
Boston, MA.

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjøvik**, *an individual*,<br><br>    **Plaintiff**,<br><br>    vs.<br><br>**Apple Inc.**, *a corporation*,<br><br>**City of Santa Clara**, *a local government*,<br><br>**Mr. Kalil/Khalil Jenab**<br>*individually,* & as *Agent/Member/Manager* of:<br>**Jenab Family LP,**<br>**Jenab Family Ventures LLC,**<br>& as *Trustee/Agent* of:<br>**The Jenab Family Trust,**<br><br>    **Defendants**. | **Case No.** 5:25-cv-07360-PCP.<br><br>**Amended Complaint**<br><br>**Environmental Citizen Suit**<br><br>   **Resource Conservation & Recovery Act (RCRA)**, 42 U.S.C. § 6972<br><br>   **Clean Air Act**, 42 U.S.C. § 7604<br><br>   **Clean Water Act**, 33 U.S.C. § 1365<br><br>   **Emergency Planning & Community Right-to-Know Act (EPCRA)**, 42 U.S.C. § 11046<br><br>   **Toxic Substances Control Act (TSCA)**, 15 U.S.C. § 2619<br><br>**Public Nuisance**<br>Cal. Civ. Code 3491 |

**Demand for Jury Trial**

# INTRODUCTION

1. This matter involves a public safety threat, imminent environmental disaster, admitted zoning mistake, and comprehensive market failure. This matter arises from a property with a high-hazard, unmarked semiconductor manufacturing facility (a "*chip fab*") operating at 3250 Scott Blvd in Santa Clara, California. The facility is using, storing, and releasing alarming amounts of deadly gases and very dangerous chemicals without notice or warning; next to a high-density residential apartment complex (The "Santa Clara Square Apartments") across the street; and is surrounded by restaurants, gyms, churches, medical clinics, bike lanes, nature trails, creeks flowing the SF Bay, and multiple city parks and children's playgrounds.

2. The Property Owners are also the long-time owner of an adjacent federally managed toxic waste dump clean-up site (the "Synertek site") with a contaminated groundwater plume flowing north under the same homes and kids. The owner's been fighting the EPA's request to amend the Record of Decision for that site for years, while concurrently enabling the same kind of reckless operations at this that created the adjacent toxic waste dump in the 1980s  The operator/tenant for The Chip Fab is a large, wealthy, domestic corporation which certainly has the resources to locate its chip fabs in properly zoned locations that do not share property lines with the open windows of residential apartments, public parks with sunbathers and picnic tables, retired folks walking on nature trails, or, most critically, little children playing on outdoor playground equipment just feet away from The Chip Fab releasing gases regulated as chemical weapons.

3. The City conspired with the other defendants to conceal The Chip Fab from nearby residents and businesses; failed to report the company's name, activities, or emissions; kept The Chip Fab out of the EIR for a new 1,800+ unit dense- residential apartment complex next door; failed to cite and report environmental violations, and received multiple complaints from residents injured by exposure to industrial chemicals –yet failed to investigate or warn, and instead took actions to invite vulnerable people to city parks next to The Chip Fab, knowing people were being hurt and could be killed. The City faced litigation in California court over a situation much like this from 1993-2000+, with California trial and appellate court orders forbidding the City from siting chip fabs next to kids and churches, and threatening the current Mayor (prior council member) with contempt for violating court orders and still insisting on siting children next to deadly chemicals. *LSI Logic Corp. v. City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995).

4. The Chip Fab, like all semiconductor fabrication and manufacturing facilities, engages in ultrahazardous activities. Due to the kinds, methods ,and quantity of chemicals used, even if a chip fab is in full legal compliance, it can still cause severe harm to nearby residents and accidents can occur which would result in catastrophic chemical disasters with mass injuries and/or environmental devastation.  Even worse, The Chip Fab has been operating without required permits, refusing to file required reports, refusing to notify the community about leaks, spills, or its basic operations; and has already been releasing and emitting incredible amounts of toxic substances into the air, water, land, and into human bodies – with years of reports of chemical injuries and pollution.

5. This unlawfully reckless siting and zoning was facilitated, approved, and concealed by the same Silicon Valley city where this public safety hazard is located. The same departments and employes worked on both projects (The Chip Fab and huge apartment complex) at the same time, and all concealed The Chip Fab from the EIR and CEQA process for the residential development, knowing the siting and zoning was in direct and egregious violation of federal, state, regional, and county code –the city's own General Plan, polices, and ordinances.

6. The Chip Fab is also located in close proximity to two creeks flowing to the SF Bay and which are protected by the Clean Water Act. The San Tomas Aquino Creek is a mostly artificial channel that routes surface waters flowing out to the SF Bay.

7. The Saratoga Creek is the only natural creek in Santa Clara County that flowed from the Santa Cruz mountains, across the valley floor, and out to the Pacific Ocean.  The City unlawfully "filled" this ancient creek in the 1970s – but Saratoga Creek represents an extensive, underground, hydrothermal aquifer system – working its way through cracks, faults, and serpentine processes – and still actively surfacing in natural springs and overflowing wells at the Premise.  This is still flowing, as it has for millions of years, through the valley floor and out of the Pacific Ocean – but now there's a chip fab sitting directly on top of it, with The Chip Fab's stormwater and emissions/pollution flowing into the springs and aquifer, and then into the SF Bay, which are all waters of the US.

8. The Chip Fab is polluting the air with at least a (self-reported) eight tons of industrial chemicals and heavy metal air emissions each year, repeated leaks of toxic gases; discharging at least 40,000 gallons of contaminated waste water every day; polluting the storm

water, groundwater, underground and above ground federally protected water ways; contaminating the soil and near by structures and vegetation, and injuring nearby residents, workers, and wildlife.

9. Accordingly, this is an federal environmental Citizen Suit brought pursuant to the federal statutes that were enacted in the 1970s-1980s in response to market-failure-type environment and safety hazards like this case, including: provisions of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972, Clean Air Act, 42 U.S.C. § 7604, Clean Water Act, 33 U.S.C. § 1365, Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11046, and Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619 (collectively referred to herein as the "Citizen Suit Provisions," and this action as the "Citizen Suit.") This Citizen Suit is brought in order to enforce the terms of, and to effectuate the congressional intent of, the RCRA, 42 U.S.C. § 6901 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., Clean Water Act, 33 U.S.C. § 1251 et seq., the EPCRA, 42 U.S.C. § 11001 et seq., and TSCA, 15 U.S.C. § 2601 et seq., (collectively referred to herein as the "Federal Environmental Statutes").

10. This is also a California Public Nuisance case brought under California Civil Code § 3491 and in order to enforce the terms of, and effectuate the legislative intent of, California Civil Code Division 4, Part 3 "*Nuisance*," including rights and responsibilities under the California Constitution; obligations and mandates under the California health/safety, natural resources, fire, and civil code; and the local law and policy within regional regulations and ordinances.

11. This lawsuit is brought by the Plaintiff for several reasons, but primarily due to her own experience suffering severe chemical exposure injuries caused by the operations at The Chip Fab in 2020, then followed by years of profound and overwhelming concern about the imminent and substantial endangerment to the surrounding community created by the ongoing activity and releases. This lawsuit is filed to seek redress for the Plaintiff's own informational, emotional, recreational, and existential injuries; to punish the Defendants for their wrongdoing; as an action to abate the hazards, mitigate harm caused, and protect the surrounding community, workers at the site and impacted businesses, and the surrounding environment (including the ancient redwood trees and Saratoga creek, and the adjacent San Tomas Aquino creek and trails, with both creeks flowing through sensitive ecosystems, north to the SF Bay, and then out to the Pacific Ocean). The Plaintiff is deeply connected to this site and eternally haunted by the harm that is occurring there.

## JURISDICTION & VENUE

12. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to the Citizen Suit Provisions of the Federal Environmental Statutes under 28 U.S.C. § 1331 (an action arising under the laws of the United States); and/or 28 U.S.C. § 1332 (diversity of citizenship between parties with more than $75,000 at stake in statutory fines) and 28 U.S.C. § 1367 (supplemental jurisdiction). Additionally, this Court has an additional basis for providing relief under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 1651 (injunctive relief), and under principles of equity and public policy.

13. Venue is proper in the Northern District of California, because the source of the violations is located within this judicial District, the violations and endangerment occurred and occur in the District, the release and damage occur and occurred at properties and business operations within this District, Defendants reside in the District, and this District inherently represents local community interests related to this matter. This case was filed at the San Jose Division due to the close proximity to the facility.

## SIXTY DAY NOTICE & YEARS OF PRIOR COMPLAINTS

14. The Plaintiff became severely ill in Feb. 2020 immediately after moving into the Santa Clara Square Apartments next to The Chip Fab. It was not until Sept. 2020 that the Plaintiff discovered she was being exposed to industrial chemicals (noticing VOCs spiking at the same times as her worst symptoms, appearing on a mobile phone application dashboard for her indoor air purifiers). The Plaintiff promptly investigated further and reported the apparent chemical emergency to the city, county, state, and federal governments. The state and US government did not know about The Chip Fab.

15. After accidently discovering The Chip Fab while researching public records related to buildings around the apartments where she had lived in 2020, Plaintiff reported The Chip Fab and its violations and hazards, to the same agencies in June 2023. (Exhibit C: June 2023 Environmental Complaint). The Plaintiff filed complaints to US EPA, state, and local agencies, including the City of Santa Clara. (Exhibit D: Proof of Service of June 2023 Environmental Complaint). The cover page of her complaint warned that she was prepared to file a Citizen Suit due to imminent and substantial endangerment if the agencies did not act.

16. The US EPA took formal RCRA enforcement action for hundreds of violations it found during just two brief inspections, which resulted in a Consent Agreement and Final Order,

Gjovik v. Apple, Santa Clara, Jenab, et al. | Amended Complaint | P. 4

penalty for those specific violations, but no other liability waivers, and express terms protecting further injunctive and equitable relief, and the final agreement credited the Plaintiff for making the complaint and providing the tip.[1] Apple is also facing at least six separate air pollution violations cited by the BAAQMD, based on the Plaintiff's complaints and tip.

17. In Sept. 2023, the Plaintiff also proceeded to sue Apple about the activities and harm caused to her, combined with a retaliation lawsuit – as come to find out The Chip Fab is run by her ex-employer, and it was her ex-employer who nearly killed her, then covered it up, retaliated against her including sending a Workplace Violence investigator to fire her without explanation, and then terrorized her for years.

18. The lawsuit is well underway and one of many active claims includes a California crime victim retaliation action (Cal. Labor Code 98.7) that argues the tenant/operator nearly killed the Plaintiff in 2020 with hazards from The Chip Fab, knew they almost killed her with their emissions/dumping, and then harassed her and belligerently fired her as an act of retaliation because she was a victim of their environmental crimes at The Chip Fab. (*Ashley Gjovik v. Apple Inc.,* N.D. Cal., Case No. 3:23-cv-04597, 2023-). The case is in discovery, and the Plaintiff is moving for Summary Judgement.

19. The Plaintiff also filed labor, safety, and environmental complaints to relevant agencies. Apple settled with the Plaintiff and NLRB over the Plaintiff's charges filed to NLRB alleging that Apple's US employment agreements, confidentiality agreements, dozens of work policies, and their written surveillance policies/practices, all violate federal labor laws. Apple entered their first national settlement agreement with the NLRB, agreed with withdraw those terms, stop enforcing those terms, and to post a three-page notice of employee rights and Apple's promise to stop violating the NLRA.[2] NLRB also filed a complaint against Apple for unlawfully suspending, terminating, and threatening the Plaintiff; including creating and ordering an unlawful five-point balancing test in June 2021, that had to be satisfied by the Plaintiff if she wanted to talk to other people about environmental compliance or workplace safety concerns.

---

[1] *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).
[2] For NLRB: *Apple, Ashley Gjovik,* 32-CA-282142, 32-CA-283161, Dec. 2024 Complaint & Notice of Hearing; *Apple, Gjovik, 3*2-CA-284428, April 4 2025 Trilateral Settlement & Consent Agreement.

Gjovik v. Apple, Santa Clara, Jenab, et al. | Amended Complaint | P. 5

20. However, still no agencies have taken enforcement action to actually abate the hazard created by The Chip Fab. People are still being injured and there is constant threat of catastrophic harm as long as that facility continues to operate in this location and especially as long as it continues to fail to comply with basic environmental and healthy/safety legal requirements.

21. Thus, on June 30 2025, the Plaintiff served Sixty Day Notice to Defendants and U.S. EPA of her intent to file a Citizen Suit against Defendants over The Chip Fab and violations of federal Environmental Statutes. Defendants were notified via electronic mail and formally served via a process server and/or Certified Mail. (Exhibit A – Sixty Day Notice).Apple was served on behalf of itself and its contractors/agents. Mr. Kalil/Khalil Jenab was served on behalf of himself and his various business entities and partnerships. The City was served on behalf of the City itself, its vicarious liability for the acts of tis employees and departments (including Fire Dept., HazMat, Water/Sewer) and the San José-Santa Clara Regional Wastewater Facility co-owned by the City.

22. The Plaintiff formally served Notice and receipts of service of the Notice to the Administrator of the U.S. EPA and the Regional Administrator of U.S. EPA Region IX. Plaintiff also sent electronic versions of the Sixty-Day Notice to the U.S. EPA Enforcement and Compliance team, the California EPA (DTSC, Water Quality Board, etc.), the BAAQMD, the Santa Clara County DEH, and the U.S. DOJ ENRD. Plaintiff provided Notice of the actual and threatened endangerment, injury, and damage alleged herein by mailing notices of endangerment and of intent to file suit pursuant to RCRA § 7002(b)(2)(A), to the U.S. EPA the California EPA, and Defendants. (Exhibit B – Proof of Service of Sixty-Day Notice).

23. The Plaintiff's Sixty-Day+ Notice and June 2023 Notice provided the Defendants and responding agencies with direct and sufficient information enabling them to determine the laws Plaintiff alleged the Defendants violated, the types of activities alleged to constitute the violations, sufficient information to determine the facts of the violations, and the contact information for the Plaintiff.  The Plaintiff also complained about injuries caused by The Chip Fab to most Defendants for at least two years. Further, reporting that a "chip fab" is operating next to thousands of home and a playground is basically reporting someone is drilling for oil next to an elementary school - - the facts are them selves inherently alarming.

24. More than sixty days have passed since the Notice was served on the Defendants and the state and federal agencies. During this time, neither the EPA, nor the State of California,

has commenced or is diligently prosecuting a court action to redress the violations alleged, or took actions to force compliance in order to prevent recurrence of ongoing issues, nor are any entities taking legal or administrative actions to abate the hazards caused by the activities. The EPA RCRA enforcement action simply took Apple's word for it that Apple corrected the violations, limited the action to only violations found during the 2023-2024 inspection, and only "settled" a tiny fine. [3] (Exhibit E: Oct. 2025 EPA RCRA Enforcement Action).

# PARTIES

## I. Plaintiff: Ashley Gjovik

25.  Ashley Gjovik (pronounced "JOE-vik") is the Plaintiff in this action ("Plaintiff") and is a citizen of the United States, prior resident of the SF Bay Area in California (2015-2022), and current resident of Massachusetts who is domiciled in Boston. Plaintiff uses her California LLC address (2108 N St. Ste. 4553 Sacramento, CA, 95816) on legal papers for privacy due to physical safety concerns, but this action is brought by her as an individual. Plaintiff currently lives on the East Coast due to circumstances created by Apple, but intends to return to California when able.

26.  The Plaintiff worked for Apple Inc from 2015 until 2021. At the time Apple fired her, she was a Sr. Engineering Program Manager working for a Director and Sr. Director in Apple's Hardware Engineering organization and Product Integrity team. Plaintiff always received positive performance reviews, and was positioned as a "problem solver," chief of staff, and process expert. Her reviews designated her as "key talent" and "irreplaceable." Even the performance review drafted shortly before she was fired was mostly positive and the only "performance issues" noted were her complaints about work conditions, unlawful secrecy rules, and safety issues.

27.  The Plaintiff graduated from Santa Clara University in 2022 through their part-time evening program, and with a Juris Doctor degree and Certificate in Public International Law with honors. During her legal education in 2018-2022, Plaintiff was an Emery Merit Scholar; made Dean's List every year; received CALI Excellence for the Future Awards for obtaining top grades in Property Law, Statutory Analysis and the Legislative Process, and Public Health Law; and received the Witkin Award for Academic Excellence award in Property Law. She also worked in

---

[3] US EPA, *EPA Takes Action Against Apple for Inadequate Hazardous Waste Management*, Nov. 18 2025, https://www.epa.gov/newsreleases/epa-takes-action-against-apple-inadequate-hazardous-waste-management

Apple's legal department in 2019 developing Apple's first AI ethics policy and received glowing reviews. The relief requested in her retaliation lawsuits includes reinstatement at the company.

28.  Plaintiff lived at the Santa Clara Square Apartments from Feb. 2020 through Oct. 2020. She lived on the third floor of Building 4 located at 3390 Octavius Drive, with a corner unit looking out at the corner of Augustine Dr. and Octavius Dr. The apartments were brand new and the outdoor areas were spectacularly beautiful. She spent time relaxing and appreciating nature in the city's "Meadow Park," walking along the city's Redwood Trail and the San Tomas Aquino creek trail, and appreciating the beautiful redwood trees outside her unit's windows. She shopped at the adjacent Whole Foods, visited the adjacent medical clinics, and picked up meals at the next-door restaurant. At all times, she was exposed to chip fab exhaust, pollution, and safety hazards.

29.  She became severely ill and disabled within days of moving into the apartment. The injuries were promptly investigated and eventually diagnosed in late 2020 and early 2021 as acute exposure to industrial chemicals from an unknown source. While investigating the possible source, she partnered with and was advised by state and federal environmental agencies and public health officials, legal and policy experts at her law school, and long-time SF Bay Area labor and environment community activists. Despite all this expertise, no one discovered The Chip Fab until the Plaintiff discovered it in Feb. 2023, and she's been begging for help to abate the hazard since.

## II.  Defendant: Apple Inc. (Operator; Violator; Tortfeasor; & PRP)

30.  Apple Inc. is a corporation headquartered in California at 1 Apple Park Way, Cupertino, CA 95014. Apple Inc "Apple" refers also to its employees, Directors, Board, legal counsel, subsidiaries, affiliates, contractors, and other agents. (Cal. Civ. C. § 2295 et seq.).

31.  In this case, regarding the properties and facilities at issue, Apple is an "operator" and "owner," a "tenant" and "lessee," a potentially responsible party under RCRA, CERCLA

32.  Apple rents and operates a semiconductor manufacturing facility at 3250 Scott Blvd, in Santa Clara, California. Apple has operated The Chip Fab since approximately 2015, but was named on planning documents back to 2014. From then to current day, Apple has either refused to disclose what its operations are and/or misrepresented it activities as a simple research and development. Apple's key hazmat contractor at The Chip Fab appears to be Advanced Chemical Transport, Inc. d.b.a. ACTEnviro, operating under Master Service Agreement No. CP201322217

and associated agreements. In most documentation it appears the EH&S manager/lead at The Chip Fab is Apple employee Tom Huynh and the EH&S engineer is his employee, Kevin Sung.

33. Apple executives were fully aware of The Chip Fab, including the vast number of hazardous materials and hazardous waste. Every year, Apple submitted a sworn financial assurance document to the Santa Clara Fire Department which detailed hazardous waste treatment and disposal operations, and was signed by Apple's CFO, Luca Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. The Apple CFO certifies hazardous waste activities and violations at The Chip Fab. Mr. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.

34. Apple is fully aware of the relevant environmental violations as its currently employs a prior U.S. EPA Administrator (Lisa Jackson) and much of her prior U.S. EPA staff, in its Government Affairs and Lobbying team. Plaintiff has repeatedly caught Jackson attempting to interfere with the EPA and its officials while it was under investigation or otherwise subject to agency orders regarding the Plaintiff's Apple office on a Triple Superfund site in Sunnyvale, California – including Jackson sending the EPA Administrator letters of recommendation for the person she wanted to be appointed as Regional Administrator and who would oversee Apple, sending the letter from her Apple email account in Nov. 2021.

35. Further, from at least 2019 to current, Apple filed written, formal statements to the U.S. EPA and to the public claiming it is a leader in environmental compliance, that it forbids use of the chemicals its regularly using in The Chip Fab, and that it demands strict compliance with the EH&S laws that is blatantly violates at The Chip Fab. Apple's Supplier Responsibility policies extensively detail the environmental and safety legal obligations for operations at its factories – which it knowingly refuses to comply with at its own chip fab. Apple knew what the law is and intentionally chose to violate those laws in pursuit of the economic benefits of noncompliance at The Chip Fab. Apple also applied for U.S. EPA "chemical safety" awards as recently as last year – with the EPA granting awards while Apple was under investigation for RCRA violations.

36. Apple has been subject to multiple environmental lawsuits and consent agreements

in the United States including recently in California and North Carolina.[4] However, the only other known modern instance of Apple operating a semiconductor manufacturing facility in the United States was described by a union leader, as published in The American Prospect, as "*easily [one of] the most unsafe sites*" the leader had *"ever walked on."*[5]  Public records show that Apple's prior domestic manufacturing facility in the SF Bay Area was back in the 1990s and described by the New York Times as "*Apple Computers Used to Be Built in the U.S.; It Was a Mess.*"[6]

37.     Apple has also previously been caught exposing its employees to lethal gases including in North Carolina,[7] China,[8] and Arizona. In Arizona, Apple handled the recent toxic gas exposure by lying to the employees and claiming the evacuation alarm was simply a testing exercise but also at least for a brief period of time, implied someone may physically assault them, or kill them, if they did not evacuate; while concealing the evacuation was required due to Apple's toxic gas leaks. "*People were told that there was an active-shooting drill, and they were running, and [told] to evacuate the area. So, our guys got out of the area. And they found out later that it was a gas leak. And they were just trying to hide that. So, no one trusts them.*" (The American Prospect, June 22 2023).

## III.  DEFENDANT: CITY OF SANTA CLARA (PARK OWNER; VIOLATOR; CONTRIBUTOR; TORTFEASOR)

38.     Defendant City of Santa Clara is a municipal corporation organized under the laws of California, with its principal place of business located at 1500 Warburton Avenue Santa Clara, CA 95050. California Gov. Code expressly authorizes that a city may be sued, including for injuries caused by acts or omissions by the entity itself and/or its employees. Cal. Gov't Code § 811.2, 815, 945; Restatement (Third) Of Agency §2.04 (AM. L. Inst. 2006).

39.     In California, it is "manifest that the legislature intended to allow" nuisance actions against governments when the claims are tailored to meet statutory provisions and with a "profound interest… in the eradication of the evils caused by the various forms of pollution."

---

[4] The Carolina Journal, *Apple clean energy project fined for environmental violations*, Oct. 6 2017.
[5] The American Prospect, *Chipmaker's Scramble to Build Marred by Mistakes and Injuries,* June 22 2023.
[6] NYT, "*Apple Computers Used to Be Built in the U.S. It Was a Mess,*" Dec. 15 2018.
[7] The Guardian, *Five injured in chlorine gas leak at Apple data centre: Workers treated at the scene in North Carolina by paramedics before taken to hospital after exposure to noxious fumes*, June 2 2015.
[8] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China,* July 27 2012.

GJOVIK V. APPLE, SANTA CLARA, JENAB, ET AL. | AMENDED COMPLAINT | P. 10

*Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931-936 (1972).

40. The City is entity that is subject to local, state, and federal environmental oversight. For example, the City received eight Notices of Violation for High Priority Violations of the Clean Air Act," from the BAAQMD in just the last three years. Four are noted as settled; and four are still open. US EPA enforcement shows at least fifteen CAA enforcement actions taken against the City since 2017. (WWTP BAAQM, Title V Major Source).

41. The City also holds multiple NPDES permits including POTWs R2-2020-0001 for individual nutrient, mercury, PCB. The NPDES permits cover at least stormwater and wastewater management. The City's water, wastewater, and recycled water have been managed by Director Gary Welling. His department is responsible for "ensuring compliance with federal and state regulations related to water, recycled water, wastewater, worker safety." (City of SC Wastewater System). The Plaintiff spoke with Welling in 2020-2021, met with the Mayor of Santa Clara several times in 2021, and at least one other victim also contacted the Mayor and Welling. Neither disclosed The Chip Fab, took action to help, or warned the victims.

42. The City co-owns a large wastewater treatment plant known as the San José-Santa Clara Regional Wastewater Facility ("The SJ-SC RWF") and which includes a 175-acre wastewater processing area, 750-acre sludge-drying area, and 850-acre salt pond. Another 825 acres of open land were purchased as "bufferlands" with the purpose of "buffering" adjacent communities and environment from the risk of accidental chemical releases and other hazards associated with operations at the The SJ-SC RWF. (San José-Santa Clara Regional Wastewater Facility, The Plant Master Plan, Nov. 2013). The City, as a highly regulated entity, owning and operating a complex treatment facility, understands the important of risk mitigation regarding air pollution and other hazards arising from industrial operations

43. The City of Santa Clara requested to exclusively control the implementation and enforcement of federal hazardous materials and hazardous waste laws through California's "Certified Unified Program Agency" ("CUPA") program. (Santa Clara City Code 15.60.020). Otherwise, the U.S. EPA delegation to Cal. EPA, then delegates this responsibility to the Santa Clara County Dept. of Environmental Health or California DTSC. (Cal. Code Regs. Tit. 27, § 15100). Only Santa Clara, Sunnyvale, and Gilroy have opted to manage federal hazardous waste

---

compliance at a city-level.[9]

44. The City Fire Department has a "Hazardous Materials Division" which is "under the direct supervision of the Assistant Fire Chief or Deputy Fire Chief." This division includes hazardous materials administration, training, legislative, and inspection divisions. (Santa Clara City Code 2.85.070). The CUPA implementing statutes and regulations repeatedly using the term "shall," not "may," regarding the implementation and enforcement of federal environmental laws. ("*The unified program agencies in each jurisdiction shall do all of the following…* ) and the delegation of federal environmental enforcement to a city is a privilege with mandatory obligations. (Cal. Code Regs. Tit. 27, § 15330.).

45. The City was conditionally delegated authority by California EPA to implement and enforce various federal environmental programs within its jurisdiction, including but not limited to air quality permitting, wastewater pretreatment oversight, hazardous waste regulation, and emergency planning coordination.

> "The City of Santa Clara Fire Department has been designated the Certified Program Agency by the State of California Environmental Protection Agency's (CalEPA). The CUPA protects Californians from hazardous waste and hazardous materials by ensuring consistency throughout the state regarding the implementation of administrative requirements, permits, inspections, and enforcement at the local regulatory level."

(Santa Clara City Code 15.60.020, 15.60.130).

46. The City has assumed regulatory oversight responsibilities over the Facility's environmental compliance through its delegated authority under environmental programs.

> "The City does hereby assume responsibility for the enforcement and implementation of the Hazardous Waste Generator Program, Onsite Hazardous Waste Treatment Program, and Tiered Permitting Program… Hazardous Materials Release Response Plans and Inventories (Business Plans) Program, … Hazardous Materials Area Plan Program… California Accidental Release Prevention (CalARP) Program…"

(Santa Clara City Code 15.60.020).

47. The City Fire Department has been under CUPA corrective action oversight by CalEPA for years. The most recent status report, dated Sept. 16 2024, notes the City was still unable to correct multiple systemic deficiencies, including that: "The City is not consistently following up and documenting return to compliance in CERS for Hazardous Waste Generators;

---

[9] Santa Clara County, Unidocs, Who Regulates What in Santa Clara County Page, http://www.unidocs.org/members/whoregulateswhat.html (last accessed 10/24/25)

the City is not ensuring all businesses comply with Hazardous Materials Business Plans; the City is not inspecting CalARP stationary source facilities; the City is not inspecting each facility subject to HMBP requirements at least once every three years; the City is not inspection all Hazardous Waste Generator facilities with appropriate frequency; and the City is not regulating all facilities subject to the Hazardous Waste Generator Program." (CUPA Corrective Action Report, Sept. 16 2024).

48. The City Council has been subject to lawsuits and court orders regarding situations just like this with reckless siting and zoning, intersection with federal and local environmental enforcement, and basic public safety considerations. *LSI Logic v Santa Clara* (1993-2000). The City repeatedly withheld delayed and withheld critical records regarding The Chip Fab, in violation of the California Public Records Act; and failed to make the public aware of dangerous leaks, spills, and chemical releases.

49. In direct violation of its mandates, the City has knowingly facilitated concealed The Chip Fab and its hazards since at least 2014, failed to enforce federal environmental regulations, ignored basic public safety protocols, invited vulnerable people to dangerous conditions, failed to warn of known hazards, and concealed risks and harm from affected residents, the community overall, and from other regulatory agencies.

## IV. Defendant: Mr. Kalil/Khalil Jenab, et al ("The Property Owners")

50. Khalil/Kalil Jenab, is named individually; as Agent and/or Member and/or Manager of Jenab Family LP and/or Jenab Family Ventures LLC; and as Trustee of the Jenab Family Trust ("The Property Owner"). Mr. Jenab is listed as the current owner of the Property and regulatory filings reference the mailing address 108 Sylvian Way, Los Altos, CA, 94022. However, on August 29 2025, Mr. Jenab corresponded in email saying, "for the record, the property is held by Jenab Family LP" and "Cushman & Wakefield has no ownership interest or involvement with the subject property and should not be identified as a party." ("C&W").

51. During the timeframe in question, investigative reports also show the property was owned by a variety of other entities, sometimes not reflecting Mr. Jenab's' name. An Intelius Location Report on August 29 2025 noted that the Property has been transferred multiple times since 2017, including between the "Lindsey Family Trust," Julia A Lindsey, Kathleen J Woodruff,

"Lindsey Julia Family Trust," "Lindsey Property Trust," Jenab Family Trust," "191 Baypointe LLC," "Woodruff Kathleen Trust," "Jenab Family Ventures LLC," "Jenab 1997 Family Trust," and "Jenab Family LP." Mr. Jenab is listed as an Agent for 191 Baypointe LLC along with James Lindsey, the two appear to be long-time business partners, and its unclear if James Lindsey *et al.* also still owns the Property. Plaintiff reserves the right to amend to add Mr. Lindsey (and/or his LPs, LLCs, trusts, etc.) if needed.

52. Further, Mr. Jenab has used his work email and job title on regulatory paperwork for the property, including one document stating he was filing the applications and/or signing documents on behalf of his employer ("on behalf of Cassidy Turley"), an entity who was later acquired by Cushman & Wakefield, where Mr. Jenab works now. Mr. Jenab is a Vice Chairman and a licensed Real Estate Salesperson (License No. 00848988). His company profile advertises that he has "over 35 years of experience in Tenant and Landlord representation, he has closed over $3 Billion transactions in our local market" and "as a respected commercial real estate expert, he has successfully completed each transaction which required … assisting with the design and construction implementation." [10]

53. It is unclear who the complete list of parties are which own and have owned The Property. Requests to view the lease have been denied thus far. Regardless, Mr. Jenab appears to be at least one property owner; and property owners are responsible for maintenance of their properties. [11] Mr. Jenab even entered a formal "Santa Clara City Stormwater Maintenance Responsibility" agreement for 3250 Soctt in at least April 2022. Mr. Jenab is also regularly copied on, receives copies of, has to sign/authorize, and filed under his name, documents related to environmental and safety laws, permits, and regulated operations. Most of the permits, notices, and other filings include Mr. Jenab's name somewhere within the paperwork.

54. Mr. Jenab also owns the adjacent property at 3050 Coronado Drive, which is the

---

[10] Cushman & Wakefield, Kalil Jenab, https://www.cushmanwakefield.com/en/united-states/people/kalil-jenab

[11] See for example: "The owner, occupant, lessee, or tenant of any property within the city shall be responsible for the maintenance of property and premises in a manner consistent with the provisions of this chapter and this Code." Santa Clara City Code 8.30.04; "Correction and abatement of violations… shall be the responsibility of the owner or the owner's authorized agent…."; Santa Clara City Code 15.60.100.

Gjovik v. Apple, Santa Clara, Jenab, et al. | Amended Complaint | P. 14

"ground zero" for the Synertek CERCLA Superfund clean-up Site. (RWQCB SL721241222; EPA No. CAD0990832735). The Synertek Site was listed as a CERCLA National Priority List site in September 1989 due to solvent pollution and VOCs in onsite and offsite groundwater that originated from leaks in that chip facility's solvent and neutralization tanks.(DTSC No. 60001754).

55. On June 28, 1991 US EPA issued a Record of Decision (ROD) for the Synertek Site with Honeywell (who acquired Synertek) as the primary Responsible Party. The primary contaminants of concern are trichloroethene, dichloroethene, and trichloroethene. This federally managed, long-term environmental clean-up is based on only less than ten years of semiconductor manufacturing from 1974 to 1984. (DTSC No. 60001754).

56. The Record of Decision needs to be amended to reflect a new remediation strategy after the last plan of groundwater extraction and treatment system, was not able to sufficiently remediate the pollution. (SEMS RM No. 100029800, 2022). EPA also requested to amend the Deed/ROD, and/or add a Land Use Covenant to include vapor intrusion concerns and risk mitigation requirements. (EPA, June 3 2021). The groundwater plume extends and migrates under The Chip Fab at 3250 Scott Blvd and also the high-density apartments. (SEMS RM No. 100029800, 2022). However over the last ~seven years, most or all of the groundwater wells capable to identifying the groundwater contamination flowing under the apartments, were removed or retired, and now there is no way to monitor – despite the known pollution following downgradient under thousands of homes.

57. The Sept.2022, the EPA/USACE "Five Year Report" for the Synertek Site noted that "a restrictive land use covenant… has been in place since 1991. The RWQCB and EPA approved updated draft deed language for the restrictive covenant to incorporate current California legal requirements for deed restrictions." EPA's reported noted that Mr. Jenab "reviewed proposed language for the updated deed restriction and responded in May 2021" refusing "to sign the deed restriction because the proposed changes were too extensive." (SEMS RM No. 100029800, 2022). The 2022 Report and 2021 emails expanded that Mr. Jenab apparently claimed that he is "*under no obligation to sign it*" and even the Responsible Party, Honeywell – a weapons manufacturer, had agreed to these protective terms, and "*requested redline edits to the draft deed language*" from Mr. Jenab to clarify his concerns. It appears Mr. Jenab never responded. (RWQCB 43S0124).

58. Prior CERCLA vapor intrusion testing at Jenab's property at 3050 Coronado Drive

Gjovik v. Apple, Santa Clara, Jenab, et al. | Amended Complaint | P. 15

in 2014 found high levels of TCE (9.1 µg/m³ -- compared to the commercial urgent action level of 7 µg/m³) in the indoor air. (RWQCB, SYN-IA4, 6/27/14). One building next-door to The Chip Fab and the Superfund site, hosts a "Family Prayer House" with church services of up to ninety people on weekends and smaller groups on weekdays, including small children and infants. The EPA and RWQCB noted they "*would like to have a sampling location added to the room identified as a nursery*." These are apparently the requests and requirements that Mr. Jenab is apparently fighting.

59. The Property Owners, including Mr. Jenab, have a documented pattern of environmental violations: owns property designated as a Superfund site (severe contamination requiring EPA oversight for clean-up); refused EPA requests and objected to clean-up agreements; leased adjacent property knowing it would generate toxic waste and workers would be exposed to new and existing toxic waste; both properties discharge pollution into the federally protected San Tomas Aquino Creek; and participated in, or failed to objected to, the destruction and removal of all groundwater wells monitoring groundwater contamination from all three of his properties migrating downgradient to thousands of apartments.

60. Meanwhile, in Mr. Jenab's professional role, acting with fully commercial interests, Mr. Jenab is leasing and selling additional properties with hazardous waste operations and/or toxic waste dump properties around his own toxic waste dump sites and chip fabs, and also the children's playground and the apartments filled with thousands of unsuspecting residents. Currently, Mr. Jenab, on behalf of C&W, is selling/leasing 3301, 3351, & 3371 Olcott Street – next to San Tomas Aquino Creek and "*walking distance to Santa Clara Square marketplace*." (C&W). Mr. Jenab's C&W webpage also claims "Whizz Systems" is a client, which implies Mr. Jenab was also involved in the buying, selling, and/or leasing of 3240 Scott Blvd next to The Chip Fab – a property that for the last two years has been attempting to obtain city permission to build more dense residential directly next to The Chip Fab.

61. Mr. Jenab is also currently leasing/selling 2975 & 3001 Stender Way which is also advertised as being near Santa Clara Square. (C&W). In 2016, Mr. Jenab was also credited with selling the "Coronado Stender Business Park" consisting of seven buildings south of 3250-3260 Scott Blvd and directly adjacent to the Synertek Superfund site. (NAI BT Commercial/SBDC). Mr. Jenab's advertisements for this area designed the location of nearby tech companies but omitted Apple's presence at 3250-3260 Scott Blvd.

## GENERAL ALLEGALIONS

62. From the 1950s to the 1970s, the US operated many semiconductor manufacturing factories domestically, with many located in Silicon Valley. These fabrication plants ("fabs") gave Silicon Valley its name.[12] There are still dozens of CERCLA/Superfund clean-up sites in Santa Clara Co., primary from chip fabs and their toxic waste spills, leaks, and dumping. Santa Clara Co. has always had more Superfund sites than any other county in the nation.

63. The semiconductor manufacturing processes can be broken down into three major categories: blank wafer production; semiconductor fabrication; and assembly/packaging. Semiconductor ("chip") wafers are made from materials like silicon (Si), gallium arsenide (GaAs), and indium phosphide (InP). Most chip substrates will require the same processing steps and produce similar emissions of regulated pollutants. However, the processing materials for etching, "doping," and layering operations may differ and result in different hazardous emissions. (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2, *Semiconductor Manufacturing*).

64. Semiconductor manufacturing "is one of the most chemical-intensive industries ever developed" and the rate of chemical-related illness for semiconductor manufacturing is "higher than that of any other single industry."[13] "The human toll of semiconductor manufacturing is known since at least the early 1980s. Scientists have linked twice the expected rate of miscarriages, various aggressive forms of cancer, other lethal diseases with semiconductor fabs across the world.[14]

65. More than 400 chemical products are used in semiconductor manufacturing. More than 10% of the known chemical products contain carcinogens. In addition, an estimated 40% of chemical products in semiconductor manufacturing contain supposedly "trade secret" substances – leaving regulators, neighbors, and workers without information about what they're being exposed

---

[12] The Verge, *How the next generation of semiconductor factories kicked up a fight over environmental review,* (Oct. 13 2023).
[13] Dr. Joseph LaDou, *Occupational Health in the Semiconductor Industry,* Challenging the Chip, pg 33-34, Temple University Press (2006).
[14] Electronics Watch, *The climate crisis and the electronics industry: Labour Rights, Environmental Sustainability and the Role of Public Procurement*, May 2020.