**Ashley M. Gjovik, JD**
*In Propria Persona*
~~2108 N St. Ste. 4553~~
~~Sacramento, CA, 95816~~
~~(408) 883-4428~~(415) 964-6272
legal@ashleygjovik.com
Boston, MA.

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjøvik,**<br>*an individual*,<br><br>**Plaintiff,**<br><br>vs.<br><br>**Apple Inc.,**<br>*a corporation,*<br><br>**City of Santa Clara,**<br>*a local government,*<br><br>**Mr. Kalil/Khalil Jenab**<br>*individually,* & as<br>*Agent/Member/Manager* of:<br>**Jenab Family LP,**<br>**Jenab Family Ventures LLC,**<br>& as *Trustee/Agent* of:<br>**The Jenab Family Trust,**<br><br>**Defendants.** | **Case No.** ~~*To be assigned*~~5:25-cv-07360-PCP.<br><br>**Amended Complaint**<br><br>**Environmental Citizen Suit**<br>  **Resource Conservation & Recovery Act (RCRA),** 42 U.S.C. § 6972<br>  **Clean Air Act,** 42 U.S.C. § 7604<br>  **Clean Water Act,** 33 U.S.C. § 1365<br>  **Emergency Planning & Community Right-to-Know Act (EPCRA),** 42 U.S.C. § 11046<br>  **Toxic Substances Control Act (TSCA),** 15 U.S.C. § 2619<br><br>**Public Nuisance** |

CAL. CIV. CODE 3491

# DEMAND FOR JURY TRIAL
# Table of Contents

INTRODUCTION ................................................................ 6

JURISDICTION & VENUE ........................................................ 9

SIXTY DAY NOTICE & YEARS OF PRIOR COMPLAINTS ...................... 9

PARTIES ...................................................................... 14

   I.   PLAINTIFF: ASHLEY GJOVIK ............................................ 14

   II.  DEFENDANT: APPLE INC. .............................................. 16

   III.  DEFENDANT: CITY OF SANTA CLARA ................................... 19

   IV.  DEFENDANT: MR. KALIL/KHALIL JENAB, ET AL ("THE PROPERTY OWNERS") ........ 22

GENERAL ALLEGATIONS ...................................................... 27

   V.   NATURAL FEATURES & ECOSYSTEM ...................................... 28

      A.   San Tomas Aquino Creek ......................................... 29

      B.   The Saratoga Creek ............................................. 30

      C.   The Underground Aquifer System ................................. 32

   VI.  THE PREMISE & OPERATIONS .......................................... 37

      D.   In 2014, The City Approves a Heavy Industrial Chip Fab in a Light Industrial Zone, also Earmarked for Future Residential Housing. ...................................... 38

      E.   In 2015, The City Approved Development of Thousands of Apartments Directly Across the Street from a Chip Fab. ............................................ 40

      F.   The City Should Have Shut-Down Industrial Operations at the Chip Fab in 2016. ..... 47

      G.   Ongoing Violations and injuries, the City ignores Complaints, & Apple Starts Gets Bloomberg to Gaslight the Neighborhood. .................................... 50

      H.   Investigations Begin But The Violations And Incidents Do Not Stop. ...................... 61

   VII.  THE MODERN PREMISE & SURROUNDING ENVIRONMENT .................... 74

   VIII. VIOLATIONS OF PUBLIC POLICY & COMMON SENSE ...................... 84

      I.   Community Member Injuries & Complaints ........................... 84

      J.   Santa Clara's Violations Related to the Santa Clara Appellate Court Zoning Court Order (1996-ongoing?) .................................................... 90

K.   Apple's Violations of the Dec. 2016 – Dec. 2020 DTSC Consent Agreement .............. 92

L.   Additional High Density Residential Planned Closer to 3250 Scott at 3240 Scott ....... 94

M.   The April 2025 Planning Commission Meeting ..................................................... 95

N.   The May 2025 City Council Meeting .................................................................. 99

**LEGAL CLAIMS AGAINST THE DEFENDANTS** ............................................... **102**

IX.   COUNT ONE: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH ANDTHE ENVIRONMENT, IN VIOLATION OF THE RCRA § 7002(A)(1)(B)..................................................................................102

X.   COUNT TWO: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN AIR ACT. ...................................................................................108

XI.   COUNT THREE: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN WATER ACT..................................................................................120

XII.   CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE RCRA. ...........................................................122

A.   COUNT 4: APPLE & THE PROPERTY OWNERS VIOALTED RCRA 42 U.S.C. §§ 6922, 6928 BY FAILING TO COMPLY WITH HAZARDOUS WASTE MANAGEMENT REQUIREMENTS. ..................................................................................122

B.   COUNT 5: APPLE, THE CITY, & PROPERTY OWNERS VIOALTED 42 U.S.C. § 6923 BY FAILING TO COMPLY WITH HAZARDOUS WASTE RECORDKEEPING REQUIREMENTS. ..................................................................................124

C.   COUNT 6: APPLE & THE PROPERTY OWNERS VIOALTED 42 U.S.C. § 6925 BY OPERATING WITHOUT REQUIRED PERMITS & VIOLATION THE TERMS OF THE PERMITS THEY DID HAVE. ..........................................................................126

D.   COUNT 7: APPLE VIOALTED 42 U.S.C. § 6923 BY CONTRIBUTING TO THE UNLAWFUL TRANSPORT OF HAZARDOUS WASTE. ...........................................127

E.   COUNT 8: APPLE, THE CITY, & THE PROPERTY OWNER VIOALTED 42 U.S.C. § 6924, 42 U.S.C. 6928 BY VIOALTING HAZARDOUS WASTE TREATMENT STANDARDS & REQUIREMENTS. ..............................................................................127

XIII.   CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE CLEAN AIR ACT.............................................129

F.   COUNT 9: APPLE AND THE PROPERTY OWNER VIOLATED 42 U.S.C. 7413 BY OPERATING A STATIONARY SOURCE WIHTOUT PERMITS .................................136

G.   COUNT 10: APPLE & PROPERTY OWNER VIOLATED 42 U.S.C. §§ 7502, 7661 BY

*OPERATING SOURCES WITHOUT TITLE V PERMITS and BY FAILING TO OBTAIN PRECONSTRUCTION PERMITS.* ........................................................... 138

H.    *COUNT 11: APPLE & THE PROEPRTY OWNERS VIOALTED HAZARDOUS AIR POLLUTANTS STANDARDS.* ..................................................................140

I.    *COUNT 12: APPLE & THE PROEPRTY OWNER VIOLATED NON-ATTAINMENT STANDARDS WITH OZONE POLLUTION.* ............................................142

J.    *COUNT 13: APPLE VIOLATED 42 U.S. CODE § 7604 BY EXCEEDING EMISSION LIMITS.* ....................................................................................146

K.    *COUNT 14: THE CITY VIOALTED NAAQS & CRITICAL AIR POLLUTANT STANDARDS IN SITING THE FAB AND APARTMENTS.* .........................147

L.    *COUNT 15: THE CITY VIOALTED CAA WHEN IT APPROVED THE SANTA CLARA SQUARE EIR, WITH TERMS REUFSING TO COMPLY WITH NON-ATTAINMENT STANDARDS.* .........................................................................149

XIV.    CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE CLEAN WATER ACT. .........................................150

M.    *COUNT 16: THE CITY VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY FILLING A CREEK WITHOUT A PERMIT.* ............................................................ 155

N.    *COUNT 17: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY MAINTAINING AN UNLAWFULLY FILLED A CREEK & DISCHARING ADDITIONAL POLLUTION INTO THAT CREEK.* .................................................. 158

O.    *COUNT 18: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1311 BY DISCHARGING UNPERMITTED AND FORBIDDEN POLLUTED WASTEWATER.* ....160

P.    *COUNT 19: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1316 BY CONCEALING THE SOURCE OF DISHCARGED WASTEWATER WAS A SEMICONDUCTOR MANUFACTURING.* ............................................................. 161

Q.    *COUNT 20: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1317 BY FAILING TO PROPERLY TREAT DISCHARGED WASTEWATER.* .............................162

R.    *COUNT 21: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING WASTEWATER DISCHARGE AND TREATMENT.* .......................................................163

S.    *COUNT 22: THE CITY VIOLATED § 1319 BY FAILING TO TAKE ENFORCEMENT ACTION REGARDING DISCHARGES.* ...............................................166

T.    *COUNT 23: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1342 REGARDING STORMWATER.* ......................................................................169

U.    *COUNT 24: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING PUBLIC NOTICE & ENGAGEMENT REGARDING THE CHIP FAB'S STORMWATER DISCHARGE AND PERMITTING.* ........................................................................ 171

XV.     CITIZEN SUIT ENFORCEMENT ACTION AGAINST DEFENDANTS FOR
VIOLATIONS OF THE EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-
KNOW ACT. .................................................................................................. 173
    A.     *COUNT 25: APPLE AND THE PROPERTY OWNER VIOLATED EPCRA*
    *NOTIFICATION AND REPORTING REQUIREMENTS.* .......................................... 174
    B.     *COUNT 26: APPLE, THE CITY, & THE PROPERTY OWNER VIOLATED EPCRA*
    *TRI REQUIREMENTS.* .................................................................................. 177
    C.     *COUNT 27: THE CITY VIOLATED EPCRA BY CONCEALING AND DENYING*
    *REQUESTS FOR HAZARD INFORMATION IT WAS REQURIED TO PROVIDE.* ........ 181
XVI.     CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS
FOR THEIR VIOLATIONS OF THE TSCA. ............................................................ 182
    A.     *COUNT 28: APPLE VIOLATED THE TSCA WITH NMP (15 U.S.C. §§ 2605, 2614-*
    *2615; 40 CFR PART 751).* ......................................................................... 183
    B.     *COUNT 29: APPLE VIOLATED THE TSCA WITH MERCURY (15 U.S.C. §§ 2605,*
    *2607, 2614-2615).* .................................................................................... 185
    C.     *COUNT 30: APPLE VIOLATED THE TSCA WITH TCE (15 U.S.C. §§ 2605, 2614-*
    *2615; 40 C.F.R. § 751.301).* ...................................................................... 186
    D.     *COUNT 31: APPLE VIOLATED THE TSCA WITH LEAD (15 U.S.C. §§ 2605, 2614-*
    *2615, 2681-2689; 40 CFR PART 745).* ....................................................... 188
    E.     *COUNT 32: ALL DEFENDANTS VIOLATED TSCA BY USING AND DISPOSING*
    *OF IMMINENTLY HAZARDOUS CHEMICAL SUBSTANCES AND MIXTURES. (15*
    *U.S.C. §§ 2605-2606, 2615).* ..................................................................... 189
XVII.     PUBLIC NUISANCE ABATEMENT AND ENFORCMENT AGAINST
DEFENDNTS.  (CAL. CIV CODE § 3491 ET SEQ.) ........................................... 191
    F.     *COUNT 33: APPLE VIOLATED CAL. CIV CODE § 3491 ET SEQ.* ...................... 193
    G.     *COUNT 34: THE PROPERTY OWNER VIOLATED CAL. CIV CODE § 3491 ET SEQ.*
    197
    H.     *COUNT 35: THE CITY OF SANTA CLARA VIOLATED CAL. CIV CODE § 3491 ET*
    *SEQ.* ........................................................................................................ 199
**RELIEF SOUGHT** ................................................................................... **204**
**CONCLUSION** ......................................................................................... **208**

# INTRODUCTION

1.      This matter involves a public safety threat, imminent environmental disaster, admitted zoning mistake, and comprehensive market failure. This matter arises from a property with a high-hazard, unmarked semiconductor manufacturing facility (a "*chip fab*") operating at 3250 Scott Blvd in Santa Clara, California. The facility is using, storing, and releasing alarming amounts of deadly gases and very dangerous chemicals without notice or warning; next to a high-density residential apartment complex (The "Santa Clara Square Apartments") across the street; and is surrounded by restaurants, gyms, churches, medical clinics, bike lanes, nature trails, creeks flowing the SF Bay, and multiple city parks and children's playgrounds.

2.      The Property Owners are also the long-time owner of an adjacent federally managed toxic waste dump clean-up site (the "Synertek site") with a contaminated groundwater plume flowing north under the same homes and kids. The owner's been fighting the EPA's request to amend the Record of Decision for that site for years, while concurrently enabling the same kind of reckless operations at this   that created the adjacent toxic waste dump in the 1980s  The operator/tenant for The Chip Fab is a large, wealthy, domestic corporation which certainly has the resources to locate its chip fabs in properly zoned locations that do not share property lines with the open windows of residential apartments, public parks with sunbathers and picnic tables, retired folks walking on nature trails, or, most critically, little children playing on outdoor playground equipment just feet away from The Chip Fab releasing gases regulated as chemical weapons.

3.      The City conspired with the other defendants to conceal The Chip Fab from nearby residents and businesses; failed to report the company's name, activities, or emissions; kept The Chip Fab out of the EIR for a new 1,800+ unit dense- residential apartment complex next door; failed to cite and report environmental violations, and received multiple complaints from residents injured by exposure to industrial chemicals –yet failed to investigate or warn, and instead took actions to invite vulnerable people to city parks next to The Chip Fab, knowing people were being hurt and could be killed. The City faced litigation in California court over a situation much like this from 1993-2000+, with California trial and appellate court orders forbidding the City from siting chip fabs next to kids and churches and threatening the current Mayor (prior council member) with

contempt for violating court orders and still insisting on sitting children next to deadly chemicals. *LSI Logic Corp. v. ~~an~~City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995).

4.      The Chip Fab, like all semiconductor fabrication and manufacturing facilities, engages in ultrahazardous activities. Due to the kinds, methods ,and quantity of chemicals used, even if a chip fab is in full legal compliance, it can still cause severe harm to nearby residents and accidents can occur which would result in catastrophic chemical disasters with mass injuries and/or environmental devastation. Even worse, The Chip Fab has been operating without required permits, refusing to file required reports, refusing to notify the community about leaks, spills, or its basic operations; and has already been releasing and emitting incredible amounts of toxic substances into the air, water, land, and into human bodies – with years of reports of chemical injuries and pollution.

5.      This unlawfully reckless siting and zoning was facilitated, approved, and concealed by the same Silicon Valley city where this public safety hazard is located. The same departments and employes worked on both projects (The Chip Fab and huge apartment complex) at the same time, and all concealed The Chip Fab from the EIR and CEQA process for the residential development, knowing the siting and zoning was in direct and egregious violation of federal, state, regional, and county code –the city's own General Plan, polices, and ordinances.

6.      The Chip Fab is also located near two creeks flowing to the SF Bay and which are protected by the Clean Water Act. The San Tomas Aquino Creek is a mostly artificial channel that routes surface waters flowing out to the SF Bay.

7.      The Saratoga Creek is the only natural creek in Santa Clara County that flowed from the Santa Cruz mountains, across the valley floor, and out to the Pacific Ocean. The City unlawfully "filled" this ancient creek in the 1970s – but Saratoga Creek represents an extensive, underground, hydrothermal aquifer system – working its way through cracks, faults, and serpentine processes – and still actively surfacing in natural springs and overflowing wells at the Premise. This is still flowing, as it has for millions of years, through the valley floor and out of the Pacific Ocean – but now there's a chip fab sitting directly on top of it, with The Chip Fab's stormwater and emissions/pollution flowing into the springs and aquifer, and then into the SF Bay, which are all waters of the US.

8.      The Chip Fab is polluting the air with at least a (self-reported) eight tons of industrial chemicals and heavy metal air emissions each year, repeated leaks of toxic gases; discharging at least 40,000 gallons of contaminated waste water every day; polluting the storm water, groundwater, underground and above ground federally protected water ways; contaminating the soil and nearby structures and vegetation, and injuring nearby residents, workers, and wildlife.

1.9.      Accordingly, this is an federal environmental Citizen Suit brought pursuant to the federal statutes that were enacted in the 1970s-1980s in response to market-failure-type environment and safety hazards like this case, including: provisions of the Resource Conservation and Recovery Act, (RCRA), 42 U.S.C. § 6972, Clean Air Act, 42 U.S.C. § 7604, Clean Water Act, 33 U.S.C. § 1365, Emergency Planning and Community Right-to-Know Act, (EPCRA), 42 U.S.C. § 11046, and Toxic Substances Control Act, ("TSCA"), 15 U.S.C. § 2619 (collectively referred to herein as the "Citizen Suit Provisions," and this action as the "Citizen Suit.")  This Citizen Suit is brought in order to enforce the terms of, and to effectuate the congressional intent of, the Resource Conservation and Recovery ActRCRA, 42 U.S.C. § 6901 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., Clean Water Act, 33 U.S.C. § 1251 et seq., the Emergency Planning and Community Right to Know ActEPCRA, 42 U.S.C. § 11001 et seq., and Toxic Substances Control ActTSCA, 15 U.S.C. § 2601 et seq., (collectively referred to herein as the "Federal Environmental Statutes").

2.10.      TheThis is also a California Public Nuisance claim iscase brought under California Civil Code § 3491 and in order to enforce the terms of, and effectuate the legislative intent of, California Civil Code Division 4, Part 3 "*Nuisance*," including other related and/or incorporated state and local code, and certain rights and responsibilities under the California Constitution; obligations and mandates under the California health/safety, natural resources, fire, and civil code; and the local law and policy within regional regulations and ordinances.

11.      This lawsuit is brought by the Plaintiff for several reasons, but primarily due to her own experience suffering severe chemical exposure injuries caused by the operations at The Chip Fab in 2020, then followed by years of profound and overwhelming concern about the imminent and substantial endangerment to the surrounding community created by the ongoing activity and releases. This lawsuit is filed to seek redress for the Plaintiff's own informational, emotional, recreational, and existential injuries; to punish the Defendants for their wrongdoing; as an action

to abate the hazards, mitigate harm caused, and protect the surrounding community, workers at the site and impacted businesses, and the surrounding environment (including the ancient redwood trees and Saratoga creek, and the adjacent San Tomas Aquino creek and trails, with both creeks flowing through sensitive ecosystems, north to the SF Bay, and then out to the Pacific Ocean). The Plaintiff is deeply connected to this site and eternally haunted by the harm that is occurring there.

## JURISDICTION, & VENUE, & NOTICE

3.12.    This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to the Citizen Suit Provisions of the Federal Environmental Statutes under 28 U.S.C. § 1331 (an action arising under the laws of the United States); and/or 28 U.S.C. § 1332 (diversity of citizenship between parties with more than $75,000 at stake in statutory fines) and 28 U.S.C. § 1367 (supplemental jurisdiction). Additionally, this Court has an additional and independent basis for providing relief under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 1651 (injunctive relief), and under principles of equity and public policy.

13.    On and around June 30 2025, Plaintiff providedVenue is proper in the Northern District of California, because the source of the violations is located within this judicial District, the violations and endangerment occurred and occur in the District, the release and damage occur and occurred at properties and business operations within this District, Defendants reside in the District, and this District inherently represents local community interests related to this matter. This case was filed at the San Jose Division due to the close proximity to the facility.

## SIXTY DAY NOTICE & YEARS OF PRIOR COMPLAINTS

14.    The Plaintiff became severely ill in Feb. 2020 immediately after moving into the Santa Clara Square Apartments next to The Chip Fab. It was not until Sept. 2020 that the Plaintiff discovered she was being exposed to industrial chemicals (noticing VOCs spiking at the same times as her worst symptoms, appearing on a cell phone application dashboard for her indoor air purifiers). The Plaintiff promptly investigated further and reported the apparent chemical emergency to the city, county, state, and federal governments. The state and US government did not know about The Chip Fab.

15.    After accidently discovering The Chip Fab while researching public records related to buildings around the apartments where she had lived in 2020, Plaintiff reported The Chip Fab

and its violations and hazards, to the same agencies in June 2023. (Exhibit C: June 2023 Environmental Complaint). The Plaintiff filed complaints to US EPA, state, and local agencies, including the City of Santa Clara. (Exhibit D: Proof of Service of June 2023 Environmental Complaint). The cover page of her complaint warned that she was prepared to file a Citizen Suit due to imminent and substantial endangerment if the agencies did not act.

16.     The US EPA took formal RCRA enforcement action for hundreds of violations it found during just two brief inspections, which resulted in a Consent Agreement and Final Order, penalty for those specific violations, but no other liability waivers, and express terms protecting further injunctive and equitable relief, and the final agreement credited the Plaintiff for making the complaint and providing the tip.[1] Apple is also facing at least six separate air pollution violations cited by the BAAQMD, based on the Plaintiff's complaints and tip.

17.     In Sept. 2023, the Plaintiff also proceeded to sue Apple about the activities and harm caused to her, combined with a retaliation lawsuit – as come to find out The Chip Fab is run by her ex-employer, and it was her ex-employer who nearly killed her, then covered it up, retaliated against her including sending a Workplace Violence investigator to fire her without explanation, and then terrorized her for years.

18.     The lawsuit is well underway and one of many active claims includes a California crime victim retaliation action (Cal. Labor Code 98.7) that argues the tenant/operator nearly killed the Plaintiff in 2020 with hazards from The Chip Fab, knew they almost killed her with their emissions/dumping, and then harassed her and belligerently fired her as an act of retaliation because she was a victim of their environmental crimes at The Chip Fab. (*Ashley Gjovik v. Apple Inc.*, N.D. Cal., Case No. 3:23-cv-04597, 2023-). The case is in discovery, and the Plaintiff is moving for Summary Judgement.

19.     The Plaintiff also filed labor, safety, and environmental complaints to relevant agencies. Apple settled with the Plaintiff and NLRB over the Plaintiff's charges filed to NLRB alleging that Apple's US employment agreements, confidentiality agreements, dozens of work policies, and their written surveillance policies/practices, all violate federal labor laws. Apple

---

[1] *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

entered their first national settlement agreement with the NLRB, agreed with withdraw those terms, stop enforcing those terms, and to post a three-page notice of employee rights and Apple's promise to stop violating the NLRA.[2] NLRB also filed a complaint against Apple for unlawfully suspending, terminating, and threatening the Plaintiff; including creating and ordering an unlawful five-point balancing test in June 2021, that had to be satisfied by the Plaintiff if she wanted to talk to other people about environmental compliance or workplace safety concerns.

20.    However, no agencies have taken enforcement action to actually abate the hazard created by The Chip Fab. People are still being injured and there is constant threat of catastrophic harm if that facility continues to operate in this location and especially as long as it continues to fail to comply with basic environmental and health/safety legal requirements.

4.21.    Thus, on June 30 2025, the Plaintiff served Sixty Day Notice to Defendants and U.S. EPA of her intent to file a Citizen Suit against Defendants over Defendants'The Chip Fab and violations of federal Environmental Statutes. Defendants were notified via electronic mail and formally served via a process server and/or Certified Mail. (Exhibit A – Sixty Day Notice).Apple was served on behalf of itself and its contractors/agents. Mr. Kalil/Khalil Jenab was served on behalf of himself and his various business entities and partnerships. The City was served on behalf of the City itself, its vicarious liability for the acts of its employees and departments (including Fire Dept., HazMat, Water/Sewer) and the San José-Santa Clara Regional Wastewater Facility co-owned by the City.

5.22.    The Plaintiff formally served Notice and receipts of service of the Notice to the Administrator of the U.S. EPA and the Regional Administrator of U.S. EPA Region IX. Plaintiff also sent electronic versions of the Sixty-Day Notice to the U.S. EPA Enforcement and Compliance team, the California EPA, (DTSC, Water Quality Board, etc.), the BAAQMD, the Santa Clara County DEH, and the U.S. DOJ ENRD. Plaintiff provided Notice of the actual and threatened endangerment, injury, and damage alleged herein by mailing notices of endangerment and of intent to file suit pursuant to RCRA §7002(b)(2)(A), to the U.S. EPA the California EPA, and Defendants. (Exhibit B – Proof of Service of Sixty-Day Notice).

[2] For NLRB: *Apple, Ashley Gjovik,* 32-CA-282142, 32-CA-283161, Dec. 2024 Complaint & Notice of Hearing; *Apple, Gjovik, 3*2-CA-284428, April 4 2025 Trilateral Settlement & Consent Agreement.

~~6.~~23.    The Plaintiff's Sixty-Day~~+ Notice and June 2023~~ Notice provided ~~Defendant~~the Defendants and responding agencies with direct and sufficient information enabling them to determine the ~~requirements~~laws Plaintiff ~~alleges Defendant~~alleged the Defendants violated, the types of activities alleged to constitute the violations, sufficient information to determine the facts of the violations, and the contact information for the Plaintiff. The Plaintiff also complained about injuries caused by The Chip Fab to most Defendants for at least two years. Further, reporting that a "chip fab" is operating next to thousands of homes and a playground is basically reporting someone is drilling for oil next to an elementary school - -the facts are themselves inherently alarming.

~~7.~~24.    More than sixty days have passed since the Notice was served ~~upon Defendant~~on the Defendants and the state and federal agencies. During this time, neither the EPA, nor the State of California, has commenced or is diligently prosecuting a court action to redress the violations alleged ~~herein.~~, or took actions to force compliance in order to prevent recurrence of ongoing issues, nor are any entities taking legal or administrative actions to abate the hazards caused by the activities. The EPA RCRA enforcement action simply took Apple's word for it that Apple corrected the violations, limited the action to only violations found during the 2023-2024 inspection, and only "settled" with a tiny fine. [3] (Exhibit E: Oct. 2025 EPA RCRA Enforcement Action).

~~8.        Following service of the Sixty Day Notice, the City never responded to the Plaintiff.~~

~~9.        Following service of the Sixty Day Notice, Mr. Jenab et al. responded for the first time on August 29 at 6:08 PM (the last business day before the filing date), in response to Plaintiff's requests for information in preparation of filing the Complaint and arranging Service.~~

~~10.        Following service of the Sixty Day Notice, Apple did not respond directly to this matter until August 29 2025 at 5:56 PM (the last business day before the filing date), at which point Apple's counsel sent Plaintiff a sort of informal Motion to Dismiss. Apple's counsel still did not confirm if they were retained for the litigation, would not confirm details for service, and the attorney was expressly named as a wrongdoer in the Notice and his letter defended his own actions.~~

---

[3] US EPA, *EPA Takes Action Against Apple for Inadequate Hazardous Waste Management*, Nov. 18 2025, https://www.epa.gov/newsreleases/epa-takes-action-against-apple-inadequate-hazardous-waste-management

Plaintiff objected to the conflict, suggested she would pursue Disqualification if that individual proceeded, and also asked again for the Service information. Apple did not respond.

11. Plaintiff provided Notice of the actual and threatened endangerment, injury, and damage alleged herein by mailing notices of endangerment and of intent to file suit pursuant to RCRA § 7002(b)(2)(A), to the U.S. EPA the California EPA, and Defendants. The U.S. EPA, California EPA, and City of Santa Clara received this notice in 2023 and still have not acted. The Defendant Apple received this notice directly and constructively since 2020, and again formally in this latest Notice, but had not stopped their violations.

12. Under Local Rules, a *Pro Se* Plaintiff must open new cases with a physical paper Complaint left with the Courthouse Clerk. After this case is docketed and electronic filing is granted for the Plaintiff, the Plaintiff will post Exhibits for the Complaint including copies of the Sixty Day Notice and Proof of Service of the Notice.

13. Venue is proper in the Northern District of California, because the source of the violations is located within this judicial District, the violations and endangerment occurred and occur in the District, the release and damage occur and occurred at properties and business operations within this District, Defendants reside in the District, and this District inherently represents local community interests related to this matter.

14. This case was filed at the San Jose Division due to the close proximity to the facility but could also be transferred to the San Francisco Division to manage concurrently with existing litigation (*Ashley Gjovik v. Apple Inc.,* N.D. Cal., Case No. 3:23-cv-04597, 2023 ). Notice of Pendency will be posted on the pending case in the San Francisco Division. Plaintiff leaves assignment to the Court's discretion.

## 3250 Scott Blvd, Santa Clara

15.1. The violations, nuisance, endangerment, and harm for which Plaintiff seeks relief arises from the property and operations located at 3250 Scott Blvd in Santa Clara, California (the "Property", APN 216-29-117).

16. The vertical and horizontal extent of the releases, pollution, and contamination at, and emanating from the Property, including locations where contamination has come to be located or threatens to become located, are hereby referred to as the "Premise" and generally refers to a

radius of roughly ~1,000 feet around the Property.

17.     The Property and the Premise have been impacted by contamination at and emanating from the operations of Apple Inc at 3250 Scott Boulevard ("Apple Operations"). The Property and the Premise have also been impacted by contamination at and emanating from other historic semiconductor operations at the Property and at the adjacent 3050 Coronado Blvd, a.k.a. the "Synertek Inc Building 1" Superfund site ("Synertek Operations," CAD990832735). Public records show that Defendant Mr. Jenab *et al.* owns both the 3250 Scott Boulevard and 3050 Coronado Boulevard properties.

18.     The Apple Operations at the Property are occurring less than ~300 feet from thousands of homes. Also, within ~500 feet from the Property and Apple Operations are two public city parks, picnic tables, outdoor fitness stations, large swimming pools, and a children's playground. Within 1,000 feet there is also a church, grocery store, urgent care facility, a school, elder care facility, and the San Tomas Aquino and Saratoga Creeks and public trail.

# PARTIES

## I.   Plaintiff: Ashley Gjovik

~~19.~~25.  Ashley Gjovik (pronounced "JOE-vik") is the Plaintiff in this action ("Plaintiff") and is a citizen of the United States, prior resident of the SF Bay Area in California, (2015-2022), and current resident of Massachusetts who is domiciled in Boston. Plaintiff uses her California LLC address (2108 N St. Ste. 4553 Sacramento CA, 95816) on legal papers for privacy due to physical safety concerns, but this action is brought by her as an individual. Plaintiff currently lives on the East Coast due to circumstances created by Apple but intends to return to California when able.

20.     Plaintiff worked for Defendant Apple Inc from 2015 until Apple terminated her employment in 2021. Plaintiff lived next to the Property and Apple Operations, at the Santa Clara Square Apartments, in 2020,  where she became severely ill and injured due to chemical exposure.

26.     The Plaintiff worked for Apple Inc from 2015 until 2021. At the time Apple fired her, she was a Sr. Engineering Program Manager working for a Director and Sr. Director in Apple's Hardware Engineering organization and Product Integrity team. Plaintiff always received positive performance reviews, and was positioned as a "problem solver," chief of staff, and process expert. Her reviews designated her as "key talent" and "irreplaceable." Even the performance review

drafted shortly before she was fired was mostly positive and the only "performance issues" noted were her complaints about work conditions, unlawful secrecy rules, and safety issues.

21.27.   The Plaintiff graduated from Santa Clara University in 2022 through their part-time evening program, and with a Juris Doctor degree and Certificate in Public International Law with honors. During her legal education in 2018-2022, Plaintiff was an Emery Merit Scholar; made Dean's List every year; received CALI Excellence for the Future Awards for obtaining top grades in Property Law, Statutory Analysis and the Legislative Process, and Public Health Law; and ~~also~~ received the Witkin Award for Academic Excellence award in Property Law. ~~Plaintiff feels confident she can proceed effectively as a *pro se* Plaintiff~~She also worked in Apple's legal department in 2019 developing Apple's first AI ethics policy and received glowing reviews. The relief requested in her retaliation lawsuits includes reinstatement at the company.

~~22.    Plaintiff has not taken the bar exam is not an attorney, as she has been focused on her legal battle with her ex-employer, Apple Inc, after the company nearly killed her with its environmental violations at the Property in 2020, causing contamination of the Premise where she lived in 2020; took adverse actions against her in her employment, including suspending and firing her in 2021; and then undertook a multi-year scheme of retaliation, harassment, and obstruction through current day, which is captured in the pending RICO Lawsuit.~~

28.    ~~In 2023, Plaintiff filed a related action, concerning the same, similar, and related subject matter, against Defendant Apple Inc in the matter of *Ashley Gjovik*~~Plaintiff lived at the Santa Clara Square Apartments from Feb. 2020 through Oct. 2020. She lived on the third floor of Building 4 located at 3390 Octavius Drive, with a corner unit looking out at the corner of Augustine Dr. and Octavius Dr. The apartments were brand new, and the outdoor areas were spectacularly beautiful. She spent time relaxing and appreciating nature in the city's "Meadow Park," walking along the city's Redwood Trail and the San Tomas Aquino creek trail and appreciating the beautiful redwood trees outside her unit's windows. She shopped at the adjacent Whole Foods, visited the adjacent medical clinics, and picked up meals at the next-door restaurant. At all times, she was exposed to chip fab exhaust, pollution, and safety hazards.

29.    She became severely ill and disabled within days of moving into the apartment. The injuries were promptly investigated and eventually diagnosed in late 2020 and early 2021 as acute

exposure to industrial chemicals from an unknown source. While investigating the possible source, she partnered with and was advised by state and federal environmental agencies and public health officials, legal and policy experts at her law school, and long-time SF Bay Area labor and environment community activists. Despite all this expertise, no one discovered The Chip Fab until the Plaintiff discovered it in Feb. 2023, and she has been begging for help to abate the hazard since.

## II.    DEFENDANT: APPLE INC.

23.    ~~v. *Apple Inc.,*~~ N.D. Cal., Case No. 3:23-cv-04597 (the "RICO Lawsuit"). In that matter, Plaintiff's claims against Apple included Private Nuisance, Ultrahazardous Activities, IIED — Fear of Cancer, and RICO with environmental-related Predicate Acts, amongst other claims.

24.    In 2023-2024, the NLRB found in Plaintiff's favor against Apple, with the NLRB filing a Complaint against Apple, alleging the company violated federal labor law when it threatened, suspended, and terminated the Plaintiff's employment in 2021 in retaliation for Plaintiff's protected concerted activities around environmental, health, and safety issues (*Apple, Ashley Gjovik,* 32-CA-282142, 32-CA-283161).

25.    The NLRB also found in Plaintiff's favor regarding her charges that Apple's employment policies (including NDAs and other confidentiality policies) violate federal labor law. NLRB filed a Complaint against Apple on Sept. 27 2024. On April 4 2025, the NLRB, Plaintiff, and Apple entered a trilateral national settlement with extensive injunctive and declaratory remedies to be completed by Apple, including an ongoing consent agreement. (*Apple, Gjovik, 32-*CA-284428).

26.    Plaintiff also had a U.S. Dept. of Labor Whistleblower Retaliation case against the Apple under CERCLA, RCRA, CAA, and TSCA. However, the ALJ decided, based on Apple's counsel's Motion to Dismiss, that the CERCLA generally does not apply to Apple, even when operating on a Triple Superfund Site — and then the ALJ refused to hear the remainder of the Plaintiff's arguments. The case was filed in 2021, dismissed in 2024, and is still awaiting an appellate decision. (*Ashley Gjovik v Apple Inc,* OALJ 2024-CER-00001, ARB 2024-0060).

## II.    DEFENDANT: APPLE INC.

27.30.    Apple Inc. is a corporation headquartered in California at 1 Apple Park Way, Cupertino, CA 95014. Apple Inc "Apple" refers also to its employees, Directors, Board, legal

counsel, subsidiaries, affiliates, contractors, and other agents. (Cal. Civ. C. § 2295 et seq.).

31.    In this case, regarding the properties and facilities at issue, Apple is an "operator" and "owner," a "tenant" and "lessee," a potentially responsible party under RCRA, CERCLA

~~28.~~32.   Apple rents and operates a semiconductor manufacturing facility at 3250 Scott Blvd, in Santa Clara, California. Apple has operated ~~this facility~~The Chip Fab since approximately 2015 ~~without required federal air permits, hazardous waste permits, or other required approvals. Instead~~but was named on planning documents back to 2014. From then to current day, Apple has either refused to disclose what its operations are and/or misrepresented ~~its operations~~it activities as a simple research and development ~~facility~~. Apple's key hazmat contractor at The Chip Fab appears to be Advanced Chemical Transport, Inc. d.b.a. ACTEnviro, operating under Master Service Agreement No. CP201322217 and associated agreements. In most documentation it appears the EH&S manager/lead at The Chip Fab is Apple employee Tom Huynh and the EH&S engineer is his employee, Kevin Sung.

33.    Apple executives were fully aware of The Chip Fab, including the vast number of hazardous materials and hazardous waste. Every year, Apple submitted a sworn financial assurance document to the Santa Clara Fire Department which detailed hazardous waste treatment and disposal operations, and was signed by Apple's CFO, Luca Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. The Apple CFO certifies hazardous waste activities and violations at The Chip Fab. Mr. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.

~~29.~~34.   Apple is fully aware of the relevant environmental violations as its currently employs a prior U.S. EPA Administrator (Lisa Jackson)~~and much of her prior U.S. EPA staff, in its Government Affairs and Lobbying team~~ and much of her prior U.S. EPA staff, in its Government Affairs and Lobbying team. Plaintiff has repeatedly caught Jackson attempting to interfere with the EPA and its officials while it was under investigation or otherwise subject to agency orders regarding the Plaintiff's Apple office on a Triple Superfund site in Sunnyvale, California – including Jackson sending the EPA Administrator letters of recommendation for the person she wanted to be appointed as Regional Administrator and who would oversee Apple, sending the letter

from her Apple email account in Nov. 2021.

30.35.  Further, from at least 2019 to current, Apple has statedfiled written, formal statements to the U.S. EPA and to the public thatclaiming it is a leader in environmental compliance, includingthat it forbids use of the chemicals its regularly using in applying for U.S.The Chip Fab, and that it demands strict compliance with the EH&S EPA "chemical safety" awards as recently as last year. laws that is blatantly violates at The Chip Fab. Apple's Supplier Responsibility documents alsopolicies extensively detail the environmental and safety legal obligations for operations at its  factories – which it knowingly refuses to comply with at its own chip fab. Apple knew what the law is and intentionally chose to violate those laws in pursuit of the economic benefits of noncompliance. at The Chip Fab. Apple also applied for U.S. EPA "chemical safety" awards as recently as last year – with the EPA granting awards while Apple was under investigation for RCRA violations.

31.36.  Apple has been subject to multiple environmental lawsuits and consent agreements in the United States including recently in California and North Carolina.[4] However, the only other known modern instance of Apple operating a semiconductor manufacturing facility in the United States was described by a union leader, as published in The American Prospect, as "*easily [one of] the most unsafe sites*" the leader had "*ever walked on.*"[5]  Public records show that Apple's prior domestic manufacturing facility in the SF Bay Area was back in the 1990s and described by the New York Times as "*Apple Computers Used to Be Built in the U.S.; It Was a Mess.*"[6]

32.  Public records show that it appears the last time Apple operated a manufacturing facility in the SF Bay Area was in the 1990s, and it was later described by the NYT as "*Apple Computers Used to Be Built in the U.S. It Was a Mess.*"[7]

33.37.  Apple has also previously  been caught exposing its employees to legthal gases

---

[4] The Carolina Journal, *Apple clean energy project fined for environmental violations*, Don Carrington, Oct. 6 2017, https://www.carolinajournal.com/apple-clean-energy-project-fined-for-environmental-violations/.
[5] The American Prospect, *Chipmaker's Scramble to Build Marred by Mistakes and Injuries,* June 22 2023.
[6] The American Prospect, *Chipmaker's Scramble to Build Marred by Mistakes and Injuries,* June 22 2023, https://prospect.org/labor/2023-06-22-tsmc-semiconductor-factory-phoenix-accidents/ NYT, "*Apple Computers Used to Be Built in the U.S. It Was a Mess,*" Dec. 15 2018.
[7] NYT, "*Apple Computers Used to Be Built in the U.S. It Was a Mess," Dec. 15 2018,* https://www.nytimes.com/2018/12/15/business/apple-california-manufacturing-history.html

including in North Carolina,[8] China,[9] and ~~in recently in~~ Arizona. In Arizona, ~~the~~Apple handled the recent toxic gas exposure ~~was handled~~ by lying to the employees ~~that~~and claiming the evacuation alarm was simply a ~~fire drill~~testing exercise but also at least for a brief period of time, implied someone may physically assault them, or kill them, if they did not evacuate; while concealing the evacuation was required due to Apple's toxic gas leaks. "*People were told that there was an active-shooting drill, and they were running, and [told] to evacuate the area. So, our guys got out of the area. And they found out later that it was a gas leak. And they were just trying to hide that. So, no one trusts them.*" (The American Prospect, June 22 2023).

~~34.~~1.    ~~Apple executives were fully aware of Property and its Operations, including the vast number of hazardous materials and hazardous waste, as every year, Apple submitted a financial assurance document to the Santa Clara Fire Department which detailed hazardous waste treatment and disposal operations, and was signed by Apple's CFO, Luca Maestri — including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. Mr. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.~~

## III.    <span>DEFENDANT:</span> CITY OF SANTA CLARA

~~35.~~38.  Defendant City of Santa Clara is a municipal corporation organized under the laws of California, with its principal place of business located at 1500 Warburton Avenue Santa Clara, CA 95050. California Gov. Code expressly authorizes that a city may be sued, including for injuries caused by acts or omissions by the entity itself and/or its employees. Cal. ~~The current City Attorney is Glen R. Googins.~~[10]Gov't Code § 811.2, 815, 945; Restatement (Third) Of Agency §2.04 (AM. L. Inst. 2006).

39.      In California, it is "manifest that the legislature intended to allow" nuisance actions against governments when the claims are tailored to meet statutory provisions and with a

---

[8] The Guardian, *Five injured in chlorine gas leak at Apple data centre: Workers treated at the scene in North Carolina by paramedics before ~~being~~ taken to hospital after exposure to noxious fumes*, June 2 2015. https://www.theguardian.com/technology/2015/jun/02/injured-chlorine-gas-leak-apple-data-centre
[9] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China,* July 27 2012~~,~~. https://www.nbcnews.com/news/world/report-deadly-gas-leak-apple-suppliers-plant-china-flna714480.
~~[10] Santa Clara, City Attorney, https://www.santaclaraca.gov/our-city/departments-a-f/city-attorney-s-office~~

"profound interest… in the eradication of the evils caused by the various forms of pollution." *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931-936 (1972).

40.    The City is entity that is subject to local, state, and federal environmental oversight. For example, the City received eight Notices of Violation for High Priority Violations of the Clean Air Act," from the BAAQMD in just the last three years. Four are noted as settled; and four are still open. US EPA enforcement shows at least fifteen CAA enforcement actions taken against the City since 2017. (WWTP BAAQM, Title V Major Source).

41.    The City also holds multiple NPDES permits including POTWs R2-2020-0001 for individual nutrient, mercury, PCB. The NPDES permits cover at least stormwater and wastewater management. The City's water, wastewater, and recycled water have been managed by Director Gary Welling. His department is responsible for "ensuring compliance with federal and state regulations related to water, recycled water, wastewater, worker safety." (City of SC Wastewater System). The Plaintiff spoke with Welling in 2020-2021, met with the Mayor of Santa Clara several times in 2021, and at least one other victim also contacted the Mayor and Welling. Neither disclosed The Chip Fab, took action to help, or warned the victims.

42.    The City co-owns a large wastewater treatment plant known as the San José-Santa Clara Regional Wastewater Facility ("The SJ-SC RWF") and which includes a 175 -acre wastewater processing area, 750-acre sludge-drying area, and 850-acre salt pond. Another 825 acres of open land were purchased as "bufferlands" with the purpose of "buffering" adjacent communities and environment from the risk of accidental chemical releases and other hazards associated with operations at the SJ-SC RWF. (San José-Santa Clara Regional Wastewater Facility, The Plant Master Plan, Nov. 2013). The City, as a highly regulated entity, owning and operating a complex treatment facility, understands the importance of risk mitigation regarding air pollution and other hazards arising from industrial operations.

43.    The City of Santa Clara requested to exclusively control the implementation and enforcement of federal hazardous materials and hazardous waste laws through California's "Certified Unified Program Agency" ("CUPA") program. (Santa Clara City Code 15.60.020). Otherwise, the U.S. EPA delegation to Cal. EPA, then delegates this responsibility to the Santa Clara County Dept. of Environmental Health or California DTSC. (Cal. Code Regs. Tit. 27, §

15100). Only Santa Clara, Sunnyvale, and Gilroy have opted to manage federal hazardous waste compliance at a city-level.[11]

36.44. The City Fire Department has "hazardous materials divisionsa "Hazardous Materials Division" which areis "under the direct supervision of the Assistant Fire Chief or Deputy Fire Chief." These divisions includeThis division includes hazardous materials administration, training, legislative, and inspection divisions. (Santa Clara City Code 2.85.070). The CUPA implementing statutes and regulations repeatedly using the term "shall," not "may," regarding the implementation and enforcement of federal environmental laws. ("*The unified program agencies in each jurisdiction shall do all of the following…* ) and the delegation of federal environmental enforcement to a city is a privilege with mandatory obligations. (Cal. Code Regs. Tit. 27, § 15330.).

37.45. The City has beenwas conditionally delegated authority by California EPA to implement and enforce various federal environmental programs within its jurisdiction, including but not limited to air quality permitting, wastewater pretreatment oversight, hazardous waste regulation, and emergency planning coordination.

> "The City of Santa Clara Fire Department has been designated the Certified Program Agency by the State of California Environmental Protection Agency's (CalEPA). The CUPA protects Californians from hazardous waste and hazardous materials by ensuring consistency throughout the state regarding the implementation of administrative requirements, permits, inspections, and enforcement at the local regulatory level."

(Santa Clara City Code 15.60.020, 15.60.130).

38.46. The City has assumed regulatory oversight responsibilities over the Facility's environmental compliance through its delegated authority under state and federal environmental programs.

> "The City does hereby assume responsibility for the enforcement and implementation of the Hazardous Waste Generator Program, Onsite Hazardous Waste Treatment Program, and Tiered Permitting Program… Hazardous Materials Release Response Plans and Inventories (Business Plans) Program, … Hazardous Materials Area Plan Program… California Accidental Release Prevention (CalARP) Program…"

(Santa Clara City Code 15.60.020).

39.  The City has knowingly permitted and facilitated the Operations at the Property since 2015, failed to enforce federal environmental regulations, and concealed violations from

---

[11] Santa Clara County, Unidocs, Who Regulates What in Santa Clara County Page, http://www.unidocs.org/members/whoregulateswhat.html (last accessed 10/24/25)

affected residents and other regulatory agencies.

40.47.  The City Fire Department has been under CUPA corrective action oversight by CalEPA for years. The most recent status report, dated Sept. 16 2024, notes ~~that~~ the ~~Santa Clara government~~City was still unable to correct multiple systemic deficiencies, including that: "The City is not consistently following up and documenting return to compliance in CERS for Hazardous Waste Generators; the City is not ensuring all businesses comply with Hazardous Materials Business Plans; the City is not inspecting CalARP stationary source facilities; the City is not inspecting each facility subject to HMBP requirements at least once every three years; the City is not inspection all Hazardous Waste Generator facilities with appropriate frequency; and the City is not regulating all facilities subject to the Hazardous Waste Generator Program." (CUPA Corrective Action Report, Sept. 16 2024).

- ~~the City is not inspection all Hazardous Waste Generator facilities with appropriate frequency; and~~
- ~~the City is not regulating all facilities subject to the Hazardous Waste Generator Program.~~

48.    The City Council has been subject to lawsuits and court orders regarding situations just like this with reckless siting and zoning, intersection with federal and local environmental enforcement, and basic public safety considerations. *LSI Logic v Santa Clara* (1993-2000). The City repeatedly delayed and withheld critical records regarding The Chip Fab, in violation of the California Public Records Act; and failed to make the public aware of dangerous leaks, spills, and chemical releases.

49.    In direct violation of its mandates, the City has knowingly facilitated concealed The Chip Fab and its hazards since at least 2014, failed to enforce federal environmental regulations, ignored basic public safety protocols, invited vulnerable people to dangerous conditions, failed to warn of known hazards, and concealed risks and harm from affected residents, the community overall, and from other regulatory agencies.

Defendant: ~~(CUPA Corrective Action Report, Sept. 16 2024).~~

## IV.    MR. KALIL/KHALIL JENAB, ET AL ("THE PROPERTY OWNERS")

41.50.  Khalil/Kalil Jenab, is named individually; as Agent and/or Member and/or

Manager of Jenab Family LP and/or Jenab Family Ventures LLC; and as Trustee of the Jenab Family Trust ("~~Mr. Jenab *et al.*"). During the timeframe in question, investigative reports also show the property was owned by "The Woodruff Trust." Mr. Jenab is a Vice Chairman at Cushman & Wakefield and is a licensed Real Estate Salesperson (License No.~~ The Property Owner"). ~~00848988).~~ Mr. Jenab is listed as the current owner of the Property and regulatory filings reference the mailing address 108 Sylvian Way, Los Altos, CA, 94022. However, on August 29 2025, Mr. Jenab corresponded in email saying, "for the record, the property is held by Jenab Family LP" and "Cushman & Wakefield has no ownership interest or involvement with the subject property and should not be identified as a party." ("C&W").

~~42.~~51.   During the timeframe in question, investigative reports also show the property was owned by a variety of other entities, sometimes not reflecting Mr. Jenab's name. An Intelius Location Report on August 29 2025 noted that the Property has been transferred multiple times since 2017, including between the "Lindsey Family Trust," Julia A Lindsey, Kathleen J Woodruff, "Lindsey Julia Family Trust," "Lindsey Property Trust," Jenab Family Trust," "191 Baypointe LLC," "Woodruff Kathleen Trust," "Jenab Family Ventures LLC," "Jenab 1997 Family Trust," and "Jenab Family LP." Mr. Jenab is listed as an Agent for 191 Baypointe LLC along with James Lindsey, the two appear to be long-time business partners, and it's unclear if James Lindsey *et al.* also still owns the Property. Plaintiff reserves the right to amend to add Mr. Lindsey (and/or his LPs, LLCs, trusts, etc.) if needed.

52.     Further, Mr. Jenab has used his work email and job title on regulatory paperwork for the property, including one document stating he was filing the applications and/or signing documents on behalf of his employer ("on behalf of Cassidy Turley"), an entity who was later acquired by Cushman & Wakefield, where Mr. Jenab works now. Mr. Jenab is a Vice Chairperson and a licensed Real Estate Salesperson (License No. 00848988).~~Mr. Jenab is listed as an Agent for 191 Baypointe LLC along with James Lindsey, the two appear to be long-time business partners, and its unclear if James Lindsey *et al.* also still own the Property. Plaintiff~~ His company profile advertises that he has "over 35 years of experience in Tenant and Landlord representation, he has closed over $3 Billion transactions in our local market" and "as a respected commercial real estate expert, he has successfully completed each transaction which required … assisting with the design

and construction implementation." [12]

43.    It is unclear who is the complete list of parties which own and have owned The Property. Requests to view the lease have been denied thus far. Regardless, Mr. Jenab appears to be at least one property owner; and property owners ~~reserves the right to amend to add Mr. Lindsey (and/or his LPs, LLCs, trusts, etc.) if needed.~~ ("Mr. Jenab *et al.* and Mr. Lindsey *et al.*").

44.    Either Mr. Jenab *et al.*, or he and ~~Mr.~~ Lindsey *et al.*, as property owners, were and are responsible for maintenance ~~("the owner, occupant, lessee, or tenant of any property within the city shall be responsible for the maintenance of property and premises in a manner consistent with the provisions of this chapter and this Code."~~ of their properties. [13] Mr. Jenab even entered a formal "Santa Clara City Stormwater Maintenance Responsibility" agreement for 3250 Soctt in at least April 2022. Mr. ~~Code 8.30.04).~~

~~45.~~53.    Mr. Jenab *et al.* ~~was and is aware because he was~~ Jenab is also regularly copied on, ~~received~~receives copies of, has to sign/authorize, and ~~signed~~file under his name, documents related to environmental and safety laws, permits, and regulated operations. ~~"correction and abatement of violations… shall be the responsibility of the owner or the owner's authorized agent… In no event is notice necessary before abatement, when the hazard is a clear and present danger to the public welfare. All costs related to such abatement shall become a lien on the subject property." (Santa Clara City Code 15.60.100).~~Most of the permits, notices, and other filings include Mr. Jenab's name somewhere within the paperwork.

## ~~GENERAL ALLEGATIONS~~

## ~~V.~~ MR. ~~THE PROPERTY AND OPERATIONS~~

46.    Apple started semiconductor manufacturing operations at the Property no later than 2015. The Property is used for semiconductor fabrication and manufacturing, which requires

---

[12] Cushman & Wakefield, Kalil Jenab, https://www.cushmanwakefield.com/en/united-states/people/kalil-jenab

[13] See for example: "The owner, occupant, lessee, or tenant of any property within the city shall be responsible for the maintenance of property and premises in a manner consistent with the provisions of this chapter and this Code." Santa Clara City Code 8.30.04; "Correction and abatement of violations… shall be the responsibility of the owner or the owner's authorized agent…;" Santa Clara City Code 15.60.100.

specific permits and oversight (the "Operations").

54.     Per City records, Apple began planning use of the facility around 2014, with August 11 2014 meeting notes between Apple and the city Fire Dept. (2014_095 AA) noting that at that time "*no residential use was proposed*" so there was "*no off site consequences studies*" are assumed. Jenab also owns the adjacent property at 3050 Coronado Drive, which is the "ground zero" for the Synertek CERCLA Superfund clean-up Site. (RWQCB SL721241222; EPA No. CAD0990832735). The Synertek Site was listed as a CERCLA National Priority List site in September 1989 due to solvent pollution and VOCs in onsite and offsite groundwater that originated from leaks in that chip facility's solvent and neutralization tanks.(DTSC No. 60001754).

55.     On June 28, 1991 US EPA issued a Record of Decision (ROD) for the Synertek Site with Honeywell (who acquired Synertek) as the primary Responsible Party. The primary contaminants of concern are trichloroethene, dichloroethene, and trichloroethene. This federally managed, long-term environmental clean-up is based on only less than ten years of semiconductor manufacturing from 1974 to 1984. (DTSC No. 60001754).

56.     The Record of Decision needs to be amended to reflect a new remediation strategy after the last plan of groundwater extraction and also treatment system, was not able to sufficiently remediate the pollution. (SEMS RM No. 100029800, 2022). EPA also requested to amend the Deed/ROD, and/or add a Land Use Covenant to include vapor intrusion concerns and risk mitigation requirements. (EPA, June 3 2021). The groundwater plume extends and migrates under The Chip Fab at 3250 Scott Blvd and also the high-density apartments. (SEMS RM No. 100029800, 2022). However, over the last ~seven years, most or all of the groundwater wells capable to identifying the groundwater contamination flowing under the apartments, were removed or retired, and now there is no way to monitor – despite the known pollution following downgradient under thousands of homes.

57.     The Sept.2022, the EPA/USACE "Five Year Report" for the Synertek Site noted that one area in "a restrictive land use covenant… has been in place since 1991. The RWQCB and EPA approved updated draft deed language for the restrictive covenant to incorporate current California legal requirements for deed restrictions." EPA's reported noted that Mr. Jenab "reviewed proposed language for the updated deed restriction and responded in May 2021"

refusing "to sign the deed restriction because the proposed changes were too extensive." (SEMS RM No. 100029800, 2022). The 2022 Report and 2021 emails expanded that Mr. Jenab apparently claimed that he is "*under no obligation to sign it*" and even the Responsible Party, Honeywell – a weapons manufacturer, had agreed to these protective terms, and "*requested redline edits to the draft deed language*" from Mr. Jenab to clarify his concerns. It appears Mr. Jenab never responded. (RWQCB 43S0124).

58.     Prior CERCLA vapor intrusion testing at Jenab's property at 3050 Coronado Drive in 2014 found elevated levels of TCE (9.1 μg/m³ -- compared to the commercial urgent action level of 7 μg/m³) in the indoor air. (RWQCB, SYN-IA4, 6/27/14). One building next-door to The Chip Fab and the Superfund site, hosts a "Family Prayer House" with church services of up to ninety people on weekends and smaller groups on weekdays, including small children and infants. The EPA and RWQCB noted they "*would like to have a sampling location added to the room identified as a nursery.*" These are apparently the requests and requirements that Mr. Jenab is apparently fighting.

59.     The Property Owners, including Mr. Jenab, have a documented pattern of environmental violations: owns property designated as a Superfund site (severe contamination requiring EPA oversight for clean-up); refused EPA requests and objected to clean-up agreements; leased adjacent property knowing it would generate toxic waste and workers would be exposed to new and existing toxic waste; both properties discharge pollution into the federally protected San Tomas Aquino Creek; and participated in, or failed to objected to, the destruction and removal of all groundwater wells monitoring groundwater contamination from all three of his properties migrating downgradient to thousands of apartments.

60.     Meanwhile, in Mr. Jenab's professional role, acting with fully commercial interests, Mr. Jenab is leasing and selling additional properties with hazardous waste operations and/or toxic waste dump properties around his own toxic waste dump sites and chip fabs, and also the children's playground and the apartments filled with thousands of unsuspecting residents. Currently, Mr. Jenab, on behalf of C&W, is selling/leasing 3301, 3351, & 3371 Olcott Street – next to San Tomas Aquino Creek and "*walking distance to Santa Clara Square marketplace.*" (C&W). Mr. Jenab's C&W webpage also claims "Whizz Systems" is a client, which implies Mr. Jenab was also involved in the buying, selling, and/or leasing of 3240 Scott Blvd next to The Chip Fab – a property that for the

last two years has been attempting to obtain city permission to build more dense residential directly next to The Chip Fab.

61.      Mr. Jenab is also currently leasing/selling 2975 & 3001 Stender Way which is also advertised as being near Santa Clara Square. (C&W). In 2016, Mr. Jenab was also credited with selling the "Coronado Stender Business Park" consisting of seven buildings south of 3250-3260 Scott Blvd and directly adjacent to the Synertek Superfund site. (NAI BT Commercial/SBDC). Mr. Jenab's advertisements for this area designed the location of nearby tech companies but omitted Apple's presence at 3250-3260 Scott Blvd.

## GENERAL ALLEGATIONS

62.      From the 1950s to the 1970s, the US operated many semiconductor manufacturing factories domestically, with many located in Silicon Valley. These fabrication plants ("fabs") gave Silicon Valley its name.[14] There are still dozens of CERCLA/Superfund clean-up sites in Santa Clara Co., primary from chip fabs and their toxic waste spills, leaks, and dumping. Santa Clara Co. has always had more Superfund sites than any other county in the nation.

63.      The semiconductor manufacturing processes can be broken down into three major categories: blank wafer production; semiconductor fabrication; and assembly/packaging. Semiconductor ("chip") wafers are made from materials like silicon (Si), gallium arsenide (GaAs), and indium phosphide (InP). Most chip substrates will require the same processing steps and produce similar emissions of regulated pollutants. However, the processing materials for etching, "doping," and layering operations may differ and result in different hazardous emissions. (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2, *Semiconductor Manufacturing*).

64.      Semiconductor manufacturing "is one of the most chemical-intensive industries ever developed" and the rate of chemical-related illness for semiconductor manufacturing is "higher than that of any other single industry."[15]    "The human toll of semiconductor manufacturing is known since at least the early 1980s. Scientists have linked twice the expected rate

---

[14] The Verge, *How the next generation of semiconductor factories kicked up a fight over environmental review,* (Oct. 13 2023).
[15] Dr. Joseph LaDou, *Occupational Health in the Semiconductor Industry,* Challenging the Chip, pg 33-34, Temple University Press (2006).

of miscarriages, various aggressive forms of cancer, other lethal diseases with semiconductor fabs across the world.[16]

65.    More than four hundred chemical products are used in semiconductor manufacturing. More than 10% of the known chemical products contain carcinogens. In addition, an estimated 40% of chemical products in semiconductor manufacturing contain supposedly "trade secret" substances – leaving regulators, neighbors, and workers without information about what they're being exposed to.[17] Operations and management of a chip fab is extremely complex, technical, high-risk, expensive, and dangerous – which is why many electronics companies design their chips but then outsource manufacturing to other companies who specialize in chip fab (i.e. Global Foundries, etc.).

66.    However, for other companies, in-house chip fabs traditionally became a source of machismo bravado and were used as a status symbol. In the 1980s, AMD's CEO, Jerry Sanders, famously dismissed rivals who outsourced chip manufacturing. Sanders declared that "*real men have fabs*" – which has become an iconic quote in the field. This history helps to explain the reckless misconduct and otherwise inexplicable entitlement of the Defendants and their misconduct.

67.    Proposals to construct semiconductor fabrication facilities are subject to lengthy environmental reviews because they create a major negative impact on the environment around them. Chip fabs consume wild quantities of energy and water and can produce thousands of tons of hazardous waste. (CSIS).

68.    Prior to the Plaintiff's complaint about The Chip Fab to the Bay Area Air District in 2024, none of the Defendants had never informed Bay Area Air District that Apple and Jenab et al was constructing a chip fab, operating a chip fab, or that they were doing anything other than typical office-based research & development at 3250 Scott Blvd. (Bay Area Air District Violations No. A64215, A64216). The fine and settlement agreement are still pending.

## V.    NATURAL FEATURES & ECOSYSTEM

---

[16] Electronics Watch, *The climate crisis, and the electronics industry: Labour Rights, Environmental Sustainability and the Role of Public Procurement*, May 2020.
[17] Kim S, Yoon C, Ham S, et al. *Chemical use in the semiconductor manufacturing industry*. International Journal of Occupational and Environmental Health. 2018 Jul - Oct;24(3-4):109-118. DOI: 10.1080/10773525.2018.1519957. PMID: 30281405; PMCID: PMC6237170.

## A.    SAN TOMAS AQUINO CREEK

69.    San Tomas Aquino Creek is located along the eastern property line of the Santa Clara Square Apartments. The San Tomas Aquino Creek is also located ~ 700 feet from The Chip Fab. The Creek originates in the Santa Cruz mountains and flows into the valley floor. Historically the Creek does not appear to have extended to the SF Bay.

70.    The Creek is exposed with moving surface water; thus, air pollution can easily settle in the water and on the banks of the creek. The Creek flows north out to Guadalupe Slough, into the SF Bay, and into the Pacific Ocean. The bottom of San Tomas Aquino Creek has an elevation of 15.5 feet to 19.6 feet." (Geotechnical Investigation, Santa Clara Square, pg6, 24 July 2015; SCSA Hydrology Study ,August 17, 2015).

71.    "The creek has been heavily altered from its natural state… bound by paved and concrete reinforced levies on both banks…. channelized and altered from its native state." (SCSA Biological Resources Assessment, 2015). The "Santa Clara Square Biological Resources Assessment" noted in passing that San Tomas Aquino Creek might be "potentially within the jurisdiction of USACE under Section 404 of the Clean Water Act" (May 2015 ).

72.    Prior to artificial modifications, San Tomas Aquino Creek channel lost its definition well before reaching the SF Bay and was notably shallow and poorly defined (Beller, E. et al, Nov. 2010). Survey notes described the creek as "very shallow" and about four meters wide (Beller, E. et al, Nov. 2010)

73.    The natural flow of San Tomas Aquino Creek displayed characteristic serpentine terrane behavior. Reports described the "scatters" of the creek around Hamilton Avenue, and the "sink" of the creek around Williams Road, a mile further north (Beller, E. et al, Nov. 2010). One early map shows two termini of the creek labeled "sink of creek". These descriptions illustrate the shallow, discontinuous nature of the channel, which presumably spread into a marsh and disappeared into coarse gravels. Disconnected distributary channels then rose from pressurized aquifers and flowed north below the terminus of the superficial waters of the San Tomas Aquino Creek, hydrologically connecting to Sanjon Creek and the SF Bay.

74.    Serpentine forms when oceanic crust are altered by hydrothermal fluids and it creates highly fractured, permeable bedrock with extensive underground flow networks. The

Creek's hydrological behavior reflects natural fracture systems through serpentinized basements. The Creek is following natural fracture systems through the serpentine bedrock, which is why it "scatters," develops multiple "sinks," and loses its defined channel before reaching the Bay.

75.    Despite modern alterations, the San Tomas Aquino Creek still supports native plant and fish species and is considered a sensitive biological community. The formal "Beneficial Uses" of the San Tomas Aquino Creek include "freshwater replenishment, ground water recharge, cold freshwater habitat, fish migration, preservation, and spawning, warm freshwater habitat, wildlife habitat, and recreation" (RWQCB, SFB, 2009).

76.    San Tomas Aquinas Creek  is managed under Clean Water Act 303(d). (EPA Id. CAR205500402080624165713). The formal TMDL pollutants are "trash."

77.    Recent sightings reported to iNaturalist in 2024 confirmed the continued presence of fish in the creek near the Santa Clara Square Apartments and Chip Fab, including Chinook Salmon (*Oncorhynchus tshawytscha*) (Nov 12-13 2024, iNaturalist, Id. No. 251599313, 251464788) and European Carp (*Cyprinus carpio*) (March 2024, iNaturalist, Id. No. 216635588) in San Tomas Aquino Creek.

## B.    THE SARATOGA CREEK

78.    Saratoga Creek is a tributary that originates from the Santa Cruz Mountains around Castle Rock Ridge. It has also been named Arroyo Quito, Campbell Creek, Big Moody Creek, and San Jon Creek where it flowed to the Sloughs and Bay.

79.    Saratoga Creek is ancient and was one of the sources of the sedimentary deposit of "alluvial fans" of the valley floor. (Cal. Dept. of Consv. 2002). The Creek "once surged with mountain runoff."[18] Academic reconstruction of historic Bay Area ecology and watersheds (1800-1850) document Saratoga Creek as the only permanent creek in the Santa Clara County area that flowed from the Santa Cruz mountains to the Bay (alongside the Guadalupe River).

80.    Saratoga Creek flowed from the hills in southern Saratoga, alongside ponds and marshes, and repeatedly sunk and reemerged through the valley floor. Saratoga Creek consolidated into the Sanjon Creek past what is now US 101, where the Creeks transition into a "wet meadow"

---

[18] SF Gate, *Saratoga Creek restoration project removes more than trees: Some residents lose their backyards,* Feb 19, 2021.

with salt marshes, and eventually flowed with the Guadalupe River at the San Francisco Bay tidal marshlands and flowed out into the Pacific Ocean. (SFEI, 2010)[19].

81.    In northern Santa Clara, after the transition boundary where Sanjon and Saratoga Creeks became wet meadows, but before they transitioned to marshland, there were also unique "alkali meadows" that supported rare and specialized alkaline ecosystems (Beller et al., 2010; Reed, 1862). Serpentine soils are known for hosting rare and endemic plant species because few plants can tolerate the high mineral content and low nutrient levels, such as in "alkali meadows."

82.    The locations where the historic Saratoga Creek would sink and disappear, only to rise up again and still find its way to connect to Sanjon, the marshlands, and the Bay --- are regions of Santa Clara near assumed concealed faults and unexplained magnetic anomalies (Chase, 1992; Schmidt et al., 2014). These areas of Santa Clara that appear to have unmapped faults, are also thought to contain "major serpentine sheet," based on aeromagnetic anomaly data (Roberts and Jachens, 2003; Wentworth, 2010).

83.    Major, historic earthquakes caused targeted, fault-like patterns of property damage in Santa Clara, despite the City of Santa Clara having not known or mapped faults – and similar damage only occurring in areas around established faults. The nearest mapped fault is Monte Vista-Shannon, which is about 12km southwest of The Premise.

84.    The fault at Monte Vista-Shannon is also where the Saratoga and San Tomas Aquino Creeks enter the valley from the hills. If Saratoga Creek/aquifer flowed through the valley floor, both on the surface and also deep within hydrothermal systems, it would be expected the flow of the creek/aquifer followed the location and direction of a series of mini faults along the valley floor and traveling to the Bay, which would charge the aquifer.

85.    San Tomas Aquino Creek was "channelized" around 1965. (EKI, SCS, 2013). Then, Saratoga Creek was "filled" at some point around 1970-1974 (Freedom Circle ESA, 1997). By 1974, Saratoga Creek was filled and "the area where the creek ran has been graded" and an industrial office park was built on the filled land by 1976. (EKI, SCS, 2013). Saratoga Creek surface waters historically flowed across what is currently known as 3260 Scott Blvd and 3250 Scott Blvd

---

[19] San Francisco Estuary Institute (SFEI), *Historical Vegetation and Drainage Pat Terns of Western Santa Clara Valley* (Nov. 2010).

(between the two buildings), across Montgomery Drive along the Santa Clara Square Apartments.

86.    Saratoga Creek is managed under Clean Water Act 303(d). (EPA Id. CAR205500401990218133956). The formal TMDL pollutants are "trash" and Diazinon. Saratoga Creek and San Tomas Creek are "major drainages that pass through Santa Clara Valley" and "originate in the Santa Cruz Mountains." (Santa Clara Valley Habitat Plan, Ch. 3, Pg. 8, Aug. 2012).

87.    The current confined, subterranean aquifer located under, and sometimes bubbling out onto, The Premise – is located squarely within this zone of apparent serpentine hydrothermal systems, including earthquake damage from assumed concealed faults and the unusual alkaline ecosystems. It also located just south of the nexus for the alkali wetlands and meadows (estimated to be located between Lawrence Expressway and San Tomas Expressway (W-E), and Bayshore Freeway/U.S. 101 and Central Expressway(N-S)).

## C.    THE UNDERGROUND AQUIFER SYSTEM

88.    The entire Saratoga Creek system—including the artesian springs, the creek (both above ground and where it flows deep into the serpentine before resurfacing), the alkali meadows and sloughs connected to the bay and ocean—are all likely part of the "waters of the US" and subject to Clean Water Act regulation. Saratoga Creek is definitely regulated under CWA because it is a tributary to the bay and ocean. But the entire Saratoga Creek system has a clear, continuous hydrological connection via the creek, sloughs, and bay, to a traditional navigable water with the ocean/bay. The alkali meadow and sloughs had (and could have again) hydrophytic vegetation, hydric soils, and wetland hydrology – all of which is adjacent to the creek and the bay/ocean.

89.     The evidence strongly implies that the Saratoga Creek system's continuous and consistent flow arises from a hydrothermal system which is at least as a "relatively permanent" water body. The specific point where the water comes back up from the hydrothermal system is part of the continuous flow path of the jurisdictional creek. *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) - buried creek in culvert still "waters of the US" . *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001) - underground flow does not remove jurisdiction.

 

SFEI, *Historical Vegetation and Drainage Pat Terns of Western Santa Clara Valley*, (Historic 1800 v Modern 2007 Drainage) (Historical Conditions Circa 1850).

90.     There are multiple lines of evidence suggesting that the Saratoga Creek system is still flowing underground in/around the historic location of the Creek. One of the most compelling data sources is the presence of multiple, documented natural springs and "artesian features" on The Premise. (See Figure 1, created by the Plaintiff).

91.     Saratoga Creek originates from areas of Santa Clara Vally that are famous for natural springs, serpentine, and hydrothermal systems (Congress Springs, etc.). Historic aerial photos of the Premise show Saratoga Creek as a consistently flowing Creek. Seasonal serpentine seeps appear like grasslands in winter months, but all photos of the Premise show a consistently flowing Creek.

92.     USGS has mapped ninety-two springs across Santa Clara Valley and only seven

active springs occur on serpentine soils. These springs may provide "serpentine seeps" which provide critical habits for alkaline/serpentine-associated species like *Mt. Hamilton thistle.*" (Santa Clara Valley Habitat Plan, Ch. 3, Pg. 8, Aug. 2012).

93.    Seeps occur when water penetrates the surface and creates a small wetland habitat that supports wetland vegetation. Serpentine seeps are a "Sensitive Land Cover Type" and the "equivalent to sensitive natural communities as defined by the California Department of Fish and Game." "Serpentine seeps are a type of wetland and… alteration of hydrologic regimes by adjacent land uses and development can change and, in some case, remove the water source for these seeps. This can result in partial or complete loss of seep wetlands." (Santa Clara Valley Habitat Plan)

94.    Here, at The Premise, we now have at least six natural springs documented at the Premise following penetrations into the ground and groundwater systems. Two are at the Synertek site, and five are at the Santa Clara Square Apartments.

95.    These springs were discovered by multiple environmental contractors, with some monitored for decades, and the data was consistent with an interconnected underground, flowing aquifer. However, the springs all represent the same deep, alkali water system – with unexpected pressure and force – and the surrounding soils all show extensive evidence of serpentine.

96.    At the Synertek site (3050 Coronado Dr.), Honeywell groundwater monitoring well MW-03B1 is frequently mentioned in federal and state monitoring reports (i.e., it "*has historically been observed to be an artesian well based on water seen on the pavement around the well and the depth to water measured as the top of casing*" -- Synertek GW January 28, 2015).

97.    The well was dug around 1988 to monitor the B1 aquifer and only allows inflow of water from 100-105 ft below ground (CH2MHill, Synertek, 2010). For the last thirty-years, well MW-03B1 has documented to release water from deep underground aquifers, contained under such pressure that the water naturally rises one hundred feet up the well shaft, and continues to rise, spilling out onto the pavement. However, when the well was dug in 1988 the water level was nineteen feet below surface, and then as the pressure increased the depth to water decreased, hitting zero feet below surface in 1995 and remaining there in subsequent annual measurements. (CH2MHill, Synertek, 2010). The pH of water from well 3B1 generally trends to alkaline.

98.    A second Honeywell B1 aquifer ground monitoring well at the Synertek site, (MW-

20B), also taps into a pressurized source with increasing pressure raising the water level starting from in 2001. The MW-20B well allows inflow of water from 34-44 feet below the surface, and the pressured water rises up to at or near the surface.

99.     The pressure measured in MW-20B places its surface level (how high it wants to rise above its water level) at around thirty-five feet with a depth to water of 0 in 2010. (CH2MHill, Synertek, 2010). Water tested from MW-20B is alkaline and with pH values greater than nine, and in 2012 the pH even exceeded 11 (the pH of ammonia).

100.    The groundwater reports note there are "variations in vertical hydraulic gradient" and the pressurized flow at MW-03B1 and MW-20B represent "localized hydraulic mounds." (CH2MHill, Synertek, 2010). The excavated soil for 3B1 was olive grey, dark grey, grayish green to dark green, and olive to olive grey. (Geotracker). The excavated soil for MW-20B was colored dark olive, pale olive, olive and wet, olive-grey, olive brown, dark grey, and "mottled rust." The gradients and soil coloring provides additional evidence to support that this aquifer and the springs are part of a serpentine hydrothermal system.

101.    In 2015, the EIR for the Santa Clara Square Apartments noted a large, pressurized, underground aquifer (which they referred to as an "artesian feature") flowing only ~35 feet beneath the surface and across a distance of at least three blocks wide. (Santa Clara Square Apartments, EIR, Oct. 2015). Two of the springs (C6-3 & C5-2) had water flowing up and out of the ground (Geotechnical Investigation, Santa Clara Square, 24 July 2015).

102.    Groundwater Well C6-3 appears to be located in Creekside Park at the SW corner of the apartments and adjacent to The Chip Fab. In addition, a 2015 boring hole at around 15 ft deep, south of Creekside Park, was noted as "*very moist – boring may fill with water by tomorrow*." (Cal. EPA DTSC, Santa Clara Square Apartments, 2015). Well C5-2 is located around Scott Blvd and Montgomery Drive, along the original Saratoga Creek bed, and north of The Chip Fab.



**FIGURE 1: MAP OF HISTORIC SARATOGA CREEK FLOW & CURRENT NATURAL SPRINGS / ARTESIAN ACQUIFERS (AMG).**

103.    The Geotechnical Report explained that wells were dug for Cone Penetration Tests and four of those wells were pressured springs ("artesian features") contained by a 5-10 foot layer of "sand and gravel" and "silty to sandy clays" at around thirty-five feet below the surface. The pressure measurements for all four springs estimated that a natural flow under current conditions would result in the water spitting up to 10 to 13 feet in the air and above the surface. (Geotechnical

Investigation, Santa Clara Square, 24 July 2015).

104.    Project reports also noted the elevation of groundwater at the Premise seem to fluctuate in relation to the ground-level flow of the San Tomas Aquino Creek, indicating the underground Saratoga Creek aquifer and the 'channelized" San Tomas Aquino Creek are receiving water from the same/similar locations to the south.

105.    The EIR for Santa Clara Square Apartments addressed what appears to an expansive, flowing, active underground aquifer – representing the deeper levels of the "filled" Saratoga Creek -- by simply stating that Saratoga Creek was "filled" in 1968-1980. And *"if excavations are not made into the sand and gravel layer approximately thirty-five feet bgs… the artesian condition should not affect the project."* (Geotechnical Investigation, Santa Clara Square, p. 16, 24 July 2015).

# VI.    THE PREMISE & OPERATIONS

106.    The violations, nuisance, endangerment, and harm for which Plaintiff seeks relief arises from the property and operations located at 3250 Scott Blvd in Santa Clara, California (the "Property", APN 216-29-117).

107.    The existing building at 3250 Scott Blvd was built around 1973 and used for semiconductor manufacturing by GE, Intersil, Harris Corp., and Synergy Semiconductor. The building was expanded several times over the years but appears to have been vacant from around 2000 through 2013.

108.    The fact that the surface of the Creek was filled but the aquifer continues to flow consistently underground as an "artesian feature" is evidence that the Creek was unlawfully filled and negligent attempts were made to relocate and channelize a water of the US, without USACE guidance, and accordingly, the aquifer was not relocated or channelized, but instead is still flowing underground with increasing pressure that could continue to increase to the point of a geyser. This is quite literally why people are legally required to consult with the US Army Corp. of Engineers and not attempt to do something like without engineering supervision.

### D.     In 2014, The City Approves a Heavy Industrial Chip Fab in a Light Industrial Zone, also Earmarked for Future Residential Housing.

109.     The Property where The Chip Fab is now located has been zoned as "Light Industrial" since at least 2008. (S.C.C. 2010-2035 General Plan).

110.     In 2010, City of Santa Clara published its General Plan (2010-2035). The plan had an EIR, went through hearings and reviews, and completed a CEQA-like process. The General Plan expressly designated the premise (including The Chip Fab, Mr. Jenab's other properties, and the location where the Sant Clara Square Apartments were built), as an area where the City planned to convert to residential zoning, to build new housing, and to phase out/relocate any industrial use.

~~47.~~111.  Light Industrial Zoning is intended for "manufacturing, warehousing (including data centers), and wholesale establishments." (S.C.C.C. 18.16.010(B)(3)). In the Santa Clara City General Plan (2010-2035), the Property was designated for "Low Intensity Office/R&D" Land Use. (S.C.C. 2010-2035 General Plan).

112.     "Research and Development" includes "research, and the design, development and testing of electrical, electronic, magnetic, optical and mechanical components in advance of product manufacturing" and "may allow for minor manufacturing." (S.C.C.C. 18.160.180).

113.     ~~facility~~In the General Plan, the location where the Santa Clara Square Apartments was built was part of the "Central Expressway Focus Area" --- a "future focus area" scheduled for consideration in Phase III, starting no earlier than 2023, and only after numerous conditions were met (GP 5.4.7).

114.     The General Plan instructed that the Premise "*requires additional planning*" with "*careful planning of each area*" as "*essential to ensure…an appropriate interface with surrounding development*" and is a "*prerequisites for development,*" because it represents a change from existing industrial use to high-density residential neighborhoods. (GP 5.4.7).

115.     Each "Future Focus Area" requires a "*comprehensive plan prior to any rezoning*" (G1, P1) and the implementation of measures and compatibility provisions to reduce conflicts with surrounding non-residential uses (G3, P7) Until requirements are met, to "discourage any new development that would preclude the implementation of the residential neighborhoods identified,"

including the location where Santa Clara Square was developed. (P5).

116. On Feb. 18 2014, Irvine Company, LLC filed an application for development of commercial buildings at Santa Clara Square. The company requested the property be rezoned and approved for construction of 1.2m sq ft of office space and 125k sq ft of retail.

117. In 2014, The Property Owners owned 3250 Scott Blvd., and construction was underway with major demolition, construction, structural retrofits seismic upgrades, replacement of waste lines and installation of new u/g plumbing for the sanity sewer. (BLD 2014-36384).

118. The building permits and renovation documentation expressly noted chip fab terminology including: "*clean rooms*" and "burn-in rooms." (BLD2014-36767).

119. Notices were supposedly posted and mailed May 29 2014 within 500 ft of property. There was a Planning Commission hearing on May 28 2014 and a City Council hearing on June 10 2014. (Santa Clara Res. No. 14-8149, pg1-2; 14-8180).

120. In 2014, there was a planning application for 3250 Scott Blvd., but it appears there was no public hearing or environmental review. (PLN2014-10675).

121. Meeting notes between The Property Owners, Apple, and the City Fire Dept/HazMat team. on August 11 2014 noted that "*no residential use was proposed*" nearby so there was "*no off-site consequences studies*" assumed. (Aug. 2014_095 AA, pg1-2).

122. The Aug. 2014 meeting notes also warned that one area of The Chip Fab may need "*explosion control.*" ~~(pg2). These~~ ". (Aug. 2014_095 AA, pg1-2).

~~48.~~123. The Aug. 2014 meeting notes also ~~expressly~~ stated that "*air permit will be thru BAAQMD*" and that ~~they~~Apple and The Property Owners need to discuss "CalARP" with the fire department. (Aug. 2014_095 AA, pg1~~)~~_-2).

124. In 2014-2015, when Apple leased this property, and also at least two others, new coverage said that "*sources familiar with the transactions*" claimed that "*Apple insisted*" that the details of those leases "*be kept private and confidential.*"[20]

125. On Sept. 30 2014 an application was filed requesting approval for demolition of existing systems at the Facility, and then " installation of new system."

126. Around Nov 2014, a permit application was also filed for "interior/exterior

---

[20] Mercury News, *Apple signs two big Santa Clara leases in fresh expansion,* July 23 2015.

improvements." The noted headcount for the Facility was "1,252 people."

127.    In 2014, an evaluation of sewer capacity for 3250 Scott Blvd suggested "flow from the development would enter the City's sanitary sewer system at manhole S73-33 on Scott Blvd and drain northward." (Dec. 12 2014, RMC Technical Memo, Sanity Sewer Capacity Evaluation for the Aria Project). The sewer model does not explain how the outflow would travel to S73-33, as it is a significant distance to the west of the property.

128.    The 2014 sewer modeling suggested a "*surcharge of about 9 inches*" for the 12-inch line on Scott Blvd with The Chip Fab's water discharge flow. (Dec. 12 2014, RMC Technical Memo, Sanity Sewer Capacity Evaluation for the Aria Project).

129.    On Dec. 10 2014, an NPDES MCR C3 Stormwater Management plan was drafted for The Property Owners and Apple. The stormwater management plan included two bio-retention areas in the back and a self-treating area in the front. Control measures were installing a self-treating area, draining wash areas to the sewer, draining covered dumpster areas to the sewer, labeling storm drains, beneficial landscaping, outdoor material storage protection, and installing covers and drains in loading docks and maintenance bays.

130.    On Dec. 10 2014, an NPDES MCR C3 Stormwater Management plan noted that Mr. Jenab is the party responsible for operations and maintenance of the stormwater management at the Chip Fab.

## E. In 2015, The City Approved Development of Thousands of Apartments Directly Across the Street from a Chip Fab.

131.    On Jan. 21 2015, the Irvine Company, LLC filed a zoning application for what would become the Santa Clara Square Apartments. Prior to SCSA, the nearest residential area to this area was 0.75 miles to the SW on Bowers Ave and NE on Agnew Rd. (PC Staff Report, 12/9/15, pg6).

132.    On March 16, 2015, a biological field survey was conducted for the Santa Clara Square Project. (SCSA Biological Assessment, 2015)

133.    On March 23 2015, a city Notice was posted for the "Santa Clara Square-Residential/Mixed Use" development project. The application asked for approval to build nine apartment complexes with 2,200 rental apartment units, development of 40,000 gsf of retail space, 4,5000 gsf of leasing space, and approx. 38,000 gsf of amenity space. (SCH Number 2015032075).

134. The development was directly across the street from 3250 Scott Blvd.

135. In May 2015, the City Manager and City Council approved use of city resources to complete a "service load increase" for 3250 Scott Blvd including to "replace existing padmounted oil switch with new vacuum switch; pull in 310' of 1100 AL tri 15kV cable" and "install 12kV of metering at customer's switchgear." (May 12 2015, Estimate: $93,866.39 ,City Council Mtg; Est. No. 33670).

136. Between Jan. 2015 and May 2015, the Irvine Company, LLC held "focused meetings with nearby property owners and tenants." (Planning Commission Staff Report, 12/9/15 PG10). This would have included meeting with Apple and The Property Owners where they would have discussed that they are about to build dense residential apartments next to a chip fab.

137. In July 2015, permits indicate the Chip Fab installed public safety radio coverage (FIR15-00335). In Sept. 2015, permits indicate the Chip Fab installed the fire alarm system, five new fire hydrants, post-indicator valves, a riser, and a backflow preventer. (FIR15-00145)

138. Earlier in 2015, the City Building dept. had cited The Chip Fab for numerous issues and the City sent a warning letter on Sept. 2 2015 addressed to the "property owner," demanding corrective action by Sept. 10 2015 including that all unpermitted work cease, the owner/tenant file applications for permits and obtain approval of permits prior to starting work, requiring inspections before work is completed, and issuing a "*stop work*" order for Phases III-IV of the construction until the facility comes into compliance.

139. On Sept 8 2015, Apple filed a Fire Dept. application for The Chip Fab's "Risk Management Plan" (RMP). These RMP plans are legally required for Facility's where there could be potentially catastrophic releases of toxic gases and/or extremely dangerous substances. The tracking permit for this RMP was not completed/closed until Dec 19 2022. (FIR2015-00985).

49.140. In 2015, Apple registered the facility as a Large Quantity Generator, for Hazardous Chemical Management, Chemical Storage, Hazardous Waste Treatment, and an above ground storage tank (CAR000278176). Apple did not request any air permits for semiconductor manufacturing. In 2015, Defendants filed and approved permits for hundreds of chip fab tool installation and fit ups.

50. However, none of the Defendants reported to the regulating agencies (U.S. EPA,

Cal. EPA, BAAQMD, the San Jose Wastewater Treatment Facility, etc.) that Apple was doing semiconductor manufacturing at the Property. Instead, the agencies discovered this due to Citizen Complaints and/or monitoring.

51.    The semiconductor manufacturing processes has three major categories: blank wafer production (where blank wafers are produced, usually at dedicated facilities); semiconductor fabrication (where integrated circuits are produced on the wafers); and assembly and packaging (where the wafers are cut into individual integrated circuits which are then mounted into a package for assembly on a printed circuit board). (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2, *Semiconductor Manufacturing*)

52.    Semiconductor wafers may be made from materials like silicon, gallium arsenide, or indium phosphide. In general, all substrates will have the same processing steps and similar emissions of regulated pollutants. However, different substrates require the use of different processing materials for etching, doping, and layering operations resulting in different hazardous air pollutant emissions. (BAAQMD Permit HandbookSept., Sect. 7, Ch. 4, Rev. 2, *Semiconductor Manufacturing*). These activities are dangerous, use a variety of hazardous materials and toxic gases, and create extensive amounts of hazardous waste and emission.

53.141. In September 2015, Defendantsthe Chip Fab installed an "Acid Waste Neutralization" system under the RCRA's "Permit by Rule" regulations. The first required inspection under 22 CCR 66265.192 was in September 2015, the inspections were required every five years, and Defendants did not complete their next inspection until November 2020 – two months overdue. The specifications in the records obtained by U.S. EPA show the system was designed for the Property in December of 2014 and was built in January 2015. (Oct. 2022, TRC Assessment).

142.    In or around 2015, DefendantsIn Nov. 2015, Apple and The Property Owners also installed a 7,500 gallon Hydrogen (H2) tank on the exterior gas pad (FIR15-00387) and a 1,700 gallon diesel tank for the emergency generator (FIR15-00456).

143.    On Oct. 5 2015, The Irvine Company's "Santa Clara Square-Residential/Mixed Use" Draft EIR was noticed. On Dec. 4 2015, the Final Santa Clara Square EIR was noticed (PC Staff Report, 12/9/15). On Nov. 10 2015, California EPA's DTSC division approved the Santa Clara

Square's EIR's "Hazards and Hazardous Materials Section" (FEIR LA-2).

144.    Both 2015 Santa Clara Square EIR documents listed nearby industrial facilities and development projects, but there was no mention of 3250 Scott Blvd in the 503 pages of the Draft EIR (Oct. 2015) or the 616 pages of Final EIR (Dec. 2015). Impact Sciences prepared the EIR and their own company blogs posts state that "*the EIR was completed on a highly expedited* schedule."[21]

145.    The Oct. 2015 EIR claimed there were only one CalARP regulated industrial facility within 2,600 ft of the apartments, and it was Applied Materials (1,000 ft away, at the corner of Bowers and Scott, near the restaurants), not 3250 Scott Blvd (directly adjacent to residential). The list of facilities considered was provided directly by the Santa Clara Fire Department, via the Fire Dept's own search, and then reported in email.[22] The Fire Dept. then insisted on using ARS for spill modeling (instead of WCRS) with potential ammonia and chorine releases and found the gases would not travel further than 500 ft and accordingly would not impact the apartments. (BASELINE 2015; Santa Clara Square, Draft EIR, 4.6-23-24, Oct. 2015). Among other issues, even small chlorine gas spill can require a 4,700 ft downwind protection zone. (CAMEO, ERG).

146.    The "Hazards and Hazardous Materials" section of the EIR then put forth a collection of assertions that make it crystal-clear that the City, The Irvine Company, The Property Owners, and Apple all knew that Santa Clara Square Apartments were fundamentally incompatible with an adjacent chip fab and that the issue was discussed among legal teams (per the EIR footnotes stuffed full of creative legal citations offered to somehow justify their positions of indifference starting with a case finding it unnecessary to speculate about the effects of a sewage treatment facility that likely would never be built, as somehow relevant to federally mandated toxic gas and chemical spill modeling.

147.    The "Hazards" section of the EIR also offered a variety of false assurances, such as claiming that because the weak spill modeling for the selected Applied Materials gas scenario did not expand past 500 ft, then "an accidental release of hazardous materials from…. any other commercial/industrial facility within 0.5 mile of the project would not be expected to endanger the

---

[21] https://impactsciences.com/project/santa-clara-square-residential-mixed-use-project/
[22] FN4: "Santa Clara Fire Department, 2015. Email communication between Jack Lin from the Fire Prevention and Hazardous Materials Division of the Santa Clara Fire Department and Patrick Sutton from BASELINE. 29 July."

health and/or safety of future residents on the project site." (Santa Clara Square, Draft EIR, 4.6-25, Oct. 2015). They have to consider different substances, situations, and vectors – they cannot give up after one negligent, best-case scenario ammonia spill model. Further, if that is true, why do they need a fancy hazmat emergency response vehicle?

148.    They added "furthermore, Applied Materials has an Emergency Response Team of over 150 members that are trained to respond to accidental releases in accordance with procedures described in the facility's Integrated Contingency Plan," that "all emergency response and planning activities are coordinated with the Santa Clara Fire Department," and "Fire Department inspects the facility to ensure hazardous materials are being properly managed." (BASELINE 2015; Santa Clara Square, Draft EIR, 4.6-25, Oct. 2015).

149.    3250 Scott and Apple registered for CalARP in 2015. The EIR says, "according to the Fire Department, as of September 2015 two existing facilities within 0.5 mile of the project site have submitted applications under the CalARP program" and state, "they are modifying their existing operations" and "will be subject to the CalARP." The next section is provided verbatim due to the self-incriminating language and framing:

"It is anticipated that these applications or other applications in the future will continue lawful industrial activities in proximity to the project. This could increase the hazard risk of existing and future sensitive receptors in the vicinity of these facilities, including the project site receptors. This represents a potentially significant impact. The City's Fire Marshal has indicated that this impact can be substantially lessened with improved hazardous materials and mobile response capabilities. Mitigation Measure HAZ-3 would be implemented, which requires the project to make a fair share contribution to the City of Santa Clara towards the acquisition cost of an emergency vehicle with hazardous materials response capabilities…. These projects would also be required to comply with local, state, and federal hazardous materials laws which are designed to avoid and minimize adverse impacts on public health, safety, and the environment. Additionally, the City of Santa Clara Fire Marshall would oversee potential storage of hazardous materials. Each cumulative project has been or will be subject to environmental review and if significant impacts are identified, mitigation measures would be implemented to avoid or reduce the impacts."

(Santa Clara Square, Draft EIR, 4.6-25-26, 28-29, Oct. 2015).

150.    The City's promise that the Fire Dept would actually conduct inspections, ensure compliance with environmental laws, and require environmental review processes is not only

something they failed to do, but are in this case, the City is arguing those are discretionary duties and they cannot be held liable for any harm caused by their negligence or intentionally refusal to do those things. They did get a cool new truck though.

151.    City metrics indicate the majority of use of the new hazmat emergency response vehicle was in response to alarms, spills, leaks, and injuries at The Chip Fab. Further, the Fire Dept. apparently did not have a hazmat response vehicle like this prior to The Irvine Company assisting to purchase the hazmat response vehicle, implying the City approved the extremely high risk facility without any emergency response capability. Further, the City also indicated that the design of the Santa Clara Square Apartments would not allow "fire truck access" in case of an emergency. (Santa Clara Res. No. 15.8272 p. 7) but the City approved it anyways.

152.    On Dec. 4 2015, Notices of the final public hearing for Santa Clara Square were posted and mailed directly to property owners within five hundred feet of the Santa Clara Square apartments. On Dec. 9 2015, the Planning Commission met and discussed SCSA, "The Commission clarified with staff that the General Plan Land Use designation for the site changes in the third phase of the General Plan; however, to comply with the current General Plan phase, an amendment is necessary to bring the project into compliance with the General Plan." "fully purchased new fire truck for the Fire Department" "The Commission …encouraged the applicant to proceed with construction as expeditiously as possible in contrast to utilizing the full term length of the agreement."

54.153. Around Nov. 19 2015, Apple said it "began to discharge into the sanitary sewer under IWWDP SC-461B. (Apple letter to ESD, Linda Knudsen, 5/11/2016). In 2015, Apple installed a "Heavy Metals Rinse" (HMR) System under the RCRA "Permit by Rule" regulations. The specifications obtained by U.S. EPA showed that the system was designed for the Property in or around July of 2013 and winter of 2014. It appears Defendants did not qualify the complete system until 2017. DefendantsApple's documentation noted that "the system generally handles heavy metals (potentially toxic) waste liquids generated from laboratory activities." (Oct. 2022 TRC Assessment). It is unclear why DefendantsApple referred to 'potentially toxic' heavy metals, as heavy metals are inherently hazardous under RCRA.

154.    On Dec. 15 2015, the City Council held a public hearing to consider the rezoning.

(Santa Clara Res. No. 15.8272, pg2; (Planning Commission Staff Report, 12/9/15 PG10). Despite all the fancy footwork deep in the Hazards section of the EIR, during the hearing, the Planning Commission simply claimed, "the area surrounding the project site consists mainly of commercial and institutional uses is fully developed…with areas undergoing…rejuvenation of buildings consistent with the City's General Plan." (Planning Commission Staff Report, 12/9/15 PG2). "General light industrial uses and manufacturing exist south of Scott Boulevard." (Planning Commission Staff Report, 12/9/15 Pg6).

155.    The density proposed is 55 du/ac which is "higher than the maximum allowed residential density of 50du/ac under the High Density Residential designation" but was approved by the city stating the increased density "is compatible with planned uses on neighboring properties and consistent with other applicable General Plan principles." (Planning Commission Staff Report, 12/9/15 PG7). They also noted it "would not result in an incompatible land use or a built environment on site that would preclude the continued operation of the surrounding land uses." Id

156.    The City Council passed the rezoning resolution with four justifications. First, the residential development "complements and is supportive of the surrounding uses." (¶ 3A). Second, that it would "protect and improve the…stability of the area" and "conserve property values." (¶ 3B). Third, that the rezoning would allow "imaginative…concepts… in the development standards associated with building heights." (¶ 3C). Finally, that existing zoning is "inappropriate or inequitable" because the City of Santa Clara "currently does not have a zoning district consistent with the proposed… designations."(¶ 3D). (Santa Clara Res. No. 15.8272, 3-4).

157.    Eleven pages of Conditions of Approval ("CoA") were attached to Santa Clara Res. No. 15.8272. The first condition for approval is that the developer must agree to "defend and indemnify and hold [the city] free and harmless from and against any and all claims, losses, damages, attorney's fees, injuries, costs, and liabilities arising from any suit for damages or for equitable or injunctive relief which is filed by a third party against the City by reason of its approval of developer's project." (Ex. CoA, #G1, pg1). The conditions also require Storm Water and Urban Runoff Management Plans, BAAQMD air permits, p1, p4, p5 p8, p9  storm drains e7, e9 , e10 ST12, ST10

158.    The Final 2015 EIR for the Santa Clara Square Apartments noted unexpected

findings of Benzene and Vinyl Chloride in the shallow topsoil (<1") on the property where the apartments were to be developed. It was noted as an anomaly, despite its close proximity to Property (directly across the street, near the hazardous waste treatment systems), and the absence of any alternative modern contamination source in the area.

55.    Upon initiating Operations at the Property, Defendant Apple was quickly cited for building, environmental, health, safety, and fire code violations in at least 2015 (stop work order due to construction without permits), 2016 (spill of cooling water into storm drains, fire code and California ASPA violations, health and safety code violations, failure to properly monitor wastewater discharge), 2019 (wastewater testing violations), 2020 (fire code violations, using two EPA ID numbers, inaccurate hazardous materials inventory data, no spill plans or training, no business permit, no signature from supervisor on records, and failure to properly monitor wastewater discharge again).

159.    The City In Dec. 2015, the City of Santa Clara approved a rezoning request including 1,800 apartment units, 40,000 sq ft of retail, 4,500 sq ft of leasing, 38,000 sq ft amenity space, seven parking garages, three public parks, and additional open space.(Santa Clara Res. No. 15.8272, 1-2) – directly adjacent to an ultrahazardous chip fab.

## F. The City Should Have Shut-Down Industrial Operations at the Chip Fab in 2016.

160.    On Jan. 13, 2016, the City and The Irvine Company signed a Development Agreement for Santa Clara Square

161.    In Jan. through March 2016, the facility installed a "toxic gas monitoring and leak detection," "dry -chem fire suppression system" in a "new chemical bunker, and "digital alarm communications transmitter" (FIR15-00311; FIR15-00301; FIR16-00870).

162.    On Jan. 22 2016, California EPA DTSC approved the "Santa Clara Square Apartment"" development as a Brownfield restoration, including a clean-up of contamination from the Synertek Superfund site owned by Mr. Jenab and The Property Owners.

163.    On March 14 2016, City building inspectors complained that they cannot complete inspections because there still is no city approved plans for the property and facility. On March 29 2016, one inspector noted: "finding existing permit for plumbing and mechanical IF one exists. If

not issued, obtain required permits and reconcile all plumbing and mechanical inspections performed to date with building inspection manager." (BLD2015-38456).

164.    On April 16 2016, Apple's wastewater testing laboratory emailed Apple's hazardous waste contractor Advanced Chemical Transport about The Chip Fab's "*issues with the city*" and suggested that Torrent be given direct access to the Chip Fab if Torrent will an NDA with Apple and that regulatory testing be noted as for "ACT on behalf of Apple" rather then failing to mention Apple at all, or else just use the Chip Fab address but "*without ever referring Apple's name… that way we have remained in the spirit of confidentiality while still providing enough information to the inspector to conclude the results are tied to Apple.*" Apple is a regulated party and was trying to conceal its name from regulators and also avoid any written connection to potential evidence of its environmental violations – and the contractors were brainstorming ways to help Apple do it.

165.    April 15 2016, process named "R&D labs, discharge through AWN." Through 2016, regularly tested positive for particulate and floc, and with low levels of ammonia. Also not monitoring or taking flow measurements on weekends or holidays.

166.    Apple was cited for violations with wastewater discharge in March-May 2016, with response letter on June 6 2016 saying a remedy taken where "Apple reviewed plans with the City to ensure accurate understanding of the requirements for the submittal."

167.    In July 2016, The Property Owners and Apple filed a Planning application requesting architecture review of and expansion of the equipment yard with an amendment to the zoning. (Oct. 20 2016, PLN2016-12290).

56.168. On Aug. 24 2016, The Fire Department inspected the Property on August 24 2016 and found Apple failed "to have a business plan readily available to personnel of the business or the unified program facility with responsibilities for emergency response or training. HSC 6.95 25505(c)")," and Apple was not inspecting their fire sprinkler systems on a quarterly basis or maintaining records on site. The City also noted that Apple needed to "2401 add the diversion tank to the [Acid Waste Neutralization] on CERS as tank 5." The Inspection Report from the city reported the inspection took 90 minutes.

169.    In NovemberOn Sept. 21 2016, the San Jose Wastewater Facility wrote to Apple, that they "*amended to add the requirements for the Categorical Electrical and Electronic Components –*

*Semiconductor effluent guidelines under 40 CFR Subpart A due to reclassification of your facility processes from Research and Development to Categorical. This Permit is more stringent than your current Permit and is effective 30 days after the Date of Issue.*" (cc City of Santa Clara Env Compliance Officer, Mike Vasquez). (Amended Wastewater Discharge Permit SC-461-B).

170.    On November 8 2016, Apple, via an EKI Geologist, submitted an RCRA Hazardous Waste Generator Permit-by-Rule application to the California EPA for ~~Operations at the Property. In November of 2016, a couple of weeks later,~~the Chip Fab. Despite the site sitting on top of the Synertek Superfund site plume and a documented history of onsite releases, the application claimed there was no indication of hazardous chemical or waste disposal "in, on, or under the property." The application did however admit that groundwater wells on the property have shown contamination and that there was a history liquid/sludge "surface impoundments, collection ponds, and/or lagoons." (DTSC 1151 11/8/16).

~~57.~~171. On Nov. 22 2016, the California DTSC approved Apple's request for a Tiered Permit/Permit-by-Rule at the Property~~, which is owned by~~. DTSC noted they would do an onsite inspection to verify the information in the application, but DTSC later confirmed there was never any inspection. ~~Mr. Jenab *et al.*~~

~~58.    In November of 2016, California EPA DTSC approved the "Santa Clara Square Apartment"" development as a Brownfield restoration, including a clean-up of contamination from the Synertek Superfund site owned by Mr. Jenab *et al.*~~

~~59.    Neither California EPA nor Defendants ever disclosed to the public that Apple was operating a semiconductor manufacturing facility across the street from the apartments. (see EIR and related documents).~~

172.    ~~Defendants~~On Nov. 29 2016, the City building department sent Apple and The Property Owners and final warning to "*correct the code violation*" as described in CRN2015 and stated, "*there have been no passing inspections since 8/15/2016.*" They warned they  will take enforcement "*without further notice*" if Apple and The Property Owner do not "*take appropriate actions …to abate the violation(s)."* (CRN2015-01196, BLDG-2015-39182).

173.    Around Dec. 8 2016 Apple entered a Consent Agreement with the California EPA over Apple's violations of hazardous waste laws at other facilities in Cupertino and Sunnyvale. The

agreement was binding on all of Apple's facilities and operations in California that used, stored, or disposed to hazardous waste for at least five years.

174.    By 2016, the Chip Fab had installed aboveground storage tanks with hazardous gases, waste, and other materials located on the exterior of the property. This included a sulfuric acid H2SO4 tank, sodium hydroxide NaOH tank (FIR2015-01118), and liquid oxygen (LOX) tank adjacent to service yard on west side (BLD16-44685). In 2016, Apple was cited for spilling cooling water into storm drains, fire code and California ASPA violations, health and safety code violations, and failure to properly monitor wastewater discharge.

## G.    Ongoing Violations and injuries, the City ignores Complaints, & Apple Starts Gets Bloomberg to Gaslight the Neighborhood.

60.    The facility installed a "Solvent Waste System" in mid-2017 but did not report or register. Apple filed a permit to the City (FIR2016-01097), but none of the defendants reported it under the RCRA or other environmental laws.

61.175. DefendantsRecords noted: "the solvent waste lift station, collection cabinet and associated ancillary plipming were constructed in 2015. The solvent tank was constructed in June 2017, and installation of the tank and ancillary piping was completed in 2018."  (Oct. 2022 TRC Assessment). The assessment notes the tank is governed by RCRA:

> Purpose: 22 CCR 66265.192 requires that owners of a new hazardous waste tank system (subject to 22 CCR 67450.2 "Permit by Rule") to ensure that the tank system is adequately designed and constructed, and obtain and keep on file at the Facility a written assessment reviewed and certified by an independent, qualified, professional engineer, registered in California that attests to the tank system's integrity.

However, despite requesting an RCRA related assessment, and receiving a formal document significance the RCRA applicability, Defendants never reported the storage and treatment system.

62.176. Further, the specifications obtained by U.S. EPA show the system was designed for Apple in December 2014 with pressure tests occurring in Sept. 2015, despite Apple later claiming they did not use the system until 2017. The Assessment also did not discuss the exhaust system for the tank. This was a critical violation noted in the U.S. EPA RCRA Inspection report. Defendants were assumably as the Chip Fab as exhausting hazardous solvent waste emissions directly into the ambient air of The Premise.

177. ~~City records for the Property contain at least sixteen chemical spill/leak incident reports at 3250 Scott within only three years. These incident reports included eight confirmed leaks/spills: leaks of phosphine and silane on June 1 2019; a phosphine leak on October 21 2019; a Tetraethyl Orthosilicate ("TEOS") leak on July 17 2020; a major phosphine leak on April 30 2021; a 5% fluorine gas leak on April 18 2022, a Hexafluorobutadiene leak on May 29 2022, and leaks of two unnamed toxic gases on September 20 2022 and December 21 2022.~~ Records from the City's monitoring and oversight of the Chip Fab's wastewater compliance who that in Feb. 2017, Apple was discharging wastewater into the public sewers with "contained purple flakes" and the samples for formal testing did not have calibration stickers, chain of custody records, or any signatures. On Aug. 31 2017, wastewater testing results showed 6.7 ug/L ETBE; 29 ug/L of 1-1, Dichloropropene, 24 ug/L of Trichloroethene (TCE), 0.321 mg/L of copper, and 0.07 mg/L of zinc. The sample and report was signed by an Apple Senior Manager on Sept. 14 2017.

178. The SJ-SC WWF applications ask which toxic substances/pollutants and EPA priority Polluants are used at the facility. Based on the answers, the facility then need to preform testing or provide certifications regarding those substances. Chloroethylene is listed which includes TCE, PCE, and VC – but apparently Apple did not select Chloroethylene because they did not have to test for it or certify use/disposal. Similarly, Apple only certified Toluene and Benzene once or twice despite regular use and emissions.

179. Apple's wastewater testing results in 2017-2018 showed consistently elevated levels of "biochemical oxygen demand (BOD). When high-BOD wastewater is discharged, microorganisms consume substantial amounts of dissolved oxygen from the receiving water body, which can harm or kill aquatic life. In addition, a sudden influx of high-BOD industrial wastewater can overwhelm a municipal wastewater treatment plant by depleting the oxygen in its own treatment process, leading to inefficient treatment or a complete process failure. Apple's Nov. 2017-Feb.2018 wastewater results ranged from  280 – 340 mg/L. BOD levels above 200 mg/L in industrial wastewater is considered "very high."

180. In March 2019, the "Watershed Protection Division" of the SJ-SC WWF issued a Lab Report for a 48 Hour survival test on Apple's wastewater noting that Apple's "effluent sample is toxic to *Ceriodaphnia dubia* (water flea) at 100% concentration." The Lab urged that  the "results

should be confirmed by a Certified Testing Laboratory using approved EPA procedures." (Report LE44403, March 12-14 2019, Biologist& Lab Supervisor. 3/26/19). There does not appear to be any follow up after that.

181.     In 2018, Apple filed a permit requesting to "rezone gas audible/visual devices into four zones, so only the area involved in an alarm is evacuated when a gas detector alarms." (FIR18-01235). This indicated Apple regularly had toxic gas alarms going off in the Chip Fab and thought the resulting evacuations were not needed, so planned to not evacuate the entire building even if a lethal gas was released.

182.     In 2018, there was some cryptic press coverage about the The Chip Fab, which referred to the Chip Fab as a "secret" manufacturing facility that "is located on an otherwise unremarkable street in Santa Clara… and near a few other unmarked Apple offices."[23] At this time, the Santa Clara Square Apartments were already built out, with construction in final phases, and with banners and advertisements apparent to anyone driving by. The articles did not provide the street address for the Chip Fab, and the coverage discussed a "secret" facility used to develop MicroLED screens and discussed the matter as if it were light development, with no admission of the ultrahazardous chip fab activities.

183.     Apple is notorious for a public relations tactic, where Apple exerts its influence with the media and government agencies to establish Apple's preferred narrative as a general understanding, even if its contrary to facts and/or logic. This often includes targeted "leaks" of information to friendly reporters, one of which (Mark Gurman at Bloomberg) wrote the 2018 article about the Chip Fab including visiting Santa Clara and taking a photo of the building. Apple's public relations strategy is referred to as RDF or Apple's "*Reality Distortion Field*."

184.     The only explanation as to why Apple would "leak" any information about their "secret" facility to a Bloomberg technology reporter, allow him to take photos of the building when they repeatedly told other people not to take photos of their building, and "ok" employees providing quotes and information when they will normally fire employees  for talking to reporters about anything – is because Apple wanted to build their RDF about the chip fab – creating a public narrative that they're working on "displays," in a "unremarkable" industrial area only nearby to

---

[23] Bloomberg, *Apple is Secretly Developing its Own Screens for the First Time,* March 18 2018.

other unmarked Apple offices – with no mention of high-density residential apartments, public parks, or playgrounds.

185.     .Apple also reframed their negligent construction, operations, and oversight – and their constant regulation violations – in the articles by framing the issues at the Chip Fab by saying it "*took several months to get the… plant operational*." [24] The article said that Apple "*almost killed the project*" in 2017 and the work "*ramped up around 2018… but the project languished due to high costs and technical challenges*."[25]

186.     After the EPA inspected the chip fab in 2023, Apple got the same Bloomberg reporter and other "friendlies" to write additional articles about the EPA inspection and Apple's violations, that again framed the operations as assembling displays rather than doing chip fab, Apple's RCRA violations as simply mislabeling rather than exhausting toxic solvent vapors into apartment windows, and which also made negative statements about the Plaintiff including implying her claims against Apple do not have merit.

187.     This is what Apple does – and Apple executed their public relations strategy with the specific intent of misleading the public about their activities at The Chip Fab, creating a false narrative in respected publications that there are no houses  or parks next to their chip fab, and that the Plaintiff sucks and no one should listen to her. For this lawsuit, Apple's intentional concealment, and misrepresentation of their ultrahazardous activities is a factor as to why the Chip Fab creates an unreasonable risk to the public and why Apple needs to be punished for the harm and dangers its created at the Premise.

~~63.~~188. In July 2018-June 2019, Apple's wastewater test results reported the water Apple was flushing into the public sewers next to the apartments was "light grey," with "particulate/floc," and included arsenic and elevated BOD.

189.     On Sunday June 1 2019, a toxic gas alarm went off at the facility triggered by silane and phosphine gases. Apple stated they were 'purging their lines' but did not place the system in 'test mode,' and said that the release was part of routine operations. ~~(Santa Clara City Fire Department Incident Report 2019-1904285).~~ No notice was made to the public, and no report was

---

[24] TIME, *Apple Is Using a Secret Facility to Do Something It's Never Done Before*, March 19 2018.
[25] Bloomberg, *Apple to Begin Making In-House Screens in 2024 in Shift Away From Samsung*, Jan. 11 2023.

filed to the county, state, or federal governments. (City Incident No. 2019-1904285)

190.    Around July-August 2019, a Santa Clara Square resident complained the water in her apartment was frequently colored blue and she reported that test results for a sample of the water from her bath tub showed high conductivity (525.1 umhos), high grains per gallon (12.31 grains), a high sodium absorption ratio (7.05 ), elevated nickel (0.03 ppm), and very high amounts of copper (4.55 PPM) and lead (0.024 PPM). She lived in Santa Clara Square's Building 2 3315 Montgomery Drive, directly across the street from the Chip Fab and on the firth floor, where the plumbing would be "pulling" the drinking water while the likely defective backflow and cross-connection plumbing at the Chip Fab may have been contaminating the drinking water lines with Chip Fab discharge.

191.    In Aug. 2019, the City gathered two samples from Building 2, ran its own tests, which also had elevated copper and lead, but not exceeding federal limits, and then gave up and did nothing more to investigate. Around April of 2021, the Plaintiff and another chemical exposure victim spoke with the City Mayor and head of the Water/Sewer Dept., Gary Welling, sharing details of their injuries – but the City then ignored their complaints and did nothing to investigate.

192.    The drinking water at the Premise comes from City owned and managed groundwater wells, in addition to city utility lines, and so the City was incentivized to ignore the complaint about the blue water as it did with Plaintiff's complaints of chemical exposure. (Work Order 2019-08-08-021).

64.193. Around Sept. 2019, Apple's wastewater discharge monitoring lab results reported the water was light grey with particulate, and the BOD was 440 mg/L. Apple was discharging this wastewater into the public sewers, with lines shared with thousands of apartments, and likely improper/inadequate cross-connections controls. The City knew all of this and did nothing.

194.    On Monday, October 21, 2019, a toxic gas alarm went off at the facility triggered by phosphine gas and. The reported noted that "upon arrival [the City] found the affected portion of the building evacuated." Apple said, "the gas cabinet would remain shut down and that it would be serviced by the appropriate technician." (Santa Clara City Fire Department Incident Report 2019-1908541). No notice was made to the public, and no report was filed to the county, state, or federal governments. (S.C.F.D. Incident No. 2019-1908541)

65.195. In Feb. 2020, Apple's wastewater monitoring results under its NPDES permit with The City, included arsenic (11 ug/L , 13 ug/L), barium (7.5 ug/ L, 7. 9 ug/ L), copper (10 ug/ L), vanadium (1.2 ug/L), molybdenum (1.1 ug/L), zinc (30 ug/L), acetone (640 ug/L), di-n-butyl phthalate, 2-4,Dichlorophenol, and more trichloroethene (TCE). Apple's records also continued to document, and submit to the City, that no one is onsite to monitor or inspect the hazardous waste or industrial systems on the weekends.

66.196. On Friday, July 17, 2020 an alarm went off due to a Tetraethyl Orthosilicate (TEOS) leak. The report noted "An engineer was working on tool, and the plumbing had been installed backward." (~~Santa Clara~~ City ~~Fire Department~~ Incident ~~Report~~No. 2020-2005200).

67.197. ~~Monday,~~On August 17, 2020, a toxic gas alarm went off at the Property and City report noted that Apple said: "the building had a power outage which caused a shutdown and subsequent activation of all of the toxic gas alarms. Once the system came back online, the meters were checked and all showed readings that no gasses were released" revealing that Apple's toxic gas alarms did not function during power outages and thus would not detect releases during those times. (~~Santa Clara~~City ~~Fire Department~~Incident Report 2020-2006068)).

198.    Around Sept. 2 2020, the Plaintiff realized she was being exposed to dangerous chemicals in her home, did not know where they were coming from or what they were, but found elevated levels of "VOCs" on her indoor air monitors that correlated to when her medical systems were the worst. Most compelling was a major spike in VOCs the night before at 3 AM at the same time she had one of her "dying spells" where she would wake up at 3 AM feeling like she was choking and had symptoms of heart failure. A week later, the Plaintiff had another one of these spells, recorded VOC spikes, and had her blood and urine tested the next day which indicated she had been exposed to arsine gas (a gaseous form of arsenic that is lethal) within hours of the test, around 3 AM. Her heart monitoring devices also showed her blood pressure and heart rate had plummeted.

199.    In Sept. 2020, Plaintiff noticed an Apple facility at 3250 Scott Blvd, near her apartment and  also on the Synertek Superfund groundwater plume. Previously, the Plaintiff realized her symptoms and observations represented chemical exposure, but her best guess at a source was the Synertek Superfund contamination on the other property owned by Mr. Jenab. The

Plaintiff sent emails and filed complaints requesting help to US EPA, Cal. EPA, BAAQMD, and the City.

200.    Plaintiff mentioned the facility to Apple on at least September 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S and Plaintiff had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in the activities at the Property. Apple's EH&S Director suggested that Plaintiff use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Apple knew it was responsible for the Plaintiff severe chemical injuries no later than Sept. 2020.

201.    On Oct. 26 2020, The City complete da "Evaluation for WPS Pretreatment Program Slug Discharge Prevention Plan" for the Chip Fab's NPDES permit. The City noted that the Chip Fab is "low risk" and there is "no further action required." The City and/or Apple claimed the facility was "inspected by EPA staff" and that EPA did not indicate need for Slug Plan, thus the facility is "low risk" – however per the US EPA, they did not know about the site until 2023, and California EPA said they never conducted any inspections or talked to the owners or operators after 2016. It appears the City may have been referring to the City Fire Dept. conducting CUPA inspections but called themselves "EPA" for some reason.

202.    The Oct. 26 2020 NPDES risk review claimed there are "no chemicals stored on site greater than 5 gallons, or if they are all are stored and used inside secondary containment," that there is "generally good housekeeping," and the "staff are knowledgeable and trained on chemical storage." Accordingly, the City said there was "no risk mitigation needed," including no need for spill plans, no inventory, no plan of sewer inlets or system ops/controls, no structural controls, no process logs, and no employee training or procedures. (NPDES permit no. SC461B).

~~68.~~203.The City's inspection of the Chip Fab on Oct. 26 2020 was coded as HWLQG/Routine. (Oct. 26 2020 email sent to Luca Maestri and Tom Huynh at Apple). The City's inspection of the facility on Dec. 23 2020 was recorded as Permit by Rule/Not Routine, HW-LGQ/Routine, HMRRP/Not Routine, and ASPA/Not Routine. In 2020, the City cited Apple for fire code violations, using two EPA ID numbers, inaccurate hazardous materials inventory data, no spill plans or training, no business permit, no signature from supervisor on records, and failure to

properly monitor wastewater discharge again).

204.   The city reported six total violations at the Property to CERS. This consisted of five violations of the Aboveground Petroleum Storage Act and one violation of the Hazardous Materials Release Response Plans. All reported violations were dated Oct. 13 2020. No RCRA violations were reported to CERS or the U.S. EPA. (CERS 385316 / 10633816).

205.   In Oct. 2020, Plaintiff asked her manager from Apple Legal if she knew anyone who practiced environmental law because Plaintiff may be interested in the field and wanted to learn more. Plaintiff was introduced to Apple's EH&S counsel. They met twice on a video chat, on Nov. 2 2020 and Nov. 6 2020. Plaintiff spoke about her experience in 2020 and what she had learned about remediation sites. During the conversation, the lawyer admitted to Plaintiff that Apple did not have EH&S counsel prior to her, that she was still catching up, that Apple needed to be doing inspections and testing that it had not done, and she was trying to get them to start soon.

206.   Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring Dec. 14 2020. This occurred after Plaintiff had notified Apple EH&S and environmental legal about what occurred to her near the Property.

69.1.   In September 2020, Plaintiff notified Apple of the chemical exposure at her apartment and spoke with an executive in Apple's EH&S team about it at that time. (Plaintiff saw an Apple building was next door, the Property, and thought Apple may have insights into the risk of the Synertek Superfund site). In September 2020, Plaintiff notified the City Fire Department about her chemical exposure injuries next to the Property and requested an investigation. Under information and belief, by September 2020, at least Apple and the City knew the Property was responsible for Plaintiff's severe injuries in 2020.

70.207. The City's inspection of the facility on Oct. 13Dec. 23 2020 was coded as HWG/Routine and Permit by Rule/Routine. The City's notification to Apple included the following violations:

71.   RCRA Hazardous Waste Generator; Permit by Rule (PBR)
- Minor Violation: 3010002 - Hazardous Waste Generator: Identification Number. Facility has two IDs, inactivate the ID not currently in use and provide documentation for reason on keeping two different IDs.
- Minor Violation: 2405 HSC 25200.3(f) (CA), HSC 25201.5(d)(7)(A), CCR 67450.2(b)(3)(B): Plot plan correctly shows unit locations. (3210).

Administration/Documentation – General. Plot plan does not show location of FTU-01 and FTU-02, also plot plan labeling is not readable. Citation: 22 CCR Multiple ; 40 CFR 1 265; HSC 6.5 Multiple; 22 CCR Multiple ; 40 C.F.R. 1 265; HSC 6.5 Multiple; 40 CFR 1 265; HSC 6.5 Multiple

72.    HMRRP - Hazardous Materials Release Response Plans (HMRRP)

- Minor Violation: Failure to electronically submit complete and accurate hazardous material inventory information for all hazardous materials on site at or above reportable quantities. HSC 6.95 25505(a)(1), 25506, 25508(a)(1), 25508(a)(3). Provide correct inventory with corrected reporting measurements - 1700 gallons Diesel Is missing, Argon is reported in pounds, zero amount of chlorine reported; update chemical inventory on CERS with corrected list and amounts of chemicals on site.

73.    Aboveground Petroleum Storage Act (APSA)

- Class II Violation: 2517 HSC 25270.6(a)(1) or (2) Failed to file tank facility statement or business plan. (4010032). Failure to submit a tank facility statement on or before January 1 annually unless a current Business Plan has been submitted. Last submittal on 5/18/18, submit details on CERS within 30 days. Citation: HSC 6.67 25270.6(a)(1); HSC 6.67 25270.6(a)(2); HSC 6.67 25270.6(a)(1), 25270.6(a)(2);

- Minor Violation: 2528 HSC 25270.12(a) 25270.4.5(a) SPCC Plan shall include training program (40 C.F.R. 112.7(f)) (4020001). Failure to provide the following training to all oil-handling personnel: 1. Operation and maintenance of equipment to prevent discharges. 2. Discharge procedure protocols. 3. Applicable pollution control laws, rules, and regulations. 4. General facility operations. 5. Contents of the SPCC Plan. Provide training record for tank inspection personnel. Citation: HSC 6.67 25270.4.5(a); 40 CFR 1 112.7(f)(1); HSC 6.67 25270.4.5(a)

- Minor Violation: 2529 HSC 25270.12(a), 25270.4.5(a). Records of inspections or tests not signed by supervisor or inspector (40 CFR 112.7(e)) (4010021). Failure to comply with one or more of the following requirements: 1. Have record of inspections and tests, including integrity tests, signed by the appropriate supervisor or inspector. 2. Keep written procedures and records of inspections and tests, including integrity tests, for at least three years. 3. Keep comparison records. Citation: 40 CFR 1 112.7(e); 40 CFR 1 112.8(c)(6); HSC 6.67 25270.4.5(a)

- Minor Violation: 2547 Failed to conduct annual spill prevention briefings (40 CFR 112.7(f)(3)) (4010023). Failure to include in the SPCC plan an adequate description of employee training. Training shall address, at a minimum: operation and maintenance of equipment to prevent discharges; discharge procedure protocols; applicable pollution control laws, rules, and regulations; general facility operations; content of the facility SPCC plan; and annual discharge prevention briefings for oil-handling personnel to assure adequate understanding of the SPCC plan. Provide record of annual briefing (not available on site). Citation: 40 CFR 1 112.7(f)(1), 112.7(f)(3); HSC 6.67 25270.4.5 (a)

- ~~Minor Violation: 2502 H&SC 25270.4.5(a)~~ Facility owner/operator shall implement SPCC Plan element(s). [ref. CFR 112.3] (4010001). Failure to prepare a Spill Prevention, Control, and Countermeasures ~~(SPCC) Plan. Citation: 40 CFR 1 112.3, 112.6; HSC 6.67 25270.4.5(a).~~

~~74.    The City's inspection of the facility on October 26 2020 was coded as HWLQG/Routine. (Oct. 26 2020 email sent to Luca Maestri and Tom Huynh at Apple).~~

~~75.1.    Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its exhaust system for over five years, with the first replacement occurring December 14 2020. This occurred after Plaintiff had notified Apple EH&S and environmental legal about what occurred to her near the Property.~~

~~76.    The City's inspection of the facility on December 23 2020 was recorded as Permit by Rule/Not Routine, HW LGQ/Routine, HMRRP/Not Routine, and ASPA/Not Routine.~~

~~77.    The City noted new violations at the Property including failure to provide five-year certification for the fire sprinkler/standpipe system (0064), that fire alarms were not tested on an annual basis and records were not maintained on site (0078), and that there were no annual test reports for the toxic gas alarms (0082).~~

~~78.~~208. At least two RCRA violations were recorded and reported, with an email notification sent from the City to Apple. However, that notification contained no information about what the violation was, and the violation was not recorded in the city's list of violations found during inspections. (Dec. 23 2020 email sent to Luca Maestri and Tom Huynh at Apple).

209.    If the City reported Apple's unauthorized hazardous waste tank, Apple would have been in violation of Apple's consent agreement with the state of California, and those violations would have prevented Apple from ending the permanent injunction. The Order ending the consent agreement was signed by the court on December 22 2020 and docketed January 14 2021. (*The People of California v. Apple Inc*, 16-cv-303579, Superior Court of California, Santa Clara County).

~~79.1.~~  On Nov. 2020, the City renewed Apple's NPDES wastewater permit for ~ 41,352 gallons/day average discharge. The permit stated that the City "intends but is not obligated to do semiannual monitoring of pH and TTO" and "semiannual arsenic, chromium, copper, nickel, pH, silver, zinc." There is apparently no other regular monitoring. The permit also notes that "federal limits are concentration based or discharge prohibited in 40 CFR 403.5" implying the City expects

Apple to self-monitor and govern itself. ~~The city reported six total violations at the Property to CERS. This consisted of five violations of the Aboveground Petroleum Storage Act and one violation of the Hazardous Materials Release Response Plans. All reported violations were dated Oct. 13 2020. No RCRA violations were reported to CERS or the U.S. EPA. (CERS 385316 / 10633816).~~

~~80.~~210. ~~In December 2020, Apple filed its first manifests to dispose of solvent saturated activated carbon, signifying they changed their carbon filters for the first time and/or legally disposed of the filters for the first time. The 2024 U.S. EPA RCRA report notes that Apple reported the management of activated carbon as a waste only started around December 14 2020. EPA also noted the solvent saturated carbon is an RCRA waste and Apple had been unlawfully disposing of it as non RCRA waste. (EPA CEI pg 13-14).~~

~~81.~~211. On Friday April 30 2021, a toxic gas alarm went off due to another phosphine leak. The city noted "the ventilation system was increased to exhaust the gas out of the facility as fast as possible." ~~(Santa Clara City Fire Department Incident Report 2021-2103124).~~ The City added Apple's "EHS staff was advised to contact CAL OES for their required notification" and noted the Fire Dept. "contacted CAL OES to obtain an incident number 21-2288." ~~(Santa Clara City Fire Department Incident Report 2021-2103124).~~ The Fire Department used the codename "ARIA" in their own report, and the term "Responsible Party" in the CalOES report and never used Apple's actual name in either report. Apple never reported the leak to California OES or any other government agency. (City Incident Report 2021-2103124).

~~82.~~212. Around 2021, TCE began spiking in groundwater samples collected directly downgradient from Apple's facility. Earlier, in 2017 the NPDES sampling of Apple's wastewater showed expected TCE in Apple's discharge (24 ug/L). Apple's inventories, manifests, chemical reporting never included TCE. This implies Apple was covertly using TCE at the facility and quietly disposing of it by pouring it down the drain and into the sewer. TCE is a synthetic chemical. TCE is not naturally occurring in the environment. As a toxic, long-lived, volatile, chlorinated hydrocarbon, and likely carcinogen, TCE is strictly regulated by the state of California and the federal government. TCE is a hazardous substance as that term is defined in federal law, 42 U.S.C. § 9601(14) and state law, Cal. Health & Safety Code § 25281(h).

83.213. On June 30 2021, Apple via Susan Creighton ("Global Research EHS Manager") filed Apple's only TRI report for the facility. Apple reported that in 2020 disposed of 260.17 pounds of NMP through "Stack or Point Air Emissions" gas "gaseous" waste and used an "absorber" as a treatment method that had an expected efficient of > 50% but < or = 95%. Apple also reported treating 2,342 pounds of NMP onsite and transporting an additional 14743 pounds for offsite treatment. (95051NTRSL3250S doc. Cont. No. 1320219310885).

84.    In 2021, Apple also reported releasing at least 7.8 tons (15,608 pounds) of volatile organic compounds into the atmosphere around the Property in 2020. (U.S. EPA TRI/NEI).

85.214. On Monday, April 18, 2022 toxic gas alarms went off at the Property. The City report noted Apple said "an employee accidentally turned on the bottle for 5% gas fluorine while it was in the cabinet. The system automatically alarmed upon detection of the gas and evacuated it to the atmosphere as designed" and the "the sensor inside the cabinet was reading at 4.38 PPM, but the staff advises that the." After sensor may be over saturatedstarted to drop, entered room in "tyvek suits and takes time before it drops."(Santa Clara wearing SCBA as recommended by technical reference material... ensure the chemical bottle was fully closed." (City Fire Department Incident ReportNo. 2022-2203209). No notice was made to the public, and no report was filed to the county, state, or federal governments.

86.215. On Sunday, May 29, 2022 toxic gas alarms went off due to a Hexafluorobutadiene leak. The city noted "Per the engineer who developed the exhaust system, if the identified levels for the leak have zeroed out then you can allow 30 minutes of the exhaust system to work, and the entire lab should be safe to make entry." (sic). The city added "The chemical is a known respiratory and fire hazard." (Santa Clara City Fire Department Incident ReportNo. 2022-2204500). No notice was made to the public, and no report was filed to the county, state, or federal governments.

## H.    The City previously denied there were 2023 incident reports in response to Public Records Requests. However, in 2023, there were at least two incident reports. The first report was on Friday,Investigations Begin But The Violations And Incidents Do Not Stop.

87.216. On January 13 2023 in response to there was a toxic gas or fire alarm at the Chip

Fab, but the City noted it was "cancelled while still enroute." (Incident Report 2023-2300384).

217.    On February 21 2023, Plaintiff discovered the semiconductor fabrication activities at 3250 Scott. Plaintiff posted on Twitter in real-time as she learned about it, expressing severe distress.

"APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING and APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF and THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT."
@ashleygjovik (February 21 2023 11:29 PM).

218.    Until that day, Plaintiff did not know it was Apple who was responsible for making her so ill in 2020. Further, until that day, Plaintiff did not know the chemicals she was exposed to in 2020 were potentially lethal to human life. Plaintiff had described the experience as "thinking she was dying" but did not realize she likely could have actually died.[26]

219.    ~~The second report was for Friday,~~ About five weeks later, Apple filed planning and building permit applications for the "installation of new screen wall and mechanical yard area for the installation of a new VOC abetment system. New solvent exhaust fans will be installed on the roof to support the new VOC abatement system." (PLN23-000163; BLD23-68895). The March 31 2023 building permit application is still noted as open, and with corrections needed --- more than two years later. Planning Dept. stamped it around Oct. 2022.

~~88.~~220.    On May 12 2023 ~~where all,~~ the toxic gas alarm ~~activations were~~ as the Chip Fab went off. Apple said the gas alarm spiked with elevated levels ~~that immediately~~ but quickly returned to normal. The report noted that Apple "*stated this would not happen if there was a gas release… There was a power outage that appeared to cause the alarm... The Facilities Manager stated they would have their alarm system checked.*"  (Incident Report 2023-2304092). It appears that eight years into operations at the Chip Fab, they still had not properly configured the toxic gas alarms to still being able to function during power outages.

221.    The Plaintiff filed her first formal complaint about the Chip Fab  around June 12 2023. She demanded investigation and enforcement action, documenting all the evidence she gathered and attaching exhibits to show the dangers and wrongdoing. The EPA confirmed in June

---

[26] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste,* SF Bay View, March 26 2021, https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

2023 that they would investigate, met with her to discuss, and then conducted the first site inspection in Aug. 2023.

222.    In May-Aug. 2023 Apple's wastewater monitoring reporting the color was "light grey" or "dark grey," with "particulate/floc," and contained ammonia (218 mg/L, 149 ug/L).




U.S. EPA photo 4a dated 8/17/23.          U.S. EPA photo 13a dated 1/16/2024.

223.    On Aug. 10 2023,  the City noted there was a "high gas alarm" at the Chip Fab due to chlorine gas but did not elaborate further (City Incident 2023-2306933).

224.    U.S. EPA's Aug 17 2023 Compliance Evaluation Inspection cited Apple for violations of RCRA requirements related to hazardous waste generators and RCRA permits including 262.11 (generators must determine if their solid waste is a hazardous waste), 270.1(c) (RCRA permits are required for hazardous waste storage, treatment, and disposal), and .262.17(a)(5)(i)-(ii) (must label hazardous waste containers). This included that 'a container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste. A container holding hazardous waste must not be opened, handled, or stored in a manner that may rupture the container or cause it to leak." **(262.17(a)(1)(iv)).** (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).

225.    Then U.S. EPA's January 16 2024 Focused Compliance Inspection of Apple's facility found additional violations including: "A person who generates a solid waste, as defined in 40 CFR 261.2, must make an accurate determination as to whether that waste is a hazardous waste

in order to ensure wastes are properly managed according to applicable RCRA regulations." **(262.11);** "A large quantity generator must mark or label its containers with the following… the date upon which each period of accumulation begins clearly visible for inspection on each container' (262.17(a)(5)(i)(C));

226.    The US EPA's list of violations also included that "a large quantity generator accumulating hazardous waste in tanks must do the following… mark or label its tanks with an indication of the hazards of the contents…; hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704)." (262.17(a)(5)(ii)(B)). (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).



U.S. EPA photo 6a dated 8/17/23.              Photos from Apple's SWT (2022).

227.    EPA's report also noted violations regarding: "The owner or operator must inspect, where present, at least once each operating day, data gathered from monitoring and leak detection equipment (e.g., pressure or temperature gauges, monitoring wells) to ensure that the tank system is being operated according to its design." (265.195(a)) and "A generator that transports or offers for transport a hazardous waste for offsite treatment, storage, or disposal, or a treatment, storage, or disposal facility that offers for transport a rejected hazardous waste load, must prepare a

Manifest…."(U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd). (262.20(a)(1)).

89.228.        During three federal RCRA inspections in August 2023 and January 2024, the U.S. EPA found at least 19nineteen unique violations of the RCRA, with over hundred unique occurrences. Among other issues was literal piles of toxic waste.

90.229.        U.S. EPA's also discovered that Apple was operating an unpermitted 1,700 gallon hazardous waste storage and treatment system which was venting solvent exhaust into the atmosphere. U.S. EPA noted that "the tank was marked with the words, 'Hazardous Waste,' and used for the accumulation of spent solvent waste. At the time of the inspection, the solvents were being managed as California Only Waste." (EPA Rep. Attachment A, page 6).




U.S. EPA photo 4a dated 8/17/23.        U.S. EPA photo 13a dated 1/16/2024.

 

U.S. EPA photo 6a dated 8/17/23.              Photos from Apple's SWT report (2022).

91.230. The U.S. EPA told Apple to notify the BAAQMD of the tank (2024 EPA Inspection Report), and on September 13 2023, Apple applied for a permit with Tom Huynh writing:

> Apple Inc. (Apple) currently owns and operates emission sources under BAAQMD Plant #22839, located in Santa Clara, CA. Apple is requesting an authority to construct and permit to operate for a 1,700 gallon solvent waste tank (S-NEW) at the facility. S-NEW is a horizontal aboveground tank receiving waste solvent and water from solvent spray benches and wet benches from S-1 (Semiconductor Fab Research and Development Facility)… We appreciate BAAQMD's ongoing support. If you have any questions regarding the attached application, please call me at [number].

(Apple Inc. Plant #22839, Ref. 0664430).

92.231. Among other issues, Apple did not disclose in their letter that they had been operating this tank since 2017, and Apple appeared to be coercing BAAQMD to not create a paper trail of questions or concerns. The specifications for the tank were attached onto page 29, and the document was reviewed and signed by Apple's contractors on October 18 2016. The contractor records dated October 2016 show fabrication and pressure testing occurred before the claimed operational date.

93.    In August 2023, the U.S. EPA found this tank was venting the solvent exhaust to the roof, and Apple was using a 55-gallon container filled with "Activated Carbon" for abatement, but the U.S. EPA noted "the container was not labeled or identified in Apple's air permit or their RCRA tank assessment."  The U.S. EPA also captured a photo of the exhaust and noted that it was:

~~94.~~232. "a photo of three vents connected to Apple's 55-gallon container filled with 'Activated Carbon'. The two vents on the left are emergency vents for the double-walled tank. The vent on the right is the main vent."

(U.S. EPA, Attachment A, page 8, photograph 7b). Notably, the exhaust vent is extremely narrow and pointed downward, away from the air flow at roof level.

~~95.     After Plaintiff learned of Apple's activities at 3250 Scott Blvd and announced her discovery publicly in February 2023, Defendant Apple then proceeded to file permits in early April for "*installation of a new VOC abatement system*" with "*two new solvent exhaust fans.*" (Permit BLD23-68895).~~

~~96.~~233. The U.S. EPA's August 2023 inspection reported noted that the exhaust system for the solvent tank was not referenced in Apple's October 2022 system assessment. Per U.S. EPA, Apple claimed the device was already included in their BAAQMD permit, however EPA noted it was never mentioned in that application. (U.S. EPA CEI pg13-14).

~~97.~~234. It appears that based on the timelines and inconsistencies, Apple obtained the new activated charcoal abatement system after they realized that Plaintiff learned about the Defendants activities at the Property. Defendants then rushed to install the new system prior to the U.S. EPA inspection, and in their haste, it appears they connected the wrong vent pipes, venting to the curved down backup pipe as a primary exhaust. Then upon EPA questioning Defendants about it, it appears Defendants decided to present the issue as negligence instead of an intentional cover-up.





*U.S. EPA photo 7b dated 8/17/23.*

98.    U.S. EPA's Aug 17 2024 Compliance Evaluation Inspection cited    Apple    for violations of RCRA requirements related to hazardous waste generators and RCRA permits including 262.11 (generators must determine if their solid waste is a hazardous waste), 270.1(c) (RCRA permits are required for hazardous waste storage, treatment, and disposal), and .262.17(a)(5)(i) (ii) (must label hazardous waste containers).

99.    **Hazardous Waste Generators:**

- **262.17(a)(1)(iv): Management of containers.** "A container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste. EPA's inspection also found violations regarding:A container holding hazardous waste must not be opened, handled, or stored in a manner that may rupture the container or cause it to leak."

- **262.17(b): Time limits.** "A large quantity generator who accumulates hazardous waste for more than 90 days is subject to the requirements of 40 CFR parts 124, 264 through 268, and part 270 of this chapter, and the notification requirements of section 3010 of RCRA for treatment, storage, and disposal facilities, unless it has been granted an extension to the 90-day period."

(U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).[27]

100.1.  Per U.S. EPA's report, the Santa Clara City Fire Department made an unexpected visit to Apple's factory the morning of the U.S. EPA's inspection, effectively putting Apple on notice and obstructing the U.S. EPA's ability to surprise Apple, as is standard with unannounced

---

[27] U.S. EPA, 3250 Scott Blvd, Apple Inc, https://echo.epa.gov/detailed-facility-report?fid=110001168254

~~hazardous waste inspections. The U.S. EPA report noted that the U.S. EPA inspection was unannounced. The City of Santa Clara Assistant Fire Marshall apparently said he had scheduled inspections three weeks prior. (pg3). However, there is no record of these inspections on CERS or in the agency records, and the City has repeatedly refused to respond to Public Records Requests related to this supposed pre-planned inspection.~~

~~101.    Then U.S. EPA's January 16 2025 Focused Compliance Inspection of Apple's facility found additional violations including:~~

~~102.    **Hazardous Waste Generators:**~~

- ~~**262.11:** "A person who generates a solid waste, as defined in 40 CFR 261.2, must make an accurate determination as to whether that waste is a hazardous waste in order to ensure wastes are properly managed according to applicable RCRA regulations."~~
- ~~**262.17(a)(5)(i)(C): Containers.** "A large quantity generator must mark or label its containers with the following... the date upon which each period of accumulation begins clearly visible for inspection on each container."~~
- ~~**262.17(a)(5)(ii)(B): Tanks.** "A large quantity generator accumulating hazardous waste in tanks must do the following... mark or label its tanks with an indication of the hazards of the contents...; hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704)."~~
- ~~**262.20(a)(1): Paper manifest.** "A generator that transports or offers for transport a hazardous waste for offsite treatment, storage, or disposal, or a treatment, storage, or disposal facility that offers for transport a rejected hazardous waste load, must prepare a Manifest...."~~

~~103.    **TSD IS Tank System Standards:**~~

- ~~**265.195(a): Daily inspection requirements:** "The owner or operator must inspect, where present, at least once each operating day, data gathered from monitoring and leak detection equipment (e.g., pressure or temperature gauges, monitoring wells) to ensure that the tank system is being operated according to its design."~~

~~104.    **TSD IS Air Emission Standards and Leaks**~~

~~105.~~235.        **Subpart BB 265.1063(b)(3):** "Leak detection monitoring, as required in §§ 265.1052 through 265.1062, shall comply with the following requirements...The instrument shall be calibrated before use on each day of its use by the procedures specified in Reference Method 21." <u>(</u>Subpart ~~CC~~<u>BB</u> 265.~~1083(c)(1):~~<u>1063(b)(3)).</u> <u>And,</u> "a tank, surface impoundment, or

container for which all hazardous waste entering the unit has an average VO concentration at the point of waste origination of less than 500five hundred parts per million by weight (ppmw)… The average VO concentration shall be determined using the procedures specified in § 265.1084(a) of this subpart. The owner or operator shall review and update, as necessary, this determination at least once every 12 months following the date of the initial determination for the hazardous waste streams entering the unit." (Subpart CC 265.1083(c)(1)). (270.1(c)). (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).

106.    Permits (Generally)

107.236.    270.1(c):EPA's Aug. 2023 and Jan. 2024 inspections also found violations regarding:, that "RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR part 261. The terms "treatment," "storage," "disposal," and "hazardous waste" are defined in § 270.2. Owners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit…If a post-closure permit is required, the permit must address applicable 40 CFR part 264 groundwater monitoring, unsaturated zone monitoring, corrective action, and post-closure care requirements of this chapter." (270.1(c)). (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).

237.    On Aug 30 2023, a City incident report (which was previously withheld from the Plaintiff for years and finally released just weeks ago) notes an Apple employee was injured from Hydrogen fluoride (fluorane) gas exposure. HF is an extremely dangerous substance that can cause death upon contact .The city's report noted the a 29-year old man was exposed to 2 mL of HF for 15 minutes, the employee was rinsed in an emergency shower for 10 minutes, and then two tubes of calcium gluconate "antidote" were applied. The employee was taken by ambulance to VMC as the "county tox hospital." The FD said that Apple was filing a "corporate incident report" and requested information from the FD. The FD apparently did not request any information from Apple. (City Incident No. 2023-2307611).

238.    Apple's wastewater monitoring results in Sept.-Nov 2023 reported the samples were "light grey" and "dark grey," with "particulate/floc," and contained ammonia (160 ug/L), arsenic, copper, chromium, and zinc.

239.    On Nov 3 2023, a gas leak was documented at Apple's office at 3260 Scott Blvd, also owned by Mr. Jenab et al, and the utility company requested an encroachment for repairs, and the city warned them to "use extreme caution" (EP23-0492)

240.    On Dec 8 2023, a toxic gas alarm went off at the Chip Fab and "a security officer for Apple was on scene. They assisted with notifying building engineers and helping [the FD] get into the building. [FD] eventually used the keys in the Knox box to open the door. [FD] walked into a command room to view the building sensors from a computer monitor. It showed a GD089 area sensor that spiked for a few seconds at .65 ppm for chlorine. It was above the alarm level, and the sensor triggered an alarm. The spiked settled back to zero after a few seconds. Shortly thereafter, facility engineers arrived on scene. They confirmed the spike and attributed it to a sensor error."(City Incident Report 2023-2310880).

241.    On Feb 22 2024, the City vaguely reported that they "responded to [The Chip Fab] code 3 for a report of a male feeling dizzy. Upon arrival E99 was met at the front door by the patients coworkers and lead to the pt. E99 assessed pt and took basic vitals. Pt was alert and oriented X 4. ALS care was provided. Pt signed AMA .Pt was advised of the risks and signed AMA" (Incident No. 2024-2401745).

242.    Then in March 2024, per an Apple-dedicated tech reporter, supposedly Apple "ceased" the operations at The Chip Fab, laid off employees at the facility, and claimed to be "winding down" the project due to the cost and complexity."[28]   However, Apple has never said or indicated this directly in regulatory or legal filings, or when asked directly about operations at the facility, and Apple has been asked repeatedly. Recent news coverage also framed the facility as a QA testing location and the operations as "screen manufacturing."

243.    Around April 11 2024, the City finally repaired the gas leak outside of the Chip Fab and next to the apartment complex – it was open for at least three months. (EP23-0492). A follow-up was scheduled for April 2025 but is still marked incomplete.

244.    On May 30 2024, the  City FD noted they responded to an emergency at the Chip Fab. They wrote an employee complained of dizziness and Apple had him sit outside to wait for the FD. The worker was "exposed to HCL gas and was outside for fresh air decon." The City noted

---

[28] Bloomberg, *Apple Scraps Plan to Design Display for Watch In-House, Cuts Jobs,* March 22 2024.

the employee refused transport to the hospital. The FD noted "The patient understands that the condition they have may get worse and that by refusing transport could result in a more serious condition including death. The patient made the decision to sign the form… and again refuse the offer for transport to a hospital. A witness also signed the form." (Cit Incident 2024-2401745).

245. Apple's 2024 wastewater monitoring reports regularly noted the presence of "particulate/floc," elevated BOD, and Ammonia – including up to 185 mg/L on in April 2024. Results in Nov. 2024 also included arsenic and copper. The sample captured on June 25 2024 was colored "yellow."

246. Plaintiff also filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including Rule 2-1-301 failure to obtain "Authority to Construct" (August 29 and September 12 2024); Rule 2-1-302 failure to obtain a "Permit to Operate" (August 29 and September 12 2024); and Rule 9-7-307 for exceeding the "Final Emission Limits" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO) emissions.

247. On Dec. 18 2024, the NLRB filed a Complaint against Apple that alleged, among other federal labor law violations, the Apple "directed employees to refrain from talking about workplace environmental health and safety concerns with other employees," including by "threaten[ing] employees with discipline…" "told employees to use [a] following five-point balancing test in advance of communicating workplace health and safety concerns to other employees…," and told "employees to first communicate their workplace health and safety concerns directly with [Apple]" prior to speaking with coworkers or the government. (*Apple Inc & Ashley Gjovik*, 32-CA-282142, 32-CA-283161).

248. Around Jan. 2025, Bloomberg now reported that Apple still has a team at the "secretive facility" and says they are "developing microLED displays intended for AR glasses." Bloomberg's Mark Gurman reported "the facility is in Santa Clara, 15 minutes away from Apple's headquarters in Cupertino. The team there was originally also building the microLED displays for future Apple Watch models…. but that idea was canceled last year, with many of the engineers laid off."[29]

249. On March 25 2025, Apple's own defense counsel on that same NLRB case was

---

[29] Bloomberg, Apple Remains a Threat in AR, Even as Meta and Google Race Ahead, Jan. 26 2025.

nominated to become the new General Counsel of the NLRB.[30] The NLRB then cancelled the hearing for Plaintiff's retaliation case.

250. On April 4 2025, NLRB, Plaintiff, and Apple entered a trilateral national settlement agreement regarding Apple's unlawful work policies and secrecy rules. (*Apple Inc & Ashley Gjovik*, 32-CA-284428).

251. After Ms. Carey was confirmed as the new NLRB GC, in Sept. 2025, the NLRB abruptly dismissed its own retaliation complaint against Apple for firing the Plaintiff, when the firing was under the same policies Apple said it would withdraw under the consent agreement, and NLRB's explanation did not exceed four sentences, but did accuse the Plaintiff of probably being a leaker and wanting to be suspended, but saying it would still sue Apple over the five-point balancing test issue, after NLRB smeared its own witness and sabotaged its own settlement agreement. (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).[31]

108. The most recent update for the ~~Property~~Chip Fab that Plaintiff could find from the City was posted by the City on or around June 10 2025. The City cited Apple for a number of fire code violations at the ~~facility~~Chip Fab including noting that "it is unclear what the emergency power off button serves in FACP room," "clear storage in front of exterior exit door obstructing egress in the small parts room," and "MOCVD bunker - relocate 'danger' sign from exit door." (Santa Clara, Permit FOP 25-10526).(Santa Clara, Permit FOP 25-10526).

~~109.~~252. ~~The U.S. EPA ECHO website shows the majority of 2023-2024 RCRA violations at the Property are still open. (See U.S. EPA~~ The City also noted new violations at the Chip Fab including failure to provide five-year certification for the fire sprinkler/standpipe system (0064), that fire alarms were not tested on an annual basis and records ~~for the site, to be filed subsequently as an exhibit).~~were not maintained on site (0078), and that there were no annual test reports for the toxic gas alarms (0082).

## VI. The Premise and Zoning

~~110.~~1. The Property has been zoned as "Light Industrial" since at least 2008. (S.C.C.

---

[30] Sludge, *Trump NLRB Pick Has History of Crushing Unions,* June 2 2025.
[31] U.S. EPA, 3250 Scott Blvd, Apple Inc, https://echo.epa.gov/detailed-facility-report?fid=110001168254

2010-2035 General Plan). Light Industrial Zoning is intended for "manufacturing, warehousing (including data centers), and wholesale establishments." (S.C.C.C. 18.16.010(B)(3)). In the 2010-2023 Santa Clara City General Plan, the Property is designated for "Low Intensity Office/R&D" Land Use. (S.C.C. 2010-2035 General Plan). "Research and Development" includes "research, and the design, development and testing of electrical, electronic, magnetic, optical and mechanical components in advance of product manufacturing" and "may allow for minor manufacturing." (S.C.C.C. 18.160.180).

111.1. The City and County have a "Heavy Industrial" zoning designation that is intended, conditionally, for activities like semiconductor manufacturing. "Heavy Industrial" zoning is intended for "heavy manufacturing and other facilities that use and store noxious and hazardous materials." (S.C.C.C. 18.16.010(B)(4)). This Zone includes "manufacturing" and "fabrication" and "that produces odors… hazardous waste materials, or particulates that may negatively affect other uses on the same site or neighboring properties" and requires approval of a Conditional Use Permit. (S.C.C.C. 18.160.090, 18.16.020, Table 2-13. S.C.D.F.C. 12.2; S.C.C. 2010-2035 General Plan). "This district should be located so as to minimize adverse effects on adjoining areas." (SCCZO §§ 2.40.010, 2.10.040; Heavy Industrial Only Table 2.40-1).

253. After being put on notice about the public safety issue created by the facility, the City updated the 2023 2025 General Plan to still designate the Property as "Low Intensity Office/R&D" but updated the Land Use for all properties surrounding the Property to "High Density Residential" including additional public "Open Space." In 2025, the wastewater testing reports Apple filed to the city do not include information on influent amount, the last date meter calibrate, or equipment observations. Half of the filings are missing sample results. There are inconsistent effluent amounts with no temporal duration. In Jan. 2025, the City assigned new inspector to the Chip Fab, who has only been working in this field for less than year.

254. In May -Aug 2025, wastewater monitoring reports regularly included the presence of ammonia up to 185 mg/L in May 2025. As of Sept. 2025, the running amount of effluents discharged from the Chip Fab was 145,296,660 gallons.

## VII. The Modern Premise & Surrounding Environment

255. The apartments have 1,840 dwelling units with an expected residential population

of more than 4,880 people. (Santa Clara Square, Air Quality Assessment, pg12, Sept. 30 2015; PLN2017-12688).

256.     "The Premise" includes the vertical and horizontal extent of the chemical releases, pollution, and contamination emanating from the Chip Fab, including locations where contamination has come to be located or threatens to become located, and generally refers to a radius of roughly 1,000 feet around the Chip Fab.

112.257.     The Premise has been impacted by contamination at and emanating from the Chip Fab. The Premise has also been impacted by contamination at and emanating from other historic semiconductor operations at the Property and at the adjacent 3050 Coronado Blvd, a.k.a. the Synertek Superfund site ("Synertek Site," CAD990832735). (S.C.C. 2010-2035 General Plan).

113.258.     Today, the Premise, with adjacent and nearby properties within ~1,000ft of the Property and its Operations, includes:

- The Santa Clara Square Apartments (including homes, playgrounds, fitness trails, swimming pools, BBQs),
- The Santa Clara Square Clubhouse (3405 Montgomery Dr),
- Saratoga and San Tomas Aquino Creeks,
- San Tomas Aquino Creek/Saratoga Creek Trail,
- Meadow Park (3355 Octavius Dr),
- Creekside Park (3225 Scott Blvd),
- Carbon Health Urgent & Primary Care (2712 Augustine Dr #120),
- Whole Foods grocery store (2732 Augustine Dr Ste 1600),
- Grace Adult Day Health Care (3010 Olcott St),
- Bay Area Driving Academy (3080 Olcott St C 150),
- University of California, Santa Cruz Silicon Valley Extension (3175 Bowers Ave),
- Silicon Valley Christian Assembly church (3131 Bowers Ave).
- Opa! Authentic Greek (2722 Augustine Dr Ste 130**),**
- Woof Gang Bakery & Grooming (2722 Augustine Dr Suite 140),
- Gong Cha (2712 Augustine Dr #110),
- Commons East Café (2515 Augustine Dr),
- Sweetgreen (2532 Augustine Dr),
- Barebottle Brewing Company (2520 Augustine Dr),
- OrangeTwist spa (2722 Augustine Dr #120),
- Sonder Living (2712 Augustine Dr #130),
- Bafang Dumpling (2702 Augustine Dr #120),
- Lee's Sandwiches (3243 Coronado Pl),

- Club Pilates (3347 Coronado Pl),
- Starbucks (3253 Coronado Pl),
- Charisma Nails & Waxing (3233 Coronado Pl),
- Pacific Catch (3315 Coronado Pl),
- Chipotle Mexican Grill (3249 Coronado Pl),
- Bishops Barbershop (3237 Coronado Pl),
- Jaks Authentic Indian & Modern Vibe (3333 Coronado Pl).

114.    Further, there The Chip Fab is an open planning/development application to convert an industrial building (3240 Scott Blvd) next to the Property (3250 Scott Blvd) into "five-story residential redevelopment."[32] These buildings directly share a property line.

115.    The Environmental Impact Report for the development of the apartments was finalized in December of 2015, at least six months after Apple started operations, and the EIR never mentioned Apple's facility despite being directly across the street from the development.

116.    The City was actively involved in Apple's new facility yet approved the EIR despite knowing and intentional omission of Apple's fabrication activities.[33]    When Apple was seeking approval from the city for the facility in 2014-2015, City documents noted zoning concerns if there was residential adjacent, and the need for air permits, but those concerns were not revisited in subsequent approvals.

117.    The apartments went through a full multi year EIR process with multiple government agencies and public notice/comment, however it was never disclosed that Apple was operating a stealth semiconductor fabrication facility, and emitting tons of toxic chemicals into the atmosphere.[34] The City of Santa Clara knew Apple was doing this and never included it in the EIR, nor did they ever warn residents about it.[35]

118.259.        The Property and its Operations are an illegal nonconformity: it constitutes "an illegally created…structure, or use that was illegally constructed, created, installed, or initiated

---

[32] Preliminary Plans for 3240 Scott Boulevard, Santa Clara, SF YIMBY, April 25 2024, https://sfyimby.com/2024/04/preliminary-plans-for-3240-scott-boulevard-santa-clara.html
[33] It is unclear whether The Irvine Company was aware of Apple's activities.
[34] City of Santa Clara, SCSA, https://www.santaclaraca.gov/Home/Components/BusinessDirectory/BusinessDirectory/121/3650?alpha=S
[35] CalEPA, DTSC, SCSA, https://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=60002212

GJOVIK V. APPLE, SANTA CLARA, JENAB, ET AL. | AMENDED COMPLAINT | PAGEP. 76 OF

without proper permits or approvals, and which does not comply with the provisions of ~~this~~[the] Zoning Code." (SCCC 18.160.140). "No provision of [the City's] Zoning Code shall validate or legalize any land use, structure, or subdivision constructed, created, established, or maintained in violation of the City's Zoning Code. (SCCC 18.02.04).

260.     The City and County have a "Heavy Industrial" zoning designation that is intended, conditionally, for activities like semiconductor manufacturing. "Heavy Industrial" zoning is intended for "heavy manufacturing and other facilities that use and store noxious and hazardous materials." (S.C.C.C. 18.16.010(B)(4)).

261.     The Heavy Industrial Zoning includes "manufacturing" and "fabrication" and "that produces odors… hazardous waste materials, or particulates that may negatively affect other uses on the same site or neighboring properties" and requires approval of a Conditional Use Permit. (S.C.C.C. 18.160.090, 18.16.020, Table 2-13. S.C.D.F.C. 12.2; S.C.C. 2010-2035 General Plan). The Heavy Zoning district is to "be located so as to minimize adverse effects on adjoining areas."(SCCZO §§ 2.40.010, 2.10.040;  Heavy Industrial Only Table 2.40-1).



262.     ~~Above: Google Street~~While the Plaintiff lived at the Santa Clara Square apartments, she spent time at Meadow Park and Redwood Trail Park. Redwood Trail is a "park easement" where The Irvine Company granted an easement and right-of-way to city of Santa Clara for the "Redwood Trail" for "constructing, installing, maintaining, repairing, replacing, operating, supervising, policing, and public use of parkland and park improvements." (Parklands Easement

Grant: Santa Clara Square Apartments - Redwood Trail, Jan. 2019).

263.    The Santa Clara Square apartments include 4.39 acres of public parks. (Planning Commission Staff Report, 12/9/15 PG10). This includes Meadow/Core Park, Creekside Park, and the Redwood Trail Easement and Creek Trail Connection. Amenities in the public parks include a children's playground, restroom building, picnic areas, benches and tables, bike racks, pathways, and trail walkways, and fitness stations connected to the redwood trail.

264.    Irvine Company deeded Meadow Park to Santa Clara "*for use as a community or neighborhood public park*" but retained an "Environmental Monitoring" easement for itself and CalEPA ("maintenance, monitoring, and other actions required by the California Department of Toxic Substances Control."). (2). The Park was granted "as is," without representation or warranty concerning conditions or suitability, denying responsibility or liability, and declaring Irvine Company "*shall have… no duty to warn*" Santa Clara or "*any other person of latent or patent defects, conditions or risks*." (3.3).



Above: "Meadow Park," Landezine International Landscape Award (SCSA, 2022).

Above: View of the apartments and Meadow Park to the right,
and with the Property behind the apartments and to the left, in a deep smog haze;
(Google Streetview, January 2023).

## VII.  THE POLLUTION AND CONTAMINATION

119.1.   The Final 2016 EIR for the Santa Clara Square Apartments noted unexpected findings of Benzene and Vinyl Chloride in the shallow topsoil (<1") on the property where the apartments were to be developed. It was noted as an anomaly, despite its close proximity to Property (directly across the street, near the hazardous waste treatment systems), and the absence of any alternative modern contamination source in the area.

120.   In addition, beginning Around 2021, TCE began spiking in groundwater samples collected directly downgradient from Apple's facility. Earlier, in 2017 the NPDES sampling of Apple's wastewater showed expected TCE in Apple's discharge (24 ug/L).

121.   Apple's inventories, manifests, chemical reporting never included TCE. This implies Apple was covertly using TCE at the facility and quietly disposing of it by pouring it down the drain and into the sewer.

122.   TCE is a manmade chemical. TCE is not naturally occurring in the environment. As a toxic, long-lived, volatile, chlorinated hydrocarbon, and likely carcinogen, TCE is strictly regulated by the state of California and the federal government. TCE is a hazardous substance as that term is defined in federal law, 42 U.S.C. § 9601(14) and state law, Cal. Health & Safety Code § 25281(h). When TCE is discarded or disposed of into the environment, including soil, groundwater, or surface water, it becomes a hazardous waste and solid waste as defined in federal law, 42 U.S.C. § 6903(5), (27), respectively.

123.   Environmental investigations at and around the Property demonstrate that that soil, soil vapor, and groundwater are impacted by chlorinated volatile organic compounds, including trichloroethylene ("TCE") and its breakdown products (i.e., DCE, vinyl chloride, etc.). During its operations at the Property, Apple handled, generated, disposed of, released, used, or stored these chemicals. Apple operated its business at the Property when these chemicals appear to have been released into the environment.

124.   The facility, apartments, and other surrounding buildings and public access ways sit on a federal Superfund site (the Synertek site) and state-managed Brownfield clean-up site. The areas is already saturated with hazardous waste, and efforts are supposed to be underway to clean up the existing contamination, not create new and more contamination. Based on sampling data

and historical records, some of these chemicals cannot be explained as being from historic sources such as the Synertek Operation, now owned by Mr. Jenab *et al.*; however, Mr. Jenab *et al.*, as owners of the Property, are also responsible for Apple's Operations.

125.    Activities at the Property generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Property. During rain events, this pollution washes off of those surfaces and flows into the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay Watershed, of which the San Francisco Bay is a part. Stormwater from the Facility discharges into the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay, of which the San Francisco Bay is a part.

126.1.    Operations and emissions at the Property occur outdoors and may cause pollutants to be exposed to rainfall. The types of pollutants released by the Property into the immediate environment are known to include, or have the potential to include, among other contaminants, total suspended solids, hazardous materials, heavy metals, nitrogen, and other pollutants. The industrial materials stored, and the pollutants generated at the Property are exposed to stormwater flows.

127.    The San Tomas Aquino Creek is located ~ 700 feet from the factory. The Creek is exposed, and air pollution can easily settle in the water and on the banks of the creek. The Creek flows north out to Guadalupe Slough, into the SF Bay, and into the Pacific Ocean.

128.    The Saratoga Creek historically runs directly between Apple's buildings at 3260 Scott Blvd and 3250 Scott Blvd, under the Santa Clara Square Apartments, and flowing north to the bay from Saratoga and the St. Cruz Mountains. The EIR and related investigations for the apartment development, compared with historical records for the area, strongly suggest the Saratoga Creek continues to run through the area as an underground aquifer, large natural spring, and active serpentine hydrothermal system.[36]

265.    The deed also requires that City of Santa Clara "shall at all times, to the fullest extent required by law, comply with the provisions of any DTSC Land Use Covenant recorded

---

[36] Gjovik, Ashley M. *"Deep Time Geology in Santa Clara County: Evidence for Two Billion Years of Active Continental Margin Processes."* The Journal of Decolonized Ecology and Evolution 1, no. 1 (July 15, 2025). https://doi.org/10.5281/zenodo.15892989.

against the Park." ((3.4(a)(iii)). (Dedication Grant Deed: Santa Clara Square- Meadow Park, Feb. 2020). The conditions for the parks include that "all features and amenities in the private open spaces and public parkland must be in substantial compliance with Federal, State, & Local regulations, as well as Park Standards." Santa Clara Res. No. 15.8272 CoA pg11

266.    In The Irvine Company's deed of the parks to the City, the agreement states that The Irvine Company will not indemnify the City regarding the parks, to "the extent such liability is ultimately adjudicated to have arisen in whole or in part from the active negligence or willful misconduct of City or the City Parties; the obligation to defend is not similarly limited.( 8(a) Park Maintenance Agreement (April 9, 2019). The agreement agrees that if either party sues the other side over the parks, the venue of the lawsuit includes the United States District Court, Northern District of California, San Jose, California. (14(H) Park Maintenance Agreement (April 9, 2019)).

267.    There appears to be major backflow risks and issues which could introduce the Chip Fab wastewater releases into the drinking water. Around July-August 2019, a Santa Clara Square resident complained the water in her apartment was frequently colored blue and she reported that test results for a sample of the water from her bath tub showed high conductivity (525.1 umhos), high grains per gallon (12.31 grains), a high sodium absorption ratio (7.05 ), elevated nickel (0.03 ppm), and very high amounts of copper (4.55 PPM) and lead (0.024 PPM).

268.    She lived in Santa Clara Square's Building 2 3315 Montgomery Drive, directly across the street from the Chip Fab and on the firth floor, where the plumbing would be "pulling" the drinking water while the likely defective backflow and cross-connection plumbing at the Chip Fab may have been contaminating the drinking water lines with Chip Fab discharge.

269.    On Aug. 22 2019, Santa Clara ran its own test. (20-708) at the same building from unit 515 and 508 in 3315 Montgomery. Two samples. Copper was 900 ug/L (515) and 480 ug/L (508). Lead was 7.5 ug/L (515). Work Order 2019-08-08-021 "water quality" "blue water."

270.    On Aug. 12 2019 there was a "water main leak" next to the Chip Fab at 3240 Scott Blvd. Water main leaks are known to trigger cross-connection issues at industrial sites that can make wastewater enter the drinking water systems if there is negligent connections - -the City would that, and know about the water main leak, and know about Apple's fab – when it ignored the complaints about strange drinking water.

271.    Backflow issues were reported with City main leaks and backflow failures around the Premise in July 2016, Feb. 2018, March 2018, Oct. 2018, July 2022, and July 2023. Apple has a backflow preventer failure reported at "cross streets Montgomery Dr / Coronado Dr" in Feb-March 2018. (that location is right to the resident who reported blue water). (WO No. 69513).

272.    The Plaintiff lived in Building 4 (3390 Octavius Drive) which was estimated to have a unit sewer flow of 154 gpd/unit. Plaintiff complained of odor and fumes from the sewer system, and strange particulate and appearance of the tap water. There were strange yellow plagues in the shower and bathtub.

273.    In July 2023, City records show multiple complaints from another building on the Premise, and on Octavius, including that "for the last 6+/- months, there has been a strong chlorine smell coming from the water. In the last 2-3 weeks, there has been an ammonia smell happening (RP described it as smelling like 'bad shrimp')." The City ticket noted "Water at the meters have no odor and appearance is within known parameters for the area" but that "Compliance is aware of site complaints." (035 132519).

274.    The sewer lines flow south to north with 3250 Scott Blvd entering the main sewer lines at S74-38 on Scott Blvd, near to the branch that travels down Octavius Drive along the Apartments (S74-40). The sewer lines then travel north on Octavius, turn left on Augustine and flow west to Bowers Ave. There is also an intersection Augustine where sewer lines from Montgomery Drive cross south to north, cure left on Duane Ave, and flow west to Bowers Ave.

275.    There is also a branch entering the Scott Blvd lines from the south, running along Coronado from around the Synertek Superfund site, flowing north and intersection around S73-32, which appears to carry heavy flow and would then create pressure at that "T" which seems likely to nudge 3250 Scott Blvd's outflow towards the Santa Clara Square branch as the path of least resistance. (August 21 2017, RMC Technical Memo, Revised Sanity Sewer Capacity Evaluation for the Santa Clara Square, for City of Santa Clara).

276.    An evaluation of sewer capacity for 3250 Scott Blvd in 2014 suggested "flow from the development would enter the City's sanitary sewer system at manhole S73-33 on Scott Blvd and drain northward." (Dec. 12 2014, RMC Technical Memo, Sanity Sewer Capacity Evaluation for the Aria Project). The model does not explain how the outflow would travel to S73-33 as it is a

significant distance to the west from the property. The modeling suggested a "surcharge of about 9 inches" for the 12-inch line on Scott Blvd with the facility flow. Modeled on ~150 gpm during business hour.

277.    As of 2016, all the sewer lines in this area were 12-16". 3250 Scott and the apartments also share the same sub-catchments (Santa Clara, Sanity Sewer, Master Plan Update, RMC). The City 2016 Sanity Sewer Master Plan noted Bowers Ave (including the Augustine intersection) requires a capacity improvement with a new sewer line of at least24" diameter pipes to run in addition to the existing trunk.

278.    The 2016 report also noted that there was "Backwater" causing "Surcharge" along Scott Blvd west of The Chip Fab, and on Augustine west of the apartments. "Surcharge" due to "Throttle" along Scott where it intersects with Bowers. It also shows that Bowers is estimated at 100-150% at capacity along both Scott and Augustine. As of 2020 (Res. 20-8833) Santa Clara noted it only had ~22 Significant Industrial Users in the city. This included Apple's 3250 Scott.

279.    In addition, the City's recycled water flows from Cornado to Montgomery then Augustine and east then south down Octavius, and west to lakeside . Recycled water only allowed for ground floor residential, also must keep away from playgrounds and eating areas, and storm drain, or domestic plumbing – painted purple  used for irrigating on SCSA on Scott Blvd., including the parks.

## VIII.    VIOLATIONS OF PUBLIC POLICY & COMMON SENSE
### I. COMMUNITY MEMBER INJURIES & COMPLAINTS

280.    Plaintiff Ashley Gjovik was a resident of Santa Clara County, California, who have been and continue to be injured by the ongoing violations described herein. Plaintiffs resided within the direct exposure pathway of uncontrolled emissions, pollution, and contamination from the semiconductor manufacturing facility operated by Apple Inc. at 3250 Scott Blvd, Santa Clara, California.

281.    Plaintiff was a resident of the ~1,800-unit apartment complex at the Santa Clara Square Apartments, located across the street from the Property. Plaintiff has standing as persons who have been and continue to be injured by the ongoing violations described herein; and Plaintiff did suffer injuries and ongoing injuries.

282.    In February 2020, Plaintiff moved into a large, new apartment at the Santa Clara Square Apartments and quickly became severely ill. Plaintiff suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Plaintiff also suffered bradycardia, volatile blood pressure with hypertension and hypotension and a high frequency of premature ventricular contractions.

283.    From February - September 2020, Plaintiff was screened for multiple severe and fatal diseases and disorders, including Multiple sclerosis, brain tumors, fatal arrhythmias, and Neuromyelitis optica. Plaintiff also suffered skin rashes, burns, and hives, and her hair fell out, and she had a shaved head for nearly a year as the bald patches slowly grew back.

284.    Due to the sudden illness, Plaintiff visited the Emergency Room on February 13 2020, and Urgent Care on February 20 2020. Plaintiff subsequently consulted with dozens of doctors who screened her for all sorts of diseases, subjecting Plaintiff to extensive blood draws, urine samples, injections, and scans – including potentially dangerous procedures like MRI and CT scans with contrast, of which Plaintiff had multiple. Plaintiff was too sick to work and went on disability.

285.    While sick in 2020, Plaintiff would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure.

286.    On September 2 2020, Plaintiff discovered elevated levels of volatile organic compounds in her home. What immediately captured Plaintiff's attention was the large spike in volatile organic compounds had occurred the night prior, around 3 AM, while she had been suffering from a "dying" spell.

287.    Plaintiff sought multiple occupational and environmental exposure doctors, who told Plaintiff that all of her symptoms were consistent with solvent and other chem. exposure. After Plaintiff discovered her medical issues at the apartment were due to a chem. emergency, Plaintiff quickly filed complaints with City, California EPA DTSC and BAAQMD, and EPA. She also called Poison Control, who said what she described also sounded like Benzene exposure. (Note: Defendants reported they were exhausting benzene into the air).

288.    In September 2020, Plaintiff hired an industrial hygienist to test the indoor air at

her apartment. She purchased an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Only half the total contaminants were accounted for in the test and the California EPA informed her that testing with Summa™ canisters for 24-hours is superior and would have yielded better results.

289.    Still, Plaintiff's limited testing returned results showing a number of the chemicals in use by Apple at 3250 Scott including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, and xylene.

~~129.~~290.       In September 2020, Plaintiff set up additional air monitors to observe the levels of volatile organic compounds in her apartment next to the 3250 Scott factory (though she was not aware of the factory exhaust at that time).

291.    The results of the data validated what Plaintiff had noticed with her symptoms and ad hoc testing – that the volatile organic compounds mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). Plaintiff notified several Apple executives of her findings and activities, including her Apple managers.

292.    In September 2020, Plaintiff's blood and urine medical tests returned results with industrial chemicals, including arsenic, mercury, toluene, and xylenes. Also noteworthy are the symptoms of Plaintiff's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match phosphine and arsine gas exposure. Both phosphine and arsine are extremely dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of arsine gas onsite.

293.    Plaintiff's medical tests from September 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood but not her urine. There is no other plausible explanation except that she was exposed to arsine gas within hours prior to the test, overnight, in her bedroom. Arsine gas is primarily used for chip fab and as a chemical warfare weapon.

294.    In September 2020, Plaintiff notified Apple of the chemical exposure at her apartment and spoke with an executive in Apple's EH&S team about it at that time. (Plaintiff saw an Apple building was next door, the Property, and thought Apple may have insights into the risk of the Synertek Superfund site). In September 2020, Plaintiff notified the City Fire Department

about her chemical exposure injuries next to the Property and requested an investigation. Under information and belief, by September 2020, at least Apple and the City knew the Property was responsible for Plaintiff's severe injuries in 2020.

295.    Plaintiff has an active whistleblower retaliation and labor violation lawsuit against Defendant Apple Inc, with claims approved to move ahead including a termination in violation of policy, retaliation against her as a victim of crime (these environmental crimes), and retaliation for acting as a legislative witness (including about this chemical exposure).

296.    In 2023, Plaintiff undertook months of research about 3250 Scott, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint. On June 23 2023, Plaintiff filed complaints about 3250 Scott to the EPA, CalEPA, the city of Santa Clara, and Santa Clara County. Plaintiff drafted a 28-page memo with dozens of exhibits. Plaintiff also posted on Twitter that she did so and provided a public link.

297.    The U.S. EPA, Cal. EPA, Santa Clara County, and city of Santa Clara received Plaintiff's complaint about the Property and Operations in June 2023. The complaint noted that Plaintiff may pursue a citizen suit over the issues if the U.S. EPA does not act. The U.S. EPA confirmed they opened an RCRA investigation, did conduct inspections, did document violations, sent Apple an administrative Notice of Show Cause, but has taken no further public actions. The EPA has failed to commence an enforcement action against the Defendants for clear RCRA violations. The EPA has failed to issue emergency orders to address imminent endangerment, including immediate installation of required emission controls.

298.    An RCRA Enforcement manager in EPA's Enforcement and Compliance division for Hazardous Waste and Chemicals confirmed receipt on June 20 2023. The U.S. EPA department told Plaintiff they were reviewing the complaint and documents she provided. Plaintiff had a call with the RCRA Enforcement manager on June 21 2023. An inspector was assigned, and a formal investigation was opened around July 12 2023. Plaintiff met with the EPA's RCRA Enforcement and Compliance team several times.

299.    The U.S. EPA RCRA team then inspected Apple's factory in August 17 and 18 2023 and January 16 2024. The August 17, 2023 inspection was coded as a "*Compliance Evaluation Inspection,*" defined as "*primarily an on-site evaluation of the compliance status of the site about all*

*applicable RCRA Regulations and Permits.*" The January 16, 2024 inspection was coded as a "*Focused Compliance Inspection.*"

300.    Per the formal report, the EPA inspectors identified at least nineteen unique violations of the Resource Conservation and Recovery Act at 3250 Scott, including provisions with both civil and criminal enforcement. Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation.

301.    The U.S. EPA also found Apple was emitting exhaust from its fabrication activities through a system that did not have required permits and did not have monitoring. The EPA also found Apple was storing hazardous waste unlabeled and piled in corners, sometimes with lids left off containers so they do not explode, and failing to perform any inspections of the waste on weekends, and instead just hoping for the best until they return on Mondays.

302.    The U.S. EPA never confirmed they were investigating the CAA violations, despite being directly asked to by the Plaintiff, and the BAAQMD finding at least six air quality violations at the site. Despite conducting a comprehensive inspection in 2023-2024 that documented extensive violations including potential criminal violations, EPA has failed to open any investigation into any violations of the CAA, CWA, EPCRA, or TSCA. The Defendants, and the U.S. and California EPA agencies, have failed to notify residents of exposure.

303.    The U.S. EPA is the federal agency responsible for enforcing the Clean Air Act, RCRA, TSCA, CWA, and EPCRA. The U.S. EPA has actual knowledge of the violations described herein through its 2023-2025 investigation. Despite this knowledge and the imminent and substantial endangerment to public health, the U.S. EPA/U.S. DOJ has failed to take meaningful enforcement action and most of the violations are still open.

304.    Per U.S. EPA's report, the Santa Clara City Fire Department made an unexpected visit to Apple's factory the morning of the U.S. EPA's inspection, effectively putting Apple on notice and obstructing the U.S. EPA's ability to surprise Apple, as is standard with unannounced hazardous waste inspections. The U.S. EPA report noted that the U.S. EPA inspection was unannounced. The City of Santa Clara Assistant Fire Marshall apparently said he had scheduled inspections three weeks prior. (pg3). However, there is no record of these inspections on CERS or in the agency records, and the City has repeatedly refused to respond to Public Records Requests

related to this supposed pre-planned inspection.

305. Plaintiff's personal toxic tort claims were dismissed by a U.S. Court due to expiration of statute of limitations, finding that based on just the permits the City of Santa Clara approved for Apple's Operations and Apple's one TRI filing at the Chip Fab ever, that Plaintiff should have figured out Defendants were operating an off-books fab next to Plaintiff's home, assumed it was Apple who nearly killed the Plaintiff in 2020, and sued Apple prior to 2023 – regardless of Apple intentionally covering up their activities, and their ongoing harassment and retaliation against her. (*Gjovik v. Apple,* 3:23-CV-04597-EMC, Northern District of California).

306. Apple's defense arose out of the reasoning that chip fabs are so dangerous that a reasonable person should immediately suspect them as the cause of severe chemical injuries . For Statute of Limitations to dismiss the case, Apple argued that fabs are *notoriously* dangerous, and everyone knows fabs cause severe chemical injuries, and the Plaintiff should have *immediately* suspected the nearby fab – any reasonable person would have connected her symptoms to semiconductor manufacturing -- therefore, no tolling - she should have sued years ago.

307. But for Siting/Operations, and to avoid liability/regulations, the defendants claim it's fine to operate a fab 300 feet from 1,800 apartments, no special notification needed for residents, normal industrial operations, nothing to worry about, safe to have children's playgrounds nearby, and no buffer zones required.

308. If fabs are so notoriously dangerous that a lay person should immediately know they caused severe chemical injuries, then they should never be sited near homes. Further, extensive community notification is mandatory; buffer zones should be required; emergency response plans must be in place; and real estate disclosures should be mandatory. If fabs are safe enough to operate near residential areas, then: it would not be reasonable for someone to suspect a fab as the injury source and the discovery rule should apply, statute of limitations should toll, and victims need expert analysis to connect cause and effect.

309. Most ultrahazardous activities have visible indicators - an oil derrick, a chemical plant with tanks and smokestacks, blasting operations, etc. The statute of limitations reasoning makes sense in those contexts because you can see the dangerous activity. It is obviously extremely industrial and hazardous, the causation link is apparent, and you know immediately who to

investigate and sue.

310.     Here, the Chip Fab is an unmarked one-story building that looks like an office space and with no external indication of hazardous operations, no warning signs visible to public, and no obvious chemical storage. Apple's reporter at Bloomberg also repeatedly claimed they are just playing with LED screens. Compare to oil drilling: If someone drilled for oil in an underground facility with no surface indication, and used an unmarked building as their surface operations, and a neighbor got sick... the court would not say "you should have known there was secret oil drilling operations nearby - everyone knows oil is secretly extracted in residential areas!"

311.     Apple's counsel Melinda Riechert also made false statements to the Court that "*The agencies couldn't figure out [what Apple was doing at 3250 Scott] because there was no problem. Believe me, they would have come after Apple if there was a problem. It's [Gjovik] who's claiming there's a problem not the agencies.*" (Feb. 21 2025, page 13 at lines 17-21). (*Gjovik v. Apple,* 3:23-CV-04597-EMC, Northern District of California). ~~During~~ At the time Riechert said that the EPA and BAAQMD were taking formal enforcement actions against Apple over the Chip Fab. The EPA Released a press releasee about the enforcement action a couple of weeks ago and credited the Platini.

312.     The U.S. EPA's 2024 RCRA CEI report and 2025 RCRA CAFO are incorporated here: as government reports and orders which are judicially noticeable for their existence and records of official agency action, and for evidence of judicial admissions and denials made by the Defendant; but not for the truth of any statements made by Defendants (such as Apple claiming, without verification, that it has come into compliance with the RCRA).  The U.S. EPA's official press release for the RCRA enforcement action is also incorporated here.

## J. Santa Clara's Violations Related to the Santa Clara Appellate Court Zoning Court Order (1996-ongoing?)

313.     Around 1993, a chip fab (ESI Logic) on Scott Blvd sued City of Santa Clara for insisting on citing a school and church next to multiple chip fabs, including their plant. It was the business and their landlord who pursued the litigation for over seven years and fiercely advocated about the ultrahazardous nature of chip fab including toxic gases. Santa Clara fought it but lost with the Court of Appeals in California ordering their siting and zoning decision be reversed and demanded they prove with a complete and accurate EIR they could safely and effectively locate

those activities next to each other. Santa Clara suggested making a "toxic gas leak panic room" for the kids and then evacuating them down Scott Blvd in case there is a massive chlorine gas leak. The Court repeatedly threated the City with contempt of court if they did not cease trying to create a dangerous condition and refuse to comply with mandatory procedures and processes. *LSI Logic Corporation v. City of Santa Clara and MCA*, No.H012427, Court of Appeal, Sixth District, California (1995).

314.     The case wrapped up and after LSI Logic moved on, around 2004, City of Santa Clara decided they satisfied the court order sufficiently to justify approving the school with 400 "pre-kindergarten through 8th grade" students under a "Conditional Use Permit approved by the Santa Clara City Council in 1994." The *LSI Logic v. Santa Clara* lawsuit closed around two thousand, and during the litigation the city's "mitigation" of creating a shelter-in-place safe room for the children was found insufficient and unlawfully negligent. However, the city approved the 1994 Use Permit in 2004 based on mitigations including "*an emergency preparedness plan and a shelter-in-place plan and warning system.*" (Initial Study Dec 2015, pg 65, PLN2013-10185).

315.     Then around 2015, Santa Clara approved the school to increase students with another 90 children and approved it under something the city called an "Ongoing Special Permit." (Planning Commission, Aug. 21 2024, 24-1205). In 2015, Santa Clara suggested that the shelter-in-place and alarm mitigations which were previously found unlawfully negligent, but which they then used to justify the 2004 approval, would further allow them to increase the amount of children on site to 900. (Initial Study Dec 2015, pg 65, PLN2013-10185). In 2018, another application was filed "to amend the current Use Permit to allow for expansion of the existing pre-kindergarten through eighth grade school from 400 students up to 900 students." (PLN2018-13109; U.1970; CEQA2019-01070). It would also approve the "addition of multi-purpose room, youth lounge, medical consultation clinic, office and meeting rooms." (Planning Commission, 24-1205, Aug. 21 2024).

316.     The city never mentioned *LSI Logic v. Santa Clara* but did state in the Study that "the proposed expansion of the MCA facility into the adjacent building would require an amended CUP that would incorporate restrictions on the uses of the site so as not to limit the allowable industrial land uses in the surrounding project area." (Initial Study Dec 2015, pg 65, PLN2013-10185). The city's justification for meeting this requirement was that "while the number of children

on-site would increase, the use of the site would be consistent with the existing operations which were determined to be compatible with the surrounding land uses." (Id. at 11).

317.    The MCA argued that while their request violates modern zoning code, it should still be approved under "Classic Zoning Code" where "schools and other similar uses were conditionally permitted in the Light Industrial (ML) zoning." (PLN2018-13109 CUP Res. No.    ). The city determined only a Mitigated Negative Declaration was needed. Santa Clara said the public community meeting on March 14 2019 had "no attendance" and the 30-day public review of the Draft MND "did not receive public comments." (PLN2018-13109 CUP & MND Res. No.    ).

~~130.~~318.    In August 2024, the Santa Clara Planning Commission approved the requested Conditional Use Permit to allow an increase in the school's allowed capacity to 900 students. (Planning Commission, Aug. 21 2024, 24-1205). On Sept. 24 2024, in violation of the *LSI Logic v. Santa Clara* injunction, the Mayor and City Council members voted unanimously to approve the Permit. (Consent ~~Decree (2016-2020)~~Calendar, Sept. 24 2024, 24-17).

319.    The MCA children's school is located in a building that is around 2,600 ft (0.7 miles) away from the Chip Fab at 3250 Scott Blvd. The Shelter-in-Place & Evacuation Plan orders that in case of a chemical spill near the school, the staff and 900 children are to evacuate to and assemble at "Meadow Park" which is noted as a "Public Open Space" and is directly across the street from the Property and Operations at 3250 Scott Blvd. (MCA – Campus Expansion, Santa Clara. April 25 2024).

320.    The Conditions of Approval for the Conditional Use Permit and Mitigated Negative Declaration for the school include a duty to defend and indemnify of the City for its approval of the project.

> "ATTORNEY'S OFFICE: The Developer agrees to defend and indemnify and hold City, its officers, agents, employees, officials and representatives free and harmless from and against any and all claims, losses, damages, attorneys' fees, injuries, costs, and liabilities arising from any suit for damages or for equitable or injunctive relief which is filed by a third party against the City by reason of its approval of developer's project."

(PLN2018-13109, Conditions of Approval).

## K.    APPLE'S VIOLATIONS OF THE DEC. 2016 – DEC. 2020 DTSC CONSENT AGREEMENT

~~131.~~321.    During the period of most egregious violations (including Plaintiff's physical

~~and~~ injuries and harm to her property), Apple was operating under an active Consent Decree with the State of California for hazardous waste violations at another facility. (*People of the state of California v. Apple Inc* 16CV303579 Superior Court of the state of California County of Santa Clara). The timing of consent decree termination immediately following Company's knowledge of plaintiff's poisoning demonstrates consciousness of guilt and obstruction of justice.

~~132.~~322.    The Complaint was filed under Cal. Health and Safety Code, §§ 25100 et seq. and Paragraph 31 listed the violations which included:

- "Causing **treatment and disposal of hazardous waste at an unauthorized point**, at and from Sunnyvale Facility (Health & Saf. Code,§ 25189.2, subds. (c) and (d)).
- **Transportation of hazardous waste without manifests** from Sunnyvale Facility (Health & Saf. Code §25160, Cal. Code Regs., tit. 22, §§ 66262.20, 66262.23. 66268.7).
- **Failure to report and track export of hazardous waste** from Tantau Avenue Facility (Health & Saf. Code § 25162.1, Cal. Code Regs, tit. 22, §§ 66273.40, 66262.53, 66262.56, 66262.57).
- **Failure to label or otherwise clearly mark** used oil containers as **"Hazardous Waste"** (Cal. Code Regs., tit. 22, § 66262.34, subd. (f))."

*The People of California v. Apple Inc,* Complaint, page 7, paragraph 31 (2016).

~~133.~~323.    The permanent injunction, Ordered Dec. 08 2016, and docketed Dec. 12 2016, included the following:

"The terms of this Stipulation and the Final Judgment shall apply to and be binding on (a) Apple its successors, and its officers, directors, and employees, and all persons acting within the control of Apple …**at any facility in California owned or operated by Apple at which electronic waste or any other hazardous waste is treated,** or recycled ("Apple Facility") and (b) the Department and any successor agency of the Department that may have responsibility for, and  jurisdiction over, the subject matter of the Complaint and Final Judgment….

Section 7: Apple shall be enjoined and ordered as follows:

a. Apple shall ensure that its officers, directors, and employees, representatives, and all persons acting within the control of Apple **at any Apple Facility** comply with **all of the laws and regulations specifically identified in the violations alleged in Paragraph 31** of the Complaint.

b. Any officer or employee of Apple assuming responsibility for, or oversight of, hazardous waste management at Apple, including Apple's Facility manager, primary and secondary emergency coordinators, and the technicians responsible for baghouse maintenance and operations, must attend and successfully complete Modules 1-V relating to hazardous waste

at California Compliance School within six months of their hire, promotion, or assumption of responsibility unless they have attended the California Compliance School and passed the relevant modules within the last five years before the date of their hiring, promotion, or assumption of responsibility.

c. Apple shall ensure that e-waste labeled as Universal Waste, including shredded e- waste, is not mixed or otherwise placed in containers with dust derived from its shredding operations.

d. Apple **shall conduct weekly inspections of all areas of its facilities where hazardous waste is generated or accumulated**, including an inspection of all municipal waste containers and e-waste containers to inspect for improper management of hazardous waste. **Apple shall maintain a written log on-site of the inspections** required by Cal. Code of Regs, tit. 22, section 66265.15. The log shall be furnished upon request, and shall be made available at all reasonable times for inspection, to any officer, employee, or representative of DTSC or the local Certified Unified Program Agency ("CUPA")."

Emphasis added.

~~134.~~324.    On Dec. 09-11 2020, Apple and the California Department of Justice stipulated to end the permanent injunction against Apple.

~~135.~~325.    The document was prepared and filed by Apple's defense counsel, William F. Tarantino (head of environmental litigation at Morrison & Foerster, and prior staff at U.S. EPA Region IX Office of Regional Counsel for prosecution of violations of the CAA, CWA, and RCRA).[37] Scott B. Murray signed for Apple on Dec. 11 2020 as "Director, Commercial Litigation."

~~136.~~326.    Reed Soto, Deputy Attorney General, signed on behalf of the California government dated Dec. 9 2020. The stipulation included the text: "The Department has reviewed Apple's history of compliance with the terms of the Final Judgment, and the Department, as of this date, has no information that Apple has not substantially complied with its obligations under the Final Judgment."

~~137.~~327.    Around 2022-2023, Plaintiff requested copies of any communications, drafts, or memorandums related to the decision to end the consent agreement through Public Records Requests. Both the California AG office and CalEPA claimed there were no records or documentation.

**L.** ~~The City did not report any RCRA or related violations at the Property on CERS or to the~~

---

[37] William F. Tarantino, MoFo, https://www.mofo.com/people/william-tarantino

### U.S. EPA ~~from 2016 through~~ Additional High Density Residential Planned Closer to 3250 Scott at 3240 Scott

328.    There is an approved planning pre-application under the "Housing Crisis Act" (SB330) requesting permission to build a five-story "high-density residential" building with 166 condominiums at (3240 Scott Blvd).[38] (PRE-24-00038). There is also a pending application submitted to the city in Oct. 2024, currenting "In Review," requesting to "rezone" 3240 Scott Blvd "from Low Intensity Office R&D to High Density Residential."(PLN24-00556 & PLN24-00579). 3240 Scott shares a property line with 3250 Scott Blvd.

329.    "The Builder's Remedy Law is applicable to the Project because, as of the date of the Applicant's SB 330 Preliminary Application, the City did not have an adopted Housing Element in substantial compliance with the State Housing Element law." (PRE-24-00038). "High density multi-family residential uses are located adjacent to the Project Site to the east and across Scott Boulevard to the north. Light industrial uses are located to the west and south." (Id).

330.    "Residential amenities and common open space would be provided on the first floor and roof level." (Id.) "The Applicant reserves the right to request... incentives, concessions, waivers of development standards or other relief in the event the City identifies other elements of Project design that do not comply with proposed general plan and zoning development standards and would otherwise have the effect of physically precluding the construction of the Project." (id.)

### M.    The April 2025 Planning Commission Meeting

331.    On April 16 2025, the City held a public Planning Commission hearing regarding a proposed amendment to the City's General Plan (2010-2035) that would withdraw City support for residential housing to be located at The Premise and near similar industrial facilities, with City Attorneys and Planning Dept. leadership admitting that the siting and zoning of The Premise, with a chip fab next to dense residential, where the Plaintiff almost died in 2020 -- is unlawful, illogical, inappropriate, "a bad place for housing," "awkward," and "not good land use or planning."

332.    However, the Planning Dept. and City Attorney's office attempted to present this *mea culpa* as a cryptic proposal to the Planning Commission, requesting to revise the City's General

---

[38] Preliminary Plans for 3240 Scott Boulevard, Santa Clara, SF YIMBY, April 25 2024, https://sfyimby.com/2024/04/preliminary-plans-for-3240-scott-boulevard-santa-clara.html

Plan to remove three "Focus Areas" where the City proposed residential development in industrial areas of the City. Two of the three areas were noncontroversial because either the property owners did not want residential (this included additional Apple & Jenab properties, over on Kifer), or the proposal was to build housing next to an airport -- a universally unpopular idea. The source of contention was the Focus Area covering The Premise (also at issue in this lawsuit).

333.    The City's initial justification for its request was that The City is building housing in other parts of the City and wants to focus on those areas instead. The Commission questioned the City Attorneys as to why they urgently requires the Commission to take formal action to amend a General Plan regarding conceptual "Focus Areas" if it's simply currently focusing on other neighborhoods. The City then claimed they want to "*maintain existing industrial and office use,*" these updates would be "consistent" with California housing and zoning law, and the City does not think its "ideal" to turn over industrial sites to housing. (01:49:32).

334.    During the meeting, The City avoided discussing The Premise specifically. The maps of the "Focus Area" also showed carve-outs for the Chip Fab, omitting them from the "Focus Area," as if they did not exist.

335.    This discussion also occurred only 1.5 months after The Honorable Judge Chen dismissed the Plaintiff's Toxic Tort claims against Apple regarding the Premise, claiming there was no statute of limitations tolling or continuous injury claims, because the Plaintiff should have sorted out more quickly that Apple was running an illicit skunkworks Chip Fab next to her bedroom and then sued her current employer for almost killing her, within two-years the first time Apple dumped toxic waste on her in her residential apartment at the Santa Clara Square Apartments.

336.    During the April 16 2025 Planning Commission meeting, the City repeatedly claimed the Focus Area around The Premise is exclusively Light Industrial activity with only data centers and offices. All discussion of industrial activity revolved around data centers. (01:50:45).

337.    One of the Planning Commissioners questioned City staff about their request and complained that it sounded like The City had a "*vested interest*," and the Commissioner wanted to know **"*where the origin of this [idea] came from.*"** (01:54:27). The Commissioner questioned the City Attorneys directly and asked one attorney if "*there is no more interest or intention for housing*" around The Premise. In response, the Asst. City Attorney responded: "*Correct. Yes.*"( 01:57:16).

338.    The Planning Commissioner then asked: *"**are there other implications to this that are not being presented in this presentation? Are there other concerns?"**(* 01:58:37).

339.    The City Attorney's office then pivoted and claimed that the request is to assist residential developers because the current Focus Areas require a comprehensive plan which is too burdensome. (02:02:12).

340.    Then another Planning Commissioner asked if the City really thought that someone might want to develop a residential apartment in "***these very highly industrial areas."*** (02:02:29).

341.    The City Attorney's office responded that "*there has been interest, and t**he City does not think [the Premise] is an appropriate place to put residential this time"** and that is "*why we would like to remove the focus area for residential.*" The Attorney said the Focus Area with The Premise **"*does not make good land use, planning, or a good neighborhood."*** (02:04:56).

342.    A different Planning Commissioner chimed in and commented that he is "*pretty sure nobody on the City Council wants to have a data center at the back door*" of residential, and they should not put data centers *"in the back door of a residential area."*

343.    Another t Planning Commissioner questioned City staff asking, "*you are, basically, declaring we don't want residential there.*" (02:08:15).

344.    The City Attorney's office replied that *"the point of removing this is, that, yes, we are declaring that we do not want residential here."* (02:08:50).

345.    A Planning Commissioner asked the City Attorney's office and Planning Dept. about their statement that the amendment "***brings us in line with some state regulations***" and asked  if they could "*elaborate a little bit more on that*" such as, if the Commission "*did not do this we would be out of ---*" (02:08:53).

346.    The Planning Dept. interrupted and responded "*yeah, so yeah, you, right now, it is zoned as Light industrial. Heavy Industrial. Now, there is conflict. Because if you anticipate for this residential in the Focus Area, you are not aligning with the current use, which is Light Industrial, Heavy Industrial."* (02:09:17).

347.    The same Planning Commissioner asked what *"is the consequence of that?"* (02:09:33).

348.    There was then ~six seconds of silence and squirming, until one of the City Staff

responded that "*I do not think there is legal vulnerability. It's just awkward. You can't have a general plan that is internally inconsistent. This is not a legal inconsistency.*" (02:09:40).

349.    The Planning Commissioner clapped back and questioned what would happen if the Commission refused to approve the amendment, saying: "*if we said we are not going to do it -- all of a sudden, we will have a different problem -- and we have to deal with the State. **You are not in line with regulations, right?**"* (02:10:30).

350.    The recorded video then showed ~41 seconds of the Planning Dept. and City Attorney's office huddling together, whispering with each other, and continued to squirm in their chairs. The City staff finally responded that "*it looks funny,*" (02:11:04) and "*it would not be my first pick for how to draft a general plan, but it's not going to get us into legal trouble.*" (02:11:09).

351.    City staff added that, **"*it would send a more appropriate message that residential is not appropriate in this area any longer -- given the existing built use*s.*"** (02:12:40).

352.    Another City staff member added confidently that "*the planners have made the call that this is not an appropriate area for housing and have suggested we should remove the focus areas that says this is a good place for housing. We have a general plan policy that says -- you cannot put housing in these areas until we get a precise plan for the entire region. By removing the Focus Areas, that policy will no longer apply. You no longer need a precise plan for housing for the entire region, because **we do not think it is a good place for housing at all. We do not want housing there.**"* (02:12:53).

353.    The City Attorney's office added that "*if somebody comes in with a housing proposal without the Focus Area constraint, they can apply for a general plan amendment and rezone. Staff may recommend denial because **they think this is a bad place for housing. They do not think you should have housing right in the middle of an industrial area.**"* (02:13:29).

354.    A Planning Commissioner complained that he was "*concerned that it is going to discourage a concerted effort for development of housing, specifically, in the Focus Areas.*" (02:14:10). They City's attorney's responded that "*it will.*" (02:14:21).

355.    Another Planning Commissioner commented that at the "*time when these were designated as Focus Areas, the conflicts already existed*" and **"*it was pretty apparent*"** and "***everybody knew.***" (02:15:25). There was then a jumbled mix of interruptions from the City staff with "*um. so, some…. no,*" "*not this much. No,*" and "*this was 15 years ago, 2010, or a little before that.*" (02:15:37).

356.    One of the Planning Commissioners joked "*we only had 30 data centers.*" (02:15:41). The Attorney responded that **"*a lot of these didn't exist*"** and **"*that's the problem.*"**(02:15:49 ). A Commissioner commented it "*is not an area where I would want to convert to residential either.*" Anther added, "*well me neither.*" (02:22:53).

357.    Another Commission complained about the City's urgent, hyperfocus on getting the Commission to approve removing The Premise from the General Plan and it was  giving her a **"*sense that there is another layer at play here*".** (02:25:05). She noted the City's actions were being unfriendly to housing and "*more open to light industrial,* and "*she's not saying any particular business, other than light industrial, as its classification…* " (02:25:24).

358.    A Planning Commissioner then added that "*data centers may end up disappearing someday too, the same way a lot of other manufacturing did in our city.*" The City Attorneys interrupted him and said they are done and need a formal vote. (02:28:52). The Planning Commission refused to vote on the request, deferred it to the City Council, and also apparently refused to certify the meeting notes.[39] (City PC Hearing, # 25-214, 4/16/2025).[40]

## N.    THE MAY 2025 CITY COUNCIL MEETING

359.    On May 27 2025, the Santa Clara City Council met and discussed the removal of the Focus Area for the Premise form the General Plan. The City Director of Community Development provided a presentation and summarized the prior Planning Commission discussion in April 2025. (25-608, May 27, 2025)[41]

360.    The Director's presentation framed the justification for the amendment as "*market demand*" and "***legal compliance.***" She added that after "*the initial future focus areas were introduced*

---

[39] *"Please note: this meeting's minutes have not been finalized yet. Actions taken on legislation and their results are not available."* (4/16/2025).

[40] City of Santa Clara, Legislative Public Meetings, Planning Commission, *PUBLIC HEARING: Rec. on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas,* 4/16/25, (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7301977&GUID=6A9DD113-26FB-4052-86CE-B2F74FE06A77&Options=ID|Text|&Search=25-214

[41] City of Santa Clara, Legislative Public Meetings, City Council and Authorities Concurrent, *Public Hearing: Action on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas,* 5/27/2025 (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7409908&GUID=C17C98CD-A6CF-4BC5-A385-4F5A70DDDD5F&Options=ID|Text|&Search=25-608

*in the general plan, development has changed due to market demand and the city's certified housing element now delineates where future housing could be located." (04:19:13).*

361.    She added that "*some of the Focus Areas have represented locations where industrial and office land uses could be converted for residential development opportunities; however, since these were introduced back in the General Plan some 15 years ago, or 20 years ago -- development has changed due to market demand.*" (04:21:31).

362.    She added, "*and these are being removed because **these areas are not ideal locations for housing, because they already have a development pattern that has lots of industrial in it.***" (04:23:04) and "***there is already existing Heavy Industrial** and Light Industrial and Low Intensity Office…. That these future land uses be consistent with that development pattern that is already there.*" (04:23:13).

363.    She then spoke about the area where the Premise is located and noted that it "*has a dense concentration of data centers already, and it is unlikely that it would be converted into housing. **It would be incompatible with future housing** and there is a lot of investment into a data center building, and a lot of like, updates that occurred to data center buildings every 3-5 years, and this area is already Light Industrial and it's already primarily data centers.*" (04:24:42).

364.    The Director explained that another reason to remove the Focus Area is because "***it makes no sense** because there would be residential next to data centers.*" (4:26:25). She added that the California "*HCD has a very special criteria for site selection for housing and these would not meet that site selection criteria, so that is a really strong reason not to put the housing there.*" (04:28:35).

365.    Councilmember Jain said he did not understand the request to withdraw the Focus Area and thought that the Santa Clara Square Apartments are "*extremely successful.*"

366.    Councilmember Jain suggested he thought that the City should intentionally surround data centers with housing so the tenants can use "*the heat, the waste heat from the data center to provide heating for the housing.*" (04:30:51).

367.    Councilmember Jain said he likes "*the idea of building, certainly office -- not you know, polluting industrial; and I think maybe we could carve it out in a way that we are not violating affirmatively fair housing by **putting people next to polluting light industrial** where there might be **hazardous chemicals they use there and such.***" Jain added "*finally, we are desperately looking for*

*places for shelters, and one option, because we have so many in the City, is to **put shelters near, in, Light Industrial areas**.*" (04:31:40).

368.    The City Manager commented that "*with regard to data centers and having adjacent uses, it doesn't mean that we cannot have adjacent uses just right outside of that area for the type of facilities that can utilize the heat from data centers, right?*" (04:36:19). She added the Focus Area with the Chip Fab "*already has many standalone data centers…. and also, it is not just the state law, but it is also just….I think the established land use patterns that have been occurring in these locations and whether it would be really likely to have future residential in these areas.*" (04:37:58).

369.    Mayor Gillmor commented about the importance of having dedicated industrial areas in a city. (04:38:27). Another Councilmember commented that "*many of our general fund monies come from areas such as retail, such as data centers, such as industrial, and these do help pay for city services, and these are also areas that would use less city services versus housing. Housing tends to use more city services, so -- you know, it is really a policy decision.*"

370.    The City Manager said she wanted "*to address the question on shelters and the Light Industrial areas. The zoning for shelters and the zoning for housing is different, and there are a number of actions that councils can take to establish shelters in warehouses.*" (04:42:17). The City Attorneys chimed in and agreed that amended the General Plan Focus Areas would help enable the City Council to build homeless shelters around the Premise and other industrial areas.( 04:42:17).

371.    Councilmember Park then commented that the discussion is not actually a "*policy discussion,*" but is rather a "*planning discussion*" and is really about "*our vision for the city*" and "*what do we want the city to feel like?*" He noted that he "*literally uses the existence of the Central Expressway focus plan to justify different projects north of 101, and it makes sense to connect the housing that is already there with the housing that's coming after it.*" (04:45:07). He said, "*it's not just about land use*" and "*land use should follow what we want the City to feel like.*"

372.    Councilmember Park added that he "*looks at the Central Expressway focus area, and I mean, it's right next to one of the largest companies in Santa Clara with one of the largest –well, several of the largest parking lots in Santa Clara.*" (04:48:08).

373.    Mayor Gillmor asked if there were any questions and City staff said no. They asked if there "*is there any member of the public that would like to speak on this issue?*" But staff said "*I don't*

*--there's no one here. it's 10:12 PM.*" (04:50:27).

374.    Mayor Gillmor then added she thinks they "*need to preserve our industrial areas for industrial and manufacturing uses.*" She said she would "*like to see us focus on the residential market improvements in all those areas that we want to develop -- **and leave the industrial area alone**.*" Mayor Gillmor said she doesn't "***see another Santa Clara Square.***" (04:54:01).

375.    Councilmember Gonzalez commented that "*when we look at what brings money into our general fund quickly -- if there's this need for Light Industrial and office --  I think we have responsibility to capitalize on that.*" She added that "*I also want to understand that staff has done the work to put forward three properties that have historically not been appropriate for housing, have not, you know, been petitioned for, so, I, again, am in support*" of keeping them as Focus Areas. (04:56:46).

376.    The City Council then voted to Amend the General Plan (2010-2025 ) to remove the three Focus Areas, and accordingly, to withdraw their encouragement for developers to build residential around Chip Fabs and data centers. (25-608, May 27, 2025)[42]

## LEGAL CLAIMS AGAINST THE DEFENDANTS

## IX.    COUNT ONE: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH ANDTHE ENVIRONMENT, IN VIOLATION OF THE RCRA § 7002(A)(1)(B).

### (CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS).

377.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other RCRA Counts below.

378.    Defendants Apple, The City, and The Property Owner are responsible for ongoing violations of the RCRA. Abatement and enforcement are available under the RCRA Citizen Suit

---

[42] City of Santa Clara, Legislative Public Meetings, City Council and Authorities Concurrent, *Public Hearing: Action on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas*, 5/27/2025 (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7409908&GUID=C17C98CD-A6CF-4BC5-A385-4F5A70DDDD5F&Options=ID|Text|&Search=25-608

provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

379. The Plaintiff brings this action under Pub. L. 89–272, title II, § 7002(a)(1)(B) of the RCRA. This is the RCRA's citizen enforcement provision for the abatement of imminent and substantial endangerment. (a.k.a. 42 U.S.C. § 6972).

~~138.~~ As required by § 7002(b)(1) of the RCRA, advanced notice of violations were provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA, and the Defendants on June 30 2025. Further, notice of violations was provided by the U.S. EPA to the Defendant(s) and California EPA and its CUPA, years ago, including demands to correct the violations, but the violations have not been corrected. ~~2020. In 2023, the City told the U.S. EPA that there were no RCRA violations in any prior inspections. (see 2024 U.S. EPA RCRA Inspection Report details).~~

~~139. If Apple started using their 1,700 gallon Solvent Waste Tank in 2017, then the October 2020 inspection would have been the first time the City saw the tank in use. The City would have known the tank was being operated without RCRA permits and that it was exhausting to the ambient air around the Premise. Yet the City made no note of it.~~

380. Further, no notice is required for claims brought under Subchapter III "Hazardous Waste Management," per § 7002(b)(1)(iii). At the time of filing, Plaintiff had no knowledge of commencement of diligent prosecution (civil or criminal) by the federal or state governments on this matter.

381. "Any person," including this Plaintiff, may bring a lawsuit under RCRA § 7002(a)(1)(B) against "any person," including these Defendants, when a "solid or hazardous waste… may present an imminent and substantial endangerment to health or the environment." *Id*. Here, the solid and hazardous waste at The Chip Fab created, threatens to create, and present an imminent and substantial endangerment to health and the environment.

382. Apple is a responsible party under § 7002 as "any person" including but not limited to a "past [and] present generator," and/or a "past [and] present owner or operator of a treatment, storage, or disposal facility." Apple is the permittee for a RCRA large quantity generator permit and treats and stores massive quantities of hazardous waste at the Property, produced at The Chip

Fab. Apple "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

383.    The Property Owner is a responsible party under § 7002 as "any person" including but not limited to a "past [and] present owner or operator of a treatment, storage, or disposal facility." The Property Owner owns 3250 Scott Blvd, and it is a used for hazardous waste treatment, storage, and disposal. The Property Owner "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

384.    The City is a responsible party under § 7002 as "any person" including "any… governmental instrumentality or agency." The city "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

385.    Under Section 1004(5) of RCRA, "hazardous waste" is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may… cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

386.    Under RCRA § 1004(27), "solid waste" includes "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial… operations" but not "industrial discharges which are point sources subject to permits under section 1342 of Title 33" (NPDES). 42 U.S.C. § 6903(27).

387.    Under Section 1004(3) of RCRA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). An "open dump" refers to "any facility or site where solid waste is disposed" which is not permitted for the disposal of hazardous waste. 42 U.S.C. § 6903(14).

388.    The solid and hazardous wastes handled, stored, treated, transported, and disposed/released at The Chip Fab present an imminent and substantial endangerment to health and the environment.

389.    For example, Apple operates a 1,700-gallon unpermitted hazardous waste treatment tank that vents toxic solvent vapors directly into the atmosphere without any emission controls, located less than 300 feet from a 2,000-unit apartment complex where families and children live. The US EPA took formal action and fined Apple for the issue, but failed to confirm Apple actually corrected the issue, or to further inspect to determine if there were more unauthorized emissions.

390.    U.S. EPA RCRA inspectors also recently found piles of unlabeled, undated hazardous waste stored haphazardly and in open containers at The Chip Fab. US EPA also noted that Apple was leaving The Chip Fab, and all of its hazardous waste and toxic gases, unsupervised and unmonitored on weekends. The Property Owners also failed to monitor hazards and dangerous conditions on weekends. The City knew the hazardous and dangerous conditions have bene unmonitored on weekends and took no action, never cited the RCRA violation, and failed to warn the adjacent community.

391.    These ongoing, unlawful releases have already caused severe chemical poisoning of nearby residents, including documented presence of arsenic, mercury, and industrial solvents in victims' blood and urine. One victim, the Plaintiff, suffered clustered of symptoms consistent with acute toxic gas exposure that occurred every few weeks, always around 3 AM, waking up choking and with symptoms of heart failure. Approximately 3,000 residents live within 1,000 feet of the facility, including families with children who use adjacent parks and playgrounds, creating a substantial risk of exposure and mass injuries and/or death.

392.    U.S. EPA inspectors also recently documented that Apple had been venting hazardous waste exhaust at The Chip Fab without permits and unabated. EPA noted that Apple had recently installed makeshift carbon filters for only some vents, without monitoring or verification they were abating the exhaust, and without air permits. EPA fined Apple for this under RCRA but failed to confirm the issue was actually corrected. The Property Owner and City contributed to the ongoing violations and dangers because they knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

393.    There are years of Incident Reports for operations at The Chip Fab documenting storage, use, emissions, leaks, and releases of extremely hazardous gases including arsine, phosphine, and fluorine – gases that can cause immediate death upon exposure. The Property Owner and City contributed to the ongoing violations and dangers because they knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

394.    Apple and its contractors transported, treated, stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1)-(7) and knew that their actions put other people in imminent danger of death or serious bodily injury. 42 U.S.C. 6928(e); 40 C.F.R. 260 – 265. The Property Owner and City contributed to the ongoing violations and dangers because they knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

395.    Defendants' transported, treated, stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1) - (7) and knew that such acts put another person in imminent danger of death or serious bodily injury. 42 U.S.C. 6928(e); 40 C.F.R. 260 – 265. The endangerment will continue without judicial intervention because Defendants have failed to install required emission controls or obtain proper permits despite years of notice from regulatory agencies.

396.    Defendant Apple also terminated the Plaintiff in violation of the RCRA's anti-retaliation provision at 42 U.S. Code § 6971 (*"employee protection"*), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication. In 2025, NLRB took enforcement action against Apple over its unlawfully restrictive confidentiality policies and work rules, which prevented employees from discussing work conditions or reporting safety issues, including the Plaintiff, who was the Charging Party and party to the national settlement agreement. Concealment of safety risks only increases the dangers presented at The Chip Fab.

397.    Apple and The Property Owners caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of chemicals in the environment in, at, and around The Chip Fab, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and groundwater, because they released or otherwise discarded

chemicals, or controlled and/or operated the Property from which chemicals were released or otherwise discarded, and failed to prevent or abate the contamination caused by the chemicals .

398.   For example, when TCE is discarded or disposed of into the environment, including soil, groundwater, or surface water, it becomes a hazardous waste and solid waste as defined in federal law, 42 U.S.C. § 6903(5),(27). Environmental investigations at and around Thee Chip Fab demonstrate that that soil, soil vapor, and groundwater are impacted by chlorinated volatile organic compounds, including trichloroethylene ("TCE") and its breakdown products (i.e., DCE, vinyl chloride, etc.). During its 2015-current operations, Apple handled, generated, disposed of, released, used, and/or stored TCE – with TCE showing up in its wastewater monitoring results. Apple operated The Chip Fab when these chemicals appear to have been released into the environment and appeared in the groundwater and/or Saratoga Creek aquifer system. The EIR for the apartments also revealed unexplained Benzene and Toluene in the topsoil, but Apple also had these chemicals at The Chip Fab, and the contamination was near the Property.

399.   Once the various discharges of chemicals, whether intentional, sudden, and accidental, or otherwise were released into the environment, these chemicals continued to spread and migrate within the environment in, at, and around the Property and Premise, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the groundwater. Once released into the environment, these chemicals continued to spread and migrate within the environment at the Property, causing additional harm to the environment and continuing to threaten public health and the environment. The Property needs to be further investigated and characterized so that a remedial action plan can then be developed and implemented.

400.   The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories. The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.

401.    Apple also violated 42 U.S.C. § 3001-3005 by improper treatment and disposal of hazardous waste, including open dumping of hazardous waste into the air, soil, and water.

402.    Santa Clara has knowledge of these violations and contributed to these violations by knowingly failing to document or cite the violations, and by withholding information from the community (public records requests, spill, and incident reports, EIRs, etc.) and other government agencies.

403.    The Property Owner has knowledge of these violations, contributed to the violations, and refused to abate the violations. Accordingly, all three defendants have also violated 42 U.S.C. § 6973 (Section 7003) by creating and maintaining an imminent and substantial endangerment to the community and the environment.

404.    Plaintiff is entitled to injunctive relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), restraining Defendants from their respective violations, and requiring each party to act. This includes a complete, timely, and appropriate investigation and abatement of all actual and potential endangerments arising from the released solid wastes and hazardous wastes at and emanating to or from The Chip Fab.

405.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent allowable to cover community health and restoration projects.

# X.    COUNT TWO: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN AIR ACT.

### (CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS)

406. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other CAA Counts below.

407. Defendants Apple, The City, and The Property Owner are responsible for ongoing violations of the Clean Air Act and the creation of an imminent and substantial endangerment arising from air emissions/releases at The Chip Fab. Abatement and enforcement are available under the CAA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

408. For assessing community risks and hazards, a 1,000 foot radius is recommended around the project property boundary. BAAQMD recommends that any proposed project that includes the siting of a new source or receptor assess associated impacts within 1,000 feet, considering both individual and nearby cumulative sources (i.e., proposed project plus existing and foreseeable future projects). Cumulative sources represent the combined total risk values of each individual source within the 1,000-foot evaluation zone. (Bay Area Air Quality Management District CEQA Guidelines May 2010 Ch. 5, 2-3).

409. When evaluating whether a new source of TAC and/or PM2.5 emissions would adversely affect existing or future proposed receptors, a Lead Agency shall examine: • the extent to which the new source would increase risk levels, hazard index, and/or PM2.5 concentrations at nearby receptors, • whether the source would be permitted or non-permitted by the BAAQMD, and • whether the project would implement Best Available Control Technology for Toxics (T-BACT), as determined by BAAQMD. Bay Area Air Quality Management District CEQA Guidelines May 2010 Ch. 5, 5

410. If a project is likely to be a place where people live, play, or convalesce, it should be considered a receptor. It should also be considered a receptor if sensitive individuals are likely to spend a significant amount of time there Examples of receptors include residences, schools and school yards, parks and playgrounds, daycare centers, nursing homes, and medical facilities. Residences can include houses, apartments, and senior living complexes. Medical facilities can

include hospitals, convalescent homes, and health clinics. Playgrounds could be playing areas associated with parks or community centers. Bay Area Air Quality Management District CEQA Guidelines May 2010 Ch. 5, 8

411.    On May 1 2023, Apple obtained a Bay Area Air Quality Management District Permit to Operate a "Semiconductor fab." (Plant No. 22839). Apple previously had no air permits for their fabrication exhaust. The permit conditions included maximum limits for chemical usage and emissions. The permit included max annual usage limits of arsine (78lb/yr), Phosphine (198lb/yr), Silane (19lb/yr), and Chlorine (1lb/yr). (Permit, page 8). Apple filed an updated request to include the exhaust from their unpermitted hazardous waste treatment tank on September 15 2023, and it was approved around April 2024. (Permit 32236).

412.    The Facility conducts activities that require permits under the Clean Air Act. The Defendants and their agents conduct these activities, and the Defendant have knowledge that these activities require Clean Air Act permits but have failed to ensure that proper permits were obtained. The Defendants have allowed the  Facility to continue operating without required Clean Air Act permits despite having actual knowledge of the permit requirements. These unpermitted activities constitute ongoing violations of the  Clean Air Act.

413.    Apple violated 42 U.S.C. § 7410 (Section 110) by dumping hazardous substances into the atmosphere that exceed state-specific emission limits.

414.    Apple violated 42 U.S.C. § 7411 (Section 111) by dumping hazardous substances into the atmosphere which exceed emission standards, including chemicals like Arsine, Phosphine, Silane, Benzene, Mercury, and NMP.

415.    Apple violated 42 U.S.C. § 7412 (Section 112) by dumping hazardous substances into the atmosphere that knowingly and intentionally does not comply with MACT standards.

416.    Apple violated and is violating 42 U.S.C. 7413(c)(4)&(5) and 42 U.S.C. 7412(b)(1) by negligently and knowingly releasing hazardous air pollutants listed under Section 7412 of the Clean Air Act and extremely hazardous substances listed pursuant to 42 U.S.C.11002(a)(2) into the ambient air around the Premise (including parks, playgrounds, and thousands of homes, and negligently and knowingly put the people living, working, visiting, and recreating within and around the Premise in imminent danger, and/or risk of serious bodily injury or even death.

417.   The Defendants have created, maintained, and concealed an imminent and substantial endangerment to the public and environment through hazardous air emissions.

418.   Apple violated 42 U.S.C. 7413(c)(2)(B).by knowingly failing, and refusing, to notify regulators and public of hazardous air emissions and air pollution as required by the CAA.

419.   Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the apartments were four-five stories high (75-85ft), creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

420.   Apple violated . 42 U.S.C. 7413(c)(2)(A) by knowingly making false material statements, representations, or certifications in; omitted material information from; and altered, concealed, or failed to file or maintain a document filed or required to be maintained under the CAA.

421.   The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories including failure to warn, failure to abate, enabling the violations, prior bad acts showing M.O., benefiting from non-compliance, and so on.

~~140.1.~~ The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.~~If the City reported Apple's unauthorized hazardous waste tank, Apple would have been in violation of Apple's consent agreement with the state of California, and those violations would have prevented Apple from ending the permanent injunction. The Order ending the consent agreement was signed by the court on December 22 2020 and docketed January 14 2021. (*The People of California v. Apple Inc*, 16-cv-303579, Superior Court of California, Santa Clara County).~~

## VIII.   PERSONAL INJURIES AND STANDING

141.1.   Plaintiff Ashley Gjovik was a resident of Santa Clara County, California, who have been and continue to be injured by the ongoing violations described herein. Plaintiffs resided within the direct exposure pathway of uncontrolled emissions, pollution, and contamination from the semiconductor manufacturing facility operated by Apple Inc. at 3250 Scott Blvd, Santa Clara, California.

142.1.   Plaintiff was a resident of the ~1,800 unit apartment complex at the Santa Clara Square Apartments, located across the street from the Property. Plaintiff has standing as persons who have been and continue to be injured by the ongoing violations described herein; and Plaintiff did suffer injuries and ongoing injuries.

143.1.   In February 2020, Plaintiff moved into a large, new apartment at the Santa Clara Square Apartments and quickly became severely ill. Plaintiff suffered severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin. Plaintiff also suffered bradycardia, volatile blood pressure with hypertension and hypotension and a high frequency of premature ventricular contractions.

144.1.   From February – September 2020, Plaintiff was screened for multiple severe and fatal diseases and disorders, including Multiple sclerosis, brain tumors, fatal arrhythmias, and Neuromyelitis optica. Plaintiff also suffered skin rashes, burns, and hives, and her hair fell out and she had a shaved head for nearly a year as the bald patches slowly grew back.

145.1.   Due to the sudden illness, Plaintiff visited the Emergency Room on February 13 2020, and Urgent Care on February 20 2020. Plaintiff subsequently consulted with dozens of doctors who screened her for all sorts of diseases, subjecting Plaintiff to extensive blood draws, urine samples, injections, and scans – including potentially dangerous procedures like MRI and CT scans with contrast, of which Plaintiff had multiple. Plaintiff was too sick to work and went on disability.

146.1.   While sick in 2020, Plaintiff would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure On September 2 2020, Plaintiff discovered elevated levels of volatile organic compounds in her home. What immediately captured Plaintiff's attention was the large spike in volatile organic compounds had occurred the night prior, around 3 AM, while she

had been suffering from a "dying" spell.

147.1.   Plaintiff sought multiple occupational and environmental exposure doctors, who told Plaintiff that all of her symptoms were consistent with solvent and other chem. exposure. After Plaintiff discovered her medical issues at the apartment were due to a chem. emergency, Plaintiff quickly filed complaints with City, California EPA DTSC and BAAQMD, and EPA. She also called Poison Control, who said what she described also sounded like Benzene exposure. (Note: Defendants reported they were exhausting benzene into the air).

148.   Notably, almost all of the reported toxic gas leaks during the time frames Plaintiff had complained in 2020 that her symptoms seemed to always be the worst around 8-9 AM, 10-11 PM, and sometimes around 2-3 AM. One of the few chem. spills that did not occur during those times was root caused to an Apple engineer "accidently" turning on lethal fluorine gas.

149.   Similarly, another incident was root caused to an Apple engineer accidently installing the gas for a tool "backwards." Less than 2 weeks following the April 2021 phosphine leak, Apple's manifests included 60lbs of "*vacuum filters contaminated with glass dust*," implying there may have been a phosphine explosion.

150.   The TEOS leak occurred on July 17 2020. That day Plaintiff was suddenly covered in hives, rashes, and skin abnormalities. She visited a dermatologist who had no idea what caused the rash.

151.1.   In September 2020, Plaintiff hired an industrial hygienist to test the indoor air at her apartment. She purchased an inspection, soil testing, and a two hour sorbent tube based TO-17 air panel. Only half the total contaminants were accounted for in the test and the California EPA informed her that testing with Summa™ canisters for 24 hours is superior and would have yielded better results.

152.1.   Still, Plaintiff's limited testing returned results showing a number of the chemicals in use by Apple at 3250 Scott including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, and xylene.

153.1.   In September 2020, Plaintiff set up additional air monitors to observe the levels of volatile organic compounds in her apartment next to the 3250 Scott factory (though she was not

aware of the factory exhaust at that time). The results of the data validated what Plaintiff had noticed with her symptoms and ad hoc testing – that the volatile organic compounds mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). Plaintiff notified several Apple executives of her findings and activities, including her Apple managers.

154.1.  In September 2020, Plaintiff's blood and urine medical tests returned results with industrial chemicals, including arsenic, mercury, toluene, and xylenes. Also noteworthy are the symptoms of Plaintiff's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match phosphine and arsine gas exposure. Both phosphine and arsine are extremely dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of arsine gas onsite.

155.    Plaintiff's medical tests from September 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood but not her urine. There is no other plausible explanation except that she was exposed to arsine gas within hours prior to the test, overnight, in her bedroom.

156.    In September 2020, Plaintiff noticed an Apple facility at 3250 Scott Blvd, near her apartment and  also on the Synertek Superfund groundwater plume. Plaintiff has realized her symptoms and observations represented chemical exposure, but her best guess at a source was the Synertek Superfund contamination, on the property owned by Mr. Jenab *et al.*

157.    Plaintiff mentioned the facility to Apple on at least September 8, 9, 10, and 13, 2020 – inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S and Plaintiff had at least two phone calls. The woman who responded who was also actually in charge of Real Estate/EH&S teams involved in the activities at the Property.

158.    In September 2020, Apple's EH&S Director suggested that Plaintiff use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in September 2021, Apple Employee Relations, conferred with Apple EH&S about Plaintiff's environmental concerns only hours before Apple abruptly terminated the Plaintiff's employment.

159.    In October 2020, Plaintiff asked her manager from Apple Legal if she knew anyone who practiced environmental law because Plaintiff may be interested in the field and wanted to learn

more. Plaintiff was introduced to Apple's EH&S counsel. They met twice on a video chat, on November 2 2020 and November 6 2020. Plaintiff spoke about her experience in 2020 and what she had learned about remediation sites.

160.1.   During the conversation, the lawyer admitted to Plaintiff that Apple did not have EH&S counsel prior to her, that she was still catching up, that Apple needed to be doing inspections and testing that it had not done, and she was trying to get them to start soon.

161.1.   On February 21 2023, Plaintiff discovered the semiconductor fabrication activities at 3250 Scott. Plaintiff posted on Twitter in real time as she learned about it, expressing severe distress.

"APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING and APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF and THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT."
@ashleygjovik (February 21 2023 11:29 PM).

162.1.   Until that day, Plaintiff did not know it was Apple who was responsible for making her so ill in 2020. Further, until that day, Plaintiff did not know the chemicals she was exposed to in 2020 were potentially lethal to human life. Plaintiff had described the experience as "thinking she was dying" but did not realize she likely could have actually died.[43]

163.1.   Plaintiff undertook months of research about 3250 Scott, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint. On June 23 2023, Plaintiff filed complaints about 3250 Scott to the EPA, CalEPA, the city of Santa Clara, and Santa Clara County. Plaintiff drafted a 28-page memo with dozens of exhibits. Plaintiff also posted on Twitter that she did so and provided a public link.

164.1.   An RCRA Enforcement manager in EPA's Enforcement and Compliance division for Hazardous Waste and Chemicals confirmed receipt on June 20 2023. The U.S. EPA department told Plaintiff they were reviewing the complaint and documents she provided. Plaintiff had a call with the RCRA Enforcement manager on June 21 2023. An inspector was assigned, and a formal investigation was opened around July 12 2023. Plaintiff met with the EPA's RCRA Enforcement and Compliance team several times.

---

[43] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste,* SF Bay View, March 26 2021, https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

165.1.   The U.S. EPA RCRA team then inspected Apple's factory in August 17 and 18 2023 and January 16 2024. The August 17, 2023 inspection was coded as a "*Compliance Evaluation Inspection*," defined as "*primarily an on site evaluation of the compliance status of the site about all applicable RCRA Regulations and Permits*." The January 16, 2024 inspection was coded as a "*Focused Compliance Inspection*."

166.1.   Per the formal report, the EPA inspectors identified at least 19 unique violations of the Resource Conservation and Recovery Act at 3250 Scott, including provisions with both civil and criminal enforcement.   Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation.

167.1.   The U.S. EPA also found Apple was emitting exhaust from its fabrication activities through a system that did not have required permits and did not have monitoring. The EPA also found Apple was storing hazardous waste unlabeled and piled in corners, sometimes with lids left off containers so they do not explode, and failing to perform any inspections of the waste on weekends, and instead just hoping for the best until they return on Mondays.

168.1.   Plaintiff started working on her first draft of the complaint in this instant civil lawsuit only on or around August 16 2023 and filed suit on September 7 2023, only two days prior to the statute of limitations expiration for her *Tamney* claim, and after only being able to spend roughly three weeks on research and drafting.

169.1.   Plaintiff also filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including Rule 2 1 301 failure to obtain "Authority to Construct" (August 29 and September 12 2024); Rule 2-1-302 failure to obtain a "Permit to Operate" (August 29 and September 12 2024); and Rule 9 7 307 for exceeding the "Final Emission Limits" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO) emissions.

170.1.   Plaintiff has an active whistleblower retaliation and labor violation lawsuit against Defendant Apple Inc, with claims approved to move ahead including a termination in violation of policy, retaliation against her as a victim of crime (these environmental crimes), and retaliation for acting as a legislative witness (including about this chemical exposure).

## IX.   FAILURE OF ENFORCEMENT AGENCIES

171.1.   The U.S. EPA is the federal agency responsible for enforcing the Clean Air Act,

RCRA, TSCA, CWA, and EPCRA. The U.S. EPA has actual knowledge of the violations described herein through its 2023-2025 investigation. Despite this knowledge and the imminent and substantial endangerment to public health, the U.S. EPA/U.S. DOJ has failed to take meaningful enforcement action and most of the violations are still open.

172.   The California EPA delegated federal environmental oversight of operational activities to the regional air board (BAAQMD), the San Jose Regional Wastewater Treatment Facility, and the City Fire Department. The CUPA overseeing the facility at 3250 Scott Blvd is the Santa Clara City Fire Department and Hazardous Materials team. The City of Santa Clara Code Enforcement oversees stormwater discharges. The City opted out of Santa Clara County Dept. of Env. Health oversight for unknown reasons.

173.422.   The U.S. EPA was made aware of the chemical emergency In Sept. of 2020 and failed to diagnose the source to this location at 3250 Scott Blvd. The Santa Clara City Fire Dept./HazMat was made aware of the chemical exposure in Sept. of 2020 and must have known it was due to Apple's facility but said nothing. The Mayor of Santa Clara was put on notice about the health issues, including with reports from additional victims in spring of 2021, but did nothing.

174.423.   The City has violated the Clean Air Act at § 304(a)(3) by an unreasonable delay in enforcement of the CAA despite actual knowledge of severe and ongoing violations of the CAA. The City has violated the RCRA at § 7002(a)(1)(B) by failure to prevent or abate an ongoing imminent and substantial endangerment to the public and environment.

175.424.   The City has violated the Cal PRA in denying Public Records related to the facility. The City has obstructed the U.S. EPA investigation into operations at the facility. The City has concealed violations from EPA, BAAQMD, and affected residents. The City has unlawfully issued building permits for unpermitted hazardous waste treatment facility. The City has approved the facility's "R&D" designation while knowing actual semiconductor manufacturing operations. The City failed to require federal permits before allowing operations to commence.

176.   Apple has other facilities in Santa Clara (i.e., 335 Brokaw Rd Apple Inc CAR000276360, 2630 Walsh Ave Apple Inc CAT000603704, etc.) that show the same pattern of egregious violations of environmental, health/safety, and fire code laws—and the same pattern of agency neglect and failure to enforce environmental laws.

177.    On Dec. 18 2024, the NLRB filed a Complaint against Apple that alleged, among other federal labor violations, the Defendant "directed employees to refrain from talking about workplace environmental health and safety concerns with other employees," including by "threaten[ing] employees with discipline…" "told employees to use the following five point balancing test in advance of communicating workplace health and safety concerns to other employees…," and told "employees to first communicate their workplace health and safety concerns directly with [Apple]" prior to speaking with coworkers or the government. (*Apple Inc & Ashley Gjovik*, 32 CA 282142, 32 CA 283161).

178.    On Jan. 2 2025, Apple filed an Answer to NLRB's Complaint and argued the NLRB's Complaint violated the U.S. Constitution including by violating Apple's rights under the First Amendment (Freedom of Speech & Assembly), Fifth Amendment (Takings Clause) Rights, Seventh Amendment (Right to Jury Trial), and reliance on federal labor case law decided under *Chevron* deference. (*Apple Inc & Ashley Gjovik*, 32 CA 282142, 32 CA 283161).

179.    Apple's counsel Melinda Riechert testified that "*The agencies couldn't figure out [what Apple was doing at 3250 Scott] because there was no problem. Believe me, they would have come after Apple if there was a problem. It's [Gjovik] who's claiming there's a problem not the agencies.*" (Feb. 21 2025, page 13 at lines 17-21). (*Gjovik v. Apple*, 3:23-CV-04597-EMC, Northern District of California).

180.    As of February 2025, Apple's agents have testified to a federal court that government agencies have not identified any "problems" with Apple's operations at 3250 Scott and they are not "coming after Apple" related to the site.

181.    On April 4 2025, NLRB, Plaintiff, and Apple entered a trilateral national settlement agreement regarding Apple's work policies (32 CA 284428).

182.    On March 25 2025, Apple's defense counsel on that same NLRB case was nominated to become the new General Counsel of the NLRB.[44] The NLRB then cancelled the hearing for Plaintiff's retaliation case and it has not been rescheduled.

183.    Plaintiff's personal toxic tort claims were dismissed by a U.S. Court due to

---

[44] Sludge, *Trump NLRB Pick Has History of Crushing Unions, June 2 2025,* https://readsludge.com/2025/06/02/trump-nlrb-pick-has-history-of-crushing-unions/

expiration of statute of limitations, finding that based on just the permits the City of Santa Clara approved for Apple's Operations, that Plaintiff should have figured out Defendants were operating an off books fab next to Plaintiff's home, assumed it was Apple who nearly killed the Plaintiff in 2020, and sued Apple prior to 2023 - regardless of Apple intentionally covering up their activities, and their ongoing harassment and retaliation against her. (*Gjovik v. Apple,* 3:23-CV-04597-EMC, Northern District of California).

184.1. The U.S. EPA, Cal. EPA, Santa Clara County, and city of Santa Clara received Plaintiff's complaint about the Property and Operations in June 2023. The complaint noted that Plaintiff may pursue a citizen suit over the issues if the U.S. EPA does not act. The U.S. EPA confirmed they opened an RCRA investigation, did conduct inspections, did document violations, sent Apple an administrative Notice of Show Cause, but has taken no further public actions. The EPA has failed to commence an enforcement action against the Defendants for clear RCRA violations. The EPA has failed to issue emergency orders to address imminent endangerment, including immediate installation of required emission controls.

185.1. The U.S. EPA never confirmed they were investigating the CAA violations, despite being directly asked to by the Plaintiff, and the BAAQMD finding at least six air quality violations at the site. Despite conducting a comprehensive inspection in 2023-2024 that documented extensive violations including potential criminal violations, EPA has failed to open any investigation into any violations of the CAA, CWA, EPCRA, or TSCA. The Defendants, and the U.S. and California EPA agencies, have failed to notify residents of exposure.

## LEGAL CLAIMS

## X. First Cause of Action: RCRA Citizen Suit Pursuant to the RCRA § 6972(a)(1)(A)

425. Plaintiff incorporates WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding

its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent allowable to cover community health and restoration projects.

## XI.  COUNT THREE: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN WATER ACT.

### (CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS).

186.426.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other paragraphsCounts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other CWA Counts below.

427.    Defendants Apple, The City, and The Property Owner are responsible for ongoing violations of the Clean Water Act and the creation of an imminent and substantial endangerment arising from discharges via wastewater and stormwater at The Chip Fab. Abatement and enforcement are available under the CWA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

428.    The City must know that discharges from the Facility into the sewer system are causing downstream residents to become ill. Despite this knowledge, the City has failed to take appropriate enforcement action to stop the harmful discharges.

429.    Apple violated 33 U.S.C. §§ 1311, 1316, 1317 with unpermitted discharges, discharges in violation of effluent limits, and without NPDES permits.

430.    Apple violated 33 U.S.C. § 1342(k) by violating standards imposed under section 1317 and releasing toxic pollutants that are injurious to human health.

431.    Defendants' knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3)

432.    Apple violated 33 U.S.C. § 1317(d) as noted above and in doing so, wrongfully

introduced pollutants into a treatment works (the The SJ-SC RWF).

433.    Apple violated 33 U.S.C. § 1319(b) when it negligently introduced into a sewer system and into a publicly owned treatment works pollutants and hazardous substances which it knew or reasonably should have known could cause personal injury or property damage.

434.    Apple violated 33 U.S.C. § 1319(c)(3) when it knowingly violated the above stated provisions of the Clean Water Act, including while knowing their unlawful acts and omissions put people, including the surrounding community, in imminent danger of death and serious bodily injury.

435.    The Property Owners violated it. 33 U.S.C. § 1319(c)(3) when they knowingly violated the Clean Water Act, and knew their unlawful acts and omissions put people, including the surrounding community, in imminent danger of death and serious bodily injury.

436.    The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories.

437.    The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.

438.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent

allowable to cover community health and restoration projects.

## XII.    CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE RCRA.

439.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. The allegations and claims listed in above RCRA *Imminent & Substantial Endangerment* claim are also incorporated here.

440.    Defendants Apple, The City, and The Property Owner are responsible for ongoing violations of the RCRA. Abatement and enforcement are available under the RCRA Citizen Suit provisions. The RCRA violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

~~187.~~441.    The Plaintiff brings this action under, Pub. L. 89–272, title II, § 7002(a)(1)(A) of RCRA~~, under~~ which ~~Plaintiff brings this action, is RCRA's~~enables citizen enforcement ~~provision~~ for violations of any "permit, standard, regulation, condition, requirement, prohibition, or order" under the RCRA. (42 U.S.C. § 6972). As explained in COUNT ONE, the express terms of the RCRA statute allow it to be brought against "any person," including "~~the United States and~~ any ~~other~~... governmental instrumentality or agency." ~~Id~~Id. The municipal and business entity defendants have violated the RCRA, are responsible under the RCRA, and enforcement is available under the RCRA Citizen Suit provisions of 42 U.S.C. § 6901.

~~188.    As required by § 7002(b)(1) of the RCRA, sixty day notice of violations was provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA, and the Defendants on June 30 2025. Further, notice of violations was provided by the U.S. EPA to the Defendant(s) and California EPA and its CUPA, over a year ago including demands to correct the violations, but the violations have not been corrected. Further, no notice is required for claims brought under Subchapter III "Hazardous Waste Management," per § 7002(b)(1)(iii).~~

~~189.    The Defendants have violated the RCRA, and enforcement is available under 2 U.S.C. § 6901. The Facility generates, transports, treats, and disposes of hazardous waste subject~~

to RCRA regulation. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention. The entirety of the U.S. EPA RCRA CEI report is incorporated here, including facts, allegations, and RCRA violations.

190. **DUMPING**: Defendants have violated 42 U.S.C. § 3001 3005 by improper treatment and disposal of hazardous waste, including open dumping of hazardous waste into the air, soil, and water.

191. **DUMPING & PUBLIC DANGER:** Defendants have violated 42 U.S.C. § 6973 (Section 7003) by creating and maintaining an imminent and substantial endangerment to the community and the environment.

## A.    PERMITS/STANDARDS: THE DEFENDANTS HAVE COUNT 4: APPLE & THE PROPERTY OWNERS VIOALTED RCRA 42 U.S.C. §§ 6922, 6928 BY FAILING TO COMPLY WITH HAZARDOUS WASTE MANAGEMENT REQUIREMENTS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS).

192.442.    Apple violated 42 U.S.C. § 6922, 40 C.F.R. Part 262 (Section 3002) by failureing to properly characterize hazardous waste streams; improper storage of hazardous waste beyond regulatory time limits; failure to properly manifest hazardous waste shipments; and inadequate personnel training and emergency procedures. Apple also knowingly treated, stored, and/or disposed of a hazardous waste in knowing violation of a material permit conditions in violation of 42 U.S.C. 6928(d)(2)(B) and (C); 40 C.F.R. 260 – 265.

443.    **PERMITS/STANDARDS:** This is an ongoing, long-running issue that intersects and exacerbates the larger issues. The Defendants have violated EPA took formal enforcement action about similar and related issues. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

444.    However, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or enhanced oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

445.    The Property Owner violated 42 U.S.C. § 6922 by failing to ensure proper

hazardous waste management procedures were in place at its property and failing to investigate or intervene when there were violations and complaints about dangers and injures caused by the improper hazardous waste management.

446.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B.    COUNT 5: APPLE, THE CITY, & PROPERTY OWNERS VIOALTED 42 U.S.C. § 6923, ~~(SECTION 3003)~~ BY FAILING TO COMPLY WITH HAZARDOUS WASTE RECORDKEEPING REQUIREMENTS.

### (CLAIM AGAINST APPLE, THE CITY & PROPERTY OWNERS).

~~193.~~447.    Apple violated 42 U.S.C. § 6923, by failing to keep required records, failing to properly label waste, and failing to comply with manifest rules~~, and transporting hazardous waste without manifests and without proper categorization.~~.

~~194.    PERMITS/STANDARDS: The~~Apple generates, stores, treats, transports, and disposes of hazardous waste at the Property. All three defendants have ~~violated 42 U.S.C. § 6924, (Section 3004) by failing~~knowingly contributed to ~~comply with treatment, storage, and disposal standards. The Defendants have violated 40 C.F.R. Part 264 265, through uncontrolled air emissions from hazardous waste treatment tanks;~~the alteration, destruction, concealment, and intentional failure to ~~install~~file, records which are required ~~air emission control devices; failure to conduct required air emission monitoring and testing; and failure to maintain emission control equipment in proper working order.~~

~~195.    PERMITS/STANDARDS: The Defendants have violated 42 U.S.C. § 6925, 40 C.F.R. Parts 264, 270 (Section 3005) by operating hazardous waste treatment facility without required RCRA permit; operating without other required permits; and violating permit terms and conditions.~~

196.    **FEDERAL DELEGATION:** ~~The City serves as the primary oversight agency for RCRA permit compliance for multiple aspects of the Facility's hazardous waste operations. The City has allowed unpermitted hazardous waste activities and processes to occur at the Facility and failed to report RCRA violations to appropriate state and federal agencies despite having knowledge of such violations.~~

~~197.~~448.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly ~~treated, stored,~~to be maintained and/or ~~disposed of a hazardous waste without a permit.~~ filed pursuant to Subtitle C. 42 U.S.C. 6928(d)~~(2)(A~~4); 40 C.F.R. 260 – 265.

~~198.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly treated, stored, and/or disposed of a hazardous waste  in knowing violation of a material permit condition. 42 U.S.C. 6928(d)(2)(B) and (C); 40 C.F.R. 260 – 265.~~

~~199.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' knowingly transported or causes to be transported a hazardous waste without a manifest where one is required by the regulations. 42 U.S.C. 6928(d)(5).~~

~~200.~~449.    **KNOWING AND WILLFUL VIOLATIONS:** ~~Defendants'~~Apple omitted material information and made false material statements in documents filed or used for purposes of compliance with Subtitle C RCRA hazardous waste regulations~~.~~; all three defendants have knowledge of those omissions and false statements, and all three defendants contributed to these violations, despite knowledge that information was required and material. 42 U.S.C. 6928(d)(3).

450.    These are an ongoing, long-running issue that intersect and exacerbates the larger issues. The EPA took formal enforcement action about similar and related issues but only against Apple. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025). Further, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or enhanced oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

451.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the

Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### C.     COUNT 6: APPLE & THE PROPERTY OWNERS VIOALTED 42 U.S.C. § 6925 BY OPERATING WITHOUT REQUIRED PERMITS & VIOLATION THE TERMS OF THE PERMITS THEY DID HAVE.

#### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

452.     The Defendants have violated 42 U.S.C. § 6925, 40 C.F.R. Parts 264, ~~KNOWING AND WILLFUL VIOLATIONS: Defendants' Generates, stored, treated, transported, disposed of, exported, or otherwise handles~~by operating hazardous waste ~~and knowingly alters, destroys, conceals, or fails to file records~~ treatment facility without required ~~to be maintained~~RCRA permit; operating without other required permits; and violating permit terms and conditions.

453.     This is an ongoing, long-running issue that intersects and exacerbates the larger issues. The EPA took formal enforcement action about similar and related issues. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

454.     However, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or ~~filed pursuant to Subtitle C.~~enhanced oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

455.     The Property Owner violated 42 U.S.C. § 6922 by failing to ensure proper required permits were in place at its property, and failing to investigate or intervene when there were violations issued related to failure to have required permits related to hazardous waste treatment, air emissions, and water discharge.

456.     WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the

Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### D.    COUNT 7: APPLE VIOALTED 42 U.S.C. § 6923 BY CONTRIBUTING TO THE UNLAWFUL TRANSPORT OF HAZARDOUS WASTE.

### (CLAIM AGAINST APPLE)

457.    Apple and its contractors violated 42 U.S.C. § 6923, (Section 3003) by transporting hazardous waste from the Property without manifests and without proper categorization. They knowingly transported or cause to be transported hazardous waste without a manifest where one is required by the regulations. 42 U.S.C. 6928(d)(45).

458.    Apple was under a California EPA DTSC consent agreement and permanent injunction at the time of many of these violations, and still intentionally violated the same and similar legal requirements, knowing it was illegal, but doing it anyway.

459.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### E. COUNT 8: APPLE, THE CITY, & THE PROPERTY OWNER VIOALTED 42 U.S.C. § 6924, 42 U.S.C. 6928 BY VIOALTING HAZARDOUS WASTE TREATMENT STANDARDS & REQUIREMENTS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

460.    Apple, The Property Owners, and Santa Clara violated 42 U.S.C. § 6924, (Section

3004) by failing to comply with hazardous waste treatment, storage, and disposal standards at the Property. All three defendants have violated and/or contributed to violations of 40 C.F.R. Part 264-265, through the uncontrolled air emissions from hazardous waste treatment tanks; their failure to ensure installation of required air emission control devices; their failure to conduct required air emission monitoring and testing; and their failure to ensure emission control equipment is in proper working order.

201.461.    Apple violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265. by knowingly treated, stored, and disposed of a hazardous waste without a permit at The Chip Fab..

462.    The city Santa Clara violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265 by knowing of these violations and contributed to these violations by refusing to document or cite the violations, and by withholding information from the community (public records requests, EIRs, etc.) and other government agencies.

202.    The City serves as the primary oversight agency for RCRA permit compliance for multiple aspects of the Facility's hazardous waste operations. KNOWING AND WILLFUL VIOLATIONS:  Defendant Apple also terminated the Plaintiff in violation of the RCRA's anti-retaliation provision at 42 U.S. Code § 6971 ("*employee protection*"), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

## XI.  SECOND CAUSE OF ACTION: ABATEMENT OF IMMINENT AND SUBSTANTIAL ENDANGERMENT PURSUANT TO THE RCRA § 7002(A)(1)(B)

463.    Plaintiff incorporates The City has allowed, enabled, and concealed unpermitted hazardous waste activities and processes to occur, and refused to report RCRA violations to appropriate state and federal agencies despite having knowledge of such violations.

464.    The Property Owner violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265  by having knowledge of these violations, contributing to the violations, and refused to report or abate the violations.

465.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its

operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

# XIII.    CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE CLEAN AIR ACT.

203.466.        The allegations contained in all other paragraphsthe Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein.

204.    Pub. L. 89–272, title II, § 7002(a)(1)(B) of RCRA, under which Plaintiff brings this action, is RCRA's citizen enforcement provision for abatement of imminent and substantial endangerment. (42 U.S.C. § 6972). Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when a "solid or hazardous waste… may present an imminent and substantial endangerment to health or the environment." *Id.*

205.    The express terms of the statute enable that "any person may commence a civil action on his own behalf… against":

- "any person, including the United States and any other governmental instrumentality or agency;" including,
- "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility;" who contributed to,
- "past or present handling, storage, treatment, transportation, or disposal" of "any solid or hazardous waste ;" which may,
- "present an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

206.1.    Under Section 1004(5) of RCRA, "hazardous waste" is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported

or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

207.1.   Under RCRA § 1004(27), "solid waste" includes "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial… operations" but not "industrial discharges which are point sources subject to permits under section 1342 of Title 33" (NPDES). 42 U.S.C. § 6903(27).

208.1.   Under Section 1004(3) of RCRA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). An "open dump" refers to "any facility or site where solid waste is disposed" which is not permitted for the disposal of hazardous waste. 42 U.S.C. § 6903(14).

209.1.   As required by § 7002(b)(2) of the RCRA, constructive ninety day notice of violations was provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA, and the Defendants. Further, notice of violations was provided by the U.S. EPA to the Defendant(s) and California EPA and its CUPA, over a year ago including demands to correct the violations, but the violations have not been corrected. Further, no notice is required for claims brought under Subchapter III "Hazardous Waste Management," per § 7002(b)(2)(A)(iii). At the time of filing, Plaintiff had no knowledge of commencement of diligent prosecution (civil or criminal) by the federal or state governments on this matter.

210.   **IMMINENT AND SUBSTANTIAL ENDANGERMENT:** The solid and hazardous wastes handled, stored, treated, transported, and disposed of by Defendants at the Facility present an imminent and substantial endangerment to health and the environment.

211.   Defendants operate a 1,700-gallon unpermitted hazardous waste treatment tank that vents toxic solvent vapors directly into the atmosphere without any emission controls, located 300 feet from a 2,000-unit apartment complex where families and children live.

212.   In 2023-2024, U.S. EPA inspectors found piles of unlabeled toxic waste stored in open containers and documented Defendants were leaving the Property and Operations unsupervised on weekends.

213.   In 2023-2024, U.S. EPA inspectors documented that Defendants had been venting

hazardous waste exhaust unabated, and found Defendants recently installed makeshift carbon filters for only some vents, without monitoring or verification they were abating the exhaust, and without air permits.

214. Defendants emit, leak, and release extremely hazardous gases including arsine, phosphine, and fluorine that can cause immediate death upon exposure.

215. These ongoing illegal releases have already caused severe chemical poisoning of nearby residents, including documented presence of arsenic, mercury, and industrial solvents in victims' blood and urine, with symptoms consistent with acute toxic gas exposure occurring during nighttime emission events.

216. Approximately 3,000 residents live within 1,000 feet of the facility, including families with children who use adjacent parks and playgrounds, creating substantial risk of mass exposure.

217.1. The endangerment will continue without judicial intervention because Defendants have failed to install required emission controls or obtain proper permits despite years of notice from regulatory agencies.

218. **KNOWING AND WILLFUL VIOLATIONS:** Defendants' transported, treated, stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1) – (7) and knew that such acts put another person in imminent danger of death or serious bodily injury. 42 U.S.C. 6928(e); 40 C.F.R. 260 – 265.

219. **KNOWING AND WILLFUL VIOLATIONS:** Defendant Apple also terminated the Plaintiff in violation of the RCRA's anti-retaliation provision at 42 U.S. Code § 6971 ("*employee protection*"), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

220. **REMEDIAL ACTION REQUIRED:** Defendants caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of chemicals in the environment in, at, and around the Property, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and groundwater, because Defendants released or otherwise discarded chemicals, or controlled and/or operated the Property from which chemicals were released or otherwise discarded, and failed to prevent or abate the contamination caused by the chemicals .

221.    Once the various discharges of chemicals, whether intentional, sudden, and accidental, or otherwise were released into the environment, these chemicals continued to spread and migrate within the environment in, at, and around the Property and Premise, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the groundwater. Once released into the environment, these chemicals continued to spread and migrate within the environment at the Property, causing additional harm to the environment and continuing to threaten public health and the environment.

222.    The Site needs to be further investigated and characterized so that a remedial action plan can then be developed and implemented at the Site, and regulatory closure obtained. Plaintiff is entitled to injunctive relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), restraining Defendants and requiring them to take such action, including a complete, timely, and appropriate investigation and abatement of all actual and potential endangerments arising from the released solid wastes and hazardous wastes at and emanating to or from the Site.

## XII.    THIRD CAUSE OF ACTION: CLEAN AIR ACT CITIZEN SUIT

223.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

224.    The Defendants have violated the Clean Air Act through unpermitted air emissions, air emissions in violation of air pollution standards, and failure to obtain required permits related to exhaust and air releases. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention. Enforcement is available under 42 USC § 7604(a).

225.    The BAAQMD (Rule 30, etc.) and U.S. EPA (NESHAP, 40 CFR Part 63 Subpart BBBBB, etc.) have air emission regulations specific to Semiconductor Manufacturing, which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated. The County has Ordinances (SCCOC Sec. B11 360, etc.) related to Toxic Gases which also were not complied with and which have been and are being violated.

226.1.    The Facility conducts activities that require permits under the Clean Air Act. The Defendants and their agents conduct these activities, and the Defendant have knowledge that these

activities require Clean Air Act permits but have failed to ensure that proper permits were obtained. The Defendants have allowed the  Facility to continue operating without required Clean Air Act permits despite having actual knowledge of the permit requirements. These unpermitted activities constitute ongoing violations of the  Clean Air Act.

227.    Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the apartments were four stories high, creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

228.    The California Air Resources Act, Health and Safety Code sections 39000 et seq., contains provisions required by the federal Clean Air Act. The State Air Resources Board (ARB) is responsible for developing the state implementation plan required by the federal CAA. (Cal. Health & Safety Code § 39602).

229.1.    On May 1 2023, Apple obtained a Bay Area Air Quality Management District Permit to Operate a "Semiconductor fab." (Plant No. 22839). Apple previously had no air permits for their fabrication exhaust. The permit conditions included maximum limits for chemical usage and emissions. The permit included max annual usage limits of arsine (78lb/yr), Phosphine (198lb/yr), Silane (19lb/yr), and Chlorine (1lb/yr). (Permit, page 8). Apple filed an updated request to include the exhaust from their unpermitted hazardous waste treatment tank on September 15 2023, and it was approved around April 2024. (Permit 32236).

467.    Defendants Apple, The City, and The Property Owner are responsible for ongoing violations of the Clean Air Act. Abatement and enforcement are available under 33 USC § 1365(a)(1) Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

468.    "The Clean Air Act (CAA), 42 U.S.C. § 7401 et seq., is the primary federal law designed to improve air quality to protect human health and the environment. The CAA authorizes EPA to set health based National Ambient Air Quality Standards (NAAQS),, as well as stationary source National Emission Standards for Hazardous Air Pollutants (NESHAP).In general, semiconductor fabs are subject to both construction and operation permitting requirements under the CAA. Specific CAA permitting requirements vary by permitting authority and facility,

depending on factors such as the air quality designations applicable to the facility's location and the nature of the facility's emissions." (NIST).

469.    A variety of air pollutants may be emitted from semiconductor fabrication facilities. These include acid fumes and organic solvent emissions from cleaning, rinsing, resist drying, developing, and resist stripping; HCl emissions from etching; and various other emissions from spent etching solutions, spent acid baths, and spent solvents. Processes related to semiconductor fabrication, such as water purification and industrial wastewater treatment, may also generate air emissions at semiconductor facilities. (NIST, Modernization And Expansion Of Existing Semiconductor Fabrication Facilities).

~~230.~~470.    Plaintiff filed a complaint against Apple with the BAAQMD in July of 2024 and shared the U.S. EPA RCRA inspection report with them, leading them conduct their own onsite investigations on Aug. 29 2024 and Aug. 12 2024. BAAQMD then cited Apple for a number of air quality violations at the facility including multiple violations of 2-1-301 and 2-1-302 (Permit Requirements – Authority to Construct and Permit to Operate) and 9-7-307.1 (NOx and CO Emission limits). (Violations A64215A, A64215B, A64219A, A64218A, A64216A, and A64216B).

~~231.~~471.    Apple also reported some emissions to the Bay Area Air Quality Management Board, in difficult to find agency filings, and with unknown methodology as to how they estimated the emissions if they had no monitoring systems. (Plant No. 22839, "Facility Search Tool"). The most recent Criteria Pollutant Cal. ARB data is from 2023. In 2023, Apple reported 6.95 tons of TOG, 6.9 tons of ROG, and 0.24 tons of NOX. (Plant No. 22839, 2023). The most recent Cal. ARB Toxic data is from 2022. In 2022, Apple reported emitting 5,730 pounds of Isopropyl Alcohol fumes, 5 pounds of diesel exhaust, 1.35 pounds of benzene, and also formaldehyde, nickel, manganese, cadmium, lead, toluene, arsenic, mercury, beryllium, and Chromium VI. (Plant No. 22839, 2022).

~~232.    The most recent Cal. ARB Toxic data is from 2022. In 2022, Apple reported emitting 5,730 pounds of Isopropyl Alcohol fumes, 5 pounds of diesel exhaust, 1.35 pounds of benzene, 0.15 pounds of formaldehyde, and also reportable amounts of nickel, manganese, cadmium, lead, toluene, arsenic, mercury, beryllium, and Chromium VI.~~ (Plant No. 22839, 2022).

~~233.    The U.S. EPA website shows that Apple's only filed one TRI report for its~~

Operations at the Facility, in 2021. ~~It is unclear why no reports were filed prior or after, and why Apple chose to file a report only for the year in which it nearly killed its employee, Plaintiff, with its illegal emissions.Apple then cited that same report in the RICO Lawsuit as a basis for why the court should dismiss the Plaintiff's claims, saying the report should have put her on notice to sue Apple earlier.~~ Apple then apparently never filed another TRI report.

234.    The one TRI report was filed in or around June 2021 with emission data from 2020. That TRI report includes emissions at the Property in 2020 (when Plaintiff became severely ill next to the Property) of 16,084 pounds of Criteria Air Pollutants, 15,608 pounds of volatile organic compounds (VOCs), 372 pounds of Nitrogen oxides, and 260 pounds of TRI Air Toxics (NMP).[45]

235.    The 2020-2021 TRI report included air emissions of Benzene, Carbon Monoxide, Sulfur Dioxide, Formaldehyde, Toluene, Nickel, Lead, Arsenic, Mercury, Acetaldehyde, Chrysene, Fluoranthene, Xylene, Naphthalene, Benz[a]anthracene, Chromium VI, Beryllium, Manganese, and Cadmium.

236.    **DUMPING:** The Defendants have violated 42 U.S.C. § 7410 (Section 110) by dumping hazardous substances into the atmosphere that exceed state-specific emission limits.

237.    **DUMPING**: The Defendants have violated 42 U.S.C. § 7411 (Section 111) by dumping hazardous substances into the atmosphere which exceed emission standards, including chemicals like Arsine, Phosphine, Silane, Benzene, Mercury, and NMP.

238.    **DUMPING**: The Defendants have violated 42 U.S.C. § 7412 (Section 112) by dumping hazardous substances into the atmosphere that knowingly and intentionally does not comply with MACT standards.

472.    The Santa Clara Square Apartments "include residences that are considered sensitive receptors." (Santa Clara Square, Air Quality Assessment, pg 17, Sept. 30 2015). "Sensitive receptors are locations where an identifiable subset of the general population (children, asthmatics, the elderly, and the chronically ill) that is at greater risk than the general population to the effects of air pollutants are likely to be exposed. These locations include residences, schools, playgrounds, childcare centers, retirement homes, hospitals, and medical clinics." (Santa Clara Square, Air Quality Assessment, pg 16, Sept. 30 2015). The facility is located within federally

---

[45] U.S. EPA, https://echo.epa.gov/air-pollutant-report-new?fid=110001168254

designated "Air Quality Nonattainment Areas" including for PM2.5 and 1-Hour and 8-Hour Ozone. It is also in a Carbon Monoxide Maintenance Status Area. (EPA FID 110001168254).

## F. COUNT 9: APPLE AND THE PROPERTY OWNER VIOLATED 42 U.S.C. 7413 BY OPERATING A STATIONARY SOURCE WIHTOUT PERMITS/STANDARDS: The Defendants have violated 42 U.S.C. § 7411 (Section 111) by

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

473.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

474.    Facilities that release significant air pollutants must obtain operating permits stipulating various emission and operational controls. Operating without such a permit or failing to comply with standards of performance for any of the conditions specified in the permit constitutes a violation. This includes not adhering to monitoring, record-keeping, or reporting requirements.

475.    The only air permit Apple and the Property Owners had for the Chip Fab until ~2023 covered general emissions of a couple of chemicals and did not disclose chip fab activities. The first major revision of the permit following the Plaintiff's complaints now included actually chip fab sources. The 2023 permit noted it covered "five stacks" for "semiconductor fab" and a sixth stack for diesel engine emergency generator exhaust (Plant 22839).

476.    However, that permit still did not cover most of the emissions, and following the Plaintiff's complaints directly to BAAQMD they conducted an inspection, cited violations, and have been negotiating a new permit with Apple.

477.    CARB and BAAQMD uses "owner/operator" in permit terms for semiconductor manufacturing. (BAAQMD Permit Handbook pg58; Cal. Code Regs. Tit. 17, § 95320 et seq.).

239.478.    Apple was and is an operator of a stationary sources.source, knowingly constructed a new source, modified an existing source, emitted a hazardous pollutant, and failed to comply with a requirement in violation of an applicable NESHAP. 42 U.S.C. 7413(c)(1).

479.    **PERMITS/STANDARDS.** The Property Owners were and are an owner of a

stationary source, knowingly constructed a new source, modified an existing source, emitted a hazardous pollutant, and failed to comply with a requirement in violation of an applicable NESHAP. 42 U.S.C. 7413(c)(1).

480.    The Property Owners were and are an owner of a source subject to the operating permits program, knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1) , 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

481.    Apple was and is an operator of a source subject to the operating permits program and knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1) , 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

482.    The ~~Defendants have~~ Property Owners were and are the owner of a source subject to the operating permits program and knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1) , 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

483.    Apple has repeatedly violated and/or are in violation of requirements to obtain a permit as a condition of operations. (42 U.S. Code § 7604(a)(4)).

484.    The Property Owners have repeatedly violated and/or are in violation of requirements to obtain a permit as a condition of operations. (42 U.S. Code § 7604(a)(4)).

485.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### G.     COUNT 10: APPLE & PROPERTY OWNER VIOLATED 42 U.S.C. §§ 7502, 7661 BY OPERATING SOURCES WITHOUT TITLE V PERMITS AND BY FAILING TO OBTAIN PRECONSTRUCTION PERMITS.

#### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

486.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

487.    Major sources of air pollution are required to obtain an operating permit under Title V of the CAA. No major source may operate without a Title V permit.42 U.S.C. §§ 7661a(a) and 7661b(a). A new major source or a major modification of an existing one, in a nonattainment area, also cannot begin construction or operation without obtaining a Nonattainment New Source Review (NSR) and preconstruction approvals under 42 U.S.C. § 7502.

488.    The New Source Review program requires that new or modified industrial facilities in areas that do not meet NAAQS obtain permits before construction begins. These permits must demonstrate that the new facility will not contribute to further air quality degradation and will employ the best control technology. Violating these requirements can lead to significant penalties.

489.    A "major source" is any stationary source or any group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. (7412. 42 USC § 7661(2); 42 U.S. Code § 7412).

490.    "A stationary source consists of a single emission source with an identified emission point, such as a stack at a facility. Facilities can have multiple emission point sources located on-site and sometimes the facility as a whole is referred to as a stationary source" (Bay Area Air Quality Management District CEQA Guidelines May 2010  4-2).

491.    It's very unusual for a smaller plant (rather than a huge industrial complex) to qualify as a Major Source – however, chip fab is one type of activity that could create enough

pollution to qualify, and at The Chip Fab, Apple was not abating most/all of its pollution for years. Generally, a smaller factory would not be a major source because it would be abating its emissions and reducing pollution, so even if it produced enough hazardous waste that releasing that waste could qualify, they would never release all that waste directly into the air. However, Apple and the Property Owners did at The Chip Fab..

492.    In 2014-2015, Apple constructed a new/modified major emitting facility without a permit required under part C of subchapter I relating to significant deterioration of air quality. (42 U.S. Code § 7604(a)(3)). The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

493.    In 2014-2015, The Property Owners constructed a new/modified major emitting facility without a permit required under part C of subchapter I relating to significant deterioration of air quality. (42 U.S. Code § 7604(a)(3)). The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

494.    Apple violated 42 U.S.C. § 7502 by constructing and operating a new/modified major source in a nonattainment area without preconstruction approval by the BAAQMD. BAAQMD cited Apple for this violation in 2024.) The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

495.    The Property Owners violated 42 U.S.C. § ~~7412 (Section 112)~~7502 by constructing and operating a new/modified major source in a nonattainment area without preconstruction approval by ~~failing to comply with~~ the BAAQMD. BAAQMD has not cited the Property Owners for this violation. The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

496.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## H.     COUNT 11: APPLE & THE PROEPRTY OWNERS VIOALTED HAZARDOUS AIR POLLUTANTS STANDARDS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

497.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

240.498.    The National Emission Standards for Hazardous Air Pollutants (NESHAPs) are stringent regulations aimed at controlling air toxics that are known to cause cancer or other serious health impacts. Facilities that release any of these toxic pollutants above the threshold levels violate the CAA. NESHAP establishes national emission standards for hazardous air pollutants which regulate sources and source categories that emit hazardous air pollutants that pose risks to human health.

499.    **PERMITS/STANDARDS:** The DefendantsEPA promulgated NESHAP for semiconductor manufacturing facilities in 2003 and amended the semiconductor NESHAP in 2008. 40 CFR Part 63, Subpart BBBBB. In the amended NESHAP, EPA imposed a new air pollution control technology standard on semiconductor manufacturing facilities, requiring such facilities to install maximum achievable control technology (MACT) for existing and new combined process vent streams containing inorganic and organic HAPs. EPA also clarified the emission control requirements for process vents by adding definitions for organic, inorganic, and combined HAP process vent streams that contain both organic and inorganic HAPs.

500.    The regulations also require new, reconstructed, or existing major sources of HAPs at semiconductor fabrication facilities to install emission controls on process vents and storage tanks. The regulations prescribe separate control requirements for process vents containing organic pollutants, such as methanol, and process vents containing inorganic pollutants, such as hydrogen chloride (HCl, or hydrochloric acid) or hydrogen fluoride (HF, or hydrofluoric acid).

501.    Facilities must reduce emissions from process vents containing organic air toxics by 98 percent, or to below 20 parts per million (ppm) by volume and must reduce emissions from process vents containing inorganic pollutants by 95 percent, or to below 0.42 ppm by volume. In

addition, facilities must reduce HAP emissions from storage tanks with capacities greater than 1,500 gallons to the same level of control as inorganic process vents.

502.    There are established BAAQMD BACTs for semiconductor manufacturing specific to solvent cleaning stations, photoresist operations, Circuit Board Etching, and Siliconizing Reactors, Furnace Chambers, and Chemical Vapor deposition Reactors  (BAAQMD BACT / TBACT Workbook).

503.    The U.S. EPA has air emission regulations specific to Semiconductor Manufacturing,  which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated. (NESHAP, 40 CFR Part 63 Subpart BBBBB,).

504.    The BAAQMD has air emission regulations specific to Semiconductor Manufacturing,  which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated (Reg. 8, Rule 30 "Semiconductor Wafer Fabrication Operations", etc.)

505.    Apple violated NESHAP by refusing to comply with 40 CFR Part 63 Subpart BBBBB. Among other excuses, Apple refuses to publicly admit it's doing chip fab at the Chip Fab and believes it's a voluntarily designation – including refusing to get a chip fab NPDES permit (until the treatment works caught them and made them get one), refusing to get a chip fab air permit (until BAAQMD caught them and made them get one), etc.

506.    Apple is still refusing to file TRI reports (CAA/EPCRA requirements).by claiming they can choose to identify their manufacturing as being something other than chip fab, even if its chip fab – and accordingly, Apple says that, means they do not have to file TRI reports that would otherwise be required for chip fab, because Apple decided they don't have to say they are doing chip fab and there's no EPCRA enforcement agency that can force them like with the other stuff.

507.    Apple also refused to set up monitoring devices so there is no way to know how much pollution it was emitting, so it did not have to report those emissions.

508.    Apple violated . 42 U.S.C. 7413(c)(2)(C) by knowingly failing to install a monitoring device or method required by CAA at the Chip Fab. Apple also failed to report emissions data accurately and did not maintain required records.

509.    The Property Owners violated 42 U.S.C. 7413(c)(2)(C) by knowingly failing to

install a monitoring device or method required by CAA, while knowing the building was used for chip fab, and Apple had not installed monitoring devices.

510.   Apple reported emitting tons of federal Hazardous Air Pollutants every year including Chlorine, Cresol, Hexane, Hydrogen fluoride, Methyl tert butyl ether, Phosphine, Toluene, Xylenes, Mercury, Nickel, and Lead.

511.   California has prioritized anti-pollution efforts on several substances listed independently both as federal HAPs and California TACs including Benzene ($C_6H_6$), Cadmium, Chloroform ($CHCl_3$), and Formaldehyde (HCHO). § 39655. Apple also emitted these chemicals too.

512.   Apple violated 42 U.S.C. § 7412 by failing to comply with national emission standards for hazardous air pollutants.

513.   WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

# I. COUNT 12: APPLE & THE PROEPRTY OWNER VIOLATED NON-ATTAINMENT STANDARDS WITH OZONE POLLUTION.

## (CLAIM AGAINST APPLE & PROPERTY OWNERS)

514.   The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

515.   Ground-level ozone (also known as smog) is created by chemical reactions between ozone precursors oxides of nitrogen and volatile organic compounds in the presence of sunlight. Emissions from industrial facilities and electric utilities, motor vehicle exhaust, gasoline vapors, and chemical solvents are some of the major sources of these ozone precursors. High ozone levels

aggravate respiratory and cardiovascular diseases, reduced lung function, and increase coughing and chest discomfort." (Santa Clara Square, Air Quality Assessment, pg1, Sept. 30 2015).

516.    Under the Clean Air Act, the San Francisco Bay Area is a non-attainment area for ozone (O$_3$) and particulate matter. "High ozone levels are caused by the cumulative emissions of reactive organic gases (ROG) and nitrogen oxides (NOx)." "High ozone levels are caused by the cumulative emissions of reactive organic gases (ROG) and nitrogen oxides (NOx). Ground-level O3 is a secondary CAP, which is formed when nitrogen oxides (NOx) react with a class of pollutants called reactive organic gases (ROG) in the presence of sunlight. (BAAQMD, Emissions Inventory, 2024).

|  | Ozone Risks |
|---|---|
| Health | "Ozone is highly toxic via inhalation or by contact of liquid to skin, eyes, or mucous membranes. It is capable of causing acute to chronic lung damage, burns, and death or permanent injury…An increased respiratory rate, shallow breathing, cough, dyspnea (shortness of breath), bronchitis, pulmonary edema, and pulmonary hemorrhage may occur. Tachycardia (rapid heart rate) and hypotension (low blood pressure) may be observed. Neurologic effects include fatigue, dizziness, drowsiness, headache, and depression." Ozone can be toxic at a concentration of 100 ppm for 1 minute. Ozone is capable of causing death from pulmonary edema." (EPA, 1998; CAMEO, 2025). |
| Fire Hazard | "Severe explosion hazard when shocked, exposed to heat or flame, or by chemical reaction with organic substances, especially reducing agents. Ozone is a powerful oxidizing agent." (EPA, 1998; CAMEO, 2025). |
| Reactivity | "Ozone is a propellant; ignites upon contact with alcohols, amines, ammonia, beryllium alkyls, boranes, dicyanogen, hydrazines, hydrocarbons, hydrogen, nitroalkanes, powdered metals, silanes, or thiols." (CAMEO, 2025). |

517.    Ozone is most likely to form in the summer and early fall on warm, windless, sunny days. Breathing ozone can aggravate asthma and other respiratory diseases, irritate the eyes, reduce visibility, and damage vegetation. (BAAQMD, 2025). The precursor pollutants react under certain meteorological conditions to form high ozone levels. Controlling the emissions of these precursor pollutants is the focus of the Bay Area's attempts to reduce ozone levels. The highest ozone levels in the Bay Area occur in the eastern and southern inland valleys that are downwind of air pollutant

sources.

518.    Apple repeatedly had ozone toxic gas alarms going off in the chip fab for years, and when the City arrived, responding to the alarms, Apple nor the City could determine if the ozone was "leaked" in the building, or the alarm was triggered by the toxic ozone created outside and around the building due to Apple unlawful emissions of ozone precursors.

519.    Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any part D of subchapter I (relating to nonattainment). (42 U.S.C. § 7604(a)(1),(f)).

520.    The Property owners have repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any part D of subchapter I (relating to nonattainment). (42 U.S.C. § 7604(a)(1),(f)).

521.    Apple has violated 42 U.S.C. § 7410 (Section 110) by failing to comply with state implementation plan requirements.

~~241.~~522.        The Property Owners have violated 42 U.S.C. § 7410 (Section 110) by failing to comply with state implementation plan requirements.

~~242.    **PERMITS/STANDARDS**: The Defendants have violated 42 U.S.C. § 7491 (Section 169) by failing to comply with visibility protection standards.~~

523.    **KNOWING AND WILLFUL VIOLATIONS**: ~~Defendants' who were owners or operators of a stationary source, knowingly constructed a new source, modified an existing source, emitted a hazardous pollutant, and failed to comply with a requirement~~ Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including condition/ requirement under subchapter VI relating to ozone protection. (42 U.S. Code § 7604(a)(1),(f)).

~~243.~~    The Property Owners have repeatedly violated, and is in violation of, an ~~applicable NESHAP. 42 U.S.C. 7413(c)(1).~~

~~244.    **KNOWING AND WILLFUL VIOLATIONS**: Defendants' knowingly made false material statements, representations,~~emission standard or ~~certifications in; omitted material information from; and altered, concealed, or failed to file or maintain a document filed or required to be maintained under the CAA. 42 U.S.C. 7413(c)(2)(A).~~

245.    **KNOWING AND WILLFUL VIOLATIONS**: Defendants' knowingly falsified, tampered with, and/or failed to install a monitoring device or method required by CAA. 42 U.S.C. 7413(c)(2)(C).

246.    **KNOWING AND WILLFUL VIOLATIONS**: Defendants' knowingly failed to notify or report as required by the CAA. 42 U.S.C. 7413(c)(2)(B).

247.    **KNOWING AND WILLFUL VIOLATIONS**: Defendants' negligently and knowingly released into the ambient air hazardous air pollutant listed under Section 7412 of the Clean Air Act and extremely hazardous substances listed pursuant to 42 U.S.C.11002(a)(2) at the time of the release, and negligently and knowingly put another person(s) in imminent danger or death or serious bodily injury. 42 U.S.C. 7413(c)(4)&(5), 42 U.S.C. 7412(b)(1).

248.    **KNOWING AND WILLFUL VIOLATIONS**: Defendants' who were owners or operators of a source subject to the operating permits program, knowingly operated the source without an operating permit or in violation of a permit<u>limitation under this chapter including condition/</u> requirement. 42 U.S.C. 7413(c)(1) [42 U.S.C. 7661(1) (2), 42 U.S.C. 7661a(a)].

<s>249.</s><u>524.</u>    **KNOWING AND WILLFUL VIOLATIONS**: Defendant Apple also terminated the Plaintiff in violation of the CAA's anti-retaliation provision at 42 U.S. Code § 7622 ("*employee* <u>under subchapter VI relating to ozone</u> protection"), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication. <u>. (42 U.S. Code § 7604(a)(1),(f).</u>

# XIII.  FOURTH CAUSE OF ACTION: CLEAN WATER ACT CITIZEN SUIT

<u>525.</u>    Plaintiff incorporates the <u>WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.</u>

## J. COUNT 13: APPLE VIOLATED 42 U.S. CODE § 7604 BY EXCEEDING EMISSION LIMITS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

~~250.~~526.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other ~~paragraphs~~Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

527.    ~~The Defendants~~Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any condition or requirement of a permit under part C of subchapter I (relating to significant deterioration of air quality). (42 U.S. Code § 7604(a)(1),(f)).

528.    Apple emitted more pollutants than allowed under the EPA's standards and the specific limits set any issued permit. Apple exceeded emissions of criteria pollutants (like sulfur dioxide, nitrogen oxides, and particulate matter)  Apple exceeded emissions of hazardous air pollutants which pose significant health risks.

529.    Apple has repeatedly violated the conditions of the permits it was operating under as it entered the permit knowing they did not reflect its actual operations, and that it did not have the required technology to ensure compliance, and that it did not intent to ensure compliance. (42 U.S. Code § 7604(a)(3)).

530.    Apple has repeatedly violated emission standards/limitations under this chapter including an emission limitation, standard of performance, or emission standard (42 U.S. Code § 7604(a)(1),(f)). Apple has repeatedly violated emission standards/limitation under this chapter including any requirement under section 7411 or 7412 of this title, (42 U.S. Code § 7604(a)(1),(f)). Apple repeatedly violated permit terms and conditions (42 U.S. Code § 7604(a)(4)). Apple repeatedly violated an order issued by the Administrator or a State with respect to such a standard or limitation. (42 U.S. Code § 7604(a)(1)).

531.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the

Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## K.    COUNT 14: THE CITY VIOALTED NAAQS & CRITICAL AIR POLLUTANT STANDARDS IN SITING THE FAB AND APARTMENTS.

### (CLAIM AGAINST THE CITY)

532.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

533.    NAAQS "standards identify levels of air quality for six criteria pollutants, which are considered the maximum levels of ambient air pollutants considered safe, with an adequate margin of safety, to protect public health and welfare. The six criteria pollutants are ozone ($O_3$), carbon dioxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), PM10, PM2.5, and lead (Pb)." (Santa Clara Square, Air Quality Assessment, pg2, Sept. 30 2015).

534.    "The significance of a pollutant concentration is determined by comparing the concentration to an appropriate ambient air quality standard. The standards represent the allowable pollutant concentrations designed to ensure that the public health and welfare are protected, while including a reasonable margin of safety to protect the more sensitive individuals in the population." (Santa Clara Square, Air Quality Assessment, pg 3).

535.    Apple has alleged to has repeatedly violated or to be in violation of any schedule established under any applicable State implementation plan approved by the Administrator. (42 U.S. Code § 7604(a)(4)).

536.    The City's Air Quality Policies include to "Protect the air quality of the City of Santa Clara and its sphere of influence" including to "romote land use and transportation policies which maintain air quality." (SCVWD, Stream Maintenance Program Renewal, Draft EIR, July 2025, Appendix C, C-29).

537.    Santa Clara county has by far the most carbon monoxide emissions of any of the nine San Francisco Bay Area counties. Santa Clara county reported average CO air emissions of

206 tons/day, which is 25% of the total CO the region.

538.    Similarly, Santa Clara county also reports the highest rates of emissions of reactive organic gases and PM 10, and the second highest rates for emissions of total organic gases, $SO_2$, and $NO_X$. The majority of $SO_2$ emissions and stationary NOx emissions originated from refineries and chemical plants. (BAAQMD, Emissions Inventory, 2024).

539.    If state and local governments do not meet the air quality standards set by the EPA, they can be found in violation of the CAA. This usually triggers a requirement for these jurisdictions to revise their State Implementation Plans (SIPs) to address non-compliance.

540.    Reactive Organic Gases are a type of volatile organic compounds (VOCs) that contribute to the formation of photochemical smog. Most ROG are photochemically reactive and can interact with NOx. NOx is a group of highly reactive gases (ie, NO and NO2) and reacts with other volatile organic compounds in the atmosphere to produce ozone on hot days. (BAAQMD, Emissions Inventory, 2024).

541.    Sulfur oxides are compounds that consist of sulfur and oxygen molecules (i.e., sulfur dioxide). sulfur dioxide (SO2) reacts with other compounds to form sulfuric acid, sulfurous acid, and sulfate particles. (BAAQMD, Emissions Inventory, 2024).

542.    NOx is a group of highly reactive gases, with NO and NO2 as the principal constituents. NOx typically reacts with other volatile organic compounds in the atmosphere to produce ozone on hot days. (BAAQMD, Emissions Inventory, 2024).

543.    Carbon monoxide is an odorless, invisible, flammable gas that can be dangerous to human health in high concentrations, especially indoors with little ventilation.. (BAAQMD, Glossary).

544.    The EIR for the Santa Clara Square Apartments admitted that construction of the apartments would violate non-attainment standards and create severe air pollution, but the City approved the EIR anyway and did not require compliance with pre-construction air permitting.

545.    The EIR for the Santa Clara Square Apartments admitted that the operations of such dense housing would violate non-attainment standards and create severe air pollution, but the City approved the EIR anyway and did not require compliance with pre-construction air permitting.

546.    The Planning and Building applications for the Chip Fab, by nature of the operations, would violate non-attainment standards and create severe air pollution, but the City approved the EIR anyway and did not require compliance with pre-construction air permitting.

547.    In 2014-2015, the City knew about the air pollution that was created and would be created by the Chip Fab; and knew about the air pollution that would be created by the Santa Clara Square development; and knew about the air pollution that would be created by operations at Santa Clara Square; and the City approved it anyways.

548.    Further, the City intentionally concealed the Chip Fab as another air pollution source, from the EIR and planning process, and it was never mentioned – including any cumulative analysis, which is legally required. The only mention at all of the Chip Fab was of the adjacent 3260 Scott Blvd office, noting the Owner was Mr. Jenab, and as of Sept 2015 the EIR falsely claimed the "Plant closed 12/21/14" (pg.150).

549.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## L. COUNT 15: THE CITY VIOALTED CAA WHEN IT APPROVED THE SANTA CLARA SQUARE EIR, WITH TERMS REUFSING TO COMPLY WITH NON-ATTAINMENT STANDARDS.

### (CLAIM AGAINST THE CITY)

550.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

551.    The EIR documented that during project operations, emissions of ROGs would exceed the significance thresholds by 12 percent.

552.    The 2017 EIR addendum claimed the nearest sensitive receptors were 2,000 feet away (p. 12, 16). The EIR also noted there will be sensitive receptors onsite but claimed the impact would be "less than significant because at same location." (p. 17). For informational purposes it is noted that sources of air pollutant and TAC emissions near the site could adversely affect these receptors." (Santa Clara Square, Air Quality Assessment, Sept. 30 2015).

553.    The EIR stated that for cumulative impact they are supposed to analyze stationary sources "1,000 feet of the project site." However, instead of complying with the Clean Air Act, the City and The Irvine Company intentionally violated the Clean Air Act, with reckless indifference to the environment and health/safety. They claimed that if they were to consider air pollution sources within 1000ft (such as the Chip Fab) in a cumulative air pollution analysis, it would be an unlawful reverse CEQA mandate which is a "matter of debate at the present time." They then cited a hodge podge of court cases, claiming the holding was that they do not need to consider the effect of the environment on the project – but the cases they cited were examples were the factory at issue was more than a mile away.

554.    The EIR further stated that the only concern in approving a development like this must be compliance with CEQA, not federal laws. The EIR cited a SCOTUS case and implied it meant there is no legal requirement to consider the risks to human health/safety when building a large residential apartment complex in an inherently unsafe location.

555.    Then, in 2017, an addendum to the EIR was completed, after which point Apple had filed some permits and there was enough public information that someone doing an EIR in that area would certainly know there's a Chip Fab – but the EIR stated "there have been no other changes in circumstances or substantial new information that would alter the conclusions of the 2015 ER with respect to air quality impacts such that additional environmental review would be triggered."

556.    The City of Santa Clara violated the Clean Air Act when it intentionally, knowingly, recklessly, refused to acknowledge or comply with the Clean Air Act. Instead, the City intentionally refused to acknowledge Clean Air Act requirements, contributed to, and officiated formal government documents with these violations, made them officially city acts and records, knowing there would be harm to people, property, and environmental due to their violations.

## XIV.    CITIZEN SUIT ENFORCEMENT ACTIONS ACTION

## AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE CLEAN WATER ACT.

557.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein.

251.558.    Defendants Apple, The City, and The Property Owner have violated the Clean Water Act, and enforcement is available under 33 USC § 1365(a)(1).) Citizen Suit provisions. The Defendants violations are in the past, but also ongoing, long-running, and also expected to continue in the future without serious enforcement action including judicial intervention.

559.    The Porter Cologne Water Quality Control Act, California Water Code sections 13300–13999 and Title 23Apple is responsible for violations of the California Administrative Code, is analogous to the federal Clean Water Act because Apple "owns, leases, operates, controls, or supervises a source"(The Chip Fab) as defined by 33 U.S. Code § 1316(a), and Apple's actions, omissions, and that source give rise to these claims.

560.    The Property Owners are liable under the Clean Water Act because they "owns, leases, operates, controls, or supervises a source" (The Chip Fab and Synertek Superfund site) as defined by 33 U.S. Code § 1316(a)—and The Property Owner's actions, omissions, and those sources give rise to these claims.

561.    The City is liable under the Clean Water Act (CWA) in that because it regulates discharges "owns, leases, operates, controls, or supervises a source" (The SJ-SC RWF) as defined by 33 U.S. Code § 1316(a) and The City's actions, omissions, and that may affect the qualitysource give rise to these claims.

562.    City of Santa Clara is the state's waters. The California Act is broader in scope thanco-owner of The San Jose/Santa Clara Water Pollution Control Plant ("SJ-SC RWF"). The treatment works plant was first constructed in 1956 and is located at 700 Los Esteros Road San Jose, CA 95134. (CIWQS Place Number 255333; ORDER No. R2-2020-0001 NPDES No. CA0037842).

563.    The Clean Water Act/NPDES permits governing the federal CWA, however, in that it includes groundwater, whileSJ-SC RWF regulate the CWA regulates only surface waters. The

~~Porter~~Cologne Act is implemented by City of Santa Clara directly and individually regarding the operation of the "City of Santa Clara wastewater collection system" and the SJ-SC RWF's wastewater discharge into receiving waters of the U.S. (here, the "Artesian Slough," a tributary to the San Francisco Bay via the Coyote Creek).

~~252.~~564.    The California State Water Resources Control Board, issued a NPDES stormwater permit to the City of Santa Clara, as part of the municipal permitting program. The City has been the primarily regulated party regarding stormwater discharges in Santa Clara since the 1990s. The City's Clean Water Act permits include Order Nos. R2-2022-0018 and R2-2023-0019.

~~253.~~565.    Apple has a permit San Jose-Santa Clara Regional Wastewater Facility (SC-461B). On November 19 2015, the San Jose-Santa Clara Regional Wastewater Facility notified Apple of their status as a Significant Industrial User as defined under 40 CFR 403.3(t)(i) and (ii), and of their responsibilities as industrial users under the RCRA. (Permit SC-461B). The Facility is also regulated by the Industrial Stormwater Permit.

~~254.~~566.    The Wastewater Facility also discovered Apple was doing semiconductor fabrication and revoked Apple's prior "research and development" NPDES permit and issued a different and more comprehensive one specific for semiconductor fabrication on Oct. 21 2016. The Wastewater Facility said the new permit was to comply with 40 C.F.R. 469 Subpart A. The Wastewater Facility also cc'd Mike Vasquez, the Environmental Compliance Officer for the City of Santa Clara.

~~255.~~567.    On March 30 2016, Apple was cited by the San Jose-Santa Clara Regional Wastewater Facility for Failure to Use Proper Sample Method in Discharge Reports in violation of 40 CFR 403.12 (g)(3) and SCCC-13.10.580. On April 11 2016, Apple was cited by the San Jose-Santa Clara Regional Wastewater Facility for Inappropriate sample frequency in violation of 40 CFR 403.12(h) and SCCC-13.10.500. On May 11 2016, Apple was also cited for Late Reporting Discharge Reports in violation of SCCC-13.10.580. (Permit SC-461B Warning Notice WN-009174). The Notice of Violation explained:

> "The permit conditions contained in the San José-Santa Clara Regional Wastewater Facility Industrial Discharge Permit, SC-461B for Apple, Inc. requires sample analyses by 40 CFR 136 methods and sampling during the monitoring period from 9/1/2015 to

2/29/2016 for Self-Monitoring Report due on 3/31/2016. Apple, Inc. failed to analyze samples collected for Self-Monitoring Report (SMR) using 40 CFR 136 methods and failed to sample during the monitoring period. Apple, Inc. did re-analyze samples using correct methods, but the final and complete self-monitoring report was not received until 5/11/2016, after the permit required due date of 3/31/2016."

(Warning Notice WN-009174, May 23 2016).

256.568.    On March 30 2016, the San Jose-Santa Clara Regional Wastewater Facility approved a request for Apple to discharge wastewater from their "deionization system and fab plumbing" to the sewer system but instructed all discharges must comply with 40 CFR 403.5 "National Pretreatment Standards: Prohibited Discharges" and warned Apple that "The discharge of water or wastewater which causes pollution or violation of any effluent limitations, national standard of performance, or national pretreatment or toxicity standard may result in the assessment of civil penalties and/or suspension of sewer service to your facility." (March 30 2016).

257.569.    On June 6 2016, Apple responded via Linda Knudsen, explaining despite operating for a year at the facility, "inadequate systems were in place to predict a permit response requirement in a timely manner" and "Procedures with the lab were not set up for collection of samples." Knudsen noted that one of the remedies taken was  that "Apple reviewed plans with the City to ensure accurate understanding of the requirements for the submittal."

258.570.    On June 9 2016, a Santa Clara City Stormwater Inspector reported that Apple had dumped cooling water into the storm drains. The ticket was not updated until Feb. 10 2022, six years later, when it was closed as completed 27 minutes after being assigned. (Santa Clara Spill Ticket #1657490). On September 21 2020, Apple was cited by the San Jose-Santa Clara Regional Wastewater Facility for inappropriate sample frequencies in violation of 40 CFR 403.12(g) and SCCC-13.10.420.

"The permit condition contained in the San José-Santa Clara Regional Wastewater Facility Industrial Permit, SC-461B for Apple, Inc., requires sampling during the monitoring period from 3/1/2020 to 8/31/2020 for Self-Monitoring Report due on 9/30/2020. Apple, Inc., did not collect samples during the monitoring period."

(Warning Notice WN-009573, Jan. 29 2021).

259.571.    3250 Scott reported an average daily water usage of around 44,000 gallons per day and the sewer pipes carrying 3250 Scott's discharges flowed downhill and directly around the apartment where Plaintiff lived in 2020. In 2020, the government had already started

investigating the plumbing at her apartment as a ~~possible~~ vector for some unknown solvent vapor pollution.

~~260.~~572.       On February 11 2021, Apple via Tom Huynh, submitted a letter to San Jose-Santa Clara Regional Wastewater Facility blaming staffing due to COVID.

573.    Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, the government mandated testing revealed the presence of 29 µg/L of 1,1-Dichloropropane, 24 µg/L of Trichloroethylene ("trichloroethylene"), and 6.7 µg/L of Ethyl tertiary-butyl ether (ETBE).

574.    Among other issues, it's unclear why Apple had trichloroethylene on site but not in any of its chem. inventories, and then, in addition, why exactly Apple was pouring that trichloroethylene down the drain.

575.    The Facility discharges wastewater into the City's sewer system, which reaches the Pacific Ocean.

576.    This is apparently the only Apple facility regulated as a Significant Industrial User with the SJ-SC WWF, and as of 2022 there were only 126 SIU total across Santa Clara, San Jose, Campell ,and Milpitas.

577.    The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging without appropriate permits. Industrial stormwater discharge without permit ⬜ Violation of stormwater permit conditions. The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging in violation of permit terms and conditions. Defendants have falsified discharge monitoring and have not reported what they discharge. Defendants have failed to pretreat discharge. Defendants' knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3).

578.    On June 9 2016, a Santa Clara City Stormwater Inspector reported that Apple had dumped cooling water into the storm drains. The ticket was not updated until Feb. 10 2022, six years later, when it was closed as completed 27 minutes after being assigned. (Santa Clara Spill Ticket #1657490). "Actual" April 5 2022 inspection – need "no dumping" medallions on all overflow structures – bioretention area 3 does not appear to be a thing / follow up June 3 2022 –

still missing medallions.

579.    Monthly bioretention inspection needed – date 1/10/22. 2/8/22 3/5/22 – 4/9/22

261.580.    Santa Clara city Code Enforcement team then conducted their first Stormwater Inspection of the facility on April 5 2022. The reported noted that two bioretention areas were missing required cobblestones or had too many, the other bioretention area "*does not appear to be a bioretention area or other stormwater treatment facility*" and noted that none of Apple's storm drains at the facility had required "*No Dumping*" medallions. Santa Clara city marked them "in compliance – implement corrective actions." Upon reinspection on June 3 2022, the bioretention areas had not been corrected and the storm drains still did not have "No Dumping" medallions. No updated reports were provided by the city.

The Facility

## M.    COUNT 16: THE CITY VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY FILLING A CREEK WITHOUT A PERMIT.

### (CLAIM AGAINST THE CITY OF SANTA CLARA)

581.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

582.    Plaintiff incorporates the allegations contained in the first five sections, through "General Allegations," and the allegations  contained in other Counts under this same statute,  as though those allegations are fully set forth herein.

583.    The US EPA jointly administers CWA Section 404 with US Army Corps. of Engineers under a Memorandum of Agreement with the Department of Defense. (SCVWD, Stream Maintenance Program Manual, Ch. 2, Pg. 11, R14290, 2027-2036; 59 Federal Register 94-1311). A permit under 33 U.S. Code § 1344 of the Clean Water Act is required prior to any filling of the Waters of the US or discharging of fill material into the Waters of the US.

584.    US EPA and USACE issued a Regional General Permit for a stream maintenance in Santa Clara County under the authority of 33 U.S.C. §§ 1341, 1344. (FSPN-1996- 225250S). "Within the Program area, Section 10 jurisdictional waters include… the lower reaches of … San

Tomas Aquino, Calabazas… creeks, and the Guadalupe River." (SCVWD, Stream Maintenance Program Manual, Ch. 2, Pg. 3, R14290, 2027-2036).

585.    The Clean Water Act § 1311(a) prohibition on unpermitted discharges of "any pollutant" into Waters of the US, expressly incorporates filling and dredging if the filling or dredging does not comply with the legal requirements under § 1344. The original fill material is a "pollutant" under the CWA, and it was dumped onto the Creek in violation of Section 404.

586.    At some point in the 1970s, the City of Santa Clara authorized, ordered, and/or contributed to the "filling" of a Saratoga Creek (aka Campbell's Creek aka Sanjon Creek) that flows to the SF Bay and into the Pacific Ocean.

587.    The City also violated 33 U.S.C. §1341 when it filled Saratoga Creek in such a way as to result in the discharge of dredged and filled materials into the surface waters of the US including San Tomas Aquino Creek and the SF Bay, without a permit to fill the creek, or for the activities required to fill the creek, and without obtaining a certification from the California government regarding the plans for implementing the filling of the creek, and for compliance with Clean Water Act and California statement water quality standards. (SCVWD, Stream Maintenance Program Manual, Ch. 2, Pg. 12, R14290, 2027-2036).

588.    An unpermitted discharge of fill material is a violation that continues every day the fill remains in place. The unpermitted fill is a pollutant that continues to be present in the WOTUS, violating the law daily. This is an ongoing violation. *Friends of the Earth v. Laidlaw Environmental Services,* 528 U.S. 167 (2000) – (continuing violations restart statute of limitations). *Atlantic States Legal Foundation v. Eastman Kodak Co.,* 12 F.3d 353 (2d Cir. 1993) – (ongoing maintenance of unpermitted condition is continuing violation).

589.    There is no statute of limitations for the initial act when there are ongoing violations. 28 U.S.C. § 2462. There are no exemptions from the regulated permitting process, even for flood mitigations, "where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced." 33 U.S.C. § 1344(f).

590.    Saratoga Creek is part of a deep, actively circulating serpentine system flowing to the Bay. Due to the nature of these hydrothermal systems, the entire area is a jurisdictional Water of the US. A "creek bed" it is the entire geological structure that channels the water flow. This

deeply circulating hydrothermal system means at least the 30-foot deep, two-block-wide area is also a component of the stream's functional channel.

591.    Saratoga Creek is unambiguously a "relatively permanent, standing or continuously flowing body of water" (or a direct tributary thereof) because the hydrothermal circulation ensures the deep flow is a continuous source, and geological evidence indicates that it has flowed into the Pacific Ocean, and/or had Ocean waters flowing through it, for hundreds of millions of years.

592.    The CWA aims to protect the chemical, physical, and biological integrity of Waters of the US. The filling and subsequent redirection physically isolates the surface water from the deep serpentine vault circulation. The fill interferes with the temperature, pressure, and mineral exchange of the serpentine system, which are essential physical and chemical characteristics of the Waters of the US.

593.    The deep, flowing serpentine water supports specialized endemic aquatic life adapted to the specific hydrothermal regime. By filling the channel and isolating the circulation, the physical structure needed for the biological integrity of the WOTUS has been fundamentally destroyed. The degradation of the stream's physical and biological integrity continues every day the unpermitted fill prevents the natural circulation and exchange, supporting your claim for restoration.

594.    The City also violated of Section 10 of the federal Rivers and Harbors Act of 1899, the oldest federal environmental law, as it is now incorporated into the Clean Water Act at 33 USC § 1341, by obstructing and altering waters of the U.S. without prior authorization from the federal government and without ensuring compliance with additional integrated regulations, including the Federal Endangered Species Act (FESA). Compliance with the FESA is a requirement for the stream maintenance permit.

595.    The Premise is known to provide a direct or adjacent habitat for the federally protected Bay Checkerspot Butterfly (threatened -- *Euphydryas editha bayensis*), California Red-Legged Frog (endangered -- *Rana draytonii*), and California Tiger Salamander (endangered & threatened -- *Ambystoma californiense*). (SCVWD, Stream Maintenance Program Manual, Ch. 2, 2027-2036). Both Saratoga Creek and San Tomas Aquino Creeks are known to provide a direct and adjacent habitat (i.e., the Slough and Bay), for federally protected , threatened fish species including

Chinook Salmon (*Oncorhynchus tshawytscha*), Green Sturgeon (*Acipenser medirostris*), and Central California Coast Steelhead (*Oncorhynchus mykiss*). (SCVWD, Stream Maintenance Program Manual, Ch. 3, Att. C, 2027-2036).

596.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

597.    WHEREFORE, The Plaintiff to seek civil penalties for the five-year prior to this lawsuit, and equitable and injunctive relief requiring the Defendant City of Santa Clara to remove the unpermitted fill, restore the Saratoga Creek bed to its original condition, and remediate the damage and harm caused to the natural ecosystem around the Saratoga Creek.

## N.    COUNT 17: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY MAINTAINING AN UNLAWFULLY FILLED A CREEK & DISCHARING ADDITIONAL POLLUTION INTO THAT CREEK.

### (CLAIMS AGAINST APPLE AND THE PROPERTY OWNERS)

598.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

599.    Apple and The Property Owners contributed to the above-described violations of 33 U.S.C. §§ 1311, 1344 by maintaining the unlawful filling of Saratoga Creek.

600.    The Property Owners must have been aware of a massive, active hydrothermal, aquifer system flowing under their properties at 3250 Scott Blvd, 3260 Scott Blvd, and 3050 Coronado Drive. Apple must be aware of the same, with its General Counsel previously spending 14 years running the legal department, including environmental compliance for Honeywell who is

the Responsible Party for a the Synertek Superfund site, which is located on the creek/aquifer .

601.    In 2017, Katharine Adams joined Apple as General Counsel. Prior leading Apple Legal & Security teams, Adamas was Honeywell's General Counsel since 2003. Adams specialized in environmental law and worked as an attorney for the DOJ's Environment and Natural Resources division. Adams must be aware of the unlawfully filled aquifer system at the Premise – including the active, natural spring documented in US EPA and California environmental reports as part of oversight of the Synertek Superfund site, where Honeywell is the Responsible Party.

602.    At the Synertek site, groundwater monitoring well # MW-03B1 is frequently mentioned in federal and state monitoring reports (i.e., "well MW-03B1 has historically been observed to be an artesian well based on water seen on the pavement around the well and the depth to water measured as the top of casing" -- Synertek GW January 28, 2015).

603.    Well MW-03B1 was drilled on the 3050 Coronado Dr. property (adjacent to The Chip Fab) to monitor the B1 aquifer (encountered at around 100ft bgs) and tapped into a natural spring. Deep soil borings were gathered near the spring in 1991 as part of the Synertek site CERCLA investigations. The results showed additional evidence to support the spring is part of a serpentine hydrothermal system including olive-colored soil and rocks at the depth of the B1 aquifer. (Synertek GW January 28, 2015).).

604.    Further, the formal EIR for the Santa Clara Square Apartments noted a large, pressurized, underground aquifer (which they referred to as an "artesian feature") flowing only ~30 feet underground and across a distance of at least two blocks wide. (Santa Clara Square Apartments, EIR, Oct. 2015). It was also thought to be attributable to the B1 aquifer.

605.    Apple and The Property Owners must have known the Saratoga Creek was still flowing under the Premise, that it was been unlawfully filled, that the Clean Water Act required "daylighting" the creek and remediating the damage to the ecosystem surrounding the creek – but instead of abating or reporting the violations, instead, Apple and the Property Owners undertook dangerous manufacturing activities that create extensive hazardous waste and emissions, knowing at least some of that pollution would find its way onto the soil and stormwater, and enter the Saratoga Creek aquifer system through the soil, wells, and springs.

606.    The defendant admits to releasing 8 tons per year of toxic pollutants into the air.

Those pollutants settled on the defendant's property, which sits directly on an ancient creek channel that flows underground to San Francisco Bay. The defendant knew—or should have known—that this area has unique geology.

607.    Historic maps show a permanent creek flowing alongside the facility. An artesian well on the defendant's own property proves pressurized groundwater is flowing beneath the site. When toxic pollutants settle on highly permeable serpentine rock above a pressurized underground creek, they don't stay there. They wash into the ground, enter the creek, and flow to the Bay. This happened every time it rained for over ten years.

608.    Apple never sought or obtained a Clean Water Act permit for these discharges. Apple is liable for unpermitted discharge of pollutants to waters of the United States.

609.    The Property Owner never sought or obtained a Clean Water Act permit for these discharges. The Property Owner is liable for unpermitted discharge of pollutants to waters of the United States.

610.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## O.    COUNT 18: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1311 BY DISCHARGING UNPERMITTED AND FORBIDDEN POLLUTED WASTEWATER.

### [Claim Against Defendants Apple & The Property Owners]

611.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

612.    Apple violated 33 U.S.C. § 1311(a) by discharging pollutants without required

permits, whether by failing to apply for required permits, for failing to disclose their actual discharges during the permitting process.

613.    The Property Owners violated 33 U.S.C. § 1311(a) by knowing Apple discharging pollutants without required permits; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

614.    Apple violated 33 U.S.C. § 1311(f) by discharging pollutants consisting of chemical warfare agents into the Waters of the US, which is forbidden without exception.

615.    The Property Owners violated 33 U.S.C. § 1311(f) by knowing Apple by discharging pollutants consisting of chemical warfare agents; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

616.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## P. COUNT 19: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1316 BY CONCEALING THE SOURCE OF DISHCARGED WASTEWATER WAS A SEMICONDUCTOR MANUFACTURING.

### (CLAIM AGAINST APPLE AND THE PROPERTY OWNER)

617.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

618.    Apple violated 33 U.S.C. 1316(e) by operating a new source in violation of the standards of performance applicable to the source.

619. The Property Owners violated 33 U.S.C. 1316(e) by knowing that Apple was operating in violation of standards of performance; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

620. Apple and The Property Owner failed to disclose to the The SJ-SC RWF that the wastewater into the City's was created from chip fab operations, which requires a NPDES permit specific to Semiconductor Manufacturing.

621. The City and its' SJ-SC RWF are required by 33 U.S.C. § 1342, to only "issue permits which can be terminated or modified for cause including…obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts." Upon discovering The Chip Fab's actual operations in 2016, they simply revised and correct the permit designation but took no enforcement against Apple or The Property Owners.

622. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## Q. COUNT 20: APPLE & THE PROPERTY OWNERS VIOLATED 33 USC § 1317 BY FAILING TO PROPERLY TREAT DISCHARGED WASTEWATER.

### (CLAIM AGAINST THE PROPERTY OWNER)

623. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

624. Apple violated 33 U.S.C. § 1317(d) by operating a source in such a way as to discharge polluted wastewater in violation of effluent standards/prohibitions into a treatment works.

625. The Property Owners violated 33 U.S.C. § 1317(d) by knowing that Apple was discharging wastewater in violation of CWA effluent standards/prohibitions; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

626. Apple violated 33 U.S.C. § 1317(d) by operating a source in such a way as to discharge polluted wastewater into a treatment works and in violation of pretreatment standards.

627. The Property Owners violated 33 U.S.C. § 1317(d) by knowing that Apple was discharging polluted wastewater in violation of pretreatment standards; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

628. Apple violated 33 U.S.C. § 1342(k) by also violating 33 U.S.C. §§ 1312, 1316, 1317, 1343 as noted above and for which there is no "permit shield."

629. The Property Owners violated 33 U.S.C. § 1342(k) by knowing Apple was violating 33 U.S.C. §§ 1312, 1316, 1317, 1343; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

630. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## R.    COUNT 21: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING WASTEWATER DISCHARGE AND TREATMENT.

### (CLAIM AGAINST THE CITY OF SANTA CLARA)

631. The allegations contained in the Amended Complaint sections through "General

Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

632.    . The Chip Fab discharges around 40,000 or more gallons each day of polluted wastewater, releasing that wastewater into the public sewer system, which ultimately reaches the Pacific Ocean. The City owned by The City and which is transported to The City's SJ-SC RWF treatment works. After The SJ-SC RWF treats the received wastewater, around eighty percent is discharged to the SF Bay, part of the Pacific Ocean (a Water of the US). The remaining twenty percent of the wastewater is redirected to a Water Recycling Program System, co-owned and operated by City of Santa Clara. The City sells this recycled water for profit.

633.    The polluted wastewater discharged by The Chip Fab, and treated by the City's The SJ-SC RWF, is either dumped into the Pacific Ocean or returned to the Premise and discharged across the public parks and playgrounds, around the apartments and common areas, and along the public sidewalks and trails. The City profits from collecting permit and treatment fees, co-owns accounting and operations, purchases its own recycled water for use at its public parks and playgrounds; is accountable and responsible for the public sewers, water lines, and other infrastructure servicing The Chip Fab's wastewater and the recycled water systems around the Premise.

634.    The more wastewater that is discharged by The Chip Fab into the sewers and flowing to the The SJ-SC RWF, the more recycled water the City can sell for profit. If The City and its SJ-SC RWF know The Chip Fab's wastewater is heavily polluted by semiconductor manufacturing and CWA violations, then the City's NPDES permit governing The SJ-SC RWF would require the City to expend additional costs and resources to properly treat the polluted wastewater prior to selling that wastewater as recycled water. While the Plaintiff was there, the recycled water around the apartments was labeled with warning signs indicating the recycled water is known to be toxic and/or harmful to humans and animals.

635.    The NPDES permit issued by the City for the Chip Fab fails to include the legally required amount of detail regarding the operations and hazards at The Chip Fab.

636.    The City of Santa Clara, individually and jointly as The SJ-SC RWF, violated 33

U.S.C. § 1342(b)(3) by issuing wastewater discharge permits to Apple and The Property Owners for discharges into public sewers from The Chip Fab, which transport the polluted wastewater to the Facility and then the Facility releases treated wastewater into navigable waters, but the City failed to "ensure that the public… receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application." There was no public notice or participation for the City's permitting of The Chip Fab and no public participation.

637.    The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(7) by failing to" abate violations" by Apple and The Property Owners of the permit and the permit program, related to The Chip Fab, including failing to pursue "civil and criminal penalties and other ways and means of enforcement."

638.    The City of Santa Clara, individually and jointly as The SJ-SC RWF, violated 33 U.S.C. § 1342(b)(8) by issuing wastewater discharge permits to Apple and The Property Owners for The Chip Fab (as a designated Significant Industrial User) for discharges into public sewers, which then transported the polluted wastewater to the treatment plant, and which then released those wastewater into the Waters of the US – because the City failed to ensure the permitting process required and actually identified the "terms of character and volume of pollutants" of a "significant source introducing pollutants subject to pretreatment standards under section 1317(b)."

639.    The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to create and maintain " a program to assure compliance with such pretreatment standards" by The Chip Fab.

640.    The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to ensure The Chip Fab provided "adequate notice to the permitting agency" of new discharges of pollutants (1311, 1316) and/or a "substantial change in volume or character of pollutants being introduced" at/after the issuance of the permit.

641.    The City of Santa Clara, individually and jointly as the SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to ensure The Chip Fab provided "adequate notice to the permitting agency" with "information on the quality and quantity of effluent to be introduced" into the City's treatment works.

642.    The City of Santa Clara, individually and jointly as the SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(9) by failing to ensure The Chip Fab, a Significant Industrial User of a publicly owned treatment works, and Apple and The Property Owners, provided "will comply with sections 1284(b), 1317, and 1318" of the Clean Water Act.

643.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## S. COUNT 22: THE CITY VIOLATED § 1319 BY FAILING TO TAKE ENFORCEMENT ACTION REGARDING DISCHARGES.

### (CLAIM AGAINST THE CITY OF SANTA CLARA)

644.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

645.    Under 33 U.S.C. § 1319(f), when a municipality, such as City of Santa Clara, owns/operates ~~the municipal wastewater treatment system and has delegated authority under the CWA's~~ a treatment works, such as the SJ-SC RWF, and the City, as owner of the treatment works, has knowledge that an industrial user is violating 33 USC § 1317, such as by discharging polluted wastewater in violation of effluent standards and prohibitions, into the City's treatment works, such as Apple and The Property Owners 33 USC 1317(d) violations at The Chip Fab; then the City, as owner of the treatment work has mandatory obligations.

646.    The owner of the treatment works must "commence appropriate enforcement action within 30 days of the date of such notification." The City and its treatment works have known for years about Apple and The Property Owners 33 USC § 1317 violations at The Chip Fab, but the City and its treatment works have taken no enforcement actions.

647.    If the municipality does not "commence appropriate enforcement action," then the EPA or a Citizen may commence a civil action about the industrial user's violations. The Plaintiff in this Citizen Suit complained to the EPA in 2023 about unlawful and dangerous discharges of "polluted wastewater in violation of effluent standards and prohibitions" with evidence of ongoing hazards and reported injuries arising The Chip Fab's wastewater discharges into the sewers at the Premise. The EPA failed to take enforcement action. The Plaintiff's Sixty Day notice discussed these concerns, but no action was taken to abate the violations and hazards. Accordingly, this Citizen Suit.

648.    Under 33 U.S.C. § 1319(f), the civil action "shall join" both the owner/operate of the treatment works and the owner/operator of the source of the pollution. The action may "seek appropriate relief, including but not limited to, a permanent or temporary injunction" against one or both parties. Accordingly, the Plaintiff pleads this claim against all Defendants. A District Court "shall have jurisdiction to… require the owner or operator of the treatment works and the owner or operator of the source to take such action as may be necessary to come into compliance with this chapter." (§ 1319).

262.649.    As part of the USEPA's National Pollutant Discharge Elimination System (NPDES) pretreatment program.), municipalities are required to maintain NPDES permits for stormwater discharges. The municipalities, in turn, must require that individual projects within their jurisdiction comply with the requirements of these permits. The City is a permittee to the Santa Clara County Municipal Regional Stormwater NPDES Permit (Order R2-2009-0074, NPDES Permit No. CAS612008). The permit applies directly to City of Santa Clara individually and more generally through the City's membership in the "Santa Clara Valley Urban Runoff Pollution Prevention Program."

650.    The permit regulates municipal stormwater discharges in the City of Santa Clara, including The Chip Fab and the Santa Clara Square Apartments. (SCVWD, Stream Maintenance Program Manual, Ch. 2, Pg. 12, R14290, 2027-2036).

651.    The Stormwater Control Operation and Maintenance Plan is between the City, and the Property Owner requires the Property Owner submit annual maintenance logs to the City. Based on Public Records request responses, the Property Owner has never filed these to the city.

652. The City violated 33 U.S. Code § 1342 when it approved the stormwater management plan for The Santa Clara Square Apartments. The project encompass 33.5 acres, and 9.5 acres are pervious, and twenty-four acres are non-pervious. During the EIR process, the city decided that no hydromodification management was required because the development increased the pervious area from 6.6 to 9.5, even though there are still twenty-four acres of non-pervious. (Planning Commission Staff Report, 12/9/15 p. 9).

653. The City knew the apartments were next to a high hazard Chip Fab and waived all stormwater management requirements while knowing there would be extensive pollution, and a significant amount of that pollution would end up in the Saratoga Creek system and Pacific Ocean.

654. The City has failed to diligently inspect and monitor stormwater mitigation at the Chip Fab. The City knows the Chip Fab is releasing tons of pollutants into the air, which settle on the land, and enter the stormwater when it rains – and the City has done nothing. The City discovered Apple was dumping cooling fluid into the storm drains in 2016, did not do anything until 2022, and then still did nothing about it.

655. The City owns and controls the stormwater management infrastructure. "The City owns and maintains 15-, 18- and 21-inch storm drains in Augustine Drive, an 18-inch storm drain in Montgomery Drive, a 15-inch storm drain in Octavius Drive, 21- and 24-inch storm drains in Scott Boulevard, and a 24- inch storm drain on the eastern border of the project site." (SCSA 2017 EIR Addendum No. 1).

656. The City owns and controls the 1) stormwater infrastructure 2) the wastewater infrastructure 3) the stormwater treatment mandates and technology the 4) the wastewater treatment works  and 5) the permitting process for both types of discharge. The City's failure to enforce the CWA with the Chip Fab, but the City also violated the CWA regarding its own violations with the Chip Fab.

657. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as

available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## T.    COUNT 23: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1342 REGARDING STORMWATER.

### (CLAIM AGAINST APPLE AND THE PROPERTY OWNERS)

658.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

659.    The Plaintiff incorporates the allegations contained in the first five sections, through "General Allegations," and the allegations contained in other Counts under this same statute, as though those allegations are fully set forth herein.

660.    The industrial materials stored, and the pollutants generated at the Property are exposed to stormwater flows.

661.    Pollution from industrial air emissions (like metals or solvents) settles onto the ground, rooftops, and parking lots. When rainwater hits these impervious surfaces, it becomes contaminated stormwater runoff. Activities at the Chip Fab generate significant debris and particulate matter, which contain pollutants and settle on surfaces.

662.    *Sierra Club v. ICG Hazard, Inc.*, 781 F.3d 281 (6th Cir. 2015)-- (Air emissions that deposit into waters of the US are a CWA violation); *Ohio Valley Environmental Coalition v. Fola Coal Co.*, 845 F.3d 133 (4th Cir. 2017).

663.    Operations and emissions at the Chip Fab occur outdoors and may cause pollutants to be exposed to rainfall. The types of pollutants released by The Chip Fab into the immediate environment have contaminants, including total suspended solids, hazardous materials, heavy metals, nitrogen, and other pollutants.

664.    During rain events, this pollution washes off those surfaces and flows into Saratoga Creek, San Thomas Aquino Creek, the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay Watershed, of which the San Francisco Bay is a part.

665.    The storm water from the Chip Fab drains out of an 18" pipe into the San Tomas

Aquino Creek (EL 30.02 to #42 to #44, to #39).

666.    Apple's Permit-by-Rule application to CalEPA DTSC on Nov. 8 2016 admitted that rain and wash water drains to the storm drain and sewer. (application notes that "slightly contaminated storm or wastewater can seriously contaminate evaporation or settling areas (with no drainage) over a period of time."

667.    The NPDES permit issued by the City to Apple for wastewater at the Chip Fab required that "The Permittee shall provide protection from accidental discharge of prohibited materials or other wastes regulated by City of Santa Clara Code Chapter 13.10 into either the storm drain or sanitary sewer systems."

668.    The NPDES permit states that "Any person who intentionally or negligently violates any provisions of the Permit issued, or who intentionally or negligently discharges waste or wastewater which causes pollution, or violates any effluent limitation, National Standard of Performance, or National Pretreatment or Toxicity Standard, may be civilly liable to the City."

669.    The NPDES permit states "The Perrnittee shall properly dispose of pretreatment or other sludge and any hazardous wastes (e.g., spent chemicals) used or generated at the Permittee's facility so as to prevent the discharge of such materials to the San Jose-Santa Clara Regional Wastewater Facility or sanitary sewer." (SC-461B | SJ ESD & SC)

670.    Apple has violated 33 U.S.C. § 1342 (NPDES) by discharging pollutants into stormwater without appropriate and required permits.

671.    Apple has violated 33 U.S. Code § 1311 (Effluent limitations) by allowing and enabling discharges of pollutants into stormwater at the Chip Fab that exceed the amounts allowed, if any, on the NPDES permit and/or stormwater O&M agreement issued by the city.

672.    The Property Owners have violated 33 U.S.C. § 1342 (NPDES) by discharging pollutants into stormwater without appropriate and required permits.

673.    The Property Owners have violated 33 U.S. Code § 1311 (Effluent limitations) by allowing and enabling discharges of pollutants into stormwater at the Chip Fab that exceed the amounts allowed, if any, on the NPDES permit and/or stormwater O&M agreement issued by the city.

674.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the

Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## U.    COUNT 24: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING PUBLIC NOTICE & ENGAGEMENT REGARDING THE CHIP FAB'S STORMWATER DISCHARGE AND PERMITTING.

### (CLAIM AGAINST THE CITY OF SANTA CLARA)

675.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

676.    The City of Santa Clara violated 33 U.S.C. § 1342(b)(3) by creating pseudo-permits to Apple and The Property Owners for stormwater discharge into navigable waters.

677.    The City issued an O&M agreement as if it was a permit.

678.    The City also attempted to incorporate stormwater provisions into a wastewater permit, in dicta.

679.    Either way, the City failed to "ensure that the public… receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application."

680.    There was no public notice or participation for the City's permitting of The Chip Fab under the Clean Water Act, and no public participation.

681.    "Pollution prevention outreach is required by the NPDES wastewater discharge permit" (City of San Jose).

~~263.~~682.    "Any pollutant that flows into the storm drain ends up in our creeks, the San Francisco Bay and eventually the ocean. The City of Santa Clara has three ephemeral creeks (Calabazas Creek, Saratoga Creek and San Tomas Aquino Creek) and the Guadalupe River. …

Nothing besides clean water may be dumped or allowed to flow into a storm drain. "[46] The San Tomas Aquino Creek and Saratoga Creek flow to the San Francisco Bay and then into the Pacific Ocean, the Waters of the United States under Section 301/402.."(City of Santa Clara).[47]

264.1. Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, the government mandated testing revealed the presence of 29 μg/L of 1,1 Dichloropropane, 24 μg/L of Trichloroethylene ("trichloroethylene"), and 6.7 μg/L of Ethyl tertiary butyl ether (ETBE).

265.1. Among other issues, it's unclear why Apple had trichloroethylene on site but not in any of its chem. inventories, and then, in addition, why exactly Apple was pouring that trichloroethylene down the drain.

266.   **DUMPING:** The Defendants have violated 33 U.S.C. §§ 1311, 1316, 1317 with unpermitted discharges, discharges in violation of effluent limits, and without NPDES permits.

267.   **DUMPING:** The Defendants have violated 33 U.S.C. §§ 1313, 1345 with violations of water quality standards and unlawful disposal of sewage sludge.

268.   **DUMPING:** The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging without appropriate permits. Industrial stormwater discharge without permit ⍰ Violation of stormwater permit conditions

269.   **PERMITS/STANDARDS:** The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging in violation of permit terms and conditions. Defendants have falsified discharge monitoring and have not reported what they're actually discharging. Defendants have failed to pretreat discharge.

270.1.   **FEDERAL DELGATION:** The City has knowledge that discharges from the Facility into the sewer system are causing downstream residents to become ill. Despite this knowledge, the City has failed to take appropriate enforcement action to stop the harmful discharges.

---

[46] Santa Clara City, Stormwater Pollution Prevention, https://www.santaclaraca.gov/our-city/departments-g-z/public-works/environmental-programs/stormwater-pollution-prevention
[47] Santa Clara City, Stormwater Pollution Prevention, https://www.santaclaraca.gov/our-city/departments-g-z/public-works/environmental-programs/stormwater-pollution-prevention

271. ~~KNOWING AND WILLFUL VIOLATIONS:~~ ~~Defendants' knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3)~~

## XIV. ~~Fifth Cause of Action: Emergency Planning and Community Right-to-Know Act Citizen Suit~~

683. ~~Plaintiff incorporates~~ WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XV. CITIZEN SUIT ENFORCEMENT ACTION AGAINST DEFENDANTS FOR VIOLATIONS OF THE EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT.

684. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other ~~paragraphs~~Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. ~~The Defendants~~

685. In addition, the factual allegations pled under other Citizen Suit statutes, and Public Nuisance, specifically regarding 1) emissions, discharges, and releases, 2) notifications and access to information, and 3) risk of harm to people located outside of The Chip Fab, are also hereby incorporated under this section, as though those allegations were fully set forth herein.

~~272.~~686. Defendants Apple, The City, and The Property Owner have violated the EPCRA~~,~~ and Citizen Suit enforcement is available under 42 U.S. Code § 11046. The ~~Defendants~~ violations are ~~in the past, but also~~ ongoing, long-running, and ~~also~~ expected to continue in the future without serious enforcement action including judicial intervention.

## A.     COUNT 25: APPLE AND THE PROPERTY OWNER VIOLATED EPCRA NOTIFICATION AND REPORTING REQUIREMENTS.

### (CLAIMS AGAINST APPLE AND THE PROPERTY OWNERS)

687.   The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

688.   Apple and The Property Owner violated EPCRA §302, 42 U.S.C. § 11002 ("Emergency planning notification") by failure to notify State Emergency Response Commission (SERC) and failure to designate facility representative. "A person responsible for a facility must, as soon as he or she has knowledge of an unauthorized discharge from or at such facility, immediately notify the local fire agency and the Director of such discharge." (S.C.C.C., § B11-395; Ord. No. NS-517.72, § 2, 4-15-03).

689.   Apple and The Property Owner violated EPCRA § 304, 42 U.S.C. § 11004, ("Emergency Release Notification") by failing to report releases of extremely hazardous substances and CERCLA substances that exceeded reportable quantities and failing to provide community notifications. They did not report the releases, actions taken to respond and contain the release, or known or anticipated health risks associated with the release. The City has knowledge of chemical releases from the Facility but has failed to require Defendants to make reports and failed to notify the community as required under EPCRA § 304. Further, the California Fire Code requires that NFPA 704 Fire Diamonds be placed at "entrances to locations where hazardous materials are stored, dispensed, used, or handled in quantities requiring a permit." (Chapter 50, § 5003.5).

273.1.  Apple violated the EPCRA §§ 311 and 312 (Hazardous Chemical Inventory Reporting) by failing to keep an accurate and up-to-date inventory of hazardous chemicals and failing to report those inventories to the state and local government. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists   extensive amounts of very dangerous

substances including Silane, Chlorine gas, Ammonia (NH$_3$), sulfuric acid, and dichlorosilane.[48] Apple's hazardous waste manifests for the site show that in 2024 its still processing at least 120 tons of arsenic, at least 50 tons of ignitable waste, and at least 36 tons of corrosive waste at this single facility. ~~An owner or operator of a new or modified facility that will be used for the handling of acutely hazardous materials must prepare an RMPP. (Health & Safety Code §§ 25531 - 25541.). Anyone required to file a plan is also required to report releases or threatened releases of hazardous materials to the administering agency. (Health & Safety Code § 25507; Cal. Code Regs. tit. 19, § 2703.). CalARP is California's program to implement the federal Accidental Release Prevention program (ARP) with certain additional provisions specific to California.~~

690.    It is also disposed of at least 46.85 tons of "unspecified solvent mixture" as "non-RCRA" waste in just 2025.[49]

~~274.~~691.        EPCRA § 326(a)(1)(A), under which Plaintiff brings this action, is EPCRA's citizen enforcement provision for the owner and operator Defendants' failure to submit emergency notices under section 11004(c), submit material safety data sheets or a lists under section 11021(a), complete and submit an inventory form under section 11022(a), and complete and submit a toxic chemical release form under section 11023(a). (42 U.S. Code § 11046).

~~275.~~692.        "Complete and accurate records are absolutely essential to meaningful compliance with EPCRA Section 313 reporting requirements." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). Facilities "must submit an EPCRA Section 313 report for each EPCRA Section 313 chemical or chemical category that exceeds a threshold for manufacturing, OR processing, OR otherwise use (providing you meet the employee and SIC Code criteria)." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007).

~~276.~~693.        "Any person may commence a civil action on his own behalf." (42 U.S. Code § 11046(a)(1)). The district court shall have jurisdiction in actions brought under subsection (a) against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement. (42 U.S. Code § 11046(c)).

~~277.~~694.        "One of the primary goals of EPCRA is to increase the public's knowledge

---

[48] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals
[49] U.S. EPA, https://hwts.dtsc.ca.gov/facility/CAR000278176

of, and access to, information on both the presence of toxic chemicals in their communities and on releases into the environment and other waste management activities of those chemicals." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). "Most semiconductor manufacturing industry facilities fall under SIC Code 3674 (Semiconductors and Related Devices) and are required to prepare a report (or reports) if they meet the employee and chemical activity thresholds." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). There is a formal 187 page U.S. EPA guide dedicated to EPCRA reporting requirements for Semiconductor Manufacturing. (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007).

695.    Plaintiff spent an incredible amount of time in 2020-2021 researching and investigating, trying to figure out what happened to her next to the Property. She reviewed public records for the nearby next-door buildings, including 3250 Scott. When she pulled looked up the Property on the U.S. EPA portal in 2020, the ECHO page noted that there had been no Toxics Release Inventory releases reported since the 1990s, cited no violations or issues, and made the office look quite benign. Apple managed and continues to manage 3250 Scott as an unmarked office building without any designation as to who was using the building or for what they were using it. In the regulatory paperwork that did exist, Apple repeatedly tried to use code names and to disguise their activities.

696.    On August 16 2025, Plaintiff and other concerned community members held a rally and press conference outside the Property to discuss Plaintiff's plan to file this lawsuit. Community members expressed concern that there was no Apple logo on the building and there was no indication that industrial or hazardous activities were occurring in the facility. The community members did locate an NFPA 704 Fire Diamond at an entrance near the street (4-4-4-W placard indicating the Operations at the Property are lethal, may detonate, can explode under normal conditions, and to not add water or else it will make things worse). On August 16 2025, two people came out of the Chip Fab and demanded the community members to not approach or photograph the entrance and Fire Diamond. One person had an Apple badge. The other person refused to confirm they work for Apple, claimed to work for the 49ers, and then claimed to be associated with law enforcement.

697.    Defendants were engaged in ultrahazardous activities with strict liability, and

Defendants had a critical duty to warn others of the danger of their activities at the facility. Defendants also had a statutory obligation to comply with permitting requirements and to notify the government of their activities, which they failed to do at every opportunity. Defendants also had a duty under federal Right to Know to notify the community of the chemicals they used and released – but they did not do that either. Apple also used illegal non-disclosure agreements to unlawfully silence its employees about health/safety and environmental issues. Defendants ran Operations at the Facility as an old-school Silicon Valley "*skunkworks*" project.[50] (Cal. Penal Code Section 387).

698.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B.    COUNT 26: APPLE, THE CITY, & THE PROPERTY OWNER VIOLATED EPCRA TRI REQUIREMENTS.

### (CLAIMS AGAINST APPLE, THE CITY, & THE PROPERTY OWNERS)

699.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

700.    Apple and The Property Owner violated the EPCRA § 313, 42 U.S.C. § 11023, ("Toxic Chemical Release Inventory") by failing to report toxic chemical releases (TRI reporting) TRI reporting failures For TCE, NMP, arsenic compounds. The City has failed to ensure that the

---

[50] See, for example, the Lockheed "Skunkworks" case, NYT, *Jury Awards $760 Million in Chemical Trial,* Aug. 8 1998, ("One factor in the case was that the Stealth fighter's secrecy could have increased exposure to the chemicals. … the chemical companies knew about those conditions and did not provide adequate warning"), https://www.nytimes.com/1998/08/08/business/jury-awards-760-million-in-chemical-trial.html

Facility submits required Toxics Release Inventory (TRI) reports under EPCRA § 313.

~~278.1.~~ The U.S. EPA website shows that Apple has only filed one TRI report for its Operations at the Facility, in 2021. It is unclear why no reports were filed prior or after, and why Apple chose to file a report only for the year in which it nearly killed its employee, Plaintiff, with its illegal emissions. Apple then cited that same report in the RICO Lawsuit as a basis for why the court should dismiss the Plaintiff's claims, saying the report should have put her on notice to sue Apple earlier. ~~for.~~ ~~In the regulatory paperwork that did exist, Apple repeatedly tried to use code names and to disguise their activities.~~

~~279.    On August 16 2025, Plaintiff and other concerned community members held a rally and press conference outside the Property to discuss Plaintiff's plan to file this lawsuit. Community members expressed concern that there was no Apple logo on the building and there was no indication that industrial or hazardous activities were occurring in the facility. The community members did locate an NFPA 704 Fire Diamond at an entrance near the street (4-4-4 W placard indicating the Operations at the Property are lethal, may detonate, can explode under normal conditions, and to not add water or else it will make things worse).~~

~~280.1.~~ On August 16 2025, two people came out of the Property ~~and demanded the community members to not approach or photograph the entrance and Fire Diamond. One person had an Apple badge. The other person refused to confirm they work for Apple, claimed to work for the 49ers, and then claimed to be associated with law enforcement.~~

~~281.1.    Defendants were engaged in ultrahazardous activities with strict liability, and Defendants had a critical duty to warn others of the danger of their activities at the facility. Defendants also had a statutory obligation to comply with permitting requirements and to notify the government of their activities, which they failed to do at every opportunity. Defendants also had a duty under federal Right to Know to notify the community of the chemicals they used and released – but they did not do that either. Apple also used illegal non-disclosure agreements to unlawfully silence its employees about health/safety and environmental issues. Defendants ran~~

Operations at the Facility as an old-school Silicon Valley "*skunkworks*" project.[51] (Cal. Penal Code Section 387).

282.1. **STANDARDS:** The Defendants have violated EPCRA §302, 42 U.S.C. § 11002 ("Emergency planning notification") by failure to notify State Emergency Response Commission (SERC) and failure to designate facility representative. "A person responsible for a facility must, as soon as he or she has knowledge of an unauthorized discharge from or at such facility, immediately notify the local fire agency and the Director of such discharge." (S.C.C.C., § B11-395; Ord. No. NS 517.72, § 2, 4-15-03).

283.1. **STANDARDS:** The Defendants have violated EPCRA § 304, 42 U.S.C. § 11004, ("Emergency Release Notification") by failing to report releases of extremely hazardous substances and CERCLA substances that exceeded reportable quantities and failing to provide community notifications. The Defendant's did not report the releases, actions taken to respond and contain the release, or known or anticipated health risks associated with the release. The City has knowledge of chemical releases from the Facility but has failed to require Defendants to make reports and failed to notify the community as required under EPCRA § 304. Further, the California Fire Code requires that NFPA 704 Fire Diamonds be placed at "entrances to locations where hazardous materials are stored, dispensed, used, or handled in quantities requiring a permit." (Chapter 50, § 5003.5).

284. **STANDARDS:** The Defendants have violated the EPCRA §§ 311 and 312 (Hazardous Chemical Inventory Reporting) by failing to keep an accurate and up-to-date inventory of hazardous chemicals and failing to report those inventories to the state and local government.

285. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists extensive amounts of very dangerous substances including Silane, Chlorine gas, Ammonia ($NH_3$), sulfuric acid, and dichlorosilane.[52] Apple's hazardous waste manifests for the site show that in 2024 its still processing at least 120 tons of arsenic, at least 50 tons of ignitable waste, and at least 36 tons

---

[51] See, for example, the Lockheed "Skunkworks" case, NYT, *Jury Awards $760 Million in Chemical Trial,* Aug. 8 1998, ("One factor in the case was that the Stealth fighter's secrecy could have increased exposure to the chemicals. … the chemical companies knew about those conditions and did not provide adequate warning"), https://www.nytimes.com/1998/08/08/business/jury-awards-760-million-in-chemical-trial.html

[52] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals

of corrosive waste at this single facility. It's also disposed of at least 46.85 tons of "unspecified solvent mixture" as "non RCRA" waste in just 2025.[53]

701.    **STANDARDS.** Apple then apparently never filed another TRI report.

702.    The one TRI report was filed in or around June 2021 with emission data from 2020. That TRI report includes emissions at the Property in 2020 (when Plaintiff became severely ill next to the Property) of 16,084 pounds of Criteria Air Pollutants, 15,608 pounds of volatile organic compounds (VOCs), 372 pounds of Nitrogen oxides, and 260 pounds of TRI Air Toxics (NMP).[54] The 2020-2021 TRI report included air emissions of Benzene, Carbon Monoxide, Sulfur Dioxide, Formaldehyde, Toluene, Nickel, Lead, Arsenic, Mercury, Acetaldehyde, Chrysene, Fluoranthene, Xylene, Naphthalene, Benz[a]anthracene, Chromium VI, Beryllium, Manganese, and Cadmium.

703.    The NAICS code for "Semiconductor and Related Device Manufacturing" is 334413. Apple used this code at least in 2020 when it filed its only TRI report. Its EIS is also set to this. Its RCRA is set to 541715 Research and Development in the Physical, Engineering, and Life Sciences.

704.    Apple refuses to publicly admit it's doing chip fab at the Chip Fab and believes it's a voluntarily designation – including refusing to get a chip fab NPDES permit (until the treatment works caught them and made them get one), refusing to get a chip fab air permit (until BAAQMD caught them and made them get one), etc. Apple is still refusing to file TRI reports (CAA/EPCRA requirements).by claiming  they can choose to identify their manufacturing as being something other than chip fab, even if its chip fab – and accordingly, Apple says that, means they do not have to file TRI reports that would otherwise be required for chip fab, because Apple decided they don't have to say they are doing chip fab and there's no EPCRA enforcement agency that can force them like with the other stuff.

705.    The facility is required to file TRI reports under the EPCRA as a semiconductor manufacturing facility. The facility regularly releases multiple chemicals listed the EPCRA Part 372 including: Arsenic, Benzene, Isopropyl, Lead, Mercury, NMP, Toluene, and Xylene.

706.    Apple assertion that does not have to file TRI reports because it unilaterally decided

---

[53] U.S. EPA, https://hwts.dtsc.ca.gov/facility/CAR000278176
[54] U.S. EPA, https://echo.epa.gov/air-pollutant-report-new?fid=110001168254

its NAICS code is something other than its actual operations and activities, is a violation of EPCRA.

707.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## C.    COUNT 27: THE CITY VIOLATED EPCRA BY CONCEALING AND DENYING REQUESTS FOR HAZARD INFORMATION IT WAS REQURIED TO PROVIDE.

### (CLAIMS AGAINST APPLE, THE CITY, & THE PROPERTY OWNERS)

708.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

709.    The City violated EPCRA § 326(a)(1)(C), under which Plaintiff brings this action, is EPCRA's citizen enforcement provisiondue to the state government's emergency response agency (delegated here through CUPA to the City of Santa Clara), for failurefailing to provide a mechanism for public availability of information in accordance with section 11044(a). (42 U.S. Code § 11046).

286.1.  (42 U.S. Code § 11046).

287.710.    STANDARDS:The City violated EPCRA § 326(a)(1)(D), under which Plaintiff brings this action, is EPCRA's citizen enforcement provisiondue to the state government's emergency response agency (delegated here through CUPA to the City of Santa Clara), for failurefailing to respond to a request for tier II information under section 11022(e)(3). (42 U.S. Code § 11046).

288.711.    An owner or operator of a new or modified facility that will be used for the

handling of acutely hazardous materials must prepare an RMPP. (Health & Safety Code §§ 25531-25541.). Anyone required to file a plan is also required to report releases or threatened releases of hazardous materials to the administering agency. (Health & Safety Code § 25507; Cal. Code Regs. tit. 19, § 2703.).

712.     CalARP is California's program to implement the federal Accidental Release Prevention program (ARP) with certain additional provisions specific to California.

289.     **STANDARDS:** The Defendants have violated the EPCRA § 313, 42 U.S.C. § 11023, ("Toxic Chemical Release Inventory") by failing to report toxic chemical releases (TRI reporting) TRI reporting failures for TCE, NMP, arsenic compounds. The City has failed to ensure that the Facility submits required Toxics Release Inventory (TRI) reports under EPCRA § 313.

## XV.   Sixth Cause of Action: Toxic Substances Control Act Citizen Suit

290.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

713.     The City violated the EPCRA and state law when it concealed Apple's activities from the Santa Clara Square EIR, concealed the need for the RMP, allowed Apple to provide a partial and incomplete RMP years overdue, and did not claim the RMP was complete until 7 years into operations.

714.     WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XVI.   CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDNTS FOR THEIR VIOLATIONS OF THE TSCA.

715.     The allegations contained in the Amended Complaint sections through "General

Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. Defendants are responsible for ongoing violations of the TSCA. Abatement and enforcement are available under the TSCA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

291.716.    Plaintiff brings this action under TSCA's citizen enforcement provision 15 U.S. Code § 2619 for violation of this chapter. The statute expressly authorizes civil actions by "any person" against "any person" or "any…governmental instrumentality or agency." (15 USC § 2619(a)(1)). This includes corporations. 15 U.S. Code § 2615(b). Defendants violated the Chapter, including §§ 2605 and 2614.

292.717.    This includes companies like Apple and The Defendants haveProperty Owners, and cities like Santa Clara. 15 U.S. Code § 2615(b). All three defendants violated the TSCA through conduct related to lead, and multiple violations of other rules and orders.Chapter, including §§ 2605 and 2614. The Defendants violations are in the past, but also ongoing, and also expected to continue in the future without judicial intervention. Enforcement is available under 15 USC § 2619(a).

718.    **STANDARDS:** The Defendants haveChip Fabs are highly regulated by TSCA because they use so many propriety and Trade Secret substances and mixtures, are generally inherently dangers. At chip fabs, "the chemical cocktail changes faster than toxicologists can keep up with… the synthesis and use and application of chemicals is outracing the ability of the toxicology community to make safe evaluations." [55]

## A. COUNT 28: APPLE VIOLATED THE TSCA WITH NMP (15 U.S.C. §§ 2605, 2614-2615; 40 CFR PART 751).

### (CLAIMS AGAINST APPLE)

719.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts

---

[55] The fight to clean up the toxic legacy of semiconductors, Dec. 8 2023, https://www.theverge.com/23990525/semiconductor-biden-infrastructure-plan-toxic-chemicals

under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

720.   NMP (n-methyl-2-pyrrolidone) is regulated under 40 CFR Part 751, 89 Fed. Reg. 51134. Apple's violation of Apple reported to the government that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the atmosphere around 3250 Scott. In 2022, the EPA severely restricted the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under TSCA. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists a number of TSCA regulated chemicals including, but not limited to, extensive amounts of n-methyl-2-pyrrolidone (NMP) and glycol ethers.[56]

~~293.~~721.    Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with NMP by unlawful manufacturing, processing, and/or ~~distribution; violations of~~ distributing; violating use restrictions; and fail~~ure~~ing to comply with phase-out requirements~~, including with, but not limited to, NMP, TCE, and Mercury~~.

722.   **STANDARDS: The Defendants have**Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, NMP, ~~TCE, and~~by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S. Code § 2614(1)-(4).

723.   N-Methyl-2-Pyrrolidone (NMP) ($C_5H_9NO$) "causes headache if inhaled; redness, plain, and blurred vision if exposed to eyes or skin; and a burning sensation in the throat and chest if ingested. "Exposure to very high concentrations could cause lowering of consciousness." (InChem, WHO, 2014). Suspected of damaging fertility or the unborn child. A harmful contamination of the air will not or will only very slowly be reached on evaporation of this substance at 20°C; on spraying or dispersing, however, much faster." (InChem, WHO, 2014).

724.   Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply

---

[56] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals

with the requirement. 15 U.S.C. 2615(b)

725.     WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B. COUNT 29: APPLE VIOLATED THE TSCA WITH MERCURY (15 U.S.C. §§ 2605, 2607, 2614-2615).

### (CLAIMS AGAINST APPLE)

726.     The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

727.     Mercury, is regulated under 15 U.S.C. 2607(b)(10)(D), Part 713, 83 FR 30073 as well as EPCRA 313 and The Frank R. Lautenberg Chemical Safety for the 21st Century Act (Lautenberg Act) (Pub. L. 114-182, 130 Stat. 448), Under section 8(b)(10)(D) of the Toxic Substances Control Act (TSCA), any person who "intentionally uses mercury in a manufacturing process" must comply with federal mercury reporting requirements. (applies under NAICS 334413, 334419, and 541712). (15 U.S.C. 2607(b)(10)) 40 CFR Part 713

728.     EPA's enforcement program is aimed at protecting the public by targeting persons or entities who neither comply nor cooperate to address their legal obligations… Under TSCA, EPA may file an enforcement action against violators, seeking penalties of up to $37,500 per violation, per day." (EPA, Compliance Guide: *Reporting Requirements for the Mercury Inventory of the Toxic Substances Control Act,* January 2022 EPA-740-B-22-001).

729.     Inhalation of mercury causes cough, sore throat, shortness of breath, fever, vomiting, diarrhea, abdominal pain, high blood pressure, tremor, headache, weakness, birth defects, infertility, and death. (INCHEM, WHO, Nov. 2019; ASTDR ToxGuide, 2024). Mercury

warnings include "Do NOT let this chemical enter the environment." "Very toxic to aquatic life with long lasting effects." (INCHEM, WHO, Nov. 2019).

730.    Elemental Hg exists as a (e.g., mercuric chloride; HgCl) gas, liquid, or solid. Biomarkers more strongly correlated to exposure to elemental mercury and inorganic mercury include mercury in blood (or plasma) Median total urinary mercury level: and mercury or total mercury in urine. (ASTDR ToxGuide, 2024). "Atmospheric mercury is primarily in the form of gaseous elemental mercury, which is subject to long range transport. Therefore, mercury can be found in locations far removed from its release site. There is no odor warning even when toxic concentrations are present." (INCHEM, WHO, Nov. 2019). Mercury is a neurotoxin. (ASTDR).

731.    Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with Mercury by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

294.732.    Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, Mercury, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which DefendantsApple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; and for failing or refusing to establish and maintain records, or; and for failing to submit reports, notices and other required information. 15 U.S. Code § 2614(1)-(4).

733.    Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

734.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## C. COUNT 30: APPLE VIOLATED THE TSCA WITH TCE (15 U.S.C. §§ 2605, 2614-2615; 40 C.F.R. § 751.301).

## (CLAIMS AGAINST APPLE)

735.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

736.    Trichloroethylene (TCE), Subpart D, 40 C.F.R. § 751.301, 89 FR 102568, December 17, 2024. DUMPING: The Defendants have Inhalation of TCE causes dizziness, drowsiness, headache, blurred vision, weakness, nausea, unconsciousness, cardia failure, and "an attitude of irresponsibility." (INCHEM, WHO, April 2013; US Coast Guard CHRIS, 1999). Dermal exposure causes redness, dermatitis, pain, and dry skin. INCHEM, WHO, April 2013.

737.    "In December 2024, EPA issued a final rule regulating TCE under the Toxic Substances Control Act (TSCA) to protect people from health risks including liver cancer, kidney cancer, and non-Hodgkin's lymphoma." All uses of TCE are eventually prohibited. industrial and commercial uses of TCE are prohibited after September 15, 2025. (EPA, TSCA Fact Sheet, 2024).

738.    "Harmful to aquatic life with long lasting effects " INCHEM, WHO, April 2013. The substance is harmful to aquatic organisms. The substance may cause long-term effects in the aquatic environment. It is strongly advised not to let the chemical enter the environment." "Decomposes on contact with hot surfaces or flames. This produces toxic and corrosive fumes of phosgene and hydrogen chloride." (INCHEM, WHO, April 2013.). Regulated by EPCRA 313 TRI, CERCLA RQ and a Carcinogen.

739.    Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with TCE by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

740.    Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, TCE, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S. Code § 2614(1)-(4).

741.    Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

742.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## D. COUNT 31: APPLE VIOLATED THE TSCA WITH LEAD (15 U.S.C. §§ 2605, 2614-2615, 2681-2689; 40 CFR PART 745).

### (CLAIMS AGAINST APPLE)

743.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

744.    Lead, 15 U.S. Code § 2681-2689, 40 CFR Part 745, Section 21. Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with Lead by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

745.    Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, Lead, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S. Code § 2614(1)-(4).

746.    Inhalation of lead causes cough, metallic taste, abdominal pain, headache, confusion, drowsiness, unconsciousness, convulsions. "Inhalation of high concentrations may

cause effects on multiple organs." "A harmful concentration of airborne particles can be reached quickly when dispersed." (INCHEM, WHO, Nov. 2019).

747.    Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

748.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## E. COUNT 32: ALL DEFENDANTS VIOLATED TSCA BY USING AND DISPOSING OF IMMINENTLY HAZARDOUS CHEMICAL SUBSTANCES AND MIXTURES. (15 U.S.C. §§ 2605-2606, 2615).

### (CLAIMS AGAINST ALL DEFENDANTS)

749.    The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

750.    Apple violated 15 U.S. Code § 2606 of the TSCA by using and disposing of imminently hazardous chemical substances and mixtures. 15 U.S. Code § 2606(a).

751.    The Property Owner and the City knew Apple was doing this, and knew it created hazardous, but did not stop or abate it, and instead enabled, concealed, and contributed to the violations.

295.752.    The risk to health or the environment is considered imminent because the use and disposal of the chemical substance and mixture, or any combination of such activities, is likely to result in such injury to health or the environment in violation of § 2605, and/or before a final rule under § 2605 of this title can protect against such risk. 15 U.S. Code §§ 2605(a), 2606(f).

This includes improper use and disposal of: TCE, NMP, Mercury, and Lead.

- Trichloroethylene (TCE), Subpart D, 40 C.F.R. § 751.301, 89 FR 102568, December 17, 2024.

- NMP (n-methyl-2-pyrrolidone), 40 CFR Part 751, 89 Fed. Reg. 51134.

- Mercury, 15 U.S.C. 2607(b)(10)(D), Part 713, 83 FR 30073.

- Lead, 15 U.S. Code § 2681-2689, 40 CFR Part 745, Section 21.

296.1.  Apple reported to the government that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the atmosphere around 3250 Scott. In 2022, the EPA severely restricted the legal use of NMP as "*it presents an unreasonable risk of injury to human health*" under TSCA. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists a number of TSCA regulated chemicals including, but not limited to, extensive amounts of n-methyl-2-pyrrolidone (NMP) and glycol ethers.[57]

297.753.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants'Apple knowingly and willfully violated provisions of §§ 2614 and 2689, and knew at the time of the violation that the violation places another person in imminent danger of death or serious bodily injury. 15 U.S.C. 2615(b)(2)(A).

298.    **KNOWING AND WILLFUL VIOLATIONS:** Defendants' were subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

299.    **KNOWING AND WILLFUL VIOLATIONS:** Defendant Apple also terminated the Plaintiff in violation of the TSCA's anti-retaliation provision at 15 U.S. Code § 2622 ("*employee protection*"), which is tracked in the RICO Lawsuit and the U.S. Dept. of Labor adjudication.

754.    **Seventh Cause of Action: Public Nuisance** The Property Owner and City contributed to these violation by failing to abate them, failing to report them, failing to warn, and failing to assist those who were harmed.

755.    WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the

---

[57] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals

harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XVI.XVII.   PUBLIC NUISANCE ABATEMENT AND ENFORCMENT AGAINST DEFENDNTS.
### (Cal. Civ Code § 3491 et seq.)

300.756.   Plaintiff incorporates The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other paragraphsCounts under this statute, are hereby incorporated as though those allegations were fully set forth herein. In addition, the factual allegations pled under the federal Counts, are also incorporated under this section, as though those allegations were fully set forth herein.

301.757.   Defendants Apple, The City, and The Property Owner are responsible for creating, maintaining, and failing to abate a dangerous and continuous Public Nuisance. Abatement and enforcement actions are available under the California Public Nuisance statutes and common law. The Public Nuisance is ongoing, long-running, and expected to continue in the future without judicial intervention including abatement. From at least 2015 to the present, the Property has been owned, operated, managed, used, and/or directly or indirectly permitted to be used in such a manner as to constitute a public nuisance under the California Civil Code. The public nuisance as described herein is injurious to health, indecent or offensive to the senses, and/or an obstruction to the free use of property, and it substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property.

302.758.   Under California Civil Code an nuisance is "Anything which is injurious to health… or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, … of any…stream… or any public park, square, street, or highway." Cal. Civ. C. §

3479. The public nuisance as described herein is injurious to health, indecent or offensive to the senses, and/or an obstruction to the free use of property, and it substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. C. § 3480.

303.    In violation of Santa Clara City Code Chapter 8.30, Defendants have created a public nuisance with conditions which are offensive or annoying to the senses, detrimental to property values and community appearance, an obstruction to or interference with the comfortable enjoyment of adjacent property or premises, and hazardous or injurious to the health, safety, or welfare of the general public.

304.    In violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), Defendant's created conditions which are injurious to health, is indecent or offensive to the senses, and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

305.    Defendants created an attractive nuisance in violation of Santa Clara City Code 8.30.020(c) by creating unsafe conditions directly adjacent to public parks and a public playground. Defendants spread of smoke, dust, and fumes over a considerable area filled with private residences, effects numerous people, and interferes with the use of public spaces is an express public nuisance under the Restatement 2nd of Torts Section 821(b) comment g.

306.759.        Defendants activities The Defendants actions with the Chip Fab created conditions which are injurious to health, including, but not limited to, the indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, orand unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

307.    Defendants, who, at all times relevant herein, have owned and/or controlled the Property, have been on actual notice of the nuisance, and yet have failed to take reasonable steps to

prevent or abate it. As a result of this failure, and of the Defendants' mismanagement of the Property, they have caused or contributed to an acutely serious threat to the health, safety, and welfare of those present at and around the Property, as well as persons in the surrounding community.

760.    Plaintiff is enabled to maintain an action for public nuisance because this public nuisance was especially injurious to herself. Plaintiff was harmed to a different degree and of a different kind, than the public – including that she also has standing for a private nuisance claim (even if her statute of limitations ran out for compensatory damages). Plaintiff has exhausted administrative remedies and has no alternative but to seek judicial enforcement of federal environmental laws designed to protect public health and the environment.

308.761.    The Plaintiff has no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described, and her prior attempt at private nuisance and ultrahazardous activities claims were dismissed due to the Defendant Apple's arguments about tolling of statute of limitations.

309.762.    Unless the nuisance described in this Complaint is abated, the surrounding community, neighborhood, and the residents of the city will suffer irreparable injury and damage, in that said conditions will continue to be injurious to the enjoyment and free use of the Premise by those who live and work near the Property as well as the general public.

763.    All Defendants are independently and jointly liable, including through theories of contribution, condonation, conspiracy, failure to warn, failure to abate, encouragement, enablement, and strict liability.

## F. COUNT 33: APPLE VIOLATED CAL. CIV CODE § 3491 *ET SEQ.*

### (CLAIMS AGAINST APPLE)

764.    Apple operates and controls the Chip Fab and 3260 Scott Blvd, and has been on actual notice of the nuisance, but has failed to take reasonable steps to prevent or abate the nuisance and it is a nuisance they can independently abate.

765.    As a result of Apple's failures and their mismanagement of the Chip Fab, Apple has caused and contributed to an acutely serious threat to the health, safety, and welfare of those

present at and around the Premise and in the surrounding community.

766.    Apple stores, uses, and releases extensive amounts of pyrophoric materials, including Silane gases. Apple has repeatedly failed to comply with fire code provision related to these materials, including the silane gas – which can easily detonate and create "fireball explosions." Apples silane gas management repeatedly failed to have backup, secondary containment, emergency shut off, alarms, backup power, and extremely basic safety mechanisms.

|  | Silane (Silicon tetrahydride) Risks |
|---|---|
| Health | "Vapors may cause dizziness or asphyxiation without warning, especially when in closed or confined areas. Some may be toxic if inhaled at high concentrations. Contact with gas or liquefied gas may cause burns, severe injury, and/or frostbite. Fire may produce irritating and/or toxic gases. (ERG, 2024) |
| Fire Hazard | "Extremely Flammable. Will be easily ignited by heat, sparks, or flames. Will form explosive mixtures with air…will ignite spontaneously in air and may re-ignite." (ERG Guide 116; CAMEO, 2025). |
| Reactivity | "Slowly reacts with water to form silicon hydroxides and hydrogen gas…Even traces of the free halogens may cause violent explosions, when handling silane, extreme caution should be taken," (CAMEO, 2025). |

767.    Apple's activities at the Chip Fab creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

768.    Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

769.    Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because the Chip Fab creates conditions which are injurious to health, indecent or offensive to the senses, and are an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at

the same time an entire community or neighborhood, and considerable number of persons.

770.    Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

771.    Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

772.    Apple created a public nuisance with the Chip Fab, by creating imminent and substantial endangerment to thousands of residents, including children playing in nearby parks, the

773.    Apple created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many people; and interferes with the use of public spaces.



CAMEO Map Tool for Initial Isolation and Protective Action Distances, Emergency Response Guidebook (ERG), ER 119, UN/NA 2188 Arsine Gas (not on fire), (screenshot taken 11/12/2025), https://cameochemicals.noaa.gov/unna/2188

774. Apple uses, stores, release, transports, and leaks/spills an extraordinary amount of toxic gases that are acutely dangerous to live orgasms including gases that are classified as chemical weapons including arsine, chlorine, phosphine, and fluorine.

775. Apple created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. Apple violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events. Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

310.776. Apple's conduct violates dozens of statutes and thus Apple is creating and maintaining s *per se* nuisance. Apple is concurrently willful refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health and Safety, Section

777. The harm created ~~by Defendants~~ Apple's actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

778. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a pubic nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

## G.    COUNT 34: THE PROPERTY OWNER VIOLATED CAL. CIV CODE § 3491 *ET SEQ.*

### (CLAIMS AGAINST THE PROPERTY OWNER)

779.    The Property Owner owns and controls The Chip Fab, 3260 Scott, and the property with the Synertek site.  The Property Owner has been on notice of the nuisance emanating from the Chip Fab and directly impacting The Premise but has failed to take reasonable steps to prevent or abate the nuisance. A property owner is generally jointly liable for most environmental and safety violations that occur at their property, especially when the actions / omissions related to their tenant and the operations of the tenant that the landlord/owner knows are occurring at its own property.

780.    As a result of their failures, and of The Property Owners general mismanagement, The Property Owner has caused and contributed to an acutely serious threat to the health, safety, and welfare of those present at and around The Premise and surrounding community. Where the Property Owners did not cause the nuisance, they maintained it, protected it, failed to abate it, and failed to warn people of the dangers.

781.    The Property Owners has specialized knowledge of this specific area and about industrial facilities, due to his professional specialization in selling and leasing exactly these kinds of facilities, in exactly these locations, for decades.

782.    The Property Owners 's activities at the Chip Fab creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

783.    The Property Owners  created a public nuisance with the Chip Fab, in violation  of Santa Clara City Code Chapter 8.30, because the Chip Fab activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

784.    The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because the Chip Fab creates conditions which are injurious to health, indecent or offensive to the senses, and are an obstruction

to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

785.    The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

786.    The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

787.    The Property Owners created a public nuisance with the Chip Fab, by creating imminent and substantial endangerment to thousands of residents, including children playing in nearby parks.

788.    The Property Owners created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many people; and interferes with the use of public spaces.

789.    The Property Owners created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. The Property Owners violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events.  Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

790.    The Property Owners' conduct violates dozens of statutes and thus The Property Owners are creating and maintaining  s *per se* nuisance. The Property Owners are concurrently willful refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health

and Safety.

311.791.    The harm created by The Property Owners actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

792.    DefendantsWHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to  create and implement a Corrective Action Plan to correct its operations  to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a pubic nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

## H.    COUNT 35: THE CITY OF SANTA CLARA VIOLATED CAL. CIV CODE § 3491 *ET SEQ.*

### (CLAIMS AGAINST CITY OF SANTA CLARA)

793.    The City of Santa Clara owns and controls The Parks (Meadow Park, Creekside Park, Redwood Trail, etc.),  The City has been on notice of the nuisance emanating from the Chip Fab and directly impacting The Parks but has failed to take reasonable steps to prevent or abate the nuisance.

794.    As a result of this failure, and of The City's general mismanagement of The Parks and other City owned property, resources, and infrastructure, The City has caused and contributed to an acutely serious threat to the health, safety, and welfare of those present at and around The Premise and surrounding community.

795.    Where the City did not directly cause the nuisance, The City did maintained it, protected it, failed to abate it, and failed to warn people of the dangers. Specific to the Parks and

public spaces, the City also invited people to those areas and assured them they were safe, when the City knew they were dangerous.

The City had employees and department with specialized knowledge about all of these issues, activities, and violation – and knew the risks, but proceeding anyway.

796.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

797.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance, in violation of Santa Clara City Code Chapter 8.30, because the activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

798.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because they create conditions which are injurious to health, indecent or offensive to the senses, and are an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

799.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a

public nuisance, in violation of Santa Clara City Code Chapter 8.30, because actions creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

800.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the it created conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

801.    The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance by creating imminent and substantial endangerment to thousands of residents, including children playing in nearby parks.

802.    The City's misconduct and negligence related to parks, EIRs, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, air emissions, and fire safety; created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many people; and interferes with the use of public spaces.

803.    The City's misconduct and negligence related EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. The City violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events. Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

804.    The unsafe conditions with the prior pollution, and DTSC and CERCLA

remediation sites, were neglected by the City, but directly adjacent, and under/on, public parks and a public playground, creating an attractive nuisance in violation of Santa Clara city code 8.30.020(c). The City's playgrounds create an attractive nuisance, and the City fails to warn of dangers, but does invite vulnerable populations to the hazard.

The unsafe conditions at the Chip Fab, contributed to and maintained by the City, are directly adjacent to public parks and a public playground, creating an attractive nuisance in violation of Santa Clara city code 8.30.020(c). The City's playgrounds create an attractive nuisance, and the City fails to warn of dangers, but does invite vulnerable populations to the hazard.

805.    The City knows that Apple stores, uses, and releases extensive amounts of pyrophoric materials, including Silane gases, and that Apple has repeatedly failed to comply with fire code provision related to these materials, including the silane gas – which can easily detonate and create "fireball explosions." Apple's silane gas management repeatedly failed to have backup, secondary containment, emergency shut off, alarms, backup power, and extremely basic safety mechanisms.  The City knew about these issues and documented them in their records ("Silane Exhaust: Exhausts connect to Silane storage and use shall be shut down when there is failure to the exhaust system. How is this accomplished?"-- MEP 3, BLD21-63026, CRR Div. Plan Check Comments/Conditions, 1/3/2022). Yet the City failed to take enforcement .

806.    The City would press for basic disclosures and safety mechanisms ("Silane exhaust: Failure of the ventilation system for Silane shall shutdown the source of gas as indicated on the review response. -- G-4, BLD21-63026, CRR Div. Plan Check Comments/Conditions, 2/11/2022).

807.    Apple and the Property Owner would push back claiming its no-big-deal and their coworkers already said its fine ("Associated FIR21-983 GLSS permit was approved by C. Lee. The scope of work of areas being altered in this installation are very minimal - this project is an equipment replacement project. This project is not installing any new silane equipment. The plans show that this project is not altering the centralized GEX system that the silane gas equipment is exhausted by other than demolishing one branch from the central system which will have no impact to the functionality).

808.    Then the City gives up despite Apple and the Property Owner admitting to exhausting pyrophoric gases, that can spontaneously combust, next to a playground.

809.    Silane and similar materials could "detonate" the Chip Fab, yet concurrently the City approved development the Santa Clara Square apartments while also knowing it could not provide basic fire service to the apartments. The Fire Chief's formal request to the City Manager regarding "alternative materials/methods" to provide emergency fire services for the 1,800+ unit apartment complex next to an ultrahazardous industrial facility was suggested an "increase in the fire sprinkler system density within each of the five office buildings, and the purchase or funding of specialized firefighting and inspection equipment… that would address the Fire Department conditions of approval, such as the establishment of an unmanned aerial vehicle program and purchase of unmanned aerial vehicles (UAVs), and the purchase of handheld thermal imaging cameras with video recording equipment." (2/5/2017).

810.    The City FD approved ultrahazardous siting of heavy industrial next to dense residential, knowing it cannot provide basic fire services in case of a fire or explosion, but suggested it would still approve the development if the City bought it drones and UV cameras. (December 5, 2017, Fire Chief to City Manager for Council Action).

~~312.~~811.    The City's conduct ~~in~~ violates dozens of statutes and thus The City's creating and maintaining ~~this nuisance violates dozens or hundreds of statutes and thus is a~~ s *per se* nuisance. ~~Defendants creation and maintenance of public nuisance, and~~ City's concurrently willful ~~omission~~refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. ~~Penal Code Title 10, Crimes against the Public Health and Safety, Section 372~~Penal Code Title 10, Crimes against the Public Health and Safety.

~~313.    This case represents one of the most egregious examples of environmental non-compliance in recent history. A major corporation has operated an unpermitted semiconductor facility for nearly a decade, poisoning residents including their own employee, while regulatory agencies fail to act despite documented knowledge of extensive violations.~~

~~314.    Plaintiff is enabled to maintain an action for public nuisance because this public nuisance was especially injurious to herself. Plaintiff was harmed to a different degree and in a different kind, than the general public.~~

~~315.~~1.    ~~The imminent and substantial endangerment to thousands of residents, including~~

children playing in nearby parks, demands immediate action. ~~Plaintiff has exhausted administrative remedies and has no alternative but to seek judicial enforcement of federal environmental laws designed to protect public health and the environment.~~

812.   The harm created by City's actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

813.   WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a pubic nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

# RELIEF SOUGHT

~~316.~~814.   Plaintiff hereby demands a jury on all issues which can be heard by a jury. Plaintiff requests the following remedies against all Defendants, jointly and severally, except as specifically noted otherwise, and to the fullest extent authorized by law and deemed appropriate by this Court:

- A DECLARATION that each Defendant are in violation of the RCRA, CAA, CWA, EPCRA, and TSCA;
- A DECLARATION that each Defendant has violated and continues to violate the applicable regulations and orders promulgated thereunder;
- A DECLARATION that the Chip Fab constitutes a Public Nuisance.
- A DECLARATION that the Chip Fab has created an imminent and substantial endangerment.

- A DECLARATION that Residents and Workers injured by the Chip Fab, shall have a Right to a Remedy.
- A DECLARATION that the public has a RIGHT TO KNOW about dangerous and hazardous activities occurring at the Chip Fab that could harm them and/or the environment around them.

## XVII. AN ORDER OF Injunctive & Declaratory Relief

- Preliminary and permanent injunctive relief enjoining the Defendant's to ENJOING the Defendants to comply with all provisions of the RCRA, CAA, CWA, EPCRA, and TSCA at the facility, and jointly and severally abate the consequences of their prior and ongoing violations.

317. Preliminary and permanent injunctive relief enjoining the Defendant's to jointly and severally abate the consequences of having contributed and/or its contributing to the handling, storage, treatment, transportation and/or disposal of hazardous waste resulting in an imminent and substantial endangerment at and in the vicinity of the site, by developing and implementing a Remedial Action Plan, approved by the court, which fully abates the endangerment.

- Injunctive relief is required AN ORDER of Injunctive Relief to ENFORCE the environmental laws that the Defendants are violating, and if not possible in that location, then to cease operations at that location.
- AN ORDER of Injunctive Relief to ENFORCE the environmental laws that the Defendants are violating, including installation of required emission controls meeting all federal standards, and restoration of the environmentenvironmental harm caused by these violations.
- AN ORDER of Injunctive Relief is required to RESTRAIN the Defendants from continuing their violations of these environmental laws, including prohibiting all future unpermitted discharges into the air, water, and ground, and ordering a federal monitor to oversee compliance auditing.
- AN ORDER of Injunctive Relief is required to RESTRAIN the Defendants from maintaining their imminent and substantial risk of danger to the public and environment, including remediation of contamination, providing comprehensive air

monitoring with real time public disclosure, and community health monitoring program for all affected residents.

- A preliminary injunction is AN ORDER of Injunctive Relief to COMPEL Defendants REMEDIATOIN the unlawful filling of the Saratoga Creek and to restore the natural ecosystem, with a Correction Action Plan authorized by USACE and EPA, and approved by this Court.

- AN ORDER of Injunctive Relief REQUIRING the development and implementation of a Remedial Action Plan, approved by the court, which fully abates the endangerment and nuisance,

- AN ORDER of Injunctive Relief REQUIRING environmental clean-up and remediation from unlawful pollution, dumping, and releases,

- AN ORDER of Injunctive Relief REQUIRING mandatory training including safety school, environmental compliance, and labor laws for all officials managing oversight, operations, and remediation at The Premise.

- AN ORDER of Injunctive Relief REQUIRING each Defendant establishment formal complaint investigation protocols for EH&S complaints about The Premise, including whistleblower protection policies,

- AN ORDER of Injunctive Relief to MONITOR the Defendants required to order the immediate actions to cease violations and remediate harm caused, with required REPORTING, NOTICES, AND MONITORSHIP.

- AN ORDER of Preliminary Injunction for CESSATION of all semiconductor fabrication operations chip fab and other hazardous activities, until full compliance is assured.

318. COMPLIANCE ORDERS for Cleanup and Remediation, and Monitoring/Reporting requirements.

319. A DECLARATION that FINES against each Defendants are in violation of the RCRA, CAA, CWA, EPCRA, and TSCA.

## XVIII.  CIVIL PENALTIES

320. All penalties available under applicable statutes with fines for for their federal

violations to be , as authorized by statute and with all penalties paid to the U.S. Treasury. Penalties should be enhanced for knowing and willful violations, and should include recovery of economic benefits obtained by avoiding compliance.

## XIX. Supplemental Environmental Projects

- --- with the maximum allowable of penalty funds should be directed towards community projects including community air monitoring network installation and operation, medical monitoring program for exposed residents (especially the children), environmental restoration of contaminated areas, and emergency response capability enhancement.

## XX. Costs and Fees

- FEES & COSTS for the Plaintiff including Attorney's fees and costs; expert witness fees and technical consultant costs; environmental investigation and monitoring costs; all other costs and fees the court deems proper.

321.    Note: Plaintiff is in Chapter 7 Bankruptcy in Boston and has disclosed this pending litigation but does not believe it to be an "asset." In order to protect the integrity of this litigation, which represents important public rights and interests, Plaintiff does not request any personal damages; however does not waive her right to request such damages in other litigation, as a victim of crime,  later in this litigation, and/or at other times.

# ~~CERTIFICATION~~

# CONCLUSION

~~322.~~815.        Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Filed: ~~September 2~~November 29 2025 (CORRECTED)

/s/ Ashley M. Gjovik
*Pro Se Plaintiff*

Email: legal@ashleygjovik.com
~~Physical Address:~~Phone: (415) 964-6272
Home: 18 Worcester Sq. Apt. 1, Boston, ~~Massachusetts~~MA, 01228
Mailing ~~Address~~: 2108 N St. Ste. 4553 Sacramento, CA, 95816
~~Phone: (408) 883-4428~~

CERTIFICATE

**ATTACHED APPENDIX OF EXHIBITS:**
(PROOFS OF COMPLAINTS AND SERVICE)

I hereby certify that a true and correct copy of the Complaint and Summons will be served upon the Defendants Apple Inc, Kalil/Khalil Jenab, City of Santa Clara.

In addition, Personal Service of the Complaint will be made to the U.S. Attorney General pursuant to RCRA § 6972/§ 7002(b)(2)(F), Clean Air Act § 7604, Clean Water Act § 1365.

In addition, Certified Mail of the Complaint will be made to the U.S. Environmental Protection Agency Administrator at 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460, pursuant to RCRA § 6972/§ 7002(b)(2)(F), Clean Air Act § 7604, Clean Water Act § 1365.

- In addition, in addition, electronic mail, or other courtesy notification will be sent to the California EPA, San Jose Regional Wastewater Facility, Bay Area Air Quality Management District, and U.S. EPA Enforcement and Compliance team. Exhibit A: June 2025 Sixty Day Notice
- Exhibit B: Proof of Service of June 2025 Sixty-Day Notice
- Exhibit C: June 2023 Environmental Complaint
- Exhibit D: EPA Records & Oct. 2025 EPA RCRA Enforcement Action

# EXHIBITS:

# IMAGES & MAPS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## CA WILDLIFE BIOS | HISTORICAL CREEKS | SARATOGA CREEK



HISTORICAL PATH OF SARATOGA AKA CAMPBELL CREEK PRIOR TO 1970

**Map Legend**

Historical Channels Ecology - SFEI [ds3202]

LegLabel

—— Creek / River

—— Paleochannel / Less Certain

—— Slough / Distributary

—— Tidal Channel

### Historical Topographic Map



| | TARGET QUAD | SITE NAME: | 3310 Montgomery Drive | CLIENT: | Erler & Kalinowski, Inc. |
|---|---|---|---|---|---|
| N | NAME:     MILPITAS | ADDRESS: | 3310 Montgomery Drive | CONTACT: | Kat Wuelfing |
| ↑ | MAP YEAR:  1980 | | Santa Clara, CA 95054 | INQUIRY#: | 3629208.4 |
| | PHOTOREVISED FROM :1961 | LAT/LONG: | 37.3812 / -121.9736 | RESEARCH DATE: | 06/07/2013 |
| | SERIES:     7.5 | | | | |
| | SCALE:     1:24000 | | | | |



Historical Topographic Map



| TARGET QUAD | | SITE NAME: | 3310 Montgomery Drive | CLIENT: | Erler & Kalinowski, Inc. |
|---|---|---|---|---|---|
| NAME: | MILPITAS | ADDRESS: | 3310 Montgomery Drive | CONTACT: | Kat Wuelfing |
| MAP YEAR: | 1973 | | Santa Clara, CA 95054 | INQUIRY#: | 3629208.4 |
| PHOTOREVISED FROM :1961 | | LAT/LONG: | 37.3812 / -121.9736 | RESEARCH DATE: | 06/07/2013 |
| SERIES: | 7.5 | | | | |
| SCALE: | 1:24000 | | | | |



INQUIRY #: 3629208.5

YEAR: 1968

⇧ N

|⊢————⊣| = 500'

## Historical Topographic Map



| | | | |
|---|---|---|---|
| **TARGET QUAD** | SITE NAME: | 3310 Montgomery Drive | CLIENT: | Erler & Kalinowski, Inc. |
| NAME: MILPITAS | ADDRESS: | 3310 Montgomery Drive | CONTACT: | Kat Wuelfing |
| MAP YEAR: 1961 | | Santa Clara, CA 95054 | INQUIRY#: | 3629208.4 |
| | LAT/LONG: | 37.3812 / -121.9736 | RESEARCH DATE: | 06/07/2013 |
| SERIES: 7.5 | | | | |
| SCALE: 1:24000 | | | | |



## Historical Topographic Map



| | TARGET QUAD | SITE NAME: | 3310 Montgomery Drive | CLIENT: | Erler & Kalinowski, Inc. |
|---|---|---|---|---|---|
| N | NAME: SAN JOSE | ADDRESS: | 3310 Montgomery Drive | CONTACT: | Kat Wuelfing |
| ↑ | MAP YEAR: 1953 | | Santa Clara, CA 95054 | INQUIRY#: | 3629208.4 |
| | | LAT/LONG: | 37.3812 / -121.9736 | RESEARCH DATE: | 06/07/2013 |
| | SERIES: 15 | | | | |
| | SCALE: 1:62500 | | | | |

### Historical Topographic Map



N ↑

| | | | |
|---|---|---|---|
| **TARGET QUAD** | SITE NAME: 3310 Montgomery Drive | CLIENT: Erler & Kalinowski, Inc. |
| NAME: MILPITAS | ADDRESS: 3310 Montgomery Drive | CONTACT: Kat Wuelfing |
| MAP YEAR: 1953 | Santa Clara, CA 95054 | INQUIRY#: 3629208.4 |
| | LAT/LONG: 37.3812 / -121.9736 | RESEARCH DATE: 06/07/2013 |
| SERIES: 7.5 | | |
| SCALE: 1:24000 | | |

**Historical Topographic Map**



| | TARGET QUAD | | SITE NAME: | 3310 Montgomery Drive | CLIENT: | Erler & Kalinowski, Inc. |
|---|---|---|---|---|---|---|
| N | NAME: | SAN JOSE | ADDRESS: | 3310 Montgomery Drive | CONTACT: | Kat Wuelfing |
| ↑ | MAP YEAR: | 1899 | | Santa Clara, CA 95054 | INQUIRY#: | 3629208.4 |
| | | | LAT/LONG: | 37.3812 / -121.9736 | RESEARCH DATE: | 06/07/2013 |
| | SERIES: | 15 | | | | |
| | SCALE: | 1:62500 | | | | |





Figure 3-6

Santa Clara Valley HCP/NCCP Watersheds