**Ashley M. Gjovik, JD**
*In Propria Persona*
Boston, MA
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJØVIK,** *an individual*, <br><br> **PLAINTIFF,** <br><br> vs. <br><br> **APPLE INC.,** *a corporation,* <br><br> **CITY OF SANTA CLARA,** *a local government*, <br><br> **MR. JENAB ET AL** *(individually, LP, LLC, &/or Trust)* <br><br> **DEFENDANTS.** | **CASE NO. 25-CV-07360-PCP** <br> **ENV. "CITIZEN SUIT"** <br> **& CAL. PUBLIC NUISANCE** <br><br> **JUDGE: P. CASEY PITTS** <br><br> <u>**NOTICE OF PENDENCY**</u> <br><br> **CLEAN WATER ACT** <br> **SECTION 404 (FILLING)** <br> **SIXTY DAY NOTICE** <br> **PERIOD INITIATED** |

# NOTICE OF PENDENCY

1.    Plaintiff files this Notice to inform the Court that on December 11, 2025, the Plaintiff served a sixty-day notice of intent to file a Clean Water Act Section 404 citizen suit concerning the unlawful burial and filling of Saratoga Creek over a large area, that also includes the Site in this proceeding. The CWA Section 404 claims intersect significantly with the factual allegations and legal claims in the instant environmental citizen suit.

2.    Based on ongoing legal research and the content of the sixty-day notice (attached as Exhibit A), Plaintiff does not presently intend to incorporate the CWA Section 404 allegations directly into this action. Plaintiff anticipates managing the Section 404 claims in a separate but related case if the U.S. government does not take their own enforcement action.

3.    Additionally, the Court lacks subject matter jurisdiction over new CWA Section 404 "filling" claims until sixty (60) days following service of notice pursuant to 33 U.S.C. § 1365(b) (jurisdiction vests after February 9, 2026). Certified Mail service was initialed on Dec. 11 2025 (Exhibit B) and a courtesy email copy was sent to regulators the same day (Exhibit C).

## I.  CLEAN WATER ACT SECTION 404 SIXTY-DAY NOTICE

### A. SUMMARY OF SECTION 404 VIOLATIONS

4.    On December 11, 2025, Plaintiff initiated service of the sixty-day notice pursuant to 33 U.S.C. § 1365(b) for violations of Clean Water Act Section 404 (33 U.S.C. § 1344). The notice alleges that between approximately 1950 and 1985, the City of Santa Clara and various developers/corporations discharged fill material into Saratoga Creek and adjacent jurisdictional wetlands without obtaining required Section 404 permits from the U.S. Army Corps of Engineers.

5.    Specifically, the notice alleges that Defendants:

- Buried Saratoga Creek by placing fill material in the creek channel and installing  and/or reusing underground pipes
- Filled approximately 500+ acres of tideland-adjacent wet meadow through grading, placement of fill material, and construction of residential and industrial development
- Installed infrastructure that blocks fish passage and impairs water quality

6.    The fill material remains in place, and the buried creek continues flowing through underground infrastructure. Each day the unpermitted fill remains constitutes a continuing

violation of the Clean Water Act.

## B. Defendants Subject to Section 404 Liability

7.    The CWA Section 404 notice identifies the following Potentially Responsible Parties for the original creek burial and wetland fill:

- **City of Santa Clara** (as permitting authority, utility operator and owner, stormwater management owner,  annexor and property owner)
- **Kaiser-Aetna** (*Kaiser Aluminum and Chemical Corporation & Aetna Life and Casualty*)
- **Marriott International, Inc.**
- **Intel Corporation**
- **Intersil/Harris Semiconductor (L3Harris)**
- **Mission Engineers, Inc.**

## C. Intersection with Ongoing Discharge Claims in Instant Case

8.    The Section 404 notice reveals a critical fact relevant to ongoing pollution claims in the instant case: what is labeled and functions as "stormwater infrastructure" at the Site is actually the buried Saratoga Creek system, a highly-protected Water of the United States.

9.    Research conducted in this case and while preparing the Section 404 notice established that:

- Saratoga Creek was never eliminated—it was diverted underground into infrastructure deliberately mislabeled as "storm drains" but the creek continues flowing through this underground system, where multiple documented "stormwater" discharge points are actually discharge points for the buried creek
- As part of this, additional actions were taken to block spawning grounds for endangered species (Chinook Salmon), Native American burial grounds were disturbed and remains were likely unlawfully disposed of, Prime Farm Land was destroyed, national cultural resources were erased, and the baylands and protected wetlands were directly harmed

10.    Ultimately, this means that discharges into storm drain systems at the Site constitute direct discharges into Saratoga Creek, a Water of the United States, immediately triggering Clean Water Act Section 301 and 402 requirements.

### D. Implications for Instant Case

11.    This revelation directly affects claims in the instant environmental citizen suit (Case No. 5:25-cv-07360):

1. **Water Quality Claims**: Alleged contamination and water quality violations involve direct discharges into a jurisdictional watercourse, not merely into storm drains (so dumping anything into these storm drains is basically the equivalent of dumping *directly* into a federally protected waterway)

2. **Discharge Violations**: Unpermitted discharges that Plaintiff alleges occurred through the "stormwater system" are actually unpermitted discharges directly into Saratoga Creek

3. **Remediation Obligations**: Proper remediation of ongoing violations may require addressing both the unpermitted fill (Section 404) and ongoing unpermitted discharges (Section 301/402)

4. **Enhanced Liability**: Discharges into the underground creek system by others (such as modern owners or tenants) may carry enhanced liability as direct discharges into waters of the United States

### E. Jurisdictional Status of Section 404 Claims

- **Defendant Subject to CWA 404 Claims**: City of Santa Clara **only**

- **Legal Basis**: Unauthorized discharge of dredged and/or fill material into waters of the United States

- **Prior Court Reference**: Previously referenced in Plaintiff's Case Management Notice (Dkt. 49, filed November 30, 2025)

- **Jurisdictional Notice Period**: Subject matter jurisdiction over CWA Section 404 claims will not vest until after February 9, 2026

- **Anticipated Filing**: Plaintiff anticipates filing CWA Section 404 claims in a separate but related action if the government does not initiate enforcement within the sixty-day notice period, as Section 404 citizen suits concerning unlawful creek burial typically are managed as stand-alone actions focused on daylighting and wetland restoration

## II.  PENDING LITIGATION

12.    Because Plaintiff is providing this update concerning the Section 404 notice,

Plaintiff also takes this opportunity to apprise the Court of other pending actions involving the parties, as claims in those matters intersect with facts and allegations in the instant case.

### F. Employment Retaliation Litigation

- **Case No.**: 23-cv-04597-EMC
- **Court**: United States District Court, Northern District of California
- **Filed**: 2023
- **Nature**: Toxic Torts, RICO, 17200, Labor Law , & Retaliation
- **Defendant**: Apple Inc.
- **Active Claims include**:
    - Termination in Violation of Public Policy (*Tamney* claim)
    - California Whistleblower Protection Act (Cal. Lab. Code § 1102.5)
    - Retaliation for Discussing Pay (Cal. Lab. Code § 232)
    - Retaliation for Discussing & Disclosing Work Conditions (Cal. Lab. Code § 232.5)
    - Retaliation for Exercising Constitutional Rights outside of the Workplace (Cal. Lab. Code § 96k)
    - Retaliation Due to Crime Victim Status (Cal. Lab. Code § 230(c) & (e))
    - Retaliation for Protected Safety Activities (Cal. Lab. Code § 6310)
    - Retaliation for Filing Labor Complaints (Cal. Lab. Code § 98.6)
- **Related Claims on Appeal**: Environmental claims including private nuisance, ultrahazardous activities, and IIED (fear of cancer) were dismissed on statute of limitations grounds and are currently on appeal. 17200 claim was also dismissed under statute of limitations and is also on appeal. The RICO claim covers shared environmental facts and is partially on appeal and partially dismissed without prejudice.
- **Note**: Retaliation claims include allegations of retaliation for whistleblower activity concerning the subject matter of the instant environmental case

### G. NLRB Proceedings (Apple Inc)

- **Case Nos.**: 32-CA-282142 (filed August 26, 2021); 32-CA-283161 (filed September 16, 2021). Partially dismissed; dismissals currently under appeal
- **Settlement**: Apple Employee Handbook case (32-CA-284428) settled April 3, 2025, concerning work policies and NDAs that may be relevant if evidence emerges that

Defendant Apple instructed employees not to report issues or discuss compliance matters

### H. U.S. Department of Labor Whistleblower Appeal

- **Tribunal**: Administrative Review Board (ARB), U.S. Department of Labor Office of Administrative Law Judges (OALJ)
- **Case No.**: 2024-CER-00001
- **Nature**: CERCLA whistleblower retaliation (primary claim); in 2024, Plaintiff requested inclusion of claims related to the facility in the instant case (RCRA, Clean Air Act, etc.) upon learning that the employer harmed the employee in addition to separate toxic waste retaliation

## III. GOVERNMENT ENFORCEMENT ACTIONS

### I. Bay Area Air Quality Management District (BAAQMD)

- **Action**: Notice of Violations issued August-September 2024
- **Facility No.**: 22839
- **Status**: Pending enforcement proceedings
- **Data Source**: California EPA Air Resources Board

### J. Environmental Protection Agency

- **Action**: Consent Agreement & Final Order
- **Docket**: *In re Apple, Inc.,* U.S. EPA Docket No. RCRA-09-2026-0006
- **Date**: October 27, 2025
- **Subject Matter**: Hazardous waste violations from August 2023 and January 2024
- **EPA Press Release**: *"EPA Takes Action Against Apple for Inadequate Hazardous Waste Management"* (November 18, 2025)
- **Scope of Settlement**: EPA settlement addresses only civil penalties for specific RCRA violations; EPA expressly preserved the right for any party to pursue injunctive relief for those issues and made clear the settlement resolves only the specified violations and nothing else. The settlement expressly relied on Defendant's representations that violations were remediated.

## K. INTERSECTION OF FACTS AND CLAIMS

13.     The various pending actions share common facts and overlapping allegations. Plaintiff resided adjacent to the facility operated by Defendants and was exposed to environmental hazards. Upon complaining about environmental violations and hazardous conditions, Plaintiff was terminated from employment with Apple Inc. The retaliation claims in Case No. 23-cv-04597-EMC are predicated in part on Plaintiff's whistleblowing activities concerning the environmental violations that form the basis of the instant citizen suit. The government enforcement actions by BAAQMD and EPA were initiated based on Plaintiff's tips and disclosures to regulatory authorities.

**DATED**: December 11, 2025

**Respectfully submitted,**

_____

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*
Dec. 11 2025,
Boston, MA

legal@ashleygjovik.com
2108 N St. Ste. 4553 Sacramento, CA, 95816
(415) 964-6272

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Ashley M. Gjovik
ashleymgjovik@protonmail.com
(415) 964-6272
2108 N St. Ste. 4553
Sacramento, CA, 95816

# SIXTY DAY NOTICE of INCOMING
# CLEAN WATER ACT CITIZEN SUIT

December 11, 2025

RE: SIXTY-DAY NOTICE OF INTENT TO FILE CLEAN WATER ACT CITIZEN SUIT
33 U.S.C. § 1365(b)

VIOLATIONS: Clean Water Act Sections 404, 401, and 1311

LOCATION: Saratoga Creek System and Adjacent Wetlands, Santa Clara County, California

TO: U.S. Environmental Protection Agency, U.S. Army Corps of Engineers, Potentially Responsible Parties, and California State Agencies (Full Service List on Page 42).

This Notice provides the sixty-day notice required by Clean Water Act Section 505(b) of intent to file a citizen enforcement action for ongoing violations at Saratoga Creek in Santa Clara County, California.

Between approximately 1950 and 1985, the identified parties discharged fill material into Saratoga Creek and adjacent jurisdictional wetlands without required Section 404 permits by burying the creek and filling approximately 500+ acres of wetlands. The unpermitted fill remains in place, constituting continuing daily violations.

Additional exhibits and supporting documentation are available online at: https://www.ashleygjovik.com/saratoga-creek-system.html

Due to file size, these materials are not included with this mailing but are incorporated by reference. I am available to provide additional information, answer questions, or supply further documentation as needed.

Unless these violations are remediated within sixty days, I intend to file suit in the United States District Court for the Northern District of California.

Respectfully,
/s/ Ashley M. Gjovik
Ashley M. Gjovik

# TABLE OF CONTENTS

**INTRODUCTION** _____ 4

**SARATOGA CREEK SYSTEM** _____ 5

**PRELIMINARY SITE REVIEW** _____ 6

**ASSESSEMENT AND FINDINGS** _____ 8

   A.   THE SARATOGA CREEK SYSTEM IS A WATER OF THE UNITED STATES. _____ 8

   B.   THE SITE SURROUNDING SARATOGA CREEK WAS PRIME FARM LAND _____ 9

   C.   THE SITE IS TIDELAND-ADJACENT WET MEADOW AND BAYLANDS WETLAND 10

   D.   THE SITE CONTINUES TO HAVE A UNIQUE HABITAT AND ECOLOGY THAT CAN SUPPORT ENDANGERED AND RARE WILDLIFE._____ 14

   E.   THE ONLY KNOWN FORMAL "CHANNELING" PROJECT AT THE SITE WAS THE REINFORCEMENT OF A 19TH CENTURY IRRIGATION DITCH._____15

   F.   SARATOGA CREEK CONTINUES FLOWING UNDERGROUND THROUGH CONCEALED "STORMWATER INFRASTRUCTURE" _____ 16

**THE UNMAPPED FLOW OF THE CREEK & THE RISK CAUSED BY THE VIOLATIONS/CONCEALMENT** _____ 23

**POTENTIALLY RESPONSIBLE PARTIES** _____ 25

   CITY OF SANTA CLARA _____ 25

   KAISER-AETNA (KAISER ALUMINUM AND CHEMICAL CORPORATION & AETNA LIFE AND CASUALTY) _____ 26

   MARRIOTT INTERNATIONAL _____ 27

   MISSION ENGINEERS, INC._____ 28

   INTEL CORPORATION _____ 29

   INTERSIL/HARRIS SEMICONDUCTOR (L3HARRIS)_____ 29

**VIOLATIONS OF THE CLEAN WATER ACT** _____ 29

   G.   VIOLATION OF 33 U.S.C. § 1344 - UNLAWFUL FILLING OF WATERS OF THE UNITED STATES _____ 29

   H.   VIOLATION OF 33 U.S.C. § 1341 - WATER QUALITY CERTIFICATION _____31

   I.   VIOLATION OF 33 U.S.C. § 1311 - EFFLUENT LIMITATIONS AND UNPERMITTED DISCHARGES _____ 32

   J.   VIOLATION OF FEDERAL ENDANGERED SPECIES ACT OF 1973 & CALIFORNIA ENDANGERED SPECIES ACT OF 1984 _____ 32

**VIOLATION OF CLEAN WATER ACT SECTION 404 AND NATIONAL HISTORIC PRESERVATION ACT SECTION 106** _____ 33

K.    DESTRUCTION OF NATIVE AMERICAN BURIAL GROUNDS AND SACRED SITES
34

L.    DESTRUCTION OF HISTORIC AGRICULTURAL LANDSCAPE OF STATE AND
NATIONAL SIGNIFICANCE _____ 35

M.   VIOLATIONS OF SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION
ACT _____ 36

**VIOLATIONS OF CALIFORNIA LAW** _____ **38**

N.    VIOLATION OF CALIFORNIA FISH AND GAME CODE § 1602 - LAKE AND
STREAMBED ALTERATION _____ 38

O.    VIOLATION OF CALIFORNIA FISH AND GAME CODE § 5948 - BARRIERS TO FISH
PASSAGE _____ 39

**REQUESTS & CONCLUSION** _____ **41**

**SERVICE & NOTICE** _____ **42**



*Oct. 1, 1968, 65,000ft, 457mm x 229mm*

## INTRODUCTION

This Notice provides the sixty-day notice required by Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), of my intent to file a citizen enforcement action for ongoing violations of Clean Water Act Sections 404, 401, and 1311 at Saratoga Creek and adjacent wetlands in Santa Clara County, California.

Between approximately 1950 and 1985, the parties identified in this Notice discharged fill material into Saratoga Creek and adjacent jurisdictional wetlands without obtaining required permits from the U.S. Army Corps of Engineers. They buried Saratoga Creek by placing fill material in the creek channel and installing underground pipes. They filled approximately 500+ acres of tideland-adjacent wet meadow by grading, placing fill material, and constructing residential and industrial development. They installed a drop structure at the San Tomas Aquino Creek/Saratoga Creek confluence that functions as a complete barrier to fish passage. None of these activities were authorized by Clean Water Act Section 404 permits, and no Section 401 state water quality certification was obtained.

These violations continue to the present day. The fill material remains in place in waters of the United States. The buried creek continues flowing through underground infrastructure. Each day the unpermitted fill remains constitutes a continuing violation of the Clean Water Act. There is no statute of limitations for continuing violations.

I am also notifying state agencies of related violations of California Fish and Game Code (streambed alteration without required agreements, fish passage barriers) and requesting that they investigate and take appropriate enforcement action.

This Notice satisfies the sixty-day notice requirement under 33 U.S.C. § 1365(b). If the violations are not remediated within sixty days, I intend to file suit in the United States District Court for the Northern District of California seeking declaratory and injunctive relief, civil penalties, and attorneys' fees. If EPA or the Army Corps commences enforcement action within sixty days, citizen suit may be precluded.

## SARATOGA CREEK SYSTEM

The nature of these violations is shockingly systemic and long-running and has been carried out in such a way that in order to explain the violations, I also must introduce you to the history of the area where these violations have and are occurring. The decades of concealment and continuous violations require a sort of "*truth commission*" about this stream and a specific region around it's natural path to the Pacific Ocean. Today, as a result of these violations, most government and academic reports no longer recognize the existence of Saratoga Creek within the City of Santa Clara – and if they do, they imply it is a tributary to the San Tomas Aquino Creek. Yet, Saratoga Creek flows through Santa Clara as it has for thousands of years, just now not in the way it would prefer.

Saratoga Creek is a stream originating in the Santa Cruz mountains and flowing to the Bay. The creek has been known by multiple names (including Arroyo Quito, Arroyo Tito, Big Moody Creek, Campbell Creek, Quito Creek, and Sanjon Creek) The creek was official renamed to "Saratoga Creek" around the 1950s. Saratoga Creek is ancient and was one of the sources of the sedimentary deposit of "alluvial fans" across the Valley floor. Academic reconstruction of historic Bay Area ecology and watersheds (1800-1850) document Saratoga Creek as the only permanent creek in the Santa Clara County area that flowed from the Santa Cruz Mountains to the bay.

The headwaters of Saratoga Creek originate in Santa Cruz Mountains at 3,100 feet, approximately 10 miles to the southwest, the Pacific Congress Springs. Saratoga Creek flows in an eastern direction through forested terrain, continues through the foothills of the Town of Saratoga, and then along the alluvial plain of the Santa Clara Valley, through the Cities of San Jose and Santa Clara. Saratoga Creek was previously a tributary to the Guadalupe River at Alviso and the Baylands, flowing out to Guadalupe Slough.

The San Tomas Aquino and Calabazas Creeks were tributaries to Saratoga Creek. The area of Saratoga Creek where the three creeks converged as they flowed to the bay was generally referred to as "Sanjon Creek." The "Sanjon" section generally consists of the Slough/mouth to Bayshore Freeway followed by sections from El Camino Real to Stevens Creek Road, and Stevens Creek Road to Saratoga.

San Tomas historically did not flow across the valley but following diversion and channeling activities, it flowed to connect with Saratoga Creek about a mile southwest of Agnew. A 1875 publication described Saratoga Creek as a "considerable stream, furnishing a power adequate for quite a milling interest, a pasteboard and papermill being in full operation when we visited." (Hand-Book and Directory of Santa Clara, San Benito, Santa Cruz, Monterey Counties, 1875). In 1963, a San Jose

Mercury News article reported Saratoga Creek was "raging" and "wiped out a 20 foot bridge." (Feb. 1 1953).

The Saratoga Creek System is a very deep and complex body of water. It flows a long distance, connects mountains to ocean, produces mineral springs and alkaline meadows, flows through serpentine and areas of unique mineral deposits, is associated with an abundance of artesian wells and springs, and it runs at least 200 feet below the ground surface, and discharges partially to the subsurface, in addition to its superficial waters.

In northern Santa Clara, Saratoga Creek created "alkali wet meadows" that supported rare and specialized alkaline ecosystems. The locations where the historic Saratoga Creek would sink and disappear, only to rise up again and still find its way to connect to Sanjon, the marshlands, and the Bay are regions of Santa Clara near assumed concealed faults and unexplained magnetic anomalies. These areas of Santa Clara that appear to have unmapped faults, are also thought to contain "major serpentine sheet," based on aeromagnetic anomaly data. Serpentine soils are known for hosting rare and endemic plant species because few plants can tolerate the high mineral content and low nutrient levels, such as in "alkali meadows."

This was an expansive tidal-terrestrial transition zone (a gradient between intertidal areas and upland terrestrial and/or fluvial environments) that occupied the broad interface between high marsh and the large expanses of wet meadow and alkali meadow on the valley floor.

Major, historic earthquakes caused targeted, fault-like patterns of property damage in Santa Clara, despite the City of Santa Clara having not known or mapped faults – and similar damage only occurring in areas around established faults. The nearest mapped fault is Monte Vista-Shannon, which is about 12km southwest of The Premise. The fault at Monte Vista-Shannon is also where the Saratoga and San Tomas Aquino Creeks enter the valley from the hills. If Saratoga Creek/aquifer flowed through the valley floor, both on the surface and also deep within hydrothermal systems, it would be expected the flow of the creek/aquifer followed the location and direction of a series of mini faults along the valley floor and traveling to the Bay, which would charge the aquifer.

The current confined, subterranean aquifer located under, and sometimes bubbling out onto, The Site – is located squarely within this zone of apparent serpentine hydrothermal systems, including along earthquake damage from assumed concealed faults and the unusual alkaline ecosystems. Serpentine forms when oceanic crust are altered by hydrothermal fluids and it creates highly fractured, permeable bedrock with extensive underground flow networks. The Creek's hydrological behavior reflects natural fracture systems through serpentinized basements. The Creek is following natural fracture systems through the serpentine bedrock, which is why it "scatters," develops multiple "sinks," and loses its defined channel before reaching the Bay. The Site is also located near the nexus for the alkali wetlands and meadows.

## PRELIMINARY SITE REVIEW

The issues giving rise to this Notice occur at a very specific location ("the Site") located in the northern end of the Santa Clara Valley plain and which starts at around Cabrillo Ave on the southern boundary, with 237 Southbay Freeway as the northern boundary, modern Calabazas Creek on the west

and modern San Tomas Creek on the eastern boundary. This includes portions of Tasman Drive, 101 Bayshore Freeway, Scott Blvd, Central Expressway, Walsh Ave, and the Caltrain/Southern Pacific Railway. (Exhibit A). This combined area stretches about 6 km tall by 1.8 km wide, with 11 sq km total.

I reviewed the following categories of historical documents obtained from government website and other public sources, which I used to assess the history of the site and the timeline of the events giving rise to this matter: aerial photographs ranging from 1938 through 2025, topographic maps ranging from 1899 through 2012, hand drawn maps and sketches going back to the 1830s, USGS reports back to 1908, local and state hydrology reports and assessments going back to the 1920s, zoning and annexation lawsuits against the city going back to the 1970s, historic newspapers articles back to the 1860s, and county parcel maps and surveys. I also reviewed reports on historic ecology, wildlife, geology, mineralogy, seismology, and biological and cultural resources. Many of these are posted on my website and several are provided in the attached exhibit.

The Site was an unincorporated area of Santa Clara County until City of Santa Clara incrementally annexed it in the 1950s-1980s. It has been referred to as "Bayside," "Jefferson," "Santa Clara-Agnew-Alviso," "North Valley," "North Central," and "history junction." The land was included in Rancho land grants for sites known as Pastoria de las Borrega, Rancho Ulistac, and the Enright Plot. Prior to colonization, the Site was a key location for local Native Americans due to the rich natural resources and proximity to bay. (Exhibit E).

The Site was a wet meadow, directly adjacent to the Baylands, and supplied with artesian water and the Saratoga Creek. The Site was one of the few areas of the Santa Clara Valley that was settled in the mid 1800s, outside of the Mission and Rancheros Some of the original Santa Clara County pioneers settled at the site after arriving in covered wagons in the 1850s-1860s. They chose the Site for orchards and the fruits they grew at this location, and the names of these pioneer families, are a key part of what became Santa Clara's designation of being "The Valley of Heart's Delight."

Farmers began to produce crops in the moist grasslands adjacent to South Bay in the 1850s. To enable the shipment of these crops to San Francisco, entrepreneurs developed small ports along the bayshore or in major sloughs (e.g., Robert's Landing, Eden Landing, Alviso) (""Towns grew where creeks met the tides.").

These families and other orchardists farmed the Site as strictly agricultural land (primarily pears orchards, row crop vegetable farming, and pastureland) for over a hundred years. In the 1950s, these families were still living on unincorporated agricultural land with minimal urban infrastructure, and (based on news articles quotes), perfectly content to stay that way. The pear orchards were concentrated around Saratoga Creek reflecting similar boundaries as within the known floodplain area stretching from what is now Kiefer up to Tasman Drive and concentrated around the natural flow of the Creek.

These parcels were more distributed then adjacent parcels and families in the prime area from Keifer up to 101 included Jamison, Putnam, Brown, Bracher, McComas, Wilcox, Weston, Lawrence, and Morrison. Many of the pioneers and their descendants became politicians, judges, and helped found state agricultural coalitions. This area included both public land and part of the Ulistac Ranchero granted to three Native Americans.

The Enright Tract was a large tilted square with its southeast corner pointed toward Town of Santa Clara and Mission and its northeast corner touching the southeast corner of the Bracher/Morrison plot. The tilted eastern edge of the Enright Tract forced the flow of the Saratoga Creek into a ditch (replacing its prior sink/seep structure with several 1k ft meandering steams.), and where the Plot ended, the creek continued up through the southwest corner of the Bracher/Morrison plot, then up through the Wilcox farm, and the Jamison and Brown farms, and Putnam and Agnews, and so on. (Exhibit E). The Site was the last remaining large agricultural area in the City of Santa Clara prior to the City's annexations and industrial development in the 1960s-1980s.

As of a June 1955 San Jose Evening News article, one portion of the Jamison ranch west of Coffin (Bowers) road has never been plowed, and has remained as virgin pastureland to this day." A Jamison family member was quoted adding that "artesian wells flowed year-round."

Government geological, hydrological, and ecological studies starting in the early 1900s documented unique features about the Site including high groundwater elevation, an abundance of artesian wells, shallow blue marine clay, and alkaline waters and soils. Surveys, maps, and field studies from the 19th century designated the Site as a Wet Meadow Mocho soils that transitions to a Wet Alkali Meadow on the northern section.

The documented 1850 channel of Saratoga Creek flowed down from the Santa Cruz Mountains and cross the Valley floor, but sometimes it "sank" into the ground and at other points it reemerged as a seep, spring, marsh, or continued on its way as the creek. Saratoga Creek is a deep hydrothermal system that flows far deeper than superficial waters. Prior to the modern diversions and realignment molestation, it was frequently referred to as a "system" rather than a standalone creek.

One of the sink/reemergence areas is at the Site and sinks at around Cabrillo but reemerges south of the Southern Pacific Railroad tracts. Historically the area where it sank contained a freshwater marsh and several 1k ft meandering steams. In northern area near Tasman Drive there was also a Willow Grove. At the top of the Site near 237, the Site transitioned to Tidal Marshes and Salt Marshes.

## ASSESSEMENT AND FINDINGS

### A.    THE SARATOGA CREEK SYSTEM IS A WATER OF THE UNITED STATES.

San Tomas Aquino Creek is expressly named in U.S. Army Corps of Engineers (USACE), San Francisco District's SPN-1996-225250S- Santa Clara Valley Water District Stream Maintenance Program for routine stream maintenance activities in stream channels and banks managed by Valley Water in Santa Clara County, California. San Tomas is listed as a "major waterway."

Saratoga Creek and San Tomas Aquino Creek are also already managed under the Clean Water Act 303(d). The TMDL pollutants include "trash" and Diazinon. Regulators complained about trash being dumped into Saratoga Creek around the site since at least the 1950s. In a 1970s Flood Control report, the writer went so far to suggest the City of Santa Clara police "remind residents of their duties in regard to trash dumping in this and other creeks and would inform them that their own police forces are capable of

dealing with violators."). Trash dumping into the Saratoga and San Tomas Aquino Creeks is still an open and ongoing issue around the Site and so the issue is actively tracked by the US EPA.

Saratoga Creek, naturally and as modified into San Tomas Aquino Creek, includes tidally influenced waters and wetlands, and are also directly adjacent to mudflats and salt marshes, all of which are part of the SF Bay (Pacific Ocean) ecosystem and hydrology.

Saratoga Creek is also direct tributaries to navigable waters of the United States including the San Francisco Bay and Pacific Ocean. Saratoga Creek is definitely regulated under CWA because it is a tributary to the bay and ocean, but the entire Saratoga Creek system has a clear, continuous hydrological connection via the creek, sloughs, and bay, to a traditional navigable water with the ocean/bay. The alkali meadow and sloughs had (and could have again) hydrophytic vegetation, hydric soils, and wetland hydrology – all of which is adjacent to the creek and the bay/ocean.

The evidence strongly implies that the Saratoga Creek system's continuous and consistent flow arises from a hydrothermal system which is at least as a "relatively permanent" water body. The specific point where the water comes back up from the hydrothermal system is part of the continuous flow path of the jurisdictional creek. *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) - buried creek in culvert still "waters of the US" . *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001) - underground flow does not remove jurisdiction.

The entire Saratoga Creek system: including the artesian springs, the creek, both above ground and where it flows deep into the serpentine before resurfacing, the wet meadows and marshes, the alkali meadows and sloughs, are all connected to the bay and ocean and thus are all part of the "waters of the US" and subject to Clean Water Act regulation.

Further, the sections of Saratoga Creek at the Site directly affect interstate and foreign commerce as this was Prime Farm Land with world-famous orchards that produced pears and other and other produce that were literally talked about around the world and documented in history books. The violations in this Notice, used, degraded, and destroyed the very same waters that has implicated interstate commerce for the Site for over 175 years.

## B.    THE SITE SURROUNDING SARATOGA CREEK WAS PRIME FARM LAND

The lands surrounding Saratoga Creek in Santa Clara constituted prime agricultural land from the earliest period of documented observation through the modern era. In 1827, British explorer F.W. Beechey described the wet meadow near Santa Clara as "more marsh than that part of the ground over which they had just traveled," documenting the site's distinctive hydrology that would sustain agricultural productivity for over a century. Bryant (1848) similarly observed a "fertile plain" between the Bay and San José that "at certain seasons of the year, is sometimes inundated," establishing that the seasonal flooding regime was well-understood as a defining characteristic of these lands.

The agricultural value of these wetland soils was explicitly recognized by contemporary observers and land users. The "swampy lands," or wet meadows, surrounding Santa Clara were considered the "best grazing lands" in testimony provided in the 1861 federal land case *U.S. v. Manuel Alviso*. This was not incidental praise—the wet meadow character of the land was the precise quality that made it agriculturally

superior. In the 1840s, the area near Santa Clara was known as the *bajío* or lowland (as opposed to the *alta* or high ground of Santa Clara) and was explicitly described in the 1862 federal land case *U.S. v. Mary S. Bennett* as having "good fertile soil, being subject to overflow, and the retention of its humidity in the Summer." This moisture retention capacity—directly attributable to the Saratoga Creek hydrological system—was the critical factor enabling productive agriculture in California's dry summer climate.

This agricultural productivity was not merely historical but continued uninterrupted into the modern era. As of 1967, "half of the valley floor is still agrarian" including "orchards, vineyards, row crops, and pasture," as documented in the Engineer's Report for the San Tomas Aquino Creek improvement project. The Site therefore represented prime farmland by any measure: fertile soils sustained by a permanent water source, documented agricultural productivity spanning more than 140 years, and active agricultural use at the time of development. The destruction of this agricultural system—particularly through elimination of the Saratoga Creek water source that sustained its fertility—represented the loss of irreplaceable prime agricultural land.

## C.    THE SITE IS TIDELAND-ADJACENT WET MEADOW AND BAYLANDS WETLAND

Comprehensive hydrological, geological, and soil data confirm that the area surrounding Saratoga Creek constitutes baylands, jurisdictional wetlands, alkali wet meadow, and tideland-adjacent wet meadow within the meaning of the Clean Water Act and California wetland protection laws. The site exhibits characteristics diagnostic of wetlands including hydric soils, artesian groundwater systems with continuous surface emergence, tidal influence on groundwater elevations, and historical documentation as "tidal flats or swamp areas." The presence of multiple confined aquifers under artesian pressure, groundwater emergence zones spanning thousands of feet, and serpentine-influenced alkaline spring systems establish that this area represents an extension of San Francisco Bay baylands into the valley floor—a unique hyperlocal sub-basin with estuarine characteristics despite its distance from open bay waters.

Hydrology studies conducted at locations between Bowers Avenue and San Tomas Aquino Creek, and between Central Expressway and Highway 101, documented multiple aquifer systems with artesian conditions. The shallowest aquifer occurs approximately 10-20 feet below ground surface and discharges to wetlands at the bay. This aquifer is separated from deeper systems by a 5-10 foot thick aquitard composed of sandy/silty clay, creating confined conditions that generate upward hydraulic pressure.

The intermediate aquifer at 30-40 feet below ground surface also discharges to the bay and exhibits broad ongoing artesian conditions confirmed at multiple study points across the site. The presence of artesian flow at this depth—with water rising under natural pressure without pumping—demonstrates confined aquifer conditions characteristic of bay-connected groundwater systems.

The deepest studied aquifer occurs at approximately 100-108 feet below ground surface and exhibits "variations in vertical hydraulic gradient" with documented artesian flow at monitoring wells on site. This depth corresponds to the Baylands stratified aquifer containing bay mud, confirming hydrological connectivity to San Francisco Bay estuarine systems. The Baylands aquifer system is known to create

conditions resulting in groundwater emergence on the land surface, including artesian springs, seeps, and swamps—all of which are present at this site.

A recent Groundwater Management Plan documented multiple "groundwater emergence" zones along Saratoga Creek and San Tomas Aquino Creek on site, including two large areas each spanning approximately 5,000 square feet. These emergence zones represent locations where confined aquifer pressure forces groundwater to the surface, creating persistent wetland conditions independent of precipitation or surface water inflow.

Geological borings throughout the site repeatedly documented the presence of blue, bluish-gray, and blue-green clays—distinctive indicators of serpentine geology and reducing soil conditions. Blue clay was frequently encountered at depths of 10-30 feet below ground surface. Boring samples were consistently described as "mottled caliche, with organics, and very wet," with reports of sloughs and cave-ins indicating saturated, unstable subsurface conditions. Soil colors documented in borings—including olive, olive-grey, grey, red, yellow, dark green, grayish green, olive-brown, and "mottled rust"—provide additional evidence of serpentine influence and hydrothermal activity. Wells at the site have produced alkaline water, confirming the geochemical signature of serpentine hydrothermal systems.

At least six natural springs have been documented at the site following penetrations into the ground and groundwater systems: two at the Synertek site (3050 Coronado Drive) and four at Santa Clara Square Apartments. These springs were discovered by multiple independent environmental contractors, monitored for decades, and demonstrated data consistent with an interconnected underground flowing aquifer. All springs represent the same deep, alkaline water system characterized by unexpected pressure and force, with surrounding soils showing extensive evidence of serpentine geology.

At the Synertek site, Honeywell groundwater monitoring well MW-03B1 has been documented for thirty years as releasing water from deep underground aquifers contained under such pressure that water naturally rises one hundred feet up the well shaft and continues rising, spilling out onto the pavement. The well, installed circa 1988 to monitor the B1 aquifer, allows inflow only from 100-105 feet below ground. When first installed in 1988, the water level was nineteen feet below surface; as pressure increased over time, the depth to water decreased, reaching zero feet below surface (flowing at ground level) in 1995 and remaining at or above surface in all subsequent annual measurements. The pH of water from well MW-03B1 trends alkaline, consistent with serpentine influence.

A second monitoring well at the Synertek site (MW-20B) also taps a pressurized source, with increasing pressure raising the water level beginning in 2001. This well allows inflow from 34-44 feet below surface, with pressured water rising to at or near ground surface. Pressure measurements in MW-20B place its hydraulic head approximately thirty-five feet above the water-bearing zone, with depth to water at zero in 2010. Water from MW-20B is strongly alkaline with pH values greater than 9, and in 2012 the pH exceeded 11 (equivalent to ammonia). Excavated soils from both wells exhibited colors diagnostic of serpentine geology: olive grey, dark grey, grayish green, dark green, olive, olive-grey, olive-brown, and "mottled rust."

Groundwater reports note "variations in vertical hydraulic gradient" and describe the pressurized flow at MW-03B1 and MW-20B as representing "localized hydraulic mounds"—terminology consistent

with artesian springs rather than simple groundwater table conditions. The vertical gradients and distinctive soil coloring provide evidence that this aquifer system constitutes a serpentine hydrothermal system, a rare and ecologically significant wetland type.

The 2015 Environmental Impact Report for Santa Clara Square Apartments documented a large, pressurized underground aquifer (termed an "artesian feature") flowing approximately 35 feet beneath the surface and spanning at least three city blocks. Four monitoring wells dug for Cone Penetration Tests encountered artesian conditions, with water confined by a 5-10 foot layer of "sand and gravel" and "silty to sandy clays" at approximately thirty-five feet below ground surface. Pressure measurements for all four springs estimated that natural flow under current conditions would result in water ejecting 10 to 13 feet into the air above ground surface—demonstrating extraordinary hydraulic pressure inconsistent with typical groundwater conditions and diagnostic of confined aquifer systems.

Two springs (C6-3 and C5-2) exhibited water flowing up and out of the ground during investigation. Well C6-3 appears located in Creekside Park at the southwest corner of the apartments adjacent to the former chip fabrication facility. A 2015 boring hole approximately 15 feet deep south of Creekside Park was noted as "very moist – boring may fill with water by tomorrow," indicating rapid groundwater infiltration. Well C5-2 is located near Scott Boulevard and Montgomery Drive, along the original Saratoga Creek channel bed and north of the chip fab facility.

The Santa Clara Square Geotechnical Report acknowledged this "expansive, flowing, active underground aquifer—representing the deeper levels of the 'filled' Saratoga Creek" but addressed it only by stating that Saratoga Creek was "filled" in 1968-1980 and that "if excavations are not made into the sand and gravel layer approximately thirty-five feet bgs… the artesian condition should not affect the project." This acknowledgment confirms developers' knowledge of the buried creek and persistent wetland hydrology while attempting to engineer around rather than remediate the unpermitted fill.

Soils at the site exhibit characteristics diagnostic of hydric soils and reducing conditions consistent with jurisdictional wetlands. Multiple reports confirm groundwater in site areas is affected by tidal streams, tidal patterns, and sea level rise, with brackish water documented at depths from shallow surface levels to 70 feet below ground surface. The presence of brackish water demonstrates hydrological connectivity to San Francisco Bay tidal systems despite the site's distance from open water.

In the 1950s, Santa Clara County officially classified soil at the site as "tidal flats or swamp areas" and warned the soil is not permeable. This historical classification establishes that government agencies recognized the wetland character of these lands prior to development and filling. The site experienced repeated severe flooding, especially in areas that historically supported the densest orchard development—flooding that necessitated the extensive agricultural tile drainage systems later exploited for creek burial.

Wet meadows covered broad portions of the Santa Clara Valley prior to hydromodification and are characterized by poor drainage conditions associated with dense clay soils and nearly flat topography. Wet meadows are flooded for days or weeks depending on rainfall events and landscape position. These characteristics precisely match conditions documented at the site: dense blue/grey clay layers creating

confined aquifers, flat topography with minimal natural drainage gradient, seasonal inundation requiring artificial drainage for agriculture, and persistent groundwater emergence.

Project reports note that groundwater elevation at the site fluctuates in relation to the ground-level flow of San Tomas Aquino Creek, indicating the underground Saratoga Creek aquifer system and the channelized San Tomas Aquino Creek receive water from the same or similar source areas to the south. This hydrological connectivity demonstrates that burial of Saratoga Creek did not eliminate the creek—it merely forced the watercourse underground while surface expressions of the same aquifer system continue emerging through springs and seeps.

The 2006 Saratoga Creek Watershed Stewardship Plan identifies a distinct sub-sub-basin within the Santa Clara Valley subbasin in the northern region near the bay where this site is located. This area exhibits thick clay layers creating confined aquifers, as documented at the site. The site occupies the northern central basin and exhibits geology and hydrology diagnostic of this unique formation. The site constitutes a unique hyperlocal sub-basin within a larger sub-basin, functioning as an extension of the San Francisco Bay baylands into the valley floor.

More than half of the Santa Clara Valley region with large amounts of clay and artesian conditions is expected to occur on salt marshes. Water-saturated estuarine mud—predominantly gray, green, and blue clay and silty clay—underlies marshlands and tidal mud flats of San Francisco Bay. Ordinarily, blue clays are only expected at approximately 300 feet below ground surface around the valley floor; their presence at 10-30 feet depth at this site confirms estuarine/baylands geology extending inland from the bay margin.

The documented influence of tidal patterns on site groundwater elevations, the presence of brackish water, and the hydrological connectivity to bay discharge areas establish that this site functions as tideland-adjacent wetland within federal and state regulatory definitions. Even though the site is not immediately adjacent to open bay waters, the hydrological regime is controlled by bay tidal cycles, confined aquifer systems that discharge to the bay, and groundwater chemistry reflecting estuarine influence.

Since the 1960s, the formal written policy of the San Francisco Bay Conservation and Development Commission has stated: "It is the basic policy of the Resources Agency that this Agency and its Departments, Boards and Commissions will not authorize or approve projects that fill or otherwise harm or destroy coastal, estuarine, or inland wetlands." The policy further requires that "any proposed fills, dikes, or piers should be thoroughly evaluated to determine their effects on marshes and mud flats, and then modified as necessary to minimize any harmful effects."

This policy was in effect throughout the period when Saratoga Creek was buried and tideland-adjacent wet meadow was filled for development. The defendants' failure to seek BCDC review or comply with this policy demonstrates regulatory evasion and knowing conversion of protected wetlands.

A January 31, 1965 article in the San Jose Mercury News described the stretch of Saratoga and San Tomas Aquino Creeks as "a snake in the grass floodwise," noting that "a thick fog will back water up over its narrow banks." This contemporaneous recognition of chronic flooding problems reflects the natural wetland hydrology of the area—conditions that required burial and filling rather than accommodation through appropriate development siting or design.

The comprehensive evidence of artesian aquifer systems with continuous surface discharge, serpentine hydrothermal springs with extraordinary hydraulic pressure, hydric soils with reducing conditions, tidal influence on groundwater, historical classification as "tidal flats or swamp areas," wet meadow vegetation and flooding patterns, and hydrological connectivity to San Francisco Bay baylands establishes that the site constitutes jurisdictional wetlands and waters of the United States requiring Clean Water Act Section 404 permits for any filling or alteration. The defendants' filling of these wetlands without required permits violates federal and state wetland protection laws.

## D. THE SITE CONTINUES TO HAVE A UNIQUE HABITAT AND ECOLOGY THAT CAN SUPPORT ENDANGERED AND RARE WILDLIFE.

Despite decades of burial and development, the site continues supporting unique habitat and rare wildlife populations. Saratoga Creek maintains a native rainbow trout population confirmed through genetic analysis to be of native origin, not hatchery stock, representing remnants of historical steelhead runs. A 1985 California Department of Fish and Game survey documented "a major steelhead and king salmon spawning area" approximately 200 yards downstream of the barrier, and recent iNaturalist observations from November 2024 confirmed Chinook salmon (*Oncorhynchus tshawytscha*) presence near the buried creek system during spawning season (Observation IDs 251599313, 251464788). The proximity of spawning habitat to the barrier demonstrates that removal would immediately restore access to approximately 15 miles of upstream habitat.

Wetland vegetation communities persist where surface flow remains. A 2020 survey at Saratoga Creek documented mixed riparian woodland and arroyo willow shrubland with dominant species satisfying Army Corps wetland vegetation criteria (SCVWD Groundwater Management Plan, 2021). A 1975 City of Santa Clara ecological report documented native riparian vegetation including cattail (*Typha* sp.), horsetail rush (*Equisetum* sp.), and arroyo willow (*Salix lasiolepis*) along the creek corridor from Monroe Street to Lawrence Expressway, establishing baseline conditions persisting through the violation period (City of Santa Clara, Ecological Report: Saratoga Creek, 1975-1977).

The site contains regionally significant serpentine seep habitat. USGS has mapped only seven active springs on serpentine soils across the entire Santa Clara Valley; this site contains at least six documented serpentine springs with strongly alkaline pH (exceeding 11), providing critical habitat for rare serpentine-associated species like Mount Hamilton thistle (Santa Clara Valley Habitat Plan, Ch. 3, Pg. 8, Aug. 2012). The concentration of multiple serpentine springs makes this one of fewer than ten such locations statewide. The site also provides habitat for federally listed California red-legged frog (*Rana draytonii*), California tiger salamander (*Ambystoma californiense*), and Bay checkerspot butterfly (*Euphydryas editha bayensis*), with documented wetland vegetation, seasonal flooding, and serpentine geology creating conditions supporting these imperiled species.

The persistence of native fish, wetland vegetation, and functioning artesian springs despite extreme alteration demonstrates ecological resilience and high restoration potential. Removal of unpermitted fill, daylighting of buried creek channels, and elimination of fish passage barriers would restore critical habitat

for multiple ESA-listed species and rare serpentine seep ecosystems found in fewer than ten locations statewide.

**E.    THE ONLY KNOWN FORMAL "CHANNELING" PROJECT AT THE SITE WAS THE REINFORCEMENT OF A 19TH CENTURY IRRIGATION DITCH.**

Starting in the 1850s, settlers created irrigation channels, straighten, diverted, and realigned, and otherwise modified and connected the streams and other aquifers. Levees were built at the banks and irrigation ditches were created. They also dug wells and installed pumps for the artesian springs. Some also had to install tile drain ditches and pump the ground water back into the Guadalupe Creek channel.

The spring-fed Calabazas Creek was redirected from its natural channel in 1875 and diverted to Saratoga Creek. San Tomas Aquino was also redirected to flow into Saratoga Creek. Around 1870, the Guadlupe River was modified to drain the river to Alviso Slough rather than Guadalupe Slough. These tributaries were disconnected from the river and re-routed directly into Guadalupe Slough between 1870s-1890s.

The modern San Tomas Aquino Creek is a "channelized water conveyance structure" and was built around 1897. Around this time, significant portions of Saratoga Creek were "straightened" and "realigned" including the artificial sharp turns around the Enright tract. (Exhibit E).

In the early 20th century, levees were built around the tidal marsh downstream from these creeks and the marsh was converted to commercial salt ponds. There was also extensive channel extension, straightening, widening, and the construction of engineered flood control levee. The modern watershed contains an extensive network of mostly engineered surface channels, and subsurface drainage pipes that connect key portions of the stream network in the lower elevation stream reaches.

In the 1950s, following decades of severe flooding, projects were undertaken to try to restore natural creek flow, improve drainage, and remove obstructions. Around 1956, the project to realign Calabazas creek was approved and it proceeded to redirect Calabazas creek to flow to the bay in its natural channel, rather than artificially divert it to Saratoga Creek.

At this time San Tomas ran in an artificially straight channel (likely a drainage ditch) and Saratoga Creak meandered over to that channel in its discharge to the bay, connecting around Agnew Rd (what is now Mission College Blvd). There was also another connection point around Monroe St at what was the corner of the Enright tract. Since at least the early 20th century, the Enright plot and adjacent farms created an irrigation ditch that further diverted a portion of the already diverted Saratoga Creek to farms on the east side of the tract. The ditch had a steep and unnatural angle but was built simply for irrigation.

In the 1950s, the first housing developments were constructed around the Site, south of the Southern Pacific Railroad line and in the Enright tract. The development started on the western side of the plot and by the early 1960s then also included the portion of the Enright tract where this sharply angled diversion had been built. The developer of the housing, and the local governments, apparently did not modify the existing agricultural irrigation systems but instead built the housing and roads around the agriculture irrigation infrastructure. Aerial photos show these drainage ditches and creek diversions running alongside the tract homes.

In 1961 an Engineer's Report published by the Santa Clara County Flood Control and Water Conservation District for "Proposed Improvements for Zone NC-1, the North Central Zone." At the time the report was published it noted that "a portion of the flows of Saratoga Creek are diverted into the San Tomas Aquino Creek between El Camino Real and Bayshore Highway." The report appears to be referring to this sharp-angled drainage ditch. No modern reports have explained why this sharp turn exists, why it was designed, or when it was built. The reports do carry an assumption that it was built to redirect and rechanneled the Saratoga Creek to avoid flowing through the homes as part of the development.

The 2006 Saratoga Creek Watershed Stewardship Plan notes under channel conveyance that there were "excavated earth," "trapezoidal concrete," and modified floodplain" construction at Saratoga Creek around the Site but provides no other details and notes the year the changes occurred as "unknown. The first documented modification to the channel was the 1981 excavation and reinforcement of the "confluence" between Saratoga Creek and San Tomas Aquino creeks, which as noted, was a century old drainage ditch.

Review of aerial photos and consideration of the historic Enright irrigation infrastructure exposes that the sharp turn at Monroe St. was not "built" in modern times, but rather the primary channel of Saratoga Creek was concealed and what remained visible on maps was only the drainage diversion. The question then became what happened to the Saratoga Creek section flowing northward? The 1961 repot noted that "it appears at least part of the Saratoga Creek channel was redirected into the drainage ditch, and the natural channel was filled." So even by 1961, the agency in charge of flood-mitigation channeling and rerouting already did not know and could not find out, or was not allowed to report, what was done to the Creek at that location.

## F.  SARATOGA CREEK CONTINUES FLOWING UNDERGROUND THROUGH CONCEALED "STORMWATER INFRASTRUCTURE"

Multiple independent lines of evidence establish that Saratoga Creek was never eliminated—it continues flowing underground through infrastructure deliberately mislabeled as "storm water drainage." The creek originates from areas of Santa Clara Valley famous for natural springs, serpentine geology, and hydrothermal systems. Historic aerial photographs show Saratoga Creek as a consistently flowing watercourse, and as a 1965 San Jose Mercury News article noted, "The water never goes away and like sea water pushing through serpentine, it will find a way to flow."

The defendants buried the creek under development but could not eliminate the hydrological system—they simply concealed it by routing flows through pipes labeled as storm drains. This concealment has persisted for over 50 years through systematic erasure of historical records, mislabeling of infrastructure, and deliberate avoidance of documentation that would trigger regulatory enforcement.

Following the initial violations, defendants implemented decades of concealment that obscured not only the original violations themselves but also the subsequent violations and the entire basis for liability. The concealment included systematic suppression of information establishing that: the site is adjacent to San Francisco Bay National Wildlife Refuge baylands, the site is jurisdictional wetland, the site has artesian aquifers and alkali meadow characteristics, the site contains abundant serpentine and marine blue clay

geology, and the site historically supported anadromous fish runs and rare habitat types. Many people involved in current site operations may not even know something is being concealed—the violations occurred before they were born, and the historical record has been so thoroughly erased that the site's true ecological history and legal status remain unknown to most.

The general history of the "Bayside" area—including similar portions of Sunnyvale, San Jose, and northern Santa Clara—has been deliberately forgotten and erased. Research papers consistently note sparse information and documentation regarding historical hydrology, ecology, biology, and cultural resources in this area. This absence of documentation is particularly egregious considering the site directly abuts the Don Edwards San Francisco Bay National Wildlife Refuge, founded in 1974 and administered by the U.S. Fish and Wildlife Service, with a shared or near-shared boundary.

The systemic concealment by potentially responsible parties appears intentional and substantially motivated by proximity to the Wildlife Refuge. To properly label the site a "wetland" would invite conversation about conservation, protection, and restoration—outcomes fundamentally incompatible with industrial development and continuing operations. This imperative for concealment intensified after 1965 when the McAteer-Petris Act established the San Francisco Bay Conservation and Development Commission, which led to creation of the Wildlife Refuge and numerous other bayside conservation efforts. Developers and the City recognized that acknowledging the site's wetland character and ecological connectivity to San Francisco Bay would subject it to the same protective regime being established for adjacent baylands—potentially preventing or severely constraining development.

By concealing the site's true character and systematically avoiding creation of records linking it to bay-adjacent wetland systems, defendants ensured development could proceed without triggering the conservation and regulatory attention being directed at neighboring areas that were properly recognized as baylands. This concealment strategy has succeeded for 50 years, enabling hundreds of acres of wetland fill and industrial development immediately adjacent to a National Wildlife Refuge specifically established to protect bay-adjacent habitats.

Regulators have noticed signs that something is amiss but have lacked a jurisdictional trigger to initiate enforcement. In 1994, the California State Water Resources Control Board created a record in the case file for the Synertek Superfund toxic waste remediation project including aerial photographs with the docket entry: "Aerial Site Photos (7-12-1994), 43S0124 Synertek Building 1 Aerial Photos of Site.pdf." The file included two photos with a handwritten index noting: "Aerial Photos of Site Area: 1) 1970 Photo with Former Stream and 2) 1994 Photo." The 1970 photograph shows Saratoga Creek flowing through the site, and the central location was circled by the regulator—demonstrating regulatory awareness that a stream historically flowed through the Superfund site but had disappeared by 1994. The notation "Former Stream" acknowledges the creek's elimination but does not investigate how it was eliminated, whether permits were obtained, or where the water currently flows.

I       n January 2017, the California EPA Regional Water Quality Control Board made a notation on the GeoTracker project site for the Synertek Superfund facility on Coronado Drive. As part of a site visit for the five-year review process, the regulator "Walked the length of the pollutant plume as far as the construction site at Scott Boulevard at downgradient edge of plume… Went to San Tomas Aquino Creek

at Scott Boulevard were the storm drain …entered the Creek…. San Tomas Aquino Creek was flowing strongly due to the very wet weather of the past couple of months. The two storm drains that enter the Creek on opposite banks at Scott Boulevard Bridge both had good flows of clear water. This may be due to groundwater infiltration as the soil is probably pretty well saturated at this time."

The regulator noted "good flow of clear water" coming from storm drains at a time when it was not actively raining and noted San Tomas Aquino Creek was also "flowing strongly." This observation indicates the source of the strong creek flow was also the source of the stormwater discharge from the property—not typical storm drain behavior where rainfall runoff would be turbid and intermittent. The regulator did not note standing water on the ground, indicating the continuous clear flow was emerging from underground infrastructure rather than surface runoff. The regulator came remarkably close to discovering the truth: these are not storm drains but discharge points for buried Saratoga Creek, still flowing through underground conveyance infrastructure installed 40-50 years earlier.

Regulators have been constrained from acting due to the systemic and pervasive nature of these violations. An enforcement action demanding remediation would require extensive effort to force potentially unwilling parties to devote substantial resources to abate, mitigate, and restore violations spanning 50+ years and hundreds of acres. Individual regulators may have noticed warning signs but lacked a jurisdictional trigger to initiate formal investigation and enforcement proceedings. Absent a permit application, ESA consultation requirement, citizen complaint, or other triggering event, agencies have no procedural basis to launch investigations into historical violations at sites where current operations appear compliant with existing permits.

This citizen suit 60-day notice provides the jurisdictional trigger regulators have lacked. Either the federal government must investigate and pursue enforcement action, or private enforcement through citizen suit will proceed. The pattern of regulatory observations noting anomalies without investigation—the 1994 "Former Stream" notation, the 2017 observation of continuous clear water flow from "storm drains"—demonstrates that agencies have been aware something is wrong but required a formal mechanism to compel action. This notice provides that mechanism.

A 1961 Engineer's Report for the North Central Zone explicitly acknowledged Saratoga Creek's continued function: "the balance of flood waters continue in the old Saratoga Creek channel across the Bayshore Highway and again reach San Tomas Aquino Creek." The report confirmed that despite Saratoga Creek being apparently "filled," it continued flowing and connecting to San Tomas Aquino Creek near Agnew Street/Mission College Boulevard. The 1961 diagrams identify the "natural channel of Saratoga Creek" with the notation: "NOTE: DO NOT FILL NATURAL CHANNEL OF SARATOGA CREEK, (TO REMAIN OPEN FOR LOCAL DRAINAGE). PROVIDE DRAINAGE INLET TO NEW CHANNEL" (Engineer's Report of Proposed Improvements for Zone NC-1, p. 38, 1961).



*Engineer's Report of Proposed Improvements for Zone NC-1, the North Central Zone; Santa Clara County Flood Control & Water Conservation Dist., p. 38 (1961). https://archive.org/details/csjvwd_000237/*

This explicit instruction establishes that engineers knew they were not eliminating the creek but diverting it while maintaining the natural channel for drainage. The report warned: "Backfilling of any portion of the creek will be done only under permission so that there will always remain adequate capacity for flood control and drainage." This directive was ignored as extensive backfilling occurred without documented permissions, leading to the need for emergency channelization in 1981 when the inadequate underground system failed during wet weather.

Aerial photographs show the creek channel persisting around residential areas, then "reappearing" after the homes near City-owned Bracher Park and continuing to flow northward. Available records indicate the City repurposed existing agricultural irrigation infrastructure, upgraded it into "stormwater management," and piped Saratoga Creek under homes where it reemerged into surface channel around Bracher Park and the Southern Pacific Railroad tracks. This pattern—burial followed by resurfacing—demonstrates the creek was diverted underground rather than eliminated.

Parcel maps from 1970 for Kaiser-Aetna's industrial park and Intel's development note the creek would be "abandoned" where it flowed across properties. However, utility notes reference unusual and unexplained stormwater conveyance systems, and a May 1, 1970 "underground drainage easement" (14 Misc. Rec. 528) was recorded at creek crossing locations. Rather than abandoning the watercourse, they created legal rights to underground conveyance infrastructure—burying the creek while maintaining flow through pipes labeled as storm drains.

At the Synertek site (3050 Coronado Drive), monitoring well MW-03B1 taps water under such pressure that it rises 100 feet up the well shaft and spills onto pavement. When installed in 1988, water was 19 feet below surface; by 1995 pressure increased until depth reached zero feet, where it remained continuously overflowing. The 2015 EIR for Santa Clara Square Apartments documented "a large,

pressurized, underground aquifer (which they referred to as an 'artesian feature') flowing only ~30 feet underground and across a distance of at least two blocks wide," acknowledging this represents "the deeper levels of the 'filled' Saratoga Creek"; an explicit admission the creek continues flowing underground.

A recent geotechnical investigation near Monroe Street found "approximately 2.5 to 3 feet of undocumented fill across the site." A Phase I Environmental Site Assessment noted properties were graded in the 1970s and "the Saratoga Creek segment was filled." The presence of "undocumented fill" throughout the historic creek corridor confirms the channel was buried without required permits, and current investigators recognize this pattern but avoid documenting it in ways triggering enforcement.

Despite major creek modifications, installation of extensive underground conveyance systems, and construction of discharge infrastructure, there are no as-built records, specifications, or reports documenting what was done, why, or with what implications. This absence reflects deliberate avoidance of creating records establishing the work as creek modification requiring federal and state permits. By labeling everything "storm water infrastructure" and avoiding as-built documentation showing creek diversion, defendants concealed the true nature of work from regulatory agencies.

Contemporary Environmental Impact Reports note aerial photos indicate Saratoga Creek's prior channel "appears to have been filled" but provide no further details. Reports vaguely state San Tomas Aquino Creek was "channelized" without investigating the mechanism or legal compliance. There is never mention of potential Clean Water Act violations or inquiry into the current state of the Saratoga Creek system. This pattern demonstrates continuing concealment—modern consultants recognize something irregular occurred but avoid documenting it in ways triggering regulatory enforcement.

The convergence of evidence—1961 engineering reports acknowledging continued creek function, 1970 parcel maps showing underground easements, 1994 regulatory notations of "Former Stream," 2017 observations of continuous discharge from "storm drains," artesian wells documenting pressurized underground flow, and developer EIRs acknowledging underground aquifers are the "filled" creek—establishes that Saratoga Creek was never eliminated. The defendants buried the creek, labeled it as storm water drainage, systematically erased historical documentation, and maintained this concealment for over 50 years. The creek continues flowing beneath the site, discharging through infrastructure deliberately mislabeled to evade Clean Water Act jurisdiction. This ongoing concealment constitutes continuing violations of federal and state environmental laws.

This explicit instruction—contemporaneous with the development period—establishes that engineers and officials knew they were not eliminating the creek but rather diverting it into new channels while maintaining the natural channel for drainage. The report's warning that "there are several drainage facilities now discharging into the Saratoga Creek downstream from this point" and that "it will, therefore be necessary to maintain the lower portion of Saratoga Creek as a flood control facility" confirms the creek's continuing hydrological function was recognized and required.

The 1961 report further warned: "Backfilling of any portion of the creek will be done only under permission so that there will always remain adequate capacity for flood control and drainage in the lower portion of the Saratoga Creek." This directive was apparently ignored, as extensive backfilling occurred without documented permissions and without maintaining adequate capacity—leading to the need for the

1981 "emergency" channelization project when wet weather returned and the inadequate underground system failed to handle actual creek flows.

The 1961 report suggested to "divert all waters of Saratoga Creek into San Tomas Creek at the present point of partial diversion, approximately 3.8k north of El Camino Real." This suggestion immediately preceded housing development construction at that location. While there is no record of official approval for complete diversion, numerous notations about stormwater and irrigation systems appear in that area's development records—suggesting the diversion was implemented but documented as "stormwater infrastructure" rather than creek modification.

Parcel maps from February 1970 for Kaiser-Aetna's industrial park development note the creek would be "abandoned" where it flowed across the property, with City Council approval of street patterns. However, utility and infrastructure notes in these parcel maps reference unusual and otherwise unexplained stormwater and water conveyance systems. While the maps called to "abandon" and "fill" Saratoga Creek, the actual infrastructure suggests the "fill" included underground pipes and channels diverting creek flow underground to discharge points into San Tomas Aquino Creek near Agnew Road/Mission College Boulevard—maintaining the same ultimate discharge location but through hidden conveyance.

Intel's 1970 parcel map, documenting the first major industrial building at Bowers and Highway 101, similarly notes "abandoning" Saratoga Creek where it flowed across the property. Yet a May 1, 1970 "underground drainage easement" (14 Misc. Rec. 528; quitclaim deed 8908 OR. 237, 238, 240, 242, 250) was recorded at the creek crossing location, indicating that rather than abandoning the watercourse, they created legal rights to underground conveyance infrastructure.

A January 26, 2017 site visit documented as part of a five-year review process provides direct observational evidence of the underground creek system. The inspector went to San Tomas Aquino Creek at Scott Boulevard "where the storm drain (that extracted and treated groundwater was previously discharged into) entered the Creek." The inspector noted: "San Tomas Aquino Creek was flowing strongly due to the very wet weather of the past couple of months. The two storm drains that enter the Creek on opposite banks at the Scott Boulevard Bridge both had good flows of clear water. This may be due to groundwater infiltration as the soil is probably pretty well saturated at this time."

This observation is critical for several reasons: (1) Two separate discharge points on opposite banks is unusual for storm drains and consistent with distributed creek channel infrastructure; (2) "Good flows of clear water" during wet weather—when actual storm drains would be carrying turbid runoff—indicates base flow from a watercourse rather than surface runoff; (3) The inspector's hypothesis of "groundwater infiltration" acknowledges the flow characteristics are inconsistent with typical storm drains; (4) Continuous flow during saturated conditions matches creek hydrology, not storm water hydrology. The inspector was observing Saratoga Creek discharging through infrastructure labeled as storm drains—the physical manifestation of the decades-old concealment scheme.

Multiple artesian monitoring wells prove the underground aquifer system continues functioning with extraordinary hydraulic pressure. At the Synertek site (3050 Coronado Drive), groundwater monitoring well MW-03B1 has been "historically observed to be an artesian well based on water seen on the pavement

around the well" (Synertek Groundwater Report, January 28, 2015). This well, drilled to monitor the B1 aquifer at 100-105 feet below ground surface, taps water under such pressure that it rises one hundred feet up the well shaft and spills onto the pavement. When installed in 1988, the water level was nineteen feet below surface; by 1995 pressure had increased until depth to water reached zero feet below surface, where it has remained. Deep soil borings in 1991 showed olive-colored soils and rocks at the B1 aquifer depth—evidence of serpentine hydrothermal systems.

Similarly, the 2015 Environmental Impact Report for Santa Clara Square Apartments documented "a large, pressurized, underground aquifer (which they referred to as an 'artesian feature') flowing only ~30 feet underground and across a distance of at least two blocks wide." The EIR acknowledged this represents "the deeper levels of the 'filled' Saratoga Creek"—an explicit admission that the creek was not eliminated but continues flowing underground as a confined aquifer system.

A recent geotechnical investigation for a HUD-assisted project near Monroe Street and San Tomas Aquino Creek found "approximately 2.5 to 3 feet of undocumented fill across the site." A Phase I Environmental Site Assessment for properties north of Highway 101 similarly noted that evidence suggests properties were graded in the 1970s and "the Saratoga Creek segment was filled." The presence of "undocumented fill"—fill that was never properly permitted or recorded—throughout the area where Saratoga Creek historically flowed confirms the creek channel was buried without required authorizations, and that officials conducting current investigations recognize this pattern but have not triggered enforcement action.

In the 1980s, poorly documented "flood control" construction occurred along Saratoga Creek between Cabrillo Avenue and Monroe Street, including widening the channel (actually the prior drainage ditch), rebuilding creek banks with gabions, and increasing channel capacity through excavation and additional gabion installation (1984-1986). This work was necessary because the underground pipe system installed in the 1950s-1970s proved inadequate when wet weather returned in the early 1980s—the pipes could not handle actual creek flows, causing flooding and requiring emergency capacity upgrades to the receiving channel (San Tomas Aquino Creek) and formalization of discharge points. (Exhibit H).

The 1981 channelization project costing $2.7 million was not creating new infrastructure—it was reinforcing and formalizing the receiving channel and discharge connections for an underground creek burial system that had been operating covertly for two decades but whose capacity proved inadequate during the 1980-1983 wet period.

In the 1960s, the City of Santa Clara aggressively pursued annexation of large portions of the site—previously unincorporated agricultural land. The City brokered real estate development deals and used housing development as justification for annexation, gaining control over the northern/central area that represented the only available expansion territory. As the government entity approving permits, operating utilities, and controlling infrastructure documentation, the City could implement creek burial through its own "stormwater" utility systems without triggering external regulatory review.

In the 1970s, the City repeated this pattern with industrial park development, securing deals with Kaiser-Aetna to develop hundreds of acres and again using development as justification for annexation. The piecemeal nature of development—with agricultural parcels sold, razed, and graded incrementally as

the City and developers "coerced each owner to sell"—allowed gradual creek burial across multiple projects, none individually large enough to trigger comprehensive environmental review.

Despite major modifications to creek channels, installation of extensive underground conveyance systems, and construction of discharge infrastructure, there are no as-built records, specifications, or reports documenting what was done, why it was done, or what the implications are. This absence of documentation is not accidental—it reflects deliberate avoidance of creating records that would establish the work as creek modification requiring federal and state permits. By labeling everything as "storm water infrastructure" and avoiding as-built documentation showing creek diversion, the defendants concealed the true nature of the work from regulatory agencies.

Contemporary Environmental Assessments and Environmental Impact Reports note that aerial photos and records indicate Saratoga Creek's prior channel "appears to have been filled" on parcels slated for industrial development, but provide no further details. Reports vaguely state San Tomas Aquino Creek was "channelized" in the 1960s. Critically, there is never any mention of need for investigation, potential Clean Water Act violations, or inquiry into the current state and location of the Saratoga Creek aquifer system. This pattern of acknowledging creek disappearance without investigating the mechanism or legal compliance demonstrates continuing concealment—modern consultants recognize something irregular occurred but avoid documenting it in ways that would trigger regulatory enforcement.

The convergence of evidence—1961 engineering reports acknowledging continued creek function, 1970 parcel maps showing "abandonment" paired with underground easements, 2017 observations of continuous discharge from "storm drains," artesian wells documenting pressurized underground flow, developer EIRs acknowledging underground aquifers are the "filled" creek, and the pattern of undocumented fill throughout the historic creek corridor—establishes that Saratoga Creek was never eliminated. The defendants buried the creek in underground infrastructure, labeled it as storm water drainage, avoided creating documentation of the true purpose, and have maintained this concealment for over 50 years. The creek continues flowing beneath the site, discharging through infrastructure deliberately mislabeled to evade Clean Water Act jurisdiction and avoid remediation requirements. This ongoing concealment constitutes continuing violations of federal and state environmental laws.

## THE UNMAPPED FLOW OF THE CREEK & THE RISK CAUSED BY THE VIOLATIONS/CONCEALMENT

Based on this research, there are now at least three covert and otherwise undocumented channels for Saratoga Creek flow at the Site beyond the formally designated channel and diversion to San Tomas Aquino creek. These paths are:

1. through the underground aquifer systems (as its known to flow hundreds of feet below the surface);
2. through those aquifers emerging as artesian springs and seeps (which have been documented at the Site by regulators in recent years and going back more than a century);

3. and through whatever underground "stormwater" channel(s) the City and its developers (Kaiser Aetna, etc.) built in the 1960s-1980s, and which appear to still exit under the current residential and industrial development.

The underground aquifer systems appear to have great mobility even alongside the "channels" of Saratoga Creek as it is apparently has the least mount of hardened channel of any creek in the West Santa Clara Valley watershed. A 2006 report estimates that only 6.5% of the entire creek has a "hard bottom", primarily along the Cabrillo/Monroe diversion site. The remainder of the creek is "soft bottom" meaning that the channel provides and earthen ingress/egress for that water flow into the soil and shallow groundwater nearby.

As note with the state's stormwater discharge observations in 2017, it appears the creek not only still flows in the natural channel, but that its still actively fed by the same headwaters (the mountains and/or artesian sources along the way). I would guess that the Saratoga Creek is fed from artesian sources in additional to the mountain headwaters, as the nearby Calabazas Creek is similarly known. Saratoga Creek emerges in a location that was know as the Congress Springs and became famous for artesian spring mineral waters, then flows to the valley floor in Saratoga around a known fault and hydrothermal systems, and then flows down and out the central, heart of the Santa Clara Plain where its natural channel was surrounded by artesian wells, marshes, and wet meadows.

The disconnect between modern framing of Saratoga Creek as assumably seasonal or ephemeral may arise out of the diversion of the creek's surface flows from its subsurface flow and sources. For instance the 2006 Water District Stewardship Plan for Saratoga Creek noted that when the creek reached the valley floor it became an ephemeral creek (where it probably entered the faults and recharged in the hydrothermal systems), and then was fed artificially by the Districts Stevens Creek pipeline where it was able to maintain flow upstream of 280 but then dries out. Then the report notes that at a later point around Forbes Ave, the "water returns to the creek and maintains a wet creek downstream to the confluence of San Tomas Aquino creek."

Looking at the historical ecology maps (Exhibits B-C), the location at Forbes Ave is directly adjacent to the freshwater marsh and oak woodland where San Tomas Aquino creek naturally sunk into the ground and created a sort of oak-wetland in the valley floor. This would be a predictable source of artesian waters and underground aquifers. Looking at maps of areas known to be modified, there were modifications made on the creek around Prospect Rd/Hamilton Ave and its noted as an artificial segment of the channel. This again implies that Saratoga Creek is fed by both the mountain headwaters and also subsurface waters systems in the valley flood.

The data reviewed of artesian wells at the site, as discussed above, indicates this pressured and/or hydrothermal system is still very active. This creates another issue and significant risk. These artesian waters systems are powerful and can cause a variety of damage if they are interfered with and obstructed from their normal processes. Aquifer systems, like Saratoga Creek, that flow in both the surface and sub-surface, and are fed along its path by springs and underground sources, need to be able to express themselves at the surface when pressure builds up underground.

We've seen that when Saratoga Creek is not able to flow freely, it raises the groundwater. For instance after, after "upgrading" the Saratoga Creek/San Tomas Aquino Creeks in 1964 between Bayshore and Calabazas Retarding Basin, the surrounding land subsided about 1.5ft following the pressure release.

An example of what can go wrong when pressure is not released occurred in 1983 in San Jose, where following severe wet weather cycles, groundwater levels were at a "near historic high… in at least one area of San Jose where a depressed portion of U.S. Route 101 exists."

The reports states that "the high groundwater level induced artesian flow onto U.S. 101 in excess of 1,100 gal/min. The flow led to piping of fines from underneath the freeway, slab uplift in excess of 10 in., and buoyancy of an underground water storage vault." This required an emergency "installation of temporary dewatering wells and implementation of an effective grouting program and chemically grouted structure tie-down anchors stabilized the area without shutting down traffic."

The Site was already under pressure from the thick clay and poor drainage, but even back in 1952 the Site was flagged by the Flood District as suffering from "inverted dams" where the roads compact the soil and "act to restrict subsurface drainage and in some instances cause the land to become waterlogged. This in turn causes greater runoff of surface waters because the soil has lost its normal absorption characteristics." Roads named as "good examples" of inverted damns included El Camino Real, the Bayshore, Monterey, and Coffin are good examples of such inverted dams.

At least one of the artesian wells at Synertek is shooting water up from 100ft bgs with enough force to spill out on the sidewalk. There are additional flowing wells in that area. The apartments reported what sounds like at least a 1 block by 3 block area of artesian pressure only 30bgs and which sounds like it has the potential to create a geyser if it was ruptured.

## POTENTIALLY RESPONSIBLE PARTIES

Based on the Preliminary Site Review and Assessment, the following parties are identified as primary potentially responsible parties (PRPs) for the violations documented in this Notice. This list focuses on entities that were instrumental in executing the violating acts, have continuing control over the infrastructure and properties involved, and possess the authority and resources to directly remediate ongoing violations.

The original violations occurred between the 1950s-1980s through coordinated actions by local and regional government entities and major corporations that led the large-scale implementation of development overlying the buried creek system. The exclusion of any party from this list does not imply immunity from liability. This Notice focuses on continuous and ongoing violations that form the foundation for subsequent violations, prioritizing parties with direct control over remediation pathways.

### CITY OF SANTA CLARA

The City of Santa Clara exercised comprehensive control over the affected area through its roles as property owner, planning authority, permit issuer, utility operator, and development proponent. The City approved all development permits and infrastructure plans that buried Saratoga Creek and filled

tideland-adjacent wet meadow, operated the municipal utilities that converted agricultural drainage to "storm water" infrastructure, owned strategic properties where creek burial occurred (including Bracher Elementary/Park where the creek resurfaces, and parcels along the former Enright Estate drainage junction), and directly brokered real estate transactions enabling the violations. The City annexed this area specifically to enable development, as the northern/central region represented the only available expansion area, then profited through utility revenues, increased tax base, and direct real estate deals—including projects involving City leadership who maintained private real estate interests in affected properties.

The City continues to own key properties (Great America Parkway, 2400 Agnew Road, Bracher Park, electric substations, Marriott parcels, and others), operates the underground pipe network carrying buried creek flows, controls access to infrastructure documentation, maintains "storm drain" discharge points into San Tomas Aquino Creek, and has authority to modify or remove the fish passage barrier. City leadership during critical periods included Gary Gillmor (Council ~1965, Mayor ~1969) and his daughter Lisa Gillmor (Council 1992-2000, 2011-2016, Mayor 2016-present), who co-own a real estate business that managed deals for City properties in the Site, including wetlands with Native American burial sites where the City built a municipal golf course and later established a garbage dump on sensitive baylands.

## KAISER-AETNA (KAISER ALUMINUM AND CHEMICAL CORPORATION & AETNA LIFE AND CASUALTY)

Kaiser-Aetna developed the San Tomas Industrial Park beginning in 1980 on large parcels (Parcel B: 48.7 acres; Parcel C: 55.1 acres) directly overlying Saratoga Creek's historical channel. A September 10, 1970 parcel map explicitly noted "approximate location of Saratoga Creek (to be abandoned)"—direct documentary evidence that developers knew they were eliminating a functioning creek. Construction permits (BLD1980-52465) authorized activities labeled "grade & drain" rather than "creek modification," structuring the work to avoid environmental review while filling the natural creek channel, installing underground pipes beneath the industrial park, and creating discharge points into San Tomas Aquino Creek.

The creek entered Kaiser-Aetna's Parcel B from Intel's property to the south, flowed north through "future Scott Boulevard," continued into Parcel C, and proceeded toward Bayshore Freeway/Duane Avenue before discharging—Kaiser-Aetna's development eliminated this entire above-ground reach. The explicit notation of intent to "abandon" the creek establishes knowing participation distinct from inadvertent impacts. Kaiser-Aetna's industrial park created the northern terminus of the buried creek system where underground pipes discharge into San Tomas Aquino Creek near Scott Boulevard, and the partnership or successors may retain ownership or easement rights over the underground infrastructure that continues operating today.

| 07/24/1980 | BLD1980-52465 | Building Permit | GRADE & DRAIN (3500 CU.YDS) | 3236 SCOTT BL, SANTA CLARA CA 95054 | Finaled |
| 09/03/1980 | BLD1980-52794 | Building Permit | CONSTRUCT IND. BUILDING, OCC.B-2, MF=17 | 3236 SCOTT BL, SANTA CLARA CA 95054 | Finaled |

City of Santa Clara - 1500 Warburton Avenue, Santa Clara, CA 95050



## __MARRIOTT INTERNATIONAL__

Marriott International, Inc. (operating through Fespar Enterprises, Marriott Hotels, Great America Marriott Hotels, and Frontier World) developed extensive hotel, entertainment, and commercial properties across hundreds of acres of filled wetland directly overlying the buried creek system. Marriott's development encompassed the Great America theme park and Freedom Center/Freedom Circle commercial corridor—a scale comparable to Kaiser-Aetna's industrial park and representing one of the largest single conversions of tideland-adjacent wet meadow in the affected area.



The company's properties required massive grading and filling across land with high water table and artesian pressure, connected to and relied upon the underground pipe network carrying buried Saratoga Creek, and necessarily integrated with the "storm water" system that functions as buried creek conveyance. A 1979 parcel map (442m8) documents development activities in direct proximity to creek infrastructure, and the timing and location of projects (contemporaneous with Kaiser-Aetna and immediately north of residential creek burial) positioned Marriott as key to extending the burial system northward.

Marriott continues operating major facilities on affected parcels including hotel properties (104-40-20, 21, 36, 37) and the Great America theme park, where ongoing operations depend on drainage infrastructure that buried the creek. The company's long-term maintenance of drainage systems managing continuous groundwater emergence demonstrates knowledge of hydrological conditions inconsistent with typical developed land, implicating Marriott in ongoing operation of unpermitted creek burial and wetland fill infrastructure at scale matching or exceeding Kaiser-Aetna's culpability.

### MISSION ENGINEERS, INC.

Mission Engineers, Inc. (2355 De La Cruz Boulevard, Santa Clara) provided civil engineering and land surveying services during 1959-1980s when creek burial and wetland fill occurred. As the civil engineering firm preparing site plans, grading designs, and drainage plans for multiple developments in the affected area, Mission Engineers designed infrastructure that redirected Saratoga Creek into underground pipes labeled as "storm water" systems, filled jurisdictional wetlands, and blocked fish passage—all without required federal permits. The firm's professional role in designing pipe networks, calculating hydraulic capacity, and preparing construction documents that enabled the violations suggests either knowing participation or professional negligence in failing to identify required permits and environmental review.

## INTEL CORPORATION

Intel Corporation constructed the first major industrial facility in the San Tomas Industrial Park, building a chip fabrication plant at 3065 Bowers Avenue beginning April 1970 (BLD1970-36770) while Saratoga Creek still flowed above-ground across the parcel. Intel's Parcel A (26.8 acres, 216-46-15) had the creek flowing southwest to northeast, entering near Central Expressway/Kifer Road and exiting toward Kaiser-Aetna land. Building permits authorized Intel to "Install area and storm drains and manhole," "Install sanitary sewer," and "install plumbing"—activities enabling creek redirection into underground infrastructure. A May 1, 1970 "underground drainage easement" (14 Misc. Rec. 528; quitclaim deed 8908 OR. 237, 238, 240, 242, 250) at the northeastern corner formalized underground pipes replacing natural surface flow, with timing indicating the easement specifically enabled creek burial.

Intel's permit applications described the site as "heavily landscaped" despite the land being active agricultural orchards—mischaracterization that obscured the site's wet meadow conditions and avoided disclosing a named creek flowed across the property. As the pioneering industrial developer in this location, Intel either originated or early-adopted the approach of burying creek flow in "storm drain" infrastructure that subsequent developers replicated, and the company's facility continues operating with underground pipes carrying diverted creek flow beneath or adjacent to the property.

## INTERSIL/HARRIS SEMICONDUCTOR (L3HARRIS)

Intersil constructed a chip fabrication facility at 3250 Scott Boulevard beginning fall 1973, completed in 1974 (BLD1973-41856). Records indicate Intersil or parent company Harris Semiconductor served as general contractor for broader San Tomas Industrial Park development, suggesting roles beyond constructing their own facility and potentially including coordination of underground pipe system installation carrying buried Saratoga Creek across multiple parcels.

This general contractor role positioned Intersil/Harris to design, implement, or supervise the filling and "storm water" infrastructure that functioned as creek burial, making the company instrumental in executing the violation scheme at scale across the industrial park.

# VIOLATIONS OF THE CLEAN WATER ACT

Substantial evidence supports that violations of the Clean Water Act have occurred relating to the filling and burial of Saratoga Creek, the filling of tideland-adjacent wet meadow, and the discharge of fill material into waters of the United States. San Francisco Bay is a resource of national significance providing scenic beauty, recreational facilities, port access for domestic and international commerce, and functioning as the largest tidal estuary on the West Coast with wildlife habitat of nationwide importance. The Saratoga Creek system flows directly to Guadalupe Slough and San Francisco Bay, establishing clear federal jurisdiction under the Clean Water Act.

## G.  VIOLATION OF 33 U.S.C. § 1344 - UNLAWFUL FILLING OF WATERS OF THE UNITED STATES

Section 404 of the Clean Water Act requires a permit from the U.S. Army Corps of Engineers prior to any discharge of fill material into waters of the United States. The U.S. EPA jointly administers Section 404 with the Army Corps under a Memorandum of Agreement with the Department of Defense (59 Federal Register 94-1311; SCVWD Stream Maintenance Program Manual, Ch. 2, Pg. 11, R14290, 2027-2036). EPA and the Army Corps issued a Regional General Permit for stream maintenance in Santa Clara County under authority of 33 U.S.C. §§ 1341, 1344 (FSPN-1996-225250S). Within the program area, "Section 10 jurisdictional waters include… the lower reaches of… San Tomas Aquino, Calabazas… creeks, and the Guadalupe River" (SCVWD Stream Maintenance Program Manual, Ch. 2, Pg. 3, R14290, 2027-2036).

Prior to 1977, both the Corps and EPA defined "fill material" as "any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose" (40 FR 31325, July 25, 1975; 40 FR 41291, September 5, 1975). In 1977, the Corps amended this definition to add a "primary purpose test," excluding material discharged primarily to dispose of waste (42 FR 37130, July 19, 1977). Persons or entities that discharge material to waters of the U.S. that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of any portion of a water of the U.S. are regulated under Section 404.

Section 404 establishes a program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands. Activities regulated under this program include fill for development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), and mining projects. The basic premise is that no discharge of dredged or fill material may be permitted if: (1) a practicable alternative exists that is less damaging to the aquatic environment, or (2) the nation's waters would be significantly degraded. Applicants must show that steps have been taken to avoid impacts to wetlands, streams, and aquatic resources; that potential impacts have been minimized; and that compensation will be provided for all remaining unavoidable impacts.

There are no exemptions from the Section 404 permitting process, even for flood control activities, "where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced" (33 U.S.C. § 1344(f)). The defendants' characterization of creek burial and wetland fill as "storm water management" or "flood control" does not exempt these activities from Section 404 permit requirements.

The defendants discharged fill material into Saratoga Creek by burying the creek channel in underground pipes, filled tideland-adjacent wet meadow to construct residential and commercial development, and altered the hydrological regime of jurisdictional waters without obtaining required Section 404 permits. These activities replaced aquatic areas with dry land, changed the bottom elevation of waters of the United States, and permanently altered the area's hydrological characteristics—all activities requiring Section 404 authorization that was not obtained.

There is no statute of limitations for the initial act when there are ongoing violations (28 U.S.C. § 2462). The fill material remains in place, the buried creek continues flowing through unpermitted infrastructure, and the altered hydrology persists—constituting continuing violations occurring each day the unpermitted fill remains and the waters remain impaired. A landowner cannot permanently alter an

area's hydrological regime by discharging dredge and fill materials into wetlands without obtaining a Section 404 permit. *United States v. Akers*, 785 F.2d 814 (9th Cir. 1986), cert. denied, 479 U.S. 828 (1986).

In *United States v. Akers*, aerial surveys revealed ditching and leveling that filled natural channels and converted wetlands. The Ninth Circuit held that activities with a drying effect on wetlands are not exempt from Section 404 permit requirements, even when characterized as agricultural improvements. The court emphasized that "the intent of Congress in enacting the Act was to prevent conversion of wetlands to dry lands. It is thus the substantiality of the impact on the wetland that must be considered." The defendants' activities—like those in *Akers*—converted forested and wet meadow areas into non-wetland developed tracts through construction of infrastructure and filling of low-lying areas, constituting unpermitted discharges of fill material.

Activities such as discharge of fill or alteration affecting streams, rivers, and wetlands in the Bay Area are regulated by the U.S. Army Corps of Engineers, the San Francisco Regional Water Quality Control Board, and California Department of Fish & Wildlife. The Bay Conservation and Development Commission regulates activities in and adjacent to San Francisco Bay. Jurisdictional wetlands in the Bay Area include tidal, brackish, and freshwater marshes; seasonal wetlands; seeps; and vernal pools. Rivers and streams are considered "other waters" and are regulated by wetland permitting agencies. Any proposed dredge and fill activities within waters of the U.S. including wetlands require a Section 404 permit from the Army Corps. No such permits were obtained for the activities at this site.

## H.    VIOLATION OF 33 U.S.C. § 1341 - WATER QUALITY CERTIFICATION

Under Section 401 of the Clean Water Act, a federal agency may not issue a permit or license to conduct any activity that may result in any discharge into waters of the United States unless a Section 401 water quality certification is issued or waived (33 U.S.C. § 1341). States and authorized Tribes where the discharge would originate are generally responsible for issuing water quality certifications. In cases where a state does not have authority, EPA is responsible for issuing certification.

In accordance with Section 401, projects that apply for an Army Corps permit for discharge of dredged or fill material must obtain water quality certification from the appropriate Regional Water Quality Control Board indicating that the action would uphold state water quality standards. The State Water Resources Control Board has certified a number of nationwide permits for California, and Regional Boards are responsible for issuing 401 certification for other permits.

The defendants violated 33 U.S.C. § 1341 when they filled Saratoga Creek and tideland-adjacent wet meadow in a manner resulting in discharge of dredged and fill materials into surface waters of the United States, including San Tomas Aquino Creek and San Francisco Bay, without obtaining required permits and without obtaining certification from the California Regional Water Quality Control Board regarding plans for implementing the fill, compliance with the Clean Water Act, and compliance with California water quality standards (SCVWD Stream Maintenance Program Manual, Ch. 2, Pg. 12, R14290, 2027-2036).

The burial of Saratoga Creek in underground pipes, the redirection of creek flows through infrastructure labeled as "storm drains," and the filling of wet meadow for development all constitute

activities that discharge fill material and alter water quality in downstream waters. These activities required Section 401 certification to ensure compliance with state water quality standards, protection of beneficial uses, and mitigation of impacts to aquatic resources. No such certification was obtained, violating the explicit prohibition against federal permits or licenses being issued without state water quality certification.

## I.    VIOLATION OF 33 U.S.C. § 1311 - EFFLUENT LIMITATIONS AND UNPERMITTED DISCHARGES

Section 1311(a) of the Clean Water Act prohibits the discharge of "any pollutant" into waters of the United States except in compliance with the Act's permitting requirements. This prohibition expressly incorporates filling and dredging activities when such activities do not comply with the legal requirements under Section 1344. The CWA generally prohibits the discharge of pollutants into waters of the U.S. without a permit issued by EPA, or a State or Tribe approved by EPA under Section 402, or in the case of dredged or fill material, by the Army Corps or an approved State or Tribe under Section 404.

The fill material discharged into Saratoga Creek and tideland-adjacent wet meadow constitutes a "pollutant" under the Clean Water Act. The defendants dumped fill material onto the creek channel and into jurisdictional wetlands in violation of Section 404 permit requirements, and this unpermitted fill material remains in place as a continuing discharge of pollutants into waters of the United States. The burial of the creek in pipes, while allowing water to continue flowing, does not eliminate the violation— the physical fill material occupying the former creek channel and former wetland areas remains an unpermitted discharge that violates Section 1311(a).

The defendants' failure to remove the unpermitted fill and restore waters of the United States constitutes a continuing violation of Section 1311. Each day the fill material remains in place without proper authorization represents an ongoing discharge of pollutants into waters of the United States, subjecting the defendants to continuing liability under the Clean Water Act's enforcement provisions.

## J.    VIOLATION OF FEDERAL ENDANGERED SPECIES ACT OF 1973 & CALIFORNIA ENDANGERED SPECIES ACT OF 1984

Both Saratoga Creek and San Tomas Aquino Creek provide direct and adjacent habitat to Guadalupe Slough and San Francisco Bay for federally protected threatened fish species, including Chinook Salmon (*Oncorhynchus tshawytscha*) (64 FR 50394; 70 FR 37159; 79 FR 20802), Green Sturgeon (*Acipenser medirostris*), and Central California Coast Steelhead (*Oncorhynchus mykiss*) (65 FR 36074; 71 FR 833; 79 FR 20802). The site also provides direct or adjacent habitat for the federally threatened Bay Checkerspot Butterfly (*Euphydryas editha bayensis*), the federally endangered California Red-Legged Frog (*Rana draytonii*), and the federally endangered and threatened California Tiger Salamander (*Ambystoma californiense*).

Recent archaeological evidence confirms the historical presence of these species in the watershed. Morphology-based analysis of 17,288 fish specimens excavated from Native American middens at Mission Santa Clara (CA-SCL-30H), circa 1781–1834 CE, identified 88 salmonid vertebrae. Ancient DNA

sequencing identified three individuals as Chinook salmon and the remainder as steelhead/rainbow trout. These findings comprise the first physical evidence of salmon nativity to the Guadalupe River watershed, extending their documented historic range to include San Francisco Bay's southernmost tributary system.

A drop structure at the San Tomas Aquino/Saratoga Creek confluence creates a complete barrier to upstream fish migration. According to a 1993-1994 study commissioned by Valley Water, this structure was identified as "a complete barrier to upstream migration, which precluded use of Saratoga Creek by anadromous salmonids." A 1985 California Department of Fish and Game survey described it as "a large barrier at the first entry point of Saratoga Creek into San Tomas Aquino Creek" and documented a "major steelhead and king salmon spawning area" just 200 yards downstream—confirming that fish reach this point but can proceed no further.

The barrier blocks access to approximately 15 miles of historical spawning habitat in Saratoga Creek, constituting a "take" under ESA Section 9 (applicable since Central California Coast steelhead listing in 1997) and violating California Fish & Game Code Section 5937, which has required fish passage at dams since the 1870s. The structure appears designed to prevent fish from accessing an underground pipe system carrying buried Saratoga Creek flow, where fish entry would expose the creek burial through mortality events, system blockages, or spawning attempts revealing continuous creek flow in infrastructure labeled as storm drains.

The burial and rerouting of Saratoga Creek constitutes significant habitat modification under ESA Section 9's prohibition on "take," which includes habitat modification that actually kills or injures wildlife by significantly impairing essential behavioral patterns including breeding. *Palila v. Hawaii Dept. of Land & Natural Resources*, 649 F. Supp. 1070 (D. Haw. 1986), established that habitat destruction preventing population recovery constitutes actionable injury to protected species even without direct killing. The modification of tideland-adjacent wet meadow and serpentine hydrothermal creek habitat destroyed specialized ecosystems—including alkali wet meadows and thermal seeps—upon which unique wildlife populations depend. The continued destruction prevents species population recovery and expansion, indirectly suppressing populations toward local extinction.

Federal agencies must consult with NOAA Fisheries and U.S. Fish & Wildlife Service under ESA Section 7 before authorizing, funding, or carrying out actions that may affect listed species. The creek burial, wetland fill, and barrier installation would have required Section 7 consultation if properly permitted under Clean Water Act Section 404. The absence of such consultation—combined with the absence of 404 permits—suggests the work was structured to evade federal review. Under California Endangered Species Act (CESA), project impacts on state-listed endangered or threatened species are considered significant under CEQA and require mitigation. The California Native Plant Protection Act's legislative intent to "preserve, protect, and enhance endangered plants in this state" was expanded by CESA to include threatened and endangered species categories with enhanced legal protections. State-listed species present or potentially present on site have been significantly impacted without required consultation or mitigation.

## VIOLATION OF CLEAN WATER ACT SECTION 404 AND NATIONAL HISTORIC PRESERVATION ACT SECTION 106

Between approximately 1960 and 1985, the City of Santa Clara and various developers systematically destroyed one of the most culturally, ecologically, and historically significant landscapes in California through a pattern of unlawful filling, diversion, and development activities that violated multiple federal environmental and cultural resource protection laws.

The Site consisted of wet meadows, alkali meadows, freshwater marshes, and jurisdictional wetlands directly fed by the ancient Saratoga Creek hydrothermal system and abundant artesian wells that flowed year-round. Defendants discharged massive quantities of fill material into these waters of the United States without obtaining required authorization under Section 404 of the Clean Water Act (post-1972) and/or Section 10 of the Rivers and Harbors Act of 1899.

Saratoga Creek, a perennial waterway flowing from the Santa Cruz Mountains to the San Francisco Bay, has existed for thousands of years and was documented in academic reconstructions of historic Bay Area ecology (1800-1850) as the only permanent creek in Santa Clara County that flowed from the mountains to the bay. The Site was located within the Saratoga Creek system where the creek would sink, reemerge as seeps and springs, and flow through a complex network of marshes and meandering streams before continuing to the Bay. This hydrologically complex system created rare alkali wet meadows, freshwater marshes, and tidal-terrestrial transition zones that supported specialized endemic plant species and served as critical wildlife habitat.

Despite the obvious jurisdictional nature of these wetlands and waters—characterized by standing water, hydric soils, wetland vegetation, artesian springs, and direct hydrologic connectivity to navigable waters—Defendants filled and developed upon these areas without obtaining any Clean Water Act Section 404 permit from the U.S. Army Corps of Engineers. This unauthorized discharge continues to this day, as the fill material remains in place, perpetuating ongoing daily violations.

## K.    DESTRUCTION OF NATIVE AMERICAN BURIAL GROUNDS AND SACRED SITES

The Site was located within the ancestral territory of the Clareño people (also known as Ohlone) and was a key location for Native Americans for thousands of years due to its rich natural resources, permanent water sources, and proximity to the Bay. The Site included portions of Rancho Ulistac, which was named after a Clareño chief and granted in 1845 to three Clareño men: Marcello, Pio, and Cristobal. Archaeological evidence documents continuous Native American occupation from at least 430-1070 CE, including residential structures and extensive burial sites.

The presence of Native American burial grounds at the Site was documented in public records dating back to at least 1955. A June 1955 San Jose Evening News article explicitly noted that "tiny mounds that dot the portion mark spots where Indian graves were placed" on the Jamison plot within the Site. (Exhibit F). Subsequent government studies confirmed this, including the 1998 Master Plan for City of Santa Clara Open Space Park and the 2016 Initial Study for the San Tomas Expressway, which documented that "Native American archaeological sites have been recorded on the wide valley terraces within a half mile of major rivers and creeks and adjacent to the original San Francisco Bay shoreline," and that "an area of Ulistac to the east of the northern portion of the Site contains archaeological evidence from 430-1070 CE, including homes and large burial sites."

Despite this documented knowledge spanning decades, Defendants proceeded with filling and development activities that disturbed, destroyed, and removed Native American human remains and funerary objects. The current location and disposition of these ancestral remains is unknown. Defendants have provided no accounting for whether the bones of the Clareño ancestors were discarded as construction debris, pulverized during grading operations, removed and relocated without tribal consultation or consent, or remain buried beneath concrete and asphalt. This represents one of the most profound forms of desecration—not merely disturbing graves, but erasing them so completely that their very existence has been removed from modern maps and institutional memory.

## L.    DESTRUCTION OF HISTORIC AGRICULTURAL LANDSCAPE OF STATE AND NATIONAL SIGNIFICANCE

The Site was the epicenter of California's "Valley of Heart's Delight," the agricultural region that gave Santa Clara County its international reputation for fruit production. The Site was settled by pioneer families in the 1850s-1860s who arrived in covered wagons and chose this specific location for its unique combination of artesian water, fertile wet meadow soils, and proximity to Saratoga Creek. These families (including the Jamison, Putnam, Brown, Bracher, McComas, Wilcox, Weston, Lawrence, and Morrison families) cultivated pear orchards and vegetable crops that became synonymous with California agriculture. Many of these pioneer families went on to become judges, politicians, and founders of state agricultural coalitions, cementing their significance in California history.

This land was farmed continuously for over 100 years, from the 1850s through the 1950s-1960s, representing one of the longest periods of continuous agricultural use in Santa Clara County. As documented in the June 1955 San Jose Evening News, portions of the Jamison ranch "ha[d] never been plowed, and ha[d] remained as virgin pastureland to this day," with artesian wells that "flowed year-round." The pear orchards were concentrated along Saratoga Creek within the natural floodplain, representing a sophisticated understanding of water management that utilized the area's unique hydrology. The agricultural practices developed here—adapting to wet meadows, alkali soils, artesian water systems, and seasonal flooding—were innovative and significant to the development of California agriculture.

The Site was part of historic Rancho land grants including Pastoria de las Borregas, Rancho Ulistac, and the Enright Plot, directly connecting it to Spanish and Mexican colonial land use patterns and to Native American land stewardship under the 1845 Rancho Ulistac grant. (Exhibit E). The agricultural landscape included not only orchards and fields but also the infrastructure of 19th-century farming: irrigation systems utilizing artesian water, farmhouses, barns, agricultural outbuildings, fenced pastures, tree-lined farm roads, and the critical relationship between agricultural practices and the natural hydrology of Saratoga Creek.

By the 1960s, the Site represented the last remaining large-scale agricultural area in the City of Santa Clara and one of the few surviving examples of the original Valley of Heart's Delight landscape that had not yet been consumed by urbanization. Its destruction marked the erasure of a landscape that was of both state and national significance to California's agricultural heritage.

## M.  VIOLATIONS OF SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT

The unauthorized filling of wetlands required federal permits under Section 404 of the Clean Water Act, thereby triggering mandatory consultation under Section 106 of the National Historic Preservation Act of 1966. Section 106 requires federal agencies to consider the effects of federally licensed, permitted, or funded activities on historic properties that are listed on, or eligible for listing on, the National Register of Historic Places.

The Site contained multiple categories of historic properties eligible for the National Register. Under Archaeological and Cultural Properties (Criteria A and D) there are Native American burial grounds dating from at least 430-1070 CE; archaeological sites containing evidence of residential structures and village areas; traditional cultural properties of religious and spiritual significance to the Clareño people and their descendant tribes; and properties eligible under the category of "Ethnic Heritage" and "Archaeology – Prehistoric."

Under Historic Agricultural Properties (Criteria A, B, and C) there were rural historic landscape representing California's Valley of Heart's Delight, properties associated with pioneer settlement patterns of the 1850s-1860s, farmsteads associated with significant persons (pioneer families who became judges, politicians, and agricultural leaders), virgin pastureland and agricultural landscapes demonstrating 100+ years of continuous agricultural use, properties significant under "Agriculture," "Community Planning and Development," and "Settlement Patterns", and rural vernacular landscape eligible as a historic district.

Under the Historic Rancho Land Grant Properties (Criteria A and C), portions of Rancho Ulistac (1845 Mexican land grant to three Clareño men), portions of Pastoria de las Borregas, and properties significant to Spanish/Mexican colonial history and Native American land tenure under Mexican land grant system.

Prior to issuing or authorizing any permit under Section 404 of the Clean Water Act, the U.S. Army Corps of Engineers was required to identify these historic properties, consult with the State Historic Preservation Officer, consult with affected Native American tribes (particularly regarding properties of traditional religious and cultural significance), assess the effects of the proposed filling activities on these properties, and develop measures to avoid, minimize, or mitigate adverse effects.

Defendants deliberately evaded these Section 106 requirements by:

1. Failing to disclose to federal agencies the documented presence of Native American burial grounds despite public records dating to 1955,
2. Failing to disclose the historic and archaeological significance of the Site,
3. Either obtaining no Section 404 permit at all, or obtaining permits through a process that failed to identify or consider impacts to historic properties,
4. Proceeding with development without any tribal consultation whatsoever,
5. Proceeding with development without any evaluation of impacts to the historic agricultural landscape,
6. Proceeding with development despite vocal opposition from these farmers who wanted to continue using the land for orchards and agriculture.

The Section 106 process, had it been properly followed, would have required archaeological surveys to document the extent of burial grounds and cultural resources, government-to-government consultation with federally recognized tribes and their Tribal Historic Preservation Officers, consultation with descendant communities regarding the treatment and disposition of human remains, evaluation of the historic agricultural landscape for National Register eligibility, development of a Memorandum of Agreement to avoid or mitigate adverse effects, possible nomination of properties to the National Register, and at minimum, documentation and salvage archaeology before destruction. None of this occurred.

Defendants destroyed a landscape of extraordinary convergent significance: a place where Indigenous peoples had lived, died, and been buried for over a thousand years; where Spanish and Mexican colonization intersected with Native land grants; where California pioneer families established some of the first non-mission agricultural settlements; where unique ecological conditions created rare alkali meadows and specialized plant communities; where an ancient creek system connected mountains to ocean through a complex hydrothermal network; and where over a century of agricultural innovation created the landscape that gave California its identity as the "Valley of Heart's Delight."

This was a landscape that, had it been properly evaluated, could have qualified for designation as a National Historic Landmark, a Traditional Cultural Property of national significance, a Rural Historic Landscape District on the National Register, a sacred site under Executive Order 13007, and/or a Critical Habitat under the Endangered Species Act (for species dependent on alkali meadow ecosystems) Instead, it was filled, paved, and erased from institutional memory through decades of concealment and documentation manipulation, such that "most government and academic reports no longer recognize the existence of Saratoga Creek within the City of Santa Clara."

These violations continue today. The unauthorized fill remains in place in waters of the United States, constituting ongoing daily violations of Section 404. The human remains of Clareño ancestors remain disturbed, removed, or destroyed without proper treatment, repatriation, or reburial. The historic properties have been destroyed without the documentation, mitigation, or public accountability that Section 106 requires. The Saratoga Creek system continues to be diverted, confined, and concealed beneath urban development, with its very existence denied in modern planning documents.

The appropriate remedy includes restoration of illegally filled wetlands where feasible, archaeological investigation to locate and properly repatriate any remaining Native American human remains, belated Section 106 consultation with affected tribes, documentation of the destroyed historic properties for the historic record, designation of any remaining undisturbed portions as protected areas, civil penalties reflecting decades of ongoing violations, and acknowledgment and public accounting of what was destroyed

This is a case of systematic, knowing destruction of a landscape of profound significance—ecological, cultural, and historical—carried out through concealment, misrepresentation, and the deliberate evasion of federal environmental and cultural resource protection laws that existed at the time of development.

# VIOLATIONS OF CALIFORNIA LAW

## N.    VIOLATION OF CALIFORNIA FISH AND GAME CODE § 1602 - LAKE AND STREAMBED ALTERATION

California Fish and Game Code Section 1602 prohibits any entity from substantially diverting or obstructing the natural flow of, or substantially changing or using any material from the bed, channel, or bank of any river, stream, or lake, or depositing debris or waste where it may pass into any river, stream, or lake, without first notifying and entering into a streambed or lakebed alteration agreement with the California Department of Fish and Wildlife (CDFW). The statute requires that permitted alterations not substantially adversely affect existing fish or wildlife resources.

California's Lake and Streambed Alteration Program under Section 1600 et seq. regulates projects affecting the flow, channel, or banks of rivers, streams, and lakes. Section 1602 requires state or local governmental agencies, public utilities, and private individuals to notify CDFW and enter into an alteration agreement before construction of any project that will:

- Substantially divert, obstruct, or change the natural flow or the bed, channel, or bank of any river, stream, or lake;
- Deposit or dispose of debris, waste, or other material containing crumbled, flaked, or ground pavement where it may pass into any river, stream, or lake;
- Substantially change or use any material from the bed, channel, or bank of any river, stream, or lake; or
- Result in disposal or deposition of debris, waste, or other material containing crumbled, flaked, or ground pavement where it can pass into any river, stream, or lake.

Section 1602 generally applies to any work undertaken in-channel and within and/or associated riparian habitat of a river, stream, or lake. All diversions, obstructions, or changes to the natural flow or bed, channel, or bank of any river, stream, or lake in California that supports fish or wildlife resources are subject to CDFW regulation under Section 1602. It is unlawful for any person, governmental agency, or public utility to undertake such activities without first notifying CDFW and obtaining required approvals.

"Waters of the state" include any surface water or groundwater within the boundaries of the state, including: all wetlands that meet the current or any historic definition of waters of the United States; natural wetlands; wetlands created by modification of a surface water of the state; artificial wetlands greater than one acre in size (with some exceptions); and artificial wetlands less than one acre resulting from historic human activity that are not subject to ongoing operation/maintenance and have become a relatively permanent part of the natural landscape (State Policy for Water Quality Control: State Wetland Definition and Procedures for Discharges of Dredged or Fill Material to Waters of the State).

The defendants substantially diverted and obstructed the natural flow of Saratoga Creek by redirecting the creek into underground pipes, substantially changed the bed, channel, and banks of the creek by burying the natural channel and replacing it with artificial conveyance, and substantially adversely affected existing fish and wildlife resources by eliminating access to approximately 15 miles of spawning

habitat and destroying riparian and aquatic ecosystems. These activities occurred without notification to CDFW and without entering into required streambed alteration agreements.

The burial of Saratoga Creek eliminated the natural streambed, removed riparian vegetation, destroyed aquatic habitat, blocked fish passage, altered sediment transport, modified water temperature regimes, and eliminated the ecological functions of a natural creek system. The installation of underground pipes and the construction of the drop structure barrier constitute substantial obstructions to natural flow and fundamental alterations to the stream channel requiring Section 1602 notification and agreement. The filling of tideland-adjacent wet meadow and the modification of natural drainage patterns further altered waters of the state without required authorization.

The defendants' characterization of these activities as "storm water infrastructure" installation does not exempt the work from Section 1602 requirements. The statute applies to alterations of rivers, streams, and lakes regardless of how such alterations are labeled in permit applications. The continuous flow characteristics, the presence of fish and wildlife resources, and the connection to navigable waters establish that Saratoga Creek is a jurisdictional stream requiring CDFW oversight for any substantial alterations.

The defendants' actions have substantially adversely affected existing fish and wildlife resources in violation of Section 1602(a). The burial of the creek eliminated spawning habitat, rearing habitat, and migration corridors for anadromous salmonids and other native fish species. The installation of the drop structure created a complete barrier to upstream fish migration, preventing access to historical spawning grounds documented as far back as Native American occupation (circa 1781-1834 CE). The destruction of riparian habitat eliminated cover, food sources, and breeding areas for terrestrial and avian wildlife dependent on creek corridor ecosystems. The alteration of natural flow patterns and water temperature regimes degraded habitat quality for sensitive species including California red-legged frog, California tiger salamander, and numerous special-status plant and invertebrate species associated with alkali wet meadow and serpentine seep habitats.

## O.  VIOLATION OF CALIFORNIA FISH AND GAME CODE § 5948 - BARRIERS TO FISH PASSAGE

California Fish and Game Code Section 5948 prohibits any person from causing or permitting to exist any artificial barrier in any stream in California that will prevent the passing of fish up and down stream or that is deleterious to fish as determined by the commission. The statute provides:
"No person shall cause or having caused, permit to exist any log jam or debris accumulation or any other artificial barrier, except a dam for the storage or diversion of water, public bridges and approaches thereto, groins, jetties, seawalls, breakwaters, bulkheads, wharves and piers permitted by law, and debris from mining operations, in any stream in this State, which will prevent the passing of fish up and down stream or which is deleterious to fish as determined by the commission, subject to review by the courts."

The defendants have caused and permitted to exist an artificial barrier at the San Tomas Aquino Creek/Saratoga Creek confluence that prevents fish from passing up and down stream. The drop structure, documented in 1985 California Department of Fish and Game surveys and 1993-1994 studies as

a "complete barrier to upstream migration," blocks access to approximately 15 miles of Saratoga Creek spawning habitat for ESA-listed Central California Coast steelhead, Chinook salmon, and other anadromous fish species.

The barrier does not fall within Section 5948's enumerated exceptions. It is not a dam for storage or diversion of water in the traditional sense—it is a grade control structure that appears designed to prevent fish from accessing underground pipe infrastructure carrying buried creek flows. It is not a public bridge, groin, jetty, seawall, breakwater, bulkhead, wharf, pier, or mining debris. The structure functions as an "other artificial barrier" explicitly prohibited by the statute when such barriers prevent fish passage.

The 1985 California Department of Fish and Game survey identified "a major steelhead and king salmon spawning area" approximately 200 yards downstream of the barrier, confirming that fish reach this location but cannot proceed further upstream. The 1993-1994 study commissioned by Valley Water identified the drop structure as "a complete barrier to upstream migration, which precluded use of Saratoga Creek by anadromous salmonids." These official determinations by California fish and wildlife authorities establish that the barrier prevents fish passage as prohibited by Section 5948.

Historical documentation confirms that steelhead trout were present in Saratoga Creek (then called Campbell Creek) as recently as 1905, with reports indicating fish had not ascended the creek for "the previous 15 years" by 1953. The barrier has eliminated access to spawning habitat documented for over a century, including habitat identified through archaeological evidence from Native American middens at Mission Santa Clara (CA-SCL-30H) dating to 1781-1834 CE, which contained salmonid remains confirming the historic nativity of salmon and steelhead to the Guadalupe River watershed's southernmost tributaries.

Beyond preventing upstream passage, the barrier is deleterious to fish by fragmenting populations, eliminating genetic exchange between upstream and downstream segments, reducing available spawning and rearing habitat, concentrating fish in limited downstream areas subject to higher predation and competition, and preventing natural recolonization of upstream habitats following disturbance events. The barrier's effects compound other stressors on ESA-listed species already facing population declines and habitat loss throughout their range.

Valley Water's operation of the creek system has created additional barriers to fish passage beyond the drop structure. Infrastructure including culverts, channel constrictions, and flow modifications create passage impediments throughout the watershed. Valley Water's management of instream flows— potentially reducing flows to dangerous levels to maximize water extraction—exacerbates passage barriers by creating conditions where natural features become impassable due to insufficient water depth or velocity. These operational barriers, combined with the physical drop structure, threaten the existence of fish stocks in the watershed and violate Section 5948's prohibition on barriers preventing fish passage.

The defendants have caused the barrier to exist and continue to permit its existence without remediation. Each day the barrier remains in place constitutes a continuing violation of Section 5948. The defendants' failure to remove the barrier or install fish passage facilities perpetuates the violation and the harm to protected fish populations.

# REQUESTS & CONCLUSION

I request that the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers investigate these violations, initiate enforcement action within sixty days, require removal of unpermitted fill and restoration of waters of the United States, and assess civil penalties.

I request that California agencies investigate violations of state law and coordinate with federal agencies on remediation.

The potentially responsible parties are notified that unless these violations are remediated within sixty days, I will file a Clean Water Act citizen suit in federal court. The unpermitted fill must be removed. The creek must be daylighted. The wetlands must be restored.

For over fifty years, Saratoga Creek has flowed underground through infrastructure installed without Clean Water Act permits. Hundreds of acres of wetlands were filled without authorization. These violations continue daily. Federal and state agencies have sixty days to act. If they decline, private enforcement will proceed.

Respectfully,

/s/ Ashley M. Gjovik

December 11 2025

An appendix with additional exhibits is available here:
http://www.ashleygjovik.com/uploads/1/3/7/0/137008339/gjovik_cwa_citizensuit_appendix_exhibits_20251211.pdf

**Email**: ashleymgjovik@protonmail.com [1]
**Phone:** (415) 964-6272
**Physical Address:** 18 Worcester Sq., Apt. 1, Boston, MA, 02118
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Website:** https://www.ashleygjovik.com/saratoga-creek-system.html

# SERVICE & NOTICE

## <u>FEDERAL REGULATOR NOTICE</u>

U.S. EPA, Pacific Southwest, Region 9.
Wetlands Regulation (CWA 404)
75 Hawthorne Street, M.C. # WTR-2-2, San
Francisco, CA 94105

U.S. EPA, Pacific Southwest, Region 9.
Water Division
75 Hawthorne Street, San Francisco, CA 94105

U.S. EPA, Pacific Southwest, Region 9.
Enforcement and Compliance Assurance
Division: Water and Air, Waste and Chemicals
Branches.
75 Hawthorne Street, San Francisco, CA 94105

U.S. EPA, Office of Wetlands, Oceans and
Watersheds: Watershed Restoration,
Assessment, and Protection Division.
1200 Pennsylvania Avenue, Mail code: 4502T,
Washington, DC 20460

Department of the Army, Corps of Engineers,
San Francisco District, Regulatory Division.
450 Golden Gate Ave., 4th Floor
San Francisco, California 94102-3404

Peninsula Corridor Joint Powers Board,
Region 9 Office
Federal Transit Administration, U.S. DOT
888 S Figueroa St Ste 440, Los Angeles, CA
90017, United States

## <u>CALIFORNIA REGULATOR NOTICE</u>

California Dept. of Fish and Wildlife,
Bay Delta Region (Region 3),
2825 Cordelia Road Unit 100,
Fairfield, CA 94534

California Dept. of Fish and Wildlife,
Law Enforcement Division, Central District.
P.O. Box 944209,
Sacramento, CA 94244-2090

California EPA Water Board
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

San José / Santa Clara Regional Wastewater
Facility
200 E. Santa Clara St.
San Jose, Ca 95113

Santa Clara Valley Water District (SCVWD)
aka San Tomas Flood Control, et al.
5750 Almaden Expressway
San Jose, CA 95118-3686

County of Santa Clara
70 West Hedding Street
9th Floor
San Jose, CA 95110

San Francisco Bay Conservation and
Development Commission,
375 Beale St, Suite 510
San Francisco, CA 94105.

# DEFENDANT NOTICE

**City of Santa Clara**
1500 Warburton Avenue
Santa Clara, CA 95050

Kaiser Aetna aka KACOR Realty aka Kaiser
Aluminum and Chemical Corporation and
Aetna Life and Casualty, et al.

**Kaiser Aluminum Corporation**
1550 West McEwen Drive, Suite 500
Franklin, TN 37067

**Aetna Inc.**
151 Farmington Avenue
Hartford, CT 06156

**Marriott International, Inc.**
7750 Wisconsin Ave.
Bethesda, MD 20814

**Intel Corporation**
2200 Mission College Blvd.,
Santa Clara, CA 95054-1549

**L3Harris**
Intersil/Harris Semiconductor
1025 W. NASA Boulevard
Melbourne, FL 32919

**Mission Engineers,**
2355 De La Cruz Blvd.
Santa Clara, CA 95050

# EXHIBIT A



**EXHIBIT B**



Watching Our Watersheds (WOW) Historic Santa Clara Valley,
https://valleywater.maps.arcgis.com/apps/MapJournal/index.html?appid=7ca58d914afe456fac2a1920a7c66149

**EXHIBIT C**



SFEI, Historical Vegetation and Drainage Patterns of Western Santa Clara Valley (2010).

## EXHIBIT D



1939, Flight C-5750 Fairchild Aerial Surveys for the USDA



1939, Flight C-5750 Fairchild Aerial Surveys for the USDA



Aerial, 1948, 229 mm x 299 mm, 152.31 mm



1956, Aero Services Corporation for the USDA



Aerial, Aug. 15 1960



1963, Flight SCL



Aerial, Oct 1 1968, 457 mm x 229 mm



Aerial, Dec. 13 1972, 65k ft



Aerial, June 6 1974



Aerial, 1977



1983



1999



INQUIRY #: 3629208.5

YEAR: 2010

⬆ N

⊢————⊣ = 500'

Aerial Photograph. Scale: 1″=500′ Flight Year: 2010 EDR

# EXHIBIT E



1866 BLM SURVEY



(Farm) map number five (Santa Clara Co., California). (Thompson & West, San Francisco, Cala. 1876)



(Farm) map number five (Santa Clara Co., California). (Thompson & West, San Francisco, Cala. 1876)



1953, SAN JOSE WEST, USGS



1955, MILPITAS, USGS



1961, MILPITAS, USGS



1968, MILPITAS, USGS

**EXHIBIT F**

# Santa Clara Ranch Sold For $900,000

SANTA CLARA—In the largest sale of farmland in recent Santa Clara County history, the 335-acre Ralph W Johnson Ranch on Coffin road has been sold to an undisclosed purchaser for about $900,000.

Revenue stamps on the deed recorded today by Peninsula Title Guaranty Co., holding title, the purchase price was indicated at the near-million mark. The property is one of the key pear growing acreages in the county, but also includes much pasture and row crop land.

Records show the property sold involves about 156 acres west of Coffin road and another parcel of about 179 acres east of the road. The tract lies about midway between Agnew road on the south and Mountain View-Alviso road on the north.

The sector is in the heart of "history junction," for it was the area in which early pioneers settled the rich Santa Clara farming region. One portion of the ranch west of Coffin road has never been plowed, and has remained as virgin pastureland to this day. Tiny mounds that dot the portion mark spots where Indian graves were placed

Charles Pond and Arnold B Jamison of the San Jose realty firm of Jamison, Pond & Scott represented both buyer and seller. Jamison, a native of this area and himself a pear grower, recalled that as a boy he had trod the acres many times, and used to hunt ducks on the portion near where Campbell, or Saratoga, Creek now runs in wet weather.

"In those days it was known as the old San Jon Creek, and artesian wells flowed year-round to make an ideal duck hunting section," Jamison said.

## FOR FARM USE

Pond and Jamison said the new owner plans to maintain the property for agricultural use for the time being, and the firm will act as agent for him. Atty. Charles Luckhardt represented the buyer.

Johnson was born on the tract west of Coffin road and grew up there. He now maintains his home east of Coffin road on an 88-acre ranch which was first settled by Rush M. McComas, pioneer who came to the county in 1861 and bought the ranch in 1864. Rush McComas was a member of the Constitutional Convention in 1879, served in the State Assembly, was county treasurer from 1884 to 1892, was president of the old Garden City Bank in San Jose, helped form California Pear Growers Association, and was much interested in floriculture. He grew outstanding dahlias and chrysanthemums, and the McComas dahlia bears his name. He died in 1903, and his wife and eight children are now also deceased.

## OTHER HISTORY

Charles L. McComas held an 80-acre section, part of the property just sold, and came here in 1863. He bought his farm in 1872. He and his wife, raised children, all of whom are now dead also. One of his daughters, Dora, married the late Samuel J. Irwin. They built their home on the site of the old McComas family home after their marriage in 1920. Both are dead.

Another piece of the property just sold was first farmed by James Billings, who came here in 1854, farmed for about six years and then moved into Santa Clara where he was justice of the peace from 1863 to 1869. He sold out to John R. Billings, a brother, who came here in 1860. John's children, William and Aimee L., inherited the property. Mrs. Aimee Billings Johnson was the mother of Ralph W Johnson Records show her estate was valued at more than $175,000 upon her death in 1952.

San Jose Evening News (June 15 1955)



Historical Atlas of Santa Clara County (1876)

## EXHIBIT G

Sun, Nov 08, 1970   |   San Jose Mercury News   (San Jose, CA)   |   Page 8

## S.C. ART GALLERY

# Moving of Historic House Under Way

SANTA CLARA — Work is still under way here in preparation for moving the historic Jamison-Brown home to the Triton Museum of Art grounds, where it will become an art gallery and reception hall.

**The Victorian home was built in 1866. Later a large upstairs room was added, which is paneled with hundreds of different woods from all over the world.**

The seven-room structure, in "excellent" shape according to building inspectors, was donated to the city by Kaiser Aetna.

Kaiser Aetna bought the 50-acre parcel on which the home is located for expansion of the 300-acre San Tomas Industrial Park. The land is adjacent to the Bayshore Freeway near San Tomas Expressway.

The City Council recently authorized $10,000 to cover costs of moving the home to the Triton grounds, and a committee has been formed to raise another $10,000 for restoration.

Kaiser Aetna and Coldwell, Banker and Co., the industrial park's management and sales agent, also made donations toward the restoration fund.

The home was built 104 years ago by Samuel Jamison, whose family sold it to the Brown Family in 1914. Until last month George Brown and his wife and two children occupied the home.

The Jamison-Brown Historical House Committee, which is handling the moving and restoration, is composed of John McDonald, Maryanne Brooks, David Thimgan, George Brown and Ross Trigg.

# Double Session

An end to double sessions at two San Jose elementary schools is in sight following the San Jose Unified District board meeting this week.

Trustees accepted the low bid of Designed Facilities

**EXHIBIT H**



USGS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

 **Mailform**

**Mailform, Inc.**
607 North Avenue, Door 18
Wakefield, MA 01880
**Phone:** +18053959596
**Email:** team@mailform.io

**Ashley M. Gjøvik**
18 Worcester Sq Apt 1
Boston, MA 02118
United States
**Email:** amgjovik@gmail.com

**Invoice Number:** 61fc05ad-5c93-4463-9dfe-b16433fffe31
**Date:** December 11, 2025

| Description | Quantity | Price | Amount |
|---|---|---|---|
| #6845dbb7-372d-4db3-a60e-9de6a63af664 Recipient: Attorney General, Pamela Bondi, US Department of Justice, 950 Pennsylvania Avenue NW, Washington DC 20530, United States Services: COLOR,CERTIFIED,ELECTRONIC RETURN RECEIPT Files: CWA CCS 60D Notice CWA 404 20251211.pdf, EMAIL NOTICE.pdf USPS Certified Mail w/Electronic Return Receipt; 72 pages; Double Sided; Color | 1 | 67.67 | 67.67 |

| | | |
|---|---|---|
| **Total:** | | 67.67 |
| **Tax** | | 4.22 |
| **Amount Paid:** | | 71.89 |

 **Mailform**

**Mailform, Inc.**
607 North Avenue, Door 18
Wakefield, MA 01880
**Phone:** +18053959596
**Email:** team@mailform.io

**Ashley M. Gjøvik**
18 Worcester Sq Apt 1
Boston, MA 02118
United States
**Email:** amgjovik@gmail.com

**Invoice Number:** 3c2729e1-6f67-4914-ad1c-0eeb21efec2a
**Date:** December 11, 2025

| Description | Quantity | Price | Amount |
| --- | --- | --- | --- |
| #4ac55312-9235-441a-9301-57fe57940f16 Recipient: EPA Administrator, Lee Zeldin, Environmental Protection Agency, 1200 Pennsylvania Avenue, N.W., Washington DC 20460, United States Services: COLOR,CERTIFIED,ELECTRONIC RETURN RECEIPT Files: EMAIL NOTICE.pdf, CWA CCS 60D Notice CWA 404 20251211.pdf USPS Certified Mail w/Electronic Return Receipt; 72 pages; Double Sided; Color | 1 | 67.67 | 67.67 |

| | | |
| --- | --- | --- |
| **Total:** | | 67.67 |
| **Tax** | | 4.22 |
| **Amount Paid:** | | 71.89 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

# Clean Water Act Section 505(b) Sixty-Day Notice - Saratoga Creek System, Santa Clara County

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Cohen.Sahrye@epa.gov, torres.tomas@epa.gov, miller.amy@epa.gov, scozzafava.michaele@epa.gov, cespn-rg-info@usace.army.mil |
| Date | Thursday, December 11th, 2025 at 9:07 PM |

Dear Regulators,

I am providing the attached sixty-day notice as a courtesy and will also serve it via certified mail as required by Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b). This notice communicates my intent to file a citizen enforcement action for ongoing violations of Clean Water Act Sections 404, 401, and 1311 at the Saratoga Creek system and adjacent wetlands in Santa Clara, California.

Between approximately 1950 and 1985, the parties identified in this notice discharged fill material into Saratoga Creek and adjacent jurisdictional wetlands without obtaining required permits from the U.S. Army Corps of Engineers.

They repeatedly buried Saratoga Creek (a superficial and 200ft below ground surface aquifer) by placing fill material in the creek channel and installing underground pipes, managing the Waters of the U.S. as if it were stormwater runoff.

They filled approximately 500+ acres of tideland-adjacent wet meadow, destroyed rare and nationally important ecosystems, and intentionally installed a drop structure that functions as a complete barrier to fish passage in a stream that provides natural habitat for Chinook Salmon.

They also razed prime farmland of international acclaim against the farmers' wishes, non-consensually annexed these pioneer farming families' land, disturbed soils known to contain Native American burial grounds and artifacts, presumably disposed of Native American remains via a garbage dump, clear-cut irreplaceable pear orchards, and filled the natural wetland and creek in order to cover it with concrete and build industrial parks—which they used to create no less than four Superfund toxic waste cleanup sites in just a couple of decades.

None of these activities were authorized by Clean Water Act Section 404 permits, and no Section 401 state water quality certification was obtained.

These violations continue to the present day. The fill material remains in place in waters of the United States. The buried creek continues flowing through underground infrastructure, or builds pressure underground where it lost the ability to surface and seep.

Each day the unpermitted fill remains constitutes a continuing violation of the Clean Water Act.

The attached notice provides detailed documentation of these violations. I can also provide extensive historical aerial photographs, engineering reports, groundwater studies, and regulatory observations spanning multiple decades which I found during my own research. Additional exhibits and supporting documentation are available online at: https://www.ashleygjovik.com/saratoga-creek-system.html A detailed appendix of exhibits specific to the Notice is available at this link:

http://www.ashleygjovik.com/uploads/1/3/7/0/137008339/gjovik_cwa_citizensuit_appendix_exhibits_20251211.pdf

The notice will be sent via certified mail will satisfy the sixty-day notice requirement under 33 U.S.C. § 1365(b). If the violations are not remediated within sixty days, I intend to file suit in the United States District Court for the Northern District of California seeking declaratory and injunctive relief, civil penalties, and attorneys' fees.

If the EPA or the Army Corps commences enforcement action within sixty days, a citizen suit may be precluded under 33 U.S.C. § 1365(b)(1)(B). I would strongly prefer that the EPA and Army Corps take action as I am not a civil engineer and this matter will require professional engineering oversight.

I have a pending citizen suit already filed in the Northern District of California regarding hazardous waste and related violations at a specific facility in this location (*Gjovik v. Apple Inc., Santa Clara, Jenab, et al.*, No. 5:25-cv-07360, N.D. Cal.). Only in researching that facility did I realize what was done in the overall area, and accordingly I file this Notice and request enforcement action.

I am available to provide additional information, answer questions, or supply further documentation as needed.

Respectfully,

Ashley M. Gjovik, JD

Contact Information:
Ashley M. Gjovik
Email: ashleymgjovik@protonmail.com
Phone: (415) 964-6272
2108 N St. Ste. 4553, Sacramento, CA, 95816

Attachments:
CWA_CCS_60D_Notice_CWA_404_20251211.pdf (70 pages)
COMPLAINT FILED Report Environmental Violations - Submitted _ ECHO _ US EPA

—
**Ashley M. Gjøvik**
**BS, JD, PMP**

---

**5.60 MB**   2 files attached

COMPLAINT FILED Report Environmental Violations - Submitted _ ECHO _ US EPA.pdf 415.44 KB

CWA CCS 60D Notice CWA 404 20251211.pdf 5.19 MB

# Clean Water Act & California State Law Violations - Saratoga Creek System, Santa Clara County

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Jason.Faridi@wildlife.ca.gov, centralenforcementdistrict@wildlife.ca.gov, complaints@calepa.ca.gov<Complaints@calepa.ca.gov> |
| Date | Thursday, December 11th, 2025 at 9:12 PM |

Dear Regulators,

I am providing a copy of the attached sixty-day notice as a courtesy to inform you of significant ongoing environmental violations at the Saratoga Creek system and adjacent wetlands in Santa Clara, California. While this notice is being formally served on the U.S. EPA and U.S. Army Corps of Engineers regarding violations of the Clean Water Act, the documented violations also implicate multiple California state laws under your agency's jurisdiction.

**Federal Violations (CWA Sections 404, 401, 1311):**

Between approximately 1950 and 1985, the parties identified in this notice discharged fill material into Saratoga Creek and adjacent jurisdictional wetlands without obtaining required federal permits. They buried Saratoga Creek (a superficial and 200ft below ground surface aquifer) by placing fill material in the creek channel and installing underground pipes, managing Waters of the U.S. as if they were stormwater runoff. They filled approximately 500+ acres of tideland-adjacent wet meadow and installed a drop structure that functions as a complete barrier to fish passage.

**California State Law Violations:**

The documented activities also constitute violations of at least:

- **California Fish and Game Code § 1602** - Substantial diversion and obstruction of natural creek flow, and alteration of the bed, channel, and banks of Saratoga Creek without notification to CDFW or required streambed alteration agreements
- **California Fish and Game Code § 5948** - Installation and maintenance of an artificial barrier preventing fish passage to approximately 15 miles of documented spawning habitat for ESA-listed species including Chinook Salmon and Central California Coast Steelhead
- **California Fish and Game Code § 5937** - Failure to provide sufficient water and fish passage at barriers
- **Porter-Cologne Water Quality Control Act** - Discharge of waste (fill material) into waters of the state without required permits and water quality certification
- **California Endangered Species Act** - Impacts to state-listed species including California Red-Legged Frog, California Tiger Salamander, and rare serpentine-associated plant species
- **California Native Plant Protection Act** - Destruction of rare alkali wet meadow and serpentine seep ecosystems supporting endangered plant communities

**Additional Impacts:**

The violations also involved destruction of Native American burial grounds and artifacts (California Public Resources Code §§ 5097-5097.6), destruction of a historic agricultural landscape of state and national significance, and creation of multiple Superfund toxic waste sites on filled wetlands.

**These violations continue to the present day.** The fill material remains in place, the buried creek continues flowing through underground infrastructure or builds pressure where it cannot surface, and the fish passage barrier continues blocking access to critical spawning habitat.

The attached notice provides detailed documentation including historical aerial photographs, engineering reports, groundwater studies, and regulatory observations spanning multiple decades. Additional exhibits are available online at:

https://www.ashleygjovik.com/saratoga-creek-system.html

Detailed appendix:
http://www.ashleygjovik.com/uploads/1/3/7/0/137008339/gjovik_cwa_citizensuit_appendix_exhibits_20251211.pdf

**Timeline & Coordination:**

The sixty-day notice period under the Clean Water Act begins upon certified mail service to EPA and the Army Corps. If federal enforcement commences within sixty days, citizen suit may be precluded under 33 U.S.C. § 1365(b)(1)(B). However, **California agencies retain independent authority to investigate and pursue enforcement for state law violations regardless of federal action.**

I respectfully request that your agency:

1. Review the documented violations under your jurisdiction
2. Initiate investigation and enforcement action as appropriate
3. Consider coordinating with federal agencies on remediation requirements, or take independent action
4. Contact me if you need additional information or documentation

I have a pending citizen suit in the Northern District of California regarding hazardous waste violations at a specific facility on this location (*Gjovik v. Apple Inc., Santa Clara, Jenab, et al.*, No. 5:25-cv-07360, N.D. Cal.). Research for that case revealed the broader pattern of violations documented in this notice. EPA and Army Corps was sent an email copy of the current Notice today.

I am available to provide additional information, answer questions, meet with investigators, or supply further documentation as needed.

Respectfully,

Ashley M. Gjovik, JD

Contact Information:
Ashley M. Gjovik
Email: ashleymgjovik@protonmail.com
Phone: (415) 964-6272
2108 N St. Ste. 4553, Sacramento, CA, 95816

Attachments:
CWA_CCS_60D_Notice_CWA_404_20251211.pdf (70 pages)

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

---

**5.19 MB**   1 file attached

CWA CCS 60D Notice CWA 404 20251211.pdf 5.19 MB