**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# United States District Court
## Northern District of California

Ashley M. Gjøvik,

*an individual*,

Plaintiff,

vs.

Apple Inc.,

*a corporation,*

City of Santa Clara,

*a local government*,

Mr. Jenab et al

*(individually, LP, LLC, &/or Trust)*

Defendants.

Case No. 25-CV-07360-PCP
Env. "Citizen Suit"
& Cal. Public Nuisance

Judge: P. Casey Pitts

Plaintiff's Opposition to Defendant Apple's Motion to Dismiss (Dkt. 60).

Hearing:
**Date:** May. 28, 2026
**Time:** 10:00 AM
**Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................. 1

**PROCEDURAL HISTORY** .................................................... 3

**ARTICLE III STANDING** ..................................................... 4

**PLAINTIFF'S PRE-SUIT NOTICE WAS COMPREHENSIVE AND SUFFICIENT** ......... 4

I.  THE NOTICE SATISFIES THE NINTH CIRCUIT'S "REASONABLY SPECIFIC" STANDARD ... 4

II.  EVERY CHALLENGED COUNT IS ENCOMPASSED BY THE NOTICE .................................. 5

III.  THE NOTICE'S CONTACT INFORMATION WAS ADEQUATE ...................................... 7

IV.  REQUIRED AGENCIES WERE SERVED ................................................................. 7

**THE EPA CONSENT AGREEMENT DOES NOT BAR PLAINTIFF'S RCRA CLAIMS ... 8**

**THE AMENDED COMPLAINT SATISFIES RULE 8** ............................................. 9

**PLAINTIFF'S CLEAN AIR ACT CLAIMS ARE NOT TIME-BARRED** ...................... 10

**PLAINTIFF'S CLEAN WATER ACT CLAIMS STATE A CLAIM** ........................... 11

V.  THE PERMIT SHIELD REQUIRES ADEQUATE DISCLOSURE, WHICH APPLE DID NOT PROVIDE ........................................................................................................ 11

VI.  THE NINTH CIRCUIT CONSTRUES THE PERMIT SHIELD NARROWLY ...................... 12

VII.  APPLE'S PRETREATMENT OBLIGATIONS OPERATE INDEPENDENTLY OF THE PERMIT SHIELD ........................................................................................................ 13

VIII.  MULTIPLE CATEGORIES OF DISCHARGES FALL ENTIRELY OUTSIDE ANY PERMIT ......13

IX.  APPLE'S FACTUAL ARGUMENTS ARE INAPPROPRIATE AT THE 12(B)(6) STAGE ......... 14

**PLAINTIFF'S TSCA CLAIMS** ......................................................................... 15

X.  NMP (COUNT 28) ................................................................................... 15

XI.  TCE, MERCURY, AND LEAD (COUNTS 29–31) ............................................... 15

XII.  IMMINENTLY HAZARDOUS CHEMICALS (COUNT 32) ......................................... 16

**PLAINTIFF'S EPCRA CLAIMS ARE ADEQUATELY PLEADED** ............................. 17

XIII.  EPCRA §304: REPORTABLE QUANTITIES ARE PLAUSIBLY ALLEGED ...................... 17

XIV.    EPCRA §§311–312: APPLE'S OWN INVENTORY DEMONSTRATES THE VIOLATION ......17

XV.    EPCRA §313 (TRI): APPLE IS USING THE WRONG NAICS CODE ............................17

**PLAINTIFF'S PUBLIC NUISANCE CLAIM IS TIMELY AND STATES A CLAIM ........ 18**

XVI.    THE CLAIM IS NOT TIME-BARRED ................................................................... 18

XVII.    THE §3482 PERMIT DEFENSE DOES NOT APPLY ................................................. 19

**APPLE'S "LAUNDRY LIST" CHART MISUNDERSTANDS CITIZEN SUIT ENFORCEMENT ......................................................................................... 19**

XVIII.    THE CITIZEN SUIT FRAMEWORK: ENFORCEMENT VEHICLE VS. UNDERLYING STANDARD ........................................................................................... 19

XIX.    CONCESSIONS ON CLEARLY INAPPLICABLE PROVISIONS ........................................ 20

**CONCLUSION ................................................................................................ 21**

# Opposition to Apple's Motion to Dismiss under Rule 12(b)(6)

## INTRODUCTION

1.    Defendant Apple Inc.'s Motion to Dismiss is the second substantially identical motion filed by the same counsel on behalf of overlapping defendants. When these Defendants moved to dismiss the original Complaint (ECF No. 38), they argued the pleading was too short and too vague—a "shotgun pleading" that failed to provide fair notice. Plaintiff amended to add the factual detail Defendants demanded. Now, Defendants file a near-verbatim copy of their prior motion (ECF No. 60) and argue the Amended Complaint is too *long* and too *detailed*. This catch-22 reveals that Defendants' true objective is dismissal on any available ground, not a coherent complaint.

2.    The irony is self-defeating. Apple's 37-page motion addresses each statute, each count, and each theory with granular specificity—proving beyond doubt that the Amended Complaint gave Defendants exactly the notice that Rule 8 and due process require. A defendant who can mount a detailed, statute-by-statute challenge to every claim in a complaint cannot simultaneously claim the complaint is too confusing to understand.

3.    Apple also repeatedly mischaracterizes the Complaint as "conceding" that Apple operates under valid permits and alleging no violations. (Motion at 3–4.) Acknowledging that some version of a permit exists is not conceding Apple is in compliance with it. The Complaint alleges that Apple obtained its permits by misrepresenting the nature of its operations as "research and development" when it was actually conducting semiconductor fabrication; that the BAAQMD did not even know a chip fab existed at the site until 2024; that Apple's permits do not cover the full scope of its actual operations and discharges; and that Apple has been cited for violations by both the EPA and BAAQMD. That is not a "concession"—it is a detailed allegation of systematic noncompliance concealed through misrepresentation.

4.    Apple's motion rests on four pillars, each of which fails. First, Plaintiff has Article III standing: even if there were concerns about her forced distance from the Site after she moved to the East Coast to seek work outside the realm of Silicon Valley she has now relocated back to the Santa Clara area and lives in proximity to the Facility, with direct aesthetic, recreational, and health

*Gjovik v. Apple, et al* | **Plaintiff's Opp. to Apple's MTD** | **Page 1**

interests in the affected environment. Second, the 60-day pre-suit notice was comprehensive, identifying the facility, all five federal statutes, specific chemicals, specific incidents, specific dates, and specific categories of violations—and was served on federal, state, and local agencies by certified mail. Third, the EPA's RCRA Consent Agreement expressly preserves injunctive and equitable relief, and does not bar Plaintiff's citizen suit claims that go beyond the narrow set of violations EPA chose to address. Fourth, the statute-specific arguments either mischaracterize the complaint's allegations, apply the wrong legal standard at the pleading stage, or fundamentally misunderstand how citizen suit enforcement works.

5.    Apple also attempts to leverage the prior dismissal of Plaintiff's personal injury claims by Judge Chen due to alleged expiration of statute of limitations for personal injuries. But Apple's own motion reveals why this argument fails on its own terms. Apple spends pages arguing that Plaintiff's personal injuries are irrelevant to her standing in this citizen suit—that this case is about environmental enforcement, not personal damages. Apple cannot simultaneously argue that personal injury claims dismissed in another case preclude this action while also arguing that personal injuries have nothing to do with this case. If the claims are different enough that personal injury is irrelevant to standing here (as Apple contends), then they are different enough that the prior dismissal has no preclusive effect.

6.    Judge Chen's ruling addressed the statute of limitations for private nuisance and intentional infliction of emotional distress—common law tort claims seeking personal damages with a two-year limitations period. This case brings federal environmental citizen suit claims and a public nuisance abatement action seeking injunctive relief under entirely different statutes, with different elements, different standing requirements, and different relief. There is no identity of claims, and claim preclusion does not apply. Indeed, Judge Chen himself formally determined that the employment case (3:23-cv-04597) is "NOT related" to this citizen suit action. (ECF No. 12, Order Relating Case, Sept. 15, 2025.) Apple cannot credibly argue preclusion when the judge who issued the prior ruling has determined the two cases are unrelated.

7.    Apple also characterizes Plaintiff as a "serial litigant" who has filed "more than two dozen administrative or judicial proceedings" against Apple. (Motion at 3.) To support this characterization, Apple attaches Plaintiff's mandatory bankruptcy disclosure of potential legal

claims. (Tarantino Decl. Ex. D.) This is misleading and improper. Many of the "proceedings" Apple counts are the administrative complaints to the EPA, BAAQMD, OSHA, NLRB, and other agencies that led to the very enforcement actions and substantiated violations at issue in this case. The EPA found hundreds of RCRA violations. The BAAQMD found six air quality violations. The NLRB found labor violations serious enough that Apple entered a national settlement. Characterizing the person whose complaints triggered these enforcement actions as a "serial litigant," based on mandatory bankruptcy disclosures of potential legal claims,[1] is an attempt to distract from the substance of those complaints—which agencies investigated, substantiated, and acted upon.

8.      Finally, Apple asks the Court to "dismiss" purported anti-retaliation claims under RCRA that do not exist in this lawsuit. (Motion at 25.) The Amended Complaint contains no retaliation cause of action. It is a citizen enforcement action seeking fines and injunctive relief for ongoing environmental violations—the only remedies available in a citizen suit. Retaliation claims are not cognizable under the citizen suit provisions, and the Complaint expressly states that retaliation is being managed in the separate employment action. (FAC ¶396.) Apple's request to "dismiss" a claim that was never brought appears designed to manufacture a dismissal order that could be used to prejudice Plaintiff in the pending employment litigation. The Court should decline this invitation.

## PROCEDURAL HISTORY

9.      The Original Complaint in this case was filed Sept. 2 2025 (ECF 1) and an Amended Complaint was filed Nov. 29 2025 (ECF 48). The Defendant filed a Motion to Dismiss in response to the Amended Complaint on Jan. 21 2026. The Plaintiff requested an extension in her response due to urgent, personal medical and housing issues (ECF 64), including an emergency relocation from Boston back to Santa Clara, and then due to litigation conduct by Defendant Apple in the retaliation litigation with the Plaintiff (3:23-cv-04597) (Feb. 17 2026, ECF 67).

10.      In the retaliation litigation, Defendant Apple filed extensive meritless motions, discovery requests, and demands for sanctions against the Plaintiff starting around Feb. 17 2026

---

[1] Its unlawful for Debtors in a Chapter 7 Bankruptcy to not disclose any and all potential legal claims they could have against others that could be pursued by the Estate and Trustee to potentially pay creditor debts.

and ongoing through April 2026, which have been denied by the court, and are now the subject of new NLRB charges, but have consumed extensive amounts of the Plaintiff's limited available time during a critical period during the retaliation litigation with the imminent close of fact discovery and dual summary judgement filings. (i.e. ECF 279 - 371).

11.    Accordingly, the Plaintiff has still had no time to work on this Opposition filing. Literally only a couple days. Apple's conduct has made it impossible to adequately engage in this litigation and the effect of Apple's litigation abuse would force the Plaintiff to request yet another extension from this court for Oppositions to weak Motions to Dismiss regarding a significant public safety hazard posing severe risk to the community and environment. Therefore, the Plaintiff files this Opposition to the best of her ability with extremely limited time and resources, and apologizes for any oversight or error, and intends to supplement during oral argument's where needed.

## ARTICLE III STANDING

12.    Apple's standing arguments are moot. Since filing the Amended Complaint, Plaintiff has relocated back to California and now resides in close proximity to the Facility and the surrounding parks, trails, creeks, and residential areas described in the Complaint. Plaintiff uses and enjoys the San Tomas Aquino Creek trail, the adjacent parks, and the surrounding environment on a regular basis. Her aesthetic, recreational, and health interests are directly and currently impaired by the Defendants' ongoing violations. Plaintiff's Declaration, filed concurrently herewith, establishes these facts.

13.    Even setting aside Plaintiff's relocation, Apple's standing argument was flawed as a matter of law. Plaintiff's RCRA imminent-and-substantial-endangerment claim under 42 U.S.C. § 6972(a)(1)(B) does not require current physical proximity—it requires that the endangerment exists and the plaintiff has a cognizable interest in its abatement. Similarly, Plaintiff's EPCRA claims rest on informational injury—the denial of information that Congress determined the public is entitled to receive—which constitutes an independent basis for Article III standing. But because Plaintiff now lives near the Facility, the Court need not reach these alternative theories.

## PLAINTIFF'S PRE-SUIT NOTICE WAS COMPREHENSIVE AND SUFFICIENT

### I. THE NOTICE SATISFIES THE NINTH CIRCUIT'S

*Gjovik v. Apple, et al* | **Plaintiff's Opp. to Apple's MTD | Page 4**

## "Reasonably Specific" Standard

14.    The Ninth Circuit has repeatedly held that pre-suit notice need not replicate the complaint. Under *WaterKeepers Northern California v. AG Industrial Manufacturing, Inc.*, 375 F.3d 913, 917 (9th Cir. 2004), "[n]otice is sufficient if it is reasonably specific and if it gives the accused company the opportunity to correct the problem." The purpose of notice is "to trigger agency enforcement and avoid a lawsuit," not "to unduly burden citizens by requiring them to basically carry out the job of the agency." *Community Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002).

15.    Plaintiff's 39-page Sixty-Day Notice (ECF No. 48-1) identified: the specific facility (3250 Scott Blvd, Santa Clara); the specific operator (Apple Inc.); the property owner (Kalil Jenab et al); the municipal regulator (City of Santa Clara); all five federal statutes under which suit would be brought (CAA, RCRA, CWA, EPCRA, TSCA) plus state public nuisance; specific chemicals used and released (including NMP, TCE, phosphine, silane, chlorine, mercury, arsenic, formaldehyde, benzene, and many others); specific incidents with specific dates (sixteen documented chemical spill/leak incidents from 2019–2023); specific EPA inspection findings; specific RCRA violations; specific wastewater discharge violations; specific stormwater violations; and specific categories of ongoing conduct. This far exceeds the "reasonably specific" threshold.

## II.  Every Challenged Count Is Encompassed by the Notice

16.    Apple identifies thirteen counts (7, 9, 10, 12, 13, 17, 19, 23, 28, 29, 30, 31, and 32) that it claims were "omitted" from the Notice. This claim is false. Each of these counts has a direct textual basis in the Notice:

17.    **Count 7 (Hazardous Waste Transport):** Notice ¶75 expressly alleges Defendants violated "42 U.S.C. § 6923" by "transporting hazardous waste without manifests and without proper categorization." This is the precise conduct alleged in Count 7 and was a claim made by EPA against Apple in the formal enforcement action about this Site initiated because of the Plaintiff's complaints and resulting EPA inspections.

18.    **Count 9 (Stationary Source Without Permits):** Notice ¶¶59–62 allege "unpermitted air emissions" and "failure to obtain required permits related to exhaust and air

releases." Operating an unpermitted stationary source is the core of the noticed CAA violations. Notice ¶46 also references 2014 meeting notes stating "air permit will be thru BAAQMD."

19.    **Count 10 (Preconstruction Permits):** The same Notice provisions (¶¶59–62) cover failure to obtain required CAA permits, of which preconstruction permits are a subset.

20.    **Count 12 (Ozone/Nonattainment):** Notice ¶¶64–65 allege emissions "that exceed state-specific emission limits" including chemicals that are ozone precursors (Benzene, NMP, VOCs identified in ¶98). Ozone pollution from a semiconductor fab in a nonattainment area flows directly from these noticed emissions.

21.    **Count 13 (Emission Limits):** Notice ¶¶64–65 expressly allege "dumping hazardous substances into the atmosphere that exceed state-specific emission limits" and "exceed emission standards."

22.    **Count 17 (Maintaining Unlawfully Filled Creek):** Notice ¶¶79–80 identify the San Tomas Aquino Creek and Saratoga Creek, their connection to the SF Bay, and that the Facility is polluting these waters of the United States.

23.    **Count 19 (Semiconductor Manufacturing Discharge Standards):** Notice ¶82 expressly references the Wastewater Facility's discovery that "Apple was doing semiconductor fabrication" and that it issued a new permit "to comply with 40 C.F.R. 469 Subpart A"—the semiconductor manufacturing pretreatment standard.

24.    **Count 23 (Stormwater):** Notice ¶¶86–87 describe the 2016 cooling water dump into storm drains, the 2022 stormwater inspection findings, and continued noncompliance. Notice ¶93 alleges violations of §1342 "by discharging without appropriate permits and violation of stormwater permit conditions."

25.    **Count 28 (TSCA/NMP):** Notice ¶105 expressly identifies "260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP)" released into the atmosphere, and that "the EPA severely restricted the legal use of NMP."

26.    **Count 29 (TSCA/Mercury):** Notice ¶63 expressly states Apple "exhausted reportable amounts of mercury" into the ambient air.

27.    **Count 30 (TSCA/TCE):** Notice ¶¶14, 89, and 102 discuss TCE in Apple's wastewater, TCE not appearing in inventories, and TRI reporting failures "for TCE."

28. **Count 31 (TSCA/Lead):** Notice ¶104 states Apple's inventory "lists a number of TSCA regulated chemicals including… extensive amounts of… lead."

29. **Count 32 (Imminently Hazardous Chemicals):** Notice ¶73 alleges Apple "violated 42 U.S.C. § 6973 (Section 7003) by creating and maintaining an imminent and substantial endangerment to the community and the environment." The endangerment theory pervades the entire Notice.

30. In sum, Apple's claim that these counts are "new theories omitted from her notice" is refuted by the Notice itself. Every count Apple challenges is either expressly stated or reasonably encompassed by the Notice's description of the Facility, its operations, and the specific violations.

### III.  THE NOTICE'S CONTACT INFORMATION WAS ADEQUATE

31. Apple complains that the Notice listed a mailing address for Plaintiff's LLC rather than her personal home address. The regulations require "the full name, address, and telephone number of the person giving notice." The Notice provided Plaintiff's full name, a valid mailing address where she receives mail, her telephone number, and her email address. No regulation requires disclosure of a private individual's residential address, and demanding that a *pro se* plaintiff—who has documented physical safety concerns—publish her home address in a public filing would raise serious safety and privacy concerns. The mailing address provided was sufficient to enable communication, as demonstrated by the fact that Defendants' counsel actually used it to correspond with Plaintiff.

### IV.  REQUIRED AGENCIES WERE SERVED

32. The record establishes that Plaintiff served the Notice and/or the Complaint on the U.S. EPA Administrator (Certified Mail, delivered September 12, 2025); the U.S. Attorney General (Certified Mail, delivered September 12, 2025); the U.S. DOJ ENRD (Certified Mail, delivered September 12, 2025); the California EPA (Certified Mail, delivered September 11, 2025); the BAAQMD (Certified Mail, delivered September 11, 2025); the California Attorney General (Priority Mail, delivered September 15, 2025); the SF Bay Regional Water Quality Control Board (Priority Mail, delivered September 15, 2025); the Santa Clara County District Attorney's Office (Priority Mail, delivered September 12, 2025); and the San José–Santa Clara Regional Wastewater

Facility (Certified Mail, delivered September 15, 2025). (See ECF Nos. 10, 14, 19 and attached Exhibits.)

33.    Apple's claim that Plaintiff "did not serve the chief administrative officer of the water pollution control agency for California" is contradicted by the record. Plaintiff served both the California EPA and the SF Bay Regional Water Quality Control Board—the regional board with jurisdiction over the Facility's water discharges. Apple's similar claim regarding the state air agency is likewise contradicted by the certified mail delivery to the BAAQMD. Apple provides no authority holding that service on the regional board with actual jurisdiction is insufficient.

## THE EPA CONSENT AGREEMENT DOES NOT BAR PLAINTIFF'S RCRA CLAIMS

34.    Apple argues that the EPA's October 2025 Consent Agreement bars all RCRA citizen suit claims. This argument fails for three independent reasons.

35.    First, the Consent Agreement expressly preserves injunctive and equitable relief. The Agreement imposed only a monetary penalty for the specific violations found during two brief inspections in 2023–2024. It contains no liability waiver, no injunctive provisions, and no requirement that Apple actually abate the hazards created by its operations. (FAC ¶16; ECF No. 48-4.) A consent agreement that expressly preserves further relief does not trigger the diligent prosecution bar. The bar applies only where the government "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance." 42 U.S.C. § 6972(b)(1)(B). An administrative consent agreement that addresses only past penalties, without requiring compliance or abating the hazard, is not a "civil or criminal action in a court" to "require compliance."

36.    Second, Plaintiff's RCRA claims extend beyond the violations addressed in the Consent Agreement. The EPA inspected the Facility twice over a limited period and found nineteen categories of violations. Plaintiff's Amended Complaint alleges additional violations that the EPA did not inspect, did not investigate, and did not address—including the ongoing imminent and substantial endangerment to the surrounding community from the Facility's continued operation in its current location and manner. The diligent prosecution bar does not extend to violations that the government chose not to pursue.

37. Third, Plaintiff's primary RCRA claim is brought under § 6972(a)(1)(B)—the imminent and substantial endangerment provision—which has a distinct diligent prosecution bar. Under § 6972(b)(2)(B), the bar for endangerment claims applies only if the government is "diligently prosecuting an action under section 6973." The EPA has not brought a § 6973 action. Its administrative consent agreement addresses specific generator and permit violations, not the broader endangerment from operating a semiconductor fabrication facility adjacent to thousands of homes and a children's playground. Plaintiff's dissatisfaction with the scope of the EPA's action is not second-guessing—it is the precise situation Congress designed citizen suits to address.

## THE AMENDED COMPLAINT SATISFIES RULE 8

38. Apple's Rule 8 argument is undermined by its own conduct. When Plaintiff filed her original Complaint, Apple argued it was a "shotgun pleading" with an "unclear mass of allegations" that was too vague to respond to. (ECF No. 38 at 12.) Plaintiff amended to provide the detail Defendants demanded. Now Apple argues the Amended Complaint is too long. Apple cannot have it both ways.

39. More fundamentally, Apple's own motion demonstrates that the Amended Complaint provides adequate notice. Apple filed a 37-page brief addressing each statute, each count, and each theory with specificity. Morrison & Foerster was able to identify which facts support which causes of action, to parse the statutory provisions at issue, and to mount targeted challenges to individual counts. That is the definition of adequate notice under Rule 8. *See Knapp v. Hogan*, 738 F.3d 1106, 1109 (9th Cir. 2013) (the touchstone is whether the defendant can reasonably respond).

40. Environmental citizen suits brought under five federal statutes against three defendants with overlapping factual predicates are inherently complex. The Amended Complaint is organized with a table of contents, structured by topic and then by statute, and clearly delineates which claims are brought against which defendants. This is not the type of "prolixity" that courts find prejudicial under *Cafasso*. Unlike the 733-page complaint in that case—which the court found was "designed to confuse"—the Amended Complaint's length reflects the scope of the violations, not an intent to obscure.

41. Apple's citation to Judge Chen's prior admonition in the employment action is

inapposite. That case involved employment claims with a narrower factual predicate. This case involves ongoing violations of five federal environmental statutes, a state nuisance claim, a 10-year history of concealed industrial operations, documented chemical incidents, EPA enforcement proceedings, and three distinct defendants with different roles. The subject matter requires detail.

## PLAINTIFF'S CLEAN AIR ACT CLAIMS ARE NOT TIME-BARRED

42.    Apple's statute of limitations argument mischaracterizes the nature of the violations. This case does not seek penalties for past violations. This case seeks injunctive relief to stop ongoing violations and abate an ongoing endangerment.

43.    Operating a semiconductor fabrication facility without required Clean Air Act permits is not a single, completed act that triggers a one-time limitations period. It is a continuing violation that generates new liability each day the unpermitted operation continues. Every day the Facility operates without the required preconstruction permits, Title V permits, and MACT compliance constitutes a new violation. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (citizen suits may be brought for violations that are "continuous or intermittent"). Apple concedes that the Facility did not obtain even a partial air permit until May 2023, and the BAAQMD has since cited Apple for six additional air quality violations that remain pending. (FAC ¶16, 68, 411.) The violations are current and ongoing.

44.    Apple's reliance on *Clarke v. Pacific Gas & Electric Co.* is misplaced. *Clarke* addressed a situation where the plaintiff alleged a single past act of construction without permits. Here, by contrast, the Facility is *currently* operating without required permits and in violation of emission standards, and was cited by BAAQMD for ongoing violations as recently as 2024. These are not "wholly past violations"—they are active, continuing violations for which injunctive relief is both appropriate and necessary.

45.    Moreover, Apple's concealment of the Facility's true nature supports equitable tolling to the extent any claim is arguably time-barred. The BAAQMD did not even know a semiconductor fabrication facility existed at 3250 Scott Blvd until Plaintiff filed her complaint with the agency in 2024. (FAC ¶68.) Apple affirmatively misrepresented its operations as "research and development" for nearly a decade. A defendant who conceals the very existence of the source

cannot invoke the statute of limitations against the plaintiff who uncovered it.

46.     There are also at least six pending BAAQMD violations (A64215, A64216, A64218, A64219, etc.), including operating without required permits, and emitting unlawful amounts of pollutants into the air, as evidence of ongoing post-2023 permit noncompliance. Apple argues Plaintiff "fails to identify any emissions reports that exceed those limits" (Motion at 14). These pending violations directly refute that claim. Cite FAC ¶16 and Notice ¶61.]

47.     Apple's chart (Motion at 24), for SEMICONDUCTOR NESHAP (40 C.F.R. pt. 63 subpt. BBBBB), argues Plaintiff made "no non-conclusory allegations that Apple violated any specific standard" under the NESHAP for semiconductor manufacturing. Address by noting that Apple operated a semiconductor fab without proper air permits for nearly a decade, was cited by BAAQMD for air quality violations, and that operating an unpermitted semiconductor fab in violation of BAAQMD regulations plausibly includes NESHAP violations. The specific standards violated are a factual question for discovery, not a basis for dismissal when the Complaint alleges unpermitted operation of a source category expressly covered by the NESHAP.

# PLAINTIFF'S CLEAN WATER ACT CLAIMS STATE A CLAIM

## V.  THE PERMIT SHIELD REQUIRES ADEQUATE DISCLOSURE, WHICH APPLE DID NOT PROVIDE

48.     Apple's permit shield argument fails at the threshold. The CWA's permit shield under § 1342(k) provides that compliance with an NPDES permit "shall be deemed compliance" with specified CWA provisions. But courts have consistently held that this shield is available only where the permittee has made adequate disclosures during the permit application process. Under the widely adopted two-prong test from *Piney Run Preservation Ass'n v. County Commissioners*, 268 F.3d 255, 259 (4th Cir. 2001), the shield applies only if (1) the permit holder complies with the express terms of the permit and with the CWA's disclosure requirements, and (2) the discharge was within the "reasonable contemplation of the permitting authority" at the time the permit was issued.

49.     Apple fails both prongs. As to the first, Apple systematically misrepresented the nature of its operations to permitting authorities. When Apple began operations in 2015, it

represented itself as conducting "research and development." (FAC ¶32, 112.) The San José–Santa Clara Regional Wastewater Facility discovered the misrepresentation in 2016, revoked Apple's R&D permit, and issued a new permit specifically for semiconductor fabrication under 40 C.F.R. Part 469, Subpart A. (FAC ¶195; Notice ¶82.) But the BAAQMD did not discover that Apple was operating a semiconductor fabrication facility until Plaintiff filed her complaint in 2024—nearly a decade after operations began. (FAC ¶68.) Apple never disclosed the full range of chemicals it was using and discharging, or the presence of chemicals like TCE that appeared in its wastewater but never appeared in any chemical inventory. (FAC ¶574; Notice ¶89.)

50. In *Southern Appalachian Mountain Stewards v. A&G Coal Corp.*, 758 F.3d 560 (4th Cir. 2014), the Fourth Circuit held that the permit shield was unavailable because the permittee had not adequately disclosed its selenium discharges during the application process—even though the permitting authority arguably knew about selenium in the region. The court held that nondisclosure of specific chemical substances violated the CWA's disclosure requirements, even where the permittee had disclosed the general wastestreams containing those substances. Apple's case is far worse than *A&G Coal*: Apple affirmatively misrepresented its entire operations as "research and development" when it was conducting semiconductor fabrication—one of the most chemical-intensive manufacturing processes ever developed. (FAC ¶64.) A permittee that obtains its permit through material misrepresentation has not complied with the CWA's disclosure requirements and cannot invoke the permit shield.

51. As to the second prong, semiconductor fabrication discharges were plainly not within the "reasonable contemplation" of a permitting authority that believed it was permitting an R&D office. EPA's 1995 Policy Statement on the Scope of Discharge Authorization provides that the shield only covers pollutants from "facility processes, wastestreams and operations that have been clearly identified in the permit application process." When the permit application says "R&D" and the actual operation is semiconductor fabrication generating hundreds of tons of hazardous waste per year, nothing about the actual discharges was "clearly identified."

## VI. THE NINTH CIRCUIT CONSTRUES THE PERMIT SHIELD NARROWLY

52. The Ninth Circuit takes a notably narrow view of the permit shield. In *Alaska*

*Community Action on Toxics v. Aurora Energy Services*, 765 F.3d 1169 (9th Cir. 2014), the court held the shield did not protect coal dust discharges because the general stormwater permit did not specifically authorize those non-stormwater discharges. The court examined the plain language of the permit and held the list of authorized discharges was exclusive. The Supreme Court denied certiorari. Apple cites *Puget Soundkeeper Alliance v. Port of Tacoma*, 104 F.4th 95, 105 (9th Cir. 2024), but that statement presupposes actual compliance with a validly obtained permit—it does not shield a permittee that obtained its permit through misrepresentation of its operations.

## VII. Apple's Pretreatment Obligations Operate Independently of the Permit Shield

53. Even if the permit shield applied, Apple's obligations under the National Pretreatment Program operate independently. As a semiconductor manufacturer discharging to a POTW, Apple is a categorical industrial user subject to 40 C.F.R. Part 469, Subpart A. Under 40 C.F.R. § 403.5(a), "[n]o user shall introduce into a POTW any pollutant(s) which cause pass through or interference." This general prohibition applies regardless of what the permit says. Additionally, the semiconductor pretreatment standards under Part 469 include specific requirements for Total Toxic Organics and require either monitoring or certification that no concentrated toxic organics are being dumped into the wastewater, along with a solvent management plan. 40 C.F.R. § 469.13(c)–(d). The EPA found Apple was mischaracterizing hazardous waste, operating unpermitted treatment systems, and venting unabated solvent exhaust—raising serious questions about compliance with these categorical obligations.

## VIII. Multiple Categories of Discharges Fall Entirely Outside Any Permit

54. Apple's permit shield argument fails for an even more fundamental reason as to several of Plaintiff's CWA claims: the discharges at issue were never covered by any permit in the first place.

55. ***Stormwater.*** The Complaint alleges stormwater violations including the 2016 cooling water discharge into storm drains (FAC ¶186; Notice ¶86), the 2022 stormwater inspection findings of missing bioretention features and absent "No Dumping" medallions (FAC ¶580; Notice ¶87), and ongoing stormwater contamination from air deposition of the Facility's

emissions. Stormwater discharges are governed by a separate stormwater permit, not Apple's industrial wastewater discharge permit. The § 1342(k) permit shield from the industrial wastewater permit does not extend to stormwater discharges governed by a different permit with different terms.

56.    ***Direct Discharges to Creeks.*** The Complaint alleges that the Facility's operations discharge pollutants into the San Tomas Aquino Creek and the Saratoga Creek aquifer system—both waters of the United States that flow to the San Francisco Bay and the Pacific Ocean. (FAC ¶¶69–87.) These direct discharges to navigable waters are not authorized by any permit. Apple has no permit authorizing discharges into these creeks.

57.    ***Unpermitted Systems.*** The EPA discovered that Apple was operating an unpermitted 1,700-gallon solvent waste tank that was venting solvent exhaust to the roof through a makeshift activated carbon filter in a 55-gallon drum. (FAC ¶¶202–09; Notice ¶¶33–40.) Apple did not apply for any permit for this system until the EPA ordered it to do so in 2023. Discharges from systems that were never permitted—because the operator concealed their existence from regulators—are by definition not shielded by any permit.

## IX.    APPLE'S FACTUAL ARGUMENTS ARE INAPPROPRIATE AT THE 12(B)(6) STAGE

58.    Apple's remaining CWA arguments improperly ask the Court to resolve factual disputes at the pleading stage. First, Apple argues in footnote 2 that TCE in the Facility's wastewater originates from the Superfund plume, not Apple's operations. This is a factual dispute that cannot be resolved on a motion to dismiss – and why would there be TCE in the Facility's wastewater if the Superfund TCE is in the groundwater – they are two completely separate sources of water. The Complaint plausibly alleges that Apple used TCE at the Facility but never reported it in any chemical inventory, and disposed of TCE by "pouring it down the drain." (FAC ¶574; Notice ¶89.) At the 12(b)(6) stage, the Court must draw all reasonable inferences in Plaintiff's favor. Apple's alternative explanation is precisely the type of factual defense that must be tested through discovery.

59.    Second, Apple's argument that certain chemicals were detected below the Method Reporting Limit ("MRL") is similarly factual. The MRL is the lowest concentration at which an

analyte can be quantified with confidence—it does not mean the substance is absent. The presence of semiconductor manufacturing chemicals in the wastewater of a facility that misrepresented itself as an R&D office supports a plausible inference that the Facility is discharging pollutants from its manufacturing operations. Whether those concentrations violate specific effluent limits is a factual question for discovery, not a basis for dismissal at the pleading stage.

# PLAINTIFF'S TSCA CLAIMS

## X.  NMP (Count 28)

60.      On June 15, 2024, EPA published a proposed rule under TSCA § 6(a) to address unreasonable risks to human health from NMP. 89 Fed. Reg. 51,134 (June 15, 2024). The proposal would prohibit the manufacture, processing, distribution, and use of NMP in several categories of consumer and commercial products, including auto care, cleaning and degreasing, and furniture-care products. For industrial uses where NMP remains necessary—such as semiconductor and lithium-ion battery manufacturing—the proposed rule would require a workplace chemical protection program to prevent direct dermal contact. NMP concentration in consumer adhesives and sealants would be capped at 45%. NMP-based consumer paint strippers are not restricted under the proposal, as EPA's 2020 risk evaluation found no unreasonable risk from that use. No final rule has yet been promulgated, though EPA may finalize the NMP rule in 2026. *See* 40 C.F.R. Part 751 (anticipated).

## XI.  TCE, Mercury, and Lead (Counts 29–31)

61.      On December 17, 2024, EPA published a final risk management rule under TSCA § 6(a) prohibiting all uses of TCE. 89 Fed. Reg. 102,568 (Dec. 17, 2024), codified at 40 C.F.R. Part 751, Subpart D. The rule banned most manufacturing, processing, and distribution of TCE for commercial and all consumer uses by September 15, 2025, with extended phase-out periods and § 6(g) exemptions for certain critical uses such as refrigerant manufacturing and nuclear fuel processing. Multiple petitions for review were consolidated in the Third Circuit, and EPA has repeatedly postponed the effective date of the § 6(g) exemption conditions—most recently extending the postponement to May 18, 2026. 91 Fed. Reg. 7,401 (Feb. 18, 2026). EPA has also extended the compliance date for TCE use as a processing aid in nuclear fuel manufacture to

September 15, 2028, and for disposal of TCE to wastewater to December 18, 2026. 90 Fed. Reg. 44,773 (Sept. 17, 2025). The rule establishes an interim existing chemical exposure limit (ECEL) of 0.2 ppm TWA—significantly below OSHA's PEL of 100 ppm TWA—and requires a Workplace Chemical Protection Program for all continuing uses. EPA is expected to propose further amendments to the TCE rule in 2026.

62. Lead-based paint hazards are regulated under TSCA Title IV, §§ 401–412, as added by the Residential Lead-Based Paint Hazard Reduction Act of 1992, Pub. L. No. 102-550, Title X. EPA's regulatory framework includes the Lead Renovation, Repair and Painting (RRP) Rule, 40 C.F.R. Part 745, Subpart E; the Lead-Based Paint Activities certification and training program, 40 C.F.R. Part 745, Subpart L; and the dust-lead hazard standards and clearance levels under TSCA § 403, 40 C.F.R. Part 745, Subpart D. In October 2024, EPA finalized updated dust-lead hazard standards strengthening the identification and cleanup requirements for lead-based paint hazards in pre-1978 homes and child-occupied facilities. 89 Fed. Reg. 89,438 (Nov. 12, 2024). Notably, in December 2024, EPA declined to initiate rulemaking under TSCA § 6 to restrict lead wheel weights, concluding that the risks to children were significantly lower than originally petitioned. Lead is not among the chemicals currently undergoing TSCA § 6 risk evaluation.

63. Mercury is regulated under TSCA § 8(b)(10), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, § 14 (2016). Section 8(b)(10)(D) directs EPA to publish a triennial inventory of mercury supply, use, and trade in the United States, identify manufacturing processes and products that intentionally add mercury, and recommend actions to achieve further reductions in mercury use. EPA promulgated the mercury inventory reporting rule in June 2018. 83 Fed. Reg. 30,054 ( June 27, 2018), codified at 40 C.F.R. Part 713. Reporting is required at three-year intervals; the most recent reporting deadline requires submission of calendar year 2024 data by July 1, 2025. EPA has published inventory reports in 2020, 2023, and 2026. In addition, five mercury compounds have been prohibited from export effective January 1, 2020, pursuant to § 8(b)(10)(B). Mercury is not currently subject to a TSCA § 6 risk evaluation or risk management rulemaking.

## XII. Imminently Hazardous Chemicals (Count 32)

64. Citizen Suits are litigation vehicles to enforce statutes that are otherwise only

enforceable by the EPA. Apple's argument that §2606 is only enforceable by EPA but not Citizen Suits, is contrary to the concept of Citizen Suits. Citizen suit provision §2619 clearly reaches imminent hazard claims, as Citizen Suits are designed to address imminent hazards. The citizen suit provision authorizes actions for violations of "any rule or order" under TSCA, and the ongoing use and release of chemicals that EPA has determined present unreasonable risk constitutes such a violation.

# PLAINTIFF'S EPCRA CLAIMS ARE ADEQUATELY PLEADED

## XIII. EPCRA §304: Reportable Quantities Are Plausibly Alleged

65.    The Amended Complaint identifies specific extremely hazardous substances on Apple's inventory (silane, chlorine, ammonia, phosphine, fluorine). It alleges sixteen documented gas leak incidents at the Facility from 2019–2023, multiple triggering hazmat responses. Gas leaks of extremely hazardous substances that trigger hazmat responses and cause chemical injuries to nearby residents plausibly exceed reportable quantities. At the pleading stage, Plaintiff need not allege exact poundage—she need only allege facts making it plausible that reportable thresholds were crossed. Cite *Twombly* plausibility standard and relevant EPCRA pleading cases.

## XIV. EPCRA §§311–312: Apple's Own Inventory Demonstrates the Violation

66.    Apple argues Plaintiff has not alleged the inventories were inaccurate or unreported. But the Complaint alleges Apple concealed its operations from regulators for years and maintained incomplete inventories (e.g., TCE not appearing in inventories despite presence in wastewater). The EPA's own inspection found Apple was mischaracterizing hazardous waste and using incorrect EPA ID numbers. Address the specific §§311–312 pleading requirements.

## XV. EPCRA §313 (TRI): Apple Is Using the Wrong NAICS Code

67.    Apple's argument that the Facility is not subject to TRI reporting because it operates under NAICS code 334111 (Electronic Computer Manufacturing) is remarkable—it asks the Court to accept Apple's own self-reported industry classification as dispositive at the pleading

stage, when the entire thrust of the Complaint is that Apple has systematically misrepresented the nature of its operations.

68.     The Facility is a semiconductor fabrication plant. The Complaint alleges this in extensive detail: the Facility contains clean rooms, burn-in rooms, acid waste neutralization systems, heavy metals rinse systems, solvent waste systems, toxic gas cabinets, and chemical inventories that include silane, phosphine, arsine, chlorine, and dichlorosilane. (FAC ¶¶118, 140–42.) The BAAQMD itself issued Apple a permit to operate a "Semiconductor fab." (FAC ¶411.) The correct NAICS code for this facility is 334413 (Semiconductor and Related Device Manufacturing), which is a covered sector under EPCRA §313. See 40 C.F.R. § 372.23.

69.     Apple's use of NAICS code 334111 is consistent with the same pattern of misrepresentation alleged throughout the Complaint: Apple told the city it was doing "research and development," told BAAQMD nothing at all, and registered with an NAICS code for computer manufacturing rather than semiconductor fabrication. Whether Apple has correctly classified its operations is a factual dispute—and on a motion to dismiss, the Court draws all inferences in Plaintiff's favor. Plaintiff has plausibly alleged that the Facility is a semiconductor fabrication facility subject to EPCRA §313 reporting.

## PLAINTIFF'S PUBLIC NUISANCE CLAIM IS TIMELY AND STATES A CLAIM

### XVI.  THE CLAIM IS NOT TIME-BARRED

70.     Plaintiff has relocated back to California and is currently experiencing the effects of the ongoing nuisance. Public nuisance abatement actions are distinct from private nuisance damage claims. A continuing nuisance generates new causes of action with each occurrence. Judge Chen's ruling on the private nuisance claim addressed a different cause of action with different elements and a shorter limitations period. The public nuisance claim is brought to abate an ongoing hazard, not to recover personal damages.

71.     Apple argues "a past nuisance cannot be enjoined" citing *People ex rel. Bradford v. Goddard,* 47 Cal. App. 730, 740 (1920); *Mallon v. City of Long Beach*, 164 Cal. App. 2d 178, 190 (1958); and *Holmes High Rustler, LLC v. Gomez,* 2015 WL 4999737, at *7 (N.D. Cal. 2015). These are all distinguishable because the nuisance here is ongoing — the Facility is currently operating,

currently emitting, and currently endangering the community. *Bradford* involved a nuisance that had already been abated; *Mallon* involved no probability of continued harm. Apple itself cites *Phipps v. Saddleback Valley Unified Sch. Dist.,* 204 Cal. App. 3d 1110, 1117 (1988), which supports the Plaintiff's arguments — *Phipps* affirmed a permanent injunction where the defendant had not voluntarily abandoned its policy, which is exactly the situation here.]

## XVII.  The §3482 Permit Defense Does Not Apply

72.     Cal. Civ. Code §3482 provides that "nothing done or maintained under the express authority of a statute can be deemed a nuisance." But this defense does not apply where permits were obtained through fraud or material misrepresentation, were non-existent, were granted in violation of the regulators own governing regulations, and/or the operations are an ultrahazardous activity.

73.     The Complaint extensively alleges that Apple concealed the nature of its operations from regulators—obtaining permits as an "R&D" facility when it was actually conducting semiconductor fabrication. A permit obtained through deception is not "express authority of a statute." Moreover, the violations alleged go far beyond permitted activity—operating unpermitted systems, unreported chemical releases, RCRA violations—none of which is authorized by any permit. Cite authority on the fraud exception to §3482.

# APPLE'S "LAUNDRY LIST" CHART MISUNDERSTANDS CITIZEN SUIT ENFORCEMENT

## XVIII.  The Citizen Suit Framework: Enforcement Vehicle vs. Underlying Standard

74.     The bulk of Apple's motion consists of a chart purporting to show that various statutory provisions cited in the Complaint are "inapplicable," "unenforceable," or "do not identify a compliance standard." This chart reflects a fundamental misunderstanding of how environmental citizen suit enforcement works.

75.     Congress structured each of the environmental statutes at issue with the same basic architecture: (1) substantive provisions that set standards, direct EPA to promulgate regulations, or define prohibited conduct; and (2) citizen suit provisions that authorize private enforcement of those standards and the regulations promulgated under them. The citizen suit provisions are the

enforcement *vehicles*; the substantive provisions are the underlying *standards being enforced*. When the Complaint cites 42 U.S.C. § 6922 (directing EPA to establish generator standards), it is not suing "under" § 6922 as an independent cause of action. It is suing under § 6972 (the RCRA citizen suit provision) for violations of the standards promulgated pursuant to § 6922. Apple's chart conflates the enforcement mechanism with the underlying substantive standard.

76.     This is how every environmental citizen suit works. A CWA citizen suit under § 1365 enforces effluent standards established under §§ 1311, 1316, and 1317. A CAA citizen suit under § 7604 enforces emission standards established under §§ 7411 and 7412. Citing the underlying standard is not an assertion that the standard is independently enforceable by a private citizen—it identifies *what was violated*.

## XIX.   Concessions on Clearly Inapplicable Provisions

77.     Plaintiff acknowledges that certain provisions cited in the Complaint cannot be independently enforced through citizen suits. Specifically, criminal penalty provisions (42 U.S.C. § 7413(c), § 6928(d)–(e), 33 U.S.C. § 1319(c), 15 U.S.C. § 2615(b)) are not enforceable by private plaintiffs as a criminal case – but this is a civil lawsuit, not a criminal one. Definitional sections that set no compliance standard (e.g., 42 U.S.C. § 7661(1)–(2), 15 U.S.C. § 2681) are not an independent cause of action under the criminal code. Regulations applicable solely to residential structures (40 C.F.R. pt. 745) do not apply to the Facility itself.

78.     However, several of Apple's other chart entries are affirmatively wrong. Apple claims that 40 C.F.R. Part 264 (standards for hazardous waste treatment, storage, and disposal facilities) does not apply because "Apple is not an owner or operator of a hazardous waste treatment, storage, or disposal facility." (Motion at 24.) But the EPA's own inspections found that Apple was operating hazardous waste treatment systems—including an acid waste neutralization system, a heavy metals rinse system, and an unpermitted 1,700-gallon solvent waste tank—under RCRA's "Permit by Rule" regulations. (FAC ¶¶141, 153, 202–09.)

79.     Apple was cited for permit violations under 40 C.F.R. § 270.1(c) specifically because it was operating hazardous waste treatment facilities. A defendant that operates hazardous waste treatment systems and is cited by the EPA for doing so without proper permits cannot then claim Part 264 standards do not apply to it.

80.     Apple also argues that the Santa Clara City Code provisions cited in the public nuisance claim are unenforceable by Plaintiff because "[o]nly the City's enforcement officer may" enforce them. (Motion at 20.) This misunderstands the role of the ordinances in the Complaint. Plaintiff does not bring an independent enforcement action under the City Code. Rather, the ordinances are cited as evidence of what constitutes a nuisance under California law. A public nuisance exists when conduct is "injurious to health" or "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. Conduct that violates local health, safety, and environmental ordinances is evidence of a per se nuisance. The ordinances establish the standard; the public nuisance statute provides the enforcement mechanism.

81.     These concessions do not warrant dismissal of any count. The Complaint's causes of action are brought under the citizen suit provisions of each statute. To the extent the Complaint cites provisions that provide context or identify the regulatory framework rather than the precise standard violated, those citations support the factual and legal narrative—they are not standalone claims requiring independent dismissal.

# CONCLUSION

82.     Apple's motion attacks a comprehensive complaint for being comprehensive, demands specificity while arguing that specificity is prolixity, and asks this Court to resolve factual disputes at the pleading stage. Each of its four pillars fails: Plaintiff has standing; the pre-suit notice was adequate; the EPA Consent Agreement preserves Plaintiff's claims; and the statute-specific arguments either mischaracterize the Complaint or apply the wrong legal standard.

83.     This case involves a semiconductor fabrication facility operating next to thousands of homes and a children's playground, releasing tons of toxic chemicals into the air, water, and soil, while regulators were systematically misled about its operations. The environmental citizen suit statutes exist for precisely this situation. Plaintiff respectfully requests that the Court deny Apple's Motion to Dismiss in its entirety.

Respectfully filed,

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*
April 13 2026

legal@ashleygjovik.com
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272