**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjøvik**, *an individual*, <br><br> **Plaintiff**, <br><br> vs. <br><br> **Apple Inc.**, *a corporation*, <br><br> **City of Santa Clara**, *a local government*, <br><br> **Mr. Jenab et al** *(individually, LP, LLC, &/or Trust)* <br><br> **Defendants**. | **Case No. 25-CV-07360-PCP** <br> **Env. "Citizen Suit" & Cal. Public Nuisance** <br><br> **Judge: P. Casey Pitts** <br><br><br> **Plaintiff's Opposition to Defendant Jenab et al's Motion to Dismiss (Dkt. 62).** <br><br><br> **Hearing:** <br> **Date:** May. 28, 2026 <br> **Time:** 10:00 AM <br> **Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PROCEDURAL HISTORY ................................................................................. 1

STATEMENT OF FACTS .................................................................................. 2

LEGAL STANDARD ......................................................................................... 3

ARGUMENT ...................................................................................................... 3

    I.    THE FAC COMPLIES WITH RULE 8 ........................................................... 3

    II.    PLAINTIFF'S PRE-SUIT NOTICE SATISFIES STATUTORY REQUIREMENTS ...................... 4

    III.    THE PROPERTY OWNER/LANDLORD DEFENDANTS ARE PROPERLY SUBJECT TO CITIZEN SUIT LIABILITY ................................................................ 5

    IV.    FEDERAL ENVIRONMENTAL LAW TREATS PROPERTY OWNERSHIP AS A BASIS FOR LIABILITY ............................................................................ 7

    V.    THE FAC ALLEGES FAR MORE THAN PASSIVE OWNERSHIP. ........................................... 8

    VI.    PLAINTIFF STATES A CLAIM UNDER THE CLEAN AIR ACT ..................................... 9

    VII.    PLAINTIFF STATES A CLAIM UNDER THE CLEAN WATER ACT ............................. 10

    VIII.    PLAINTIFF STATES A CLAIM UNDER TSCA ...................................................... 11

    IX.    PLAINTIFF STATES A CLAIM UNDER EPCRA ................................................... 12

    X.    PLAINTIFF STATES A CLAIM FOR PUBLIC NUISANCE ....................................... 13

    XI.    RESPONSE TO DEFENDANTS' STATUTORY TABLES ........................................... 14

CONCLUSION ................................................................................................ 15

# Opposition to Jenab's
# Motion to Dismiss under Rule 12(b)(6)
## INTRODUCTION

1. The Property Owner/Landlord Defendants ask this Court to dismiss claims arising from one of the most extensively documented patterns of environmental noncompliance in recent Northern California history. The facility at 3250 Scott Boulevard in Santa Clara has been the subject of two federal EPA inspections documenting at least nineteen unique RCRA violations with over one hundred unique occurrences, six Bay Area Air Quality Management District violations, multiple wastewater discharge violations, over sixteen documented chemical spill and leak incidents—including releases of phosphine, silane, fluorine gas, and hexafluorobutadiene—and years of unpermitted, concealed ultrahazardous operations adjacent to sensitive populations.

2. The Property Owner/Landlord Defendants owned the property throughout all of this, leased and continued leasing it to Apple despite actual knowledge of the violations and public safety risks, and took no action to abate the hazards, report the violations, or protect the thousands of residents living three hundred feet away.

3. The Property Owner/Landlord Defendants' motion also reprises many of the same arguments raised in Apple's concurrently filed motion. When moving to dismiss the original Complaint, these same Defendants argued it was an impermissible "shotgun pleading" that lacked sufficient factual detail. (Dkt. 38 at § IV.D.1.) Plaintiff amended in direct response. Now Defendants argue the First Amended Complaint says too much. The Court should reject this *heads-I-win-tails-you-lose* approach. The Property Owner/Landlord Defendants' motion should be denied in its entirety.

## PROCEDURAL HISTORY

4. The Original Complaint in this case was filed Sept. 2 2025 (ECF 1) and an Amended Complaint was filed Nov. 29 2025 (ECF 48). The Defendant filed a Motion to Dismiss in response to the Amended Complaint on Jan. 21 2026. The Plaintiff requested an extension in her response due to urgent, personal medical and housing issues (ECF 64), including an emergency relocation from Boston back to Santa Clara, and then due to litigation conduct by Defendant Apple in the retaliation litigation with the Plaintiff (3:23-cv-04597) (Feb. 17 2026, ECF 67).

5.      In the retaliation litigation, Defendant Apple filed extensive meritless motions, discovery requests, and demands for sanctions against the Plaintiff starting around Feb. 17 2026 and ongoing through April 2026, which have been denied by the court, and are now the subject of new NLRB charges, but have consumed extensive amounts of the Plaintiff's limited available time during a critical period during the retaliation litigation with the imminent close of fact discovery and dual summary judgement filings (i.e. ECF 279 – 371 – nearly a hundred docket entries since Feb. 17 2026). [1]

6.      Accordingly, the Plaintiff has still had no time to work on this Opposition filing. Literally only a couple days. Apple's conduct has made it impossible to adequately engage in this litigation and the effect of Apple's litigation abuse would force the Plaintiff to request yet another extension from this court for Oppositions to weak Motions to Dismiss regarding a significant public safety hazard posing severe risk to the community and environment. Therefore, the Plaintiff files this Opposition to the best of her ability with extremely limited time and resources, and apologizes for any oversight or error, the slight delay past mid-night in filing, and intends to supplement during oral arguments where needed.

# STATEMENT OF FACTS

7.      Plaintiff incorporates by reference the detailed factual allegations in the First Amended Complaint and the Sixty-Day Notice (ECF No. 48-1). Since approximately 2015, Apple Inc. has operated at the Property Owner/Landlord's unpermitted semiconductor fabrication facility at 3250 Scott Boulevard in Santa Clara, California. (FAC ¶¶ 32, 45.) The facility is located less than three hundred feet from the Santa Clara Square Apartments, approximately two thousand residential units, and approximately two hundred feet from an outdoor children's playground. (FAC ¶¶ 3, 140.) Also nearby are public parks, trails, a church, a school, an elder care facility, a university campus, a Whole Foods grocery store, and the San Tomas Aquino Creek. (FAC ¶¶ 3, 138-140.) The site also sits on a federal Superfund site. (FAC ¶ 136.)

8.      Defendant Kalil Jenab and the various business entities, own the property and has leased it throughout the period of violations. (FAC ¶¶ 52-53.) The FAC alleges the Property

---

[1] Here, in this case, the Property Owner/Landlord strangely is represented by counsel for the Tenant/Operator Apple, despite clear, conflicting legal interests between Owners and Tenants in environmental disputes.

Owner/Landlord Defendants knew about the violations and hazards, failed to ensure there were appropriate permits, took no steps to correct or report them, and instead concealed the dangers. (FAC ¶ 393.) The Property Owner/Landlord Defendants were involved in the permitting process (FAC ¶¶ 117-121) and continued to lease despite years of documented violations. (FAC ¶ 53.)

9. The U.S. EPA inspected the facility in August 2023 and January 2024 and documented at least nineteen unique RCRA violations, including an unpermitted 1,700-gallon hazardous waste treatment system venting solvent exhaust into the atmosphere. (FAC ¶¶ 32-43.) The BAAQMD cited multiple air quality violations in 2024. (FAC ¶ 61.) Between 2015 and 2023, at least sixteen chemical spill or leak incidents were documented—none reported to state or federal agencies. (FAC ¶¶ 12-31.) The EPA consent agreement expressly provides that it does not preclude further enforcement action beyond fines. The agreement preserves all claims for injunctive relief, which is the primary relief Plaintiff seeks.

# LEGAL STANDARD

10. On a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need only state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a facial Rule 12(b)(1) motion, the same standard applies. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

# ARGUMENT

## I. THE FAC COMPLIES WITH RULE 8

11. Defendants' Rule 8 argument is irreconcilable with their own prior position. In their first motion to dismiss (Dkt. 38), these same Defendants argued the original Complaint was an impermissible "shotgun pleading" lacking factual detail. (Dkt. 38 at § IV.D.1.) Plaintiff amended in response. Now the same Defendants argue it is too long.

12. A plaintiff who is told her complaint lacks detail and then provides that detail has not violated Rule 8. The FAC's length reflects genuine complexity: multiple federal environmental

statutes, three categories of defendants, a decade of operations, EPA-documented RCRA violations, BAAQMD violations, chemical spill incidents, a consent decree history, and extensive regulatory noncompliance. This is not the "prolixity" in *Cafasso*, where a 733-page complaint contained allegations "spread across unrelated claims." 637 F.3d 1047, 1058 (9th Cir. 2011).

13.    Defendants' reliance on Judge Chen's comments from the separate tort litigation (Tarantino Decl. Exs. A, E) is misplaced. That case—*Gjovik v. Apple Inc.*, Case No. 3:23-cv-04597-EMC—involved personal injury tort claims (private nuisance, IIED, ultrahazardous activities) with different legal standards, different elements, and a different procedural posture. This case is an environmental citizen suit under five federal statutes and California public nuisance law. It's also concerning that defense counsel for a Property Owner/Landlord is filing very similar motions as that for its concurrently represented Tenant client, and citing litigation between the Tenant and Plaintiff, for the unrelated Property Owner/Landlord.

14.    Further, the factual complexity inherent in alleging ongoing violations of the CAA, CWA, RCRA, TSCA, and EPCRA across multiple defendants is categorically different from a personal injury tort case. Judge Chen's comments about pleading length in the tort context do not govern the level of factual detail appropriate for a multi-statute environmental citizen suit nor does it create the law of the case for this separate litigation. And notably, Judge Chen did not dismiss that case on Rule 8 grounds—he dismissed on statute of limitations.

## II.   PLAINTIFF'S PRE-SUIT NOTICE SATISFIES STATUTORY REQUIREMENTS

15.    The Notice is substantively sufficient. The Ninth Circuit requires that pre-suit notice be "reasonably specific" and give "the accused company the opportunity to correct the problem." *WaterKeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004). The purpose is "to trigger agency enforcement and avoid a lawsuit," not "to unduly burden citizens." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002).

16.    Plaintiff's Sixty-Day Notice (ECF No. 48-1) exceeds these requirements. The Notice is a detailed, 38-page document identifying: the specific facility; the specific defendants and their roles; the specific statutes; the specific chemicals (NMP, arsine, phosphine, silane, TCE, benzene, mercury, formaldehyde, chlorine, fluorine, hexafluorobutadiene, among others); specific

regulatory violations; sixteen specific chemical incidents with dates and incident report numbers; specific permit numbers; and the specific relief sought.

17.    The FAC's counts are encompassed by the Notice. Defendants argue seven FAC counts (9, 10, 12, 17, 19, 23, 32) were not in the Notice. Each is a natural elaboration of a plainly noticed statutory framework.

- *Count 9 (Stationary Source):* Notice ¶ 67 alleges violations of CAA § 7411, "standards of performance for stationary sources."
- *Count 10 (Preconstruction Permits):* Notice ¶ 59 alleges "unpermitted air emissions" and "failure to obtain required permits." Apple had no air permits until May 2023. (¶ 60.)
- *Count 12 (Ozone Pollution):* Notice ¶¶ 64-69 alleges emission standard violations encompassing ozone precursors; ¶ 98 details VOC emissions.
- *Count 17 (Creek):* Notice ¶¶ 79-80 identifies San Tomas Aquino Creek and Saratoga Creek; ¶ 91 alleges CWA violations; ¶¶ 86-87 describes stormwater discharge to these creeks.
- *Count 19 (Semiconductor Standards):* Notice ¶ 66 alleges CAA § 7412 MACT violations. The semiconductor MACT at 40 C.F.R. pt. 63 subpt. BBBBB implements Section 112.
- *Count 23 (Stormwater/Air):* Notice alleges both air emissions (¶¶ 58-70) and stormwater violations (¶¶ 86-87). Their intersection is a natural consequence.
- *Count 32 (Imminently Hazardous Chemicals):* Notice ¶ 73 alleges RCRA endangerment; ¶¶ 103-107 alleges TSCA violations.

18.    The technical requirements are satisfied. *Plaintiff's address.* The Notice includes Plaintiff's full name, a functioning mailing address, phone number, and email. The regulations do not require a private residential address. Defendants suffered no prejudice. *Service on state agencies.* Plaintiff served the U.S. Attorney General, U.S. EPA Administrator, U.S. DOJ ENRD, CalEPA, BAAQMD, California Attorney General, S.F. Bay Regional Water Quality Control Board, San José-Santa Clara Regional Wastewater Facility, and Santa Clara County DA, all with confirmed delivery. (ECF Nos. 10, 14.)

## III.   THE PROPERTY OWNER/LANDLORD DEFENDANTS ARE PROPERLY SUBJECT TO CITIZEN SUIT LIABILITY

19.    The Property Owner/Landlord Defendants ask this Court to treat them as passive bystanders who happen to hold title. That characterization ignores both the facts and the structure of federal environmental law. They are property owners who made the affirmative decision to lease their property for semiconductor fabrication directly adjacent to thousands of homes, a children's

playground, public parks, and a school—and then continued that lease for nearly a decade while violations accumulated, chemicals leaked, permits were never obtained, and residents were exposed. Federal environmental law has consistently treated property ownership as a basis for environmental liability, not a shield against it.

20.    The Property Owner/Landlord Defendants' land use decision created the endangerment. This case is, at its core, about putting a semiconductor fabrication facility next to thousands of homes. The Property Owner/Landlord Defendants made that possible. They leased their property for fabrication operations beginning in approximately 2014-2015. (FAC ¶¶ 46, 52.) At the same time, the Santa Clara Square Apartments—approximately two thousand units—were being developed directly across the street. (FAC ¶¶ 3-4.) The EIR for the apartments was finalized in December 2015, at least six months after Apple began operations, and never mentioned the facility. (FAC ¶ 4.)

21.    The Property Owner/Landlord Defendants were not ignorant. They were involved in permitting. (FAC ¶¶ 117-121.) City documents from 2014 noted zoning concerns "if there was residential adjacent" and the need for air permits. (Sixty-Day Notice ¶ 46.) The same documents acknowledged the need for "explosion control" and noted that California Accidental Release Prevention (CalARP) requirements applied. (Id.) The Property Owner/Landlord Defendants knew they were placing one of the most chemically intensive industrial processes in existence—involving arsine, phosphine, silane, chlorine gas, solvents, and other acutely hazardous chemicals—next to a massive residential development under construction. That is not a passive act. It is the foundational decision that created the endangerment alleged in this case.

22.    This matters for two independent reasons. First, it demonstrates that the contribution to endangerment was a deliberate land use decision with foreseeable consequences. Second, it undermines any argument by Apple that it reasonably relied on the landlord's willingness to lease as evidence that fabrication was appropriate for this location. If Apple defends itself by pointing to the Property Owner/Landlord Defendants' decision to lease, then the Property Owner/Landlord Defendants cannot simultaneously claim they had nothing to do with the resulting endangerment. The circular finger-pointing between operator and owner confirms that both are properly before this Court, as well as the conflict held by shared legal counsel for the two

parties.

## IV.  FEDERAL ENVIRONMENTAL LAW TREATS PROPERTY OWNERSHIP AS A BASIS FOR LIABILITY.

23.    *CERCLA—the foundational framework.* CERCLA imposes strict, joint and several liability on "any current owner or operator" of a facility where hazardous substances have been released. 42 U.S.C. § 9607(a)(1). The statute says "owner *or* operator"—not "owner *and* operator." Courts have held that ownership alone suffices. See *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir. 1985). If Congress holds owners strictly liable under CERCLA—even owners with no knowledge—it defies reason that a knowing, concealing owner is immune from the citizen suit provisions of RCRA, CAA, and CWA.

24.    *RCRA § 6972(a)(1)(B)—the broadest citizen suit provision.* RCRA authorizes suit against "any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment." 42 U.S.C. § 6972(a)(1)(B). The statute expressly names owners. The enumerated categories are illustrative; the statute reaches "any person" who has "contributed to" the handling or disposal presenting endangerment.

25.    *CAA § 7604(a)—"any person" in violation.* The CAA authorizes suit "against any person . . . who is alleged to be in violation of . . . an emission standard or limitation." 42 U.S.C. § 7604(a)(1). It separately authorizes suit "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit." Id. § 7604(a)(3). The CAA's enforcement provision, § 7413(b), distinguishes between "the owner or operator of an affected source" (mandatory enforcement) and "any other person" (discretionary enforcement), confirming that non-operators can violate the CAA.

26.    *CWA § 1365—"any person" in violation.* The CWA authorizes suit "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation." 33 U.S.C. § 1365(a)(1). "Any person"—not "any operator."

27.    The Property Owner/Landlord Defendants' position requires the Court to read an

"operator" limitation into statutes that say "any person." The Court should give effect to the text Congress enacted.

## V. THE FAC ALLEGES FAR MORE THAN PASSIVE OWNERSHIP.

28. The FAC alleges a pattern of affirmative conduct:
- **Affirmative land use decision:** Leasing for semiconductor fabrication adjacent to a residential development under construction, with knowledge of the hazards involved, including the need for air permits and explosion control. (FAC ¶¶ 46, 52-53; Sixty-Day Notice ¶ 46.)
- **Involvement in permitting:** Active participation in establishing the operations that produced the violations. (FAC ¶¶ 117-121.)
- **Knowledge of violations:** Awareness of environmental violations, chemical spills, fires, and regulatory findings over years. (FAC ¶ 393; FAC ¶¶ 12-31, 32-43, 61.)
- **Concealment:** Rather than reporting violations or warning the public, the Property Owner/Landlord Defendants "concealed the dangers." (FAC ¶ 393.) Concealment is an affirmative act.
- **Continued leasing:** Continuing the lease despite documented violations, enabling hazardous operations to persist. (FAC ¶ 53.) Each continuation with knowledge is an affirmative decision to enable the endangerment.
- **Failure to exercise owner authority:** Jenab had authority to condition the lease on compliance, require permits, restrict hazardous operations, or terminate the lease. He exercised none of these. The Property Owner/Landlord Defendants held the ultimate authority over whether these operations continued on their property.

29. *L.A. Waterkeeper* is distinguishable. In *L.A. Waterkeeper v. SSA Terminals, LLC*, 702 F. Supp. 3d 903 (C.D. Cal. 2023), the City of Long Beach owned a port terminal with no alleged knowledge of or participation in the specific violations. The allegations amounted to "generally grouping" the Property Owner/Landlord with the operator. Id. at 934-35. Here, the FAC alleges specific individual conduct: an affirmative land use decision, permitting involvement, actual knowledge, concealment, and continued leasing despite documented violations.

30. Moreover, *L.A. Waterkeeper* addressed the "operator" theory. Under RCRA § 6972(a)(1)(B), the question is not whether the Property Owner/Landlord Defendants "operated" the facility but whether they "contributed to" the handling of hazardous waste presenting endangerment—a different and broader standard.

31. *Burlington Northern* confirms that knowledge plus intentional conduct creates liability. In *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 612 (2009), the

Supreme Court held that Shell's "mere knowledge that spills and leaks continued to occur was insufficient"—but Shell had "taken numerous steps to reduce the likelihood of spills." The Property Owner/Landlord Defendants are on the wrong side of that line. Unlike Shell, they did nothing to address the violations. They did not condition the lease on compliance, report the violations, or warn residents. Instead, they concealed the dangers and continued to profit. Knowledge combined with concealment is more than sufficient to establish contribution.

32.     The proximity to sensitive receptors magnifies the Property Owner/Landlord Defendants' responsibility. Whether waste presents "imminent and substantial endangerment" depends on what the waste is and where it is—and who is nearby. The Facility is less than three hundred feet from approximately two thousand apartments, two hundred feet from a children's playground, and within one thousand feet of parks, a church, a school, an elder care facility, and a university. (FAC ¶¶ 3, 138-140.)

33.     The one-story building vented exhaust toward four-story residential buildings whose "fresh air intake" vents drew in the contaminated air. (Sixty-Day Notice ¶ 58.) A property owner who places one of the most chemically hazardous industrial processes within three hundred feet of homes, a playground, and a school—and allows it to operate for years with documented violations—has contributed to an imminent and substantial endangerment.

34.     State and local law confirm the Property Owner/Landlord Defendants' affirmative obligations. Plaintiff agrees that City Code provisions are not the independent basis for federal claims. But they demonstrate the Property Owner/Landlord Defendants had affirmative legal obligations regarding their property that they breached. Santa Clara City Code § 8.30.40 assigns property maintenance responsibility to the "owner" as well as the "occupant, lessee, or tenant." These obligations refute the self-portrayal of parties with no connection to conditions at the Facility.

## VI.  Plaintiff States a Claim Under the Clean Air Act

35.     The FAC alleges ongoing violations. Under *Gwaltney*, 484 U.S. at 64, a citizen suit plaintiff must make "a good-faith allegation of continuous or intermittent violation." The Facility continues to operate. (FAC ¶¶ 97, 134.) The BAAQMD cited Apple for violations in 2024—after the 2023 permit application—including violations of permit requirements and emission limits.

(FAC ¶ 61.) Apple had no air permit from approximately 2015 to May 2023. (FAC ¶¶ 60, 475.) The unpermitted solvent waste tank exhaust was not added until approximately April 2024. (FAC ¶ 60.)

36.    The statute of limitations does not bar injunctive relief for ongoing violations. The five-year limitations period applies to penalty claims for discrete past violations, not injunctive relief for ongoing violations. Each day of a continuing violation is a separate violation. The 2024 BAAQMD violations conclusively demonstrate noncompliance notwithstanding the 2023 permit.

37.    Defendants cite orders from the prior tort case (Tarantino Decl. Exs. E, F) for statute of limitations principles, but the accrual rules in the tort context are inapplicable to environmental citizen suits. In the tort case, Judge Chen applied the discovery rule to personal injury claims, finding that Plaintiff should have discovered her injury earlier. Citizen suit claims do not accrue based on when the plaintiff discovers her injury—they are based on *ongoing violations*. Under Gwaltney, the question is whether the defendant is currently in violation, not when the plaintiff first learned of the violations. The tort SOL analysis has no bearing on whether injunctive relief is available for continuing environmental violations.

## VII.    PLAINTIFF STATES A CLAIM UNDER THE CLEAN WATER ACT

38.    The permit shield does not bar Plaintiff's claims. The "permit shield" under 33 U.S.C. § 1342(k) only protects compliant discharges. The FAC alleges: (1) "falsified discharge monitoring" (Sixty-Day Notice ¶ 94); (2) sampling frequency violations in 2016 and 2020 (FAC ¶¶ 567, 570); (3) stormwater violations outside the industrial wastewater NPDES permit (Sixty-Day Notice ¶¶ 86-87); and (4) the NPDES permit was initially for "research and development" and not revised for semiconductor fabrication until October 2016 (Sixty-Day Notice ¶ 82).

39.    The TCE source is a factual dispute not resolvable on a 12(b)(6) motion. Apple's chemical inventories never included TCE despite it appearing in wastewater at 24 µg/L in 2017 (Sixty-Day Notice ¶¶ 14, 89), and TCE began spiking in downgradient groundwater around 2021 (id. ¶ 14). At the pleading stage, this supports a reasonable inference that Apple was using and discharging TCE without reporting it.

40.    The FAC alleges ongoing violations. The Facility continues to discharge, and the pattern of violations—repeated sampling violations, unreported chemicals, stormwater noncompliance uncorrected on reinspection (Sixty-Day Notice ¶ 87)—supports a good-faith

continuing violation allegation under Gwaltney.

## VIII.  PLAINTIFF STATES A CLAIM UNDER TSCA

41.    Trichloroethylene is now regulated and effectively banned under TSCA. Defendants' motion focuses narrowly on NMP, but Plaintiff's TSCA claims are not limited to NMP. On December 17, 2024, the EPA published a final rule effectively banning all uses of trichloroethylene (TCE). 40 C.F.R. Part 751, Subpart D. The rule prohibits most uses within one year and specifically prohibits disposal of TCE to industrial pre-treatment, industrial treatment, or publicly owned treatment works.

42.    Apple was covertly using TCE—it appeared in wastewater at 24 µg/L in 2017 but was never in Apple's inventories or manifests. (Sixty-Day Notice ¶¶ 14, 89.) TCE spiked in downgradient groundwater around 2021. (Id. ¶ 14.) Apple's 2025 manifests show "unspecified solvent mixture" as "non-RCRA" waste. (Id. ¶ 97.) If Apple continues to use or dispose of TCE, it violates 40 C.F.R. Part 751, Subpart D.

43.    Methylene chloride is regulated under TSCA. The EPA's final methylene chloride rule, effective July 8, 2024, restricts industrial and commercial use and requires a Workplace Chemical Protection Program. 40 C.F.R. Part 751, Subpart B. Plaintiff's 2020 air monitoring detected methylene chloride. (Sixty-Day Notice ¶ 180.)

44.    The NMP risk determination supports RCRA and public nuisance claims. Plaintiff acknowledges that the proposed NMP rule has not been finalized. However, the EPA's December 2022 Risk Determination—submitted by Defendants themselves as Tarantino Decl. Exhibit B— formally found that NMP "presents an unreasonable risk of injury to health under its conditions of use." The Defendants invite this Court to consider this document, and the Court should: it supports Plaintiff's RCRA imminent endangerment and public nuisance claims. Apple released 260 pounds of NMP into the atmosphere in 2020—a chemical EPA has formally determined causes miscarriages, reduced fertility, and damage to the liver, kidneys, immune system, and nervous system. (Sixty-Day Notice ¶ 27.) Additional TSCA claims are not dependent on NMP.

45.    The FAC also alleges TSCA violations related to lead (Sixty-Day Notice ¶ 104) and glycol ethers. TSCA § 2614 makes it unlawful to use a chemical the user knew was manufactured or distributed in violation of TSCA rules. If Apple is using TCE in violation of Part 751, continued

use also violates § 2614. Apple's failure to include TCE in inventories is potentially a § 2607 violation.

## IX. PLAINTIFF STATES A CLAIM UNDER EPCRA

46.     EPCRA §§ 302 and 304 do not depend on NAICS codes. Defendants' NAICS code argument applies only to the § 313 TRI claim. The § 302 and § 304 claims depend on whether the facility has covered extremely hazardous substances above threshold quantities, not industry sector classification.

47.     *§ 302.* The Facility stores silane, chlorine gas, ammonia, sulfuric acid, dichlorosilane, phosphine, and arsine (Sixty-Day Notice ¶ 97; FAC ¶ 690)—multiple of which are designated extremely hazardous substances under Appendix A to 40 C.F.R. pt. 355. This is sufficient at the pleading stage.

48.     *§ 304.* At least sixteen documented chemical spill and leak incidents, including multiple phosphine releases, fluorine gas, hexafluorobutadiene, and TEOS—none reported. (Sixty-Day Notice ¶¶ 12-31.) The exact quantity of a toxic gas release inside an industrial facility is information peculiarly within Defendants' control.

49.     Apple is using the wrong NAICS code. NAICS 334111 (Electronic Computer Manufacturing) describes establishments assembling electronic computers. The official classification expressly provides that "the manufacture of non-assembled electronic components is excluded, including semiconductors, integrated circuits, and loaded printed circuit boards, which are classified under 334413."

50.     Apple fabricates semiconductors. Apple told the BAAQMD in its September 2023 permit application that it operates a "Semiconductor fab." (Sixty-Day Notice ¶ 36.) The EPA documented semiconductor fabrication operations. The chemicals used—arsine, phosphine, silane, NMP, chlorine gas, dichlorosilane—are hallmarks of semiconductor fabrication, not computer assembly. The correct code is 334413. EPA publishes a TRI factsheet specifically for NAICS 334413. Apple cannot avoid TRI reporting by selecting an inapplicable code.

51.     Apple's own TRI report proves reporting is required. Defendants submit Apple's TRI Facility Report as Tarantino Decl. Exhibit C to support the NAICS code argument. But this exhibit undermines Defendants' position. Exhibit C shows that *Apple itself filed a TRI report for this*

*Facility* for the year 2020, reporting air emissions of NMP, benzene, carbon monoxide, formaldehyde, and other chemicals. If the Facility were genuinely exempt from § 313 reporting, Apple would not have filed this report. The single report for one year of a decade of operations raises the inference that Apple selectively reported while ignoring ongoing obligations for every other year. Apple reported 15,608 pounds of VOCs and 260 pounds of NMP in 2020 alone. (Sixty-Day Notice ¶ 98.) The absence of reports for every other year supports systematic § 313 noncompliance.

52.    The EPCRA violations also extend to §§ 311 and 312. Apple's inventories never included TCE despite it appearing in wastewater and downgradient groundwater, demonstrating inaccurate inventories. (Sixty-Day Notice ¶¶ 14, 89, 101.)

## X.  Plaintiff States a Claim for Public Nuisance

53.    The statute of limitations does not bar Plaintiff's claim. Plaintiff has returned to California and resides near the Facility. Because the FAC alleges a continuing nuisance, each repetition commences a new limitations period. *Beck Dev. Co. v. S. Pac. Transp. Co.,* 44 Cal. App. 4th 1160, 1217 (1996).

54.    Defendants rely on Judge Chen's statute of limitations analysis from the tort case (Tarantino Decl. Exs. E, F) to argue that Plaintiff's public nuisance claim is similarly time-barred. But Judge Chen's ruling addressed *private* nuisance—a tort claim with a two-year statute of limitations for injuries to a private party. This case asserts *public* nuisance under Cal. Civ. Code § 3491 et seq., which has a three-year limitations period and, for continuing nuisances, resets with each new injury to the public. Plaintiff has returned to the area and continues to be affected by the ongoing nuisance. The tort case's SOL analysis does not govern.

55.    Cal. Civ. Code § 3482 does not bar Plaintiff's claim. The Facility operated without any air permit from 2015 to May 2023—not "under the express authority of a statute." The BAAQMD cited Apple for violations after the permit was issued. The EPA documented nineteen RCRA violations and opened a criminal investigation. The unpermitted hazardous waste treatment tank was not authorized until 2024. The § 3482 defense does not shield pervasive noncompliance.

56.    Plaintiff can enforce her public nuisance claim. A private plaintiff may maintain an action for public nuisance if it was "especially injurious" to her. Cal. Civ. Code § 3493. The FAC

alleges injuries different in kind and degree, including severe chemical exposure with documented medical symptoms. (FAC ¶¶ 176-184.)

## XI.   RESPONSE TO DEFENDANTS' STATUTORY TABLES

57.     Plaintiff acknowledges that certain provisions cited in the Complaint cannot be independently enforced through citizen suits. Specifically, criminal penalty provisions (42 U.S.C. § 7413(c), § 6928(d)–(e), 33 U.S.C. § 1319(c), 15 U.S.C. § 2615(b)) are not enforceable by private plaintiffs as a criminal case – but this is a civil lawsuit, not a criminal one. Definitional sections that set no compliance standard (e.g., 42 U.S.C. § 7661(1)–(2), 15 U.S.C. § 2681) are not an independent cause of action under the criminal code. Regulations applicable solely to residential structures (40 C.F.R. pt. 745) do not apply to the Facility itself.

58.     However, several of Apple's other chart entries are affirmatively wrong. Apple claims that 40 C.F.R. Part 264 (standards for hazardous waste treatment, storage, and disposal facilities) does not apply because "Apple is not an owner or operator of a hazardous waste treatment, storage, or disposal facility." (Motion at 24.) But the EPA's own inspections found that Apple was operating hazardous waste treatment systems—including an acid waste neutralization system, a heavy metals rinse system, and an unpermitted 1,700-gallon solvent waste tank—under RCRA's "Permit by Rule" regulations. (FAC ¶¶141, 153, 202–09.)

59.     Apple was cited for permit violations under 40 C.F.R. § 270.1(c) specifically because it was operating hazardous waste treatment facilities. A defendant that operates hazardous waste treatment systems and is cited by the EPA for doing so without proper permits cannot then claim Part 264 standards do not apply to it.

60.     Apple also argues that the Santa Clara City Code provisions cited in the public nuisance claim are unenforceable by Plaintiff because "[o]nly the City's enforcement officer may" enforce them. (Motion at 20.) This misunderstands the role of the ordinances in the Complaint. Plaintiff does not bring an independent enforcement action under the City Code. Rather, the ordinances are cited as evidence of what constitutes a nuisance under California law. A public nuisance exists when conduct is "injurious to health" or "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. Conduct that violates local health, safety, and environmental ordinances is evidence of a per se

nuisance. The ordinances establish the standard; the public nuisance statute provides the enforcement mechanism.

61.    These concessions do not warrant dismissal of any count. The Complaint's causes of action are brought under the citizen suit provisions of each statute. To the extent the Complaint cites provisions that provide context or identify the regulatory framework rather than the precise standard violated, those citations support the factual and legal narrative—they are not standalone claims requiring independent dismissal.

# CONCLUSION

62.    For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety. The FAC adequately alleges Article III standing, the pre-suit notice satisfies statutory requirements, and Plaintiff states plausible claims under the CAA, CWA, RCRA, TSCA, EPCRA, and California public nuisance law.

Respectfully filed,

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*
April 14 2026 (2 AM)
San Jose, California

legal@ashleygjovik.com
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272