**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjøvik**,

*an individual*,

**Plaintiff**,

vs.

**Apple Inc.**,

*a corporation,*

**City of Santa Clara**,

*a local government*,

**Mr. Jenab et al**

*(individually, LP, LLC, &/or Trust)*

**Defendants**.

**Case No. 25-CV-07360-PCP**

**Env. "Citizen Suit" & Cal. Public Nuisance**

**Judge: P. Casey Pitts**

**Plaintiff's Opposition to Defendant the City of Santa Clara's Motion to Dismiss (Dkt. 58).**

**Hearing:**
**Date:** May 28, 2026
**Time:** 10:00 AM
**Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

PROCEDURAL HISTORY ...................................................................................... 2

LEGAL STANDARD .............................................................................................. 2

ARGUMENT ........................................................................................................... 3

    I.    THE CITY IS NOT MERELY A PASSIVE REGULATOR — IT ACTIVELY CONTRIBUTED TO AN IMMINENT AND SUBSTANTIAL ENDANGERMENT ............................................................ 3

    II.    PLAINTIFF'S RCRA CLAIMS AGAINST THE CITY ARE COGNIZABLE UNDER § 7002(A)(1)(B) AND ARE NOT BARRED BY HECKLER ........................................................ 6

    III.    PLAINTIFF'S CWA CLAIMS ARE BASED ON THE CITY'S OWN PERMIT OBLIGATIONS, NOT ENFORCEMENT DISCRETION ............................................................................ 7

        A.    *Stormwater: The City Is Liable Under Its Own MS4 Permit* ..................................... 7

        B.    *Wastewater: The Brandt-Erichsen Declaration and Request for Judicial Notice Should Be Disregarded* ......................................................................................................... 9

    IV.    PLAINTIFF'S CAA CLAIMS AGAINST THE CITY ARE BASED ON AFFIRMATIVE CONDUCT, NOT ENFORCEMENT DELAY .................................................................. 10

    V.    PLAINTIFF'S EPCRA CLAIMS ...................................................................... 11

    VI.    PLAINTIFF'S TSCA CLAIMS ........................................................................ 11

    VII.    THE EIR ALLEGATIONS ARE EVIDENCE OF THE CITY'S KNOWLEDGE AND CONCEALMENT, NOT A CEQA CHALLENGE .................................................... 12

    VIII.    CWA § 404 CREEK-FILLING CLAIMS ARE NOT ASSERTED AS A STANDALONE CAUSE OF ACTION IN THIS CASE ........................................................................... 12

    IX.    PLAINTIFF STATES A CLAIM FOR PUBLIC NUISANCE AGAINST THE CITY ............... 14

        C.    *Plaintiff Satisfies the "Special Injury" Requirement* ............................................... 14

        D.    *The City's Conduct Was a "Substantial Factor" in Causing the Nuisance* .................. 15

        E.    *The City's Liability Extends Beyond "Failure to Warn"* ......................................... 16

        F.    *The City Is Independently Liable for Dangerous Conditions on Public Property* .......... 16

        G.    *The City Breached Mandatory Duties Under Its CUPA Delegation* ........................... 17

        H.    *The Court Has Subject Matter Jurisdiction Over the State Law Claim* ...................... 19

REQUEST FOR JUDICIAL NOTICE .................................................................. 19

CONCLUSION ..................................................................................................... 19

*Gjovik v. Santa Clara, et al* **| Plaintiff's Opp. to the City's MTD**

# OPPOSITION TO CITY OF SANTA CLARA MOTION TO DISMISS UNDER RULE 12(B)(6)

## INTRODUCTION

1.     The City of Santa Clara seeks dismissal of all claims against it on the theory that its relationship to the Apple Facility is "solely as a regulator" whose enforcement decisions are shielded from judicial review. MTD at 1. The Amended Complaint alleges far more than regulatory inaction.

2.     The Complaint and Amended Complaint alleges that the City voluntarily assumed exclusive regulatory authority over hazardous waste operations at the Apple Facility through the CUPA program, then approved the construction of a semiconductor fabrication facility in an Industrial zone that the City's own General Plan had earmarked for residential conversion and later admitted was inappropriate and unsafe siting. ECF 48, ¶¶ 43–46, 109–115. While processing those permits, the City simultaneously approved the construction of over 1,800 residential apartments directly across the street — and deliberately excluded the facility from the Environmental Impact Report for those apartments, despite the same City departments working on both projects concurrently. ECF 48, ¶¶ 131–150.

3.     The City received direct complaints from residents suffering chemical exposure injuries, including through personal meetings with the Mayor and the Director of Water and Sewer Utilities, and took no action. ECF 48, ¶ 41. Throughout this period, the City continued to invite vulnerable populations, including small children, to City-owned parks and playgrounds located directly adjacent to a facility that was, by its own filings, releasing at least eight tons of hazardous air pollutants annually. ECF 48, ¶¶ 793–813. The City failed to report known violations to CalEPA, the EPA, or the Bay Area Air Quality Management District while collecting tax revenue and utility payment. ECF 48, ¶¶ 49, 68. And the City has been subject to CalEPA corrective action for years due to systemic failures in the very CUPA program it volunteered to administer. ECF 48, ¶ 47.

4.     The City's Motion rests principally on *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Sierra Club v. Whitman*, 268 F.3d 898 (9th Cir. 2001), for the proposition that regulatory conduct is shielded from citizen suit liability. The conduct alleged here extends far beyond the exercise of enforcement discretion. The City affirmatively contributed to an imminent and substantial endangerment to human health and the environment through concealment, facilitation, and

reckless indifference — conduct cognizable under the Resource Conservation and Recovery Act ("RCRA"), the Clean Water Act ("CWA"), and California public nuisance law. The Motion should be denied.

## PROCEDURAL HISTORY

5. The Original Complaint in this case was filed Sept. 2 2025 (ECF 1) and an Amended Complaint was filed Nov. 29 2025 (ECF 48). The Defendant filed a Motion to Dismiss in response to the Amended Complaint on Jan. 21 2026. The Plaintiff requested an extension in her response due to urgent, personal medical and housing issues (ECF 64), including an emergency relocation from Boston back to Santa Clara, and then due to litigation conduct by Defendant Apple in the retaliation litigation with the Plaintiff (3:23-cv-04597) (Feb. 17 2026, ECF 67).

6. In the retaliation litigation, Defendant Apple filed extensive meritless motions, discovery requests, and demands for sanctions against the Plaintiff starting around Feb. 17 2026 and ongoing through April 2026, which have been denied by the court, and are now the subject of new NLRB charges, but have consumed extensive amounts of the Plaintiff's limited available time during a critical period during the retaliation litigation with the imminent close of fact discovery and dual summary judgement filings. (i.e. ECF 279 - 371).

7. Accordingly, the Plaintiff has still had no time to work on this Opposition filing. Literally only a couple days. Apple's conduct has made it impossible to adequately engage in this litigation and the effect of Apple's litigation abuse would force the Plaintiff to request yet another extension from this court for Oppositions to weak Motions to Dismiss regarding a significant public safety hazard posing severe risk to the community and environment. Therefore, the Plaintiff files this Opposition to the best of her ability with extremely limited time and resources, and apologizes for any oversight or error, the slight delay past mid-night in filing, and intends to supplement during oral arguments where needed.

## LEGAL STANDARD

8. Under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must construe facts and reasonable inferences in the light most favorable to the nonmoving party. *Id.* The pleading standard does not require "detailed factual allegations," but

demands more than conclusory accusations. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

9.     The Ninth Circuit maintains a "powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248–49 (9th Cir. 1997). When a plaintiff appears pro se, the Court is required to construe the allegations liberally and afford the benefit of any doubt. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). A pro se litigant must be given leave to amend unless it is clear that deficiencies cannot be cured. *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

10.     The City introduces a declaration with extrinsic governance documents regarding the San José-Santa Clara Regional Wastewater Facility (the "Brandt-Erichsen Declaration," ECF 58-1). On a Rule 12(b)(6) motion, a court generally may not consider materials outside the pleadings without converting the motion to one for summary judgment under Rule 56. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The Court should either disregard this declaration or, if it elects to consider it, convert the motion and permit Plaintiff to conduct discovery and submit responsive evidence.

11.     The City has also filed a Request for Judicial Notice (ECF 59) seeking consideration of a 1959 sewage treatment plant agreement and a 1983 master wastewater treatment agreement. Plaintiff does not dispute that these agreements exist as historical municipal government documents. However, the Court should not take judicial notice of the City's *characterization* of what these decades-old agreements mean for the current allocation of Clean Water Act responsibility — that is a disputed factual question not amenable to judicial notice. Under Rule 201, a court may notice the existence and contents of government records, but may not resolve disputed facts stated therein for the truth of the matter asserted. *Lee*, 250 F.3d at 689-90. The City asks this Court to accept not merely that these agreements exist, but that they conclusively establish the City bears no responsibility for the RWF's industrial waste program. That is precisely the type of disputed factual inference that judicial notice cannot supply.

## ARGUMENT

### I.  THE CITY IS ACTIVELY CONTRIBUTED TO AN IMMINENT AND SUBSTANTIAL ENDANGERMENT

*Gjovik v. Santa Clara, et al* | **Plaintiff's Opp. to the City's MTD** | **Page 3**

12.    The City's entire motion rests upon the premise that it is a regulator whose enforcement decisions are shielded by *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Sierra Club v. Whitman*, 268 F.3d 898 (9th Cir. 2001). However, *Heckler* concerned the FDA's decision not to take enforcement action regarding lethal injection drugs — a quintessentially discretionary determination about the deployment of limited enforcement resources. *Heckler*, 470 U.S. at 831–32. This case is categorically different.

13.    The Amended Complaint does not merely allege that the City failed to enforce environmental laws with sufficient vigor. It alleges that the City undertook affirmative steps that contributed to the endangerment. These affirmative acts include:

- **Concealment:** The City deliberately excluded the chip fab from the Santa Clara Square EIR, notwithstanding that the same City departments were simultaneously processing the chip fab's construction permits and the apartment approvals. ECF 48, ¶¶ 144–150.
- **Affirmative Siting and Zoning Decisions:** The City approved the construction of a heavy industrial semiconductor fabrication facility in a Light Industrial zone that was earmarked for future residential conversion, and subsequently approved dense residential housing directly across the street — in direct violation of its own General Plan. ECF 48, ¶¶ 109–115.
- **Invitation of Vulnerable Populations into Known Hazards:** The City operates Meadow Park and Creekside Park directly adjacent to the facility, markets these parks with playgrounds, BBQ facilities, and fitness equipment, and invites the public — including small children — to spend time in locations the City knew were contaminated by industrial emissions. ECF 48, ¶¶ 793–813.
- **Receiving and Disregarding Injury Reports:** Multiple residents, including Plaintiff, reported chemical exposure injuries directly to the Mayor, the Fire Department, and the Water and Sewer Director. The City did not investigate, did not warn, and did not disclose the chip fab's existence. ECF 48, ¶ 41.
- **Obstruction of Federal Investigation:** Plaintiff alleges the City provided advance notice to Apple regarding an unannounced EPA RCRA inspection. ECF 48, ¶ 22 (original complaint).
- **Active Participation in Permitting Without Referral:** The City processed the chip fab's CalARP registration, had full knowledge of the deadly chemicals on site, and never referred the matter to BAAQMD or EPA despite knowing the facility lacked required permits. ECF 48, ¶¶ 139, 145, 424.

14.    *Heckler* does not immunize affirmative governmental misconduct. The Supreme Court was careful to note that the presumption of unreviewability applies to an agency's "decision not to take enforcement action," and that the presumption may be rebutted where an agency "has

*Gjovik v. Santa Clara, et al* | **Plaintiff's Opp. to the City's MTD** | **Page 4**

consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4. Here, the City has not merely declined to enforce — it has actively concealed violations, obstructed investigations, and invited people into known hazards. This constitutes the "abdication" the Court warned about.

15.    The City cites *Sierra Club v. Whitman* for the proposition that enforcement decisions are discretionary. That case, however, involved a challenge to EPA's decision not to withdraw a state's delegated authority — a wholly discretionary policy judgment. 268 F.3d at 905. Unlike *Whitman*, the Amended Complaint here alleges that the City directly participated in creating and maintaining the endangerment through affirmative acts that extend far beyond any exercise of enforcement discretion. When a governmental entity's own conduct contributes to the harm, it is answerable as a "person" under the citizen suit provisions, not shielded as a regulator.

16.    This is not the first time the City of Santa Clara has been subject to litigation for recklessly siting semiconductor fabrication facilities in proximity to residences and sensitive receptors. In *LSI Logic Corp. v. City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995), a California trial court and then the Court of Appeal issued orders forbidding the City from siting chip fabs next to children and churches, and the current Mayor of Santa Clara (then a Council member) was threatened with contempt for violating those court orders. ECF 48, ¶ 3. The City's conduct in this case replicates the same pattern — authorizing ultrahazardous industrial operations in immediate proximity to the most vulnerable populations — that a California court found unacceptable more than two decades ago.

17.    The City's pattern of deference to Apple is also informed by its economic dependency. Apple is the largest corporate taxpayer in Santa Clara County. The City receives direct property tax revenue from the facility, and a substantial portion of its operating budget depends upon revenues from the technology companies it purports to regulate. ECF 48, ¶¶ 45–47. When a municipality's fiscal existence is intertwined with the operations of the very entity it regulates, the conflict of interest is inherent — and it is precisely the type of regulatory capture that the federal environmental citizen suit provisions were designed to address. The CUPA delegation was intended as a benefit to the regulated community and the public, not as a mechanism for a city to shield its largest taxpayer from federal oversight.

## II. Plaintiff's RCRA Claims Against the City Are Cognizable Under § 7002(a)(1)(B) and Are Not Barred by Heckler

18.    RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), authorizes citizen suits against "any person … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." The term "any person" expressly includes "governmental instrumentality or agency." 42 U.S.C. § 6903(15). The "contributed to" standard is expansive. As the Supreme Court has recognized, RCRA's imminent endangerment provision is "essentially a codification of common law public nuisance" that should be construed broadly. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486 (1996).

19.    Critically, Plaintiff's claim is not a nondiscretionary-duty claim under § 7002(a)(2). It is a direct liability claim under § 7002(a)(1)(B), which reaches "any person" who has "contributed to" the endangerment. The City's reliance on *Heckler* and its argument that citizen suits are available only against EPA for nondiscretionary duties entirely misses the mark. Section 7002(a)(1)(B) is a separate and independent basis for liability that does not depend upon enforcement discretion analysis. It imposes liability on any entity — including a municipality — whose conduct has contributed to the handling, storage, or disposal of hazardous waste presenting an imminent and substantial endangerment.

20.    Moreover, the City conflates RCRA's two citizen suit provisions. The City argues that Plaintiff must allege violations of specific "permits, standards, regulations, conditions, requirements, prohibitions, or orders" under § 6972(a)(1). MTD at 5–6. The Plaintiff does do this; however, what the City cites is the standard for claims under § 6972(a)(1)(A), which authorizes enforcement actions for specific RCRA violations.

21.    Plaintiff's RCRA claims are also brought under § 6972(a)(1)(B), the imminent endangerment provision, which contains no such requirement. Section (a)(1)(B) requires only that a person "contributed to" the handling or disposal of hazardous waste that "may present an imminent and substantial endangerment." *See United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1383 (8th Cir. 1989). The City's attempt to graft § (a)(1)(A)'s requirements onto a § (a)(1)(B) claim should be rejected.

*Gjovik v. Santa Clara, et al* | Plaintiff's Opp. to the City's MTD | Page 6

22. The City's characterization of Plaintiff's allegations as merely "pejorative characterizations of the City's role as a regulator" (MTD at 6) disregards the Amended Complaint's detailed factual allegations of affirmative misconduct. The Amended Complaint alleges, inter alia, that the City voluntarily assumed exclusive CUPA authority over the facility (ECF 48, ¶¶ 43–46); knew the facility was generating, storing, and disposing of hazardous waste in violation of RCRA (ECF 48, ¶¶ 402, 462–463); concealed those violations from EPA and CalEPA (ECF 48, ¶ 49); continued to approve operations despite actual knowledge of ongoing violations; has been under CalEPA corrective action for systemic CUPA failures (ECF 48, ¶ 47); and processed hazardous waste financial assurance documents signed by Apple's CFO demonstrating the City's full knowledge of the scope of operations (ECF 48, ¶ 33).

23. The City's assertion that the Amended Complaint is "internally inconsistent" because it acknowledges City inspections and citations (MTD at 6) misapprehends Plaintiff's theory. Plaintiff does not claim the City never inspected. Plaintiff alleges the City inspected, found violations, and then concealed those violations from other agencies and the public while continuing to permit operations, declining to warn the community, and inviting members of the public to parks adjacent to the hazard. Conducting a cursory inspection and then suppressing the results is not the exercise of enforcement discretion — it is affirmative concealment.

24. Additionally, the Ninth Circuit has held that sixty-day notice requirements do not apply to RCRA claims involving the mishandling of hazardous waste under the imminent endangerment provision. *Covington v. Jefferson County*, 358 F.3d 626, 637 (9th Cir. 2004). To the extent the City argues that any RCRA claims were insufficiently noticed, which is incorrect because they were sufficiently noticed, this authority disposes of that argument for the § 7002(a)(1)(B) claims at issue.

### III. PLAINTIFF'S CWA CLAIMS ARE BASED ON THE CITY'S OWN PERMIT OBLIGATIONS, NOT ENFORCEMENT DISCRETION

#### A. STORMWATER: THE CITY IS LIABLE UNDER ITS OWN MS4 PERMIT

25. The City holds its own municipal NPDES stormwater permit (Permit No. CAS612008), implemented through California Regional Water Quality Control Board Order No. R2-2023-0019. This permit imposes mandatory — not discretionary — obligations on the City,

employing the term "shall" repeatedly. ECF 48, ¶ 563. The permit requires the City to "implement an industrial and commercial site control program at all sites that could reasonably be considered to cause or contribute to pollution of stormwater runoff" (Order R2-2023-0019, C4); "[c]onduct inspections, effective follow-up, and enforcement to abate potential and actual non-stormwater discharges" (id.); and "[e]ffectively prohibit the discharge of non-stormwater … into storm drain systems and watercourses" (id. at C(5)(c)–(d)).

26.     These are the City's own permit conditions — conditions that the City, as an MS4 permittee, is legally obligated to satisfy. A citizen suit under 33 U.S.C. § 1365(a)(1) authorizes claims against "any person" alleged to be in violation of "an effluent standard or limitation." The City's failure to comply with its own mandatory permit requirements constitutes a direct violation, not an unreviewable exercise of enforcement discretion.

27.     The City attempts to dismiss these claims by noting that it conducted some inspections and cited Apple in 2016. MTD at 11. However, the Amended Complaint alleges that the City's inspections were inadequate and its enforcement illusory. ECF 48, ¶¶ 578, 580, 654. One citation a decade ago does not satisfy the City's ongoing mandatory permit obligations to conduct "effective follow-up" and "enforcement to abate."

28.     The City cites *Los Angeles Waterkeeper v. SSA Terminals, LLC*, 702 F. Supp. 3d 903 (C.D. Cal. 2023), where a plaintiff "generally grouped" a city with industrial operators without alleging the city itself violated pollution control requirements. That case is distinguishable. In *SSA Terminals*, the City of Long Beach was a landowner, not an MS4 permittee with its own mandatory compliance obligations for the specific industrial facility at issue. Here, the City is both a landowner (of the adjacent parks) and an MS4 permittee with express obligations to control industrial stormwater discharges within its jurisdiction.

29.     The City dismisses as incoherent Plaintiff's allegation that the City created "pseudo-permits" for stormwater discharge. MTD at 12. The Amended Complaint alleges that the City incorporated stormwater discharge authorization into maintenance agreements and wastewater permit terms rather than issuing proper industrial stormwater permits with the required public notice, monitoring, and reporting provisions. ECF 48, ¶¶ 676–678. The allegation is that the City effectively authorized stormwater discharges from the chip fab through informal

instruments that circumvented the CWA's procedural requirements.

30.    Regarding public notice, the Amended Complaint alleges that the City issued stormwater authorization without any public notice or participation — a requirement inherent in CWA § 402 permitting. ECF 48, ¶¶ 679–680. If the Court finds additional specificity is required, Plaintiff respectfully requests leave to amend.

31.    The stormwater claims against the City carry additional weight in light of evidence, alleged in the Amended Complaint and documented in ECF 55, that what the City labels "stormwater infrastructure" at the Premise is in fact the buried channel of Saratoga Creek — a Water of the United States that the City diverted underground into pipes and then relabeled as storm drains. ECF 48, ¶¶ 78–108; ECF 55, ¶¶ 8–11. (See also concurrently filed Declaration).

32.    The City manages this buried creek under its MS4 NPDES permit as though it were ordinary stormwater runoff, without disclosing to regulators, to NPDES permitting authorities, or to the public that the infrastructure is actually carrying the continuous flow of a jurisdictional waterway. This means that every discharge from the chip fab into the City's "storm drain" system constitutes a direct, unpermitted discharge into a Water of the United States — not merely a discharge into a municipal storm sewer.

33.    The City's use of its own stormwater permit to manage a concealed creek is not an exercise of enforcement discretion. It is a direct CWA violation: the City is operating stormwater infrastructure that carries a Water of the United States without disclosing the true nature of that water body to the permitting authority, without obtaining the permits required for discharges into jurisdictional waters, and without implementing the protections that would be required if the regulatory agencies understood that industrial pollutants were being discharged directly into a creek flowing to the San Francisco Bay. The City's concealment of the creek within its stormwater system is of a piece with its broader pattern of concealing the chip fab itself — and it independently supports Plaintiff's CWA claims, RCRA contribution claims, and public nuisance claims.

### B. Wastewater: The Brandt-Erichsen Declaration and Request for Judicial Notice Should Be Disregarded

34.    The City's wastewater arguments rely upon the Brandt-Erichsen Declaration and the two wastewater agreements attached thereto. As set forth above, these extrinsic materials are

improper on a 12(b)(6) motion, and the City's Request for Judicial Notice (ECF 59) does not cure that deficiency. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Judicial notice permits the Court to acknowledge that these agreements exist; it does not permit the Court to accept the City's contested interpretation that these agreements relieve the City of all CWA responsibility.

35.     Even if the Court considers the 1959 and 1983 agreements, they do not dispose of Plaintiff's claims. These agreements are sixty-seven and forty-three years old, respectively. The current operational reality of the RWF may differ substantially from what was committed to paper decades ago. The agreements may have been superseded, amended, or modified by subsequent agreements, ordinances, or course of dealing. The City has not represented that these are the only or the most current governing documents — and Plaintiff has had no opportunity to conduct discovery regarding the current governance structure of the RWF or the City's actual role in industrial wastewater permitting and enforcement.

36.     The Amended Complaint's allegations, which must be accepted as true at this stage, establish that the City co-owns the RWF (ECF 48, ¶ 42); holds its own NPDES permits independent of the RWF (ECF 48, ¶ 41); manages its own water and sewer utilities through Director Gary Welling, whose department is responsible for "ensuring compliance with federal and state regulations related to water, recycled water, wastewater, worker safety" (ECF 48, ¶ 41); was directly contacted by multiple victims of chemical exposure, including the Plaintiff, regarding pollution at the Premise and took no action (ECF 48, ¶ 41); and that the RWF itself cited Apple for permit violations (ECF 48, ¶¶ 567, 570).

37.     These allegations plausibly establish that the City bears some responsibility for wastewater management at the chip fab, regardless of the formal allocation of administrative roles in decades-old intergovernmental agreements. The precise scope of that responsibility is a factual question for discovery, not a 12(b)(6) determination.

## IV.  Plaintiff's CAA Claims Against the City Are Based on Affirmative Conduct, Not Enforcement Delay

38.     The City correctly notes that BAAQMD, not the City, is the air permitting authority. However, the Amended Complaint's CAA claims against the City are premised not on the City's failure to issue air permits, but on the City's affirmative role in facilitating the

construction and concealed operation of a major air pollution source without any air quality review. The City approved the chip fab's construction through its planning and building permit process, knowing the facility would emit at least eight tons of hazardous air pollutants annually. ECF 48, ¶¶ 118–129. The City then concealed the facility from the EIR process and from BAAQMD, which did not learn of the chip fab's existence until Plaintiff filed complaints in 2024. ECF 48, ¶ 68.

39.    Plaintiff acknowledges that the CAA citizen suit provision is narrow in scope. To the extent the Court finds the CAA claims against the City are not independently cognizable, Plaintiff respectfully requests that the City's CAA-related conduct be considered as part of the RCRA "contributed to" analysis and the public nuisance causation analysis, where the City's overall pattern of concealment is directly relevant.

40.    The City also notes that the CAA provides no cause of action for alleged violations of the California Public Records Act. MTD at 7 n.4. Plaintiff does not assert a standalone PRA claim. References to the PRA in the Amended Complaint are allegations of concealment — evidence of the City's knowledge and intent to conceal the chip fab's operations, relevant to the RCRA and public nuisance claims.

## V.  Plaintiff's EPCRA Claims

41.    Plaintiff acknowledges that EPCRA's citizen suit provision identifies specific entities against which suit may be brought, and that the statutory text does not expressly authorize citizen suits against a municipal CUPA for the particular obligations Plaintiff has identified. However, the substance of the EPCRA allegations — the City's concealment of hazardous chemical information, failure to provide emergency notifications, and failure to ensure community right-to-know — are cognizable under RCRA's broader imminent endangerment provision and the public nuisance claim. If the Court dismisses the standalone EPCRA claims against the City, Plaintiff requests that the underlying factual allegations be preserved in connection with those surviving claims.

42.    Regarding notice: To the extent the Court finds the EPCRA notice insufficient, Plaintiff requests leave to amend rather than dismissal with prejudice, as any deficiency is curable.

## VI.  Plaintiff's TSCA Claims

43. Plaintiff acknowledges that TSCA's regulatory framework primarily imposes obligations on manufacturers, processors, and distributors. However, the facts underlying the TSCA claims — the City's knowledge that extremely hazardous substances were being used, stored, released, and disposed of at the facility in violation of federal law — are directly relevant to the RCRA imminent endangerment claim and the public nuisance claim. If the Court dismisses the standalone TSCA claims against the City, Plaintiff requests that these factual allegations be preserved for use in connection with those surviving claims.

## VII. The EIR Allegations Are Evidence of the City's Knowledge and Concealment, Not a CEQA Challenge

44. The City argues that allegations related to the Santa Clara Square EIR are untimely under CEQA's statute of limitations and cannot be brought under federal citizen suit provisions. MTD at 17–18. This argument fundamentally mischaracterizes Plaintiff's claims.

45. Plaintiff is not challenging the EIR under CEQA. No CEQA claim is pleaded in this action. The EIR and the circumstances surrounding it are cited as direct evidence of the City's knowledge, intent, and pattern of concealment. Specifically, the EIR record establishes that the City knew about the chip fab's operations as early as 2014 (ECF 48, ¶¶ 119–121, 136, 144); that the City's Fire Department provided the list of CalARP-regulated facilities to the EIR preparers and deliberately omitted 3250 Scott Boulevard (ECF 48, ¶ 145); that the City made affirmative false assurances about the safety of the area while knowing a chip fab was being constructed directly across the street (ECF 48, ¶ 147); and that the City acknowledged the risk was sufficiently severe to warrant the purchase of a dedicated hazmat emergency response vehicle, yet simultaneously assured residents the area was safe (ECF 48, ¶ 149).

46. These facts constitute admissions — evidence of the City's scienter and its affirmative role in creating the conditions giving rise to the ongoing endangerment. Courts routinely permit parties to reference historical documents as evidence of knowledge and intent in ongoing violation cases. The CEQA statute of limitations governs challenges to the adequacy of an EIR, not the use of EIR-related evidence to prove a defendant's knowledge in a separate federal action.

## VIII. CWA § 404 Creek-Filling Claims Are Not Asserted as

*Gjovik v. Santa Clara, et al* | **Plaintiff's Opp. to the City's MTD | Page 12**

## A STANDALONE CAUSE OF ACTION IN THIS CASE

47.    The City argues that Plaintiff's CWA § 404 claims must be dismissed because they were not included in the original sixty-day notice. MTD at 17. This argument is moot. As Plaintiff stated in ECF 55, Plaintiff does not presently assert CWA § 404 claims as a standalone cause of action in this case. ECF 55, ¶ 2. Where the Plaintiff had alleged a new CWA § 404 claim in her Amended Complaint, she formally withdraws it and as noted, would seek to pursue that claim in a separate lawsuit in the context of the 1950s-1990s filling of wetlands and tidelands, and burying and diversion of the Saratoga Creek.

48.    Plaintiff served a separate sixty-day notice for CWA § 404 violations on December 11, 2025, received by the City on December 18, 2025, and by the EPA and Attorney General by December 23, 2025. ECF 55; ECF 66. The sixty-day period has expired. Neither the EPA nor the U.S. Army Corps of Engineers has commenced enforcement action regarding the creek burial — which is, of course, the very precondition that vests citizen suit jurisdiction under 33 U.S.C. § 1365(b)(1)(B). The unpermitted fill material remains in place in a Water of the United States. The buried creek continues flowing through concealed underground infrastructure every day. The City actively manages this infrastructure under its NPDES stormwater permits as though it were ordinary runoff. Each day the unpermitted fill remains constitutes a continuing violation of the Clean Water Act for which there is no statute of limitations. *United States v. Akers*, 785 F.2d 814 (9th Cir. 1986), cert. denied, 479 U.S. 828 (1986) (unpermitted fill remaining in waters of the United States constitutes a continuing violation). Plaintiff reserves the right to file a separate action or seek leave to incorporate § 404 claims at the appropriate time.

49.    However, the factual allegations regarding the buried Saratoga Creek are directly relevant to Plaintiff's existing CWA claims in this action. The discovery that the City's "stormwater infrastructure" is actually the buried Saratoga Creek system means that discharges from the chip fab into the "storm drain" system constitute direct discharges into a Water of the United States. ECF 55, ¶¶ 8–11. The City has been managing this concealed creek under its MS4 NPDES stormwater permit without disclosing the true nature of the water body to the permitting authorities or the public. This fact strengthens the existing CWA § 301/402 discharge claims, which were properly noticed and pleaded, and independently supports both the RCRA

"contributed to" claim and the public nuisance claim. The concealment of a Water of the United States within a municipal stormwater system — beneath a facility storing chemicals that react violently with water, adjacent to 1,800 apartments and a pressurized artesian aquifer system — is precisely the type of conduct the citizen suit provisions were designed to address.

## IX.  Plaintiff States a Claim for Public Nuisance Against the City

50.    The City raises four arguments against the public nuisance claim: (1) Plaintiff lacks standing because she resides in Boston; (2) the City did not "cause" the nuisance; (3) "failure to warn" is not a basis for nuisance liability; and (4) supplemental jurisdiction fails if the federal claims are dismissed. The City further asserts that Plaintiff "has not alleged facts sufficient to state a claim against the City for causing a public nuisance and cannot plausibly do so." MTD at 18.

51.    The assertion that Plaintiff "cannot plausibly do so" is refuted by the factual record: Plaintiff suffered documented chemical exposure injuries while residing adjacent to a chip fab the City deliberately concealed; the City owns parks where children actively play in contaminated air; the City approved violently incompatible zoning that created the conditions for mass exposure and fatalities, all of which is occurring on high pressure artesian water features and buried creeks that could create a geyser under a facility with exterior warnings that it contains chemicals that cannot be mixed with water. These are not speculative allegations. Each of the City's arguments fails.

### C. Plaintiff Satisfies the "Special Injury" Requirement

52.    California law requires that a private person "may maintain an action for a public nuisance, if it is specially injurious to himself." Cal. Civ. Code § 3493. The "special injury" requirement asks whether the plaintiff has suffered a particularized harm different from the general public, not whether the plaintiff currently resides at the location of the nuisance. *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1549 (2009).

53.    Plaintiff suffered acute chemical exposure injuries in 2020 while living at the Santa Clara Square Apartments — injuries that were promptly investigated, diagnosed as acute exposure to industrial chemicals, and have had lasting health consequences. ECF 48, ¶¶ 28–29. A person physically poisoned by a nuisance has suffered a quintessential "special injury" — one does not lose standing to seek abatement simply by moving away.

54.    The City cites *Hacala v. Bird Rides, Inc.*, 90 Cal. App. 5th 292 (2023), and *Sierra Club, Inc. v. Exxon Mobil Corp.*, No. 24-CV-07288-RS (N.D. Cal. Sept. 5, 2025). Neither case involved a plaintiff who suffered documented physical injury from the nuisance and subsequently relocated. Plaintiff here was exposed, diagnosed, and continues to suffer the effects of chemical exposure caused by this facility.

55.    However, this argument is also subsequently moot as the Plaintiff returned to California on or around Jan. 31 2026 and now resides in Alviso next to San Tomas Creek, and has visited the facility at 3250 Scott Blvd and also Santa Clara Square Apartments as recently as April 2026. (See concurrently filed Declaration).

### D. THE CITY'S CONDUCT WAS A "SUBSTANTIAL FACTOR" IN CAUSING THE NUISANCE

56.    The City cites *Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal. App. 5th 350 (2017) (the sea lion case). That case is readily distinguishable. In *City of San Diego*, the city installed a fence at La Jolla Cove, and the court found the fence had no impact on sea lion population dynamics or behavior. 8 Cal. App. 5th at 361. The nuisance was entirely natural and the city's actions were unrelated to its cause.

57.    Here, the City's conduct was a direct and substantial factor. The City approved the chip fab's construction in a zone designated for residential conversion, in violation of its own General Plan (ECF 48, ¶¶ 109–115); deliberately omitted the chip fab from the EIR, preventing residents from knowing about acute dangers (ECF 48, ¶¶ 144–150); failing to notify community members about releases; and continues operating parks and playgrounds adjacent to the facility while knowing conditions are hazardous and potentially lethal (ECF 48, ¶¶ 793–813). *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 102 (2017), held that affirmative promotion of a harmful product was a "substantial factor" in causing a nuisance, even where the defendants did not apply the product themselves. Analogously, the City's affirmative promotion of residential living adjacent to a concealed chip fab constitutes a "substantial factor."

58.    As the California Supreme Court held in *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931–36 (1972), the legislature intended to allow nuisance actions against governments with a "profound interest … in the eradication of the evils caused by the various forms of pollution."

### E. The City's Liability Extends Beyond "Failure to Warn"

59.     The City argues that nuisance liability does not extend to a "failure to warn." MTD at 20. However, it does extend, and further Plaintiff does not base her nuisance claim solely on failure to warn. The claim is based on the City's affirmative role in creating, maintaining, and concealing the nuisance.

### F. The City Is Independently Liable for Dangerous Conditions on Public Property

60.     Under California Government Code § 835, a public entity is liable for injury caused by a dangerous condition of its property when the property was in a dangerous condition at the time of injury, that condition created a reasonably foreseeable risk of the kind of injury which occurred, the dangerous condition proximately caused the injury, and the public entity had actual or constructive notice of the dangerous condition in sufficient time to have taken protective measures. *Vedder v. County of Imperial*, 36 Cal. App. 3d 654, 659 (1974); *Ducey v. Argo Sales Co.*, 25 Cal. 3d 707, 715–716 (1979).

61.     Here, the City owns and operates Meadow Park (3355 Octavius Drive) and Creekside Park / Redwood Trail Park (3225 Scott Boulevard), both located directly across the street from the chip fab. These parks feature playgrounds, BBQ facilities, fitness equipment, picnic tables, and restrooms. ECF 48, ¶¶ 793–813. The City markets these parks to the public, including families with small children, while having actual knowledge that the adjacent chip fab is releasing toxic substances into the ambient air. The City's parks constitute public property maintained in a dangerous condition within the meaning of § 835.

62.     *Vedder* is directly on point. In that case, third parties leasing airport property stored large quantities of gasoline and other combustible materials on the property, and the court held that "one who negligently stores gasoline and other highly combustible chemicals on his property, or knowingly permits such negligent storage, may be liable to others for a fire-incurred loss even though the fire was actually started by the negligent conduct of others." 36 Cal. App. 3d at 660. The *Vedder* court further held that a municipality's failure to provide adequate safety measures on property it owns was a proper factor in determining that the property was maintained in a hazardous condition under § 835. *Id.* at 660–661. Analogously, the City here owns parks adjacent to a facility

it knows is releasing toxic chemicals, invites the public into those parks, and provides no warning of the adjacent hazard.

63.     Furthermore, where an injury was caused by both a dangerous condition and a third party's negligence, the plaintiff need not show that the dangerous condition caused the third party's conduct. *Cordova v. City of Los Angeles*, 61 Cal. 4th 1099, 1106 (2015). Thus, the City cannot evade liability by asserting that Apple's operations — rather than the City's parks — are the proximate cause. *Baldwin v. State of California*, 6 Cal. 3d 424, 428 (1972) ("[T]he state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury.").

### G. The City Breached Mandatory Duties Under Its CUPA Delegation

64.     Under California Government Code § 815.6, "where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 498–499 (2000); *Sutherland v. City of Fort Bragg*, 86 Cal. App. 4th 13, 19 (2000).

65.     The CUPA implementing statutes and regulations impose mandatory obligations using "shall," not "may." The delegation requires that "[t]he unified program agencies in each jurisdiction shall do all of the following" regarding the implementation and enforcement of federal environmental laws. Cal. Code Regs. Tit. 27, § 15330. These enactments were designed to protect the public from the hazards of hazardous materials and waste — precisely the type of injury suffered by Plaintiff and the community. The City's breach of these mandatory duties was the proximate cause of those injuries, satisfying the three-prong test for liability under § 815.6.

66.     The City also assumed a duty it was not required to undertake. Liability may be imposed when safety officers assume a duty to provide a particular level of protection but then fail to do so. *Williams v. State of California*, 34 Cal. 3d 18, 23–24 (1983); *Baker v. City of Los Angeles*, 188 Cal. App. 3d 902, 908 (1986). By requesting exclusive CUPA status, the City voluntarily committed to protect the residents of Santa Clara from the dangers of hazardous materials and waste, knowing that those residents would reasonably rely upon that commitment. Other regulatory agencies —

*Gjovik v. Santa Clara, et al* | **Plaintiff's Opp. to the City's MTD** | **Page 17**

including the Santa Clara County Department of Environmental Health and CalEPA DTSC — were thereby excluded from oversight. When the City then failed to fulfill that commitment, the resulting injuries were foreseeable and attributable to that voluntary assumption of duty.

67.    Additionally, the City's Fire Department's CUPA activities are not shielded by fire department immunity. California Health & Safety Code § 1799.107 provides immunity for fire department personnel engaged in firefighting activities, but CUPA administration — hazardous waste inspections, regulatory compliance, emergency planning — is not firefighting. *See Potter v. City of Oceanside*, 114 Cal. App. 3d 564 (1981) (fire captain liable for negligent advice regarding gas leak); *Wilson v. County of San Joaquin*, 38 Cal. App. 5th 1 (2019) (fire department liable for negligent emergency medical services). The City cannot invoke firefighting immunity for its failures as a hazardous waste regulator.

68.    The depth of the City's indifference to its CUPA obligations is reflected in its own budget. The City allocates only 3.95 full-time employees to CUPA administration and enforcement for the entire city. The City's total annual CUPA enforcement penalties were $9,087 in FY 2023–24 — approximately thirty-five percent of what the City annually fines residents for violations of its bingo enforcement program ($25,984). City of Santa Clara FY 2025/26 Adopted Biennial Operating Budget at 209–210, 472. This is not the profile of a regulator exercising informed discretion. It is the profile of a municipality that has substantively abdicated its CUPA responsibilities while retaining the jurisdictional title that excludes other agencies from oversight.

69.    To the extent the City may assert design immunity under Government Code § 830.6 regarding the siting and design of the parks or adjacent development, that defense is unavailable here. Design immunity is lost when conditions change such that the original design presents a dangerous condition. *Baldwin v. State of California*, 6 Cal. 3d 424, 434 (1972) ("[D]esign immunity persists only so long as conditions have not changed. Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan.").

70.    If negligence independent of the design is even partly responsible for the harm, then design immunity does not apply. *Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 575 (1977). Here, the dangerous condition arose not from the original design of the parks but from the City's

subsequent decision to conceal an adjacent semiconductor fabrication facility and its hazardous emissions. The "changed conditions" — the construction and operation of an unannounced chip fab emitting eight tons of hazardous substances annually — extinguished any design immunity that may have existed when the parks were originally approved.

71.     The City has not responded to these arguments, which Plaintiff raised in her prior Opposition (Dkt. 32, §§ D.1–D.6). The City's continued silence on these independent bases for municipal liability constitutes a concession that these theories are legally viable. Plaintiff incorporates her prior briefing on these theories by reference.

### H. The Court Has Subject Matter Jurisdiction Over the State Law Claim

72.     The City argues that dismissal of the federal claims would eliminate supplemental jurisdiction. MTD at 18 n.9. However, at minimum, the RCRA § 7002(a)(1)(B) claim and the CWA stormwater claim survive this motion, providing the federal anchor for supplemental jurisdiction. Moreover, even if the federal claims against the City alone were dismissed, the Court retains original jurisdiction over the federal claims against the Tenant/Operator and the Property Owners/Landlord arising from the same case and controversy. 28 U.S.C. § 1367; *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).

## REQUEST FOR JUDICIAL NOTICE

73.     The City Requests the Court take Judicial Notice of "Sewage Treatment Plant Agreement Between San Jose and Santa Clara," and the "Master Agreement for the Wastewater Treatment Between City of San Jose, City of Santa Clara and County Sanitation District #4." The Plaintiff does not oppose Judicial Notice of the existence of these documents. However, while courts may take judicial notice of the existence of public records, judicial notice "cannot be taken of the truth of the contents of those records." *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).

## CONCLUSION

74.     The City's Motion to Dismiss should be denied. The Complaint and Amended Complaint states plausible claims against the City under RCRA § 7002(a)(1)(B) for contributing to an imminent and substantial endangerment, under the CWA for violating its own MS4 permit

obligations, and under California public nuisance law for creating, maintaining, and concealing a hazardous condition that has injured Plaintiff and threatens the surrounding community.

75.     The City's *Heckler* defense fails because this is not a case about enforcement discretion. It is a case about a municipality that actively participated in creating and concealing an environmental and public health disaster. The City cannot shelter behind a general principle of enforcement discretion when its own affirmative conduct is the subject of the claims.

76.     The City requests dismissal with prejudice. MTD at 21. This request should be denied. In the Ninth Circuit, dismissal with prejudice is inappropriate where there is any possibility that deficiencies can be cured by amendment. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). This standard applies with particular force to pro se litigants. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).

77.     Plaintiff has already substantially strengthened her allegations through amendment, and additional specificity can readily be provided through further amendment if the Court identifies any deficiencies. Dismissal with prejudice would be particularly inappropriate given the serious ongoing public safety and environmental concerns at the heart of this case.

78.     If the Court finds any claims insufficiently pleaded, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice, consistent with the Ninth Circuit's liberal approach to pro se pleadings and the strong public interest in abating ongoing environmental hazards.

Respectfully filed,

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*
April 14 2026 (2:20 AM)
legal@ashleygjovik.com
2108 N St. Ste. 4553, Sacramento, CA, 95816
(415) 964-6272

*Gjovik v. Santa Clara, et al* | **Plaintiff's Opp. to the City's MTD | Page 20**