**Ashley M. Gjovik, JD**
*In Propria Persona*
Alviso, San José, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJØVIK**, <br> *an individual*, <br><br> **PLAINTIFF**, <br><br> **vs.** <br><br> **APPLE INC.**, <br> *a corporation,* <br><br> **CITY OF SANTA CLARA,** <br> *a local government*, <br><br> **MR. JENAB ET AL** <br> *(individually, LP, LLC, &/or Trust)* <br><br> **DEFENDANTS**. | **Case No. 25-CV-07360-PCP** <br><br> **JUDGE: P. CASEY PITTS** <br><br><br> **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION UNDER RCRA, CAA, CWA, & PUBLIC NUISANCE** <br><br><br> **HEARING:** <br> **Date:** June 4 2026 <br> **Time:** 10:00 AM <br> **Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................1

II.     FACTUAL BACKGROUND ..................................................3

III.    LEGAL STANDARD...........................................................6

IV.     LIKELIHOOD OF SUCCESS ON THE MERITS ...........................8

    A.    RCRA § 6972(A)(1)(B) — IMMINENT AND SUBSTANTIAL ENDANGERMENT .........8

    B.    CAA § 304 — CITIZEN ENFORCEMENT ........................................14

    C.    CWA § 505 — CITIZEN ENFORCEMENT........................................17

    D.    CALIFORNIA PUBLIC NUISANCE — CIVIL CODE §§ 3479, 3480, 3491, 3493 ......20

V.      IRREPARABLE HARM .....................................................21

VI.     BALANCE OF EQUITIES ...................................................22

VII.    PUBLIC INTEREST..........................................................23

VIII.   REQUESTED RELIEF .......................................................23

IX.     CONCLUSION................................................................25

# TABLE OF AUTHORITIES

### Cases

*Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491–94 (7th Cir. 2011).------------------------13

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) --------------------------------- 6

*Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986) --------------------20

*Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993)-------------- 5

*Blackstone Headwaters Coal. v. Gallo Builders*, 32 F.4th 99 (1st Cir. 2022) (en banc). ------14

*Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)------------------------------------------------------------------------------------------------------25

*Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 873–75 (9th Cir. 2013). ----------------------------------------------------------------------------------------------------13

*Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019 (9th Cir. 2014) -------------------------------------------------------------------------------------------- 7

*Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC*, 80 F. Supp. 3d 1180 (E.D. Wash. 2015) ------------------------------------------------------------------------------------------------- 7

*Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183 (2020). ------------------------------- 8

*Cox v. City of Dallas*, 256 F.3d 281, 300 (5th Cir. 2001) ------------------------------------------ 7

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 366–69 (5th Cir. 2020) (en banc). -------------------------------------------------------------------------------------------------- 8

*Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000). 11

*Gjøvik v. Apple Inc.*, 3:23-cv-04597 (N.D. Cal.) ---------------------------------------------------- 3

*Group Against Smog & Pollution v. Shenango, Inc.*, 810 F.3d 116, 123–27 (3d Cir. 2016). --14

*Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001).---------------------- 5

*Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850–51 (9th Cir. 2011) ----------------------------- 7

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005)--------------------- 7

*LAJIM, LLC v. General Electric Co.*, 917 F.3d 933, 944 (7th Cir. 2019) ----------------------14

*LSI Logic Corp. v. City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995)---------- 1

*Luthringer v. Moore*, 190 P.2d 1 (Cal. 1948) ------------------------------------------------------- 8

*Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006)-------------- 7

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).----------------------------------------------------------------------------------------------------- 6

*McIvor v. Mercer-Fraser Co.*, 76 Cal. App. 2d 247, 254 (1946) --------------------------------- 8

*Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931–36 (1972) ---------------------------------- 8

*People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1103–05 (1997)------------------------------- 8

*People v. Apple Inc.*, No. 16-CV-303579 (Cal. Super. Ct., Santa Clara Cnty.) ----------------- 3

*People v. ConAgra Grocery Prods.*, 17 Cal. App. 5th 51, 79 (2017) --------------------------- 8

*Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)-------------------------------- 7

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). ---------------------25

*Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022–23 (9th Cir. 2009) ------------------------25

*United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) --------------------------------------- 5

*United States v. Power Eng'g Co.*, 191 F.3d 1224, 1230 (10th Cir. 1999) --------------------- 7

*Winter v. NRDC*, 555 U.S. 7, 20 (2008). ---------------------------------------------------- 6

*Winter v. Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32, 1135 (9th Cir. 2011) (en banc). ------------------------------------------------------------------------ 6

STATUTES

Cal. Civil Code §§ 3479–3480 -------------------------------------------------------------23

Cal. Gov't Code §§ 811.2, 815, 945 -------------------------------------------------------21

Cal. Gov't Code §§ 811.2, 815, 945. ------------------------------------------------------ 8

California Civil Code § 3479 -------------------------------------------------------------- 8

California Civil Code § 3491 -------------------------------------------------------------- 1

California Fire Code § 5003.3 ------------------------------------------------------------20

Clean Air Act, 42 U.S.C. § 7604(a)(1) ---------------------------------------------------- 1

Clean Water Act, 33 U.S.C. § 1365 -------------------------------------------------------- 1

RCRA, 42 U.S.C. § 6972(a)(1)(A) and (B) -------------------------------------------------- 1

SCCC §§ 13.10.300, 13.10.340, 13.10.550 -------------------------------------------------20

SCCC Chapter 8.30 -----------------------------------------------------------------------20

SCCOC Chapter B11 -----------------------------------------------------------------------20

# MOTION FOR PRELIMINARY INJUNCTION

1.      **PLEASE TAKE NOTICE** that on June 4 2026 , Plaintiff Ashley M. Gjøvik moves this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(A) and (B); the Clean Air Act, 42 U.S.C. § 7604(a)(1) and (3); the Clean Water Act, 33 U.S.C. § 1365; and California Civil Code § 3491. The motion is supported by the accompanying memorandum, the concurrently filed Declaration of Ashley M. Gjøvik with exhibits, the concurrently filed Declaration of Steve Zeltzer with exhibits, the concurrently filed Request for Judicial Notice, pleadings, and oral argument the Court permits.

## I.    INTRODUCTION

2.      Apple Inc. operates a semiconductor fabrication and manufacturing facility at 3250 Scott Blvd, Santa Clara. The facility handles dangerous chemicals including arsine, phosphine, chlorine, hydrofluoric acid, silane, and pyrophoric precursors that ignite on contact with air/water. Apple's own dispersion modeling places its arsine worst-case toxic endpoint at 1.1 miles — encompassing thousands of residents, an apartment complex, a children's playground across the lot line, an urgent care clinic, places of worship, and public parks. Pl. Decl., Ex. B at 00003296.

3.      The Sixth District Court of Appeal has previously held the City of Santa Clara's approval of sensitive receptors adjacent to chip fabs unlawfully negligent, rejecting the City's "*shelter-in-place safe room*" mitigation. *LSI Logic Corp. v. City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995); RJN. That precedent put the City — including current Mayor Lisa Gillmor as a council member at the time — on direct notice that approving sensitive uses next to chemical hazards in this same City violates the duty owed to the surrounding community. The City approved exactly that here, concealed it from the community, and continues to conceal the danger.

4.      Apple's own engineering team has, in declaration under penalty of perjury, identified specific failure modes for these chemicals and assigned to each consequence column the phrase "*personnel exposure resulting in injury and/or fatality (site personnel or neighbors)."* Pl. Decl., Ex. E. The phrase appears across at least eleven distinct nodes in the operator's own hazard analysis covering fire, explosion, sabotage, truck fire, and toxic gas leak failure modes for arsine, chlorine, ammonia, phosphine, diborane, silane, and the pyrophoric organometallics.

5.    Because these chemicals can produce mass-casualty harm if released, Congress and the California Legislature enacted statutes regulating use and where approved, requiring specific safety controls. The chemicals and receptors are present. The safety controls are documented to be failing and the plant should have never been approved in that location. The Santa Clara Fire Department — the CalARP Administering Agency —formally wrote that Apple's plume models are "*not favorable for this area*" and on June 17, 2025 withheld approval of an adjacent residential project pending environmental review. Pl. Decl., Ex. D. EPA's October 2025 Consent Agreement and Final Order documents seven RCRA counts; the underlying April 2024 Inspection Report identifies nineteen Potential Violations, fourteen "still outstanding" when the NOV issued. ECF No. 48-4. EPA's inspection of the facility — eight years into operations — was triggered by Plaintiff's tip; that tip later prompted a separate August 2024 federal criminal investigation, with an EPA Region 9 enforcement employee writing it was the first parallel proceedings case of their career. Pl. Decl., Exs. U, Z. The Bay Area Air Quality Management District (BAAQMD) documented Apple's Solvent Waste Tank "unpermitted since 7/15/2017" with piping vented "directly to the atmosphere"; six BAAQMD violations remain Pending as of April 26, 2026. Pl. Decl., Exs. M-3, Y. Apple's own sworn 2024 throughput report confirms permit-cap exceedances of arsine 84%, phosphine 61%, and boron trichloride 824%. Pl. Decl., Ex. W. The County's post-Bhopal Toxic Gas Ordinance permitting regime has no records for this facility. Pl. Decl., Ex. H.

6.    The failure modes the operator's own engineers predicted have materialized: at least eleven toxic gas incidents at the facility between June 2016 and May 2024 (with Santa Clara withholding records after that date). Records include a April 2021 phosphine release that re-entered the lab via HVAC over 800 square feet (CAL OES Reportable); the April 2022 fluorine release "evacuated to the atmosphere as designed"; a hexafluorobutadiene release from primary AND secondary cylinders simultaneously in May 2022; and worker chemical-exposure hospitalizations in August 2023 and May 2024. Pl. Decl., Exs. J, L. Plaintiff offered all three Defendants a comprehensive menu of stipulated interim mitigation in September 2025 — signage, monitoring, completion of unfiled permits, third-party assessments, monthly reporting — none requiring admission of liability. All three Defendants refused any and every measure. Pl. Decl., Ex. R.

7.    Apple's opposition to regulatory oversight is not new. From December 2016

through December 2020, Apple operated under a binding California state-court permanent injunction for hazardous-waste violations covering "any facility in California owned or operated by Apple at which electronic waste or any other hazardous waste is treated, or recycled" — which included 3250 Scott Boulevard. *People v. Apple Inc.*, No. 16-CV-303579 (Cal. Super. Ct., Santa Clara Cnty.); RJN. The unpermitted operations EPA documented at this facility began in at least 2015, were ongoing throughout the state-court injunction's pendency, but unreported. Plaintiff's 2025 notice to EPA was EPA's first effective contact with the facility's RCRA noncompliance.

8.      Apple is also judicially estopped from arguing the opposite of what it argued in the prior personal-injury case before this District. In *Gjøvik v. Apple Inc.*, 3:23-cv-04597 (N.D. Cal.), Apple successfully obtained a statute-of-limitations dismissal on the position that upon notice that Apple was operating a facility there, and deeper research revealing it's a semiconductor manufacturing plant, the Plaintiff and any other victims should have discovered the true operations and immediately suspected the facility as the cause of severe chemical injuries. Apple cannot now defend this PI on the position that the same facility presents no extraordinary risk and is appropriately sited adjacent to dense residential – fab is either ultrahazardous activity or its not.

9.      The relief Plaintiff seeks is targeted: removal of hazardous waste, hazardous materials, and toxic gases from the facility within thirty days, with prohibition on resumption pending merits resolution and prohibition on the property owner re-leasing the property for hazardous use. Apple may continue to occupy the building for office or non-industrial use. The relief addresses the chemicals, not the building.

## II.    <u>FACTUAL BACKGROUND</u>

10.      ***The facility and its operations.*** Apple operates at 3250 Scott Boulevard a III-V compound semiconductor fabrication facility — a "fab" — internally codenamed "Aria." The October 21, 2025 City of San José Publicly Owned Treatment Works (POTW) inspection report describes Apple's operations as "wafer preparation, lithography, layering, doping, polishing, grinding, testing, and bonding" of semiconductor devices on gallium arsenide, gallium nitride, sapphire, and silicon substrates, operating 24/7 with continuous wastewater discharge. Pl. Decl., Ex. G at 9. EPA has determined Apple is a Large Quantity Generator under EPA ID CAR000278176, generating more than 1,000 kilograms of hazardous waste per calendar month.

ECF No. 48-4 (CAFO ¶ 28). Annual hazardous waste generation totals approximately 98.4 million pounds, including 96.7 million pounds per year of corrosive waste discharged through the Acid Waste Neutralization (AWN) system. ECF No. 3-0 at 00003211 (Sixty-Day Notice). Apple is a categorical industrial user under 40 CFR Part 469.

11.    Apple's chemical inventory disclosed to its CalARP regulator materially understates the hazard. Apple's Risk Management Plan (RMP) discloses only three regulated substances — anhydrous ammonia (3,700 lb), arsine (120 lb), and chlorine (400 lb). Pl. Decl., Ex. B at 00003274. The chemicals actually present, confirmed across Apple's Process Hazard Analysis (PHA), the BAAQMD permit, and POTW inspection records, also include phosphine, diborane, hydrogen bromide, hydrogen iodide, boron trichloride, fluorine, disilane, dichlorosilane, silicon tetrachloride, silane, trifluoromethane, hexafluorobutadiene, mercury, chromium, arsenic, lead, and pyrophoric organometallic precursors used in MOCVD operations including trimethylaluminum (ignites violently in air), trimethylgallium, triethylgallium, trimethylindium, diethyl zinc (ignites in air or water), and phosphorus trichloride. Pl. Decl., Exs. B, E, G, M.

12.    ***The receptors.*** The facility is across the lot line from the Santa Clara Square Apartments, approved at up to 1,840 units (340 occupied as of 2019). Pl. Decl., Exs. O, B at 00003290. Apple's RMP Comp dispersion modeling places its arsine worst-case toxic endpoint at 1.1 miles, encompassing 5,343 residents (not including the apartments – which they excluded from the analysis) in 1,787 housing units, an amusement park, a college, places of worship, the San Tomas Aquino Creek Trail, VTA Light Rail, and Highway 101; ammonia worst case at 0.3 miles (only 340 occupied apartments and a Whole Foods); chlorine worst case at 0.2 miles. Pl. Decl., Ex. B at 00003290, 00003296, 00003304. A pending Builder's Remedy application seeks approval for an additional 166-unit five-story residential building at 3240 Scott Boulevard, immediately across the lot line. Pl. Decl., Ex. D. The 2015 EIR documented that the City Fire Marshal had identified the need for additional hazardous-materials response capacity before approval of the adjacent residential development. Pl. Decl., Ex. S.

13.    Adjacent to the facility are public parks (Meadow Park, Creekside Park), a children's playground, an urgent care clinic, restaurants, places of worship including a Family Prayer House with a nursery, and the Redwood and San Tomas Aquino Creek Trails. The Granada

Islamic School (Muslim Community Association), enrolling up to 900 pre-K through eighth-grade students within Apple's arsine plume, operates a Shelter-in-Place plan that — in a chemical emergency — directs the children to evacuate to Meadow Park, directly across the street from the facility. The evacuation route runs the children toward the source. The facility itself bears no public identification of the operator and no street-visible warning signs; the only hazard signage is an NFPA fire diamond visible only from the parking lot, displaying three "4" ratings — the highest on the NFPA scale – which Apple forbid the public from photographing. Zeltzer Decl. ¶¶ 17-19.

14.     *The receiving waters.* The facility sits adjacent to and atop multiple waters of the United States. The San Tomas Aquino Creek runs along the eastern property line approximately 700 feet from the facility, flows north to Guadalupe Slough, and continues into the San Francisco Bay; it is 303(d)-listed and recent iNaturalist sightings document Chinook Salmon (*Oncorhynchus tshawytscha*) immediately adjacent the facility. Am. Compl. ¶¶ 69–77. The plant's stormwater is released to San Tomas Creek. Plaintiff personally observed visibly polluted conditions in the Creek immediately downstream of Apple's stormwater outfall on multiple occasions in 2026 — froth, bubbles, and chemical-mess conditions during dry-weather flow — and conducted field measurements documenting anomalously alkaline pH (8.9–9.4), elevated TDS, alkalinity above 240 ppm, and total chlorine in the 3-10 ppm range. Pl. Decl. ¶¶ 47-51; Exs. F, N. The Saratoga Creek system historically flowed across what is now Apple's facility; the City unlawfully filled the surface portion in approximately 1960-1980, and the aquifer beneath the fill remains active, with multiple monitoring wells documenting pressurized hydrothermal flow continuing northward toward the Bay. Am. Compl. ¶¶ 78–105.

15.     The unpermitted fill is a continuing violation each day it remains in place. *Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993). The active aquifer beneath the fill is itself a jurisdictional Water of the United States into which Apple is currently discharging. Plaintiff personally located and photographed an active outlet of the Saratoga Creek system just under Highway 101, north of Scott Boulevard, with visible flowing water during dry-weather conditions. Pl. Decl. ¶ 46; Ex. F. Underground waters part of a continuous flow path to traditional navigable waters remain within CWA jurisdiction. *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007); *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001). The pressurized

artesian aquifer at approximately 35 feet below grade has carried documented and increasing head pressure since 1988 — the Honeywell well MW-03B1 went from 19 feet depth-to-water in 1988 to zero by 1995, with water rising 100 feet up the well shaft and spilling upward; the 2015 Geotechnical Investigation documented four pressurized springs with measured pressure sufficient to drive the water column 10 to 13 feet above grade if uncapped. Am. Compl. ¶¶ 96–105. Apple's facility — handling silane, dichlorosilane, silicon tetrachloride, the pyrophoric organometallics, and 49% hydrofluoric acid — sits directly above this pressurized aquifer.

16.    ***Pre-suit notice and meet-and-confer.*** Plaintiff served pre-suit notice under RCRA § 6972(b)(2)(A), CAA § 7604(b)(1)(A), and CWA § 1365(b)(1)(A) on June 30, 2025; notice periods have elapsed; no court action by EPA or the State is pending against any Defendant. ECF Nos. 3-0, 3-1 (Sixty-Day Notice and certificate); ECF Nos. 10, 14, 19, 48-1, 48-2, 55, 66 (proofs of service and revised notice). On September 25, 2025, Plaintiff offered all three Defendants a comprehensive stipulated interim injunctive proposal — air-emission and sewer monitoring with auto-shutoff alarms, public warning signage, basic operator-identification signage, completion of unfiled hazardous-substance permits, independent professional-engineer assessments, monthly compliance reporting — none requiring admission of liability. Pl. Decl. ¶¶ 26-A–26-B; Ex. R. None of the three Defendants offered a counter-proposal or agreed to any specific element.

## III.    <u>LEGAL STANDARD</u>

17.    A preliminary injunction is appropriate where the plaintiff shows likelihood of success on the merits, likelihood of irreparable harm, balance of equities tipping in plaintiff's favor, and that the injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The Ninth Circuit's "serious questions" sliding scale survives *Winter* v. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32, 1135 (9th Cir. 2011) (en banc). Environmental injury "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Cottrell*, 632 F.3d at 1135. Where any element of relief is mandatory, the heightened standard requires that "the law and facts clearly favor the moving party." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

18.     RCRA § 6972(a)(1)(B) authorizes citizen suits against any past or present generator, transporter, or owner-operator who has contributed or is contributing to handling, storage, treatment, transportation, or disposal of any solid or hazardous waste "which may present an imminent and substantial endangerment to health or the environment." The standard is precautionary: "may present" requires only a "reasonable prospect that a serious, near-term threat to human health or the environment exists" (*Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006)); "imminent" refers to the nature of the threat, not when it arose, and "[a]n imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public" (*Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)); "substantial" means "serious" (*Cox v. City of Dallas*, 256 F.3d 281, 300 (5th Cir. 2001)). For non-operator contributors, the Ninth Circuit requires "active control over the means of disposal." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850–51 (9th Cir. 2011). Federal courts have ordered substantial mandatory and prohibitory relief in RCRA endangerment cases. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005); *United States v. Power Eng'g Co.*, 191 F.3d 1224, 1230 (10th Cir. 1999); *Cmty. Ass'n for Restoration of the Env't v. Cow Palace, LLC*, 80 F. Supp. 3d 1180 (E.D. Wash. 2015). The Ninth Circuit's *Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019 (9th Cir. 2014), holding that pure aerial emissions alone do not constitute "disposal" does not affect this case, which rests on hazardous-waste handling, treatment without permit, ground-water and stormwater pathways, and migration from the adjacent Synertek Superfund TCE/DCE plume — each within RCRA's "disposal" definition.

19.     The CAA citizen suit, 42 U.S.C. § 7604, authorizes private enforcement against any person violating an emission standard or limitation, including conditions of locally-delegated permits issued under federally-approved SIP authority (including BAAQMD Regulations 8-30, 2-1-301, 2-1-302, and 9-7-307), and against any person who constructs or operates an emission source without a required permit. § 7604(a)(1), (3). Section 112(r)(1) imposes a general duty on owners of stationary sources handling extremely hazardous substances to identify hazards, design and maintain a safe facility, and minimize release consequences. Standing is "easily met" with documented sore throat, respiratory problems, fear for health, avoidance of the source, and improvement of symptoms upon moving away. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,

968 F.3d 357, 366–69 (5th Cir. 2020) (en banc).

20.    The CWA citizen suit, 33 U.S.C. § 1365, reaches violations of § 1311 (unlawful-acts), § 1317 (pretreatment standards), and § 1342 permit conditions; § 1319(f) imposes affirmative enforcement duties on POTW owners with knowledge of § 1317 violations; permits are required for "the functional equivalent of a direct discharge" through groundwater or other indirect pathways. *Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183 (2020).

21.    California Civil Code § 3479 defines a nuisance to include "[a]nything which is injurious to health . . . or is . . . an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." § 3480 defines public nuisance affecting "an entire community or neighborhood, or any considerable number of persons." § 3490: "No lapse of time can legalize a public nuisance." § 3493 authorizes private actions for special injury. California public nuisance reaches nuisance per se (statutory violation), nuisance in fact (*People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1103–05 (1997); *People v. ConAgra Grocery Prods.*, 17 Cal. App. 5th 51, 79 (2017)), and absolute nuisance via strict liability for ultrahazardous activity (*Luthringer v. Moore*, 190 P.2d 1 (Cal. 1948); *McIvor v. Mercer-Fraser Co.*, 76 Cal. App. 2d 247, 254 (1946)). A public entity is reachable as a public nuisance defendant. *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931–36 (1972); Cal. Gov't Code §§ 811.2, 815, 945.

## IV.    <u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

### A. <u>RCRA § 6972(a)(1)(B) — Imminent and Substantial Endangerment</u>

22.    Plaintiff is overwhelmingly likely to succeed on the merits of the RCRA endangerment claim. EPA has determined the facility's hazardous waste codes include D001, D002, D003, D004, D011, D035, F003, and F005. ECF No. 48-4 (CAFO ¶ 27). Apple is a Large Quantity Generator. *Id.* ¶ 28. Annual hazardous waste generation totals approximately 98.4 million pounds. ECF No. 3-0 at 00003211. The threshold is met without controversy.

23.    ***The chemicals are inherently capable of mass-casualty harm.*** The targeted hazard inventory includes substances whose properties — without controls functioning correctly — produce death, irreversible injury, or fireball explosions in residential areas. Arsine (120 lb onsite) has a NIOSH IDLH of 3 ppm; it is odorless at lethal concentrations, causes intravascular hemolysis

with delayed multi-organ failure, and has no effective antidote. The DOT Emergency Response Guidebook protective-action distance for a small arsine release is approximately 528 feet — exceeding the distance to occupied residential units across the lot line. Phosphine (41-lb cylinders) has an IDLH of 50 ppm and OSHA PEL of 0.3 ppm; no antidote. Chlorine (400 lb onsite) is regulated as a chemical warfare agent under 33 U.S.C. § 1311(f); IDLH 10 ppm; ERG protective-action distance of 528 feet for small releases, more than four miles for large. Hydrogen fluoride (49% concentration) causes systemic fluorosis and cardiac arrhythmia at small surface-area exposures; ERG distance 3,168 feet. Fluorine has an IDLH of 25 ppm. The pyrophoric organometallics — trimethylaluminum and diethyl zinc — ignite violently in air and water respectively. Silane and dichlorosilane are pyrophoric and can produce fireball detonation. The facility also stores 7,500 gallons of hydrogen on the exterior gas pad. Pl. Decl., Exs. B, E, G, M-1. Each ERG protective-action distance for the substances Apple holds reaches or exceeds the distance from the facility to occupied residential units across the lot line. The receptor geography is, as a matter of physical measurement, within the hazard envelope.

24.    ***The operator's own engineers admit failure modes producing injury or fatality to neighbors.*** The September 2020 PHA Revalidation, prepared by Apple's retained consultant and signed under penalty, identifies specific failure modes and assigns to each consequence column the phrase "personnel exposure resulting in injury and/or fatality (site personnel or neighbors)." The phrase appears across at least eleven distinct nodes — toxic gas leak (arsine, phosphine), fire, explosion, hostile act/sabotage, truck fire, arsine and chlorine fire/explosion/sabotage, and bulk ammonia fire/explosion/sabotage/truck fire — at PHA nodes Q1, Q10, Q11, Q13, Q14, Q15, Q41–Q45, Q80–Q82, and Q92–Q93. Pl. Decl., Ex. E at 00003386, 00003388, 00003392, 00003393, 00003402, 00003432–34, 00003447–48, 00003614–17.

25.    The operator further withheld Group 2 (pyrophoric MOCVD organometallic precursors), Group 4 (HPM tool abatement and facility exhaust), Group 5 (HPM liquid abatement), and Group 6 (wastewater system) hazard analysis tables from the version of the PHA sent to the SCFD — the regulator that, the PHA elsewhere acknowledges, specifically requested coverage of the wastewater system. *Id.* at 00003363, 00003369, 00003374. *Mallinckrodt*'s "reasonable prospect that a serious, near-term threat to human health or the environment exists" is established

on the operator's own document. 471 F.3d at 296.

26.    ***Apple's own RMP\*Comp dispersion modeling places acutely toxic plumes over thousands of residents.*** The 1.1-mile arsine, 0.3-mile ammonia, and 0.2-mile chlorine worst-case toxic endpoints are calculated by Apple's own consultant. The CalARP Administering Agency that received the modeling — the SCFD — has formally written that the operator's plume models *"are not favorable for this area"* and on June 17, 2025 withheld fire-department approval of an adjacent residential project pending environmental review. Pl. Decl., Ex. D.

27.    ***The catastrophic-incident pathway is acute and increasing.*** The pressurized artesian aquifer at approximately 35 feet bgs carries documented and increasing head pressure since 1988, with measured pressure under current conditions sufficient to drive the water column 10 to 13 feet above grade if uncapped. Apple's facility — handling water-reactive and pyrophoric chemicals (silane, dichlorosilane, silicon tetrachloride, trimethylaluminum, diethyl zinc) and 49% hydrofluoric acid — sits directly above this system. The geotechnical engineers' only mitigation recommendation: "if excavations are not made into the sand and gravel layer approximately thirty-five feet bgs… the artesian condition should not affect the project." Am. Compl. ¶ 105. Apple has known of the increasing aquifer pressure since 2015 and has done nothing.

28.    ***The release pathways are documented in operation.*** Eleven incidents at the facility between June 2016 and May 2024 establish a recurring cadence across every category of engineered control: a June 2016 cooling water release to the storm drain (Doc L #1657490); a June 2019 silane and phosphine release Apple's emergency response team characterized as *"a normal process for them"* (SCFD #2019-1904285); an October 2019 phosphine spike at 3.3× OSHA PEL from mechanical failure (#2019-1908541); a July 2020 TEOS release at 17.5 ppm from plumbing installed backward (#2020-2005200); the April 2021 phosphine release that passed through scrubbers and into the lab via HVAC (CAL OES Reportable; #2021-2103124); the April 2022 5% fluorine release *"evacuated to atmosphere as designed"* (#2022-2203209); the May 2022 hexafluorobutadiene release from primary and secondary cylinders simultaneously (#2022-2204500); chlorine alarms in August 2023 (#2023-2306933) and December 2023 at 0.65 ppm (#2023-2310880); a worker hospitalized for HF dermal exposure (#2023-2307611); and a worker exposed to HCl gas in May 2024 (#2024-2404731). Pl. Decl., Exs. J, L. The pattern includes

scrubber failure, designed atmospheric release, mechanical failure of containment, installation deficiency, simultaneous failure of redundant primary and secondary controls, and direct worker exposure — five chemical-release events in the past three years alone. Plaintiff's documented chemical-exposure injuries during her 2020 residence at the Apartments — blood and urine testing showing arsenic, mercury, toluene, and xylenes; 3 AM symptoms consistent with arsine and phosphine exposure; symptom remission upon relocation — are traceable to the same facility through the same pathways. *Env't Tex.*, 968 F.3d at 366–69; *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000).

29.    ***The safety controls the law requires are documented across seven regulators to be failing.*** Apple's own retained consultant — BSI EHS Services and Solutions — affirmatively marked seventeen findings "Not Compliant" in the April 2019 RMP Audit, including: no employees had completed required emergency response training four years into operation; SOPs for arsine and chlorine lacked emergency procedures; Management of Change training had not been delivered; the Construction Contractor Safety Program was not implemented; and contractor training on covered processes was nonexistent. Pl. Decl., Ex. C at 00003228–230, 00003253. PHA action items remain open five years past their certified completion date. Pl. Decl., Ex. E at 00003515–22. EPA's April 2024 inspection identified 19 Potential Violations, 14 still outstanding when the NOV issued — including the still-outstanding RCRA § 3005 violation in PV #6 (Apple "*improperly treating the waste . . . by diluting the solvent waste with water and other wastes");* Subpart BB leak detection calibrated only 1 of 34 times on a day of monitoring use over four years (PV #17); fifteen weekly RCRA inspections missed in 2023 including twelve consecutive weeks immediately before EPA arrived (PV #16); forty-eight daily tank inspections missed on weekends (PV #18); Subpart CC applicability for SW-TNK-2 and SW-LS never evaluated (PV #19); activated carbon abatement neither permitted nor managed (PVs #7, #11); and 228 D001 ignitable hazardous-waste manifests shipped off-site as Non-RCRA between June 2022 and December 2023 (PVs #14, #15). ECF No. 48-4 (EPA April 30, 2024 Compliance Inspection Report).

30.    Apple's own sworn submissions to BAAQMD across three reporting cycles document order-of-magnitude reporting variance. The January 2023 submission reported 0.0147 lb of arsine, 0.1344 lb of phosphine, 0.0091 lb of boron trichloride, and 0.0007 lb of silane at the

S-1 R&D Facility — yet *the same submission* reported 12,722 therms of natural gas across five Thermal Processing Units, the abatement infrastructure required by Permit Condition 26031 to operate at 1,400°F, which does not run unless process gas exists to abate. Pl. Decl., Ex. X. The same-document contradiction forecloses any "small-R&D-scaled-up" rebuttal at the document level. The 2023 submission, filed February 21, 2024 — *after* EPA's August 2023 and January 2024 inspections — reported 154 lb of arsine, 280.8 lb of phosphine, 10.4 lb of boron trichloride, and 0.4713 lb of silane. Pl. Decl., Ex. V. Apple's reporting before EPA intervention bore no consistent relationship to what Apple subsequently certified. BAAQMD itself withheld its own records from federal criminal investigators: when EPA's Criminal Investigation Division contacted BAAQMD in August 2024, BAAQMD "did not have an inspection report from their most recent inspection in 2023 and only had an internal 'inspection summary' which they could not provide" and "expressed reservations about providing the most recent air permit." Pl. Decl., Ex. Z.

31.    The SCFD has documented since August 2016 that Apple has failed to make its HMBP readily available to emergency response personnel. Pl. Decl., Ex. K (Violation #1010017); Cal. H&SC § 25505(c). The October 2020 SCFD inspection found Apple's CERS chemical inventory reported zero chlorine while the RMP showed 400 lb in two Program Level 3 processes. *Id.* (Violation #1010004). CalEPA's September 2024 CUPA Corrective Action Report found the City was not following up on Hazardous Waste Generator violations, was not ensuring HMBP compliance, was not inspecting CalARP stationary sources, and was not regulating all facilities subject to the Hazardous Waste Generator Program. Am. Compl. ¶ 47. The County's Toxic Gas Ordinance permitting regime has no records — the SCFD's PRA response: "*Fire Department was unable to locate records under the 'Toxic Gas System (i.e., SCCO B11-380)' designation.*" Pl. Decl., Ex. H. Every category of safety control the law requires is documented to be failing.

32.    ***Each Defendant has contributed within § 6972(a)(1)(B).*** *Apple Inc.* generated all hazardous waste at the facility, registered as the Large Quantity Generator under EPA ID CAR000278176, holds the wastewater discharge permit SC-461B and BAAQMD air permit Plant #22839, and signed the federal CAFO. Apple's contribution is direct and undenied. *The Property Owner Defendants* (Khalil Jenab et al.) own 3250 Scott Boulevard, signed the April 2022 Stormwater Maintenance Responsibility agreement with the City, and own the adjacent 3050

Coronado Drive — the Synertek CERCLA Superfund site. Am. Compl. ¶¶ 53–58. The Property Owners refused EPA's requested Land Use Covenant deed-restriction updates for the Synertek site — combined with his ability to rent to another tenant for the same high-risk activities, supports *Hinds*'s "active control over the means of disposal" requirement. *Id.* ¶ 57; 654 F.3d at 850–51. RCRA reaches owners "*who fail to abate an existing hazardous condition of which [they are] aware*," and "*contributing to*" is broadly construed. *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1382–84 (8th Cir. 1989).

33.     *The City of Santa Clara* voluntarily assumed the role of Certified Unified Program Agency (SCCC 15.60.020), making itself the delegated enforcement authority for federal hazardous materials, hazardous waste, RCRA, CalARP, and petroleum storage at this facility; CUPA enforcement is mandatory (Cal. Code Regs. tit. 27 § 15330); the City has demonstrably abandoned that responsibility per CalEPA's September 2024 Corrective Action Report. The City further concealed Apple's CalARP-regulated status from the 2015 EIR (Am. Compl. ¶¶ 144–152); operates and advertises public parks and playground next door with no warnings; and approved high-density residential adjacent to a high-hazard facility in violation of its own General Plan setback rule. RCRA reaches a governmental defendant whose conduct contributes to endangerment through deficient oversight. *Cox*, 256 F.3d at 292; *Aceto*, 872 F.2d at 1383.

34.     ***The diligent prosecution bar does not apply.*** RCRA § 6972(b)(2)(B) bars citizen suits only where EPA or the State has commenced and is diligently prosecuting an action under § 7003 or CERCLA § 106; none of the predicate circumstances exists here. The Ninth Circuit holds that an administrative penalty order does not trigger the bar; only a court action does. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 873–75 (9th Cir. 2013). The October 2025 EPA CAFO is administrative; the August-September 2024 BAAQMD violations are administrative; no judicial action is pending. The CAFO expressly preserves further federal enforcement: "*Full compliance with this CA/FO shall only resolve Respondent's liability for federal civil penalties for the violations specifically alleged herein and does not in any case affect the right of the EPA to pursue appropriate injunctive or other equitable relief or criminal sanctions.*" ECF No. 48-4 (CAFO ¶ 51). The bar applies only to commencement, not continuation. *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491–94 (7th Cir. 2011). The parallel CAA bar requires

a court action; an administrative matter does not trigger it. *Group Against Smog & Pollution v. Shenango, Inc.*, 810 F.3d 116, 123–27 (3d Cir. 2016). The CWA injunctive-relief bar at § 1319(g)(6)(A) is limited to civil-penalty claims and does not bar suits for injunctive relief. *Blackstone Headwaters Coal. v. Gallo Builders*, 32 F.4th 99 (1st Cir. 2022) (en banc).

35.    The principal remaining adverse RCRA-PI authority is *LAJIM, LLC v. General Electric Co.*, 917 F.3d 933, 944 (7th Cir. 2019) (holding injunctive relief discretionary where existing oversight is adequate). Existing oversight here is demonstrably inadequate. EPA's first-ever inspection of the facility — eight years into operations — was triggered by Plaintiff's tip, not autonomous regulatory function. Pl. Decl., Ex. U. EPA's Criminal Investigation Division opened a separate criminal investigation in August 2024 based on the same Plaintiff tip; the EPA Region 9 enforcement attorney's career had not previously presented conduct rising to the level of parallel civil-criminal coordination. Pl. Decl., Ex. Z. BAAQMD obstructed the federal criminal investigator's access to its own records. The CalARP AHJ has formally questioned the safety case; the CUPA is under State Corrective Action; EPA's still-outstanding findings remain unresolved; BAAQMD's violations remain Pending sixteen months later; the County Toxic Gas Ordinance regime has no records. The pattern is deficient and reactive, not preventive. Citizen-initiated agency action is the precise circumstance Congress contemplated when it preserved citizen-suit rights through the statutory diligent-prosecution carve-outs.

## B. CAA § 304 — Citizen Enforcement

36.    Plaintiff is overwhelmingly likely to succeed on the merits of the Clean Air Act claim. There are open BAAQMD air pollution violations and partially settled federal RCRA air-related violations. The October 2025 POTW inspection — the most recent comprehensive regulatory characterization — describes Apple's operations as wafer preparation, lithography, layering, doping, polishing, grinding, testing, and bonding with cleanroom gases including HCl, ammonia, chlorine, disilane, boron trichloride, silicon tetrachloride, dichlorosilane, and trifluoromethane, and trimethylaluminum used in MOCVD reactors. Pl. Decl., Ex. G at 9–10. These are the operations Regulation 8-30-210 expressly defines. The BAAQMD Permit Handbook § 7.4 confirms applicability; the BACT/TBACT Workbook framework establishes that BACT

applies separately to three source categories within any fab — photoresist operations, solvent cleaning stations, and siliconizing reactors/furnace chambers/vapor deposition — and Apple's operations include source points in all three.

37.    Section 7604(a)(3) authorizes citizen suits against any person who constructs or operates an emission source without a required permit. BAAQMD Regulations 2-1-301 and 2-1-302 are SIP-approved conditions enforceable through § 7604. BAAQMD's own May 2024 Engineering Evaluation states the S-3 Solvent Waste Tank *"has been unpermitted since 7/15/2017."* Pl. Decl., Ex. M-3. Apple did not apply for the BAAQMD permit until September 13, 2023 — *after* EPA's August 2023 inspection identified the uncontrolled venting condition. Four months after issuing the May 2024 permit, BAAQMD cited Apple under Reg 2-1-301 (Violations A64215A, A64216A) and Reg 2-1-302 (Violations A64215B, A64216B) for additional unpermitted sources beyond the S-3 tank. Pl. Decl., Ex. Y. At every regulatory engagement, BAAQMD has discovered emission sources Apple was operating without authorization that Apple had not affirmatively disclosed.

38.    Section 7604(a)(1) reaches violation of permit terms and emission limits. BAAQMD Rule 9-7-307 establishes Final Emission Limits in the Bay Area, a federal nonattainment area for ozone. NOx is an ozone precursor; CO and $NO_2$ are regulated criteria pollutants. BAAQMD's September 12, 2024 inspection cited Apple under Rule 9-7-307.1 — Violations A64218A and A64219A. Pl. Decl., Ex. Y. Both remain Pending. Apple's own sworn 2024 throughput report documents independent exceedances of multiple permit caps. Apple's EHS Lead, Kevin Sung, certified under penalty of law on February 12, 2025 that for the 12-month period ending December 31, 2024, the S-1 R&D Facility used arsine at 143.5 lb against the 78 lb/yr permit cap (84% over), phosphine at 317.9 lb against the 198 lb/yr cap (61% over), and boron trichloride at 9.24 lb against the 1 lb/yr cap (824% over). Pl. Decl., Ex. W; Ex. M-1 (Permit Condition 26031 ¶ 1d). Each is a documented violation of an "emission standard or limitation" under § 7604(f) on the operator's own sworn certification.

39.    The structural emission control architecture has documented gaps. The activated carbon canister on the S-3 tank was, EPA found, *"neither permitted under CAA nor managed under RCRA"* (PV #7); the rooftop activated carbon boxes were sized using miscalculated breakthrough

times, releasing VOCs uncontrollably to atmosphere when overwhelmed (PV #11); two additional tank systems (SW-TNK-2 and SW-LS) have never been evaluated for whether they require air emission controls (PV #19); the Subpart BB leak detection monitoring required to identify undetected emissions was non-functional under the regulation for four years (1 of 34 calibrations on day of use) (PV #17). ECF No. 48-4 (each still outstanding). The cabinet ventilation system has a designed atmospheric-release pathway documented in operation. Pl. Decl., Ex. J Incidents 5, 7, 9. The operator's own engineering team admits routine failure modes — fan failure, pump failure, water loss, pH adjust failure, treatment chemical exhaustion, control failure, EMO activation, missed preventive maintenance, power failure — produce "*Exceedance of emissions limits with potential permit violation.*" Pl. Decl., Ex. E at 00003478, 00003480–81, 00003490, 00003494, 00003498, 00003501–02.

40.    Section 112(r)(1) — the General Duty Clause — applies to the extremely hazardous substances at this facility. The seventeen Not Compliant findings in BSI's 2019 Audit, the open PHA action items, the non-functional Subpart BB leak detection, the unavailable HMBP, the falsified CERS submission, the seven-year unpermitted S-3 tank, and the still-pending August-September 2024 BAAQMD violations are each, individually and collectively, failures of the duty to identify hazards, design and maintain a safe facility, and minimize the consequences of releases. EPA has consistently treated General Duty Clause violations as the basis for substantial enforcement actions. *See, e.g.*, *EPA v. Pacific Gas & Elec. Co.* (2025);[1] *EPA v. Sasol Chemicals* (2024);[2] *EPA v. Dyno Nobel* (2024);[3] *EPA v. Nalco* (2025).[4]

41.    Plaintiff has Article III standing for the CAA citizen suit. Plaintiff lived at the Santa Clara Square Apartments from February through October 2020 and now resides in San Jose. Pl. Decl. ¶¶ 2–4. During her residence at the Apartments, she suffered severe chemical exposure

[1] US EPA, First-Ever Accidental Release Rule Settlement Reached with Pacific Gas & Electric, https://www.epa.gov/newsreleases/first-ever-accidental-release-rule-settlement-reached-pacific-gas-electric
[2] US EPA, EPA Announces $1.4M Settlement with Sasol Chemicals for Alleged Chemical Accident Prevention Violations at Westlake, La., Facility, https://www.epa.gov/newsreleases/epa-announces-14m-settlement-sasol-chemicals-alleged-chemical-accident-prevention
[3] US EPA, EPA requires Dyno Nobel, Inc. to correct Clean Air Act violations at Cheyenne plant, https://www.epa.gov/newsreleases/epa-requires-dyno-nobel-inc-correct-clean-air-act-violations-cheyenne-plant
[4] US EPA, EPA Reaches Settlement with Nalco Production and Nalco Co. for Alleged Clean Air Act Violations in Chicago, https://www.epa.gov/newsreleases/epa-reaches-settlement-nalco-production-and-nalco-co-alleged-clean-air-act-violations

injuries documented in extensive medical records, including blood and urine tests showing arsenic and arsine gas, mercury, toluene, and xylenes; emergency room and urgent care visits; and 3 AM symptoms consistent with arsine and phosphine exposure. *Id.* Standing is "easily met" with sore throat, respiratory problems, fear for health, avoidance of the source, and improvement of physical symptoms upon moving away. *Env't Tex.*, 968 F.3d at 366–69.

42.     Two separate federal regulators have independently characterized Plaintiff as the source of the tip leading to federal action against the facility — the August 1, 2023 EPA Region 9 internal email identifies Plaintiff as "potentially exposed to air emissions from this location" (Pl. Decl., Ex. U); the August 7, 2024 EPA Criminal Investigation Division email opening the criminal investigation identifies the source as "a tip from a citizen . . . concerned about several potential CAA violations from an Apple Inc. facility" (Pl. Decl., Ex. Z). Plaintiff is local and is still actively involved in monitoring, investigating, and organizing with the community around this site.

## C. <u>CWA § 505 — Citizen Enforcement</u>

43.     Plaintiff is likely to succeed on the merits of the Clean Water Act claim. Apple is a categorical industrial user under 40 CFR Part 469, classified as such by the City of San José POTW Source Control program at the May 2016 inspection and confirmed in October 2020 and October 2025. Pl. Decl., Ex. G at 5. Apple discharges approximately 96.7 million pounds per year of corrosive waste through the AWN system to the POTW.

44.     Section 1311(a) and § 1317 pretreatment violations occur through Apple's dilution-based discharge architecture. The 2020 PHA admits *"Higher concentration in discharge to AWN and/or flow of makeup water"* as a documented consequence of power failures for both corrosive and ammonia systems, and that operations are calibrated to permit-edge levels with rinse cycles *"determined by AWN system parameters and regulatory limits (fluorides)."* Pl. Decl., Ex. E at 00003481, 00003502, 00003541. Apple's "95% water" admission to BAAQMD in March 2024 confirms the dilution practice. Pl. Decl., Ex. M-4. EPA's still-outstanding PV #6 captures the same conduct: *"improperly treating the waste . . . by diluting the solvent waste with water and other wastes."* ECF No. 48-4. The 228 D001 manifests shipped as Non-RCRA "Water with Solvents" between June 2022 and December 2023 document the same dilution practice on the off-site side.

Apple's own SC-461B monitoring submissions document specific contaminant concentrations — ammonia up to 185 mg/L; arsenic, copper, chromium, zinc; elevated BOD; samples reported "*light grey*," "*dark grey*," "*yellow*," with "*particulate/floc*"; and trichloroethylene (TCE) — a IARC Group 1 human carcinogen — first detected at 24 µg/L in 2017 and intermittently thereafter. Pl. Decl., Ex. T. TCE does not appear in any Apple chemical inventory, RMP submission, BAAQMD permit application, or hazardous waste manifest, supporting the inference Apple was using TCE undisclosed and disposing through the wastewater pathway. The Regional Wastewater Facility has no corresponding records for the post-2023 period — the lab-testing that produced the earlier contamination evidence has not been continued. Pl. Decl., Ex. AA.

45.    The pretreatment system has never been comprehensively inspected. The 2015 inspections were pre-operational; the 2016 inspection was post-startup; at the October 26, 2020 inspection, "*Was the Inspector allowed to enter the facility? No*" (Pl. Decl., Ex. G at 6); and at the October 21, 2025 inspection — the most recent — "*Due to time limitations, the bulk chemical waste storage bunkers were not inspected*" (*Id.* at 11). At least nine major system components have never been independently verified by an outside regulator. The operator's permit applications have been documented as materially inaccurate at three of five POTW inspections. *Id.* at 6, 9.

46.    Storm drain release pathways and field-observed receiving-waters conditions further support the claim. Apple's own engineering admissions establish "*Storm drain contamination/release*" as a recognized consequence at chemical receipt at loading dock, manual handling, and tanker fill. Pl. Decl., Ex. E at 00003505, 00003567, 00003568. The October 2025 POTW inspection confirms storm drains adjacent to hazardous waste storage bunkers. Pl. Decl., Ex. G at 10. The City Stormwater Inspector documented a confirmed cooling water release to the storm drain on June 9, 2016. Pl. Decl., Ex. L.

47.    Plaintiff personally observed visibly polluted conditions in San Tomas Aquino Creek immediately downstream of Apple's stormwater outfall on multiple occasions in 2025 — froth, bubbles, and chemical-mess conditions during dry-weather flow — and conducted field measurements documenting anomalously alkaline pH (8.9–9.4), elevated TDS, alkalinity above 240 ppm, and total chlorine in the 3-10 ppm range. Pl. Decl. ¶¶ 47-51; Exs. F, N. While the Creek receives water from multiple watersheds, the field observations establish anomalous chemistry

consistent with industrial discharge influence in a § 303(d)-listed water of the United States immediately downstream of Apple's documented stormwater pathway.

48.     The Saratoga Creek system is itself a water of the United States. The historic surface flow extended directly under Apple's facility; the aquifer beneath the surface fill remains active, with multiple monitoring wells documenting pressurized hydrothermal flow continuing northward toward the Bay. Am. Compl. ¶¶ 78–105. Plaintiff personally observed and photographed the Saratoga Creek system's active outlet just under Highway 101, north of Scott Boulevard, with visible flowing water during dry-weather conditions. Pl. Decl. ¶ 46; Ex. F. Underground waters part of a continuous flow path to traditional navigable waters remain within Clean Water Act jurisdiction. *Moses*, 496 F.3d 984; *Headwaters*, 243 F.3d 526. Permits are required for "the functional equivalent of a direct discharge" through groundwater or other indirect pathways. *Cnty. of Maui*, 590 U.S. at 183. Apple's stormwater and emissions deposit on the surface above the aquifer; Apple's hazardous waste storage bunkers are located adjacent to multiple storm drains. Cumulative to the §§ 1311(a) and 1317 violations, § 1311(f) absolutely prohibits the discharge of any chemical warfare agent into the navigable waters of the United States; chlorine is so regulated; Apple has 400 pounds onsite. Pl. Decl., Ex. B at 00003274.

49.     The cross-connection drinking water pathway provides further evidence. In July–August 2019, a resident at the Santa Clara Square Apartments reported water frequently colored blue with copper at 4.55 PPM and lead at 0.024 PPM; the City's August 2019 testing of two units confirmed elevated copper at 900 μg/L and 480 μg/L and lead at 7.5 μg/L. Am. Compl. ¶¶ 190–191. Apple has a February-March 2018 backflow preventer failure at Montgomery/Coronado between the facility and the resident's apartment. *Id.* ¶ 271. In July 2023, residents on Octavius Drive reported chlorine smell in drinking water for six months and ammonia smell in the previous two-three weeks. *Id.* ¶ 273. *Cnty. of Maui*, 590 U.S. at 183. The City's recycled water system carries treated wastewater from the regional facility back to public parks, the children's playground, and apartment landscaping immediately adjacent to Apple. Am. Compl. ¶ 279.

50.     Section 1319(f) imposes an affirmative enforcement duty on owners of treatment works with knowledge that an industrial user is violating § 1317. The City of Santa Clara, co-owner of the San José/Santa Clara Regional Wastewater Facility, has knowledge of the operator's

pretreatment violations through the chronic permit application inaccuracy findings, the 2016 stormwater inspector report, and the documented chemical inventory disclosure failures. The City's failure to commence appropriate enforcement action authorizes this citizen suit.

### D. California Public Nuisance — Civil Code §§ 3479, 3480, 3491, 3493

51.     Plaintiff is overwhelmingly likely to succeed on the public nuisance claim under each of three independent doctrinal pathways. Apple's conduct violates federal RCRA, CAA, CWA, and EPCRA, plus Cal. H&SC § 6.95, California Fire Code § 5003.3 ("Hazardous materials in any quantity shall not be released . . . into the atmosphere") and §§ 6004, 6005, SCCOC Chapter B11 (post-Bhopal Toxic Gas Ordinance), SCCC Chapter 8.30, SCCC §§ 13.10.300, 13.10.340, 13.10.550 (wastewater discharge violations declared public nuisances per se), and Santa Clara General Plan Policy 5.3.5-P19 (500-foot residential setback for hazardous use, which the SCFD itself documented Apple violates: "general plan says hazardous use shall not be within 500 feet of site." Pl. Decl., Ex. D at 1). *ConAgra* affirmed a $1.15 billion abatement fund for community-wide hazardous-substance exposure (17 Cal. App. 5th at 79); the gravity of harm here — engineering admissions of failure modes producing injury or fatality to neighbors, dispersion modeling placing acutely toxic plumes over thousands of residents, eleven documented incidents over eight years, two confirmed worker chemical-exposure hospitalizations, drinking water contamination evidence — overwhelms any utility analysis. *Acuna*, 14 Cal. 4th at 1103–05. *Luthringer*, 190 P.2d 1, controls; the activity here (chlorine handled as a chemical warfare agent, pyrophoric organometallics, water-reactive compounds, 49% hydrofluoric acid in proximity to dense residential land use) falls squarely within that framework. The mere apprehension of injury from a dangerous condition may itself constitute a nuisance. *McIvor*, 76 Cal. App. 2d at 254.

52.     Plaintiff's special injury under § 3493 is established by documented chemical-exposure injuries qualitatively distinct from the general public's. *Birke*, 169 Cal. App. 4th at 1548; *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986); Restatement (Second) of Torts § 821C cmt. d. The City of Santa Clara is reachable as a public nuisance defendant at the very least. *Nestle*, 6 Cal. 3d at 931–36; Cal. Gov't Code §§ 811.2, 815, 945. The City's April-May 2025 General Plan amendment proceedings supply party admissions: the Planning Commission

and City Council formally and on the record characterized the location as "*not an appropriate area for housing*"; "*we do not want housing there*"; "*not good land use, planning, or a good neighborhood*"; "*you cannot have housing in the middle of an industrial area.*" Am. Compl. ¶¶ 331–376. These are admissions by the City defendant that the use it has long approved and continues to approve violates the duty owed to the surrounding community. § 3490 forecloses any defense based on duration: No lapse of time can legalize a public nuisance.

## V.   IRREPARABLE HARM

53.     The harm is irreparable on each of the four claims. Environmental injury is presumptively irreparable; "[i]f such injury is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545. The harm here is more than presumptively irreparable; it is likely, near-term, and catastrophic. The targeted hazard inventory — arsine, phosphine, chlorine, hydrogen fluoride, silane, pyrophoric organometallics — is inherently capable of mass-casualty, irreversible harm including death, permanent organ damage, hypocalcemia, deep tissue damage, fireball explosions, and increased lifetime cancer risk. The engineered controls have documented multi-modality failures: scrubbers failed to contain phosphine (April 2021); cabinet ventilation has a designed atmospheric-release pathway documented in operation; redundant primary and secondary cylinder controls failed simultaneously (May 2022); Subpart BB leak detection has been non-functional years; foundational PHA action items remain open five years past completion. The catastrophic-incident scenario is imminent — the pressurized artesian aquifer beneath the facility carries documented and increasing head pressure, with Apple's water-reactive and pyrophoric chemicals sitting directly above it. None of the 5,343 residents within the arsine plume has been adequately notified because the Toxic Gas Ordinance regime has no records, the CERS inventory underreports the chemicals, and the HMBP has been unavailable to first responders for more than nine years.

54.     The receptor population is uniquely vulnerable: infants, children at the playground across the street, elderly residents, asthmatics, individuals at the urgent care clinic, and 900 children at the Granada Islamic School whose Shelter-in-Place plan directs them to Meadow Park — directly across the street from the facility, with the evacuation route running the children toward the source. The existing oversight cannot prevent the harm. The pattern is reactive, not preventive.

The proper status quo is not continued operation while regulators discover further unpermitted sources; it is cessation pending Apple's affirmative demonstration of compliance and absence of risk. Atmospheric dispersion, soil and groundwater contamination, ecological destruction, aquifer-mediated release, and cross-connection contamination cannot be undone.

## VI.    BALANCE OF EQUITIES

55.    The balance tips sharply in Plaintiff's favor. The relief is targeted at the chemicals, not the building. Removing all hazardous waste, hazardous materials, and toxic gases within thirty days eliminates the endangerment without prohibiting Apple from continuing office or non-industrial use. Apple's commercial interest in continuing operations *with* the chemicals is not a legitimate equitable interest given the documented compliance failure and exceptional risk of catastrophic failure – including mass casualties. The Property Owner Defendants have no commercial interest in continuing the lease at the price of community endangerment; the proposed leasing prohibition tracks pre-existing regulatory categories the property is already subject to.

56.    The City has now formally taken the position, in its April-May 2025 General Plan amendment proceedings, that the location is "*not appropriate for housing*" and "*not good land use, planning, or a good neighborhood*," and the City's own Fire Department has formally withheld approval of the adjacent residential project pending environmental review. The City's equitable position has converged with Plaintiff's. The Defendants' uniform refusal to engage with even basic stipulated mitigation — public warning signage, basic operator-identification signage, completion of unfiled hazardous-substance permits, all of trivial cost — at a facility whose hazard signage carries the highest NFPA hazard ratings (Health "4," Flammability "4," Reactivity "4") (Zeltzer Decl. ¶¶ 18-19), during ongoing federal RCRA enforcement and pending BAAQMD enforcement, does not present an equitable position warranting the Court's deference. The community's interest in not being killed by a release, in not having children at a playground inside a 1.1-mile arsine plume, in not having 900 schoolchildren whose evacuation route runs toward the source, and in having the regulatory regime function as designed overwhelms any commercial interest in continuing operations the regulators have documented to be unlawful.

57.    To the extent the thirty-day chemical-removal element is mandatory rather than prohibitory, the heightened standard requires that "the law and facts clearly favor the moving

party." *Marlyn Nutraceuticals*, 571 F.3d at 879. Both clearly do. RCRA § 6972(a)(1)(B) controls as to chemical endangerment, and its elements are met by the operator's own engineering admissions, the operator's own dispersion modeling, the documented release pattern, and the documented multi-regulator failure. Federal courts have ordered substantial mandatory and prohibitory relief in RCRA endangerment cases. *Power Eng'g*, 191 F.3d at 1234 (mandatory PI requiring $3.5 million financial assurance); *Interfaith*, 399 F.3d at 266 (mandatory injunction requiring excavation and remediation); *Cow Palace*, 80 F. Supp. 3d at 1228 (comprehensive relief despite ongoing state agency involvement). The chemicals are the source of the endangerment; the engineered controls have documented multi-modality failures; and as Apple's history under the *People v. Apple Inc.* state-court injunction confirms, leaving the chemicals on site during the pendency of this action perpetuates the endangerment the statutes require the Court to abate.

## VII.    <u>PUBLIC INTEREST</u>

58.    Congress has declared the public interest in the underlying statutes. 42 U.S.C. § 6902 (RCRA); 42 U.S.C. § 7401 (CAA); 33 U.S.C. § 1251 (CWA). The California Legislature has declared the public interest in Cal. Civil Code §§ 3479–3480 and the Health & Safety Code chemical-emergency regime. The Santa Clara County Toxic Gas Ordinance was enacted in 1985 in direct response to Bhopal, where the legislature recognized that without specific local controls on toxic gases, facilities like this produce catastrophes that kill thousands. Where Congress has spoken through public-protective statutes and the state appellate court has spoken in this same City, the public interest is informed by the underlying statutory and judicial purpose. *Cottrell*, 632 F.3d at 1138. The City has now formally taken the position that the location is "not appropriate for housing" because of exactly this kind of facility. The public interest is established by Congress, the California Legislature, the California Court of Appeal, the County, and the City itself.

## VIII.    <u>REQUESTED RELIEF</u>

59.    Plaintiff respectfully requests that the Court enter the following preliminary injunction pending trial:

60.    ***Primary relief — cessation of hazardous use.*** (1) Within thirty days of this Order, Defendants Apple Inc. and Kalil Jenab (in his individual capacity and as agent, member, manager, or trustee of Jenab Family LP, Jenab Family Ventures LLC, and the Jenab Family Trust) shall cause

the removal of all hazardous waste, hazardous materials, and toxic gases from 3250 Scott Blvd. to a properly licensed off-site facility. (2) Within thirty-five days, Apple shall file a sworn declaration by Apple's Director of Environment, Health and Safety confirming the removal, identifying receiving licensed facilities, and attaching all hazardous waste manifests and transfer documentation. (3) Apple shall not resume any use, storage, handling, or treatment of hazardous waste, hazardous materials, or toxic gases at 3250 Scott Boulevard during the pendency of this action absent further order of this Court. (4) Defendant Jenab shall not lease or authorize occupancy of 3250 Scott Boulevard to any operator for use involving hazardous waste, hazardous materials, or toxic gases above CalARP, RMP, or Toxic Gas Ordinance threshold quantities during the pendency of this action. The foregoing does not prohibit Apple from occupying the building for office or non-industrial use that does not involve hazardous waste, hazardous materials, or toxic gases above CalARP, RMP, or Toxic Gas Ordinance threshold quantities.

61.    ***Alternative or additional relief — community protection.*** (5) Within thirtydays, the City of Santa Clara shall install signage at the perimeter of Meadow Park, Creekside Park, the children's playgrounds within five hundred feet of 3250 Scott Boulevard, and the Redwood and San Tomas Aquino Creek Trail segments within one thousand feet of 3250 Scott Boulevard, identifying the proximity to a CalARP-regulated facility and providing emergency response information. (6) If Defendants Apple and Jenab do not comply with primary relief, the City shall close to public access Meadow Park, Creekside Park, the children's playgrounds within five hundred feet, and the trail segments within one thousand feet, until compliance is confirmed. (7) The City shall suspend processing of Planning Applications PLN24-00556 and PLN24-00579 — the proposed 166-unit residential building at 3240 Scott Boulevard, immediately across the lot line — and any other pending or future residential rezoning applications within one thousand feet of 3250 Scott Boulevard, during the pendency of this action. The suspension is necessary to preserve the integrity of equitable relief: the federal court is being asked to address an ongoing endangerment to a population, and the Court's ability to grant meaningful merits relief would be undermined if the City were simultaneously expanding the population inside the endangerment radius. The City's own Fire Department has already formally withheld approval of those very applications pending environmental review. Pl. Decl., Ex. D.

62.    ***Disclosure and monitoring.*** (8) The statutory rights of entry and information-gathering under RCRA § 3007, CWA § 308, and CAA § 114 apply during the pendency of this action. Defendants Apple and Jenab shall file quarterly reports with the Court identifying compliance status, beginning ninety (90) days from this Order. (9) Within sixty (60) days, Apple shall retain at its expense a third-party safety auditor approved by the Court, reporting to the Court no less than quarterly on the status of every Potential Violation identified in EPA's April 30, 2024 Compliance Inspection Report and every action item identified in the September 2020 PHA Revalidation Report.

63.    ***Equitable terms.*** The Court retains jurisdiction to enforce and modify this Order; the relief is narrowly tailored to the endangerment and is specific, verifiable, and enforceable. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022–23 (9th Cir. 2009). Plaintiff respectfully requests the Court waive the Rule 65(c) bond or set a nominal bond of one dollar. The Ninth Circuit holds the court has discretion to dispense with security or require only nominal security where requiring security would effectively deny access to judicial review. *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). This is a public-interest environmental citizen suit brought by an individual private plaintiff under federal statutes that contemplate citizen enforcement.

## IX.    CONCLUSION

64.    The chemicals at this facility can kill thousands of people in minutes if released. Apple's own engineers have admitted in writing under penalty that specific failure modes will cause injury or fatality to neighbors. Apple's own dispersion modeling places acutely toxic plumes over at least 5,000 residents. The safety controls the law requires are documented across seven separate regulators to be failing. The California Court of Appeal previously held this same City's approval of sensitive receptors adjacent to chip fabs unlawfully negligent in *LSI Logic*. EPA's Criminal Investigation Division opened a federal criminal investigation in August 2024 — its enforcement employee's first parallel-proceedings case — on the same Plaintiff tip that produced the civil CAFO. The failure modes have materialized repeatedly. Each of the claims independently satisfies the *Winter* preliminary injunction standard. The preliminary injunction should be granted by the court to protect the public and the environment from imminent, substantial harm.

Respectfully submitted,

/s/ **Ashley M. Gjovik** (*Pro Se*)
April 27, 2026
Alviso, City of San José, California
legal@ashleygjovik.com
(415) 964-6272