**Ashley M. Gjovik, JD**
*In Propria Persona*
Alviso, San José, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJØVIK**, <br> *an individual*, <br><br> **PLAINTIFF**, <br><br> **vs.** <br><br> **APPLE INC.**, <br> *a corporation,* <br><br> **CITY OF SANTA CLARA,** <br> *a local government*, <br><br> **MR. JENAB ET AL** <br> *(individually, LP, LLC, &/or Trust)* <br><br> **DEFENDANTS**. | **Case No. 25-CV-07360-PCP** <br><br> **JUDGE: P. CASEY PITTS** <br><br> **DECLARATION OF ASHLEY GJOVIK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION UNDER RCRA, CAA, CWA, & PUBLIC NUISANCE** <br><br> **HEARING:** <br> **Date:** June 4 2026 <br> **Time:** 10:00 AM <br> **Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# F. <u>EXHIBIT F</u>

*Exhibit F — Photographs of Field Observations at Saratoga Creek and San Tomas Aquino Creek.*





San Tomas/Saratoga Creek and pond/swamp flowing to the SF Bay (San Tomas Aquino Creek Trail; Alviso, San Jose; April 24 2026, photos by Ashley Gjovik).



San Francisco Bay, National Wildlife Refuge, Pond A8 (photo taken by Ashley Gjovik, March 10 2026)



San Francisco Bay, National Wildlife Refuge, Guadalupe slough/river ( photo taken by Ashley Gjovik, April 10 2026)



Photo of Ashley Gjovik at Meadow Park, Santa Clara Square Apartments, with a hot mocha from Whole Foods at Santa Clara Square (April 11 2026; photos taken by Ashley Gjovik)

# G.     <u>EXHIBIT G</u>

*Exhibit G — San José ESD Source Control Permit Inspection Reports*



| | | |
|---|---|---|
| Work Task ID | : | 961506 |
| Due Date | : | 10/21/2025 |
| Inspection Date | : | 10/21/2025 |
| Inspection Type | : | Permit |
| Inspector | : | Christopher Bradley |
| | | Jameel Dhakni |

## Permit Inspection Report

| | | | |
|---|---|---|---|
| **Company Name:** | Apple, Inc. (102597) | **Permit Number:** | SC-042CU |
| **Address:** | 3250 Scott Blvd | **Permit Contact:** | Allan Sherlock |
| | Santa Clara, CA 95054 | | Grace Fisk |
| | | | Stephen Kelly |

Was the Inspector allowed to enter the facility? Yes

Inspection performed with Source Control Case Manager? Yes

## Facility General Information

Provide a description of facility, products, services, company structure, operating hours, discharge hours, and pertinent history

Apple, Inc. (hereafter, Apple) is a research and development (R and D) facility that manufactures semiconductor devices from various wafer substrates, including gallium arsenide, gallium nitride, sapphire, and silicon. Their operations include wafer preparation, lithography, layering, doping, polishing, grinding, testing, and bonding. The products developed at this facility are used as prototypes and are not intended for sale. They operate Monday through Friday, 24/7, with production ending on Saturday at 6 am. Discharge hours are 24/7, seven days a week, because their wastewater treatment systems operate continuously.

They have an average of 25 employees working production onsite, with up to 100 office staff.

Facility changes, compliance issues, and future plans since last permit issuance? Yes

Permit application accurate? No

Recent changes include removing electrolytic plating processes (Cu, Ni, Au, Indium, etc.) from Chase B in the Class 10 Cleanroom. The plating line was reportedly removed during the week of 10/20/2025, according to the site contacts. The Industrial User (IU) stated that their R and D processes no longer require these operations due to a shift in their scope of work. They do not plan to bring these operations back at the time of the inspection. However, plating chemistry was still listed in their permit application and was onsite at the time of the inspection.

Chromium chemistry had been removed from the site. Therefore, chromium monitoring will be removed from the permit.

Mercury was listed in the permit application. IU provided a detailed response on how it is used for equipment calibration and used in dry applications. Mercury will not be added to the permit for monitoring.

There have been no recent violations or compliance issues.

General Facility Layout accurate? Yes

Block flow diagram accurate? No

Average gallons per day per process was not accurate. IU used the same numbers as the last permit application submittal.

Plumbing layout accurate? Yes

Categorical processes conducted at this facility

R and D Semiconductor Manufacturing Operations – lithography, dry and wet etching, doping, film and metal layering, grinding and polishing, bonding, and cleaning.

Non-categorical processes conducted at this facility

Water softener reject, reverse osmosis reject, and cooling and fluid tower reject wastewater.

Description of facility wastewaters

Wastewater is produced within the cleanrooms and from the scrubbers used for wastewater and exhaust treatment. Solvents and hydrofluoric acid waste are transported offsite. Acid and caustic wastewater generated on-site are treated through the acid-waste neutralization system (AWN). Concentrated heavy metal wastewater is hauled away, while low-concentration metal wastewater is discharged.

Wastewater Characteristics:

Acidic pH < 5.0, Ammonia, Caustic pH > 12.5, Flammable, Heavy Metals, Solvents, Toxic Substances

Pretreatment Process/Equipment:

| | |
|---|---|
| **Permit Inspection Report** | Work Task ID    :  961506<br>Inspection ID    :  669447 |

Ammonia scrubber, acid scrubber, point-of-use (POU) toxic gas abatement systems, vacuum distillation evaporator for heavy metals, and an acid-waste neutralization system.

Solvents, heavy-metal concentrate from the vacuum distillation evaporator, lithography solutions (developer and photoresist), and etch wastes containing hydrofluoric acids are regularly hauled offsite.

**Flow Variability:**

Does not contain discharge with variability. Not a Centralized Waste Management company.

**Dilution streams:**

None

**Regulated TTOs at this facility:**

No

**Has Toxic Organic Management Plan been submitted?** Yes

---

## Facility Inspection

**Maintenance procedures up to date?** Yes

**Observations of general facility areas (shipping, receiving, quality control, laboratory, machine shop, etc.)**

Clean and well-kept with no issues noted. Chemical cabinets are present in these areas.

**Observations of the process area**

CLASS 10 and CLASS 1000 CLEANROOMS:
The bulk of semiconductor manufacturing operations is completed here. There are multiple chases each with a process chase and a back-end chase that holds the chemical and gas storage and feed systems.

Wafer Storage – All wafers that will be processed at the facility enter through the receiving dock and then sorted and stored prior to processing. Wafer types include silicon, gallium arsenide, gallium nitride, and sapphire. There are two chemical cabinets containing solvents and flammables within the wafer storage area.

Lithography – This was observed in two separate chases. Photoresist and developer solutions containing solvents are collected in carboys located underneath the grated flooring. The IU stated that their vendor who hauls this waste comes twice a day to remove the carboys. An acid scrubber is used to treat exhaust associated with the lithography processes and tools.

Plating Shop – One automated plating tool used for electrolytic plating of various metals such as copper, nickel, gold, indium, silver, etc. The tool was observed to be powered down and not in use, and it will no longer be used, according to IU. The plating line is set up for a substrate size that is not relevant to their current R and D activities. IU also stated that they do not have plans to continue plating in the future.

Grinding Lab – One room for sawing, grinding, and polishing operations. Waste can be hauled or treated depending on the constituents (arsenic and other metals).

Vapor/Chemical Etch – Observed in multiple chases within the class 10 cleanroom. Wet etch waste that does not contain solvents or hydrofluoric acid is treated onsite by their vacuum distillation system.

Doping – IU performs silicon, magnesium, tellurium, carbon, and zinc doping.

Layering/Deposition/Sputtering – IU performs gold, titanium, gold germanium alloy, platinum, nickel, palladium, silver, and ruthenium layering. R and D layers are also deposited in the Metal-Organic Chemical Vapor Deposition (MOCVD) and Metal Organic Deposition (MOD) cleanrooms.

The cleanroom uses a variety of gases for its operations, including, but not limited to, HCl, Ammonia, Chlorine, Disilane, Boron Trichloride, Silicon Tetrachloride, Dichlorosilane, and Trifluoromethane. Acid, ammonia, and point-of-use abatement systems are used to treat fume exhausts.

Trimethylaluminum (TMA) used in the MOVVD reactors is connected to a POU scrubber.

## Permit Inspection Report

### Observations of the pretreatment area and pretreatment system

The facilities pad houses the AWN, a 2200-gallon equalization tank, vacuum distillation evaporator, ammonia scrubber, and acid scrubber. The scrubbers and equalization tank are located on the second story of the facilities pad. The pretreatment systems are contained within secondary containment. Point-of-use abatement systems are situated within the cleanroom labs.

The ammonia and acid scrubbers, point-of-use abatement systems, and vacuum distillation evaporator are all plumbed to the AWN.

The AWN uses sodium hydroxide and sulfuric acid for treatment. The system is equipped with multiple sensors, alarms, and set points for pH and fluoride, and can recirculate at the final stage if pH or fluoride is outside the allowed ranges. The AWN consists of an equalization tank and three treatment tanks before discharging to the sanitary sewer.

The vacuum distillation evaporator separates heavy metals and other pollutants from process wastewater. The heavy metals that are separated from the wastestream are hauled offsite. The remaining wastewater is plumbed to the AWN prior to discharge.

### Description of in-house testing procedures

IU monitors pH, flow, fluoride, and wastewater systems daily.

## Monitoring Equipment

### pH Meter

#### How is compliance with pH discharge limits achieved?

PH is continuously monitored in the three-stage AWN system and can recirculate for additional treatment if outside the set point ranges.

Meets requirements? Yes

Has pH Alarm? Yes

Has Auto-shutoff valve? Yes

### Flow Meter: Effluent

Meets requirements? Yes

### Sample Point

Sample name and location - Sample Point 01 - Final Effluent Discharge

Sample point acceptable? Yes

## Chemical / Wastes Storage Area

### Waste types generated

Developer solution and photoresist strip solution.

Chemicals / wastes properly labeled? Yes

Chemicals / wastes properly stored? Yes

Discrepancies in chemical / wastes inventory? No

Proper spill containment? Yes

### Other observations of the chemical storage area and deficiencies

Due to time limitations, the bulk chemical waste storage bunkers were not inspected. These are located at the facilities pad near the wastewater treatment system. Bulk virgin sulfuric acid, virgin ammonia, and various gas types are also stored here. The facilities pad has secondary containment engineering structures to prevent slug discharges.

Chemical cabinets are spread out through the facility, containing mostly flammables, caustics, acids, and solvents. No issues with compatibility or storage were seen.

## Slug Discharge Potential

Slug discharge potential evaluation conducted and evaluation form submitted? Yes

Slug Discharge Potential Issue Explanation

## Outdoors Areas

### Description of facility outdoors areas including storage areas, trash enclosures, or stormwater issues

Outdoor areas were observed as clean and tidy. However, near the hazardous waste storage bunkers, there are multiple storm drains. These are covered and concealed to prevent accidental discharges. No other issues were noted.

| **Permit Inspection Report** | |
|---|---|

## Logs / Records / Site Plans Review

### Control Plans

Emergency Management Plan, Hazardous Materials Business Plan, Spill Plan

### Logs / Records

pH, pH calibration, Flow, Manifests/Waste hauling, Spills, Employee training, Site inspection

Description of wastes hauled, quantities hauled, hauling frequencies, and hauling companies

Hauling Company:

Advanced Chemical Transport (ACT) LLC

Frequencies:

Daily, Weekly, Monthly, Yearly

Wastes Hauled:

Buffered Oxide Etch (BOE) - 700 lbs/month

Activated Carbon – 140 lbs/year

Ethylene Glycol  – 200 lbs /month

Gallium Arsenide Wafers – 200 lbs/month

Gallium Chloride Solution – 200 lbs/month

Heavy Metal Concentrate (from Vacuum Distillation Evaporator) - 3000 lbs/week

Hydrochloric acid with oil – 50 lbs/year

Hydrochloric acid waste – 22 lbs/month

Carboxylic acid waste – 480 lbs/month

Lab Debris – 200 lbs/week

Tetramethylammonium Hydroxide Solution – 600 lb per/year

Ammonium fluoride – 200 lbs/year

Silver and Isobornyl Acetate – 12 lbs/year

Flammable toxic solvents (1,1,1,3,3,3-HEXAMETHYLDISILAZANE, 1,3,5-TRIMETHYLBENZENE) –150 lbs/year

Photoresist Strip – 1000 lbs/3 months

Sulfuric Acid waste – 50 lbs/month

Water with corrosion inhibitor – 840 lbs/year

Water with solvents (butyl acetate, IPA) - 450 lbs/year

Water with solvents (IPA, N-Methyl Pyrrolidone) - 2000 lb/week

## Employee Training

Regular Employee Training: HazComm/Right to Know, Materials handling, HAZWOPER, DOT Hazmat Transport, Emergencies, Pretreatment system, pH calibration, Spill Response

## Exit Interview and Action Items

IU was thanked for their time and asked to submit the following items:

-Corrected flows on pgs. 4 & 5.

-Engineering calculations used for flows.

-Updated block-flow diagram with the correct number of gallons discharged from each process flow.

-Full set of water bills (12-months) for three influent water meters

-Supplemental information on semiconductor processes conducted onsite, along with the source of each pollutant that the City of San Jose has as a local limit for (Au, Cu, Ni, Zi, etc.).

## Permit Writer Follow-up

-Water bills were received 10/29/25.

-Site map received on 10/23/25.

-Revised block-flow received 10/23/25.

-Engineering calculations received 10/28/25.

-Corrected flows (pgs. 4 & 5) received 10/23/25.

-Supplemental process information was received on 11/5/2025.

## Field Notes

-Processes that use HF and solvents are hauled offsite.

-Processes conducted on Gallium Arsenide wafers are segregated from other waste streams for hauling.



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

| | | |
|---|---|---|
| Work Task ID | : | 784950 |
| Due Date | : | 08/13/2015 |
| Inspection Date | : | 08/13/2015 |
| Inspection Type | : | Permit |
| Inspector | : | Anju Whig |
| | | Sharon Stremel |

## Permit Inspection Report

| | | | |
|---|---|---|---|
| **Company Name:** | Apple, Inc. (102597) | **Permit Number:** | SC-461B |
| **Address:** | 3250 Scott Blvd | **Permit Contact:** | Alan Clary |
| | Santa Clara, CA 95054 | | John Shull |
| | | | Mike Cheng |
| | | | Tony Soriano |

Was the Inspector allowed to enter the facility? Yes

Inspection performed with Source Control Case Manager? No

Case manager had a meeting run long and was unable to make the inspection. A follow up inspection will be conducted with the case manager when more installation of equipment has been completed at the site.

## Facility General Information

Provide a description of facility, products, services, company structure, operating hours, discharge hours, and pertinent history

Facility performs computer equipment R&D. No products for sale are manufactured at this facility.
This is a new facility. They were still in the process of plumbing and installing equipment at the time of inspection. Treatment systems were in place but not yet in operation.

Facility changes, compliance issues, and future plans since last permit issuance? No

Permit application accurate? Yes

General Facility Layout accurate? Yes

Block flow diagram accurate? Yes

Plumbing layout accurate? Yes

Categorical processes conducted at this facility

Site conducts semiconductor and metal finishing processes, however is R&D only so categorical standards will not apply.

Non-categorical processes conducted at this facility

Site performs semiconductor and metal finishing processes on wafer substrates, however is R&D so these processes will be non-categorical. Processes include etching and cleaning, bonding, electroplating, etching, lithography, deposition, and cutting/polishing. Additionally, discharges from acid scrubbers, ammonia scrubbers, and abatement units are treated and discharged through the AWN.

Description of facility wastewaters

Wastewater characteristics are primarily acidic or basic wastewater. Solvents will be captured. Heavy metals will be initially captured, however the site plans to evaluate the wastewater for potential treatment and discharge.

Wastewater Characteristics:

Acidic pH < 5.0, Ammonia, Caustic pH > 12.5, Heavy Metals, Solvents, Suspended Solids

Pretreatment Process/Equipment:

Waste segregation. Solvents and heavy metals are segregated, including baths and first few rinses. Other process wastewaters go through acid waste neutralization.

Flow Variability:

Does not contain discharge with variability. Does not discharge from categorical process. Not a Centralized Waste Management company.

Dilution streams:

Cooling Water

Description of dilution streams and volumes

Most utility waters do not discharge through AWN and sample point. Some cooling water is combined with low concentration process water for the gray water collection tank. Gray water collection is reused in the ammonia and acid scrubbers, but overflow is plumbed to the AWN.

Regulated TTOs at this facility:

N/A

Has Toxic Organic Management Plan been submitted? N/A

## Permit Inspection Report

Work Task ID    :    784950
Inspection ID   :    524512

**Facility Inspection**

Maintenance procedures up to date? N/A

Observations of general facility areas (shipping, receiving, quality control, laboratory, machine shop, etc.)
Still in construction/ installation phase.

Observations of the process area
Still in installation phase.

Observations of the pretreatment area and pretreatment system
Systems are installed, but facility is waiting on permits to bring chemicals onsite and begin use.

Description of in-house testing procedures
Facility has built in testing equipment. pH is monitored in each stage of treatment, after the AWN but before recirculation, and after recirculation. The pH monitoring after recirculation was requested during the inspection.

**Monitoring Equipment**

**pH Meter**

How is compliance with pH discharge limits achieved?
pH compliance is measured after the AWN to trigger recirculation. The IU will be installing a pH meter with chart recorder after the recirculation point as requested during the inspection.

Meets requirements? No

Explanation of pH measurement deficiencies
pH meter is currently before recirculation. Facility will be moving it to after recirculation, or installing another meter after recirculation.

Has pH Alarm? Yes

Has Auto-shutoff valve? Yes

**Flow Meter:** Effluent

Meets requirements? Yes

**Sample Point**

Sample name and location - SP-01 Final Effluent
The sample point is located after the AWN and recirculation, immediately before combining with non-process wastewater and discharging.

Sample point acceptable? Yes

**Chemical / Wastes Storage Area**

Waste types generated
In construction phase, no wastes or chemicals present onsite during inspection.

Chemicals / wastes properly labeled? N/A

Chemicals / wastes properly stored? N/A

Discrepancies in chemical / wastes inventory? No

Proper spill containment? Yes

**Slug Discharge Potential**

Slug discharge potential evaluation conducted and evaluation form submitted? Yes

Slug Discharge Potential Issue Explanation
No issues observed. Site is new and has not yet begun processing.

**Outdoors Areas**

Description of facility outdoors areas including storage areas, trash enclosures, or stormwater issues
Outdoor areas are well organized. Storage areas have adequate secondary containment. There were stormwater drains observed in the utility area near chemical storage areas, however contact indicated these are kept closed unless needed.

**Logs / Records / Site Plans Review**

**Control Plans**
Emergency Management Plan, Hazardous Materials Business Plan, Solvent Management, Spill Plan

**Logs / Records**

Description of wastes hauled, quantities hauled, hauling frequencies, and hauling companies
New site does not yet have waste accumulations.

| | |
|---|---|
| **Permit Inspection Report** | Work Task ID     :   784950<br>Inspection ID    :   524512 |

**Employee Training**

        Regular Employee Training:

**Exit Interview and Action Items**

        Reviewed updates to permit application needed, and additional facility diagram updates. Contact was asked to give an update on construction so a second inspection can be scheduled.

**Permit Writer Follow-up**

        A second inspection was completed with the site case manager on 9/1/2015. See 9/1/2015 inspection report for further details and follow-ups.

**Field Notes**

A Permit Inspection was conducted by permit writers Sharon Terwilliger and Anju Whig. Case Manager John Fosnaugh was unavailable at the time of the inspection, and a follow up inspection will be conducted with him when the project is further along. Contacts from the facility included Mike Cheng (EORM), Alan Clary (Integrated Engineering Services) , John Shull (Apple), and Tony Soriano (Apple).

The permit application was reviewed and some clarifications were discussed. The IU will be submitting an updated application, as well as a copy of the chemical inventory.

The indoor areas were inspected. All processes will be conducted inside a clean room environment. Some tools were installed but the process area is in the beginning of tool installation. Additional dry process areas were inspected including office areas, a sound room, and other dry process rooms. IU performs standard semiconductor processes on wafers, primarily sapphire or gallium arsenide (GaAs).The contact indicated GaAs wastestreams are segregated. Water reduction practices include sensors, rinse baths, spray rinses, water changes based on cycles, timers, reuse, and reduced flow mode.

The roof area is accessible by stairs and was inspected. The area includes the ammonia abatement units and air scrubbers. There is also a wastewater equalization tank on this area, which allows remaining wastewater treatment processes to occur through gravity drain. Lift stations were in progress of being installed. Water softener and DI systems were installed.

The heavy metals accumulation tank was installed. The IU currently plans to accumulate and haul heavy metal wastestreams but is planning to evaluate onsite treatment feasibility once processes start and may want to treat and discharge in the future after processes have been going and wastewater metals concentrations are determined. Heavy metal rinse baths are sent to the AWN.

Solvents are hard plumbed to a chemical feed cabinet for accumulation in drums. The contact indicated the solvent baths and first couple rinse baths will be accumulated and hauled off site for disposal. The last rinses are considered to have trace to no solvents and will discharge to gray water accumulation to be reused in scrubbers.

The AWN was inspected. The AWN is designed with a line coming off that runs through a pH meter. If the pH is out, water is recirculated automatically. The system is designed so during recirculation water will back up in various stages of the system before allowing out of spec water to discharge. AWN stages will back up, then the equalization tank, then the lift stations, then process discharges would be halted. The final pH meter and a flow meter was also located in this location. Inspectors requested pH meter be moved to after recirculation, but will check on if the meter and pH both being recorded on a chart will be sufficient. The final flow meter and sample point is located after the recirculation pipe.



| Work Task ID | : | 785725 |
|---|---|---|
| Due Date | : | 09/01/2015 |
| Inspection Date | : | 09/01/2015 |
| Inspection Type | : | Permit |
| Inspector | : | John Fosnaugh |
| | | Sharon Stremel |

## Permit Inspection Report

| **Company Name:** | Apple, Inc. (102597) | **Permit Number:** | SC-461B |
|---|---|---|---|
| **Address:** | 3250 Scott Blvd | **Permit Contact:** | Alan Clary |
| | Santa Clara, CA 95054 | | Chris Talbert |
| | | | Jack Kelly |
| | | | Mike Cheng |
| | | | Tony Soriano |

Was the Inspector allowed to enter the facility? Yes

Inspection performed with Source Control Case Manager? Yes

## Facility General Information

Provide a description of facility, products, services, company structure, operating hours, discharge hours, and pertinent history

Facility performs computer equipment R&D. No products for sale are manufactured at this facility.
This is a new facility. They were still in the process of plumbing and installing equipment at the time of inspection. Treatment systems were in place but not yet in operation.

Facility changes, compliance issues, and future plans since last permit issuance? No

Permit application accurate? Yes

General Facility Layout accurate? Yes

Block flow diagram accurate? Yes

Plumbing layout accurate? Yes

Categorical processes conducted at this facility

Site conducts semiconductor and metal finishing processes, however is R&D only so categorical standards will not apply.

Non-categorical processes conducted at this facility

Site performs semiconductor and metal finishing processes on wafer substrates, however is R&D so these processes will be non-categorical. Processes include etching and cleaning, bonding, electroplating, etching, lithography, deposition, and cutting/polishing. Additionally, discharges from acid scrubbers, ammonia scrubbers, and abatement units are treated and discharged through the AWN.

Description of facility wastewaters

Wastewater characteristics are primarily acidic or basic wastewater. Solvents will be captured. Heavy metals will be initially captured, however the site plans to evaluate the wastewater for potential treatment and discharge.

Wastewater Characteristics:

Acidic pH < 5.0, Ammonia, Caustic pH > 12.5, Heavy Metals, Solvents, Suspended Solids

Pretreatment Process/Equipment:

Waste segregation. Solvents and heavy metals are segregated, including baths and first few rinses. Other process wastewaters go through acid waste neutralization.

Flow Variability:

Does not contain discharge with variability. Does not discharge from categorical process. Not a Centralized Waste Management company.

Dilution streams:

Cooling Water

Description of dilution streams and volumes

Most utility waters do not discharge through AWN. Some cooling water is combined with other wastewater and reused in the scrubbers, but is plumbed to collection tank that will discharge overflow to AWN.

Regulated TTOs at this facility:

N/A

Has Toxic Organic Management Plan been submitted? N/A

## Facility Inspection

Maintenance procedures up to date? N/A

**Permit Inspection Report**

Observations of general facility areas (shipping, receiving, quality control, laboratory, machine shop, etc.)

Still in construction/ installation phase.

Observations of the process area

Still in installation phase.

Observations of the pretreatment area and pretreatment system

Systems are installed, but facility is waiting on permits to bring chemicals onsite and begin use.

Description of in-house testing procedures

Facility has built in testing equipment. pH is monitored in each stage of treatment, after the AWN but before recirculation, and after recirculation. The pH monitoring after recirculation was requested during the inspection.

## Monitoring Equipment

### pH Meter

How is compliance with pH discharge limits achieved?

pH compliance is measured after the AWN to trigger recirculation. The IU will be installing a pH meter with chart recorder after the recirculation point as requested during the inspection.

Meets requirements? No

Explanation of pH measurement deficiencies

pH meter is currently before recirculation. Facility will be moving it to after recirculation, or installing another meter after recirculation.

Has pH Alarm? Yes

Has Auto-shutoff valve? Yes

**Flow Meter:** Effluent

Meets requirements? Yes

### Sample Point

Sample name and location - SP-01 Final Effluent

The sample point is located after the AWN and recirculation, immediately before combining with non-process wastewater and discharging.

Sample point acceptable? Yes

## Chemical / Wastes Storage Area

Waste types generated

In construction phase, no wastes or chemicals present onsite during inspection.

Chemicals / wastes properly labeled? N/A

Chemicals / wastes properly stored? N/A

Discrepancies in chemical / wastes inventory? No

Proper spill containment? Yes

## Slug Discharge Potential

Slug discharge potential evaluation conducted and evaluation form submitted? Yes

Slug Discharge Potential Issue Explanation

No issues observed. Site is new and has not yet begun processing.

## Outdoors Areas

Description of facility outdoors areas including storage areas, trash enclosures, or stormwater issues

Outdoor areas are well organized. Storage areas have adequate secondary containment. There were stormwater drains observed in the utility area near chemical storage areas, however contact indicated these are kept closed unless needed.

## Logs / Records / Site Plans Review

### Control Plans

### Logs / Records

Description of wastes hauled, quantities hauled, hauling frequencies, and hauling companies

New site does not yet have waste accumulations.

## Employee Training

Regular Employee Training:

| **Permit Inspection Report** | Work Task ID | : | 785725 |
| --- | --- | --- | --- |
| | Inspection ID | : | 525120 |

**Exit Interview and Action Items**

IU will be moving or installing a new pH meter after recirculation. Additional cleanroom equipment installations had been completed since the 8/13/2015 inspection, however equipment installation was still not complete and does not anticipate being complete until after commencement of discharge from other completed processes. The discharge pipe is plumbed to discharge by gravity over a large floor drain with a gap between the end of the pipe and the drain. They were asked to construct a box around the discharge point, or determine another method to close the drain grate off as a discharge point for containers. IU did not want to directly plumb the pipe in order to maintain an air gap.

**Permit Writer Follow-up**

IU submitted updated application.

**Field Notes**

A second permit inspection was conducted with John Fosnaugh from the City of San Jose, with IU contacts Mike Cheng (EORM), Chris Talbert (EORM), Alan Clary (Integrated Engineering Services), Jack Kelly (Apple) and Tony Soriano (Apple).

This inspection was performed to review utility systems, treatment, and process equipment and plumbing with the inspector present and update on the process. Mr. Cheng expects equipment to be setup over phases and does not expect all equipment setup before start of discharge.

The equipment pad was reviewed again. In addition to moving the pH meter they were asked to enclose the discharge location. Currently discharge after the AWN and sample point occurs from a pipe discharging to an open floor sink. Mr. Clary designed it this way to include a required air gap. They were asked to put a structure around this floor drain to prevent easy access or accidental spills into the floor drain. The final pH meter is being asked to be moved from before recirculation to after recirculation, preferably in the sample point box.

Wastewater and utility piping was nearly complete and observed during the inspection. Most observed piping was labeled and they are continuing to label pipes.

The process area was inspected again, and more equipment had been installed. Chemistry was not on site yet, and no processes were in progress. The facility is waiting for their approved permit to bring chemistry on site, since they will need to have support equipment – scrubbers, utility processes – running and discharging at that time.



CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

| | | |
|---|---|---|
| Work Task ID | : | 802129 |
| Due Date | : | 05/18/2016 |
| Inspection Date | : | 05/18/2016 |
| Inspection Type | : | Permit |
| Inspector | : | Anju Whig |
| | | John Fosnaugh |
| | | Sharon Stremel |
| | | Varsha Patel |

## Permit Inspection Report

| | | | |
|---|---|---|---|
| **Company Name:** | Apple, Inc. (102597) | **Permit Number:** | SC-461B |
| **Address:** | 3250 Scott Blvd | **Permit Contact:** | Ian Ludwig |
| | Santa Clara, CA 95054 | | Jeff Burkmeyer |
| | | | Mike Cheng |
| | | | Tony Soriano |

Was the Inspector allowed to enter the facility? Yes

Inspection performed with Source Control Case Manager? Yes

### Facility General Information

Provide a description of facility, products, services, company structure, operating hours, discharge hours, and pertinent history

The facility makes semiconductor devices that are sent to another Apple facility for research and development. They run one production shift per day Monday-Friday. Some tools are still being installed, however other processes have started at the facility.

Facility changes, compliance issues, and future plans since last permit issuance? Yes

Facility has installed additional processes and finalized tool installation plans.

Permit application accurate? Yes

General Facility Layout accurate? Yes

Block flow diagram accurate? Yes

Plumbing layout accurate? Yes

Categorical processes conducted at this facility

Company performs R&D semiconductor manufacturing.

Non-categorical processes conducted at this facility

Non-process flows include utility wastewater, such as RO Reject and water softener water. These waste streams combine with process flows after the sample point and are not a source of dilution at their monitoring point.

Description of facility wastewaters

Wastewater is produced from air scrubbers and cleanroom process wastewater. Cleanroom processes include wafer etching and cleaning, bonding, electroplating, etching, lithography, deposition and cutting/polishing. Metals and solvent waste waters are segregated for hauling.

Wastewater Characteristics:

Acidic pH < 5.0, Ammonia, Caustic pH > 12.5, Heavy Metals, Solvents, Toxic Substances

Pretreatment Process/Equipment:

This facility has waste hauling for solvent and heavy metals waste, and acid neutralization for pH adjustment.

Flow Variability:

Does not contain discharge with variability. Not a Centralized Waste Management company.

Dilution streams:

None

Regulated TTOs at this facility:

This site's chemical inventory includes toluene, naphthalene, and a variety of other solvents not regulated under 40 CFR 469.

Has Toxic Organic Management Plan been submitted? No

### Facility Inspection

Maintenance procedures up to date? Yes

Observations of general facility areas (shipping, receiving, quality control, laboratory, machine shop, etc.)

The facility is clean, organized and well maintained.

Observations of the process area

All processes are conducted in their clean room, which is organized and well kept. Most equipment is self maintained with chemical feed systems accessible for maintenance through service chases.

**Permit Inspection Report**

Observations of the pretreatment area and pretreatment system

Pretreatment is conducted outside the building, on the roof area (air scrubbers and equalization) and equipment pad. Some low concentration wastewaters are collected in a gray water tank that is reused as scrubber water. other wastewater is collected in the equalization tank, which then flows to the acid waste neutralization system where it is adjusted for pH, monitored, and discharged. Other waste streams including solvents and heavy metals are collected for hauling and are not discharged.

Description of in-house testing procedures

Different stages of the AWN have continuous pH monitors to monitor treatment and discharge. The site has two redundant final pH monitoring systems, each displayed and recorded in their digital system.

## Monitoring Equipment

### pH Meter

How is compliance with pH discharge limits achieved?

Effluent pH is achieved through an acid waste neutralization system with pH monitoring to adjust pH and monitor discharge. Final effluent monitoring is done through redundant pH meters with continuous recording devices. All meters are displayed on their monitoring system which can be monitored from their control room.

Meets requirements? Yes

Has pH Alarm? Yes

Has Auto-shutoff valve? Yes

### Flow Meter: Effluent

Meets requirements? Yes

### Sample Point

Sample name and location - Sample Point 01 - Final Discharge is a sampling box located on the discharge pipe between the AWN and sewer connection. Dilution flows combine with the final effluent after the sampling point, immediately before the connection to the underground sewer piping.

Sample point acceptable? Yes

## Chemical / Wastes Storage Area

Waste types generated

Waste drums and containers are stored in segregated chemical bunkers each with its own secondary containment located in the corner of the utility pad. Drums present were observed to be stored inside the bunkers and properly labeled.

Chemicals / wastes properly labeled? Yes

Chemicals / wastes properly stored? Yes

Discrepancies in chemical / wastes inventory? No

Proper spill containment? Yes

## Slug Discharge Potential

Slug discharge potential evaluation conducted and evaluation form submitted? No

Explanation why evaluation was not conducted or necessary

Slug evaluation conducted in last year as part of the initial permit issuance.

Slug Discharge Potential Issue Explanation

## Outdoors Areas

Description of facility outdoors areas including storage areas, trash enclosures, or stormwater issues

The facility includes a large building, with an adjacent equipment pad that is fenced and covered. Above the roof of the treatment pad are air scrubber equipment, accessible by stairs.

While most of the pad is covered, some areas are open and there are storm drains near the chemical bunkers. Chemical bunkers are secondarily contained and storm water drains have safety drains and are tested for potential contaminants prior to opening drains.

## Logs / Records / Site Plans Review

### Control Plans

Emergency Management Plan, Hazardous Materials Business Plan, Spill Plan

Other: Site plans were not reviewed during the permit inspection but have been reviewed previously. Solvent management was discussed and a solvent management plan will be required as part of the permit.

### Logs / Records

## Permit Inspection Report

**Description of wastes hauled, quantities hauled, hauling frequencies, and hauling companies**

This facility hauls a variety of wastes, including hazardous wastes and concentrated chemistry. They also collect solvent wastewater and heavy metals wastewater for hauling. This facility will have regular hauling of wastes once fully in operation.

### Employee Training

Regular Employee Training:

### Exit Interview and Action Items

Updated flows and permit information is needed to supplement the application.

### Permit Writer Follow-up

During an inspection during the 2016 EPA Pretreatment Compliance Inspection on 6/28/2016, the permit was again discussed and updated process information, flows, and permit application was requested, and received on 7/18/2016.

### Field Notes

An announced permit inspection was conducted by inspectors John Fosnaugh and Sharon Terwilliger with IU Contacts Mike Cheng, Tony Soriano, Ian Ludwig, and Jeff Birkmeyer. The inspection was primarily conducted with Mr. Cheng and Mr. Soriano with assistance from the additional staff for process information. This inspection was to walk through their process area and confirm processes from original permit and reevaluate their qualification as an R&D facility or if Federal Categorical Standards will apply to them. They are currently permitted as an SIU by flow.

Changes since the last permit inspection were reviewed with the facility. Equipment was being installed and hooked up to utilities during the last inspection and no equipment was in use prior to the permit issuance. Several tools had been started up and additional tools installed at the time of this inspection. They still have additional tools planned for installation, but have started processing and producing process wastewater for treatment and disposal.

The polishing and dicing room was inspected. Slurries are used for physical surface preparation. The equipment is programmed to direct wastewater to either the HF holding tank for hauling or the AWN for treatment depending on if it contains HF. These processes occur before metals would be added to the wafers, on wafer blanks only and is not expected to have metals, only SiO2.

The dicing equipment in this area is used for creating cross sections for failure analysis and may be performed on wafers in various stages of process, so may contain metals in particulate form, which is filtered.

Wafers used on site include silicon and sapphire (gallium arsenide) wafers.

Wet benches and processing equipment was inspected. Solvent benches discharge to a solvent collection system that currently drums solvent waste for hauling. Wet benches were observed to contain chemicals for semiconductor processes and commonly found in semiconductor manufacturing facilities. Complete semiconductor devices are made at this facility but they are not standard micro circuitry but mechanical electric devices. The device is created mechanical properties with electrical connection, and fits the description of a MEMS device. Devices are manufactured and sent to another facility for final connections to be made and research is conducted on the devices after that point.

Process review shows they make complete semiconductor devices through standard semiconductor processes and will be subject to 40 CFR 469 categorical standards. Metal processes are conducted as part of the semiconductor manufacturing process and will not be subject to the 40 CFR 433 metal finishing category.

The treatment area was inspected as well. Soft water reject has been plumbed to after the sample point and will no longer contribute a dilution source to the sample point. The composite sampler was also observed installed on site. The pH at time of inspection was 8.88 S.U. at 12:39 and the flow reading was 1,784,040 gallons.



| | | |
|---|---|---|
| Work Task ID | : | 891654 |
| Due Date | : | 10/26/2020 |
| Inspection Date | : | 10/26/2020 |
| Inspection Type | : | Permit |
| Inspector | : | Chris Fivecoat |
| | | John Fosnaugh |

## Permit Inspection Report

| | | | |
|---|---|---|---|
| **Company Name:** | Apple, Inc. (102597) | **Permit Number:** | SC-461B |
| **Address:** | 3250 Scott Blvd | **Permit Contact:** | Austin DeBaene |
| | Santa Clara, CA 95054 | | Tom Huynh |
| | | | Tony Soriano |

Was the Inspector allowed to enter the facility? No

Inspection performed with Source Control Case Manager? Yes

## Facility General Information

Provide a description of facility, products, services, company structure, operating hours, discharge hours, and pertinent history

Apple Inc. performs research and development for computer electrical and electronic components, including deposition and etching of semiconductor materials. The facility is a Research and Development facility manufacturing semiconductor devices on wafers for internal research. The site is purely R&D and does not sell any products.

Operating hours:
Office: 8AM-5PM, First Shift: 8AM-5PM, Second Shift: 5PM-12AM, Third Shift: 12AM-8AM (24/7).

Facility changes, compliance issues, and future plans since last permit issuance? No

Permit application accurate? No

Application has the following deficiencies:
- Agent for Service of Process
- Description of manufacturing and fabrication processes
- Number of production days
- Hazardous waste manifests
- Section I - Add arsenic, lead, chromium, and copper
- Spill prevention plan/HMBP
- TOMP
- Inspection logs and checklists
- Documentation of engineering estimates
- Discharge logs starting 5/7/19 - 7/1/19

General Facility Layout accurate? Yes

Block flow diagram accurate? No

Block flow diagram does not accurately reflect water sources and uses, influent vs effluent.

Plumbing layout accurate? Yes

Categorical processes conducted at this facility

Apple, Inc. conducts processes for research and and development of manufacture of semiconductors. Manufacture of semiconductors is regulated under 40CFR 469, therefore making them categorical. Etching and cleaning, bonding, electroplating and etching, lithography, deposition, and cutting/polishing materials.

Non-categorical processes conducted at this facility

Description of facility wastewaters

R&D labs wastewater, ammonia scrubber, acid scrubber, point of use abatement units.

Wastewater Characteristics:

Acidic pH < 5.0, Ammonia, Caustic pH > 12.5, Heavy Metals, Solvents, Suspended Solids

Pretreatment Process/Equipment:

Acid Scrubber, Ammonia Scrubber, Point of Use Abatement systems, Distillation Evaporator, Acid Waste Neutralization, Equalization, and Waste Stream Segregation and Waste Hauling.

Flow Variability:

Contains discharge with variability. Not a Centralized Waste Management company.

## Permit Inspection Report

Dilution streams:
> None

Regulated TTOs at this facility:
> Chloroethylenes

Has Toxic Organic Management Plan been submitted? Yes

## Facility Inspection

Maintenance procedures up to date? Yes

Observations of general facility areas (shipping, receiving, quality control, laboratory, machine shop, etc.)

> Shipping/Receiving - Chemical delivery and haul out is secondarily contained, leak detectors are installed, and connection point is located within the treatment pad area.

Observations of the process area

> Clean Rooms are class 10 - 100.  The main fab. is class 10.

> Chemicals delivery is conducted via cart and pump stations to photolithography.  Developer waste is hauled offsite.  Waste developer is automated and leak detectors are installed in the floor.

> All solvents containing waste and wastewater is pumped to the solvents collection system.

> Layers/Plating - Indium, nickel, titanium, copper.  This process is via plating and is automated.

> Etching-  Vacuum based etching in which no water is used.  The etch tool with water goes to the acid scrubber which  discharges to the AWN system.

> Solvent cleaning - The first rinse goes to waste collection.  Other rinses for the AWN.  The solvent is used to cut the metals in order to remove the metals layers.  Solvent etch.  gold layers are reclaimed via filters.  This process is automated.

> Plating Shop - Applies gold.  All rinses are discharged to the AWN.  Electroless plating is performed.  The process for the mixtures is part of the research and development.

> Plasma vapor deposition of metals layers is is a dry process.  Wet etch is performed using hydrofluoric acid.  The rinse is collected and hauled.  The final rinse goes to the AWN.  This process is automated.  Spin rinse dryers discharge to the AWN.

> Metrology - Inspections are performed.  No wet process.

> Polishing - Slurry waste goes to the slurry waste collection tank.  The concentrate is hauled.  Wastewater is discharged to the AWN.  there are no metals in the wastewater discharge to the AWN.  Polishers that heavy metals is wastewater is collected and hauled.

Observations of the pretreatment area and pretreatment system

> The pretreatment area and system is very extensive and includes waste stream segregation of acids, caustics, metal bearing waste streams, solvents, fluoride burn box and wet, ammonia scrubber, acid scrubber, metals evaporator, AWN system,  equalization, diversion tanks, and hazardous waste storage.  The pretreatment system and all components are extensively covered and described in the permit application.  The pretreatment area was inspected and is clean, maintained, and no issues of concern were noted.

> At the time of inspection the pH monitor indicated 8.19 S.U., the pH chart indicated 8.15 S.U.,  and effluent flow meter totalizer indicated 103,997,530 gal.

Description of in-house testing procedures

> The monitor for both pH and fluoride.

## Monitoring Equipment
### pH Meter

## Permit Inspection Report

Work Task ID : 891654
Inspection ID : 607439

**How is compliance with pH discharge limits achieved?**

The pH is redundantly monitored in each of the three chambers of the AWN. Each pH tank is continuously monitored with local indication and remote indication at the PCS. Chemical addition to each is based on the pH controller utilizing a combination of feed forward and feedback control. If the pH is outside effluent set point range, 6.5 and 10 S.U., the final effluent discharge valve closes an d the final effluent diversion valve opens which flows to a diversion tank. Wastewater held in the diversion tank is retreated or hauled offsite.

Meets requirements? Yes

Has pH Alarm? Yes

Has Auto-shutoff valve? Yes

**Flow Meter:** Effluent

Meets requirements? Yes

**Sample Point**

Sample name and location - 01 - Final Discharge. Refrigerated composite sampler located on the equipment pad on the West side of the building.

Sample point acceptable? Yes

## Chemical / Wastes Storage Area

Waste types generated

Solvents, sodium hydroxide, ammonium hydroxide, and buffered oxide etch (BOE).

Chemicals / wastes properly labeled? Yes

Chemicals / wastes properly stored? Yes

Discrepancies in chemical / wastes inventory? No

Proper spill containment? Yes

Other observations of the chemical storage area and deficiencies

Chemicals are all properly labeled, segregated, and secondarily contained. Leak detectors are installed.

## Slug Discharge Potential

Slug discharge potential evaluation conducted and evaluation form submitted? Yes

Slug Discharge Potential Issue Explanation

## Outdoors Areas

Description of facility outdoors areas including storage areas, trash enclosures, or stormwater issues

Outside areas were observed. No issues of concern were noted.

## Logs / Records / Site Plans Review

**Control Plans**

**Logs / Records**

Description of wastes hauled, quantities hauled, hauling frequencies, and hauling companies

Logs and Records were not reviewed during the inspection. All applicable Logs and Records were either reviewed or will be submitted and reviewed as part of the permit application.

## Employee Training

Regular Employee Training: HazComm/Right to Know, Materials handling, DOT Hazmat Transport, Emergencies, Pretreatment system, pH calibration, Spill Response

## Exit Interview and Action Items

An exit interview was conducted and any inspection findings and permit application deficiencies reviewed. Overall the facility is well maintained on issues of concern were noted.

## Permit Writer Follow-up

All application deficiencies and required supporting documentation provided. The application has been completed.

## Field Notes

# H.     <u>EXHIBIT H</u>

*Exhibit H — Santa Clara FD Memorandum re PRA 23-518 Item J.*

 **City of Santa Clara**
The Center of What's Possible

Fire Department
**Memorandum**

**Date:**    October 18, 2023

**To:**    City Clerk

**From:**    Fire Department

**Subject:**  Public Records Request - 23-518 Item J

*Any plans, permits, applications, reviews, inspections, or notices related to a Toxic Gas System. (ie, SCCO B11-380).*

Fire Department was unable to locate records under the "Toxic Gas System (i.e. SCCO B11-380)" designation.

 **cc:**        File

# I. <u>EXHIBIT I</u>

*Exhibit I — 2022 Planning Commission election*



Sign In

# City of Santa Clara Legislative Public Meetings

The Center of What's Possible

| City Website | User Guide | Search Files | Calendar | Council and Authorities | Boards and Commissions | TMAC |

Share  RSS  Alerts

| Details | Reports |

File #:    22-677   Version: 1     Name:

Type:    Public Hearing/General Business     Status:    Agenda Ready

File created:    5/5/2022     In control:    Council and Authorities Concurrent Meeting

On agenda:    6/6/2022     Final action:

Title:    Interviews and Action to Appoint One Applicant to the Planning Commission for One Full Term Ending June 30, 2026

Attachments:    1. Applications, 2. Voting Guidelines, 3. Conflicts Review

| History (1) | Text |

| 1 record | Group | Export |

| DATE | VER. | ACTION BY | ACTION | RESULT | ACTION DETAILS | MEETING DETAILS | VIDEO OR AUDIO |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 6/6/2022 | 1 | Council and Authorities Concurrent Meeting | Adopted | Pass | Action details | Meeting details | ▶ Video or Audio |

# City of Santa Clara

## Agenda

## Call and Notice of Special Meeting

## City Council



| | | |
|---|---|---|
| **Monday, June 6, 2022** | **5:30 PM** | **Hybrid Meeting** |
| | | **Council Chambers/Virtual** |
| | | **1500 Warburton Avenue** |
| | | **Santa Clara, CA 95050** |

The City of Santa Clara will be conducting City Council meetings in a hybrid manner (in-person and continues to have methods for the public to participate remotely). Pursuant to Government Code Section 54953(e) and City of Santa Clara Resolution No. 22-9087, Councilmembers may teleconference from remote locations and the City continues to provide methods for the public to participate remotely:

• Via Zoom:

o https://santaclaraca.zoom.us/j/99706759306

Meeting ID: 997-0675-9306 or

o Phone: 1(669) 900-6833
• Via the City's eComment (now available during the meeting)
• Via email to PublicComment@santaclaraca.gov

As always, the public may view the meetings on SantaClaraCA.gov, Santa Clara City Television (Comcast cable channel 15 or AT&T U-verse channel 99), or the livestream on the City's YouTube channel or Facebook page.

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of California Government Code §54956 ("The Brown Act") and Section 708 of the Santa Clara City Charter, the Mayor calls for a Special Meeting of the Santa Clara City Council to commence and convene on June 6, 2022 at 5:30 p.m. for a Special Meeting to be held virtually, to consider the following matter(s) and to potentially take action with respect to them.

### 5:30 PM SPECIAL COUNCIL MEETING

### Call to Order

*Call to Order in the Council Chambers (Open to the Public)*

### Pledge of Allegiance and Statement of Values

### Roll Call

**Special City Council Meeting**                    **Meeting Agenda**                    **June 6, 2022**

## PUBLIC PRESENTATIONS

*[This item is reserved for persons to address the Council or authorities on any matter not on the agenda that is within the subject matter jurisdiction of the City or Authorities. The law does not permit action on, or extended discussion of, any item not on the agenda except under special circumstances. The governing body, or staff, may briefly respond to statements made or questions posed, and appropriate body may request staff to report back at a subsequent meeting. Although not required, please submit to the City Clerk your name and subject matter on the speaker card available in the Council Chambers.]*

## INTERVIEWS

1.      **22-677**      Interviews and Action to Appoint One Applicant to the Planning Commission for One Full Term Ending June 30, 2026

## REPORTS OF MEMBERS AND SPECIAL COMMITTEES

## ADJOURNMENT

The next regular scheduled meeting is on Tuesday, June 7, 2022, in the City Hall Council Chambers.


**City of Santa Clara**
The Center of What's Possible

CITY OF SANTA CLARA
OFFICE OF THE CITY CLERK

2022 APR 27 PM 1: 15

## Position

**Board/Commission/Committee Applying for***

Planning Commission

## Personal Information

**Name***

Ashley M. Gjovik

**Email***

[REDACTED]

**Address***

Street Address

[REDACTED]

Address Line 2

2310

City

SANTA CLARA

State / Province / Region

CA

Postal / Zip Code

95050-4854

Country

United States

**Primary Phone #***

[REDACTED]

**Secondary Phone #**

## Additional Information

**Are you eligible to vote in Santa Clara?***

Yes

**Are you a registered voter of Santa Clara?***

Yes

**Have you attended a meeting of this Board/ Commission/ Committee?***

Yes

**Present Employer**

ex-Apple Inc.

**Job Title**

Engineering Program Manager; Law Student

## Work Experience

Previous Government Bodies/ Elective Offices Applicant has served

| | Government Bodies/ Elective Offices | Position/ Office Held | From Date | To Date |
|---|---|---|---|---|
| 1 | North Clackamas School District (Oregon) | Human Resources Specialist | | |
| 2 | North Clackamas School District (Oregon) | Government & Community Relations | | |
| 3 | North Clackamas School District (Oregon) | Finance & Accounting Clerk | | |

Civic or Charitable Organizations to which Applicant has belonged

| Civic or Charitable Organization | Position Held | From Date | To Date |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 1 | ACLU San Francisco Chapter | ACLU SF Chapter Leader | |
| 2 | PAW Animal Welfare Team | Medical Team Volunteer | |
| 3 | Portland State University, RHA | Housing Representative & Tenant Advocate | |
| 4 | Cal. Dept. of Public Health, Env. Health | Community Education Volunteer | |
| 5 | SCU Environmental Law Society | Community Outreach Chair | |
| 6 | ACLU Santa Clara Law Club | Director of Diversity, Equity, & Inclusion | |
| 7 | No New Jail SF | Criminal Justice Researcher | |
| 8 | Law Foundation of Silicon Valley | Human Rights Legal Researcher | |

## Special Interests, Hobbies or Talents

Interests: Human Rights; Public International Law; Privacy; Public Policy; Public Interest Law

High School, College, Professional, Vocational Schools attended

| | High School, College, Professional, Vocational School | Major Subject | Degree Dates / Anticipated Graduation |
|---|---|---|---|
| 1 | Santa Clara University | Juris Doctor | |
| 2 | Portland State University | Bachelor of Science | |
| 3 | University of Oxford | Focus: Transitional Justice | |

## Special awards or recognition received

Chronological:
Dean's List, Santa Clara University, School of Law
Emery Merit Scholar, Santa Clara University, School of Law
CALI Excellence for the Future Award: Public Health Law
CALI Excellence for the Future Award: Legislation & Statutory Analysis
Witkin Award for Academic Excellence: Property Law
CALI Excellence for the Future Award: Property Law
Nike Maxim Award: "0.2 Nike is a Company"
Sigma Tau Delta, International English Honors Society
Dean's List, Portland State University
Bennington College Scholarship

## Reasons

Please state reasons why you want to become a member of this Board/Commission/Committee, including what specific objectives you would be working toward as a member of this advisory board:

I would like to champion that Santa Clara provides better support for low income residents, and to encourage new development is approved with environmentally and culturally responsible planning.

## Additional Information

Any other information which you feel would be useful to the City Council in reviewing your application:

Certifications:
Santa Clara University, School of Law, Public International Law, with honors
Project Management Institute (PMI), Project Management Professional (PMP)

## Conflict of Interests

Are you associated with any Organization/Employment that might be deemed a conflict of interest in performing your duties if appointed to this position?

No

## Abstaining from Votes

City policy directs all advisory body members not to vote on matters where there exists a potential conflict of interest. Would you be willing to abstain from voting if such a conflict arises?

Yes

## Signature and Acknowledgement

### Signature*

*Ashley M. Gjovik*

By clicking submit you are confirming that you are the person listed in this application, and that all information provided is truthful and correct. All information provided will be public information.

you want to support a trolley line? I know everyone talks about bicyclists. I ride myself and up and down San Tomas creek all the time. I don't see people doing that people my age. I don't see young people doing it. the only other people are doing it on weekends so I think we have to have a real -- I don't want to talk too much about this. I think we have to have a real discussion about what we mean by transit or public transportation and what we have to do here.

>> Thank you. I think that was the extent of the questions so if you're ready to give us a one minute closing statement.

>> Sure. Thank you very much for the opportunity. Sounds like you have a lot of great candidates here so I am sure it's a tough decision for you.

>> It's going to be. I can tell already. Thank you so much for applying and you're welcome to stay as well or the Clerk's Office will let you know. Thank you Vinny.

>> Okay Madam Mayor and Council we have our next candidate and she is via Zoom. This is Ashley Gjovik and we're promoting her over to panelists and she can turn on her camera if she chooses to. There she is.

>> Are we going to see you? Hi Ashley. Welcome.

>> Thank you so much.

>> Welcome.

>> Good to get start?

>> Yes. Sorry. I just blurted that U you can start Ashley. You have up to three minutes in an opening statement and tell us about yourself and why you applied for the questions and I know we gave you questions ahead of time and we're going to ask you again so whenever you're ready to start go ahead.

>> Thank you so much Mayor. Thank you. Thank you allowing me to go for this role. My name is Ashley Gjovik and I work in Santa Clara and out of Sunnyvale and how with a human rights

City of Santa Clara Transcript

00:45:24 group based in Europe and started this week. I rented from two of the largest apartment complexes in the city and graduating from the University of law this month and even though I haven't lived in Santa Clara City I spent time here. As you know it's one of the wealthiest and powerful in the nation. The Silicon Valley has some of the highest per capita income but not across demographics and genders and races and 50% evictions are black and 40 are Latino and -- yet 17% of the unhoused population Latinos are 26% of the total population yet 44% of the unhoused population. Meanwhile the price is astronomical. A salary of $250,000 a year is required to buy a home and created some of the worst income inequality and families are houseless on any night in the county and nearly 200 people die on the streets each year. This inequality gross worse every year with great amount people -- (paused)

00:47:01 >> In a Brown Field site here. The question is not about whether we build on these sites. It's how we do it safely and exposure -- and how we ensure that human dignity is respected including people's right to know what pollution they maybe exposed to and I believe Santa Clara is not only powerful and critical city but extremely high risk for human rights violation and I would like to join the Commission for a human rights lens and the standard assessment on criteria.

00:47:36 >> Thank you Ashley. We're going to go ahead and start with our questions.

00:47:41 >> Thank you Ashley for applying. What development in Santa Clara is a good example of planning and why?

00:47:51 >> So I thought about this for a little bit and the example I'm going to give will make Mayor Gillmor chuckle a little bit. I am actually still going with Santa Clara Square apartments and where I lived and suffered

from hazardous waste exposure but besides that it was a beautiful place to live. It was convenient. It was a great strategy to have so many restaurants and commercial activity so close to really dense housing as well as businesses so people could cross the street to get home and with a city that has major transportation issues and concerns not only was it convenient but it also helped with the environment that there's less carbon emissions and creates a sense of community and so many people in such a dense area.

>> Great. Okay. Yes, I did chuckle a little bit on that. All right. All right. The next question we have is what do you believe your role as a Planning Commissioner would be?

>> It's an advisory role is my understanding. It definitely is looking over all the documentation for the proposal, trying to understand it, pointing out risks where you see them, asking questions, but ultimately it's a comment. It's whether you think it's a good idea or not but not the end of the line at all and there's lots of other Commissions that will weigh in on specific topics which is great because you get expertise in different areas so I look forward if I am chosen for this role to do a lot of research and reading and preparing various specific recommendations they think are critical enough to raise to the broader group.

>> Thank you.

>> Thank you. So do you have any thoughts about El Camino Specific Area Plan?

>> I do. El Camino Real is critical for transportation, not just across the city but the county and spent e norm mouse amount of time in vehicles on El Camino Real. It's also a really nice hub for recreation and business and a balance has to be made for the area and facilitate transportation and public

00:50:10 transportation and walkability
00:50:11 are in conflict with insuring a
00:50:15 fast moving highway but at the
00:50:17 same time the community aspect
00:50:18 and folks that live might be
00:50:22 drawn to the residential living
00:50:23 towards this area. They can
00:50:25 walk out the door and get lunch
00:50:27 so I am very excited to see the
00:50:29 development activities that have
00:50:32 taken place however one aspect
00:50:33 of El Camino that must be
00:50:36 addressed is its name. Santa
00:50:38 Clara in my name is over due
00:50:41 with a reckoning of the mission
00:50:43 here. Other missions have
00:50:44 started this process in the last
00:50:46 two, three years. Governor
00:50:47 Newsom also made statements.
00:50:51 Sand Ford and Hastings are
00:50:52 working on renaming as well but
00:50:55 Santa Clara proudly markets
00:50:57 itself with symbols of
00:51:00 concentration cames from the
00:51:03 native people and ensuring
00:51:05 cultural analysis and planning
00:51:06 proposals and mitigating the
00:51:09 brutality here. I have done
00:51:11 extensive research on the topic
00:51:15 that I am happy to share
00:51:16 regardless but I would like to
00:51:18 see a thoughtful approach and a
00:51:21 reckoning with our history.
00:51:24 >> Thank you.
00:51:25 >> Thank you for applying
00:51:26 Ashley and congratulations on
00:51:27 You're up coming graduation so
00:51:30 the last question we have for
00:51:31 you do you believe is that we
00:51:33 need more fees and TDM measures
00:51:36 for developers to abide by? And
00:51:38 do we need any transportation
00:51:41 improvements?
00:51:42 Yes. Wholehearted yes. You
00:51:46 know one of the things that kind
00:51:47 of shocked me and I work for big
00:51:50 tech seeing companies that have
00:51:52 more money than God and they
00:51:54 keep it for themselves and seems
00:51:55 like a battle to get basic taxes
00:51:59 for the lunch program. I think
00:52:01 transportation that's one area
00:52:03 -- shuttleels help and bringing
00:52:14 employees in and it has an
00:52:17 impact on infrastructure and
00:52:19 there should be real fees where
00:52:21 you can get them and
00:52:24 transportation improvements. the
00:52:26 fact if I -- when I lived in
00:52:29 Mountain View and came to Santa
00:52:31 Clara University I had to take a

bus to get to the train and the bus is subject to transportation issues. It was a mess. It didn't make sense and such a short distance and took so long to get to and from and a conversation to be had with transportation.

>> Thank you.

>> Oh is that it? Sorry. That was the last question. I was waiting for another one. Ashley --

>> You could ask me more.

>> We probably could all day long. Could you give us a closing one minute statement anything you want to add that you haven't said already and we're ready to hear that.

>> Thank you for the opportunity to interview. Thank you for listening to my positions on these things. I would be ecstatic to have the opportunity and honor to be able to voice my thoughts on these very important matters. Like I mentioned this is one of the most powerful areas in the nation. They're not insignificant decision to be made and direct impact of these decisions and honored to be part of it and regardless thank you for the opportunity to interview and thank you for everything that you guys do to build and manage a city despite a lot of different conflicting priorities and obstacles in the way. I know it's not an easy job.

>> Thank you Ashley. We will make our decision this evening. If you're able to stay with us and tune in that is great. If not the City Clerk's Office will notify you tomorrow. Okay. Thank you.

>> Thank you.

>> Okay. Madam Mayor and Council our next applicant Cesar Magdaleno informed he he won't be able to make it this evening so we'll move forward with Ram Misra and we will move him over as a panelist.

>> Hello. Can you hear me?

>> Yes we can. Hi. Welcome. And thank you for applying to the Planning Commission.

# J. **EXHIBIT J**

*Exhibit J — Santa Clara FD HazMat Incident Reports for 3250 Scott Boulevard.*

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 09/28/2023 13:13:47
Number of Pages: 3

Incident Report
2019-1904285  -000

## Basic

| | |
|---|---|
| Alarm Date and Time | 08:40:52    Saturday, June 1, 2019 |
| Arrival Time | 08:44:44 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 09:17:33    Saturday, June 1, 2019 |
| Response Time | 0:03:52 |
| Turnout Time | 0:01:33 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | B |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 80 - Information, investigation & enforcement, other |
| Casualties | No |
| Apparatus - Suppression | 2 |
| Personnel - Suppression Personnel | 4 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

## Situation

| | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

## Hazmat

| | |
|---|---|
| Area Affected | 1 - Square Feet |
| Hazmat Action Taken 1 | 34 - Investigate |
| Cause of Release | 1 - Intentional |
| Disposition | 1 - Completed by fire service only |

## Hazmat Chemicals

| | |
|---|---|
| Chemical Name | Hazardous Material |

## Apparatus - E99

| | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:03:52 |
| Apparatus Dispatch Date and Time | 08:40:52    Saturday, June 1, 2019 |
| En route to scene date and time | 08:42:25    Saturday, June 1, 2019 |
| Apparatus Arrival Date and Time | 08:44:44    Saturday, June 1, 2019 |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 09/28/2023 13:13:47
Number of Pages: 3

Incident Report
2019-1904285   -000

| Apparatus - E99 | |
| --- | --- |
| Apparatus Clear Date and Time | 09:17:26     Saturday, June 1, 2019 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 4062 - Cantanho, Trevor |
| | Position: DE |
| | Amount 1: $0.00 |
| Personnel 2 | 6448 - Lerner, Lukas |
| | Position: FF |
| Personnel 3 | 5747 - Carter, Gail |
| | Position: DE |

| Apparatus - H99 | |
| --- | --- |
| Apparatus ID | H99 |
| Response Time | 0:04:03 |
| Apparatus Dispatch Date and Time | 08:40:52     Saturday, June 1, 2019 |
| En route to scene date and time | 08:42:44     Saturday, June 1, 2019 |
| Apparatus Arrival Date and Time | 08:44:55     Saturday, June 1, 2019 |
| Apparatus Clear Date and Time | 09:17:33     Saturday, June 1, 2019 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | Suppression |
| Apparatus Type | 93 - HazMat unit |
| Personnel 1 | 5751 - Gandy, Aaron |
| | Position: DE |

| Authority | |
| --- | --- |
| Reported By | 4062 - Cantanho, Trevor |
| | 06:39:02     Sunday, June 2, 2019 |
| Officer In Charge | - , |
| Reviewer | - , |

| Narratives | |
| --- | --- |
| Narrative Name | New Narrative |
| Narrative Type | Incident |
| Narrative Date | 06:34:18     Sunday, June 2, 2019 |
| Author | 4062 - Cantanho, Trevor |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | At 0840 hours on Saturday June 1, 2019 we were dispatched to a chemical spill/leak. Two units were assigned to this incident. Four personnel responded. We arrived on scene at 0844 hours and cleared at 0917 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is laboratory or science lababoratory. Other special haz mat actions were also taken. No mutual/automatic |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 09/28/2023 13:13:48
Number of Pages: 3

Incident Report
2019-1904285   -000

| Narratives |
| --- |

aid was given or received.

Alarm number 1904285 has been assigned to this incident.

E99 and H99 responded to a gas leak at Apple.  E99 and H99 arrived on scene and found nothing showing and an evacuation in progress.  Apples ERT was on scene and they stated that they had been purging their lines but did not put their system in test.  The alarm was for .5 parts per billion that was going through their scrubbers.  The chemicals were Silane and Phosephine.  This release was a normal process for them, and there were no further actions needed by Fire or Hazmat.

E99 cleared.

E99B
A/C T.Cantanho

End of Report

 **City of
Santa Clara**
The Center of What's Possible

Fire Department
**Memorandum**

**Date:**    October 18, 2023

**To:**    City Clerk

**From:**    Fire Department

**Subject:**  Public Records Request - 23-518 Item A

*In a prior request, a fire department/haz mat report was released for a 2019 silane/phosphine leak at 3250 Scott. Please provide any additional documents or correspondence related to that matter if the city has any.*

Fire Department does not have any further other than what was presented in Public Record Request # 20-77 (https://santaclara.nextrequest.com/requests/20-77).

  **cc:**         File

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
*user@ci.santa-clara.ca.us*
*Printed: 09/28/2023 13:15:37*
*Number of Pages: 3*

Incident Report
2019-1908541   -000

## Basic

| | |
|---|---|
| Alarm Date and Time | 23:06:21    Monday, October 21, 2019 |
| Arrival Time | 23:10:19 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 23:48:42    Monday, October 21, 2019 |
| Response Time | 0:03:58 |
| Turnout Time | 0:01:51 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | C |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | 1 - Mutual aid received |
| Alarms | 1 |
| Action Taken 1 | 63 - Restore fire alarm system |
| Action Taken 2 | 86 - Investigate |
| Casualties | No |
| Apparatus - Suppression | 1 |
| Personnel - Suppression Personnel | 3 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 599 - Business office |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

## Situation

| | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

## Person Involved - ███████

| | |
|---|---|
| Last Name | ██████ |
| First Name | ████ |
| Street Address | |

## Hazmat

| | |
|---|---|
| Area Affected | 1 - Square Feet |
| Area Affected Units | 4 |
| Cause of Release | 2 - Unintentional release |
| Factors Contributing To Release 1 | 50 - Mechanical failure, malfunction, other |
| Disposition | 2 - Completed with fire service present |

## Hazmat Chemicals

| | |
|---|---|
| Chemical Name | Hazardous Material |

Printed:  09/28/2023 13:15:37

*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*
*Printed: 09/28/2023 13:15:37*
*Number of Pages: 3*

Incident Report
2019-1908541  -000

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:03:58 |
| Apparatus Dispatch Date and Time | 23:06:21    Monday, October 21, 2019 |
| En route to scene date and time | 23:08:12    Monday, October 21, 2019 |
| Apparatus Arrival Date and Time | 23:10:19    Monday, October 21, 2019 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 5306 - Beals, Jason |
| | Position: DE |
| | Amount 1: $0.00 |
| Personnel 2 | 6762 - Orozco, Jose |
| | Position: FF |
| Personnel 3 | 7225 - Vo, Trung |
| | Position: FF |

| Authority | |
|---|---|
| Reported By | 5306 - Beals, Jason |
| | 07:39:54    Tuesday, October 22, 2019 |
| Officer In Charge | 5306 - Beals, Jason |
| | 07:39:57    Tuesday, October 22, 2019 |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | Engine 99 |
| Narrative Type | Incident |
| Narrative Date | 07:29:58    Tuesday, October 22, 2019 |
| Author | 5306 - Beals, Jason |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | At 2306 hours on Monday October 21, 2019 we were dispatched to a chemical spill/leak. One unit was assigned to this incident. Three personnel responded. We arrived on scene at 2310 hours and cleared at 2348 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is business office. The primary task(s) performed at the scene by responding personnel was to restore fire alarm system. Other special haz mat actions were also taken. Mutual aid was received on this incident. |
| | Alarm number 1908541 has been assigned to this incident. |
| | Engine 99 responded code 3 for the report of a toxic gas alarm. Upon arrival we found the affected portion of the building evacuated. We located the alarm panel and found that it showed a spike of Phosphine at 1ppm for 2 to 3 minutes inside a Phosphine gas cabinet. At the time of our arrival the detector was showing 0ppm. Facility personnel ████████ arrived on scene and assisted with resetting the system. He stated that the gas cabinet |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 09/28/2023 13:15:37
Number of Pages: 3

Incident Report
2019-1908541   -000

| Narratives |
| --- |

would remain shut down and that it would be serviced by the appropriate technician in the morning. We checked with the alarm company for a reset via SCFD Comm and confirmed that it was reset. Engine 99 cleared the scene.

End of Report

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:36:29
Number of Pages: 3

Incident Report
2020-2005200   -000

| Basic | |
|---|---|
| Alarm Date and Time | 08:58:27    Friday, July 17, 2020 |
| Arrival Time | 09:03:14 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 09:54:25    Friday, July 17, 2020 |
| Response Time | 0:04:47 |
| Turnout Time | 0:02:01 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | B |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Casualties | No |
| Apparatus - Suppression | 1 |
| Personnel - Suppression Personnel | 3 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Person Involved - ██████████ | |
|---|---|
| Involvement Code | ██ |
| Last Name | ██ |
| First Name | ████ |
| Business Name | ███ |
| Street Address | |
| City, State Zip | █ |
| Phone | █████ |

| Hazmat | |
|---|---|
| Area Affected | 1 - Square Feet |
| Area Affected Units | 1 |
| Cause of Release | 2 - Unintentional release |
| Factors Contributing To Release 1 | 60 - Design/construction/installation deficiency, other |
| Disposition | 1 - Completed by fire service only |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:36:29
Number of Pages: 3

Incident Report
2020-2005200   -000

| Hazmat Chemicals | |
|---|---|
| Chemical Name | Hazardous Material |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:04:47 |
| Apparatus Dispatch Date and Time | 08:58:27    Friday, July 17, 2020 |
| En route to scene date and time | 09:00:28    Friday, July 17, 2020 |
| Apparatus Arrival Date and Time | 09:03:14    Friday, July 17, 2020 |
| Apparatus Clear Date and Time | 09:52:48    Friday, July 17, 2020 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 4062 - Cantanho, Trevor |
| | Position: DE |
| | Amount 1: $0.00 |
| Personnel 2 | 6220 - Quinley, Ryan |
| | Position: FF |
| Personnel 3 | 6379 - Golovey, Dmitriy |
| | Position: FF |

| Authority | |
|---|---|
| Reported By | 4062 - Cantanho, Trevor |
| | 21:08:12    Friday, July 17, 2020 |
| Officer In Charge | - , |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | New Narrative |
| Narrative Type | Incident |
| Narrative Date | 20:57:00    Friday, July 17, 2020 |
| Author | 4062 - Cantanho, Trevor |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | At 0858 hours on Friday July 17, 2020 we were dispatched to a chemical spill/leak. One unit was assigned to this incident. Three personnel responded. We arrived on scene at 0903 hours and cleared at 0954 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is laboratory or science lababoratory. The primary task(s) performed at the scene by responding personnel were material detection, monitoring, sampling, and analysis. Other special haz mat actions were also taken. No mutual/automatic aid was given or received. |
| | Alarm number 2005200 has been assigned to this incident. |
| | E99 responded to Apple for a gas alarm.  E99 arrived on scene.  The building was |

*Santa Clara City Fire Department*
*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*
*Printed: 10/03/2023 06:36:29*
*Number of Pages: 3*

Incident Report
2020-2005200   -000

| Narratives |
| --- |

evacuated, and personnel were in the designated areas.  I made contact with Apples Incident Commander. He stated that they had a detector in a cabinet that had a hit of Tetraethyl Orthosilicate TEOS.  An engineer was working on tool and the plumbing had been installed backward.  This caused a small amount of gas to release inside the cabinet. The tool was shut off and the gas stopped leaking.  The IC took us into their remote monitoring room where they were able to show us the sensor readings in the cabinet where the leak was and the area sensors in the room. The monitor showed a spike in TEOS was 17.5 ppm when the history was pulled up.  The area sensor for the room did not detect any TEOS.  Upon our arrival the sensor inside the cabinet was reading 0.00 ppm and the area sensor in the room was reading 0.00 ppm. At this time there was no emergency and no risk to the staff or SCFD personnel. Facility staff and the E99 entered the room with a CGI running to get eyes on the tool.  The scene was given back to the facility staff for them to fix their tool appropriately.

E99 cleared

E99B
A/C T.Cantanho

End of Report

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:41:54
Number of Pages: 4

Incident Report
2021-2103124   -000

| Basic | |
|---|---|
| Alarm Date and Time | 08:29:29    Friday, April 30, 2021 |
| Arrival Time | 08:33:48 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 13:03:56    Friday, April 30, 2021 |
| Response Time | 0:04:19 |
| Turnout Time | 0:01:30 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | B |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 41 - Identify, analyze hazardous materials |
| Action Taken 2 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Casualties | No |
| Apparatus - Suppression | 3 |
| Personnel - Suppression Personnel | 7 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Person Involved - ▇▇▇▇▇ | |
|---|---|
| Involvement Code | ▇▇ |
| Last Name | ▇▇▇ |
| First Name | ▇▇ |
| Street Address | ▇▇▇▇▇▇▇ |
| City, State Zip | ▇▇▇▇▇▇▇▇▇▇ |
| Phone | ▇▇▇▇ |

| Hazmat | |
|---|---|
| Inside/On Structure Flag | 1 |
| Area Affected | 1 - Square Feet |
| Area Affected Units | 500 |
| Cause of Release | 1 - Intentional |
| Factors Contributing To Release 1 | 00 - Other factor contributed to release |

777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:41:55
Number of Pages: 4

Incident Report
2021-2103124   -000

| Hazmat | |
| --- | --- |
| Disposition | 1 - Completed by fire service only |

| Hazmat Chemicals | |
| --- | --- |
| Chemical Name | Phosphine |
| DOT ID | 23 - Division 2.3 Gases toxic by inhalation |
| CAS Registration | 7803-51-2 |
| Chemical ID | 2199 |
| Container Type | 12 - Cylinder |
| Estimated Container Capacity | 1145 |
| Released Units | 22 - Pounds |
| Physical State When Released | 3 - Gas |
| Released Into | 1 - Air |

| Apparatus - E99 | |
| --- | --- |
| Apparatus ID | E99 |
| Response Time | 0:04:19 |
| Apparatus Dispatch Date and Time | 08:29:29    Friday, April 30, 2021 |
| En route to scene date and time | 08:31:37    Friday, April 30, 2021 |
| Apparatus Arrival Date and Time | 08:33:48    Friday, April 30, 2021 |
| Apparatus Clear Date and Time | 09:50:56    Friday, April 30, 2021 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 4062 - Cantanho, Trevor |
| | Position: DE |
| | Amount 1: $3.00 |
| Personnel 2 | 5748 - Cole, Michael |
| | Position: DEP |
| Personnel 3 | 6225 - Marrone, Phillip |
| | Position: FFP |

| Apparatus - H99 | |
| --- | --- |
| Apparatus ID | H99 |
| Response Time | 0:04:35 |
| Apparatus Dispatch Date and Time | 08:29:29    Friday, April 30, 2021 |
| En route to scene date and time | 08:31:48    Friday, April 30, 2021 |
| Apparatus Arrival Date and Time | 08:34:04    Friday, April 30, 2021 |
| Apparatus Clear Date and Time | 13:03:55    Friday, April 30, 2021 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | Suppression |
| Apparatus Type | 93 - HazMat unit |
| Personnel 1 | 5751 - Gandy, Aaron |
| | Position: DE |
| | Amount 1: $1.00 |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:41:55
Number of Pages: 4

Incident Report
2021-2103124   -000

| Apparatus - E98 | |
|---|---|
| Apparatus ID | E98 |
| Response Time | 0:09:52 |
| Apparatus Dispatch Date and Time | 08:46:33    Friday, April 30, 2021 |
| En route to scene date and time | 08:48:03    Friday, April 30, 2021 |
| Apparatus Arrival Date and Time | 08:56:25    Friday, April 30, 2021 |
| Apparatus Clear Date and Time | 09:37:08    Friday, April 30, 2021 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| Personnel 1 | 7225 - Vo, Trung |
| | Position: FF |
| | Amount 1: $3.00 |
| Personnel 2 | 2170 - Siu, Ken -t |
| | Position: DEP |
| Personnel 3 | 4075 - Price, Brian - w |
| | Position: CA |

| Authority | |
|---|---|
| Reported By | 4062 - Cantanho, Trevor |
| | 18:48:16    Saturday, May 1, 2021 |
| Officer In Charge | - , |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | New Narrative |
| Narrative Type | Incident |
| Narrative Date | 18:36:04    Saturday, May 1, 2021 |
| Author | 4062 - Cantanho, Trevor |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | At 0829 hours on Friday April 30, 2021 we were dispatched to a chemical spill/leak. Three units were assigned to this incident. Seven personnel responded. We arrived on scene at 0833 hours and cleared at 1303 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is laboratory or science lababoratory. The primary task(s) performed at the scene by responding personnel were to identify and analyze hazardous materials. Other special haz mat actions were also taken. No mutual/automatic aid was given or received. |
| | Alarm number 2103124 has been assigned to this incident. |
| | E99 responded to ARIA for a toxic gas alarm.  E99 arrived on scene and was met by ERT staff.  They stated that they had a Phosphine sensor alarm in their lab.  They were purging the lines for a phosphine gas cabinet.  The phosphine had gone through the scrubbers and back in through the air handling system and into the lab area, separate from the gas cabinet. |

777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
*Printed: 10/03/2023 06:41:55*
*Number of Pages: 4*

Incident Report
2021-2103124   -000

| **Narratives** |
| --- |

Area sensors in the lab indicated that there was a peak reading of 32 PPB.  Measurements were made after the incident and a determination was made that there was a .001145 lbs. of phosphine that had been purged.  We determined that the readings in the lab were accurate based on the curvature of the graph.  Multiple area sensors all reading phosphine gas were in alarm.

The crew from E99 and H99 set up the command structure and requested E98 code 2 for backup entry and decontamination.  A ICS 208 was started and is available at I:\HAZMAT\ICS 208 for full documentation of the incident.

There were no exposures to the gas.  The ventilation system was increased to exhaust the gas out of the facility as fast as possible. We decided that nonintervention was the safest course of action due to there was no current leak at the time, and the PPB was diminishing.  Once the area sensors read 0 PPB we made a joint entry with our sensors and an ERT member from ARIA with one of their sensors.  It was determined that there wasn't any phosphine left in the facility and it was clear to let employees back into the building.

ARIAs EHS staff was advised to contact CAL OES for their required notification.  I contacted CAL OES to obtain an incident number 21-2288.

E99 cleared.

E99B
A/C T.Cantanho

End of Report

| SITE SAFETY AND CONTROL PLAN ICS 208 HM | 1. Incident Name: Apple - Aria | 2. Date Prepared: 4-30-2021 | 3. Operational Period: Time: 0845 - |
|---|---|---|---|

## Section I. Site Information

4. Incident Location: 3250 Scott Blvd., Santa Clara

## Section II. Organization

| 5. Incident Commander: A/C T. Cantanho | 6. HM Group Supervisor: A/C T. Cantanho | 7. Tech. Specialist - HM Reference: D/E A. Gandy |
|---|---|---|
| 8. Safety Officer: | 9. Entry Leader: A/C T. Cantanho | 10. Site Access Control Leader: ERT |
| 11. Asst. Safety Officer - HM: D/E A. Gandy | 12. Decontamination Leader: Capt. B. Price | 13. Safe Refuge Area Mgr: ERT |
| 14. Environmental Health: | 15. | 16. |

| 17. Entry Team: (Buddy System) Name | PPE Level | 18. Decontamination Element: Name | PPE Level |
|---|---|---|---|
| Entry 1 F/F-P P. Marrone | Turn-Outs w/ SCBA | Decon 1 B. Price | Turn-outs/SCBA |
| Entry 2 D/E-P M. Cole | Turn Outs w/ SCBA | Decon 2 T. Vo | Turn-outs/SCBA |
| Entry 3 | | Decon 3 | |
| Entry 4 | | Decon 4 | |

## Section III. Hazard/Risk Analysis

| 19. Material: | Container type | Qty. | Phys. State | pH | IDLH | F.P. | I.T. | V.P. | V.D. | S.G. | LEL | UEL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phosphine | Cyl. | | Gas | 7 | 50 ppm | — | 212°F | 2.93x10 | 1.17 | >1 | 1.79 | 0.1k |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Comment: Wide Flam. Range 1.6% - 98% , Reactive w/ air

## Section IV. Hazard Monitoring

| 20. LEL Instrument(s): Ph3 Toxi Rae ay Multi Rae Lite | 21. O₂ Instrument(s): Multi Rae Lite |
|---|---|
| 22. Toxicity/PPM Instrument(s): Ph3 Toxi Rae | 23. Radiological Instrument(s): n/a |

Comment: Facility provided PPB monitor

## Section V. Decontamination Procedures

| 24. Standard Decontamination Procedures: | YES: X | NO: |
|---|---|---|

Comment: Fresh Air, Fan Assist if needed

## Section VI. Site Communications

| 25. Command Frequency: C92 | 26. Tactical Frequency: C92 | 27. Entry Frequency: C92 |
|---|---|---|

## Section VII. Medical Assistance

| 28. Medical Monitoring: YES: NO: X | 29. Medical Treatment and Transport In-place: YES: NO: X |
|---|---|

Comment: Medical to be determined... All clear entry, common PPE

ICS 208 HM                     Page 1                     3/98

Scanned with CamScanner

## Section VIII.  Site Map

30.  Site Map:

Building

E99

main Entry

CP

Hngr

Hot Zone

Tool Room

gas cabnets

N

Tool Room is isolated & vented

Emergeny Exit

| Weather ☒ | Command Post ☒ | Zones ☒ | Assembly Areas ☐ | Escape Routes ☒ | Other ☐ |

## Section IX.  Entry Objectives

31.  Entry Objectives:

Verify room all clear, after facility equipment shows 0 reading.

## Section X.  SOP S and Safe Work Practices

| 32.  Modifications to Documented SOP s or Work Practices: | YES: | NO: ☒ |

Comment:

## Section XI.  Emergency Procedures

33.  Emergency Procedures:

Evac Plan in place, Emergeny decon with fresh air & nose line water

## Section XII.  Safety Briefing

34.  Asst. Safety Officer - HM  Signature:

Safety Briefing Completed (Time):

09:25

35.  HM Group Supervisor  Signature:

36.  Incident Commander  Signature:

ICS 208 HM                           Page 2                                    3/98

Scanned with CamScanner

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: Apple - Aria | 2. Operational Period: Date From: 04/30/21   Date To: 04/30/21   Time From: 0845   Time To: 0940 | |
|---|---|---|
| 3. Name: Cantanho | 4. ICS Position: I.C / HmGS | 5. Home Agency (and Unit): SCFD E99 |

**6. Resources Assigned:**

| Name | ICS Position | Home Agency (and Unit) |
|---|---|---|
| Gary | ASO | SCFD Hm99 |
| Cole | Entry | SCFD E99 |
| Marrow | Entry | SCFD E99 |
| Price | Decon | SCFD E98 |
| Vo | Decon | SCFD E98 |
| Siu | Decon | SCFD E98 |
| | | |
| | | |

**7. Activity Log:**

| Date/Time | Notable Activities |
|---|---|
| 08:45 | Arrived, Establish Command, Planning |
| 09:20 | Safty Meeting |
| 09:24 | On Air - Entry |
| 09:30 | 'AH Zeros' Entry Team Exiting |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| 8. Prepared by: Name: Gandy | Position/Title: ASO / Tech Ref.   Signature: |
|---|---|
| ICS 214, Page 1 | Date/Time: 04/30/21   09:15 |

*Santa Clara City Fire Department*
*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*
*Printed: 10/03/2023 06:46:50*
*Number of Pages: 4*

Incident Report
2022-2203209   -000

| Basic | |
|---|---|
| Alarm Date and Time | 10:42:08    Monday, April 18, 2022 |
| Arrival Time | 10:49:01 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 11:39:42    Monday, April 18, 2022 |
| Response Time | 0:06:53 |
| Turnout Time | 0:00:29 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | A |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 86 - Investigate |
| Casualties | No |
| Apparatus - Suppression | 3 |
| Personnel - Suppression Personnel | 7 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 984 - Industrial plant yard - area |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Person Involved - ██████████ | |
|---|---|
| Involvement Code | ██████ |
| Last Name | ██████ |
| First Name | ████ |
| Street Address | ████████████████ |
| City, State Zip | ████████████████████ |
| Phone | ████████████ |

| Hazmat | |
|---|---|
| Area Affected | 1 - Square Feet |
| Area Affected Units | 1 |
| Cause of Release | 2 - Unintentional release |
| Factors Contributing To Release 1 | 72 - Accidentally turned on, not turned off |
| Disposition | 2 - Completed with fire service present |

777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:46:50

Incident Report
2022-2203209  -000

Number of Pages: 4

| Hazmat Chemicals | |
|---|---|
| Chemical Name | Hazardous Material |

| Apparatus - E98 | |
|---|---|
| Apparatus ID | E98 |
| Apparatus Dispatch Date and Time | 10:42:08    Monday, April 18, 2022 |
| En route to scene date and time | 10:44:41    Monday, April 18, 2022 |
| Apparatus Clear Date and Time | 10:45:03    Monday, April 18, 2022 |
| Apparatus priority response | Yes |
| Apparatus cancelled after dispatch | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 93 - Cancelled en route |
| Apparatus Type | 11 - Engine |
| Personnel 1 | 4070 - Lombardo, David-D |
| | Position: DE |
| | Amount 1: $3.00 |
| Personnel 2 | 5757 - Mervine, Eli |
| | Position: FF |
| Personnel 3 | 2538 - Herscovitch, Michael -w |
| | Position: CP |

| Apparatus - H99 | |
|---|---|
| Apparatus ID | H99 |
| Response Time | 0:06:53 |
| Apparatus Dispatch Date and Time | 10:42:08    Monday, April 18, 2022 |
| En route to scene date and time | 10:45:16    Monday, April 18, 2022 |
| Apparatus Arrival Date and Time | 10:49:01    Monday, April 18, 2022 |
| Apparatus Clear Date and Time | 11:39:42    Monday, April 18, 2022 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | Suppression |
| Apparatus Type | 93 - HazMat unit |
| First Arriving Unit | Yes |
| Personnel 1 | 6381 - Renshaw, Christopher |
| | Position: DE |
| | Amount 1: $1.00 |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:04:21 |
| Apparatus Dispatch Date and Time | 10:45:19    Monday, April 18, 2022 |
| En route to scene date and time | 10:45:48    Monday, April 18, 2022 |
| Apparatus Arrival Date and Time | 10:49:40    Monday, April 18, 2022 |
| Apparatus Clear Date and Time | 11:39:15    Monday, April 18, 2022 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:46:50
Number of Pages: 4

Incident Report
2022-2203209   -000

| Apparatus - E99 | |
|---|---|
| Personnel 1 | 4970 - Ayllon, Aitor |
| | Position: CP |
| | Amount 1: $3.00 |
| Personnel 2 | 4977 - Kleinheinz, Phillip |
| | Position: DEP |
| Personnel 3 | 7225 - Vo, Trung |
| | Position: FF |

| Authority | |
|---|---|
| Reported By | 4970 - Ayllon, Aitor |
| | 15:00:05    Monday, April 18, 2022 |
| Officer In Charge | 4970 - Ayllon, Aitor |
| | 15:00:06    Monday, April 18, 2022 |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | E99 |
| Narrative Type | Incident |
| Narrative Date | 14:43:48    Monday, April 18, 2022 |
| Author | 4970 - Ayllon, Aitor |
| Author Rank | CP |
| Author Assignment | 1 |
| Narrative Text | At 1042 hours on Monday April 18, 2022 we were dispatched to a chemical spill/leak. Three units were assigned to this incident. Seven personnel responded. We arrived on scene at 1049 hours and cleared at 1139 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is Industrial plant yard/area. The primary task(s) performed at the scene by responding personnel was investigation. Other special haz mat actions were also taken. No mutual/automatic aid was given or received. |

Alarm number 2203209 has been assigned to this incident.

E99 responded Code 3 to the above address for a report of a chemical leak with no reset. E99 and H99 arrived on scene of a large commercial building with evacuation in progress. E99/H99 crew met with the business IC, Safety Officer, and ERT who were managing the incident currently.  Per the IC, ███████, an employee accidentally turned on the bottle for 5% gas fluorine while it was in the cabinet.  The system automatically alarmed upon detection of the gas and evacuated it to the atmosphere as designed.  The bottle was quickly turned off by the employee and all occupants of the lab were evacuated.  Upon our arrival, the IC was able to confirm that the lab and any rooms that it was attached to via ventilation ducts where evacuated.  The lab has sensors inside the cabinet, which was sealed, and outside the cabinet.  The sensors outside the cabinet never registered any gas leak during the entire event.  The sensor inside the cabinet was reading at 4.38 PPM upon arrival, but the staff advises that the sensor may be over saturated and takes time before it drops.  H99 provided technical references for chemical during the event.  E99 crew spoke with IC, Safety Officer, and ERT to develop a plan moving forward.

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:46:50
Number of Pages: 4

Incident Report
2022-2203209   -000

| Narratives |
| --- |

After approximately 5-10 minutes the sensor reading began to drop.  ERT sent in an investigation and backup crew to inspect the lab once both internal and external sensors read 0 PPM.  All people entering the lab to be in tyvek suits and wearing SCBA as recommended by technical reference material.  A portable fluorine sensor would be used to clear the area and the teams would also ensure the chemical bottle was fully closed. ERT to report out, via radios, to IC and Safety Officer upon entry.  E99 and H99 to assist Apple staff and provide emergency services if needed.  Crews made entry and confirmed the bottle was closed and there was no active leak in the lab or cabinet.  Once this was confirmed the evacuation was lifted and E99/H99 was cleared from the scene to return to quarters.

PPE
turnouts

End of report

Ayllon

End of Report

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:47:40
Number of Pages: 6

Incident Report
2022-2204500   -000

| Basic | |
|---|---|
| Alarm Date and Time | 14:19:00   Sunday, May 29, 2022 |
| Arrival Time | 14:23:17 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 17:11:39   Sunday, May 29, 2022 |
| Response Time | 0:04:17 |
| Turnout Time | 0:00:00 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 02 |
| Shift | A |
| Incident Type | 422 - Chemical spill or leak |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 86 - Investigate |
| Action Taken 2 | 55 - Establish safe area |
| Action Taken 3 | 44 - Hazardous materials leak control & containment |
| Casualties | No |
| Apparatus - Suppression | 3 |
| Apparatus - EMS | 1 |
| Apparatus - Other | 1 |
| Personnel - Suppression Personnel | 4 |
| Personnel - EMS Personnel | 1 |
| Personnel - Other | 4 |
| Hazardous Material Released | 0 - Special hazmat actions required or spill >= 55 gallons |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Person Involved - ▮▮▮▮▮▮▮▮ | |
|---|---|
| Last Name | ▮▮▮▮▮ |
| First Name | ▮▮ |
| Business Name | ▮▮▮▮▮▮ |
| Street Address | ▮▮▮▮▮▮ |
| City, State Zip | ▮▮▮▮▮▮▮▮ |

| Person Involved - ▮▮▮▮▮▮ | |
|---|---|
| Last Name | ▮▮▮ |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:47:40
Number of Pages: 6

Incident Report
2022-2204500   -000

| Person Involved - ████████ | |
|---|---|
| First Name | ████ |
| Business Name | ████████ |
| Street Address | ████████ |
| City, State Zip | ████████████ |
| Phone | ██████ |

| Hazmat | |
|---|---|
| Inside/On Structure Flag | 1 |
| Area Affected | 1 - Square Feet |
| Area Affected Units | 800 |
| Hazmat Action Taken 1 | 11 - Identify, analyze hazardous materials |
| Hazmat Action Taken 2 | 12 - Hazmat detection, monitoring, sampling, & analysis |
| Hazmat Action Taken 3 | 14 - Hazmat leak control and containment |
| Cause of Release | 5 - Cause under investigation |
| Disposition | 7 - Released to private agency |

| Hazmat Chemicals | |
|---|---|
| Chemical Name | Hazardous Material |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:03:49 |
| Apparatus Dispatch Date and Time | 14:19:28    Sunday, May 29, 2022 |
| En route to scene date and time | 14:19:57    Sunday, May 29, 2022 |
| Apparatus Arrival Date and Time | 14:23:17    Sunday, May 29, 2022 |
| Apparatus Clear Date and Time | 16:51:07    Sunday, May 29, 2022 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 86 - Investigate |
| Apparatus Action Taken 2 | 55 - Establish safe area |
| Apparatus Action Taken 3 | 44 - Hazardous materials leak control & containment |
| Apparatus Action Taken 4 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 4970 - Ayllon, Aitor |
| | Position: CP |
| | Amount 1: $3.00 |
| Personnel 2 | 4977 - Kleinheinz, Phillip |
| | Position: DEP |
| Personnel 3 | 7225 - Vo, Trung |
| | Position: FF |

| Apparatus - H199 | |
|---|---|
| Apparatus ID | H199 |
| Response Time | 0:04:17 |
| Apparatus Dispatch Date and Time | 14:19:00    Sunday, May 29, 2022 |
| En route to scene date and time | 14:19:00    Sunday, May 29, 2022 |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
*user@ci.santa-clara.ca.us*
*Printed: 10/03/2023 06:47:40*
*Number of Pages: 6*

Incident Report
2022-2204500   -000

| **Apparatus - H199** |
|---|

| | |
|---|---|
| Apparatus Arrival Date and Time | 14:23:17     Sunday, May 29, 2022 |
| Apparatus priority response | Yes |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 86 - Investigate |
| Apparatus Action Taken 2 | 55 - Establish safe area |
| Apparatus Action Taken 3 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Apparatus Type | 62 - Light and air unit |

| **Apparatus - T192** |
|---|

| | |
|---|---|
| Apparatus ID | T192 |
| Response Time | 0:04:38 |
| Apparatus Dispatch Date and Time | 14:19:00     Sunday, May 29, 2022 |
| En route to scene date and time | 14:21:08     Sunday, May 29, 2022 |
| Apparatus Arrival Date and Time | 14:23:38     Sunday, May 29, 2022 |
| Apparatus priority response | Yes |
| Number of People | 4 |
| Apparatus Use | 0 |
| Apparatus Action Taken 1 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Apparatus Action Taken 2 | 86 - Investigate |
| Apparatus Action Taken 3 | 44 - Hazardous materials leak control & containment |
| Apparatus Action Taken 4 | 55 - Establish safe area |
| Apparatus Type | 12 - Truck or aerial |
| Personnel 1 | 5756 - McGee, Michael |
| | Position: DEP |
| | Amount 1: $4.00 |
| Personnel 2 | 6385 - Cook, Mitchell |
| | Position: FFP |
| Personnel 3 | 7223 - Gladfelter, Chris |
| | Position: FF |
| Personnel 4 | 3081 - Christian, Doug -t,w |
| | Position: CA |

| **Apparatus - H99** |
|---|

| | |
|---|---|
| Apparatus ID | H99 |
| Response Time | 0:15:28 |
| Apparatus Dispatch Date and Time | 14:19:00     Sunday, May 29, 2022 |
| En route to scene date and time | 14:21:50     Sunday, May 29, 2022 |
| Apparatus Arrival Date and Time | 14:34:28     Sunday, May 29, 2022 |
| Apparatus Clear Date and Time | 16:51:22     Sunday, May 29, 2022 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | EMS |
| Apparatus Action Taken 1 | 86 - Investigate |
| Apparatus Action Taken 2 | 55 - Establish safe area |
| Apparatus Action Taken 3 | 44 - Hazardous materials leak control & containment |
| Apparatus Action Taken 4 | 42 - Hazmat detection, monitoring, sampling, & analysis |
| Apparatus Type | 93 - HazMat unit |
| Personnel 1 | 4974 - Hernandez, Carlos |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:47:41
Number of Pages: 6

Incident Report
2022-2204500   -000

| Apparatus - H99 | |
|---|---|
| | Position: DE |
| | Amount 1: $1.00 |

| Apparatus - B91 | |
|---|---|
| Apparatus ID | B91 |
| Response Time | 0:00:04 |
| Apparatus Dispatch Date and Time | 15:09:49   Sunday, May 29, 2022 |
| Apparatus Arrival Date and Time | 15:09:53   Sunday, May 29, 2022 |
| Apparatus Clear Date and Time | 17:11:39   Sunday, May 29, 2022 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | Suppression |
| Apparatus Type | 92 - Chief officer car |
| Personnel 1 | 4071 - Miller, Drew |
| | Position: BC |
| | Amount 1: $1.00 |

| Authority | |
|---|---|
| Reported By | 4970 - Ayllon, Aitor |
| | 04:59:46   Monday, May 30, 2022 |
| Officer In Charge | 4970 - Ayllon, Aitor |
| | 04:59:48   Monday, May 30, 2022 |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | E99 |
| Narrative Type | Incident |
| Narrative Date | 04:36:56   Monday, May 30, 2022 |
| Author | 4970 - Ayllon, Aitor |
| Author Rank | CP |
| Author Assignment | 1 |
| Narrative Text | At 1419 hours on Sunday May 29, 2022 we were dispatched to a chemical spill/leak. Five units were assigned to this incident. Nine personnel responded. We arrived on scene at 1423 hours and cleared at 1711 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 02. The general description of this property is laboratory or science lababoratory. The primary task(s) performed at the scene by responding personnel was investigation. Other special haz mat actions were also taken. No mutual/automatic aid was given or received. |
| | Alarm number 2204500 has been assigned to this incident. |
| | E99 responded Code 3 to the above address for a report of a chemical gas leak from Apple Inc. R&D facility.  E99 arrived on scene of a large commercial buidling with security and RP outside waiting for us.  E99 and T192 made initial contact with █████████, processing engineer.  He advised that the building was shut down for the weekend except for him and one security guard.  Both of them had evacuated the buidling and there should be nobody else inside.  Security checks via cameras and "scan in" confirmed this.  T192 |

Page 4 of 6                                    Printed:  10/03/2023 06:47:41

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 10/03/2023 06:47:41
Number of Pages: 6

Incident Report
2022-2204500   -000

| Narratives |
| --- |

crew was initially asked to perform a 360 of the building to ensure nobody else was loitering outside the building.

███ advised that the sensors have identified that the leaked chemical seems to be confined to the lab of origin.  Entry was made into the front lobby and ERT office to review the security panel.  The chemical, Hexafluorobutadiene, had been released from the cylinders main and secondary cylinders and activated their respective cabinet alarms.  In addition, the ambient sensors in the room had also been activated.  There were no additional sensor alarms in adjacent rooms but, per staff, those sensors may not be calibrated for that specific chemical.  Additional Apple employees arrived to assist with the lead being ███████, facilities manager.

Staff was able to provide us with chemical identification, card access through the building, maps, and details of their exhaust system.  Per the engineer who developed the exhaust system, if the identified levels for the leak have zeroed out then you can allow 30 minutes of the exhaust systme to work and the entire lab should be safe to make entry.  The chemical is a known respiratory and fire hazard in the concentrations and gas form it is found in outside of the cylinder.

Based on the information at hand the decision was made to make entry in turnouts and SCBA's with a combination of their portable sensor equipment and ours.  Objectives were to confirm there was no chemical present in adjoining rooms, room of origin, cyilnder cabinets, and manually confirm that all cyilnders valves are closed.  Assignments as follows.

IC/HMGS/Entry Team Leader: Ayllon
Safety Officer: Miller
ASO: Hernandez
Tech Ref: Kleinheinz
Entry Team: Christian and Cook
Backup Team: Mcgee and Gladfelter
Medical Monitoring: Vo
Decon: Many
Facilities Assistance: ███████
Medical Transport: County EMS #253

A briefing was conducted prior to entry including a safety message, review of objectives, chemical review.  County EMS was on scene staging for the entry.  Entry team and backup team (Par 4 total) made access into "warm zone" at 1616 with 10 minutes alerts.  No alerts on any monitoring equipment in adjacent rooms, room of origin, or in the cabinets.  All cylinder valves confirmed to be shut off.  All teams, Par 4, made exit at 1630.  Event was Code 4 at 1636.  Faciliity turned back over to the Apple reps.  Report to be referred to DFM Chun for additional investigation.  All units to clear and return to quarters.

PPE
Turnouts, SCBA's

Ayllon

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 08:17:36
Number of Pages: 2

Incident Report
2023-2306933   -000

| Basic | |
|---|---|
| Alarm Date and Time | 14:17:28   Thursday, August 10, 2023 |
| Arrival Time | 14:23:54 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 14:50:25   Thursday, August 10, 2023 |
| Response Time | 0:06:26 |
| Turnout Time | 0:01:56 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | A |
| Incident Type | 730 - System malfunction, other |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 86 - Investigate |
| Casualties | No |
| Apparatus - Suppression | 1 |
| Personnel - Suppression Personnel | 3 |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |



| Apparatus - E98 | |
|---|---|
| Apparatus ID | E98 |
| Response Time | 0:06:26 |
| Turnout Time | 0:01:56 |
| Apparatus Dispatch Date and Time | 14:17:28   Thursday, August 10, 2023 |
| En route to scene date and time | 14:19:24   Thursday, August 10, 2023 |
| Apparatus Arrival Date and Time | 14:23:54   Thursday, August 10, 2023 |
| Apparatus Clear Date and Time | 14:50:25   Thursday, August 10, 2023 |
| Apparatus priority response | Yes |
| Number of People | 3 |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
*user@ci.santa-clara.ca.us*
*Printed: 05/02/2025 08:17:36*
*Number of Pages: 2*

Incident Report
2023-2306933   -000

| Apparatus - E98 | |
|---|---|
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 5306 - Beals, Jason |
| | Position: CA |
| | Amount 1: $3.00 |
| Personnel 2 | 5754 - Lambert, Chase |
| | Position: DEP |
| Personnel 3 | 8233 - Zuniga-Perez, Edwin |
| | Position: PFF |

| Authority | |
|---|---|
| Reported By | 5306 - Beals, Jason |
| | 15:23:34    Thursday, August 10, 2023 |
| Officer In Charge | 5306 - Beals, Jason |
| | 15:23:36    Thursday, August 10, 2023 |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | Engine 98 |
| Narrative Type | Incident |
| Narrative Date | 15:14:52    Thursday, August 10, 2023 |
| Author | 5306 - Beals, Jason |
| Author Rank | CA |
| Author Assignment | 1 |
| Narrative Text | Engine 98 responded code 3 to the address above for a high gas alarm and arrived without incident. Upon arrival we met with facilities personnel who took us to the gas alarm monitoring system which showed a momentary spike of Chlorine. The current reading upon our arrival was 0ppm. The facility Emergency Response Team donned PPE and appropriate monitors for entry to the room where the alarm originated. Engine 98 crew donned PPE and acted as the backup team. The Emergency Response Team made entry and found zero readings on their monitoring equipment which confirmed the 0ppm on the alarm monitoring system. It was determined that there was no emergency. Engine 98 cleared the scene. |
| | End of report by Captain Beals |

End of Report

Printed:  05/02/2025 08:17:36

*Santa Clara City Fire Department*
*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*

Incident Report
2023-2307611  -000

*Printed: 05/02/2025 08:18:37*
*Number of Pages: 3*

| Basic | |
|---|---|
| Alarm Date and Time | 09:58:14    Wednesday, August 30, 2023 |
| Arrival Time | 10:03:30 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 10:22:02    Wednesday, August 30, 2023 |
| Response Time | 0:05:16 |
| Turnout Time | 0:01:59 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | B |
| Incident Type | 321 - EMS call, excluding vehicle accident with injury |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 31 - Provide first aid & check for injuries |
| Action Taken 2 | 32 - Provide basic life support (BLS) |
| Action Taken 3 | 33 - Provide advanced life support (ALS) |
| Casualties | No |
| EMS Provided | Yes |
| Apparatus - Suppression | 1 |
| Personnel - Suppression Personnel | 3 |
| Property Use | 700 - Manufacturing, processing |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | MEDICAL |
| Final Dispatch Code | MEDICAL |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:05:16 |
| Turnout Time | 0:01:59 |
| Apparatus Dispatch Date and Time | 09:58:14    Wednesday, August 30, 2023 |
| En route to scene date and time | 10:00:13    Wednesday, August 30, 2023 |
| Apparatus Arrival Date and Time | 10:03:30    Wednesday, August 30, 2023 |
| Apparatus Clear Date and Time | 10:22:02    Wednesday, August 30, 2023 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 31 - Provide first aid & check for injuries |
| Apparatus Action Taken 2 | 32 - Provide basic life support (BLS) |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 08:18:37
Number of Pages: 3

Incident Report
2023-2307611   -000

| Apparatus - E99 | |
|---|---|
| Apparatus Action Taken 3 | 33 - Provide advanced life support (ALS) |
| Apparatus Action Taken 4 | 30 - Emergency medical services, other |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 5310 - Poloni, Stephanie |
| | Position: DE |
| | Amount 1: $0.00 |
| Personnel 2 | 5747 - Carter, Gail |
| | Position: CA |
| Personnel 3 | 7221 - Willis, Samuel |
| | Position: FF |
| | Amount 1: $3.00 |

| Authority | |
|---|---|
| Reported By | 5747 - Carter, Gail |
| | 15:06:12    Wednesday, August 30, 2023 |
| Officer In Charge | 5747 - Carter, Gail |
| | 15:06:15    Wednesday, August 30, 2023 |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | E99B |
| Narrative Type | Incident |
| Narrative Date | 14:40:24    Wednesday, August 30, 2023 |
| Author | 5747 - Carter, Gail |
| Author Rank | CA |
| Author Assignment | 1 |
| Narrative Text | F2307611   E Type:   PHONE   MEDICAL MEDICAL CALL      Sub Type: 8B01C   CARBON HAZMT  CBRN  Disp: |

COMMENTS:
HAZMET EXPOSURE BY LIQUID IN A BOTTLEEMS 133

E99B was dispatched on a Bravo-level medical call for report of a Hazmat exposure at location indicated in District 9. E99 PAR3/0 Carter, Poloni, Willis. No delays encountered in turnout or enroute. Arrived on the scene of a local R&D building, met curbside by security, and directed into front lobby entrance and ERT control room. Crew was met on arrival with MSDS for product involved and other pertinent information about the exposure. Pt. was a 29 y.o. M found sitting upright in an office chair alert/awake and breathing, rubbing antidote on his R forearm secondary to a dermal exposure to approx. 2 mL of "spent" HF approx. 15 mins PTA. Per site emergency procedures, the ERT had rinsed the affected area in an emergency shower for 10 mins. and then the pt. topically applied (x2) tubes of calcium gluconate antidote per first aid instructions in MSDS. Per site protocol the pt. was then considered decontaminated and was moved from the lab to the location found. Pt. was not complaining of pain nor symptomatic at time of contact. E99 crew rendered ALS assessment and care to the pt. XSCA M16R arrived on the scene and was updated as to the material of concern, the route of exposure, and the decontamination/antidote administered thusfar by the site (County event #0133). E99

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
*Printed: 05/02/2025 08:18:37*
*Number of Pages: 3*

Incident Report
2023-2307611   -000

| Narratives |
| --- |

CAPT and XSCA paramedic made face-to-face and agreed that satisfactory decon had occured and on an appropriate destination. VMC was chosen as the county tox-hospital. In addition to completing medical charting, E99 crew completed a "Patient Decontamination Survey Sheet for Transport to Hospital" and provided it to M16R for transport w/ the patient in addition to a copy of the product MSDS sheet in accordance w/ XSC EMS Policy #610 - 'Hazardous Materials Incidents - EMS Response and Transport.' Pt. walked to the gurney under his own power where he was secured and loaded for Code 2 return to VMC. Pertinent information to complete corporate incident reporting was provided to the facility management prior to departure, to include but limited to FD event number and rig designators involved. Cleanup, decon, and documentation were conducted curbside prior to departure from the scene. For further medical details related to this call, please refer to the XSC EMS Patient Care Report (PCR) authored by FF-P S. Willis, SCFD. E99 subsequently cleared the scene and RTQ. End of report. G. Carter, CPT E99B SCFD 15A47 8/30/2023 1507 hrs.

End of Report

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 11:12:20
Number of Pages: 3

Incident Report
2023-2310880   -000

| Basic | |
|---|---|
| Alarm Date and Time | 21:21:05   Friday, December 8, 2023 |
| Arrival Time | 21:26:07 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 21:53:44   Friday, December 8, 2023 |
| Response Time | 0:05:02 |
| Turnout Time | 0:00:34 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | A |
| Incident Type | 744 - Detector activation, no fire - unintentional |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 86 - Investigate |
| Action Taken 2 | 60 - Systems and services, other |
| Casualties | No |
| Apparatus - Suppression | 2 |
| Personnel - Suppression Personnel | 4 |
| Property Use | 629 - Laboratory or science lababoratory |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | ALARM |
| Final Dispatch Code | ALARM |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |



| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:05:02 |
| Turnout Time | 0:01:53 |
| Apparatus Dispatch Date and Time | 21:21:05   Friday, December 8, 2023 |
| En route to scene date and time | 21:22:58   Friday, December 8, 2023 |
| Apparatus Arrival Date and Time | 21:26:07   Friday, December 8, 2023 |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
*Printed: 05/02/2025 11:12:20*
*Number of Pages: 3*

Incident Report
2023-2310880   -000

| Apparatus - E99 | |
|---|---|
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 86 - Investigate |
| Apparatus Action Taken 2 | 63 - Restore fire alarm system |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 4133 - Mar, Larry |
| | Position: CA |
| | Amount 1: $3.00 |
| Personnel 2 | 6228 - Perry, Robert |
| | Position: FFP |
| Personnel 3 | 7225 - Vo, Trung |
| | Position: FF |

| Apparatus - H99 | |
|---|---|
| Apparatus ID | H99 |
| Response Time | 0:02:59 |
| Turnout Time | 0:00:34 |
| Apparatus Dispatch Date and Time | 21:23:13    Friday, December 8, 2023 |
| En route to scene date and time | 21:23:47    Friday, December 8, 2023 |
| Apparatus Arrival Date and Time | 21:26:12    Friday, December 8, 2023 |
| Apparatus priority response | Yes |
| Number of People | 1 |
| Apparatus Use | Suppression |
| Apparatus Action Taken 1 | 60 - Systems and services, other |
| Apparatus Type | 93 - HazMat unit |
| Personnel 1 | 4974 - Hernandez, Carlos |
| | Position: DE |
| | Amount 1: $1.00 |

| Authority | |
|---|---|
| Reported By | 4133 - Mar, Larry |
| | 23:00:01    Friday, December 8, 2023 |
| Officer In Charge | 4133 - Mar, Larry |
| | 23:00:05    Friday, December 8, 2023 |
| Reviewer |  - , |

| Narratives | |
|---|---|
| Narrative Name | Engine 99 |
| Narrative Type | Incident |
| Narrative Date | 22:45:31    Friday, December 8, 2023 |
| Author | 4133 - Mar, Larry |
| Author Rank | CA |
| Author Assignment | 1 |
| Narrative Text | At 2121 hours on Friday December 8, 2023 we were dispatched to an unintentional detector activation. Two units were assigned to this incident. Four personnel responded. |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 11:12:20
Number of Pages: 3

Incident Report
2023-2310880   -000

| Narratives |
| --- |

We arrived on scene at 2126 hours and cleared at 2153 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is laboratory or science laboratory. The primary task(s) performed at the scene by responding personnel was investigation. No mutual or automatic aid was given or received.

Alarm number 2310880 has been assigned to this incident.

Engine 99 was dispatched for toxic gas alarm at a building in DIstrict 9. Hazmat 99 attached to the call. We arrived at the front entrance. A security officer for Apple was on scene. They assisted with notifying building engineers and helping us get into the building. We eventually used the keys in the Knox box to open the door. We walked into a command room to view the building sensors from a computer monitor. It showed a GD089 area sensor that spiked for a few seconds at .65 ppm for chlorine. It was above the alarm level and the sensor triggered an alarm. The spiked settled back to zero after a few seconds. Shortly thereafter, facility engineers arrived on scene. They confirmed the spike and attributed it to a sensor error. They were able to reset the area sensor. All sensors showed normal operations. We secured the building keys back into the Knox vault. We secured our Knox key back into our key vault. Engine 99 and Hazmat 99 cleared the scene. Endof report by Captain Larry Mar.

End of Report

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 11:14:44
Number of Pages: 2

Incident Report
2024-2404731  -000

| Basic | |
|---|---|
| Alarm Date and Time | 07:37:15    Thursday, May 30, 2024 |
| Arrival Time | 07:43:11 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 07:55:31    Thursday, May 30, 2024 |
| Response Time | 0:05:56 |
| Turnout Time | 0:02:28 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | C |
| Incident Type | 321 - EMS call, excluding vehicle accident with injury |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 32 - Provide basic life support (BLS) |
| Casualties | No |
| EMS Provided | Yes |
| Apparatus - Suppression | 1 |
| Personnel - Suppression Personnel | 3 |
| Property Use | 700 - Manufacturing, processing |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | MEDICAL |
| Final Dispatch Code | MEDICAL |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:05:56 |
| Turnout Time | 0:02:28 |
| Apparatus Dispatch Date and Time | 07:37:15    Thursday, May 30, 2024 |
| En route to scene date and time | 07:39:43    Thursday, May 30, 2024 |
| Apparatus Arrival Date and Time | 07:43:11    Thursday, May 30, 2024 |
| Apparatus Clear Date and Time | 07:55:31    Thursday, May 30, 2024 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 7225 - Vo, Trung |
| | Position: FF |

Santa Clara City Fire Department
777 BENTON ST.
Santa Clara, CA 95050
408-615-4900
user@ci.santa-clara.ca.us
Printed: 05/02/2025 11:14:44
Number of Pages: 2

Incident Report
2024-2404731   -000

| Apparatus - E99 | |
|---|---|
| | Amount 1: $3.00 |
| Personnel 2 | 6761 - Maya, Eduardo |
| | Position: FFP |
| Personnel 3 | 6769 - Flournoy, Robert |
| | Position: DE |
| | Amount 1: $3.00 |

| Authority | |
|---|---|
| Reported By | 6769 - Flournoy, Robert |
| | 14:32:26    Thursday, May 30, 2024 |
| Officer In Charge | - , |
| Reviewer | - , |

| Narratives | |
|---|---|
| Narrative Name | E99 |
| Narrative Type | Incident |
| Narrative Date | 14:30:28    Thursday, May 30, 2024 |
| Author | 6769 - Flournoy, Robert |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | At 0737 hours on Thursday May 30, 2024 we were dispatched to an EMS call. One unit was assigned to this incident. Three personnel responded. We arrived on scene at 0743 hours and cleared at 0755 hours. The incident occurred at 3250 SCOTT Bl, SANTA CLARA. The local station is 09. The general description of this property is manufacturing, processing. The primary task(s) performed at the scene by responding personnel was to provide basic life support (BLS). No mutual or automatic aid was given or received.

Alarm number 2404731 has been assigned to this incident.
Engine 99 were dispatched on this call code 3.   We arrived on scene and met with the patient.  The chief complaint was dizziness.  PT was found outside with staff. PT was exposed to HCL gas and was outside for fresh air decon. Vital signs and medical history were taken and recorded.  A physical survey of the patient was made.  County Ambulance arrived on scene and was apprised of the patient's condition.   BLS care was provided by a EMT on Engine 99.  The patient was offered transport to a hospital by ambulance and chose to refuse it.  The SCFD Refusal of Service Information Sheet was explained to the patient in detail.  The patient understands that the condition they have may get worse and that by refusing transport could result in a more serious condition including death.  The patient made the decision to sign the form (electronic version) and again refuse the offer for transport to a hospital.  A witness also signed the form.  See electronic copy of form.  County Ambulance was cancelled.   For specific details regarding patient care, refer to the Pre-Hospital Care Report written by DE Flournoy.  All times approximate.  Report by Acting Captain Flournoy 99A. E 99 cleared. End of report. |

End of Report

Santa Clara City Fire Department
*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*
*Printed: 05/02/2025 11:13:46*
*Number of Pages: 2*

Incident Report
2024-2401745  -000

| Basic | |
|---|---|
| Alarm Date and Time | 21:53:57    Thursday, February 22, 2024 |
| Arrival Time | 21:58:39 |
| Controlled Date and Time | |
| Last Unit Cleared Date and Time | 22:31:44    Thursday, February 22, 2024 |
| Response Time | 0:04:42 |
| Turnout Time | 0:02:01 |
| Priority Response | Yes |
| Completed | Yes |
| Fire Department Station | 09 |
| Shift | C |
| Incident Type | 321 - EMS call, excluding vehicle accident with injury |
| Aid Given or Received | N - None |
| Alarms | 1 |
| Action Taken 1 | 33 - Provide advanced life support (ALS) |
| Casualties | No |
| EMS Provided | Yes |
| Apparatus - Suppression | 2 |
| Personnel - Suppression Personnel | 5 |
| Property Use | 549 - Specialty shop |
| Location Type | Address |
| Address | 3250  SCOTT BL |
| City, State Zip | SANTA CLARA, CA 95050 |
| Latitude | 37.379521 |
| Longitude | -121.97163 |

| Situation | |
|---|---|
| Initial Dispatch Code | MEDICAL |
| Final Dispatch Code | MEDICAL |
| Incident Delay | 0 - No Delay |
| Incident Reported By | 1 - No - I Did Not Check |
| Response Type | 3 - Code 3 |
| Critical Incident | No |

| Apparatus - E99 | |
|---|---|
| Apparatus ID | E99 |
| Response Time | 0:04:42 |
| Turnout Time | 0:02:01 |
| Apparatus Dispatch Date and Time | 21:53:57    Thursday, February 22, 2024 |
| En route to scene date and time | 21:55:58    Thursday, February 22, 2024 |
| Apparatus Arrival Date and Time | 21:58:39    Thursday, February 22, 2024 |
| Apparatus Clear Date and Time | 22:31:44    Thursday, February 22, 2024 |
| Apparatus priority response | Yes |
| Number of People | 3 |
| Apparatus Use | Suppression |
| Apparatus Type | 11 - Engine |
| First Arriving Unit | Yes |
| Personnel 1 | 5761 - Wilkie, Triston |
| | Position: DE |

*Santa Clara City Fire Department*
*777 BENTON ST.*
*Santa Clara, CA 95050*
*408-615-4900*
*user@ci.santa-clara.ca.us*
*Printed: 05/02/2025 11:13:46*
*Number of Pages: 2*

Incident Report
2024-2401745   -000

## Apparatus - E99

| | |
|---|---|
| | Amount 1: $3.00 |
| Personnel 2 | 6768 - Kent, David |
| | Position: DE |
| Personnel 3 | 8226 - Flaherty, Mitch |
| | Position: FF |

## Apparatus - M92

| | |
|---|---|
| Apparatus ID | M92 |
| Response Time | 0:05:47 |
| Turnout Time | 0:03:42 |
| Apparatus Dispatch Date and Time | 21:53:57   Thursday, February 22, 2024 |
| En route to scene date and time | 21:57:39   Thursday, February 22, 2024 |
| Apparatus Arrival Date and Time | 21:59:44   Thursday, February 22, 2024 |
| Apparatus priority response | Yes |
| Number of People | 2 |
| Apparatus Use | Suppression |
| Apparatus Type | 76 - ALS unit |
| Personnel 1 | 4970 - Ayllon, Aitor |
| | Position: CP |
| Personnel 2 | 6380 - Kastner, Steven |
| | Position: FF |

## Authority

| | |
|---|---|
| Reported By | 6768 - Kent, David |
| | 07:54:07   Friday, February 23, 2024 |
| Officer In Charge | - , |
| Reviewer | - , |

## Narratives

| | |
|---|---|
| Narrative Name | E99 |
| Narrative Type | Incident |
| Narrative Date | 07:47:25   Friday, February 23, 2024 |
| Author | 6768 - Kent, David |
| Author Rank | DE |
| Author Assignment | 1 |
| Narrative Text | E99 responded to above address code 3 for a report of a male feeling dizzy. Upon arrival E99 was met at the front door by the patients coworkers and lead to the pt. . E99 assessed pt and took basic vitals. Pt was alert and oriented X 4. ALS care was provided. Pt signed AMA.Pt was advised of the risks and signed AMA. Engine 94 cleared the scene and returned to quarters. All times approximate.  For further details refer to PCR by Paramedic M. Flaherty.
End of report by DE  Kent. |

End of Report

# K.    <u>EXHIBIT K</u>

*Exhibit K — Santa Clara FD Outstanding Fire Code Violations Report for 3250 Scott Boulevard*

Date Printed: 3/7/2023

# Santa Clara Fire Department

Page 1 of 2

Outstanding Fire Code Violations
3250 SCOTT BLVD
For the period 1/1/2010 to 1/31/2023.

| BL # | DBA | Address | Last Inspection Date | Phone |
|------|-----|---------|---------------------|-------|
| 201509 | Apple Inc | 3250 SCOTT BLVD | 12/23/2020 | (408) 974-2183 |

| | INSP. DATE | STATUS | DATE CORRECTED | INSPECTOR |
|---|---|---|---|---|
| 0064. Provide 5-year service certification for fire sprinkler/standpipe system. | 12/23/2020 | Outstanding | | Dhillon |
| 0078. Fire alarm systems shall be tested on an annual basis. Records shall be maintained on site. | | Outstanding | | Dhillon |
| 0082. Provide inspection, testing, and maintenance records for fire, life safety, hazmat systems as noted. *Note: Annual test report for emergency alarm* | | Outstanding | | Dhillon |
| 3010002 - Hazardous Waste Generator: Identification Number *Note: Facility has two IDs, inactivate the ID not currently in use and provide documentation for reason on keeping two different IDs* | 10/13/2020 | Corrected | 11/16/2020 | Dhillon |
| 1010004 - Hazardous Materials Inventory -  Failure to electronically submit complete and accurate hazardous material inventory information for all hazardous materials on site at or above reportable quantities. HSC 6.95 25505(a)(1), 25506, 25508(a)(1), 25508(a)(3) (Minor) *Note: Provide correct inventory with corrected reporting measurements - 1700 gallons Diesel Is missing, Argon is reported in pounds, zero amount of chlorine reported; update chemical inventory on CERS with corrected list and amounts of chemicals on site.* | | Corrected | 12/23/2020 | Dhillon |
| 2405 HSC 25200.3(f) (CA), HSC 25201.5(d)(7)(A), CCR 67450.2(b)(3)(B) Plot plan correctly shows unit locations. *Note: Plot plan does not show location of FTU-01 and FTU-02, also plot plan labeling is not readable* | | Corrected | 11/16/2020 | Dhillon |
| 2502 H&SC 25270.4.5(a) Facility owner/operator shall implement SPCC Plan element(s). [ref. CFR 112.3] | | Corrected | 11/13/2020 | Dhillon |
| 2517 HSC 25270.6(a)(1) or (2) Failed to file tank facility statement or business plan. *Note: Last submittal on 5/18/18, submit details on CERS within 30 days.* | | Corrected | 11/16/2020 | Dhillon |
| 2528 HSC 25270.12(a) 25270.4.5(a) SPCC Plan shall include training program (40 CFR 112.7(f)) *Note: Provide training record for tank inspection personnel* | | Corrected | 10/21/2020 | Dhillon |
| 2529 HSC 25270.12(a), 25270.4.5(a) Records of inspections or tests not signed by supervisor or inspector (40 CFR 112.7(e)) | | Corrected | 10/13/2020 | Dhillon |
| 2547 Failed to conduct annual spill prevention briefings (40 CFR 112.7(f)(3)) *Note: Provide record of annual briefing (not available on site)* | | Corrected | 10/21/2020 | Dhillon |

| BL # | DBA | Address | Last Inspection Date | | Phone |
|------|-----|---------|---------------------|--|-------|

| | | Last Inspection Date | | | |
|---|---|---|---|---|---|
| 0007.  A valid business license/operational fire permit must be obtained within 30-days of this notice.  To obtain your permit contact City of Santa Clara, Finance Department (408) 615-2310. *Note: Building 3260 Scott requires a business lic,* | 1/31/2020 | Corrected | 2/19/2020 | Dhillon |
| 2499 Other violations *Note: 2401 add the diversion tank to the AWN on CERS as tank 5.* | 8/24/2016 | Corrected | 10/13/2020 | Brazil |
| 13. Fire sprinkler systems are required to be inspected on a quarterly basis.  Records shall be maintained on site for five years. | | Corrected | 12/23/2020 | Brazil |
| 2599  Other CalAPSA Violation.  (see notes) *Note: Update the contact list* | | Corrected | 10/13/2020 | Brazil |
| FP See Attached List. | | Corrected | 12/23/2020 | Brazil |
| 1010017 - Business plan readily available - Failure to have a business plan readily available to personnel of the business or the unified program facility with responsibilities for emergency response or training. HSC 6.95 25505(c) (Minor) *Note: 1804* | | Outstanding | | Brazil |

# L. EXHIBIT L

*Exhibit L — City of Santa Clara Stormwater Spill Report #1657490*

February 15, 2023, 11:18 am

# Report a Spill - #1657490

- Tatiana Andrade



LOCATION - **3250 Scott Boulevard, Santa Clara, CA, United States**
SOURCE OF COMPLAINT - **Stormwater Inspector**
TYPE OF MATERIAL (IF KNOWN) - **Cooling water**
POTENTIAL OR ACTUAL - **Actual**
CURRENTLY ASSIGNED TO - **Tatiana Andrade**
DESCRIPTION - **Cooling water went into storm drain**

## Details

STATUS - **Completed**
PRIORITY - **None**
SUBMITTED BY - **[Verified Official] Tatiana Andrade**
SUBMITTED THROUGH - **gov.publicstuff.com**
FOLLOWERS - **lpradabaez@santaclaraca.gov, kahickey@santaclaraca.gov**

## Dates

DATE SUBMITTED - **June 9, 2016, 12:24 pm**
Completed: **2022-02-10T22:06:50.556Z**
DUE DATE - **N/A**

## Contact

NAME - ▮▮▮▮▮▮▮▮
EMAIL - **N/A**
PHONE - ▮▮▮▮▮▮▮▮

## Workflow

COMPLETE - **February 10, 2022, 2:06 pm**
STEP NAME - **Step 1**
ASSIGNEE - **Tatiana Andrade**
DEPARTMENT - **N/A**
DESCRIPTION - **Please confirm this request was investigated and resolved. If so, please mark completed.**

## Comments

There are no comments on this request yet.

## Change Log

Jun 9, 2016
12:24pm

**Request was submitted**

Feb 10, 2022
1:39pm

**Step 1 assignee**: *'Tatiana Andrade'* set
**Step 1 assigned at**: *'Jun 9th, 2016 12:24pm'* updated to *'Feb 10th, 2022 01:39pm'*
**Step 1 description**: *'Please confirm this request was investigated and resolved. If so, please mark completed '* set

Feb 10, 2022
2:06pm

**Step 1 completed at**: *'Feb 10th, 2022 02:06pm'* set
**Step 1 completed by**: *'Karin Hickey'* set
**Completed At**: *'Feb 10th, 2022 02:06pm'* set
**Status**: *'Submitted'* updated to *'Completed'*
**Responded At**: *'Feb 10th, 2022 02:06pm'* set
**Locale Origin**: *'en'* set

# M.    <u>EXHIBIT M</u>

*Exhibit M — BAAQMD Records for Plant #22839*

# Eric Grulke

| | |
|---|---|
| **From:** | Eric Grulke |
| **Sent:** | Wednesday, April 9, 2025 9:35 AM |
| **To:** | 'Kevin Sung' |
| **Cc:** | Thu Bui |
| **Subject:** | RE: BAAQMD AN32101 - Invoice Due |

Hi Kevin – AN32101 has been cancelled from our system. We look forward to your reapplication in the future.

---

**From:** Eric Grulke
**Sent:** Wednesday, February 19, 2025 2:36 PM
**To:** Kevin Sung <kevin_sung@apple.com>
**Cc:** Thu Bui <TBui@baaqmd.gov>
**Subject:** BAAQMD AN32101 - Invoice Due

Hi Kevin,

As discussed earlier, please find the preliminary invoice for AN32101 attached for payment in the next 10 days (by 3/5/2025) or we will proceed with cancelling the application.

Please note that the Permit to Operate Fee and Toxic Surcharge will be updated pending the approval of AN30150.

Thank you,

Eric

**Eric Grulke** *(he/him)*
Senior Air Quality Engineer
egrulke@baqmd.gov
P: (415) 749-8672



375 BEALE STREET, SUITE 600 | SAN FRANCISCO, CA 94105

*The Engineering staff is telecommuting until further notice. If already assigned, please include your plant number or facility number on all correspondence.*



**BAY AREA**

**AIR QUALITY**

**MANAGEMENT**

**DISTRICT**

**ALAMEDA COUNTY**
Pauline Russo Cutter
Scott Haggerty
Rebecca Kaplan
Nate Miley

**CONTRA COSTA COUNTY**
John Gioia
David Hudson
(Vice Chair)
Karen Mitchoff
Mark Ross

**MARIN COUNTY**
Katie Rice
(Secretary)

**NAPA COUNTY**
Brad Wagenknecht

**SAN FRANCISCO COUNTY**
Edwin M. Lee
Hillary Ronen
Jeff Sheehy

**SAN MATEO COUNTY**
David Canepa
Carole Groom
Doug Kim

**SANTA CLARA COUNTY**
Margaret Abe-Koga
Cindy Chavez
Liz Kniss
(Chair)
Rod G. Sinks

**SOLANO COUNTY**
Pete Sanchez
James Spering

**SONOMA COUNTY**
Teresa Barrett
Shirlee Zane

Jack P. Broadbent
**EXECUTIVE OFFICER/APCO**

Connect with the
Bay Area Air District:

   

July 17, 2023

Apple, Inc.

Attention: Kevin Sung
3250 Scott Blvd.
Santa Clara, CA 95054

| | |
|---|---|
| Application No.: | 32101 |
| Plant No. | 22839 |
| Equipment Location: | |
| *Same as above* | |

Dear Applicant:

SUBJECT:           REQUEST FOR FEES AND ADDITIONAL INFORMATION

Your application for a Permit to Operate the following equipment:

**S-1        Research and Development Facility**

**A-18      Fume Scrubber**
Make: Viron; Rating: 20,000 SCFM

**A-19      Thermal Oxidizer**
Make: Munters; Model: Zeolite Rotor Concentrator; Rating: 25,000 SCFM

has been assigned the above application number and is currently incomplete. In order to complete our evaluation, please submit the following items. Please note that Air District Forms can be found here: https://www.baaqmd.gov/forms/permits.

1.  Please provide updated Potential to Emit (PTE) calculations in excel format for Criteria, HAP, and TAC emissions, as applicable, based on the material's SDSs to ensure the facility's compliance with BACT and HRA requirements.

    a.  Identify materials used by name as indicated on SDS, in addition to their associated source, and include chemical breakdown.

    b.  Provide any SDSs not previously submitted for each material referenced in the emissions calculations.

    c.  If any materials are recovered, please update emissions estimates using 100% emission factor from <u>net usage</u>. (Net usage = materials initially input – materials recovered)

    d.  Provide maximum daily throughput limits for each material associated with S-1.

2.  Please provide the past 3 years of material throughput data for S-1 for cumulative increase calculation purposes.

3.  Complete CEQA Appendix Form H for the project.

4.  Please provide a basis for the information marked as CBI per Section 6254.7 of the CA Government. Noted that questions on BAAQMD forms cannot be considered trade secret, but responses may be.

5.  Invoice 4NT45 (attached) is based on Schedule H of Regulation 3 and is subject to change based on the response to Part 2 above.

Please submit the above items within 60 days or the application will be canceled. Your submittal will be acted upon within 15 working days of receipt of the above items, and if complete, your permit will be issued within 35 working days.  Construction or operation of equipment without an Authority to Construct or Permit to Operate will result in appropriate enforcement action.

Under the California Public Records Act, all information in your permit application will be considered a matter of public record and may be disclosed to a third party. If you wish to keep certain items in your application trade secret, please follow the guidelines described in Regulation 2, Rule 1, Section 202.7 for submittals containing trade secret information.

Please include your application number with any correspondence with the Air District. The Air District's regulations may be viewed online at www.baaqmd.gov  If you have any questions on this matter, please contact me at **(415) 749-8672** or **egrulke@baaqmd.gov.**

Very truly yours,

Eric Grulke
Air Quality Engineer

Enclosure: Invoice 4NT45



**PERMIT APPLICATION INVOICE**

BAY AREA
AIR QUALITY
MANAGEMENT
DISTRICT

| INVOICE NUMBER: | 4NT45 |
| INVOICE DATE: | 7/17/23 |
| DUE DATE: | 8/16/23 |
| APPLICATION NO: | 32101 |
| SITE NUMBER: | E2839 |
| CUSTOMER NUMBER: | 25BD7E2839 |

375 BEALE STREET, SUITE 600
SAN FRANCISCO, CA 94105
(415) 749-4990

Apple, Inc
One Apple Park Way, 991 SB01
Cupertino, CA 95014

Kevin Sung

**Equipment Location :**

Apple, Inc
3250 Scott Boulevard
Santa Clara, CA 95054

**For questions regarding check or online payments, please contact:**
(415) 749-4636 | customerpayments@baaqmd.gov
**For questions regarding fees and other permit info, please contact**
**Eric Grulke (415) 749 - 8672**

| Item | Description | Amount |
|------|-------------|--------|
| 000072 | Permit Modification - SB01 | 95,406.00 |

| | |
|---|---|
| Total Application Fees | **95,406.00** |
| Amount Paid | **0.00** |
| **Amount Due** | **$95,406.00** |

## Save Time, Pay Online:  www.baaqmd.gov/Pay

Visa, Mastercard, Discover, and eCheck payments accepted online.

If paying by check or money order, remove this bottom portion and mail it using the envelope provided. The top portion is for your records.

**THIS INVOICE IS NOW DUE AND PAYABLE**

**Amount Due: $95,406.00**

| INVOICE NUMBER: | 4NT45 |
| INVOICE DATE: | 7/17/23 |
| DUE DATE: | 8/16/23 |
| APPLICATION NO: | 32101 |
| SITE NUMBER: | E2839 |
| CUSTOMER NUMBER: | 25BD7E2839 |

The District only accepts checks or money orders by mail. Credit card information sent through the mail will be destroyed, and could delay or cancel your permit.

1. Make your check payable to BAAQMD
2. Write the invoice number   4NT45   on the face of the check.
3. If paying more than one invoice, write a separate check for each invoice.
4. Mail this portion with your check payment.

Your Application is subject to cancelation if payment is not received by the invoice due date. Your application will be reactivated upon payment of this invoice.

Construction or operation of equipment without an Authority to Contruct or Permit to Operate will result in appropriate enforcement action. BAAQMD Regulations are on display at the District Offices, 375 Beale Street, San Francisco. A copy of  Regulation 3 (FEES) may be obtained by calling the Public Information & Education Office at (415) 749-4900. BAAQMD Regulations are also available on the District's web site at www.baaqmd.gov.

**BAY AREA AIR QUALITY MGMT DIST.**
**375 BEALE STREET, SUITE 600**
**SAN FRANCISCO, CA 94105**

**Application No.:** 32101

**Project Title:** Permit Modification - SB01

| Invoice No. | : | 4NT45 |
|---|---|---|
| Invoice Date | : | 7/17/2023 |
| Due Date | : | 8/16/2023 |

Page 86 of 522   Filed 04/27/26   Document 80-4   Case 5:25-cv-07360-PCP

| Device Type | Device No. | Equipment Description | Filing Fee | Initial Fee | Late Fee | Permit Fee | Back Fee | Toxic Fee | Risk Fee | Fee Sched. |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 18 | Fume Scrubber | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Ex |
| A | 19 | Thermal Oxidizer | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Ex |
| S | 1 | Research and Development Facility | 593.00 | 36,955.00 | 0.00 | 18,464.00 | 0.00 | 1,846.00 | 37,548.00 | H |

**ENGINEERING EVALUATION**
**Apple Inc. (Facility ID No. 22839)**
**3250 Scott Blvd, Santa Clara, CA 95054**
**Application No. 32236**

**Background**

Apple Inc. ("Apple") is applying for a Permit to Operate for the following equipment:

**S-3    Solvent Waste Tank**
Horizontal Aboveground Tank; Capacity: 1,700 gallons;
Contents: Waste Solvent Mixture (Isopropyl Alcohol, Water)
*Abated by*
**A-12   Carbon Absorption Canister, 200 lbs Activated Carbon, 100 cfm**
Make: Carbtrol; Model: G-1S; Vessel: One (1) Epoxy-coated Poly Drum

S-3 is a horizontal aboveground tank receiving waste solvent and water from solvent spray benches and wet benches from S-1 (Semiconductor Fab Research and Development Facility) and is abated by A-12. As A-12 is a voluntary add-on abatement device, the POC removal efficiency is not included in the emissions estimates and the Air District will not require Apple to be equipped with two carbon adsorption canisters in series. Since the Carbon Adsorption Canister is not giving any emission reduction credit, there will not be any monitoring requirement at the exhaust of A-12.  However, all carbon adsorption canister's records of changes including operating duration and change out date will be required in the permit condition.

Typically, the tank contains ~95% water and ~5% solvent.  The vapor pressures of the solvents that are collected in the solvent waste tank are shown below. IPA is the solvent that is used in the largest quantity and has the highest vapor pressure. The emission calculations conservatively assume that 100% of the contents of the tank is IPA.

This source has been unpermitted since 7/15/2017 and back fees were collected accordingly. This evaluation report will discuss compliance of the proposed project with all applicable rules and regulations.

**Table 1: Tank Properties**

| Parameter | | Unit | Solvent Waste Tank |
|---|---|---|---|
| Dimensions | Tank Type | -- | Horizontal, Rectangular, Fixed Roof |
| | Shell Height | feet | 6.17 |
| | Tank Length | feet | 8.42 |
| | Shell Diameter | feet | 5.89 |
| | Working Volume | gallons | 1700 |
| | Net Throughput | gal/yr | 170,000 |
| | Turnovers per Year | -- | 100 |
| | Insulated? | -- | Yes |
| Breather Vent Settings | Vacuum Setting | psig | -0.50 |
| | Pressure Setting | psig | 0.50 |
| Nearest Major City | | -- | Santa Clara, CA |
| Maximum Fill Rate (Based on Pump) | | gal/hr | 600 |

*Note: Shell diameter is calculated as the diameter of a vertical cross-section of the horizontal tank*

### Table 2: Chemical Properties

| Component[1] | CAS | Mol wt (lb/lb-mole) | Vapor Pressure Constants [2,3] | | | Max VP (psi) |
|---|---|---|---|---|---|---|
| | | | A | B | C | |
| IPA | 67-63-0 | 60.1 | 7.74 | 1357.43 | 197.34 | 1.5 |

*1. Solvent waste composition used in this analysis is conservative.*
*2. IPA data is from NIST Webbook:*
*https://webbook.nist.gov/cgi/cbook.cgi?ID=C67630&Mask=4&Type=ANTOINE&Plot=on*
*3. NIST Webbook constants are expressed in units of bar and K for pressure and temperature respectively. The coefficients have been converted to appropriate units for Equation 1-26.  A is converted by adding 2.8751; B remains the same; to convert C parameter from deg K to deg C, 273.15 is added. Pressure is then converted from mmHg to psia (760 mmHg = 14.7 psia) for use in other equations.*
*Ref: TANKS model FAQs. Accessed at https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-chapter-7-tanks-software-frequent-questions#5*

### Emissions

- Tank Operation Schedule: 365 days/year, 24 hours/day.
- Max throughput (Per Apple): 170,000 gallons/year; 1,700 gallons/day (equivalent to one full tank shipment per day).
- Assume 100% of waste solvent is IPA at 1.5 psia.
- Emission calculation is based on AP-42 Chapter 7 – Liquid Storage Tank.
- Please see attached Excel Spreadsheet created for this application.

### Table 3: POC Emissions Summary

| Parameter | Lbs/day | Lbs/yr | Tons/yr | Notes |
|---|---|---|---|---|
| Breathing loss (POC), Ls | 0.04 | 13.22 | 0.0066 | 13.22 lbs/yr / 365 days/yr = 0.04 lbs/day |
| Working loss (POC), Lw | 3.48 | 163.38 | 0.0817 | 170,000 gallons/year; 1,700 gallons/day |
| **Total routine loss (POC), $L_T$** | **3.52** | **176.60** | **0.0883** | **$L_T = L_S + L_W$** |

### Plant Cumulative Increase

Table 4 summarizes the cumulative increase in criteria pollutant emissions that will result from this application. As A-12 is a voluntary add-on abatement device, the abatement efficiency effects are not included in the emissions estimates.

### Table 4: Plant Cumulative Emissions Increase, Post 4/5/91

| Pollutant | Existing Emissions Post 4/5/91 (tons/yr) | Application Emissions (tons/yr) | Cumulative Emissions (tons/yr) |
|---|---|---|---|
| NOx | 0.6380 | 0 | 0.6380 |
| POC | 1.1830 | **0.0883** | 1.2713 |
| CO | 0.1200 | 0 | 0.1200 |
| $PM_{10}/PM_{2.5}$ | 0.0170 | 0 | 0.0170 |
| $SO_2$ | 0.0009 | 0 | 0.0009 |

**Health Risk Assessment (HRA)**
Apple included the list below of all potential solvents that could enter S-3. Note that emission calculations conservatively assume 100% of the contents of the tank are solvents.

| Solvent | Vapor Pressure | TACs | Weight % |
|---|---|---|---|
| IPA | 43 mm Hg | Isopropyl Alcohol | 100% |
| AZ 300T | 0.2 mm Hg (0.2 torr) | --- | --- |
| EKC 265 | VP of largest constituent = 0.075 mm Hg (0.1 hPa) | --- | --- |
| ST-121A | VP of largest constituent = 0.42 mm Hg | --- | --- |
| N-Methyl-2-pyrrolidone (NMP) | 0.75 mm Hg (0.43 hPa) | --- | --- |

IPA is the most volatile solvent and the only material containing a TAC (Isopropyl Alcohol). As the Waste Solvent Tank only contains solvent and water, Isopropyl Alcohol is conservatively assumed to be only solvent contained in S-3. Additionally, it was assumed that all POC emissions calculated in Table 3 are IPA.

**Table 5: TAC Emissions**

| TAC | Lbs/hr[1] | Acute Trigger (lbs/hr) | Triggered? | Lbs/yr[1] | Chronic Trigger (lbs/yr) | Triggered? |
|---|---|---|---|---|---|---|
| Isopropyl Alcohol | 0.15 | 1.4 | No | 176.60 | 2.70E+05 | No |

1. *Abatement due to A-12 not accounted for as a worst-case POC emissions estimate.*

It can be seen from Table 5 that a Health Risk Assessment (HRA) is not required for this application.

**Best Available Control Technology (BACT)**
In accordance with Regulation 2-2-301, BACT is triggered for any new or modified source with the potential to emit 10 pounds or more per highest day of POC, NPOC, NOx, CO, $SO_2$, $PM_{10}$ or $PM_{2.5}$. Per Table 2, BACT is not triggered by the unabated emissions from S-3.

**Offsets**
Offsets must be provided for any new or modified source at a facility that will have the potential to emit more than 10 tons per year of NOx or POC, as specified in Regulation 2-2-302; 100 tons per year or more of $PM_{2.5}$, $PM_{10}$ or sulfur dioxide, as specified in Regulation 2-2- 303. All sources were installed post 4/5/91 and the facility does not have any exempt and/or registered sources. However, as the facility has a diesel emergency generator (S-2), the plant PTE is equivalent to the existing plant cumulative increase plus the emissions associated with an additional 100 hours of operation per year of S-2.

3

**Table 6. Potential to Emit**

| Pollutant | Existing Annual Emissions (TPY) | Application 26855 (S-2) Emissions[1] (TPY) | Application 32236 Emissions (TPY) | Facility Annual Emissions (TPY) | Offset Requirement (TPY) | Offset Required |
|---|---|---|---|---|---|---|
| NOx | 0.638 | 1.276 | 0 | 1.914 | >10 | N |
| POC | 1.183 | 0.060 | 0.0883 | 1.331 | >10 | N |
| CO | 0.120 | 0.240 | 0 | 0.360 | - | N |
| $PM_{10}/PM_{2.5}$[1] | 0.017 | 0.034 | 0 | 0.051 | ≥100 | N |
| $SO_2$ | 0.001 | 0.0026 | 0 | 0.004 | ≥100 | N |

*(1) Emissions associated with an additional 100 hours of operation per year of S-2. 50 hours of operation per year already included in facility cumulative increase.*

Since the facility's potential to emit is below the offsets trigger levels specified in Regulation 2-2, offsets are not required.

**Statement of Compliance**
The owner/operator of S-3 and A-12 are expected to comply with all applicable requirements. Key requirements are listed below:

**Air District Rules**
The owner/operator of the source (S-3) is subject to and expected to comply with the following BAAQMD Regulations:

| Tank Capacity | True Vapor Pressure of Tank Organic Content | | |
|---|---|---|---|
| | >0.5 to ≤ 1.5 psia | >1.5 to <11 psia | ≥11psia |
| ≥1.0 m³ to ≤37.5 m³ (≥264 gallons to ≤9,906 gallons) | Submerged till pipe | Submerged fill pipe (underground tank or aboveground non-gasoline tank), pressure vacuum valve, internal or external floating roof | Pressure tank or approved emission control system |

- Regulation 8, Rule 5, Section 301- Storage Tank Requirement. S-3 is equipped with submerged fill pipe as required.
- Regulation 8, Rule 5, Section 302 Requirements for Submerged Fill Pipes; S-3 is subject to a submerged fill pipe requirement for the top filling 302.1, or the side filling requirement 302.2.
- Regulation 8, Rule 5, Section 403 Inspection Requirement for Pressure Relief Devices; S-3 is subject to requirements of pressure vacuum valve inspection 403.1 and 403.2.
- Regulation 8, Rule 5, Section 501 Records keeping requirement; S-3 is subject to record keeping requirements of section 501.1 to keep an accurate record of the type and amount of liquids stored.

**New Source Performance Standards (NSPS)**
S-3 is not subject to NSPS.

4

**National Emissions Standards for Hazardous Air Pollutants (NESHAP)**
S-3 is not subject to NESHAP.

**California Environmental Quality Act (CEQA)**
This permit application is not subject to CEQA because the evaluation is a ministerial action (Public Resources Code Section 21080(b)(1) and CEQA Guidelines Section 15268(a)) conducted using the fixed standards and objective measurements outlined in standard air permitting/engineering reference materials including, but not limited to: permitting handbooks, permitting manuals, permitting guidance documents, source test/lab sampling results, and emissions factor clearinghouses. Therefore, the applicant was not required to submit any CEQA-related information.

**Prevention of Significant Deterioration (PSD)**
This application is not part of a PSD project as defined in Regulation 2-2.

**Public Notification (Regulation 2-1-412)**
The public notification requirements of Regulation 2-1-412 apply to projects which result in an increase in toxic air contaminant or hazardous air contaminant emission at facilities within 1,000 feet of the boundary of a K-12 school or are located within an overburdened community (OBC) and require an HRA. There are no K-12 schools within 1,000 feet of Apple and the site is not located within an OBC. Therefore, the public notice requirements do not apply.

## Permit Condition 100284

1. The owner/operator of S-3 shall abate the Solvent Waste Tank with a Carbon Absorption Canister (A-12) at all times. (Basis: Cumulative Increase)

2. The owner/operator of S-3 shall not exceed 170,000 gallons of Waste Solvent mixture during any consecutive twelve-month period.
   (Basis: Cumulative Increase)

3. The owner/operator of S-3 shall not exceed 1,700 gallons of Waste Solvent mixture during any calendar day.
   (Basis: Cumulative Increase, Regulation 2-5)

4. The owner/operator of S-3 shall not exceed a maximum true vapor pressure of 1.5 psia for all materials stored in S-3. Routine sampling is not required but may be requested by Air District staff during inspections. (Basis: Cumulative Increase)

5. The owner/operator may store alternate liquid(s) other than the materials specified in Parts 2 and 3 and/or usages in excess of those specified in Parts 2 and 3, provided that the owner/operator can demonstrate that all of the following are satisfied:
   a. Total POC and/or NPOC emissions from S-3 do not exceed 176.60 pounds in any consecutive twelve-month period;

5

    b.  Total POC and/or NPOC emissions from S-3 do not exceed 3.52 pounds in any calendar day;

    c.  The use of these materials does not increase toxic emissions equal to or above any TAC trigger level of Table 2-5-1 in Regulation 2-5. The owner/operator shall maintain records of any TAC component contents of each alternate material used and supporting mass emission calculations demonstrating TAC emissions do not equal or exceed the acute and/or chronic TAC trigger levels in Table 2-5-1 of Regulation 2, Rule 5 by calculating TAC emissions on a pound per hour and pound per year basis, respectively.

  (Basis: Cumulative Increase; Regulation 2-5)

6.  To determine compliance with the above parts, the owner/operator shall maintain the following records and provide all of the data necessary to evaluate compliance with the above parts, including the following information:

    a.  Quantities and/or shipment manifests of liquid stored in this source on a daily and monthly basis.

    b.  If a material other than those specified in Parts 2 and 3 is stored: POC and/or NPOC and toxic component contents of each material used; and mass emission calculations to demonstrate compliance with Part 5, on a daily and monthly basis.

    c.  Daily and monthly throughput and/or emission calculations shall be totaled for each consecutive twelve-month period.

    d.  Results of IPA content and water content analysis of Waste Solvent mixture, corresponding TVP calculations, and dates taken.

    e.  Dates of all Carbon Absorption Canister (A-12) change-outs and duration of operation between change-out.

All records shall be retained on-site for two years, from the date of entry, and made available for inspection by Air District staff upon request. These recordkeeping requirements shall not replace the recordkeeping requirements contained in any applicable Air District Regulations.

(Basis: Cumulative Increase; Regulation 2-5)

***End of Conditions***

**<u>Recommendation</u>**

I recommend the Air District to issue a Permit to Operate to Apple for the following sources:

**S-3    Solvent Waste Tank**
Horizontal Aboveground Tank; Capacity: 1,700 gallons;
Contents: Waste Solvent Mixture (Isopropyl Alcohol, Water)

*Abated by*
**A-12   Carbon Absorption Canister**
Make: Carbtrol; Model: G-1S

Prepared By:  Eric Grulke, Senior Air Quality Engineer (5/1/2024)

**DATA FORM T**
**Organic Liquid Evaporation**
**(tankage, loading and handling)**

## BAY AREA AIR QUALITY MANAGEMENT DISTRICT

375 Beale Street, Suite 600...San Francisco, CA 94105

(415) 749-4990   FAX (415)-749-5030

1. Business Name: Apple Inc.                                    Plant No: 22839

2. SIC No: 3674    Date of Initial Operation  7/15/17 (approx)    (if unknown, leave blank)  Source No S- NEW

3. Name or Description  Solvent Waste Tank

4. Code materials* in order of highest throughputs:  1) 157    2) 427    3) ____    4) ____

5. Total throughput (all materials), last 12 months:  170    thousand gal  **or**  _____ thousand bbl

6. Typical % of total annual throughput:  Dec-Feb 25 %    Mar-May 25 %    Jun-Aug 25 %    Sep-Nov 25 %

   ☐ Check box if loading/handling facility; complete lines 7-11 and omit the remainder of this form.  (Also complete one Form T for each storage tank)

7. ● Usage type: ☐ Bulk plant (truck/rail car)    ☐ Bulk plant (marine)    ☐ Vehicle service station
   ☐ Aircraft/marine servicing    Other: N/A

8. ● How many nozzles/loading arms? N/A    How many pumps? N/A

9. ● Make and model of nozzles/loading arms:  N/A

10. ● Nozzle/arm loads tank by: ☐ splash fill    ☐ submerged fill    ☐ part splash, part submerged

11. ● Upon loading, vapor space in tank(s) is: ☐ Vented directly to atmosphere
    ☐ Collected by nozzle/arm and sent to Abatement Device(s): A _____ A _____

12. Annual Average: Storage vapor pressure 0.73  psia **or** tank temperature _____°F and RVP _____psia

13. Highest v.p. of all materials stored: 1.29  psia **or** high tank temperature _____°F and high RVP _____psia

14. Highest °API of all material stored: N/A °    Lowest initial B.P. of all materials stored: 180.5 °F

15. Tank Type: ☐ underground    ■ fixed roof    ☐ internal floating roof    ☐ floating roof
    ☐ pressure    ☐ other: _____

16. Tank volume: 1.7  thousand gallons  **or**  _____ thousand barrels

17. Tank Diameter: 5.89 ft    height or length: 6.17 ft    Check if applicable: ■ heated  ■ insulated

*Fixed Roof Tanks Only*

18. Maximum fill rate: 600 gal/hr  **or**  _____ bbl/hr

19. Average height of vapor space: 2.3 ft    Highest head space reactivity 50 %
    ■ Check box if emissions from this tank are controlled; complete lines 20 and 21.

20. ● Emissions vent to what source(s) and/or abatement device(s)? S_____  S_____  A NEW  A_____

21. ● Do all gauging/sampling devices have gas-tight covers? ■ yes    ☐ no

22. Paint color: ☐ Aluminum    ■ White    ☐ Light grey    ☐ Medium grey    ☐ Other _____

23. Paint Condition: ■ good    ☐ poor

*Floating Roof Tanks Only*

24. Shell Type: ☐ gunited    ☐ riveted    ☐ welded    ☐ other: _____

25. Seal Type: ☐ single    ☐ double    ☐ other: _____    Condition: ☐ tight  ☐ loose

26. Maximum withdrawn rate: _____gal/hr  **or**  _____ bbl/hr

27. Do all gauging/sampling devices enter below liquid level and have gas-tight covers? ☐ yes    ☐ no

28. Roof type: ☐ pan  ☐ pontoon  ☐ other: _____    Is emergency roof drain at least 90% covered? ☐ yes  ☐ no

| Person completing this form    Tom Huynh | Date 9/12/2023 |

***See Material Code Reference List.***

*(revised 4/12/16)*

| Form Appendix H |
|---|

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**
375 Beale Street, Suite 600. . . San Francisco, CA  94105. . . (415) 749-4990. . . Fᴀx (415) 749-5030
Website: www.baaqmd.gov

## APPENDIX H

### ENVIRONMENTAL INFORMATION FORM
(To Be Completed By Applicant)

Date Filed: 2/20/2024

**General Information**

1.  Name and address of developer or project sponsor:
    Apple Inc. 3250 Scott Boulevard, Santa Clara, CA 95054

2.  Address of project: 3250 Scott Boulevard, Santa Clara, CA 95054

    Assessor's Block and Lot Number: 216-29-117

3.  Name, address, and telephone number of person to be contacted concerning this project:
    Kevin Sung, One Apple Park Way, MS 991-SB01, Cupertino, CA 95014

4.  Indicate number of the permit application for the project to which this form pertains:

    32236

5.  List and describe any other related permits and other public approvals required for this project, including those required by city, regional, state, and federal agencies:
    N/A

6.  Existing zoning district: Low Intensity Office/ R&D

7.  Proposed use of site (Project for which this form is filed):

    Tank is utilized as part of R&D activities within the building

**Project Description**

8.  Site size.  No change to existing.

9.  Square footage.  No change to existing.

10. Number of floors of construction.   No change to existing.

11. Amount of off-street parking provided.  No change to existing.

12. Attach plans.  Provided with application.

13. Proposed scheduling. Existing

14. Associated project.  N/A

15. Anticipated incremental development.   None

(revised 4/12/16)

16.  If residential, include the number of units, schedule of unit sizes, range of sale prices or rents, and type of household size expected. N/A

17.  If commercial, indicate the type, whether neighborhood, city or regionally oriented, square footage of sales area, and loading facilities.  N/A

18.  If industrial, indicate type, estimated employment per shift, and loading facilities No change to existing

19.  If institutional, indicate the major function, estimated employment per shift, estimated occupancy, loading facilities, and community benefits to be derived from the project.  N/A

20.  If the project involves a variance, conditional use or rezoning application, state this and indicate clearly why the application is required.  N/A

Are the following items applicable to the project or its effects?  Discuss below all items checked yes.  Attach additional sheets as necessary.

|  |  | Yes | No |
|---|---|---|---|
| 21. | Change in existing features of any bays, tidelands, beaches, or hills, or substantial alteration of ground contours. | ☐ | ■ |
| 22. | Change in scenic views or vistas from existing residential areas or public lands or roads. | ☐ | ■ |
| 23. | Change in pattern, scale or character of general area of project. | ☐ | ■ |
| 24. | Significant amounts of solid waste or litter. | ☐ | ■ |
| 25. | Change in dust, ash, smoke, fumes or odors in vicinity. | ☐ | ■ |
| 26. | Change in ocean, bay, lake, stream or groundwater quality or quantity, or alteration of existing drainage patterns. | ☐ | ■ |
| 27. | Substantial change in existing noise or vibration levels in the vicinity. | ☐ | ■ |
| 28. | Site on filled land or on slope of 10 percent or more. | ☐ | ■ |
| 29. | Use of disposal of potentially hazardous materials, such as toxic substances, flammables or explosives. | ☐ | ■ |
| 30. | Substantial change in demand for municipal services (police, fire, water,   sewage, etc.). | ☐ | ■ |
| 31. | Substantially increase fossil fuel consumption (electricity, oil, natural gas, etc.). | ☐ | ■ |
| 32. | Relationship to a larger project or series of projects. | ☐ | ■ |

2

**Environmental Setting**

33.    Describe the project site as is exists before the project, including information on topography, soil stability, plants and animals, and any cultural, historical or scenic aspects.  Describe any existing structures on the site, and the use of the structures.  Attach photographs of the site.  Snapshots or Polaroid photos will be accepted. The tank is located within an existing office/ R&D building.

34.    Describe the surrounding properties, including information on plants and animals and any cultural, historical or scenic aspects.  Indicate the type of land use (residential, commercial, etc.), intensity of land use (one-family, apartment houses, shops, department stores, etc.), and scale of development (height, frontage, set-back, rear yard, etc.).  Attach photographs of the vicinity.  Snapshots or Polaroid photos will be accepted. Nearby buildings are a mix of R&D, light industrial and high density residential.

**Certification**

I hereby certify that the statements furnished above and in the attached exhibits present the data and information required for this initial evaluation to the best of my ability, and that the facts, statements, and information presented are true and correct to the best of my knowledge and belief.

2/20/2024
_____
Date

_____
Signature

For Apple Inc.
_____

(Note: This is only a suggested form.  Public agencies are free to devise their own format for initial studies.)

3

# N.**EXHIBIT N**

*Exhibit N — Field Testing Equipment Invoices and Product Specifications*

# Order Summary

Order placed April 12, 2026     Order # 113-1002235-7060207

| Ship to | Payment method | Order Summary | |
|---|---|---|---|
| Ashley Gjovik | Visa ending in ███ | Item(s) Subtotal: | $70.92 |
| ███████████ | [View related transactions] | Shipping & Handling: | $6.99 |
| ALVISO, CA 95002-3701 | | Your Coupon Savings: | -$2.50 |
| United States | | Free Shipping: | -$6.99 |
| | | Total before tax: | $68.42 |
| | | Estimated tax to be collected: | $6.85 |
| | | Grand Total: | $75.27 |

## Delivered April 17

It was handed directly to a receptionist or someone at a front desk.



**Varify 17in1 Complete Drinking Water Test Kit - 100 Strips + 2 Bacteria Tester Kits - Well, Tap, Home, City Water Testing Strip for Lead, Alkaline, Chlorine, Hardness, Iron, Fluoride, Copper & More**
Sold by: Varify
**Return or replace items: Eligible through May 17, 2026**
$26.97





**Instant 4-in-1 TDS Meter Digital Water Tester for Drinking Water | Accurate 0–9990 PPM EC & Temp Readings | Ideal for RO Systems, Aquariums, Pools – Built for Professionals, Easy for Anyone**
Sold by: Varify
**Return or replace items: Eligible through May 17, 2026**
$9.97



**PH Meter for Water Hydroponics Digital PH Tester Pen 0.01 High Accuracy Pocket Size with 0-14 PH Measurement Range for Household Drinking, Pool and Aquarium (1, Yellow, Normal)**
Sold by: HappyFlowers
**Return or replace items: Eligible through May 17, 2026**
$8.99

Back to top

Conditions of Use     Privacy Notice     Consumer Health Data Privacy Disclosure     Your Ads Privacy Choices

© 1996-2026, Amazon.com, Inc. or its affiliates

## COMMON QUESTIONS (BACTERIA TEST)

**Are Coliform Bacteria Harmful?**
Coliform bacteria are present in the environment and feces of all warm-blooded animals and humans. Coliform bacteria are unlikely to cause illness. However, their presence in drinking water indicates that disease-causing organisms (pathogens) could be in the water system.

**What should be done if the test is positive?**
When coliforms have been detected, make sure you've run the test properly and not accidentally contaminated it. If you feel the jar may have been contaminated, we suggest retesting. If the result indicates bacterial confirmation, further lab testing will be necessary for Fecal coliform or E. coli. Boiling the water is advised until disinfection and lab testing can confirm that contamination has been eliminated.

## COMMON QUESTIONS (16 PARAMETER TEST)

**My test results do not match the color chart. Why?**
If you experience this, it is highly likely that you are holding the test strip upside down when comparing your results. Make sure to place the handle of the test strip at the bottom of the color chart facing upwards.

**What is the clear test tube for?**
This clear test tube allows you to easily transport and store the water source you are testing. You can fill the test tube with water and dip the strip directly into it. Although, this tube is not required for testing. You can dip the strip directly into the water source or use a normal cup if preferred.

Visit **varifytest.com** for further information
or contact us at **info@varifytest.com** for help.

**varify**

# varify

# COMPLETE
## WATER TEST KIT

# USER
# GUIDE

✓ RESULTS IN SECONDS

✓ PROFESSIONAL GRADE

✓ EASY TO USE

✓ EPA COMPARISON

SUPPORTS CLEAN WATER WORLDWIDE

# 16 PARAMETER WATER TEST STRIP

## TEST USE

This water test strip can be used to detect levels of certain unwanted contaminants commonly found in drinking water (tap, ground, well). It can also be used for testing pools, spas, aquariums, etc.

## ⚠️ IMPORTANT TO KNOW

**1  Test for 60 seconds**

When using the 16 parameter water test strip, your results are complete (ready to compare) after dipping the test strip and shaking off any excess water. The test strip can be dipped directly into the water source being tested. Alternatively, you can fill the clear test tube and proceed to dip the strip. Upon completion, make sure to compare your results immediately. To do this, place the handle of the test strip at the bottom of the color chart facing upwards. The test strip is no longer valid outside of a 60 second testing period. Discard the test strip after 60 seconds as any further color change will be meaningless.

**2  Prevent altered results**

Heres what you can do to prevent decreased shelf life of the strip and altered results.

- ✓ **Do Store in a cool dry place away from direct sunlight.**
- ✓ **Do Avoid touching or polluting test areas of the strip.**
- ✓ **Do Keep the cap on tight between uses.**
- ✓ **Do read the instructions carefully before use.**
- ✓ **Do not place wet fingers in the bottle.**
- ✓ **Do not remove the desiccant pouch.**

**3  Primary and Secondary Drinking Water Regulations**

The EPA sets legal limits on over 90 contaminants in drinking water. There are two categories, primary and secondary. Primary contaminants are substances that can be toxic in small amounts. On the other hand, secondary contaminants are less toxic species and would include cosmetic issues (color, taste, and odor) of drinking water. These strips test for the most commonly found primary contaminants (lead, fluoride, copper, mercury, chlorine, nitrite, nitrate), as well as the most commonly found secondary contaminants (Sulfate, Zinc, Manganese, Iron, and pH.)

# BACTERIA TEST FOR WATER

## TEST USE

This bacteria test can be used to check for total coliform bacteria in drinking water (tap, ground, well). It can also be used for pools, spas, lakes, and more.

## ⚠️ IMPORTANT TO KNOW

**1  Test for 48 hours**

When you run the bacteria test at room temperature 68-90°F (20-32°C), the test is complete in 48 hours. The solution in the jar will turn green if coliform are present. Discard the test jar after 48 hours as any further color change will be meaningless.

**2  Prevent Contamination**

Here's what you can do to prevent accidental contamination of the test jar and water sample.

- ✓ **Do wash your hands thoroughly with soap and water before performing the test.**
- ✓ **Do flush the tap for 3-5 minutes to rinse away contamination on the faucet.**
- ✓ **Do not open the jar until you're ready to test.**
- ✓ **Do not open the jar during the 48 hour incubation period.**
- ✓ **Do not touch the inside of the jar or lid when opening or closing the jar.**
- ✓ **Do not touch the faucet outlet, it could contaminate the water sample.**

**3  Total Coliform, Fecal Coliform, and E.coli**

Total coliform is a large collection of different kinds of bacteria. Fecal coliform are types of total coliform that exist in feces. E. coli is a subgroup of fecal coliform. Most bacteria tests (such as this one) are designed to test for total coliform bacteria. If the test is positive, it is likely that fecal coliform or E. coli are present in the water source. In this case, the sample should be further analyzed at a lab. If the coliform test result is negative, that means there is no coliform present, E. coli or otherwise.

---

 Visit **varifytest.com** for further information and EPA recommended limits

Live Chat: **live.varifytest.com**
Email: **info@varifytest.com**

# EPA Standards Reference Sheet

| Contaminant / Parameter | EPA Primary Standard - Maximum Level | Source | Health Effects |
|---|---|---|---|
| Lead | 0.015 mg/L | Corrosion of plumbing; natural deposits | Deficit in learning ability for children; kidney problems & high blood pressure for adults |
| Copper | 1.3 mg/L | Corrosion of plumbing; natural deposits | Liver & kidney damage |
| Mercury | 0.002 mg/L | Natural deposits; refineries & factories | Kidney damage |
| Fluoride | 4 mg/L | Water additive; fertilizer & aluminum factories | Bone disease; mottled teeth |
| Total Chlorine | 4 mg/L | Water disinfectant | Skin irritation; stomach discomfort |
| Nitrite | 1 mg/L | Runoff from fertilizer and animal waste | Blue baby syndrome (infants under 6 months old); shortness of breath; nausea; dizziness |
| Nitrate | 10 mg/L | Runoff from fertilizer and animal waste | Blue baby syndrome (infants under 6 months old); shortness of breath; nausea; dizziness |
| Coliform Bacteria | Negative result | Bacterial contamination | Potential for diarrhea/bloody diarrhea; vomiting and stomach pains (E. coli) |
| **EPA Secondary Standard - Recommended Limit** | | | |
| Iron | 0.3 mg/L | Natural deposits; corrosion; refineries & factories | Rusty color & staining; metallic taste |
| Manganese | 0.05 mg/L | Natural deposits; refineries & factories | Black/brown color; bitter metallic taste |
| Zinc | 5 mg/L | Natural deposits; fertilizer | Metallic taste |
| Sulfate | 250 mg/L | Natural deposits; fertilizer; sewage treatment plants | Salty taste |
| Hydrogen Sulfide | 0 mg/L | Sulfur gas forming in water supply | Rotten egg odor and foul taste |
| pH | 6.5 - 8.5 | Alkalinity; minerals; water treatment chemicals | Low pH: bitter metallic taste; corrosion High pH: slippery feel; deposits |
| Total Alkalinity | 75 - 150 mg/L | Minerals | Low alkalinity is associated with acidic pH and corrosion |
| Total Hardness | 10 - 100 mg/L | Minerals | Mineral scale buildup; dry skin and hair; damage to appliances |
| Sodium Chloride | 250 mg/L | Water softeners, natural deposits, sewage & fertilizers | Bloating - swollen hands & feet |

# KNOW YOUR PARAMETERS

- **LEAD:**
Lead can enter drinking water when your plumbing that contains lead corrodes. Corrosion of pipes can be caused by acidic water (low pH). Side effects include damage to the nervous system, infertility, and decreased kidney function.

- **IRON:**
Iron is a naturally occurring mineral that can enter your well water through surrounding soil. It does not pose a threat to your health, but can cause various complications with your appliances.

- **SODIUM CHLORIDE:**
Sodium Chloride increases the electrical conductivity of water and thus increases its corrosively. In metal pipes, chloride reacts with metal ions to form soluble salts, thus increasing levels of metals in drinking-water.

- **NITRITE:**
Nitrites come from fertilizers through the runoff of water and sewage deposits. They can stimulate the growth of harmful bacterias.

- **PH:**
Water with a pH lower than 7 is considered acidic, and water with a pH above 8.5 is considered basic. A pH of 7 is considered pure, and a range of 6.5 to 8.5 is recommended.

- **HARDNESS:**
Hardness is the amount of dissolved calcium and magnesium. Soft water can cause corrosion of your plumbing and appliances. Hard water can cause residue buildup and difficulties using soap.

- **ZINC:**
Zinc is an essential nutrient for our bodies, usually introduced into water by products such as steel production. However, exposure to high levels can lead to stomach cramps, nausea, and vomiting.

- **MERCURY:**
Mercury is a naturally occurring element that occurs from the degassing of the earth's crust. High levels can cause kidney damage.

- **HYDROGEN SULFIDE:**
Hydrogen Sulfide gas occurs naturally in some groundwater through decomposing organic matter such as plant decay. Drinking water with high levels of hydrogen sulfide produces a pungent rotten egg smell. This can lead to nausea and stomach pain.

- **FLUORIDE:**
Fluoride is a natural compound found in many rocks and is added to public water sources to prevent cavities. Groundwater can contain high levels of fluoride, which can cause dental fluorosis and thyroid problems.

- **COPPER:**
Copper can enter your drinking water through corrosion of pipes or direct contamination. High levels can cause nausea, vomiting, and diarrhea.

- **TOTAL CHLORINE:**
Chlorine is added to drinking water to kill disease causing pathogens. Total chlorine is the amount of Free Chlorine + Used chlorine (Chloramines) in your water. Nausea, diarrhea, and vomiting are common side effects of ingesting too much chlorine.

- **NITRATE:**
Nitrate is one of the most common groundwater contaminants in drinking water. It most commonly comes from fertilizer runoff. Excess amounts can cause blue baby disease - a lack of oxygen to the brain.

- **ALKALINITY:**
Alkalinity is the level of dissolved minerals in your water that help neutralize acidity. Water with low levels of alkalinity are more likely to be corrosive, and high levels can cause scaling.

- **SULFATE:**
Sulfate is naturally occuring in the earth's sediment and can cause a laxative effect, as well as clogged plumbing.

- **MANGANESE:**
Manganese occurs naturally in surface water, although human activities are also responsible for manganese in drinking water. Possible side effects are stained clothes/appliances and nerve damage.

- **TOTAL COLIFORM / E. COLI BACTERIA:**
Common sources of bacteria in drinking water include sewers, septic systems, and animal waste. Fecal coliform bacteria can lead to stomach ache, nausea, and various severe illnesses.



- Total coliform ············
- Fecal coliform ············
- E. coli ····················

For more information, visit **varifytest.com** or contact us at **info@varifytest.com.**
You can also find more information at **epa.gov.**

Deliver to Ashley
Alviso 95002

Industrial & Scientific ▾

Search Amazon

EN ▾

Hello, Ashley
Account & Lists ▾

Returns
& Orders

0

All | Rufus | Join Prime | Same-Day Delivery | Amazon Haul | Medical Care ▾ | Prime Video | Amazon Basics | Buy Again | Audible | Pet Supplies

Industrial & Scientific | Janitorial & Facilities | Safety Supplies | Medical Supplies | Food Service | Diagnostic Equipment | Material Handling | Educational Supplies

Industrial & Scientific › Test, Measure & Inspect › Substance Analysis Instrumentation › pH Testing › pH Meters

---

**Last purchased Apr 12, 2026**
Size: **Normal** | Color: **Yellow** | Number of Items: **1** | View order





6 VIDEOS

Click to see full view



**☀ Ask Rufus**

Can it measure pH in soil?

Does it need to be calibrated often?

Is this pen waterproof?

Why you might like this

Compare with similar

Ask something else

# Digital pH Meter Tester Pen for Water, Pre-Calibrated, High Accuracy ±0.01, 0–14 pH Range, Pocket Size for Drinking Water, Pool, Aquarium & Hydroponics (Yellow)

Visit the Ruolan Store

3.9        (11,462)   |   Search this page

**2K+ bought** in past month

---

**-10%** $**8**⁹⁹

List Price: $9.99 ⓘ     Price history

Get $60 off instantly: Pay $0.00 $8.99 upon approval for the Amazon Store Card. No annual fee.

FREE Returns

Number of Items: **1**

| **1** $8.99 ~~$9.99~~ | **2** $12.99 |

Size: **Normal**

Color: **Yellow**

- 【Pre-Calibrated for Immediate Use】 The pH meter is pre-calibrated before shipment and can be used directly out of the box. For best accuracy, readings may vary slightly depending on water conditions and environment.
- 【High Accuracy & Wide Measurement Range】 Measures pH values from 0 to 14 with high accuracy (±0.01 under standard conditions). Provides stable and reliable readings for daily water testing.
- 【Easy Operation】 Simply turn on the device, immerse the probe into the solution, gently stir, and wait for the reading to stabilize before recording the result.
- 【Compact & Portable Design】 Pocket-size design allows easy carrying for testing anytime, anywhere. Suitable for home, travel, and outdoor use.
- 【Multi-Purpose Water Testing】 Ideal for drinking water, swimming pools, aquariums, hydroponics, RO systems, and other environments requiring pH monitoring.

---

## Additional Details

 Verified by Transparency
Each item has a unique code that we verify before shipping.
Learn more

⚑ Report an issue with this product or seller

## Consider a similar item

YINMIK YK-P01 pH Tester Digital pH Meter for Water Hydroponics, Accurate pH Temp Meter with ATC for Pool,

prime

Enjoy fast, free delivery, exclusive deals, and award-winning movies & TV shows.

Join Prime

---

$**8**⁹⁹

FREE delivery **Saturday, May 2**

Your recent order earned you FREE delivery on items shipped by Amazon. Order within 10 hrs and 35 mins

Or Prime members get FREE delivery **Tomorrow, April 28**.
Join Prime

Deliver to Ashley - Alviso 95002

**In Stock**

Quantity: 1

Add to cart

Buy Now

Ships from   Amazon
Sold by      HappyFlowers
Returns      FREE 30-day refund/replacement
Gift options Available at checkout

⌄ See more

Add to Auto Buy

Add to List

## O.      <u>EXHIBIT O</u>

*Exhibit O — City of Santa Clara Archived Projects Record for the Santa Clara Square Project.*

Case 5:25-cv-03360-PCP   Document 80-4   Filed 04/27/26   Page 106 of 522

# Projects Listing

## Santa Clara Square development project (The Irvine Company)



**Category:**      Archived Projects

**Address:**      2600 Augustine Drive (plus multiple addresses on Augustine, Octavious, Montgomery, Scott and Coronado)
Santa Clara, CA

# Summary

**Project description and status**: The Santa Clara Square project encompasses approximately 93 acres and includes office, retail, mixed-use and residential space with approximately 1,862,000 square feet (sf) of office, 178,000 sf of retail and up to 1840 units of residential apartment units. Phase I of the office portion is approximately 618,000 sf.  Phases II & III of the office portion total approximately 1,243,300 sf. The buildings are complete and the owner is securing tenant leases for the space. The office portion of the project also includes up to 13,000 sf of retail and amenity buildings. This retail space is constructed and available for leasing. Phase I of the retail portion is comprised of 125,000 sf. The retail center is occupied by a market as an anchor tenant along with 4 main restaurant pads. The buildings are constructed and securing tenants. The residential/mixed-use portion of the project is comprised of 40,000 sf of retail and up to 1840 of apartments in seven buildings. The two mixed-use residential/retail buildings, five residential buildings and new City park are under construction.

**Property owner/applicant**: The Irvine Company

Case 5:25-cv-03360-PCP   Document 80-4   Filed 04/27/26   Page 107 of 522

**File numbers:** PLN2008-06858 (original approval); PLN2013-09609 (addendum to office and retail); PLN2014-10256 (addendum to office and retail); PLN2014-10577 (amendment to office area); PLN2015-10899 (residential/mixed-use original approval); PLN2017-12688 (residential/mixed-use addendum)

**Parcel numbers:** APNs 216-29-112, -053; 216-45-006, -009, -011, -014, -019, -022, -023, -024, -025, -027, -028, -031, -032, 036, -037, -038

**Project planner/City contact**: Debby Fernandez, Associate Planner; dfernandez@santaclaraca.gov, 408-615-2450

# Resources

**Environmental review documents**

**City Council meeting (5/5/09) minutes**

**Planning Commission hearing (6/26/13) minutes**

**City Council meeting (7/2/13) minutes**

**Planning Commission hearing (5/28/14) minutes**

**City Council meeting (6/10/14) minutes**

**Planning Commission hearing (10/22/14) minutes**

**City Council meeting (11/18/14) minutes**

**Planning Commission hearing (12/9/15) minutes**

**City Council meeting (12/15/15) minutes**

**Planning Commission hearing (10/11/17) minutes**

**City Council meeting (11/21/17) minutes** and **presentation** (PDF)

*Return to full list >>*

# CEQA Archive

## Santa Clara Square Residential/Mixed-Use Project (CEQA)

**Category:** Archive - All CEQA Documents, Archive - Environmental Impact Report (EIR)

**Address:** 2600-2610 Augustine Dr, 3300-3380 Montgomery Dr & 3265 Scott Blvd; 3283 Scott Blvd; 3255 Scott Blvd & 2500 Augustine Dr; 3303-3309 Octavius Dr & 3221-3233 Scott Blvd; 2620 Augustine Dr; 3230 Scott Blvd; 3236 Scott Blvd

Santa Clara, CA 95054

## EIR Addendum No. 1

Notice for Planning Commission Meeting of October 11, 2017 (PDF)

Addendum No. 1(PDF)

Appendix A (PDF)

Appendix B (PDF)

Appendix C (PDF)

Appendix D (PDF)

Appendix E (PDF)

## Final Environmental Impact Report

Errata Memo for the FEIR (PDF): Distributed December 9, 2015

Final Environmental Impact Report (PDF): Distributed December 4, 2015

## Draft Environmental Impact Report

45-day review period: October 5, 2015 - November 19, 2015

Notice of Availability (PDF)

Volume I EIR (PDF)

Volume II EIR

   Cover Page (PDF)

   4.2 Air Quality and Greenhouse Gas Emission Assessment (PDF)

   4.3 Biological Resources, Biological Assessment, Tree Surveys (PDF)

   4.4 Cultural Resources Assessment Report (PDF)

   4.7 Hydrology Study (PDF)

   4.9 Environmental Noise Impact Report (PDF)

Volume III EIR

   Cover Page (PDF)

   4.11 Transportation Impact Analysis (PDF)

Case 5:25-cv-07360-PCP    Document 80-4    Filed 04/27/26    Page 109 of 522

4.12 Water Supply Assessment (PDF)

4.13 Geotechnical Investigation Reports (PDF)

## Resources

If you are looking for a development plan or document, please reach out to the Planning Division at planning@santaclaraca.gov or 408-615-2450.

*Return to full list >>*

# P. **EXHIBIT P**

*Exhibit P — Feb. 2026 MoFo Letter*

**IIIORRISON FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AMSTERDAM, AUSTIN, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, MIAMI, NEW
YORK, PALO ALTO, SAN DIEGO, SAN
FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

February 23, 2026

Writer's Direct Contact
+1 (415) 268-6358
WTarantino@mofo.com

Via E-Mail and Certified Mail (Return Receipt Requested)

Ashley Gjøvik
2108 N St. Ste. 4553
Sacramento, CA 95816
legal@ashleygjovik.com

Re:     *Gjovik v. Apple Inc. et al.,* **No. 5:25-cv-07360-PCP (N.D. Cal.) – Access to 3250 Scott Blvd.**

Ms. Gjøvik:

I am writing to clarify our earlier correspondence regarding access to Apple property as related to the environmental enforcement action you brought against Apple.  Our letter was intended to be directed towards access to 3250 Scott Boulevard, and was sent in response to your February 17, 2026 Motion to Change Time for Filing Oppositions to Defendants' Motions to Dismiss stating that you intended to "inspect the subject property."  It was not our intention to bar you from public easements or Apple's properties that are otherwise open to the public, or to otherwise prevent you from accessing Apple property if doing so is permitted by law (including the National Labor Relations Act) or if you have separate, valid authorization to enter.  We understand that you are not an employee of Apple.

Any access to the 3250 Scott Boulevard facility for purposes of this case would be governed by the Federal Rules of Civil Procedure (FRCP) related to discovery and inspection of property.  You are free to use the court-governed processes of the FRCP to request inspection of this property, subject to Apple's own reservation of rights, including the right to object to any evidence gathered from any Apple-owned or leased property.

Thank you for your cooperation.

Regards,

William F. Tarantino

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| | DO NOT WRITE IN THIS SPACE | |
|---|---|---|
| Case | | Date Filed |
| | 32-CA-381754 | 02-22-2026 |

**INSTRUCTIONS:**

File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Apple Inc | b. Tel. No.<br>(408) 996-1010 |
|---|---|
| | c. Cell No. |
| | f. Fax. No. |

| d. Address *(Street, city, state, and ZIP code)*<br>One Apple Park Way<br><br>CA Cupertino 95014 | e. Employer Representative<br>Tim  Donald Cook<br>CEO | g. e-mail<br>tcook@apple.com |
|---|---|---|
| | | h. Number of workers employed<br>500 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Computer Hardware | j. Identify principal product or service<br>Consumer technology |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)  1,4                                                          of the National Labor Relations Act, and these unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
Ashley Marie Gjovik

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>2108 N. St  Ste. 4553<br>CA Sacramento  95816 | 4b. Tel. No.<br>(415) 964-6272 |
|---|---|
| | 4c. Cell No.<br>(415) 964-6272 |
| | 4d. Fax No. |
| | 4e. e-mail<br>ashleymgjovik@protonmail.com |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No.<br>(415) 964-6272 |
|---|---|
| | Office, if any, Cell No.<br>(415) 964-6272 |
| *(signature of representative or person making charge)*     Ashley Marie Gjovik<br><br>*(Print/type name and title or office, if any)* | Fax No. |
| Address   2108 N. St  Ste. 4553<br>Sacramento  CA 95816      Date 02/22/2026 11:24:53 PM | e-mail<br>ashleymgjovik@protonmail.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**Case: 32-CA-381754**                                              **Date Filed: 02-22-2026**

## Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, discussing wages, hours, or other terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Marie Gjovik | Forbidden from all employer property forever | 02/20/2026 |
| Ashley Marie Gjovik | Threaten to report ee to police if engage in PCA | 02/20/2026 |
| Ashley Marie Gjovik | Threaten sanctions against ee if engages in PCA | 02/20/2026 |

**8(a)(4)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) filed charges or cooperated with the NLRB.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Marie Gjovik | Forbidden from all employer property forever | 02/20/2026 |
| Ashley Marie Gjovik | Threaten to report ee to police if engage in PCA | 02/20/2026 |
| Ashley Marie Gjovik | Threaten sanctions against ee if engages in PCA | 02/20/2026 |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from engaging in protected concerted activities.

| Work Rule |
|---|
| Forbidden from the employer''s retail stores |
| Forbidden from employer''s cafeterias (Caffe Macs) |
| Forbidden from the employer''s corporate "property" |
| Forbidden from employer property anywhere forever |
| Cannot enter employer''s public property for PCA |
| Cant support strike or picket on employer property |
| Can''t gather onsite evidence w/ coworkers for NLRB |
| Can''t get any evidence from coworkers for NLRB |
| Employer will report trespass if violate work rule |
| Employer will seek sanctions if violate work rule |

**Ashley M. Gjovik, JD**
*In Propria Persona*
San Jose, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
legal@ashleygjovik.com

# UNITED STATES

## NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **ASHLEY M. GJOVIK,** *an individual*, | **Case No. 32-CA-381754** |
| | **Filed Feb. 22 2026** |
| Charging Party, | **Respondent: Apple Inc.** |
| & | |
| **APPLE INC.,** *a corporation,* | **NLRB CHARGE COVER LETTER** |
| Charged Party. | |

# UNFAIR LABOR PRACTICE CHARGE COVER LETTER

**RE: UNFAIR LABOR PRACTICE CHARGE AGAINST APPLE INC.**
**Charging Party**: Ashley Gjovik
**Charged Party:** Apple Inc., One Apple Park Way, Cupertino, CA 95014
**Re: 32-CA-381754 —** *Ashley M. Gjovik v. Apple* **Inc. Cover Letter and Initial Evidence Submission**

# INTRODUCTION

1.      This cover letter accompanies Charge 32-CA-381754, filed February 22, 2026 against Apple Inc. ("Apple" or "Employer"), alleging violations of Sections 8(a)(1) and 8(a)(4) of the National Labor Relations Act. Additional evidence and argument will be provided during investigation. The Charging Party is available to meet with the assigned Board agent at any time.

2.      On February 20, 2026 — days after the Charging Party filed three NLRB against Apple, and on the same day as a court conference at which Apple complained about the Charging Party's protected activity — a second Apple law firm, Morrison & Foerster LLP ("Morrison Foerster"), sent the Charging Party a letter "on behalf of Apple Inc." banning her from a specific address AND "any Apple-owned or leased property" for "any purpose."

3.      Any attempt to enter would be treated as trespassing. The letter threatened "appropriate relief from Court, including enforcement measures and sanctions." The ban was global and permanent — every Apple retail store, office, cafeteria, and campus worldwide, forever.

4.      On February 23, 2026 — one day after the Charging Party filed this charge — Morrison Foerster sent a revised letter narrowing the ban to a single address (3250 Scott Blvd), acknowledging the NLRA, conceding it was not intended to bar the Charging Party from public areas. This walkback is consciousness of guilt.

5.      The background facts and April 2025 settlement are set forth in the cover letter for Charge 2 (32-CA-381430), submitted concurrently, and are incorporated by reference.

# THE TRESPASS/BAN LETTER (FEB. 20, 2026)

6.      On February 20, 2026 at approximately 8:10 AM, Morrison Foerster called the Charging Party requesting a phone conversation, stating they would be

sending an "upsetting letter." At approximately 9:50 AM, a phone call occurred during which the Charging Party objected and complained about harassment by Apple. At approximately 10:37 AM, Morrison Foerster emailed a PDF letter "on behalf of Apple Inc."

7.      The letter banned the Charging Party from the specific address at issue in the environmental citizen suit AND from "any Apple-owned or leased property" for "any purpose." The letter required that all information gathering be conducted through "formal federal discovery." It threatened that any attempt to enter would be treated as trespassing and that Apple would seek "appropriate relief from Court, including enforcement measures and sanctions."

8.      The ban was extraordinary in scope. It covered not just the single property relevant to the environmental litigation but all Apple-owned or leased property worldwide — every retail store, every corporate campus, every cafeteria, every office. And it was for "any purpose" — not limited to specific disruptive conduct or safety concerns.

9.      The trespass ban, as originally issued, would prohibit the Charging Party from engaging in the following Section 7 protected activities: entering any Apple retail store (a public accommodation); picketing, leafleting, or organizing on or near Apple property; gathering evidence with current or former coworkers for NLRB proceedings; collecting evidence from coworkers at Apple locations for pending NLRB cases; supporting any strike or labor action on Apple property; investigating environmental contamination at the site that is the subject of the citizen suit — contamination that is the workplace safety concern that generated the protected concerted activity underlying the environmental case.

10.     I complained to the lawyers that the letter violated the NLRA. ("This letter also claims I cannot access any Apple property generally (*You are not permitted to enter 3250 Scott Boulevard or any other Apple-owned or Apple-leased property for any purpose. Any attempt to access these premises will be treated as trespassing*") -- which would include unmarked buildings that I do not know are Apple property, Apple locations where I may want to meet with ex-coworkers to organize and discuss work conditions, and also Apple retail stores.").

11.     She added, "the NLRA expressly says the employer cannot forbid employees from accessing employer property to organize with employees, with the basis for the prohibition being due to the employee's protected concerted activity. I'm still an employee of Apple under the Act, and this lawsuit is protected concerted activity, so Apple is forbidding me from accessing any Apple property BECAUSE OF my protected concerted activity. That's a NLRA violation I will be adding to the current pile of NLRB charges Apple's accumulated this week. If a coworker wanted to invite me to eat at Cafe Macs with them, or meet them in a lobby of a building, to

discuss NLRB charges, unions, or workplace safety, I should be able to do that and if Apple wants to ban me from its buildings because of my protected activity, that's illegal."

# THE PROTEST & WALKBACK (FEB. 23, 2026)

12. Then on Feb. 23, 2026 — one day after Charging Party's protest and the Charging Party filing this Charge — Morrison Foerster sent a revised letter that: (a) narrowed the ban to 3250 Scott Blvd only, abandoning the global property ban; (b) acknowledged the NLRA, stating the ban was not intended to interfere with labor rights; (c) conceded the ban was not intended to bar the Charging Party from public areas; (d) noted "we understand you are not an employee of Apple."

13. Each element of the walkback is evidence of consciousness of guilt. If the original letter meant what Apple now says it meant — a narrow, site-specific restriction — no walkback was necessary. But the walkback itself preserves a chilling effect – and the walkback likely stoked the increasing retaliation as documented in the Feb. 26 2026 charge.

14. Further, under *Briggs Manufacturing Co.*, 75 NLRB 569, 570-571 (1947) — "employee" under Section 2(3) "covers... former employees of a particular employer." Accord *Eastex*, 437 U.S. at 564; *Redwood Empire, Inc.*, 296 NLRB 369, 391 (1989); *Little Rock Crate & Basket Co.*, 227 NLRB 1406, 1406 (1977). *Grand Sierra* confirmed this: "as a former employee of the Respondent involved in a labor dispute relating to her former employment, [she] falls within the Act's broad definition of 'employee.'"

15. Apple's walkback states "we understand you are not an employee of Apple." Under Section 2(3) and the cases above, the CP is an employee. Apple's denial of her employee status is an attempt to define her out of the Act's protections. If Apple acknowledged she was an employee and then banned her, that would be an obvious adverse employment action. Apple's denial of status is designed to reframe the ban as a property management decision rather than a labor relations action. The Board in Grand Sierra rejected this framing — the question is whether the ban chills Section 7 rights, not whether the employer acknowledges the employee's status.

# THE PROPERTY BAN AS 8(A)(1) INTERFERENCE

16. *MEI-GSR Holdings, LLC d/b/a Grand Sierra Resort*, 365 NLRB No. 76 (2017). Employer's counsel sent former employee a letter banning her from the premises "in light of the on-going litigation" after she filed a class wage lawsuit. Board

found 8(a)(1) violation. Key holdings:

17. The test is objective, not subjective — whether the ban "reasonably tends to interfere with the free exercise of employee rights under the Act," regardless of intent. *Webasto Sunroofs, Inc.*, 342 NLRB 1222, 1223 (2004); *American Freightways Co.*, 124 NLRB 146, 147 (1959). "A finding of restraint or coercion does not depend on the subjective reaction of employees." *Helena Laboratories Corp.*, 228 NLRB 294, 295 (1977).

18. The ban need not affect wages, hours, or conditions — it need only tend to chill: "The Respondent's exclusion of Sargent, in response to her participation in protected concerted activity, would reasonably tend to chill employees from exercising their Section 7 rights. Upon observing or learning of this targeted action... the Respondent's employees reasonably would conclude they, too, might be subject to reprisals." Citing *Schwartz Mfg. Co.*, 289 NLRB 874, 878-879 (1988), enf'd 895 F.2d 415 (7th Cir. 1990).

19. Singling out one former employee while others retain access is the violation: "The Respondent routinely granted former employees access to its premises, and denied Sargent alone such access based on her protected activity. Section 7 plainly does not permit that." Open-to-the-public facilities strengthen the case: "Had the Respondent barred Sargent from a private workplace, to which it had not granted routine and unfettered access to the public, the legal question before us would surely be different."

20. The employer's litigation interest does not justify the ban. The Board rejected concerns about inadvertent interactions, court restrictions, and workplace disruption. Nothing prevents the employer from directing its own managers not to discuss litigation — but it cannot ban the employee from the premises. The ban letter and the physical exclusion are independent violations. The Board found them "sufficiently distinct in both time and effect... to constitute independent violations."

21. The case against Apple is stronger than Grand Sierra in every respect:
- PCA: Grand Sierra involved a wage lawsuit. Here, the CP filed NLRB charges (protected under 8(a)(4)) AND a citizen suit arising from coworker organizing about toxic workplace conditions (Section 7 mutual aid and protection). Both are independently PCA.
- Scope: Grand Sierra banned one person from one property. Apple banned one person from "any Apple-owned or leased property" for "any purpose" — every retail store, campus, office, and cafeteria worldwide.
- Animus: Grand Sierra's letter cited only "ongoing litigation." Apple's Dkt. 280 fn. 2 expressly connects the current conduct to the termination the Board already addressed and cites the IPA the settlement required Apple to rescind.
- Walkback: Grand Sierra's employer did not walk back the ban. Apple did — one

day after the CP filed an NLRB charge about the ban — constituting consciousness of guilt. Apple acknowledged the NLRA, conceded the ban was not intended to bar from public areas, and noted "we understand you are not an employee of Apple." Each element of the walkback is an admission the original ban was unlawful.

- Coordination: Grand Sierra involved one law firm. Apple's ban was coordinated across three firms within six days (Morrison Foerster — ban; Orrick — motions; Pillsbury — Rule 9011 threats).
- The specific property: The CP's citizen suit involves the contaminated site at 3250 Scott Blvd — the very property Apple banned her from first. Apple banned her from investigating the contamination that is the subject of the PCA lawsuit.

22.    *Schwartz Mfg. Co.*, 289 NLRB 874, 878-879 (1988), enf'd 895 F.2d 415 (7th Cir. 1990) is also instructive. In the absence of a uniformly enforced policy excluding former employees from the workplace, employer unlawfully ejected former employees engaged in union activity. The Board found the ejection violated 8(a)(1) because the employer selectively applied its property rights against employees engaged in protected activity. Apple had no prior trespass restriction against the CP. Apple selectively imposed a global ban targeting one former employee immediately after she filed NLRB charges.

23.    Under *Stericycle, Inc.*, 372 NLRB No. 113 (2023). A rule that has a reasonable tendency to chill employees in the exercise of Section 7 rights, from the perspective of an employee who is economically dependent on the employer, is presumptively unlawful. The global property ban — covering every Apple retail store, campus, office, and facility — would prohibit the CP from: entering any Apple retail store (a public accommodation); picketing, leafleting, or organizing on or near Apple property; gathering evidence with current or former coworkers for NLRB proceedings; investigating contamination at the site that is the subject of the citizen suit; and supporting any collective action on Apple property.

24.    Apple cannot demonstrate a legitimate and substantial business interest that justifies a global, permanent ban and cannot be achieved through more narrowly tailored means. Apple's own walkback proves this — Apple narrowed to one address, conceded public areas were excluded, and acknowledged the NLRA. If Apple could achieve its interests through a single-site restriction, the original global ban was unjustified.

25.    Merely proposing overly broad restrictions that would prevent employees from exercising Section 7 rights violates 8(a)(1). *McLaren Macomb*, 372 NLRB No. 58 (2023). The original global ban — "any Apple-owned or leased property" for "any purpose" — is an overly broad restriction. Sending it violates 8(a)(1).

26.    Morrison Foerster's revised letter states Apple "reserves the right to object to any evidence gathered from any Apple-owned or leased property." Even after narrowing the physical ban, Apple signals that evidence the CP gathers from Apple property — for NLRB proceedings, for the citizen suit, for the civil case — may be challenged. This creates uncertainty about whether Section 7 evidence-gathering activity will be penalized.

# THE PROPERTY BAN AS 8(A)(4) RETALIATION

27.    *Nash v. Florida Industrial Commission*, 389 U.S. 235, 238 (1967). "Congress has made it clear that it wishes all persons with information about such [unfair labor] practices to be completely free from coercion against reporting them to the Board." The ban was sent February 20, days after the CP filed Charges 1-3 and on the same day as a court conference at which Apple complained about the CP's protected activity. The ban is retaliation for filing charges.

28.    Pain Relief Centers, P.A., 371 NLRB No. 143 (2022). Board found employer's legal actions against NLRB discriminatees constituted ULPs where filed shortly after Board proceedings and targeting protected activity. The trespass ban was sent by a second Apple law firm while the CP had pending NLRB charges. It targeted the CP's ability to investigate conditions at the contaminated site — the site that is the subject of PCA arising from the same workplace safety concerns underlying the Board proceedings.

29.    Apple was served with Charges 1-3. The February 20 court conference dealt directly with Apple's complaints about the CP's protected activity. Morrison Foerster called the CP the morning of February 20 saying they would send an "upsetting letter." The ban followed hours later. The walkback followed one day after the CP filed Charge 4 about the ban AND after the CP sent direct feedback to Morrison Foerster explaining the ban violated the NLRA. Apple's walkback was in direct response to the CP's assertion of NLRA rights — which is itself PCA that triggered the revision.

# PROTECTED ACTIVITY & EMPLOYER KNOWLEDGE

30.    The Charging Party's protected activity triggering this retaliation includes, but is not limited to: (a) filing three new charges against Apple — 8(a)(4); (b) the environmental citizen suit itself, which arose from escalating concerns about toxic workplace conditions at 3250 Scott Blvd and related Apple facilities — Section 7 at its core; (c) pleading the NLRB settlement and complaints in the Citizen Suit which Apple's counsel moved to "dismiss" as if they were charges; (d) all prior protected concerted activity since 2021.

31.    Apple had full knowledge: Apple was served with NLRB charges; the February 20 court conference (same day as the trespass letter) dealt directly with Apple's complaints about the Charging Party's protected activity; Apple had full knowledge of the environmental suit and its origins in workplace safety concerns.

32.    Former employees can still be employees under Section 2(3) of the Act. Employees terminated in retaliation who can't find comparable work because of ongoing retaliation and pending Board proceedings are employees. The settlement itself names Charging Party as Charging Party and treats her as an employee. Apple doesn't get to unilaterally declare she is not an employee by saying "we understand you are not an employee of Apple" — that's Apple trying to define her out of the Act's protections while trying to banish her from all Apple property.

33.    Morrison Foerster represents Apple in the citizen suit. In November and December 2025, Morrison Foerster filed motions to dismiss characterizing the CP's claims as baseless. Then on February 20, 2026, the same firm sent the ban letter "on behalf of Apple Inc." banning the CP from the property at issue in that same citizen suit — and from all Apple property. The firm that is attacking the citizen suit as meritless is the firm that executed the retaliatory ban because of the citizen suit. The citizen suit is PCA. Morrison Foerster's motions to dismiss express animus toward that PCA. Morrison Foerster's ban letter acts on that animus. Same firm, same PCA, same hostility — first trying to kill it in court, then punishing the employee for pursuing it.

# THE CITIZEN SUIT, PCA, NEXUS, & ANIMUS

34.    Apple filed motions to dismiss the citizen suit in November and December 2025, arguing that all of the Charging Party's complaints are baseless, that no one should credit her allegations, and that all claims should be dismissed. Then in February 2026, Apple banned the Charging Party from the very property at issue — and from all Apple property — citing the citizen suit as the reason.

35.    The Citizen Suit is PCA. Apple is engaging in ULPs including threats, retaliation, coercion, unlawful work rules, and intimidation because of the Charging Party's PCA and Apple frequently admits it writing. The trespass ban is part of a coordinated campaign across three+ law firms within a one-week: Morrison Foerster sent the trespass letter on February 20; Orrick filed the Protective Order enforcement motions on February 18-26; Pillsbury (Apple's bankruptcy counsel) threatened Rule 9011 sanctions on February 26–27. Three firms, coordinated action, targeting one pro se individual in Chapter 7 bankruptcy, a discriminatee denylisted from her profession and now insolvent and homeless.

36.    The original ban covered all Apple property worldwide for any purpose

forever — wildly disproportionate to any legitimate concern about a single property in an environmental case. The walkback — narrowing the ban, acknowledging the NLRA, noting "not an employee," conceding public areas excluded — was sent one day after the Charging Party filed this charge. The timing and content of the walkback demonstrate that Apple recognized the original letter was unlawful.No prior communication about trespass concerns. No warning. No opportunity to address. Immediate blanket ban from all property worldwide.

37. Under *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565-566 (1978), Section 7 protects employee efforts to "improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship," including "appeals to legislators" and to the public. A citizen suit about toxic workplace conditions — filed after coworker organizing about contamination at Apple facilities — is mutual aid and protection under Section 7 at its core.

38. Filing an employment-related lawsuit can be PCA. *Le Madri Restaurant*, 331 NLRB 269, 275 (2000). The citizen suit arose directly from workplace safety complaints employees organized around — contamination at 3250 Scott Blvd and related Apple facilities.

39. Morrison Foerster's letter banned the CP from the address at issue in the citizen suit AND from "any Apple-owned or leased property." Apple identifies the citizen suit as the reason. The citizen suit is PCA. Apple is telling the Board the reason for the ban: the CP's protected activity. The Board does not need to infer motive. Apple stated it.

40. The settlement's catch-all provides: "WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of their rights under Section 7." A global property ban issued days after the CP filed NLRB charges, explicitly connected to the citizen suit (PCA), interferes with Section 7 rights. If the ban prevents organizing, picketing, leafleting, or evidence-gathering for NLRB proceedings, it enforces a restriction broader than any Apple had before the settlement.

# CONCLUSION

41. This Cover Letter is filed in support of the Feb. 22 2026 Charge. In addition, a detailed Legal Memorandum will be subsequently filed as well with additional exhibits and evidence.

Respectfully submitted,



**/s/ Ashley M. Gjovik**
*Pro Se Charging Party*
San Jose, California
Dated: March 05 2026

# Q.    <u>EXHIBIT Q</u>

*Exhibit Q — SB14 Hazardous Waste Management Performance Report*



# Apple Scott
# SB14 Performance Report

**Apple, Inc.**
**3250 Scott Blvd**
**Santa Clara, CA**

September 2019

APL-GAELG_00003207

# Contents

**Purpose** 3

Source Reduction Evaluation Review and Plan (Plan) ......................................................................3

Hazardous Waste Management Performance Report ......................................................................3

Summary Progress Report.................................................................................................................3

**Scope** 3

Site Contact Information....................................................................................................................3

**General Site Information** 4

**Comparison of Major Waste Streams** 5

**Waste Management Approaches** 6

AWN Waste Stream ..........................................................................................................................6

Flammable Liquid Bulk Waste..........................................................................................................6

HMR Waste .......................................................................................................................................6

49% Hydrofluoric Acid and Used Hydrofluoric Acid Waste............................................................6

**Factors Affecting Major Waste Streams** 7

AWN Waste Stream...........................................................................................................................7

Flammable Liquid Bulk Waste..........................................................................................................7

HMR Waste .......................................................................................................................................7

49% Hydrofluoric Acid and Used Hydrofluoric Acid Waste............................................................7

Section Six..........................................................................................................................................8

**Certifications – Technical and Financial** 8

Technical Certification Statement for the Performance Report.......................................................8

Financial Certification Statement .....................................................................................................8

APL-GAELG_00003208

**Section One**

# Purpose

This SB14 Hazardous Waste Management Performance Report (Performance Report) was prepared for the Sunnyvale Apple facility located at 3250 Scott Boulevard in Santa Clara, California. The Performance Report includes sufficient details to convey an understanding of the hazardous waste management approaches used at the site required in California Code of Regulations, Title 22, Div. 4.5, Chapter 31.

This Performance Report documents the site's current efforts and effectiveness in managing hazardous waste. It also includes discussions of the site's approaches to managing hazardous waste, including source reduction, offsite recycling, treatment, and disposal.

As a hazardous waste generator, the site has prepared the following documents that describe the source reduction program it has developed and is implementing required by SB14:

## Source Reduction Evaluation Review and Plan (Plan)

- Includes an estimate of the quantity of hazardous wastes generated

- Contains an evaluation of potential source reduction approaches

- Provides a timetable for implementing selected source-reduction measures and a four-year numerical goal

- Addresses the predicted effectiveness of selected measures at reducing hazardous waste and releases to all environmental media (the air, land, and water)

## Hazardous Waste Management Performance Report

- Includes an assessment of the effect on waste generation of each waste management approach implemented since the baseline year of 2018

## Summary Progress Report

- Summarizes the result of implementing the source-reduction measures and the amount of reduction anticipated

The site must retain the Plan, Performance Report, and SPR, and have the documents readily available for onsite review by the Department of Toxic Substances Control (DTSC), a local agency or the public.

# Scope

This program applies to the Apple facility (SB01) located at 3250 Scott Blvd in Santa Clara, California.

## Site Contact Information

The site EHS manager for 3250 Scott Boulevard is Tom Huynh, tom_huynh@apple.com, (408) 595-0947.

A copy of this document is maintained by Apple EHS and available onsite.

APL-GAELG_00003209

**Section Two**

# General Site Information

| | |
|---|---|
| **Name of the Site** | SB01 |
| **Street address**<br>**City, county, and zip code** | 3250 Scott Blvd<br>Santa Clara, CA 94085 |
| **Telephone number (main)** | (408) 996-1010 |
| **EPA Identification Number(s)** | CAR000000278176 |
| **Standard Industrial Classification (SIC) code** | 3571 |
| **Type of business or activity conducted** | Research and development |
| **Length of time the company has been in business at the present site** | 4 years |
| **Major products manufactured or services provided** | Research and development |
| **Number of employees** | 250 |
| **A general description of the site operations, with corresponding block diagrams focusing on quantity and type of raw materials, hazardous waste, and final products produced at the site** | The site conducts confidential research and development of various parts for products. |

APL-GAELG_00003210

**Section Three**

# Comparison of Major Waste Streams

For the Performance Report, 2018 is the Baseline Year and 2018 is the Reporting Year. 2018 is the first year the facility is subject to the formal reviewing and documentation required by SB14 and as such Table 1 shows the projected reduction in waste for the next reporting year. Comparison of major hazardous waste streams generated in 2018 will be included in 2022 reporting data.

**Table 1: Comparison of Major Waste Streams, Baseline Year 2014 to Reporting Year 2018**

| Major Waste Stream | 2018 CWC | Constituents Which Cause the Waste Stream to be Hazardous | Hazardous Waste Management Approach | Weight (lbs.) for Baseline Year (2018) | 2018 Projected Source Reduction (< X %) | Weight (lbs.) for Reporting Year (2018) | Reduction Achieved (lbs.) |
|---|---|---|---|---|---|---|---|
| AWN Waste Stream | | Corrosive liquids | Onsite wastewater treatment | 96,746,001.6 | 0 | | 0 |
| FLAMMABLE LIQUID- BULK (CH1505500, CH1505500SB1) | 214 | Isopropyl alcohol, tetramethylammonium hydroxide | Offsite treatment/ disposal | 284,750 | 0 | 284,750 | 0 |
| HMR WASTE (P211742, P21174sb01) | 791 | Sulfuric acid, hydrochloric acid | Offsite treatment/ disposal | 1,340,770 | 0 | 1,340,770 | 0 |
| 49% HYDROFLUORIC ACID WASTE and USED HYDROFLUORIC ACID (WIP382018) | 791 | Hydrofluoric acid | Offsite treatment/ disposal | 183 | 0 | 183 | 0 |

APL-GAELG_00003211

**Section Four**

# Waste Management Approaches

Hazardous waste management approaches are methods and techniques of controlling the generation and handling of hazardous waste. Approaches can include source reduction, onsite and offsite recycling, onsite and offsite treatment, and disposal. The major waste stream in the baseline/reporting year 2018 and the management approaches for this waste is discussed and quantified in this section.

## AWN Waste Stream

In baseline year 2018, the site generated 96,746,001.6 pounds of AWN waste stream. 2018 was the baseline and reporting year, as such no formal reduction measures have been established and no source reduction was achieved. In 2018, AWN waste stream was managed using onsite treatment.

## Flammable Liquid Bulk Waste

In baseline year 2018, the site generated 284,750 pounds of flammable liquid bulk waste stream. 2018 was the baseline and reporting year, as such no formal reduction measures have been established and no source reduction was achieved. In 2018, flammable liquid bulk stream was managed using offsite treatment/disposal.

## HMR Waste

In baseline year 2018, the site generated 1,340,770 pounds of HMR waste stream. 2018 was the baseline and reporting year, as such no formal reduction measures have been established and no source reduction was achieved. In 2018, HMR waste stream was managed using offsite treatment/disposal.

## 49% Hydrofluoric Acid and Used Hydrofluoric Acid Waste

In baseline year 2018, the site generated 183 pounds of 49% hydrofluoric acid waste stream. 2018 was the baseline and reporting year, as such no formal reduction measures have been established and no source reduction was achieved. In 2018, 49% hydrofluoric acid stream was managed using offsite treatment/disposal.

APL-GAELG_00003212

**Section Five**

# Factors Affecting Major Waste Streams

The amount of hazardous waste generated is affected by the amount of R&D experimentation within the facility. How these factors affected each major waste stream in 2018 is discussed in this section.

## AWN Waste Stream

AWN waste is generated through R&D operations.

The amount of this waste stream produced is influenced by R&D requests which cannot be controlled and varies greatly depending on the need. The waste generation is controlled and optimized with software controls and recipes which are continually optimized based on previous R&D findings.

## Flammable Liquid Bulk Waste

Flammable liquid bulk waste is generated through R&D operations.

The amount of this waste stream produced is influenced by R&D requests which cannot be controlled and varies greatly depending on the need. The waste generation is controlled and optimized with software controls and recipes which are continually optimized based on previous R&D findings.

## HMR Waste

HMR waste is generated through R&D operations.

The amount of this waste stream produced is influenced by R&D requests which cannot be controlled and varies greatly depending on the need. The waste generation is controlled and optimized with software controls and recipes which are continually optimized based on previous R&D findings.

## 49% Hydrofluoric Acid and Used Hydrofluoric Acid Waste

49% hydrofluoric acid waste is generated through R&D operations.

The amount of this waste stream produced is influenced by R&D requests which cannot be controlled and varies greatly depending on the need. The waste generation is controlled and optimized with software controls and recipes which are continually optimized based on previous R&D findings.

APL-GAELG_00003213

Section Six

# Certifications – Technical and Financial

## Technical Certification Statement for the Performance Report

I certify this Hazardous Waste Management Performance Report meets the following requirement, as applicable:

- The Performance Report identifies factors that affect the generation and onsite and offsite management of hazardous wastes and summarizes the effect of those factors on the generation and on-site and off-site management of hazardous wastes.

Name                                              Signature

Title                                              Date

- 

## Financial Certification Statement

I certify that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluated the information submitted. Based on my inquiry of persons who manage the system, or the persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for making false statements of representations to the Department, including the possibility of fines for criminal violations.

Name                                              Signature

Title                                              Date

APL-GAELG_00003214

# R.EXHIBIT R

*Exhibit R — September 25, 2025 Meet-and-Confer Email Proposing Stipulated Preliminary Injunctive Order.*

Sent | ashleymgjovik@protonmail.com | Proton Mail

# Meet/Confer: 5:25-cv-07360 | Imminent and Substantial Endangerment | Stipulated Preliminary Injunctive Order

From    Ashley Gjovik <ashleymgjovik@protonmail.com>

To      Tarantino, William F.<WTarantino@mofo.com>, Brendan Macaulay<bmacaulay@nossaman.com>, Svend Brandt-Erichsen<sbrandterichsen@nossaman.com>

Date    Thursday, September 25th, 2025 at 1:42 AM

Hello,

I believe early interim mitigation measures are critical in this Environmental Citizen Suit. I plan to file a Motion for Preliminary Injunction if necessary, but would prefer to negotiate a stipulated agreement with Defendants if possible. This would be a voluntary interim agreement with a goal to reduce the alleged risk of harm to the public and environment.

It is my intention that this agreement would be submitted to the Court to approve in a formal Order and to be active during this litigation. However, if the underlying claim(s) were dismissed, the agreement would then be presumably revoked or otherwise dissolved by court order. Similarly, if there was a settlement agreement or judgment against the Defendant(s), then portions of the agreement could be implemented within a Permanent Injunction/Consent Agreement but that would still need to be approved by the Court, EPA, and DOJ.

It is also my intention that a stipulated agreement would neither require an admission of liability or harm from Defendants, nor would it preclude or modify the Plaintiff's Imminent and Substantial Endangerment claims and requested remedies. We could all stipulate to those points.

In good faith and in the spirit of negotiation and cooperation, I propose the following categories of mitigation and abatement activities that I would like to see captured in an interim agreement. The list below does not have to be a one-or-nothing list, or the exclusive options, or restricted to exactly as stated. These are proposals as a starting point for negotiations. Most of these requests arise out of a combination of multiple federal statutes and also the state public nuisance laws -- so consider this a cookbook or menu of options to choose from and to get us started. Let's develop something that just ultimately, generally reduces the risk of harm.

AIR EMISSIONS, SEWER RELEASES, & LEAKS/SPILLS
- Installation, operation, and maintenance of air emission monitoring and emergency control equipment for all site exhaust systems which release hazardous substances -- including auto-shut off controls and alarms when releases exceed unsafe thresholds -- within 90 days.
- Installation, operation, and maintenance of sewer release monitoring and emergency control equipment for all site discharge systems which release hazardous substances -- including auto-shut off controls and alarms when releases exceed unsafe thresholds -- within 90 days.
  - If the Owner/Operator is unwilling to do this and the City doesn't want to force those Parties to do this, then a counter request to the City would be to install some sort of sewer line vapor intrusion mitigation system for the downgradient sewer flow by/around the apartments.
- Installation, operation, and maintenance of air quality monitoring stations (including on-site and off-site down-wind stations) with publicly available data -- within 90 days.

- An advisory/request to the manager of the next door apartments to install secondary abatement/mitigation equipment in their "fresh air intakes" and residential plumbing connected to the shared sewer system.
- Installation, operation, and maintenance of exterior audible and visual alarms with 30 days to provide an alarm/notification if leaks/spills occur which do or could result in a release of toxic gases and/or extremely or very dangerous substances into the ambient air.

(Examples of legal precedent/authority: *In re Chief Supply Corp No*. VI-7003-97 Region 6, RCRA 7003; *In re Shallow Water Refinery,* No. vII-97-CAA-120 Region 7, CAA; EPCRA; *In re Trinity American Corp,* Region 4, CAA; *In re Minerec Mining Chemicals,* No. R9-94-34 Region 9, CAA 303; *United States v. Deaton,* 332 F.3d 698, 714 (4th Cir. 2003), CWA; *United States v. Holtzman*, 762 F.2d 720, 724-25 (9th Cir. 1985), CAA; *United States v. Cinergy Corp*., 582 F. Supp. 2d 1055 (S.D. Ind. 2008), CAA; CAA 303 & 112(r); RCRA 3007, 3008, 3013, 7003; Senate Committee on Env and Public Works, Clean Air Act Amendments of 1989, Senate Report No. 228, 101st Congress, 1st Session 211 (1989); Rest.2d Torts; National EPA Enforcement and Compliance Initiative: Chemical Accident Risk Reduction under CAA and EPCRA).

## PUBLIC ACCESS, WARNINGS, & IDENTIFICATION

- Installation of a fence around the property preventing people and land-animals from entering the premises.
- Installation of "danger" and/or "warning" signs and NFPA fire diamonds on the fences and/or exterior of the building where they can be seen by the public.
- Installation of "No Smoking" due to fire hazard signs within visibility of sidewalks and near emission vents, and at every vent releasing pyrophoric gases (ie, silane, etc).
- Installation of basic signage on the building identifying the name of the Operator company with the sign/logo visible from streets and sidewalks.
- Installation of signage or other indicators designating that semiconductor manufacturing/fabrication is occurring at the facility.
- Some sort of public disclosure confirming that semiconductor manufacturing/fabrication operations are actively occurring at the facility (this could be in the agreement itself and on this case docket).
- Coordinate between Defendants and apartment complex owner to either temporarily restrict access to the next-door parks/playgrounds; or install Prop 65 warning signs and set up air monitoring stations with audible alarms if air pollution exceeds certain levels.

(Examples of legal precedent/authority: *In re County of Westchester,* No 94-7003-0215, Region 2, RCRA 7003; *In re Rail Services Inc,* No. 91-14R Region 4, RCRA 7003; *In re Chief Supply Corp,* No. VI-7003-97 Region 6, RCRA 7003; *In re Redound Industries Inc,* No. II, 94-0214 Region 2, RCRA 7003; *United States v. Cinergy Corp. ,* 582 F. Supp. 2d 1055 (S.D. Ind. 2008), CAA; TSCA 8 and 11; RCRA 3007, 3013, 7003; CAA 114 & 112(r); EPCRA; CWA 308; CERCLA 104 & 106; *Garcia v. Soogian*, 52 Cal.2d 107, 110, (1959); Rest.2d Torts; National EPA Enforcement and Compliance Initiative: Chemical Accident Risk Reduction under CAA and EPCRA).

## PERMITS, ASSESSMENTS, & REPORTING

- Completed submission of all required hazardous substance, fire code, and health/safety permits within 30 days, if not already submitted or approved.
- Retain an independent consultant who is a professional engineer to conduct an Environment Site Assessment / Environmental Impact Report, and share the results with DOJ, EPA, the Plaintiff, and all Defendants. Ideally at least two consultants -- one also hired by the Plaintiff -- who would conduct inspections/assessments and create reports concurrently or together. To be completed within 90 days.
- Retain an independent consultant who is a professional engineer to develop complete Risk Management Plans and Contingency Plans for all emissions/discharge vectors which could result in the release of extremely/very dangerous chemicals and toxic gases. Ideally at least two consultants -- one also hired by the Plaintiff -- who

would develop the reports together. Share the completed reports with DOJ, EPA, the Plaintiff, all Defendants within 90 days. Once EPA and/or Plaintiff approves, then post report publicly (could be posted on this case docket).

- Retain an independent consultant who is a professional engineer and toxic gas specialist to develop a Toxic Gas management plan for the facility (ie arsine, chlorine, phosphine, fluorine, etc.) and share the results with DOJ, EPA, the Plaintiff, and all Defendants. Ideally at least two consultants -- one also hired by the Plaintiff -- who would develop the report/plan together OR could hire/retain a SCC DEH employee with expertise on this topic. To be completed within 30 days.
- File all required (yet not previously filed) historical emission, leak, and spill reports retroactively within 30 days (includes TRI, NEI, NPDES, RCRA/CERCLA, EPCRA, CARB, CalOES, CalEPA, etc.).
- Complete monthly reports regarding performance of obligations under the agreement, until completion of the requirements and/or termination of the agreement, co-signed by an official/director at each Defendant entity. Each report would be sent to DOJ, EPA, the Plaintiff, and all Defendants. Can negotiate confidentiality terms for the reports.

(Examples of legal precedent/authority: *In re County of Westchester*, No 94-7003-0215, Region 2, RCRA 7003; *In re Oliver R. Hill,* No. 7003-95-0203 Region 2, RCRA 7003; TSCA 8 and 11; RCRA 3007, 3013, 7003; CAA 114 & 321; CWA 308; CERCLA 103 & 106; Guidelines for Using the Imminent Hazard, Enforcement and Emergency Response Authorities of Superfund and Other Statutes, Environmental Protection Agency, 47 Fed. Reg. 20664; OLCE FRL-2117-2, May 13, 1982; Rest.2d Torts; National EPA Enforcement and Compliance Initiative: Reducing Air Toxics in Overburdened Communities).

If we proceed with some sort of interim agreement with some projects and tasks such as those noted above, and they are executed in good faith, then I am also willing to agree to advocate that reasonable costs and expenses for the above activities should be deducted from any final penalties in this action, pending approval from the Court, and if no objection to that final Order/Settlement by DOJ or EPA.

I also understand that you may not want to put things in writing during the negotiation period, so phone calls or video chats are ok platforms to discuss these matters. Similarly, we don't have to draft the agreement until we feel confident we'd move forward on it and in which case we can consider it 'confidential' until its finalized. I recognize that in order to reach compromise on matters like this, that the overall benefit of the agreement must out-weigh the risk for all parties, and so I want to encourage a discussion that respects that dynamic.

That said, I'd like to request a response from all Parties as to if they'd be willing to engage in negotiations on this. If no party is willing to engage in negotiations, then I will proceed to file the Motion for a Preliminary Injunction early next week. However, I do not need an immediate agreement that the Parties will definitely agree to an agreement, nor do I need an immediate agreement on the terms of a potential plan. I would delay filing my motion if it appears at least one of the Parties is seriously considering an interim agreement and is engaged in good faith negotiations about such an agreement. As you will need to trust me during this process, I will also need to trust you all as well.

Please note that if I file a Motion for Preliminary Injunction (due to the alleged imminent and substantial endangerment and resulting alleged irreparable harm, combined with the Defendants refusal to negotiate any sort of good faith voluntary interim agreement), I would then also request more extensive remedies in addition to the items listed here. It's my view that if the Defendants refuse to negotiate some sort of interim mitigation plan, that is then evidence further supporting the need for more drastic remedies. Thus, in line with similar cases and precedent, one thing I would then also request is that all hazardous substance activities at the facility cease pending the litigation (resulting in the facility operations being shut-down related to anything that uses, stores, generates, treats, or

disposes of hazardous and solid wastes; including gases and air emissions -- and all hazardous substances to be removed from the site). This is an extreme request that I do feel is justified in this situation, however I would prefer to negotiate something voluntary in order to reduce the need for motion practice, to conserve Court resources, and to work together cooperatively towards a solution. I also understand that a voluntary agreement with the Owner/Operator would likely only occur if the agreement does not include a facility shut-down and that's the primary reason I'm not making the request here, but I would make that request in a Motion, if filing a Motion is required.

I hope we can find some common ground here.


Respectfully,
-Ashley


—

**Ashley M. Gjøvik**
**BS, JD, PMP**
**(415) 964-6272**


Sent with [Proton Mail](#) secure email.

# S. <u>EXHIBIT S</u>

*Exhibit S — Final Environmental Impact Report for Santa Clara Square Apartments (2015).*

*City of Santa Clara*

# Santa Clara Square
# Residential/Mixed Use Project
# Draft Environmental Impact Report

# Volume I



Prepared for:

City of Santa Clara
1500 Warburton Avenue
Santa Clara, California 95050

Prepared by:



**IMPACT SCIENCES, INC.**

505 14th Street, Suite 1230
Oakland, CA 94612

October 2015

# Santa Clara Square-Residential/Mixed Use Project

# Draft Environmental Impact Report

# SCH No. 2015032075

# Volume I

**Prepared for:**

City of Santa Clara
1500 Warburton Avenue
Santa Clara, California 95050

**Prepared by:**

Impact Sciences, Inc.
505 14th Street, Suite 1230
Oakland, California 94612

**October 2015**

# TABLE OF CONTENTS

Section                                                                                                                                    Page

1.0    INTRODUCTION ................................................................................................................................1.0-1
    1.1    Purpose of this EIR ...............................................................................................................1.0-1
    1.2    Summary of the Proposed Project .....................................................................................1.0-2
    1.3    Environmental Review Process ...........................................................................................1.0-2
    1.4    Scope of this EIR ...................................................................................................................1.0-3
    1.5    Report Organization .............................................................................................................1.0-4

2.0    EXECUTIVE SUMMARY ...................................................................................................................2.0-1
    2.1    Purpose ...................................................................................................................................2.0-1
    2.2    Project Location .....................................................................................................................2.0-1
    2.3    Project Description ................................................................................................................2.0-2
    2.4    Project Objectives .................................................................................................................2.0-2
    2.5    Alternatives ............................................................................................................................2.0-3
        2.5.1    Alternative 1: No Project/No Redevelopment .................................................2.0-3
        2.5.2    Alternative 2: No Project/Planned Development .............................................2.0-3
        2.5.3    Alternative 3: Reduced Residential Density ......................................................2.0-4
    2.6    Issues to be Resolved/Areas of Controversy ...................................................................2.0-4
    2.7    Impact Summary ...................................................................................................................2.0-5

3.0    PROJECT DESCRIPTION .................................................................................................................3.0-1
    3.1    Introduction ...........................................................................................................................3.0-1
    3.2    Project Approvals ..................................................................................................................3.0-1
    3.3    Project Objectives .................................................................................................................3.0-2
    3.4    Project Setting .......................................................................................................................3.0-3
        3.4.1    Existing Site Conditions .....................................................................................3.0-4
    3.5    Project Characteristics .........................................................................................................3.0-6
        3.5.1    Proposed Land Uses ............................................................................................3.0-6
    3.6    Circulation and Parking .......................................................................................................3.0-9
        3.6.1    Circulation ............................................................................................................3.0-9
        3.6.2    Parking ..................................................................................................................3.0-15
    3.7    Landscaping ..........................................................................................................................3.0-15
    3.8    Utilities ..................................................................................................................................3.0-17
        3.8.1    Potable Water ......................................................................................................3.0-17
        3.8.2    Wastewater ..........................................................................................................3.0-17
        3.8.3    Storm Drainage ...................................................................................................3.0-17
        3.8.4    Electricity and Natural Gas ...............................................................................3.0-19
        3.8.5    Sustainable Development Features ....................................................................3.0-19
    3.9    Demolition and Construction Activities ...........................................................................3.0-21
    3.10    Lead and Responsible Agencies .......................................................................................3.0-23

4.0     ENVIRONMENTAL IMPACT ANALYSIS ................................................................................4.0-1
    4.0.1    Introduction .................................................................................................................4.0-1
    4.0.2    levels of Significance..................................................................................................4.0-1
    4.0.3    Format of Resource Topic Sections..........................................................................4.0-2
        4.0.3.1   Introduction....................................................................................................4.0-2
        4.0.3.2   Environmental Setting...................................................................................4.0-2
        4.0.3.3   Regulatory Considerations ...........................................................................4.0-3
        4.0.3.4   Project Impacts and Mitigation Measures ...................................................4.0-3
        4.0.3.5   Cumulative Impacts and Mitigation Measures ............................................4.0-3
        4.0.3.6   References Section..........................................................................................4.0-10
    4.1     Aesthetics .....................................................................................................................4.1-1
        4.1.1    Introduction....................................................................................................4.1-1
        4.1.2    Environmental Setting....................................................................................4.1-1
        4.1.3    Regulatory Considerations .............................................................................4.1-6
        4.1.4    Impacts and Mitigation Measures .................................................................4.1-10
        4.1.5    References .......................................................................................................4.1-20
    4.2     Air Quality ...................................................................................................................4.2-1
        4.2.1    Introduction....................................................................................................4.2-1
        4.2.2    Environmental Setting....................................................................................4.2-1
        4.2.3    Regulatory Considerations .............................................................................4.2-6
        4.2.4    Impacts and Mitigation Measures .................................................................4.2-14
        4.2.5    References .......................................................................................................4.2-40
    4.3     Biological Resources ...................................................................................................4.3-1
        4.3.1    Introduction....................................................................................................4.3-1
        4.3.2    Environmental Setting....................................................................................4.3-1
        4.3.3    Regulatory Considerations .............................................................................4.3-6
        4.3.4    Impacts and Mitigation Measures .................................................................4.3-11
        4.3.5    References .......................................................................................................4.3-20
    4.4     Cultural Resources ......................................................................................................4.4-1
        4.4.1    Introduction....................................................................................................4.4-1
        4.4.2    Environmental Setting....................................................................................4.4-1
        4.4.3    Regulatory Considerations .............................................................................4.4-3
        4.4.4    Impacts and Mitigation Measures .................................................................4.4-8
        4.4.5    References .......................................................................................................4.4-13
    4.5     Greenhouse Gas Emissions.........................................................................................4.5-1
        4.5.1    Introduction....................................................................................................4.5-1
        4.5.2    Environmental Setting....................................................................................4.5-1
        4.5.3    Regulatory Considerations .............................................................................4.5-6
        4.5.4    Impacts and Mitigation Measures .................................................................4.5-26
        4.5.5    References .......................................................................................................4.5-45
    4.6     Hazards and Hazardous Materials..............................................................................4.6-1
        4.6.1    Introduction....................................................................................................4.6-1
        4.6.2    Environmental Setting....................................................................................4.6-1
        4.6.3    Regulatory Setting .........................................................................................4.6-13
        4.6.4    Impacts and Mitigation Measures .................................................................4.6-17
        4.6.5    References .......................................................................................................4.6-29

4.7 Hydrology and Water Quality ...................................................................................................4.7-1
   4.7.1 Introduction.......................................................................................................................4.7-1
   4.7.2 Environmental Setting.....................................................................................................4.7-1
   4.7.3 Regulatory Setting ...........................................................................................................4.7-6
   4.7.4 Impacts and Mitigation Measures .................................................................................4.7-9
   4.7.5 References .........................................................................................................................4.7-17
4.8 Land Use and Planning .............................................................................................................4.8-1
   4.8.1 Introduction.......................................................................................................................4.8-1
   4.8.2 Environmental Setting.....................................................................................................4.8-1
   4.8.3 Regulatory Setting ...........................................................................................................4.8-2
   4.8.4 Impacts and Mitigation Measures .................................................................................4.8-5
   4.8.5 References .........................................................................................................................4.8-23
4.9 Noise ............................................................................................................................................4.9-1
   4.9.1 Introduction.......................................................................................................................4.9-1
   4.9.2 Fundamentals of Noise and Vibration..........................................................................4.9-1
   4.9.3 Environmental Setting.....................................................................................................4.9-4
   4.9.4 Regulatory Considerations .............................................................................................4.9-8
   4.9.5 Impacts and Mitigation Measures ...............................................................................4.9-12
   4.9.6 References .........................................................................................................................4.9-26
4.10 Public Services ...........................................................................................................................4.10-1
   4.10.1 Introduction.....................................................................................................................4.10-1
   4.10.2 Environmental Setting....................................................................................................4.10-1
   4.10.3 Regulatory Considerations ...........................................................................................4.10-4
   4.10.4 Impacts and Mitigation Measures ...............................................................................4.10-6
   4.10.5 References .......................................................................................................................4.10-14
4.11 Transportation and Traffic......................................................................................................4.11-1
   4.11.1 Introduction.....................................................................................................................4.11-1
   4.11.2 Environmental Setting....................................................................................................4.11-3
   4.11.3 Regulatory Considerations .........................................................................................4.11-18
   4.11.4 Impacts and Mitigation Measures .............................................................................4.11-21
   4.11.5 References .......................................................................................................................4.11-90
4.12 Utilities and Service Systems, including Energy .................................................................4.12-1
   4.12.1 Introduction.....................................................................................................................4.12-1
   4.12.2 Environmental Setting....................................................................................................4.12-1
   4.12.3 Regulatory Considerations ...........................................................................................4.12-9
   4.12.4 Impacts and Mitigation Measures .............................................................................4.12-15
   4.12.5 References .......................................................................................................................4.12-37
4.13 Other Resource Topics.............................................................................................................4.13-1
   4.13.1 Introduction.....................................................................................................................4.13-1
   4.13.2 Agriculture and Forestry Resources............................................................................4.13-1
   4.13.3 Geology and Soils ...........................................................................................................4.13-2
   4.13.4 Mineral Resources...........................................................................................................4.13-5
   4.13.5 Population and Housing.................................................................................................4.13-6
   4.13.6 References .........................................................................................................................4.13-7

5.0    ALTERNATIVES ..................................................................................................................5.0-1
  5.1    Introduction .....................................................................................................................5.0-1
  5.2    Project Objectives ...........................................................................................................5.0-2
  5.3    Impacts of the Proposed Project.....................................................................................5.0-3
         5.3.1    Aesthetics .........................................................................................................5.0-3
         5.3.2    Air Quality .......................................................................................................5.0-4
         5.3.3    Biological Resources ........................................................................................5.0-4
         5.3.4    Cultural Resources...........................................................................................5.0-4
         5.3.5    Greenhouse Gas Emissions .............................................................................5.0-5
         5.3.6    Hazards and Hazardous Materials...................................................................5.0-5
         5.3.7    Hydrology and Water Quality .........................................................................5.0-5
         5.3.8    Land Use and Planning.....................................................................................5.0-5
         5.3.9    Noise.................................................................................................................5.0-6
         5.3.10   Public Services..................................................................................................5.0-6
         5.3.11   Transportation and Traffic...............................................................................5.0-6
         5.3.12   Utilities and Service Systems, Including Energy .................................................5.0-7
         5.3.13   Other Resource Topics ....................................................................................5.0-7
  5.4    Alternatives Evaluated in Detail .....................................................................................5.0-7
  5.5    Alternative Impact Analysis ............................................................................................5.0-8
         5.5.1    Alternative 1: No Project/No Redevelopment .................................................5.0-8
         5.5.2    Alternative 2: No Project/Planned Development ...............................................5.0-11
         5.5.3    Alternative 3: Reduced Residential Density......................................................5.0-18
  5.6    Environmentally Superior Alternative.............................................................................5.0-24
  5.7    References ........................................................................................................................5.0-29

6.0    OTHER CEQA CONSIDERATIONS ................................................................................6.0-1
  6.1    Introduction .....................................................................................................................6.0-1
  6.2    Significant Unavoidable Effects ......................................................................................6.0-1
  6.3    Significant Irreversible Environmental Changes .............................................................6.0-3
         6.3.1    Commit Future Generations to Similar Uses ...................................................6.0-3
         6.3.2    Irreversible Changes to the Physical Environment ...........................................6.0-4
         6.3.3    Consumption of Natural Resources .................................................................6.0-4
  6.4    Growth-Inducing Impacts................................................................................................6.0-4
         6.4.1    Removal of an Impediment to Growth.............................................................6.0-5
         6.4.2    Population and Economic Growth ....................................................................6.0-7
         6.4.3    Development of Open Space .............................................................................6.0-8
  6.5    Mandatory Findings of Significance.................................................................................6.0-8
  6.6    References ........................................................................................................................6.0-9

7.0    REPORT PREPARATION ..................................................................................................7.0-1
  7.1    Lead Agency .....................................................................................................................7.0-1
  7.2    EIR Consultant.................................................................................................................7.0-1

## Appendices

**Volume II**

4.2    Air Quality and Greenhouse Gas Emission Assessment

4.3    Biological Resources

Biological Assessment
Tree Surveys

4.4        Cultural Resources Assessment Report

4.7        Hydrology Study

4.9        Environmental Noise Impact Report


**Volume III**

4.11      Transportation Impact Analysis

4.12      Water Supply Assessment

4.13      Geotechnical Investigation Reports

# LIST OF FIGURES

Figure        Page

3.0-1   Project Location ....................................................................................................................3.0-5
3.0-2   Site Plan ...............................................................................................................................3.0-7
3.0-3   Scott Boulevard Elevations................................................................................................3.0-11
3.0-4   Augustine Drive Elevations ...............................................................................................3.0-12
3.0-5   Main Street Elevations .......................................................................................................3.0-13
3.0-6   Circulation Plan .................................................................................................................3.0-14
4.1-1   Key to Viewpoint Locations................................................................................................4.1-3
4.1-2   Existing Viewpoints 1 and 2 ...............................................................................................4.1-4
4.1-3   Existing Viewpoints 3 and 4 ...............................................................................................4.1-7
4.1-4   Existing Viewpoints 5 and 6 ...............................................................................................4.1-8
4.1-5   Existing Viewpoints 7 and 8 ...............................................................................................4.1-9
4.1-6   Park Perspective ................................................................................................................4.1-16
4.1-7   Montgomery Drive Perspective.........................................................................................4.1-17
4.1-8   San Tomas Aquino Creek Trail Perspective ....................................................................4.1-18
4.2-1   TAC Sources within 1,000 feet of the Project Site...........................................................4.2-31
4.9-1   Noise Monitoring Locations ...............................................................................................4.9-7
4.9-2   General Plan Noise Standards ..........................................................................................4.9-10
4.9-3   Minimum Recommended STC Ratings for Windows and Exterior Doors ..................4.9-15
4.11-1   Project Area and Study Intersections.................................................................................4.11-5
4.11-2   Existing Transit Service ......................................................................................................4.11-6
4.11-3   Existing Bicycle Facilities....................................................................................................4.11-7
4.11-4   Project Trip Distribution....................................................................................................4.11-38

# LIST OF TABLES

| Table | | Page |
|---|---|---|
| 2.0-1 | Summary of Proposed Project Impacts and Mitigation Measures | 2.0-6 |
| 2.0-2 | Summary Comparison of Project Alternatives | 2.0-27 |
| 3.0-1 | Project Site Land Use Designations | 3.0-2 |
| 3.0-2 | Proposed Building Space | 3.0-6 |
| 3.0-3 | Residential Unit Mix Summary | 3.0-8 |
| 3.0-4 | Proposed Residential Parking | 3.0-15 |
| 3.0-5 | Project Site Trees | 3.0-16 |
| 3.0-6 | Estimated Quantities of Construction Wastes | 3.0-21 |
| 4.0-1 | Approved Projects | 4.0-4 |
| 4.0-2 | Pending Projects | 4.0-8 |
| 4.2-1 | Ambient Air Quality Standards | 4.2-3 |
| 4.2-2 | Highest Measured Air Pollutant Concentrations Measured Nearest the Project Site | 4.2-5 |
| 4.2-3 | National Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin | 4.2-7 |
| 4.2-4 | California Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin | 4.2-9 |
| 4.2-5 | Average Daily Construction Emission Thresholds | 4.2-15 |
| 4.2-6 | Operational Emission Thresholds | 4.2-16 |
| 4.2-7 | Unmitigated Santa Clara Square Residential/Mixed Use Project Construction Emissions | 4.2-20 |
| 4.2-8 | Santa Clara Square Residential/Mixed Use Project Operational Emissions | 4.2-25 |
| 4.2-9 | Community Health Risk to Project Sensitive Receptors | 4.2-33 |
| 4.2-10 | Roadway Source Excess Cancer Risk and Annual PM2.5 Concentrations at Proposed Project Site | 4.2-36 |
| 4.2-11 | Combined Maximum Community Health Risk Levels | 4.2-38 |
| 4.5-1 | Top Five GHG Producer Countries and the European Union (Annual) | 4.5-4 |
| 4.5-2 | GHG Emissions in California | 4.5-5 |
| 4.5-3 | AB 32 Scoping Plan Measures (SPMs) | 4.5-13 |
| 4.5-4 | Santa Clara Climate Action Plan Compliance with BAAQMD Requirements for Qualified GHG Reduction Strategy | 4.5-21 |
| 4.5-5 | Project Operational GHG Emissions | 4.5-33 |
| 4.5-6 | Proposed Project Consistency with Santa Clara Climate Action Plan | 4.5-34 |
| 4.5-7 | Proposed Project Consistency with Plan Bay Area | 4.5-41 |
| 4.6-1 | Groundwater and Soil Vapor Sampling on the 3236 Scott Boulevard Property | 4.6-6 |
| 4.6-2 | Soil and Groundwater and Soil Vapor Sampling on the 3230 Scott Boulevard Property | 4.6-7 |
| 4.6-3 | Groundwater and Soil Vapor Sampling on the 3265 Scott Boulevard Property | 4.6-9 |
| 4.6-4 | Soil and Groundwater Sampling on the 3255 Scott Boulevard Property | 4.6-10 |
| 4.6-5 | Soil and Groundwater Sampling on Portions of APNs 216-45-011 and 216-45-028 | 4.6-11 |
| 4.8-1 | Project Site Land Use Designations | 4.8-6 |
| 4.8-2 | General Plan Consistency Analysis | 4.8-10 |
| 4.9-1 | Outside to Inside Noise Attenuation (dB(A)) | 4.9-2 |
| 4.9-2 | Human Response to Transient Vibration | 4.9-4 |
| 4.9-3 | Vibration Criteria for Continuous Vibration | 4.9-4 |
| 4.9-4 | Monitored Noise Levels | 4.9-6 |
| 4.9-5 | Santa Clara Square Residential/Mixed Use Project Construction Noise Levels | 4.9-20 |
| 4.9-6 | Santa Clara Square Residential/Mixed Use Project Anticipated Construction Phasing Plan | 4.9-21 |

# LIST OF TABLES (continued)

Table                                             Page

4.9-7  Construction Vibration Levels (in PPV) ................................................................................4.9-23
4.10-1  Project Area Schools.............................................................................................................4.10-3
4.11-1  Study Intersections...............................................................................................................4.11-8
4.11-2  Signalized Intersection Level of Service Definitions .......................................................4.11-12
4.11-3  Unsignalized Intersection Level of Service Definitions ..................................................4.11-13
4.11-4  Freeway Segment Level of Service Definitions ...............................................................4.11-14
4.11-5  Existing Conditions - Study Intersection LOS Summary ..............................................4.11-15
4.11-6  Baseline Transportation Infrastructure Improvements in Study Area .......................4.11-27
4.11-7  Baseline Intersection Levels of Service .............................................................................4.11-28
4.11-8  Baseline Freeway Levels of Service....................................................................................4.11-32
4.11-9  Summary of Data Sources for Project Mixed-Use Reductions (MainStreet Tool) .....4.11-35
4.11-10  Project Trip Generation.......................................................................................................4.11-36
4.11-11  Background (2020) Transportation Infrastructure Improvements in Study Area.....................4.11-39
4.11-12  Cumulative (2040) Transportation Infrastructure Improvements in Study Area ......4.11-40
4.11-13  City Place Cumulative (2040) Transportation Infrastructure Improvements in Study Area...4.11-42
4.11-14  Baseline with Project Intersection Levels of Service .......................................................4.11-44
4.11-15  Baseline with Project Freeway Levels of Service..............................................................4.11-50
4.11-16  Background (2020) with Project Intersection Levels of Service......................................4.11-55
4.11-17  Background (2020) with Project Freeway Volume to Capacity Ratio Changes.........................4.11-61
4.11-18  Cumulative (2040) with Project Intersection Levels of Service ....................................4.11-70
4.11-19  Cumulative (2040) with Project Freeway Volume to Capacity Ratio Changes.........................4.11-76
4.11-20  City Place Cumulative (2040) with Project Intersection Levels of Service ..................4.11-82
4.11-21  City Place Cumulative (2040) with Project Volume to Capacity Ratio Changes .......................4.11-88
4.12-1  Estimated Project Water Demand ......................................................................................4.12-17
4.12-2  Changes in Water Demand from the UWMP (afy) by Planning Period, Excluding the
          Proposed Project and Including Projects Not Specifically Considered in the UWMP .............4.12-18
4.12-3  Changes in Water Demand from the UWMP (afy) By Planning Period, Including Projects
          Not Specifically Considered in the UWMP and Treating Project Demand as a New Water
          Use Occurring in the 2015–2019 Planning Period ...........................................................4.12-19
4.12-4  UWMP Normal Year Supply and Demand Projections 2015-2035 (acre-feet) ...........................4.12-20
4.12-5  UWMP Single Dry Year Supply and Demand Projections 2015-2035 (acre-feet) ......................4.12-21
4.12-6  UWMP Multiple Dry Year Supply and Demand Projections with SFPUC Supplies 2015–
          2035 (acre-feet) .....................................................................................................................4.12-22
4.12-7  2010 UWMP Multiple Dry Year Supply and Demand Projections 2015–2035 Without
          SFPUC Supplies After 2018 (acre-feet) .............................................................................4.12-23
4.12-8  Summary of City Voluntary and Mandatory Water Demand Management Measures ...........4.12-24
4.12-9  Estimated Project Average Dry Weather Wastewater Generation................................4.12-26
4.12-10  Estimated Project Solid Waste Generation.......................................................................4.12-30
4.12-11  Estimated Project Electricity Demand ..............................................................................4.12-32
4.12.12  Estimated Project Natural Gas Demand ...........................................................................4.12-32
5.0-1  Summary Comparison of Project Alternatives..................................................................5.0-25

# 1.0   INTRODUCTION

This Environmental Impact Report (EIR) has been prepared to provide an assessment of the potentially significant environmental effects of the proposed Santa Clara Square – Residential/Mixed Use project (proposed project), located on Scott Boulevard, between Bowers Avenue and San Tomas Aquino Creek in the central portion of the City of Santa Clara. As required by the California Environmental Quality Act (CEQA), this Draft EIR: (1) assesses the potentially significant environmental effects of the proposed project, including cumulative impacts of the proposed project in conjunction with other reasonably foreseeable development; (2) identifies feasible means of avoiding or substantially lessening significant adverse impacts; and (3) evaluates a range of reasonable alternatives to the proposed project, including the No Project Alternative.

## 1.1     PURPOSE OF THIS EIR

The purpose of this EIR is to inform decision makers for the City of Santa Clara, other responsible agencies, and the public of the environmental consequences of implementing the project as proposed. The EIR has been prepared in accordance with and in fulfillment of the *CEQA Statute and Guidelines (State CEQA Guidelines)*. The City of Santa Clara is the Lead Agency for this EIR. The Santa Clara City Council has the principal responsibility for authorizing the implementation of the project as proposed.

As described in CEQA and the *State CEQA Guidelines*, public agencies are required to avoid or substantially lessen significant environmental effects of a project where feasible. A public agency has an obligation to balance the potential significant effects on the environment from the implementation of a proposed project with its benefits, including economic, social, technological, legal, and other benefits. This Draft EIR is an informational document, the purpose of which is: to identify the potentially significant effects of the proposed project on the environment and to indicate the manner in which those significant effects can be avoided or lessened; to identify any significant and unavoidable adverse impacts that cannot be mitigated; and to identify reasonable and feasible alternatives to the proposed project that would eliminate any significant adverse environmental effects or reduce the impacts to a less than significant level.

The Lead Agency is required to consider the information in the EIR, along with any other relevant information, in making its decisions on the proposed project. Although the EIR does not determine the ultimate decision that the City Council will make regarding implementation of the proposed project, CEQA requires the Lead Agency to consider the information in the EIR and make findings regarding each significant effect identified in the EIR. If the City Council determines the EIR to be adequate, it will

certify the Final EIR prior to taking action on the proposed project and requested entitlements. Other agencies may also use this EIR in their review and approval processes.

## 1.2      SUMMARY OF THE PROPOSED PROJECT

The project applicant, Irvine Company, proposes to demolish the existing buildings on the 334-acre project site and construct an infill, mixed-use residential development project that would consist of 1,800 apartment units with approximately 1,750,000 gross square feet (gsf) of residential building space. The proposed project also includes approximately 40,000 gsf of retail space, 4,500 gsf of leasing space, and approximately 38,000 gsf of amenity space. The apartments would be located in seven apartment complexes, with the residential units in each complex arranged around a central parking garage. The apartment complexes would include landscaped walkways and paseos and courtyards with outdoor BBQ areas and lounge areas as well as other recreational amenities. Several of the complexes would include swimming pools, spas, and cabanas. Other infrastructure improvements (i.e., sewer, water, and storm drainage) needed to serve the proposed project would also be constructed. A trail would be constructed between the Santa Clara Square Office Project (under construction) and the residential complex adjacent to San Tomas Aquino Creek and Octavius Drive. The trail would provide connection to the San Tomas Aquino Creek trail. Access to the proposed project would be provided by Bowers Avenue, Scott Boulevard, and Augustine Drive.

## 1.3      ENVIRONMENTAL REVIEW PROCESS

The City of Santa Clara issued a Notice of Preparation (NOP) for this Draft EIR on March 23, 2015 and circulated it for 30 days. A scoping meeting was held on April 20, 2015.

The City of Santa Clara has filed a Notice of Completion (NOC) with the Governor's Office of Planning and Research, State Clearinghouse indicating that this Draft EIR has been completed and is available for review and comment by the public.

The Draft EIR will be available for review by public and interested parties, agencies, and organizations for a review period of 45 days, as required by California law. In reviewing the Draft EIR, reviewers should focus on the document's adequacy in identifying and analyzing significant effects of the proposed project on the environment and ways in which the significant effects of the project might be avoided or mitigated. To ensure inclusion in the Final EIR and full consideration by the Lead Agency, comments on the Draft EIR must be received in writing during the 45-day public review period at the following address:

Contact: Yen Han Chen, Associate Planner

The City of Santa Clara
City Hall
1500 Warburton Avenue
Santa Clara, California 95050
Email address: ychen@santaclaraca.gov

Responses to comments on the Draft EIR will be prepared and included in the Final EIR. The Draft EIR text and appendices, together with the response to comments document and any text changes to the Draft EIR made in response to comments or other new information, will constitute the Final EIR.

The City of Santa Clara will review the Final EIR for adequacy and consider it for certification pursuant to the requirements of Section 15090 of the *State CEQA Guidelines*. If the City certifies the Final EIR, it will then consider the project separately for approval or denial. If the City chooses to approve the project, findings on the feasibility of reducing or avoiding significant environmental effects will be made and, if necessary, a Statement of Overriding Considerations will be prepared. If the City approves the project, a Notice of Determination (NOD) will be prepared and filed with the State Clearinghouse and the County Clerk. The NOD will include a description of the project, the date of approval, an indication of whether the Findings and Statement of Overriding Considerations were prepared, and the address where the Final EIR and record of project approval are available for review.

## 1.4    SCOPE OF THIS EIR

The City of Santa Clara completed a preliminary review of the application for the proposed project, as described in Section 15060 of the *State CEQA Guidelines*, and determined that a Project EIR was required. The City also determined that the following key environmental topics would be evaluated in detail in the Draft EIR:

- Aesthetics
- Air Quality
- Biological Resources
- Cultural Resources
- Greenhouse Gas Emissions
- Hazards and Hazardous Materials

- Hydrology and Water Quality
- Land Use and Planning
- Noise
- Public Services and Recreation
- Transportation and Traffic
- Utilities and Service System, including Energy

The City selected these environmental topics for thorough analysis based on anticipated environmental impacts and scoping comments received during the 30-day scoping period. The Draft EIR also addresses

the following topics: agricultural resources; geology and soils; mineral resources; and population and housing, but at a lower level of detail.

## 1.5    REPORT ORGANIZATION

This Draft EIR is organized into the following sections:

**Section 1.0, Introduction**, provides an introduction and overview describing the purpose and scope of topics addressed in this Draft EIR and the environmental review process.

**Section 2.0, Executive Summary**, presents a brief description of the proposed project, summarizes environmental consequences that would result from implementation of the proposed project, provides a summary table that denotes anticipated significant environmental impacts, describes identified mitigation measures, and indicates the level of significance of impacts before and after mitigation. In addition, this section also presents a brief description of alternatives to the proposed project and provides a table comparing each of the alternatives to the proposed project.

**Section 3.0, Project Description**, describes the proposed project, including the proposed land uses, on-site parking and circulation, as well as other improvements such as pedestrian facilities, landscaping, and utilities to serve the proposed development.

**Section 4.0, Environmental Impact Analysis**, describes the environmental setting, including applicable plans and policies for each environmental topic identified above; provides an analysis of the significant environmental impacts of the proposed project; and identifies mitigation measures to avoid or reduce the magnitude of significant impacts.

**Section 5.0, Alternatives**, summarizes alternatives to the proposed project and the comparative environmental consequences and benefits of each alternative. This section includes an analysis of the No Project Alternative, among others as required by CEQA.

**Section 6.0, Other CEQA Considerations**, provides a discussion of the project's significant and unavoidable impacts and significant irreversible environmental changes, the potential for growth inducement due to project implementation, and mandatory findings of significance.

**Section 7.0, Report Preparation,** provides a list of the individuals involved in the preparation of the Draft EIR.

**Appendices** to this Draft EIR include the technical reports used to prepare the Draft EIR sections.

# 2.0   EXECUTIVE SUMMARY

## 2.1    PURPOSE

This Environmental Impact Report (EIR) provides an assessment of the potentially significant environmental effects from implementation of the proposed Santa Clara Square -Residential/Mixed Use project (proposed project). This Executive Summary is intended to provide the decision makers, responsible agencies, and the public with a clear, simple, and concise description of the proposed project and the potential significant environmental impacts that could result from its implementation.

The *California Environmental Quality Act (CEQA) Guidelines (*Section 15123) require that a summary be included in an EIR that identifies all major conclusions, identifies each significant effect, recommended mitigation measure(s), and alternatives that would minimize or avoid potential significant impacts of the proposed project. The summary is also required to identify areas of controversy known to the lead agency, including issues raised by agencies and the public and issues to be resolved. These issues can include the choice among alternatives and whether or how to mitigate significant effects. All of these requirements of an EIR summary are addressed in the sections below. This summary focuses on the major areas of importance in the environmental analysis for the proposed project and utilizes non-technical language to promote understanding. The City of Santa Clara City Council is the CEQA lead agency for the proposed project.

## 2.2    PROJECT LOCATION

The approximately 33.4-acre project site, located in the central portion of the City of Santa Clara on Scott Boulevard, between Bowers Avenue and San Tomas Aquino Creek. It is accessible by three major Bay Area freeways: the U.S. 101 Highway (U.S. 101) to the north, Interstate 880 (I-880) to the east, and Interstate 280 (I-280) to the south. The main arterial streets that provide access from the freeways to the project area are Bowers Avenue, Central Expressway, and San Tomas Expressway. Direct access to the site is provided by Bowers Avenue, Scott Boulevard, and Augustine Drive. Other roads that provide access to portions of the project site include Montgomery Drive, and Octavius Drive. The project site is developed with numerous businesses, surface parking, site infrastructure, and landscaping. The area surrounding the project site is fully developed and consists mainly of commercial and institutional uses.

## 2.3    PROJECT DESCRIPTION

The project applicant (Irvine Company) proposes to demolish the existing buildings on the project site and construct a mixed-use residential development project that would consist of 1,800 apartment units

and an overall site density of 55.4 dwelling units per acre. The proposed project also includes approximately 40,000 gsf of retail space, 4,500 gsf of leasing space, and approximately 38,000 gsf of amenity space. The proposed project includes a parking within each of the seven (7) apartment complexes. Other infrastructure improvements (i.e., sewer, water, and storm drainage) needed to serve the proposed project would also be constructed. Direct access to the site is provided by Bowers Avenue, Scott Boulevard, and Augustine Drive. Other roads that provide access to portions of the project site include Montgomery Drive, and Octavius Drive. The proposed site plans include removal of the existing landscaping and planting of new trees and shrubs on the site, and installation of electrical outlets in exterior areas to facilitate the use of electrical lawn and landscape maintenance equipment. See **Section 3.0, Project Description**, for more information about the project characteristics.

## 2.4    PROJECT OBJECTIVES

The City of Santa Clara has developed the following primary objectives to satisfy the requirements of the *California Environmental Quality Act (CEQA) Guidelines* Section 15124 (b).

- Provide development consistent with the City's long-term development goals.

- Create a mixed-use development of a scale and character that complements and is supportive of the surrounding uses.

- Create a mixed-use development that maximizes density with accessibility to alternate transportation modes, and integrates pedestrian, bicycle, transit, open space and outdoor uses to encourage active centers.

- Implement smart growth principles by redeveloping underutilized properties with higher density housing projects in mixed-use areas.

The applicant's project objectives are to develop a well-designed, economically feasible residential community that consists of a variety of residential products and unit types, and incorporates smart-growth elements such as redevelopment of underutilized properties. The applicant's key objectives for the proposed project are to:

- Create a sustainable infill mixed use project that complements the adjacent office campus to the north (the previously approved office "district") and the retail properties to the west (the previously approved retail "district") and thereby provides the third distinct "district" that completes the total vision for an integrated, walkable, live/work/play Santa Clara Square community;

- Develop new residential neighborhoods in conjunction with appropriate retail, parks, open space and other public uses, along transit corridors;

- Attain a Project designed to a minimum LEED Gold or greater equivalent standard;

- Improve the range of types of residential units within the Santa Clara Square community and the City; and

- Improve the jobs/housing balance within the City.

## 2.5     ALTERNATIVES

Consistent with CEQA requirements, a reasonable range of alternatives was evaluated that could feasibly avoid or lessen any significant environmental impacts while substantially attaining the basic objectives of the proposed project. The alternatives analyzed in detail in this Draft EIR are presented below.

### 2.5.1     Alternative 1: No Project/No Redevelopment

As required under the *State CEQA Guidelines*, the EIR's alternatives analysis must include consideration of the No Project Alternative. The "No Project" analysis discusses the existing conditions as well as what would reasonably be expected to occur in the foreseeable future if the project was not approved (*CEQA Guidelines* Section 15126.6(e) (2) and (3) (A)). Under the No Project/No Redevelopment Alternative, the 13 existing buildings, hardscape, and landscaping would remain in their current condition and the buildings would remain occupied with commercial and light industrial uses.

### 2.5.2     Alternative 2: No Project/Planned Development

The five full parcels on the project site are occupied by office buildings and are designated Light Industrial in the City's General Plan Phases I and II: 2010-2015 and 2015-2023 and High Density Residential in the City's General Plan Phase III: 2023-2035. The two partial parcels are currently developed with parking lots serving an adjacent office complex and are designated Community Commercial under all General Plan phases. The proposed project accelerates the City of Santa Clara's long term growth strategy for the area by proposing to redesignate four of the full parcels High Density Residential prior to 2023 and redesignate the fifth full parcel and two partial parcels Regional Mixed Use. The Planned Development Alternative would also accelerate the City's long term growth strategy for the area prior to 2023 by requesting a redesignation of the parcels, but would do so according to the General Plan's Phase III designations. As a result, the five full parcels would be redesignated High Density Residential and the two partial parcels would remain Community Commercial and would be developed in conjunction with the previously approved Santa Clara Square Retail Center project. This alternative is analyzed in detail below because it would redevelop the site consistent with the future land use designations provided for the site in the General Plan in the long run (i.e., after 2023). A No Project alternative that redevelops the project site with more intense light industrial uses was not evaluated because it is highly unlikely that any new light industrial development would be proposed for the project site between 2015 and 2023 as it is designated for residential use in the long run.

The High Density Residential designation allows densities ranging from 37 to 50 units per acre. The five full parcels cover approximately 33.4 acres. Therefore under this alternative, a maximum of 1,670 residential dwelling units (130 units fewer than the proposed project) would be constructed on these parcels. No retail would be provided as this land use is not allowed under the High Density Residential designation. The overall residential density would be approximately 50 dwelling units per acre. The two partial parcels would be redeveloped as a street in accordance with the previously approved Santa Clara Square Retail Center project. The amount of amenity space would remain the same as the proposed project. A total of 2,986 parking spaces would be required. This alternative would involve similar demolition activities and slightly reduced construction activities as compared to the proposed project.

### 2.5.3     Alternative 3: Reduced Residential Density

Under the Reduced Residential Density Alternative, the number of residential units proposed would be reduced by approximately 25 percent compared to the proposed project, thus lowering the number of residential units to 1,350 units. The overall residential density would be approximately 40 dwelling units per acre. The amount of retail and amenity space would remain the same. The reduction in the number of residential units that would be built would be achieved by removing the top floor of some buildings and/or otherwise modifying the building plans to eliminate some units. The project footprint and landscaping plans under this alternative would essentially be the same as the proposed project. As a result of the 25 percent reduction in the number of residential units, the parking needs of this alternative would be lower and a total of 2,414 parking spaces would be needed, instead of 3,218 parking spaces needed under the proposed project. All other aspects of the proposed project would remain the same. This alternative would involve similar demolition activities and slightly reduced construction activities as compared to the proposed project, but the same development footprint. This alternative is analyzed in detail below because it would reduce the proposed project's significant operational traffic and air quality impacts.

### 2.6     ISSUES TO BE RESOLVED/AREAS OF CONTROVERSY

The City issued a Notice of Preparation (NOP) for this Draft EIR on March 23, 2015 and circulated it for 30 days. The City also conducted a scoping meeting on April 20, 2015 from 6:00 to 7:30 PM at the City Hall. Based on the scoping comments received on the NOP, the City notes the issues to be resolved and areas of controversy relate to traffic, parking, air quality, noise, trees, and the density of the proposed development. All of these issues were considered in the preparation of this Draft EIR. Scoping comments are on file with the City.

## 2.7      IMPACT SUMMARY

A detailed discussion regarding potential environmental impacts of the proposed project is provided in **Section 4.0, Environmental Impact Analysis.** A summary of the impacts of the proposed project is provided in **Table 2.0-1, Summary of Impacts and Mitigation Measures**. Also provided in **Table 2.0-1** are mitigation measures, which are proposed to avoid or reduce significant project impacts. The table indicates whether implementation of the recommended mitigation measures would reduce the impact to a less than significant level. **Table 2.0-2, Summary Comparison of Project Alternatives**, presents the environmental impacts of each alternative to allow the decision makers, agencies, and the public to compare and contrast these alternatives and weigh their relative merits and demerits.

**Table 2.0-1**

**Summary of Proposed Project Impacts and Mitigation Measures**

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Aesthetics** | | | |
| **Impact AES-1** | | | |
| Redevelopment of the project site would not substantially degrade the visual character of the project area. | Less than significant | No mitigation is required. | Less than significant |
| **Impact AES-2** | | | |
| Implementation of the proposed project would not introduce a new source of substantial light and glare. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact AES-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative visual impacts. | Less than significant | No mitigation is required. | Less than significant |
| **Air Quality** | | | |
| **Impact AIR-1** | | **Mitigation Measure AIR-1** | |
| Construction activities associated with the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or state ambient air quality standard (including resulting in emissions which exceed quantitative thresholds for ozone precursors), but would result in substantial dust emissions. | Potentially Significant | The construction contractor(s) shall implement the following BMPs during project construction:<br><br>• All exposed surfaces (e.g., parking areas, staging areas, soil piles, graded areas, and unpaved access roads) shall be watered two times per day.<br><br>• All haul trucks transporting soil, sand, or other loose material off-site shall be covered.<br><br>• All visible mud or dirt track-out onto adjacent public roads shall be removed using wet power vacuum street sweepers at least once per day. The use of dry power sweeping is prohibited.<br><br>• All vehicle speeds on unpaved roads shall be limited to 15 mph.<br><br>• All roadways, driveways, and sidewalks to be paved shall be completed as soon as possible and feasible. Building pads shall be laid as soon as possible and feasible after grading, unless seeding or soil binders are used. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | • Idling times shall be minimized either by shutting equipment off when not in use or reducing the maximum idling time to five minutes (as required by the California airborne toxics control measure Title 13, Section 2485 of California Code of Regulations [CCR]). Clear signage shall be provided for construction workers at all access points. | |
| | | • All construction equipment shall be maintained and properly tuned in accordance with manufacturer's specifications. All equipment shall be checked by a certified mechanic and determined to be running in proper condition prior to operation. | |
| | | • Post a publicly visible sign with the telephone number and person to contact at the Lead Agency regarding dust complaints. This person shall respond and take corrective action within 48 hours. The Air District's phone number shall also be visible to ensure compliance with applicable regulations. | |
| **Impact AIR-2** | | **Mitigation Measure AIR-2** | |
| Operation of the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or State ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors), but would result in ROG emissions that exceed the BAAQMD numeric ROG CEQA thresholds. | Significant | The project applicant will prepare and submit a TDM program for the proposed project (to fulfill the requirements of the City's Climate Action Plan) for approval by the City. The approved program will be implemented for the life of the project. | Significant and Unavoidable |
| **Impact AIR-3** | | | |
| The proposed project would not conflict with or obstruct implementation of the applicable air quality plan. | Less than significant | No mitigation is required. | Less than significant |
| **Impact AIR-4** | | | |
| Project construction activities and operations would not expose existing or future sensitive receptors to substantial pollutant concentrations. | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Impact AIR-5** | | | |
| Project operation would not expose project sensitive receptors to substantial pollutant concentrations. | Less than significant | No mitigation is required. | Less than significant |
| **Impact AIR-6** | | | |
| The proposed project would not create objectionable odors affecting a substantial number of people. | No impact | No mitigation is required. | No impact |
| **Cumulative Impact AIR-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would result in significant cumulative air quality impacts. | Significant | No mitigation measures are feasible. | Significant and unavoidable |
| **Biological Resources** | | | |
| **Impact BIO-1** | | **Mitigation Measure BIO-1** | |
| The proposed project could have an adverse effect on special-status bird and non-special status bird species during the nesting season. | Potentially Significant | For the protection of special status bird species and birds species protected by the Migratory Bird Treaty Act and Fish and Game Codes, project activities shall occur during the non-breeding bird season to the extent feasible (September 1 – January 31). However, if vegetation removal, grading, demolition of structures, or initial ground-disturbing activities must occur during the breeding season (February 1 through August 31), a survey for active bird nests shall be conducted by a qualified biologist no more than 14 days prior to the start of these activities. The survey shall be conducted in a sufficient area around the work site to identify the location and status of any nests that could potentially be affected by project activities. | Less than significant |
| | | If active nests of protected species are found within project impact areas or close enough to these areas to affect breeding success, a work exclusion zone shall be established around each nest by a qualified biologist. Established exclusion zones shall remain in place until all young in the nest have fledged or the nest otherwise becomes inactive (e.g., due to predation). Appropriate exclusion zone sizes vary dependent upon bird species, nest location, existing visual buffers and ambient sound levels, and other factors; an exclusion zone radius may be as small as 50 feet (for common, disturbance-adapted species) or as large as 250 feet or more for raptors. Exclusion zone size may also be reduced from established levels if supported with nest monitoring by a qualified biologist indicating that work activities outside the reduced radius are not adversely impacting the | |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | nest. | |
| **Impact BIO-2** | | **Mitigation Measure BIO-2** | |
| The proposed project could affect riparian habitat, sensitive natural community, or wetlands nor interfere with the movement of any wildlife species. | Potentially Significant | All construction activities shall avoid the creek. Best Management Practices (BMPs) shall be developed and implemented during construction to prevent discharge of any project-related materials such as fuel, engine lubricants or sediment. Only natural fiber or biodegradable materials shall be used for BMPs. All erosion control products shall be removed at the completion of construction activities. | Less than significant |
| **Impact BIO-3** | | **Mitigation Measure BIO-3** | |
| The proposed project would not conflict with applicable local policies protecting biological resources. | Less than significant | During the design and construction phases, the proposed project will adhere to the following recommendations: **Design** • Verify the location and tag of the trees to be preserved. Include trunk locations and tag numbers on all plans. • Provide for the Consulting Arborist to review all future project submittals including grading, utility, drainage, irrigation, and landscape plans. • Use only herbicides safe for use around trees and labeled for that use, even below pavement. • Design irrigation systems so that no trenching will occur within the Tree Protection Zone. **Pre-Construction and Demolition** • Prepare a site work plan which identifies access and haul routes, construction trailer and storage areas, etc. • Establish a Tree Protection Zone around each tree to be preserved. For design purposes, the Tree Protection Zone shall be 20 inches from the trunk in all directions. No grading, excavation, construction, or storage of materials shall occur within that zone. • Install protection around trees to be preserved. Stack and secure hay bales 6 feet high around tree trunks. As an alternative, employ 6 foot chain link with posts sunk into the ground or install plastic orange fencing around tree root zones. No entry will be permitted into a tree protection zone without permission of the project superintendent. • Trees to be removed shall be felled so as to fall away from the Tree Protection Zone and avoid pulling and breaking of roots of trees that are to remain. If roots are entwined, the consultant may require first severing the major woody root mass before extracting the trees, or grinding the stump below ground. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | • Trees to be retained may require pruning to provide clearance and/or correct defects in structure. All pruning is to be performed by an ISA Certified Arborist or Certified Tree Worker and shall adhere to the latest editions of the ANSI Z133 and A300 standards as well as the ISA Best Management Practices for Tree Pruning. Pruning contractor shall have the C25/D61 license specification.<br><br>**Tree Protection during Construction**<br><br>• Prior to beginning work, the contractors working in the vicinity of trees to be preserved are required to meet with the Consulting Arborist at the site to review all work procedures, access routes, storage areas, and tree protection measures.<br><br>• Any grading, construction, demolition, or other work that is expected to encounter tree roots should be monitored by the Consulting Arborist.<br><br>• If injury should occur to any tree during construction, it should be evaluated as soon as possible by the Consulting Arborist so that appropriate treatments can be applied.<br><br>• Fences will be erected to protect trees to be preserved. Fences are to remain until all site work has been completed. Fences may not be relocated or removed without permission of the project manager.<br><br>• Any additional tree pruning needed for clearance during construction must be performed by a qualified arborist and not by construction personnel.<br><br>• All trees shall be irrigated on a schedule to be determined by the Consulting Arborist. Each irrigation shall wet the soil within the Tree Protection Zone to a depth of 30 inches. | |
| **Impact BIO-4**<br><br>The proposed project would not conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other applicable habitat conservation plan. | No impact | No mitigation is required. | No impact |
| **Cumulative Impact BIO-4**<br><br>The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts on biological resources. | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Cultural Resources** | | | |
| **Impact CUL-1** | | | |
| The proposed project would not cause a substantial adverse change in the significance of a historical resource as defined in CEQA Guidelines §15064.5. | Less than significant | No mitigation is required. | Less than significant |
| **Impact CUL-2** | | **Mitigation Measure CUL-2** | |
| The proposed project would not cause a substantial adverse change in the significance of an archaeological resource pursuant to CEQA Guidelines §15064.5. | Less than significant | (a) The applicant shall note on any plans that require ground-disturbing excavation that there is a potential for exposing buried cultural resources, including prehistoric Native American burials. | Less than significant |
| | | (b) The applicant shall retain a Professional Archaeologist to provide preconstruction briefing(s) to supervisory personnel of any excavation contractor to alert them to the possibility of exposing significant prehistoric archaeological resources within the project area. The briefing shall discuss any archaeological objects that could be exposed, the need to stop excavation at the discovery, and the procedures to follow regarding discovery protection and notification of the applicant and archaeological team. An "Alert Sheet" shall be posted in conspicuous locations on the project site to alert personnel to the procedures and protocols to follow for the discovery of potentially significant prehistoric archaeological resources.[1] | |
| | | (c) The applicant shall retain a Professional Archaeologist on an "on-call" basis during ground disturbing construction for the project to review, identify and evaluate cultural resources that may be inadvertently exposed during construction. The archaeologist shall review and evaluate any discoveries to determine if they are historical resource(s) and/or unique archaeological resources under the California Environmental Quality Act. | |
| | | (d) If the Professional Archaeologist determines that any cultural resources exposed during construction constitute a historical resource and/or unique archaeological resource, he/she shall notify the applicant and other appropriate parties of the evaluation and recommended mitigation measures to mitigate to a less-than significant impact in accordance with California Public Resources Code Section 21083.2 and | |

---

[1] Significant prehistoric cultural resources may include: a) Human bone - either isolated or intact burials; b) Habitation (occupation or ceremonial structures as interpreted from rock rings/features, distinct ground depressions, differences in compaction (e.g., house floors); c) Artifacts including chipped stone objects such as projectile points and bifaces; groundstone artifacts such as manos, metates, mortars, pestles, grinding stones, pitted hammerstones; and, shell and bone artifacts including ornaments and beads; d) Various features and samples including hearths (fire-cracked rock; baked and vitrified clay), artifact caches, faunal and shellfish remains (which permit dietary reconstruction), distinctive changes in soil stratigraphy indicative of prehistoric activities; and e) Isolated prehistoric artifacts.

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | *State CEQA Guidelines* Section 15064.5. Mitigation measures may include avoidance, preservation in-place, recordation, additional archaeological testing and data recovery among other options. The completion of a formal Archaeological Monitoring Plan (AMP) may be recommended by the Project Archaeologist if significant archaeological deposits are exposed during ground disturbing construction. Development and implementation of the AMP will be determined by the City of Santa Clara. Treatment of any significant cultural resources shall be undertaken with the approval of the project proponent and the City of Santa Clara. | |
| | | (e) A Monitoring Closure Report shall be filed with the City of Santa Clara at the conclusion of ground disturbing construction if archaeological and Native American monitoring of excavation was undertaken. | |
| **Impact CUL-3** | | | |
| The proposed project would not directly or indirectly destroy a unique paleontological resource or site or unique geological feature. | Less than significant | No mitigation is required. | Less than significant |
| **Impact CUL-4** | | **Mitigation Measure CUL-4** | |
| The proposed project would not disturb any human remains, including those interred outside of formal cemeteries. | Less than significant | The treatment of human remains and of associated or unassociated funerary objects discovered during any soil-disturbing activity within the project site shall comply with applicable State laws. This shall include immediate notification of the Santa Clara County Medical Examiner and the City of Santa Clara. | Less than significant |
| | | In the event of the coroner's determination that the human remains are Native American, notification of the Native American Heritage Commission is required who shall appoint a Most Likely Descendant (MLD) (Public Resources Code Section 5097.98). | |
| | | The applicant, archaeological consultant, and MLD shall make all reasonable efforts to develop an agreement for the treatment, with appropriate dignity, of human remains and associated or unassociated funerary objects (CEQA Guidelines Section 15064.5(d)). The agreement should take into consideration the appropriate excavation, removal, recordation, analysis, custodianship, curation, and final disposition of the human remains and associated or unassociated funerary objects. The California Public Resources Code allows 48 hours to reach agreement on these matters. If the MLD and the other parties do not agree on the reburial method, the project will follow Public Resources Code Section 5097.98(b) which states that "the landowner or his or her authorized representative shall reinter the human remains and items associated with Native American burials with appropriate dignity on the property in a location not | |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | subject to further subsurface disturbance." | |
| **Cumulative Impact CUL-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative cultural resource impacts. | Less than significant | No mitigation is required. | Less than significant |
| **Greenhouse Gas Emissions** | | | |
| **Impact GHG-1** | | | |
| The proposed project would generate greenhouse gas emissions, either directly or indirectly, that would not have a significant impact on the environment. | Less than significant | No mitigation is required. | Less than significant |
| **Impact GHG-2** | | | |
| Operation of the proposed project would not conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing GHG emissions. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact GHG-1** | | | |
| The proposed project would not result in a significant cumulative GHG impact. | Less than significant | No mitigation is required. | Less than significant |
| **Hazards and Hazardous Materials** | | | |
| **Impact HAZ-1** | | | |
| The proposed project would not create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials. | Less than significant | No mitigation is required. | Less than significant |
| **Impact HAZ-2** | | **Mitigation Measure HAZ-2** | |
| The proposed project could create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment. | Potentially Significant | **Mitigation Measure HAZ-2a:** Agricultural chemicals or other contaminated media that may be identified by DTSC shall be addressed prior to or as part of project construction under a site remediation plan approved by the DTSC. The remediation plan will be developed for the project site to prevent unacceptable human health risks to site users from chemicals of concern (COCs). The remediation plan shall require:<br><br>(1) implementation of a worker health and safety plan covering all workers potentially exposed to hazardous materials in accordance | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | with state and federal worker safety regulations; | |
| | | (2) remedial strategies and approaches that will achieve protection of site users based upon health-based standards or the presence of naturally occurring constituents for the management of shallow soil known to be contaminated by agricultural chemicals and any additional contaminated media encountered during demolition or excavation. Contaminated soil management options may include, for example, on-site encapsulation under the oversight of DTSC, appropriate off-site disposal, institutional controls (e.g., land use covenants), and engineering controls to mitigate exposure of site users from impacted media; | |
| | | (3) procedures to require notice to the City of Santa Clara prior to invasive earthwork that all contaminated soil excavation and management will comply with a final site remediation plan approved and overseen by DTSC. | |
| | | (4) procedures to provide notice to the City of Santa Clara Fire Department for the removal of USTs and comply with the substantive City requirements should an UST or other underground structure be discovered on the 3230 Scott Boulevard property or elsewhere on the project site, and address any associated soil impacts; and | |
| | | (5) provisions to visually inspect soil underlying existing buildings for potential unknown contamination. | |
| | | **Mitigation Measure HAZ-2b:** If dewatering is to be performed as a part of construction activities, the project applicant will obtain and comply with all applicable permits and requirements prior to the discharge of any groundwater to surface waters or sanitary sewer. Requirements may include treatment, monitoring, and reporting to ensure that the discharge meets the appropriate water quality objectives for the receiving waters. | |
| **Impact HAZ-3** | | **Mitigation Measure HAZ-3** | |
| The proposed project would not expose future project site residents to substantial risk associated with hazardous materials storage and use on nearby properties. | Potentially significant | The project will make a fair share contribution to the City of Santa Clara towards the acquisition cost of an emergency vehicle with hazardous materials response capabilities. | Less than significant |
| **Impact HAZ-4** | | | |
| The proposed project would not emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed school. | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Impact HAZ-5** | | | |
| The project site is not located on a list of hazardous material sites subject to corrective action compiled pursuant to Government Code Section 65962.5 (Cortese List). | No impact | No mitigation is required. | No impact |
| **Impact HAZ-6** | | | |
| The proposed project would not result in a safety hazard to aircraft due to building construction or result in a safety hazard due to aircraft for people living or working on the site. | Less than significant | No mitigation is required. | Less than significant |
| **Impact HAZ-7** | | | |
| The proposed project would not impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan nor would the proposed project expose people or structures to a significant risk of loss, injury, or death involving wildland fires. | No impact | No mitigation is required. | No impact |
| **Cumulative Impact HAZ-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts related to hazardous materials. | Less than significant | No mitigation is required. | Less than significant |
| **Hydrology and Water Quality** | | | |
| **Impact HYDRO-1** | | | |
| The proposed project would not result in the discharge of storm water that would violate water quality standards or otherwise substantially degrade water quality. | Less than significant | No mitigation is required. | Less than significant |
| **Impact HYDRO-2** | | | |
| The proposed project would not substantially deplete groundwater supplies, interfere substantially with groundwater recharge, or affect | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| groundwater quality. | | | |
| **Impact HYDRO-3** | | | |
| The proposed project would not substantially alter the existing drainage pattern of the site or area in a manner that would result in substantial erosion, siltation, or flooding on- or off-site, nor result in runoff, which would exceed the capacity of existing or planned stormwater drainage systems. | Less than significant | No mitigation is required. | Less than significant |
| **Impact HYDRO-4** | | | |
| The proposed project would not place housing within a 100-year flood hazard area or place structures within a 100-year flood hazard area that could redirect flood flows. | No impact | No mitigation is required. | No impact |
| **Impact HYDRO-5** | | | |
| The proposed project would not expose people or structures to a significant risk involving flooding due to the failure of a levee or dam. | Less than significant | No mitigation is required. | Less than significant |
| **Impact HYDRO-6** | | | |
| The proposed project would not expose people or structures to a significant risk involving flooding due to inundation of the site by seiche, tsunami, or mudflow. | No impact | No mitigation is required. | No impact |
| **Cumulative Impact HYDRO-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in a significant cumulative impact related to hydrology and water quality. | Less than significant | No mitigation is required. | Less than significant |
| **Land Use and Planning** | | | |
| **Impact LU-1** | | | |
| The proposed project would not physically divide an established community. | No impact | No mitigation is required. | No impact |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Impact LU-2** | | | |
| The proposed project would conflict with an applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect. | Significant | No mitigation measures are feasible. | Significant and unavoidable |
| **Impact LU-3** | | | |
| The proposed project would not conflict with any applicable habitat conservation plan or natural community conservation plan. | No impact | No mitigation is required. | No impact |
| **Cumulative Impact LU-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts related to land use and planning. | Less than significant | No mitigation is required. | Less than significant |
| **Noise** | | | |
| **Impact NOISE-1** | | **Mitigation Measure NOISE-1** | |
| Residential and commercial uses proposed at the project site would be exposed to exterior noise levels greater than those considered "compatible" per the City of Santa Clara General Plan, the State Building Code, and CALGreen. | Potentially Significant | **Mitigation Measure NOISE-1a:** A project-specific acoustical analysis shall be prepared by a qualified acoustical consultant as the project design is refined to determine specific noise attenuation improvements (e.g., STC ratings, exterior wall construction, treatment of facade openings) that must be included in the project to reduce interior noise levels to meet the City of Santa Clara and the State Building Code criterion of an Ldn of 45 dB or less and the CALGreen interior noise guideline of Leq(h) 50 dB for commercial spaces. The results of the analysis and recommended ratings for windows and doors shall be submitted to the City Building Official for approval and approved prior to issuance of building permits. Forced air mechanical ventilation, satisfactory to the City Building Official, shall be considered where windows must remain closed in order to achieve the interior noise criteria.<br><br>**Mitigation Measure NOISE-1b:** A project-specific acoustical analysis shall be prepared by a qualified acoustical consultant as the project design is refined to determine specific noise attenuation improvements (e.g., reconfiguration, sounds walls, glass screen, or other equivalent measures) that must be included in the project to reduce exterior noise levels to meet the City outdoor noise guidelines for primary outdoor-use spaces. The results of the analysis and recommended noise attenuation improvements | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | shall be submitted to the City Building Official for approval and approved prior to issuance of building permits. | |
| **Impact NOISE-2** Project generated traffic would not substantially increase noise levels in the area. | Less than significant | Implement **Mitigation Measures Noise-1a** and **Noise 1b.** | Less than significant |
| **Impact NOISE-3** Noise from heating, ventilating, and air conditioning equipment for the proposed buildings may exceed the 65 dB(A) Leq daytime and 60 dB(A) Leq nighttime noise standard at existing neighboring commercial properties or the 55 dB Leq daytime and 50 dB Leq nighttime noise standard at residential units within the project site. | Potentially Significant | **Mitigation Measure NOISE-3** Mechanical equipment shall be selected and designed to reduce impacts on surrounding uses to meet the City's Noise Ordinance requirements. A qualified acoustical consultant shall be retained to review mechanical noise as these systems are developed to determine specific noise reduction measures necessary to reduce noise to comply with the City's Noise Ordinance. | Less than significant |
| **Impact NOISE-4** Noise generated by the proposed parking garages would not result in a substantial permanent increase in ambient noise levels at existing neighboring properties or at residential properties within the project site. | Less than significant | No mitigation is required. | Less than significant |
| **Impact NOISE-5** Noise generated by construction activities on the project site would substantially increase noise levels at residential and other noise sensitive land uses in the vicinity of the project site. | Potentially Significant | **Mitigation Measure NOISE-5** Construction-related activities shall be conducted in accordance with the following: <br> • If necessary based on the final construction plan and equipment list, a site specific noise reduction plan should be prepared by a qualified acoustical consultant, detailing locations of construction noise barriers and other site mitigation, to reduce noise levels at adjacent commercial properties. <br> • Pursuant to the Santa Clara City Code, construction activities within 300 feet of any residence shall be limited to the hours of 7:00 AM to 6:00 PM, Monday through Friday and 9:00 AM to 6:00 PM on Saturday. No construction shall occur on Sundays and holidays. <br> • During construction, mufflers shall be provided for all heavy construction equipment and all stationary noise sources in accordance with the manufacturers' recommendations. <br> • Unnecessary idling of internal combustion engines shall be limited. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| | | • Stationary noise sources and staging areas shall be located as far as is feasible from existing commercial uses, or contractors shall be required to provide additional noise-reducing engine enclosures (with the goal of achieving approximately 10 dB(A) of reduction compared to uncontrolled engines). Locating stationary noise sources near existing roadways away from adjacent properties is recommended (i.e., at the southwest corner of the project site). | |
| | | • Air compressors and pneumatic equipment shall be equipped with mufflers, and impact tools shall be equipped with shrouds or shields. | |
| | | • If for construction purposes, locating stationary construction equipment near existing commercial uses is required, an eight foot tall sound-rated fence should be erected between the equipment and the sensitive receptors. The fence should be located as close to the equipment as is feasible. | |
| | | • Construction vehicle access routes shall be designed to minimize the impact on existing commercial uses. The vehicle access route should be along Scott Boulevard. | |
| | | • A "construction liaison" shall be designated to ensure coordination between construction staff and neighboring properties to minimize disruptions due to construction noise. Occupants and property owners adjacent to the construction activity shall be notified in writing of the construction schedule and the contact information for the construction liaison. | |
| | | • A qualified acoustical engineer shall be retained as needed to address neighbor complaints as they occur. If complaints occur, noise measurements could be conducted to determine if construction noise levels at adjacent property lines are within the standards. Short-term or long-term construction noise monitoring could also be utilized to diagnose complaints and determine if additional mitigation is required for certain phases of construction. | |
| **Impact NOISE-6** | | | |
| The construction of the project would not expose persons or structures on and outside of the project site to excessive groundborne vibration. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact NOISE-1** | | | |
| Traffic volumes along roadways serving the project area will increase as a result of cumulative growth planned in and around the City of Santa Clara. The project would | Potentially Significant | No mitigation measures are feasible. | Significant and unavoidable |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| make a "cumulatively considerable" contribution to cumulative traffic noise increases at noise sensitive receptors within the project vicinity. | | | |
| **Public Services** | | | |
| **Impact PUB-1** | | | |
| The proposed project would not require the construction of new or physically altered fire facilities. | Less than significant | No mitigation is required. | Less than significant |
| **Impact PUB-2** | | | |
| The proposed project would not require the construction of new or physically altered police facilities. | Less than significant | No mitigation is required. | Less than significant |
| **Impact PUB-3** | | | |
| The proposed project would not require the construction of new or physically altered school facilities. | Less than significant | No mitigation is required. | Less than significant |
| **Impact PUB-4** | | | |
| The proposed project would not require the construction of new or physically altered library facilities. | Less than significant | No mitigation is required. | Less than significant |
| **Impact PUB-5** | | **Mitigation Measure PUB-5** | |
| Development of the proposed project would increase the use of existing neighborhood parks or other recreational facilities such that substantial physical deterioration of the facilities could occur or be accelerated. In addition, the demand created by the proposed project could require the construction of new or physically altered parks and recreation facilities. | Potentially Significant | The project applicant shall pay park in-lieu fees per City Code (Chapter 17.35) to satisfy the balance of the City's parkland dedication requirement. Any in-lieu fees imposed under this chapter shall be due and payable to the City prior to issuance of a building permit for each dwelling unit, consistent with City Code Chapter 17.35 and as specified in the Development Agreement for the project. | Less than significant |
| **Cumulative Impact PUB-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in a significant cumulative impact on public services. | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Transportation and Traffic** | | | |
| **Impact TRANS-1** | | | |
| Development of the proposed project would not conflict with the applicable standards adopted by the local jurisdictions to evaluate the performance of CMP and non-CMP intersections under Baseline conditions. | Less than significant | No mitigation is required. | Less than significant |
| **Impact TRANS-2** | | | |
| Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at LOS F under Baseline conditions. | Significant | No mitigation measures are feasible. | Significant and unavoidable |
| **Impact TRANS-3** | | **Mitigation Measure TRANS-3** | |
| Development of the proposed project would conflict with the applicable standards adopted by the local jurisdictions to evaluate the performance of CMP and non-CMP intersections under Background (2020) conditions. | Significant | The project applicant will make a fair-share contribution to the City of Santa Clara for payment to responsible jurisdictions for the construction of improvements at intersections where the proposed project would contribute to a significant adverse impact. | Significant and unavoidable |
| **Impact TRANS-4** | | | |
| Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio of greater than 1 under Background (2020) conditions. | Significant | No mitigation measures are feasible. | Significant and unavoidable |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Impact TRANS-5** | | | |
| Development of the proposed project would not result in a hazard due to a design feature. | Less than significant | No mitigation is required. | Less than significant |
| **Impact TRANS-6** | | | |
| Development of the proposed project would not result in inadequate emergency access. | Less than significant | No mitigation is required. | Less than significant |
| **Impact TRANS-7** | | | |
| Development of the proposed project would not conflict with policies, programs or plans for alternate transportation. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact TRANS-1** | | **Cumulative Mitigation Measure TRANS-1** | |
| Development of the proposed project would conflict with the applicable standards adopted by the local jurisdictions to evaluate the performance of CMP and non-CMP intersections under Cumulative (2040) with project conditions. | Significant | Implement **Mitigation Measure TRANS-3.** | Significant and unavoidable |
| **Cumulative Impact TRANS-2** | | | |
| Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio greater than 1 under Cumulative (2040) with project conditions. | Significant | No mitigation measures are feasible. | Significant and unavoidable |
| **Cumulative Impact TRANS-3** | | **Cumulative Mitigation Measure TRANS-3** | |
| Development of the proposed project would conflict with the applicable standards adopted by the jurisdictions to evaluate the performance of CMP and non-CMP intersections under City Place Cumulative (2040) with project conditions. | Significant | Implement **Mitigation Measure TRANS-3.** | Significant and unavoidable |
| **Cumulative Impact TRANS-4** | | | |
| Development of the proposed project | Significant | No mitigation measures are feasible. | Significant and |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio greater than 1 under City Place (2040) conditions. | | | unavoidable |
| **Utilities and Service Systems** | | | |
| **Impact UTL-1** | | | |
| Development of the proposed project would not result in the need for new or expanded water supply entitlements. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-2** | | | |
| Development of the proposed project would not require expansion of the CSC's water delivery system. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-3** | | | |
| Development of the proposed project would not require the construction of new or expanded wastewater treatment facilities nor would it result in an exceedance of wastewater treatment requirements of the San Francisco Bay Regional Water Quality Control Board. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-4** | | | |
| Development of the proposed project would require the construction of new or expanded wastewater conveyance systems. The construction of new or expanded wastewater conveyance systems would not result in significant environmental effects. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-5** | | | |
| Development of the proposed project would require the construction of new or expanded new storm water drainage facilities on-site. The construction of new or expanded new storm water drainage facilities would not result in significant | Less than significant | No mitigation is required. | Less than significant |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| environmental effects. | | | |
| **Impact UTL-6** | | | |
| Development of the proposed project would generate solid waste, but not enough to require the expansion of the permitted capacity of a regional landfill. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-7** | | | |
| Development of the proposed project would comply with all applicable federal, state, and local statutes and regulations related to solid waste. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-8** | | | |
| The proposed project would comply with Title 24 and not result in the excessive consumption of energy resources that could not be accommodated within the long-term electricity supply and distribution system of SVP or the long-term natural gas supply and distribution system of PG&E. | Less than significant | No mitigation is required. | Less than significant |
| **Impact UTL-9** | | | |
| The proposed project would not involve a wasteful use of energy as related to project construction activities or transportation energy use. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact UTL-1** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in a significant cumulative impact on water supply, wastewater, electricity, and natural gas. | Less than significant | No mitigation is required. | Less than significant |
| **Cumulative Impact UTL-2** | | | |
| The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would result in a significant cumulative impact related to long-term landfill capacity. | Significant | No mitigation measures are feasible. | Significant and unavoidable |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Other Resource Topics** | | | |
| **Impact AG-1** | | | |
| The proposed project would not convert farmland to non-agricultural use, conflict with existing zoning for agricultural use or a Williamson Act contract, or conflict with existing zoning for, or cause rezoning of, forest land or timberland. In addition, the proposed project would not result in the loss of forest land or conversion of forest land to non-forest use, or involve other changes in the existing environment that could result in conversion of Farmland to non-agricultural use. | No impact | No mitigation is required. | No impact |

| Environmental Topic and Impact | Level of Significance before Mitigation | Mitigation Measures | Level of Significance after Mitigation |
|---|---|---|---|
| **Impact GEO-1**<br>The proposed project would not expose people and structures to substantial adverse effects related to seismic ground shaking, and/or seismic-related ground failure. | Less than significant | No mitigation is required. | Less than significant |
| **Impact GEO-2**<br>The proposed project could be located on expansive soil, but would not create substantial risks to life or property. | Less than significant | No mitigation is required. | Less than significant |
| **Impact GEO-3**<br>The proposed project would not expose people or structures to potential substantial adverse effects associated with landslides. In addition, the project would not result in substantial soil erosion nor be located on unstable soil. Finally, the proposed project would not require the use of septic tanks or alternative wastewater disposal systems. | Less than significant | No mitigation is required. | Less than significant |
| **Impact MR-1**<br>The proposed project would not result in the loss of availability of a known mineral resource or in the loss of availability of a locally important mineral resource recovery site. | No impact | No mitigation is required. | No impact |
| **Impact PH-1**<br>The proposed project would not induce substantial population growth in the area, either directly or indirectly, nor would it displace substantial numbers of existing housing or people necessitating the construction of replacement housing elsewhere. | Less than significant | No mitigation is required. | Less than significant |

**Table 2.0-2**
**Summary Comparison of Project Alternatives**

| | Project Impact | Proposed Project (Before and After Mitigation) | No Project Alternative | Planned Development Alternative | Reduced Residential Density Alternative |
|---|---|---|---|---|---|
| AIR-1 | Construction activities associated with the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or state ambient air quality standard (including resulting in emissions which exceed quantitative thresholds for ozone precursors), but would result in substantial dust emissions. | PS/LTS | NE | PS-/LTS- | PS-/LTS- |
| AIR-2 | Operation of the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or State ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors), but would result in ROG emissions that exceed the BAAQMD numeric ROG CEQA thresholds. | S/SU | NE | S-/SU | S-/SU |
| CUM AIR-1 | The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would result in significant cumulative air quality impacts. | S/SU | NE | S-/LTS | LTS/LTS |
| BIO-1 | The proposed project could have an adverse effect on special-status bird and non-special status bird species during the nesting season. | PS/LTS | NE | PS=/LTS | PS=/LTS |
| BIO-2 | The proposed project could affect any riparian habitat, sensitive natural community, or wetlands nor interfere with the movement of any wildlife species. | PS/LTS | NE | PS=/LTS | PS=/LTS |

| | Project Impact | Proposed Project (Before and After Mitigation) | No Project Alternative | Planned Development Alternative | Reduced Residential Density Alternative |
|---|---|---|---|---|---|
| HAZ-2 | The proposed project could create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment. | PS/LTS | NE | PS=/LTS | PS=/LTS |
| HAZ-3 | The proposed project could expose future project site residents to substantial risk associated with hazardous materials storage and use on nearby properties. | PS/LTS | NE | PS=/LTS | PS=/LTS |
| LU-2 | The proposed project would conflict with an applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect. | S/SU | NE | S-/SU- | S-/SU- |
| NOISE-1 | Residential and commercial uses proposed at the project site would be exposed to exterior noise levels greater than those considered "compatible" per the City of Santa Clara General Plan, the State Building Code, and CALGreen. | PS/LTS | NE | PS-/LTS | PS-/LTS |
| NOISE-3 | Noise from heating, ventilating, and air conditioning equipment for the proposed buildings may exceed the 65 dB(A) Leq daytime and 60 dB(A) Leq nighttime noise standard at existing neighboring commercial properties or the 55 dB Leq daytime and 50 dB Leq nighttime noise standard at residential properties within the site. | PS/LTS | NE | PS-/LTS | PS-/LTS |
| NOISE-5 | Noise generated by construction activities on the project site would substantially increase noise levels at residential and other noise sensitive land uses in the vicinity of the project site. | PS/LTS | NE | PS-/LTS | PS-/LTS |
| CUM NOISE-1 | Traffic volumes along roadways serving the project area will increase as a result of cumulative growth planned in and around the City of Santa Clara. The project would make a "cumulatively considerable" contribution to cumulative traffic noise increases at noise sensitive receptors within the project vicinity. | PS/SU | NE | PS-/SU- | PS-/SU- |
| PUB-5 | Development of the proposed project would increase the use of existing neighborhood parks or other recreational facilities such that substantial physical deterioration of the facilities could occur or be accelerated. In addition, the demand created by the proposed project could require the construction of new or physically altered parks and recreation facilities. | PS/LTS | NE | PS-/LTS | PS-/LTS |

| Project Impact | | Proposed Project (Before and After Mitigation) | No Project Alternative | Planned Development Alternative | Reduced Residential Density Alternative |
|---|---|---|---|---|---|
| TRANS-2 | Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at LOS F under Baseline conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| TRANS-3 | Development of the proposed project would conflict with the applicable standards adopted by the local jurisdictions to evaluate the performance of CMP and non-CMP intersections under Background (2020) conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| TRANS-4 | Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio of greater than 1 under Background (2020) conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| CUM TRANS-1 | Development of the proposed project would conflict with the applicable standards adopted by the local jurisdictions to evaluate the performance of CMP and non-CMP intersections under Cumulative (2040) with project conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| CUM TRANS-2 | Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio greater than 1 under Cumulative (2040) with project conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| CUM TRANS-3 | Development of the proposed project would conflict with the applicable standards adopted by the jurisdictions to evaluate the performance of CMP and non-CMP intersections under City Place Cumulative (2040) with project conditions. | S/SU | NE | PS-/SU- | S-/SU- |
| CUM TRANS-4 | Development of the proposed project would conflict with the applicable congestion management program, which is the Santa Clara County CMP, as it would add traffic volumes in excess of one percent of the capacity of freeway segments operating at a V/C ratio greater than 1 under City Place (2040) conditions. | S/SU | NE | PS-/SU- | S-/SU- |

| Project Impact | | Proposed Project (Before and After Mitigation) | No Project Alternative | Planned Development Alternative | Reduced Residential Density Alternative |
|---|---|---|---|---|---|
| CUM UTL-2 | The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would result in a significant cumulative impact related to long-term landfill capacity. | S/SU | NE | S-/SU- | S-/SU- |

KEY

| | |
|---|---|
| SU | *Significant and unavoidable* |
| PS | *Potentially significant impact* |
| LTS | *Less than significant impact* |
| NE | *No Effect* |
| = | *Impact similar to proposed project* |
| - | *Impact less than proposed project* |
| + | *Impact greater than proposed project* |

# 3.0   PROJECT DESCRIPTION

## 3.1      INTRODUCTION

The section presents the details of the Santa Clara Square -Residential/Mixed Use project in terms of the project objectives, the project setting, project characteristics, and construction schedule and activities. The project applicant, Irvine Company (applicant) has submitted an application to the City of Santa Clara for approval of the Santa Clara Square -Residential/Mixed Use project and related entitlements (proposed project). The approximately 33.4-acre project site is located in the central portion of the City of Santa Clara on Scott Boulevard, between Bowers Avenue and San Tomas Aquino Creek. The project site consists of five parcels of land (APNs 216-45-022, 216-45-023, 216-45-024, 216-29-112, and 216-29-053) and portions of two parcels (APNs 216-45-011 and 216-45-028). Three of the five full parcels and the two partial parcels are located to the north of Scott Boulevard, and the remaining two full parcels are located to the south of Scott Boulevard. The San Tomas Aquino Creek Trail runs along the eastern boundary of the project site. The project site is currently developed with commercial/business park buildings, surface parking, site serving infrastructure, and landscaping.

The applicant proposes to demolish the existing buildings on the project site and construct a residential mixed-use development project that would consist of 1,800 rental apartment units that would be developed in seven (7) apartment complexes. The project includes a central parking garage as part of each residential complex. The project also includes approximately 40,000 gross square feet (gsf) of retail space, 4,500 gsf of leasing space, and approximately 38,000 gsf of amenity space. The proposed retail space would be located in the northwestern portion of the project site along the east side of a new street that would run north-south connecting Scott Boulevard to Augustine Drive. Other infrastructure improvements (i.e., sewer, water, and storm drainage) needed to serve the proposed project would also be constructed. Portions of the project site will be developed with a public park and other open space uses, such as a trail section along Scott Boulevard and Augustine Drive connecting to San Tomas Aquino Trail.

## 3.2      PROJECT APPROVALS

In addition to seeking approval to develop the proposed residential/mixed-use project, the Irvine Company is requesting a General Plan Amendment (GPA) to change the land use designations for all project site parcels. As noted above, the project site is composed of five full parcels and two partial parcels which are shown on **Figure 3.0-1, Project Location**. **Table 3.0-1, Project Site Land Use Designations** shows the existing land use designations for each project site parcel per the City of Santa Clara's 2010-2035 General Plan and the land use designations changes requested by the applicant for the proposed project.

**Table 3.0-1**
**Project Site Land Use Designations**

| Parcel (APN) | City of Santa Clara 2010-2035 General Plan | | | Proposed Designation |
| | Phase I: 2010-2015 | Phase II: 2015-2023 | Phase III: 2023-2035 | |
| --- | --- | --- | --- | --- |
| 216-45-011[1] | Community Commercial | Community Commercial | Community Commercial | Regional Mixed Use |
| 216-45-028[1] | Community Commercial | Community Commercial | Community Commercial | Regional Mixed Use |
| 216-45-022 | Light Industrial | Light Industrial | High Density Residential | Regional Mixed Use |
| 216-45-023 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |
| 216-45-024 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |
| 216-29-112 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |
| 216-29-053 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |

*Source: City of Santa Clara 2010; Irvine Company 2015.*

[1] Note that the land use designation of APNs 216-45-011 and 216-45-028 was changed to Community Commercial per resolution 14-8148. This change is not reflected in the General Plan land use maps.

The project site parcels would also need to be rezoned to allow for the proposed land uses. The proposed project accelerates the City of Santa Clara's long term growth strategy as stated in Phase III: 2023-2035 of the General Plan to develop new residential neighborhoods in conjunction with appropriate retail, parks, open space, and other public uses, along transit corridors.

The proposed residential/mixed-use project, GPA, and rezoning will require approval from the City of Santa Clara. Because of the discretionary approvals required, the project is subject to compliance with CEQA. The City of Santa Clara will be the CEQA lead agency and will direct the CEQA review process.

## 3.3     PROJECT OBJECTIVES

The City of Santa Clara has developed the following primary objectives to satisfy the requirements of the *California Environmental Quality Act (CEQA) Guidelines* Section 15124 (b).

• Provide development consistent with the City's long-term development goals.

• Create a mixed-use development of a scale and character that complements and is supportive of the surrounding uses.

- Create a mixed-use development that maximizes density with accessibility to alternate transportation modes, and integrates pedestrian, bicycle, transit, open space and outdoor uses to encourage active centers.

- Implement smart growth principles by redeveloping underutilized properties with higher density housing projects in mixed-use areas.

The applicant's project objectives are to develop a well-designed, economically feasible residential community that consists of a variety of residential products and unit types, and incorporates smart-growth elements such as redevelopment of underutilized properties. The applicant's key objectives for the proposed project are to:

- Create a sustainable infill mixed use project that complements the adjacent office campus to the north (the previously approved office "district") and the retail properties to the west (the previously approved retail "district") and thereby provides the third distinct "district" that completes the total vision for an integrated, walkable, live/work/play Santa Clara Square community;

- Develop new residential neighborhoods in conjunction with appropriate retail, parks, open space and other public uses, along transit corridors;

- Attain a Project designed to a minimum LEED Gold or greater equivalent standard;

- Improve the range of types of residential units within the Santa Clara Square community and the City; and

- Improve the jobs/housing balance within the City.

## 3.4    PROJECT SETTING

The City of Santa Clara is located in the Santa Clara Valley near the southwestern end of San Francisco Bay (see **Figure 3.0-1**). The Santa Clara Valley is bounded on the west by the Santa Cruz Mountains and on the east by the Diablo Range. The City of Santa Clara is bordered by San Jose to the north, east, and south, and Sunnyvale and Cupertino to the west.

The approximately 33.4-acre project site is located in the central portion of the City of Santa Clara on Scott Boulevard, between Bowers Avenue and San Tomas Aquino Creek. It is accessible by three major Bay Area freeways: the U.S. 101 Highway (U.S. 101) to the north, Interstate 880 (I-880) to the east, and Interstate 280 (I-280) to the south. The main arterial streets that provide access from the freeways to the project area are Bowers Avenue, Central Expressway, and San Tomas Expressway. Direct access to the site is provided by Bowers Avenue, Scott Boulevard, and Augustine Drive. Other roads that provide access to portions of the project site include Montgomery Drive and Octavius Drive. The Santa Clara Valley Transportation Authority (VTA) provides bus service to the project site via Routes 58 and 304.

The area surrounding the project site is fully developed and consists mainly of commercial and institutional uses. The nearest residential uses are located 0.75 mile to the southwest of the project site on Bowers Avenue and 0.75 mile to the northeast on Agnew Road. Mission College is located across U.S. 101 to the northwest of the project site.

## 3.4.1    Existing Site Conditions

The project site is developed with approximately 13 one- and two-story buildings (some buildings are connected), internal roadways, parking lots, and landscaping. The total existing building space among the existing buildings on the project site is approximately 419,405 gsf. There is a one-story building with associated parking lots located to the north of Scott Boulevard adjacent to San Tomas Aquino Creek. A cluster of seven one-story buildings with associated parking lots are bounded by Montgomery Drive to the west and Octavius Drive to the east. Three one-story buildings and parking lots are located to the west of Montgomery Drive. A two-story building and a one-story building are located to the south of Scott Boulevard adjacent to San Tomas Aquino Creek. Surface parking surrounds all of the buildings. The parking lots and buildings are flanked by mature trees and landscaping consisting of irrigated lawn, ground cover, and shrubs. A number of businesses currently occupy the project site. The existing buildings are in good condition and suitable for re-tenanting at full occupancy as office space at any time if the proposed project is not developed.

Approximately 26.8 acres (80 percent) of the project site is currently under impervious surfaces (buildings, internal roadways, sidewalks, and parking lots). The remaining 6.6 acres (20 percent) of the site is pervious and landscaped with trees and shrubs.

The area to the north of the project site (north of Augustine Drive) and the area to the west of the project site between Scott Boulevard and Augustine Drive were previously approved by the City for redevelopment. The area to the north is approved for the construction of approximately 1.86 million square feet of Class A office space with 13,000 square feet of retail, and the area to the west is approved for development of 125,000 square feet of retail space for a total of 2 million square feet of development. Construction is underway in the area to the north of Augustine Drive.



**SOURCE:** Google Inc., March 2015, Imagery Date February 2014

Legend

— Project Site

— Parcel Boundary

FIGURE **3.0–1**

Project Location

1176.002•07/15

## 3.5       PROJECT CHARACTERISTICS

## 3.5.1       Proposed Land Uses

The proposed project would develop a mix of residential and retail uses on the approximately 33.4-acre site. As part of the proposed project, the existing buildings would be demolished and the site would be developed with rental apartment units; retail, leasing and amenity space; parking; site serving infrastructure; and landscaping. The proposed site plan is shown in **Figure 3.0-2, Site Plan**. **Table 3.0-2, Proposed Building Space**, presents a summary of the various types of building space that would be constructed on the project site as part of the proposed project. A brief description of the proposed uses follows the table.

**Table 3.0-2**
**Proposed Building Space**

| Proposed Land Use | Space |
|---|---|
| Residential | 1,800 du |
| Retail | 40,000 gsf |
| Leasing | 4,500 gsf |
| Amenity | 38,000 gsf |

*Source: Irvine Company, 2015*

### *Apartment Units*

The proposed project would develop 1,800 apartment units. The proposed apartments would include studios, one-bedroom, and two-bedroom units ranging in size from approximately 595 to 1,178 net rentable square feet (nrsf). The residential unit mix is summarized in **Table 3.0-3, Residential Unit Mix Summary,** below.



APPROXIMATE SCALE IN FEET

304  152  0  304

SOURCE: Irvine Company, July 2015

FIGURE 3.0-2

Site Plan

1176.002•09/15

**Table 3.0-3**
**Residential Unit Mix Summary**

| Housing Type | Number of Units | Unit Size (NRSF) | Total (NRSF) | Mix |
|---|---|---|---|---|
| Studio | 232 | 595 to 693 | 146,072 | 8% |
| One-Bedroom Units | 880 | 719 to 1,078 | 817,293 | 47% |
| Two-Bedroom Units | 688 | 1,052 to 1,178 | 786,634 | 45% |
| **Totals** | **1,800** | | **1,750,000** | |

*Source: Irvine Company, 2015*
*nrsf – net rentable square feet*

The apartments would be located in seven apartment complexes, with the residential units arranged around a central parking garage, as shown in **Figure 3.0-2**. The residential buildings would be generally approximately 75 feet tall with towers at building corners extending up to 85 feet tall. As a voluntary matter, vapor barrier systems would be installed below Buildings 2, 5, 6, and 7. **Figure 3.0-3, Scott Boulevard Elevations, Figure 3.0-4, Augustine Drive Elevations,** and **Figure 3.0-5, New Street (as yet unnamed) Elevations**, shows the proposed building elevations as viewed from Scott Boulevard, Augustine Drive, and the new street (as yet unnamed).

The architectural details that would be used for the project site buildings would vary with the location and the types of uses within the buildings. The style and details that are planned range from Formal Italian, Palladian, Formal Spanish, and Early California. Buildings at prominent locations at intersections of frequented roadways such as corner of Scott Boulevard and Octavius Drive would be architecturally designed with unique elements. Landscape features and towers would be used for entrances.

## Retail Space

The proposed project includes approximately 40,000 gsf of ground floor retail uses. The retail uses would be located at street level along the new street (as yet unnamed) frontage and a portion of Augustine Drive. Uses could include restaurants ranging from sit down to "fast casual," coffee shops, dessert stores, clothing, service retail, day spas, specialty retail, bicycle shops, and wellness centers. Outdoor seating areas could be developed along the new street (as yet unnamed) or Augustine Drive frontages of the proposed project.

## Amenity Space

The proposed project would include approximately 38,000 gsf of amenity space. This would include the club rooms, pool lounge, fitness facilities, and game rooms.

## *Open Space and Outdoor Areas*

The residential complexes would include landscaped walkways and paseos and courtyards with outdoor BBQ areas and lounge areas as well as other recreational amenities. Several of the complexes would include private swimming pools, spas, and cabanas. A core public park central to the community would be located along Octavius Drive between Buildings 4 and 5. A creekside public park would be located at the southeastern edge of the community along Scott Boulevard adjacent to the San Tomas Aquino trail. A redwood trail would be built along the frontage of the apartment buildings facing Augustine Drive, Octavius Drive and Scott Boulevard connecting both public park areas and providing a linkage to the San Tomas Aquino trail. This will serve as a new publicly accessible connection from the project to the San Tomas Aquino trail.

## 3.6     CIRCULATION AND PARKING

### 3.6.1     Circulation

**Figure 3.0-6, Circulation Plan**, shows the conceptual vehicular circulation on the project site. Vehicular access to the site would be provided from the two arterials Bowers Avenue and Scott Boulevard. Direct access to the site is provided by Bowers Avenue, Scott Boulevard, and Augustine Drive. Other roads that provide access and circulation within portions of the project site include Montgomery Drive, Octavius Drive, and the proposed new street (as yet unnamed). Access driveways to the residential parking areas within the project site would be provided along Scott Boulevard, Montgomery Drive, and Octavius Drive.

The project includes the following on-site and off-site transportation modifications for vehicle, transit, bicycle, and pedestrian travel:

## *Roadway Modifications*

- Install a signal at the Montgomery Drive/Scott Boulevard intersection.

- Signage, striping, and pavement upgrades to Octavius Drive. Upgrades include new pavement overlay, new striping that maintains the center two-way-left-turn-lane, bicycle lanes, vehicle parking, and pullouts for loading and unloading.

- Signal upgrade modification at Octavius Drive / Scott Boulevard to include a protected left turn into the project site.

- Add a private street between Buildings 1 and 2 that provides access between Montgomery Drive and new street (as yet unnamed).

- Install signal interconnect along Scott Boulevard between Bowers Avenue and Octavius Drive (all current and future signals).

*Transit Infrastructure Modifications*

- Upgrade bus stop facilities on the north side of Scott Boulevard near the Octavius Drive intersection. Specific upgrades will be determined based on coordination with the City of Santa Clara and VTA.

*Bicycle and Pedestrian Infrastructure Modifications*

- Provide bicycle lanes along Octavius Drive.

- Provide bicycle lanes along Montgomery Drive.

- Provide high visibility crosswalks with Rapid Rectangular Flashing Beacons (RRFB) at the uncontrolled crossings on Augustine Drive and Octavius Drive ("knuckle") that provides access to the San Tomas Aquino Creek Trail.

- Provide minimum six- to eight-foot sidewalks along all frontage roads adjacent to the Santa Clara Square Residential developments including Octavius Drive. An eight to ten-foot sidewalk will be built between Montgomery Drive and new street (as yet unnamed) on Augustine Drive and Scott Boulevard.



SOUTH ELEVATION ALONG SCOTT BOULEVARD

ENHANCED FINISHES
BELOW THE LINE TO MATCH
RETAIL PROPERTIES
ALONG MAIN STREET

30/30 PLASTER
WITH CLAY TILE ROOF
ABOVE RED LINE

SMOOTH TROWEL PLASTER
BELOW RED LINE

16/20 PLASTER WITH
CONCRETE TILE ROOF
ABOVE BLUE LINE

30/30 PLASTER
BELOW BLUE LINE

1. EXTERIOR PLASTER,
   FINE SAND AND SMOOTH TROWEL FINISH
2. EXTERIOR PLASTER, 30/30
3. EXTERIOR PLASTER, 16/20
4. ALUMINUM WINDOWS
5. ALUMINUM SLIDING DOOR
6. ALUMINUM STOREFRONT
7. VINYL WINDOWS
8. VINYL SLIDING DOOR WITH TRANSOM
9. GFRC COLUMN
10. ORNAMENTAL METAL RAILING (SIM. MONTICELLO)

11. GFRC WAINSCOT
12. FAUX LIMESTONE WAINSCOT
13. DECORATIVE NICHE WITH IRON GRILL
14. PAINTED STEEL TRELLIS
15. WOOD TRELLIS
16. EXTERIOR FAUX LIMESTONE TRIM
17. EXTERIOR GFRC TRIM
18. GFRP WINDOW SURROUND
19. GFRP OPENING SURROUND
20. FOAM FASCIA (STUCCO FINISH SAME AS CLOSEST
FIELD) AND RAIN GUTTER

21. EXTERIOR FOAM TRIM
22. FOAM CORBELS
23. METAL CANOPY
24. FABRIC AWNING ("FERRARI" LINE OF CANVAS)
25. STONE VENEER
26. BRICK VENEER
27. COPPER ROOF
28. CLAY TILE ROOF, TYPE 1
29. CLAY TILE ROOF, TYPE 2
30. CONCRETE TILE ROOF, TYPE 1
31. CONCRETE TILE ROOF, TYPE 2

32. STOOP
33. 1" ALUMINUM REGLET

** NOTES:
1. GARAGE ROOF TOP TRAFFIC COATING TO BE NEOGARD COLOR MATCH TO DURANAR SUMMER SUEDE, TYP.
2. RESIDENTIAL LOW SLOPE ROOF TO BE SARNAFIL COPPER, TYP.
3. INTERNAL DOWNSPOUTS AT THE RETAIL LOCATIONS
4. ALUMINUM WINDOWS / ALUMINUM SLIDING DOORS ABOVE RETAIL AND AMENITIES WITH ENHANCED FINISHES OF BRICK AND STONE VENEERS.

**SOURCE:** MVE & Partners, July 2015

FIGURE **3.0–3**

Scott Boulevard Elevations

1176.002•07/15



NORTH  ELEVATION ALONG AUGUSTINE DRIVE

ENHANCED FINISHES BELOW THE LINE
TO MATCH RETAIL PROPERTIES
ALONG MAIN STREET

30/30 PLASTER ABOVE
SMOOTH TROWEL PLASTER BELOW
RED LINE

1. EXTERIOR PLASTER,
   FINE SAND AND SMOOTH TROWEL FINISH
2. EXTERIOR PLASTER, 30/30
3. EXTERIOR PLASTER, 16/20
4. ALUMINUM WINDOWS
5. ALUMINUM SLIDING DOOR
6. ALUMINUM STOREFRONT
7. VINYL WINDOWS
8. VINYL SLIDING DOOR WITH TRANSOM
9. GFRC COLUMN
10. ORNAMENTAL METAL RAILING (SIM. MONTICELLO)

11. GFRC WAINSCOT
12. FAUX LIMESTONE WAINSCOT
13. DECORATIVE NICHE WITH IRON GRILL
14. PAINTED STEEL TRELLIS
15. WOOD TRELLIS
16. EXTERIOR FAUX LIMESTONE TRIM
17. EXTERIOR GFRC TRIM
18. GFRP WINDOW SURROUND
19. GFRP OPENING SURROUND
20. FOAM FASCIA (STUCCO FINISH SAME AS CLOSEST FIELD) AND RAIN GUTTER

21. EXTERIOR FOAM TRIM
22. FOAM CORBELS
23. METAL CANOPY
24. FABRIC AWNING ("FERRARI" LINE OF CANVAS)
25. STONE VENEER
26. BRICK VENEER
27. COPPER ROOF
28. CLAY TILE ROOF, TYPE 1
29. CLAY TILE ROOF, TYPE 2
30. CONCRETE TILE ROOF, TYPE 1
31. CONCRETE TILE ROOF, TYPE 2

32. STOOP
33. 1" ALUMINUM REGLET

** NOTES:
1. GARAGE ROOF TOP TRAFFIC COATING TO BE NEOGARD COLOR MATCH TO DURANAR SUMMER SUEDE, TYP.
2. RESIDENTIAL LOW SLOPE ROOF TO BE SARNAFIL COPPER, TYP.
3. INTERNAL DOWNSPOUTS AT THE RETAIL LOCATIONS
4. ALUMINUM WINDOWS / ALUMINUM SLIDING DOORS ABOVE RETAIL AND AMENITIES WITH ENHANCED FINISHES OF BRICK AND STONE VENEERS.

**SOURCE:** MVE & Partners, July 2015

FIGURE **3.0–4**

Augustine Drive Elevations

1176.002•07/15



WEST ELEVATION ALONG MAIN STREET

1. EXTERIOR PLASTER,
   FINE SAND AND SMOOTH TROWEL FINISH
2. EXTERIOR PLASTER, 30/30
3. EXTERIOR PLASTER, 16/20
4. ALUMINUM WINDOWS
5. ALUMINUM SLIDING DOOR
6. ALUMINUM STOREFRONT
7. VINYL WINDOWS
8. VINYL SLIDING DOOR WITH TRANSOM
9. GFRC COLUMN
10. ORNAMENTAL METAL RAILING (SIM. MONTICELLO)

11. GFRC WAINSCOT
12. FAUX LIMESTONE WAINSCOT
13. DECORATIVE NICHE WITH IRON GRILL
14. PAINTED STEEL TRELLIS
15. WOOD TRELLIS
16. EXTERIOR FAUX LIMESTONE TRIM
17. EXTERIOR GFRC TRIM
18. GFRP WINDOW SURROUND
19. GFRP OPENING SURROUND
20. FOAM FASCIA (STUCCO FINISH SAME AS CLOSEST FIELD) AND RAIN GUTTER

21. EXTERIOR FOAM TRIM
22. FOAM CORBELS
23. METAL CANOPY
24. FABRIC AWNING ("FERRARI" LINE OF CANVAS)
25. STONE VENEER
26. BRICK VENEER
27. COPPER ROOF
28. CLAY TILE ROOF, TYPE 1
29. CLAY TILE ROOF, TYPE 2
30. CONCRETE TILE ROOF, TYPE 1
31. CONCRETE TILE ROOF, TYPE 2

32. STOOP
33. 1" ALUMINUM REGLET

** NOTES:
1. GARAGE ROOF TOP TRAFFIC COATING TO BE NEOGARD COLOR MATCH TO DURANAR SUMMER SUEDE, TYP.
2. RESIDENTIAL LOW SLOPE ROOF TO BE SARNAFIL COPPER, TYP.
3. INTERNAL DOWNSPOUTS AT THE RETAIL LOCATIONS
4. ALUMINUM WINDOWS / ALUMINUM SLIDING DOORS ABOVE RETAIL AND AMENITIES WITH ENHANCED FINISHES OF BRICK AND STONE VENEERS.

FIGURE **3.0–5**

**Main Street Elevations**



**LEGEND**

| | |
|---|---|
| — · — · — · — | Multi-use Trail |
| — · — · — · — | Bike Lane |
| — · — · — · — | Pedestrian Path/Sidewalk |
| — — — — — | Existing Creek Trail |
| — — — — — | Existing Pedestrian Path Trail |
| — — — — — | Existing Bike Lane |
| ◄► | Vehicular Access |
| ◄► | Pedestrian Crossing |
| (5B) | Bus/Transit Stop |
| ⬚ | Signal Modification/Signal Improvement per Agustine Drive Improvement Plans (by others) |
| ⬚ | Proposed New Signal or Existing Signal Modification to be Constructed with Apartment Development |

400'   200'   0   400'

**APPROXIMATE SCALE IN FEET**

**SOURCE:** Civil Engineering Associates 06/29/2015.

FIGURE **3.0–6**

Circulation Plan

1176.002•09/15

### 3.6.2     Parking

**Table 3.0-4, Proposed Residential Parking** shows the number of parking spaces and configuration of parking proposed at the project site. Resident parking would be provided within each of the seven apartment complexes at a rate of 1.0 parking space per studio unit, 1.5 parking spaces per one-bedroom dwelling unit, and 2.0 parking spaces per two-bedroom dwelling unit. Visitor parking would be provided in each garage at a rate of 10 percent of the total unit count. Retail parking would be provided off of the project site within the Office Campus Parking Garage "G2" located across Augustine Drive near the western portion of the project site. There are 200 parking spaces available for the retail within Garage "G2."

**Table 3.0-4**
**Proposed Residential Parking**

| Unit Type | City Required Parking Ratio | Number of Units | Bldg 1 | Bldg 2 | Bldg 3 | Bldg 4 | Bldg 5 | Bldg 6 | Bldg 7 |
|---|---|---|---|---|---|---|---|---|---|
| Unit Count | | 1,800 | 156 | 198 | 261 | 281 | 331 | 248 | 325 |
| Studio | 1.0 | 232 | 33 | 56 | 68 | 41 | 34 | 0 | 0 |
| One-Bedroom | 1.5 | 880 | 111 | 125 | 159 | 200 | 267 | 213 | 245 |
| Two-Bedroom | 2.0 | 688 | 98 | 118 | 174 | 212 | 238 | 212 | 324 |
| Visitor Required | 10% total units | | 16 | 20 | 27 | 29 | 34 | 25 | 33 |
| *Total Required* | | *3,112* | *258* | *319* | *428* | *482* | *573* | *450* | *602* |
| **Total Provided** | | **3,218** | **287** | **363** | **464** | **474** | **580** | **446** | **604** |
| ADA Parking (2% total parking provided) | | 68 | 6 | 8 | 10 | 10 | 12 | 9 | 13 |
| Van ADA Parking (1 of every 8 ADA parking provided) | | 14 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| EV Charging Stations (4% of total units) | | 73 | 6 | 8 | 10 | 12 | 14 | 10 | 13 |

*Source: Irvine Company, 2015*

### 3.7     LANDSCAPING

**Figure 3.0-2** shows the proposed landscaping plan for the project site. This plan includes the planting of new trees and shrubs throughout the site. Based on the arborist report prepared for the site, there are 448 existing trees on the site. The City of Santa Clara General Plan Policy 5.10.1-P3 requires "preservation of all City-designated heritage trees listed in the Heritage Tree Appendix 8.10 of the General Plan." In addition, General Plan Policy 5.10.1-P4 provides the criteria for the identification of trees that the City seeks to protect. This policy states "Protect all healthy cedars, redwoods, oaks, olives, bay laurel, and pepper trees of any size, and all other trees over 36 inches in circumference measured from 48 inches

above grade on private and public property as well as in the public right-of-way." None of the trees on the project site qualify as Heritage Trees, and 189 of the trees qualify as protected trees per General Plan Policy 5.10-1-P4. Project construction would require the removal of 350 trees, while 33 trees would be relocated to other parts of the project site, and 65 trees would be preserved. **Table 3.0-5, Project Site Trees**, presents the status of trees to be removed, relocated and preserved on site.

**Table 3.0-5**
**Project Site Trees**

| Status of Tree | Not protected | Protected | Total |
|---|---|---|---|
| Preserve | 14 | 51 | 65 |
| Relocate | 14 | 19 | 33 |
| Remove | 231 | 119 | 350 |
| **Total** | **259** | **189** | **448** |

*Source: HortScience 2015*

Of the 350 trees that would be removed, 118 qualify as protected trees. The project applicant would be required to comply with General Plan Policy 5.3.1-P10, which requires that new development "provide opportunities for increased landscaping and trees in the community, including requirements for new development to provide street trees and a minimum 2:1 on- or off-site replacement for trees removed as part of the project." In addition, the City's Design Guidelines require that mature trees removed or proposed for removal be replaced on-site, at a minimum, with a 24- or 36-inch box. Other standards may apply in cases where particular planting requirements must be met. This includes providing specimen size material for protected trees and installing appropriately sized trees, such as less than or equal to 15 gallons where there are physical limitations.

In order to compensate for the protected trees removed at a 2:1 ratio according to General Plan Policy 5.3.1-P10, 238 replacement trees would be required. The proposed landscaping plan calls for installing more than 1,000 trees, which would exceed the requirements of the General Plan. Per the City's Design Guidelines, the proposed nursery stock size would be 24- and 36-inch boxes. To the extent feasible, drought-resistant and low-water-use plantings would be installed on the project site.

## 3.8      UTILITIES

### 3.8.1      Potable Water

The City of Santa Clara Water and Sewer Utilities (CSC) would provide water service to the project site. CSC uses groundwater and surface water supplies from the Santa Clara Valley Water District (SCVWD) and the San Francisco Hetch-Hetchy System to provide water to various land uses throughout the City. CSC owns and maintains the existing water mains surrounding the project site, including the water mains in Scott Boulevard and Augustine Drive.

Potable water service would be provided to the site by the existing and proposed water infrastructure system. The proposed project is estimated to require approximately 289.2 acre-feet of potable water annually. If the annual water demand associated with the existing commercial/business park uses on the project site (119.6 acre-feet) is deducted from this number, the net additional water required by the proposed project would be about 169.6 acre- feet/year.

### 3.8.2      Wastewater

CSC provides wastewater service to the project site. Services provided by CSC include construction, operation, and maintenance of the City's sanitary sewer system. CSC operates and maintains the sewer mains located in Scott Boulevard, Augustine Drive, Octavius Drive, and Montgomery Drive. Wastewater generated in the City of Santa Clara is treated at the San Jose/Santa Clara Water Pollution Control Plant (SJSCWPCP), which is a regional wastewater treatment facility serving eight tributary wastewater collection agencies.

Wastewater generated within the project site would be collected through an on-site collection system and discharged into the existing wastewater mains in the four streets listed above for conveyance to the SJSCWPCP.

Average dry weather flows for the proposed project would be approximately 470,237 gallons per day (gpd), or about 327 gallons per minute (gpm). If the average dry weather flow associated with the existing uses on the project site (58,717 gpd) is deducted from this number, the net average dry weather flow from the site would be about 411,520 gpd, or about 286 gpm.

### 3.8.3      Storm Drainage

The site is currently served by the City's municipal storm drainage facilities. The existing sites drain primarily via onsite private storm drain systems which are connected to the existing systems through

public manholes or catch basin connections. Some smaller areas drain overland to the public streets and the drainage is collected into the public systems via street catch basins.

There are three primary storm drainage systems adjacent to the project. The first one runs from west to east within Scott Boulevard from Montgomery Drive to the San Tomas Aquino Creek and ranges in size from 21 inches to 27 inches along the project frontage. The second system runs from south to north within Octavius Drive and then extends to San Tomas Aquino Creek through private property via public easements. This system ranges in size from 15 inches to 21 inches along the project frontage. The third system is composed of a network of pipes within Scott Boulevard, Bowers Avenue, Montgomery Drive and Augustine Drive. This system consists of pipes ranging in size from 18 inches to 24 inches along the project frontage. The system ultimately works its way under Highway 101 to the north and then east to San Tomas Aquino Creek where it discharges via a 60-inch outfall.

There is one additional existing public storm drain system in the area which runs along the southern boundary of APNs 216-29-053 and 216-29-112 in a public easement. This system varies in size from 24 to 27 inches along the project frontage and runs from east to west and ultimately outfalls into San Tomas Aquino Creek.

Storm water from proposed impervious surfaces on the site would be collected, treated, and discharged to the existing storm drains in the project area. The project proposes to reuse the existing storm drain connections from the existing developments but will also include some additional connections.

The existing project site is about 33.4 acres and is composed of approximately 6.6 acres of pervious surface (primarily landscaping and unpaved areas) and the remainder of the site is covered by impervious surfaces (parking, roofs, driveways, etc.). The proposed project will have approximately 9.5 acres of pervious surfaces with the remainder of the site (23.9 acres) being impervious. Therefore the project will result in a net increase in pervious surfaces of approximately 2.9 acres and an equivalent amount of reduction in impervious surfaces. As a result, storm water runoff from the project site will decrease compared to existing conditions. For the reasons stated above, the public storm drainage infrastructure is adequate and would not be altered.

Furthermore, in order to comply with current National Pollutant Discharge Elimination System (NPDES) permitting and the local government Municipal Regional Permit (MRP), the project includes Low Impact Development (LID) measures to reduce storm water runoff and mimic site predevelopment hydrology. Based on the criteria for determining the appropriate type of LID treatment for the type of project proposed, the project proposes primarily to utilize a system of distributed biotreatment areas. The basic design concept is to route flows from impervious surfaces into biotreatment areas for treatment prior to discharging the storm water into the public storm drain system. In addition, the NPDES and MRP

regulations require certain projects to implement Hydromodification Management (HM) controls. HM controls limit runoff from proposed projects to predevelopment levels. Due to the fact that proposed project will be reducing impervious surfaces and thus reducing overall runoff, the project is not required to implement HM controls.

### 3.8.4      Electricity and Natural Gas

The proposed project is estimated to require approximately 8,743 megawatt hours (MWh) per year of electricity. This includes usage associated with residential, retail, leasing and amenity uses. The existing office space on the project site generates an estimated 8,258 MWh of electricity demand. If this demand is subtracted from the project's projected electricity demand, the net electricity usage for the proposed project would be 485 MWh.

The proposed project is estimated to require about 12,754 million British Thermal Units per year (mBTU/y) of natural gas. This includes usage associated with residential, retail, leasing and amenity uses and also assumes that the residential usage will be at least 15 percent better than Title 24 (2008) and that Energy Star appliances will be installed in the residential units. Deducting for natural gas usage associated with the office use of the existing buildings, the net natural gas usage for the proposed project would be 5,539 mBTU/year. The proposed project would comply with Title 24 (2013) standards and General Plan Policy 5.10.3-P4 that requires new development to promote sustainable buildings and land planning, including programs that reduce energy consumption in new development.

### 3.8.5      Sustainable Development Features

The proposed project proposes high-density residential and retail on a site with easy access to employment centers and transit. The proposed project will achieve a minimum of a LEED Gold or greater equivalent. In addition, the project proposes to incorporate the following measures to minimize energy and water consumption, improve indoor environmental quality, minimize waste disposed in landfills, and minimize vehicular traffic and associated air pollutant emissions. These measures include:

*Water*

- Reclaimed Irrigation Water

    – The reclaimed water main will be extended approximately 1,600 linear feet throughout the development to provide service to the entire project site.

    – Reclaimed water will be used for irrigation of all landscape other than new and existing mature redwood trees that will be preserved. The redwood trees will be on a potable drip irrigation system, which will comply with the City's water restriction ordinance.

- New landscape plants will be drought tolerant, native to California or other Mediterranean climates, or other low water use species.

- High efficiency irrigation systems and smart controllers that use satellite weather data will be utilized.

- All water fixtures (faucets, showerheads, and toilets) will be low flow and/or WaterSense certified for low water use.

- All units will be equipped with Energy Star certified dishwashers for low water use.

- Common hot water boiler systems will be used for efficient hot water distribution.

## Energy

- All buildings will exceed Title 24 energy requirements by a minimum of 10 percent.

- All apartments will be equipped with Energy Star certified appliances (dishwashers and refrigerators).

- Energy efficient LED and fluorescent light fixtures will be utilized within the apartment buildings and for exterior lighting.

- A minimum of 15 percent of the roof areas will be reserved for future photovoltaic (PV) solar installation. Infrastructure (conduit, structural elements, etc.) will be provided to facilitate the future PV solar installation.

- All parking garages will be equipped with Electric Vehicle (EV) charging stations.

## Materials

- More than 65 percent of all demolition materials and construction debris will be recycled.

- Existing concrete from demolition will be crushed and re-used as base rock for the building foundations, roadways, sidewalks, and utility trenches.

## Site Planning & Design

- The proposed project is a mixed use project with apartments that is complementary with the adjacent office and retail development. The pedestrian and bicycle orientation of the proposed project will reduce vehicular trips.

- The proposed project will include direct connections to the adjacent San Tomas Creek Trail. The proposed project will also include a network of pedestrian and bicycle trails to and from the San Tomas Creek Trail, the retail center, parks, office campus, and all residential buildings.

- All residential buildings will be equipped with secure bicycle storage rooms.

## 3.9    DEMOLITION AND CONSTRUCTION ACTIVITIES

Construction of the proposed project would be preceded by the demolition of the existing buildings on the project site. Demolition would generally proceed as follows: (1) the contents of the buildings would be characterized; (2) any hazards present would be abated, including, but not limited to, asbestos containing materials and lead-based paint; (3) reusable and recyclable materials would be identified and removed; (4) the structure would be demolished and removed; and (5) the foundation slabs and underground utilities would be removed.

As noted earlier, the project site is developed with approximately 419,405 square feet of building space, asphalt parking lots, internal roadways and driveways, and concrete walkways and sidewalks that would be demolished as part of the proposed project. The demolition and site preparation is expected to generate about 27,465 tons of construction wastes, and 100,000 cubic yards of soil as shown in **Table 3.0-6, Estimated Quantities of Construction Wastes**. The proposed project is subject to the City Construction and Demolition Ordinance, which requires 50 percent diversion as well as CALGreen Code (as described above). Debris generated from the demolition of the buildings would be sorted into materials that can be reused or recycled, materials that are contaminated and cannot be reused, and non-hazardous waste materials. Each type of material would be appropriately reused, stored, and/or disposed. Fluorescent light fixtures and other items that would require separate handling would be removed prior to building demolition. Metal, wire, conduit, etc., would be hauled off-site and sent to a recycling firm. Most of the concrete and asphalt would be crushed and ground to use on the site as engineered fill as needed. This material would be stockpiled on the site until needed. It is estimated that of the total demolition debris that would be generated, about 2,430 tons would be hauled to a City-certified disposal facility.

**Table 3.0-6**
**Estimated Quantities of Construction Wastes**

| Material Type | Quantity | Description of Disposal/Use |
|---|---|---|
| Concrete | 16,200 tons | stockpiled onsite for crushing as needed |
| Asphalt | 7,970 tons | stockpiled onsite for crushing as needed |
| Construction debris | 2,430 tons | transported to disposal facility |
| Lumber | 253 tons | transported to resale facility |
| Metals | 429 tons | transported to recycling facility |
| Green Waste | 183 tons | transported to recycling facility |
| Soil | 100,000 cubic yards | exported off-site |
| **Total** | **27,465 tons of waste** **100,000 cubic yards of soil** | |

*Source: Complete Environmental Solutions, 2015.*

Site clearing and demolition would be followed by excavation and grading, utility infrastructure, and foundation work. Preliminary grading studies indicate that approximately 100,000 cubic yards of soil would be removed from the site (CEA 2015b). Subsequent construction phases will include building construction, completion of exterior improvements, and installation of landscaping. Portions of the project site would be used as the staging area for storage of construction vehicles and equipment during construction.

It is anticipated that the City Council would consider the Draft EIR for certification in early 2016. If the proposed project were approved, construction would begin. The project would be constructed in three phases (referred to as Phase 1, Phase 2, and Phase 3) between the years 2016 and 2020 as shown in **Figure 3.0-2.** Site demolition work under Phase 1 would begin in summer 2016, followed by site grading and utility infrastructure work. Full occupancy of Phase 1 would occur in late 2018. Phase 2 would be constructed and occupied between the years 2016 and 2019. Construction of Phase 3 would begin in early 2018 and full occupancy of the proposed project would occur in mid-2020.

## 3.10     LEAD AND RESPONSIBLE AGENCIES

### Lead Agency

The City of Santa Clara has the principal responsibility for approving the proposed project. For this reason, the City is the "Lead Agency" as defined by CEQA and is responsible for preparation of this environmental document.

### Responsible Agencies

As defined by CEQA, "Responsible Agencies" are public agencies other than the Lead Agency that have discretionary approval over the project. The Draft EIR prepared for the proposed project would serve as the primary source of environmental information for each Responsible Agency. The following agencies are considered responsible agencies for the proposed project.

**Regional Water Quality Control Board (RWQCB).** The RWQCB is a responsible agency for this project. The proposed project will need to submit a Notice of Intent for coverage under the State National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Runoff Associated with Construction Activity (General Construction Permit).

**Department of Toxic Substances Control (DTSC).** The DTSC is a responsible agency for this project. DTSC will oversee the site mitigation under a voluntary oversight agreement in accordance with the California Land Reuse and Revitalization Act (CLRRA) program, DTSC will approve a Site Remediation Plan that includes applicable relevant and appropriate requirements, remedial action objectives and goals, cleanup approach and strategy, and the path for regulatory closure.

**Bay Area Air Quality Management District (BAAQMD).** The BAAQMD is responsible for monitoring ambient air pollutant levels throughout the basin and developing and implementing attainment strategies to ensure that future air quality will be within federal and state standards. Although no permit is required for building demolition, the BAAQMD requires notification of demolition projects of this size. Notification is performed through filing of a form provided by the BAAQMD. BAAQMD Regulation 11, Rule 2 also requires that a survey for asbestos be performed before demolition as well as the proper removal and disposal of any asbestos found.

## Trustee Agencies

As defined by CEQA, a trustee agency is a public agency having jurisdiction by law over natural resources affected by a project which are held in trust for the people of the State of California. The following agency is considered a trustee agency for the proposed project.

**California Department of Fish and Wildlife (CDFW).** The CDFW has jurisdiction with regard to the fish and wildlife of the state, designated rare or endangered native plants, and to game refuges, ecological reserves, and other areas administered by the department. Although the project site is completely developed with urban uses and natural habitats are no longer present, the site still provides habitat for some bird species and is also located near a creek, and therefore could be of interest to the CDFW.

---

## 3.11    REFERENCES

Civil Engineering Associates (CEA). 2015a. Santa Clara Square Apartments EIR Energy Report. July 15.

Civil Engineering Associates (CEA). 2015b. Santa Clara Square Preliminary Grading Calculations. March 3.

Complete Environmental Solutions, Inc. 2015. Air Quality Equipment Usage (EIR Documents) – Santa Clara Square. July 27.

HortScience, Inc. 2015. Santa Clara Square Apartments Tree Assessment. July 24.

# 4.0   ENVIRONMENTAL IMPACT ANALYSIS

## 4.0.1   INTRODUCTION

This section presents an analysis of each resource topic that has been identified through preliminary environmental analysis and the public scoping process as likely to be affected by the proposed Santa Clara Square-Residential/Mixed Use project (proposed project). Each topical subsection describes the environmental setting of the proposed project as it relates to that specific environmental topic; the impacts that could result from implementation of the proposed project; and mitigation measures that would avoid, reduce, or compensate for the significant impacts of the proposed project.

## 4.0.2   LEVELS OF SIGNIFICANCE

Under the California Environmental Quality Act (CEQA), a variety of terms are used to describe the levels of significance of adverse impacts. The definitions of terms used in this Draft EIR are presented below.

- **Significant and Unavoidable Impact.** An impact that exceeds the defined standards of significance and cannot be avoided or reduced to a less than significant level through implementation of feasible mitigation measures.

- **Significant Impact.** An impact that exceeds the defined standards of significance and that can be avoided or reduced to a less than significant level through implementation of feasible mitigation measures.

- **Potentially Significant Impact.** A significant impact that may ultimately be determined to be less than significant; the level of significance may be reduced through implementation of policies or guidelines (that are not required by statue or ordinance), or through further definition of the proposed project detail in the future. Potentially significant impacts may also be impacts for which there is not enough information to draw a firm conclusion; however, for the purpose of this Draft EIR, they are considered significant. Such impacts are equivalent to Significant Impacts and require the identification of feasible mitigation measures.

- **Less Than Significant Impact.** Impacts that are adverse but that do not exceed the specified standards of significance.

- **No Impact.** The proposed project would not create an impact.

### 4.0.3     FORMAT OF RESOURCE TOPIC SECTIONS

Each environmental topic considered in this section of the Draft EIR is addressed under six primary subsections: Introduction, Environmental Setting, Regulatory Considerations, Project Impacts and Mitigation Measures, Cumulative Impacts and Mitigation Measures, and References. An overview of the information included in these sections is provided below.

### 4.0.3.1     Introduction

The introduction section describes the topic to be analyzed and the contents of the analysis. It also provides the sources used to evaluate the potential impact of the proposed project.

### 4.0.3.2     Environmental Setting

The environmental setting section for each environmental topic provides a description of the applicable physical setting of the project area and its surroundings (e.g., existing land uses, existing soil conditions, existing transportation network and operating conditions).

CEQA requires an evaluation of a proposed project's environmental impacts against conditions existing without the project. Historically this was interpreted to mean the specific, static conditions that existed at the moment in time that the environmental review was commenced with the publication of the Notice of Preparation (NOP); however, in a 2013 court ruling[1] the California Supreme Court held that it is appropriate to evaluate a proposed project's operational impacts relative to existing conditions that reflect changes taking place in the baseline at the time of preparation of the Draft EIR, based on substantial evidence available to the Lead Agency. The specific example the Court used was: "in an EIR for a new office building, the analysis of impacts on sunlight and views in the surrounding neighborhood might reasonably take account of a larger tower already under construction on an adjacent site at the time of EIR preparation." Therefore, this Draft EIR evaluates the operational impacts of the proposed project against the conditions that can be expected to exist when the project would be built and occupied (i.e., by 2016–2020), based on information available to the Lead Agency about projects currently under construction. In addition, based on the same court ruling, the EIR analysis assumes that under the No Project scenario, the existing buildings on the project site would be fully occupied with office and R&D uses because the site and buildings have been historically occupied and could be re-tenanted at any time in their current configurations for office, R&D and light industrial uses under the current Light Industrial and Community Commercial land use designations and existing zoning without any discretionary approvals by the City of Santa Clara per Santa Clara City Code Section 18.46.030(e).

---

[1]     Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, et al (8/5/13) 57 Cal.4th 439,453.

### 4.0.3.3      Regulatory Considerations

The overview of regulatory considerations for each environmental topic is organized by agency, including applicable federal, state, regional, and local policies.

### 4.0.3.4      Project Impacts and Mitigation Measures

This subsection lists the significance criteria that are used to evaluate impacts, followed by a discussion of the impacts that would result from implementation of the proposed project. Impacts are numbered and shown in bold type, and the mitigation measures are numbered to correspond to the impact. Impacts and mitigation measures are numbered consecutively within each topical section.

### 4.0.3.5      Cumulative Impacts and Mitigation Measures

The cumulative impact analysis focuses on the change in the environment that would result from the incremental impact of the proposed project when added to the impacts of other closely related past, present, and reasonably foreseeable future projects. Cumulative impacts can result from individually minor but collectively significant project impacts taking place over a period of time.

The *State CEQA Guidelines* suggest that the analysis of cumulative impacts for each environmental factor can employ one of two methods to establish the effects of other past, current, and probable future projects. A lead agency may select a list of projects, including those outside the control of the agency, or alternatively, a summary of projections. These projections may be from an adopted general plan or related planning document, or from a prior environmental document that has been adopted or certified, and these documents may describe or evaluate regional or area-wide conditions contributing to the cumulative impact.

This Draft EIR evaluates cumulative impacts using a list of closely related past, present, and reasonably foreseeable future projects. The projects listed in **Table 4.0-1, Approved Projects** and **Table 4.0-2, Pending Projects**, are included in the cumulative analysis for the proposed project. Reasonably foreseeable future projects are defined to include approved but not built projects **(Table 4.0-1)** and projects for which applications have been submitted but have not yet been approved (**Table 4.0-2**). Of this list, 19 projects (presented in the tables in italics) are within 1.5 miles of the project site, with the closest reasonably foreseeable project located directly adjacent to the northwest of the project site. These include projects that are currently under construction or are expected to be constructed between 2016 and 2019. As the construction of some of these projects would overlap with that of the proposed project (2016 to 2019), the potential for the construction impacts of these projects to cumulate with the impacts of the proposed project are evaluated in this Draft EIR. These projects are also considered in the evaluation of cumulative operational impacts.

**Table 4.0-1**
**Approved Projects**

| Project | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| *Intel SC-13* | *2250 Mission College Boulevard* | *Development of 100,000 sf of office land use* | *2017-2020* |
| Former BAREC site/ Summerhill and Charities Housing | 90 Winchester Boulevard | Development of 165 senior apartment units | Project subject to financing. |
| Hewlett-Packard/Agilent Technologies | 5301 Stevens Creek Boulevard | Development of 727,500 sf of office and research and development | 2025s |
| 3 Com/Cognac Great America | 5402 Great American Parkway | Development of 278,000 sf of office/research and development | 2017-2020 |
| *2350 Mission College Boulevard Office Retail* | *2350 Mission College Boulevard* | *Development of 300,000 sf of office in two buildings and a six-story parking garage; 6,000 sf of retail* | *2016-2018* |
| *Sobrato Office Development* | *4301, 4401, and 4551 Great America Parkway* | *Development of two 12-story office buildings totaling 718,000 sf and one four-story parking garage on a developed property with two 300,000 sf existing office buildings that are to remain* | *2025* |
| Fairfield Development | 900 Kiely Boulevard | Development of 766 housing units, 57 single-family development, 68 row houses, 116 townhouses, and 525 apartments – Modification to current PD-MC approval allowing additional 27 apartment units | Phase 1 for Northern apartment building complete. Phase II starting for south apartment building. Single-family development and townhouses under construction. |
| *Augustine Bowers Industrial Campus/Equity Office* | *2620–2727 Augustine Drive (includes properties on Bowers Avenue and Scott Boulevard)* | *Development of 1,862,100 sf of office, 13,000 sf of office-serving accessory retail, and 125,000 sf of specialty retail.* | 2017-2020 |
| *NVIDIA* | *2600, 2800 San Tomas Expressway, and 2400 Condensa Street* | *Development of 1,200,000 sf of office and high-tech lab buildings replacing approx. 690,000 sf of office space* | *2017-2020* |
| *Mission College Master Plan* | *Mission College Boulevard and Great America Parkway* | *Development of additional 427,000 sf* | *2017-2020* |
| *Yahoo!* | *5010 Old Ironsides Drive* | *Phased development of a 3,060,000 sf office/R&D campus consisting of 13 six-story buildings, three commons buildings, surface parking & two levels of below grade parking* | *2035* |
| *Menlo Equities Office Park* | *3333 Scott Boulevard* | *Development of 735,000 sf (five buildings) office space* | *Some phases completed* |

| Project | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| Mellon Bank/Perry Arrillaga | 5403 Stevens Creek | Development of two six-story office buildings totaling 375,000 sf and one parking structure with 1,281 spaces and 38 surface parking spaces in conjunction with demolition of existing one-story commercial building | One building completed |
| *Patrick Duran* | *4888 Patrick Henry* | *Development of 13,000 sf addition to existing industrial/office* | *2017-2018* |
| Calvary Southern Baptist Church | 3137 Forbes Avenue | Development of two-story building, 14,000+ sf and parking, landscaping improvements | 2016-2020 |
| Santa Clara University | 1043 Alviso St. | Development of four-story parking garage and three-story Art and Art History building in conjunction with removal/demo/relocation of structures on the project site | Garage completed, Art building under construction |
| Six single-family project (formerly 9 unit townhome condominium project) | 3499 The Alameda | Rezoning to PD from ML to facilitate development of six single-family homes | Under construction |
| *James Redfield* | *4306 Fillmore Street* | *Rezoning single-family property to PD to allow lot split and building of second new SFD on smaller lots.* | *Under construction* |
| SCU Steve Brodie | 1079 Alviso Street | Rezoning of one parcel to allow Larrder House relocation | NA |
| *Sobrato* | *2200 Lawson Lane* | *Amend PD zoning (PLN2007-06379) and Development Agreement (PLN2008-06880) for approved office R&D campus to increase building sf of allowable office space from 516,000 to 613,800 sf* | *One to two years for new permit; Previously approved project under construction* |
| *Office Building* | *3000 Bowers Avenue* | *Development of two five-story 150,000 sf office buildings, one two-story 17,400 sf amenity building, and six-story parking structure with a total of 1,200 parking spaces in conjunction with demolition of an existing 100,042 sf two-story office building* | *Under construction* |
| Silicon Valley Builders | 2585 El Camino Real | Development of four-story 222 unit multi-family residential development with wrap parking structure with 375 on-site parking spaces in conjunction with demolition of commercial building | Under construction |
| Silicon Valley Builders | 555 Saratoga Avenue | Development of three-story condominium project with 13 units | 2017 |
| *SVP* | *2805 and 2807 Mission College Boulevard* | *Data center retrofit in existing office building* | *2016-2017* |

| Project | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| *Applied Materials* | *3303 Scott Blvd.* | *Development of three story office building at approximately 78,000 sf* | *NA* |
| Silicon Sage Builders | 1460 Monroe Avenue | Development of four-story mixed-use development 1,800 sf of ground floor retail and 18 residential units above; 43 surface parking spaces | Under construction |
| Prometheus | 45 Buckingham Drive and 66 Saratoga Avenue | Development of four-story 222-unit multi-family residential development with wrap parking structure with 375 on-site parking spaces in conjunction with demolition of existing commercial building | Site work commenced |
| *U-Haul and Self-Storage* | *2121 Laurelwood Road* | *Rescind PD and rezone to ML to allow U-Haul facility and self-storage business* | *Under construction* |
| David Tymn for Mozart Dev. | 3051 Homestead Road | Demolish existing single-family residence, and replacement with eight detached homes | Under construction |
| *Sobrato* | *4301 Great America Parkway* | *Construct up to 718,000 square feet of new office space in up to 1,018,000 square feet of office development; up to two, five-level parking structures with up to 3,360 total parking spaces;* | *2016-2018* |
| Dennis Chargin | 865 Pomeroy Avenue | Development of additional 20 one-bedroom apartment units within an existing apartment complex | Under construction |
| *Tiemo Mehner/CoreSite* | *3001 Coronado Drive* | *Development of two three-story 92,147 sf buildings and other improvements such as bio-swales, parking, and landscaping.* | *Under construction* |
| BNP Leasing Corp | 5450 Great America Parkway | Development of a 6-story office building on an existing office/R&D site with 3 office buildings and subgrade and surface parking | 2015 |
| Charles McKeag | 166 Saratoga Avenue | Development of 33-unit residential project (phase I) on 1.74-acre site. Total building area 54,000 sf | TBD |
| Silicon Valley Builders | 1313 Franklin Street | Development of multifamily residential project with 46 units and 16,000 sf or retail space and four stories | TBD |
| *Tiemo Mehner* | *3001 and 3032 Coronado Drive* | *AC and DA for two new data centers along with vacation of a portion of Coronado Drive* | *Under construction* |
| *DH Family Partnership* | *750 Walsh Avenue* | *Development of a new 57,000 sf industrial warehouse building and surface parking and site improvement* | *Under construction* |
| *TI and ARC* | *2930 Corvin Drive* | *Convert an existing industrial building into a data center (2.5 MW energy use)* | *TBD* |
| Oracle* | 4090 and 4100 Network Circle | Development of one new 3-story building and one new single-story building with associated site improvements to an existing office campus | 2016-2017 |

| Project | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| Cogswell College | 5302 Betsy Ross Drive | Cogswell Polytechnical College - private educational institution | 2015 |
| Mehdi Shemirizi | 1480 Main Street | Development of a mixed use project with 12 multi-family units and 1,000 square feet of retail. | 2015-2016 |
| *Jane Vaughn* | *3333 Scott Boulevard* | *Development of 1.316 million square feet of office buildings.* | *Under construction* |
| JOMA Studio Architects | 1701 Lawrence Road | Development of nine attached single family homes. | 2015-2016 |
| Eli Engleman | 990 Wren Avenue | Construction of five new detached two story single family homes with attached garage. | 2015-2016 |
| -- | 3700 El Camino Real | Development of 87,000 square feet of retail and commercial and 476 multi-family units. | 2015-2016 |
| Santa Clara University | 455 El Camino Real | Re-use of existing office building for SCU off-campus graduate studies. | 2015-2016 |
| *Menlo Equities* | *3345 Scott Boulevard* | *Development of six-story Building D.* | *2015-2016* |
| Michael Fischer | 820 Civic Center Drive | Development of three-unit townhouses. | 2015-2016 |

*Source: City of Santa Clara, 2015*
*sf = square feet*
*NA = Information not available*
*Italic indicates that the project is within 1.5 miles of the proposed project.*
*[1] All construction periods are in reference to 2015.*

**Table 4.0-2**
**Pending Projects**

| Applicant | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| Scott Menard | 3305 Kifer Road | Development of 48 attached townhomes and stacked flats with 109 parking spaces and open space. | TBD |
| Irvine Company | 575 Benton Street | Development of a five-story mixed use building consisting of 27,000 square feet of commercial space and 385 multi-family units. | 2016-2020 |
| Lennar Commercial | 3607 Kifer Road | Development of an off-site five-level parking structure at 3607 Tahoe Way and a five-story 199,460 square foot office building. | TBD |
| Pinn Bros | 1890 El Camino Real | Development of 28 townhomes | 2017-2018 |
| *Johnathon Fearn/ Summerhill Homes* | *3505 Kifer Road* | *Development of 996 residential units with 37,000 square foot retail and associated open space, landscaping, parking and other improvements as part of the Lawrence Station Area Plan* | *Two to five years* |
| Westfield Valley Fair | 2855 Stevens Creek Boulevard | New Movie Theater complex and new retail tenant space and free standing bank building | 2016 |
| SCU Steve Brodie | 455 El Camino Real | Re-use of existing office building for SCU for graduate studies off-campus instruction/occupation | 2015-2016 |
| City Ventures | 1525 Alviso Street | Development of 40 townhomes in a three-story structure (next to Mission Inn motel) | Two to three years |
| Summerhill Homes | 2230 El Camino Real | Demolition of existing commercial buildings and the development of 164 apartment units | Two years |
| Rubicon Investments | 100 North Winchester Boulevard | Demolition of an existing 3 story building and the development of a 60 unit senior apartment community | One to two years |
| *Jon Shank* | *1220 Memorex Drive* | *Development of a self-storage facility* | *2016* |
| Sobrato | 2250 El Camino Real | Development of 48 apartments on three floors over podium parking (Western Motel site) | 2017 |
| *Related* | *5155 Stars and Stripes Drive* | *Development of up to 8,000,000 sf of office, commercial and residential space along with construction of parking facilities, provision of open space, and public and private infrastructure improvements and/or relocations* | *Start 2017 (Phased over 20 years)* |
| Kurt Anderson | 2891 Homestead Road | Replacement of a single family residence and detached garage with a 13-unit two- and three-story townhome development on a podium over at-grade parking | 2015-2016 |

| Applicant | Location | Description | Anticipated Year Built[1] |
|---|---|---|---|
| *Montana Lowe Enterprises (Centennial Gateway LLC)* | *5120 Star and Stripes Drive* | *Development of up to 730,000 sf of office, retail, restaurant, and hotel space; pedestrian amenity areas; structured/podium parking (possibly connected to existing City parking structure); site, landscape improvements, and expansion of proposed parcels into the existing right of way* | *2016* |
| Martha Polanco/ Dory Marhamat | 1075 Pomeroy Avenue | Development of five-unit townhome project | 2014–2015 |
| Jerry Mangono | 2255 The Alameda | Rezone of small parcel to include one living unit and office | NA |
| Mike Sullivan for Citation Homes | 2490 and 2500 El Camino Real | Development of eight contiguous parcels (2490 and 2500 El Camino Real) totaling 8.4 acres with a 100 percent residential project consisting of up to 492 multifamily units and 19 townhomes (at approx. 60 du/ac) | Two to five years |
| Swim Center at Central Park | 909 Kiely Boulevard | Two Olympic-sized pools, special event venue. Replacement and possible enhancement of current facilities. | Four to 10 years |
| *MCA* | *3033 Scott Boulevard* | *Expansion of activities at Muslim Community Association to include new high school and doubling of student enrollment.* | *NA* |

*Source: City of Santa Clara, 2015*
*sf = square feet*
*- = Information not available*
*NA = Not applicable*
*Italic indicates that the project is within 1.5 miles of the proposed project.*
*[1] All dates for construction timeframes are in reference to 2015.*

However, the analysis of cumulative traffic impacts in **Section 4.11** does not rely on a list of projects but is instead based on regional projections of growth. The cumulative traffic analysis is based on the VTA traffic model that utilizes the Association of Bay Area Governments regional growth projections including the City of Santa Clara's General Plan growth projections. Two cumulative traffic scenarios are evaluated in this Draft EIR. The first cumulative scenario, termed Cumulative (2040) conditions, refers to the Year 2040 traffic volumes based on forecasts from the VTA traffic model, which contains Citywide development and roadway improvements expected to occur by the Year 2040. The second cumulative scenario termed City Place Cumulative (2040) conditions includes the City Place project. The City Place project is a large mixed use but largely office development, proposed but not yet approved in north Santa Clara (listed in **Table 4.0-2** above as a project proposed by Related at 5155 Stars and Stripes Drive, Santa Clara).

The cumulative impacts discussion describes the cumulative impacts of the proposed project and determines whether implementation of the proposed project in combination with other foreseeable development would result in a significant cumulative impact, and, if so, whether the project's contribution to the significant cumulative impact would be cumulatively considerable.

Section 15130 of the *State CEQA Guidelines* provides direction regarding cumulative impact analysis as follows:

- an EIR should not discuss cumulative impacts that do not result in part from the proposed project;

- a lead agency may determine that an identified cumulative impact is less than significant, and shall briefly identify facts and analysis in the EIR supporting its determination;

- a lead agency may determine a project's incremental effect is not cumulatively considerable, and therefore is not significant, and shall briefly describe in the EIR the basis of its determination; and

- a lead agency may determine a project's cumulatively considerable contribution to a significant cumulative impact may be rendered less than cumulatively considerable and therefore residually not significant, if the project implements or funds its fair share of mitigation measure or measures designed to alleviate the cumulative impact.

## 4.0.3.6    References Section

This subsection lists the references used to prepare the environmental setting and impact analysis for each section of the EIR.

# 4.1   AESTHETICS

## 4.1.1   INTRODUCTION

This section describes the existing visual setting, focusing on the visual character of the project site and views from surrounding public areas, and the potential for the proposed project to affect those conditions. The analysis of the proposed project's potential visual effects is based on field observations of the project site and surroundings in addition to a review of the proposed project's conceptual drawings and technical data, aerial and ground-level photographs of the project area, and public planning documents.

## 4.1.2   ENVIRONMENTAL SETTING

### 4.1.2.1   Regional Visual Setting

The City of Santa Clara is located in the Santa Clara Valley near the southwestern end of San Francisco Bay (see **Figure 3.0-1, Project Location**). The Santa Clara Valley is bordered on the west by the Santa Cruz Mountains and on the east by the Diablo Range. The City of Santa Clara is bordered by San Jose to the north, east and south, and Sunnyvale and Cupertino to the west. The City is mostly built out, and development predominates the visual setting. Residential and commercial uses are located primarily in the southern portion of the City, while industrial uses exist primarily in the northern portion of the City.

### 4.1.2.2   Project Site and Vicinity Visual Setting

*Existing Visual Setting*

The approximately 33.4-acre project site is currently developed with commercial/business park buildings surrounded by parking lots and mature landscaping. Visual elements on the project site vary among the parcels. Two parcels located to the north of Scott Boulevard and to the east of Montgomery Drive are developed with one-story buildings with red tile roofs and sidings of wood and glass windows with concrete columns. The parcel located to the north of Scott Boulevard and west of Montgomery Drive is developed with one-story buildings with sidings painted shades of light grey. The parcel to the south of Scott Boulevard directly adjacent to San Tomas Aquino Creek is developed with one-story buildings with grey siding covering the upper half of the building and large multi-pane windows interspersed by blue siding. The parcel located to the south of Scott Boulevard further from San Tomas Aquino Creek is developed with a two-story building, with cream colored concrete walls and a red tiled overhang. Paved (asphalt and concrete) parking lots and walkways are interspersed among the buildings. Landscaped areas with irrigated lawn, shrubs, and mature trees line the buildings and parking lots. Mature trees,

including redwood trees, olive trees, and sycamore, are concentrated on the periphery of the parcels along the roadways.

The site is visible from local roadways, including Scott Boulevard, Augustine Drive, Octavius Drive, and Montgomery Drive, and partially visible from other nearby roadways. All buildings are visible, although the mature trees along the roadways do provide some screening. However, a majority of the trees on the site are deciduous, which lose their leaves during fall and winter.

### *Surrounding Land Uses*

As shown in **Figure 3.0-1, Project Location,** the area surrounding the project site is fully developed and consists primarily of commercial and institutional uses. Business parks with offices and industrial uses surround the project site. San Tomas Aquino Creek and a bicycle and pedestrian path traverse the eastern boundary of the site.

### 4.1.2.3    Public Views of the Project Site

Based on a reconnaissance of the project site conducted on April 30, 2015, public views of the area are those observed from the roadways that are adjacent to the project site. In order to document the existing visual character of the project site and its surroundings, photographs were taken from locations where public views of the site are most attainable. **Figure 4.1-1, Key to Viewpoint Locations**, identifies the location of photograph viewpoints taken from public vantage points in the project area and its surroundings. These photographs show the various viewpoints described below.

### *Viewpoint 1: Scott Boulevard and Octavius Drive facing North*

As shown in **Figure 4.1-2, View 1: Scott Boulevard and Octavius Drive facing North**, the most prominent features visible from this viewpoint are the entrance driveway, mature trees, and the grassy berm along the perimeter. Utility boxes and a sign are also visible. Small portions of the existing buildings and a parking lot with cars parked are visible in the background, but they are partially screened by the mature trees.

### *Viewpoint 2: Augustine Drive and Octavius Drive facing Southwest*

As shown in **Figure 4.1-2, View 2: Augustine Drive and Octavius Drive facing Southwest**, the most prominent features of the project site from this viewpoint is one of the buildings surrounded by mature trees and a grassy berm in the foreground. Partial views of parked cars located in parking lots adjacent to the building are also available.



SOURCE: Impact Sciences and Google Earth, July 2015

FIGURE **4.1-1**

Key to Viewpoint Locations

1176.002•07/15

**SOURCE:** Impact Sciences, Inc., July 2015

FIGURE **4.1–2**

Existing Viewpoints 1 and 2

### *Viewpoint 3: Augustine Drive and Montgomery Street facing South*

As shown in **Figure 4.1-3, View 3: Augustine Drive and Montgomery Street facing South**, the most prominent features on the project site visible from this viewpoint are the mature trees in the foreground on the eastern side of the road and an existing building in the foreground on the western side of the road. Scott Boulevard is visible at the end of Montgomery Street. A partial view of a parking lot on the east side of the street that is screened by a grassy berm is also available from this viewpoint.

### *Viewpoint 4: Scott Boulevard facing Southeast*

As shown in **Figure 4.1-3, View 4: Scott Boulevard facing Southeast**, the most prominent features of the project site from this viewpoint are mature evergreen trees in the foreground and a two-story office building in the background. Beyond the two-story building is a one story building on the adjacent parcel.

### *Viewpoint 5: San Tomas Aquino Trail (South of Scott Boulevard) facing Southwest*

As shown in **Figure 4.1-4, View 5: San Tomas Aquino Trail (South of Scott Boulevard) facing Southwest**, the most prominent features of the project site from this viewpoint is a one-story building directly adjacent to the trail. A partial view of a parking lot and the perimeter driveway serving the building is also available from this viewpoint. Vegetation, consisting of ivy, shrubs, and a mature evergreen tree, is also visible in the foreground.

### *Viewpoint 6: San Tomas Aquino Trail (South of Scott Boulevard) facing Northwest*

As shown in **Figure 4.1-4, View 6: San Tomas Aquino Trail (South of Scott Boulevard) facing Northwest**, the most prominent features of the project site from this viewpoint is a portion of the one story building and some mature trees. Vegetation including ivy and shrubs as well as a chain-link fence is also visible in the foreground.

### *Viewpoint 7: Scott Boulevard facing Northwest*

As shown in **Figure 4.1-5, View 7: Scott Boulevard facing Northwest**, the most prominent features of the project site from this viewpoint are mature evergreen trees lining Scott Boulevard and an ivy covered berm in the foreground. Tarped spoils and a one-story red tile roofed building are located in the background.

*Viewpoint 8: San Tomas Aquino Trail (North of Scott Boulevard) facing Southwest*

As shown in **Figure 4.1-5, View 8: San Tomas Aquino Trail (North of Scott Boulevard) facing Southwest**, the most prominent feature of the project site from this viewpoint is a red tile roofed single-story building that is partially obscured by a hedge. Mature trees separate the existing building and the trail.

*Existing Light and Glare*

There are several sources of light and glare on the project site: streetlights, vehicles, and building windows. The major light sources in the project vicinity include the office and industrial uses to the north, west, and south of the site, and car headlights and streetlights associated with Scott Boulevard. No lighting is provided along San Tomas Aquino Creek to the east. Car headlights add a substantial amount of nighttime light in the project area along Scott Boulevard due to the high volume of vehicles that use that roadway. Sources of glare include daytime reflections off structures and vehicles traveling on the roadways surrounding the site and vehicles parked in surface parking lots, and headlights on the same roadways at night.

## 4.1.3    REGULATORY CONSIDERATIONS

There are no federal or state regulations related to aesthetics that apply to the proposed project.

### 4.1.3.1    Local Plans and Policies

*City of Santa Clara General Plan*

The City of Santa Clara General Plan contains transition goals and policies relating to the compatibility between existing and new development in the City. General Plan goals and policies relevant to the proposed project are as follows:

**Transition Goals**

**Goal 5.5.2-G1**          High quality, enjoyable and livable neighborhoods.

**Goal 5.5.2-G2**          Preservation of the character of individual neighborhoods.

**Goal 5.5.2-G3**          New development that is compatible with adjacent existing and planned residential neighborhoods.



SOURCE: Impact Sciences, Inc., July 2015

FIGURE **4.1-3**

Existing Viewpoints 3 and 4

1176.002•07/15

**SOURCE:** Impact Sciences, Inc., July 2015

FIGURE **4.1-4**



Existing Viewpoints 5 and 6

1176.002•07/15



**SOURCE:** Impact Sciences, Inc., July 2015

FIGURE **4.1–5**

Existing Viewpoints 7 and 8

1176.002•07/15

**Transition Policies**

**Policy 5.5.2-P1**     Require that new development incorporate building articulation and architectural features, including front doors, windows, stoops, porches or bay windows along street frontages, to integrate new development into existing neighborhoods.

**Policy 5.5.2-P2**     Implement design review guidelines for setback, heights, materials, massing, articulation, and other standards to support Transition Policies and promote neighborhood compatibility.

**Policy 5.5.2-P5**     Require that new development provide an appropriate transition to surrounding neighborhoods.

**Policy 5.5.2-P6**     Adjust new building height, scale and massing along the site perimeter abutting planned lower-intensity uses.

**Policy 5.5.2-P7**     For buildings of three stories or greater, increase the setback of upper stories where they abut lower-intensity residential uses.

**Policy 5.5.2-P12**    Screen loading and trash areas to preclude visibility from off-site and public streets.

## 4.1.4     IMPACTS AND MITIGATION MEASURES

## 4.1.4.1     Significance Criteria

In accordance with Appendix G of the *California Environmental Quality Act (CEQA) Guidelines*, the impacts of the proposed project related to aesthetics would be considered significant if it would:

- have a substantial adverse effect on a scenic vista;

- substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway;

- substantially degrade the existing visual character or quality of the site and its surroundings; or

- create a new source of substantial light or glare which would adversely affect day or nighttime views in the area.

## 4.1.4.2     Methodology

Project conditions were evaluated against the existing visual character of the project site in the context of existing uses, vegetation, and visual character. The potential impacts to the visual character of the site and surroundings were evaluated in terms of massing, size, and type of land use. The proposed project's potential to introduce substantial new lighting and/or create new sources of glare that could affect nearby existing uses also was evaluated in order to determine potential impacts to visual resources.

## 4.1.4.3     Issues Not Discussed Further

The proposed project would not have an adverse effect on a scenic vista because the City of Santa Clara General Plan does not identify the project site or its surroundings as part of a scenic vista. Furthermore, due to existing urban development in the project vicinity, there are no viewing locations in the project vicinity that provide views of any scenic vistas. Therefore, the proposed residential/mixed use project would not block any public views of known scenic vistas.

Highway 101, located about one city block to the north of the project site, is not designated a scenic highway by the State of California (Caltrans 2007). Therefore, the proposed project would have no impact on scenic resources within a state scenic highway.

## 4.1.4.4     Project Impacts and Mitigation Measures

**Impact AES-1:**     **Redevelopment of the project site would not substantially degrade the visual character of the project area. (***Less than Significant***)**

The proposed project would alter the visual character of the project site by replacing existing commercial/business park buildings and landscaping with seven new residential complexes and landscaping. Visual impacts that could occur during the demolition, grading, building construction, and occupancy of the proposed project are discussed below.

### *Construction*

The existing buildings on the site would be demolished, the site would be graded, and additional infrastructure would be installed to support the residential and retail uses proposed for the site prior to construction of the proposed complexes. Of the 448 existing trees on the site, 65 trees would be preserved, 33 trees would be relocated, and 350 trees would be removed during the demolition phase.  During the construction of the proposed project, the site would be graded as necessary to accommodate the future buildings and wood framing up to five-stories would be constructed for the residential units and mixed uses. Once the residential and mixed-use buildings are completed for each construction phase,

architectural finishes would be applied and landscaping installed towards the end of the construction phase. The appearance of the project site would vary depending on the work and equipment being used at the site. As is customary for all new construction, the site would be enclosed with temporary construction fencing and generally most of the on-site storage of soils, pipes, and building materials would not be visible to motorists using nearby streets. However, when in use on the site, large construction equipment would be visible above the perimeter fence and the buildings under construction would be visible. The visual effects of construction activities would be temporary (i.e., for the duration of the construction activities) and the project site would appear similar to other construction sites, which is not unusual in urban areas. Furthermore, the project vicinity is not a scenic area where views of construction activities could adversely affect the scenic quality. Therefore, project construction activities would not result in a significant visual impact.

## Project Completion and Occupancy

Upon project completion, the long-term visual character of the project site would be established, including the final size and bulk of the structures, the architectural finishes, and landscaping. The following provides a brief discussion of how the proposed project would alter the existing views of the site and its surroundings, followed by a discussion of how the project would affect the existing visual character of the project site and its surroundings.

### Views from Scott Boulevard

Views of the project site from Scott Boulevard looking to the north currently consist of mature trees and grassy berms that screen most of the existing parking lots and structures on the site. The grassy berms and some of the trees would be removed and the project site perimeter along this roadway would be hardscaped with a parkway-style sidewalk and landscaped with shrubs, hedges, and trees. Several mature trees along Scott Boulevard would be retained and protected. The proposed retail at the corner of Scott Boulevard and Main Street would have signage indicating what type of stores would be available. The other buildings visible from Scott Boulevard would be four and five story apartments. Views of courtyards would be available at three locations where there are insets in the apartment buildings (refer to **Figure 3.0-3, Scott Boulevard Elevations** in **Section 3.0, Project Description**).

The building complexes would be finished in the Formal Italian, Palladian, Formal Spanish, and Early California styles with design elements that include stucco walls, a low-pitched tile roof, and small balconies with decorative iron trims. The height of the apartment complexes and retail buildings would be about 70 feet above finished grade. At locations with styled architectural elements such as towers, the height would be up to approximately 80 feet. The proposed buildings would be taller than the existing

structures. Therefore, the visibility of the project site development would be greater as compared to existing conditions.

**Views from Octavius Drive**

Views of the project site from Octavius Drive to the east and west currently consist of single-story office buildings with red tiled roofs that are partially obscured by mature trees and grassy berms. In addition, a view of a large parking lot is available from Octavius Drive to the west. Under the proposed project, the berms, many of the trees, and the parking lot on the west side of Octavius Drive would be replaced by an open grassy park area with walkways and trees. A large courtyard area inset amid one of the apartment complexes would provide two pools with poolside seating. The proposed four- to five-story apartment complexes would be constructed behind the open space area. A similar apartment complex would also be constructed on the eastern side of Octavius Drive. Trees would be planted along the roadway and a pool would be visible from the roadway inset amid the complex. As the proposed buildings would be taller than the existing structures, the visibility of project site development from Octavius Drive would be greater compared to existing conditions (**Figure 4.1-6, Park Perspective)**.

**Views from Augustine Drive**

Views of the project site from Augustine Drive to the south currently consist of one- and two-story buildings with red tiled roofs that are partially obscured by mature trees and berms as well as views of adjacent parking lots. Under the proposed project, the berms, many of the trees, and the parking lots would be removed and the project site perimeter along this roadway would be hardscaped with a parkway-style sidewalk and landscaped with planters, hedges, and trees including palm trees. Retail space would be constructed along Augustine Drive between Montgomery Drive and Main Street. Outdoor seating areas and signage would be visible from the street. As the proposed buildings would be taller than the existing structures, the visibility of project site development from Augustine Drive would increase compared to existing conditions (refer to **Figure 3.0-4, Augustine Drive Elevations** in **Section 3.0, Project Description**).

**Views from Montgomery Drive**

Views of the project site from Montgomery Drive to the east and west currently consist of single-story buildings that are partially obscured by mature trees and berms as well as views of adjacent parking lots. Under the proposed project, the berm, trees, and parking lots would be removed and the project site perimeter along this roadway would be hardscaped with a parkway-style sidewalk and landscaped with shrubs and trees. A promenade would be constructed on the west side between Montgomery Drive and Main Street that would connect the apartment complexes on the eastern and western sides of

Montgomery Drive to the retail areas along Main Street. Leasing offices would be constructed on the ground floor along Montgomery Drive, adjacent to the promenade entryways. As the proposed buildings would be taller, the visibility of project site development from Montgomery Drive would increase compared to existing conditions (**Figure 4.1-7, Montgomery Drive Perspective**).

**Views from San Tomas Aquino Creek Trail**

Views of the project site from San Tomas Aquino Creek Trail to the south and north of Scott Boulevard currently consist of one- to two story commercial and office buildings that are partially obscured by mature trees as well as views of the adjacent parking lots. Under the proposed project, the majority of the visible trees except a few evergreen trees and the parking lots would be removed. The area between the future four- to five-story apartment complexes would be landscaped with shrubs and trees along the creek trail. As the proposed buildings would be taller, the visibility of project site development from San Tomas Aquino Creek Trail would increase compared to existing conditions (**Figure 4.1-8, San Tomas Aquino Creek Trail Perspective**).

## *Conclusion*

Implementation of the proposed project would increase the height and density of development on the project site relative to existing conditions on and adjacent to the site. However, parcels to the north have been approved and are under construction to build multiple-story, high-rise office buildings and parking garages. Although the proposed project would increase the intensity of development on the project site, it would not constitute a substantial degradation in the visual character of the project area, as it would convert the land use on the site from light industrial to primarily residential and mixed-use, which would be compatible with the City's long-term goals. The ground floor retail uses would be visually compatible with the approved and under construction retail uses located across Main Street and Bowers Avenue. The buildings would be finished in the Formal Italian, Palladian, Formal Spanish, and Early California styles, which includes stucco walls and a low-pitched tile roof similar to some of the existing buildings on the project site but with a higher level of architectural detail for windows and balconies than currently exists.

The removal of the berms and many of the existing trees on the project site would alter the appearance of the project site. Although the proposed project would remove 350 of the 448 trees currently on the site, the landscaping plan calls for planting of more than 1,000 trees of the following (HortScience 2015). The trees would consist of varying heights and would help to soften views of the building complexes from the surrounding roadways, including Scott Boulevard, Octavius Drive, Augustine Drive, Montgomery Drive, and Main Street (as shown in **Figures 3.0-3, 3.0-4, 4.1-7**, **4.1-8**, and **4.1-9**). Over time, the newly planted trees would grow into larger trees more comparable in size to the existing trees. As discussed in **Chapter**

**3.0, Project Description**, the proposed nursery stock size would be 24- and 36-inch boxes. It may take 10 to 20 years before the trees are of a similar fullness as the existing trees. However, there would be a substantially greater number of trees and shrubs planted as part of the proposed project compared to the existing landscaping, which would compensate for the smaller size of the new trees before they achieve full maturity.

Although implementation of the proposed project would substantially change the visual character of the project site, the project would not substantially degrade the visual character of the project area during construction and upon completion of construction, because the project site is already developed with urban uses. The proposed project would enhance the visual character of the site by incorporating higher quality architectural finishes, open space recreational areas, and integrated landscaping with a greater number of trees than currently exist on the site. The impact of the proposed project related to visual character would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

----

**Impact AES-2:**      **Implementation of the proposed project would not introduce a new source of substantial light and glare. (*Less than Significant*)**

The project site is currently developed with several sources of light and glare, including streetlights, building interiors, building windows, and vehicles parked in the parking lots, which, depending on sun angles, produce varying amounts of glare. The proposed project would not have any surface parking lots, reducing the potential for glare from parked vehicles and parking lot lighting. Glare from building windows could potentially increase under the proposed project as the surface area of building windows would be greater than under existing conditions. However, some of the building windows would be recessed behind balconies. In addition, non-reflective materials would be used in the construction of the proposed buildings. Overall, the proposed project would not result in a substantial new source of glare.

Similar to existing conditions, street lighting would be provided along the perimeter of the project site and in the parking garages and courtyards. Exterior lighting would be designed to minimize light spill. Furthermore, trees would line the perimeter of the site, which would also minimize the potential for light spill. Given the type of retail included in the proposed project, these facilities are not expected to operate through the nighttime hours, and therefore would not result in increased nighttime lighting in the area.



**SOURCE:** Impact Sciences, July 2015

FIGURE **4.1-6**

Park Perspective

1176.002•07/15



**SOURCE:** Impact Sciences, July 2015

FIGURE **4.1-7**

Montgomery Drive Perspective

1176.002•07/15



**SOURCE:** Impact Sciences, July 2015

FIGURE **4.1-8**

San Tomas Aquino Creek Trail Perspective

1176.002•07/15

Interior nighttime lighting would be more visible than under existing conditions due to the nature of residential uses and the greater heights of the buildings; however, the diffused light showing through windows would not be considered a substantial new source of light. Furthermore, there are no residential receptors in the immediate vicinity of the project site that could be affected by increased nighttime lighting on the project site. The impact related to light and glare would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

## 4.1.4.5    Cumulative Impacts and Mitigation Measures

**Cumulative Impact AES-1:**    **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative visual impacts. (*Less than Significant*)**

The project is located in an area that is experiencing extensive redevelopment. The area to the north of the project site (north of Augustine Drive) and the area to the east of the project site between Scott Boulevard and Augustine Drive were previously approved by the City for redevelopment. The area to the north is approved for the construction of approximately 1.9 million square feet of Class A office space, and the area to the east is approved for development of 138,000 square feet of retail space for a total of 2 million square feet of development. Construction is underway in the area to the north of Augustine Drive. Several additional projects are approved or pending approval with the City on properties to the south and west of the project site. Therefore, the visual character of the project vicinity is expected to change from current conditions. However, the cumulative effect of all these projects on the visual character and quality of the area would not be adverse because the entire area would be transformed from lower-density urban development typical of the 1970s and 1980s to high-density development that is more typical of modern-day areas adjacent to Bay Area freeways such as Highway 101, including the areas on both sides of Highway 101 in the project vicinity. Additionally, cumulative projects in the project vicinity are not expected to cause significant impacts related to light and glare given the existing light sources already present in the City and the fact that the majority of the planned development would occur on currently developed sites with existing light and glare. Therefore, cumulative impacts to visual resources are considered less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

### 4.1.5    REFERENCES

Caltrans. 2007. California Scenic Highway Mapping System. Updated December 2007. http://www.dot.ca.gov/hq/LandArch/scenic_highways/. Accessed July 31, 2015.

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan*. Adopted November 2010, last amended December 2014.

HortScience, Inc. 2015. *Santa Clara Square Apartments Tree Assessment*. July 24.

HortScience, Inc. 2014a. *Santa Clara Square Apartments Tree Survey*. September 24.

HortScience, Inc. 2014b. *Santa Clara Square South Tree Survey*. November 28.

# 4.2   AIR QUALITY

## 4.2.1    INTRODUCTION

This section presents existing air quality conditions in the project area (including the project site, the applicable air district jurisdiction, and the air basin) and analyzes the potential air quality impacts, both temporary (i.e., construction) and long term (i.e., operational), from the implementation of the proposed Santa Clara Square Residential/Mixed Use project. Implementation of the proposed project includes relocation and consolidation of soil impacted with elevated arsenic, lead, and organochlorine pesticides and construction activities associated with this soil remediation are included in the analysis. The section also provides a description of the regulatory framework for air quality management on a federal, state, regional, and local level. The section is based on an Air Quality and Greenhouse Gas Emission Assessment prepared for the proposed project by Illingworth & Rodkin, Inc., dated September 30, 2015. The report is included in **Appendix 4.2** of this Draft EIR**.**

## 4.2.2    ENVIRONMENTAL SETTING

### 4.2.2.1    Climate and Meteorology

The project site is located in the City of Santa Clara, which is situated in the Santa Clara Valley in the southern portion of the San Francisco Bay and within the boundaries of the San Francisco Bay Area Air Basin (SFBAAB). The SFBAAB includes all of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, and Santa Clara counties as well as the southern half of Sonoma County and the southwestern portion of Solano County.

The climate of the Bay Area is Mediterranean in character, with mild, rainy winter weather from November through March and warm, dry weather from June through October. Pollutant emissions are high in the Santa Clara Valley, especially from motor vehicle congestion. High summer temperatures, stable air, and mountains surrounding the valley combine to promote ozone formation. In addition to the many local sources of pollution, prevailing winds carry ozone precursors from San Francisco, San Mateo, and Alameda counties to the Santa Clara Valley. The valley tends to channel pollutants to the southeast. In addition, on summer days with low-level inversions, ozone can be recirculated by southerly drainage flows in the late evening and early morning and by the prevailing northwesterly winds in the afternoon. A similar recirculation pattern occurs in the winter, affecting levels of carbon monoxide and particulate matter. This movement of the air up and down the valley, during these periods, increases the concentrations of the pollutants and their correlative impacts.

Mean minimum temperatures in the project area range from high 50s in the summer to low 40s in the winter. Mean maximum summer temperatures are in the low 80s and winter maximum temperatures in the high 50s. Winds in the valley are greatly influenced by the terrain, resulting in a mean prevailing flow that roughly parallels the valley's northwest-southeast axis. A north-northwesterly sea breeze flows through the valley during the afternoon and early evening, and a light south-southeasterly drainage flow occurs during the late evening and early morning. In the summer the southern end of the valley sometimes becomes a "convergence zone," when air flowing from the Monterey Bay gets channeled northward into the southern end of the valley and meets with the prevailing north-northwesterly winds.

Wind speeds are greatest in the spring and summer and weakest in the fall and winter. Nighttime and early morning hours frequently have calm winds in all seasons, while summer afternoons and evenings are quite breezy. Strong winds are rare, associated mostly with the occasional winter storm.

## 4.2.2.2     Regional Air Quality

The determination of whether a region's air quality is healthful or unhealthful is made by comparing contaminant levels in ambient air samples to national and state standards. Health-based air quality standards have been established by California and the federal government for the following seven criteria[1] air pollutants: ozone ($O_3$), carbon monoxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), respirable particulate matter less than 10 microns in diameter (PM10), fine particulate matter less than 2.5 microns in diameter (PM2.5), and lead (Pb). These standards were established to protect sensitive receptors with a margin of safety from adverse health impacts due to exposure to air pollution. The state and national ambient air quality standards for each of the monitored pollutants and their effects on health are summarized in **Table 4.2-1, Ambient Air Quality Standards**. The "primary" standards have been established to protect the public health. The "secondary" standards are intended to protect the nation's welfare and account for air pollutant effects on soil, water, visibility, materials, vegetation and other aspects of the general welfare. California standards are generally the same or more stringent than federal standards.

---

[1]     "Criteria" pollutants are air pollutants for which the US EPA has established air quality standards. They are so named because the US EPA periodically publishes criteria documents to help establish the federal air quality standards.

**Table 4.2-1**
**Ambient Air Quality Standards**

| Air Pollutant | Averaging Time | California Standards | National Standards[1] Primary[2,3] | National Standards[1] Secondary[2,4] |
|---|---|---|---|---|
| Ozone (O$_3$) | 8-hour | 0.070 ppm (137 μg/m³) | 0.075 ppm (147 μg/m³) | Same as primary |
| | 1-hour | 0.09 ppm (180 μg/m³) | --[5] | -- |
| Carbon Monoxide (CO) | 8-hour | 9.0 ppm (10 mg/m³) | 9 ppm (10 mg/m³) | -- |
| | 1-hour | 20 ppm (23 mg/m³) | 35 ppm (40 mg/m³) | -- |
| Nitrogen Dioxide (NO$_2$) | Annual | 0.030 ppm (57 μg/m³) | 0.053 ppm (100 μg/m³) | Same as primary |
| | 1-hour | 0.18 ppm (339 μg/m³) | 0.100 ppm[6] (188 μg/m³) | -- |
| | Annual | -- | --[7] | -- |
| | 24-hour | 0.04 ppm (105 μg/m³) | --[7] | -- |
| Sulfur Dioxide (SO$_2$) | 3-hour | -- | -- | 0.5 ppm (1300 μg/m³) |
| | 1-hour | 0.25 ppm (655 μg/m³) | 0.075 ppm[7] (196 μg/m³) | -- |
| Respirable Particulate Matter (PM10) | Annual | 20 μg/m³ | -- | -- |
| | 24-hour | 50 μg/m³ | 150 μg/m³ | Same as primary |
| Fine Particulate Matter (PM2.5) | Annual | 12 μg/m³ | 12 μg/m³ | -- |
| | 24-hour | No separate state standard | 35 μg/m³ | -- |
| Lead | Calendar Quarter | -- | 1.5 μg/m³ | Same as primary |
| | 30-day Average | 1.5 μg/m3 | -- | -- |

*Source: Illingworth & Rodkin, Inc., 2015*

*ppm = parts per million by volume; μg/m³ = microgram per cubic meter; mg/m³ = milligrams per cubic meter.*

[1] *Standards, other than for ozone and those based on annual averages, are not to be exceeded more than once a year. The ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above the standard is equal to or less than one.*

[2] *Concentrations are expressed first in units in which they were promulgated. Equivalent units given in parenthesis.*

[3] *Primary Standards: The levels of air quality necessary, with an adequate margin of safety to protect the public health. Each state must attain the primary standards no later than three years after that state's implementation plan is approved by the U.S. Environmental Protection Agency (US EPA).*

[4] *Secondary Standards: The levels of air quality necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant.*

[5] *The national 1-hour ozone standard was revoked by US EPA on June 15, 2005. A new 8-hour standard was established in May 2008.*

[6] *The form of the 1-hour NO$_2$ standard is the 3-year average of the 98th percentile of the daily maximum 1-hour average concentration.*

[7] *On June 2, 2010 the US EPA established a new 1-hour SO$_2$ standard, effective August 23, 2010, which is based on the 3-year average of the annual 99th percentile of the 1-hour daily maximum. The US EPA also revoked both the existing 24-hour and annual average SO$_2$ standards.*

Air quality of a region is considered to be in attainment of the National Ambient Air Quality Standards (NAAQS) if the measured ambient air pollutant levels are not exceeded more than once per year, except for O$_3$, PM10, PM2.5, and those based on annual averages or arithmetic mean. The NAAQS for O$_3$, PM10, and PM2.5 are based on statistical calculations over one- to three-year periods, depending on the pollutant. The SFBAAB is currently designated as a marginal nonattainment area with respect to the

national standard for 8-hour O$_3$, and nonattainment for 24-hour PM2.5; and is designated as attainment or unclassifiable for all other pollutants. Additional details regarding the attainment status are provided later in this section.

Air quality of a region is considered to be in attainment of the state standards if the measured ambient air pollutant levels for O$_3$, CO, SO$_2$ (1- and 24-hour), NO$_2$, PM10, PM2.5, and visibility reducing particles are not exceeded, and all other standards are not equaled or exceeded at any time in any consecutive three-year period. The SFBAAB is currently designated as a nonattainment area with respect to the state standards for O$_3$, PM10, and PM2.5 and is designated as attainment or unclassified for all other pollutants. Additional details regarding the attainment status are provided later in this section.

Air quality in the SFBAAB is affected by the pollutants generated by dense population centers, heavy vehicular traffic, and industry. However, as mentioned above, coastal sea breezes tend to transport pollutants generated within the SFBAAB to inland locations such as the Central Valley. The air pollutants within the SFBAAB are generated by two categories of sources: stationary and mobile. Stationary sources comprise "point sources," which have one or more emission sources at a single facility, or "area sources," which are widely distributed and produce many small emissions. Point sources are usually associated with manufacturing and industrial uses and include sources such as refinery boilers or combustion equipment that produce electricity or process heat. Examples of area sources include residential water heaters, painting operations, lawn mowers, agricultural fields, landfills, and consumer products, such as barbecue lighter fluid or hair spray. "Mobile sources" refer to operational and evaporative emissions from on- and off-road motor vehicles.

### 4.2.2.3    Local Air Quality

The air quality of any region is evaluated by comparing the concentrations of air pollutants present in the air to an appropriate ambient air quality standard. The standards represent the allowable pollutant concentrations designed to ensure that the public health and welfare are protected, while including a reasonable margin of safety to protect the more sensitive individuals in the population. The Bay Area Air Quality Monitoring District (BAAQMD) operates more than 30 air-quality monitoring stations throughout the SFBAAB to measure ambient concentrations of the criteria pollutants. The nearest monitoring station to the project site is located on Jackson Street in San José. **Table 4.2-2, Ambient Pollutant Concentrations Measured Nearest the Project Site**, provides a summary of air pollutant monitoring data for this station. This table shows the highest air pollutant concentrations measured at the station over the three-year period from 2010 through 2014.

**Table 4.2-2**
**Highest Measured Air Pollutant Concentrations Measured Nearest the Project Site**

| | Year | | | | |
|---|---|---|---|---|---|
| **Pollutant** | **2010** | **2011** | **2012** | **2013** | **2014** |
| **OZONE (O$_3$)** | | | | | |
| Maximum 1-hour concentration (ppm) | **0.126** | **0.098** | **0.101** | 0.093 | **0.097** |
| Maximum 8-hour concentration (ppm) | **0.086** | 0.067 | 0.062 | **0.079** | **0.078** |
| **CARBON MONOXIDE (CO)** | | | | | |
| Maximum 8-hour concentration (ppm) | 2.2 | 2.2 | 1.9 | 2.5 | 1.9 |
| **NITROGEN DIOXIDE (NO$_2$)** | | | | | |
| Maximum 1-hour concentration (ppm) | 0.064 | 0.061 | 0.067 | 0.059 | 0.058 |
| Annual average concentration (ppm) | 0.014 | 0.015 | 0.013 | 0.015 | 0.013 |
| **RESPIRABLE PARTICULATE MATTER (PM$_{10}$)** | | | | | |
| Maximum 24-hour concentration, state ($\mu$g/m$^3$) | 46.8 | 44.3 | **59.6** | **58.0** | **55.0** |
| Annual arithmetic mean concentration ($\mu$g/m$^3$) | 19.5 | 19.2 | 18.8 | **22.3** | 19.9 |
| **FINE PARTICULATE MATTER (PM$_{2.5}$)** | | | | | |
| Maximum 24-hour concentration ($\mu$g/m$^3$) | **41.5** | **50.5** | **38.4** | **57.7** | **60.4** |
| Annual arithmetic mean concentration ($\mu$g/m$^3$)[6] | 9.0 | 9.9 | 9.1 | 12.4 | 8.4 |

*Source: BAAQMD Air Quality Summaries for 2010 – 2014, Illingworth & Rodkin, Inc., 2015.*

*ppm = parts per million by volume; $\mu$g/m$^3$ = microgram per cubic meter.*

*Values reported in **bold** exceed ambient air quality standards.*

## 4.2.2.4    Sensitive Receptors

Certain groups of people are more affected by air pollution than others. The California Air Resources Board (CARB) has identified the following persons who are most likely to be affected by air pollution: children under 14, the elderly over 65, athletes, and people with cardiovascular and chronic respiratory diseases. These groups are classified as sensitive receptors. Locations that may contain a high concentration of these sensitive population groups include residential areas, hospitals, daycare facilities, elder care facilities, elementary schools, and parks. The closest sensitive receptors to the project site are more than 2,000 feet from the project boundaries. New residents that would occupy the project are considered sensitive receptors. All project residential locations for the purposes of this analysis are assumed to include infants, children, and adults.

### *Localized Carbon Monoxide Concentrations*

Traffic congestion along roadways and at intersections has the potential to generate localized high levels of CO. The BAAQMD monitoring stations have not recorded any exceedances of the state or federal CO standards since 1991. However, because elevated CO concentrations are generally localized, heavy traffic

volumes and congestion at specific intersections or roadway segments can lead to high levels of CO, or hotspots, while concentrations at the nearest air quality monitoring station may be below state and federal standards.

### 4.2.3    REGULATORY CONSIDERATIONS

Air quality within the SFBAAB is addressed through the efforts of various federal, state, regional, and local government agencies. These agencies work jointly as well as individually to improve air quality through legislation, regulations, planning, policymaking, education, and a variety of programs. With respect to the proposed project, the BAAQMD would administer most of the air quality requirements affecting the proposed project. The agencies primarily responsible for improving the air quality within the SFBAAB are discussed below along with their individual responsibilities.

### 4.2.3.1    United States Environmental Protection Agency

#### *Criteria Pollutants*

The United States Environmental Protection Agency (US EPA) is responsible for implementing and enforcing the federal Clean Air Act (CAA) and developing the NAAQS. The NAAQS identify concentrations for seven criteria pollutants that are considered the maximum levels of ambient (background) air pollutants considered safe, with an adequate margin of safety, to protect the public health and welfare. The seven criteria pollutants are $O_3$, CO, $NO_2$, $SO_2$, PM10, PM2.5, and lead. The federal ambient air quality standards and the relevant health effects of the criteria pollutants are summarized above in **Table 4.2-1**. As part of its implementation responsibilities, the US EPA requires each state to prepare and submit a State Implementation Plan (SIP) that demonstrates the means to attain and/or maintain the federal standards. The SIP must integrate federal, state, and local plan components and regulations to identify specific measures to reduce pollution in nonattainment areas, using a combination of performance standards and market-based programs.

The SFBAAB is currently classified by the US EPA as a marginal nonattainment area for the 8-hour standard for $O_3$ and a nonattainment area for PM2.5. Additionally, it has been designated as an attainment/unclassifiable area for the 1-hour and 8-hour standards for CO and the annual standard for $NO_2$, and as an attainment area for the quarterly lead standard and 24-hour and annual $SO_2$ standards. The SFBAAB is currently designated as unclassifiable for the 24-hour PM10 standard. In response to its implementation and enforcement responsibilities, the US EPA requires each state to prepare and submit a State Implementation Plan (SIP) describing how the state will achieve the federal standards by specified dates, depending on the severity of the air quality within the state or air basin. The status of the SFBAAB

with respect to attainment with the NAAQS is summarized in **Table 4.2-3, National Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin**.

Table 4.2-3
National Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin

| Pollutant | Designation/Classification |
|---|---|
| Ozone ($O_3$) | Nonattainment/Marginal |
| Carbon Monoxide (CO) | Attainment/Maintenance |
| Nitrogen Dioxide ($NO_2$) | Attainment/Unclassifiable |
| Sulfur Dioxide ($SO_2$) | Attainment |
| Respirable Particulate Matter (PM10) | Unclassifiable |
| Fine Particulate Matter (PM2.5) | Nonattainment |
| Lead (Pb) | Attainment |

*Source:*

*US Environmental Protection Agency, "Region 9: Air Programs, Air Quality Maps," http://www.epa.gov/region9/air/maps/. 2015*

[1]*The US EPA promulgated a new 1-hour NAAQS for NO2 which became effective on April 12, 2010. The US EPA issued final area designations in January 2012 which became effective February 29, 2012).*

## *Hazardous Air Pollutants*

Regulation of hazardous air pollutants (HAPs) under federal regulations is achieved through federal and state controls on individual sources. Federal law defines HAPs as non-criteria air pollutants with short-term (acute) and/or long-term (chronic or carcinogenic) adverse human health effects. The 1990 federal CAA Amendments offer a comprehensive plan for achieving significant reductions in both mobile and stationary source emissions of HAPs. Under the 1990 CAA Amendments, a total of 189 chemicals or chemical families were designated HAPs because of their adverse human health effects. Title III of the 1990 federal CAA Amendments amended Section 112 of the CAA to replace the former program with an entirely new technology-based program. Under Title III, the US EPA must establish maximum achievable control technology emission standards for all new and existing "major" stationary sources through promulgation of National Emission Standards for Hazardous Air Pollutants (NESHAP). Major stationary sources of HAPs are required to obtain an operating permit from the BAAQMD pursuant to Title V of the 1990 CAA Amendments. A major source is defined as one that emits at least 10 tons per year of any HAP or at least 25 tons per year of all HAPs. The proposed project would not be considered a major source.

## 4.2.3.2     California Air Resources Board

CARB, a branch of the California Environmental Protection Agency (CalEPA), oversees air quality planning and control throughout California. It is primarily responsible for ensuring implementation of the 1988 California Clean Air Act (CCAA), for responding to the federal CAA requirements, and for regulating emissions from motor vehicles and consumer products within the state. The CCAA and other California air quality statutes designate local air districts, such as the BAAQMD, with the responsibility for regulating most stationary sources, and to a certain extent, area sources.

CARB has established ambient air quality standards for the state (i.e., California Ambient Air Quality Standards [CAAQS]). These standards apply to the same seven criteria pollutants as the federal CAA and also address sulfates ($SO_4$), visibility-reducing particles, hydrogen sulfide ($H_2S$) and vinyl chloride ($C_2H_3Cl$). The CAAQS are more stringent than the federal standards and, in the case of PM10 and $SO_2$, far more stringent. Based on monitored pollutant levels, the CCAA divides $O_3$ nonattainment areas into four categories (moderate, serious, severe, and extreme) to which progressively more stringent planning and emission control requirements apply.

The SFBAAB is a nonattainment area for the California 1-hour and 8-hour ozone standard. The SFBAAB is designated as nonattainment for the California 24-hour and annual PM10 standards, as well as the California annual PM2.5 standard. The SFBAAB is designated as attainment or unclassifiable for all other CAAQS. The ozone precursors (reactive organic gases [ROG], and oxides of nitrogen [$NO_X$]), in addition to PM10, are the criteria air pollutants of concern for projects located in the SFBAAB. The status of the SFBAAB with respect to attainment with the CAAQS is summarized in **Table 4.2-4, California Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin**.

**Table 4.2-4**

**California Ambient Air Quality Standard Designations – San Francisco Bay Area Air Basin**

| Pollutant | Designation/Classification |
|---|---|
| Ozone ($O_3$) | Nonattainment[1] |
| Carbon Monoxide (CO) | Attainment |
| Nitrogen Dioxide ($NO_2$) | Attainment |
| Sulfur Dioxide ($SO_2$) | Attainment |
| Respirable Particulate Matter (PM10) | Nonattainment |
| Fine Particulate Matter (PM2.5) | Nonattainment |
| Lead (Pb) | Attainment |
| Sulfates ($SO_4$) | Attainment |
| Hydrogen Sulfide ($H_2S$) | Unclassified |
| Vinyl Chloride | Unclassified |
| Visibility Reducing Particles | Unclassified |

*Source: California Air Resources Board, "Area Designations Maps/State and National," http://www.arb.ca.gov/desig/adm/adm.htm. 2013*

[1]  *CARB has not issued area classifications based on the new state 8-hour standard. The previous classification for the 1-hour ozone standard was Serious.*

## *Toxic Air Contaminants*

California law defines toxic air contaminants (TACs) as air pollutants which may cause or contribute to an increase in mortality or an increase in serious illness, or which may pose a present or potential hazard to human health. A total of 245 substances have been designated TACs under California law; they include the federal HAPs adopted as TACs in accordance with Assembly Bill 2728. The Air Toxics Hot Spots Information and Assessment Act of 1987, Assembly Bill 2588 (AB 2588), seeks to identify and evaluate risk from air toxics sources; AB 2588 does not regulate air toxics emissions directly. Under AB 2588, sources emitting more than 10 tons per year of any criteria air pollutant must estimate and report their toxic air emissions to the local air districts. Local air districts then prioritize facilities on the basis of emissions, and high priority facilities are required to submit a health risk assessment and communicate the results to the affected public. Depending on risk levels, emitting facilities are required to implement varying levels of risk reduction measures. The BAAQMD is responsible for implementing AB 2588 in the SFBAAB.

The BAAQMD is currently working to control TAC impacts from local hot spots and from ambient background concentrations. The control strategy involves reviewing new sources to ensure compliance with required emission controls and limits, maintaining an inventory of existing sources to identify major TAC emissions and developing measures to reduce TAC emissions. The BAAQMD publishes the results

of the various control programs in an annual report, which provides information on the current TAC inventory, AB 2588 risk assessments, TAC monitoring programs, and TAC control measures and plans.

One of the TACs being controlled by the BAAQMD is particulate matter from diesel-fueled engines, also known as diesel particulate matter (DPM). Compared to other TACs, DPM emissions are estimated to be responsible for about 70 percent of the total ambient air toxics risk in the SFBAAB. On a statewide basis, the average potential cancer risk associated with these emissions is over 500 potential cancer cases per million exposed persons. In addition to these general risks, DPM can also present elevated localized or near-source exposures. Depending on the activity and nearness to receptors, these potential risks can range from a low number to 1,500 cancer cases per million exposed persons (CARB 2015).

### 4.2.3.3    Bay Area Air Quality Management District

Management of air quality in the SFBAAB is the responsibility of the BAAQMD. The BAAQMD is responsible for bringing and/or maintaining air quality in the SFBAAB within federal and state air quality standards. Specifically, the BAAQMD has responsibility for monitoring ambient air pollutant levels throughout the SFBAAB and developing and implementing attainment strategies to ensure that future emissions will be within federal and state standards. The following plans have been developed by the BAAQMD to achieve attainment of the federal and state ozone standards. The Clean Air Plan (CAP) and Ozone Strategy fulfill the planning requirements of the CCAA, while the Ozone Attainment Plan fulfills the federal CAA requirements.

*Clean Air Plans*

The CCAA requires air districts within nonattainment areas to prepare triennial assessments and revisions to their Clean Air Plans (CAPs). The BAAQMD has prepared a series of CAPs, the most recent and rigorous of which was adopted in September 2010 (BAAQMD 2010). The 2010 CAP continues the air pollution reduction strategy established by the 1991 CAP and represents the fourth triennial update to the 1991 CAP, following previous updates of 1994, 1997, and 2000. The 2010 CAP is designed to address attainment of the state standard for ozone, particulate matter, air toxics, and greenhouse gases. CAPs are intended to focus on the near-term actions through amendments of existing regulations and promulgation of new District regulations.

The Bay Area 2010 CAP provides a comprehensive plan to improve Bay Area air quality and protect public health. The 2010 CAP defines a control strategy that the BAAQMD and its partners will implement to: (1) reduce emissions and decrease ambient concentrations of harmful pollutants; (2) safeguard public health by reducing exposure to air pollutants that poses the greatest health risk, with an emphasis on protecting the communities most heavily impacted by air pollution; and (3) reduce greenhouse gas

emissions to protect the climate. The 2010 CAP is designed to update the most recent ozone plan, the BAAQMD 2005 Ozone Strategy, to comply with state air quality planning requirements as codified in the California Health and Safety Code. State law required the CAP to include all feasible measures to reduce emissions of ozone precursors and to reduce transport of ozone precursors to neighboring air basins.

The SFBAAB was designated as non-attainment for the national 24-hour PM2.5 standard, and was required to prepare a PM2.5 State Implementation Plan (SIP) pursuant to federal air quality guidelines by December 2012. However, in January 2013, the US EPA issued a final ruling that the Bay Area had attained the PM2.5 standard, and was therefore not required to submit a SIP as long as monitoring data shows that the Bay Area attains the standard. The SFBAAB will continue to be designated "nonattainment" until the BAAQMD submits a re-designation request and that request is approved by the US EPA. The 2010 CAP is not a SIP document and does not respond to federal requirements for PM2.5 or ozone planning. However, in anticipation of future PM2.5 planning requirements, the CAP control strategy also aims to reduce PM emissions and concentrations. In addition, US EPA is currently reevaluating national ozone standards, and is likely to tighten those standards in the near future. The 2010 CAP updates the BAAQMD's most recent state ozone plan, the 2005 Ozone Strategy, by addressing new emerging challenges and opportunities. The 2010 CAP control strategy includes revised, updated, and new measures in the three traditional control measure categories: Stationary Source Measures, Mobile Source Measures, and Transportation Control Measures. In addition, the CAP identifies two new categories of control measures: Land Use and Local Impact Measures, and Energy and Climate Measures (BAAQMD 2010). The control measures in the CAP will also help in the SFBAAB's continuing effort to attain national ozone standards.

## 2001 Ozone Attainment Plan

The BAAQMD developed the 2001 Ozone Attainment Plan as a guideline to achieve the then federal 1-hour ozone standard (BAAQMD 2001). The 2001 Ozone Attainment Plan was approved by CARB in 2001 and by the US EPA in 2003. In April 2004, the US EPA determined the SFBAAB had attained the federal 1-hour ozone standard. Due to the attainment status of the SFBAAB, the 1-hour ozone requirements set forth in the 2001 Ozone Attainment Plan were not required anymore. A year later, in 2005, the federal 1-hour ozone standard was revoked by the US EPA for a new and more health-protective 8-hour standard. The SFBAAB was designated as marginal nonattainment for the federal 8-hour ozone standard. Although designated as nonattainment, areas designated as marginal nonattainment or less were not required to submit new attainment plans. Nonetheless, the control measures and strategies described in the 2001 Ozone Attainment Plan for the 1-hour standard will also help achieve attainment with the 8-hour standard.

## BAAQMD Rules and Regulations

Specific rules and regulations have been adopted by the BAAQMD that limit emissions that can be generated by various uses and/or activities. These rules regulate not only the emissions of the state and federal criteria pollutants, but also the emissions of TACs. The rules are also subject to ongoing refinement by the BAAQMD.

In general, all stationary sources with air emissions are subject to the BAAQMD's rules governing their operational emissions. Some emissions sources are further subject to regulation through the BAAQMD's permitting process. Through this permitting process, the BAAQMD also monitors the amount of emissions being generated by stationary sources and uses this information in developing the CAP. A few of the primary BAAQMD rules applicable to the proposed project include, among others, the following:

- **Regulation 8, Rule 3 (Architectural Coatings):** This rule sets limits on reactive organic gases (ROG) content in architectural coatings sold, supplied, offered for sale, or manufactured within the BAAQMD's jurisdiction. The rule also includes time schedules that specify when more stringent ROG standards are to be enforced. The rule applies during the construction phase of a project. In addition, any periodic architectural coating maintenance operations are required to comply with this rule.

- **Regulation 8, Rule 15 (Emulsified and Liquid Asphalts):** This rule sets limits on the ROG content in emulsified and liquid asphalt used for maintenance and paving operations. The rule includes specific ROG content requirements for various types of asphalt (e.g., emulsified asphalt, rapid-cure liquid asphalt, slow-cure liquid asphalt). This rule applies during the construction phase of a project. In addition, any future asphalt maintenance of a project's roads would be required to comply with the ROG standards set in Rule 15.

- **Regulation 9, Rule 6 (Nitrogen Oxide Emission from Natural Gas-Fired Water Heaters):** This rule sets a limit on the $NO_x$ emissions from natural gas-fired water heaters. The rule applies to natural gas-fired water heaters manufactured after July 1, 1992 with a heat input rating of less than 75,000 BTU/hour. Water heaters subject to the rule must not emit more than 40 nanograms of $NO_x$ per joule of heat output.

- **Regulation 9, Rule 7 (Nitrogen Oxide and Carbon Monoxide from Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters):** This rule limits the $NO_x$ and CO emissions from industrial, institutional, and commercial boilers, steam generators, and process heaters. The rule applies to boilers with a heat input rating greater than 10 million BTU/hour fired exclusively with natural gas, liquefied petroleum gas, or a combination or boilers with a heat input rating greater than 1 million BTU/hour fired with other fuels.

- **Regulation 9, Rule 8 (Nitrogen Oxides and Carbon Monoxide from Stationary Internal Combustion Engines):** This rule limits the $NO_x$ and CO emissions from stationary internal combustion engines. The rule applies to engines rated at greater than 50 brake horsepower, but it exempts emergency generators that would not run for more than 100 hours per year.

## BAAQMD CEQA Guidelines

In April 1996, the BAAQMD prepared its *BAAQMD California Environmental Quality Act (CEQA) Guidelines* as a guidance document to provide lead government agencies, consultants, and project proponents with uniform procedures for assessing air quality impacts and preparing the air quality sections of environmental documents for projects subject to CEQA. On June 2, 2010, the BAAQMD adopted updated *CEQA Air Quality Guidelines*, which were again updated in May 2011. These guidelines describe the criteria that the BAAQMD proposed for use when reviewing and commenting on the adequacy of documents prepared under CEQA, such as this Draft EIR. The updated BAAQMD *CEQA Air Quality Guidelines* include recommended thresholds for use by Bay Area lead agencies in determining whether the proposed projects would have significant adverse air quality impacts, methodologies for predicting project emissions and impacts, and recommended measures that can be used to avoid or reduce significant air quality impacts.

The significance thresholds under the BAAQMD's *CEQA Air Quality Guidelines* were challenged by the California Building Industry Association. A March 2012 Alameda County Superior Court judgment determined that the BAAQMD had failed to evaluate the environmental impacts of the land use development patterns that would result from adoption of the thresholds and ordered the thresholds set aside. Although the Court of Appeal reversed that judgment, the California Supreme Court is currently reviewing the limited issue of whether CEQA requires an analysis of the environment's impact on a project. Because the court order directing BAAQMD to set aside the thresholds remains in place pending final resolution of the case, BAAQMD currently does not recommend any specific threshold. Instead, the BAAQMD recommends that the lead agency should "determine appropriate air quality thresholds of significance based on substantial evidence in the record (BAAQMD 2014)." The Court did not rule on or question the adequacy of the evidentiary basis supporting the significance thresholds that are contained in the *CEQA Air Quality Guidelines* and the BAAQMD-recommended impact assessment methodologies. Therefore, a lead agency has the discretion to use the significance thresholds and methodology for analyzing air quality impacts under CEQA based on the evidence and technical studies supporting the guidelines. The City has decided that in this circumstance it will utilize the methodologies and thresholds in the *CEQA Air Quality Guidelines*.

#### 4.2.3.4     Local Plans and Policies

*City of Santa Clara General Plan*

The City of Santa Clara General Plan contains goals and policies relating to air quality (criteria air pollutants and toxic air contaminants). General Plan goals and policies relevant to the proposed project are as follows:

**Air Quality Goals**

**Goal 5.10.2-G1**          Improved air quality in Santa Clara and the region.

**Air Quality Policies**

**Policy 5.10.2-P1**          Support alternative transportation modes and efficient parking mechanisms to improve air quality.

**Policy 5.10.2-P2**          Encourage development patterns that reduce vehicle miles traveled and air pollution.

**Policy 5.10.2-P3**          Encourage implementation of technological advances that minimize public health hazards and reduce the generation of air pollutants.

**Policy 5.10.2-P5**          Promote regional air pollution prevention plans for local industry and businesses.

**Policy 5.10.2-P6**          Require "Best Management Practices" for construction dust abatement.

### 4.2.4     IMPACTS AND MITIGATION MEASURES

#### 4.2.4.1     Significance Criteria

For the purposes of this Draft EIR, air quality impacts of the proposed project would be considered significant if they would exceed the following Standards of Significance, which are based on Appendix G of the *State CEQA Guidelines* and the BAAQMD *CEQA Air Quality Guidelines*. According to Appendix G of the *State CEQA Guidelines*, a project would normally have a significant impact on air quality if it would:

- conflict with or obstruct implementation of the applicable air quality plan;

- violate any air quality standard or contribute substantially to an existing or projected air quality violation;

- result in a cumulatively considerable net increase of any criteria pollutant for which the project region is nonattainment under an applicable federal or state ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors);

- expose sensitive receptors to substantial pollution concentrations; or

- create objectionable odors affecting a substantial number of people.

The BAAQMD *CEQA Air Quality Guidelines* quantify these thresholds with defined numeric values and evaluation criteria for pollutant emissions. As noted above, although the Court of Appeal ruling with respect to the *CEQA Air Quality Guidelines* has been appealed and the Supreme Court has granted the petition for review, the City has decided that it will use the methodological approach and numeric thresholds in BAAQMD *CEQA Air Quality Guidelines* to determine whether the impacts of the proposed project exceed the thresholds identified in Appendix G of the *State CEQA Guidelines*. The BAAQMD's evaluation criteria for determining air quality impacts provide defined thresholds for pollutant emissions. These quantitative thresholds for air quality impact evaluation from the BAAQMD *CEQA Air Quality Guidelines* are presented below.

## Construction Emissions

Impacts related to construction emissions associated with the proposed project would be considered significant if the construction emissions exceeded the thresholds listed in **Table 4.2-5, Average Daily Construction Emission Thresholds**.

**Table 4.2-5**
**Average Daily Construction Emission Thresholds**

| Criteria Air Pollutants | Average Daily Emissions (Pounds per Day) |
|---|---|
| ROG | 54 |
| NO$_X$ | 54 |
| PM10 (Exhaust) | 82 |
| PM2.5 (Exhaust) | 54 |

*Source: Bay Area Air Quality Management District, CEQA Air Quality Guidelines, May 2011.*

## Operational Emissions

Impacts from direct and/or indirect operational emissions associated with the proposed project would be considered significant if they exceeded the daily or the annual emissions thresholds in **Table 4.2-6, Operational Emission Thresholds**.

**Table 4.2-6**
**Operational Emission Thresholds**

| Criteria Air Pollutants | Average Daily Emissions (Pounds per Day) | Maximum Annual Emissions (Tons per Year) |
|---|---|---|
| ROG | 54 | 10 |
| NOx | 54 | 10 |
| PM10 | 82 | 15 |
| PM2.5 | 54 | 10 |

*Source: Bay Area Air Quality Management District, CEQA Air Quality Guidelines, May 2011.*

Direct emissions are those that are emitted on a site and include emissions from stationary sources and on-site mobile equipment, if applicable. Examples of land uses and activities that generate direct emissions are industrial operations and sources subject to an operating permit by the BAAQMD. Indirect emissions come from mobile sources that access the project site, but generally are emitted off-site. For many types of land development projects, the principal source of air pollutant emissions is the motor vehicle trips generated by the project.

## *Toxic Air Contaminant Emissions*

**Single Source Impact Threshold**

If project emissions of TACs or PM2.5[2] during construction or project operation cause an existing sensitive receptor to be exposed to levels that exceed any of the thresholds of significance listed below, the proposed project would result in a significant impact and mitigation would be required. Exposure of project site sensitive receptors to TAC levels that exceed the thresholds of significance listed below would also result in a significant impact and require mitigation.

- An excess cancer risk level of more than 10 in 1 million, or a non-cancer (chronic or acute) hazard index greater than 1.0.

- An incremental increase of more than 0.3 micrograms per cubic meter ($\mu g/m^3$) annual average PM2.5.

---

[2] One of the TACs being controlled by the BAAQMD is particulate matter from diesel-fueled engines, also known as diesel particulate matter (DPM). Compared to other TACs, DPM emissions are estimated to be responsible for about 70 percent of the total ambient air toxics risk in the Basin. DPM is emitted in equipment and vehicle exhaust in the form of PM2.5 emissions. The BAAQMD *CEQA Air Quality Guidelines* therefore include a concentration-based threshold for PM2.5 emitted during construction and operation of a proposed project.

**Cumulative Source Impact Threshold**

A project would have a cumulatively considerable impact if the aggregate total of human health risks from all past, present, and foreseeable future sources within a 1,000-foot radius of the fence line of a source or from the location of a receptor, plus the contribution from the project, exceeds the following thresholds.

- An excess cancer risk level of more than 100 in 1 million or a chronic non-cancer hazard index (from all local sources) greater than 10.0.

- 0.8 µg/m³ annual average PM2.5.

## *Odors*

For impacts associated with odors, the BAAQMD considers project operations that result in five confirmed complaints per year averaged over three years to have a significant impact.

## *Local Carbon Monoxide Concentrations*

The impact associated with a project's indirect CO emissions is considered significant if the emissions will contribute to a violation of the state standards for CO (9.0 ppm averaged over 8 hours and 20 ppm over 1 hour).

## 4.2.4.2    Methodology

### *Construction Emissions of Criteria Pollutants*

The California Emissions Estimator Model (CalEEMod) Version 2013.2.2 was used to predict emissions from the construction of the proposed project. Average daily emissions from project construction were calculated, including both on-site and off-site activities. On-site activities would consist of the operation of off-road construction equipment, as well as on-site truck travel (e.g., haul trucks, water trucks, dump trucks, and concrete trucks), whereas off-site sources would be emissions from construction vehicle trips. For more information on model inputs and assumptions, see **Impact AIR-1** below.

### *Operational Emissions of Criteria Pollutants*

CalEEMod was also used to predict emissions from the operation of the proposed project. The use of this model for evaluating air pollutant emissions from land use projects is recommended by the BAAQMD. The project land use types and size, trip generation rate and other project-specific information were input

to the model to estimate operational emissions. For more information on model inputs and assumptions, see **Impact AIR-2** below.

### *Operational CO Impact*

The BAAQMD recommends CO modeling for a plan or a project if the addition of project traffic would increase traffic volumes at affected intersections to more than 44,000 vehicles per hour. No intersections affected by the proposed project would handle more than 44,000 vehicles per hour, and so no CO modeling is required.

### *Community Health Risk Impacts*

The methodology used to assess community health risk impacts from exposure to TAC emissions is described under **Impact AIR-5**.

### 4.2.4.3    Project Impacts and Mitigation Measures

**Impact AIR-1:**   **Construction activities associated with the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or state ambient air quality standard (including resulting in emissions which exceed quantitative thresholds for ozone precursors), but would result in substantial dust emissions. (***Potentially Significant; Less than Significant with Mitigation***)**

Construction activities associated with the proposed project would result in short-term emissions of criteria pollutants from the operation of construction equipment and vehicles and emissions of fugitive dust during site excavation and grading. The project's construction emissions are estimated below and evaluated for their potential to result in a significant impact. CalEEMod was used to estimate emissions from the construction of the proposed project assuming full build out. Project description information, adjustments to the model, and assumptions used in the modeling are summarized below.

### *Construction Schedule, Phases, and Equipment*

It is anticipated that the proposed project would be constructed in a series of phases over about 40 months, from April 2016 through August 2019. Assuming 22 construction days per month, there would be 880 workdays. The construction schedule, estimated hauling volumes, and anticipated on-site construction equipment used for the emission calculations are shown in **Appendix 4.2**. The modeled

construction activities include the use of equipment and truck trips associated with soil remediation. The following information was input into the model to estimate construction emissions.

**Phase 1 (Buildings 1 and 2)**

- 354-dwelling unit: "Apartments Low Rise"
- 650 spaces: "Enclosed Parking with Elevator"
- Disturbed site acreage: 7.24 acres

**Phase 2 (Buildings 3, 4 and 5)**

- 873-dwelling unit: "Apartments Low Rise"
- 1,518 spaces: "Enclosed Parking with Elevator"
- Disturbed site acreage: 12.69 acres

**Phase 3A (Building 6)**

- 248-dwelling unit: "Apartments Low Rise"
- 446 space: "Enclosed Parking with Elevator"
- Disturbed site acreage: 3.74 acres

**Phase 3B (Building 7)**

- 325-dwelling unit: "Apartments Low Rise"
- 604 space: "Enclosed Parking with Elevator"
- Disturbed site acreage: 6.08 acres

For construction haul truck and concrete truck trip estimates provided by the project applicant see pages 81-84 in **Appendix 4.2**. For vendor, worker, and haul truck one-way trips, lengths of 7.3 miles, 12.4 miles, and 20 miles, respectively were used. These are the default trip lengths assumed in the CalEEMod model. Concrete truck trips were assumed to be 7.3 miles (vendor trip length).

Default architectural coating emission inputs were used in terms of the volatile organic compound (VOC) content in paints. Refined emissions modeling of PM2.5 from on-site activities was performed as part of the construction health risk assessment addressed later under **Impact AIR-6**.

## Total Emissions

**Table 4.2-7, Santa Clara Square Residential/Mixed Use Project Construction Emissions,** shows the average daily construction emissions of ROG, NOX, PM10 exhaust, and PM2.5 exhaust from the construction of the proposed project. Average daily emissions were computed by dividing total emissions by the total number of construction days. Total emissions are the sum of the annual emissions over the construction period. The number of construction days was computed at 880, assuming 22 days per month and 40 months of construction. As indicated in **Table 4.2-7**, estimated average daily project construction emissions would not exceed the thresholds for ROG, NOx, PM10, and PM2.5. As a result, the impact associated with construction-period emissions of criteria pollutants would be less than significant.

**Table 4.2-7**
**Unmitigated Santa Clara Square Residential/Mixed Use Project Construction Emissions**

| Scenario | Average Daily Emissions | | | |
| --- | --- | --- | --- | --- |
| | ROG | NOx | PM10 Exhaust | PM2.5 Exhaust |
| Total Construction Emissions (tons) | | | | |
| Phase 1 | 4.35 | 4.05 | 0.17 | 0.16 |
| Phase 2 | 10.17 | 6.57 | 0.25 | 0.23 |
| Phase 3A | 2.98 | 2.61 | 0.09 | 0.09 |
| Phase 3B | 3.85 | 2.41 | 0.09 | 0.08 |
| Total Phase 1-3B | 21.35 | 15.64 | 0.60 | 0.57 |
| Average Emissions (lbs/day) [1] | 49 | 36 | 1 | 1 |
| Thresholds (lbs/day) | 54 | 54 | 82 | 54 |
| Exceeds Threshold? | **No** | **No** | **No** | **No** |

*Source: Illingworth & Rodkin, Inc., 2015*
*1 - based on 880 construction days*

Construction activities, particularly during site preparation and grading, would temporarily generate fugitive dust, including PM10 and PM2.5. Sources of fugitive dust would include disturbed soils at the construction site during grading and soil remediation and trucks carrying uncovered loads of soils. Unless properly controlled, vehicles leaving the site would deposit mud on local streets, which could be an additional source of airborne dust after it dries. Fugitive dust emissions would vary from day to day, depending on the nature and magnitude of construction activity and local weather conditions. Fugitive dust emissions would also depend on soil moisture, silt content of soil, wind speed, and the amount of equipment operating. Larger dust particles would settle near the source, while fine particles would be dispersed over greater distances from the construction site. The *CEQA Air Quality Guidelines* consider the impact from a project's construction-phase dust emissions to be less than significant if best management

practices listed in the guidelines are implemented. Without these BMPs, the impact from dust emissions would be potentially significant.

**Mitigation Measure AIR-1** is proposed, which requires that the dust control BMPs put forth by the BAAQMD are implemented by the proposed project. In addition, as part of the soil remediation activities and pursuant to **Mitigation Measure HAZ-2a**, a site remediation plan will be prepared by the project applicant and approved by the Department of Toxic Substances Control (DTSC). The plan would specify measures that would be taken to limit generation of dust, such as covering stockpiled soil generated during remedial activities.

With the implementation of the required BAAQMD recommended BMPs pursuant to **Mitigation Measure AIR-1** and the site remediation plan pursuant to **Mitigation Measure HAZ-2a**, the construction of the proposed project would not result in substantial emissions of fugitive dust, PM10 or PM2.5, and the impact associated with construction-period emissions of fugitive dust, PM10 and PM2.5 is considered less than significant.

**Mitigation Measures:**

AIR-1       The construction contractor(s) shall implement the following BMPs during project construction:

- All exposed surfaces (e.g., parking areas, staging areas, soil piles, graded areas, and unpaved access roads) shall be watered two times per day.

- All haul trucks transporting soil, sand, or other loose material off-site shall be covered.

- All visible mud or dirt track-out onto adjacent public roads shall be removed using wet power vacuum street sweepers at least once per day. The use of dry power sweeping is prohibited.

- All vehicle speeds on unpaved roads shall be limited to 15 mph.

- All roadways, driveways, and sidewalks to be paved shall be completed as soon as possible and feasible. Building pads shall be laid as soon as possible and feasible after grading, unless seeding or soil binders are used.

- Idling times shall be minimized either by shutting equipment off when not in use or reducing the maximum idling time to five minutes (as required by the California

airborne toxics control measure Title 13, Section 2485 of California Code of Regulations [CCR]). Clear signage shall be provided for construction workers at all access points.

- All construction equipment shall be maintained and properly tuned in accordance with manufacturer's specifications. All equipment shall be checked by a certified mechanic and determined to be running in proper condition prior to operation.

- Post a publicly visible sign with the telephone number and person to contact at the Lead Agency regarding dust complaints. This person shall respond and take corrective action within 48 hours. The Air District's phone number shall also be visible to ensure compliance with applicable regulations.

**Significance after Mitigation**: Less than significant

---

**Impact AIR-2:**       **Operation of the proposed project would not result in a violation of an air quality standard, contribute substantially to an existing or projected air quality violation, or result in a cumulatively considerable net increase of a criteria pollutant for which the project region is non-attainment under an applicable national or State ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors), but would result in ROG emissions that exceed the BAAQMD numeric ROG CEQA thresholds. (***Significant; Significant and Unavoidable***)**

Operational air emissions from the project would be generated primarily from autos driven by future residents and employees. Other sources of operational emissions are architectural coatings and maintenance products, consumer products, and energy use on the project site, including the combustion of natural gas in stoves, heaters, and boilers. CalEEMod was used to estimate emissions from operation of the proposed project assuming full build out.

The project would replace office uses that would no longer generate emissions, both on-site as well as off-site. The emissions associated with the existing office uses were also modeled using CalEEMod and then subtracted from the project's operational emissions to estimate the net increase in emissions due to the proposed project. The CalEEMod operational emissions modeling outputs are provided in **Appendix 4.2**. Project description information, adjustments to the model, and assumptions used in the modeling are summarized below.

*Land Use Descriptions*

Project land uses inputs used in CalEEMod to model operational emissions from the entire project are as follows:

- 1,800 dwelling units: "Apartments Mid Rise," 1,750,000sf, population: 4,842 persons

- 40,000 sf "Strip Mall," retail, population: 100 workers

- 38,000 sf "Health Club," amenities, population: 0

- 4,500 sf "General Office Building," leasing office, population: 11

*Year of Analysis*

Emissions associated with vehicle travel depend on the year of analysis because emission control technology requirements are phased-in over time. Therefore, the earlier the year analyzed in the model, the higher the emission rates used by CalEEMod. The earliest year the project could possibly be constructed and fully occupied would be 2020. Emissions associated with build-out later than 2020 would be lower, because newer vehicles have to meet increasingly more stringent emissions standards, while older, more polluting, vehicles are retired.

*Trip Generation Rates*

CalEEMod allows the user to enter specific vehicle trip generation rates, which were inputted into the model using the 11,737 daily trips generation rate provided in the project traffic report. Weekend rates used in CalEEMod were adjusted proportionally to the weekday rate. The project daily trip generation took into account reductions of 14 percent for the mix of uses and proximity to local and regional employment. There were no reductions taken for transportation demand management programs or for proximity to alternative transportation pathways (e.g., bicycle/pedestrian trails). The default trip lengths and trip types specified by CalEEMod were used. No adjustments to vehicle miles traveled (VMT) were made to account for the effect of a transportation demand management (TDM) program.

*Area Sources*

Adjustments were made to the area source inputs of CalEEMod. These include an adjustment that no residences would use wood-burning stoves or fireplaces, because wood burning stoves and fireplaces are expressly excluded from the proposed project. All fireplaces were assumed to be natural-gas fired. Wood burning fireplaces and woodstoves were set to 0.

No adjustments were made in CalEEMod for consumer products.[3] However, CalEEMod computes emissions associated with consumer products for all land uses, regardless of their types. This is an unrealistic default assumption because certain land uses (e.g., parking structures) are not associated with the use of consumer products. For this analysis, the parking structures are not considered sources of consumer product ROG emissions. To correct for this assumption, a separate model run for the parking structures was developed to compute the consumer product emissions that the model erroneously generates for the parking structures. These emissions were subtracted from the project's modeled emissions.

The BAAQMD threshold of significance for ROG considered the emission levels for which a project's individual emissions would be cumulatively considerable on a regional scale.[4] Consumer products are associated with the residents and occupants of new buildings, many of whom relocate from other parts of the SFBAAB.

### Energy Efficiency

The 2013 Title 24 Building Standards became effective in 2014 and are predicted to result in 25 percent less energy for lighting, heating, cooling, ventilation, and water heating than the 2008 standards that CalEEMod consumption rates are based upon.[5] Therefore, the CalEEMod runs were adjusted to account for the greater energy efficiency that is required by law.

### Existing Office Uses

Emissions associated with the existing uses were modeled as if they were to continue operating at full occupancy in 2020. The land use, 419,000 square feet of "General Office Building," was entered into CalEEMod. The trip generation rate per thousand square feet was computed and entered into CalEEMod. Weekend rates were adjusted proportionally. All other CalEEMod defaults were used to compute the emissions from the existing uses.

---

[3]  Per the CalEEMod User's Guide: Consumer products are chemically formulated products used by household and institutional consumers, including, but not limited to, detergents; cleaning compounds; polishes; floor finishes; cosmetics; personal care products; home, lawn, and garden products; disinfectants; sanitizers; aerosol paints; and automotive specialty products.

[4]  BAAQMD. 2011. *BAAQMD CEQA Air Quality Guidelines*. May. See page 2-1.

[5]  California Energy Commission. 2012. *2013 Building Energy Efficiency Standards FAQ*. May.

*Operational Emissions in 2020*

**Table 4.2-8, Santa Clara Square Residential/Mixed Use Project Operational Emissions,** shows the predicted emissions in terms of annual emissions in tons and average daily operational emissions in pounds per day, assuming 365 days of operation per year. Daily average emissions are reported as net emissions, where emissions from existing uses are subtracted from the proposed project emissions. As shown in **Table 4.2-8**, average daily and annual emissions of NOx, PM10, or PM2.5 emissions associated with operation would not exceed the significance thresholds. However, emissions of ROG are predicted to exceed the BAAQMD significance thresholds by 12 percent. These emissions would be considered significant. Approximately 63 percent of the ROG emissions from the project are associated with what the CalEEMod model classifies as "Area Sources." These emissions primarily include architectural coatings (primarily paints) and consumer products (chemically formulated household products). Consumer products, which are associated with residential uses, make up over 50 percent of the total ROG emissions, with architectural coatings accounting for 13 percent, and traffic generated by the project accounting for 37 percent of the total ROG emissions.

**Appendix 4.2** to this Draft EIR includes the operational CalEEMod model output files for the proposed project and the existing uses.

**Table 4.2-8**
**Santa Clara Square Residential/Mixed Use Project Operational Emissions**

| | | Estimated Emissions | | | |
| | | | | PM10 | PM2.5 |
| **Emissions Source** | | **ROG** | **NOx** | **Exhaust** | **Exhaust** |
|---|---|---|---|---|---|
| Annual Existing Emissions (operating in 2020) [a] | | -3.44 | -3.56 | -3.00 | -0.85 |
| Annual Project Operational Emissions [a] | | 16.01 | 11.19 | 9.60 | 2.76 |
| Adjustment for Parking Structure ROG [a, c] | | -1.57 | n/a | n/a | n/a |
| *Net Annual Emissions in 2020* [a] | | *11.00* | *7.63* | *6.60* | *1.91* |
| *Annual Thresholds (in tons)* | | *10* | *10* | *15* | *10* |
| | *Exceeds Threshold?* | *Yes* | *No* | *No* | *No* |
| Net Average Daily Emissions (lbs./day)[b] | | 60 | 42 | 36 | 10 |
| *Daily Thresholds (in lbs.)* | | *54* | *54* | *82* | *54* |
| | *Exceeds Threshold?* | *Yes* | *No* | *No* | *No* |

*Source: Illingworth & Rodkin, Inc., 2015*
*[a] – in tons*
*[b] - Assumes 365-day operation.*
*c- Due to the manner in which it is set up, CalEEMod estimates emissions of ROG from consumer products for all building structures. Because consumer products would not be used in the parking structures, the emissions were subtracted.*

As discussed above, consumer products make up over 50 percent of the ROG emissions that exceed the significance thresholds. Specifically, the consumer products that emit ROGs are items that consumers make independent choices to use, and range from deodorants to cleaning solvents and charcoal fluid and are not tied to a specific project or project location. CalEEMod calculates ROG emissions as a function of residential square footage, so the larger a residential project, the larger the emissions. There are no means to reduce emissions from consumer products.

If the ROG emissions from consumer products were subtracted out, the net annual emissions would be 7.29 tons per year, which is below the BAAQMD threshold of 10 tons per year. Similarly, the average daily emissions would be 39.9 lbs/day, which is also below BAAQMD's significance threshold of 54 lbs/day. The BAAQMD threshold of significance for ROG considered the emission levels for which a project's individual emissions would be cumulatively considerable on a regional scale.[6] Many of the future residents of the project may be relocating from other existing residential units in the Bay Area, in which case the CalEEMod's calculated ROG impact on a regional level is overstated. More particularly, if only 15 percent of project residents relocate from other locations within the Bay Area, ROG emissions would be below the significance criterion.

To mitigate the project's significant impact related to ROG emissions, **Mitigation Measure AIR-2** is proposed which requires the project applicant to prepare and implement a travel demand management (TDM) program that will reduce traffic emissions, including emissions of ROG. ROG emissions from mobile sources make up about 37 percent of the project's total ROG emissions. Although a TDM program would reduce the project's operational mobile emissions, the reduction would not be adequate to fully mitigate the significant impact related to operational ROG emissions, and the remaining emissions would still exceed the significance thresholds. Therefore, the project's impact associated with operational emissions exceeding applicable air quality standards for ROG would be considered significant and unavoidable under the BAAQMD numeric ROG CEQA thresholds.

**Mitigation Measures:**

AIR-2        The project applicant will prepare and submit a TDM program for the proposed project (to fulfill the requirements of the City's Climate Action Plan) for approval by the City. The approved program will be implemented for the life of the project.

**Significance after Mitigation**: Significant and unavoidable

---

[6]    BAAQMD. 2011. *BAAQMD CEQA Air Quality Guidelines*. May. See page 2-1.

**Impact AIR-3:**      **The proposed project would not conflict with or obstruct implementation of the applicable air quality plan. (*Less than Significant*)**

As noted above, the 2010 Clean Air Plan, adopted by the BAAQMD in September 2010, is the air quality plan that is applicable to the nine-county air basin. That plan includes an emissions inventory that is based on projected growth within the Bay Area counties and cities. Because 2010 Clean Air Plan was developed before the City of Santa Clara updated its 2014 Housing Element and related Land Use Policies, the Clean Air Plan may not fully reflect the projected population and employment growth for the City of Santa Clara, including the growth associated with the proposed project. Furthermore, as discussed above under **Impact AIR-2**, the project's operational emissions of ROG are predicted to exceed the BAAQMD numeric ROG CEQA thresholds. Since the growth in emissions due to the proposed project may not be fully accounted for in the development projections in the current Clean Air Plan and the project's operational emissions exceed the numeric ROG threshold, the project could be considered to be in conflict with the Clean Air Plan.

However, there are several aspects of the proposed project that demonstrate that the project would not conflict with the Clean Air Plan nor obstruct its implementation. The development of the project site would be considered urban "infill." The project would put housing in a central portion of the Bay Area and in close proximity of employment centers, and the project would be in proximity of existing transit with regional connections. Therefore, the proposed project would have lower emissions if developed at the project site, than the same amount of housing at a site in another more remote portion of the Bay Area that would generate more and longer vehicle trips and result in greater mobile emissions. In addition, as noted above, this project would help address the jobs-housing imbalance in the area and if only 15 percent of the project residents relocate to the site from other parts of the Bay Area, the exceedance of the ROG threshold would not occur. Furthermore, as required by **Mitigation Measure AIR-2**, the project applicant will develop and implement a TDM program which would further reduce the project's mobile emissions. In addition, as shown by the analysis in **Section 4.5, Greenhouse Gas Emissions**, the project is generally consistent with, and would help achieve the goals of the Plan Bay Area Regional Transportation Plan/Sustainable Communities Strategy (RTP/SCS) adopted in 2013 and the City of Santa Clara's Climate Action Plan. For all of these reasons, the proposed project would not conflict with the Clean Air Plan nor obstruct its implementation. The impact would be less than significant.

**Mitigation Measures:** No mitigation measures are required.

**Impact AIR-4:**     **Project construction activities and operations would not expose existing or future sensitive receptors to substantial pollutant concentrations. (***Less than Significant***)**

Project construction activities and vehicular traffic generated by project operations would have the potential to expose sensitive receptors to substantial pollutant concentrations.  The potential for each of these impacts is evaluated below.

*Exposure to Pollutant Concentrations during Construction*

Construction activity for the proposed project would include the demolition of existing buildings, followed by soil remediation, site grading, placement of utilities, building construction, paving, application of architectural coatings, and interior finishing. Construction equipment and associated heavy-duty truck traffic generates exhaust which contains diesel particulate matter (DPM), which is a known TAC. The BAAQMD recommends that the impact from DPM is evaluated by estimating a project's fine particulate matter or PM2.5 emissions and resulting concentrations (BAAQMD 2012). The BAAQMD *CEQA Air Quality Guidelines* recommend modeling of PM2.5 concentrations if sensitive receptors are present within 1,000 feet of a construction site to determine whether nearby sensitive receptors (which are defined as residences, day care centers, schools and elderly care facilities) could be exposed to substantial concentrations of DPM, resulting in community health risk impacts. In the event that sensitive receptors are not present within 1,000 feet, construction site DPM emissions are considered unlikely to result in community health effects. There are no existing sensitive receptors that could be affected by the project's construction activity. The closest existing sensitive receptors are more than 2,000 feet from the project. As no existing sensitive receptors are in close proximity of the project site, no existing sensitive receptors would be exposed to substantial pollutant concentrations, including PM2.5 emissions, during construction.

With respect to the new project residents who might occupy portions of the project site while construction is still underway in a later phase of the project, exposure of these receptors to high PM2.5 concentrations from construction activities is not expected to occur. During later phases of the project, Phase 1 could be occupied while interior finish construction is occurring at Phase 2 and some building construction is occurring at Phase 3. No grading, hauling, or intense use of heavy equipment is anticipated during these later phases. Furthermore, because Phase 3 is approximately 850 feet upwind of Phase 1, DPM emissions as a result of Phase 3 construction would not result in a significant community risk impacts on future residents of Phase 1.

Similar to construction-phase DPM emissions, dust emissions generated during site grading would also have the potential to affect human health, especially because of the presence of residual contamination in project site soils. However, for the same reasons presented above and because **Mitigation Measure AIR-1** and **Mitigation Measure HAZ-2** would be implemented, site grading and soil remediation activities would not expose nearby receptors to substantial pollutant concentrations, and the impact would be less than significant.

*Exposure to Pollutant Concentrations during Project Operation*

CO emitted by project traffic is the criteria pollutant that would have the potential to result in substantial pollutant concentrations. Congested intersections with a large volume of traffic have the greatest potential to cause high, localized concentrations of CO. Air pollutant monitoring data indicate that CO levels have been at healthy levels (i.e., below State and federal standards) in the Bay Area since the early 1990s. As a result, the region has been designated as attainment for the standard. There is an ambient air quality monitoring station in San José that measures CO concentrations. The highest measured level over any 8-hour averaging period during the last three years is less than 3.0 ppm, compared to the ambient air quality standard of 9.0 ppm. The project would generate a relatively small amount of new traffic: 7,390 net new trips during the entire day or 576 trips during the busiest hour. BAAQMD screening guidance indicates that the project would have a less than significant impact with respect to CO levels if the addition of project traffic would not increase the total traffic at any affected intersection to more than 44,000 vehicles per hour. The Traffic Impact Assessment prepared for the proposed project shows that the cumulative traffic volumes at all intersections affected by the project would be less than 44,000 vehicles per hour. Therefore, the project will not result in the violation of the CO standards and would not expose sensitive receptors to substantial CO concentrations.

In summary, project construction and operation would not result in the exposure of sensitive receptors to substantial pollutant concentrations. The impact would be less than significant.

**Mitigation Measures:** No mitigation measures are required.

---

**Impact AIR-5:**    **Project operation would not expose project sensitive receptors to substantial pollutant concentrations. (***Less than Significant***)**

The proposed project includes residences that are considered sensitive receptors.[7] There are existing sources of TAC emissions near the site that could adversely affect these project site receptors. The effects of these sources on the project site receptors were analyzed in two categories: (1) effects of stationary sources and (2) effects of nearby roadways. Utilizing the guidance in the BAAQMD *CEQA Air Quality Guidelines*, TAC sources within 1,000 feet of the project site were identified and evaluated. These sources are shown in **Figure 4.2-1, TAC Sources within 1,000 feet of the Project Site**.

Emissions of TACs that could affect the project site receptors were estimated using information and screening tools provided by BAAQMD. Health risks were evaluated for a hypothetical maximally exposed individual (MEI) located within each residential building. The hypothetical MEI is an individual assumed to be located where the highest concentrations of air pollutants are predicted to occur. Health risks potentially associated with concentrations of TACs were calculated as estimated lifetime excess cancer risks, assuming almost continuous on-site exposure. The lifetime excess cancer risk for a pollutant is estimated as the product of a lifetime dose and the cancer potency factor derived by the Office of Environmental Health Hazard Assessment (OEHHA). In other words, it represents the increased cancer risk associated with continuous exposure to the concentrations of TAC in the air over a 70-year lifetime. Excess cancer risk calculations were adjusted to reflect the greater sensitivity of infants and small children by applying the age-sensitivity factors put forth by BAAQMD. The BAAQMD screening cancer risks are also based on 70-year lifetime exposures with adjustments for infants and childhood sensitivity.

---

[7]    The effect of the environment on the project (also called "CEQA in reverse") is a matter of debate at the present time. There have been a number of court decisions in recent years, including the *Ballona Wetlands Land Trust v. City of Los Angeles* ruling, where the courts have ruled that the effect of the environment on the project does not need to be studied in a CEQA document. Also in granting the petition for review of *CBIA v BAAQMD*, which is discussed above, the Supreme Court noted that the issue to be briefed and argued will be limited to the following: Under what circumstances, if any, does the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) require an analysis of how existing environmental conditions will impact future residents or users (receptors) of a proposed project? Nonetheless, consistent with the current thresholds in Appendix G of the State CEQA Guidelines this analysis evaluates the environment's effect on the project.



**SOURCE:** Illingworth & Rodkin, Inc, *"Administrative DRAFT Santa Clara Square Residential and Mixed Use Project Air Quality and Greenhouse Gas Emissions Assessment"*, 08/28/2015.

FIGURE **4.2-1**

TAC Sources within 1,000 feet of the Project Site

1176.002•09/15

Evaluation of potential non-cancer health effects from exposure to short-term and long-term concentrations in the air was performed by comparing modeled concentrations in air with the reference exposure levels (RELs). A REL is a concentration in the air at or below which no adverse health effects are anticipated. RELs are based on the most sensitive adverse effects reported in the medical and toxicological literature. Potential non-cancer effects were evaluated by calculating a ratio of the modeled concentration in the air and the REL. This ratio is referred to as a hazard quotient/index. The cancer potency factors, unit risk values, and RELs used to characterize health risks associated with modeled concentrations in the air were obtained from information set forth by the BAAQMD and the California OEHHA.

### Community Health Risk Impacts from Stationary Sources

The BAAQMD was contacted to provide a list of TAC sources within about one-quarter mile of the project site. The District responded by providing a *Stationary Source Identification Form (SSIF)* that included the permitted sources and their screening risk and annual PM2.5 concentrations. Many of these sources were more than 1,000 feet from the project site, and were not included in this analysis. The District provided emissions data for sources that had screening levels above the thresholds. In addition, the District provided confirmation of the facilities that were currently in operation and provided emissions information for each source. The plant numbers for several sources were updated, since these facilities have changed ownership since the original BAAQMD database was created. The District provided screening community risk levels that were not distance-adjusted.

Emissions from diesel generators were adjusted using the District's *Distance Adjustment Multiplier Tool for Diesel Internal Combustion (IC) Engines*. The District's screening risk levels along with the distance between the source and the receptor were entered to provide the screening risk levels at the specified distance. For other sources, the emissions data reported by the District were entered into the District's *Risk and Hazards Screening Emission Calculator (Beta Version)*. This tool provided the risk for various sources. This allowed the identification of the diesel engine emissions sources, where the impacts from those could then be entered to the *Distance Adjustment Multiplier Tool for Diesel Internal Combustion (IC) Engines*. Almost all sources affecting the site were diesel generators.

One source, Plant Number 19539, CoreSite, had screening cancer risks above the thresholds. The facility has recently expanded or was approved for expansion that would increase emissions from the facility. These emissions are not reflected in BAAQMD's database. This facility houses data centers that will, upon completion of expansion, include up to 51 large diesel engines that serve as emergency standby generators. Emissions data from CEQA documents obtained from the City were used with dispersion modeling that utilized historical meteorological data to predict impacts from the testing emissions of

these generators. US EPA's AERMOD dispersion model were used with a 5-year set of hourly meteorological data collected at the San José International Airport and provided by BAAQMD. While the CoreSite facility has many large diesel generators, the limited period of operation for maintenance and testing greatly limits their impacts in terms of air quality.

Source 22595 at 2795 Augustine Drive is a new source permitted in 2014 that includes three small diesel engines used in emergencies for fire pumps. BAAQMD does not have emissions data for these engines; however, these engines are small and used infrequently. The source is 850 feet or further from the nearest project buildings. Because the engines are used infrequently, are new and meet the latest emissions standards and are 850 feet or further away from the project, their contribution to the cumulative community risk to the project MEIs is considered to be negligible and these were not included in this assessment.

**Table 4.2-9, Community Health Risk to Project Sensitive Receptors,** summarizes modeled or screening level risk and maximum PM2.5 concentration from each identified nearby stationary source and the total cumulative risk from all sources. As indicated in **Table 4.2-9**, the maximum cancer risk from stationary sources is computed to be 7.2 in 1 million and the maximum annual PM2.5 concentration would be less than 0.1 μg/m³. None of the identified stationary sources exceed the BAAQMD single-source thresholds of 10.0 in 1 million for cancer risk, 0.3 μg/m³ for PM2.5 concentrations, or hazard index threshold of 1.0. The impact associated with stationary source emissions is considered less than significant.

**Table 4.2-9**
**Community Health Risk to Project Sensitive Receptors**

| Emissions Source | Cancer Risk[a] | Hazard Index | Maximum PM2.5 Concentration (μg/m³) |
|---|---|---|---|
| **19142 MW West Properties[b]** | | | |
| Buildings 1 & 2 = 1,850 feet | -- | -- | -- |
| Buildings 3, 4 & 5 = 1,000 feet | 0.3 | <0.01 | <0.01 |
| Building 6 = 650 feet | 0.6 | <0.01 | <0.01 |
| Building 7 = 850 feet | 0.4 | <0.01 | <0.01 |
| **19292 Drawbridge Realty Trust[b]** | | | |
| Buildings 1 & 2 = 1,850 feet | -- | -- | -- |
| Buildings 3, 4 & 5 = 1,000 feet | 0.2 | <0.01 | <0.01 |
| Building 6 = 500 feet | 0.5 | <0.01 | <0.01 |
| Building 7 = 600 feet | 0.4 | <0.01 | <0.01 |
| **19856 ON Semiconductor Inc.[b]** | | | |
| Buildings 1 & 2 = 1,600 feet | -- | -- | -- |
| Buildings 3, 4 & 5 = 1,200 feet | -- | -- | -- |

| Emissions Source | Cancer Risk[a] | Hazard Index | Maximum PM2.5 Concentration (µg/m³) |
|---|---|---|---|
| Building 6 = 1,000 feet | 0.5 | <0.01 | <0.01 |
| Building 7 = 380 feet | 2.4 | <0.01 | <0.01 |
| **19539 CoreSite Real Estate[c]** | | | |
| Buildings 1 & 2 = 1,600 feet | 1.5 – 3.0 | <0.01 | <0.01 |
| Buildings 3, 4 & 5 = 1,200 feet | <0.01 – 2.2 | <0.01 | <0.01 |
| Building 6 = 1,000 feet | <0.01 – 1.0 | <0.01 | <0.01 |
| Building 7 = 380 feet | 1.0 - 2.0 | <0.01 | <0.01 |
| **19198 Kalil Jenab[c]** | | | |
| Buildings 1 & 2 = 200 feet | 7.2 | -- | -- |
| Buildings 3, 4 & 5 = > 200 feet | 7.2 | -- | -- |
| Building 6 = 750 feet | 1.2 | <0.01 | <0.01 |
| Building 7 = 750 feet | 1.2 | <0.01 | <0.01 |
| **17945 Universal Semiconductor Technology[c]** | | | |
| Buildings 1 & 2 = > 1,600 feet | -- | -- | -- |
| Buildings 3, 4 & 5 = > 1,200 feet | -- | -- | -- |
| Building 6 = 1,000 feet | 0.4 | <0.01 | <0.01 |
| Building 7 = 380 feet | 1.9 | <0.01 | <0.01 |
| **Maximum Single Source** | **7.2** | **<0.01** | **<0.01** |
| Single-Source Threshold | *10.0* | *1.0* | *0.3* |
| ***Exceed Threshold?*** | ***No*** | ***No*** | ***No*** |
| **Cumulative Sources** | | | |
| Buildings 1 & 2 | 10.2 | <0.01 | 0.01 |
| Buildings 3, 4 & 5 | 9.9 | <0.01 | 0.01 |
| Building 6 | 4.2 | <0.01 | 0.01 |
| Building 7 | 9.1 | <0.01 | 0.01 |
| Cumulative-Source Threshold | *100.0* | *10.0* | *0.8* |
| ***Exceed Threshold?*** | ***No*** | ***No*** | ***No*** |

*Source: Illingworth & Rodkin, Inc., 2015*

[a]  *Cancer risk reported in excess cases per million.*

[b]  *Source is diesel generators, so used BAAQMD distance multiplier to adjust risk.*

[c]  *Source is diesel generators with only emissions data, so used BAAQMD Risk and Hazards Emission Screening Calculator and distance multiplier to adjust risk.*

## *Community Health Risk Impacts from Roadway Sources*

### Local Roadways

Busy roadways are a source of TAC emissions that can affect new sensitive receptors at the project site. Busy roadways near the project were evaluated using the BAAQMD *Roadway Screening Analysis Calculator* to estimate cancer risk, annual PM2.5, and non-cancer hazard impacts. The roadway orientation (e.g., elevation direction), side of the roadway proximate to the project, distance to the roadway, and traffic volume were entered to the calculator. Daily traffic added by the proposed project was also input to the

calculator. Results of these assessments are summarized in **Table 4.2-10, Roadway Source Excess Cancer Risk and Annual PM2.5 Concentrations at the Proposed Project Site**. A description of the nearby roadways is provided below.

- Scott Boulevard – This roadway, which is adjacent to the project site, is a high-volume local roadway. According to the traffic study, the roadway will carry about 19,000 average daily traffic (ADT) in the future with existing, plus background and plus project traffic projections (i.e., Background + Project). New residences were assumed to be as close as 50 feet from the nearest through travel lane.

- Bowers Avenue – This roadway is a major north-south arterial roadway with a projected traffic volume of 40,700 ADT. The roadway is located 1,000 feet west or further from the closest project buildings.

- San Tomas Expressway – This roadway is a major north-south arterial roadway with a projected traffic volume of 111,939 ADT. The roadway is located 900 feet east or further from the closest project buildings.

The maximum screening cancer risk at the project site from any of these roadway sources is 9.4 in 1 million, and the maximum screening annual PM2.5 concentration would be 0.2 $\mu g/m^3$. These levels do not exceed the single-source thresholds of 10.0 in 1 million for cancer risk and 0.3 $\mu g/m^3$ for PM2.5 concentrations. Note that BAAQMD screening tables indicate that roadways do not pose non-cancer health hazards and therefore a hazard index was not calculated. Only screening methods were used to compute these levels since they were found not to exceed significance levels. Lower impacts would likely have been reported had refined modeling techniques been utilized.

**U.S. Highway 101**

A review of the project area using *Google Earth* along with the BAAQMD *Highway Screening Analysis Tool* identified impacts from U.S. Highway 101 (US 101) located just over 750 feet to the north. The BAAQMD *Highway Screening Analysis Tool* and the *Google Earth map tool* are used to identify estimated screening risk and hazard impacts from highways throughout the Bay Area.[8] Screening level TAC impacts are provided for each State Highway in each county for discrete distances from 10 feet to 1,000 feet. Because this screening tool predicted potentially significant cancer risk and PM2.5 exposures for a portion of the project, a refined health risk analysis was performed using site and project specific data.

Refined modeling of US 101 was conducted that took into account traffic volume and vehicle mix reported by Caltrans, air pollutant emission rates using CARB's EMFAC2011 model, dispersion modeling

---

[8] Available at http://www.baaqmd.gov/plans-and-climate/california-environmental-quality-act-ceqa/ceqa-tools (accessed September 1, 2015).

using U.S. EPA's CAL3QHCR roadway model with historical meteorological data, and cancer risk calculations that incorporate age sensitivity factors. A review of the traffic information reported by Caltrans indicates that US 101 near the project traffic includes 191,000 annual average vehicles per day that are about 4.2 percent trucks, of which 1.8 percent are considered heavy duty trucks and 2.4 percent are medium duty trucks.[9]

Note that cancer risk includes effects of diesel particulate matter emissions and TACs from total organic emissions that come from gasoline-powered vehicles. The cancer risk calculations assume infants and small children would occupy the project. Annual PM2.5 concentrations include exhaust, tire wear, brake wear, and re-entrained roadway dust emissions.

The maximum cancer risk from Highway 101 at the project site is computed at 7.4 in 1 million and the maximum annual PM2.5 concentration would be 0.3 $\mu g/m^3$. These levels do not exceed the single-source thresholds of 10.0 in one million for cancer risk and 0.3 $\mu g/m^3$ for PM2.5 concentrations.[10] Therefore, roadway impacts are expected to be lower than modeled values.

**Table 4.2-10**
**Roadway Source Excess Cancer Risk and Annual PM2.5 Concentrations at Proposed Project Site**

| Roadway Source | Cancer Risk[a] | Hazard Index | Maximum PM2.5 Concentration ($\mu g/m^3$) |
|---|---|---|---|
| **US 101 – 191,000 ADT [b]** | | | |
| Buildings 1 & 2 = 850 feet south | 2.5 – 5.3 | <0.01 | 0.1 – 0.2 |
| Buildings 3, 4 & 5 = 730 feet south | 2.9 – 7.4 | <0.01 | 0.1 – 0.3 |
| Building 6 = 870 feet south | 3.2 – 4.9 | <0.01 | 0.1 – 0.2 |
| Building 7 = >1,000 feet south | 2.1 – 3.0 | <0.01 | 0.1 |
| **Scott Boulevard –19,204 ADT [c]** | | | |
| Buildings 1 & 2 = 50 feet north | 2.0 – 8.5 | <0.01 | <0.1 – 0.2 |
| Buildings 3, 4 & 5 = 50 feet north | 2.0 – 8.5 | <0.01 | <0.1 – 0.2 |
| Building 6 = 50 feet north | 2.0 – 8.5 | <0.01 | <0.1 – 0.2 |
| Building 7 = 50 feet north | 2.2 – 9.4 | <0.01 | 0.1 – 0.2 |

---

[9]    California Department of Transportation. 2014a. *2013 Annual Average Daily Truck Traffic on the California State Highway System.*

[10]   The maximum calculated concentration modeled at the site of a future building the project site is 0.33 $\mu g/m^3$. However, the BAAQMD threshold is 0.3, not 0.30, and the third significant figure (i.e., 0.03) is mathematically not meaningful, given the other data inputs. It is standard practice to round down to 0.3 if the calculated concentration is less than 0.35. In addition, the calculated value did not take into account the 8 story office structures that will be constructed between Highway 101 and the residential project. Studies indicate that the presence of an obstruction or barrier along a highway can reduce concentrations of particulate matter due to the creation of diversions and diffusion. Sonoma Technology, Inc. 2011. *Soundwall Impacts on Near-road Air Quality.* January.

| Roadway Source | Cancer Risk[a] | Hazard Index | Maximum PM2.5 Concentration (μg/m³) |
|---|---|---|---|
| **Bowers Avenue – 40,700 ADT [c]** | | | |
| Buildings 1 & 2 = 1,000 feet east | * - 2.3 | <0.01 | 0.1 |
| Buildings 3, 4 & 5 = >1,000 feet | * | * | * |
| Building 6 = >1,000 feet | * | * | * |
| Building 7 = >1,000 feet | * | * | * |
| **Montague/San Tomas Expressway – 111,939 ADT [c]** | | | |
| Buildings 1 & 2 = >1,000 feet | * - 3.3 | <0.01 | * - 0.1 |
| Buildings 3, 4 & 5 = >1,000 feet | 3.3 | <0.01 | 0.1 |
| Building 6 = 1,000 feet west | 3.3 | <0.01 | 0.1 |
| Building 7 = 900 feet west | 3.4 | <0.01 | 0.1 |
| **Maximum Single Source** | **9.4** | **<0.01** | **0.3** |
| Single-Source Threshold | *10.0* | *1.0* | *0.3* |
| ***Exceed Threshold?*** | ***No*** | ***No*** | ***No*** |
| **Combined Sources** | | | |
| Buildings 1 & 2 | 14.3 | <1 | 0.3 |
| Buildings 3, 4 & 5 | 14.7 | <1 | 0.4 |
| Building 6 | 15.0 | <1 | 0.3 |
| Building 7 | 15.7 | <1 | 0.4 |
| Combined-Source Threshold | *100.0* | *10.0* | *0.8* |
| ***Exceed Threshold?*** | ***No*** | ***No*** | ***No*** |

*Source: Illingworth & Rodkin, Inc., 2015*

*Note: If source greater than 1,000 feet, then value reported as **

[a]  *Cancer risk reported in excess cases per million.*

[b]  *Refined modeling using EMFAC2011 and CAL3QHCR*

[c]  *BAAQMD Roadway Screening Calculator*

## Summary of Community Health Risk Level Impacts

Scott Boulevard traffic would present the maximum single-source cancer risk of 9.4 in 1 million, based on the screening roadway calculator. The maximum single-source annual PM2.5 concentration was from U.S. Highway 101, modeled as 0.3 μg/m³. Stationary sources had lower maximum impacts. These impacts would be even lower had refined modeling techniques been utilized.

The combined community health risk levels were computed at the receptor most influenced by nearby sources. This was conservatively assessed by adding the highest effects from stationary sources to the highest roadway effects, assuming the maximum effect from each source occurs at the same location. These combined community health risk levels are shown in **Table 4.2-11, Combined Maximum Community Health Risk Levels**. The combined cancer risk, annual PM2.5 concentrations, and non-cancer hazards from all cumulative sources in the project vicinity would be below the cumulative source significance thresholds. Therefore, the impact on project site receptors would be less than significant.

**Table 4.2-11**
**Combined Maximum Community Health Risk Levels**

| Building | Health Risk Modeling or Adjusted Screening Level Results | | |
| --- | --- | --- | --- |
| | Cancer Risk | Hazard Index | PM2.5 (µg/m3) |
| Buildings 1 & 2 | 14.3 | <1 | 0.3 |
| Buildings 3, 4 & 5 | 14.7 | <1 | 0.4 |
| Building 6 | 19.2 | <1 | 0.3 |
| Building 7 | 24.8 | <1 | 0.4 |
| *Cumulative Source Threshold* | *100* | *10* | *0.8* |
| **Exceed Threshold?** | **No** | **No** | **No** |

*Source: Illingworth & Rodkin, Inc., 2015*

**Mitigation Measures:** No mitigation measures are required.

---

**Impact AIR-6:** **The proposed project would not create objectionable odors affecting a substantial number of people. (*Less than Significant*)**

Project construction would generate localized emissions of diesel exhaust during equipment operation and truck activity. These emissions may be noticeable from time to time to adjacent receptors. However, they would be temporary, short-term, and localized and are not likely to result in confirmed odor complaints. Furthermore, BAAQMD BMPs would be implemented to minimize diesel exhaust emissions emitted on the project site during construction. The odor impact from construction-phase emissions would be less than significant. The proposed project does not include any land uses that could subject existing receptors in the project vicinity to substantial odors.

There are no sources of substantial odors near the project site that could subject the new residents of the site to substantial odors. There would be no impact on the new residents related to exposure to odors.

**Mitigation Measures:** No mitigation measures are required.

---

## 4.2.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact AIR-1:**    **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would result in significant cumulative air quality impacts. (*Significant; Significant and Unavoidable*)**

CEQA defines cumulative impacts as two or more individual effects which, when considered together, are either significant or "cumulatively considerable," meaning they add considerably to a significant environmental impact. Cumulative impacts can result from individually minor but collectively significant projects (*State CEQA Guidelines* Section 15355). An adequate cumulative impact analysis considers a project over time and in conjunction with other past, present, and reasonably foreseeable future projects whose impacts might compound those of the project being assessed.

According to the BAAQMD's *CEQA Air Quality Guidelines*, project emissions that do not exceed the BAAQMD emission thresholds would not have a significant cumulative impact whereas a proposed project that would individually have a significant air quality impact would also be considered to have a significant cumulative air quality impact. The mass-based significance thresholds published by the BAAQMD are designed to ensure compliance with both NAAQS and CAAQS and are based on an inventory of projected emissions in the SFBAAB. As these are based on the projected growth in the SFBAAB, if a project is estimated to result in emissions that do not exceed the thresholds, the project's contribution to the cumulative impact on air quality would not be substantial. As discussed in **Impact AIR-1** and shown in **Table 4.2-7**, the construction emissions associated with the proposed project would not exceed emission thresholds. However, as discussed in **Impact AIR-2** and shown in **Table 4.2-8**, the project's operational emissions of ROG are predicted to exceed the significance thresholds by 12 percent and these emissions would be considered significant. As noted in **Impact AIR-3**, this project would help address the jobs-housing imbalance in the area and if only 15 percent of the project residents relocate to the site from other parts of the Bay Area, the exceedance of the ROG threshold would not occur. As required by **Mitigation Measure AIR-2**, the project applicant will develop and implement a TDM program which would further reduce the project's mobile emissions. However, no feasible mitigation measures are available to reduce the operational emissions of ROG from consumer product use, and the reductions achieved by the TDM program would not be adequate to fully mitigate the impact. Therefore, the project's impact related to ROG emissions would be significant and unavoidable. Accordingly, the cumulative impact relative to ROG emissions from project operations would also be considered significant and unavoidable.

**Mitigation Measures:** No mitigation measures are feasible.

**Significance after Mitigation**: Significant and unavoidable

---

### 4.2.5    REFERENCES

Bay Area Air Quality Management District (BAAQMD). 2001. *Revised San Francisco Bay Area Ozone Attainment Plan for the 1-Hour National Ozone Standard*. October.

BAAQMD. 2006. *Bay Area 2005 Ozone Strategy*. January.

BAAQMD. 2010. *Air Toxics NSR Program Health Risk Screening Analysis (HSRA) Guidelines.* January.

BAAQMD. 2010. *Bay Area 2010 Clean Air Plan*. September.

BAAQMD. 2011. *CEQA Air Quality Guidelines*. May.

BAAQMD. 2012. Recommended Methods for Screening and Modeling Local Risks and Hazards. May.

California Air Resources Board and Office of Environmental Health Hazard Assessment. 2015. "Consolidated Table of OEHHA/ARB Approved Risk Assessment Health Values." http://www.arb.ca.gov/toxics/healthval/contable.pdf.

City of Santa Clara. 2010. City of Santa Clara 2010-2035 General Plan. November 16. Updated in December 2014.

Illingworth & Rodkin. 2015. *Santa Clara Square – Air Quality and Greenhouse Gas Emission Assessment, Santa Clara, California*. September 30.

## 4.3   BIOLOGICAL RESOURCES

### 4.3.1   INTRODUCTION

This section evaluates the potential impacts to biological resources from the construction and occupancy of the proposed project. The biological resources addressed in this section include special-status plants and wildlife, sensitive habitats, and conservation plans. Regulations and policies affecting biological resources in the City of Santa Clara are also described. Information presented in this section is based on a biological assessment prepared for the project by WRA Environmental Consultants. This report is included in **Appendix 4.3** of this Draft EIR**.**

### 4.3.2   ENVIRONMENTAL SETTING

#### 4.3.2.1   Regional Location

The City of Santa Clara is located in the Santa Clara Valley near the southwestern end of San Francisco Bay. The Santa Clara Valley is bounded on the west by the Santa Cruz Mountains and on the east by the Diablo Range.

#### 4.3.2.2   Project Site

The project site is an approximately 33.4-acre site located in the central portion of the City of Santa Clara on Scott Boulevard, between Bowers Avenue and San Tomas Aquino Creek. The project site is developed with 13 one- and two-story office buildings (some buildings are connected), parking lots, internal roadways, and landscaping. Surface parking surrounds all of the buildings. The parking lots and buildings are flanked by mature trees and landscaping consisting of irrigated lawn, ground cover, and shrubs. Approximately 80 percent of the project site is currently under impervious surfaces (buildings, internal roadways, sidewalks, and parking lots). The remaining 20 percent of the site is pervious and landscaped with trees and shrubs.

The project site contains many ornamental trees planted as landscaping when the parcels were developed. The site is dominated by oaks (*Quercus sp.*), olive (*Olea europaea*) and redwood (*Sequoia sempervirens*) trees. All of the trees are non-native, ornamental species, and are not any of the species specifically named in the General Plan as Protected trees, nor are any of the trees listed as Heritage trees by the City. The non-native/ornamental trees present on-site provide suitable habitat for two special-status wildlife species and many common birds, whose nests and nesting habitat are protected during nesting bird season (February 1 through August 31) per the Migratory Bird Treaty Act (16 USC. 704).

### 4.3.2.3     Surrounding Land Uses

The area surrounding the project site is fully developed and consists mainly of office and manufacturing uses. Office uses are located to the south, west, and to the east. High-rise office buildings and parking garages are under construction to the north. Scott Boulevard crosses the southern portion of the project site.

### 4.3.2.4     Plant Communities and Wildlife Habitat Special-Status Wildlife Species

For purposes of this analysis, special-status wildlife species are defined as those that are state or federally listed as Threatened or Endangered, proposed for listing as Threatened or Endangered, designated as state or federal candidates for listing, a federal Bird of Conservation Concern, a state Species of Special Concern, a state Fully Protected Animal, or a species that may otherwise be considered "Rare" under Section 15380 of the *2015 California Environmental Quality Act (CEQA) Guidelines*.

### *Special-Status Wildlife Species*

Known occurrences of special-status wildlife species are documented in the California Natural Diversity Data Base (CNDDB). To identify special-status wildlife species that have historically occurred in the vicinity of the project site, the CNDDB was reviewed for the USGS 7.5-minute quadrangle on which the project site is located (i.e., West San Jose) and the surrounding quadrangles which cover a radius of 5 miles from the project site (i.e., San Jose East, Cupertino, Mountain View, Milpitas, and Calaveras Reservoir). The results of the search indicate that 55 special-status wildlife species have been documented in the vicinity of the project site (**Appendix 4.3**). Due to the developed nature of the project site and its vicinity, of the 55 special-status wildlife species recorded within a 5-mile radius of the project site, only two special-status wildlife species have a moderate potential to occur or have been recorded as present on the site: Nuttall's woodpecker (*Picoides nuttallii*) and oak titmouse (*Baeolophus inornatus*). The remaining special-status wildlife species are not likely to occur on or adjacent to the project site due to specific habitat requirements not identified in the project study area. Special-status wildlife species documented in the broader project study area are found in natural habitats, including oak woodland, chaparral, coastal scrub, grassland or coastal saltmarsh, or have specialized requirements such as wetland habitats which are absent from the project site (WRA 2015).

**Nuttall's woodpecker**

This species is a federal Bird of Conservation Concern and state Species of Special Concern. Nuttall's woodpecker, common in much of its range, is a year-round resident throughout most of California west of the Sierra Nevada. Typical habitat is oak or mixed woodland, and riparian areas. Nesting occurs in tree

them are considered to be highly imperiled, and therefore, are considered to be sensitive plant communities.

The project site is developed and composed of impervious surfaces (buildings, internal roadways, sidewalks, and parking lots), lawn, shrubs, and non-native ornamental trees. No sensitive vegetation or aquatic communities are present within the project site. The site has been designed to move surface water away and prevent ponding anywhere on the site. No evidence of saturation or inundation was observed during the site visit. Thus, no sensitive aquatic communities are present within the project site. Additionally, the vegetation present within the site is not a native vegetation community, and it is maintained as such, which precludes the growth of native, sensitive vegetation communities throughout the site (WRA 2015).

San Tomas Aquino Creek is located approximately 50 feet east of the project site, and it is considered a sensitive biological community. The creek has been heavily altered from its natural state in the project vicinity. It is bound by paved and concrete reinforced levies on both banks. Box culverts are also present under many of the bridge crossings, including the Scott Boulevard Bridge. These alterations channelize the creek and prevent it from interacting with the surrounding developed areas. Although the creek is located outside the footprint of the proposed project, the creek may receive runoff from the project site via the municipal storm drains. Though San Tomas Aquino Creek has been channelized and altered from its native state, it still supports native plant species and several native fish species. Historic records documented steelhead (*Oncorhynchus mykiss*) in the creek; however, recent surveys have shown that steelhead have not occupied the creek in recent years, and they are considered absent (WRA 2015).

## Wildlife Movement Corridors

Wildlife corridors are described as pathways or habitat linkages that connect discrete areas of natural open space otherwise separated or fragmented by topography, changes in vegetation, and other natural or manmade obstacles such as urbanization. Fragmentation of natural habitat creates isolated "islands" of habitat that may not provide sufficient area or resources to accommodate sustainable populations for a number of species, adversely affecting both genetic and species diversity. Wildlife corridors partially or largely mitigate the adverse effects of fragmentation by (1) allowing animals to move between remaining habitats to replenish depleted populations and increase the gene pool available, (2) providing escape routes from fire, predators, and human disturbances, thus reducing the risk that catastrophic events (such as fire or disease) will result in population or species extinction, and (3) serving as travel paths for individual animals moving throughout their home range in search of food, water, mates, and other needs, or for dispersing juveniles in search of new home ranges. The project site is fully developed and is surrounded by development. San Tomas Aquino Creek to the east has been channelized, and is separated

cavities, principally those of oaks and larger riparian trees. This species forages on a variety of arboreal invertebrates.

This species was observed foraging in oak trees along the eastern portion of the project site. Suitable nesting trees are limited within the project site, however the oak trees along the eastern portion of the project site may provide nesting as well as foraging habitat for the species. This species is relatively common within this portion of its range (WRA 2015).

**Oak titmouse**

This species is a federal Bird of Conservation Concern. This relatively common species is a year-round resident throughout much of California including most of the coastal region, the Central Valley and the western Sierra Nevada foothills. Its primary habitat is woodland dominated by oaks. Local populations have adapted to woodlands of pines and/or junipers in some areas. The oak titmouse nests in tree cavities, usually natural cavities or those excavated by woodpeckers, though they may partially excavate their own. Seeds and arboreal invertebrates make up the species' diet.

This species commonly occurs within urbanized areas where oaks are present. Because the species utilizes tree cavities for nesting, only certain trees such as oaks can provide nesting habitat for the species. Trees suitable for nesting within the project site are limited. However, due to the presence of suitable trees and access to low quality urban foraging habitat within the project site, there is a moderate potential for this species to occur within the project site (WRA 2015).

### *Special-Status Plant Species*

For the purposes of this analysis, special-status plants include those species that are state or federally listed as Rare, Threatened or Endangered; federal candidates for listing; proposed for state or federal listing; or included on Lists 1 and 2 of the California Native Plant Society (CNPS) Inventory of Rare and Endangered Plants of California (CNPS Inventory).

To identify special-status plant species that have historically occurred in the vicinity of the project site, the same USGS quadrangles were reviewed that were reviewed to identify special-status wildlife species. The results of the search indicate that 52 special-status plant species have been documented in the vicinity of the project site (**Appendix 4.3**). However, due to the developed nature of the project site and its vicinity, no special-status plant species have potential to occur on the project site. Special-status plant species documented in the broader project study area are found in natural habitats, including oak woodland, chaparral, coastal scrub, grassland or coastal saltmarsh, or have specialized requirements such as serpentine or clay soils or wetland habitats which are absent from the project site (WRA 2015).

## Serpentine Grassland

Serpentine grassland is a rare land cover type found in pockets throughout California. This land cover type is not found at the project site but is described here because of its importance for special-status species. The serpentine grasslands in the South Bay support the Bay checkerspot butterfly, a federally threatened species, along with several rare plant species. Air quality modeling and habitat analysis have demonstrated how serpentine grasslands in the Santa Clara Valley have been affected by atmospheric nitrogen sources from throughout the South Bay.[1] Nitrogen becomes airborne and then eventually settles out on the landscape. When it settles out onto natural habitats it serves as an inadvertent fertilizer, adding nitrogen to the soil. Serpentine grasslands are naturally nutrient poor, which is what makes them unique. As a result, a nutrient-poor habitat creates an environment where many rare plants occur. When those habitats are fertilized by atmospheric nitrogen, it enables nonnative plants to overrun the native plants and reduce habitat quality overall.

An adverse impact on serpentine grasslands could result in loss of habitat for the federally threatened Bay checkerspot butterfly, which relies on the native dotseed plantain (*Plantago erecta*).[2] The dotseed plantain grows only in serpentine grassland habitat. The added nitrogen allows nitrogen-poor serpentine soils to be invaded by nonnative annual grasses that displace the native forbs that provide caterpillar food and adult nectar for the butterfly. Native species' cover and richness are reduced, and native plant species, including the dotseed plantain, become less prevalent. The major invasive grass species include Italian ryegrass and soft brome, with localized stands of common barley and compact brome (*Bromus madritensis*). Dense stands of dotseed plantain across many slopes and soil depths are essential for Bay checkerspot butterfly populations. Loss of host plants and nectar sources due to nonnative grass invasions leads to rapid declines and eventual local extinction of populations.

## Sensitive Biological Communities

Sensitive plant communities are communities that are of limited distribution statewide or within a county or region and are often vulnerable to environmental effects of projects. These communities may or may not contain special-status species or their habitat. The most current version of the *Vegetation Alliances and Associations, Vegetation Classification and Mapping Program* (CDFG 2011) indicates the level of rarity and imperilment of vegetation types. For alliances with state ranks of S1 through S3, all associations within

---

[1] Santa Clara Valley Habitat Agency. 2012. Final Santa Clara Valley Habitat Plan. Available at: http://scv-habitatagency.org/178/Final-Habitat-Plan.

[2] *Plantago erecta* is referred to by a number of common names; the Santa Clara Valley Habitat Plan refers to it as dwarf plantain.

from the project site by a fence, levee, paved trail, and concrete lined banks. . Therefore, the site is not considered to be part of an established wildlife movement corridor.

## *Waters of the United States and Waters of the State*

Wetlands, creeks, streams, and permanent and intermittent drainages are subject to the jurisdiction of the US Army Corps of Engineers (USACE) under Section 404 of the Federal Clean Water Act. The CDFW also generally has jurisdiction over these resources pursuant to Sections 1602-1603 of the California Fish and Game Code. The project site is fully developed, and consists of parking lots, office buildings, and landscaped grounds.

## 4.3.3     REGULATORY CONSIDERATIONS

### 4.3.3.1     Federal and State Laws and Regulations

### *Federal Endangered Species Act*

Under the federal Endangered Species Act (FESA), the Secretary of the Interior and the Secretary of Commerce have joint authority to list a species as Threatened or Endangered (16 United States Code [USC] 1533[c]). Pursuant to the requirements of the FESA, an agency reviewing a proposed project within its jurisdiction must determine whether any federally listed or proposed species may be present in the project region, and whether the proposed project would result in a "take"[3] of such species. The "take" provision of the FESA applies to actions that would result in injury, death, or harassment of a single member of a species protected under the Act. In addition, the agency is required to determine whether the project is likely to jeopardize the continued existence of any species proposed to be listed under the FESA, or result in the destruction or adverse modification of critical habitat for such species (16 USC 1536[3][4]). If it is determined that a project may result in the "take" of a federally listed species, a permit from the US Fish and Wildlife Service (USFWS) would be required under Section 7 or Section 10 of the FESA. Section 7 applies if there is a federal nexus (e.g., the project is on federal land, the lead agency is a federal entity, a permit is required from a federal agency, or federal funds are being used). Section 10 applies if there is no federal nexus.

---

[3]  "Take," as applied in Section 9 of the FESA, means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect or to attempt to engage in any such conduct." "Harass" is further defined by the USFWS (50 CFR. Section 17.3) as an intentional or negligent act or omission that creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, and sheltering. "Harm" is defined as "an act which actually kills or injures wildlife." This may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

Substantial, adverse project-related impacts to FESA-listed species or their habitats would be considered significant impacts in this EIR. Proposed species are granted limited protection under the FESA and must be addressed in Biological Assessments (under Section 7 of the Act); proposed species otherwise have no protection from "take" under federal law, unless they are emergency-listed species. Candidate species are afforded no protection under the Act. However, the USFWS recommends that candidate species and species proposed for listing also be considered in informal consultation during a project's environmental review.

## Clean Water Act

The federal Water Pollution Control Act of 1972, often referred to as the Clean Water Act, is the nation's primary law for regulating discharges of pollutants into waters of the United States. The objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The regulations adopted pursuant to the Act deal extensively with the permitting of actions in waters of the United States, including wetlands. The Act's statutory sections and implementing regulations provide more specific protection for riparian and wetland habitats than any other federal law. The US Environmental Protection Agency (US EPA) has primary authority under the Clean Water Act to set standards for water quality and for effluents, but the USACE has primary responsibility for permitting the discharge of dredge or fill materials into streams, rivers, and wetlands.

## Migratory Bird Treaty Act

The federal Migratory Bird Treaty Act (16 USC, Section 703, Supplement I, 1989) prohibits killing, possessing, or trading in migratory birds, except in accordance with regulations prescribed by the Secretary of the Interior. The Act encompasses whole birds, parts of birds, and bird nests and eggs.[4]

## California Endangered Species Act

Under the California Endangered Species Act (CESA), the CDFW has the responsibility for maintaining a list of Threatened and Endangered species (California Fish and Game Code Section 2070). The CDFW also maintains a list of "candidate species," which are species formally under review for addition to either the list of Endangered species or the list of Threatened species. In addition, the CDFW maintains lists of "species of special concern," which serve as watch lists. Pursuant to the requirements of the CESA, an agency reviewing a proposed project within its jurisdiction must determine whether any state-listed

---

[4] The Act covers hundreds of birds, including varieties of loon, grebe, albatross, booby, pelican, cormorant, heron, stork, swan, goose, duck, vulture, eagle, hawk, falcon, fail, plover, avocet, sandpiper, phalarope, gull, tern, murre, puffin, dove, cuckoo, roadrunner, owl, swift, hummingbird, kingfisher, woodpecker, swallow, jay, magpie, crow, wren, thrush, mockingbird, vireo, warbler, cardinal, sparrow, blackbird, finch, and many others.

Endangered or Threatened species could be present on the project site and determine whether the proposed project could have a potentially significant impact on such species. In addition, the CDFW encourages informal consultation on any proposed project that may affect a candidate species. Project-related impacts to species on the CESA Endangered or Threatened lists would be considered significant impacts in this EIR. Impacts to "species of concern" would be considered significant if the species met the criteria set forth under the *State CEQA Guidelines* Section 15380, or if the species were also protected under any of the other statutes or policies discussed in this section.

## California Native Plant Protection Act

State listing of plant species began in 1977 with the passage of the California Native Plant Protection Act (NPPA), which directed the CDFW to carry out the legislature's intent to "preserve, protect, and enhance Endangered plants in this state." The NPPA gave the California Fish and Wildlife Commission the power to designate native plants as Endangered or Rare and to require permits for collecting, transporting, or selling such plants. The CESA expanded upon the original NPPA and enhanced legal protection for plants. The CESA established Threatened and Endangered species categories and grandfathered all Rare animals (but not Rare plants) into the act as Threatened species. Thus, there are three listing categories for plants in California: Rare, Threatened, and Endangered.

## California Fish and Game Code

The California Fish and Game Code provides a variety of protections for species that are not federally or state-listed as Threatened, Endangered, or of special concern.

- Section 3503 protects all breeding native bird species in California by prohibiting the take,[5] possession, or needless destruction of nests and eggs of any bird, with the exception of non-native English sparrows and European starlings (Section 3801).

- Section 3503.5 protects all birds of prey (in the orders Falconiformes and Strigiformes) by prohibiting the take, possession, or killing of raptors and owls, their nests, and their eggs.

- Section 3513 of the code prohibits the take or possession of migratory nongame birds as designated in the Migratory Bird Treaty Act or any parts of such birds except in accordance with regulations prescribed by the Secretary of the Interior.

- Section 3800 of the code prohibits the taking of nongame birds, which are defined as birds occurring naturally in California that are not game birds or fully protected species.

---

[5] "Take" in this context is defined in Section 86 of the California Fish and Game Code as to "hunt, pursue, catch, capture, or kill, or to attempt to hunt, pursue, catch, capture, or kill."

- Section 3511 (birds), Section 5050 (reptiles and amphibians), and Section 4700 (mammals) designate certain wildlife species as fully protected in California.

## 4.3.3.2    Local Plans and Policies

### *City of Santa Clara General Plan*

**General Land Use Policies**

| | |
|---|---|
| **Policy 5.3.1-P10** | Provide opportunities for increased landscaping and trees in the community, including requirements for new development to provide street trees and a minimum 2:1 on- or off-site replacement for trees removed as part of the proposal to help increase the urban forest and minimize the heat island effect. |

**Conservation Goals**

| | |
|---|---|
| **Goal 5.10.1-G1** | The protection of fish, wildlife and their habitats, including rare and endangered species. |
| **Goal 5.10.1-G2** | Conservation and restoration of riparian vegetation and habitat. |

**Conservation Policies**

| | |
|---|---|
| **Policy 5.10.1-P1** | Require environmental review prior to approval of any development with the potential to degrade the habitat of any threatened or endangered species. |
| **Policy 5.10.1-P2** | Work with Santa Clara Valley Water District and require that new development follow the "Guidelines and Standards for Lands Near Streams" to protect streams and riparian habitats. |
| **Policy 5.10.1-P3** | Require preservation of all City-designated heritage trees listed in the Heritage Tree Appendix 8.10 of the General Plan. |
| **Policy 5.10.1-P4** | Protect all healthy cedars, redwoods, oaks, olives, bay laurel and pepper trees of any size, and all other trees over 36 inches in circumference measured from 48 inches above-grade on private and public property as well as in the public right-of-way. |
| **Policy 5.10.1-P5** | Encourage enhancement of land adjacent to creeks in order to foster the reinstatement of natural riparian corridors where possible. |

**Policy 5.10.1-P11**    Require use of native plants and wildlife compatible non-native plants, when feasible, for landscaping on City property.

**Policy 5.10.1-P12**    Encourage property owners and landscapers to use native plants and wildlife-compatible nonnative plants, when feasible.

## Santa Clara City Code

### Chapter 12.35 Trees and Shrubs

*12.35.020 Alteration or removal – Permit required.*

*No tree, plant or shrub planted or growing in the streets or public places of the City shall be altered or removed without obtaining a written permit from the superintendent of streets. No person without such authorization shall trench around or alongside of any such tree, plant or shrub with the intent of cutting the roots thereof or otherwise damaging the same. (Ord. 931 § 2; Ord. 1140 § 7, 4-19-68. Formerly § 30-2).*

*Stat. Ref.: Injury to trees and shrubs, C.C. § 3346; C.C.P. §§ 733 and 734; Pen. C. §§ 600 and 622; Sts. & H.C.A. § 730.5.*

## City of Santa Clara Community Design Guidelines

### Landscaping

Minimum Planting Sizes:

The following minimum plant sizes shall apply when landscaping is required as a condition of approval or in any planting area within the public right-of-way. Other standards may apply in cases where particular planting requirements must be met.

Trees:

1.  Minimum fifteen (15) gallon on private property

2.  Minimum fifteen (15) gallon street tree

3.  Minimum twenty-four (24) or thirty-six (36) inch box to replace a mature tree which has been or is proposed to be removed

## 4.3.4    IMPACTS AND MITIGATION MEASURES

### 4.3.4.1    Significance Criteria

In accordance with Appendix G of the *State CEQA Guidelines*, the impact of the proposed project on biological resources would be considered significant if it would:

- have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS;

- have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS;

- have a substantial adverse effect on federally protected wetlands as defined by Section 404 of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) Through direct removal, filling, hydrological interruption, or other means;

- interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites;

- conflict with the provisions of an adopted habitat conservation plan, natural community conservation plan, or other approved local, regional, or state habitat conservation plan; or

- conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance.

### 4.3.4.2    Methodology

The analysis below compares identified impacts to the standards of significance stated above and determines the impact's level of significance under CEQA. If the impact is determined to be significant, the analysis identifies feasible mitigation measures to eliminate the impact or reduce it to a less than significant level. If the impact cannot be reduced to a less than significant level after implementation of all feasible mitigation measures, then the impact is identified as significant and unavoidable. The project's potential contribution to cumulative impacts is also identified.

### 4.3.4.3    Project Impacts and Mitigation Measures

**Impact BIO-1:**            **The proposed project could have an adverse effect on special-status bird and non-special status bird species during the nesting season.** (*Potentially Significant; Less than Significant with Mitigation*)

A site assessment dated May 2015 was prepared by WRA Environmental Consultants to determine whether sensitive biological communities and special-status plant and wildlife species or their habitat are present on the project site that could be potentially affected by the proposed project. This assessment is included in its entirety in **Appendix 4.3** of this Draft EIR.

Due to the developed nature of the project site, no special-status plant species have potential to occur on the project site. Similarly, due to the poor quality foraging and roosting habitat, there is no potential for special-status bat species to be on the project site (WRA 2015). The project site does not contain suitable habitat for any other special-status mammal, amphibian, or invertebrate species.

The project site contains many non-native ornamental trees planted as landscaping when the parcel was developed. The trees provide suitable nesting and foraging habitat for two special-status bird species, Nuttall's woodpecker (USFWS Bird of Conservation Concern and state Species of Special Concern) and oak titmouse (USFWS Bird of Conservation Concern), as well as non-special status birds that are protected when nesting under the Migratory Bird Treaty Act (MBTA). As a result, there is potential to significantly affect these bird species if trees or structures containing active nests are removed, pruned, or otherwise disturbed during the breeding season (February 1 through August 31). Additionally, loud noise associated with construction activity has the potential to disturb nesting occurring in close proximity to the construction zone and result in the abandonment of an active nest. The loss of an active nest is considered a potentially significant impact.

**Mitigation Measure BIO-1** would be implemented to mitigate impacts to special-status birds and non-special status birds protected under the MBTA to a less than significant level.

**Mitigation Measures:**

**BIO-1**            For the protection of special status bird species and birds species protected by the Migratory Bird Treaty Act and Fish and Game Codes, project activities shall occur during the non-breeding bird season to the extent feasible (September 1 – January 31). However, if vegetation removal, grading, demolition of structures, or initial ground-disturbing activities must occur during the breeding season (February 1 through August 31), a survey for active bird nests shall be conducted by a qualified biologist no more than 14

days prior to the start of these activities. The survey shall be conducted in a sufficient area around the work site to identify the location and status of any nests that could potentially be affected by project activities.

If active nests of protected species are found within project impact areas or close enough to these areas to affect breeding success, a work exclusion zone shall be established around each nest by a qualified biologist. Established exclusion zones shall remain in place until all young in the nest have fledged or the nest otherwise becomes inactive (e.g., due to predation). Appropriate exclusion zone sizes vary dependent upon bird species, nest location, existing visual buffers and ambient sound levels, and other factors; an exclusion zone radius may be as small as 50 feet (for common, disturbance-adapted species) or as large as 250 feet or more for raptors. Exclusion zone size may also be reduced from established levels if supported with nest monitoring by a qualified biologist indicating that work activities outside the reduced radius are not adversely impacting the nest.

**Significance after Mitigation:** Less than significant

---

| Impact BIO-2: | **The proposed project could affect any riparian habitat, sensitive natural community, or wetlands nor interfere with the movement of any wildlife species. (***Potentially Significant; Less than Significant with Mitigation***)** |

The project site is completely developed, and no riparian habitat or other sensitive natural community is present on the site. Therefore, the project would not directly affect onsite riparian habitat or other sensitive natural communities. The project site borders San Tomas Aquino Creek and is separated from the project site by a berm approximately 6 feet high. The creek is not within the project site and no project-related construction activities would occur in the creek. However, the creek may receive runoff from the project site following rain events. Runoff from the site during construction could contain sediment and result in excess siltation in the creek, which in turn could impact aquatic species by interfering with gill function. Other contaminants such as fuels and lubricants could also be inadvertently discharged into the creek with the runoff from the construction site which would adversely affect the aquatic resources in the creek. This would be considered a potentially significant impact. **Mitigation Measure BIO-2** would be implemented to mitigate impacts to aquatic species in San Tomas Aquino Creek to a less than significant level.

There is no serpentine grassland habitat on or near the site, but as discussed in **Section 4.11, Transportation and Traffic**, the project would generate approximately 7,390 new daily vehicle trips, which in turn would result in the release of nitrogen into the atmosphere. As discussed above, an increase in nitrogen could have a negative effect on the dotseed plantain found in serpentine grassland habitat, which is essential for Bay checkerspot butterfly populations. Loss of host plants and nectar sources due to nonnative grass invasions could lead to a rapid decline and eventual extinction of the populations.

The closest Bay checkerspot butterfly populations to the project site are in the Santa Teresa hills, just south of San Jose (approximately 14.5 miles from the project site) and on Coyote Ridge (approximately 17 miles south of the project site). In 2012, the Santa Clara Valley Habitat Plan conducted an analysis to estimate the contributions of various sources and geographic areas to nitrogen deposition within the Bay checkerspot butterfly habitats (SCVHCP Appendix E).[6] The air quality analysis completed for receptors in those locations, and others farther south, determined that 46 percent of nitrogen deposited on serpentine grasslands in Santa Clara County comes from mobile and stationary sources within the City of San Jose. Other parts of Santa Clara County, including the City of Santa Clara, but excluding Gilroy and Morgan Hill, contribute 12.8 percent of the deposited nitrogen. The remaining 41.2 percent was attributed to sources in Gilroy and Morgan Hill, as well as other Bay Area counties (San Mateo, San Francisco, Alameda, Contra Costa) plus sources as distant as Nevada.

In 2013, the U.S. Fish & Wildlife Service (USFWS) recognized that the analysis in SCVHCP Appendix E constitutes "the best scientific information available at this time for the Action Area [i.e., the Santa Clara Valley Habitat Conservation Plan Area, which does not include the proposed Project site]."[7] In doing so, however, the USFWS recognized that "there are inherent limitations and uncertainties associated with the simulations used in the analysis. For example, the representation of physical and chemical processes in the models may include unknown errors or shortcomings…The location, amount, and type of N emissions in the Action Area in the future are difficult to predict because of the complex combination of additional point and mobile emission sources that will result from Plan Covered Activities. An important example is the uncertainty of additional automobile emissions, which are anticipated to be the primary source of new N-deposition in the Action Area. Although vehicular emissions may decrease over time, as

---

[6] Santa Clara Valley Habitat Agency. 2012. Final Santa Clara Valley Habitat Plan. Appendix E. available at http://scv-habitatagency.org/178/Final-Habitat-Plan.

[7] USFWS. 2013. Biological and Conference Opinion on Issuance of a Section 10(a)(1)(B) Permit for the Santa Clara Valley Habitat Conservation Plan/Natural Community Conservation Plan. April. Available: http://scv-habitatagency.org/DocumentCenter/Home/View/343.

technology and emissions standards improve, the amount of this reduction is difficult to estimate because technological improvements are uncertain and may have unexpected effects."[8]

The proposed project is well outside known and suspect Bay checkerspot butterfly habitat, surrounded by other commercial, urban and otherwise developed properties. The project accordingly will not result in direct impacts on the species or its habitat. Moreover, given the distance of the proposed project from the serpentine soil habitats targeted for conservation and the insignificant contribution that this one project would make to the hundreds of thousands of vehicle trips (existing, planned, and future) in the more immediate vicinity of the habitat that may contribute to changes in the chemical makeup of the soil, the proposed project will not, standing alone, have a significant impact Bay checkerspot butterfly habitat.

While the theory that cumulative effects of nitrogen deposition tied to vehicles, power plants and other sources of emissions in the SCVHCP area (which includes the impacted serpentine habitat) has been documented, the indirect effects of the project, located more than 14.5 miles from the nearest Bay checkerspot butterfly habitat, would be difficult to accurately assess in light of the distance between the project and the area of potential effects, the amount of other sources of nitrogen in the intervening area, and the recognized uncertainty regarding the makeup of future automobile emissions and the source of these mobile emissions (while some of the trips generated by the project will begin closer to the serpentine habitat, others will originate from points much further from the Action Area). With other intervening sources of harm, including countless other sources of nitrogen, the project cannot be identified as the proximate cause of direct and indirect impacts on the Bay checkerspot butterfly.

The project site is developed and located in a densely developed area. As the project site is bordered on all sides by development, it does not provide habitat connectivity between undeveloped lands and is not part of a regional wildlife movement corridor. Therefore, there would be no impact to wildlife movement because of the proposed project.

**Mitigation Measures**:

**BIO-2**          All construction activities shall avoid the creek. Best Management Practices (BMPs) shall be developed and implemented during construction to prevent discharge of any project-related materials such as fuel, engine lubricants or sediment. Only natural fiber or biodegradable materials shall be used for BMPs. All erosion control products shall be removed at the completion of construction activities.

**Significance after Mitigation:** Less than significant

---

[8] *Id.* at 80.

---

**Impact BIO-3:** **The proposed project would not conflict with applicable policies protecting biological resources. (***Less than Significant***)**

There are 448 existing trees representing 24 species on the project site (HortScience 2015).

There are three policies in the City of Santa Clara General Plan related to trees. The City of Santa Clara General Plan Policy 5.10.1-P3 requires "preservation of all City-designated heritage trees listed in the Heritage Tree Appendix 8.10 of the General Plan." In addition, General Plan Policy 5.10-1-P4 provides the criteria for the identification of trees that the City seeks to protect. This policy states "Protect all healthy cedars, redwoods, oaks, olives, bay laurel, and pepper trees of any size, and all other trees over 36 inches in circumference measured from 48 inches above-grade on private and public property as well as in the public right-of-way." Finally, General Plan Policy 5.3.1-P10 requires new development to provide street trees and a minimum 2:1 on- or off-site replacement for trees removed as part of the project.

Of the 448 existing trees on the project site, none is listed as a Heritage Tree in the General Plan. However, 189 of the trees on the project site meet both the trunk circumference and health criteria and are the species specifically identified for protection in General Plan Policy 5.10-1-P4. Project construction would require the removal of 350 trees, while the remaining trees would either be preserved in place or relocated to another portion of the project site. Of the 350 trees that would be removed, per General Plan Policy 5.10-1-P4, 119 trees qualify as protected trees (HortScience 2015).

The applicant would be required to comply with General Plan Policy 5.3.1-P10, which requires that new development "provide opportunities for increased landscaping and trees in the community, including requirements for new development to provide street trees and a minimum 2:1 on- or off-site replacement for trees removed as part of the project." In addition, the City's Design Guidelines require that mature trees removed or proposed for removal be replaced on-site, at a minimum, with a 24- or 36-inch box. Other standards may apply in cases where particular planting requirements must be met. This includes providing specimen size material for protected trees and installing appropriately sized trees, such as less than or equal to 15 gallons where there are physical limitations.

In order to compensate for the protected tree removed at a 2:1 ratio according to General Plan Policy 5.3.1-P10, 238 replacement trees would be required. The proposed landscaping plan calls for installing more than 1,000 trees, which may include the following species: podocarpus gracilior standard, washingtonia robusta, Olea europaea, podocarpus gracilior, Ulmus parvifolia 'Allee', lophostemon confertus, acacia melanoxylon, cinnamomum camphora, nyssa sylvatica, platanus x acerifolia, quercus ilex, Acer species, Cercis species, lagerstroemia species, cupressus sempervirens, Agonis flexuosa,

Arbutus 'Marina', bauhinia purpurea, Chitalpa tashkentensis, Laurus nobilis, Lophostemon confertus, Magnolia species, magnolia soulangeana, Maytenus boaria, Pinus eldarica, podocarpus gracilior, Podocarpus macrophyllus, Pyrus calleryana, Pyrus kawakamii, Tilia cordata, Jacaranda mimosifolia, Lagerstroemia species, Schinus molle, Sequoia sempervirens, Phoenix dactylifera, Chamaerops humilis, and Phoenix reclinata. This would exceed the requirements of the General Plan policy. Per the City's Design Guidelines, the proposed nursery stock size would be 24- and 36-inch boxes. The proposed landscaping plan for the site depicts four general areas of tree planting: (1) entry drive, at grade retail parking, and street trees along Monroe Street; (2) courtyard podium; (3) pool and recreation area; and (4) perimeter, emergency vehicle access, and open space. There would be a time lag between when the existing trees are removed and the newly planted trees reach sizes and heights similar to the existing trees. It may take 10 to 20 years before the new trees are of a similar fullness and height as the existing trees. However, there would be a substantially greater number of trees and shrubs planted as part of the proposed project as opposed to the existing landscaping, which would compensate for the smaller size of the new trees before they achieve full maturity.

As the proposed project would exceed the requirement contained in the City's General Plan, it would not conflict with applicable policies protecting biological resources. The loss of habitat for common bird species and urban wildlife provided by the site trees would be compensated by the replacement trees and landscaping that would be provided as part of the proposed project.

To ensure successful tree preservation during the design and construction phases, the following mitigation measure is proposed.

**Mitigation Measures:**

**BIO-3**         During the design and construction phases, the proposed project will adhere to the following recommendations:

**Design**

- Verify the location and tag of the trees to be preserved. Include trunk locations and tag numbers on all plans.

- Provide for the Consulting Arborist to review all future project submittals including grading, utility, drainage, irrigation, and landscape plans.

- Use only herbicides safe for use around trees and labeled for that use, even below pavement.

- Design irrigation systems so that no trenching will occur within the Tree Protection Zone.

**Pre-Construction and Demolition Treatments and Recommendations**

- Prepare a site work plan which identifies access and haul routes, construction trailer and storage areas, etc.

- Establish a Tree Protection Zone around each tree to be preserved. For design purposes, the Tree Protection Zone shall be 20 inches from the trunk in all directions. No grading, excavation, construction, or storage of materials shall occur within that zone.

- Install protection around trees to be preserved. Stack and secure hay bales 6 feet high around tree trunks. As an alternative, employ 6 foot chain link with posts sunk into the ground or install plastic orange fencing around tree root zones. No entry will be permitted into a tree protection zone without permission of the project superintendent.

- Trees to be removed shall be felled so as to fall away from the Tree Protection Zone and avoid pulling and breaking of roots of trees that are to remain. If roots are entwined, the consultant may require first severing the major woody root mass before extracting the trees, or grinding the stump below ground.

- Trees to be retained may require pruning to provide clearance and/or correct defects in structure. All pruning is to be performed by an ISA Certified Arborist or Certified Tree Worker and shall adhere to the latest editions of the ANSI Z133 and A300 standards as well as the ISA Best Management Practices for Tree Pruning. Pruning contractor shall have the C25/D61 license specification.

**Tree Protection during Construction**

- Prior to beginning work, the contractors working in the vicinity of trees to be preserved are required to meet with the Consulting Arborist at the site to review all work procedures, access routes, storage areas, and tree protection measures.

- Any grading, construction, demolition, or other work that is expected to encounter tree roots should be monitored by the Consulting Arborist.

- If injury should occur to any tree during construction, it should be evaluated as soon as possible by the Consulting Arborist so that appropriate treatments can be applied.

- Fences will be erected to protect trees to be preserved. Fences are to remain until all site work has been completed. Fences may not be relocated or removed without permission of the project manager.

- Any additional tree pruning needed for clearance during construction must be performed by a qualified arborist and not by construction personnel.

- All trees shall be irrigated on a schedule to be determined by the Consulting Arborist. Each irrigation shall wet the soil within the Tree Protection Zone to a depth of 30 inches.

**Significance after Mitigation:** Less than significant

---

**Impact BIO-4:**    **The proposed project would not conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other applicable habitat conservation plan. (*No Impact*)**

The project site is not located within the portion of Santa Clara County that is covered by the Santa Clara Valley Habitat Conservation Plan (HCP)/Natural Community Conservation Plan (NCCP) (Santa Clara Valley HCP/NCCP website). The City is not a member jurisdiction of the HCP/NCCP, and the HCP/NCCP does not impose any obligations on non-members. There are no other HCPs or NCCPs applicable to the project area. No conflicts with an HCP/NCCP, or other conservation plan would occur.

**Mitigation Measures**: No mitigation measures are required.

---

### 4.3.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact BIO-1:**    **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts on biological resources. (*Less than Significant*)**

Cumulative development includes closely related past, present, and reasonably foreseeable development that could affect the same biological resources as the proposed project in such a way that a combined physical impact could occur. As previously discussed, the proposed project would primarily affect the already developed and landscaped project site. Therefore, the proposed project would not result in a substantial loss of undeveloped land or wildlife habitat, or any impacts on special-status plant or wildlife species. Further, measures would be implemented to prevent impacts to nesting birds and mature trees (see **Mitigation Measures BIO-1**, **BIO-2**, and **BIO-3**). The impacts to nesting birds from construction of the proposed project would be avoided through the implementation of mitigation measures and the project would plant more trees than are planned for removal and protect the trees that are recommended for preservation. Therefore, the project would not contribute substantially towards cumulative impacts to sensitive biological resources in the project region.

**Mitigation Measures:** No mitigation measures are required.

---

### 4.3.5    REFERENCES

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan*. Adopted November 2010, last amended December 2014.

WRA Environmental Consultants. 2015. *Biological Assessment for Santa Clara Square Residential/Mixed Use Project*. May.

HortScience, Inc. 2015. *Santa Clara Square Apartments Tree Assessment*. July 24.

HortScience, Inc. 2014a. *Santa Clara Square Apartments Tree Survey*. September 24.

HortScience, Inc. 2014b. *Santa Clara Square South Tree Survey*. November 28.

## 4.4    CULTURAL RESOURCES

### 4.4.1    INTRODUCTION

This section evaluates the potential impacts to cultural resources (historical, archaeological, and paleontological) from the implementation of the proposed project. Information presented in this section is based on a cultural resources assessment report prepared for the project by Basin Research Associates. This report is included in **Appendix 4.4** of this Draft EIR**.**

### 4.4.2    ENVIRONMENTAL SETTING

#### 4.4.2.1    Archaeological Resources

Archaeological resources are the physical remains of past human activities and can be either prehistoric or historic. Archaeological sites contain significant evidence of human activity. Generally, a site is defined by a significant accumulation or presence of: food remains, waste from the manufacturing of tools, tools, pottery, concentrations or alignments of stones, modification of rock surfaces, unusual discoloration or accumulation of soil, and/or human skeletal remains.

The aboriginal inhabitants of the project vicinity belonged to a group known as the *Tamyen* (*Tamien*) subgroup of the Costanoans[1] who occupied the central Santa Clara Valley. A records search conducted for the proposed project and a 0.25 mile radius indicated that no prehistoric sites have been recorded or reported on or adjacent to the project site. In addition, no known Native American villages, trails, traditional use areas, or contemporary use areas have been identified on, adjacent to, or near the project site. A Native American Heritage Commission search of the *Sacred Lands Inventory* failed to indicate the presence of Native American cultural resources in the immediate project area (Basin Research 2015).

The project site is within an alluvial plain away from the high sensitivity bay shore and marsh areas and the Guadalupe River is located approximately two miles east of the project site (Basin Research 2015).

#### 4.4.2.2    Historic Resources

*Hispanic Era Resources*

The project site is located within ungranted lands approximately 400 to 600 feet south of the southwest corner of the *Rancho Ulistac* and approximately 0.4/0.5 mile northeast of the northeast corner of the

---

1    Also known as the *Ohlone*.

*Enright Tract*. The project area was probably used for grazing cattle as the export of tallow and hides was a major economic pursuit of the Santa Clara Valley and California during the Hispanic Period. No known Hispanic Period resources have been identified in or adjacent to the project site (Basin Research 2015).

### American Era Resources

The town of Santa Clara grew up around the secularized Mission Santa Clara. The town was primarily an American creation and not a direct successor to the Mission pueblo. Santa Clara was a favorable location on account of environmental factors, the presence of former Mission lands and buildings, and roads to San Francisco and San Jose (e.g., El Camino Real, The Alameda).

A records search conducted for the proposed project and a 0.25-mile radius indicated that no historic sites have been recorded or reported on or adjacent to the project site (Basin Research 2015).

A limited map review for the period between 1776 to 1850 indicates that there are no known adobe dwellings or other features such as roads, corrals, mills, etc. in or adjacent to the project. In addition, various historic maps dating to the 1850s through 1870s shows a north-south "Road" that conforms to the approximate alignment of present-day Bowers Avenue and another "Road" along the present-day alignment of channelized San Tomas Aquinas Creek. A short "Lane" is shown east of "Campbell's or Sanjon Creek" (present-day Saratoga Creek). "Campbell's or Sanjon Creek" proceeds through the project site north of Scott Boulevard while San Tomas Aquinas Creek (or Arroyo) is not mapped. In addition, a "House" is shown located south of the southeasternmost Scott Boulevard parcels (Basin Research 2015).

A map from 1943 shows US Highway 101/Bayshore Highway north of the project. A 1961 map indicates that the project site and immediate vicinity are orchards and a single structure is located in the southeast corner of the southeasternmost parcel and another structure is located on the east side of the former Saratoga Creek. By 1973 the orchards no longer exist and Scott Boulevard has been built. By 1980 the two structures previously discussed are no longer extant and the streets have been reconfigured with the construction of Augustine Drive, Montgomery Drive, and Octavius Drive. All but one of the current day buildings are present on the project site as of 1980 (Basin Research 2015).

### 4.4.2.3    Paleontological Resources

Paleontological resources (fossils) are the remains and/or traces of prehistoric plant and animal life exclusive of human remains or artifacts. Fossil remains such as bones, teeth, shells, and wood are found in the geologic deposits (rock formations) in which they were originally buried. Fossils represent a limited, non-renewable, sensitive scientific and educational resource. The potential for fossil remains at a location can be predicted through previous correlations that have been established between the fossil

occurrence and the geologic formations within which they are buried. For this reason, knowledge of the geology of a particular area and the paleontological resource sensitivity of particular rock formations make it possible to predict where fossils will or will not be encountered.

A search of the University of California Museum of Paleontology Specimen Search database indicated that there are no known paleontological resources within the City of Santa Clara (UCMP 2015). The City of Santa Clara is located a significant distance from the bay and situated on alluvial fan deposits of the Holocene age (less than 10,000 years old), consisting of gravel, sand and finer sediments. The Holocene age deposits on the surface are underlain by Pleistocene age strata, which is in turn underlain by the Santa Clara Formation. Geologic units of Holocene age are generally not considered sensitive for paleontological resources, because biological remains younger than 10,000 years are not usually considered fossils. However, older Pleistocene sediments and Santa Clara Formation deposits are considered sensitive for paleontological resources (CSC 2011).

## 4.4.3    REGULATORY CONSIDERATIONS

### 4.4.3.1    Federal Regulations

#### *National Historic Preservation Act, Section 106*

The National Historic Preservation Act (NHPA) establishes the National Register of Historic Places (NRHP), and defines federal criteria for determining the historical significance of archaeological sites, historic buildings and other resources. To be determined eligible for the NRHP, a potential historic property must meet one of four historical significance criteria (listed below), and also must possess sufficient deposition, architectural, or historic integrity to retain the ability to convey the resource's historic significance. Resources determined to meet these criteria are eligible for listing in the NRHP and are termed historic properties. A resource may be eligible at the local, state, or national level of significance.

A property is eligible for the NRHP if it possesses integrity of location, design, setting, materials, workmanship, feeling, and association, and it:

1.  is associated with events that have made a significant contribution to the broad patterns of our history;

2.  is associated with the lives of a person or persons of significance in our past;

3.  embodies the distinctive characteristics of a type, period or method of construction, or represents the work of a master, or possesses high artistic value, or represents a significant and distinguishable entity whose components may lack individual distinction; or

4. has yielded or may be likely to yield information important in prehistory or history.

A resource that lacks historic integrity or does not meet one of the NRHP criteria of eligibility is not considered a historic property, and effects to such a resource are not considered significant under the NHPA.

### 4.4.3.2 State Regulations

#### California Environmental Quality Act

Under the *California Environmental Quality Act (CEQA) Guidelines* Section 15064.5, a project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment. The Guidelines define cultural resources as including both historical and archaeological properties, establish the California Register of Historical Resources (CRHR), set forth criteria for establishing the significance of historical resources, and find that cultural resources that meet the criteria of eligibility for the CRHR are significant historical resources. The criteria for eligibility of resources to the CRHR closely mirror the NRHP criteria listed above.

### 4.4.3.3 Local Plans and Policies

#### City of Santa Clara General Plan

The City of Santa Clara General Plan contains goals and policies relating to the development and preservation of cultural resources in the City. General Plan policies relevant to the proposed project are as follows:

**Archaeological and Cultural Resources Goals**

**Goal 5.6.3-G1**      Protection and preservation of cultural resources, as well as archaeological and paleontological sites.

**Goal 5.6.3-G2**      Appropriate mitigation in the event that human remains, archaeological resources, or paleontological resources are discovered during construction activities.

**Archaeological and Cultural Resources Policies**

**Policy 5.6.3-P1**      Require that new development avoid or reduce potential impacts to archaeological, paleontological and cultural resources.

**Policy 5.6.3-P2**          Encourage salvage and preservation of scientifically valuable paleontological or archaeological materials.

**Policy 5.6.3-P3**          Consult with California Native American tribes prior to considering amendments to the City's General Plan.

**Policy 5.6.3-P4**          Require that a qualified paleontologist/archaeologist monitor all grading and/or excavation if there is a potential to affect archeological or paleontological resources, including sites within 500 feet of natural water courses and in the Old Quad neighborhood.

**Policy 5.6.3-P5**          In the event that archaeological/paleontological resources are discovered, require that work be suspended until the significance of the find and recommended actions are determined by a qualified archaeologist/paleontologist.

**Policy 5.6.3-P6**          In the event that human remains are discovered, work with the appropriate Native American representative and follow the procedures set forth in State law.

**Criteria for Local Significance**

In addition to the policies listed above, General Plan Appendix 8.9 includes the Criteria for Local Significance, which were adopted by the City of Santa Clara City Council on April 20, 2004. The criteria establish evaluation measures to ensure that the resource is at least 50 years old and that the property is associated with an important individual or event, an architectural innovation, and/or an archaeological contribution in order to be deemed significant. The criteria are presented below.

*Qualified Historic Resource*

Any building, site, or property in the City that is 50 years old or older and meets certain criteria of architectural, cultural, historical, geographical, or archeological significance is potentially eligible.

*Criteria for Historical or Cultural Significance*

To be historically or culturally significant, a property must meet at least one of the following criteria:

- The site, building, or property has character, interest, integrity and reflects the heritage and cultural development of the city, region, state, or nation.

- The property is associated with a historical event.

- The property is associated with an important individual or group who contributed in a significant way to the political, social, and/or cultural life of the community.

- The property is associated with a significant industrial, institutional, commercial, agricultural, or transportation activity.

- A building's direct association with broad patterns of local area history, including development and settlement patterns, early or important transportation routes or social, political, or economic trends and activities. Included is the recognition of urban street pattern and infrastructure.

- A notable historical relationship between a site, building, or property's site and its immediate environment, including original native trees, topographical features, outbuildings, or agricultural setting.

*Criteria for Architectural Significance*

To be architecturally significant, a property must meet at least one of the following criteria:

- The property characterizes an architectural style associated with a particular era and/or ethnic group.

- The property is identified with a particular architect, master builder, or craftsman.

- The property is architecturally unique or innovative.

- The property has a strong or unique relationship to other areas potentially eligible for preservation because of architectural significance.

- The property has a visual symbolic meaning or appeal for the community.

- A building's unique or uncommon building materials, or its historically early or innovative method of construction or assembly.

- A building's notable or special attributes of an aesthetic or functional nature. These may include massing, proportion, materials, details, fenestration, ornamentation, artwork or functional layout.

*Criteria for Geographic Significance*

To be geographically significant, a property must meet at least one of the following criteria:

- A neighborhood, group or unique area directly associated with broad patterns of local area history.

- A building's continuity and compatibility with adjacent buildings and/or visual contribution to a group of similar buildings.

- An intact, historical landscape or landscape features associated with an existing building.

- A notable use of landscaping design in conjunction with an existing building.

*Criteria for Archaeological Significance*

For the purposes of CEQA, an "important archaeological resource" is one which:

- is associated with an event or person of

    - o    recognized significance in California or American history, or

    - o    recognized scientific importance in prehistory;

- can provide information, which is both of demonstrable public interest, and useful in addressing scientifically consequential and reasonable or archaeological research questions;

- has a special or particular quality such as oldest, best example, largest, or last surviving example of its kind;

- is at least 100 years old and possesses substantial stratigraphic integrity; or

- involves important research questions that historical research has shown can be answered only with archaeological methods.

## *Santa Clara City Code*

Title 12, Chapter 12.25 of the Santa Clara City Code contains "mitigation requirements for potentially significant archaeological impacts." If, during the course of construction or grading activities, a cultural resource is found, all work within 50 feet of the find must stop and a qualified archaeologist is to examine the find, determine its significance, and submit a treatment plan to the City. Other requirements in this section include monitoring of earth-moving activities by a qualified archaeologist if archaeological resources are found on-site and notification of the County Coroner if Native American remains are found.

## 4.4.4    IMPACTS AND MITIGATION MEASURES

### 4.4.4.1    Significance Criteria

The impact of the proposed project on cultural resources would be considered significant if it would exceed the following Standards of Significance, in accordance with Appendix G of the *State CEQA Guidelines*:

- cause a substantial adverse change in the significance of a historical resource as defined in *State CEQA Guidelines* §15064.5;

- cause a substantial adverse change in the significance of an archaeological resource pursuant to *State CEQA Guidelines* §15064.5;

- directly or indirectly destroy a unique paleontological resource or site or unique geological feature; or

- disturb any human remains, including those interred outside of formal cemeteries.

### 4.4.4.2    Methodology

The analysis below compares identified impacts based on information from the Cultural Resources Assessment Report to the standards of significance stated above and determines the impact's level of significance under CEQA. If the impact is determined to be significant, the analysis identifies feasible mitigation measures to eliminate the impact or reduce it to a less than significant level. If the impact cannot be reduced to a less than significant level after implementation of all feasible mitigation measures, then the impact is identified as significant and unavoidable. The project's potential contribution to cumulative impacts is also identified.

### 4.4.4.3    Project Impacts and Mitigation Measures

**Impact CUL-1:**          **The proposed project would not cause a substantial adverse change in the significance of a historical resource as defined in CEQA Guidelines §15064.5. (***Less than Significant***)**

The 13 existing one- and two-story business park and office buildings on the project site were constructed between the 1970s to early 1980s and therefore are less than 50 years of age. Furthermore, the buildings are common tilt-up construction type and do not have the potential to meet any of the California Register criteria. None of the structures on the project site is a historical resource (Basin Research Associates 2015). Therefore, demolition of the existing buildings on the project site as part of project construction would result in a less than significant impact on historic resources.

**Mitigation Measures:** No mitigation measures are required.

---

**Impact CUL-2:**          **The proposed project would not cause a substantial adverse change in the significance of an archaeological resource pursuant to CEQA Guidelines §15064.5. (***Less than Significant***)**

The entire project site has been subject to extensive disturbance in conjunction with the construction of the one- and two-story business park and office buildings, utilities, parking lots, and landscaping. Therefore, any archaeological resources that were located on the project site have likely already been disturbed. Similarly, any archaeological resources present within Scott Boulevard, Montgomery Drive, Octavius Drive, and Augustine Drive right-of-way have also likely been disturbed by the construction of the roadway and underground utilities. A records search conducted by the California Historical

Resources Information System (CHRIS)/Northwest Information Center (NWIC) was negative for recorded and/or reported resources in or adjacent to the proposed project. In addition, the proposed project is located in an area of very low potential for prehistoric archaeological resources and no known ethnographic, traditional or contemporary Native American resources have been identified in or adjacent to the proposed project. There is a low potential for exposing subsurface archaeological materials within the project site during project construction including excavation within potential utility right-of-way. However, historic maps indicate that around the 1950s a "house" was located on the property and later, several mid-20th century structures were on or adjacent to the proposed project (Basin Research Associates 2015).

Based on the above, the potential to encounter or disturb significant subsurface prehistoric and historic archaeological resources during construction of the proposed project appears to be low to very low. Furthermore, if activities associated with development of the proposed project did uncover archaeological resources, adherence to the requirements listed in Public Resources Code Section 21083.2 (and, for work within the City public right of way, Chapter 12.25 of the Santa Clara City Code) would reduce potential adverse effects. Therefore, impacts to prehistoric and historic archaeological resources are considered less than significant.

Nonetheless, **Mitigation Measure CUL-2** is proposed, which would ensure that impacts of the proposed project on currently unknown prehistoric and historic archaeological resources remain less than significant should any be encountered during construction.

**Mitigation Measures:**

**CUL-2**  (a) The applicant shall note on any plans that require ground-disturbing excavation that there is a potential for exposing buried cultural resources, including prehistoric Native American burials.

(b) The applicant shall retain a Professional Archaeologist to provide preconstruction briefing(s) to supervisory personnel of any excavation contractor to alert them to the possibility of exposing significant prehistoric archaeological resources within the project area. The briefing shall discuss any archaeological objects that could be exposed, the need to stop excavation at the discovery, and the procedures to follow regarding discovery protection and notification of the applicant and archaeological team. An "Alert Sheet" shall be posted in conspicuous locations on the project site to alert personnel to the

procedures and protocols to follow for the discovery of potentially significant prehistoric archaeological resources.[2]

(c) The applicant shall retain a Professional Archaeologist on an "on-call" basis during ground disturbing construction for the project to review, identify and evaluate cultural resources that may be inadvertently exposed during construction. The archaeologist shall review and evaluate any discoveries to determine if they are historical resource(s) and/or unique archaeological resources under the California Environmental Quality Act.

(d) If the Professional Archaeologist determines that any cultural resources exposed during construction constitute a historical resource and/or unique archaeological resource, he/she shall notify the applicant and other appropriate parties of the evaluation and recommended mitigation measures to mitigate to a less-than significant impact in accordance with California Public Resources Code Section 21083.2 and *State CEQA Guidelines* Section 15064.5. Mitigation measures may include avoidance, preservation in-place, recordation, additional archaeological testing and data recovery among other options. The completion of a formal *Archaeological Monitoring Plan* (AMP) may be recommended by the Project Archaeologist if significant archaeological deposits are exposed during ground disturbing construction. Development and implementation of the AMP will be determined by the City of Santa Clara. Treatment of any significant cultural resources shall be undertaken with the approval of the project proponent and the City of Santa Clara.

(e) A *Monitoring Closure Report* shall be filed with the City of Santa Clara at the conclusion of ground disturbing construction if archaeological and Native American monitoring of excavation was undertaken.

---

2 Significant prehistoric cultural resources may include:

a. Human bone - either isolated or intact burials.

b. Habitation (occupation or ceremonial structures as interpreted from rock rings/features, distinct ground depressions, differences in compaction (e.g., house floors).

c. Artifacts including chipped stone objects such as projectile points and bifaces; groundstone artifacts such as manos, metates, mortars, pestles, grinding stones, pitted hammerstones; and, shell and bone artifacts including ornaments and beads.

d. Various features and samples including hearths (fire-cracked rock; baked and vitrified clay), artifact caches, faunal and shellfish remains (which permit dietary reconstruction), distinctive changes in soil stratigraphy indicative of prehistoric activities.

e. Isolated prehistoric artifacts.

**Impact CUL-3:**      **The proposed project would not directly or indirectly destroy a unique paleontological resource or site or unique geological feature. (***Less than Significant***)**

The project site is located within the Santa Clara Valley, which is a broad alluvial plain between the Santa Cruz Mountains to the southwest and west, and the Diablo Range to the northeast. The project site is located on an alluvial plain and there are no unique geologic features within the project site. The project site is generally underlain by native alluvial soils consisting of interbedded complex silts, clays, and sand to a depth of at least 465 feet below ground surface (EKI 2013). As discussed above in **Section 4.4.2.3, Paleontological Resources**, alluvial deposits that underlie the City of Santa Clara are generally not considered sensitive for paleontological resources. As a result, the likelihood of discovering paleontological resources on the project site during grading and excavation is low. Furthermore, the site has been extensively disturbed in conjunction with the construction of the buildings currently located on the project site. While the proposed project would include grading and excavation activities, it is improbable that paleontological resources would be discovered because no paleontological resources have been discovered in this area of Santa Clara. This impact is considered less than significant.

**Mitigation Measures:** No mitigation measures are required.

---

**Impact CUL-4:**      **The proposed project would not disturb any human remains, including those interred outside of formal cemeteries. (***Less than Significant***)**

As discussed above under **Impact CUL-2**, the potential to expose significant subsurface prehistoric and historic archaeological resources including human remains interred outside of a formal cemetery during construction of the proposed project appears to be low to very low. Furthermore, if activities associated with development of the proposed project did uncover human remains, adherence to the requirements listed in Public Resources Code Section 21083.2 (and, for work within the City public right-of-way, Chapter 12.25 of the Santa Clara City Code) would reduce potential adverse effects. Therefore, impacts to human remains are considered less than significant. Nonetheless, **Mitigation Measure CUL-4** is proposed, which would ensure that impacts of the proposed project remain less than significant should any human remains be encountered on the project site.

**Mitigation Measures:**

**CUL-4**      The treatment of human remains and of associated or unassociated funerary objects discovered during any soil-disturbing activity within the project site shall comply with

applicable State laws. This shall include immediate notification of the Santa Clara County Medical Examiner and the City of Santa Clara.

In the event of the coroner's determination that the human remains are Native American, notification of the Native American Heritage Commission is required, who shall appoint a Most Likely Descendant (MLD) (Public Resources Code Section 5097.98).

The applicant, archaeological consultant, and MLD shall make all reasonable efforts to develop an agreement for the treatment, with appropriate dignity, of human remains and associated or unassociated funerary objects (CEQA Guidelines Section 15064.5(d)). The agreement should take into consideration the appropriate excavation, removal, recordation, analysis, custodianship, curation, and final disposition of the human remains and associated or unassociated funerary objects. The California Public Resources Code allows 48 hours to reach agreement on these matters. If the MLD and the other parties do not agree on the reburial method, the project will follow Public Resources Code Section 5097.98(b) which states that "the landowner or his or her authorized representative shall reinter the human remains and items associated with Native American burials with appropriate dignity on the property in a location not subject to further subsurface disturbance."

---

## 4.4.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact CUL-1:**    **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative cultural resource impacts. (*Less than Significant*)**

Anticipated future development in some portions of the City of Santa Clara has the potential to adversely affect cultural resources. However, anticipated future development would be subject to environmental review and required by state law to implement mitigation measures that avoid or substantially lessen potentially significant impacts to cultural resources. These mitigation measures would generally avoid or substantially lessen the severity of impacts to cultural resources (CSC 2011). As discussed above, impacts of the proposed project to cultural resources are less than significant, and mitigation is proposed to ensure that impacts to prehistoric and historic archaeological resources remain less than significant. Therefore, the contribution of the proposed project to cumulative impacts to cultural resources in the City of Santa Clara or the broader region would be cumulatively not considerable.

**Mitigation Measures:** No mitigation measures are required.

---

### 4.4.5     REFERENCES

Basin Research Associates. 2015. *Cultural Resources Assessment Report Santa Clara Square: Residential/Mixed Use Parcels Project.* June.

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan.* Adopted November 2010, last amended December 2014.

CSC. 2011. City of Santa Clara 2010–2035 General Plan Integrated Final Environmental Impact Report. January.

EKI. 2013. *Phase I Environmental Site Assessment Park Square Phase I and II.* April.

University of California Museum of Paleontology, Specimen Search, 2015. http://ucmpdb.berkeley.edu/, accessed on July 14.

## 4.5   GREENHOUSE GAS EMISSIONS

### 4.5.1     INTRODUCTION

This section discusses the existing global, national, and statewide conditions related to greenhouse gases (GHG) and global climate change and evaluates the potential impacts on global climate from the implementation of the proposed project. The section also provides a discussion of the applicable federal, state, regional, and local agencies that regulate, monitor, and control GHG emissions. Information presented in this section is based on an Air Quality and Greenhouse Gas Emissions Assessment prepared for the proposed project by Illingworth & Rodkin, Inc. The report is included in its entirety in **Appendix 4.2** of this Draft EIR**.**

### 4.5.2     ENVIRONMENTAL SETTING

### 4.5.2.1     Background

Global climate change refers to any significant change in climate measurements, such as temperature, precipitation, or wind, lasting for an extended period (i.e., decades or longer) (US EPA 2008a). Climate change may result from:

- Natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun;

- Natural processes within the climate system (e.g., changes in ocean circulation, reduction in sunlight from the addition of GHG and other gases to the atmosphere from volcanic eruptions); and

- Human activities that change the atmosphere's composition (e.g., through burning fossil fuels) and the land surface (e.g., deforestation, reforestation, urbanization, desertification).

The primary effect of global climate change has been a rise in the average global tropospheric temperature of 0.2 degree Celsius (°C) per decade, determined from meteorological measurements worldwide between 1990 and 2005. Climate change modeling using 2000 emission rates shows that further warming is likely to occur, which would induce further changes in the global climate system during the current century (IPCC 2007). Changes to the global climate system and ecosystems, and to California, could include:

- Declining sea ice and mountain snowpack levels, thereby increasing sea levels and sea surface evaporation rates with a corresponding increase in tropospheric water vapor due to the atmosphere's ability to hold more water vapor at higher temperatures (IPCC 2007);

- Rising average global sea levels primarily due to thermal expansion and the melting of glaciers, ice caps, and the Greenland and Antarctic ice sheets (model-based projections of global average sea level

rise at the end of the 21st century (2090–2099) range from 0.18 meter to 0.59 meter or 0.59 foot to 1.94 feet) (IPCC 2007);

- Changing weather patterns, including changes to precipitation, ocean salinity, and wind patterns, and more energetic aspects of extreme weather, including droughts, heavy precipitation, heat waves, extreme cold, and the intensity of tropical cyclones (IPCC 2007);

- Declining Sierra snowpack levels, which account for approximately half of the surface water storage in California, by 70 percent to as much as 90 percent over the next 100 years (Cal EPA 2006);

- Increasing the number of days conducive to ozone formation by 25 to 85 percent (depending on the future temperature scenario) in high ozone areas located in the Southern California area and the San Joaquin Valley by the end of the 21st century (Cal EPA 2006);

- Increasing the potential for erosion of California's coastlines and sea water intrusion into the Sacramento and San Joaquin Delta and associated levee systems due to the rise in sea level (Cal EPA 2006);

- Increasing pest infestation, making California more susceptible to forest fires (Cal EPA 2006);

- Increasing the demand for electricity by 1 to 3 percent by 2020 due to rising temperatures resulting in hundreds of millions of dollars in extra expenditures (Cal EPA 2006); and

- Summer warming projections in the first 30 years of the 21st century ranging from about 0.5 to 2 °C (0.9 to 3.6 °F) and by the last 30 years of the 21st century, from about 1.5 to 5.8 °C (2.7 to 10.5 °F) (Cal EPA 2006).

The natural process through which heat is retained in the troposphere[1] is called the "greenhouse effect." The greenhouse effect traps heat in the troposphere through a threefold process as follows: (1) short-wave radiation in the form of visible light emitted by the Sun is absorbed by the Earth as heat; (2) long-wave radiation is re-emitted by the Earth; and (3) GHGs in the upper atmosphere absorb or trap the long-wave radiation and re-emit it back towards the Earth and into space. This third process is the focus of current climate change actions.

While water vapor and carbon dioxide ($CO_2$) are the most abundant GHGs, other trace GHGs have a greater ability to absorb and re-radiate long-wave radiation. To gauge the potency of GHGs, scientists have established a Global Warming Potential (GWP) for each GHG based on its ability to absorb and re-emit long-wave radiation over a specific period. The GWP of a gas is determined using $CO_2$ as the reference gas, which has a GWP of 1 over 100 years (IPCC 1996).[2] For example, a gas with a GWP of 10 is

---

[1]  The troposphere is the bottom layer of the atmosphere, which varies in height from the Earth's surface from 6 to 7 miles).

[2]  All Global Warming Potentials are given as 100-year values.

10 times more potent than $CO_2$ over 100 years. The use of GWP allows GHG emissions to be reported using $CO_2$ as a baseline. The sum of each GHG multiplied by its associated GWP is referred to as "carbon dioxide equivalents" ($CO_2$e). This essentially means that 1 metric ton of a GHG with a GWP of 10 has the same climate change impacts as 10 metric tons of $CO_2$.

## 4.5.2.2     Greenhouse Gases

State law defines GHGs to include the following six compounds:

- **Carbon Dioxide ($CO_2$)**. Carbon dioxide primarily is generated by fossil fuel combustion from stationary and mobile sources. Due to the emergence of industrial facilities and mobile sources over the past 250 years, the concentration of carbon dioxide in the atmosphere has increased 35 percent (US EPA 2008b). Carbon dioxide is the most widely emitted GHG and is the reference gas (GWP of 1) for determining the GWP of other GHGs. In 2004, 82.8 percent of California's GHG emissions were carbon dioxide (California Energy Commission 2007).

- **Methane ($CH_4$)**. Methane is emitted from biogenic sources (i.e., resulting from the activity of living organisms), incomplete combustion in forest fires, landfills, manure management, and leaks in natural gas pipelines. In the United States, the top three sources of methane are landfills, natural gas systems, and enteric fermentation (US EPA n.d.[a]). Methane is the primary component of natural gas, which is used for space and water heating, steam production, and power generation. The GWP of methane is 21.

- **Nitrous Oxide ($N_2O$)**. Nitrous oxide is produced by natural and human-related sources. Primary human-related sources include agricultural soil management, animal manure management, sewage treatment, mobile and stationary combustion of fossil fuel, adipic acid production, and nitric acid production. The GWP of nitrous oxide is 310.

- **Hydrofluorocarbons (HFCs)**. HFCs typically are used as refrigerants in both stationary refrigeration and mobile air conditioning. The use of HFCs for cooling and foam blowing is growing particularly as the continued phase-out of chlorofluorocarbons (CFCs) and hydrochlorofluorocarbons (HCFCs) gains momentum. The GWP of HFCs ranges from 140 for HFC-152a to 6,300 for HFC-236fa.

- **Perfluorocarbons (PFCs)**. Perfluorocarbons are compounds consisting of carbon and fluorine. They are primarily created as a byproduct of aluminum production and semiconductor manufacturing. Perfluorocarbons are potent GHGs with a GWP several thousand times that of carbon dioxide, depending on the specific PFC. Another area of concern regarding PFCs is their long atmospheric lifetime (up to 50,000 years) (Energy Information Administration 2007). The GWPs of PFCs range from 5,700 to 11,900.

- **Sulfur Hexafluoride ($SF_6$)**. Sulfur hexafluoride is a colorless, odorless, nontoxic, nonflammable gas. It is most commonly used as an electrical insulator in high voltage equipment that transmits and distributes electricity. Sulfur hexafluoride is the most potent GHG that has been evaluated by the Intergovernmental Panel on Climate Change with a GWP of 23,900. However, its global warming contribution is not as high as the GWP would indicate due to its low mixing ratio, as compared to carbon dioxide (4 parts per trillion [ppt] in 1990 versus 365 parts per million [ppm] of $CO_2$) (US EPA n.d.[b]).

## 4.5.2.3    Contributions to Greenhouse Gas Emissions

*Global*

Worldwide anthropogenic (manmade) GHG emissions are tracked for industrialized nations (referred to as Annex I) and developing nations (referred to as Non-Annex I). Man-made GHG emissions for Annex I and Annex II nations are available through 2012. The sum of these emissions totaled approximately 23,093 million metric tons of $CO_2$ equivalents (MMTCO2e).[3] It should be noted that global emissions inventory data may vary depending on the source of the emissions inventory data.[4] The top five countries and the European Union accounted for approximately 68 percent of the total global GHG emissions based on 2012 data (See **Table 4.5-1, Top Five GHG Producer Countries and the European Union [Annual]**). The GHG emissions in more recent years may differ from the inventories presented in **Table 4.5-1**; however, the data is representative of currently available global inventory data.

**Table 4.5-1**
**Top Five GHG Producer Countries and the European Union (Annual)**

| Emitting Countries | GHG Emissions (MMTCO2e) |
|---|---|
| China | 9,313 |
| United States | 5,123 |
| European Union (EU), 28 Member States | 3,611 |
| India | 1,722 |
| Russian Federation | 2,075 |
| Japan | 1,249 |
| **Total** | **23,093** |

*Source: World Resources Institute, "Climate Analysis Indicators Tool (CAIT)," http://cait.wri.org/. 2012. Excludes emissions and removals from land use, land-use change, and forestry (LULUCF).*

*United States*

As noted in **Table 4.5-1**, the United States was the number two producer of global GHG emissions. The primary GHG emitted by human activities in the United States was $CO_2$, representing approximately 82 percent of the total US GHG emissions (US EPA 2013). Carbon dioxide from fossil fuel combustion, the

---

[3]    The $CO_2$ equivalent emissions commonly are expressed as "million metric tons of carbon dioxide equivalent (MMTCO2E)." The carbon dioxide equivalent for a gas is derived by multiplying the tons of the gas by the associated GWP, such that MMTCO2E = (million metric tons of a GHG) x (GWP of the GHG). For example, the GWP for methane is 21. This means that the emission of one million metric tons of methane is equivalent to the emission of 21 million metric tons of $CO_2$.

[4]    The global emissions are the sum of Annex I and non-Annex I countries, without counting Land-Use, Land-Use Change and Forestry (LULUCF).

largest source of GHG emissions, accounted for approximately 83 percent of US GHG emissions (US EPA 2013).

## State of California

The California Air Resources Board (CARB) compiles GHG inventories for the State of California. Based on the 2013 GHG inventory data (i.e., the latest year for which data are available), California emitted 459.3 MMTCO2e including emissions resulting from imported electrical power in 2013 (CARB 2015). Based on the CARB inventory data and GHG inventories compiled by the World Resources Institute, California's total Statewide GHG emissions rank second in the United States (Texas is number one) with emissions of 418 MMTCO2e excluding emissions related to imported power (CARB 2015).

The primary contributors to GHG emissions in California are transportation, industry, electric power production from both in-state and out-of-state sources, agriculture and forestry, and other sources, which include commercial and residential activities. **Table 4.5-2, GHG Emissions in California**, provides a summary of GHG emissions reported in California in 2000 and 2013 separated by categories defined by the United Nations Intergovernmental Panel on Climate Change (IPCC).

**Table 4.5-2**
**GHG Emissions in California**

| Source Category | 2000 (MMTCO2e) | Percent of Total | 2013 (MMTCO2e) | Percent of Total |
|---|---|---|---|---|
| **ENERGY** | **409.2** | **87.2%** | **382.4** | **83.3%** |
| Energy Industries | 159.12 | 33.9% | 140.8 | 30.6% |
| Manufacturing Industries & Construction | 22.71 | 4.8% | 19.93 | 4.3% |
| Transport | 174.92 | 37.3% | 168.2 | 36.6% |
| Other (Residential/Commercial/Institutional) | 44.67 | 9.5% | 45.25 | 9.9% |
| Solid Fuels | 0.08 | 0.01% | 0.02 | 0.004% |
| Oil and Natural Gas | 6.50 | 1.4% | 7.23 | 1.6% |
| Geothermal Energy Production | 1.13 | 0.2% | 0.95 | 0.2% |
| Pollution Control Devices | 0.11 | 0.02% | 0.01 | 0.002% |
| **INDUSTRIAL PROCESSES & PRODUCT USE** | **20.1** | **4.3%** | **31.8** | **6.9%** |
| Mineral Industry | 5.51 | 1.2% | 4.97 | 1.1% |
| Chemical Industry | 0.05 | 0.01% | 0.05 | 0.01% |
| Non-Energy Products from Fuels & Solvent Use | 3.30 | 0.7% | 0.07 | 0.02% |
| Electronics Industry | 0.57 | 0.1% | 0.30 | 0.07% |
| Substitutes for Ozone Depleting Substances | 6.35 | 1.4% | 18.02 | 3.9% |
| Other Product Manufacture and Use | 0.95 | 0.2% | 0.63 | 0.1% |
| Other | 3.31 | 0.7% | 5.50 | 1.2% |
| **AGRICULTURE, FORESTRY, & OTHER LAND USE** | **29.5** | **6.3%** | **33.8** | **7.4%** |
| Livestock | 19.66 | 4.2% | 23.92 | 5.2% |

| Source Category | 2000 (MMTCO$_2$e) | Percent of Total | 2013 (MMTCO$_2$e) | Percent of Total |
|---|---|---|---|---|
| Aggregate Sources & Non-CO$_2$ Sources on Land | 9.87 | 2.1% | 9.85 | 2.1% |
| **WASTE** | **9.9** | **2.1%** | **11.3** | **2.4%** |
| Solid Waste Disposal | 7.21 | 1.5% | 8.32 | 1.8% |
| Biological Treatment of Solid Waste | 0.24 | 0.05% | 0.54 | 0.1% |
| Wastewater Treatment & Discharge | 2.47 | 0.5% | 2.41 | 0.5% |
| **EMISSIONS SUMMARY** | | | | |
| Gross California Emissions | 468.8 | | 459.3 | |

*Source: California Air Resources Board, "California Greenhouse Gas 2000-2013 Inventory by IPCC Category - Summary," http://www.arb.ca.gov/cc/inventory/data/tables/ghg_inventory_ipcc_sum_2000-13_20150831.pdf. 2015*

Between 2000 and 2013, the population of California grew by approximately 4.6 million (from 33.8 to 38.4 million) (US Census). This represents an increase of approximately 13.6 percent from 2000 population levels. In addition, the California economy, measured as gross state product, grew from $1.3 trillion in 2000 to $2.2 trillion in 2013 representing an increase of approximately 69 percent (California Statistical Abstract, 2002, Legislative Analyst's Office, 2014). Despite the population and economic growth, California's net GHG emissions decreased by approximately 2 percent. CARB attributes the decrease in GHG emissions to the success of AB 32 and AB 1803 (CARB 2014).

## 4.5.3    REGULATORY CONSIDERATIONS

### 4.5.3.1    Intergovernmental Panel on Climate Change

The World Meteorological Organization (WMO) and United Nations Environmental Program (UNEP) established the IPCC in 1988. The goal of the IPCC is to evaluate the risk of climate change caused by human activities. Rather than performing research or monitoring climate, the IPCC relies on peer-reviewed and published scientific literature to make its assessment. While not a regulatory body, the IPCC assesses information (i.e., scientific literature) regarding human-induced climate change and the impacts of human-induced climate change, and recommends options to policy makers for the adaptation and mitigation of climate change. The IPCC reports its evaluations in special reports called "assessment reports." The latest assessment report (i.e., Fifth Assessment Report, consisting of three working group reports and a synthesis report based on the first four reports) was published in 2013.[5] In its 2013 report, the IPCC stated that "Each of the last three decades has been successively warmer at the Earth's surface than any preceding decade since 1850. In the Northern Hemisphere, 1983-2012 was *likely* the warmest 30-year period of the last 1,400 years" (IPCC 2013).

---

[5]    The IPCC's Fifth Assessment Report is available online at https://www.ipcc.ch/report/ar5/

## 4.5.3.2    Federal

In *Massachusetts vs. EPA*, the Supreme Court held that United States Environmental Protection Agency (US EPA) has the statutory authority under Section 202 of the Clean Air Act (CAA) to regulate GHGs from new motor vehicles. The court did not hold that the US EPA was required to regulate GHG emissions; however, it indicated that the agency must decide whether GHGs from motor vehicles cause or contribute to air pollution that is reasonably anticipated to endanger public health or welfare. Upon the final decision, the President signed Executive Order 13432 on May 14, 2007, directing the US EPA, along with the Departments of Transportation, Energy, and Agriculture, to initiate a regulatory process that responds to the Supreme Court's decision.

In December 2007, the President signed the Energy Independence and Security Act of 2007, which sets a mandatory Renewable Fuel Standard (RFS) requiring fuel producers to use at least 36 billion gallons of biofuel in 2022 and sets a national fuel economy standard of 35 miles per gallon by 2020. The act also contains provisions for energy efficiency in lighting and appliances and for the implementation of green building technologies in federal buildings. On July 11, 2008, the US EPA issued an Advanced Notice of Proposed Rulemaking (ANPRM) on regulating GHGs under the CAA. The ANPRM reviews the various CAA provisions that may be applicable to the regulation of GHGs and presents potential regulatory approaches and technologies for reducing GHG emissions. On April 10, 2009, the US EPA published the Proposed Mandatory Greenhouse Gas Reporting Rule in the *Federal Register* (US EPA 2009). The rule was adopted on September 22, 2009 and covers approximately 10,000 facilities nationwide, accounting for 85 percent of US GHG emissions.

On September 15, 2009, the US EPA and the Department of Transportation's (DOT) National Highway Traffic Safety Administration (NHTSA) issued a joint proposal to establish a national program consisting of new standards for model year 2012 through 2016 light-duty vehicles that will reduce GHG emissions and improve fuel economy. The proposed standards would be phased in and would require passenger cars and light-duty trucks to comply with a declining emissions standard. In 2012, passenger cars and light-duty trucks would have to meet an average standard of 295 grams of $CO_2$ per mile and 30.1 miles per gallon. By 2016, the vehicles would have to meet an average standard of 250 grams of $CO_2$ per mile and 35.5 miles per gallon.[6] These standards were formally adopted by the US EPA and DOT on April 1, 2010.

---

[6]    The $CO_2$ emission standards and fuel economy standards stated are based on US EPA formulas.

On December 7, 2009, the US EPA Administrator signed two distinct findings regarding GHGs under section 202(a) of the Clean Air Act:

- **Endangerment Finding:** The Administrator finds that the current and projected concentrations of the six key well-mixed GHGs (carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride) in the atmosphere threaten the public health and welfare of current and future generations.

- **Cause or Contribute Finding:** The Administrator finds that the combined emissions of these well-mixed greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas pollution which threatens public health and welfare.

While these findings did not impose additional requirements on industry or other entities, this action was a prerequisite to finalizing the US EPA's proposed GHG emissions standards for light-duty vehicles, which were jointly proposed by the US EPA and DOT. On April 1, 2010, the US EPA and NHTSA issued final rules requiring that by the 2016 model-year, manufacturers must achieve a combined average vehicle emission level of 250 grams of $CO_2$ per mile, which is equivalent to 35.5 miles per gallon as measured by US EPA standards. These agencies are currently in the process of developing similar regulations for the 2017 through 2025 model years.

### 4.5.3.3    State

*Title 24 Building Standards Code*

The California Energy Commission first adopted Energy Efficiency Standards for Residential and Nonresidential Buildings (California Code of Regulations, Title 24, Part 6) in 1978 in response to a legislative mandate to reduce energy consumption in the state. Although not originally intended to reduce GHG emissions, increased energy efficiency and reduced consumption of electricity, natural gas, and other fuels associated with Title 24 compliance would result in fewer GHG emissions from subject to the standard. The standards are updated periodically to allow for the consideration and inclusion of new energy efficiency technologies and methods. The latest revisions were adopted in 2013 and became effective on July 1, 2014.

Part 11 of the Title 24 Building Standards Code is referred to as the California Green Building Standards Code (CALGreen Code). The purpose of the CALGreen Code is to "improve public health, safety and general welfare by enhancing the design and construction of buildings through the use of building concepts having a positive environmental impact and encouraging sustainable construction practices in the following categories: (1) Planning and design; (2) Energy efficiency; (3) Water efficiency and conservation; (4) Material conservation and resource efficiency; and (5) Environmental air quality (California Building Standards Commission 2009). The CALGreen Code is not intended to substitute or

be identified as meeting the certification requirements of any green building program that is not established and adopted by the California Building Standards Commission (CBSC). The CBSC has released a *2010 Draft California Green Building Standards Code* on its website (California Building Standards Commission 2010). The update to Part 11 of the Title 24 Building Standards Code became effective on January 1, 2011. Part 11 was updated again in 2013 and the updated CALGreen Code became effective July 1, 2015. Unless otherwise noted in the regulation, all newly constructed buildings in California are subject of the requirements of the CALGreen Code.

## Assembly Bill 1493

In response to the transportation sector's contribution of more than half of California's $CO_2$ emissions, Assembly Bill 1493 (AB 1493, Pavley) was enacted on July 22, 2002. AB 1493 requires CARB to set GHG emission standards for passenger vehicles, light-duty trucks, and other vehicles whose primary use is noncommercial personal transportation. CARB adopted the standards in September 2004. The new standards will be phased in during the 2009 through 2016 model years. When fully phased in, the near term (2009–2012) standards will result in a reduction of about 22 percent in GHG emissions compared to the emissions from the 2002 fleet, while the midterm (2013–2016) standards will result in a reduction of about 30 percent.

Before these regulations may go into effect, the US EPA must grant California a waiver under the federal CAA, which ordinarily preempts state regulation of motor vehicle emission standards. On June 30, 2009, the US EPA formally approved California's waiver request. However, in light of the September 15, 2009, announcement by the US EPA and NHTSA regarding the national program to reduce vehicle GHG emissions, California—and states adopting California emissions standards—have agreed to defer to the proposed national standard through model year 2016 if granted a waiver by the US EPA. The 2016 endpoint of the two standards is similar, although the national standard ramps up slightly more slowly than required under the California standard. The Pavley standards require additional reductions in $CO_2$ emissions beyond 2016 (referred to as Phase II standards). While the Phase II standards have yet to be fully developed, CARB has made it clear that the state intends to pursue additional reductions from motor vehicles in the 2017 through 2025 timeframe under the California Global Warming Solutions Act of 2006.

## Executive Order S-3-05 and the Climate Action Team

In June 2005, Governor Schwarzenegger established California's GHG emissions reduction targets in Executive Order S-3-05. The Executive Order established the following goals: GHG emissions should be reduced to 2000 levels by 2010, 1990 levels by 2020, and 80 percent below 1990 levels by 2050. The

Secretary of Cal/EPA is required to coordinate efforts of various agencies in order to collectively and efficiently reduce GHGs. Some of the agency representatives involved in the GHG reduction plan include the Secretary of the Business, Transportation, and Housing Agency; the Secretary of the Department of Food and Agriculture; the Secretary of the Resources Agency; the Chairperson of CARB; the Chairperson of the CEC; and the President of the Public Utilities Commission.

Representatives from each of the aforementioned agencies comprise the Climate Action Team. The Cal/EPA secretary is required to submit a biannual progress report from the Climate Action Team to the governor and state legislature disclosing the progress made toward GHG emission reduction targets. In addition, another biannual report must be submitted illustrating the impacts of global warming on California's water supply, public health, agriculture, coastline, and forests, and reporting possible mitigation and adaptation plans to combat these impacts. Some strategies currently being implemented by state agencies include CARB introducing vehicle climate change standards and diesel anti-idling measures, the CEC implementing building and appliance efficiency standards, and the Cal/EPA implementing their green building initiative. The Climate Action Team also recommends future emission reduction strategies, such as using only low-GWP refrigerants in new vehicles, developing ethanol as an alternative fuel, reforestation, solar power initiatives for homes and businesses, and investor-owned utility energy efficiency programs. According to the report, implementation of current and future emission reduction strategies have the potential to achieve the goals set forth in Executive Order S-3-05.

## *Assembly Bill 32*

In furtherance of the goals established in Executive Order S-3-05, the legislature enacted Assembly Bill 32 (AB 32, Nuñez and Pavley), the California Global Warming Solutions Act of 2006, which Governor Schwarzenegger signed on September 27, 2006. AB 32 represents the first enforceable statewide program to limit GHG emissions from all major industries with penalties for noncompliance. AB 32 requires the state to undertake several actions. The major requirements are discussed below.

### CARB Early Action Measures

CARB is responsible for carrying out and developing the programs and requirements necessary to achieve the goal of AB 32—the reduction of California's GHG emissions to 1990 levels by 2020. The first action under AB 32 resulted in CARB's adoption of a report listing three specific early-action greenhouse gas emission reduction measures on June 21, 2007. On October 25, 2007, CARB approved six additional early-action GHG reduction measures under AB 32. CARB has adopted regulations for all early action measures. The early-action measures are divided into three categories:

- Group 1 – GHG rules for immediate adoption and implementation

- Group 2 – Several additional GHG measures under development

- Group 3 – Air pollution controls with potential climate co-benefits

The first three early-action regulations, adopted June 21, 2007, meeting the narrow legal definition of "discrete early-action GHG reduction measures" are:

- A low-carbon fuel standard to reduce the "carbon intensity" of California fuels;

- Reduction of refrigerant losses from motor vehicle air conditioning system maintenance to restrict the sale of "do-it-yourself" automotive refrigerants; and

- Increased methane capture from landfills to require broader use of state-of-the-art methane capture technologies.

- The six additional early-action regulations, adopted on October 25, 2007, also meeting the narrow legal definition of "discrete early-action GHG reduction measures," are:

- Reduction of aerodynamic drag, and thereby fuel consumption, from existing trucks and trailers through retrofit technology;

- Reduction of auxiliary engine emissions of docked ships by requiring port electrification;

- Reduction of perfluorocarbons from the semiconductor industry;

- Reduction of propellants in consumer products (e.g., aerosols, tire inflators, and dust removal products);

- The requirement that all tune-up, smog check and oil change mechanics ensure proper tire inflation as part of overall service in order to maintain fuel efficiency; and

- Restrictions on the use of sulfur hexafluoride ($sf_6$) from non-electricity sectors if viable alternatives are available.

**State of California Greenhouse Gas Inventory and 2020 Limit**

As required under AB 32, on December 6, 2007, CARB approved the 1990 greenhouse gas emissions inventory, thereby establishing the emissions limit for 2020. The 2020 emissions limit was set at 427 $MMTCO_2e$. CARB also projected the state's 2020 GHG emissions under "business as usual" (BAU) conditions—that is, emissions that would occur without any plans, policies, or regulations to reduce GHG emissions. CARB used an average of the state's GHG emissions from 2002 through 2004 and projected the 2020 levels based on population and economic forecasts. The projected net emissions totaled approximately 596 $MMTCO_2e$. Therefore, CARB established that the state must reduce its 2020 BAU emissions by approximately 29 percent in order to meet the 1990 target.

The inventory revealed that in 1990, transportation, with 35 percent of the state's total emissions, was the largest single sector, followed by industrial emissions, 24 percent; imported electricity, 14 percent; in-state electricity generation, 11 percent; residential use, 7 percent; agriculture, 5 percent; and commercial uses, 3 percent (these figures represent the 1990 values, compared to **Table 4.5-2**, which presents 2013 values). AB 32 does not require individual sectors to meet their individual 1990 GHG emissions levels; the total statewide emissions are required to meet the 1990 threshold by 2020.

**CARB Mandatory Reporting Requirements**

In addition to the 1990 emissions inventory, on December 6, 2007 CARB adopted regulations requiring the mandatory reporting of GHG emissions for large facilities. The mandatory reporting regulations require annual reporting from the largest facilities in the state, which account for approximately 94 percent of point source GHG emissions from industrial and commercial stationary sources in California. About 800 separate sources fall under the reporting rules and include electricity-generating facilities, electricity retail providers and power marketers, oil refineries, hydrogen plants, cement plants, cogeneration facilities, and industrial sources that emit over 25,000 tons of carbon dioxide each year from on-site stationary combustion sources. Transportation sources, which account for 37 percent of California's total GHG emissions, are not covered by these regulations but will continue to be tracked through existing means.

**AB 32 Climate Change Scoping Plan**

As indicated above, AB 32 requires CARB to adopt a scoping plan indicating how reductions in significant GHG sources will be achieved through regulations, market mechanisms, and other actions. After receiving public input on their discussion draft of the scoping plan, the CARB Governing Board approved the *Climate Change Scoping Plan* on December 11, 2008. Key elements of the Scoping Plan include the following recommendations:

- expanding and strengthening existing energy efficiency programs as well as building and appliance standards;

- achieving a statewide renewable energy mix of 33 percent;

- developing a California cap-and-trade program that links with other Western Climate Initiative partner programs to create a regional market system;

- establishing targets for transportation-related GHG emissions for regions throughout California and pursuing policies and incentives to achieve those targets;

- adopting and implementing measures pursuant to existing state laws and policies, including California's clean car standards, goods movement measures, and the Low Carbon Fuel Standard; and

- creating targeted fees, including a public goods charge on water use, fees on high global warming potential gases, and a fee to fund the administrative costs of the state's long-term commitment to AB 32 implementation.

**Table 4.5-3, AB 32 Scoping Plan Measures (SPMs)**, lists CARB's preliminary recommendations for achieving GHG emissions reductions under AB 32 along with a brief description of the requirements and applicability.

**Table 4.5-3**
**AB 32 Scoping Plan Measures (SPMs)**

| Scoping Plan Measure | Description |
|---|---|
| **SPM-1**: California Cap-and-Trade Program linked to Western Climate Initiative | Implement a broad-based cap-and-trade program that links with other Western Climate Initiative Partner programs to create a regional market system. Ensure California's program meets all applicable AB 32 requirements for market-based mechanisms. Capped sectors include transportation, electricity, natural gas, and industry. Projected 2020 business-as-usual emissions are estimated at 512 metric tons of $CO_2$ equivalents (MTCO$_2$e); preliminary 2020 emissions limit under cap-and-trade program are estimated at 365 MTCO$_2$e (29 percent reduction). |
| **SPM-2**: California Light-Duty Vehicle GHG Standards | Implement adopted Pavley standards and planned second phase of the program. AB 32 states that if the Pavley standards (AB 1493) do not remain in effect, CARB shall implement equivalent or greater alternative regulations to control mobile sources. |
| **SPM-3**: Energy Efficiency | Maximize energy efficiency building and appliance standards, and pursue additional efficiency efforts. The Scoping Plan considers green building standards as a framework to achieve reductions in other sectors, such as electricity. |
| **SPM-4**: Renewables Portfolio Standard | Achieve 33 percent Renewables Portfolio Standard by both investor-owned and publicly owned utilities. |
| **SPM-5**: Low Carbon Fuel Standard | CARB identified the Low Carbon Fuel Standard as a Discrete Early Action item and the final regulation was adopted on April 23, 2009. In January 2007, Governor Schwarzenegger issued Executive Order S-1-07, which called for the reduction of the carbon intensity of California's transportation fuels by at least 10 percent by 2020. |
| **SPM-6**: Regional Transportation-Related Greenhouse Gas Targets | Develop regional greenhouse gas emissions reduction targets for passenger vehicles. SB 375 requires CARB to develop, in consultation with metropolitan planning organizations (MPOs), passenger vehicle greenhouse gas emissions reduction targets for 2020 and 2035 by September 30, 2010. SB 375 requires MPOs to prepare a sustainable communities strategy to reach the regional target provided by CARB. |
| **SPM-7**: Vehicle Efficiency Measures | Implement light-duty vehicle efficiency measures. CARB is pursuing fuel-efficient tire standards and measures to ensure properly inflated tires during vehicle servicing. |
| **SPM-8**: Goods Movement | Implement adopted regulations for port drayage trucks and the use of shore power for ships at berth. Improve efficiency in goods movement operations. |
| **SPM-9**: Million Solar Roofs Program | Install 3,000 MW of solar-electric capacity under California's existing solar programs. |
| **SPM-10**: Heavy/Medium-Duty Vehicles | Adopt heavy- and medium-duty vehicle and engine measures targeting aerodynamic efficiency, vehicle hybridization, and engine efficiency. |

| Scoping Plan Measure | Description |
|---|---|
| **SPM-11**:  Industrial Emissions | Require assessment of large industrial sources to determine whether individual sources within a facility can cost-effectively reduce greenhouse gas emissions and provide other pollution reduction co-benefits. Reduce greenhouse gas emissions from fugitive emissions from oil and gas extraction and gas transmission. Adopt and implement regulations to control fugitive methane emissions and reduce flaring at refineries. |
| **SPM-12**:  High Speed Rail | Support implementation of a high-speed rail (HSR) system. This measure supports implementation of plans to construct and operate a HSR system between Northern and Southern California serving major metropolitan centers. |
| **SPM-13**:  Green Building Strategy | Expand the use of green building practices to reduce the carbon footprint of California's new and existing inventory of buildings. |
| **SPM-14**:  High GWP Gases | Adopt measures to reduce high global warming potential gases. The Scoping Plan contains 6 measures to reduce high-GWP gases from mobile sources, consumer products, stationary sources, and semiconductor manufacturing. |
| **SPM-15**:  Recycling and Waste | Reduce methane emissions at landfills. Increase waste diversion, composting, and commercial recycling. Move toward zero-waste. |
| **SPM-16**:  Sustainable Forests | Preserve forest sequestration and encourage the use of forest biomass for sustainable energy generation. The federal government and California's Board of Forestry and Fire Protection have the regulatory authority to implement the Forest Practice Act to provide for sustainable management practices. This measure is expected to play a greater role in the 2050 goals. |
| **SPM-17**:  Water | Continue efficiency programs and use cleaner energy sources to move water. California will also establish a public goods charge for funding investments in water efficiency that will lead to as yet undetermined reductions in greenhouse gases. |
| **SPM-18**:  Agriculture | In the near-term, encourage investment in manure digesters and at the five-year Scoping Plan update determine if the program should be made mandatory by 2020. Increase efficiency and encourage use of agricultural biomass for sustainable energy production. CARB has begun research on nitrogen fertilizers and will explore opportunities for emission reductions. |

*Source: California Air Resources Board, Climate Change Scoping Plan, 2008*

As of October 2010, CARB has identified ongoing programs and has adopted regulations for 29 individual measures to reduce GHG emissions in accordance with the *Climate Change Scoping Plan* strategies. The *Climate Change Scoping Plan* was re-approved by CARB in August 2011. Subsequently, the *First Update to the Climate Change Scoping Plan* was approved in May 2014.

In September 2012, CARB adopted a California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms, which established the cap-and-trade program to manage greenhouse gas emissions, for California. The cap-and-trade program is a key element that will enable California to achieve the GHG emission goals of AB 32. The cap-and-trade program is a market-based approach wherein the government determines an overall emission target or "cap" for a particular set of facilities. The cap is the total amount of emissions that all of the facilities can produce. Tradable emissions allowances totaling the overall emissions cap, are distributed, either by auction or given out, amongst the particular set of facilities. The emissions allowances can be traded amongst the facilities.

The Renewables Portfolio Standard (RPS) Program was established in 2002 under Senate Bill (SB) 1078 which required 20 percent of the electricity used by California to come from renewable energy sources by 2017. This was accelerated by SB 107 in 2006 which required 20 percent of electricity retail sales to come from renewable energy sources by 2010 and then by Executive Order S-14-08 in 2008 which required 33 percent of electricity sold by retail sellers to be produced by renewable energy in 2020. In April 2011, SB X1-2 required that all electricity retailers adopt the new RPS goals providing 20 percent renewable sources by the end of 2013, 25 percent by the end of 2016, and 33 percent by the end of 2020.

As previously mentioned, CARB approved the First Update to the Climate Change Scoping Plan on May 22, 2014. The First Update identifies opportunities to leverage existing and new funds to further drive GHG emission reductions. The First Update defines CARB's climate change priorities for the next five years and develops an integrated framework for achieving both air quality and climate goals in California beyond 2020. It also evaluates how to align the State's "longer-term" GHG reduction strategies with other State policy priorities for water, waste, natural resources, clean energy, transportation, and land use (CARB 2014).

## Senate Bill 97 (State CEQA Guidelines)

In August 2007, the legislature enacted SB 97 (Dutton), which directed the Governor's Office of Planning and Research (OPR) to develop guidelines under the California Environmental Quality Act (CEQA) for the mitigation of GHG emissions.

On June 19, 2008, OPR issued a technical advisory as interim guidance regarding the analysis of GHG emissions in CEQA documents (OPR 2008). The advisory indicated that a project's GHG emissions, including those associated with vehicular traffic and construction activities should be identified and estimated. The advisory further recommended that the lead agency determine significance of the impacts and impose all mitigation measures that are necessary to reduce GHG emissions to a less than significant level. The advisory did not recommend a specific threshold of significance. Instead, OPR requested that CARB recommend a method for setting thresholds that lead agencies may adopt (OPR 2009).

To formulate CEQA Guideline Amendments for GHG emissions, OPR submitted the *Proposed Draft CEQA Guideline Amendments for Greenhouse Gas Emissions* to the Secretary for Natural Resources on April 13, 2009. The Natural Resources Agency conducted formal rulemaking procedures in 2009 and adopted the CEQA Guideline Amendments on December 30, 2009. They became effective in March 2010.

## *Senate Bill 375*

The California legislature passed SB 375 (Steinberg) on September 1, 2008. SB 375 requires CARB to set regional GHG reduction targets after consultation with local governments. The target must then be incorporated within that region's regional transportation plan (RTP), which is used for long-term transportation planning, in a Sustainable Communities Strategy (SCS). SB 375 also requires each region's regional housing needs assessment (RHNA) to be adjusted based on the Sustainable Communities Strategy in its RTP. Additionally, SB 375 reforms the environmental review process to create incentives to implement the strategy, especially transit priority projects. The governor signed SB 375 into law on September 30, 2008.

On January 23, 2009, CARB appointed a Regional Targets Advisory Committee (RTAC) to provide recommendations and methodologies to be used in the target setting process. The RTAC provided its recommendations in a report to CARB on September 29, 2009. On August 9, 2010, CARB staff issued the *Proposed Regional Greenhouse Gas Emission Reduction Targets for Automobiles and Light Trucks Pursuant to Senate Bill 375* (CARB 2010b). CARB staff proposed draft reduction targets for the four largest MPOs (Bay Area, Sacramento, Southern California, and San Diego) of 7 to 8 percent for 2020 and reduction targets between 13 to 16 percent for 2035. For the Bay Area, CARB established a draft target of 7 percent for 2020 and 15 percent for 2035. These targets were recommended to CARB by the Metropolitan Transportation Commission, which adopted the thresholds for its planning purposes on July 28, 2010. Of note, the proposed reduction targets explicitly exclude emission reductions expected from the AB 1493 and low carbon fuel standard regulations. CARB adopted the final targets on September 23, 2010.

### 4.5.3.4    Regional Programs

### *Bay Area Air Quality Management District*

On June 2, 2010, the Bay Area Air Quality Management District (BAAQMD) adopted updated *CEQA Air Quality Guidelines*. These guidelines contain GHG operational emissions significance thresholds and recommended methodologies and models to be used for assessing the impacts of project-specific GHG emissions on global climate change. The updated *CEQA Air Quality Guidelines* recommend that thresholds of significance for GHG emissions should be related to AB 32's GHG reduction goals or the state's strategy to achieve the 2020 GHG emissions limit, and also provide recommended measures for reducing GHG emissions from land use development projects and stationary sources.

The significance thresholds under BAAQMD's *CEQA Air Quality Guidelines* were challenged by the California Building Industry Association. The Alameda County Superior Court ruled that BAAQMD must set aside the approval of the guidelines and not approve any new guidelines until the BAAQMD

complies with CEQA. This ruling was subsequently overturned on appeal, but this ruling was in turn appealed, and the California Supreme Court has agreed to rule on select portions of the case. While the case continues through the courts, the BAAQMD is not recommending the use of the significance thresholds in the guidelines to determine the significance of air quality impacts. Instead, the BAAQMD recommends that the lead agency should "determine appropriate air quality thresholds of significance based on substantial evidence in the record." The Court did not rule on or question the adequacy of the evidentiary basis supporting the significance thresholds that are contained in the *CEQA Air Quality Guidelines* and the BAAQMD-recommended impact assessment methodologies. Therefore, a lead agency has the discretion to use the significance thresholds and methodology for analyzing air quality impacts, including GHG impacts, under CEQA based on the evidence and technical studies supporting the guidelines.

**Bay Area Air Quality Management District - GHG Thresholds of Significance**

BAAQMD's *CEQA Air Quality Guidelines* contain three thresholds of significance that may be used to evaluate the significance of the operational GHG emissions of a land development project (including mixed-use residential projects such as the proposed project). These thresholds of significance can be used by a lead agency to determine whether the project exceeds the first GHG significance criteria from Appendix G of the *State CEQA Guidelines*, i.e., whether the project generates GHG emissions, "either directly or indirectly, that may have a significant impact on the environment." BAAQMD's GHG thresholds include a bright-line threshold of 1,100 metric tons of $CO_2$e per year (MTCO$_2$e/yr). Projects that have operational emissions below 1,100 metric tons of $CO_2$e per year are considered to have less than significant GHG emissions. For projects that result in operational emissions that exceed the bright-line threshold, the BAAQMD has put forth a GHG efficiency threshold of 4.6 metric tons $CO_2$e/service person/year (where service persons are residents and employees). Projects that have operational emissions below 4.6 metric tons of $CO_2$e/service person/year are considered to have less than significant GHG emissions. A project's GHG impact may also be evaluated in terms of the project's compliance with a qualified GHG Reduction Strategy (BAAQMD 20101, p. 2-4; Table 2.1)

**Qualified GHG Reduction Strategy**

Section 4.3 of BAAQMD's *CEQA Air Quality Guidelines* lays out the standards for a qualified GHG Reduction Strategy that is consistent with AB 32 goals and is therefore valid for use as a threshold of significance. These required elements (which correspond to the Plan Elements listed in the *State CEQA Guidelines* Section 15183.5) are as follows. A qualified GHG Reduction Strategy must:

- Quantify GHG emissions, both existing and projected, over a specified time period, resulting from activities within a defined geographic area;

- Establish a level, based on substantial evidence, below which the contribution to GHG emissions from activities covered by the plan would not be cumulatively considerable;

- Identify and analyze the GHG emissions resulting from specific actions or categories of actions anticipated within the geographic area;

- Specify measures or a group of measures, including performance standards that substantial evidence demonstrates, if implemented on a project-by-project basis, would collectively achieve the specified emissions level;

- Monitor the plan's progress; and

- Adopt the GHG Reduction Strategy in a public process following environmental review (BAAQMD 2011, pp. 4-7 through 4-11).

If a project is located in a community with an adopted qualified GHG Reduction Strategy, the impact of a project's GHG emissions may be considered less than significant if the project is consistent with the GHG Reduction Strategy. However, a project must demonstrate its consistency by identifying and implementing all applicable feasible measures and policies from the GHG Reduction Strategy into the project (BAAQMD 2011, pp. 3-1, 4-4). This approach is consistent with Section 15183.5 of the *State CEQA Guidelines*, which provides for tiering of GHG emissions analysis from a programmatic-level planning document, such as a qualified GHG Reduction Strategy, to project-specific CEQA analysis.

### *Association of Bay Area Governments and Metropolitan Transportation Commission*

In July 2013, the Association of Bay Area Governments (ABAG) and the Metropolitan Transportation Commission (MTC) adopted Plan Bay Area (Plan), which includes the region's Sustainable Communities Strategy (SCS) and the 2040 Regional Transportation Plan (RTP). This is the nine-county region's first long-range plan to meet the requirements of Senate Bill 375 (2008), which calls on each of the state's 18 metropolitan areas to develop a SCS to accommodate future population growth and reduce greenhouse gas emissions from cars and light trucks. A number of lawsuits were filed challenging the Final EIR prepared for the Plan. However, until the court provides a decision with respect to the lawsuits, the Plan remains in effect.

### 4.5.3.5    Local Plans and Policies

*City of Santa Clara Climate Action Plan*

On December 3, 2013, the City of Santa Clara adopted the Santa Clara Climate Action Plan (CAP). Santa Clara prepared this CAP in an effort to prepare a BAAQMD-qualified GHG Reduction Strategy, and which can act as a threshold of significance under CEQA for determining whether a project's operational GHG emissions would result in a significant impact.

The CAP establishes goals and emissions reduction measures that the City will implement to achieve the state-recommended GHG emissions reduction target of 15 percent below 2008 emissions by the year 2020. The primary goals include changing the Silicon Valley Power (SVP) power mix, promoting energy efficiency, conservation of water, and reduction of waste with the overall effect to reduce emissions from the City of Santa Clara. The Santa Clara CAP identifies the sources of GHG emissions caused by actions within the City and estimates how these emissions may change over time. The CAP also provides strategies to reduce the GHG emission levels to meet legislative requirements outlined in AB 32 and SB 375. Additionally, the CAP builds on existing efforts of City departments, businesses, and community groups to reduce GHG emissions and will identify future efforts needed to achieve the state goals. Finally, the CAP provides performance metrics and tracking mechanisms to monitor future progress towards meeting the City's GHG goals.

The following steps were taken in preparation of the Santa Clara CAP:

- Prepared the communitywide and municipal operations emissions inventory for the baseline year 2008;

- Established the GHG reduction target;

- Solicited input from the community, business stakeholders, and decision makers;

- Reviewed current City programs and quantified the greenhouse gas reductions resulting from the implementation of these programs;

- In coordination with City staff from different City departments, prepared a list of potential GHG reduction measures in five major areas: transportation, energy, off-road construction equipment, waste disposal, and water and wastewater;

- Categorized the potential reduction measures by implementation feasibility, by time frame (Near (by 2015), mid (by 2020), or long-term (by 2035)), barriers to implementation, and resources needed for implementation;

- Reviewed the draft GHG reduction measures with BAAQMD staff; and

- Developed and quantified draft GHG reduction measures.

After receiving both written and verbal testimony at the public hearings before both the Planning Commission and the City Council, the Council adopted a Negative Declaration pursuant to CEQA, adopted the CAP, and approved an amendment to the General Plan to include the CAP as part of Appendix 8.13.

Though the BAAQMD does not issue official certification that a CAP is a qualified GHG Reduction Strategy that can be utilized as a GHG Threshold of Significance, the BAAQMD issued a comment letter on November 20, 2013, voicing BAAQMD's strong endorsement and approval of the Santa Clara CAP (BAAQMD 2013). The BAAQMD letter states that the BAAQMD "believe[s] that the City's Climate Action Plan will likely achieve its GHG reduction target and that the City will be in a good position to use the CAP as a tierable document under CEQA" (BAAQMD 2013, p. 2).

The Santa Clara CAP is a qualified GHG Reduction Strategy because it meets each of the requirements enumerated in the BAAQMD guidelines, as described in **Table 4.5-4**, **Santa Clara Climate Action Plan Compliance with BAAQMD Requirements for Qualified GHG Reduction Strategy**, below.

Because the Santa Clara CAP meets the BAAQMD requirements for a qualified GHG Reduction Strategy, and has been endorsed as a tierable document by BAAQMD, the Santa Clara CAP is a qualified GHG Reduction Strategy. Thus, a project that demonstrates its consistency with the Santa Clara CAP by identifying and implementing all applicable feasible measures and policies from the GHG Reduction Strategy into the project will result in a less than significant impact related to operational GHG emissions.

**Table 4.5-4**
**Santa Clara Climate Action Plan Compliance with BAAQMD Requirements for Qualified GHG Reduction Strategy**

| BAAQMD Requirement | Compliance with Requirement? |
|---|---|
| Quantify greenhouse gas emissions, both existing and projected over a specified time, resulting from activities within a defined geographic area | **Yes.** The City prepared the communitywide and municipal operations emissions inventory for the baseline year 2008, and analyzed anticipated 2020 emissions according to a business as usual calculation, for all of the activities within the Santa Clara CAP area. |
| Establish a level, based on substantial evidence, below which the contribution to GHG emissions from activities covered by the plan would not be cumulatively considerable | **Yes.** The CAP established a GHG reduction target of 15 percent below 2008 emission levels by 2020, which would results in GHG emissions from activities covered by the plan not being cumulatively considerable. The goals and measures included in the plan are designed to make sure that Santa Clara meets, and even exceeds, this goal (Santa Clara anticipates that it will reduce its GHG emissions to 23.4 percent below 2008 emissions levels by 2020). |
| Identify and analyze the GHG emissions resulting from specific actions or categories of actions anticipated within the geographic area | **Yes.** The CAP reviewed and quantified emissions by sector, including nonresidential energy, transportation, residential energy, off-road equipment, waste, water and wastewater energy, and direct wastewater. The CAP also reviewed current City programs and quantified the GHG reductions resulting from the implementation of these programs. |
| Specify measures or a group of measures, including performance standards that substantial evidence demonstrates, if implemented on a project-by-project basis, would collectively achieve the specified emissions level | **Yes.** In coordination with City staff from different City departments, the City prepared a list of GHG reduction measures in five major areas: transportation, energy, off-road construction equipment, waste disposal, and water and wastewater. The City then categorized the reduction measures by implementation feasibility, by time frame (Near (by 2015), mid (by 2020), or long-term (by 2035)), barriers to implementation, and resources needed for implementation. The City anticipates that it will surpass its goal and will achieve a 23.4 percent reduction in GHG emissions by 2020. |
| Monitor the plan's progress | **Yes.** The CAP provides performance metrics and tracking mechanisms to monitor future progress towards meeting the City's GHG goals. |
| Adopt the GHG Reduction Strategy in a public process following environmental review | **Yes.** The City adopted the CAP on 12/3/13 following a public hearing and prepared a Negative Declaration for the CAP. |

## City of Santa Clara General Plan

The City of Santa Clara's General Plan contains goals and policies relating to GHG reduction and are listed below for ease of reference.

**Prerequisite Policies**

**Policy 5.1.1-P10**     Prior to 2015, adopt a Climate Action Plan to implement the City's sustainability and environmental quality Goals and Policies, including any necessary health impact assessment.

**Policy 5.1.1-P11**     Prior to 2010, update the City's Urban Water Management Plan and encourage a 20 percent reduction in consumption.

**Policy 5.1.1-P15**     Prior to 2015, work with Valley Transportation Authority and other responsible agencies to develop a Regional Transportation Plan to address the Sustainable Community Strategy goals of AB 32 (2006) and SB 375 (2008).

**General Land Use Policies**

**Policy 5.3.1-P10**     Provide opportunities for increased landscaping and trees in the community, including requirements for new development to provide street trees and a minimum 2:1 on- or off –site replacement for trees removed as part of the proposal.

**Policy 5.3.1-P11**     Encourage new developments proposed within a reasonable distance of an existing or proposed recycled water distribution system to utilize recycled water for landscape irrigation, industrial processes, cooling and other appropriate uses.

**Policy 5.3.1-P12**     Encourage convenient pedestrian connections within new and existing developments.

**Policy 5.3.1-P14**     Encourage Transportation Demand Management strategies and the provision of bicycle and pedestrian amenities in all new development in order to decrease use of the single-occupant automobile and reduce vehicle miles traveled.

**Commercial Land Use Policies**

**Policy 5.3.3-P6**     Encourage neighborhood retail uses within a 10-minute walk of residential uses throughout the City.

**Policy 5.3.3-P10**     Encourage new grocery stores near residential neighborhoods to provide Santa Clara residents with access to fresh and healthy food options.

**General Mobility and Transportation Policies**

**Policy 5.8.1-P1**     Create accessible transportation networks system to meet the needs of all segments of the population, including youth, seniors, persons with disabilities and low-income households.

**Policy 5.8.1-P4**         Expand transportation options and improve alternate modes that reduce greenhouse gas emissions.

**Policy 5.8.1-P5**         Work with local, regional, state and private agencies, as well as employers and residents, to encourage programs and services that reduce vehicle miles traveled.

**Policy 5.8.1-P6**         Implement Level of Service standards that support in-creased transit ridership, biking and walking, in order to decrease vehicle miles traveled and reduce air pollution, energy consumption and greenhouse gas emissions.

**Policy 5.8.1-P7**         Explore options to apply traffic fees toward bicycle, pedestrian, transit and roadway improvements in order to implement a circulation system that optimizes travel by all modes.

**Roadway Network and Policies**

**Policy 5.8.2-P5**         Support "traffic calming" and other neighborhood traffic management techniques to enhance the quality of life within existing neighborhoods and to discourage through-traffic on local streets.

**Policy 5.8.2-P8**         Minimize disruption of traffic flow resulting from truck traffic and deliveries, particularly during commute hours.

**Transit Network Policies**

**Policy 5.8.3-P8**         Require new development to include transit stop amenities, such as pedestrian pathways to stops, benches, traveler information and shelters.

**Policy 5.8.3-P9**         Require new development to incorporate reduced on-site parking and provide enhanced amenities, such as pedestrian links, benches and lighting, in order to encourage transit use and increase access to transit services.

**Bicycle and Pedestrian Network Policies**

**Policy 5.8.4-P6**         Require new development to connect individual sites with existing and planned bicycle and pedestrian facilities, as well as with on-site and neighborhood amenities/services, to promote alternate modes of transportation.

**Policy 5.8.4-P7**    Require new development to provide sidewalks, street trees and lighting on both sides of all streets in accordance with City standards, including new developments in employment areas.

**Policy 5.8.4-P8**    Require new development and public facilities to provide improvements, such as sidewalks, landscaping and facilities, to promote pedestrian and bicycle use.

**Policy 5.8.4-P9**    Encourage pedestrian and bicycle-oriented amenities, such as bike racks, benches, signalized, mid-block crosswalks, and bus benches or enclosures.

**Transportation Demand Management Policies**

**Policy 5.8.5-P1**    Require new development to include transportation demand management site-design measures, including preferred carpool and vanpool parking, enhanced pedestrian access, bicycle storage and recreational facilities.

**Policy 5.8.5-P2**    Require development to offer on-site services, such as ATMs, dry cleaning, exercise rooms, cafeterias and concierge services, to reduce daytime trips.

**Policy 5.8.5-P3**    Encourage all new development to provide on-site bicycle facilities and pedestrian circulation.

**Policy 5.8.5-P4**    Encourage new development to participate in shuttle programs to access local transit services within the City, including buses, light rail, Bay Area Rapid Transit, Caltrain, Altamont Commuter Express Yellow Shuttle and Lawrence Caltrain Bowers/Walsh Shuttle services.

**Policy 5.8.5-P5**    Encourage transportation demand management programs that provide incentives for the use of alternative travel modes to reduce the use of single occupant vehicles.

**Policy 5.8.5-P6**    Encourage transportation demand management programs that include shared bicycle and autos for part-time use by employees and residents to reduce the need for personal vehicles.

**Policy 5.8.5-P7**    Promote programs that reduce peak hour trips, such as flexible work hours, telecommuting, home based businesses and off -site business centers, and encourage businesses to provide alternate, off -peak hours for operations.

**Policy 5.8.5-P8**          Encourage local events that connect employees and residents with local transit providers and ride sharing options.

**Policy 5.8.5-P9**          Promote transportation demand management programs that provide education, information and coordination to connect residents and employees with alternate transportation opportunities.

**Conservation Policies**

**Policy 5.10.1-P3**         Require preservation of all City-designated heritage trees listed in the Heritage Tree Appendix 8.10 of the General Plan.

**Policy 5.10.1-P4**         Protect all healthy cedars, redwoods, oaks, olives, bay laurel and pepper trees of any size, and all other trees over 36 inches in circumference, measured from 48 inches above-grade on private and public property as well as in the public right-of-way.

**Policy 5.10.1-P9**         Encourage curbside recycling and composting of organic and yard waste.

**Policy 5.10.1-P10**        Promote the reduction, recycling and safe disposal of household hazardous wastes through public education and awareness and through an increase in hazardous waste collection events.

**Policy 510.1-P11**         Require use of native plants and wildlife-compatible non-native plants, when feasible, for landscaping on City property.

**Policy 5.10.1-P12**        Encourage property owners and landscapers to use native plants and wildlife-compatible non-native plants, when feasible.

**Air Quality Policies**

**Policy 5.10.2-P1**         Support alternative transportation modes and efficient parking mechanisms to improve air quality.

**Policy 5.10.2-P2**         Encourage development patterns that reduce vehicle miles traveled and air pollution.

**Policy 5.10.2-P3**         Encourage implementation of technological advances that minimize public health hazards and reduce the generation of air pollutants.

**Policy 5.10.2-P4**    Encourage measures to reduce greenhouse gas emissions to reach 30 percent below 1990 levels by 2020.

**Policy 5.10.2-P5**    Promote regional air pollution prevention plans for local industry and businesses.

**Policy 5.10.2-P6**    Require "Best Management Practices" for construction dust abatement.

**Energy Policies**

**Policy 5.10.3-P2**    Encourage new development to incorporate sustainable building design, site planning and construction, including encouraging solar opportunities.

**Policy 5.10.3-P3**    Reduce energy consumption through sustainable construction practices, materials and recycling.

**Policy 5.10.3-P4**    Promote sustainable buildings and land planning for all new development, including programs that reduce energy and water consumption in new development.

**Water Policies**

**Policy 5.10.4-P1**    Promote water conservation through development standards, building requirements, landscape design guidelines, education, compliance with the State Water Conservation Ordinance, and other applicable Citywide policies and programs.

**Policy 5.10.4-P7**    Require installation of native and low-water-consumption plant species when landscaping new development and public spaces to reduce water usage.

## 4.5.4    IMPACTS AND MITIGATION MEASURES

### 4.5.4.1    Significance Criteria

The impacts related to GHG emissions resulting from the implementation of the proposed project would be considered cumulatively significant if they would exceed the following significance criteria, in accordance with Appendix G of the *State CEQA Guidelines*:

- generate greenhouse gas emissions, either directly or indirectly, that may have a significant impact on the environment; or

- conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing the emissions of greenhouse gases.

As noted by the BAAQMD in its guidelines, "GHG emissions contribute, on a cumulative basis, to the significant adverse environmental impacts of global climate change." "No single land use project could generate enough GHG emissions to noticeably change the global average temperature" (BAAQMD CEQA Guidelines 2011).

The *State CEQA Guidelines* include Section 15064.4, which states that, when making a determination with respect to the significance of a project's GHG emissions, a lead agency shall have discretion to determine whether to: (1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use; and/or (2) Rely on a qualitative analysis or performance-based standards.

Section 15064.4 also states that a lead agency should consider the following factors when assessing the significance of the impact of GHG emissions on the environment: (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project; and (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of GHG emissions.

A project's impact relative to the first Appendix G criterion may be evaluated by performing a direct calculation of the GHG emissions resulting from the proposed project and comparing the emissions with the BAAQMD CEQA thresholds of significance for GHG emissions. The BAAQMD thresholds were developed specifically for the Bay Area after considering the latest Bay Area GHG inventory and the effects of AB 32 scoping plan measures that would reduce regional emissions. The BAAQMD intends to achieve GHG reductions from new land use developments to close the gap between projected regional emissions and the AB 32 targets.

BAAQMD's GHG thresholds include a bright-line threshold of 1,100 metric tons of $CO_2e$ per year ($MTCO_2e$/yr). Projects that have operational emissions below 1,100 metric tons of $CO_2e$ per year are considered to have less than significant GHG emissions. For projects that result in operational emissions that exceed the bright-line threshold, the BAAQMD has put forth a GHG efficiency threshold of 4.6 metric tons $CO_2e$/service person/year (where service persons are residents and employees). Projects that have operational emissions below 4.6 metric tons of $CO_2e$/service person/year are considered to have less than significant GHG emissions. The guidelines also include another threshold, which provides for the

evaluation of a project's impact based on the project's compliance with a qualified GHG reduction strategy.

There are no thresholds put forth by the BAAQMD for evaluating the significance of a project's construction-phase GHG emissions, though the BAAQMD recommends that emissions be quantified, reported, and evaluated.

A project's impact relative to the second Appendix G criterion may be evaluated by demonstrating compliance with plans, policies, or regulations adopted by local governments to curb GHG emissions. According to the Natural Resources Agency:

> *Provided that such plans contain specific requirements with respect to resources that are within the agency's jurisdiction to avoid or substantially lessen the agency's contributions to GHG emissions, both from its own projects and from private projects it has approved or will approve, such plans may be appropriately relied on in a cumulative impacts analysis (Natural Resources Agency 2009).*

As noted above, the City of Santa Clara adopted its CAP on December 3rd 2013, which establishes goals and emissions reduction measures that the City will implement to achieve the state-recommended GHG emissions reduction target of 15 percent below 2008 levels by the year 2020. In addition, the final version of the MTC/ABAG "Plan Bay Area," which includes the Bay Area's Sustainable Communities Strategy (SCS) and the 2040 Regional Transportation Plan, was adopted in July 2013. Both the SCS and the City's CAP are applicable plans adopted by local governments to reduce GHG emissions and comply with AB 32.

Given the above, the significance of the proposed project's impacts with respect to the GHG emissions and global climate change will be assessed based on the BAAQMD's GHG thresholds of significance as well as compliance with the SCS and the City's CAP.

## 4.5.4.2    Methodology

GHG emissions were computed for the full build out scenario of the proposed project. Specifically, construction emissions were computed for a 40 month period (April 2016 through August 2019) and operational emissions were estimated for 2020, the first complete year of full project occupancy. The California Emissions Estimator Model Version 2013.2.2 (CalEEMod) was used to estimate GHG emissions. Modeling output that includes assumptions is provided in **Appendix 4.2**.

## 4.5.4.3    Project Impacts and Mitigation Measures

**Impact GHG-1:**          **The proposed project would generate greenhouse gas emissions, either directly or indirectly, that would not have a significant impact on the environment. (*Less than Significant*)**

### *Construction GHG Emissions*

During construction, the proposed project, including soil remediation, would directly contribute to climate change through its contribution of GHGs from the exhaust of construction equipment and construction workers' vehicles. The manufacture of construction materials used by the proposed project would indirectly contribute to climate change (upstream emission source). Upstream emissions are emissions that are generated during the manufacture of products used for construction (e.g., cement, steel, and transport of materials to the region). The upstream GHG emissions for this project, which may also include perfluorocarbons and sulfur hexafluoride, are not estimated in this impact analysis because they are not within the control of the City or the project applicant and the lack of data precludes their quantification without speculation.

The BAAQMD recommends that GHG emissions from the construction of a proposed project be estimated, reported and evaluated, but does not provide any guidance on what level of construction-phase GHG emissions would be considered substantial enough to result in a significant impact. $CO_2$ emissions associated with project construction were assumed to occur in 2016 through 2019. The construction of the proposed project would emit a total of 3,346 $MTCO_2e$ over the 3-year construction period, while the highest annual emissions in any one year would be 1,519 $MTCO_2e$ occurring in 2017. These emissions would be short-term, occurring only during construction and therefore would have a very limited impact on overall state emission rates. Neither the City nor the BAAQMD have put forth quantitative thresholds for evaluation of the significance of a project's construction emissions. However, if the BAAQMD's operational per capita threshold is used, on an annual per capita basis, the proposed project's maximum construction emissions would be approximately 0.7 $MTCO_2e/yr$, well below the BAAQMD operational per capita threshold of 4.6 $MTCO_2e/yr$. Furthermore, as required by the City's municipal code, the proposed project would be required to recycle or reuse at least 50 percent of construction waste or demolition materials and at least 10 percent of the building materials used would need to be local building materials. For all of the reasons provided above, the impact of the proposed project's construction-phase GHG emissions would be less than significant.

## *Operational GHG Emissions*

The CalEEMod model was used to estimate operational GHG emissions associated with the proposed project. CalEEMod provides emissions for transportation, areas sources, electricity consumption, natural gas combustion, electricity usage associated with water usage and wastewater discharge, and solid wasteland filling and transport. Unless otherwise noted below, the CalEEMod model defaults for the Santa Clara County were used to estimate operational GHG emissions associated with the proposed project.

### Model Year

The model uses mobile emission factors from the California Air Resources Board's EMFAC2011 model, which includes the effect of new regulations to reduce GHG emissions. These regulations include the Pavley Rule that increases fleet efficiency (reducing fuel consumption) and the low carbon fuel standard. This model is sensitive to the year selected, since vehicle emissions have and continue to be reduced due to fuel efficiency standards and low carbon fuels. The Year 2020 was analyzed since it is the first full year that the proposed project would be fully occupied.

### Traffic

The project traffic study predicted 11,737 daily trips would be generated by the proposed project and this data was input to the CalEEMod model.

### Transportation Measures

The project proposes to incorporate electric vehicle charging stations, convenient access to trails, and walkable paseos to decrease use of the single-occupant automobile and reduce vehicle miles traveled. The effects of these project features that would reduce trips and emissions were not included in the CalEEMod emissions modeling. Further, there were no reductions taken for transportation demand management programs or for proximity to alternate transportation pathways (e.g., bike/pedestrian trails).

### Area Sources (including Natural Gas and Electricity Consumption)

The proposed project is required by law to meet 2013 Title 24 standards, which went into effect July 1, 2015. The energy efficiency of the proposed project is assumed to be 25 percent greater than assumed in the CalEEMod model defaults as the defaults are based on historical energy usage for various land use

types prior to 2008.[7] Therefore, the CalEEMod runs were adjusted to account for the reduction in energy consumption. No other energy efficient features of the project were taken into account in the CalEEMod runs. Emissions rates associated with electricity consumption were adjusted to account for Silicon Valley Power's CO2 intensity rate of 680 pounds of CO2 per megawatt of electricity produced, as reported in the City's CAP.

**Sequestration**

Vegetation acts to remove $CO_2$ from the atmosphere. The removal or change in vegetation could result in a change in $CO_2$ emissions from sequestration. The proposed project would remove about 350 mature trees. However, these trees would be replaced with more than 1,000 new trees and landscaping. CalEEMod default sequestration rate for trees ranges from about 0.02 to 0.04 metric tons of $CO_2$ per tree. The net result caused by the proposed project is likely to be a small increase in sequestration that would reduce the $CO_2$ emission caused by the project. This effect was not included in the analysis.

**Baseline Emissions**

The proposed project would replace 419,405 gross square feet (gsf) (approximately 419,000 gsf) of existing office space. CalEEMod was used to estimate GHG emissions that would result in 2020 if this building space were to remain and continue to be occupied by office uses (2020 baseline emissions). The purpose for modeling these emissions was to predict the net increase in GHG emissions that would be associated with the proposed project. The trip rates for these baseline office uses were obtained from the project Traffic Impact Assessment and were input into the CalEEMod model.

**Per Capita Rate**

The per capita rate is the total annual GHG emissions expressed in metric tons divided by the service population (i.e., number of residents and employees). A future service population of 2.69 persons per household and 2.5 employees per 1,000 square feet of retail of retail or office space was assumed. The average household size of 2.69 persons was obtained from the Department of Finance for the City of Santa Clara. The proposed project is a mixed-use residential development that would include 1,800 rental apartment units, a central parking garage as part of each residential complex, approximately 40,000 gsf of retail space, 4,500 gsf of leasing space, and approximately 38,000 gsf of amenity space. Based on these

---

[7] Buildings constructed to the 2013 Title 24 standards will use 25 percent less energy than building constructed to the 2008 Title 24 standards.

rates, the service population associated with the proposed project would be 111 workers and 4,842 new residents and is determined by the following calculations:

- 1,800 rental apartment units * 2.69 = 4,842

- 44,500 leasable square feet of retail * 2.5 workers/1,000 square feet = 111

**Computed Operational GHG Emissions**

As shown in **Table 4.5-5, Project Operational GHG Emissions**, below, the proposed project would result in GHG emissions of approximately 13,218 MTCO$_2$e/yr. If 2020 baseline emissions generated by the continued office uses on the site are subtracted, the net increase in emissions from the project site would be approximately 7,262 MTCO$_2$e/yr. Both estimates exceed the bright-line-threshold of 1,100 MTCO$_2$e/yr. Therefore, the per capita emissions for the proposed project were calculated. Per capita operational emissions from the proposed uses alone were estimated to be 2.7 MTCO$_2$e/yr (calculated by dividing annual emissions of 13,218 MTCO$_2$e by a service population of 4,953 persons), whereas the per capita net increase was estimated to be 1.5 MTCO$_2$e/yr (calculated by dividing annual emissions of 7,262 MTCO$_2$e by a service population of 4,953 persons), both of which are below the per capita threshold of 4.6 MTCO$_2$e/yr. As a result, the impact from the proposed project's operational GHG emissions would be considered less than significant.

**Mitigation Measures:** No mitigation measures are required.

**Table 4.5-5**
**Project Operational GHG Emissions**

| Scenario | Emissions (Metric Tons $CO_2e$/year) |
|---|---|
| **Proposed Project** | |
| Area sources | 82 |
| Energy use | 3,407 |
| Mobile sources | 8,798 |
| Solid waste | 496 |
| Water | 254 |
| *Total Emissions* | *13,218* |
| **Baseline** | |
| *Total Emissions* | *5,956* |
| **Increase in Annual Emissions (i.e., Proposed Project –Baseline)** | **7,262** |
| *Significance Threshold* | 1,100 |
| Exceed? | Yes |
| **Proposed Project Per Capita Emissions** | **2.7** |
| **Net Increase in Per Capita Emissions** | **1.5** |
| *Significance Thresholds* | 4.6 |
| **Exceed?** | No |

*Source: Illingworth & Rodkin, Inc., 2015*
*Emissions calculations are provided in **Appendix 4.2**.*

---

**Impact GHG-2:**     **Operation of the proposed project would not conflict with an applicable plan, policy, or regulation adopted for the purpose of reducing GHG emissions. (*Less than Significant*)**

Implementation of the proposed project would result in a significant impact related to GHG emissions if the project were in conflict with an applicable plan, policy, or regulation concerning greenhouse gas reductions. As noted above, the City's CAP and the SCS are the applicable plans adopted for the purpose of reducing GHG emissions. In addition, AB 32 is the relevant regulation with which to review the project's compliance. The proposed project's consistency with the plans and regulations is evaluated below.

## *Santa Clara Climate Action Plan Consistency Analysis*

**Table 4.5-6, Proposed Project Consistency with Santa Clara Climate Action Plan**, below summarizes the Santa Clara CAP's emission reduction strategies, goals, and measures, and the proposed project's consistency with these strategies, goals, and measures. The proposed measures will fill the local emissions reduction gap and will help achieve the Santa Clara CAP emissions reduction target. Most of the emissions reductions come for the Coal-Free and Large Renewables focus area, which corresponds to the largest sources of emissions in Santa Clara. Because the Coal-Free and Large Renewables measures are to be implemented by the City, they are not applicable to the proposed project. The CAP concludes that implementing the following measures would enable the community to reduce emissions by 23.4% below 2008 levels by 2020.

For purposes of CEQA analysis, a project that is consistent with each of the applicable feasible measures from the Santa Clara CAP has a less than significant GHG emissions impact.

**Table 4.5-6**
**Proposed Project Consistency with Santa Clara Climate Action Plan**

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| **Focus Area 1: Coal-Free and Large Renewables** | | |
| **Goal** | Eliminate coal from SVP's portfolio and increase use of natural gas and renewable energy. | The measures to eliminate coal from SVP's portfolio and increase the use of natural gas and renewable energy are to be implemented by the City. The proposed project is consistent with these measures because the project will in no way hinder the City from implementing these measures. |
| **Measure 1.1: Coal-free by 2020** | Replace the use of coal in Silicon Valley Power's portfolio with natural gas by 2020. **Citywide performance metric for this measure:** 100% of coal power replaced with natural gas. | N/A. This is a measure to be implemented by the City. The proposed project will in no way hinder the City from implementing this measure. |
| **Measure 1.2: Renewable energy resources** | Investigate the use of City-owned property for large-scale renewable energy projects. | N/A. This is a measure to be implemented by the City. The proposed project will in no way hinder the City from implementing this measure. |
| **Measure 1.3: Utility-installed renewables** | Develop up to five solar PV projects with a total installed capacity of 3 to 5 MW. **Citywide performance metric for this measure:** New solar PV projects generating a total of 5 MW. | N/A. This is a measure to be implemented by the City. The proposed project will in no way hinder the City from implementing this measure. Furthermore, a minimum of 15% of the roof areas will be reserved for future photovoltaic (PV) solar installation. Infrastructure (conduit, structural elements, etc.) will be provided to facilitate the future PV solar installation |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| **Focus Area 2: Energy Efficiency Programs** | | |
| **Goal** | Maximize the efficient use of energy throughout the community. | Consistent. The project will be designed and constructed to meet a LEED Gold or equivalent standard. Example of measures included in the project that will reduce energy use include:<br><br>• All buildings will exceed Title 24 energy requirements by a minimum of 10 percent.<br><br>• All apartments will be equipped with Energy Star certified appliances (dishwashers and refrigerators).<br><br>• Energy efficient LED and fluorescent light fixtures within the apartment buildings and for exterior lighting.<br><br>• A minimum of 15 percent of the roof areas will be reserved for future photovoltaic (PV) solar installation. Infrastructure (conduit, structural elements, etc.) will be provided to facilitate the future PV solar installation.<br><br>• All parking garages will be equipped with Electric Vehicle (EV) charging stations |
| **Measure 2.1: Community electricity efficiency** | Achieve City-adopted electricity efficiency targets to reduce community-wide electricity use by 5% through incentives, pilot projects, and rebate programs.<br><br>**Citywide performance metric for this measure:** 159,100 megawatt hours (MWh) electricity savings. | Consistent. The proposed project will comply with all electricity use reduction programs to help the City reach its 5% reduction target. The new buildings would be constructed to be 10 percent better than 2013 Title 24 and appliances would be Energy Star rated. |
| **Measure 2.2: Community natural gas efficiency** | Work with community and social services agencies to provide information from Pacific Gas & Electric (PG&E) to promote voluntary natural gas retrofits in 5% of multi-family homes, 7% of single-family homes, and 7% of nonresidential space through strategic partnerships connecting residents and business owners to available financing resources.<br><br>**Citywide performance metric for this measure:** 1,700 single-family homes, 1,000 multi-family homes, 410 commercial accounts, and 130 industrial accounts complete natural gas efficiency upgrades. | N/A. The proposed project is not a retrofit, and will be provided with natural gas. Furthermore, the proposed project will cooperate with the implementation of this voluntary measure. |
| **Measure 2.3: Data centers** | Encourage new data centers with an average rack power rating of 15 kW or more to identify and implement cost-effective and energy-efficient practices.<br><br>**Citywide performance metric for this measure:** 10% of new data centers utilizing energy-efficient practices. | N/A. The proposed project is not a data center. The proposed project will in no way hinder the City from implementing this measure. |
| **Measure 2.4: Customer-installed solar** | Incentivize and facilitate the installation of 6 MW of customer-owned residential and nonresidential solar PV projects.<br><br>**Citywide performance metric for this measure:** New solar PV projects generating 6 MW in total installed capacity on homes, nonresidential buildings, parking garages, parking lots, and other feasible areas. Equivalent to 900 residential and 330 nonresidential installations. | N/A. This is a measure to be implemented by the City. The proposed project will advance the goal of this measure by reserving a minimum of 15 percent of the roof areas for future photovoltaic (PV) solar installation. Infrastructure (conduit, structural elements, etc.) will be provided to facilitate the future PV solar installation. |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| **Measure 2.5: Municipal energy efficiency** | Reduce municipal electricity use by 10% through comprehensive energy retrofits of existing equipment and implementation of previously identified energy efficiency projects with a benefit-cost ratio of one or greater. | N/A. The proposed project is not a municipal entity. The proposed project will in no way hinder the City from implementing this measure. |
| | The City should: | |
| | Benchmark energy use in City facilities using a normalization process, such as that offered through the EPA's Portfolio Service Manager. | |
| | Identify facilities appropriate for an in-depth energy audit and retro-commissioning site visit | |
| | Bundle any and all identified projects to reach an attractive payback period, generally less than five years. | |
| | **Citywide performance metric for this measure:** Replace inefficient equipment in 50% of municipal buildings and facilities. Complete all previously identified cost-effective identified energy efficiency projects. | |
| **Measure 2.6: Municipal renewables** | Install 1 MW of solar or other renewables at City-owned facilities. | N/A. The proposed project is not a City-owned facility. The proposed project will in no way hinder the City from implementing this measure. |
| | **Citywide performance metric for this measure:** New solar PV projects generating 1,000 kW in total installed capacity. | |
| **Focus Area 3: Water Conservation** | | |
| **Goal** | Reduce GHG-intensive water use practices. | Consistent. The proposed project is consistent with the measures aimed at reducing GHG-intensive water use practices. The proposed project includes the following water conservation measures: |
| | | • Reclaimed Irrigation Water |
| | | – The reclaimed water main will be extended approximately 1600 linear feet throughout the development to provide service to the entire Santa Clara Square development. |
| | | – Reclaimed water will be used for irrigation of all landscape other than new and existing mature redwood trees that will be preserved. The redwood trees will be on a potable drip irrigation system, which will comply with the City's water restriction ordinance. |
| | | • New landscape plants will be drought tolerant, native to California or other Mediterranean climates, or other low water use species. |
| | | • High efficiency irrigation systems and smart controllers that use satellite weather data will be used. |
| | | • All water fixtures (faucets, showerheads, and toilets) will be low flow and/or WaterSense certified for low water use. |
| | | • All units will be equipped with Energy Star certified dishwashers for low water use. |
| | | • Common hot water boiler systems will be used for efficient hot water distribution. |
| **Measure 3.1: Urban Water Management Plan targets** | Meet the water conservation goals presented in the 2010 Urban Water Management Plan to reduce per capita water use by 2020. | Consistent. This is a measure to be implemented by the City. However, as detailed above, the proposed project includes a suite of project features to reduce water consumption by 20 percent compared to baseline |
| | Promote water conservation in new | |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
|  | development through the use of development standards and building requirements | conditions. To achieve this the proposed project will install high efficiency toilets, water sub-metering, water efficient fixtures, and high efficiency irrigation systems. In addition, the proposed project would use low water and drought-resistant plants in the project's landscaping where feasible, group plants by water needs, and utilize reclaimed water. |
|  | Revisit the currently adopted landscape design guidelines to increase efficiency in outdoor water use in new development. |  |
|  | Provide information to residents and businesses about the economic and environmental benefits of water conservation and low-cost retrofit opportunities. |  |
|  | **City-wide performance metric for this measure:** Achieve 100% compliance of the SB X7-7 reduction goal to save 1,362 acre-feet |  |
| **Focus Area 4: Waste Reduction** | | |
| **Goal** | Increase recycling opportunities for all disposed materials. | Consistent. The proposed project is consistent with all the measures aimed at increasing recycling opportunities for all disposal materials. |
| **Measure 4.1: Food waste collection** | Support the expansion of existing food waste and composting collection routes in order to provide composting services to 25% of existing restaurants. | N/A. This is a measure to be implemented by the City. Restaurants in the retail portion of the proposed project will fully cooperate with the City's compost collection routes. |
|  | **Citywide performance metric for this measure:** Participation of 120 restaurants in Santa Clara. |  |
| **Measure 4.2: Increased waste diversion** | Work with regional partners to increase solid waste diversion to 80% through increased recycling efforts, curbside food waste pickup, and construction and demolition waste programs. | Consistent. This is a measure to be implemented by the City. However, the proposed project will work to appropriately dispose of all construction waste. Debris generated from the demolition of existing buildings would be sorted into materials that can be reused or recycled, materials that are contaminated and cannot be reused, and non-hazardous waste materials. Materials would then be appropriately disposed of, and most of the concrete and asphalt from the demolition would be crushed and ground to use on the site as engineered fill. The project will divert 50% of all construction waste, including 100% of all asphalt and concrete, and 65% (by weight) of all remaining materials. |
|  | Update the Santa Clara City Code (SCCC) to lower the threshold for construction and demolition collection requirements. |  |
|  | Adopt recycling ordinances that incorporate new standards for trash, recycling, and composting collection enclosures. For example, require enclosures to accommodate two 4-yard containers. |  |
|  | Work with trash collection providers to increase the types of recyclables and organic materials that collection services will accept for recycling. |  |
|  | Work with apartment building owners and managers to implement recycling programs. | Upon operation of the proposed project a waste recycling program will be available to all residents and businesses located on the project site. |
|  | **Citywide performance metric for this measure:** Increase the waste diversion rate from 58% to 80%. |  |
| **Focus Area 5: Off-Road Equipment** | | |
| **Goal** | Ensure efficient operations of off-road equipment. | Consistent. The proposed project is consistent with all measures intended to ensure efficient operations of off-road equipment. |
| **Measure 5.1: Lawn and garden equipment** | Support and facilitate a community-wide transition to electric outdoor lawn and garden equipment through outreach, coordination with BAAQMD, and outdoor electrical outlet requirements for new development. | Consistent. This is a measure to be implemented by the City. As new development, the project will be equipped with the outdoor electrical outlets necessary to accommodate electric outdoor lawn and garden equipment. The project applicant will cooperate with the City and BAAQMD's efforts to encourage the use of electric outdoor equipment. |
|  | Encourage and support local and regional retrofit and replacement programs using pamphlet materials and the City's website, and |  |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| | at public events. | |
| | Support BAAQMD efforts to re-establish a voluntary exchange program for residential lawn mowers and backpack-style leaf blowers. | |
| | Require new buildings to provide outdoor electrical outlets in accessible locations to charge or power electric lawn and garden equipment. | |
| | **Citywide performance metric for this measure:** Exchange 1,170 leaf blowers and 130 lawn mowers with electric models. | |
| **Measure 5.2: Alternative construction fuels** | Require construction projects to comply with BAAQMD best management practices, including alternative-fueled vehicles and equipment. | Consistent. The proposed project is required to comply with BAAQMD's best management practices to control on-site construction exhaust emissions. |
| | **Citywide performance metric for this measure:** 30% of construction equipment switches from conventional technologies to hybrid, compressed natural gas (CNG), electric, or biodiesel. | |
| **Focus Area 6: Transportation and Land Use** | | |
| **Goal** | Establish land uses and transportation options that minimize single-occupant vehicle use. | Consistent. The proposed project is consistent with all measures intended to establish land uses and transportation options that minimize single-occupant vehicle use. |
| **Measure 6.1: Transportation demand management program** | Require new development located in the city's transportation districts to implement a TDM program to reduce drive-alone trips.<br><br>The City will offer both a prescriptive and a performance method for projects to demonstrate compliance to minimize the need for additional analysis but provide flexibility for projects proposing alternative methods. To help projects comply using the prescriptive method, the City will prepare checklists for representative project types (residential, commercial, mixed use, office/R&D). Each checklist will identify applicable actions and the estimated vehicle miles traveled (VMT) reductions to occur through implementation.<br><br>Each project subject to the requirements will be required to submit an annual TDM monitoring report to City staff to evaluate the progress of TDM goals.<br><br>**City-wide performance metric for this measure:** TDM reporting results in a 1% overall reduction in citywide VMT, with individual projects achieving a minimum 5% to 10% reduction in VMT based on implementation of TDM best practices. | Consistent. According to Figure 22 of the Santa Clara CAP, the project site is located in one of the four identified transportation districts (Transportation Management District 1). According to the CAP, proposed high density residential projects comprised of at least 25 housing units or more than 10,000 non-residential square feet and located in District 1 are required to reduce VMT by 20 percent, 10 percent of which must come from a Transportation Demand Management (TDM) program. In compliance with this requirement and consistent with **Mitigation Measure AIR-2**, the applicant will be required to prepare a TDM program that provides the necessary reduction in VMT. The program will be submitted to the City for review and approval. For a list of TDM measures and the associated VMT reductions, see Chapter 11 in the TIA (**Appendix 4.11**). |
| **Measure 6.2: Municipal transportation demand management** | Develop and implement a transportation demand management program for City employees to encourage alternative modes of travel and reduce single-occupant vehicle use.<br><br>**Citywide performance metric for this measure:** Achieve a 20% reduction in commute-related VMT from City employees. | N/A. This is a measure to be implemented by the City. The proposed project is not a City project and does not employ City employees. The proposed project will in no way hinder the City from implementing this measure. |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| **Measure 6.3: Electric vehicle parking** | Revise parking standards for new multi-family residential and nonresidential development to allow that a minimum of one parking space, and a recommended level of 5% of all new parking spaces, be designated for electric vehicle charging.<br><br>Install EV charging stations in public parking lots.<br><br>At the time of the next comprehensive Zoning Code update, amend Sections 18.74.020(f) and 18.74.020(i) of the Santa Clara City Code (SCCC) to require a portion of new nonresidential parking spaces to include EV charging facilities, consistent with the SCCC.<br><br>At the time of the next comprehensive Zoning Code update, amend Section 18.18.130 of the SCCC to require that all new multi-family residential and nonresidential development contain at least one new EV charging station and to encourage a recommended maximum of 5% of all new multi-family parking spaces include EV charging stations.<br><br>**City-wide performance metric for this measure:** 430 parking spaces in new commercial, industrial, and multi-family development that utilize EV charging stations | Consistent. This measure, which calls for changes to the Santa Clara City Code, is to be implemented by the City. The proposed project will in no way hinder the implementation of this measure. As of this date, the City has not yet amended the Santa Clara City Code to adopt the specific requirements for electric vehicle parking.<br><br>The proposed project will include a total of 3,218 parking spaces, and will include 73 vehicle charging stations (4% of total parking). |
| **Focus Area 7: Urban Heat Island Effect** | | |
| **Goal** | Mitigate the heat island effect through shading and cooling practices. | The proposed project will be consistent with all measures intended to mitigate the heat island effect through shading and cooling practices. The proposed project includes an extensive landscaping plan, and will plant more than 1,000 trees on the site. |
| **Measure 7.1: Urban forestry** | Create a tree-planting standard for new development and conduct a citywide tree inventory every five years to track progress of the requirements.<br><br>At the time of the next comprehensive Zoning Code update, amend the SCCC to require a portion of new development to plant shade trees.<br><br>Review other City tree planting programs, and determine whether to implement an incentive program and/or an educational campaign.<br><br>Collaborate with local environmental or community organizations to fund program costs or outreach.<br><br>Identify and promote desirable tree types and locations for plantings to minimize the effect of root systems on infrastructure.<br><br>**Citywide performance metric for this measure:** Each new development incorporates a minimum of two shade trees near south-facing windows for a total tree-planting goal of 2,500. | Consistent. This is a measure to be implemented by the City. The proposed project will in no way hinder the implementation of this measure.<br><br>At the current time, the Santa Clara City Code has not yet been amended to require a portion of all new development to plant shade trees.<br><br>However, the proposed project will include extensive landscaping features, including the preservation of 66 trees and relocation of 33 trees. While 350 trees would be removed (including 118 protected trees), the applicant would be required to comply with General Plan Policy 5.3.1-P10, which requires that new development "provide opportunities for increased landscaping and trees in the community, including requirements for new development to provide street trees and a minimum 2:1 on- or off-site replacement for trees removed as part of the project." The proposed project will plant more than 1,000 new trees to replace the 350 trees that are removed. In addition, the proposed project will retain and protect most of redwood trees onsite. |

| Goal or Measure | Goal or Measure Description | Proposed Project Consistency Analysis |
|---|---|---|
| **Measure 7.2: Urban cooling** | Require new parking lots to be surfaced with low-albedo materials to reduce heat gain, provided it is consistent with the Building Code.<br><br>**Citywide performance metric for this measure:** All new uncovered parking lots and spaces utilize light-colored and/or permeable pavements. | Consistent. This is a measure to be implemented by the City. The proposed project will in no way hinder the implementation of this measure.<br><br>Parking for the proposed project will be in enclosed garages. The proposed project includes a central parking garage as part of each residential complex. Retail parking would be provided off of the project site within the Office Campus Parking Garage "G2" located across Augustine Drive near the western portion of the project site. |

The proposed project is consistent with all applicable goals and measures in the Santa Clara CAP.

## RTP/SCS Consistency Analysis

As noted earlier, the Plan Bay Area (the region's RTP/SCS) was adopted in 2013. As a high-density mixed-use development, the proposed project would be consistent with the Plan Bay Area. **Table 4.5-7, Proposed Project Consistency with the Plan Bay Area**, below summarizes the Bay Area Plan's goals and the proposed project's consistency with these goals. The proposed project would construct 1,800 dwelling units contributing to an increase in housing in the region which would support Goal One identified in the Plan Bay Area. The residential units would be located adjacent to a new office and retail development, and provides much needed housing in a job rich area of the Bay region. The 1,800 units will assist the City in improving its current jobs housing imbalance. In addition, 40,000 gross square feet (gsf) of retail uses, would create jobs in the region and support Goal Two identified in the Plan Bay Area. The project will also provide bicycle and pedestrian amenities. The bicycle and pedestrian amenities are listed in **Chapter 3.0, Project Description**. Furthermore, in compliance with **Mitigation Measure AIR-2**, the project applicant will prepare and submit a TDM program for the proposed project (to fulfill the requirements of the City's Climate Action Plan), and the City-approved plan will be implemented for the life of the project.  The proposed project is consistent with the SCS because there are no density or other land use requirements within the SCS that apply to the proposed project site. The jobs-housing connection strategy of the Plan Bay Area, the SCS's land use element, creates a series of land use classifications for the bay area region that provide density, scale, and character guidelines for select areas and corridors within each county. A set of maps included as an appendix to the jobs-housing connection strategy describes the portions each Bay Area county that are bound by these land use guidelines. However, the Santa Clara County map reveals that the proposed project location is not within an area bound by these guidelines. Therefore, the proposed project is consistent with the Plan Bay Area SCS.

**Table 4.5-7**
**Proposed Project Consistency with Plan Bay Area**

| Bay Area Plan Goal | | Proposed Project Consistency Analysis |
|---|---|---|
| **Climate Protection:** | Reduce greenhouse gas emissions from cars and light-duty trucks by 15% per capita by 2035 | Consistent. The proposed project will comprise retail and residential uses. Local access retail uses on the project site will reduce the number of vehicle trips made by the residents. The proposed project complements the previously approved Santa Clara Square Office and Retail developments, and would create a new walkable community. The proposed project is pedestrian and bicycle oriented to reduce vehicular trips and includes direct connections to the adjacent San Tomas Creek Trail. The development will also include a network of pedestrian and bicycle trails to and from the San Tomas Creek Trail, the retail center, parks, office campus, and all residential buildings. All residential buildings will be equipped with secure bicycle storage rooms. |
| **Adequate Housing:** | Plan for housing sufficient to house 100% of the Bay Area's future workers and residents from all income levels, without displacing current low-income residents | Consistent. The proposed project is a high density mixed-use development and will include 1,800 dwelling units. The addition of high density residential housing will assist the City in improving its current jobs housing imbalance. The existing uses at the site are office, and no low-income residents will be displaced as a result of the proposed project. |
| **Healthy and Safe Communities:** | Improve air quality and reduce exposure to fine and coarse particulates across the Bay Area | Consistent. As discussed in **Section 4.2 Air Quality,** during construction implementation of BMPs will reduce exposure to fine and coarse particles. |
| | Reduce injuries and fatalities from all collisions (including bike and pedestrian by 50%) | N/A. This is a measure to be implemented by ABAG. However, the proposed project will not include hazardous design features that will increase the likelihood of multi-modal collisions. |
| | Increase the average time Bay Area residents spend walking or biking for transportation each day by 15 minutes per person per day | Consistent. The proposed project will include walkable paseos and access to the local trails. The development include a network of pedestrian and bicycle trails to and from the San Tomas Creek Trail, the retail center, parks, office campus, and all residential buildings. All residential buildings will be equipped with secure bicycle storage rooms, and will provide a total of 727 bicycle parking spaces. |

| Bay Area Plan Goal | | Proposed Project Consistency Analysis |
|---|---|---|
| **Equitable Access**: | Promote access to housing, jobs and transportation for all Bay Area residents, particularly low-income and lower-middle income Bay Area residents. | Consistent. The proposed project is a mixed-use development that will include 1,800 dwelling units and 40,000 square feet of retail space. |
| **Economic Vitality**: | Grow economic productivity in the Bay Area by 2% annually | Consistent. The proposed project is a mixed-use development and will include retail space. |
| **Transportation System Effectiveness**: | Maintain the Bay Area's transportation system in good repair | N/A. This is a measure to be implemented by ABAG. |
| | Boost the number of trips taken without a car across the Bay Area by 10% | N/A. This is a measure to be implemented by ABAG. |
| | Reduce vehicle miles traveled (VMT) per capita by 10%. | Consistent. The proposed project will comply with the Santa Clara CAP, which requires a reduction of VMT by 20 percent, 10 percent of which must come from a Transportation Demand Management (TDM) program. The proposed project applicant will develop a TDM program that will offer amenities and incentives to encourage residents to use carpooling, transit, bicycling, and walking instead of driving their private automobiles. As described above, the proposed project is designed to be a walkable community and is integrated with the previously approved Santa Clara Square Office and Retail developments. |

## AB 32 Consistency Analysis

AB 32 is the basis for reduction of GHG emissions in California. Local agencies such as the BAAQMD base their planning and regulations on the requirements included in AB 32, which include a reduction of GHG emissions to 1990 rates by 2020. The BAAQMD adopted the GHG significance thresholds specifically to meet AB 32 requirements within its jurisdiction, and so plans and projects that meet those thresholds can be assumed to meet the requirements of AB 32. As the per capita GHG emissions from the proposed project are well below the BAAQMD efficiency threshold for project-level GHG emissions, the project is in compliance with AB 32. Furthermore, the proposed project is an infill development and is located approximately 2.5 miles northeast to the Lawrence Caltrain Station. Furthermore, the proposed project includes retail space and is adjacent to a large retail complex that has been approved for construction, residents living on the project site and in the surrounding neighborhood would be able to access the retail uses without the use of a vehicle, thus reducing vehicle trips. While not necessary to satisfy BAAQMD's efficiency threshold, as set forth in the Project Description the proposed project will be designed and constructed to meet a LEED Gold or equivalent standard, and would include walkable

paseos and as well as provide access to surrounding trails. In addition, the project includes the following energy reducing features that were not accounted for in the calculation of the GHG emissions from the proposed project:

- All buildings will exceed Title 24 energy requirements by a minimum of 10 percent.

- All apartments will be equipped with Energy Star certified appliances (dishwashers and refrigerators).

- Energy efficient LED and fluorescent light fixtures within the apartment buildings and for exterior lighting.

- A minimum of 15 percent of the roof areas will be reserved for future photovoltaic (PV) solar installation. Infrastructure (conduit, structural elements, etc.) will be provided to facilitate the future PV solar installation.

- All parking garages will be equipped with Electric Vehicle (EV) charging stations.

Therefore the proposed project will be consistent with the measures included in AB 32, as well as the goals and policies in the City's General Plan, and the project's GHG emissions impact will be less than significant.

**Mitigation Measures:** No mitigation measures are required.

---

### 4.5.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact GHG-1:**    **The proposed project would not result in a significant cumulative GHG impact. (***Less than Significant***)**

As the impact from a project's GHG emissions is a cumulative impact, the analysis presented in the section provides an adequate analysis of the proposed project's cumulative impact related to GHG emissions. Based on the analysis above, the proposed project would result in a less than significant cumulative impact.

**Mitigation Measures:** No mitigation measures are required.

---

## 4.5.5     REFERENCES

Association of Bay Area Governments (ABAG). 2013. Bay Area Plan.

Bay Area Air Quality Management District. 2010. *CEQA Air Quality Guidelines*. May. http://www.baaqmd.gov/Divisions/Planning-and-Research/CEQA-GUIDELINES.aspx.

California Air Resources Board (CARB). 2010. *California Greenhouse Gas 2000–2012 Inventory by Scoping Plan Category – Summary*. http://www.arb.ca.gov/cc/inventory/pubs/reports/ghg_inventory_00-12_report.pdf

California Air Resources Board (CARB). 2014. First Update to the Climate Change Scoping Plan. May.

California Air Resources Board (CARB). 2015. *California Greenhouse Gas Emission Inventory-2015 Edition.* http://www.arb.ca.gov/cc/inventory/data/data.htm

California Building Standards Commission. 2009. 2013 California Green Building Standards Code.

California Energy Commission. 2007. *Revisions to the 1990–2004 Greenhouse Gas Emissions Inventory Report, Published in December 2006*. http://www.energy.ca.gov/2006publications/CEC-600-2006-013/2007-01-23_GHG_INVENTORY_REVISIONS.PDF.

California Environmental Protection Agency (Cal EPA), Climate Action Team. 2006. *Climate Action Team Report to Governor Schwarzenegger and the Legislature*.

California Natural Resources Agency. 2009. *Final Statement of Reasons for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB-97*.

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan*. Adopted November 2010, last amended December 2014.

CSC. 2013. *Santa Clara Climate Action Plan*. Adopted December 3.

California Statistical Abstract. 2002. http://www.dof.ca.gov/html/FS_DATA/STAT-ABS/documents/CA_StatAbs02w.pdf.

Energy Information Administration. 2007. "Other Gases: Hydrofluorocarbons, Perfluorocarbons, and Sulfur Hexafluoride." http://www.eia.doe.gov/oiaf/1605/ggrpt/summary/other_gases.html.

Illingworth & Rodkin. 2013. *Santa Clara Square Residential Mixed Use Project – Air Quality and Greenhouse Gas Emission Assessment, Santa Clara, California*. August 28

Intergovernmental Panel on Climate Change (IPCC). 2007. *Climate Change 2007: The Physical Science Basis, Summary for Policymakers.*

Intergovernmental Panel on Climate Change (IPCC). "Climate Change 2013: The Physical Science Basis." http://www.climatechange2013.org/.

Legislative Analyst Office. 2014. "California is the World's Eighth Largest Economy." http://www.lao.ca.gov/LAOEconTax/Article/Detail/1.

State of California, Governor's Office of Planning and Research (OPR). 2008. *CEQA and Climate Change: Addressing Climate Change Through California Environmental Quality Act (CEQA) Review*.

State of California, Governor's Office of Planning and Research (OPR). 2009. *Draft CEQA Guideline Amendments for Greenhouse Gas Emissions*.

U.S. Census Bureau. 2015. State and County QuickFacts. http://quickfacts.census.gov/qfd/states/06000.html.

US Census Bureau. 2011. Census 2000 Data for the State of California. https://www.census.gov/census2000/states/ca.html.

US Environmental Protection Agency (US EPA). "Overview of Greenhouse Gases." http://www.epa.gov/climatechange/ghgemissions/gases.html.

US Environmental Protection Agency (US EPA). n.d.(a) "High GWP Gases and Climate Change," http://www.epa.gov/highgwp/scientific.html#sf6.

US Environmental Protection Agency (US EPA). n.d.(b) "Methane: Sources and Emissions," http://www.epa.gov/methane/sources.html.

# 4.6 HAZARDS AND HAZARDOUS MATERIALS

## 4.6.1 INTRODUCTION

This section describes the existing conditions with respect to hazards and hazardous materials on the project site and its vicinity, and potential impacts related to hazards and hazardous materials that may occur as a result of the implementation of the proposed project. Regulations and policies related to hazards and hazardous materials are also described in this section. The analysis of the proposed project's potential effects from hazards and hazardous waste is based on Phase I and Phase II Environmental Site Assessments (ESAs), additional subsurface investigations prepared for various parcels within the project site, government records searches, and public planning documents. All of the reports and sources used in the preparation of the analysis are listed in **Section 4.6.5, References** and are on file with the City.

## 4.6.2 ENVIRONMENTAL SETTING

A number of properties may cause a substance to be considered hazardous, including toxicity, ignitability, corrosivity, or reactivity. According to the State of California (California Code of Regulations Section 66084), hazardous material is defined as

> *a substance or combination of substances which, because of its quantity, concentration, or physical, chemical or infectious characteristics, may either: 1) cause, or significantly contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating irreversible illness; or 2) pose a substantial present or potential hazard to human health or environment when improperly treated, stored, transported or disposed of or otherwise managed.*

Hazardous wastes are hazardous materials that no longer have practical use, such as substances that have been discarded, discharged, spilled, or contaminated, or are being stored prior to proper disposal. In California, hazardous waste is a discarded material that meets any of a list of criteria in the California Code of Regulations (CCR), including:

- The waste exhibits the characteristics of hazardous wastes identified in CCR Title 22, Division 4.5, Chapter 11, Article 3. Such characteristics include whether the material is ignitable, corrosive, reactive, or toxic.

- The waste is listed, contains a constituent that is listed, or is a mixture of hazardous waste that is listed in CCR Title 22, Division 4.5, Chapter 11.

Hazardous materials may include products such as pesticides, petroleum products, solvents, chemical intermediates, and heavy metals. Hazardous waste may include spent, discarded, spilled, or contaminated products, or wastes from certain industrial processes, as well as a mixture (e.g., soil, water,

carbon, construction debris, building materials) that exhibits the characteristics of hazardous wastes. California regulates hazardous waste management under CCR Title 22, Division 4.5.

The need for and the level of site mitigation related to soil or groundwater affected by hazardous materials depends on specific site conditions, including planned site use, potential receptors, and exposure pathways. Site mitigation requirements are typically evaluated on a case-by-case basis by the lead regulatory agency overseeing a site.

Activities on the project site that could expose the public to hazardous materials or wastes during project development and operation include improper handling or use of hazardous materials during the course of business; failure of storage containment systems; fire, explosion, or other emergencies; unsound disposal or treatment methods; accidents during transport; or exposure to contaminated soil or groundwater (for example, during excavation and grading).

## 4.6.2.1    Existing Conditions

The existing project site consists of numerous business park buildings, paved parking lots and walkways, and landscaped areas with trees, shrubs, and lawn. San Tomas Aquino Creek is a channelized stream that is located along the eastern boundary of the project site.

Groundwater is generally present between 10 and 12 feet below ground surface (bgs) across the project site (Roux 2015b). Based on investigations conducted at a nearby site, groundwater in the vicinity of the project site first occurs around 10 feet bgs, within the A-aquifer, and extends down to 20 feet bgs. The B-aquifer is encountered between 30 feet to 50 feet bgs. It is separated from the A-aquifer by 5 to 10 feet of silty to sandy clays (EKI 2013a, EKI 2013b, EKI 2014a, EKI 2014b, EKI 2014c,). These two aquifers are expected to be located beneath the entire project site.

### *Hazardous Materials and Waste*

Some of the buildings on the project site are occupied and are currently used for offices and industrial uses, which have the potential to involve hazardous materials use. Several of the buildings are currently vacant because of the pending proposed project, but were recently used for offices and industrial uses. Current and previous potential releases of hazardous materials within the project site may include or have included potential releases associated with spills on the site. Common hazardous waste produced by offices would include spent cleaning chemicals, degreasers, fluorescent bulbs, old paint, and printing waste. The project site could also potentially be affected by releases on adjacent sites.

## Hazardous Materials Transportation

Hazardous materials are routinely transported by truck in the project vicinity. The California Vehicle Code and California Department of Transportation (DOT) regulations generally prohibit transportation of hazardous materials through residential neighborhoods, although local deliveries are allowed. These regulations also require that hazardous materials be transported via routes with the least overall travel time. The City of Santa Clara Public Works Department has designated truck routes for hazardous materials transport to provide access to light industrial and industrial facilities in the City. These routes include U.S. 101 located approximately 700 feet to the north of the project site and the Caltrain and Union Pacific Railroad lines, located approximately 3,000 feet to the south.

## Existing Hazards

The project site is composed of five full parcels of land (APNs 216-45-022, 216-45-023, 216-45-024, 216-29-112, and 216-29-053) and portions of two parcels (APNs 216-45-011 and 216-45-028) (see **Figure 3.0, Project Location**). Phase I ESAs were completed for all parcels, and Phase II ESAs were completed for selected parcels. Additional soil, soil vapor, and groundwater investigations were conducted across the project site in 2014 and 2015 (Roux 2015b). The information and analysis from these Phase I ESAs, Phase II ESAs, and additional investigations are presented below. The entire project site was historically used for orchard use. As a result of this use, the project site contains residual pesticides in shallow soil. This agricultural-related contamination is discussed below. Site conditions related to the project site's post-agricultural use are discussed further below by APN; the APN-specific discussions do not include data summaries associated with the presence of pesticides in shallow soil as those are addressed for the entire project site below.

Screening levels for chemicals in soil, groundwater, and soil vapor are not regulations, and the presence of a chemical at concentrations in excess of a screening does not necessarily indicate adverse effects on human health or the environment, rather that additional evaluation is warranted (RWQCB 2013). Groundwater concentrations of chemicals detected in groundwater were compared with Maximum Contaminant Level (MCLs) for drinking water, and to Regional Water Quality Control Board Environmental Screening Levels (ESLs) for Potential Vapor Intrusion Concerns (Table E-1) (RWQCB 2015; RWQCB 2013b). Soil vapor concentrations were compared to Regional Screening Levels (RSLs) for

Chemical Contaminants at Superfund Sites, with California-modified levels per DTSC HERO HHRA Note Number 3 [1] (US EPA 2013; DTSC 2015a; DTSC 2011).

## Agricultural Contamination

Agricultural chemicals, such as lead arsenate and organochlorine pesticides, were applied throughout the project site prior to its development for office park use in the late 1970s. Soil sampling was performed across the project site in 2013, 2014 and 2015 to evaluate the extent of arsenic, lead, and organochlorine pesticide compounds in soils (EKI 2014b, EKI 2014c, Roux 2015b). In soil, on the portion of the project site north of Scott Boulevard, arsenic, lead, and the organochlorine compounds 4,4'-dichlorodiphenyldichloroethylene (DDE), aldrin, and dieldrin were detected in one or more soil samples at concentrations above respective risk-based screening criteria for residential land use (EKI 2014c, EKI 2014d, Roux 2015b, Roux 2014). In the area of the project site south of Scott Boulevard, arsenic, lead, DDE, chlordane, and dieldrin were detected in one or more soil samples at concentrations above respective risk-based screening criteria for residential land use (EKI 2014b, Roux 2015b).

Additionally, 4,4'-dichlorodiphenyltrichloroethane (DDT) and its breakdown products were detected in some samples at concentrations that could result in soil being classified as a non-RCRA hazardous waste if excavated and disposed off-site. Reported concentrations of arsenic, lead, and chlordane in soil samples could also potentially classify the soil as a RCRA or non-RCRA hazardous waste if excavated and disposed of off-site, but further testing prior to disposal would be required to determine the final waste classification[2] (EKI 2014b, Roux 2015b).

Given that the majority of the properties are currently capped with buildings and pavement, the potential for exposure to pesticides in soil by typical site users is low under the current conditions throughout the project site (EKI 2013a, EKI 2013b, EKI 2014a, EKI 2014b, EKI 2014c).

## Parcel-Specific Conditions

**APN 216-29-112 (3236 Scott Boulevard)**

---

[1] DTSC (2011) considers an attenuation factor of 0.001 appropriate to calculate allowable soil vapor under new residential structures from indoor air goals. Therefore residential indoor air screening levels (available as a RSL) are divided by 0.001 to calculate soil vapor screening levels.

[2] These chemicals are present at concentrations that, if disposed of off-site would be subjected to the Waste Extraction Test (WET) and Toxicity Characteristic Leaching Procedure (TCLP) tests. If the WET leachate contained a chemical at a concentration above its respective Soluble Threshold Limit Concentration (STLC) value, the soil would be considered a non-RCRA hazardous waste. If the TCLP leachate contained a chemical at a concentration above its respective TCLP value, or TCLP values, the soil would be considered RCRA hazardous wastes.

The 3236 Scott Boulevard property is situated south of Scott Boulevard, generally between Coronado Drive to the west and the San Tomas Aquino Creek to the east. This property is developed with a large, two-story building and a parking lot. The property is currently vacant but was most recently used for manufacturing of gallium arsenide wafers by Universal Semiconductor Technologies, Inc.'s (USTI) (EKI 2014a).

The property was formerly a RWQCB a cleanup program site due to the presence of VOCs in groundwater, but it received regulatory closure in June 2015 (RWQCB 2015). Soil, soil vapor, and groundwater samples have been collected from this property. The results of the most recent groundwater sampling event in July 2015 and soil vapor sampling are discussed in **Table 4.6-1.**

The Phase I ESA conducted in 2014 concluded that given the open RWQCB site status, the presence of VOCs in groundwater beneath the property was considered to be a Recognized Environmental Condition (REC). The Phase I ESA added that once a RWQCB issues a no further action letter, this condition would no longer be considered a REC (EKI 2014a). The RWQCB issued its closure letter for 3236 Scott Boulevard in June 2015 (RWQCB 2015b). Therefore, the presence of residual VOC concentrations in groundwater is now considered to be a historical REC.

An area of soil south of the existing building on this property contained arsenic from minor spills associated with previous uses on the property. As a part of the City of Santa Clara Fire Department facility closure process, arsenic-impacted soil in this area was excavated and disposed of, off-site, as a non-RCRA hazardous waste. Sampling indicated that arsenic concentrations remaining in soil are below the Fire Department-approved cleanup level of 19 milligrams per kilogram (mg/kg). Therefore, further cleanup was not required by the Fire Department. The remediation of the arsenic release and associated facility closure was considered in the Phase I ESA to be a historical REC (EKI 2014a).

**Table 4.6-1**

**Groundwater and Soil Vapor Sampling on the 3236 Scott Boulevard Property**

| Sample Type | Findings |
|---|---|
| *Groundwater* | |
| From four grab groundwater sampling locations throughout the 3236 Scott Boulevard property (July 2015) | VOCs, including 1,1,1-TCA and its breakdown products (1,1-DCA and 1,1-DCE), were detected in shallow grab groundwater samples at concentrations above laboratory reporting limits. |
| | Detected VOC concentrations were well below their respective RWQCB ESLs for potential vapor intrusion from groundwater for residential land use. |
| | 1,1-DCA and 1,1-DCE were detected in one or more samples at concentrations slightly above drinking water standard MCLs. The RWQCB issued a no further action letter for groundwater on the property in June 2015. |
| *Soil Vapor* | |
| From seven soil vapor sampling locations throughout the 3236 Scott Boulevard property (July 2015) | VOCs, including PCE, TCE, 1,1-DCE, 1-1,DCA, benzene, ethylbenzene, toluene, and xylenes were detected in one or more soil vapor samples at concentrations above laboratory reporting limits. |
| | All detected VOC concentrations were below their respective residential Regional Screening Level (RSL) for potential vapor intrusion from soil vapor for both residential/unrestricted and commercial land use. |

*Source: Roux 2015b*

*ESL - Environmental Screening Level*

*RSL – EPA Regional Screening level. DTSC has modified the screening levels for certain chemicals, and the revised concentrations are used, herein. This screening level is referred to as the Cal-modified RSL.*

**APN 216-29-053 (3230 Scott Boulevard)**

The 3230 Scott Boulevard property is situated on the south side of Scott Boulevard and immediately west of the San Tomas Aquino Creek. The property is developed with a large single-story office and laboratory building and parking lot areas. At the time of the Phase I ESA, the property was occupied by Skyworks Solution, Inc., which used the facility as an office and electronic testing laboratory space.

Soil, soil vapor, and groundwater sampling were conducted to determine whether there is any contamination, which may impact future project users, from existing or past uses affecting the project site. The results of soil vapor and groundwater sampling are discussed in **Table 4.6-2.**

Phase I and II ESA performed in 2014 concluded that VOCs (1,1-DCA and 1,1-DCE) are present in groundwater on the property at concentrations exceeding California drinking water standards. Based on the apparent groundwater flow direction and other factors, this contamination may be originating from an upgradient site to the west or southwest. The Phase I and II ESA considered the presence of VOCs in groundwater beneath the property a REC (EKI 2014b).

One soil gas sample collected from the western property boundary, adjacent to 3236 Scott Boulevard, contained vinyl chloride at a concentration exceeding its Cal-modified RSL for vapor intrusion risks for residential/unrestricted land use (EKI 2014b).

A 500-gallon wastewater Underground Storage Tank (UST) was installed on the property in 1979. The available records do not indicate the location of the UST or any records of its removal. Given the configuration of the site, the UST was most likely located south of the building. Based on the results of the groundwater and soil vapor sampling discussed in **Table 4.6-2**, the UST has not resulted in an impact on groundwater and is not considered to be an environmental concern (EKI 2014b).

**Table 4.6-2**
**Soil and Groundwater and Soil Vapor Sampling on the 3230 Scott Boulevard Property**

| Sample Type | Findings |
|---|---|
| *Groundwater* | |
| From six shallow grab groundwater sampling locations throughout the 3230 Scott Boulevard site (November 2014) | VOCs, including PCE, TCE, 1,1,1-TCA, 1,1-DCA, 1,1-DCE, 1,2-DCA, and Freon 113 were detected in shallow groundwater samples at concentrations above laboratory reporting limits. |
| | 1,1-DCA and 1,1-DCE were detected at concentrations above California MCLs drinking water standards, all other VOC concentrations were below drinking water standards. |
| | Concentrations of VOCs in groundwater were well below their respective RWQCB ESLs for vapor intrusion for both residential/unrestricted and commercial/industrial land use. |
| | Concentrations of metals in groundwater samples are consistent with naturally occurring background concentrations. |
| *Soil Vapor* | |
| From nine soil vapor sampling locations throughout the 3230 Scott Boulevard site (November 2014) | One sample collected near the western site boundary contained vinyl chloride at a concentration greater than the Cal-modified RSL for vapor intrusion risk for residential land use. T This result prompted additional sampling on the adjacent 3236 Scott Property, which revealed no vinyl chloride concentrations or associated risks, as discussed above. |
| | Detections of all other chemicals in soil gas samples are below screening criteria for residential land use. The available soil gas results indicate that a significant risk of vapor intrusion to current or future building occupants is not present on the site. |

*Source: EKI 2014b, Roux 2015b*
*ESL – environmental screening level*
*RSL – EPA Regional Screening level. DTSC has modified the screening levels for certain chemicals. This screening level is referred to as the Cal-modified RSL.*

**APN 216-45-022 (3265 Scott Boulevard - formerly referred to as Montgomery Research Park)**

The 3265 Scott Boulevard property (referred to as Montgomery Research Park in the Phase I ESA) is situated on the western side of Montgomery Drive between Scott Boulevard and Augustine Drive. At the

time of the Phase I ESA in 2013, this property consisted of three buildings with several companies occupying the leased space.

Prior to the property's development as light industrial buildings in the 1970s, a structure, likely associated with the apparent farmhouse and support buildings located further north along Saratoga Creek, appears to have been located on the northeastern corner of the property. Given the age of this structure, it is possible that exterior paint on the structure may have contained lead. If the paint flaked from this structure over time or was disturbed during demolition of the structure, it is possible that lead paint may have been introduced to shallow soil. As discussed above, shallow and deeper soil sampling was conducted to determine the extent of agricultural chemicals in soil, including lead. Therefore, the extent of any such potential lead paint contamination would be expected to have been defined by this sampling.

The current buildings on this property were built in 1976 and have had a number of tenants that are reported to have stored and used chemicals as a part of manufacturing processes, including the former Zeta Laboratories facility (3265 Scott Boulevard, southernmost building). Soil and groundwater sampling was performed in the vicinity of the former Zeta Laboratories building in 1989, and low levels of Freon compounds were detected, but below environmental screening levels (EKI 2013a). Groundwater sampling was also performed immediately downgradient of the property on the adjacent property to the north (SCS Office Phase II) and no VOCs were detected in the groundwater samples (Roux 2015a). The results of groundwater sampling on the property to determine potential contamination from Zeta Laboratories are presented in **Table 4.6-3.**

The Synertek property (3050 Coronado Drive) is a U.S. EPA NPL (i.e., Superfund) site and is located approximately 900 feet south and generally upgradient of the 3265 Scott property. Groundwater was sampled to evaluate potential contamination migrating onto the property from the Synertek site. The results are presented in **Table 4.6-3.** Based on groundwater flow direction in this area and available data, VOCs in groundwater from the Synertek site do not appear to be migrating onto the 3265 Scott property and would, therefore, not be expected to cause vapor intrusion into future residential or commercial uses (Roux 2015b, EKI 2013a).

Soil vapor sampling was conducted on the southern portion of the property in December 2014 and August 2015. VOCs were detected above laboratory reporting limits, but below the Cal-modified RSLs for residential use. As described in **Table 4.6-3** below, benzene concentrations in two samples were slightly above its RWQCB ESL for potential vapor intrusion risk for residential land use (Roux 2015b). Benzene was not detected in either groundwater samples on this property, and was not detected in groundwater

samples in the two grab groundwater samples, off site and downgradient of the property on the Santa Clara Square Office Phase II property north of Augustine Drive (Roux 2015a, Roux 2015b).

**Table 4.6-3**
**Groundwater and Soil Vapor Sampling on the 3265 Scott Boulevard Property**

| Sample Type and Location | Findings |
|---|---|
| *Groundwater* | |
| Near the former Zeta Laboratories facility (1989) | Freon was detected in concentrations below screening criteria (drinking water criteria and vapor intrusion ELSs for residential land use). |
| Nearest upgradient Synertek shallow groundwater monitoring well, south of Scott Boulevard (May 2012) | VOCs were not found at detectable concentrations. |
| Two grab groundwater samples, off site and downgradient of the property, north of Augustine Drive (November 2014) | No VOCs were detected in either grab groundwater sample above laboratory reporting limits. |
| Two grab groundwater samples collected from southern, upgradient property boundary (December 2014) | No VOCs were detected in either grab groundwater sample above laboratory reporting limits. |
| *Soil Vapor* | |
| Six locations on the southern half of the property, in the vicinity of the former Zeta Laboratories facility (December 2014 and August 2015) | VOCs, including benzene, ethylbenzene, toluene, and xylenes were detected in one or more soil vapor samples at concentrations above laboratory reporting limits, but below the Cal-modified RSL for residential land use. |

*Source: EKI 2013a, Roux 2015a, Roux 2015b*

*RSL – Regional Screening Level. DTSC has modified the screening levels for certain chemicals. This screening level is referred to as the Cal-modified RSL.*

**APNs 216-45-023, 216-45-024, 216-45-025 (3255 Scott Boulevard, formerly referred to as Park Square)**

The 3255 Scott Boulevard property (formerly referred to as Park Square in the Phase I) is located at the intersection of Scott Boulevard and Octavius Drive. The Phase I for this property includes the two parcels in the northeastern portion of the project site as well as some off-site parcels to the northeast of the project site that are being developed as the SCS Office Phase III project. There are several one-story buildings on the property that are leased by numerous tenants.

Grab samples of shallow groundwater and soil vapor samples were collected from the property as described in **Table 4.6-4**. A few samples exceeded environmental screening levels but would likely not pose a significant risk to future residential or commercial uses. No significant groundwater contamination appears to be originating from the site (EKI 2014c). However, groundwater impacts are likely originating offsite sources including potentially Synertek (EKI 2013b, EKI 2014c).

There is no documentation identifying a significant on-site release. Soil vapor samples were collected from across the property as shown in **Table 4.6-4.** Benzene was detected in one sample from the

southeastern corner of the property at a concentration above the Cal-modified RSL for potential vapor intrusion risk for residential land use. In addition, one sample collected in 2013 from beneath the 3233 Scott Boulevard building in the southern portion of the property contained vinyl chloride at a concentration above the Cal-modified RSL for residential land use (EKI 2014c, Roux 2015b). A sample taken from the same location in August 2015 contained vinyl chloride at a concentration well below screening levels.

**Table 4.6-4**
**Soil and Groundwater Sampling on the 3255 Scott Property**

| Sample Location | Findings |
|---|---|
| *Groundwater* | |
| Four grab groundwater samples from the southern and eastern portions of the property (June 2013)<br><br>Four Synertek site wells located on the up and downgradient edges of the property (May and November 2014) | VOCs, including 1,1-DCE, 1,1-DCA, TCE, Freon 113, and 1,1,1-TCA, were detected in one or more shallow groundwater samples at concentrations above laboratory reporting limits. Detected concentrations of 1,1-DCE and 1,1-DCA from one location in the southeastern portion of the property exceeded California MCLs; all other VOC concentrations were below drinking water standards. Concentrations of VOCs in groundwater were below their respective RWQCB potential vapor intrusion ESL for residential land uses, and appear to have migrated onto the property from off-site areas. |
| *Soil Vapor* | |
| Nine soil gas samples across the property (June 2013)<br><br>Nine soil vapor samples from across the southern portion of the property (December 2014)[3]<br><br>Four soil vapor samples on the southern portion of the property (August 2015) | VOCs, including 1,1-DCA, 1,1-DCE, 1,1,1-TCA, TCE, Freon 11, Freon 113, 1,24-TMB, toluene, vinyl chloride, and xylenes were detected in one or more samples at concentrations above laboratory reporting limits.<br><br>In June 2013, vinyl chloride was detected in one sample beneath the 3233 Scott Boulevard building in the southern portion of the property at a concentration above its Cal-modified RSL for residential land use. The sample collected in August 2015 from the same area contained vinyl chloride at a concentration well below screening levels.<br><br>In August 2015, benzene was detected in one sample from the southeastern corner of the property at a concentration above the Cal-modified RSL for potential vapor intrusion risk for residential land use. Eight soil vapor samples have been collected in this area, and all were below the benzene screening level and many below detection limits. Additionally, three groundwater samples were previously collected on three sides of this building, and none of them contained any benzene. Roux (2015b) concluded that this result was anomalous. These additional samples document that the elevated benzene concentration is anomalous. No other VOCs were detected in soil vapor samples above their respective screening levels for potential vapor intrusion from soil vapor for residential land use. |

*Source: EKI 2013b, EKI 2014c, Roux 2015b*
*ESL – environmental screening level*
*RSL – Regional Screening Level. DTSC has modified the screening levels for certain chemicals. This screening level is referred to as the Cal-modified RSL.*

---

[3] Laboratory reporting limits for selected VOCs exceeded applicable screening levels.

**APNs 216-45-011 and 216-45-028 (Partial Parcels)**

The project site includes eastern portions (approximately 140 feet wide) of APNs 216-45-011 and 216-45-028, which are located at the western boundary of the project site. APNs 216-45-011 and 216-45-028 and the areas to the west are currently part of a DTSC voluntary cleanup site referred to as the Santa Clara Square Retail site (EKI 2014d)

No groundwater or soil vapor samples were collected from the two partial parcels. **Table 4.6-5, Soil and Groundwater Sampling on Portions of APNs 216-45-011 and 216-45-028,** presents the results of sampling for groundwater and soil vapor on the remainder portions of these two parcels. It presents the results of sampling closest to the two project site partial parcels. No VOCs were detected in groundwater above laboratory reporting limits. VOCs were detected in soil vapor at concentrations above laboratory reporting limits but well below screening levels (EKI 2014d). A release of approximately 40 gallons of hydraulic oil was documented inside the 2620 Augustine Drive building at the former elevator location, just west of the partial parcels. Remediation of residual hydraulic oil was conducted during remedial work on the Santa Clara Square Retail Center project site. This remediation consisted of excavating petroleum impacted soil to just below the water table and placing oxygen release compound at the base of the excavation (Roux 2015b).

**Table 4.6-5**
**Soil and Groundwater Sampling on Portions of APNs 216-45-011 and 216-45-028**

| Sample Location | Findings |
|---|---|
| *Groundwater* | |
| One grab groundwater sample | No VOCs were detected above laboratory reporting limits. |
| *Soil Vapor* | |
| Two soil vapor samples (March 2013) | VOCs, including 1,1-DCE and toluene were detected at concentrations above laboratory reporting limits but well below screening levels. |

Source: EKI 2014d, Roux 2014

## 4.6.2.2    Government Records Searches

Based on searches of government records conducted in conjunction with the preparation of the Phase I and Phase II ESAs, none of the parcels that make up the project site are on the Cortese list prepared pursuant to Government Code Section 65962.5.

### 4.6.2.3    Fire Hazards

The majority of the City is urbanized and developed with limited open space. The project site and the areas around the project site are developed. There are no wildfire hazards in the City of Santa Clara (CSC 2011).

### 4.6.2.4    Asbestos Containing Materials

Asbestos is a common name for a group of naturally occurring fibrous silicate minerals that are made up of strong durable fibers, which vary in size and physical shape. Asbestos is strong, incombustible, and corrosion resistant. Because of its physical properties, asbestos was used in many commercial products in construction and many other industries, since prior to the 1940s and up until the early 1970s. Asbestos is commonly found in various manmade products including insulation, ceiling and floor tiles, roof shingles, cement, and automotive brakes and clutches.

Asbestos fibers are relatively stable in the environment, because asbestos is a mineral. Asbestos fibers do not evaporate into air. Asbestos Containing Materials (ACMs) are building materials containing more than 1 percent asbestos (some state and regional regulators impose a 0.10-percent threshold). ACMs that can be crushed into a powder are termed "friable asbestos." When ACM become friable, there is chance that asbestos fibers can become suspended in air.

It is under these conditions that airborne asbestos fibers represent the most significant risk to human health. Asbestos particles do not migrate through soil. Asbestos fibers do not dissolve in water, but under certain conditions could become waterborne and accumulate in steam beds and sediment. Asbestos is a potential health concern, since long term, chronic inhalation exposure to high levels of asbestos can cause lung diseases, including asbestosis, mesothelioma, and/or lung cancer. All of the existing structures present within the project site were built after 1975. Therefore there is potential for some of the project site buildings to contain ACMs. Several different federal, state, and local agencies regulate asbestos. Generally, worker exposure is regulated by the federal Occupational Safety and Health Administration (OSHA) and its California State counterpart Cal/OSHA.

### 4.6.2.6    Lead-Based Paints

Until 1978, when the US Consumer Product Safety Commission (CPSC) phased out the sale and distribution of residential paint containing lead, many homes were treated with paint containing some amount of lead. It is estimated that over 80 percent of all housing built prior to 1978 contains some lead-based paint (LBP). The mere presence of lead in paint may not constitute a material to be considered hazardous. In fact, if in good condition (no flaking or peeling), most intact LBP is not considered to be a

hazardous material. In poor condition, LBPs can create a potential health hazard for building occupants, especially children. All of the existing structures present within the project site were built after 1975. Therefore, there is potential for LBPs to be found on the project site.

### 4.6.2.7    Airport Hazards

There are no airports in the City of Santa Clara. However, the Mineta San Jose International Airport is located adjacent to the City approximately 1.4 miles to the southeast of the project site.

### 4.6.3    REGULATORY SETTING

Hazardous materials handling and hazardous waste management are governed by federal, state, and local laws and regulations. Key regulations are summarized below.

### 4.6.3.1    Federal Regulations

The US Environmental Protection Agency (US EPA) is the main federal agency responsible for enforcing laws and regulations relating to hazardous materials and wastes, including evaluation and remediation of contamination and hazardous wastes. The US EPA works collaboratively with other agencies to enforce hazardous materials handling and storage regulations and site cleanup requirements. The Occupational Safety and Health Administration (OSHA) and the Department of Transportation (DOT) are authorized to regulate safe transport of hazardous materials.

Federal regulations which regulate the handling (including transportation), storage, workplace safety, and disposal of hazardous materials and wastes are contained primarily in Titles 10, 29, 40, and 49 of the Code of Federal Regulations (CFR), specifically the Resource Conservation and Recovery Act of 1976 (RCRA). The National Contingency Plan, CFR Title 40, part 300, implements Comprehensive Environmental Responsibility, Compensation, and Liability Act of 1980 (CERCLA), which addresses the cleanup of hazardous substances at sites the Federal government has determined represent a threat to human health and the environment.

RCRA created a major new federal hazardous waste "cradle-to-grave" regulatory program administered by EPA. Under RCRA, US EPA regulates the generation, treatment, and disposal of hazardous waste, and the investigation and remediation of hazardous waste sites. RCRA includes procedures and requirements for reporting releases of hazardous materials and for cleanup of such releases. RCRA also includes procedures and requirements for handling hazardous wastes or soil or groundwater contaminated with hazardous wastes. Individual states may apply to US EPA to authorize them to implement their own hazardous waste programs in lieu of RCRA, as long as the state program is at least as stringent as federal

RCRA requirements. California has been authorized by US EPA to implement its own hazardous waste program, with certain exceptions. The California program is handled by the Department of Toxic Substances Control (DTSC), see below.

CERCLA establishes clean-up liability regime and process for certain properties contaminated by hazardous substances that poses a threat to human health and the environment. The Hazardous Materials Transportation Act is administered by the DOT via its issuance of inspections, training, and transportation requirements and information; the federal government delegates enforcement authority to the states.

## 4.6.3.2    State Regulations

State agencies that regulate the use of hazardous materials include the California Environmental Protection Agency (Cal/EPA), the Office of Emergency Services (OES), the Department of Health Services (DHS), the DTSC, and, the State Water Resources Control Board (State Board), and the Regional Water Quality Control Boards (RWQCBs).

The DTSC, the State Board, and the RWQCBs agreed to a Brownfield Memorandum of Agreement (MOA), which establishes procedures and guidelines for identifying the lead agency for a single site, calls for a single uniform site assessment procedure, requires all cleanups to address the requirements of the agencies, defines roles and responsibilities, provides for ample opportunity for public involvement, commits agencies to review timeframes, and commits agencies to coordinate and communicate on brownfields issues. Through this process, it is decided whether a particular environmental cleanup site will be overseen by the DTSC or the applicable RWQCB.

The DTSC regulates the generation, transportation, treatment, storage, and disposal of hazardous waste, and the investigation and remediation of hazardous waste sites. The DTSC implements the provisions of both federal and state hazardous waste laws through the California Hazardous Waste Control Law. The DTSC and the RWQCBs administer laws for the clean-up on of environmentally impacted sites. Lead responsibility for remediation depends on the proposed use of a parcel, the character of waste contaminants, and the need for site monitoring.

The California Highway Patrol (CHP) and the California Department of Transportation (Caltrans) are the primary enforcement agencies for hazardous materials transportation regulations.

State regulations applicable to hazardous materials are contained in Titles 8, 22, and 26 of the California Code of Regulations (CCR) and include the State Water Code, Underground Storage Tank Code, Cortese

Act (listing of hazardous waste and substances sites), and Proposition 65 (safe drinking water and toxics enforcement).

Cal/OSHA regulates work practices at asbestos levels less than 1 percent. Samples containing less than 1 percent asbestos are regulated as outlined in 8 CCR Section 1529.

The California Accidental Release Prevention (CalARP) program regulates facilities that store greater than a threshold quantity of a regulated substance, which the State has determined represents a potential health and safety hazard beyond the facility's boundary. The regulated substances include 276 toxic chemicals and 63 flammable substances. This program requires a regulated facility to develop and implement a Risk Management Plan (RMP) that includes the following: (1) a Hazard Assessment, (2) Prevention Elements, (3) Management System, and (4) Emergency Response Program. The Hazard Assessment requires external event analyses, including seismic analysis, worst-case release scenario (WCRS) modeling, alternate release scenarios (ARS) modeling, and a review of historical accidents. The prevention elements, which are in place to prevent an accidental release, include operating procedures, mechanical integrity, training, incident investigation, and managing change that may occur in the processes. The facilities are required to have a management system in place to ensure that all of the prevention elements are being implemented. The facilities are also required to have an emergency response program, including an emergency response plan (BASELINE 2015). CalARP regulated facilities are required to submit their risk management plan (RMP) to the local CUPA. The Santa Clara Fire Department is the CUPA for the City of Santa Clara.

### 4.6.3.3    Local Regulations

*Bay Area Air Quality Management District*

The Bay Area Air Quality Management District (BAAQMD) is the local National Emissions Standards for Hazardous Air Pollutants (NESHAPS) authority for the Bay Area. The BAAQMD requires 10 business days' notification prior to the commencement of demolition activities or work that affects regulated Asbestos Containing Materials (ACMs).

*Municipal Fire and Environmental Code*

The Municipal Fire and Environmental Code (Fire Code) provides guidelines for property owners handling hazardous materials. The Fire Code includes detailed information indicating under what circumstances an operational permit is required for storage of hazardous materials and the associated fee for the permit. The operational permits are required for storing or using compressed gases or hazardous materials on a property of certain types and quantities. Additional fees are required for annual

inspections by the City of Santa Clara Fire Department and associated with Certified Unified Program Agency (CUPA) programs.

The Fire Prevention/Hazardous Materials Division is a division within the City of Santa Clara Fire Department responsible for various elements including recordation and inspection of hazardous waste generators and Fire Code enforcement. Additionally the Hazardous Materials Division implements the California Accidental Release Prevention Program (CalARP) which is designed to prevent the accidental release of regulated substance including hazardous materials.

## City of Santa Clara General Plan

### Conservation Policies

**Policy 5.10.1-P10**   Promote the reduction, recycling and safe disposal of household hazardous wastes through public education and awareness and through an increase in hazardous waste collection events.

### Safety Goals

**Goal 5.10.5-G1**   Protection of life, the environment, and property from natural catastrophes and man-made hazards.

**Goal 5.10.5-G2**   Adequate emergency preparedness plans.

**Goal 5.10.5-G3**   Availability of emergency services in the event of a disaster.

**Goal 5.10.5-G4**   City codes and regulations that are consistent with applicable regional, state, and federal regulations for safety.

### Safety Policies

**Policy 5.10.5-P1**   Use the City's Local Hazard Mitigation Plan as the guide for emergency preparedness in Santa Clara.

**Policy 5.10.5-P4**   Identify appropriate evacuation routes so people can be efficiently evacuated in the event of a natural disaster.

**Policy 5.10.5-P22**    Regulate development on sites with known or suspected contamination of soil and/or groundwater to ensure that construction workers, the public, future occupants, and the environment are adequately protected from hazards associated with contamination, in accordance with applicable regulations.

**Policy 5.10.5-P23**     Require appropriate clean-up and remediation of contaminated sites.

**Policy 5.10.5-P24**     Protect City residents from the risks inherent in the transport, distribution, use, and storage of hazardous materials.

**Policy 5.10.5-P25**     Use Best Management Practices to control the transport of hazardous substances and to identify appropriate haul routes to minimize community exposure to potential hazards.

**Policy 5.10.5-P26**     Survey pre-1980 buildings and abate any lead-based paint and asbestos prior to structural renovation and demolition, in compliance with all applicable regulations.

**Policy 5.10.5-P28**     Continue to require all new development and subdivisions to meet or exceed the City's adopted Fire Code provisions.

**Policy 5.10.5-P29**     Continue to refer proposed projects located within the Airport Influence Area to the Airport Land Use Commission.

**Policy 5.10.5-P30**     Review the location and design of development within Airport Land Use Commission jurisdiction for compatibility with the Airport Land Use Compatibility Plan.

## 4.6.4     IMPACTS AND MITIGATION MEASURES

### 4.6.4.1     Significance Criteria

In accordance with Appendix G of the *California Environmental Quality Act (CEQA) Guidelines*, the impact of the proposed project related to hazards and hazardous materials would be considered significant if it would:

- create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials;

- create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment;

- emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within 0.25 mile of an existing or proposed school;

- be located on a site that is included on a list of hazardous materials sites compiled pursuant to government code section 65962.5 and, as a result, create a significant hazard to the public or the environment;

- for a project located within an airport land use plan or, where such a plan has not been adopted, within 2 miles of a public airport or public use airport, would the project result in a safety hazard for people residing or working in the project area;

- for a project within the vicinity of a private airstrip, would the project result in a safety hazard for people residing or working in the project area;

- impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan; or

- expose people or structures to a significant risk of loss, injury, or death involving wildland fires, including where wildlands are adjacent to urbanized areas or where residences are intermixed with wildlands.

## 4.6.4.2    Methodology

Given the residential nature of the proposed development, the analysis below is focused on the potential for any existing on- or off-site contamination to affect the future site uses. Project impacts are evaluated relative to the above standards of significance by utilizing information on existing hazards and hazardous materials provided by the Phase I and Phase II ESAs prepared by EKI and the subsurface investigations performed by Roux and others for the various properties on the project site.

In order to evaluate the risk to the future site users from contamination present in all media (soil, soil vapor and groundwater) at the project site, environmental screening criteria set forth by the DTSC and the RWQCB for residential land use were used. As explained above, environmental screening criteria used include the San Francisco Bay Region RWQCB Environmental Screening Levels (ESLs) and the California-modified Regional Screening Levels (Cal-modified RSLs) (RWQCB 2013, DTSC 2015). ESLs and RSLs are guidelines for evaluation of potential environmental risks and are not enforceable regulatory criteria, and the presence of a chemical at concentrations in excess of a screening does not necessarily indicate adverse effects on human health or the environment, rather that additional evaluation is warranted (RWQCB 2013). Concentrations of chemicals detected in groundwater were also screened against the California Maximum Contaminant Levels (MCLs), which are regulatory standards for drinking water that apply to public water systems. MCLs were used to determine whether the discharge of dewatering water could adversely affect receiving waters.

## 4.6.4.4    Project Impacts and Mitigation Measures

**Impact HAZ-1:**    **The proposed project would not create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials. (*Less than Significant*)**

The proposed project consists of residential and commercial uses. These land uses do not generally involve the routine use, transport, or disposal of significant amounts of hazardous materials, including hazardous chemical, radioactive, and biohazardous materials. Furthermore, compliance with local, state, and federal regulations would minimize risks associated with the routine transport, use, or disposal of hazardous materials during project occupancy. As such, potential impacts during operation are considered to be less than significant.

Although small quantities of hazardous materials would be used during project construction, compliance with local, state, and federal regulations, as well as the implementation of a construction-phase stormwater pollution prevention plan (SWPPP) in compliance with National Pollutant Discharge Elimination System (NPDES) requirements, would minimize risks associated with the routine transport, use, or disposal of hazardous materials during project construction.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HAZ-2:**    **The proposed project could create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment. (*Potentially Significant; Less than Significant with Mitigation*)**

Several types of hazardous materials that are currently present on the project site have a potential to adversely affect construction workers during site clearing, grading, demolition and construction. Some of the hazardous materials, if not properly managed, could also adversely affect the environment and the future site residents. The analysis below evaluates the potential for these conditions to affect construction workers, future site residents, and the environment.

**Asbestos**

Due to the age of several structures on the project site, there is a potential for asbestos-containing materials (ACMs) to be present. ACMs contain greater than 1.0 percent asbestos. Trace ACMs contain less than 1.0 percent but greater than 0.1 percent asbestos. These materials are regulated under the Toxic

Substances Control Act and National Emissions Standards for Hazardous Air Pollutants requirements), or as geological deposits, in which case they are typically regulated by standards established by the California Air Resources Board and regulated by local air pollution control district standards.

Section 19827.5 of the California Health and Safety Code, adopted January 1, 1991, requires that local agencies not issue demolition or alteration permits until an applicant has demonstrated compliance with notification requirements under applicable federal regulations regarding hazardous air pollutants, including asbestos. The California Legislature has vested the BAAQMD with authority to regulate airborne pollutants, including asbestos, through both inspection and law enforcement. BAAQMD is to be notified 10 days in advance of any proposed demolition or abatement work. The local office of the California Occupational Safety and Health Administration (Cal-OSHA) must be notified of asbestos abatement to be carried out. Pursuant to California law, the City of Santa Clara would not issue the required demolition permit until the applicant has complied with the above notice requirements. Compliance with these regulations and procedures, already established as a part of the permit review process, would ensure that potential impacts from asbestos during project-related demolition would be reduced to a less than significant level.

**Lead-Based Paint**

Based on the age of several structures on the project site, there is the potential that lead may be present in the interior and exterior surfaces of the existing buildings, including paint and glazing on ceramic tiles.

Demolition of the buildings as part of the proposed project would comply with Cal-OSHA Lead Construction Standard, Title 8, California Code of Regulation (CCR) 1532. Lead-based paint still bonded to the building material proposed for demolition would not require removal ahead of time. However, peeling, flaking, or blistering lead-based paint would need to be removed prior to demolition. The regulations and procedures established by Cal-OSHA would ensure that potential impacts from lead-based paint disturbance during construction would be reduced to a less than significant level.

**Other Hazardous Building Materials**

Other hazardous materials commonly found in building materials that may be affected during demolition and renovation activities associated with redevelopment include fluorescent lighting, electrical switches, heating/cooling equipment, and thermostats that can contain hazardous materials, which may pose a health risk if not handled and disposed of properly. The procedures established by the Metallic Discards Act of 1991 (California Public Resources Code, Sections 42160-42185) and other state and federal guidelines and regulations would ensure that potential impacts from disturbance of other hazardous building materials during construction would be reduced to a less than significant level.

**Subsurface Contamination from Residual Pesticides**

Based on the evaluation of the soil on the project site conducted by EKI and Roux, residual pesticides, including arsenic, lead, and several organochlorine pesticide compounds (i.e., DDE, dieldrin, aldrin, and chlordane) are present in the project site soils from its historical use as orchards. This contamination has the potential to pose a human health risk to construction workers and future residential occupants at the project site, and the impact is considered potentially significant.

**Subsurface Contamination from Prior Non-Agricultural Uses**

As discussed above in **Section 4.6.2.1**, the five full parcels and two partial parcels that make up the project site were evaluated for the presence of any hazardous conditions associated with the past and present commercial and light industrial uses, including an evaluation whether contamination in soil, soil vapor and groundwater is present at concentrations that could adversely affect the future project site residents through vapor intrusion. Based on the data collected, the studies determined that two VOCs (vinyl chloride and benzene) in soil vapor and VOCs in ground water were the contaminants of potential concern. Although VOCs were detected in shallow groundwater at concentrations above drinking water standards at several locations on the project site, the studies found that the concentrations did not exceed vapor intrusion ESLs and therefore are not expected to pose a vapor intrusion risk to future site residents. With respect to vinyl chloride, that contaminant was detected in soil vapor from two locations at concentrations above environmental screening levels for potential vapor intrusion risk for residential use. However, subsequent soil vapor samples from the general vicinity of these sampling locations did not contain vinyl chloride at concentrations close to or exceeding applicable screening levels. Moreover, proximate samples of groundwater did not reveal concentrations of vinyl chloride. Similarly, benzene was detected in one sample (along the eastern edge of the project site, north of Scott Boulevard) at a concentration above the Cal-modified RSL for potential vapor intrusion risk for residential land use. However, no proximate values of benzene were detected. Therefore, neither vinyl chloride, benzene nor any other chemical presents a significant risk with respect to potential vapor intrusions issues. Nonetheless, as a further protective measure, as stated in **Section 3.0, Project Description**, the proposed project includes a vapor intrusion mitigation system that will be installed below Buildings 2, 5, 6, and 7.

Based on the Phase I and Phase II ESA, a UST and any associated soil impacts could potentially be present on the 3230 Scott Boulevard property. Should this condition remain on the project site, it could pose a potential human health risk to the site residents, and the impact would be considered potentially significant.

**Dewatering**

Construction activities at depths of 10 feet or more may extend into the groundwater table and necessitate dewatering. As noted above, VOCs are present in the groundwater at certain locations on the project site at levels that exceed California MCLs. The contaminated water would not be expected to pose a significant human health risk for the construction workers at the project site; however, the groundwater extracted as part of dewatering activities could potentially affect receiving waters, if not managed appropriately. The impact would be potentially significant.

**Mitigation Measures:**

To address the potentially significant impacts related to residual pesticides in the project site soils and the potential presence of a UST and related contamination on the project site, **Mitigation Measure HAZ-2a** would be implemented which requires the development and implementation of a Response Plan that includes procedures for removal or on-site management of contaminated soil, procedures for management of construction dewatering water, procedures for removal of USTs, and the protection of construction workers from exposure to impacted soil through measures included in a health and safety plan. In addition, **Mitigation Measure HAZ-2b** would be implemented to avoid and minimize impacts from construction dewatering water.

**HAZ-2a**     Agricultural chemicals or other contaminated media that may be identified by DTSC shall be addressed prior to or as part of project construction under a site remediation plan approved by the DTSC. The remediation plan will be developed for the project site to prevent unacceptable human health risks to site users from chemicals of concern (COCs). The remediation plan shall require:

(1) implementation of a worker health and safety plan covering all workers potentially exposed to hazardous materials in accordance with state and federal worker safety regulations;

(2) remedial strategies and approaches that will achieve protection of site users based upon health-based standards or the presence of naturally occurring constituents for the management of shallow soil known to be contaminated by agricultural chemicals and any additional contaminated media encountered during demolition or excavation. Contaminated soil management options may include, for example, on-site encapsulation under the oversight of DTSC, appropriate off-site disposal, institutional controls (e.g., land use covenants), and engineering controls to mitigate exposure of site users from impacted media;

(3)  procedures to require notice to the City of Santa Clara prior to invasive earthwork that all contaminated soil excavation and management will comply with a final site remediation plan approved and overseen by DTSC;

(4)  procedures to provide notice to the City of Santa Clara Fire Department for the removal of USTs and comply with the substantive City requirements should an UST or other underground structure be discovered on the 3230 Scott Boulevard property or elsewhere on the project site, and address any associated soil impacts; and

(5)  provisions to visually inspect soil underlying existing buildings for potential unknown contamination.

**HAZ-2b**      If dewatering is to be performed as a part of construction activities, the project applicant will obtain and comply with all applicable permits and requirements prior to the discharge of any groundwater to surface waters or sanitary sewer. Requirements may include treatment, monitoring, and reporting to ensure that the discharge meets the appropriate water quality objectives for the receiving waters.

**Significance after Mitigation**: These measures would reduce potentially significant human health and environmental risk impacts from contaminated soil and groundwater during construction and occupancy of the project site to a less than significant level.

---

**Impact HAZ-3:**      **The proposed project could expose future project site residents to substantial risk associated with hazardous materials storage and use on nearby properties. (*Potentially Significant; Less than Significant with Mitigation*)**

The proposed project involves the construction of a mixed-use development that would include residential apartments. The new apartments would be located in an area where commercial and light industrial uses are currently present, some of which involve the storage and use of hazardous materials. An accidental release of certain hazardous materials on these nearby properties could potentially affect the future site residents. An accidental release assessment was prepared by BASELINE Environmental Consulting to determine whether there is a potential for one or more existing commercial and industrial facilities within 0.5 mile of the project site to have an accidental release that could endanger the health and safety of the future residents of the project site. The results of the assessment are summarized below.

The Santa Clara Fire Department performed a records search of regulated facilities to determine whether there were any facilities within 0.5 mile of the project site boundary that are subject to CalARP regulations, described above

Based on the Santa Clara Fire Department's records search, at this time there is only one CalARP facility, "Applied Materials," located within 0.5 mile of the project site boundary.[4] Applied Materials is a research and development facility located approximately 0.2 miles west- southwest of the project site. The facility stores and uses quantities of anhydrous ammonia and chlorine in excess of the applicable CalARP thresholds and therefore, is subject to the CalARP program requirements. In 2010, the facility submitted an updated RMP to the Santa Clara City Fire Department - Hazardous Materials Division (BASELINE 2015).

As part of the RMP, the facility performed off-site consequence analyses to evaluate the potential distances toxic vapor clouds of anhydrous ammonia or chlorine would have to travel before dissipating to a "toxic end point" concentration, such that serious injuries from short-term exposures will no longer occur. In accordance with CalARP regulations, the facility estimated the distance to toxic end points under both a worst case release scenario (WCRS) and alternative release scenario (ARS) for ammonia and chlorine. A WCRS is defined by the United States Environmental Protection Agency ("USEPA") as the release of the largest quantity of a regulated substance from a single vessel or process line failure that results in the greatest radius of impact. A WCRS is a screening tool that does not assess the possible causes or probability that any specific release scenario might occur; the release is simply assumed to occur. Furthermore, a WCRS assumes the entire quantity of hazardous material stored in the vessel or process line is released, does not account for the safety mechanisms that are in place (e.g., shut-off valves and secondary containment), and applies overly conservative meteorological conditions for air dispersion modeling that would rarely occur. An ARS is modeled to provide a more accurate, foreseeable and realistic evaluation of the potential offsite consequence of a release. Since the ARS provides a more realistic assessment of an accidental release, the results of the ARS modeling for anhydrous ammonia and chorine are summarized below (BASELINE 2015).[5]

---

[4] Santa Clara Fire Department, 2015. Email communication between Jack Lin from the Fire Prevention and Hazardous Materials Division of the Santa Clara Fire Department and Patrick Sutton from BASELINE. 29 July.

[5] Numerous courts of appeal have held that CEQA does not require an EIR engage in speculation to analyze an unrealistic worst case scenario. *See, e.g.*, *Napa Citizens for Honest Gov't v. Napa Cnty. Bd. of Supervisors*, 91 Cal. App. 4th 342, 373; *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 681; *Citizens for a Sustainable Treasure Island v. City & Cnty. of San Francisco* (2014) 227 Cal. App. 4th 1036, 1068; *N. Coast Rivers Alliance v. Marin Mun. Water Dist. Bd. of Directors* (2013) 216 Cal. App. 4th 614, 635.

For the ammonia process, the most reasonable ARS that would likely result in the greatest release into the atmosphere outside of an enclosure was chosen to be a release from the activation of or break in the rupture disk of one of the Y-cylinders during transport. There are two scenarios where the failure of a rupture disk could conceivably occur. One is from cylinder overpressure, resulting from extremely high heat, and the second is failure of an aged and/or worn rupture disk. Although considered highly unlikely because of requirements included in the facility risk management plan (e.g., rupture disks are replaced every 3 to 5 years and the cylinders are inspected prior to filling by the gas supplier and prior to off-loading at the facility), the latter of these occurrences is believed to be the more likely of the two. While a release is not foreseeable because of precautions already in place and required by law, based on USEPA guidance for off-site consequence analysis, the estimated ARS radius of impact for anhydrous ammonia was 0.1 mile. Therefore, the ARS radius of impact for ammonia would not affect the project site (BASELINE 2015).

For the chlorine system, the most reasonable scenario that would likely result in the greatest release into the atmosphere was chosen to be the rupture of a pipe outside the enclosure. While also not foreseeable, because of precautions already in place and required by CalARP regulations in the exceptionally unlikely event of a line rupture, the high-flow detector would immediately shut off flow from the chlorine cylinders. No other active mitigation measures were taken into account for this release scenario. Based on USEPA guidance for off-site consequence analysis, the estimated ARS radius of impact for chlorine was 0.1 mile. Therefore, the ARS radius of impact for chlorine would not affect the project site (BASELINE 2015).

Furthermore, Applied Materials has an Emergency Response Team of over 150 members that are trained to respond to accidental releases in accordance with procedures described in the facility's Integrated Contingency Plan. All emergency response and planning activities are coordinated with the Santa Clara Fire Department, including releases of anhydrous ammonia or chlorine. The Santa Clara Fire Department inspects the facility to ensure hazardous materials are being properly managed (BASELINE 2015).

Based on the analysis conducted by BASELINE Environmental Consulting, an accidental release of hazardous materials from Applied Materials or any other commercial/industrial facility within 0.5 mile of the project would not be expected to endanger the health and/or safety of future residents on the project site. The impact would be less than significant.

According to the Fire Department, as of September 2015 two existing facilities within 0.5 mile of the project site have submitted applications under the CalARP program as they are modifying their existing operations to include the storage and handling of regulated chemicals in excess of the applicable CalARP thresholds and therefore, will be subject to the CalARP program requirements. It is anticipated that these

applications or other applications in the future will continue lawful industrial activities in proximity to the project. This could increase the hazard risk to existing and future sensitive receptors in the vicinity of these facilities, including the project site receptors. This represents a potentially significant impact. The City's Fire Marshal has indicated that this impact can be substantially lessened with improved hazardous materials mobile response capabilities. **Mitigation Measure HAZ-3** would be implemented, which requires the project to make a fair share contribution to the City of Santa Clara towards the acquisition cost of an emergency vehicle with hazardous materials response capabilities.

**Mitigation Measures**:

HAZ-3          The project will make a fair share contribution to the City of Santa Clara towards the acquisition cost of an emergency vehicle with hazardous materials response capabilities.

**Significance After Mitigation:** Less than significant

---

**Impact HAZ-4:**        **The proposed project would not emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed school. (*Less than Significant*)**

The Mission College is located across U.S. 101 to the northwest of the project site. No other schools are located within 0.25 mile of the project site. As discussed above, only small quantities of hazardous materials would be used on-site during construction of the proposed project and compliance with local, state, and federal regulations, as well as the implementation of a construction-phase SWPPP in compliance with NPDES requirements would minimize any potential for impacts to nearby schools. In addition, operation of the proposed project does not involve any use that would result in hazardous emissions. The impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HAZ-5:**  **The project site is not located on a list of hazardous material sites subject to corrective action compiled pursuant to Government Code Section 65962.5 (Cortese List). (*No Impact*)**

As noted earlier in this section, there are no open hazardous material sites subject to corrective action compiled pursuant to Government Code Section 65962.5 (Cortese List) present on the project site. Therefore, there would be no impact.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HAZ-6:**  **The proposed project would not result in a safety hazard to aircraft due to building construction or result in a safety hazard due to aircraft for people living or working on the site. (*Less than Significant*)**

There are no public or private airports located within the City of Santa Clara. However, the project site is located approximately 1.4 miles from the Norman Y. Mineta San Jose International Airport in San Jose and Moffett Federal Airfield, located about 3.75 miles northwest of the project site.

The identified flight paths and approaches for Moffett Federal Airfield are well away from the project site and would not result in a safety hazard for people living on the project site. The flight paths of the nearby San Jose International Airport are not directly over or adjacent to the project site (Santa Clara County Airport Land Use Commission 2011). Consequently, the aircrafts flying the area would not result in a safety hazard to people living or working on the project site. The impact would be less than significant.

The project site is not located within an airport influence area or within an airport safety zone. The project site is located within the FAR Part 77 Surfaces 212 feet (above MSL) height restriction zone (Santa Clara County Airport Land Use Commission 2011). As the proposed buildings would reach a maximum height of 85 feet above MSL, the proposed project would not exceed the 212-foot height restriction that is applicable to this zone. For these reasons, this impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HAZ-7:**  **The proposed project would not impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation**

**plan nor would the proposed project expose people or structures to a significant risk of loss, injury, or death involving wildland fires. (*No Impact*)**

The project site is located in an urban area, and construction and operation of the proposed project would not interfere with the operation of traffic along U.S 101, Bowers Avenue, Scott Boulevard, or Montague Expressway, such that emergency response could be affected. The project site is located in an extensively urbanized area at a substantial distance from the closest wildland areas. No impacts with regard to implementation of an emergency response plan or wildland fire hazards would occur.

**Mitigation Measures**: No mitigation measures are required.

---

### 4.6.4.5    Cumulative Impacts and Mitigation Measures

**Cumulative Impact HAZ-1:** **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts related to hazardous materials. (*Less than Significant*)**

The proposed project's hazardous materials impacts, discussed above under **Project Impacts and Mitigation Measures,** focus on the use, transportation, storage, and disposal of hazardous materials and hazardous wastes during construction and occupancy of the proposed development. Construction-related hazardous materials impacts would generally be site-specific and limited to the duration of the construction activity, and would continue to be highly regulated under federal, state, and local regulations, and the project would therefore not result in a cumulatively considerable contribution to a significant cumulative impact. With respect to the use, storage, transportation, and disposal of hazardous materials during project occupancy, as a mixed-use, largely residential project, the proposed project would not involve the use of hazardous materials in substantial quantities. The other foreseeable development projects in the City, as listed in **Tables 4.0-1** and **4.0-2,** are also predominately redevelopment projects. Only a few of the foreseeable projects within 1.5 mile of the project site are residential, and similar to the proposed project would use minimal hazardous materials which would not likely be sources of new substantial hazardous materials use. However most of the cumulative projects are industrial and commercial which could potentially use, store, transport, and dispose hazardous materials. These projects would also be required to comply with local, state, and federal hazardous materials laws which are designed to avoid and minimize adverse impacts on public health, safety, and the environment. Additionally, the City of Santa Clara Fire Marshall would oversee potential storage of hazardous materials. Each cumulative project has been or will be subject to environmental review and if

significant impacts are identified, mitigation measures would be implemented to avoid or reduce the impacts. Furthermore, according to the City's General Plan EIR, with implementation of General Plan policies new development and redevelopment that occurs in areas with soil or groundwater contamination would not pose a significant hazard to people or the environment (CSC 2011). For the reasons presented above, the cumulative impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

## 4.6.5     REFERENCES

BASELINE Environmental Consulting. 2015. Technical Memorandum for an Accidental Release Assessment, Santa Clara Square. August.

City of Santa Clara. 2010. City of Santa Clara 2010-2035 General Plan. November 16. Updated in December 2014.

CSC. 2011. *City of Santa Clara 2010–2035 General Plan Integrated Final Environmental Impact Report*. January.

DTSC, 2011. *Guidance for the Evaluation and Mitigation of Subsurface Vapor Intrusion to Indoor Air*, California Environmental Protection Agency Department of Toxic Substances Control, October.

DTSC. 2015a. *Human Health Risk Assessment (HHRA) Note, HERO HHRA Note Number 3.* May.

DTSC. 2015b. *Letter to Santa Clara County Barbara A. Lee, Director 700 Heinz Avenue Berkeley, California 94 710-2721 Department of Environmental Health and City of Santa Clara Planning & Inspection.* August.

EKI. 2013a. *Phase I Environmental Site Assessment Montgomery Research Park.* June.

EKI. 2013b. *Phase I Environmental Site Assessment Park Square Phase I and II.* April.

EKI. 2014a. *Phase I Environmental Site Assessment 3236 Scott Boulevard.* December.

EKI. 2014b. *Phase I Environmental Site Assessment and Results of Phase II Subsurface Investigation 3230 Scott Boulevard.* December.

EKI. 2014c. *Results of Phase II Subsurface Investigation Park Square South of Augustine Drive*. January.

EKI. 2014d. *Final Response Plan, Santa Clara Square Retail, Santa Clara, California.* July.

Roux. 2014. *Results of Soil Characterization and Confirmation Sampling Program Santa Clara Square Retail Site, Santa Clara, California.* October

Roux. 2014. *Results of Soil Characterization and Confirmation Sampling Program Santa Clara Square Retail Site, Santa Clara, California.* October

Roux. 2015a. *Final Response Plan, Santa Clara Square Office Phase II and III Development, Santa Clara, California.* June.

Roux. 2015b. *Results of Soil Characterization and Confirmation Sampling Program, Santa Clara Square Apartments Site, Santa Clara, California. October.*

RWQCB. 2013. *Environmental Screening Levels,* California Regional Water Quality Control Board, Region 2, December 2013.

RWQCB, 2013b. *Screening for Environmental Concerns at Sites with Contaminated Soil and Groundwater, Interim Final, California Regional Water Quality Control Board*, Region 2. December.

RWQCB 2015. California State Regional Water Quality Control Board's Modified Maximum Contaminant Levels (MCLs) August.

RWQCB. 2015b. No Further Action, 3236 Scott Boulevard, Santa Clara, Santa Clara, County. June.

Santa Clara County Airport Land Use Commission. 2011. *Comprehensive Land Use Plan Santa Clara County Norman Y. Mineta San Jose International Airport*. May 25.

U.S. EPA, 2015 *Regional Screening Levels for Chemicals at Superfund Sites*. June.

# 4.7   HYDROLOGY AND WATER QUALITY

## 4.7.1     INTRODUCTION

This section describes existing hydrologic conditions at the project site and in its vicinity and analyzes the potential for the proposed project to result in significant impacts to water quality, groundwater supplies, groundwater recharge, site drainage, and flooding. Regulations and policies applicable to hydrology and water quality are also described in this section. Information presented in this section was obtained from the Santa Clara Square Apartments EIR Hydrology Study prepared by Civil Engineering Associates. This report is included in **Appendix 4.7** of this Draft EIR**.** Additional information presented in this section was obtained from the Phase I and Phase II Environmental Site Assessments (ESA) conducted for various parcels within the project site [3230 Scott Boulevard, 3236 Scott Boulevard, Montgomery Research Park (MRP), and Park Square], City of Santa Clara 2010 Urban Water Management Plan, Santa Clara County Urban Runoff Pollution Prevention Program Urban Runoff Management Plan, and Santa Clara Valley Water District (SCVWD) 2010 Urban Water Management Plan.

## 4.7.2     ENVIRONMENTAL SETTING

### 4.7.2.1     Regional Setting

*Regional Hydrology and Water Quality*

The project site is located within the Santa Clara Watershed. Within the Santa Clara Watershed the project site can be further identified as being in the West Valley Watershed (SCVWD 2015). Except for the most southern portion of the West Valley Watershed which is hilly, sparsely developed, and moderately to heavily vegetated with trees, brush and grass, the watershed is flat and heavily developed, with minor amounts of trees, brush, and grass (SCVWD 2015).

San Tomas Aquino Creek, the nearest drainage, is located approximately 50 feet to the east of the project site. San Tomas Aquino Creek originates in the hills of the Santa Cruz Mountains to the south of the project site and flows north into the San Francisco Bay (SCVWD 2015). The creek has been heavily altered from its natural state in the project vicinity. It is bound by paved and concrete reinforced levies on both banks. Box culverts are also present under many of the bridge crossings, including the Scott Boulevard Bridge. These alterations channelize the creek and prevent it from interacting with the surrounding developed areas. Although the creek is located outside the footprint of the proposed project, the creek may receive runoff from the project site via the municipal storm drains.

## Groundwater Hydrology

The City of Santa Clara is underlain by the Santa Clara Subbasin (Basin 2-9.02), the larger of two interconnected groundwater subbasins in Santa Clara County. The Santa Clara Subbasin is approximately 22 miles long and narrows from a width of about 15 miles near the northern boundary of Santa Clara County to approximately 0.5 mile at the Coyote Narrows, where the Santa Cruz Mountains and Diablo Mountain Range nearly converge. The subbasin is bordered by the Santa Cruz Mountains to the west and Diablo Mountain Range to the east and covers 225 square miles. The Santa Clara Subbasin is divided into two subareas, the Santa Clara Plain and the Coyote Valley (SCVWD 2011).

The groundwater basins are recharged through percolation of runoff, direct precipitation, subsurface inflow, and artificial recharge. Groundwater recharge is managed by the Santa Clara Valley Water District (SCVWD) through 18 recharge systems that include over 70 off-stream ponds with a combined surface area of more than 320 acres, and more than 30 local creeks. The Santa Clara Subbasin is assumed to have a safe yield of approximately 200,000 acre-feet/year (afy). The operational storage capacity of the Santa Clara Plain subarea is estimated to be 350,000 acre-feet (af) and of the Coyote Valley subarea is estimated to be between 23,000 to 33,000 af. The Llagas Subbasin, the other interconnected groundwater basin in Santa Clara County, has an operational storage capacity between 150,000 to 165,000 af (SCVWD 2011).

The Santa Clara Plain underlies the northerly portion of the Santa Clara County and includes the majority of the streams and recharge facilities operated by SCVWD (SCVWD 2011).

## Potable Water Service

The City of Santa Clara Water and Sewer Utilities Department (CSC) provides municipal water service to all areas within the City of Santa Clara. The CSC water supply includes local groundwater, imported water from the SCVWD, imported water from the San Francisco Public Utilities Commission (SFPUC) Hetch Hetchy Regional Water System (Hetch Hetchy System), and recycled water from South Bay Water Recycling (SBWR). The predominant source of potable water is local groundwater extracted from City-owned and operated wells. The most recent data on groundwater as a percentage of overall supply in the City of Santa Clara is from 2010 and indicates that about 60 percent of the overall water supply was met by local groundwater resources (CSC 2015). The project site is located in Pressure Zone I which is the middle portion of the City and is served by City of Santa Clara well water (CSC 2011a).

## *Local Groundwater*

As stated earlier, the City of Santa Clara is underlain by the Santa Clara Subbasin, the larger of two interconnected groundwater basins in Santa Clara County. Groundwater recharge is managed by the SCVWD, which estimates that the operational storage capacity of the Santa Clara Subbasin is 350,000 acre-feet with an estimated annual withdrawal limit of 200,000 acre-feet. The Santa Clara Subbasin is not adjudicated. The allowable withdrawal or safe yield of groundwater by the City of Santa Clara is dependent on several factors including: withdrawals by other water agencies, quantity of water recharged and the carry over storage from the previous year. The SCVWD estimates the carryover storage in April of every year when the quantity of imported water available to the SCVWD by contract and the local water yield can be estimated fairly accurately. Based on the calculated carryover capacity and the anticipated customer demands, the SCVWD reviews and modifies its groundwater management strategy in order to maintain adequate water in the basin to avoid subsidence. The most recent information from the California Department of Water Resources indicates that the Santa Clara Subbasin is not in a state of overdraft, and the information from the SCVWD indicates that the groundwater levels are generally rising from historic low levels, but are currently lower than the 5 year average (CSC 2011a, SCVWD 2015b).

The SCVWD actively monitors groundwater elevations to evaluate current groundwater conditions and land subsidence, optimize recharge efforts, assess groundwater storage, and support groundwater management efforts. The District also surveys hundreds of benchmarks each year to determine if there has been any change in the land surface elevation. Monthly reports on water level conditions are available prepared by the District. The most recent data available was published in September 2015 and is as follows:

**Santa Clara Plain**

- The August managed recharge estimate is 3,300 acre-feet. The year-to-date managed recharge estimate is 13,900 acre-feet, or 36 percent of the five-year average.

- The August groundwater pumping estimate is 6,100 acre-feet. The year-to-date groundwater pumping estimate is 44,000 acre-feet, or 73 percent of the five-year average.

- The groundwater level in the Santa Clara Plain (San Jose) is about 7 feet higher than August last year and about 23 feet lower than the five-year average.

**Coyote Valley:**

- The August managed recharge estimate is 550 acre-feet. The year-to-date managed recharge estimate is 4,300 acre-feet, or 49 percent of the five-year average.

- The August groundwater pumping estimate is 900 acre-feet. The year-to date groundwater pumping estimate is 6,000 acre-feet, or 79 percent of the five-year average. The groundwater level in Coyote Valley is about one foot higher than June last year and 6 feet lower than the five-year average (SCVWD 2015b).

**Groundwater Wells**

The City's groundwater wells are strategically distributed around the City. This distribution of wells adds to the reliability of the water system and minimizes the possibility of localized subsidence due to localized over-drafting. The City's 2010 Urban Water Management Plan (UWMP) contained a detailed analysis of the historic pumping rates and the depth to water at each well. Minor seasonal fluctuations in the depth to water were noted in the analysis but there is no evidence of declining water table or over-drafting; in fact, as stated above, groundwater levels have been generally rising from historic low levels but are currently lower than the 5 year average (CSC 2011a, SCVWD 2015b).

The City of Santa Clara has historically pumped between 13,930 acre-feet and 15,943 acre-feet/year from the groundwater basin between 2004 and 2013 (CSC 2015). These volumes are lower than the amount that has historically been pumped. The historic high for groundwater utilization occurred in 2000 (CSC 2011a).

**Groundwater Quality**

The SCVWD tested 26 domestic wells in North County and 286 wells in South County in 2013. Of the water supply wells tested in 2013 in Santa Clara County, 79 percent met primary drinking water standards. The wells that did not meet primary drinking well standards have elevated nitrate levels and are located in South County. Excluding the wells with nitrate contaminate, 99 percent of the wells would meet primary water standards (SCVWD 2013).

## 4.7.2.2    Project Site Hydrology

The approximately 33.4-acre project site is generally flat and developed with buildings, site infrastructure, parking, and landscaping.

There are three primary storm drainage systems adjacent to the project. One runs from west to east within Scott Boulevard from Montgomery Drive to the San Tomas Aquino Creek and ranges in size from 21 inches to 27 inches along the project frontage. Another runs from south to north within Octavius Drive and then extends to San Tomas Aquino Creek through private property via public easements. This system ranges in size from 15 inches to 21 inches along the project frontage. The remaining system is comprised of a network of pipes within Scott Boulevard, Bowers Avenue, Montgomery Drive and Augustine Drive. This system consists of pipes ranging in size from 18 inches to 24 inches along the

project frontage and ultimately works its way under Highway 101 to the north and then east to San Tomas Aquino Creek via a 60 inches outfall.

There is one additional existing public storm drain system in the area which runs along the southern boundary of the parcels located south of Scott Boulevard in a public easement. This system varies in size from 24 inches to 27 inches along the project frontage and runs from east to west and ultimately outfalls into San Tomas Aquino Creek.

The project site is located within Flood Zone X (areas outside of the 100-year flood hazard area) and no portion of the site is within a Flood Insurance Rate Map designated 100-year flood zone. The San Tomas Aquino channel is identified as a flood zone.

The project site is within the dam failure inundation area for Lenihan Dam, but is not within any of the other dam inundation areas (SCVWD 1995). The project site is also outside of the sea level rise inundation zones (NOAA 2015).

## 4.7.2.3    Project Site Soils and Groundwater

Surface soils on the project site are classified by National Resources Conservation Service (NRCS) as Urban Land, 0 to 2 percent slope, which is defined as land mostly covered by development (NRCS 2013). Based on the City of Santa Clara General Plan, the soils on the project site are somewhat poor to poorly drained. Water permeability through the soil is generally very slow and soil erosion hazard is low. The project site area is within a liquefaction hazard area as defined in the Santa Clara General Plan (CSC 2011b).

Based on the geotechnical investigation of the project site, the upper 7 to 18 feet of native materials on the project site consist of stiff to hard clay. Medium stiff to stiff clay and sandy clay were encountered below the upper clay layer. This second layer is approximately 12 to 27 feet thick and has interbedded layers of loose to medium dense sand, silty sand and clayey sand from approximately one to seven feet in thickness. Below this second layer are stiff to very stiff clay with interbedded layers of sand and gravel to the maximum depths explored of 100 feet (Langan Treadwell Rollo 2015).

The vicinity around the project site is underlain by two aquifers, designated as A-aquifer and B-aquifer. The A-aquifer generally extends approximately between 10 to 20 feet below ground surface (bgs) and the B-aquifer extends approximately between 30 to 50 feet bgs. Silty to sandy clays, ranging from 5 to 10 feet thick separates the two aquifers (Langan Treadwell Rollo 2015).

## 4.7.3    REGULATORY SETTING

This section describes the federal, state, and local regulatory context to be considered for the proposed project, and addresses hydrology and water quality concerns, including development strategies, stormwater pollution prevention plans, and stormwater management practices.

### 4.7.3.1    Federal and State Regulations

*Federal Pollution Control Act*

The Federal Pollution Control Act, commonly known as the Clean Water Act (CWA), was originally enacted in 1948. The primary purpose of this Act is restoring and maintaining the chemical, physical, and biological integrity of the nation's water in order to achieve a level of water quality that provides for recreation in and on the water and the propagation of fish and wildlife. Section 208 of the CWA and the requirements of the Code of Federal Regulations require local water management plans. Preparation of these water management plans has been delegated to the individual states by the United States Environmental Protection Agency (US EPA), which is charged with implementing the CWA.

The project site is located within the southern portion of the 2.9-million-acre San Francisco Bay Basin, which is governed by the San Francisco Bay Regional Water Quality Control Board (RWQCB), also known as Region 2. San Francisco Bay RWQCB manages water quality within the region through the Water Quality Control Plan (WQCP or the Basin Plan), the master water quality control planning document for the San Francisco Bay RWQCB. The Basin Plan designates beneficial uses and water quality objectives for waters of the state and includes programs to achieve water quality objectives. Objectives for 22 water quality parameters such as bacteria levels and dissolved oxygen are included in the Basin Plan.

The San Francisco Bay RWQCB implements the Basin Plan by issuing and enforcing waste discharge requirements for appropriate persons and groups; these can include individuals, communities, or businesses whose waste discharges may affect water quality. These requirements can be either State Waste Discharge Requirements for discharge to land, or federally delegated National Pollutant Discharge Elimination System (NPDES) permits for discharges to surface water. Dischargers are required to meet water quality objectives and, thus, protect beneficial uses.

The State of California is required by Section 303(d) of the CWA to provide the US EPA with a list of water bodies considered by the state to be impaired (i.e., not meeting water quality standards and not supporting their beneficial uses). San Tomas Aquino Creek is not included on the 2010 Section 303(d) list of impaired water bodies, which is the most recent list of impaired water bodies published by the SWRCB. However, the area of the San Francisco Bay that receives stormwater runoff from the project site,

San Francisco Bay, South, is included on the 2010 Section 303(d) list for several contaminants, including pesticides, metals, exotic species, and polychlorinated biphenyls (PCBs) (SWRCB 2010).

## California Porter-Cologne Act

The California Porter-Cologne Act of 1970 is largely responsible for creating the state's extensive regulatory program for water pollution control. Pursuant to this act, the responsibility for protection of water quality in California rests with the State Water Resources Control Board (SWRCB). The SWRCB in turn has delegated the regulation of the nine hydrologic basins to nine Regional Water Quality Control Boards. The Porter-Cologne Act gives the SWRCB and Regional Water Quality Control Boards broad powers to protect water quality by regulating waste discharges to water and land and by requiring cleanup of hazardous conditions.

The SWRCB provides oversight and coordination while the Regional Boards guide and regulate water quality in streams and aquifers through development of WQCPs or Basin Plans. As noted above, the project site drains to waters regulated by the Region 2 (San Francisco Bay) Basin Plan, which was approved in 1995 and updated in 2011. The latest version of the Basin Plan is effective as of December 31, 2011.

## National Pollutant Discharge Elimination System

The US EPA has delegated management of California's NPDES program to the SWRCB and the nine regional board offices. The NPDES program was established in 1972 to regulate the quality of effluent discharged from easily detected point sources of pollution such as wastewater treatment plants and industrial discharges. The 1987 amendments to the CWA [Section 402(p)] recognized the need to address nonpoint-source storm water runoff pollution and expanded the NPDES program to operators of municipal separate storm sewer systems (MS4s), construction projects, and industrial facilities.

### Construction

The SWRCB administers the NPDES General Permit for Discharges of Stormwater Runoff Associated with Construction Activity (General Construction Permit). A notice of intent must be submitted to the SWRCB prior to the beginning of construction for projects disturbing 1 acre or more of land to be covered under the General Construction Permit. The General Construction Permit requires that a Stormwater Pollution Prevention Plan (SWPPP) be developed, identifying potential sources of pollution and specifying runoff controls during construction for the purpose of minimizing the discharge of pollutants in storm water from the construction area. In addition, the SWPPP must identify post-construction control measures and a monitoring plan.

**Municipal**

The City of Santa Clara is a participating agency, or co-permittee, to the Santa Clara Valley Urban Runoff Pollution Prevention Program (SCVURPPP). The SCVURPPP is designed to reduce pollution discharged into the South San Francisco Bay to the maximum extent practicable and includes regulatory, monitoring, and outreach measures. Since the first five-year permit was issued by the San Francisco Bay RWQCB in 1990, the SCVURPPP has successively implemented a series of comprehensive stormwater management plans for urban runoff management meeting regional board standards. When the permit was renewed in 2001, the San Francisco Bay RWQCB included new design standards for runoff treatment control measures (Provision C.3) from new development and significant redevelopment. The reissued permit also required development of a Hydrograph Modification Management Plan (HMMP) to manage increased peak runoff flows and volumes (hydromodification) and avoid erosion of stream channels and degradation of water quality caused by new and redevelopment projects (Provision C.3.f).

In 2009, the San Francisco Bay RWQCB issued a regional NPDES permit (NPDES Permit Order R2-2009-0074, NPDES Permit No. CAS612008) for storm water consolidating requirements for all Bay Area municipalities and flood control agencies that discharge directly to San Francisco Bay. Under the Municipal Regional Stormwater NPDES Permit (MRP), development projects that create, add, or replace 10,000 square feet or more of impervious surfaces must (1) include stormwater treatment measures; (2) ensure that the treatment measures be designed to meet hydraulic sizing design criteria as required in Provision C.3 of the MRP; and (3) ensure that stormwater treatment measures are properly installed, operated, and maintained.

In November 2011, the San Francisco Bay RWQCB amended the MRP to allow low impact development (LID) treatment reduction credits for three categories of "Smart Growth" development, specifically urban infill, high density, and transit oriented development projects, called "Special Projects." When considered at the watershed scale, such projects were recognized by the RWQCB as having inherent water quality and other environmental benefits. Special projects that are determined to be eligible for receiving LID treatment reduction credits are allowed to use specific types of non-LID treatment if the use of LID treatment is first evaluated and determined to be infeasible (SCVURPPP 2012).

### 4.7.3.2    Local Regulations

*City of Santa Clara General Plan*

The City of Santa Clara General Plan contains policies relating to stormwater management and flooding. General Plan policies relevant to the proposed project are as follows:

**Safety Policies**

**Policy 5.10.5-P11**       Require that new development meets stormwater and water management requirements in conformance with state and regional regulations.

**Policy 5.10.5-P12**       Continue to participate in the National Flood Insurance Program and encourage all property owners within flood hazard areas to carry flood insurance.

**Policy 5.10.5-P13**       Require that development complies with the Flood Damage Protection Code.

**Policy 5.10.5-P14**       Coordinate with the Federal Emergency Management Agency to ensure appropriate designation and mapping of floodplains.

**Policy 5.10.5-P15**       Require new development to minimize paved and impervious surfaces and promote on-site Best Management Practices for infiltration and retention, including grassy swales, pervious pavement, covered retention areas, bioswales, and cisterns, to reduce urban water run-off.

**Policy 5.10.5-P16**       Require new development to implement erosion and sedimentation control measures to maintain an operational drainage system, preserve drainage capacity, and protect water quality.

**Policy 5.10.5-P17**       Require that grading and other construction activities comply with the Association of Bay Area Governments' Manual of Standards for Erosion and Sediment Control Measures and with the California Stormwater Quality Association (CASQA), Stormwater Best Management Practices Handbook for Construction.

**Policy 5.10.5-P18**       Implement the Santa Clara Valley Nonpoint Source Pollution Control Program, Santa Clara Valley Urban Runoff Pollution Prevention Program and the Urban Runoff Management Plan.

## 4.7.4      IMPACTS AND MITIGATION MEASURES

## 4.7.4.1     Significance Criteria

In accordance with Appendix G of the *California Environmental Quality Act (CEQA) Guidelines*, the impact of the proposed project on hydrology and water quality would be considered significant if it would:

- violate any water quality standards or waste discharge requirements;

- substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table level;

- substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner that would result in substantial erosion or siltation on-site or off-site;

- substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner that would result in flooding on-site or off-site;

- create or contribute runoff water that would exceed the capacity of existing or planned stormwater drainage systems, or provide substantial additional sources of polluted runoff;

- otherwise substantially degrade water quality;

- place housing within a 100-year flood hazard area as mapped on a federal Flood Hazard Boundary or Flood Insurance Rate Map or other flood hazard delineation map;

- place within a 100-year flood hazard area structures that would impede or redirect flood flows; or

- expose people or structures to a significant risk of loss, injury, or death involving flooding, including flooding as a result of the failure of a levee or dam or inundation by seiche, tsunami, or mudflow.

### 4.7.4.2    Methodology

The potential impacts from construction and occupancy of the proposed project on hydrology and water quality were assessed quantitatively by making a comparison between the existing development and the proposed project. The assessment evaluates whether the proposed project could result in an adverse change in hydrologic conditions that could result in on- or off-site flooding or increase the discharge of urban runoff pollutants into receiving waters.

### 4.7.4.3    Project Impacts and Mitigation Measures

**Impact HYDRO-1:**    **The proposed project would not result in the discharge of storm water that would violate water quality standards or otherwise substantially degrade water quality. (*Less than Significant*)**

The greatest potential sources of surface water pollutants associated with the proposed project would be construction-phase erosion of the project site and urban runoff pollutants generated from impervious surfaces on-site following the completion of construction. Potential for water quality impacts during project construction and occupancy are evaluated below.

## Construction Phase Runoff

Project construction would involve the disturbance of the 33.4-acre project site. Proposed construction and grading activities would include demolition of existing structures, removal of asphalt, site grading, and the operation of heavy equipment. Although the project site is essentially flat and the potential for soil erosion is considered to be low, peak storm water runoff could result in short-term sheet erosion within areas of exposed or stockpiled soils. Furthermore, the compaction of soils by heavy equipment may reduce the infiltration capacity of soils and increase runoff and erosion potential. Given the above, pollutants such as soil, sediments, and other substances associated with construction activities (e.g., oil, gasoline, grease, and surface litter) could enter the local storm drain system.

As discussed above, projects that would disturb areas of 1 acre or more during construction are required to comply with the state's NPDES General Permit for Discharges of Storm Water Associated with Construction Activity (Construction General Permit). The project construction contractor would be required to file a notice of intent to obtain coverage under the Construction General Permit. This permit requires that a SWPPP be prepared that would include appropriate erosion control measures. In addition, the SWPPP would require that if any spills of materials known to be water pollutants or hazardous materials do occur, the proper agencies would be contacted immediately (if necessary) and appropriate cleanup of the spill would take place as soon as possible. Erosion control measures that would be implemented during site grading and construction would include the use of straw hay bales, straw bale inlet filters, filter barriers, and silt fences. The proposed project would be also required to comply with the City Storm Drains and Discharges ordinance and incorporate the BMPs outlined in the California Stormwater Quality Association (CASQA) *Stormwater Best Management Practices for Construction*. The SWPPP would be submitted to the City of Santa Clara Building Inspection Division for approval prior to issuance of a grading permit. Adherence to the requirements described above would ensure that the construction of the proposed project would not discharge storm water that would violate water quality standards or substantially degrade surface water quality. Given the above, the implementation of the proposed project would have a less than significant short-term impact on water quality during construction.

## Operational Phase Runoff

During project occupancy, potential impacts on surface water quality would be less than the impacts on surface water quality under existing conditions. There are approximately 26.8 acres of impervious surfaces currently on the project site. After development of the proposed project, impervious surfaces on the project site would total about 23.9 acres, which represents net decrease in impervious surfaces of 2.9

acres, an 11 percent decrease in impervious surfaces below current conditions (CEA 2015). Therefore the total volume of runoff from the project site is expected to decrease compared to existing conditions.

The quality of runoff from the project site would generally be similar to the runoff under existing conditions and typical of developed urban areas, where a variety of activities contribute pollutants such as petroleum products, coliform bacteria, nitrogen, phosphorus, heavy metals, pesticides, herbicides, and byproducts of pavement wear. However, under the MRP, development projects that create, add, or replace 10,000 square feet or more of impervious surfaces must: (1) include storm water treatment measures; (2) ensure that the treatment measures are designed to meet hydraulic sizing design criteria as required in Provision C.3 of the MRP; and (3) ensure that storm water treatment measures are properly installed, operated, and maintained. The project is required by law to comply with the MRP and would include a system of distributed biotreatment areas to treat runoff from the project site before it is discharged into the storm drains and eventually into San Tomas Aquino Creek. All runoff from impervious areas would be routed a series of bioretention areas for treatment prior to discharge into the public storm water system. Bioretention areas, or "rain gardens," function as soil and plant-based filtration devices that remove pollutants through a variety of physical, biological, and chemical treatment processes, and are recommended by the Regional Water Quality Control Board for use in urban areas. With the incorporation of these storm water treatment systems, the quality of runoff that is discharged from the project site would not violate water quality standards or substantially degrade surface water quality. The proposed project would result in a less than significant impact on surface water quality.

Urban runoff is not subject to waste discharge requirements. No wastewater would be discharged directly from the project site into receiving waters. The wastewater generated on the project site following project occupancy would be collected and conveyed to the San Jose/Santa Clara Water Pollution Control Plant (WPCP) for treatment. The wastewater flows from the project site would be similar to flows generated by mixed use projects and would not have any specific characteristics or qualities that would not be treatable at the WPCP. In addition, as noted under **Impact UTL-3**, the additional wastewater discharged to the WPCP by the proposed project would not exceed the capacity of the treatment plant. Given this, the proposed project would not result in wastewater flows that would cause the WPCP to exceed the wastewater treatment requirements imposed on the facility by the San Francisco Bay Regional Water Quality Control Board. The impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

———————————

**Impact HYDRO-2:**   **The proposed project would not substantially deplete groundwater supplies, interfere substantially with groundwater recharge, or affect groundwater quality. (***Less than Significant***)**

Implementation of the proposed project would increase the amount of potable water used on the project site. When accounting for historic water use at the site and projected uses of the project site, the potable water demand on the project site would increase by approximately 169.6 acre-feet per year (afy) with the proposed project. As discussed in **Section 4.12, Utilities and Service Systems, including Energy**, the City has prepared a water supply assessment (WSA) for the proposed project which shows that the increase in water demand due to the proposed project, in conjunction with the projected demand by other development in the City, would be adequately served by the available supply.

Groundwater is one of the City of Santa Clara's main sources of water and the City pumps groundwater from the Santa Clara subbasin. As the water demand associated with the proposed planned projects is well within the demand projections included in the CSC 2010 UWMP, and would not exceed previous estimates, the City is expected to withdraw groundwater at rates indicated in its CSC 2010 UWMP. Groundwater is not expected to be pumped at a higher rate to serve the proposed project and other planned growth. Furthermore, the Santa Clara Valley Water District (SCVWD) actively manages the groundwater subbasin. The SCVWD monitors the quality, supply, and management of the local groundwater basin as summarized in Appendix E, District Groundwater Management Plan 2001 of the 2010 SCVWD UWMP. This plan protects groundwater quality, monitors the groundwater extraction, and promotes groundwater recharge to ensure that groundwater does not exceed the annual 200,000 acre-feet withdrawal limit for the basin. The allowable withdrawal or safe yield of groundwater by the City of Santa Clara is determined based on several factors including: withdrawals by other water agencies, quantity of water recharged and the carryover storage from the previous year. The SCVWD currently uses projected supply, carryover capacity, and anticipated demand to predict potential water shortages (CSC 2011a).

According to the SCVWD, the subbasin has a safe yield of approximately 200,000 afy. The demand for groundwater in 2035 is projected to be 167,290 afy, including anticipated growth in the region such as the proposed project, which is 16 percent less than the safe yield of the subbasin (SCVWD 2010). As a result, the proposed project would not substantially deplete groundwater supplies.

Natural recharge in the basin occurs principally as infiltration from streambeds that flow from the upland areas within the drainage basin and from direct percolation of precipitation that falls on the basin floor (DWR 2003). In addition, the recharge area for the potable water aquifer used by the City of Santa Clara is a very small portion of the southwest corner of the City. The project site is not located within the 26 acres

used for recharge (CSC 2011b). There are approximately 26.8 acres of impervious surfaces currently on the project site. After development of the proposed project, impervious surfaces on the project site would total about 23.9 acres, which represents an 11 percent decrease below current conditions (CEA 2015). The proposed project will therefore not interfere with, and may instead improve groundwater recharge. The impact would be less than significant.

Groundwater quality impacts generally occur when leaks or spills of hazardous materials occur at industrial facilities or other land uses that store and use hazardous materials. The proposed project includes residential land uses and some commercial uses that would not use or store the types or volumes of hazardous materials that would pose the risk of groundwater contamination. Therefore, the impact to groundwater quality would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HYDRO-3:** **The proposed project would not substantially alter the existing drainage pattern of the site or area in a manner that would result in substantial erosion, siltation, or flooding on- or off-site, nor result in runoff, which would exceed the capacity of existing or planned stormwater drainage systems. (*Less than Significant*)**

As discussed above, there are three primary storm drainage systems adjacent to the project that are located in existing street right of ways and drain into San Tomas Aquino Creek to the east and northeast of the project site. Drainage on the project site would be designed and constructed in accordance with the current CBC, and all site drainage would be routed to the City's storm drain system, which also serves the surrounding area. This system is designed to accommodate existing and future flows from the project site and the surrounding area. Furthermore, as discussed above, the proposed project would result in a reduction in impervious surfaces on the project site. Due to the reduction in impervious surfaces and the incorporation of biotreatment areas, the post-development site runoff would be slightly reduced. As the volume and rate of runoff from the project site would not increase compared to existing conditions, the project would not result in runoff that exceeds the capacity of existing or planned stormwater drainage systems.

As there would not be an increase in the volume and rate of site runoff, stormwater runoff from the project site would not result in significant erosion or siltation on- or off-site, nor would it result in flooding. This impact is considered less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HYDRO-4:** **The proposed project would not place housing within a 100-year flood hazard area or place structures within a 100-year flood hazard area that could redirect flood flows. (*No Impact*)**

The project site is not located within a 100-year flood zone. The project site is located in Flood Zone X, which is an area outside the 500-year floodplain (FEMA 2009). As a result, implementation of the proposed project would not place housing or structures within a flood hazard area. There would be no impact.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HYDRO-5:** **The proposed project would not expose people or structures to a significant risk involving flooding due to the failure of a levee or dam. (*Less than Significant*)**

The project site is within the dam failure inundation area for Lenihan Dam (SCVWD 1995). The project site is located at the very edge of the inundation area with the assumption that the Lexington reservoir is at maximum capacity. Regardless, there is a potential risk to the structures and associated people proposed for the project site. However, the SCVWD maintains vigilant monitoring, inspection, and maintenance of all their dams including Lenihan Dam. Additionally, SCVWD maintains proper emergency response programs to respond post-earthquake for dam monitoring and for potential inundation events. Due to the safety precautions and unlikelihood of dam failure, the impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

**Impact HYDRO-6:** **The proposed project would not expose people or structures to a significant risk involving flooding due to inundation of the site by seiche, tsunami, or mudflow. (*No Impact*)**

The project site is located approximately 23 miles east of the Pacific Ocean and about 4 miles south of San Francisco Bay. As a result, the project site is not located close to a large body of water, tidal or otherwise,

that could result in inundation by seiche or tsunami. In addition, the project site is essentially flat, and therefore would not be subject to mudflow. No impact would occur.

**Mitigation Measures**: No mitigation measures are required.

---

## 4.7.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact HYDRO-1: The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in a significant cumulative impact related to hydrology and water quality. (*Less than Significant*)**

As discussed under **Impact HYDRO-1** above, the redevelopment of the proposed project site would generate a smaller volume of runoff than under existing conditions because of the decrease in impervious surfaces on the project site as a result of the proposed project as well as from the incorporation of biotreatment areas. Cumulative projects are listed in **Tables 4.0-1** and **4.0-2.** The majority of development in the project vicinity and in the rest of the City of Santa Clara is expected to consist of redevelopment of existing developed properties. Furthermore, new development and redevelopment in the City would be required to comply with Provision C.3 of the MRP which requires implementation of LID measures to minimize the generation of additional runoff. Therefore overall, runoff is not expected to increase and may in fact decrease. All projects are also required to comply with the policies in the City of Santa Clara General Plan. According to the General Plan Policy 5.10.5-P15, the City requires new development to minimize paved and impervious surfaces and promote on-site Best Management Practices for infiltration and retention, including grassy swales, pervious pavement, covered retention areas, bioswales, and cisterns, to reduce urban water run-off. Policy 5.10.5-P16 requires new development to implement erosion and sedimentation control measures to maintain an operational drainage system, preserve drainage capacity, and protect water quality. Therefore, the changes in runoff in the City as a result of cumulative development are unlikely to result in erosion and sedimentation effects or flooding in the creeks that receive the runoff discharged by City storm drains. In addition, for the reasons presented above, the proposed project, in conjunction with other approved and proposed projects would not result in a significant cumulative impact on groundwater resources through reduced recharge.

All new development, including the proposed project, would be required to comply with the conditions of the MRP to avoid adverse effects on water quality. The permit requires all new development to incorporate design measures and controls that would improve the quality of stormwater that is discharged into the storm drain system. As a result, future runoff from new or redeveloped sites is

expected to have improved water quality compared to the runoff from existing development. Therefore, the proposed project, in conjunction with other approved and proposed projects, would not result in a significant cumulative impact on surface water quality.

Cumulative projects, including the proposed project, would be supplied potable water by CSC which relies on a combination of surface and groundwater sources for water supply, with approximately half of the water used in the City obtained from groundwater wells. The quality, supply, and management of the local groundwater basin is monitored by the SCVWD and summarized in Appendix E, District Groundwater Management Plan 2001 of the 2010 SCVWD UWMP. This plan protects groundwater quality, monitors groundwater extraction, and promotes groundwater recharge to ensure that groundwater does not exceed the annual 200,000 acre-feet withdrawal limit. Furthermore, the City's UWMP and SCVWD UWMP have projected potable water demand and supply though 2035 (see **Section 4.12, Utilities and Service Systems, including Energy**). According to these projections and as evaluated in **Impact HYDRO-2** above, the City has enough supply to meet the projected demand without causing a depletion of groundwater resources. Therefore, cumulative development would not result in a significant cumulative impact on the Santa Clara Valley subbasin.

Furthermore each cumulative project has been or will be subject to environmental review and if significant impacts are identified, mitigation measures would be implemented to avoid or reduce the impacts. According to the City's General Plan EIR, General Plan policies would minimize effects from future projects to storm drain systems, to water quality from storm water runoff, and groundwater recharge, and the cumulative impact would be less than significant (CSC 2011b).

**Mitigation Measures**: No mitigation measures are required.

---

### 4.7.5     REFERENCES

California Department of Water Resources (DWR). 2003. *California's Groundwater - Bulletin 118, Update 2003*.

City of Santa Clara (CSC). 2011a. 2010 Urban Water Management Plan. May.

CSC. 2011b. Integrated Final EIR 2010-2035 General Plan for City of Santa Clara. 2011.

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan*. Adopted November 2010, last amended December 2014.

CSC. 2015. *Santa Clara Square Apartments Water Supply Assessment for Compliance with California Water Code Section 10910.* August.

Civil Engineering Associates (CEA). 2015. *Santa Clara Square Apartments EIR Hydrology Study*. May 28.

Langan Treadwell Rollo. 2015. *Geotechnical Investigation Santa Clara Square*. July 24.

Federal Emergency Management Agency (FEMA). 2009. Flood Insurance Rate Map No. 06085C0063H for Santa Clara County, California. May 18.

National Oceanic and Atmospheric Administration (NOAA). 2015. Sea Level Rise and Coastal Flooding Impacts. http://coast.noaa.gov/slr/. Accessed June 11, 2015.

National Resources Conservation Service (NRCS). 2013. Web Soil Survey National Cooperative Soil Survey. November.

San Francisco Bay Conservation and Development Commission (BCDC). 2007. San Francisco Bay Plan.

Santa Clara County Urban Runoff Pollution Prevention Program (SCVURPPP). 2012. C.3 Stormwater Handbook.

Santa Clara Valley Water District (SCVWD). 1995. Inundation Map of Lexington Dam Sheet 4 of 4. March.

Santa Clara Valley Water District (SCVWD). 2011. 2010 Urban Water Management Plan. July.

Santa Clara Valley Water District (SCVWD). 2013. Annual Groundwater Report for Calendar Year 2013.

Santa Clara Valley Water District (SCVWD). 2015a. Watershed Information. http://www.valleywater.org/Services/WatershedInformation.aspx.

Santa Clara Valley Water District (SCVWD). 2015b. September 2015 Groundwater Conditions Report http://www.valleywater.org/Services/GroundwaterMonitoring.aspx.

State Water Resources Control Board (SWRCB). 2010. 2010 Integrated Report (Clean Water Act Section 303(d) List/305(b) Report. http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml.

# 4.8   LAND USE AND PLANNING

## 4.8.1     INTRODUCTION

This section addresses the land use impacts of the proposed project, focusing in particular on the consistency of the proposed project with applicable local and regional land use policies. The proposed project is subject to the City's General Plan, the City's Climate Action Plan, and several regional plans, including the Plan Bay Area.

## 4.8.2     ENVIRONMENTAL SETTING

### 4.8.2.1    Existing Land Use

The 33.4-acre project site consists of five parcels of land (APNs 216-45-022, 216-45-023, 216-45-024, 216-29-112, and 216-29-053) and portions of two other parcels (APNs 216-45-011 and 216-45-028). Three of the five full parcels and the two partial parcels are located to the north of Scott Boulevard and the remaining two full parcels are located to the south of Scott Boulevard.

The project site is developed with approximately 13 one- and two-story buildings (some buildings are connected), internal roadways, parking lots, and landscaping. The total existing building space among the existing buildings on the project site is approximately 419,405 square feet. There is a one-story building with associated parking lots located to the north of Scott Boulevard adjacent to San Tomas Aquino Creek. A cluster of seven one-story buildings with associated parking lots are bounded by Montgomery Drive to the west and Octavius Drive to the east. Three one-story buildings and parking lots are located to the west of Montgomery Drive. A two-story building and a one-story building are located to the south of Scott Boulevard adjacent to San Tomas Aquino Creek. Surface parking surrounds all of the buildings. The parking lots and buildings are flanked by mature trees and landscaping consisting of irrigated lawn, ground cover, and shrubs. A number of businesses currently occupy the project site.

### 4.8.2.2    Existing Adjacent Land Uses

The area surrounding the project site is fully developed and consists primarily of light industrial and commercial office uses. New office buildings are currently under construction directly to the north. Commercial office and light industrial businesses are located to the east across San Tomas Aquino Trail Creek and directly to the west and south. Other land uses within less than one mile of the project site include Mission College and a single-family residential neighborhood to the northwest across US Highway 101, a single-family residential neighborhood to the northeast across US Highway 101, and a single-family neighborhood to the south on the other side of the Caltrain corridor.

### 4.8.2.3    Existing Land Use Designations and Zoning

The City of Santa Clara General Plan includes phases that are intended to direct short, mid, and long term growth in the City. Phase I was completed at the end of 2014. The time frame of Phase II is anticipated to extend from 2015 to 2023 while Phase III is expected to occur from 2023 to 2035. The timing of the phases is generally aligned with the housing element update cycles, which are mandated by the State (CSC 2010). The five full project parcels are designated Light Industrial in the City's General Plan Phase I and Phase II, and High Density Residential in Phase III. These parcels are currently zoned Light Industrial (ML) on the City's Zoning Map. The two partial parcels are designated Community Commercial in the City's General Plan under all phases and are zoned Planned Development (PD) ("Retail Center") per Resolution 14-8148.

### 4.8.2.4    Adjacent Land Use Designation and Zoning

Parcels to the north of the project site are designated Light Industrial in the City's General Plan Phase I and Phase II, and High Density Residential in Phase III while parcels to the east of the project site across San Tomas Aquino Creek Trail are designated Low Intensity Office/R&D and High Intensity Office/R&D in the City's General Plan under all phases. Parcels to the south of the project site are designated Light Industrial, Low Intensity Office/R&D and High Intensity/R&D in the City's General Plan Phase I and Phase II, and High Density Residential, Low Intensity Office/R&D and High Intensity/R&D in Phase III. Parcels to the west of the project site are designated High Intensity Office/R&D in the City's General Plan under all phases. Parcels to the north, south and east are zoned Light Industrial (ML) on the City's Zoning Map. Parcels to the west are zoned Planned Development (PD) ("Retail Center") per Resolution 14-8148.

### 4.8.3    REGULATORY SETTING

### 4.8.3.1    Regional Plans

*Plan Bay Area*

In July 2013, the Association of Bay Area Governments (ABAG) and the Metropolitan Transportation Commission (MTC) adopted Plan Bay Area (Plan), which includes the region's Sustainable Communities Strategy (SCS) and the 2040 Regional Transportation Plan (RTP). This is the nine-county region's first long-range plan to meet the requirements of Senate Bill 375, which calls on each of the state's 18 metropolitan areas to develop a SCS to accommodate future population growth and reduce greenhouse gas emissions from cars and light trucks.

The Jobs-Housing Connection Strategy of the Plan Bay Area "serves as the land-use element of the Draft Preferred Scenario" for the plan. The Jobs-Housing Connection Strategy creates a series of land use classifications for the Bay Area region which provide density, scale, and character "guidelines" for select areas and corridors within each county. For high intensity, medium intensity, and moderate intensity areas, the density, scale, and character guidelines are established as regional policy (ABAG 2013).

However, unlike General Plan land use designations, only certain areas within each county are classified and given land use guidelines. These select classified portions, which together comprise the Jobs-Housing Connection Strategy's land use growth pattern, are "shaped" by "locally selected Priority Development Areas (PDAs), the region's core transit network, the Bay Area's network of open spaces and conservation land including Priority Conservation Areas (PCAs), and opportunities to increase access to job centers." PDAs are areas nominated by local jurisdictions as appropriate places to concentrate future growth because they are "served by transit supported by local plans to provide a wider range of housing options along with amenities and services to meet the day-to-day needs of residents in a pedestrian-friendly environment" (ABAG 2013).

## Bay Area 2010 Clean Air Plan

The Bay Area Air Quality Management District (BAAQMD) is the regional agency that regulates sources of air pollutants within the nine-county Bay Area region. The BAAQMD prepares clean air plans as required under state and federal law. The Bay Area 2010 Clean Air Plan (CAP), which is the latest CAP for the Bay Area, provides a comprehensive plan to improve Bay Area air quality and protect public health. The 2010 CAP defines a control strategy that the District and its partners will implement to: (1) reduce emissions and decrease ambient concentrations of harmful pollutants; (2) safeguard public health by reducing exposure to air pollutants that pose the greatest health risk, with an emphasis on protecting the communities most heavily impacted by air pollution; and (3) reduce greenhouse gas emissions to protect global climate.

## Santa Clara County Congestion Management Program

The Valley Transportation Authority (VTA) oversees the Santa Clara County Congestion Management Program (CMP), which was last updated in October 2013. State legislation requires that all urbanized counties in California prepare a CMP to obtain each county's share of gas tax revenue. The CMP legislation requires that each CMP contain five mandatory elements: (1) a system definition and traffic Level of Service (LOS) standard element; (2) a multimodal performance measures element; (3) a transportation demand management and trip reduction element; (4) a land use impact analysis program element; and (5) a capital improvement program element. In addition to these mandated

elements, the Santa Clara County CMP includes three additional elements: a countywide transportation model and data base element, an annual monitoring and conformance element, and multimodal improvement plan element.

## San Francisco Bay Regional Water Quality Control Plan

The San Francisco Regional Water Quality Control Board (San Francisco RWQCB) regulates water quality in the San Francisco Bay Area region. The San Francisco RWQCB regulates surface water quality in the Bay Area via the Regional Water Quality Control Plan (Basin Plan), which was last amended in March 2015. The Basin Plan lists the beneficial uses which the San Francisco RWQCB has identified for local aquifers, streams, marshes, rivers, and the Bay, as well as water quality objectives, and criteria that must be met to protect these uses. The San Francisco RWQCB implements the Basin Plan by issuing and enforcing waste discharge requirements to control water quality and protect beneficial uses. These can include permits for "point sources" such as wastewater treatment plants or "non-point sources" such as the urban runoff discharged by a City's stormwater drainage system.

### 4.8.3.2    Local Plans

## City of Santa Clara 2010-2035 General Plan

The City of Santa Clara 2010–2035 General Plan was most recently updated in December 2014. The General Plan is primarily a policy document that sets goals and policies concerning the community and gives direction to growth and development. In particular, the General Plan includes goals and policies for land use, community design, circulation, housing, public facilities, open space, recreation, conservation, noise, seismic and safety, sustainability, and historic preservation. These policies are designed to direct new development and redevelopment so that it meets City standards and is consistent with City goals. The City of Santa Clara is a charter city under California law, and is generally exempt from the requirement that its land use and development decisions be consistent with its General Plan.

## City of Santa Clara Climate Action Plan

The City of Santa Clara prepared and adopted a Climate Action Plan (CAP) on December 3, 2013. The Santa Clara CAP establishes goals and emissions reduction measures that the City will implement to achieve the state-recommended GHG emissions reduction target of 15 percent below 2008 levels by the year 2020. Additional information on the Santa Clara CAP is presented in **Section 4.5, Greenhouse Gas Emissions**.

### City of Santa Zoning Ordinance

The City of Santa Clara's Zoning Ordinance is Title 18 of the Code of the City of Santa Clara. The Zoning Map for the City of Santa Clara outlines specific zoning districts for residential, commercial, industrial, and mixed uses. The Zoning Ordinance provides specific regulations governing permitted uses, lot areas, lot widths, yards, building heights, and other important features to guide development within the zoning districts.

## 4.8.4     IMPACTS AND MITIGATION MEASURES

### 4.8.4.1     Standards of Significance

In accordance with Appendix G of the *California Environmental Quality Act (CEQA) Guidelines*, the impact of the proposed project related to land use and planning would be considered significant if it would:

- physically divide an established community;

- conflict with any applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect; or

- conflict with any applicable habitat conservation plan or natural community conservation plan.

### 4.8.4.2     Methodology

To determine the potential for the proposed project to result in conflicts with an applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect, the proposed project's consistency with the plan's goals and policies was evaluated.

### 4.8.4.3     Project Impacts and Mitigation Measures

**Impact LU-1:**          **The proposed project would not physically divide an established community. (***No Impact***)**

The proposed project would involve the construction of a new residential and commercial mixed-use development on a site that is currently developed with office buildings. Because it would be located entirely within an infill site surrounded by office and light industrial buildings, the proposed project would not divide an established community. No impact would occur.

**Mitigation Measures**: No mitigation measures are required.

| Impact LU-2: | **The proposed project would conflict with an applicable land use plan, policy, or regulation of an agency with jurisdiction over the project adopted for the purpose of avoiding or mitigating an environmental effect. (*Significant; Significant and Unavoidable)*** |
|---|---|

## *City of Santa Clara General Plan*

### Consistency with the General Plan Land Use Designation

As noted above, the City's General Plan includes phases that are intended to direct short, mid, and long term growth in the City. Phase I was completed at the end of 2014. The time frame of Phase II is anticipated to extend from 2015 to 2023 while Phase III is expected to occur from 2023 to 2035. As noted above, the project site is composed of five full parcels and two partial parcels. The five full project parcels (APN 216-45-022; 216-45-023; 216-45-024; 216-29-112; and 216-29-053) are designated Light Industrial in the City's General Plan Phase I and Phase II, and High Density Residential in Phase III. The two partial parcels are currently designated Community Commercial for Phase I through Phase III.

The project applicant is requesting a General Plan Amendment (GPA) to change the land use designations for all project site parcels and ensure the proposed project is consistent with the City's General Plan land use designation. With the purpose of allowing the establishment of a mixed use development that includes both residential and retail uses, the applicant is requesting that the land use designation of three parcels be changed to Regional Mixed Use, and the remaining four parcels be changed to High Density Residential. The existing and future GP designations of each of the project parcels as well as the proposed land use designations are shown in **Table 4.8-1.**

**Table 4.8-1**
**Project Site Land Use Designations**

| | City of Santa Clara 2010-2035 General Plan | | | |
|---|---|---|---|---|
| Parcel (APN) | Phase I: 2010-2015 | Phase II: 2015-2023 | Phase III: 2023-2035 | Proposed Designation |
| 216-45-011* | Community Commercial | Community Commercial | Community Commercial | Regional Mixed Use |
| 216-45-028* | Community Commercial | Community Commercial | Community Commercial | Regional Mixed Use |
| 216-45-022 | Light Industrial | Light Industrial | High Density Residential | Regional Mixed Use |
| 216-45-023 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |

| | | | High Density Residential | |
|---|---|---|---|---|
| 216-45-024 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |
| 216-29-112 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |
| 216-29-053 | Light Industrial | Light Industrial | High Density Residential | High Density Residential |

*Source: City of Santa Clara 2010. Irvine Company 2015.*

*\* indicates a partial parcel*

*[1] Note that the land use designation of APNs 216-45-011 and 216-45-028 was changed to Community Commercial per resolution 14-8148. This change is not reflected in the General Plan land use maps.*

Regional Mixed Use designation in the City's General Plan is intended for high-intensity, mixed-use development along major transportation corridors in the City and permits all types of retail, local serving offices, hotel, and service uses, except for auto-oriented uses, to meet local and regional needs. Residential development of 37 to 50 units per gross acre and a minimum FAR of 0.15 for commercial uses are required. Site frontage along major streets (arterials or collectors) is required to have active, commercial uses. The proposed project would develop three parcels (APN 216-45-022 and portions of APN 216-45-011 and APN 216-45-028 with a total area of 7.2 acres) with 40,000 square feet of retail which yields a FAR of 0.13, and 354 residential units which yields a residential density of 49 du/acre. Although the proposed residential density would be consistent with the allowed residential density of 37 to 50 du/acre under the Regional Mixed Use designation, the proposed commercial intensity would be lower than the minimum FAR of 0.15 prescribed under the Regional Mixed Use designation. The General Plan Policy 5.5.1-P7 allows a 10 percent reduction in the minimum allowed non-residential square footage for new mixed use projects with exemplary design that provide appropriate transition to existing neighborhoods, as does the proposed project. However, the commercial intensity for these parcels would still be lower than the minimum adjusted FAR of 0.1425, and therefore the project would not be consistent with the intensity allowed under the proposed land use designation.

The remaining four parcels (APN 216-45-023, 216-45-024, 216-29-112, and 216-29-053 with a total area of 26.3 acres) would be developed with 1,446 residential units. The current General Plan Light Industrial land use designation of these four parcels would need to be revised to High Density Residential to be compatible with the proposed residential land uses. The General Plan envisions that these parcels would remain in light industrial use through Phase II (i.e., through 2023) and transition to High Density Residential after that year. However, the proposed project which will be fully occupied by 2020, proposes to change the land use on these parcels to high density residential approximately 3 years ahead of the General Plan schedule. This creates what may be perceived as an inconsistency with the General Plan

The project proposes a residential density of approximately 55 du/ac on these four parcels, which is higher than the maximum allowed residential density of 50 du/ac under the High Density Residential

designation. General Plan Policy 5.5.1-P6 allows a 10 percent increase in residential density for projects proposing a minimum LEED Gold or greater equivalent, provided that the increased density and/or intensity is compatible with planned uses on neighboring properties and consistent with other applicable General Plan policies. The project is proposing a minimum LEED Gold or greater equivalent, and is compatible with planned uses on neighboring properties. As a result, the proposed project is eligible for an adjusted density of 55 du/ac, which is equal to the density proposed by the project for these parcels. For this reason, the proposed residential density for these project parcels would not conflict with the proposed land use designation.

The City of Santa Clara is a charter city under California law, and is generally exempt from the requirement that its land use and development decisions be consistent with its General Plan. CEQA, nonetheless, requires the EIR to discuss such inconsistencies. Approval of the GPA would change the existing land use designations for all project site parcels and ensure the proposed project is consistent with the City's General Plan land use designation. However as a charter city, the City may approve the project as proposed, despite the inconsistency with the minimum commercial FAR under the Regional Mixed Use land use designation, and the fact that it proposes to change land use on parcels that are not planned for residential uses until after 2023. Therefore, while there is an identified inconsistency with the General Plan land use designation with respect to the amount of proposed commercial development and an early change in land use, the proposed project would not conflict with the General Plan, and this impact would be less than significant.

**Consistency with General Plan Goals and Policies**

The proposed project is a smart growth, infill redevelopment project. The proposed project will address the City's housing needs with infill development and place housing in a portion of the City where jobs are concentrated and where more employment growth is anticipated as a result of the development of 1.8 million square feet of office space to the north of the project between Scott Boulevard and US 101, and 125,000 square feet of retail space that is approved for development to the west of the project. As a result, the residential portion of the proposed project would provide the final element needed to transform the area into a "complete" community. In addition, the proposed project is a mixed-use development that will include a combination of residential and commercial retail uses to provide localized services for the future residents and surrounding uses. Each of the retail components will create jobs and support the

growth of a balanced community. The proposed project will also help address the City's longstanding jobs/housing imbalance.[1]

The project proposes residential use within the currently defined Central Avenue Expressway Future Focus Area and is designated for high density residential use in Phase III, or starting in 2023. Because the project site was slated in Phase III of the General Plan for future development as High Density Residential, the proposed project accelerates the City of Santa Clara's long term growth strategy as stated in Phase III (2023-2035) of the General Plan to develop new residential neighborhoods in conjunction with appropriate retail, parks, open space, and other public uses, along transit corridors. Changed circumstances necessitate a shift in both the timing and nature of redevelopment to reflect the development opportunities that are currently available, and to align growth and development with the new Santa Clara Square Retail and Office developments. Because the project is planned to be fully occupied between 2017 and 2020, the proposed General Plan amendment accelerates the timing of high density residential use at this site by about 3 to 5 years.

The project proposes a General Plan amendment that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site. Changed circumstances necessitate a shift in both the timing and nature of redevelopment to reflect the development opportunities that are currently available, and to align growth and development with the new Santa Clara Square Retail and Office developments. As explained below in **Table 4.8-2, General Plan Consistency Analysis**, the project meets the goals and purpose of the future focus area policies because it is planned to be integrated with adjacent office and retail development that is currently under construction, and will include construction of the infrastructure improvements needed to support the proposed new retail and residential development. The proposed mixed use project will also address public services such as police, fire, schools, libraries, and parks, and will contribute its fair share of fees to ensure the City and the future residents are adequately supported.

A detailed analysis of the proposed project's consistency with applicable General Plan mixed-use land use policies is provided in **Table 4.8-2**.

---

[1]    See the 2010-2035 Santa Clara General Plan Final Environmental Impact Report, Sec. 4.2.5.5 (p. 125), which states that "the level of job growth [in the City of Santa Clara] will continue to out-pace housing development within the City, continuing the City's long-standing jobs/housing imbalance."

**Table 4.8-2**
**General Plan Consistency Analysis**

| Applicable Policies | Project Consistency |
|---|---|
| **Mixed Use Land Use Policies** | |
| 5.3.4-P2: Encourage mixed-use development in proximity to employment centers and residential neighborhoods throughout the City. | **Consistent.** The proposed project is a residential/mixed-use project and is located proximate to employment centers and residential neighborhoods. The area surrounding the project site consists mainly of office and light industrial uses. Single-family residential uses are located less than one mile to the northeast, northwest, and south of the project site. |
| 5.3.4-P4: Require mixed-use development to meet the density and intensity specified in the land use classifications. | **Not Consistent**: The project applicant is requesting a General Plan Amendment (GPA) to change the land use designations for all project site parcels. If approved, the residential densities for parcels designated as Regional Mixed Use (APN 216-45-022 and portions of APN 216-45-011 and APN 216-45-028) would be consistent with the density specified in the land use classification. Commercial intensity for these parcels would be lower than the allowed minimum FAR of 0.15. General Plan Policy 5.5.1-P7 allows for a ten percent reduction in the minimum allowed non-residential square footage for mixed-use projects. However, the commercial intensity for these parcels would still be lower than the minimum adjusted FAR of 0.1425, and therefore the project would not be consistent with the intensity allowed under the General Plan. |
| | The remaining parcels would be designated High Density Residential and developed at approximately 55 du/ac (higher than the maximum allowed residential density of 50 du/ac). General Plan Policy 5.5.1-P6 allows for a ten percent increase in residential density for projects proposing a minimum LEED Gold or greater equivalent, provided that the increased density is compatible with planned uses on neighboring properties. The proposed project meets the minimum LEED standard (i.e., Gold) and is compatible with planned uses on neighboring properties. As a result, the adjusted density on these parcels would be 55 du/ac, which is equal to the density proposed for these parcels. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. |
| 5.3.4-P5: Encourage mixed-use development site planning and design to implement the elements illustrated in Figures 7.3-2 and 7.3-3, including street tree planting along all streets. | **Consistent.** Landscaping for the proposed project would include planting of new trees and shrubs. The project applicant would comply with the General Plan Policy 5.3.1-P10, which requires new development to "provide opportunities for increased landscaping and trees within the community, including requirements for new development to provide street trees at a minimum of 2:1 on or off-site replacement for trees removed as part of the project." |
| 5.3.4-P7: Use design techniques, such as stepping down building heights, and siting incompatible activities, such as loading and unloading, away from residential uses. | **Consistent.** The project design includes architectural pauses, recessed building facades, and style transitions, including a variation in massing, roof forms, and wall planes. The architectural features would result in a project that is cohesive with the architectural style of the surrounding properties. |
| 5.3.4-P8: Encourage building heights of up to five stories in large mixed-use developments along arterial street frontages, with the potential for taller buildings north of the Caltrain corridor. | **Consistent.** The project site is located approximately 0.5 miles northeast of the Caltrain corridor. The proposed project's retail uses would be located along the new street and a portion of Augustine Drive. The residential buildings would be approximately 75 feet tall (5 stories) with towers at building corners extending up to 85 feet tall. |

| | |
|---|---|
| 5.3.4-P9: Encourage ground-level windows and building entries that support a visual connection to activities. | **Consistent.** The retail structures located along the new street and a portion of Augustine Drive would include street level windows and doors to support a visual connection to activities. |
| 5.3.4-P10: Require parking to be substantially below-grade or in structures with active uses along streets. | **Consistent.** Although the project does not include below grade parking, the proposed project includes a central parking garage as part of each residential complex. This central parking facility would be located off of the primary streets. Residential units would be arranged around each central parking garage and the proposed retail uses would be located at street level along the new street frontage and a portion of Augustine Drive. |
| 5.3.4-P11: Foster active, pedestrian-oriented uses at the ground level, such as retail shops, offices, restaurants with outdoor seating, public plazas or residential units with front stoops, in mixed-use development. | **Consistent**. The proposed mixed-use project includes approximately 40,000 gross square feet of ground floor retail uses, primarily along the new street frontage and a portion of Augustine Drive. Uses could include restaurants ranging from sit down to "fast casual," coffee shops, dessert stores, clothing, service retail, day spas, specialty retail, bicycle shops, and wellness centers. Outdoor seating areas could be developed along the new street or Augustine Drive. Amenities such as a promenade, linear park, courtyards, and seating areas, would encourage pedestrian activity throughout the project site. |
| 5.3.4-P12: Prioritize pedestrian-oriented streetscape and building design in mixed-use development, including features such as wider sidewalks, street furniture, specialty planters, signage, public art, street trees, special paving materials, decorative awnings, enhanced entrances, colors, variety of materials and textures and distinctive building massing and articulation. | **Consistent.** The residential complexes would include landscaped walkways and paseos to encourage pedestrian activity within the planned development. As shown in **Figures 3.0-4** and **3.0-5**, retail structures would incorporate massing appropriate for the pedestrian scale and would be oriented to street level. Street trees would be provided throughout the project site. Entrances to the project site would be enhanced with landscape features and/or towers. |
| 5.3.4-P13: Encourage pedestrian linkages in mixed-use areas through measures such as enhanced lighting, curb bulb-outs, mid-block pedestrian crossings, pedestrian "refuge" areas in planted medians and pedestrian-oriented building frontages. | **Consistent.** As described above, buildings would be oriented for pedestrian use by providing entrances at the ground level, safe crossings and pedestrian-scale lighting. Lighting would be installed along walkways and in parking lots to create a safe nighttime environment that is conducive to walking. |

| Future Focus Area Policies and Goals | |
|---|---|
| **Goal 5.4.7 – G1:** All applicable prerequisites are met, and a comprehensive plan is adopted, prior to implementation of any Future Focus Area. | **Not Consistent**. The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. |
| | The project proposes residential use within the currently defined Central Avenue Expressway Future Focus Area and is designated for high density residential use in Phase III, or starting in 2023. Because the project site was slated in Phase III of the General Plan for future development as High Density Residential, the proposed project accelerates the City of Santa Clara's long term growth strategy as stated in Phase III (2023 2035) of the General Plan to develop new residential neighborhoods in conjunction with appropriate retail, parks, open space, and other public uses, along transit corridors. Changed circumstances necessitate a shift in both the timing and nature of redevelopment to reflect the development opportunities that are currently available, and to align growth and development with the new Santa Clara Square Retail and Office developments. |
| | The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site. However, as explained below, the project meets the goals and purpose of the future focus area policies because it is planned to be integrated with adjacent office and retail development that is currently under construction, and will include construction of the infrastructure improvements needed to support the proposed new retail and residential development. The proposed mixed use project will also address public services such as police, fire, schools, libraries, and parks, and will contribute its fair share of fees to ensure the City and the future residents are adequately supported. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. |

| | |
|---|---|
| **Goal 5.4.7 – G2:** Adequate infrastructure, services and funding are planned to support new development in Future Focus Areas. | **TRANSPORTATION**<br><br>**Traffic Infrastructure Modifications**<br><br>• Install a signal at the Montgomery Drive/Scott Boulevard intersection.<br><br>• Signage, striping, and pavement upgrades to Octavius Drive. Upgrades include new pavement overlay, new striping that maintains the center two-way-left-turn-lane, bicycle lanes, vehicle parking, and pullouts for loading and unloading.<br><br>• Signal upgrade modification at Octavius Drive / Scott Boulevard to include a protected left turn into the project site.<br><br>• Add a private street between Apartment Buildings 1 and 2 that provides access between Montgomery Drive and new street (as yet unnamed).<br><br>• Install signal interconnect along Scott Boulevard between Bowers Avenue and Octavius Drive (all current and future signals).<br><br>**Transit Infrastructure Modifications**<br><br>• Upgrade bus stop facilities on the north side of Scott Boulevard near the Octavius Drive intersection. Specific upgrades will be determined based on coordination with the City of Santa Clara and VTA.<br><br>**Bicycle and Pedestrian Infrastructure Modifications**<br><br>• Provide bicycle lanes along Octavius Drive.<br><br>• Provide bicycle lanes along Montgomery Drive.<br><br>• Provide high visibility crosswalks with Rapid Rectangular Flashing Beacons (RRFB) at the uncontrolled crossings on Augustine Drive and Octavius Drive ("knuckle") that provides access to the San Tomas Aquino Creek Trail.<br><br>• Provide minimum six- to eight-foot sidewalks along all frontage roads adjacent to the Santa Clara Square Residential developments including Octavius Drive. An eight to ten-foot sidewalk will be built between Montgomery Drive and new street (as yet unnamed) on Augustine Drive and Scott Boulevard. |

| **Goal 5.4.7 – G2:** Adequate infrastructure, services and funding are planned to support new development in Future Focus Areas (continued) | **SERVICES**<br><br>**Library**: The City's library system currently has 3.76 books per capita and 4.30 items per capita and therefore meets or exceeds the service goals of 3.0 volumes (books) per capita and 3.4 items (books and audio visual volumes) per capita. Even with the addition of project population, the City's library system would continue to meet or exceed its service goals and would not require new or physically altered facilities to accommodate a larger collection<br><br>**Police**: To maintain the current officer-to-service population ratio, the City would need to add four to five officers to serve the residents and employees generated by the proposed project. Although additional officers would be required to maintain the existing officer-to-service population, the SCPD has indicated that there are no plans to expand the existing police facility at 601 El Camino Real at this time. As a result, the addition of four to five officers would not require the construction of any additional SCPD facilities or expansion of existing facilities, the construction of which could result in environmental impacts, as the increase in officers would not be substantial.at this time.<br><br>**Fire and Life Safety**: The SCFD has indicated that the proposed project would not trigger the need for a new or expanded fire facility to maintain acceptable service ratios (Tomlin 2015). As a result, implementation of the proposed project would not require the construction of new or physically altered SCFD facilities.<br><br>**Schools**: All of the schools that serve the project site are at or over capacity. As a result, the K-12 students associated with the proposed project would result in the overutilization of these schools. The SCUSD has plans to address this issue by building additional facilities elsewhere in the City. In accordance with SB 50, the project applicant would pay these fees to help mitigate impacts to the school district and provide funding for new facilities. In addition, the school district would receive a portion of the property taxes collected annually after the project is constructed as well as SCUSD General Obligation bond taxes that are collected annually concurrent with property taxes. The school district has indicated that these monies along with developer fees would fully mitigate the school impacts and help meet the school needs of the students associated with the proposed project.<br><br>**Funding:** The project applicant prepared a Fiscal Impact Analysis for the entire Santa Clara Square area, and found that development of the Santa Clara Square area would result in a projected net recurring annual surplus to the City General Fund, and a payment of a one-time City development impact fees. The results of this analysis show that development of the project will have a positive effect on the City's budget. |

| | |
|---|---|
| **Goal 5.4.7 – G3:** New residential development that includes provisions for compatibility with surrounding nonresidential uses. | **Consistent.** The project is proposing a minimum LEED Gold or greater equivalent, and is compatible with planned uses on neighboring properties. It is located in close proximity to the Central Expressway transit corridor, and complements the approved neighboring Santa Clara Square Office and Retail developments by providing a diversity of housing types in mid-rise buildings that is contextually appropriate, both in land use as well as in scale and design. The proposed project accommodates anticipated market demand for housing in close proximity to these developments and will assist the City in improving its current jobs housing imbalance. With this project, the greater Santa Clara Square area will become a balanced, mixed-use neighborhood that a true activity center that will improve the quality, design and utility of the area along Scott Boulevard between Bowers Avenue and the Central Expressway and will reduce dependency on automobile transportation, in order to advance the City's progress in meeting its housing objectives with infill development. Because of the close proximity of the approved specialty retail center, and approved office campus, the neighborhood as a whole will provide more than the minimum required commercial uses. The proposed retail component of this mixed use project will link the residential units to the specialty retail center by creating a walking street for residents, nearby office employees, and others in Santa Clara |
| **Policy 5.4.7 – P1:** Implement development in Future Focus Areas in conformance with applicable General Plan policies for Neighborhood Compatibility, Mobility and Transportation, Public Services, and Environmental Quality. | **Not Consistent**. The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site. With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. Because the project site was slated in Phase III of the General Plan for future development as High Density Residential, the proposed project accelerates the City of Santa Clara's long term growth strategy as stated in Phase III (2023-2035) of the General Plan to develop new residential neighborhoods in conjunction with appropriate retail, parks, open space, and other public uses, along transit corridors. Changed circumstances necessitate a shift in both the timing and nature of redevelopment to reflect the development opportunities that are currently available, and to align growth and development with the new Santa Clara Square Retail and Office developments. The project meets the goals and purpose of the future focus area policies because it is planned to be integrated with adjacent office and retail development that is currently under construction, and will include construction of the infrastructure improvements needed to support the proposed new retail and residential development. The proposed mixed use project will also address public services such as police, fire, schools, libraries, and parks, and will contribute its fair share of fees to ensure the City and the future residents are adequately supported. |
| **Policy 5.4.7 – P3.** Allow Future Focus Area plans to be initiated by one or more private parties who provide funding to the City for planning the entire Focus Area; the City may include a reimbursement program for the private parties as part of the Future Focus Area Plan. | This policy is designed to be implemented by the City. |

| | |
|---|---|
| **Policy 5.4.7 – P4.** Until such time as a comprehensive plan is adopted for a Future Focus Area, allow development in accordance with the land use designations on the Phase II General Plan Land Use Diagram. | **Not Consistent.** The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site.<br><br>With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. As explained above, the project meets the goals and purpose of the future focus area policies because it is planned to be integrated with adjacent office and retail development that is currently under construction, and will include construction of the infrastructure improvements needed to support the proposed new retail and residential development. The proposed mixed use project will also address public services such as police, fire, schools, libraries, and parks, and will contribute its fair share of fees to ensure the City and the future residents are adequately supported. |
| **Policy 5.4.7 – P5.** Discourage any new development that would preclude the implementation of the residential neighborhoods identified in the Future Focus Areas, Phases II and III, of the General Plan Land Use Diagrams. | **Consistent.** The proposed project would not in any way preclude the implementation of the residential neighborhoods identified in any other Future Focus Areas. Rather, the project, including the GPA, accelerates the City of Santa Clara's long term growth strategy as stated in Phase III (2023 -2035) of the General Plan to develop new residential neighborhoods in conjunction with appropriate retail, parks, open space, and other public uses, along transit corridors. Changed circumstances necessitate a shift in both the timing and nature of redevelopment to reflect the development opportunities that are currently available, and to align growth and development with the new Santa Clara Square Retail and Office developments. |
| **Policy 5.4.7 – P6:** Encourage new comprehensive plans for Future Focus Areas to provide a full complement of uses, including neighborhood-oriented retail and commercial activities, open space, and public facilities. | **Not Consistent.** The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site.<br><br>With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. With the addition of 1,800 high density residential units, the Santa Clara Square neighborhood provides a full complement of uses including over 1.86 million square feet of office that is currently under construction, and 125,000 square feet of specialty retail use. The proposed retail component of this mixed use project will link the residential units to the specialty retail center by creating a walking street for residents, nearby office employees, and others in Santa Clara. |

| **Policy 5.4.7 – P7.** Implement appropriate measures for new residential development to reduce any land use conflicts with surrounding non-residential uses. | **Consistent.** The residential development has been specifically designed to reduce conflicts with existing and planned surrounding office, retail, and light industrial uses. Notably, the project includes: |
| --- | --- |
| | 1. Mixed Use New Street – Where the retail center abuts the proposed apartment district, a pedestrian-scale, mixed-use 'downtown main street' is planned; characterized by restaurants, coffee shops, service retail, professional office, various hard/soft goods and rental apartments. The final ground floor tenant mix will vary over time and will be influenced by market demand and trending. Portions of the new street will have apartments or office over retail shops creating a distinct mixed use character. |
| | 2. Central Plaza – The focal area of the new street is planned to be a Central Plaza designed for various activities including dining, concerts, promotional events and other people gathering activities. The goal is to develop an active, public open space that brings office, retail and residential users together into one interactive people gathering place. |
| | 3. Public Park –A highly integrated and fine-grained public and private park system is being proposed. Unlike conventional parks, it addresses multi-dimensional aspects of daily leisure preferences (including creative, learning, diversionary, relaxation and athletic) as well as the needs of multiple age groups. A unique feature is the physical integration of the open space system into the neighborhood so all residents will experience and touch the system on a frequent, daily basis. |
| | 4. Central Promenade – In order to provide pedestrian connectivity between workplace, services and housing, a wide, uninterrupted Central Promenade will connect from the restaurant cluster (adjacent to Bowers) through the retail center, the new street/Central Plaza and the Public Park, ultimately connecting to the regional San Tomas Creek Trail. This promenade will encourage exercise, social interaction, people watching as well as encourage walking rather than driving to meet many daily needs. |
| | Finally, the project has been designed to place the parking garage on the parcels south of Scott Street adjacent to the existing light industrial uses and will provide a buffer for the residents at this location. |
| **Policy 5.4.7 – P8.** Require development of public amenities, including parks and open space, in the first phase of development for all Future Focus Areas. | **Not Consistent.** The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site. |
| | With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. The proposed project will include extensive open space features including four parks, and public facilities including 38,000 SF of amenity space (including club rooms, pool lounges, fitness facilities, and game rooms), a network of pedestrian and bicycle trails as well as other bicycle features, and connections to the Tomas Aquino Creek Trail. In addition to the amenities described above, the project includes the following: |

*4.8  Land Use and Planning*

| Policy 5.4.7 – P8. Require development of public amenities, including parks and open space, in the first phase of development for all Future Focus Areas (continued) | • Redwood Trail – Residential buildings have been carefully located to preserve a number of existing redwood trees. Adjacent to Augustine, Octavius and Scott, where preserved redwoods tend to be concentrated, a meandering walking and jogging trail is planned which will be flanked by activity nodes including barbeques, seating areas and par course exercise structures. The goal is to create a Redwood Linear Park around the periphery of the district that provides linkage to the San Tomas Creek regional trail as well as wellness and fitness opportunities for both residents and workers. |
|---|---|
| | • Activities for All Age Groups – Within both the public and private open spaces an effort is being made to provide for all age groups. Passive meeting and contemplative areas are sprinkled throughout the district, swimming pools and fitness centers will include all-age components and child play areas will be specifically designed for the three primary child age stages. Several areas will be designed for the teen age group allowing gathering and socialization with appropriate public visibility. |
| | In addition, the landscape plan has been carefully designed to support the open space concepts described above as well as the following design principles: |
| | • Incorporate preservation of many existing redwood trees on-site. Those requiring removal will be replaced at a 1:1 ratio. The redwood preservation concepts attempt to showcase the best and largest specimens in key open spaces within the apartment district as well as along streets where many of the best specimens are located. The redwood trees will provide the strongest visual landscape element within the overall district. |
| | • Provide landscape differentiation between areas within the overall district. Landscape and hardscape elements will help clarify various zones such as the mixed use character of the new street, the urban stoops of Robertson, the organic Redwood Trail along portions of Augustine and the corporate character of the office district. |
| | • Visually soften the massing of the architecture. Both redwood and other introduced tall-growing trees will be used to reduce the impact of apartment building scale and height. Lower pedestrian scale trees will be planted along walkways, plazas and entries to provide intimacy and direct views |
| | • Enhance sustainability. Shade trees will be introduced to reduce urban heat island effect during the summer as well as provide shade to encourage pedestrian activity. |
| | • Identify People Gathering Places. Accent tree plantings and enhanced hardscape elements will be used to help identify plazas, courtyards, seating/meeting areas and other special activity areas. Landscape color, special paving, lighting, banners and other techniques will be used to differentiate between primary active and secondary passive places. |

| | |
|---|---|
| **Policy 5.4.7 – P9.** Emphasize walkability and access to transit and existing roadways in Future Focus Area comprehensive plans. | **Not Consistent.** The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site.<br><br>With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. As explained above, the proposed project will create a highly walkable environment because it is a mixed use residential and commercial development that sites a pedestrian-oriented new street in close proximity to residential uses, includes an extensive system of pedestrian oriented walkways, paseos, and connections, and includes extensive open space and park areas. The proposed project will enhance connectivity to public transit by including upgrades to bus stop facilities on the north side of Scott Boulevard near the Octavius Drive intersection (specific upgrades will be determined based on coordination with the City and VTA), and will improve access to existing roadways by constructing a new north-south road that will run between and connect Augustine Drive and Scott Boulevard. |
| **Policy 5.4.7 – P10.** Provide access across expressways or major arterial streets so that new residential development in Future Focus Areas has adequate access to neighborhood retail, services and public facilities. | **Not Consistent.** The project is not consistent with the current General Plan designation, but with the proposed GPA would be consistent. The project proposes a GPA that will take the project site out of the future focus area, and would allow high density residential and commercial retail use on the project site.<br><br>With the GPA, the proposed project is consistent with this policy. The proposed GPA is not expected to result in any physical environmental impacts that are not already addressed in other chapters of the Draft EIR. The proposed project is consistent with this policy because it includes within the development access to 40,000 SF of neighborhood retail and services, 38,000 SF of amenity space including public facilities, and is directly adjacent to the new Santa Clara Square Retail and Office developments. Based on its location and design, proposed project residents will not need to cross expressways or major arterial streets in order to meet these needs. |

## City of Santa Clara Zoning Code

The proposed project's five full parcels (APN 216-45-022; 216-45-023; 216-45-024; 216-29-112; and 216-29-053) are designated as Light Industrial (ML) and would be rezoned to Planned Development (PD) to accommodate the proposed project. The two partial parcels (APN 216-45-011 and APN 216-45-028) which are zoned PD ("Retail Center") would also be rezoned to allow for residential use.

The proposed development plan has been designed to provide an environment of a stable, desirable character not out of harmony with its surrounding neighborhood. As noted above, the proposed commercial density provides an FAR of 0.13 (40,000 sf/307,692 sf), which is less than the commercial FAR minimum of 0.15 for commercial uses in the Regional Mixed Use land use designation. As also stated

above, General Plan Policy 5.5.1-P7 allows a 10 percent reduction in the minimum allowed non-residential square footage for new mixed use projects with exemplary design that provide appropriate transition to existing neighborhoods, as does the proposed project. However, the commercial intensity for these parcels would still be lower than the minimum adjusted FAR of 0.1425. To be fully consistent with the FAR minimum of 0.1425 for Regional Mixed Use with a 10 percent reduction applied, the proposed project would have to include approximately 43,850 sf of commercial uses. While the PD zone states that the development plan "must meet the most restrictive standards of this title and the corresponding existing or proposed General Plan land use designation with respect to residential density, nonresidential intensity of uses, and other conditions pertinent to the proposed use," this requirement is further expressly qualified that such strict compliance is to be required "in such a way as to form a harmonious, integrated project of sufficient unity and architectural quality to justify the mixture of normally separated uses or to justify certain exceptions to the normal regulations of this title." Historically, the City has interpreted this provision to mean that while the PD zone includes certain limited references to the General Plan, it does so in a limited and specific way and is not intended by the City to subject the City to an overarching General Plan consistency requirement otherwise applicable to general law cities nor to limit the City from approving a Planned Development that is not consistent with a strict reading of the General Plan land use classification that otherwise furthers the objectives of the General Plan. If the City finds that the proposed project meets the objectives of the PD zone by providing "an environment of a stable, desirable character not out of harmony with its surrounding neighborhood," and that the specific nature of the inconsistency with the General Plan land use classification's minimum FAR requirement is acceptable in this case because strict compliance is not necessary for the proposed project to "form a harmonious, integrated project of sufficient unity and architectural quality," the City may, in its discretion, approve the project as proposed, consistent with the applicable requirement of the PD zone. Therefore, there is no conflict with the Zoning Code, and the impact would be less than significant.

### City of Santa Clara Climate Action Plan

A detailed discussion of the project's consistency with the City's CAP is provided in **Section 4.5, Greenhouse Gas Emissions.** As discussed in **Section 4.5,** the proposed project would not conflict with the CAP, and the impact would be less than significant.

### Plan Bay Area

The proposed project is not located within a PDA. Therefore, there is no density or land use designation within the Plan Bay Area that is applicable to the project site. No conflicts with the Plan Bay Area would result, and the impact would be less than significant.

### Bay Area 2010 Clean Air Plan

A detailed discussion of the proposed project's consistency with the 2010 Clean Air Plan is provided in **Section 4.2, Air Quality**. As discussed in **Section 4.2**, with mitigation, the proposed project would not have an adverse impact on air quality during construction. Although the proposed project would have a significant effect on air quality during operation, it would not conflict with the Clean Air Plan, and the impact would be less than significant.

### Santa Clara County Congestion Management Program

A discussion of the proposed project's impacts to the local transportation system, including CMP-designated intersections, is provided in **Section 4.11, Transportation and Traffic**. As discussed in **Section 4.11**, the proposed project would result in a significant project-level impact at two CMP-designated intersections under Background conditions, and cumulative traffic impacts at four CMP-designated intersections under Cumulative (2040) conditions and five CMP-designated intersections under City Place Cumulative (2040) conditions. While mitigation is proposed to reduce impacts to a less than significant at a majority of these CMP-designated intersections under each scenario, at many intersections mitigation is either not feasible or not within the control of the applicant or the City. Therefore, the proposed project would conflict with the CMP, and this impact would be significant and unavoidable.

### San Francisco Bay Regional Water Quality Control Plan (Basin Plan)

A discussion of the proposed project's potential impacts on water quality is provided in **Section 4.7, Hydrology and Water Quality**. As discussed in **Section 4.7**, with adherence to National Pollution Discharge Elimination System (NPDES) requirements during construction and operation, implementation of the proposed project would not have an adverse effect on water quality. Therefore, the proposed project would not conflict with the Basin Plan, and this impact would be less than significant.

**Mitigation Measures**: No mitigation measures are available.

**Significant after Mitigation:** The project would result in a significant and unavoidable impact due to conflicts with the Santa Clara County Congestion Management Program.

---

**Impact LU-3:**        **The proposed project would not conflict with any applicable habitat conservation plan or natural community conservation plan. (***No Impact***)**

As discussed in **Section 4.3, Biological Resources**, the project site is not located within the portion of Santa Clara County that is covered by the Santa Clara Valley Habitat Conservation Plan (HCP)/Natural Community Conservation Plan (NCCP). There are no other HCPs or NCCPs applicable to the project area. No conflicts with an HCP/NCCP, or other conservation plan would occur, and this impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

## 4.8.4.4    Cumulative Impacts and Mitigation Measures

**Cumulative Impact LU-1:**        **The proposed project, in conjunction with other past, present and reasonably foreseeable future development, would not result in significant cumulative impacts related to land use and planning. (***Less than Significant***)**

The City of Santa Clara is predominately developed, and the planned development occurring in the City near the project site is largely redevelopment of previously developed parcels. Therefore, the approved and pending projects included in **Tables 4.0-1** and **4.0-2** would not substantially change the land uses in the project area. Furthermore, the addition of 1,800 residential units to the City of Santa Clara will help improve the City's jobs/housing balance. In addition, future development in the City of Santa Clara would be reviewed for consistency with the General Plan designations and policies by the City of Santa Clara, in accordance with the requirements of CEQA, the State Zoning and Planning Law, and the State Subdivision Map Act, all of which require findings of plan and policy consistency prior to approval of entitlements for development. For this reason, impacts associated with inconsistency of future development in the City with adopted plans and policies would not be significant. As shown in the analysis above, the proposed project would not conflict with any local or regional plans adopted for avoiding environmental impacts. The proposed project would not contribute to any cumulative land use impacts, and this impact would be less than significant.

**Mitigation Measures**: No mitigation measures are required.

---

## 4.8.5    REFERENCES

Association of Bay Area Governments/Metropolitan Transportation Commission. 2013. *Plan Bay Area.* Adopted July 18.

Bay Area Air Quality Management District. 2010. *Bay Area 2010 Clean Air Plan.*

City of Santa Clara (CSC). 2014. *City of Santa Clara 2010-2035 General Plan.* Adopted November 2010, last amended December 2014.

CSC. 2013. *Charter of the City of Santa Clara California.* August 20.

CSC. 2013. *Zoning Ordinance of the City of Santa Clara.* August 20.

CSC. 2013. *Santa Clara Climate Action Plan.* Adopted December 3.

San Francisco Regional Water Quality Control Board. 1995. *San Francisco Bay Regional Water Quality Control Plan, as amended 2010.*

Valley Transportation Authority. 2013. *Santa Clara County Congestion Management Program.* October.

**APPENDIX 4.13**

**Geotechnical Investigation Reports**

# GEOTECHNICAL INVESTIGATION
# SANTA CLARA SQUARE
# Santa Clara, California

**Prepared For:**
**The Irvine Company**
**Newport Beach, California**

**Prepared By:**
**Langan Treadwell Rollo**
**4030 Moorpark Avenue, Suite 210**
**San Jose, California  95117**



**Serena Jang, G.E.**
**Senior Project Manager**

**John Gouchon, G.E.**
**Principal/Vice President**

**24 July 2015**
**770612501**

## LANGAN TREADWELL ROLLO

4030 Moorpark Avenue, Suite 210    San Jose, CA 95117    T: 408.551.6700    F: 408.551.0344    www.langan.com

New Jersey • New York • Virginia • California • Pennsylvania • Connecticut • Florida • Abu Dhabi • Athens • Doha • Dubai • Istanbul

*Geotechnical Investigation*  
Santa Clara Square  
Santa Clara, California

*24 July 2015*  
*770612501*  
*Page i*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | INTRODUCTION | 1 |
| 2.0 | SCOPE OF SERVICES | 2 |
| 3.0 | FIELD EXPLORATION AND LABORATORY TESTING | 3 |
| | 3.1 Borings | 3 |
| | 3.2 Cone Penetration Test | 4 |
| | 3.3 Laboratory Testing | 5 |
| | 3.4 Soil Corrosivity Testing | 5 |
| 4.0 | SITE AND SUBSURFACE CONDITIONS | 6 |
| | 4.1 Existing Site Conditions | 6 |
| | 4.2 Subsurface Conditions | 6 |
| 5.0 | SEISMIC AND GEOLOGIC HAZARDS | 9 |
| | 5.1 Regional Seismicity | 9 |
| | 5.2 Fault Rupture | 11 |
| | 5.3 Liquefaction and Associated Hazards | 11 |
| |     5.3.1 Liquefaction | 12 |
| |     5.3.2 Cyclic Densification | 12 |
| |     5.3.3 Lateral Spreading | 12 |
| | 5.4 Tsunami | 13 |
| 6.0 | DISCUSSION AND CONCLUSIONS | 13 |
| | 6.1 Expansive Soil Considerations | 14 |
| | 6.2 Foundations and Settlement | 14 |
| | 6.3 Groundwater Considerations | 16 |
| | 6.4 Excavation and Monitoring | 16 |
| | 6.5 Corrosion Potential | 17 |
| 7.0 | RECOMMENDATIONS | 18 |
| | 7.1 Earthwork | 18 |
| |     7.1.1 Site Preparation | 18 |
| |     7.1.2 Quality Control of Lime Treatment | 20 |
| | 7.2 Foundations | 21 |
| |     7.2.1 Spread Footing Foundations | 21 |
| |     7.2.2 Mat Foundation | 22 |
| |     7.2.3 P-T Slab Foundation | 23 |
| | 7.3 Floor Slab | 25 |
| | 7.4 Below-Grade Walls | 27 |
| |     7.4.1 Retaining Walls | 27 |
| |     7.4.2 Swimming Pool Considerations | 30 |
| | 7.5 Shoring Design | 30 |
| |     7.5.1 Tieback Design Criteria and Installation Procedure | 31 |
| |     7.5.2 Tieback Testing | 32 |
| |     7.5.3 Penetration Depth of Soldier Piles | 33 |
| | 7.6 Drainage and Dewatering Systems | 34 |
| | 7.7 Construction Monitoring | 34 |
| | 7.8 Concrete Pavement and Exterior Slabs | 35 |

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page ii

## TABLE OF CONTENTS (Cont.)

| | | | |
|---|---|---|---|
| **7.9** | **Seismic Design** | ............................................................................ | **35** |
| **7.10** | **Asphalt Pavements** | .................................................................. | **36** |
| **7.11** | **Utilities** | ..................................................................................... | **37** |
| **7.12** | **Site Drainage** | ............................................................................ | **38** |
| **7.13** | **Landscaping** | ............................................................................. | **38** |
| **7.14** | **Bioretention Systems** | ............................................................ | **38** |
| **8.0** | **ADDITIONAL GEOTECHNICAL SERVICES** | ........................... | **39** |
| **9.0** | **LIMITATIONS** | ............................................................................ | **40** |

**REFERENCES**

**FIGURES**

**APPENDICES**

**DISTRIBUTION**

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*                                              *24 July 2015*
*Santa Clara Square*                                                          *770612501*
*Santa Clara, California*                                                       *Page iii*

**LIST OF FIGURES**

Figure 1        Site Location Map

Figure 2        Site Plan with Existing Buildings

Figure 3        Site Plan with Proposed Development

Figure 4        Map and Major Faults and Earthquake Epicenters in
                the San Francisco Bay Area

Figure 5        Modified Mercalli Intensity Scale

Figure 6        Design Parameters for Soldier-Pile-and-Lagging Temporary Shoring
                System

**LIST OF APPENDICES**

Appendix A    Logs of Test Borings

Appendix B    Cone Penetration Tests

Appendix C    Laboratory Data

Appendix D    Soil Corrosivity Evaluation and Recommendations for Corrosion Control

Appendix E    Historical Groundwater Levels at Nearby Monitoring Wells

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 1*

### GEOTECHNICAL INVESTIGATION
### SANTA CLARA SQUARE
### Santa Clara, California

## 1.0    INTRODUCTION

This report presents the results of the geotechnical investigation by Langan Treadwell Rollo for the proposed Santa Clara Square development in Santa Clara, California.   The approximate location of the site is shown on Figure 1.

The site is bound by Augustine Drive to the north, San Tomas Aquino Creek Trail to the east, Scott Boulevard to the south and future retail to the west and encompasses approximately 28 acres.   It is currently occupied by several one- to two-story office buildings that are surrounded by paved parking lots and landscaping as shown on Figure 2.   It is relatively flat, with ground surface elevations ranging from approximately Elevation 26 to 32 feet[1] (HMH Engineers, 2014).

The proposed Residential Phase development includes six residential buildings, designated as B1 through B6, as shown on Figure 3.   The proposed buildings will be as follows:

- Building B1 will have a two- to three-story concrete podium with four-stories of Type V or Type III wood-framed structures wrapped around a Type I four-story concrete parking garage.   The building will be at-grade.

- Building B2 will be a four-story Type III wood-framed structure wrapped around a Type I four-story concrete parking garage; the parking garage and the wood-framed structure will be at-grade.

- Buildings B3 through B6 will be five-story Type III wood-framed structures wrapped around a Type I five-story concrete parking garage; the parking garage and the wood-framed structure will be at-grade.

---

[1]    All elevations reference elevations from "TOPO and Boundaries Map" dated 1/14/14 (HMH Engineers, 2014)

**LANGAN TREADWELL ROLLO**

Based on correspondences from PASE and DCI, the project structural engineers, preliminary building loads (dead plus live loads) for the project are:

- wood framed structures (five-story) range from 480 psf to 610 psf (uniform load).

- concrete parking structure range from 165 kips to 445 kips (column load).

In addition, site improvements will include a new private roadway west of Building B1 and B2, two new swimming pools and landscape improvement around the new buildings as shown on Figure 3.

## 2.0    SCOPE OF SERVICES

Our scope of services was outlined in our proposal dated 9 July 2013.  The purpose of our investigation was to provide geotechnical design recommendations for the proposed development.  Our services included reviewing available information in our files of nearby sites, exploring the site by drilling 16 borings, performing 21 Cone Penetration Tests (CPTs) and performing laboratory tests and engineering analyses to develop conclusions and recommendations regarding:

- anticipated subsurface conditions including groundwater levels

- 2013 California Building Code (CBC) site classification, mapped values $S_S$ and $S_1$, modification factors $F_a$ and $F_v$ and $S_{MS}$ and $S_{M1}$

- site seismicity and potential for seismic hazards including liquefaction, lateral spreading, fault rupture

- appropriate foundation type(s) including shallow foundations and alternatives for deep foundations, as necessary

- design parameters for the recommended foundation type(s), including vertical and lateral capacities and associated estimated settlements

- subgrade preparation for slab-on-grade floors and exterior slabs and flatwork, including sidewalks

- site preparation, grading, and excavation, including criteria for fill quality and compaction

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 3*

- soil corrosivity with a brief evaluation

- construction considerations

## 3.0    FIELD EXPLORATION AND LABORATORY TESTING

We began our investigation by reviewing previous geotechnical investigations performed in the vicinity of the site. To further investigate subsurface conditions at the site, we drilled 16 test borings and performed 21 Cone Penetration Tests (CPTs).

Prior to performing the field exploration, we:

- obtained soil boring/monitoring well permit from the Santa Clara Valley Water District (SCVWD)

- notified Underground Service Alert

- checked the boring locations for underground utilities using a private utility locator

Details of the field exploration activities and laboratory testing are described in the remainder of this section.

## 3.1    Borings

The approximate locations of the borings drilled at the site are shown on Figures 2 and 3. The borings were drilled on 8 through 10 April 2014 by Exploration Geoservices Inc. using a truck mounted hollow stem auger drill rig.

Eleven borings, designated as B1-1, B1-2, B2-1, B3-1, B4-1, B4-2, B5-1, B6-1 and B6-2, were drilled to a depth of approximately 45 feet below ground surface (bgs). In addition, five shallow borings designated as BP-1 through BP-5 were drilled to a depth of approximately 11½ feet bgs. During drilling, our field engineer logged the borings and obtained representative samples of soil encountered for visual classification and laboratory testing.

Logs of test borings are presented in Appendix A on Figures A-1 through A-14. The soil encountered in the borings was classified in accordance with the Classification Chart, presented on Figure A-15. All borings were backfilled with cement grout at the completion of drilling in accordance with the requirements of SCVWD.

**LANGAN TREADWELL ROLLO**

Samples were obtained using the following split-barrel sampler types.

- Standard Penetration (SPT) sampler with a 2.0-inch-outside diameter and a 1.5-inch-inside diameter, without liners;

- Sprague and Henwood (S&H) sampler with a 3.0-inch-outside diameter, 2.5-inch-inside diameter, lined with 2.43-inch-inside diameter, stainless-steel tubes.

The sampler types were chosen on the basis of soil type and desired sample quality for laboratory testing. In general, the S&H sampler was used to obtain samples in medium stiff to very stiff cohesive soils. The SPT sampler was used to evaluate the relative density of granular soils.

The SPT and S&H samplers were driven with a 140-pound, above ground, safety hammer falling 30 inches. The SPT and S&H samplers were driven up to 18 inches and the hammer blows required to drive the samplers every six inches of penetration were recorded and are presented on the boring logs. A "blow count" is defined as the number of hammer blows per six inches of penetration. In all cases, the samples were driven 18 inches. The blow counts required to drive the S&H and SPT samples were converted to approximate SPT N-values using factors of 0.6 and 1.0, respectively, to account for sample type and hammer energy (Mobile 61 hammer) and are shown on the boring logs.

The blow counts used for this conversion were the last two blow counts of the 18-inch drive.

Upon completion of the borings they were backfilled with grout consisting of cement, bentonite, and water in accordance with the requirements of SCVWD. The soil cuttings and drilling fluid were placed in 55-gallon drums stored temporarily at the site, tested, and were eventually transported off-site for proper disposal.

### 3.2    Cone Penetration Test

The CPTs (designated as C1-1 through C1-3, C2-1 through C2-3, C3-1 through C3-4, C4-1, C4-2, C5-1 through C5-4, C6-1 through C6-3 were performed from 7 through 11, 14 and 15 April 2014 by John Sarmiento and Associates (JSA) at the approximate locations shown on Figures 2 and 3. The CPTs were advanced to depths of approximately 82 to 100 feet bgs.

The CPTs were performed by hydraulically pushing a 1.4-inch-diameter, cone-tipped probe, with a projected area of 15 square centimeters, into the ground. The cone tip measures tip resistance, and the friction sleeve behind the cone tip measures frictional resistance. Electrical

**LANGAN TREADWELL ROLLO**

strain gauges or load cells within the cone continuously measured the cone tip resistance and frictional resistance during the entire depth of each probing. Accumulated data was processed by computer to provide engineering information, such as the types and approximate strength characteristics of the soil encountered. The CPT logs, showing tip resistance and friction ratio by depth, as well as interpreted SPT N-Values, friction angle, soil strength parameters, and interpreted soil classification, are presented in Appendix B on Figures B-1 through B-19. Soil types were estimated using the classification chart shown on Figure B-20.

Pore-pressure dissipation tests (PPDTs) were performed during the advancement of C1-3 and C3-3 at various depths. PPDTs are conducted at various depths to measure hydrostatic water pressures and to determine the approximate depth of the groundwater level. The variation of pore pressure with time is measured behind the tip of the cone and recorded. For this investigation, the duration of the tests range from approximately 317 to 525 seconds. The results of the two PPDTs are presented on Figures B-21 through B-22.

Upon completion of the field investigation, the CPT holes were backfilled with cement-bentonite grout in accordance with the requirements of SCVWD.

## 3.3    Laboratory Testing

The samples recovered from the field investigation were examined to verify their soil classification, and representative samples were selected for laboratory testing. Samples were tested to measure moisture content, fines contents, shear strength, plasticity (Atterberg Limits), R-value and compressibility, where appropriate. Results of the laboratory tests are included on the boring logs and in Appendix C.

## 3.4    Soil Corrosivity Testing

To evaluate the corrosivity of the soil near the foundation subgrade, we performed corrosivity tests on samples obtained from the upper 8.5 feet.  The corrosivity of the soil samples was evaluated by CERCO Analytical using the following ASTM Test Methods:

- Redox - ASTM D1498
- pH - ASTM D4972
- Resistivity (100% Saturation) – ASTM G57
- Sulfide – ASTM D4658M
- Chloride – ASTM D4327
- Sulfate – ASTM D4327

*LANGAN TREADWELL ROLLO*

The laboratory corrosion test results and a brief corrosivity evaluation are presented in Appendix D.

## 4.0    SITE AND SUBSURFACE CONDITIONS

The existing site and subsurface conditions observed and encountered, respectively, are discussed in this section.

### 4.1    Existing Site Conditions

The site is relatively flat, with the ground surface elevation ranging from Elevation 26.2 to 32.1 feet.  Currently, the site is occupied by one- to two-story office buildings and surrounding asphalt paving and landscaping.  As-built drawings are not available for the existing buildings.

San Tomas Aquino Creek Trail is located along the eastern property line.  Based on a topographic map (HMH Engineers, 2014), the bottom of the adjacent creek ranges from Elevation 15.5 feet to 19.6 feet.

Based on our review of historic aerial photographs from 1948 to 1968 (NETR Online, 2014), the site was previously orchard farmland.  A former segment of Saratoga Creek appears to have run through the site along the western boundary Building B1 and the eastern boundary of Building B5, as shown on Figure 3.  Based on the aerial photographs, the creek appears to have most likely been filled in between 1968 and 1980, as part of the existing development.

### 4.2    Subsurface Conditions

The surface material encountered in the borings and CPTs consists of six inches of asphalt concrete (AC) and aggregate base (AB).  Beneath the pavement section, the borings and CPTs indicate the site is underlain by alluvial deposits.  The upper 7 to 18 feet consists of stiff to hard clay.  Laboratory tests results indicate the near surface clay layer has moderate to high expansion potential[2] with plasticity indices ranging from 20 to 47, is overconsolidated[3] and has a compression ratio of 0.11.  Where tested, the undrained shear strengths of the near surface clays range from 2,310 to 3,390 pounds per square foot (psf).

---

[2]    Highly expansive soil undergoes large volume changes with changes in moisture content.
[3]    An overconsolidated clay has experienced a pressure greater than its current load.

**LANGAN TREADWELL ROLLO**

Medium stiff to stiff clay and sandy clay were encountered below the upper clay layer. This layer is approximately 12 to 27 feet thick and has interbedded layers of loose to medium dense sand, silty sand and clayey sand from approximately one to seven feet in thickness. Where tested, the undrained shear strengths of the clay range from 680 to 1,110 psf and the clay is overconsolidated and has compression ratios ranging of 0.10 to 0.17.

Below these layers are stiff to very stiff clay with interbedded layers of sand and gravel to the maximum depths explored of 100 feet. Where tested, the undrained shear strength of the clays in the lower layer ranges from 1,840 to 4,530 psf. A relatively continuous medium dense to very dense sand and gravel layer was encountered at depths of 25 to 38 feet in the borings and CPTs. The thickness of the sand and gravel layer ranges from approximately 2 to 10 feet, with the exception of B6-1, where the sand layer appears to be greater than 18 feet thick.

The groundwater levels encountered in the borings during drilling and CPTs are summarized in Table 1.

**LANGAN TREADWELL ROLLO**

**TABLE 1**
**Summary of Groundwater Elevations**
**Encountered During Drilling**

| Exploration Point | Approximate Ground Surface Elevation (feet)[1] | Date Measured | Groundwater Depth[2] (feet) | Approximate Groundwater Elevation (feet) |
|---|---|---|---|---|
| B1-1 | 30.0 | 4/10/14 | 17.0 | 13.0 |
| B1-2 | 29.5 | 4/10/14 | 12.0 | 17.5 |
| B2-1 | 30.3 | 4/10/14 | 14.5 | 15.8 |
| B3-1 | 27.0 | 4/10/14 | 11.0 | 16.0 |
| B4-1 | 30.0 | 4/8/14 | 16.0 | 14.0 |
| B4-2 | 31.0 | 4/9/14 | 9.0 | 22.0 |
| B5-1 | 29.6 | 4/9/14 | 9.0 | 20.6 |
| B6-1 | 30.5 | 4/9/14 | 12.0 | 18.5 |
| B6-2 | 29.5 | 4/9/14 | 11.0 | 18.5 |
| BP-1 | 28.9 | 4/8/14 | 9.0 | 19.9 |
| BP-2 | 29.3 | N/A | Groundwater not encountered | |
| BP-3 | 28.0 | N/A | Groundwater not encountered | |
| BP-4 | 29.8 | N/A | Groundwater not encountered | |
| BP-5 | 31.1 | N/A | Groundwater not encountered | |
| C1-1 | 29.5 | 4/14/14 | 9.0 | 20.5 |
| C1-2 | 29.2 | 4/14/14 | 8.0 | 21.2 |
| C1-3 | 29.8 | 4/11/14 | 8.0 | 21.8 |
| C2-1 | 30.5 | 4/14/14 | 8.7 | 21.8 |
| C2-2 | 30.5 | 4/14/14 | 8.0 | 22.5 |
| C2-3 | 30.7 | 4/14/14 | 9.6 | 21.1 |
| C3-1 | 27.0 | 4/11/14 | 8.0 | 19.0 |
| C3-2 | 27.5 | 4/15/14 | 2.2 | 25.3 |
| C3-3 | 29.7 | 4/10/14 | 8.6 | 21.1 |
| C3-4 | 30.3 | 4/10/14 | 8.0 | 22.3 |
| C4-1 | 28.0 | 4/9/14 | 10.1 | 17.9 |
| C4-2 | 28.2 | 4/9/14 | 7.0 | 21.2 |
| C5-1 | 30.4 | 4/10/14 | 5.7 | 24.7 |
| C5-2 | 29.5 | 4/10/14 | 8.0 | 21.5 |
| C5-3 | 31.0 | 4/9/14 | 7.7 | 23.3 |
| C5-4 | 29.4 | 4/9/14 | 9.0 | 20.4 |
| C6-1 | 32.0 | 4/8/14 | 9.8 | 22.2 |
| C6-2 | 31.2 | 4/8/14 | 8.0 | 23.2 |
| C6-3 | 29.2 | 4/8/14 | 8.0 | 21.2 |

Notes:

1.  Ground surface elevations taken from file titled "TOPO and Boundaries Map" dated 1/14/14 downloaded from project Buzzsaw site.

2.  Groundwater depths were recorded during drilling.  These depths may not represent stabilized levels, and groundwater levels may also fluctuate due to seasonal rainfall.

**LANGAN TREADWELL ROLLO**

A groundwater monitoring and sampling summary report was prepared for the nearby former Synertek site (CH2MHill, 2015) located at 3050 Coronado Drive.  As part of the Synertek study, four groundwater monitoring wells, designated as MW-28A, MW-29A, MW-33A and MW-34A were located within the project site, as shown on Figures 2 and 3.  The historic groundwater levels for MW-28A, MW-29A, MW-33A and MW-34A are presented in Appendix E.

Based on the CH2MHill report, the vicinity around the project site has two aquifers, designated as A-aquifer and B-aquifer.  The A-aquifer generally extends approximately between 10 to 20 feet bgs and the B-aquifer extends approximately between 30 to 50 feet bgs.  Silty to sandy clays, ranging from 5 to 10 feet thick separates the two aquifers.  The CH2MHill report also discusses an artesian[4] condition was also observed in one of the Synertek site's monitoring wells within the B-aquifer.

During our investigation, the PPDTs conducted at C1-3 and C3-3 were performed in the B-aquifer at depths of 34.9 and 34.6 feet bgs, respectively.  The calculated head of groundwater was measured to be 10 to 13 feet above the ground surface elevation, indicating the sand and gravel layer may be an artesian aquifer.  Also, prior to the grouting of CPTs C5-2 and C6-3, groundwater was observed flowing out of the hole which also indicates artesian condition.

## 5.0    SEISMIC AND GEOLOGIC HAZARDS

### 5.1    Regional Seismicity

The major active faults in the area are the San Andreas, Monte Vista-Shannon, Hayward, and Calaveras faults.  These and other faults of the region are shown on Figure 4.  For each of the active faults within approximately 55 km from the site, the distance from the site and estimated mean characteristic Moment magnitude[5] [2007 Working Group on California Earthquake Probabilities (WGCEP) (2008) and Cao et al. (2003)] are summarized in Table 2.

---

[4]    An artesian aquifer is a confined aquifer containing groundwater under positive pressure.

[5]    Moment magnitude is an energy-based scale and provides a physically meaningful measure of the size of a faulting event.  Moment magnitude is directly related to average slip and fault rupture area.

**LANGAN TREADWELL ROLLO**

**TABLE 2**

**Regional Faults and Seismicity**

| Fault Segment | Approx. Distance from fault (km) | Direction from Site | Mean Characteristic Moment Magnitude |
|---|---|---|---|
| Monte Vista-Shannon | 12 | Southwest | 6.50 |
| Total Hayward | 14 | Northeast | 7.00 |
| Total Hayward-Rodgers Creek | 14 | Northeast | 7.33 |
| Total Calaveras | 16 | East | 7.03 |
| N. San Andreas – Peninsula | 17 | Southwest | 7.23 |
| N. San Andreas (1906 event) | 17 | Southwest | 8.05 |
| N. San Andreas – Santa Cruz | 23 | South | 7.12 |
| Zayante-Vergeles | 32.5 | South | 7.00 |
| San Gregorio Connected | 38.3 | West | 7.50 |
| Greenville Connected | 40 | East | 7.00 |
| Mount Diablo Thrust | 41 | Northeast | 6.70 |
| Monterey Bay-Tularcitos | 53 | Southwest | 7.30 |

Figure 4 also shows the earthquake epicenters for events with magnitude greater than 5.0 from January 1800 through December 2000. Since 1800, four major earthquakes have been recorded on the San Andreas Fault. In 1836 an earthquake with an estimated maximum intensity of VII on the Modified Mercalli (MM) scale (Figure 5) occurred east of Monterey Bay on the San Andreas Fault (Toppozada and Borchardt 1998). The estimated Moment magnitude, $M_w$, for this earthquake is about 6.25. In 1838, an earthquake occurred with an estimated intensity of about VIII-IX (MM), corresponding to a $M_w$ of about 7.5. The San Francisco Earthquake of 1906 caused the most significant damage in the history of the Bay Area in terms of loss of lives and property damage. This earthquake created a surface rupture along the San Andreas Fault from Shelter Cove to San Juan Bautista approximately 470 kilometers in length. It had a maximum intensity of XI (MM), a $M_w$ of about 7.9, and was felt 560 kilometers away in Oregon, Nevada, and Los Angeles. The most recent earthquake to affect the Bay Area was the Loma Prieta Earthquake of 17 October 1989, in the Santa Cruz Mountains with a $M_w$ of 6.9, approximately 39 km from the site.

In 1868 an earthquake with an estimated maximum intensity of X on the MM scale occurred on the southern segment (between San Leandro and Fremont) of the Hayward Fault. The estimated $M_w$ for the earthquake is 7.0. In 1861, an earthquake of unknown magnitude (probably a $M_w$ of about 6.5) was reported on the Calaveras Fault. The most recent significant earthquake on this fault was the 1984 Morgan Hill earthquake ($M_w = 6.2$).

**LANGAN TREADWELL ROLLO**

The 2007 WGCEP at the U.S. Geologic Survey (USGS) predicted a 63 percent chance of a magnitude 6.7 or greater earthquake occurring in the San Francisco Bay Area in 30 years. More specific estimates of the probabilities for different faults in the Bay Area are presented in Table 3.

**TABLE 3**
**WGCEP (2008) Estimates of 30-Year Probability**
**of a Magnitude 6.7 or Greater Earthquake**

| Fault | Probability (percent) |
|---|---|
| Hayward-Rodgers Creek | 31 |
| N. San Andreas | 21 |
| Calaveras | 7 |
| San Gregorio | 6 |

## 5.2     Fault Rupture

Historically, ground surface ruptures closely follow the trace of geologically young faults. The site is not within an Earthquake Fault Zone, as defined by the Alquist-Priolo Earthquake Fault Zoning Act and no known active or potentially active faults exist on the site. Therefore, we conclude the risk of fault offset through the site from a known active fault is low. In a seismically active area, the remote possibility exists for future faulting in areas where no faults previously existed; however, we conclude that the risk of surficial ground deformation from faulting at the site is low.

## 5.3     Liquefaction and Associated Hazards

The site is in a seismically active area and will be subject to very strong shaking during a major earthquake. Strong ground shaking during an earthquake can result in ground failure such as that associated with soil liquefaction[6], lateral spreading[7], and cyclic densification[8]. Each of

---

[6]  Liquefaction is a transformation of soil from a solid to a liquefied state during which saturated soil temporally loses strength resulting from the buildup of excess pore water pressure, especially during earthquake-induced cyclic loading. Soil susceptible to liquefaction includes loose to medium dense sand and gravel, low-plasticity silt, and some low-plasticity clay deposits.

[7]  Lateral spreading is a phenomenon in which surficial soil displaces along a shear zone that has formed within an underlying liquefied layer. Upon reaching mobilization, the surficial blocks are transported downslope or in the direction of a free face by earthquake and gravitational forces.

[8]  Cyclic densification is a phenomenon in which non-saturated, cohesionless soil is compacted by earthquake vibrations, causing ground surface settlement.

these conditions has been evaluated based on our literature review, field investigation and analyses, and is discussed in this section.

### 5.3.1   Liquefaction

The site is located within a zone designated with the potential for liquefaction, as identified by the California Geologic Survey (CGS) in a map titled, *State of California Seismic Hazard Zones, Milpitas Quadrangle*, prepared by the California Geologic Survey, dated October 19, 2004.

When saturated soil with little to no cohesion liquefies during a major earthquake, it experiences a temporary loss of shear strength as a result of a transient rise in excess pore water pressure generated by strong ground motion.  Flow failure, lateral spreading, differential settlement, loss of bearing, ground fissures, and sand boils are evidence of excess pore pressure generation and liquefaction.

Layers of loose to medium dense saturated sand and silty sand, varying in thickness from approximately six inches to six feet, were encountered below the groundwater level from depths of approximately 35 to 55 feet bgs.  Based on our analyses, we conclude several of these layers could potentially liquefy during a major earthquake and may experience liquefaction-induced settlement.

Following the procedures presented in the 1996 NCEER and the 1998 NCEER/NSF workshops on the Evaluation of Liquefaction Resistance of Soils (Youd and Idriss 2001) and a peak ground acceleration (PGA) of 0.4g based on the Design Earthquake (Section 7.6), we estimate liquefaction induced settlement of these layers could be on the order of ¼ to 1 inch.  Because the potentially liquefiable layers are discontinuous, we estimate that up to one inch of differential settlement may occur during an earthquake.

### 5.3.2   Cyclic Densification

Cyclic densification refers to seismically-induced differential compaction of non-saturated granular material (sand and gravel above the groundwater table) caused by earthquake vibrations.  The borings and CPTs indicate that the materials above the water table are predominantly composed of stiff to hard clayey soils, and therefore seismic densification is unlikely.

### 5.3.3   Lateral Spreading

Lateral spreading is a phenomenon in which a surficial soil displaces along a shear zone that has formed within an underlying liquefied layer.  The surficial blocks are transported downslope

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 13*

or in the direction of a free face, such as a channel, by earthquake and gravitational forces. Lateral spreading is generally the most pervasive and damaging type of liquefaction-induced ground failure generated by earthquakes.

The project site is 50 feet from the San Tomas Aquino Creek. According to Youd, Hansen, and Bartlett (1999), for significant lateral spreading displacements to occur, the soils should consist of saturated cohesionless sandy sediments with $(N_1)_{60}$ less than 15. The potentially liquefiable soil underlying the site generally has $(N_1)_{60}$ greater than 15 and therefore does not fall within the parameters applicable to the Youd, Hansen, and Bartlett lateral displacement model. Also, the site is relatively flat and the potentially liquefiable soils are not continuous, hence, we conclude widespread shear zones should not develop for significant lateral displacements to occur during liquefaction. Therefore, lateral spreading is not likely to affect the site.

## 5.4    Tsunami

Recent published maps (California Emergency Agency, 2009) indicate the project site is not within the tsunami inundation zone; therefore, we conclude the potential risk by inundation from tsunami to be low within the project site. However, the project civil engineer should evaluate the impact of sea level rise on the potential risk of inundation from a tsunami.

## 6.0    DISCUSSION AND CONCLUSIONS

From a geotechnical standpoint, the proposed project is feasible provided the site conditions and geotechnical issues discussed below are properly addressed during the design and construction of the proposed buildings. The primary geotechnical issues include:

- the presence of near surface expansive soil

- the presence of the former Saratoga Creek

- the presence of moderately compressible alluvial deposits

- the presence of shallow groundwater

- the potential for liquefaction-induced settlement

These issues and their impact on the geotechnical aspects of the project are discussed in the following subsections.

**LANGAN TREADWELL ROLLO**

## 6.1    Expansive Soil Considerations

The existing near-surface soil has a moderate to high expansion potential.  Moisture fluctuations in near-surface expansive soil could cause the soil to expand or contract resulting in movement and potential damage to improvements that overlie them.  Potential causes of moisture fluctuations include drying during construction, and subsequent wetting from rain, capillary rise, landscape irrigation, and type of plant selection.

For improvements at-grade, the volume changes from expansive soils can cause cracking of foundations, floor slabs and exterior flatwork.  Therefore, foundations, slabs and concrete flatwork should be designed and constructed to resist the effects of the expansive soil.  These effects can be mitigated by moisture conditioning the expansive soil and providing select, non-expansive fill below interior and exterior slabs and supporting foundations below the zone of severe moisture change.

An alternative to importing select fill includes lime treatment of the near surface soil.  Lime stabilization of the at-grade building pads and the subgrade of exterior flatwork and pavement may be a cost-effective means of improving on-site soils for use as non-expansive fill within the building pad.

If the surface soil becomes wet, it may be difficult to compact during the winter.  If required, the soil can be mixed with lime to aid in compaction.  Lime can also reduce the swell potential and increase the shear strength of the soil.

The degree to which lime will react with soil depends on such variables as type of soil, minerals present, quantity and type of lime, and the length of time the lime-soil mixture is cured.  The quantity of lime added generally ranges from 5 to 7 percent by weight and should be determined by laboratory testing.  If lime is intended to reduce swelling potential and/or increase the strength of the soil, the lime treatment contractor should collect a bulk sample of the soil and perform laboratory tests to determine if the lime will react with the soil, the amount of lime required and the resulting plasticity index.  We should be provided with the results to evaluate the effectiveness of the lime.

## 6.2    Foundations and Settlement

The proposed development will consist of 4- to 5-story wood-framed structures wrapped around concrete parking garages.  The proposed structures will be at-grade.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 15*

We understand minor fills and cuts are planned for the remaining improvements of the project. If new fill is added at the site, we anticipate approximately ¼-inch and ½-inch of consolidation settlement for one and two feet of new fill, respectively.

The proposed buildings can be supported on shallow footings that are founded near the bottom of the zone of severe moisture change or with post-tensioned slabs-on-grade (P-T slabs) bearing on the stiff native alluvial soils.  Localized soft soil, if encountered under footing locations, should be excavated and recompacted or replaced with lean or structural concrete.

The proposed building sites are susceptible to the following potential sources of settlement:

- consolidation of the underlying alluvial deposits under the weight of new building loads or new fill

- liquefaction-induced settlement.

To evaluate the settlement of the site due to consolidation of the alluvial deposits under the weight of the new building loads, we performed laboratory consolidation tests on relatively undisturbed samples of the clay, as presented in Appendix C.  The test results indicate the alluvial clay generally has an OCR of 1.5 to 3.2.

Design recommendations for footings and the P-T slabs are presented in Section 7.2.  Based on the building loads provided by PASE and DCI, we estimate total static settlement of approximately ½-inch to 1 inch for P-T slabs.  For footings, the total consolidation settlements for footing are presented in Table 4.

**TABLE 4**

**Summary of Footing Settlement**

| Footing Type | Total Static Settlement (inch) |
|---|---|
| Spread Footing | ½ to 1 |
| Continuous Footing | ¼ to ½ |

Where adjacent continuous footings are relatively close (adjacent units), the total settlements will likely double.  Differential settlement between adjacent footings, typically 20 feet apart, should not exceed ½-inch.

**LANGAN TREADWELL ROLLO**

As discussed previously, we estimate that up to one inch of liquefaction-induced settlements may occur; differential settlement between columns may be on the order of ½ inch during a major earthquake.  These settlements are in addition to the predicted consolidation static settlement.  The structural engineer should evaluate the impact of liquefaction-induced settlement to structures supported on shallow foundations.  If the total and differential settlements are not tolerable than a stiffer foundation system such as an interconnected grid system or mat should be used.

We understand the design team is considering preserving existing Redwood trees that occupy the area east of Buildings B3 and B5.  Trees with large roots or have high water demand should be avoided since they can dry out the soil beneath foundations and cause settlement.

## 6.3    Groundwater Considerations

The depth to groundwater can fluctuate by several feet depending upon the amount of rainfall, the level of the nearby San Tomas Aquino Creek and the amount of groundwater pumping and/or recharge in the local area.

Based on historic groundwater data at the project site (CH2MHill, 2015), the high historic groundwater appears to be at Elevation 23 feet at the southern portion of the site (along Scott Boulevard) and Elevation 20 feet on the northern portion of the site (along Augustine Drive).  Based on the monitoring well information, the groundwater appears to flow generally south to north.  Therefore, we conclude a design groundwater elevation should be linearly interpolated between Elevation 24 feet at the southern portion of the site and Elevation 21 feet at the northern portion of the site.

The groundwater depths measured during our field investigation do not represent stabilized levels, and groundwater levels may also fluctuate due to seasonal rainfall.  Therefore, we have relied on the historic groundwater data (CH2MHill, 2015) to determine the design groundwater elevation.  The groundwater depths measured at CPT C1-3, C3-3, C5-2 and C6-3 indicate the sand and gravel layer at depths of approximately 35 feet bgs are under an artesian condition.  If excavations are not made into the sand and gravel layer approximately 35 feet bgs (B-aquifer), the artesian condition should not affect the project.

## 6.4    Excavation and Monitoring

The soil to be excavated from the site consists of materials that can be excavated with conventional earthmoving equipment such as loaders and backhoes, except where foundations

**LANGAN TREADWELL ROLLO**

and slabs of existing buildings are encountered.  Removal of these may require the use of jackhammers or hoe-rams.  Excavations resulting from the removal of foundations, slabs and underground utilities that extend below the bottom of the proposed foundation/floor level should be cleaned of any loose soil/debris and backfilled with lean concrete or properly compacted fill.

The surficial soil is clayey and moderately to highly plastic.  If earthwork is performed in wet weather conditions, it may be difficult to compact the soil; it may need to be aerated during dry weather.  Light grading equipment may be needed to avoid damaging the subgrade.

### 6.5    Corrosion Potential

CERCO Analytical performed tests on three soil samples from the site to evaluate corrosion potential to buried metals and concrete.  The results of the tests are presented in Appendix D and summarized in Table 5.

**TABLE 5**
**Summary of Corrosivity Test Results**

| Test Boring | Sample Depth (feet) | pH | Sulfate (ppm) | Resistivity (ohms-cm) | Redox (mV) | Chloride (ppm) |
|---|---|---|---|---|---|---|
| BP-1 | 0 to 5 | 8.33 | 110 | 9,600 | 400 | N.D |
| BP-3 | 6 to 8.5 | 8.17 | 49 | 17,000 | 350 | N.D |
| BP-5 | 0 to 5 | 7.98 | 130 | 9,800 | 420 | N.D |

N.D. = None Detected

Based upon resistivity measurements, the soil samples tested are classified as "mildly corrosive" to buried iron, steel, cast iron, ductile iron, galvanized steel and dielectric coated steel or iron.  The chemical analysis indicates reinforced concrete and cement mortar coated steel, should not be affected by the corrosivity of the soil.  To protect reinforcing steel from corrosion, adequate coverage should be provided as required by the building code.

A brief evaluation of the corrosivity of the soil samples is presented in Appendix D.  For more detailed recommendations regarding the corrosion protection of buried metals and concrete, a licensed corrosion consultant should be retained.

**LANGAN TREADWELL ROLLO**

## 7.0    RECOMMENDATIONS

From a geotechnical standpoint, the site can be developed as planned, provided the recommendations presented in this section of the report are incorporated into the design and contract documents.  Criteria for foundation design, together with recommendations for site preparation, floor slabs, fill placement and seismic design are presented in this section of the report.

### 7.1    Earthwork

The following subsections presents recommendations for site preparation and lime treatment.

#### 7.1.1    Site Preparation

Demolition in areas to be developed should include removal of existing pavement and underground obstructions, including foundations of existing structures.  Any vegetation and organic topsoil should be stripped in areas to receive new site improvements.  Stripped organic soil can be stockpiled for later use in landscaped areas, if approved by the owner and architect; organic topsoil should not be used as compacted fill.

Demolished asphalt and concrete at the site may be crushed to provide recycled construction materials, including sand, free-draining crushed rock, and Class 2 aggregate base (AB) provided it is acceptable from an environmental standpoint.  Where crushed rock will be used beneath vapor retarders and in other applications where free-draining materials are required, it should have no greater than six percent of material passing the 3/8-inch sieve and meet the other requirements presented in Section 7.3.  Where recycled Class 2 AB will be used beneath pavements, it should meet requirements of the Caltrans Standard Specifications.  Recycled Class 2 AB that does not meet the Caltrans specifications should not be used beneath City streets, but it is acceptable for use as select fill within building pads and beneath concrete flatwork, provided it meets the requirements for select fill as presented later in this section.

Existing underground utilities beneath areas to receive new improvements should be removed or abandoned in-place by filling them with grout.  The procedure for in-place abandonment of utilities should be evaluated on a case-by-case basis, and will depend on location of utilities relative to new improvements.  However, in general, existing utilities within four feet of final grades should be removed, and the resulting excavation should be properly backfilled based on the recommendations presented in this section.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 19*

Prior to placing fill, the subgrade exposed after stripping and site clearing, as well as other portions of the site that will receive new fill or site improvements, should be scarified to a depth of at least eight inches, moisture-conditioned to at least three percent above the optimum moisture content, and compacted to at least 88 percent relative compaction[9], where the exposed material consists of moderately to highly expansive soil.  Where lean clay or sandy soil are encountered during grading, the scarified surface should be moisture-conditioned to above the optimum moisture content and compacted to at least 90 percent relative compaction.  An exception to this general procedure is within any proposed vehicle pavement areas, where the upper six inches of the pavement subgrade should be compacted to at least 95 percent relative compaction regardless of expansion potential.

We understand excavations on the order of five feet may be made to contain soils impacted from past agricultural activities. If this occurs,  we recommend the backfill for the excavation should be moisture-conditioned to at least three percent above the optimum moisture content and compacted to at least 88 to 92 percent relative compaction.

Heavy construction equipment should not be allowed directly on the final subgrade.  The clay exposed at the foundation level may be susceptible to disturbance under construction equipment loads.  If the subgrade is disturbed during the rainy season, it may be necessary to place a minimum 12-inch working pad consisting of crushed rock on top of the subgrade or lime treating the upper 12 inches of the subgrade to winterize it.  Any select fill placed during grading should meet the following criteria:

- be free of organic matter

- contain no rocks or lumps larger than three inches in greatest dimension

- have a low expansion potential (defined by a liquid limit of less than 40 and plasticity index lower than 12)

- have a low corrosion potential[10]

- be approved by the geotechnical engineer.

All fill placed beneath improvements should meet the criteria for select fill previously discussed in this section.  All select fill should be moisture-conditioned to above optimum moisture

---

[9]   Relative compaction refers to the in-place dry density of soil expressed as a percentage of the maximum dry density of the same material, as determined by the ASTM D1557-07 laboratory compaction procedure.

[10]  Low corrosion potential is defined as a minimum resistivity of 2,000 ohms-cm and maximum sulfate and chloride concentrations of 250 parts per million.

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page 20

content, placed in horizontal lifts not exceeding eight inches in loose thickness, and be compacted to at least 90 percent relative compaction, except for fill that is placed within the proposed pavement areas.  In these situations, the upper six inches of the soil subgrade, all select fill and aggregate baserock materials should be compacted to at least 95 percent relative compaction.  Where used, sand containing less than 10 percent fines (particles passing the No. 200 sieve) should also be compacted to at least 95 percent relative compaction.  Samples of on-site and proposed import fill materials should be submitted to the geotechnical engineer for approval at least three business days prior to use at the site.

We recommend that at least 12 inches of select fill be placed above native soil in areas that will have concrete flatwork, and 18 inches beneath building slabs-on-grade.  Materials for capillary break (sand and gravel) should not count as part of the select fill.  The select fill should extend at least five feet beyond building footprints.  Select material should meet the criteria presented later in this section for select fill.

Alternatively, instead of placing select fill, the upper 18 inches of the existing surface soil in building pads may be lime treated to reduce the expansion potential and help winterize the site.  We recommend that at least 5 percent lime by weight of the soil be used to treat the upper 18 inches of native soil for at-grade structures.  The lime treatment should extend at least five feet beyond building footprints where hardscape areas are planned; however, landscape areas should not be lime treated because the lime treated soil may make it difficult for the plants to survive.  In landscape areas adjacent to building footprints and exterior slabs, select fill should be placed.  The lime treatment contractor should evaluate the type and amount of lime to reduce the plasticity index of the soil to meet the select fill criteria.

### 7.1.2   Quality Control of Lime Treatment

Lime treatment of fine-grained soils generally includes site preparation, application of lime, mixing, compaction, and curing of the lime treated soil.  Field quality control measures should include checking the depth of lime treatment, degree of pulverization, lime spread rate measurement, lime content measurement, and moisture content and density measurements, and mixing efficiency.  Quality control may also include laboratory tests for unconfined compressive strength tests on representative samples.

The lime treatment process should be designed by a contractor specializing in its use and who is experienced in the application of lime in similar soil conditions.  Based on our experience with lime treatment, we judge that the specialty contractor should be able to treat the moderate to highly expansive on-site material to produce a non-expansive fill for building subgrade.

**LANGAN TREADWELL ROLLO**

If the lime treatment alternative is selected, we recommend that the specialty contractor prepare a treatment specification for our review prior to construction.

## 7.2    Foundations

The following subsections provide recommendations for P-T slab, spread footings and mat foundation for the proposed buildings.

### 7.2.1   Spread Footing Foundations

Spread footings may be used above the design groundwater table or where hydrostatic uplift is not a concern.  A firm subgrade consisting of native soil should be exposed at the bottom of the proposed footing excavations.  If isolated areas of soft material or fill are encountered in the bottom of the excavation, they should be removed to expose firm material.  Resulting overexcavations should be backfilled with lean or structural concrete.

The recommended bearing capacities for spread footings is 3,500 psf.  To reduce the potential for movement of the footings due to shrink and swell of the expansive clay, we recommend that perimeter footings be bottomed at least 36 inches below the lowest adjacent soil subgrade.  Interior footings should extend at least 30 inches below the lowest adjacent  soil subgrade (measured from the top of the select fill).

Footings should be at least 18 inches wide for continuous footings and 24 inches for isolated spread footings.  Footings adjacent to utility trenches (or other footings) should bear below an imaginary 1.5:1 (horizontal to vertical) plane projected upward from the bottom edge of the utility trench (or adjacent footings).

Lateral forces can be resisted by a combination of friction along the base of the footing, and passive resistance against the vertical faces of the foundation..  Frictional resistance should be computed using a base friction coefficient of 0.30.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation.  For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used.  Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If passive pressure on the walls is relied upon for lateral resistance, the walls should be designed to resist the passive pressure.  To calculate the passive resistance against the vertical faces of the footings, we recommend an equivalent fluid

**LANGAN TREADWELL ROLLO**

weight of 250 pounds per cubic foot (pcf).  The upper foot should be ignored unless confined by a slab.  The values for the friction coefficient and passive pressures include a factor of safety of 1.5.

Footing excavations should be free of standing water, debris, and disturbed materials prior to placing concrete.  The bottoms and sides of the footing excavations or mat subgrade should be moistened following excavation and maintained in a moist condition until the capillary break or concrete are placed.  If the foundation soil dries during construction, the footing will eventually heave, which may result in cracking and distress.  We should check footing excavations prior to placement of reinforcing steel.

Positive surface drainage should be provided around the building to direct surface water away from the foundations.  In addition, roof downspouts should be discharged into controlled drainage facilities to keep the water away from the foundations.  If subdrains are used to keep water away from foundations, they should be placed above the groundwater table.

7.2.2   Mat Foundation

The recommended maximum bearing pressures and the associated design moduli of subgrade reaction for mats are presented in Table 6.

**TABLE 6**

**Mat Foundations**

| Building Configuration | Maximum Allowable Static Bearing Pressure (psf) | Modulus of Subgrade Reaction (kcf) |
|---|---|---|
| At-Grade | 3,500 | 30 |

The moduli values are representative of the anticipated settlement under the building loads and are based on the maximum allowable bearing pressure.  The modulus of subgrade reaction is not linear and therefore larger settlements may occur if the bearing pressure exceeds those in Table 6.  Higher maximum allowable bearing pressures may be acceptable; however, we will need to evaluate the higher stresses and the area effected by the higher stresses and determine if the modulus of subgrade reaction needs to be revised.  Therefore, after the mat analysis is completed, we should review the computed settlement and bearing pressure

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page 23

distributions to check that the modulus value is appropriate.  Resistance to lateral loads can be mobilized by a combination of passive pressure acting against the vertical faces of the mat and friction along the base of the mat.  Passive resistance may be calculated using lateral pressures corresponding to an equivalent fluid weight of 250 pcf; the upper foot of soil should be ignored unless confined by a concrete slab or pavement.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation. For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used. Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If waterproofing is not used, frictional resistance should be computed using a base friction coefficient of 0.3.  These values include a factor of safety of about 1.5 and may be used in combination without reduction.

If weak or non-engineered fill is encountered in the mat excavation bottom, it should be over-excavated and replaced with engineered fill or lean concrete.  The bottom and sides of mat excavations should be wetted following excavation and maintained in a moist condition until concrete is placed.  If the foundation soil dries during construction, the foundation will heave when exposed to moisture, which may result in cracking and distress.

We should observe mat subgrade prior to placement of reinforcing steel.  The excavation for the mat should be free of standing water, debris, and disturbed materials prior to placing concrete.

### 7.2.3    P-T Slab Foundation

As discussed in Section 6.2, we estimated differential settlements (both static and seismic) of the ground.  Differential settlement across or within a building will depend on the rigidity of the P-T slab.  The proposed residential buildings may be supported on P-T slabs bearing on native material and engineered fill prepared in accordance with our previous recommendations.

For design of P-T slabs for seasonal differential movement, we recommend using the parameters presented in Table 7.  The P-T slabs should be checked for the edge-lift condition using special "no-swell" design equations specified by the Post Tensioning Institute (2008).

**LANGAN TREADWELL ROLLO**

**TABLE 7**
**P-T Slab Design Parameters**

| Parameter | Value | |
|---|---|---|
| | **Buildings West of Montgomery Drive** | **Buildings East of Montgomery Drive** |
| Thornwaite Moisture Index | 0 | |
| Edge moisture variation distance edge lift center lift | 3.5 feet 6.1 feet | 4.1 feet 7.8 feet |
| Depth to constant soil suction | 10 feet | |
| Constant soil suction | 3.7 pF | |
| Soil differential movement edge lift center lift | 3.7 inches 2.3 inches | 1.4 inches 1.0 inches |

The P-T slabs should be at least eight inches thick, with a thickened edge that is embedded at least 12 inches below the lowest adjacent outside grade or six inches below the water vapor retarder (part of capillary break), whichever is lower.  The maximum bearing pressure beneath P-T slabs should not exceed 3,500 psf for dead plus live loads and 4,700 psf under total load conditions.

To accommodate seismically induced settlement, we recommend each building area should be designed for soil differential movement of 1 inch in 40 feet and to span an unsupported area of 10 feet in diameter at any location within the interior, cantilever a distance of 3 feet along the edges and 5 feet at the corners.  This evaluation for "areas of non-support" is empirical and is not intended to model actual slab performance; the purpose of this evaluation is to establish foundation stiffness and to control differential movement.

We should check the P-T subgrade prior to placing reinforcing steel or a moisture barrier, if required.  The exposed subgrades and excavations for the deepened edge should be free of standing water, debris, and disturbed materials prior to placing concrete.  The bottom of the excavation should be kept moist before concrete is placed.  We should check the subgrade after cleaning, but prior to placement of crushed rock to check that loose to disturbed material

**LANGAN TREADWELL ROLLO**

has been removed and the subgrade is firm and non-yielding.  If loose, disturbed, or otherwise undesirable material is observed at the subgrade, it should be overexcavated to firm, competent material and be replaced with either engineered fill or concrete.

Resistance to lateral loads can be mobilized by a combination of passive pressure acting against the vertical faces of the P-T slab and friction along the base.  Passive resistance may be calculated using lateral pressures corresponding to an equivalent fluid weight of 250 pcf; the upper foot of soil should be ignored unless confined by a concrete slab or pavement.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation. For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used. Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If waterproofing is not used, frictional resistance should be computed using a base friction coefficient of 0.3.  These values include a factor of safety of about 1.5 and may be used in combination without reduction.

Moisture is likely to condense on the underside of concrete floors, even if they are above the groundwater.  To reduce water vapor transmission through the floor slabs of habitable areas, we recommend installing a capillary moisture break and a water vapor retarder beneath the P-T slab, as discussed in Section 7.3 (unless the slab is waterproofed).

To reduce shrinkage and swelling beneath the P-T slab, we recommend a clay or concrete plug be installed where utilities enter beneath the building, as recommended in Section 7.11.

## 7.3    Floor Slab

Because expansive soil is present near the existing ground surface, an 18-inch thick layer of select fill should be placed beneath the floor slab for at-grade buildings.  Where soft or loose soil is present at the subgrade elevation prior to placing select fill, the weak soil should be removed and replaced with engineered fill or lean concrete.

Where slab-on-grade floors are to be cast, the soil subgrade should be scarified to a depth of six inches, moisture conditioned to at least 3 percent above optimum moisture content, and rolled to provide a firm, non-yielding surface compacted to 88 to 93 percent relative compaction.  If the subgrade is disturbed during excavation for footings and utilities, it should be re-rolled.  Loose, disturbed materials should be excavated, removed, and replaced with engineered fill during final subgrade preparation.

**LANGAN TREADWELL ROLLO**

Moisture is likely to condense on the underside of the slabs, even though they will be above the design groundwater table.  Consequently, a moisture barrier should be installed beneath the slabs if movement of water vapor through the slabs would be detrimental to its intended use.  A moisture barrier is generally not required beneath parking garage slabs, except for areas beneath mechanical, electrical, and storage rooms.  A typical moisture barrier consists of a capillary moisture break and a water vapor retarder.

The capillary moisture break should consist of at least four inches of clean, free-draining gravel or crushed rock.  The vapor retarder should meet the requirements for Class C vapor retarders stated in ASTM E1745-97.  The vapor retarder should be placed in accordance with the requirements of ASTM E1643-98.  These requirements include overlapping seams by six inches, taping seams, and sealing penetrations in the vapor retarder.  The vapor retarder should be covered with two inches of sand to aid in curing the concrete and to protect the vapor retarder during slab construction.  The particle size of the gravel/crushed rock and sand should meet the gradation requirements presented in Table 8.

**TABLE 8**
**Gradation Requirements for Capillary Moisture Break**

| Sieve Size | Percentage Passing Sieve |
|---|---|
| *Gravel or Crushed Rock* | |
| 1 inch | 90 – 100 |
| 3/4 inch | 30 – 100 |
| 1/2 inch | 5 – 25 |
| 3/8 inch | 0 – 6 |
| *Sand* | |
| No. 4 | 100 |
| No. 200 | 0 – 5 |

The sand overlying the membrane should be dry at the time concrete is cast.  Excess water trapped in the sand could eventually be transmitted as vapor through the slab.  If rain is forecast prior to pouring the slab, the sand should be covered with plastic sheeting to avoid wetting.  If the sand becomes wet, concrete should not be placed until the sand has been dried or replaced.

Concrete mixes with high water/cement (w/c) ratios result in excess water in the concrete, which increases the cure time and results in excessive vapor transmission through the slab.

**LANGAN TREADWELL ROLLO**

Therefore, concrete for the floor slab should have a low w/c ratio - less than 0.50.  If approved by the project structural engineer, the sand can be eliminated and the concrete can be placed directly over the vapor retarder, provided the w/c ratio of the concrete does not exceed 0.45 and water is not added in the field.  If necessary, workability should be increased by adding plasticizers.  In addition, the slab should be properly cured.  Before the floor covering is placed, the contractor should check that the concrete surface and the moisture emission levels (if emission testing is required) meet the manufacturer's requirements.

## 7.4    Below-Grade Walls

The following section presents our recommendations for below-grade walls.

### 7.4.1    Retaining Walls

To construct retaining walls and below-grade walls (i.e., elevator pits), the site may be open cut and/or temporarily shored.  Excavations that will be deeper than five feet and will be entered by workers should be shored or sloped in accordance with CAL-OSHA standards (29 CFR Part 1926).  It is the responsibility of the contractor to determine the safe excavation slopes; however, we recommend temporary cuts greater than 4 feet be no steeper than 1.5:1 (horizontal:vertical).

Because the on-site soil is expansive, we recommend designing below grade walls for at-rest lateral pressures corresponding to equivalent fluid unit weights of 70 pcf and 90 pcf for drained and undrained conditions, respectively.  Because the site is in a seismically active area, the design should also be checked for seismic conditions.  Under seismic loading conditions, there will be an added seismic increment that should be added to active earth pressures (Sitar et al. 2012).  We used the procedures outlined in Sitar et al. (2012) and the peak ground acceleration based on the DE ground motion level (see Section 7.9) to compute the seismic pressure increment.  We recommend the walls be designed for the more critical of at-rest pressures or total pressure (active plus seismic pressure increment).  Below-grade walls backfilled with native soil should be designed for the equivalent fluid weights and pressures presented in Table 9A.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 28*

**TABLE 9A**

**Below-Grade Wall Design Earth Pressures
with Native Soil Backfill
(Drained Conditions Above Design Groundwater Level)**

|  | Static Conditions | | Seismic Conditions[1] |
|---|---|---|---|
|  | Unrestrained Walls – Active (pcf[3]) | Restrained Walls – At-rest (pcf) | Total Pressure – Active Plus Seismic Pressure Increment (pcf) |
| Drained Condition[2] | 45 | 70 | 70 |
| Undrained Condition | 80 | 90 | 95 |

Notes:

1.  The more critical condition of either at-rest pressure for static conditions or active pressure plus a seismic pressure increment for seismic conditions should be checked.
2.  Applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.
3.  pcf = pounds per cubic foot

If open cuts are made for the below-grade walls and select fill is used as backfill, then the walls may be designed using the earth pressures presented on Table 9B.

**TABLE 9B**

**Below-Grade Wall Design Earth Pressures with Select Fill Backfill
(Drained Conditions Above Design Groundwater Level)**

|  | Static Conditions | | Seismic Conditions[1] |
|---|---|---|---|
|  | Unrestrained Walls – Active (pcf[3]) | Restrained Walls – At-rest (pcf) | Total Pressure – Active Plus Seismic Pressure Increment (pcf) |
| Drained Condition[2] | 35 | 55 | 65 |
| Undrained Condition | 80 | 90 | 95 |

Notes:

1.  The more critical condition of either at-rest pressure for static conditions or active pressure plus a seismic pressure increment for seismic conditions should be checked.
2.  Applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.
3.  pcf = pounds per cubic foot

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 29*

Select wall backfill should consist of soil described in Section 7.1.  For cantilever walls retaining level backfill (i.e. landscape walls), the pressures presented above may be used and will depend if the wall retains native soil (expansive) or select fill.

If surcharge loads occur above an imaginary 45-degree line projected up from the bottom of a retaining wall, a surcharge pressure should be included in the wall design.  If this condition exists, we should be consulted to estimate the added pressure on a case-by-case basis.  Where truck traffic will pass within 10 feet of retaining walls, temporary traffic loads should be considered in the design of the walls.  Traffic loads may be modeled by a uniform pressure of 100 pounds per square foot applied in the upper 10 feet of the walls.

The lateral earth pressures recommended for the drained condition are applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.  One acceptable method for backdraining the walls is to place a prefabricated drainage panel against the back side of the wall. The drainage panel should extend down to the base of the wall or the design groundwater elevation (design groundwater elevations are discussed in Section 6.3) to a perforated PVC 20 collector pipe. The pipe should be surrounded on all sides by at least four inches of Caltrans Class 2 permeable material (Caltrans Standard Specifications Section 68-1.025). We should check the manufacturer's specifications regarding the proposed prefabricated drainage panel material to verify that it is appropriate for the intended use. An acceptable alternative is to backdrain the wall with Caltrans Class 2 material at least one foot wide, extending down to the base of the wall. A perforated PVC pipe should be placed at the bottom of the gravel, as described for the first alternative. The pipe in either alternative should be sloped to drain into an appropriate outlet. We should check the manufacturer's specifications for the proposed drainage panel material to verify it is appropriate for its intended use.

Wall backfill should be compacted to at least 90 percent relative compaction using light compaction equipment.  Wall backfill with less than 10 percent fines, or deeper than five feet, should be compacted to at least 95 percent relative compaction for its entirety.  If heavy equipment is used, the wall should be appropriately designed to withstand loads exerted by the equipment and/or temporarily braced.

If below grade walls and structures, including walls and floors for elevator pits and sump pits, extend below the design groundwater level, we recommend the structures be waterproofed and water stops placed at all construction joints to protect against moisture migration.  The waterproofing should be placed directly against the backside of the walls and according to manufacturer's specifications.

**LANGAN TREADWELL ROLLO**

7.4.2   Swimming Pool Considerations

We recommend a zone of select, non-expansive fill be installed around the proposed pools. The width of this zone should be equal to 1/2 of the depth of the pool (e.g. where the pool is 12 feet deep, the select fill should extend at least 6 feet beyond the back of the pool walls). The select fill should extend from the bottom of the pool excavation up to the bottom of the exterior concrete flatwork.  Once the select fill shell zone has been excavated, we recommend that the sides and bottom of the excavation be kept wet until the select fill has been placed.  In addition, the remaining concrete flatwork in the pool area (beyond the pool shell) should be underlain by at least 12 inches of select fill to reduce the potential for differential movement between the pool and the surrounding concrete flatwork.

If the zone of non-expansive soil is provided, the walls of the pool may be designed using the restrained walls (at-rest) and seismic conditions lateral earth pressures presented in Table 9B.

If the zone of non-expansive soil is not provided, the swimming pool walls should be designed using the restrained (at-rest) lateral earth pressures presented in Table 9A.

The proposed swimming pool may extend below the design ground water elevation at the site. The pool bottom should be underlain by an eight-inch-thick gravel blanket (underlain by filter fabric) and be equipped with hydrostatic pressure relief valves to prevent excess hydrostatic pressure from damaging the pool in the event it is drained.

During the installation of the pool, groundwater may be encountered.  If groundwater is encountered during construction, the excavation should be dewatered three feet below the bottom of the excavation.  Excavations that will be deeper than five feet and will be entered by workers should be shored or sloped in accordance with the OSHA standards (29 CFR Part 1926).

**7.5    Shoring Design**

As discussed in Section 6.4, a soldier-pile-and-lagging system is an acceptable method to retain the excavation where open cuts are not feasible.  The lateral pressures recommended for designing tied-back or braced shoring systems are presented on Figure 6.  The passive pressures presented on Figure 6 include a safety factor of 1.5.  A cantilever soldier-pile-and-lagging shoring system can be designed to resist an active earth pressure of 35 pcf and may be designed using the same passive pressures presented on Figure 6.

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page 31

The soldier piles should extend below the excavation bottom a minimum of five feet and be sufficient to achieve lateral stability and resist the downward loading of the tiebacks. Recommendations for computing penetration depth of soldier piles to resist vertical loads are presented in Section 7.5.3.

If traffic occurs within 10 feet of the shoring, a uniform surcharge load of 100 psf should be added to the design. An increase in lateral design pressure for the shoring may be required where heavy construction equipment or stockpiled materials are within a distance equal to the shoring depth. Construction equipment should not be allowed within five feet from the edge of the excavation unless the shoring is specifically designed for the appropriate surcharge. The increase in pressure should be computed after the surcharge loads are known. The anticipated deflections of the shoring system should be estimated to check if they are acceptable.

The shoring system should be designed by a licensed civil engineer experienced in the design of retaining systems, and installed by an experienced shoring specialty contractor. The shoring engineer should be responsible for the design of temporary shoring in accordance with applicable regulatory requirements. Control of ground movement will depend as much on the timeliness of installation of lateral restraint as on the design. We should review the shoring plans and a representative from our office should observe the installation of the shoring.

7.5.1   Tieback Design Criteria and Installation Procedure

Temporary tiebacks may be used to restrain the shoring. The vertical load from the temporary tiebacks should be accounted for in the design. Design criteria for tiebacks are presented on Figure 6.

Tiebacks should derive their load-carrying capacity from the soil behind an imaginary line sloping upward from a point H/5 feet away from the bottom of the excavation and sloping upwards at 60 degrees from the horizontal, where H is the wall height in feet. Tiebacks should have a minimum unbonded length of 15 feet. All tiebacks should have a minimum bonded length of 15 feet and spaced at least four feet on center. The bottom of the excavation should not extend more than two feet below a row of unsecured tiebacks.

Tieback allowable capacity will depend upon the drilling method, hole diameter, grout pressure, and workmanship. The existing sandy soils may cave, therefore, solid flight augers should not be used for tieback installation. We recommend a smooth cased tieback installation method

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 32*

(such as a Klemm type rig) be used. For estimating purposes, we recommend using the skin friction values presented on Figure 6. These values include a factor of safety of about 1.5. Higher skin friction values may be used if confirmed with pre-production performance tests.

The contractor should be responsible for determining the actual length of tiebacks required to resist the lateral earth pressures imposed on the temporary retaining systems. Determination of the tieback length should be based on the contractor's familiarity with his installation method. The computed bond length should be confirmed by a performance- and proof-testing program under the observation of an engineer experienced in this type of work. Replacement tiebacks should be installed for tiebacks that fail the load test.

The first two production tiebacks and two percent of the remaining tiebacks should be performance-tested to at least 1.25 times the design load. All other temporary tiebacks should be proof-tested to at least 1.25 times the design load. Recommendations for tieback testing are presented in Section 7.5.2. The performance tests will be used to determine the load carrying capacity of the tiebacks and the residual movement. The performance-tested tiebacks should be checked 24 hours after initial lock off to confirm stress relaxation has not occurred. The geotechnical engineer should evaluate the results of the performance tests and determine if creep testing is required and select the tiebacks that should be creep tested. If any tiebacks fail to meet the proof-testing requirements, additional tiebacks should be added to compensate for the deficiency, as determined by the shoring designer.

7.5.2   Tieback Testing

We should observe tieback testing. The first two production tiebacks and two percent of the remaining tiebacks should be performance-tested to at least 1.25 times the design load. The remaining tiebacks should be confirmed by proof tests also to at least 1.25 times the design load.

The movement of each tieback should be monitored with a free-standing, tripod-mounted dial gauge during performance and proof testing. The performance test is used to verify the capacity and the load-deformation behavior of the tiebacks. It is also used to separate and identify the causes of tieback movement, and to check that the designed unbonded length has been established. In the performance test, the load is applied to the tieback in several cycles of incremental loading and unloading. During the test, the tieback load and movement are measured. The maximum test load should be held for a minimum of 10 minutes, with readings taken at 0, 1, 3, 6, and 10 minutes. If the difference between the 1- and 10-minute reading is

**LANGAN TREADWELL ROLLO**

less than 0.04 inch during the loading, the test is discontinued.  If the difference is more than 0.04 inch, the holding period is extended by 50 minutes to 60 minutes, and the movements should be recorded at 15, 20, 25, 30, 45, and 60 minutes.

A proof test is a simple test used to measure the total movement of the tieback during one cycle of incremental loading.  The maximum test load should be held for a minimum of 10 minutes, with readings taken at 0, 1, 2, 3, 6, and 10 minutes.  If the difference between the 1- and 10-minute reading is less than 0.04 inch, the test is discontinued.  If the difference is more than 0.04 inch, the holding period is extended by 50 minutes to 60 minutes, and the movements should be recorded at 15, 20, 25, 30, 45, and 60 minutes.

We should evaluate the tieback test results and determine whether the tiebacks are acceptable.  A performance- or proof-tested tieback with a ten-minute hold is acceptable if the tieback carries the maximum test load with less than 0.04 inch movement between one and 10 minutes, and total movement at the maximum test load exceeds 80 percent of the theoretical elastic elongation of the unbonded length.

A performance- or proof-tested tieback with a 60-minute hold is acceptable if the tieback carries the maximum test load with less than 0.08 inch movement between six and 60 minutes, and total movement at the maximum test load exceeds 80 percent of the theoretical elastic elongation of the unbonded length.  Tiebacks that failed to meet the first criterion will be assigned a reduced capacity.

If the total movement of the tiebacks at the maximum test load does not exceed 80 percent of the theoretical elastic elongation of the unbonded length, the contractor should replace the tiebacks.

### 7.5.3   Penetration Depth of Soldier Piles

The shoring designer should evaluate the required penetration depth of the soldier piles.  The soldier piles should have sufficient axial capacity to support the vertical load component of the tiebacks and the vertical load acting on the piles, if any.  To compute the axial capacity of the piles, we recommend using an allowable friction of 1,000 psf on the perimeter of the piles below the excavation level.

**LANGAN TREADWELL ROLLO**

## 7.6     Drainage and Dewatering Systems

Drainage control design should include provisions for positive surface gradients so that surface runoff is not permitted to pond, particularly adjacent to structures, or on roadways or pavements.  Surface runoff should be directed away from foundations to properly designed and installed drop inlets.

We recommend a temporary well system be installed around the perimeter of proposed excavations to dewater the excavations during construction.  The system should be designed and constructed by a qualified dewatering contractor.  The system should be capable of drawing the groundwater down to a depth of at least three feet below the bottom of the proposed excavation.  The groundwater should be maintained at this level until sufficient weight and/or tiedown capacity is available to resist the hydrostatic uplift pressure due to the natural groundwater elevation.  If water enters the excavation along the perimeter, an edge drain, sump, and pump system should be installed to intercept the water.  We recommend the edge drain be:

- at least one foot deep

- at least one foot wide

- sloped at an inclination of at least one percent toward the nearest sump

- backfilled with free draining crushed rock (½- to ¾-inch gradation) or Class 2 permeable material.

The number and depth of dewatering wells should be determined by a dewatering designer or contractor.  The volume of water discharged should be monitored and a record of the amount should be submitted to the owner.  Prior to disposal of the water, permits and testing of the water may be required.  Where dewatering wells penetrate the bottom of the pool, special attention should be given to properly sealing the wells when they are abandoned and waterproofing the penetration to prevent groundwater from seeping through them into the pool.

## 7.7     Construction Monitoring

To monitor ground movements and shoring movements, during the excavation activities, we recommend installing and monitoring survey points on the adjacent streets and improvements that are within 75 feet of the proposed excavation.  These points should be used to monitor the vertical and horizontal movements of the shoring and these improvements.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 35*

The instrumentation should be read regularly and the results should be submitted to us in a timely manner for review.    Initially, depending upon the speed of excavation, the instrumentation should be read about every week.  The frequency of readings may, in the later stages of construction, be modified as appropriate.

## 7.8    Concrete Pavement and Exterior Slabs

Differential ground movement due to expansive soil and settlement will tend to distort and crack the pavements and exterior improvements such as courtyards and sidewalks.  Periodic repairs and replacement of exterior improvements should be expected during the life of the project.  Mastic joints or other positive separations should be provided to permit any differential movements between exterior slabs and the buildings.

To reduce the potential for cracking related to expansive soil, we recommend exterior concrete flatwork be underlain by at least 12-inches of select fill, of which the upper four inches should consist of aggregate base compacted to at least 90 percent relative compaction for non-vehicular areas.  The subgrade should be compacted to at least 90 percent relative compaction, and should provide a smooth, non-yielding surface for support of the concrete slabs.

Where rigid pavement is required for loading and service areas, we recommend a minimum of six inches of concrete for medium traffic and a minimum of eight inches of concrete for heavy traffic.  The upper six inches of subgrade should be compacted to at least 95 percent relative compaction and should provide a smooth, non-yielding surface.  The concrete should be underlain by at least 6 inches of Class 2 Aggregate base.  Aggregate base material should conform to the current State of California Department of Transportation (Caltrans) Standard Specifications.

## 7.9    Seismic Design

For seismic design in accordance with the provisions of 2013 CBC/ASCE 7-10, we recommend the following:

- Risk Targeted Maximum Considered Earthquake (MCE$_R$) S$_s$ and S$_1$ of 1.5g and 0.6g, respectively.

- Site Class D

- Site Coefficients F$_A$ and F$_V$ of 1.0 and 1.5

**LANGAN TREADWELL ROLLO**

- MCE$_R$ spectral response acceleration parameters at short periods, S$_{MS}$, and at one-second period, S$_{M1}$, of 1.5g and 0.9g, respectively.

- Design Earthquake (DE) spectral response acceleration parameters at short period, S$_{DS}$, and at one-second period, S$_{D1}$, of 1.0g and 0.6g, respectively.

## 7.10    Asphalt Pavements

The State of California flexible pavement design method was used to develop the recommended asphalt concrete pavement sections. We expect the final soil subgrade in asphalt-paved areas will generally consist of on-site soil. On the basis of the laboratory test results on this soil, we selected an R-value of 5 for design.

For our calculations, we assumed a Traffic Index (TI) of 4 for automobile parking areas with occasional trucks, and 5 and 6 for driveways and truck-use areas; these TIs should be confirmed by the project civil engineer. Table 10 presents our recommendations for asphalt pavement sections.

**TABLE 10**

**Pavement Section Design**

| TI | Asphalt Concrete (inches) | Class 2 Aggregate Base R = 78 (inches) |
|----|---------------------------|----------------------------------------|
| 4  | 2.5                       | 8                                      |
| 5  | 3                         | 10                                     |
| 6  | 4                         | 11.5                                   |

Pavement components should conform to the current Caltrans Standard Specifications. The upper six inches of the soil subgrade in pavement areas should be moisture-conditioned to above optimum and compacted to at least 95 percent relative compaction and rolled to provide a smooth non-yielding surface. Aggregate base should be compacted to at least 95 percent relative compaction.

**LANGAN TREADWELL ROLLO**

## 7.11    Utilities

The corrosivity report provided in Appendix D of this report should be reviewed and corrosion protection measures used if needed.  A corrosion engineer should be retained if additional recommendations are needed.

Utility trenches should be excavated a minimum of four inches below the bottom of pipes or conduits and have clearances of at least four inches on both sides.  Where necessary, trench excavations should be shored and braced, in accordance with all safety regulations, to prevent cave-ins.  Where sheet piling is used as shoring, and is to be removed after backfilling, it should be placed a minimum of two feet away from the pipes or conduits to prevent disturbance to them as the sheet piles are extracted.  It may be difficult to drive sheet piles if cobbles, coarse grained gravel layers or buried obstructions are encountered.

Backfill for utility trenches should be compacted according to the recommendations presented for the general site fill.  Jetting of trench backfill is not permitted.  To provide uniform support, pipes or conduits should be bedded on a minimum of four inches of sand or fine gravel.  After pipes and conduits are tested, inspected (if required), and approved, they should be covered to a depth of six inches with sand or fine gravel, which should then be mechanically tamped or compacted with a vibratory plate.  Backfill should be placed in lifts of eight inches or less, moisture-conditioned, and compacted to at least 90 percent relative compaction.  If sand or gravel with less than 10 percent fines (particles passing the No. 200 sieve) is used, it should be compacted to 95 percent relative compaction.

Special care should be taken in controlling utility backfilling in pavement areas.  Poor compaction may cause excessive settlements, resulting in damage to exterior improvements.

Where utility trenches backfilled with sand or gravel enter the building pads, an impermeable plug consisting of low-expansion potential clay or lean concrete, at least five feet in length, should be installed at the building line.  Further, where sand- or gravel-backfilled trenches cross planter areas and pass below asphalt or concrete pavements, a similar plug should be placed at the edge of the pavement.  The purpose of these plugs is to reduce the potential for water to become trapped in trenches beneath the building or pavements.  This trapped water can cause heaving of soils beneath slabs and softening of subgrade soil beneath pavements.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*  
*Santa Clara Square*  
*Santa Clara, California*

*24 July 2015*  
*770612501*  
*Page 38*

## 7.12    Site Drainage

Positive surface drainage should be provided around the building to direct surface water away from the existing building foundations. To reduce the potential for water ponding adjacent to the buildings, we recommend the ground surface within a horizontal distance of five feet from the buildings be designed to slope down and away from the buildings with a surface gradient of at least two percent in unpaved areas and one percent in paved areas. In addition, roof downspouts should be discharged into controlled drainage facilities to keep the water away from the foundations.

## 7.13    Landscaping

The use of water-intensive landscaping around the perimeter of the buildings should be avoided to reduce the amount of water introduced to the subgrade. Irrigation of landscaping around the building should be limited to drip or bubbler-type systems. Trees with large roots or have high water demand should also be avoided since they can dry out the soil beneath foundations and cause settlement. The purpose of these recommendations is to avoid large differential moisture changes adjacent to the foundations, which have been known to cause significant differential movement over short horizontal distances in expansive soil, resulting in cracking of slabs and architectural damage.

To reduce the potential for irrigation water entering the pavement section, vertical curbs adjacent to landscaped areas should extend through any aggregate base and at least six inches into the underlying soil. In heavily watered areas, such as lawns, it may also be necessary to install a subdrain behind the curb to intercept excess irrigation water.

## 7.14    Bioretention Systems

Bioretention areas are landscaping features used to treat stormwater runoff within a development site. They are commonly located in parking lot islands and landscape areas. Surface runoff is directed into shallow, landscaped depressions, which usually include mulch and a prepared soil mix. Typically, the filtered runoff is collected in a perforated underdrain beneath the bioretention system and returned to the storm drain system. For larger storms, runoff is generally diverted past the bioretention areas to the storm drain system.

The soil within a bioretention system should typically have an infiltration rate sufficient to draw down any pooled water within 48 hours after a storm event. Based on the "Bioretention Manual" prepared by The Prince George's County (2007), the infiltration rate of the bioretention

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 39*

soil is recommended to exceed ½ inch per hour; cohesionless soils like sand meet this criterion. Cohesive soils like clay and silts do not meet the infiltration rate requirement and are considered unsuitable in a bioretention system, particularly when they are expansive. For areas where there are unsuitable in-situ soils, the bioretention system can be created by importing a suitable soil mix and providing an underdrain. Based on our observation of the soil at the site, the in-situ clays are relatively impervious and do not meet the infiltration rate requirements. The bioretention system will need to be constructed with suitable imported soil and include an underdrain system.

Underdrains are typically at the invert of the bioretention system to intercept water that does not infiltrate into the surrounding soils. Underdrains consist of a perforated PVC pipe in a gravel blanket. The gravel should be virgin rock, double washed, uniformly graded and should be ½ inch to 1½ inches in diameter. It should also be wrapped in a filter fabric (Mirafi 140N or equivalent). The perforated PVC pipe cross-section area should be determined based on the desired hydraulic conductivity of the underdrain. The PVC pipe should be bedded on two to three inches of gravel and covered with gravel and a filter fabric (Mirafi 140NC or equivalent).

Because of the presence of near surface expansive soil, bioretention systems should be set back a minimum of five feet from building foundations, slabs, concrete flatwork or pavements. Overflow from bioretention areas should be directed to the storm drain system away from building foundations and slabs.

Typically, the bottom of the bioretention system is recommended to be a minimum of two feet or more above the groundwater table.

## 8.0    ADDITIONAL GEOTECHNICAL SERVICES

Prior to construction, we should review the project plans and specifications to check their conformance with the intent of our recommendations. During construction, we should observe the installation of the shallow foundations and preparation of the building pad subgrade. We should also observe the subgrade preparation and any fill placement and perform field density tests to check that adequate moisture conditioning and fill compaction has been achieved beneath proposed sidewalks and pavement areas. These observations will allow us to compare the actual with the anticipated soil conditions and to check that the contractor's work conforms with the geotechnical aspects of the plans and specifications.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 40*

## 9.0    LIMITATIONS

The conclusions and recommendations presented in this report apply to the site and construction conditions as we have described them and are the result of engineering studies and our interpretations of the existing geotechnical conditions.  Actual subsurface conditions may vary.  If any variations or undesirable conditions are encountered during construction, or if the proposed construction will differ from that described in this report, Langan Treadwell Rollo should be notified so that supplemental recommendations can be developed.  Our scope of services relates solely to the geotechnical aspects of the project and does not address environmental concerns.

**LANGAN TREADWELL ROLLO**

## REFERENCES

ASCE/SEI 7-10 (2010). Minimum Design Loads for Buildings and Other Structures.

Autodesk Buzzsaw (2014).  Irvine Company, Apartment Development Site, Santa Clara Square.

California Building Standards Commission (2013). California Building Code.

California Department of Conservation Division of Mines and Geology (1997).  *Guidelines for Evaluating and Mitigating Seismic Hazards in California.*  Special Publication 117.

California Division of Mines and Geology (1996). *Probabilistic Seismic Hazard Assessment for the State of California*, CDMG Open-File Report 96-08.

California Division of Mines and Geology (2004). "State of California Seismic Hazard Zones, Milpitas Quadrangle, prepared by the California Geologic Survey".

Cao, T., Bryant, W. A., Rowshandel, B., Branum D. and Wills, C. J. (2003). "The Revised 2002 California Probabilistic Seismic Hazard Maps."

CH2MHILL (2015).  "2014 Groundwater Monitoring and Sampling Summary Report, Former Synertek Building No. 1, 3050 Coronado Drive, Santa Clara, California".

HMH Engineers (2014).  "Existing Overall Site Plan, Santa Clara Square Master Community Plan, Development Area Plan 1, Santa Clara, CA", Sheet C-1

Holzer, T.L. et al. (2008). "Liquefaction Hazard Maps for Three Earthquake Scenarios for the Communities of San Jose, Campbell, Cupertino, Los Altos, Los Gatos, Milpitas, Mountain View, Palo Alto, Santa Clara, Saratoga and Sunnyvale, Northern Santa Clara County."  USGS Open File Report 2008-1270.

Idriss, I.M. and Boulanger, R.W. (2008). "Soil Liquefaction During Earthquakes." Earthquake Engineering Research Institute. Monograph MNO-12.

Lienkaemper, J.J. (1992).  "Map of recently active traces of the Hayward Fault, Alameda and Contra Costa counties, California."  Miscellaneous Field Studies Map MF-2196.

NETR Online (2014).  Historic Aerial Photographs from 1948, 1956, 1968 and 1980 (http://www.historicaerials.com/aerials.php?scale=2000&lon=-121.95498657227&lat=37.355739593506&year=2005), downloaded 7/8/2014.

**LANGAN TREADWELL ROLLO**

# REFERENCES
## (Continued)

Nichols, D.R., and N.A. Wright (1971).  "Preliminary map of historic margins of marshland, San Francisco Bay, California:  USGS Open-File-Report.

Post-Tensioning Institute (2008).  "Design of Post-Tensioned Slabs-on-Ground."  3rd Edition with 2008 Supplement, PTI DC10.1-08.

The Prince George's County, Maryland (2007).  "Bioretention Manual, Environmental Services Division, Department of Environmental Resources, The Prince George's County, Maryland".

Seed, H.B. and Idriss, I.M. (1971).  "Simplified Procedure for Evaluating Soil Liquefaction during Earthquakes," Journal of Geotechnical Engineering Division, ASCE, 97 (9), 1249-1273.

Sitar, N., E.G. Cahill and J.R. Cahill (2012).  "Seismically Induced Lateral Earth Pressures on Retaining Structures and Basement Walls."

Treadwell & Rollo (2011).  "Geotechnical Investigation, 3333 Scott Boulevard, Santa Clara, California."

Treadwell & Rollo (2012).  "Updated Geotechnical Investigation, NVIDIA Campus, Santa Clara, California."

Tokimatsu, K. and Seed, H.B. (1987).  "Evaluation of Settlements in Sand due to Earthquake Shaking."  Journal of Geotechnical Engineering, Vol. 113, No. 8, pp. 861-878.

Working Group on California Earthquake Probabilities (WGCEP) (2007).  "The Uniform California Earthquake Rupture Forecast, Version 2." Open File Report 2007-1437.

Working Group on California Earthquake Probabilities (WGCEP) (2003). "Summary of Earthquake Probabilities in the San Francisco Bay Region:  2002 to 2031." Open File Report 03-214.

Youd, T.L., and Idriss, I.M. (2001).  "Liquefaction Resistance of Soils:  Summary Report from the 1996 NCEER and 1998 NCEER/NSF Workshops on Evaluation of Liquefaction Resistance of Soils," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 127, No. 4.

Youd, T.L., and Garris, C.T. (1995). "Liquefaction-induced ground-surface disruption." Journal of Geotechnical Engineering, American Society of Civil Engineers, Vol. 121, 805-809.

Youd, T.L., Hansen, C.M., and Bartlett, S.F., (2002).  Revised Multilinear Regression Equations for Prediction of Lateral Spread Displacement, Journal of Geotechnical and Geoenvironmental Engineering, December 2002.

**LANGAN TREADWELL ROLLO**

**FIGURES**

*LANGAN TREADWELL ROLLO*



**NOTES:**

World street basemap is provided through Langan's Esri ArcGIS software licensing and ArcGIS online.
Credits: Sources: Esri, DeLorme, NAVTEQ, USGS, Intermap, iPC, NRCAN.

| **SANTA CLARA SQUARE** Santa Clara, California | **SITE LOCATION MAP** |
| --- | --- |
| **LANGAN TREADWELL ROLLO** | Date 09/26/14 \| Project No. 770612501 \| Figure 1 |

Path: \\langan.com\data\SJ\data5\770612501\ArcGIS\ArcMap_Documents\Site Location MapR.mxd  User: jvicente

AUGUSTINE DRIVE

AUGUSTINE DRIVE

▲ C1-2

▲ C3-1

MW-33A ⊞

⬙ B63-2

▲ C3-2

◈ BP-4

⬙ B1-1

⊞ MW-34A

◈ B3-1

▲ C4-1

CG3-1 ▲

▲ C1-1

MONTGOMERY DRIVE

◈ B1-2

▲ C3-4

◈ B4-1

▲ C1-3

OCTAVIUS DRIVE

▲ C3-3

◈ BP-5

⬙ BG3-1

CG3-2 ▲

SAN THOMAS AQUINO CREEK TRAIL

▲ C2-1

◈ BP-3

◈ B4-2

◈ BP-2

◈ B2-1

▲ C5-2

▲ C4-2

▲ C5-4

◈ BP-1

▲ C2-2

▲ C6-2

▲ C2-3

◈ B5-1

▲ C5-1

⊞ MW-29A

SCOTT BOULEVARD

▲ C5-3

MW-28A ⊞

▲ C6-3

◈ B6-1

◈ B6-2

▲ C6-1

## EXPLANATION

BP-1 ◈  Approximate location of boring by Langan Treadwell Rollo, April 2014

MW-33A ⊞  Approximate location of shallow groundwater monitoring well by CH2MHill, 2013

C1-1 ▲  Approximate location of cone penetration test by Langan Treadwell Rollo, April 2014

— · — · —  Approximate property boundary

N

**SANTA CLARA SQUARE**
Santa Clara, California

### SITE PLAN WITH EXISTING BUILDINGS

| Date 04/23/14 | Project No. 770612501 | Figure 2 |

0      150 Feet

Approximate scale

*LANGAN TREADWELL ROLLO*

Reference: Esri, Digital Globe, GeoEye, i-cubed, USDA, USGS AEX, Getmapping, Aerogrid, IGN, IGP, swisstopo, and GIS User Community .



\langan.com\data\SJ\data5\770612501\Cadd_Data — 770612501\2D-DesignFiles\Geotechnical\770612501-B-SP0101.dwg   9/26/14



**EXPLANATION**

**BP-1** ⬥ Approximate location of boring by Langan Treadwell Rollo, April 2014

**C1-1** ▲ Approximate location of cone penetration test by Langan Treadwell Rollo, April 2014

**MW-33A** ⬛ Approximate location of shallow groundwater monitoring well by CH2MHill, 2013

▬‥▬‥ Approximate location of former Saratoga Creek (NETR Online, 2014)

Reference: Base map from a drawing titled "Residential Site Plan," by The Irvine Company, dated 05/12/15.

**SANTA CLARA SQUARE**
Santa Clara, California

**SITE PLAN WITH PROPOSED DEVELOPMENT**

Date 08/15/14 | Project No. 770612501 | Figure 3

0 — 150 Feet
Approximate scale

**LANGAN TREADWELL ROLLO**

C:\Users\Cyoung\appdata\local\temp\AcPublish_6440\770612501-B-SP0102.dwg 7/09/15



**Earthquake Epicenter**

- Magnitude 5 to 5.9
- Magnitude 6 to 6.9
- Magnitude 7 to 7.4
- Magnitude 7.5 to 8
- County Boundary

**Notes:**

1. The earthquake source data is provided by the California Department of Conservation's (DOC) California Geological Survey (CGS).
2. Basemap hillshade and County boundaries provided by USGS and California Department of Transportation.
3. Map displayed in California State Coordinate System, California (Teale) Albers, North American Datum of 1983 (NAD83), Meters.

| 0 | 5 | 10 | 20 |

Miles

**SANTA CLARA SQUARE**
Santa Clara, California

**LANGAN TREADWELL ROLLO**

**MAP OF MAJOR FAULTS AND EARTHQUAKE EPICENTERS IN THE SAN FRANCISCO BAY AREA**

| Date 04/22/14 | Project No. 770612501 | Figure 4 |

**I**  **Not felt by people, except under especially favorable circumstances. However, dizziness or nausea may be experienced.**
Sometimes birds and animals are uneasy or disturbed. Trees, structures, liquids, bodies of water may sway gently, and doors may swing very slowly.

**II**  **Felt indoors by a few people, especially on upper floors of multi-story buildings, and by sensitive or nervous persons.**
As in Grade I, birds and animals are disturbed, and trees, structures, liquids and bodies of water may sway. Hanging objects swing, especially if they are delicately suspended.

**III**  **Felt indoors by several people, usually as a rapid vibration that may not be recognized as an earthquake at first. Vibration is similar to that of a light, or lightly loaded trucks, or heavy trucks some distance away. Duration may be estimated in some cases.**
Movements may be appreciable on upper levels of tall structures. Standing motor cars may rock slightly.

**IV**  **Felt indoors by many, outdoors by a few. Awakens a few individuals, particularly light sleepers, but frightens no one except those apprehensive from previous experience. Vibration like that due to passing of heavy, or heavily loaded trucks. Sensation like a heavy body striking building, or the falling of heavy objects inside.**
Dishes, windows and doors rattle; glassware and crockery clink and clash. Walls and house frames creak, especially if intensity is in the upper range of this grade. Hanging objects often swing. Liquids in open vessels are disturbed slightly. Stationary automobiles rock noticeably.

**V**  **Felt indoors by practically everyone, outdoors by most people. Direction can often be estimated by those outdoors. Awakens many, or most sleepers. Frightens a few people, with slight excitement; some persons run outdoors.**
Buildings tremble throughout. Dishes and glassware break to some extent. Windows crack in some cases, but not generally. Vases and small or unstable objects overturn in many instances, and a few fall. Hanging objects and doors swing generally or considerably. Pictures knock against walls, or swing out of place. Doors and shutters open or close abruptly. Pendulum clocks stop, or run fast or slow. Small objects move, and furnishings may shift to a slight extent. Small amounts of liquids spill from well-filled open containers. Trees and bushes shake slightly.

**VI**  **Felt by everyone, indoors and outdoors. Awakens all sleepers. Frightens many people; general excitement, and some persons run outdoors.**
Persons move unsteadily. Trees and bushes shake slightly to moderately. Liquids are set in strong motion. Small bells in churches and schools ring. Poorly built buildings may be damaged. Plaster falls in small amounts. Other plaster cracks somewhat. Many dishes and glasses, and a few windows break. Knickknacks, books and pictures fall. Furniture overturns in many instances. Heavy furnishings move.

**VII**  **Frightens everyone. General alarm, and everyone runs outdoors.**
People find it difficult to stand. Persons driving cars notice shaking. Trees and bushes shake moderately to strongly. Waves form on ponds, lakes and streams. Water is muddied. Gravel or sand stream banks cave in. Large church bells ring. Suspended objects quiver. Damage is negligible in buildings of good design and construction; slight to moderate in well-built ordinary buildings; considerable in poorly built or badly designed buildings, adobe houses, old walls (especially where laid up without mortar), spires, etc. Plaster and some stucco fall. Many windows and some furniture break. Loosened brickwork and tiles shake down. Weak chimneys break at the roofline. Cornices fall from towers and high buildings. Bricks and stones are dislodged. Heavy furniture overturns. Concrete irrigation ditches are considerably damaged.

**VIII**  **General fright, and alarm approaches panic.**
Persons driving cars are disturbed. Trees shake strongly, and branches and trunks break off (especially palm trees). Sand and mud erupts in small amounts. Flow of springs and wells is temporarily and sometimes permanently changed. Dry wells renew flow. Temperatures of spring and well waters varies. Damage slight in brick structures built especially to withstand earthquakes; considerable in ordinary substantial buildings, with some partial collapse; heavy in some wooden houses, with some tumbling down. Panel walls break away in frame structures. Decayed pilings break off. Walls fall. Solid stone walls crack and break seriously. Wet grounds and steep slopes crack to some extent. Chimneys, columns, monuments and factory stacks and towers twist and fall. Very heavy furniture moves conspicuously or overturns.

**IX**  **Panic is general.**
Ground cracks conspicuously. Damage is considerable in masonry structures built especially to withstand earthquakes; great in other masonry buildings - some collapse in large part. Some wood frame houses built especially to withstand earthquakes are thrown out of plumb, others are shifted wholly off foundations. Reservoirs are seriously damaged and underground pipes sometimes break.

**X**  **Panic is general.**
Ground, especially when loose and wet, cracks up to widths of several inches; fissures up to a yard in width run parallel to canal and stream banks. Landsliding is considerable from river banks and steep coasts. Sand and mud shifts horizontally on beaches and flat land. Water level changes in wells. Water is thrown on banks of canals, lakes, rivers, etc. Dams, dikes, embankments are seriously damaged. Well-built wooden structures and bridges are severely damaged, and some collapse. Dangerous cracks develop in excellent brick walls. Most masonry and frame structures, and their foundations are destroyed. Railroad rails bend slightly. Pipe lines buried in earth tear apart or are crushed endwise. Open cracks and broad wavy folds open in cement pavements and asphalt road surfaces.

**XI**  **Panic is general.**
Disturbances in ground are many and widespread, varying with the ground material. Broad fissures, earth slumps, and land slips develop in soft, wet ground. Water charged with sand and mud is ejected in large amounts. Sea waves of significant magnitude may develop. Damage is severe to wood frame structures, especially near shock centers, great to dams, dikes and embankments, even at long distances. Few if any masonry structures remain standing. Supporting piers or pillars of large, well-built bridges are wrecked. Wooden bridges that "give" are less affected. Railroad rails bend greatly and some thrust endwise. Pipe lines buried in earth are put completely out of service.

**XII**  **Panic is general.**
Damage is total, and practically all works of construction are damaged greatly or destroyed. Disturbances in the ground are great and varied, and numerous shearing cracks develop. Landslides, rock falls, and slumps in river banks are numerous and extensive. Large rock masses are wrenched loose and torn off. Fault slips develop in firm rock, and horizontal and vertical offset displacements are notable. Water channels, both surface and underground, are disturbed and modified greatly. Lakes are dammed, new waterfalls are produced, rivers are deflected, etc. Surface waves are seen on ground surfaces. Lines of sight and level are distorted. Objects are thrown upward into the air.

| | |
|---|---|
| **SANTA CLARA SQUARE**<br>San Clara, California | **MODIFIED MERCALLI INTENSITY SCALE** |
| *LANGAN TREADWELL ROLLO* | Date 04/22/14 \| Project No.  770612501 \| Figure  5 |



Notes: 1. Passive pressure includes a factor of safety of about 1.5.
2. For soldier piles spaced at more than three times the soldier pile diameter, the passive pressure should be assumed to act over three diameters.
3. Active pressure should be assumed to act over one pile diameter.

**SANTA CLARA SQUARE**
Santa Clara, California

**DESIGN PARAMETERS FOR SOLDIER-PILE-AND-LAGGING TEMPORARY SHORING SYSTEM**

Date 07/09/14 | Project No. 770612501 | Figure 6

**LANGAN TREADWELL ROLLO**

**APPENDIX A**

**LOGS OF TEST BORING**

*LANGAN TREADWELL ROLLO*

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B1-1**<br>PAGE 1 OF 2 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | Logged by: | M. Lattin |
|---|---|---|---|

| Date started: | 4/10/14 | Date finished: 4/10/14 |
|---|---|---|

Drilling method:    Hollow Stem Auger

| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety | LABORATORY TEST DATA |
|---|---|---|

Sampler:    Sprague & Henwood (S&H)

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION<br><br>Ground Surface Elevation: 30.0 feet[2] | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | | | CLAY (CL)<br>brown, dry, with trace sand and gravel | | | | | | |
| 3 | | | | | | CLAY (CH)<br>dark brown, very stiff, moist, high plasticity | | | | | | |
| 4 | | | | | CH | | | | | | | |
| 5 | | | | | | LL = 56, PI = 35, see Figure C-15 | | | | | | |
| 6 | S&H | | 8<br>12<br>18 | 18 | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | S&H | | 7<br>11<br>16 | 16 | | CLAY (CL)<br>light brown and tan with dark brown mottling, very stiff, moist | | | | | | |
| 9 | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | |
| 11 | S&H | | 9<br>12<br>16 | 17 | CL | TxUU Test, see Figure C-6 | TxUU | 1,260 | 2,620 | | 21.1 | 105 |
| 12 | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | |
| 14 | S&H | | 8<br>9<br>11 | 12 | | with decomposed organics | | | | | | |
| 15 | | | | | | SANDY CLAY (CL)<br>gray-brown, medium stiff to stiff, wet | | | | | | |
| 16 | | | | | | | | | | | | |
| 17 | | | | | | ▽ (04/10/14, 12:00 p.m.) | | | | | | |
| 18 | | | | | | | | | | | | |
| 19 | S&H | | 4<br>6<br>7 | 8 | CL | | | | | | 33.4 | 90 |
| 20 | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | |
| 23 | | | | | | CLAY with SAND (CL)<br>gray-brown, stiff, wet | | | | | | |
| 24 | S&H | | 9<br>11<br>12 | 14 | | | | | | | | |
| 25 | | | | | | | | | | | | |
| 26 | | | | | CL | | | | | | | |
| 27 | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | |
| 29 | S&H | | 7<br>10<br>11 | 13 | SP-SC | SAND with CLAY and GRAVEL (SP-SC) | | | | | | |
| 30 | | | | | | | | | | | | |

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-1a |
|---|---|

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B1-1**<br>PAGE 2 OF 2 |
| --- | --- | --- |



| DEPTH (feet) | Sampler Type | Sample | Blows/6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 31 | | | | | SP-SC | SAND with CLAY and GRAVEL (SP-SC) (continued) gray-brown, medium dense, wet | | | | | | |
| 32 | | | | | | SAND (SP) gray, medium dense, wet, fine-grained | | | | | | |
| 33-35 | S&H | | 8 9 13 | 13 | SP | | | | | | | |
| 35-37 | | | | | CL | CLAY (CL) gray, stiff, wet, with trace fine-grained sand and organics | | | | | | |
| 38-40 | S&H | | 6 9 12 | 13 | | SANDY CLAY (CL) gray, stiff, wet, fine-grained sand | | | | 59.9 | 23.2 | |
| 41-43 | | | | | CL | | | | | | | |
| 44-45 | S&H | | 7 7 7 | 8 | | fine- to coarse-grained sand, trace fine gravel | | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 17 feet below ground surface during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-1b |
| --- | --- |

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14



**PROJECT:**

**SANTA CLARA SQUARE**
Santa Clara, California

**Log of Boring B1-2**

PAGE 1 OF 2

| Boring location: | See Site Plan, Figure 2 |
|---|---|
| Date started: | 4/10/14 |
| Date finished: | 4/10/14 |
| Drilling method: | Hollow Stem Auger |
| Hammer weight/drop: | 140 lbs./30 inches |
| Hammer type: | B61 Safety |
| Sampler: | Sprague & Henwood (S&H), Standard Penetration Test (SPT) |

Logged by: M. Lattin

**LABORATORY TEST DATA**

**MATERIAL DESCRIPTION**

Ground Surface Elevation: 29.5 feet[2]

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6"[1] | SPT N-Value[1] | LITHOLOGY | Material Description | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | | | CLAY (CL) brown, dry, trace gravel and sand | | | | | | |
| 3–4 | | | | | CH | CLAY (CH) dark brown, very stiff, moist, moderate to high plasticity | | | | | | |
| 5–6 | S&H | | 8 18 23 | 25 | | | | | | | | |
| 8–9 | S&H | | 4 10 13 | 14 | CL | CLAY (CL) light yellow-brown with gray mottling, stiff, moist | | | | | 25.3 | 100 |
| 10–11 | S&H | | 8 9 16 | 15 | | | | | | | | |
| 12 | | | | | | ▽ (04/10/14, 9:30 a.m.) | | | | | | |
| 14 | S&H | | 6 9 13 | 13 | SP | SAND (SP) gray-brown, medium dense, wet | | | | | | |
| 15 | | | | | | CLAY (CL) gray-brown, stiff, wet | | | | | | |
| 19–20 | S&H | | 6 7 8 | 9 | CL | with some fine-grained sand Consolidation Test, see Figure C-1 | | | | | 35.5 | 86 |
| 24–25 | S&H | | 3 5 6 | 7 | | | | | | | | |
| 26–27 | | | | | CL | SANDY CLAY (CL) gray, medium stiff, wet, fine-grained sand | | | | | | |
| 29 | S&H | | 4 5 5 | 6 | CL | CLAY (CL) gray, medium stiff, wet, with trace fine- to medium-grained sand | TxUU | 2,320 | 680 | | 25.8 | 98 |

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

**LANGAN TREADWELL ROLLO**

| Project No.: | 770612501 | Figure: | A-2a |
|---|---|---|---|

| PROJECT: | SANTA CLARA SQUARE<br>Santa Clara, California | Log of Boring B1-2 |
|---|---|---|

PAGE 2 OF 2

## SAMPLES

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION |
|---|---|---|---|---|---|---|
| 31 | | | | | CL | CLAY (CL) (continued)<br>TxUU Test, see Figure C-7 |
| 32-33 | | | | | CL | SANDY CLAY (CL)<br>gray, stiff, wet, trace organics and fine gravel |
| 34-35 | SPT | | 27<br>11<br>9 | 21 | GP | GRAVEL with SAND (GP)<br>gray, medium dense, wet, fine- to coarse gravel,<br>fine-grained sand |
| 35-38 | | | | | CL | CLAY with SAND (CL)<br>gray, stiff, wet |
| 39-40 | SPT | | 3<br>7<br>9 | 10 | | |
| 40-42 | | | | | SC | CLAYEY SAND (SC)<br>gray, medium dense, wet, fine-grained sand |
| 42-44 | | | | | CL | SANDY CLAY (CL)<br>gray, stiff, wet, fine-grained sand |
| 44-45 | SPT | | 11<br>9<br>14 | 23 | SP | SAND (SP)<br>gray, medium dense, wet, fine-grained |

### LABORATORY TEST DATA

Type of Strength Test · Confining Pressure Lbs/Sq Ft · Shear Strength Lbs/Sq Ft · Fines % · Natural Moisture Content, % · Dry Density Lbs/Cu Ft

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 12 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: | Figure: |
|---|---|
| 770612501 | A-2b |

TEST GEOTECH LOG  770612501.GPJ  TR.GDT  9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B2-1**<br>PAGE 1 OF 2 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | | Logged by: | M. Lattin |
|---|---|---|---|---|

| Date started: | 4/10/14 | Date finished: 4/10/14 |
|---|---|---|

Drilling method:    Hollow Stem Auger

| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety | LABORATORY TEST DATA |
|---|---|---|

Sampler:    Sprague & Henwood (S&H), Standard Penetration Test (SPT)



Ground Surface Elevation: 30.3 feet[2]

| DEPTH (feet) | Sampler Type | Blows/6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1–2 | | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB)<br>CLAY (CL)<br>brown, dry, trace sand and gravel | | | | | | |
| 3–9 | S&H (5–6) | 6/9/15; 6/10/12 | 14; 13 | CH | CLAY (CH)<br>gray, very stiff, moist, high plasticity<br><br>LL = 70 , PI = 47, see Figure C-15<br>TxUU Test, see Figure C-8<br><br>dark brown, stiff | TxUU | 720 | 2,310 | | 24.8 | 96 |
| 10–13 | S&H | 6/10/12 | 13 | CL | CLAY with SAND (CL)<br>dark brown, stiff, moist, trace decomposed organics | | | | | | |
| 14–15 | S&H | 4/9/9 | 11 | SP | SAND (SP)<br>brown-gray, medium dense, wet, fine-grained, with trace fines<br>(04/10/14, 1:30 p.m.) | | | | | 23.4 | 103 |
| 16–17 | | | | CL | CLAY with SAND (CL)<br>brown, stiff, wet | | | | | | |
| 18–22 | S&H (19–20) | 4/6/8 | 8 | CL | SANDY CLAY (CL)<br>brown with gray mottling, medium stiff to stiff, wet, with trace fine gravel | | | | | | |
| 23–27 | S&H (24) | 11/13/16 | 17 | SC | CLAYEY SAND (SC)<br>brown-gray, medium dense, wet, fine-grained sand, with trace fine- to coarse gravel | | | | 31.5 | 15.4 | |
| 28–30 | S&H (29) | 5/6/10 | 10 | CL | CLAY with SAND (CL)<br>gray, stiff, wet, fine-grained sand, with some silt | | | | | 24.5 | 102 |

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-3a |
|---|---|

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B2-1**<br>PAGE 2 OF 2 |
|---|---|---|



**SAMPLES**

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION |
|---|---|---|---|---|---|---|
| 31–32 | | | | | CL | CLAY with SAND (CL) (continued) |
| 33–37 | S&H | | 7 8 9 | 10 | CL | SANDY CLAY (CL)<br>gray, stiff, wet, fine-grained sand |
| 38–42 | SPT | | 9 24 22 | 46 | SP | SAND (SP)<br>gray, dense, wet, fine- to coarse-grained |
| 43–45 | SPT | | 5 10 19 | 19 | CL | medium dense, fine- to medium-grained, trace fine gravel<br>CLAY (CL)<br>gray, very stiff, wet |

**LABORATORY TEST DATA**

| Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|
| | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 14.5 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-3b |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B3-1**<br>PAGE 1 OF 2 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | | Logged by: | M. Lattin |
|---|---|---|---|---|

| Date started: | 4/10/14 | Date finished: | 4/10/14 |
|---|---|---|---|

Drilling method:   Hollow Stem Auger

| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety | LABORATORY TEST DATA |
|---|---|---|

Sampler:   Sprague & Henwood (S&H), Standard Penetration Test (SPT)

**MATERIAL DESCRIPTION**

Ground Surface Elevation: 27.0 feet[2]

| DEPTH (feet) | Sampler Type | Blows/6" | SPT N-Value[1] | LITHOLOGY | Material Description | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | CH | CLAY (CH)<br>dark brown, dry, trace sand and gravel, moderate to high plasticity | | | | | | |
| 3 | | | | | CLAY (CL)<br>light brown, stiff, moist, trace fine sand, high plasticity | | | | | | |
| 4 | | | | CL | | | | | | | |
| 5-6 | S&H | 4<br>9<br>15 | 14 | | LL = 49, PI = 31, see Figure C-15<br>Consolidation Test, see Figure C-2 | | | | | 22.2 | 101 |
| 7 | | | | | CLAY with SAND (CL)<br>brown-gray, medium stiff to stiff, moist, trace fine gravel | | | | | | |
| 8-9 | S&H | 3<br>5<br>8 | 8 | CL | | | | | | | |
| 10-11 | S&H | 6<br>7<br>9 | 10 | | SANDY CLAY (CL)<br>dark brown-gray, stiff, wet, fine-grained sand<br>(04/10/14, 7:30 a.m.) | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | CL | | | | | | | |
| 14-15 | S&H | 7<br>9<br>10 | 11 | | increase in sand content | | | | | | |
| 16 | | | | | SILTY SAND (SM)<br>gray, loose, wet, fine-grained sand | | | | | | |
| 17-18 | | | | | | | | | | | |
| 19-20 | S&H | 5<br>6<br>9 | 9 | SM | | | | | | | |
| 21 | | | | | CLAY with SAND (CL)<br>gray, stiff to very stiff, wet, with trace organics | | | | | | |
| 22-23 | | | | | | | | | | | |
| 24-25 | S&H | 9<br>11<br>14 | 15 | CL | | | | | | | |
| 26 | | | | | CLAY (CL)<br>gray, very stiff, wet, with some silt | | | | | | |
| 27-28 | | | | CL | | | | | | | |
| 29-30 | S&H | 11<br>15<br>20 | 21 | | TxUU Test, see Figure C-9 | TxUU | 2,320 | 2,530 | | 21.4 | 104 |

Water level mark (04/10/14, 7:30 a.m.) at approximately 11 feet.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-4a |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B3-1**<br>PAGE 2 OF 2 |
|---|---|---|



| DEPTH (feet) | SAMPLES | | | | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | | | | | | | | |
| 31 | | | | | CL | CLAY (CL) (continued) | | | | | | |
| 32 | | | | | | CLAYEY SAND (SC) | | | | | | |
| 33 | SPT | | 7 11 13 | 24 | SC | gray, medium dense, wet, fine-grained sand, trace fine-grained gravel | | | | 30.7 | 26.7 | |
| 34 | | | | | | brown | | | | | | |
| 35 | | | | | | SANDY CLAY (CL) | | | | | | |
| 36 | | | | | | olive-gray, very stiff, wet | | | | | | |
| 37 | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | |
| 39 | SPT | | 9 10 10 | 20 | CL | | | | | | | |
| 40 | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | |
| 43 | | | | | | gray | | | | | | |
| 44 | S&H | | 11 27 31 | 35 | GP-GM | | | | | | | |
| 45 | | | | | | GRAVEL with SILT and SAND (GP-GM) gray, dense, wet, fine- to coarse sand, fine- to coarse gravel | | | | 10.9 | | 130 |
| 46 | | | | | | | | | | | | |
| 47 | | | | | | | | | | | | |
| 48 | | | | | | | | | | | | |
| 49 | | | | | | | | | | | | |
| 50 | | | | | | | | | | | | |
| 51 | | | | | | | | | | | | |
| 52 | | | | | | | | | | | | |
| 53 | | | | | | | | | | | | |
| 54 | | | | | | | | | | | | |
| 55 | | | | | | | | | | | | |
| 56 | | | | | | | | | | | | |
| 57 | | | | | | | | | | | | |
| 58 | | | | | | | | | | | | |
| 59 | | | | | | | | | | | | |
| 60 | | | | | | | | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 11 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-4b |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B4-1**<br>PAGE 1 OF 2 |
|---|---|---|

| | |
|---|---|
| Boring location: | See Site Plan, Figure 2 |
| Date started: 4/8/14 | Date finished: 4/8/14 |
| Drilling method: | Hollow Stem Auger |
| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety |
| Sampler: | Sprague & Henwood (S&H), Standard Penetration Test (SPT) |

Logged by: M. Lattin

LABORATORY TEST DATA

Ground Surface Elevation: 30.0 feet[2]

| DEPTH (feet) | Sampler Type | Blows/6"[1] | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | | CLAY (CL)<br>brown, dry, trace gravel and sand | | | | | | |
| 3 | SPT | 5 12 18 | 30 | CL | CLAY (CL)<br>dark brown, very stiff to hard, moist, some organics, moderate plasticity<br>LL = 41, PI = 20, see Figure C-15 | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | S&H | 10 26 28 | 32 | | with some gravel and concrete debris | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | S&H | 11 16 23 | 23 | | SANDY CLAY (CL)<br>light olive-gray, very stiff, moist | | | | | 17.7 | 111 |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | S&H | 7 10 13 | 14 | | brown, stiff | | | | | | |
| 12 | | | | CL | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | S&H | 7 15 17 | 19 | | very stiff | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | ▽ (04/08/14, 8:00 a.m.) | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | CLAY (CL)<br>gray, stiff, wet | | | | | | |
| 19 | S&H | 6 7 8 | 9 | | | | | | | | |
| 20 | | | | CL | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | SANDY CLAY (CL)<br>olive-gray, medium stiff, wet, with some silt | | | | | | |
| 24 | S&H | 4 5 7 | 7 | CL | TxUU Test, see Figure C-10 | TxUU | 2,040 | 1,020 | | 21.4 | 106 |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | SAND with CLAY (SP-SC)<br>gray, medium dense, wet, medium- to coarse-grained sand, subangular to subrounded gravel | | | | | | |
| 28 | | | | SP-SC | | | | | | | |
| 29 | S&H | 4 12 19 | 19 | | Sieve Analysis Test, see Figure C-16 | | | | 10.2 | 13.4 | |
| 30 | | | | | | | | | | | |

**LANGAN TREADWELL ROLLO**

| Project No.: | Figure: |
|---|---|
| 770612501 | A-5a |

TEST GEOTECH LOG 770612501.GPJ  TR.GDT  9/26/14



PROJECT: **SANTA CLARA SQUARE**
Santa Clara, California

**Log of Boring B4-1**

PAGE 2 OF 2

SAMPLES

LABORATORY TEST DATA

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Material Description:**

31–32: SP-SC — SAND with CLAY (SP-SC) (continued)

32–33: CL — CLAY (CL) gray, stiff, wet

34: S&H, 5 7 9, N-Value 10

35–37: SC — CLAYEY SAND (SC) brown-gray, medium dense, wet

37: SANDY CLAY (CL) gray, stiff, wet, with trace fine subangular gravel

39: S&H, 7 8 10, N-Value 11 — CL

Natural Moisture Content: 19.7, Dry Density: 112

44: S&H, 8 12 14, N-Value 16

45: SP — SAND with GRAVEL (SP) gray, medium dense, wet

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 16 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

Project No.: 770612501    Figure: A-5b

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

| PROJECT: | **SANTA CLARA SQUARE** Santa Clara, California | **Log of Boring B4-2** PAGE 1 OF 2 |

| Boring location: | See Site Plan, Figure 2 | Logged by: M. Lattin |
| Date started: 4/9/14 | Date finished: 4/9/14 | |
| Drilling method: Hollow Stem Auger | | |
| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety | LABORATORY TEST DATA |
| Sampler: Sprague & Henwood (S&H), Standard Penetration Test (SPT) | | |

Ground Surface Elevation: 31.0 feet[2]

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6"[1] | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1–2 | | | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) CLAY (CL) dark brown, dry, with some gravel and organics, moderate plasticity | | | | | | |
| 3–7 | S&H | | 10 19 27 | 28 | CH | CLAY (CH) brown, very stiff, moist, moderate to high plasticity | | | | | | |
| 8–9 | S&H | | 7 8 8 | 10 | CL | SANDY CLAY (CL) brown-gray, stiff, moist, fine- to medium-grained sand, with trace fine gravel ▽ (04/09/14, 8:00 a.m.) | | | | | | |
| 10–12 | SPT | | 11 19 27 | 46 | SP | SAND (SP) dark gray, dense, wet, fine- to medium-grained | | | | | | |
| 13–17 | S&H | | 6 9 11 | 12 | CL | CLAY (CL) brown, stiff, wet, with trace decomposed organics | | | | | | |
| 18–20 | S&H | | 4 5 6 | 7 | CL | CLAY (CL) gray, medium stiff, wet, with some silt, moderate to high plasticity | | | | | 34.9 | 88 |
| 21–26 | S&H | | 6 9 11 | 12 | CL | stiff | | | | | | |
| 27–28 | | | | | SP-SM | SAND with SILT (SP-SM) gray, medium dense, wet, fine-grained | | | | | | |
| 29–30 | SPT | | 5 6 7 | 13 | CL | CLAY (CL) | | | | 6.9 | 18.3 | |

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-6a |

TEST GEOTECH LOG  770612501.GPJ  TR.GDT  9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B4-2**<br>PAGE 2 OF 2 |
|---|---|---|



| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | | | | | CL | CLAY (CL) (continued) gray, stiff, wet | | | | | | |
| 32 | | | | | | CLAYEY SAND (SC) gray, medium dense, wet, fine- to medium-grained | | | | | | |
| 33 | | | | | SC | | | | | | | |
| 34 | S&H | | 8 12 16 | 17 | | | | | | | 28.0 | 97 |
| 35 | | | | | | CLAY with SAND (CL) brown-gray, very stiff, wet | | | | | | |
| 36 | | | | | CL | | | | | | | |
| 37 | | | | | | SANDY CLAY (CL) gray, stiff, wet, fine-grained sand | | | | | | |
| 38 | | | | | CL | | | | | | | |
| 39 | S&H | | 7 9 12 | 13 | | | | | | 55 | 28.9 | |
| 40 | | | | | | CLAY (CL) gray, stiff, wet, with some silt | | | | | | |
| 41 | | | | | | | | | | | | |
| 42 | | | | | CL | | | | | | | |
| 43 | | | | | | | | | | | | |
| 44 | S&H | | 9 11 15 | 16 | | very stiff | | | | | | |
| 45 | | | | | | | | | | | | |
| 46 | | | | | | | | | | | | |
| 47 | | | | | | | | | | | | |
| 48 | | | | | | | | | | | | |
| 49 | | | | | | | | | | | | |
| 50 | | | | | | | | | | | | |
| 51 | | | | | | | | | | | | |
| 52 | | | | | | | | | | | | |
| 53 | | | | | | | | | | | | |
| 54 | | | | | | | | | | | | |
| 55 | | | | | | | | | | | | |
| 56 | | | | | | | | | | | | |
| 57 | | | | | | | | | | | | |
| 58 | | | | | | | | | | | | |
| 59 | | | | | | | | | | | | |
| 60 | | | | | | | | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 9 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-6b |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B5-1** |
|---|---|---|

PAGE 1 OF 2

| Boring location: | See Site Plan, Figure 2 | | Logged by: M. Lattin |
|---|---|---|---|
| Date started: | 4/9/14 | Date finished: 4/9/14 | |
| Drilling method: | Hollow Stem Auger | | |
| Hammer weight/drop: | 140 lbs./30 inches | Hammer type: B61 Safety | |
| Sampler: | Sprague & Henwood (S&H), Standard Penetration Test (SPT) | | |

LABORATORY TEST DATA

**MATERIAL DESCRIPTION**

Ground Surface Elevation: 29.6 feet[2]

| DEPTH (feet) | Sampler Type | Blows/6" | SPT N-Value[1] | LITHOLOGY | Material Description | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|
| 1 | | | | | 6 inches asphalt concrete (AC) and aggregate base (AB) | | |
| 2 | | | | CH | CLAY (CH)<br>dark brown, dry, with trace gravel and sand, moderate to high plasticity | | |
| 3 | | | | | CLAY with SAND (CL)<br>light yellow-brown, very stiff, moist moderate plasticity | | |
| 4 | | | | | | | |
| 5 | | | | CL | | | |
| 6 | S&H | 9<br>12<br>15 | 16 | | LL = 42, PI = 20, see Figure C-15 | | |
| 7 | | | | | | | |
| 8 | S&H | 7<br>7<br>14 | 13 | CL | SANDY CLAY (CL)<br>brown-gray, stiff, moist | | |
| 9 | | | | | (04/09/14, 9:30 a.m.) | | |
| 10 | SPT | 3<br>6<br>9 | 15 | | SAND (SP)<br>gray-brown, medium dense, wet, fine- to coarse-grained, some fine gravel | | |
| 11 | | | | | | | |
| 12 | | | | SP | | | |
| 13 | | | | | | | |
| 14 | SPT | 5<br>7<br>8 | 15 | | | | |
| 15 | | | | | SANDY CLAY (CL)<br>brown, stiff to very stiff, wet | | |
| 16 | | | | CL | | | |
| 17 | | | | | SAND (SP)<br>gray-brown, very dense, wet, fine-grained, with some fines and trace fine gravel | | |
| 18 | | | | | | | |
| 19 | SPT | 11<br>27<br>33 | 60 | | | | |
| 20 | | | | SP | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | | | | |
| 24 | SPT | 4<br>6<br>9 | 15 | | CLAY (CL)<br>gray, stiff to very stiff, wet | | |
| 25 | | | | | | | |
| 26 | | | | CL | | | |
| 27 | | | | | | | |
| 28 | | | | | CLAY with SAND (CL)<br>gray, stiff, wet, with trace organics<br>Consolidation Test, see Figure C-3 | | |
| 29 | S&H | 6<br>7<br>8 | 9 | CL | | 26.8 | 96 |
| 30 | | | | | | | |

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-7a |
|---|---|

| PROJECT: | SANTA CLARA SQUARE<br>Santa Clara, California | Log of Boring B5-1<br>PAGE 2 OF 2 |
|---|---|---|



| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | | | | | CL | CLAY with SAND (CL) (continued) | | | | | | |
| 32 | | | | | | | | | | | | |
| 33 | | | | | SP | SAND (SP)<br>gray, medium dense, wet, fine- to coarse-grained | | | | | | |
| 34–35 | SPT | | 9 10 12 | 22 | SP | | | | | | | |
| 36 | | | | | | | | | | | | |
| 37–38 | | | | | CL | SANDY CLAY (CL)<br>gray, very stiff, wet, with trace organics, fine-grained sand | | | | | | |
| 39–40 | SPT | | 5 7 9 | 16 | | CLAY (CL)<br>gray, stiff, wet | | | | | | |
| 41 | | | | | CL | | | | | | | |
| 42 | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | |
| 44–45 | S&H | | 7 9 11 | 12 | | stiff, with some fine-grained sand | | | | | 29.0 | 96 |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 9 feet below ground surface during drilling.

[1] S&H and SPT blow counts for the last two increments were converted to SPT N-Values using factors of 0.6 and 1.0, respectively to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-7b |

TEST GEOTECH LOG  770612501.GPJ  TR.GDT  9/26/14



| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B6-1**<br>PAGE 1 OF 2 |
|---|---|---|

| | | |
|---|---|---|
| Boring location: | See Site Plan, Figure 2 | Logged by:   M. Lattin |
| Date started: | 4/9/14 | Date finished:  4/9/14 |
| Drilling method: | Hollow Stem Auger | |
| Hammer weight/drop:  140 lbs./30 inches | Hammer type:  B61 Safety | **LABORATORY TEST DATA** |
| Sampler:   Sprague & Henwood (S&H) | | |

**Ground Surface Elevation: 30.5 feet[2]**

| DEPTH (feet) | Sampler Type | Blows/6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | CH | CLAY (CH) dark brown, moist, trace gravel and sand, moderate to high plasticity | | | | | | |
| 3–4 | | | | CL | CLAY (CL) brown, stiff to very stiff, moist, with some sand | | | | | | |
| 5–6 | S&H | 6 12 13 | 15 | CL | | | | | | | |
| 7 | | | | | | | | | | | |
| 8–9 | S&H | 8 14 18 | 19 | | | | | | | | |
| 10–12 | S&H | 5 6 9 | 9 | CL | CLAY (CL) gray-brown, stiff, moist TxUU Test, see Figure C-11 (04/09/14, 3:00 p.m.) | TxUU | 1,260 | 1,110 | | 26.1 | 95 |
| 13–15 | S&H | 3 3 4 | 4 | CL | SANDY CLAY (CL) gray-brown, soft to medium stiff, wet, with trace organics Consolidation Test, see Figure C-4 | | | | | 25.7 | 99 |
| 16 | | | | | | | | | | | |
| 17–20 | S&H | 5 6 7 | 10 | CL | SANDY CLAY (CL) gray, stiff, wet, with trace organics | | | | | | |
| 21–23 | | | | CL | CLAY (CL) gray, stiff, wet, with some fine sand and trace organics | | | | | | |
| 24–25 | S&H | 7 10 11 | 13 | CL | | | | | | | |
| 26 | | | | | | | | | | | |
| 27–28 | | | | SP | SAND (SP) gray, medium dense, wet, fine-grained | | | | | | |
| 29–30 | S&H | 8 9 11 | 12 | SP | | | | | | 21.2 | 107 |

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-8a |
|---|---|

TEST GEOTECH LOG 770612501 REVISED 8-15-2014.GPJ  TR.GDT  8/15/14

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B6-1**<br>PAGE 2 OF 2 |
|---|---|---|



| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | | | | | CL | CLAY (CL)<br>gray, stiff, wet | | | | | | |
| 34 | S&H | | 7<br>8<br>11 | 11 | CL | olive | | | | | 27.4 | 95 |
| 37 | | | | | | CLAY with SAND (CL)<br>gray-brown, stiff, wet | | | | | | |
| 39 | S&H | | 7<br>9<br>12 | 13 | CL | | | | | | | |
| 40 | | | | | SM | SILTY SAND (SM)<br>gray with light brown mottling, medium dense, wet | | | | | | |
| 42 | | | | | SP | SAND (SP)<br>gray, medium dense, wet, fine- to coarse-grained, with trace fine gravel | | | | | | |
| 44 | HA | | 7<br>12<br>19 | 19 | SP | | | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 12 feet below ground surface during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-8b |
|---|---|

TEST GEOTECH LOG 770612501 REVISED 8-15-2014.GPJ TR.GDT 8/15/14

| PROJECT: | **SANTA CLARA SQUARE** Santa Clara, California | **Log of Boring B6-2** PAGE 1 OF 2 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | Logged by:    M. Lattin |
|---|---|---|
| Date started: | 4/9/14 | Date finished:  4/9/14 | |
| Drilling method: | Hollow Stem Auger | |
| Hammer weight/drop: | 140 lbs./30 inches | Hammer type:  B61 Safety |

Sampler:    Sprague & Henwood (S&H), Standard Penetration Test (SPT)

LABORATORY TEST DATA

Ground Surface Elevation: 29.5 feet[2]

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | 6 inches asphalt concrete (AC) and aggregate base (AB) | | | | | | |
| 2 | | | | | CH | CLAY (CH) dark brown, dry, with trace gravel and sand, moderate to high plasticity | | | | | | |
| 3 | | | | | | | | | | | | |
| 4 | | | | | | CLAY (CH) yellow-brown, very stiff, moist, trace sand, high plasticity | | | | | | |
| 5 | | | | | | | | | | | | |
| 6 | S&H | | 11 18 21 | 23 | CH | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | S&H | | 9 13 21 | 20 | | brown LL = 52, PI = 29, see Figure C-15 | | | | | | |
| 9 | | | | | | | | | | | | |
| 10 | | | | | | medium stiff | | | | | | |
| 11 | S&H | | 3 4 6 | 6 | ▽ | (04/09/14, 12:30 p.m.) | | | | | | |
| 12 | | | | | SC | CLAYEY SAND (SC) brown, loose, wet | | | | | | |
| 13 | | | | | | SANDY CLAY (CL) brown, medium stiff, wet | | | | | | |
| 14 | S&H | | 2 4 6 | 6 | | | | | | | | |
| 15 | | | | | CL | | | | | | | |
| 16 | | | | | | | | | | | | |
| 17 | | | | | | SILTY SAND (SM) gray, medium dense, wet, with trace organics | | | | | | |
| 18 | | | | | SM | | | | | | | |
| 19 | S&H | | 7 9 10 | 11 | | | | | | | | |
| 20 | | | | | CL | CLAY (CL) gray, stiff, wet | | | | | | |
| 21 | | | | | | CLAY (CL) gray, stiff, wet, with some sand, trace organics and fine gravel | | | | | | |
| 22 | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | |
| 24 | S&H | | 6 7 9 | 10 | | Consolidation Test, see Figure C-5 | | | | | 29.4 | 91 |
| 25 | | | | | CL | | | | | | | |
| 26 | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | |
| 29 | S&H | | 7 9 10 | 11 | | less sand content | | | | | | |
| 30 | | | | | | | | | | | | |

*LANGAN TREADWELL ROLLO*

TEST GEOTECH LOG 770612501 REVISED 8-15-2014.GPJ  TR.GDT  8/15/14

| Project No.: 770612501 | Figure: A-9a |
|---|---|

| PROJECT: | **SANTA CLARA SQUARE**<br>Santa Clara, California | **Log of Boring B6-2**<br>PAGE 2 OF 2 |
|---|---|---|



| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION | Type of Strength Test | Confining Pressure Lbs/Sq Ft | Shear Strength Lbs/Sq Ft | Fines % | Natural Moisture Content, % | Dry Density Lbs/Cu Ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | | | | | CL | CLAY (CL) (continued) | | | | | | |
| 34 | S&H | | 7 9 12 | 13 | | gray-brown, increase in fine-grained sand content | | | | | | |
| 36 | | | | | SP | SAND (SP)<br>gray, medium dense, wet, fine-grained | | | | | | |
| 37 | | | | | CL | CLAY (CL)<br>gray, stiff to very stiff, wet, with trace organics | | | | | | |
| 39 | S&H | | 10 12 13 | 15 | | TxUU Test, see Figure C-12 | TxUU | 2,900 | 1,840 | | 20.9 | 105 |
| 41 | | | | | CL | CLAY (CL)<br>gray, stiff, wet, with trace organics | | | | | | |
| 44 | S&H | | 5 7 10 | 10 | | | | | | | | |
| 45 | | | | | | Boring terminated at a depth of 45 feet below ground surface. | | | | | | |

Boring terminated at a depth of 45 feet below ground surface.
Boring backfilled with cement grout.
Groundwater encountered at 11 feet below ground surface during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.:<br>770612501 | Figure:<br>A-9b |
|---|---|

TEST GEOTECH LOG 770612501 REVISED 8-15-2014.GPJ  TR.GDT  8/15/14



| PROJECT: | **SANTA CLARA SQUARE** Santa Clara, California | **Log of Boring BP-1** PAGE 1 OF 1 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | | Logged by: | M. Lattin |
|---|---|---|---|---|

| Date started: | 4/8/14 | Date finished: | 4/8/14 |
|---|---|---|---|

Drilling method: Hollow Stem Auger

Hammer weight/drop: 140 lbs./30 inches    Hammer type: B61 Safety

Sampler: Sprague & Henwood (S&H)

**LABORATORY TEST DATA**

### MATERIAL DESCRIPTION

Ground Surface Elevation: 28.9 feet[2]

| DEPTH (feet) | Sampler Type | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | Material Description |
|---|---|---|---|---|---|
| 1 | BULK | | | | 6 inches asphalt concrete (AC) and aggregate base (AB) |
| 2 | BULK | | | CH | CLAY (CH) dark brown, dry, some organics, gravel, and sand, moderate to high plasticity |
| 3 | | | | | |
| 4 | | | | | CLAY (CL) light olive-brown, stiff, moist, with some sand |
| 5–6 | S&H | 5 / 11 / 14 | 14 | CL | |
| 7 | | | | | SANDY CLAY (CL) brown, stiff, moist, fine-grained sand |
| 8 | S&H | 7 / 9 / 10 | 11 | CL | |
| 9 | | | | | ▽ (04/08/14, 3:15 p.m.) |
| 10–11 | S&H | 3 / 4 / 4 | 5 | CL | SANDY CLAY (CL) brown, medium stiff, wet |

Boring terminated at a depth of 11.5 feet below ground surface. Boring backfilled with cement grout and cuttings. Groundwater encountered at 9 feet below ground surface during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-10 |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14



| PROJECT: | SANTA CLARA SQUARE<br>Santa Clara, California | Log of Boring BP-2 |
| --- | --- | --- |
| | | PAGE 1 OF 1 |

| Boring location: | See Site Plan, Figure 2 | Logged by: M. Lattin |
| --- | --- | --- |
| Date started: | 4/8/14 | Date finished: 4/8/14 | |
| Drilling method: | Hollow Stem Auger | |
| Hammer weight/drop: | 140 lbs./30 inches | Hammer type: B61 Safety | LABORATORY TEST DATA |
| Sampler: | Sprague & Henwood (S&H) | |

**MATERIAL DESCRIPTION**

Ground Surface Elevation: 29.3 feet[2]

6 inches asphalt concrete (AC) and aggregate base (AB)

**CLAY (CH)**
dark brown, dry, with some organics, gravel, sand, moderate to high plasticity
R-Value Test, see Figure C-15

**CLAY (CL)**
brown, very stiff, moist, with some sand

**CLAY (CL)**
gray with brown mottling, stiff, moist

**CLAY (CL)**
yellow-brown, stiff, moist, with trace decomposed organics

Samples:
- BULK  —  CH
- S&H  9/12/18  N-Value 18  CL
- S&H  8/10/11  N-Value 13  CL
- S&H  6/8/11  N-Value 12  CL

Boring terminated at a depth of 11.5 feet below ground surface.
Boring backfilled with cement grout and cuttings.
Groundwater not encountered during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-11 |
| --- | --- |

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14



**PROJECT:** **SANTA CLARA SQUARE**
Santa Clara, California

**Log of Boring BP-3**
PAGE 1 OF 1

Boring location: See Site Plan, Figure 2

Logged by: M. Lattin

Date started: 4/9/14        Date finished: 4/9/14

Drilling method: Hollow Stem Auger

Hammer weight/drop: 140 lbs./30 inches    Hammer type: B61 Safety

Sampler: Sprague & Henwood (S&H)

**LABORATORY TEST DATA**

## SAMPLES

| DEPTH (feet) | Sampler Type | Sample | Blows/ 6" [1] | SPT N-Value [1] | LITHOLOGY | MATERIAL DESCRIPTION |
|---|---|---|---|---|---|---|

Ground Surface Elevation: 28.0 feet [2]

6 inches asphalt concrete (AC) and aggregate base (AB)

**CLAY (CH)**
dark brown, dry, with trace gravel and sand, moderate to high plasticity — CH

BULK

**CLAY (CL)**
light brown and brown, stiff, moist, with trace fine-grained sand — CL

S&H  4 7 13  12

S&H  4 7 9  10

**SANDY CLAY (CL)**
gray-brown, stiff, moist — CL

S&H  5 7 8  9

Boring terminated at a depth of 11.5 feet below ground surface.
Boring backfilled with cement grout.
Groundwater not encountered during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

Project No.: 770612501    Figure: A-12

TEST GEOTECH LOG  770612501.GPJ  TR.GDT  9/26/14

| PROJECT: | **SANTA CLARA SQUARE** Santa Clara, California | **Log of Boring BP-4** PAGE 1 OF 1 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | Logged by: | M. Lattin |
|---|---|---|---|

| Date started: | 4/10/14 | Date finished: | 4/10/14 |
|---|---|---|---|

Drilling method:    Hollow Stem Auger

| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety |
|---|---|

Sampler:    Sprague & Henwood (S&H)

**LABORATORY TEST DATA**



MATERIAL DESCRIPTION

Ground Surface Elevation: 29.8 feet[2]

| DEPTH (feet) | Sampler Type | Blows/ 6" | SPT N-Value[1] | LITHOLOGY | MATERIAL DESCRIPTION |
|---|---|---|---|---|---|
| 1–3 | BULK | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) / CLAY (CL) olive-brown, dry, trace sand and gravel, moderate plasticity / R-Value Test, see Figure C-16 |
| 5–7 | S&H | 8 / 19 / 33 | 25 | CH | CLAY (CH) dark brown, very stiff, moist, moderate to high plasticity |
| 8–9 | S&H | 7 / 20 / 36 | 34 | | hard |
| 10–11 | S&H | 8 / 13 / 16 | 17 | CL | SANDY CLAY (CL) brown-gray, very stiff, moist, trace decomposed organics |

Boring terminated at a depth of 11.5 feet below ground surface.
Boring backfilled with cement grout.
Groundwater not encountered during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-13 |
|---|---|

TEST GEOTECH LOG  770612501.GPJ  TR.GDT  9/26/14

| PROJECT: | **SANTA CLARA SQUARE** Santa Clara, California | **Log of Boring BP-5** PAGE 1 OF 1 |
|---|---|---|

| Boring location: | See Site Plan, Figure 2 | Logged by: M. Lattin |
|---|---|---|
| Date started: 4/10/14 | Date finished: 4/10/14 | |
| Drilling method: Hollow Stem Auger | | |
| Hammer weight/drop: 140 lbs./30 inches | Hammer type: B61 Safety | **LABORATORY TEST DATA** |
| Sampler: Sprague & Henwood (S&H) | | |



### SAMPLES / MATERIAL DESCRIPTION

Ground Surface Elevation: 31.1 feet[2]

| DEPTH (feet) | Sampler Type | Blows/6" | SPT N-Value[1] | LITHOLOGY | Material Description |
|---|---|---|---|---|---|
| 1–4 | BULK | | | CL | 6 inches asphalt concrete (AC) and aggregate base (AB) |
| | | | | | CLAY (CL) brown, dry, trace sand and gravel |
| | | | | CH | CLAY (CH) dark brown, very stiff, moist, trace organics, moderate to high plasticity |
| 5–6 | S&H | 8 / 13 / 21 | 20 | CH | |
| 8–9 | S&H | 11 / 9 / 21 | 17 | | gray-brown |
| 10–11 | S&H | 9 / 13 / 18 | 19 | CL | SANDY CLAY (CL) olive-gray, stiff, moist, with strong cemented zones |

Boring terminated at a depth of 11.5 feet below ground surface.
Boring backfilled with cement grout.
Groundwater not encountered during drilling.

[1] S&H blow counts for the last two increments were converted to SPT N-Values using a factor of 0.6, to account for sampler type and hammer energy.
[2] Elevations based on "Topo and Boundaries Map," by HMH Engineers, dated 01/14/14.

**LANGAN TREADWELL ROLLO**

| Project No.: 770612501 | Figure: A-14 |
|---|---|

TEST GEOTECH LOG 770612501.GPJ TR.GDT 9/26/14

## UNIFIED SOIL CLASSIFICATION SYSTEM

| Major Divisions | | Symbols | Typical Names |
|---|---|---|---|
| Coarse-Grained Soils (more than half of soil > no. 200 sieve size) | Gravels (More than half of coarse fraction > no. 4 sieve size) | GW | Well-graded gravels or gravel-sand mixtures, little or no fines |
| | | GP | Poorly-graded gravels or gravel-sand mixtures, little or no fines |
| | | GM | Silty gravels, gravel-sand-silt mixtures |
| | | GC | Clayey gravels, gravel-sand-clay mixtures |
| | Sands (More than half of coarse fraction < no. 4 sieve size) | SW | Well-graded sands or gravelly sands, little or no fines |
| | | SP | Poorly-graded sands or gravelly sands, little or no fines |
| | | SM | Silty sands, sand-silt mixtures |
| | | SC | Clayey sands, sand-clay mixtures |
| Fine -Grained Soils (more than half of soil < no. 200 sieve size) | Silts and Clays LL = < 50 | ML | Inorganic silts and clayey silts of low plasticity, sandy silts, gravelly silts |
| | | CL | Inorganic clays of low to medium plasticity, gravelly clays, sandy clays, lean clays |
| | | OL | Organic silts and organic silt-clays of low plasticity |
| | Silts and Clays LL = > 50 | MH | Inorganic silts of high plasticity |
| | | CH | Inorganic clays of high plasticity, fat clays |
| | | OH | Organic silts and clays of high plasticity |
| Highly Organic Soils | | PT | Peat and other highly organic soils |

### GRAIN SIZE CHART

| Classification | Range of Grain Sizes | |
|---|---|---|
| | U.S. Standard Sieve Size | Grain Size in Millimeters |
| Boulders | Above 12" | Above 305 |
| Cobbles | 12" to 3" | 305 to 76.2 |
| Gravel | 3" to No. 4 | 76.2 to 4.76 |
| coarse | 3" to 3/4" | 76.2 to 19.1 |
| fine | 3/4" to No. 4 | 19.1 to 4.76 |
| Sand | No. 4 to No. 200 | 4.76 to 0.075 |
| coarse | No. 4 to No. 10 | 4.76 to 2.00 |
| medium | No. 10 to No. 40 | 2.00 to 0.420 |
| fine | No. 40 to No. 200 | 0.420 to 0.075 |
| Silt and Clay | Below No. 200 | Below 0.075 |

▽ Unstabilized groundwater level

▼ Stabilized groundwater level

### SAMPLE DESIGNATIONS/SYMBOLS

Sample taken with Sprague & Henwood split-barrel sampler with a 3.0-inch outside diameter and a 2.43-inch inside diameter. Darkened area indicates soil recovered

Classification sample taken with Standard Penetration Test sampler

Undisturbed sample taken with thin-walled tube

Disturbed sample

Sampling attempted with no recovery

Core sample

Analytical laboratory sample

Sample taken with Direct Push or Drive sampler

### SAMPLER TYPE

| | | | | |
|---|---|---|---|---|
| C | Core barrel | | PT | Pitcher tube sampler using 3.0-inch outside diameter, thin-walled Shelby tube |
| CA | California split-barrel sampler with 2.5-inch outside diameter and a 1.93-inch inside diameter | | S&H | Sprague & Henwood split-barrel sampler with a 3.0-inch outside diameter and a 2.43-inch inside diameter |
| D&M | Dames & Moore piston sampler using 2.5-inch outside diameter, thin-walled tube | | SPT | Standard Penetration Test (SPT) split-barrel sampler with a 2.0-inch outside diameter and a 1.5-inch inside diameter |
| O | Osterberg piston sampler using 3.0-inch outside diameter, thin-walled Shelby tube | | ST | Shelby Tube (3.0-inch outside diameter, thin-walled tube) advanced with hydraulic pressure |

**SANTA CLARA SQUARE**
San Clara, California

**CLASSIFICATION CHART**

**LANGAN TREADWELL ROLLO**

Date 09/26/14 | Project No. 770612501 | Figure  A-15

# T. **EXHIBIT T**

*Exhibit T — Apple Industrial Wastewater Discharge Monitoring Submissions*

# San José-Santa Clara
# Regional Wastewater Facility
# Industrial Wastewater Discharge Permit

| Average Daily Process Flow in gal/day | 41,352 |
|---|---|

PERMIT NO: **SC-461B**

EFFECTIVE DATE: 11/20/2020

EXPIRATION DATE: 11/19/2025

DATE OF ISSUE: 11/19/2020

NAME OF COMPANY: APPLE, INC.

MAILING ADDRESS: One Apple Park Way

Cupertino, CA 95014

DISCHARGE ADDRESS: 3250 Scott Blvd., Santa Clara, CA 95054

EPA CATEGORY: Electrical and Electronic Components - Semiconductor - New Source

(Under 40 CFR) 40 CFR 469 Subpart A

SIC NO: 3571

This Permit is issued under authority established in the Santa Clara City Code, Chapter 13, Section 10.420, "Mandatory Wastewater Discharge Permits." It is the duty of the permittee to comply with all applicable federal, state, and local laws, whether expressly stated in this permit or not.

**All spills, upsets, slugs, bypasses, and or accidental discharges into the storm or sanitary sewer must be reported <u>immediately</u> to the San José-Santa Clara Regional Wastewater Facility at 408-945-3000.**

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

A. 1 FEDERAL DISCHARGE CONDITIONS

The San José-Santa Clara Regional Wastewater Facility intends, but is not obligated, to conduct the following monitoring.

| Sample Point 01 – Final Discharge | | | | | |
|---|---|---|---|---|---|
| Pollutant | Federal Daily Min. S.U. | Federal Daily Max. mg/L | Federal Monthly Average mg/L | City Sample Type | Monitoring Frequency |
| pH | 5.0 | | | GRAB | Semiannual |
| TTO-F | | 1.37 | | GRAB | Semiannual |

__X__    The Total Toxic Organic compounds applicable to your facility are listed at ___40 CFR 469 Subpart A.___

Compliance with the discharge limit for Total Toxic Organics (TTOs) is determined by the sum of Total Toxic Organic compounds for the Federal Categorical Standard(s) applicable to your facility, listed in the attached table, and which are found to be present in the discharge at a concentration greater than ten (10) micrograms per liter. For Total Toxic Organics, the method detection limit must be 0.010 mg/L or less.

> **Compliance with the conditions of this permit**
> **shall be determined using all applicable limits**

The Federal limits set forth above are:

__X__    Concentration Based or discharges prohibited in 40 CFR 403.5

_____    Production Based

_____    Calculated using the Combined Wastestream Formula as specified in 40 CFR 403.6
See calculations on the next page.

2

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

## Federal 469.12 List of Total Toxic Organics

The term "Total toxic organics (TTO)" means the sum of the concentrations for each of the following toxic organic compounds which is found in the discharge at a concentration greater than ten (10) micrograms per liter:

| | |
|---|---|
| 1,2,4 Trichlorobenzene | 2,4,6 Trichlorophenol |
| Chloroform | Carbon Tetrachloride |
| 1,2 Dichlorobenzene | 1,2 Dichloroethane |
| 1,3 Dichlorobenzene | 1,1,2 Trichloroethane |
| 1,4 Dichlorobenzene | Dichlorobromomethane |
| Ethylbenzene | Pentachlorophenol |
| 1,1,1 Trichloroethane | Di-n-butyl phthalate |
| Methylene Chloride | 4 Nitrophenol |
| Naphthalene | Anthracene |
| 2 Nitrophenol | 1,2 Diphenylhydrazine |
| Bis (2-ethylhexyl) phthalate | Isophorone |
| Tetrachloroethylene | Butyl benzyl phthalate |
| Toluene | 1,1 Dichloroethylene |
| Trichloroethylene | 2,4 Dichlorophenol |
| 2 Chlorophenol | Phenol |

3                                                                 Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

A. 2  LOCAL DISCHARGE CONDITIONS-INTERFERING SUBSTANCES AND AVERAGE LIMITS

The San José-Santa Clara Regional Wastewater Facility intends, but is not obligated, to conduct the following monitoring.

| Sample Point 01- Final Discharge | | | | |
|---|---|---|---|---|
| Pollutant | Unit | Daily Minimum | Daily Maximum | Monitoring Frequency |
| Antimony | mg/L | | 5.0 | |
| Arsenic | mg/L | | 1.0 | Semiannual |
| Beryllium | mg/L | | 0.75 | |
| Cadmium | mg/L | | 0.70 | |
| Chromium Total | mg/L | | 1.0 | Semiannual |
| Copper | mg/L | | 2.3 | Semiannual |
| Cyanide Total | mg/L | | 0.50 | |
| Lead | mg/L | | 0.4 | |
| Mercury | mg/L | | 0.010 | |
| Nickel | mg/L | | 0.5 | Semiannual |
| Oil and Grease | mg/L | | 150 | |
| pH | S.U. | 6.0 | <12.5 | Semiannual |
| Phenols | mg/L | | 30.0 | |
| Selenium | mg/L | | 1.0 | |
| Silver | mg/L | | 0.70 | Semiannual |
| Zinc | mg/L | | 2.6 | Semiannual |

1)  Table reflects the regular frequency for scheduling and collecting Grab and Composite samples by the San José-Santa Clara Regional Wastewater Facility (RWF). The number, location, frequency, and types of samples collected may be changed at the discretion of the RWF.

2)  Compliance with the local discharge limits for metals will be enforced using Composite or Grab samples.

3)  The use of Diluting Waters as a partial or complete substitute for adequate treatment, to achieve compliance, or to meet any limitations set forth for wastewater, or to minimize any requirement imposed in a Wastewater Discharge Permit is prohibited.

> **Compliance with the conditions of this permit
> shall be determined using all applicable limits**

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

B.    SELF-MONITORING REQUIREMENTS

Any deviation from sampling or analysis protocols specified in this Permit or local, state, or federal code, or any violation of a condition of this Permit may result in the revocation of this Permit.

All wastewater pretreatment and monitoring equipment shall be properly operated and maintained in proper working condition.

Where pretreatment does not exist, all industrial wastewater shall be plumbed in such a way that a sample may be obtained after the process which generates the regulated wastestream, but prior to connection to the sanitary sewer system and prior to the introduction of any non-regulated or dilution flows.

If sampling performed for self-monitoring indicates a violation, the San José-Santa Clara Regional Wastewater Facility must be notified within 24 hours of the permittee becoming aware of the violation. The Permittee must resample, analyze the samples, and submit the resampling results to the San José-Santa Clara Regional Wastewater Facility within 30 days of becoming aware of a violation. A laboratory certified by the California Department of Health Services shall perform testing in accordance with 40 CFR 136.

B. 1  SELF-MONITORING REPORTING REQUIREMENTS

All self-monitoring information shall be reported on the standard Self-Monitoring Reporting form, which may be obtained by contacting San José-Santa Clara Regional Wastewater Facility. Reports shall be mailed or delivered to the following address, on or before the reporting deadline(s) specified below, and shall be addressed to the Source Control Inspector assigned to the permittee's facility.

> **Environmental Services Department**
> **Source Control**
> **200 E Santa Clara St, 7th Floor**
> **San Jose, CA 95113-1905**

| | |
|---|---|
| X | All required self-monitoring reporting shall be submitted by the last day of the following reporting months, each year the Permit is in effect: **MARCH AND SEPTEMBER** <ul><li>For the SMR due on the last day of March, the reporting period is from the first day of September in the previous year to the last day of February in the current year.</li><li>For the SMR due on the last day of September, the reporting period is from the first day of March in the current year to the last day of August in the current year.</li></ul> |

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

The following shall be submitted with each Self-Monitoring Report:

| | |
|---|---|
| X | Average daily flow in gallons/day |
| X | Maximum daily flow in gallons/day |
| X | Results of Part B.2 of this permit |
| | Water bills for reporting period |
| X | Copies of daily flowmeter totalizer readings |
| X | Verification of effluent flowmeter calibration must be submitted annually from the date of initial calibration with the **September** Self-Monitoring Report |
| X | Documentation of calculations for reported water use values |
| | Waste manifests for reporting period |
| | pH recorder charts |
| | Average production volume in _____ (units produced) per |
| X | Copies of self-monitoring analytical results, detection limits, documentation of the method used, and chain of custody, shall be submitted with the permittee's Self-Monitoring Report. |
| X | If the permittee monitors any pollutant required to be monitored in Part B.2 of this permit more frequently than required by this permit, using collection and analytical methods specified in 40 CFR 136, the result of this monitoring shall be included in the permittee's Self-Monitoring Report pursuant to 40 CFR 403.12 (g) (5). |
| X | Documentation of the laboratory's quality assurance/quality control (QA/QC) shall be provided with the self-monitoring test results. |

COMMENTS:
In the event that the permittee anticipates an average daily production or average daily flow increase or decrease of 20% or more for a period of more than 60 calendar days, the permittee shall notify the Director of Environmental Services in writing prior to the change.

Permit No. SC-461B

## San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit

B.2  SELF-MONITORING REQUIREMENTS-INTERFERING SUBSTANCES

| X | Samples shall be collected at the following sample point using methods specified in 40 CFR 136: Located along the discharge pipe after the acid waste neutralization system, after all treatment, and immediately prior to final discharge to the sanitary sewer. |
|---|---|

| Pollutant | Monitoring Frequency | Sampling Type* |
|---|---|---|
| Arsenic | Semiannual | GRAB |
| Cadmium | | |
| Chromium Total | Semiannual | GRAB |
| Copper | Semiannual | GRAB |
| Cyanide Total | | |
| Cyanide Amenable | | |
| Lead | | |

| Pollutant | Monitoring Frequency | Sampling Type* |
|---|---|---|
| Mercury | | |
| Nickel | Semiannual | GRAB |
| Oil and Grease | | |
| pH | Semiannual | GRAB |
| Silver | Semiannual | GRAB |
| TTOs [1] | Semiannual | GRAB |
| Zinc | Semiannual | GRAB |

*A Sampling Type of COMP must be a Composite Sample.

[1] Total Toxic Organics Testing and Certification Requirements:

| X | You must either sample for all applicable Total Toxic Organic compounds identified earlier in the included list(s) or certify that you have implemented a Toxic Organic Management Plan.  All analyses must be performed per current EPA method(s). |
|---|---|
| | Submit sample results for all Total Toxic Organic compounds with each Self-Monitoring Report. |
| X | Submit certification that a Toxic Organic Management Plan is being implemented with each Self-Monitoring Report. |

COMMENTS: In the event that monitoring by the POTW or the permittee demonstrates a violation of the federal discharge standard for TTOs, the permittee may not certify in lieu of testing. The permittee shall sample **monthly** for those TTO compounds in violation until it is demonstrated that the Toxic Organic Management Plan is adequate to prevent further violations. The permittee shall continue to sample **monthly** until written notice removing this requirement is received from the San José-Santa Clara Regional Wastewater Facility.

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

B.3  EQUIPMENT REQUIRED

| X | **COMPOSITE SAMPLER** |
|---|---|
| X | Capacity: ___2.5___ gallons |
| X | Refrigerated to 4 degrees Centigrade |
|   | Flow proportional |
| X | Time proportional |

| X | **FLOW METER** | | |
|---|---|---|---|
| X | Continuous non-resettable totalizing meter | | |
|   | Influent | | |
| X | Effluent from pretreatment | | With chart recorder |
|   | Influent dedicated to process | | |

| X | **CONTINUOUS pH RECORDER (0-14 Scale)** |
|---|---|

| X | **SAMPLING POINT (Clearly Labeled)** |
|---|---|
| X | Minimum _5_ gallons |
|   | Install within _____ days of the issuance date of this Permit |
| X | Clearly identified on a pretreatment plumbing diagram |
| X | Clearly identified on analytical results submitted with Self-Monitoring Reports |

| | **OTHER** |
|---|---|

8                                                                    Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

C.   OTHER REQUIREMENTS

Within _____ days of Permit issuance, establish or install the following:

_____   A non-resettable effluent totalizing flow meter

_____   With recording capability

This flow meter shall be calibrated according to the manufacturer's recommendations. Documentation of calibration shall be submitted with the results of Part B.2 of this permit.

_____   A non-resettable influent totalizing flow meter dedicated to process.

_____   A method of accurate flow quantification with documentation approved by the Director of Environmental Services

| | |
|---|---|
| | Within 60 days of Permit issuance, a Waste Minimization Plan prepared in accordance with established guidelines must be submitted. |
| | Submit a Waste Minimization update annually in _____ of each year. |
| | Within 90 days of Permit issuance, a Solvent Management Plan prepared in accordance with established guidelines must be submitted. The permittee must certify that the Solvent Management Plan is being implemented. |
| | Within 90 days of Permit issuance for first time permittees, or by _____ for current permittees, a plan for the prevention of Slug Discharges must be submitted. The plan shall be prepared in accordance with the guidelines set forth at 403.8 (f) (2) (v). The permittee must certify that the Slug Prevention Plan is being implemented. |
| X | In order to certify in lieu of testing for Total Toxic Organic compounds with each Self-monitoring Report, a Toxic Organic Management Plan prepared in accordance with established guidelines must be submitted and approved. |
| | See additional requirements attached. |

D.   COMPLIANCE SCHEDULE

__X__   None

_____   See compliance schedule established on _____.

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

E.   STIPULATIONS

ACCIDENTAL DISCHARGE

The Permittee shall provide protection from accidental discharge of prohibited materials or other wastes regulated by City of Santa Clara Code Chapter 13.10 into either the storm sewer or sanitary sewer systems.

Facilities to prevent accidental discharge of prohibited materials shall be provided and maintained at the Permittee's expense.

The Permittee shall notify the San José-Santa Clara Regional Wastewater Facility, the City of San José Environmental Services Department, and the City of Santa Clara by telephone or in person within one (1) hour of becoming aware of accidentally discharging wastes of reportable quantities as determined in 40 CFR 117 or discharge of any substance, which, if otherwise disposed of, would be a hazardous waste under 40 CFR Part 261, to enable countermeasures to be taken by the San José-Santa Clara Regional Wastewater Facility and the City of San José Environmental Services Department to minimize damage to the sanitary sewer system, plant, treatment processes, and the receiving waters. If hazardous waste is discharged, the Permittee shall be subject to all requirements in 40 CFR 403.12(p).

Permittee telephone notification shall be followed, within five (5) days of the date of occurrence, by a detailed written statement describing the causes of the accidental discharge and the measures being taken to prevent future occurrences.

Notification to the City will not relieve the Permittee of notification requirements under any other federal, state or local law, nor of liability for any expense, loss or damage to the sanitary sewer system, Plant or treatment process or receiving waters or for any fines or penalties imposed on the City of San José Environmental Services Department and the City of Santa Clara on account thereof under applicable provisions of state or federal law.

The Permittee must maintain a spill control plan for protection against accidental discharges, including but not limited to, berming of chemicals and waste materials. The review of such plans and procedures shall not relieve the Permittee from the responsibility of modifying the facility as necessary to provide the protection necessary to meet the requirements of City of Santa Clara Code Chapter 13.10 or other state or federal regulations.

The plan must be reviewed and revised as needed within thirty (30) days after an accidental discharge has occurred or as required by the director.

APPLICABLE PENALTIES

Any person who intentionally or negligently violates any provisions of the Permit issued, or who intentionally or negligently discharges waste or wastewater which causes pollution, or violates any effluent limitation, National Standard of Performance, or National Pretreatment or Toxicity Standard, may be civilly liable to the City for a sum of up to Ten Thousand Dollars ($10,000) for the first day in which such violation occurs, up to Twenty-Five Thousand Dollars ($25,000) for the second day in which such violation occurs and Fifty Thousand Dollars ($50,000) for each additional day. Any violation of the local daily maximum discharge conditions, or any other violation of the Santa Clara Sewer Use Ordinance (Santa Clara City Code, Section 13.10 et seq.) is punishable by a fine of up to One Thousand Dollars ($1,000.00) or imprisonment in the city or county jail for a period of up to (6) six months, or both such fine and imprisonment. Each day such violation

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

continues is a separate offense. Violation of any of the provisions of this Permit or the falsification or misrepresentation of information by the Permittee may constitute a violation of local, state or federal law and may result in the revocation of the Permit and the issuance of a Cease and Desist Order.

BYPASS PROHIBITION AND PROVISIONS

"Bypass" means the intentional diversion of wastestreams from any portion of a Permittee's treatment facility.

A Bypass is prohibited, and the City of San José Environmental Services Department and City of Santa Clara may take enforcement action against a Permittee for a bypass, unless;

    A. Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage, i.e., substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production;

    B. There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance; and

    C. The Permittee submitted notices as required by the following:

    *Notice of Bypass*

        1. If a Permittee knows in advance of the need for a bypass, the Permittee shall submit prior notice to the City of San José Environmental Services Department, if possible at least ten days before the date of the bypass.

        2. A Permittee shall submit oral notice of an unanticipated bypass that exceeds applicable Pretreatment Standards to the City of San José Environmental Services Department and San José-Santa Clara Regional Wastewater Facility within 24 hours from the time the Permittee becomes aware of the bypass. A written submission shall also be provided within five days of the time the Permittee becomes aware of the bypass. The written submission shall contain a description of the bypass and its cause; the duration of the bypass, including exact dates and times, and, if the bypass has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass.

The Director of the Environmental Services Department may approve an anticipated bypass, after considering its adverse effects, if the Director determines that the bypass will meet the three conditions A through C.

COMPOSITE SAMPLE

A composite sample must represent the discharge from a production day. The Permittee shall collect composite samples over the part of the day when wastewater is being discharged.

                                             Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

DUTY TO MITIGATE

The Permittee shall mitigate or take all reasonable measures to lessen the duration and severity of any Permit violation.

TRANSFERABILITY

Wastewater Discharge Permits are issued to a specific user for a specific operation. This Wastewater Discharge Permit shall not be reassigned, transferred, or sold to a new owner or user or used on premises for facilities or operations not covered by the permit without prior approval of the Director.

Wastewater Discharge Permits may be transferred to a new owner or operator only if the permittee provides advance written notice to the Director and the Director approves the Wastewater Discharge Permit transfer. The notice to the Director must include a certification by the new owner or operator which:

A. States that the new owner and/or operator has no immediate intent to change the facility's operations and processes;

B. Identifies the specific date on which the transfer is to occur; and

C. Acknowledges full responsibility for complying with the existing individual wastewater discharge permit.

Failure to provide advance notice of a transfer renders the Wastewater Discharge Permit void as of the date of facility transfer.

Upon an approved transfer, the existing owner or operator shall provide a copy of this Wastewater Discharge Permit to the new owner or operator. The new owner or operator shall submit a Wastewater Discharge Permit Application and appropriate permit application fee to the City of San José Environmental Service Department within 30 days of the date of the approved transfer.

NOTIFICATION OF CHANGE

The Permittee shall promptly notify the City of San José Environmental Services Department of any significant change in quantity or quality of the discharge as reported in the Permit application. In the event of such change, a new application will be required. Notification of such change shall be provided to the City of San José Environmental Services Department at least 30 days prior to such change.

"Significant Change" includes but is not limited to, any change in a Permittee's operation that results in any of the following:

A. An increase or decrease in annual average process flow of twenty-five percent (25%) over the standard discharger's average process flow for the Permittee's most immediate preceding twelve (12) months.

B. An increase or decrease in annual average process flow that results in a change from low flow discharger to standard discharger or from standard discharger to low flow discharger.

13                                                          Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

C. An increase or decrease in annual average process flow that results in a change from non-significant industrial user to significant industrial user or from significant industrial user to non-significant industrial user.

D. An increase or decrease in annual production rate of twenty-five percent (25%) for any Permittee subject to production-based limits over the Permittee's production rate for the most immediately preceding twelve (12) months.

E. Adding or deleting process discharge or sample points.

F. Waiver of monitoring requirements for any pollutant not present.

NOTIFICATION OF DISPOSAL

Within 180 days of the commencement of discharge to the sanitary sewer of any substance which, if otherwise disposed of would be a hazardous waste under 40 CFR 261, the Permittee shall notify the EPA, the State, the San José-Santa Clara Regional Wastewater Facility and the City of San José Environmental Services Department of the discharge of these wastes, and anticipated discharges of these wastes over a calendar month and a calendar year. This reporting does not apply to the discharge of less than 15 kilograms per month unless the wastes are "acutely hazardous" wastes, as specified in 40 CFR 261.30(d) and 261.33(e).

NOTIFICATION OF SLUG LOADING

A Slug Discharge is any discharge of a non-routine, episodic nature, including but not limited to an accidental spill or a non-customary batch discharge, which has a reasonable potential to cause interference or pass through, or in any other way violate the San José-Santa Clara Regional Wastewater Facility's regulations, local limits, or National Pollutant Discharge Elimination System Permit conditions. The results of such activities shall be available to the City of San José Environmental Services Department upon request.

A Permittee that is also a Significant Industrial User is required to notify the City of San José Environmental Services immediately of any changes at its facility affecting the potential for a Slug Discharge. If the City of San José Environmental Services decides that a slug discharge control plan is required, the plan shall contain, at a minimum, the following elements:

A. Description of discharge practices, including non-routine batch discharges;

B. Description of stored chemicals;

C. Procedures for immediately notifying the San José-Santa Clara Regional Wastewater Facility of slug discharges, including any discharge that would violate a prohibition under § 403.5(b) with procedures for follow-up written notification within five days;

D. If necessary, procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and/or measures and equipment for emergency response.

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

POWER TO INSPECT

The City of San José Director of the Environmental Services Department and other duly authorized employees and agents of the City of San José Environmental Services Department or other representative City of Santa Clara personnel bearing credentials and identification shall have the right to access upon all properties for the purpose of inspecting any sewer or storm drain connection, including all discharge connections of roof and surface drains and plumbing fixtures; inspecting, observing, measuring, photographing, sampling, and testing the quality, consistency, and characteristics of sewage and industrial wastewaters being discharged into any public sewer or natural outlet; and inspecting and copying any records relating to quantity and quality of wastewater discharges, including but not limited to water usage and effluent discharged, chemical usage, and hazardous waste records.

The City of San José Director of the Environmental Services Department and the City of Santa Clara may terminate service or revoke the Permit of any person who has discharged wastewater to the sanitary sewer system and has unreasonably refused access to the representatives and agents of the City, as described in this stipulation.

PROHIBITED SUBSTANCES

Permittee shall comply with discharge prohibitions set forth in Santa Clara City Code, Chapter 13.10, which contains sections which prohibit the discharge of several substances and a number of additional types of pollutants. It is the duty of the permittee to become acquainted with these prohibitions, and to take all reasonable measures to assure that no violations of the prohibitions in Chapter 13.10 occur as a direct or indirect result of the permittee's activities or discharge.

RECORD KEEPING

All submitted and onsite records shall be retained for a minimum of three years. This period shall be automatically extended for the duration of any enforcement action concerning the Permittee, or where the Permittee has been specifically notified of a longer retention period as required by the Director of the City of San José Environmental Services Department. Such records shall be available for inspection and copying by the City of San José Director of the Environmental Services Department, and other duly authorized employees and agents of the City of San José Environmental Services Department or other representative City of Santa Clara personnel bearing credentials and identification. Records shall include the date, exact place, method and time of sampling and the names of the person or persons taking the sample, the dates analysis were performed, the name of person(s) who performed the analysis, quality assurance and quality control data, the analytical techniques/methods used, and the results of such analysis.

SEVERABILITY

The provisions of this Permit are severable, and if any provision of this Permit, or the application of any provision of this Permit to any circumstance is held invalid, the application of such provisions to other circumstances, and the remainder of this Permit, shall not be affected thereby.

SLUDGE AND HAZARDOUS WASTE DISPOSAL

The Permittee shall properly dispose of pretreatment or other sludge and any hazardous wastes (e.g., spent chemicals) used or generated at the Permittee's facility so as to prevent the discharge of such materials to the San José-Santa Clara Regional Wastewater Facility or sanitary sewer.

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

SIGNATORY REQUIREMENTS

Any reports submitted pursuant to Part B. 2 or Part C, or as Notification per these Stipulations of this Permit shall be signed as follows:

A.  By a responsible corporate officer if the Permittee submitting the reports is a corporation. For the purposes of this Permit, a responsible corporate officer shall be defined as (1) A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation or, (2) the manager of one or more manufacturing, production, or operation facilities, who is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiate and direct other comprehensive measures to assure long-term environmental compliance with environmental laws and regulations; can ensure that the necessary systems are established or actions taken to gather complete and accurate information for Permit requirements, if authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

B.  By a general partner or proprietor if the Permittee submitting the reports is a partnership or sole proprietorship respectively.

C.  By a duly authorized representative of the responsible corporate officer, general partner or proprietor, when that authorization is made in writing and submitted with the report to the City of San José Environmental Services Department. The authorization shall specify either an individual or a position having responsibility for the overall operation of the facility from which the industrial discharge originates, or having overall responsibility for environmental matters for the company. If an authorization under this section is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, or overall responsibility for environmental matters for the company, a new authorization satisfying the requirements of this section must be submitted to the City of San José Environmental Services Department prior to or together with any reports to be signed by an authorized representative.

SUBMISSION OF PERMIT APPLICATION

**Unless otherwise specified in the conditions of the existing Permit, a new Permit application must be submitted at least ninety (90) days prior to (1) commencing discharge to the sanitary system, (2) commencing operation of a zero discharging categorical process, or (3) expiration of existing discharge permit and must be accompanied by the appropriate fees.**

TERMINATION OF SERVICE, REVOCATION AND PERMIT MODIFICATION

Pursuant to Chapter 13.10 of the Santa Clara City Code, the City of Santa Clara Director of Water and Sewer Utilities and the City of San Jose Director of Environmental Services, City of Santa Clara may modify the Permit with thirty days written notice to the permittee, revoke the Permit with ten days written notice to the permittee, and/or suspend service if the permittee uses the sanitary sewer in a manner or way that endangers the public health or safety, or public or private property. If such endangerment is imminent, or for any other reason the City of Santa Clara Director of Water

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

and Sewer Utilities and the City of San José Director of Environmental Services deems sufficient cause, the City of Santa Clara Director of Water and Sewer Utilities and the City of San José Director of Environmental Services may act to suspend service immediately.

UPSET

"Upset" means an unintentional and temporary noncompliance with categorical pretreatment standards because of factors beyond the reasonable control of the Permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventative maintenance, or careless or improper operation.

UPSET - REBUTTAL

The following circumstances may be raised as an affirmative defense to an action brought for noncompliance with categorical pretreatment standards:

A. The Permittee can demonstrate through properly signed, contemporaneous operating logs, or other relevant evidence that:

   1. The Permittee can identify the cause(s) of the Upset;

   2. When the upset occurred, the facility was being operated in a prudent and workman-like manner, and in compliance with applicable operation and maintenance procedures;

   3. The Permittee has submitted the following information to the City of San José Environmental Services Department:

      a. A description of the discharge to the San José-Santa Clara Regional Wastewater Facility or sanitary sewer and the cause of the noncompliance;

      b. The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue: and

      c. Steps being taken and/or planned to be taken to reduce, eliminate and prevent recurrence of the noncompliance.

   4. The Permittee shall report the information specified in subsection A.3 to the City of San José Director of Environmental Services or designee within twenty-four (24) hours of becoming aware of the Upset, and provide written notice within five (5) days of becoming aware of the Upset.

B. The Permittee seeking to establish the occurrence of an Upset as an affirmative defense shall have the burden of proof.

C. The Permittee shall control production of all discharges to the extent necessary to maintain compliance with categorical pretreatment standards upon reduction, loss, or failure of its treatment facility until the facility is restored or an alternative method of treatment is provided. The requirement under this Section applies even in a situation where the primary source of power of the treatment facility is reduced, lost or fails.

Permit No. SC-461B

**San José-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit**

F.    AGENCY APPROVAL

INSPECTOR

Chris Fivecoat (Nov 12, 2020 11:07 PST)

Chris Fivecoat

PERMIT WRITER

*John Fosnaugh*
John Fosnaugh (Nov 12, 2020 11:10 PST)

John Fosnaugh

KERRIE ROMANOW
Director
Environmental Services Department

*Rajani Nair*
Rajani Nair (Nov 13, 2020 13:11 PST)                    Nov 13, 2020

By:    RAJANI NAIR                                                          DATE
Deputy Director
Environmental Services Department
Watershed Protection Division

DIANE ASUNCION
Acting Compliance Manager
City of Santa Clara

18                                                        Permit No. SC-461B



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Environmental Services Department*

SAN JOSÉ-SANTA CLARA REGIONAL WASTEWATER FACILITY
WATERSHED PROTECTION

**CONTRIBUTING AGENCIES**

CITY OF SAN JOSÉ
CITY OF SANTA CLARA
COUNTY SANITATION DIST. NO. 2 - 3
BURBANK SANITARY DISTRICT
CUPERTINO SANITARY DISTRICT
CITY OF CUPERTINO
CITY OF MILPITAS
WEST VALLEY SANITATION DISTRICT
CITIES OF CAMPBELL, LOS GATOS
MONTE SERENO, AND SARATOGA

11/19/2020

Mr. Tom Huynh
Apple, Inc.
One Apple Park Way
Cupertino, CA 95014

Discharge Address: 3250 Scott Blvd., Santa Clara, CA 95054

Dear Mr. Huynh:

Enclosed is Wastewater Discharge Permit No. SC-461B issued to Apple, Inc., 3250 Scott Blvd.,
Santa Clara, CA 95054, dated November 20, 2020. This Permit expires on November 19, 2025.
Please note any special requirements in your Permit regarding equipment installation and the
submittal schedule for self-monitoring reports.

An application for permit renewal is due ninety days prior to the expiration date for this Permit, and
must be accompanied by the appropriate permit fee. Applications received after the due date will be
subject to delinquent fees and enforcement actions.

If the quantity or strength of the wastewater discharged from your firm substantially changes, an
application for a new permit must be submitted pursuant to Section 13.10.440 of the Santa Clara
City Code.

Any questions or comments regarding your Permit should be directed to Chris Fivecoat, the
Environmental Inspector assigned to your company. Mr. Fivecoat can be reached at
(408) 793-4382 or chris.fivecoat@sanjoseca.gov.

Sincerely,

*Rajani Nair*

Rajani Nair (Nov 13, 2020 13:11 PST)

RAJANI NAIR
Deputy Director

Enclosure

cc:    Diane Asuncion, Acting Compliance Manager, City of Santa Clara

200 E. Santa Clara Street, 7th Floor, San José, CA 95113  *tel* (408) 793-5300 *tel* (408) 945-3000 *fax* (408) 271-1930