**Ashley M. Gjovik, JD**
*In Propria Persona*
Alviso, San José, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJØVIK**, <br> *an individual*, <br><br> **PLAINTIFF**, <br><br> **vs.** <br><br> **APPLE INC.**, <br> *a corporation,* <br><br> **CITY OF SANTA CLARA,** <br> *a local government*, <br><br> **MR. JENAB ET AL** <br> *(individually, LP, LLC, &/or Trust)* <br><br> **DEFENDANTS**. | **Case No. 25-CV-07360-PCP** <br><br> **JUDGE: P. CASEY PITTS** <br><br> **SUPPLEMENTARY REQUEST FOR JUDICIAL NOTICE & DECLARATION** <br><br> **IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION UNDER RCRA, CAA, CWA, & PUBLIC NUISANCE** <br><br> **HEARING:** <br> **Date:** June 25 2026 <br> **Time:** 10:00 AM <br> **Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# **TABLE OF CONTENTS**

I.    REQUEST FOR JUDICIAL NOTICE ........................................................................1

    A.    GOVERNMENT RECORDS ..................................................................... 1

II.   DECLARATION ...............................................................................................2

    B.    RESPONSES TO PUBLIC RECORDS ACT AND FOIA REQUESTS ........................... 2

    C.    REPORTS AND STUDIES ..................................................................... 3

    D.    ADDITIONAL FIELD OBSERVATIONS OF RECEIVING WATERS ........................... 5

# SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE & DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## I.    REQUEST FOR JUDICIAL NOTICE

1.    Plaintiff Ashley Gjovik respectfully requests, pursuant to Fed. R. Civ. E. 201, that the Court take judicial notice of the following of the public records described within and attached as Exhibits. Plaintiff submits this Request in support of her Motion for a Preliminary Injunction.

2.    Under Federal Rules of Evidence 201, a court must take judicial notice of certain facts "if a party requests it and the court is supplied with the necessary information" and a court may take judicial notice of matters of public record not subject to reasonable dispute. Fed. R. Evid. 201(b)-(c); *Lee v. City of Los Angeles,* 250 F.3d 668, 689–90 (9th Cir. 2001). A fact is "not subject to reasonable dispute" if it is generally known, or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)– (2).

3.    A court may take judicial notice of agency reports that are "factual findings resulting from an investigation made pursuant to authority granted by law" and which suggest a pattern of violations with a company's day-to-day operations. *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992). The Court may take judicial notice of records related to permits  See, e.g.,*Olympic Forest Coalition v. Coast Seafoods Co.,* 884 F.3d 901, 904 (9th Cir. 2018) (reviewing court notices letter from Washington Department of Ecology to defendant about pollution discharge permit).

4.    The Court may take judicial notice of letters from agencies related to environmental matters. See, e.g., *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1032 n.11 (9th Cir. 2018) (in Endangered Species Act case, reviewing court notices USFS letter requesting re-consultation with Fish and Wildlife Service before approving forest management project).  A court may also consider documents attached to the pleadings (see, *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir. 2001)) and documents which are "not physically attached to the complaint" if the complaint "necessarily relies' on them" (*Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998)).

## A.  GOVERNMENT RECORDS

1.      The Plaintiff requests that the court take judicial notice of several records and documents published on government websites, provided as a response to FOIA requests submitted to government agencies, or published by the government agencies in another forum as specified.

2.      Plaintiff requests Judicial Notice of the US EPA's "Waterbody Report" webpage for Saratoga Creek. A true and correct copy is attached as Exhibit A. The URL of the page in the Exhibit is https://mywaterway.epa.gov/waterbody-report/CA_SWRCB/CAR2055004019990218133956/2026

3.      Plaintiff request Judicial Notice of the BAAQMD settlement agreement with Apple Inc dated April 30 2026 - May 2 2026. A true and correct copy is attached as Exhibit B. The document is signed by counsel for Apple Inc in this proceeding at Morrison Foerster and Elizabeth Schmidt the Director of Environmental Health & Safety at Apple Inc. Apple agreed to pay a $125,000 civil penalty.

4.      Plaintiff requests Judicial Notice of the Groundwater Elevation report titled "Approximate location of groundwater elevation monitoring wells within a .5 mile radius around 3250 Scott Blvd, Santa Clara, California, 95054" run on May 5 2026 at https://gis.valleywater.org/groundwaterelevations/report.php. A true and correct copy is attached as Exhibit C.

## II.    **DECLARATION**

5.      I, Ashley M. Gjøvik, declare as follows: I am the Plaintiff in this action. I am over the age of eighteen and competent to testify. I make this declaration in support of my Motion for Preliminary Injunction. I have personal knowledge of the facts stated herein, except where stated on information and belief, and if called as a witness I could and would competently testify thereto.

### B. **RESPONSES TO PUBLIC RECORDS ACT AND FOIA REQUESTS**

1.      Attached as Exhibit D is a "Laboratory Work/Test Request" and "Acute Toxicity Screening" Laboratory Reports provided by City of San Jose in response to Public Records Act requests regarding the wastewater at 3250 Scott Blvd. These are reports about water quality of a sample taken at the chip fab on March 12 2019 and finding the effluent from the chip fab to be "toxic to *Ceriodaphnia dubia*" possibly attributable to the "high pH." This record was described

in the Amended Complaint at ¶ 180, pages 43-44 (Dkt. 48).

2.      Attached as Exhibit E is a "Self-Monitoring Report" provided by City of San Jose in response to Public Records Act requests regarding the waste water at 3250 Scott Blvd. The records are dated March-April 2023 and indicate a "Daily Flow" of wastewater from the chip fab regularly exceeding 40,000-50,000 gallons a day between August 31 2022 - Feb. 28 2023. During that time period, the documents note the average "Daily Flow" is 49,315 gallons of wastewater a day, the maximum wastewater in one day was 76,350 gallons, and the total gallons of waste water reported during the time period for the location was 8,925,960 gallons

3.      Attached as Exhibit F are additional pages of the 2022 Stormwater Inspection Report featured in Exhibit L of the first Declaration, together with true and correct copies of the photographs and site maps provided by the City of Santa Clara in response to a Public Records Act request for stormwater records at 3250 Scott Blvd.

## C. REPORTS AND STUDIES

4.      Attached as Exhibit G is a true and correct copy of the excerpts of the San Francsico Estuary Institute (SFEI) report: ***Historical Vegetation and Drainage Patterns of Western Santa Clara Valley***. The excerpt includes pages 24-34 and discussed the historical creek and wetland geography and ecology around the site. The citation listed on the SFEI website is: Beller, EE; Salomon, M; Grossinger, RM. 2010. Historical Vegetation and Drainage Patterns of Western Santa Clara Valley: *A technical memorandum describing landscape ecology in Lower Peninsula, West Valley, and Guadalupe Watershed Management Areas*. SFEI Contribution No. 622. SFEI: Oakland.[1]

5.      Attached as Exhibit H is a true and correct copy of the excerpts of the San Francsico Estuary Institute (SFEI) report: ***Resilient Landscape Vision for the Calabazas Creek, San Tomas Aquino Creek, and Pond A8 Area: Bayland-Creek Reconnection Opportunities***. The excerpt includes pages 12-19 and discusses the historical creek and wetland geography and ecology around

---

[1] SFEI, *Historical Vegetation and Drainage Patterns of Western Santa Clara Valley: A technical memorandum describing landscape ecology in Lower Peninsula, West Valley, and Guadalupe Watershed Management Areas,* https://www.sfei.org/documents/historical-vegetation-and-drainage-patterns-western-santa-clara-valley-technical

the site. The citation listed on the SFEI website is: McKnight, K; Dusterhoff, SD; Grossinger, RM; Askevold, RA. 2018. Resilient Landscape Vision for the Calabazas Creek, San Tomas Aquino Creek, and Pond A8 Area: Bayland-Creek Reconnection Opportunities. SFEI Contribution No. 870. San Francisco Estuary Institute-Aquatic Science Center: Richmond, CA. p. 40.[2]

6.      Attached as Exhibit I is a true and correct copy a Technical Memorandum titled "Sanitary Sewer Capacity Evaluation for the Aria Project (APN: 216-29-117)" for 3250 Scott Blvd dated Dec. 12 2014  provided by Santa Clara in response to a Public Records Act request and detailing stormwater management specifications.

7.      Attached as Exhibit J is a true and correct copy of the City of Santa Clara's PLN2014-10675 "Architectural Review" for 3250 Scott Blvd dated Oct. 31 2014 titled "Aria Redevelopment" provided by Santa Clara in response to a Public Records Act request and detailing stormwater management specifications.

8.      Attached as Exhibit K is a true and correct copy of the "Santa Clara Square Apartments EIR Hydrology Study" dated August 17, 2015 discussing "hydrology and stormwater" at the apartments next to 3250 Scott Blvd.

9.      Attached as Exhibit L is a true and correct copy of the "Geotechnical Investigation, Santa Clara Square" dated 24 July 2015 discussing the geology and hydrology at the apartments next to 3250 Scott Blvd including the "artesian aquifer" and "artesian condition."

10.     Attached as Exhibit M excerpted diagrams from the Santa Clara County Flood and Water Conversation District's 1961 *"Engineer's Report of Proposed Improvements for Zone NC-1, the North Central Zone."*  A true and correct copy is attached as Exhibit B. These diagrams show the rerouting of the Saratoga Creek around the site including Scott Blvd and Highway 101. This document is posted by  Santa Clara Valley Water District Library on the Internet Archive at https://archive.org/details/csjvwd_000237

11.     Attached as Exhibit N are Plot Plans for parcels at and around 3250 Scott Blvd obtained   from   the   "Santa   Clara   County   Surveyor's   Office   Record   Map   GIS"   portal   at

---

[2] SFEI, *Resilient Landscape Vision for the Calabazas Creek, San Tomas Aquino Creek, and Pond A8 Area: Bayland-Creek Reconnection Opportunities,* https://www.sfei.org/documents/resilient-landscape-vision-calabazas-creek-san-tomas-aquino-creek-and-pond-a8-area

https://experience.arcgis.com/experience/be2e1200b3c543909d27d8ef23483a15.

## D. ADDITIONAL FIELD OBSERVATIONS OF RECEIVING WATERS

12.     I have personally visited and observed conditions at locations relevant to the receiving-waters analysis in the accompanying motion. In my prior Declaration and Exhibits I described my prior visits to the San Tomas Aquino/Saratoga Creek around the site. That filing described visits on April 11 2026 and April 18 2026 (see, Dkt. 80, *Declaration -- San Tomas Aquino Creek Field Observations; Field Test Results; Exhibit N -- Field Testing Equipment Invoices and Product Specifications; Exhibit F — Photographs of Field Observations at Saratoga Creek and San Tomas Aquino Creek*).

13.     I visited the Creek again on May 1 2026, gathered additional photographs, and used the same testing equipment described prior (see, Dkt. 80, *Declaration -- Field Testing Methodology*).. Exhibit O is a true and correct compilation of photographs I captured during my field visit to the San Tomas Aquino Creekon May 1 2026, immediately downstream of Apple's stormwater outfall, showing the froth, bubbles, and pollution. The photographs include geolocation metadata recorded by my mobile device at the time of capture, establishing the date, time, and approximate GPS coordinates of each photograph. Selected photographs from the compilation also show the field testing methodology described, including the digital pH meter in use and the multi-parameter test strip kit reference card used for color comparison.

14.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

**/s/ Ashley M. Gjovik (***Pro Se***)**
May 7, 2026
Alviso, City of San José, California
legal@ashleygjovik.com
(415) 964-6272

# III.    EXHIBITS

## E.  EXHIBIT A

*Exhibit A — U.S. EPA, "Waterbody Report" for Saratoga Creek (Assessment Unit ID CAR2055004019990218133956), available at https://mywaterway.epa.gov/waterbody-report/CA_SWRCB/CAR2055004019990218133956/2026 (last accessed May 2026).*



🇺🇸 An official website of the United States government

🔍

MENU

Glossary | Data | ⓘ About | 👥 Educators | ✉ Contact Us<https://www.epa.gov/waterdata/forms/contact-us-about-hows-my-waterway>

# How's My Waterway?

Explore, Discover and Learn about your water.

# Waterbody Report

🔴 **Saratoga Creek**
**Assessment Unit ID:** CAR2055004019990218133956

**Waterbody Condition:** 📄 Impaired (Issues Identified)

**Existing Plans for Restoration:** No

📄 **303(d) Listed:** Yes

**Year Reported:** 2026

📄 **303(d) List Status:** Submitted to EPA for Review

**Other Years Reported:**
2018 <https://epa.gov/waterbody-report/ca_swrcb/car2055004019990218133956/2018>, 2022 <https://epa.gov/waterbody-report/ca_swrcb/car2055004019990218133956/2022>, 2024 <https://epa.gov/waterbody-report/ca_swrcb/car2055004019990218133956/2024> (opens new browser tab)

**Organization Name (ID):** California (CA_SWRCB)

**What type of water is this?**

Stream/creek/river (14.2 Miles)

**Where is this water located?**

Information Not Available

▼ <u>Advanced Filtering</u>
(opens new browser tab)

**Download Waterbody Data (2026)** 📄 📄

The map shows the location and extent of the Assessment Unit for the 2024 reporting cycle. The Assessment Unit may have changed over time.





County of Santa Clara, California State Parks, Esri, TomTom, Garmin, SafeGraph, FAO, METI/NASA, USGS, Bureau of Land Management, EPA, NPS… Powered by Esri <https://www.esri.com/>

## Assessment Information from 2026

### State or Tribal Nation specific designated uses:

Information on Water Quality Standards <https://www.epa.gov/wqs-tech/state-specific-water-quality-standards-effective-under-clean-water-act-cwa>

Collapse All ▶

### Agricultural Supply

Insufficient Info ⌄

Identified Issues for Use

No impairments evaluated for this use.

🗎 Other Water Quality Parameters Evaluated

**Insufficient Information**

- Chloride
- pH
- Specific Conductivity

### Cold Freshwater Habitat

Impaired ⌄

Identified Issues for Use

🗎 **Impaired Parameters**                                **Plan in Place**

Benthic Macroinvertebrates Bioassessments                        No

🗎 Other Water Quality Parameters Evaluated

**Insufficient Information**

- Alkalinity
- Ammonia
- Anthracene
- Arsenic
- Benz[a]anthracene
- Benzo[a]pyrene (Pahs)
- Bifenthrin
- Cadmium
- Chlordane
- Chloride
- Chlorine
- Chromium
- Chrysene
- Copper
- Cyfluthrin
- Cypermethrin
- Ddd (Dichlorodiphenyldichloroethane)
- Dde (Dichlorodiphenyldichloroethylene)
- Ddt (Dichlorodiphenyltrichloroethane)
- Deltamethrin
- Dieldrin
- Dissolved Oxygen
- Endrin
- Esfenvalerate
- Fluoranthene
- Fluorene
- Hexachlorocyclohexane (Hch)
- Lambda-Cyhalothrin
- Lead
- Mercury
- Naphthalene
- Nickel
- Permethrin
- pH
- Phenanthrene
- Polycyclic Aromatic Hydrocarbons (Pahs) (Aquatic Ecosystems)
- Pyrene
- Pyrethroids
- Temperature

- Toxicity
- Zinc

## Municipal and Domestic Supply                                                   Insufficient Info    ⌄

### Identified Issues for Use
No impairments evaluated for this use.

📑 Other Water Quality Parameters Evaluated
***Insufficient Information***

- Specific Conductivity

## Non-Contact Water Recreation                                                    Insufficient Info    ⌄

### Identified Issues for Use
No impairments evaluated for this use.

📑 Other Water Quality Parameters Evaluated
***Insufficient Information***

- Pathogens

## Warm Freshwater Habitat                                                         Insufficient Info    ⌄

### Identified Issues for Use
No impairments evaluated for this use.

📑 Other Water Quality Parameters Evaluated
***Insufficient Information***

- Alkalinity
- Ammonia
- Anthracene
- Arsenic
- Benz[a]anthracene
- Benzo[a]pyrene (Pahs)
- Bifenthrin
- Cadmium
- Chlordane
- Chloride
- Chlorine
- Chromium
- Chrysene
- Copper
- Cyfluthrin
- Cypermethrin
- Ddd (Dichlorodiphenyldichloroethane)
- Dde (Dichlorodiphenyldichloroethylene)
- Ddt (Dichlorodiphenyltrichloroethane)
- Deltamethrin
- Dieldrin
- Dissolved Oxygen
- Endrin
- Esfenvalerate
- Fluoranthene
- Fluorene
- Hexachlorocyclohexane (Hch)
- Lambda-Cyhalothrin
- Lead
- Mercury
- Naphthalene
- Nickel
- Permethrin
- Phenanthrene
- Polycyclic Aromatic Hydrocarbons (Pahs) (Aquatic Ecosystems)

- Pyrene
- Pyrethroids
- Toxicity
- Zinc

**Water Contact Recreation**                                        Insufficient Info ⌄

Identified Issues for Use

No impairments evaluated for this use.

📄 Other Water Quality Parameters Evaluated

*Insufficient Information*

- Pathogens

---

**Probable sources contributing to impairment from 2026:**

No probable sources of impairment identified for this waterbody.

---

**Assessment Documents**

No documents are available

---

**Plans to Restore Water Quality**

**What plans are in place to protect or restore water quality?**
*Links below open in a new browser tab.*

| Plan | Impairments | Type | Completion Date |
|---|---|---|---|
| California Trash Policy: Amendment to the Water Quality Control Plan for Ocean Waters of California to Control Trash and Part 1 Trash Provisions of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bays, and Estuaries of California <https://epa.gov/plan-summary/ca_swrcb/ca-trash-policy-4b> | Trash | 📄 4B Restoration Approach | 2021-02-23 |



# Discover.

**Accessibility Statement**

<https://www.epa.gov/accessibility/epa-accessibility-statement>

**Budget & Performance**

<https://www.epa.gov/planandbudget>

**Contracting**

<https://www.epa.gov/contracts>

**EPA www Web Snapshot**

<https://www.epa.gov/home/wwwepagov-snapshots>

**Grants** <https://www.epa.gov/grants>

# Connect.

**Data** <https://www.epa.gov/data>

**Inspector General**

<https://www.epa.gov/office-inspector-general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**

<https://www.epa.gov/newsroom>

**Regulations.gov** ⧉

<https://www.regulations.gov/>

**Subscribe**

<https://www.epa.gov/newsroom/email-subscriptions-epa-news-releases>

# Ask.

**Contact EPA**

<https://www.epa.gov/home/forms/contact-epa>

**EPA Disclaimers**

<https://www.epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines**

<https://www.epa.gov/aboutepa/epa-hotlines>

**FOIA Requests**

<https://www.epa.gov/foia>

## No FEAR Act Data

<https://www.epa.gov/ocr/no-fear-act-data>

## Plain Writing

<https://www.epa.gov/web-policies-and-procedures/plain-writing>

## Privacy and Security Notice

<https://www.epa.gov/privacy/privacy-and-security-notice>

## USA.gov

<https://www.usa.gov/>

## White House

<https://www.whitehouse.gov/>

## Frequent Questions

<https://www.epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.





## F.  <u>EXHIBIT B</u>

*Exhibit B — Settlement Agreement and Mutual Release between the Bay Area Air Quality Management District (BAAQMD) and Apple Inc., dated April 30 – May 2, 2026, executed by counsel for Apple Inc. (Morrison & Foerster LLP) and by Elizabeth Schmidt, Director of Environmental Health & Safety at Apple Inc., assessing a $125,000 civil penalty.*

**Settlement Agreement
By and Between
The Bay Area Air Quality Management District
and
Apple, Inc.
(Notices of Violation A64215, A64216, A64218, A64219, A65128)**

1.    The Bay Area Air Quality Management District ("Air District") is the regional governmental agency charged with the primary responsibility for maintaining healthy air quality in the San Francisco Bay Area.

2.    Apple, Inc. ("Apple") is a global technology company that designs and manufactures electronic devices and is headquartered at One Apple Park Way, Cupertino, California 95014.

3.    The Air District alleges that at all relevant times, Apple was subject to and violated Air District regulations as described in Notices of Violation ("NOVs") A64215, A64216, A64218, A64219, and A65128, which are, by this reference, incorporated into this Settlement Agreement ("Agreement").

4.    The Air District and Apple ("Parties") agree to settle NOVs A64215, A64216, A64218, A64219, and A65128 for: (i) payment by Apple to the Air District of a civil penalty in the amount of **One Hundred Twenty-Five Thousand Dollars ($125,000)**, and (ii) implementation of the compliance measure set forth in Paragraph 7 below. Apple's entry into this Settlement Agreement is not and shall not be construed as an admission of any liability, wrongdoing, or responsibility with respect to any violations of any rule, law, statute, policy, or regulation that are alleged in NOVs A64215, A64216, A64218, A64219, and A65128.

5.    Apple shall pay the $125,000 civil penalty specified in Paragraph 4 within thirty (30) calendar days after the Effective Date of this Settlement Agreement in accordance with the payment provisions set forth in Paragraph 6 below.  If Apple fails to pay the full penalty by the due date, Apple shall pay the Air District a stipulated penalty of Five Hundred Dollars ($500) for each day after the due date on which the Air District has not received full payment.  Each stipulated penalty is cumulative and in addition to any other applicable stipulated penalty and any other payment required by this Settlement Agreement.

6.    Apple shall pay the $125,000 civil penalty specified in Paragraph 4, and any additional stipulated penalties owed under this Settlement Agreement, either (i) by wire transfer, according to wire

transfer instructions provided by the Air District; or (ii) by check, made payable to the "Bay Area Air Quality Management District" and with "NOV Nos. A64215, A64216, A64218, A64219, and A65128" written in the memo area of the check.  If paid by check, Apple shall mail or deliver the check to:

> Bay Area Air Quality Management District
> Office of the General Counsel
> Alexander Crockett, General Counsel
> 375 Beale Street, Suite 600
> San Francisco, California 94105

Upon initiating the wire transfer or mailing or delivering the check, Apple shall notify the Air District via email at OOiyemhonlan@baaqmd.gov, MVinluanChan@baaqmd.gov, and JPan@baaqmd.gov, and shall attach with the email a completed Internal Revenue Service Form W-9 for Apple.  Apple shall be responsible for all payment processing, check cancellation, and other fees and costs associated with making penalty payments under this Paragraph 6.

7. Commencing on the Effective Date of this Settlement Agreement, Apple shall retain an original copy of the emission results generated by the equipment used to periodically test the boilers located at 3250 Scott Boulevard, Santa Clara, California 95054 (Air District Facility Id. No. 22839). Periodic testing of Apple's boilers is required pursuant to Air District Regulation 9, Rule 7.  An original copy of the emission results must be retained in either digital or printed form, must accurately reflect the emission data collected at the time of testing, and must indicate whether the data complies with the requirements in Air District Regulation 9, Rule 7, Section 307.  Apple shall retain an original copy of the emission results for two (2) years from the date of testing and make these records available to the Air District upon request.  Nothing in this paragraph 7 prevents Apple from also maintaining the emission results for the boilers in other forms and formats.

8. Apple's full payment of the $125,000 civil penalty specified in Paragraph 4 above and complete satisfaction of all of its other obligations under this Settlement Agreement will fully and finally settle, conclude and resolve all claims that have been or could have been asserted between the Air District and Apple arising out of or related to the allegations and conduct that are the basis for NOVs A64215, A64216, A64218, A64219, and A65128.  In consideration of Apple's full payment of the civil penalty specified in Paragraph 4 and satisfaction of all other obligations under this Settlement Agreement, the Air District hereby releases Apple and its principals, officers, receivers, trustees,

successors and assignees, subsidiary and parent corporations from any claims arising out of or related to the allegations and conduct that are the basis for NOVs A64215, A64216, A64218, A64219, and A65128.

9.     Nothing in this Settlement Agreement shall be construed as limiting the ability of the Air District to take future enforcement action arising out of violations or alleged violations not covered by this Settlement Agreement. Furthermore, nothing in this Settlement Agreement shall be construed as limiting the rights of the Air District to rely on the violations alleged in NOVs A64215, A64216, A64218, A64219, and A65128, and to offer proof thereof, in any such future enforcement action for purposes of demonstrating Apple's frequency of past violations pursuant to Health & Safety Code section 42403(b)(4) or other applicable provision of law.

10.     Apple's failure to perform any of the terms or conditions of this Settlement Agreement will render Apple in violation of the Settlement Agreement, and the Air District may, at its sole discretion, void this Settlement Agreement, upon written notice to Apple, or take any other action to enforce the Settlement Agreement. The failure by a Party to enforce any provision of this Settlement Agreement shall not be construed as a waiver of such provision, nor shall it prevent the Party thereafter from enforcing such provision or any other provision of this Settlement Agreement. The rights and remedies granted to each Party herein are cumulative, and the election of one right or remedy by a Party shall not constitute a waiver of such Party's right to assert all other remedies available to it under this Settlement Agreement or as otherwise provided by law.

11.     Unless otherwise specified in this Settlement Agreement, whenever one Party is required to provide notice to the other Party under this Settlement Agreement, the notice shall be provided in writing by first class mail and/or email addressed as follows:

As to the Air District:                     As to Apple:

Bay Area Air Quality Management District     Apple Inc.
Omonigho Oiyemhonlan                         Bethany French, Esq.
Assistant Counsel II                         EHS Counsel
375 Beale Street, Suite 600                  One Apple Park Way 60-2LAW
San Francisco, CA 94105                      Cupertino, CA 95014
Omonigho.Oiyemhonlan@baaqmd.gov              B_French@apple.com

Either Party may change its contact information for purposes of notices, at any time, by giving notice of

Page 3 of 6

such change in conformity with the notice provisions of this paragraph. Notices provided pursuant to this paragraph shall be deemed to be provided and received upon emailing or five days from mailing, as applicable.

12.    This Settlement Agreement binds Apple, and any principals, officers, receivers, trustees, successors and assignees, subsidiary and parent corporations, and the Air District and any successor agency that may have responsibility for and jurisdiction over the subject matter of this Settlement Agreement.

13.    The Superior Court of California, County of San Francisco, shall hear any dispute between the Parties arising from this Settlement Agreement.

14.    This Settlement Agreement shall be interpreted and enforced in accordance with the laws of the State of California, without regard to California's choice-of-law rules.

15.    Both Parties have jointly participated in the drafting and reviewing of this Settlement Agreement. Accordingly, the Parties agree that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be applied in interpreting this Settlement Agreement.

16.    This Settlement Agreement is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Apple is responsible for achieving and maintaining compliance with all applicable federal, State, and local laws, regulations, and permits; and Apple's compliance with this Settlement Agreement shall not be a defense to any action commenced pursuant to any such laws, regulations, or permits. The Air District does not, by its execution of this Settlement Agreement, warrant or aver in any manner that Apple's compliance with any aspect of this Settlement Agreement will result in compliance with any provisions of federal, State, or local laws, regulations, or permits. Nothing in this Settlement Agreement shall be referenced, used, or interpreted to require the Air District to enter into or offer the same or similar terms to any person in any other or future legal, administrative, or enforcement proceeding or similar proceeding.

17.    The Parties understand and agree that the penalties provided for and payable under this Settlement Agreement are non-dischargeable under United States Code, title 11, section 523(a)(7), which provides that a debt may not be discharged in bankruptcy to the extent such debt is for a fine,

penalty, or forfeiture payable to and for the benefit of a governmental unit.

18.     The settlement of the matters covered by this Settlement Agreement without further litigation is fair, reasonable, and in the interests of the Air District, Apple, and the public. The Parties, and each of them, (i) have participated fully in the review and drafting of this Settlement Agreement; (ii) understand and accept all of the terms of this Settlement Agreement; (iii) enter into this Settlement Agreement freely and voluntarily; (iv) have had an opportunity to consult with legal counsel regarding this Settlement Agreement; (v) are fully informed of the terms and effect of this Settlement Agreement; (vi) have agreed to this Settlement Agreement after independent investigation and agree that it was not arrived at through fraud, duress, or undue influence; and (vii) knowingly and voluntarily intend to be legally bound by this Settlement Agreement.

19.     Each provision of this Settlement Agreement is severable, and in the event that any provision, or part thereof, of this Settlement Agreement is held to be illegal, invalid or unenforceable in any jurisdiction, the remainder of this Settlement Agreement shall remain in full force and effect.

20.     This Settlement Agreement constitutes the entire agreement and understanding between the Parties, and it fully supersedes and replaces any and all prior negotiations and agreements of any kind or nature, whether written or oral, between the Parties, concerning the matters covered herein.

21.     No agreement to modify, amend, extend, supersede, terminate, or discharge this Settlement Agreement, or any portion thereof, shall be valid or enforceable unless it is in writing and signed by both Parties.

22.     This Settlement Agreement may be executed in one or more counterparts, each of which shall have the same force and effect as an original, but all of which together shall constitute one and the same instrument. Electronic, facsimile, and photocopied signatures shall be valid signatures.

23.     The Effective Date of this Settlement Agreement shall be the date upon which it is fully executed.

24.     Each of the undersigned expressly represents that they are authorized to execute this Settlement Agreement on behalf of, and to bind, the Party for whom they sign below.

*          *          *          *          *

Page 5 of 6

So agreed, stipulated and executed:

Bay Area Air Quality Management District
375 Beale Street, Suite 600
San Francisco, California 94105

Apple, Inc.
One Apple Park Way
Cupertino, CA 95014

Dated:

Dated:    5/2/2026

By: _____
Philip M. Fine
Executive Officer/APCO

By: _____
Elizabeth Schmidt
Director of Environmental
Health & Safety

Approved as to Form By:

Bay Area Air Quality Management
Office of the General Counsel
Alexander G. Crockett
General Counsel
Omonigho Oiyemhonlan
Assistant Counsel II

Approved as to Form By:

Morrison Foerster
425 Market Street
San Francisco, CA 94105

Dated:    5/1/2026

By: _____
Alexander G. Crockett
General Counsel

Dated:    4/30/2026

By: _____
William F. Tarantino
Partner

## G. <u>EXHIBIT C</u>

*Exhibit C — Santa Clara Valley Water District, Groundwater Elevation Report titled "Approximate location of groundwater elevation monitoring wells within a .5 mile radius around 3250 Scott Blvd, Santa Clara, California, 95054," generated May 5, 2026 from https://gis.valleywater.org/groundwaterelevations/report.php.*

Date of Request: May 5, 2026
Subject: Request for generalized depth-to-groundwater at the site location

The historic and recent depth-to-water measurements in groundwater elevation monitoring wells within .5 mile(s) of properties located around 3250 Scott Blvd, Santa Clara, California, 95054 are presented in the table below. The data are raw monitoring data that have not been analyzed for seasonal or other trends. A map is provided to give the locations of the groundwater elevation monitoring wells and the property. Please note that the closest depth-to-water well is approximately 322 feet from the property.

*Please note that these data are regional and general in nature. The Santa Clara Valley Water District (District) does not guarantee that the groundwater data presented accurately reflects conditions at any particular site or time nor does it guarantee the accuracy of any geographically presented data. The District makes no guarantees or warranty, expressed or implied, as to the accuracy, timeliness, completeness, or adequacy of this data for any use or particular purpose. In consideration of the District making this information available, any user of the data accepts it as is and assumes responsibility for its use. The User agrees to defend, indemnify, and hold the District harmless from and against all damage, loss, or liability arising from any use of the data. Groundwater data may vary greatly from site to site. A site-specific investigation may be necessary to determine site-specific conditions.*

# Approximate location of groundwater elevation monitoring wells within a .5 mile radius around 3250 Scott Blvd, Santa Clara, California, 95054



Groundwater Elevations Monitoring Wells within .5 mile: 5

| Location ID | Well ID | Measurement Date | Depth to Water Reading (feet below ground surface) | Water Level Elevation (feet, NAVD88) | Water Level Status |
|---|---|---|---|---|---|
| 1 | 06S01W27E002 | 4/17/1970 | 67.6 | -35.0 | Static reading |
| 1 | 06S01W27E002 | 5/6/1970 | 110.0 | -77.4 | Static reading |
| 1 | 06S01W27E002 | 5/21/1970 | 84.6 | -52.0 | Static reading |
| 1 | 06S01W27E002 | 6/16/1970 | 118.5 | -85.9 | Static reading |
| 1 | 06S01W27E002 | 7/23/1970 | 110.6 | -78.0 | Static reading |
| 1 | 06S01W27E002 | 11/5/1970 | 73.5 | -40.9 | Static reading |
| 1 | 06S01W27E002 | 2/9/1971 | 48.3 | -15.7 | Static reading |
| 1 | 06S01W27E002 | 3/19/1971 | 47.0 | -14.3 | Static reading |
| 1 | 06S01W27E002 | 4/21/1971 | 47.0 | -14.3 | Static reading |
| 1 | 06S01W27E002 | 5/17/1971 | 78.5 | -45.9 | Static reading |
| 1 | 06S01W27E002 | 6/21/1971 | 72.0 | -39.4 | Static reading |
| 1 | 06S01W27E002 | 7/21/1971 | 87.6 | -55.0 | Static reading |
| 1 | 06S01W27E002 | 8/18/1971 | 85.4 | -52.8 | Static reading |
| 1 | 06S01W27E002 | 9/17/1971 | 88.0 | -55.4 | Static reading |
| 1 | 06S01W27E002 | 11/5/1971 | 65.4 | -32.8 | Static reading |
| 1 | 06S01W27E002 | 12/3/1971 | 54.5 | -21.9 | Static reading |
| 1 | 06S01W27E002 | 12/29/1971 | 47.3 | -14.7 | Static reading |
| 1 | 06S01W27E002 | 2/9/1972 | 42.8 | -10.2 | Static reading |
| 1 | 06S01W27E002 | 3/3/1972 | 43.0 | -10.3 | Static reading |
| 1 | 06S01W27E002 | 4/5/1972 | 69.2 | -36.6 | Static reading |
| 1 | 06S01W27E002 | 5/5/1972 | 68.2 | -35.6 | Static reading |

Groundwater Elevation Data Report

| | | | | |
|---|---|---|---|---|
| 1 | 06S01W27E002 6/7/1972 | 79.5 | -46.9 | Static reading |
| 1 | 06S01W27E002 7/7/1972 | 99.1 | -66.5 | Static reading |
| 1 | 06S01W27E002 8/17/1972 | 95.5 | -62.9 | Static reading |
| 1 | 06S01W27E002 9/20/1972 | 102.0 | -69.4 | Static reading |
| 1 | 06S01W27E002 10/25/1972 | 77.1 | -44.5 | Static reading |
| 1 | 06S01W27E002 12/5/1972 | 65.0 | -32.4 | Static reading |
| 1 | 06S01W27E002 1/8/1973 | 56.8 | -24.2 | Static reading |
| 1 | 06S01W27E002 2/5/1973 | 52.8 | -20.2 | Static reading |
| 1 | 06S01W27E002 3/6/1973 | 49.5 | -16.9 | Static reading |
| 1 | 06S01W27E002 6/27/1973 | 83.0 | -50.4 | Static reading |
| 1 | 06S01W27E002 8/9/1973 | 85.0 | -52.4 | Static reading |
| 1 | 06S01W27E002 9/25/1973 | 79.7 | -47.1 | Static reading |
| 1 | 06S01W27E002 10/31/1973 | 62.3 | -29.7 | Static reading |
| 1 | 06S01W27E002 11/28/1973 | 49.0 | -16.4 | Static reading |
| 1 | 06S01W27E002 12/28/1973 | 39.8 | -7.2 | Static reading |
| 1 | 06S01W27E002 1/22/1974 | 37.1 | -4.5 | Static reading |
| 1 | 06S01W27E002 2/21/1974 | 34.5 | -1.9 | Static reading |
| 1 | 06S01W27E002 3/21/1974 | 34.5 | -1.9 | Static reading |
| 1 | 06S01W27E002 4/23/1974 | 34.8 | -2.1 | Static reading |
| 1 | 06S01W27E002 5/17/1974 | 54.1 | -21.4 | Static reading |
| 1 | 06S01W27E002 6/20/1974 | 63.3 | -30.7 | Static reading |
| 1 | 06S01W27E002 7/18/1974 | 68.2 | -35.6 | Static reading |
| 1 | 06S01W27E002 8/29/1974 | 68.2 | -35.6 | Static reading |
| 1 | 06S01W27E002 9/26/1974 | 64.4 | -31.8 | Static reading |
| 1 | 06S01W27E002 10/24/1974 | 52.5 | -19.9 | Static reading |
| 1 | 06S01W27E002 11/27/1974 | 33.8 | -1.2 | Static reading |
| 1 | 06S01W27E002 12/13/1974 | 28.5 | 4.2 | Static reading |
| 1 | 06S01W27E002 1/30/1975 | 18.8 | 13.8 | Static reading |
| 1 | 06S01W27E002 2/10/1975 | 16.4 | 16.3 | Static reading |
| 1 | 06S01W27E002 3/31/1975 | 11.5 | 21.2 | Static reading |
| 1 | 06S01W27E002 4/30/1975 | 16.2 | 16.4 | Static reading |
| 1 | 06S01W27E002 6/5/1975 | 37.5 | -4.9 | Static reading |
| 1 | 06S01W27E002 9/18/1975 | 57.8 | -25.2 | Static reading |
| 2 | 06S01W28F002 6/7/1971 | 63.6 | -27.8 | Static reading |
| 3 | 06S01W28R001 10/21/1969 | 113.5 | -72.7 | Static reading |
| 3 | 06S01W28R001 12/18/1969 | 90.6 | -49.8 | Static reading |
| 3 | 06S01W28R001 1/21/1970 | 80.7 | -39.9 | Static reading |
| 3 | 06S01W28R001 2/26/1970 | 70.2 | -29.4 | Static reading |
| 3 | 06S01W28R001 3/26/1970 | 73.5 | -32.6 | Static reading |
| 3 | 06S01W28R001 7/14/1970 | 142.7 | -101.9 | Static reading |
| 3 | 06S01W28R001 8/26/1970 | 102.7 | -61.9 | Static reading |
| 3 | 06S01W28R001 11/5/1970 | 91.5 | -50.6 | Static reading |
| 3 | 06S01W28R001 2/9/1971 | 57.8 | -16.9 | Static reading |
| 3 | 06S01W28R001 3/19/1971 | 57.1 | -16.3 | Static reading |
| 3 | 06S01W28R001 4/21/1971 | 56.8 | -16.0 | Static reading |
| 3 | 06S01W28R001 5/17/1971 | 80.1 | -39.3 | Static reading |
| 3 | 06S01W28R001 6/21/1971 | 81.7 | -40.9 | Static reading |
| 3 | 06S01W28R001 8/18/1971 | 92.5 | -51.6 | Static reading |
| 3 | 06S01W28R001 9/17/1971 | 99.5 | -58.6 | Static reading |
| 3 | 06S01W28R001 11/5/1971 | 76.5 | -35.6 | Static reading |
| 3 | 06S01W28R001 12/3/1971 | 65.4 | -24.6 | Static reading |
| 3 | 06S01W28R001 12/30/1971 | 57.5 | -16.6 | Static reading |
| 3 | 06S01W28R001 2/9/1972 | 52.5 | -11.7 | Static reading |
| 3 | 06S01W28R001 3/3/1972 | 53.1 | -12.3 | Static reading |
| 3 | 06S01W28R001 5/5/1972 | 79.1 | -38.3 | Static reading |
| 3 | 06S01W28R001 6/7/1972 | 91.0 | -50.1 | Static reading |
| 3 | 06S01W28R001 7/7/1972 | 105.4 | -64.5 | Static reading |
| 3 | 06S01W28R001 8/14/1972 | 109.4 | -68.5 | Static reading |
| 3 | 06S01W28R001 9/20/1972 | 108.6 | -67.8 | Static reading |
| 3 | 06S01W28R001 10/25/1972 | 88.0 | -47.1 | Static reading |
| 3 | 06S01W28R001 12/5/1972 | 75.5 | -34.6 | Static reading |
| 3 | 06S01W28R001 1/8/1973 | 67.0 | -26.2 | Static reading |
| 3 | 06S01W28R001 2/5/1973 | 62.8 | -21.9 | Static reading |
| 3 | 06S01W28R001 3/6/1973 | 59.1 | -18.3 | Static reading |
| 3 | 06S01W28R001 5/18/1973 | 82.0 | -41.1 | Static reading |
| 3 | 06S01W28R001 6/27/1973 | 92.0 | -51.1 | Static reading |

| | | | | |
|---|---|---|---|---|
| 3 | 06S01W28R001 9/25/1973 | 90.2 | -49.4 | Static reading |
| 3 | 06S01W28R001 10/31/1973 | 77.9 | -37.1 | Static reading |
| 3 | 06S01W28R001 11/28/1973 | 59.5 | -18.7 | Static reading |
| 3 | 06S01W28R001 12/28/1973 | 53.1 | -12.3 | Static reading |
| 3 | 06S01W28R001 1/22/1974 | 48.6 | -7.8 | Static reading |
| 3 | 06S01W28R001 2/21/1974 | 46.6 | -5.8 | Static reading |
| 3 | 06S01W28R001 3/21/1974 | 44.3 | -3.5 | Static reading |
| 3 | 06S01W28R001 4/23/1974 | 44.6 | -3.8 | Static reading |
| 3 | 06S01W28R001 5/17/1974 | 56.5 | -15.7 | Static reading |
| 3 | 06S01W28R001 6/20/1974 | 67.6 | -26.8 | Static reading |
| 3 | 06S01W28R001 7/18/1974 | 74.1 | -33.3 | Static reading |
| 3 | 06S01W28R001 8/29/1974 | 79.7 | -38.9 | Static reading |
| 3 | 06S01W28R001 9/27/1974 | 76.5 | -35.6 | Static reading |
| 3 | 06S01W28R001 10/24/1974 | 64.4 | -23.6 | Static reading |
| 3 | 06S01W28R001 11/26/1974 | 43.3 | -2.5 | Static reading |
| 3 | 06S01W28R001 12/13/1974 | 38.8 | 2.0 | Static reading |
| 3 | 06S01W28R001 1/30/1975 | 26.9 | 14.0 | Static reading |
| 3 | 06S01W28R001 2/10/1975 | 24.0 | 16.9 | Static reading |
| 3 | 06S01W28R001 3/31/1975 | 20.3 | 20.6 | Static reading |
| 3 | 06S01W28R001 4/29/1975 | 24.7 | 16.1 | Static reading |
| 3 | 06S01W28R001 6/5/1975 | 47.3 | -6.5 | Static reading |
| 3 | 06S01W28R001 9/18/1975 | 63.3 | -22.4 | Static reading |
| 3 | 06S01W28R001 12/22/1975 | 30.3 | 10.6 | Static reading |
| 3 | 06S01W28R001 4/5/1976 | 49.5 | -8.7 | Static reading |
| 3 | 06S01W28R001 5/27/1976 | 69.2 | -28.4 | Static reading |
| 3 | 06S01W28R001 7/28/1976 | 98.1 | -57.3 | Static reading |
| 3 | 06S01W28R001 9/15/1976 | 85.4 | -44.6 | Static reading |
| 3 | 06S01W28R001 12/15/1976 | 61.0 | -20.2 | Static reading |
| 3 | 06S01W28R001 4/8/1977 | 53.8 | -13.0 | Static reading |
| 3 | 06S01W28R001 5/26/1977 | 54.1 | -13.3 | Static reading |
| 3 | 06S01W28R001 9/21/1977 | 83.7 | -42.9 | Static reading |
| 3 | 06S01W28R001 12/5/1978 | 58.8 | -17.9 | Static reading |
| 3 | 06S01W28R001 4/9/1979 | 40.5 | 0.4 | Static reading |
| 3 | 06S01W28R001 6/6/1979 | 67.6 | -26.8 | Static reading |
| 3 | 06S01W28R001 9/14/1979 | 96.5 | -55.6 | Static reading |
| 3 | 06S01W28R001 12/3/1979 | 61.8 | -20.9 | Static reading |
| 3 | 06S01W28R001 4/3/1980 | 41.3 | -0.5 | Static reading |
| 3 | 06S01W28R001 6/2/1980 | 53.5 | -12.7 | Static reading |
| 3 | 06S01W28R001 9/18/1980 | 72.0 | -31.2 | Static reading |
| 3 | 06S01W28R001 12/5/1980 | 57.8 | -16.9 | Static reading |
| 3 | 06S01W28R001 4/7/1981 | 38.8 | 2.0 | Static reading |
| 3 | 06S01W28R001 6/2/1981 | 62.8 | -21.9 | Static reading |
| 3 | 06S01W28R001 9/24/1981 | 89.2 | -48.4 | Static reading |
| 3 | 06S01W28R001 12/8/1981 | 51.0 | -10.2 | Static reading |
| 3 | 06S01W28R001 4/7/1982 | 39.5 | 1.4 | Static reading |
| 3 | 06S01W28R001 6/10/1982 | 59.8 | -18.9 | Static reading |
| 3 | 06S01W28R001 9/14/1982 | 73.9 | -33.0 | Static reading |
| 3 | 06S01W28R001 12/7/1982 | 41.0 | -0.1 | Static reading |
| 3 | 06S01W28R001 4/18/1983 | 27.9 | 13.0 | Static reading |
| 3 | 06S01W28R001 6/8/1983 | 41.3 | -0.5 | Static reading |
| 3 | 06S01W28R001 9/14/1983 | 61.0 | -20.2 | Static reading |
| 3 | 06S01W28R001 12/6/1983 | 28.5 | 12.3 | Static reading |
| 3 | 06S01W28R001 4/24/1984 | 40.8 | 0.1 | Static reading |
| 3 | 06S01W28R001 6/7/1984 | 56.5 | -15.7 | Static reading |
| 3 | 06S01W28R001 9/24/1984 | 72.5 | -31.7 | Static reading |
| 4 | 06S01W28K001 2/8/1971 | 56.5 | -15.7 | Static reading |
| 4 | 06S01W28K001 7/27/1971 | 94.2 | -53.4 | Static reading |
| 4 | 06S01W28K001 8/18/1971 | 89.2 | -48.4 | Static reading |
| 4 | 06S01W28K001 9/17/1971 | 97.5 | -56.6 | Static reading |
| 4 | 06S01W28K001 11/5/1971 | 74.9 | -34.0 | Static reading |
| 4 | 06S01W28K001 12/3/1971 | 62.3 | -21.4 | Static reading |
| 4 | 06S01W28K001 12/30/1971 | 56.5 | -15.7 | Static reading |
| 4 | 06S01W28K001 2/9/1972 | 51.5 | -10.7 | Static reading |
| 4 | 06S01W28K001 3/3/1972 | 52.3 | -11.5 | Static reading |
| 4 | 06S01W28K001 4/5/1972 | 73.5 | -32.6 | Static reading |
| 4 | 06S01W28K001 5/4/1972 | 76.1 | -35.3 | Static reading |

| 4 | 06S01W28K001 | 6/7/1972 | 89.2 | -48.4 | Static reading |
|---|---|---|---|---|---|
| 4 | 06S01W28K001 | 7/7/1972 | 104.0 | -63.1 | Static reading |
| 4 | 06S01W28K001 | 8/14/1972 | 107.0 | -66.2 | Static reading |
| 4 | 06S01W28K001 | 9/20/1972 | 103.7 | -62.9 | Static reading |
| 4 | 06S01W28K001 | 10/25/1972 | 84.6 | -43.8 | Static reading |
| 4 | 06S01W28K001 | 12/5/1972 | 73.2 | -32.4 | Static reading |
| 4 | 06S01W28K001 | 1/4/1973 | 67.4 | -26.6 | Static reading |
| 4 | 06S01W28K001 | 2/5/1973 | 60.0 | -19.2 | Static reading |
| 4 | 06S01W28K001 | 3/6/1973 | 57.1 | -16.3 | Static reading |
| 4 | 06S01W28K001 | 5/18/1973 | 73.5 | -32.6 | Static reading |
| 4 | 06S01W28K001 | 6/27/1973 | 83.0 | -42.1 | Static reading |
| 4 | 06S01W28K001 | 8/9/1973 | 91.0 | -50.1 | Static reading |
| 4 | 06S01W28K001 | 9/25/1973 | 87.0 | -46.1 | Static reading |
| 4 | 06S01W28K001 | 10/31/1973 | 84.6 | -43.8 | Static reading |
| 4 | 06S01W28K001 | 11/27/1973 | 57.5 | -16.6 | Static reading |
| 4 | 06S01W28K001 | 12/28/1973 | 49.0 | -8.2 | Static reading |
| 4 | 06S01W28K001 | 1/22/1974 | 45.3 | -4.5 | Static reading |
| 4 | 06S01W28K001 | 2/20/1974 | 47.6 | -6.8 | Static reading |
| 4 | 06S01W28K001 | 3/21/1974 | 41.0 | -0.1 | Static reading |
| 4 | 06S01W28K001 | 4/23/1974 | 42.8 | -1.9 | Static reading |
| 4 | 06S01W28K001 | 5/17/1974 | 51.3 | -10.5 | Static reading |
| 4 | 06S01W28K001 | 6/21/1974 | 68.2 | -27.4 | Static reading |
| 4 | 06S01W28K001 | 7/18/1974 | 72.0 | -31.2 | Static reading |
| 4 | 06S01W28K001 | 8/29/1974 | 76.1 | -35.3 | Static reading |
| 4 | 06S01W28K001 | 9/27/1974 | 75.1 | -34.3 | Static reading |
| 4 | 06S01W28K001 | 10/23/1974 | 70.0 | -29.2 | Static reading |
| 4 | 06S01W28K001 | 11/26/1974 | 59.1 | -18.3 | Static reading |
| 4 | 06S01W28K001 | 12/13/1974 | 49.3 | -8.4 | Static reading |
| 4 | 06S01W28K001 | 1/30/1975 | 28.5 | 12.3 | Static reading |
| 4 | 06S01W28K001 | 2/10/1975 | 24.7 | 16.1 | Static reading |
| 4 | 06S01W28K001 | 3/31/1975 | 19.8 | 21.1 | Static reading |
| 4 | 06S01W28K001 | 4/29/1975 | 24.0 | 16.9 | Static reading |
| 4 | 06S01W28K001 | 6/5/1975 | 47.0 | -6.2 | Static reading |
| 4 | 06S01W28K001 | 9/18/1975 | 60.0 | -19.2 | Static reading |
| 4 | 06S01W28K001 | 12/23/1975 | 33.1 | 7.8 | Static reading |
| 4 | 06S01W28K001 | 4/5/1976 | 40.0 | 0.8 | Static reading |
| 4 | 06S01W28K001 | 5/27/1976 | 64.0 | -23.2 | Static reading |
| 4 | 06S01W28K001 | 7/28/1976 | 94.2 | -53.4 | Static reading |
| 4 | 06S01W28K001 | 12/15/1976 | 59.1 | -18.3 | Static reading |
| 4 | 06S01W28K001 | 4/7/1977 | 51.5 | -10.7 | Static reading |
| 4 | 06S01W28K001 | 5/26/1977 | 58.5 | -17.7 | Static reading |
| 4 | 06S01W28K001 | 9/21/1977 | 80.1 | -39.3 | Static reading |
| 4 | 06S01W28K001 | 12/5/1977 | 80.5 | -39.6 | Static reading |
| 4 | 06S01W28K001 | 3/29/1978 | 65.0 | -24.2 | Static reading |
| 4 | 06S01W28K001 | 6/6/1978 | 64.6 | -23.8 | Static reading |
| 4 | 06S01W28K001 | 12/4/1978 | 52.5 | -11.7 | Static reading |
| 5 | 06S01W27N004 | 12/20/1963 | 123.7 | -75.0 | Static reading |
| 5 | 06S01W27N004 | 1/24/1964 | 118.1 | -69.5 | Static reading |
| 5 | 06S01W27N004 | 2/24/1964 | 117.5 | -68.9 | Static reading |
| 5 | 06S01W27N004 | 3/26/1964 | 121.7 | -73.0 | Static reading |
| 5 | 06S01W27N004 | 4/21/1964 | 155.9 | -107.3 | Static reading |
| 5 | 06S01W27N004 | 5/22/1964 | 171.9 | -123.3 | Static reading |
| 5 | 06S01W27N004 | 6/19/1964 | 173.9 | -125.3 | Static reading |
| 5 | 06S01W27N004 | 8/21/1964 | 190.9 | -142.3 | Static reading |
| 5 | 06S01W27N004 | 10/19/1964 | 179.2 | -130.6 | Static reading |
| 5 | 06S01W27N004 | 11/21/1964 | 163.2 | -114.5 | Static reading |
| 5 | 06S01W27N004 | 12/29/1964 | 149.0 | -100.4 | Static reading |
| 5 | 06S01W27N004 | 1/27/1965 | 147.0 | -98.4 | Static reading |
| 5 | 06S01W27N004 | 2/23/1965 | 139.2 | -90.5 | Static reading |
| 5 | 06S01W27N004 | 3/26/1965 | 148.0 | -99.4 | Static reading |
| 5 | 06S01W27N004 | 4/22/1965 | 132.5 | -83.9 | Static reading |
| 5 | 06S01W27N004 | 8/25/1965 | 184.2 | -135.6 | Static reading |
| 5 | 06S01W27N004 | 9/24/1965 | 188.0 | -139.3 | Static reading |
| 5 | 06S01W27N004 | 10/26/1965 | 172.9 | -124.3 | Static reading |
| 5 | 06S01W27N004 | 11/22/1965 | 155.9 | -107.3 | Static reading |
| 5 | 06S01W27N004 | 12/23/1965 | 146.0 | -97.4 | Static reading |

Groundwater Elevation Data Report

| | | | | |
|---|---|---|---|---|
| 5 | 06S01W27N004 1/24/1966 | 140.2 | -91.5 | Static reading |
| 5 | 06S01W27N004 2/24/1966 | 134.9 | -86.3 | Static reading |
| 5 | 06S01W27N004 3/22/1966 | 131.9 | -83.3 | Static reading |
| 5 | 06S01W27N004 4/25/1966 | 159.4 | -110.8 | Static reading |
| 5 | 06S01W27N004 5/23/1966 | 174.2 | -125.5 | Static reading |
| 5 | 06S01W27N004 6/24/1966 | 192.7 | -144.1 | Static reading |
| 5 | 06S01W27N004 7/27/1966 | 199.5 | -150.8 | Static reading |
| 5 | 06S01W27N004 9/27/1966 | 190.0 | -141.3 | Static reading |
| 5 | 06S01W27N004 10/25/1966 | 182.4 | -133.8 | Static reading |
| 5 | 06S01W27N004 11/22/1966 | 166.0 | -117.4 | Static reading |
| 5 | 06S01W27N004 12/27/1966 | 156.9 | -108.3 | Static reading |
| 5 | 06S01W27N004 1/24/1967 | 155.9 | -107.3 | Static reading |
| 5 | 06S01W27N004 2/20/1967 | 148.4 | -99.8 | Static reading |
| 5 | 06S01W27N004 3/22/1967 | 147.7 | -99.0 | Static reading |
| 5 | 06S01W27N004 4/26/1967 | 142.4 | -93.8 | Static reading |
| 5 | 06S01W27N004 5/24/1967 | 147.4 | -98.8 | Static reading |
| 5 | 06S01W27N004 6/23/1967 | 158.5 | -109.9 | Static reading |
| 5 | 06S01W27N004 8/25/1967 | 172.7 | -124.0 | Static reading |
| 5 | 06S01W27N004 9/26/1967 | 200.5 | -151.8 | Static reading |
| 5 | 06S01W27N004 10/27/1967 | 156.2 | -107.5 | Static reading |
| 5 | 06S01W27N004 11/29/1967 | 152.7 | -104.0 | Static reading |
| 5 | 06S01W27N004 12/12/1967 | 144.0 | -95.4 | Static reading |
| 5 | 06S01W27N004 1/16/1968 | 123.5 | -74.9 | Static reading |
| 5 | 06S01W27N004 2/21/1968 | 115.2 | -66.5 | Static reading |
| 5 | 06S01W27N004 3/20/1968 | 111.0 | -62.4 | Static reading |
| 5 | 06S01W27N004 4/18/1968 | 113.5 | -64.8 | Static reading |
| 5 | 06S01W27N004 6/20/1968 | 157.2 | -108.5 | Static reading |
| 5 | 06S01W27N004 7/26/1968 | 169.7 | -121.0 | Static reading |
| 5 | 06S01W27N004 8/19/1968 | 153.2 | -104.5 | Static reading |
| 5 | 06S01W27N004 9/18/1968 | 141.2 | -92.5 | Static reading |
| 5 | 06S01W27N004 10/22/1968 | 137.5 | -88.9 | Static reading |
| 5 | 06S01W27N004 11/25/1968 | 125.0 | -76.4 | Static reading |
| 5 | 06S01W27N004 12/26/1968 | 115.5 | -66.8 | Static reading |
| 5 | 06S01W27N004 1/27/1969 | 107.4 | -58.8 | Static reading |
| 5 | 06S01W27N004 2/25/1969 | 101.5 | -52.9 | Static reading |
| 5 | 06S01W27N004 3/25/1969 | 100.5 | -51.9 | Static reading |
| 5 | 06S01W27N004 4/24/1969 | 94.9 | -46.3 | Static reading |
| 5 | 06S01W27N004 5/7/1969 | 117.1 | -68.5 | Static reading |
| 5 | 06S01W27N004 8/20/1969 | 131.9 | -83.3 | Static reading |
| 5 | 06S01W27N004 10/23/1969 | 110.2 | -61.6 | Static reading |
| 5 | 06S01W27N004 11/25/1969 | 97.1 | -48.5 | Static reading |
| 5 | 06S01W27N004 12/18/1969 | 95.5 | -46.9 | Static reading |
| 5 | 06S01W27N004 1/21/1970 | 84.6 | -36.0 | Static reading |
| 5 | 06S01W27N004 2/26/1970 | 74.1 | -25.4 | Static reading |
| 5 | 06S01W27N004 3/26/1970 | 74.5 | -25.9 | Static reading |
| 5 | 06S01W27N004 5/5/1970 | 112.5 | -63.9 | Static reading |
| 5 | 06S01W27N004 6/9/1970 | 109.0 | -60.4 | Static reading |
| 5 | 06S01W27N004 7/14/1970 | 127.4 | -78.8 | Static reading |
| 5 | 06S01W27N004 8/26/1970 | 104.7 | -56.1 | Static reading |
| 5 | 06S01W27N004 11/5/1970 | 85.4 | -36.8 | Static reading |
| 5 | 06S01W27N004 2/9/1971 | 56.5 | -7.9 | Static reading |
| 5 | 06S01W27N004 3/19/1971 | 56.5 | -7.9 | Static reading |
| 5 | 06S01W27N004 4/21/1971 | 55.8 | -7.2 | Static reading |
| 5 | 06S01W27N004 5/17/1971 | 78.5 | -29.9 | Static reading |
| 5 | 06S01W27N004 6/21/1971 | 81.0 | -32.4 | Static reading |
| 5 | 06S01W27N004 7/21/1971 | 96.1 | -47.5 | Static reading |
| 5 | 06S01W27N004 8/18/1971 | 91.0 | -42.4 | Static reading |
| 5 | 06S01W27N004 9/17/1971 | 97.5 | -48.9 | Static reading |
| 5 | 06S01W27N004 11/5/1971 | 75.9 | -27.3 | Static reading |
| 5 | 06S01W27N004 12/3/1971 | 64.6 | -16.0 | Static reading |
| 5 | 06S01W27N004 12/29/1971 | 57.1 | -8.4 | Static reading |
| 5 | 06S01W27N004 2/9/1972 | 52.5 | -3.9 | Static reading |
| 5 | 06S01W27N004 3/3/1972 | 52.8 | -4.2 | Static reading |
| 5 | 06S01W27N004 4/5/1972 | 76.1 | -27.4 | Static reading |
| 5 | 06S01W27N004 5/5/1972 | 78.5 | -29.9 | Static reading |
| 5 | 06S01W27N004 6/7/1972 | 89.2 | -40.6 | Static reading |

| | | | | |
|---|---|---|---|---|
| 06S01W27N004 | 7/7/1972 | 103.0 | -54.4 | Static reading |
| 06S01W27N004 | 8/17/1972 | 106.0 | -57.4 | Static reading |
| 06S01W27N004 | 9/20/1972 | 106.4 | -57.8 | Static reading |
| 06S01W27N004 | 10/25/1972 | 87.0 | -38.4 | Static reading |
| 06S01W27N004 | 12/5/1972 | 74.5 | -25.9 | Static reading |
| 06S01W27N004 | 1/4/1973 | 69.2 | -20.6 | Static reading |
| 06S01W27N004 | 2/5/1973 | 61.5 | -12.8 | Static reading |
| 06S01W27N004 | 3/6/1973 | 57.8 | -9.2 | Static reading |
| 06S01W27N004 | 5/18/1973 | 73.9 | -25.3 | Static reading |
| 06S01W27N004 | 6/27/1973 | 84.4 | -35.8 | Static reading |
| 06S01W27N004 | 8/9/1973 | 92.9 | -44.3 | Static reading |
| 06S01W27N004 | 9/25/1973 | 87.0 | -38.4 | Static reading |
| 06S01W27N004 | 10/31/1973 | 69.6 | -20.9 | Static reading |
| 06S01W27N004 | 11/28/1973 | 56.8 | -8.2 | Static reading |
| 06S01W27N004 | 12/28/1973 | 50.0 | -1.4 | Static reading |
| 06S01W27N004 | 1/22/1974 | 44.3 | 4.4 | Static reading |
| 06S01W27N004 | 2/21/1974 | 41.0 | 7.7 | Static reading |
| 06S01W27N004 | 3/21/1974 | 40.0 | 8.7 | Static reading |
| 06S01W27N004 | 4/23/1974 | 40.0 | 8.7 | Static reading |
| 06S01W27N004 | 5/17/1974 | 51.5 | -2.9 | Static reading |
| 06S01W27N004 | 6/20/1974 | 62.8 | -14.2 | Static reading |
| 06S01W27N004 | 7/18/1974 | 68.6 | -19.9 | Static reading |
| 06S01W27N004 | 8/29/1974 | 72.5 | -23.9 | Static reading |
| 06S01W27N004 | 9/27/1974 | 69.2 | -20.6 | Static reading |
| 06S01W27N004 | 10/24/1974 | 57.1 | -8.4 | Static reading |
| 06S01W27N004 | 11/26/1974 | 41.0 | 7.7 | Static reading |
| 06S01W27N004 | 12/13/1974 | 37.5 | 11.2 | Static reading |
| 06S01W27N004 | 4/29/1975 | 22.7 | 25.9 | Static reading |
| 06S01W27N004 | 6/5/1975 | 43.6 | 5.0 | Static reading |
| 06S01W27N004 | 9/18/1975 | 56.1 | -7.5 | Static reading |
| 06S01W27N004 | 12/22/1975 | 28.5 | 20.2 | Static reading |
| 06S01W27N004 | 4/5/1976 | 38.8 | 9.8 | Static reading |
| 06S01W27N004 | 5/27/1976 | 63.3 | -14.7 | Static reading |
| 06S01W27N004 | 7/28/1976 | 87.0 | -38.4 | Static reading |
| 06S01W27N004 | 9/15/1976 | 78.7 | -30.1 | Static reading |
| 06S01W27N004 | 5/26/1977 | 51.0 | -2.4 | Static reading |
| 06S01W27N004 | 9/21/1977 | 79.5 | -30.9 | Static reading |
| 06S01W27N004 | 12/5/1977 | 69.6 | -20.9 | Static reading |
| 06S01W27N004 | 3/27/1978 | 53.5 | -4.9 | Static reading |
| 06S01W27N004 | 6/6/1978 | 61.5 | -12.8 | Static reading |
| 06S01W27N004 | 9/18/1978 | 76.9 | -28.3 | Static reading |
| 06S01W27N004 | 12/5/1978 | 55.1 | -6.5 | Static reading |
| 06S01W27N004 | 4/9/1979 | 37.5 | 11.2 | Static reading |
| 06S01W27N004 | 6/6/1979 | 59.8 | -11.2 | Static reading |
| 06S01W27N004 | 9/14/1979 | 85.4 | -36.8 | Static reading |
| 06S01W27N004 | 12/3/1979 | 57.1 | -8.4 | Static reading |
| 06S01W27N004 | 4/3/1980 | 36.5 | 12.2 | Static reading |
| 06S01W27N004 | 6/2/1980 | 44.0 | 4.7 | Static reading |
| 06S01W27N004 | 9/16/1980 | 60.5 | -11.8 | Static reading |
| 06S01W27N004 | 12/5/1980 | 55.8 | -7.2 | Static reading |
| 06S01W27N004 | 4/7/1981 | 30.8 | 17.9 | Static reading |
| 06S01W27N004 | 6/2/1981 | 49.5 | -0.8 | Static reading |
| 06S01W27N004 | 9/24/1981 | 78.1 | -29.4 | Static reading |
| 06S01W27N004 | 12/8/1981 | 57.8 | -9.2 | Static reading |
| 06S01W27N004 | 4/7/1982 | 34.8 | 13.8 | Static reading |
| 06S01W27N004 | 6/10/1982 | 49.5 | -0.8 | Static reading |
| 06S01W27N004 | 9/14/1982 | 61.5 | -12.8 | Static reading |
| 06S01W27N004 | 12/7/1982 | 34.5 | 14.2 | Static reading |
| 06S01W27N004 | 4/18/1983 | 40.5 | 8.2 | Static reading |
| 06S01W27N004 | 6/7/1983 | 27.9 | 20.8 | Static reading |
| 06S01W27N004 | 9/14/1983 | 47.0 | 1.7 | Static reading |
| 06S01W27N004 | 12/6/1983 | 23.3 | 25.4 | Static reading |
| 06S01W27N004 | 4/24/1984 | 29.3 | 19.4 | Static reading |
| 06S01W27N004 | 6/7/1984 | 41.3 | 7.4 | Static reading |
| 06S01W27N004 | 9/24/1984 | 58.1 | -9.5 | Static reading |
| 06S01W27N004 | 12/5/1984 | 39.5 | 9.2 | Static reading |

| 5 | 06S01W27N004 | 4/2/1985 | 35.1 | 13.6 | Static reading |
| 5 | 06S01W27N004 | 6/4/1985 | 52.8 | -4.2 | Static reading |
| 5 | 06S01W27N004 | 9/19/1985 | 76.9 | -28.3 | Static reading |

**Location ID 1 - Mouse-drag chart to zoom in, right-click to reset chart**

**Location ID 2 - Mouse-drag chart to zoom in, right-click to reset chart**

**Location ID 3 - Mouse-drag chart to zoom in, right-click to reset chart**

**Location ID 4 - Mouse-drag chart to zoom in, right-click to reset chart**

**Location ID 5 - Mouse-drag chart to zoom in, right-click to reset chart**

## H. <u>EXHIBIT D</u>

*Exhibit D — City of San José, "Laboratory Work/Test Request" and "Acute Toxicity Screening" Laboratory Reports for sample collected at 3250 Scott Blvd on March 12, 2019 (effluent reported as toxic to Ceriodaphnia dubia, possibly attributable to high pH); produced by the City of San José in response to a California Public Records Act request.*



CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

**Environmental Services Department**
**Watershed Protection Division**
**ESD Laboratory**

_Lab Supervisor/Designee_

## LABORATORY WORK/TEST REQUEST

| Date Request/Submitted: 3/12/19 | Customer/ Section/ Dept: Source Control | Send Report To: Varsha Patel; Nick Menge |
|---|---|---|
| Originator: NM 3/12/19 Nicklas Alex Chieh Varsha Patel | ProjectName2: MISC SOURCE CONTROL | |
| Sample Collector: Nicklaus Menge | | |

| Date &Time Collected | LIMS SampleID | Location Code/ Description (Customer Sample ID) | Containers: No./Type/Vol. | Analysis | Preserved? | Urgent? |
|---|---|---|---|---|---|---|
| 3/12/19 1018 | LE44403 | Apple (Grab) | 1L Amber | Toxicity | Y | Y |
| 3/12/19 0719 | LE44404 | Apple (Comp) | 1L Amber | Toxicity | Y | Y |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Relinquished By: (Print Name) Nicklous Menge | Received By: (Print Name) Rey Honrada | 3/12/19 |
|---|---|---|
| Signature: (Sign) | Date/Time: 3/12/19 1058 | Signature: (Sign) | Date/Time: 10:58 |

| Work Request#: 2019-03-12-018 | Comments: |
|---|---|
| Expenditure Code: 513 - Source Control | |

Watershed Protection Division
Environmental Services Department

# LABORATORY REPORT

CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

California Environmental Laboratory Registration Number 1313

## Acute Toxicity Screening

Sample Source: Apple (Grab)

Sample Date: 03/12/2019

Sample ID: LE44403

Analysis Start Date: 03/12/2019   Analyst: MK

Analysis End Date: 03/14/2019   Analyst: PM

Sample comments: Initial pH: 9.2 S.U., Total Residual Chlorine: 3.4 mg/L. Chlorine was removed using Sodium Thiosulfate prior to the test initiation.

Results:

| 48-Hour *Ceriodaphnia dubia* Survival Test (% Survival) | | | | |
|---|---|---|---|---|
| Concentration (%) | Replicate 1 | Replicate 2 | Replicate 3 | Replicate 4 |
| Lab Control | 100 | 100 | 100 | 100 |
| 0.1 | 100 | 100 | 100 | 100 |
| 1.0 | 100 | 100 | 100 | 100 |
| 10 | 100 | 100 | 100 | 100 |
| 100 | 0.0 | 0.0 | 0.0 | 0.0 |

Conclusion: The effluent sample is toxic to *Ceriodaphnia dubia* (water flea) at 100% concentration. High pH might have contributed to the mortality. These results should be confirmed by a Certified Testing Laboratory using approved EPA Procedures.

| | | | |
|---|---|---|---|
| *PRugst2* | 3/26/19 | *Kimnguyen* | 3/26/19 |
| Priti Mugatwala Biologist | Date | Kim T. Nguyen Laboratory Supervisor | Date |
| *Alex Chieh signature* | 3/26/19 | *signature* | 3/27/19 |
| Alex Chieh DateQA AC | Date | Noel Enoki Laboratory Manager | Date |

Note: The results are provided for informational purposes only to use in assessing the potential risk of discharge.

Watershed Protection Division
Environmental Services Department

# LABORATORY REPORT

**CITY OF**
**SAN JOSE**
CAPITAL OF SILICON VALLEY

California Environmental Laboratory Registration Number 1313

## Acute Toxicity Screening

Sample Source: Apple (Comp)
Sample Date: 03/12/2019
Sample ID: LE44404
Sample comments: Initial pH: 8.8 S.U., Total Residual Chlorine: <0.1 mg/L.

Analysis Start Date: 03/13/2019   Analyst: MK
Analysis End Date: 03/15/2019   Analyst: PM

Results:

| 48-Hour *Ceriodaphnia dubia* Survival Test (% Survival) | | | | |
|---|---|---|---|---|
| Concentration (%) | Replicate 1 | Replicate 2 | Replicate 3 | Replicate 4 |
| Lab Control | 100 | 100 | 100 | 100 |
| 0.1 | 100 | 100 | 100 | 100 |
| 1.0 | 100 | 100 | 100 | 100 |
| 10 | 100 | 100 | 100 | 80 |
| 100 | 80 | 80 | 40 | 40 |

Conclusion: The effluent sample is toxic to *Ceriodaphnia dubia* (water flea) at 100% concentration. The organisms that survived were moribund at 100% concentration. Mortality might be related due to high sample pH. These results should be confirmed by a Certified Testing Laboratory using approved EPA Procedures.

_____   3/26/19
Priti Mugatwala          Date
Biologist

_____   3/26/19
Kim T. Nguyen            Date
Laboratory Supervisor

_____   3/26/19
Alex Chieh               Date
QA

_____   3/27/19
Noel Enoki               Date
Laboratory Manager

Note: The results are provided for informational purposes only to use in assessing the potential risk of discharge.

## I.  <u>**EXHIBIT E**</u>

*Exhibit E — City of San José, "Self-Monitoring Report" for 3250 Scott Blvd dated March–April 2023, covering reporting period August 31, 2022 – February 28, 2023 (average daily flow 49,315 gallons; maximum single-day flow 76,350 gallons; total reported 8,925,960 gallons of wastewater); produced by the City of San José in response to a California Public Records Act request*

**City of San Jose**
Environmental Services Department, Watershed Protection Division
**Source Control Self Monitoring Report Checklist**

| Facility ID Number | 102597 | | | |
|---|---|---|---|---|
| IU Name | Apple, Inc. | SMR Due Date | 3 / 31 / 23 |
| Permit Number | SC-461B | Date Received | 3 / 30 / 23 |
| Reporting Period | 9 / 1 / 22 To 2 / 28 / 23 | Date Reviewed/Entered | 4 / 13 / 23 |
| Inspector | Isaac Tam | QC Review Date | 8/9 / 23 |

| Received: Yes | No | N/A | Item |
|---|---|---|---|
| | | | *Self Monitoring Requirements:* |
| ☒ | ☐ | ☐ | Was the SMR submitted within 4 days of the due date? |
| ☒ | ☐ | ☐ | Are there SMR Forms used for all sample points? |
| ☒ | ☐ | ☐ | Are there SMR Forms used for all samples collected? |
| | | | *SMR Form Requirements:* |
| ☒ | ☐ | ☐ | Is IU information (name, address, permit number, sample information, etc.) correct on all forms? |
| ☒ | ☐ | ☐ | Are analytical results and detection limits listed for all required parameters? |
| ☒ | ☐ | ☐ | Is the sample type (grab, composite) correct for all required parameters? |
| ☒ | ☐ | ☐ | Is flow measurement device (effluent meter, influent meter, water bills, or batch logs) identified? |
| ☒ | ☐ | ☐ | Are average and maximum flow data listed? |
| ☒ | ☐ | ☐ | Is the Certification Statement complete? Correct signatures, dates, names, and titles? |
| ☒ | ☐ | ☐ | Are the SMR forms certified by a responsible official? |
| | | | *Permit Requirements:* |
| ☒ | ☐ | ☐ | Are Laboratory Reports present for all required parameters? |
| ☒ | ☐ | ☐ | Are proper analytical methods used for all parameters (per 40 CFR 136)? |
| ☒ | ☐ | ☐ | Is documentation of QA/QC included with analytical results? |
| ☒ | ☐ | ☐ | Is QA/QC free of any issues? (hold time, temperature, 15 minutes for pH, etc.) |
| ☒ | ☐ | ☐ | Is the Chain(s) of Custody included with analytical results? |
| ☒ | ☐ | ☐ | Do the Detection Limits and Results match the lab report? |
| ☒ | ☐ | ☐ | Are daily flow meter totalizer readings included? |
| ☐ | ☐ | ☒ | Are batch discharge logs included? |
| ☒ | ☐ | ☐ | Are TTO Certification Forms included? |
| ☐ | ☐ | ☒ | Are Toxic Organic Worksheets included? |
| ☒ | ☐ | ☐ | Is the annual effluent flow meter calibration included? |
| ☐ | ☐ | ☒ | Are water bills included? |
| ☐ | ☐ | ☒ | Are waste manifests included? |
| ☐ | ☐ | ☒ | Are pH recorder charts included? |
| ☐ | ☐ | ☒ | Is the average production volume included? |
| ☐ | ☐ | ☒ | Are additional required certification documents included? (ZDC, Power Plant, NSCIU, etc.) |
| ☐ | ☐ | ☒ | Other: |
| | | | *Inspector Certification:* |
| ☒ | ☐ | ☐ | Is the SMR complete? |
| ☐ | ☐ | ☒ | If no, has the IU been notified to submit required information? Due: ___ / ___ / ___ |
| ☒ | ☐ | ☐ | Is the SMR free of violations? |
| ☐ | ☐ | ☒ | If no, has a recommendation for enforcement been submitted? |

Signature: _____   Date: 4 / 13 / 23

Source Control Self Monitoring Report Review Checklist   1 of 1   Document #: 01-02-10232

**San José-Santa Clara Regional Wastewater Facility**

# SELF MONITORING REPORT (SMR)

| Permitted Company Name: Apple Inc. | | Permit #: SC-461B | Wastewater Facility Use Only |
|---|---|---|---|
| Discharge Address: 3250 Scott Blvd., Santa Clara, CA 95054 | | | Sample #: _____ |
| SMR Monitoring Period: 09/01/2022　to 2/28/2023 | SMR Due Date: 3/31/2023 | | Date Received: 3/30/23 |
| Sample Date/Time: 01/25/23 /15:04　Sampled by: | | Sample Point #: | Received by: I. Tam |
| | | | Date Entered: 4/13/23 |

## LAB REPORT SAMPLE RESULTS

**ALL VIOLATIONS MUST BE REPORTED TO YOUR INSPECTOR WITHIN 24 HOURS OF RECEIVING SAMPLE RESULTS**

| Analyte | Detection Limit | Result (mg/L) | Grab/ Composite (G/C) | Analyte | Detection Limit | Result (mg/L) | Grab/ Composite (G/C) | Use one SMR Form for each Sample Point or Sample. Additional SMR forms included: |
|---|---|---|---|---|---|---|---|---|
| Antimony | 0.020 | <0.020 | C | Total Toxic Organics (TTO)* | 0.010 | <0.01 | G | Yes ☐　No ☐　N/A ☑ |
| Arsenic | 0.010 | <0.010 | C | Phenols (T)** | 0.001 | <0.001 | G | Are all samples collected and analyzed using methods specified in 40 CFR 136? |
| Beryllium | 0.0010 | <0.0010 | C | Oil & Grease | N/A | N/A | N/A | Yes ☑　No ☐　N/A ☐ |
| Cadmium | 0.010 | <0.010 | C | Cyanide (T)** | N/A | N/A | N/A | Composite Sample Information: |
| Chromium (T)** | 0.010 | <0.010 | C | Other: Barium | 0.010 | <0.010 | C | Sample Duration (Hours): 24 Number of Batches: continuous flow system |
| Copper | 0.020 | <0.020 | C | Other: Cobalt | 0.010 | <0.010 | C | ☐ No discharge this monitoring period. |
| Lead | 0.050 | <0.050 | C | Other: Molybdenum | 0.5 | <0.5 | C | Attachments Included: Lab Report & QA/QC Provided: |
| Mercury | 0.00020 | <0.00020 | C | Other: Thallium | 0.20 | <0.20 | C | Yes ☑　No ☐　N/A ☐ |
| Nickel | 0.010 | <0.010 | C | Other: Vanadium | 0.020 | <0.020 | C | Chain of Custody: Yes ☑　No ☐　N/A ☐ |
| Selenium | 0.020 | <0.020 | C | Other: | | | | Daily Flow Meter Logs and Calcs.: Yes ☑　No ☐　N/A ☐ |
| Silver | 0.010 | <0.010 | C | * Totalize all permit-listed organics which have been detected at or above 10 ug/L (0.010 mg/L). | | | | Certification Forms/Worksheets: Yes ☑　No ☐　N/A ☐ |
| Zinc | 0.020 | <0.020 | C | Report total in mg/L. ** (T) = Total | | | | |

**pH Sample (Grab) Result (S.U.):** 9.13　**Date:** 01/25/23　**Collection Time:** 15:04　**Analysis Time:** 15:04

Discharge Measurement by:
Effluent Meter ☑
Influent Meter ☐
Water Bills ☐
Batch Logs ☐

| Process Flow Data | Total Flow (Gallons) | |
|---|---|---|
| Process Name: R&D Labs, Discharge through AWN | | Date Flow Meter Last Calibrated: 8/3/2023 |
| Process Name: | | |
| Process Name: | | Calibration Certification Included: Yes ☑　No ☐　N/A ☐ |

**Monitoring Period One Day Maximum Effluent Discharged GPD:** 76,350　**Date:** 1/26/2023

**Monitoring Period Average Flow Calculation:** 8,925,960 gallons (total process flow discharged) / 181 days (facility production days) = 49,315 GPD (average flow Gallons per Day)

## CERTIFICATION STATEMENT

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

3-23-23
Date

Kevin Sung, EHS Engineer
Printed Name and Title

Kristina Raspe, VP
Printed Name and Title

200 E. Santa Clara Street, 7th Floor, San José, CA 95113 ● tel 408-945-3000 ● fax 408-271-1930 www.sanjoseca.gov/pretreatment



March 29, 2023

Attn: Stephanie Parrish
Environmental Services Department – Source Control
200 East Santa Clara, 7th Floor
San Jose, CA 95113-1905

RE: Self-Monitoring Report (SMR), Industrial Waste Water Permit #SC-461B for 3250 Scott Blvd., Santa Clara – Reporting Period: September 1, 2022 – February 28, 2023

Dear Stephanie Parrish:

Please find enclosed the Self-Monitoring Report (SMR) for an Apple Inc. facility located at 3250 Scott Blvd, Santa Clara, CA 94054. The SMR has been prepared in accordance with Wastewater Discharge Permit Number SC-461B (the Permit) for the subject reporting period. The report confirms that we are complying with all discharge permit limits.

As required by the Permit, the SMR has been prepared on the standard SMR Reporting Form with the required supporting data included as attachments. If you have any questions, please contact me at kevin_sung@apple.com or 408-908-0167.



EHS Engineer

**Attachments**

Attachment 1 – San Jose/Santa Clara Water Pollution Control Plant Self-Monitoring Report
Attachment 2 – Flowmeter Totalizer Readings
Attachment 3 – Flowmeter Calibration
Attachment 4 – Sample Data
Attachment 5 – TTO Compound Worksheets and Certification Statement

**Apple**
1 Apple Park Way, MS
319-5EHS
Cupertino, CA 95014
T 408 996-1010
F 408 996-0275



# Attachment 1

San Jose/Santa Clara Water Pollution Control Plant Self-Monitoring Report

**Apple**
1 Apple Park Way, MS
319-5EHS
Cupertino, CA 95014
T 408 996-1010
F 408 996-0275



# Attachment 2

Flowmeter Totalizer Readings

**Apple**
1 Apple Park Way, MS
319-5EHS
Cupertino, CA 95014
T 408 996-1010
F 408 996-0275

## AWN Flowmeter Totalizer Readings

3250 Scott Blvd. Santa Clara, CA

Self-Monitoring Report, Permit #SC-461B

Mar-23

| Date | Discharge Total at FE-AWN-DIS-1 | Daily Flow | Comments |
|---|---|---|---|
| 8/31/22 | 94,228,400 | | |
| 9/1/22 | 94,259,120 | 30720 | |
| 9/2/22 | 94,294,200 | 35080 | |
| 9/3/22 | 94,332,300 | 38100 | |
| 9/4/22 | 94,367,940 | 35640 | |
| 9/5/22 | 94,399,920 | 31980 | |
| 9/6/22 | 94,429,850 | 29930 | |
| 9/7/22 | 94,473,670 | 43820 | |
| 9/8/22 | 94,520,670 | 47000 | |
| 9/9/22 | 94,558,830 | 38160 | |
| 9/10/22 | 94,603,400 | 44570 | |
| 9/11/22 | 94,651,900 | 48500 | |
| 9/12/22 | 94,708,160 | 56260 | |
| 9/13/22 | 94,757,740 | 49580 | |
| 9/14/22 | 94,812,060 | 54320 | |
| 9/15/22 | 94,860,840 | 48780 | |
| 9/16/22 | 94,911,960 | 51120 | |
| 9/17/22 | 94,961,220 | 49260 | |
| 9/18/22 | 95,028,110 | 66890 | |
| 9/19/22 | 95,048,140 | 20030 | |
| 9/20/22 | 95,096,720 | 48580 | |
| 9/21/22 | 95,144,000 | 47280 | |
| 9/22/22 | 95,192,340 | 48340 | |
| 9/23/22 | 95,244,430 | 52090 | |
| 9/24/22 | 95,292,880 | 48450 | |
| 9/25/22 | 95,334,850 | 41970 | |
| 9/26/22 | 95,380,020 | 45170 | |
| 9/27/22 | 95,421,560 | 41540 | |
| 9/28/22 | 95,467,190 | 45630 | |
| 9/29/22 | 95,516,300 | 49110 | |
| 9/30/22 | 95,570,280 | 53980 | |
| 10/1/22 | 95,612,150 | 41870 | |
| 10/2/22 | 95,660,330 | 48180 | |
| 10/3/22 | 95,696,710 | 36380 | |
| 10/4/22 | 95,745,120 | 48410 | |
| 10/5/22 | 95,797,270 | 52150 | |
| 10/6/22 | 95,850,340 | 53070 | |
| 10/7/22 | 95,903,490 | 53150 | |
| 10/8/22 | 95,961,840 | 58350 | |
| 10/9/22 | 96,012,870 | 51030 | |
| 10/10/22 | 96,059,340 | 46470 | |
| 10/11/22 | 96,111,660 | 52320 | |
| 10/12/22 | 96,163,690 | 52030 | |
| 10/13/22 | 96,215,400 | 51710 | |
| 10/14/22 | 96,264,830 | 49430 | |
| 10/15/22 | 96,313,410 | 48580 | |
| 10/16/22 | 96,355,870 | 42460 | |
| 10/17/22 | 96,401,840 | 45970 | |
| 10/18/22 | 96,449,270 | 47430 | |
| 10/19/22 | 96,492,880 | 43610 | |
| 10/20/22 | 96,554,620 | 61740 | |
| 10/21/22 | 96,611,200 | 56580 | |
| 10/22/22 | 96,662,810 | 51610 | |
| 10/23/22 | 96,706,192 | 43382 | |
| 10/24/22 | 96,770,860 | 64668 | |
| 10/25/22 | 96,818,070 | 47210 | |
| 10/26/22 | 96,870,970 | 52900 | |

## AWN Flowmeter Totalizer Readings

3250 Scott Blvd. Santa Clara, CA

Self-Monitoring Report, Permit #SC-461B

Mar-23

| Date | Discharge Total at FE-AWN-DIS-1 | Daily Flow | Comments |
|---|---|---|---|
| 10/27/22 | 96,923,580 | 52610 | |
| 10/28/22 | 96,981,970 | 58390 | |
| 10/29/22 | 97,032,840 | 50870 | |
| 10/30/22 | 97,083,900 | 51060 | |
| 10/31/22 | 97,131,550 | 47650 | |
| 11/1/22 | 97,188,880 | 57330 | |
| 11/2/22 | 97,243,660 | 54780 | |
| 11/3/22 | 97,298,360 | 54700 | |
| 11/4/22 | 97,353,760 | 55400 | |
| 11/5/22 | 97,406,540 | 52780 | |
| 11/6/22 | 97,459,940 | 53400 | |
| 11/7/22 | 97,510,900 | 50960 | |
| 11/8/22 | 97,563,620 | 52720 | |
| 11/9/22 | 97,620,740 | 57120 | |
| 11/10/22 | 97,672,240 | 51500 | |
| 11/11/22 | 97,731,950 | 59710 | |
| 11/12/22 | 97,777,250 | 45300 | |
| 11/13/22 | 97,817,150 | 39900 | |
| 11/14/22 | 97,859,180 | 42030 | |
| 11/15/22 | 97,912,350 | 53170 | |
| 11/16/22 | 97,964,260 | 51910 | |
| 11/17/22 | 98,015,000 | 50740 | |
| 11/18/22 | 98,069,430 | 54430 | |
| 11/19/22 | 98,102,090 | 32660 | |
| 11/20/22 | 98,167,230 | 65140 | |
| 11/21/22 | 98,216,820 | 49590 | |
| 11/22/22 | 98,263,600 | 46780 | |
| 11/23/22 | 98,307,440 | 43840 | |
| 11/24/22 | 98,354,880 | 47440 | |
| 11/25/22 | 98,398,460 | 43580 | |
| 11/26/22 | 98,442,590 | 44130 | |
| 11/27/22 | 98,478,550 | 35960 | |
| 11/28/22 | 98,524,610 | 46060 | |
| 11/29/22 | 98,577,960 | 53350 | |
| 11/30/22 | 98,631,140 | 53180 | |
| 12/1/22 | 98,685,080 | 53940 | |
| 12/2/22 | 98,735,300 | 50220 | |
| 12/3/22 | 98,783,710 | 48410 | |
| 12/4/22 | 98,833,940 | 50230 | |
| 12/5/22 | 98,879,190 | 45250 | |
| 12/6/22 | 98,930,920 | 51730 | |
| 12/7/22 | 98,985,980 | 55060 | |
| 12/8/22 | 99,033,510 | 47530 | |
| 12/9/22 | 99,093,350 | 59840 | |
| 12/10/22 | 99,142,970 | 49620 | |
| 12/11/22 | 99,188,640 | 45670 | |
| 12/12/22 | 99,236,990 | 48350 | |
| 12/13/22 | 99,297,690 | 60700 | |
| 12/14/22 | 99,354,790 | 57100 | |
| 12/15/22 | 99,404,400 | 49610 | |
| 12/16/22 | 99,457,230 | 52830 | |
| 12/17/22 | 99,510,590 | 53360 | |
| 12/18/22 | 99,559,190 | 48600 | |
| 12/19/22 | 99,607,850 | 48660 | |
| 12/20/22 | 99,668,010 | 60160 | |
| 12/21/22 | 99,716,350 | 48340 | |
| 12/22/22 | 99,785,040 | 68690 | |

## AWN Flowmeter Totalizer Readings
3250 Scott Blvd. Santa Clara, CA

Self-Monitoring Report, Permit #SC-461B

Mar-23

| Date | Discharge Total at FE-AWN-DIS-1 | Daily Flow | Comments |
|------|------|------|------|
| 12/23/22 | 99,816,260 | 31220 | |
| 12/24/22 | 99,859,100 | 42840 | |
| 12/25/22 | 99,901,020 | 41920 | |
| 12/26/22 | 99,946,404 | 45384 | |
| 12/27/22 | 99,991,530 | 45126 | |
| 12/28/22 | 100,036,720 | 45190 | |
| 12/29/22 | 100,074,270 | 37550 | |
| 12/30/22 | 100,115,770 | 41500 | |
| 12/31/22 | 100,157,640 | 41870 | |
| 1/1/23 | 100,200,480 | 42840 | |
| 1/2/23 | 100,240,730 | 40250 | |
| 1/3/23 | 100,283,970 | 43240 | |
| 1/4/23 | 100,336,580 | 52610 | |
| 1/5/23 | 100,390,560 | 53980 | |
| 1/6/23 | 100,440,605 | 50045 | |
| 1/7/23 | 100,494,650 | 54045 | |
| 1/8/23 | 100,531,990 | 37340 | |
| 1/9/23 | 100,569,330 | 37340 | |
| 1/10/23 | 100,618,130 | 48800 | |
| 1/11/23 | 100,671,460 | 53330 | |
| 1/12/23 | 100,727,900 | 56440 | |
| 1/13/23 | 100,781,470 | 53570 | |
| 1/14/23 | 100,836,870 | 55400 | |
| 1/15/23 | 100,882,950 | 46080 | |
| 1/16/23 | 100,933,240 | 50290 | |
| 1/17/23 | 100,979,640 | 46400 | |
| 1/18/23 | 101,035,510 | 55870 | |
| 1/19/23 | 101,094,400 | 58890 | |
| 1/20/23 | 101,142,720 | 48320 | |
| 1/21/23 | 101,207,760 | 65040 | |
| 1/22/23 | 101,250,930 | 43170 | |
| 1/23/23 | 101,295,550 | 44620 | |
| 1/24/23 | 101,353,910 | 58360 | |
| 1/25/23 | 101,411,930 | 58020 | |
| 1/26/23 | 101,488,280 | 76350 | |
| 1/27/23 | 101,525,090 | 36810 | |
| 1/28/23 | 101,576,040 | 50950 | |
| 1/29/23 | 101,626,150 | 50110 | |
| 1/30/23 | 101,672,170 | 46020 | |
| 1/31/23 | 101,719,840 | 47670 | |
| 2/1/23 | 101,775,420 | 55580 | |
| 2/2/23 | 101,826,760 | 51340 | |
| 2/3/23 | 101,879,510 | 52750 | |
| 2/4/23 | 101,929,660 | 50150 | |
| 2/5/23 | 101,977,610 | 47950 | |
| 2/6/23 | 102,019,530 | 41920 | |
| 2/7/23 | 102,074,280 | 54750 | |
| 2/8/23 | 102,128,340 | 54060 | |
| 2/9/23 | 102,181,910 | 53570 | |
| 2/10/23 | 102,239,450 | 57540 | |
| 2/11/23 | 102,291,260 | 51810 | |
| 2/12/23 | 102,338,330 | 47070 | |
| 2/13/23 | 102,381,810 | 43480 | |
| 2/14/23 | 102,436,730 | 54920 | |
| 2/15/23 | 102,493,540 | 56810 | |
| 2/16/23 | 102,547,570 | 54030 | |
| 2/17/23 | 102,602,408 | 54838 | |

## AWN Flowmeter Totalizer Readings

3250 Scott Blvd. Santa Clara, CA

Self-Monitoring Report, Permit #SC-461B

Mar-23

| Date | Discharge Total at FE-AWN-DIS-1 | Daily Flow | Comments |
|------|---------------------------------|------------|----------|
| 2/18/23 | 102,657,570 | 55162 | |
| 2/19/23 | 102,699,840 | 42270 | |
| 2/20/23 | 102,736,970 | 37130 | |
| 2/21/23 | 102,793,760 | 56790 | |
| 2/22/23 | 102,845,400 | 51640 | |
| 2/23/23 | 102,900,970 | 55570 | |
| 2/24/23 | 102,965,490 | 64520 | |
| 2/25/23 | 103,012,620 | 47130 | |
| 2/26/23 | 103,058,170 | 45550 | |
| 2/27/23 | 103,099,690 | 41520 | |
| 2/28/23 | 103,154,360 | 54670 | |
| Summary | Maximum (Gallons) | 76350 | 1/26/23 |
| | Total (Gallons) | 8925960 | |
| | Number of Days | 181 | |
| | Daily Average (GPD) | 49315 | |

## Daily AWN Water Discharge Flow Total

**Month:** FEB              **Year 2023**

| Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|------|------|--------------------------------|---------|
| 1 | 0600 | 101,775,420 | GG |
| 2 | 0600 | 101,826,760 | GG |
| 3 | 0800 | 101,879,510 | TS |
| 4 | 0730 | 101,929,660 | GG |
| 5 | 0910 | 101,977,610 | GG |
| 6 | 0700 | 102,019,530 | GG |
| 7 | 0720 | 102,074,280 | B |
| 8 | 0730 | 102,128,340 | B |
| 9 | 0700 | 102,181,910 | B |
| 10 | 0730 | 102,239,450 | B |
| 11 | 0730 | 102,291,260 | B |
| 12 | 0800 | 102,338,330 | B |
| 13 | 0700 | 102,381,810 | B |
| 14 | 0730 | 102,436,730 | B |
| 15 | 0730 | 102,493,540 | B |
| 16 | 0700 | 102,547,570 | B |
| 17 | 0730 | 102,602,400 | B |
| 18 | 0730 | 102,657,570 | B |
| 19 | 0740 | 102,699,840 | B |
| 20 | 7AM | 102,736,990 | B |
| 21 | 8:00am | 102,793,760 | CB |
| 22 | 7:00am | 102,845,400 | CB |
| 23 | 7:30am | 102,900,970 | CB |
| 24 | 8:00am | 102,965,490 | CB |
| 25 | 9am | 103,012,620 | CB |
| 26 | 9am | 103,058,170 | CB |
| 27 | 8:30am | 103,099,690 | CB |
| 28 | 08:30 | 103,154,360 | TS |
| 29 | | | |
| 30 | | | |
| — | | | |

## Daily AWN Water Discharge Flow Total

**Month:** SAN          **Year 2023**

| Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|------|------|--------------------------------|---------|
| 01/01/23 | 8:00 | 100 200 480 | OJ |
| 01/02/23 | 8 00 | 100 240 750 | PJ |
| 01/03/23 | 8:00 | 100 28 3970 | PJ |
| 04 | 08:00 | 100,336,580 | TS |
| 05 | 08:30 | 100,390,560 | TS |
| 06 | 08:30 | 100,440,605 | TS |
| 1/7 | 08:00 | 100,494,650 | TS |
| 1/8 | 08:00 | 100,531,990 | TS |
| 1/9 | 08:30 | 100,569,330 | DJ |
| 10 | 0700 | 100,618,130 | AS |
| 11 | 0730 | 100,671,460 | B |
| 12 | 0700 | 100,727,900 | B |
| 13 | 0700 | 100,781,470 | B |
| 14 | 0730 | 100,836,870 | B |
| 15 | 7:20 | 100,882,950 | AB |
| 16 | 9:00 | 100,933,240 | B |
| 17 | 0800 | 100,979,640 | JL |
| 18 | 0900 | 101,355,542 101,035,510 | JL |
| 19 | 0830 | 101,094,400 | JL |
| 20 | 0800 | 101,142,720 | JL |
| 21 | 0900 | 101,207,760 | JL |
| 22 | 1000 | 101,250,430 | JL |
| 23 | 1000 | 101,243,550 | JL |
| 24 | 9:00 | 101,353,910 | TS |
| 25 | 8:00 | 101,411,930 | CG |
| 26 | 10:00 | 101,468,280 | CG |
| 27 | 10:00 | 101,525,040 | CG |
| 28 | 9:00 | 101,576,040 | CB |
| 29 | 9:00 | 101,626,150 | CB |
| 30 | 9:00 | 101,672,170 | CG |
| 31 | 6:00 | 101,719,840 | ck |

## Daily AWN Water Discharge Flow Total

Month 12          Year 2022

| Day/Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|---|---|---|---|
| 1 | 8:00 | 98,685,080 | D+ |
| 2 | 7:30 | 98,735,300 | DZ |
| 3 | 8:30 | 98,783,110 | DZ |
| 4 | 8:00 | 48,833,940 | DZ |
| 5 | 4:00 | 98,874,190 | JC |
| 6 | 8:30 | 48,930,920 | JC |
| 7 | 8:00 | 48,985,980 | JC |
| 8 | 4:00 | 99,033,310 | JC |
| 9 | 8:00 | 99,093,350 | JC |
| 10 | 7:30 | 99,142,970 | JC |
| 11 | 6:30 | 99,188,640 | JC |
| 12 | 0730 | 99,236,990 | AB |
| 13 | 0730 | 99,297,690 | AB |
| 14 | 0730 | 99,354,790 | AB |
| 15 | 0730 | 99,404,400 | AB |
| 16 | 0730 | 99,457,230 | AB |
| 17 | 0730 | 99,510,590 | AB |
| 18 | 0745 | 99,559,190 | AB |
| 19 | 08:00 | 99,607,550 | Joo / Allen |
| 20 | 08:00 | 99,668,010 | DF |
| 21 | 07:45 | 99,716,350 | TS |
| 22 | 0800 | 99,785,040 | TS |
| 23 | 08:00 | 99,816,260 | TS |
| 24 | 08:00 | 99,859,100 | TS |
| 25 | 08:00 | 99,901,020 | TS |
| 26 | 09:00 | 99,946,404 | Jh |
| 27 | 09:00 | 99,991,530 | Jh |
| 28 | 08:00 | 100,036,720 | Jh |
| 29 | 08:30 | 100,074,270 | Jh |
| 30 | 07:30 | 100,115,770 | PJ |
| 31 | 07:30 | 100,157,640 | DL |

## Daily AWN Water Discharge Flow Total

Month _Nov_            Year 2022

| Day/Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|---|---|---|---|
| 1 | 8.00 | 97,188,880 | DJ |
| 2 | 8 00 | 97,243,660 | DJ |
| 3 | 7:15 | 97,298,360 | DJ |
| 4 | 8:00 | 97,353,760 | PI |
| 5 | 8:00 | 97,406,540 | DT |
| 6 | 8:00 | 97,459,940 | DT |
| 7 | 8:00 | 97,510,900 | DT |
| 8 | 8:00 | 97,563,620 | DI |
| 9 | 07 00 | 97,620,740 | TS |
| 10 | 08:00 | 97,672,240 | DI |
| 11 | 09:00 | 97,731,950 | TS |
| 12 | 06 15 | 97,777,250 | TS |
| 13 | 06:30 | 97,817,150 | TS |
| 14 | 0700 | 97,859,180 | BB |
| 15 | 07:70 | 97,912,350 | BB |
| 16 | 0730 | 97,964,260 | BB |
| 17 | 0730 | 98,015,000 | BB |
| 18 | 0730 | 98,069,430 | BB |
| 19 | 0730 | 98,102,010 | AS |
| 20 | 0730 | 98,167,230 | AS |
| 21 | 0800 | 98,216,820 | TL |
| 22 | 0830 | 98,263,600 | TL |
| 23 | 0800 | 98,303,440 | TL |
| 24 | 0830 | 98,354,880 | TL |
| 25 | 0900 | 98,398,460 | TL |
| 26 | 0700 | 98,442,540 | TL |
| 27 | 0630 | 98,478,550 | TL |
| 28 | 07:30 | 98,524,610 | DJ |
| 29 | 07:30 | 98,577,960 | DJ |
| 30 | 07:30 | 98,631,140 | DJ |
| 31 | | | |

NH3 Scrubber cleaning

## Daily AWN Water Discharge Flow Total

**Month** Oct          **Year 2022**

| Day/Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|---|---|---|---|
| 1 | 930 | 95,612,150 | JL |
| 2 | 920 | 95,660,330 | JL |
| 3 | 8:00 | 45,696,710 | DS |
| 4 | 7:45 | 95,745,120 | DS |
| 5 | 7:30 | 95,797,270 | DS |
| 6 | 7:00 | 95,850,340 | DS |
| 7 | 7:30 | 95,903,490 | DJ |
| 8 | 7:30 | 95,961,840 | OJ |
| 9 | 9:00 | 96,012,870 | DS |
| 10 | 0730 | 96,037,340 96,059,340 | B |
| 11 | 0730 | 96,111,660 | B |
| 12 | 0730 | 96,163,690 | B |
| 13 | 0730 | 96,215,400 | B |
| 14 | 0730 | 96,264,830 | B |
| 15 | 0713 | 96,313,410 | B |
| 16 | 09:25 | 96,355,870 | B |
| 17 | 09:12 | 96,401,840 | TS |
| 18 | 07:37 | 96,449,270 | TS |
| 19 | 04:10 | 96,492,880 | TS |
| 20 | 07:50 | 96,554,620 | TS |
| 21 | 07:41 | 96,611,200 | TS |
| 22 | 06:37 | 96,662,810 | TS |
| 23 | 05:10 | 96,706,192 | TS |
| 24 | 07:30 | 96,770,860 | JL |
| 25 | 07:30 | 96,818,070 | JL |
| 26 | 08:00 | 96,870,970 | JL |
| 27 | 0830 | 96,923,380 | JL |
| 28 | 11:30 | 96,981,970 | JL |
| 29 | 9:30 | 95,032,840 | JL |
| 30 | 8:30 | 97,083,900 | JL |
| 31 | 8:00 | 97,131,550 | DS |

Acid Scrubber Cleaning done

## Daily AWN Water Discharge Flow Total

Month __SEPT.__                Year 2022

| Day/Date | Time | Discharge Total at FE-AWN-DIS-1 | Intials |
|---|---|---|---|
| 1 | 07:30 | 94,259,120 | JL |
| 2 | 07:30 | 94,294,200 | JL |
| 3 | 07:30 | 94,332,300 | JL |
| 4 | 07:30 | 94,367,970 | JL |
| 5 | 06:30 | 94,399,920 | TS |
| 6 | 06:30 | 94,429,850 | JS |
| 7 | 08:00 | 94,473,470 | TS |
| 8 | 08:30 | 94,520,670 | TS |
| 9 | 05:00 | 94,558,830 | TS |
| 10 | 06:00 | 94,603,400 | TS |
| 11 | 07:00 | 94,651,900 | TS |
| 12 | 0780 | 94,708,160 | S |
| 13 | 0:700 | 94,757,740 | DS |
| 14 | 0:700 | 94,812,060 | DS |
| 15 | 0:730 | 94,860,840 | DS |
| 16 | 0730 | 94,911,960 | DS |
| 17 | 0900 | 94,961,220 | PS |
| 18 | 0930 | 95,028,110 | DS |
| 19 | 0730 | 95,048,140 | AS |
| 20 | 0700 | 95,096,720 | AB |
| 21 | 0730 | 95,144,000 | AB |
| 22 | 0730 | 95,192,340 | AB |
| 23 | 0730 | 95,244,430 | AB |
| 24 | 0730 | 95,292,880 | AB |
| 25 | 0730 | 95,334,850 | AB |
| 26 | 0800 | 95,380,020 | JL |
| 27 | 0730 | 95,421,560 | JL |
| 28 | 0730 | 95,467,140 | JL |
| 29 | 0830 | 95,516,300 | JL |
| 30 | 0930 | 95,570,280 | JL |
| 31 | 0730 | | |

### J.  <u>EXHIBIT F</u>

*Exhibit F — Photographs and site maps from the 2022 Stormwater Inspection at 3250 Scott Blvd, produced by the City of Santa Clara in response to a California Public Records Act request, supplementing the inspection report at Exhibit L of Plaintiff's prior Declaration.*



## Stormwater Facility Annual Operation and Maintenance Inspection Report

Compliance Program
1700 Walsh Avenue, Santa Clara, CA 95050

Inspector Name: D. Han
Email: dhan@santaclaraca.gov

### General

| | |
|---|---|
| SITE NAME Apple | ADDRESS: 3250 Scott Blvd, Santa Clara, CA 95054 |
| DATE AND TIME OF INSPECTION 4/5/2022, 9:00am 6/3/2022, 8:00am | REASON FOR INSPECTION (e.g. routine/annual, follow-up, or response to complaint) Routine (first visit) Follow-up |

### Review of Stormwater Control Operation and Maintenance Plan

| | |
|---|---|
| RECORD No & DATE: N/A | SECTIONS OUT OF DATE AND UPDATES NEEDED: |
| CONTACT NAME, PHONE, EMAIL: | ■ Owner contact Information ❑ Information on changes to facilities  received ❑ Records of previous inspections ❑ Other: |

MAINTENANCE LOGS: ❑ Consistent with maintenance schedule in Plan. ❑ Not consistent with maintenance schedule (note exceptions):

Submit Annual Report with Maintenance Logs to environment@santaclaraca.gov each year by December 31.

### Results of Site Inspection

Overall condition of site and any exceptional circumstances:

| LIST STORMWATER FACILITIES INSPECTED (Use designations/IMP #s from Plan) | ITEMS INSPECTED AND EXCEPTIONS NOTED: |
|---|---|
| Bioretention Areas 1-2 | -Bioretention area plants are healthy and well-maintained  -Curb cuts should be free of obstructions completed  <br> -Cobblestones needed at curb cuts completed  -Cobblestones should not be higher than curb cut, remove excess from BA 1  BA #1: some excess removed, continue to monitor area to ensure water can flow into basin  -One bubble-up in BA 2 needs cobblestones  BA #2: bubble-up needs cobblestones |
| Storm Drains | -All storm drain overflow structures need "No Dumping" medallions  BA #1-2: "No Dumping" medallions needed at (3) storm drain overflows |
| "Bioretention Area 3" | -This area does not appear to be a bioretention area or other stormwater treatment facility |

### Compliance Summary and Recommended Follow-up

| SITE STATUS: | FOLLOW-UP PLAN AND SCHEDULE: |
|---|---|
| ❑ In compliance—No corrective actions required.  ☒ In compliance—Implement corrective actions.  ❑ Not in compliance—Correct and reinspect. | Please address items noted above prior to re-inspection. Please provide tentative completion date by April 15, 2022.  Thank you!  Please address items noted above and send photos of completion by June 13, 2022. Thank you. |
| | NAME OF INSPECTOR: Damaris Han  SIGNATURE: |

BA #1: some excess cobblestones removed, continue to monitor area to ensure water can flow into basin
BA #1: "No Dumping" medallions needed at 2 storm drain overflows




BA #2: cobblestones needed at bubble-up
BA #2: "No Dumping" medallion needed at storm drain overflow

 



BA #1: some excess cobblestones removed, continue to monitor area to ensure water can flow into basin

BA #1: "No Dumping" medallions needed at 2 storm drain overflows





## K. __EXHIBIT G__

*Exhibit G — Excerpts (pp. 24–34) from San Francisco Estuary Institute (SFEI), Historical Vegetation and Drainage Patterns of Western Santa Clara Valley: A Technical Memorandum Describing Landscape Ecology in Lower Peninsula, West Valley, and Guadalupe Watershed Management Areas (Beller, Salomon & Grossinger 2010) (SFEI Contribution No. 622).*

*November 2010*

# HISTORICAL VEGETATION AND DRAINAGE PATTERNS OF WESTERN SANTA CLARA VALLEY:

A technical memorandum describing landscape ecology in Lower Peninsula, West Valley, and Guadalupe Watershed Management Areas



**By the San Francisco Estuary Institute**

*Erin Beller*

*Micha Salomon*

*Robin Grossinger*



**San Francisco Estuary Institute**

**7770 Pardee Lane, 2nd Flr, Oakland, CA 94621**

**p: 510-746-7334 (SFEI), f: 510-746-7300, www.sfei.org**

HISTORICAL ECOLOGY PROGRAM
CONTRIBUTION NO. 622 • NOVEMBER 2010



## HISTORICAL CONDITIONS, CIRCA 1850

The map at left reconstructs the habitat characteristics of west Santa Clara Valley prior to significant Euro-American modification.

Subtidal Water
Tidal Flat
Tidal Marsh

Alkali Meadow
Wet Meadow
Valley Freshwater Marsh
Perennial Freshwater Pond
Willow Grove
Sycamore Grove
Wild Rose Thicket
Box Elder Grove
Oak Savanna
Oak Woodland
Chaparral

1:150,000

0  1  2  3  4  5  Miles

0  1  2  3  4  5  6  7  8  9  Kilometers



1:24,000

**GUADALUPE RIVER AND ARROYO SECO DE GUADALUPE.** Currently, the stream we call Guadalupe River begins at the confluence of Guadalupe Creek and Alamitos Creek near Coleman Avenue, at the mouth of Almaden Valley. Until the late 19th century, however, Guadalupe River originated in an array of springs and wetlands in the Willow Glen area, more than four miles north of the contemporary origin at the Guadalupe Creek/Alamitos Creek confluence (fig. 12). The upper portion of today's Guadalupe River (south of Willow Glen) was called Arroyo Seco de Guadalupe, Arroyo Seco de San José de Guadalupe, or Arroyo Seco de los Capitancillos. It dissipated into groves of willows and sycamores adjacent to the Willow Glen wetland complex and just south of the railroad.

The historical Guadalupe River emerged from springs 1,500 feet to the west of the Arroyo Seco de Guadalupe's termination. That the distinctly named streams were discontinuous is explicitly shown by several maps (e.g., U.S. District Court 1860, Rayner 1871, Herrmann ca. 1879, Thompson and Herrmann 1879), and documented by other early descriptions which refer to the Willow Glen area as the head or source of the Guadalupe River. Surveyor Charles T. Healy (1860b), following the Guadalupe River upstream in May 1860, noted that he was "standing in the bog, or swamp, at the head of the said Guadalupe river" at the modern intersection of Pine and Bird avenues in San José. Other sources refer to this area as the "willow grove at the head of the Guadalupe" (now Willow Glen; Herrmann ca. 1879), the "head of Guadalupe River" (Thompson and Herrmann 1879, U.S. Surveyor General 1880), or the "sources of Guadalupe Creek [referring to the river]" (Vischer ca. 1865). One early map labels the willow grove as the *nacimiento*, or source, of Guadalupe River (U.S. District Court ca. 1840; fig. 13).

By 1871, the Lewis Canal had been created to connect Guadalupe River to the mouth of Arroyo Seco de Guadalupe (Rayner 1871). The half-mile long, straight canal bypassed the head of Guadalupe River, connecting to the river south of Willow Street. By the turn of the century, surveyors no longer distinguished these different reaches and the Arroyo Seco-Lewis Canal-Guadalupe River alignment became simply the "Guadalupe River" (USGS 1899b), as it remains today.

The extensive complex of willow groves, wetlands, and sycamores at the head of Guadalupe River, an area known today as Willow Glen, is discussed in more detail in the Willow Groves section (see p. 41).

**Fig. 12. Mouth of Arroyo Seco de Guadalupe and head of the Guadalupe River.** The mainstem of Arroyo Seco de Guadalupe terminated in a grove of sycamores and willows to the east of the Guadalupe River (a); series of sloughs (b) also carried water northward through the willow groves toward the Guadalupe River.



**Fig. 13. Head of the Guadalupe River, ca. 1840.** An early rendition of the city of San José and surroundings also shows the "Nacimiento del Río de Guadalupe," or the origin of the Guadalupe River. The colorful depiction of trees illustrates the densely vegetated area at the head of the river. (U.S. District Court ca. 1840, courtesy of The Bancroft Library, UC Berkeley)

**LOS GATOS CREEK.** A number of early sources clearly document a confluence of Los Gatos Creek with the Guadalupe River (e.g., Lewis 1851a, Lewis 1854, Rayner 1871, Herrmann 1875, Thompson and West 1876; fig. 14). In 1861, one surveyor asserted that while the two streams did spread into sloughs in the region's willow groves, "the main point of junction is well defined" (Smith 1861). These sources make it clear that by the mid-1850s, Los Gatos Creek and Guadalupe River joined at a clearly defined confluence near their present junction.

However, the earliest available sources (1850-1853) are not as clear regarding the existence of a defined confluence of the two channels. Each pre-1854 map we discovered that depicts the reach of Guadalupe River where the Los Gatos confluence is today (e.g., Duval 1850, White 1850b, Lewis and White 1853b) shows a slough at the location of the present-day confluence, but none show its connection to upstream Los Gatos Creek, and none label the channel "Los Gatos." The lack of identification of the creek as Los Gatos, the cessation of the channel a short distance from Guadalupe River, and the size of the depicted channel suggest that the confluence as we know it today did not exist at that time. This channel may have been one of a series of sloughs to transport water from the spread of Los Gatos Creek to the Guadalupe River. This interpretation is supported by some later maps which also show multiple channels of the Los Gatos near its confluence, suggesting a more diffuse connection between it and Guadalupe River (Lewis 1851a, Arnold 1855, Allardt 1862).



**Fig. 14. An early (1869) lithograph** showing a bird's eye view of San José also shows the well-defined channel of Los Gatos Creek (a) entering Guadalupe River (b) near its present confluence north of The Alameda/Santa Clara Street. (Gray and Gifford 1869, courtesy of The Bancroft Library, UC Berkeley)

Detailed testimony by former Santa Clara County surveyor William J. Lewis (1857a) strongly supports this interpretation of the earliest available maps:

> In February, 1850 I made a survey along the left bank of the creek [Los Gatos] and found that below the point indicated on the map by station 29 [about 1,000 feet north of the Western Pacific Railroad crossing] the channel ceased and the water spread itself over the country finding its way to the river by various minor channels.
>
> During the heavy rains which occurred in the winter of 1852-3, a new channel was formed below this point, which is represented on the accompanying map and marked "new channel".
>
> The before named Fernandez and Chabollo [José Fernandez and Pedro Chabollo, two early residents of the area] went with me on the ground and testified that at the date of the Grant the channel of the Los Gatos terminated near the crossing of the road by the Splinoes [Splivalo] house [near Riverside Drive]. They separately testified that they never heard of any stream below this point or any one entering the Guadalupe River called the "Los Gatos." They also pointed out the minor channels and indications of former channels of both sides of the line run from station 28 to station 29 by which the water found its way to the river...

This description indicates that what we recognize today as the confluence of Guadalupe River and Los Gatos Creek was established relatively recently, after the flooding of 1852-3. Before that time, Los Gatos Creek spread above Lincoln Avenue into multiple sloughs, which passed through the willow grove between Los Gatos Creek and Guadalupe River before water from the creek reached the river (fig. 15).



**Fig. 15. Los Gatos Creek and the Guadalupe River.** Before the mid-1850s, water from Los Gatos Creek (a) found its way to the Guadalupe River (b) through a series of overflow channels traversing the willow groves and wet meadows of the area. By the late 1850s a more defined confluence of the two streams had been established, though testimony confirms that no such connection had existed previously. While this undated map was drafted after a connection between the two streams was established, it appears to be a composite of multiple surveys. It is possible that the cartography near Santa Clara predated the change. (Unknown ca. 1870, courtesy of The Bancroft Library, UC Berkeley)

## Wetlands

We mapped several different types of wetlands (including a few riparian habitats): wet meadows, alkali meadows, ponds, freshwater marshes, willow groves, one box elder grove, a sycamore grove, and a few small wild rose thickets. In total, we mapped approximately 30,800 acres of wetland habitats, or over 30% of the study area. Wet and alkali meadows covered large portions of the flat clay adobe land ringing the Bay, extending far inland along depressional areas near Guadalupe River and Canoas Creek. Freshwater marshes, willow groves, springs, and ponds occurred in high groundwater areas or areas of emergent groundwater and limited drainage, often within the wet meadow matrix.

In this section, we discuss the general characteristics of each habitat type, and describe notable locations where they occur.

### Wet meadows

Wet meadows, which covered broad portions of the Santa Clara Valley prior to hydromodification, are characterized by poor drainage conditions associated with dense clay soils and nearly flat topography. They are flooded for days or weeks depending on rainfall events and their landscape position. As a result of high water retention (from rainfall/surface runoff) and/or high groundwater levels, these areas stay moist longer than adjacent, more

well-drained lands. Wet meadows occupied a large portion of the study area (**24%**), covering much of the area just upslope from the Bay tidal marshes and extending further inland south along the west side of Guadalupe River.

Historical descriptions of wet meadows capture their treeless, seasonally inundated nature. In his reconstruction of pre-modification vegetation patterns in the vicinity of Palo Alto, Cooper (1926) described the habitat as an "open meadow-like belt" around the edge of the Bay. In 1827, Beechey ([1831]1941) described the wet meadow near Santa Clara as "more marsh than that part of the ground over which they had just traveled," and Bryant (1848) noted a "fertile plain" between the Bay and San José that "at certain seasons of the year, is sometimes inundated."

More spatially specific references to wet meadow lands, captured in historical maps and GLO survey notes, refer to wet meadow lands as "rich black clay" (Reed 1866), "level rich land" (Tracy 1853), "open prairie" (Reed 1866), "adobe lands" (Reed 1866), and "low wet meadow land" (Tracy 1853). Along Canoas Creek south of Capitol Expressway, surveyor Sherman Day (1854) described "moist land," "meadow land; stiff clay wet in winter," and "stiff black mould, wet in winter and baked in summer." In the 1840s near Santa Clara, it was known as the *bajío* or lowland (as opposed to the *alta* or high ground of Santa Clara) and was described as "good fertile soil, being subject to overflow, and the retention of its humidity in the Summer" (Forbes 1862a).

Wet meadows were widely recognized as fertile soil and rich grazing land. An early survey of the wet meadows around The Alameda classifies them as "rich moist soil," "rich moist land," and "fine rich soil" (Duval 1850). These areas of rich grass growth were heavily used by the Mission's cattle, which "ran about the Mission and watered there" (Campbell 1861a). The "swampy lands," or wet meadows, surrounding Santa Clara were considered the "best grazing lands" (Forbes 1861a). This remained true even into the 1930s, when dairy cows also made use of the rich grazing available on these soils (fig. 16).

*...after walking through about 2 miles of mud and water I arrived at Santa Clara.*

—BURRELL, IN FEBRUARY 1853

During the dry summer, these areas would have been ideal for traveling quickly through the region from Palo Alto to San José (and indeed the "summer road" passed through the wet meadows; Brown 1963). In the winter months, though, inundated wet meadows would have been impassable – or nearly so – for hundreds of acres (Forbes 1861b). Pedro Font, traveling through the Santa Clara Valley in March 1776, noted that west of the Guadalupe River parts of the valley, "being such low ground," were "somewhat miry in spots, and plainly, if it rains very much it becomes untravelable" (Brown 2005). Vancouver ([1798]1984), traveling in November 1792, was not so fortunate:

> Having passed through this imaginary park [of oaks northwest of Santa Clara], we advanced a few miles in an open clear meadow, and arrived in a low swampy country; through which our progress was very slow, the horses being nearly knee-deep in mud and water for about six miles.



**Fig. 16. "Dairy lands of a shallow depression east of San José," ca. 1936.** From the cattle of Mission times to dairy cows of the 20th century, wet meadows have been identified as valuable grazing land for stock. (Torbert 1936)

> The badness of our road rendered this part of the journey somewhat unpleasant. About dark we reached better ground, and soon after the night closed in, we arrived at the mission of Santa Clara.

In the Santa Clara/San José area, wet meadows extended further inland, nearly surrounding Santa Clara and extending back along Canoas Creek and into the Willow Glen area of San José. Abundant references to wet meadow areas in early accounts of the Santa Clara-San José area reflect their dominance in the region. Mission Santa Clara itself was first built on wet meadow land in order to be near a steady water supply, though it was eventually moved (in the late 1810s and early 1820s and after a number of other moves; Bojorquez 1862, Skowronek and Wizorek 1997) to a tongue of coarser soils and higher ground jutting into the wet meadows, where Santa Clara University stands today (Pacheco 1862, Bojorquez 1862, Lapham 1903, Broek 1932).

These areas were largely without trees, except for scattered willow groves and swamps which sometimes occurred along or at the terminus of creeks (e.g., Guadalupe River and Stevens Creek), or where supplied by emergent groundwater at springs. Occasional oaks colonized protrusions of higher, gravelly soil within the meadow or at their edges. (Early shade trees planted in the area, such as those along The Alameda, would have been notable, and striking, on the otherwise treeless plain.) The dominant plant species were probably rhizomatous ryegrasses (*Leymus* spp.) with a significant component of obligate and facultative wetland plant species such as wire rush (*Juncus balticus)*, irisleaf rush *(Juncus xiphioides)*, buttercup *(Ranunculus californicus*), and blue eyed grass *(Sisyrinchium bellum)* (Ratliff 1988, Holstein 2000). Hoover's button-celery (*Eryngium aristulatum* var. *hooveri*) was collected in the wet meadow east of Palo Alto in 1899 (CNDDB 2010). Other historically documented species in the wet meadow include the California wild rose (*Rosa californica)*, wild nettles, and blackberries (Duval 1850, Howe 1851, U.S. District Court ca. 1860, Herrmann 1879).

Ponds and perennial wetlands formed in low depressional areas and in places of emergent groundwater within the wet meadow. Numerous features ranging from ponds under 0.2 acres to wetlands well over 300 acres were documented within the wet meadow area (see p. 32 for further detail). Many of these sources of perennial fresh water would have been heavily used – and perhaps exhausted – fairly early. As early as 1861, James Alex Forbes (1861a), testified that "in former times there were many water holes" in the wet meadows surrounding the Mission, emphasizing their relatively early disappearance.

**MAPPING METHODOLOGY.** We used the 1958 soils map (Gardner et al. 1958) as the foundation of our mapping of the historical extent of wet meadow. This survey identifies a number of heavy textured, poorly drained basin soils which coincide with historical descriptions of wet meadow conditions. These soils are described as "developed under various degrees of slow or very slow runoff and high groundwater levels," typically having "smooth and nearly level relief (<0.5% in slope)," and mostly "heavily textured." They report that these soils had, either at the time of survey (1940-41) or in recent historical times, poor drainage and herbaceous vegetation. Basin soils with an alkali component were mapped as alkali meadows (see p. 31).

In addition to the basin soils, a few other soils classified as "over basin clays" were included in wet meadow mapping based on descriptions by Gardner et al. (1958) of the relatively recent nature of these deposits. Gardner attributes these shallow deposits to large-scale erosion since 1850 due to agricultural practices, which buried downstream basin clay soils under lighter loams of the Mocho series: "Differences in depth of Mocho soil material on either side of old levees or road embankments…indicate that nearly all of the material that has become the Mocho soils has been deposited since about 1850" (Gardner et al. 1958). For example, the historically swampy Willow Glen area was identified by Gardner et al. 1958 as basin clays with a recent silty overlay. The underlying clays presumably correspond to the historical habitats, while recent deposition from Guadalupe River has buried the historical clay-dominated surface in several feet of siltier material. In addition to the Mocho series, we also included other "over basin clays" soils in our mapping, including Yf (Yolo loam over Clear Lake clay) and Cc (Campbell silty clay over basin clays). Inclusion of these soils is supported by the historical record, with reports of "no timber" (Herrmann 1879) and willow groves in these areas. While wet meadow presence in these areas is only inferred from these descriptions, they cover a very small portion of the study area.

A few additional modifications were made where evidence from earlier historical sources directly contradicted our interpretation of Gardner's mapping. For example, Orestimba loams were excluded from wet meadow mapping around Santa Clara, based on evidence that the Mission occupied significantly higher and drier ground (Lewis 1861, Lapham 1903). In a few places (e.g., gravelly soils northeast and east of Mountain View) the older

historical soils survey (Lapham 1903), though more coarsely mapped than the later survey, was found to more closely reflect the distribution of oaks and wet meadows as shown on detailed historical sources. In these areas, the wet meadow boundary was modified to exclude areas with documented oaks, and reflect the earlier soils mapping effort. Lastly, we relied on the earlier soils report in the vicinity of the San José International Airport, where Lapham's depiction of clay soils extending almost to the Guadalupe River more closely matches GLO surveyors' descriptions of landscape pattern. It is possible that in this area, the 1950s mapping may have been affected by earth fill associated with airport construction.

### Alkali meadows

Alkali meadows occurred as an ecotone in a narrow band in the low areas between wet meadow and south San Francisco Bay tidal marshlands. As Reed (1862) describes the alkaline area just east of San José, "it was a medium between the two, it was neither like the upland nor like the Salt marsh, but it partook of the character of both." It included both lands subject to extreme high tidal flooding and poorly drained non-tidal soils.

Despite covering a small proportion of the study area (less than 3%), the presence of alkali meadows is significant: they are recognized today as a relatively rare native grassland type (Holstein 2000, Faber 2005). The characteristic vegetation was saltgrass (*Distichlis spicata*; Reed 1866, Lapham 1904, Cooper 1926, Gardner et al. 1958), though other species were also recorded in Santa Clara Valley alkali meadows, including alkali milk vetch (*Astragalus tener* var. *tener*; CNDDB 2010) and common tarweed (*Centromadia pungens*, Cooper 1926).

Alkali meadow lands were agriculturally unproductive, seasonally inundated, and often far from inhabited areas. As a result, little direct historical documentation exists for these areas. Local resident G. F. Beardsley, interviewed by Cooper (1926) about conditions circa 1870 in the Palo Alto area, described a strip of "wiry hard grass" (interpreted as *Distichlis* by Cooper) "several hundred yards to one-quarter mile wide" at the upland edge of the tidal marsh. This statement corresponds with a similar description from a survey of Rancho Las Pulgas (north of San Francisquito Creek), stating that "the precise demarcation between the Tide Marsh and the firm land is well defined by the growth of a peculiar species of aquatic plant, a salt grass which covers the flat along the edges of the Bay, and on its inner margin grows slightly above the elevation of ordinary high tide. It varies in width from a few hundred yard to more than a mile" (Stephens 1856). Both statements are roughly consistent with our alkali meadow mapping in the Lower Peninsula area. A GLO surveyor crossing the alkali meadow area at the mouth of Saratoga Creek (then Sanjon Creek) in 1866 makes no distinction between the alkali meadow and surrounding wet meadow lands, possibly suggesting somewhat slight alkali influence in that area (Reed 1866). Just east of the study area boundary, a patch of alkali southeast of the Highway 17/Highway 101 interchange was described by

surveyor Sherman Day (1854): "...on the plain, among 'salt wood'...Surface level. Soil a stiff clay loam, with some alkali on the last half mile very tenacious of water in winter. No timber..." This description would probably also pertain to the small (<25 acres) pockets of alkali meadow in the Canoas area (north of Blossom Hill Road).

Previous research in Coyote Valley suggests that alkali soils as mapped by Gardner et al. in the early 1940s correspond closely to historical testimony regarding alkali extent in that area (Grossinger et al. 2006). To delineate the extent of alkali meadows, we used mapping of alkali extent in the 1958 soils report (Gardner et al. 1958). The report identified areas slightly (S), moderately (M), and strongly (A) affected by soluble salts or alkali. Slightly affected areas contain from 0.20-0.49% alkali, moderately affected areas contain 0.50-0.99% alkali, and strongly affected areas contain over one percent alkali (Gardner et al. 1958). While the majority of the mapped areas were only slightly affected by alkali, a few had alkali concentrations of over 0.70%.

### Freshwater marshes and ponds

Freshwater marshes are seasonally flooded areas with groundwater at or near the surface throughout most, if not all, of the year. They would have typically been dominated by bulrushes (*Schoenoplectus* sp.), cattails (*Typha latifolia* and *domingensis*), sedges (*Carex* sp.), spikerushes (*Eleocharis* sp.), and rushes (*Juncus* sp.). Perennial ponds are permanently flooded, non-vegetated areas, often occurring within larger complexes of marshland and willow groves.

In comparison to other habitats, marshes and ponds covered a small proportion of the study area (under two percent). However, perennial ponds were important sources of year-round water in this semi-arid environment, and many were documented by early sources. The vast majority of ponds and marshes in western Santa Clara Valley were mapped within the wet meadow area on impermeable basin soils. Some occurred at the spread of terminal creeks (e.g., Saratoga Creek), and others in areas of springs and emergent groundwater (e.g., at the head of Guadalupe River). Called *lagunas* (ponds or lakes) or *ciénegas* (marshes) by Spanish-speaking residents, many of these features were captured by early surveys. Undoubtedly, however, given the often small size of the features and their potential early disappearance, there were a number of historical marshes and ponds that were not captured by our historical data set.

**VALLEY FRESHWATER MARSH AND TULARES DE LAS CANOAS.** While a few freshwater marshes were documented in the Lower Peninsula and West Valley watershed areas (e.g., at the mouth of Saratoga Creek), the majority were identified in the Guadalupe River/Canoas Creek watershed area. These features were associated with the Arroyo Seco de Guadalupe distributary, as well as with wet areas along the Guadalupe River, where marshes were

interspersed with extensive willow groves and swamps on the west side of the river (Duval 1850, Lewis 1857b; fig. 17).

A major concentration of freshwater marshes in the study area was in the Canoas Creek watershed. One of the valley's largest freshwater wetland complexes – the Tulares de las Canoas – ran through the middle of what is now called Blossom Valley. More than ½ mile wide, the Tulares de las Canoas included tule marshes, perennial ponds, willow groves, and wet meadows. Vista Park, Meadows Park, and much of western Martial Cottle Park lie within the former wetland area. Subdivision-sized oak groves on slightly higher lands surrounded the wetlands to the west and east. The area was a notable source of perennial fresh water, and was used as a water

**Fig. 17. This early map depicts** willow groves, marshes (a), and wet meadows (b) between Santa Clara and the Guadalupe River, 1850. (Duval 1850, courtesy of the Office of the Santa Clara County Surveyor)



supply for the city of San José through the mid-1850s (Wyatt and Arbuckle 1948).

The Tulares de las Canoas extended from north of the San Juan Bautista Hills southeast to at least Blossom Hill Drive. The area's present drain, Canoas Creek, roughly marks the broad slough or chain of open water ponds as much as 700 ft wide that formed the spine of the wetlands, called Arroyo de las Tulares de las Canoas. The name presumably referred to the canoes made from tules and likely used to travel the slough and, when flooded in the winter, the entire wetland area.

Perennial marsh surrounded the central slough, extending a few hundred feet to the west and up to a thousand feet to the east (fig. 18). Lewis' maps show an array of ponds and marshes, but the 1853 map also shows early ditching (Lewis 1851a, Lewis and White 1853a). Similarly, Herrmann's (1868) survey of lands between Monterey Road and Gulnac's Island shows dry channels and "reclaimed ponds" bordered by a dam and mill race, supporting Brown's (2005) contention that the area was significantly drained by the mid-1850s. These remnant features, drained features, and the width observed by Day in 1854 suggest a general width substantially wider than that shown a few decades later (e.g., Thompson and West 1876).

One of the most well-documented elements of the Tulares was a large pond in the present-day Martial Cottle farm location. The pond and evidence of surrounding wetlands is well evidenced in early aerial photography of the area, and the distinctive pond outline remains visible today (fig. 19).

FRESHWATER PONDS. Perennial freshwater ponds were often part of larger wetland complexes dominated by emergent vegetation, such as in the Tulares de las Canoas area described above. They also appeared as discrete features, and a few even had individual names that have been preserved in the historical record (e.g., Laguna de la Punta del Roblar or Laguna de los Patos). Many of the small lakes in the study area were surrounded by small complexes of willows and marsh (fig. 20; Suñol 1862).

In addition to wetland-associated ponds, a few instances of ponds occurring in oak groves were also documented. Former resident G. F. Beardsley, interviewed by Cooper (1926) about historical conditions in the Santa Clara Valley, recalled "small ponds with willow about them" in the oak woodland east of the modern crossing of Stevens Creek by Central Expressway. Fernandez (1864) described "little lakes…inside of the Roblar" in the oak grove (Punta del Roblar) formerly near the intersection of Lawrence and Central expressways.

As early as the mid-1860s, settlers began to notice the disappearance of some ponds as a result of their utility for irrigation and domestic use (and possibly from artesian extraction). San Jose Mercury editor J. J. Owen editorialized that "many of our early settlers are aware that numerous lagunas or ponds once existed in various parts of the valley, which of late

L. **EXHIBIT H**

*Exhibit H — Excerpts (pp. 12–19) from San Francisco Estuary Institute (SFEI), Resilient Landscape Vision for the Calabazas Creek, San Tomas Aquino Creek, and Pond A8 Area: Bayland-Creek Reconnection Opportunities (McKnight, Dusterhoff, Grossinger & Askevold 2018) (SFEI Contribution No. 870).*



# RESILIENT LANDSCAPE
# VISION
### for the Calabazas Creek, San Tomas Aquino Creek, and Pond A8 Area
#### BAYLAND-CREEK RECONNECTION OPPORTUNITES



**SFEI** | **AQUATIC SCIENCE CENTER**
SAN FRANCISCO ESTUARY INSTITUTE & THE AQUATIC SCIENCE CENTER

**PRIMARY AUTHORS**
Katie McKnight
Scott Dusterhoff
Robin Grossinger

**DESIGN AND LAYOUT**
Ruth Askevold
Katie McKnight

**PREPARED BY**    San Francisco Estuary Institute-Aquatic Science Center

**IN COOPERATION WITH**
Santa Clara Valley Water District
South Bay Salt Ponds Restoration Project

**FUNDED BY**    San Francisco Bay Water Quality Improvement Fund, EPA Region IX

A PRODUCT OF **HEALTHY WATERSHEDS** • **RESILIENT BAYLANDS**

**MAY 2018**

SAN FRANCISCO ESTUARY INSTITUTE PUBLICATION #870

# HISTORICAL CHANGE

*Historical accounts of the Santa Clara Valley from the early 1800s describe the region as having fertile soils, artesian water, sheltering oaks, and a temperate climate, making it what was considered to be one of the most beautiful and productive places in California (Beller et al. 2010). Within the lower reaches of Calabazas and San Tomas Aquino creeks and the adjacent baylands, dramatic alterations to the landscape over the past 150 years have caused considerable changes to tidal and fluvial process and the resulting landscape features and habitat conditions.*

### HISTORICAL PROCESSES & FEATURES

In the mid-19th century, Calabazas and San Tomas Aquino creeks flowed from the Santa Cruz Mountains across the valley towards the extensive tidal marsh and mudflats that bordered the lower valley. Tidal action transported fine sediment onto the marshlands during flood tides and scoured an expansive network of tidal channels during ebb tides. Salt pannes existed around the edge of the tidal marsh, and are features associated with little direct freshwater inundation (unless seasonally inundated as a result of emerging groundwater and/or channelized runoff) and areas of high marsh plain removed from frequent tidal flooding (Beller et al. 2010). These salt pannes likely existed on the western edge of the study area away from the mouths of streams that maintained direct connections to the Bay, such as Guadalupe River. An expansive tidal-terrestrial transition zone (hereafter, the "transition zone"; the gradient between intertidal areas and upland terrestrial and/or fluvial environments) occupied the broad interface between high marsh and the large expanses of wet meadow and alkali meadow on the valley floor (Beller et al. 2013). Differences in landscape features (e.g., slope, fluvial influence, tidal inundation dynamics, groundwater levels, soil type) resulted in natural variations in the physical dimensions and habitat composition of the historical transition zone. The transition zone provided valuable ecosystem functions for feeding and breeding and allowed species to migrate around the marsh edge and between low-lying and upland habitats, providing high-tide and storm refuge for many marsh wildlife (Beller et al. 2013).

Calabazas and San Tomas Aquino creeks were both discontinuous streams typical to Santa Clara Valley, transitioning from more well-defined meandering channels at higher elevations on the alluvial plain, to shallower distributaries around the 100–200 foot elevation contour, which lost definition well before reaching the Bay. Historically, Calabazas Creek sank into the alluvium in the oak savanna around today's Stevens Creek Boulevard, near Cupertino High School. Flows from Calabazas Creek traveled subsurface before reemerging as a series of shallow sloughs that eventually supported the wet meadows that covered the low-lying areas of the valley floor and ultimately draining to the baylands. San Tomas Aquino Creek also disappeared underground in the oak savanna high on the alluvial plain, terminating far from the Bay. Historical maps show a series of disconnected distributary channels flowing north of San Tomas Aquino's terminus, which connected wet season flows to Sanjon Creek (known as lower San Tomas Aquino Creek today). Sanjon Creek was likely a relatively small, shallow watercourse that received flood flows from the creeks and drained directly into the baylands (Beller et al. 2010).

**Historical ecology map (ca. 1850) of the study area** with conceptualized diagrams illustrating key physical processes occurring on the landscape.



TIDAL-FLUVIAL MIXING ZONE

RIPARIAN CORRIDOR

DISCONTINUOUS STREAM

HWY 237

HWY 101

Guadalupe River

Sanjon Creek

Calabazas Creek

N

0    0.5    1.0    1.5    2.0 miles

**Historical Habitat Types**

- Shallow Tidal Channel
- Shallow Bay / Tidal Flat
- Tidal Marsh
- Tidal Marsh Panne
- Valley Freshwater Marsh
- Wet Meadow
- Willow Grove
- Salt Flat
- Alkali Meadow (high concentration)
- Alkali Meadow (low concentration)
- Oak Savanna or Grassland
- Oak Woodland
- Perennial Freshwater Pond
- Perennial Creek
- Intermittent Creek

13

During large storm events, episodic pulses of sediment would have caused the distributary channels on both Calabazas and San Tomas Aquino creeks to be unstable, filling with sediment and carving out new channels on the valley floor. Sanjon Creek likely received flows from Calabazas, San Tomas Aquino, and Saratoga (located between Calabazas and San Tomas Aquino) creeks during periods of large flows (Beller et al. 2010), depositing pulses of freshwater, nutrients and sediment that sustained marsh development.

The nearby Guadalupe River, which maintained a direct connection to the tidal marsh and Bay year-round, contributed major flows of freshwater, nutrients, and sediment to the surrounding baylands. Regular freshwater influence from Guadalupe River likely reduced tidal channel density, sinuosity, and panne abundance, and increased average panne size in this zone (Beller et al. 2013, Grossinger 1995) compared to transition zones with little freshwater influence. Willow groves and other riparian habitats existed along the banks of these streams and likely acted as an important upland wildlife corridor connecting diverse habitats across the valley floor. Oak savanna and oak woodland habitats were common higher up on the valley floor in areas with more coarse gravel loam soils, and bordering the wet meadow habitats.

**Historical habitats in west Santa Clara Valley** prior to significant Euro-American modification. (Beller et al. 2010)



## *CURRENT PROCESSES & FEATURES*

Europeans settled in the Santa Clara Valley as early as 1777, leading to significant landscape modifications by the early to mid-1800s (Beller et al. 2010). From the 1850s to the 1950s, the diking of tidal marshes became common practice in the South Bay to make ponds for salt production (Grossinger and Askevold 2005). The creation of leveed salt ponds from tidal marsh cut off sediment and nutrient delivery, and led to considerable baylands subsidence. In the adjacent lowlands, some channels were straightened to accommodate development and to improve flood management (Beller et al. 2010). The historically more discontinuous channels of Calabazas and San Tomas Aquino creeks were converted to continuous channels, taking freshwater out to the Bay, bypassing the salt ponds and marshes, and altering the transport of water across the valley floor (Beller et al. 2010).  The construction of stormdrain networks and engineered channels further increased the connectivity of the watersheds far beyond historical conditions. In some cases, entirely new channels were created (e.g., Sunnyvale East and West). As a result of the widespread increase in channel connectivity, floodwaters during the rainy season that would have supported seasonal wetlands or recharged groundwater were disconnected from the floodplain and diverted directly to the Bay. In addition, Calabazas and San Tomas Aquino (formerly Sanjon) creeks likely decreased in sinuosity as they were straightened and realigned (Beller et al. 2010).



**History of tidal marsh conversion to salt ponds in South San Francisco Bay.** (courtesy of Oakland Museum of California, Grossinger and Askevold 2005)



*(above)*
**Historical drainage network with historical creek names (in blue, ca. 1800) and modern drainage network (in white, 2007) in western Santa Clara Valley.** (Beller et al. 2010)

*(top and middle right)*
**Historical alignments of Calabazas, San Tomas Aquino, and Guadalupe creeks** near the boundary of Highway 237 landfill. (maps courtesy of Crawford Consulting, Inc.)

*(bottom right)*
**Present-day alignments of Calabazas, San Tomas Aquino and Guadalupe Creeks.** (courtesy of Google Earth)



Widespread development and continued channel straightening increased the need for flood management and channel dredging by the middle of the 20th century. By the 1950s, Calabazas and San Tomas Aquino creeks were diverted around the baylands, a departure from the historical surficial connections via Sanjon Creek. By 1951, Calabazas Creek had been diverted to the west while San Tomas Aquino Creek had been extended north into Guadalupe River (Crawford Consulting 2002). By 1963, the creation of a landfill adjacent to the southeastern edge of Pond A8S resulted in the loss of existing tidal marsh and the realignment of San Tomas Aquino Creek away from Guadalupe River to flow west and join Calabazas Creek (Crawford Consulting 2002). The realigned channel formed a 90-degree bend on San Tomas Aquino Creek, an unnatural turn that still exacerbates sedimentation and flood conveyance challenges today. By 1963, Calabazas and San Tomas Aquino creeks were widened and constricted by levees and, over time, the stream bed aggraded due to fluvial and tidal sedimentation. Today, Calabazas and San Tomas Aquino creeks have moderate average annual sediment loads: approximately 14,000 tons/yr and 29,000 tons/yr respectively (as calculated from records for water years 1957 to 2013) (SFEI-ASC 2016). Sediment accumulates in the lower reaches of these channels, requiring regular removal to maintain flood capacity.

Once-coherent habitat mosaics within the Calabazas-San Tomas Aquino baylands that supported suites of native species and communities have also changed substantially following Euro-American colonization (Robinson et al. 2015). The majority of upland transition zone habitats have been lost to agriculture and development, and the small fragments that remain exist as transitions between the upper limits of tidal marsh and the steep slope of artificial levees (Beller et al 2013). Because of this,

17

transition zone habitats are considered a conservation and restoration priority and offer additional benefits as critical accommodation space for marsh migration and flood abatement as sea level rises (Beller et al. 2015, Bayland Goals 2016). The vast majority of alkali and freshwater meadows in the region were drained and converted for agriculture and, later, industrial uses and housing. Upstream of the baylands, former oak savannas and woodlands were lost to large-scale clearing for agriculture and development.

Habitat restoration efforts progressed by the early 2000s. These efforts seek to preserve the remaining fragments of historical habitats, restore portions that were lost, and implement management strategies with multiple benefits to address modern flood risk management challenges. The current tidal marsh areas within the study site are confined to the deposited silts of sedimented areas between levees, Sunnyvale Baylands Seasonal Wetland Preserve, and Harvey Marsh, a CalTrans mitigation project. Additional open space exists atop the capped landfill and in adjacent open spaces, mostly in the form of urban parks.



**Study area of Calabazas Creek, San Tomas Aquino Creek, and Pond A8 interface and adjacent land uses.**
(basemap courtesy of Google Earth Pro)

**Current habitat map of the study area** with diagrams illustrating some of the changes that have occurred in the landscape compared to historical conditions (ca. 1850).

FLOOD CONTROL LEVEES

Sunnyvale West

HWY 237

HWY 101

Sunnyvale East

San Tomas Aquino Creek

Guadalupe River

Calabazas Creek

STRAIGHTENED CHANNELS

historical course

contemporary course

INCREASED CONNECTIVITY THROUGH STORM DRAIN NETWORK

N

0    0.5    1.0    1.5    2.0 miles

**Land Cover Types**

| | | | |
|---|---|---|---|
| Lagoon Perennial Vegetation | | Open Space | |
| Shallow Bay | | Developed | |
| Tidal Flat | | Water | |
| Salt Pond or Storage Basin | | Levee | |
| Tidal Marsh | | Storm Drains | |
| Tidal Panne | | Creeks | |

19

## M. <u>EXHIBIT I</u>

*Exhibit I — Technical Memorandum, "Sanitary Sewer Capacity Evaluation for the Aria Project (APN: 216-29-117)," 3250 Scott Blvd, dated December 12, 2014; produced by the City of Santa Clara in response to a California Public Records Act request.*

# Technical Memorandum



| | |
|---:|:---|
| **Subject:** | **Sanitary Sewer Capacity Evaluation for the Aria Project (APN: 216-29-117)** |
| **Prepared For:** | Falguni Amin, City of Santa Clara |
| **Prepared by:** | Winola Cheong, P.E. California License No. C-71669 |
| **Reviewed by:** | Gisa Ju, P.E. California License No. C-31823 |
| **Date:** | December 12, 2014 |

At the request of the City of Santa Clara (City), RMC evaluated the potential sanitary sewer capacity impact of the proposed Aria project (APN 216-29-117) at 3250 Scott Blvd. using the City's sanitary sewer hydraulic model. This technical memorandum (TM) summarizes the approach, model input, and results of the analysis.

Flow from the development would enter the City's sanitary sewer system at manhole S73-33 on Scott Blvd. and drain northward to Rabello and Northside pump stations via two parallel sewers on Great America Parkway. **Figure 1** shows the sewer lines that are affected by the additional flow from this development (affected lines in red). Note that the Rabello and Northside pump stations are not included in the model at this time. As such, this analysis only evaluated the capacity impact of the development on downstream pipes, but did not include any evaluation of the capacities of the two pump stations.

**Figure 1: Trunk Sewers Downstream of the Proposed Aria Project Site**

Sanitary Sewer Capacity Evaluation for the
Aria Project Site

**Figure 2: Estimated Daily Sewer Discharge Pattern**



## 3  Model Results

Profiles of the sewers downstream of the loading manhole under peak wet weather flow (PWWF) conditions were evaluated.

*Without the Development,* model predicted that the 12-inch line along Scott Blvd. would be about 65 to 75 percent full; and the 33-inch line on Bowers Ave. would show a surcharge of about 4 inches. The 33-inch line on Great America Parkway and the 36- to 42-inch line downstream would be about 80 to 100 percent full. Total peak flow to the Rabello and Northside pump stations would be about 46.9 mgd.

*With the Development,* model predicted that the 12-inch line along Scott Blvd. would show a surcharge of about 9 inches, and the surcharge in the 33-inch line on Bowers Ave. would increase to about 6 inches. The 33-inch line on Great America Parkway and the 36- to 42-inch line downstream would be about 80 to 100 percent full. Total peak flow to the pump stations would be about 47.3 mgd. Since the surcharge in the 12-inch line on Scott Blvd. is less than one foot and the sewer would have a freeboard of over 5 feet, the surcharge is considered acceptable.

As previous stated, this analysis did not include any evaluation of the pump capacities of the Rabello and Northside pump stations since they are not in the model at this time. According to City staff, the total firm capacity[1] for both the Rabello and Northside stations is approximately 38.2 MGD[2]. The City will be evaluating the required improvements to increase the stations' total firm capacity as part of the ongoing Sewer System Master Plan Update study.

---

[1] Firm capacity is defined as the capacity of a pump station with the largest pump out of service.

[2] Table 1: Pump Station Firm Capacities and Inflows, City of Santa Clara Sanitary Sewer Pump Station Evaluation, Schaaf & Wheeler, December 3, 2010.

### N. **EXHIBIT J**

*Exhibit J — City of Santa Clara, PLN2014-10675 "Architectural Review" for 3250 Scott Blvd ("Aria Redevelopment"), dated October 31, 2014; produced by the City of Santa Clara in response to a California Public Records Act request.*



```
*************************************
```
CITY OF SANTA CLARA
**PROJECT CLEARANCE COMMITTEE**
**SUBDIVISION COMMITTEE**
```
*************************************
```
**PCC/SC ROUTING SHEET**

**I.**  **Distribution Date:**          10/24/2014

**Date Comments due:**          10/31/2014

**Project Planner:**            **Gregory Qwan**

**Tentative PCC/SC Date:**      11/4/2014

**Applicant's Request:**        **Architectural Review of an expansion of the existing office/R&D facility, interior & exterior TI's, tree removal and replacement, landscape plan, and various parking lot and site improvements**

**II.**  **File No.(s):**          **PLN2014-10675**

**Address: /APN:**          **3250 Scott Blvd. / 216-29-117**

**Applicant/Owner:**        **Gary Aquilina / Khalil Jenab for Cassidy Turley**

**CEQA Determination:**     **TBD**

**Date Last Heard:**        N/A

**Related File No.(s):**    N/A

**III.**  **STAFF DISTRIBUTION**

| DEPARTMENT | STAFF REPRESENTATIVE/E-MAIL | PHONE # |
|---|---|---|
| ☒ City Attorney's Office | Alexander Abbe .......... AAbbe@santaclaraca.gov | 615-2231 |
| ☒ Building Inspection Division | Bounmy Soumountha ... Bsoumountha@santaclaraca.gov | 615-2430 |
| ☐ City Manager's Office | Alan Kurotori ............... AKurotori@santaclaraca.gov | 615-2210 |
| ☒ Electric Utility | Leonard Buttitta ............ Lbuttitta@santaclaraca.gov | 261-5469 |
| ☒ Electric Utility (fiber optics) | Rene Campos ............... rcampos@svpower.com | 426-7591 |
| ☒ Engineering - Property Division | Noel Lozano ................. NLozano@santaclaraca.gov | 615-3045 |
| ☒ Engineering - Traffic Division | Dennis Ng .................... Dng@santaclaraca.gov | 615-3021 |
| ☒ Fire Dept. - Fire Marshal | Martin Von Raesfeld. ... Mvonraesfeld@santaclaraca.gov | 615-4971 |
| ☒ Planning Division | Gloria Sciara* ............... Gsciara@santaclaraca.gov | 615-2453 |
| ☒ Police Department | Tom Leipelt ................ TLeipelt@santaclaraca.gov | 615-4866 |
| ☒ Street Department | Acting Director ............ @santaclaraca.gov | 615-3081 |
| ☒ Street Department | Lina Pradabaenz .......... LPradabaez@santaclaraca.gov | 615-3080 |
| ☒ Water and Sewer Utilities | Rashmi Ramachandra ... Rramachanadra@santaclaraca.gov | 615-2017 |
| ☐ Parks and Recreation | James Teixeira ............. Jteixeira@santaclaraca.gov | 615-2261 |
| ☐ Historical Coordinator | Yen Chen ................ ychen@santaclaraca.gov | 615-2455 |
| ☐ Planning Division (Historic referral) | Craig Mineweaser, AIA .... Craig@mineweaser.com ...... email or ....... | |

mail plans to 17154 Monte Grande Drive, Soulsbyville, CA 95372

# Schaaf & Wheeler

### CONSULTNG CIVIL ENGINEERS

James R. Schaaf, Ph. D, PE
Kirk R. Wheeler, PE
Peder C. Jorgensen, PE
Charles D. Anderson, PE
Daniel J. Schaaf, PE

870 Market Street, Suite 1278
San Francisco, CA 94102-2906
415-433-4848
Fax 415-433-1029

M. Eliza McNulty, PE
Benjamin L. Shick, PE
Leif M. Coponen, PE
**Principal Emeritus**
David A. Foote, PE

December 10, 2014

**RECEIVED**

DEC 1 0

City of San.
Planning D....

Planning Department
City of Santa Clara
1500 Warburton Avenue
Santa Clara, CA 95050

**Re: Aria Redevelopment**

To Whom It May Concern,

At the request of Kier & Wright, we have performed a third-party review of the Aria
Stormwater Management Plan (SWMP) dated December 8th, 2014. The project consists of
redeveloping the existing hardscape and landscaping around the existing industrial building
located at 3250 Scott Boulevard in Santa Clara

Based on our review of the SWMP, the plan complies with the requirements of the RWQCB
C.3 provisions and the SCVURPPP C.3 Stormwater Handbook (April 2012). The project creates
or replaces less than 50% of the existing impervious area and therefore must only treat the new
or replaced impervious surfaces. The site would incorporate site design principles; source
control measures; self-retaining, self-treating and bio-retention areas to treat the stormwater
runoff from an area equal to the new and replaced onsite impervious area. The project will
treat portions of the existing roof via bio-retention in-lieu of treating a portion of the new
pavement. Treatment control measures are 100% Low Impact Development (LID).

The sizing, selection, and preliminary design of storm water treatment control BMPs in the
SWMP meet the requirements of the NPDES MRP C.3 provisions based on the information
supplied in the SWMP.

If you require any additional information, please feel free to call me at the number above.

Sincerely,
Schaaf & Wheeler

Caitlin Gilmore, PE
Associate Engineer

No. 76810
EXP. 12/31/16

**RECEIVED**

DEC 1 0 2014

City of Santa Clara
Planning Division

Santa Clara • San Francisco • Santa Rosa • Salinas





*TO BE COMPLETED BY KIER + JRIGHT THEN THIRD PARTY to REVIEW + APPROVE ≈3WEEKS*

# The City of Santa Clara
# Stormwater Management Plans
# Review Process (SWMP)



Santa Clara
All-America City
2001

RECEIVED

DEC 1 0 2014

City of Santa Clara
Planning Division

Stormwater management is required by the Federal Government through the National Pollutant Discharge Elimination System (NPDES) program. The City of Santa Clara complies with the NPDES requirement through participation in the Santa Clara Valley Urban Runoff Pollution Prevention Program (SCVURPPP).

## PLANNING REVIEW

If a development project requires a Storm Water Management Plan (SWMP), a Draft or Preliminary Plan is required to be submitted with the project application as part of the project submittal requirements.

1. Submit Draft SWMP for City staff's review through Project Clearance Committee (PCC).
   a) A Draft SWMP may be prepared by a civil engineer, a licensed architect, or a landscape architect; however the consultant must be a qualified consultant per SCVURPP qualifications.
   b) The Draft SWMP must include the following forms (attached):
      • Provision C.3 Data Form;
      • Infiltration/Harvesting and Use Feasibility Screening Worksheet;
      • Stormwater Treatment Sizing Requirements Worksheets;
      • Hydromodification Management Requirements.
2. Any outstanding issues must be addressed by applicant before the project can be deemed complete by the PCC.

## BUILDING PERMIT REVIEW

3. Along with other required plans and documents for the building application, submit five copies of the Final SWMP (wet stamped and signed by the licensed/qualified consultant).
4. The Final SWMP must be certified by a third-party consultant from SCVURPPP's current list of qualified consultants. In addition to the Final SWMP, five copies of the approval letter from the certified third party reviewer (wet stamped and signed) must be submitted.
5. After the above requirements are met, along with all other building permit requirements, the building permits are cleared for issuance.
6. Prior to issuance of the final occupancy, the applicant shall enter into Operations and Maintenance (O&M) agreement with the City. The project operator is responsible for the operations and maintenance of the SWMP and stormwater BMPs consistent with the O&M agreement throughout the life of the project.

## POST CONSTRUCTION

7. The City conducts periodic post-construction site inspections of BMPs, operation and maintenance practices.

---

**IMPERVIOUS SURFACES**
*An impervious surface prevents the infiltration or passage of water into the soil Impervious surfaces include building rooftops, covered patios, driveways, parking lots, paved areas, sidewalks and streets.*

**LOW IMPACT DEVELOPMENT (LID)**
*Removal of pollutants from stormwater runoff using the following types of stormwater treatment measures: rainwater harvesting and use, infiltration, evapotranspiration or if infeasible, biotreatment.*

---

City of Santa Clara Planning Division – 1500 Warburton Ave. – (408) 615-2450
Planning Division Staff are available 8am-noon and 1pm-5pm, Monday-Friday.
www.santaclaraca.gov
page 1 of 1                                                                rev. 2/14

 **Santa Clara Valley**
*Urban Runoff*
**Pollution Prevention Program**



## PROVISION C.3 DATA FORM

---

**Which Projects Must Comply with Stormwater Requirements?**

**All projects** that create and/or replace **10,000 sq. ft.** or more of impervious surface on the project site must fill out this worksheet and submit it with the development project application.

**All restaurants, auto service facilities, retail gasoline outlets, and uncovered parking lot projects** (stand-alone or part of another development project, including the top uncovered portion of parking structures) that create and/or replace **5,000 sq. ft.** or more of impervious surface on the project site must also fill out this worksheet.

Interior remodeling projects, routine maintenance or repair projects such as re-roofing and re-paving, and single family homes that are not part of a larger plan of development are **NOT** required to complete this worksheet.

**What is an Impervious Surface?**

An impervious surface is a surface covering or pavement that prevents the land's natural ability to absorb and infiltrate rainfall/stormwater. Impervious surfaces include, but are not limited to rooftops, walkways, paved patios, driveways, parking lots, storage areas, impervious concrete and asphalt, and any other continuous watertight pavement or covering. Pervious pavement, underlain with pervious soil or pervious storage material (e.g., drain rock), that infiltrates rainfall at a rate equal to or greater than surrounding unpaved areas OR that stores and infiltrates the water quality design volume specified in Provision C.3.d of the Municipal Regional Stormwater Permit (MRP), is not considered an impervious surface.

**For More Information**

For more information regarding selection of Best Management Practices for stormwater pollution prevention or stormwater treatment contact: the Planning Department at 408-615-2450 and request the Stormwater Pollution Prevention Information Packet.

---

## 1. Project Information

**Project Name:** Aria                                    **APN #** 216-29-117

**Project Address:** 3250 Scott Blvd., Santa Clara 95054

**Cross Streets:** Scott Blvd. & Montgomery Dr.

**Applicant/Developer Name:** Kier & Wright Civil Engineers & Surveyors, Inc.

**Project Phase(s):** 1 of 1      **Engineer:** Kier & Wright Civil Engineers & Surveyors, Inc.

**Project Type (Check all that apply):** ☐ New Development   ☑ Redevelopment

☐ Residential  ☐ Commercial  ☑ Industrial  ☐ Mixed Use  ☐ Public  ☐ Institutional

☐ Restaurant  ☐ Uncovered Parking  ☐ Retail Gas Outlet  ☐ Auto Service (SIC code) _____
(5013-5014, 5541, 7532-7534, 7536-7539)

☐ Other _____

**Project Description:** Site & tenant improvements

_____

**Project Watershed/Receiving Water (creek, river or bay):**
☐ Calabasas Creek   ☐ Saratoga Creek   ☑ San Tomas Aquino Creek   ☐ Guadalupe River

## 2. Project Size

| a. Total Site Area: 5.8 acre | b. Total Site Area Disturbed: 2.93 acre (including clearing, grading, or excavating) | | | |
|---|---|---|---|---|
| | Existing Area (ft$^2$) | Proposed Area (ft$^2$) | | Total Post-Project Area (ft$^2$) |
| | | Replaced | New | |
| *Impervious Area* | | | | |
| Roof | 68,960 | 0 | 0 | 68960 |
| Parking | 123,560 | 14,901 | 2,421 | 72,226 |
| Sidewalks and Streets | 21,830 | 32,241 | 2,867 | 36,558 |
| c. Total Impervious Area | 214,350 | 47,242 | 5,288 | 177,744 |
| d. Total new and replaced impervious area | | 52,530 | | |
| *Pervious Area* | | | | |
| Landscaping | 38,420 | 25,484 | 49,542 | 75,026 |
| Pervious Paving | 0 | 0 | 0 | 0 |
| Other (e.g. Green Roof) | 0 | 0 | 0 | 0 |
| e. Total Pervious Area | 38,420 | 27,484 | 49,542 | 75,026 |
| f. Percent Replacement of Impervious Area in Redevelopment Projects (Replaced Total Impervious Area ÷ Existing Total Impervious Area) x 100% = 24.5 % | | | | |

## 3. State Construction General Permit Applicability:

a. Is #2.b. equal to 1 acre or more?

☑ Yes, applicant must obtain coverage under the State Construction General Permit (i.e., file a Notice of Intent and prepare a Stormwater Pollution Prevention Plan) (see www.swrcb.ca.gov/water_issues/programs/stormwater/construction.shtml for details).

☐ No, applicant does not need coverage under the State Construction General Permit.

## 4. MRP Provision C.3 Applicability:

a. Is #2.d. equal to **10,000** sq. ft. or more, or **5,000** sq. ft. or more for restaurants, auto service facilities, retail gas outlets, and uncovered parking?

*(\*Note that for public projects, the 5,000 sq. ft. threshold does not take effect until 12/1/12.)*

☑ Yes, C.3. source control, site design and treatment requirements apply

☐ No, C.3. source control and site design requirements may apply – check with local agency

b. Is #2.f. equal to 50% or more?

☐ Yes, C.3. requirements (site design and source control, as appropriate, and stormwater treatment) apply to entire site

☑ No, C.3. requirements only apply to impervious area created and/or replaced

## 5. Hydromodification Management (HM) Applicability:

a. Does project create and/or replace one acre or more of impervious surface AND is the total post-project impervious area greater than the pre-project (existing) impervious area?

　　☐　Yes (continue)　　　　　☑ No – exempt from HM, go to page 3

b. Is the project located in an area of HM applicability (green area) on the HM Applicability Map? ( www.scvurppp-w2k.com/hmp_maps.htm )

　　☐　Yes, project must implement HM requirements

　　☐　No, project is exempt from HM requirements

## 6.  Selection of Specific Stormwater Control Measures:

### Site Design Measures

- ☑ Minimize land disturbed
- ☑ Minimize impervious surfaces
- ☑ Minimum-impact street or parking lot design
- ☑ Cluster structures/ pavement
- ❏ Disconnected downspouts
- ❏ Pervious pavement
- ❏ Green roof
- ❏ Microdetention in landscape
- ☑ Other self-treating area
- ❏ Self-retaining area
- ❏ Rainwater harvesting and use (e.g., rain barrel, cistern connected to roof drains) [1]
- ❏ Preserved open space: _____ ac. or sq. ft .(circle one)
- ❏ Protected riparian and wetland areas/buffers (Setback from top of bank: _____ ft.)
- ❏ Other _____

### Source Control Measures

- ❏ Alternative building materials
- ☑ Wash area/racks, drain to sanitary sewer [2]
- ☑ Covered dumpster area, drain to sanitary sewer [2]
- ❏ Sanitary sewer connection or accessible cleanout for swimming pool/spa/fountain [2]
- ☑ Beneficial landscaping (minimize irrigation, runoff, pesticides and fertilizers; promotes treatment)
- ☑ Outdoor material storage protection
- ☑ Covers, drains for loading docks, maintenance bays, fueling areas
- ☑ Maintenance (pavement sweeping, catch basin cleaning, good housekeeping)
- ☑ Storm drain labeling
- ❏ Other _____

### Treatment Systems

- ❏ None (all impervious surface drains to self-retaining areas)

#### LID Treatment

- ❏ Rainwater harvest and use (e.g., cistern or rain barrel sized for C.3.d treatment)
- ❏ Infiltration basin
- ❏ Infiltration trench
- ❏ Exfiltration trench
- ❏ Underground detention and infiltration system (e.g. pervious pavement drain rock, large diameter conduit)

#### Biotreatment [3]

- ☑ Bioretention area
- ❏ Flow-through planter
- ❏ Tree box with bioretention soils
- ❏ Other _____

#### Other Treatment Methods

- ❏ Proprietary tree box filter [4]
- ❏ Media filter (sand, compost, or proprietary media) [4]
- ❏ Vegetated filter strip [5]
- ❏ Dry detention basin [5]
- ❏ Other _____

### Flow Duration Controls for Hydromodification Management (HM)

- ❏ Detention basin
- ❏ Underground tank or vault
- ❏ Bioretention with outlet control
- ❏ Other _____

[1] Optional site design measure; does not have to be sized to comply with Provision C.3.d treatment requirements.
[2] Subject to sanitary sewer authority requirements.
[3] Biotreatment measures are allowed only with completed feasibility analysis showing that infiltration and rainwater harvest and use are infeasible.
[4] These treatment measures are only allowed if the project qualifies as a "Special Project".
[5] These treatment measures are only allowed as part of a multi-step treatment process.

7. **Treatment System Sizing for Projects with Treatment Requirements**

Indicate the hydraulic sizing criteria used and provide the calculated design flow or volume:

| Treatment System Component | Hydraulic Sizing Criteria Used[3] | Design Flow or Volume (cfs or cu.ft.) |
|---|---|---|
| Biotreatment | 2b | 0.18 cfs |
| | | |
| | | |

[3]Key:  1a: Volume – WEF Method
      1b: Volume – CASQA BMP Handbook Method
      2a: Flow – Factored Flood Flow Method
      2b: Flow – CASQA BMP Handbook Method
      2c: Flow – Uniform Intensity Method
      3: Combination Flow and Volume Design Basis

8. **Alternative Certification:**  Was the treatment system sizing and design reviewed by a qualified third-party professional that is not a member of the project team or agency staff?

    ■ Yes    ☐ No    Name of Reviewer  Caitlin Gilmore, PE, Schaaf & Wheeler

9. **Operation & Maintenance Information**
    A. Property Owner's Name  Jenab Family Trust
    B. Responsible Party for Stormwater Treatment/Hydromodification Control O&M:
        a. Name:  Apple Inc. [Contact: Jeff White]
        b. Address:  1 Infinite Loop, Cupertino CA 95014
        c. Phone/E-mail:  408-974-8221 / jeffwhite@apple.com

---

*This section to be completed by Municipal staff.*

**O&M Responsibility Mechanism**
Indicate how responsibility for O&M is assured.  Check all that apply:

☐   O&M Agreement

☐   Other mechanism that assigns responsibility (describe below):

_____
_____

---

GARY AQUILINA           12.16.2014

Name of Applicant (Print)           Date

_____

Name of Applicant (Sign)




### Infiltration/Harvesting and Use Feasibility Screening Worksheet

*Apply these screening criteria for **C.3 Regulated Projects** * required to implement Provision C.3 stormwater treatment requirements. See the Glossary (Attachment 1) for definitions of terms marked with an asterisk (\*). Contact municipal staff to determine whether the project meets **Special Project*** criteria. If the project meets Special Project criteria, it may receive LID treatment reduction credits.*

1. **Applicant Info**

   Site Address: ____3250 Scott Blvd., Santa Clara____ ,CA   APN: 216-29-117

   Applicant Name: Kier & Wright Civil Engineers & Surveyors, Inc.  Phone No.: (408) 727-6665

   Mailing Address: 3350 Scott Blvd, Santa Clara, CA 95054

2. **Feasibility Screening for Infiltration**          Peninsula Communities, LLC

   Do site soils either (a) have a **saturated hydraulic conductivity*** (Ksat) that will NOT allow infiltration of 80% of the annual runoff (that is, the Ksat is LESS than 1.6 inches/hour), or, if the Ksat rate is not available, (b) consist of Type C or D soils?[1]

   ☑ Yes (continue)          ☐ No – complete the Infiltration Feasibility Worksheet. If infiltration of the C.3.d amount of runoff is found to be feasible, there is no need to complete the rest of this screening worksheet.

3. **Recycled Water Use**

   Check the box if the project is installing and using a recycled water plumbing system for non-potable water use.

   ☐ The project is installing a recycled water plumbing system, and installation of a second non-potable water system for harvested rainwater is impractical, and considered infeasible due to cost considerations. Skip to Section 6.

4. **Calculate the Potential Rainwater Capture Area\* for Screening of Harvesting and Use**

   *Complete this section for the entire project area. If rainwater harvesting and use is infeasible for the entire site, and the project includes one or more buildings that each have an individual roof area of 10,000 sq. ft. or more, then complete Sections 4 and 5 of this form for each of these buildings.*

   4.1   Table 1 for (check one): ☐ The whole project   ☑ Area of 1 building roof (10,000 sq.ft. min.)

| Table 1: Calculation of the **Potential Rainwater Capture Area\***  *The Potential Rainwater Capture Area may consist of either the entire project area or one building with a roof area of 10,000 sq. ft. or more.* | | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| | Pre-Project Impervious surface[2] (sq.ft.), if applicable | Proposed Impervious Surface[2] (IS), in sq. ft. | | Post-project landscaping (sq.ft.), if applicable |
| | | Replaced[3] IS | Created[4] IS | |
| a. Enter the totals for the area to be evaluated: | 214,350 | 47,242 | 5,288 | |
| b. Sum of replaced and created impervious surface: | N/A | 52,530 | | N/A |
| c. Area of existing impervious surface that will NOT be replaced by the project. | 125,214 | N/A | | N/A |

---

[1] Base this response on the site-specific soil report, if available. If this is not available, consult soil hydraulic conductivity maps in Attachment 3.

[2] Enter the total of all impervious surfaces, including the building footprint, driveway(s), patio(s), impervious deck(s), unroofed porch(es), uncovered parking lot (including top deck of parking structure), impervious trails, miscellaneous paving or structures, and off-lot impervious surface (new, contiguous impervious surface created from road projects, including sidewalks and/or bike lanes built as part of new street). Impervious surfaces do NOT include vegetated roofs or pervious pavement that stores and infiltrates rainfall at a rate equal to immediately surrounding, unpaved landscaped areas, or that stores and infiltrates the **C.3.d amount of runoff\***.

[3] "Replaced" means that the project will install impervious surface where existing impervious surface is removed.

[4] "Created" means the project will install new impervious surface where there is currently no impervious surface.

\* For definitions, see Glossary (Attachment 1).

4.2   Answer this question ONLY if you are completing this section for the entire project area. If existing impervious surface will be replaced by the project, does the area to be replaced equal 50% or more of the existing area of impervious surface? *(Refer to Table 1, Row "a". Is the area in Column 2 > 50% of Column 1?)*

☐   Yes, C.3. stormwater treatment requirements apply to areas of impervious surface that will remain in place as well as the area created and/or replaced. This is known as the 50% rule.

☐   No, C.3. requirements apply only to the impervious area created and/or replaced.

4.3   Enter the square footage of the **Potential Rainwater Capture Area\***. If you are evaluating only the roof area of a building, or you answered "no" to Question 4.2, this amount is from Row "b" in Table 1. If you answered "yes" to Question 4.2, this amount is the sum of Rows "b" and "c" in Table 1.:

_____ 52,530 square feet.

4.4   Convert the measurement of the **Potential Rainwater Capture Area\*** from square feet to acres (divide the amount in Item 4.3 by 43,560):

_____ 1.21 acres.

5.   **Feasibility Screening for Rainwater Harvesting and Use**

5.1   Use of harvested rainwater for landscape irrigation:

Is the onsite landscaping LESS than 2.5 times the size of the **Potential Rainwater Capture Area\*** (Item 4.3)? (Note that the landscape area(s) would have to be contiguous and within the same Drainage Management Area to use harvested rainwater for irrigation via gravity flow.)

☐   Yes (continue)      ☑   No –   Direct runoff from impervious areas to **self-retaining areas\*** OR refer to Table 11 and the curves in Appendix F of the LID Feasibility Report to evaluate feasibility of harvesting and using the C.3.d amount of runoff for irrigation.

5.2   Use of harvested rainwater for toilet flushing or non-potable industrial use:

a.   Residential Projects: Proposed number of dwelling units:_____
Calculate the dwelling units per impervious acre by dividing the number of dwelling units by the acres of the **Potential Rainwater Capture Area\*** in Item 4.4. Enter the result here:

_____)

Is the number of dwelling units per impervious acre LESS than 100 (assuming 2.7 occupants/unit)?

☐   Yes (continue)      ☐   No – complete the Harvest/Use Feasibility Worksheet.

b.   Commercial/Industrial Projects: Proposed interior floor area:_____ 58,905 (sq. ft.)

Calculate the proposed interior floor area (sq.ft.) per acre of impervious surface by *dividing the interior floor area (sq.ft.) by the acres of the* **Potential Rainwater Capture Area\*** *in Item 4.4. Enter the result here:*
_____48,682

Is the square footage of the interior floor space per impervious acre LESS than 70,000 sq. ft.?

☑   Yes (continue)      ☐   No – complete the Harvest/Use Feasibility Worksheet

c.   School Projects: Proposed interior floor area:_____ (sq. ft.)

Calculate the proposed interior floor area per acre of impervious surface by *dividing the interior floor area (sq.ft.) by the acres of the* **Potential Rainwater Capture Area\*** *in Item 4.4 . Enter the result here:*
_____.

Is the square footage of the interior floor space per impervious acre LESS than 21,000 sq. ft.?

☐   Yes (continue)      ☐   No – complete the Harvest/Use Feasibility Worksheet

* For definitions, see Glossary (Attachment 1).

*Infiltration/Harvesting and Use Feasibility Screening Worksheet*

d. Mixed Commercial and Residential Use Projects

- Evaluate the residential toilet flushing demand based on the dwelling units per impervious acre for the residential portion of the project, following the instructions in Item 5.2.a, except you will use a prorated acreage of impervious surface, based on the percentage of the project dedicated to residential use.

- Evaluate the commercial toilet flushing demand per impervious acre for the commercial portion of the project, following the instructions in Item 5.2.a, except you will use a prorated acreage of impervious surface, based on the percentage of the project dedicated to commercial use.

e. Industrial Projects: Estimated non-potable water demand (gal/day): **994**_____

  Is the non-potable demand LESS than 2,400 gal/day per acre of the Potential Rainwater Capture Area?

  ■ Yes (continue)    ☐ No — refer to the curves in Appendix F of the LID Feasibility Report to evaluate feasibility of harvesting and using the C.3.d amount of runoff for industrial use.

## 6. Use of Biotreatment

If only the "Yes" boxes were checked for all questions in Sections 2 and 5, or the project will have a recycled water system for non-potable use (Section 3), then the applicant may use appropriately designed bioretention facilities for compliance with C.3 treatment requirements. The applicant is encouraged to maximize infiltration of stormwater if site conditions allow.

## 7. Results of Screening Analysis

Based on this screening analysis, the following steps will be taken for the project (check all that apply):

☑ Implement biotreatment measures (such as an appropriately designed bioretention area).

☐ Conduct further analysis of infiltration feasibility by completing the Infiltration Feasibility Worksheet.

☐ Conduct further analysis of rainwater harvesting and use (check one):

  ☐ Complete the Rainwater Harvesting and Use Feasibility Worksheet for:

    ☐ The entire project
    ☐ Individual building(s), if applicable, describe:_____

  ☐ Evaluate the feasibility of harvesting and using the C.3.d amount of runoff for irrigation, based on Table 11 and the curves in Appendix F of the LID Feasibility Report

  ☐ Evaluate the feasibility of harvesting and using the C.3.d amount of runoff for non-potable industrial use, based on the curves in Appendix F of the LID Feasibility Report.

 **Infiltration Feasibility Worksheet**
**Municipal Regional Stormwater Permit (MRP)**
**Stormwater Controls for Development Projects**



Infeasible - Please refer to Screening Worksheet

*Complete this worksheet for* **C.3 Regulated Projects*** *for which the soil hydraulic conductivity (Ksat) exceeds 1.6. Use this checklist to determine the feasibility of treating the* **C.3.d** ***amount of runoff**** *with infiltration. Where it is infeasible to treat the C.3.d amount of runoff\* with infiltration or rainwater harvesting and use, stormwater may be treated with* **biotreatment*** *measures. See Glossary (Attachment 1) for definitions of terms marked with an asterisk (\*).*

## 1. Enter Project Data.

1.1  Project Name:

1.2  Project Address:

1.3  Applicant/Agent Name:

1.4  Applicant/Agent Address:

1.5  Applicant/Agent Email:

Applicant / Agent Phone:

## 2. Evaluate infiltration feasibility.

*Check "Yes" or "No" to indicate whether the following conditions apply to the project. If "Yes" is checked for any question, then infiltration is infeasible, and you can continue to Item 3.1 without answering any further questions in Section 2.  If all of the answers in Section 2 are "No," then infiltration is feasible, and you may design* **infiltration facilities*** *for the area from which runoff must be treated.  Items 2.1 through 2.3 address the feasibility of using* **infiltration facilities***, *as well as the potential need to line bioretention areas.*

| | | Yes | No |
|---|---|---|---|
| 2.1 | Would infiltration facilities at this site conflict with the location of existing or proposed underground utilities or easements, or would the siting of infiltration facilities at this site result in their placement on top of underground utilities, or otherwise oriented to underground utilities, such that they would discharge to the utility trench, restrict access, or cause stability concerns? (If yes, attach evidence documenting this condition.) | ☐ | ☐ |
| 2.2 | Is there a documented concern that there is a potential on the site for soil or groundwater pollutants to be mobilized?  (If yes, attach documentation of mobilization concerns.) | ☐ | ☐ |
| 2.3 | Are geotechnical hazards present, such as steep slopes, areas with landslide potential, soils subject to liquefaction, or would an infiltration facility need to be built less than 10 feet from a building foundation or other improvements subject to undermining by saturated soils? (If yes, attach documentation of geotechnical hazard.) | ☐ | ☐ |

Respond to Questions 2.4 through 2.8 only if the project proposes to use an **infiltration device\*.**

| | | Yes | No |
|---|---|---|---|
| 2.4 | Do local water district or other agency's policies or guidelines regarding the locations where infiltration may occur, the separation from seasonal high groundwater, or  setbacks from potential sources of pollution prevent infiltration devices from being implemented at this site? (If yes, attach evidence documenting this condition.) | ☐ | ☐ |
| 2.5 | Would construction of an infiltration device require that it be located less than 100 feet away from a septic tank, underground storage tank with hazardous materials, or other potential underground source of pollution?  (If yes, attach evidence documenting this claim.) | ☐ | ☐ |

## Infiltration Feasibility Worksheet

|  |  | Yes | No |
|---|---|---|---|
| 2.6 | Is there a seasonal high groundwater table or mounded groundwater that would be within 10 feet of the base of an infiltration device* constructed on the site?  (If yes, attach documentation of high groundwater.) | ☐ | ☐ |
| 2.7 | Are there land uses that pose a high threat to water quality – including but not limited to industrial and light industrial activities, high vehicular traffic (i.e., 25,000 or greater average daily traffic on a main roadway or 15,000 or more average daily traffic on any intersecting roadway), automotive repair shops, car washes, fleet storage areas, or nurseries?  (If yes, attach evidence documenting this claim.) | ☐ | ☐ |
| 2.8 | Is there a groundwater production well within 100 feet of the location where an infiltration device would be constructed?  (If yes, attach map showing the well.) | ☐ | ☐ |

## 3. Results of Feasibility Determination

|  |  | Infeasible | Feasible |
|---|---|---|---|
| 3.1 | Based on the results of the Section 2 feasibility analysis, infiltration is (check one): | ☐ | ☐ |

---

→ If "FEASIBLE" is indicated for Item 3.1, then the amount of stormwater requiring treatment must be treated with infiltration (or rainwater harvest and use, if feasible).  **Infiltration facilities*** may be designed for the area from which runoff must be treated.

→ If "INFEASIBLE" is checked for item 3.1, then the applicant may use appropriately designed **biotreatment facilities*** for compliance with C.3 treatment requirements. The applicant is encouraged to maximize infiltration of stormwater if site conditions allow.

---

_____
Name: of Applicant (Print)

_____          _____
Name of Applicant (Sign)                                          Date



## Rainwater Harvesting and Use Feasibility Worksheet
**Municipal Regional Stormwater Permit (MRP)**
**Stormwater Controls for Development Projects**



Infeasible - Please refer to Screening Worksheet

Complete this worksheet for all **C.3 Regulated Projects*** for which the project density exceeds the **screening density*** provided by municipal staff. Use this worksheet to determine the feasibility of treating the **C.3.d amount of runoff*** with rainwater harvesting and use for indoor, non-potable water uses.   Where it is infeasible to treat the C.3d amount of runoff with either harvesting and use or infiltration, stormwater may be treated with **biotreatment*** measures. See Glossary (Attachment 1) for definitions of terms marked with an asterisk (*).

Complete this worksheet for the entire project area.  If the project includes one or more buildings that each individually has a roof area of 10,000 square feet or more, complete a separate copy of this form for each of these buildings.

## 1. Enter Project Data.

1.1   Project Name: _____

1.2   Project Address: _____

1.3   Applicant/Agent Name: _____

1.4   Applicant/Agent Address: _____

*(For projects with a potential non-potable water use other than toilet flushing, skip to Question 5.1)*

1.5   Project Type:                          If residential or mixed use, enter # of dwelling units:  _____

1.6                                         Enter square footage of non-residential interior floor area.:  _____

1.7   **Potential rainwater capture area*:**                                                          _____ sq.ft.

1.8   If it is a **Special Project***, indicate the percentage of **LID treatment*** reduction:       _____ percent
      *(Item 1.8 applies only to entire project evaluations, not individual roof area evaluations.)*

1.9   Total potential rainwater capture area that will require  LID treatment:                         _____ sq.ft.
      *(This is the total rain capture area remaining after any Special Project LID treatment reduction is applied.)*

## 2.  Calculate Area of Self-Treating Areas, Self-Retaining Areas, and Areas Contributing to Self-Retaining Areas.
*(For areas within the Potential Rain Capture Area only)*

2.1   Enter square footage of any **self-treating areas*** in the area that is being evaluated:        _____ sq.ft.

2.2   Enter square footage of any **self-retaining areas*** in the area that is being evaluated:       _____ sq.ft.

2.3   Enter the square footage of areas contributing runoff to **self-retaining area***:               _____ sq.ft.

2.4   TOTAL of Items 2.1, 2.2, and 2.3:                                                                _____ sq.ft.

## 3. Subtract credit for self-treating/self-retaining areas from area requiring treatment.

3.1   Subtract the TOTAL in Item 2.4 from the potential rainwater capture area in Item 1.9:            _____ sq.ft.

3.2   Convert the remaining area required for treatment in Item 3.1 from square feet to acres:         _____ acres

## 4. Determine feasibility of use for toilet flushing based on demand

4.1   Project's dwelling units per acre of adjusted potential rain capture area (Divide the number in 1.5 by the number in 3.2)                                                                      _____ dwelling units/acre

4.2   Non-residential interior floor area per acre of adjusted potential rain capture area (Divide the number in 1.6 by the number in 3.2)                                                           _____ Int. non-res. floor area/acre

*Note: formulas in Items 4.1 and 4.2 are set up, respectively, for a residential or a non-residential project. Do not use these pre-set formulas for mixed use projects. **For mixed use projects**, evaluate the residential toilet flushing demand based on the dwelling units per acre for the residential portion of the project (use a prorated acreage, based on the percentage of the project dedicated to residential use).  Then evaluate the commercial toilet flushing demand per acre for the commercial portion of the project (use a prorated acreage, based on the percentage of the project dedicated to commercial use).*

4.3  Identify the number of dwelling units per impervious acre needed in your Rain Gauge Area to provide the toilet flushing demand required for rainwater harvest feasibility.

_____ dwelling units/acre

4.4  Identify the square feet of non-residential interior floor area per impervious acre needed in your Rain Gauge Area to provide the toilet flushing demand required for rainwater harvest feasibility.

_____ int. non-res. floor area/acre

*Check "Yes" or "No" to indicate whether the following conditions apply. If "Yes" is checked for any question, then rainwater harvesting and use is infeasible.  As soon as you answer "Yes", you can skip to Item 6.1. If "No" is checked for all items, then rainwater harvesting and use is feasible and you must harvest and use the C.3.d amount of stormwater, unless you infiltrate the C.3.d amount of stormwater*.*

4.5  Is the project's number of dwelling units per acre of adjusted area requiring treatment (listed in Item 4.1) LESS than the number identified in Item 4.3?  ☐ Yes   ☐ No

4.6  Is the project's square footage of non-residential interior floor area per acre of adjusted area requiring treatment (listed in Item 4.2) LESS than the number identified in Item 4.4?  ☐ Yes   ☐ No

## 5. Determine feasibility of rainwater harvesting and use based on factors other than demand.

5.1  Does the requirement for rainwater harvesting and use at the project conflict with local, state, or federal ordinances or building codes?  ☐ Yes   ☐ No

5.2  Would the technical requirements cause the harvesting system to exceed 2% of the Total Project Cost, or has the applicant documented economic hardship in relation to maintenance costs? (If so, attach an explanation.)  ☐ Yes   ☐ No

5.3  Do constraints, such as a slope above 10% or lack of available space at the site, make it infeasible to locate on the site a cistern of adequate size to harvest and use the C.3.d amount of water?  (If so, attach an explanation.)  ☐ Yes   ☐ No

5.4  Are there geotechnical/stability concerns related to the surface (roof or ground) where a cistern would be located that make the use of rainwater harvesting infeasible?  (If so, attach an explanation.)  ☐ Yes   ☐ No

5.5  Does the location of utilities, a septic system and/or **heritage trees\*** limit the placement of a cistern on the site to the extent that rainwater harvesting is infeasible?  (If so, attach an explanation.)  ☐ Yes   ☐ No

*Note 1: It is assumed that projects with significant amounts of landscaping will either treat runoff with landscape dispersal (self-treating and self-retaining areas) or will evaluate the feasibility of havesting and using rainwater for irrigation using the curves in Appendix F of the LID Feasibility Report.*

## 6. Results of Feasibility Determination

|  | Infeasible | Feasible |
|---|---|---|
| 6.1  Based on the results of the feasibility analysis in Item 4.4 and Section 5, rainwater harvesting/use is (check one): | ☐ | ☐ |

→ *If "FEASIBLE" is indicated for Item 6.1 the amount of stormwater requiring treatment must be treated with harvesting/use, unless it is infiltrated into the soil.*

→ *If "INFEASIBLE" is checked for Item 6.1, then the applicant may use appropriately designed* **bioretention** *\*,[1] facilities for compliance with C.3 treatment requirements. If Ksat > 1.6 in./hr., and infiltration is unimpeded by subsurface conditions, then the bioretention facilities are predicted to infiltrate 80% or more average annual runoff.  If Ksat < 1.6, maximize infiltration of stormwater by using bioretention if site conditions allow, and remaining runoff will be discharged to storm drains via facility underdrains.  If site conditions preclude infiltration, a lined bioretention area or flow-through planter may be used.*

_____
Applicant (Print)

_____
Applicant (Sign)

_____
Date



**City of Santa Clara**
**Stormwater Treatment Sizing Requirements Worksheets**



## I. Introduction

All development projects creating or replacing 10,000 sq. ft. or more of impervious surface (or 5,000 sq. ft. for automotive shops, gas stations, restaurants and parking lots) on the project site are subject to the requirements of Provision C.3. of the City's stormwater discharge permit, which include providing low impact development (LID) treatment measures for runoff from impervious surfaces.

There are three methods of sizing treatment measures (see Table 1 for examples):

- **Volume-based** - the method for treatment measures that operate based on the volume of water treated (i.e., they detain an amount of runoff for a certain amount of time to allow settling, contact with media, or infiltration into the soil);

- **Flow-based** – the method for treatment measures that operate based on a continuous flow of runoff and remove pollutants either by filtration or centrifugal force;

- **Combination volume- and flow-based** – a method for treatment measures that are designed for both storage of a volume of water and flow through a filtration media.

The City of Santa Clara's stormwater permit provides several options for design criteria for volume- and flow-based treatment measures. The City has reviewed these options and developed a simplified design approach that reflects the rainfall and runoff characteristics typical of City projects. Use of the simplified approach presented in these worksheets is encouraged by City staff for design of treatment measures for most projects.

**Table 1. Flow- and Volume-Based Treatment Measure Sizing Criteria**

| Type of Treatment Measure | LID? | Hydraulic Sizing Criteria |
|---|---|---|
| Bioretention area | Yes | Flow- or volume-based or combination |
| Flow-through planter box | Yes | Flow- or volume-based or combination |
| Tree well filter (biotreatment soil) | Yes | Flow-based |
| Infiltration trench | Yes | Volume-based |
| Subsurface infiltration system | Yes | Volume-based |
| Rainwater harvesting and reuse | Yes | Volume-based |
| Media filter | No | Flow-based |
| Extended detention basin | No | Volume-based |

## II. Type of Treatment Measure Proposed for Project

1. Does the treatment measure operate based on the volume of water? ___ Yes __✓__ No

   *If Yes, continue to Section III.—Sizing for Volume-Based Treatment Controls on page 2.*

2. Does the treatment measure operate based on flow through the unit? _✓_ Yes ____ No

   *If Yes, continue to Section IV.—Sizing for Flow-Based Treatment Controls on page 5.*

 **Stormwater Treatment Sizing Requirements Worksheets**

## III.    City of Santa Clara Simplified Method for Sizing Volume-Based Controls

The City's permit allows two methods for sizing volume-based controls—the Urban Runoff Quality Management method (URQM Method) or the California Stormwater Best Management Practice[1] (BMP) Handbook Method.  The City of Santa Clara has selected a preferred method from these two to conduct sizing of volume-based controls.  The simplified method is based on several assumptions and uses parameters specific to the City of Santa Clara.

The simplified method utilizes the California BMP Handbook Method, adapted based on local conditions, and the San Jose rain gauge curves. This simplified approach makes the following assumptions:

A.  The project site slopes are close to 1% or less.

B.  The soils are either clay or heavily compacted.

The equation that will be used to size the BMP is:

BMP Volume  =  (Correction Factor)  ×  (Unit Storage)  ×  (Drainage Area to the BMP)

**Step 1**:  Determine the percent imperviousness of the area draining to the BMP.

a.   Determine the drainage area for the BMP: _____ acres

b.   Determine the amount of impervious surface area in the drainage area: _____ acres

c.   Determine percent imperviousness of the drainage area: _____%

% impervious area = (amount of impervious area/drainage area for the BMP) × 100

% impervious area = _____

**Step 2**:  Find the unit storage volume for capture of 80% of annual runoff (inches)—assuming clay soil and ≤1% slope.

a.   Using the site imperviousness value from **Step 1.c.** above and **Table 2** below, obtain the unit storage volume. _____(inches)

---

[1] For the purpose of this worksheet, a stormwater best management practice, or BMP, is the same as a stormwater treatment measure or device.

 **Stormwater Treatment Sizing Requirements Worksheets**

**Table 2: Unit Storage Volume for 80% Capture[2]**
*(assuming 1% slope, San Jose Airport Rain Gauge, clay soils)*

| Percent Site Imperviousness | Unit Basin Storage for 80% Capture (inch) |
|---|---|
| 30% | 0.36 |
| 35% | 0.37 |
| 40% | 0.38 |
| 45% | 0.39 |
| 50% | 0.40 |
| 55% | 0.42 |
| 60% | 0.44 |
| 65% | 0.46 |
| 70% | 0.47 |
| 75% | 0.49 |
| 80% | 0.51 |
| 85% | 0.53 |
| 90% | 0.55 |
| 95% | 0.57 |
| 100% | 0.58 |

---

[2] Source: SCVURPPP C.3. Stormwater Handbook, April 2012. Appendix B, Figure B-2: "Unit Basin Volume for 80% Capture – San Jose Airport Rain Gage."

SW Treatment Sizing Worksheet_rev May 2012    EOA, Inc.                    Page 3 of 7



**Stormwater Treatment Sizing Requirements Worksheets**

**Step 3:** Determine the mean annual rainfall at the site to determine the correction factor.

a.  Locate the project site on **Figure 1**. Estimate the mean annual rainfall at the location of the project: _____inches

(Each line on Figure 1, called a rainfall isopleth, indicates locations where the same amount of rainfall falls on average each year (e.g., the isopleth marked 14 indicates that areas crossed by this line average 14 inches of rainfall per year). If the project location is between two lines, estimate the mean annual rainfall depending on the location of the site—your estimate should be between 13 and 16 inches.)

b.  The San Jose Airport gauge is the nearest rain gauge. Its mean annual rainfall is 13.9 inches. Determine the correction factor for the rainfall at the site using the information from **Step 3.a.**, and the San Jose Airport rain gauge.

Correction Factor = mean annual rainfall at the site (from Step 3.a.)/13.9 inches

Correction Factor: _____

**Step 4:** Size the BMP, using the following equation:

BMP Volume = (Correction Factor) × (Unit Storage Volume) × (Drainage Area to BMP)

BMP Volume = (Step 3.b.) × (Step 2.a. (in.)) × (Step 1.a. (ac.)) × 43,560 $ft^2$/ac ÷ 12 in./ft.

**BMP Volume = _____ cubic feet**

 **Stormwater Treatment Sizing Requirements Worksheets**

## IV.   City of Santa Clara Simplified Method for Sizing Flow-Based Treatment Measures

The City's permit allows three methods for sizing flow-based treatment measures—the Factored Flood Flow Method (10% of the 50-year peak rainfall intensity); the California BMP Handbook Method (the flow produced by a rain event equal to at least 2 times the 85th percentile hourly rainfall intensity); or the Uniform Intensity method (the flow produced by a rain event equal to 0.2 inches/hour). The City of Santa Clara has selected the California BMP Handbook Method for sizing of flow-based controls. The Uniform Intensity method may also be used.

### California BMP Handbook Flow Approach

The design rainfall intensity (I) is twice the 85th percentile value. The 85th percentile hourly rainfall intensity for San Jose Airport rain gauge is <u>0.087 in /hr</u>. Therefore, the design rainfall intensity that is equivalent to twice the 85th percentile storm event for the San Jose Airport rain gauge is **0.17 in /hr.**

The intensity represents the rate of rainfall (a depth per hour) and needs to be converted to a flow of runoff from the drainage area to the BMP.

The flow is calculated using the rational formula $Q = CIA$, where:

   Q is the flow in cubic feet per second (cfs),

   C is the runoff coefficient of the drainage area to the BMP

   I is the design intensity, adjusted for project location (in/hr), and

   A is the area <u>draining to the BMP</u> (acres)

**Step 1.** Determine the drainage area (A) for the BMP in acres: <u>1.2          </u> ac.

**Step 2.** Determine the amount of impervious area draining to the BMP (acres): <u>1.2     </u> ac.

**Step 3.** Determine the impervious ratio, *i:*      (not the same as "I", the rainfall intensity)

   $i$ = (percent imperviousness of drainage area for BMP) ÷ 100
           -- OR --
   $i$ = amount of impervious area (acres)/drainage area for the BMP (A) (acres)

   $i$ = <u>1           </u> (range will be from 0-1)

 **Stormwater Treatment Sizing Requirements Worksheets**

**Step 4.** Determine the runoff coefficient, C, using **Table 3** below
OR the following equation, where $i$ = impervious ratio from **Step 3**.

$$C = 0.858i^3 - 0.78i^2 + 0.774i + 0.04$$

$C =$ $\underline{\text{0.89}}$

## Table 3: Runoff Coefficients "C"

| Site Imperviousness $(i)$ | Runoff Coefficient C |
|---|---|
| 0.00 | 0.04 |
| 0.05 | 0.08 |
| 0.10 | 0.11 |
| 0.15 | 0.14 |
| 0.20 | 0.17 |
| 0.25 | 0.20 |
| 0.30 | 0.23 |
| 0.35 | 0.25 |
| 0.40 | 0.28 |
| 0.45 | 0.31 |
| 0.50 | 0.34 |
| 0.55 | 0.37 |
| 0.60 | 0.41 |
| 0.65 | 0.45 |
| 0.70 | 0.49 |
| 0.75 | 0.54 |
| 0.80 | 0.60 |
| 0.85 | 0.66 |
| 0.90 | 0.73 |
| 0.95 | 0.81 |
| 1.00 | 0.89 |

**Step 5.** Determine the mean annual rainfall at the site to determine the correction factor for the design rainfall intensity.

    a. Locate the project site on **Figure 1**. Estimate the mean annual rainfall at the location of the project: $\underline{\text{13.8}}$ inches

    (Each line on Figure 1, called a rainfall isopleth, indicates locations where the same amount of rainfall falls on average each year (e.g., the isopleth marked 14 indicates that areas crossed by this line average 14 inches of rainfall per year). If the project location is between two lines, estimate the mean annual rainfall depending on the location of the site—your estimate should be between 13 and 16 inches.)

 **Stormwater Treatment Sizing Requirements Worksheets**

b. The San Jose Airport gauge is the nearest rain gauge. Its mean annual rainfall is 13.9 inches. Determine the correction factor for the rainfall at the site using the information from **Step 5.a.**, and the San Jose Airport rain gauge.

Correction Factor = mean annual rainfall at the site (from Step 5.a.)/13.9 inches

Correction Factor: __0.99__

**Step 6.** Determine the design flow (Q) using Q = CIA, where C is the runoff coefficient, I is the adjusted design intensity (in/hr), and A is the drainage area for the BMP (acres)

Q = CIA = (Runoff Coefficient) × (Rainfall intensity) × (Correction factor) × (Drainage area to BMP)

Q = (**Step 4**) × (0.17 in/hr) × (**Step 5.b.**) × (**Step 1** (acres))

Q = __0.18__ cfs [3]

---

[3] No conversion factor for correct units is needed for the rational formula because (1 acre-in/hr) × (43,560 sq.ft/acre) × (1ft/12 in) × (1hr/3600 sec) = 1 ft$^3$/ sec or cfs.

SW Treatment Sizing Worksheet_rev May 2012    EOA, Inc.                                    Page 7 of 7

## O. **EXHIBIT K**

*Exhibit K — "Santa Clara Square Apartments EIR Hydrology Study," dated August 17, 2015 (hydrology and stormwater analysis for the apartments adjacent to 3250 Scott Blvd).*

**APPENDIX 4.7**

**Hydrology Study**

**Civil Engineering Associates**

224 Airport Parkway
Suite 525
San Jose, CA  95110
Phone: (408) 453-1066
Fax: (408) 453-1060

August 17, 2015                                                                                          14-101

Carlene Matchniff
**IRVINE COMPANY**
690 N McCarthy Blvd, Ste 100,
Milpitas, CA 95035

**RE: Santa Clara Square Apartments EIR Hydrology Study**

Dear Carlene,

The purpose of this study is to provide an analysis of the proposed project's impact in terms of hydrology and stormwater quality.  The study has been divided into 4 basic components as outlined below:

    A.  Existing and Planned Storm Drainage Infrastructure
    B.  Proposed Types of Stormwater Treatment
    C.  Best Management Practices (BMPs) and related NPDES Compliance
    D.  Summary of Change in Runoff due to Proposed Project

**A.  Existing and Planned Storm Drainage Infrastructure**

The proposed project is located in the central portion of the City of Santa Clara on Scott Boulevard – between Bowers Avenue and San Tomas Aquino Creek.  Currently the project site is developed with a number of commercial/business park buildings, parking lots, internal roadways, and landscaping.  Seven parcels (APNs 216-45-022, 216-45-023, 216-45-024, 216-29-112, 216-29-053 and portions of 216-45-011, 216-45-028 & 216-45-025) comprise the project site.  Six of the eight parcels are located to the north of Scott Boulevard and two parcels are located to the south of Scott Boulevard.  The San Tomas Aquino Creek Trail runs along the eastern boundary of the project site.

The existing sites drain primarily drain via onsite private storm drain systems which are connected to the existing systems through public manholes or catch basin connections.  Some smaller areas drain overland to the public streets and the drainage is collected into the public systems via street catch basins.

There are three primary storm drainage systems adjacent to the project.  One runs from west to east within Scott Boulevard from Montgomery Dr. to the San Tomas Aquino Creek and ranges in size from 21" to 27" along the project frontage.  Another runs from south to north within Octavius Drive and then extends to San Tomas Aquino Creek through private property via public easements.  This system ranges in size from 15" to 21" along the project frontage.  The remaining system is comprised of a network of pipes within Scott Boulevard, Bowers Avenue, Montgomery Drive, and Augustine Drive.  It consist pipes ranging in size from 18" to 24" along the project frontage and ultimately works its way under Highway 101 to the north and then east to San Tomas Aquino Creek via a 60" outfall.

There is one additional existing public storm drain system in the area which runs along the southern boundary of APN's 216-29-053 and 216-29-112 in a public easement.  This system varies in size



from 24" to 27" along the project frontage and runs from east to west and ultimately outfalls into San Tomas Aquino Creek.

The San Tomas Aquino Creek is separated from the project by the San Tomas Aquino Creek Trail which is elevated approximately 4-6' above the current and proposed project.  The creek is channelized with concrete at the under crossing of Scott Boulevard and the concrete surface continues through the project frontage to the south.  Just to the north of the undercrossing of Scott Boulevard the channel becomes earthen but is again channelized in concrete at the undercrossing of Highway 101 to the north.

The project primarily proposes to reuse the existing storm drain connections from the existing developments to reduce impacts on the public infrastructure but will also include some additional connections.  The public storm drainage infrastructure shall remain primarily untouched and the project does not propose to modify the existing drainage systems in any significant way.

## B.  Proposed Types of Stormwater Treatment

As a part of complying with current National Pollutant Discharge Elimination System (NPDES) permitting and the local government Municipal Regional Permit (MRP), projects of this size are required to implement Low Impact Development (LID) measures to reduce stormwater runoff and mimic site predevelopment hydrology.

LID promotes minimizing disturbed areas and impervious cover and utilizing infiltration, storage, evapotranspiration (evaporating stormwater into the air directly or through plant transpiration) and/or biotreating stormwater runoff onsite.

Based on the criteria for determining the appropriate type of LID treatment, the project proposes primarily to utilize a system of distributed biotreatment areas.  The basic design concept is to route flows from impervious surfaces into biotreatment areas for treatment prior to discharging the stormwater into the public storm drain system.

In addition, the NPDES and MRP regulations require certain projects to implement Hydromodification Management (HM) controls.  HM controls limit runoff from proposed projects to predevelopment levels.  Due to the fact that proposed project will be reducing impervious surfaces and thus reducing overall runoff, the project is not considered an HM project and is not required to implement HM controls.

The project is also located within an area identified on the City of Santa Clara HM Applicability Map as "Catchments Draining to Hardened Channel and/or Tidal Areas". Any project located within one of these areas is also exempt from HM requirements.

## C.  Best Management Practices (BMPs) and related NPDES Compliance

In addition to the LID stormwater treatment requirements that control project design and post construction water treatment, the State NPDES General Construction Permit sets requirements for protection measures during the construction of a project.  These measures are generally referred to as Best Management Practices (BMPs).

2



The General Permit requires projects that disturb one acre or more of land to file a Notice of Intent with the State Water Resources Control Board and develop a Storm Water Pollution Prevention Plan (SWPPP) which includes an Erosion Control Plan.  These documents outline how the project will protect against stormwater pollution and more specifically outline which BMPs will be utilized and how.  These documents are required to be prepared and submitted to the State prior to any earth disturbing activities.

The final design of the SWPPP and Erosion Control Plan will be done prior to construction.  The California Stormwater Quality Association has generated an advisory BMP Handbook which outlines and details a number of BMPs.  This Handbook is often utilized as a source for developing the site specific BMPs.  Listed below are a number of typical BMPs and their CASQA Handbook detail number for reference that will potentially be implemented with the construction of the proposed project.

| GENERAL BMP CATEGORY | TYPICAL BMPs UTILIZED AND CASQA DETAIL REFERENCE |
| --- | --- |
| Erosion Control | EC-1 Scheduling |
| | EC-2 Preservation of Existing Vegetation |
| Sediment Control | SE-2 Sediment Basin |
| | SE-5 Fiber Roll |
| | SE-7 Street Sweeping & Vacuuming |
| | SE-10 Storm Drain Inlet Protection |
| Tracking Control | TC-3 Maintain Paved Driveway |
| | TC-1 Stabilized / Rocked Entry |
| Wind Erosion | WE-1 Wind Erosion Control  - Water Down Site |
| Non-Stormwater Management | NS-6 Illicit Connection/Discharge |
| | NS-7 Potable Water/Irrigation |
| | NS-12 Concrete Curing |
| | NS-13 Concrete Finishing |
| Waste Management | WM-3 Stockpile Management |

The final SWPPP and Erosion Control design shall implement BMPs which prevent impacts to the existing storm infrastructure and the adjacent San Tomas Aquino Creek.  With proper design and implementation the proposed project should not impact the adjacent creek in any significant way.


**D.   Summary of Change in Runoff due to Proposed Project**

The existing project site is roughly 33.4 acres and is comprised of approximately 6.6 acres of pervious surface (primarily landscaping and unpaved areas) and the remainder being impervious surface (parking, roofs, driveways, etc.).  The proposed development will have approximately 9.5 acres of pervious surface with the remainder being impervious.  This results in a net increase in pervious surface of approximately 2.9 acres and an equivalent amount of impervious surface reduction.

As part of the construction level design of the project, the final onsite storm pipe routing and plumbing plans will be completed.  At that time a specific set of hydraulic calculations will be performed to confirm final pipe sizing for the onsite storm drain system as well as the connections to the public storm drain system.



Based on the fact that the proposed project will be reducing impervious surface it can be generally assumed that the project will not have a significant impact on the public infrastructure and can be further deduced that the impacts on the public system will actually be reduced.

John Gaylord
R.C.E. #62516

## P.  <u>EXHIBIT L</u>

*Exhibit L — "Geotechnical Investigation, Santa Clara Square," dated July 24, 2015 (discussing site geology and hydrology, including the artesian aquifer and artesian conditions, at the apartments adjacent to 3250 Scott Blvd).*

**APPENDIX 4.13**

**Geotechnical Investigation Reports**

# GEOTECHNICAL INVESTIGATION
# SANTA CLARA SQUARE
# Santa Clara, California

**Prepared For:**
**The Irvine Company**
**Newport Beach, California**

**Prepared By:**
**Langan Treadwell Rollo**
**4030 Moorpark Avenue, Suite 210**
**San Jose, California  95117**



**Serena Jang, G.E.**
**Senior Project Manager**

**John Gouchon, G.E.**
**Principal/Vice President**

**24 July 2015**
**770612501**

**LANGAN TREADWELL ROLLO**

4030 Moorpark Avenue, Suite 210     San Jose, CA 95117     T: 408.551.6700     F: 408.551.0344     www.langan.com

New Jersey  •  New York  •  Virginia  •  California  •  Pennsylvania  •  Connecticut  •  Florida  •  Abu Dhabi  •  Athens  •  Doha  •  Dubai  •  Istanbul

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page i*

## TABLE OF CONTENTS

1.0    **INTRODUCTION** ................................................................................ 1

2.0    **SCOPE OF SERVICES** ...................................................................... 2

3.0    **FIELD EXPLORATION AND LABORATORY TESTING** .................. 3
     3.1    **Borings** ..................................................................................... 3
     3.2    **Cone Penetration Test** .............................................................. 4
     3.3    **Laboratory Testing** ................................................................... 5
     3.4    **Soil Corrosivity Testing** ........................................................... 5

4.0    **SITE AND SUBSURFACE CONDITIONS** ....................................... 6
     4.1    **Existing Site Conditions** .......................................................... 6
     4.2    **Subsurface Conditions** ............................................................ 6

5.0    **SEISMIC AND GEOLOGIC HAZARDS** .......................................... 9
     5.1    **Regional Seismicity** ................................................................. 9
     5.2    **Fault Rupture** ......................................................................... 11
     5.3    **Liquefaction and Associated Hazards** ................................. 11
         5.3.1    **Liquefaction** .............................................................. 12
         5.3.2    **Cyclic Densification** .................................................. 12
         5.3.3    **Lateral Spreading** ..................................................... 12
     5.4    **Tsunami** ................................................................................. 13

6.0    **DISCUSSION AND CONCLUSIONS** ............................................ 13
     6.1    **Expansive Soil Considerations** .............................................. 14
     6.2    **Foundations and Settlement** ................................................. 14
     6.3    **Groundwater Considerations** ................................................ 16
     6.4    **Excavation and Monitoring** ................................................... 16
     6.5    **Corrosion Potential** ............................................................... 17

7.0    **RECOMMENDATIONS** ................................................................. 18
     7.1    **Earthwork** ............................................................................... 18
         7.1.1    **Site Preparation** ........................................................ 18
         7.1.2    **Quality Control of Lime Treatment** ........................... 20
     7.2    **Foundations** ........................................................................... 21
         7.2.1    **Spread Footing Foundations** .................................... 21
         7.2.2    **Mat Foundation** ......................................................... 22
         7.2.3    **P-T Slab Foundation** ................................................. 23
     7.3    **Floor Slab** .............................................................................. 25
     7.4    **Below-Grade Walls** ................................................................ 27
         7.4.1    **Retaining Walls** ......................................................... 27
         7.4.2    **Swimming Pool Considerations** ................................ 30
     7.5    **Shoring Design** ...................................................................... 30
         7.5.1    **Tieback Design Criteria and Installation Procedure** ... 31
         7.5.2    **Tieback Testing** ......................................................... 32
         7.5.3    **Penetration Depth of Soldier Piles** ........................... 33
     7.6    **Drainage and Dewatering Systems** ...................................... 34
     7.7    **Construction Monitoring** ........................................................ 34
     7.8    **Concrete Pavement and Exterior Slabs** ............................... 35

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page ii

## TABLE OF CONTENTS (Cont.)

**7.9     Seismic Design**............................................................................**35**
**7.10    Asphalt Pavements**......................................................................**36**
**7.11    Utilities** ........................................................................................**37**
**7.12    Site Drainage**...............................................................................**38**
**7.13    Landscaping** ................................................................................**38**
**7.14    Bioretention Systems** .................................................................**38**

**8.0     ADDITIONAL GEOTECHNICAL SERVICES**....................................**39**

**9.0     LIMITATIONS** ..................................................................................**40**

**REFERENCES**

**FIGURES**

**APPENDICES**

**DISTRIBUTION**

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page iii*

**LIST OF FIGURES**

Figure 1        Site Location Map

Figure 2        Site Plan with Existing Buildings

Figure 3        Site Plan with Proposed Development

Figure 4        Map and Major Faults and Earthquake Epicenters in
                the San Francisco Bay Area

Figure 5        Modified Mercalli Intensity Scale

Figure 6        Design Parameters for Soldier-Pile-and-Lagging Temporary Shoring
                System

**LIST OF APPENDICES**

Appendix A    Logs of Test Borings

Appendix B    Cone Penetration Tests

Appendix C    Laboratory Data

Appendix D    Soil Corrosivity Evaluation and Recommendations for Corrosion Control

Appendix E    Historical Groundwater Levels at Nearby Monitoring Wells

**LANGAN TREADWELL ROLLO**

# GEOTECHNICAL INVESTIGATION
# SANTA CLARA SQUARE
### Santa Clara, California

## 1.0    INTRODUCTION

This report presents the results of the geotechnical investigation by Langan Treadwell Rollo for the proposed Santa Clara Square development in Santa Clara, California.   The approximate location of the site is shown on Figure 1.

The site is bound by Augustine Drive to the north, San Tomas Aquino Creek Trail to the east, Scott Boulevard to the south and future retail to the west and encompasses approximately 28 acres.   It is currently occupied by several one- to two-story office buildings that are surrounded by paved parking lots and landscaping as shown on Figure 2.   It is relatively flat, with ground surface elevations ranging from approximately Elevation 26 to 32 feet[1] (HMH Engineers, 2014).

The proposed Residential Phase development includes six residential buildings, designated as B1 through B6, as shown on Figure 3.   The proposed buildings will be as follows:

- Building B1 will have a two- to three-story concrete podium with four-stories of Type V or Type III wood-framed structures wrapped around a Type I four-story concrete parking garage.   The building will be at-grade.

- Building B2 will be a four-story Type III wood-framed structure wrapped around a Type I four-story concrete parking garage; the parking garage and the wood-framed structure will be at-grade.

- Buildings B3 through B6 will be five-story Type III wood-framed structures wrapped around a Type I five-story concrete parking garage; the parking garage and the wood-framed structure will be at-grade.

---

[1]    All elevations reference elevations from "TOPO and Boundaries Map" dated 1/14/14 (HMH Engineers, 2014)

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 2*

Based on correspondences from PASE and DCI, the project structural engineers, preliminary building loads (dead plus live loads) for the project are:

- wood framed structures (five-story) range from 480 psf to 610 psf (uniform load).

- concrete parking structure range from 165 kips to 445 kips (column load).

In addition, site improvements will include a new private roadway west of Building B1 and B2, two new swimming pools and landscape improvement around the new buildings as shown on Figure 3.

## 2.0   SCOPE OF SERVICES

Our scope of services was outlined in our proposal dated 9 July 2013.  The purpose of our investigation was to provide geotechnical design recommendations for the proposed development.  Our services included reviewing available information in our files of nearby sites, exploring the site by drilling 16 borings, performing 21 Cone Penetration Tests (CPTs) and performing laboratory tests and engineering analyses to develop conclusions and recommendations regarding:

- anticipated subsurface conditions including groundwater levels

- 2013 California Building Code (CBC) site classification, mapped values $S_S$ and $S_1$, modification factors $F_a$ and $F_v$ and $S_{MS}$ and $S_{M1}$

- site seismicity and potential for seismic hazards including liquefaction, lateral spreading, fault rupture

- appropriate foundation type(s) including shallow foundations and alternatives for deep foundations, as necessary

- design parameters for the recommended foundation type(s), including vertical and lateral capacities and associated estimated settlements

- subgrade preparation for slab-on-grade floors and exterior slabs and flatwork, including sidewalks

- site preparation, grading, and excavation, including criteria for fill quality and compaction

**LANGAN TREADWELL ROLLO**

- soil corrosivity with a brief evaluation

- construction considerations

## 3.0    FIELD EXPLORATION AND LABORATORY TESTING

We began our investigation by reviewing previous geotechnical investigations performed in the vicinity of the site. To further investigate subsurface conditions at the site, we drilled 16 test borings and performed 21 Cone Penetration Tests (CPTs).

Prior to performing the field exploration, we:

- obtained soil boring/monitoring well permit from the Santa Clara Valley Water District (SCVWD)

- notified Underground Service Alert

- checked the boring locations for underground utilities using a private utility locator

Details of the field exploration activities and laboratory testing are described in the remainder of this section.

### 3.1    Borings

The approximate locations of the borings drilled at the site are shown on Figures 2 and 3. The borings were drilled on 8 through 10 April 2014 by Exploration Geoservices Inc. using a truck mounted hollow stem auger drill rig.

Eleven borings, designated as B1-1, B1-2, B2-1, B3-1, B4-1, B4-2, B5-1, B6-1 and B6-2, were drilled to a depth of approximately 45 feet below ground surface (bgs). In addition, five shallow borings designated as BP-1 through BP-5 were drilled to a depth of approximately 11½ feet bgs. During drilling, our field engineer logged the borings and obtained representative samples of soil encountered for visual classification and laboratory testing.

Logs of test borings are presented in Appendix A on Figures A-1 through A-14. The soil encountered in the borings was classified in accordance with the Classification Chart, presented on Figure A-15. All borings were backfilled with cement grout at the completion of drilling in accordance with the requirements of SCVWD.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 4*

Samples were obtained using the following split-barrel sampler types.

- Standard Penetration (SPT) sampler with a 2.0-inch-outside diameter and a 1.5-inch-inside diameter, without liners;

- Sprague and Henwood (S&H) sampler with a 3.0-inch-outside diameter, 2.5-inch-inside diameter, lined with 2.43-inch-inside diameter, stainless-steel tubes.

The sampler types were chosen on the basis of soil type and desired sample quality for laboratory testing. In general, the S&H sampler was used to obtain samples in medium stiff to very stiff cohesive soils. The SPT sampler was used to evaluate the relative density of granular soils.

The SPT and S&H samplers were driven with a 140-pound, above ground, safety hammer falling 30 inches. The SPT and S&H samplers were driven up to 18 inches and the hammer blows required to drive the samplers every six inches of penetration were recorded and are presented on the boring logs. A "blow count" is defined as the number of hammer blows per six inches of penetration. In all cases, the samples were driven 18 inches. The blow counts required to drive the S&H and SPT samples were converted to approximate SPT N-values using factors of 0.6 and 1.0, respectively, to account for sample type and hammer energy (Mobile 61 hammer) and are shown on the boring logs.

The blow counts used for this conversion were the last two blow counts of the 18-inch drive.

Upon completion of the borings they were backfilled with grout consisting of cement, bentonite, and water in accordance with the requirements of SCVWD. The soil cuttings and drilling fluid were placed in 55-gallon drums stored temporarily at the site, tested, and were eventually transported off-site for proper disposal.

## 3.2    Cone Penetration Test

The CPTs (designated as C1-1 through C1-3, C2-1 through C2-3, C3-1 through C3-4, C4-1, C4-2, C5-1 through C5-4, C6-1 through C6-3 were performed from 7 through 11, 14 and 15 April 2014 by John Sarmiento and Associates (JSA) at the approximate locations shown on Figures 2 and 3. The CPTs were advanced to depths of approximately 82 to 100 feet bgs.

The CPTs were performed by hydraulically pushing a 1.4-inch-diameter, cone-tipped probe, with a projected area of 15 square centimeters, into the ground. The cone tip measures tip resistance, and the friction sleeve behind the cone tip measures frictional resistance. Electrical

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 5*

strain gauges or load cells within the cone continuously measured the cone tip resistance and frictional resistance during the entire depth of each probing. Accumulated data was processed by computer to provide engineering information, such as the types and approximate strength characteristics of the soil encountered. The CPT logs, showing tip resistance and friction ratio by depth, as well as interpreted SPT N-Values, friction angle, soil strength parameters, and interpreted soil classification, are presented in Appendix B on Figures B-1 through B-19. Soil types were estimated using the classification chart shown on Figure B-20.

Pore-pressure dissipation tests (PPDTs) were performed during the advancement of C1-3 and C3-3 at various depths. PPDTs are conducted at various depths to measure hydrostatic water pressures and to determine the approximate depth of the groundwater level. The variation of pore pressure with time is measured behind the tip of the cone and recorded. For this investigation, the duration of the tests range from approximately 317 to 525 seconds. The results of the two PPDTs are presented on Figures B-21 through B-22.

Upon completion of the field investigation, the CPT holes were backfilled with cement-bentonite grout in accordance with the requirements of SCVWD.

### 3.3    Laboratory Testing

The samples recovered from the field investigation were examined to verify their soil classification, and representative samples were selected for laboratory testing. Samples were tested to measure moisture content, fines contents, shear strength, plasticity (Atterberg Limits), R-value and compressibility, where appropriate. Results of the laboratory tests are included on the boring logs and in Appendix C.

### 3.4    Soil Corrosivity Testing

To evaluate the corrosivity of the soil near the foundation subgrade, we performed corrosivity tests on samples obtained from the upper 8.5 feet.  The corrosivity of the soil samples was evaluated by CERCO Analytical using the following ASTM Test Methods:

- Redox - ASTM D1498
- pH - ASTM D4972
- Resistivity (100% Saturation) – ASTM G57
- Sulfide – ASTM D4658M
- Chloride – ASTM D4327
- Sulfate – ASTM D4327

**LANGAN TREADWELL ROLLO**

The laboratory corrosion test results and a brief corrosivity evaluation are presented in Appendix D.

## 4.0    SITE AND SUBSURFACE CONDITIONS

The existing site and subsurface conditions observed and encountered, respectively, are discussed in this section.

### 4.1    Existing Site Conditions

The site is relatively flat, with the ground surface elevation ranging from Elevation 26.2 to 32.1 feet.  Currently, the site is occupied by one- to two-story office buildings and surrounding asphalt paving and landscaping.  As-built drawings are not available for the existing buildings.

San Tomas Aquino Creek Trail is located along the eastern property line.  Based on a topographic map (HMH Engineers, 2014), the bottom of the adjacent creek ranges from Elevation 15.5 feet to 19.6 feet.

Based on our review of historic aerial photographs from 1948 to 1968 (NETR Online, 2014), the site was previously orchard farmland.  A former segment of Saratoga Creek appears to have run through the site along the western boundary Building B1 and the eastern boundary of Building B5, as shown on Figure 3.  Based on the aerial photographs, the creek appears to have most likely been filled in between 1968 and 1980, as part of the existing development.

### 4.2    Subsurface Conditions

The surface material encountered in the borings and CPTs consists of six inches of asphalt concrete (AC) and aggregate base (AB).  Beneath the pavement section, the borings and CPTs indicate the site is underlain by alluvial deposits.  The upper 7 to 18 feet consists of stiff to hard clay.  Laboratory tests results indicate the near surface clay layer has moderate to high expansion potential[2] with plasticity indices ranging from 20 to 47, is overconsolidated[3] and has a compression ratio of 0.11.  Where tested, the undrained shear strengths of the near surface clays range from 2,310 to 3,390 pounds per square foot (psf).

---

[2]    Highly expansive soil undergoes large volume changes with changes in moisture content.
[3]    An overconsolidated clay has experienced a pressure greater than its current load.

**LANGAN TREADWELL ROLLO**

Medium stiff to stiff clay and sandy clay were encountered below the upper clay layer.  This layer is approximately 12 to 27 feet thick and has interbedded layers of loose to medium dense sand, silty sand and clayey sand from approximately one to seven feet in thickness.  Where tested, the undrained shear strengths of the clay range from 680 to 1,110 psf and the clay is overconsolidated and has compression ratios ranging of 0.10 to 0.17.

Below these layers are stiff to very stiff clay with interbedded layers of sand and gravel to the maximum depths explored of 100 feet.  Where tested, the undrained shear strength of the clays in the lower layer ranges from 1,840 to 4,530 psf.  A relatively continuous medium dense to very dense sand and gravel layer was encountered at depths of 25 to 38 feet in the borings and CPTs.  The thickness of the sand and gravel layer ranges from approximately 2 to 10 feet, with the exception of B6-1, where the sand layer appears to be greater than 18 feet thick.

The groundwater levels encountered in the borings during drilling and CPTs are summarized in Table 1.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 8*

**TABLE 1**
**Summary of Groundwater Elevations**
**Encountered During Drilling**

| Exploration Point | Approximate Ground Surface Elevation (feet)[1] | Date Measured | Groundwater Depth[2] (feet) | Approximate Groundwater Elevation (feet) |
|---|---|---|---|---|
| B1-1 | 30.0 | 4/10/14 | 17.0 | 13.0 |
| B1-2 | 29.5 | 4/10/14 | 12.0 | 17.5 |
| B2-1 | 30.3 | 4/10/14 | 14.5 | 15.8 |
| B3-1 | 27.0 | 4/10/14 | 11.0 | 16.0 |
| B4-1 | 30.0 | 4/8/14 | 16.0 | 14.0 |
| B4-2 | 31.0 | 4/9/14 | 9.0 | 22.0 |
| B5-1 | 29.6 | 4/9/14 | 9.0 | 20.6 |
| B6-1 | 30.5 | 4/9/14 | 12.0 | 18.5 |
| B6-2 | 29.5 | 4/9/14 | 11.0 | 18.5 |
| BP-1 | 28.9 | 4/8/14 | 9.0 | 19.9 |
| BP-2 | 29.3 | N/A | Groundwater not encountered | |
| BP-3 | 28.0 | N/A | Groundwater not encountered | |
| BP-4 | 29.8 | N/A | Groundwater not encountered | |
| BP-5 | 31.1 | N/A | Groundwater not encountered | |
| C1-1 | 29.5 | 4/14/14 | 9.0 | 20.5 |
| C1-2 | 29.2 | 4/14/14 | 8.0 | 21.2 |
| C1-3 | 29.8 | 4/11/14 | 8.0 | 21.8 |
| C2-1 | 30.5 | 4/14/14 | 8.7 | 21.8 |
| C2-2 | 30.5 | 4/14/14 | 8.0 | 22.5 |
| C2-3 | 30.7 | 4/14/14 | 9.6 | 21.1 |
| C3-1 | 27.0 | 4/11/14 | 8.0 | 19.0 |
| C3-2 | 27.5 | 4/15/14 | 2.2 | 25.3 |
| C3-3 | 29.7 | 4/10/14 | 8.6 | 21.1 |
| C3-4 | 30.3 | 4/10/14 | 8.0 | 22.3 |
| C4-1 | 28.0 | 4/9/14 | 10.1 | 17.9 |
| C4-2 | 28.2 | 4/9/14 | 7.0 | 21.2 |
| C5-1 | 30.4 | 4/10/14 | 5.7 | 24.7 |
| C5-2 | 29.5 | 4/10/14 | 8.0 | 21.5 |
| C5-3 | 31.0 | 4/9/14 | 7.7 | 23.3 |
| C5-4 | 29.4 | 4/9/14 | 9.0 | 20.4 |
| C6-1 | 32.0 | 4/8/14 | 9.8 | 22.2 |
| C6-2 | 31.2 | 4/8/14 | 8.0 | 23.2 |
| C6-3 | 29.2 | 4/8/14 | 8.0 | 21.2 |

Notes:

1.  Ground surface elevations taken from file titled "TOPO and Boundaries Map" dated 1/14/14 downloaded from project Buzzsaw site.

2.  Groundwater depths were recorded during drilling.  These depths may not represent stabilized levels, and groundwater levels may also fluctuate due to seasonal rainfall.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 9*

A groundwater monitoring and sampling summary report was prepared for the nearby former Synertek site (CH2MHill, 2015) located at 3050 Coronado Drive.  As part of the Synertek study, four groundwater monitoring wells, designated as MW-28A, MW-29A, MW-33A and MW-34A were located within the project site, as shown on Figures 2 and 3.  The historic groundwater levels for MW-28A, MW-29A, MW-33A and MW-34A are presented in Appendix E.

Based on the CH2MHill report, the vicinity around the project site has two aquifers, designated as A-aquifer and B-aquifer.  The A-aquifer generally extends approximately between 10 to 20 feet bgs and the B-aquifer extends approximately between 30 to 50 feet bgs.  Silty to sandy clays, ranging from 5 to 10 feet thick separates the two aquifers.  The CH2MHill report also discusses an artesian[4] condition was also observed in one of the Synertek site's monitoring wells within the B-aquifer.

During our investigation, the PPDTs conducted at C1-3 and C3-3 were performed in the B-aquifer at depths of 34.9 and 34.6 feet bgs, respectively.  The calculated head of groundwater was measured to be 10 to 13 feet above the ground surface elevation, indicating the sand and gravel layer may be an artesian aquifer.  Also, prior to the grouting of CPTs C5-2 and C6-3, groundwater was observed flowing out of the hole which also indicates artesian condition.

## 5.0    SEISMIC AND GEOLOGIC HAZARDS

### 5.1    Regional Seismicity

The major active faults in the area are the San Andreas, Monte Vista-Shannon, Hayward, and Calaveras faults.  These and other faults of the region are shown on Figure 4.  For each of the active faults within approximately 55 km from the site, the distance from the site and estimated mean characteristic Moment magnitude[5] [2007 Working Group on California Earthquake Probabilities (WGCEP) (2008) and Cao et al. (2003)] are summarized in Table 2.

---

[4]    An artesian aquifer is a confined aquifer containing groundwater under positive pressure.

[5]    Moment magnitude is an energy-based scale and provides a physically meaningful measure of the size of a faulting event.  Moment magnitude is directly related to average slip and fault rupture area.

**LANGAN TREADWELL ROLLO**

**TABLE 2**

**Regional Faults and Seismicity**

| Fault Segment | Approx. Distance from fault (km) | Direction from Site | Mean Characteristic Moment Magnitude |
|---|---|---|---|
| Monte Vista-Shannon | 12 | Southwest | 6.50 |
| Total Hayward | 14 | Northeast | 7.00 |
| Total Hayward-Rodgers Creek | 14 | Northeast | 7.33 |
| Total Calaveras | 16 | East | 7.03 |
| N. San Andreas – Peninsula | 17 | Southwest | 7.23 |
| N. San Andreas (1906 event) | 17 | Southwest | 8.05 |
| N. San Andreas – Santa Cruz | 23 | South | 7.12 |
| Zayante-Vergeles | 32.5 | South | 7.00 |
| San Gregorio Connected | 38.3 | West | 7.50 |
| Greenville Connected | 40 | East | 7.00 |
| Mount Diablo Thrust | 41 | Northeast | 6.70 |
| Monterey Bay-Tularcitos | 53 | Southwest | 7.30 |

Figure 4 also shows the earthquake epicenters for events with magnitude greater than 5.0 from January 1800 through December 2000. Since 1800, four major earthquakes have been recorded on the San Andreas Fault. In 1836 an earthquake with an estimated maximum intensity of VII on the Modified Mercalli (MM) scale (Figure 5) occurred east of Monterey Bay on the San Andreas Fault (Toppozada and Borchardt 1998). The estimated Moment magnitude, $M_w$, for this earthquake is about 6.25. In 1838, an earthquake occurred with an estimated intensity of about VIII-IX (MM), corresponding to a $M_w$ of about 7.5. The San Francisco Earthquake of 1906 caused the most significant damage in the history of the Bay Area in terms of loss of lives and property damage. This earthquake created a surface rupture along the San Andreas Fault from Shelter Cove to San Juan Bautista approximately 470 kilometers in length. It had a maximum intensity of XI (MM), a $M_w$ of about 7.9, and was felt 560 kilometers away in Oregon, Nevada, and Los Angeles. The most recent earthquake to affect the Bay Area was the Loma Prieta Earthquake of 17 October 1989, in the Santa Cruz Mountains with a $M_w$ of 6.9, approximately 39 km from the site.

In 1868 an earthquake with an estimated maximum intensity of X on the MM scale occurred on the southern segment (between San Leandro and Fremont) of the Hayward Fault. The estimated $M_w$ for the earthquake is 7.0. In 1861, an earthquake of unknown magnitude (probably a $M_w$ of about 6.5) was reported on the Calaveras Fault. The most recent significant earthquake on this fault was the 1984 Morgan Hill earthquake ($M_w = 6.2$).

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*                                                                                      *24 July 2015*
*Santa Clara Square*                                                                                                    *770612501*
*Santa Clara, California*                                                                                                 *Page 11*

The 2007 WGCEP at the U.S. Geologic Survey (USGS) predicted a 63 percent chance of a magnitude 6.7 or greater earthquake occurring in the San Francisco Bay Area in 30 years. More specific estimates of the probabilities for different faults in the Bay Area are presented in Table 3.

**TABLE 3**
**WGCEP (2008) Estimates of 30-Year Probability**
**of a Magnitude 6.7 or Greater Earthquake**

| Fault | Probability (percent) |
|---|---|
| Hayward-Rodgers Creek | 31 |
| N. San Andreas | 21 |
| Calaveras | 7 |
| San Gregorio | 6 |

## 5.2    Fault Rupture

Historically, ground surface ruptures closely follow the trace of geologically young faults. The site is not within an Earthquake Fault Zone, as defined by the Alquist-Priolo Earthquake Fault Zoning Act and no known active or potentially active faults exist on the site. Therefore, we conclude the risk of fault offset through the site from a known active fault is low. In a seismically active area, the remote possibility exists for future faulting in areas where no faults previously existed; however, we conclude that the risk of surficial ground deformation from faulting at the site is low.

## 5.3    Liquefaction and Associated Hazards

The site is in a seismically active area and will be subject to very strong shaking during a major earthquake. Strong ground shaking during an earthquake can result in ground failure such as that associated with soil liquefaction[6], lateral spreading[7], and cyclic densification[8]. Each of

---

[6]   Liquefaction is a transformation of soil from a solid to a liquefied state during which saturated soil temporally loses strength resulting from the buildup of excess pore water pressure, especially during earthquake-induced cyclic loading. Soil susceptible to liquefaction includes loose to medium dense sand and gravel, low-plasticity silt, and some low-plasticity clay deposits.

[7]   Lateral spreading is a phenomenon in which surficial soil displaces along a shear zone that has formed within an underlying liquefied layer. Upon reaching mobilization, the surficial blocks are transported downslope or in the direction of a free face by earthquake and gravitational forces.

[8]   Cyclic densification is a phenomenon in which non-saturated, cohesionless soil is compacted by earthquake vibrations, causing ground surface settlement.

**LANGAN TREADWELL ROLLO**

these conditions has been evaluated based on our literature review, field investigation and analyses, and is discussed in this section.

### 5.3.1    Liquefaction

The site is located within a zone designated with the potential for liquefaction, as identified by the California Geologic Survey (CGS) in a map titled, *State of California Seismic Hazard Zones, Milpitas Quadrangle*, prepared by the California Geologic Survey, dated October 19, 2004.

When saturated soil with little to no cohesion liquefies during a major earthquake, it experiences a temporary loss of shear strength as a result of a transient rise in excess pore water pressure generated by strong ground motion.  Flow failure, lateral spreading, differential settlement, loss of bearing, ground fissures, and sand boils are evidence of excess pore pressure generation and liquefaction.

Layers of loose to medium dense saturated sand and silty sand, varying in thickness from approximately six inches to six feet, were encountered below the groundwater level from depths of approximately 35 to 55 feet bgs.  Based on our analyses, we conclude several of these layers could potentially liquefy during a major earthquake and may experience liquefaction-induced settlement.

Following the procedures presented in the 1996 NCEER and the 1998 NCEER/NSF workshops on the Evaluation of Liquefaction Resistance of Soils (Youd and Idriss 2001) and a peak ground acceleration (PGA) of 0.4g based on the Design Earthquake (Section 7.6), we estimate liquefaction induced settlement of these layers could be on the order of ¼ to 1 inch.  Because the potentially liquefiable layers are discontinuous, we estimate that up to one inch of differential settlement may occur during an earthquake.

### 5.3.2    Cyclic Densification

Cyclic densification refers to seismically-induced differential compaction of non-saturated granular material (sand and gravel above the groundwater table) caused by earthquake vibrations.  The borings and CPTs indicate that the materials above the water table are predominantly composed of stiff to hard clayey soils, and therefore seismic densification is unlikely.

### 5.3.3    Lateral Spreading

Lateral spreading is a phenomenon in which a surficial soil displaces along a shear zone that has formed within an underlying liquefied layer.  The surficial blocks are transported downslope

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 13*

or in the direction of a free face, such as a channel, by earthquake and gravitational forces. Lateral spreading is generally the most pervasive and damaging type of liquefaction-induced ground failure generated by earthquakes.

The project site is 50 feet from the San Tomas Aquino Creek. According to Youd, Hansen, and Bartlett (1999), for significant lateral spreading displacements to occur, the soils should consist of saturated cohesionless sandy sediments with $(N_1)_{60}$ less than 15. The potentially liquefiable soil underlying the site generally has $(N_1)_{60}$ greater than 15 and therefore does not fall within the parameters applicable to the Youd, Hansen, and Bartlett lateral displacement model. Also, the site is relatively flat and the potentially liquefiable soils are not continuous, hence, we conclude widespread shear zones should not develop for significant lateral displacements to occur during liquefaction. Therefore, lateral spreading is not likely to affect the site.

## 5.4    Tsunami

Recent published maps (California Emergency Agency, 2009) indicate the project site is not within the tsunami inundation zone; therefore, we conclude the potential risk by inundation from tsunami to be low within the project site. However, the project civil engineer should evaluate the impact of sea level rise on the potential risk of inundation from a tsunami.

## 6.0    DISCUSSION AND CONCLUSIONS

From a geotechnical standpoint, the proposed project is feasible provided the site conditions and geotechnical issues discussed below are properly addressed during the design and construction of the proposed buildings. The primary geotechnical issues include:

- the presence of near surface expansive soil

- the presence of the former Saratoga Creek

- the presence of moderately compressible alluvial deposits

- the presence of shallow groundwater

- the potential for liquefaction-induced settlement

These issues and their impact on the geotechnical aspects of the project are discussed in the following subsections.

**LANGAN TREADWELL ROLLO**

**6.1      Expansive Soil Considerations**

The existing near-surface soil has a moderate to high expansion potential.   Moisture fluctuations in near-surface expansive soil could cause the soil to expand or contract resulting in movement and potential damage to improvements that overlie them.   Potential causes of moisture fluctuations include drying during construction, and subsequent wetting from rain, capillary rise, landscape irrigation, and type of plant selection.

For improvements at-grade, the volume changes from expansive soils can cause cracking of foundations, floor slabs and exterior flatwork.   Therefore, foundations, slabs and concrete flatwork should be designed and constructed to resist the effects of the expansive soil.   These effects can be mitigated by moisture conditioning the expansive soil and providing select, non-expansive fill below interior and exterior slabs and supporting foundations below the zone of severe moisture change.

An alternative to importing select fill includes lime treatment of the near surface soil.   Lime stabilization of the at-grade building pads and the subgrade of exterior flatwork and pavement may be a cost-effective means of improving on-site soils for use as non-expansive fill within the building pad.

If the surface soil becomes wet, it may be difficult to compact during the winter.   If required, the soil can be mixed with lime to aid in compaction.   Lime can also reduce the swell potential and increase the shear strength of the soil.

The degree to which lime will react with soil depends on such variables as type of soil, minerals present, quantity and type of lime, and the length of time the lime-soil mixture is cured.   The quantity of lime added generally ranges from 5 to 7 percent by weight and should be determined by laboratory testing.   If lime is intended to reduce swelling potential and/or increase the strength of the soil, the lime treatment contractor should collect a bulk sample of the soil and perform laboratory tests to determine if the lime will react with the soil, the amount of lime required and the resulting plasticity index.   We should be provided with the results to evaluate the effectiveness of the lime.

**6.2      Foundations and Settlement**

The proposed development will consist of 4- to 5-story wood-framed structures wrapped around concrete parking garages.   The proposed structures will be at-grade.

**LANGAN TREADWELL ROLLO**

We understand minor fills and cuts are planned for the remaining improvements of the project. If new fill is added at the site, we anticipate approximately ¼-inch and ½-inch of consolidation settlement for one and two feet of new fill, respectively.

The proposed buildings can be supported on shallow footings that are founded near the bottom of the zone of severe moisture change or with post-tensioned slabs-on-grade (P-T slabs) bearing on the stiff native alluvial soils.  Localized soft soil, if encountered under footing locations, should be excavated and recompacted or replaced with lean or structural concrete.

The proposed building sites are susceptible to the following potential sources of settlement:

- consolidation of the underlying alluvial deposits under the weight of new building loads or new fill

- liquefaction-induced settlement.

To evaluate the settlement of the site due to consolidation of the alluvial deposits under the weight of the new building loads, we performed laboratory consolidation tests on relatively undisturbed samples of the clay, as presented in Appendix C.  The test results indicate the alluvial clay generally has an OCR of 1.5 to 3.2.

Design recommendations for footings and the P-T slabs are presented in Section 7.2.  Based on the building loads provided by PASE and DCI, we estimate total static settlement of approximately ½-inch to 1 inch for P-T slabs.  For footings, the total consolidation settlements for footing are presented in Table 4.

**TABLE 4**

**Summary of Footing Settlement**

| Footing Type | Total Static Settlement (inch) |
|---|---|
| Spread Footing | ½ to 1 |
| Continuous Footing | ¼ to ½ |

Where adjacent continuous footings are relatively close (adjacent units), the total settlements will likely double.  Differential settlement between adjacent footings, typically 20 feet apart, should not exceed ½-inch.

**LANGAN TREADWELL ROLLO**

As discussed previously, we estimate that up to one inch of liquefaction-induced settlements may occur; differential settlement between columns may be on the order of ½ inch during a major earthquake.  These settlements are in addition to the predicted consolidation static settlement. The structural engineer should evaluate the impact of liquefaction-induced settlement to structures supported on shallow foundations.  If the total and differential settlements are not tolerable than a stiffer foundation system such as an interconnected grid system or mat should be used.

We understand the design team is considering preserving existing Redwood trees that occupy the area east of Buildings B3 and B5.  Trees with large roots or have high water demand should be avoided since they can dry out the soil beneath foundations and cause settlement.

## 6.3    Groundwater Considerations

The depth to groundwater can fluctuate by several feet depending upon the amount of rainfall, the level of the nearby San Tomas Aquino Creek and the amount of groundwater pumping and/or recharge in the local area.

Based on historic groundwater data at the project site (CH2MHill, 2015), the high historic groundwater appears to be at Elevation 23 feet at the southern portion of the site (along Scott Boulevard) and Elevation 20 feet on the northern portion of the site (along Augustine Drive). Based on the monitoring well information, the groundwater appears to flow generally south to north.  Therefore, we conclude a design groundwater elevation should be linearly interpolated between Elevation 24 feet at the southern portion of the site and Elevation 21 feet at the northern portion of the site.

The groundwater depths measured during our field investigation do not represent stabilized levels, and groundwater levels may also fluctuate due to seasonal rainfall.  Therefore, we have relied on the historic groundwater data (CH2MHill, 2015) to determine the design groundwater elevation.  The groundwater depths measured at CPT C1-3, C3-3, C5-2 and C6-3 indicate the sand and gravel layer at depths of approximately 35 feet bgs are under an artesian condition.  If excavations are not made into the sand and gravel layer approximately 35 feet bgs (B-aquifer), the artesian condition should not affect the project.

## 6.4    Excavation and Monitoring

The soil to be excavated from the site consists of materials that can be excavated with conventional earthmoving equipment such as loaders and backhoes, except where foundations

**LANGAN TREADWELL ROLLO**

and slabs of existing buildings are encountered.  Removal of these may require the use of jackhammers or hoe-rams.  Excavations resulting from the removal of foundations, slabs and underground utilities that extend below the bottom of the proposed foundation/floor level should be cleaned of any loose soil/debris and backfilled with lean concrete or properly compacted fill.

The surficial soil is clayey and moderately to highly plastic.  If earthwork is performed in wet weather conditions, it may be difficult to compact the soil; it may need to be aerated during dry weather.  Light grading equipment may be needed to avoid damaging the subgrade.

## 6.5    Corrosion Potential

CERCO Analytical performed tests on three soil samples from the site to evaluate corrosion potential to buried metals and concrete.  The results of the tests are presented in Appendix D and summarized in Table 5.

**TABLE 5**
**Summary of Corrosivity Test Results**

| Test Boring | Sample Depth (feet) | pH | Sulfate (ppm) | Resistivity (ohms-cm) | Redox (mV) | Chloride (ppm) |
|---|---|---|---|---|---|---|
| BP-1 | 0 to 5 | 8.33 | 110 | 9,600 | 400 | N.D |
| BP-3 | 6 to 8.5 | 8.17 | 49 | 17,000 | 350 | N.D |
| BP-5 | 0 to 5 | 7.98 | 130 | 9,800 | 420 | N.D |

N.D. = None Detected

Based upon resistivity measurements, the soil samples tested are classified as "mildly corrosive" to buried iron, steel, cast iron, ductile iron, galvanized steel and dielectric coated steel or iron.  The chemical analysis indicates reinforced concrete and cement mortar coated steel, should not be affected by the corrosivity of the soil.  To protect reinforcing steel from corrosion, adequate coverage should be provided as required by the building code.

A brief evaluation of the corrosivity of the soil samples is presented in Appendix D.  For more detailed recommendations regarding the corrosion protection of buried metals and concrete, a licensed corrosion consultant should be retained.

**LANGAN TREADWELL ROLLO**

## 7.0    RECOMMENDATIONS

From a geotechnical standpoint, the site can be developed as planned, provided the recommendations presented in this section of the report are incorporated into the design and contract documents.  Criteria for foundation design, together with recommendations for site preparation, floor slabs, fill placement and seismic design are presented in this section of the report.

### 7.1    Earthwork

The following subsections presents recommendations for site preparation and lime treatment.

7.1.1   Site Preparation

Demolition in areas to be developed should include removal of existing pavement and underground obstructions, including foundations of existing structures.  Any vegetation and organic topsoil should be stripped in areas to receive new site improvements.  Stripped organic soil can be stockpiled for later use in landscaped areas, if approved by the owner and architect; organic topsoil should not be used as compacted fill.

Demolished asphalt and concrete at the site may be crushed to provide recycled construction materials, including sand, free-draining crushed rock, and Class 2 aggregate base (AB) provided it is acceptable from an environmental standpoint.  Where crushed rock will be used beneath vapor retarders and in other applications where free-draining materials are required, it should have no greater than six percent of material passing the 3/8-inch sieve and meet the other requirements presented in Section 7.3.  Where recycled Class 2 AB will be used beneath pavements, it should meet requirements of the Caltrans Standard Specifications.  Recycled Class 2 AB that does not meet the Caltrans specifications should not be used beneath City streets, but it is acceptable for use as select fill within building pads and beneath concrete flatwork, provided it meets the requirements for select fill as presented later in this section.

Existing underground utilities beneath areas to receive new improvements should be removed or abandoned in-place by filling them with grout.  The procedure for in-place abandonment of utilities should be evaluated on a case-by-case basis, and will depend on location of utilities relative to new improvements.  However, in general, existing utilities within four feet of final grades should be removed, and the resulting excavation should be properly backfilled based on the recommendations presented in this section.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 19*

Prior to placing fill, the subgrade exposed after stripping and site clearing, as well as other portions of the site that will receive new fill or site improvements, should be scarified to a depth of at least eight inches, moisture-conditioned to at least three percent above the optimum moisture content, and compacted to at least 88 percent relative compaction[9], where the exposed material consists of moderately to highly expansive soil.  Where lean clay or sandy soil are encountered during grading, the scarified surface should be moisture-conditioned to above the optimum moisture content and compacted to at least 90 percent relative compaction.  An exception to this general procedure is within any proposed vehicle pavement areas, where the upper six inches of the pavement subgrade should be compacted to at least 95 percent relative compaction regardless of expansion potential.

We understand excavations on the order of five feet may be made to contain soils impacted from past agricultural activities. If this occurs,  we recommend the backfill for the excavation should be moisture-conditioned to at least three percent above the optimum moisture content and compacted to at least 88 to 92 percent relative compaction.

Heavy construction equipment should not be allowed directly on the final subgrade.  The clay exposed at the foundation level may be susceptible to disturbance under construction equipment loads.  If the subgrade is disturbed during the rainy season, it may be necessary to place a minimum 12-inch working pad consisting of crushed rock on top of the subgrade or lime treating the upper 12 inches of the subgrade to winterize it.  Any select fill placed during grading should meet the following criteria:

- be free of organic matter

- contain no rocks or lumps larger than three inches in greatest dimension

- have a low expansion potential (defined by a liquid limit of less than 40 and plasticity index lower than 12)

- have a low corrosion potential[10]

- be approved by the geotechnical engineer.

All fill placed beneath improvements should meet the criteria for select fill previously discussed in this section.  All select fill should be moisture-conditioned to above optimum moisture

---

[9]     Relative compaction refers to the in-place dry density of soil expressed as a percentage of the maximum dry density of the same material, as determined by the ASTM D1557-07 laboratory compaction procedure.

[10]    Low corrosion potential is defined as a minimum resistivity of 2,000 ohms-cm and maximum sulfate and chloride concentrations of 250 parts per million.

**LANGAN TREADWELL ROLLO**

Geotechnical Investigation
Santa Clara Square
Santa Clara, California

24 July 2015
770612501
Page 20

content, placed in horizontal lifts not exceeding eight inches in loose thickness, and be compacted to at least 90 percent relative compaction, except for fill that is placed within the proposed pavement areas.  In these situations, the upper six inches of the soil subgrade, all select fill and aggregate baserock materials should be compacted to at least 95 percent relative compaction.  Where used, sand containing less than 10 percent fines (particles passing the No. 200 sieve) should also be compacted to at least 95 percent relative compaction.  Samples of on-site and proposed import fill materials should be submitted to the geotechnical engineer for approval at least three business days prior to use at the site.

We recommend that at least 12 inches of select fill be placed above native soil in areas that will have concrete flatwork, and 18 inches beneath building slabs-on-grade.  Materials for capillary break (sand and gravel) should not count as part of the select fill.  The select fill should extend at least five feet beyond building footprints.  Select material should meet the criteria presented later in this section for select fill.

Alternatively, instead of placing select fill, the upper 18 inches of the existing surface soil in building pads may be lime treated to reduce the expansion potential and help winterize the site. We recommend that at least 5 percent lime by weight of the soil be used to treat the upper 18 inches of native soil for at-grade structures.  The lime treatment should extend at least five feet beyond building footprints where hardscape areas are planned; however, landscape areas should not be lime treated because the lime treated soil may make it difficult for the plants to survive.  In landscape areas adjacent to building footprints and exterior slabs, select fill should be placed.  The lime treatment contractor should evaluate the type and amount of lime to reduce the plasticity index of the soil to meet the select fill criteria.

7.1.2   Quality Control of Lime Treatment

Lime treatment of fine-grained soils generally includes site preparation, application of lime, mixing, compaction, and curing of the lime treated soil.  Field quality control measures should include checking the depth of lime treatment, degree of pulverization, lime spread rate measurement, lime content measurement, and moisture content and density measurements, and mixing efficiency.  Quality control may also include laboratory tests for unconfined compressive strength tests on representative samples.

The lime treatment process should be designed by a contractor specializing in its use and who is experienced in the application of lime in similar soil conditions.  Based on our experience with lime treatment, we judge that the specialty contractor should be able to treat the moderate to highly expansive on-site material to produce a non-expansive fill for building subgrade.

**LANGAN TREADWELL ROLLO**

If the lime treatment alternative is selected, we recommend that the specialty contractor prepare a treatment specification for our review prior to construction.

## 7.2    Foundations

The following subsections provide recommendations for P-T slab, spread footings and mat foundation for the proposed buildings.

### 7.2.1    Spread Footing Foundations

Spread footings may be used above the design groundwater table or where hydrostatic uplift is not a concern.  A firm subgrade consisting of native soil should be exposed at the bottom of the proposed footing excavations.  If isolated areas of soft material or fill are encountered in the bottom of the excavation, they should be removed to expose firm material.  Resulting overexcavations should be backfilled with lean or structural concrete.

The recommended bearing capacities for spread footings is 3,500 psf.  To reduce the potential for movement of the footings due to shrink and swell of the expansive clay, we recommend that perimeter footings be bottomed at least 36 inches below the lowest adjacent soil subgrade.  Interior footings should extend at least 30 inches below the lowest adjacent  soil subgrade (measured from the top of the select fill).

Footings should be at least 18 inches wide for continuous footings and 24 inches for isolated spread footings.  Footings adjacent to utility trenches (or other footings) should bear below an imaginary 1.5:1 (horizontal to vertical) plane projected upward from the bottom edge of the utility trench (or adjacent footings).

Lateral forces can be resisted by a combination of friction along the base of the footing, and passive resistance against the vertical faces of the foundation..  Frictional resistance should be computed using a base friction coefficient of 0.30.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation.  For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used.  Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If passive pressure on the walls is relied upon for lateral resistance, the walls should be designed to resist the passive pressure.  To calculate the passive resistance against the vertical faces of the footings, we recommend an equivalent fluid

*Geotechnical Investigation*                                                                       *24 July 2015*
*Santa Clara Square*                                                                                    *770612501*
*Santa Clara, California*                                                                                 *Page 22*

weight of 250 pounds per cubic foot (pcf). The upper foot should be ignored unless confined by a slab. The values for the friction coefficient and passive pressures include a factor of safety of 1.5.

Footing excavations should be free of standing water, debris, and disturbed materials prior to placing concrete. The bottoms and sides of the footing excavations or mat subgrade should be moistened following excavation and maintained in a moist condition until the capillary break or concrete are placed. If the foundation soil dries during construction, the footing will eventually heave, which may result in cracking and distress. We should check footing excavations prior to placement of reinforcing steel.

Positive surface drainage should be provided around the building to direct surface water away from the foundations. In addition, roof downspouts should be discharged into controlled drainage facilities to keep the water away from the foundations. If subdrains are used to keep water away from foundations, they should be placed above the groundwater table.

7.2.2   Mat Foundation

The recommended maximum bearing pressures and the associated design moduli of subgrade reaction for mats are presented in Table 6.

**TABLE 6**

**Mat Foundations**

| Building Configuration | Maximum Allowable Static Bearing Pressure (psf) | Modulus of Subgrade Reaction (kcf) |
|---|---|---|
| At-Grade | 3,500 | 30 |

The moduli values are representative of the anticipated settlement under the building loads and are based on the maximum allowable bearing pressure. The modulus of subgrade reaction is not linear and therefore larger settlements may occur if the bearing pressure exceeds those in Table 6. Higher maximum allowable bearing pressures may be acceptable; however, we will need to evaluate the higher stresses and the area effected by the higher stresses and determine if the modulus of subgrade reaction needs to be revised. Therefore, after the mat analysis is completed, we should review the computed settlement and bearing pressure

**LANGAN TREADWELL ROLLO**

distributions to check that the modulus value is appropriate.  Resistance to lateral loads can be mobilized by a combination of passive pressure acting against the vertical faces of the mat and friction along the base of the mat.  Passive resistance may be calculated using lateral pressures corresponding to an equivalent fluid weight of 250 pcf; the upper foot of soil should be ignored unless confined by a concrete slab or pavement.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation. For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used. Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If waterproofing is not used, frictional resistance should be computed using a base friction coefficient of 0.3.  These values include a factor of safety of about 1.5 and may be used in combination without reduction.

If weak or non-engineered fill is encountered in the mat excavation bottom, it should be over-excavated and replaced with engineered fill or lean concrete.  The bottom and sides of mat excavations should be wetted following excavation and maintained in a moist condition until concrete is placed.  If the foundation soil dries during construction, the foundation will heave when exposed to moisture, which may result in cracking and distress.

We should observe mat subgrade prior to placement of reinforcing steel.  The excavation for the mat should be free of standing water, debris, and disturbed materials prior to placing concrete.

7.2.3    P-T Slab Foundation

As discussed in Section 6.2, we estimated differential settlements (both static and seismic) of the ground.  Differential settlement across or within a building will depend on the rigidity of the P-T slab.  The proposed residential buildings may be supported on P-T slabs bearing on native material and engineered fill prepared in accordance with our previous recommendations.

For design of P-T slabs for seasonal differential movement, we recommend using the parameters presented in Table 7.  The P-T slabs should be checked for the edge-lift condition using special "no-swell" design equations specified by the Post Tensioning Institute (2008).

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*                                                                                      *24 July 2015*
*Santa Clara Square*                                                                                                   *770612501*
*Santa Clara, California*                                                                                               *Page 24*

**TABLE 7**
**P-T Slab Design Parameters**

| Parameter | Value | |
|---|---|---|
| | **Buildings West of Montgomery Drive** | **Buildings East of Montgomery Drive** |
| Thornwaite Moisture Index | 0 | |
| Edge moisture variation distance<br>edge lift<br>center lift | 3.5 feet<br>6.1 feet | 4.1 feet<br>7.8 feet |
| Depth to constant soil suction | 10 feet | |
| Constant soil suction | 3.7 pF | |
| Soil differential movement<br>edge lift<br>center lift | 3.7 inches<br>2.3 inches | 1.4 inches<br>1.0 inches |

The P-T slabs should be at least eight inches thick, with a thickened edge that is embedded at least 12 inches below the lowest adjacent outside grade or six inches below the water vapor retarder (part of capillary break), whichever is lower.  The maximum bearing pressure beneath P-T slabs should not exceed 3,500 psf for dead plus live loads and 4,700 psf under total load conditions.

To accommodate seismically induced settlement, we recommend each building area should be designed for soil differential movement of 1 inch in 40 feet and to span an unsupported area of 10 feet in diameter at any location within the interior, cantilever a distance of 3 feet along the edges and 5 feet at the corners.  This evaluation for "areas of non-support" is empirical and is not intended to model actual slab performance; the purpose of this evaluation is to establish foundation stiffness and to control differential movement.

We should check the P-T subgrade prior to placing reinforcing steel or a moisture barrier, if required.  The exposed subgrades and excavations for the deepened edge should be free of standing water, debris, and disturbed materials prior to placing concrete.  The bottom of the excavation should be kept moist before concrete is placed.  We should check the subgrade after cleaning, but prior to placement of crushed rock to check that loose to disturbed material

**LANGAN TREADWELL ROLLO**

has been removed and the subgrade is firm and non-yielding.  If loose, disturbed, or otherwise undesirable material is observed at the subgrade, it should be overexcavated to firm, competent material and be replaced with either engineered fill or concrete.

Resistance to lateral loads can be mobilized by a combination of passive pressure acting against the vertical faces of the P-T slab and friction along the base.  Passive resistance may be calculated using lateral pressures corresponding to an equivalent fluid weight of 250 pcf; the upper foot of soil should be ignored unless confined by a concrete slab or pavement.  If waterproofing is used, the allowable friction factor will depend on the type of waterproofing used at the base of the foundation. For bentonite-based waterproofing membranes, such as Paraseal and Voltex, a friction factor of 0.15 should be used. Friction factors for other types of waterproofing membranes should be provided by the manufacturer.  If waterproofing is not used, frictional resistance should be computed using a base friction coefficient of 0.3.  These values include a factor of safety of about 1.5 and may be used in combination without reduction.

Moisture is likely to condense on the underside of concrete floors, even if they are above the groundwater.  To reduce water vapor transmission through the floor slabs of habitable areas, we recommend installing a capillary moisture break and a water vapor retarder beneath the P-T slab, as discussed in Section 7.3 (unless the slab is waterproofed).

To reduce shrinkage and swelling beneath the P-T slab, we recommend a clay or concrete plug be installed where utilities enter beneath the building, as recommended in Section 7.11.

## 7.3    Floor Slab

Because expansive soil is present near the existing ground surface, an 18-inch thick layer of select fill should be placed beneath the floor slab for at-grade buildings.  Where soft or loose soil is present at the subgrade elevation prior to placing select fill, the weak soil should be removed and replaced with engineered fill or lean concrete.

Where slab-on-grade floors are to be cast, the soil subgrade should be scarified to a depth of six inches, moisture conditioned to at least 3 percent above optimum moisture content, and rolled to provide a firm, non-yielding surface compacted to 88 to 93 percent relative compaction.  If the subgrade is disturbed during excavation for footings and utilities, it should be re-rolled.  Loose, disturbed materials should be excavated, removed, and replaced with engineered fill during final subgrade preparation.

**LANGAN TREADWELL ROLLO**

Moisture is likely to condense on the underside of the slabs, even though they will be above the design groundwater table. Consequently, a moisture barrier should be installed beneath the slabs if movement of water vapor through the slabs would be detrimental to its intended use. A moisture barrier is generally not required beneath parking garage slabs, except for areas beneath mechanical, electrical, and storage rooms. A typical moisture barrier consists of a capillary moisture break and a water vapor retarder.

The capillary moisture break should consist of at least four inches of clean, free-draining gravel or crushed rock. The vapor retarder should meet the requirements for Class C vapor retarders stated in ASTM E1745-97. The vapor retarder should be placed in accordance with the requirements of ASTM E1643-98. These requirements include overlapping seams by six inches, taping seams, and sealing penetrations in the vapor retarder. The vapor retarder should be covered with two inches of sand to aid in curing the concrete and to protect the vapor retarder during slab construction. The particle size of the gravel/crushed rock and sand should meet the gradation requirements presented in Table 8.

**TABLE 8**
**Gradation Requirements for Capillary Moisture Break**

| Sieve Size | Percentage Passing Sieve |
|---|---|
| *Gravel or Crushed Rock* | |
| 1 inch | 90 – 100 |
| 3/4 inch | 30 – 100 |
| 1/2 inch | 5 – 25 |
| 3/8 inch | 0 – 6 |
| *Sand* | |
| No. 4 | 100 |
| No. 200 | 0 – 5 |

The sand overlying the membrane should be dry at the time concrete is cast. Excess water trapped in the sand could eventually be transmitted as vapor through the slab. If rain is forecast prior to pouring the slab, the sand should be covered with plastic sheeting to avoid wetting. If the sand becomes wet, concrete should not be placed until the sand has been dried or replaced.

Concrete mixes with high water/cement (w/c) ratios result in excess water in the concrete, which increases the cure time and results in excessive vapor transmission through the slab.

**LANGAN TREADWELL ROLLO**

Therefore, concrete for the floor slab should have a low w/c ratio - less than 0.50.  If approved by the project structural engineer, the sand can be eliminated and the concrete can be placed directly over the vapor retarder, provided the w/c ratio of the concrete does not exceed 0.45 and water is not added in the field.  If necessary, workability should be increased by adding plasticizers.  In addition, the slab should be properly cured.  Before the floor covering is placed, the contractor should check that the concrete surface and the moisture emission levels (if emission testing is required) meet the manufacturer's requirements.

## 7.4    Below-Grade Walls

The following section presents our recommendations for below-grade walls.

### 7.4.1    Retaining Walls

To construct retaining walls and below-grade walls (i.e., elevator pits), the site may be open cut and/or temporarily shored.  Excavations that will be deeper than five feet and will be entered by workers should be shored or sloped in accordance with CAL-OSHA standards (29 CFR Part 1926).  It is the responsibility of the contractor to determine the safe excavation slopes; however, we recommend temporary cuts greater than 4 feet be no steeper than 1.5:1 (horizontal:vertical).

Because the on-site soil is expansive, we recommend designing below grade walls for at-rest lateral pressures corresponding to equivalent fluid unit weights of 70 pcf and 90 pcf for drained and undrained conditions, respectively.  Because the site is in a seismically active area, the design should also be checked for seismic conditions.  Under seismic loading conditions, there will be an added seismic increment that should be added to active earth pressures (Sitar et al. 2012).  We used the procedures outlined in Sitar et al. (2012) and the peak ground acceleration based on the DE ground motion level (see Section 7.9) to compute the seismic pressure increment.  We recommend the walls be designed for the more critical of at-rest pressures or total pressure (active plus seismic pressure increment).  Below-grade walls backfilled with native soil should be designed for the equivalent fluid weights and pressures presented in Table 9A.

**LANGAN TREADWELL ROLLO**

**TABLE 9A**

**Below-Grade Wall Design Earth Pressures
with Native Soil Backfill
(Drained Conditions Above Design Groundwater Level)**

| | Static Conditions | | Seismic Conditions[1] |
|---|---|---|---|
| | Unrestrained Walls – Active (pcf[3]) | Restrained Walls – At-rest (pcf) | Total Pressure – Active Plus Seismic Pressure Increment (pcf) |
| Drained Condition[2] | 45 | 70 | 70 |
| Undrained Condition | 80 | 90 | 95 |

Notes:

1.  The more critical condition of either at-rest pressure for static conditions or active pressure plus a seismic pressure increment for seismic conditions should be checked.
2.  Applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.
3.  pcf = pounds per cubic foot

If open cuts are made for the below-grade walls and select fill is used as backfill, then the walls may be designed using the earth pressures presented on Table 9B.

**TABLE 9B**

**Below-Grade Wall Design Earth Pressures with Select Fill Backfill
(Drained Conditions Above Design Groundwater Level)**

| | Static Conditions | | Seismic Conditions[1] |
|---|---|---|---|
| | Unrestrained Walls – Active (pcf[3]) | Restrained Walls – At-rest (pcf) | Total Pressure – Active Plus Seismic Pressure Increment (pcf) |
| Drained Condition[2] | 35 | 55 | 65 |
| Undrained Condition | 80 | 90 | 95 |

Notes:

1.  The more critical condition of either at-rest pressure for static conditions or active pressure plus a seismic pressure increment for seismic conditions should be checked.
2.  Applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.
3.  pcf = pounds per cubic foot

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 29*

Select wall backfill should consist of soil described in Section 7.1.  For cantilever walls retaining level backfill (i.e. landscape walls), the pressures presented above may be used and will depend if the wall retains native soil (expansive) or select fill.

If surcharge loads occur above an imaginary 45-degree line projected up from the bottom of a retaining wall, a surcharge pressure should be included in the wall design.  If this condition exists, we should be consulted to estimate the added pressure on a case-by-case basis. Where truck traffic will pass within 10 feet of retaining walls, temporary traffic loads should be considered in the design of the walls.  Traffic loads may be modeled by a uniform pressure of 100 pounds per square foot applied in the upper 10 feet of the walls.

The lateral earth pressures recommended for the drained condition are applicable to walls that are backdrained to prevent the buildup of hydrostatic pressure.  One acceptable method for backdraining the walls is to place a prefabricated drainage panel against the back side of the wall. The drainage panel should extend down to the base of the wall or the design groundwater elevation (design groundwater elevations are discussed in Section 6.3) to a perforated PVC 20 collector pipe. The pipe should be surrounded on all sides by at least four inches of Caltrans Class 2 permeable material (Caltrans Standard Specifications Section 68-1.025). We should check the manufacturer's specifications regarding the proposed prefabricated drainage panel material to verify that it is appropriate for the intended use. An acceptable alternative is to backdrain the wall with Caltrans Class 2 material at least one foot wide, extending down to the base of the wall. A perforated PVC pipe should be placed at the bottom of the gravel, as described for the first alternative. The pipe in either alternative should be sloped to drain into an appropriate outlet. We should check the manufacturer's specifications for the proposed drainage panel material to verify it is appropriate for its intended use.

Wall backfill should be compacted to at least 90 percent relative compaction using light compaction equipment.  Wall backfill with less than 10 percent fines, or deeper than five feet, should be compacted to at least 95 percent relative compaction for its entirety.  If heavy equipment is used, the wall should be appropriately designed to withstand loads exerted by the equipment and/or temporarily braced.

If below grade walls and structures, including walls and floors for elevator pits and sump pits, extend below the design groundwater level, we recommend the structures be waterproofed and water stops placed at all construction joints to protect against moisture migration.  The waterproofing should be placed directly against the backside of the walls and according to manufacturer's specifications.

**LANGAN TREADWELL ROLLO**

7.4.2   Swimming Pool Considerations

We recommend a zone of select, non-expansive fill be installed around the proposed pools. The width of this zone should be equal to 1/2 of the depth of the pool (e.g. where the pool is 12 feet deep, the select fill should extend at least 6 feet beyond the back of the pool walls). The select fill should extend from the bottom of the pool excavation up to the bottom of the exterior concrete flatwork.  Once the select fill shell zone has been excavated, we recommend that the sides and bottom of the excavation be kept wet until the select fill has been placed.  In addition, the remaining concrete flatwork in the pool area (beyond the pool shell) should be underlain by at least 12 inches of select fill to reduce the potential for differential movement between the pool and the surrounding concrete flatwork.

If the zone of non-expansive soil is provided, the walls of the pool may be designed using the restrained walls (at-rest) and seismic conditions lateral earth pressures presented in Table 9B.

If the zone of non-expansive soil is not provided, the swimming pool walls should be designed using the restrained (at-rest) lateral earth pressures presented in Table 9A.

The proposed swimming pool may extend below the design ground water elevation at the site. The pool bottom should be underlain by an eight-inch-thick gravel blanket (underlain by filter fabric) and be equipped with hydrostatic pressure relief valves to prevent excess hydrostatic pressure from damaging the pool in the event it is drained.

During the installation of the pool, groundwater may be encountered.  If groundwater is encountered during construction, the excavation should be dewatered three feet below the bottom of the excavation.  Excavations that will be deeper than five feet and will be entered by workers should be shored or sloped in accordance with the OSHA standards (29 CFR Part 1926).

**7.5    Shoring Design**

As discussed in Section 6.4, a soldier-pile-and-lagging system is an acceptable method to retain the excavation where open cuts are not feasible.  The lateral pressures recommended for designing tied-back or braced shoring systems are presented on Figure 6.  The passive pressures presented on Figure 6 include a safety factor of 1.5.  A cantilever soldier-pile-and-lagging shoring system can be designed to resist an active earth pressure of 35 pcf and may be designed using the same passive pressures presented on Figure 6.

**LANGAN TREADWELL ROLLO**

The soldier piles should extend below the excavation bottom a minimum of five feet and be sufficient to achieve lateral stability and resist the downward loading of the tiebacks. Recommendations for computing penetration depth of soldier piles to resist vertical loads are presented in Section 7.5.3.

If traffic occurs within 10 feet of the shoring, a uniform surcharge load of 100 psf should be added to the design. An increase in lateral design pressure for the shoring may be required where heavy construction equipment or stockpiled materials are within a distance equal to the shoring depth. Construction equipment should not be allowed within five feet from the edge of the excavation unless the shoring is specifically designed for the appropriate surcharge. The increase in pressure should be computed after the surcharge loads are known. The anticipated deflections of the shoring system should be estimated to check if they are acceptable.

The shoring system should be designed by a licensed civil engineer experienced in the design of retaining systems, and installed by an experienced shoring specialty contractor. The shoring engineer should be responsible for the design of temporary shoring in accordance with applicable regulatory requirements. Control of ground movement will depend as much on the timeliness of installation of lateral restraint as on the design. We should review the shoring plans and a representative from our office should observe the installation of the shoring.

7.5.1    Tieback Design Criteria and Installation Procedure

Temporary tiebacks may be used to restrain the shoring. The vertical load from the temporary tiebacks should be accounted for in the design. Design criteria for tiebacks are presented on Figure 6.

Tiebacks should derive their load-carrying capacity from the soil behind an imaginary line sloping upward from a point H/5 feet away from the bottom of the excavation and sloping upwards at 60 degrees from the horizontal, where H is the wall height in feet. Tiebacks should have a minimum unbonded length of 15 feet. All tiebacks should have a minimum bonded length of 15 feet and spaced at least four feet on center. The bottom of the excavation should not extend more than two feet below a row of unsecured tiebacks.

Tieback allowable capacity will depend upon the drilling method, hole diameter, grout pressure, and workmanship. The existing sandy soils may cave, therefore, solid flight augers should not be used for tieback installation. We recommend a smooth cased tieback installation method

**LANGAN TREADWELL ROLLO**

(such as a Klemm type rig) be used.  For estimating purposes, we recommend using the skin friction values presented on Figure 6.  These values include a factor of safety of about 1.5. Higher skin friction values may be used if confirmed with pre-production performance tests.

The contractor should be responsible for determining the actual length of tiebacks required to resist the lateral earth pressures imposed on the temporary retaining systems.  Determination of the tieback length should be based on the contractor's familiarity with his installation method.  The computed bond length should be confirmed by a performance- and proof-testing program under the observation of an engineer experienced in this type of work.  Replacement tiebacks should be installed for tiebacks that fail the load test.

The first two production tiebacks and two percent of the remaining tiebacks should be performance-tested to at least 1.25 times the design load.  All other temporary tiebacks should be proof-tested to at least 1.25 times the design load.  Recommendations for tieback testing are presented in Section 7.5.2.  The performance tests will be used to determine the load carrying capacity of the tiebacks and the residual movement.  The performance-tested tiebacks should be checked 24 hours after initial lock off to confirm stress relaxation has not occurred. The geotechnical engineer should evaluate the results of the performance tests and determine if creep testing is required and select the tiebacks that should be creep tested.  If any tiebacks fail to meet the proof-testing requirements, additional tiebacks should be added to compensate for the deficiency, as determined by the shoring designer.

7.5.2   Tieback Testing

We should observe tieback testing.  The first two production tiebacks and two percent of the remaining tiebacks should be performance-tested to at least 1.25 times the design load.  The remaining tiebacks should be confirmed by proof tests also to at least 1.25 times the design load.

The movement of each tieback should be monitored with a free-standing, tripod-mounted dial gauge during performance and proof testing.  The performance test is used to verify the capacity and the load-deformation behavior of the tiebacks.  It is also used to separate and identify the causes of tieback movement, and to check that the designed unbonded length has been established.  In the performance test, the load is applied to the tieback in several cycles of incremental loading and unloading.  During the test, the tieback load and movement are measured.  The maximum test load should be held for a minimum of 10 minutes, with readings taken at 0, 1, 3, 6, and 10 minutes.  If the difference between the 1- and 10-minute reading is

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*  
*Santa Clara Square*  
*Santa Clara, California*

*24 July 2015*  
*770612501*  
*Page 33*

less than 0.04 inch during the loading, the test is discontinued.  If the difference is more than 0.04 inch, the holding period is extended by 50 minutes to 60 minutes, and the movements should be recorded at 15, 20, 25, 30, 45, and 60 minutes.

A proof test is a simple test used to measure the total movement of the tieback during one cycle of incremental loading.  The maximum test load should be held for a minimum of 10 minutes, with readings taken at 0, 1, 2, 3, 6, and 10 minutes.  If the difference between the 1- and 10-minute reading is less than 0.04 inch, the test is discontinued.  If the difference is more than 0.04 inch, the holding period is extended by 50 minutes to 60 minutes, and the movements should be recorded at 15, 20, 25, 30, 45, and 60 minutes.

We should evaluate the tieback test results and determine whether the tiebacks are acceptable.  A performance- or proof-tested tieback with a ten-minute hold is acceptable if the tieback carries the maximum test load with less than 0.04 inch movement between one and 10 minutes, and total movement at the maximum test load exceeds 80 percent of the theoretical elastic elongation of the unbonded length.

A performance- or proof-tested tieback with a 60-minute hold is acceptable if the tieback carries the maximum test load with less than 0.08 inch movement between six and 60 minutes, and total movement at the maximum test load exceeds 80 percent of the theoretical elastic elongation of the unbonded length.  Tiebacks that failed to meet the first criterion will be assigned a reduced capacity.

If the total movement of the tiebacks at the maximum test load does not exceed 80 percent of the theoretical elastic elongation of the unbonded length, the contractor should replace the tiebacks.

7.5.3   Penetration Depth of Soldier Piles

The shoring designer should evaluate the required penetration depth of the soldier piles.  The soldier piles should have sufficient axial capacity to support the vertical load component of the tiebacks and the vertical load acting on the piles, if any.  To compute the axial capacity of the piles, we recommend using an allowable friction of 1,000 psf on the perimeter of the piles below the excavation level.

**LANGAN TREADWELL ROLLO**

**7.6      Drainage and Dewatering Systems**

Drainage control design should include provisions for positive surface gradients so that surface runoff is not permitted to pond, particularly adjacent to structures, or on roadways or pavements.  Surface runoff should be directed away from foundations to properly designed and installed drop inlets.

We recommend a temporary well system be installed around the perimeter of proposed excavations to dewater the excavations during construction.  The system should be designed and constructed by a qualified dewatering contractor.  The system should be capable of drawing the groundwater down to a depth of at least three feet below the bottom of the proposed excavation.  The groundwater should be maintained at this level until sufficient weight and/or tiedown capacity is available to resist the hydrostatic uplift pressure due to the natural groundwater elevation.  If water enters the excavation along the perimeter, an edge drain, sump, and pump system should be installed to intercept the water.  We recommend the edge drain be:

- at least one foot deep

- at least one foot wide

- sloped at an inclination of at least one percent toward the nearest sump

- backfilled with free draining crushed rock (½- to ¾-inch gradation) or Class 2 permeable material.

The number and depth of dewatering wells should be determined by a dewatering designer or contractor.  The volume of water discharged should be monitored and a record of the amount should be submitted to the owner.  Prior to disposal of the water, permits and testing of the water may be required.  Where dewatering wells penetrate the bottom of the pool, special attention should be given to properly sealing the wells when they are abandoned and waterproofing the penetration to prevent groundwater from seeping through them into the pool.

**7.7      Construction Monitoring**

To monitor ground movements and shoring movements, during the excavation activities, we recommend installing and monitoring survey points on the adjacent streets and improvements that are within 75 feet of the proposed excavation.  These points should be used to monitor the vertical and horizontal movements of the shoring and these improvements.

**LANGAN TREADWELL ROLLO**

The instrumentation should be read regularly and the results should be submitted to us in a timely manner for review.   Initially, depending upon the speed of excavation, the instrumentation should be read about every week.  The frequency of readings may, in the later stages of construction, be modified as appropriate.

## 7.8      Concrete Pavement and Exterior Slabs

Differential ground movement due to expansive soil and settlement will tend to distort and crack the pavements and exterior improvements such as courtyards and sidewalks.  Periodic repairs and replacement of exterior improvements should be expected during the life of the project.  Mastic joints or other positive separations should be provided to permit any differential movements between exterior slabs and the buildings.

To reduce the potential for cracking related to expansive soil, we recommend exterior concrete flatwork be underlain by at least 12-inches of select fill, of which the upper four inches should consist of aggregate base compacted to at least 90 percent relative compaction for non-vehicular areas.  The subgrade should be compacted to at least 90 percent relative compaction, and should provide a smooth, non-yielding surface for support of the concrete slabs.

Where rigid pavement is required for loading and service areas, we recommend a minimum of six inches of concrete for medium traffic and a minimum of eight inches of concrete for heavy traffic.  The upper six inches of subgrade should be compacted to at least 95 percent relative compaction and should provide a smooth, non-yielding surface.  The concrete should be underlain by at least 6 inches of Class 2 Aggregate base.  Aggregate base material should conform to the current State of California Department of Transportation (Caltrans) Standard Specifications.

## 7.9      Seismic Design

For seismic design in accordance with the provisions of 2013 CBC/ASCE 7-10, we recommend the following:

- Risk Targeted Maximum Considered Earthquake ($MCE_R$) $S_s$ and $S_1$ of 1.5g and 0.6g, respectively.

- Site Class D

- Site Coefficients $F_A$ and $F_V$ of 1.0 and 1.5

**LANGAN TREADWELL ROLLO**

- $MCE_R$ spectral response acceleration parameters at short periods, $S_{MS}$, and at one-second period, $S_{M1}$, of 1.5g and 0.9g, respectively.

- Design Earthquake (DE) spectral response acceleration parameters at short period, $S_{DS}$, and at one-second period, $S_{D1}$, of 1.0g and 0.6g, respectively.

## 7.10    Asphalt Pavements

The State of California flexible pavement design method was used to develop the recommended asphalt concrete pavement sections. We expect the final soil subgrade in asphalt-paved areas will generally consist of on-site soil. On the basis of the laboratory test results on this soil, we selected an R-value of 5 for design.

For our calculations, we assumed a Traffic Index (TI) of 4 for automobile parking areas with occasional trucks, and 5 and 6 for driveways and truck-use areas; these TIs should be confirmed by the project civil engineer. Table 10 presents our recommendations for asphalt pavement sections.

**TABLE 10**

**Pavement Section Design**

| TI | Asphalt Concrete (inches) | Class 2 Aggregate Base R = 78 (inches) |
|---|---|---|
| 4 | 2.5 | 8 |
| 5 | 3 | 10 |
| 6 | 4 | 11.5 |

Pavement components should conform to the current Caltrans Standard Specifications. The upper six inches of the soil subgrade in pavement areas should be moisture-conditioned to above optimum and compacted to at least 95 percent relative compaction and rolled to provide a smooth non-yielding surface. Aggregate base should be compacted to at least 95 percent relative compaction.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 37*

## 7.11    Utilities

The corrosivity report provided in Appendix D of this report should be reviewed and corrosion protection measures used if needed.  A corrosion engineer should be retained if additional recommendations are needed.

Utility trenches should be excavated a minimum of four inches below the bottom of pipes or conduits and have clearances of at least four inches on both sides.  Where necessary, trench excavations should be shored and braced, in accordance with all safety regulations, to prevent cave-ins.  Where sheet piling is used as shoring, and is to be removed after backfilling, it should be placed a minimum of two feet away from the pipes or conduits to prevent disturbance to them as the sheet piles are extracted.  It may be difficult to drive sheet piles if cobbles, coarse grained gravel layers or buried obstructions are encountered.

Backfill for utility trenches should be compacted according to the recommendations presented for the general site fill.  Jetting of trench backfill is not permitted.  To provide uniform support, pipes or conduits should be bedded on a minimum of four inches of sand or fine gravel.  After pipes and conduits are tested, inspected (if required), and approved, they should be covered to a depth of six inches with sand or fine gravel, which should then be mechanically tamped or compacted with a vibratory plate.  Backfill should be placed in lifts of eight inches or less, moisture-conditioned, and compacted to at least 90 percent relative compaction.  If sand or gravel with less than 10 percent fines (particles passing the No. 200 sieve) is used, it should be compacted to 95 percent relative compaction.

Special care should be taken in controlling utility backfilling in pavement areas.  Poor compaction may cause excessive settlements, resulting in damage to exterior improvements.

Where utility trenches backfilled with sand or gravel enter the building pads, an impermeable plug consisting of low-expansion potential clay or lean concrete, at least five feet in length, should be installed at the building line.  Further, where sand- or gravel-backfilled trenches cross planter areas and pass below asphalt or concrete pavements, a similar plug should be placed at the edge of the pavement.  The purpose of these plugs is to reduce the potential for water to become trapped in trenches beneath the building or pavements.  This trapped water can cause heaving of soils beneath slabs and softening of subgrade soil beneath pavements.

**LANGAN TREADWELL ROLLO**

## 7.12    Site Drainage

Positive surface drainage should be provided around the building to direct surface water away from the existing building foundations. To reduce the potential for water ponding adjacent to the buildings, we recommend the ground surface within a horizontal distance of five feet from the buildings be designed to slope down and away from the buildings with a surface gradient of at least two percent in unpaved areas and one percent in paved areas. In addition, roof downspouts should be discharged into controlled drainage facilities to keep the water away from the foundations.

## 7.13    Landscaping

The use of water-intensive landscaping around the perimeter of the buildings should be avoided to reduce the amount of water introduced to the subgrade.  Irrigation of landscaping around the building should be limited to drip or bubbler-type systems.  Trees with large roots or have high water demand should also be avoided since they can dry out the soil beneath foundations and cause settlement.   The purpose of these recommendations is to avoid large differential moisture changes adjacent to the foundations, which have been known to cause significant differential movement over short horizontal distances in expansive soil, resulting in cracking of slabs and architectural damage.

To reduce the potential for irrigation water entering the pavement section, vertical curbs adjacent to landscaped areas should extend through any aggregate base and at least six inches into the underlying soil.  In heavily watered areas, such as lawns, it may also be necessary to install a subdrain behind the curb to intercept excess irrigation water.

## 7.14    Bioretention Systems

Bioretention areas are landscaping features used to treat stormwater runoff within a development site. They are commonly located in parking lot islands and landscape areas. Surface runoff is directed into shallow, landscaped depressions, which usually include mulch and a prepared soil mix.  Typically, the filtered runoff is collected in a perforated underdrain beneath the bioretention system and returned to the storm drain system.  For larger storms, runoff is generally diverted past the bioretention areas to the storm drain system.

The soil within a bioretention system should typically have an infiltration rate sufficient to draw down any pooled water within 48 hours after a storm event.  Based on the "Bioretention Manual" prepared by The Prince George's County (2007), the infiltration rate of the bioretention

**LANGAN TREADWELL ROLLO**

soil is recommended to exceed ½ inch per hour; cohesionless soils like sand meet this criterion.  Cohesive soils like clay and silts do not meet the infiltration rate requirement and are considered unsuitable in a bioretention system, particularly when they are expansive.  For areas where there are unsuitable in-situ soils, the bioretention system can be created by importing a suitable soil mix and providing an underdrain.  Based on our observation of the soil at the site, the in-situ clays are relatively impervious and do not meet the infiltration rate requirements. The bioretention system will need to be constructed with suitable imported soil and include an underdrain system.

Underdrains are typically at the invert of the bioretention system to intercept water that does not infiltrate into the surrounding soils.  Underdrains consist of a perforated PVC pipe in a gravel blanket.  The gravel should be virgin rock, double washed, uniformly graded and should be ½ inch to 1½ inches in diameter.  It should also be wrapped in a filter fabric (Mirafi 140N or equivalent).  The perforated PVC pipe cross-section area should be determined based on the desired hydraulic conductivity of the underdrain.  The PVC pipe should be bedded on two to three inches of gravel and covered with gravel and a filter fabric (Mirafi 140NC or equivalent).

Because of the presence of near surface expansive soil, bioretention systems should be set back a minimum of five feet from building foundations, slabs, concrete flatwork or pavements. Overflow from bioretention areas should be directed to the storm drain system away from building foundations and slabs.

Typically, the bottom of the bioretention system is recommended to be a minimum of two feet or more above the groundwater table.

## 8.0    ADDITIONAL GEOTECHNICAL SERVICES

Prior to construction, we should review the project plans and specifications to check their conformance with the intent of our recommendations.  During construction, we should observe the installation of the shallow foundations and preparation of the building pad subgrade.  We should also observe the subgrade preparation and any fill placement and perform field density tests to check that adequate moisture conditioning and fill compaction has been achieved beneath proposed sidewalks and pavement areas.   These observations will allow us to compare the actual with the anticipated soil conditions and to check that the contractor's work conforms with the geotechnical aspects of the plans and specifications.

**LANGAN TREADWELL ROLLO**

*Geotechnical Investigation*
*Santa Clara Square*
*Santa Clara, California*

*24 July 2015*
*770612501*
*Page 40*

## 9.0    LIMITATIONS

The conclusions and recommendations presented in this report apply to the site and construction conditions as we have described them and are the result of engineering studies and our interpretations of the existing geotechnical conditions.  Actual subsurface conditions may vary.  If any variations or undesirable conditions are encountered during construction, or if the proposed construction will differ from that described in this report, Langan Treadwell Rollo should be notified so that supplemental recommendations can be developed.  Our scope of services relates solely to the geotechnical aspects of the project and does not address environmental concerns.

**LANGAN TREADWELL ROLLO**

**REFERENCES**

ASCE/SEI 7-10 (2010). Minimum Design Loads for Buildings and Other Structures.

Autodesk Buzzsaw (2014). Irvine Company, Apartment Development Site, Santa Clara Square.

California Building Standards Commission (2013). California Building Code.

California Department of Conservation Division of Mines and Geology (1997). *Guidelines for Evaluating and Mitigating Seismic Hazards in California.* Special Publication 117.

California Division of Mines and Geology (1996). *Probabilistic Seismic Hazard Assessment for the State of California*, CDMG Open-File Report 96-08.

California Division of Mines and Geology (2004). "State of California Seismic Hazard Zones, Milpitas Quadrangle, prepared by the California Geologic Survey".

Cao, T., Bryant, W. A., Rowshandel, B., Branum D. and Wills, C. J. (2003). "The Revised 2002 California Probabilistic Seismic Hazard Maps."

CH2MHILL (2015). "2014 Groundwater Monitoring and Sampling Summary Report, Former Synertek Building No. 1, 3050 Coronado Drive, Santa Clara, California".

HMH Engineers (2014). "Existing Overall Site Plan, Santa Clara Square Master Community Plan, Development Area Plan 1, Santa Clara, CA", Sheet C-1

Holzer, T.L. et al. (2008). "Liquefaction Hazard Maps for Three Earthquake Scenarios for the Communities of San Jose, Campbell, Cupertino, Los Altos, Los Gatos, Milpitas, Mountain View, Palo Alto, Santa Clara, Saratoga and Sunnyvale, Northern Santa Clara County." USGS Open File Report 2008-1270.

Idriss, I.M. and Boulanger, R.W. (2008). "Soil Liquefaction During Earthquakes." Earthquake Engineering Research Institute. Monograph MNO-12.

Lienkaemper, J.J. (1992). "Map of recently active traces of the Hayward Fault, Alameda and Contra Costa counties, California." Miscellaneous Field Studies Map MF-2196.

NETR Online (2014). Historic Aerial Photographs from 1948, 1956, 1968 and 1980 (http://www.historicaerials.com/aerials.php?scale=2000&lon=-121.95498657227&lat=37.355739593506&year=2005), downloaded 7/8/2014.

*LANGAN TREADWELL ROLLO*

## REFERENCES
### (Continued)

Nichols, D.R., and N.A. Wright (1971).  "Preliminary map of historic margins of marshland, San Francisco Bay, California:  USGS Open-File-Report.

Post-Tensioning Institute (2008).  "Design of Post-Tensioned Slabs-on-Ground."  3rd Edition with 2008 Supplement, PTI DC10.1-08.

The Prince George's County, Maryland (2007).  "Bioretention Manual, Environmental Services Division, Department of Environmental Resources, The Prince George's County, Maryland".

Seed, H.B. and Idriss, I.M. (1971).  "Simplified Procedure for Evaluating Soil Liquefaction during Earthquakes," Journal of Geotechnical Engineering Division, ASCE, 97 (9), 1249-1273.

Sitar, N., E.G. Cahill and J.R. Cahill (2012).  "Seismically Induced Lateral Earth Pressures on Retaining Structures and Basement Walls."

Treadwell & Rollo (2011).  "Geotechnical Investigation, 3333 Scott Boulevard, Santa Clara, California."

Treadwell & Rollo (2012).  "Updated Geotechnical Investigation, NVIDIA Campus, Santa Clara, California."

Tokimatsu, K. and Seed, H.B. (1987).  "Evaluation of Settlements in Sand due to Earthquake Shaking."  Journal of Geotechnical Engineering, Vol. 113, No. 8, pp. 861-878.

Working Group on California Earthquake Probabilities (WGCEP) (2007).  "The Uniform California Earthquake Rupture Forecast, Version 2." Open File Report 2007-1437.

Working Group on California Earthquake Probabilities (WGCEP) (2003). "Summary of Earthquake Probabilities in the San Francisco Bay Region:  2002 to 2031." Open File Report 03-214.

Youd, T.L., and Idriss, I.M. (2001).  "Liquefaction Resistance of Soils:  Summary Report from the 1996 NCEER and 1998 NCEER/NSF Workshops on Evaluation of Liquefaction Resistance of Soils," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 127, No. 4.

Youd, T.L., and Garris, C.T. (1995). "Liquefaction-induced ground-surface disruption." Journal of Geotechnical Engineering, American Society of Civil Engineers, Vol. 121, 805-809.

Youd, T.L., Hansen, C.M., and Bartlett, S.F., (2002).  Revised Multilinear Regression Equations for Prediction of Lateral Spread Displacement, Journal of Geotechnical and Geoenvironmental Engineering, December 2002.

**LANGAN TREADWELL ROLLO**



**EXPLANATION**

BP-1 — Approximate location of boring by Langan Treadwell Rollo, April 2014

C1-1 — Approximate location of cone penetration test by Langan Treadwell Rollo, April 2014

MW-33A — Approximate location of shallow groundwater monitoring well by CH2MHill, 2013

— Approximate location of former Saratoga Creek (NETR Online, 2014)

**SANTA CLARA SQUARE**
Santa Clara, California

**SITE PLAN WITH PROPOSED DEVELOPMENT**

Date 08/15/14 | Project No. 770612501 | Figure 3

**LANGAN TREADWELL ROLLO**

0        150 Feet

Approximate scale

Reference: Base map from a drawing titled "Residential Site Plan," by The Irvine Company, dated 05/12/15.

A. **EXHIBIT M**

*Exhibit M — Excerpted diagrams from Santa Clara County Flood and Water Conservation District, Engineer's Report of Proposed Improvements for Zone NC-1, the North Central Zone (1961), depicting the rerouting of Saratoga Creek around the site (including Scott Blvd and Highway 101); archived by the Santa Clara Valley Water District Library at https://archive.org/details/csjvwd_000237.*

# SANTA CLARA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT



# ENGINEER'S REPORT OF PROPOSED IMPROVEMENTS FOR ZONE NC-1, THE NORTH CENTRAL ZONE

JANUARY 1961

ENGINEER'S REPORT

PROPOSED IMPROVEMENTS FOR ZONE NC-1

PROJECTS 2, 3, 5, 6, 7, 8, 10, 15, 16, 20, 21, 24

JANUARY 1961

SANTA CLARA COUNTY FLOOD CONTROL
AND WATER CONSERVATION DISTRICT

Donald K. Currlin
Manager-Counsel

DEPARTMENT OF PUBLIC WORKS

James B. Enochs, Director

ADVISORY COMMITTEE

David S. Arata Jr., Chairman
W. Lynn Beatty
W. C. Garcia

BOARD OF SUPERVISORS

Sam P. Della Maggiore, Chairman
Ed. R. Levin
Wesley L. Hubbard
Howard Weichert
Ralph H. Mehrkens

# SANTA CLARA COUNTY FLOOD CONTROL
## AND
# WATER CONSERVATION DISTRICT

DONALD K. CURRLIN
MANAGER - COUNSEL

112 HAMLINE STREET

GEORGE H. PRIME
SUPERVISING ENGINEER

SAN JOSE 10, CALIFORNIA
CYPRESS 5-1050

January 1961

Honorable Board of Supervisors
County of Santa Clara
20 West Rosa Street
San Jose 10, California

Gentlemen:

Transmitted herewith is the Engineer's Report on the Proposed Improvements for Zone NC-1 (North Central) of the Santa Clara County Flood Control and Water Conservation District. This report includes twelve proposed projects consisting of a total of 52.3 miles of channel improvements. The estimated total cost of these flood control facilities is $12,750,000 and it is believed that a bond issue in this amount can be financed by a maximum bond tax rate of 15 cents, plus 5 cents for current operating expense, making a maximum total of 20 cents per $100 of assessed value.

It is recommended that your Honorable Board hold a public hearing on these proposed improvements as required by law.

Very truly yours,

JAMES B. ENOCHS
Director of Public Works

JP:JBE:am



# MAP AND GENERAL CONSTRUCTION PLANS

OF

ZONE NC-I (NORTH CENTRAL) PROJECT NO. 2

# SAN TOMAS AQUINO CREEK IMPROVEMENTS

FROM

WILDCAT CREEK TO CALABAZAS CREEK HOLDING BASIN

## SANTA CLARA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT

## SANTA CLARA COUNTY, CALIFORNIA

PLATE I



PROFILE

UNLINED SECTION

LINED SECTION UNDER S.P.R.R. BRIDGE

LINED SECTION UNDER NEW KIFER ROAD BRIDGE

UNLINED SECTION

CONCRETE LINED CHANNEL    EARTH CHANNEL    CONFLUENCE STRUCTURE    EARTH CHANNEL

PLAN

NOTE: ALIGNMENT AND CURVATURE OF THE PROPOSED CHANNEL ON THIS SHEET ARE SUBJECT TO MODIFICATION PENDING FINAL DESIGN OF THE SAN TOMAS EXPRESSWAY

MAP & GENERAL CONSTRUCTION PLANS FOR IMPROVEMENTS IN ZONE NC-1 (NORTH CENTRAL)

PROJECT NC-1-2
SAN TOMAS AQUINO CREEK

SANTA CLARA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT

| ENGINEERING APPROVAL | Design By C.B.C & D.R. | SCALE: As Shown |
| | Checked By C.B.C & D.R. | |
| By George H. Prime | | |
| GEORGE H. PRIME SUPERVISING ENGINEER | Drawn By V.K. | JOB NO. 1315 |
| APPROVED FOR DEPT. OF PUBLIC WORKS | GEORGE S. NOLTE CIVIL ENGINEERS SANTA CLARA, CALIF. | |
| By James B. Enochs | Date JAN 7 1961 | SHEET 9 OF 13 |
| JAMES B. ENOCHS DIRECTOR | | |

PLATE 9



LINED SECTION UNDER BAYSHORE BRIDGE

PROFILE

UNLINED SECTION
JUNCTION WITH SARATOGA CREEK TO STA. 586+50

EARTH CHANNEL

NOTE:
Do not fill natural channel of Saratoga Creek, (to remain open for local drainage)
Provide drainage inlet to new channel

Construct transitions and lining through bridge.

Construct triple 12×12' box culvert and transitions or duplicate Bayshore Bridge.

Remove existing structures within R/W

Drop structure

Construct 15' Form-type bridge

PLAN

SCALE
0  100 200  400    600

MAP & GENERAL CONSTRUCTION PLANS
FOR IMPROVEMENTS IN ZONE NC-I (NORTH CENTRAL)

## PROJECT NC-1-2
## SAN TOMAS AQUINO CREEK

SANTA CLARA COUNTY FLOOD CONTROL
AND WATER CONSERVATION DISTRICT

| ENGINEERING APPROVAL | Design By CBCE DP | SCALE: As Shown |
| | Checked By CBCE DP | |
| By George H. Prime | Drawn By Kk | JOB NO 1315 |
| SUPERVISING ENGINEER | | |
| APPROVED FOR DEPT. OF PUBLIC WORKS | GEORGE S. NOLTE CIVIL ENGINEERS SANTA CLARA, CALIF | SHEET 10 OF 12 |
| By James B Enochs | Date JAN 1961 | |
| JAMES B ENOCHS DIRECTOR | | |

PLATE 10



PLATE II



PROFILE

PLAN

MAP & GENERAL CONSTRUCTION PLANS
FOR IMPROVEMENTS IN ZONE NC-I (NORTH CENTRAL)

PROJECT NC-I-2
SAN TOMAS AQUINO CREEK

SANTA CLARA COUNTY FLOOD CONTROL
AND WATER CONSERVATION DISTRICT

PLATE 12

**A. <u>EXHIBIT N</u>**

*Exhibit N — Plot Plans for parcels at and around 3250 Scott Blvd, obtained from the Santa Clara County Surveyor's Office Record Map GIS portal at https://experience.arcgis.com/experience/be2e1200b3c543909d27d8ef23483a15.*

OFFICE OF COUNTY ASSESSOR    SANTA CLARA COUNTY, CALIFORNIA

| BOOK | PAGE |
|---|---|
| 216 | 29 |

1" = 200'

224 / 46

OWEN ST.

R.O.S. 160—M—50
(3156.06)

Arroyo    San Tomas Aquino

PCL.1    105
PCL.2
PCL.4    PCL.3    Channel    S.C.V.W.D.
(3200.94)    P.M.827—M—41
453.60    342.18    247.49    471.62

P.M. 314—M—52    PCL. 7    PCL.1
3.39 AC.NET    PCL.2
2.09 AC.NET    PCL.1
3.840± Ac.

P.M. 922—M—54    124    107    106    108

P.M. 463—M—42    261,366 sf

—2975—    425
259.21    2915

P.M.401—M—38 STENDER WY.    P.M.338—40
2900/02/50/62/72
384.92    321.80

OCTAVIUS DR.    111    PCL. 1
3.00 AC.    83    PCL. B
3.15 Ac.    123    PCL. A
2.22 Ac.    122

P.M. 510—M—11    PCL. B    364.79
358.27

45    84    450.20
467.82

117    120    121

PCL. B
5.80 AC.    2.00 AC. NET
PCL. C    PCL. 2
3.397 AC.    PCL. 1
2.839 AC.    NORTHWESTERN PKWY.

MONTGOMERY DR.    416.75

426.48    304.92
3005    2901
CORONADO DR.
L.L.A. 22790156

60    PCL. S
1.64 AC. NET    116    702.51

317.28    169.17

P.M. 331—M—10    336.48    133.32

2.03    ...ASSESSED ON PG. 46
PCL. A
6.27 AC.

59    PCL. R
1.64 AC. NET    2.03    64.39

308.04    411.72
3205    3111
CORONADO DR.    46

DETAIL : N.T.S.

EXPRESSWAY    CENTRAL
2734 / 2833    TWP. 6S.—R.1W.
CONDENSA (FMLY. KIFER RD.)
28

TRA DET. MAP 93

LAWRENCE E. STONE — ASSESSOR
Cadastral map for assessment purposes only.
Compiled under R. & T. Code, Sec. 327.
Effective Roll Year 2025—2026

Case 5:25-cv-07360-RCP Document 88 Filed 05/07/26 Page 170 of 187



| BOOK | PAGE |
|---|---|
| 104 | 40 |

TRA DET. MAP 93

LAWRENCE E. STONE — ASSESSOR
Cadastral map for assessment purposes only.
Compiled under R. & T. Code, Sec. 327.
Effective Roll Year 2025—2026





PARCEL MAP

P'TN LANDS OF KAISER-AETNA

BEING A PORTION

PCL "C", BOOK 273 OF PCL MAPS, PAGE 4

WITHIN THE CITY OF SANTA CLARA
SANTA CLARA COUNTY, CALIFORNIA

MISSION ENGINEERS

1495 FRANKLIN ST.    SANTA CLARA, CALIF.
JOHN JAY BROWN    CIVIL ENGINEER
SCALE 1"=100'    AUGUST 1973
JOB Nº J-0102-D    DWG M-5384
SHEET 1 OF 1 SHEET    C.S.C. 6.888



**RECORD OF SURVEY CERTIFICATE**

This Record of Survey complies with the provisions of the Subdivision Map Act, Division 2, (commencing with Section 66410) of Title 7 of the Government Code and appropriate local ordinances.

January 11, 1977
Date

S.M. Cristofano R.C.E. 10827
Director of Public Works
City Engineer
City of Santa Clara, California

**LEGEND**

⊛ Found standard City of Santa Clara Monument
• Found State of California Highway Monument
○ Set ¾" Iron Pipe with L.S. tag 3439
⊚ Standard City of Santa Clara Street Monument to be set by January 1, 1978.

**BASIS OF BEARING**

The bearing of the course designated as "N36°27'53"W 755.72 feet" between found City of Santa Clara Monuments of the monument line of Mission College Boulevard, as said course, monuments, monument line and Boulevard are shown on Parcel Map 3306, recorded on March 10, 1976 in Book 368 of Maps at pages 31, 32 and 33, Santa Clara County Records, has been used as the basis of bearings for this survey.

**SURVEYOR'S CERTIFICATE**

This map correctly represents a survey made by me or under my direction in conformance with the requirements of the Land Surveyors Act at the request of the City of Santa Clara in the month of December 1976.

John C. Nuessmann L.S. 3439

**COUNTY SURVEYOR'S CERTIFICATE**

This map has been examined for conformance with the requirements of the Land Surveyors Act this 12th day of January 1977.

Dean P. Larson, County Surveyor

By: Deputy

**RECORDER'S CERTIFICATE**

File Nº. 5522860
Fee $5.00 Paid
Filed this 12th day of January 1977 at 3:40 PM. in Book 386 of Maps at page 54 at the request of John C. Nuessmann.

George A. Mann, County Recorder

By: Deputy

# RECORD OF SURVEY

OF PROPOSED STREET IN MARRIOTT COMMERCIAL PARK IMPROVEMENT PROJECT NO. 173
BEING PORTIONS OF THE LANDS OF MARRIOTT CORPORATION, SUCCESSOR BY MERGER TO FESPAR ENTERPRISES, INC. AND MARRIOTT HOTELS INC.,
STEPHEN & MARY DORCICH & ZATON CORPORATION
AS SHOWN ON RECORD OF SURVEY RECORDED ON AUGUST 22, 1974 IN BOOK 345 OF MAPS AT PAGES 1 TO 8, INCLUSIVE
SANTA CLARA COUNTY RECORDS

SANTA CLARA COUNTY,                    CALIFORNIA
SCALE : 1" = 200'                      DECEMBER 1976

**WILSEY & HAM**
1035 E. HILLSDALE BLVD. FOSTER CITY, CALIFORNIA 94404

LOCATION MAP

STATE HIGHWAY 101

1944-1014-15

## LOCATION MAP

PROJECT

NORTH

LEGEND:

◉ Existing Standard City of Santa Clara Monument.

▪ State of California Highway Monument as shown on Record of Survey Book 386 Page 54.

● 3/4" Iron Pipe with L.S. tag 3805 as shown on Record of Survey Book 386 Page 54.

◉ 3/4" Iron Pipe with L.S. tag 3805 to be set by January 1, 1978.

◎ Standard City of Santa Clara Street Monument to be set by January 1, 1978.

BASIS OF BEARING:

The bearing of the course designated as "N36 27'53"W 755.72 feet" between found City of Santa Clara Monuments of the monumentline of Mission College Boulevard, as said course, monuments, monumentline and Boulevard are shown on Parcel Map 3396, recorded on March 10, 1976 in Book 368 of Maps at Pages 31, 32 and 33, Santa Clara County Records, has been used as the basis of bearings for this survey.

STATE OF CALIFORNIA     ) S.S.
COUNTY OF SANTA CLARA   )

On this 29th day of December, 1977, before me, Georgia B. Rooks, a Notary Public in and for said County and State, personally appeared William L. Reed and Richard M. Parker, known to me to be the asst. secty. and asst. vice pres. respectively, of Title Insurance and Trust Company, the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named and they acknowledge to me that such corporation executed the same.
IN WITNESS WHEREOF, I have set my hand and official seal on the day and year in this certificate first above written.

My Commission expires 1-12-81                Georgia B. Rooks
                                             Notary Public in and for the
                                             County of Santa Clara
                                             State of California

GEORGIA B. ROOKS
NOTARY PUBLIC-CALIFORNIA
SANTA CLARA COUNTY
My commission expires Jan. 12, 1981

STATE OF CALIFORNIA     ) S.S.
COUNTY OF SANTA CLARA   )

On this 29th day of DEC, 1977, before me, Patricia R. Green, a Notary Public in and for said County and State, personally appeared DAVID L. BROWN and ____ respectively, of Marriott Properties, Inc., the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named and they acknowledge to me that such corporation executed the same.
IN WITNESS WHEREOF, I have set my hand and official seal on the day and year in this certificate first above written.

My Commission expires July 25, 1981        Patricia R. Green
                                           Notary Public in and for the
                                           County of Santa Clara
                                           State of California

OFFICIAL SEAL
PATRICIA R. GREEN
NOTARY PUBLIC — CALIFORNIA
PRINCIPAL OFFICE IN THE
COUNTY OF SANTA CLARA
Comm. Exp. July 25, 1981

OWNERS' CERTIFICATE
We, the undersigned, hereby certify that we are the owners of or have some right, title or interest in and to the real property shown within the boundary of this Parcel Map and that we consent to the preparation and recordation of said Parcel Map.

AS OWNERS:

Marriott Corporation, successor by merger to Fespar Enterprises, Inc. and Marriott Hotels, Inc.

David L. Brown
GROUP VICE PRESIDENT

Stephen N. Dorcich, Executor for        Stephen N. Dorcich, Executor for
the Estate of Stephen Dorcich           the Estate of Mary Dorcich

AS TRUSTEE:

Title Insurance and Trust Company, a California Corporation

William L. Reed                         Richard M. Parker
assistant secretary                     assistant vice president

AS LESSEE:

Marriott Properties, Inc., a Delaware Corporation

David L. Brown
GROUP VICE PRESIDENT

STATE OF CALIF.         ) S.S.
COUNTY OF SANTA CLARA   )

On this 29th day of DEC, 1977, before me, PATRICIA R. GREEN a Notary Public in and for said County and State, personally appeared DAVID L. BROWN and ____, known to me to be the Group Vice Pres and ____ respectively, of Marriott Corporation the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named and they acknowledge to me that such corporation executed the same.
IN WITNESS WHEREOF, I have set my hand and official seal on the day and year in this certificate first above written.

My Commission expires July 25, 1981        Patricia R. Green
                                           Notary Public in and for the
                                           County of SANTA CLARA
                                           State of CALIFORNIA

OFFICIAL SEAL
PATRICIA R. GREEN
NOTARY PUBLIC — CALIFORNIA
PRINCIPAL OFFICE IN THE
COUNTY OF SANTA CLARA
Comm. Exp. July 25, 1981

STATE OF CALIFORNIA     ) S.S.
COUNTY OF SANTA CLARA   )

On this 29 day of Dec, 1977, before me, Beverly J. Gaffett a Notary Public in and for said County and State, personally appeared Stephen N. Dorcich, known to me to be the person whose name is subscribed to the within instrument as the Executor for the Estates of Stephen Dorcich and Mary Dorcich, and he acknowledged to me that he executed the same on behalf of the Estates therein named.
IN WITNESS WHEREOF, I have set my hand and official seal in the day and year in this certificate first above written.

My Commission expires 9-14-1981        Beverly J. Gaffett
                                       Notary Public in and for the
                                       County of Santa Clara
                                       State of California

BEVERLY J. GAFFETT
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My commission expires Sept. 14, 1981

SURVEYOR'S CERTIFICATE

This work was prepared by me or under my direction and was compiled from record data in conformance with the requirements of the Subdivision Map Act at the request of Marriott Corporation on December 1976. I hereby certify that it conforms to the Approved Tentative Map and the conditions of approval thereof. Parcel Corner Monuments and Street Centerline Monuments, as shown, will be set by January 1, 1978.

James O. Webb Jr.
James O. Webb Jr. - L.S. 3805

CITY ENGINEER'S CERTIFICATE

This map conforms with the requirements of the Subdivision Map Act and local ordinances.

Date: Dec. 29, 1977        James T. Gleeson        R.C.E. 16938
                           Asst. Director of Public Works
                           City of Santa Clara, California

RECORDER'S CERTIFICATE

Filed this 29th day of December, 1977, at 4:49 P.M. in Book 410 of Maps at Pages 29 & 30, at the request of James O. Webb, Jr.

File No. 5887351

Fee $ 7.00 paid

George A. Mann, County Recorder

By: B. Louise Whitmer
    Deputy

## PARCEL MAP

BEING A RESUBDIVISION OF
LANDS OF MARRIOTT CORPORATION, SUCCESSOR BY MERGER
TO FESPAR ENTERPRISES, INC. AND MARRIOTT HOTELS INC.,
AND STEPHEN & MARY DORCICH
AS SHOWN ON RECORD OF SURVEY RECORDED ON JANUARY 12, 1977
IN BOOK 386 OF MAPS AT PAGE 54
SANTA CLARA COUNTY RECORDS

CITY OF SANTA CLARA,              SANTA CLARA COUNTY, CALIFORNIA
SCALE : 1" = 200'                          JANUARY 1977

WILSEY & HAM
1035 E. HILLSDALE BLVD.  FOSTER CITY, CALIFORNIA  94404



**PARCEL MAP**

BEING A RESUBDIVISION OF
LANDS OF MARRIOTT CORPORATION, SUCCESSOR BY MERGER
TO FESPAR ENTERPRISES, INC. AND MARRIOTT HOTELS INC.,
AND STEPHEN & MARY DORCICH
AS SHOWN ON RECORD OF SURVEY RECORDED ON JANUARY 12,1977
IN BOOK 386 OF MAPS AT PAGE 54
SANTA CLARA COUNTY RECORDS

CITY OF SANTA CLARA,        SANTA CLARA COUNTY, CALIFORNIA
SCALE : 1" = 200'                              JANUARY 1977

WILSEY & HAM

1035 E. HILLSDALE BLVD.   FOSTER CITY, CALIFORNIA   94404

LOCATION MAP

INSET 1

INSET 2

December 29, 1977, File No. 5887351

Book 410 of Maps, Pages 29 + 30

1944-0707-15

SHEET 2 OF 2 SHEETS

S 1056

410/30

## ENGINEER'S CERTIFICATE

This map was prepared by me or under my direction and is based upon a field survey in conformance with the requirements of the Subdivision Map Act at the request of A. & P. Company on July 21, 1978. I hereby state that the parcel map substantially conforms to the approved or conditionally approved Tentative map, if any.

Dated March 5, 1979

PAUL E NOWACK   R.C.E. 18764

## CITY ENGINEER'S CERTIFICATE

This map conforms with the requirement of the Subdivision Map Act and local ordinance.

Dated May 16, 1979

S. M. CRISTOFANO   R.C.E. 10827
CITY OF SANTA CLARA
DIRECTOR OF PUBLIC WORK / CITY ENGINEER

## RECORDER'S CERTIFICATE

File No. 6379042 Fee $ 5.00
Filed this 18TH day of MAY, 1979, at 3:16 P.M. in Book 442 of Maps at page 8 at the request of Paul E. Nowack and Associates

GEORGE A. MANN, County Recorder

By Kathryn A. Coverston DEPUTY

442/8

## ACKNOWLEDGMENT

STATE OF CALIFORNIA   S.S.
COUNTY OF SANTA CLARA

On this 9th day of April, 1979 before me, the undersigned, a Notary Public in and for said state, personally appeared E. M. Woodburn known to me to be the asst. vice President, and Claudia Nichols known to me to be asst. Secretary of the corporation that executed the within instrument known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors, As Trustee

WITNESS my hand and official seal



LAURA M. RICKARD
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My commission expires June 19, 1981

Laura M. Rickard
NOTARY PUBLIC IN AND FOR THE COUNTY OF
SANTA CLARA, STATE OF CALIFORNIA

## NOTES AND LEGEND

All distances and dimensions are shown in feet and decimals thereof.

—— —— Indicates the boundary of land subdivided by this map.

⊚ Indicates City Standard Monument Found per (P.M. Bk. 410 M. Pg. 29 & 30)
● Indicates 3/4" Iron Pipe Found per (P.M. Bk. 410 M. Pg. 29 & 30)
○ Indicates 3/4" Iron Pipe Set.

## OWNER'S CERTIFICATE

We hereby certify that we are the owners of or have some right, title or interest in and to the real property included within the subdivision shown upon this map; that we are the only persons whose consent is necessary to pass a clear title to said real property; that we hereby consent to the making and recording of this map and subdivision within the distinctive border line.

We hereby offer for dedication to public use easement for underground electrical facilities on or over those certain strips of land designated as U.G.E.E. (Underground Electrical Easement) Easements are to be free from building and structures of any kind except lawful fences and structures permitted within an underground electrical easement

AS OWNERS:

RICHARD T. PEERY, TRUSTEE UNDER TRUST AGREEMENT DATED JULY 20, 1977 (VOLUME 060 O.R. SANTA CLARA COUNTY RECORDS COMMENCING PAGE 100)
TITLE INSURANCE AND TRUST COMPANY, a California Corporation, As Trustee

JOHN ARRILLAGA TRUSTEE UNDER TRUST AGREEMENT DATED JULY 20, 1977 (VOLUME 060 O.R. SANTA CLARA COUNTY RECORDS COMMENCING PAGE 73)

asst. vice president

assistant secretary

## ACKNOWLEDGMENT

STATE OF CALIFORNIA   S.S.
COUNTY OF SANTA CLARA

On this 5th day of March, 1979, before me, the undersigned, a Notary Public in and for said state, personally appeared RICHARD T. PEERY and JOHN ARRILLAGA known to me to be the persons whose are subscribed to within instrument and that they acknowledged to me that they executed the same, As Owners

WITNESS my hand and official seal.

OFFICIAL SEAL
JUDITH E. MATTSON
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN THE
COUNTY OF SANTA CLARA
My Commission Expires April 28, 1980

Judith E. Mattson
NOTARY PUBLIC IN AND FOR THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA

## BASIS OF BEARINGS

The bearing N. 0°02'19"E of the Centerline of FREEDOM CIRCLE, as shown on that certain Parcel Map recorded in Book 410 of Maps at pages 29 and 30, Santa Clara County Records was taken as the basis of bearings for this map.

## CITY CLERK'S CERTIFICATE

I hereby certify that the Tentative of PARCEL MAP was approved by the City Council of the City of Santa Clara at a duly authorized meeting held on AUGUST 14, 1978 and that said Council did, at said meeting accept the dedication of all easements offered for dedication and shown on said map within said subdivision for the purposes set forth in the offer of dedication

A. S. Belich
CITY CLERK AND EX-OFFICIO CLERK OF THE CITY COUNCIL OF THE CITY OF SANTA CLARA, STATE OF CALIFORNIA

# PARCEL MAP

CONSISTING OF ONE (1) SHEET, BEING ALL OF PARCEL 3, AS SHOWN ON THAT CERTAIN "PARCEL MAP" RECORD IN BOOK 410 OF MAPS AT PAGE 29 & 30, SANTA CLARA COUNTY RECORDS AND LYING WITHIN THE

# CITY OF SANTA CLARA, CALIFORNIA

PAUL E. NOWACK AND ASSOC., INC.
CIVIL ENGINEERS-SURVEYORS
220 STATE STREET   SUITE E
LOS ALTOS, CALIFORNIA 94022
415/941-2626

DATE MAR. 1979
SCALE AS SHOWN
DRAWN BY H.T.
APPROVED BY P.E.N
DRAWING NO 8216

SCALE: 1" = 100'

**Lands of Marriott Corporation** Bk. 410, Pg. 29 & 30

**PARCEL 1** 3.2699± Ac.

**PARCEL 2** 8.2797± Ac.

STATE HIGHWAY 101

FREEDOM CIRCLE

¢ MISSION COLLEGE BOULEVARD

Lands of Marriott Corporation Bk. 410 Pg. 29 & 30

San Tomas Aquino Creek

C.S.C. S. 1142



RECORD OF SURVEY CERTIFICATE

This Record of Survey complies with the provisions of the Subdivision Map Act, Division 2, (commencing with Section 66410) of Title 7 of the Government Code and appropriate local ordinances.

January 11, 1977
Date

S.M. Cristofano R.C.E. 10827
Director of Public Works
City Engineer
City of Santa Clara, California

### LEGEND

⊛ Found standard City of Santa Clara Monument
● Found State of California Highway Monument
○ Set 3/4" Iron Pipe with L.S. tag 3439
⊚ Standard City of Santa Clara Street Monument to be set by January 1, 1978.

### BASIS OF BEARING

The bearing of the course designated as "N36°27'53"W 755.72 feet" between found City of Santa Clara Monuments of the monument line of Mission College Boulevard, as said course, monuments, monument line and Boulevard are shown on Parcel Map 3306, recorded on March 10, 1976 in Book 368 of Maps at pages 31, 32 and 33, Santa Clara County Records, has been used as the basis of bearings for this survey.

### SURVEYOR'S CERTIFICATE

This map correctly represents a survey made by me or under my direction in conformance with the requirements of the Land Surveyors Act at the request of the City of Santa Clara in the month of December 1976.

John C. Nuessmann L.S. 3439

### COUNTY SURVEYOR'S CERTIFICATE

This map has been examined for conformance with the requirements of the Land Surveyors Act this 12th day of January 1977.

Dean P. Larson, County Surveyor
By: _____ Deputy

### RECORDER'S CERTIFICATE

File Nº 5522860
Fee $5.00  Paid
Filed this 12th day of January 1977 at 3:40 P.M. in Book 386 of Maps at page 54 at the request of John C. Nuessmann.

George A. Mann, County Recorder
By: _____ Deputy

## RECORD OF SURVEY

OF PROPOSED STREET IN MARRIOTT COMMERCIAL PARK IMPROVEMENT PROJECT NO. 173
BEING PORTIONS OF THE LANDS OF MARRIOTT CORPORATION, SUCCESSOR BY MERGER TO FESPAR ENTERPRISES, INC. AND MARRIOTT HOTELS INC.,
STEPHEN & MARY DORCICH & ZATON CORPORATION
AS SHOWN ON RECORD OF SURVEY RECORDED ON AUGUST 22, 1974 IN BOOK 345 OF MAPS AT PAGES 1 TO 8, INCLUSIVE SANTA CLARA COUNTY RECORDS

SANTA CLARA COUNTY,          CALIFORNIA
SCALE : 1" = 200'            DECEMBER 1976

### WILSEY & HAM
1035 E. HILLSDALE BLVD. FOSTER CITY, CALIFORNIA 94404

LOCATION MAP

PROJECT

STATE HIGHWAY 101

386/54
386/54

1944-1014-15



## SURVEYOR'S CERTIFICATE

This map was prepared by me or under my direction and is based from record data in conformance with the requirements of the Subdivision Map Act at the request of JOHN ARRILLAGA during November, 1976. I hereby state that the parcel map procedures of the local agency have been complied with and that this parcel map conforms to the approved tentative map and the conditions of approval thereof which were required to be fulfilled prior to the filing of the parcel map.

*Paul E. Nowack*
PAUL E. NOWACK          R.C.E. 18764

## CITY ENGINEER'S CERTIFICATE

This map conforms with the requirement of the Subdivision Map Act and local ordinance.

Dated March 4, 1977

*Sam Cristofano*
S.M. CRISTOFANO          R.C.E. 10827
DIRECTOR OF PUBLIC WORK / CITY ENGINEER
CITY OF SANTA CLARA

## RECORDER'S CERTIFICATE

File No. 5583614  Fee $ 5.00
Filed this 18th day of MARCH, 1977, at 8:00 A.M. in Book 391 of Maps at page 6 at the request of Paul E. Nowack and Associates

GEORGE A. MANN, County Recorder

By _____ DEPUTY

391
6

## BASIS OF BEARINGS

The bearing N. 76°30'56"W of the centerline of SCOTT BOULEVARD as shown on that certain map entitled "RECORD OF SURVEY" recorded in Book 333 of Maps at page 36, Santa Clara County Records was taken as basis of bearings for this map.

391
6

## NOTES AND LEGEND

All distances and dimensions are shown in feet and decimals thereof.
———— Indicates distinctive boundary of land subdivided by this map.
◎ Indicates City Standard Monument as per Record of Survey (BK. 333 M. Pg 36)
● Indicates 3/4" Iron Pipe found (as per Parcel Map, Bk. 334 of Maps Pg. 28)

## OWNER'S CERTIFICATE

We hereby certify that we are the owners of or have some right title or interest in and to the real property included within the subdivision shown on this map; that we are the only persons whose consent is necessary as set forth under Government Code 66445 F; that we hereby consent to the making of said map and subdivision as shown within the distinctive border line
We hereby offer for dedication to public use easements for underground electrical facilities under on or over those certain strips of land designated as U.G.E.E (Underground Electrical Easement) Easements are to be kept free from building and structures of any kind except lawful fences and utility structures permitted within on Underground Electrical Easement.

AS OWNERS:

*Richard T. Peery*
RICHARD T. PEERY          A MARRIED MAN, AS HIS SOLE & SEPARATE
                          AS TO AN UNDIVIDED 1/2 INTEREST

*John Arrillaga*
JOHN ARRILLAGA          A MARRIED MAN, AS HIS SOLE & SEPARATE
                        AS TO UNDIVIDED 1/2 INTEREST

RH 3/9/77

## ACKNOWLEDGMENT

STATE OF CALIFORNIA
COUNTY OF SANTA CLARA
On this 21st day of January, 1977, before me, the undersigned, a Notary Public in and for said State, personally appeared RICHARD T. PERRY and JOHN ARRILLAGA known to me to be the persons who are subscribed to within Instrument and that they acknowledged to me that they executed the same, As Owners.
WITNESS my hand and official seal

*Mary Jo Milks*
NOTARY PUBLIC IN AND FOR THE COUNTY OF
SANTA CLARA, STATE OF CALIFORNIA

OFFICIAL SEAL
MARY JO MILKS
NOTARY PUBLIC — CALIFORNIA
PRINCIPAL OFFICE IN THE
COUNTY OF SANTA CLARA
My Commission Expires October 7, 1977

## CITY CLERK'S CERTIFICATE

I hereby certify that this Parcel Map was approved by the City Council of the City of Santa Clara at a duly authorized meeting held on February 1, 1977, and that said Council did, at said meeting accept the dedication of all portions of land and all easements offered for dedication and shown on said map within said subdivision for the purposes set forth in the offer of dedication

*A. S. Belick*
CITY CLERK AND EX-OFFICIO CLERK OF THE COUNCIL
OF THE CITY OF SANTA CLARA, CALIFORNIA

# PARCEL MAP

CONSISTING OF ONE (1) SHEET
BEING ALL OF PARCEL C, D AND E, AS SHOWN ON THAT CERTAIN MAP ENTITLED "PARCEL MAP" RECORDED IN BOOK 334 OF MAPS, AT PAGE 28, SANTA CLARA COUNTY RECORDS AND LYING WITHIN THE

# CITY OF SANTA CLARA, CALIFORNIA

 

| | |
|---|---|
| PAUL E. NOWACK AND ASSOC., INC. | DATE: NOV 1976 |
| CIVIL ENGINEERS-SURVEYORS | SCALE: AS SHOWN |
| 220 STATE STREET  SUITE E | DRAWN BY: H.T. |
| LOS ALTOS, CALIFORNIA 94022 | APPROVED BY: P.E.N. |
| 415/941-2626 | DRAWING NO: 6288 |

S.1043

DATAPRINT



# PARCEL MAP

### LANDS OF

### KAISER AETNA A PARTNERSHIP,
### INTEL CORP & AMPEX CORP.

IN THE CITY OF SANTA CLARA
COUNTY OF SANTA CLARA, CALIFORNIA.
BEING A PORTION OF SECTION 28, T.6S., R.1W., M.D.B.&M.

## MISSION      ENGINEERS

1495 FRANKLIN ST.          SANTA CLARA, CALIF.

JOHN JAY BROWN           CIVIL ENGINEER

SCALE: 1"=200'              APRIL, 1970

JOB NO. J0102 C. J0954 & J1273    DWG. NO. M 4572

SHEET 1 OF 2 SHEETS



### PARCEL MAP

LANDS OF

KAISER AETNA, A PARTNERSHIP,
INTEL CORP. & AMPEX CORP.

IN THE CITY OF SANTA CLARA
COUNTY OF SANTA CLARA, CALIFORNIA
BEING A PORTION OF SECTION 28, T.6 S., R.1W., M.D.B.&M.

### MISSION ENGINEERS

1495 FRANKLIN ST.            SANTA CLARA, CALIF.

JOHN JAY BROWN            CIVIL ENGINEER

SCALE: 1"= 200'            APRIL, 1970

JOB NO. J0102C, J0954, J1273        DWG. NO. M 4573

SHEET 2 OF 2 SHEETS

A. **EXHIBIT O**

*Exhibit O — Photographs taken by Plaintiff on May 1 2026 at San Tomas Aquino Creek by Scott Blvd in Santa Clara.*





Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd overpass in City of Santa Clara.





Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd overpass in City of Santa Clara.



Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd overpass in City of Santa Clara.

Field tests overall on May 1 2026 showed pH 9.25-9.5, TDS 505-607 PPM, alkalinity > 240 PPM, chlorine ~10-20 PPM, iron at ~0.3 PPM, hardness > 425 PPM, & copper at ~0.2 PPM.





Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd overpass in City of Santa Clara.

 

Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd overpass in City of Santa Clara.

Field tests overall on May 1 2026 showed pH 9.25-9.5, TDS 505-607 PPM, alkalinity > 240 PPM, chlorine ~10-20 PPM, iron at ~0.3 PPM, hardness > 425 PPM, & copper at ~0.2 PPM.






Photos by Ashley Gjovik during May 1 2026 visit to San Tomas Aquino Creek at the Scott Blvd building outfall upstream from Scott Blvd, in City of Santa Clara.