WILLIAM F. TARANTINO [SBN 215343]
WTarantino@mofo.com
ALBERTO J. CORONA [SBN 339906]
ACorona@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

JULIE Y. PARK [SBN 259929]
JuliePark@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, California 92130-3588
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

Attorneys for Defendants APPLE INC., KALIL
JENAB, JENAB FAMILY LP, JENAB FAMILY
VENTURES LLC, and JENAB FAMILY TRUST

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| ASHLEY M. GJOVIK, | Case No. 5:25-cv-07360-PCP |
|---|---|
| Plaintiff, | **DEFENDANTS APPLE INC., KALIL JENAB, JENAB FAMILY VENTURES LLC, AND JENAB FAMILY TRUST'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| APPLE INC., ET AL. | |
| Defendants. | Date:  June 25, 2026 |
| | Time: 10:00 a.m. |
| | Courtroom:  8, 4th Floor |
| | Judge:  Hon. P. Casey Pitts |
| | FAC Filed:  November 29, 2026 |
| | Trial Date:  TBD |

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-07360-PCP

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................... 1

II.     EVIDENTIARY OBJECTIONS............................................................................ 2

III.    FACTUAL BACKGROUND AND RECORD CORRECTIONS ................................. 3

        A.    Engineering Controls and Compliance Systems ........................................ 4

        B.    Historical Events and Remediation ......................................................... 5

IV.     LEGAL STANDARD ......................................................................................... 6

V.      ARGUMENT .................................................................................................... 7

        A.    RCRA Does Not Authorize a Facility-Wide Shutdown Based on Permitted
              Air Emissions and Non-Waste Chemical Inventory ................................... 7

        B.    The Clean Air Act Does Not Support Emergency Relief Where Plaintiff
              Shows No Standing, No Current Violation, and No Actual Imminent Risk ........ 11

        C.    The Clean Water Act Does Not Reach Plaintiff's Speculative Wastewater,
              Stormwater, and Groundwater Theories ................................................. 15

        D.    A Permitted, Compliant Facility Is Not an Enjoinable Public Nuisance ............. 20

        E.    The Balance of the Equities Weighs Heavily Against Shutting Down
              Apple's Permitted Research Operations and Plaintiff's Request Is Grossly
              Disproportionate........................................................................................ 21

        F.    The Public Interest Favors Continued Regulatory Oversight and Not a
              Court-Ordered Shutdown of Lawful Operations...................................... 23

        G.    Plaintiff's Speculation Cannot Support a Finding of Irreparable Harm .............. 25

VI.     CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)................................................................................................ 23

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).................................................................................. 6

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
    729 F.3d 937 (9th Cir. 2013)................................................................................ 6, 7

*Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*,
    768 F. Supp. 2d 1092 (D. Colo. 2011)..................................................................... 10

*Candlestick Heights Cmty. All. v. City & Cnty. of S.F.*,
    No. 23-cv-00082-SK, 2023 WL 9317153 (N.D. Cal. Dec. 21, 2023),
    *aff'd*, 2025 WL 275112 (9th Cir. Jan. 23, 2025)...................................................... 12

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015).................................................................................. 25

*Cnty. of Maui v. Hawaii Wildlife Fund*,
    590 U.S. 165 (2020)................................................................................................. 20

*CTIA – The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019).................................................................................... 23

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*,
    764 F.3d 1019 (9th Cir. 2014)............................................................................. 8, 11

*Earth Island Inst. v. Carlton*,
    No. CIV. S-09-202, 2009 WL 9074754 (E.D. Cal. Aug. 20, 2009) ....................... 25

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*,
    713 F.3d 502 (9th Cir. 2013).............................................................................. 9 n.1

*Ecological Rts. Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000).................................................................................. 12

*Eisenstecken v. Tahoe Reg'l Plan. Agency*,
    No. 2:20-cv-02349-DJC-CKD, 2025 WL 1531678 (E.D. Cal. May 28, 2025)....... 21

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020).............................................................................. 12, 13

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
  61 F.4th 1012 (5th Cir. 2023)........................................................................................... 13

*Fortyune v. Am. Multi-Cinema, Inc.*,
  364 F.3d 1075 (9th Cir. 2004)......................................................................................... 25

*Friends of the Earth v. Sanderson Farms, Inc.*,
  No. 17-cv-03592-RS, 2019 WL 3457787 (N.D. Cal. July 31, 2019),
  *aff'd*, 992 F.3d 939 (9th Cir. 2021) ................................................................................. 12

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc)............................................................................. 7

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) ............................................................................................. 12, 20, 24

*Hanford Challenge v. Moniz*,
  No. 4:15-CV-5086-TOR, 2016 WL 11795779 (E.D. Wash. Nov. 15, 2016) .......................... 9

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007)......................................................................................... 25

*Kiva Health Brands LLC v. Kiva Brands, Inc.*,
  402 F. Supp. 3d 877 (N.D. Cal. 2019) .............................................................................. 23

*L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
  506 F. Supp. 3d 1018 (C.D. Cal. 2020).......................................................................... 9, 11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................................................ 12

*Luthringer v. Moore*,
  31 Cal. 2d 489 (1948) ..................................................................................................... 21

*McIvor v. Mercer-Fraser Co.*,
  76 Cal. App. 2d 247 (1946)............................................................................................. 21

*N. Cal. River Watch v. Fluor Corp.*,
  No. 10-cv-05105-MEJ, 2014 WL 3385287 (N.D. Cal. July 9, 2014)...................................... 7

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
  457 F.3d 941 (9th Cir. 2006)........................................................................................... 12

*Oakland Trib., Inc. v. Chronicle Publ'g Co.*,
  762 F.2d 1374 (9th Cir. 1985)......................................................................................... 23

*Park Vill. Apartments Tenants Ass'n v. Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011).......................................................................................... 7

*People ex rel. Bradford v. Goddard*,
    47 Cal. App. 730 (1920)...................................................................................................... 21

*People ex rel. Gallo v. Acuna*,
    14 Cal. 4th 1090 (1997) ..................................................................................................... 21

*Price v. U.S. Navy*,
    39 F.3d 1011 (9th Cir. 1994)................................................................................................ 8

*Pub. Watchdogs v. S. Cal. Edison Co.*,
    No. 19-CV-1635 JLS (MSB), 2019 WL 6497886 (S.D. Cal. Dec. 3, 2019),
    *aff'd*, 984 F.3d 744 (9th Cir. 2020) ................................................................................... 21

*Puget Soundkeeper All. v. Port of Tacoma*,
    104 F.4th 95 (9th Cir. 2024)............................................................................................... 16

*Remington v. Mathson*,
    42 F. Supp. 3d 1256 (N.D. Cal. 2012), *aff'd*, 575 F. App'x 808 (9th Cir. 2014) ..................... 3

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)............................................................................................. 8

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)......................................................................................................... 12

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ............................................................................................................. 6

**Statutes, Regulations, and Rules**

42 U.S.C.
    § 6903(27) ....................................................................................................................... 8
    § 6972(a)(1)(B) ......................................................................................................... 7, 8, 9
    § 7604(a)(1)................................................................................................................... 14

40 C.F.R.
    Part 136 ......................................................................................................................... 19
    Part 469 ......................................................................................................................... 16

40 C.F.R. § 68.25 ........................................................................................................... 5, 14

Fed. R. Evid.
    401.................................................................................................................................. 2
    602.................................................................................................................................. 2
    701............................................................................................................................... 2, 3
    702............................................................................................................................... 2, 3
    801(c) ............................................................................................................................. 2
    803(6)(D)........................................................................................................................ 2
    805.................................................................................................................................. 2

Cal. Civ. Code § 3482 ............................................................................................................ 21

**Other Authorities**

BAAQMD Regulation 2-5 ...................................................................................................... 14

U.S. Centers for Disease Control and Prevention, Hand Sanitizer Guidelines and
    Recommendations (Mar. 12, 2024), https://www.cdc.gov/clean-
    hands/about/hand-sanitizer.html ................................................................................ 10 n.2

## I.    INTRODUCTION

Plaintiff has not identified (because she cannot) a single present violation or hazardous condition at Apple's semiconductor research and development facility at 3250 Scott Blvd. in Santa Clara. Yet she asks this Court for the most extraordinary relief available: a mandatory injunction ordering Apple to remove the materials it is permitted and authorized to use at a facility subject to continuous oversight by the California EPA, the Bay Area Air Quality Management District, and local wastewater and fire authorities. Granting her request would shutter an active research and development operation—not because anything is wrong, but because Plaintiff speculates that something might go wrong. That does not suffice. Preliminary injunctions are exceptional remedies, and mandatory injunctions are particularly disfavored. Plaintiff fails to show that the law and facts clearly favor her position. She identifies no condition requiring emergency relief, and no set of facts suggesting even a likelihood of success on the merits. Her motion should be denied, and as explained in Apple's motion to dismiss, the complaint should be dismissed in its entirety.

Rather than identifying any facts to support likelihood of success on the merits, Plaintiff offers only unqualified and unfounded opinions on past events, hypothetical worst-case scenarios, and speculative theories untethered to current operations. Each of the cited events were investigated by the facility or, in limited circumstance, responsible agencies. Corrective actions were taken where appropriate, and the matters were resolved. Her RCRA claim improperly treats permitted air emissions and useful chemical inventory as "waste," even though RCRA regulates only waste handling—not ordinary chemical use or air emissions. Her Clean Air Act claim fails because she lacks standing and identifies no current violation or actual imminent risk. Her Clean Water Act claim fails because Apple operates within its permits, monitoring data demonstrate compliance, and Plaintiff's stormwater and groundwater theories are speculative. Her nuisance claim repackages the same deficient theories and fails to identify an ongoing interference with any public right. Without any viable cause of action, Plaintiff cannot show a likelihood of success on the merits.

The remaining preliminary injunction factors—irreparable harm, balance of the equities, and public interest—independently confirm that relief should be denied. Plaintiff delayed seeking an injunction, relies on hypothetical worst-case modeling rather than evidence of imminent harm,

and asks the Court to override the judgments of the expert agencies charged with overseeing the Facility. The requested injunction would halt lawful semiconductor research operations based on conjecture rather than any demonstrated imminent danger. The motion should be denied.

## II.    EVIDENTIARY OBJECTIONS

Defendants object to Plaintiff's declaration and exhibits on these grounds: (1) relevance, Fed. R. Evid. 401; (2) lack of foundation and speculation, Fed. R. Evid. 602; (3) hearsay, Fed. R. Evid. 801(c); and (4) improper opinion by a lay witness, Fed. R. Evid. 701, 702. Defendants also object to the Amended Declaration of Steve Zeltzer on these grounds: (1) relevance, Fed. R. Evid. 401; (2) hearsay, Fed. R. Evid. 801(c); and (3) lacks foundation and is speculative, Fed. R. Evid. 602. While courts retain discretion to consider otherwise inadmissible evidence at the preliminary injunction stage, the submissions are so deficient that the Court should afford them no weight.

*First*, Plaintiff's declaration seeks to introduce irrelevant information. Fed. R. Evid. 401. It either relies on historical information that is irrelevant to current conditions or recites her personal policy preferences that are not probative of any issue before the Court. (*See*, *e.g.*, Gjovik Decl. Ex. I, Dkt. No. 80-4 (Plaintiff's 2022 application to Santa Clara Planning Commission).)

*Second*, Plaintiff's declaration relies on inadmissible hearsay. For example, her in-home air quality testing document (Gjovik Decl. Ex. A, Dkt. No. 80-3.) consists entirely of statements and findings made by third parties and is not subject to any hearsay exception. Her apartment's Environmental Impact Report (*id.* Ex. S, Dkt. No. 80-4) has the same defect when offered against Apple and the Jenab Defendants. Likewise, her medical records are hearsay within hearsay and lack a declaration from a custodian or qualified witness. Fed. R. Evid. 803(6)(D), 805. (Gjovik Decl. Ex. A, Dkt. No. 80-3.) Exhibits U and Z to Plaintiff's declaration are EPA emails that do not reflect agency findings; contain statements made by representatives of other agencies, including BAAQMD; and are not indicative of any criminal or other agency findings regarding the Facility.

*Third*, Plaintiff's declaration includes statements that lack foundation and are speculative. Fed. R. Evid. 602. For example, Plaintiff relies on speculation as to the causes of her medical symptoms and their link to the Facility. (Gjovik Decl. ¶¶ 8-15, 20, Dkt. No. 80-3.) Plaintiff offers no foundation for her field observations or their link to Apple's Facility other than the fact that she

observed conditions downstream from the Facility's outfall. (*Id.* ¶ 37.) Nor does Plaintiff possess any expert qualifications in environmental science, chemistry, or any related discipline that would qualify her observations. Her observations are inadmissible. *See Remington v. Mathson*, 42 F. Supp. 3d 1256, 1260 (N.D. Cal. 2012) ("[Plaintiff's] speculative assertions that contamination allegedly found on his property originates from the [Defendant's] property is not competent evidence and is not admissible evidence . . . ."), *aff'd*, 575 F. App'x 808 (9th Cir. 2014).

*Fourth*, Plaintiff's declaration relies on scientific and technical knowledge not suitable for lay witness testimony. Fed. R. Evid. 701. Plaintiff effectively admits that she is not qualified in analytical chemistry, that she did not base her scientific opinions on sufficient facts or data, and that she did not use reliable methods. Fed. R. Evid. 702. Instead, she concedes that she relied on an at-home drinking water test kit and a hydroponics pH meter "not certified for laboratory-grade analytical results." (Gjovik Decl. ¶¶ 38, 40, Dkt. No. 80-3.) Plaintiff holds no degree, certification, or professional training in analytical chemistry, environmental science, or any related discipline that would qualify her to interpret the results these instruments produced. She also offers nothing to support her claims that her "readings" were anomalous. (*Id.* ¶ 39.) Accordingly, the Court should disregard most—if not all—of Plaintiff's declaration in support of her motion.

## III.    FACTUAL BACKGROUND AND RECORD CORRECTIONS

Apple operates a semiconductor research and development facility located at 3250 Scott Boulevard, Santa Clara, California (the "Facility"). The Facility is used for research and development of semiconductor technologies, which necessarily involves the use of specialized chemicals—including arsine, phosphine, chlorine, silane, and other gaseous and liquid reagents— as part of the semiconductor fabrication process. These chemicals are not waste; they are active inventory materials used in chemical synthesis and semiconductor research. (Declaration of Elizabeth Schmidt in Support of Apple's Opposition to Motion for Preliminary Injunction ("Schmidt Decl.") ¶ 46.) The Facility has been in operation since approximately 2015 and is situated in an area zoned for industrial use. (First Amended Complaint ("FAC") ¶ 32, Dkt. No. 48.) Plaintiff herself concedes that Apple has had a permit for the Facility's operations since it began operations. (*Id.* ¶ 475.)

The Facility is subject to comprehensive regulatory oversight by multiple federal, state, and local agencies. The Bay Area Air Quality Management District (BAAQMD) regulates the Facility's air emissions and has issued permits governing the use and emission of toxic air contaminants. Plaintiff concedes that Apple obtained a valid air permit from BAAQMD on May 1, 2023, which authorizes and limits annual emissions of arsine, phosphine, silane, and chlorine. (FAC ¶ 411.) The United States Environmental Protection Agency (EPA) exercises authority over the Facility's hazardous waste management under the Resource Conservation and Recovery Act (RCRA). The City of San Jose's Publicly Owned Treatment Works (POTW) regulates the Facility's wastewater discharges under Industrial Wastewater Discharge Permit SC-461B. The Facility also holds a valid National Pollutant Discharge Elimination System (NPDES) permit (FAC ¶¶ 129, 195, 565)—subject to oversight by the State Water Resources Control Board (SWRCB), and the San Francisco Bay Regional Water Quality Control Board (RWQCB). Additionally, the Facility is subject to the California Accidental Release Prevention (CalARP) program, which requires risk management planning for regulated substances above threshold quantities. The Santa Clara Fire Department oversees the Facility's Hazardous Materials Business Plan (HMBP) and chemical inventory disclosures through the California Environmental Reporting System (CERS). (Schmidt Decl. ¶¶ 4–5.) Apple operates the Facility in compliance with all applicable permits and regulatory requirements. Plaintiff does not allege—because she cannot—that Apple has exceeded any emission limit or violated any condition of its discharge permits. (*See generally* FAC.)

A.    **Engineering Controls and Compliance Systems**

The Facility maintains multiple independent layers of engineered protection designed to prevent uncontrolled releases and to ensure compliance with all applicable environmental regulations. These include automated gas detection and shutdown systems, dry scrubbers that abate toxic gas emissions with >99.9% efficiency, containment systems, ventilation controls, and safe-drain valves on storm drains that remain closed unless weather conditions indicate rain. (Schmidt Decl. ¶ 14; Declaration of Steven Trammell in Support of Apple's Opposition to Motion for Preliminary Injunction ("Trammell Decl.") ¶ 15; Declaration of Rizik Michael in Support of Apple's Opposition to Motion for Preliminary Injunction ("Michael Decl.") ¶¶ 3–4, 8.) The

Facility's Acid Waste Neutralization (AWN) system processes all wastewater prior to discharge to the POTW, ensuring compliance with the numeric effluent limits established in Permit SC-461B. (Declaration of Wendy Tredway in Support of Apple's Opposition to Motion for Preliminary Injunction ("Tredway Decl."), Ex. C at 6–10.) Apple's semiannual monitoring reports consistently demonstrate compliance with all applicable wastewater permit limits: concentrations of arsenic, copper, chromium, and zinc are below the limits established in Apple's permit across every reporting period from September 2016 through March 2026. (Schmidt Decl. ¶ 23.) To the extent trace trichloroethylene ("TCE") was detected once in Apple's wastewater in 2017, that one detection was below the Practical Quantitation Limit ("PQL"), meaning the concentration is too low to have confidence in the analytical results (*see* Gjovik Decl. Ex. T at 18, Dkt. No. 80-5) and is not evidence of any current condition. All hazardous waste generated at the Facility is appropriately classified when generated, stored in compliance with RCRA requirements, and transported offsite by licensed transporters under proper manifests. (Schmidt Decl. ¶ 44.) Solvent waste collected in the Facility's S-3 Solvent Waste Tank is removed as hazardous waste and is not discharged to the wastewater system. (*Id.* ¶ 21.)

As required by the CalARP program and EPA's Risk Management Program rule, 40 C.F.R. § 68.25, the Facility has prepared worst-case release scenario analyses for each regulated toxic substance. These analyses are conservative planning exercises mandated by regulation; they assume a complete failure of the largest vessel containing a regulated substance with no credit for any existing engineering controls, containment systems, or emergency response capabilities. (Trammell Decl. ¶ 11; Tredway Decl. ¶ 11; *id.* Ex. C at 1–4.) The existence of these modeled scenarios reflects the Facility's compliance with its regulatory obligations and not the likelihood of any such release occurring, particularly given the multiple layers of protection in place.

**B.    Historical Events and Remediation**

Plaintiff's motion relies heavily on a series of historical events spanning from 2014 through 2024 to suggest that the Facility poses an ongoing danger. However, each of these has been investigated, explained, and—where corrective action was warranted—fully remediated. Far from evidencing an ongoing danger, these events demonstrate that the Facility's engineering controls

and monitoring systems are functioning as intended and that Apple's programs are effective.

Each of the incidents Plaintiff cites was either a false positive sensor reading, a minor event that did not result in any release to the environment, or an event for which Apple promptly implemented corrective measures; none reflects any ongoing or unresolved condition at the Facility. (Schmidt Decl. ¶¶ 14–20.)

The regulatory agencies with jurisdiction over the Facility have confirmed that any identified violations have been resolved. EPA investigated the Facility, commenced enforcement, and entered into a Consent Agreement and Final Order (CAFO) in October 2025 after determining that Apple "has undertaken compliance actions to address and resolve regulatory issues identified by EPA during the inspections." (Dkt. No. 48-4 at 7.) Indeed, EPA found that Apple was in compliance with RCRA as of 2024. (*See id.* at 51-54.) BAAQMD has likewise resolved all outstanding air quality violations through settlement. (*See* Dkt. No. 88, Ex. B.) No regulatory agency has identified any ongoing violation or unresolved compliance issue at the Facility. Plaintiff's personal dissatisfaction with the EPA settlement, and her grievance that the scope of EPA's inspection was insufficient (FAC ¶¶ 24, 450) cannot overcome the consent agreement's preclusive effect on a subsequent citizen suit for the same alleged violations.

## IV.    LEGAL STANDARD

Preliminary injunctions are "extraordinary remed[ies] never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The Ninth Circuit uses a "'sliding scale' approach to evaluat[e] the first and third *Winter* elements" where "a preliminary injunction may be granted when there are 'serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff,' so long as 'the other two elements of the *Winter* test are also met.'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011)). However, this "sliding scale" does not relieve a plaintiff of their need to show a likelihood of success on the merits—where they fail to do so,

courts do not consider the remaining three *Winter* factors. *Id.*

Mandatory injunctions are particularly disfavored because they go beyond maintaining the status quo. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The burden on Plaintiff is "doubly demanding" and "she must establish that the law and facts *clearly favor* her point, not simply that she is likely to succeed." *Id.* "[M]andatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartments Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

## V.    ARGUMENT

All of Plaintiff's theories share a common, fatal deficiency: none identifies a present violation or ongoing noncompliance that could support the extraordinary mandatory relief Plaintiff seeks. Plaintiff's claims rest on her own unqualified opinions, undeveloped "facts" and a misreading of the statutes under which she brings this citizen suit. On those bases, she asks this Court to shutter a facility that has been permitted, inspected, and found compliant by every relevant regulatory authority—including EPA, BAAQMD, the City of San Jose, and the Santa Clara Fire Department. (*See, e.g.*, Michael Decl. ¶¶ 5–7, 9.) Her reliance on historical incidents, worst-case regulatory modeling, and speculative theories untethered to any current violation only underscores that the regulatory process is functioning as intended: Apple monitors its operations, reports to the responsible agencies, and corrects any issues to ensure the Facility operates safely within its permits.

### A.    RCRA Does Not Authorize a Facility-Wide Shutdown Based on Permitted Air Emissions and Non-Waste Chemical Inventory

RCRA's citizen suit provision does not authorize general public-safety challenges to industrial operations; it is limited to practices involving "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). To succeed on her RCRA claim, Plaintiff must "do more than establish the presence of solid or hazardous wastes at a site." *N. Cal. River Watch v. Fluor Corp.*, No. 10-cv-05105-MEJ, 2014 WL 3385287, at *8 (N.D. Cal. July 9, 2014). "Instead, 'endangerment must [be shown to] be substantial or serious, and there must be some necessity for the action." *Id.* (quoting

*Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). Plaintiff claims that the Facility's air emissions and the gaseous chemicals stored onsite under significant engineering controls present an imminent and substantial endangerment. However, any emissions are not "waste" as defined under RCRA. Nor does the definition of "waste" extend to all chemicals at the facility. The waste at the Facility is handled in accordance with RCRA: all waste is characterized, and hazardous waste is appropriately stored and manifested when transported offsite.

Plaintiff's chief complaint is the duly permitted emission of arsine, phosphine, silane, and other gaseous chemicals. (Mot. ¶¶ 8–11.) As a preliminary matter, RCRA does not extend to air emissions generally. 42 U.S.C. § 6972(a)(1)(B), the citizen suit provision which Plaintiff claims to be acting under, plainly limits an action to address imminent and substantial endangerment to those caused by "past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste." By its own terms, this provision does not extend to air emissions. *See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) ("RCRA's definition of 'disposal' does not include the act of 'emitting'"). The Ninth Circuit has specifically held that "RCRA's citizen-suit provision . . . does not permit individuals to bring suit to enforce § 6924(n)," the provision concerning air emissions. *Id.* at 1025. "[T]he very existence of § 6924(n) suggests that Congress, by not including 'emitting' in the actions prohibited under § 6972(a)(1)(B), intended to exclude it." *Id.* This exclusion is dispositive of Plaintiff's RCRA claim. Her theory relies on past gas releases, air dispersion modeling, and alleged inhalation exposure through ambient air—none of which are subject to a RCRA citizen suit.

Plaintiff focuses on chemicals at the Facility without reference to which, if any are regulated as "waste." Chemical reagents—or the ingredients used in chemical synthesis—in inventory are not "waste" under RCRA and are not subject to citizen suit liability unless there is an intent to discard them. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (9th Cir. 2004) (finding RCRA's definition of solid waste to be limited to "discarded" material where "discard" meant "cast aside; reject; abandon; give up"); 42 U.S.C. § 6903(27). Chemicals maintained for later use are not discarded and therefore are not "waste." Plaintiff again collapses the distinction between "waste" and chemicals, generally, by treating the facility's chemical inventory—such as arsine, phosphine,

chlorine—intended for later use in semiconductor research, as if their mere presence establishes the existence of hazardous *waste*.[1] Plaintiff's motion does not identify what, if anything has been discarded, abandoned, or otherwise converted into waste within the meaning of the statute. The mere presence of chemicals does not support mandatory injunctive relief under RCRA. Instead, RCRA requires a showing that an imminent and substantial endangerment from waste disposal and management actually exists. 42 U.S.C. § 6972(a)(1)(B); *see also Hanford Challenge v. Moniz*, No. 4:15-CV-5086-TOR, 2016 WL 11795779, at *3-4 (E.D. Wash. Nov. 15, 2016) (denying preliminary injunction for imminent and substantial endangerment claim because, among other reasons, toxic vapors from the hazardous waste tank had been contained, no further vapor exposures had occurred, and accordingly, no longer presented an imminent and substantial risk). Plaintiff's accusations concerning Apple's engineering controls that do not relate to waste are irrelevant under RCRA and confirm that Plaintiff fails to carry her heightened burden.

Additionally, as explained below in response to Plaintiff's Clean Water Act argument, *infra* § V(B), Plaintiff's stormwater allegations do not identify disposal under RCRA because they rely entirely on proximity, observation, and a historical cooling-water event that did not pose any risk to human health or the environment. Plaintiff's field observations of creek conditions are speculative and are not probative of Apple's operations: they do not identify the alleged waste, the disposal mechanism, what concentrations pose a risk, or whether they are even traceable to Apple. As with the storage of chemicals, the presence of groundwater under the Facility has no connection to waste and thus cannot be construed as a RCRA violation.

Plaintiff tries to support her claims by referencing EPA's previous identification of several instances of noncompliance with RCRA. (Mot. at 11.) However, the EPA has publicly acknowledged that Apple has since brought the Facility into compliance with RCRA, and Plaintiff cannot claim otherwise. Notably, EPA's RCRA investigation did not identify any immediate risk that could support an imminent and substantial endangerment finding. *See L.A. Unified Sch. Dist.*

---

[1] Even if there were leaks or inadvertent releases, which would be mitigated by the controls implemented at the facility, those are not waste under RCRA. *See Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013) (escaping chemicals are "neither a manufacturing waste by-product nor a material that the consumer . . . no longer wants and has disposed of or thrown away").

*v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1034 (C.D. Cal. 2020) (at the preliminary injunction phase, past agency statement of RCRA violation did not support a finding of imminent harm). Practically, the solvent waste at issue posed no risk to the community and cannot meet the imminent and substantial endangerment standard: the tank contained an aqueous mixture of about 95% water and 5% isopropyl alcohol (i.e. rubbing alcohol).[2] (Gjovik Decl. Ex. M at 87, Dkt. No. 80-4.) At this concentration, the solvent is practically inert. EPA declined to pursue the matter, which confirms there is no imminent and substantial endangerment. *See Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*, 768 F. Supp. 2d 1092, 1109-11 (D. Colo. 2011).

Plaintiff's baseless attempts to invent present violations cannot support her extraordinary request. Her allegations only serve to highlight her lack of expertise in this area. For example, Plaintiff's contention that Apple withheld information from the Santa Clara Fire Department is belied by the documents Plaintiff cites and Apple's evidence. (Gjovik Decl. Ex. E at 00003363, 00003369, 00003374, Dkt. No. 80-3; Michael Decl. ¶¶ 5–7.) As Apple's evidence shows, all groups of chemicals maintained at the Facility are listed in the Risk Management Plan (RMP) report, which is then submitted to the fire department. The list of chemicals is also submitted to the fire department as part of the Hazardous Materials Business Plan (HMBP) chemical inventory. (Schmidt Decl. ¶¶ 4–5.) Apple's RMP is also required to disclose the California Accidental Release Program (CalARP)-regulated substances only above threshold quantities—other chemicals are disclosed through the California Environmental Reporting System (CERS), BAAQMD permits, and wastewater permits under separate regulatory regimes. The only three chemicals at the Facility that meet the CalARP reporting threshold are ammonia, arsine, and chlorine. (*Id.* ¶ 5.) Other group 2, 3, 5, and 6 chemicals do not exceed this threshold and therefore do not need to be reported through the RMP and are instead disclosed to other agencies as appropriate. (Tredway Decl. ¶ 10; *id.* Ex. C at 22–27.) Any deficiencies in the April 2019 RMP audit have since been corrected and are irrelevant to a request for an injunction based on current operations. (Schmidt Decl. ¶¶ 6–10.)

Plaintiff's reliance on certain events from 2014 through 2024 is also misplaced as these

---

[2] For reference, hand sanitizers are at least 60% alcohol. (*See* U.S. Centers for Disease Control and Prevention, Hand Sanitizer Guidelines and Recommendations (Mar. 12, 2024), https://www.cdc.gov/clean-hands/about/hand-sanitizer.html.)

occurrences only underscore that the Facility has safeguards in place to prevent and detect discharges. Each of the incidents Plaintiff cites was either a false positive sensor reading, a minor event that did not result in any release to the environment, or an event for which Apple promptly implemented corrective measures; none reflects any ongoing or unresolved condition at the Facility. (Schmidt Decl. ¶¶ 14–20.)

None of the incidents of gas releases—even if the events were as Plaintiff described them—constitute anything subject to RCRA. Plaintiff does not link any of these emissions to solid waste disposed of in land or water first before becoming gas. *BNSF*, 764 F.3d at 1024. Moreover, the remaining events Plaintiff cites have been addressed, and there is no ongoing risk from the facility. This falls far short of the showing required for a preliminary injunction. And even if Plaintiff could show a likelihood of success on her RCRA claim, an "'imminent and substantial endangerment claim,' when established, does not necessarily translate into likely imminent harm." *L.A. Unified Sch. Dist.*, 506 F. Supp. 3d at 1035 (denying preliminary injunction for RCRA imminent and substantial endangerment claim).

### B. The Clean Air Act Does Not Support Emergency Relief Where Plaintiff Shows No Standing, No Current Violation, and No Actual Imminent Risk

Plaintiff's motion repeatedly conflates air emissions with hazardous wastes under RCRA. (*See, e.g.*, Mot. at 8–9 (claiming that there is imminent and substantial endangerment under RCRA due to gases such as arsine and silane); 11–12 (discussing Apple's submissions to BAAQMD concerning air emissions).) But as noted above, these emissions are not subject to a RCRA citizen suit. *See supra* § V(A).  Thus, the Clean Air Act ("CAA") is the only statutory scheme that applies to air emissions. Even under the proper statutory framework, however, Plaintiff's claims fail as a matter of law and are otherwise unlikely to succeed for multiple independent reasons.

*First*, the past violations that Plaintiff cites have all been resolved: Apple is fully compliant with all Clean Air Act regulations. (Schmidt Decl. ¶ 30.) In fact, Plaintiff seeks judicial notice of the settlement between BAAQMD and Apple resolving all of these wholly past violations. (*See* Dkt. No. 88, Ex. B.) Plaintiff cites the CAA's General Duty Clause to support her claim for an injunction, but that does not move the needle. The General Duty Clause does not provide Plaintiff

with an open-ended vehicle to second-guess a facility's engineering controls; it requires identification of a specific failure to identify hazards, design a safe facility, or minimize release consequence—none of which Plaintiff has plausibly alleged given the documented remediation.[3]

*Second*, as explained in Apple's motion to dismiss the FAC (Dkt. No. 60, the "MTD"), Plaintiff lacks standing to pursue her CAA claims. To establish injury in fact in an environmental case, a plaintiff must show an aesthetic or recreational interest in a particular place that is impaired by the defendant's conduct. *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000); *Candlestick Heights Cmty. All. v. City & Cnty. of S.F.*, No. 23-cv-00082-SK, 2023 WL 9317153, at *10–11 (N.D. Cal. Dec. 21, 2023), *aff'd*, 2025 WL 275112 (9th Cir. Jan. 23, 2025). Plaintiff identifies no such interest. She severed her connection to the Facility in 2020, alleges no ongoing use of any nearby area, and cannot retroactively create jurisdiction through post-filing litigation conduct, including her claimed relocation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564, 569 n.4 (1992); *Friends of the Earth v. Sanderson Farms, Inc.*, No. 17-cv-03592-RS, 2019 WL 3457787, at *4 (N.D. Cal. July 31, 2019), *aff'd*, 992 F.3d 939 (9th Cir. 2021). Even if her relocation mattered, mere proximity is insufficient; Plaintiff does not demonstrate how her use of the area is impaired. *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 952-53 (9th Cir. 2006). Nor can her alleged past physical injuries support prospective standing, as an entirely past injury does not confer standing to seek injunctive relief, *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009), and Plaintiff herself told the EPA that "[w]ithin a week of vacating the location in October 2020, [her] disabling medical issues vanished." (Dkt. No. 48-3 at 10.) Finally, the settlement of all outstanding BAAQMD violations since the filing of this motion eliminates any remaining theory of ongoing or imminent injury. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987).

Plaintiff's citation to *Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357 (5th Cir. 2020), which is nonbinding out-of-circuit authority, does not save her case, much less confer a clear probability of success. First, this opinion was subsequently vacated in its entirety.

---

[3] Plaintiff's specific claims concerning the Risk Management Plan Audit are addressed further below. *See infra* § V(F).

*See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 61 F.4th 1012 (5th Cir. 2023). Moreover, the case is inapposite. There, the plaintiffs were members of a citizen group who actively lived in and visited the area around the ExxonMobil facility at issue at the time the suit was filed. They articulated injuries such as respiratory problems or limiting outdoor activities due to fear of emissions. *See Env't Tex.*, 968 F.3d at 367. By contrast, Plaintiff lived across the country from the Facility at the time she filed this action and any symptoms she attributed to the Facility had resolved by her own admission. (*See* MTD at 2.) Lack of standing is fatal to Plaintiff's CAA claims, and thus she cannot succeed on the merits.

*Third*, Plaintiff is wrong on the facts underlying her request for preliminary relief. Plaintiff claims that Apple's reporting to BAAQMD shows "order-of-magnitude reporting variance." (Mot. at 11–12.) This is not true. Plaintiff claims that Apple reported higher quantities of arsine, phosphine, boron trichloride, and silane in February 2024 than in January 2023 and concludes that this somehow shows a failure of safety controls. (*Id.*)[4] Plaintiff's evidence does not support this position. In fact, the January 2023 numbers were prepopulated by BAAQMD on the reporting forms; none were entered by Apple. (*See* Gjovik Decl. Ex. V, Dkt. No. 80-5; Schmidt Decl. ¶ 12.) Plaintiff—who holds no qualifications in air quality monitoring or emissions accounting—offers no basis for her interpretation of these regulatory submissions. Plaintiff's exhibits, plus Apple's own records reflecting these submissions from the time the relevant permit was issued in 2018, show that BAAQMD had not previously requested reporting on any of these chemicals. (*See* Gjovik Decl. Ex. X, Dkt. No. 80-5; Schmidt Decl. ¶ 12.) There was no "order-of-magnitude reporting variance," but rather a difference between Apple's actual usage data and BAAQMD's prepopulated values. (Mot. at 11–12.) The 2024 report Plaintiff herself included in her submission shows that year-over-year usage remains comparable. (*See* Gjovik Decl. Ex. W, Dkt. No. 80-5.) This discrepancy between Plaintiff's offered evidence and her argument does not favor her claims and cannot justify mandatory injunctive relief.

Plaintiff also claims that Apple's 2024 throughput report demonstrates violation of an

---

[4] These claims appear in Plaintiff's RCRA section, but as noted above can only be addressed under the CAA. *See supra* § V(A).

emission standard or limitation that may be enjoined under 42 U.S.C. § 7604(a)(1). (Mot. at 15.) This claim mischaracterizes the actual permit limits. The permit does not impose a single, fixed usage cap; rather, it expressly allows for other volumes to be used if the usage does not trigger the toxics emissions screening trigger defined in BAAQMD Regulation 2-5. (*See* Gjovik Decl. Ex. M, Dkt. No. 80-4.) Regulation 2-5 allows for 0.58 lb./year of arsine emissions and 31 lb./year of phosphine emissions. BAAQMD Regulation 2-5 at 12, 23.[5] Apple's arsine and phosphine emissions are abated through a system with 99.9% abatement efficiency, leading to post-abatement emissions of 0.07175 lb./year and 0.15895 lb./year, respectively. (Schmidt Decl. ¶ 11.) Apple's emissions are well below the Regulation 2-5 limits and compliant with the relevant permit. Thus, there is no violation of an emission standard or limitation to even be subject to an injunction.

Additionally, Plaintiff's attempt to rely on Apple's RMP*Comp dispersion modeling reflects a fundamental misunderstanding of what that modeling is designed to show. (*See* Mot. at 10.) The modeling evaluates hypothetical worst-case release scenarios for regulatory compliance purposes; it is not evidence of any actual imminent danger posed by the Facility. The worst-case scenario analyses Plaintiff cites are required by the CalARP program and EPA's Risk Management Program rule, 40 C.F.R. § 68.25, which require regulated facilities to model a hypothetical worst-case release scenarios for regulated hazardous substances. By design, those scenarios are conservative planning exercises that assume catastrophic failures under highly conservative and unlikely conditions, without accounting for existing engineering controls, containment systems, mitigation measures, or emergency response capabilities. (Trammell Decl. ¶ 11.) The modeling is intended to support emergency planning and prevention programs by identifying the outer bounds of theoretical consequences, not to predict likely outcomes or characterize risk during normal operations. (*Id.* ¶ 10.)

Plaintiff claims these regulatory planning exercises are evidence of an actual, imminent hazard. But the existence of a modeled worst-case toxic endpoint at a given distance does not mean that such a release is likely, imminent, or even plausible given the controls in place; it means only

---

[5] Plaintiff cites Apple's use of boron trichloride, but boron trichloride is not a defined Regulation 2-5 toxic. *See generally* BAAQMD Regulation 2-5.

that the Facility complied with its regulatory obligation to model such a scenario and design its safety systems accordingly. The Facility maintains multiple independent layers of engineered protection, including automated gas detection and shutdown systems, scrubbers, containment systems, and ventilation controls, all specifically designed to prevent the uncontrolled releases that the worst-case scenarios hypothetically assume. (Trammell Decl. ¶ 15; Michael Decl. ¶ 8.)

Every facility that handles, manufactures, uses, or stores regulated substances above threshold quantities must prepare the same type of worst-case analysis. Accepting Plaintiff's theory would mean that any CalARP-regulated facility could be subjected to shutdown solely based on the existence of its own mandatory regulatory filings. Such a result would penalize good-faith compliance with the safety-planning regime Congress and the California Legislature enacted to protect the public. Indeed, there are over 800 CalARP-regulated facilities in the same zip code as the Facility, many handling the same chemicals as the Facility and with similar compliance histories. (*See* Tredway Decl. ¶ 12; *id.* Ex. C at 31.) Allowing an injunction here would put all of these facilities in the crosshairs and would create a perverse incentive to avoid the very regulatory compliance that protects public safety.

In sum, Plaintiff's CAA claims fail for multiple independent reasons: she lacks standing and her factual premises are incorrect. Moreover, the violations she relies upon have been fully resolved. Plaintiff therefore cannot demonstrate a clear likelihood of success on the merits of any of her Clean Air Act claims.

### C. The Clean Water Act Does Not Reach Plaintiff's Speculative Wastewater, Stormwater, and Groundwater Theories

Plaintiff cannot succeed on the merits of her Clean Water Act ("CWA") claims because: (1) Apple operates under valid permits and the permit shield bars her claims; (2) her "dilution-based discharge architecture" theory mischaracterizes ignores the architecture of Apple's fully permitted wastewater treatment system and rests on the false premise that solvent waste enters the wastewater stream—it does not, and the resolved RCRA solvent-handling violation she cites has nothing to do with wastewater discharge; (3) Apple's wastewater monitoring data consistently show compliance with all applicable permit limits; (4) her own exhibits confirm that the sole TCE

detection was below the Practical Quantitation Limit ("PQL") and therefore analytically unreliable; and (5) her stormwater and groundwater theories are speculative and unsupported. Plaintiff contends that Apple violates the CWA through several theories: (a) that Apple, as a categorical industrial user under 40 C.F.R. Part 469, violates Sections 1311(a) and 1317 pretreatment standards through an alleged "dilution-based discharge architecture" (Mot. at 17); (b) that Apple's stormwater discharges contaminate San Tomas Aquino Creek, a 303(d)-listed water of the United States (*id.* at 18–19); (c) that the Saratoga Creek system constitutes a jurisdictional water into which Apple is allegedly discharging through groundwater pathways (*id.* at 19); and (d) that Apple's wastewater monitoring submissions reveal the presence of contaminants including TCE (*id.* at 17–18). None of these theories has any merit, much less demonstrates that the law and facts clearly favor Plaintiff's position.

*First*, Apple operates the Facility pursuant to valid permits, so the permit shield bars Plaintiff's CWA claims. *See Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95, 105 (9th Cir. 2024) ("[I]f a permitholder complies with the terms of its permit, it need not fear liability under the Clean Water Act." (citing 33 U.S.C. § 1342(k))). Apple operates the Facility under Industrial Wastewater Discharge Permit SC-461B issued by the City of San Jose Publicly Owned Treatment Works ("POTW") and under a valid NPDES permit. (*See* FAC ¶¶ 129, 195, 565.) The Facility's wastewater treatment system is designed to comply with treatment requirements under the Categorical Industrial User designation, 40 C.F.R. Part 469, as imposed and regulated by the POTW. (Tredway Decl. Ex. C at 6–10.) Plaintiff does not allege—because she cannot—that Apple has violated any condition of its discharge permit. To the contrary, Apple's semiannual monitoring reports from September 2016 through March 2026 uniformly demonstrate compliance: concentrations of arsenic, copper, chromium, and zinc are below the limits established in Apple's permit. (Schmidt Decl. ¶ 23.) The POTW also independently verifies Apple's compliance by conducting its own sampling up to three times per month using a permanently installed refrigerated automatic sampler that collects 24-hour composite samples, which the City then retrieves and analyzes for compliance with discharge standards. (Tredway Decl. Ex. C at 9.) Apple has received the City of San Jose and San Jose–Santa Clara Regional Wastewater Facility's "Certificate of

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-07360

16

Recognition" for maintaining compliance with federal and local industrial wastewater regulations every year since 2019. (Tredway Decl. Ex. C at 9.) Plaintiff identifies no permit exceedance, and the permit shield accordingly forecloses her CWA claims.

*Second*, Plaintiff's "dilution-based discharge architecture" theory (Mot. at 17) ignores both the engineering design of the Facility's wastewater treatment system and the fact that the solvent waste Plaintiff takes issue with is never discharged to the environment. The Facility's AWN system is a fully permitted hazardous waste treatment system that removes hazardous characteristics from wastewater prior to discharge. The system incorporates multiple layers of engineered safeguards, including continuous pH monitoring with automatic alarms, automatic shutoff interlocks that halt discharge if treatment parameters are not met, secondary containment for all tanks and piping, and mixing and retention tanks that hold wastewater long enough to complete treatment reactions and allow monitoring before discharge. (Tredway Decl. Ex. C at 6–10.) The system passed professional engineering evaluation prior to operation. (*Id.* at 7.) The entire wastewater treatment system is also protected from contact with stormwater, preventing any potential pollutant discharge through that pathway. (*Id.* at 6.) After treatment, the discharged water no longer exhibits hazardous characteristics and complies with all wastewater discharge standards—it is not, as Plaintiff implies, the discharge of untreated hazardous waste. (*Id.* at 6–10.) Plaintiff fails to recognize that solvent waste collected in the S-3 Solvent Waste Tank is removed from the Facility as hazardous waste and is not discharged to the wastewater system at all. The only wastewater discharged from the Facility is processed through the AWN system and discharged to the POTW under Permit SC-461B. (Schmidt Decl. ¶ 21.) The "95% water" characterization Plaintiff attributes to Apple was in fact a statement in BAAQMD's own Engineering Evaluation describing the composition of the material in the solvent waste tank for purposes of conservative air emission calculations; that statement had nothing to do with wastewater discharges. (*See* Gjovik Decl. Ex. M, Dkt. No. 80-4.) EPA's Potential Violation #6, which Plaintiff also cites, likewise concerns the treatment of solvent waste under RCRA, not the discharge of wastewater to the POTW under the CWA. (*See* Dkt. No. 48-4.) Solvent waste from the Facility's tools is identified and classified at the source, and all applicable hazardous waste codes are assigned and tracked through to the collection tank to ensure proper

handling; the contents of the tank are then removed as hazardous waste by a licensed transporter and never enter the wastewater system. (Schmidt Decl. ¶ 21.) Plaintiff wrongly characterizes a RCRA waste-handling issue (already resolved through the CAFO) as a CWA discharge violation that does not exist.

*Third*, Apple's wastewater monitoring data consistently demonstrate compliance with all applicable permit limits, and Plaintiff's reliance on those data to establish a CWA violation is unavailing. (Mot. at 17–18.) As to the regulated metals—arsenic, copper, chromium, and zinc—Apple's semiannual monitoring reports consistently show concentrations below the limits established in Apple's permit across every reporting period from September 2016 through March 2026. (Schmidt Decl. ¶ 23.) If any readings had been unacceptable, the City of San Jose would have notified Apple and required corrective action; no such notification has been issued. To the contrary, the City of San Jose's own Source Control Section Sampling Inspection Reports uniformly reflect that Apple's self-monitoring reports are "free of violations." (*See, e.g.*, Gjovik Decl. Ex. T, Dkt. No. 80-5 (Monitoring ID 827371 (Nov. 2022 SMR checklist: "Is the SMR free of violations? Yes"); Monitoring ID 828931 (Sept.–Oct. 2023 SMR checklist: "Is the SMR free of violations? Yes")).) Plaintiff claims that Apple's monitoring data show "ammonia up to 185 mg/L; arsenic, copper, chromium, zinc; elevated BOD; samples reported 'light grey,' 'dark grey,' 'yellow,' with 'particulate/floc.'" (Mot. at 18.) But the parameters Plaintiff highlights (ammonia, BOD, and sample color) are not subject to numeric effluent limits under Apple's Industrial Wastewater Discharge Permit, nor does their detection constitute a permit exceedance or violation. (Schmidt Decl. ¶ 23.) These parameters are monitored for informational purposes, and their presence in monitoring data is routine for industrial wastewater discharges. The 185 mg/L ammonia reading Plaintiff cites was not from Apple's own sampling; it was from the City of San Jose's Source Control Section Sampling Inspection Report, and notably, the sample that showed 185 mg/L ammonia was described as "clear" in color, undermining Plaintiff's narrative of visible contamination. (*See* Gjovik Decl. Ex. T, Dkt. No. 80-5 (Monitoring ID 829975, Apr. 2, 2024).) The City reviewed this data and did not identify any violation or require corrective action, confirming that the reading was within acceptable parameters. As to the alleged pH discrepancy between the

City's grab sample (9.01) and Apple's IU meter reading (8.43), no corrective actions were required; the City's pH reading reflects a 24-hour composite average of 96 samples collected every 15 minutes, whereas Apple's IU meter provides a real-time measurement at a single moment, and the meters are calibrated weekly using two buffer solutions. (Schmidt Decl. ¶ 22.) Detection of a substance in wastewater is not a violation; only an exceedance of an applicable effluent limit or permit condition constitutes noncompliance. Plaintiff identifies no such exceedance.

*Fourth*, the single detection of trace TCE in Apple's wastewater, nearly ten years ago, cannot underpin a request for injunctive relief to remedy an imminent harm. Moreover, that reading was below the PQL, meaning the concentration is too low to have confidence in the analytical result. (*See* Mot. at 18; Gjovik Decl. Ex. T at 18, Dkt. No. 80-5.) Plaintiff's speculation that Apple must be "using TCE undisclosed and disposing through the wastewater pathway" (Mot. at 18) is contradicted by the sub-PQL detection levels and does not constitute evidence of a CWA violation in any event.

*Fifth*, Plaintiff's stormwater and groundwater discharge theories are speculative and unsupported. Plaintiff claims to have observed "visibly polluted conditions" in San Tomas Aquino Creek and conducted field measurements showing elevated pH and chlorine. (Mot. at 18–19.) But as Plaintiff herself concedes, "the Creek receives water from multiple watersheds." (*Id.* at 18.) Plaintiff offers no evidence connecting her observations to any discharge from the Facility, as opposed to the numerous other potential sources along the creek. Plaintiff's "field measurements" were not conducted using laboratory-grade equipment or methods, were not collected or analyzed by a certified laboratory, and do not satisfy the analytical requirements of 40 C.F.R. Part 136—the standard methods required for CWA compliance determinations. Plaintiff has no training or credentials in water quality sampling, field chemistry, or environmental monitoring protocols, and her handheld consumer instruments and visual observations cannot substitute for validated analytical data sufficient to establish a permit exceedance or any other actionable CWA violation. Moreover, the Facility is equipped with safe-drain valves on its storm drains that remain closed unless weather reports indicate rain, preventing inadvertent releases to the storm drain system. (Schmidt Decl. ¶ 14.) The single documented stormwater incident—a release of a maximum of two

gallons of wash water used to clean cooling water tanks in June 2016 (*see id.*)—occurred nearly ten years ago, was self-reported by Apple in compliance with regulatory requirements, and constitutes a wholly past violation that could not support a citizen suit even if it involved a release of any regulated substance. *See Gwaltney*, 484 U.S. at 64.

Plaintiff's theory that Apple is "currently discharging" into the Saratoga Creek aquifer system (Mot. at 5, 19) is equally speculative. Plaintiff identifies no pollutant that Apple has discharged into groundwater, no monitoring data showing contamination attributable to Apple in any groundwater well, and no factual basis for concluding that any substance from the Facility has reached the aquifer. The mere existence of a pressurized aquifer beneath the Facility does not establish that Apple is discharging into it. Plaintiff's invocation of *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020), is inapposite; that case involved an admitted discharge of pollutants through injection wells into groundwater that concededly reached the ocean. Here, there is no documented discharge into groundwater whatsoever, much less an admission of one. Plaintiff's theory is pure speculation insufficient to demonstrate likelihood of success on the merits.

*Finally*, to the extent Plaintiff relies on historical incidents, such as the 2016 cleaning water release or 2017 sampling data, these are wholly past violations that cannot form the basis of a citizen suit. *See Gwaltney*, 484 U.S. at 64. Nor can they support a preliminary injunction. Plaintiff has not identified a single current CWA violation at the Facility. Apple operates in full compliance with its discharge permits, Apple's monitoring data consistently show concentrations below applicable limits, and the regulatory agencies with jurisdiction over the Facility's wastewater discharges have not identified any outstanding noncompliance. Plaintiff has not demonstrated a likelihood of success on the merits of her CWA claims, and her motion for a preliminary injunction should be denied as to those claims.

### D.  A Permitted, Compliant Facility Is Not an Enjoinable Public Nuisance

Plaintiff's attempt to use her nuisance claim to shut down the entire Facility is an outrageous overreach. A facility operating under valid permits issued by multiple regulatory authorities, with no current violations and no unresolved compliance issues, is not an enjoinable public nuisance as a matter of law. Cal. Civ. Code § 3482 ("Nothing which is done or maintained under the express

authority of a statute can be deemed a nuisance."); *see also Eisenstecken v. Tahoe Reg'l Plan. Agency*, No. 2:20-cv-02349-DJC-CKD, 2025 WL 1531678, at *10 (E.D. Cal. May 28, 2025) (finding permitted activity could not constitute a public nuisance as a matter of law); *Pub. Watchdogs v. S. Cal. Edison Co.*, No. 19-CV-1635 JLS (MSB), 2019 WL 6497886, at *17, *19 (S.D. Cal. Dec. 3, 2019) (granting motion to dismiss and denying preliminary injunction on public nuisance claim, in part because actions pursuant to regulatory licenses and certificates are barred by California Civil Code section 3482), *aff'd*, 984 F.3d 744 (9th Cir. 2020). Plaintiff's reliance on years-old incidents that have long since been investigated and resolved does not move the needle. *People ex rel. Bradford v. Goddard*, 47 Cal. App. 730, 740 (1920) (reversing trial verdict where public nuisance had been abated, as it could no longer be enjoined).

The cases Plaintiff cites are inapposite. Plaintiff relies on *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090 (1997), to suggest that the utility analysis mandates an injunction. But that case has no bearing here—it involved gang activity and, at most, stands for the proposition that courts may enjoin public nuisances to further the public interest. *Id.* at 1103-05. She also cites *Luthringer v. Moore*, 31 Cal. 2d 489 (1948), to argue that use of chemicals is a nuisance when risk is speculative. *Luthringer* is not a nuisance case—it is a personal injury case involving an exterminator brought to spray cockroaches with hydrocyanic gas, which the plaintiff inhaled. *McIvor v. Mercer-Fraser Co.*, 76 Cal. App. 2d 247 (1946), also does not stand for Plaintiff's proposition that any fear of harm automatically constitutes a nuisance. Apprehension of injury may constitute a nuisance where "it interferes with the comfortable enjoyment of property." *McIvor*, 76 Cal. App. 2d at 254. Plaintiff does not show that the Facility's current operations impair use to nearby property or that the law and facts on this issue clearly favor a mandatory preliminary injunction. The little evidence she does offer from years ago is not probative of current conditions.

**E.    The Balance of the Equities Weighs Heavily Against Shutting Down Apple's Permitted Research Operations and Plaintiff's Request Is Grossly Disproportionate**

The balance of the equities tips decisively against Plaintiff because the relief she seeks—a mandatory shutdown of one of Apple's core research and development operations—is extraordinary, and presents a much greater hardship where Plaintiff has not identified any concrete

harm in the absence of an injunction.

Plaintiff's contrary arguments are unavailing. Plaintiff contends that the balance of equities tips "sharply" in her favor because the requested relief is "targeted at the chemicals, not the building." but that is a distinction without a difference. (Mot. at 22.) Plaintiff's requested relief fundamentally misapprehends the nature of semiconductor research and development operations. The Facility is a highly integrated engineering environment in which hazardous materials are integral components of specialized gas distribution networks, ventilation systems, abatement systems, scrubbers, interlocks, gas cabinets, emergency shutdown systems, and precision fabrication tools operating under highly controlled conditions. (Schmidt Decl. ¶ 46; Tredway Decl. Ex. C at 3–6, 19–22.) The Facility's equipment is highly calibrated and cannot simply be switched off and restarted at will. Compliance with the proposed injunction would require Apple to undertake a complex, multi-step process: each piece of equipment would need to be safely deactivated, all hazardous materials and process gases would need to be purged from the systems under controlled conditions, and the equipment would then need to be prepared for an indefinite period of inactivity to prevent degradation. (Schmidt Decl. ¶ 47.) Similarly, once any injunctive relief expired or was dissolved, Apple could not simply resume operations. The Facility's semiconductor fabrication tools would need to be recalibrated, requalified, and brought back online through an extensive recommissioning process—a process that could take months and would impose substantial costs with no corresponding environmental benefit. (*Id.* ¶ 48.) The disruption to Apple's ongoing research and development programs during this period would be severe and, in many respects, irreversible, as time-sensitive research initiatives cannot be suspended and resumed without significant loss of progress and data.

Plaintiff also claims that Apple's "commercial interest in continuing operations *with* the chemicals is not a legitimate equitable interest given the documented compliance failure and exceptional risk of catastrophic failure." (Mot. at 22.) Apple has a substantial and legitimate interest in continuing its lawful, permitted operations. Apple operates the Facility under valid permits issued by BAAQMD, holds a valid NPDES permit for wastewater discharges, and discharges to the POTW under Permit SC-461B. (*See* MTD at 15; FAC ¶¶ 129, 195, 411.) The RCRA violations

identified by EPA have been resolved through the CAFO, and all air quality violations have been resolved with BAAQMD. (Dkt. No. 48-4 at 7; Dkt. No. 88, Ex. B.) A facility operating in compliance with its permits and regulatory obligations has a substantial and legitimate interest in continuing those operations. *Cf. Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (speculative environmental harm does not automatically outweigh concrete economic injury).

Plaintiff further contends that Defendants' refusal to agree to stipulated interim mitigation measures undermines any claim to equitable deference. (Mot. at 22.) Not so. Declining an opposing party's unilateral demands is not evidence of wrongdoing, nor can it create an equitable inference against that party. Apple engaged with Plaintiff regarding her demands over several weeks, with no obligation to accept demands that assume violations Plaintiff cannot establish.

Plaintiff's delay in seeking this injunction further undermines her position. In considering the balance of the equities, a court must "balance the interests of all parties and weigh the damage to each." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (citation omitted). On one side, Apple faces significant impacts if the Court mandates the cessation of all research and development activities at the Facility. On the other, Plaintiff has not identified any concrete, non-speculative harm she will suffer in the absence of an injunction. *See supra* § V(B). Plaintiff's nearly eight-month delay in filing this motion "implies a lack of urgency and irreparable harm." *Kiva Health Brands LLC v. Kiva Brands, Inc.*, 402 F. Supp. 3d 877, 897 (N.D. Cal. 2019) (quoting *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)). The regulatory landscape has only improved during the period of Plaintiff's delay: the CAFO resolved the RCRA violations Plaintiff relies upon, and all outstanding air violations have been resolved with BAAQMD. *See supra* §§ V(A), V(B). Far from revealing an escalating emergency, the months since Plaintiff filed suit have seen the cited regulatory matters addressed and resolved.

The balance of the equities therefore weighs decisively against the extraordinary mandatory relief Plaintiff seeks, and the Court should decline to issue a preliminary injunction.

### F.    The Public Interest Favors Continued Regulatory Oversight and Not a Court-Ordered Shutdown of Lawful Operations

The public interest is best served by respecting the expert determinations of the regulatory

agencies charged with enforcing the environmental statutes Plaintiff invokes. The citizen suit provisions of RCRA, the CAA, and the CWA reflect Congress's judgment that regulatory agencies, not private litigants, are the primary enforcers of environmental law, and that citizen suits serve as a backstop only when agencies fail to act. *See Gwaltney*, 484 U.S. at 60 ("The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action."). As set forth above, *see supra* §§ III(B), V.E, the agencies with jurisdiction over the Facility have acted: EPA resolved the RCRA issues through the CAFO, and BAAQMD has resolved any outstanding air quality violations. Plaintiff contends that the public interest favors an injunction because "Congress has declared the public interest in the underlying statutes." (Mot. at 23.) Those statutes do not support the relief Plaintiff seeks. Where, as here, the agencies have acted and the Facility is in compliance, the public interest weighs strongly against judicial intervention that would displace the agencies' judgments.

As discussed above, *see supra* § V(B), the Facility is one of more than 800 CalARP-regulated facilities in zip code 95054 alone, collectively handling more than 2,000 chemical line items. (Tredway Decl. ¶ 12; *id.* Ex. C at 31.) The injunction Plaintiff seeks would set a precedent threatening the continued operation of hundreds of lawful, regulated facilities that are essential to Silicon Valley's semiconductor and technology industries, and that operate under the same regulatory framework Plaintiff now asks this Court to ignore.

The public interest would also be affirmatively harmed by the relief Plaintiff seeks. Plaintiff seeks an order to remove all hazardous materials from the Facility within thirty days and prohibit Apple from resuming operations during the pendency of this action, effectively shutting down an active research and development facility that contributes to technological innovation. The speculative benefit from a facility-wide shutdown does not outweigh the concrete harm to Apple's operations, its employees, and the broader interest in continued lawful semiconductor research.

Finally, Plaintiff's reliance on isolated statements by City officials during General Plan amendment proceedings does not establish that the public interest favors this injunction. (Mot. at 22.) Those statements concerned land use planning decisions, not whether an existing, permitted facility should be forcibly shut down by court order.

**G.      Plaintiff's Speculation Cannot Support a Finding of Irreparable Harm**

Contrary to Plaintiff's assertions, "[n]o longer is there any presumption of [irreparable] harm in an environmental case, nor is a showing of a mere possibility of irreparable harm sufficient." *Earth Island Inst. v. Carlton*, No. CIV. S-09-202 FCD/EFB, 2009 WL 9074754, at *27 (E.D. Cal. Aug. 20, 2009); *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (no presumption of irreparable injury for violation of environmental laws). Plaintiff's theory relies on theoretical worst-case scenarios, not likely outcomes. "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). In reality, the Facility is in compliance and has implemented increased safety protocols in the years since 2014. (Schmidt Decl. ¶ 30.) Past incidents at the Facility do not rise to the level of irreparable harm, either. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) ("While 'past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy,' 'past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.'" (citations omitted)).

Plaintiff has not shown that the surrounding community faces any actual, imminent danger from the Facility operating within its permitted use. As detailed above, the Facility's engineering controls, abatement systems, and regulatory compliance measures are specifically designed to protect the surrounding community. (*See, e.g.*, Schmidt Decl. ¶¶ 14, 30; Trammell Decl. ¶ 15; Michael Decl. ¶¶ 8–9.)

Plaintiff's failure to advance a competent theory of irreparable harm is an independent basis for denying preliminary injunctive relief, and as a result, the Court should deny Plaintiff's motion.

**VI.      CONCLUSION**

For the above reasons, the Court should deny Plaintiff's motion for preliminary injunction.

Dated: May 28, 2026

MORRISON & FOERSTER LLP

By: */s/ William F. Tarantino*
William F. Tarantino

*Attorneys for Defendants*
APPLE INC., KALIL JENAB, JENAB FAMILY LP, JENAB FAMILY VENTURES LLC, and JENAB FAMILY TRUST