WILLIAM F. TARANTINO [SBN 215343]
WTarantino@mofo.com
ALBERTO J. CORONA [SBN 339906]
ACorona@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

JULIE Y. PARK [SBN 259929]
JuliePark@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, California 92130-3588
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

Attorneys for Defendants APPLE INC., KALIL
JENAB, JENAB FAMILY LP, JENAB FAMILY
VENTURES LLC, and JENAB FAMILY TRUST

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ASHLEY M. GJOVIK,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC., ET AL.<br><br>Defendants. | Case No. 5:25-cv-07360-PCP<br><br>**DECLARATION OF ELIZABETH SCHMIDT IN SUPPORT OF DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 25, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8, 4th Floor<br>Judge: Hon. P. Casey Pitts<br><br>FAC Filed: November 29, 2026<br>Trial Date: TBD |

SCHMIDT DECL. ISO APPLE'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-07360-PCP

## I.   INTRODUCTION AND QUALIFICATIONS

1.   I am the head of Environment, Health & Safety ("EHS") for Apple Inc. I make this declaration based on my personal knowledge, documents available to and on information gathered from members of the Apple EHS team responsible for the 3250 Scott Boulevard facility in Santa Clara, California (the "Facility"). I have a bachelor's degree in Chemistry and have worked in various EHS roles at Apple for 18 years. In my role as EHS director, I am familiar with the operations at 3250 Scott. If called as a witness, I could and would testify competently to the facts stated herein.

2.   I submit this declaration in opposition to Plaintiff's Motion for Preliminary Injunction. I have reviewed the allegations raised in Plaintiff's declarations and supporting exhibits, as well as the underlying regulatory records, internal compliance documentation, and reports maintained by Apple EHS. The purpose of this declaration is to provide an account of Apple's environmental, health, and safety compliance status at the Facility.

3.   Apple maintains a comprehensive, multi-layered regulatory compliance program at the Facility. Apple's operations are subject to state and federal and local laws, as well as requirements administered by the Bay Area Air Quality Management District ("BAAQMD"), the Santa Clara County Fire Department ("SCCFD"), the City of San Jose's wastewater program, and the California Environmental Protection Agency, among others. Apple engages third-party auditors, maintains robust engineering controls, and promptly addresses findings when they arise.

## II.   PROCESS HAZARD ANALYSIS AND RISK MANAGEMENT PLAN

4.   Plaintiff alleges that Apple "withheld" from the SCCFD certain Process Hazard Analysis ("PHA") tables for Group 2 (pyrophoric MOCVD organometallics), Group 4 (HPM tool abatement and facility exhaust), Group 5 (HPM liquid abatement), and Group 6 (wastewater system). This is inaccurate. All Groups are listed in the Risk Management Plan ("RMP") report, which is submitted to the SCCFD. These groups are discussed in the PHA for conducting process hazard analysis, specifically to address potential failure points and controls in place. These

chemicals are also submitted in Apple's Hazardous Materials Business Plan ("HMBP") chemical inventory, which the SCCFD has access to.

5.      Plaintiff further asserts that Apple's RMP discloses only three regulated substances—anhydrous ammonia (3,700 lb), arsine (120 lb), and chlorine (400 lb)—while numerous other hazardous chemicals are present. This characterization misrepresents the applicable regulatory framework. Only chemicals that exceed the California Accidental Release Prevention ("CalARP") threshold are required to be included in the RMP. At 3250 Scott Boulevard, the chemicals that exceed the threshold are ammonia, arsine, and chlorine. Other Group 2, 4, 5, and 6 chemicals do not exceed the threshold and therefore are not required to be included in the RMP/PHA. These chemicals are disclosed to all other agencies as appropriate through the California Environmental Reporting System ("CERS"), BAAQMD permits, and Publicly Owned Treatment Works ("POTW") permits—each of which constitutes a separate and independent regulatory program.

## III.    BSI COMPLIANCE AUDIT FINDINGS AND REMEDIATION

6.      Plaintiff cites a 2019 audit conducted by Apple's retained consultant, BSI, which identified 17 findings marked "Not Compliant." Plaintiff's characterization fails to acknowledge the purpose and function of such audits. The BSI audit report lists findings identified during the audit. Apple utilizes it and tracks actions to closure separately. All actions were tracked to completion, as confirmed in the recent audit conducted by BSI and described in the declarations of Wendy and Steve Trammel, submitted with this opposition.   While all deficiencies were remediated, details of select findings are described below.

7.      Plaintiff references 2023 BSI Finding #8, alleging that Process Safety Information ("PSI") and process flow diagrams were not updated to reflect the CS Clean addition—a carryover from 2019. This was updated on June 24, 2020.

8.      Regarding 2023 BSI Findings #15–17, concerning SOPs that did not include emergency procedures and SOPs still at 2016 versions: all SOPs were updated by August 13, 2023. Apple has subsequently updated them again in 2025.

/ / /

SCHMIDT DECL. ISO APPLE'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-07360-PCP

2

9. Regarding 2023 BSI Findings #21–23, concerning gas cabinet certifications and magnahelics: the magnahelics have identifiable marks for safe operating range. The gas cabinets are equipped with low-flow alarms. When low flow occurs, it is indicated on the PCS system. Facility staff also check for alarms daily. The exhaust flow sensor will shut down the system if exhaust is not adequate.

10. Regarding 2023 BSI Finding #33, alleging that hot work permit records were not available and that employees were "instructed not to maintain" records: this is not true. Hot work permits are kept for one year per the SCV program. Facilities keep the hot work permits at their desks.

## IV. BAAQMD PERMIT CONDITIONS AND AIR EMISSIONS

11. Plaintiff alleges that Apple's 2024 throughput report confirms permit-cap exceedances for arsine (84% over), phosphine (61% over), and boron trichloride (824% over). This allegation requires context. While Apple used volumes exceeding certain permit limits, Condition #2 of the governing permit, attached hereto as Exhibit A, allows for other volumes and materials to be used if the usage does not trigger the toxic emissions screening trigger defined in BAAQMD Regulation 2-5. Boron trichloride is not a defined Regulation 2-5 toxic substance and therefore was not subject to permit caps at that time. Arsine and phosphine are abated through the CS Clean system and then the acid scrubber. The permit allows for 95% abatement efficiency of the acid scrubber. The CS Clean system achieves >99.9% efficiency per the manufacturer's specifications. Assuming 99.9% abatement from the CS Clean system followed by 95% from the acid scrubber, arsine and phosphine do not trigger the Regulation 2-5 limits.

12. Plaintiff alleges a dramatic swing in BAAQMD emissions reporting—a January 2023 submission reporting arsine at 0.0147 lb versus a February 2024 submission reporting 154 lb, characterized as an approximately 10,000x increase. Apple did not report 0.0147 lbs usage in 2023. That figure was what was printed by BAAQMD on the 2023 Data Update form as "previously reported," but, again, "previously reported" does not align with Apple's reported value. First, data updates submitted in February 2023 (for 2022 usage) did not require arsine reporting. Apple has data update records starting from 2018 usage. No data update submitted from 2018 to 2022

requested arsine usage. The initial permit was issued in April 2018, which means there would have been no data updates submitted prior to 2018. In February 2024, Apple did report usage of 154 lbs of arsine for 2023.

## V.    FACILITY INCIDENTS (2016–2024)

13.    Plaintiff catalogs a series of incidents at the Facility spanning from 2016 to 2024, characterizing them as evidence of systemic noncompliance. None reflected significant or material noncompliance. Each of these incidents was appropriately investigated and, where necessary, remediated. I address them below.

14.    **June 2016 – Cooling Water Release.** Apple reported a stormwater release of cooling tower water, demonstrating that Apple was following regulatory reporting requirements. The building has safe-drain valves on the storm drains. Safe-drain valves are closed unless weather reports indicate rain, at which time facilities open them.

15.    **June 2019 – Gas Cylinder Change-Out Incident.** Plaintiff characterizes a June 2019 incident as a "silane and phosphine release" in which Apple's Emergency Response Team characterized the event as "a normal process." In fact, this occurred during an arsine cylinder change-out from the gas cabinet. During change-out, engineers are on supplied air and sensors are put on test because it is expected that minor amounts will be vented during disconnection and reconnection. These amounts are vented through the gas cabinet exhaust, which vents to the Jupiter dry scrubber. No toxic gas was released to the environment because it was abated by the scrubbing system. During the incident, the wrong sensors were put on test—the silane sensors were placed in test mode instead of the arsine sensors. The SCCFD's reference to "a normal process" was referring to the normal process of changing out gas cylinders.

16.    **October 2019 – Phosphine Alarm.** Plaintiff alleges a phosphine spike at 3.3 times the OSHA PEL from "mechanical failure." Investigation showed that the alarm was from a gas cabinet, and an email confirmed there was no leaking inside the cabinet. This indicated the gas sensor malfunctioned, not a mechanical failure. The shape of the trend indicates a probable false detection—it was a direct spike up and direct descent down. A real detection would have shown a gradual descent. The exhaust from the gas cabinet is connected to an abatement system prior to

release. If there were a leak, the gas cylinder would shut down at the high-level alarm, and the exhaust from the gas cabinet would be scrubbed by the abatement system.

17.    **July 2020 – TEOS Detection.** Plaintiff characterizes this as a "TEOS release at 17.5 ppm from plumbing installed backward." The term "release" is a misnomer. TEOS was "detected" by sensors, triggering an immediate shutdown of the equipment. Any material is captured within the exhausted enclosure and directed to tool abatement. The material is then transferred to house abatement. No hazardous material was "released" to the environment or exposed to personnel in the area, demonstrating that the safety engineering controls prescribed for the tool functioned properly. The vendor was performing a start-up as part of a commissioning process, and corrections were made subsequently after the event. Labels that were missing or incorrect have since been corrected and verified. This tool is currently being decommissioned for removal offsite.

18.    **April 2021 – Phosphine Alarm in Lab Space.** Plaintiff describes an April 2021 incident as a "phosphine release passed through scrubbers and re-entered lab via HVAC over 800 sq ft." After the emergency response concluded, Facility staff investigated further and found a restroom sewer roof vent was near the air intake. The source was determined not to be phosphine, but from the sewer vent—sewer gas has a cross-sensitivity that can register on a PH3 sensor—near the air intake. The restroom roof vent was reconfigured to a higher position so it would not affect flow to the air intake. No further incidents occurred after this reconfiguration.

19.    **December 2023 – Chlorine Alarm.** The ERT assessed the event and reviewed the gas detection trend chart. The shape of the trend indicates a probable false detection—it was a direct spike up and direct descent down. A real detection would have shown a gradual descent. This was an area chlorine sensor. No other chlorine sensors in the space, including the tool sensor, registered any detection. A real alarm would have triggered the tool sensor first, then the area sensor, because the leak would have originated from the tool to the area.

20.    **May 2024 – HCl Exposure.** Apple performed a root cause analysis and determined that a vendor supplying HCL to the facility had inadvertently opened an air valve on his delivery truck that pressurized the HCL compartment, which led to HCl emissions when the pressure triggered the release valve. As a result of the exposure, Apple security personnel experienced

transient lightheadedness. Apple implemented additional security personnel training and implemented buffer zones for bulk chemical delivery.

## VI.    WASTEWATER AND CLEAN WATER ACT COMPLIANCE

21.    Plaintiff alleges that Apple's "95% water" statement to BAAQMD in March 2024 "confirms a dilution practice." This mischaracterizes the record. The "95% water" reference, as written in the BAAQMD Engineering Evaluation, was for the purpose of understanding what is at the tank for BAAQMD's evaluation. For conservative emission calculations, BAAQMD assumed 100% IPA. Solvent waste from the tools is currently characterized at the tools. All waste codes are carried through to the tank. The solvent waste from the tank is removed as hazardous waste. There is no discharge from the tank to the wastewater system.

22.    Regarding the alleged pH discrepancy between the City's grab sample (9.01) and Apple's IU meter reading (8.43), no corrective actions were required. There was no finding issued on this sample result, and the City did not request any corrective actions. When the City collects samples, they collect samples over 24 hours in the composite sampler, which collects 96 samples every 15 minutes over a 24-hour period. The City's pH 9.01 is an average over 24 hours. The Apple IU meter provides a real-time measurement at a single moment. The meters are calibrated weekly using two buffer solutions (pH 4 and pH 10) that form a calibration curve. When the offset reaches -40mV, the probes are replaced.

23.    Plaintiff alleges elevated levels of ammonia, arsenic, copper, chromium, zinc, and elevated biochemical oxygen demand (BOD) in Apple's monitoring submissions. This is not true on multiple levels. First, ammonia, BOD, and color do not have permit conditions in the Industrial Wastewater Discharge Permit. The 185 mg/L ammonia figure cited by Plaintiff is from San Jose's—not Apple's—"Source Control Section Sampling Inspection Report." If there were unacceptable readings, San Jose would have notified Apple. To my knowledge, they did not. Regarding arsenic, copper, chromium, and zinc, I have reviewed Apple's semiannual monitoring reports and each all show below permit limits for every reporting period from September 2016 through March 2026.

## VII.    CHEMICAL INVENTORY AND CERS COMPLIANCE

24.    Plaintiff alleges that during an October 2020 SCCFD inspection, Apple's CERS chemical inventory reported zero chlorine while the RMP showed 400 lb. This is not accurate. Assuming this comment is alleging a discrepancy in the CERS submittal Apple submitted on February 24, 2020 (accepted by SCCFD on July 17, 2020), there are three line items for chlorine in the Hazardous Materials Inventory. One line item for "100% chlorine toxic" for room "Bake out-1021" shows 0 lbs, but the other two line items each show "Chlorine" at 200 pounds maximum daily amount, in Gas Room 1190 and Gas Room 1185, respectively. Chlorine has appeared in every CERS report accepted by SCCFD, from submissions on August 30, 2016 through February 28, 2025.

25.    Regarding the allegation that 1,700 gallons of diesel was "missing" from CERS: this is also inaccurate. The diesel inventory has been reported under the common name "Hydrotreated Middle Distillate" at 1,700 gallons for the diesel generator. Looking back from 2015 to present, diesel appears in inventory at 1,700 gallons across multiple SCCFD-accepted submissions.

26.    Plaintiff alleges that since August 2016, the SCCFD documented that Apple failed to make the HMBP readily available to emergency response personnel. This is not true. Apple has submitted HMBP documents and had SCCFD accept them every year from 2015 through present. The HMBP is readily available currently.

27.    As of the date of this declaration, the CERS inventory is accurate and complete. As a spot check, the inventory submitted on February 12, 2026 reflects chlorine in two rows totaling 440 lbs and hydrotreated middle distillate at 1,700 gallons, consistent with on-site quantities.

## VIII.    FIRE CODE COMPLIANCE AND TOXIC GAS ORDINANCE

28.    Plaintiff contends that the County Toxic Gas Ordinance ("TGO") permitting regime has "no records" for this Facility, citing an SCCFD PRA response that the "Fire Department was unable to locate records under the 'Toxic Gas System (i.e., SCCO B11-380)' designation." The PRA request used "Toxic Gas Systems," which is not a common name used in regulatory parlance. There is no separate TGO "permitting regime." Toxic Gas Ordinance requirements are built into each tool plan-check review for installation. All TGO requirements are incorporated into the local

ordinance codes, fire codes, and building codes. All tools go through city permitting and approval, including inspections and sign-off by the fire department, which reviews tool installation plans against the codes. As set forth in the declaration of engineer Rizik Michael, this site meets all required elements cited in SCCO B11-380.

29.     Regarding SCCFD outstanding fire code violations: the violation dated December 23, 2020 was corrected on December 27, 2020, but SCCFD failed to close it on their end. Apple EHS sent the requested document via email to Saroj Dhillon on December 27, 2020. The violation dated August 24, 2016, related to the business plan, which has always been available via the CERS portal. Apple EHS also keeps a hard copy of the Emergency Response Plan in the ERT room.

## IX.     APPLE'S ONGOING COMMITMENT TO COMPLIANCE

30.     Apple takes its environmental, health, and safety obligations seriously. The Facility operates under a multi-layered compliance framework that includes:

- **Risk Management Plan (RMP):** Apple maintains and submits to the SCCFD a comprehensive RMP addressing all CalARP-regulated substances above threshold quantities, with associated PHA tables for all identified process groups.
- **Third-Party Auditing:** Apple retains independent auditors (BSI) to conduct periodic compliance audits of its RMP and CalARP programs, and diligently tracks all findings to closure.
- **Engineering Controls:** The Facility is equipped with redundant safety systems, including gas detection sensors, abatement systems (CS Clean and acid scrubbers), low-flow alarms on gas cabinets, safe-drain valves on storm drains, and exhausted enclosures on process tools.
- **Emergency Response:** Apple maintains a trained Emergency Response Team ("ERT") and keeps the Emergency Response Plan readily accessible in the ERT room and via the CERS portal.
- **Regulatory Reporting:** Apple files required disclosures through CERS, BAAQMD, the City of San Jose wastewater program, and other applicable agencies, and has done so consistently since operations commenced.

- **Continuous Improvement:** Apple regularly updates SOPs, process flow diagrams, and safety documentation in response to audit findings, incident investigations, and evolving regulatory requirements.

31.    The allegations in Plaintiff's motion rely on a pattern of misunderstandings and mischaracterization—taking routine regulatory processes (such as third-party audit findings or data-update formatting in BAAQMD submissions), isolated sensor anomalies, and inapplicable regulatory frameworks and presenting them as evidence of systemic noncompliance. As I have detailed above, Apple has addressed each of these matters and has systems in place to maintain the Facility in compliance with all applicable environmental, health, and safety requirements.

32.    For all of these reasons, Plaintiff's characterization of the Facility as presenting imminent environmental and safety hazards is not supported by the facts.

## X.    RECENT REGULATORY SETTLEMENTS

33.    Apple has resolved outstanding regulatory matters arising from the Facility's operations. Apple voluntarily entered into settlement agreements with both the United States Environmental Protection Agency ("EPA") and the Bay Area Air Quality Management District ("BAAQMD"), and has implemented enhanced compliance measures to prevent similar issues from recurring. These settlements demonstrate that Apple takes its regulatory obligations seriously and acts promptly to address and resolve any concerns raised by regulators.

### A.    U.S. EPA Consent Agreement and Final Order (Docket No. RCRA-09-2026-0006)

34.    EPA conducted inspections at the Facility on August 17–18, 2023, and January 16, 2024. On April 30, 2024, EPA sent Apple a Notice of Violation and Request for Information. On November 6, 2024, EPA sent Apple a second Request for Information. Apple provided responses to the Notice of Violation and to each Request for Information, and undertook compliance actions to address and resolve regulatory issues identified by EPA during the inspections and in related communications, including areas of concern and potential violations.

35.     Both EPA and Apple agreed that settling this action without the filing of a complaint or the adjudication of any issue of fact or law was in their respective interest and in the public interest. The EPA's findings, and Apple's corrective responses, are summarized as follows:

- **Waste Determination (Count I).** During the inspection, EPA observed six 1-gallon containers of corrosive waste and three small containers of unknown waste that were not marked as hazardous waste or dated, though they were subsequently determined to be hazardous waste. In addition, EPA observed that the contents of the 1,700-gallon solvent waste tank were being managed as Non-RCRA Hazardous Waste Liquid (CA-133 waste), when certain spent solvents utilized in Apple's process were characteristic for ignitability (D001) and/or corrosivity (D002) when spent. Apple subsequently updated its characterization and management of the spent solvent waste stream to comply with RCRA requirements.

- **Land Disposal Restriction Notifications (Count II).** During the inspection and records review, EPA observed that on 105 days between June 29, 2022, and March 1, 2024, Apple shipped hazardous waste from the solvent waste tank offsite for treatment or disposal under the waste code CA-133, without an accompanying RCRA hazardous waste code, and without notifying the off-site receiving facility of the Land Disposal Restriction determination for this waste stream. Apple subsequently updated its characterization and management of the spent solvent waste stream to comply with RCRA requirements.

- **90-Day Accumulation (Count III).** During the inspection, EPA observed one 5-gallon waste container containing D002 waste that had been stored at the Facility for more than 90 days—from March 2, 2023, until August 17, 2023, when it was sent offsite for disposal. Apple has since implemented more rigorous tracking protocols to ensure all containers are shipped within the permitted accumulation period.

- **Air Emission Controls on Solvent Waste Lift Station Tank (Count IV).** During the inspection and attendant document review, EPA observed that piping from the solvent waste lift station tank that may contain solvent exhaust was connected to the general exhaust system, which vents directly to the atmosphere. In response, Apple subsequently installed

a conservation pressure/vacuum breather vent to serve as a closure device on the solvent waste lift station tank.

- **Container Labeling (Count V).** During the August 17, 2023 inspection, EPA documented two 5-gallon containers of corrosive (D002) waste that were not labeled or dated, and eleven 5-gallon containers of corrosive (D002) waste with labels that were not clearly visible for inspection. During the January 16, 2024 inspection, EPA documented three 5-gallon containers of corrosive (D002) waste and eight 5-gallon containers of ignitable (D001) waste with labels that were not clearly visible for inspection. Apple has since implemented enhanced labeling protocols, including standardized labeling procedures and routine audits of container marking practices.

- **Container Management (Count VI).** During the inspection, EPA observed one 55-gallon container marked as corrosive liquid (D002) that was open in Apple's central accumulation area. Apple has reinforced its container closure procedures and training requirements for all personnel responsible for hazardous waste handling.

- **Daily Tank Inspections (Count VII).** EPA determined that Apple failed to perform and document daily inspections of its solvent waste lift station tank, and failed to perform and document inspections of its solvent waste tank on weekends and holidays when hazardous waste was being stored in the tanks. Apple has since implemented a seven-day-per-week inspection schedule and electronic documentation system for all hazardous waste tanks at the Facility.

36. Because Apple had undertaken compliance actions to address and resolve the issues identified during the inspections and in related communications—including the specific issues described in the Counts—EPA did not require additional compliance actions in the Consent Agreement and Final Order. EPA's decision not to impose injunctive relief or ongoing compliance obligations reflects its recognition that Apple had already voluntarily remediated the identified issues.

37. Apple agreed to pay a civil penalty of $261,283. In executing the Consent Agreement and Final Order, Apple certified under penalty of law to EPA that it has taken the steps

necessary to comply with RCRA and its implementing regulations for the specific violations at the Facility alleged in the Consent Agreement.

38.    I personally signed the Consent Agreement and Final Order on behalf of Apple on October 23, 2025, in my capacity as Director of Environment, Health and Safety. Attached hereto as Exhibit B is a true and correct copy of the Consent Agreement and Final Order.

B.    **B. BAAQMD Settlement Agreement (NOVs A64215, A64216, A64218, A64219, and A65128)**

39.    The Air District alleged that Apple was subject to and violated Air District regulations as described in five Notices of Violation: NOVs A64215, A64216, A64218, A64219, and A65128. These NOVs related to the following issues at the Facility:

- **Operating Equipment Without Permits (NOVs A64215 and A64216).** Between 2017 and 2023, Apple installed and operated several pieces of equipment at the Facility without an Authority to Construct or Permit to Operate from the Air District, allegedly in violation of Rules 2-1-301 and 2-1-302. In July 2017, Apple installed and began operating an unpermitted waste solvent tank and carbon canisters. Then, from 2019 to 2023, Apple installed and began operating an unpermitted carbon filter, thermal processing unit, and catalytic bead filters – each of these are air pollution control devices designed to reduce air emissions. Apple has since obtained the necessary permits and conducted a comprehensive review of all equipment and emission points at the Facility to confirm that all sources are properly permitted or included in the pending air permit modification application.

- **Boiler Emission Exceedances (NOVs A64218 and A64219).** Apple submitted emission test results for three boilers at the Facility. When Air District staff corrected the raw test results, Boilers #2 and #3 exceeded the NOx emission limit of 30 parts per million (corrected at 3% oxygen) in 2023 and 2024, respectively. Apple took corrective action and retested the affected boilers.

- **Failure to Conduct Annual Emission Test (NOV A65128).** This is unrelated to the Facility at issue here. Apple is required to conduct an emission test of its boilers every

calendar year pursuant to Rule 9-7-506. In 2023, Apple allegedly failed to timely complete an emission test of a boiler at the company's Cupertino facility.

40. The Air District and Apple agreed to settle all five NOVs for (i) payment of a civil penalty in the amount of $125,000, and (ii) implementation of a compliance measure requiring Apple to retain original emission test results. Apple's entry into the Settlement Agreement is not and shall not be construed as an admission of any liability, wrongdoing, or responsibility with respect to any violations alleged in the five NOVs. (Gjovik. Supp. Request for Judicial Notice, Dkt. 88, Ex. B.)

41. As a compliance measure, Apple agreed to retain an original copy of the emission results generated by the equipment used to periodically test the boilers located at 3250 Scott Boulevard, Santa Clara, California. An original copy of the emission results must be retained in either digital or printed form, must accurately reflect the emission data collected at the time of testing, and must indicate whether the data complies with the requirements in Air District Regulation 9, Rule 7, Section 307. Apple is required to retain an original copy of the emission results for two years from the date of testing and make these records available to the Air District upon request.

42. Apple's full payment of the $125,000 civil penalty and complete satisfaction of all other obligations under the Settlement Agreement will fully and finally settle, conclude, and resolve all claims that have been or could have been asserted between the Air District and Apple arising out of or related to the allegations and conduct that are the basis for the five NOVs.

43. I signed the BAAQMD Settlement Agreement on behalf of Apple in my capacity as Global Director of Environmental Health & Safety.

**C.    Compliance Enhancements Implemented as a Result of the Settlements**

44. Beyond the specific corrective actions required by the EPA and BAAQMD settlements, Apple has voluntarily implemented the following additional compliance enhancements at the Facility to prevent similar issues from arising in the future:

- **Enhanced Hazardous Waste Characterization Program.** Apple has updated and formalized its waste characterization procedures to ensure that all waste streams—including

solvent waste—are properly characterized with all applicable RCRA and California hazardous waste codes at the point of generation. The characterization of the solvent waste tank has been updated to include all applicable D-listed and F-listed codes (D001, D002, F003, F005), and Land Disposal Restriction notifications now accompany all offsite shipments.

- **Improved Container and Labeling Management.** Apple has implemented standardized labeling procedures for all hazardous waste containers in the central accumulation area, including pre-printed labels that capture required information (waste composition, physical state, hazard indications, and accumulation start date). The Facility conducts routine internal audits of container marking and closure practices.

- **Seven-Day Inspection Program.** Apple has transitioned from a weekday-only inspection schedule for hazardous waste tanks to a seven-day-per-week inspection protocol, including weekends and holidays, whenever hazardous waste is stored in the tanks. Inspection records are maintained electronically for prompt retrieval and regulatory review.

- **Air Emission Controls.** Apple installed a conservation pressure/vacuum breather vent on the solvent waste lift station tank immediately upon EPA's identification of the issue and has implemented a periodic verification program to ensure all tank openings maintain compliant closure devices.

- **Comprehensive Equipment Permitting Review.** Following the BAAQMD NOVs, Apple conducted a comprehensive review of all equipment and emission points at the Facility to confirm that all sources are properly permitted or included in pending permit applications. Apple has obtained permits for previously unpermitted equipment, including the waste solvent tank and associated abatement devices.

- **Boiler Emissions Record Retention.** Consistent with the BAAQMD Settlement Agreement, Apple now retains original emission results from periodic boiler testing for a minimum of two years in either digital or printed form, with records available for regulatory inspection upon request.

- **Training and Accountability.** Apple has enhanced training for all personnel involved in hazardous waste generation, handling, storage, and shipment at the Facility, with particular emphasis on waste determination procedures, container management, labeling requirements, and inspection documentation. Training records are maintained and updated annually.

45.    These settlements and the associated compliance improvements demonstrate Apple's good faith and ongoing commitment to regulatory compliance at the Facility. The fact that EPA specifically declined to impose additional compliance measures because Apple had already voluntarily remediated the identified issues underscores that the regulatory agencies responsible for overseeing the Facility have confidence in Apple's corrective actions and compliance posture.

## XI.    IMPACT OF THE REQUESTED INJUNCTION

46.    Hazardous materials such as silane, phosphine and ammonia are essential to the work done at the facility. They are used precision fabrication tools operating under highly controlled conditions and specialized gas distribution networks, which incorporate ventilation systems, abatement systems, scrubbers, interlocks, gas cabinets, emergency shutdown systems, and other safeguard.

47.    The Facility's equipment is highly calibrated and cannot simply be switched off and restarted at will. Removing all hazardous gasses from the facility would increase employee exposure risk and would require Apple to undertake a complex, multi-step process: each piece of equipment would need to be safely disabled, all hazardous materials and process gases would need to be purged from the systems under controlled conditions, and the equipment would then need to be prepared for an indefinite period of inactivity to prevent degradation.

///

///

///

///

///

///

If the order was later lifted, Apple could not simply resume operations. The Facility's semiconductor fabrication tools would need to be recalibrated, requalified, and brought back online through a recommissioning process, which could take months and would impose substantial costs with no corresponding environmental benefit. The disruption to Apple's ongoing research and development programs during this period would be significant as time-sensitive research initiatives cannot be suspended and resumed without loss of progress and data.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 28, 2026, at Cupertino California.

By: _____
ELIZABETH SCHMIDT

Global Director of
Environment, Health & Safety
Apple Inc.

SCHMIDT DECL. ISO APPLE'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-07360-PCP

16