# Exhibit C

Wendy Tredway, CHMM

NW Regional Director, Managing Principal

BSI America Professional Services Inc.

Response to Preliminary Injunction – explanation and plain language information

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| 2. Apple Inc. operates a semiconductor fabrication and manufacturing facility at 3250 Scott Blvd, Santa Clara. The facility handles dangerous chemicals including arsine, phosphine, chlorine, hydrofluoric acid, silane, and pyrophoric precursors that ignite on contact with air/water. Apple's own dispersion modeling places its arsine worst-case toxic endpoint at 1.1 miles — encompassing thousands of residents, an apartment complex, a children's playground across the lot line, an urgent care clinic, places of worship, and public parks. Pl. Decl., Ex. B at 00003296. | Response: <br>• Yes, these chemicals are onsite <br>• Yes, the worst case scenario shows a toxic endpoint of 1.1 miles for Arsine based on the EPA modeling software (RMP*Comp) <br><br> Explanation of the requirement: <br><br> Under the EPA Risk Management Program (RMP) rule defines a toxic end point as "the maximum distance a toxic vapor cloud from an accidental release <u>might</u> travel before dissipating to a concentration below which the general public could be exposed for 30–60 minutes without serious, irreversible health effects or escape-impairing symptoms" <br><br> For a Program 3 site under the RMP rule, this calculation is used as part of the required offsite consequence analysis (OCA). An OCA is required to evaluate 2 endpoints – a worst case | **What is an "endpoint"?** <br>An endpoint is a concentration of a chemical in the air that EPA considers serious enough to potentially cause harm to people exposed for a short period of time. <br><br> It is not necessarily a lethal level. It is more like a level where people may experience <br>• serious irritation, <br>• breathing difficulty, <br>• disorientation, <br>• or other health effects that could interfere with escaping safely. <br><br> EPA provides specific endpoint values for regulated toxic chemicals in the RMP rule. <br><br> Where do toxic endpoint values come from? <br>To determine these endpoint values, EPA primarily uses emergency exposure |

1

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
|  | (the 1.1 mile radius) and an alternative case (the smaller radii).<br><br>This is a theoretical exercise and does not mean that it will happen, rather it provides a discovery mechanism for organizations to validate that controls are in place to prevent this from happening and if not, identify potential corrective actions to implement those controls. It also informs the public notification.<br><br>**EPA's OCA guidance document, section 1.4 specifically states (Risk Management Program Guidance for Offsite Consequence Analysis (March 2009))**<br><br>"Worst-case consequence distances obtained using these tables <u>are not intended to be precise predictions of the exact distances that might be reached</u> in the event of an actual accidental release. For this guidance, worst-case distances are based on modeling results assuming the combination of worst-case conditions required by the rule. This combination of conditions occurs rarely and is unlikely to persist for very long." | guidelines developed by health and safety experts. The preferred source is the ERPG-2 value, which represents the highest concentration most people could be exposed to for one hour without experiencing serious or irreversible health effects or losing the ability to safely leave the area.<br><br>If an ERPG-2 value is not available for a chemical, EPA uses another conservative health-based value called the "Level of Concern" (LOC), which is typically based on a fraction of , typically $1/10^{th}$ , the chemical's Immediately Dangerous to Life and Health (IDLH) concentration.<br><br>A toxic endpoint is a planning tool used to understand the potential reach of a hypothetical chemical release scenario. It is not a prediction that an accident will occur, and it does not mean the public is in immediate danger. |

2

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| 5. Because these chemicals can produce mass-casualty harm if released, Congress and the California Legislature enacted statutes regulating use and where approved, requiring specific safety controls. The chemicals and receptors are present. [...] The County's post- Bhopal Toxic Gas Ordinance permitting regime has no records for this facility. Pl. Decl., Ex. H. | **This claim is false and shows a basic misunderstanding of regulatory structure and authority.**<br><br>In Santa Clara County, hazardous materials programs are managed through California's "CUPA" system, which stands for **Certified Unified Program Agency**. The CUPA structure is intended to simplify environmental and hazardous materials regulation by placing several state and local programs under one lead agency instead of requiring facilities to work with multiple regulators separately. In practical terms, this means the CUPA is the primary local agency responsible for:<br>• hazardous materials business plans (HMBPs),<br>• hazardous waste oversight,<br>• underground and aboveground storage tanks,<br>• accidental release prevention programs (CalARP/RMP),<br>• inspections,<br>• permits,<br>• and emergency preparedness coordination.<br>For facilities located within the **City of Santa Clara**, the **CUPA authority is the Santa Clara Fire Department Community Risk Reduction Division**. | **In plain language:**<br><br>**This claim is false and shows a basic misunderstanding of regulatory structure and authority.**<br><br>The Toxic Gas Ordinance is essentially a local safety law designed to make sure facilities using dangerous gases have strong prevention and emergency systems in place before an accident happens.<br><br>While the County of Santa Clara has the long established local TGO, facilities in the City of Santa Clara operate under the state's CUPA system (Certified Unified Program Agency) where toxic gas oversight is the responsibility of the City including coordination between:<br>• the City Fire Department/CUPA,<br>• fire code officials,<br>• building officials,<br>• and in some situations County environmental health requirements or historical county ordinance structures depending on the facility and permitting pathway.<br>This layered structure exists largely because Santa Clara County has a very high concentration of semiconductor and advanced technology facilities that |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | The City operates as its own CUPA and is responsible for implementing programs such as: <br> • Hazardous Materials Business Plans, <br> • CalARP, <br> • Aboveground Petroleum Storage Act requirements, <br> • underground storage tanks, <br> • hazardous waste treatment oversight, <br> • fire code enforcement related to hazardous materials, <br> • inspections and enforcement activities. <br> The County of Santa Clara Department of Environmental Health also operates a CUPA program, but it generally regulates facilities in: <br> • unincorporated county areas, <br> • and certain cities that do not run their own CUPA programs. <br> This distinction is important because people often assume "Santa Clara County" regulates all hazardous materials activities throughout the county, but in reality some cities, including the City of Santa Clara, have their own local CUPA authority. <br><br> With respect to the **Toxic Gas Ordinance (TGO)**, the County of Santa Clara has a long-established local | use specialty toxic gases in manufacturing and research operations. <br><br> Apple has consistently worked with the local authority and extensive records exist that evidence Apple's engagement with the regulators. |

4

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
|  | ordinance focused specifically on highly hazardous toxic gases commonly used in industries such as semiconductor manufacturing. The purpose of the ordinance is to protect workers, emergency responders, the public, and surrounding property from accidental toxic gas releases. The ordinance applies to gases considered highly toxic based on their ability to cause serious harm at very low concentrations. Facilities using these gases may be required to implement extensive engineering and safety controls depending on the type and quantity of gas involved. Typical responsibilities under the Toxic Gas Ordinance include: <br> • obtaining permits before installing or modifying toxic gas systems, <br> • conducting engineering reviews and plan approvals, <br> • maintaining gas detection and alarm systems, <br> • providing emergency shutdown capabilities, <br> • ensuring seismic protection for gas systems, <br> • maintaining ventilation and gas cabinets, <br> • leak testing, |  |

5

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | <ul><li>emergency response preparedness,</li><li>employee training,</li><li>maintaining self-contained breathing apparatus (SCBA),</li><li>and supporting inspections and emergency planning activities.</li></ul> | |
| 10. Annual hazardous waste generation totals approximately 98.4 million pounds, including 96.7 million pounds per year of corrosive waste discharged through the Acid Waste Neutralization (AWN) system." | This statement is misleading – it seems to indicate that corrosive waste is flowing through the system directly.<br><br>The wastewater system is fully permitted and designed to treat the waste to meet discharge requirements listed in the POTW permit. This means that the waste is treated to a point it is considered non-hazardous prior to discharge into the sanitary sewer. At no time is this waste discharged directly to any surface waters. Additionally, the entire wastewater treatment system is protected from contact with stormwater, preventing potential pollutant discharge into waters of the United States.<br><br>The wastewater system is designed to comply with treatment requirements under the Categorical Industrial User designation (40 CFR 469) as imposed/regulated by the POTW. | A hazardous waste treatment system for acid waste neutralization is designed to make acidic or caustic wastewater safe enough to legally discharge to a sanitary sewer system without causing harm to people, sewer infrastructure, treatment plants, or the environment.<br><br>In simple terms:<br>The system takes wastewater that is too acidic or corrosive to send directly to the sewer and treats it until it meets regulatory discharge limits.<br>The key concept is that hazardous waste itself is not allowed to be discharged to the sewer. Instead, the waste must first be properly treated so that the final discharged water no longer exhibits hazardous characteristics and complies with wastewater permit requirements.<br><br>**Why this is NOT considered "discharging hazardous waste"** |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | Additionally, requirements for these types of systems to be installed and authorized to operate include:<br>• Hazardous waste treatment system permit by rule authorization through the CUPA<br>• Financial responsibility for closure obligations<br>• Hazardous waste treatment system professional engineer certification<br>• Waste analysis and waste analysis plan<br>• Phase 1 environmental evaluation/checklist<br>• Owner notification | This is one of the most important regulatory concepts. Under California and federal hazardous waste laws untreated hazardous waste cannot simply be dumped into a sewer.<br>The treatment system must:<br>1. properly treat the waste,<br>2. remove the hazardous characteristic (such as corrosivity),<br>3. meet sewer discharge permit requirements,<br>4. and ensure prohibited contaminants are not discharged.<br>After treatment, the discharged water should:<br>• no longer be hazardous waste,<br>• and must comply with local wastewater discharge standards.<br><br>**Safeguards required to prevent hazardous discharges**<br>These systems are heavily controlled and monitored because regulators want to prevent accidental releases of untreated hazardous waste.<br>Common protections include:<br>Continuous pH monitoring<br>The system constantly measures pH levels.<br>If the pH is outside acceptable limits: |

7

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
|  |  | • alarms activate, <br> • discharge can automatically stop, <br> • or the water is redirected back into the treatment system. <br> **Automatic shutoff/interlocks** <br> Many systems include controls that: <br> • stop discharge if treatment fails, <br> • prevent untreated waste from bypassing the system, <br> • or isolate tanks during abnormal conditions. <br><br> **Secondary containment** <br> Tanks and piping are placed within containment areas to prevent spills or leaks from reaching the environment. <br><br> **Mixing and retention tanks** <br> Wastewater is held in tanks long enough to fully mix, complete treatment reactions, and allow monitoring before discharge. <br><br> This helps avoid sending concentrated untreated waste directly to the sewer. <br><br> **Sampling and testing** <br> Facilities periodically test wastewater for specific contaminants that are stipulated in their permit such as metals, solvents, fluoride, total toxic |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | organics, or other regulated contaminants. **This ensures treatment is effective beyond just pH adjustment.**<br><br>For this site specifically, the POTW regularly, up to 3 times per month, calls the site to start the permanently installed refrigerated automatic sampler that collects a 24 -hour composite sample. The city then picks up the sample and has it analyzed for compliance with discharge standards.<br><br>The site also collects semiannual samples for inclusion in required wastewater permit reporting and has received the "Certificate of Recognition" for maintaining compliance with federal and local industrial wastewater regulations presented by the City of San Jose and San Jose Santa Clara Wastewater Facility since 2019.<br><br>Operator oversight and maintenance Facilities must inspect systems, calibrate instruments, maintain pumps and sensors, train personnel, and document system performance.<br><br>**Important practical point** |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | The goal of these systems is controlled treatment before discharge, not disposal of untreated hazardous waste. A properly operating neutralization system is intended to ensure:<br>• the sewer system is protected,<br>• wastewater treatment plants are protected,<br>• workers and emergency responders are protected,<br>• and environmental releases are prevented.<br><br>In high-tech industries such as semiconductor manufacturing, these systems are highly automated and engineered with multiple layers of protection. |
| 11. Apple's chemical inventory disclosed to its CalARP regulator materially understates the hazard. Apple's Risk Management Plan (RMP) discloses only three regulated substances —anhydrous ammonia (3,700 lbs.), arsine (120 lab), and chlorine (400 lbs.). Pl. Decl., Ex. B at 00003274. The chemicals actually present, confirmed across Apple's Process Hazard Analysis (PHA), the BAAQMD permit, and POTW inspection records, also include phosphine, diborane, hydrogen bromide, hydrogen | Response – **The assertion that Apple understated the hazards or did not disclose information as required is false.**<br><br>Only 3 materials are disclosed in the RMP because the RMP regulation has established specific threshold quantities for specific chemicals. The 3 substances included in the RMP are the only chemicals onsite that meet or exceed the thresholds listed in Table 1, 2 and/or 3 of the EPA and California Accidental Release Prevention (Cal | **Apple reported and continues to report as required by the applicable regulations.**<br><br>Under the federal Risk Management Program (RMP) rule and California's Accidental Release Prevention (CalARP) Program, not every hazardous chemical at a facility automatically triggers a full risk management plan requirement.<br><br>Instead, the regulations focus on specific chemicals that EPA or |

10

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| iodide, boron trichloride, fluorine, disilane, dichlorosilane, silicon tetrachloride, silane, trifluoromethane, hexafluorobutadiene, mercury, chromium, arsenic, lead, and pyrophoric organometallic precursors used in MOCVD operations including trimethylaluminum (ignites violently in air), trimethylgallium, triethylgallium, trimethylindium, diethyl zinc (ignites in air or water), and phosphorus trichloride. Pl. Decl., Exs. B, E, G, M. | ARP) standards. As stated in the RMP that was submitted to regulators, Apple uses the following chemicals in excess of the regulatory thresholds as follows:<br><br>Anhydrous Ammonia – 500 lbs.<br>Arsine – 100 lbs.<br>Chlorine – 100 lbs.<br><br>There are no other materials onsite that exceed any listed thresholds under these regulations. All thresholds are the lowest California (table 3) threshold listed. Apple does not exceed any federal level thresholds under the RMP rule.<br><br>Additional substances listed do not have any thresholds under RMP or CalARP and are not required to be reported or assessed in the RMP program.<br><br>The reporting mechanism used to report other hazardous materials not listed under the RMP or CalARP regulations is the California Hazardous materials business plan which contains a hazardous materials inventory statement as a required element. The standard threshold volumes under this requirement are 55 gallons, 500 lbs. or 200 cubic feet of a hazardous material | California considers especially dangerous if accidentally released in large amounts. These chemicals are assigned something called a threshold quantity.<br><br>In plain language:<br>A threshold quantity is the amount of a specific hazardous chemical that regulators believe could create a significant offsite safety risk if accidentally released.<br><br>If a facility has a chemical above that threshold amount, the facility must include that chemical and its associated process in its Risk Management Plan (RMP/CalARP program).<br><br>If the amount is below the threshold, the facility does not need to include it in the formal RMP/CalARP analysis — even though the chemical may still be hazardous and regulated under other programs. |

11

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | stored onsite. The Apple facility submits all required information via the California Environmental Reporting System (CERS) on an annual basis. Additionally, during the initial facility build design and permitting process, along with each subsequent tool installation permit submittal, a Maximum Allowable Quantity analysis was/is submitted as part of the plan check process, during which all hazardous materials are disclosed. | |
| *12 The receptors* | The plaintiff claims that the Santa Clara Square Apartments are not included in the RMP submittal. This is true for the initial submittal because the apartments did not exist at the time of initial creation. All potential receptors that existed at the time were included.<br><br>This information was updated in the 2019 submittal as listed in section 2, table 1 of the RMP document. The estimated residential population in that specific complex at the time was 340 units, built in 2018. Additional businesses and other receptors were added at this time as well. This information was also updated in the 2025 update to reflect additional businesses and updated residential population estimates. This information | Under the EPA Risk Management Program (RMP) rule, facilities that perform an Offsite Consequence Analysis (OCA) must identify something called public and environmental receptors.<br><br>In plain language, this means:<br><br>The facility must look at what people, buildings, and environmentally sensitive areas could potentially be affected if a serious chemical release happened.<br><br>The purpose is to understand:<br>• who or what could be exposed,<br>• how severe the impact area might be, |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | has been updated as required, on frequencies established by the regulations. | • and whether nearby communities or sensitive environments could be at risk.<br><br>**What is a "receptor"?**<br>A receptor is simply a person, place, building, or environmental area that could potentially be affected by a chemical release. Think of it as "What is in the path of the release?"<br><br>**Public Receptors**<br>Public receptors are places where people could reasonably be present. Examples include:<br>• homes and apartments,<br>• schools,<br>• hospitals,<br>• daycare centers,<br>• businesses,<br>• office buildings,<br>• shopping centers,<br>• parks,<br>• stadiums,<br>• transportation routes,<br>• and other occupied areas.<br>The facility evaluates whether any of these locations fall within the modeled toxic or flammable impact area from the release scenario.<br><br>**Example in simple terms** |

13

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | If a facility models a chlorine release and determines the toxic endpoint could extend 1 mile from the site, they must identify whether anything within that 1-mile area includes:<br>• neighborhoods,<br>• schools,<br>• businesses,<br>• or other populated areas.<br>If yes, those are considered public receptors.<br><br>**Environmental Receptors**<br>Environmental receptors are sensitive natural areas that could be harmed by a release.<br>Examples include:<br>• national or state parks,<br>• wildlife refuges,<br>• protected habitats,<br>• wetlands,<br>• preserves,<br>• forests,<br>• or habitats for endangered species.<br>The idea is to determine whether a chemical release could affect environmentally sensitive locations, not just people.<br><br>**What facilities are NOT required to do**<br>The OCA receptor analysis: |

14

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | • does NOT predict actual injuries,<br>• does NOT estimate death counts,<br>• does NOT model exact environmental damage,<br>• and does NOT mean those areas definitely would be harmed.<br><br>Instead, it is a planning tool used to identify "Could this release potentially reach these people or places?"<br><br><br>**Why EPA requires this**<br>EPA uses receptor information to support:<br>• emergency response planning,<br>• community awareness,<br>• risk communication,<br>• and accident prevention efforts.<br>It helps local fire departments, emergency planners, LEPCs, CUPAs, and facilities themselves understand the possible reach of a major accidental release.<br><br>**Important practical point**<br>Many industrial facilities handle hazardous materials safely every day without incidents.<br><br>The receptor analysis is based on: |

15

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | • conservative modeling assumptions,<br>• hypothetical accidental releases,<br>• and planning scenarios.<br><br>The goal is preparedness — not to suggest that an accident is likely.<br><br>**Simple analogy**<br>Think of the OCA as a weather forecast cone for a hurricane. The cone does not mean every location inside will definitely be damaged, but it helps identify areas that could potentially be affected and should be considered in planning.<br><br>Public and environmental receptors work the same way in an RMP analysis; they identify who or what falls within the possible impact area of a modeled release scenario.<br><br>Apple reported identified potential receptors that existed at the time of each submittal. |
| 23 The chemicals are inherently capable of mass-casualty harm. The targeted hazard inventory includes substances whose properties — without controls functioning correctly | This statement relies on the idea that controls are not functioning. Based on my site visit and the records I reviewed, this is not the state of operations. Controls are designed and operated to | Regarding the claim of "without controls functioning properly"<br><br>The facility, specifically the systems supporting chemicals called out in this |

16

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| —produce death, irreversible injury, or fireball explosions in residential areas. Arsine (120 lbs. onsite) has a NIOSH IDLH of 3 ppm; it is odorless at lethal concentrations, causes intravascular hemolysis with delayed multi-organ failure, and has no effective antidote. The DOT Emergency Response Guidebook protective-action distance for a small arsine release is approximately 528 feet — exceeding the distance to occupied residential units across the lot line. Phosphine (41-lb cylinders) has an IDLH of 50 ppm and OSHA PEL of 0.3 ppm; no antidote. Chlorine (400 lb onsite) is regulated as a chemical warfare agent under 33 U.S.C. § 1311(f); IDLH 10 ppm; ERG protective action distance of 528 feet for small releases, more than four miles for large. Hydrogen fluoride (49% concentration) causes systemic fluorosis and cardiac arrhythmia at small surface-area exposures; ERG distance 3,168 feet. Fluorine has an IDLH of 25 ppm. The pyrophoric organometallics — trimethylaluminum and diethyl zinc — ignite violently in air and water respectively. Silane and dichlorosilane are pyrophoric and can produce fireball detonation. The facility also stores 7,500 gallons of hydrogen on the exterior gas pad. Pl. | avoid single point failure – meaning if one thing goes wrong or fails it's backed up by a secondary control. An example of this would be a gas line break -this could be a serious event. To prevent this from happening, redundant engineering controls are in place including:<br>• restricted flow orifice that limits the amount of gas that can leave the cylinder<br>• an excess flow switch that shuts off pneumatic valve at the cylinder<br>• gas detection with tool/cylinder shutdown and evacuation/response protocols<br>• administrative controls (evacuation, preventative maintenance, training, etc.)<br><br>These controls are very standard in the semiconductor industry and the site conducted PHAs to validate that the controls in place are appropriate, complete and redundant. Additionally, mechanical integrity, maintenance and inspection programs require scheduled testing and maintenance to assure continued functionality of safety controls. | case are designed with redundant controls, which are backup safety measures designed to prevent an accident even if one control fails.<br><br>**In plain language:**<br>Instead of relying on a single safety system, multiple layers of protection are put in place so that if one thing stops working, another system is still there to prevent a problem.<br><br>Avoiding a "single point failure" means designing a system so that no single equipment failure, human error, or power loss can immediately lead to a dangerous event.<br><br>For example a toxic gas system may have:<br>• a gas detector,<br>• an automatic shutoff valve,<br>• exhaust ventilation,<br>• alarms,<br>• and emergency backup power.<br>If one control fails, the others still help keep people safe.<br><br>A simple everyday example is an airplane having multiple engines and backup systems — the aircraft is designed so one failure does not automatically cause a catastrophe. |

17

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| Decl., Exs. B, E, G, M-1. Each ERG protective-action distance for the substances Apple holds reaches or exceeds the distance from the facility to occupied residential units across the lot line. The receptor geography is, as a matter of physical measurement, within the hazard envelope. | The DOT ERG is not a valid reference for emergency planning associated with operational activities conducted at this site, it is designed for generic transportation related incidents. See plain language explanation for more details.<br><br>The reference to 33 U.S.C. § 1311(f) is not valid and shows a misunderstanding of regulatory structure and how regulatory requirements are implemented and enforced. Chlorine is regulated as in industrial chemical with regards to semiconductor operations – not a chemical warfare agent.<br><br>Using the United States Code as a reference for onsite compliance and operational activities is incorrect as it does not establish detailed requirements to adhere to. The laws direct the agencies to enact regulations, which set the specific operational requirements. | The DOT Emergency Response Guidebook (ERG) was designed primarily for transportation emergencies, not for managing or planning operations inside a complex semiconductor manufacturing facility.<br><br>**In plain language:**<br>The ERG is meant to help first responders quickly identify immediate hazards during transportation accidents involving trucks, railcars, cargo containers, or shipping incidents. <u>It is not intended to serve as a detailed engineering, operational, or emergency planning tool for fixed industrial facilities like semiconductor fabs.</u><br><br>**What the ERG is actually for**<br>The ERG was created by transportation agencies to support firefighters, police, hazmat teams, and emergency responders during the first few minutes of a transportation incident.<br>Typical examples include:<br>• a tanker truck rollover,<br>• leaking railcar,<br>• highway accident,<br>• shipping container fire,<br>• or unknown chemical spill during transport.<br>The guidebook provides: |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | • quick isolation distances,<br>• evacuation suggestions,<br>• immediate safety hazards,<br>• and general response guidance.<br>It is intentionally simplified because responders often have very little information, are under time pressure, and may not know exactly what chemical is involved.<br><br>**Why semiconductor facilities are fundamentally different**<br>Semiconductor manufacturing environments are far more complex than transportation scenarios.<br><br>A semiconductor facility involves:<br>• permanent engineered systems,<br>• specialized gas distribution networks,<br>• ventilation systems,<br>• abatement systems,<br>• scrubbers,<br>• interlocks,<br>• gas cabinets,<br>• emergency shutdown systems,<br>• and highly controlled operational conditions.<br>The ERG does not account for these controls. |

19

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | **The ERG assumes a generic transportation release** The ERG generally assumes: <ul><li>an uncontrolled release,</li><li>outdoor conditions,</li><li>limited engineering controls,</li><li>and minimal knowledge of facility-specific protections.</li></ul> But semiconductor facilities are designed with: <ul><li>multiple containment layers,</li><li>automated shutdown systems,</li><li>toxic gas monitoring,</li><li>redundant ventilation,</li><li>seismic restraints,</li><li>excess flow controls,</li><li>and specialized emergency procedures.</li></ul> These systems significantly change: <ul><li>release behavior,</li><li>exposure potential,</li><li>and emergency response actions.</li></ul> **Semiconductor chemicals behave differently onsite** Many semiconductor materials are pyrophoric, highly reactive, toxic at very low concentrations, or used in complex mixtures. In a fab environment, these materials may be diluted, exhausted through scrubbers, enclosed in gas |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | cabinets, and distributed through specialized piping systems.<br><br>The ERG does not evaluate or account for:<br>• facility process design,<br>• exhaust flow,<br>• gas detection systems,<br>• room pressurization,<br>• or treatment technologies.<br><br>**The ERG is not a regulatory planning model**<br>For semiconductor facility planning, regulations typically require:<br>• detailed hazard analysis,<br>• process hazard analysis (PHA),<br>• toxic gas modeling,<br>• RMP/CalARP analysis,<br>• fire code engineering analysis,<br>• and facility-specific emergency planning.<br>These evaluations use engineering calculations, dispersion modeling, process-specific scenarios, and actual facility design information.<br>The ERG is too generalized for this purpose.<br><br>**Example in plain language**<br>Using the ERG to plan semiconductor facility operations would be similar to |

21

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | using a roadside first-aid pamphlet to design a hospital emergency room. The pamphlet may be useful during an initial emergency, but it is not detailed enough to manage:<br>• complex systems,<br>• engineering controls,<br>• specialized hazards,<br>• or long-term operational planning.<br><br>**Important nuance**<br>The ERG can still have limited value onsite for:<br>• initial responder reference,<br>• transportation-related incidents,<br>• loading dock emergencies,<br>• or quick hazard identification.<br>However it is not applicable to and it should not be relied upon as the primary basis for semiconductor operational planning, process safety design, or facility emergency preparedness. The hazards, controls, and operational complexity of semiconductor manufacturing require much more detailed and facility-specific analysis. |
| 25. The operator further withheld Group 2 (pyrophoric MOCVD organometallic precursors), Group 4 (HPM tool abatement and facility exhaust), Group | The assertion that information was "withheld" is false. Withholding implies intent to conceal and this was simply not the case. The RMP was updated to | Under the RMP Program 3 rules, the focus of a Process Hazard Analysis (PHA) is the **covered process** — meaning the specific system that |

22

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| 5 (HPM liquid abatement), and Group 6 (wastewater system) hazard analysis tables from the version of the PHA sent to the SCFD — the regulator that, the PHA elsewhere acknowledges, specifically requested coverage of the wastewater system. *Id.* at 00003363, 00003369, 00003374. *Mallinckrodt*'s "reasonable prospect that a serious, near-term threat to human health or the environment exists" is established on the operator's own document. 471 F.3d at 296. | reflect only covered processes as required by the regulations.<br><br>The RMP regulation requires evaluation of covered processes – meaning creation of an RMP including a process hazard evaluation for the specific system(s) that contains a regulated chemical above the threshold quantity.<br><br>In the initial PHA that was conducted during the design and planning phase of the facility (2015), Apple included all covered processes. Additionally, Apple decided to add processes to the PHA review that were not required. The intent was to complete a comprehensive site evaluation and assure that the facility was reviewed in a holistic manner. To be clear, the addition of the non-covered processes was a voluntary exercise and included systems that were/are not required to be reviewed.<br><br>At the 5 year update cycle, it was suggested by the PHA facilitators that Apple could proceed during the update cycle by reviewing only the covered processes because that meets the requirements of the regulation. The authority having jurisdiction accepted this submittal. | contains a regulated chemical above the threshold quantity.<br><br>**In plain language:**<br>The PHA is intended to evaluate the systems and equipment that could directly contribute to a serious accidental release of the covered chemical.<br>The reason facilities do not evaluate every unrelated system onsite is because: the regulation is specifically focused on preventing catastrophic releases from the regulated hazardous chemical process itself.<br><br>**What is considered part of a "covered process"?**<br>A covered process usually includes storage vessels, gas cabinets, piping, valves, pumps, scrubbers, ventilation, monitoring systems, controls, and connected equipment that are involved in storing, transferring, using, treating, or controlling the covered chemical.<br><br>The boundary is generally based on: "Could this equipment affect the safe handling or accidental release potential of the regulated substance?"<br><br>**Example**<br>Imagine a semiconductor facility with: |

23

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | The additional statement of "…" reasonable prospect that a serious, near-term threat to human health or the environment exists" is established on the operator's own document", is misleading and shows a lack of understanding of the hazard analysis process. The possibility of threat to human health and the environment is evaluated as a "what-if" exercise for a worst -case scenario without controls in place. In no way does a PHA stating "Personnel exposure resulting in injury and/or fatality (site personnel or neighbors)" as a potential consequence indicate an imminent threat or a likely failure. It purely establishes that it is a possibility if no controls are in place. Controls are evaluated against this statement to validate that all appropriate controls exist. If these controls do not exist and/or the controls are deemed inadequate, corrective actions are listed for follow up and closure.<br><br>Furthermore, if at any time during a PHA the design is found to be deficient to the point of imminent danger, the Facilitator would suggest pausing the PHA so the engineers could re-evaluate design and return to the PHA process | • arsine gas systems,<br>• office HVAC,<br>• cafeteria equipment,<br>• domestic water systems,<br>• and regular compressed air lines.<br>If arsine exceeds the RMP threshold quantity the arsine delivery system becomes the covered process.<br><br>The PHA would evaluate:<br>• gas cylinders,<br>• gas cabinets,<br>• distribution piping,<br>• exhaust systems,<br>• toxic gas monitoring,<br>• emergency shutoffs,<br>• scrubbers,<br>• and supporting systems tied to arsine safety.<br>But it would generally not evaluate cafeteria refrigerators, restroom plumbing, office lighting, or unrelated building systems, because those systems do not directly impact the accidental release risk of arsine.<br><br>**Important nuance:**<br>Some "non-chemical" systems CAN still matter<br>Even if a system does not contain the covered chemical itself, it may still |

24

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | when a sufficient design was in place to review. If the system was already active, as would be the case during an update cycle or management of change type of review, the Facilitator would immediately stop the PHA and recommend issuing a stop work order.<br><br>There were no such items identified during any PHA cycle associated with this site.<br><br>The action item closure list maintained by Apple contains details of all action item closure status. | need evaluation if it affects process safety. Examples:<br>• emergency power,<br>• exhaust ventilation,<br>• control systems,<br>• cooling water,<br>• compressed air used for valves,<br>• fire suppression,<br>• or monitoring systems.<br>Why? Because failure of those systems could contribute to a release, loss of containment, or failure of safeguards.<br><br>So the question is not simply "Does it contain the chemical?"<br>The real question is "Could failure of this system contribute to a dangerous release or make safeguards fail?"<br><br>**Why the regulation is scoped this way**<br>The RMP rule is designed to focus effort on higher-risk systems, major accident prevention, and catastrophic release scenarios.<br><br>If every system at a large facility had to be analyzed in full detail regardless of connection to the covered process:<br>• PHAs would become unmanageably large,<br>• resources would be diluted, |

25

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | • and the analysis would lose focus on the highest-risk hazards.<br>The goal is to concentrate detailed safety analysis on the systems most relevant to accidental release prevention.<br><br>**Simple analogy**<br>Think of a covered process like the engine and fuel system of an airplane. A safety review would absolutely focus on fuel lines, engines, controls, and backup systems. But it would probably not deeply evaluate passenger reading lights, beverage carts, or seat upholstery, unless those systems somehow affected flight safety.<br><br>The analysis focuses on systems that could realistically contribute to the major hazard being evaluated.<br><br>**Practical real-world approach**<br>In practice, facilities usually define the covered process boundaries by asking:<br>• What equipment contains the regulated chemical?<br>• What equipment controls or protects that system?<br>• What failures could lead to a release? |

26

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | • What utilities or support systems are safety-critical?<br><br>That becomes the scope of the PHA. The purpose is to ensure the systems that matter most to preventing a catastrophic chemical release are thoroughly evaluated and protected. |
| **26. Apple's own RMP\*Comp dispersion modeling places acutely toxic plumes over thousands of residents.** The 1.1-mile arsine, 0.3-mile ammonia, and 0.2-mile chlorine worst-case toxic endpoints are calculated by Apple's own consultant. The CalARP Administering Agency that received the modeling — the SCFD — has formally written that the operator's plume models *"are not favorable for this area"* and on June 17, 2025 withheld fire-department approval of an adjacent residential project pending environmental review. Pl. Decl., Ex. D. | Yes, this is true and further confirms that the plaintiff may not understand the regulatory requirements or the basic elements of a process hazard analysis.<br><br>As previously stated, the regulation requires a review of worst-case scenarios without controls for the toxic endpoint calculation.<br><br>This does not imply in any way that the threat is imminent or probable.<br><br>The EPA's modeling software, RMP\*Comp was used to calculate toxic endpoint values. | A toxic endpoint, calculated using EPA's RMP\*Comp software is a planning tool used to understand the potential reach of a hypothetical chemical release scenario. It is not a prediction that an accident will occur, and it does not mean the public is in immediate danger.<br><br>**In plain language:**<br>The model is designed to answer the question, "How far could a chemical travel under a specific set of assumptions if a serious release happened?" not "Is this likely to happen?"<br><br>The calculations are intentionally conservative and are often based on worst-case assumptions required by regulation. These assumptions may include:<br>• a large release happening suddenly, |

27

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| | | <ul><li>unfavorable weather conditions that prevent dispersion,</li><li>and limited credit for safety systems and emergency controls.</li></ul>Because of this, the calculated endpoint distance is typically much larger than what would occur during most realistic incidents. |
| 2. ***The safety controls the law requires are documented across seven regulators to be failing.*** Apple's own retained consultant — BSI EHS Services and Solutions — affirmatively marked seventeen findings "Not Compliant" in the April 2019 RMP Audit, including: no employees had completed required emergency response training four years into operation; SOPs for arsine and chlorine lacked emergency procedures; Management of Change training had not been delivered; the Construction Contractor Safety Program was not implemented; and contractor training on covered processes was nonexistent. Pl. Decl., Ex. C at 00003228–230, 00003253. PHA action items remain open five years past their certified completion date. Pl. Decl., Ex. E at 00003515–22. EPA's April 2024 inspection identified 19 Potential | BSI conducted the 2019 internal audit for the RMP and did have findings that were documented in the report. That audit did not reflect that the safety controls were failing.<br><br>The action item closure list maintained by Apple contains details of all action item closure status. Steven Trammell's has offered opinions on the status of the various action items. | |

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| Violations, 14 still outstanding when the NOV issued — including the still-outstanding RCRA § 3005 violation in PV #6 (Apple "*improperly treating the waste . . . by diluting the solvent waste with water and other wastes");* Subpart BB leak detection calibrated only 1 of 34 times on a day of monitoring use over four years (PV #17); fifteen weekly RCRA inspections missed in 2023 including twelve consecutive weeks immediately before EPA arrived (PV #16); forty-eight daily tank inspections missed on weekends (PV #18); Subpart CC applicability for SW-TNK-2 and SW-LS never evaluated (PV #19); activated carbon abatement neither permitted nor managed (PVs #7, #11); and 228 D001 ignitable hazardous-waste manifests shipped off-site as Non-RCRA between June 2022 and December 2023 (PVs #14, #15). ECF No. 48-4 (EPA April 30, 2024 Compliance Inspection Report). | | |
| 31. The SCFD has documented since August 2016 that Apple has failed to make its HMBP readily available to emergency response personnel. Pl. Decl., Ex. K (Violation #1010017); Cal. H&SC § 25505(c). The October 2020 SCFD inspection found Apple's CERS chemical inventory reported zero | Based on discussions and validation with the CERS system (05/07/26), Apple has submitted their HMBP via the CERS system as required.<br><br>Based on discussions and validation with the CERS system (05/07/26), the | |

29

| Plaintiff's point (numbering is from the PI file) | Regulatory explanation/requirements | Plain language interpretation |
|---|---|---|
| chlorine while the RMP showed 400 lb in two Program Level 3 processes. *Id.* (Violation #1010004). CalEPA's September 2024 CUPA Corrective Action Report found the City was not following up on Hazardous Waste Generator violations, was not ensuring HMBP compliance, was not inspecting CalARP stationary sources, and was not regulating all facilities subject to the Hazardous Waste Generator Program. Am. Compl. ¶ 47. The County's Toxic Gas Ordinance permitting regime has no records — the SCFD's PRA response: "*Fire Department was unable to locate records under the 'Toxic Gas System (i.e., SCCO B11-380)' designation.*" Pl. Decl., Ex. H. Every category of safety control the law requires is documented to be failing. | "omission" of chlorine from the 2020 HMBP submittal was not intentional; it was oversight that was brought to the site's attention when their submittal was rejected by the CUPA. In my professional experience with these types of submittals, I can confidently say that rejections are a relatively common occurrence when information is missing or incorrect. This is not considered a "violation", rather a normal step in the process when needed.<br><br>The site representatives corrected the inventory immediately upon notification by the and resubmitted. | |

Map of CalARP facilities in 95054 zip code 818 sites – pulled from CalEPA Regulated Site Portal

