**Ashley M. Gjovik, JD**
*In Propria Persona*
Alviso, San José, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY M. GJØVIK**,

*an individual*,

    **PLAINTIFF**,

        **vs.**

**APPLE INC.,**

*a corporation,*

**CITY OF SANTA CLARA,**

*a local government*,

**MR. JENAB ET AL**

*(individually, LP, LLC, &/or Trust)*

    **DEFENDANTS**.

**Case No. 25-CV-07360-PCP**

**JUDGE: P. CASEY PITTS**

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION UNDER RCRA, CAA, CWA, & PUBLIC NUISANCE (DKT. 80)**

**RE: DEFENDANT CITY OF SANTA CLARA'S OPPOSITION (DKT. 89-90)**

**HEARING:**
**Date:** June 25 2026
**Time:** 10:00 AM
**Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   THE CITY IS NOT IMMUNE FOR ITS OWN CONDUCT, PROPERTY, AND PERMITS......................................................................................................................2

III.   III.   PLAINTIFF RAISES SERIOUS QUESTIONS, WITH THE BALANCE TIPPING SHARPLY, ON THE RCRA ENDANGERMENT CLAIM ...................................3

IV.   PLAINTIFF IS LIKELY TO SUCCEED ON THE CLEAN WATER ACT CLAIM FOR THE CITY'S OWN MS4-PERMIT VIOLATIONS........................................................5

V.   PLAINTIFF IS LIKELY TO SUCCEED ON THE PUBLIC NUISANCE CLAIM .........7

VI.   IRREPARABLE HARM IS LIKELY, NOT SPECULATIVE ..................................9

VII.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR THE TARGETED RELIEF ............................................................................................. 10

VIII.  POINTS THE CITY DOES NOT ADDRESS.......................................................... 12

IX.   EVIDENTIARY OBJECTIONS........................................................................... 12

X.   XI.   CONCLUSION................................................................................... 12

# REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.    <u>INTRODUCTION</u>

1.     The City's opposition responds principally to claims directed at the facility's operator and largely passes over the conduct for which the City itself is answerable. Its organizing premise is that every claim against it impermissibly seeks to direct the City's enforcement discretion under *Heckler v. Chaney*. That premise is incorrect, and it leaves the City's own conduct, property, and permit obligations unaddressed.

2.     But Plaintiff does not ask this Court to order the City to prosecute Apple. She asks the Court to hold the City answerable for its own conduct: its operation of the storm-sewer system that conveys the facility's discharges; its ownership, design, and active operation of two public parks and a children's playground directly across the lot line from a facility the City's own consultant predicts can kill the people in them; its violation of its own municipal NPDES permit; and its affirmative permitting and concealment of unpermitted hazardous-waste operations. None of that is "discretion." All of it is actionable.

3.     Two features of the Opposition should frame the Court's review. First, the City does not dispute the danger. It offers no rebuttal to the operator's own Process Hazard Analysis, which assigns "personnel exposure resulting in injury and/or fatality (site personnel or neighbors)" across at least eleven failure nodes (Pl. Decl. Ex. E); to Apple's own toxic gas dispersion modeling; or to Apple's permit-cap exceedances of arsine, phosphine, and boron trichloride (Pl. Decl.). The City's quarrel is attribution, not endangerment.

4.     Second, the City never engages Plaintiff's strongest theory against it — its liability as the owner of the parks and playground in the hazard zone — addressing the City only in its regulatory capacity. An argument the opposition does not address may be treated as conceded for purposes of this motion. Because the balance of hardships tips sharply toward preventing a potential mass-casualty release, serious questions going to the merits suffice; Plaintiff is also likely to succeed on the nuisance and Clean Water Act claims. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

## II.  THE CITY IS NOT IMMUNE FOR ITS OWN CONDUCT, PROPERTY, AND PERMITS

5.  *Heckler* and *Sierra Club v. Whitman* do not support the breadth the City claims for them. *Heckler* is an Administrative Procedure Act case about the presumptive unreviewability of a federal agency's discretionary decision not to bring an enforcement action. 470 U.S. at 831–32. *Sierra Club* holds only that a citizen cannot use the citizen-suit provisions to compel EPA to undertake discretionary enforcement. 268 F.3d at 902. Neither immunizes a defendant for its own statutory violations, and neither narrows the citizen-suit defendant categories, which expressly reach "any … governmental instrumentality or agency." 42 U.S.C. § 6972(a)(1)(B); 33 U.S.C. § 1365(a)(1). The City is sued as a violator and a contributor, not for declining to prosecute a third party.

6.  As to the state-law public nuisance claim, California likewise does not immunize a public entity that creates or maintains a hazard. Where an enactment imposes a mandatory duty "designed to protect against the risk of a particular kind of injury," the entity is liable for injury of that kind proximately caused by its breach. Cal. Gov't Code § 815.6; *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 498–99 (2000). The CUPA program the City voluntarily assumed, its MS4 permit, and the County Toxic Gas Ordinance are framed in mandatory "shall" terms, not discretionary ones.

7.  And under Government Code § 835, a public entity is liable for a dangerous condition of its own property of which it had notice and failed to protect against — even where the danger is created in part by a third party. *Vedder v. County of Imperial*, 36 Cal. App. 3d 654, 659–61 (1974) (county liable, as both a § 835 dangerous condition and a public nuisance, for permitting storage of combustible chemicals and failing to protect on public land); *Cordova v. City of Los Angeles*, 61 Cal. 4th 1099, 1106 (2015); *Baldwin v. State of California*, 6 Cal. 3d 424, 428 (1972) ("the state gains no immunity … because … the dangerous condition of its property combines with a third party's negligent conduct"). California "manifest[ly] … intended to allow" nuisance actions against governments for pollution. *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931–36 (1972). The City's opposition does not address section 815.6, section 835, *Vedder*, or *Nestle*.

8.      These principles fit the record. The three elements of section 815.6 are present: the CUPA implementing regulations, the MS4 permit, and the Toxic Gas Ordinance impose obligatory "shall" duties, not discretionary ones; those enactments exist precisely to protect neighbors from toxic releases of the kind threatened here; and the City's failure to discharge them is a proximate cause of the unwarned hazard. Haggis, 22 Cal. 4th at 498–99; *Sutherland v. City of Fort Bragg*, 86 Cal. App. 4th 13, 19 (2000).

9.      The City also assumed these duties voluntarily when it requested exclusive CUPA status, inducing reliance by the residents it undertook to protect. *Williams v. State of California,* 34 Cal. 3d 18 (1983); *Baker v. City of Los Angeles*, 188 Cal. App. 3d 902, 908 (1986). And even the licensing immunity the City invokes carries an exception: a public entity has a duty not to authorize a use it knows an operator cannot conduct safely. Cal. Gov't Code § 818.4. The City does not engage any of this.

10.     Nor is the Fire Department immune for conduct outside firefighting: a public entity is liable where its safety personnel give negligent advice or otherwise act to increase the risk of harm. *Potter v. City of Oceanside*, 114 Cal. App. 3d 564 (1981) (fire captain's negligent advice caused escaping gas to ignite and explode); *Benavidez v. San Jose Police Dep't*, 71 Cal. App. 4th 853, 863 (1999). The City's concealment of the facility's hazards from residents and first responders, and its tip to the operator before EPA's unannounced inspection, are affirmative acts of that kind.

## III.     III.   PLAINTIFF RAISES SERIOUS QUESTIONS, WITH THE BALANCE TIPPING SHARPLY, ON THE RCRA ENDANGERMENT CLAIM

11.     The City attacks the "contributor" prong as if Plaintiff's only theory were non-enforcement. It is not. The Ninth Circuit's cases hold that a regulator's passive choice not to act is not "active control," *Center for Biological Diversity v. U.S. Forest Service*, 80 F.4th 943, 954 (9th Cir. 2023), and that incidental conveyance of a contaminant is not "contributing," *California River Watch v. City of Vacaville*, 39 F.4th 624, 631–33 (9th Cir. 2022). Plaintiff's theory is neither. The City affirmatively issued building permits for the hazardous-waste treatment systems EPA later cited as unpermitted; affirmatively approved and maintained the facility's "R&D" designation

while on notice of categorical semiconductor manufacturing; affirmatively concealed RCRA violations, including by transmitting a violation notice to Apple stripped of the violation detail and by alerting the operator before EPA's unannounced inspection; and it owns and operates the sewer and storm-drain systems that are the physical disposal pathway for the facility's waste (see Am. Compl. ¶¶ 168, 203, 207–208, 304; Mot. ¶ 35). That is "active[] involve[ment] in the … disposal process." *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011). At a minimum these facts present "serious questions going to the merits." *Cottrell*, 632 F.3d at 1135.

12.     The City's own authorities prove the point by contrast. In *Center for Biological Diversity* the agency merely authorized a third party's lead-ammunition use; it neither handled the waste nor operated any disposal system. 80 F.4th at 954. In Vacaville the city was a downstream water purveyor that delivered already-contaminated drinking water it never generated or managed as waste. 39 F.4th at 631–33. And in *Los Angeles Waterkeeper* the city's only connection was passive ownership of piers. 702 F. Supp. 3d at 934. Here, by contrast, the City operates a pretreatment and storm-sewer program built to convey industrial waste, co-owns the treatment works that receives the facility's corrosive discharge, issued the permits for the waste-treatment systems, and concealed the violations. That is active involvement, not incidental conveyance or passive permitting.

13.     Contribution under section 6972(a)(1)(B) is joint. A defendant who has contributed to the handling or disposal of the waste need not be the sole or primary contributor, so the City's role alongside the operator is sufficient, and the statute expressly reaches a "governmental instrumentality or agency."

14.     The endangerment prong is established and uncontested. "May present an imminent and substantial endangerment" requires only "a reasonable prospect that a serious, near-term threat … exists," *Mallinckrodt*, 471 F.3d at 296, and an imminent hazard may exist at any point in a chain of events that may ultimately result in harm. See *Price v. United States Navy*, 39 F.3d 1011 (9th Cir. 1994). The hazard here is concrete and present. The facility holds arsine, phosphine, chlorine, 49% hydrofluoric acid, silane, and pyrophoric organometallics that ignite or detonate on contact with air or water (Pl. Decl. Exs. B, E). It sits roughly thirty-five feet above a pressurized artesian aquifer whose head has been rising since 1988 — from nineteen feet depth-to-water to zero by

1995, with measured pressure sufficient to drive water ten to thirteen feet above grade if uncapped (Am. Compl. ¶¶ 96–105; Mot. ¶ 27).

15. An upward breach of that water into the process and storage areas — where water-reactive chemicals are held — is a fire-and-explosion pathway to a mass-casualty toxic-gas release. That is precisely the chain of events the endangerment standard reaches, and the conditions exist now. The eleven documented toxic-gas incidents between 2016 and 2024, including worker hospitalizations (Pl. Decl. Ex. J), confirm the release pathways are not hypothetical. The City offers no contrary evidence; its response — that the Fire Department arrived within minutes — concedes the incidents occurred and addresses response, not endangerment.

16. The City's third-prong argument — that Plaintiff has shown no completed offsite release and none "likely" during the pendency of the case — applies the wrong test. RCRA is a preventive statute: it reaches conduct that "may present" an endangerment, and an endangerment is a threatened or potential harm rather than a realized one. The operator's own dispersion modeling and Process Hazard Analysis, which the City does not dispute, satisfy that standard. RCRA does not require proof that the harm has already occurred.

17. The two qualifiers confirm the showing rather than defeat it. "Imminent" describes the threat, not the harm: a risk is imminent when the conditions giving rise to it exist now, even if the resulting injury would occur later. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485–86 (1996). "Substantial" requires that the threatened harm be serious, not that its probability be quantified. A rising artesian aquifer beneath a stockpile of water-reactive and pyrophoric chemicals, an arsine inventory modeled to reach more than five thousand residents, and eleven documented release events satisfy both. The City's insistence on proof of a completed offsite release would read the words "may present" out of the statute.

## IV. <u>PLAINTIFF IS LIKELY TO SUCCEED ON THE CLEAN WATER ACT CLAIM FOR THE CITY'S OWN MS4-PERMIT VIOLATIONS</u>

18. The City's CWA argument is directed at the section 1319(f) POTW-notice provision, which is not the basis of Plaintiff's claim. That claim rests on the City's own municipal stormwater permit. The City is a permittee under municipal storm-sewer NPDES Permit No.

CAS612008 (Order No. R2-2023-0019), which requires ("shall") that the City implement an industrial and commercial site-control program, conduct inspections and enforcement, and "effectively prohibit the discharge of non-stormwater … into storm drains" (Am. Compl. ¶¶ 578, 580; Order No. R2-2023-0019 §§ C.4, C.5).

19. A permit condition issued under § 1342 is an "effluent standard or limitation" enforceable by citizen suit. 33 U.S.C. § 1365(f); see *NRDC v. County of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013). Suing an MS4 permittee for violating its own permit is not directing enforcement discretion — it is the paradigmatic citizen suit. Unlike the plaintiff in Los Angeles Waterkeeper, Plaintiff does not "generally group" the City with the facility operator; she identifies the City's own NPDES permit and its own conduct. The City itself opened this issue by asserting it "has performed its MS4 permit obligations" (Opp. 3); that places its compliance squarely in dispute. The violations are ongoing, not wholly past: the facility continues to operate and discharge and the conditions Plaintiff documented recur, which is all the citizen-suit provision requires. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987).

20. And the record creates a genuine dispute. Plaintiff documented dry-weather froth, sheen, discoloration, and trash in San Tomas Aquino Creek immediately downstream of the facility's stormwater outfall on April 11, April 18, and May 1, 2026, with field readings of anomalously alkaline pH (8.9–9.5) and total chlorine of 3–20 ppm (Pl. Decl. ¶¶ 34–40, Exs. F, N). The City's own inspector previously documented a cooling-water release to the storm drain at this facility (Pl. Decl. Ex. L, Report #1657490), and the City's wastewater inspection records place storm drains immediately adjacent to the facility's hazardous-waste storage (Pl. Decl.).

21. The City's answer is a "Finding Report" of no pollution (Brandt-Erichsen Ex. 2) — but it is a dry-weather, visual-only inspection conducted May 12–20, 2026, on none of the dates Plaintiff documented conditions; it took no water samples and tested for none of the parameters Plaintiff measured; it was completed May 26, two days before the Opposition; and it was performed by the City's own Assistant Fire Marshal / CUPA Manager — the very program CalEPA's September 2024 Corrective Action Report found was not following up on violations (Am. Compl. ¶ 47; Mot. ¶ 31).

22. A later clean visual look cannot refute earlier intermittent discharge it did not test

for. At minimum, this is a factual dispute that supports the monitoring relief Plaintiff seeks; it is not a basis to deny relief. (Plaintiff's field readings are offered, consistent with her declaration, as percipient observations warranting formal sampling — Pl. Decl. ¶ 40 — which is the relief sought.)

23.     The City's assertion that it satisfied its permit is, in any event, unsupported. The only declaration the City filed is from its litigation counsel, authenticating documents; no inspector or stormwater official with personal knowledge attests that the City's program in fact prevented the discharges at issue. The permit's duty to "effectively prohibit" non-stormwater discharges is measured by results, not by the existence of a written program, so documented discharges the City did not abate are violations regardless of the procedures it recites.

24.     The permit's requirements are not met by paperwork. It obligates the City to operate an illicit-discharge detection and elimination program and to trace and abate non-stormwater discharges to its system — the very inquiry the City's creek investigation declined to perform when it took no samples and inspected on dates other than those Plaintiff documented. A permittee that does not detect and eliminate the discharges its permit requires it to prohibit is in violation regardless of the breadth of its written plan.

25.     The receiving waters are indisputably waters of the United States — the surfacing Saratoga Creek system, Guadalupe Slough, and the Bay — which is what makes the City's MS4 obligation to "effectively prohibit" non-stormwater discharges into those watercourses a federal duty. The facility's pollutants reach those waters both through the storm system and through the groundwater directly beneath the building, a pathway the Supreme Court has confirmed can require a permit. See *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020). The receiving water is also listed as impaired under Clean Water Act section 303(d), which heightens the City's obligation to prevent the discharge of pollutants of concern into it.

## V.    <u>PLAINTIFF IS LIKELY TO SUCCEED ON THE PUBLIC NUISANCE CLAIM</u>

26.     The public nuisance claim provides an independent basis for relief, and the City's response does not reach its principal ground. The City owns, designed, advertises, and actively operates Meadow Park, Creekside Park, and a children's playground within the plume across the lot line (RJN Exs. 5–6; Pl. Decl.). Inviting the public into a hazard the City created and maintains

is affirmative conduct and a "substantial factor" in the harm — the *ConAgra* model of affirmative placement, not the passive non-causation of *Citizens for Odor Nuisance Abatement v. City of San Diego. People v. ConAgra Grocery Products Co.*, 17 Cal. App. 5th 51, 102 (2017).

27. It is also a textbook § 835 dangerous condition under *Vedder*. The City's causation argument — that "any offsite impacts … are caused by the facility, not the City" (Opp. 10) — addresses the City as permitter and does not reach the City as landowner; the opposition offers no answer to that theory. The condition is also "injurious to health" within the meaning of Civil Code § 3479 beyond the airborne hazard: residents reported to the City discolored potable water, elevated metals, and odors consistent with cross-connection or backflow into the drinking-water system, which the City did not abate.

28. The same facts establish a dangerous condition of public property under Government Code section 835. The parks and playground lie within the modeled plume and above the area affected by the rising aquifer; that condition creates a reasonably foreseeable risk of the kind of injury threatened; the City had notice — from the eleven Fire Department incident responses, the residents' exposure complaints since 2020, CalEPA's 2024 findings, and the substantially similar Silicon Valley toxic-gas releases of the 1980s and 1990s in Plaintiff's request for judicial notice, see *Salas v. Cal. Dep't of Transp.*, 198 Cal. App. 4th 1058, 1072 (2011) — and because City employees helped create the condition, notice is presumed, *Brown v. Poway Unified Sch. Dist.,* 4 Cal. 4th 820, 834 (1993). A public entity may be required to alter its property to barrier a danger posed by a third party, *Zelig v. County of Los Angeles*, 27 Cal. 4th 1112, 1139 (2002), which is precisely the modest signage-and-closure relief sought. As in *Vedder*, the City's failure to protect on land it owns and operates is itself part of the dangerous condition.

29. The condition is, independently, a public nuisance because it is both unlawful and injurious to the community: the facility operates in continuing violation of federal hazardous-waste, air, and water requirements and of the City's own General Plan setback and the Toxic Gas Ordinance, and the City has permitted and maintained that condition on and around its own property. Cal. Civ. Code §§ 3479, 3480. A public entity that creates and maintains such a condition is subject to abatement to the same extent as a private party. *Nestle*, 6 Cal. 3d at 936. Plaintiff also satisfies the special-injury requirement for a private action to abate a public nuisance. She used the

affected parks and was sickened there, and she resided within the modeled plume — injuries different in kind, not merely in degree, from those of the public at large. Cal. Civ. Code § 3493.

30.     The City's two affirmative defenses fail. Civil Code § 3482 ("nothing done under the express authority of a statute") is construed narrowly and does not shelter operations conducted in violation of permits; the City's own General Plan Policy 5.3.5-P19 forbids hazardous use within 500 feet of residences — a setback the Fire Department documented this facility violates (Pl. Decl. Ex. D; Mot. ¶ 51) — so the condition is the opposite of statutorily authorized. And the statute of limitations does not bar the claim: "No lapse of time can legalize a public nuisance." Cal. Civ. Code § 3490. The nuisance is the ongoing operating condition and the City's current acts — its 2024 approval to expand the adjacent school and its pending approval of new residential units at 3240 Scott (Mot. ¶ 61; see Am. Compl.) — not the 2014 zoning. This is not a CEQA challenge, and the 30-day CEQA limitations period the City invokes is beside the point.

31.     The City's own record reinforces the claim. Its Planning Commission and Council stated on the record that the location is "not an appropriate area for housing," that "we do not want housing there," and that it is "not good land use, planning, or a good neighborhood" (Am. Compl. ¶¶ 331–376) — party admissions that the use it approved and continues to expand is incompatible with the surrounding community. And the City does not address the prior litigation concerning this same City's siting of sensitive receptors near chip fabrication that Plaintiff submitted for judicial notice (*LSI Logic Corp. v. City of Santa Clara* (RJN Ex. 22); Mot. ¶ 3).

## VI.     <u>IRREPARABLE HARM IS LIKELY, NOT SPECULATIVE</u>

32.     Environmental injury "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco*, 480 U.S. at 545. The City's reliance on *Winter's* "likely, not possible" standard and on S&W Atlas misreads the record. The likelihood here is not built on the catastrophic scenario alone; it rests on a documented, recurring pattern — eleven toxic-gas incidents and worker hospitalizations across 2016–2024, including multiple chemical-release events in the last three years (Pl. Decl. Ex. J) — and on a hazard that is measurably increasing, as the artesian pressure beneath the water-reactive chemical inventory continues to rise (Am. Compl. ¶¶ 96–105). The catastrophic release supplies the magnitude ("substantial"); the recurring releases and rising pressure supply the likelihood

("imminent"). There is, in addition, a present and ongoing informational injury: the residents within the modeled arsine plume have received no warning, because the County and City Toxic Gas Ordinance regime has no records for this facility, the State CERS inventory underreports the chemicals, and the Hazardous Materials Business Plan has been unavailable to first responders for years (Pl. Decl.). That harm is occurring now and is redressable now.

33.     These harms cannot be remedied in damages. A toxic release cannot be undone, and the loss of the safe use of the City's public parks and of timely warning about an adjacent hazard is the kind of injury equity exists to prevent. Amoco, 480 U.S. at 545. Plaintiff's use of the affected area and her reasonable concern about exposure also establish her standing, which the City does not contest. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 183–85 (2000). The City's assertion that no evidence connects the parks to the facility cannot be squared with the operator's own modeling. The playground sits a few hundred feet from the facility, and both parks fall well within the 1.1-mile radius Apple's arsine analysis identifies. The risk to those public spaces is established by the City's co-defendant's own analysis, which the City does not dispute

## VII.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR THE TARGETED RELIEF

34.     The relief sought from the City is narrow and largely informational: warning signage at the City's own parks and trails; conditional closure of those spaces only if the operator fails to remove the chemicals; and a freeze on expanding the residential population inside the endangerment radius pending merits resolution. The City's "alarm and mislead the public" objection is untenable where the City's own Fire Department has already withheld approval of the very 3240 Scott project at issue pending environmental review (Pl. Decl.), and where the City has stated on the record that it does not want housing there.

35.     A temporary pause in processing a pending application while an acute safety question is resolved deprives no one of a vested right; a pending discretionary application confers none. See Avco Cmty. Developers, Inc. v. South Coast Reg'l Comm'n, 17 Cal. 3d 785 (1976). The equities are further fixed by the City's conduct in this litigation: Plaintiff offered all defendants a no-liability menu of interim mitigation — including basic warning and operator-identification

signage of trivial cost — and the City refused every measure and offered no counter-proposal (Pl. Decl. Ex. R; Mot. ¶ 6).

36. The City cannot both refuse cost-free warning measures and maintain that warning the public would itself cause harm. The public interest, declared by Congress (42 U.S.C. § 6902; 33 U.S.C. § 1251), by the California Legislature, and by the County's post-Bhopal Toxic Gas Ordinance, lies in protecting a residential community, a children's playground, and a school evacuation route from a hazard the regulators charged with preventing it have not addressed.

37. Finally, the equities cannot be assessed without the City's documented stake in the status quo. The operator is among the County's largest property taxpayers — a matter subject to judicial notice from the Assessor's public reports — the facility itself generates municipal revenue, and the property's value depends in part on the hazards remaining undisclosed; that structural conflict explains the enforcement vacuum the citizen-suit provisions exist to fill and is a proper consideration in the balance. See *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309 (5th Cir. 2024). The City's litigation-generated "no pollution" finding — produced by the very program a state agency found deficient, and submitted two days before its brief — is that conflict operating in real time.

38. Finally, the equities cannot be assessed without the City's documented stake in the status quo. The operator is among the County's largest property taxpayers — a matter subject to judicial notice from the Assessor's public reports — the facility itself generates municipal revenue, and the property's value depends in part on the hazards remaining undisclosed; that structural conflict explains the enforcement vacuum the citizen-suit provisions exist to fill and is a proper consideration in the balance. See *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,* 123 F.4th 309 (5th Cir. 2024).

39. The City's litigation-generated "no pollution" finding — produced by the very program a state agency found deficient, and submitted two days before its brief — is that conflict operating in real time. The relief requested — monitoring, warning, and conditional abatement — falls within the prospective equitable remedies that the citizen-suit provisions and California nuisance law authorize, including against a public entity. See *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 484 (1996).

## VIII.    POINTS THE CITY DOES NOT ADDRESS

40.    The City does not contest the operator's PHA fatality-to-neighbors findings, the toxic gas modeling, or the sworn permit-cap exceedances; it does not contest Plaintiff's standing; it does not address its liability as owner of the parks and playground; it does not mention *LSI Logic;* and it does not address its refusal of cost-free interim mitigation. Each of these points may be treated as conceded for purposes of this motion. Together they confirm that the City's defense rests on the single premise that its conduct is categorically unreviewable as an exercise of enforcement discretion — a premise that is incorrect for the reasons stated above.

## IX.    EVIDENTIARY OBJECTIONS

41.    Pursuant to Civil Local Rule 7-3(c), Plaintiff objects to the Brandt-Erichsen Declaration and its Exhibit 2 (the "Finding Report") and Exhibit 3 (the Valley Water emails). The declarant is the City's litigation counsel and lacks personal knowledge of the field investigations the exhibits describe; the documents are offered for the truth of their conclusion that no pollution exists and are inadmissible hearsay lacking foundation, Fed. R. Evid. 602, 801–802, 901, unsupported by any declaration from a percipient investigator.

42.    While a court may consider some evidence on a preliminary-injunction motion that would be inadmissible at trial, these self-generated, after-the-fact materials warrant little or no weight: they were prepared during this litigation, by the same CUPA program a state oversight agency found deficient, on dates other than those Plaintiff documented, and without any water sampling. The objection is preserved; in the alternative, the documents do not rebut Plaintiff's showing for the reasons stated in Part IV.

## X.    XI.   CONCLUSION

43.    For the foregoing reasons, Plaintiff respectfully requests that the Court grant the preliminary injunction as to the City of Santa Clara, or in the alternative the targeted park-warning, conditional-closure, and population-freeze relief described in the motion, together with such other relief as the Court deems just.

Respectfully submitted,

/s/ **Ashley M. Gjovik** (*Pro Se*)
June 4, 2026
Alviso, City of San José, California
legal@ashleygjovik.com
(415) 964-6272