**Ashley M. Gjovik, JD**
*In Propria Persona*
Alviso, San José, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJØVIK**, <br> *an individual*, <br><br> **PLAINTIFF**, <br><br> **vs.** <br><br> **APPLE INC.**, <br> *a corporation,* <br><br> **CITY OF SANTA CLARA,** <br> *a local government*, <br><br> **MR. JENAB ET AL** <br> *(individually, LP, LLC, &/or Trust)* <br><br> **DEFENDANTS**. | **Case No. 25-CV-07360-PCP** <br><br> **JUDGE: P. CASEY PITTS** <br><br><br> **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION UNDER RCRA, CAA, CWA, & PUBLIC NUISANCE (DKT. 80)** <br><br> **RE: DEFENDANT'S APPLE INC, JENAB, ETC. AL OPPOSITION (DKT. 91)** <br><br><br> **HEARING:** <br> **Date:** June 25 2026 <br> **Time:** 10:00 AM <br> **Location:** Courtroom 8 – 4th Floor, 280 South 1st St., San Jose, CA |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.    PLAINTIFF HAS STANDING ON THREE INDEPENDENT GROUNDS ....................1

III.    THE ADMINISTRATIVE SETTLEMENTS NEITHER BAR THIS SUIT NOR PROVE COMPLIANCE ..................................................................................3

IV.    THE MULTI-YEAR, MULTI-AGENCY RECORD IS A PATTERN ........................4

V.    LIKELIHOOD OF SUCCESS — RCRA ENDANGERMENT (WASTE)......................5

VI.    LIKELIHOOD OF SUCCESS — CLEAN AIR ACT.................................................7

VII.    LIKELIHOOD OF SUCCESS — CLEAN WATER ACT ........................................9

VIII.    LIKELIHOOD OF SUCCESS — PUBLIC NUISANCE .........................................10

IX.    THE JENAB DEFENDANTS' LIABILITY IS UNREBUTTED.............................12

X.    IRREPARABLE HARM IS LIKELY, NOT SPECULATIVE....................................12

XI.    BALANCE OF EQUITIES AND PUBLIC INTEREST ..........................................13

XII.    TAILORING, EVIDENTIARY OBJECTIONS, AND BOND ................................14

XIII.    CONCLUSION ....................................................................................16

# REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.   INTRODUCTION

1.      Defendants' opposition rests almost entirely on declarations from Apple's own personnel—Schmidt, Trammell, Michael, and Tredway—reciting Apple's preferred characterizations as though they were established facts. They are not. They are contested assertions by interested witnesses, offered without the underlying data, and at this stage they are weighed against, not credited over, the documentary record Plaintiff has placed before the Court. That record consists of Defendants' own admissions and the findings of federal, state, county, and local regulators. Stripped of the declarations' framing, the opposition concedes the dispositive facts: the facility stores arsine, phosphine, chlorine, hydrogen fluoride, silane, and pyrophoric organometallics across the lot line from 1,840 residences, a children's playground, two public parks, and a school of 900 children;

2.      Apple's own hazard analysis and dispersion modeling place injury and fatality endpoints squarely on those receptors; and Apple has been cited for environmental violations by the EPA and the air district, paying penalties under both. Defendants brand the site a "research and development facility," but Apple's own throughput describes an industrial fabrication operation: a Large Quantity Generator producing on the order of 98 million pounds of hazardous waste annually and reporting tens of thousands of therms of natural gas through abatement units that do not run without process gas. The "R&D" label cannot shrink the hazard the documents describe.

3.      Defendants stake the case on two threshold defenses—that Plaintiff lacks standing, and that administrative settlements bar or defeat her claims. Both fail as a matter of law. Standing is established three times over. And the citizen-suit bars Defendants invoke require a civil action in court; the EPA Consent Agreement and Final Order and the air-district settlement are administrative resolutions that do not bar this suit and, because each disclaims any admission of wrongdoing, cannot establish the compliance Defendants claim. On the merits, Defendants' repeated refrain— "permitted, compliant, resolved"—is the contested premise of the case, contradicted by the violations Defendants concede occurred. The motion should be granted.

## II.   PLAINTIFF HAS STANDING ON THREE INDEPENDENT GROUNDS

4.      Defendants' standing argument depends on a single narrative—that Plaintiff "severed

her connection" in 2020 and "lived across the country"—and on the proposition that her symptoms "vanished" after she moved. That narrative is incomplete, and it misstates the law. Each citizen-suit statute authorizes suit by "any person" (42 U.S.C. § 7604(a); 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a)); Article III is the only gate, and Plaintiff clears it on three independent grounds.

5.      First, current connection. Plaintiff resides in the affected area—Alviso/San José, within the radius of Apple's own modeled toxic endpoints—and her supplemental submissions document field use of the affected creek and surrounding area on April 11, April 18, and May 1, 2026. Under *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 181–83 (2000), current recreational and aesthetic use of the affected area, coupled with reasonable concern about ongoing violations, is sufficient; a plaintiff need not prove actual environmental harm to her interest, because "reasonable concerns" caused by the defendant's conduct suffice. Plaintiff's concern—grounded in Apple's own fatality modeling—is more than reasonable. Defendants' contention that she alleges "no ongoing use" simply ignores the dated, present-tense use in the record. Plaintiff also suffers an ongoing informational injury: she is among the residents and park users entitled to know what hazards the facility presents, and the record shows that disclosure obligations—the County toxic-gas records, the first-responder chemical inventory, and park warnings—were not met, an injury that persists so long as the nondisclosure does.

6.      Second, exposure-based injury. The Ninth Circuit and others treat exposure-induced increased risk of disease, and the corresponding need for medical monitoring, as concrete injury-in-fact. See *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947–50 (9th Cir. 2002) (credible threat of future harm is injury); NRDC v. EPA, 735 F.3d 873, 878 (9th Cir. 2013) (increased risk from toxic exposure is concrete); *Friends for All Children v. Lockheed Aircraft Corp.,* 746 F.2d 816, 825–27 (D.C. Cir. 1984); *Cottrell v. Alcon Labs.,* 874 F.3d 154, 163 (3d Cir. 2017). Defendants' "vanished within a week" point conflates remission of acute symptoms with the absence of injury. Remission of acute symptoms says nothing about chronic disease risk from documented exposure to a Group 1 carcinogen, or about the monitoring that exposure warrants; that injury travels with Plaintiff regardless of where she lives.

7.      Third, Defendants misuse *Lujan* footnote 4. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992), bars standing manufactured for litigation—affidavits asserting a "someday" intent to visit a place. It does not bar standing that arises from a genuine life development. Returning

to live and use the area where the pollution occurs is not a litigation artifice. For prospective relief, moreover, the relevant inquiry is whether the plaintiff faces ongoing or imminent injury when relief is sought; Plaintiff's return to the affected area is therefore squarely relevant, not foreclosed. Defendants' reliance on Environment Texas does not change the analysis: that decision was later vacated, and Plaintiff does not need it, because Laidlaw and the increased-risk line independently establish standing here.

8.      Causation and redressability are equally clear. Her injuries trace to the facility's documented releases, and an order directed at the facility's hazardous materials would reduce the risk that produces them; that Plaintiff's information prompted the EPA enforcement which yielded the CAFO confirms the facility is the source the agency itself acted upon. Her medical records reflect arsenic detected in blood rather than urine—a pattern consistent with recent acute inhalation exposure rather than dietary intake—alongside other markers; that evidence corroborates the exposure injury, though Plaintiff's standing does not depend on it given the current-use and increased-risk grounds. The emotional-distress and disease-risk consequences of the exposure period are, moreover, the kind of injury that persists regardless of present residence; Defendants' "symptoms vanished" argument addresses none of it.

## III.    THE ADMINISTRATIVE SETTLEMENTS NEITHER BAR THIS SUIT NOR PROVE COMPLIANCE

9.      Defendants' most-repeated theme is that the EPA Consent Agreement and Final Order (CAFO) and the air-district settlement have "resolved" everything—supposedly precluding this suit and proving compliance. The argument fails twice. It is not a bar. Each citizen-suit statute bars a private action only where a government has "commenced and is diligently prosecuting a civil action in a court of the United States or a State." 42 U.S.C. § 7604(b)(1)(B) (CAA); 33 U.S.C. § 1365(b)(1)(B) (CWA); 42 U.S.C. § 6972(b)(1)(B) (RCRA). An administrative settlement is not a court action. The CAFO is an administrative resolution; the air-district settlement is an administrative resolution of notices of violation. Neither triggers the bar. See *Friends of the Earth v. Laidlaw Env't Servs*., 528 U.S. 167, 174–75 (2000); *Atlantic States Legal Found. v. Eastman Kodak Co.,* 933 F.2d 124, 127 (2d Cir. 1991) (administrative settlements do not bar a citizen suit). The narrowest provision, CWA § 1319(g)(6), concerns diligently prosecuted administrative penalty proceedings and, by its terms, addresses civil-penalty liability rather than the prospective injunctive

relief Plaintiff seeks here. And RCRA's endangerment bar, § 6972(b)(2)(B)–(C), is keyed to court actions under RCRA § 7003 or CERCLA § 106; a § 3008 administrative settlement does not qualify, and the CAFO by its terms preserves equitable relief. Plaintiff carries this affirmatively so the point is foreclosed however Defendants frame it.

10.    It is not proof of compliance. A consent order is a negotiated exit from specific allegations, not an adjudication of innocence. Apple agreed to pay $261,283 to resolve seven RCRA counts; it agreed to pay $125,000 to resolve five air-district notices of violation, a settlement signed by one of Apple's own declarants. Both settlements contain no-admission clauses. Defendants cannot simultaneously invoke those settlements as proof Apple did nothing wrong and rely on the no-admission clauses to avoid the consequence of having paid them.  The settlements are evidence that the violations occurred—regulators do not extract six-figure penalties for compliant conduct— while the no-admission clauses mean Apple has not been adjudicated compliant. Defendants' assertion that "EPA found Apple in compliance with RCRA as of 2024" misdescribes what a CAFO does: it records that EPA agreed not to pursue further enforcement of the specific cited violations. That is not a global compliance finding, and it does not reach the conduct this suit addresses—the air, water, groundwater, and nuisance theories the CAFO never touched.

## IV.    THE MULTI-YEAR, MULTI-AGENCY RECORD IS A PATTERN

11.    Defendants invoke "wholly past" as an incantation. The doctrine is narrower than they suggest. A violation is "wholly past" only when it has ceased with no reasonable likelihood of recurrence; recurring violations punctuated by remediation are not. Gwaltney requires only a good-faith allegation of continuous or intermittent violation, and the record here far exceeds that floor. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found*., 484 U.S. 49, 64 (1987); *Sierra Club v. Union Oil Co.,* 853 F.2d 667, 671 (9th Cir. 1988) (intermittent or sporadic violations support a citizen suit; complete cessation is required to moot one); *Carr v. Alta Verde Indus*., 931 F.2d 1055, 1063 (5th Cir. 1991); *Pawtuxet Cove Marina v. Ciba-Geigy Corp*., 807 F.2d 1089, 1094 (1st Cir. 1986).

12.    The documented events span 2014, 2015, 2016, 2017, 2019, 2022, and 2024, across the EPA, the air district, the fire department, and the County. A facility that has generated an environmental violation or hazardous release roughly every year or two for a decade has not stopped; it has a pattern. Defendants' own supporting declaration confirms how recent that pattern is: Apple's environmental-compliance declarant describes the seven RCRA counts EPA resolved, multiple

pieces of air-emission control equipment operated without a permit from 2017 through 2023, and boiler nitrogen-oxide limit exceedances in both 2023 and 2024—the latter settled with the air district only weeks before this opposition was filed (Schmidt Decl. ¶¶ 35, 39).

13.    The combined civil penalties, on the order of $386,000 across the two agencies within roughly eighteen months, are not the signature of the "minor" or "routine" matters the brief describes. That pattern is the precise circumstance the citizen-suit provisions were enacted to address. Defendants' own authority confirms it: Gwaltney describes citizen suits as supplementing agency action, and the gap they fill is exactly this one—where the responsible local regulator (whose oversight the State found deficient in its September 2024 corrective-action findings) has not abated the hazard. Defendants' "all resolved" framing is the rhetorical move citizen-suit law exists to defeat.

14.    The breadth of the record reinforces the point. Beyond the EPA civil settlement, Plaintiff's tip prompted a parallel federal criminal investigation; the fire department, as the CalARP authority having jurisdiction, found the facility's plume models "not favorable for this area" and withheld approval of the adjacent residential project pending review; and the State's September 2024 corrective-action findings faulted the local regulator for failing to follow up on generator violations, ensure hazardous-materials-plan compliance, and inspect the accidental-release sources. A hazard that draws civil enforcement, a criminal referral, an adverse safety finding from the fire authority, and a state rebuke of the local regulator, all within the same period, is not a closed chapter. It is exactly the unaddressed, ongoing risk for which the citizen suit was designed.

V.    <u>**LIKELIHOOD OF SUCCESS — RCRA ENDANGERMENT (WASTE)**</u>

15.    Defendants attack a claim Plaintiff does not bring. They argue at length that RCRA does not reach air emissions, citing *Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014). Plaintiff agrees that bare aerial emissions are not "disposal," and her RCRA endangerment claim does not rest on them. It rests on the handling, storage, and treatment of solid and hazardous waste—which is what § 6972(a)(1)(B) covers. Apple is a Large Quantity Generator (EPA ID CAR000278176) producing on the order of 98 million pounds of hazardous waste annually, with listed and characteristic codes including D001, D002, D003, D004, D011, D035, F003, and F005. The endangerment threshold is therefore met without dispute; the question is the manner of waste handling, and the record shows it failing.

16.    Defendants' own declaration removes any doubt that this is a waste case, not an air

case. Apple's compliance declarant describes the seven counts EPA resolved in the CAFO (Schmidt Decl. ¶ 35): managing the facility's large solvent waste tank as "non-RCRA" when its contents were in fact D001 ignitable and D002 corrosive characteristic hazardous waste; shipping hazardous waste offsite on more than one hundred days over roughly twenty-one months without the required RCRA codes and land-disposal-restriction notifications; connecting the solvent waste tank's exhaust to a general vent that discharged to the atmosphere without abatement until EPA required a control device; multi-day over-accumulation; mislabeled and unlabeled containers; an open corrosive-waste container; and missed inspections. That is mischaracterized hazardous waste, uncontrolled venting from a waste tank, and failed waste-handling controls—not the "permitted air emission" or "chemical inventory for later use" that Defendants' *BNSF* and *Safe Air* arguments assume. By Apple's own account, the conduct EPA penalized falls within RCRA, and the same atmospheric venting from a waste storage tank is a release Defendants cannot relabel out of every statute at once.

17.    Defendants' "inventory is not waste" argument under *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1041 (9th Cir. 2004), misses the claim for the same reason. The claim targets actual waste streams and their mismanagement: treatment of solvent waste by impermissible dilution (EPA Potential Violation #6); Subpart BB leak detection that, on EPA's findings, was calibrated once in thirty-four required occasions over four years (PV #17); 228 manifests for D001 ignitable waste shipped as non-RCRA (PV #14–15); and unmanaged carbon abatement (PV #7, #11). Defendants' attempt to recharacterize the solvent waste as "95% water, 5% isopropyl alcohol … practically inert," likened to hand sanitizer, is doubly flawed. The "95% water" figure comes from the air district's engineering evaluation estimating volatile-organic emissions—an air calculation, not a waste characterization—and EPA cited the very solvent handling as a violation, which is incompatible with "no risk." In any event, under the mixture rule, a mixture containing listed hazardous waste remains hazardous regardless of dilution unless formally delisted. 40 C.F.R. § 261.3(a)(2)(iii). Dilution does not convert hazardous waste into rubbing alcohol.

18.    Two further points answer Defendants directly. RCRA reaches "treatment" of hazardous waste, and EPA's findings describe treatment occurring without the required controls— the impermissible dilution and the unmanaged abatement—so the claim is not, as Defendants suggest, an attempt to label unused inventory as waste. And the CAFO penalty itself, $261,283 across seven RCRA counts, is record evidence that the waste-handling violations occurred;

Defendants cannot at once cite the CAFO as proof of compliance and dismiss the conduct it penalized as immaterial. Defendants' remaining RCRA authorities do not help them. *Hanford Challenge* denied relief where the toxic vapors had been contained and no further exposures had occurred; here, by contrast, the releases recur and the controls have repeatedly failed, so the predicate for that holding is absent. *Brown Group Retail* turned on EPA having declined to pursue the matter; EPA did the opposite here, prosecuting and extracting a penalty, which is evidence of endangerment, not its absence.  And the footnote suggestion that escaping chemicals are never "waste" (*Ecological Rights Found. v. PG&E*) addressed stray product, not a generator's characterized hazardous-waste streams;—the D-listed and F-listed wastes Apple itself manifests. Defendants' contention that Apple fully disclosed its chemicals to the fire department likewise rests on their declarants' say-so; the cited disclosure regime reaches only substances above accidental-release thresholds, leaving other hazardous materials reported, if at all, through separate systems—precisely the gap Plaintiff identifies. On seriousness, the "substantial" element requires only that the threatened harm be serious; no quantification of risk is required. *Cox v. City of Dallas,* 256 F.3d 281 (5th Cir. 2001).

19.    On endangerment, the standard favors Plaintiff. "May present" requires only a reasonable prospect of a serious near-term threat (*Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006)); "imminent" refers to the nature of the threat, not the timing of harm (*Price v. U.S. Navy,* 39 F.3d 1011, 1019 (9th Cir. 1994)); and "substantial" requires seriousness, not quantification of risk. Apple's own Process Hazard Analysis assigns "personnel exposure resulting in injury and/or fatality (site personnel or neighbors)" across at least eleven nodes, and its own dispersion modeling places worst-case toxic endpoints on the surrounding population—on the order of 1.1 miles for arsine, reaching thousands of residents, with additional endpoints for ammonia and chlorine. Apple's sworn throughput certifications independently report usage above the permitted caps—on the order of 84% over for arsine, 61% over for phosphine, and several-fold over for boron trichloride. Defendants' reliance on *S&W Atlas*—that a "may present" showing does not automatically equal likely imminent harm—is met by the recurring-release record and the measurably increasing aquifer pressure beneath the water-reactive inventory, which together supply the likelihood *S&W Atlas* found lacking on its facts.

## VI.    LIKELIHOOD OF SUCCESS — CLEAN AIR ACT

20.    Plaintiff's air claims proceed under § 304(a)(1) (violation of an emission standard or

limitation, including federally enforceable provisions of the SIP-approved air-district rules), § 304(a)(3) (operating an emission source without a required permit), and the § 112(r)(1) general duty. The unpermitted S-3 solvent waste tank—which the air district found "unpermitted since 7/15/2017" and which vented to the atmosphere—is a textbook § 304(a)(3) violation, and the additional unpermitted sources the district continues to identify confirm the pattern. Defendants' own declaration confirms the scope: from 2017 through 2023 Apple installed and operated multiple air-pollution-control devices—a waste solvent tank, carbon canisters, a carbon filter, a thermal processing unit, and catalytic bead filters—without an Authority to Construct or a Permit to Operate, and its throughput reports for that period did not reflect the emissions associated with that unpermitted equipment (Schmidt Decl. ¶ 39). A facility that operated its own emission controls without permits for six years cannot claim a clean, fully permitted posture. The sworn certifications, signed under penalty by Apple's own representative, are admissions of permit-cap exceedances.

21. Defendants' contrary "facts" are declaration gloss. They assert that the apparent year-over-year increase is an artifact because the earlier figures were "prepopulated by" the air district, and that abated emissions sit below the Regulation 2-5 screening triggers. Those are interpretive assertions by Apple's witness about Apple's own sworn submissions; at most they create a fact dispute, which is not a basis to deny relief, and they do not erase exceedances that appear on Apple's own certifications. Defendants' observation that boron trichloride is not a listed Regulation 2-5 toxic does not cure the problem: the certification still reports usage far above the permitted throughput, a permit-compliance question independent of the screening triggers, and boron trichloride remains a water-reactive, acutely hazardous material that bears directly on the endangerment and nuisance analysis whatever its screening status. The "99.9% abatement efficiency" figure on which Defendants lean throughout is a design specification, not an operational record—and the operational record, which Defendants concede through the notices of violation and release incidents, shows scrubber and detection failures. A 0.1% escape of arsine, a substance with a workplace exposure limit measured in hundredths of a part per million, is not reassurance. Finally, the worst-case modeling Defendants seek to minimize is Apple's own; that it was prepared for planning does not make its inputs—the chemicals, quantities, and endpoints—any less real.

22. The general-duty theory is independently supported. Section 112(r)(1) imposes a continuing obligation to identify hazards, design and maintain a safe facility, and minimize the

consequences of releases. The 2019 audit's seventeen "Not Compliant" findings, the open items in Apple's own Process Hazard Analysis, and the leak-detection system EPA found calibrated once in thirty-four required occasions are concrete failures of that duty, not the "open-ended second-guessing" Defendants describe. Because the air-district rules are part of the federally approved implementation plan, their conditions are enforceable through the citizen-suit provision, and the unpermitted source and exceedances identified above are violations of "an emission standard or limitation" within the meaning of the statute.

**VII.    LIKELIHOOD OF SUCCESS — CLEAN WATER ACT**

23.    Defendants' permit-shield argument sweeps far wider than the doctrine allows. The shield protects only discharges of pollutants "within the reasonable contemplation of the permitting authority" when the permit issued. *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 268 (4th Cir. 2001); see *Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95 (9th Cir. 2024); 33 U.S.C. § 1342(k). It does not shield undisclosed pollutants, unpermitted stormwater discharges, or discharges through pathways the permit never addressed. The trichloroethylene detection in Plaintiff's Exhibit T points to a pollutant not contemplated in the permit; the shield does not reach it. The shield also presupposes a permit posture Apple did not maintain: by its own declarant's account, Apple operated multiple devices without required air permits from 2017 through 2023, and the solvent waste tank vented to the atmosphere without authorization until EPA intervened (Schmidt Decl. ¶¶ 35, 39)— facts incompatible with the fully permitted, fully compliant premise on which the shield depends. Nor is the stormwater pathway the closed system the opposition implies: Apple's own evidence describes storm-drain valves opened, by human judgment, whenever weather reports indicate rain, so that during rain events the facility discharges through that pathway (Schmidt Decl. ¶ 14)— precisely the kind of manual, judgment-dependent control whose failures the record documents.

24.    Defendants' repeated insistence that "detection is not a violation" and that there is "no numeric exceedance" applies the wrong test. CWA violations include unpermitted discharges, discharges of undisclosed pollutants, and violations of the categorical pretreatment standards— including the prohibited-discharge provisions and the express prohibition on using dilution as a substitute for treatment. 40 C.F.R. §§ 403.5, 403.6(d); *Hawaii's Thousand Friends v. City of Honolulu,* 821 F. Supp. 1368, 1393 (D. Haw. 1993). Plaintiff's pretreatment theory is precisely that Apple achieves numeric concentration limits through a dilution architecture rather than treatment;

Defendants' response—that the neutralization system "treats" the waste and that concentrations fall below limits—does not address the anti-dilution rule at all, and the resolved solvent-handling violation (PV #6) confirms that dilution was in fact occurring.

25.     Defendants' factual rejoinders are themselves contested and, in places, self-undermining. Their assertion that solvent waste is "never discharged" because it is hauled away as hazardous waste is a declaration statement, not an adjudicated fact, and it sits awkwardly beside EPA's finding that the solvent stream was being treated by impermissible dilution. Their explanations for the monitoring anomalies prove the broader point rather than rebut it: that a 185 mg/L ammonia reading was "clear" in color, or that a pH excursion reflects a composite average versus a real-time meter, are merits arguments about contested data, not a demonstration that no violation occurred—and the dilution architecture is precisely the mechanism by which mass loading can persist while concentrations read within limits. None of this is suited to resolution against Plaintiff on a paper record at the preliminary stage.

26.     The surface-water claim is the strongest and Defendants barely engage it. San Tomas Aquino Creek is a 303(d)-listed water of the United States with surface flow to the Bay. The facility's safe-drain valves and self-reported 2016 release confirm a stormwater pathway to that water exists; that the cooling-water release was "self-reported" underscores, rather than excuses, the discharge. Defendants' "multiple watersheds" response goes to the weight of Plaintiff's field observations, not to whether a discharge pathway exists, and the field observations are offered to warrant sampling, not as the final analytical word. The groundwater theory under *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020), is cumulative; Plaintiff does not rest the motion on it. The point for present purposes is narrower: Defendants have not shown the absence of a CWA violation, which is their burden to defeat a likelihood showing built on the pretreatment and surface-water pathways.

27.     Two of Defendants' supporting points do not bear the weight placed on them. The "Certificate of Recognition" Apple cites is a courtesy designation for program participation, not an adjudication that every discharge complied with the Act; and the City of San José's "independent" verification carries less reassurance where the co-owner of the treatment works is itself a defendant whose oversight is in question. An unauthorized discharge of a pollutant from a point source is a violation of 33 U.S.C. § 1311(a) whether or not a downstream sampler later records a number within a numeric limit; the inquiry is the discharge, not solely the concentration that survives dilution.

## VIII.     <u>LIKELIHOOD OF SUCCESS — PUBLIC NUISANCE</u>

28.    Defendants' nuisance defense reduces to Civil Code § 3482—that nothing done under the express authority of a statute is a nuisance. The defense is construed narrowly and does not shield operations conducted in violation of permits or outside their terms. The documented EPA and air-district violations defeat the defense on its own premise: conduct that violates the governing permits is not conduct done under their express authority. The authorities Defendants cite confirm the limit. *Public Watchdogs* and *Eisenstecken* involved fully compliant, federally licensed activity; here, the premise of full compliance is the contested issue and the record refutes it. Defendants' reliance on *Goddard*—where an abated nuisance could no longer be enjoined—fails for the same reason: the condition here is ongoing, not abated, as the recurring releases and unresolved regulatory findings show. Section 3482 is independently inapplicable to the 2017–2023 period, during which, by Apple's own account, substantial equipment operated without the required permits (Schmidt Decl. ¶ 39); activity conducted without a permit is not activity done "under the express authority of a statute."

29.    Defendants also misread Plaintiff's California authorities. *Luthringer v. Moore*, 31 Cal. 2d 489 (1948), is the California ultrahazardous-activity case; it holds that one who handles a dangerously volatile substance bears liability for the resulting harm regardless of care, and the principle applies directly to storing arsine, phosphine, and hydrogen fluoride beside homes and a school. *McIvor v. Mercer-Fraser Co.*, 76 Cal. App. 2d 247, 254 (1946), actually supports Plaintiff: reasonable apprehension of injury from a dangerous condition is a nuisance where it interferes with the comfortable enjoyment of property—which the documented incidents, the plume, and the inability to safely use the adjacent parks supply. Plaintiff's claim also proceeds as nuisance per se and nuisance in fact (*People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090 (1997); *People v. ConAgra Grocery Prods. Co.,* 17 Cal. App. 5th 51 (2017)). Civil Code § 3490 defeats any laches or duration defense, and Plaintiff's documented exposure injuries supply the special injury required for private enforcement under § 3493.

30.    Defendants' remaining response—that Plaintiff cannot show present interference with a public right—is answered by the public character of the receptors and by admissions in the record. The interference runs to public parks, a public playground, public trails, and a school; that is a public right by definition. And the City's own on-record statements during the 2025 General Plan proceedings—that the area is "not an appropriate area for housing" and that "you cannot have housing in the middle of an industrial area"—are party admissions confirming that the surrounding

land cannot be safely used as residential, which is the interference Plaintiff alleges. Defendants' effort to confine those statements to "land-use planning" does not blunt their evidentiary force on the question of present hazard.

## IX.    THE JENAB DEFENDANTS' LIABILITY IS UNREBUTTED

31.    Although the opposition is filed jointly on behalf of Apple and the Jenab defendants, it advances no defense specific to the property owner. Every argument it makes is that Apple operates compliantly; none addresses the owner's independent exposure. That silence is telling, because the owner's liability does not depend on Apple's compliance. Jenab owns 3250 Scott Boulevard; signed the April 2022 Stormwater Maintenance Responsibility agreement assuming obligations for the stormwater pathway at issue; owns the adjacent Synertek parcel at 3050 Coronado, a CERCLA site; declined EPA's requested Land Use Covenant deed update; and retains the ability to re-lease the premises for the same hazardous use. Each of those facts supports relief running to the owner—particularly the requested prohibition on re-leasing for hazardous use, which Apple's compliance posture does nothing to answer. Because the Jenab defendants offer no contrary showing, Plaintiff's likelihood of success as to them stands unrebutted on this record.

## X.    IRREPARABLE HARM IS LIKELY, NOT SPECULATIVE

32.    Plaintiff does not rely on a presumption. She meets the standard the cases require—likely, not merely possible, irreparable harm—directly. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). The likelihood is supplied not by a single hypothetical but by a documented record of recurring releases—eleven hazardous-materials incidents between 2016 and 2024, including worker hospitalizations from hydrogen fluoride and hydrochloric acid exposure, a phosphine release that passed the scrubbers and re-entered the laboratory through the ventilation system, and a fluorine release "evacuated to atmosphere as designed." Most recently, in May 2024, Apple's own declaration describes a hydrogen chloride release that caused Apple security personnel to experience lightheadedness, after which Apple instituted buffer zones for bulk chemical delivery (Schmidt Decl. ¶ 20)—an actual, recent human exposure on the property, and a tacit acknowledgment that the prior delivery practice was unsafe. That history establishes the probability; Apple's own modeling establishes the magnitude.

33.    The proximity that converts magnitude into harm is a matter of measurement, not opinion. The published Department of Transportation Emergency Response Guidebook protective-

action distances for the substances on site—arsine, which is odorless at lethal concentrations and has no antidote; phosphine; chlorine stored in hundreds of pounds; forty-nine-percent hydrogen fluoride; and thousands of gallons of hydrogen on an exterior pad—meet or exceed the judicially noticeable distance from the building to the nearest residences and parks, on the order of a few hundred feet. That comparison rests on government tables and recorded distances, not on Plaintiff's credentials, and it places the receptor population inside the protective-action zone for a credible release.

34.     The acute, increasing pathway is the pressurized artesian aquifer rising beneath a facility holding water-reactive and pyrophoric materials—a mechanism Defendants do not engage anywhere in their brief. The receptors are uniquely vulnerable: infants in a nearby nursery, 900 schoolchildren whose shelter plan routes them toward the source, elderly residents, and urgent-care patients. And there is no adequate warning in place: no records exist under the County's post-Bhopal Toxic Gas Ordinance, the chemical inventory was for years unavailable to first responders, and the parks bear no signage. Once a release reaches that population, no later remedy repairs it. That is the definition of irreparable harm.

## XI.     BALANCE OF EQUITIES AND PUBLIC INTEREST

35.     The relief is targeted at the chemicals, not the building; Apple may retain the structure for office use. Defendants' "distinction without a difference" response, supported by declarations describing an integrated facility that cannot be switched off and on, goes to the cost of compliance, not to whether the equities favor protecting the surrounding population from a documented hazard. There is no cognizable equitable interest in continuing operations that regulators have already found unlawful. To the extent Defendants invoke *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987), that decision turns on whether the environmental harm is "sufficiently likely"; where it is, the Court recognized, "the balance of harms will usually favor the issuance of an injunction to protect the environment." The harm here is concrete and documented, not speculative.

36.     Defendants' own conduct tips the balance. In the September 2025 meet-and-confer, Plaintiff offered a no-liability menu of trivial-cost interim measures—monitoring with automatic shutoff, warning signage, operator identification, completion of unfiled permits, third-party assessment, and monthly reporting. Defendants agreed to none and counter-proposed nothing. A party that refuses cost-free measures to reduce a documented risk cannot credibly claim the Court's equitable deference. The "800 CalARP facilities in the same zip code" argument is a floodgates

appeal, not a legal principle; if anything, it cuts the other way, because allowing a documented serial violator to continue would signal that compliance is optional. The requested relief is fact-specific to a facility uniquely situated atop a pressurizing aquifer beside 1,840 homes, a playground, and a school—not a categorical rule. As to delay, the eight-month interval reflects diligence, not dilatoriness: the statutes require sixty-day pre-suit notice; the air-district settlement was signed only in late April or early May 2026; and the field observations were obtained only weeks before the motion. See *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011). The harm is continuing, which further blunts any delay inference. The public interest, declared by Congress and the Legislature in the very statutes Plaintiff invokes, favors the relief.

37.     That public interest is not an abstraction. Congress declared it in RCRA, the Clean Air Act, and the Clean Water Act; the California Legislature declared it in the nuisance statutes and the chemical-emergency regime; and the County declared it in the toxic-gas ordinance adopted after the Bhopal disaster to govern exactly this kind of facility. Where the public interest has been fixed by statute, the inquiry is not whether an injunction is convenient for the regulated party but whether relief serves the protective purpose the legislature enacted. Here it does. The agencies' administrative settlements have not abated the hazard, and the local regulator's oversight was found wanting; an order directed at the hazardous materials themselves vindicates the public interest the statutes define rather than displacing it.

## XII.    TAILORING, EVIDENTIARY OBJECTIONS, AND BOND

38.     Defendants' framing of the legal standard does not foreclose relief. The Ninth Circuit's serious-questions sliding scale survives Winter: a preliminary injunction is available where there are serious questions going to the merits and the balance of hardships tips sharply toward the plaintiff, so long as the remaining Winter factors are met. All. for the *Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). And in environmental cases the Supreme Court has recognized that environmental injury is often irreparable and that the balance of harms will usually favor protective relief. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiff satisfies the full Winter standard on this record; to the extent the Court views any element as close, the sliding scale applies because the hardship balance tips sharply where the cost to Defendants is the temporary, compensable interruption of a noncompliant operation and the cost to the public is exposure to a potentially fatal release.

39.     Defendants overstate the burden by labeling the relief "mandatory." The core relief is preventive—halting the continued use and storage of mass-casualty chemicals pending trial—and the removal component is the means of effecting that prevention, not an affirmative directive to undertake something new. As to these defendants, moreover, key components are plainly prohibitory: barring the owner from re-leasing the premises for the same hazardous use, and barring Apple from resuming or expanding that use pending trial. Even under the heightened standard of *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015), Plaintiff meets it, because the law and facts clearly favor relief on Defendants' own documents. See *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 879 (9th Cir. 2009). The relief is specific, verifiable, and enforceable, and the Court may retain jurisdiction to supervise compliance. Fed. R. Civ. P. 65(d).

40.     Defendants' evidentiary objections do not carry the day. At the preliminary-injunction stage a court may consider evidence that would be inadmissible at trial, and Plaintiff's observations are offered as percipient lay observation—what she saw, smelled, and measured, warranting investigation—not as expert opinion. More to the point, the technical core of Plaintiff's showing does not depend on her testing at all; it rests on Apple's own hazard analysis and dispersion modeling, the EPA and air-district findings, and Apple's own monitoring submissions, none of which is Plaintiff's lay opinion. Plaintiff separately objects, under Civil Local Rule 7-3(c), to the weight of Defendants' supporting declarations. Each opines on ultimate issues—"compliant," "resolved," "minor"—without the underlying data, and each carries a limitation the Court should weigh.

41.     Ms. Tredway is affiliated with the firm Apple retains to audit the facility on an ongoing basis, including the audits that produced the "Not Compliant" findings now at issue, and her comparison to hundreds of "similar" facilities rests on a registry count that sweeps in dry cleaners and gas stations rather than fabs handling arsine and phosphine at this scale. Mr. Trammell is a litigation-retained expert who made a single site visit and reviewed only incident logs for 2019 through 2023—excluding the pre-2019 history, the May 2024 hydrogen chloride exposure, and all 2025–26 events—and who confirmed closure of action items using Apple's own tracking system, the adequacy of which is itself disputed. Mr. Michael designed the gas-distribution systems in 2014 and attests only that the design met the codes then in force; he offers nothing about how the systems have operated since, the incidents that followed, or the endangerment that exists now.

42.     The declarations' recurring explanation that every gas alarm was a "false detection"

or sensor malfunction is also not the reassurance Defendants suppose: a facility that attributes each alarm at an arsine and phosphine operation to instrument error has either unreliable detection or a practice of discounting alarms, and neither supports denying relief. And to the extent the declarations are credited, their factual content—the CAFO counts, the years of unpermitted equipment, the recent exceedances, and the recent exposure—establishes the very pattern the motion describes. Finally, any bond under Rule 65(c) should be waived or set at a nominal amount, as is appropriate for a public-interest citizen suit brought by an individual plaintiff of limited means; the district court has broad discretion to do so. See *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

## XIII.    CONCLUSION

43.    Defendants ask the Court to accept their declarants' word that nothing is wrong, while conceding the chemicals, the receptors, the modeling, and the violations. Standing is established three times over; the administrative settlements neither bar this suit nor prove compliance; and on every claim the dispositive facts come from Defendants' own admissions and the regulators' findings. For the foregoing reasons, Plaintiff respectfully requests that the Court grant the preliminary injunction, or in the alternative the targeted interim relief described in the motion, together with such other relief as the Court deems just.

Respectfully submitted,



---

**/s/ Ashley M. Gjovik (***Pro Se***)**
June 4, 2026
Alviso, City of San José, California
legal@ashleygjovik.com
(415) 964-6272