**Ashley M. Gjovik, JD**
*In Propria Persona*
(415) 964-6272
legal@ashleygjovik.com
San Jose, California.

# United States District Court
## Northern District of California

**Ashley M. Gjøvik,**
*an individual,*

**Plaintiff,**

**vs.**

**Apple Inc.,**
*a corporation,*

**City of Santa Clara,**
*a local government,*

**& The Property Owners:**
**Mr. Kalil Jenab,**
*individually and as agent of various entities,*

**and Ms. Julia Lindsey &**
**Ms. Kathleen Woodruff.**
*in their respective capacities as trustees.*

**Defendants.**

**Case No.** 5:25-cv-07360-PCP.

**Third Amended Complaint**

**Environmental Citizen Suit**

**Resource Conservation & Recovery Act (RCRA),**
**42 U.S.C. § 6972**

**Clean Air Act,**
**42 U.S.C. § 7604**

**Clean Water Act,**
**33 U.S.C. § 1365**

**Emergency Planning & Community Right-to-Know Act (EPCRA),**
**42 U.S.C. § 11046**

**Toxic Substances Control Act (TSCA),**
**15 U.S.C. § 2619**

**Public Nuisance**
**Cal. Civ. Code 3491**

## Demand for Jury Trial

# TABLE OF CONTENTS

**INTRODUCTION** ........ 1

**JURISDICTION & VENUE** ........ 4

**PROCEDURAL HISTORY** ........ 4

**PARTIES** ........ 7

I. PLAINTIFF: ASHLEY GJOVIK ........ 8
II. DEFENDANT: APPLE INC. ........ 9
III. DEFENDANT: CITY OF SANTA CLARA ........ 11
IV. DEFENDANT: "THE PROPERTY OWNERS" ........ 14

**GENERAL ALLEGATIONS** ........ 15

V. NATURAL FEATURES & ECOSYSTEM ........ 16
*A. San Tomas Aquino Creek* ........ *16*
*B. Saratoga Creek* ........ *17*
*C. The Underground Aquifer System* ........ *19*
*D. Synertek Superfund Site* ........ *22*
VI. THE PREMISE & OPERATIONS ........ 23
*E. In 2014, The City Approves a Heavy Industrial Chip Fab in a Light Industrial Zone, also Earmarked for Future Residential Housing.* ........ *24*
*F. In 2015, The City Approved Development of Thousands of Apartments Directly Across the Street from a Chip Fab.* ........ *26*
*G. The City Should Have Shut-Down Industrial Operations at the Chip Fab in 2016.* ........ *31*
*H. Ongoing Violations and injuries, ignores Complaints, & Apple's Media Misdirection Campaign.* ........ *33*
*I. Investigations Begin But The Violations And Incidents Continue.* ........ *41*
VII. THE MODERN PREMISE & SURROUNDING ENVIRONMENT ........ 50
VIII. VIOLATIONS OF PUBLIC POLICY & COMMON SENSE ........ 56
*J. Community Member Injuries & Complaints* ........ *56*
*K. Santa Clara's Violations Related to the Santa Clara Appellate Court Zoning Order (1996-ongoing).* ........ *61*
*L. Apple's Violations of the Dec. 2016 – Dec. 2020 DTSC Consent Agreement* ........ *63*
*M. Additional High Density Residential Planned Closer to 3250 Scott at 3240 Scott* ........ *64*
*N. The April 2025 Planning Commission Meeting* ........ *65*
*O. May 2025 City Council Meeting* ........ *68*

**LEGAL CLAIMS AGAINST THE DEFENDANTS** ............ **69**

IX. COUNT 1: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT, IN VIOLATION OF THE RCRA § 7002(A)(1)(B). ............ 69

X. COUNT 2: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN AIR ACT. ............ 75

XI. COUNT 3: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN WATER ACT. ............ 78

XII. CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE RCRA. ............ 80

*A. COUNT 4: APPLE & THE PROPERTY OWNERS VIOLATED RCRA 42 U.S.C. §§ 6922, 6928 BY FAILING TO COMPLY WITH HAZARDOUS WASTE MANAGEMENT REQUIREMENTS. ............ 81*

*B. COUNT 5: APPLE, THE CITY, & PROPERTY OWNERS VIOLATED 42 U.S.C. § 6923 BY FAILING TO COMPLY WITH HAZARDOUS WASTE RECORDKEEPING REQUIREMENTS. ............ 82*

*C. COUNT 6: APPLE & THE PROPERTY OWNERS VIOLATED 42 U.S.C. § 6925 BY OPERATING WITHOUT REQUIRED PERMITS & VIOLATION THE TERMS OF THE PERMITS THEY DID HAVE. ............ 83*

*D. COUNT 7: APPLE VIOLATED 42 U.S.C. § 6923 BY CONTRIBUTING TO THE UNLAWFUL TRANSPORT OF HAZARDOUS WASTE. ............ 84*

*E. COUNT 8: APPLE, THE CITY, & THE PROPERTY OWNERS VIOLATED 42 U.S.C. § 6924, 42 U.S.C. 6928 BY VIOLATING HAZARDOUS WASTE TREATMENT STANDARDS & REQUIREMENTS. ............ 84*

XIII. CITIZEN SUIT ENFORCEMENT ACTIONS AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE CLEAN AIR ACT. ............ 85

*F. COUNT 9: APPLE AND THE PROPERTY OWNERS VIOLATED 42 U.S.C. 7413 BY OPERATING A STATIONARY SOURCE WITHOUT PERMITS ............ 87*

*G. COUNT 10: APPLE & PROPERTY OWNER VIOLATED 42 U.S.C. §§ 7502, 7661 BY OPERATING SOURCES WITHOUT TITLE V PERMITS and BY FAILING TO OBTAIN PRECONSTRUCTION PERMITS. ............ 89*

*H. COUNT 11: APPLE & THE PROPERTY OWNERS VIOLATED HAZARDOUS AIR POLLUTANTS STANDARDS. ............ 91*

*I. COUNT 12: APPLE & THE PROPERTY OWNERS VIOLATED NON-ATTAINMENT STANDARDS WITH OZONE POLLUTION. ..... 93*

*J. COUNT 13: APPLE VIOLATED 42 U.S.C. § 7604 BY EXCEEDING EMISSION LIMITS. ..... 96*

*K. COUNT 14: THE CITY VIOLATED NAAQS & CRITICAL AIR POLLUTANT STANDARDS IN SITING THE FAB AND APARTMENTS. ..... 97*

*L. COUNT 15: THE CITY VIOLATED CAA WHEN IT APPROVED THE SANTA CLARA SQUARE EIR, WITH TERMS REFUSING TO COMPLY WITH NON-ATTAINMENT STANDARDS. ..... 99*

XIV. CITIZEN SUIT ENFORCEMENT ACTIONS AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE CLEAN WATER ACT. ..... 100

*M. COUNTS 16-17: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY DISCHARGING ADDITIONAL POLLUTION INTO SARATOGA CREEK. ..... 105*

*N. COUNT 18: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1311 BY DISCHARGING UNPERMITTED AND FORBIDDEN POLLUTED WASTEWATER. ..... 107*

*O. COUNT 19: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1316 BY CONCEALING THE SOURCE OF DISCHARGED WASTEWATER WAS SEMICONDUCTOR MANUFACTURING. ..... 108*

*P. COUNT 20: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1317 BY FAILING TO PROPERLY TREAT DISCHARGED WASTEWATER. ..... 109*

*Q. COUNT 21: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING WASTEWATER DISCHARGE AND TREATMENT. ..... 110*

*R. COUNT 22: THE CITY VIOLATED § 1319 BY FAILING TO TAKE ENFORCEMENT ACTION REGARDING DISCHARGES. ..... 113*

*S. COUNT 23: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1342 REGARDING STORMWATER. ..... 115*

*T. COUNT 24: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING PUBLIC NOTICE & ENGAGEMENT REGARDING THE CHIP FAB'S STORMWATER DISCHARGE AND PERMITTING. ..... 117*

XV. CITIZEN SUIT ENFORCEMENT ACTION AGAINST DEFENDANTS FOR VIOLATIONS OF THE EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT. ..... 118

*A. COUNT 25: APPLE AND THE PROPERTY OWNERS VIOLATED EPCRA NOTIFICATION AND REPORTING REQUIREMENTS. ..... 119*

*B. COUNT 26: APPLE, THE CITY, & THE PROPERTY OWNERS VIOLATED EPCRA*

*TRI REQUIREMENTS.* ........ *122*
*C. COUNT 27: THE CITY VIOLATED EPCRA BY CONCEALING AND DENYING REQUESTS FOR HAZARD INFORMATION IT WAS REQUIRED TO PROVIDE.* ........ *124*
XVI. CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE TSCA. ........ 125
*A. COUNT 28: APPLE VIOLATED THE TSCA WITH NMP (15 U.S.C. §§ 2605, 2614-2615; 40 CFR PART 751).* ........ *126*
*B. COUNT 29: APPLE VIOLATED THE TSCA WITH MERCURY (15 U.S.C. §§ 2605, 2607, 2614-2615).* ........ *127*
*C. COUNT 30: APPLE VIOLATED THE TSCA WITH TCE (15 U.S.C. §§ 2605, 2614-2615; 40 C.F.R. § 751.301).* ........ *129*
*D. COUNT 31: APPLE VIOLATED THE TSCA WITH LEAD (15 U.S.C. §§ 2605, 2614-2615, 2681-2689; 40 CFR PART 745).* ........ *130*
*E. COUNT 32: ALL DEFENDANTS VIOLATED TSCA BY USING AND DISPOSING OF IMMINENTLY HAZARDOUS CHEMICAL SUBSTANCES AND MIXTURES. (15 U.S.C. §§ 2605-2606, 2615).* ........ *131*
XVII. PUBLIC NUISANCE ABATEMENT AND ENFORCEMENT AGAINST DEFENDANTS. (CAL. CIV CODE § 3491 ET SEQ.) ........ 132
*F. COUNT 33: APPLE VIOLATED CAL. CIV CODE § 3491 ET SEQ.* ........ *134*
*G. COUNT 34: THE PROPERTY OWNERS VIOLATED CAL. CIV CODE § 3491 ET SEQ.* ........ *138*
*H. COUNT 35: THE CITY OF SANTA CLARA VIOLATED CAL. CIV CODE § 3491 ET SEQ.* ........ *140*
**RELIEF SOUGHT** ........ **145**

# INTRODUCTION

1. This matter involves a public safety threat, imminent environmental disaster, admitted zoning mistake, and comprehensive market failure. This matter arises from a property with a high-hazard, unmarked semiconductor manufacturing facility (a "*chip fab*") operating at 3250 Scott Blvd in Santa Clara, California. The facility is using, storing, and releasing alarming amounts of deadly gases and very dangerous chemicals without notice or warning; next to a high-density residential apartment complex (The "Santa Clara Square Apartments") across the street; and is surrounded by restaurants, gyms, churches, medical clinics, bike lanes, nature trails, creeks flowing the SF Bay, and multiple city parks and children's playgrounds.

2. The Property Owners are also the long-time owners of an adjacent federally managed toxic waste dump clean-up site (the "Synertek site") with a contaminated groundwater plume flowing north under the same homes and kids. The owns have been fighting the EPA's request to amend the Record of Decision for that site for years, while concurrently enabling the same kind of reckless operations at this  that created the adjacent toxic waste dump in the 1980s The operator/tenant for The Chip Fab is a large, wealthy, domestic corporation which certainly has the resources to locate its chip fabs in properly zoned locations that do not share property lines with the open windows of residential apartments, public parks with sunbathers and picnic tables, retired folks walking on nature trails, or, most critically, little children playing on outdoor playground equipment just feet away from The Chip Fab releasing gases regulated as chemical weapons.

3. The City conspired with the other defendants to conceal The Chip Fab from nearby residents and businesses; failed to report the company's name, activities, or emissions; kept The Chip Fab out of the EIR for a new dense, residential apartment complex next door; failed to cite and report environmental violations, and received multiple complaints from residents injured by exposure to industrial chemicals –yet failed to investigate or warn, and instead took actions to invite vulnerable people to city parks next to The Chip Fab, knowing people were being hurt and could be killed. The City faced litigation in California court over a situation much like this from 1993-2000+, with California trial and appellate court orders forbidding the City from siting chip fabs next to kids and churches and threatening the current Mayor (prior council member) with contempt for violating court orders and still insisting on sitting children next to deadly chemicals.

*LSI Logic Corp. v. City of Santa Clara*, No. H012427 (Cal. Ct. App. Aug. 21, 1995).

4. The Chip Fab, like all semiconductor fabrication and manufacturing facilities, engages in ultrahazardous activities. Due to the kinds, methods, and quantity of chemicals used, even if a chip fab is in full legal compliance, it can still cause severe harm to nearby residents and accidents can occur which would result in catastrophic chemical disasters with mass injuries and/or environmental devastation. Even worse, The Chip Fab has been operating without required permits, refusing to file required reports, refusing to notify the community about leaks, spills, or its basic operations; and has already been releasing and emitting incredible amounts of toxic substances into the air, water, land, and into human bodies – with years of reports of chemical injuries and pollution.

5. This unlawfully reckless siting and zoning was facilitated, approved, and concealed by the same Silicon Valley city where this public safety hazard is located. The same departments and employes worked on both projects (The Chip Fab and huge apartment complex) at the same time, and all concealed The Chip Fab from the EIR and CEQA process for the residential development, knowing the siting and zoning was in direct and egregious violation of federal, state, regional, and county code –the city's own General Plan, polices, and ordinances.

6. The Chip Fab is also located near two creeks flowing to the SF Bay and which are protected by the Clean Water Act. The San Tomas Aquino Creek is a mostly artificial channel that routes surface waters flowing out to the SF Bay.

7. Saratoga Creek is the only natural creek in Santa Clara County that flowed from the Santa Cruz mountains, across the valley floor, and out to the Pacific Ocean. The City unlawfully "filled" this ancient creek in the 1970s – but Saratoga Creek represents an extensive, underground, hydrothermal aquifer system – working its way through cracks, faults, and serpentine processes – and still actively surfacing in natural springs and overflowing wells at the Premise. This is still flowing, as it has for millions of years, through the valley floor and out of the Pacific Ocean – but now there's a chip fab sitting directly on top of it, with The Chip Fab's stormwater and emissions/pollution flowing into the springs and aquifer, and then into the SF Bay, which are all waters of the US.

8. The Chip Fab is polluting the air with at least a (self-reported) eight tons of industrial chemicals and heavy metal air emissions each year, repeated leaks of toxic gases;

discharging at least 40,000 gallons of contaminated wastewater every day; polluting the storm water, groundwater, underground and above ground federally protected water ways; contaminating the soil and nearby structures and vegetation, and injuring nearby residents, workers, and wildlife.

9. Accordingly, this is an federal environmental Citizen Suit brought pursuant to the federal statutes that were enacted in the 1970s-1980s in response to market-failure-type environment and safety hazards like this case, including: provisions of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972, Clean Air Act, 42 U.S.C. § 7604, Clean Water Act, 33 U.S.C. § 1365, Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11046, and Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619 (collectively referred to herein as the "Citizen Suit Provisions," and this action as the "Citizen Suit.") This Citizen Suit is brought in order to enforce the terms of, and to effectuate the congressional intent of, the RCRA, 42 U.S.C. § 6901 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., Clean Water Act, 33 U.S.C. § 1251 et seq., the EPCRA, 42 U.S.C. § 11001 et seq., and TSCA, 15 U.S.C. § 2601 et seq., (collectively referred to herein as the "Federal Environmental Statutes").

10. This is also a California Public Nuisance case brought under California Civil Code § 3491 and in order to enforce the terms of, and effectuate the legislative intent of, California Civil Code Division 4, Part 3 "*Nuisance*," including rights and responsibilities under the California Constitution; obligations and mandates under the California health/safety, natural resources, fire, and civil code; and the local law and policy within regional regulations and ordinances.

11. This lawsuit is brought by the Plaintiff for several reasons, but primarily due to her own experience suffering severe chemical exposure injuries caused by the operations at The Chip Fab in 2020, then followed by years of profound and overwhelming concern about the imminent and substantial endangerment to the surrounding community created by the ongoing activity and releases. This lawsuit is filed to seek redress for the Plaintiff's own informational, emotional, recreational, and existential injuries; to punish the Defendants for their wrongdoing; as an action to abate the hazards, mitigate harm caused, and protect the surrounding community, workers at the site and impacted businesses, and the surrounding environment (including the ancient redwood trees and Saratoga creek, and the adjacent San Tomas Aquino creek and trails, with both creeks flowing through sensitive ecosystems, north to the SF Bay, and then out to the Pacific Ocean). The Plaintiff is deeply connected to this site and eternally haunted by the harm that is occurring there.

# JURISDICTION & VENUE

12. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to the Citizen Suit Provisions of the Federal Environmental Statutes under 28 U.S.C. § 1331 (an action arising under the laws of the United States); and/or 28 U.S.C. § 1332 (diversity of citizenship between parties with more than $75,000 at stake in statutory fines) and 28 U.S.C. § 1367 (supplemental jurisdiction). Additionally, this Court has an additional basis for providing relief under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 1651 (injunctive relief), and under principles of equity and public policy.

13. Venue is proper in the Northern District of California, because the source of the violations is located within this judicial District, the violations and endangerment occurred and occur in the District, the release and damage occur and occurred at properties and business operations within this District, Defendants reside in the District, and this District inherently represents local community interests related to this matter. This case was filed at the San Jose Division due to the close proximity to the facility.

# PROCEDURAL HISTORY

14. The Plaintiff became severely ill in Feb. 2020 immediately after moving into the Santa Clara Square Apartments next to The Chip Fab. It was not until Sept. 2020 that the Plaintiff discovered she was being exposed to industrial chemicals (noticing VOCs spiking at the same times as her worst symptoms, appearing on a cell phone application dashboard for her indoor air purifiers). The Plaintiff promptly investigated further and reported the apparent chemical emergency to the city, county, state, and federal governments. The California and U.S. government did not know about The Chip Fab.

15. After accidently discovering The Chip Fab while researching public records related to buildings around the apartments where she had lived in 2020, Plaintiff reported The Chip Fab and its violations and hazards, to the same agencies in June 2023. The Plaintiff filed complaints to U.S. EPA, state, and local agencies, including the City of Santa Clara. (Exhibit C: June 2023 Environmental Complaint). The cover page of her complaint warned that she was prepared to file a Citizen Suit due to imminent and substantial endangerment if the agencies did not act.

16. The US EPA took formal RCRA enforcement action for hundreds of violations it found during just two brief inspections, which resulted in a Consent Agreement and Final Order,

penalty for those specific violations, but no other liability waivers, and express terms protecting further injunctive and equitable relief, and the final agreement credited the Plaintiff for making the complaint and providing the tip.[1] Apple is also facing at least six separate air pollution violations cited by the BAAQMD, based on the Plaintiff's complaints and tip.

17. In Sept. 2023, the Plaintiff also proceeded to sue Apple about the activities and harm caused to her, combined with a retaliation lawsuit – as come to find out The Chip Fab is run by her ex-employer, and it was her ex-employer who nearly killed her, then covered it up, and terminated her employment in retaliation against her. One of the claims includes a California crime victim retaliation action (Cal. Labor Code 98.7) that argues the tenant/operator nearly killed the Plaintiff in 2020 with hazards from The Chip Fab, knew they almost killed her with their emissions/dumping, and then harassed her and fired her as an act of retaliation because she was a victim of their environmental crimes at The Chip Fab. This lawsuit (*Ashley Gjovik v. Apple Inc.,* N.D. Cal., Case No. 3:23-cv-04597, 2023-) also contains "toxic tort" claims including Private Nuisance, Ultrahazardous Activities, and Intentional Infliction Of Emotional Distress (Fear of Cancer) which were dismissed under statute of limitations arguments. The lawsuit is currently pending appeal with the Ninth Circuit (*Ashley M. Gjovik v. Apple Inc.*), 26-4716, 9th Circuit Court of Appeals (2026-pending).[2]

18. The Plaintiff also filed labor, safety, and environmental complaints to relevant agencies. Apple settled with the Plaintiff and NLRB over the Plaintiff's charges filed to NLRB alleging that Apple's US employment agreements, confidentiality agreements, dozens of work policies, and their written surveillance policies/practices, all violate federal labor laws. Apple entered their first national settlement agreement with the NLRB, agreed with withdraw those terms, stop enforcing those terms, and to post a three-page notice of employee rights and Apple's promise to stop violating the NLRA.[3] NLRB also filed a complaint against Apple for unlawfully suspending, terminating, and threatening the Plaintiff; including creating and ordering an unlawful

---

[1] *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

[2] The scheduling order for Case: 26-4716 was issued July 23 2026 and the Plaintiff's (Ashley Gjovik) opening brief is due Oct. 14 2026 and the Defendant's (Apple Inc) brief is due Nov. 13 2026.

[3] For NLRB: *Apple, Ashley Gjovik,* 32-CA-282142, 32-CA-283161, Dec. 2024 Complaint & Notice of Hearing; *Apple, Gjovik, 3*2-CA-284428, April 4 2025 Trilateral Settlement & Consent Agreement.

five-point balancing test in June 2021, that had to be satisfied by the Plaintiff if she wanted to talk to other people about environmental compliance or workplace safety concerns.

19. However, no agencies have taken formal enforcement action to abate the hazard created by The Chip Fab. People are still being injured and there is constant threat of catastrophic harm if that facility continues to operate in this location and especially if it continues to fail to comply with basic environmental and health/safety legal requirements.

20. Thus, on June 30 2025, the Plaintiff served Sixty-Day Notice to Apple, City of Santa Clara, Mr. Jenab et al and U.S. EPA of her intent to file a Citizen Suit against Defendants over The Chip Fab and violations of federal Environmental Statutes. Defendants were notified via electronic mail and formally served via a process server and/or Certified Mail. (Exhibit A: June 2025 Sixty-Day Notice).

21. Apple was served on behalf of itself and its contractors/agents. Mr. Kalil/Khalil Jenab was served on behalf of himself and his various business entities and partnerships. The City was served on behalf of the City itself, its vicarious liability for the acts of its employees and departments (including Fire Dept., HazMat, Water/Sewer) and the San José-Santa Clara Regional Wastewater Facility co-owned by the City.

22. In August 25 2026, Ms. Julia Lindsey was also served with the Sixty Day notice as Trustee of the Lindsey Julia Family Trust and Lindsey Property Trust. In August 25 2026, Ms. Kathleen Woodruff was also served with the Sixty Day notice as Trustee of the Woodruff Kathleen Trust. On August 24 2026, Mr. Lindsey was served with the Sixty day notice individually and as agent/trustee of the various Lindsey family trusts. The Sixty Day notice does not apply to the California Public Nuisance claims or any of the Citizen Suit claims that do not require a Sixty Day notice. The Plaintiff also believes the Lindsey family trusts were effectively served with the Sixty Day notice when the co-owners, Mr. Jenab et al, were served in June 2025.

23. The Plaintiff formally served Notice and receipts of service of the Notice to the Administrator of the U.S. EPA and the Regional Administrator of U.S. EPA Region IX. Plaintiff also sent electronic versions of the Sixty-Day Notice to the U.S. EPA Enforcement and Compliance team, the California EPA (DTSC, Water Quality Board, etc.), the BAAQMD, the Santa Clara County DEH, and the U.S. DOJ ENRD. Plaintiff provided Notice of the actual and threatened endangerment, injury, and damage alleged herein by mailing notices of endangerment and of intent

to file suit pursuant to RCRA § 7002(b)(2)(A), to the U.S. EPA the California EPA, and Defendants. (Exhibit B: Proof of Service of Sixty-Day Notice).

24. The Plaintiff's Sixty-Day Notice and June 2023 Notice provided the Defendants and responding agencies with direct and sufficient information enabling them to determine the laws Plaintiff alleged the Defendants violated, the types of activities alleged to constitute the violations, sufficient information to determine the facts of the violations, and the contact information for the Plaintiff. The Plaintiff also complained about injuries caused by The Chip Fab to most Defendants for at least two years. Further, reporting that a "chip fab" is operating next to thousands of homes and a playground is reporting someone is drilling for oil next to an elementary school - -the facts are themselves inherently alarming.

25. More than sixty days have passed since the Notice was served on the Defendants and the state and federal agencies. During this time, neither the EPA, nor the State of California, has commenced or is diligently prosecuting a court action to redress the violations alleged, or took actions to force compliance in order to prevent recurrence of ongoing issues, nor are any entities taking legal or administrative actions to abate the hazards caused by the activities.

26. The Oct. 27 2025 U.S. EPA informal, administrative RCRA enforcement action never verified that Apple corrected its violations, limited the action only to violations found during the 2023-2024 inspection, and settled with a relatively small fine.[4] The May 2 2026 Bay Area Air Quality Management District informal, administrative enforcement action and settlement with Apple only settled violations related to the facilities boilers, but required no admission of fault, and also included a trivial fine.[5] (Settlement Agreement p.1-2, ¶ 4,7 p.3, ¶ 9, p.4, ¶ 16; Exhibit D: Government Agency Records). Neither precludes this action and the limited scope of both actions further reinforce the need for this lawsuit.

## PARTIES

---

[4] US EPA, *EPA Takes Action Against Apple for Inadequate Hazardous Waste Management*, Nov. 18 2025, https://www.epa.gov/newsreleases/epa-takes-action-against-apple-inadequate-hazardous-waste-management

[5] BAAQMD, Settlement Agreement by and between the Bay Area Air Quality Management District and Apple, Inc. (Notices of Violation A64215, A64216, A64218, A64219, A65128), May 2 2026. Signed by Bay Area Air Quality Management District management and general counsel, and Apple, Inc. via the company's global Director of Environmental Health & Safety, Elizabeth Schmidt, and Apple's defense counsel at Morrison Foerster, Mr. William F. Tarantino (Partner).

# I. Plaintiff: Ashley Gjovik

27. Ashley Gjovik (pronounced "JOE-vik") is the Plaintiff in this action ("Plaintiff") Gjovik is a citizen of the United States and current resident of San Jose, California (domiciled in Alviso). She is a longtime resident of the San Francisco Bay Area since 2015 other than brief stays on the East Coast. Plaintiff uses her California LLC address (2108 N St. Ste. 4553 Sacramento, CA, 95816) on legal papers for privacy, but this action is brought by her as an individual. The Plaintiff has a renewed California Real ID good through 2031 and intends to remain in Santa Clara County indefinitely. [Exhibit E: Standing Exhibits].

28. Plaintiff files this Second Amended Complaint from the "Embassy Suites by Hilton Santa Clara Silicon Valley" 2885 Lakeside Drive in Santa Clara, California where she is lodging tonight as she recreates and enjoys the aesthetic beauty of Santa Clara Square and the San Tomas Aquino/Saratoga Creek, located adjacent to the Chip Fab. [Exhibit E: Standing Exhibits]. Her hotel room is ~2,100 feet from the Chip Fab at 3250 Scott Blvd and she plans to return monthly due to her enjoyment of and interest in the natural beauty of this area.

29. The Plaintiff worked for Apple Inc from 2015 until 2021 as a Sr. Engineering Program Manager working for a Director and Sr. Director in Apple's Hardware Engineering organization and Product Integrity team. Plaintiff always received positive performance reviews, and was positioned as a "problem solver," chief of staff, and process expert. Her reviews designated her as "key talent" and "irreplaceable." The Plaintiff's undergraduate degree is a Bachelor of Science and she took courses in Ecology, Evolution, Math, Physics, Geography, and Chemistry. The Plaintiff graduated from Santa Clara University in 2022 with a Juris Doctor degree and Certificate in Public International Law with honors. During her legal education in 2018-2022, Plaintiff was an Emery Merit Scholar; made Dean's List every year; received CALI Excellence for the Future Awards for obtaining top grades in Property Law, Statutory Analysis and the Legislative Process, and Public Health Law; and received the Witkin Award for Academic Excellence award in Property Law. She also received an A grade in International Environmental Law.

30. Plaintiff lived at the Santa Clara Square Apartments from Feb. 2020 through Oct. 2020. She lived on the third floor of Building 4 located at 3390 Octavius Drive, with a corner unit looking out at the corner of Augustine Dr. and Octavius Dr. The apartments were brand new, and she found the outdoor parks, trails, and recreation areas to be spectacularly beautiful. She spent

time relaxing and appreciating nature in the city's "Meadow Park," walking along the city's Redwood Trail and the San Tomas Aquino/Saratoga Creek trail, and appreciating the beautiful redwood trees outside her unit's windows. She shopped at the adjacent Whole Foods, visited the adjacent medical clinics, and ate food from the on-site restaurants. At all times, she was exposed to chip fab exhaust, pollution, and safety hazards. [Exhibit E: Standing Exhibits].

31. She became severely ill and disabled within days of moving into the apartment. The injuries were promptly investigated and eventually diagnosed in late 2020 and early 2021 as acute exposure to industrial chemicals from an unknown source. While investigating the possible source, she partnered with and was advised by state and federal environmental agencies and public health officials, legal and policy experts at her law school, and long-time SF Bay Area labor and environment community activists. Despite all this expertise, no one discovered The Chip Fab until the Plaintiff discovered it in Feb. 2023, and she has been begging for help to abate the hazard ever since. Due to the hazard, the Plaintiff was forced to move away from a natural environment she loved, with the environmental violations injuring the Plaintiff's body then, creating ongoing medical monitoring requirements, creating emotional distress about ongoing risk for cancer and disease, and forcing her to leave an area where she wanted to live.

## II. Defendant: Apple Inc.

32. Apple Inc. is a corporation headquartered in California at 1 Apple Park Way, Cupertino, CA 95014. Apple Inc "Apple" refers also to its employees, Directors, Board, legal counsel, subsidiaries, affiliates, contractors, and other agents. (Cal. Civ. C. § 2295 et seq.).

33. In this case, regarding the properties and facilities at issue, Apple is an "operator" and "owner," a "tenant" and "lessee," a potentially responsible party under RCRA, CERCLA

34. Apple rents and operates a semiconductor manufacturing facility at 3250 Scott Blvd, in Santa Clara, California. Apple has operated The Chip Fab since approximately 2015 but was named on planning documents back to 2014. From then to current day, Apple has either refused to disclose what its operations are and/or misrepresented it activities as simple research and development. Apple's key hazmat contractor at The Chip Fab appears to be Advanced Chemical Transport, Inc. d.b.a. ACTEnviro, operating under Master Service Agreement No. CP201322217 and associated agreements. In most documentation it appears the EH&S manager/lead at The Chip Fab is Apple employee Tom Huynh and the EH&S engineer is his employee, Kevin Sung.

35. Apple executives were fully aware of The Chip Fab, including the vast number of hazardous materials and hazardous waste. Every year, Apple submitted a sworn financial assurance document to the Santa Clara Fire Department which detailed hazardous waste treatment and disposal operations, and was signed by Apple's CFO, Luca Maestri – including affixing a company seal. Each financial assurance filing also attached a detailed confirmation letter from Apple's third-party auditor, E&Y, on behalf of Apple. The Apple CFO certifies hazardous waste activities and violations at The Chip Fab. Mr. Maestri was also on the email distribution list for notification of hazardous waste violations at the facility.

36. Apple is fully aware of the relevant environmental violations as its currently employs a prior U.S. EPA Administrator (Lisa Jackson) and much of her prior U.S. EPA staff, in its Government Affairs and Lobbying team. Plaintiff has repeatedly caught Jackson attempting to interfere with the EPA and its officials while it was under investigation or otherwise subject to agency orders regarding the Plaintiff's Apple office on a Triple Superfund site in Sunnyvale, California – including Jackson sending the EPA Administrator letters of recommendation for the person she wanted to be appointed as Regional Administrator and who would oversee Apple, sending the letter from her Apple email account in Nov. 2021.

37. Further, from at least 2019 to current, Apple filed written, formal statements to the U.S. EPA and to the public claiming it is a leader in environmental compliance, that it forbids use of the chemicals its regularly using in The Chip Fab, and that it demands strict compliance with the EH&S laws that is blatantly violates at The Chip Fab. Apple's Supplier Responsibility policies extensively detail the environmental and safety legal obligations for operations at its factories – which it knowingly refuses to comply with at its own chip fab. Apple knew what the law is and intentionally chose to violate those laws in pursuit of the economic benefits of noncompliance at The Chip Fab. Apple also applied for U.S. EPA "chemical safety" awards as recently as last year – with the EPA granting awards while Apple was under investigation for RCRA violations.

38. Apple has been subject to multiple environmental lawsuits and consent agreements in the United States including recently in California and North Carolina.[6] However, the only other known modern instance of Apple operating a semiconductor manufacturing facility in the United

[6] The Carolina Journal, *Apple clean energy project fined for environmental violations*, Oct. 6 2017.

States was described by a union leader, as published in The American Prospect, as "*easily [one of] the most unsafe sites*" the leader had "*ever walked on*."[7] Public records show that Apple's prior domestic manufacturing facility in the SF Bay Area was back in the 1990s and described by the New York Times as "*Apple Computers Used to Be Built in the U.S.; It Was a Mess.*"[8]

39. Apple has also previously been caught exposing its employees to lethal gases including in North Carolina,[9] China,[10] and Arizona. In Arizona, Apple handled the recent toxic gas exposure by lying to the employees and claiming the evacuation alarm was simply a testing exercise but also at least for a brief period of time, implied someone may physically assault them, or kill them, if they did not evacuate, while concealing the evacuation was required due to Apple's toxic gas leaks. "*People were told that there was an active-shooting drill, and they were running, and [told] to evacuate the area. So, our guys got out of the area. And they found out later that it was a gas leak. And they were just trying to hide that. So, no one trusts them.*" (The American Prospect, June 22 2023).

## III. DEFENDANT: CITY OF SANTA CLARA

40. Defendant City of Santa Clara is a municipal corporation organized under the laws of California, with its principal place of business located at 1500 Warburton Avenue Santa Clara, CA 95050. California Gov. Code expressly authorizes that a city may be sued, including for injuries caused by acts or omissions by the entity itself and/or its employees. Cal. Gov't Code § 811.2, 815, 945; Restatement (Third) Of Agency §2.04 (AM. L. Inst. 2006).

41. In California, it is "manifest that the legislature intended to allow" nuisance actions against governments when the claims are tailored to meet statutory provisions and with a "profound interest… in the eradication of the evils caused by the various forms of pollution." *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 931-936 (1972).

42. The City is entity that is subject to local, state, and federal environmental oversight. For example, the City received eight Notices of Violation for High-Priority Violations of the Clean Air Act," from the BAAQMD in just the last three years. Four are noted as settled; and four are still open. US EPA enforcement shows at least fifteen CAA enforcement actions taken against the

[7] The American Prospect, *Chipmaker's Scramble to Build Marred by Mistakes and Injuries,* June 22 2023.
[8] NYT, "*Apple Computers Used to Be Built in the U.S. It Was a Mess,*" Dec. 15 2018.
[9] The Guardian, *Five injured in chlorine gas leak at Apple data centre: Workers treated at the scene in North Carolina by paramedics before taken to hospital after exposure to noxious fumes*, June 2 2015.
[10] NBC News, *Report: Deadly gas leak at Apple supplier's plant in China,* July 27 2012.

City since 2017. (WWTP BAAQM, Title V Major Source).

43. The City also holds multiple stormwater and wastewater NPDES permits including POTWs R2-2020-0001 which also covers nutrient, mercury, and PCB pollution. Director Gary Welling has managed the City's water, wastewater, and recycled water. His department is responsible for "ensuring compliance with federal and state regulations related to water, recycled water, wastewater, worker safety." (City of SC Wastewater System). The Plaintiff spoke with Welling in 2020-2021, met with the Mayor of Santa Clara several times in 2021, and at least one other victim also contacted the Mayor and Welling. Neither disclosed The Chip Fab, took action to help, or warned the victims.

44. The City co-owns a large wastewater treatment plant known as the San José-Santa Clara Regional Wastewater Facility ("The SJ-SC RWF") and which includes a 175 -acre wastewater processing area, 750-acre sludge-drying area, and 850-acre salt pond. Another 825 acres of open land were purchased as "bufferlands" with the purpose of "buffering" adjacent communities and environment from the risk of accidental chemical releases and other hazards associated with operations at the SJ-SC RWF. (San José-Santa Clara Regional Wastewater Facility, The Plant Master Plan, Nov. 2013). The City, as a highly regulated entity, owning and operating a complex treatment facility, understands the importance of risk mitigation regarding air pollution and other hazards arising from industrial operations.

45. The City of Santa Clara requested to exclusively control the implementation and enforcement of federal hazardous materials and hazardous waste laws through California's "Certified Unified Program Agency" ("CUPA") program. (Santa Clara City Code 15.60.020). Otherwise, the U.S. EPA delegation to Cal. EPA, then delegates this responsibility to the Santa Clara County Dept. of Environmental Health or California DTSC. (Cal. Code Regs. Tit. 27, § 15100). Only Santa Clara, Sunnyvale, and Gilroy have opted to manage federal hazardous waste compliance at a city-level.[11]

46. The City Fire Department has a "Hazardous Materials Division" which is "under the direct supervision of the Assistant Fire Chief or Deputy Fire Chief." This division includes hazardous materials administration, training, legislative, and inspection divisions. (Santa Clara

---

[11] Santa Clara County, Unidocs, Who Regulates What in Santa Clara County Page, http://www.unidocs.org/members/whoregulateswhat.html (last accessed 10/24/25)

City Code 2.85.070). The CUPA implementing statutes and regulations repeatedly using the term "shall," not "may," regarding the implementation and enforcement of federal environmental laws. ("*The unified program agencies in each jurisdiction shall do all of the following…*") and the delegation of federal environmental enforcement to a city is a privilege with mandatory obligations. (Cal. Code Regs. Tit. 27, § 15330.).

47. The City was conditionally delegated authority by California EPA to implement and enforce various federal environmental programs within its jurisdiction, including but not limited to air quality permitting, wastewater pretreatment oversight, hazardous waste regulation, and emergency planning coordination.

> "The City of Santa Clara Fire Department has been designated the Certified Program Agency by the State of California Environmental Protection Agency's (CalEPA). The CUPA protects Californians from hazardous waste and hazardous materials by ensuring consistency throughout the state regarding the implementation of administrative requirements, permits, inspections, and enforcement at the local regulatory level."

(Santa Clara City Code 15.60.020, 15.60.130).

48. The City has assumed regulatory oversight responsibilities over the Facility's environmental compliance through its delegated authority under environmental programs.

> "The City does hereby assume responsibility for the enforcement and implementation of the Hazardous Waste Generator Program, Onsite Hazardous Waste Treatment Program, and Tiered Permitting Program… Hazardous Materials Release Response Plans and Inventories (Business Plans) Program, … Hazardous Materials Area Plan Program… California Accidental Release Prevention (CalARP) Program…"

(Santa Clara City Code 15.60.020).

49. The City Fire Department has been under CUPA corrective action oversight by CalEPA for years. The most recent status report, dated Sept. 16 2024, notes the City was still unable to correct multiple systemic deficiencies, including that: "The City is not consistently following up and documenting return to compliance in CERS for Hazardous Waste Generators; the City is not ensuring all businesses comply with Hazardous Materials Business Plans; the City is not inspecting CalARP stationary source facilities; the City is not inspecting each facility subject to HMBP requirements at least once every three years; the City is not inspection all Hazardous Waste Generator facilities with appropriate frequency; and the City is not regulating all facilities subject to the Hazardous Waste Generator Program." (CUPA Corrective Action Report, Sept. 16 2024).

50. The City Council has been subject to lawsuits and court orders regarding situations

just like this with reckless siting and zoning, intersection with federal and local environmental enforcement, and basic public safety considerations. *LSI Logic v Santa Clara* (1993-2000). The City repeatedly delayed and withheld critical records regarding The Chip Fab, in violation of the California Public Records Act; and failed to make the public aware of dangerous leaks, spills, and chemical releases.

51. In direct violation of its mandates, the City has knowingly facilitated concealed The Chip Fab and its hazards since at least 2014, failed to enforce federal environmental regulations, ignored basic public safety protocols, invited vulnerable people to dangerous conditions, failed to warn of known hazards, and concealed risks and harm from affected residents, the community overall, and from other regulatory agencies.

## IV. Defendant: "The Property Owners"

52. Mr. Kalil Jenab is named individually as Agent and/or Member and/or Manager of Jenab Family LP and/or Jenab Family Ventures LLC; and as Trustee of the Jenab Family Trust. On regulatory filings, Mr. Jenab is personally listed as the current owner of The Chip Fab, with the personal mailing address of 108 Sylvian Way, Los Altos, CA, 94022. However, on August 29 2025, Mr. Jenab corresponded in email saying, "for the record, the property is held by Jenab Family LP." Yet in May 2026, Apple's 30(b)(6) designee testified the landlord and lessor of 3250 Scott Blvd in 2020-2021 was the Jenab Family Trust. (Exhibit F: Schmidt Depo. 54:23-55:5.). Property records also show non-transferred holdings by the Trust and LLC as well. Mr. Jenab is a Vice Chairperson and a licensed Real Estate Salesperson (License No. 00848988).

53. Mr. Jenab's professional profile advertises that he has "over 35 years of experience in Tenant and Landlord representation, he has closed over $3 Billion transactions in our local market" and "as a respected commercial real estate expert, he has successfully completed each transaction which required … assisting with the design and construction implementation." Mr. Jenab is regularly copied on, receives copies of, must sign/authorize, and file under his name, documents related to environmental and safety laws, permits, and regulated operations at The Chip Fab. Most of the permits, notices, and other filings include Mr. Jenab's name somewhere within the paperwork.

54. Ms. Julia Lindsey is named as a defendant in a role of Trustee of Lindsey Julia Family Trust and Lindsey Property Trust. Property record searches indicate the address for the

trusts is/was 124 Wildwood Ave, Piedmont, California, 94610. Meet/confer with defense counsel indicates that this property interest was transferred to Ms. Julia Lindsey from her father, Mr. James Lindsey on or around 2012.

55. Ms. Kathleen Woodruff is named as a defendant in a role of Trustee of Woodruff Kathleen Trust. Property record searches indicate the address for the trusts is/was 70 Ellsworth St, San Francisco, California, 94110. Meet/confer with defense counsel indicates that this property interest was transferred to Ms. Woodruff from her father, Mr. James Lindsey on or around 2012.

56. All of the above parties are hereby referred to as "The Property Owners." Property owners are responsible for maintenance of their properties.[12] The Property Owners, including Mr. Jenab, have a documented pattern of environmental violations: owns property designated as a Superfund site (severe contamination requiring EPA oversight for clean-up); refused EPA requests and objected to clean-up agreements; leased adjacent property knowing it would generate toxic waste and workers would be exposed to new and existing toxic waste; both properties discharge pollution into the federally protected San Tomas Aquino Creek; and participated in, or failed to objected to, the destruction and removal of all groundwater wells monitoring groundwater contamination from all three of his properties migrating downgradient to thousands of apartments.

## GENERAL ALLEGATIONS

57. From the 1950s through the 1970s, the semiconductor fabrication plants ("fabs") concentrated in Santa Clara County gave Silicon Valley its name.[13] Their legacy of toxic spills, leaks, and dumping left the County with more CERCLA/Superfund sites than any other county in the nation.

58. Semiconductor manufacturing comprises blank wafer production, fabrication, and assembly/packaging. Wafers are made from silicon (Si), gallium arsenide (GaAs), indium phosphide (InP), and similar substrates, and the etching, "doping," and layering processes emit a

[12] See for example: "The owner, occupant, lessee, or tenant of any property within the city shall be responsible for the maintenance of property and premises in a manner consistent with the provisions of this chapter and this Code." Santa Clara City Code 8.30.04; "Correction and abatement of violations… shall be the responsibility of the owner or the owner's authorized agent….;" Santa Clara City Code 15.60.100.

[13] The Verge, *How the next generation of semiconductor factories kicked up a fight over environmental review*, (Oct. 13 2023).

range of regulated hazardous pollutants. (BAAQMD Permit Handbook, Sect. 7, Ch. 4, Rev. 2, *Semiconductor Manufacturing*). Because fabs consume enormous quantities of energy and water and can generate thousands of tons of hazardous waste, proposals to construct them are ordinarily subject to lengthy environmental review. (CSIS).

59. Semiconductor manufacturing "is one of the most chemical-intensive industries ever developed," with a chemical-related illness rate "higher than that of any other single industry."[14] Its human toll has been documented since the early 1980s: fabs worldwide have been linked to twice the expected rate of miscarriages, aggressive cancers, and other lethal diseases.[15] More than four hundred chemical products are used in the industry; over 10% contain carcinogens, and an estimated 40% contain "trade secret" substances — leaving regulators, neighbors, and workers uninformed about their exposures.[16]

60. Because fab operations are complex, expensive, and dangerous, many electronics companies design chips but outsource fabrication to specialists. For others, in-house fabs became status symbols: in the 1980s, AMD's CEO famously declared that "*real men have fabs*." That industry culture of entitlement is consistent with, and helps explain, Defendants' conduct here.

61. Before Plaintiff's 2024 complaint to the Bay Area Air District, no Defendant had ever informed the District that Apple and The Property Owners were constructing or operating a chip fab — rather than typical office-based R&D — at 3250 Scott Blvd. (Bay Area Air District Violations No. A64215, A64216). The resulting fine and settlement agreement remain pending.

## V. Natural Features & Ecosystem

### A. San Tomas Aquino Creek

62. San Tomas Aquino Creek runs along the eastern property line of the Santa Clara Square Apartments, approximately 700 feet from The Chip Fab. Originating in the Santa Cruz Mountains, it flows north to Guadalupe Slough, the San Francisco Bay, and the Pacific Ocean; as open surface water, it readily receives settling air pollution. The creek bottom sits at an elevation

---

14 Dr. Joseph LaDou, *Occupational Health in the Semiconductor Industry,* Challenging the Chip, pg 33-34, Temple University Press (2006).

15 Electronics Watch, *The climate crisis, and the electronics industry: Labour Rights, Environmental Sustainability and the Role of Public Procurement*, May 2020.

16 Kim S, Yoon C, Ham S, et al. *Chemical use in the semiconductor manufacturing industry.* International Journal of Occupational and Environmental Health. 2018 Jul - Oct;24(3-4):109-118. DOI: 10.1080/10773525.2018.1519957. PMID: 30281405; PMCID: PMC6237170.

of 15.5 to 19.6 feet. (Geotechnical Investigation, Santa Clara Square, pg6, 24 July 2015; SCSA Hydrology Study, Aug. 17 2015). The creek "has been heavily altered from its natural state… bound by paved and concrete reinforced levies on both banks…. channelized and altered from its native state," and is "potentially within the jurisdiction of USACE under Section 404 of the Clean Water Act." (SCSA Biological Resources Assessment, May 2015).

63. Before artificial modification, the creek was "very shallow," about four meters wide, and lost channel definition well before the Bay: early surveys describe "scatters" and "sinks," with maps labeling two termini "sink of creek." (Beller, E. et al, Nov. 2010). The channel evidently spread into marsh and disappeared into coarse gravels, with disconnected distributary channels rising from pressurized aquifers and flowing north to connect hydrologically with Sanjon Creek and the Bay. This behavior is characteristic of serpentine terrane: serpentine forms where oceanic crust is altered by hydrothermal fluids, creating highly fractured, permeable bedrock with extensive underground flow networks through which surface waters "scatter," "sink," and reemerge.

64. Despite these alterations, San Tomas Aquino Creek still supports native plant and fish species and is a sensitive biological community. Its designated "Beneficial Uses" include "freshwater replenishment, ground water recharge, cold freshwater habitat, fish migration, preservation, and spawning, warm freshwater habitat, wildlife habitat, and recreation." (RWQCB, SFB, 2009). The Creek is managed under Clean Water Act § 303(d) (EPA Id. CAR2055004020080624165713), with "trash" as the formal TMDL pollutant. 2024 iNaturalist sightings confirm continued fish presence near the Apartments and Chip Fab, including Chinook Salmon (*Oncorhynchus tshawytscha*) (Nov. 12-13 2024, Id. No. 251599313, 251464788) and European Carp (*Cyprinus carpio*) (March 2024, Id. No. 216635588).

### B. Saratoga Creek

65. Saratoga Creek — historically also named Arroyo Quito, Campbell Creek, Big Moody Creek, and San Jon Creek — originates in the Santa Cruz Mountains near Castle Rock Ridge. The ancient creek helped deposit the alluvial fans of the valley floor (Cal. Dept. of Consv. 2002) and "once surged with mountain runoff."[17] Academic reconstructions of historic Bay Area ecology (1800-1850) document Saratoga Creek as the only permanent creek in the area, alongside

17 SF Gate, *Saratoga Creek restoration project removes more than trees: Some residents lose their backyards,* Feb 19, 2021.

the Guadalupe River, flowing from the Santa Cruz Mountains to the Bay.

66. The creek repeatedly sank and reemerged through the valley floor, consolidated into Sanjon Creek past what is now US 101, transitioned into "wet meadow" with salt marshes, and flowed with the Guadalupe River through the Bay's tidal marshlands to the Pacific. (SFEI, 2010)[18]. Between the wet meadows and marshland lay rare "alkali meadows" supporting specialized alkaline ecosystems (Beller et al., 2010; Reed, 1862); serpentine soils host rare and endemic species because few plants tolerate their high mineral and low nutrient content.

67. The locations where the historic creek sank and rose again lie near assumed concealed faults and unexplained magnetic anomalies (Chase, 1992; Schmidt et al., 2014), in areas thought to contain a "major serpentine sheet." (Roberts and Jachens, 2003; Wentworth, 2010). Major historic earthquakes caused targeted, fault-like patterns of property damage in Santa Clara despite no mapped faults there. If the Saratoga Creek aquifer flows through the valley floor both at the surface and within deep hydrothermal systems, its flow would be expected to follow a series of minor faults toward the Bay, charging the aquifer.

68. San Tomas Aquino Creek was "channelized" around 1965 (EKI, SCS, 2013); Saratoga Creek was "filled" around 1970-1974 (Freedom Circle ESA, 1997), and by 1976 an industrial office park stood on the graded, filled land. (EKI, SCS, 2013). Saratoga Creek's surface waters historically flowed across what is now 3260 and 3250 Scott Blvd (between the two buildings) and across Montgomery Drive along the Santa Clara Square Apartments. Saratoga Creek is managed under Clean Water Act § 303(d) (EPA Id. CAR2055004019990218133956), with "trash" and Diazinon as formal TMDL pollutants; Saratoga and San Tomas Creeks are "major drainages that pass-through Santa Clara Valley" and "originate in the Santa Cruz Mountains." (Santa Clara Valley Habitat Plan, Ch. 3, Pg. 8, Aug. 2012).

69. The confined, subterranean aquifer located under — and at times surfacing onto — The Premise sits squarely within this zone of apparent serpentine hydrothermal systems, concealed-fault earthquake damage, and unusual alkaline ecosystems, just south of the historic alkali wetlands nexus (estimated between Lawrence and San Tomas Expressways (W-E), and U.S. 101 and Central Expressway (N-S)).

---

18 San Francisco Estuary Institute (SFEI), *Historical Vegetation and Drainage Patterns of Western Santa Clara Valley* (Nov. 2010).

## C. The Underground Aquifer System

70. The entire Saratoga Creek system — the artesian springs, the creek above ground and where it flows through the serpentine before resurfacing, and the alkali meadows and sloughs connected to the Bay and ocean — is likely "waters of the United States" subject to Clean Water Act regulation. Saratoga Creek is regulated as a tributary, and the system as a whole has a continuous hydrological connection to a traditional navigable water; the alkali meadow and sloughs had (and could again have) hydrophytic vegetation, hydric soils, and wetland hydrology adjacent to the creek and Bay.

71. The evidence strongly implies that the Saratoga Creek system's continuous and consistent flow arises from a hydrothermal system which is at least as a "relatively permanent" water body. The specific point where the water comes back up from the hydrothermal system is part of the continuous flow path of the jurisdictional creek. *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007) - buried creek in culvert still "waters of the US." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001) - underground flow does not remove jurisdiction.




SFEI, *Historical Vegetation and Drainage Patterns of Western Santa Clara Valley,* (Historic 1800 v Modern 2007 Drainage) (Historical Conditions Circa 1850).

72. Multiple lines of evidence show the Saratoga Creek system still flows underground in and around its historic location — most compellingly, the multiple documented natural springs and "artesian features" on The Premise. (See Figure 1, created by Plaintiff). Saratoga Creek

originates in areas known for natural springs, serpentine, and hydrothermal systems (e.g., Congress Springs), and historic aerial photographs of the Premise consistently show a flowing creek.

73. USGS has mapped ninety-two springs across Santa Clara Valley, only seven on serpentine soils; these may provide "serpentine seeps" — critical habitat for alkaline-associated species such as *Mt. Hamilton thistle*. Serpentine seeps are a "Sensitive Land Cover Type," the "equivalent to sensitive natural communities as defined by the California Department of Fish and Game," and "a type of wetland" where "alteration of hydrologic regimes by adjacent land uses and development can… result in partial or complete loss of seep wetlands." (Santa Clara Valley Habitat Plan, Ch. 3, Pg. 8, Aug. 2012).

74. At The Premise, at least seven natural springs have been documented following penetrations into the ground — two at the Synertek site and five at the Santa Clara Square Apartments. Discovered by multiple environmental contractors and in some cases monitored for decades, the springs present data consistent with a single interconnected, flowing underground aquifer: the same deep, alkali water system, under unexpected pressure, in soils showing extensive evidence of serpentine.

75. At the Synertek site (3050 Coronado Dr.), Honeywell groundwater monitoring well MW-03B1 "*has historically been observed to be an artesian well based on water seen on the pavement around the well and the depth to water measured as the top of casing*." (Synertek GW, Jan. 28 2015). Dug around 1988 to monitor the B1 aquifer, the well admits water only from 100-105 feet below ground, yet for thirty years pressurized water has risen one hundred feet up the shaft and spilled onto the pavement: the depth to water fell from nineteen feet at installation to zero by 1995 and has remained there. (CH2MHill, Synertek, 2010). A second Honeywell B1 well, MW-20B, likewise taps a pressurized source: it admits water from 34-44 feet below surface, its depth to water reached zero by 2010, and its water is alkaline, with pH values above nine — exceeding 11 in 2012. (CH2MHill, Synertek, 2010).

76. Groundwater reports note "variations in vertical hydraulic gradient" and describe the pressurized flow at MW-03B1 and MW-20B as "localized hydraulic mounds." (CH2MHill, Synertek, 2010). Excavated soils from both wells were olive, olive-grey, dark green/grey, and "mottled rust" (Geotracker) — gradients and coloring further supporting that this aquifer and its springs belong to a serpentine hydrothermal system.

77. In 2015, the EIR for the Santa Clara Square Apartments identified a large, pressurized underground aquifer (an "artesian feature") flowing approximately 35 feet beneath the surface across a distance at least three blocks wide, with two springs (C6-3 & C5-2) flowing out of the ground. (SCSA EIR, Oct. 2015; Geotechnical Investigation, Santa Clara Square, 24 July 2015). Well C6-3 appears to be in Creekside Park at the southwest corner of the apartments, adjacent to The Chip Fab; Well C5-2 lies near Scott Blvd and Montgomery Drive, along the original Saratoga Creek bed, north of The Chip Fab. A 2015 boring hole approximately 15 feet deep south of Creekside Park was noted as "*very moist – boring may fill with water by tomorrow*." (Cal. EPA DTSC, Santa Clara Square Apartments, 2015).

78. The Geotechnical Report explained that four Cone Penetration Test wells were pressurized springs ("artesian features") confined by a 5-10 foot layer of "sand and gravel" and "silty to sandy clays" approximately thirty-five feet below surface; pressure measurements estimated natural flow would eject water 10 to 13 feet into the air. (Geotechnical Investigation, Santa Clara Square, 24 July 2015). Project reports also noted groundwater elevation at the Premise fluctuates with the surface flow of San Tomas Aquino Creek, indicating the underground Saratoga Creek aquifer and the channelized San Tomas Aquino Creek receive water from the same or similar southern sources. The EIR addressed this flowing aquifer — the deeper levels of the "filled" Saratoga Creek — by stating only that the creek was "filled" in 1968-1980 and that "*if excavations are not made into the sand and gravel layer approximately thirty-five feet bgs… the artesian condition should not affect the project.*" (Id. at 16).

79. That the Creek's surface was filled while the aquifer continues to flow underground as a pressurized "artesian feature" is evidence the Creek was unlawfully filled, and that negligent attempts were made to relocate and channelize a water of the United States without USACE guidance — precisely the work for which consultation with the U.S. Army Corps of Engineers is legally required.




**FIGURE 1: MAP OF HISTORIC SARATOGA CREEK FLOW & CURRENT NATURAL SPRINGS / ARTESIAN ACQUIFERS (AMG).**

## D. Synertek Superfund Site

80. Mr. Jenab also owns the adjacent property at 3050 Coronado Drive — the center of the Synertek CERCLA Superfund site. (RWQCB SL721241222; EPA No. CAD0990832735). The Synertek Site was listed on the CERCLA National Priority List in September 1989 due to solvent pollution and VOCs in onsite and offsite groundwater originating from leaks in that chip facility's solvent and neutralization tanks. (DTSC No. 60001754). On June 28, 1991, U.S. EPA issued a Record of Decision (ROD) naming Honeywell (which acquired Synertek) as primary Responsible Party; the primary contaminants of concern are trichloroethene and dichloroethene. This federally managed, long-term clean-up stems from less than ten years of semiconductor manufacturing, 1974 to 1984. (DTSC No. 60001754).

81. The ROD must now be amended after groundwater extraction and treatment failed to sufficiently remediate the pollution. (SEMS RM No. 100029800, 2022). EPA also requested amendment of the Deed/ROD and/or a Land Use Covenant to address vapor intrusion risk. (EPA, June 3 2021). The groundwater plume extends and migrates under The Chip Fab and the high-density apartments — yet over roughly the last seven years, most or all of the groundwater wells capable of identifying contamination flowing under the apartments were removed or retired, leaving no means of monitoring pollution flowing downgradient beneath thousands of homes. (SEMS RM No. 100029800, 2022).

82. The Sept. 2022 EPA/USACE Five-Year Report noted a restrictive land use covenant has been in place since 1991 and that RWQCB and EPA approved updated deed language incorporating current California legal requirements. Mr. Jenab "reviewed proposed language for the updated deed restriction and responded in May 2021," refusing "to sign the deed restriction because the proposed changes were too extensive" and claiming he is "*under no obligation to sign it*" — even though the Responsible Party, Honeywell, had agreed to the protective terms. Honeywell "*requested redline edits to the draft deed language*" from Mr. Jenab to clarify his concerns; he never responded. (SEMS RM No. 100029800, 2022; RWQCB 43S0124).

83. CERCLA vapor intrusion testing at Mr. Jenab's 3050 Coronado Drive property in 2014 found elevated TCE in indoor air (9.1 $\mu g/m^3$, versus the 7 $\mu g/m^3$ commercial urgent action level). (RWQCB, SYN-IA4, 6/27/14). A building adjacent to The Chip Fab and Superfund site hosts a "Family Prayer House" with weekend services of up to ninety people, including small children and infants; EPA and RWQCB noted they "*would like to have a sampling location added to the room identified as a nursery*." These are the requests and requirements Mr. Jenab is resisting.

## VI. The Premise & Operations

84. The violations, nuisance, endangerment, and harm for which Plaintiff seeks relief arise from the property and operations at 3250 Scott Blvd in Santa Clara, California (the "Property," APN 216-29-117). The existing building was constructed around 1973 and used for semiconductor manufacturing by GE, Intersil, Harris Corp., and Synergy Semiconductor; it was expanded several times and appears to have been vacant from around 2000 through 2013.

85. The facility is a Large Quantity Generator (EPA ID CAR000278176), generating more than 1,000 kilograms of hazardous waste per calendar month; EPA has determined its

hazardous waste codes include D001, D002, D003, D004, D011, D035, F003, and F005. Annual hazardous waste generation totals approximately 98.4 million pounds, including approximately 96.7 million pounds per year of corrosive waste discharged through the facility's Acid Waste Neutralization system into the public sewer. Apple is a categorical industrial user under 40 CFR Part 469.

86. The City of San José POTW's October 21, 2025 inspection — the most recent comprehensive regulatory characterization of the site — describes Apple's operations as '*wafer preparation, lithography, layering, doping, polishing, grinding, testing, and bonding*' of semiconductor devices on gallium arsenide, gallium nitride, sapphire, and silicon substrates, operating 24/7 with continuous wastewater discharge. (SJ POTW Inspection Report, Oct. 21 2025.)

87. Apple's 30(b)(6) designee testified that parties other than Apple 'hold responsibilities related to environmental health and safety at that facility,' identifying 'the landlord' — including structural responsibility for the building and responsibility for hazardous materials or waste. (Exhibit F: Schmidt Depo. 49:15-21, 51:24-52:11.).

## E. In 2014, The City Approves a Heavy Industrial Chip Fab in a Light Industrial Zone, also Earmarked for Future Residential Housing.

88. The Property has been zoned "Light Industrial" since at least 2008. (S.C.C. 2010-2035 General Plan). Light Industrial zoning is intended for "manufacturing, warehousing (including data centers), and wholesale establishments" (S.C.C.C. 18.16.010(B)(3)), and the Property was designated for "Low Intensity Office/R&D" land use — "research, and the design, development and testing of electrical, electronic, magnetic, optical and mechanical components in advance of product manufacturing," which "may allow for minor manufacturing." (S.C.C. 2010-2035 General Plan; SCCC. 18.160.180). The City's 2010 General Plan — adopted after an EIR and a CEQA-like process of hearings and reviews — expressly designated the Premise (including The Chip Fab, The Property Owner's other properties, and the future Santa Clara Square Apartments site) as an area the City planned to convert to residential zoning while phasing out or relocating industrial use.

89. The future apartments site fell within the "Central Expressway Focus Area," a "future focus area" scheduled for consideration in Phase III, beginning no earlier than 2023, and

only after numerous conditions were met. (GP 5.4.7). The General Plan instructed that the Premise "*requires additional planning*," with "*careful planning of each area*" as "*essential to ensure…an appropriate interface with surrounding development*" and a "*prerequisite for development*," because it represented a change from industrial to high-density residential use. (GP 5.4.7). Each "Future Focus Area" requires a "*comprehensive plan prior to any rezoning*" (G1, P1) and implementation of compatibility measures to reduce conflicts with surrounding non-residential uses (G3, P7); until those requirements are met, the City is to "discourage any new development that would preclude the implementation of the residential neighborhoods identified" — including where Santa Clara Square was developed. (P5).

90. On Feb. 18 2014, Irvine Company, LLC applied to rezone and develop Santa Clara Square with 1.2 million square feet of office space and 125,000 square feet of retail.

91. In 2014, The Property Owners owned 3250 Scott Blvd., where construction was underway: major demolition, structural retrofits, seismic upgrades, replacement of waste lines, and new underground sanitary sewer plumbing. (BLD 2014-36384). The building permits and renovation documents expressly used chip fab terminology, including "*clean rooms*" and "burn-in rooms." (BLD2014-36767). A 2014 planning application was filed for 3250 Scott Blvd., but there was no public hearing or environmental review. (PLN2014-10675). By contrast, for the neighboring project, notices were posted and mailed on May 29 2014 to properties within five hundred feet, with a Planning Commission hearing May 28 2014 and City Council hearing June 10 2014. (Santa Clara Res. No. 14-8149, pg1-2; 14-8180).

92. Meeting notes among The Property Owners, Apple, and the City Fire Dept./HazMat team on August 11 2014 recorded that "*no residential use was proposed*" nearby, so "*no off-site consequences studies*" were assumed; warned that one area of The Chip Fab might require "*explosion control*"; stated the "*air permit will be thru BAAQMD*"; and noted Apple and The Property Owners needed to discuss "CalARP" with the fire department. (Aug. 2014_095 AA, pg1-2).

93. In 2014-2015, when Apple leased this property and at least two others, news coverage reported "*sources familiar with the transactions*" stating "*Apple insisted*" the lease details

"*be kept private and confidential.*"[19] On Sept. 30 2014, an application was filed for demolition of existing systems at the Facility and "installation of new system"; around Nov. 2014, a permit application for "interior/exterior improvements" listed a facility headcount of "1,252 people."

94. A 2014 sewer capacity evaluation for 3250 Scott Blvd suggested flow "would enter the City's sanitary sewer system at manhole S73-33 on Scott Blvd and drain northward" — without explaining how outflow would travel to S73-33, a significant distance west of the property — and modeled a "*surcharge of about 9 inches*" for the 12-inch Scott Blvd line with The Chip Fab's discharge flow. (Dec. 12 2014, RMC Technical Memo, Sanitary Sewer Capacity Evaluation for the Aria Project). On Dec. 10 2014, an NPDES MCR C3 Stormwater Management plan was drafted for The Property Owners and Apple — two bio-retention areas in back, a self-treating area in front, and control measures including draining wash and covered dumpster areas to the sewer, labeling storm drains, protecting outdoor material storage, and installing covers and drains in loading docks and maintenance bays. The plan named Mr. Jenab as responsible for operation and maintenance of stormwater management at the Chip Fab.

### F. In 2015, The City Approved Development of Thousands of Apartments Directly Across the Street from a Chip Fab.

95. On Jan. 21 2015, the Irvine Company filed a zoning application for what would become the Santa Clara Square Apartments — directly across the street from 3250 Scott Blvd. Before SCSA, the nearest residential area was 0.75 miles away. (PC Staff Report, 12/9/15, pg6). On March 23 2015, the City posted Notice for the "Santa Clara Square-Residential/Mixed Use" project: nine apartment complexes with 2,200 rental units, 40,000 gsf of retail, 4,500 gsf of leasing space, and ~38,000 gsf of amenity space. (SCH Number 2015032075). A biological field survey was conducted March 16, 2015. (SCSA Biological Assessment, 2015).

96. In May 2015, the City Manager and City Council approved city resources for a "service load increase" at 3250 Scott Blvd, including replacing the padmounted oil switch with a vacuum switch, pulling 310 feet of 1100 AL tri 15kV cable, and installing 12kV metering at the customer's switchgear. (May 12 2015, Estimate: $93,866.39, City Council Mtg; Est. No. 33670). Between January and May 2015, the Irvine Company held "focused meetings with nearby property

19 Mercury News, *Apple signs two big Santa Clara leases in fresh expansion,* July 23 2015.

owners and tenants" (Planning Commission Staff Report, 12/9/15 PG10) — meetings that would have included Apple and The Property Owners and put them on notice that dense residential apartments were about to be built next to a chip fab.

97. In July 2015, permits indicate the Chip Fab installed public safety radio coverage (FIR15-00335); in Sept. 2015, a fire alarm system, five new fire hydrants, post-indicator valves, a riser, and a backflow preventer (FIR15-00145). Earlier in 2015, the City Building department cited The Chip Fab for numerous issues, and on Sept. 2 2015 sent a warning letter to the "property owner" demanding corrective action by Sept. 10 2015 — directing that all unpermitted work cease, that permits be obtained before starting work, and that inspections occur before work is completed — and issuing a "*stop work*" order for Phases III-IV of construction until the facility came into compliance.

98. On Sept. 8 2015, Apple filed a Fire Department application for The Chip Fab's "Risk Management Plan" (RMP) — legally required for facilities with the potential for catastrophic releases of toxic gases or extremely dangerous substances. The tracking permit was not completed or closed until Dec. 19 2022. (FIR2015-00985).

99. In 2015, Apple registered the facility as a Large Quantity Generator for Hazardous Chemical Management, Chemical Storage, Hazardous Waste Treatment, and an aboveground storage tank (CAR000278176), and Defendants filed and obtained permits for hundreds of chip fab tool installations and fit-ups. In Sept. 2015, the Chip Fab installed an "Acid Waste Neutralization" system under RCRA's "Permit by Rule" regulations; records obtained by U.S. EPA show the system was designed in December 2014 and built in January 2015. (Oct. 2022, TRC Assessment). In Nov. 2015, Apple and The Property Owners installed a 7,500-gallon hydrogen (H2) tank on the exterior gas pad (FIR15-00387) and a 1,700-gallon diesel tank for the emergency generator (FIR15-00456).

100. On Oct. 5 2015, the Irvine Company's Draft EIR for "Santa Clara Square-Residential/Mixed Use" was noticed; the Final EIR was noticed Dec. 4 2015 (PC Staff Report, 12/9/15), and on Nov. 10 2015 California EPA's DTSC approved the EIR's "Hazards and Hazardous Materials Section." (FEIR LA-2). Both EIR documents listed nearby industrial facilities and development projects — but 3250 Scott Blvd is not mentioned anywhere in the 503-page Draft EIR (Oct. 2015) or the 616-page Final EIR (Dec. 2015). The preparer, Impact Sciences, states on

its own blog that "*the EIR was completed on a highly expedited schedule*."[20]

101. The Oct. 2015 EIR claimed only one CalARP-regulated industrial facility existed within 2,600 feet of the apartments: Applied Materials, 1,000 feet away at Bowers and Scott — not 3250 Scott Blvd, directly adjacent to the residential site. The facility list came directly from the Santa Clara Fire Department via the Department's own search, reported by email.[21] The Fire Department then insisted on ARS spill modeling (instead of WCRS) for potential ammonia and chlorine releases, concluding the gases would travel no further than 500 feet and would not impact the apartments. (BASELINE 2015; SCSA Draft EIR, 4.6-23-24, Oct. 2015). Among other deficiencies, even a small chlorine gas spill can require a 4,700-foot downwind protection zone. (CAMEO, ERG).

102. The EIR's "Hazards and Hazardous Materials" section makes clear that the City, The Irvine Company, The Property Owners, and Apple all understood the apartments were fundamentally incompatible with an adjacent chip fab, and that legal teams addressed the issue — the section's footnotes are dense with strained legal citations offered to justify positions of indifference. It also offered false assurances: because best-case spill modeling for the selected Applied Materials scenario did not extend past 500 feet, the EIR asserted that "an accidental release of hazardous materials from…. any other commercial/industrial facility within 0.5 mile of the project would not be expected to endanger the health and/or safety of future residents on the project site," and cited Applied Materials' 150-member Emergency Response Team, coordination with the Fire Department, and Fire Department inspections. (SCSA Draft EIR, 4.6-25, Oct. 2015; BASELINE 2015). Modeling a single best-case ammonia spill cannot substitute for consideration of different substances, situations, and exposure vectors.

103. 3250 Scott and Apple registered for CalARP in 2015. The EIR acknowledged that, "according to the Fire Department, as of September 2015 two existing facilities within 0.5 mile of the project site have submitted applications under the CalARP program," are "modifying their existing operations," and "will be subject to the CalARP." The next passage is provided verbatim due to its self-incriminating language and framing:

---

20 https://impactsciences.com/project/santa-clara-square-residential-mixed-use-project/
21 FN4: "Santa Clara Fire Department, 2015. Email communication between Jack Lin from the Fire Prevention and Hazardous Materials Division of the Santa Clara Fire Department and Patrick Sutton from BASELINE. 29 July."

> "It is anticipated that these applications or other applications in the future will continue lawful industrial activities in proximity to the project. This could increase the hazard risk of existing and future sensitive receptors in the vicinity of these facilities, including the project site receptors. This represents a potentially significant impact. The City's Fire Marshal has indicated that this impact can be substantially lessened with improved hazardous materials and mobile response capabilities. Mitigation Measure HAZ-3 would be implemented, which requires the project to make a fair share contribution to the City of Santa Clara towards the acquisition cost of an emergency vehicle with hazardous materials response capabilities…. These projects would also be required to comply with local, state, and federal hazardous materials laws which are designed to avoid and minimize adverse impacts on public health, safety, and the environment. Additionally, the City of Santa Clara Fire Marshall would oversee potential storage of hazardous materials. Each cumulative project has been or will be subject to environmental review and if significant impacts are identified, mitigation measures would be implemented to avoid or reduce the impacts."

(Santa Clara Square, Draft EIR, 4.6-25-26, 28-29, Oct. 2015).

104. The City's promises that the Fire Department would conduct inspections, ensure compliance with environmental laws, and require environmental review are not only obligations the City failed to perform — the City now argues they are discretionary duties for which it cannot be held liable, whether its failures were negligent or intentional. Apple's own 30(b)(6) designee testified that the CUPA — confirmed as the Santa Clara City Fire Department — is 'a California-assigned entity' with 'the responsibility to check and confirm compliance' and to 'ensure the space is safe.' (Exhibit F: Schmidt Depo. 49:23-50:19, 58:10.).

105. City metrics indicate most deployments of the new hazmat response vehicle were responses to alarms, spills, leaks, and injuries at The Chip Fab. The Fire Department had no such vehicle before The Irvine Company helped purchase one — implying the City approved this high-risk facility with no existing emergency response capability. The City also acknowledged the apartments' design would not permit "fire truck access" in an emergency (Santa Clara Res. No. 15.8272 p. 7), yet approved it.

106. On Dec. 4 2015, notices of the final public hearing were posted and mailed to property owners within five hundred feet of the apartments. On Dec. 9 2015, the Planning Commission "clarified with staff that the General Plan Land Use designation for the site changes in the third phase of the General Plan; however, to comply with the current General Plan phase, an amendment is necessary to bring the project into compliance with the General Plan"; noted the "[f]ully purchased new fire truck for the Fire Department"; and "encouraged the applicant to proceed with construction as expeditiously as possible in contrast to utilizing the full-term length

of the agreement."

107. Around Nov. 19 2015, Apple "began to discharge into the sanitary sewer under IWWDP SC-461B." (Apple letter to ESD, Linda Knudsen, 5/11/2016). In 2015, Apple also installed a "Heavy Metals Rinse" (HMR) system under RCRA "Permit by Rule"; specifications obtained by U.S. EPA show it was designed around July 2013 and winter 2014. Apple's documentation stated "the system generally handles heavy metals (potentially toxic) waste liquids generated from laboratory activities" — a notable hedge, as heavy metals are inherently hazardous under RCRA. (Oct. 2022 TRC Assessment).

108. On Dec. 15 2015, the City Council held a public hearing on the rezoning. (Santa Clara Res. No. 15.8272, pg2). Notwithstanding the analysis buried in the EIR's Hazards section, the Planning Commission asserted that "the area surrounding the project site consists mainly of commercial and institutional uses[,] is fully developed…with areas undergoing…rejuvenation of buildings consistent with the City's General Plan," and that "[g]eneral light industrial uses and manufacturing exist south of Scott Boulevard." (Planning Commission Staff Report, 12/9/15, pg2, 6). The proposed density of 55 dwelling units per acre exceeded the 50 du/ac maximum under the High-Density Residential designation, but the City approved it, finding the increased density "is compatible with planned uses on neighboring properties and consistent with other applicable General Plan principles" and "would not result in an incompatible land use or a built environment on site that would preclude the continued operation of the surrounding land uses." (Id. at 7).

109. The City Council passed the rezoning resolution on four findings: the development "complements and is supportive of the surrounding uses" (¶ 3A); it would "protect and improve the…stability of the area" and "conserve property values" (¶ 3B); it would allow "imaginative…concepts… in the development standards associated with building heights" (¶ 3C); and existing zoning is "inappropriate or inequitable" because the City "currently does not have a zoning district consistent with the proposed… designations" (¶ 3D). (Santa Clara Res. No. 15.8272, 3-4).

110. Eleven pages of Conditions of Approval ("CoA") were attached to Santa Clara Res. No. 15.8272. The first condition requires the developer to "defend and indemnify and hold [the city] free and harmless from and against any and all claims, losses, damages, attorney's fees, injuries, costs, and liabilities arising from any suit for damages or for equitable or injunctive relief

which is filed by a third party against the City by reason of its approval of developer's project." (Ex. CoA, #G1, pg1). The conditions also require Storm Water and Urban Runoff Management Plans, BAAQMD air permits (P-1, 4-5, 8-9), and storm drains (E-7, 9-10; ST10, 12).

111. The Final 2015 EIR noted unexpected findings of benzene and vinyl chloride in the shallow topsoil (less than one inch deep) on the apartments property. The finding was dismissed as an anomaly — despite the property sitting directly across the street from the Property and its hazardous waste treatment systems, and the absence of any alternative modern contamination source in the area.

112. In Dec. 2015, the City approved the rezoning — 1,800 apartment units, 40,000 $ft^2$ of retail, 4,500 $ft^2$ of leasing, 38,000 $ft^2$ of amenity space, seven parking garages, three public parks, and additional open space — directly adjacent to an ultrahazardous chip fab. (Santa Clara Res. No. 15.8272, 1-2).

## G. The City Should Have Shut-Down Industrial Operations at the Chip Fab in 2016.

113. On Jan. 13, 2016, the City and The Irvine Company signed a Development Agreement for Santa Clara Square. In Jan.-March 2016, the facility installed "toxic gas monitoring and leak detection," a "dry-chem fire suppression system" in a "new chemical bunker," and a "digital alarm communications transmitter." (FIR15-00311; FIR15-00301; FIR16-00870). On Jan. 22 2016, California EPA DTSC approved the Santa Clara Square development as a Brownfield restoration, including clean-up of contamination from the Synertek Superfund site owned by Mr. Jenab and/or The Property Owners.

114. On March 14 2016, City building inspectors reported they could not complete inspections because there were still no approved plans for the property. On March 29 2016, one inspector noted: "*finding existing permit for plumbing and mechanical IF one exists. If not issued, obtain required permits and reconcile all plumbing and mechanical inspections performed to date with building inspection manager.*" (BLD2015-38456).

115. On April 16 2016, Apple's wastewater testing laboratory emailed Apple's hazardous waste contractor, Advanced Chemical Transport, regarding The Chip Fab's "*issues with the city*," proposing that Torrent be given direct access to the Chip Fab under an NDA with Apple; that regulatory testing be labeled as for "ACT on behalf of Apple" rather than naming Apple; or that

the Chip Fab address be used "*without ever referring Apple's name… that way we have remained in the spirit of confidentiality while still providing enough information to the inspector to conclude the results are tied to Apple.*" Apple — a regulated party — sought to conceal its name from regulators and avoid any written connection to potential evidence of its environmental violations, and its contractors devised means to assist.

116. Beginning April 15 2016, a process identified as "R&D labs, discharge through AWN" regularly tested positive through 2016 for particulate and floc, with low levels of ammonia and no monitoring or flow measurements on weekends or holidays. Apple was cited for wastewater discharge violations in March-May 2016; its June 6 2016 response stated that as a remedy "Apple reviewed plans with the City to ensure accurate understanding of the requirements for the submittal."

117. In July 2016, The Property Owners and Apple filed a Planning application requesting architecture review and expansion of the equipment yard, with a zoning amendment. (Oct. 20 2016, PLN2016-12290). On Aug. 24 2016, the Fire Department inspected the Property and found Apple failed "to have a business plan readily available to personnel of the business or the unified program facility with responsibilities for emergency response or training. HSC 6.95 25505(c)"; failed to inspect its fire sprinkler systems quarterly or maintain records on site; and needed to "add the diversion tank to the [Acid Waste Neutralization] on CERS as tank 5."

118. On Sept. 21 2016, the San Jose Wastewater Facility wrote to Apple that its permit was "*amended to add the requirements for the Categorical Electrical and Electronic Components – Semiconductor effluent guidelines under 40 CFR Subpart A due to reclassification of your facility processes from Research and Development to Categorical. This Permit is more stringent than your current Permit and is effective 30 days after the Date of Issue.*" (cc City of Santa Clara Env. Compliance Officer, Mike Vasquez) (Amended Wastewater Discharge Permit SC-461-B).

119. On November 8 2016, Apple, through an EKI geologist, submitted an RCRA Hazardous Waste Generator Permit-by-Rule application to the California EPA. Despite sitting atop the Synertek Superfund plume with a documented history of onsite releases, the application claimed no indication of hazardous chemical or waste disposal "in, on, or under the property" — while acknowledging that groundwater wells on the property showed contamination and that there was a history of liquid/sludge "surface impoundments, collection ponds, and/or lagoons." (DTSC

1151 11/8/16). On Nov. 22 2016, DTSC approved the Tiered Permit/Permit-by-Rule, noting it would conduct an onsite inspection to verify the application — but DTSC later confirmed no inspection ever occurred.

120. On Nov. 29 2016, the City building department sent Apple and The Property Owners a final warning to "*correct the code violation*" described in CRN2015, stating "*there have been no passing inspections since 8/15/2016*" and warning of enforcement "*without further notice*." (CRN2015-01196, BLDG-2015-39182). Around Dec. 8 2016, Apple entered a Consent Agreement with the California EPA over hazardous waste violations at its Cupertino and Sunnyvale facilities — binding on all Apple facilities and operations in California that used, stored, or disposed of hazardous waste, for at least five years.

121. By 2016, the Chip Fab had installed exterior aboveground storage tanks holding hazardous gases, waste, and other materials, including a sulfuric acid (H2SO4) tank, a sodium hydroxide (NaOH) tank (FIR2015-01118), and a liquid oxygen (LOX) tank adjacent to the west service yard (BLD16-44685). In 2016, Apple was cited for spilling cooling water into storm drains, fire code and California ASPA violations, health and safety code violations, and failure to monitor wastewater discharge.

### H. Ongoing Violations and injuries, ignores Complaints, & Apple's Media Misdirection Campaign.

122. The facility installed a "Solvent Waste System" in mid-2017. Apple filed a permit with the City (FIR2016-01097), but no Defendant reported the system under RCRA or any other environmental law. Records note the "solvent waste lift station, collection cabinet and associated ancillary piping were constructed in 2015. The solvent tank was constructed in June 2017, and installation of the tank and ancillary piping was completed in 2018." (Oct. 2022 TRC Assessment). The Assessment itself confirms the tank is governed by RCRA: 22 CCR 66265.192 requires owners of a new hazardous waste tank system (subject to 22 CCR 67450.2 "Permit by Rule") to ensure the system is adequately designed and constructed and to keep on file a written integrity assessment certified by an independent, qualified professional engineer registered in California. Despite requesting and receiving that RCRA assessment, Defendants never reported the storage and treatment system. Specifications obtained by U.S. EPA further show the system was designed for

Apple in December 2014 with pressure tests in Sept. 2015 — despite Apple's later claim that it did not use the system until 2017. The Assessment also omitted the tank's exhaust system — a critical violation noted in the U.S. EPA RCRA inspection report, as the Chip Fab was exhausting hazardous solvent waste emissions directly into the ambient air of The Premise.

123. City monitoring records show that in Feb. 2017 Apple was discharging wastewater into the public sewers containing "purple flakes," with formal testing samples lacking calibration stickers, chain-of-custody records, or signatures. Aug. 31 2017 wastewater results showed 6.7 µg/L ETBE; 29 µg/L 1-1, Dichloropropene; 24 µg/L trichloroethene (TCE); 0.321 mg/L copper; and 0.07 mg/L zinc — signed by an Apple Senior Manager on Sept. 14 2017.

124. The SJ-SC RWF permit applications ask which toxic substances and EPA priority pollutants are used at a facility, which drives required testing and certifications. Chloroethylene is listed (covering TCE, PCE, and VC), but Apple apparently did not select it — and thus never had to test for its presence or certify its use and disposal. Similarly, Apple certified toluene and benzene only once or twice despite regular use and emissions.

125. Apple's 2017-2018 wastewater results showed consistently elevated biochemical oxygen demand (BOD), ranging 280-340 mg/L from Nov. 2017 to Feb. 2018 — well above the 200 mg/L threshold considered "very high" for industrial wastewater. High-BOD discharge depletes dissolved oxygen in receiving waters, harming or killing aquatic life, and can overwhelm a municipal treatment plant into inefficient treatment or complete process failure. In March 2019, the SJ-SC RWF "Watershed Protection Division" issued a laboratory report for a 48-hour survival test finding Apple's "effluent sample is toxic to *Ceriodaphnia dubia* (water flea) at 100% concentration," urging that the "results should be confirmed by a Certified Testing Laboratory using approved EPA procedures." (Report LE44403, March 12-14 2019, Biologist & Lab Supervisor, 3/26/19). No follow-up appears to have occurred.

126. In 2018, Apple filed a permit to "rezone gas audible/visual devices into four zones, so only the area involved in an alarm is evacuated when a gas detector alarms" (FIR18-01235) — indicating both that toxic gas alarms activated regularly and that Apple planned not to evacuate the entire building even upon release of a lethal gas.

127. In 2018, press coverage referred to the Chip Fab as a "secret" manufacturing facility "located on an otherwise unremarkable street in Santa Clara… and near a few other unmarked

Apple offices."[22] By then the Santa Clara Square Apartments were built out, in final construction phases, with banners and advertisements visible from the street. The articles gave no street address, described the facility as developing MicroLED screens, and framed the work as light development — with no acknowledgment of ultrahazardous chip fab activities.

128. Apple is known for a public relations tactic — its "*Reality Distortion Field*" — of exerting influence over media and government to establish Apple's preferred narrative as accepted understanding, contrary to facts, including through targeted "leaks" to friendly reporters. One such reporter, Mark Gurman of Bloomberg, wrote the 2018 article, visited Santa Clara, and photographed the building. The only plausible explanation for Apple "leaking" information about a "secret" facility, permitting photographs it forbids others from taking, and approving employee quotes when it ordinarily terminates employees for speaking to reporters, is that Apple sought to establish a public narrative that it was merely developing "displays" in an "unremarkable" industrial area — with no mention of the adjacent high-density apartments, public parks, or playgrounds.

129. The articles also recast Apple's negligent construction, operations, and continual violations, reporting that it "*took several months to get the… plant operational*,"[23] that Apple "*almost killed the project*" in 2017, and that work "*ramped up around 2018… but the project languished due to high costs and technical challenges*."[24] After the EPA inspected the Chip Fab in 2023, Apple arranged for the same reporter and other friendly outlets to publish further articles framing the operations as display assembly rather than chip fabrication, characterizing Apple's RCRA violations as mere mislabeling rather than the exhausting of toxic solvent vapors toward apartment windows, and disparaging Plaintiff, including by implying her claims lack merit. Apple executed this strategy with the specific intent of misleading the public about The Chip Fab. Apple's intentional concealment and misrepresentation of its ultrahazardous activities is a factor in why the Chip Fab creates an unreasonable risk to the public and why punitive measures are warranted.

130. In July 2018-June 2019, Apple's wastewater test results reported that the water

[22] Bloomberg, *Apple is Secretly Developing its Own Screens for the First Time,* March 18 2018.
[23] TIME, *Apple Is Using a Secret Facility to Do Something It's Never Done Before*, March 19 2018.
[24] Bloomberg, *Apple to Begin Making In-House Screens in 2024 in Shift Away From Samsung,* Jan. 11 2023.

Apple discharged into public sewers beside the apartments was "light grey" with "particulate/floc," and contained arsenic and elevated BOD.

131. In April 2019, Apple's own retained auditor, BSI EHS Services and Solutions, marked seventeen findings '*Not Compliant*' in the facility's Risk Management Program audit — including that no employees had completed required emergency response training four years into operation; that the standard operating procedures for arsine and chlorine lacked emergency procedures; that Management of Change training had not been delivered; and that the Construction Contractor Safety Program was not implemented and contractor training on covered processes was nonexistent. (BSI RMP Audit, April 2019.)

132. On Sunday, June 1 2019, a toxic gas alarm was triggered by silane and phosphine gases. Apple stated it was "purging their lines" but had not placed the system in test mode, and characterized the release as routine operations. No notice was given to the public, and no report was filed with the county, state, or federal governments. (City Incident No. 2019-1904285). On Monday, October 21 2019, a toxic gas alarm was triggered by phosphine gas; responders "upon arrival found the affected portion of the building evacuated," and Apple stated "the gas cabinet would remain shut down and that it would be serviced by the appropriate technician." Again: no public notice, and no report to any government. (S.C.F.D. Incident No. 2019-1908541).

133. Around July-August 2019, a Santa Clara Square resident complained the water in her apartment was frequently colored blue; her bathtub sample showed high conductivity (525.1 umhos), high grains per gallon (12.31), a high sodium absorption ratio (7.05), elevated nickel (0.03 ppm), and very high copper (4.55 PPM) and lead (0.024 PPM). She lived on the fifth floor of Building 2 (3315 Montgomery Drive), directly across from the Chip Fab — where the plumbing would be "pulling" drinking water while likely defective backflow and cross-connection plumbing at the Chip Fab may have been contaminating the drinking water lines with Chip Fab discharge.

134. In Aug. 2019, the City took two samples from Building 2, found elevated copper and lead (though not exceeding federal limits), and investigated no further. (Work Order 2019-08-08-021). Around April 2021, Plaintiff and another chemical exposure victim shared details of their injuries with the City Mayor and the head of the Water/Sewer Department, Gary Welling; the City ignored them. The drinking water at the Premise comes from City-owned groundwater wells and utility lines, giving the City an incentive to disregard both the blue water complaint and Plaintiff's

chemical exposure complaints.

135. Around Sept. 2019, Apple's discharge monitoring reported light grey water with particulate and BOD of 440 mg/L, discharged into public sewers sharing lines with thousands of apartments, with improper or inadequate cross-connection controls. The City knew this and took no action.

136. On Friday, July 17 2020, an alarm activated due to a Tetraethyl Orthosilicate (TEOS) leak; "An engineer was working on tool, and the plumbing had been installed backward." (City Incident No. 2020-2005200). On August 17 2020, a toxic gas alarm activated; Apple attributed it to a "power outage… [that] caused a shutdown and subsequent activation of all the toxic gas alarms" — revealing that the toxic gas alarms did not function during power outages and could not detect releases during those periods. (City Incident Report 2020-2006068).

137. Around Sept. 2 2020, Plaintiff realized she was being exposed to dangerous chemicals in her home — without knowing the source or substances — after finding elevated VOC levels on her indoor air monitors that correlated with her worst medical symptoms. Most notably, a major VOC spike occurred at 3 AM the night before, contemporaneous with one of her "dying spells," in which she would wake feeling she was suffocating, with symptoms of heart failure. A week later she had another spell, recorded VOC spikes, and had blood and urine tested the next day — indicating exposure to arsine gas (a lethal gaseous form of arsenic) within hours of the test, around 3 AM. Her heart monitors showed her blood pressure and heart rate had plummeted.

138. In Sept. 2020, Plaintiff noticed an Apple facility at 3250 Scott Blvd, near her apartment and atop the Synertek Superfund groundwater plume. Her best hypothesis for a source had been the Synertek contamination on Mr. Jenab's other property; she sent emails and filed complaints requesting help from the U.S. EPA, Cal. EPA, BAAQMD, and the City. In 2021, Apple conducted a floor penetration survey at 3250 Scott Boulevard as part of a vapor intrusion program; penetrations were identified and repairs were made. (Exhibit F: Schmidt Depo. 102:23-103:7.) The facility sits directly atop the Synertek Superfund groundwater plume, and slab penetrations are recognized vapor-intrusion pathways — yet no Defendant disclosed the survey, findings, or the underlying risk to adjacent residents.

139. Gjovik raised the facility with Apple on at least September 8, 9, 10, and 13, 2020; Apple EH&S and Plaintiff had at least two phone calls, and the responding executive oversaw the

Real Estate/EH&S teams involved in activities at the Property. Apple's EH&S Director suggested Plaintiff use a special paid disaster leave — "*extreme condition leave*" — to move out of her apartment. Apple knew it was responsible for Plaintiff's severe chemical injuries no later than Sept. 2020. Apple's Director of EH&S — who personally took Plaintiff's 2020 call — testified she '*knew that we had operations at that building*' at the time (Schmidt Depo. 206:22-25), yet Apple's 30(b)(6) designee claimed that prior to Plaintiff's termination Apple never '*look[ed] into 3250 Scott operations being a potential cause*' of the Plaintiff (or her neighbors or coworkers) 2020 injuries: '*No. It was not at all, and it was never brought up that way.*' (Id. 230:18-22; see also 246:15-21.).

140. On Oct. 26 2020, the City completed an "Evaluation for WPS Pretreatment Program Slug Discharge Prevention Plan" for the Chip Fab's NPDES permit, deeming it "low risk" with "no further action required." The City and/or Apple claimed the facility was "inspected by EPA staff" and that EPA saw no need for a Slug Plan — but per the U.S. EPA, it did not know of the site until 2023, and California EPA confirmed it conducted no inspections and had no contact with the owners or operators after 2016. (The City may have been referring to its own Fire Department CUPA inspections while describing itself as "EPA.") The same review claimed there were "no chemicals stored on site greater than 5 gallons, or if they are all are stored and used inside secondary containment," "generally good housekeeping," and "knowledgeable and trained" staff — concluding "no risk mitigation needed": no spill plans, no inventory, no plan of sewer inlets or system operations, no structural controls, no process logs, and no employee training or procedures. (NPDES permit no. SC461B).

141. The City's Oct. 26 2020 inspection was coded HWLQG/Routine (email to Luca Maestri and Tom Huynh at Apple); its Dec. 23 2020 inspection was recorded as Permit by Rule/Not Routine, HW-LGQ/Routine, HMRRP/Not Routine, and ASPA/Not Routine. In 2020, the City cited Apple for fire code violations, maintaining two EPA ID numbers, inaccurate hazardous materials inventory data, absent spill plans and training, no business permit, missing supervisor signatures, and — again — failure to properly monitor wastewater discharge. The City reported six total violations at the Property to CERS, all dated Oct. 13 2020 — five under the Aboveground Petroleum Storage Act and one under Hazardous Materials Release Response Plans. No RCRA violations were reported to CERS or the U.S. EPA. (CERS 385316 / 10633816).

142. In Oct. 2020, Plaintiff asked her manager at Apple Legal for an introduction to

anyone practicing environmental law and was introduced to Apple's EH&S counsel. In video meetings on Nov. 2 and Nov. 6 2020, Plaintiff described her 2020 experience and what she had learned about remediation sites. The attorney acknowledged Apple had no EH&S counsel before her, that she was still catching up, and that Apple needed to conduct inspections and testing it had not performed, which she was attempting to initiate.

143. Apple did not replace the carbon/charcoal in its exhaust system for over five years; the first replacement occurred Dec. 14 2020 — after Plaintiff notified Apple EH&S and environmental legal of her exposure near the Property.

144. The City's Dec. 23 2020 inspection notified Apple of violations including: two EPA IDs requiring deactivation of one; an unreadable plot plan omitting FTU-01 and FTU-02; incorrect inventory (1,700 gallons of diesel omitted, argon reported in pounds, zero chlorine reported); failure to submit an annual tank facility statement (last submitted 5/18/18); failure to train oil-handling personnel on discharge prevention, protocols, applicable law, facility operations, and the SPCC Plan; inspection and test records unsigned by supervisor or inspector (40 CFR 112.7(e)); an SPCC plan lacking adequate training descriptions and annual discharge prevention briefings; and failure to prepare a Spill Prevention, Control, and Countermeasures plan at all (40 CFR 112.3).

145. At least two RCRA violations were recorded and reported, with an email notification from the City to Apple — but the notification contained no information about the violations, and they were omitted from the City's list of inspection violations. (Dec. 23 2020 email to Luca Maestri and Tom Huynh at Apple). Had the City reported Apple's unauthorized hazardous waste tank, Apple would have been in violation of its consent agreement with the State of California, and those violations would have prevented Apple from terminating the permanent injunction. The Order ending the consent agreement was signed December 22 2020 and docketed January 14 2021. (*The People of California v. Apple Inc*, 16-cv-303579, Superior Court of California, Santa Clara County).

146. In Nov. 2020, the City renewed Apple's NPDES wastewater permit for an average discharge of ~41,352 gallons per day. The permit stated the City "intends but is not obligated to do semiannual monitoring of pH and TTO" and "semiannual arsenic, chromium, copper, nickel, pH, silver, zinc" — with no other regular monitoring — and noted "federal limits are concentration based or discharge prohibited in 40 CFR 403.5," implying the City expected Apple to self-monitor

and govern itself.

147. In Feb. 2020, Apple's wastewater monitoring under its NPDES permit with the City included arsenic (11 μg/L, 13 μg/L), barium (7.5, 7.9 μg/L), copper (10 μg/L), vanadium (1.2 μg/L), molybdenum (1.1 μg/L), zinc (30 μg/L), acetone (640 μg/L), di-n-butyl phthalate, 2-4,Dichlorophenol, and additional trichloroethene (TCE). Apple's records also continued to document — and submit to the City — that no one is onsite to monitor or inspect the hazardous waste or industrial systems on weekends.

148. On Friday, April 30 2021, a toxic gas alarm activated due to another phosphine leak. The City noted "the ventilation system was increased to exhaust the gas out of the facility as fast as possible," advised Apple's EHS staff to contact CAL OES, and itself "contacted CAL OES to obtain an incident number 21-2288." The Fire Department used the codename "ARIA" in its own report and "Responsible Party" in the CalOES report — never Apple's name in either. Apple never reported the leak to California OES or any other government agency. (City Incident Report 2021-2103124).

149. Around 2021, TCE began spiking in groundwater samples collected directly downgradient from Apple's facility; NPDES sampling in 2017 had already shown TCE in Apple's discharge (24 μg/L). Yet Apple's inventories, manifests, and chemical reporting never included TCE — implying Apple was covertly using TCE and disposing of it into the sewer. TCE is a synthetic chemical that does not occur naturally in the environment; as a toxic, persistent, volatile, chlorinated hydrocarbon and carcinogen, it is strictly regulated and is a hazardous substance under federal law, 42 U.S.C. § 9601(14), and state law, Cal. Health & Safety Code § 25281(h).

150. On June 30 2021, Apple, through Susan Creighton ("Global Research EHS Manager"), filed Apple's only TRI report ever for the facility, reporting that in 2020 it disposed of 260.17 pounds of NMP through "Stack or Point Air Emissions" as "gaseous" waste using an "absorber" with expected efficiency > 50% but ≤ 95%; treated 2,342 pounds of NMP onsite; and transported an additional 14,743 pounds for offsite treatment. (95051NTRSL3250S doc. Cont. No. 1320219310885).

151. Apple's 30(b)(6) designee later testified Apple stopped TRI reporting after 2021 because it '*correctly categorized the building as an R and D facility and not as a manufacturing site*' — while admitting the site fabricates chip '*subparts*' and '*components*.' (Exhibit F: Schmidt Depo.

207:9-22, 231:9-16, 232:1-2.) The recharacterization conflicts with the facility's 2016 regulatory reclassification to Categorical Semiconductor status and Apple's own 2023 air permit application describing a 'Semiconductor Fab' facility.

152. On Monday, April 18 2022, toxic gas alarms activated after "an employee accidentally turned on the bottle for 5% gas fluorine while it was in the cabinet"; the cabinet sensor read 4.38 PPM, the system "evacuated it to the atmosphere as designed," and staff re-entered in "*Tyvek suits and wearing SCBA… [to] ensure the chemical bottle was fully closed.*" (City Incident No. 2022-2203209). On Sunday, May 29 2022, toxic gas alarms activated due to a Hexafluorobutadiene leak — "*a known respiratory and fire hazard*" per the City. (City Incident No. 2022-2204500). For both: no public notice, and no report filed with any county, state, or federal authority.

### I. Investigations Begin But The Violations And Incidents Continue.

153. On January 13 2023, a toxic gas or fire alarm at the Chip Fab was "cancelled while still enroute." (Incident Report 2023-2300384). On May 12 2023, the toxic gas alarm activated again; Apple said the alarm spiked but quickly returned to normal, "*stated this would not happen if there was a gas release… There was a power outage that appeared to cause the alarm… The Facilities Manager stated they would have their alarm system checked.*" (Incident Report 2023-2304092). Eight years into operations, the toxic gas alarms still could not function through power outages.

154. On February 21 2023, Plaintiff discovered the semiconductor fabrication activities at 3250 Scott. Plaintiff posted on Twitter in real-time as she learned about it, expressing severe distress.

> "APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING and APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF and THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." @ashleygjovik (February 21 2023 11:29 PM).

155. Until that day, Plaintiff did not know that Apple was responsible for her severe 2020 illness, nor that the chemicals she was exposed to were potentially lethal — she had described the

experience as "thinking she was dying" without realizing she could have died.[25]

156. About five weeks later, Apple filed planning and building permit applications for "installation of new screen wall and mechanical yard area for the installation of a new VOC abetment system. New solvent exhaust fans will be installed on the roof to support the new VOC abatement system." (PLN23-000163; BLD23-68895). The March 31 2023 building permit application remains open, with corrections needed, more than two years later.

157. Plaintiff filed her first formal complaint about the Chip Fab in June 2023, demanding investigation and enforcement and documenting her evidence with exhibits. The EPA confirmed in June 2023 it would investigate, met with her, and conducted its first site inspection in Aug. 2023. Apple's May-Aug. 2023 wastewater monitoring reported "light grey" or "dark grey" color with "particulate/floc" and ammonia (218 mg/L, 149 µg/L). On Aug. 10 2023, the City noted a "high gas alarm" at the Chip Fab due to chlorine gas, without elaboration. (Incident No. 2023-2306933).



U.S. EPA photo 4a dated 8/17/23.



U.S. EPA photo 13a dated 1/16/2024.

158. U.S. EPA's Aug. 17 2023 Compliance Evaluation Inspection cited Apple for RCRA violations including 40 CFR 262.11 (generators must determine whether solid waste is hazardous waste), 270.1(c) (RCRA permits required for hazardous waste storage, treatment, and disposal), 262.17(a)(5)(i)-(ii) (hazardous waste container labeling), and 262.17(a)(1)(iv) (containers must be

[25] Ashley Gjovik, *I thought I was dying: My apartment was built on toxic waste,* SF Bay View, March 26 2021, https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

kept closed during accumulation and not handled in a manner that may cause rupture or leaks). (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).

159. U.S. EPA's January 16 2024 Focused Compliance Inspection found additional violations, including failure to make accurate hazardous waste determinations (262.11); failure to mark containers with accumulation start dates (262.17(a)(5)(i)(C)); failure to mark or label tanks with hazard indications consistent with DOT (49 CFR part 172 subparts E-F), OSHA HazCom (29 CFR 1910.1200), or NFPA 704 requirements (262.17(a)(5)(ii)(B)); failure to inspect monitoring and leak detection data each operating day (265.195(a)); and failure to prepare manifests for hazardous waste transported offsite (262.20(a)(1)). (Id.).



U.S. EPA photo 6a dated 8/17/23.




Photos from Apple's SWT (2022).

160. Across three federal RCRA inspections in August 2023 and January 2024, the U.S. EPA found at least nineteen unique violations of RCRA, with over one hundred unique occurrences — including accumulated piles of toxic waste. EPA also discovered Apple was operating an unpermitted 1,700-gallon hazardous waste storage and treatment system venting solvent exhaust into the atmosphere: "the tank was marked with the words, 'Hazardous Waste,' and used for the accumulation of spent solvent waste. At the time of the inspection, the solvents were being managed as California Only Waste." (EPA Rep. Attachment A, page 6). Apple's 30(b)(6) designee and Director of EH&S, Elizabeth Schmidt, admitted under oath that Apple was cited by the government for regulatory violations at the facility: '*We recently just had EPA and BAAQMD*

*violations that were settled.*' (Exhibit F: Schmidt Depo. 208:1-6, May 14 2026.).[26]

161. The U.S. EPA directed Apple to notify the BAAQMD of the tank (2024 EPA Inspection Report), and on September 13 2023 Apple applied for a permit, with Tom Huynh writing that Apple "is requesting an authority to construct and permit to operate for a 1,700-gallon solvent waste tank (S-NEW)… a horizontal aboveground tank receiving waste solvent and water from solvent spray benches and wet benches from S-1 (Semiconductor Fab Research and Development Facility)… We appreciate BAAQMD's ongoing support." (Apple Plant #22839, Ref. 0664430). Apple did not disclose it had been operating this tank since 2017. The tank specifications attached at page 29 were reviewed and signed by Apple's contractors on October 18 2016, and contractor records show fabrication and pressure testing occurred before the claimed operational date.

162. Under oath, Apple's 30(b)(6) designee minimized these violations, characterizing the unpermitted hazardous waste tank as containing '*95 percent water and up to 5 percent isopropyl alcohol, what you have mostly in, like, your hand sanitizer*,' and describing the nineteen RCRA violations as '*some violations around labeling*' that were '*all corrected*.' (Exhibit F: Schmidt Depo. 208:12-18, 209:4-9.) Apple's own permit application described the same unit as a '1,700-gallon solvent waste tank' receiving 'waste solvent' from a 'Semiconductor Fab Research and Development Facility,' and the EPA photographed it marked 'Hazardous Waste.'

163. In August 2023, the U.S. EPA found the tank venting solvent exhaust to the roof through a 55-gallon container of "Activated Carbon" for abatement — "the container was not labeled or identified in Apple's air permit or their RCRA tank assessment." EPA photographed "three vents connected to Apple's 55-gallon container filled with 'Activated Carbon'. The two vents on the left are emergency vents for the double-walled tank. The vent on the right is the main vent." (U.S. EPA, Attach. A, page 8, photograph 7b). Notably, the exhaust vent is extremely narrow and pointed downward, away from the air flow at roof level. The exhaust system was not referenced in Apple's October 2022 system assessment; Apple claimed it was included in its BAAQMD permit, but EPA noted it was never mentioned in that application. (US EPA CEI pg13-14).

164. Based on these timelines and inconsistencies, Apple obtained the new activated

[26] *Q: "[H]as Apple ever been cited by the government for regulatory violations at this facility?" A: "Yes." Q: "What regulatory violations and what agencies?" A: "We recently just had EPA and BAAQMD violations that were settled."* (Schmidt Depo. 208:1-6.)

charcoal abatement system after learning Plaintiff had discovered Defendants' activities at the Property, rushed to install it before the U.S. EPA inspection, and in its haste connected the wrong vent pipes — venting through the curved-down backup pipe as primary exhaust. When EPA questioned Defendants, they elected to present the issue as negligence rather than an intentional cover-up.



*U.S. EPA photo 7b dated 8/17/23.*

165. EPA's inspection also found violations of RCRA air emission standards, including failure to calibrate leak detection monitoring instruments before each day's use per Reference Method 21 (Subpart BB, 265.1063(b)(3)) and failure to determine and annually update average volatile organic concentrations for waste streams entering tanks, surface impoundments, or containers (Subpart CC, 265.1083(c)(1); 265.1084(a)). EPA further cited 270.1(c): RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" during a unit's active life, with post-closure permits addressing 40 CFR part 264 groundwater monitoring, unsaturated zone monitoring, corrective action, and post-closure care. (U.S. EPA April 2024 Inspection Report; U.S. ECHO page for 3250 Scott Blvd).

166. On Aug. 30 2023, a City incident report — withheld from Plaintiff for years and released only weeks ago — documented an Apple employee injured by hydrogen fluoride gas exposure. HF is an extremely dangerous substance that can cause death on contact. A 29-year-old man was exposed to 2 mL of HF for 15 minutes, rinsed in an emergency shower for 10 minutes, treated with two tubes of calcium gluconate "antidote," and transported by ambulance to VMC as

the "county tox hospital." Apple filed a "corporate incident report" and requested information from the Fire Department; the Fire Department requested nothing from Apple. (City Incident No. 2023-2307611).

167. Apple's Sept.-Nov. 2023 wastewater monitoring reported "light grey" and "dark grey" samples with "particulate/floc," containing ammonia (160 µg/L), arsenic, copper, chromium, and zinc.

168. On Nov. 3 2023, a gas leak was documented at Apple's office at 3260 Scott Blvd (also owned by The Property Owners). the utility company requested an encroachment for repairs and the City warned them to "use extreme caution." (EP23-0492). The City did not repair this gas leak — outside the Chip Fab and adjacent to the apartment complex — until around April 11 2024, six months after it was identified; a follow-up scheduled for April 2025 remains marked incomplete.

169. On Dec. 8 2023, a toxic gas alarm activated; the Fire Department used Knox box keys to enter and observed building sensors showing "a GD089 area sensor that spiked for a few seconds at .65 ppm for chlorine… above the alarm level… The spike[] settled back to zero after a few seconds," which facility engineers attributed to sensor error. (City Incident Report 2023-2310880). On Feb. 22 2024, the City reported responding "code 3 for a report of a male feeling dizzy" at The Chip Fab; the patient was assessed, provided ALS care, "advised of the risks and signed AMA." (Incident No. 2024-2401745). On May 30 2024, the City Fire Department responded to an emergency at the Chip Fab where an employee "exposed to HCL gas… was outside for fresh air decon"; the employee refused hospital transport, signing a form acknowledging "that the condition they have may get worse and that by refusing transport could result in a more serious condition including death." (City Incident 2024-2404731).

170. The Santa Clara County Toxic Gas Ordinance (SCCO Chapter B11), enacted in 1985 in direct response to the Bhopal disaster to regulate exactly this category of facility, requires permits for toxic gas systems. The permitting regime has no records for this facility: in response to Plaintiff's Public Records Act request, the Fire Department responded that it '*was unable to locate records under the 'Toxic Gas System (i.e., SCCO B11-380)' designation."*

171. In March 2024, per an Apple-dedicated technology reporter, Apple purportedly "ceased" operations at The Chip Fab, laid off employees, and claimed to be "winding down" the

project due to cost and complexity.[27] Apple has never stated or indicated this in regulatory or legal filings, or when asked directly about operations at the facility — and it has been asked repeatedly. Recent coverage has also recharacterized the facility as a QA testing location and the operations as "screen manufacturing." On May 14 2026, Apple's 30(b)(6) designee confirmed under oath that Apple is still using the facility at 3250 Scott Boulevard. (Exhibit F: Schmidt Depo. 64:14-16.).

172. Apple's 2024 wastewater monitoring regularly noted "particulate/floc," elevated BOD, and ammonia — up to 185 mg/L in April 2024 — with arsenic and copper in Nov. 2024; the June 25 2024 sample was colored "yellow."

173. Plaintiff filed a complaint with the BAAQMD in July 2024, resulting in at least six violation notices to date, including Rule 2-1-301, failure to obtain an "Authority to Construct" (August 29 and September 12 2024); Rule 2-1-302, failure to obtain a "Permit to Operate" (August 29 and September 12 2024); and Rule 9-7-307, exceeding the "Final Emission Limits" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO).

174. BAAQMD's own May 2024 Engineering Evaluation states the S-3 Solvent Waste Tank '*has been unpermitted since 7/15/2017*' with piping vented '*directly to the atmosphere*.' Four months after issuing the May 2024 permit, BAAQMD cited Apple for *additional* unpermitted sources beyond the S-3 tank (Violations A64215A/B under Reg. 2-1-301; A64216A/B under Reg. 2-1-302). At every regulatory engagement, BAAQMD has discovered emission sources Apple was operating without authorization that Apple had not affirmatively disclosed.

175. Apple's sworn annual submissions to BAAQMD document order-of-magnitude reporting variance. Apple's January 2023 submission reported 0.0147 lb of arsine, 0.1344 lb of phosphine, 0.0091 lb of boron trichloride, and 0.0007 lb of silane for the year — while the same document reported 12,722 therms of natural gas burned across five Thermal Processing Units, the abatement infrastructure required by Permit Condition 26031 to operate at 1,400°F, which does not run unless process gas exists to abate. Apple's next submission, filed February 21, 2024 — after EPA's August 2023 and January 2024 inspections — reported 154 lb of arsine, 280.8 lb of phosphine, and 10.4 lb of boron trichloride. Apple's reporting before EPA intervention bore no consistent relationship to what Apple subsequently certified."

[27] Bloomberg, *Apple Scraps Plan to Design Display for Watch In-House, Cuts Jobs,* March 22 2024.

176. On Dec. 18 2024, the NLRB filed a Complaint against Apple alleging, among other federal labor law violations, that Apple "directed employees to refrain from talking about workplace environmental health and safety concerns with other employees," including by "threaten[ing] employees with discipline…," told employees to apply a "five-point balancing test in advance of communicating workplace health and safety concerns to other employees," and told "employees to first communicate their workplace health and safety concerns directly with [Apple]" before speaking with coworkers or the government. (*Apple Inc & Ashley Gjovik*, 32-CA-282142, 32-CA-283161).

177. Around Jan. 2025, Bloomberg reported Apple still has a team at the "secretive facility," now "developing microLED displays intended for AR glasses"; Mark Gurman reported "the facility is in Santa Clara, 15 minutes away from Apple's headquarters in Cupertino. The team there was originally also building the microLED displays for future Apple Watch models…. but that idea was canceled last year, with many of the engineers laid off."[28]

178. On February 12, 2025, Apple's EHS Lead certified under penalty of law that for the twelve-month period ending December 31, 2024, the facility used arsine at 143.5 lb against its 78 lb/yr permit cap (84% over), phosphine at 317.9 lb against its 198 lb/yr cap (61% over), and boron trichloride at 9.24 lb against its 1 lb/yr cap (824% over). (2024 Annual Throughput Certification; Permit Condition 26031 ¶ 1d.) Each is a documented exceedance of an emission limitation on the operator's own sworn certification.

179. On March 25 2025, Apple's own defense counsel in that NLRB case was nominated to become General Counsel of the NLRB.[29] The NLRB then cancelled the hearing for Plaintiff's retaliation case. On April 4 2025, the NLRB, Plaintiff, and Apple entered a trilateral national settlement agreement regarding Apple's unlawful work policies and secrecy rules. (*Apple Inc & Ashley Gjovik*, 32-CA-284428). After Ms. Carey was confirmed as NLRB General Counsel, in Sept. 2025 the NLRB abruptly dismissed its own retaliation complaint against Apple for terminating Plaintiff — a termination effected under the same policies Apple had agreed to withdraw — in an explanation of no more than four sentences. The agency thereby disparaged its

[28] Bloomberg, Apple Remains a Threat in AR, Even as Meta and Google Race Ahead, Jan. 26 2025.
[29] Sludge, *Trump NLRB Pick Has History of Crushing Unions,* June 2 2025.

own witness and undermined its own settlement agreement.

180. In May-Aug. 2025, wastewater monitoring regularly reported ammonia up to 185 mg/L (May 2025). As of Sept. 2025, the Chip Fab had discharged 145,296,660 gallons of effluent. Apple's 2025 wastewater filings to the City omit influent amounts, last meter calibration dates, and equipment observations; half the filings are missing sample results; and effluent amounts are inconsistent, with no temporal duration. In Jan. 2025, the City assigned the Chip Fab a new inspector with less than a year of experience in the field.

181. Around June 10 2025, the City cited Apple for fire code violations at the Chip Fab, including that "it is unclear what the emergency power off button serves in FACP room" (Cal. Fire Code 703.1); storage obstructing an exit door egress (CFC 1003.6); "MOCVD bunker - relocate 'danger' sign from exit door"; failure to provide five-year certification for the fire sprinkler/standpipe system (0064); failure to test fire alarms annually or maintain records on site (0078); and no annual test reports for the toxic gas alarms (0082). (Santa Clara, Permit FOP 25-10526; Inspection Report 1675, Routine Inspection - 20381037).

182. The facility's pretreatment system has never been comprehensively inspected. The 2015 inspections were pre-operational; at the October 26, 2020 inspection, the inspector's report records: '*Was the Inspector allowed to enter the facility? No*'; and at the October 21, 2025 inspection — the most recent — '*Due to time limitations, the bulk chemical waste storage bunkers were not inspected.*' At least nine major system components have never been independently verified by an outside regulator, and the operator's permit applications have been documented as materially inaccurate at three of five POTW inspections. The October 2025 inspection also confirms storm drains located immediately adjacent to the hazardous waste storage bunkers.

183. The last reported government environmental inspections of The Chip Fab occurred on January 15 2026, conducted by the City as CUPA, reported to CERS months later, and disclosed to Plaintiff via Public Records Act request. The "Hazardous Waste Generator" inspection found a 5-gallon bucket in Bay 1118 "labeled as reclaim filters… observed without a hazardous waste label," confirmed to be waste, in violation of 22 CCR 66262.16(b)(4)(A) and 66262.17(a)(5)(A) (CERS Id. 385316) — but not reported as a RCRA violation or to the U.S. EPA (per the U.S. EPA ECHO website). The same day's "Aboveground Petroleum Storage Act" inspection found failures to keep signed inspection/test records, written procedures, and comparison records for bulk storage

containers, violating California law (19 CCR 1601, 1611(a)(6); HSC 25270.4.5(a)) and Section 311 of the federal Clean Water Act (40 CFR 112.7(a)(1), 112.7(e), 112.8(c)(6)) — also not reported to the U.S. EPA.[30]

184. In spring 2026, Plaintiff personally observed and documented visibly polluted conditions in San Tomas Aquino Creek immediately downstream of the facility's stormwater outfall during dry-weather flow — froth, sheen, discoloration, and trash — on April 11, April 18, and May 1, 2026, and conducted field measurements documenting anomalously alkaline pH (8.9–9.5), elevated total dissolved solids, alkalinity above 240 ppm, and total chlorine in the 3–20 ppm range. Plaintiff also located and photographed an active outlet of the historic Saratoga Creek system just north of Scott Boulevard beneath Highway 101, with visible flowing water during dry-weather conditions — confirming the buried creek system remains a flowing water. These observations are offered as percipient observations warranting formal sampling, which no agency has conducted.

# VII. The Modern Premise & Surrounding Environment

185. The apartments contain 1,840 dwelling units with an expected residential population exceeding 4,880 people. (Santa Clara Square, Air Quality Assessment, pg12, Sept. 30 2015; PLN2017-12688). "The Premise" includes the vertical and horizontal extent of the chemical releases, pollution, and contamination emanating from the Chip Fab, including locations where contamination has come to be located or threatens to become located — generally a radius of roughly 1,000 feet around the Chip Fab. The Premise has been impacted by contamination at and emanating from the Chip Fab, as well as from other historic semiconductor operations at the Property and at the adjacent 3050 Coronado Blvd, a.k.a. the Synertek Superfund site ("Synertek Site," CAD990832735).

186. Today, the Premise and adjacent properties within ~1,000 feet of the Property and its Operations include: the Santa Clara Square Apartments (homes, playgrounds, fitness trails, swimming pools, BBQs) and Clubhouse (3405 Montgomery Dr); Saratoga and San Tomas Aquino Creeks and the San Tomas Aquino Creek/Saratoga Creek Trail; Meadow Park (3355 Octavius Dr) and Creekside Park (3225 Scott Blvd); Carbon Health Urgent & Primary Care (2712 Augustine Dr

[30] US EPA, Enforcement and Compliance History Online, 3250 Scott Boulevard, Santa Clara, CA 95054; https://echo.epa.gov/detailed-facility-report?fid=110001168254

#120); a Whole Foods grocery store (2732 Augustine Dr Ste 1600); Grace Adult Day Health Care (3010 Olcott St); Bay Area Driving Academy (3080 Olcott St C 150); the University of California, Santa Cruz Silicon Valley Extension (3175 Bowers Ave); Silicon Valley Christian Assembly church (3131 Bowers Ave); and more than a dozen restaurants, cafés, and personal-service businesses on Augustine Dr and Coronado Pl, including Opa! Authentic Greek, Woof Gang Bakery & Grooming, Gong Cha, Commons East Café, Sweetgreen, Barebottle Brewing Company, OrangeTwist spa, Sonder Living, Bafang Dumpling, Lee's Sandwiches, Club Pilates, Starbucks, Charisma Nails & Waxing, Pacific Catch, Chipotle, Bishops Barbershop, and Jaks Authentic Indian.

187. Apple's Risk Management Plan discloses only three regulated substances to its CalARP regulator: anhydrous ammonia (3,700 lb), arsine (120 lb), and chlorine (400 lb). The chemicals actually present — confirmed across Apple's own Process Hazard Analysis, its BAAQMD permit, and POTW inspection records — also include phosphine, diborane, hydrogen bromide, hydrogen iodide, boron trichloride, fluorine, disilane, dichlorosilane, silicon tetrachloride, silane, trifluoromethane, hexafluorobutadiene, mercury, chromium, arsenic, lead, 49% hydrofluoric acid, and pyrophoric organometallic MOCVD precursors including trimethylaluminum (ignites violently in air), trimethylgallium, triethylgallium, trimethylindium, diethyl zinc (ignites in air or water), and phosphorus trichloride. The facility also stores 7,500 gallons of hydrogen on the exterior gas pad.

188. Apple's own RMP*Comp dispersion modeling places its arsine worst-case toxic endpoint at 1.1 miles — encompassing 5,343 residents in 1,787 housing units, an amusement park, a college, places of worship, the San Tomas Aquino Creek Trail, VTA Light Rail, and Highway 101 — while excluding the Santa Clara Square Apartments, the nearest residences, from the analysis entirely. The modeled ammonia worst case extends 0.3 miles (reaching the occupied apartments and the Whole Foods); the chlorine worst case extends 0.2 miles. (Apple RMP submissions to SCFD.)

189. Published U.S. DOT Emergency Response Guidebook protective-action distances for the substances onsite meet or exceed the distance from the facility to the occupied residences across the lot line: approximately 528 feet for a small arsine release (arsine is odorless at lethal concentrations, causes intravascular hemolysis with delayed multi-organ failure, and has no antidote); 528 feet for a small chlorine release and more than four miles for a large one; and 3,168

feet for hydrogen fluoride. As a matter of physical measurement, the surrounding residential population sits inside the protective-action envelope for a credible release.

190. The Chip Fab is an illegal nonconformity: "an illegally created …structure, or use that was illegally constructed, created, installed, or initiated without proper permits or approvals, and which does not comply with the provisions of [the] Zoning Code." (SCCC 18.160.140). "No provision of [the City's] Zoning Code shall validate or legalize any land use, structure, or subdivision constructed, created, established, or maintained in violation of the City's Zoning Code." (SCCC 18.02.04).

191. The City and County maintain a "Heavy Industrial" zoning designation intended, conditionally, for activities like semiconductor manufacturing — "heavy manufacturing and other facilities that use and store noxious and hazardous materials." (S.C.C.C. 18.16.010(B)(4)). Heavy Industrial zoning covers "manufacturing" and "fabrication" "that produces odors… hazardous waste materials, or particulates that may negatively affect other uses on the same site or neighboring properties," requires a Conditional Use Permit, and must "be located so as to minimize adverse effects on adjoining areas." (SCCC 18.160.090, 18.16.020, Table 2-13; S.C.D.F.C. 12.2; S.C.C. 2010-2035 General Plan; SCCZO §§ 2.40.010, 2.10.040; Heavy Industrial Only Table 2.40-1).

192. While Plaintiff lived at the apartments, she spent time at Meadow Park and Redwood Trail Park. Redwood Trail is a "park easement" The Irvine Company granted to the City for "constructing, installing, maintaining, repairing, replacing, operating, supervising, policing, and public use of parkland and park improvements." (Parklands Easement Grant, Jan. 2019). The apartments include 4.39 acres of public parks — Meadow/Core Park, Creekside Park, and the Redwood Trail Easement and Creek Trail Connection — with a children's playground, restroom building, picnic areas, benches, bike racks, pathways, trail walkways, and fitness stations. (Planning Commission Staff Report, 12/9/15 PG10).

193. The Premise is known to provide direct or adjacent habitat for the federally protected Bay Checkerspot Butterfly (threatened — *Euphydryas editha bayensis*), California Red-Legged Frog (endangered — *Rana draytonii*), and California Tiger Salamander (endangered & threatened — *Ambystoma californiense*). (SCVWD, Stream Maintenance Program Manual, Ch. 2, 2027-2036). Saratoga and San Tomas Aquino Creeks provide direct and adjacent habitat (i.e., the Slough and Bay) for federally protected, threatened fish species including Chinook Salmon

(*Oncorhynchus tshawytscha*), Green Sturgeon (*Acipenser medirostris*), and Central California Coast Steelhead (*Oncorhynchus mykiss*). (SCVWD, Stream Maintenance Program Manual, Ch. 3, Att. C, 2027-2036).

194. Irvine Company deeded Meadow Park to Santa Clara "*for use as a community or neighborhood public park*" but retained an "Environmental Monitoring" easement for itself and CalEPA ("maintenance, monitoring, and other actions required by the California Department of Toxic Substances Control"). (§ 2). The Park was granted "as is," without representation or warranty as to conditions or suitability, with Irvine Company declaring it "*shall have… no duty to warn*" Santa Clara or "*any other person of latent or patent defects, conditions or risks*." (§ 3.3).




Above: "Meadow Park," Landezine International Landscape Award (SCSA, 2022).




Above: View of the apartments and Meadow Park to the right, and with the Property behind the apartments and to the left, in a deep smog haze; (Google Streetview, January 2023).

195. The deed requires that the City "shall at all times, to the fullest extent required by law, comply with the provisions of any DTSC Land Use Covenant recorded against the Park" (§ 3.4(a)(iii)) (Dedication Grant Deed: Santa Clara Square-Meadow Park, Feb. 2020), and the parks' conditions require "all features and amenities in the private open spaces and public parkland must be in substantial compliance with Federal, State, & Local regulations, as well as Park Standards." (Santa Clara Res. No. 15.8272 CoA pg11). In the Park Maintenance Agreement, Irvine Company disclaims indemnifying the City to the extent liability arises from the City's active negligence or willful misconduct (though the obligation to defend is not similarly limited) (§ 8(a)), and the parties agreed that venue for park-related suits includes the United States District Court, Northern District of California, San Jose. (§ 14H) (Park Maintenance Agreement, April 9, 2019).

196. Apple's September 2020 Process Hazard Analysis (PHA) Revalidation, prepared by Apple's retained consultant and signed under penalty, identifies specific failure modes for the facility's chemicals and assigns to each consequence column the phrase '*personnel exposure resulting in injury and/or fatality (site personnel or neighbors).*' The phrase appears across at least eleven distinct hazard nodes — toxic gas leak (arsine, phosphine), fire, explosion, hostile act/sabotage, truck fire, and arsine, chlorine, and bulk ammonia fire/explosion/sabotage scenarios — at PHA nodes Q1, Q10, Q11, Q13–Q15, Q41–Q45, Q80–Q82, and Q92–Q93. (Apple PHA Revalidation, Sept. 2020.)

197. Apple withheld the PHA's Group 2 (pyrophoric MOCVD organometallic precursors), Group 4 (HPM tool abatement and facility exhaust), Group 5 (HPM liquid abatement), and Group 6 (wastewater system) hazard analysis tables from the version of the PHA it sent to the Santa Clara Fire Department — the regulator that, the PHA elsewhere acknowledges, had specifically requested coverage of the wastewater system. PHA action items remain open five years past their certified completion dates.

198. The PHA further admits that routine failure modes — fan failure, pump failure, water loss, pH adjustment failure, treatment chemical exhaustion, control failure, EMO activation, missed preventive maintenance, and power failure — produce '*Exceedance of emissions limits with potential permit violation*,' and identifies '*Storm drain contamination/release*' as a recognized consequence at the chemical receiving dock, during manual handling, and at tanker fill.

199. On September 25, 2025, Plaintiff offered all three Defendants a comprehensive

stipulated interim mitigation proposal — air-emission and sewer monitoring with automatic shutoff alarms, public warning signage, basic operator-identification signage, completion of unfiled hazardous-substance permits, independent professional-engineer assessments, and monthly compliance reporting — none requiring any admission of liability. All three Defendants refused every measure and offered no counter-proposal.

# VIII. Violations of Public Policy & Common Sense

## J. Community Member Injuries & Complaints

200. Plaintiff Ashley Gjovik was a resident of Santa Clara County, California, residing at the Santa Clara Square Apartments directly across the street from the Property — within the direct exposure pathway of uncontrolled emissions, pollution, and contamination from Apple's semiconductor manufacturing facility at 3250 Scott Blvd. Plaintiff has standing as a person who has been, and continues to be, injured by the ongoing violations described herein.

201. In February 2020, Plaintiff moved into a new apartment at Santa Clara Square and quickly became severely ill — suffering fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, abnormal skin and muscle sensations, bradycardia, volatile blood pressure, and frequent premature ventricular contractions. She visited the Emergency Room on February 13 2020 and Urgent Care on February 20 2020. From February through September 2020, she was screened for multiple severe and fatal diseases — including multiple sclerosis, brain tumors, fatal arrhythmias, and Neuromyelitis optica — by dozens of doctors, undergoing extensive blood draws, urine samples, injections, and scans, including multiple MRI and CT scans with contrast. She suffered rashes, burns, and hives; her hair fell out, and she kept a shaved head for a year while bald patches slowly regrew. She became too sick to work and went on disability.

202. While ill in 2020, Plaintiff would occasionally wake at 3 AM feeling as though she were dying, with symptoms of heart failure and asphyxia; heart monitoring showed arrhythmias, bradycardia, and low blood pressure. On September 2 2020, Plaintiff discovered elevated volatile organic compound levels in her home — and that a large VOC spike had occurred the night prior, around 3 AM, during one of her "dying" spells.

203. Multiple occupational and environmental exposure physicians told Plaintiff her symptoms were consistent with solvent and other chemical exposure. Once she understood her medical issues were a chemical emergency, she promptly filed complaints with the City, California

EPA DTSC, BAAQMD, and the U.S. EPA. Poison Control advised that her description was also consistent with benzene exposure. (Defendants reported they were exhausting benzene into the air.)

204. In September 2020, Plaintiff hired an industrial hygienist to evaluate her indoor air, purchasing an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Only half the total contaminants were accounted for; California EPA advised that 24-hour Summa™ canister testing was superior and would have yielded better results. Even so, her limited testing detected numerous chemicals in use by Apple at 3250 Scott, including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, and xylene. Plaintiff then installed additional air monitors, which validated her observations: VOCs spiked mostly in the early morning and late at night, consistent with exhaust from an automated mechanical system — which is what it was. She notified several Apple executives, including her managers, of her findings.

205. In September 2020, Plaintiff's blood and urine tests returned results showing industrial chemicals including arsenic, mercury, toluene, and xylenes. The symptoms of her 3 AM attacks — both her subjective reports and real-time heart monitoring — match phosphine and arsine gas exposure. Both gases are extremely dangerous, potentially fatal, and without antidotes; Apple keeps a significant quantity of arsine gas onsite. Tests taken the morning after a 3 AM attack revealed significant arsenic in her blood but not her urine — for which no plausible explanation exists other than exposure to arsine gas within hours before the test, overnight, in her bedroom. Arsine gas is used primarily in chip fabrication and as a chemical warfare agent.

206. In September 2020, Plaintiff notified Apple of the chemical exposure at her apartment and spoke with an Apple EH&S executive (having seen an Apple building nearby and believing Apple might have insight into the Synertek Superfund risk). She also notified the City Fire Department of her injuries and requested an investigation. On information and belief, by September 2020 at least Apple and the City knew the Property was responsible for Plaintiff's severe injuries.

207. In 2023, Plaintiff undertook months of research about 3250 Scott — consulting experts, meeting with agencies, and requesting public records. On June 23 2023, she filed complaints about 3250 Scott with the U.S. EPA, CalEPA, the City, and Santa Clara County: a 28-

page memorandum with dozens of exhibits, noting she might pursue a citizen suit if the U.S. EPA did not act. She also posted a public link on Twitter.

208. An RCRA Enforcement manager in EPA's Enforcement and Compliance division for Hazardous Waste and Chemicals confirmed receipt on June 20 2023; an inspector was assigned and a formal investigation initiated. Plaintiff spoke with the manager on June 21 2023 and met with EPA's RCRA Enforcement and Compliance team several times. The EPA inspected Apple's factory on August 17-18 2023 (a "*Compliance Evaluation Inspection*" — "*primarily an on-site evaluation of the compliance status of the site about all applicable RCRA Regulations and Permits*") and January 16 2024 (a "*Focused Compliance Inspection*"). EPA records confirm the inspections were initiated by Plaintiff's tip: '*This inspection is based on a tip and complaint received by Ashley Gjovik… [who] was potentially exposed to air emissions from this location.*' (Exhibit F: Schmidt Depo. 249:22-250:3, Ex. X-3.)

209. Per the formal report, EPA inspectors identified at least nineteen unique RCRA violations at 3250 Scott, including provisions carrying both civil and criminal enforcement. Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation; emitting fabrication exhaust through an unpermitted, unmonitored system; storing hazardous waste unlabeled and accumulated in corners — at times with container lids left off so they would not explode — and performing no waste inspections on weekends. EPA's Criminal Investigation Division also conducted a criminal inspection of the facility in 2023, coordinating with BAAQMD, based on '*a tip from a citizen… concerned about several potential Clean Air Act violations from an Apple facility*' (Ex. X-4); Apple's designee testified this criminal aspect '*was not communicated*' to Apple. (Exhibit F: Schmidt Depo. 251:7-252:14.).

210. When EPA's Criminal Investigation Division contacted BAAQMD in August 2024, BAAQMD '*did not have an inspection report from their most recent inspection in 2023 and only had an internal 'inspection summary' which they could not provide*' and '*expressed reservations about providing the most recent air permit*' to the federal criminal investigator. An EPA Region 9 enforcement employee wrote that this was the first parallel civil-criminal proceedings case of their career.

211. The U.S. EPA never confirmed it was investigating the CAA violations, despite Plaintiff's direct requests and the BAAQMD's finding of at least six air quality violations at the

site. Despite its comprehensive 2023-2024 inspections documenting extensive violations — including potential criminal violations — EPA has failed to open any investigation into violations of the CAA, CWA, EPCRA, or TSCA; has failed to commence an enforcement action for clear RCRA violations beyond an administrative Notice of Show Cause; and has failed to issue emergency orders to address imminent endangerment, including immediate installation of required emission controls.

212. Neither Defendants nor the U.S. and California EPAs have notified residents of their exposure. The U.S. EPA — the federal agency responsible for enforcing the CAA, RCRA, TSCA, CWA, and EPCRA — has actual knowledge of the violations described herein through its 2023-2025 investigation, yet the U.S. EPA and U.S. DOJ have taken no meaningful enforcement action, and most violations remain open.

213. Per U.S. EPA's report, the Santa Clara City Fire Department made an unexpected visit to Apple's factory the morning of the U.S. EPA's unannounced inspection — effectively putting Apple on notice and defeating EPA's ability to conduct the surprise inspection standard for hazardous waste enforcement. The City's Assistant Fire Marshall claimed he had scheduled inspections three weeks prior (pg3), but no record of them exists on CERS or in agency records, and the City has repeatedly refused to respond to Public Records Requests about this purportedly pre-planned inspection.

214. Plaintiff's personal toxic tort claims were dismissed by a U.S. Court as time-barred — the court finding that, based on the permits the City approved for Apple's Operations and Apple's single TRI filing, Plaintiff should have deduced that Defendants were operating an unregistered fab next to her home, attributed her 2020 injuries to Apple, and sued before 2023 — regardless of Apple's intentional concealment and its ongoing harassment and retaliation against her. (*Gjovik v. Apple,* 3:23-CV-04597-EMC, Northern District of California).

215. Apple's statute-of-limitations defense rested on the premise that chip fabs are *notoriously* dangerous — that any reasonable person would immediately connect severe chemical injuries to a nearby fab, so no tolling applies. Yet for siting and operations, and to avoid liability and regulation, Defendants maintain it is acceptable to operate a fab 300 feet from thousands of apartments — with no resident notification, no buffer zones, and no concern for children's playgrounds. These positions cannot coexist. If fabs are so notoriously dangerous that laypersons

should immediately identify them as the cause of chemical injuries, they should never be sited near homes, and community notification, buffer zones, emergency response plans, and real estate disclosures must be mandatory. If fabs are instead safe enough for residential areas, then it would not be reasonable to suspect a fab as an injury source, the discovery rule should apply, limitations should toll, and victims require expert analysis to connect cause and effect.

216. Most ultrahazardous activities have visible indicators — an oil derrick, a chemical plant with tanks and smokestacks, blasting operations — so the causal link is apparent and victims know whom to investigate. Here, the Chip Fab is an unmarked one-story building resembling office space, with no external indication of hazardous operations, no warning signage visible to the public, and no obvious chemical storage — while Apple's chosen reporters repeatedly claimed the company was merely developing LED screens. If someone secretly drilled for oil beneath an unmarked building and a neighbor fell ill, no court would hold that the neighbor "should have known" of the concealed operations.

217. Apple's counsel Melinda Riechert also made false statements to the Court: "*The agencies couldn't figure out [what Apple was doing at 3250 Scott] because there was no problem. Believe me, they would have come after Apple if there was a problem. It's [Gjovik] who's claiming there's a problem not the agencies.*" (Feb. 21 2025, page 13 at lines 17-21) (*Gjovik v. Apple,* 3:23-CV-04597-EMC, N.D. Cal.). At that time, the EPA and BAAQMD were pursuing formal enforcement actions against Apple over the Chip Fab. The EPA has since issued a press release regarding the enforcement action, crediting Plaintiff.

218. The U.S. EPA's 2024 RCRA CEI report and 2025 RCRA CAFO are incorporated herein as government reports and orders — judicially noticeable for their existence and as records of official agency action, and as evidence of admissions and denials made by Defendant — but not for the truth of statements made by Defendants (such as Apple's unverified claim that it has come into RCRA compliance). Apple's Director of EH&S, Elizabeth Schmidt, executed the consent agreement on Apple's behalf and confirmed her signature under oath. (Exhibit F: Schmidt Depo. 33:4-8, 209:20-23, Ex. V.) The U.S. EPA's official press release for the RCRA enforcement action is also incorporated herein. (Exhibit D: Government Agency Records).

219. The facility bears no public identification of its operator and no street-visible warning signs. The only hazard signage is an NFPA 704 fire diamond visible only from the parking

lot, displaying '4' — the highest rating on the NFPA scale — for Health ('deadly'), Flammability, and Reactivity, with the special-hazard quadrant marked W̶ (water-reactive).

220. On August 16, 2025, community and labor advocates held a press conference outside 3250 Scott Blvd regarding this suit; NBC Bay Area covered it on the nightly news. When advocates photographed the NFPA hazard placard from the parking lot, an unidentified individual emerged from the building, asserted the public was '*not allowed*' to photograph the building's hazard warning sign, claimed '*law enforcement*' authority, and — asked who she worked for — answered '*the 49ers*' before walking away. An accompanying Apple-badged employee did not identify the operator. The exchange was recorded and published, and was reported by Left Coast Right Watch, '*Strange Hecklers At Press Conference About Secret Apple Semiconductor Center*' (Aug. 18 2025).

221. In May 2026, Apple's Director of EH&S, testifying as its corporate designee, could not state when Apple leased the facility, how long Apple has operated it, the name of the adjacent Superfund site, its responsible party, or whether contaminated groundwater flows beneath the facility. (Exhibit F: Schmidt Depo. 51:10-18, 57:19-58:3, 63:18-23.) Apple's institutional ignorance of the most basic environmental facts about its own chip fab — voiced by the executive who signed its EPA consent agreement — reflects the indifference that produced the violations alleged herein.

### K. Santa Clara's Violations Related to the Santa Clara Appellate Court Zoning Order (1996-ongoing).

222. Around 1993, a chip fab on Scott Blvd (LSI Logic) sued the City of Santa Clara over the City's insistence on siting a school and church next to multiple chip fabs, including its plant. The business and its landlord litigated for over seven years, extensively documenting the ultrahazardous nature of chip fabrication, including its toxic gases. Santa Clara fought and lost: the California Court of Appeal reversed the City's siting and zoning decisions and required a complete and accurate EIR demonstrating those activities could safely coexist. The City had proposed a "toxic gas leak panic room" for the children and evacuation down Scott Blvd during a mass chlorine gas leak; the Court repeatedly threatened contempt if the City did not cease attempting to create a dangerous condition and refusing to comply with mandatory procedures. *LSI Logic Corporation v. City of Santa Clara and MCA*, No. H012427, Court of Appeal, Sixth District, California (1995).

223. After LSI Logic relocated, around 2004 the City determined it had sufficiently satisfied the court order to approve the school with 400 "pre-kindergarten through 8th grade" students under a "Conditional Use Permit approved by the Santa Clara City Council in 1994" — based on mitigations including "*an emergency preparedness plan and a shelter-in-place plan and warning system*" (Initial Study Dec 2015, p. 65, PLN2013-10185), even though those same shelter-in-place mitigations had been found insufficient and unlawfully negligent during the litigation.

224. Around 2015, the City approved another ninety students under an "Ongoing Special Permit" (Planning Commission, Aug. 21 2024, 24-1205), and in 2018 an application was filed "to amend the current Use Permit to allow for expansion of the existing pre-kindergarten through eighth grade school from 400 students up to 900 students," plus a multi-purpose room, youth lounge, medical consultation clinic, office, and meeting rooms. (PLN2018-13109; U.1970; CEQA2019-01070; Planning Commission, 24-1205, Aug. 21 2024).

225. The City never mentioned *LSI Logic v. Santa Clara*, but stated the expansion "would require an amended CUP that would incorporate restrictions on the uses of the site so as not to limit the allowable industrial land uses in the surrounding project area," and justified compliance on the ground that "while the number of children on-site would increase, the use of the site would be consistent with the existing operations which were determined to be compatible with the surrounding land uses." (Initial Study Dec 2015, p. 65, 11, PLN2013-10185). The MCA argued that although the request violates the modern zoning code, it should be approved under the "Classic Zoning Code," in which "schools and other similar uses were conditionally permitted in the Light Industrial (ML) zoning." (PLN2018-13109 CUP Res.). The City determined only a Mitigated Negative Declaration was needed, reporting that the March 14 2019 community meeting had "no attendance" and the 30-day public review of the Draft MND "did not receive public comments." (PLN2018-13109 CUP & MND Res.).

226. In August 2024, the Planning Commission approved the Conditional Use Permit increasing the school's capacity to nine hundred students (Planning Commission, Aug. 21 2024, 24-1205), and on Sept. 24 2024 — in violation of the *LSI Logic v. Santa Clara* injunction — the Mayor and City Council voted unanimously to approve it. (Consent Calendar, Sept. 24 2024, 24-17).

227. The MCA children's school is approximately 2,600 feet (0.79 km) from the Chip

Fab. Its Shelter-in-Place & Evacuation Plan directs that, in a chemical spill near the school, staff and 900 children evacuate to and assemble at "Meadow Park" — directly across the street from the Property and Operations at 3250 Scott Blvd. (MCA — Campus Expansion, Santa Clara, April 25 2024). The Conditions of Approval for the CUP and MND include a duty to defend and indemnify the City "from and against any and all claims, losses, damages, attorneys' fees, injuries, costs, and liabilities arising from any suit… filed by a third party against the City by reason of its approval of developer's project." (PLN2018-13109, Conditions of Approval).

## L. Apple's Violations of the Dec. 2016 – Dec. 2020 DTSC Consent Agreement

228. During the period of Apple's most egregious violations — including Plaintiff's physical injuries and harm to her property — Apple was operating under an active Consent Decree with the State of California for hazardous waste violations at another facility. (*People of the State of California v. Apple Inc*, 16CV303579, Superior Court of California, County of Santa Clara). The timing of the consent decree's termination, immediately following Apple's knowledge of Plaintiff's poisoning, demonstrates consciousness of guilt and obstruction of justice.

229. The Complaint was filed under Cal. Health and Safety Code §§ 25100 et seq.; Paragraph 31 alleged violations including: causing treatment and disposal of hazardous waste at an unauthorized point at and from the Sunnyvale Facility (Health & Saf. Code, § 25189.2(c)-(d)); transportation of hazardous waste without manifests from the Sunnyvale Facility (Health & Saf. Code § 25160; Cal. Code Regs., tit. 22, §§ 66262.20, 66262.23, 66268.7); failure to report and track export of hazardous waste from the Tantau Avenue Facility (Health & Saf. Code § 25162.1; Cal. Code Regs., tit. 22, §§ 66273.40, 66262.53, 66262.56, 66262.57); and failure to label or otherwise clearly mark used oil containers as "Hazardous Waste" (Cal. Code Regs., tit. 22, § 66262.34(f)). (*The People of California v. Apple Inc,* Complaint, page 7, ¶ 31 (2016)).

230. The permanent injunction, ordered Dec. 08 2016 and docketed Dec. 12 2016, included the following:

> "The terms of this Stipulation and the Final Judgment shall apply to and be binding on (a) Apple its successors, and its officers, directors, and employees, and all persons acting within the control of Apple …**at any facility in California owned or operated by Apple at which electronic waste or any other hazardous waste is treated,** or recycled ("Apple Facility")….
>
> Section 7: Apple shall be enjoined and ordered as follows:

> a. Apple shall ensure that its officers, directors, and employees, representatives, and all persons acting within the control of Apple **at any Apple Facility** comply with **all of the laws and regulations specifically identified in the violations alleged in Paragraph 31** of the Complaint….
>
> d. Apple **shall conduct weekly inspections of all areas of its facilities where hazardous waste is generated or accumulated**, including an inspection of all municipal waste containers and e-waste containers to inspect for improper management of hazardous waste. **Apple shall maintain a written log on-site of the inspections** required by Cal. Code of Regs, tit. 22, section 66265.15. The log shall be furnished upon request and shall be made available at all reasonable times for inspection, to any officer, employee, or representative of DTSC or the local Certified Unified Program Agency ("CUPA")."
>
> Emphasis added. (The injunction also required, inter alia, California Compliance School hazardous waste training for responsible officers and employees, and segregation of Universal Waste e-waste from shredding dust.)

231. On Dec. 09-11 2020, Apple and the California Department of Justice stipulated to terminate the permanent injunction. The stipulation was prepared and filed by Apple's defense counsel, William F. Tarantino (head of environmental litigation at Morrison & Foerster and former staff at U.S. EPA Region IX Office of Regional Counsel for prosecution of CAA, CWA, and RCRA violations),[31] signed for Apple by Scott B. Murray ("Director, Commercial Litigation") on Dec. 11 2020, and signed for California by Deputy Attorney General Reed Soto on Dec. 9 2020. The stipulation recited: "The Department has reviewed Apple's history of compliance with the terms of the Final Judgment, and the Department, as of this date, has no information that Apple has not substantially complied with its obligations under the Final Judgment."

232. Around 2022-2023, Plaintiff requested, via Public Records Requests, copies of any communications, drafts, or memoranda related to the decision to terminate the consent agreement. Both the California Attorney General's office and CalEPA claimed no such records or documentation exist.

## M. Additional High Density Residential Planned Closer to 3250 Scott at 3240 Scott

233. There is an approved planning pre-application under the "Housing Crisis Act" (SB330) to build a five-story "high-density residential" building with 166 condominiums at 3240

[31] William F. Tarantino, MoFo, https://www.mofo.com/people/william-tarantino

Scott Blvd[32] (PRE-24-00038), and a pending application submitted Oct. 2024, currently "In Review," to "rezone" 3240 Scott Blvd "from Low Intensity Office R&D to High Density Residential." (PLN24-00556 & PLN24-00579). 3240 Scott shares a property line with 3250 Scott Blvd.

234. "The Builder's Remedy Law is applicable to the Project because, as of the date of the Applicant's SB 330 Preliminary Application, the City did not have an adopted Housing Element in substantial compliance with the State Housing Element law." (PRE-24-00038). The application notes "[h]igh density multi-family residential uses are located adjacent to the Project Site to the east and across Scott Boulevard to the north[;] Light industrial uses are located to the west and south," proposes "[r]esidential amenities and common open space… on the first floor and roof level," and reserves the right to request "incentives, concessions, waivers of development standards or other relief" from any standards that would "physically preclud[e] the construction of the Project." (Id.).

235. The Santa Clara Fire Department — the CalARP Administering Agency — formally wrote that Apple's plume models are '*not favorable for this area*,' and on June 17, 2025 withheld fire-department approval of the adjacent 3240 Scott residential project pending environmental review. The Fire Department's own records also document that the facility violates Santa Clara General Plan Policy 5.3.5-P19, the City's 500-foot residential setback for hazardous uses: '*general plan says hazardous use shall not be within 500 feet of site.*' (SCFD records, 2025.)

## N. The April 2025 Planning Commission Meeting

236. On April 16 2025, the City held a public Planning Commission hearing on a proposed General Plan (2010-2035) amendment that would withdraw City support for residential housing at The Premise and near similar industrial facilities — with City Attorneys and Planning Department leadership acknowledging that the siting and zoning of The Premise, a chip fab beside dense residential housing where Plaintiff nearly died in 2020, is unlawful, illogical, inappropriate, "a bad place for housing," "awkward," and "not good land use or planning."

237. The Planning Department and City Attorney's office presented the proposal as removing three "Focus Areas" where the City had planned residential development in industrial

[32] Preliminary Plans for 3240 Scott Boulevard, Santa Clara, SF YIMBY, April 25 2024, https://sfyimby.com/2024/04/preliminary-plans-for-3240-scott-boulevard-santa-clara.html

areas. Two were noncontroversial (property owners — including additional Apple and Jenab properties on Kifer — did not want residential, or the proposal placed housing next to an airport). The contested Focus Area was the one covering The Premise, also at issue in this lawsuit. The maps presented carved the Chip Fab out of the Focus Area entirely, as if it did not exist, and the City avoided discussing The Premise specifically, describing the Focus Area as exclusively Light Industrial with only data centers and offices. (01:50:45).

238. The City initially justified the request as refocusing housing efforts elsewhere; when the Commission questioned why formal action was urgently required, the City claimed it wished to "*maintain existing industrial and office use*," that the updates were "consistent" with California housing and zoning law, and that it does not consider it "ideal" to convert industrial sites to housing. (01:49:32).

239. One Commissioner observed it sounded as though the City had a "*vested interest*" and asked "*where the origin of this [idea] came from*" (01:54:27), asking a City Attorney directly whether "*there is no more interest or intention for housing*" around The Premise; the Assistant City Attorney responded: "*Correct. Yes.*" (01:57:16). Asked whether "*there [are] other implications to this that are not being presented*" (01:58:37), the City Attorney's office pivoted, claiming the request would assist residential developers because the Focus Areas' comprehensive-plan requirement is too burdensome. (02:02:12).

240. Asked whether anyone would genuinely want residential in "***these very highly industrial areas***" (02:02:29), the City Attorney's office responded "*there has been interest, and the City does not think [the Premise] is an appropriate place to put residential this time… why we would like to remove the focus area for residential*," and that the Focus Area containing The Premise "*does not make good land use, planning, or a good neighborhood.*" (02:04:56). Another Commissioner noted nobody on the City Council "*wants to have a data center at the back door*" of residential. Pressed — "*you are, basically, declaring we don't want residential there*" (02:08:15) — the City Attorney's office replied: "*the point of removing this is, that, yes, we are declaring that we do not want residential here.*" (02:08:50).

241. Asked to elaborate on the claim that the amendment "*brings us in line with some state regulations*" (02:08:53), the Planning Department explained the conflict between anticipated residential and current Light/Heavy Industrial use (02:09:17). Asked the "*consequence*" (02:09:33),

after roughly six seconds of silence, staff responded: "*I do not think there is legal vulnerability. It's just awkward. You can't have a general plan that is internally inconsistent. This is not a legal inconsistency.*" (02:09:40). When a Commissioner pressed what would happen if the Commission refused — "*You are not in line with regulations, right?*" (02:10:30) — the video shows approximately 41 seconds of the Planning Department and City Attorney's office conferring in whispers before staff responded "*it looks funny*" (02:11:04) and "*it would not be my first pick for how to draft a general plan, but it's not going to get us into legal trouble.*" (02:11:09).

242. Staff added that the amendment "*would send a more appropriate message that residential is not appropriate in this area any longer – given the existing built uses*" (02:12:40), and: "*the planners have made the call that this is not an appropriate area for housing.... we do not think it is a good place for housing at all. We do not want housing there.*" (02:12:53). The City Attorney's office added that if a housing proposal came in, "*[s]taff may recommend denial because they think this is a bad place for housing. They do not think you should have housing right in the middle of an industrial area.*" (02:13:29). When a Commissioner expressed concern the change would "*discourage a concerted effort for development of housing*" in the Focus Areas (02:14:10), the City's attorneys responded "*it will.*" (02:14:21).

243. A Commissioner observed that when the Focus Areas were designated, "*the conflicts already existed,*" "***it was pretty apparent,***" and "***everybody knew***" (02:15:25) — met by interruptions from City staff ("*um. so, some.... no,*" "*not this much. No,*" "*this was 15 years ago, 2010, or a little before that*") (02:15:37). One Commissioner joked "*we only had 30 data centers*" (02:15:41); the Attorney responded "***a lot of these didn't exist***" and "*that's the problem.*" (02:15:49). Commissioners agreed it "*is not an area where I would want to convert to residential either*" (02:22:53); another stated the City's urgency gave her a "***sense that there is another layer at play here.***" (02:25:05). When a Commissioner mused that "*data centers may end up disappearing someday too, the same way a lot of other manufacturing did in our city,*" the City Attorneys interrupted and demanded a formal vote. (02:28:52). The Planning Commission declined to vote, deferred the request to the City Council, and apparently declined to certify the meeting notes.[33] (City PC

33 "*Please note: this meeting's minutes have not been finalized yet. Actions taken on legislation and their results are not available.*" (4/16/2025).

Hearing, # 25-214, 4/16/2025).[34]

## O. May 2025 City Council Meeting

244. On May 27 2025, the City Council took up removal of the Focus Area covering the Premise from the General Plan, with the City Director of Community Development presenting and summarizing the April Planning Commission discussion. (25-608, May 27, 2025)[35]. The Director framed the justification as "*market demand*" and "*legal compliance*," explaining that since the Focus Areas were introduced, "*development has changed due to market demand and the city's certified housing element now delineates where future housing could be located.*" (04:19:13; 04:21:31).

245. She stated the areas are being removed because "*these areas are not ideal locations for housing, because they already have a development pattern that has lots of industrial in it*" (04:23:04), including "*existing Heavy Industrial and Light Industrial and Low Intensity Office*" (04:23:13). Of the Premise area specifically, she said it "*has a dense concentration of data centers already, and it is unlikely that it would be converted into housing. It would be incompatible with future housing*" (04:24:42); that removing the Focus Area "*makes no sense because there would be residential next to data centers*" (04:26:25) [sic — i.e., that retaining it makes no sense]; and that California "*HCD has a very special criteria for site selection for housing and these would not meet that site selection criteria, so that is a really strong reason not to put the housing there.*" (04:28:35).

246. Councilmember Jain said he did not understand the request and considered the Santa Clara Square Apartments "*extremely successful*"; he suggested intentionally surrounding data centers with housing to use "*the heat, the waste heat from the data center to provide heating for the housing*" (04:30:51), while acknowledging concerns about "*putting people next to polluting light industrial*" where "*there might be hazardous chemicals they use there and such,*" and proposing to "*put shelters near, in, Light Industrial areas.*" (04:31:40). The City Manager and City Attorneys agreed

---

34 City of Santa Clara, Legislative Public Meetings, Planning Commission, *PUBLIC HEARING: Rec. on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas,* 4/16/25, (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7301977&GUID=6A9DD113-26FB-4052-86CE-B2F74FE06A77&Options=ID|Text|&Search=25-214

35 City of Santa Clara, Legislative Public Meetings, City Council and Authorities Concurrent, *Public Hearing: Action on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas*, 5/27/2025 (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7409908&GUID=C17C98CD-A6CF-4BC5-A385-4F5A70DDDD5F&Options=ID|Text|&Search=25-608

the amendment would help enable the Council to build homeless shelters around the Premise and other industrial areas. (04:36:19; 04:42:17).

247. Other comments included the importance of dedicated industrial areas (Mayor Gillmor, 04:38:27); that "*many of our general fund monies come from areas such as retail, such as data centers, such as industrial… areas that would use less city services versus housing*"; and Councilmember Park's view that the discussion was really about "*our vision for the city*" and that he "*literally uses the existence of the Central Expressway focus plan to justify different projects north of 101.*" (04:45:07-04:48:08). When the Mayor called for public comment, staff noted "*there's no one here. it's 10:12 PM.*" (04:50:27).

248. Mayor Gillmor added that the City "*need[s] to preserve our industrial areas for industrial and manufacturing uses*" and to "*leave the industrial area alone*" — stating she does not want to "*see another Santa Clara Square.*" (04:54:01). The City Council then voted to amend the General Plan (2010-2035) to remove the three Focus Areas — withdrawing its encouragement for developers to build residential housing around chip fabs and data centers. (25-608, May 27, 2025)[36].

# LEGAL CLAIMS AGAINST THE DEFENDANTS

## IX. COUNT 1: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT, IN VIOLATION OF THE RCRA § 7002(A)(1)(B).

### (CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS).

249. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other RCRA Counts below.

250. Defendants Apple, The City, and The Property Owners are responsible for ongoing violations of the RCRA. Abatement and enforcement are available under the RCRA Citizen Suit

36 City of Santa Clara, Legislative Public Meetings, City Council and Authorities Concurrent, *Public Hearing: Action on a General Plan Amendment to Remove the Lawrence Station Phase II, Central Expressway, and De La Cruz Focus Areas*, 5/27/2025 (Transcript, Video, & Audio), https://santaclara.legistar.com/LegislationDetail.aspx?ID=7409908&GUID=C17C98CD-A6CF-4BC5-A385-4F5A70DDDD5F&Options=ID|Text|&Search=25-608

provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

251. The Plaintiff brings this action under Pub. L. 89–272, title II, § 7002(a)(1)(B) of the RCRA. This is the RCRA's citizen enforcement provision for the abatement of imminent and substantial endangerment. (a.k.a. 42 U.S.C. § 6972).

252. As required by § 7002(b)(1) of the RCRA, advanced notice of violations were provided by the Plaintiff to the EPA Administrator, the California EPA and its CUPA, and the Defendants on June 30 2025. Further, notice of violations was provided by the U.S. EPA to the Defendant(s) and California EPA and its CUPA, years ago, including demands to correct the violations, but the violations have not been corrected. Further, no notice is required for claims brought under Subchapter III "Hazardous Waste Management," per § 7002(b)(1)(iii). At the time of filing, Plaintiff had no knowledge of commencement of diligent prosecution (civil or criminal) by the federal or state governments on this matter.

253. "Any person," including this Plaintiff, may bring a lawsuit under RCRA § 7002(a)(1)(B) against "any person," including these Defendants, when a "solid or hazardous waste… may present an imminent and substantial endangerment to health or the environment." *Id.* Here, the solid and hazardous waste at The Chip Fab created, threatens to create, and present an imminent and substantial endangerment to health and the environment.

254. Apple is a responsible party under § 7002 as "any person" including but not limited to a "past [and] present generator," and/or a "past [and] present owner or operator of a treatment, storage, or disposal facility." Apple is the permittee for a RCRA large quantity generator permit and treats and stores massive quantities of hazardous waste at the Property, produced at The Chip Fab. Apple "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

255. The Property Owners is a responsible party under § 7002 as "any person" including but not limited to a "past [and] present owner or operator of a treatment, storage, or disposal facility." The Property Owners owns 3250 Scott Blvd, and it is used for hazardous waste treatment, storage, and disposal. The Property Owners "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an

imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

256. The City is a responsible party under § 7002 as "any person" including "any… governmental instrumentality or agency." The city "contributed to" the "past or present handling, storage, treatment, transportation, or disposal" of "solid or hazardous waste" which presents "an imminent and substantial endangerment to health or the environment." RCRA § 7002(a)(1)(B).

257. Under Section 1004(5) of RCRA, "hazardous waste" is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may… cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

258. Under RCRA § 1004(27), "solid waste" includes "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial… operations" but not "industrial discharges which are point sources subject to permits under section 1342 of Title 33" (NPDES). 42 U.S.C. § 6903(27).

259. Under Section 1004(3) of RCRA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). An "open dump" refers to "any facility or site where solid waste is disposed" which is not permitted for the disposal of hazardous waste. 42 U.S.C. § 6903(14).

260. The solid and hazardous wastes handled, stored, treated, transported, and disposed/released at The Chip Fab present an imminent and substantial endangerment to health and the environment.

261. For example, Apple operates a 1,700-gallon unpermitted hazardous waste treatment tank that vents toxic solvent vapors directly into the atmosphere without any emission controls, located less than 300 feet from a 1,840-unit apartment complex where families and children live. The U.S. EPA took formal action and fined Apple for the issue, but failed to confirm Apple corrected the issue, or to further inspect to determine if there were more unauthorized emissions.

262. U.S. EPA RCRA inspectors also recently found piles of unlabeled, undated

hazardous waste stored haphazardly and in open containers at The Chip Fab. US EPA also noted that Apple was leaving The Chip Fab, and all its hazardous waste and toxic gases, unsupervised and unmonitored on weekends. The Property Owners also failed to monitor hazards and dangerous conditions on weekends. The City knew the hazardous and dangerous conditions had been unmonitored on weekends and took no action, never cited the RCRA violation, and failed to warn the adjacent community.

263. These ongoing, unlawful releases have already caused severe chemical poisoning of nearby residents, including documented presence of arsenic, mercury, and industrial solvents in victims' blood and urine. One victim, the Plaintiff, suffered clustered of symptoms consistent with acute toxic gas exposure that occurred every few weeks, always around 3 AM, waking up choking and with symptoms of heart failure. Approximately 3,000 residents live within 1,000 feet of the facility, including families with children who use adjacent parks and playgrounds, creating a substantial risk of exposure and mass injuries and/or death.

264. U.S. EPA inspectors also recently documented that Apple had been venting hazardous waste exhaust at The Chip Fab without permits and unabated. EPA noted that Apple had recently installed makeshift carbon filters for only some vents, without monitoring or verification they were abating the exhaust, and without air permits. EPA fined Apple for this under RCRA but failed to confirm the issue was corrected. The Property Owners and City contributed to the ongoing violations and dangers because they knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

265. There are years of Incident Reports for operations at The Chip Fab documenting storage, use, emissions, leaks, and releases of extremely hazardous gases including arsine, phosphine, and fluorine – gases that can cause immediate death upon exposure. The Property Owners and City contributed to the ongoing violations and dangers because they knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

266. Apple and its contractors transported, treated, stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1)-(7) and knew that their actions put other people in imminent danger of death or serious bodily injury. 42 U.S.C. 6928(e); 40 C.F.R. 260 – 265. The Property Owners and City contributed to the ongoing violations and dangers because they

knew about these issues, took no steps to correct the issues or report the violations, and instead concealed the dangers.

267. Defendants transported, treated, stored, and/or disposed of a hazardous waste in violation of 42 U.S.C. 6928(d)(1) - (7) and knew that such acts put another person in imminent danger of death or serious bodily injury. 42 U.S.C. 6928(e); 40 C.F.R. 260 – 265. The endangerment will continue without judicial intervention because Defendants have failed to install required emission controls or obtain proper permits despite years of notice from regulatory agencies.

268. In 2025, NLRB took enforcement action against Apple over its unlawfully restrictive confidentiality policies and work rules, which prevented employees from discussing work conditions or reporting safety issues, including the Plaintiff, who was the Charging Party and party to the national settlement agreement. Concealment of safety risks only increases the dangers presented at The Chip Fab.

269. Apple and The Property Owners caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of chemicals in the environment in, at, and around The Chip Fab, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and groundwater, because they released or otherwise discarded chemicals, or controlled and/or operated the Property from which chemicals were released or otherwise discarded, and failed to prevent or abate the contamination caused by the chemicals .

270. For example, when TCE is discarded or disposed of into the environment, including soil, groundwater, or surface water, it becomes a hazardous waste and solid waste as defined in federal law, 42 U.S.C. § 6903(5),(27). Environmental investigations at and around The Chip Fab demonstrate that that soil, soil vapor, and groundwater are impacted by chlorinated volatile organic compounds, including trichloroethylene ("TCE") and its breakdown products (i.e., DCE, vinyl chloride, etc.). During its 2015-current operations, Apple handled, generated, disposed of, released, used, and/or stored TCE – with TCE showing up in its wastewater monitoring results. Apple operated The Chip Fab when these chemicals appear to have been released into the environment and appeared in the groundwater and/or Saratoga Creek aquifer system. The EIR for the apartments also revealed unexplained Benzene and Toluene in the topsoil, but Apple also had these chemicals at The Chip Fab, and the contamination was near the Property.

271. Once the various discharges of chemicals, whether intentional, sudden, and accidental, or otherwise were released into the environment, these chemicals continued to spread and migrate within the environment in, at, and around the Property and Premise, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the groundwater. Once released into the environment, these chemicals continued to spread and migrate within the environment at the Property, causing additional harm to the environment and continuing to threaten public health and the environment. The Property needs to be further investigated and characterized so that a remedial action plan can then be developed and implemented.

272. The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories. The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.

273. Apple also violated 42 U.S.C. §§ 6921–6925 by improper treatment and disposal of hazardous waste, including open dumping of hazardous waste into the air, soil, and water.

274. Santa Clara has knowledge of these violations and contributed to these violations by knowingly failing to document or cite the violations, and by withholding information from the community (public records requests, spill, and incident reports, EIRs, etc.) and other government agencies.

275. The Property Owners has knowledge of these violations, contributed to the violations, and refused to abate the violations. Accordingly, all three defendants have also violated 42 U.S.C. § 6973 (Section 7003) by creating and maintaining an imminent and substantial endangerment to the community and the environment.

276. Plaintiff is entitled to injunctive relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), restraining Defendants from their respective violations, and requiring each party to act. This includes a complete, timely, and appropriate investigation and abatement of all actual and potential endangerments arising from the released solid wastes and hazardous wastes at and emanating to or

from The Chip Fab.

277. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent allowable to cover community health and restoration projects.

# X. COUNT 2: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN AIR ACT.

### (CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS)

278. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other CAA Counts below.

279. Defendants Apple, The City, and The Property Owners are responsible for ongoing violations of the Clean Air Act and the creation of an imminent and substantial endangerment arising from air emissions/releases at The Chip Fab. Abatement and enforcement are available under the CAA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

280. For assessing community risks and hazards, a 1,000-foot radius is recommended around the project property boundary. BAAQMD recommends that any proposed project that includes the siting of a new source or receptor assess associated impacts within 1,000 feet, considering both individual and nearby cumulative sources (i.e., proposed project plus existing and near future projects). Cumulative sources represent the combined total risk values of each

individual source within the 1,000-foot evaluation zone. (Bay Area Air Quality Management District CEQA Guidelines May 2010 Ch. 5, 2-3).

281. When evaluating whether a new source of TAC and/or PM2.5 emissions would adversely affect existing or future proposed receptors, a Lead Agency shall examine: • the extent to which the new source would increase risk levels, hazard index, and/or PM2.5 concentrations at nearby receptors, • whether the source would be permitted or non-permitted by the BAAQMD, and • whether the project would implement Best Available Control Technology for Toxics (T-BACT), as determined by BAAQMD. Bay Area Air Quality Management District CEQA Guidelines May 2010 Ch. 5, 5

282. If a project is likely to be a place where people live, play, or convalesce, it should be considered a receptor. It should also be considered a receptor if sensitive individuals are likely to spend a significant amount of time there. Examples of receptors include residences, schools and school yards, parks and playgrounds, daycare centers, nursing homes, and medical facilities. Residences can include houses, apartments, and senior living complexes. Medical facilities can include hospitals, convalescent homes, and health clinics. Playgrounds could be playing areas associated with parks or community centers. (Bay Area Air Quality Management District CEQA Guidelines May 2010, Ch. 5, 8).

283. On May 1 2023, Apple obtained a Bay Area Air Quality Management District Permit to Operate a "Semiconductor fab." (Plant No. 22839). Apple previously had no air permits for their fabrication exhaust. The permit conditions included maximum limits for chemical usage and emissions. The permit included max annual usage limits of arsine (78lb/yr), Phosphine (198lb/yr), Silane (19lb/yr), and Chlorine (1lb/yr). (Permit, page 8). Apple filed an updated request to include the exhaust from their unpermitted hazardous waste treatment tank on September 15 2023, and it was approved around April 2024. (Permit 32236).

284. The Facility conducts activities that require permits under the Clean Air Act. The Defendants and their agents conduct these activities, and the Defendant have knowledge that these activities require Clean Air Act permits but have failed to ensure that proper permits were obtained. The Defendants have allowed the Facility to continue operating without required Clean Air Act permits despite having actual knowledge of the permit requirements. These unpermitted activities constitute ongoing violations of the Clean Air Act.

285. Apple violated 42 U.S.C. § 7410 (Section 110) by dumping hazardous substances into the atmosphere that exceed state-specific emission limits.

286. Apple violated 42 U.S.C. § 7411 (Section 111) by dumping hazardous substances into the atmosphere which exceed emission standards, including chemicals like Arsine, Phosphine, Silane, Benzene, Mercury, and NMP.

287. Apple violated 42 U.S.C. § 7412 (Section 112) by dumping hazardous substances into the atmosphere that knowingly and intentionally does not comply with MACT standards.

288. Apple violated and is violating 42 U.S.C. 7413(c)(4)&(5) and 42 U.S.C. 7412(b)(1) by negligently and knowingly releasing hazardous air pollutants listed under Section 7412 of the Clean Air Act and extremely hazardous substances listed pursuant to 42 U.S.C.11002(a)(2) into the ambient air around the Premise (including parks, playgrounds, and thousands of homes, and negligently and knowingly put the people living, working, visiting, and recreating within and around the Premise in imminent danger, and/or risk of serious bodily injury or even death.

289. The Defendants have created, maintained, and concealed an imminent and substantial endangerment to the public and environment through hazardous air emissions.

290. Apple violated 42 U.S.C. 7413(c)(2)(B).by knowingly failing, and refusing, to notify regulators and public of hazardous air emissions and air pollution as required by the CAA.

291. Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the apartments were four-five stories high (75-85ft), creating a high likelihood that Apple's factory exhaust entered the interior air of the apartments through open windows and the 'fresh air intake' vents.

292. Apple violated. 42 U.S.C. 7413(c)(2)(A) by knowingly making false material statements, representations, or certifications in; omitted material information from; and altered, concealed, or failed to file or maintain a document filed or required to be maintained under the CAA.

293. The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories including failure to warn, failure to abate, enabling the violations, prior bad acts showing M.O., benefiting from non-compliance, and so on.

294. The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.

295. The City has violated the Clean Air Act at § 304(a)(3) by an unreasonable delay in enforcement of the CAA despite actual knowledge of severe and ongoing violations of the CAA. The City has violated the RCRA at § 7002(a)(1)(B) by failure to prevent or abate an ongoing imminent and substantial endangerment to the public and environment.

296. The City has violated the Cal PRA in denying Public Records related to the facility. The City has obstructed the U.S. EPA investigation into operations at the facility. The City has concealed violations from EPA, BAAQMD, and affected residents. The City has unlawfully issued building permits for unpermitted hazardous waste treatment facility. The City has approved the facility's "R&D" designation while knowing actual semiconductor manufacturing operations. The City failed to require federal permits before allowing operations to commence.

297. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent allowable to cover community health and restoration projects.

## XI. COUNT 3: CONTRIBUTION TO AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT IN VIOLATION OF THE CLEAN WATER ACT.

**(CLAIM AGAINST APPLE, THE CITY, & PROPERTY OWNERS).**

298. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other CWA Counts below.

299. Defendants Apple, The City, and The Property Owners are responsible for ongoing violations of the Clean Water Act and the creation of an imminent and substantial endangerment arising from discharges via wastewater and stormwater at The Chip Fab. Abatement and enforcement are available under the CWA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

300. The City must know that discharges from the Facility into the sewer system are causing downstream residents to become ill. Despite this knowledge, the City has failed to take appropriate enforcement action to stop the harmful discharges.

301. Apple violated 33 U.S.C. §§ 1311, 1316, 1317 with unpermitted discharges, discharges in violation of effluent limits, and without NPDES permits.

302. Apple violated 33 U.S.C. § 1342(k) by violating standards imposed under section 1317 and releasing toxic pollutants that are injurious to human health.

303. Defendants knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3)

304. Apple violated 33 U.S.C. § 1317(d) as noted above and in doing so, wrongfully introduced pollutants into a treatment works (the The SJ-SC RWF).

305. Apple violated 33 U.S.C. § 1319(b) when it negligently introduced into a sewer system and into a publicly owned treatment works pollutants and hazardous substances which it knew or should have known could cause personal injury or property damage.

306. Apple violated 33 U.S.C. § 1319(c)(3) when it knowingly violated the above stated provisions of the Clean Water Act, including while knowing their unlawful acts and omissions put people, including the surrounding community, in imminent danger of death and serious bodily injury.

307. The Property Owners violated it. 33 U.S.C. § 1319(c)(3) when they knowingly

violated the Clean Water Act, and knew their unlawful acts and omissions put people, including the surrounding community, in imminent danger of death and serious bodily injury.

308. The Property Owners are responsible and liable due to their affirmative responsibilities as property owners and landlords, and for contributing to the issues, among other liability theories.

309. The City is responsible and liable due to their contribution to these issues by their voluntarily assumption of mandatory CUPA responsibilities and subsequent intentional abandonment of those duties, their failure to warn of the dangers, their design and siting that created increased risk of harm, their concealment of information the public has a right to know about, their negligent advice worsening issues and dangers, and their ownership of the adjacent parks, playgrounds, sidewalks, and streets – among other theories of liability.

310. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the imminent and substantial endangerment, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) to create and implement a Community Engagement plan to notify the surrounding community about its violations and to receive feedback from the community regarding its Remediation and Corrective Action Plans; (5) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (6) Civil penalties as available under the statute, to be paid to the U.S. Treasury, (7) Fines to fund Supplement Environmental Projects to the full extent allowable to cover community health and restoration projects.

## XII. CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE RCRA.

311. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. The allegations and claims listed in above RCRA *Imminent & Substantial Endangerment* claim are also incorporated here.

312. Defendants Apple, The City, and The Property Owners are responsible for ongoing

violations of the RCRA. Abatement and enforcement are available under the RCRA Citizen Suit provisions. The RCRA violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

313. The Plaintiff brings this action under, Pub. L. 89–272, title II, § 7002(a)(1)(A) of RCRA which enables citizen enforcement for violations of any "permit, standard, regulation, condition, requirement, prohibition, or order" under the RCRA. (42 U.S.C. § 6972). As explained in COUNT ONE, the express terms of the RCRA statute allow it to be brought against "any person," including "any… governmental instrumentality or agency." *Id.* The municipal and business entity defendants have violated the RCRA, are responsible under the RCRA, and enforcement is available under the RCRA Citizen Suit provisions of 42 U.S.C. § 6901.

## A. COUNT 4: APPLE & THE PROPERTY OWNERS VIOLATED RCRA 42 U.S.C. §§ 6922, 6928 BY FAILING TO COMPLY WITH HAZARDOUS WASTE MANAGEMENT REQUIREMENTS.

**(CLAIM AGAINST APPLE & PROPERTY OWNERS).**

314. Apple violated 42 U.S.C. § 6922, 40 C.F.R. Part 262 by failing to properly characterize hazardous waste streams; improper storage of hazardous waste beyond regulatory time limits; failure to properly manifest hazardous waste shipments; and inadequate personnel training and emergency procedures. Apple also knowingly treated, stored, and/or disposed of a hazardous waste in knowing violation of a material permit conditions in violation of 42 U.S.C. 6928(d)(2)(B) and (C); 40 C.F.R. 260 – 265.

315. This is an ongoing, long-running issue that intersects and exacerbates the larger issues. The EPA took formal enforcement action about similar and related issues. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

316. However, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or enhanced oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

317. The Property Owners violated 42 U.S.C. § 6922 by failing to ensure proper hazardous waste management procedures were in place at its property and failing to investigate or

intervene when there were violations and complaints about dangers and injures caused by the improper hazardous waste management.

318. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B. COUNT 5: APPLE, THE CITY, & PROPERTY OWNERS VIOLATED 42 U.S.C. § 6923 BY FAILING TO COMPLY WITH HAZARDOUS WASTE RECORDKEEPING REQUIREMENTS.

**(CLAIM AGAINST APPLE, THE CITY & PROPERTY OWNERS).**

319. Apple violated 42 U.S.C. § 6923, by failing to keep required records, failing to properly label waste, and failing to comply with manifest rules.

320. Apple generates, stores, treats, transports, and disposes of hazardous waste at the Property. All three defendants have knowingly contributed to the alteration, destruction, concealment, and intentional failure to file, records which are required to be maintained and/or filed pursuant to Subtitle C. (42 U.S.C. 6928(d)(4); 40 C.F.R. 260 – 265).

321. Apple omitted material information and made false material statements in documents filed or used for purposes of compliance with Subtitle C RCRA hazardous waste regulations; all three defendants have knowledge of those omissions and false statements, and all three defendants contributed to these violations, despite knowledge that information was required and material. (42 U.S.C. 6928(d)(3)).

322. These are an ongoing, long-running issue that intersect and exacerbates the larger issues. EPA took formal enforcement action about similar and related issues but only against Apple. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025). Further, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or enhanced

oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

323. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### C. COUNT 6: APPLE & THE PROPERTY OWNERS VIOLATED 42 U.S.C. § 6925 BY OPERATING WITHOUT REQUIRED PERMITS & VIOLATION THE TERMS OF THE PERMITS THEY DID HAVE.

**(CLAIM AGAINST APPLE & PROPERTY OWNERS)**

324. The Defendants have violated 42 U.S.C. § 6925, 40 C.F.R. Parts 264, by operating hazardous waste treatment facility without required RCRA permit; operating without other required permits; and violating permit terms and conditions.

325. This is an ongoing, long-running issue that intersects and exacerbates the larger issues. The EPA took formal enforcement action about similar and related issues. *In the Matter of Apple, Inc.*, U.S. EPA Docket No. RCRA-09-2026-0006, Consent Agreement and Final Order (EPA Region IX Oct. 27, 2025).

326. However, the EPA's enforcement action was limited in scope to only three-days of inspections that occurred nearly two years ago, and EPA never confirmed the issues were actually resolved (such as the creation of new processes or enhanced oversight to prevent the issues from recurring or even conducting a follow-up inspection prior to closing the enforcement action).

327. The Property Owners violated 42 U.S.C. § 6922, 6925 by failing to ensure proper required permits were in place at its property, and failing to investigate or intervene when there were violations issued related to failure to have required permits related to hazardous waste treatment, air emissions, and water discharge.

328. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the

harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## D. COUNT 7: APPLE VIOLATED 42 U.S.C. § 6923 BY CONTRIBUTING TO THE UNLAWFUL TRANSPORT OF HAZARDOUS WASTE.

**(CLAIM AGAINST APPLE)**

329. Apple and its contractors violated 42 U.S.C. § 6923, (Section 3003) by transporting hazardous waste from the Property without manifests and without proper categorization. They knowingly transported or cause to be transported hazardous waste without a manifest where one is required by the regulations. 42 U.S.C. 6928(d)(5).

330. Apple was under a California EPA DTSC consent agreement and permanent injunction at the time of many of these violations, and still intentionally violated the same and similar legal requirements, knowing it was illegal, but doing it anyway.

331. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## E. COUNT 8: APPLE, THE CITY, & THE PROPERTY OWNERS VIOLATED 42 U.S.C. § 6924, 42 U.S.C. 6928 BY VIOLATING HAZARDOUS WASTE TREATMENT STANDARDS & REQUIREMENTS.

**(CLAIM AGAINST APPLE & PROPERTY OWNERS)**

332. Apple, The City, and The Property Owners violated 42 U.S.C. § 6924, (Section 3004) by failing to comply with hazardous waste treatment, storage, and disposal standards at the Property. All three defendants have violated and/or contributed to violations of 40 C.F.R. Part 264-

265, through the uncontrolled air emissions from hazardous waste treatment tanks; their failure to ensure installation of required air emission control devices; their failure to conduct required air emission monitoring and testing; and their failure to ensure emission control equipment is in proper working order.

333. Apple violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265 by knowingly treated, stored, and disposed of a hazardous waste without a permit at The Chip Fab.

334. The City violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265 by knowing of these violations and contributed to these violations by refusing to document or cite the violations, and by withholding information from the community (public records requests, EIRs, etc.) and other government agencies.

335. The City serves as the primary oversight agency for RCRA permit compliance for multiple aspects of the Facility's hazardous waste operations. The City has allowed, enabled, and concealed unpermitted hazardous waste activities and processes to occur, and refused to report RCRA violations to appropriate state and federal agencies despite having knowledge of such violations.

336. The Property Owners violated 42 U.S.C. 6928(d)(2)(A); 40 C.F.R. 260 – 265 by having knowledge of these violations, contributing to the violations, and refused to report or abate the violations.

337. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XIII. CITIZEN SUIT ENFORCEMENT ACTIONS AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE CLEAN AIR ACT.

338. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts

under this statute, are hereby incorporated as though those allegations were fully set forth herein.

339. Defendants Apple, The City, and The Property Owners are responsible for ongoing violations of the Clean Air Act. Abatement and enforcement are available under 42 U.S.C. § 7604 Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention. Apple's 30(b)(6) designee testified refused to give a yes-or-no on whether other entities could be responsible for Apple's own air emissions at the Chip Fab: "It's so scenario specific…. It could be very situational." (Exhibit F: Schmidt Depo. 52:12-16; see also 53:6-8).

340. "The Clean Air Act (CAA), 42 U.S.C. § 7401 et seq., is the primary federal law designed to improve air quality to protect human health and the environment. The CAA authorizes EPA to set health based National Ambient Air Quality Standards (NAAQS), as well as stationary source National Emission Standards for Hazardous Air Pollutants (NESHAP). In general, semiconductor fabs are subject to both construction and operation permitting requirements under the CAA. Specific CAA permitting requirements vary by permitting authority and facility, depending on factors such as the air quality designations applicable to the facility's location and the nature of the facility's emissions." (NIST).

341. A variety of air pollutants may be emitted from semiconductor fabrication facilities. These include acid fumes and organic solvent emissions from cleaning, rinsing, resist drying, developing, and resist stripping; HCl emissions from etching; and various other emissions from spent etching solutions, spent acid baths, and spent solvents. Processes related to semiconductor fabrication, such as water purification and industrial wastewater treatment, may also generate air emissions at semiconductor facilities. (NIST, Modernization And Expansion Of Existing Semiconductor Fabrication Facilities).

342. Plaintiff filed a complaint against Apple with the BAAQMD in July of 2024 and shared the U.S. EPA RCRA inspection report with them, leading them conduct their own onsite investigations on Aug. 29 2024 and Aug. 12 2024. BAAQMD then cited Apple for several air quality violations at the facility including multiple violations of 2-1-301 and 2-1-302 (Permit Requirements – Authority to Construct and Permit to Operate) and 9-7-307.1 (NOx and CO Emission limits). (Violations A64215A, A64215B, A64219A, A64218A, A64216A, and A64216B).

343. Apple also reported some emissions to the Bay Area Air Quality Management

Board, in difficult to find agency filings, and with unknown methodology as to how they estimated the emissions if they had no monitoring systems. (Plant No. 22839, "Facility Search Tool"). The most recent Criteria Pollutant Cal. ARB data is from 2023. In 2023, Apple reported 6.95 tons of TOG, 6.9 tons of ROG, and 0.24 tons of NOX. (Plant No. 22839, 2023). The most recent Cal. ARB Toxic data is from 2022. In 2022, Apple reported emitting 5,730 pounds of Isopropyl Alcohol fumes, five pounds of diesel exhaust, 1.35 pounds of benzene, and formaldehyde, nickel, manganese, cadmium, lead, toluene, arsenic, mercury, beryllium, and Chromium VI. (Plant No. 22839, 2022).

344. The Santa Clara Square Apartments "include residences that are considered sensitive receptors." (Santa Clara Square, Air Quality Assessment, pg 17, Sept. 30 2015). "Sensitive receptors are locations where an identifiable subset of the general population (children, asthmatics, the elderly, and the chronically ill) that is at greater risk than the general population to the effects of air pollutants are likely to be exposed. These locations include residences, schools, playgrounds, childcare centers, retirement homes, hospitals, and medical clinics." (Santa Clara Square, Air Quality Assessment, pg 16, Sept. 30 2015). The facility is located within federally designated "Air Quality Nonattainment Areas" including for PM2.5 and 1-Hour and 8-Hour Ozone. It is also in a Carbon Monoxide Maintenance Status Area. (EPA FID 110001168254).

### F. COUNT 9: APPLE AND THE PROPERTY OWNERS VIOLATED 42 U.S.C. 7413 BY OPERATING A STATIONARY SOURCE WITHOUT PERMITS

#### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

345. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

346. Facilities that release significant air pollutants must obtain operating permits stipulating various emission and operational controls. Operating without such a permit or failing to comply with any of the conditions specified in the permit constitutes a violation. This includes not adhering to monitoring, record-keeping, or reporting requirements.

347. The only air permit Apple and the Property Owners had for the Chip Fab until

~2023 covered general emissions of a couple of chemicals and did not disclose chip fab activities. The first major revision of the permit following the Plaintiff's complaints now included chip fab sources. The 2023 permit noted it covered "five stacks" for "semiconductor fab" and a sixth stack for diesel engine emergency generator exhaust (Plant 22839).

348. However, that permit still did not cover most of the emissions, and following the Plaintiff's complaints directly to BAAQMD they conducted an inspection, cited violations, and have been negotiating a new permit with Apple.

349. CARB and BAAQMD uses "owner/operator" in permit terms for semiconductor manufacturing. (BAAQMD Permit Handbook pg58; Cal. Code Regs. Tit. 17, § 95320 et seq.).

350. Apple was and is an operator of a stationary source, knowingly constructed a new source, modified an existing source, emitted a hazardous pollutant, and failed to comply with a requirement in violation of an applicable NESHAP. 42 U.S.C. 7413(c)(1).

351. The Property Owners were and are an owner of a stationary source, knowingly constructed a new source, modified an existing source, emitted a hazardous pollutant, and failed to comply with a requirement in violation of an applicable NESHAP. 42 U.S.C. 7413(c)(1).

352. The Property Owners were and are an owner of a source subject to the operating permits program, knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1), 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

353. Apple was and is an operator of a source subject to the operating permits program and knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1), 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

354. The Property Owners were and are the owner of a source subject to the operating permits program and knowingly operated the source without an operating permit or in violation of a permit requirement. 42 U.S.C. 7413(c)(1), 42 U.S.C. 7661(1)-(2), 42 U.S.C. 7661a(a)].

355. Apple has repeatedly violated and/or are in violation of requirements to obtain a permit as a condition of operations. (42 U.S.C. § 7604(a)(4)).

356. The Property Owners have repeatedly violated and/or are in violation of requirements to obtain a permit as a condition of operations. (42 U.S.C. § 7604(a)(4)).

357. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the

harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### G. COUNT 10: APPLE & PROPERTY OWNER VIOLATED 42 U.S.C. §§ 7502, 7661 BY OPERATING SOURCES WITHOUT TITLE V PERMITS AND BY FAILING TO OBTAIN PRECONSTRUCTION PERMITS.

**(CLAIM AGAINST APPLE & PROPERTY OWNERS)**

358. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

359. Major sources of air pollution are required to obtain an operating permit under Title V of the CAA. No major source may operate without a Title V permit.42 U.S.C. §§ 7661a(a) and 7661b(a). A new major source or a major modification of an existing one, in a nonattainment area, also cannot begin construction or operation without obtaining a Nonattainment New Source Review (NSR) and preconstruction approvals under 42 U.S.C. § 7502.

360. The New Source Review program requires that new or modified industrial facilities in areas that do not meet NAAQS obtain permits before construction begins. These permits must demonstrate that the new facility will not contribute to further air quality degradation and will employ the best control technology. Violating these requirements can lead to significant penalties.

361. A "major source" is any stationary source or any group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. (7412. 42 U.S.C. § 7661(2); 42 U.S.C. § 7412).

362. "A stationary source consists of a single emission source with an identified emission point, such as a stack at a facility. Facilities can have multiple emission point sources located on-

site and sometimes the facility as a whole is referred to as a stationary source" (Bay Area Air Quality Management District CEQA Guidelines May 2010 4-2).

363. It's very unusual for a smaller plant (rather than a huge industrial complex) to qualify as a Major Source – however, chip fab is one type of activity that could create enough pollution to qualify, and at The Chip Fab, Apple was not abating most/all of its pollution for years. Generally, a smaller factory would not be a major source because it would be abating its emissions and reducing pollution, so even if it produced enough hazardous waste that releasing that waste could qualify, they would never release all that waste directly into the air. However, Apple and the Property Owners did at The Chip Fab.

364. In 2014-2015, Apple constructed a new/modified major emitting facility without a permit required under part C of subchapter I relating to significant deterioration of air quality. (42 U.S.C. § 7604(a)(3)). The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

365. In 2014-2015, The Property Owners constructed a new/modified major emitting facility without a permit required under part C of subchapter I relating to significant deterioration of air quality. (42 U.S.C. § 7604(a)(3)). The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

366. Apple violated 42 U.S.C. § 7502 by constructing and operating a new/modified major source in a nonattainment area without preconstruction approval by the BAAQMD. BAAQMD cited Apple for this violation in 2024.) The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

367. The Property Owners violated 42 U.S.C. § 7502 by constructing and operating a new/modified major source in a nonattainment area without preconstruction approval by the BAAQMD. BAAQMD has not cited the Property Owners for this violation. The unlawfully constructed facility is a continuous violation and accordingly there is no statute of limitations for the violations.

368. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the

Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## H. COUNT 11: APPLE & THE PROPERTY OWNERS VIOLATED HAZARDOUS AIR POLLUTANTS STANDARDS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

369. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

370. The National Emission Standards for Hazardous Air Pollutants (NESHAPs) are stringent regulations aimed at controlling air toxics that are known to cause cancer or other serious health impacts. Facilities that release any of these toxic pollutants above the threshold levels violate the CAA. NESHAP establishes national emission standards for hazardous air pollutants which regulate sources and source categories that emit hazardous air pollutants that pose risks to human health.

371. EPA promulgated NESHAP for semiconductor manufacturing facilities in 2003 and amended the semiconductor NESHAP in 2008. 40 CFR Part 63, Subpart BBBBB. In the amended NESHAP, EPA imposed a new air pollution control technology standard on semiconductor manufacturing facilities, requiring such facilities to install maximum achievable control technology (MACT) for existing and new combined process vent streams containing inorganic and organic HAPs. EPA also clarified the emission control requirements for process vents by adding definitions for organic, inorganic, and combined HAP process vent streams that contain both organic and inorganic HAPs.

372. The regulations also require new, reconstructed, or existing major sources of HAPs at semiconductor fabrication facilities to install emission controls on process vents and storage tanks. The regulations prescribe separate control requirements for process vents containing organic pollutants, such as methanol, and process vents containing inorganic pollutants, such as hydrogen chloride (HCl, or hydrochloric acid) or hydrogen fluoride (HF, or hydrofluoric acid).

373. Facilities must reduce emissions from process vents containing organic air toxics by 98 percent, or to below 20 parts per million (ppm) by volume and must reduce emissions from process vents containing inorganic pollutants by 95 percent, or to below 0.42 ppm by volume. In addition, facilities must reduce HAP emissions from storage tanks with capacities greater than 1,500 gallons to the same level of control as inorganic process vents.

374. There are established BAAQMD BACTs for semiconductor manufacturing specific to solvent cleaning stations, photoresist operations, Circuit Board Etching, and Siliconizing Reactors, Furnace Chambers, and Chemical Vapor deposition Reactors (BAAQMD BACT / TBACT Workbook).

375. The U.S. EPA has air emission regulations specific to Semiconductor Manufacturing, which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated. (NESHAP, 40 CFR Part 63 Subpart BBBBB,).

376. The BAAQMD has air emission regulations specific to Semiconductor Manufacturing, which apply to this Property and Operations, but which were not complied with, and which have been and are actively being violated (Reg. 8, Rule 30 "Semiconductor Wafer Fabrication Operations", etc.)

377. Apple violated NESHAP by refusing to comply with 40 CFR Part 63 Subpart BBBBB. Among other excuses, Apple refuses to publicly admit it's doing chip fab at the Chip Fab and believes it's a voluntarily designation – including refusing to get a chip fab NPDES permit (until the treatment works caught them and made them get one), refusing to get a chip fab air permit (until BAAQMD caught them and made them get one), etc.

378. Apple is still refusing to file TRI reports (CAA/EPCRA requirements).by claiming they can choose to identify their manufacturing as being something other than chip fab, even if its chip fab – and accordingly, Apple says that, means they do not have to file TRI reports that would otherwise be required for chip fab, because Apple decided they don't have to say they are doing chip fab and there's no EPCRA enforcement agency that can force them like with the other stuff.

379. Apple also refused to set up monitoring devices so there is no way to know how much pollution it was emitting, so it did not have to report those emissions.

380. Apple violated. 42 U.S.C. 7413(c)(2)(C) by knowingly failing to install a monitoring device or method required by CAA at the Chip Fab. Apple also failed to report emissions data

accurately and did not maintain required records.

381. The Property Owners violated 42 U.S.C. 7413(c)(2)(C) by knowingly failing to install a monitoring device or method required by CAA, while knowing the building was used for chip fab, and Apple had not installed monitoring devices.

382. Apple reported emitting tons of federal Hazardous Air Pollutants every year including Chlorine, Cresol, Hexane, Hydrogen fluoride, Methyl tert butyl ether, Phosphine, Toluene, Xylenes, Mercury, Nickel, and Lead.

383. California has prioritized anti-pollution efforts on several substances listed independently both as federal HAPs and California TACs including Benzene ($C_6H_6$), Cadmium, Chloroform ($CHCl_3$), and Formaldehyde (HCHO). § 39655. Apple also emitted these chemicals too.

384. Apple violated 42 U.S.C. § 7412 by failing to comply with national emission standards for hazardous air pollutants.

385. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## I. COUNT 12: APPLE & THE PROPERTY OWNERS VIOLATED NON-ATTAINMENT STANDARDS WITH OZONE POLLUTION.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

386. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

387. Ground-level ozone (also known as smog) is created by chemical reactions between ozone precursors oxides of nitrogen and volatile organic compounds in the presence of sunlight.

Emissions from industrial facilities and electric utilities, motor vehicle exhaust, gasoline vapors, and chemical solvents are some of the major sources of these ozone precursors. High ozone levels aggravate respiratory and cardiovascular diseases, reduced lung function, and increase coughing and chest discomfort." (Santa Clara Square, Air Quality Assessment, pg1, Sept. 30 2015).

388. Under the Clean Air Act, the San Francisco Bay Area is a non-attainment area for ozone ($O_3$) and particulate matter. "High ozone levels are caused by the cumulative emissions of reactive organic gases (ROG) and nitrogen oxides (NOx)." "High ozone levels are caused by the cumulative emissions of reactive organic gases (ROG) and nitrogen oxides (NOx). Ground-level O3 is a secondary CAP, which is formed when nitrogen oxides (NOx) react with a class of pollutants called reactive organic gases (ROG) in the presence of sunlight. (BAAQMD, Emissions Inventory, 2024).

| | **Ozone Risks** |
|---|---|
| **Health** | "Ozone is highly toxic via inhalation or by contact of liquid to skin, eyes, or mucous membranes. It is capable of causing acute to chronic lung damage, burns, and death or permanent injury…An increased respiratory rate, shallow breathing, cough, dyspnea (shortness of breath), bronchitis, pulmonary edema, and pulmonary hemorrhage may occur. Tachycardia (rapid heart rate) and hypotension (low blood pressure) may be observed. Neurologic effects include fatigue, dizziness, drowsiness, headache, and depression." Ozone can be toxic at a concentration of 100 ppm for 1 minute. Ozone is capable of causing death from pulmonary edema." (EPA, 1998; CAMEO, 2025). |
| **Fire Hazard** | "Severe explosion hazard when shocked, exposed to heat or flame, or by chemical reaction with organic substances, especially reducing agents. Ozone is a powerful oxidizing agent." (EPA, 1998; CAMEO, 2025). |
| **Reactivity** | "Ozone is a propellant; ignites upon contact with alcohols, amines, ammonia, beryllium alkyls, boranes, dicyanogen, hydrazines, hydrocarbons, hydrogen, nitroalkanes, powdered metals, silanes, or thiols." (CAMEO, 2025). |

389. Ozone is most likely to form in the summer and early fall on warm, windless, sunny days. Breathing ozone can aggravate asthma and other respiratory diseases, irritate the eyes, reduce visibility, and damage vegetation. (BAAQMD, 2025). The precursor pollutants react under certain meteorological conditions to form high ozone levels. Controlling the emissions of these precursor

pollutants is the focus of the Bay Area's attempts to reduce ozone levels. The highest ozone levels in the Bay Area occur in the eastern and southern inland valleys that are downwind of air pollutant sources.

390. Apple repeatedly had ozone toxic gas alarms going off in the chip fab for years, and when the City arrived, responding to the alarms, Apple nor the City could determine if the ozone was "leaked" in the building, or the alarm was triggered by the toxic ozone created outside and around the building due to Apple unlawful emissions of ozone precursors.

391. Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any part D of subchapter I (relating to nonattainment). (42 U.S.C. § 7604(a)(1),(f)).

392. The Property owners have repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any part D of subchapter I (relating to nonattainment). (42 U.S.C. § 7604(a)(1),(f)).

393. Apple has violated 42 U.S.C. § 7410 (Section 110) by failing to comply with state implementation plan requirements.

394. The Property Owners have violated 42 U.S.C. § 7410 (Section 110) by failing to comply with state implementation plan requirements.

395. Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including condition/ requirement under subchapter VI relating to ozone protection. (42 U.S.C. § 7604(a)(1),(f)).

396. The Property Owners have repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including condition/ requirement under subchapter VI relating to ozone protection. (42 U.S.C. § 7604(a)(1),(f).

397. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## J. COUNT 13: APPLE VIOLATED 42 U.S.C. § 7604 BY EXCEEDING EMISSION LIMITS.

### (CLAIM AGAINST APPLE & PROPERTY OWNERS)

398. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

399. Apple has repeatedly violated, and is in violation of, an emission standard or limitation under this chapter including any condition or requirement of a permit under part C of subchapter I (relating to significant deterioration of air quality). (42 U.S.C. § 7604(a)(1),(f)).

400. Apple emitted more pollutants than allowed under the EPA′s standards and the specific limits set any issued permit. Apple exceeded emissions of criteria pollutants (like sulfur dioxide, nitrogen oxides, and particulate matter) Apple exceeded emissions of hazardous air pollutants which pose significant health risks.

401. Apple has repeatedly violated the conditions of the permits it was operating under as it entered the permit knowing they did not reflect its actual operations, and that it did not have the required technology to ensure compliance, and that it did not intend to ensure compliance. (42 U.S.C. § 7604(a)(3)).

402. Apple has repeatedly violated emission standards/limitations under this chapter including an emission limitation, standard of performance, or emission standard (42 U.S.C. § 7604(a)(1),(f)). Apple has repeatedly violated emission standards/limitation under this chapter including any requirement under section 7411 or 7412 of this title, (42 U.S.C. § 7604(a)(1),(f)). Apple repeatedly violated permit terms and conditions (42 U.S.C. § 7604(a)(4)). Apple repeatedly violated an order issued by the Administrator or a State with respect to such a standard or limitation. (42 U.S.C. § 7604(a)(1)).

403. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as

available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## K. COUNT 14: THE CITY VIOLATED NAAQS & CRITICAL AIR POLLUTANT STANDARDS IN SITING THE FAB AND APARTMENTS.

**(CLAIM AGAINST THE CITY)**

404. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within

405. NAAQS "standards identify levels of air quality for six criteria pollutants, which are considered the maximum levels of ambient air pollutants considered safe, with an adequate margin of safety, to protect public health and welfare. The six criteria pollutants are ozone (O3), carbon dioxide (CO), nitrogen dioxide (NO2), sulfur dioxide (SO2), PM10, PM2.5, and lead (Pb)." (Santa Clara Square, Air Quality Assessment, pg2, Sept. 30 2015).

406. "The significance of a pollutant concentration is determined by comparing the concentration to an appropriate ambient air quality standard. The standards represent the allowable pollutant concentrations designed to ensure that the public health and welfare are protected, while including a reasonable margin of safety to protect the more sensitive individuals in the population." (Santa Clara Square, Air Quality Assessment, pg 3).

407. Apple has alleged to has repeatedly violated or to be in violation of any schedule established under any applicable State implementation plan approved by the Administrator. (42 U.S.C. § 7604(a)(4)).

408. The City's Air Quality Policies include to "Protect the air quality of the City of Santa Clara and its sphere of influence" including to "romote land use and transportation policies which maintain air quality." (SCVWD, Stream Maintenance Program Renewal, Draft EIR, July 2025, Appendix C, C-29).

409. Santa Clara county has by far the most carbon monoxide emissions of any of the nine San Francisco Bay Area counties. Santa Clara county reported average CO air emissions of 206 tons/day, which is 25% of the total CO the region.

410. Similarly, Santa Clara county also reports the highest rates of emissions of reactive organic gases and PM 10, and the second highest rates for emissions of total organic gases, $SO_2$, and $NO_X$. The majority of $SO_2$ emissions and stationary NOx emissions originated from refineries and chemical plants. (BAAQMD, Emissions Inventory, 2024).

411. If state and local governments do not meet the air quality standards set by the EPA, they can be found in violation of the CAA. This usually triggers a requirement for these jurisdictions to revise their State Implementation Plans (SIPs) to address non-compliance.

412. Reactive Organic Gases are a type of volatile organic compounds (VOCs) that contribute to the formation of photochemical smog. Most ROG are photochemically reactive and can interact with NOx. NOx is a group of highly reactive gases (ie, NO and NO2) and reacts with other volatile organic compounds in the atmosphere to produce ozone on hot days. (BAAQMD, Emissions Inventory, 2024).

413. Sulfur oxides are compounds that consist of sulfur and oxygen molecules (i.e., sulfur dioxide). sulfur dioxide (SO2) reacts with other compounds to form sulfuric acid, sulfurous acid, and sulfate particles. (BAAQMD, Emissions Inventory, 2024).

414. NOx is a group of highly reactive gases, with NO and NO2 as the principal constituents. NOx typically reacts with other volatile organic compounds in the atmosphere to produce ozone on hot days. (BAAQMD, Emissions Inventory, 2024).

415. Carbon monoxide is an odorless, invisible, flammable gas that can be dangerous to human health in high concentrations, especially indoors with little ventilation. (BAAQMD, Glossary).

416. The EIR for the Santa Clara Square Apartments admitted that construction of the apartments would violate non-attainment standards and create severe air pollution, but the City approved the EIR anyway and did not require compliance with pre-construction air permitting.

417. The EIR for the Santa Clara Square Apartments admitted that the operations of such dense housing would violate non-attainment standards and create severe air pollution, but the City approved the EIR anyway and did not require compliance with pre-construction air permitting.

418. The Planning and Building applications for the Chip Fab, by nature of the operations, would violate non-attainment standards and create severe air pollution, but the City

approved the EIR anyway and did not require compliance with pre-construction air permitting.

419. In 2014-2015, the City knew about the air pollution that was created and would be created by the Chip Fab; and knew about the air pollution that would be created by the Santa Clara Square development; and knew about the air pollution that would be created by operations at Santa Clara Square; and the City approved it anyways.

420. Further, the City intentionally concealed the Chip Fab as another air pollution source, from the EIR and planning process, and it was never mentioned – including any cumulative analysis, which is legally required. The only mention at all of the Chip Fab was of the adjacent 3260 Scott Blvd office, noting the Owner was Mr. Jenab, and as of Sept 2015 the EIR falsely claimed the "Plant closed 12/21/14" (pg.150).

421. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## L. COUNT 15: THE CITY VIOLATED CAA WHEN IT APPROVED THE SANTA CLARA SQUARE EIR, WITH TERMS REFUSING TO COMPLY WITH NON-ATTAINMENT STANDARDS.

**(CLAIM AGAINST THE CITY)**

422. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Air Act Counts within.

423. The EIR documented that during project operations, emissions of ROGs would exceed the significance thresholds by 12 percent.

424. The 2017 EIR addendum claimed the nearest sensitive receptors were 2,000 feet away (p. 12, 16). The EIR also noted there will be sensitive receptors onsite but claimed the impact would be "less than significant because at same location." (p. 17). For informational purposes it is

noted that sources of air pollutant and TAC emissions near the site could adversely affect these receptors." (Santa Clara Square, Air Quality Assessment, Sept. 30 2015).

425. The EIR stated that for cumulative impact they are supposed to analyze stationary sources "1,000 feet of the project site." However, instead of complying with the Clean Air Act, the City and The Irvine Company intentionally violated the Clean Air Act, with reckless indifference to the environment and health/safety. They claimed that if they were to consider air pollution sources within 1000ft (such as the Chip Fab) in a cumulative air pollution analysis, it would be an unlawful reverse CEQA mandate which is a "matter of debate at the present time." They then cited a hodge podge of court cases, claiming the holding was that they do not need to consider the effect of the environment on the project – but the cases they cited were examples were the factory at issue was more than a mile away.

426. The EIR further stated that the only concern in approving a development like this must be compliance with CEQA, not federal laws. The EIR cited a SCOTUS case and implied it meant there is no legal requirement to consider the risks to human health/safety when building a large residential apartment complex in an inherently unsafe location.

427. Then, in 2017, an addendum to the EIR was completed, after which point Apple had filed some permits and there was enough public information that someone doing an EIR in that area would certainly know there's a Chip Fab – but the EIR stated "there have been no other changes in circumstances or substantial new information that would alter the conclusions of the 2015 ER with respect to air quality impacts such that additional environmental review would be triggered."

428. The City of Santa Clara violated the Clean Air Act when it intentionally, knowingly, recklessly, refused to acknowledge or comply with the Clean Air Act. Instead, the City intentionally refused to acknowledge Clean Air Act requirements, contributed to, and officiated formal government documents with these violations, made them officially city acts and records, knowing there would be harm to people, property, and environmental due to their violations.

## XIV. CITIZEN SUIT ENFORCEMENT ACTIONS AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE CLEAN WATER ACT.

429. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts

under this statute, are hereby incorporated as though those allegations were fully set forth herein.

430. Defendants Apple, The City, and The Property Owners have violated the Clean Water Act, and enforcement is available under 33 U.S.C. § 1365(a)(1) Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

431. Apple is responsible for violations of the Clean Water Act because Apple "owns, leases, operates, controls, or supervises a source"(The Chip Fab) as defined by 33 U.S.C. § 1316(a), and Apple's actions, omissions, and that source give rise to these claims.

432. The Property Owners are liable under the Clean Water Act because they "owns, leases, operates, controls, or supervises a source" (The Chip Fab and Synertek Superfund site) as defined by 33 U.S.C. § 1316(a)—and The Property Owner's actions, omissions, and those sources give rise to these claims.

433. The City is liable under the Clean Water Act because it "owns, leases, operates, controls, or supervises a source" (The SJ-SC RWF) as defined by 33 U.S.C. § 1316(a) and The City's actions, omissions, and that source give rise to these claims.

434. City of Santa Clara is the co-owner of The San Jose/Santa Clara Water Pollution Control Plant ("SJ-SC RWF"). The treatment works plant was first constructed in 1956 and is located at 700 Los Esteros Road San Jose, CA 95134. (CIWQS Place Number 255333; ORDER No. R2-2020-0001 NPDES No. CA0037842).

435. The Clean Water Act/NPDES permits governing the SJ-SC RWF regulate the City of Santa Clara directly and individually regarding the operation of the "City of Santa Clara wastewater collection system" and the SJ-SC RWF's wastewater discharge into receiving waters of the U.S. (here, the "Artesian Slough," a tributary to the San Francisco Bay via the Coyote Creek).

436. The California State Water Resources Control Board issued a NPDES stormwater permit to the City of Santa Clara, as part of the municipal permitting program. The City has been the primarily regulated party regarding stormwater discharges in Santa Clara since the 1990s. The City's Clean Water Act permits include Order Nos. R2-2022-0018 and R2-2023-0019.

437. Apple has a permit San Jose-Santa Clara Regional Wastewater Facility (SC-461B). On November 19 2015, the San Jose-Santa Clara Regional Wastewater Facility notified Apple of

their status as a Significant Industrial User as defined under 40 CFR 403.3(t)(i) and (ii), and of their responsibilities as industrial users under the RCRA. (Permit SC-461B). The Facility is also regulated by the Industrial Stormwater Permit.

438. The Wastewater Facility also discovered Apple was doing semiconductor fabrication and revoked Apple's prior "research and development" NPDES permit and issued a different and more comprehensive one specific for semiconductor fabrication on Oct. 21 2016. The Wastewater Facility said the new permit was to comply with 40 C.F.R. 469 Subpart A. The Wastewater Facility also cc'd Mike Vasquez, the Environmental Compliance Officer for the City of Santa Clara.

439. On March 30 2016, the San Jose-Santa Clara Regional Wastewater Facility for Failure cited Apple to Use Proper Sample Method in Discharge Reports in violation of 40 CFR 403.12 (g)(3) and SCCC-13.10.580. On April 11 2016, Apple was cited by the San Jose-Santa Clara Regional Wastewater Facility for Inappropriate sample frequency in violation of 40 CFR 403.12(h) and SCCC-13.10.500. On May 11 2016, Apple was also cited for Late Reporting Discharge Reports in violation of SCCC-13.10.580. (Permit SC-461B Warning Notice WN-009174). The Notice of Violation explained:

> "The permit conditions contained in the San José-Santa Clara Regional Wastewater Facility Industrial Discharge Permit, SC-461B for Apple, Inc. requires sample analyses by 40 CFR 136 methods and sampling during the monitoring period from 9/1/2015 to 2/29/2016 for Self-Monitoring Report due on 3/31/2016. Apple Inc. failed to analyze samples collected for Self-Monitoring Report (SMR) using 40 CFR 136 methods and failed to sample during the monitoring period. Apple, Inc. did re-analyze samples using correct methods, but the final and complete self-monitoring report was not received until 5/11/2016, after the permit required due date of 3/31/2016."

(Warning Notice WN-009174, May 23 2016).

440. On March 30 2016, the San Jose-Santa Clara Regional Wastewater Facility approved a request for Apple to discharge wastewater from their "deionization system and fab plumbing" to the sewer system but instructed all discharges must comply with 40 CFR 403.5 "National Pretreatment Standards: Prohibited Discharges" and warned Apple that "The discharge of water or wastewater which causes pollution or violation of any effluent limitations, national standard of performance, or national pretreatment or toxicity standard may result in the assessment of civil penalties and/or suspension of sewer service to your facility." (March 30 2016).

441. On June 6 2016, Apple responded via Linda Knudsen, explaining despite operating for a year at the facility, "inadequate systems were in place to predict a permit response requirement in a timely manner" and "Procedures with the lab were not set up for collection of samples." Knudsen noted that one of the remedies taken was that "Apple reviewed plans with the City to ensure accurate understanding of the requirements for the submittal."

442. On September 21 2020, Apple was cited by the San Jose-Santa Clara Regional Wastewater Facility for inappropriate sample frequencies in violation of 40 CFR 403.12(g) and SCCC-13.10.420.

> "The permit condition contained in the San José-Santa Clara Regional Wastewater Facility Industrial Permit, SC-461B for Apple, Inc., requires sampling during the monitoring period from 3/1/2020 to 8/31/2020 for Self-Monitoring Report due on 9/30/2020. Apple, Inc., did not collect samples during the monitoring period."

(Warning Notice WN-009573, Jan. 29 2021).

443. 3250 Scott reported an average daily water usage of around 44,000 gallons per day and the sewer pipes carrying 3250 Scott's discharges flowed downhill and directly around the apartment where Plaintiff lived in 2020. In 2020, the government had already started investigating the plumbing at her apartment as a vector for some unknown solvent vapor pollution.

444. On February 11 2021, Apple via Tom Huynh, submitted a letter to San Jose-Santa Clara Regional Wastewater Facility blaming staffing due to COVID.

445. Apple's leaks, spills, and releases were not limited to the air. Apple's wastewater discharge monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017, the government mandated testing revealed the presence of 29 µg/L of 1,1-Dichloropropene, 24 µg/L of Trichloroethylene ("trichloroethylene"), and 6.7 µg/L of Ethyl tertiary-butyl ether (ETBE).

446. Among other issues, it is unclear why Apple had trichloroethylene on site but not in any of its chem. inventories, and then, in addition, why exactly Apple was pouring that trichloroethylene down the drain.

447. The Facility discharges wastewater into the City's sewer system, which reaches the Pacific Ocean.

448. This is apparently the only Apple facility regulated as a Significant Industrial User with the SJ-SC RWF, and as of 2022 there were only 126 SIU total across Santa Clara, San Jose,

Campbell, and Milpitas.

449. The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging industrial stormwater without appropriate permits and violating permit conditions. The Defendants have violated 33 U.S.C. § 1342 (NPDES) by discharging in violation of permit terms and conditions. Defendants have falsified discharge monitoring and have not reported what they discharge. Defendants have failed to pretreat discharge. Defendants knowingly violated the Act, while they knew at the time that such acts put another person(s) in imminent danger of death or serious bodily injury. 33 U.S.C. 1319(c)(3).

450. On June 9 2016, a Santa Clara City Stormwater Inspector reported that Apple had dumped cooling water into the storm drains. The ticket was not updated until Feb. 10 2022, six years later, when it was closed as completed 27 minutes after being assigned. (Santa Clara Spill Ticket #1657490). "Actual" April 5 2022 inspection – need "no dumping" medallions on all overflow structures – bioretention area three does not appear to be a thing / follow up June 3 2022 – still missing medallions.

451. Santa Clara city Code Enforcement team then conducted their first Stormwater Inspection of the facility on April 5 2022. The reported noted that two bioretention areas were missing required cobblestones or had too many, the other bioretention area "*does not appear to be a bioretention area or other stormwater treatment facility*" and noted that none of Apple's storm drains at the facility had required "*No Dumping*" medallions. Santa Clara city marked them "in compliance – implement corrective actions." Upon reinspection on June 3 2022, the bioretention areas had not been corrected, and the storm drains still did not have "No Dumping" medallions. No updated reports were provided by the city.

452. Saratoga Creek is part of a deep, actively circulating serpentine system flowing to the Bay. Due to the nature of these hydrothermal systems, the entire area is a jurisdictional Water of the US. A "creek bed" it is the entire geological structure that channels the water flow. This deeply circulating hydrothermal system means at least the 30-foot deep, two-block-wide area is also a component of the stream's functional channel. Saratoga Creek is unambiguously a "relatively permanent, standing or continuously flowing body of water" (or a direct tributary thereof) because the hydrothermal circulation ensures the deep flow is a continuous source, and geological evidence indicates that it has flowed into the Pacific Ocean, and/or had Ocean waters flowing through it, for

hundreds of millions of years.

453. The CWA aims to protect the chemical, physical, and biological integrity of Waters of the US. The filling and subsequent redirection physically isolates the surface water from the deep serpentine vault circulation. The deep, flowing serpentine water supports specialized endemic aquatic life adapted to the specific hydrothermal regime. By filling the channel and isolating the circulation, the physical structure needed for the biological integrity of the WOTUS has been fundamentally destroyed. The degradation of the stream's physical and biological integrity continues every day the unpermitted fill prevents the natural circulation and exchange, supporting your claim for restoration. The pollution interferes with the temperature, pressure, and mineral exchange of the serpentine system, which are essential physical and chemical characteristics of the Waters of the US.

## M. COUNTS 16-17: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. §§ 1311, 1341, 1344 BY DISCHARGING ADDITIONAL POLLUTION INTO SARATOGA CREEK.

**(CLAIMS AGAINST APPLE AND THE PROPERTY OWNERS)**

454. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

455. The Property Owners must have been aware of a massive, active hydrothermal, aquifer system flowing under their properties at 3250 Scott Blvd, 3260 Scott Blvd, and 3050 Coronado Drive. Apple must be aware of the same, with its General Counsel previously spending 14 years running the legal department, including environmental compliance for Honeywell who is the Responsible Party for a the Synertek Superfund site, which is located on the creek/aquifer.

456. In 2017, Katharine Adams joined Apple as General Counsel. Prior leading Apple Legal & Security teams, Adams was Honeywell's General Counsel since 2003. Adams specialized in environmental law and worked as an attorney for the DOJ's Environment and Natural Resources division. Adams must be aware of the unlawfully filled aquifer system at the Premise – including the active, natural spring documented in US EPA and California environmental reports as part of oversight of the Synertek Superfund site, where Honeywell is the Responsible Party.

457. At the Synertek site, groundwater monitoring well # MW-03B1 is frequently mentioned in federal and state monitoring reports (i.e., "well MW-03B1 has historically been observed to be an artesian well based on water seen on the pavement around the well and the depth to water measured as the top of casing" -- Synertek GW January 28, 2015).

458. Well MW-03B1 was drilled on the 3050 Coronado Dr. property (adjacent to The Chip Fab) to monitor the B1 aquifer (encountered at around 100ft bgs) and tapped into a natural spring. Deep soil borings were gathered near the spring in 1991 as part of the Synertek site CERCLA investigations. The results showed additional evidence to support the spring is part of a serpentine hydrothermal system including olive-colored soil and rocks at the depth of the B1 aquifer. (Synertek GW January 28, 2015).

459. Further, the formal EIR for the Santa Clara Square Apartments noted a large, pressurized, underground aquifer (which they referred to as an "artesian feature") flowing only ~35 feet underground and across a distance of ~three blocks wide. (Santa Clara Square Apartments, EIR, Oct. 2015). It was also thought to be attributable to the B1 aquifer.

460. Apple and The Property Owners must have known the Saratoga Creek was still flowing under the Premise, that it was been unlawfully filled – but instead of abating or reporting the violations, instead, Apple and the Property Owners undertook dangerous manufacturing activities that create extensive hazardous waste and emissions, knowing at least some of that pollution would find its way onto the soil and stormwater, and enter the Saratoga Creek aquifer system through the soil, wells, and springs.

461. The defendant admits to releasing eight tons per year of toxic pollutants into the air. Those pollutants settled on the defendant's property, which sits directly on an ancient creek channel that flows underground to San Francisco Bay. The defendant knew—or should have known—that this area has unique geology.

462. Historic maps show a permanent creek flowing alongside the facility. An artesian well on the defendant's own property proves pressurized groundwater is flowing beneath the site. When toxic pollutants settle on highly permeable serpentine rock above a pressurized underground creek, they do not stay there. They wash into the ground, enter the creek, and flow to the Bay. This happened every time it rained for over ten years.

463. Apple never sought or obtained a Clean Water Act permit for these discharges.

Apple is liable for unpermitted discharge of pollutants to waters of the United States.

464. The Property Owners never sought or obtained a Clean Water Act permit for these discharges. The Property Owners is liable for unpermitted discharge of pollutants to waters of the United States.

465. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### N. COUNT 18: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1311 BY DISCHARGING UNPERMITTED AND FORBIDDEN POLLUTED WASTEWATER.

**[Claim Against Defendants Apple & The Property Owners]**

466. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

467. Apple violated 33 U.S.C. § 1311(a) by discharging pollutants without required permits, whether by failing to apply for required permits, for failing to disclose their actual discharges during the permitting process.

468. The Property Owners violated 33 U.S.C. § 1311(a) by knowing Apple discharging pollutants without required permits; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

469. Apple violated 33 U.S.C. § 1311(f) by discharging pollutants consisting of chemical warfare agents into the Waters of the US, which is forbidden without exception.

470. The Property Owners violated 33 U.S.C. § 1311(f) by knowing Apple by discharging pollutants consisting of chemical warfare agents; but did not stop or report those violations, and

instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

471. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### O. COUNT 19: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1316 BY CONCEALING THE SOURCE OF DISCHARGED WASTEWATER WAS SEMICONDUCTOR MANUFACTURING.

**(CLAIM AGAINST APPLE AND THE PROPERTY OWNER)**

472. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

473. Apple violated 33 U.S.C. 1316(e) by operating a new source in violation of the standards of performance applicable to the source.

474. The Property Owners violated 33 U.S.C. 1316(e) by knowing that Apple was operating in violation of standards of performance; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

475. Apple and The Property Owners failed to disclose to the The SJ-SC RWF that the wastewater was created from chip fab operations, which requires a NPDES permit specific to Semiconductor Manufacturing.

476. The City and its' SJ-SC RWF are required by 33 U.S.C. § 1342, to only "issue permits which can be terminated or modified for cause including…obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts." Upon discovering The Chip Fab's actual operations in 2016, they simply revised and correct the permit designation but took no

enforcement against Apple or The Property Owners.

477. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## P. COUNT 20: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1317 BY FAILING TO PROPERLY TREAT DISCHARGED WASTEWATER.

### (CLAIM AGAINST THE PROPERTY OWNER)

478. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

479. Apple violated 33 U.S.C. § 1317(d) by operating a source in such a way as to discharge polluted wastewater in violation of effluent standards/prohibitions into a treatment works.

480. The Property Owners violated 33 U.S.C. § 1317(d) by knowing that Apple was discharging wastewater in violation of CWA effluent standards/prohibitions; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

481. Apple violated 33 U.S.C. § 1317(d) by operating a source in such a way as to discharge polluted wastewater into a treatment works and in violation of pretreatment standards.

482. The Property Owners violated 33 U.S.C. § 1317(d) by knowing that Apple was discharging polluted wastewater in violation of pretreatment standards; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the

violations.

483. Apple violated 33 U.S.C. § 1342(k) by also violating 33 U.S.C. §§ 1312, 1316, 1317, 1343 as noted above and for which there is no "permit shield."

484. The Property Owners violated 33 U.S.C. § 1342(k) by knowing Apple was violating 33 U.S.C. §§ 1312, 1316, 1317, 1343; but did not stop or report those violations, and instead accepted economic benefits arising out of the noncompliance and which would cease with The Property Owners stopping the violations and thus contributed to the violations.

485. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### Q. COUNT 21: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING WASTEWATER DISCHARGE AND TREATMENT.

**(CLAIM AGAINST THE CITY OF SANTA CLARA)**

486. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

487. . The Chip Fab discharges around 40,000 or more gallons each day of polluted wastewater, releasing that wastewater into the public sewer system owned by The City and which is transported to The City's SJ-SC RWF treatment works. After The SJ-SC RWF treats the received wastewater, around eighty percent is discharged to the SF Bay, part of the Pacific Ocean (a Water of the US). The remaining twenty percent of the wastewater is redirected to a Water Recycling Program System, co-owned and operated by City of Santa Clara. The City sells this recycled water for profit.

488. The polluted wastewater discharged by The Chip Fab, and treated by the City's

The SJ-SC RWF, is either dumped into the Pacific Ocean or returned to the Premise and discharged across the public parks and playgrounds, around the apartments and common areas, and along the public sidewalks and trails. The City profits from collecting permit and treatment fees, co-owns accounting and operations, purchases its own recycled water for use at its public parks and playgrounds; is accountable and responsible for the public sewers, water lines, and other infrastructure servicing The Chip Fab's wastewater and the recycled water systems around the Premise.

489. The more wastewater that is discharged by The Chip Fab into the sewers and flowing to the The SJ-SC RWF, the more recycled water the City can sell for profit. If The City and its SJ-SC RWF know The Chip Fab's wastewater is heavily polluted by semiconductor manufacturing and CWA violations, then the City's NPDES permit governing The SJ-SC RWF would require the City to expend additional costs and resources to properly treat the polluted wastewater prior to selling that wastewater as recycled water. While the Plaintiff was there, the recycled water around the apartments was labeled with warning signs indicating the recycled water is known to be toxic and/or harmful to humans and animals.

490. The NPDES permit issued by the City for the Chip Fab fails to include the legally required amount of detail regarding the operations and hazards at The Chip Fab.

491. The City of Santa Clara, individually and jointly as The SJ-SC RWF, violated 33 U.S.C. § 1342(b)(3) by issuing wastewater discharge permits to Apple and The Property Owners for discharges into public sewers from The Chip Fab, which transport the polluted wastewater to the Facility and then the Facility releases treated wastewater into navigable waters, but the City failed to "ensure that the public… receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application." There was no public notice or participation for the City's permitting of The Chip Fab and no public participation.

492. The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(7) by failing to" abate violations" by Apple and The Property Owners of the permit and the permit program, related to The Chip Fab, including failing to pursue "civil and criminal penalties and other ways and means of enforcement."

493. The City of Santa Clara, individually and jointly as The SJ-SC RWF, violated 33 U.S.C. § 1342(b)(8) by issuing wastewater discharge permits to Apple and The Property Owners

for The Chip Fab (as a designated Significant Industrial User) for discharges into public sewers, which then transported the polluted wastewater to the treatment plant, and which then released those wastewater into the Waters of the US – because the City failed to ensure the permitting process required and actually identified the "terms of character and volume of pollutants" of a "significant source introducing pollutants subject to pretreatment standards under section 1317(b)."

494. The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to create and maintain "a program to assure compliance with such pretreatment standards" by The Chip Fab.

495. The City of Santa Clara, individually and jointly as The SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to ensure The Chip Fab provided "adequate notice to the permitting agency" of new discharges of pollutants (1311, 1316) and/or a "substantial change in volume or character of pollutants being introduced" at/after the issuance of the permit.

496. The City of Santa Clara, individually and jointly as the SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(8) by failing to ensure The Chip Fab provided "adequate notice to the permitting agency" with "information on the quality and quantity of effluent to be introduced" into the City's treatment works.

497. The City of Santa Clara, individually and jointly as the SJ-SC RWF, further violated 33 U.S.C. § 1342(b)(9) by failing to ensure The Chip Fab, a Significant Industrial User of a publicly owned treatment works, and Apple and The Property Owners, provided "will comply with sections 1284(b), 1317, and 1318" of the Clean Water Act.

498. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### R. COUNT 22: THE CITY VIOLATED § 1319 BY FAILING TO TAKE ENFORCEMENT ACTION REGARDING DISCHARGES.

**(CLAIM AGAINST THE CITY OF SANTA CLARA)**

499. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

500. Under 33 U.S.C. § 1319(f), when a municipality, such as City of Santa Clara, owns/operates a treatment works, such as the SJ-SC RWF, and the City, as owner of the treatment works, has knowledge that an industrial user is violating 33 U.S.C. § 1317, such as by discharging polluted wastewater in violation of effluent standards and prohibitions, into the City's treatment works, such as Apple and The Property Owners 33 U.S.C. 1317(d) violations at The Chip Fab; then the City, as owner of the treatment work has mandatory obligations.

501. The owner of the treatment works must "commence appropriate enforcement action within 30 days of the date of such notification." The City and its treatment works have known for years about Apple and The Property Owners 33 U.S.C. § 1317 violations at The Chip Fab, but the City and its treatment works have taken no enforcement actions.

502. If the municipality does not "commence appropriate enforcement action," then the EPA or a Citizen may commence a civil action about the industrial user's violations. The Plaintiff in this Citizen Suit complained to the EPA in 2023 about unlawful and dangerous discharges of "polluted wastewater in violation of effluent standards and prohibitions" with evidence of ongoing hazards and reported injuries arising The Chip Fab's wastewater discharges into the sewers at the Premise. The EPA failed to take enforcement action. The Plaintiff's Sixty-Day notice discussed these concerns, but no action was taken to abate the violations and hazards. Accordingly, this Citizen Suit.

503. Under 33 U.S.C. § 1319(f), the civil action "shall join" both the owner/operate of the treatment works and the owner/operator of the source of the pollution. The action may "seek appropriate relief, including but not limited to, a permanent or temporary injunction" against one or both parties. Accordingly, the Plaintiff pleads this claim against all Defendants. A District Court

"shall have jurisdiction to… require the owner or operator of the treatment works and the owner or operator of the source to take such action as may be necessary to come into compliance with this chapter." (§ 1319).

504. As part of the USEPA's National Pollutant Discharge Elimination System (NPDES), municipalities are required to maintain NPDES permits for stormwater discharges. The municipalities, in turn, must require that individual projects within their jurisdiction comply with the requirements of these permits. The City is a permittee to the Santa Clara County Municipal Regional Stormwater NPDES Permit (Order R2-2009-0074, NPDES Permit No. CAS612008). The permit applies directly to City of Santa Clara individually and more generally through the City's membership in the "Santa Clara Valley Urban Runoff Pollution Prevention Program."

505. The permit regulates municipal stormwater discharges in the City of Santa Clara, including The Chip Fab and the Santa Clara Square Apartments. (SCVWD, Stream Maintenance Program Manual, Ch. 2, Pg. 12, R14290, 2027-2036).

506. The Stormwater Control Operation and Maintenance Plan is between the City, and The Property Owners requires The Property Owners submit annual maintenance logs to the City. Based on Public Records request responses, The Property Owners has never filed these to the city.

507. The City violated 33 U.S.C. § 1342 when it approved the stormwater management plan for The Santa Clara Square Apartments. The project encompass 33.5 acres, and 9.5 acres are pervious, and twenty-four acres are non-pervious. During the EIR process, the city decided that no hydromodification management was required because the development increased the pervious area from 6.6 to 9.5, even though there are still twenty-four acres of non-pervious. (Planning Commission Staff Report, 12/9/15 p. 9).

508. The City knew the apartments were next to a high hazard Chip Fab and waived all stormwater management requirements while knowing there would be extensive pollution, and a significant amount of that pollution would end up in the Saratoga Creek system and Pacific Ocean.

509. The City has failed to diligently inspect and monitor stormwater mitigation at the Chip Fab. The City knows the Chip Fab is releasing tons of pollutants into the air, which settle on the land, and enter the stormwater when it rains – and the City has done nothing. The City discovered Apple was dumping cooling fluid into the storm drains in 2016, did not do anything until 2022, and then still did nothing about it.

510. The City owns and controls the stormwater management infrastructure. "The City owns and maintains 15-, 18- and 21-inch storm drains in Augustine Drive, an 18-inch storm drain in Montgomery Drive, a 15-inch storm drain in Octavius Drive, 21- and 24-inch storm drains in Scott Boulevard, and a 24- inch storm drain on the eastern border of the project site." (SCSA 2017 EIR Addendum No. 1).

511. The City owns and controls the 1) stormwater infrastructure 2) the wastewater infrastructure 3) the stormwater treatment mandates and technology the 4) the wastewater treatment works and 5) the permitting process for both types of discharge. The City's failure to enforce the CWA with the Chip Fab, but the City also violated the CWA regarding its own violations with the Chip Fab.

512. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## S. COUNT 23: APPLE & THE PROPERTY OWNERS VIOLATED 33 U.S.C. § 1342 REGARDING STORMWATER.

### (CLAIM AGAINST APPLE AND THE PROPERTY OWNERS)

513. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within

514. The Plaintiff incorporates the allegations contained in the first five sections, through "General Allegations," and the allegations contained in other Counts under this same statute, as though those allegations are fully set forth herein.

515. The industrial materials stored, and the pollutants generated at the Property are exposed to stormwater flows.

516. Pollution from industrial air emissions (like metals or solvents) settles onto the ground, rooftops, and parking lots. When rainwater hits these impervious surfaces, it becomes contaminated stormwater runoff. Activities at the Chip Fab generate significant debris and particulate matter, which contain pollutants and settle on surfaces.

517. *Sierra Club v. ICG Hazard, Inc.*, 781 F.3d 281 (6th Cir. 2015) -- (Air emissions that deposit into waters of the US are a CWA violation); *Ohio Valley Environmental Coalition v. Fola Coal Co.,* 845 F.3d 133 (4th Cir. 2017).

518. Operations and emissions at the Chip Fab occur outdoors and may cause pollutants to be exposed to rainfall. The types of pollutants released by The Chip Fab into the immediate environment have contaminants, including total suspended solids, hazardous materials, heavy metals, nitrogen, and other pollutants.

519. During rain events, this pollution washes off those surfaces and flows into Saratoga Creek, San Thomas Aquino Creek, the San Francisco Bay, its inflows, outflows, and other waters of the overall San Francisco Bay Watershed, of which the San Francisco Bay is a part.

520. The storm water from the Chip Fab drains out of an 18-inch pipe into the San Tomas Aquino Creek (EL 30.02 to #42 to #44, to #39).

521. Apple's Permit-by-Rule application to CalEPA DTSC on Nov. 8 2016 admitted that rain and wash water drains to the storm drain and sewer. (application notes that "slightly contaminated storm or wastewater can seriously contaminate evaporation or settling areas (with no drainage) over a period of time."

522. The NPDES permit issued by the City to Apple for wastewater at the Chip Fab required that "The Permittee shall provide protection from accidental discharge of prohibited materials or other wastes regulated by City of Santa Clara Code Chapter 13.10 into either the storm drain or sanitary sewer systems."

523. The NPDES permit states that "Any person who intentionally or negligently violates any provisions of the Permit issued, or who intentionally or negligently discharges waste or wastewater which causes pollution, or violates any effluent limitation, National Standard of Performance, or National Pretreatment or Toxicity Standard, may be civilly liable to the City."

524. The NPDES permit states "The Perrnittee shall properly dispose of pretreatment or other sludge, and any hazardous wastes (e.g., spent chemicals) used or generated at the

Permittee's facility so as to prevent the discharge of such materials to the San Jose-Santa Clara Regional Wastewater Facility or sanitary sewer." (SC-461B | SJ ESD & SC)

525. Apple has violated 33 U.S.C. § 1342 (NPDES) by discharging pollutants into stormwater without appropriate and required permits.

526. Apple has violated 33 U.S.C. § 1311 (Effluent limitations) by allowing and enabling discharges of pollutants into stormwater at the Chip Fab that exceed the amounts allowed, if any, on the NPDES permit and/or stormwater O&M agreement issued by the city.

527. The Property Owners have violated 33 U.S.C. § 1342 (NPDES) by discharging pollutants into stormwater without appropriate and required permits.

528. The Property Owners have violated 33 U.S.C. § 1311 (Effluent limitations) by allowing and enabling discharges of pollutants into stormwater at the Chip Fab that exceed the amounts allowed, if any, on the NPDES permit and/or stormwater O&M agreement issued by the city.

529. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### T. COUNT 24: THE CITY VIOLATED 33 U.S.C. § 1342 REGARDING PUBLIC NOTICE & ENGAGEMENT REGARDING THE CHIP FAB'S STORMWATER DISCHARGE AND PERMITTING.

**(CLAIM AGAINST THE CITY OF SANTA CLARA)**

530. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other Clean Water Act Counts within.

531. The City of Santa Clara violated 33 U.S.C. § 1342(b)(3) by creating pseudo-permits to Apple and The Property Owners for stormwater discharge into navigable waters.

532. The City issued an O&M agreement as if it was a permit.

533. The City also attempted to incorporate stormwater provisions into a wastewater permit, in dicta.

534. Either way, the City failed to "ensure that the public… receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application."

535. There was no public notice or participation for the City's permitting of The Chip Fab under the Clean Water Act, and no public participation.

536. "Pollution prevention outreach is required by the NPDES wastewater discharge permit" (City of San Jose).

537. "Any pollutant that flows into the storm drain ends up in our creeks, the San Francisco Bay and eventually the ocean. The City of Santa Clara has three ephemeral creeks (Calabazas Creek, Saratoga Creek and San Tomas Aquino Creek) and the Guadalupe River. … Nothing besides clean water may be dumped or allowed to flow into a storm drain." (City of Santa Clara).[37]

538. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XV. CITIZEN SUIT ENFORCEMENT ACTION AGAINST DEFENDANTS FOR VIOLATIONS OF THE EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT.

539. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts

[37] Santa Clara City, Stormwater Pollution Prevention, https://www.santaclaraca.gov/our-city/departments-g-z/public-works/environmental-programs/stormwater-pollution-prevention

under this statute, are hereby incorporated as though those allegations were fully set forth herein.

540. In addition, the factual allegations pled under other Citizen Suit statutes, and Public Nuisance, specifically regarding 1) emissions, discharges, and releases, 2) notifications and access to information, and 3) risk of harm to people located outside of The Chip Fab, are also hereby incorporated under this section, as though those allegations were fully set forth herein.

541. Defendants Apple, The City, and The Property Owners have violated the EPCRA and Citizen Suit enforcement is available under 42 U.S.C. § 11046. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

### A. COUNT 25: APPLE AND THE PROPERTY OWNERS VIOLATED EPCRA NOTIFICATION AND REPORTING REQUIREMENTS.

**(CLAIMS AGAINST APPLE AND THE PROPERTY OWNERS)**

542. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

543. Apple and The Property Owners violated EPCRA §302, 42 U.S.C. § 11002 ("Emergency planning notification") by failure to notify State Emergency Response Commission (SERC) and failure to designate facility representative. "A person responsible for a facility must, as soon as he or she has knowledge of an unauthorized discharge from or at such facility, immediately notify the local fire agency and the Director of such discharge." (S.C.C.C., § B11-395; Ord. No. NS-517.72, § 2, 4-15-03).

544. Apple and The Property Owners violated EPCRA § 304, 42 U.S.C. § 11004, ("Emergency Release Notification") by failing to report releases of extremely hazardous substances and CERCLA substances that exceeded reportable quantities and failing to provide community notifications. They did not report the releases, actions taken to respond and contain the release, or known or anticipated health risks associated with the release. The City has knowledge of chemical releases from the Facility but has failed to require Defendants to make reports and failed to notify the community as required under EPCRA § 304. Further, the California

Fire Code requires that NFPA 704 Fire Diamonds be placed at "entrances to locations where hazardous materials are stored, dispensed, used, or handled in quantities requiring a permit." (Chapter 50, § 5003.5).

545. Apple violated the EPCRA §§ 311 and 312 (Hazardous Chemical Inventory Reporting) by failing to keep an accurate and up-to-date inventory of hazardous chemicals and failing to report those inventories to the state and local government. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists extensive amounts of very dangerous substances including Silane, Chlorine gas, Ammonia ($NH_3$), sulfuric acid, and dichlorosilane.[38] Apple's hazardous waste manifests for the site show that in 2024 its still processing at least 120 tons of arsenic, at least 50 tons of ignitable waste, and at least 36 tons of corrosive waste at this single facility. It is also disposed of at least 46.85 tons of "unspecified solvent mixture" as "non-RCRA" waste in just 2025.[39]

546. EPCRA § 326(a)(1)(A), under which Plaintiff brings this action, is EPCRA's citizen enforcement provision for the owner and operator Defendants' failure to submit emergency notices under section 11004(c), submit material safety data sheets or a lists under section 11021(a), complete and submit an inventory form under section 11022(a), and complete and submit a toxic chemical release form under section 11023(a). (42 U.S.C. § 11046).

547. "Complete and accurate records are absolutely essential to meaningful compliance with EPCRA Section 313 reporting requirements." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). Facilities "must submit an EPCRA Section 313 report for each EPCRA Section 313 chemical or chemical category that exceeds a threshold for manufacturing, OR processing, OR otherwise use (providing you meet the employee and SIC Code criteria)." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007).

548. "Any person may commence a civil action on his own behalf." (42 U.S.C. § 11046(a)(1)). The district court shall have jurisdiction in actions brought under subsection (a) against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement. (42 U.S.C. § 11046(c)).

549. "One of the primary goals of EPCRA is to increase the public's knowledge of, and

---

[38] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals
[39] U.S. EPA, https://hwts.dtsc.ca.gov/facility/CAR000278176

access to, information on both the presence of toxic chemicals in their communities and on releases into the environment and other waste management activities of those chemicals." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). "Most semiconductor manufacturing industry facilities fall under SIC Code 3674 (Semiconductors and Related Devices) and are required to prepare a report (or reports) if they meet the employee and chemical activity thresholds." (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007). There is a formal 187-page U.S. EPA guide dedicated to EPCRA reporting requirements for Semiconductor Manufacturing. (*EPCRA for Semiconductor Manufacturing,* EPA 745-R-99-007).

550. Plaintiff spent an incredible amount of time in 2020-2021 researching and investigating, trying to figure out what happened to her next to the Property. She reviewed public records for the nearby next-door buildings, including 3250 Scott. When she pulled looked up the Property on the U.S. EPA portal in 2020, the ECHO page noted that there had been no Toxics Release Inventory releases reported since the 1990s, cited no violations or issues, and made the office look quite benign. Apple managed and continues to manage 3250 Scott as an unmarked office building without any designation as to who was using the building or for what they were using it. In the regulatory paperwork that did exist, Apple repeatedly tried to use code names and to disguise their activities.

551. On August 16 2025, Plaintiff and other concerned community members held a rally and press conference outside the Property to discuss Plaintiff's plan to file this lawsuit. Community members expressed concern that there was no Apple logo on the building and there was no indication that industrial or hazardous activities were occurring in the facility. The community members did locate an NFPA 704 Fire Diamond at an entrance near the street (4-4-4-W placard indicating the Operations at the Property are lethal, may detonate, can explode under normal conditions, and to not add water or else it will make things worse). On August 16 2025, two people came out of the Chip Fab and demanded the community members to not approach or photograph the entrance and Fire Diamond. One person had an Apple badge. The other person refused to confirm they work for Apple, claimed to work for the 49ers, and then claimed to be associated with law enforcement.

552. Defendants were engaged in ultrahazardous activities with strict liability, and Defendants had a critical duty to warn others of the danger of their activities at the facility.

Defendants also had a statutory obligation to comply with permitting requirements and to notify the government of their activities, which they failed to do at every opportunity. Defendants also had a duty under federal Right to Know to notify the community of the chemicals they used and released – but they did not do that either. Apple also used illegal non-disclosure agreements to unlawfully silence its employees about health/safety and environmental issues. Defendants ran Operations at the Facility as an old-school Silicon Valley "*skunkworks*" project.[40] (Cal. Penal Code Section 387).

553. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B. COUNT 26: APPLE, THE CITY, & THE PROPERTY OWNERS VIOLATED EPCRA TRI REQUIREMENTS.

### (CLAIMS AGAINST APPLE, THE CITY, & THE PROPERTY OWNERS)

554. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

555. Apple and The Property Owners violated the EPCRA § 313, 42 U.S.C. § 11023, ("Toxic Chemical Release Inventory") by failing to report toxic chemical releases (TRI reporting) TRI reporting failures For TCE, NMP, arsenic compounds. The City has failed to ensure that the Facility submits required Toxics Release Inventory (TRI) reports under EPCRA § 313.

---

[40] See, for example, the Lockheed "Skunkworks" case, NYT, *Jury Awards $760 Million in Chemical Trial,* Aug. 8 1998, ("One factor in the case was that the Stealth fighter's secrecy could have increased exposure to the chemicals. … the chemical companies knew about those conditions and did not provide adequate warning"), https://www.nytimes.com/1998/08/08/business/jury-awards-760-million-in-chemical-trial.html

556. The U.S. EPA website shows that Apple has only filed one TRI report for its Operations at the Facility, in 2021. It is unclear why no reports were filed prior or after, and why Apple chose to file a report only for the year in which it nearly killed its employee, Plaintiff, with its illegal emissions. Apple then cited that same report in the RICO Lawsuit as a basis for why the court should dismiss the Plaintiff's claims, saying the report should have put her on notice to sue Apple earlier. Apple then apparently never filed another TRI report.

557. The one TRI report was filed in or around June 2021 with emission data from 2020. That TRI report includes emissions at the Property in 2020 (when Plaintiff became severely ill next to the Property) of 16,084 pounds of Criteria Air Pollutants, 15,608 pounds of volatile organic compounds (VOCs), 372 pounds of Nitrogen oxides, and 260 pounds of TRI Air Toxics (NMP).[41] The 2020-2021 TRI report included air emissions of Benzene, Carbon Monoxide, Sulfur Dioxide, Formaldehyde, Toluene, Nickel, Lead, Arsenic, Mercury, Acetaldehyde, Chrysene, Fluoranthene, Xylene, Naphthalene, Benz[a]anthracene, Chromium VI, Beryllium, Manganese, and Cadmium.

558. The NAICS code for "Semiconductor and Related Device Manufacturing" is 334413. Apple used this code at least in 2020 when it filed its only TRI report. Its EIS is also set to this. Its RCRA is set to 541715 Research and Development in the Physical, Engineering, and Life Sciences.

559. Apple refuses to publicly admit it's doing chip fab at the Chip Fab and believes it's a voluntarily designation – including refusing to get a chip fab NPDES permit (until the treatment works caught them and made them get one), refusing to get a chip fab air permit (until BAAQMD caught them and made them get one), etc. Apple is still refusing to file TRI reports (CAA/EPCRA requirements).by claiming they can choose to identify their manufacturing as being something other than chip fab, even if its chip fab – and accordingly, Apple says that, means they do not have to file TRI reports that would otherwise be required for chip fab, because Apple decided they don't have to say they are doing chip fab and there's no EPCRA enforcement agency that can force them like with the other stuff.

560. The facility is required to file TRI reports under the EPCRA as a semiconductor manufacturing facility. The facility regularly releases multiple chemicals listed the EPCRA Part

[41] U.S. EPA, https://echo.epa.gov/air-pollutant-report-new?fid=110001168254

372 including: Arsenic, Benzene, Isopropyl, Lead, Mercury, NMP, Toluene, and Xylene.

561. Apple's assertion that it does not have to file TRI reports because it unilaterally decided its NAICS code is something other than its actual operations and activities, is a violation of EPCRA.

562. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### C. COUNT 27: THE CITY VIOLATED EPCRA BY CONCEALING AND DENYING REQUESTS FOR HAZARD INFORMATION IT WAS REQUIRED TO PROVIDE.

**(CLAIMS AGAINST APPLE, THE CITY, & THE PROPERTY OWNERS)**

563. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other EPCRA Counts within.

564. The City violated EPCRA § 326(a)(1)(C), under which Plaintiff brings this action, due to the state government's emergency response agency (delegated here through CUPA to the City of Santa Clara), failing to provide a mechanism for public availability of information in accordance with section 11044(a). (42 U.S.C. § 11046).

565. The City violated EPCRA § 326(a)(1)(D), under which Plaintiff brings this action, due to the state government's emergency response agency (delegated here through CUPA to the City of Santa Clara), failing to respond to a request for tier II information under section 11022(e)(3). (42 U.S.C. § 11046).

566. An owner or operator of a new or modified facility that will be used for the handling of acutely hazardous materials must prepare an RMPP. (Health & Safety Code §§ 25531- 25541.). Anyone required to file a plan is also required to report releases or threatened releases of hazardous

materials to the administering agency. (Health & Safety Code § 25507; Cal. Code Regs. tit. 19, § 2703.).

567. CalARP is California's program to implement the federal Accidental Release Prevention program (ARP) with certain additional provisions specific to California.

568. The City violated the EPCRA and state law when it concealed Apple's activities from the Santa Clara Square EIR, concealed the need for the RMP, allowed Apple to provide a partial and incomplete RMP years overdue, and did not claim the RMP was complete until 7 years into operations.

569. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

# XVI. CITIZEN SUIT ENFORCEMENT ACTIONS ACTION AGAINST DEFENDANTS FOR THEIR VIOLATIONS OF THE TSCA.

570. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. Defendants are responsible for ongoing violations of the TSCA. Abatement and enforcement are available under the TSCA Citizen Suit provisions. The violations are ongoing, long-running, and expected to continue in the future without serious enforcement action including judicial intervention.

571. Plaintiff brings this action under TSCA's citizen enforcement provision 15 U.S.C. § 2619 for violation of this chapter. The statute expressly authorizes civil actions by "any person" against "any person" or "any…governmental instrumentality or agency." (15 U.S.C. § 2619(a)(1)).

572. This includes companies like Apple and The Property Owners, and cities like Santa Clara. 15 U.S.C. § 2615(b). All three defendants violated the Chapter, including §§ 2605 and 2614.

The Defendants violations are in the past, but also ongoing, and expected to continue in the future without judicial intervention. Enforcement is available under 15 U.S.C. § 2619(a).

573. Chip Fabs are highly regulated by TSCA because they use so many propriety and Trade Secret substances and mixtures, which are inherently dangerous. At chip fabs, "the chemical cocktail changes faster than toxicologists can keep up with… the synthesis and use and application of chemicals is outracing the ability of the toxicology community to make safe evaluations." [42]

## A. COUNT 28: APPLE VIOLATED THE TSCA WITH NMP (15 U.S.C. §§ 2605, 2614-2615; 40 CFR PART 751).

### (CLAIMS AGAINST APPLE)

574. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

575. NMP (n-methyl-2-pyrrolidone) is regulated under 40 CFR Part 751, 89 Fed. Reg. 51134. Apple's violation of Apple reported to the government that in the year 2020, Apple released at least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible solvent N-Methyl-2-pyrrolidone (NMP) into the atmosphere around 3250 Scott. In 2022, the EPA proposed rules severely restricting the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under TSCA. Apple's most recent chemical inventory for the site, submitted Feb. 28 2025, lists a number of TSCA regulated chemicals including, but not limited to, extensive amounts of n-methyl-2-pyrrolidone (NMP) and glycol ethers.[43]

576. Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with NMP by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

577. Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, NMP, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know

---

[42] The fight to clean up the toxic legacy of semiconductors, Dec. 8 2023, https://www.theverge.com/23990525/semiconductor-biden-infrastructure-plan-toxic-chemicals

[43] CalEPA, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316/chemicals

where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S.C. § 2614(1)-(4).

578. N-Methyl-2-Pyrrolidone (NMP) ($C_5H_9NO$) "causes headache if inhaled; redness, plain, and blurred vision if exposed to eyes or skin; and a burning sensation in the throat and chest if ingested. "Exposure to very high concentrations could cause lowering of consciousness." (InChem, WHO, 2014). Suspected of damaging fertility or the unborn child. A harmful contamination of the air will not or will only very slowly be reached on evaporation of this substance at 20°C; on spraying or dispersing, however, much faster." (InChem, WHO, 2014).

579. Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b)

580. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## B. COUNT 29: APPLE VIOLATED THE TSCA WITH MERCURY (15 U.S.C. §§ 2605, 2607, 2614-2615).

### (CLAIMS AGAINST APPLE)

581. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

582. Mercury is regulated under 15 U.S.C. 2607(b)(10)(D), Part 713, 83 FR 30073 as well as EPCRA 313 and The Frank R. Lautenberg Chemical Safety for the 21st Century Act (Lautenberg Act) (Pub. L. 114-182, 130 Stat. 448), Under section 8(b)(10)(D) of the Toxic Substances Control Act (TSCA), any person who "intentionally uses mercury in a manufacturing process" must

comply with federal mercury reporting requirements. (applies under NAICS 334413, 334419, and 541712). (15 U.S.C. 2607(b)(10)) 40 CFR Part 713

583. EPA's enforcement program is aimed at protecting the public by targeting persons or entities who neither comply nor cooperate to address their legal obligations… Under TSCA, EPA may file an enforcement action against violators, seeking penalties of up to $37,500 per violation, per day." (EPA, Compliance Guide: *Reporting Requirements for the Mercury Inventory of the Toxic Substances Control Act,* January 2022 EPA-740-B-22-001).

584. Inhalation of mercury causes cough, sore throat, shortness of breath, fever, vomiting, diarrhea, abdominal pain, high blood pressure, tremor, headache, weakness, birth defects, infertility, and death. (INCHEM, WHO, Nov. 2019; ASTDR ToxGuide, 2024). Mercury warnings include "Do NOT let this chemical enter the environment." "Very toxic to aquatic life with long lasting effects." (INCHEM, WHO, Nov. 2019).

585. Elemental Hg exists as a (e.g., mercuric chloride; HgCl) gas, liquid, or solid. Biomarkers more strongly correlated to exposure to elemental mercury and inorganic mercury include mercury in blood (or plasma) Median total urinary mercury level: and mercury or total mercury in urine. (ASTDR ToxGuide, 2024). "Atmospheric mercury is primarily in the form of gaseous elemental mercury, which is subject to long range transport. Therefore, mercury can be found in locations far removed from its release site. There is no odor warning even when toxic concentrations are present." (INCHEM, WHO, Nov. 2019). Mercury is a neurotoxin. (ASTDR).

586. Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with Mercury by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

587. Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, Mercury, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S.C. § 2614(1)-(4).

588. Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply

with the requirement. 15 U.S.C. 2615(b).

589. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### C. COUNT 30: APPLE VIOLATED THE TSCA WITH TCE (15 U.S.C. §§ 2605, 2614-2615; 40 C.F.R. § 751.301).

### (CLAIMS AGAINST APPLE)

590. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

591. Trichloroethylene (TCE), Subpart D, 40 C.F.R. § 751.301, 89 FR 102568, December 17, 2024. Inhalation of TCE causes dizziness, drowsiness, headache, blurred vision, weakness, nausea, unconsciousness, cardiac failure, and "an attitude of irresponsibility." (INCHEM, WHO, April 2013; US Coast Guard CHRIS, 1999). Dermal exposure causes redness, dermatitis, pain, and dry skin. INCHEM, WHO, April 2013.

592. "In December 2024, EPA issued a final rule regulating TCE under the Toxic Substances Control Act (TSCA) to protect people from health risks including liver cancer, kidney cancer, and non-Hodgkin's lymphoma." All uses of TCE are eventually prohibited. industrial and commercial use of TCE is prohibited after September 15, 2025. (EPA, TSCA Fact Sheet, 2024).

593. "Harmful to aquatic life with long lasting effects "INCHEM, WHO, April 2013. The substance is harmful to aquatic organisms. The substance may cause long-term effects in the aquatic environment. It is strongly advised not to let the chemical enter the environment." "Decomposes on contact with hot surfaces or flames. This produces toxic and corrosive fumes of phosgene and hydrogen chloride." (INCHEM, WHO, April 2013.). Regulated by EPCRA 313 TRI, CERCLA RQ and a Carcinogen.

594. Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with TCE by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and failing to comply with phase-out requirements.

595. Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, TCE, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S.C. § 2614(1)-(4).

596. Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

597. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### D. COUNT 31: APPLE VIOLATED THE TSCA WITH LEAD (15 U.S.C. §§ 2605, 2614-2615, 2681-2689; 40 CFR PART 745).

**(CLAIMS AGAINST APPLE)**

598. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

599. Lead, 15 U.S.C. § 2681-2689, 40 CFR Part 745, Section 21. Apple violated TSCA Section 6, 15 U.S.C. § 2605, ("Regulation of hazardous chemical substances and mixtures") with Lead by unlawful manufacturing, processing, and/or distributing; violating use restrictions; and

failing to comply with phase-out requirements.

600. Apple violated the TSCA Section 15, 15 U.S.C. § 2614, ("Prohibited acts") including with, but not limited to, Lead, by failing and refusing to comply with requirements of Subchapter 1; by using chemical substances and mixtures which Apple knew or had reason to know where manufactured, processed, or distributed in violation of § 2604/2605; for failing or refusing to establish and maintain records; and for failing to submit reports, notices and other required information. 15 U.S.C. § 2614(1)-(4).

601. Inhalation of lead causes cough, metallic taste, abdominal pain, headache, confusion, drowsiness, unconsciousness, convulsions. "Inhalation of high concentrations may cause effects on multiple organs." "A harmful concentration of airborne particles can be reached quickly when dispersed." (INCHEM, WHO, Nov. 2019).

602. Apple was subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C. 2601-2692), yet knowingly and/or willfully failed or refused to comply with the requirement. 15 U.S.C. 2615(b).

603. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

### E. COUNT 32: ALL DEFENDANTS VIOLATED TSCA BY USING AND DISPOSING OF IMMINENTLY HAZARDOUS CHEMICAL SUBSTANCES AND MIXTURES. (15 U.S.C. §§ 2605-2606, 2615).

**(CLAIMS AGAINST ALL DEFENDANTS)**

604. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. This Count incorporates the other TSCA Counts within.

605. Apple violated 15 U.S.C. § 2606 of the TSCA by using and disposing of imminently

hazardous chemical substances and mixtures. 15 U.S.C. § 2606(a).

606. The Property Owners and the City knew Apple was doing this, and knew it created hazards, but did not stop or abate it, and instead enabled, concealed, and contributed to the violations.

607. The risk to health or the environment is considered imminent because the use and disposal of the chemical substance and mixture, or any combination of such activities, is likely to result in such injury to health or the environment in violation of § 2605, and/or before a final rule under § 2605 of this title can protect against such risk. 15 U.S.C. §§ 2605(a), 2606(f). This includes improper use and disposal of TCE, NMP, Mercury, and Lead.

608. Apple knowingly and willfully violated provisions of §§ 2614 and 2689 and knew at the time of the violation that the violation places another person in imminent danger of death or serious bodily injury. 15 U.S.C. 2615(b)(2)(A).

609. The Property Owners and City contributed to these violation by failing to abate them, failing to report them, failing to warn, and failing to assist those who were harmed.

610. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the violations, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant violated these statutes and implementing regulations and orders; (5) Civil penalties as available under the statute, to be paid to the U.S. Treasury and to Supplemental Environmental Projects.

## XVII. PUBLIC NUISANCE ABATEMENT AND ENFORCEMENT AGAINST DEFENDANTS. (CAL. CIV CODE § 3491 ET SEQ.)

611. The allegations contained in the Amended Complaint sections through "General Allegations," and the allegations contained in the Counts under this statute across all other Counts under this statute, are hereby incorporated as though those allegations were fully set forth herein. In addition, the factual allegations pled under the federal Counts, are also incorporated under this section, as though those allegations were fully set forth herein.

612. Defendants Apple, The City, and The Property Owners are responsible for creating,

maintaining, and failing to abate a dangerous and continuous Public Nuisance. Abatement and enforcement actions are available under the California Public Nuisance statutes and common law. The Public Nuisance is ongoing, long-running, and expected to continue in the future without judicial intervention including abatement. From at least 2015 to the present, the Property has been owned, operated, managed, used, and/or directly or indirectly permitted to be used in such a manner as to constitute a public nuisance under the California Civil Code.

613. Under California Civil Code, a nuisance is "*Anything which is injurious to health… or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, … of any…stream… or any public park, square, street, or highway*." Cal. Civ. C. § 3479. The public nuisance as described herein is injurious to health, indecent or offensive to the senses, and/or an obstruction to the free use of property, and it substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property.

614. The Defendants actions with the Chip Fab created conditions which are injurious to health, including, but not limited to, the indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, and unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

615. Plaintiff is enabled to maintain an action for public nuisance because this public nuisance was especially injurious to her. Plaintiff was harmed to a different degree and of a different kind, than the public – including that she also has standing for a private nuisance claim (even if her statute of limitations ran out for compensatory damages). Plaintiff has exhausted administrative remedies and has no alternative but to seek judicial enforcement of federal environmental laws designed to protect public health and the environment.

616. The Plaintiff has no adequate remedy at law in that damages are insufficient to protect the public from the present danger and harm caused by the conditions described, and her prior attempt at private nuisance and ultrahazardous activities claims were dismissed due to the Defendant Apple's arguments about tolling of statute of limitations.

617. Unless the nuisance described in this Complaint is abated, the surrounding

community, neighborhood, and the residents of the city will suffer irreparable injury and damage, in that said conditions will continue to be injurious to the enjoyment and free use of the Premise by those who live and work near the Property as well as the general public.

618. All Defendants are independently and jointly liable, including through theories of contribution, condonation, conspiracy, failure to warn, failure to abate, encouragement, enablement, and strict liability.

**FIRE & EXPLOSION HAZARDS | IMAGES OF FIRE HAZARDS AT CREEKSIDE**




**AND MEADOW PARKS, SANTA CLARA SQUARE (PHOTOS TAKEN BY ASHLEY GJOVIK ON 4/11/26 (TOP ROW) AND 8/5/26 (BOTTOM ROW)**

## F. COUNT 33: APPLE VIOLATED CAL. CIV CODE § 3491 *ET SEQ.*

**(CLAIMS AGAINST APPLE)**

619. Apple operates and controls the Chip Fab and 3260 Scott Blvd, and has been on actual notice of the nuisance, but has failed to take reasonable steps to prevent or abate the nuisance

and it is a nuisance they can independently abate.

620. As a result of Apple's failures and their mismanagement of the Chip Fab, Apple has caused and contributed to an acutely serious threat to the health, safety, and welfare of those present at and around the Premise and in the surrounding community.

621. Apple stores, uses, and releases extensive amounts of pyrophoric materials, including Silane gases. Apple has repeatedly failed to comply with fire code provision related to these materials, including the silane gas – which can easily detonate and create "fireball explosions." Apples silane gas management repeatedly failed to have backup, secondary containment, emergency shut off, alarms, backup power, and extremely basic safety mechanisms.

| | **Silane (Silicon tetrahydride) Risks** |
|---|---|
| **Health** | "Vapors may cause dizziness or asphyxiation without warning, especially when in closed or confined areas. Some may be toxic if inhaled at high concentrations. Contact with gas or liquefied gas may cause burns, severe injury, and/or frostbite. Fire may produce irritating and/or toxic gases. (ERG, 2024) |
| **Fire Hazard** | "Extremely Flammable. Will be easily ignited by heat, sparks, or flames. Will form explosive mixtures with air…will ignite spontaneously in air and may re-ignite." (ERG Guide 116; CAMEO, 2025). |
| **Reactivity** | "Slowly reacts with water to form silicon hydroxides and hydrogen gas…Even traces of the free halogens may cause violent explosions, when handling silane, extreme caution should be taken," (CAMEO, 2025). |

622. Apple's activities at the Chip Fab creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

623. Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

624. Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because the Chip Fab creates conditions which are

injurious to health, indecent or offensive to the senses, and are an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

625. Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

626. Apple created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

627. Apple created a public nuisance with the Chip Fab, by creating imminent and substantial endangerment for thousands of residents, including children playing in nearby parks, the

628. Apple created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many people; and interferes with the use of public spaces.




CAMEO Map Tool for Initial Isolation and Protective Action Distances, Emergency Response Guidebook (ERG), ER 119, UN/NA 2188 Arsine Gas (not on fire), (screenshot taken 11/12/2025), https://cameochemicals.noaa.gov/unna/2188

629. Apple uses, stores, releases, transports, and leaks/spills an extraordinary amount of toxic gases that are acutely dangerous to living organisms including gases that are classified as chemical weapons including arsine, chlorine, phosphine, and fluorine.

630. Apple created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. Apple violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events. Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

631. Apple's conduct violates dozens of statutes and thus Apple is creating and maintaining a per *se* nuisance. Apple is concurrently willful refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health and Safety, Section

632. The harm created by Apple's actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the

comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

633. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a public nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

## G. COUNT 34: THE PROPERTY OWNERS VIOLATED CAL. CIV CODE § 3491 *ET SEQ.*

**(CLAIMS AGAINST THE PROPERTY OWNER)**

634. The Property Owners owns and controls The Chip Fab, 3260 Scott, and the property with the Synertek site. The Property Owners has been on notice of the nuisance emanating from the Chip Fab and directly impacting The Premise but has failed to take reasonable steps to prevent or abate the nuisance. A property owner is generally jointly liable for most environmental and safety violations that occur at their property, especially when the actions / omissions related to their tenant and the operations of the tenant that the landlord/owner knows are occurring at its own property.

635. The Property Owners were negligent and failed to comply with legal obligations, and this caused and contributed to an acutely serious threat to the health, safety, and welfare of those present at and around The Premise and surrounding community. Where the Property Owners did not cause the nuisance, they maintained it, protected it, failed to abate it, and failed to warn people of the dangers.

636. The Property Owners has specialized knowledge of this specific area and about industrial facilities, due to his professional specialization in selling and leasing exactly these kinds of facilities, in exactly these locations, for decades.

637. The Property Owners 's activities at the Chip Fab creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

638. The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

639. The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because the Chip Fab creates conditions which are injurious to health, indecent or offensive to the senses, and are an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

640. The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

641. The Property Owners created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the Chip Fab creates conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

642. The Property Owners created a public nuisance with the Chip Fab, by creating imminent and substantial endangerment for thousands of residents, including children playing in nearby parks.

643. The Property Owners created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many

people; and interferes with the use of public spaces.

644. The Property Owners created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. The Property Owners violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events. Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

645. The Property Owners' conduct violates dozens of statutes and thus The Property Owners are creating and maintaining a *per se* nuisance. The Property Owners are concurrently willful refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health and Safety.

646. The harm created by The Property Owners actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

647. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a public nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

## H. COUNT 35: THE CITY OF SANTA CLARA VIOLATED CAL. CIV CODE § 3491 *ET SEQ*.

**(CLAIMS AGAINST CITY OF SANTA CLARA)**

648. The City of Santa Clara owns and controls The Parks (Meadow Park, Creekside

Park, Redwood Trail, etc.). The City has been on notice of the nuisance emanating from the Chip Fab and directly impacting The Parks but has failed to take reasonable steps to prevent or abate the nuisance.

649. As a result of this failure, and of The City's general mismanagement of The Parks and other City owned property, resources, and infrastructure, The City has caused and contributed to an acutely serious threat to the health, safety, and welfare of those present at and around The Premise and surrounding community.

650. Where the City did not directly cause the nuisance, The City did maintain it, protected it, failed to abate it, and failed to warn people of the dangers. Specific to the Parks and public spaces, the City also invited people to those areas and assured them they were safe, when the City knew they were dangerous.

The City had employees and department with specialized knowledge about all these issues, activities, and violation – and knew the risks, but proceeding anyway.

651. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; creates conditions which are injurious to health, including indecent and offensive to the senses, are obstructive to the free use of property so as to interfere with the comfortable enjoyment of life or property, and it unlawfully obstructs the free passage or use of public streets, public creeks, public parks, and public squares.

652. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance, in violation of Santa Clara City Code Chapter 8.30, because the activities and the conditions the activities create, are obstructive to and interfere with the comfortable enjoyment of adjacent property or premises; and are hazardous and injurious to the health, safety, and welfare of the public.

653. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a

public nuisance, in violation of Santa Clara City Code Section 8.30.030 (Ord. 1663 § 1, 11-1-94), because they create conditions which are injurious to health, indecent or offensive to the senses, and are an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; and which affects at the same time an entire community or neighborhood, and considerable number of persons.

654. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance, in violation of Santa Clara City Code Chapter 8.30, because actions creates conditions that are hazardous and injurious to the health, safety, and welfare of the public. It is detrimental to property values and an obstruction to and interference with the comfortable enjoyment of adjacent property or premises.

655. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance with the Chip Fab, in violation of Santa Clara City Code Chapter 8.30, because the it created conditions that are offensive or annoying to the senses, detrimental to property values and community appearance, and hazardous and injurious to the welfare of the public.

656. The City's misconduct and negligence related to wastewater, stormwater, recycled water, parks, streams, springs, EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, and fire safety; created a public nuisance by creating imminent and substantial endangerment to thousands of residents, including children playing in nearby parks.

657. The City's misconduct and negligence related to parks, EIRs, zoning/siting, hazmat and hazardous waste oversight, toxic gas oversight, air emissions, and fire safety; created an express public nuisance with the Chip Fab, under The Restatement 2nd of Torts Section 821(b) comment g, by spreading smoke, dust, vapors, gases, and fumes over a considerable area filled with private residences and parks; that affects many people; and interferes with the use of public spaces.

658. The City's misconduct and negligence related EIRs, access to public records, investigating resident complaints, zoning/siting, hazmat and hazardous waste oversight, toxic gas

oversight, and fire safety; created a public nuisance with the Chip Fab, in violation of County Ordinances, including SCCOC Sec. B11-360, etc., related to Toxic Gases. The City violated these ordinances, refused to comply with them, and showed reckless disregard for the legislative history, public policy, and enforcement scheme for these laws intended to prevent mass casualty events. Mishandling, negligence, and noncompliance regarding these specific toxic gases creates an immediate risk of catastrophic injury across vast areas (i.e., Bhopal).

659. The unsafe conditions with the prior pollution, and DTSC and CERCLA remediation sites, were neglected by the City, but directly adjacent, and under/on, public parks and a public playground, creating an attractive nuisance in violation of Santa Clara city code 8.30.020(c). The City's playgrounds create an attractive nuisance, and the City fails to warn of dangers, but does invite vulnerable populations to the hazard.

The unsafe conditions at the Chip Fab, contributed to and maintained by the City, are directly adjacent to public parks and a public playground, creating an attractive nuisance in violation of Santa Clara city code 8.30.020(c). The City's playgrounds create an attractive nuisance, and the City fails to warn of dangers, but does invite vulnerable populations to the hazard.

660. The City knows that Apple stores, uses, and releases extensive amounts of pyrophoric materials, including Silane gases, and that Apple has repeatedly failed to comply with fire code provision related to these materials, including the silane gas – which can easily detonate and create "fireball explosions." Apple's silane gas management repeatedly failed to have backup, secondary containment, emergency shut off, alarms, backup power, and extremely basic safety mechanisms. The City knew about these issues and documented them in their records ("Silane Exhaust: Exhausts connect to Silane storage, and use shall be shut down when there is failure to the exhaust system. How is this accomplished?" -- MEP 3, BLD21-63026, CRR Div. Plan Check Comments/Conditions, 1/3/2022). Yet the City failed to take enforcement.

661. The City would press for basic disclosures and safety mechanisms ("Silane exhaust: Failure of the ventilation system for Silane shall shutdown the source of gas as indicated on the review response. -- G-4, BLD21-63026, CRR Div. Plan Check Comments/Conditions, 2/11/2022).

662. Apple and The Property Owners would push back claiming its no-big-deal and their coworkers already said its fine ("Associated FIR21-983 GLSS permit was approved by C. Lee. The scope of work of areas being altered in this installation are very minimal - this project is an

equipment replacement project. This project is not installing any new silane equipment. The plans show that this project is not altering the centralized GEX system that the silane gas equipment is exhausted by other than demolishing one branch from the central system which will have no impact on the functionality).

663. Then the City gives up despite Apple and The Property Owners admitting to exhausting pyrophoric gases, that can spontaneously combust, next to a playground.

664. Silane and similar materials could "detonate" the Chip Fab, yet concurrently the City approved development the Santa Clara Square apartments while also knowing it could not provide basic fire service to the apartments. The Fire Chief's formal request to the City Manager regarding "alternative materials/methods" to provide emergency fire services for the enormous apartment complex next to an ultrahazardous industrial facility was suggested an "increase in the fire sprinkler system density within each of the five office buildings, and the purchase or funding of specialized firefighting and inspection equipment… that would address the Fire Department conditions of approval, such as the establishment of an unmanned aerial vehicle program and purchase of unmanned aerial vehicles (UAVs), and the purchase of handheld thermal imaging cameras with video recording equipment." (December 5, 2017).

665. The City FD approved ultrahazardous siting of heavy industrial next to dense residential, knowing it cannot provide basic fire services in case of a fire or explosion, but suggested it would still approve the development if the City bought it drones and UV cameras. (December 5, 2017, Fire Chief to City Manager for Council Action).

666. The City's conduct violates dozens of statutes and thus The City's creating and maintaining a *per se* nuisance. City's concurrently willful refusing to perform legal duties relating to the abatement and removal of a public nuisance, which are misdemeanors in violation of Cal. Penal Code Title 10, Crimes against the Public Health and Safety.

667. The harm created by City's actions and inactions is severe, imminent, prospective, and continuous. The harm substantially and unreasonably interferes with the comfortable enjoyment of life or property by those persons living and otherwise conducting their business at or near the Property. The injuries created by the harm are irreparable. Injunctive relief to protect the public and restore the environment serve an important interest and are justified and required to effectuate the congressional intent of the related environmental statutes.

668. WHEREFORE, The Plaintiff seeks (1) equitable and injunctive relief requiring the Defendant to abate the public nuisance, including all violations giving rise to the public nuisance, (2) to create and implement a Remediation Plan to remediate the harm caused by its violations, (3) to create and implement a Corrective Action Plan to correct its operations to prevent this type of issue from reoccurring; (4) Declaratory relief declaring the Defendant created a public nuisance (5) fines, punitive damages, or other penalties to be used for community projects and services, where the Defendant must atone for its actions and provide relief and restoration to the community members that the defendant harmed through its unlawful actions and this public nuisance.

## RELIEF SOUGHT

669. Plaintiff hereby demands a jury on all issues which can be heard by a jury. Plaintiff requests the following remedies against all Defendants, jointly and severally, except as specifically noted otherwise, and to the fullest extent authorized by law and deemed appropriate by this Court:

- A DECLARATION that each Defendant are in violation of the RCRA, CAA, CWA, EPCRA, and TSCA;
- A DECLARATION that each Defendant has violated and continues to violate the applicable regulations and orders promulgated thereunder;
- A DECLARATION that the Chip Fab constitutes a Public Nuisance.
- A DECLARATION that the Chip Fab has created an imminent and substantial endangerment.
- A DECLARATION that Residents and Workers injured by the Chip Fab, shall have a Right to a Remedy.
- A DECLARATION that the public has a RIGHT TO KNOW about dangerous and hazardous activities occurring at the Chip Fab that could harm them and/or the environment around them.
- AN ORDER of Injunctive Relief to ENJOIN the Defendants to comply with all provisions of the RCRA, CAA, CWA, EPCRA, and TSCA at the facility, and jointly and severally abate the consequences of their prior and ongoing violations.
- AN ORDER of Injunctive Relief to ENFORCE the environmental laws that the Defendants are violating, and if not possible in that location, then to cease operations at that location.

- AN ORDER of Injunctive Relief to ENFORCE the environmental laws that the Defendants are violating, including restoration of the environmental harm caused by these violations.
- AN ORDER of Injunctive Relief to RESTRAIN the Defendants from continuing their violations of these environmental laws, including prohibiting unpermitted discharges into the air, water, and ground,
- AN ORDER of Injunctive Relief to RESTRAIN the Defendants from maintaining their imminent and substantial risk of danger to the public and environment,
- AN ORDER of Injunctive Relief REQUIRING the development and implementation of a Remedial Action Plan, approved by the court, which fully abates the endangerment and nuisance,
- AN ORDER of Injunctive Relief REQUIRING environmental clean-up and remediation from unlawful pollution, dumping, and releases,
- AN ORDER of Injunctive Relief REQUIRING mandatory training including safety school, environmental compliance, and labor laws for all officials managing oversight, operations, and remediation at The Premise.
- AN ORDER of Injunctive Relief REQUIRING each Defendant establishment formal complaint investigation protocols for EH&S complaints about The Premise, including whistleblower protection policies,
- AN ORDER of Injunctive Relief to MONITOR the Defendants required actions to cease violations and remediate harm caused, with required REPORTING, NOTICES, AND MONITORSHIP.
- AN ORDER of Preliminary Injunction, if motion filed, for CESSATION of all chip fab and other hazardous activities, until full compliance is assured.
- FINES against each Defendants for their federal violations, as authorized by statute and with all penalties paid to the U.S. Treasury--- with the maximum allowable of penalty funds to be directed towards community projects including community air monitoring network installation and operation, medical monitoring program for exposed residents (especially the children), environmental restoration of contaminated areas, and emergency response capability enhancement.

- FEES & COSTS: litigation costs (including expert witness fees) as authorized by the citizen-suit provisions, attorney's fees if and when counsel appears, and all other costs and fees the court deems proper.



**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

*Filed on August 6 2026 from the Embassy Suites by Hilton Santa Clara Silicon Valley at Suite #931 2885 Lakeside Drive in Santa Clara, California.*

Email: legal@ashleygjovik.com
Phone: (415) 964-6272
Permanent Residence: Alviso, San Jose, California
Mailing: 2108 N St. Ste. 4553 Sacramento, CA, 95816

**ATTACHED APPENDIX OF EXHIBITS:**
(PROOFS OF COMPLAINTS AND SERVICE)
- Exhibit A: June 2025 Sixty-Day Notice
- Exhibit B: Proof of Service of June 2025 Sixty-Day Notice
- Exhibit C: June 2023 Environmental Complaint
- Exhibit D: Government Agency Records
- Exhibit E: Standing Exhibits
- Exhibit F: 30(B)(6) Deposition of Elizabeth Schmidt (Apple EH&S Director)

# EXHIBITS:

# IMAGES & MAPS


SANTA CLARA SQUARE
Santa Clara, California
SITE PLAN WITH PROPOSED DEVELOPMENT
Date 08/15/14
Project No. 770612501
Figure 3
LANGAN TREADWELL ROLLO
EXPLANATION
BP-1 Approximate location of boring by Langan Treadwell Rollo, April 2014
C1-1 Approximate location of cone penetration test by Langan Treadwell Rollo, April 2014
MW-33A Approximate location of shallow groundwater monitoring well by CH2MHill, 2013
Approximate location of former Saratoga Creek (NETR Online, 2014)
0
150 Feet
Approximate scale
AUGUSTINE DRIVE
OCTAVIUS DRIVE
MONTGOMERY DRIVE
SCOTT BOULEVARD
CORONADO DRIVE
NOT IN SCOPE
PARK

## CA WILDLIFE BIOS | HISTORICAL CREEKS | SARATOGA CREEK




HISTORICAL PATH OF SARATOGA AKA CAMPBELL CREEK PRIOR TO 1970

**Map Legend**

Historical Channels Ecology - SFEI [ds3202]

LegLabel

- Creek / River
- Paleochannel / Less Certain
- Slough / Distributary
- Tidal Channel

https://apps.wildlife.ca.gov/bios6/?al=3202 1/3


INQUIRY #: 3629208.5
YEAR: 1974
= 500'
N


INQUIRY #: 3629208.5
YEAR: 1968
= 500'
N


INQUIRY #: 3629208.5
YEAR: 1956
= 500'
N

**Historical Topographic Map**




| N ↑ | TARGET QUAD<br>NAME: MILPITAS<br>MAP YEAR: 1953<br><br>SERIES: 7.5<br>SCALE: 1:24000 | SITE NAME: 3310 Montgomery Drive<br>ADDRESS: 3310 Montgomery Drive<br>Santa Clara, CA 95054<br>LAT/LONG: 37.3812 / -121.9736 | CLIENT: Erler & Kalinowski, Inc.<br>CONTACT: Kat Wuelfing<br>INQUIRY#: 3629208.4<br>RESEARCH DATE: 06/07/2013 |
|---|---|---|---|

**Historical Topographic Map**




| | | | |
|---|---|---|---|
| N ↑ | TARGET QUAD<br>NAME: SAN JOSE<br>MAP YEAR: 1899<br><br>SERIES: 15<br>SCALE: 1:62500 | SITE NAME: 3310 Montgomery Drive<br>ADDRESS: 3310 Montgomery Drive<br>Santa Clara, CA 95054<br>LAT/LONG: 37.3812 / -121.9736 | CLIENT: Erler & Kalinowski, Inc.<br>CONTACT: Kat Wuelfing<br>INQUIRY#: 3629208.4<br>RESEARCH DATE: 06/07/2013 |


HISTORICAL CONDITIONS, CIRCA 1850
The map at left reconstructs the habitat characteristics of west Santa Clara Valley prior to significant Euro-American modification.
Subtidal Water
Tidal Flat
Tidal Marsh
Alkali Meadow
Wet Meadow
Valley Freshwater Marsh
Perennial Freshwater Pond
Willow Grove
Sycamore Grove
Wild Rose Thicket
Box Elder Grove
Oak Savanna
Oak Woodland
Chaparral
1:150,000
Miles
Kilometers
Milpitas
San Jose
Santa Clara
Campbell
Los Gatos
Saratoga
Sunnyvale
Mountain View
Los Altos
Palo Alto
Alviso
Guadalupe Creek
Stevens Creek
Permanente Creek
Saratoga Creek
Calabazas Creek
Los Gatos Creek
Coyote Creek
San Francisquito Creek