**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY M. GJØVIK,**
*an individual*,

**PLAINTIFF,**

**VS.**

**APPLE INC.,**
*a corporation,*

**CITY OF SANTA CLARA,**
*a local government*,

**MR. KALIL/KHALIL JENAB**
*individually,* & as
*Agent/Member/Manager* of:
**JENAB FAMILY LP,**
**JENAB FAMILY VENTURES LLC,**
& as *Trustee/Agent* of:
**THE JENAB FAMILY TRUST,**

**DEFENDANTS.**

**CASE 25-CV-07360-PCP**

**COMPLAINT**

**EXHIBIT C:**

**2023 CITIZEN COMPLAINT RE: 3250 SCOTT BLVD.**

**ENVIRONMENTAL CITIZEN SUIT**

# JUNE 11 2023 CITIZEN COMPLAINT (US EPA)

Login Contact Us

Your report has been successfully sent. Your confirmation is below.

# Report Environmental Violations - Submitted

Thank you for submitting information on a possible environmental violation. The information will be reviewed by EPA enforcement personnel.

This notice will be the only response you will receive regarding your submission. Due to the sensitive manner in which enforcement information must be managed by EPA, we cannot provide status reports or updates regarding any submission we receive through the Report Environmental Violations form.

Back to Report Environmental Violations page

# Report Confirmation

| | |
|---|---|
| Received | Jun 12, 2023 at 12:34am EDT |
| | |
| Your Name | Ashley Gjovik |
| Your Email | ashleymgjovik@protonmail.com |
| Your Phone Number | 4159646272 |
| | |
| Suspected Violator's Name * | Apple Inc |
| Suspected Violation Location * | 3250 Scott Blvd |

# RE: Severe Illness next to a Semiconductor Manufacturing Plant

From Sakow, Rick <Sakow.Rick@epa.gov>

To Ashley Gjovik<ashleymgjovik@protonmail.com>

CC Fong, Alison (she/her/hers)<fong.alison@epa.gov>, Trombadore, Claire (she/her/hers)<Trombadore.Claire@epa.gov>, Lin, Sharon<Lin.Sharon@epa.gov>, Lewis, Darice<Lewis.Darice@epa.gov>, R9LandSubmit<R9LandSubmit@epa.gov>

Date Tuesday, June 20th, 2023 at 8:11 PM

---

Good afternoon Ashley,

I received your tip below and am responding to confirm receipt. I will review the materials in the Google Drive folder and in the other links you provided and will follow up in the coming days. Please feel free to contact me at the number below if you'd like to discuss.

Thank you,

-Rick


Rick Sakow, Manager

Enforcement and Compliance Assurance Division

Hazardous Waste and Chemicals Section

U.S. Environmental Protection Agency, Region 9

Office: (415) 972-3495 Cell: (628) 260-2683

sakow.rick@epa.gov


---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Sunday, June 11, 2023 10:29 PM
**To:** R9LandSubmit <R9LandSubmit@epa.gov>
**Subject:** Severe Illness next to a Semiconductor Manufacturing Plant

Hello,

I'd like to submit a complaint.

I also submitted it to the city government, and the complaint systems for CalEPA and US EPA. I'm also emailing it to TRI, CAA, and CERCLA as I believe the issues touch numerous departments.

The complaint is attached. Exhibits are here: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing

Subject: a semiconductor manufacturing plant is operating without required permits <300 feet from large apartment complex; numerous code violations over seven years; numerous leaks/spills of 'very dangerous substances'; evidence of unlawful disposals and releases; evidence of RCRA non-compliance; evidence of new groundwater contamination; evidence of human injury and illness from emissions

Location: 3250 Scott Blvd Santa Clara CA | Responsible Party: Apple Inc

I also recently filed two historic reports to CalOES in order to capture two leaks/releases that were not previously reported, including phosphine and silane in 2019, and 260lbs of (now-banned) NMP in 2020. I believe your agency was notified last Thursday.

https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/79B09C90D1E843A9882589C9000091E0?OpenDocument

https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/81CAD51F3ABACB5A882589C90070829D?OpenDocument

Please let me know if you have any questions.

-Ashley

—

**Ashley M. Gjøvik, JD, PMP**

Director, The D&G Center for Reform

#1 415-964-6272

Sent with Proton Mail secure email.

**In the matter of:**

*3250 Scott Blvd.*

*Santa Clara, California*

## COMPLAINT

**Federal**

- The Occupational Safety and Health Act (1970)
- The Clean Air Act (1970)
- The Clean Water Act (1972)
- The Safe Drinking Water Act (1974)
- The Resource Conservation and Recovery Act (1976)
- The Toxic Substances Control Act (1976)
- Comprehensive Environmental Response, Compensation, and Liability Act (1980)
- Emergency Planning and Community Right-to-Know Act
- Pollution Prevention Act (1990)

**State of California**

- Cal. Code Regs., Title 22, Division 4.5
- Cal. Health and Safety Code, Ch.3.5 & 6.5
- Cal. Fire Code, Title 24, Part 9, Ch. 50
- Cal. Penal Code, § 372, Nuisance
- Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65)

**County of Santa Clara**

- Title B, Div. B11, Ch. II, §B11-6 Nuisance
- Title B, Div. B11, Ch. IV, Wastewater
- Title B, Div. B11, Ch. XII, Hazardous Materials
- Title B, Div. B11, Ch. XIV, Toxic Gas

**City of Santa Clara**

- §8 Ch.25 Waste & Ch. 30 Nuisance
- §13 Ch.10 Hazardous Materials & Ch.60 Hazards
- §18 Ch.48 “Light Industrial” Zoning Intent

*Potential RCRA § 7002(a)(1)(B) Action*

**DATE: JUNE 12 2023**

**COMPLAINANT: ASHLEY M. GJØVIK**

# TABLE OF CONTENTS

**COMPLAINT & REQUEST FOR INVESTIGATION** ..... **3**

IMMINENT AND SUBSTANTIAL ENDANGERMENT ..... 4

SITE USE ISSUES (PERMITTING & REPORTING) ..... 8

CONTAMINATION (SPILLS & CLEAN-UP) ..... 21

RESPONSIBLE PARTY ..... 23

CONCLUSION & REQUEST ..... 25

**3250 SCOTT: CONCERN SUMMARY** ..... **27**

**REFERENCES** ..... **28**

# Complaint & Request for Investigation

To Whom It May Concern,

This complaint concerns a high-risk semiconductor manufacturing plant operating in a sensitive population in Santa Clara California. Over the last eight years, the operator of this plant appears to have been engaged in unauthorized storage and disposal of hazardous waste; unlawful disposal of hazardous waste into the air, sewers, and storm drains; repeated spills and leaks of ‘very dangerous substances’ (including into outdoor air); and apparent violations of RCRA/Right to Know and Proposition 65.

The operations at this plant have been registered as a “*Chemical Storage Facility, Hazardous Waste Onsite Treatment; Above Ground Petroleum Storage Tank; Hazardous Chemical Management; Hazardous Waste Generator; and RCRA Large Quantity Hazardous Waste Generator*” since June 22, 2015.[1] The plant is not registered with CalEPA for RCRA or as a ‘Treatment-Storage-Disposal Facility’ (TSDF). The city government also opted out of oversight by the Santa Clara County Department of Environmental Health, so the city Fire Department and local wastewater facility solely manage supervision. It appears there are no records of hazardous waste treatment inspections ever.

I believe the plant requires a Full Permit from DTSC. The current DTSC permit, if there was one, was inappropriate (a permissive Permit-by-Rule without rules or conditions) and expired in 2021. In 2022, the operator told the city Planning department the site is not a hazardous material/waste site (claiming it was not on Envirostor, even though it is, but marked as ‘inactive’).






[2]

[1] CalEPA CERS, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316
[2] Envirostor, DTSC ID 71003503, https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=71003503

## IMMINENT AND SUBSTANTIAL ENDANGERMENT[3]

The plant in this complaint is only 273 feet from a large apartment complex (1,800+ units with 2,000-6,000 tenants). It is also 800 feet from the exposed San Tomas Aquino Creek waterway, which flows to the San Francisco Bay. The groundwater under the plant and flowing south/southwest under the apartments is shallow at only 6-10 feet below ground. The apartments included 'fresh air vents', which appear to have intake fans on the roof of the building that pulls outdoor air (including factory exhaust) into the HVAC for the apartment units.[4]

The apartment complex next to the manufacturing plant is the "Santa Clara Square Apartments."[5] There is a large grocery store 1,000 feet away from the factory. The factory is only 360 feet from an open-air children's playground and less than 600 feet from three large, open-air community swimming pools.




After moving into this apartment complex in February 2020, I became mysteriously ill and severely disabled. Doctors documented slowed heart rate, arrhythmias, premature ventricular

[3] *"For claims brought pursuant to RCRA § 7002(a)(1)(B), the statutory requirement that the plaintiff give "notice of the endangerment" implicitly requires that the plaintiff detail the specific endangerment situation that exists or may be created as a result of the defendant's conduct or neglect."*

[4] The property manager of the apartments is The Irvine Company (signing DTSC agreements as "3255 Scott Boulevard, LLC"). Current activities at 3250 Scott were omitted from Environmental Impact Reports for the apartments. DTSC oversees the apartment complex as a CLRRA cleanup site starting July 15, 2015. DTSC's website noted that the clean-up was "fast-tracked."

[5] based at 3320 Montgomery Drive (or 3255 Scott Blvd in contracts)

contractions, volatile blood pressure, hypotension, hypertension, rashes and hives, and tumors – but no explanation of what caused the issues. I was fainting constantly and suffering from respiratory, GI, pericarditis-like, and MS-like symptoms. These symptoms often worsened around 7-8 am and 8-11 pm. In addition, every 3-4 weeks, I would wake up precisely at 3 am, choking and suffocated, nauseous and sweaty, dizzy and disoriented, and feeling like I was dying. The 3 am choking spells included symptoms that appeared to be heart failure, though two echocardiograms were okay.




I went on short-term disability and was billed over $100,000 in medical bills trying to figure out what was wrong with me. In September 2020, I discovered the apartment complex was a Brownfield site on a Superfund plume.[6] [7] Within a week of vacating the location in October 2020, my disabling medical issues vanished. My heart rate and blood pressure stabilized, I was no longer dizzy or fainting, and I had no more 3 am choking spells. Over a few months, the rashes subsided, and the tumor shrank. Two chemical exposure doctors diagnosed my 2020 illness as acute solvent exposure.

---

[6] Santa Clara Square Apartments, Draft EIR, EKI/2013, https://www.envirostor.dtsc.ca.gov/public/final_documents2?global_id=60002212&doc_id=60395782, Final EIR: Impact Sci/2015: https://www.santaclaraca.gov/home/showdocument?id=17071

[7] US EPA, Synertek, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0902620&doc=Y&colid=70135%C2%AEion=09&type=SC




In 2021, I was connected to six additional victims after I published an article about what happened to me and what I discovered about the contamination on-site.[8] Two women complained of health issues similar to mine. One of these women then contacted the local government and CalEPA DTSC, though nothing was done by these agencies, even with additional victims reporting illness.

Limited indoor air testing via a two-hour sorbent tube showed the presence of several chemicals inside my apartment which are known to be used at the semiconductor factory, including Acetonitrile, 1,2,4-TCB, Ethylbenzene, Hexane, Toluene, Ethyl acetate, 2-Methyl-1-propanol, Acetic Acid, Acetone, and Xylenes. There was also Freon 113, which had been released in vast quantities at the plant in the 1980s-1990s.

Dr. Harrison at UCSF Occupational Health Services instructed in his visit notes that "*there remains a concern about potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies.*" (April 29, 2021). Dr. Harrison also directs the worker tracking and investigation program for the California Department of

[8] Ashley Gjovik, SF Bay View, https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

Public Health. Stanford's Dr. Nadeau also saw me and diagnosed me with Multiple-Chemical Sensitivity Syndrome caused by solvent exposure.[9]

When I notified the property manager of unexplained spiking VOCs in my apartment that aligned with my symptoms, they said they sent PG&E to inspect the area. They said they were unconcerned because there was no evidence of 'gas leaks' or 'chemical spills,' thus 'no evidence suggesting that [my apartment] was unsafe.'[10] As we now know, multiple gas leaks and chemical spills occurred nearby at 3250 Scott Blvd.

While DTSC apparently never evaluated the exposure beyond the possibility of vapor intrusion from soil or groundwater, the apartment's property manager later hired an ex-DTSC employee who now does 'environmental public relations' to deal with me. Within only a couple of days, she even agreed with me that something was wrong. She wrote, *"It sure seems something is going on, but a lot of weird things too, and I can't quite tie it all together in my head"* and *"This all just confounds me, but it sure seems something is going on."*[11]

In February of 2023, I discovered through public records requests that manufacturing activities were taking place next to my apartment at this 3250 Scott Blvd factory.[12] Upon further investigation, I discovered numerous noncompliance issues, known leaks/spills, and other chemical emissions. This factory is a direct vector for my chemical exposure and medical issues. Chemicals known to cause the symptoms I experienced are known to be on-site and even known to have leaked/spilled, and several of them were found in the indoor air of my apartment.

---

[9] Solid Waste Disposal Act § 7002, 42 U.S.C.A. § 6972(a)(1)(B). *Fresh Air for the Eastside, Inc. v. Waste Management of New York, L.L.C.*, 405 F. Supp. 3d 408 (W.D. N.Y. 2019).
[10] See Appendix, Apartment, Page 15
[11] See Appendix, Apartment, Page 16
[12] Santa Clara city PRA: https://santaclara.nextrequest.com/requests/20-508; https://santaclara.nextrequest.com/requests/23-127; https://santaclara.nextrequest.com/requests/23-517; https://santaclara.nextrequest.com/requests/23-518; https://santaclara.nextrequest.com/requests/23-548

## SITE USE ISSUES (PERMITTING & REPORTING)

The operator appears to have some waste handling permits; however, they do not seem sufficient to cover the actual activities. Further, the operator repeatedly violated record-keeping and reporting requirements. It also appears possible that the operator does not have a valid or active waste handler permit at all despite handling hazardous waste, including treatment and disposal of hazardous waste. [13]

The facility is actively used for RCRA activities. There is storage of enormous amounts of chemicals, including corrosive, ignitable, reactive, toxic, explosive, oxidizers, pyrophoric, carcinogens, and ‘very dangerous substances.’ There is a tremendous amount of waste removed to treatment facilities; however, also a significant gap between disposal and inventories, implying a similarly large amount of waste is treated and disposed of on-site. HazMat/Haz Waste tanks, containers, drip pads, evaporation systems, abatement systems, scrubbers, neutralization systems, and exhaust vents are mentioned. However, there are only two regulatory filings about treatment over eight years.

The operator has used an “Acid Waste Neutralization system” since at least March 2016. The operator reported this system in a letter requesting a discharge to the local wastewater treatment facility. In this letter, the operator noted plans to process and discharge 3,000 gallons of a corrosive solution (hydrogen peroxide, acetic acid, and peroxyacetic acid) over two days via their “neutralization system.” It appears the operator has used the neutralization system for specific toxic substances and non-specific RCRA sources, such as spent solvent wastes.

Comparing Haz Mat to CERS, the operator has persistently failed to keep its chemical inventory current in CERS, omitting numerous extremely hazardous substances stored and used in large quantities. This includes chemicals like phosphine, silane, arsine, chlorine, phosphorus trichloride, hydrogen chloride, and other very dangerous chemicals, including those categorized as chemical weapons (i.e., DHS's ‘weapons of mass effect’).

[13] RCRA § 7002(a)(1)(A)

## 3250 Scott Blvd: Rogue Chemicals; Risk Categories

| | Release / Leak / Spill / Violation | California "Proposition 65" [14] | US EPA "Extremely Hazardous Substances" [15] | TSCA Review: "Unreasonable Risks to Public Health" [16] | DHS Chemicals of Interest [17] |
|---|---|---|---|---|---|
| **Acrylonitrile** | Indoor Air | x (cancer) | x | | x (flammable) |
| **Phosphine Gas** | Multiple Leaks | | x | | x (flammable; weapon of mass effect) |
| **Silane Gas** | Multiple Leaks | | x | | x (flammable) |
| **Chlorine Gas** | Code violation for not reporting | | x | | x (toxic; weapon of mass effect) |
| **Benzene** | Indoor Air | x (cancer) | | | |
| **Ethylbenzene** | Indoor Air | x (cancer) | | | |
| **Toluene** | Indoor Air | x (cancer) | | | |
| **1,2-Dichloroethylene** | Indoor Air; WW Filings | | | | |
| **Xylenes** | Indoor Air; Urine | | | | |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | x (cancer) | | x (January 2023) | |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | x (development) | | x (December 2022) | |
| **1,2,4-Trichlorobenzene** | Indoor Air; Groundwater | | | | |

The operator's building records show the installation of several hydride abatement systems in 2019-2022 designed for phosphine and silane. However, there are no records of off-site disposal of silane or phosphine, so gases must be treated and disposed of on-site. Haz Mat inventories from 2021 report storage of at least 1,664 cubic feet (160 lbs) of phosphine and 705 cubic feet (63 lbs) of silane. At least 208 feet of diluted phosphine gas is also reported in a closed-loop system.

---

[14] Proposition 65, https://oehha.ca.gov/media/downloads/proposition-65/p65chemicalslistsinglelisttable2021p.pdf
[15] Appendix A to Part 355—The List of Extremely Hazardous Substances and Their Threshold Planning Quantities, https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-355
[16] TSCA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca
[17] DHS CISA: https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

There have been at least two phosphine/silane leaks. The first was disclosed in response to a public records request to the Fire Department. On June 1, 2019, a phosphine and silane spill resulted in an evacuation and a city Haz Mat visit. The incident report noted that the alarm was triggered by silane and phosphine "in scrubbers." This assumably refers to a treatment system and implies that the gas left a closed-loop system. It is unclear if the gases were exhausted to the outdoor air. This spill was never reported to DTSC, US EPA, or CalOES. I reported this spill to CalOES on June 8, 2023, as a historical report and to obtain more details about what occurred.[18]

Then, in 2021 there was apparently another phosphine leak. This one is only recorded in CalOES (reported by the Fire Department), but no records were released as part of the public records request, nor was the spill noted in any US EPA or CalEPA records.[19] The April 30, 2021 spill notes say phosphine gas was "*vented into the atmosphere*." The report noted that the 'scrubber system' malfunctioned (again), and the toxic gas "*entered the ventilation system*." This leak appears to be due to treatment failures, resulting in an evacuation and Haz Mat visit. Perhaps related – two weeks later, hazardous waste manifests show that 60 pounds of 'vacuum filters contaminated with glass dust' were sent for offsite incineration, implying there was some interior explosion related to the phosphine leak. Was there a phosphine explosion?

Silane (aka silicon tetrahydride) exposure can cause dizziness, asphyxiation, nausea, and burns.[20] Exposure to phosphine can cause difficulty breathing, suffocation, low blood pressure, vomiting, arrhythmia, blue skin, pulmonary edema, heart failure, coma, and death. Both gases are pyrophoric and can self-ignite in the air. An air concentration of 500 ppm (parts-per-million) of phosphine is lethal in 30 minutes, and 1000 ppm is fatal 'after a few breaths.'[21] The half-life for these chemicals is 5-28 hours in the air, and the chemical is heavier than air, so it tends to pool instead of rise. In case of spills or leaks of either chemical, the area must be evacuated at

---

[18] CalOES, 2023 for 2019, https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/81CAD51F3ABACB5A882589C90070829D
[19] CalOES, 2021, https://w3.calema.ca.gov/operational/malhaz.nsf/f1841a103c102734882563e200760c4a/197d45cf4cd38421882586c7005ec199
[20] Silane: https://www.nj.gov/health/eoh/rtkweb/documents/fs/2768.pdf
[21] Phosphine: https://cameochemicals.noaa.gov/chemical/1322, https://www.epa.gov/sites/default/files/2016-09/documents/phosphine.pdf

least 300-1,000 feet ‘in all directions,’ but evacuation is 2,640-5,280 feet downwind for larger spills.[22] The apartments are only 273 feet away. Why weren’t the apartment residents notified?[23]

In 2020, I repeatedly complained to doctors that my 3 am choking spells included waking up with my right arm cold, blue, and tingling; gasping for air; low blood pressure, bradycardia, and arrhythmia. Doctors performed two echocardiograms to rule out heart failure (as these are symptoms of heart failure). A cloud of phosphine gas, perhaps auto-released at 3 am, could have induced heart failure despite no anatomical defect.

City records show a ‘Community Risk Reduction’ meeting with the operator in 2022 about the silane and phosphine gas systems, noting it was the first risk reduction review. [Note: silane and phosphine are extremely hazardous substances, and CESQT cannot govern treatment]. The Risk Reduction report includes notes that imply exhaust ducts were not labeled and were constructed with inappropriate materials; hazardous waste may have been disposed of improperly; there was no emergency shutdown automation if the containment systems failed; and there are concerns about the distance of solvent exhausts from nearby properties.

Additional building permits and records reflect several ‘Gas Bunkers’ and ’Gas Abatement units.’ City records show frequent updates to vents, exhaust, and ductwork. In 2019, the city issued “compliance comments” for the site, apparently expressing concerns that the operator was uncertain where all its exhaust ducts were, where they went, and what was inside them. Further, the comments reflect concerns about backdrafts and exhaust vent heights on the roof related to air intake from the roof. [Note: a similar situation is an active safety issue at my Sunnyvale office with the same operator, the US EPA has ordered corrective actions.[24]]

Further, ignitable and reactive waste is supposed to be stored at least 50 feet from the property line. However, the operator’s Acid Neutralization Tank is only 38 feet from the building

[22] Phosphine: https://nj.gov/health/eoh/rtkweb/documents/fs/1514.pdf
[23] When a § 7002 (a)(1)(B) claim is based on an endangerment to human health, the plaintiff must offer proof to establish that a risk of potential exposure and likelihood of potential injury exist, which constitute a sufficiently perilous condition necessary to satisfy the "may present an imminent and substantial endangerment to health" standard. To accurately assess whether a specific factual situation involving hazardous wastes poses a potential health risk, the National Academy of Sciences has established health risk assessment guidelines, which recommend a four-step analytical process: (1) hazard identification; (2) dose-response assessment; (3) exposure assessment; and (4) risk characterization.”
[24] US EPA, TRW Microwave,
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC

to its west. It also appears there is no Waste Minimization Plan, Recyclable Materials Biennial report, Waste Stream Analysis, Pollution Prevention (P2) reports, Treatment Unit permits, Leak Detection monitoring or controls, and no record of financial assurance for closure/post-closure or 3rd party liability insurance.

In February 2016, the city requested the operator participate in CalARP due to the tenant's "certain regulated chemicals above a reporting threshold" and asked the tenant to submit a Risk Management Plan. The plan was made available for comment physically at the Fire Department for 45 days. There have been no plans submitted since. The Clean Air Act requires these plans for 'facilities that use extremely hazardous substances,' which must be revised and resubmitted to EPA every five years.' Here, the plan was not submitted to EPA, and the plan did not even leave the physical premises of a local city Fire Department. The plan also should have been revised in 2021, two years ago.

In 2020, the factory registered the treatment and release of a highly regulated and now-banned chemical through 'point emissions' and 'on-site treatment' occurring in 2020. The facility did not report these activities to US EPA Toxic Release Inventory until June 2021. The operator said 2,342 pounds of the combustible solvent NMP (N-Methylpyrrolidone) was treated onsite, and 260 pounds of NMP was released onsite via "air emissions." The waste treatment method noted was "absorber," however, the standard treatment of NMP is offsite disposal "*in original containers*" and "*do not mix with other waste*." NMP vapor is heavier than air, and the half-life in the air is estimated to be 5.2 hours. Safety sheets advise conducting downwind evacuation at least 1,000 feet in case of a spill. The apartments are 273 feet away. The Material Safety Data Sheet clearly states that NMP "*should not be released into the environment,*" "*do not let product enter drains*," and instructs to "*do not breath vapors*."[25] This release was never reported to CalOES, so I also reported the NMP release to CalOES on June 8, 2023.[26]

The TRI entry for the NMP also noted that 14,742 Pounds of the NMP was 'treated offsite' in 2020 and noted three Transporters who supposedly transported the chemical offsite.[27]

---

[25] Material Safety Data Sheet, NMP, https://www.sigmaaldrich.com/US/en/sds/SIGALD/270458
[26] CalOES, 2023 for 2020, https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/79B09C90D1E843A9882589C9000091E0?OpenDocument
[27] US EPA TRI, https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885&fac_search=fac_beginning

However, the TRI entry does not note Manifest IDs and a thorough review of the Manifests for the site does not show any NMP. There are no Manifests for removing NMP between 2015 and the current day.[28] This data submitted to TRI appears to be falsified with no NMP actually moved offsite, or if it was, then without manifests.

The EPA banned NMP as a whole chemical under TSCA in December of 2022 after proposing a rule to ban NMP back in 2017.[29] There appears to be no plan on how the operator will dispose of this now-banned chemical, and in 2021, they reported over 190 gallons of it still onsite. The operator apparently previously treated and disposed of the NMP onsite – is that what they plan to do with the rest? Are they treating and disposing on-site now? Or perhaps they are using unauthorized Transporters without manifests?

In addition to my medical issues and other symptoms, extensive property damage was consistent with NMP exposure. My white linens (clothing, sheets, towels, etc.) turned yellow; many of my metals showed corrosion and reactions (jewelry, belts, shoes, clothing, etc.); and some of my plastics also turned yellow. NMP is known to attack copper and degrade certain plastics.[30] The yellowing of lines was not a stain; there was no way to get it out. A state Public Health medical doctor suggested it appeared to be accelerated ozone yellowing from a solvent or other VOC. *"NMP tends to oxidize in the presence of air, giving a yellow color.*"[31]

The environmental consultant assigned to the site from October 2019-March 2020, signing hazardous waste manifests during that time, posted on his LinkedIn profile that during his time working at 3250 Scott, he worked to *"find cost savings for [his] client"* and *"c[a]me up with innovative methods for disposal of unique wastes."* What types of disposals did he "innovate" to cut costs? What kind of "innovation" did he undertake?

---

[28] DTSC Haz Waste Tracking System, 3250 Scott CAR000278176, https://hwts.dtsc.ca.gov/facility/CAR000278176 (2017-current); https://hwts.dtsc.ca.gov/facility/CAT000623983 (2016-2021)
[29] US EPA, TSCA: NMP, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/final-risk-evaluation-n-methylpyrrolidone-nmp
[30] https://inchem.org/documents/icsc/icsc/eics0513.htm
[31] https://chemistry.stackexchange.com/questions/165011/why-is-nmp-developing-a-yellow-color-after-distillation/165594


9


10


11

Despite a "Hazardous Waste Onsite Treatment" designation in CERS from the city agency, there is no RCRA permit, nor are there any apparent TTU permits or other treatment permits released in the public records request.[32] There are also no records of local agencies ever conducting a Hazardous Waste Onsite Treatment inspection – despite the use of at least an acid neutralization system, numerous gas abatement systems (and two silane and phosphine leaks from that system), and over ten thousand pounds of NMP treated on site.

The operator also has an "evaporation system" in its service yard. A building permit was requested in 2018 to install a new 'HMR evaporation system"; however, it appears there was an evaporation system that also existed prior. The service yard is not contained; it is open-air with a non-enclosed canopy roof. There are also at least two 'gas bunkers.' It is unclear what work is done in the yard and if solvents are being evaporated into the open air.

There are significant gaps between the chemicals noted in CERS compared to those pointed out in the Haz Mat inventories and again compared to the manifests for disposal. There are a large number of chemicals that are listed in the inventories, yet with no record of any offsite disposal or offsite treatment. This infers that a substantial amount of hazardous waste is being treated and disposed of onsite. However, there was only one TRI filing ever – the NMP in

[32] Note: a more specific request, specifically requesting these documents, has been submitted to verify, but there are no responsive documents yet.

2020. Why were no other chemicals recorded in TRI? Why wasn't the 2019 silane and phosphine leak reported? Why was this NMP release recorded in TRI? Was it only filed due to the solvent exposure issues reported by me and others?

## 3250 Scott Blvd: Reporting Status of Rogue Chemicals

| | Release / Leak / Spill / Violation | CERS | "Inventory Form" | DTSC Manifests |
|---|---|---|---|---|
| **Acrylonitrile** | Indoor Air | None | Listed | None |
| **Phosphine** | Multiple Leaks | None | Listed | None |
| **Silane** | Multiple Leaks | None | Listed | None |
| **Chlorine** | Code violation for not reporting | None | Listed | None |
| **Benzene** | Indoor Air | None | Unknown (Solutions) | Unknown (Solutions) |
| **Ethylbenzene** | Indoor Air | None | Unknown (Solutions) | Unknown (Solutions) |
| **Toluene** | Indoor Air | None | Unknown (Solutions) | Listed (5lb, 2021) |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | None | None | None |
| **1,2-Dichloroethylene** | Indoor Air; WW Filings | None | None | None |
| **Xylenes** | Indoor Air; Urine | None | Unknown (Solutions) | Listed (4lb, 2022) |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | Listed | Listed | None |
| **1,2,4-Trichlorobenzene** | Indoor Air; Groundwater | None | Listed as Solution | None |

Per documents from the local wastewater facility, the operator regularly flushes at least 40,000 gallons of water daily into wastewater lines and repeatedly fails to comply with permit requirements to frequently test the water to ensure it does not include chemical contamination above acceptable limits. The sewer lines from the plant flow near and around the apartment complex. In the fall of 2020, I reported possible vapor issues from the fire-riser drainage system

outside my bedroom with a compromised p-trap and improperly installed plumbing in the bathroom resulting in unsealed sewer connections.[33]




*My Industrial Hygienist inspection (2020)*

The operator's semi-annual wastewater self-monitoring reports have included many contaminants, including solvents. The records show TCE was present in the operator's wastewater on at least August 2017 at 24 ug/L and February 2020 at 0.248 ug/L, per the lab reports. So far, no records show the operator's registering storage, use, or disposal of TCE at this site. Hence, it is unclear if the operator has additional chemicals on site that have not been registered in CERS or with the city. The new and increasing TCE in the nearby groundwater well may also suggest TCE leaks or dumping. In January 2023, the US EPA decided that TCE is now banned due to the whole chemical having an unreasonable risk to human health.[34]

The operator has filed several 'Toxic Organic Compound' worksheets with the regional wastewater facility reporting use and disposal of 1,2-dichloroethylene; however, there is no 1,2-dichloroethylene noted in either CERS or the Haz Mat inventory documents. Similarly, wastewater filings note 'off-site disposal' of the chemical, yet there were no manifests for 1,2-dichloroethylene. Similarly, Ethylbenzene is reported in wastewater filings noted as 'off-site

---

[33] Sewer Gas: An Indoor Air Source of PCE to Consider During Vapor Intrusion Investigations, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3740581/
[34] US EPA, TSCA: TCE, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-trichloroethylene-tce

disposal,' yet there are no manifests for Ethylbenzene. These chemicals were found inside my living room during indoor air testing.

Disposal manifests are also inconsistent, with several chemicals only disposed of once and never again. These are often very toxic chemicals that appear in inventory sheets in large quantities. This infers that either the waste is being stockpiled for years before disposal or the waste is being treated and disposed of on-site. Some examples of these chemicals include manifests for 23lbs of white phosphorus only in 2017; 44lbs yellow phosphorus only in 2020; 936lbs of hexane only in 2016; and 377lbs of ferric chloride and 5lbs of toluene only in 2021. Hexane and Toluene were found in my living room. The only offsite disposal of xylenes was four pounds in 2022. Xylenes were found in my living room and in my urine.

Manifests also reflect several concerning operational issues, including that the activated carbon onsite was only first replaced in December 2020 (six years after 2015). After 2020, following my complaints, the carbon was replaced for the first time and then every year after. Generally, activated charcoal for activities like this is replaced at least every six months – not every six years. Charcoal loses its ability to filter and must be replaced; otherwise, it no longer filters, and any chemical released is not abated before entering the open air.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Activated Charcoal (Carbon)** | 0 | 0 | 0 | 0 | 0 | 630lbs | 980lbs | 1255lbs |
| **Roof HVAC Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 400lbs | 0 |
| **Vacuum Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 60lbs (with glass) | 0 |

Similarly, the roof's HVAC filters' (400 pounds) were only first replaced in 2021. Was the carbon and filters only replaced because of my complaints? Were they used to the point that they were no longer filtering when I and others were ill?

The operator's RCRA Biennial reports claimed that equal amounts of waste were generated as was shipped offsite: 344 tons in 2017, 706 tons in 2019, and 491 tons in 2021. However, these reports do not match the total amounts reflected in the manifests. Further, the

2021 Biennial report claimed no record of 'Generated Waste Managed On-Site,' yet the 2020 TRI report noted thousands of pounds of NMP managed onsite in 2020. How can the operator treat and dispose of thousands of pounds of hazardous waste onsite the same year the operator also claims it managed no hazardous waste on-site?

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **TRI – Treated Onsite** | 0 | 0 | 0 | 0 | 0 | 2,341 pounds | 0 | 0 |
| **TRI – Disposed Offsite** | 0 | 0 | 0 | 0 | 0 | 14,743 pounds | 0 | 0 |
| **TRI – Disposed Onsite** | 0 | 0 | 0 | 0 | 0 | 260.17 pounds | 0 | 0 |
| **BR – Treated Onsite** | 0 | 0 | | 0 | | 0 | | 0 |
| **BR – Disposed Offsite** | 0 | 344.2 tons | | 705.8 tons | | 290.6 tons | | 0 |
| **Manifests ID 1 – Disposed Offsite** | 2411 tons | 80.9 tons | 316.9 tons | 12.5 tons | 0 | 0 | 0 | 0 |
| **Manifests ID 2 – Disposed Offsite** | 0 | 0 | 1.1 tons | 927 tons | 835 tons | 254 tons | 512 tons | 441.5 tons |

The Biennial source codes are also peculiar, including 2.6 tons of 'spent acid' in 2021 and 6.3 tons of 'spent acid' in 2019 were tagged as 'off-specification, aged, or surplus organics.' The waste is coded as '<u>spent</u> acid' – implying tons of hazardous waste may have been stored so long it became 'aged' waste?[35] The operator also has mercury on-site and appears to have never reported it to the EPA.[36]

---

[35] US EPA, Biannual Reports, https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2017, https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2019 , https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2021
[36] US EPA, Mercury, https://www.epa.gov/mercury/frequent-questions-about-epas-mercury-inventory-reporting-rule

The operator has already been cited for several violations of fire, hazmat, environment, and health and safety laws at the plant – with the Fire Department, city planning, and the county wastewater facility writing them up repeatedly for failure to keep proper documentation, file reports on time or at all, failure to track chemicals, and failure to have business plans or spill plans. The 'root cause' of issues for two of the violations was noted as "*negligence*." [37]

Only two routine Fire Department/Haz Mat inspections are noted in CERS: in 2016 and 2020. There were apparently six violations arising out of those two inspections, and four violations from 2016 appear to have not been corrected until 2020. Further, the inspection in October of 2020 revealed several issues, including 1,700 gallons of diesel were 'missing' and the operator's stockpile of chlorine gas (a weapon of mass effect) was not reported to regulators despite having over 200 pounds on site.

Many of these violations have sat open for over three years without apparent follow-up by the city agency. In addition, some of these violations show fundamental gaps in planning and oversight – such as concurrently using two EPA IDs for hazardous waste disposal for over three years, no hazardous material training, and failure to have a business license for the 3260 Scott office adjacent to 3250 Scott. Two inspections were noted in the US EPA RCRA system on 10/26/2020 and 12/23/2020. These dates match assessments conducted by the city of Santa Clara. Therefore, it appears the city believes the facility is registered as an RCRA site, even though it does not have a DTSC permit.

[37] "Endangerment is 'substantial,' for purposes of RCRA's imminent hazard citizen suit, where there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in event remedial action is not taken." Resource Conservation and Recovery Act of 1976, § 2(a)(1)(B), 42 U.S.C.A. § 6972(a)(1)(B). Burlington Northern and Santa Fe Ry. Co. v. Grant, 505 F.3d 1013 (10th Cir. 2007).

## 3250 Scott: Violations (Excerpt)

| | City Fire Department | Other |
|---|---|---|
| **2022** | | |
| **2021** | • Phosphine leak/spill | |
| **2020** | • Fire code violations<br>• Using 2 EPA IDs<br>• Inaccurate hazmat inventory information<br>• No SPCC plan or training<br>• No signature from supervisor on records<br>• No spill prevention briefings<br>• No tank facility plan<br>• No business permit | • Wastewater testing violations |
| **2019** | • Phosphine & silane leak/spill | • Wastewater testing violations |
| **2018** | | |
| **2017** | | |
| **2016** | • Fire code violation<br>• CalASPA violation<br>• Health & Safety code violation | • Spilling cooling water solution into storm drains |
| **2015** | | • City planning ‘stop work’ order due to construction without permits and failure to heed prior warnings |

## CONTAMINATION (SPILLS & CLEAN-UP)




The groundwater at 3250 Scott is shallow and flows downgradient under the apartment complex. The US EPA Superfund site has a groundwater plume of TCE and other solvents that extends under the property.

Despite being located on a Superfund plume and having a history of waste disposal into the land/groundwater, there is no record of a clean-up assessment for the plant in Geotracker or Envirostor. There should be a remedial investigation into this site due to the US EPA TRI records of thousands of pounds of hazardous waste disposal into the ground and air due to the 'acid pit' due to the active Superfund plume and due to unstable solvents in the groundwater on site where existing groundwater wells show increasing solvents (i.e., 1,1-DCE, vinyl chloride, 1,2,4-TCB, TCE, and more).

As noted, the property also contained at least an "acid neutralization plant," "acid waste tank," and "acid neutralization pit." All of these are for waste treatment and disposal. US EPA TRI records for the plant also note repeated disposal of hazardous waste via onsite 'injection wells," "stack/point emissions," "fugitive and non-point emissions," "surface impound," and "other disposal" from 1987-1991. The fugitive onsite air releases include 26,277 pounds of Freon 113, 260 pounds of sulfuric acid, and 250 pounds of phosphoric acid.[38] Both terms 'injection wells' and 'surface impound' infer, at the very least, some form of Underground Storage Tanks. The city also cited the operator for spilling cooling water into a storm drain in June 2016.

There appears to be insufficient oversight of the contamination at the apartments and 3250 Scott. For example, per EPA documents, one of the groundwater wells flagged for

---

[38] US EPA TRI, https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885&fac_search=fac_beginning




increasing solvent contamination was accidentally buried under a sidewalk when the apartments were constructed in 2017 and required a specialty consultant to 'find' the missing well in 2022.[39] [40]

Although the DTSC plan approved the apartments and claimed groundwater was not a concern, there is increasing contamination in at least three wells around the 3250 Scott property, the 'missing' well, a well on-site at 3250 Scott, and also another well near where my apartment was located that has new and increasing TCE from an unknown source – perhaps related to the TCE found in 3250 Scott's wastewater.

Despite the US EPA overseeing vapor intrusion testing of buildings on the Superfund plume, the 3250 Scott building was somehow excluded without explanation, despite it being on the plume. I complained to US EPA and USACE about this months ago, but they have yet to respond. It seems incredibly dangerous not to evaluate 3250 Scott for vapor intrusion with all the highly reactive and explosive chemicals used at the plant.

The US EPA has also inexplicably disavowed the groundwater well on the 3250 Scott property as no longer associated with the plume and left the well unaccounted for, despite increasing contamination of 1,2,4-Trimethylbenzene that appears to potentially be caused by a recent spill or leak near the operator's acid neutralization system. The operator's Haz Mat inventories list at least one product that contains 1,2,4-TCB (Rinse Solvent T1100) and 1,2,4-TCB fumes were also found in my living room. The spill occurred at some point after 2014 and no later than 2020, a period in which the operator had control




---

[39] Geotracker, Synertek, https://geotracker.waterboards.ca.gov/profile_report?global_id=SL721241222
[40] US EPA, Synertek, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0902620

of the property where the well was located. The well with this contaminated groundwater is only 150 feet upgradient from the apartment complex buildings.

Without RCRA oversight for eight years, multiple chemical spills and leaks have already impacted the surrounding community. There has already been harm which could have been prevented by compliance with regulations.

## RESPONSIBLE PARTY

The manufacturing plant is at 3250 Scott Blvd in Santa Clara. Informally, it is called Scott 1 and was known as Synergy Semiconductor prior.[41] The tenant and operator is Apple Inc which has code-named its involvement in project documents "Project Aria." On November 8, 2016, the operator submitted a Phase 1 tiered permit application. However, on November 11, 2016, DTSC noted the application as a "Permit by Rule" despite high-risk activities, conflicting information being provided and no inspection. In addition, the operator's responses (per a third-party geologist) in the application are not complete or accurate. Finally, no approval letter was even sent, nor were any instructions provided about the PBR if one was granted.

The November 22 2016, approval letter from DTSC noted that the information provided by the applicant would "be verified by DTSC through a site visit in the near future." But, per DTSC this year, there was never any follow-up or further communication about the site after that letter. US EPA also claimed they have no records or knowledge of the site.

The records I was able to obtain reveal that the operator must have known about its RCRA and other environmental/safety responsibilities by at least 2016, yet continued to fail to meet its essential regulatory obligations or seek appropriate permits and oversight. The situation at hand exceeds the bounds of strict liability. The operator knew they caused harm and only attempted to cover up what they did while failing to take precautions to avoid future harm.

The plant operator has a long-time pattern and practice of noncompliance with local, state, and federal health/safety and environmental laws. The company even agreed to a consent decree with CalEPA DTSC in 2016 due to egregious violations of the Hazardous Waste Control Law for universal waste (§25100), including operating two off-book waste processing facilities

[41] The active EPA ID is CAR000278176.

that unlawfully processed over 2,000,000 pounds of universal waste. DTSC's complaint noted that the operator processed waste "*without informing the Department of the existence of [the] facility or complying with the Department's universal waste regulations*." DTSC also complained that the operator had shipped hazardous waste as non-hazardous waste, used a Transporter not authorized to store or treat the operator's hazardous waste, and even violated international law by shipping unauthorized hazardous waste to Canada.[42]

The operator was also recently cited and fined in North Carolina for RCRA violations, including transporting and disposing of hazardous waste by unregistered Transporters and Treaters, failure to conduct proper waste determinations, failure to register as a Large Quantity Generator, failure to track hazardous waste transports with manifests, and failing to submit reports to federal and state regulators about hazardous waste activities onsite. North Carolina's Division of Waste Management found Apple's handling of hazardous waste was "*negligent*" with a major deviation from legal requirements and with a major risk of harm to human health and the environment.[43] There are many other incidents in California and other states as well.

I am a prior long-time employee of Apple Inc. I am a state and federal witness in several open investigations and cases against Apple for labor, fraud, and whistleblower retaliation violations –based on violations of health/safety and environmental laws related to the TRW Microwave Superfund site in Sunnyvale, California (my previous office). My reports to the US EPA about the property led to a mandatory inspection, numerous correction actions, and federally overseen testing and mitigations.[44] I was promptly and violently fired for snitching.[45] I also have open California Department of Labor Retaliation cases, including retaliation under Proposition 65.

As mentioned, I also lived in the apartment complex next to the plant in 2020. I continue to suffer from the chemical exposure at the apartments and my office. While the most severe issues seem to have been resolved, I now have asthma severe enough to require an inhaler. Much

---

[42] California DTSC's lawsuit against Apple over universal waste and resulting consent agreement in 2016 can be found at *People of the State of California ex rel DTSC v Apple Inc,* Case No. 16CV303579.
[43] North Carolina's lawsuit against Apple over Hazardous Waste Rules can be found at *In Re: Apple Computer Inc.*, NCR000149526, Docket #2017-04.
[44] US EPA, TRW, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC
[45] Index on Censorship, https://journals.sagepub.com/doi/pdf/10.1177/03064220211068699

of my hair fell out, and I am still trying to regrow the bald patches. I have what appears to be permanent scar tissue on my skin from the chemical burns. I worry daily about my increased risk for cancer and disease due to the exposure. I also suffer severe PTSD from the experience. I will never be the same after what happened to me living next to 3250 Scott Blvd for eight months.

## CONCLUSION & REQUEST

I respectfully request an investigation and inspection. When I contacted US EPA and California DTSC earlier this year, they expressed no knowledge of the site. The site must be contacted about its lapsed and missing permits. I want professional inspectors to investigate this site. Does this site require an RCRA permit? What is occurring on-site? What is being released? Are testing and clean-up required? Have there been other spills and leaks?

Factories like that at 3250 Scott are supposed to properly manage their toxic chemicals and adequately track what is done with them to protect human health and the environment. Programs like Right to Know were intended to prevent chemical emergencies and ensure publicly available information about nearby hazardous substances and releases. These laws were created after deadly clouds of toxic fumes killed and disabled thousands of people in 1985.

Today, we have a factory releasing clouds of toxic chemicals around an apartment complex with thousands of people – at least some of whom became ill and disabled because of it. If the factory operator at 3250 Scott does not comply with RCRA laws and does not feel like it has to, then this operator is not incentivized to improve its environmental and health/safety performance. There is no deterrence effect to dissuade from engaging in risky and dangerous behavior. Every day the egregious misconduct is tolerated, the operator is further empowered to continue in their dangerous malfeasance.

I hope this complaint is found to justify an investigation as the situation is an ongoing threat to public health and the environment, the issues reflect persistent noncompliance by the operator, and those issues and noncompliance involve multiple agency jurisdictions. I also believe that some of this conduct may rise to criminal activity. Apple has clearly had knowledge

of the imminent and substantial risks, yet has shown persistent reckless indifference for human life. [46]

In September 2020, I contacted Apple (my then-employer), informing them about the solvent exposure diagnosis and asking if they knew of conditions around my apartment complex, noting there appeared to be an Apple office next door at 3250 Scott. Apple's Real Estate EH&S team promptly contacted me and suggested I use a special type of paid time-off called "Extreme Condition Leave" to evacuate the area and move to a new apartment. (The leave was intended for natural disasters). I also warned Apple's in-house medical clinic that other Apple employees had also reported health issues at the apartments and suggested they screen for health issues at the location. Shortly after, I also reported CERCLA non-compliance at my office to the US EPA. Apple responded by harassing and firing me.[47]

Apple's known for two years what it has done but only cares about covering up its misconduct and silencing witnesses. The government must intervene to prevent further harm. I have additional concerns and extensive supporting evidence. Please feel free to contact me with any questions, for an interview, and to obtain additional documentation.

Respectfully,

ASHLEY M. GJØVIK

**Ashley M. Gjovik**

ashleymgjovik@protonmail.com

[46] "Where it was shown in an RCRA criminal endangerment case that the defendant's employees had been exposed to toxic wastes while at work, the Tenth Circuit Court of Appeals, in affirming the defendant's conviction, held that evidence that the employees were suffering from psychoorganic syndrome as a result of the exposure, which could have impaired their mental faculties, was sufficient to meet the 'imminent danger of serious bodily injury' standard." *U.S. v. Protex Industries, Inc.*, 874 F.2d 740 (10th Cir. 1989).

[47] Gizmodo, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

# 3250 Scott: Concern Summary

| | Human Health: Residential | Human Health: Non-Residential | Ecological Repairs & Resource Restoration |
|---|---|---|---|
| **Air (Outdoor)** | • Prevent exposure to chemicals from exhaust vents<br>• Prevent exposure to chemicals from waste processing<br>• Notify community | • Prevent exposure to chemicals from exhaust vents<br>• Prevent exposure to chemicals from waste processing | n/a |
| **Air (Indoor)** | • Prevent vapor intrusion from VOCs in groundwater to occupied buildings<br>• Vapor intrusion testing | • Prevent vapor intrusion from VOCs in groundwater to occupied buildings<br>• Prevent worker exposure | n/a |
| **Groundwater** | • Develop well monitoring plan to alert if contaminated groundwater has traveled downgradient under apartments | • Evaluate groundwater contamination on-site<br>• Prevent employee exposure to groundwater<br>• Develop treatment plan, if applicable | • Establish attainment levels & attain levels in all groundwater on site, if appropriate |
| **Surface Water** | • Evaluate if any contamination of San Tomas Aquino Creek | | |
| **Soil** | • Contain any contaminated soil to prevent exposure to apartment residents | • Perform soil testing and assessment<br>• Prevent worker exposure to contaminated soil | • Cease all unauthorized land disposals<br>• Prevent any contamination from leaching into groundwater |
| **Waste** | • Contain waste<br>• Establish waste exposure monitoring (air monitoring, etc.) | • Prevent employee exposure to waste | • Evaluate contamination from acid pit, acid neutralization system, injection well disposal, point emissions, and other historic disposal<br>• Develop clean-up plan for contamination, if applicable |

# References

**Appendixes**

Exhibits: Factory History [48]

Exhibits: Factory Operations [49]

Exhibits: Santa Clara Square Apartments [50]

**Complaint Submitted To**

California EPA; US EPA; Santa Clara Fire Department; Santa Clara Planning Division; Mayor Gillmor; Santa Clara County Department of Environmental Health; see associated cases below

**Associated Open Cases:**

U.S. Department of Labor: *Ashley Gjovik v Apple* (9-3290-22-051)

California Department of Labor: *Ashley Gjovik v Apple* (RCI-CM-842830)

US NLRB: *NLRB v Apple Inc*, Complainant Ashley Gjovik (32-CA-284428 & 32-CA-284441)

**Associated Investigations:**

U.S. EPA: Synertek Superfund (CAD990832735)

U.S. EPA: TRW Microwave Superfund (CAD009159088)

U.S. NLRB: 32-CA-282142, 32-CA-283161, & 32-CA-288816

U.S. SEC: 16304-612-987-465

[48] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing
[49] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing
[50] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing

# JUNE 11 2023 CITIZEN COMPLAINT
## State/City

# Environmental Complaint System

Start Details Complete **Confirmation**

Thank you for your comments. Your complaint has been logged.

Complaint #COMP-57311 Submitted: 2023-06-11 21:25:43 PST

Please reference this complaint number during any future correspondence regarding this complaint.

# Contact Information

Receive updates regarding this complaint?

☑

Name

Ashley Gjovik

Address

City

Albany

State

New York

Zip

12202

# Re: I was poisoned at a new residential hazardous waste remediation site in Santa Clara and DTSC refuses to act

From Ashley Gjovik <ashleymgjovik@protonmail.com>

To lgillmor@santaclaraca.gov, rchahal@santaclaraca.gov

Date Tuesday, June 13th, 2023 at 10:08 PM

Hello Mayor Gillmor and Councilmember Chahal,

I have an unfortunate update on this matter. In February of this year, I discovered that across the street from Santa Clara Square Apartments, only 150 feet away, is a stealth semiconductor manufacturing factory with an enormous amount of dangerous chemicals and an extensive history of code violations, leaks, and emissions. I quickly dug in and investigated -- requesting public records requests and researching regulatory filings. I was continually horrified to find what appears to be gross negligence by the operator -- as well as documentation showing a number of chemicals that were leaked, spilled, emitted, or otherwise unaccounted for -- chemicals which also showed up in the indoor air testing I had performed in 2020 -- also matched the medical issues myself and others experienced -- and also matched much of the mysterious property damage.

I detail all of it in the attached complaint which I submitted to US EPA, Cal EPA, SCC DEH, Santa Clara FD/Haz Mat, and several others on Sunday night -- calling for a cross-functional investigation, as it appears there is also new groundwater contamination and historic soil contamination.

Exhibits are here: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK

Tamra at the city fire department responded today confirming they are investigating and shared the investigation/complaint tracking number is SER23-00153.

I know Santa Clara made an intentional decision to waive County Dept of Env Health oversight for some reason which I'm sure there was some justification for, however, this site seems like an example of a situation where additional expertise may have helped catch some of these issues or otherwise been able to spend more time understanding what the operator was up to. I'd urge some reconsideration of DEH help for higher-risk facilities like this. I don't know if it's fair to expect a city fire department to stay on top of all of this. The public records seem to show they did try but I'm not sure if they're even aware of what was going on with the US EPA TRI emission filings, or the violations from the wastewater facility, or that CalEPA never issued an actual permit.

Please let me know if you have any questions or if there's anything else I can do to help provide information and documentation.

P.S. you'll never guess who the operator is.... my ex-employer, Apple Computer. Further, they've apparently known what they've done since September 2020.

-Ashley

—

**Ashley M. Gjøvik, JD, PMP**
Director, The D&G Center
+1 415-964-6272

Sent with Proton Mail secure email.

------- Original Message -------
On Monday, February 8th, 2021 at 4:42 PM, Ashley Gjovik <agjovik@scu.edu> wrote:

Hello Mayor Gillmor and Vice Mayor Chahal,

I hope you both are well and staying healthy during these crazy times.

I'm reaching out to you with concerns about a large-scale residential development project Santa Clara city approved in 2015. I moved in to the new apartments in 2020 and within a week was the in the ER. None of my doctors could figure out what was causing the neurological and cardiac issues. We thought I go be dying — quick onset M.S. or other often fatal neurological conditions, etc. I ended up on state disability & medical leave for nearly six months.

We figured out what happened in September. We discovered my apartment was full of very high levels of VOCs (solvent fumes) and then when researching the property discovered it was a hazardous waste remediation site. I've had all three of the go-to chemical exposure doctors in this area (and even the gov agency in charge) confirm I was poisoned by solvent fumes. I moved out and was fine within a week, other than a threat of future cancer.

The problem now is the property owner and the government agency in charge refuse to act. I've been arguing with them, and all levels of the government, including the Federal EPA from September to today. All other gov agencies blame the state agency in charge for a shotty remediation plan and refusing to act now, and that agency itself even admitted on the phone they were surprised by what was actually approved. Because no VOCs were COCs (contaminants of concern), they say have have no jurisdiction on vapor intrusion issues. All other gov agencies say because this one is in charge of the site, there's nothing they can do.

The property owner hired a hazardous waste public relations consultant to deal with me and even she was convinced I was being poisoned within 48hrs and started complaining to them too. They did offer (unsolicited) to allow me to break my lease without penalty — and I did and moved out right away. However, as far as I've seen, they've done no testing, let alone further remediation. They even listed my unit to be rented out with only a week turn around and it is currently filled by a new tenant.

I was warned to not notify my neighbors because the property manager might try to sue me for defamation or something like that. The gov refuses to warn the community. And I have not been able to find lawyers willing to go up against the project manager.

So… there's an active public health issue affected maybe 2,000 people (or maybe 5k+ if you count the next door Whole Foods and restaurants) (or maybe even 10k+ if you count the next door tech office buildings before shelter in place) and no one will do a thing about it (other than me continuing to complain to the state gov on a daily/weekly basis).

I'm hoping you might help.

Raj, the development is in your district. I'm sure you've figured out which one it is by now — and why this has been such an uphill battle.

I also left voicemails with your assistants, but though I'd send an email follow up as well.

Hope to hear from you soon.

-Ashley

—

**Ashley Gjøvik**
Juris Doctor Candidate
International Law Certificate Candidate
Santa Clara University School of Law, Class of 2022
(408) 204-9976

---

**1001.17 KB** 1 file attached

3250 Scott Complaint - Final.pdf 1001.17 KB