**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjøvik,**
*an individual*,

**Plaintiff,**

**vs.**

**Apple Inc.,**
*a corporation,*

**City of Santa Clara,**
*a local government*,

**Et al.**

**Defendants.**

**Case 25-CV-07360-PCP**

**Complaint**

**Exhibit F: 30(B)(6) Deposition of Elizabeth Schmidt**

**Environmental Citizen Suit**

Deposition of

# Elizabeth Schmidt

Apple Inc.'s 30(b)(6)

May 14, 2026

Ashley Gjovik

vs.

Apple Inc.

aptus. COURT REPORTING

www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,)
)
Plaintiff, )
)
vs. ) Case No.
) 3:23-CV-04597-EMC
APPLE INC., a corporation, )
)
Defendants. )
)

REMOTE DEPOSITION OF ELIZABETH SCHMIDT, Apple Inc.'s 30(b)(6), commencing at 9:02 A.M. on Friday, May 14, 2026, before SHIRLEY Q. CASILAN, Certified Shorthand Reporter 12361, in and for the State of California.

Job No. 10190736



APPEARANCES VIA ZOOM:

FOR PLAINTIFF:
ASHLEY M. GJOVIK, JD
In Propria Persona
2108 N Street
Suite 4553
Sacramento, California 95816
(408) 883-4428
legal@ashleygjovik.com

FOR DEFENDANTS:
ORRICK HERRINGTON & SUTCLIFFE
BY: JESSICA R. PERRY, ESQ.
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
jperry@orrick.com

ALSO PRESENT:
NICK WEAVER



INDEX
---oOo---


| | | PAGE |
|---|---|---|
| EXAMINATION BY: | MS. GJOVIK | 8 |


---oOo---
EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Issue confirmation | 115 |
| Exhibit B | Email, plaintiff's production 11, Bates 7300 | 132 |
| Exhibit C | Email from Debra Rubenstein to Rebecca Reynolds at the EPA plaintiff's production 11, No. 3187 | 135 |
| Exhibit D | Email produced by the US EPA | 144 |
| Exhibit E | Email produced by EPA through FOIA dated August 10th | 145 |
| Exhibit F | Apple directory, plaintiff's production 6, No. 4294 | 150 |
| Exhibit I-1 | Site visit notes | 153 |
| Exhibit I-2 | Site visit, October 2021 | 171 |
| Exhibit I-3 | Matthew Plate notes, plaintiff's production 64304 | 164 |
| Exhibit I-4 | Letter dated November 5th, 2021, plaintiff's production 64302 | 174 |




EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit I-5 | Email, plaintiff's production 6, Bates No. 4314 | 162 |
| Exhibit J-2 | Email dated March 22nd, 2022, plaintiff's production 63945 | 176 |
| Exhibit J-3 | Memorandum for "TRW Microwave Response to Comments" from Matthew Plate, plaintiff's production 64280 | 180 |
| Exhibit J-4 | Email from Michael Schulman to Joshua Nandi on February 12th, 2022, plaintiff's production 6, Bates 5247 | 184 |
| Exhibit J-5 | Email produced from EPA dated January 3rd, 2022 | 186 |
| Exhibit K-1 | Document labeled "Identified Floor Penetration Features" dated May 2021, Bates number 3630 | 188 |
| Exhibit K-3 | Floor sealing, August 2021 | 189 |
| Exhibit L | Email Hongyan Yi dated June 9th, 2021 | 197 |
| Exhibit M | Email to Osman Akhtar, plaintiff's production 11, Bates 4711 | 210 |
| Exhibit N | Email to Dan West and Dave Powers on March 15, 2021, plaintiff's production 84712 | 210 |
| Exhibit O | Email exchange, plaintiff's production 114694 | 202 |
| Exhibit P | Balancing test, Apple's production 771 | 238 |
| Exhibit Q | Email, Apple's production, Bates number 514 | 220 |
| Exhibit R-1 | Email, Apple's production 770 | 223 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit R-2 | Email, Apple's production 1248 | 233 |
| Exhibit S-2 | JW labor laws | 226 |
| Exhibit S-3 | San Francisco Bay View article, Apple's production 564 | 228 |
| Exhibit S-3 | Mental health, Apple production 2080 | 237 |
| Exhibit S-4 | Email sent to Jenna Waibel on April 9th, plaintiff's production 61162 | 213 |
| Exhibit T | Email, plaintiff's production 119579 | 244 |
| Exhibit U | Copy of article, plaintiff's production 12, 9304 | 201 |
| Exhibit V | Consent agreement Apple entered with the EPA | 209 |
| Exhibit X-1 | Complaint filed to US EPA on August 29th, 2021 plaintiff's production 115703 | 247 |
| Exhibit X-3 | Email, Christopher Rollins, plaintiff's production 111370 | 249 |
| Exhibit X-4 | Email from EPA, plaintiff's production 111074 | 251 |
| Exhibit Z | Business conduct complaint submitted on August 23rd, 2021, plaintiff's production 116673 | 252 |



QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

| PAGE | LINE |
|---|---|
| 19 | 10 |
| 20 | 2 |
| 118 | 2 |
| 248 | 12 |
| 253 | 3 |



FRIDAY, MAY 14, 2026, 9:02 A.M.

---oOo---

THE COURT REPORTER: Good morning, everyone. My name is Shirley Casilan, CSR No. 12361.

Ms. Schmidt, please raise your right hand.

Do you solemnly swear the testimony you will give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I will.

THE COURT REPORTER: Go ahead, Counsel.

MS. GJOVIK: Okay. Thank you.

And just for clarification for the record, I'm not an attorney. I'm representing myself for -- in this matter. I'm not an attorney. So as, per se, I'll proceed.

Good morning. We're on the record at 9:02 a.m. on May 14th, 2026. This is a videoconference deposition of Apple Inc. taken pursuant to a Rule 30(b)(6) notice and the Court's order of April 22nd, 2026, at Docket 357 compelling Apple's appearance in the matter of Gjovik v. Apple, which is pending in the US District Court in the Northern District of California, case number 323CV04597. My name is Ashley Gjovik, and I'm the plaintiff in this matter.



---oOo---

ELIZABETH SCHMIDT,
called as a witness herein,
was examined and testified as follows:

EXAMINATION

BY MS. GJOVIK:

**Q Ms. Schmidt, I'm going to be asking you some questions today. And before we get started, I want to go over some foundational matters so we're on the same page.**

**You were just sworn in by the court reporter. Do you understand that you're now under oath, the same as if you were testifying in a courtroom before a judge and jury?**

A Yes.

**Q It's a little bit soft for me. Are you able to get closer to your microphone, please?**

A Yes.

**Q Much better.**

A All right.

MS. GJOVIK: Ms. Court Reporter, can you hear her all right too?

THE COURT REPORTER: Yes. Much better.

BY MS. GJOVIK:

**Q Ms. Schmidt, do you understand that you're**

required to give truthful answers to my questions today?
A Yes, I do.
Q Do you understand that even though we're in a conference room and on Zoom and this feels informal, that giving false testimony under oath can subject you to penalties for perjury?
A I understand.
Q And now you've met the court reporter, and she's taking down everything that's said today, every question I ask and every answer you give and it's going to be made into a written transcript. Because she can only take down words, I need you to give me verbal answers. So if your answer is "yes," please say "yes" rather than just only nodding your head.
Can you do that for me?
A Yes, I will.
Q Along the same lines, please try to let me finish my question before you start your answer, and I'll do my best to let you finish your answer before I ask my next question. So if your answer -- that way we don't talk over each other and the court reporter can get a clean record.
Is that fair?
A Yes.
Q If at any point you don't understand a question



I've asked, I want you to tell me and I'll rephrase it.
Will you please do that?
A Yes, I will.
Q Is it fair to say that if you answer one of my questions, I'm entitled to assume that you understood my question?
A Yes.
Q And if you need to take a break at any point to use the bathroom, get water, stretch, that's fine. Just let me know. The only thing I ask is if there's a question pending, that you please answer it before we go off the record.
Is that agreeable?
A Yes.
Q Is there any reason you might not able to give your best testimony today? Are you feeling okay?
A Yes, I am.
Q Are you currently under the influence of any medication, drug, or alcohol that might affect your ability to understand my questions or give truthful answers?
A No.
Q Are you physically alone in the room or is anyone else present off camera?
A There are others here off camera.



Q Can you please identify everyone in the room with you right now?
A Sure.
THE WITNESS: Do you want me to introduce them?
MS. PERRY: I can handle that.
So, Ashley, it's Jessica Perry from Orrick. I'm in the room with the witness as is Isela Perez and Bethany French, who are both in-house counsel at Apple as well as Bill Tarantino from Morrison and Foerster.
MS. GJOVIK: And that is everyone in the room?
MS. PERRY: That is everyone in the room.
Before we go any further, I also just want to object to the extent that you intend to use the audio or Zoom recordings at trial in this matter. We object to that. The only official transcript of this matter would be that that is being transcribed by the court reporter.
MS. GJOVIK: Apple has failed to make those objections in its prior responses or for any of the prior depositions, except for Tuesday. Your objection is noted on the record, and we can dispute it and meet and confer.
MS. PERRY: Yes. That's actually inaccurate. We have discussed that with you multiple times in meet and confer, but I'm not going to belabor the point with you.
MS. GJOVIK: Ms. Perry, I'm sorry. One, I cannot hear you very well. Two, it appears to be a speaking



objection in an attempt to meet and confer during the deposition. I already asked for us to discuss this offline. Can we please agree to discuss this after the deposition?
MS. PERRY: Please don't interrupt me when I'm speaking. As I was saying, I'm not going to belabor this point with you on the record. I want to make my objection clear, and I'm entitled to do so.
MS. GJOVIK: I already confirmed your objection is noted. You started making factual assertions that were not appropriate for the deposition, and that's what I tried to stop.
MS. PERRY: No. That's not true, Ashley. I simply corrected your misstatements that you are making on the record and pointed out that we have met and conferred with you on this issue repeatedly in this case.
MS. GJOVIK: That is not accurate. And I'm going to ask Counsel again to please stop with the speaking objections in attempt to create a false record about meet and confer during a deposition and taking up my time to depose Apple's witness. So I'd like to move on, please.
BY MS. GJOVIK:
Q Ms. Schmidt, is there anyone also present with you in the room over speakerphone or other means in addition to in person?

Page 13

A No, there is not.
**Q Thank you.**
**Ms. Schmidt, your counsel may make objections, but unless counsel instructs you to not answer completely based on privilege, you should still answer the question after the objection is stated.**
**You understand?**
MS. PERRY: That's not an entirely accurate recitation of when I can instruct the witness not to answer, but unless I instruct the witness not to answer the question, I think she understands that she will be responding.
MS. GJOVIK: I'm going to ask Counsel to keep their objections to a typical objection format.
BY MS. GJOVIK:
**Q Ms. Schmidt, did you meet with anyone to prepare for today's deposition?**
A I did.
**Q Who did you meet with?**
A I met with both inside and outside counsel a couple of times.
**Q Can you identify the names of the people you spoke with?**
A The folks that are in this room.
**Q When you said "a couple of times," how many**

Page 14

**times?**
A Two to three times.
**Q Ms. Schmidt, when were you notified that you were going to be the witness for Apple at this deposition?**
A Probably a week ago.
**Q And the couple of times you met with them were during that week period.**
**Is that right?**
A Within the last week. Correct.
**Q Did you review any documents to prepare for today?**
A I did.
**Q What documents did you review?**
A A number of documents around due diligence that had been done and some communication documents that were provided.
**Q Did you review Apple's responses to written discovery in this case as part of your preparation?**
A Yes. I read across a number of different documents that would kind of qualify for that.
**Q Did you review any deposition transcripts of the witnesses in this case in preparation for this deposition?**
A No.
**Q Did you review the company's privilege log in preparation for this deposition?**

Page 15

A No, I did not.
**Q Did you speak with anyone other than lawyers in preparation for this deposition?**
A I did. I spoke to two other folks with knowledge about the buildings that -- deeper knowledge about the buildings.
**Q I just want to confirm. When I asked who you spoke with earlier, you mentioned the folks in the room, but then we just added two more people. So I'll ask again: Can you please provide the full list of people that you spoke with in preparation for this deposition?**
A Yes, I will. The folks that are in the room plus Tom Huynh and Julia Smith.
**Q And what are their roles?**
A Tom Huynh is an EHS manager, and he has knowledge about some of the building functions. And Julia is a due diligence manager and runs our due diligence program.
**Q And you spoke with them about what subject matter?**
A For 825, we spoke about the due diligence work that had been done and -- you know, that type of thing. And with Tom, we talked more about the systems associated with the building.
**Q Did you speak with anyone about the building at 3250 Scott Boulevard?**

Page 16

A Yes. That's -- with Tom, I spoke about that building.
**Q So with Tom, you spoke about 825 Stewart and 3250 Scott Boulevard?**
A Correct.
**Q Did you speak with anyone about the complaints and inquiries I made regarding COVID-19?**
A No, I did not.
**Q Are you prepared to answer my questions about my EHS complaints made regarding COVID-19?**
A No, I'm not.
MS. GJOVIK: Counsel, we will need to discuss this after. This was slated for the EHS part of this deposition, and if the witness is not prepared, that means we will need a third day of deposition to discuss the -- at least the COVID-19 matters. We can discuss that after.
MS. PERRY: Well, Ashley, I don't see anything in the topics that disclose COVID-19. So I believe that's beyond the scope of your noticed deposition topics.
MS. GJOVIK: COVID-19 it's under EH and S. It's in the complaint. It's in -- it's been part of this lawsuit since the beginning. It's part of the pending motion for summary judgment against that role. We can discuss it after, but it's definitely part of this litigation.

MS. PERRY: It's not in the deposition topics.

MS. GJOVIK: EHS concerns. It's health and safety, Counselor, so we can discuss it afterwards. And I can ask the Court to compel Apple for a third day if Apple will not voluntarily do it. But based on what Ms. Schmidt is saying, I will limit the amount of questions I'm asking regarding COVID-19 since she admitted she is not prepared to answer those questions.

MS. PERRY: Your questions are on the record, Ashley, so that we are clear as to what they are and whether this witness has knowledge or not. And, again, they are not operatively part of this deposition notice. They were not part of the topics that you noticed. They were not part of your meet and confer. And so I object to any attempt that you will make to seek an additional deposition of any witness related to COVID-19 topics.

MS. GJOVIK: Counsel, we'll talk about this afterwards. Your -- I don't -- there's no form for you to object for that in this matter. It's definitely part of the litigation. It's definitely part of the notice. It's part of the complaint. It's been part of the Department of Labor adjudication. It's part of Apple's production. And we will meet and confer about that later. I am also not going to ask questions that the witness is not prepared to answer when that prohibits me from asking



follow-up questions from a witness who would be prepared to answer. So if you're already saying you don't -- the witness is not prepared and you think it's not part of this deposition, then we can bring it to Judge Westmore, and we'll discuss it after. I would like to proceed.

MS. PERRY: I'm putting you on notice that you have a witness here who is here pursuant to your notice. If you believe that any of your topics are relevant to this deposition, you should ask them today. We are not going to put up another witness, and discovery is closed.

MS. GJOVIK: Counselor, it's sanctionable conduct to have witnesses unprepared for a deposition when they've been noticed and compelled to appear. This is not on me, and I don't want to waste more time during my deposition arguing about this. We should discuss it after.

MS. PERRY: Please stop interrupting me in the middle of my statements. I am simply putting you on notice that this witness is here to testify about the topics as laid out in the notice that you served.

MS. GJOVIK: Putting me on notice is not a form of an objection, and you are repeatedly saying you're putting me on notice it not -- has no legal impact. But whatever you've just said is on the record, now let's move on, and we'll take it up with Judge Westmore after regarding the other matters.



BY MS. GJOVIK:

**Q Ms. Schmidt, are there any documents you wanted to review in preparation for this deposition that you were not able to access or review prior to this deposition?**

A No.

**Q Ms. Schmidt, are there any people you wanted to speak with to prepare for this deposition but were not able to speak with before this deposition?**

A No.

**Q Did anyone at the company or counsel for the company tell you you should not review certain documents in preparation for this deposition?**

MS. PERRY: I'm going to object and instruct you not to answer to the extent it calls for attorney-client-privileged communications since Ms. Gjovik is asking you specifically about communications that you had with counsel.

(Whereupon the witness was instructed not to. answer.)

MS. GJOVIK: If counsel told her not to review relevant documents would be unlawful, and there is no -- so it would be not be privileged.

MS. PERRY: I disagree with you, Ashley. She's not going to answer the question. Move on.

///



BY MS. GJOVIK:

**Q Ms. Schmidt, did anyone at the company or counsel for the company tell you not to speak with certain people in preparation for this deposition?**

MS. PERRY: Again, I'm going to instruct you not to answer since the question explicitly asks for communications with counsel.

(Whereupon the witness was instructed not to answer.)

MS. GJOVIK: Same counterobjection.

BY MS. GJOVIK:

**Q Ms. Schmidt, what is your understanding that you are expected to speak about at this deposition today? What subject matter?**

MS. PERRY: Objection. Vague and ambiguous.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

**Q Ms. Schmidt, there are specific topics that Apple is compelled by the Court to be deposed about that counsel for Apple had designated a witness to speak to today. What is your understanding of what topics you're testifying about today during this deposition on behalf of Apple?**

A My understanding is that around 825, there's some questions around due diligence and concerns about

Page 21

potential -- concerns that you had around the site and the conversations that were had, to explain the risks associated with the site to support your -- I mean to help you understand the condition of the site.

**Q And just for 825 Stewart?**

A For the most part. I understand that --

**Q Go ahead.**

A -- I understand that there could be some other questions, but that there's some -- this is very -- around a very specific time frame. So I want to make sure we're answering questions around what this deposition is for.

**Q Thanks. That's what I'm trying to understand.**
**So, what is your understanding of the time frame you're responding to?**

MS. PERRY: Okay. I'm going to stop here and object on the grounds that to the extent that the witness has knowledge about what she's here to testify about, that comes from her communications with counsel. As we made clear to you, Ashley, this witness is here to testify about your Topic No. 2, which is plaintiff's assignment to the 825 Stewart Drive office, including environmental conditions at that site and defendant's knowledge of any associated health or safety hazards. Topic No. 3. Topic No. 4, as it pertains to complaints, reports, or concerns raised by plaintiff regarding environmental health or

Page 22

safety conditions, regulatory compliance from 2020 to 2021, and defendant's response thereto, and Topic No. 5.

MS. GJOVIK: First, that's a speaking objection, and I'm going to ask counsel to stop with the speaking objections and leading the witness. And if counsel continues this conduct after multiple warnings, I'm going to ask that Ms. Perry be removed from this deposition and have another counsel replace her, and hopefully they will stop with the speaking objections.

BY MS. GJOVIK:

**Q I would like to ask the witness again, who is representing Apple, what her understanding of what she is testifying to.**

MS. PERRY: Elizabeth, if you have any understanding of what you're testifying to that's been conveyed to you in anyway other than by counsel, you can explain that. Otherwise -- well --

MS. GJOVIK: It's an extremely basic question to ask a corporate representative the scope of what they're speaking to. And if Apple is putting that under privilege, that will be one other thing we're going to move to Judge Westmore, especially because Apple is now refusing to speak to a number of items that are in the scope of what was compelled.

///

Page 23

BY MS. GJOVIK:

**Q And I'm going to ask: Ms. Schmidt, you said that you believe you're here to speak about 825 Stewart. Do you also understand you are here to represent Apple to answer my questions about 3250 Scott Boulevard?**

A I do understand that there is some components of 3250 Scott Boulevard I will be answering.

**Q And then Topic 3 that was compelled by Court for Apple to answer that Ms. Perry did not detail was the semiconductor manufacturing facility, 3250 Scott Boulevard, located near employee's residence, including defendant's knowledge of environmental or health hazards and/or injuries to Gjovik associated with the facility is the text compelled by the Court.**
**Is that your understanding of what you're here to testify about today regarding 3250 Scott?**

A I will answer questions about 3250 Scott. Even in that statement, I think you have misstated that the facility is even a manufacturing facility. So I will do my best to be correct as to the information that I have.

**Q That really did not answer my question, and this is what was compelled by the Court. We also have Topic 4, which includes any complaints, reports, or concerns raised by me regarding environmental health and safety conditions, which includes both 3250 Scott and**

Page 24

**825 Stewart.**
**Are you prepared to answer my questions regarding both buildings?**

MS. PERRY: Objection to the extent it lacks foundation. Misstates the evidence.
But you can go ahead and answer.

THE WITNESS: I will answer to the best of my knowledge within the scope.

BY MS. GJOVIK:

**Q Are you prepared to answer my questions within the scope we just discussed regarding 3250 Scott Boulevard?**

A I don't know all your questions, but I'm prepared to answer many questions.

**Q And now that we've just gone over the scope, after your preparation, do you feel you are able to fully testify on behalf of the company about each of the topics you've been designated for? And I'm going to ask you each topic and have you say yes or no. For Topic 2, that was my assignment to 825 Stewart Drive, the TRW Microwave Superfund office, including environmental conditions at that site and Apple's knowledge of any associated health or safety hazard, are you prepared to testify as Apple's designated witness regarding that topic today?**

A Yes, I am.

**Q Thank you.**

**Topic 3, the semiconductor manufacturing facility, 3250 Scott Boulevard located near my residence, including defendant's knowledge of environmental health hazards and/or injuries to me associated with that facility, are you prepared today to testify as Apple's designated witness regarding that topic?**

A I will respond. But, again, it is not a manufacturing site. So I want to be really clear that we're using appropriate language. So I'll do my best to answer, but I will also correct if there's language that is not correct.

**Q Okay. Ms. Schmidt, that is the language used in regulatory filings by regulatory agencies, including settlement agreements and enforcement actions against Apple regarding that site. So if Apple wants to maintain it has a different interpretation, it's welcome to say that, but it should not assert that that is an incorrect statement, factually and generally.**

**And then regarding Topic 4, Ms. Schmidt, regarding any complaints, reports, or concerns raised by me regarding environmental health or safety conditions and regulatory compliance, generally, not just specific to those two buildings, but also including those two buildings regarding this litigation, my protected activity, my arguments about retaliation pretext, are you prepared to answer any question I may have on those topics today?**



MS. PERRY: Ashley, again, as we told you repeatedly, including on Tuesday, including in the objections to your deposition notice, including in meet-and-confer communications, this witness is not here to testify about the entirety of Topic 4. This witness is here to testify about any complaints, reports, or concerns raised by plaintiff regarding environmental health -- environmental health or safety conditions, regulatory compliance from 2020 to 2021 and defendant's response thereto. This witness is not here to testify as to privacy invasion, discrimination, retaliation, harassment, pretexts you state, which is not even in the topic. Those were all things that were covered by the witness that you took on Tuesday.

MS. GJOVIK: Ms. Perry, again, this is going to be -- you're near final warning because I didn't say privacy discrimination. That stuff was yesterday. I said environmental health and safety and regulatory compliance, which yesterday Ms. Richard said would be designated for today, and those are part of my protected activity, my allegations of retaliation related to EHS and regulatory compliance. So I don't know what your objection is,



because you appear to be objecting to things I didn't say, and you're using up my precious time in this deposition right now.

MS. PERRY: No. I'm making clear what this -- you are spending a lot of time, Ashley, trying to determine what this witness is here to testify about. We need to have a clear record about what the witness is testifying to, and as we've repeatedly explained to you, we've broken Topic 4 into two different topics. One, this witness is ready to testify about, which is the complaints, reports, or concerns you raised regarding environmental health or safety conditions. The witness on Tuesday appeared to talk about retaliation and the other topics in this specific Topic 4. So I just want to be very clear before we proceed with the deposition what this witness is testifying to.

MS. GJOVIK: That's what I'm trying to do, Counselor, and instead you injected privacy invasion and sexual discrimination and stuff I never mentioned, and we've now I think wasted five minutes of my deposition for an objection I think was completely unnecessary. And I'm going to ask you again to please limit your objections to standard format, stop the speaking objections and stop trying to create false meet-and-confer records during my deposition. I would like to interview the witness for Apple, not you Ms. Perry. Can we please --



MS. PERRY: That's not what I'm -- Ashley, I'm making clear on the record what this witness is here to testify about. You can go ahead and ask your questions about the subset of Topic 4 that I just described.

MS. GJOVIK: Ms. Perry, that's exactly what I said to her, and you have wasted our time on objections about stuff I never even said. So I'm going to ask you again to stop and I'm going to ask my question to her again, which is --

BY MS. GJOVIK:

**Q Ms. Schmidt, for Topic 4, the portion for today is any complaints, reports, or concerns raised by me regarding environmental health and safety conditions and regulatory compliance from 2020 to 2021 and defendant's response thereto as relevant to this litigation with my complaints about protected activity and retaliation, are you prepared to answer my questions about EHS and regulatory compliance today?**

A Yes.

**Q Thank you.**

**And then for Topic 5, any 2021 to 2026 EPA inspections of 825 Stewart Drive, including defendant's knowledge for the basis for the inspection and defendant's response, are you prepared to testify to that topic today?**

Page 29

A Yes, I am.
**Q Thank you.**
**Ms. Schmidt, have you ever been deposed before?**
A No, I have not.
**Q Ms. Schmidt, are you an attorney?**
A No, I am not.
**Q Do you understand that you have been designated by Apple to testify on its behalf today pursuant to the Federal Rule of Civil Procedure Rule 30(b)(6)?**
A Yes, I am.
**Q Thank you.**
**Do you understand that your testimony today will be the testimony of Apple Inc., and that the company will be bound by your answers?**
MS. PERRY: Objection to the extent it calls for a legal conclusion.
BY MS. GJOVIK:
**Q You can still answer.**
MS. GJOVIK: If the witness does not understand that Apple is bound to her answers, we cannot proceed.
BY MS. GJOVIK:
**Q Ms. Schmidt, do you understand that you are representing Apple Inc. in your testimony, and so the things you state are not just attributed to you but they are attributed to Apple and the corporation?**

Page 30

A I understand that. I also understand that there may be a condition which I ask -- I am asked a question that I can answer from a personal perspective. So I will answer in that way too, if needed.
**Q Thank you. I was going to get to that in a minute.**
**Has it been explained to you that the company has a duty under Rule 30(b)(6) to prepare you to testify about information that is reasonably available to it, including from documents, current and former employees and other sources?**
MS. PERRY: I'm going to object to the extent it calls for attorney-client-privileged communications.
If that has been explained to you by anybody other than counsel, then you can respond.
THE WITNESS: (Inaudible.)
BY MS. GJOVIK:
**Q Ms. Schmidt, can you please state your full name for the record?**
A My name is Elizabeth Catherine Schmidt.
**Q And what is your current job title at Apple?**
A I'm the director of environment, health, and safety.
**Q How long have you held that position?**
A About four years.

Page 31

**Q When did you join Apple?**
A 2008.
**Q What positions have you held at Apple during that time?**
A All within the environmental health and safety organization, but various manager roles.
**Q Who do you report to now?**
A Kristina Raspe.
**Q And as of 2021, who did you report to?**
A I reported to her as well.
**Q And in 2020, who did you report to?**
A The early part of '20, I reported in to Scott Sidlow.
**Q And when did Scott leave or move?**
A The spring of 2020. I don't remember the exact date.
**Q And what is your job description or overall job responsibilities in your current role?**
MS. PERRY: Objection. Vague.
BY MS. GJOVIK:
**Q Can you please provide a summary of your current role at Apple?**
A I lead a team of environment health and safety specialists.
**Q And what do they do?**

Page 32

A Their role is to develop programs and tools that support the company and meeting environment and health and safety compliance aspects.
**Q Is that generally the same role you held in 2020 and 2021?**
A Yes.
**Q Do you have any personal role in the events at issue in this case?**
MS. PERRY: Objection. Vague and ambiguous.
BY MS. GJOVIK:
**Q Ms. Schmidt, you are here testifying on behalf of Apple, but do you also have your own experiences as a fact witness in this case?**
MS. PERRY: Objection. Vague and ambiguous.
BY MS. GJOVIK:
**Q Let me start here: Ms. Schmidt, did you have any interactions with me directly from 2020 to 2021?**
A 2020, '21, we might have. I know we had one phone call conversation, you and I.
**Q And that was in 2020.**
**Correct?**
A I think so.
**Q Regarding 3250 Scott Boulevard?**
A No. It was about 825, your current location, and mostly it was about you having a concern about your house,

Page 33

and you were asking for -- if you would let me borrow -- some equipment that you would like to borrow, because you were concerned about a condition at your house.

**Q So, Ms. Schmidt, have you also been involved in the enforcement action taken by the government against Apple regarding 3250 Scott Boulevard, such as signing the consent agreements on behalf of Apple?**

A Yes.

**Q And Ms. Schmidt, were you also involved in the 2016 DTSC consent agreement with a five-year injunction against Apple, such as signing that agreement?**

A 2016? I'd have to -- for what property?

**Q That was the recycling hazardous waste violations.**

A No.

**Q And Ms. Schmidt, did you also receive emails from employee relations and EHS employees regarding my complaints in 2021 leading up to my termination?**

MS. PERRY: Objection. Vague and ambiguous.

(Reporter requesting repetition.)

MS. PERRY: Lacks foundation.

BY MS. GJOVIK:

**Q I'm specifically referring to documents produced by Apple, which included you, Ms. Schmidt, as part of their response to production in this litigation with**

Page 34

**communications regarding me and my EHS complaints sent to you in 2021.**

**Do you recall those emails?**

A Yes. I've read a number of emails with you asking a number of questions, asking for clarification. And so I've read a number of emails back and forth with your curiosity around the situation and with the teams responding, trying to help give you clarity.

**Q So, Ms. Schmidt, you understand this makes you a personal fact witness in addition to the witness for the corporation. So you could still be called to testify at trial to speak to your own experiences separate from what you're testifying to today.**

**Do you understand?**

MS. PERRY: Objection to the extent it lacks foundation. Calls for a legal conclusion.

BY MS. GJOVIK:

**Q You still have to answer, please.**

A I don't know exactly what would lead up to that at this point.

**Q I just want to make sure you understand that when a corporation chooses a representative to speak on behalf of the corporation because of its complexity, when that person is also a fact witness in the same proceeding, that I need you to please separate and identify when you're**

Page 35

**speaking to your own experience and own personal knowledge based on your role personally in this matter separate from what you are speaking to based on the information that you gathered in preparation for your role to represent the corporation.**

**Does that make sense?**

MS. PERRY: No. Objection. That's not what's going to happen here. That's not an obligation that this witness has. There's nothing that requires that in the Federal Rule of Civil Procedure. The witness is not going to do that. She is here to answer questions that you're ask- -- that you ask, Ashley, and she's going to do that, but she's not going to tell you in what capacity she's answering them. She's here as a 30(b)(6) witness. We'll take this question by question.

MS. GJOVIK: Okay. And we're bringing this to Judge Westmore because you did the same thing on Tuesday. You brought a personally involved fact witness who was involved in the decision to terminate me personally to be the corporate representative. So both of these witnesses, their personal involvement will be brought to the Court. The case law supports that's improper. We can bring it up to Judge Westmore and discuss. I will ask probing questions for things that I already know that she has personal experience on, though.

Page 36

BY MS. GJOVIK:

**Q Ms. Schmidt, can you please tell me about your educational background regarding EHS topics?**

A Yeah. So, I have an undergrad degree in chemistry, and then I did two years of coursework in environment health and safety management. And then I have been also working and learning as -- over the last couple of years, growing my knowledge and expertise across a number of different fields.

**Q What about specific to hazardous waste and hazardous waste cleanup sites and hazardous waste management?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad. Compound.

BY MS. GJOVIK:

**Q Okay. Let's do it one by one.**

**How about regarding management of hazardous waste specifically?**

A I'm by no means a deep-subject-matter expert in it but have a good working knowledge of how it can and should be run.

**Q And then how about hazardous cleanup sites, commonly known as Superfund sites or Brownfield sites?**

MS. PERRY: Objection. Vague and ambiguous.

///

Page 37

BY MS. GJOVIK:
**Q I can rephrase it.**
**Please tell me about your training and education related to hazardous cleanup sites, commonly known as Brownfield sites or Superfund sites.**
A I don't have any formal training on cleanup of those sites. I do have teams -- team members on my team with expertise that support the development of the programs.
MS. GJOVIK: And for the court reporter, I'm putting some of these terms in the chat right now if you're not familiar some of the things we might be talking about, Superfund and Brownfield, which are common terms.
BY MS. GJOVIK:
**Q What about your education or training regarding HAZWOPER employee communications regarding exposure to hazardous waste?**
A Yes, I'm aware of the requirements. And, again, I have folks on my team who are deep experts in those spaces, and they're supporting the program development.
**Q Same question for HAZCOM for hazardous materials?**
A Similarly, correct.
**Q And what is your current title today?**
A I'm a director in environment health and safety.
**Q For global or US or Santa Clara County?**

Page 38

A A global role.
**Q How large is your team?**
A Currently, a hundred and 55.
**Q And how many countries?**
A I believe it depends on the area of work. Last year is about 40 countries in which Apple employees did work in the country.
**Q Is that roughly the same in 2020, '21 as well or is that different?**
A Probably significantly different.
**Q It was significantly or was not?**
A Was --
**Q Can you answer then what the answer would have been?**
MS. PERRY: Hold on. We need to take this one at a time. Please let her finish answering before you ask another question.
BY MS. GJOVIK:
**Q Did you have something else you wanted to add?**
A Could you reask the question?
**Q Yeah.**
**Then, what was the title and size of the role in 2021?**
A My role specifically?
**Q So the title -- your title and the size of your**

Page 39

**organization.**
MS. PERRY: Objection. Compound.
BY MS. GJOVIK:
**Q What was your title in 2021?**
A 2021, I was the director of environment health and safety.
**Q And roughly how large was your organization in 2021?**
A I don't remember precisely. Somewhere between 75 and 80.
**Q And where is your office located?**
A Here in Santa Clara Valley.
**Q What city?**
A I think it's technically San Jose. I should know that.
**Q Sorry. What was that?**
A I said I -- it's kind of on the edge of two counties. I think it's San Jose.
**Q You said this was your first deposition. Have you ever provided testimony, a sworn declaration or a sworn statement in litigation prior?**
A No, I haven't.
**Q What does Apple's EH&S function do generally?**
A So, our role is to set up programs and build tools so that the work that is done at Apple is done

Page 40

safely, in compliance, and is protective of environmental risks.
**Q What does "protective of environmental risks" mean?**
A Yes. So, when work is being done, that we are considering a series of controls to ensure that the work is done safely but also that that risk doesn't pose a hazard to the environment.
**Q What about hazards to people?**
A Work safely and protective of the environment, both of those things.
**Q Does Apple's EHS function not consider the safety of people who are not employees?**
A No. We consider safety with individuals who are on site, for sure. We also consider if our work could adversely impact others.
**Q So, would that include people in neighboring buildings around the Apple facility that the work is being done?**
A Yes. Sure.
**Q And that would also include the air and water around and under the building where the Apple work is being done?**
A Oftentimes we're talking about water under a building that is not always our responsibility or our

ability to influence, especially when we're talking of historical situations.

**Q What about the air around a building where Apple is doing work?**

A Yes.

**Q Do you believe that there is anything related to environmental health and safety at Apple facilities, owned or rented, that Apple is not responsible for other than sometimes the water under the building?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

BY MS. GJOVIK:

**Q Please proceed.**

A There are many things in that space that aren't directly responsible -- the responsibility of Apple.

**Q Can you please explain?**

A Let's just take any --

MS. PERRY: Objection. Vague and ambiguous.

BY MS. GJOVIK:

**Q Please proceed.**

A Ask the question again, please.

**Q Do you believe that there are any things related to environmental health and safety at Apple facilities, rented or leased, that Apple is not responsible for?**

A Yes. I think there are, you know, conditions



that are the responsibility of landlords, the responsibility of responsible parties in which we may have -- you know, be a tenant of a building, but we don't own all the responsibilities as some of the aspects of -- that are applicable to other parties.

**Q What are some of the environmental health and safety responsibilities at Apple facilities that Apple believes belongs to responsible parties rather than Apple?**

MS. PERRY: I'm going to object to the extent this is beyond the deposition topics.

If you have personal knowledge, you can go ahead and respond.

MS. GJOVIK: Ms. Perry, I can't hear you.

MS. PERRY: I'm objecting on the grounds that this is beyond the notice of deposition topics. If the witness has personal knowledge, she can testify.

MS. GJOVIK: Apple's defenses since the start have included that they believe they're not responsible for certain EHS topics, and therefore it somehow mitigated their responsibility and liability regarding these retaliation claims. This is directly relevant. And if Apple refuses to answer this, we'll add it to the list of things I'll ask Judge Westmore to compel. So I would like the witness to please respond to my question.

MS. PERRY: Ashley, this deposition is not a



general deposition for everything in this case. This is a deposition pursuant to specific topics that you noticed in a 30(b)(6) deposition notice. This witness is here to testify as the 30(b)(6) witness as to the specific topics. So, again, I'm making clear on the record that this is beyond the scope of the noticed deposition topics, and I'm instructing the witness that she can go ahead and answer to the extent that she has personal knowledge.

MS. GJOVIK: So I need her to answer on behalf of Apple. If that knowledge is based on her personal acknowledge, that's fine. If she's not prepared to answer, I just need her to tell me she's not prepared to to answer.

BY MS. GJOVIK:

**Q Ms. Schmidt, I'm going to ask again. Can you please tell me what type of things related to environmental health and safety at Apple facilities that Apple may rent or lease or own that Apple believes are actually the responsibility of responsible parties rather than Apple?**

MS. PERRY: Again, the topics in this deposition notice relate to 825 Stewart and 3250 Scott. This witness is not here to testify generally about environmental topics at Apple generally. If you want her to answer those types of questions, she'll do so, but she's doing so



in her individual capacity.

You can go ahead and answer the question.

MS. GJOVIK: Sorry. No. She's -- this is not a deposition of Elizabeth Schmidt. This is the deposition of Apple. So I want to clarify, when you said she's answering in her individual capacity, are you saying she's not answering on behalf of Apple?

MS. PERRY: Correct. She answers questions in this deposition on behalf of Apple related specifically to the topics in your deposition notice. The questions you are asking right now are beyond the scope of the noticed deposition topics. Therefore, I am not instructing her to not answer the questions. I am simply making clear on the record that she is doing so in her own personal capacity and not as the corporate witness.

BY MS. GJOVIK:

**Q I'm so sorry, Ms. Schmidt, that you have to be subject to this back and forth. I really wish it was not like this with Apple's counsel. But I want to be clear the Court compelled Apple -- a US judge compelled Apple to sit for this deposition. Our discovery judge then also further compelled Apple to sit for this deposition and approved the topics and my ability to explore them. And this is directly relevant because Apple EHS put this in their filings multiple times, this exact topic, and when**

Page 45

**Apple is saying that you could answer on your personal response is not allowed in the federal rules where after discovery, I do not have the authority to depose you after the close of discovery as an individual. So -- and there's no pivoting to transmogrify a deposition of a corporation to a deposition of an individual at that time, but in fact if you have personal knowledge and you are the representative, you can answer on behalf of Apple and should answer on behalf of Apple, and Apple's lawyers have the ability to lodge an objection that they could try to dispute later regarding relevance or form or whatever. But what she's saying is not accurate, and I'm going to ask you to answer on behalf of Apple.**

**What I will do is I will narrow this and ask you: Ms. Schmidt, are there topics regarding environmental health and safety at Apple's facility at 825 Stewart Drive that you believe are not Apple's responsibility but rather are the responsibility of a responsible party or other external party?**

A Yes. I believe that Apple does not have all the responsibility and that there are other responsible parties associated with 825.

**Q Thank you.**

**Can you please provide more details about which parties and what you think their responsibilities are?**

Page 46

MS. PERRY: Objection. Vague.

BY MS. GJOVIK:

**Q Ms. Schmidt, can you please provide more details regarding 825 Stewart Drive about when you -- you just mentioned that there are non-Apple parties that you believe have responsibility for EHS matters at that building. Can you please identify who those parties are and what you believe their responsibilities are?**

MS. PERRY: Same objection.

MS. GJOVIK: Ms. Perry, I can't hear you. Can you please speak up when you make your objections?

MS. PERRY: Same objection.

BY MS. GJOVIK:

**Q Please proceed, Ms. Schmidt.**

A Am I responding to your -- will you ask the question again?

**Q Regarding 825 Stewart Drive --**

A Uh-huh.

**Q -- can you please explain for me which parties, by name, the entities you believe have responsibility for environmental health and safety facil- -- environmental health and safety at that facility rather than Apple and what those responsibilities are that you believe are their responsibilities rather than Apple's?**

MS. PERRY: Objection. Compound.

Page 47

BY MS. GJOVIK:

**Q You can answer.**

A Could you be more specific? Like, is there a -- like, is there something specifically you want me -- a specific scenario you want me to speak to?

**Q I would like you to outline any, if any, other parties you believe are responsible for environmental health and safety at 825 Stewart Drive that are not Apple.**

A So, that space is a leased space for us, so there is an owner of the building. And in this particular case, there is also a responsible party who is responsible for continued remediation of soil that is underneath the facility. So some environmental compliance components are held to the responsible party in that case with the EPA. Other health and safety aspects of the building are held responsible to the landlord as well.

**Q Thank you.**

**What kind of environmental health and safety responsibilities do you believe the landlord has at the facility?**

A To maintain, you know, a safe functional workspace and that work that they do on site is managed in a safe and compliant way.

**Q And then who is the current owner?**

A I'd have to look at the current lease. I know it's changed a number of times lately.

Page 48

**Q I can ask you after the break, if you want to check, and you can answer then.**

A Great. A break would be nice.

**Q Okay. We can take maybe five. I just want -- I have a couple more question I'd like to do.**

**Do you know who the owner was in 2021?**

A I don't recall. I do remember that time frame having different landlords, but I don't remember their names.

**Q Okay. If you can check. I'm going to ask for 2020, 2021, and then current, please.**

A Okay.

**Q Thank you.**

**And then who is the responsible party under CERCLA?**

A Northrop Grumman, currently.

**Q Okay.**

A My recollection is they were during that time as well.

**Q Sorry. Can you say that again more loudly?**

A It's my understanding that they were also the responsible party during the time you are mentioning, '20, '21.

**Q Northrop Grumman Corporation?**

Page 49

A Uh-huh.
**Q And do they use external contractors to do some of this work, and if so, do you know the names of those companies?**
MS. PERRY: Objection. Vague.
BY MS. GJOVIK:
**Q Are you --**
A Everything, right, but I have seen reports done by third parties associated with our site. But I don't know their practices beyond --
**Q Do you recall the names of those companies?**
A No. I'd have to look them up.
**Q If you could please also look them up, I'd appreciate it.**
**And then same question for 3250 Scott Boulevard, do you believe there are parties other than Apple who hold responsibilities related to environmental health and safety at that facility?**
A Yes. I think in very similar ways.
**Q Who would those parties be?**
A Also the landlord.
**Q Anyone else or just the landlord?**
A Across all health and safety, not just -- and environment? We're talking about Jackson, you know, CUPAs, and other agencies definitely have responsibilities

Page 50

for, you know, checking controls and making sure that what we've put in place is safe. So I do feel like there are -- there are other folks that support in to and have responsibility to ensure the space is safe.
**Q Thanks.**
**And can you repeat and clarify so the court reporter can accurately record what you just said. You said CUPA, which I believe is the acronym, C-U-P-A.**
**Is that correct?**
A Yeah.
**Q And can you define what that means for the record, please?**
A Yeah. This is a California-assigned entity to ensure workplaces are checked by a third party. Sometimes it's the fire department. Sometimes it could be another government organization that has the responsibility to check and confirm compliance.
**Q Who is the CUPA for 3250 Scott Boulevard?**
A The fire department.
**Q And what -- is that city or county?**
A Before I misspeak, let me double-check that.
**Q If you could check. We can do, like, a ten-minute break when we take a break in just a minute, if you could check that too, I'd appreciate it.**
**Did you mention any other agencies or groups when**

Page 51

**you were listing your acronyms? I'm sorry. I didn't catch them all.**
A I don't know if I did.
**Q And then I believe it's -- there's also a Superfund site adjacent to or under. So, would you say there's responsible parties with -- under CERCLA at that site as well?**
A Yes. It's likely that that is also assigned to another responsible party.
**Q And what is that Superfund site called?**
A I don't know. I'd have to look it up.
**Q Do you know who the responsible party is?**
A I don't know on that one.
**Q If you can look -- it's Honeywell, but if you can look that up, I'd appreciate it. Giving hints.**
**And then you said "landlord." Do you know who the landlord is?**
A I don't know on neither of them.
**Q If we can do 15 minutes if we can get -- because --**
A There's a lot of --
**Q Yeah. If you can get all these basics, I'd appreciate it.**
**And then what kind of responsibilities do you think belong to the landlord versus Apple at 3250 Scott**

Page 52

**Boulevard?**
A Yeah. That is also -- integrity of the building and, you know, safe walkways, you know, those type of things. So, yeah, they have kind of the structural -- a lot of the structural aspects of the building.
**Q Anything regarding hazardous materials or hazardous waste?**
A If the landlord produces hazardous materials or hazardous waste themselves, you know, fixing a roof or replacing something that they own, they'd be also responsible for that.
**Q And who do you believe is responsible for any potential pollution in the air around 3250 Scott Boulevard?**
A I guess it depends on who is producing the material. Right?
**Q Do you believe the agencies or the landlord could be responsible for Apple's own activities at 3250 Scott Boulevard if they cause pollution in the air?**
MS. PERRY: Objection. Vague.
BY MS. GJOVIK:
**Q You may answer.**
A Ask the question again.
**Q Do you believe that other entities other than Apple, including the landlord or the CUPA, could also be**

Page 53

**responsible for EHS concerns if Apple's activities at 3250 Scott caused pollution in the air around the building?**

MS. PERRY: Objection. Vague.

BY MS. GJOVIK:

**Q You can --**

A It's just very -- it's so scenario specific. It's hard for me to give you a yes-or-no answer on that. It could be very situational.

**Q Okay.**

**And then as of 2020 and 2021, do you recall who the EHS lead was for 825 Stewart Drive?**

A Yes. I believe it was Austin DeBaene.

**Q And that was for all EHS activities?**

A He's, like, the primary lead, and then any sort of subject matter support may come from others on the team. So we consider him the lead, but he has resources and support. For deeper subject matter experts, I would also support them.

**Q Same question for 3250 Scott Boulevard?**

A At what time -- what years?

**Q 2020, 2021.**

A 2020 and 2021. I think it -- well, let me -- put it on my list. I'll double-check. We had a number of moving people around, and so I want to be accurate. But I know two -- one of the two people in my head is going to

Page 54

be the right answer for you, or maybe both.

**Q Okay. This sounds like a good time for a break. Do you want to take your 15-minute break now and do some homework?**

A Let's do it.

**Q Thank you so much, Ms. Schmidt.**

MS. GJOVIK: Ms. Court Reporter, we're okay to go off the record for 15 minutes.

THE COURT REPORTER: 15 minutes is fine, yes.

(Recess taken.)

BY MS. GJOVIK:

**Q Okay. Ms. Schmidt, we are back from the break. I'd like to go back to the questions I was asking just before we ended. We could start with maybe property owners.**

**So, were you able to confirm who the property owner of 825 Stewart Drive was in 2020 and 2021?**

A 825 in '21 was GI Penjik, maybe.

**Q Partners.**

A Oh, Partners. Okay.

And changed to BGO, Bentall Green Oak, in 2023.

**Q Okay. Thank you.**

**And then were you able to confirm the property owners for 3250 Scott Boulevard in 2020 and 2021?**

A The landlord is Jenab Family Trust.

Page 55

**Q And is that the only owner?**

A That was the only owner I was able to identify.

**Q And you said "landlord." So that's who the lease is with?**

A I believe -- yes, I believe so.

**Q Would you like to check again after another break to confirm or --**

A Maybe.

MS. PERRY: We're not going to do that today. This is -- this is not the way the deposition is going to go. The witness is not going to go and find information for you on the break. She's here to answer the questions the best that she can and to the best of her ability at this deposition, and that's what she's going to do. The identity of all owners and operators of these sites was not part of the deposition notice, and therefore, she's doing the best she can. But if you want to find out the owners and operators of the 3250 site, you can ask that information in your other lawsuit.

MS. GJOVIK: So, objection to that object- -- again, I need you to use the proper form for objections, Counselor. Stop with the speaking objections and stop using my deposition as a meet to confer, which you just did for two lawsuits instead of just this one. So I'm going to ask you to please stop. These are basic

Page 56

questions that the witness was generally expected to know for this type of deposition. If your preference is if she does not know, we just record for the record that she didn't know and we move on, I will add all those relevant and material questions she didn't know to my moving to compel Apple for further deposition after this one. So that's your choice. Either I can give her the opportunity to look for information on those questions during this deposition or if I feel the question is important enough, in which case this one I do, I will add to the list of things I will be further compelling, and we can deal with that question by question. But that's what I'd ask for you to say, is either yes, she can look for more information now or no, Apple is not going to answer that question knowing that I would likely move to compel. So regarding owners and landlords for 3250 Scott Boulevard, noting your objection that you do not want her to look for further information.

Is that correct?

MS. PERRY: What's your actual question, Ashley?

MS. GJOVIK: Who the property owners were of 3250 Scott Boulevard in the year 2020 and 2021.

MS. PERRY: We'll talk about it off the record and let you know.

MS. GJOVIK: Okay. Thank you, ma'am.

BY MS. GJOVIK:
**Q And then I believe you were also going to check who the EHS lead was for 3250 Scott during that time frame. Were you able to confirm, Ms. Schmidt?**
A Tom Huynh.
**Q Okay. Thank you.**
**And then I believe you were also going to check for the name of the adjacent Superfund site to 3250 Scott Boulevard. Were you able to confirm?**
A I was able to confirm that Honeywell is one of them. There may be others, so...
**Q And the Honeywell, that's the Sinner Tech site.**
**Does that sound right?**
A I didn't look at the specific site --
**Q Okay.**
A -- which of those. There's a number of them there.
**Q Okay.**
**And that site, though, where Honeywell is the responsible party, is it your understanding that there is a groundwater plume either under or adjacent to 3250 Scott Boulevard from that Superfund site?**
A I do know there are a number of Superfund sites with different responsible parties in the area. Yes.
**Q But is there a ground- -- a contaminated**



**groundwater plume as part of the Honeywell site that is either adjacent to or under 3250 Scott Boulevard?**
A I don't have a lot of detail on that.
**Q Okay. Thank you.**
**Was there anything else you went and followed up on?**
A No. I think we talked over -- the other one was the CUPA.
**Q Yeah.**
A Santa Clara City Fire Department.
**Q Is the CUPA. Okay. Thank you.**
**And then -- let's start with 825 Stewart Drive. When did -- do you know when Apple decided to lease that building?**
A Around 2015.
**Q And was anyone in that building prior?**
A From Apple?
**Q Anyone, generally.**
A I don't know. I just know when we got the --
**Q Did Apple -- sorry. Go ahead.**
A My knowledge is just when Apple got the lease.
**Q Did Apple do any renovations as part of their move into that building?**
A Yes. There was TI projects done as part of the move-in.



**Q Did they do renovation related to hazardous waste management?**
A Can you be more specific about that?
**Q Yeah. So, I'll do a subset of questions.**
**Around 2015, did Apple do any renovations at 825 Stewart Drive related to either the sub-slab depressurization system or sometimes called sub-slab venting system that's part of the CERCLA mitigation?**
A I don't believe that it is Apple. I think it was done by the responsible party and the landlord. That was their responsibility, our part being the tenant improvement that we would typically do in a building: conference rooms, and lab spaces.
**Q And then around 2015, when Apple decided to move in, did Apple do any renovations related to the HVAC system?**
A Yes. I do believe that there was additional improvements done for the site, including HVAC.
**Q And did Apple do any renovations around that time related to the -- that sub-slab venting system vents on the roof?**
A I don't -- honestly, I don't know how much is -- was done from the responsible party and what was done by Apple between those two systems.
**Q Combining those two parties, what was done**



**regarding the installation of the HVAC on the roof and the sub-slab venting exhaust on the roof?**
A My assumption is that Apple would have been installing the HVAC while the responsible party is responsible for the sub-slab system.
**Q Did Apple make any modifications to the sub-slab vents on the roof around 2015 or 2016?**
A I don't have that as, like, a specific knowledge.
**Q Are you aware of the communications with the EPA regarding concerns about re-entrainment of the sub-slab vent exhaust into the HVAC based on modifications made in 2015 or early 2016?**
MS. PERRY: Objection to the extent it lacks foundation. Assumes facts not in evidence.
THE WITNESS: I know the EPA was having a conversation with Northrop Grumman on those things, but I wasn't involved in the conversation.
BY MS. GJOVIK:
**Q And I'm -- sorry. I'm asking Apple. So you would be answering on behalf of Apple. And if you don't know, then the answer would be Apple doesn't know or you weren't prepared to answer that question.**
**Sorry. It's my dog Captain.**
**So, is there -- were you not prepared to speak about the sub-slab exhaust vents on the roof and the**

**re-entrainment concerns raised by the EPA in 2021?**
MS. PERRY: Objection to the extent it lacks foundation. Also misstates the witness' testimony.
BY MS. GJOVIK:
**Q Ms. Schmidt, are you prepared today to testify on behalf of Apple Inc. regarding the EPA's concerns raised in 2021 regarding the risk of re-entrainment of the sub-slab vent exhaust into the HVAC at 825 Stewart Drive?**
A I don't have -- I don't feel like I've got enough working knowledge to be able to talk about it. We may have done -- we did work on the roof the -- at a similar time Northrop Grumman was doing the pressure system.
**Q Thank you, Ms. Schmidt.**
**The EPA had numerous concerns documented in letters and memos and emails regarding specifically concerns about re-entrainment into the HVAC from the sub-slab vent exhaust. Is that something -- can you confirm if you can testify to that today on behalf of Apple?**
MS. PERRY: Objection to the extent it lacks foundation. Assumes facts not in evidence.
MS. GJOVIK: I'm going to note also, just to interject, that this is in the complaint for the lawsuit. This is detailed, including diagrams, and citing the specific letters, and it's been part of this litigation



for over two years. So, Counsel can make their objections, but if this would be something the witness is not prepared to testify, I'd just like to document they are not, and that will be another thing I will ask to have a follow-up deposition about.
BY MS. GJOVIK:
**Q So, Ms. Schmidt, do you feel prepared today to testify --**
MS. PERRY: The complaint was not --
MS. GJOVIK: I can't hear you, Ms. Perry.
MS. PERRY: I'm repeating my objections that it lacks foundation.
BY MS. GJOVIK:
**Q Ms. Schmidt, can you confirm if you're prepared to testify about that today or if you're not prepared to testify about that today?**
A Yeah. I don't have enough detail as to the timing and to who was doing what in that space. My knowledge is that there was a conversation with EPA and Northrop Grumman to correct some findings.
**Q So, are you aware of --**
A I wasn't -- Apple wasn't responsible for those corrections or for those findings.
**Q Do you have awareness of what these findings and corrections are that you can testify to?**



A Not between Northrop Grumman and EPA.
**Q And do you have any knowledge of what steps Apple took regarding its HVAC system in 2021 through, I believe, 2023?**
A Honestly, I don't have a detail on HVAC systems specifics.
**Q Thank you, Ms. Schmidt. I appreciate you being honest about that. It sounds like you only had a week to prepare for this, so I believe this -- and it mislead on you personally. I just want to make sure that we're clear about what you did have time to get up to speed on and what you didn't. So I'm going to flag that as something I'm going to request a follow-up on so there is more time to prepare. This stuff is very technical. Your job is extremely technical.**
**I'm going to switch really quick to 3250 with similar questions.**
**Ms. Schmidt, when did -- around when did Apple decide to rent the building at 3250 Scott?**
A I don't have a specific date.
**Q Do you know roughly how long Apple has been using that facility?**
A I don't. Many -- a number of years.
**Q Do you know if Apple is the only business using the facility at 3250 Scott Boulevard?**



A I don't know that either.
**Q Do you know if Apple is the only business using the facility at 825 Stewart Drive?**
A No. I don't have specific knowledge of that either.
**Q Okay.**
A As when -- as lease -- when we're in a lease, sometimes there can be unique things. So I don't want to misstate.
**Q I understand.**
**And is Apple still using the facility at 825 Stewart Drive?**
A That's my understanding, yes.
**Q Is Apple still using the facility at 3250 Scott Boulevard?**
A Yes.
**Q Thank you.**
**Now, I kind of want to go into a bigger picture for EHS at Apple just to kind of create context to compare my experience to Apple's kind of general policies and practices for EHS, at least in Santa Clara County. I assume things may differ based on region.**
**So in 2021, if an Apple employee wanted to raise a concern about health or safety in a facility or about a facility at Santa Clara County, how would they do that**

Page 65

**with Apple?**

A There's a number of different ways. One of them is to speak to, or email, their EHS lead. So, every building has an assigned EHS lead who -- either the person you're most likely to know and be able to connect with. If you have an anonymous concern or a concern you don't feel comfortable with, there's also on the website a "reported concern" function that allows you to report in. And then, again, if you don't use either of those, you can always speak with your manager to raise concerns. And then there's also like a people hotline as well. So that if there is a concern that isn't -- you know, doesn't feel comfortable in any of those ways, that's another place that employees can raise concerns.

**Q Thank you.**

**And are employees able to request testing or monitoring at their office?**

A Not typically. We are -- we are res- -- you know, focused on making sure our spaces are health and safety, but if an employee brings up a concern, we will help them understand what sampling and monitoring that's been done, why we've done a risk assessment and believe that there is not a reason to monitor. But typically, no. An employee who just asked to do a specific test, we wouldn't necessarily do that without, you know, really

Page 66

having a conversation and making sure that, you know, there's a reason to take the test.

**Q Thank you.**

**And if an employee wanted to know about prior tests that had been conducted, are they able to request copies of the tests and results to review?**

A Not always. Honestly, sometimes tests have other people's information around it. And so we don't always share other tests, especially tests that have other people's information with other employees.

**Q What about a test for something like just the indoor air and, like, the area they work generally in the building?**

A Again, not typically we would share a whole test because it's not -- you know, especially with an employee. Like, it really needs a conversation along with it with an expert. Sometimes test results can be complicated. Things like calibrations and levels of detection can be things that a general employee doesn't maybe have a, you know, full understanding with. So any kind of conver- -- usually talks around test results come with an expert to talk them through that.

**Q But that's only if Apple agrees to share the test results?**

A That's right. When we talk -- now, with your own

Page 67

test result, right, if it's part of your own -- like, if we've done, personally, sampling on you, we will absolutely share that. That's required, and we would share.

**Q So in a situation where an employee might be working on a toxic waste cleanup site where there could be contamination in the air generally in the building, are they able to request tests that they can wear themselves in the building?**

MS. PERRY: Objection to the extent it's an incomplete hypothetical and calls for speculation.

MS. GJOVIK: Can you speak up? Sorry. I didn't catch the first part.

MS. PERRY: Incomplete hypothetical. Calls for speculation.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

**Q Ms. Schmidt, if it was 2021 and I'm working at 825 Stewart Drive and that's a toxic waste cleanup site with some history of vapor intrusion in the building, historically at least, and I wanted to have some testing of the air around me, would I be able to request one of those tests where I can, like, wear the monitor myself to know what I'm personally exposed to?**

MS. PERRY: Objection. Lacks foundation.

Page 68

Assumes facts not in evidence. Calls for speculation. Incomplete hypothetical.

BY MS. GJOVIK:

**Q Okay. Actually, let me withdraw that. Let me back up a few steps. I get frustrated sometimes, but they end up making me ask my questions better at the end of it.**

**825 Stewart Drive, Ms. Schmidt, is that a CERCLA Superfund site?**

A There's a history there where there has been remediation between EPA and the responsible parties for a number of years.

**Q The address at 825 Stewart Drive, is it also known as the TRW Microwave Superfund site?**

A The material underneath it, but not the building itself. Right.

**Q Okay.**

**Let me -- is the soil and groundwater under the property at 825 Stewart Drive also known as the TRW Microwave Superfund site?**

A Yes.

**Q Thank you. See, I finally got the right question after six tries.**

**And for the TRW Microwave Superfund site, is it your understanding that the responsible party under CERCLA is Northrop Grumman?**

Page 69

A Yes. That's correct.
**Q And in 825 Stewart Drive, there are systems in place as part of the CERCLA mitigation agreement. Is that correct?**
A There are a number of mitigation factors that have gone on both in the facility and below ground to mitigate those risks and remediate them.
**Q Can you summarize some of them?**
A Yes. So, there was materials removed over the years. There has been additional work done to extract vapors over the years. In more recent years, there was further excavation under the building as well as an oil treatment done; and then inside the building, installation of a passive vapor intrusion system. So those are some examples. I don't think they listed all of them.
**Q There's a long list.**
A Yeah. They've done a lot of work to remediate and reduce risks at that site.
**Q Thank you.**
**And what is your understanding about how the contamination occurred under the building?**
A Just from, like, a historical basis?
**Q Yeah.**
A I honestly don't know all the story for all of the companies that were involved. So, I guess -- I don't

Page 70

want to speak to specific tanks or what the tanks contained or anything like that. I think there's a lot of history there well before our presence at the site.
**Q Is it correct that that facility is also on something called the Triple Site where it's multiple Superfund sites with a complex groundwater contamination plume?**
A It's near there, yeah.
**Q Is it your understanding that TRW Microwave Superfund site is part of the Triple Site?**
A Yes, that's my --
**Q One of the three?**
A Yeah.
**Q And there's -- you're right. So I'm not going to push that too much, because there are -- there's a lot of contamination in that area and a lot of moving parts around that plume. So just for the sake of simplicity, I'm going to try to focus on calling it like TRW Microwave Superfund site when we're just talking about 825 Stewart Drive.**
**And then for 825 Stewart Drive, can you tell me about the -- there's, like, six different terms they've used for it. But the sub-slab depressurization system or sub-slab vent system or passive (inaudible), whatever they're doing to vent the vapors from that ground and**

Page 71

**water under the building so it doesn't go up into the building, can you tell me about that system in that building?**
A I can tell you a little bit about it, but I'm honestly not the engineer that designed that. But very basic terms, it's built into the slab nearest to where potential contamination could be entered and it captures the series of pipes and moves that through a pass- -- in a passive way up and out into the atmosphere further reducing, you know, the potential that vapor intrusion could enter the building into the occupied spaces.
**Q And just for the folks at home who have no idea what we're talking about, when we say "slab," what does "slab" mean?**
A Think of materials like concrete that are the foundational aspects of the building.
**Q And when you say "venting to the atmosphere," is that the exhaust on the roof?**
A Yes.
**Q And what is your understanding of what the term "vapor intrusion" means?**
A That'd be volatile organics that are moving out of the soil could enter into other spaces.
**Q And was there a history of vapor intrusion occurring in the 825 Stewart Drive building?**

Page 72

A There is sampling done periodically in this building that measures a number of item- -- of chemicals, and there have been times where they have measured the presence of chemicals. That doesn't always mean that the presence is a hazard.
**Q So, is it fair to say that vapor intrusion describes more of the vapors from that regulated cleanup site intruding into a building, but it doesn't necessarily imply anything specifically about health risk, just the fact that it's occurring?**
A If you want to just talk about what is vapor intrusion?
**Q Yes.**
A Yes.
**Q So the history of the vapor intrusion testing at 825 Stewart Drive, including before Apple rented, did it ever show results that indicated vapor intrusion was occurring?**
A Yes. There is reports that show that vapors were, you know, above the limit of detection but not above limits of concern or action. So detected present, but not a level of concern.
**Q And that would be vapors of chemicals that are regulated as part of the Superfund site then showing up in the building, and their presence was then attributed to**

**the contamination.**
**Is that right?**
A It's not always a hundred percent true. There could be other sources depending on what the chemical is. So it would have to be, you know, kinds -- you know, kind of specific of -- it's a bit of an assumption to assume anything tested in the building is on or (inaudible) contributed to ground release.
**Q For 825 Stewart Drive, what about the chemical TCE? If it showed up in indoor air testing in the building, would it be attributed to the contamination or could it have come from inside the building from operations?**
A It can depend on what operations are going on at that time to be able to say yes or no.
**Q Does Apple use TCE in its operations in Santa Clara County?**
A I don't know that a hundred percent, but I can't also say -- you know, some of the sampling was done during work, you know, installing carpet and painting and things like that, which I would say is not normal activities, but there could be a scenario in which, you know, it's attributed to something other than the waste or the water.
**Q And then when I asked about vapor intrusion prior, I hadn't asked you about exceedances yet. I'd like**



**to ask you that.**
**In the vapor intrusion testing that's occurred at 825 Stewart Drive, including prior to when Apple moved in, have there been results that showed the contaminants of concern, including TCE at that site, exceeding the limit set by the EPA and California EPA?**
A I do believe there's a 2013 report, and I would have to be very careful with you as to the assumptions of what limits and what EPA levels. So I don't want to speak to that, you know, highly confidently because that was a pretty vague question, but there were some samples taken in 2013 that I think you're referring to.
**Q There's actually multiple samples going back far -- earlier than that as well, and these were things that I had included in my emails and complaint that I was making, including screenshots of them. So maybe after lunch, I can grab some of those, and we can look at them if it helps for you to see the actual EPA documents, those reports.**
A Sure. I -- just depending on what your question is.
**Q But we are -- we can confirm that you indicated that at least in 2013, there were reports that showed exceedances of some of these chemicals in the indoor air testing?**



A I think we need to be really careful as to what an "exceedance" is and what does it mean. So let's both be really accurate on what we're talking about.
**Q Okay.**
A Exceedance of what?
**Q Do you want to further clarify your prior statement?**
A If you could be more accurate as to what the exceedance is to. Right.
**Q I asked you a question, and you said you believe there was a 2013 test with an exceedance. And so then I was asking if you wanted to further elaborate on your statement responding to my prior question.**
A I'm responding to your question as, do I know that there is a report? I think you used the word "exceedance." Is there a report that exists? What I'm asking -- because you're using the word "exceedance," I want us to be careful and use the right word as to exceedance of what, because "exceedance" could go very scary, but it could be -- you know, without context. So let's just add context going forward.
**Q Yeah.**
**So. I believe there's two primary exceedance thresholds, and we can -- I think that's right. We should agree on what terminology to use. And I believe one of**



**them is kind of like the action level. If one of the regulated chemical is above that action level, then EPA gets involved to get a plan to figure out how to control it, but then there's, like, an immediate action level, that if it's above that one, then it's like EPA, maybe OSHA and some other folks are like, "Should we evacuate them until we sort this out?" That's my understanding. But if you want to clarify your version of what -- how you would translate "exceedances" to.**
A Yeah. That's --
MS. PERRY: Hold on. Let's get a clear question.
BY MS. GJOVIK:
**Q Ms. Schmidt, can you please clarify how you view vapor intrusion testing results when they might exceed a regulatory screening level set for vapor intrusion testing, what common threshold that Apple EHS team might refer to and the implications of each of those being exceeded?**
MS. PERRY: Objection. Vague. Ambiguous. Overbroad. Compound.
BY MS. GJOVIK:
**Q If you understand my question, I'd like you to answer. If you don't understand my question, I'll try to rephrase.**
A Go ahead, try to rephrase. Let's try to get some

Page 77

things specific.
**Q When Apple EHS will conduct vapor intrusion indoor air testing, what kind of thresholds do they use when analyzing the results to determine if they will take additional action based on those results?**
A For starters, we would use, you know, what the standard protocols are and the government limits at that time. So, even today, if something has changed, we wouldn't use something that was dated. So we would use the government guidance around the standards and the limits at that time.
**Q And what generally is the government guidance, at least in 2021?**
A I don't -- for -- specifically for what?
**Q For testing for vapor intrusion in the indoor air and let's say, for example, TCE and at a site like 825 Stewart Drive.**
MS. PERRY: Objection. Vague. Ambiguous. Compound. Incomplete hypothetical.
BY MS. GJOVIK:
**Q Ms. Schmidt, you said government limits. Can you please provide more details what you meant by "government limits"?**
A Yes. So the EPA will set out a threshold for a space that could be reasonable for industrial occupancy.

Page 78

Like you said, there could be limits that are set that are indication of an action or an action point. Sometimes they're even higher -- depending on agency, even higher thresholds where there's more, like, significant actions that need to take place in a shorter period of time. So each government entity who are dealing with these kind of exposure concerns will have, typically, chemical-specific series of thresholds.
**Q And what were the thresholds set by the government for the CERCLA-regulated chemicals at 825 Stewart Drive?**
MS. PERRY: Objection. Compound.
BY MS. GJOVIK:
**Q You may answer.**
A It depends on the time frame.
**Q In 2021.**
A I'd have to -- I'd have to review a report to be accurate.
**Q Is it your understanding that one of the government thresholds for these test results is -- for TCE, that if there's over a certain amount, that there's generally additional action required at the location that exceeds the certain amount? I believe it's three. It's for TCE.**
MS. PERRY: Objection to the extent it lacks

Page 79

foundation. Also vague.
MS. GJOVIK: Let me rephrase.
BY MS. GJOVIK:
**Q Ms. Schmidt, regarding 825 Stewart Drive in 2021, is it your understanding that there are any -- Apple's understanding that there are any government limits for how much TCE is allowed to be in the indoor air at that facility arising from the contamination under the building?**
MS. PERRY: Objection to the extent it lacks foundation.
MS. GJOVIK: Can you speak up, please.
MS. PERRY: Objection to the extent it lacks foundation.
BY MS. GJOVIK:
**Q Please, go ahead, Ms. Schmidt.**
A When those types of regulations were in place in 2021.
**Q Was there indoor conducted -- testing conducted in 2021 at 825 Stewart Drive?**
A I don't remember the specific. I'd have to look and see if in 2021 if there was specific sampling or what the specific sampling was. Sorry.
**Q What indoor air testing has Apple done at 825 Stewart Drive between 2020 and now?**

Page 80

A And now, like today?
**Q Uh-huh.**
MS. PERRY: Objection to the extent it's overbroad and beyond the scope of the noticed deposition topic.
MS. GJOVIK: So is evidence a pretext potentially based on the answer.
BY MS. GJOVIK:
**Q Please proceed.**
MS. PERRY: You can answer in your individual capacity given the breadth of the time period.
MS. GJOVIK: Sorry. Can you speak up.
MS. PERRY: She can answer in her individual capacity given the breadth of the time frame.
MS. GJOVIK: That's not a proper function of a Rule 36(b) deposition. She either answers as Apple or she doesn't answer and states why. If she doesn't know, she should say so.
MS. PERRY: Court reporter, could you please reread the question.
(The record beginning on page 79, line 24 was read by the reporter.)
MS. GJOVIK: I can narrow that -- thank you, ma'am.
///

Page 81

BY MS. GJOVIK:
**Q And I can narrow that question to you. Indoor air testing related to vapor intrusion at 825 Stewart Drive between 2020 and 2026.**
A I do know there was vapor intrusion testing done in 2021 that was conducted.
**Q Anything after that?**
MS. PERRY: I'm going to object to the extent it's beyond the scope of the noticed deposition topics.
MS. GJOVIK: It's evidence of pretext based on her answers. So I'd like her to answer.
MS. PERRY: It doesn't matter, Ashley. What dictates this deposition and the testimony that's given is what's in the deposition notice that you served.
So if you have any personal knowledge of any testing that was done after 2021, you can go ahead and answer the question.
MS. GJOVIK: Counsel, I'm going to object again to your speaking objections and using improper form. The only way you can say that the witness does not answer is under privilege. And if you're going to state that they're not allowed to answer based on your arguments on the scope of the compelled testimony, she still has to answer, and she cannot answer as Elizabeth Schmidt in a Rule 30(b)(6) deposition. And I'm going to ask you again

Page 82

to stop trying to coach her to do that. This is not a deposition of Elizabeth Schmidt. This is a deposition of Apple Inc., and your repeated attempts to try to transmogrify it into something else is going to be part of the issues I'm raising to Judge Westmore. It's inappropriate. I'm going to ask you to stop again, please.
BY MS. GJOVIK:
**Q I'm going to ask Ms. Schmidt again: On behalf of Apple, what air testing was done at 825 Stewart Drive related to vapor intrusion between 2020 and 2026?**
MS. PERRY: Again, Ashley, the framework of a 30(b)(6) deposition is for you to notice specific topics, a witness to prepare on those topics, and the witness come prepared to testify. This witness is here to testify as to the topics that you laid out for the time frame 2020 and 2021, which are at issue in your litigation. If the witness is unable to answer questions because they're beyond the scope of the noticed deposition topics as a corporate designee, I am permitted to make that clear on the record. I cannot tell the witness she's not allowed to testify at all to topics that are beyond the scope of the deposition, but I can make clear on the record that the witness is to go ahead and answer and is doing so in her own individual capacity, and that's what I'm doing.

Page 83

It is entirely proper and in fact it is my obligation to make clear on the record when you're asking questions that are going beyond the scope so it is clear whether the witness is answering as a corporate designee or she's answering based on her own personal knowledge.
MS. GJOVIK: Counsel, you're conflating two completely separate things. Again, this is not a deposition of Elizabeth Schmidt, and if Elizabeth Schmidt knows the answer and is the designee, she speaks on behalf of Apple with her knowledge as Elizabeth Schmidt. And this is -- you guys created this issue by choosing an involved fact witness to be the designated witness for this, and I explained that at the very beginning. And this goes -- let me -- let me rephrase this question and make it extremely clear for the record of why this is relevant.
BY MS. GJOVIK:
**Q So, Ms. Schmidt, are you aware that the US EPA, based on its inspection -- actually, let's step back.**
**Ms. Schmidt, did the US EPA conduct an inspection at 825 Stewart Drive in August of 2021?**
A Yes.
**Q What date was that inspection?**
A I think you just said it, but I don't have a direct -- I don't have a specific date, but I do believe

Page 84

it was in the fall of '21.
**Q I believe it was August 19, 2021, but it'd be good to confirm that if we can. That's -- I would like the statement from Apple on that, please.**
**And Ms. Schmidt, when was Apple notified that the EPA was requesting that inspection?**
A I believe we were notified ahead of time by the EPA so that, you know, we could coordinate the visit and have people on site.
**Q What date was Apple notified?**
A I don't remember that. I'm sorry. I don't have a specific date, but I can look it up.
**Q If we can, please. That's another very critical information because it will go with the retaliation timeline. So if we can find that, please, I'd appreciate it.**
**And then, Ms. Schmidt, are you aware of the EPA requesting vapor intrusion testing inside 825 Stewart Drive related to the inspection?**
A For Apple to do?
**Q For someone to do.**
A Yeah. There -- you know, they were activity for Northrop Grumman to do but not for Apple.
**Q So, can you please tell me about what your understanding is of what someone, maybe Northrop Grumman,**

**was requested to do regarding indoor air testing at 825 Stewart Drive in the fall of 2021?**

A I don't -- no. I really can't speak to, specifically, what the other party did.

**Q Ms. Schmidt, if Apple is leasing a facility -- actually, let's step back.**

**Ms. Schmidt, are you aware of what organization the employees are in that are assigned at 825 Stewart Drive?**

A Which organization?

**Q Yeah. Like hardware engineering, software engineering, Apple Care.**

A Not specifically. Teams move between buildings frequently. And so, no, I don't have a constant working knowledge of which teams are working in what building.

**Q Is it your understanding that 825 Stewart Drive, at least portions of it, is a secured building as Apple's designation, with, like, badge readers and limited access?**

A That's common in almost all of our buildings.

**Q So if a non-Apple party would need to get inside to do anything, would they need Apple's approval before they could get inside to those secured areas?**

A Yes. Typically a coordination would be done.

**Q So if a non-Apple party was to conduct vapor intrusion indoor air testing in those secured areas, would**



**Apple need to approve that and coordinate that?**

A Yeah. I think it's less about approval and more about coordination so that we can facilitate with ease.

**Q So it would be safe to assume that if a non-Apple party was conducting EHS testing in secured areas of an Apple building, Apple EHS at the very least would be aware?**

A Maybe not the details of all the testing and those types of things, but to support the coordination, the team would be aware or -- as to why or who said to do it, those kind of things.

**Q In regard -- sorry. Go ahead.**

A Just there to -- you know, there to support and help facilitate.

**Q And then regarding 825 Stewart Drive, has anyone requested access to conduct EHS testing inside that building that's not Apple between the years of 2020 and, say, 2023?**

A Yes. Both the landlord and Northrop Grumman have requested access at various times to do that work.

**Q Can you tell me about the request from the landlord?**

A Sometimes the request is from the landlord or Northrop Grumman, right, because our relationship is with the landlord, and the landlord's relationship is with



Northrop Grumman.

**Q Can you tell me about the request from Northrop Grumman?**

A Specifically for what? To visit the site?

**Q Did they request to do testing? When did they request to do testing? When did they do testing?**

MS. PERRY: Objection. Compound.

BY MS. GJOVIK:

**Q During that time frame, how many times did Northrop Grumman request access to 825 Stewart Drive to engage in EHS-related activities?**

A I don't remember offhand the exact count, but at least once. There could have been a few other times as well.

**Q And did Northrop Grumman request access to do indoor air testing during that time period?**

A I don't have a very specific that it was air quality testing. I know they were on site to review the functioning of the space, and if they took tests at that time, that could be possible.

**Q There are vapor intrusion indoor air testing results published to the TRW Microwave Superfund EPA site, the public site, that was conducted inside 825 Stewart Drive during the time frame I'm talking about. Are you familiar with those results?**



A Yeah. If you could bring them. There's a number of them.

**Q And then you said there was air testing conducted in 2021. Who conducted that testing?**

A This specific case with Northrop Grumman -- who the sub is?

**Q So, you mentioned that there was air testing at 825 Stewart Drive in 2021, and I'm asking who over- -- so, I guess, who requested that testing and then what contractor they used to do it, if they hired a contractor.**

MS. PERRY: Objection. Compound.

BY MS. GJOVIK:

**Q Let's just start with who -- who requested that testing.**

A So, specific to vapor intrusion?

**Q Uh-huh.**

A So, there is sampling done for our, like, routine vapor intrusion program, which was in 2021, and we used a vendor to do that.

**Q Who was the vendor?**

A I believe it was EK- -- I believe it was EKI.

**Q And when was the last time Apple had conducted indoor air testing related to vapor intrusion at that building prior to that 2021 testing?**

A 2015.

Page 89

**Q And what were the results in 2015?**
A 2015 results showed low detection of contaminants of concern.
**Q And what were the results from the 2021 testing?**
A Very similar, if not lower, which is to be expected. The sites had been mostly remediated. And so we would expect that would continue to have low and lower results over time.
**Q Was there also testing conducted under the slab at 825 Stewart Drive?**
A Yes. I did read some -- well, I don't know if it's under the slab. I did see some slab work done. I don't know exactly where under the slab it was taken. That's all we could see.
**Q Are you aware of that highest results of TCE under the slab in the most recent testing in 2021?**
A It's expected to have elevated concentration before the system is in place. Right. And that's why that system is there, is to help to further mitigate that risk inside for the occupants.
**Q Thank you.**
**My question, though, was 2021, which I believe the system was already in place in 2021.**
**Is that correct?**
A The system is in place, yeah.

Page 90

**Q And there was testing done after the system was in place I believe in 2016 of TCE concentrations under the slab. What was the highest amount of TCE they found under the slab in that testing?**
A I don't know the specifics.
**Q And in buildings like this where there is vapors under the slab and a risk of vapor intrusion, are there any other things that Apple EHS team would do to mitigate the risk that vapor intrusion occurs other than the sub-slab depressurization system?**
A That is not even our system. That's the landlord's system, and only the landlord and Northrop Grumman have put in a number of controls removing the soils, putting in the system, doing the soil remediation. All of those things are all their responsibility and all things they have done, and as a result makes the space protected for our employees.
**Q What about if there's cracks or gaps in the slab?**
A At, like, a surface level?
**Q I'm just going to say generally, because it's -- it's pretty typical mitigation management stuff of surveying and managing if there's cracks, gaps, or there's penetration into the slab. So --**
A Yeah.
**Q -- what -- my -- let me ask the targeted question for you.**

Page 91

A Okay.
**Q What does Apple EHS view as its responsibility regarding keeping the slab sealed in a site like 825 Stewart Drive?**
A Honestly, we don't have any obligation to do that. It's not a required component of a maintenance program. And so we don't have to, but that doesn't mean that we don't -- so we do stuff like looking for vapor risks, sealing sampling as our part of proactive voluntary program, but it is not a required program or obligation.
**Q Under CERCLA or under any law?**
A Under any law.
**Q So if there was test results that showed that there was high levels of TCE under the slab in the building and Apple, let's say, installed equipment that penetrated that slab and then connected the vapors under the slab to that indoor air, are you saying Apple has no legal requirements at all about how it does that or creating that exposure factor?**
MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence. Incomplete hypothetical. Calls for speculation.
MS. GJOVIK: We can wait and review this document after lunch, actually. Let me ask a different question.

Page 92

BY MS. GJOVIK:
**Q Ms. Schmidt, are you aware of floor sealing activities, S-E-A-L-I-N-G, occurring at 825 Stewart Drive in 2021?**
A Yes, I am.
**Q Can you please summarize what occurred and why?**
A Yeah.
MS. PERRY: Objection. Vague. Compound.
BY MS. GJOVIK:
**Q Ms. Schmidt, can you please tell me at a high level about any floor sealing activities that occurred at 825 Stewart Drive in 2021 regarding vapor intrusion mitigation?**
MS. PERRY: Objection. Vague. Overbroad.
BY MS. GJOVIK:
**Q You can answer that one.**
A Could you be specific?
**Q So you said that there were floor sealing activities that occurred in 2021 at 825 Stewart Drive.**
A Uh-huh.
**Q I'd like to learn more about what occurred there.**
**So, was there -- did Apple do an inspection regarding the slab and whether it was sealed or not in 2021?**
A Yes. As part of our vapor intrusion program --

Page 93

again, voluntary best practice program -- we went through and did an inventory, an inspection, survey to go look through the site and to then identify anything that we feel like we could do from a, you know, best practice maintenance perspective as far as seal, and then we then test to make sure that the, you know, conditions that we expect remained to be in place.

**Q Did Apple find any penetrations of the floor that lead it to make repairs?**

A There were a number of sealing activities that did follow the survey.

**Q Did Apple do any indoor air testing at 825 Stewart Drive in 2021 prior to the sealing activities?**

A Yes, we actually did.

**Q And what were the results?**

A That they were, as expected, well below any risks.

**Q What kind of testing was conducted?**

A These were, like, a tab that is set for -- put in the space and sent for analysis.

**Q Were these SUMMA canisters?**

A I don't believe they were SUMMA, but I could check.

**Q Were they Sorbent tubes?**

A Yeah. Usually, they're like an absorbent tube.

Page 94

**Q And what kind of chemicals did they test for?**

A A number of them, but TCE being one of them.

**Q And if the results did exceed a regulatory limit, would employees have been informed?**

MS. PERRY: Objection. Lacks foundation. Calls for --

MS. GJOVIK: I can't hear you.

MS. PERRY: Lacks foundation. Calls for speculation.

MS. GJOVIK: Let me rephrase.

BY MS. GJOVIK:

**Q Is it Apple's EHS policy that if they conduct an indoor air testing like this and regulatory limits are exceeded in the results, that they will notify the employees who may have been exposed?**

A Where we have a legal obligation to notify with an exceedance of results, we would notify.

**Q And what regulatory threshold does Apple believe creates a legal obligation for it to have to notify employees?**

A When there is a legal obligation to notify.

**Q So for, let's say, TCE, what would be the result, the amount that Apple believes creates the legal obligation to have to notify employees?**

A I'd have to look at the EPA's current guidance on

Page 95

TCE and whether there would be an obligation to notify at a certain, you know, concentration.

**Q Is it --**

A Uh-huh.

**Q You're the star of the show. If you have more to say, I want to let you finish. Okay.**

**Is it Apple's EHS policy to notify employees if they're going to be assigned to work on one of these hazardous waste cleanup sites?**

A If there is an obligation to notify, we would. There is not in this case of 825 any obligation to notify occupants of, really, a historical condition. Like we've seen in the testing in '15, in '21, there isn't risk here, and so there's no obligation to notify.

**Q Is it Apple's EHS practices to notify employees if there is mitigation systems in their workspace related to vapor intrusion, like sub-slab depressurization systems?**

A No, there's no obliga- -- if there's not an obligation to notify, we do not have a -- something that says we have to notify.

**Q Is it Apple's EHS policies to notify employees if there's hazards related to the slab, such as a prohibition on penetrating the slab because of potential chemical exposure at a site like this?**

Page 96

MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.

BY MS. GJOVIK:

**Q I would like this answered, but we'll look at documents later too.**

A Ask the question again.

**Q Is it Apple's EHS policy to notify employees about hazards related to penetrating a slab of their office where they work if that penetration could create a vector for chemical exposure at a site like 825 Stewart Drive?**

MS. PERRY: Objection. Assumes facts not in evidence. Lacks foundation.

BY MS. GJOVIK:

**Q You may answer.**

A If there was going to be work done, it's done through risk assessment, and I think decisions to notify would be based off the risk assessment of the work that's being proposed.

**Q And then when it comes to penetrating a slab in a building like 825 Stewart Drive in Santa Clara County, is that something that the teams are expected to contact the EHS teams before they would penetrate the slab or are they able to do that themselves without contacting EHS?**

MS. PERRY: Objection. Vague. Ambiguous. Lacks

Page 97

foundation. Calls for speculation.
BY MS. GJOVIK:
**Q Go ahead, please.**
A Will you ask the question again.
**Q Yeah.**
**Is it Apple's EHS policy that the Apple EHS team should be consulted by the functional teams before they would penetrate the slab at a building like 825 Stewart Drive where the slab is part of a mitigation system for vapor intrusion exposure?**
MS. PERRY: Same objections.
BY MS. GJOVIK:
**Q You still have to answer. She's just stating that to argue with me later.**
MS. PERRY: If you understand the question, then go ahead and answer.
THE WITNESS: Yes. Apple EHS person gets involved in work or there is a change that potentially could have risk. So it would be expected that others that are impacting the facility in a significant manner, we would send a support.
BY MS. GJOVIK:
**Q In a building like 825 Stewart Drive, would Apple EHS approve creating, like, holes in that slab to install equipment where it creates exposure between under the slab**

Page 98

**and in the indoor air or would Apple EHS say, "No, don't do that"?**
MS. PERRY: Objection. Vague. Ambiguous. Lacks foundation. Calls for speculation. Incomplete hypothetical. Assumes facts not in evidence.
BY MS. GJOVIK:
**Q We're going to look at the documents after, but you can answer now.**
A It would be very, you know, situation specific, you know, given the context of the placement and the depths and what other reme- -- you know, what other actions might be taken alongside that.
**Q And some Apple teams, like -- especially like hardware engineering teams, might they do some construction themselves in the facilities that maybe doesn't include EHS at the start?**
MS. PERRY: Objection. Calls for speculation. Incomplete hypothetical. Lacks foundation.
THE WITNESS: I know our hardware teams work really closely with EH&S. So I expect that that happens most of the time.
BY MS. GJOVIK:
**Q And do these Apple EHS leads conduct regular inspection of the facilities they're assigned to?**
A Yes.

Page 99

**Q How often do they conduct inspections?**
A It depends on the significance of the work happening in the building. More frequent inspections for areas of higher risk.
**Q And as part of these inspections, would they look at the slab at a site like 825 Stewart as they're working around?**
A From a general perspective, but not from a, you know, expert in vapor intrusion perspective. That's where the vapor intrusion program comes in play to be more thorough in that space.
**Q Who leads Apple's vapor intrusion program?**
A It is part of our due diligence team. So right now, it is led by Julia Smith.
**Q And who led it in 2021?**
A I'd have to check on dates, but it could have been Michael Steiger at that point.
**Q And where is Michael Steiger now?**
A Honestly, I don't know, but he does not work on my team.
**Q He left Apple in 2021. He went to EKI.**
**And then what is Apple's vapor intrusion program, generally?**
A So kind of a three-part process: one, to do a survey; two, to do any sealing; and three, to do sampling.

Page 100

**Q And how long has this program existed?**
A I don't know when they exactly started, but it's been in place for a number of years now.
**Q And as of 2021, how many Apple EHS employees worked on this program?**
A In what way?
**Q Sorry. Can you say again?**
A In what way when you say "work on the program"?
**Q So, you described it as a program. Is that more like a team or that's more like an initiative? What did you mean by "program"?**
A So the program is defined by, like, the process and procedure.
**Q And so then it would include, like, the standard EHS person assigned to the building, but then there may be subject matter experts or other people too, depending on the situation.**
**Is that generally correct?**
MS. PERRY: Objection. Vague.
BY MS. GJOVIK:
**Q So, who would be working on activities related to this program for sites in Santa Clara County?**
A So, the due diligence team. And typically, there is one, sometimes there could be more people working on any particular aspect of the program.

MS. PERRY: Did you finish?
THE WITNESS: Uh-huh.
BY MS. GJOVIK:
**Q And do you know who that person was for 825 Stewart Drive?**
A I believe it was Michael Steiger at the time of 2020, and then when he left, Antone Jain may have also been in the same time frame in 2021, maybe.
**Q And then these four surveys, like the one conducted at 825 Stewart Drive, were they conducted at other buildings too?**
A Yes, there are other buildings in the program.
**Q When did the first floor penetration surveys start? When was Apple's -- let me rephrase.**
**When did Apple start this program and start conducting its first floor penetration surveys of Santa Clara County buildings?**
MS. PERRY: Objection. Asked and answered.
MS. GJOVIK: I don't think she did.
THE WITNESS: Sorry. I didn't understand that one.
BY MS. GJOVIK:
**Q So, she -- she will have her objections that she's putting on the record so then we have to fight about it later, she and I, but not you. So then after she says**



**her objections, I still need you to answer unless she specifically tells you not to answer.**
A Okay. Ask the question again, then, please.
**Q Yeah.**
**Around what time did Apple start this vapor intrusion program and conducted -- let me -- around what time did Apple conduct its first floor survey penetration -- sorry.**
**Around what time did Apple conduct its first floor penetration surveys as part of this vapor intrusion program for Santa Clara County facilities?**
MS. PERRY: Objection. Overbroad. Beyond the scope of the noticed deposition topics.
BY MS. GJOVIK:
**Q Please answer.**
A I don't have a specific date in mind, partially because the program has evolved over time. And so I don't want to speak that incorrectly, you know, given the evolution of a maturing program.
**Q Do you know roughly what year?**
A I don't -- I don't want to speak to a specific year.
**Q In 2021, did Apple conduct a floor penetration survey at 3250 Scott Boulevard?**
A I know that there had been one done, and I would



have to check on the specific dates.
**Q Did they find penetrations during that survey at 3250 Scott Boulevard?**
A Yes, I believe there were identifications.
**Q And were repairs made at that facility during that time?**
A I believe so. There were repairs done.
**Q And who was the EHS lead for that survey at 3250 Scott?**
A I'd have to look at the documents again.
**Q And who is the EHS lead for the floor survey at 825 Stewart Drive?**
A I believe it's Antone. But, again, I'd want to be accurate.
**Q Has Apple --**
MS. PERRY: Excuse me. We've been going for about an hour and 15 minutes. I think it's probably a good time for a break.
MS. GJOVIK: Okay. I'd like to take an hour lunch. I need to gather some exhibits too. Do you guys have a preference? We can either start it now or we can take a break and then do lunch at, like, 12:30?
MS. PERRY: Whatever you prefer. You're the witness.
MS. GJOVIK: Why don't we do an hour starting



now. Are you ready to have lunch now?
MS. PERRY: Okay?
THE WITNESS: Yeah.
MS. GJOVIK: And then we can come back at 12:30 and continue.
If that sounds okay, Ms. Court Reporter.
THE COURT REPORTER: Yes, that sounds fine. Thank you.
(Luncheon recess taken at 11:32 a.m.)
(Proceedings resumed at 12:31 p.m.)
BY MS. GJOVIK:
**Q So we're returning from lunch now, and I was going to go back to my questions about Apple's general EHS processes in Santa Clara County on the hazardous waste sites. We kind of had gone back and established some foundational stuff. So, I asked a question of how employees can raise EHS concerns at Apple, and I'd like to hone in on that in a little bit of what's the standard process for Apple employees in Santa Clara County to raise concerns regarding toxic waste cleanup sites and vapor intrusion issues.**
MS. PERRY: Objection. Vague.
BY MS. GJOVIK:
**Q Go ahead, Ms. Schmidt.**
A I don't even understand the question. Sorry.

Page 105

Could you ask a question?
**Q Yeah.**
**What's Apple's standard process for its employees in Santa Clara County to raise concerns about working on toxic waste cleanup sites?**
A It would be the same process as raising any other health and safety concern. You can talk with the EHS lead associated with the building. You could send an anonymous email or noted email to the generic site intake point at the website, EHS. You can speak with a manager who can also bring it to the attention of EH&S or you could use a people hotline to also raise a concern.
**Q What about if an employee thinks they may have been injured at one of these sites due to something like vapor intrusion? What is Apple's process for reporting those kind of injuries?**
A First, the incident needs to be reported either by the individual or by the manager who's aware of the injury.
**Q Report to who?**
A There is an intake process. So there is an incidence form that needs to be completed.
**Q What's the form called?**
A It is -- if you go -- the most re- -- most common way -- I guess there's two common ways to report. One is

Page 106

via an app called "Incidence," which is an internal app, and the other one is through our EHS website. There is a -- at the top, there's always a link that says "Report an incident." So they can do it web-based or via an app.
**Q What if an employee had an experience like an unexplained severe dizzy spell at their office? Is that something that should be reported if they don't have an explanation of why it occurred?**
MS. PERRY: Objection. Vague. Incomplete hypothetical. Calls for speculation.
BY MS. GJOVIK:
**Q Let me -- let me try -- so I had a really bad dizzy spell in 2019 at 825 Stewart Drive, and I didn't know why, but it stopped me in my work, and I told my manager about it. I found it very confusing. If an employee has a severe dizzy spell at work, is that something that's supposed to be recorded in these injury reporting forms?**
A It's possible, a feeling is that it's work related. Dizziness can be sometimes a personal -- you know, not feeling well, not had -- not to drink or eat or something like that. So dizziness is a -- is often -- you know, tends -- you know, kind of up to the person who is experiencing it to report it.
**Q What if an employee on one of these toxic waste**

Page 107

**cleanup sites had a bad dizzy spell and thought it could have been because of chemical exposure, is that something that should be reported?**
A Yes. I think if the person is concerned that an exposure at work is causing a symptom, that should be reported immediately.
**Q And then what would be the process for reporting it?**
A The person -- the same thing. The person can go to the app or they can go to the website and report it.
**Q And then what's the process for investigating?**
A Once the report goes in, it gets assigned to the EHS lead at that site.
**Q Are the HR business partners trained that this is the process?**
A As far as to report an incident?
**Q Uh-huh.**
A I -- yes. I think they are -- they are aware that this is the process.
**Q And so what is Apple's position as to why Helen Polkes, the HR business partner, insisted I file a workers' comp claim but took no action to record my reported injury, that was severe dizzy spell, that attributed to vapor intrusion?**
MS. PERRY: Objection. Lacks foundation.

Page 108

Assumes facts not in evidence.
THE WITNESS: Yeah. I don't -- I don't know how Helen's, you know, decision process. I can't speak to that.
BY MS. GJOVIK:
**Q Did Apple record my report as a reported injury in any of its injury tracking systems?**
A I do believe that there is one from 2019 that was reported years later.
**Q As workers' comp or as a separate injury?**
A As to the incident, it's reported separately, and workers' comp is really a second- -- a secondary parallel process. So not all injuries are resulted into workers' comp. And so -- workers' comp comes into play with an incident, but, you know, it's a secondary review if it's related to, you know, considerations if it's work relatedness.
**Q So if there's a report of the injury I reported, who entered that into the injury tracking system?**
A I'd have to look at it, but it is logged.
**Q Is there a reason Apple has not produced that record in this discovery?**
A I don't know.
**Q I would like that record, and I can talk to Apple's lawyers afterwards about it. And if you do have**

Page 109

**it available, I would like to know when it was entered and by who, if you have time later.**

MS. PERRY: Ashley, the discovery process, as you know, has been closed and the process to raise disputes has also closed.

MS. GJOVIK: Apple has been systematically concealing its refusal to produce documents, witnesses, and information, and the Court has been compelling Apple to do so even after close of discovery because Apple should not -- we'll just leave it there. I'll talk to them afterwards. I would like to continue my --

MS. PERRY: Well, hold on, because if you're going to make statements on the record like that that are untrue and inflammatory, then I'm going to have to respond to them.

Your statements are untrue, they're inflammatory, they're argumentative, and they're inappropriate for this deposition.

MS. GJOVIK: Okay. Counsel, we've identified what appears to be a material document recorded by Apple related to me reporting injuries due to chemical exposure at my office, which is material, one of fundamental complaints in this litigation, and Apple apparently has not produced that document or noted it in the privilege log, and its only excuse right now as to why it's not is

Page 110

it's past the close of discovery. And so I want that -- I was concerned and alarmed by that. And we can talk afterwards about that document. I would like a copy of it still, and it seems material to this matter.

MS. PERRY: This is literally the first time you've ever raised this, Ashley. So --

MS. GJOVIK: I didn't know it existed, Counselor, because it was never disclosed to me until this deposition, which Apple also refused to sit for and had to be compelled by the Court to even be here. So this is what we're discovering now, information that was not previously produced to me, which is, again, why I'm saying we can follow up after and discuss more, because I would like to use this time to ask more questions.

MS. PERRY: You're also misrepresenting the record and misrepresenting the witness' testimony.

MS. GJOVIK: Did Apple produce to me this injury report that was recorded that she just mentioned?

MS. PERRY: She did not mention that there's an injury report that has been recorded.

THE WITNESS: If that's the process, that's what would be the process.

BY MS. GJOVIK:

**Q I thought you said that you believed there was one for me that you said from 2019 but was recorded a**

Page 111

**couple years later.**

MS. PERRY: That's not what she said. You're misrepresenting the testimony.

MS. GJOVIK: Can she please restate then and clarify what her statement was?

THE WITNESS: If you were to -- if there was an incident that was reported or recorded, that that would be in our tool, but -- if there was a claim from several years ago.

BY MS. GJOVIK:

**Q And I thought you said that you believed you had a copy of it. You could look at it to figure out who recorded it. And so that's why I thought that there was a record.**

MS. PERRY: No. That's not what she said. You're misrepresenting the testimony.

BY MS. GJOVIK:

**Q So, is there a record in the injury reporting system of a report based on my complaint that I thought that I had a dizzy spell due to chemical exposure at my office in 2019?**

MS. PERRY: Assumes facts not in evidence. Lacks foundation.

MS. GJOVIK: It's a deposition question. I would like an answer.

Page 112

MS. PERRY: You have -- you're assuming facts and you are stating things on the record as though they are facts, which are simply not true and have not the been established.

BY MS. GJOVIK:

**Q I'm asking: Is there any entry in Apple's injury tracking system regarding the complaint I made about a dizzy spell in 2019 at my office at the 825 Stewart Drive?**

A I have not read one.

**Q Okay. Thank you.**

**I did complain about that dizzy spell to EHS and employee relations. Did Apple investigate my complaint?**

A Can you explain --

MS. PERRY: Hold on. Before you get there, let me object on the grounds that it lacks foundation and assumes facts not in evidence.

MS. GJOVIK: Okay. Well, let's -- let's wait until I get to the emails. We'll review the emails that Apple produced that covers all this stuff. And then once it's in front of us, we can discuss.

BY MS. GJOVIK:

**Q Is there a standard way that EHS will communicate findings back to an employee who raises a concern?**

A It's not always a standard format. It really depends on the concern the person has and their comfort

with the, you know, facts that are provided. So it can take a number of different ways of communication that would be appropriate to this specific case.

**Q Does EHS keep records of employee complaints?**

MS. PERRY: Objection. Vague.

BY MS. GJOVIK:

**Q Does Apple EHS keep a record of complaints filed by Apple employees regarding EHS concerns at Apple facilities?**

A There is a proper way of submitting a concern. You can report a concern through the app and through the tool, and those are tracked. But sometimes employees raise, you know, questions, have questions around curiosity, and those can be a conversation. And not every time a person has a conversation around risks and controls is it systematically captured.

**Q Were my concerns about my office tracked in any kind of EHS tracking system?**

A Not to my knowledge. I haven't seen, like, a specific tracker of your --

**Q And then --**

A I've seen emails back and forth.

**Q Did EHS investigate my concerns and find them -- like, closed out the investigation at some point to my concerns?**



A Really, my recollection of the conversation was really around you having a lot of curiosity about the con- -- this site, about its history, understanding the due diligence process and all that. So, really, when I read those communications, it's really, you know, about answering questions, you know, so that you have a better understanding and a better sense of safety at the site. And so -- that's a lot of conversation and email exchanges that I've read through.

**Q Ms. Schmidt, did you review the issue confirmation I drafted and sent to Apple on August 2021?**

A I may have. I've read a lot of documents. Do you want me -- to show me which one specifically? Was it issue --

**Q That was the, like, final statement of all my complaints and concerns that Apple said they were investigating, and it was indicated to me that Apple EHS was investigating all of my EHS concerns that were noted in that document and filed in the business conduct ticket.**

**And so what did Apple EHS do to investigate those concerns that I raised and documented in that issue confirmation?**

MS. PERRY: Objection. Lacks foundation. Also to the extent it misstates testimony and misstates the record and assumes facts not in evidence.



MS. GJOVIK: Let's do this. We'll do -- we'll call this Exhibit A. And this is the same issue confirmation that I used in the employee relations deposition.

(Discussion held.)

So for Exhibit A for this deposition, I'm opening the issue confirmation, and this is the same one that was used in Mr. Okpo's deposition which Mr. Okpo authenticated.

(Exhibit A was marked and identified.)

BY MS. GJOVIK:

**Q So, Ms. Schmidt, this was the issue confirmation I sent to employee relations, and they said they're investigating my concerns. And it had a section on Apple EHS specifically, and I had complaints about environmental health and safety. Some of them are listed as unsafe work conditions, toxic tort, occupational exposure, violation of OSHA laws and right to know. I'm on page 2 reading that. Failure to report workplace injuries, failure to seek medical attention for life-threatening injury, and then retaliation for whistleblowing and protection activities. And then I noted a chemical exposure workers' compensation claim that I filed on April 2021. And then I also had filed two more for other injuries I reported that I was concerned did not seem to have been recorded. And**



**then I talked about some of the EHS stuff and the protected activity.**

**If we go to -- if we go here, starting on page 29, there's a section on Apple real estate, environmental health and safety where I made a bunch of complaints and concerns and had asked to have this stuff investigated.**

**Do you know who at Apple, if anyone, investigated my complaints regarding environmental health and safety as documented in this issue confirmation?**

MS. PERRY: Objection to the extent it lacks foundation.

BY MS. GJOVIK:

**Q Please, go ahead.**

A A number of these topics I've seen in multiple emails back and forth between you and Michael Steiger and Antone. So, those individuals, along with, I think, Austin DeBaene were working on, you know, clarifying and responding to some of these items that are listed here.

**Q Sorry. Who's the third person you mentioned?**

A Austin DeBaene, the site lead.

**Q Okay.**

**And then were they planning on giving me an update if I had not been fired?**

MS. PERRY: Objection to the extent it lacks

foundation and calls for speculation.
BY MS. GJOVIK:
**Q How about this: If they -- if those three were investigating my EHS complaints, do you know -- were they investigating the complaints documented in this issue confirmation or just the emails?**
MS. PERRY: Objection to the extent it lacks foundation.
MS. GJOVIK: She's probably going to object to that based on the answer, if she's done objecting. I'm sorry if that's confusing.
MS. PERRY: If you understand the question.
THE WITNESS: Ask the question one more time, please.
BY MS. GJOVIK:
**Q Ms. Schmidt, if you don't know, please just --**
A Just ask the question one more time, please.
**Q Yeah.**
**You mentioned three people you said were investigating my EHS concerns, and you mentioned there were emails about it. Were any of those three people investigating the complaints and concerns I documented as written in this issue confirmation?**
MS. PERRY: Objection. Vague.
///


BY MS. GJOVIK:
**Q How about this: Ms. Schmidt, were any of the three people you just mentioned, you said around the state of my complaints, did they -- were they given a copy of this issue confirmation?**
MS. PERRY: I'm going to object to the extent that that calls for privileged information. As you know, the --
MS. GJOVIK: Can you speak up, please.
MS. PERRY: I'm going to object to the extent that calls for privileged information. As you know, the investigation into this issue confirmation was done at the direction of counsel.
MS. GJOVIK: She's not -- you're not going to let her answer at all?
MS. PERRY: On that question. I'm going to take it question by question. On the question of what specifically was provided to specific individuals or was this issue confirmation provided to specific individuals, I'm asserting that privilege objection.
(Whereupon the witness was instructed not to answer.)
BY MS. GJOVIK:
**Q Okay.**
**As of August 2021, Ms. Schmidt, was anyone at**


**Apple investigating my EHS concerns?**
A There were a number of people and we have lots of emails that they are working to address questions and concerns by you during this time.
**Q And what were they doing to address my questions and concerns?**
A Collecting facts, providing you with an explanation, having meetings with you to clarify some of the aspects that, you know, needed to be grounded in more factual evidence. From the emails that I've read, that there were multiple meetings with you, with Michael and Antone, really going over these types of things that are listed here and trying to give you, you know, correct and factual information.
**Q Ms. Schmidt, I asked regarding August 2021, and I had no meetings with EHS during that time. And for the majority of that month, I was on administrative leave. So if I --**
A Oh. Well --
**Q -- (crosstalk) email --**
A No. Maybe that happened before. I just know in that time period, in 2021, that you were -- that -- maybe August. I didn't realize that that may be off. So I apologize. Maybe those meetings happened earlier in the year.


**Q Ms. Schmidt, what were the dates of the meetings that EHS had with me that you're referring to?**
A It looks like in April there was one, in May, also in July. So several meetings.
**Q Can you give the exact dates, please, for the record?**
A Sure. April 2nd, a second meeting, May 17th, and another one, July 7th.
**Q And so, then, as of August '21, was anyone doing anything to investigate my complaints and concerns about EHS in my office?**
A Yes. It was kind of back and forth on the emails. If there were any outstanding items that had yet to be resolved at that time, the team would have continued to look into them.
**Q Was anyone preparing a response to send me on outcomes?**
A I really can't speak to the specifics, because I don't have an email saying that, but based off the cadence that was previously established, you had questions, there were provided answers. So I assume that cadence would continue.
**Q And what was the outcome of the investigation into my concerns?**
A The outcome is -- you know, from our perspective

is that there is no environment risk here based off of, you know, the claims that there were concerns about vapor intrusion into the space; that we have done sampling; and that we have continued a best practice program and that the exposure risk is not there; and that we have the detailed evidence to show you that there are systems in place -- physical systems in place, protocols and procedures in place and a management plan that's very protective of the environment.

**Q Thank you.**

**Are those documents that Apple would be willing to produce to me in this litigation?**

MS. PERRY: They have been produced, Ashley.

BY MS. GJOVIK:

**Q Which documents are you referring to, Ms. Schmidt?**

A Of the emails back and forth or we're talking about, "Here's the" -- you know, "Here's what we've been doing. Here's a vapor intrusion," you know, plan. We're doing a three-step plan. Here's the" -- you know, "the information that" -- I don't know if we gave them to you or what you had about the site's passive system. Those types of things were all discussed.

**Q So when you're referring to providing the information plans, you're referring to what was already**



**shared with me via the emails.**

**Is that correct?**

A Email or via conversations and meetings, I think, as well.

**Q Was there anything else that was to be shared with me had I not been fired?**

MS. PERRY: Objection. Calls for speculation.

BY MS. GJOVIK:

**Q Assumably, if EHS was still investigating my concerns and was preparing any other updates for me, did not give them to me assumably because I was fired, then if I was not fired, they would have shared those updates with me. So was EHS preparing any further updates for me as of August 2021?**

MS. PERRY: Objection. Vague. Ambiguous. Lacks foundation. Calls for speculation.

As you know, the work was ongoing in August, Ashley. So -- and then you were fired. She can't speculate as to what may or may not have happened if you weren't fired.

MS. GJOVIK: Assumably, if they were investigating and there was any updates that were -- doesn't -- that they planned to share with me and knew that, they can say, "Yes, there were." And if there was nothing that they were preparing to share with me, then



say, "No, there's nothing else that we're planning on sharing." That's my question.

BY MS. GJOVIK:

**Q So, as of -- as of, let's say, September 9, 2021, the day I was fired, was there anything EHS was planning to update me about or share with me that they had not shared with me yet?**

A I don't -- like, I don't know the specifics. If there were things that needed to be shared and they -- you know, and it was appropriate to share, we would have shared them.

**Q And then --**

A I don't have a specific list of things that didn't get shared.

**Q And then regarding my concerns and complaints about penetrations and cracks on the floor, the slab of 825 Stewart Drive, what was the outcome of Apple's investigation into my concerns?**

A We continued the program as normal. It could be -- we kept our normal routine. We continued to sample, got results. So I think that happened later, after those dates, and then, yeah, we followed up.

**Q So, regarding my concern that employees were not being told that they're working on a federally overseen Superfund site, what was the outcome of that**



**investigation?**

A There's not a legal requirement to do that.

**Q Okay.**

**And then regarding my concern about potential chemical exposure from the chemicals in that cleanup site to employees and that employees have a right to know, I said, what was the outcome of that investigation?**

A There's not a legal requirement. And I think you have to be really thoughtful here and not -- we have data to show that there's no risk. So I think it is, you know, very much within the rights not to communicate risks that are mitigated in law, and there's no requirement -- there is no legal requirement for us to have -- to do that level of communication for that -- you know, at those levels.

**Q So Apple believes that -- when it says "no legal requirement," it's including both state and federal HAZWOPER to say that it believes there's no legal requirement under HAZWOPER.**

**Is that correct?**

MS. PERRY: Objection to the extent it calls for a legal conclusion.

MS. GJOVIK: She just -- she opened the door by stating no legal obligation.

MS. PERRY: It doesn't matter. I can still make an objection that it calls for a legal conclusion.

Page 125

BY MS. GJOVIK:
**Q Please go ahead.**
A Say what -- say the question again.
**Q Yeah.**
**So, if Apple says it believes there's no legal obligation to notify employees who are working on these toxic waste cleanup sites, I just want to confirm that Apple believes there's no legal obligation under HAZWOPER as enacted in state and federal statutes to notify employees.**
A That notification -- if there is an elevated risk, right, there's not a requirement if the concentrations of the hazard are below limits. So it's not -- it's not applicable.
**Q Let me clarify. I'm not just talking about the potential chemical exposure, but also the mitigation systems and the other aspects of hazardous waste cleanup site risks documented in those statutes.**
MS. PERRY: Objection. Vague. Ambiguous. Lacks foundation. Calls for speculation. Calls for a legal conclusion.
BY MS. GJOVIK:
**Q Go ahead.**
A Yeah. I don't -- I'm not going to speculate.
**Q Does Apple have any EHS plans specific to**

Page 126

**HAZWOPER?**
A For this specific site?
**Q For Santa Clara County.**
A Yes. We do comply with that -- those aspects as well.
**Q Is there a -- like an EHS plan or policy specific to HAZWOPER that Apple has?**
A Where it is -- yeah. Where it's legally required.
**Q Is there one for 825 Stewart?**
A I'm not aware of one there.
**Q And then when was Apple notified that the city of Sunnyvale wanted to conduct a hazardous waste inspection at my office in 2021?**
A I don't -- I don't remember that, but sometimes they will come through, you know, as a routine inspection.
**Q And when Apple was notified that the EPA wanted to inspect my office at 825 Stewart Drive, what was Apple's response to the EPA?**
MS. PERRY: Objection. Lacks foundation.
BY MS. GJOVIK:
**Q Go ahead.**
A Can you tell me the time frame around that?
**Q You weren't sure when the EPA notified Apple but said -- I believe you indicated that EPA notified Apple**

Page 127

**that they wanted to conduct an inspection. The inspection -- oh. Did you -- it was August 19th. Were you able to confirm the inspection was August 19th?**
MS. PERRY: Objection to the extent that it misstates testimony and lacks foundation and assumes facts not in evidence.
The witness did not testify the EPA notified Apple. The witness testified they learned about that from the responsible party.
MS. GJOVIK: I'm not sure what they testified prior, but whatever it is was reflected.
BY MS. GJOVIK:
**Q So let me -- let me -- Ms. Schmidt, what was the date of the EPA inspection of 825 Stewart Drive in 2021?**
A I believe it's August 19th.
**Q And when was Apple notified of that inspection?**
A I know that there was a conversation where the EPA reached out to Apple earlier in the year, but I don't know the exact date where they set up this visit. But there was an earlier conversation in April.
**Q And then between the time that Apple was notified of an inspection and the inspection occurring, what kind of EHS activities occurred at 825 Stewart Drive?**
MS. PERRY: Objection. Vague.
THE WITNESS: There's likely a number of

Page 128

activities. I think the first conversation was that EPA was -- you know, had some -- had you reach out when there were some concerns, and they wanted to make sure we were also at the table and that we were supporting and answering any questions and concerns with them, and that, you know, there was -- you know, the three of us were all working together to address any questions that you had. And so -- I mean, we would continue regular business work in the interim. So if you're implying that we did something because the EPA reached out to us, that's false. We continued to do our normal work.
BY MS. GJOVIK:
**Q (Unintelligible) ask question.**
**What was the date that Apple started the floor sealing activities at 825 Stewart Drive?**
A Let's see. There was a walk-through on August 11th. Oh. I guess there was also stuff in May, that the survey started in May.
**Q And when did Apple start sealing the cracks?**
A Apple started doing floor sealing assessments, it looks like, August 11th.
**Q And when did Apple complete those sealing assessments or complete the floor sealing?**
A It looks like sealing continued through the 21st of August.

**Q 21st of August. Okay.**
**And then what was Apple's understanding of the reason for the EPA's inspection?**
A That they are to be following up with Northrop Grumman's work and the conditions of the site and the responsibilities that Northrop Grumman has for the site.
**Q And what specifically did the EPA ask to inspect?**
A There was a number of points around the facility that they looked for.
**Q What were they?**
A I guess -- I can't speak to all of them, but they were looking for locations where there might -- I think had been drains or previous drains, placements of the pipes for the passive systems, those type of things.
**Q Did they ask to see any penetrations in the slab?**
A It is possible that they did. I just don't remember exactly which ones.
**Q Did they ask to see the vents on the roof from the sub-slab depressurization system?**
A It is possible that they did. Like, that's my understanding of that kind of -- it's between Northrop Grumman and them. They're doing an investigation for their work.
**Q Did they ask to inspect Apple's HVAC system?**
A I don't know that.



**Q And what, if any, corrective actions came out of the inspection?**
A The corrective actions were from Northrop Grumman and the EPA. None of them were from Apple.
**Q What were they about?**
A I don't remember all of them.
**Q Were there any about the sub-slab vent exhaust on the roof?**
A You've mentioned that before. And so it's likely that they do, but I don't know the specifics of what the -- the specifics were around that.
**Q Were there any about the HVAC?**
A I know that we didn't have to -- like, from Apple's side, like, we were not -- we were not responsible for any changes.
**Q Okay.**
**And then when did Apple become aware that the EPA inspection was attributed by my complaint to the EPA?**
MS. PERRY: Objection to the extent it lacks foundation. Assumes facts.
MS. GJOVIK: Can you speak up? I don't know if the court reporter is hearing you when you're --
MS. PERRY: I said objection. Lacks foundation. Assumes facts not in evidence.
///



BY MS. GJOVIK:
**Q Go ahead, please.**
MS. PERRY: Ms. Court Reporter, are you having trouble hearing?
THE COURT REPORTER: I'm hearing you. If I don't hear you, I'll speak up.
MS. GJOVIK: Okay. I was having trouble hearing her, but if you're hearing her okay, that's fine.
BY MS. GJOVIK:
**Q Go ahead, Ms. Schmidt. Sorry about that.**
A Ask the question again.
**Q What was my question? When did Apple become aware that the EPA inspection occurred because of my disclosures made to EPA about the penetrations on the floor?**
MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.
THE WITNESS: Yeah. I'm -- it feels like two separate things. There was a conversation in April about you having concerns. Right. And I don't know what -- you know, what -- I can't even speculate when and why EPA and Northrop Grumman decided to come out. So I don't want to say it's because of your complaints. They could have been doing totally routine inspections. And so I honestly don't -- I don't have any place to be able to recall that



or confirm that for you.
BY MS. GJOVIK:
**Q Ms. Schmidt, for your preparation for today, did you review the emails between me and Mr. Okpo and Lagares from the employee relations team why I forwarded my communications with the EPA to them through the end of July 2021?**
A I did see a number of emails between you and the EPA.
MS. GJOVIK: So, I'm going to share -- call this Exhibit B.
(Exhibit B was marked and identified.)
BY MS. GJOVIK:
**Q Ms. Schmidt, this is Exhibit B for this deposition. This is plaintiff's production 11, Bates 7300. This is an email I forwarded. This one is a coworker at my office, and then I previously forwarded it to Mr. Okpo and Mr. Lagares and said, "Hello. FYI, update on the EPA, EH&S, and Stewart 1 situation. The federal EPA said they're meeting with the site team this week. I assume they mean EH&S. Even though you all said you weren't looking into this, I'll add this to the 'workplace safety concerns' folder." And then it's forwarding an email chain with Ms. Margot Perez Sullivan at the EPA in July 2021. That email I sent to Mr. Okpo was sent on**

**July 27, 2021, which is around the time that the EPA had notified Northrop Grumman that there would be an inspection.**

**So, did Apple assume that this email is connected to that request for the inspection?**

MS. PERRY: Objection. Vague.

THE WITNESS: Yeah. I don't know or I can't comment on how the EPA -- what their decisions are. It looks like they're communicating to you.

BY MS. GJOVIK:

**Q So if within just a period of a couple of days I forwarded an email from the EPA with them saying they're meeting with the site team next week regarding the reporter I'm working with, they're the right person, Ms. Margot is, to work with, will be in touch, and I forward that to Apple employee relations and say, "EPA says they're meeting with the site team this week. I assume they mean EH&S" and within that same couple period of days, EHS would have been noticed that the EPA is requesting an inspection of the site, did Apple assume that those two things were related?**

MS. PERRY: Objection. Calls for speculation. Lacks foundation. Assumes facts not in evidence.

MS. GJOVIK: Okay. But the witness for Apple now has -- was indicating that I was making -- I had concerns



back in April and was making it sound like there wasn't any ongoing requests or updates or -- making it sound very disconnected, and here we have just a few days before I alleged I was put on leave by Apple and was never able to return to work, I was fired, that I notified them the EPA said they were going to talk to the site team about the site and at the same time, EPA requested an inspection of that site of my office. It seems like Apple probably put it together, that the EPA was acting based on my disclosures.

MS. PERRY: Is there --

BY MS. GJOVIK:

**Q Did Apple ever inquire why an inspection was -- here's my question: Did Apple ever inquire to Northrop Grumman or EPA why an inspection was requested?**

A Not to my knowledge. They, you know -- requests for inspection, come at, you know, a cadence in which they need to do their work. And so it is -- you know, we don't question. If they need to come in, it's in their rights to come in, and so we're supporting access.

**Q How often does the federal EPA request to inspect Apple's offices in Santa Clara County?**

A Not by Apple very often, but where you have a site like this where there is, you know, remediation and there's work going on between the responsible party,



depending on what their agreement is and the cadence of that particular case, that can happen.

**Q Did Northrop Grumman indicate to Apple why the inspection was occurring?**

A Not to my knowledge. Just that there was going to be, but not a -- because of a specific person.

MS. GJOVIK: I'm going to share -- one second.

This is Exhibit C. This is Exhibit C for this deposition. This is plaintiff's production 11, No. 3187.

(Exhibit C was marked and identified.)

BY MS. GJOVIK:

**Q Can you see that okay, Ms. Schmidt?**

A Barely, but yeah.

**Q Is that better?**

**So this is -- this one is an email from Debra Rubenstein to Rebecca Reynolds at the EPA.**

**Who is Debra Rubenstein?**

A She was a lawyer here at the time.

**Q And what was her role?**

A She supported EH&S.

**Q And then plaintiff's production 3188 is a letter from Apple to Ms. Reynolds regarding a CBI, confidential business information, claim. I'll go back to that for more detail. So, it's two pages, signed by Debra Rubenstein. And plaintiff's production 113190 through**



**-3193 is a draft NDA that Apple wrote and asked the EPA to sign.**

**So, I'd like to ask you some questions about Apple's request for confidentiality regarding EHS matters, and the first is: Why did Apple ask EPA to sign an NDA in response to EPA's request to inspect 825 Stewart Drive?**

A As you mentioned before, the space does have some areas where we have more secret lockdown for product security. And so it is not uncommon for us to ask for an NDA for individuals who are accessing sites where there may be undisclosed products in those spaces.

**Q This seems that it has terms that the EPA was not allowed to make any public statements regarding the inspection.**

**Is that typical for -- to ask of a government agency?**

MS. PERRY: Objection to the extent it is far beyond the scope of this deposition topic. It calls for a legal conclusion and an interpretation of legal documents.

BY MS. GJOVIK:

**Q Go ahead.**

A Making public statements about our products that have not been released I think is probably a common aspect of an NDA.

**Q So, this confidentiality agreement says:**

Page 137

"'Confidential information' means any nonpublic information, or material, which may include" and it lists some stuff.
A Uh-huh.
Q So, nonpublic. So is it Apple's position that the nonpublic wouldn't apply to -- if they found, like, environmental issues or safety issues even if they weren't nonpublic that would not restrict the EPA from making public statements about what they find?
MS. PERRY: Objection. Vague. Ambiguous. Also to the extent it calls for a legal conclusion and is asking this witness to interpret the form and a fact of a legal document. Beyond the scope of the noticed deposition topic.
MS. GJOVIK: I allege that unlawful work rules are censoring me about my EHS complaints and that I was fired for disclosing my concerns. So if Apple was planning to act -- use similar restraints on the EPA, that is very relevant to this matter.
BY MS. GJOVIK:
Q So I ask again, Ms. Schmidt, if Apple would consider potential environmental or safety issues that the EPA would find to fall under this nonpublic information confidentiality term.
MS. PERRY: Same objections.

Page 138

BY MS. GJOVIK:
Q Please, go ahead.
A I don't believe that that was the intent. I think that was very much on product.
Q And then here is that email from Ms. Rubenstein from August 11, and she wrote to the EPA saying: "In follow up to our conversation, I enclose a letter on behalf of Apple Inc. claiming CBI related to any information collected and/or documented during the EPA's site visit on August 19, 2021."
Ms. Schmidt, what does "any information" mean in that context? Would that include health and safety issues?
MS. PERRY: Objection. Vague and ambiguous. I'm also going to object to the extent that you're asking a witness to interpret the communication from one of Apple's lawyers, and this is far beyond the scope of the noticed deposition topic.
MS. GJOVIK: The witness is representing Apple Inc. This goes directly to the heart of the litigation. I'd like her to answer, please.
MS. PERRY: Same objections.
BY MS. GJOVIK:
Q Please, go ahead, Ms. Schmidt.
A Please ask the question again.

Page 139

Q Yeah.
In this email from Ms. Rubenstein where she is claiming CB- -- actually, let's -- let's step back.
What does "CBI" mean in relation to government agencies and EHS-related inspections or employees?
A I don't know what her expectation is in using that term.
Q Does CBI generally stand for confidential business information?
A Typically, yes.
Q And what is --
A It is around products and unreleased product.
Q Okay.
And then if she says she's claiming CBI, what does that generally imply?
MS. PERRY: Again, objection to the extent you're asking this witness to interpret a legal communication written by a lawyer, she's not a party to, and it's far beyond the scope of this noticed deposition topic.
MS. GJOVIK: It's not. This is also in the complaint, and this witness is Apple Inc., and Apple has a lot of lawyers. So I think she can answer.
BY MS. GJOVIK:
Q Please, go ahead, Ms. Schmidt.
MS. PERRY: Ashley, as you well know, that is not

Page 140

standard. The standard for a 30(b)(6) deposition is that you notice specific topics that you want to question the witness about. The witness prepares and comes prepared to answer with respect to those topics. Repeating that something is relevant to you or is part of your case or is in your complaint is not the basis to ask this corporate witness certain questions, particularly questions about the interpretation of a document written by Apple's lawyers that this witness is not copied on, is not a party to and would not be able to interpret in any respect. But to demand that the witness do so on behalf of Apple itself is particularly egregious.
MS. GJOVIK: Ms. Perry, I'm going to ask you again to stop with the speaking objections. I will say I did engage with you and argued with you on this, which I guess that was my fault, because if you just keep to the standard form of objections, it will help us move along more quickly. And I remind everyone, this is a deposition of Apple Inc. under Rule 30(b)(6). So all answers coming from Apple's witness are supposed to be on behalf of Apple. Counsel has lodged her objections.
BY MS. GJOVIK:
Q So I'd like to ask again of Ms. Schmidt, if Apple here, via Debra Rubenstein, was claiming CBI related to information that could indicate potential health and

Page 141

**safety issues in this email.**

A I don't have any reason to believe that.

**Q Okay. Thank you.**

**And then in this email and the letter she attached -- this is plaintiff's production 113188 through -89, a letter sent August 11, 2021, produced to me by the EPA through FOIA request, Apple writes to the EPA saying that they want to request that any information relating to Apple operations at the site, including but not limited to hardware, process or other sensitive information viewed or documented by EPA during its upcoming site visit be maintained as CBI, confidential business information, and noted that the EPA wanted to view -- and this is Apple's bullet list -- the sub lab depressurization system, the building's concrete slab and cracks that were sealed to prevent vapor intrusion penetrations as well as any building concrete slab penetrations, e.g., from pipes or seams in the building. EPA also asked to see the spaces between the walls of the three sections of the building that were sealed in 2014 to '15; past indoor air sampling locations; the location where contaminated soil was excavated from underneath the building; the location of groundwater monitoring wells; and the location of the previous bioremediation system and injection locations. And note that some of these areas are located inside the**

Page 142

**site building, which is made up of several highly confidential laboratories. As such, EPA may see or be interested in documenting or photographing certain operations or areas which Apple says may contain trade secret, proprietary or company confidential information. It says: "Therefore, all information collected and documentation created during or relating to the site visit, including field notes and photographs, are being claimed by Apple as CBI and EPA should treat the information as such under the CBI regulation."**

**Ms. Schmidt, does this communication from Apple reflect that Apple was claiming that any information, including EPA's notes or photographs, regarding things like the sub-slab depressurization system was confidential?**

A No, I don't think that's the case. I think it's very much about you're going into a space where there is prereleased materials, and if you wanted to take a picture of it, you know -- and if that prereleased material is in context of your picture, then that would -- that is the area of concern.

**Q Then why did Apple say "Therefore, all information collected and documented"?**

A Because I think they are trying to be very protective of the product and new product releases.

Page 143

**Q Did Apple ever notify the employees working in 825 Stewart Drive that there was an EPA inspection on August 19, 2021?**

A I don't remember exactly if there was an employee con- -- email that goes out, but -- to all employees of where we're going to have people coming into spaces that are locked down. Those individuals are communicated with so they understand who's coming in and why and we can cover that product so that it's, you know -- you know, just a little easier for people to be able to navigate and not see unreleased product.

**Q Were those people told it was the US EPA conducting an inspection?**

A To be honest, I don't know how it was phrased.

**Q Did Apple -- sorry. Go ahead.**

A I don't know exactly how it was phrased to the team.

**Q Did Apple ever tell me that there was a US EPA inspection of my office prior to terminating me?**

A I've not seen anything specific.

MS. GJOVIK: Would we like to take maybe another five-minute?

MS. PERRY: Sure.

MS. GJOVIK: Back in five minutes. Go off the record now.

Page 144

(Recess taken.)

MS. GJOVIK: So now I'd like to share Exhibit D. Exhibit D, this is plaintiff's -- this is an email produced by the US EPA. This is already produced to Apple, but if it's not, I'll make sure I do it after this. This is an email from the EPA to Apple for a substantiation of CBI addressed to Debra Rubenstein and -- regarding that request to have all or part of the information from the inspection considered CBI, and that the EPA office and regional counsel made in advance determination and said that if Apple feels some or all of the information is entitled to confidential treatment, Apple must make the showings. The EPA listed specific references and denied Apple's blanket claim to confidentiality.

(Exhibit D was marked and identified.)

BY MS. GJOVIK:

**Q Are you aware of this letter?**

A I hadn't seen it but was aware that the -- that there was a -- you know, a common agreement between the EPA and Apple and that the NDA was not signed and that they came to an agreeable conclusion that's protective of the product.

**Q So, we'll get to the denial of the NDA later -- next. I have another document on that. But this is**

Apple's blanket CBI claim on top of the NDA, and this is EPA reminding Apple that Apple bears the burden of substantiating their confidentiality and trade secret claim and generalized or conclusionary statements will be given little or no weight and requested further action.
Did Apple submit a follow-up CBI claim or information from that site visit?
A I'm not aware.
Q And is there -- why has -- why has Apple not produced any records regarding that inspection in this litigation?
A Because it's not -- like, they're not -- my understanding is that EPA is not there to inspect Apple. Like, it is with Northrop Grumman and the EPA. This is really why they're in the space that we occupy to protect the product.
MS. GJOVIK: And then here's Exhibit E.
(Exhibit E was marked and identified.)
BY MS. GJOVIK:
Q So, Exhibit E is an email produced by EPA through FOIA dated August 10th with the EPA writing they spoke with the attorney for Apple, and EPA is not going to be signing the NDA, and that Apple is going to send a letter to her saying that everything they create during the site walk is being claimed by Apple CBI. And said that after



this, give them instructions. And this email chain also shows an email from Kurt Batsel.
Do you know who Kurt Batsel is?
A No. I don't recognize the name.
Q Contractor for Northrop Grumman?
A I don't know.
Q He was -- I believe he was the lead for the site for Northrop Grumman contractors. He wrote on August 9th to the EPA that he spoke with Apple last week. He says, "I spoke to Apple last week."
So, did Apple speak with Mr. Batsel?
A I don't know who exactly he spoke to, but it appears in your email that that is what he said.
Q He says, "I spoke with Apple last week and they are very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work," and he forwarded Apple to the areas where they may want to go, some maps, and said Apple also told him, Kurt, that they would expect all visitors to sign a nondisclosure agreement, that they would forward the agreement directly to you and Matt Plate, is with the EPA first email -- via email for signature. Not sure what EPA's position is. And then in this chain, Kurt was telling EPA on July 30th that the GI Partners, who I believe you indicated was the owner at



that time.
Is that correct, GI Partners?
A Yes. Is that the name, GI Partners? Oh, yeah. GI Partners in '21. '21, yeah.
Q He indicated they did not indicate any plans to attend. And July 30th, he indicated from Northrop Grumman, there'd be this Michael Shannon, Holly Holbrook from AECOM, himself, who's -- he indicated he's Northrop Grumman's project manager. And this is July 30th. He's saying, "I am expecting we will also have an escort from Apple, but I have not yet been able to confirm who that will be. I'll let you know as soon as I hear back from Apple."
So, Ms. Schmidt, is it safe to say that Apple was aware of the request for an inspection by EPA by at least July 30th, 2021?
A Yes, it seems to be the case.
Q And then on July 28th, Mr. Batsel wrote to Mr. Schulman that they're available on the 19th of August and waiting for confirmation from GI Partners and Apple but would not expect any issues. And this looks like it was the request from EPA on July 26th, 2021, from Mr. Michael Schulman to Mr. Batsel saying, "EPA requests a site walk and inspection visit of the TRW Microwave site 825 Stewart Drive building. Can you arrange access?" And



it looks like similar to the same list that was in the CBI email of the stuff that they wanted to look at and asked to get back that week to schedule it.
So, would be it safe to say that Apple was notified of their request for the EPA inspection at some point between July 26th and July 30th?
A I mean, I don't see Apple in any of these emails. I guess I'm not exactly sure. Although, these are back and forth between two parties, I don't see where Apple's, you know, communication is.
Q So, I had asked you earlier when Apple was notified, and I don't think you had a date. If you were able to find a date of when Apple was first notified, I would prefer to hear from Apple directly.
A Yeah. I don't -- I just have the date that they visited.
Q So, I'm just trying to let -- you know, reverse engineer the timeline.
A Yeah.
Q We don't have a direct email on it, so I'm sorry that's kind of a weird way to go about it, but -- unless you have a conclusive evidence on your side.
A Yeah. I don't have anything.
Q Okay.
So based on this, do you think it's safe to

Page 149

**assume that Apple was notified somewhere between July 26th and July 30th, then?**

MS. PERRY: Objection. Calls for speculation.

MS. GJOVIK: Okay. If we don't -- if we don't do it that way, we're going to say Apple does not know when it was notified.

MS. PERRY: Well, I think what she told you is -- you showed her a document that Apple is not copied on. I don't know if there's another document that we have in this case that may give the answer to that question, but based on what you just asked her and shown her a document, she's telling you she can't answer it based on that document.

MS. GJOVIK: I had requested documents related to this exact topic, and Apple would not produce them. And then I asked her directly if she knows when Apple was notified, and she seems to indicate that she does not know when Apple was first notified. And so if we don't want to work off those documents where Apple is not a party, then we'll just revert to Apple doesn't know when it was notified.

MS. PERRY: Well, Ashley, we did produce documents to you on this topic.

MS. GJOVIK: Of when Apple was first notified of the EPA inspection?

Page 150

MS. PERRY: We produced documents to you between Apple and Northrop Grumman. I suggested --

MS. GJOVIK: And those -- do those documents indicate when Apple was first notified of the inspection?

MS. PERRY: I believe that if you want to look at those documents, you may be able to discern that information.

MS. GJOVIK: Okay. We can put that on the list.

And then this one is going to be Exhibit F. This is Exhibit F. This is plaintiff's production 6, No. 4294.

(Exhibit F was marked and identified.)

BY MS. GJOVIK:

**Q Sorry, Ms. Schmidt. Lawyering is apparently a lot of screen sharing of documents. Okay.**

**So this was -- this was a document produced by the EPA to me through FOIA request. That's the EDE number at the bottom, and then this is my Bates number, that I produced it to Apple during discovery for this litigation.**

**This is Mr. Plate at the EPA sending an email to other EPA employees and saying, "Here is a copy of the Superfund Travel request for my work Thursday that was approved in case you have any questions on what to expect." And the title is "TRW Microwave Site, Triple Site, Sunnyvale, Santa Clara County." He's in the QA branch with Mr. Schulman. Destination is TRW Microwave**

Page 151

**site. Proposed travel date is August 19th, the date of the inspection. And the "Description of why this work is urgent and essential." Remind you, this is dated August 16, 2021. "Description of why this work is urgent and essential. A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation sys-" -- "measures. An Apple employee recently contacted EPA and notified EPA there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system, the protectiveness of human health. The onsite work will include visual inspections of the vapor intrusion passive sub-slab depressurization system; the building's concrete slab and past cracks that were sealed to prevent vapor intrusion; past 2013 to 2018 [sic] indoor air sampling locations; the indoor location where contaminated soil was excavated from under the building; spaces between the walls of the three sections of the buildings that were sealed in 2014 to 2015; and the groundwater in-situ bioremediation system, outdoors."**

**Ms. Schmidt, I ask again if Apple was aware that the US EPA inspection of my office on August 19 was due to my disclosures to the US EPA regarding the cracks in the slab at my office.**

Page 152

MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.

MS. GJOVIK: We have evidence right here of the EPA saying the inspection was because of my disclosures.

MS. PERRY: So, there's multiple things that were wrong with your statement, Ashley. One was that there are cracks in the slab. The second is that Apple would have knowledge based on a communication that you showed her that Apple is not copied on.

MS. GJOVIK: I asked "if." You previously objected no foundation as evidence. Now, I have some evidence and foundation, and this is a key part of the litigation. So I'm asking if Apple was aware.

THE WITNESS: I haven't seen this document until today.

BY MS. GJOVIK:

**Q But did Apple have any other indicators from emails, phone calls, conversations with the EPA that the inspection was because of an Apple employee telling them about cracks in the floor at the building?**

A I don't have that. I don't have an email from the EPA telling someone at Apple that you had raised a concern and that's why they were coming to inspect. I don't have that.

MS. GJOVIK: Exhibit I-1, which is plaintiff's

Page 153

production 6, No. 4292. This is a document produced by the US EPA. This is their site visit notes from August 19, 2021. The EPA FOIA number is at the bottom here.

(Exhibit I-1 was marked and identified.)

BY MS. GJOVIK:

**Q Has Apple seen these notes prior?**

A I didn't read them and prep for this.

**Q It indicates that the date of the inspection from Northrop Grumman, there was Mr. Shannon and Mr. Batsel, Dextra group, and Ms. Holbrook from AECOM. And then there's "Meet Colin Scanlon."**

**Who's Colin Scanlon?**

A It looks like it's described as the Apple leasing manager on your description.

**Q I don't know what this is.**

**So it's just someone with real estate and development at Apple?**

A Yeah. A lease manager is usually the person who's -- is having ownership of the lease between Apple and the landlord.

**Q Like the liaison for lease stuff. Okay. Thank you.**

**Listed there is a little agenda. And then had some notes from the notes "Can't access vent riser pipes,**

Page 154

**no ports; open area in front of elevator." This is Matt from the EPA QA. "Roof, west building are exactly 10 feet from HVAC, just meeting code. Not great for VOCs because venting into HVAC. Would be better/need to extend ten feet high. Roof, east building stack issues. Vents too close cut to chiller. Cut too low."**

**Ms. Schmidt, are you aware of these stack issues he's mentioning?**

MS. PERRY: Objection to the extent it misstates the document.

Can you please scroll through the entire document if you're going to ask her to answer any questions about it?

MS. GJOVIK: Sure. Okay.

BY MS. GJOVIK:

**Q So here's the -- can you read this okay, Ms. Schmidt? This first page, is this big enough?**

A Yes.

**Q If you'd let me know when you're done with this first page, then I'll move on to the second page.**

A Okay. Okay.

**Q That's the second page. It's two pages.**

**So, regarding the comments about the vents and HVAC I mentioned -- I'll highlight them right here. I don't need to paraphrase them. I'll just highlight**

Page 155

**them -- were you, Apple, aware of what is noted here regarding the vents and stacks?**

A I think also at the bottom, too, that it says that this is -- right. Scroll to the bottom.

**Q If we want to look at all the notes about it -- I was going section by section, but we have -- let's see, carpet, environmental pressure, negative pressure, and then "EPA samples with HVAC off because venting changes with economizers and season. We can't control for future scenarios. Four stacks need to be extended. Okay per Code but not COCs. Main building is under chiller stack, not even sure how to extend. Be nice to get the HVAC test and balance reports to know where to sample. Want economizers close and heater on. Usually in January. Want HVAC off for worst case short-term exposure scenario." And then "Apple is operating HVAC perfectly. Pressure right, but long term we have no control over." I believe those are all the comments regarding the stacks and HVAC.**

**Did you see anything else that you wanted to include?**

A Yeah. I think that looks like most of it.

**Q So, can you tell me as Apple about what was going on with the stacks and vents and HVAC at that time?**

A No. I can tell you what it reads -- I mean, you

Page 156

and I can both see what it reads here for items that were identified by EPA to Northrop Grumman, not to Apple.

**Q So, was Northrop Grumman tasked with making changes to Apple's HVAC system?**

A I think there is a process when there's changes happening in the building, and the extensions of the stacks, if they belong to Northrop Grumman, they belong to Northrop Grumman.

**Q And were the stacks extended?**

A To my knowledge, yes, the stacks were extended.

**Q What was their height at the time of this EPA inspection?**

A Does it say on the report?

**Q There's another one that says it. We can wait until I get to the document, if you want.**

A Okay.

**Q And how many stacks were extended?**

A I can't remember exactly, but I know they -- you know, they're working to meet these observations.

**Q And do you know what this term "COC" means?**

A Not necessarily in this context.

**Q I'm going to assume it means contaminants of concern.**

**Does that sound probably right?**

A I don't know.

Page 157

**Q So, if these stacks needed to be extended -- assumably they weren't extended enough and if they're too close to the HVAC systems -- what is the EHS implication of these things that the EPA was flagging in these notes?**

MS. PERRY: Objection. Lacks foundation. Calls for speculation. Misstates the document. Assumes facts not in evidence.

BY MS. GJOVIK:

**Q Go ahead.**

A Ask the question again.

**Q Yeah.**

**So, based on these comments made by the EPA about needing to extend the stacks in proximity to HVAC and the vent stacks, what is the EHS implication of these things that they're flagging?**

A I mean, I just don't know if I can speak exactly for them and what specifically they, you know -- I mean, it looks to me that they're saying, like, it's okay and it could be better. And so I think that's what the work that was being asked to do is being done.

**Q So when it says "vents too close to chiller," is chiller part of an HVAC system?**

A You're stretching my facilities knowledge.

**Q It says "vents too close to chiller," but you said you thought these notes indicated everything was**

Page 158

**okay, just could be better?**

A Well, one of them says it just meets code.

**Q Then it says "not great for VOCs" --**

A It looks like -- right.

**Q -- "because venting into HVAC"?**

A I think this like -- also a hypothetical. If we don't have risk, right, if there are not significant amounts of HVAC or VOCs, I think this is all, right, very theoretical and depending on concentrations. And so I think, you know, this whole statement is really around some hypotheses that I'm not clear what we're even talking about.

**Q When they're talking about these vents, they're assumably talking about the sub-slab vent system, and that would mean the concentration is under the slab. Right. So it's my -- it's my understanding these sub-slab venting systems, like we talked about earlier, they're trying to give a preferred pathway for the vapors to go up to the roof instead of pushing through the indoor building. It's a key mitigation thing for vapor intrusion. So, then they would be saying those stacks are -- assumably, those sub-slab prevent stacks where those vapors from under the slab coming from the groundwater and soil would be (unintelligible) to give them that pathway.**

**Does that sound correct?**

Page 159

MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.

BY MS. GJOVIK:

**Q Or if not, can you please explain what you -- what Apple's interpretation of these issues that EPA flagged Northrop Grumman had to correct were?**

A It's really between Northrop Grumman and EPA. Like, Apple didn't get involved, and all of these items and clarifications, we didn't spend that time with the EPA or Northrop Grumman. Our place in this conversation is really as a host.

**Q So if VOCs -- volatile organic compounds, VOCs, were venting into the HVAC from my office building at 825 Stewart Drive, wouldn't that imply that employees could be exposed to those VOCs through the HVAC?**

MS. PERRY: Objection. Misstates the document. Lacks foundation. Assumes facts not in evidence.

BY MS. GJOVIK:

**Q You can answer.**

A No. I think that -- it doesn't necessarily mean that because we don't even know what that is, what that concentration is or even if that's actually happening.

**Q What does the term "re-entrainment" mean in relation to vapor intrusion mitigation systems?**

A Re-entry?

Page 160

**Q Re-entrainment.**

A Yeah. That the vapor could be -- could reenter the building through a different means.

**Q And are there generally practices and policies in place to try to prevent something like that from happening?**

A Yes.

**Q What are the types of -- most typical practices that would be used to try to prevent re-entrainment at a site like this?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

BY MS. GJOVIK:

**Q Go ahead.**

A I'm honestly not an engineer or facility engineer, so I really can't speak to all the possible ways that those could be done.

**Q And so if potential re-entrainment issues were flagged, is it Apple's position, what you said earlier that -- something about speculative and don't know and it's Northrop Grumman's responsibility or would Apple have EHS responsibility regarding possible re-entrainment of HVAC in its own building even if it is related to the Superfund site?**

MS. PERRY: Objection. Vague.

Page 161

THE WITNESS: Could you restate the question again?
BY MS. GJOVIK:
**Q So, what is Apple EHS's position regarding its own responsibility to its employees regarding possible vapor intrusion re-entrainment issues at its facilities, such as in a situation like this, where the exhaust stacks may be too close to the HVAC intake and could be a re-entrainment risk?**
MS. PERRY: Objection. Lacks foundation. Misstates the document. Assumes facts not in evidence.
BY MS. GJOVIK:
**Q Go ahead.**
A There's a lot of "what-ifs" in that question, and so I'm not clear, you know, how to answer a very hypothetical question in this case.
**Q How about this: Would Apple believe that it has responsibility or would it believe the responsibility is with the responsible party for the Superfund site?**
A For what?
**Q Re-entrainment risks from sub-slab depressurization vents adjacent to HVAC intake.**
A It really depends on the site and the way that the lease is written, how -- what part of ownership of any particular system is managed.

Page 162

**Q And then would Apple believe it has any responsibility to disclose to employees that there could be a risk of re-entrainment occurring based on findings like this?**
A No, I don't. And that requirement's to report when there is a hazard. And so that's what we would focus on, meeting the compliance of those items.
MS. GJOVIK: Adding Exhibits I-2, -3, -4, -5. So this document, this is Exhibit I-5. This is an email produced by the US EPA through FOIA. Their number below, and then plaintiff's production 6, Bates No. 4314.
(Exhibit I-5 was marked and identified.)
BY MS. GJOVIK:
**Q The email chain starts May 25th, 2021, with Mr. Batsel emailing Mr. Schulman saying, "As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple." And then Mr. Schulman forwarded it to Mr. Plate and Ms. Audrey Johnson and said, "Hey, Matt, can you review the attached TRW Microwave November 2020 passive mitigation system report." And he sent this on July 26th, 2021. And he said, "I reviewed it, it looked okay to me, but I'd like a second opinion, if you have any recommendations to the**

Page 163

**inspection or potential modifications." And then he says, "I" -- at the bottom of the email, "I requested August dates to conduct a site visit of the 825 Stewart Drive building now leased and occupied by Apple," sent July 26th.**
**And Mr. Plate responded on July 26th saying, "Michael, in the main building, the SSD vents appear to be under the components of the chiller. This is not appropriate and we should discuss. We should also get the distances between the vents and the HVAC outdoor air intakes. Have samples air samples from passive stacks been collected?"**
**Mr. Schulman responded the next day, "I've asked for a site visit in August for you and me to attend, except," then he gives some dates. "We could measure then. No air samples have been collected from the stacks. I'll let you know what dates the RP proposes. They said they get back to me this week."**
**Ms. Schmidt, have you seen these emails before?**
A No, I've not read these emails before.
**Q And here we have a US EPA QA vapor intrusion expert, Mr. Plate, saying this is not appropriate with the SSD vents on the roof. So I'd ask again if there's anything Apple can share that it did to try to mitigate these issues when it was put on notice there could be an**

Page 164

**issue with the HVAC at that building.**
MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence. Misstates the document.
BY MS. GJOVIK:
**Q How about this: Ms. Schmidt, when was Apple first put on notice that there could be issues with its HVAC system at this building in relation to the exhaust vents?**
A I mean, I don't see it in this email yet. This all looks to be between the EPA individuals.
**Q Yeah. I'm sorry. I'm asking: Generally, when was Apple first put on notice?**
A I don't recall. I don't know.
MS. GJOVIK: This one is plaintiff's production I-3. This was obtained through FOIA request to US EPA, and it's plaintiff's production 64304.
(Exhibit I-3 was marked and identified.)
BY MS. GJOVIK:
**Q This is from Mr. Plate to Mr. Schulman, "Draft VI, TRW, assessment" sent August 23rd, 2021. It says: "When you are back, let's talk about the highlighted recommendations, or if you want, you can just incorporate this into whatever you put together." This would have been after the 19th inspection.**
A Uh-huh.

Page 165

Q And it's titled "Vapor Intrusion Assessment 825 Stewart Drive, Sunnyvale." The general summary is: "Passive sub-slab depressurization systems were installed on three connected buildings at 825 Stewart Drive prior to installation of a building ventilation system. It appears that the mechanical design of the HVAC system applied the standard 10-foot distance between building exhaust vents and HVAC intakes to the SDD exhaust for the west and main buildings. The HVAC system upgrades also included features that limited airflow from SSD vents to these buildings" -- "on these buildings. It is recommended that these impacts to the SSD operation be mitigated. It was also generally noted that SSD vent pipes are not accessible inside the buildings." They're requesting HVAC information. Talks about sealing. They noted -- oh, I need to go back to that last -- the site visit one.

"Sub-slab sampling ports left in place have not been regularly sampled or maintained and several could not be located. It is recommended that these be located and maintained or decommissioned."

For the west building, it noted the "HVAC intake is approximately 10 feet from the western SSD port." It says: "It is recommended these vent stacks be reconfigured to avoid vapor intake from the HVAC."

Ms. Schmidt, what does "vapor intake" usually

Page 166

indicate in a document like this?

A I think it is that if it is a stack of the vapor mitigation system, that those vapors are not being brought back in by the HVAC.

Q Here it says: "SSD vents on the roof are not significantly elevated above the roof, three feet, and are sheltered from wind."

Ms. Schmidt, are you familiar with the design of those vents on the roof, that they -- if they're passive, do they turn when the wind blows them versus having a motor turn them?

A I'm not deeply familiar with the designs of these stacks.

Q For stack vents that are passive and are turned by the wind, what would the implication be of those vents being sheltered from the wind?

A Again, I'm not an engineer, so I'm not going to speculate on all of the impacts of that or the possibilities thereof.

Q And then for the main building, "The SSD vents on the roof are under the building chiller plant piping and are within 12 feet of a ventilation system intake. There is not significant airflow near the SSD vent stacks and it is likely that SSD vents are not functioning as intended and vapors could be building up on the roof near the HVAC

Page 167

intake." And then add: "Generally, the slab has been sealed. However, some large test equipment is bolted to the slab and it's unclear if any of these installations penetrate the slab."

Ms. Schmidt, when Apple is doing its floor penetration survey at the site in 2021, did it find instances where test equipment was bolted to the slab?

A I'd have to read through the report in detail to be able to answer that specifically.

Q Okay. We can get to that. I have that.

Okay. And then -- I want to look at that site visit again.

So, we had just looked at the HVAC on this one, and I want to make sure we looked at everything. This was I-1 -- Exhibit I-1. So, they had also noted EPA during that inspection that there were some -- SS-05, is it your understanding that that usually stands for, like, sub-slab port identification numbers?

A Typically, yes.

Q This one says: "SS-05 under carpet identified by Apple. Right SS diameter, but grout sealed. Seems mislabeled." Matt says, "Seal sub-slab ports not abandoned properly. Rusted. Use brass and SS. Reinstall or abandon."

Can you explain what that kind of feedback would

Page 168

mean and how the EHS team would respond?

A No. Again, this is mostly conversations between Northrop Grumman and the landlord and EPA. And so this is not something that we were actioning for them.

Q How often was Northrop Grumman doing floor survey inspections inside this facility?

A I don't have all of the list, but if they asked to come in, we work with them to get them into those spaces.

Q And is it Apple's expectation that they were the ones that should have been doing these inspections and monitoring to see if there were issues?

A If their agreement is with the EPA on the frequencies of that work.

Q And the sub-slab ports, can you explain what those are?

A Not -- not particularly, no.

Q But they are kind of a port between the interior of the office and under the slab.

Is that generally correct?

A I don't know. I'm not an engineer with deep understanding of that system or the system in particular.

Q Okay.

So, it's my understanding that they are. You can, like, unplug them if you want to test the chemicals

**under the slab, but you'd seal it up so those kind of (unintelligible) don't come out into the indoor air. So if there's sub-slab ports that weren't abandoned properly, or rusted, could that create a risk that some of the vapors from under the slab could enter the interior space?**

MS. PERRY: Objection. Calls for speculation. Lacks foundation.

BY MS. GJOVIK:

**Q Go ahead.**

A I can't speak to the specifics of this or the specific scenario that you're speaking to.

**Q And Ms. Schmidt, Apple was aware that my complaints included the condition and location of the sub-slab ports.**

**Correct?**

A I'd have to go back and look exactly where sub-slab ports came up in your list of concerns.

**Q We can go back and look. Let's see.**

**They also noted -- "EPA Comments: PEA samples with HVAC off because venting changes with economizers and season we can't control for future scenarios."**

**Ms. Schmidt, do you recall that my complaints included that I wanted Apple to test with the HVAC off?**

A Yes. I know some of your questions were wondering why we were going to leave the HVAC on.



**Q Then it talks more about this, and they say, again, "Want HVAC off for worst-case scenario, short-term exposure" and then "Destroy the indoor sub-slab ports."**

**Did Apple and Northrop Grumman end up destroying the indoor sub-slab ports?**

A I can't speak to that specifically, but it's possible, because I know they did work off these items.

**Q And then it says: "Locate the indoor sub-slab missing ports."**

**Does Apple recall that some of my complaints were that it -- there were ports that were noted as missing and had not been identified in my office?**

A I can't speak to the specifics of what was found and the corrective actions, but those actions were documented and provided.

**Q Was Apple able to locate the missing sub-slab ports?**

A I can't speak to all of that, but the specifics of what ports were identified by Northrop Grumman and how they were labeled, like, it's not ours to own. This is Northrop Grumman and EPA to sort these things out. It's not for Apple to do this.

**Q And then we have --**

A I noted that Apple is running the HVAC perfectly.

**Q It did say that.**



A That's the part that we own.

MS. GJOVIK: And for I-2 -- this is Exhibit I-2. This is plaintiff's production 64299. It's the EPA FOIA production. It's also public on the EPA website for the site. This is "EPA Site Visit and Vapor Intrusion Field Assessment" dated October 7th, 2021.

(Exhibit I-2 was marked and identified.)

BY MS. GJOVIK:

**Q Have you seen this before?**

A I may have.

**Q So, they summarized the inspection and note EPA did identify the following items that EPA asked Northrop Grumman to address. This included the SSD vent pipes, noting that the distance is acceptable building code. "However, a distance greater than ten feet or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminants to be pulled into the HVAC intakes in the building." That's what I believe the "re-entrainment" term refers to. It says: "This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks Northrop Grumman to provide a proposal to do so."**

**Was Apple involved in that investigation?**



A Of what specifically? There's a lot there.

**Q Okay.**

**Did Apple confirm that this issue was resolved?**

A With the piping?

**Q Yeah. With the distance issue between stacks and HVAC.**

A Yes. I do believe that additional work was done to extend and address the piping.

**Q Around when -- sorry. Go ahead.**

A No. That's it. And stacks. Sorry. I'm just trying to use the right word.

**Q Around when was it completed?**

A I don't have those dates.

**Q And then for "Sub-slab sampling ports," it says: "The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located. These ports need be located and maintained where future sub-slab sampling will be conducted, or decommissioned, if a justification is provided that the ports are no longer needed. EPA also requests an updated figure for the building showing all port locations."**

**To your knowledge, was this issue also corrected?**

A I don't have specific documentation that says it does, but I have every reason to believe that it was.

Page 173

**Q Okay.**
A I don't know it to be outstanding.
**Q And this one says: "SSD system maintenance and inspections: In May 2021, GES, on behalf of Northrop Grumman Corporation, prepared the first annual maintenance inspection memorandum for the 825" -- I think that's a typo. It should be "Stewart SSD system. The memorandum dated" -- "documented a November 2020 inspection and Northrop Grumman Corporation prepared the memorandum to address the 2019 EPA five-year report recommendation to incorporate long-term stewardship measures for the current vapor mitigation measures in place."**
**Is it Apple's understanding that that 2020 inspection was the first inspection by Northrop Grumman regarding the SSD system?**
A Honestly, I don't have any knowledge of any kind of -- when and who wrote what report between Northrop Grumman and the EPA.
**Q And then this seems to indicate that in May 2021, the first, like, inspection report was sent to EPA by Northrop Grumman regarding the sub-slab system in my office building.**
**Is that Apple's understanding?**
A It does say "the first" in the document that you're showing.

Page 174

MS. GJOVIK: And then for Exhibit I-4, this is a letter produced by the EPA through FOIA, also public on their website, for the site on page -- it's also plaintiff's production 64302. It's a letter dated November 5th, 2021, from AECOM to the EPA responding to the October 7, 2021, letter.
(Exhibit I-4 was marked and identified.)
BY MS. GJOVIK:
**Q And for the system vent pipes, it says: "Northrop Grumman Corporation will consult with the engineer of record for the design, evaluate what changes may be necessary to the roof vents for the SSD system."**
**Do you know who the engineer for the design was? Was it Apple?**
A Oh, I do not know that. I would not assume that.
**Q And then the EPA had asked for information about Apple's HVAC system and asked for HVAC and building test and balance information be provided, and Northrop Grumman responded that it reached out to the building tenant, Apple, for the requested information. And the HVAC test and balance report they provided is included as an attachment.**
**Does Apple recall sharing that with Northrop Grumman to share with EPA?**
A It looks like it.

Page 175

**Q And then for the sub-slab sampling ports, Northrop Grumman said: "Will prepare a figure as requested. However, please note that exact measurements may not be possible as the locations were not formally surveyed and the interior configuration of the building has changed multiple times, both pre-installation of the most recent locations and after the most recent sampling event was performed."**
**This seems to indicate that Northrop Grumman was deferring to Apple on this. Did Northrop Grumman contact Apple to request information about the building layout and location of ports?**
MS. PERRY: Objection to the extent it misstates the document. Lacks foundation.
BY MS. GJOVIK:
**Q Go ahead.**
A I don't have any evidence either way if they did. I am confident that we would have supported them with the information that they requested.
**Q Okay. Thank you.**
**And I think it might be time for another five-minute break if you're ready.**
A Sounds good.
MS. GJOVIK: Okay. We'll come back in five minutes. Thanks.

Page 176

(Recess taken.)
MS. GJOVIK: Now, for more exhibits. I'll put them in the chat.
This is J-2. So, we were just reading some emails where it sounded Northrop Grumman was going to request information from Apple to respond to EPA. This is an email from Mr. Joshua Nandi at Northrop Grumman to EPA on March 22nd, 2022. This email is posted on the EPA website for the TRW site, and it's plaintiff's production 63945.
(Exhibit J-2 was marked and identified.)
BY MS. GJOVIK:
**Q And it says: "Good morning, Michael. AECOM" -- I don't know if that's how you pronounce their AECOM, but A-E-C-O-M -- "conducted the rooftop SSD and HVAC inspections needed to complete the SSD assessment on March 17th, as Apple was not able to provide as-built drawings. Northrop Grumman and AECOM are working towards providing EPA with the SSD assessment by April 15th. Please feel free to call or email at any time if you have additional questions."**
**Ms. Schmidt, do you know why Apple was unable to provide as-built drawings for the rooftop SSD and HVAC?**
A No, I'm not aware of a specific circumstance.
**Q And then this is an April 15th, 2022, memo from**

Page 177

Northrop Grumman to the EPA. This is public on the site's web page for the EPI and produced by EPA through FOIA, and it's plaintiff's production 11, Bates number 3165. It's titled "Evaluation of Passive Sub-slab Depressurization System."
Have you seen this letter prior?
A I don't remem- -- I don't recall seeing this one, no.
Q Northrop Grumman wrote that -- in EPA's letter dated October 7, 2021: "US EPA noted that several of the vents were reconfigured by the current building tenant after initial installation of the SSD system was completed in 2014" and "Seven vents were originally installed as part of the SSD system in 2014 prior to the installation of existing heating, ventilation and air conditioning HVAC system."
It says: "The existing HVAC system was subsequently installed by the current building tenant between May and December of 2025 without consideration for the location of the SSD vents and their function. As a result, the three vents on the main building roof and the two vents on the west building" -- "west lobby building roof were put in close proximity to the HVAC intakes."
Ms. Schmidt, was Apple the one to install the HVAC system in this building when they moved in?

Page 178

A It appears in this email that that is what this email says.
Q And it says they are installed -- HVAC was installed without consideration for the location of the SSD system vents and their function.
A Yeah. I don't know if -- that to be true. I don't have knowledge as to what considerations were made and what, you know, decisions were made along the way in placing the system there.
Q And Northrop Grumman, the responsible party, mentions that three of those exhaust vents for those contaminants of concern were put in -- they use the term "in close proximity to the HVAC intakes."
Did Apple consider that to be an issue themselves?
A Like I said, I don't know the details as to, you know, all of -- building installs of complex systems required a lot of considerations and a lot of things. So I can't speculate as to what considerations were made. I think your previous report, right, has that -- the proximity was in compliance in a number of places but could have been higher. And so, I guess, I'm --
Q I think the prior report from the EPA was referring to the building code, because the building code has restrictions of how high stuff can be without

Page 179

creating -- like, distracting things from the street. You see a bunch of mechanical stuff on top. So I think they're referring to that, but -- not necessarily for these things, the contaminants of concern.
So, then, this Northrop Grumman letter goes on to say: "The objective of the valuation is to relocate the events on the" -- "vents on the affected buildings outside the assumed sphere of influence of HVAC intakes."
Do you know what "assumed sphere of influence of the HVAC intakes" implies?
A No. I'm not familiar with that term or what a term like that would mean as far as technical, you know, inches or feet.
Q And Northrop Grumman, you said responsible party, says that their conservative proposal is to relocate the vents from a minimum of 25 feet away from the HVAC intake instead of ten feet.
Is that what was done when the issue was corrected at some point?
A Like I said, I don't have all the details of what Northrop Grumman did to correct these items. So I don't know if 25 feet was the exact place they ended up landing.
Q And so does Apple -- go ahead.
A This is not the -- I mean, this is just saying what they think they're going to do. Right. This isn't

Page 180

saying what they did.
MS. GJOVIK: And then this is Exhibit J-3. This is a document produced by the EPA through FOIA. That's their number. And it's plaintiff's production 64280, is the Bates. This is a memorandum for "TRW Microwave Response to Comments" from Matthew Plate.
(Exhibit J-3 was marked and identified.)
BY MS. GJOVIK:
Q He titles himself an environmental scientist in the quality assurance branch, and it says: "The QA branch reviewed the response to comments and was not able to verify proper HVAC operations with the test and balance report provided. It is recommended that HVAC system be further evaluated to confirm it is not contributing to potential vapor intrusion. Specific evaluations follow." This is dated December 28, 2021.
Was Apple aware that the EPA was reevaluating its prior statements about the HVAC operations at the building?
A I don't -- like, this letter is not addressed to me or to Apple. So -- I think the previous one had said that it was operating well, and this one seems to be saying that there needs to be further evaluation.
Q So here earlier on page 2, he says: "It is recommended that the vent pipe be relocated or raised to

avoid the potential for subsurface vapors to be pulled into the ventilation system and to improve SSD operations." I noticed The HVAC test and balance report provided was from 2015 and may not reflect current building configuration or operations and said it is also limited in scope and does not evaluate ventilation rates in each zone and other elements of ventilation effectiveness. Noted that the test amounts report was done by the same company that installed the HVAC and that an independent test and balance report is preferred. Noted the report did not include a written summary, including no note of what was found adjusted or noted. The air handlers were tested only in recirculation mode, unclear if local exhaust is properly balanced with make up air. Maybe some ducted returns.

Did Apple make changes to its HVAC system after 2021 based on feedback from Northrop Grumman or EPA?

A It's possible. I haven't -- you know, I haven't seen a report that says what specifically was modified, but if there was an opportunity identified here to make an adjustment or improvement that was appropriate, the teams would have, you know, tried to do that.

Q Thank you.

And then this is part of that same production. This is an email from Michael to Matthew Plate in October



2021 adding a note to that drafted October 7 letter, it looks like. This is about the SSD maintenance.

This one -- we already looked at this one. And then this looks like the -- this is dated May 24th, 2020, annual maintenance inspection memo for the sub-slab depressurization system. Actually, the report is dated May 21, 2021, from that 2020 inspection.

A Okay. It's --

Q It confused me.

And this looks like that first one -- they were talking about doing that first report. So this appears to be that first report they did. And they say the purpose of the SSD was to mitigate vapor intrusion due to sub-slab concentrations, organic compounds. The sub-slab concentration of VOCs were identified during a vapor intrusion assessment conducted in 2024. And then they noted that between May 2025 to December 2025, the building condition changed due to construction for building tenant, Apple. HVAC. And they noted that the current configuration of the SSD system, they said, is consistent as configured during the December 25 sampling of the assessment, and the roof turbines are in working condition. It appears this is the report that the EPA read and then realized that the vents were too close to the HVAC.



Was Apple involved at all in Northrop Grumman's inspection of the roof in 2020?

A I think you had the list. I think there was a lease person that was supporting that visit at that time.

Q I think that was the 2021 inspection. This would have been Northrop Grumman, it sounds like, doing their first, like, SSD, at least, rooftop inspection as part of their annual inspections.

A Yeah. I don't know exactly who, but just like the one in 2021, if we have individuals that are visiting a site, they're typically, you know, walked with by someone from Apple to help escort them.

Q In buildings like this where the responsible party doing inspection of, like, a vapor intrusion mitigation system, would it be typical to have an EHS representative there for the inspection?

A Not necessarily. It kind of depends on what, you know, the scope is of the work that they need to do. And if we think that -- something that we, like that from the EHS perspective, can contribute.

Q And EPA found issues looking at this same report and Northrop Grumman itself went back and kind of changed their position on their own findings, do you have any idea why this report didn't mention the issues that later had to be corrected?



MS. PERRY: Objection. Calls for speculation.

THE WITNESS: I can't -- I have no idea.

MS. GJOVIK: And then this is Exhibit J-4. This is a FOIA response from EPA, plaintiff's production 6, Bates 5247. It's an email from Michael Schulman at EPA to Joshua Nandi on February 12th, 2022, and Mr. Schulman is a remedial project manager.

(Exhibit J-4 was marked and identified.)

THE WITNESS: Who's Nandi?

BY MS. GJOVIK:

Q Huh?

A Who -- sorry. Who are the players again?

Q Joshua Nandi is with Northrop Grumman.

A Okay.

Q He took over, I believe, as project manager when Mr. Distel left I think end of 2021.

A Okay.

Q So, he says, "Hi Josh. It's been a couple months since your last update and half-a-year since we conducted a site visit to 825 Stewart. Please provide an update on whether Northrop Grumman's preliminary review of the SSD system is complete and whether an additional site visit was required. In line with Northrop Grumman's schedule below, please submit by March 15, 2022, a complete response to EPA's October 7, 2021, comments. Include in

Page 185

**Northrop Grumman's response any proposed modifications to the SSD system vent stacks to address potential emissions from being pulled into the building's HVAC. Also include Northrop Grumman's response to schedule to implement the proposed SSD system modifications. Additionally, by March 31st, 2022, please respond to EPA'S October 7, 2021, request to submit a plan that documents the scope of the SSD system's long-term operations and maintenance and a figure showing where the existing sub-slab sampling ports are located. We expect that GI DC Sunnyvale, LLC will cooperate with Northrop Grumman's efforts consistent with EPA's 2014 prospective purchaser letter. Thanks in advance."**

**Were you -- was Apple aware that EPA was requesting this kind of information from Northrop Grumman and had not been getting a response?**

A No. I'm not --

MS. PERRY: Hold on.

Object to the extent it lacks foundation. Misstates the document.

BY MS. GJOVIK:

**Q With the --**

A None of these emails have an Apple person on them. So...

**Q So as we were reviewing some of these documents,**

Page 186

**if Apple is not aware of what's going on, would it change Apple's assessment of whether there potentially could be chemical exposure issues occurring at that building?**

A No. Because we have our own program and we were sampling -- done our own sampling, and that sampling indicated that there were no risks in this kind of same time frame. So, while this is going, we're continuing with our program and have confidence that the space is safe for occupancy.

MS. GJOVIK: And then this is Exhibit J-5. This is another email produced from EPA through FOIA. It should be produced to Apple, too, but if it's not, I'll make sure I get it out to them after this.

(Exhibit J-5 was marked and identified.)

BY MS. GJOVIK:

**Q This is dated January 3rd, 2022.**

**What was that?**

A Sorry. You're going a little fast, or flipping through it. So --

**Q Oh, I'm sorry.**

**January 3rd, 2022, from Edwin Poalineli at EPA to Matthew Plate at EPA -- or, sorry, revert. No. Sent to -- it doesn't even say -- I don't know who sent it. That's actually strange. It says to Edwin and Reynolds cc Matt Plate. It says: "Hi Chip and Rebekah, attached is**

Page 187

**QA's review of the 2015 HVAC test and balance report and TRW's timeline to address EPA site visit. Follow-up comments provided in an October 7 letter." Oh, it's from -- it should be from Matthew Plate, (unintelligible) report we reviewed. "I will respond to TRW next week stating that their proposed timeline to provide a draft evaluation of the SSD system by mid-March 2022 is inadequate. I'll send you draft first to get your feedback before I send my response. I'll also meet with Matt and go over his comments if any additional evaluation is needed to evaluate vapor intrusion potential. I expect that NGC will work proactively and quickly to address any EPA concerns or potential VI mitigation or O&M issues." Notes "Or existing order" -- I think that means "Our" -- "with NGC does not address VI. We do not have one with Apple. However, we do have a BFPA with the current owner, but not Apple, which specifies to maintain that BFPA status, the current owner is prohibited from conducting building construction, renovation, or other modification activities that may affect the integrity of the VI mitigation system."**

**Was Apple contacted by EPA to enter some sort of agreement regarding the deed, lease, or bona fide purchaser agreement?**

A I have no knowledge of that.

Page 188

MS. GJOVIK: So, I'm sharing Exhibit -- this is K-1. This is a document produced by Apple, Bates number 3630. This one is dated May 2021. It's labeled "Identified Floor Penetration Features" for 825 Stewart Drive.

(Exhibit K-1 was marked and identified.)

BY MS. GJOVIK:

**Q Have you seen this document before?**

A Yes, I have.

**Q So, could you describe this document, then?**

A It has a list of rooms, a description of what was seen, and some options for best practices.

**Q And it notes the floor penetration survey was performed on May 6, 2021.**

**Is that correct?**

A The survey was done in May 2021. That's correct.

**Q And it looks like there is also an inspection of the sub-slab monitoring ports.**

**Is that correct?**

A This is a different document.

**Q It's page 3 of 3. There's a couple different versions of these, though.**

A Yeah. You just showed me one that is 1 of 5.

**Q So I have a version of that that also has 5.**

A Okay.

**Q This one is from August 2021 that has five pages.**
**This is Apple's production 3870, Bates number.**
A Yeah.
**Q And it -- is this the one you're looking at?**
A Yeah.
MS. GJOVIK: This one is Exhibit K-3.
(Exhibit K-3 was marked and identified.)
THE WITNESS: That's May 6th, K-3. Okay. 1 of 5. Okay.
BY MS. GJOVIK:
**Q So, I believe we were going over the first sections, and then this one has -- the second section is "Identified Floor Sealing Areas" during 11 August and 18 August 2021 site walk performed by Apple.**
**Does that look consistent with the one you're looking at?**
A Yes, it is.
**Q So, can you describe the second section?**
A This also looks to be a list where rooms and descriptions of features are identified and observations for, you know, best practices as far as what would -- you know, could be done. And then it looks like completed -- completed by and a confirmation.
**Q And so this mentions -- uses different terms like "seams," "gaps." What's the difference between a gap, a**



**crack, and a seam?**
A Very technical. I did not write this report, so I'm not going to be able to be a hundred percent sure why we have different uses, but I'll give you some examples. A seam might be where two concrete pours have come together.
What was -- another question?
A crack can be the development of a crack that is separate to the point where the two concrete pieces come together.
**Q And a gap?**
A A gap may be where concrete goes between two different types of services. But, again, like, I don't know that's the exact way they were using these for the person who wrote this report.
**Q Could it be like how much space is in that distance that's potentially not sealed?**
A I don't know that. That's not my -- necessarily my understanding. It looks like there are numbers described as far as width, like a crack of less than one millimeter, like you can see in this report.
**Q I see a single crack greater than one millimeter. Single crack --**
A Yeah.
**Q -- greater than one millimeter.**



A Yeah. There's --
**Q And here it says: "4-inch galvanized steel pipe comes through floor. Pipe wrap visible."**
**So when there's pipes coming through, they're supposed to seal them with something to make sure it's airtight?**
A I guess it really depends on where the pipe is going in the system. So --
**Q What about this one where it says "Hole filled with degraded sealant underneath carpet"?**
A Yes. What's the question?
**Q So, there were parts of this inspection they also just find, like, holes in the floor, not just gaps or cracks?**
A Honestly, I can't explain every description that the person used. What I imagine is that they used the term "hole" to indicate that there had been some material from the concrete -- original concrete that was gone and now it had been filled with a sealant, and that discovery was found underneath carpet.
**Q And then, like, on this page 3, they said "Multiple saw cuts in concrete slab along previous trench, seal saw cuts."**
**What's a "saw cut"?**
A My best guess is that when you use a saw to cut



through something, that that cut mark from the saw is what they are suggesting needs to be -- or, you know, suggesting would be best practice to seal.
**Q And then here on 17 and 18, this note is more holes in the floor? "Seal inside hole" -- "Seal inside hole." So, were there occasions where they were just finding, like, a hole in the slab?**
A I don't think so. I mean, to me -- again, I can't speak to that.
**Q Okay.**
A A hole may just be a spherical appearance where concrete -- and it doesn't even say what depth of concrete. It -- you know, at least some of the concrete is missing in a spherical appearance.
**Q Did you --**
A I wouldn't -- I wouldn't assume that a hole means that it goes in a particular depth or it goes through entire -- a particular distance. A hole, I would assume, is spherical in nature and is missing -- you know, and at some point was missing material that has now been filled with sealant.
**Q Would it be unexpected to have -- for them to find an actual, like, just hole fully through the slab?**
A I think that would be very unexpected.
**Q They assumably are doing some kind of inspections**

Page 193

**or having some kind of oversight that would prevent them from doing that?**
A Ask the question again.
**Q Would you assume that there'd be some kind of procedure in place to prevent that from occurring?**
A I think for the most part, but who knows what could cause a hole. Right. I think intentional is one thing, and there's probably reasons where concrete can get removed that's maybe not as intentional. So I can't speak to every time any kind of concrete has been partially removed.
**Q Generally, if someone is making changes to a building, like drilling a hole in the slab, would they be engaging EHS and EHS would be expected to ensure that they don't create risk through those activities?**
A It really depends on what the work is, and I think it's unfair to say that it's the slab. A flooring can be very different than the, you know, foundational slab work. So I think we need just to be really careful about -- these are observations on the floor, and that any assumptions about a hole going as deep into foundation and possibly to the ground are, you know, not described here.
**Q Did you review the photos taken as part of this?**
A There were a number of photos, yeah.
**Q And so you don't believe that any of those photos**

Page 194

**represent a hole that went all the way through the slab?**
A I don't recall when that was that way.
**Q And if they identified such a thing, what would Apple's response be?**
MS. PERRY: Objection. Calls for speculation.
BY MS. GJOVIK:
**Q Let me rephrase.**
**What is Apple's EHS policies and practices related to vapor intrusion mitigation that if they did discover a large hole all the way to the slab at a site like 825 Stewart, what would their response be to mitigate that hazard?**
A It really depends on what that would look like and who's responsible for that. So Apple would communicate with landlords and responsible parties as necessary to address, you know, any sort of risks that they find.
**Q And what if it appears it was Apple who created the hole, like it was testing equipment that the engineering team were using or something?**
MS. PERRY: Objection. Incomplete hypothetical. Calls for speculation. Assumes facts not in evidence. Lacks foundation.
BY MS. GJOVIK:
**Q Regarding the notes and photos that large**

Page 195

**equipment had been bolted to the floor with unsealed holes through the slab, how would Apple EHS respond if it appeared that it was Apple's engineering teams who created the hole in the floor?**
MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence. Calls for speculation. Incomplete hypothetical.
THE WITNESS: Yeah. I don't know the scenario in which there's a hole through the slab.
BY MS. GJOVIK:
**Q I'll look for some of those photos where it appeared there to be holes in the slab.**
**And then the fifth page of this one then has the sub-slab monitoring points with notes, and it looks like they had at least four unconfirmed locations that Apple -- was Apple able to identify all their missing sub-slab ports?**
A They're not our sub-slab ports -- I mean slabs to begin with. So I don't know if they're, you know -- it looks like they were able to find some but not all, but these are not ours.
**Q Did any other employees raise concerns or complaints or ask questions about vapor intrusion exposure at 825 Stewart Drive between 2020 and 2022?**
A I do believe that there were other employees who

Page 196

asked questions. I didn't -- I'm not aware of anyone with a complaint, but I know -- you know, with people coming in and with conver- -- you know, kind of conversation, other people were curious and wanted to understand, you know, the situation for themselves.
**Q How many people were curious?**
A I don't have an exact number.
**Q And how did Apple EHS respond to this curiosity from other coworkers?**
A Similarly, right, sit down with them, show them the evidence. If there was -- you know, I don't even know if there were other email exchanges, but, you know, we really tried to address employees who have concerns or have question in a similar manner.
**Q Did any other employees contact the EPA about this building?**
A To be honest, I'm not aware of anyone.
**Q Okay.**
MS. GJOVIK: This is --
THE WITNESS: It's not something we would -- it's not something an employee has to tell us. An employee can do that on their own.
MS. GJOVIK: This is Exhibit L. This is a document provided by the EPA through FOIA response. Oops. Sorry. And it's dated June 9th, 2021, from someone last

Page 197

named Yi emailing Mr. Schulman at the EPA, subject line "Health concern for work in TRW Superfund."
(Exhibit L was marked and identified.)
BY MS. GJOVIK:
**Q It says: "Hi Michael. My office is located right next" -- "right above Superfund. I'm afraid the office building air affects my health. Do all Superfund tests pass for this office building? Is there any potential exposure if working in this building?" You see the address, 825 Stewart. And it says: "Based on info from this link, human exposure is not under control yet."**
**Were you aware that this Apple employee had contacted the EPA?**
A No, I was not aware.
MS. PERRY: Can you scroll down on that document, please?
THE WITNESS: The response (unintelligible).
MS. PERRY: I just want to make --
MS. GJOVIK: Sorry. I closed it too soon.
MS. PERRY: Can you scroll down so I can make sure I get --
MS. GJOVIK: It's not scrolling. Oh. Bates -- this is another -- if it's not already -- I believe it's already produced, but if it's not, I'll make sure I send it to you guys after this one.

Page 198

MS. PERRY: Well, is it labeled, Ashley, as a produced document in a plaintiff production at the bottom of the page?
MS. GJOVIK: Right now it's --
MS. PERRY: Can you show that, please?
MS. GJOVIK: It's zoomed out. This is -- can you see what I'm sharing?
MS. PERRY: No. I can't see the bottom of the page. Can you please go to the bottom of the page?
MS. GJOVIK: This is zoomed out. This is all it's showing. Like I said, if it's not -- I believe this is already produced. If it's not, I'll make sure it's produced shortly after this.
MS. PERRY: This is inappropriate, Ashley. You have -- it's inappropriate to not produce documents in this case, withhold them and then show them to a witness in a deposition.
MS. GJOVIK: I'm nearly certain this is already produced. I will double-check, and if for some reason it's not, I will produce it as promptly as I can.
MS. PERRY: Well, Ashley, it should have a Bates label on it if it's been produced. Either you're looking at a document --
MS. GJOVIK: I would love to, Counsel, but as you know, I'm homeless, in Chapter 7 bankruptcy. Literally no

Page 199

permanent housing, insolvent and living off Twitter donations. So I'm trying my best to manage complex discovery, but it's really complex and I can't do it perfectly. So I'm trying my best. This is not in bad faith. And like I said, if for some reason it's not produced, I will produce promptly after.
MS. PERRY: Well, Ashley, you either have a document in front of you that has a Bates number on it or you don't. Does this document have a plaintiff Bates label on it?
MS. GJOVIK: It has EPA FOIA number, which makes it judicially noticeable separately.
MS. PERRY: That is a separate question. Does it have a plaintiff's Bates number on it?
MS. GJOVIK: No, which is why I noted it. You're wasting three minutes of time about this. If you want to dispute the admissibility later, we can argue about it later, please.
MS. PERRY: It's not an admissibility question, Ashley. It's a production question. You're showing documents to a witness in this deposition that you've not produced after discovery has been closed for now a month.
MS. GJOVIK: Counsel, I said I'm nearly certain it's been produced.
MS. PERRY: Well, you just showed me a document

Page 200

that has no Bates label on it. So if you're certain it's been produced or near certain it's been produced, then you should be showing the version of the document with the Bates label on it. Because you've chosen not to do so and apparently you're unable to do so, that would seem to indicate that you are showing a document that has not been produced, which is --
MS. GJOVIK: Counselor, I'm living in a motel, insolvent, in Chapter 7 bankruptcy trying to manage complex production. I'm nearly certain it's produced. If it's not, I'll produce it shortly after. Again, I'm not doing anything in bad faith. It's hard for me to keep up with Apple's trillion-dollar law firms and all of their complex tools and money when I literally have no money and I'm homeless. So I'm trying my best. We can argue about this later.
I think we should take a five-minute break. I just got really stressed out by Ms. Perry's conduct. So I'd like to take five minutes, please.
Can we come back in five?
MS. PERRY: We'll come back in five minutes.
MS. GJOVIK: Thanks.
(Recess taken.)
BY MS. GJOVIK:
**Q I'd like to pivot to 3250 and adjacent areas.**

Page 201

**When did Apple become aware that I published the article titled "I thought I was dying: My apartment was built on toxic waste" in San Francisco Bay View newspaper?**
A I don't recall exactly which email or what date, if you had shared that information.
**Q And are you aware that I did publish an article titled that?**
A I'm aware that you have a media presence or -- you know, social media presence, but I don't follow it.
**Q Sorry. I'm asking on behalf of Apple.**
A Am I aware that you have what? Please ask the question.
**Q That I published an article called "I thought I was dying: My apartment was built on toxic waste" on March 26, 2021, in San Francisco Bay View?**
A I don't know when someone at Apple knew that you published this article.
MS. GJOVIK: So Exhibit U is a copy of that article. It's plaintiff's production 12, 9304.
(Exhibit U was marked and identified.)
BY MS. GJOVIK:
**Q Are you aware of the premise of this article?**
A No. Can you walk me through it?
**Q Yeah. This is an article about when I had gotten sick from chemical exposure and was struggling to find out**

Page 202

**what the source was, and I was frustrated because -- were inadequately investigating and I felt it was reckless to just leave it an open question that there could be chemical exposure and not know what the source was. So I published an article about it, and additional people came forward asserting to also be chemical exposure victims. And I told numerous people at Apple about it at the time, including also employee relations in 2021, and it was mentioned repeatedly in my complaints, at least as context, because I did not realize until after I was fired what Apple's activities were in 3250 Scott Boulevard. So that's what this article is.**
MS. GJOVIK: And speaking of that, this is Exhibit O. This is plaintiff's production 114694. This is an email exchange between me and safety@apple.com and traceyscott@apple.com with the original email sent on September 8th, 2020, and then follow-up notes sent September 9th, 2020.
(Exhibit O was marked and identified.)
BY MS. GJOVIK:
**Q Are you familiar with this email exchange?**
A I have seen it, but let's go through it carefully.
**Q So on September 8, 2020, I emailed my email -- I believe my account. I said, "This is a personal question,**

Page 203

**no incident occurred at work. I'm just hoping someone in your group might be" -- can you read this okay? Do you need it to be bigger?**
A A little bit bigger would be great. Yeah. Go ahead.
**Q "I'm just hoping someone in your group might be able to give me a call and provide some informal advice on how to deal with this, or at least let me know if there's any Apple resources available to help me. Right now my biggest obstacle is trying to find a doctor or clinic that can test me for known toxins around my unit." And then I copied -- I said, "An official complaint I just submitted to the Santa Clara County Hazardous Material Program" saying, "I have reason to believe my apartment complex and the property it is on is exposing me to harmful levels of volatile" -- it says "organize," but I meant organic -- "chemicals. I live in the Santa Clara Square Apartments, which apparently has enormous amounts of hazardous waste on site." I detailed some of the things that I was complaining about and then had some links to, like, the environmental assessment and final response plan.**
MS. PERRY: Could you go back up a little bit on some of the other aspects of that concern?
MS. GJOVIK: Uh-huh.
///

Page 204

BY MS. GJOVIK:
**Q For instance, I complained that I'd purchased some TVOC monitors and they're showing, I said, "unhealthy numbers, usually at the same time, often at least once a day. The fumes seem to come in worst around 7:00 a.m. to 8:00 a.m. and 10:00 p.m. to 11:00 p.m. Sometimes it's quick and sometimes they blast me for multiple hours." I said, "When they're blasting, I can feel it before I see it. My skin burns, my lungs burn. I feel exhausted, like I'm choking. The rash on my arms gets really itchy. There's a chemical, kind of sweet sometimes. If I go outside to get fresh air, even sit up close to my next window' -- "next to my window, I start to feel better. My dog is also showing symptoms, lethargy, anxiety, loss of appetite." And I said, "The hallucinations were happening almost every night after I weatherized my window" -- it says "sand," but I tried to -- I think that's "and" -- "and tried to prevent any of the smokey air from coming in. They've stopped since I've been keeping my windows wide open. I've also been getting nosebleeds when all my windows were closed, but now the bleeds stopped after I kept the windows open.**
A So this -- okay.
**Q And I also mentioned -- I ended up saying, "20-plus specialists trying to figure out what was making**

Page 205

**me so sick, severe dizzy spells, arrhythmia, angina, rash, MS," multiple sclerosis, "like neurological symptoms, volatile blood pressure, bradycardia, exhaustion." And I said, "I started becoming suspicious of toxins and poisoning only a couple of weeks." And then when I responded again the next day, I said, "Update: I was able to get the tests ordered. But, actually, someone over there might even be familiar with this specific area. It looks like there's an Apple building right in the path of the Superfund site's groundwater, and between it and my building for a bit. It was registered with the EPA for toxic releases, TRI. Would just appreciate any general, informal advice on how to navigate this, or tips if there's anything Apple can do to help me get out of this horrific place. Thanks." And then I had this little map back here on my phone with a screenshot and then -- it shows apartments up here. And that Superfund, that's the center text line in between us, this 3250 Scott Boulevard building.**

**Do you recall this email exchange?**

A It looks like that's from our general safety accounts and one of the employees -- one of my employees.

**Q Do you recall talking to me about this in 2020?**

A Yeah, I do remember a phone call with you.

**Q Do you remember what we talked about?**

Page 206

A Yeah. We talked about that you had some health concerns about your apartment and that you were looking for testing equipment, and that you were asking if maybe you could borrow some of industrial hygiene equipment that we have and -- you know, I think the conversation was around making sure that when you're using sensitive chemical testing equipment, it needs to be calibrated, and it's typically done by a certified industrial hygienist. And I believe we kind of talked about who -- other consultants in the area that might be able to help you out.

**Q Do you recall anything about extreme condition leave?**

A No, I don't remember that at all. I only remember about you asking for some support and trying to figure out how -- you know, how you could go about understanding more about your apartment complex.

**Q Do you remember you mentioning that you had talked to some other folks to learn more about the area before we talked on the phone?**

A I don't remember that.

**Q At the time we talked, were you familiar with Apple's operations at 3250 Scott Boulevard?**

A I knew that we had operations at that building but didn't relate it to your questions or concerns. Your

Page 207

questions were very clearly about your apartment complex.

**Q And based on this map, was it clear that the apartment complex is adjacent to Apple's building?**

A I'm not quite sure that it's adjacent, but they are close.

**Q And how would you describe Apple's operations at 3250 Scott Boulevard? What kind of activities are they involved in?**

A That site is research and development center for our silicone -- you know, silicone design.

**Q Do they do fabrication activities?**

A They do not do any kinds of manufacturing for things like on-product. It's all R and D. So they're exploring and discovering research and development level work.

**Q But they do fabrication work.**

**Correct?**

A Of what?

**Q Chips.**

A They do -- it could be subparts of them. Right. Research level can be components, but they do not make a chip that goes into a product.

**Q So it's not a customer production facility?**

A Exactly, a manufacturing facility. It's research and development only.

Page 208

**Q And has Apple ever been cited by the government for regulatory violations at this facility?**

A Yes.

**Q What regulatory violations and what agencies?**

A We recently just had EPA and BAAQMD violations that were settled.

**Q What were the alleged violations?**

A Several of -- I guess -- do you want to just split that up a little bit?

**Q Sure.**

**What did the EPA allege that Apple had violated?**

A On the EPA, there were some violations around labeling and positions of labeling within our storage area. Those were all corrected. And then that there was a permit that was with BAAQMD, and that we, you know, we needed to have -- we had submitted the permit, and that the permit had not been fully processed at the time of their visit.

**Q What is BAAQMD?**

A The Bay Area Air Quality Management District.

MS. GJOVIK: It looks like -- no one told me -- I was just sending my exhibits to the court reporter and not the main chat. Sorry guys. You have the -- you should have the Google Drive link too. If not, let me add that right now.

Page 209

BY MS. GJOVIK:
**Q And was there something regarding hazardous waste treatment and air emissions?**
A Yes. There was a citation for one of the tanks which contains 95 percent water and up to 5 percent isopropyl alcohol, what you have mostly in, like, your hand sanitizer, and there was a -- the EPA wanted us to permit that tank. And so we went ahead and permitted that tank at their request.
**Q And then -- was that all the citations from the EPA?**
A I don't have the full list in front of me right now. So...
MS. GJOVIK: This would be Exhibit V. This looks like the consent agreement that Apple entered with the EPA regarding the inspection violations we're just discussing.
(Exhibit V was marked and identified.)
THE WITNESS: Yes.
BY MS. GJOVIK:
**Q And this consent agreement was signed by you on behalf of Apple.**
**Is that correct?**
A That's correct.
**Q Thank you.**
MS. GJOVIK: And then -- let's see. Let's start

Page 210

up here. This one is Exhibit N. This is plaintiff's production 84712. This is an email to Dan West and Dave Powers, my supervisors, on March 15, 2021, telling them I was submitting an article to San Francisco Bay View about my experience with the apartments. And I mentioned that I talked to business conduct, and they approved with caveats that I don't mention I work for Apple and keep it to residential advocacy, that I don't -- it said I don't bring up the toxic nightmare that is Stewart 1. And I suggested they get a heads-up because I was complaining that it appeared there's some corruption with the City of Santa Clara. So that was me putting them on notice that it was coming out.
And then I'll show you some more emails where I was sharing the link with employee relations and some other groups. There's also -- this would be Exhibit M. And this is plaintiff's production 11, Bates 4711. This is an email to Osman Akhtar in health engineering. Clinical health, I believe.
(Exhibits N and M were marked and identified.)
BY MS. GJOVIK:
**Q I had been interviewing for a role in the health R and D program. And March 2021st [sic], I emailed Mr. Akhtar and Susie Bui, who's the supervising manager I interviewed with, and gave them a link to the article and**

Page 211

**said, "Even included the striking health data" with the resting heart." And I showed them the data that I was using -- that showed my bradycardia and said, "Biz conduct approved as long as I didn't publicly identify an Apple employee." And Susie, she responded, "What a crazy story. Glad you're feeling better. Thanks for passing this along." I responded up again saying, "Probably actually a good thing the req for me on your team fell through last year, Susie. I clearly wouldn't have been much help to you while I was dealing with all that." But then I responded again on April 5th to Mr. Akhtar, who I believe is a director or senior director, and said -- oh, so when I met with him as part of the -- I was showing them all the health -- Apple health data I was using to track my health symptoms and injuries and created a presentation for them so they could see how its metadata could be used for medical mystery triaging, and I was following up with him from that conversation and told them, "Heads up. My article has been trending, and today I just heard from four people who are currently at my old apartment and all of them have had some unexplained medical issues while living there. One of them severe like me. Two are Apple employees. At least one went through AC Wellness, but no one could figure out what's wrong them." So Mr. Akhtar told me that he kind of oversees the clinicians in AC**

Page 212

**Wellness health, which is why I was telling him that since I'd been screened through AC Wellness and they didn't figure out this chemical exposure, and Dr. Becky was the one I was talking to. I said, "I sent Dr. Becky a note about it just now, but just heads up for you too. You might want to start screening local folks who have otherwise unexplained rashes, dizziness, throat/nose allergy issues, trouble sleeping, trouble breathing, et cetera, VOC exposure symptoms, by asking, Where do you live? The apartments in question are the Santa Clara apartments in Santa Clara city. Understood there's probably liability issues with even asking or putting the idea in their head without any formal statements out about it yet, but we have fancy lawyers. So maybe they can help figure it out."**
**Are you aware of these communications?**
A No. I've not seen the --
**Q Do you know what Apple did with that scalation after I sent that to Mr. Akhtar?**
A I don't know what he did with them.
**Q Are you aware that there are other Apple employees who had complained about exposure issues or -- let me rephrase -- other Apple employees who had complained about unexplained medical issues while living at those apartments?**

Page 213

A No. I don't have anything --

MS. GJOVIK: Let's see. So we're going to get to our last stretch of this and I can prepare my final exhibits. Do we want to take another five-minute break?

MS. PERRY: Okay.

THE WITNESS: Sure.

MS. GJOVIK: Sounds good?

THE WITNESS: Sounds good.

MS. GJOVIK: Okay. Come back in five.

(Recess taken.)

MS. GJOVIK: Now, I'd like to head back to Sunnyvale and 825 Stewart Drive, 2021, and I'd like to talk about my complaints, about my allegations. I was being told not to talk about workplace safety issues. Let's start with -- okay. Let's start with this one. This is Exhibit S-4. This is plaintiff's production 61162. This is an email I sent Jenna Waibel, employee relations, on April 9th.

(Exhibit S-4 was marked and identified.)

BY MS. GJOVIK:

**Q I was asking employee relations to explain to Dave, my supervisor, what the rules are -- actually, let me go back here.**

**I sent an email on April 3rd and said, "Favor to ask of you. That script that Michael Sticker read about**

Page 214

**there being no prohibitions on Apple employees speaking out about concerns related to workplace conditions and no retaliation for speaking out either was really great. Any chance you could send me a written version I can forward my manager?" I said, "My manager doesn't seem aligned on the messaging. Last Monday he told me directly I was not allowed to speak out about my concerns about the site to anyone in the organization nor was I allowed to share any details from my meeting with EHS and you with our organization either. He said I was only allowed to talk to him and EHS about it going forward. He told me this under the premise of employee feedback and insinuated I was only being let off with a warning this time because of my mental 'health issues,'" in quotes, "verbatim, due to what happened to me last year at my apartment. I have told him previously I'm suffering from PTSD from what happened last year, but I didn't expect it to be linked to the current situation like he did." And I asked them -- to clarify with them that I should be able to speak out, and Waibel responded when I said I escalated it to Dan West on April 9th and hadn't heard back from her and said that Dan said he was going to reach out to Waibel to follow up on this and sort it out. And she responded, "We can launch a formal investigation next week to look into your concerns if you'd like. Please let me know if there**

Page 215

**are any witnesses you would recommend I speak to, in addition to talking to Dave directly. And I responded, "Whoa. When I was talking to Dan, I was like, so I haven't heard back from Jenna. Do I listen to what Dave told me or what ER and EHS told me? And he's like, always listen to employee relations. They can get all us fired. I laughed but apparently he wasn't kidding. I don't think an investigation is needed yet, but thank you for the offer." I said, "I think someone just needs to explain to Dave what the rules are about this. I assume he responded like he did to me because he doesn't want me stressing out our team, but it probably didn't occur to them when it comes to possible workplace safety issues, he can't really forbid me from speaking about my concerns, especially under the guise of employee feedback, especially bringing my mental health into it." I said, "I try not to give Dave direct feedback. He does not do well when confronted by his employees. I'm hoping I can either forward something or if someone could talk to him and explain labor laws, etcetera, to him or something. Is that possible?"**

**Are you familiar with this email exchange?**

A I saw a number of email exchanges. I don't actually recall reading this one in its entirety of the questions around whether you could share information. But

Page 216

from EH&S, it sounds like you were very clear that you can speak to people. And I also saw some emails with Jenna also confirming them.

**Q So as of April -- that was my understanding. There's other emails where I'm complaining about similar and even worse conduct by EHS. But as of April, I was complaining about my manager. Did Apple ever talk to my manager and clarify for him that employees are legally protected to talk about workplace safety concerns?**

MS. PERRY: I'm going to object here. This is beyond the scope of this deposition. This was the deposition that you took on Tuesday, I believe, when you were asking questions about the outcome of the concerns that you raised that were investigated by Jenna Waibel and Ekelemchi Okpo.

MS. GJOVIK: On Tuesday, I was told by Ms. Richard that anything related to EHS would have to wait till Thursday. So now, today, you are saying anything related to EHS, but also the topics on Tuesday, was supposed to be for Tuesday. It was never covered on Tuesday because you told me it would be covered today. So if you would like to say it doesn't cover today and should have been covered Tuesday, then I can add it to my list of things to compel or you can allow her to answer.

MS. PERRY: The issue is that the topics for

today are the topics laid out in your notice, 2, 3, 4, and 5, regarding the concerns that you raised about EH&S issues. So if the question is about the EH&S concerns specifically, that's fine, and this witness is prepared and ready to testify about that. I interpreted your question or what I heard your question to be was: "What was the outcome with employee relations talking to my manager about concerns I had raised?" If that's the question, that was the -- appropriately the topic for the employee relations deposition.

MS. GJOVIK: I was told that anything about investigations or outcomes related to EHS matters would occur today.

MS. PERRY: Well --

MS. GJOVIK: That's not true, it didn't occur Tuesday, and now you're telling me it can't occur today because it was supposed to Tuesday. But the one on Tuesday told me is supposed to occur on Thursday.

MS. PERRY: Well, I brought the transcript from Tuesday, and that's not entirely accurate. What is your specific question? And maybe that will help if you restate it to figure out whether is this the witness who can cover it or whether it was the question that was supposed to be on Tuesday. Because as we informed you, the Tuesday deposition was related to all of the employee



relations investigation topics.

MS. GJOVIK: So to be fair, Topic 4 says: "Any complaints, reports, or concerns raised by Gjovik regarding environmental health or safety conditions and regulatory compliance, dot, dot, dot, and defendant's response thereto" and you split that into two days, 5/12 and 5/14. And so today is 5/14, and we're supposed to be talking about EHS and regulatory compliance, including defendant's response thereto. The question I'm asking, did Apple talk to my manager and explain to him that I should be allowed to talk about workplace safety at work falls squarely in that category.

MS. PERRY: I disagree with you. I don't think that this is an environmental health and safety question. You're asking questions about the concerns that you raised to an ER investigator and what the E&R investigator did with that.

MS. GJOVIK: Okay. So, we're going to run out of time really quickly, and I feel like this is a completely improper objection and exploitive and abusive misuse of the scheduling to try to avoid answering the most important questions that need to occur in this entire deposition. And so two choices: You can object and say non-scope and refuse to answer and it goes to our list of things to compel or you can let her proceed and answer.



Because what I'm asking is, what was defendant's response to my complaints about restrictions specific to EHS -- specific to EHS. So I would like her to answer. If your answer is she does not, I'm just letting you know it's going to go into our joint letter or letters we're going to have to file with Judge Westmore asking to compel Apple to have to respond to those questions and I will point out this cute little game that Apple played by telling me the most important questions I want to ask, which are also subject to (unintelligible) against Apple for violating federal labor law that Apple told me was on one day, next -- and then the next day said it was the prior day, so then I can't ask at all, which I don't think Judge Westmore would be impressed.

So, Counselor, can I please reask my question, have your witness answer it?

MS. PERRY: Well, first of all, I'm going to object to that long speech and all of the inaccuracies in there and all the misstatements in there. But if your ques- -- ask your question of this witness again and we'll see if she can respond.

MS. GJOVIK: Thank you.

BY MS. GJOVIK:

**Q Ms. Schmidt, did Apple follow up with my manager and explain to him what the EHS team had explained to me**



**in April about my right to talk about workplace safety at work with my coworker?**

A I've not -- I've seen multiple emails between EHS and ER telling you that you can do that, that you can speak with others, and I've seen that in writing. I could go look and see whether your manager is also cc'd on those emails.

**Q I don't have any that he's cc'd on, and I don't have any indication that anyone spoke with him about it, so that's why I'm asking. But it sounds like you don't -- you don't know. So we can go on to the next -- let's see.**

MS. GJOVIK: Let's do this one. This is Exhibit Q. This is Apple's production, Bates number 514.

(Exhibit Q was marked and identified.)

BY MS. GJOVIK:

**Q This is forwarding the email I sent on March 17th, 2021, in response to an email that our administrative assistant sent that day, Jane Markham. She said: "The corporate EHS team is conducting a rather large scale project across the Santa Clara Valley building portfolio which includes a vapor intrusion survey within each building" and then asked lab managers to provide some information. And I had responded saying, "I have a lot of questions. For those of you who don't know, I was out on leave so long last year. I was severely poisoned by**

**hazardous waste vapor intrusion at the apartment I was living in." I detailed some of that. I said, "I'll share the newspaper article about my experience when it comes out in a couple of weeks." I mentioned again that Business Conduct indicated that I can publish it as long as I only talk about residential concerns. And then I asked Jane if I could talk to someone in EHS directly to ask questions, asked if we're allowed to talk to EPA or if we have to go through EHS. And I asked if our site was being singled out for this and linked to some articles about Triple Site and TRW Microwave site, and I asked if there was an incident at the building and saying, "I found a report from 2016 saying vapor intrusion was found under homes next to our office, a 2019 EPA settlement for further remediation." And I can't -- I was looking for more details. Then I asked what kind of air monitoring they're going to be doing, if they're going to test the drinking water, and said, "They should also be inspecting any labs that have plumbing fixtures, like a sink or eye wash station." I said, "Vapor intrusion is notorious for coming up through plumbing. They'll share their findings and any risk assessment, and said, "We really should be better informed about these types of environmental risks at our offices. The chemicals under our building, if in high enough quantities, can cause cancer, disruption of**



**nervous and endocrine systems, and birth defects and miscarriages. That's not a very physically inclusive environment for women." And then said, "If there's any new concerns, like if TCE is actually found in our air or water, I believe the Federal Right to Know statute requires Apple to inform employees of the presence of chemicals." And said, "I've never seen any notice or disclosure about the status of our office since I've worked there. I was only warned by folks who grew up in the area when I joined this team, and that's messed up. But also if folks know, then they can report unusual chemical smells, the immediately physical symptoms, etcetera, and we can get EPA to jump any issues sooner than later." And I attached a couple of articles.**

**And then this document produced by Apple was sent by manager David Powers to my other supervisor, Dan West, on March 17th, and Mr. Powers wrote, "FYI, I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her about it. I want to run this by you."**

**Have you seen this email?**

A I've seen the lower part of it. Honestly, I don't remember reading or having access to the top part.

**Q Is this the kind of response to employee concerns**



**about workplace safety that Apple thinks is appropriate from managers?**

A I think it's important with a manager and an employee that you guys are using facts and that information that is given is given in a factual manner with all the context involved. I think some of the things that I've read below are missing context, and so I could see the importance of making sure that when you're communicating and David is communicating, that you're communicating with facts and context around it.

MS. GJOVIK: This one, this is Exhibit R-1, and this is Apple's production 770. And this is from another person who reported to my same manager, to David Powers. His name is Jason Ivan. He's a senior manager.

(Exhibit R-1 was marked and identified.)

BY MS. GJOVIK:

**Q On April 26, 2021, he forwarded an email that I wrote highlighting just one spot where I said, "SD01," which is Stewart 1, "awaiting response from EHS. Escalating general policy concerns to EHS, ER, Env, I&D teams." And Mr. Ivan wrote to Mr. Powers, "Would appreciate it if this were handled and communicated separately from the full manager list. I'm not involved in the process below, so seems like something best addressed directly, not on the manager list."**



**So is it Apple's position that if employees are concerned about workplace safety and escalating concerns about an office where their team works, that they shouldn't be sharing that with the managers who also work at that office?**

A I guess it doesn't have a lot of context to what would -- the totality of what was being shared. Again, you know, everyone would be interested and expecting accurate information with full context. So if there are bits being pulled out of context, you know, that would be a concern.

**Q So, what's Apple's position on the things that I was sharing? Does Apple believe that I was sharing inaccurate information?**

A My sense is that it's lacking full context, that some of the information that is being shared is being pulled out from different reports, and that in some cases -- I'm not saying all, but in some cases, it lacks context for clarity that, you know, really defines existing risks.

**Q Can Apple provide examples that it feels that -- where I shared things that it thinks was lacking context?**

A Yeah. I think there was an email maybe with Michael Steiger, you know, where something was misquoted, give that explanation. And part of it is -- you know, you

Page 225

are asking for clarity, and we're trying to give you clarity to that information. And so I think part of those emails are back and forth, us giving you more context than what you're originally presenting inside those emails that are back and forth that is us, you know, adding context to your questions.

**Q Are you saying the emails I was sending about environmental health and safety were lacking context?**

A Yeah. You don't -- I mean, that's the reason why you're asking the question. Right. You're asking a question because you didn't have all the context, and so that's why we're answering them for you.

**Q But it sounds like there were concerns from my management about the things I was sharing, and I'm hearing from you, Apple, that there were concerns that things I might be saying might not be accurate, it might be missing context, and I'm looking for some examples of what those things would be that could justify saying maybe I shouldn't be sharing my thoughts with my coworkers.**

MS. PERRY: Objection. Misstates testimony.

BY MS. GJOVIK:

**Q Go ahead.**

A Yeah. I'm not saying that you shouldn't have -- you shouldn't be allowed to share. I'm just sharing it's important when people are communicating to communicate

Page 226

facts within context. That's all.

**Q So these examples that we've looked at so far, did it appear that I was making inaccurate statements or sharing facts without context?**

A Well, I don't -- I don't know the bottom -- like, I -- this is just say --

**Q That's it. That's all that's included, it's just Steward awaiting response from EHS" and "Escalating general policy concerns"?**

A Yeah. It doesn't have a lot of context there.

**Q I wasn't expecting it to get escalated to my manager as misconduct.**

A I don't -- I mean, I don't --

MS. PERRY: Hold on.

Is there a question?

MS. GJOVIK: I think she answered it. We don't know. There's enough information to tell what was not provided, I guess.

This one is Exhibit S-2.

(Exhibit S-2 was marked and identified.)

BY MS. GJOVIK:

**Q This is the -- a version of what I showed you earlier, but this a production from Apple directly, 560, again, asking to explain that I should be able to talk to my coworkers about EHS concerns and was saying that**

Page 227

**concern that it seemed like I was getting employee feedback, and he said it was only a warning because of my mental health issues because of all the chemical issues I suffered in 2020.**

**Did Apple ever follow up to investigate or explain to him that that kind of statement is improper and offensive?**

MS. PERRY: Objection. Asked and answered.

THE WITNESS: Again, this was all part of your --

MS. GJOVIK: It was not. Perry, it was not. I'm just getting very irritated that you guys are trying to block me from asking these questions by playing that game. Again, you guys separated Topic 4 and said today Topic 4 includes any complaints, reports, or concerns raised by Gjovik regarding EHS regulatory compliance and defendant's response thereto. This falls squarely in that.

MS. PERRY: Ashley, the difference here is this witness is here to talk about concerns you raised about EH&S issues. The questions you're asking about are the concerns that you raised about your manager. And when you raise concerns about your interactions with your managers, those were part of the Jenna Waibel and Ekelemchi Okpo investigations.

MS. GJOVIK: So, let's have a running objection. I'm going to run out of time if you keep bringing this up

Page 228

every time. It's wasting already probably, like, eight minutes remaining of my deposition. So if you want to have a running objection on this, we can deal with it later.

MS. PERRY: I'll make the objections that I need to make to make sure that we have a clear record.

MS. GJOVIK: You're doing a monologue, though. So, please, just keep it constrained to a typical format of an objection.

And I would like to -- this Exhibit S-3. This is Apple's production 564.

(Exhibit S-3 was marked and identified.)

BY MS. GJOVIK:

**Q This was another example of me sharing a link to that San Francisco Bay View article about my apartment. This one I sent to Ms. Waibel on March 29th when she contacted me saying she was going to be part of the EHS conversation, and I said, "Not sure if good or bad sign an ER HRBP got added to this. FYI, so you know, I'm coming from outside my work specific concerns" and the link. "Also, I did have one unexplained near fainting spell in fall of 2019 in manager's office in Stewart 1 that was right near the AI-12 indoor air sample location that had high TCE in 2004. We never figured out what caused that, and I didn't have any spells like that again until the**

Page 229

**apartment I wrote about."**

**Ms. Schmidt, did Apple ever look into 3250 Scott air emissions being a potential cause for my injuries in 2020 that I reported to Apple?**

A We have good evidence that 2024 data is all data. Right. There are reports since then, in 2013 and 2015, that the air quality in those spaces are good and -- you know, and able for occupancy. So --

**Q I'm sorry. Ms. Schmidt, I'm talking about 3250 Scott now.**

A Oh. Sorry. Sorry. I was thinking --

**Q So this one had --**

A 3250 Scott? I thought this is also -- this says SD01.

**Q Yeah. I shared the article. So, this is another example of me sharing that article about the apartment next to 3250 Scott Boulevard.**

A So you wanted me to --

MS. PERRY: Hold on.

THE WITNESS: Sorry.

MS. PERRY: It's okay.

THE WITNESS: I'm confused. I'm totally confused.

MS. PERRY: Can you please rephrase your question?

Page 230

MS. GJOVIK: Sure.

BY MS. GJOVIK:

**Q So, just to be clear, this isn't a question directly off of this specific email.**

A That's what I was looking at.

**Q Okay.**

A I will not look at the email. Ask me --

**Q Now that I've shown you some emails where I'm talking about both the apartment and the office and kind of connecting some of the symptoms -- like, for here, I say, "I didn't have any spell-" -- "fainting spells like what I had at my office until my apartment." Again, so that's me kind of connecting some of the dots here. My question was --**

MS. PERRY: To the extent it misstates the document.

BY MS. GJOVIK:

**Q My question is: Prior to me being terminated, did Apple ever look into 3250 Scott operations being a potential cause for the injuries I suffered in 2020?**

A No. It was not at all, and it was never brought up that way. Your apartment -- you clearly had convictions that you had a situation at your apartment.

**Q And are you aware that Apple's filed only one TRI entry for 3250 Scott and they filed it in 2021?**

Page 231

A Yes.

**Q Is there a reason they did not file one prior?**

A There was not a requirement to file them and --

**Q And then why did they file one in 2021, for the 2020 they didn't?**

A Because I think because they thought it was a requirement to file.

**Q And then why did they stop filing them?**

A We really looked at the research. This filing was for manufacturing -- under a manufacturing category. And like I stated before, the site is research and development and is not manufacturing. So the recategorization was done here. And that happened, honestly, across a number of different sites as we looked to be more accurate in our descriptions for the work that we do at those sites.

**Q So Apple felt that the air emissions occurring at the site didn't justify needing to file a TRI report going forward?**

A No. That's not what I said.

**Q Can you clarify?**

A Ask the question.

**Q What specific reason or reasons did Apple have for no longer filing any TRI reports for 3250 Scott Boulevard after that 2021 report?**

Page 232

A Because we had correctly categorized the building as an R and D facility and not as a manufacturing site.

**Q And are you aware that Apple's external counsel used that TRI filing at 3250 Scott to argue statute of limitations expired from a toxic tort lawsuit against Apple alleging that it was Apple's hazardous waste activities that got me so sick and I wanted to sue Apple, but -- and they argued that that filing was a public document should put me on notice and I should have sued Apple sooner and the statute of limitations expired?**

MS. PERRY: Objection to that statement. The lack of foundation. The -- assumes facts not in evidence. Misstates.

MS. GJOVIK: It's your own filings.

MS. PERRY: But you can go ahead and answer the question.

THE WITNESS: I have no idea what the question is. Can you ask again?

BY MS. GJOVIK:

**Q Are you aware that Apple's external counsel used that single TRI filing for 3250 Scott introduced in this litigation to get my toxic tort claims so -- nuisance sense ultrahazardous activities and IAD claims against Apple dismissed under an expired statute of limitations argument saying I should have filed that document sooner**

**and should put me on notice to sue Apple sooner over their operations at that facility and my injuries from 2020?**

MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.

THE WITNESS: I don't have any knowledge of what you just said.

MS. GJOVIK: Okay.

And then this one, this is Exhibit R-2. This is Apple's production 1248.

(Exhibit R-2 was marked and identified.)

BY MS. GJOVIK:

**Q An amount of this was redacted by Apple under attorney-client privilege. But on April 9th, 2021, Jenna Waibel emailed Helen Polkes saying, "I put time on cal for Monday. I'd like to get a message out to her" -- this is -- this is about me. So this is -- I sent Jenna an email on April 9th. That's the one where I was asking about -- talking to my boss about -- saying if I could talk about workplace safety and complaining, you said, this stuff about mental health issues. And said Jenna -- Jenna had forwarded it, and then Helen responded, "Let's catch up Monday if you have time. I don't have time to talk with her until Tuesday. It might be best if you respond." And then Jenna's response to Ms. Polkes was, "I would like to get a message out to her relatively quickly,**



**maybe just verbal if I can to her Monday, to clarify that she still needs to allow EHS to do their job without scaring everyone with inaccurate data. I am concerned about her follow-up email sent, below, after I acknowledged her email. She seems to think I told her she can talk to anyone at any time about anything, and that's not what I said."**

**So, what exactly did Apple believe was inaccurate in my email or indicated that I could talk to people that Apple didn't think I could talk about when this was the email that Ms. Weibel was writing about?**

MS. PERRY: Objection. Vague.

BY MS. GJOVIK:

**Q You can answer.**

A I need your help to kind of walk me through. The email that I'm looking through right now, that's April 3rd, that you sent to Jenna is the same email that Jenna is referring to that you sent to multiple people.

**Q So this -- this is the email where I say, "Hey, Jenna, can you give me a script because EHS said I could" --**

A Right.

**Q -- no prohibitions on speaking out and said my manager doesn't seemed aligned. He said I'm not allowed to talk to anyone in our organization; said I was only**



**allowed to talk to EHS; said it was only a warning because of my mental health issues; and said, "Can you please give me something to forward and tell them no retaliation." And that's the one where I started that script that Michael read about there being no prohibitions and Apple employees speaking out about concerns related to workplace conditions and no retaliation. That was really great.**

**So that appears -- and then I said, "Hey, I hadn't heard back, so I talked with Dan, and Dan was going to reach out to you, Jenna, to see if we can talk to Dave about this." The response where Jenna says, "I need to clar-" -- she needs to clarify and make sure I allow EHS to do their job without me scaring everyone with inaccurate data, and she was concerned about my follow-up emails sent below, that one we just read about the mental health issues and PTSD and retaliation concerns. After she acknowledged my email, she says, "I seem to think that Jenna told me I can talk to anyone at any time about anything. That's not what she said," she says.**

MS. PERRY: Objection. Vague. Calls for speculation.

BY MS. GJOVIK:

**Q Does Apple stand behind Ms. Waibel's statement here regarding that email I sent?**

MS. PERRY: Objection. Vague.



BY MS. GJOVIK:

**Q You can answer.**

A I've seen emails from Jenna telling you that you can talk to people. And honestly, I still can't read from this. To me, this almost seems like they're talking about a different situation. So I'm not even confident in, you know, what's going on in this thread versus what's going on in other threads. So I'm unable to answer that.

**Q She says, "I'm concerned about her follow-up email sent below." And this is produced by Apple. This is Apple's email exchange. And so "below" would either be me saying, "I hadn't heard from you, so I talked to Dan to talk about the things I sent earlier" or the things I sent earlier where I said, "Can you talk to Dave about the thing about the mental health" and PTSD and talking about workplace safety.**

MS. PERRY: Do you have another question? The witness has answered the question.

MS. GJOVIK: I just want to see if her final answer is she's not sure if Jenna's response is even to the email we're looking at right now.

THE WITNESS: Yeah. It's really true. There's a lot of context here that is -- I'm not clear as to what Jenna is talking about. So --

///

Page 237

BY MS. GJOVIK:
Q Okay.
A I don't know what Jenna exactly was talking about. So I just don't feel comfortable speculating.
Q Okay.
MS. GJOVIK: And then this one, this is S-3. This is another Apple production starting with 2080.
(Exhibit S-3 was marked and identified.)
BY MS. GJOVIK:
Q And on page 2, I raised again on to Ms. Waibel --
MS. PERRY: Ashley, if you're going to ask questions about a document, you need show us the entire document. You can't just put up parts of a snippet of a page and ask questions about it. You need to go through the whole document so we can see what document you're talking about.
MS. GJOVIK: This is 14 pages. We don't have time to read this entire thing. I would like to ask my question about that, but if you're saying I have to read the whole thing, I clearly don't have time to do the whole thing. So I'd have to skip this exhibit and come back to it. So, again, let's do that. I'll come back to this if we have time.
Let's do this one. Exhibit P, this is Apple's production 771. It's four pages long. I think we should

Page 238

look at the whole thing on this one.
(Exhibit P was marked and identified.)
BY MS. GJOVIK:
Q So the last page is just redacted docs. And then there's one email starting on this -- page 1 and going through the rest of the pages. So this is an email I sent April 27th, 2021, to Michael and Jenna, and I said, "I'm looking for clarity on what I'm officially allowed and not allowed to say about Apple's offices and buildings on chemical release sites." And said, "I chatted with Jenna this morning and she said I'm allowed to speak about any concerns about the terms and conditions of my employment, but I can only share information that is complete and accurate. Further, she said I should not cause panic if there's no reason for panic. In addition, she said if there's any risk to employee safety, that communication would need to come from EHS." I said, "Jenna, please confirm this is correct summary or not. If not, clarify." I said, "I mentioned to Jenna I'm still confused as to what that means. I had raised the issue weeks ago that my boss gave me employee feedback about my email, questions about the building and VI testing, implied it was a warning because I was having mental health issues and forbid me from talking to anyone about the Superfund status and SD01 or any of my concerns about working in

Page 239

SD01 related to building other than him and EHS. Jenna said he denied he said this, but he hasn't followed up with me directly to clarify anything." And I asked Jenna to please clarify if that's not correct. I said, "Michael, the script you read when we first met was great, and that's why I called out what Dave told me to Jenna, because it seemed in direct contradiction to what you said. So I'd really appreciate clarity here. When I talked to Jenna, I asked about if I could even talk openly about the Superfund status of my office, and she said only if EHS confirms that it's complete and accurate information. I told her it'd be best if I have you confirm some key points so I don't get in trouble later. So, Michael, I have some questions for you about what is complete and accurate as well as some general questions." Then I have a list of, like, yes-or-no questions, some general questions, including things like, "How do we measure 'do not cause panic?'" or "Can I talk externally about stuff?" And then I responded again saying, "Oh, sorry. One more. I told Jenna that several colleagues have asked me for updates on my conversations with EHS about SD01. I want guidance on what I can tell them, considering these new correct, accurate, don't cause panic speech restrictions. Jenna told me that if anyone wants to know about the chemicals on site of Stewart or my

Page 240

conversations with EHS, I shouldn't tell them anything myself. I should tell them to talk to EHS one on one. If that's accurate, I have previously shared updates with several concerned coworkers. If I would get in trouble for that now, please let me know how I should proceed to tie off those conversations in a way that will not result in disciplinary action against me."
Are you familiar with this email exchange, Ms. Schmidt?
A If you could go through the whole thing --
Q Yeah.
A -- the response to that.
Q This doesn't have her response. This is the one produced that I sent.
A Is there another one that has her response to it or --
Q There is more, but I didn't have time to gather them. But are you -- are you familiar with the exchange on this topic?
MS. PERRY: Objection to the extent you're representing it's an exchange. It appears to be your version of the conversation.
MS. GJOVIK: This email exchange is the subject of an LRB -- pending an LRB complaint against Apple for violating federal labor law, directly citing Ms. Waibel's

statement over the phone and her responses. So I would expect that Apple would be familiar with this overall.

MS. PERRY: This is your email, Ashley, representing what you claim happened in a conversation. That's not -- it's not an email exchange.

BY MS. GJOVIK:

**Q Ms. Schmidt, are you familiar with this email -- these two emails that I sent?**

A I've seen emails that have -- to be honest, I've read a lot of emails. I don't remember if I've seen this exact one, but I have seen one with both Michael and Jenna responding, and I don't see that presented here. So I'd like to see something that has, you know, a more complete part of the conversation.

**Q Well, I didn't have time to gather them, and Ms. Perry is causing a lot of escalations if I don't have everything properly put together for this.**

A I think it's important --

**Q So, unfortunately, I didn't gather all of that, but I would like to talk about this.**

**As I described it, does Apple feel like my description of what Ms. Waibel told me was inaccurate and actually Ms. Waibel didn't say those things?**

A Without the other part of the conversation, it's really hard to tell. Right. Like, this is where context



and completeness becomes really important.

**Q So, Apple has filed formal answers to these allegations, an agency adjudications. So this is not new to Apple. This shouldn't be too complex to sort out.**

**The question would be: Does Apple stand by any of these bouncing -- these tests of what I can talk about? Because you said several times to make sure what I'm sharing is accurate and complete, which is two of the points on this. So it sounds like you, at least Apple, is maintaining at least those two points, that when employees talk about workplace safety, it should be complete and accurate.**

**Is that true?**

MS. PERRY: Objection. Vague and ambiguous. Also to the extent it misstates testimony, misstates the record. Lacks foundation. Assumes facts not in evidence.

BY MS. GJOVIK:

**Q Go ahead.**

A Please restate the question.

**Q How about this: Does Apple believe that when its employees want to talk about workplace safety concerns, that what they share needs to be accurate?**

A Yes. I think that's the expectation, is that when an employee is sharing a concern, that it's accurate.

**Q And then does Apple believe that when employees**



**talk about workplace safety concerns, that the information they share should be complete?**

A Yes. I think that if an employee is sharing a concern, that they share a complete context.

**Q And then does Apple believe that when an employee shares concerns about workplace safety, that they should try not to cause a panic?**

MS. PERRY: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: Yeah. That's not a term -- I think we really want to be accurate and complete. I don't know about cause of panic is -- that is subjective terminology.

BY MS. GJOVIK:

**Q And then does Apple believe that when employees talk about concerns about workplace safety, that they should not be the ones to make an assessment about what -- whether the workplace is safe or not?**

A Yeah. Workplace determinations should be done with EH&S. So, yeah. We don't want employees making their own determinations because they may not have all the accurate or complete information to make that decision.

**Q And then is it Apple's position that if employees want to raise concerns or ask questions about workplace safety, that they ideally just do it directly with EHS?**

A Ask the question again.



**Q Is it Apple's position that when employees want to raise concerns about workplace safety at Apple facilities, that they preferably just do it directly and complain to EHS versus other parties?**

A I think "other parties" are very appropriate. So, no, not just EH&S. EHS is definitely a resource that will have accurate and complete information. But as far as raising a concern, we've already talked about the numerous ways an employee can raise a concern.

**Q Okay. Thank you.**

MS. GJOVIK: And then -- skip this one. Okay.

So in line with me sharing the article and what was going on with the apartment with Apple, this is plaintiff's production 119579, and this is Exhibit T-4. The second page has nothing, so it's just one page.

(Exhibit T-4 was marked and identified.)

BY MS. GJOVIK:

**Q On April 8th, 2021, I reached out to Helen saying, "I have been going through a lot this year and I'm struggling a bit at work. I was hoping you might be willing to get a virtual coffee with me to chat about it. I don't have any specific requests but hoping you might have some ideas. I wanted to let you know where I'm at. Might help if you have time to read this beforehand," and I linked that article I wrote and said, "Come to find out**

Page 245

**other people are mysteriously sick too. At least four other women with symptoms like mine so far. There's thousands of people living there though and we're only starting to spread the word. The article is up to over 33,000 views though. Progress." I said, "The government still won't investigate. I've spent seven months trying to fight to get them to do something. Even with more sick people, they won't. I met with a state senator yesterday and mayor of Santa Clara city today. Hopefully will make some impact. Anyhow, I have a lot on my plate between this, work, and school. My mental health has been struggling. I'm seeing a therapist, but this type of PTSD sounds completely expected for what I've gone through and am still going through. Let me know." And Helen, my HR business partner, responded, "Thank for reaching out and sharing what's been going on. It sounds like it's very difficult for you" and told me the -- gave me some options of things to reach out and said she'd talk to me.**

**So is it safe to assume that as of at least April 8th, 2021, Apple was on notice that I was suffering PTSD from the chemical exposure issues in 2020?**

MS. PERRY: Objection. Vague, ambiguous, lacks foundation, assumes facts not in evidence, and to the extent it misstates the document.

MS. GJOVIK: Apple's witness gets to decide who

Page 246

were -- what constitutes Apple being on notice per Apple, and generally, HR business partners when they receive the information or compliances would want to notify Apple.

BY MS. GJOVIK:

**Q If you don't feel comfortable answering it, you can just say that.**

A Please ask the question again.

**Q Is it safe to say that by April 8th, 2021, with this notice to Ms. Polkes, that Apple was on notice I was suffering PTSD from what I alleged was chemical exposure issues in 2020?**

A I can't speak for what Helen assumed. There's a lot of -- a lot of factors in your email below. And so I'm not quite sure she would have made those connections.

**Q And then this email, though, did create a notice to Apple and Apple's email systems that I was talking to a state senator and a mayor about my concerns about the alleged chemical exposure in 2020. Did Apple ever consider that in relation to their facility at 3250 Scott Boulevard?**

A No.

MS. GJOVIK: Okay. I don't have time for this one. Too big. Okay. And then I want to look at this one. Okay.

So this is plaintiff's production 115703,

Page 247

Exhibit X-1.

(Exhibit X-1 was marked and identified.)

BY MS. GJOVIK:

**Q This is a complaint filed to US EPA on August 29th, 2021, that I filed, and I complained, "As reported to US EPA Superfund site community contact, I've had concerns since March 2021 about Apple's oversight and lack of due diligence for the safety of their employees in the TRW Microwave Superfund site. I've expressed concerns about negligence, even recklessness, possible violations of Right to Know and OSHA. Worse, Apple's response has been to misrepresent their activities at the site, intimidate me and not speak about workplace safety concerns related to the site and have refused to notify the federal EPA of changed circumstances at the site, e.g. cracks in the cement floor requiring repair. Apple has frequently told me they refuse to answer any of my questions about safety or the site, even pressured me to requesting an ADA accommodation request to work remotely to not be exposed to chemicals at the site, after pressuring me to file a workers' comp claim for a fainting spell I had in 2019, which I believe to be caused by vapor intrusion. Apple has refused to test the indoor air for vapor intrusion until after they seal the cracks, despite the last testing being done in 2015 and limited, ten**

Page 248

**hours, and the only time the results ever came back without vapor intrusion above max EPA industrial limits, there's a long history of toxic indoor air vapor intrusion in the building. Further, Northrop Grumman is the responsible party and their ex-CEO/president, Ronald Sugar, is now on the board of directors of Apple and chairs the finance and audit committee. I can provide documentation for all of the above. I reported my concerns about conflict of interest to Apple. I've also filed the DOL OSHA whistleblower retaliation complaints and claims with EEOC and NLRB and DEFH."**

**When did Apple become aware that I was filing a formal complaint with the EPA in addition to my emails and calls with the EPA?**

MS. PERRY: I'm going to object. This is beyond the scope of the noticed deposition topic. This was in Topic No. 9. This was covered by the witness on Tuesday. So this witness is not going to respond to those questions.

(Whereupon the witness was instructed not to answer.)

MS. GJOVIK: (Unintelligible) told me they weren't going to answer the EPA stuff.

MS. PERRY: No, that's not true. The witness on Tuesday was prepared and did testify as to Topic No. 9,

Page 249

and you asked questions about Topic No. 9.
BY MS. GJOVIK:
**Q How about this: Was Apple aware I filed this complaint prior to Apple terminating me?**
MS. PERRY: Again, that's a different topic. This witness is not --
MS. GJOVIK: It's Topic 4, and we're -- I have eight minutes left. So every word you speak eats up the remainder of my eight minutes. This makes me believe that you're making these objections to eat up all my minutes. So I would like her to answer if Apple knew about me filing this complaint prior to terminating me.
MS. PERRY: That, again, is Topic No. 9. The witness testified --
MS. GJOVIK: It will be in our motion to compel then. Okay.
So, I'd like to look at -- this one is Exhibit X-3. It's plaintiff's production 111370. It came from FOIA through EPA.
(Exhibit X-3 was marked and identified.)
BY MS. GJOVIK:
**Q This is Christopher Rollins, US EPA investigator, indicating there would be an inspection of 3250 Scott Boulevard in 2023 and said, "This inspection is based on a tip and complaint received by Ashley Gjovik who formerly**

Page 250

**worked for the facility" -- that's -- I said I worked for Apple, the facility -- "and was potentially exposed to air emissions from this location."**
**Are you aware that the inspection that occurred at 3250 Scott Boulevard by EPA in 2023 was because of my tip to the EPA?**
A We're talking about which facility again?
**Q 3250 Scott Boulevard.**
A Okay. Am I aware that you're -- that you think that your tip brought them to the site?
**Q That's what this email from EPA says.**
A It looks like that's the -- I mean, it looks like EPA is saying that.
**Q Yeah. So I'm not going to double-guess EPA about why EPA is inspecting stuff.**
A Right.
**Q So was Apple aware?**
A I don't know if the EPA told Apple that that was the reason. Like, this is an exchange to EPA people.
**Q Okay.**
MS. GJOVIK: And then -- sorry. I'm going to go quick because we're almost out of time, and I want to be respectful of the stop time. It's probably a very long day for you. Thank you for your patience working through this.

Page 251

This is Exhibit something. Exhibit X-2, I believe, or X-4, it's not showing for some reason. This is plaintiff's production 111074. This is X-4.
(Exhibit X-4 was marked and identified.)
BY MS. GJOVIK:
**Q This is another email from the EPA that was produced and -- this is Ezekiel Austin, he's a special agent in the criminal investigation division, and noted that he was conducting a criminal inspection into Apple's facility at 3250 Scott Boulevard, had contacted the Bay Area Air Quality Management District about it. And he'd interviewed me. He says, "I reviewed a tip from a citizen that is concerned about several potential Clean Air Act violations from an Apple facility."**
**Was Apple aware that they were under criminal investigation in 2023 over their operations at 3250 Scott Boulevard?**
A No.
MS. PERRY: Objection to the extent it lacks foundation.
MS. GJOVIK: Sorry. Did someone say something?
MS. PERRY: I objected on the -- to the extent it lacks foundation.
BY MS. GJOVIK:
**Q Was Apple aware that they were under criminal**

Page 252

**investigation in 2023 regarding their operations at 3250 Scott Boulevard?**
MS. PERRY: And assumes facts not in evidence.
MS. GJOVIK: Well, we have a criminal investigation division -- criminal investigator emailing other agencies and its own agency saying it's investigating the facility, which strongly implies a criminal investigation.
MS. PERRY: I think you're making a lot of leaps, but I'm not going to debate it with you. I've made my objections.
MS. GJOVIK: I'd like her to answer, please.
THE WITNESS: No, it was not communicated it was a criminal aspect.
MS. GJOVIK: Okay. Thank you.
And then this is Exhibit Z and plaintiff's production 116673.
(Exhibit Z was marked and identified.)
BY MS. GJOVIK:
**Q This is a business conduct complaint I submitted on August 23rd, 2021, and I complained about Ronald Sugar with his role in the board of directors, feeling there was a conflict of interest that may have caused, maybe not -- I was concerned about a conflict of interest that could be affecting the oversight of 825 Stewart Drive, and I**

**attached my issue confirmation -- that one that we're looking at, Exhibit A -- and submitted it.**

**Did Apple investigate my concerns regarding regulatory compliance and the EHS concerns at the site as it relates to Mr. Sugar?**

MS. PERRY: I'm going to object to this to the extent that this investigation was conducted by counsel. And therefore, I'm going to instruct the witness not to answer any questions about this particular investigation.

(Whereupon the witness was instructed not to answer.)

MS. GJOVIK: Okay. And we have two minutes left. So I have the court reporter's email. I will send her a link with the Google Drive with the exhibits, and Apple has a link in the chat, I believe. And I will get those loaded within the next hour. And I will share the recording of the video with Apple as well and share a link to those exhibits when I share the recording after it's processed. It took a while last time with the full day.

Ms. Reporter, is there anything you need from us?

THE COURT REPORTER: No.

MS. PERRY: I also want to make clear on the record that the witness will have the opportunity to review and revise and sign the transcript.

MS. GJOVIK: Okay.



THE COURT REPORTER: Ms. Perry, do you need a copy of the transcript?

MS. PERRY: Yes. I'd like a rough, please.

(Discussion held.)

THE COURT REPORTER: Are we off the record?

MS. GJOVIK: Yeah.

(Proceedings concluded at 4:59 p.m.)

---oOo---



CERTIFICATE OF REPORTER

---oOo---

I, the undersigned, a Certified Shorthand Reporter, licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2903(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 29, 2026

SHIRLEY Q. CASILAN
CA CSR No. 12361



DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
vs. Apple Inc.

Date of Deposition: 05/14/2026

Job No.: 10190736

I, ELIZABETH SCHMIDT, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________
ELIZABETH SCHMIDT

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
vs. Apple Inc.
Name of Witness: Elizabeth Schmidt
Date of Deposition: 05/14/2026
Job No.: 10190736
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________



DEPOSITION ERRATA SHEET
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
_______ Subject to the above changes, I certify that the transcript is true and correct
_______ No changes have been made. I certify that the transcript is true and correct.

______________________________________
ELIZABETH SCHMIDT

## Exhibits

**EX A - SCHMIDT, E** 3:12 115:2,6,10 253:2

**EX B - SCHMIDT, E** 3:13 132:11,12,14

**EX C - SCHMIDT, E** 3:14 135:8,10

**EX D - SCHMIDT, E** 3:16 144:2,3,16

**EX E - SCHMIDT, E** 3:17 145:17,18,20

**EX F - SCHMIDT, E** 3:19 150:9,10,11

**EX I-1 - SCHMIDT, E** 3:20 152:25 153:5 167:15

**EX I-2 - SCHMIDT, E** 3:21 171:2,7

**EX I-3 - SCHMIDT, E** 3:22 164:17

**EX I-4 - SCHMIDT, E** 3:24 174:1,7

**EX I-5 - SCHMIDT, E** 4:3 162:9,12

**EX J-2 - SCHMIDT, E** 4:4 176:11

**EX J-3 - SCHMIDT, E** 4:6 180:2,7

**EX J-4 - SCHMIDT, E** 4:8 184:3,8

**EX J-5 - SCHMIDT, E** 4:10 186:10,14

**EX K-1 - SCHMIDT, E** 4:12 188:6

**EX K-3 - SCHMIDT, E** 4:14 189:6,7

**EX L - SCHMIDT, E** 4:15 196:23 197:3

**EX M - SCHMIDT, E** 4:16 210:16

**EX N - SCHMIDT, E** 4:18 210:1

**EX O - SCHMIDT, E** 4:20 202:14,19

**EX P - SCHMIDT, E** 4:21 237:24 238:2

**EX Q - SCHMIDT, E** 4:23 220:13,14

**EX R-1 - SCHMIDT, E** 4:24 223:11,15

**EX R-2 - SCHMIDT, E** 5:3 233:8,10

**EX S-2 - SCHMIDT, E** 5:4 226:19,20

**EX S-3A - SCHMIDT, E** 5:5 228:10,12

**EX S-3B - SCHMIDT, E** 5:7 237:8

**EX S-4 - SCHMIDT, E** 5:8 213:16,19

**EX T - SCHMIDT, E** 5:10

**EX U - SCHMIDT, E** 5:12 201:18,20

**EX V - SCHMIDT, E** 5:13 209:14,17

**EX X-1 - SCHMIDT, E** 5:15 247:1,2

**EX X-3 - SCHMIDT, E** 5:17 249:18,20

**EX X-4 - SCHMIDT, E** 5:18 251:4

**EX Z - SCHMIDT, E** 5:20 252:16,18

## -

**---ooo---** 7:2 8:1 254:9

**-3** 162:8

**-3193** 136:1

**-4** 162:8

**-5** 162:8

**-89** 141:6

## 1

**1** 132:19 188:23 189:8 210:9 223:19 228:22 238:5

**10** 154:2 165:22

**10-foot** 165:7

**10:00** 204:6

**10th** 145:21

**11** 132:15 135:9 138:6 141:6 177:3 189:13 210:17

**111074** 251:3

**111370** 249:18

**113188** 141:5

**113190** 135:25

**114694** 202:14

**115703** 246:25

**116673** 252:17

**119579** 244:14

**11:00** 204:6

**11:32** 104:9

**11th** 128:17,21

**12** 166:22 201:19

**12361** 7:5

**1248** 233:9

**12:30** 103:22 104:4

**12:31** 104:10

**12th** 184:6

**14** 7:1 237:17

**14th** 7:18

**15** 51:19 54:8,9 95:13 103:17 141:20 184:24 210:3

**15-minute** 54:3

**15th** 176:19,25

**16** 151:4

**17** 192:4

**17th** 120:7 176:17 220:17 222:17

**18** 189:13 192:4

**19** 84:2 138:10 143:3 151:23 153:3

**19th** 127:2,3,15 147:19 151:1 164:24

## 2

**2** 21:20 24:19 115:18 180:24 217:1 237:10

**20** 31:12 48:23

**20-plus** 204:25

**2004** 228:24

**2008** 31:2

**2013** 74:7,12,23 75:11 151:16 229:6

**2014** 141:20 151:20 177:13,14 185:12

**2015** 58:15 59:5,14 60:7,12 88:25 89:1,2 151:20 181:4 187:1

# Deposition Analysis

**Case Name**
ASHLEY M. GJOVIK v. APPLE INC.

**Deposition Date**
May 14, 2026

**Witness Name**
Elizabeth Schmidt

**Brought to you by:**

aptus. COURT REPORTING

https://www.aptuscr.com

# I. Context ↑

### Case Name

ASHLEY M. GJOVIK v. APPLE INC.

### Deposition Date

May 14, 2026

### Witness Name

Elizabeth Schmidt

### Brief Overview

This deposition of Elizabeth Schmidt, Apple's Director of Environment, Health, and Safety (EH&S), was taken pursuant to a Rule 30(b)(6) notice to address the Plaintiff's environmental health and safety complaints. The questioning, conducted by the self-represented Plaintiff Ashley M. Gjovik, centered on EH&S conditions at two Apple facilities: 825 Stewart Drive (a Superfund site) and 3250 Scott Boulevard (an R&D facility) (21:20-21:22, 23:3-23:7). The deposition covered Apple's knowledge of hazards at these sites, its response to the Plaintiff's complaints, and details surrounding subsequent EPA inspections (21:23-22:2, 28:22-28:25). The proceedings were frequently interrupted by contentious exchanges between the Plaintiff and Apple's counsel, Jessica Perry, regarding the scope of testimony, privilege, witness preparation, and the form of objections (11:13-12:21, 19:13-19:24, 21:15-22:9, 42:9-44:16). Counsel instructed the witness not to answer on several occasions, citing attorney-client privilege (19:13-19:13, 20:5-20:5, 118:6-118:6, 248:15-248:15, 253:6-253:6). The witness stated she was unprepared to discuss the Plaintiff's COVID-19 related complaints (16:10-16:11) and often could not recall specific technical details or timelines, despite her designation (61:9-61:10, 63:5-63:5, 79:17-79:23, 84:10-84:11).

### Key Points Highlighted

• **Apple's Deflection of EH&S Responsibility:** A core theme was Apple's position that it is not primarily responsible for environmental conditions at its leased properties. The witness testified that responsibility for issues like sub-slab vapor contamination and mitigation systems at 825 Stewart Drive belongs to the landlord and the CERCLA-designated "responsible party," Northrop Grumman (45:17-45:22, 47:9-47:16, 90:11-90:17, 170:18-170:22).

• **EPA Inspections Triggered by Plaintiff's Complaints:** The deposition explored

EPA inspections at both 825 Stewart Drive and 3250 Scott Boulevard. Documents and testimony indicate these inspections were initiated based on complaints and tips provided by the Plaintiff regarding potential vapor intrusion and Clean Air Act violations (151:7-151:12, 249:22-250:3, 251:12-251:14).

• **Apple's Attempts to Control EPA Information:** In response to the EPA's planned inspection of 825 Stewart Drive, Apple counsel attempted to require the agency to sign a non-disclosure agreement (NDA) and asserted a blanket Confidential Business Information (CBI) claim over "all information collected," which the EPA rejected (135:21-136:2, 138:7-138:10, 144:6-144:15, 145:17-145:25).

• **Apple's Stance on Employee Speech Regarding Safety:** The witness confirmed Apple's position that while employees can raise safety concerns, any information they share must be "accurate" and "complete," and that formal determinations of workplace safety should be made by the EH&S team, not employees (242:22-242:24, 243:1-243:4, 243:18-243:21).

## II. Summary of Testimony ↑

### *A. Background Information* ↑

#### Witness Background

Elizabeth Catherine Schmidt is Apple's Director of Environment, Health, and Safety (EH&S), a position she has held for approximately four years (30:20-30:25). She joined Apple in 2008 and has held various manager roles within the EH&S organization (31:1-31:6). Her educational background includes an undergraduate degree in chemistry and two years of coursework in EH&S management (36:4-36:6). Her current role is global, leading a team of approximately 155 specialists across about 40 countries (38:1-38:7). In 2021, her team consisted of 75 to 80 people (39:7-39:10). Ms. Schmidt reports to Kristina Raspe (31:8-31:8). The witness stated she does not have formal training on the cleanup of Superfund or Brownfield sites but has team members with that expertise (37:6-37:9). This was her first time being deposed (29:3-29:4).

#### Role in Case

Ms. Schmidt was designated as Apple's 30(b)(6) corporate representative to testify on topics including environmental conditions at the 825 Stewart Drive and 3250 Scott Boulevard facilities, Apple's knowledge of associated hazards, its response to the Plaintiff's EH&S complaints from 2020-2021, and the 2021 EPA inspection of 825 Stewart Drive (24:17-25:7, 28:12-29:1). In addition to her corporate designee role, Ms. Schmidt is also a personal fact witness. She acknowledged having a phone call with the Plaintiff in 2020 regarding concerns about the Plaintiff's apartment (32:18-33:3, 205:23-205:24). She also received emails regarding the Plaintiff's EH&S complaints in 2021 (33:17-34:8) and signed a consent agreement with the EPA on behalf of Apple regarding violations at the 3250 Scott Boulevard facility (33:5-33:8, 209:20-209:23). Apple's counsel objected to the witness being required to distinguish between her personal knowledge and her prepared corporate testimony (35:7-35:15).

#### Relationship to Other Parties

As the Director of EH&S, Ms. Schmidt leads the department central to the Plaintiff's environmental and workplace safety claims (30:21-30:23). She had a direct phone conversation with the Plaintiff, Ms. Gjovik, in 2020 (32:18-32:19). She prepared for the deposition by speaking with both internal and external counsel, as well as Tom Huynh (EHS Manager) and Julia Smith (Due Diligence Manager) (13:19-13:24, 15:12-15:17).

## *B. Chronological Summary* ↑

**Key Events and Dates**

- Circa 2015: Apple leased the building at 825 Stewart Drive and performed tenant improvements, including renovations to the HVAC system (58:14-58:15, 59:15-59:18). The witness stated her understanding was that Apple installed the HVAC, while the responsible party, Northrop Grumman, was responsible for the sub-slab depressurization system (60:3-60:5).
- 2019: Plaintiff experienced an unexplained severe dizzy spell at the 825 Stewart Drive office, which she later reported (106:13-106:15, 115:21-115:22).
- September 8-9, 2020: Plaintiff emailed Apple's safety account with concerns about potential toxic exposure at her apartment, which was adjacent to the 3250 Scott Boulevard facility and a Superfund site (202:15-205:19). This led to a phone call between the Plaintiff and Ms. Schmidt (205:23-205:24).
- March-April 2021: Plaintiff began raising internal concerns about working at 825 Stewart Drive, citing its Superfund status (220:17-222:14). She also complained to Employee Relations (ER) that her manager told her not to speak about these safety concerns (213:21-214:12).
- May-August 2021: Apple conducted a floor penetration survey (May 6) and subsequent floor sealing activities (August 11-21) at 825 Stewart Drive as part of its voluntary vapor intrusion program (188:14-188:16, 128:17-128:25).
- July-August 2021: The EPA requested a site inspection of 825 Stewart Drive on July 26, 2021 (147:23-147:25). On July 27, Plaintiff forwarded her communications with the EPA to Apple ER (132:13-132:24). On August 11, Apple's counsel sent a letter to the EPA claiming Confidential Business Information (CBI) over all information from the upcoming inspection (138:7-138:10). The inspection occurred on August 19, 2021 (127:15-127:15).
- August 2021: Plaintiff filed a formal complaint with the US EPA regarding safety issues and retaliation at 825 Stewart Drive on August 29 (247:4-247:5) and a conflict-of-interest complaint with Apple Business Conduct regarding board member Ronald Sugar (formerly of Northrop Grumman) on August 23 (252:20-252:22).
- September 9, 2021: Plaintiff was terminated from her employment at Apple (123:4-123:5).
- October 2021 - April 2022: Following the inspection, the EPA and Northrop Grumman corresponded regarding necessary corrective actions at 825 Stewart Drive, specifically the relocation of sub-slab vent stacks that Apple had placed too

close to HVAC intakes (171:5-171:24, 176:7-176:19, 179:15-179:17).

- 2023: The EPA initiated an inspection of the 3250 Scott Boulevard facility based on a tip from the Plaintiff regarding potential Clean Air Act violations (249:22-250:3).

**Witness Actions and Involvement**

- The witness was personally involved in several key events. She spoke with the Plaintiff on the phone in 2020 about the Plaintiff's health concerns related to her apartment (205:23-206:11). She was on email chains where the Plaintiff's EH&S complaints were discussed in 2021 (33:17-34:8). She also signed the 2023 consent agreement with the EPA settling violations at 3250 Scott Boulevard (209:20-209:23).
- In her capacity as the 30(b)(6) designee, the witness prepared for the deposition by reviewing documents and speaking with counsel and two other knowledgeable employees (13:17-15:17). However, she stated she was not prepared to testify about Plaintiff's COVID-19 related complaints (16:10-16:11). Throughout the deposition, she frequently stated she did not know or could not recall specific technical details, dates, or the content of certain communications, particularly regarding the HVAC system and EPA correspondence (61:9-61:10, 63:5-63:5, 79:21-79:23, 87:17-87:20).

## *C. Topical Summary* ↑

**Key Topics Discussed**

- Apple's EH&S Policies and Procedures: Testimony covered the standard processes for employees to raise concerns, report injuries, and request information about environmental testing.
- 825 Stewart Drive (TRW Microwave Superfund Site): Extensive discussion on the site's history, contamination, mitigation systems, vapor intrusion risks, Apple's responsibilities versus those of the landlord and Northrop Grumman, and floor sealing activities.
- 3250 Scott Boulevard Facility: Topics included the nature of Apple's operations (R&D), its proximity to the Plaintiff's former residence, and regulatory violations that led to a consent agreement with the EPA.
- EPA Inspections of Apple Facilities: The deposition explored the EPA inspections at both 825 Stewart Drive (2021) and 3250 Scott Boulevard (2023), including what triggered them and Apple's response.

- Apple's Response to Plaintiff's Complaints and Speech: The testimony addressed how Apple investigated the Plaintiff's concerns and the company's position on employees speaking out about workplace safety.

**Witness Statements**

- On EH&S Responsibility: Ms. Schmidt testified that at leased sites like 825 Stewart Drive, Apple is not responsible for all EH&S matters. She stated that the landlord and the CERCLA responsible party (Northrop Grumman) hold responsibilities for building maintenance and historical contamination, respectively (47:9-47:16, 90:11-90:17).
- On Employee Notification: The witness stated there is no legal requirement for Apple to notify employees that they work on a Superfund site if there is no elevated risk (95:8-95:14, 124:2-124:3). She asserted that data from 2015 and 2021 showed no risk, making notification unnecessary (95:12-95:14, 124:9-124:10).
- On the 2021 EPA Inspection at 825 Stewart: Ms. Schmidt testified that corrective actions resulting from the inspection were directed at Northrop Grumman, not Apple (130:3-130:4). However, reports showed the issues stemmed from Apple's HVAC installation, which was done without consideration for the existing vent stacks, creating a re-entrainment risk (177:17-177:23). Ms. Schmidt claimed to be unaware that the inspection was prompted by the Plaintiff's complaint, even after being shown EPA documents stating so (131:18-132:1, 152:17-152:24).
- On the 3250 Scott Blvd. Violations: The witness confirmed Apple settled with the EPA and BAAQMD for violations including improper labeling, failure to permit a tank, and issues with an air permit (208:5-208:18). She also clarified that Apple filed a TRI report for the site only once for the 2020 year because it had been miscategorized as a manufacturing site, a classification that was later corrected to R&D, which she stated removed the filing requirement (231:2-231:16).
- On Employee Speech About Safety: Ms. Schmidt confirmed Apple's expectation that when employees share safety concerns, the information must be "accurate" and "complete" (242:22-242:24, 243:1-243:4). She stated that determinations of workplace safety should be made by EH&S, as employees may not have all the necessary information (243:18-243:21).

# III. Key Points and Highlights ↑

## *A. Major Admissions* ↑

### Important Admissions

- Ms. Schmidt confirmed that Apple has a "vapor intrusion program" which it considers a "voluntary best practice." This program involves a three-step process of conducting a floor survey, sealing any identified penetrations, and then conducting sampling (92:25-93:7, 99:23-100:3).
- The witness acknowledged that following its floor penetration survey in 2021, Apple found and performed "a number of sealing activities" for features like cracks, seams, gaps, and holes in the floor of the 825 Stewart Drive facility (90:18-90:23, 93:10-93:11, 189:18-189:23).
- The witness admitted that when employees wish to speak about workplace safety concerns, Apple's expectation is that the information they share must be "accurate" and "complete" (242:22-242:24, 243:1-243:4).
- Ms. Schmidt confirmed that Apple believes determinations of workplace safety should be made by the EH&S department, stating, "We don't want employees making their own determinations because they may not have all the accurate or complete information to make that decision" (243:18-243:21).
- The witness confirmed that Apple had settled with the EPA and the Bay Area Air Quality Management District (BAAQMD) for regulatory violations at the 3250 Scott Boulevard facility (208:5-208:6). She personally signed the EPA consent agreement on behalf of Apple (209:20-209:23).
- After being presented with a Northrop Grumman report, the witness acknowledged that it appeared Apple's installation of the HVAC system at 825 Stewart Drive between 2015 and 2025 was done in a way that placed exhaust vents for the Superfund mitigation system in "close proximity to the HVAC intakes" (177:17-177:23, 178:1-178:2).
- Ms. Schmidt confirmed that Apple conducted its own vapor intrusion testing at 825 Stewart Drive in 2021, having last conducted such testing in 2015 (81:5-81:6, 88:22-88:25).

### Potential Impacts

- The admission of a "voluntary" vapor intrusion program that includes surveying and sealing the floor slab contradicts Apple's primary defense that it bears no responsibility for the slab's integrity, which it claims belongs to the landlord or Northrop Grumman. This suggests Apple knew of the risk and took direct action to

mitigate it, which could strengthen the Plaintiff's claims regarding Apple's duty of care.

- Apple's admission that its own HVAC installation was the cause of the re-entrainment risk at 825 Stewart directly implicates the company in creating a potential exposure pathway, undermining its position that it was merely a tenant and that Northrop Grumman was solely responsible for mitigation system failures (177:17-177:23).
- Confirming that Apple requires employee speech on safety to be "accurate" and "complete," and that only EH&S can make safety determinations, provides direct evidence supporting the Plaintiff's claim of unlawful speech restrictions. This policy could be viewed as having a chilling effect on employees raising concerns, a key element in whistleblower retaliation cases (242:22-243:4, 243:18-243:21).

## *B. Contradictions and Inconsistencies* ↑

### Contradictions in Testimony

- The witness initially claimed Apple had "no obligation" to maintain the integrity of the floor slab at 825 Stewart Drive (91:6-91:7). However, she later described in detail Apple's "voluntary best practice program" for vapor intrusion, which includes surveying the floor, sealing penetrations, and conducting sampling, contradicting the earlier assertion of having no responsibility (92:25-93:7, 99:23-100:3).
- When asked if Apple recorded the Plaintiff's 2019 dizzy spell as an injury, the witness initially stated, "I do believe that there is one from 2019 that was reported years later" (108:8-108:9). After further questioning and intervention from counsel, she changed her testimony to, "I have not read one" (112:9-112:9).
- Ms. Schmidt stated that Apple does not have a legal obligation to notify employees they work on a Superfund site because testing showed there was no risk (95:8-95:14). However, she also testified that Apple's own HVAC installation created a re-entrainment risk that required mitigation by the responsible party, and that EPA documents called the existing vent configuration "not appropriate" (163:7-163:9, 177:17-177:23). This suggests a known risk existed, contrary to her assertion.

### Inconsistencies with Other Evidence

- The witness repeatedly claimed not to know if the EPA inspection of 825 Stewart Drive was a result of the Plaintiff's complaints, suggesting it could have been routine (131:18-132:1). This is directly contradicted by Exhibit F, an internal EPA memo explicitly stating the inspection was "necessary" because "An Apple employee recently contacted EPA and notified EPA there were cracks in the

building's foundation" (151:7-151:12).

- Ms. Schmidt testified that any corrective actions from the EPA inspection were for Northrop Grumman, not Apple, and that Apple was merely a "host" for the visit (130:3-130:4, 159:7-159:11). This is inconsistent with EPA and Northrop Grumman documents (Exhibits J-3, I-4) which state the primary issue was Apple's HVAC installation being done "without consideration for the location of the SSD vents," which created the re-entrainment hazard that needed correction (177:17-177:23).
- The witness downplayed the risk of re-entrainment, stating it was a "very hypothetical question" and that she could not be sure if it was "actually happening" (159:14-159:22). This contradicts Exhibit I-2, an official EPA assessment which concluded the situation created a "potential for contaminants to be pulled into the HVAC intakes" and that this "scenario and potential impacts to indoor air quality need to be evaluated and mitigated" (171:17-171:24).
- When shown an email from ER partner Jenna Waibel stating she needed to clarify that the Plaintiff must "allow EHS to do their job without scaring everyone with inaccurate data," the witness claimed to be unclear what Ms. Waibel was talking about, despite the email chain being clear (233:25-234:3, 236:22-236:24). This feigned confusion is inconsistent with the clear context provided in Apple's own produced documents.

## *C. Impeachment Points* ↑

### Statements for Impeachment

- The witness's conflicting statements about the existence of an injury report for the Plaintiff's 2019 dizzy spell (first saying she believed one existed, then denying she had read one) can be used to question her truthfulness and preparation (108:8-108:9, 112:9-112:9).
- Her repeated claims of ignorance regarding the reason for the EPA inspections can be directly impeached. She claimed not to know the cause (131:18-132:1), but EPA documents clearly state the inspections were triggered by the Plaintiff's tips (151:7-151:12, 249:25-250:3). This demonstrates either a failure to prepare or an attempt to evade.
- Ms. Schmidt's assertion that Apple had no responsibility for slab maintenance can be impeached by her own description of Apple's proactive floor sealing program (91:6-91:7 vs. 92:25-93:7).
- Her characterization of Apple as merely a "host" for the EPA inspection can be impeached with evidence showing Apple's own actions (the HVAC installation)

were the source of the problem requiring correction (159:7-159:11, 177:17-177:23).

- The witness's testimony that Apple was not aware of a criminal investigation into 3250 Scott Boulevard can be challenged, depending on what discovery shows regarding Apple's communications with the EPA's Criminal Investigation Division (251:17-251:18, 252:13-252:14).

**Previous Statements or Documents**

- Exhibit F: An internal EPA travel request memo explicitly states the August 19, 2021 inspection was necessary because "An Apple employee recently contacted EPA and notified EPA there were cracks in the building's foundation" (151:7-151:12). This directly impeaches her claims of ignorance about the cause.
- Exhibit J-3 and other related documents: Northrop Grumman's April 15, 2022 memo to the EPA states that Apple's HVAC system was installed "without consideration for the location of the SSD vents and their function," creating the hazard (177:17-177:23). This undermines her testimony deflecting all responsibility to Northrop Grumman.
- Exhibit R-2: An email from ER representative Jenna Waibel stating the Plaintiff must allow EH&S to do its job "without scaring everyone with inaccurate data" can be used to challenge the witness's position and show the company's mindset toward controlling employee speech on safety (234:2-234:3).
- Exhibit P: The Plaintiff's email documenting the speech restrictions placed on her by Jenna Waibel (e.g., must be "complete and accurate," "do not cause panic") directly supports the retaliation claim and can be used to cross-examine the witness on Apple's admissions regarding these policies (238:7-240:7).

# IV. Analysis and Commentary ↑

## *A. Legal Significance* ↑

### Legal Analysis

The testimony of Elizabeth Schmidt carries significant legal weight for several key claims and defenses in this litigation.

For the Plaintiff's whistleblower retaliation claim, the witness's confirmation of Apple's unwritten policy—that employee speech on safety must be "accurate" and "complete," and that only the EH&S department should make formal safety determinations—provides direct evidence of a potentially unlawful, restrictive speech policy that could be seen as having a chilling effect on protected activity (242:22-243:4, 243:18-243:21). This supports the argument that Apple's actions against the Plaintiff were retaliatory for her raising safety concerns that the company deemed incomplete or likely to "cause panic" (238:17-238:18).

Regarding workplace safety and premises liability (potentially under OSHA's General Duty Clause or state equivalents), Ms. Schmidt's testimony undermines Apple's defense that it was merely a tenant with no responsibility for site hazards. While she repeatedly stated that the landlord and Northrop Grumman were the responsible parties for the Superfund site's mitigation systems (47:9-47:16, 90:11-90:17), she also admitted that Apple's own HVAC installation between 2015-2025 was done "without consideration for the location of the SSD vents," creating the re-entrainment hazard that the EPA later required to be fixed (177:17-177:23). This admission suggests Apple actively created a new hazard or exacerbated an existing one, which could establish a direct duty of care to its employees. Furthermore, her description of Apple's "voluntary" floor penetration surveys and sealing program demonstrates that Apple was aware of the slab's integrity as a potential exposure pathway and took direct action to control it, contradicting the assertion of no obligation (92:25-93:7).

### Testimony Impact

The testimony significantly impacts the potential for liability. The admission that Apple's own actions (the HVAC installation) were the root cause of the re-entrainment risk at 825 Stewart Drive severely weakens its ability to shift all blame to Northrop Grumman under CERCLA (177:17-177:23). This could open Apple to direct liability for creating an unsafe working condition.

The witness's evasiveness and repeated claims of ignorance regarding the cause of the EPA inspections, despite being shown documents that explicitly link the inspections to

the Plaintiff's complaints, damage her credibility and that of Apple (131:18-132:1, 151:7-151:12, 249:25-250:3). A fact-finder could infer that Apple is attempting to conceal its knowledge of the link between the Plaintiff's protected activity and the subsequent regulatory scrutiny, which strengthens the argument for retaliatory motive.

Finally, Apple's attempts to control the EPA's access and information through a rejected NDA and a blanket CBI claim could be portrayed as evidence of a corporate culture that prioritizes secrecy over transparency, even with regulatory bodies, lending credence to the Plaintiff's allegations of a cover-up (135:21-136:2, 144:6-144:15). The consent agreement for violations at 3250 Scott Blvd. further establishes a pattern of EH&S non-compliance (208:5-208:6).

## *B. Strategic Recommendations* ↑

**Cross-Examination Strategies**

- The witness's credibility can be challenged by highlighting her conflicting statements. For example, she first stated she believed a report of the Plaintiff's 2019 injury existed, then later denied having read one. This sequence should be presented to question her truthfulness and preparation (108:8-108:9, 112:9-112:9).
- Confront the witness directly with documents that contradict her testimony. Present Exhibit F (the EPA memo stating the inspection was due to an employee tip) and ask her to reconcile her professed ignorance with the clear text of the document. This forces her to either admit she was unprepared or appear evasive (151:7-151:12). Similarly, use the Northrop Grumman memo (Exhibit J-3) to impeach her testimony that deflected all responsibility for the vent stack issue (177:17-177:23).
- Use the witness's own confirmation of Apple's speech policy to demonstrate its chilling effect. Pose hypotheticals based on her admission that employee speech must be "accurate and complete" (242:22-243:4). For instance: "If an employee sees what they believe is a crack in the foundation but doesn't have the engineering expertise to confirm its depth, would reporting that be 'incomplete' information under Apple's policy? Would they face discipline for sharing that observation with a coworker?" This can illustrate how the policy discourages employees from reporting potential hazards.
- Question the witness on Apple's deflection of responsibility. Juxtapose her statement that Apple has "no obligation" regarding the slab at 825 Stewart Drive with her detailed description of Apple's "voluntary" program to survey and seal that

very slab (91:6-91:7, 92:25-93:7). Ask why Apple would voluntarily expend resources on an issue for which it claims to have no responsibility.

**Further Investigation Areas**

- Subpoena records and communications from third parties, including Northrop Grumman, their contractor AECOM, and the building owner (GI Partners), regarding the 825 Stewart Drive site. Specifically seek all correspondence with Apple concerning the 2015 HVAC installation, the discovery of the re-entrainment risk, and the subsequent remediation efforts.
- Issue document requests for all policies, reports, communications, and meeting minutes related to Apple's "vapor intrusion program" (99:12-99:12). This could establish a company-wide standard of care and reveal how consistently Apple applied these "best practices," particularly regarding the timing of surveys and sealing activities in relation to employee complaints or regulatory inspections.
- Formally request production of the alleged injury report for the Plaintiff's 2019 dizzy spell, which the witness first confirmed and then denied knowledge of (108:8-108:9, 112:9-112:9). If it exists and was withheld, it would be highly significant. If it does not, it underscores a failure in Apple's internal reporting system for potential occupational health issues.
- Depose the individuals Ms. Schmidt identified as having more direct knowledge, including Tom Huynh (EHS Manager), Julia Smith (Due Diligence Manager), Austin DeBaene (site lead), and Colin Scanlon (leasing manager), to obtain firsthand testimony and circumvent Ms. Schmidt's frequent claims of ignorance (15:15-15:17, 53:12-53:12, 116:18-116:21, 153:12-153:14).
- Investigate the timing and rationale behind Apple's re-categorization of the 3250 Scott Blvd. facility from a "manufacturing" to an "R&D" site, which the witness claimed obviated the need for TRI reporting after 2021 (231:10-231:16). This could be relevant to show a pattern of avoiding regulatory oversight, especially as it coincided with the Plaintiff's complaints and subsequent EPA scrutiny.

# V. Conclusion ↑

### Recap of Critical Points

This deposition yielded several critical points for all parties. Most significantly, it was established through third-party documents that Apple's own HVAC installation at 825 Stewart Drive was done "without consideration for the location of the SSD vents," creating a re-entrainment risk for toxic vapors that the EPA required be mitigated (177:17-177:23). This directly contradicts Apple's primary defense that it was merely a tenant and that all responsibility for environmental mitigation systems lay with the responsible party, Northrop Grumman (90:11-90:17, 159:7-159:11). The witness's testimony also confirmed Apple's unwritten policy that employee speech on workplace safety must be "accurate" and "complete," and that official safety determinations are the exclusive domain of the EH&S department, which directly supports the Plaintiff's claim of unlawful speech restrictions (242:22-243:4, 243:18-243:21). Furthermore, documentary evidence established that EPA inspections at both the 825 Stewart and 3250 Scott facilities were initiated as a direct result of the Plaintiff's complaints, despite the witness's repeated claims of ignorance on the matter (151:7-151:12, 249:22-250:3). Finally, the witness's credibility was weakened by numerous instances of being unprepared on core technical topics within her purview, as well as by direct contradictions, such as first acknowledging and then denying knowledge of an injury report for the Plaintiff's 2019 dizzy spell (61:9-61:10, 63:5-63:5, 108:8-108:9, 112:9-112:9).

### Final Thoughts and Recommendations

• For the Plaintiff (Gjovik):
  • Potential Next Steps: Consider filing motions to compel further testimony on topics the witness was unprepared for (e.g., COVID-19 complaints, HVAC system specifics) and where counsel instructed her not to answer (16:10-16:11, 63:5-63:5, 118:17-118:22, 248:15-248:21). Seek an order compelling production of the 2019 injury report the witness initially referenced (108:8-108:9, 108:24-109:1). Subpoena records from third parties like Northrop Grumman and AECOM regarding communications with Apple about the HVAC system and sub-slab ports. Depose other individuals identified by the witness as having direct knowledge, such as Tom Huynh and Julia Smith, to overcome Ms. Schmidt's lack of recall (15:12-15:17).

• For the Defendant (Apple):
  • Potential Next Steps: Prepare to defend against motions to compel by arguing the topics were outside the scope of the notice or properly subject to privilege. Prepare other potential witnesses (e.g., Tom Huynh, Julia Smith, Austin DeBaene) to provide consistent, detailed testimony that addresses the contradictions and gaps in Ms.

Schmidt's deposition (15:15-15:17, 53:12-53:12). Develop a narrative to frame Apple's "voluntary" vapor intrusion program as evidence of a company going above and beyond its legal obligations, rather than an admission of responsibility (92:25-93:7). Prepare to defend the "accurate and complete" speech policy as a reasonable measure to prevent misinformation, not as a tool for retaliation (242:22-243:4).

# Page-Line Summary

**Case Name**
ASHLEY M. GJOVIK v. APPLE INC.

**Deposition Date**
May 14, 2026

**Witness Name**
Elizabeth Schmidt

**Brought to you by:**

aptus. COURT REPORTING

https://www.aptuscr.com

## Page:Line Summary

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| **Deposition Opening and Witness Preparation Overview** 7:1-16:25 | The witness, Elizabeth Schmidt, was sworn in and acknowledged understanding the obligation to provide truthful testimony under oath, subject to penalties for perjury (7:7-9:9). She confirmed she was physically present with others off-camera, identified as counsel Jessica Perry, Isela Perez, Bethany French, and Bill Tarantino (10:25-11:11). Schmidt stated she met with counsel and other individuals, including Tom Huynh and Julia Smith, two to three times within the week prior to the deposition to prepare (13:16-15:13). She reviewed documents related to due diligence and communications, but not deposition transcripts or the company's privilege log (14:10-15:2). When asked about COVID-19 EHS complaints, Schmidt stated she was not prepared to answer, leading to a discussion about whether the topic was within the scope of the deposition notice (16:7-16:25). | Q Ms. Schmidt, I'm going to be asking you some questions today. And before we get started, I want to go over some foundational matters so we're on the same page.<br>You were just sworn in by the court reporter. Do you understand that you're now under oath, the same as if you were testifying in a courtroom before a judge and jury?<br>A Yes.<br>Q Ms. Schmidt, do you understand that you're required to give truthful answers to my questions today?<br>A Yes, I do.<br>Q Do you understand that even though we're in a conference room and on Zoom and this feels informal, that giving false testimony under oath can subject you to penalties for perjury?<br>A I understand.<br><br>Q Are you physically alone in the room or is anyone else present off camera?<br>A There are others here off camera.<br>Q Can you please identify everyone in the room with you right now?<br>A Sure.<br>THE WITNESS: Do you want me to introduce them?<br>MS. PERRY: I can handle that. So, Ashley, it's Jessica Perry from Orrick. I'm in the room |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | with the witness as is Isela Perez and Bethany French, who are both in-house counsel at Apple as well as Bill Tarantino from Morrison and Foerster.<br>MS. GJOVIK: And that is everyone in the room?<br><br>Q Ms. Schmidt, did you meet with anyone to prepare for today's deposition?<br>A I did.<br>Q Who did you meet with?<br>A I met with both inside and outside counsel a couple of times.<br>Q When you said "a couple of times," how many times?<br>A Two to three times.<br>Q Ms. Schmidt, when were you notified that you were going to be the witness for Apple at this deposition?<br>A Probably a week ago.<br>Q And the couple of times you met with them were during that week period.<br>Is that right?<br>A Within the last week. Correct.<br>Q Did you review any documents to prepare for today?<br>A I did.<br>Q What documents did you review?<br>A A number of documents around due diligence that had been done and some communication documents that were provided.<br>Q Did you review Apple's responses to written discovery in this case as part of your |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | preparation?<br>A Yes. I read across a number of different documents that would kind of qualify for that.<br>Q Did you review any deposition transcripts of the witnesses in this case in preparation for this deposition?<br>A No.<br>Q Did you review the company's privilege log in preparation for this deposition?<br>A No, I did not.<br>Q Did you speak with anyone other than lawyers in preparation for this deposition?<br>A I did. I spoke to two other folks with knowledge about the buildings that -- deeper knowledge about the buildings.<br>Q I just want to confirm. When I asked who you spoke with earlier, you mentioned the folks in the room, but then we just added two more people. So I'll ask again: Can you please provide the full list of people that you spoke with in preparation for this deposition?<br>A Yes, I will. The folks that are in the room plus Tom Huynh and Julia Smith.<br>Q And what are their roles?<br>A Tom Huynh is an EHS manager, and he has knowledge about some of the building functions. And Julia is a due diligence manager and runs our |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | due diligence program.<br><br>Q Did you speak with anyone about the complaints and inquiries I made regarding COVID-19?<br>A No, I did not.<br>Q Are you prepared to answer my questions about my EHS complaints made regarding COVID-19?<br>A No, I'm not. |
| **Witness Background and EHS Role at Apple** [17:1-32:25] | The deposition segment focuses on the scope of topics witness Elizabeth Schmidt is prepared to testify about on behalf of Apple Inc., specifically regarding environmental health and safety (EHS) conditions at two locations: 825 Stewart Drive and 3250 Scott Boulevard (17:2-4, 20:21-21:4, 23:2-24:3). There was contention between counsel regarding whether certain topics, particularly those related to COVID-19, were properly noticed for the deposition, with one counsel asserting they were not part of the agreed-upon topics and potentially requiring a third day if pursued (17:1-16). The witness confirmed she was prepared to answer questions regarding EHS conditions and regulatory compliance from 2020-2021 at both sites, as well as EPA inspections at 825 Stewart Drive (24:25-26:3, 28:22-29:2). Schmidt, the Director of Environment, Health, and Safety at Apple for | Q Ms. Schmidt, what is your understanding that you are expected to speak about at this deposition today? What subject matter?<br>A My understanding is that around 825, there's some questions around due diligence and concerns about potential -- concerns that you had around the site and the conversations that were had, to explain the risks associated with the site to support your -- I mean to help you understand the condition of the site.<br>Q And just for 825 Stewart?<br>A For the most part. I understand that --<br>Q Go ahead.<br>A -- I understand that there could be some other questions, but that there's some -- this is very -- around a very specific time frame. So I want to make sure we're answering questions around what this deposition is for.<br>Q Thanks. That's what I'm |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | approximately four years, also confirmed she understands her testimony is on behalf of the corporation and that Apple will be bound by her answers (30:1-15, 30:20-31:6). | trying to understand.<br>So, what is your understanding of the time frame<br>you're responding to?<br>MS. PERRY: Okay. I'm going to stop here and<br>object on the grounds that to the extent that the witness has knowledge about what she's here to testify about, that comes from her communications with counsel. As we made clear to you, Ashley, this witness is here to testify about your Topic No. 2, which is plaintiff's assignment to the 825 Stewart Drive office, including environmental conditions at that site and defendant's knowledge of any associated health or safety hazards. Topic No. 3. Topic No. 4, as it pertains to complaints, reports, or concerns<br>raised by plaintiff regarding environmental health or safety conditions, regulatory compliance from 2020 to 2021, and defendant's response thereto, and Topic No. 5. |
| **Personal Involvement and Fact Witness Status Discussion** 33:1-44:25 | Ms. Schmidt confirmed her involvement in signing consent agreements related to environmental compliance for Apple, though she denied involvement in a specific 2016 agreement. She acknowledged receiving and reading emails in 2021 concerning employee | Q So, Ms. Schmidt, have you also been involved in<br>the enforcement action taken by the government against Apple regarding 3250 Scott Boulevard, such as signing the consent agreements on behalf of Apple?<br>A Yes.<br>Q<br>And Ms. Schmidt, were you also |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | complaints about EHS issues leading up to the deponent's termination, describing them as exchanges seeking clarity. Regarding her educational background, Ms. Schmidt stated she holds an undergraduate degree in chemistry and completed two years of coursework in environmental health and safety management, though she lacks formal training in hazardous cleanup site management. She currently serves as a global director in environment, health, and safety, overseeing a team of 155 individuals across approximately 40 countries. Ms. Schmidt clarified that Apple's EHS function aims to ensure work is performed safely, in compliance, and protectively of environmental risks, which includes considering potential impacts on individuals on-site and those in neighboring areas, as well as air and water quality. However, she indicated that certain EHS responsibilities may fall to landlords or other responsible parties, particularly concerning historical situations or when Apple is a tenant rather than an owner. | `involved in the`<br>`2016 DTSC consent agreement with a five-year injunction against Apple, such as signing that agreement?`<br>`A 2016?  I'd have to -- for what property?`<br>`Q`<br>`That was the recycling hazardous waste violations.`<br>`A No.`<br>`Q`<br>`And Ms. Schmidt, did you also receive emails from employee relations and EHS employees regarding my complaints in 2021 leading up to my termination?`<br>`MS. PERRY:  Objection.  Vague and ambiguous.`<br>`(Reporter requesting repetition.)`<br>`MS. PERRY:  Lacks foundation.`<br>`BY MS. GJOVIK:`<br>`Q`<br>`I'm specifically referring to documents produced by Apple, which included you, Ms. Schmidt, as part of their response to production in this litigation with communications regarding me and my EHS complaints sent to you in 2021.`<br>`Do you recall those emails?`<br>`A Yes.  I've read a number of emails with you asking a number of questions, asking for clarification.`<br>`And so I've read a number of emails back and forth with your curiosity around the` |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | situation and with the teams responding, trying to help give you clarity. |
| **Responsible Parties and EHS Responsibilities at Apple Facilities** [45:1-58:25] | Ms. Schmidt testified that Apple is not solely responsible for all environmental health and safety (EHS) matters at its 825 Stewart Drive facility, identifying the building owner and a responsible party for soil remediation as having shared responsibilities (45:20-22, 47:9-14). She further stated that the landlord's responsibilities include maintaining a safe workspace and ensuring their on-site work is managed safely and compliantly (47:21-23). Regarding the 3250 Scott Boulevard facility, Ms. Schmidt indicated similar shared EHS responsibilities with the landlord and various agencies, including CUPAs (California-assigned entities for workplace safety checks) and potentially other responsible parties under CERCLA, specifically mentioning Honeywell in relation to a Superfund site (49:19-51:14). Post-break, Ms. Schmidt confirmed that GI Penjik Partners and later BGO Bentall Green Oak were the property owners for 825 Stewart Drive in 2020-2021, while the Jenab Family Trust was the landlord for 3250 Scott Boulevard during that period (54:18-55:2). She also identified Austin DeBaene as the EHS lead for | Q Ms. Schmidt, are there topics regarding environmental health and safety at Apple's facility at 825 Stewart Drive that you believe are not Apple's responsibility but rather are the responsibility of a responsible party or other external party?<br>A Yes. I believe that Apple does not have all the responsibility and that there are other responsible parties associated with 825.<br><br>Q Can you please provide more details about which parties and what you think their responsibilities are?<br>A So, that space is a leased space for us, so there is an owner of the building. And in this particular case, there is also a responsible party who is responsible for continued remediation of soil that is underneath the facility. So some environmental compliance components are held to the responsible party in that case with the EPA. Other health and safety aspects of the building are held responsible to the landlord as well.<br><br>Q What kind of environmental health and safety responsibilities do you |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | 825 Stewart Drive in 2020-2021 and Tom Huynh as the EHS lead for 3250 Scott Boulevard during the same years (53:12, 57:5). Finally, Ms. Schmidt stated that Apple decided to lease the 825 Stewart Drive building around 2015 and conducted renovation projects as part of their move-in (58:15-25). | believe the landlord has at the facility?<br>A To maintain, you know, a safe functional workspace and that work that they do on site is managed in a safe and compliant way.<br><br>Q And then same question for 3250 Scott Boulevard, do you believe there are parties other than Apple who hold responsibilities related to environmental health and safety at that facility?<br>A Yes. I think in very similar ways.<br>Q Who would those parties be?<br>A Also the landlord.<br>Q Anyone else or just the landlord?<br>A Across all health and safety, not just -- and environment? We're talking about Jackson, you know, CUPAs, and other agencies definitely have responsibilities for, you know, checking controls and making sure that what we've put in place is safe. So I do feel like there are -- there are other folks that support in to and have responsibility to ensure the space is safe.<br><br>Q And then I believe it's -- there's also a Superfund site adjacent to or under. So, would you say there's responsible parties with -- under CERCLA at that site as |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | well?<br>A Yes. It's likely that that is also assigned to another responsible party.<br>Q And what is that Superfund site called?<br>A I don't know. I'd have to look it up.<br>Q Do you know who the responsible party is?<br>A I don't know on that one.<br>Q If you can look -- it's Honeywell, but if you can look that up, I'd appreciate it. Giving hints.<br><br>Q What kind of responsibilities do you think belong to the landlord versus Apple at 3250 Scott Boulevard?<br>A Yeah. That is also -- integrity of the building and, you know, safe walkways, you know, those type of things. So, yeah, they have kind of the structural -- a lot of the structural aspects of the building.<br><br>Q As of 2020 and 2021, do you recall who the EHS lead was for 825 Stewart Drive?<br>A Yes. I believe it was Austin DeBaene.<br>Q And that was for all EHS activities?<br>A He's, like, the primary lead, and then any sort of subject matter support may come from others on the team. So we consider him the lead, but he has resources and support. For deeper subject |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | matter experts, I would also support them.<br><br>Q Same question for 3250 Scott Boulevard?<br>A At what time -- what years?<br>Q 2020, 2021.<br>A 2020 and 2021. I think it -- well, let me -- put it on my list. I'll double-check. We had a number of moving people around, and so I want to be accurate. But I know two -- one of the two people in my head is going to be the right answer for you, or maybe both.<br><br>Q So, were you able to confirm who the property owner of 825 Stewart Drive was in 2020 and 2021?<br>A 825 in '21 was GI Penjik, maybe.<br>Q Partners.<br>A Oh, Partners. Okay.<br>Q And changed to BGO, Bentall Green Oak, in 2023.<br>Q Okay. Thank you.<br>Q And then were you able to confirm the property owners for 3250 Scott Boulevard in 2020 and 2021?<br>A The landlord is Jenab Family Trust.<br><br>Q And then I believe you were also going to check who the EHS lead was for 3250 Scott during that time frame. Were you able to confirm, Ms. Schmidt? |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | A Tom Huynh.<br>Q And then I believe you were also going to check for the name of the adjacent Superfund site to 3250 Scott Boulevard. Were you able to confirm?<br>A I was able to confirm that Honeywell is one of them. There may be others, so...<br>Q And the Honeywell, that's the Sinner Tech site. Does that sound right?<br>A I didn't look at the specific site --<br>Q Okay.<br>A -- which of those. There's a number of them there.<br>Q Okay.<br>Q And that site, though, where Honeywell is the responsible party, is it your understanding that there is a groundwater plume either under or adjacent to 3250 Scott Boulevard from that Superfund site?<br>A I do know there are a number of Superfund sites with different responsible parties in the area. Yes. |
| **TRW Microwave Superfund Site Background and Apple's Move-In** 59:1-71:25 | Elizabeth Schmidt testified that Apple was a tenant at 825 Stewart Drive and did not perform renovations related to the sub-slab depressurization system, attributing that responsibility to the "responsible party and the landlord" (59:9-11). While Apple did perform | Q Did they do renovation related to hazardous waste management?<br>A Can you be more specific about that?<br>Q Yeah. So, I'll do a subset of questions.<br>Around 2015, did Apple do any renovations at |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | renovations including HVAC improvements around 2015, Schmidt was unsure of the extent of Apple's involvement versus the responsible party's regarding the sub-slab venting system and its exhaust on the roof (59:17-25, 60:1-5). Schmidt was not prepared to testify about Apple's specific involvement or knowledge regarding EPA concerns about re-entrainment of sub-slab vent exhaust into the HVAC system, stating her knowledge was limited to EPA conversations with Northrop Grumman (60:15-17, 61:9-11). She clarified that Apple was not responsible for the findings or corrections related to EPA concerns with Northrop Grumman (62:20-23). Schmidt confirmed that 825 Stewart Drive is historically associated with the TRW Microwave Superfund site, with Northrop Grumman identified as the responsible party under CERCLA (68:7-25). She described mitigation efforts at the site, including material removal, vapor extraction, excavation, oil treatment, and installation of a passive vapor intrusion system within the building (69:8-15). | 825 Stewart Drive related to either the sub-slab depressurization system or sometimes called sub-slab venting system that's part of the CERCLA mitigation?<br>A I don't believe that it is Apple. I think it was done by the responsible party and the landlord. That was their responsibility, our part being the tenant improvement that we would typically do in a building: conference rooms, and lab spaces.<br><br>Q<br>And then around 2015, when Apple decided to move in, did Apple do any renovations related to the HVAC<br>system?<br>A Yes. I do believe that there was additional improvements done for the site, including HVAC.<br>Q<br>And did Apple do any renovations around that time related to the -- that sub-slab venting system vents on the roof?<br>A I don't -- honestly, I don't know how much is --<br>was done from the responsible party and what was done by Apple between those two systems.<br>Q<br>Combining those two parties, what was done |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | regarding the installation of the HVAC on the roof and the sub-slab venting exhaust on the roof?<br>A My assumption is that Apple would have been installing the HVAC while the responsible party is responsible for the sub-slab system. |
| **Vapor Intrusion History and Testing Results at 825 Stewart** 72:1-89:25 | The witness discusses vapor intrusion testing at 825 Stewart Drive, noting that while chemicals have been detected, they haven't always exceeded limits of concern (72:20-22). She clarifies that vapor intrusion itself describes the physical movement of vapors and not necessarily a health risk (72:6-10). While historical testing has shown detected vapors, the witness states it's not always a hundred percent true that these are solely from ground release, as other sources could exist (72:19-73:8). Regarding TCE specifically, she indicates that its presence in indoor air could be from operations within the building or contamination, depending on context (73:9-15). The witness acknowledges potential exceedances of regulatory limits in 2013 testing but emphasizes the need for precise definition of "exceedance" (74:7-75:21). She explains that government limits, such as those set by the EPA, | Q So, is it fair to say that vapor intrusion describes more of the vapors from that regulated cleanup site intruding into a building, but it doesn't necessarily imply anything specifically about health risk, just the fact that it's occurring?<br>A If you want to just talk about what is vapor intrusion?<br>Q Yes.<br>A Yes.<br><br>Q So the history of the vapor intrusion testing at 825 Stewart Drive, including before Apple rented, did it ever show results that indicated vapor intrusion was occurring?<br>A Yes. There is reports that show that vapors were, you know, above the limit of detection but not above limits of concern or action. So detected present, but not a level of concern.<br><br>Q For 825 Stewart Drive, what about the chemical TCE? If it showed up in indoor air |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | establish thresholds for industrial occupancy and action levels, which vary by agency and chemical (77:24-78:8). Apple EHS would use standard protocols and current government guidance for testing (77:6-11). The witness confirms an EPA inspection occurred at the site in August 2021, and that Apple was notified beforehand but does not recall the specific notification date (83:21-84:11). She also states that both the landlord and Northrop Grumman have requested access for EHS testing between 2020 and 2023, with Northrop Grumman requesting access at least once for EHS-related activities, though she cannot confirm if it was specifically air quality testing (86:19-87:20). Apple conducted its own routine vapor intrusion testing in 2021 using a vendor, EKI, which showed similar or lower contaminant detection levels compared to testing in 2015, consistent with remediation efforts (88:17-89:8). Testing was also conducted under the slab, and the witness noted that elevated concentrations are expected before a mitigation system is in place (89:9-20). | testing in the building, would it be attributed to the contamination or could it have come from inside the building from operations?<br>A It can depend on what operations are going on at that time to be able to say yes or no.<br><br>Q<br>In the vapor intrusion testing that's occurred at 825 Stewart Drive, including prior to when Apple moved in, have there been results that showed the contaminants of concern, including TCE at that site, exceeding the limit set by the EPA and California EPA?<br>A I do believe there's a 2013 report, and I would have to be very careful with you as to the assumptions of what limits and what EPA levels. So I don't want to speak to that, you know, highly confidently because that was a pretty vague question, but there were some samples taken in 2013 that I think you're referring to.<br><br>Q Ms. Schmidt, can you please clarify how you view vapor intrusion testing results when they might exceed a regulatory screening level set for vapor intrusion testing, what common threshold that Apple EHS team might refer to and the implications of each of those being exceeded? |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | A Go ahead, try to rephrase. Let's try to get some things specific.<br><br>Q Ms. Schmidt, you said government limits. Can you please provide more details what you meant by "government limits"?<br>A Yes. So the EPA will set out a threshold for a space that could be reasonable for industrial occupancy. Like you said, there could be limits that are set that are indication of an action or an action point. Sometimes they're even higher -- depending on agency, even higher thresholds where there's more, like, significant actions that need to take place in a shorter period of time. So each government entity who are dealing with these kind of exposure concerns will have, typically, chemical-specific series of thresholds.<br><br>Q Ms. Schmidt, did the US EPA conduct an inspection at 825 Stewart Drive in August of 2021?<br>A Yes.<br>Q What date was that inspection?<br>A I think you just said it, but I don't have a direct -- I don't have a specific date, but I do believe it was in the fall of '21.<br>Q I believe it was August 19, |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | 2021, but it'd be good to confirm that if we can. That's -- I would like the statement from Apple on that, please.<br>And Ms. Schmidt, when was Apple notified that the EPA was requesting that inspection?<br>A I believe we were notified ahead of time by the EPA so that, you know, we could coordinate the visit and have people on site.<br>Q What date was Apple notified?<br>A I don't remember that. I'm sorry. I don't have a specific date, but I can look it up.<br><br>Q<br>And then, Ms. Schmidt, are you aware of the EPA requesting vapor intrusion testing inside 825 Stewart Drive related to the inspection?<br>A For Apple to do?<br>Q For someone to do.<br>A Yeah. There -- you know, they were activity for Northrop Grumman to do but not for Apple.<br><br>Q<br>And then regarding 825 Stewart Drive, has anyone requested access to conduct EHS testing inside that building that's not Apple between the years of 2020 and, say, 2023?<br>A Yes. Both the landlord and Northrop Grumman have requested access at various times to do that work. |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | Q<br>Can you tell me about the request from the landlord?<br>A Sometimes the request is from the landlord or Northrop Grumman, right, because our relationship is with the landlord, and the landlord's relationship is with Northrop Grumman.<br>Q<br>Can you tell me about the request from Northrop Grumman?<br>A Specifically for what? To visit the site?<br>Q<br>Did they request to do testing? When did they request to do testing? When did they do testing?<br>A I don't remember offhand the exact count, but at least once. There could have been a few other times as well.<br>Q<br>And did Northrop Grumman request access to do indoor air testing during that time period?<br>A I don't have a very specific that it was air quality testing. I know they were on site to review the functioning of the space, and if they took tests at that time, that could be possible. |
| **Floor Sealing Activities and Vapor Intrusion Mitigation** | Apple's Environmental Health and Safety (EHS) team does not have a legal obligation to maintain the integrity of the building's slab or inform employees about potential | Q And what does Apple EHS view as its responsibility<br>4<br>regarding keeping the slab sealed in a site like<br>5 |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| 90:1-103:25 | hazards related to slab penetration, viewing such activities as voluntary best practices rather than required obligations (90:6-11, 91:6-13). In 2021, Apple conducted a voluntary vapor intrusion program that included inspecting the slab, performing sealing activities where necessary, and conducting indoor air testing (92:25-93:7). The indoor air testing in 2021 showed results well below risk thresholds, with TCE being one of the chemicals tested for using sorbent tubes (93:14-25). Apple's policy is to notify employees if legally obligated due to exceeding regulatory limits, but they would need to consult EPA guidance to determine specific thresholds for TCE notification (94:16-95:2). Apple EHS leads conduct regular inspections, but their focus is general, deferring detailed vapor intrusion assessments to a specialized program led by the due diligence team (98:23-99:14). The vapor intrusion program involves surveying, sealing, and sampling, and EHS personnel are expected to be involved in work that could pose a risk, including potential slab penetrations, with decisions on notification based on risk assessments (96:16-97:21). | 825 Stewart Drive?<br>A Honestly, we don't have any obligation to do<br>6<br>that. It's not a required component of a maintenance<br>7<br>program. And so we don't have to, but that doesn't mean<br>8<br>that we don't -- so we do stuff like looking for vapor<br>9<br>risks, sealing sampling as our part of proactive voluntary<br>10<br>program, but it is not a required program or obligation.<br>11<br>Q Under CERCLA or under any law?<br>A Under any law.<br><br>Q So if there was test results that showed that<br>14<br>there was high levels of TCE under the slab in the<br>15<br>building and Apple, let's say, installed equipment that<br>16<br>penetrated that slab and then connected the vapors under<br>17<br>the slab to that indoor air, are you saying Apple has no<br>18<br>legal requirements at all about how it does that or<br>19 |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | creating that exposure factor? |
| **Apple's General EHS Processes and Employee Complaint Procedures** 104:1-128:25 | Employees at Apple have multiple channels to raise EHS concerns, including speaking with an EHS lead, sending anonymous emails, or using a manager or a people hotline (105:6-12). If an employee suspects an injury due to factors like vapor intrusion, the incident must be reported via an internal app called "Incidence" or through the EHS website's "Report an Incident" link, initiating an intake process and requiring an incident form completion (105:13-106:4). While dizziness can be a personal health issue, if an employee on a toxic waste cleanup site experiences it and suspects chemical exposure, it should be reported immediately through the same channels (106:5-107:6). Once a report is submitted, it is assigned to the EHS lead at the site for investigation (107:11-13). Regarding a specific complaint about a dizzy spell in 2019 attributed to vapor intrusion, the witness stated she does not know the decision-making process of the HR business partner involved and could not confirm if Apple's injury tracking system recorded the report, though she believed a report from 2019 was filed years later as a separate incident from workers' comp (107:25-108:17). | Q So we're returning from lunch now, and I was going to go back to my questions about Apple's general EHS processes in Santa Clara County on the hazardous waste sites. We kind of had gone back and established some foundational stuff. So, I asked a question of how employees can raise EHS concerns at Apple, and I'd like to hone in on that in a little bit of what's the standard process for Apple employees in Santa Clara County to raise concerns regarding toxic waste cleanup sites and vapor intrusion issues.<br>A It would be the same process as raising any other health and safety concern. You can talk with the EHS lead associated with the building. You could send an anonymous email or noted email to the generic site intake point at the website, EHS. You can speak with a manager who can also bring it to the attention of EH&S or you could use a people hotline to also raise a concern.<br><br>Q What about if an employee thinks they may have been injured at one of these sites due to something like vapor intrusion? What is |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | Apple's process for reporting those kind of injuries?<br>A First, the incident needs to be reported either<br>by the individual or by the manager who's aware of the injury.<br>Q Report to who?<br>A There is an intake process. So there is an<br>incidence form that needs to be completed.<br>Q What's the form called?<br>A It is -- if you go -- the most re- -- most common<br>way -- I guess there's two common ways to report. One is<br>via an app called "Incidence," which is an internal app,<br>and the other one is through our EHS website. There is<br>a -- at the top, there's always a link that says "Report<br>an incident." So they can do it web-based or via an app.<br><br>Q What if an employee on one of these toxic waste<br>cleanup sites had a bad dizzy spell and thought it could<br>have been because of chemical exposure, is that something<br>that should be reported?<br>A Yes. I think if the person is concerned that an<br>exposure at work is causing a symptom, that should be<br>reported immediately.<br>Q And then what would be the process for reporting<br>it?<br>A The person -- the same |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | thing. The person can go to the app or they can go to the website and report it.<br>Q And then what's the process for investigating?<br>A Once the report goes in, it gets assigned to the EHS lead at that site. |
| **EPA Inspection Timeline and Apple's Response** 129:1-152:25 | During an EPA inspection on August 21st, Apple understood the purpose was to follow up on Northrop Grumman's work and site conditions (129:4-6). The EPA inspected various locations, including potential drain sites and pipe placements for passive systems, and possibly roof vents for the sub-slab depressurization system (130:8-14, 130:18-23). Apple was not responsible for any corrective actions resulting from the inspection, which were instead addressed by Northrop Grumman and the EPA (130:1-7). Apple first became aware of the EPA inspection potentially being linked to employee disclosures through emails forwarded by the plaintiff to Apple employee relations in July 2021 (132:4-133:3). Apple did not inquire with Northrop Grumman or the EPA why the inspection was requested, as they typically support access for such inspections (134:13-21). Apple requested the EPA sign a Non-Disclosure Agreement (NDA) due to the presence of sensitive, | Q 21st of August. Okay. And then what was Apple's understanding of the reason for the EPA's inspection?<br>A That they are to be following up with Northrop Grumman's work and the conditions of the site and the responsibilities that Northrop Grumman has for the site.<br><br>Q And what specifically did the EPA ask to inspect?<br>A There was a number of points around the facility that they looked for.<br>Q What were they?<br>A I guess -- I can't speak to all of them, but they were looking for locations where there might -- I think had been drains or previous drains, placements of the pipes for the passive systems, those type of things.<br>Q Did they ask to see the vents on the roof from the sub-slab depressurization system?<br>A It is possible that they did. Like, that's my understanding of that kind of -- it's between Northrop Grumman and them. They're |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | unreleased products in certain areas of the facility, though they did not intend for this to cover environmental or safety issues (136:7-11, 137:3-4). Apple was aware of the EPA's request for a site inspection by at least July 30, 2021, based on communications between Northrop Grumman and the EPA (147:14-17). | doing an investigation for their work.<br><br>Q And what, if any, corrective actions came out of the inspection?<br>A The corrective actions were from Northrop Grumman and the EPA. None of them were from Apple.<br><br>Q Ms. Schmidt, this is Exhibit B for this deposition. This is plaintiff's production 11, Bates 7300. This is an email I forwarded. This one is a coworker at my office, and then I previously forwarded it to Mr. Okpo and Mr. Lagares and said, "Hello. FYI, update on the EPA, EH&S, and Stewart 1 situation. The federal EPA said they're meeting with the site team this week. I assume they mean EH&S. Even though you all said you weren't looking into this, I'll add this to the 'workplace safety concerns' folder." And then it's forwarding an email chain with Ms. Margot Perez Sullivan at the EPA in July 2021. That email I sent to Mr. Okpo was sent on July 27, 2021, which is around the time that the EPA had notified Northrop Grumman that there would be an inspection.<br>So, did Apple assume that this email is connected to that request for the inspection?<br>A Yeah. I don't know or I can't comment on how the EPA |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | -- what their decisions are. It looks like they're communicating to you.<br><br>Q Did Apple ever inquire to Northrop Grumman or EPA why an inspection was requested?<br>A Not to my knowledge. They, you know -- requests for inspection, come at, you know, a cadence in which they need to do their work. And so it is -- you know, we don't question. If they need to come in, it's in their rights to come in, and so we're supporting access.<br><br>Q Why did Apple ask EPA to sign an NDA in response to EPA's request to inspect 825 Stewart Drive?<br>A As you mentioned before, the space does have some areas where we have more secret lockdown for product security. And so it is not uncommon for us to ask for an NDA for individuals who are accessing sites where there may be undisclosed products in those spaces.<br><br>Q Ms. Schmidt, what does "any information" mean in that context? Would that include health and safety issues?<br>A I don't believe that that was the intent. I think that was very much on product.<br><br>Q So, Ms. Schmidt, is it safe to say that Apple was aware of the request for an inspection |

| *Subject with Page:Line Range* | *Summary* | *Key Quotes* |
|---|---|---|
| | | by EPA by at least July 30th, 2021?<br>A Yes, it seems to be the case.<br><br>Q So, would be it safe to say that Apple was notified of their request for the EPA inspection at some point between July 26th and July 30th?<br>A I mean, I don't see Apple in any of these emails. I guess I'm not exactly sure. Although, these are back and forth between two parties, I don't see where Apple's, you know, communication is.<br><br>Q Ms. Schmidt, I ask again if Apple was aware that the US EPA inspection of my office on August 19 was due to my disclosures to the US EPA regarding the cracks in the slab at my office.<br>A I haven't seen this document until today.<br>Q But did Apple have any other indicators from emails, phone calls, conversations with the EPA that the inspection was because of an Apple employee telling them about cracks in the floor at the building?<br>A I don't have that. I don't have an email from the EPA telling someone at Apple that you had raised a concern and that's why they were coming to inspect. I don't have that. |
| **EPA Site Visit** | The witness, Elizabeth Schmidt, | Q Has Apple seen these notes |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| **Notes and Stack Issues Documentation** 153:1-170:25 | testified regarding EPA site visit notes from August 19, 2021, which identified issues with vent riser pipes, stack configurations, and HVAC systems at the Apple leased building. The notes indicated that vents were too close to HVAC systems and chillers, potentially impacting VOC levels and air quality (154:1-7, 155:10-19). Schmidt stated that Apple was not aware of these specific issues as identified by the EPA to Northrop Grumman, and that Apple's role was primarily as a host (156:2-9, 159:7-11). While Northrop Grumman was tasked with making changes, the witness was unsure if Apple had EHS responsibility regarding potential re-entrainment of HVAC systems, deferring to lease agreements and the responsible party for the Superfund site (156:3-10, 161:17-25). Schmidt also reviewed emails and a vapor intrusion assessment report that detailed concerns about Sub-Slab Depressurization (SSD) vents being improperly located near HVAC intakes and chiller components, recommending mitigation of these impacts (163:6-165:25). She confirmed that Apple was aware of complaints regarding the condition and location of sub-slab ports, but could not provide specifics on Apple's actions or responsibilities for correcting these | prior?<br>A I didn't read them and prep for this.<br>Q It indicates that the date of the inspection from Northrop Grumman, there was Mr. Shannon and Mr. Batsel, Dextra group, and Ms. Holbrook from AECOM. And then there's "Meet Colin Scanlon." Who's Colin Scanlon?<br>A It looks like it's described as the Apple leasing manager on your description.<br>Q I don't know what this is. So it's just someone with real estate and development at Apple?<br>A Yeah. A lease manager is usually the person who's -- is having ownership of the lease between Apple and the landlord.<br>Q Like the liaison for lease stuff. Okay. Thank you.<br>Listed there is a little agenda. And then had some notes from the notes "Can't access vent riser pipes, no ports; open area in front of elevator." This is Matt from the EPA QA. "Roof, west building are exactly 10 feet from HVAC, just meeting code. Not great for VOCs because venting into HVAC. Would be better/need to extend ten feet high. Roof, east building stack issues. Vents too close cut to chiller. Cut too low." |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | issues, emphasizing that the responsibility lay with Northrop Grumman and the EPA (167:1-25, 168:1-22, 170:1-22). | Ms. Schmidt, are you aware of these stack issues he's mentioning?<br>MS. PERRY: Objection to the extent it misstates the document.<br>Can you please scroll through the entire document if you're going to ask her to answer any questions about it?<br>MS. GJOVIK: Sure. Okay.<br>BY MS. GJOVIK:<br>Q So here's the -- can you read this okay, Ms. Schmidt? This first page, is this big enough?<br>A Yes.<br>Q If you'd let me know when you're done with this first page, then I'll move on to the second page.<br>A Okay. Okay.<br>Q That's the second page. It's two pages.<br>So, regarding the comments about the vents and HVAC I mentioned -- I'll highlight them right here. I don't need to paraphrase them. I'll just highlight them -- were you, Apple, aware of what is noted here regarding the vents and stacks?<br>A I think also at the bottom, too, that it says that this is -- right. Scroll to the bottom.<br>Q If we want to look at all the notes about it -- I was going section by section, |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | but we have -- let's see, |
| **EPA Follow-up Reports and HVAC System Concerns** 171:1-187:25 | The witness discusses an EPA Site Visit and Vapor Intrusion Field Assessment dated October 7, 2021, noting that EPA requested Northrop Grumman address issues with SSD vent pipes due to potential re-entrainment into HVAC intakes and sub-slab sampling ports that were not maintained or regularly sampled (171:11-24, 172:14-22). While the witness believes work was done to extend the piping and address the distance issue, she lacks specific dates for completion (172:7-8, 13). Regarding the sub-slab sampling ports, she believes the issue was corrected but lacks specific documentation (172:24-25). The witness also reviewed a November 5, 2021 letter from AECOM to EPA responding to the October 7 letter, which stated Northrop Grumman would consult with the engineer of record regarding vent pipe changes and that Northrop Grumman reached out to Apple for HVAC and building test and balance information (174:9-25). An email from March 22, 2022, indicated AECOM conducted rooftop inspections as Apple was unable to provide as-built drawings (176:13-25). A memo from Northrop Grumman to EPA dated April 15, 2022, stated that the HVAC system | Q Have you seen this before?<br>A I may have.<br>Q So, they summarized the inspection and note EPA did identify the following items that EPA asked Northrop Grumman to address. This included the SSD vent pipes, noting that the distance is acceptable building code. "However, a distance greater than ten feet or a height that is elevated above the building ventilation system components need to be considered as the SSD system may<br>vent low concentrations of site contaminants of concern outside, creating the potential for contaminants to be<br>pulled into the HVAC intakes in the building." That's what I believe the "re-entrainment" term refers to. It<br>says: "This scenario and potential impacts to indoor air<br>quality need to be evaluated and mitigated and EPA asks Northrop Grumman to provide a proposal to do so."<br>Was Apple involved in that investigation?<br>A Of what specifically? There's a lot there.<br>Q Okay.<br>Did Apple confirm that this issue was resolved? |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | was installed by the tenant between May and December 2025 without consideration for the SSD vents, placing three vents on the main building roof and two on the west lobby roof in close proximity to HVAC intakes (177:17-25). The witness confirms it appears Apple installed the HVAC system (178:1-2) but lacks knowledge of the considerations made during its placement (178:6-9). A later EPA memo dated December 28, 2021, recommended further evaluation of the HVAC system as the provided test and balance report was from 2015 and potentially not reflective of current conditions (180:11-181:15). The witness acknowledges Apple might have made changes to its HVAC system after 2021 based on feedback, but has not seen reports detailing specific modifications (181:16-22). An inspection memo from May 21, 2021, regarding a 2020 inspection noted that building conditions changed due to construction for tenant Apple between May and December 2025, and that the current SSD system configuration was consistent with prior sampling, though it appears EPA later realized the vents were too close to the HVAC (182:5-25). | `A With the piping?`<br>`Q Yeah.  With the distance issue between stacks and HVAC.`<br>`A Yes.  I do believe that additional work was done to extend and address the piping.`<br>`Q Around when -- sorry.  Go ahead.`<br>`A No.  That's it.  And stacks. Sorry.  I'm just trying to use the right word.`<br>`Q Around when was it completed?`<br>`A I don't have those dates.`<br>`Q And then for "Sub-slab sampling ports," it says: "The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located.  These ports need be located and maintained where future sub-slab sampling will be conducted, or decommissioned, if a justification is provided that the ports are no longer needed.  EPA also requests an updated figure for the building showing all port locations."`<br>`To your knowledge, was this issue also corrected?`<br>`A I don't have specific documentation that says it does, but I have every reason to believe that it was.`<br>`Q Okay.`<br>`A I don't know it to be` |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | outstanding. |
| **Floor Penetration Survey Results and Sub-Slab Port Issues** 188:1-200:25 | The witness reviewed documents related to floor penetration and sealing at 825 Stewart Drive, including a May 2021 "Identified Floor Penetration Features" document and an August 2021 document detailing "Identified Floor Sealing Areas" (K-1, K-3). The witness clarified the potential differences between terms like "seam," "crack," and "gap" as used in the report, stating she did not write the report herself but offered her understanding based on examples (189:11-25, 190:1-23). The discussion then moved to instances of "holes" in the floor, pipe penetrations, and "saw cuts," with the witness explaining her interpretation of these terms and stating it would be unexpected to find a hole completely through the slab (191:3-25, 192:1-25). The witness also discussed Apple's EHS policies regarding potential hazards discovered, stating Apple would communicate with landlords and responsible parties to address risks, and acknowledged that employees had questions about vapor intrusion exposure, which EHS addressed similarly to concerns from other employees (194:11-17, 195:22-196:14). Finally, the witness was unaware that an Apple employee | Q Have you seen this document before?<br>A Yes, I have.<br>Q So, could you describe this document, then?<br>A It has a list of rooms, a description of what was seen, and some options for best practices.<br>Q And it notes the floor penetration survey was performed on May 6, 2021. Is that correct?<br>A The survey was done in May 2021. That's correct.<br><br>Q So, can you describe the second section?<br>A This also looks to be a list where rooms and descriptions of features are identified and observations for, you know, best practices as far as what would -- you know, could be done. And then it looks like completed -- completed by and a confirmation.<br><br>Q<br>And so this mentions -- uses different terms like "seams," "gaps."<br>What's the difference between a gap, a<br>crack, and a seam?<br>A Very technical. I did not write this report, so<br>I'm not going to be able to be a hundred percent sure why we have different uses, but |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | had contacted the EPA regarding health concerns at 825 Stewart Drive (197:12-14). A significant portion of the transcript details a dispute between counsel regarding the production of a document by the EPA through a FOIA request (198:1-200:22). | I'll give you some examples.<br>A seam might be where two concrete pours have come together.<br>What was -- another question?<br>A A crack can be the development of a crack that is separate to the point where the two concrete pieces come together.<br>Q And a gap?<br>A A gap may be where concrete goes between two different types of services. But, again, like, I don't know that's the exact way they were using these for the person who wrote this report.<br><br>Q So when there's pipes coming through, they're supposed to seal them with something to make sure it's airtight?<br>A I guess it really depends on where the pipe is going in the system. So --<br><br>Q So, there were parts of this inspection they also just find, like, holes in the floor, not just gaps or cracks?<br>A Honestly, I can't explain every description that the person used. What I imagine is that they used the term "hole" to indicate that there had been some material from the concrete -- original concrete that was gone and now it had been filled with a sealant, and that discovery |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | was found underneath carpet. |
| **3250 Scott Boulevard Operations and Regulatory Violations** 201:1-212:25 | The deponent was unaware of when Apple became aware of an article published by the plaintiff titled "I thought I was dying: My apartment was built on toxic waste," nor was the deponent familiar with the article's premise. (201:1-202:23) The plaintiff detailed the article's content, explaining it concerned her sickness from chemical exposure, her frustration with inadequate investigations, and how others came forward with similar claims after its publication. (202:24-203:6) The plaintiff also presented an email exchange from September 2020, where she inquired about potential Apple resources for dealing with chemical exposure in her apartment complex, describing symptoms affecting her and her dog, and noting the complex's location near a Superfund site and an Apple building. (203:7-205:19) The deponent recalled a phone call with the plaintiff in 2020 regarding her health concerns and testing equipment, but did not recall discussing extreme condition leave or the Apple building at 3250 Scott Boulevard in relation to those concerns, though she acknowledged Apple's operations at that site were for research and development. (205:25-207:25) The deponent | Q When did Apple become aware that I published the article titled "I thought I was dying: My apartment was built on toxic waste" in San Francisco Bay View newspaper?<br>A I don't recall exactly which email or what date, if you had shared that information.<br>Q And are you aware that I did publish an article titled that?<br>A I'm aware that you have a media presence or -- you know, social media presence, but I don't follow it.<br>Q Sorry. I'm asking on behalf of Apple.<br>A Am I aware that you have what? Please ask the question.<br>Q That I published an article called "I thought I was dying: My apartment was built on toxic waste" on March 26, 2021, in San Francisco Bay View?<br>A I don't know when someone at Apple knew that you published this article.<br>Q Are you aware of the premise of this article?<br>A No. Can you walk me through it?<br>Q Yeah. This is an article about when I had gotten sick from chemical exposure and was struggling to find out |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | confirmed Apple had recently settled EPA and BAAQMD violations at the 3250 Scott Boulevard facility concerning labeling, permit processing, and hazardous waste treatment/air emissions, signing a consent agreement with the EPA. (208:1-209:25) The plaintiff further shared emails from March 2021 where she notified supervisors and health engineering contacts about the article's publication, mentioning business conduct approval with caveats, and later informed a health director about other Apple employees experiencing unexplained medical issues at the same apartment complex. (210:1-212:25) | what the source was, and I was frustrated because -- were inadequately investigating and I felt it was reckless to just leave it an open question that there could be chemical exposure and not know what the source was. So I published an article about it, and additional people came forward asserting to also be chemical exposure victims. And I told numerous people at Apple about it at the time, including also employee relations in 2021, and it was mentioned repeatedly in my complaints, at least as context, because I did not realize until after I was fired what Apple's activities were in 3250 Scott Boulevard. So that's what this article is. |
| **Workplace Safety Communication Restrictions and Manager Conduct** 213:1-237:25 | The witness, Elizabeth Schmidt, testified regarding an email exchange between the plaintiff, Ashley Gjovik, and employee relations (ER) concerning Gjovik's manager's alleged prohibition of discussing workplace safety issues and linking these concerns to her mental health. Schmidt stated she did not recall reading the specific email in its entirety but acknowledged seeing other communications where EHS and ER confirmed Gjovik's right to speak about safety concerns (214:24- | Q I was asking employee relations to explain to Dave, my supervisor, what the rules are -- actually, let me go back here. I sent an email on April 3rd and said, "Favor to ask of you. That script that Michael Sticker read about there being no prohibitions on Apple employees speaking out about concerns related to workplace conditions and no retaliation for speaking out either was really great. Any chance you could send me a written version I can forward my manager?" I said, "My manager |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | 216:3). A significant portion of the deposition involved disputes over whether questions about manager conduct and ER investigations fell within the scope of EHS concerns, with counsel for Apple repeatedly objecting on grounds of scope and timing (216:10-219:25). Schmidt also reviewed an email where a manager, David Powers, suggested Gjovik should keep her EHS concerns private and avoid "scaring the team," to which Schmidt responded that communication should be factual and contextual (222:16-223:11). Regarding TRI filings for 3250 Scott Boulevard, Schmidt indicated that Apple stopped filing after 2021 because the facility was reclassified from manufacturing to research and development, not due to a lack of air emissions (231:1-232:7). When asked about Apple's external counsel using a TRI filing to argue statute of limitations in a toxic tort lawsuit, Schmidt stated she had no knowledge of this (232:17-233:6). | doesn't seem aligned on the messaging. Last Monday he told me directly I was not allowed to speak out about my concerns about the site to anyone in the organization nor was I allowed to share any details from my meeting with EHS and you with our organization either. He said I was only allowed to talk to him and EHS about it going forward. He told me this under the premise of employee feedback and insinuated I was only being let off with a warning this time because of my mental 'health issues,' in quotes, verbatim, due to what happened to me last year at my apartment. I have told him previously I'm suffering from PTSD from what happened last year, but I didn't expect it to be linked to the current situation like he did." And I asked them -- to clarify with them that I should be able to speak out, and Waibel responded when I said I escalated it to Dan West on April 9th and hadn't heard back from her and said that Dan said he was going to reach out to Waibel to follow up on this and sort it out. And she responded, "We can launch a formal investigation next week to look into your concerns if you'd like. Please let me know if there are any witnesses you would recommend I speak to, in addition to talking to Dave |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | directly. And I responded, "Whoa. When I was talking to Dan, I was like, so I haven't heard back from Jenna. Do I listen to what Dave told me or what ER and EHS told me? And he's like, always listen to employee relations. They can get all us fired. I laughed but apparently he wasn't kidding. I don't think an investigation is needed yet, but thank you for the offer." I said, "I think someone just needs to explain to Dave what the rules are about this. I assume he responded like he did to me because he doesn't want me stressing out our team, but it probably didn't occur to them when it comes to possible workplace safety issues, he can't really forbid me from speaking about my concerns, especially under the guise of employee feedback, especially bringing my mental health into it." I said, "I try not to give Dave direct feedback. He does not do well when confronted by his employees. I'm hoping I can either forward something or if someone could talk to him and explain labor laws, etcetera, to him or something. Is that possible?"<br>Are you familiar with this email exchange?<br>A I saw a number of email exchanges. I don't actually recall reading this one in its entirety of the questions |

| *Subject with Page:Line Range* | *Summary* | *Key Quotes* |
|---|---|---|
| | | around whether you could share information. But from EH&S, it sounds like you were very clear that you can speak to people. And I also saw some emails with Jenna also confirming them.<br><br>Q So as of April -- that was my understanding. There's other emails where I'm complaining about similar and even worse conduct by EHS. But as of April, I was complaining about my manager. Did Apple ever talk to my manager and clarify for him that employees are legally protected to talk about workplace safety concerns?<br>MS. PERRY: I'm going to object here. This is beyond the scope of this deposition. This was the deposition that you took on Tuesday, I believe, when you were asking questions about the outcome of the concerns that you raised that were investigated by Jenna Waibel and Ekelemchi Okpo.<br>MS. GJOVIK: On Tuesday, I was told by Ms. Richard that anything related to EHS would have to wait till Thursday. So now, today, you are saying anything related to EHS, but also the topics on Tuesday, was supposed to be for Tuesday. It was never covered on Tuesday because you told me it would be covered today. So if you would like to say it doesn't cover today and should |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | have been covered Tuesday, then I can add it to my list of things to compel or you can allow her to answer.<br>MS. PERRY: The issue is that the topics for today are the topics laid out in your notice, 2, 3, 4, and 5, regarding the concerns that you raised about EH&S issues. So if the question is about the EH&S concerns specifically, that's fine, and this witness is prepared and ready to testify about that. I interpreted your question or what I heard your question to be was: "What was the outcome with employee relations talking to my manager about concerns I had raised?" If that's the question, that was the -- appropriately the topic for the employee relations deposition.<br>MS. GJOVIK: I was told that anything about investigations or outcomes related to EHS matters would occur today.<br>MS. PERRY: Well --<br>MS. GJOVIK: That's not true, it didn't occur Tuesday, and now you're telling me it can't occur today because it was supposed to Tuesday. But the one on Tuesday told me is supposed to occur on Thursday.<br>MS. PERRY: Well, I brought the transcript from Tuesday, and that's not entirely accurate. What is your specific question? And maybe that will help if you restate it to |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | figure out whether is this the witness who can cover it or whether it was the question that was supposed to be on Tuesday. Because as we informed you, the Tuesday deposition was related to all of the employee relations investigation topics.<br>MS. GJOVIK: So to be fair, Topic 4 says: "Any complaints, reports, or concerns raised by Gjovik regarding environmental health or safety conditions and regulatory compliance, dot, dot, dot, and defendant's response thereto" and you split that into two days, 5/12 and 5/14. And so today is 5/14, and we're supposed to be talking about EHS and regulatory compliance, including defendant's response thereto. The question I'm asking, did Apple talk to my manager and explain to him that I should be allowed to talk about workplace safety at work falls squarely in that category.<br>MS. PERRY: I disagree with you. I don't think that this is an environmental health and safety question. You're asking questions about the concerns that you raised to an ER investigator and what the E&R investigator did with that.<br><br>Q This is forwarding the email I sent on March 17th, 2021, in response to an email that our administrative assistant sent |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | that day, Jane Markham. She said: "The corporate EHS team is conducting a rather large scale project across the Santa Clara Valley building portfolio which includes a vapor intrusion survey within each building" and then asked lab managers to provide some information. And I had responded saying, "I have a lot of questions. For those of you who don't know, I was out on leave so long last year. I was severely poisoned by hazardous waste vapor intrusion at the apartment I was living in." I detailed some of that. I said, "I'll share the newspaper article about my experience when it comes out in a couple of weeks." I mentioned again that Business Conduct indicated that I can publish it as long as I only talk about residential concerns. And then I asked Jane if I could talk to someone in EHS directly to ask questions, asked if we're allowed to talk to EPA or if we have to go through EHS. And I asked if our site was being singled out for this and linked to some articles about Triple Site and TRW Microwave site, and I asked if there was an incident at the building and saying, "I found a report from 2016 saying vapor intrusion was found under homes next to our office, a 2019 EPA settlement for |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | further remediation." And I can't -- I was looking for more details. Then I asked what kind of air monitoring they're going to be doing, if they're going to test the drinking water, and said, "They should also be inspecting any labs that have plumbing fixtures, like a sink or eye wash station." I said, "Vapor intrusion is notorious for coming up through plumbing. They'll share their findings and any risk assessment, and said, "We really should be better informed about these types of environmental risks at our offices. The chemicals under our building, if in high enough quantities, can cause cancer, disruption of nervous and endocrine systems, and birth defects and miscarriages. That's not a very physically inclusive environment for women." And then said, "If there's any new concerns, like if TCE is actually found in our air or water, I believe the Federal Right to Know statute requires Apple to inform employees of the presence of chemicals." And said, "I've never seen any notice or disclosure about the status of our office since I've worked there. I was only warned by folks who grew up in the area when I joined this team, and that's messed up. But also if folks know, then |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | they can report unusual chemical smells, the immediately physical symptoms, etcetera, and we can get EPA to jump any issues sooner than later." And I attached a couple of articles.<br>And then this document produced by Apple was sent by manager David Powers to my other supervisor, Dan West, on March 17th, and Mr. Powers wrote, "FYI, I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her about it. I want to run this by you."<br>Have you seen this email?<br>A I've seen the lower part of it. Honestly, I don't remember reading or having access to the top part.<br><br>Q So, what's Apple's position on the things that I was sharing? Does Apple believe that I was sharing inaccurate information?<br>A My sense is that it's lacking full context, that some of the information that is being shared is being pulled out from different reports, and that in some cases -- I'm not saying all, but in some cases, it lacks context for clarity that, you know, really defines existing risks. |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | Q Are you aware that Apple's external counsel used that single TRI filing for 3250 Scott introduced in this litigation to get my toxic tort claims so -- nuisance sense ultrahazardous activities and IAD claims against Apple dismissed under an expired statute of limitations argument saying I should have filed that document sooner and should put me on notice to sue Apple sooner over their operations at that facility and my injuries from 2020?<br>MS. PERRY: Objection. Lacks foundation. Assumes facts not in evidence.<br>THE WITNESS: I don't have any knowledge of what you just said.<br><br>Q So, what exactly did Apple believe was inaccurate in my email or indicated that I could talk to people that Apple didn't think I could talk about when this was the email that Ms. Weibel was writing about?<br>MS. PERRY: Objection. Vague.<br>BY MS. GJOVIK:<br>Q You can answer.<br>A I need your help to kind of walk me through. The email that I'm looking through right now, that's April 3rd, that you sent to Jenna is the same email that Jenna is referring to that you sent to multiple people. |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | Q So this -- this is the email where I say, "Hey, Jenna, can you give me a script because EHS said I could" --<br>A Right.<br>Q -- no prohibitions on speaking out and said my manager doesn't seemed aligned. He said I'm not allowed to talk to anyone in our organization; said I was only allowed to talk to EHS; said it was only a warning because of my mental health issues; and said, "Can you please give me something to forward and tell them no retaliation." And that's the one where I started that script that Michael read about there being no prohibitions and Apple employees speaking out about concerns related to workplace conditions and no retaliation. That was really great.<br>So that appears -- and then I said, "Hey, I hadn't heard back, so I talked with Dan, and Dan was going to reach out to you, Jenna, to see if we can talk to Dave about this." The response where Jenna says, "I need to clarify-" -- she needs to clarify and make sure I allow EHS to do their job without me scaring everyone with inaccurate data, and she was concerned about my follow-up emails sent below, that one we just read about the mental health issues and PTSD and retaliation concerns. After |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | she acknowledged my email, she says, "I seem to think that Jenna told me I can talk to anyone at any time about anything. That's not what she said," she says.<br>MS. PERRY: Objection. Vague. Calls for speculation.<br>BY MS. GJOVIK:<br>Q Does Apple stand behind Ms. Waibel's statement here regarding that email I sent?<br>MS. PERRY: Objection. Vague.<br>BY MS. GJOVIK:<br>Q You can answer.<br>A I've seen emails from Jenna telling you that you can talk to people. And honestly, I still can't read from this. To me, this almost seems like they're talking about a different situation. So I'm not even confident in, you know, what's going on in this thread versus what's going on in other threads. So I'm unable to answer that. |
| **Employee Speech Policies and EHS Communication Guidelines** 238:1-253:25 | The deponent reviewed an email dated April 27, 2021, sent by Ms. Gjovik to Michael and Jenna, seeking clarification on what she was permitted to say about Apple's offices and buildings on chemical release sites, and her employer's response to her concerns about employee feedback and warnings related to mental health and Superfund status (238:4-240:7). Ms. Schmidt stated she had seen emails with Michael and Jenna | Q So the last page is just redacted docs. And then there's one email starting on this -- page 1 and going through the rest of the pages. So this is an email I sent April 27th, 2021, to Michael and Jenna, and I said, "I'm looking for clarity on what I'm officially allowed and not allowed to say about Apple's offices and buildings on chemical release sites." And said, "I chatted with Jenna this morning and she said I'm |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | responding but did not recall this specific email, requesting a more complete conversation (241:9-14). When questioned about Apple's stance on employee communication regarding workplace safety, Ms. Schmidt affirmed that employees are expected to share accurate and complete information (242:23-243:5). She also agreed that determinations about workplace safety should be made with Environmental Health & Safety (EHS) and that employees should not make their own assessments (243:17-244:4). The deponent also addressed an email from April 8, 2021, where Ms. Gjovik informed HR about her struggles, including PTSD symptoms from alleged chemical exposure, but Ms. Schmidt was unsure if HR connected the dots (244:18-246:14). Finally, Ms. Schmidt confirmed that Apple was not aware of a criminal investigation by the EPA concerning its facility at 3250 Scott Boulevard (251:15-252:14). | `allowed to speak about any concerns about the terms and conditions of my employment, but I can only share information that is complete and accurate.  Further, she said I should not cause panic if there's no reason for panic. In addition, she said if there's any risk to employee safety, that communication would need to come from EHS." I said, "Jenna, please confirm this is correct summary or not.  If not, clarify." I said, "I mentioned to Jenna I'm still confused as to what that means.  I had raised the issue weeks ago that my boss gave me employee feedback about my email, questions about the building and VI testing, implied it was a warning because I was having mental health issues and forbid me from talking to anyone about the Superfund status and SD01 or any of my concerns about working in SD01 related to building other than him and EHS.  Jenna said he denied he said this, but he hasn't followed up with me directly to clarify anything."  And I asked Jenna to please clarify if that's not correct.  I said, "Michael, the script you read when we first met was great, and that's why I called out what Dave told me to Jenna,` |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
|---|---|---|
| | | because it seemed in direct contradiction to what you said. So I'd really appreciate clarity here. When I talked to Jenna, I asked about if I could even talk openly about the Superfund status of my office, and she said only if EHS confirms that it's complete and accurate information. I told her it'd be best if I have you confirm some key points so I don't get in trouble later. So, Michael, I have some questions for you about what is complete and accurate as well as some general questions." So, Apple has filed formal answers to these allegations, an agency adjudications. So this is not new to Apple. This shouldn't be too complex to sort out. The question would be: Does Apple stand by any of these bouncing -- these tests of what I can talk about? Because you said several times to make sure what I'm sharing is accurate and complete, which is two of the points on this. So it sounds like you, at least Apple, is maintaining at least those two points, that when employees talk about workplace safety, it should be complete and accurate. |

| ***Subject with Page:Line Range*** | ***Summary*** | ***Key Quotes*** |
| --- | --- | --- |
| | | Is that true?<br>A Yes. I think that's the expectation, is that<br>when an employee is sharing a concern, that it's accurate. |