# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK — 3:23-CV-04597-EMC

VERSUS — FEBRUARY 21, 2025

APPLE, INC. — SAN FRANCISCO, CA

BEFORE THE HONORABLE EDWARD M. CHEN
UNITED STATES DISTRICT JUDGE

TRANSCRIPT OF MOTION HEARING

A P P E A R A N C E S:

FOR THE GOVERNMENT:
ASHLEY M. GJOVIK, ESQUIRE
2108 N. ST
SACRAMENTO, CA 95816
ashleymgjovik@protonmail.com

FOR THE DEFENDANT:
MELINDA S. RIECHERT, ESQUIRE
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
mriechert@orrick.com

---

BETH A. KRUPA, RMR, CRR (VIA ZOOM)
United States Court Reporter
401 West Evans Street
Florence, SC 29501
Beth_krupa@scd.uscourts.gov

(Stenotype/Computer-Aided Transcription)

SAN FRANCISCO, CA, FEBRUARY 21, 2025

HONORABLE EDWARD M. CHEN, PRESIDING

* * *

(Proceedings commence at 9:15 a.m.)

THE CLERK: Next case is Gjovik versus Apple, Inc., Case No. 23-4597. Please state your appearance for the record beginning with the plaintiff.

MS. GJOVIK: My name is Ashley Gjovik. Good morning, Your Honor.

THE COURT: All right. Good morning.

MS. RIECHERT: Melinda Riechert from Orrick representing Apple.

THE COURT: All right. Good morning, Ms. Riechert. Okay. We're on for defendant's motion to dismiss portions of the fifth amended complaint and so let me address, ask the parties to address some of the key issues as I see them.

First has to do with the statute of limitations. And I will say at the outset that I think Ms. Gjovik is correct in that with respect to the delay discovery rule, federal law applies even though there may be state claims.

I think the Ninth Circuit has held in the O'Connor Boeing case that federal standard applies and there's a slight difference between the state and federal

standard. I think the federal standard requires that the -- it turns on whether the defendant knows or reasonably should have known of the cause and not just mere suspicion to the extent the state court -- state law could be construed to have that more lenient standard.

So here the question of known or should have known turns on inquiry notice, in my view, and that is whether or not a reasonable inquiry that would have been undertaken would have put the plaintiff on notice of her claim and here the -- it's clear that Ms. Gjovik had reason to believe there was some kind of a problem given all the activities.

Her contention here is that she didn't know -- she had no reason to know that specifically that -- of the actual nature of the activities that were going on at the plant that was nearby and that would have given rise to the kind of alleged injuries she claims.

But she knew there was something going on and knew that there was some risk of toxics and in her filings reflect that she believed there were reported amounts of various chemicals, including arsenic, carbon monoxide, mercury, et cetera.

But the key question it seems to me is whether she knew it or not at the time. There appears to have been a public file containing the permit that made it

clear what was -- that there was semiconductor fabrication going on.

So that's what I would like to -- so if that's evident, then there's a very good argument that one would be on inquiry notice, and that inquiry notice would have led to the discovery of, in fact, that the Aria factory was engaged in semiconductor fabrication.

I take it that's the defense argument, that given the public information that the notice requirement -- the should have known requirement was satisfied; is that correct, Ms. Riechert?

MS. RIECHERT: Correct, Your Honor.

THE COURT: I'll let you respond to that, Ms. Gjovik. I know you say you did not know, but that's not the standard. The standard is should have known and based on a reasonable inquiry would have uncovered the fact that the Aria factory was, in fact, engaged in semiconductor fabrication.

MS. GJOVIK: Thank you, Your Honor. I think this is a very unique case that has such a strong holding for the reasonable inquiry where when I knew that there was something going on, I alerted just about every government agency that could possibly be implicated by that.

And as a project manager, ensured that they all

did an inquiry on their behalf to see if they could figure out what was going on.

Many agencies took this extraordinarily seriously, the EPA looked into it for weeks. They were distracted also by the super fund issues, but I had the city looking at it, I had the state governments looking at it.

It went on for some time. That was the article I published was frustration that even with all of these experts, all of these agencies trying to figure out what was going on, they couldn't figure it out.

So if this standard, if we would say, I was on inquiry notice, I should have figured it out. But the federal EPA could not figure it out and it's their job to regulate these things and they would have even more access than I would have to the records, then no one is ever going to meet this legal standard.

THE COURT: Well, let me ask you, when you say couldn't figure out, maybe they did not, at least in their view find a -- come up with a specific finding. But the issue is not conclusively determining -- what if, in fact, there were no emissions that were sufficiently concerning, that doesn't mean that you couldn't bring a claim.

And to bring a claim, all you have to know is

what the source is. So the fact that the agencies couldn't come to a conclusion doesn't necessarily mean that you didn't have sufficient reason to believe that it was coming from this factory, because it was engaged in semiconductor manufacture.

MS. GJOVIK: Well, first, I would say that evidence that Apple filed, there's no actual evidence that was available at the time. They just said it's available now and it's a very difficult website to navigate.

I spent a freakish amount of time investigating this. I had friends intervening, telling me I just need to move on. This is, again, where I'm concerned, that if I didn't do enough, I don't think anyone would have ever done enough.

I didn't find that for some time. The public records portal points you to a complete different place. It doesn't ever send you there. I think there's also an issue that if we say that the standard for semiconductor exposure would be looking at the permits and knowing that semiconductor fab, again, it's going to be very hard for anyone to ever meet that standard.

It's just because I worked in hardware at Apple and was around the semiconductor process that those words meant something to me. So there's a lot of people that

don't understand the ultra hazardous nature of that type of operation and it is Silicon Valley, so there's tons of industrial facilities all over the place doing different kinds of level of industrial work.

Sometimes it's a problem, sometimes it's not. So it's very difficult to try to -- and so the EPA explained to me their process when they were investigating and evaluating to try to figure out if there were red flags.

And they go through the filings. They go through -- the problem here was, Apple was not filing -- they were not registered as semiconductor fab in the required systems. They were not filing their error emission reports to the federal government.

They did file some for the local government, but they were not registered for semiconductor fab, and that is something that they face violations for now. They're written up by the Bay Area Air Quality Management District.

This also, the violations raise the issue, once the government found out what they were doing, it was so facially illegal, they faced so many inspections, and they've been written up, violations and investigations, that, again, to say I should have been able to figure it out, if these agencies who it's their job to figure it

out and once they figured out what Apple specifically was doing in this situation, jumped on it and opened very formal extensive investigations and are working on enforcement actions. I don't think anyone would ever meet that standard if to say that I did not do enough.

THE COURT: Okay. Well, hold on for a second. You also allege that there are filings that show that the facility exhausted reportable amounts of mercury, arsenic, carbon monoxide, formaldehyde in the ambient air around the factory and Apple says that was available through the Bay Area Air Quality Management District publicly online back in August of 2021.

So why wouldn't that be enough to bring -- to believe that you had a claim? It was -- if you're brining in arsenic, carbon monoxide, formaldehyde, maybe you don't know every substance and maybe fabrication of, you know, of these chips and stuff could have even more, but at that point why wouldn't there be enough notice to say there's a problem here and I've got a claim?

MS. GJOVIK: So there's an argument there could be, but what I put on that claim, again, we're in -- we're in Silicon Valley which is even worse than San Francisco when it comes to the industrial operations near residential and schools, and just about every office you're going to be around is probably going to be

emitting something.

And this was a conversation, this was reflected in the article I wrote in my frustration, that there's a lot of air pollution around here and it's trying to figure out what is unusual enough that it could cause such a severe health issue.

And the issues I was having and the other victims were having, was so severe, it had to be something that was just, you know, a very, very, extreme dangerous activity.

Again, once the Bay Area Air Quality Management District, who received those filings from Apple and knew the address, once they found out that Apple was actually doing semiconductor fabrication, had multiple inspections, they're written up for multiple violations, they failed to register.

They're supposed to get permission from the air board to even operate in a location like that. There's a whole planning process and zoning that they surely would have been denied.

So one of the big issues here is what Apple was doing was so egregiously inappropriate, like, no one would think to screen for something like that, and that's why I argued ultra hazardous.

To me, this is the same thing as your neighbor

drilling for oil next to your backyard. Where you're like, you're doing what? That's crazy. That's so dangerous. You can't do that.

So it's -- this is kind of an unusual one. I also, like, I'm carrying a lot of burden of thousands of other victims. So, again, I did freakish amounts of research.

I have an engineering background. I have the legal background, in law school learning enough that I could navigate some of this. I was frequently told by these agencies that I was, like, the best researcher they've ever seen.

So if I did not do enough, no one would have ever done enough. And if I was to file a complaint, I think it's an argument against judicial economy, that if there's so many buildings around that area and there's so many potential sources, whether it was existing contamination that they're not properly venting and controlling or new stuff, I'm going to file a complaint with like 15 potential parties listed.

And what would I even -- I would say, chemicals came from maybe the ground, maybe the water, maybe the sewers, maybe the exhaust, here's a list of like 20 suspects.

That would just clog the pipes of all of the

Silicon Valley, especially, courts, because it's -- that's just too vague. You -- you need another step forward. And we've been having, I think, what, three motions to dismiss now discussing my toxic tort cases.

So they're very hard to get through and I think just having, you know, file it if you think you were exposed to chemicals would -- would not be good for the courts.

THE COURT: All right. Let me ask Ms. Riechert to respond in terms of how easy it would have been to find that the source of these various chemicals in the air was emanating from this factory, the Aria factory because it was doing semiconductor fabrication.

MS. RIECHERT: Yes, Your Honor. So the documents that she relies on to support her claim, she found in 2023. Those documents were all available in 2021, in 2020.

So there's no reason if she could find them in 2023 that she couldn't have found them earlier in 2021 and 2020 and that's the essential part of the claim. She hasn't shown that she could not have found them earlier if she used reasonable diligence.

THE COURT: And what's the proof? We're getting an echo here. I'm not sure why that is. Why --

what's your proof that these were, in fact, available as of 2020 and 2021?

MS. RIECHERT: We submitted all of that with our motion, Your Honor, in a request for judicial notice which has the links, how we got to the links, how they were available, when they were made public.

THE COURT: It relies on the way back?

MS. RIECHERT: Some of it in the way back --

MS. GJOVIK: No.

MS. RIECHERT: -- but you can see the information on the website. If you go through all the RJN, you can see how we found all of that --

MS. GJOVIK: I objected. There's no way back. There's no proof that was even available other than the day --

THE COURT: Hold on. Hold on. You are not to interrupt. I will come back to you.

So continue, Ms. Riechert.

MS. RIECHERT: Yes, Your Honor. So in the RJN, we go through all the documents that she now relies on to support her claim that she found in -- she says she found in 2023. And we show how that stuff was available on the website in 2020 or 2021.

One of them we don't have a way back going back that far. That doesn't mean it wasn't available before

then, we just didn't have a way back. But for all of the others, we show that they were available in 2020 and 2021 and she could have found them then if she used the same diligence in 2023, that she uses -- she should have used that same diligence in 2021.

So if she did find them in 2023, they were available in 2021. So why didn't she find them in 2021? Maybe they were difficult to find, but she ultimately found them. And so, therefore, she could have found them earlier.

THE COURT: What's your response to the notion that there's at least a factual question here about how reasonably or how easily they were -- could have, this record, this information about the factory could have been found when she went to all these different agencies and as she put it, they couldn't figure it out?

MS. RIECHERT: The agencies couldn't figure out because there was no problem. Believe me, they would have come after Apple if there was a problem. It's the plaintiff who's claiming there's a problem not the agencies.

But we have submitted all of this evidence to show that it was available. It's not disputed that it was available back then. We submitted all of the evidence that showed it was.

So there is no factual dispute about whether it was available in 2021, and there's no dispute that she found it in 2023. And if she had done in 2023 -- in 2021 what she did in 2023, she would have found it because it was there and there's no factual dispute on that.

THE COURT: All right. I'll let you respond to that specific point that what you found in 2023 could have been found two years earlier.

MS. GJOVIK: Thank you, Your Honor. There's no evidence that it was available then, that was my objection, that they have not proven that it was available at the time, how it would have been accessed.

I think that's fact finding. That's something that gets past motion to dismiss 12(b)(6) where it's talking to agencies, where it's understanding what a reasonable person would be expected to do.

If I may, I also just want to say that I also have the additional arguments of fraud and some version of duress of where she asks, why couldn't I figure that out in 2021.

One of the factors would be the extensive harassment and retaliation I was facing, that was a bit distracting from my environmental investigations.

THE COURT: All right. Well, so it seems like the key is how -- whether that information was available

and how accessible it was back in 2021, and I will take a closer look at your request for judicial notice, because that may be key in whether or not there's a factual question there.

MS. RIECHERT: What she did is she has her request for judicial notice where she says how she found all of this stuff and then we responded that with respect to all of the stuff that you list in your RJN that you found in 2023, all of that stuff was available in 2021.

THE COURT: Okay.

MS. RIECHERT: So we went through all of the exhibits in her RJN and we showed Exhibit 1 was available, Exhibit 2 was available, Exhibit 3 was available, so all of the ones you rely on now were available in 2021.

THE COURT: All right. Let me turn to the retaliation claims. I know there's other issues with respect to the environmental claim and I have a pretty good handle on those other issues, if we get there, if we get past the statute of limitations.

Retaliation claim, with respect to the Section 1102.5, the California whistleblower, with respect to tolling, the key is whether the prior administrative filings would have been sufficiently similar in nature as to give -- to alert the defendant

about the claims that are being made in this lawsuit.

It doesn't have to be precisely coextensive, but it has to give, sort of, reasonable, again, sort of inquiry notice.

And it seems to me that in looking at the filings, that there is enough for retaliation based on some of the disclosures and the activities and the claims that were made in the DIR complaint with respect to retaliation for workplace issues, workplace safety.

But I don't see anything in there that would have alerted the defendant about the violation of privacy rights. That seems to be a different kind of animal than a workplace safety and the complaints were -- I don't see much about -- I see something about environmental safety that can be inferred and maybe about organization and other things, but not about privacy.

So I'll let you respond to that problem, Ms. Gjovik.

MS. GJOVIK: Thank you, Your Honor. So one thing I've raised is privacy is inherent in this lawsuit because of Apple's defense which is they're allowed to invade my privacy.

So this would have been raised in part of the discussion no matter what in these type of adjudications and Apple would have known that because it's their

defense.

They would have had to know whether we have to debate whether that's a proper reason to fire someone, if that's really why they fired me. We'd have to talk about my complaints about invasion of privacy.

The citation that Apple uses for the article where I talk about this thing that really upset them, the article is called Apple Cares About Privacy Unless You Work At Apple.

And it's an interview with current and prior employees talking about privacy as a work condition, and concerned about hypocrisy from Apple.

THE COURT: Well, what we're talking about is tolling the statute of limitations which would otherwise run because of your filing in another forum, that gives you the benefit of extending the statute of limitations through tolling.

But in order to get that benefit, that pursuit in another forum such as the Department of Public Relations have to serve the function of the lawsuit.

It has to put the defendant on notice of the nature of the claim and I'm -- I find that that -- was on notice of retaliation based upon workplace reported safety violations and environmental, it's the privacy aspect that is brought in this suit but not -- I don't

see it in the DIR complaint.

MS. GJOVIK: You are correct, and I am trying to have a creative policy argument. But if we're going by prima facie, you are correct. It was not in the original complaint.

THE COURT: Let me ask about the 98 points.

MS. RIECHERT: May I respond on that point?

THE COURT: Okay. Go ahead.

MS. RIECHERT: So there were a number of claims that we believe that she's asserting retaliation for under 1102.5 that are not covered by her DIR complaint for workplace safety.

THE COURT: All right. So under the privacy, what else do you claim is not?

MS. RIECHERT: The NLRA claim under Section 8(a)(1) of the National Labor Relations Act. That was not raised. That's not a workplace safety issue and that was not raised in her DIR complaint.

There's an OSHA complaint, 29 U.S.C. 660 which is OSHA 11-C, that was not raised in her DIR complaint. There's the right of privacy, there's 42 U.S.C. 2000(e), that had nothing to do with workplace safety.

And then the last one is the antidiscrimination laws of the government code in California 1298 -- 12920. So those were all claims that she's now saying she was

retaliated against for making, but none of those were covered by the DIR complaint related to workplace safety.

THE COURT: Why wouldn't the OSHA claim of retaliation be covered or at least implied by the DIR complaint?

MS. RIECHERT: It would have to be very implied, I think, for it to be covered.

THE COURT: I mean, at least it's within the realm of the kind of things we're talking about.

MS. RIECHERT: Possibly. I would want to make one other point with respect to her allegations under 1102.5 which is that a number of the things that happened to her, she says, after she made -- relate to the conduct that occurred after she made the DIR complaint and, therefore, they could not have been covered by the DIR complaint.

For example, she talks about that she was retaliated against for making the DIR complaint, but obviously, if she's retaliated against for making the complaint, the things that happened to her could not have been in the DIR complaint because they occurred after the DIR complaint.

THE COURT: But it's still outside the limitations period, because if she complained about issues within the limitations period, then you don't need

the tolling.

MS. RIECHERT: Correct. We're talking about things that occurred outside of the limitations period, but were not tolled by the DIR complaint because they occurred after the DIR complaint but outside the limitations period.

THE COURT: What would be your response to, as you know in the Title 7 exhaustion arena, which is a little bit analogous, that that exhaustion is deemed satisfied not only by things that are raised in an EOC complaint, but things that are reasonably related or reasonably could be expected to have grown out of the original complaint.

And one could argue here, if you use that kind of notion, that retaliation for the DIR complaint even though, you know, you expect somebody to file another DIR complaint, it seems like it's transactionally related and it would be --

MS. GJOVIK: I did, I did.

THE COURT: Let me ask Ms. Riechert to respond to that first.

MS. RIECHERT: Yes, Your Honor. So there are a lot of rules with the EOC, as you know, where it has to be covered by the complaint or arise out of it. If the complaint is for discrimination, then you allege

retaliation.

That's not covered by the original complaint, and so you have to allege amended complaint. If you allege race discrimination, and then you later allege age discrimination, you have to amend your complaint.

She didn't amend the DIR complaint, and so these things that were not related to workplace safety, including discrimination and things like that, do not relate back and are not tolled because they don't relate to workplace safety, but was in the DIR complaint.

THE COURT: But the DIR complaint did raise a retaliation claim, it's just that now she's raising further acts of retaliation, so it's not like, you know, a brand new -- it does seem different to me. I don't know if there's case law on this, but it feels different. I'll let Ms. Gjovik respond to that question.

MS. GJOVIK: Sorry, I jumped in again. I just get very excited about labor rights.

So first I just want to make clear that when I filed that complaint, it was not specific to safety. It was all the labor rights. I got very, very excited to learning about all the wonderful labor laws in California.

I was not aware that California is the, like, the leading law with state labor protections, and this is

when I was getting very engaged about LRB, and California has the right to talk about work conditions, talking about invasion of privacy. That's why I took part in that article.

I want to point out that all of this happened well before I was fired. This stuff is definitely included in those complaints and some of the things that the counsel just said were incorrect.

So like the NLRB, I filed my NLRB complaint prior to the DIR complaint and Apple was served. And they had notice of counsel that they were representing that NLRB charge. I think it's like the same day I filed the DIR charge.

So I think it's a bit of puzzling they're doing of maybe it wasn't the exact same lawyer and stuff, but like Apple as a company was aware and all of this was growing out of the complaints that I made to Apple which were very extensively documented.

This is stuff that rooted out of the issue confirmation I wrote with them, which is a long detailed document of all of my concerns which covered a huge broad of issues. That was about August 22nd that that was filed.

I wasn't fired until September 9th. They said that they were investigating all of those things,

supposedly. So they were fully on notice there and I started discovery with them. I called it prediscovery. I told them I was suing them at that point and I gave them over 500 documents to support these claims they were making.

And, again, it was -- they actually said that they would not investigate the safety issues. So everything they were supposedly investigating was not safety, even though I kept bringing up the safety issues, too.

THE COURT: All right. Let me -- let me ask about the other retaliation basis, the Labor Code 98.6, that one of the keys there is whether or not there's a sufficient allegation that Apple knew that Ms. Gjovik was engaged in the activity because without the knowledge, as I previously mentioned, you can't retaliate.

There is some suggestion here, at least, for instance, the timing of the events that's alleged, that the day after Ms. Gjovik shared a post on Slack referencing the policies on rights to speak freely about wages, et cetera, she was placed on leave, that Apple was aware of the survey because they shut it down.

Maybe it's a little thin, but isn't that enough, Ms. Riechert, to -- especially if the inferences are to be drawn in favor of the pleader to find a basis

for knowledge?

MS. RIECHERT: Yes, Your Honor. My understanding on the Slack is that she said that she was questioned about the Slack posts on July 27, 2021, but she didn't participate in the pay survey until August of 2021.

And, therefore, even if the company had been asking her about her Slack in July of 2021, it would not have found something that she later put in Slack and, therefore, it couldn't -- there would be no reason to say that it knew that she had posted the paid survey in August of '21 just because they looked at her Slack on July 28th -- July 27, 2021.

THE COURT: All right. Your response to that specific point, Ms. Gjovik?

MS. GJOVIK: Yeah. So I think that is completely disconnected from the reality of corporations who highly prioritize keeping their employees quiet about concerns and not having stuff aired publicly.

We've seen this with Apple and other tech companies, even the CEOs sending emails yelling at their employees to not speak about anything publicly, keep it all private.

Apple, like these other companies, does the same thing. Once you're on a list, they're going to

interrogate you ongoing. They're going to keep an eye on what you're doing.

There are probably hundreds of articles about Apple once you're on their list, they're following up with you, saying, hey, we said stop posting that.

So to think that they became concerned about what I was doing and then I continued to escalate my advocacy to think that they stopped paying attention, I think is -- doesn't make any sense.

And then especially since they said they started investigating me, supposedly over a week before they fired me, my question then would be, what did they investigate if they were saying that they fired me for making statements that were leaking, wouldn't they then inherently be searching all of my social media, Slack, conversations with employees, to try to figure out whatever they're looking for about that leaking unless they weren't investigating and it was just pretential?

THE COURT: Do you want to respond, Ms. Riechert, to that?

MS. RIECHERT: Yes, Your Honor. She's required to allege facts that show that Apple did know that she was complaining about her wages and she just hasn't alleged those facts in the complaint.

THE COURT: All right. Well, I'm going to take

these matters under submission and we'll determine what sort of survives and what doesn't.

I will say that matters that were repled in this complaint that were outside the scope of what I had allowed, I'm going to look at that and there may be things that are not cognizable here.

I also will feel that whatever I rule with respect to this complaint, I am not inclined to allow further amendments to the pleadings here.

We need to get going on this case and there's been enough back and forth on the pleadings, but I will rule on those matters once we -- I rule on what's before me now.

MS. RIECHERT: I would just like to make one more point, Your Honor, if I could.

THE COURT: Okay.

MS. RIECHERT: You've admonished the plaintiff in this case that she needs to comply with the rules, meet the deadlines, meet the page limit requirements and yet she's continuing to not do that.

She filed her opposition late. She filed -- the second version of the opposition was late and it was 30-some pages long.

So again, it violated your rules by being late and I just think it's really important that we make it

clear, you make it clear to the plaintiff that she's got to comply with your rules. She's got to get these things done on time and she's got to comply with the page limit requirements.

THE COURT: Right. I am going to say that in my order, whatever I decide, that I expect at this point, I've given dispensation, because she's not represented although she has a legal education.

But from this point on, the rules are going to be enforced. So I will make that clear and I'm going to make that clear in the order. Whatever goes forward from here, that's going to be my expectation.

So I will take the matter under submission, but it's my intent to close the pleading stage of this case and move forward with whatever is left and we'll set a further schedule at that point.

MS. RIECHERT: There is another motion by the plaintiff to further amend the complaint that is set for hearing.

THE COURT: Well, I've already indicated that my inclination is to close the pleadings in this case. We've already had now a fifth amended complaint. We need to move forward with what we've got after I decide the issue before me now. So you will hear from me shortly.

MS. RIECHERT: Thank you very much, Your Honor.

THE COURT: Thank you, everyone.

MS. GJOVIK: Thank you, Your Honor.

THE CLERK: This hearing is concluded.

(Proceedings adjourned at 9:49 a.m.)

**************************************************

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the proceedings taken from my stenographic notes in the above-entitled matter.

/S/ Beth A. Krupa_ __March 28, 2025___
Date

Beth A. Krupa, RMR, CRR
Official Court Reporter
U.S. District Court
District of South Carolina