# EXHIBIT 7

*Gjovik v Apple Inc, City of Santa Clara, et al,* 25-CV-07360-PCP (Northern District of California). Opposition to City of Santa Clara's Motion to Dismiss (Dkt. 127).

Sign In

City of Santa Clara
The Center of What's Possible

# Legislative Public Meetings

Select Language ▼

City Website User Guide Search Files Calendar Council and Authorities Boards and Commissions TMAC

RSS Alerts

Details Reports

| | | | |
|---|---|---|---|
| File #: | HIST-41849 Version: 1 | Name: | |
| Type: | Historical | Status: | Historical |
| File created: | 2/11/2014 | In control: | Council |
| On agenda: | 2/11/2014 | Final action: | 2/11/2014 |
| Title: | Pass to print an Ordinance amending Chapter 13.10 (Sewers) of Title 13 (Public Services) by amending Sections 13.10.020, 13.10.450, 13.10.500, 13.10.580 and adding Section 13.10.670 of the City Code to comply with the US Environmental Protection Agency (US EPA) regulations. | | |
| Attachments: | 1. Pass to print an Ordinance amending Chapter 13.10 - REPORT | | |

History (1) Text

1 record Group Export

| Date | Ver. | Action By | Action | Result | Action Details | Meeting Details | Video or Audio |
|---|---|---|---|---|---|---|---|
| 2/11/2014 | 1 | Council | Adopted | | Action details | Meeting details | Not available |

Meeting Date: 02/11/14

# AGENDA REPORT

City of Santa Clara, California

Agenda Item # 7A1

Date: January 23, 2014

To: City Manager for Council Action

From: Director of Water and Sewer Utilities

Subject: Pass to Print an Ordinance Amending Chapter 13.10 of Title 13 by amending Sections 13.10.020, 13.10.450, 13.10.500, 13.10.580, and adding Section 13.10.670 of the Code of the City of Santa Clara

## EXECUTIVE SUMMARY:

Staff is proposing changes to Chapter 13.10, ("Sewers"), of the Santa Clara Municipal Code to comply with Federal regulatory requirements as administered by the US Environmental Protection Agency (US EPA) and by the State Water Resources Control Board (SWRCB). A 2012 audit by the US EPA and the SWRCB of the pretreatment program administered by the City of San Jose found that ordinance changes were required to meet current requirements.

The proposed ordinance amendments include administrative changes, such as clarification of definitions and reporting requirements for regulated facilities as described in Title 40 of the Code of Federal Regulations. Specifically, it adds new definitions and modifies the permitting and reporting requirements for certain industrial dischargers, and makes other technical and conforming changes to the City's Sewer Use Ordinance.

The proposed amendments to the City's Code will conform the City of Santa Clara's Sewer Use Ordinance and address the audit findings. The proposed changes include:

- Clarifying definitions for Significant Change, Significant Industrial User, and Upset.
- Creating new definitions for Clean Water Act, Pollutant Not Present, and Slug Control Plan.
- Allowing industrial users to apply for a waiver of sampling requirements for pollutants not present in their wastewater discharge.
- Allowing industrial users a rebuttal to an 'upset' or exceptional incident, which is unintentional and a temporary noncompliance with categorical Pretreatment Standards because of factors beyond the reasonable control of the industrial user.
- Clarifying that a late report or failure to submit reports required under federal law could subject the user to penalties. It now also provides a means for the Director to waive the assessment if the industrial discharge meets a number of conditions.

## ADVANTAGES AND DISADVANTAGES OF ISSUE:

Passage of this ordinance allows for compliance with the US EPA regulations, as well as provides uniformity in code enforcement by the San Jose-Santa Clara Regional Wastewater Facility inspectors. The consistency

between both City ordinances will help ensure standardization among customers for inspection purposes and compliance with municipal codes.

**ECONOMIC/FISCAL IMPACT:**
The ordinance revisions will have minimal, if any, financial impact to the Water and Sewer Utilities or the City. Furthermore, this ordinance revision keeps the City in compliance with US EPA regulations, consequently avoiding fines and penalties that might result from non-compliance.

**RECOMMENDATION:**
That the Council pass to print an ordinance amending Chapter 13.10 ("Sewers") of Title 13 ("Public Services") by amending Sections 13.10.020, 13.10.450, 13.10.500, 13.10.580, and adding Section 13.10.670 of the Code of the City of Santa Clara to comply with the US EPA regulations.

Christopher L. de Groot
Director of Water and Sewer Utilities

APPROVED:

Julio J. Fuentes
City Manager

***Documents Related to this Report:***
***1) Proposed Ordinance***

I:\Water\MEMOS\AGENDA\2014\Sewer Ordinance\Agenda Report_Sewer Ordinance Chap 13.10.doc

# ORDINANCE NO. _____

**AN ORDINANCE OF THE CITY OF SANTA CLARA, CALIFORNIA, AMENDING CHAPTER 13.10 ("SEWERS") OF TITLE 13 ("PUBLIC SERVICES") BY AMENDING SECTIONS 13.10.020, 13.10.580, 13.10.450, 13.10.500, AND ADDING SECTION 13.10.670 OF "THE CODE OF THE CITY OF SANTA CLARA, CALIFORNIA"**

**BE IT ORDAINED BY THE CITY OF SANTA CLARA AS FOLLOWS:**

**WHEREAS,** requirements by the U.S. Environmental Protection Agency ("US EPA") and the State Water Resources Control Board necessitate changes to the City of Santa Clara's Sewer Use Ordinance;

**WHEREAS,** said changes require Chapter 13.10 of "The Code of the City of Santa Clara, California" to be repealed and replaced; and,

**WHEREAS,** the City Council finds, pursuant to Title 14 of the California Code of Regulations, Sections 15061(b)(3) and 15308, that this Ordinance is exempt from the requirements of the California Environmental Quality Act (CEQA) in that it is not a Project which has the potential for causing a significant effect on the environment and also merely amends parts of the regulatory process for the protection of the environment.

**NOW THEREFORE, BE IT FURTHER ORDAINED BY THE CITY OF SANTA CLARA AS FOLLOWS:**

**SECTION 1**: That Section 13.10.020 ("Definitions") of Chapter 13.10 ("Sewers") of Title 13 ("Public Services") of "The Code of the City of Santa Clara, California" ("SCCC") is amended to read as follows:

**"13.10.020 Definitions.**

The definitions set forth below shall govern the application and interpretation of this chapter.

(a) "A" definitions:

(1) "Amalgam separator" means a device that: employs filtration, settlement, centrifugation, or ion exchange to remove dental amalgam and its metal constituents from a dental office vacuum system before it discharges to the sanitary sewer; has been certified under the International Organization for Standardization's standard for amalgam separators as capable of removing a minimum of ninety-five percent (95%) of dental amalgam at flow rates comparable to the flow rate of the actual vacuum suction system in operation; and does not have any automatic flow bypass.

(2) "Ammonia" means the form of nitrogen that is chemically definable as $NH_3$.

(3) "Audit protocols" means the procedures to be followed in performing flow and pollutant audit studies.

(4) "Average concentration" means the concentration of a pollutant in an industrial user's discharge that is calculated by adding the concentrations of the particular pollutant in all composite samples taken during a given time period, including, but not limited to, self-monitoring samples, and dividing the total by the number of samples taken.

(b) "B" definitions:

(1) "Batch discharge" means the discharge of wastewater resulting from an intermittent treatment process in which an identified amount of process wastewater is collected, treated to meet discharge standards, and released to the sanitary sewer system.

(2) "Best management practices" means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the introduction of pollutants to the sanitary sewer system that have been determined by the Director to be cost-effective for particular industry groups, business types, or specific industrial processes.

(3) "Biochemical oxygen demand" means the quantity of oxygen expressed in parts per million (ppm) by weight, utilized in the biochemical oxidation of organic matter under standard laboratory conditions for five days at a temperature of twenty degrees centigrade (20° C).

(c) "C" definitions:

(1) "Categorical industrial user" or "CIU" means a source performing any categorical process subject to Federal pretreatment standards, as described in 40 CFR Sections 405 through 471, as amended from time to time, that has any connection to the sanitary sewer system.

(2) "Categorical pretreatment standard" or "categorical standard" means any regulation containing pollutant discharge limits promulgated by EPA that apply to specific categories of users and which appear in 40 CFR Sections 405 through 471, as amended from time to time.

(3) "Clean Water Act" is the 1972 amendment to the Federal Water Pollution control Act, 33 U.S.C. section 1251 et seq. The Act is the primary legislation concerning water pollution and its regulation. The Act establishes a permit system that must be used by point sources of pollution such as industrial facilities, government facilities, and agricultural operations. These point sources are not allowed to discharge or dispose of the pollutants they produce in surface water without a permit from the National Pollutant Discharge Elimination System (NPDES).

(4) "Code of Federal Regulations" (or "CFR") refers to the Code of Federal Regulations as published by the Office of the Federal Register National Archives and Records Administration. Whenever a reference is made to any portion of the CFR, or to any other Federal

regulation, such reference shall apply to all amendments and additions to such portion of said regulations now or hereinafter enacted.

(5) "Composite sample" means a flow-proportional or time-proportional sample, which accurately represents the average pollutant concentration discharged during a continuous time period. A composite sample may be obtained manually or automatically, and it may be taken discretely or continuously. For manual composite sampling, at least six individual samples from each sample point shall be combined and mixed to obtain one composite sample; flow-proportion may be obtained either by varying the time interval between each discrete sample or the volume of each discrete sample.

(6) "Critical user" means a discharger whose wastewater contains priority pollutants, or who discharges any waste which has the potential to cause interference in concentration above those allowed in this chapter and/or who discharges in excess of one hundred thousand (100,000) gallons per day.

(d) "D" definitions:

(1) "Diluting waters" means noncontact cooling water, boiler blowdown, domestic sewage, groundwater, stormwater, surface drainage, reverse osmosis reject, water softener regeneration, potable waters, or any other waters that are not part of an industrial process and that do not contain priority pollutants but are combined with industrial wastewater prior to the monitoring point for industrial wastewater discharge. "Diluting waters" also includes excess water used in production processes, such as rinse tanks or rinse water running when in production in excess of operational or quality requirements.

(2) "Director," for purposes of this chapter, shall mean the Director of Water and Sewer Utilities or his/her designee.

(3) "Discharger" means any person discharging wastewater into the sanitary sewer system.

(4) "Domestic wastewater" means wastewater from private residences and other premises resulting from the use of water for personal washing, sanitary purposes and/or the elimination of human wastes and related matter.

(e) "E" definitions:

(1) "Existing source" means any source of discharge that is not a new source.

(f) "F" definitions:

(1) "Food service establishment" means a user that prepares and/or sells food for consumption either on or off the premises or washes utensils or dishes on premises that may contribute grease to the sewer system, including, but not limited to, restaurants, sandwich shops, delicatessens, bakeries, cafeterias, markets, bed and breakfast inns, motels, hotels, meeting halls, caterers, retirement and nursing homes or pizzerias. The term, as used in this chapter, does not refer to food stores or establishments that do not prepare food on premises and do not process food in a manner which may contribute grease to the sewer system.

(g) "G" definitions:

(1) "Garbage" means wastes from the preparation, cooking, and dispensing of foods, and from the handling, storage, and sale of produce.

(2) "Grab sample" means a single discrete sample collected at a particular time and place that represents the composition of the waste stream only at that time and place.

(3) "Grease" means liquid or other waste containing floatable and/or dispersed grease, vegetable oil, petroleum oil, nonbiodegradable cutting oil, or fat, oil or grease products of animal, vegetable or mineral origin which is detectable and measurable using

analytical test procedures established in the United States Code of Federal Regulations, 40 CFR Section 136.

(4) "Grease control device" means a grease interceptor, grease trap, mechanical grease removal device or other device approved for use by the Director.

(5) "Grease interceptor" means a large tank installed underground and designed to collect and control solid-food wastes and floating grease from wastewater prior to discharge into the sanitary sewer collection system. Grease interceptors are normally installed outside the building and use gravity to separate grease from the wastewater as it moves from one compartment of the interceptor to the next.

(6) "Grease trap" means a device placed under or in close proximity to sinks or other fixtures likely to discharge grease in an attempt to separate, trap and hold oil and grease substances.

(h) Reserved for future use.

(i) "I" definitions:

(1) "Industrial user" means any nonresidential user that discharges industrial wastes to the sanitary sewer system.

(2) "Industrial wastes" means the wastes from producing, manufacturing, and processing operations of every kind and nature.

(3) Interference.

(A) "Interference" means a discharge that, alone or in conjunction with a discharge or discharges from other sources, inhibits or disrupts the processes or operation of the sanitary sewer system, including the plant, or causes or significantly contributes to a violation of any requirement of the National Pollutant Discharge Elimination System (NPDES) permit, which is a permit issued to the City pursuant to Section 402 of the Clean Water Act.

(B) "Interference" also includes prevention of biosolids use or disposal by the plant in accordance with published regulations providing guidelines under Section 405 of the Federal Clean Water Act (33 U.S.C. Sections 1251 through 1387) or in regulations developed pursuant to the Solid Waste Disposal Act (SWDA) (42 U.S.C. Section 6901 et seq.), the Toxic Substances Control Act (15 U.S.C. Sections 2601 through 2654), or more stringent State regulations (including those contained in any State biosolids management plan prepared pursuant to Title IV of SWDA) applicable to the method of disposal or use employed by the plant.

(j) Reserved for future use.

(k) Reserved for future use.

(l) "L" definitions:

(1) "Low flow discharger" means an industrial discharger whose average process flow, as shown on the discharger's application to discharge and as measured as a rolling six-month average, is less than one thousand (1,000) gallons per day.

(m) "M" definitions:

(1) "Maximum allowable concentration" means the highest permissible concentration or other measure of pollutant magnitude taken at a specific point in time.

(2) "Mechanical grease removal device" means a power operated device or combination of devices using electrical equipment to heat, filter, siphon, skim or otherwise separate and retain floating grease and solid food waste prior to the wastewater exiting the trap and entering the sanitary sewer collection system.

(n) "N" definitions:

(1) "New source" means:

(A) Any building, structure, facility or installation from which there is (or may be) a discharge of pollutants, the construction of which commenced after the publication

of proposed pretreatment standards under Section 307(c) of the Clean Water Act that will be applicable to such source if such standards are thereafter promulgated in accordance with that section; provided, that:

(i) The building, structure, facility, or installation is constructed at a site at which no other source is located; or

(ii) The building, structure, facility or installation totally replaces the process or production equipment that causes the discharge of pollutants at an existing source; or

(iii) The production or wastewater generating processes of the building, structure, facility or installation are, in the sole judgment of the Director, substantially independent of an existing source at the same site. In determining whether these are substantially independent, factors such as the extent to which the new facility is integrated with the existing plant, and the extent to which the new facility is engaged in the same general type of activity as the existing source, should be considered.

(B) Construction on a site at which an existing source is located results in a modification rather than a new source if the construction does not create a new building, structure, facility, or installation meeting the criteria of subsection (n)(1)(A)(ii) or (iii) of this section but otherwise alters, replaces, or adds to existing process or production equipment.

(C) Construction of a new source as defined under this definition has commenced if the owner or operator has:

(i) Begun, or caused to begin, as part of a continuous on-site construction program:

a. Any placement, assembly or installation of facilities or equipment; or

b. Significant site preparation work, including clearing, excavating, or removal of existing buildings, structures, or facilities, which is necessary for the placement, assembly, or installation of new source facilities or equipment; or

(ii) Entered into a contractual obligation for the purchase of facilities or equipment which are intended to be used in its operation within a reasonable time. Options to purchase or contracts which can be terminated or modified without substantial loss, and contracts for feasibility, engineering, and design studies do not constitute a contractual obligation under this subsection.

(o) "O" definitions:

(1) "Owner" means any person who owns private premises that contain a source as defined in this section.

(2) "Operator" means any person who owns, leases, operates, controls, or supervises a source as defined in this section.

(p) "P" definitions:

(1) "Pass-through" means a discharge which exits the plant into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the plant's NPDES permit, including an increase in the magnitude or duration of a violation.

(2) "pH" means the logarithm of the reciprocal of the concentration of hydrogen ions in moles per liter of solution.

(3) "Plant" means the San Jose/Santa Clara Water Pollution Control Plant.

(4) "Pollutant not present" means a pollutant regulated by a categorical pretreatment standard that is not used or stored in a categorical industrial user's facility, is not

added to or created by any industrial or pretreatment process at the facility, and is not present above the background levels of the water supply.

(5) "Pretreatment standard" means prohibited discharge standards, categorical pretreatment standards, and local limits.

(6) "Priority pollutants" means all pollutants as defined by the "General Pretreatment Regulations" of the Environmental Protection Agency, found at Title 40, Chapter 1, Subchapter W, Parts 401 and 403 of the Code of Federal Regulations.

(7) "Process flow" means the daily, twenty-four (24)-hour flow of wastewater from any kind or nature of production, manufacturing, or processing operation, including industrial and commercial operations where water is used for the removal of any type of waste other than sanitary sewage. Process flow does not include diluting waters.

(q) Reserved for future use.

(r) "R" definitions:

(1) "Reasonable control measures" means control technologies, best management practices, source control practices, and waste-minimization procedures that prevent or reduce the introduction of pollutants to the sanitary sewer system and are determined by the Director to be cost-effective for particular industry groups, business types, or specific industrial processes.

(s) "S" definitions:

(1) "Sanitary sewage" means water-carried wastes from residences, business buildings, institutions, and industrial establishments, excluding ground, surface, and stormwaters, subsurface drainage, and also excluding industrial waste.

(2) "Sanitary sewer overflow" is any overflow, spill, release, discharge or diversion of untreated or partially treated wastewater from a sanitary sewer system, including

overflows or releases that reach waters of the United States, overflows or releases that do not reach waters of the United States, and backups into buildings and/or private property caused by conditions within the publicly owned portion of the sewer system.

(3) "Sanitary sewer system" means all sewers, treatment plants, and other facilities owned or operated by the City for carrying, collecting, pumping, treating, and disposing of sanitary sewage and industrial wastes.

(4) "Sewer" means a pipe or conduit for carrying sewage.

(5) "Sewer lateral" (same as "sewer service lateral") means the sewer connection piping used to convey sewage from a building or facility on a parcel (private or public property) to the City-owned sewer main. Each sewer lateral is owned by the entity that owns the property or facility from which that sewer lateral serves to convey sewage.

(6) "Significant change" means any change in an industrial user's operation that results in any of the following:

(A) An increase or decrease in annual average process flow of twenty-five percent (25%) over the standard discharger's average process flow for the discharger's most immediate preceding twelve (12) months.

(B) An increase or decrease in annual average process flow that results in a change from low flow discharger to standard discharger or from standard discharger to low flow discharger.

(C) An increase or decrease in annual average process flow that results in a change from non-significant industrial user to significant industrial user or from significant industrial user to non-significant industrial user.

(D) An increase or decrease in annual production rate of twenty-five percent (25%) for any industrial user subject to production-based limits over the industrial user's production rate for the most immediate preceding twelve (12) months.

(E) Adding of deleting process discharge or sample points.

(F) Waiver of monitoring requirements for any pollutant not present.

(7) "Significant industrial user" means:

(A) An industrial user that has processes subject to categorical pretreatment standards except as provided under subsection (C); or

(B) An industrial user that:

(i) Discharges an average of twenty-five thousand (25,000) gpd or more of process wastewater to the sanitary system (excluding sanitary, noncontact cooling and boiler blowdown wastewater); or

(ii) Contributes a process waste-stream which makes up five percent or more of the average dry weather hydraulic or organic capacity of the plant; or

(iii) Is designated as such by the Director on the basis that it has a reasonable potential for adversely affecting the plant's operation or for violating any pretreatment standard or requirement.

(C) A significant industrial user does include an industrial user that has processed subject to categorical pretreatment standards if the industrial user:

(i) Does not discharge more than 100 gpd of total categorical process wastewater;

(ii) Has complied with all applicable categorical pretreatment standards;

(iii) Never discharges any untreated concentrated wastewater; and

(iv) Submits annually a certificate statement pursuant to 40 CFR 403.12(g).

(8) An industrial user is in "significant noncompliance" if it has a violation or violations meeting one or more of the following criteria:

(A) Chronic violations of wastewater discharge limits defined here as those in which sixty-six percent (66%) or more of all the measurements taken during a six-month period exceed (by any magnitude) a numeric pretreatment standard or requirement, including instantaneous limits, as defined by 40 CFR Section 403.3(l);

(B) Technical review criteria (TRC) violations, defined here as those in which thirty-three percent (33%) or more of all the measurements for each pollutant parameter taken during a six-month period equal or exceed the product of the numeric pretreatment standard or requirement including instantaneous limits, as defined by 40 CFR Section 403.3(l), multiplied by the applicable TRC (TRC equals 1.4 for BOD, TSS, fats, oil and grease, and 1.2 for all other pollutants except pH);

(C) Any other violation of a pretreatment standard or requirement as defined by 40 CFR Section 403.3(l) (daily maximum, long-term average, instantaneous limit, or narrative standard) that the Director determines has caused, alone or in combination with other discharges, interference or pass-through (including endangering the health of the Director personnel or the general public);

(D) Any discharge of a pollutant that has caused imminent endangerment to human health, welfare or to the environment or has resulted in the plant's exercise of its emergency authority to halt or prevent such a discharge;

(E) Failure to meet, within ninety (90) days after the scheduled due date, a compliance schedule milestone contained in a discharge permit or enforcement order for starting construction, completing construction, or attaining final compliance;

(F) Failure to provide, within forty-five (45) days after the due date, required reports such as baseline monitoring reports, ninety (90)-day compliance reports, periodic self-monitoring reports, and reports on compliance with compliance schedules;

(G) Failure to accurately report noncompliance; and

(H) Any other violation or group of violations, which may include a violation of reasonable control measures, which the Director or determines will adversely affect the operation or implementation of the pretreatment program.

(9) "Slug control plan" means the document prepared pursuant to 40 CFR 403.8(f)(1)(iii)(B)(6) by a significant industrial user that describes the procedural and operational controls in place to prevent a slug load or slug discharge.

(10) "Slug load" or "slug discharge" means any discharge of a nonroutine, episodic nature, including but not limited to an accidental spill or noncustomary batch discharge, which has a reasonable potential to cause interference or pass-through or in any other way cause a violation of the provisions of this chapter or applicable permit conditions.

(11) "Source" means any building, structure, facility or installation from which there is or may be a potential as determined by the Director discharge pollutants above the local limits included in this chapter or State or Federal limits or wastewater of such volume or strength that it may cause interference, pass through or operational problems in the sanitary sewer system or at the San Jose/Santa Clara Water Pollution Control Plant.

(12) "Standard discharger" means any industrial discharger who is not a low flow discharger.

(13) Standard Methods.

(A) "Standard methods" means the procedures set forth in the Code of Federal Regulations, unless the use of another method for the analysis of industrial wastewater has been approved in writing in advance by the Director.

(B) All analyses shall be performed by a laboratory certified by the State for the specific pollutants and matrix to be analyzed, unless otherwise approved in writing, by the Director, prior to performance of a sample analysis.

(14) "Stormwaters" means the flow across any surface or in storm sewers resulting from rainfall.

(15) "Suspended solids" means solids that either float on the surface of, or are in suspension in, water, sewage, or other liquids and that are removable by laboratory filtering.

(t) "T" definitions:

(1) "Total toxic organics (TTOs)" are the sum of the concentrations for each of the regulated toxic organic compounds listed at Title 40, Chapter 1, Subchapter W, Part 401, Section 401.15 CFR and are found in the discharge at a concentration greater than ten micrograms per liter. Some categorical standards (40 CFR Sections 405 through 471) list the specific toxic organic compounds that are to be included in the summation.

(2) "Trucked or hauled waste" means any waste discharged into the sanitary sewer system after being placed in a motorized vehicle for removal from the location where the waste was generated or produced.

(u) "U" definitions:

(1) "Upset" means an unintentional and temporary noncompliance with categorical pretreatment standards because of factors beyond the reasonable control of the

industrial user. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventative maintenance, or careless or improper operation.

(2) "User" means any person responsible for payment of sewer service charges.

(v) Reserved for future use.

(w) Reserved for future use.

(x) Reserved for future use.

(y) "Y" definitions:

(1) "Yellow grease" means grease which is associated with food preparation or processing, which has not been contaminated with wash water or chemicals, or by being spilled or otherwise contaminated.

(z) "Z" definitions:

(1) "Zero discharger" or "ZDC" means an industrial facility that performs any categorical process subject to Federal pretreatment standards, as described in 40 CFR 405 through 471, that has any connection to the sanitary sewer system, but does not discharge wastewater from the categorical process to the sanitary sewer. (Ord. 1901 § 2, 11-27-12)."

**SECTION 2**: That Section 13.10.450 ("Delinquent fees") of Chapter 13.10 ("Sewers") of Title 13 ("Public Services") of "The Code of the City of Santa Clara, California" ("SCCC") is amended to read as follows:

**"13.10.450 Delinquent fees.**

(a) Discharge Permit applications are due ninety (90) days prior to (1) commencing discharge to the sanitary sewer system, (2) commencing operation of a zero discharging categorical process, or (3) expiration of the existing discharge permit. Any person who fails to

file a discharge permit application by the application due date prior to discharge shall be assessed a penalty for delinquent filing as follows:

(1) Up to and including thirty (30) days after the application due date, the penalty shall be fifty percent (50%) of the permit fee.

(2) Thirty one (31) to ninety (90) days after the application due date, the penalty shall be one hundred percent (100%) of the permit fee.

(3) Ninety-one (91) days to one (1) year after the application date, the penalty shall be two hundred percent (200%) of the permit fee.

(4) More than a one-year after the application due date, the penalty shall be one thousand percent (1,000%) of the permit fee.

(b) Such penalties shall be in addition to any other penalties or fines that may be levied, and they are in addition to any other remedies that the City may have with respect to the discharge.

(c) The Director may waive the assessment of penalty if the industrial discharger meets all of the following requirements:

(1) the industrial discharger has submitted a completed application to no later than thirty (30) days from the date the application was due;

(2) the industrial discharger has applied to the for a waiver no later than thirty (30) days form the date the application was due;

(3) the industrial discharger submitted timely applications for (a) the five (5) years immediately prior the present late application, or (b) the two (2) years immediately prior to the present late application if the industrial discharger has discharged for less than five (5) years; and

(4) the industrial discharger can provide documentation that (a) the application was postmarked or received by the Plant no later than three (3) days after the application due date, or (b) failure to submit a timely application was due to circumstances beyond the control of the industrial discharger, and cured despite the exercise of ordinary care and the absence of willful neglect."

**SECTION 3**: That Section 13.10.500 ("Permit conditions") of Chapter 13.10 ("Sewers") of Title 13 ("Public Services") of "The Code of the City of Santa Clara, California" ("SCCC") is amended to read as follows:

**"13.10.500 Permit conditions.**

(a) Discharge permits shall be expressly subject to all provisions of this chapter and all other regulations, user charges, discharge limitations, and fees established by the City and all applicable local, State, and Federal law and regulations.

(b) The permit may include such terms and conditions as the Director may deem necessary to implement this chapter, or any other applicable local, State, or Federal law and regulations, including, but not limited to:

(1) Limits on the average and maximum wastewater volume, constituents and characteristics;

(2) Requirements for installation and maintenance of flow monitoring, inspection, and sampling facilities;

(3) Specifications and pretreatment requirements for monitoring programs which may include sampling locations, frequency of sampling, number, types and standards for tests, and reporting schedule;

(4) Compliance schedules;

(5) Requirements for submission of technical reports or discharge reports;

(6) Requirements for maintaining and retaining plant records relating to wastewater discharge as specified by the City and affording the City access thereto;

(7) Requirements for notification to the City of any new introduction of wastewater constituents or any significant change in the volume or character of the wastewater constituents being introduced into the wastewater stream;

(8) Requirements and plans for protection against accidental discharges, including, but not limited to, berming of chemicals and waste materials. The review and approval of such plans and operating procedures shall not relieve the user of the responsibility of modifying the facility as necessary to provide the protection necessary to meet the requirements of this Code or other State or Federal regulations;

(9) Requirements for notification of accidental discharges;.

(10) Requirements for submission of a slug control plan or specific elements thereof."

<u>**SECTION 4**</u>: That Section 13.10.580 ("Discharge reports") of Chapter 13.10 ("Sewers") of Title 13 ("Public Services") of "The Code of the City of Santa Clara, California" ("SCCC") is amended to read as follows:

**13.10.580 Discharge reports.**

(a) Dischargers are subject to the reporting requirements as contained in Title 40 CFR. The Director may require that any person connected to or discharging wastewater into the sanitary sewer system file additional periodic discharge reports or a zero discharge report.

(b) The periodic discharge report may be required to include, but need not be limited to, nature of process, volume, rates of flow, mass emission rate, hours of operation, number of employees, hauling record, potential slug discharge, or other information which relates to the

generation of waste, including wastewater constituents and characteristics in the wastewater discharge and the ability of the discharger to meet applicable discharge limits.

(c) The zero discharge report shall certify that the zero discharger user does not discharge any process water to sanitary sewer system, or for a zero discharge categorical user, discharge any categorical process water or ancillary process water to the designated zero discharge categorical sample point or into the sanitary sewer system. This report may be required to include, but need not be limited to, the nature of the process, hours of operation, number of employees, hauling records, or other information that relates to the generation of wastes.

(d) The Director may also require such periodic discharge reports and zero discharge reports to include information concerning the chemical constituents and quantity of chemicals stored on site, including waste hauling records or other information, which relates to the generation of wastes even though they may not normally be discharged.

(e) In addition to discharge reports, the Director may require dischargers to submit such additional reports as may be necessary to allow the City to evaluate the discharger's ability to comply with this chapter, including but not limited to best management practice or self-monitoring reports.

(f) It shall be unlawful for any person who has discharged wastewater to the sanitary sewer system to refuse to file any report requested by the Director or to file any report after the application due date specified by the Director.

(g) Sampling and analysis shall be performed in accordance with 40 CFR Section 136 and amendments thereto. Where 40 CFR Section 136 does not contain sampling or analytical methods for the pollutant in question, or where the Director determines that the application of 40 CFR 136 is inappropriate for the pollutant question, sampling and analysis shall be performed by using analytical methods validated by the Director.

**13.10.585 Upset – Rebuttal.**

The following circumstances may be raised as an affirmative defense to an action brought for noncompliance with categorical pretreatment standards:

(A) The industrial user can demonstrate through properly signed, contemporaneous operating logs, or other relevant evidence that:

(i) the industrial user can identify the cause(s) of the upset;

(ii) when the upset occurred, the facility was being operated in a prudent and workman-like manner, and in compliance with applicable operation and maintenance procedures;

(iii) the industrial user has submitted the following information to the Plant:

(a) A description of the discharge to the Plant and the cause of the noncompliance;

(b) the period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue: and

(c) steps being taken and/or planned to be taken to reduce, eliminate and prevent recurrence of the noncompliance.

(iv) the industrial user shall report the information specified in subsection (A)(iii) to the or designee within twenty-four (24) hours of becoming aware of the upset, and provide written notice within five (5) days of becoming aware of the upset.

(B) The industrial user seeking to establish the occurrence of an upset as an affirmative defense shall have the burden of proof.

(C) The industrial user shall control production of all discharges to the extent necessary to maintain compliance with categorical pretreatment standards upon reduction, loss, or failure of its treatment facility until the facility is restored or an alternative method of

treatment is provided. The requirement under this section applies even in a situation where the primary source of power of the treatment facility is reduced, lost, or fails."

**SECTION 5**: That a Section 13.10.670 ("Waiver of pollutants not present") is added to Chapter 13.10 ("Sewers") of Title 13 ("Public Services") of "The Code of the City of Santa Clara, California," ("SCCC") to read as follows:

**"13.10.670 Waiver of pollutants not present.**

(a) A categorical industrial user seeking to request a waiver of monitoring requirements for pollutants not present must submit the following with its permit application:

(1) Data from at least one sampling of the facility's process wastewater prior to any treatment that is representative of all wastewater from all processes;

(2) Signature in compliance with section 14.10.460

(3) Certification statement as specified under 40 CFR 403.6(a)(2)(ii); and

(4) Other technical factors as may be required by the Director to demonstrate that the pollutant is not present in the industrial user's discharge.

(b) If approved, the waiver shall be included as part of the categorical industrial user's discharge permit. The categorical industrial user must certify in each self monitoring report with the statement set forth in 40 CFR 403.12(e)(2)(v) that there has been no increase in the wastestream due to the activities of the user of the pollutant that was waived.

(c) The waiver shall only be valid for the term of the permit, and a new request for waiver must be submitted for each new permit."

**SECTION 8**: Savings clause.

The changes provided for in this ordinance shall not affect any offense or act committed or done or any penalty or forfeiture incurred or any right established or accruing before the effective date of this ordinance; nor shall it affect any prosecution, suit or proceeding pending or any judgment

rendered prior to the effective date of this ordinance. All fee schedules shall remain in force until superseded by the fee schedules adopted by the City Council.

**SECTION 9**: Constitutionality, severability.

If any section, subsection, sentence, clause, phrase, or word of this ordinance is for any reason held by a court of competent jurisdiction to be unconstitutional or invalid for any reason, such decision shall not affect the validity of the remaining portions of the ordinance. The City Council hereby declares that it would have passed this ordinance and each section, subsection, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more section(s), subsection(s), sentence(s), clause(s), phrase(s), or word(s) be declared invalid.

**SECTION 10**: Effective date.

This ordinance shall take effect thirty (30) days after its final adoption; however, prior to its final adoption it shall be published in accordance with the requirements of Section 808 and 812 of "The Charter of the City of Santa Clara, California."

**PASSED FOR THE PURPOSE OF PUBLICATION** this _____ day of __________, 201_, by the following vote:

AYES: COUNCILORS:

NOES: COUNCILORS:

ABSENT: COUNCILORS:

ABSTAINED: COUNCILORS:

ATTEST: ______________________________
ROD DIRIDON, JR.
CITY CLERK
CITY OF SANTA CLARA

Attachments incorporated by reference: None