# EXHIBIT 10

*Gjovik v Apple Inc, City of Santa Clara, et al,* 25-CV-07360-PCP (Northern District of California). Opposition to City of Santa Clara's Motion to Dismiss (Dkt. 127).

MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MOR
BEIJ
HON
NEW
PAL
SAN
TOK

ORIGINAL

December 16, 2015

Writer's Direct Contact
+1 (415) 268.6294
RFalk@mofo.com

***By UPS Two-Day Delivery and by Email to waterqualitypetitions@waterboards.ca.gov***

State Water Resources Control Board
Office of Chief Counsel
Attn. Adrianna M. Crowl
1001 "I" Street, 22nd Floor
Sacramento, CA 95814

Re: **Water Quality Petition requesting State Water Resources Control Board's Review of Region 2's Re-Issuance of Municipal Regional (Stormwater) Permit (NPDES No. CAS612008)**

To Whom It May Concern:

Please accept this Petition for Review of the California Regional Water Quality Control Board, San Francisco Bay Region's (Region 2's) November 19, 2015 action in adopting NPDES Permit No. CAS612008, better known as Region 2's reissuance of the San Francisco Bay Municipal Regional Permit for stormwater discharges (MRP 2.0).

MRP 2.0 includes as co-permittees 76 San Francisco Bay area municipalities that collectively serve over 5.5 million Californians. To better coordinate their efforts, 15 of those co-permittees located in the Santa Clara Valley previously entered into an agreement to form the Santa Clara Valley Urban Runoff Pollution Prevention Program (SCVURPPP).[1] Likewise, to provide coordination and assistance with respect to compliance with their NPDES stormwater permit, another 21 co-permittees previously formed the San Mateo Countywide Water Pollution Prevention Program (SMCWPPP), which is administered under the City/County Association of Governments of San Mateo County (C/CAG), a joint powers agency.[2]

[1] The 15 municipal co-permittee agencies comprising SCVURPPP are: the cities of Campbell, Cupertino, Los Altos, Los Altos Hills, Los Gatos, Milpitas, Monte Sereno, Mountain View, Palo Alto, San Jose, Santa Clara, Saratoga, and Sunnyvale; the County of Santa Clara; and the Santa Clara Valley Water District.

[2] The 21 municipal co-permittee agencies comprising SMCWPPP are: the towns of Atherton, Colma, Hillsborough, Portola Valley, and Woodside; the cities of Belmont, Brisbane, Burlingame, Daly City, East Palo Alto, Foster City, Half Moon Bay, Menlo Park, Millbrae, Pacifica, Redwood City, San Bruno, San Carlos, San Mateo, and South San Francisco; and the County of San Mateo.

This Petition is submitted by SCVURPPP and SMCWPPP on both of their behalves for the benefit of their respective members.[3]

All information the State Water Resources Control Board (State Board) requires for a water quality petition of this nature is presented below.

1. **Name, address, telephone number and e-mail address (if available) of the petitioner:**

   Names of Petitioners: the Santa Clara Valley Urban Runoff Pollution Prevention Program (SCVURPPP) and the San Mateo Countywide Water Pollution Prevention Program (SMCWPPP).

   Mailing Addresses:

   For SCVURPPP:[4] c/o Robert Falk, SCVURPPP Legal Counsel, Morrison & Foerster LLP, 425 Market Street, 32nd Floor, San Francisco, CA 94105

   For SMCWPPP: c/o Matthew Fabry, PE, Manager, San Mateo Countywide Water Pollution Prevention Program, City/County Association of Governments of San Mateo County, 555 County Center, 5th Floor, Redwood City, CA 94063

   Telephones:

   For SCVURPPP: 415-268-6294

   For SMCWPPP: 650-599-1419

   Email Addresses:

   For SCVURPPP: RFalk@mofo.com

   For SMCWPPP: MFabry@smcgov.org

---

[3] SCVURPPP and SMCWPPP are collectively referred to herein as the "Petitioners." Co-permittees that are members of SCVURPPP or SMCWPPP reserve their rights to file petitions concerning MRP 2.0 on their own behalves. The City of San Jose, California will be filing such a petition, incorporating aspects of this Petition to the extent it determines it efficient to do so.

[4] Although SCVURPPP requests all communications concerning this Petition be directed to its legal counsel, whose contact information is shown above, its direct mailing address is: Santa Clara Valley Urban Runoff Pollution Prevention Program, 1021 S. Wolfe Rd., Suite 185, Sunnyvale, CA 94086. Its direct telephone number is 408-720-8811.

2. **The action or inaction of the Regional Water Board being petitioned, including a copy of the action being challenged or any refusal to act, if available.** If a copy of the regional board action is not available, the petitioner must explain why it is not included.

Action Being Challenged: Adoption of MRP 2.0, NPDES Permit No. CAS612008, by Region 2 on November 19, 2015.

The version of MRP 2.0, including its Fact Sheet and other attachments, that was last publicly noticed for adoption by Region 2 and an associated Errata sheet that was released to the public several days in advance of the November 18-19, 2015 adoption hearing, are available for download at: http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrpwrittencomments/November/Revised_Tentative_Order_11-10-15_Attachments_A_G.pdf and http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrpwrittencomments/November/Errata_and_Clarifications.pdf ).[5]

The following additional documents, which modified the above and were adopted as part of MRP 2.0, present issues raised for review herein include: **(1)** a "Staff Supplemental" first made available to the public at the hearing location just prior to the beginning of Region 2's meeting on November 18, 2015 (provided as Attachment 1 hereto), and **(2)** a "Chair's Supplemental" which the Chair of Region 2's Board first revealed and made available to those present at the adoption hearing only after the agenda item in question commenced on November 18, 2015 (provided as Attachment 2 hereto).[6]

Because its effect was, for the first time on the record, to officially characterize the nature of the "numeric performance criteria" for mercury and PCBs load reductions set forth in MRP 2.0 and its Fact Sheet as "numeric effluent limitations (NELs) rather than numeric action levels (NALs), we also include the Region 2 staff's Response to Comments document concerning these permit provisions (available for download at

---

[5] Hard or electronic copy of these documents are not being provided at this time due to the lengthy number of pages/size of the data files involved, but they can be provided under separate cover and/or .pdf upon further request.

[6] To avoid overwhelming a firewall due to the large number of pages/amount of data involved, all Attachments referenced herein are being provided only with the hard copy of this Petition being sent via UPS delivery. Electronic (.pdf) copies of any of them can also be provided under separate cover upon further request.

http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrpresponsetocomments/C11-12_Response_to_Comments.pdf ).[7]

Collectively, all of the above documents are further referred to herein as "Final MRP 2.0 Order."[8]

**3. The date the Regional Water Board acted, refused to act, or was requested to act:**

Hearing conducted on November 18-19, 2015; vote taken on November 19th.

**4. A statement of the reasons the action or inaction was inappropriate or improper:**

A. Adoption of Final MRP 2.0 Order emerged from a serially flawed and biased public participation and hearing process that did not comply with the requirements of law.

B. Region 2's inclusion of NELs as opposed to NALs for mercury and PCBs load reductions in Final MRP 2.0 Order was the result of the flawed public participation process and inaccurate statements by Region 2 staff and counsel concerning the State Board's position on the issue. Beyond this, the NELs in question were otherwise not adequately justified on the record and their adoption therefore reflects an abuse of discretion.

**5. How the petitioner is aggrieved:**

Petitioners and their member agencies (and other MRP 2.0 co-permittees and interested persons) were deprived of the full public participation (e.g., notice, comment, and open meeting observation) rights to which they are entitled by applicable federal and state law. Requirements and, in other cases, official interpretations of requirements, are included in Final MRP 2.0 Order that would not be included if the public participation process resulting in its adoption was not so flawed. Petitioners and other co-permittees were also deprived of a vote on MRP 2.0's most controversial provisions by a full, fairly

---

[7] This document can also be provided in hard copy or .pdf under separate cover upon further request.

[8] On December 10, 2015, Region 2 posted an announcement making the adopted version of MRP 2.0, as incorporating the errata and language reflecting the Staff Supplemental and Chair's Supplemental, available at the following link: http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/R2-2015-0049.pdf . This lengthy document will also be provided in hard copy and/or .pdf upon further request. (Other archived documents associated with the development and adoption of MRP 2.0 are also available at http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrp_sw_reissuance.shtml . If necessary, hard or .pdf copies of any of these can be provided on request.)

constituted, and representative Regional Board. Had flawed public participation and inaccurate Region 2 staff and counsel representations made at the adoption hearing not occurred, the numeric performance criteria for mercury and PCBs load reductions would not have been characterized or be legally enforceable as NELs. Petitioners' member agencies would then have been able to ensure compliance with MRP 2.0 through implementing required initial and follow-up actions on a timely basis, and not be subject to third party lawsuits if mercury and PCBs loading reductions fall short of their non-transparently calculated and speculative marks.

**6. The action the petitioner requests the State Water Board to take:**

The State Board should conduct further public hearings on MRP 2.0 to provide the proper and fair process and absence of bias to which the Petitioners, other co-permittees, and all members of the public are entitled. As part of this process, and as it did in the construction and industrial general stormwater permits it has adopted, the State Board should convert the numeric performance criteria for mercury and PCBs set forth in Provisions C.11 and C.12 of MRP 2.0 from NELs into NALs with an accompanying set of appropriate exceedance response action requirements (ERAs) if these benchmarks are not met in the first instance.[9]

**7. A statement of points and authorities for any legal issues raised in the petition, including citations to documents or the hearing transcript of the regional board hearing if it is available.**

A. <u>Adoption of Final MRP 2.0 Order emerged from a serially flawed and biased public participation and hearing process that did not comply with the requirements of law.</u>

Federal and state law entitles regulated entities and other members of the public to certain fundamental public participation rights in regulatory permitting proceedings, including in the NPDES context: adequate notice, a meaningful opportunity to comment based on what has been properly noticed, and a full, fair, and transparent hearing. 33 U.S.C. §§ 1342(a)(1) and1251(e); 40 C.F.R. § 124.10; Cal. Gov. Code §§ 11120 *et seq.*, 11400 *et seq.*, 11500 *et seq.* and 23 Cal. Code Regs. § 647 *et seq.* Those rights were materially abridged in these Region 2 proceedings, including as follows:

i. Two members of the Region 2 Board that were not required to recuse themselves from the MRP 2.0 proceedings due to their prior or current employment by two of the

---

[9] Indeed, there is even more reason for the State Board to utilize NALs here. Unlike in this Clean Water Act section 402(p)(3) MS4 permit, NPDES stormwater permits for construction and industrial activities *must* address the less flexible requirements of Clean Water Act section 301(b)(1)(C).

76 municipal co-permittees, nevertheless recused themselves due, at least in part, to erroneous direction one of the individuals received from the Board's legal counsel.[10] Given their municipal experience, these two additional Board members could have brought important diverse perspectives and practical insights into the Region 2 Board's deliberations on MRP 2.0's requirements and influenced the final vote. Their exclusion from the process, when not required by law and as tainted by Board counsel's prior erroneous advice that recusal was legally required, flies in the very face of the rationale for their appointments by the Governor. It in and of itself gives rise to the specter of biased decisions being made thereafter by a less diverse and less representative Regional Board. Indeed, the outcome of several key contested issues relative to MRP 2.0 might have been materially different had these two duly appointed and unconflicted Region 2 Board members participated in the proceedings.

ii. Due to one of the recusals, the Region 2 Board lost a quorum for the June 10, 2015 public hearing on all aspects of the draft permit other than its trash management requirements.[11] Instead, the proceeding continued immediately and was conducted by a subcommittee of the Board that was constituted at the spur of the moment. As such, there was no advance notice to the public that this less representative procedural device might be invoked, and there was no meaningful opportunity to object to it or the potential bias it might create with respect to the remainder of the permitting process.[12]

iii. Following the June 10, 2015 hearing, two members of this subcommittee apparently exchanged emails with each other concerning the testimony they heard and the report and recommendations they intended to provide to the Region 2 Board and staff with regard to it.[13] The content of these emails and any related communications between these two subcommittee members and other members of the Region 2 Board have never been disclosed to the public. The third member of the subcommittee, who may have brought a different perspective on the same testimony to the table, did not participate in these communications or otherwise have input into the subcommittee's report and recommendations; nor was she present when the subcommittee's report and recommendations were more officially presented to the Region 2 Board at a

---

[10] Reporter's Transcript of Proceedings June 10, 2015, Item 8 (RT-June, Attachment 3 hereto) at 6:3-8, 7:9-11; Reporter's Transcript of Proceedings July 8, 2015, Item 6 (RT-July, Attachment 4 hereto) at 6:2-7:14; Email exchange between Region 2 counsel Yuri Won and Robert Falk and Gary Grimm July 6-7, 2015 (*See* Attachment 5 hereto), discussing Cal. Gov. Code § 82030(b)(2) and http://ag.ca.gov/publications.coi.pdf at p.14.

[11] RT-June at 7:7-8:1.

[12] *Id.*

[13] RT-July at18:8-19:3.

hearing on July 7, 2015.[14] Despite Board counsel's post-hoc attempt to sanitize the record on what clearly were articulated as the subcommittee's recommendations to the remainder of the Region 2 Board and to Region 2 staff present at the July 7th hearing, the combined effect of this subcommittee effort, the recusals, and the absence of transparency and additional Board member participation at this critical stage of the public participation and hearing process deprived Petitioners and the public of their full rights and cast a dark shadow over the propriety and legitimacy of the permit adoption process's ultimate outcome.

iv. At the November 18, 2015 permit hearing, members of the public were, *for the very first time*, given notice of and access to copies of the Staff Supplemental and the Chair's Supplemental, both of which modify or effectively modify the terms of the Final MRP 2.0 Order and its compliance requirements.[15] Although the Region 2 staff and counsel took pains at the hearing to try and characterize these Supplementals as mere "clarifications" and "outgrowths," the transcript of the proceedings makes clear that the members of the Region 2 Board understood that the Supplementals represented more, and even the staff appeared to concede at one point that one aspect of the Chair's Supplemental contained new requirements.[16] Moreover, even if these Supplementals really only contained clarifications, at the very minimum, the public should have received notice of them at least 10 days prior to the hearing in order to have a real and meaningful opportunity to review and prepare testimony on their implications.[17]

v. Even more significantly, Region 2 staff did not provide requisite notice to the public that "numeric performance criteria" for mercury and PCBs loading reductions contained in MRP 2.0 were intended as NELs rather than as NALs until they released their Response to Comments document on October 19, 2015 in conjunction with the announcement of permit adoption hearing.[18] Indeed, the ambiguous nature of the

---

[14] *Id.*

[15] *See* Attachments 1 and 2 and Reporter's Transcript of Proceedings, November 18, 2015, Item 7 (RT-Nov18, Attachment 6 hereto) at 17:18-21, 51:9-54:20.

[16] Reporter's Transcript of Proceedings, November 19, 2015, Item 7 (RT-Nov19, Attachment 7 hereto)) at 115:18-126:14.

[17] *See* Cal. Gov. Code § 11125.

[18] Response to Comments, available at http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrpresponsetocomments/C11-12_Response_to_Comments.pdf , p. 4-10. As it appeared nowhere in the May 2016 Tentative Order, Fact Sheet, or associated public comment/hearing announcement, Region 2 staff's attempted explanation about having provided prior notice in various meetings and other informal communications of their *intent* to

MORRISON | FOERSTER

State Water Resources Control Board
December 16, 2015
Page Eight

term "numeric performance criteria" in the permit and its fact sheet resulted in extensive testimony at the June 10, 2015 hearing on the non-trash-related aspects of the draft permit and generated an associated formal request for clarification in terms of the NEL vs. NAL distinction in written comments which followed on July 9, 2015.[19] Hence, as a practical matter, the Response to Comments document's first time insistence that the numeric performance criteria were NELs and not something else effected a material change in the nature of the permit's requirements and the associated potential third party liability consequences to the co-permittees in the event they are unable to fully comply with them. As such, it should have commanded a revision of the draft permit/Fact Sheet and a re-opening of the written public comment period.

vi. The final deliberations of the Regional Board members at the adoption hearing on November 19, 2015 concerning their resolution of key contested issues (including concerning the imposition of NELs rather than NALs for mercury and PCBs) occurred in a lengthy, 1 hour and 45 minute closed session that was also insufficiently noticed and which was otherwise unauthorized even in the context of an adjudicative proceeding of this nature.[20] This precluded direct observation by, and

have performance criteria serve as "enforceable limits" or a "metrics approach" is irrelevant and did not exclude the possibility of them being NALs in this regard in any event. RT-Nov19 at 128:6-129:22.

[19] *See e.g.*, http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/agencies/SCVURPPP_Legal.pdf )

[20] Region 2's October 19, 2015 Public Notice of Adoption Hearing, available at http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/mrppublicnotice/MRP_Public_Notice.pdf provided no mention of a potential closed session whatsoever. The Agenda for the November 18-19, 2015 Region 2 Board Meeting, available at http://www.waterboards.ca.gov/sanfranciscobay/board_info/agendas/2015/November/11_18_15_agenda.pdf, does not provide notice of a closed session in conjunction with its specified item on MRP 2.0 (Item 7). Instead, Agenda Item 11 just contains a boilerplate omnibus reference to a closed session for "Deliberation," the authority referenced for which is Government Code section 11126(c)(3). There is also a further explanatory note contained in a boilerplate attachment to the Agenda that explains that the Board may adjourn to a closed session at any time during the regular session to, among other things, deliberate, based on the authority provided by "Government Code section 11126(a), (d) and (q)." Putting aside for a moment the question of whether any of these statutory references provide authorization for a closed session in these circumstances, what they clearly do not do is override Government Code section 11125(b)'s independent requirement to provide clear advanced notice to the public of "an item" to be discussed in closed session.

Moreover, in terms of providing authorization for a closed session on the MRP 2.0 adoption item, these references are either inapposite or non-existent. Even Government Code 11126(c)(3) extends only to deliberations on proceedings conducted pursuant to Government Code section 11500 or similar provisions of law. But Section 11500 *et seq.* concerns only proceedings conducted by administrative law judges and, to the extent Government Code section 11400 *et seq.* is considered similar, its general rule is that even an adjudicative hearing "shall be open to public observation" and may only be closed for certain limited purposes, none of

full accountability to, members of the public, as both the spirit and the letter of the Bagley-Keene Act demand.[21]

B. Region 2's inclusion of NELs as opposed to NALs for mercury and PCBs load reductions in Final MRP 2.0 Order was the result of the flawed public participation process and inaccurate statements by Region 2 staff and counsel concerning the State Board's position on the issue. Beyond this, the NELs in question were otherwise not adequately justified on the record and their adoption therefore reflects an abuse of discretion.

i. The above-described flaws in the public participation process leading up to the adoption of Final MRP 2.0 Order assume even greater importance in light of confusing, inaccurate, and sometimes misleading statements Region 2 staff and counsel made to the members of the Region 2 Board following the conclusion of public testimony at the permit adoption hearing.[22]

After having confirmed that the requirements in MRP 2.0 were best management practices (BMP) and other required actions-based measures, consistent with their TMDL implementation plans, and that good faith compliance with them would create

---

which presented themselves here. *See* Cal. Gov. Code §§ 11425.10(a)(3) and 11425.20(a)(1)-(3). Government Code section 11126(e), which was *not* referenced on the Agenda, also does not apply here since there is no significant exposure to litigation against Region 2 and, in any event, Region 2's counsel did not timely prepare and submit the requisite memorandum detailing the specific reasons and legal authority for closing the session on this basis. *See* Cal. Gov. Code 11126(e)(1), (e)(2), and (e)(2)(B) and (C)(ii).

Finally, even if the above were not the case, the transcript of the open hearing reveals that the closed session's purpose was not deliberating evidence but rather, ultimately without apparent success, for the Board members to try and craft new permit language to resolve the NEL v. NAL issue in a manner addressing the co-permittees concerns. RT-Nov19 at 158:18-159:13. (Indeed, as has been observed relative to general permits issued in California, the line between adjudicative and quasi-legislative action and associated procedural rules governing the board members blurs in a proceeding to develop a single set of requirements governing a large number of co-permittees, like the 76 present here such that erring on the side of transparency concerning the Region 2 Board members' decision-making is in order relative to this closed session issue.)

[21] *See* Cal. Gov. Code § 11120 ("It is the public policy of this state that public agencies exist to aid in the conduct of the people's business and the proceedings of public agencies be conducted openly so that the public may remain informed . . . . The people insist on remaining informed so that they may retain control over the instruments they have created.")

[22] Indeed, as described in more specific detail below, Regional Board counsel contributed to the flawed process and its biased outcome in a manner contrary to law by concurrently serving as an advocate for the staff's favored position on NELs and as a supposedly neutral advisor to the Board members at the permit adoption hearing. *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81; *Quintero v. City of Santa Ana* (2003) 114 Cal.App.4th 810. *Cf. Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal. 4th 731. (While it is not precedent, *see also* Los Angeles Superior Court's decision in *County of Los Angeles, et al. v. State Water Resources Control Bd.*, No. BC122724 (2010).)

a safe harbor for the co-permittees, staff and counsel then left the Board members in a state of confusion by respectively saying that the mercury and PCBs requirements in the permit were not-fully action-based and ultimately acknowledging that failing to meet the numeric criteria would render the co-permittees subject to enforcement and third party lawsuits even if they implemented all required actions.[23]

Then, contrary to the State Board's own conclusions and use of them, just before the improper closed session at the adoption hearing, Region 2 staff and counsel also told the Region 2 Board members that NALs would not be effective regulatory mechanisms and suggested that the State Board would see anything other than NELs as insufficiently rigorous.[24]

Rather than engaging in this distorted advocacy, the Region 2 staff (and counsel to the Region 2 Board in particular), should have presented the Board members with a more objective delineation of the State Board's position on the issue of NALs v. NELs; informed them that the State Board has not precluded the use of NALs as an "ambitious, rigorous, and transparent" alternative to NELs to date; and left the decision on whether to use NELs or NALs in the Region 2 Board members' hands in a far less tainted manner. Indeed, the staff's characterization of NALs as toothless "kick the can" regulatory tools that are meaningless and cannot be enforced conflicts with: (1) the State Board's own use of them,[25] (2) the State Board's Expert Panel's express recommendations concerning the use of NALs in *municipal* stormwater permits,[26] and (3) the guidance the State Board recently provided on this issue in WQO-2015-0075.

---

[23] *Cf.* RT-Nov19 at 12:18-17:12 and 155:9-18 with 145:12-147:5, 151:5-11, and 157:11-158:16.

[24] RT-Nov19 at165:16-166:21, 168:19-169:12, and 172:19-173:11.

[25] Storm Water General Permit Order No. 2009-0009-DWQ and Storm Water General Permit Order No. 2014-0057-DWQ.

[26] State Water Board Storm Water Panel of Experts, The Feasibility of Numeric Effluent Limits Applicable to Discharges of Storm Water Associated with Discharges from Municipal, Industrial and Construction Activities (June 19, 2006) at p. 8 ("It is not feasible at this time to set enforceable numeric effluent criteria for municipal BMPs and in particular urban discharges. . . . For catchments not treated by a structural or treatment BMP, setting a numeric effluent limit basically is not possible.) After the conclusion of the public testimony portion of the adoption hearing, Region 2 staff asserted that SCVURPPP's characterization of the Expert Panel's conclusions were amounted to gross misrepresentation. RT-Nov19 at 131:12-20. Although there is no evidence to support it in the record and it is sheer speculation at best, they then went on to assert that the Expert Panel's report was outdated and that these experts "were not *thinking* in the context of Effluent Limits . . . which are an enforceable numeric . . . performance measure that will be enforced." RT-Nov19 at 133:1-9 (emphasis supplied.)

Indeed, in the latter, although the State Board acknowledged that the Los Angeles Regional Board's use of NELs to implement 33 TMDLs in its area was not error given the number and nature of TMDLs involved, it then went on to specifically state: "We emphasize, however, that we are not taking the position that [NELs] are appropriate in all MS4 permits or even with respect to certain TMDLs within an MS4 permit . . . . We also decline to urge the regional water boards to use [NELs] in all MS4 permits."[27]

And with regard to the Region 2 staff's repeated assurances to its Board that the co-permittees concerns with NELs could be sidelined and dealt with later through the exercise of their enforcement discretion, they and counsel should have informed their Board members that the State Board had expressed a different policy preference earlier this year when it stated in WQO-2015-0075: "from a policy perspective, we find that MS4 Permittees that are developing and implementing [alternative compliance measures] should be allowed to come into compliance with . . . interim and final TMDLs through provisions built directly into their permit rather than through enforcement orders" – i.e., enforcement orders that could arise from non-compliance with NELs per se.[28]

ii. Beyond these significant process issues, the substantive justification offered by Region 2 staff for treating the numeric performance criteria for PCBs and mercury load reductions as NELs also falls short. First, while they are undoubtedly designed to further implement Region 2's mercury and PCBs TMDLs and represent an increment towards getting to the waste load allocations assigned to stormwater therein, there is nothing concrete in the record revealing how the numeric values of the NELs were actually calculated.[29] Instead, Region 2's staff state why they think the load reduction numbers they have identified as NELs for PCBs are feasible to achieve based on the Bay Area's recent performance in terms of new and redevelopment and building demolition and construction.[30] But the Region 2 staff's economic forecast (which often proves wrong even when done by actual economists) has no basis in the record and requires no deference given their lack of expertise in the discipline in question. Moreover, a plethora of testimony at the adoption hearing demonstrated that even if the staff's prediction concerning the pace of development

---

[27] WQO-2015-0075 at p. 58-59.

[28] *Id.* at 31.

[29] Region 2 counsel's last minute effort to try and create a record for their being an adequate substantive basis for the NELs through eliciting a wholly conclusory statement by a staff member is meaningless and improper advocacy, particularly without the "adequate information" to which she summarily refers actually having been delineated in the record and subject to prior public review and comment. *See* RT-Nov19 at 174:21-175:5.

[30] RT-Nov18 at 26:6-9.

and construction ends up being on target, there is still likely to be a significant shortfall in all, or at least many, co-permittees meeting the NELs.[31]

At one point, staff testified at the adoption hearing that the PCB numbers were "based on an updated assessment of controls to reduce PCBs to the maximum extent practicable" and then indicate that their calculation "started with a numerical formula."[32] But, importantly, this formula and these calculations are nowhere to be found in the record, and later in their testimony, the same staff member even indicates that they abandoned the formula-based calculation effort.[33] Their testimony then goes on to explain that they turned to "a number of sources of information" to come up with the 3 kilogram PCBs load reduction requirement, but once again, these sources were not delineated in the permit's Fact Sheet or elsewhere in the record.[34]

Indeed, the Region 2 staff member's further testimony on the issue indicates that the PCBs load reduction numbers in controversy are no more than speculative "guesstimate estimates" that represent the idea of "[h]ere is the number, we think it's attainable." [35] Ultimately, the staff even expressly conceded that "we know that there's uncertainty with the basis of our numbers," while trying to reassure the Region 2 Board members that they could deal with the uncertainly through their future exercise of enforcement discretion.[36] (Region 2's counsel then further conceded to one of the Board members that the numbers were uncertain and that the co-permittees would be in non-compliance if they did not meet them despite their good faith efforts to implement all required actions.[37])

iii. Finally, in the course of the adoption hearing, Region 2 staff revealed that, when all was said and done, their position on NELs was really based on their preference to avoid having to specify additional required actions and then expending the additional effort necessary to oversee and enforce on them if bad actors emerge among the co-

---

[31] *See e.g.*, RT-Nov18 at 138:8-142:18 and 158:7-159:22. *See also* RT-Nov18 at 67:19-68:11; 95:12-16; 104:13-105:8; 112:19-113:11; 117:1-11; 128:24-130:3; 136:1-11; 201:19-205:8; 231:-232:22; 241:1-23; 244:17-245: 15; 248:25-249:4; and 259:9-24.

[32] RT-Nov19 at 133:12-22.

[33] *Id.* at 135:22-24.

[34] *Id.* at 136:14-16.

[35] *Id.* at 137:18-19 and 145:5-6. Relative to some communities that are not likely sources of PCBs, the Region 2 staff's testimony even went further to characterize the requirements as they might default down to them as "unrealistic." RT-Nov19 at 152:2-6. *See also id.* at 167:4-18.

[36] *Id.* at 148:3-20.

[37] *Id.* at 150:18-151:11.

permittees and refused to meet their implementation obligations.[38] Instead, they ultimately admitted that their insistence on NELs reflects their preference to employ a psychology of "coercion."[39] Not only is this an inappropriate basis for calculating the numbers used for the NELs, while they voted to include them based on the mistaken understanding that the State Board would disapprove the permit if it contained NALs instead, the need for undertaking a coercive, rather than cooperative state-local partnership approach vis-à-vis the co-permittees, was not a view that was shared by the members of the Region 2 Board.[40]

8. **A statement that copies of the petition have been sent to the Regional Water Board and to the discharger, if different from the petitioner.**

Copies of this Petition have been provided to Region 2, the member agencies of SCVURPPP and SMCWPPP, and, through their respective municipal stormwater programs, all other co-permittees to MRP 2.0.

9. **A statement that the issues raised in the petition were presented to the regional board before the regional board acted, or an explanation of why the petitioner could not raise those objections before the regional board.**

Both SCVURPPP and SMCWPPP actively participated in the public comment and hearing process on MRP 2.0.[41] As demonstrated through the above citations to the record and in Attachments 3-7, all issues raised in this Petition were previously presented to Region 2 prior to its final action in adopting MRP 2.0 on November 19, 2015.[42]

In closing, Petitioners wish to note that the vast majority of MRP 2.0 was not the subject of significant dispute and is a tribute to an otherwise high level of cooperation between it and its fellow municipal stormwater programs in the San Francisco Bay Area and the Region 2 staff. SCVURPPP and SMCWPPP raise the issues in this Petition to ensure an improved, more

---

[38] *See* RT-Nov19 at 135:12-17 and 144:24-145:6.

[39] RT-Nov 19 at 170:3-172:14.

[40] RT-Nov19 at 158:18-160:1, 165:6-15, 166:22-168:5, 179:24-182:2, 185:18-187:6, 190:25-192:13, and 194:14-195:6.

[41] *See e.g.*, http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/agencies/SMCWPPP.pdf , http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/agencies/SCVURPPP.pdf , and http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/stormwater/Municipal/agencies/SCVURPPP_Legal.pdf .

[42] As to the process issues, *see also* RT-Nov18 at 252:13-254:14.

transparent, and publicly legitimate permit will be put in place that avoids the prospect of resource consuming litigation and allows for a high level of cooperation and creative approaches to continue to make meaningful and substantial progress on the highest priority water quality issues in the Bay Area.

Thank you for your consideration.

Respectfully submitted,

Robert L. Falk
Program Legal Counsel
Santa Clara Valley Urban Runoff
Pollution Prevention Program

Matthew Fabry, PE
Manager
San Mateo Countywide Water
Pollution Prevention Program

Attachments

cc: Bruce Wolfe, Executive Officer, Region 2
SCVURPPP Co-Permittees
SMCWPPP Co-Permittees
Alameda, Contra Costa, Vallejo and Fairfield Municipal Stormwater Program Managers

# PROOF OF SERVICE

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 425 Market Street, San Francisco, California 94105-2482. I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on December 16, 2015, I served a copy of the following on the addressees listed below via UPS Two Day delivery by placing a true copies thereof enclosed in sealed envelopes with charges thereon fully prepaid for collection and provision to UPS at Morrison & Foerster LLP, 425 Market Street, San Francisco, California 94105-2482 in accordance with Morrison & Foerster LLP's ordinary business practices. I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence and packages for delivery by UPS, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described below will be provided to UPS on the same date that it (they) is (are) placed at Morrison & Foerster LLP for collection and delivery to UPS:

**Water Quality Petition Requesting State Water Resources Control Board's Review of Region 2's Re-Issuance of Municipal Regional (Stormwater) Permit, NPDES No. CAS612008 (including Attachments 1-7)**

State Water Resources Control Board
Office of Chief Counsel
Attn. Adrianna M. Crowl
1001 "I" Street, 22nd Floor
Sacramento, CA 95814

Bruce Wolfe, P.E.
Executive Officer
Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

Executed this 16th day of December 2015, in San Francisco, California.

Margaret McIlhargie
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: 415-268-7079
mmcilhargie@mofo.com