# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Ashley M. Gjovik**, Plaintiff, | No. 3:23-cv-04597-EMC |
| vs. | San Francisco, California |
| **Apple Inc.**, Defendant. | May 16, 2024<br>1:30 p.m. |

**BEFORE: THE HONORABLE EDWARD M. CHEN, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA ZOOM VIDEOCONFERENCE**

**MOTION HEARING**

Official Court Reporter:
Jennifer Pancratz, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

(By Zoom Videoconference)

For the Plaintiff:

**ASHLEY M. GJOVIK**
In propria persona
2108 N St., Suite 4553
Sacramento, CA 95816

For the Defendant:

ORRICK, HERRINGTON & SUTCLIFFE LLP
By: **Melinda S. Riechert, Esq.**
1000 Marsh Rd.
Menlo Park, CA 94025

ORRICK, HERRINGTON & SUTCLIFFE LLP
By: **Kathryn G. Mantoan, Esq.**
405 Howard St., 7th Floor
San Francisco, CA 94105

**P R O C E E D I N G S**

(Proceedings commenced at 1:30 p.m.)

THE COURTROOM DEPUTY: Court is calling the case Gjovik versus Apple Inc., Case No. 23-4597.

Please state your appearance for the record, beginning with the plaintiff.

MS. GJOVIK: My name is Ashley Gjovik.

THE COURT: All right. Thank you, Ms. Gjovik.

MS. RIECHERT: My name is Melinda Riechert, and I'm appearing for Apple.

THE COURT: All right. Thank you, Ms. Riechert.

MS. MANTOAN: Good afternoon, Your Honor. My name is Katie Mantoan, appearing for Apple.

THE COURT: All right. Your audio is a little bit muffled. It kind of comes in and out. I'm not sure why. I could catch most of what you said, but when you first started it was a little muted or something there. You might want to see if you can make any adjustment to that.

All right. So this is a wide-ranging complaint with many claims. I think there are some 15 causes of action here. But I will observe that with every claim that is brought, every legal claim, there are obviously very particular requirements. If you're bringing a claim under RICO, if you're bringing a claim under Sarbanes-Oxley, there are certain requirements. If you're bringing a claim under the Ralph Civil Rights Act, there

are certain requirements.

And so we have, and we could, spend a lot of time, perhaps multiple rounds, going through and looking at, you know, each claim, each element, and determining whether or not there's enough specificity, enough has been alleged.

But when one steps back and looks at the whole picture, it seems to me that Ms. Gjovik's complaint certainly alleges certain things, for instance, about some environmental issues, which may or may not be proven ultimately, but at least, you know, I understand the theory of that, of those claims; and claims that she had engaged in protected activity that was subject to retaliation, and I think those tell -- at least the allegations set forth a fairly clear and coherent story.

I think that -- and therefore, certain claims, I think they may require a little bit more detail and things, but in my view, are likely to get to the next stage such as, for instance, the violation -- alleged violation of the California Whistleblower Act, which is pretty broad: Prohibits an employer from retaliating against an employee for reporting various things and disclosing information to a government or law enforcement agency about a violation of federal or state statute or noncompliance with a regulation, et cetera, et cetera.

And one could argue about the level of specificity

that's needed in terms of identifying the statutes, et cetera, et cetera; but given the facts here, it just seems to me that's one that's one of the stronger claims that she has.

On the other hand, if you look at some of the claims like RICO or Sarbanes-Oxley and Dodd-Frank where, for instance, under Sarbanes-Oxley, the whistleblower action there has to pertain to a report of a securities law violation or a certain species of criminal fraud like wire fraud, bank fraud, and that's much harder to see. It's not obvious from this complaint.

And similarly, Dodd-Frank is really concerned with information that pertains to securities laws violation, and I think it just appears to me to be a stretch to kind of fashion a securities fraud violation here or a claim of a securities fraud violation that underlies a whistleblower complaint. It's much easier to say there's a retaliation for reporting environmental violations.

So I made that observation and maybe partly throw the ball to your court, Ms. Gjovik. I know you've got all these cause of actions, but -- and I know you had filed a much larger complaint before. We asked you to file something that was more compact.

But I guess I'm first directing my comments to you, and that is, it does seem like some of these claims are much closer to what would likely survive or has a good chance of

surviving than others. I don't know if you see it that way, but I've given you a couple examples where Sarbanes-Oxley and Dodd-Frank would have certain requirements that don't appear to be met, but you're closer to the target when you're talking about the Whistleblower Act under California law.

I'll take your observations at this point.

MS. GJOVIK: Thank you, Your Honor.

I agree, some of my claims are stronger than others. My intention with the large number of claims was to have broad discovery for claims I thought that I had a valid claim for, but when it comes to a trial, my plan would be to definitely simplify of the strongest claims.

For the Dodd-Frank and SOX claims, I did have to really, really simplify them to meet the page limit, and I tried my best to cover that.

There's -- there's allegations of fraud related to statements that Apple makes publicly about its environmental practices that I had raised prior to being terminated, specifically pointing to articles, specifically pointing to a prior lawsuit; and my major concern was it appeared that Apple was making fraudulent statements publicly in order to have more brand loyalty, to make more money, when actually they were not doing the things they were doing.

And I had raised that to someone in Apple's environmental and lobbying team even, and she worked there, and

she agreed with me and she said she escalated it to the head of Apple government affairs before I was fired.

Another matter was the Ronald Sugar issue. There were kind of two parts. There was a lot of briefing about the -- my concern that to raise a concern about my office and what -- how Apple was managing it related to the Superfund responsible party, I'd be raising it to a person I was concerned might have been involved. So that one, there was a lot of briefing about that one.

But the other side of that is that person I was concerned about who's on Apple's board of directors was the CEO of the company who was responsible for the pollution, and it sounds like he even worked at my office in the '80s when, you know, they found the contamination. They did the cleanup.

And I was very curious, and I raised these concerns -- these are in the complaints -- before I was fired, if he disclosed his conflict of interest related to his prior company to Apple when Apple decided to lease this building to do all the installation they were doing. Because it seemed peculiar to me the building was vacant for about 13 years prior, with no one in it until Apple moved in.

So I had some of those, and then I was also raising concerns about my coworkers coming forward also claiming that they had raised concerns that were met with retaliation. There's actually a very similar case that the SEC just decided

for Activision Blizzard. I did not have time to brief it, but I wanted to, and it was exactly that. There was a culture of discrimination and retaliation while the company held itself out as progressive and that not happening, and the SEC decided that that was an SEC violation, that they were covering up the issues and that violated their rules. And I'd be happy to brief that more if that would help.

For RICO, some of the similar things I just mentioned --

THE COURT: Well, before you go off to RICO --

MS. GJOVIK: Yeah.

THE COURT: -- I mean, I think under your theory, as I understand it, though, that anything about the company that could affect its public image and thus the stock value is a sort of form of potential securities fraud.

But that would be true of any -- whether the statement, you know, actually is a commission of a securities fraud, it would be so broad that anything material about the company that is adverse -- you know, usually when we see a securities fraud case, it's a statement made to the shareholders in a -- you know, in an SEC filing or in a press release that misconveys some truth about, you know, something about the company's finances or its future sales.

And that's why the securities fraud violation usually is much more specific and focused on something to do with

shareholders and not sort of general statements to the public, although, you know, that's not to say that general statements to the public can't be a securities violation.

MS. GJOVIK: I agree, Your Honor. I also, I should emphasize, the concerns about the prior CEO of the company responsible for the pollution at my office, when I was raising concerns about whether he might have had something to do with it, I believe probably the clearest SEC claim would be failure to disclose or failure to manage a related party transaction.

And I actually had specifically, you know, quoted the director rules about that, and I was wondering if he might have been doing some self-dealing to help out his old company. And I had -- I filed a business conduct complaint before I was fired, and it was supposedly raised to, per policies, Mr. Ronald Sugar to investigate himself, and then I was complaining about that too.

But I hear your concerns and I definitely am open to focusing on the strongest claims, but I felt like I might have a plausible claim for SOX and Dodd-Frank.

THE COURT: Okay. Let me just hear response from defendants on -- just take those, the SOX and Dodd-Frank, the argument that there has been, for instance, nondisclosure of conflict of interest. There's been public statements that are -- belie the actual situation via the business, the working environment, that could affect stock prices, et cetera,

et cetera.

Why doesn't, in your view, that come within these statutes?

MS. RIECHERT: Yes. First of all, I just wanted to say that we do think this is a whistleblower -- employee whistleblower complaint, and we wanted to keep it simple; that, you know, she complained and that she was fired because she complained.

And as Ms. Gjovik said, she wants to assert a broad claim so that she can get broad discovery, and that's the exact reason why we do not think that she has the right to assert these broad claims and that this is the time to rule that there is -- these broad claims don't have merit, for all the reasons we've said in our papers, and so there shouldn't be this broad discovery.

We're going to have plenty of discovery in this case on, you know, the complaints she made and the reasons for her termination. She has other administrative proceedings that she has asserted where she's asserting other claims, and she'll have plenty of time to do the discovery in those cases.

But this does not need to be a RICO case or a SOX case or a -- any of the other types of claims that we moved to dismiss, because let's just focus on the employment claims that she is legally entitled to bring that we did not seek to dismiss on our motion to dismiss.

I can go through the various SOX allegations that were pled in the complaint and explain why I don't think that they meet the criteria of mail fraud, wire fraud, bank fraud, securities fraud. You know, SOX is very specific as to the types of things that you can bring a claim for. And --

THE COURT: Why don't you address the, for example, the one that Ms. Gjovik raised about the not reviewing, not disclosing the conflict of interest to the person who was responsible for allegedly making sure that that office was not in a polluted zone.

MS. RIECHERT: So we have a case that we cited, Denmeny, D-E-N-M-E-N-Y [sic], versus MBDA. And in that case, they rejected a SOX claim based on a concern that an individual's membership on two boards might influence one board's decision-making and then influence the company's finances.

So I don't think that asserting that somebody's on two boards and that there's a conflict of interest meets those mail fraud, wire fraud, bank fraud requirements for SOX.

THE COURT: What about potential securities fraud -- securities law violation? If there's a conflict that results in taking on, for instance, a project that has a lot of liability to it but that hasn't been disclosed, is that too many steps removed from the shareholder transaction? Would that be your position?

MS. RIECHERT: Absolutely, Your Honor. And I can also talk, if you want, about these allegedly false public statements, but I think, again, we covered that pretty well in our brief. She doesn't say what false public statements we specifically made, and obviously she's accusing the company of fraud, and we know that fraud has to be pled with specificity.

So I don't believe that she's pled with any specificity what fraudulent statements we made. And the Erhart case, E-R-H-A-R-T, versus Bofi Holding that we cited in our papers specifically says that without knowing what particular conduct the plaintiffs complained about, we cannot -- the Court cannot meaningfully analyze whether she plausibly alleges --

THE COURT: So if Ms. Gjovik is then given a chance to amend and she comes back and just theoretically says, well, here's a statement made to the press generally about the culture and the nondiscrimination and the clean -- you know, compliance with environmental laws and making sure of workplace safety and all that sort of stuff, and she alleges that all that was knowingly and falsely made to the public -- in other words, if she were then to specify the statement, I take it you would still take the position that that would not rise to the level of an allegation of a securities fraud violation. Or what would your response be to that?

MS. RIECHERT: That's exactly what our response would be. And she did that in the second amended complaint, and we

dealt that with a motion to dismiss the second amended complaint, and then it got out of the third amended complaint. So we do not believe that making -- that she's made any allegations that were linked to securities fraud, and touting environmental practices is not securities fraud.

THE COURT: What about on the RICO? She's made RICO claims. I think -- I think some of the arguments here is that in order to state a RICO claim, you have to demonstrate that there are distinct entities. You can't have a RICO claim against the corporation itself and its employees and its actors, so it has to be a non-Apple organization.

But, you know, if they're engaged in a pattern of racketeering activity, what's your response to the general RICO claim?

MS. RIECHERT: So there's an (a) and a (b) and a (d), and I have a specific response on each.

THE COURT: Okay.

MS. RIECHERT: So on the 1962(a), she was not injured by the alleged use of investment or racketeering income. And again, if Ms. Gjovik is allowed to assert a RICO claim based on the allegations in the complaint, then every employment case could be a RICO case.

RICO is very, very specific on what it requires, and she has to show that she was injured by the use of the investment or racketeering income. And simply reinvesting the

proceeds of the racketeering income isn't enough to get a RICO claim, and that's the Westways World Travel case that we cited in our papers.

THE COURT: All right.

MS. RIECHERT: So under (a), the allegations do not meet the requirements of (a), and she doesn't have standing to assert those claims.

On (c), 1962(c), again, our argument, primary argument, is the one that you've asserted, which is there's got to be a conspiracy between Apple and some other entity, and there isn't. It's just the allegations in the complaint. The enterprise is not different from Apple itself.

And your own -- Your Honor's own decision in Coronavirus Reporter versus Apple Inc. clearly shows you know a lot about this area of the law, much more than I do; but I do think that that decision, where you said that PR firms and law firms and rival developer cronies do not meet the requirements of an enterprise in order to assert a claim under (c).

And so there just isn't enough there to assert that there was an enterprise separate from Apple.

THE COURT: All right. And I'll give you a chance, Ms. Gjovik, to respond on the RICO, if there's any additional points you'd like to make on that.

MS. GJOVIK: Yes. Thank you, Your Honor.

So for the 1962(a), I don't think I included the case

and I'd appreciate a chance to try to bring it in potentially, but I did find a case in this district where investing the proceeds into a cover-up and witness intimidation effort was found to be a plausible claim.

I hear what Apple's saying with you can't just invest the money back into the enterprise, and I agree with that. There's a lot of cases that say that. I think my allegation that they were investing their proceeds into these efforts with their global security team and contractors and lawyers to silence employees and whistleblowers, to cover up the stuff they were trying to expose, I think is a plausible claim.

As for the not having a separate enterprise, I did plead a number of separate parties outside of Apple. I pleaded a lot more in previous ones, so I could definitely amend to add more, and more specificity. But there's a lot of precedent that -- alleging that a law firm is separate than the company even if they're representing the company. That was in a Philip Morris case, so the allegations of their lawyers helping them engage in the racketeering.

Also, their environmental consulting firms, which are separate companies completely, one specifically with the -- relating to chemical weapons. They did have this -- an environmental group, ACT Environmental, at that silicon fabrication facility assisting them with the manifests and the regulatory paperwork, which are state and federal filings where

you're subject to perjury if you are to write the wrong thing.

So they -- my allegation is that those consulting groups were definitely part of the enterprise and helping Apple conspire on that charge too.

THE COURT: Well, all right. So if you're alleging actual conspiracy and that they had a common purpose, they had to have shared a common purpose under -- you have to have nonconclusory allegations, you know, something to back that up.

MS. GJOVIK: I do. So my -- my kind of smoking gun on this one was discovering that it appears that Apple falsified their TRI filings, was an air quality filing for chemicals under TSCA in 2020. They entered that a certain amount of this chemical, which is regulated under TSCA, was taken off-site from the facility. However, there were no manifests that it was taken off-site. The environmental contractor is in charge of manifests and overseeing a lot of this paperwork.

So that actually can be a federal crime, and the U.S. EPA is investigating this exact matter, to be determined. But I believe that fraud of the paperwork filing, I believe that's a material, you know, omission or misleading or fraudulent statement. There's no way Apple could have done that itself. It would have had to conspire with ACT Environmental; and they would have to have a common purpose because ACT Environmental would know exactly what was happening, that it was fraud, it was going to mislead, and so their participation with that

common purpose.

THE COURT: All right. Let me get Ms. Riechert's response just on that specific example, that allegation of fraud between the environmental company and the false filing or missing manifests with regard to disposal of, I don't know, some kind of toxic chemical.

MS. RIECHERT: Again, I don't think that that's been the focus of the allegations to date. But, again, if it's just reinvesting in the same business, not in a separate legitimate business that caused the plaintiff harm, but if you're just reinvesting the proceeds of your conspiracy in your business, that's just not a RICO violation, for the reasons that we've said in the case. The Sybersound versus UAV is one of the cases that we rely on.

And, again, your decision in the Coronavirus Reporting case says that you -- using PR firms and law firms and all of that is not sufficient.

So I'm not sure specifically what the allegation is here about some manifest and -- but I -- that's not what this complaint is about.

And, again, she's had -- Ms. Gjovik's had -- this will be the third amended complaint, and I just think it's time to move this case forward on the claims that she -- that she can legally assert and that we shouldn't keep spending more time trying to add claims that are not claims that she can legally

assert.

THE COURT: All right. Well, and there are requirements with respect to, for instance, a common law theory or a theory under ultrahazardous or abnormally dangerous activities, and I'm familiar with that. But, again, it does seem to me that there are varying degrees of strength and weaknesses, and the whistleblower does seem to be certainly a more recognizable, traditional approach.

And so what I'm going to do is look at the complaint carefully and determine where it's been adequately alleged or not alleged, and if not adequately alleged, whether there will be any further leave to amend.

I do believe it would be beneficial for us to get this complaint sort of cleaned up, and let's frame what the issues are going to be and then move on to the next step. I think that's in everybody's interest here.

Do we have a CMC scheduled in this case yet?

MS. RIECHERT: I think you took it off calendar.

THE COURT: Okay. What I will do is once I rule on the pleadings here, I will set a CMC, and at that point I'll also want to talk about, you know, how we can move this case along, whether there's any interest in any kind of alternative dispute resolution, is there some way that the parties can engage in a process that might avert a longer litigation process here. So I'd like you to think about that as well.

MS. RIECHERT: If I could just speak on the 1102.5, the whistleblower claim.

THE COURT: Yeah.

MS. RIECHERT: Again, there has to be a violation of a statute or a regulation or the Constitution. And I think you have to say to whom you complained. I mean, it's only fair for us to know who she complained to.

But she says she was protesting the Gobbler application, but that's not illegal, and there is no statute that she says it's illegal to have the Gobbler application.

She did talk about audio, video recordings in the bathroom under 437 -- 435 of the Labor Code. But all she says is that the photo -- some sort of photo was taken, not that it was -- you know, that it violated that statute.

So I still think on 1102.5 there's not enough; but if we're just going to go forward, take out the ones that we don't think are appropriate, we can live with 1102.5.

THE COURT: Let me ask you -- actually, I do have a question about that, Ms. Riechert.

MS. RIECHERT: Uh-huh.

THE COURT: Because you do have to identify, under the whistleblower statute, that, you know, there's been an alleged claim of a violation of a federal or state statute or a local regulation, et cetera, et cetera.

What degree of specificity do you think that statute

requires? In other words, if you say "CERCLA" or if you say "Labor Code" or if you say -- you know, do you have to then say, and I'm specifically referring to section, you know, XYZ, subsection 2, or can you refer to the statute -- is there case law on the degree of specificity that's needed?

MS. RIECHERT: Yeah. We believe that there is a degree of specificity and that just saying "CERCLA" is not enough. I think the -- Cleveland is the case that says that just saying "CERCLA" is not enough. Just saying "Labor Code" is not enough. We know the Labor Code is like 900 pages.

So I do believe that some form of specificity -- we have to know what statute she complained that we violated. And she doesn't have to use a code number or anything like that when she made the complaint, but she needs to say, I made a complaint about this, and that violated this statute. And we don't have that in this complaint yet.

And I complained to this person on -- about this. Whether the law requires you have to say the person, I can't say a hundred percent that that's required, but I do think we're entitled to know who she complained to and the nature of the complaint. And then in the complaint she needs to say: And that violated this section of the Labor Code, that section of CERCLA.

THE COURT: All right.

MS. RIECHERT: Again, these issues are being litigated

in other forums. We have a CERCLA case already before the Department of Labor administrative appeal.

THE COURT: Yeah. Yeah.

All right. Any comments you'd like to make on that specific question, Ms. Gjovik, about how specific the complaint needs to have been -- needs to be?

MS. GJOVIK: Yes, please. Thank you, Your Honor.

I can definitely amend or brief post-hearing in far more specificity. I was trying to keep it simple. I was trying to heed Your Honor's advice of not duplicating my allegations in multiple sections, so I was hoping that the allegations I was making in the fact bank and the other claims would then be incorporated into that section so I didn't have to say everything twice and thrice.

I have a list of probably dozens of statutes that I alleged were violated prior to me being terminated, including my formal complaints to the California Department of Labor, the U.S. Department of Labor, NLRB, EEOC. Apple received notice of many of these complaints prior to me being terminated, if not saw me posting about it and talking to the press about it, which they would have been asked for comment.

So I think they've known for a very long time of those specific things. You can't fill out those forms for those agencies without having to specify why you think that law was broken that that agency oversees. So if Your Honor would like

more specificity, I'm more than happy to provide that in writing, however you'd like.

THE COURT: Well, I will, in the order dealing with this, I will let you know where we need specificity and what it is that I think is needed to satisfy. Sounds like you're confident you have the information that you could provide if necessary.

So let's -- let's see where we go. As I stated, it may be that in the final analysis some of these claims sort of fall by the wayside, but some of the central claims may well survive here. So we'll take it from there. All right.

MS. RIECHERT: Do you want to set a date for the CMC, or are you just going to --

THE COURT: Let's -- probably depends on how quickly I can get to this. I will set a date in the CMC --

MS. RIECHERT: Perfect.

THE COURT: -- in the order, you know, probably a couple weeks thereafter. So I anticipate within the next couple months we'll be seeing each other again.

MS. RIECHERT: Okay. And then would that be also online?

THE COURT: Yes. Well, I've started a -- starting in -- is it June? -- we are going back by default to a live calendar. However, I would certainly entertain requests to appear remotely.

So the rules will change. I don't -- I think it may be under my standing order now or it's going to come out soon, but as we get into June and thereafter, I'm following most of my colleagues here and kind of reverting back to live hearings. But to accommodate counsel and parties and everything else, I'm not necessarily adverse to holding Zoom hearings as well.

Yeah, Ms. Gjovik?

MS. GJOVIK: Thank you, Your Honor.

I live in Boston, and I don't have expendable income for travel so I would be very appreciative, and I was going to reach out to your deputy and ask what the preferred way to request to convert is.

THE COURT: Well, you can request that now. I mean, normally you could -- and that's exactly the kind of situation, if somebody's got to come across country and it's a financial difficulty, or to fly counsel across country for a 10-minute argument, you know, I want to be reasonable about that.

So, yeah, if you're across country and you're representing yourself at this point, I'd -- let's just do this one by Zoom. We'll note that.

MS. RIECHERT: I can appear in person because I'm local, but I'm also happy to do it by Zoom, whichever Your Honor prefers.

THE COURT: Yeah, I think it's -- hybrid can be done but it's easier if we're all on the screen instead of half and

half, so we'll do it by Zoom.

MS. RIECHERT: Sounds good.

THE COURT: Okay. Thank you, everyone.

MS. RIECHERT: Thank you very much.

THE COURT: Thank you.

MS. GJOVIK: Thank you, Your Honor.

(Proceedings concluded at 2:01 p.m.)

**C E R T I F I C A T E**

I, JENNIFER PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED this 23rd day of May, 2024.

s/Jennifer Pancratz______________
Jennifer Pancratz, RMR, CRR, CRC